**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ___1:24-cv-762___

SAMANTHA MOODY,
AMERICAN IMMIGRANT INVESTOR ALLIANCE, and
IT SERVICE ALLIANCE,

      Plaintiffs,

v.

ALEJANDRO MAYORKAS, *in his official capacity as Secretary*,
United States Department of Homeland Security; and
UR M. JADDOU, *in her official capacity as Director*,
United States Citizenship and Immigration Services

      Defendants.

---

**COMPLAINT FOR INJUNCTIVE RELIEF AND**
**ADMINISTRATIVE PROCEDURE CASE**

---

## <u>INTRODUCTION</u>

1.    This case challenges a final rule regarding changes to fees charged for immigration benefits that are scheduled to become effective on April 1, 2024. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024) ("Final Rule").

2.    The Final Rule should be enjoined preliminarily and permanently because it was promulgated without appropriate notice and comment, arbitrarily forces some businesses and individuals to fund asylum adjudications, and unlawfully imposes fee increases of 100% or higher on foreign investors seeking immigrant status based on the creation of jobs for United States workers without first completing the fee study Congress ordered prior to changing fees.

3.    This case is not an effort to derail Defendants, Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security ("DHS"), and Ur M. Jaddou, Director of United States Citizenship and Immigration Services ("USCIS"), from charging reasonable fees for the adjudication of immigration benefits; it is an effort to ensure Defendants promulgate a rule in accordance with law and procedure.

4.    **First**, the Final Rule is unlawful because it was promulgated without adequate notice and comment.

5.    **Second**, the Final Rule is unlawful because it arbitrarily and without legal justification imposes an "Asylum Program Fee" that taxes certain categories of petitioners for employment-based immigration benefits between $300 to $600 per benefit request to fund DHS's asylum program, in addition to raising fees 70% to over 200% for the cost of adjudication for the benefit. For example, the fee for I-129 Petition for L Nonimmigrant workers will rise from $460 to $1,385, in addition to the Asylum Program Fee.[1]

6.    **Third**, the Final Rule doubles immigrant investor fees through the EB-5 program in violation of law.

7.    DHS openly admits it did not complete the fee study Congress required in the EB-5 Reform and Integrity Act of 2022, Pub. L. No. 117-303, 136 Stat. 49 (Mar. 15, 2022) ("RIA"), that was due "[n]ot later than 1 year after the date of the enactment of this Act;" the deadline was March 15, 2023. RIA § 106(a), (b).

8.    Within 60 days after the fee study Congress also directed USCIS to adjust the fees it charges "to achieve efficient processing." *Id.*

---

[1] Table 7 of the Final Rule lists the immigration benefit request, the current fee, the proposed fee, and the final fee. 89 Fed. Reg. at 6308-14. USCIS has published an online "New Fee Schedule Table" that provides a percentage difference for the new fees. https://www.uscis.gov/forms/filing-fees/frequently-asked-questions-on-the-uscis-fee-rule (last accessed Mar. 15, 2024).

9. Specifically, Congress required USCIS to set fees for services provided under the immigrant investor programs "at a level sufficient to ensure the full recovery <u>only</u> of the costs of providing such services, including the cost of attaining the goal of completing adjudications, on average, not later than" 90 to 240 days, depending on the nature of the petition. *Id*. at § 106(b) (emphasis added).

10. In the Final Rule, USCIS imposed new fees on immigrant investors and regional centers without completion of the fee study and statutory principles of the RIA.

11. For example, the fee for a Form I-526/526E Immigrant Petition by Standalone/Regional Center will rise from $3,675 to $11,160, a 204% increase, but there is no corresponding justification that aligns with Congress's intent to align fees with processing times.

12. The Final Rule is thus procedurally invalid, contrary to law, and must be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 705, 706(2).

## <u>JURISDICTION AND VENUE</u>

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

14. Defendants' promulgation of the Final Rule in the Federal Register on January 31, 2024, constitutes final agency action subject to judicial review. 5 U.S.C. §§ 704, 706.

15. Plaintiffs have standing to challenge the Final Rule under 5 U.S.C. § 702 because they have been and will be injured by the Final Rule's operation. They are also within the zone of interest of the INA, which established the fund into which application fees are collected.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff Samantha Moody resides in Telluride, Colorado, and there is no real property at issue.

**PARTIES**

17.    Plaintiff Samantha Moody is a citizen of Canada. She is an EB-5 investor. She holds conditional permanent residency. Pursuant to the terms of 8 U.S.C §1186b(d)(2)(B), Plaintiff Moody must file a Form I-829, Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status, within 90 days of the expiry of her conditional status (i.e., in 2026). Plaintiff Moody resides in Telluride, CO.

18.    Plaintiff American Immigrant Investor Alliance ("AIIA") was founded in April 2021 as a Washington D.C.-based 501(c)(4) non-profit to inform, educate, and advocate on behalf of all EB-5 investors from around the world. As one of the only EB-5 focused organizations whose sole focus is on immigrant investors, AIIA strives to be an authoritative, investor-focused advocacy organization representing interests of all EB-5 investors regardless of their country of birth, adjudication status, or prior residency in the United States. When the EB-5 Regional Center program lapsed in June 2021 impacting the immigration process of over 80,000 individuals for several months, AIIA advocated for the grandfathering of all existing applicants and was successfully able to lobby Congress for the enactment of their grandfathering proposal in the EB-5 Reform and Integrity Act which passed in March 2022. AIIA continues to advocate on behalf of more than 10,000 individuals to have joined its community.

19.    Plaintiff IT Service Alliance ("ITServe") is the nation's largest trade group representing small and medium sized information technology companies. Plaintiff ITServe has over 2,200 member companies and 21 chapters spread around the country. ITServe's members rely on the H-1B visa to fill shortages of highly skilled workers in the IT sector of the economy.

Its members will be severely harmed by the increase in immigration application fees that go into effect on April 1, 2024. ITServe is headquartered in Irving, Texas.

20.     Defendant Alejandro Mayorkas is Secretary of the U.S. Department of Homeland Security, a cabinet-level department of the United States federal government. DHS, by and through Secretary Mayorkas, issued the Final Rule.

21.     Defendant Ur M. Jaddou, is the Director of U.S. Citizenship and Immigration Service, a bureau of DHS. USCIS is responsible for providing immigration adjudication services for immigration benefits.

## LEGAL AND FACTUAL FRAMEWORK

## I.    STATUTORY BACKGROUND

### A.    The Homeland Security Act Separated Immigration Services from Enforcement

22.     The Homeland Security Act of 2002 reconfigured the Immigration and Nationalization Service ("INS"). Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ("HSA").

23.     Subtitle D of Title IV addressed "immigration enforcement functions" and established the Bureau of Border Security, which now consists of Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP"). HSA §§ 441-42, 116 Stat. at 2192-94.

24.     Subtitle E created the Bureau of Citizenship and Immigration Services to manage "adjudications" of immigration applications; that bureau is now USCIS. HSA § 451, 116 Stat. at 2195-97.

25.     Section 476 of the HSA is entitled "Separation of Funding." HSA § 476, 116 Stat. at 2209. It specifies separate budgets for the two bureaus, requires that "fees imposed for a particular service, application or benefit shall be deposited" into the account of the bureau "with

5

jurisdiction over the function to which the fee relates," and provides that "no fee may be transferred" between the separate bureaus, with only limited statutory exceptions. HSA § 476(c), (d), 116 Stat. at 2209.

26.     The HSA delegated to a component, Immigration and Customs Enforcement ("ICE"), *inter alia, "*[t]he investigations program; and [t]he inspections program." HSA § 441.

27.     The statute prohibits DHS from changing the organizational structure and the responsibilities of each component agency. 6 U.S.C. § 291(b).

28.     On June 5, 2003, the DHS Secretary issued Delegation Number 0150.1, which purports to delegate to USCIS "[a]uthority to investigate alleged civil and criminal violations of immigration laws."

29.     This delegation from DHS to USCIS violated the prohibition on recombining functions of component agencies under  § 291(b) of the HSA. The DHS Secretary's delegation memo conflicts with the plain language of the HSA and the delegations of authority to ICE and USCIS in §§ 441 and 451.

30.     USCIS used this unlawful delegation to establish the Fraud Detection and National Security ("FDNS") Division at USCIS.

31.     FDNS's primary role is conducting Administrative Site Visits and Verification Program ("ASVVP").

32.     As explained on the website, these investigations focus on adjudicated approved petitions. https://www.uscis.gov/about-us/organization/directorates-and-program-offices/fraud-detection-and-national-security-directorate/administrative-site-visit-and-verification-program (last accessed Mar. 19, 2024).

33.     USCIS claims FDNS does not investigate but has authority to do so. 89 Fed. Reg. 6247 ("...FDNS's work does not fall into "intelligence" and/or "investigations" work..."), and *id.* ("One of many authorities delegated to USCIS in administering and enforcing immigration laws was the authority to 'investigate alleged civil and criminal violations of the immigration laws...'").

34.     DHS may not violate the purpose statute even if doing so would be more efficient or the agency could achieve an objective. *See* 61 Comp. Gen. 419 (1982). *See also* 39 Comp. Gen. 388 (1959).

35.     ICE operates on a mixture of appropriated funds from the general treasury and from fees in the Fraud Prevention and Detection Account.

36.     The Antideficiency Act ("ADA") at Title 31 United States Code, § 1341(a)(1)(A) *Limitations on expending and obligating amounts,* states that: "[a]n officer or employee of the United States Government or of the District of Columbia government may not—make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation…"

37.     Title 31 U.S.C. § 1532 states: "An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."

38.     The ADA prohibits a federal agency from transferring funds from one account to pay for expenses that exceed a legislative earmark. *See Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1172 (Fed. Cir. 1995) ("In view of the language of the appropriations laws at issue here and the prohibition of § 1341(a)(1)(A) against an agency spending more money for a program than has been appropriated for that program, we are not

prepared to accept the proposition that the transfer of funds for which appellants argue was 'authorized by law'").

**B.    The Immigration and Examinations Fee Account ("IEFA") Limits the Use of Funds Raised Through Application Fees**

39.    USCIS, the DHS Bureau responsible for benefit adjudications, is ninety-six percent funded through the fees it collects for the adjudication and naturalization services it provides. 89 Fed. Reg. at 6195.

40.    Fees collected for operations are deposited in the IEFA. The legislation creating the IEFA predates USCIS and defines the agency's fee-setting authority. INA § 286(m) and (n) (codified at 8 U.S.C. § 1356(m) and (n)) establish the IEFA, and provide that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m).

41.    The legislative history confirms that Congress intended to IEFA to cover adjudication and naturalization services only. The House Conference Report for the 1990 amendment states that: "Examinations Fee Account–Subsection (d)(1) provides that adjudications and naturalization fees be deposited into the Examinations Fee Account as offsetting receipts. Subsection (d)(2) allows the Department to establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program, to include the overseas program and administration." H.R. Conf. Rep. 101-909.

42.    An opinion by the General Counsel of the INS in the years following the enactment of §1356 interpreted the term "adjudication and naturalization services" to exclude enforcement. *See* 1994 *General Counsel's Opinions, 9 Immigration Law Service 2d PSD* 1994 *General Counsel Opinions, Opinion* 94-8 ("[F]ees which may be deposited into the

Examinations Fee Account are those fees which arise from applications that are processed as part of the INS's adjudication service and not its enforcement function. Funds from the Examinations Fee Account may be expended only to reimburse an appropriation for expense incurred in providing adjudicative or naturalization services.").

43.     USCIS can only use fees to cover the cost of providing adjudication and naturalization services, in line with the agency's mandate under the HSA. *See* Pub. L. No. 107-296, § 451 (6 U.S.C. § 271).

44.     USCIS also manages two other fee accounts funded by statutorily set fees, which USCIS has no authority to alter:  the Fraud Prevention and Detection Account (FDNA), INA § 214(c)(12)–(13), 286(v); 8 U.S.C. §§ 1184(c)(12)–(13), 1356(v), and the H-1B Nonimmigrant Petitioner Account, INA §§ 214(c)(9), (11), 286(s); 8 U.S.C. §§ 1184(c)(9), (11), 1356(s).

45.     The fees collected in the FDNA are split among the DHS, DOL, and Department of State to cover the fraud-related detection and prevention work of each department.

46.     Since its creation, the agency has adjusted fees in 2004, 2005, 2007, 2010, and 2016. 84 Fed. Reg. 62,280, 62,285 (Nov. 14, 2019).

47.     In 2000, USCIS promulgated a fee rule based on a "beneficiary pays model," which multiple courts preliminarily enjoined and stayed primarily because it was promulgated by an official acting without the requisite authority. *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. Sept. 29, 2020); *Northwest Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, 496 F. Supp. 3d 31 (D.D.C. Oct. 9, 2020); *USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (Aug. 3, 2020).

### C.    USCIS Historically Used Ability-to-Pay Principles Consistent with Congressional Directives

48.    DHS historically used an "ability-to-pay" model for USCIS fees. *See* 84 Fed. Reg. at 62,298. "Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay." GAO, *Federal User Fees:  A Design Guide* (May 29, 2008), https://www.gao.gov/assets/gao-08-386sp.pdf (last accessed Mar. 19, 2024).

49.    The enjoined 2020 proposed fee rule was primarily based on a "beneficiary pays model." *USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (Aug. 3, 2020)

50.    As DHS has recognized, "[t]he U.S. Government has never charged a fee for form I-589, but rather has relied on other fee-paying benefit requestors to subsidize asylum seeking applicants. Application fees from other form types have always been used to fund the operation involved in processing asylum claims." 84 Fed. Reg. at 62,318.

51.    DHS have never targeted one class of businesses or individuals for a special charge.

52.    By statute, the fees charged "may be set at a level that will ensure recovery of the full cost of providing all such services, including the cost of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m).

53.    As USCIS previously understood, "Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge." *See* Pub. L. No. 101-515, § 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990). USCIS's understanding of that Congressional directive was reflected consistently in the rulemaking proposals for the 2004,

2007, and 2010 USCIS fee rules. 69 Fed. Reg. 5088 (2004); 72 Fed. Reg. 4890 (2007); 75 Fed. Reg. 33448 (2010).

54.     For the 2016 Final Rule, DHS explicitly stated that "fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions, as well as providing similar benefits to asylum and refugee applicants and certain other immigrants at no charge." 81 Fed. Reg. 26,904, 26,908 (May 4, 2016).

55.     Never before has DHS imposed an excess charge or tax on a narrow set of applicants on top of fees collected for the adjudication of benefits to fund the asylum program.

## II.    PROPOSED RULEMAKING

### A.    Inadequate Opportunity to Comment and Insufficient Information in the Proposed Rule

56.     On January 4, 2023, DHS published a proposed rule in the Federal Register, 88 Fed. Reg. 402 (Jan. 4, 2023).

57.     DHS published a correction on January 9, 2023, at 88 Fed. Reg. 1172 (Jan. 9, 2023) to make non-substantive and technical changes.

58.     On February 24, 2023, DHS extended the comment period an additional 5 days, to March 13, 2023, for a total comment period of 68 days. *See* 88 Fed. Reg. 11825.

59.     The proposed rule stated that the data the agency "used to compute the immigration benefit request fees and biometric fees is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling 240-721-6080." 88 Fed. Reg. at 404.

60.     USCIS allegedly used an Activity Based Costing ("ABC") Model based on a balance between a "beneficiary pays" and "ability to pay" principles. 88 Fed. Reg. at 425, 490 n.251.

61.    USCIS mentioned in their "Fee Rule IEFA Fee Review Supporting Documentation" (Appendix VI) that they evaluated the possibility of utilizing previous year obligations and workloads to establish projected values. 88 Fed. Reg. at 404.

62.    The Proposed Rule stated that "[i]f USCIS continues to operate at current fee levels, it would experience an average annual shortfall (the amount by which expenses exceed revenue) of $1,868.2 million."  88 Fed. Reg. at 405.

63.    USCIS did not provide access upon public request and the number provided to gain access belonged to a private citizen with no affiliation to DHS or the fee rule calculations.

64.    Despite the invitation, the public was not allowed access to the data used to compute the immigration benefit requests.

65.    The Proposed Rule and lack of access prevented the public from discerning how the agency calculated the proposed fees.

66.    "In short, DHS" alleged that it "may charge fees at a level that will ensure recovery of all direct and indirect costs associated with providing immigration adjudication and naturalization services."  88 Fed. Reg. at 418.

**B.    The New Asylum Program Fee Based on Revenue Assumptions**

67.    With regard to the new $600 Asylum Program Fee for employers and petitioners using Forms I-129 and I-140 (which includes employment-based nonimmigrant and immigrant visa petitions), the Proposed Rule did disclose that "[t]o calculate the impact of this increase, DHS estimated the total costs associated with the proposed fee increase for each entity and divided that amount by the *sales revenue* of that entity." *Department of Homeland Security, U.S. Citizenship and Immigration Services, Small Entity Analysis (SEA) for the U.S. Citizenship and Immigration Services Fee Schedule Proposed Rule*, January 4, 2023, p. 12.

68.     DHS did not explain why it used sales revenue or gross income to calculate the Asylum Program Fee when it had used net income (income after deduction of expenses) when evaluating the "ability to pay" for an adjudication of the underlying Form.

69.     In September 2022, USCIS reported over $1 billion in cash reserves and has confirmed that it had "returned to firmer fiscal footing, with cash reserves well on their way to the designated target level..."  USCIS Fiscal Year 2022 Report,

https://www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf (Dec. 22, 2022).

70.     The Proposed Rule entirely failed to consider why a paradigm shift from everyone-pays to the Transfer Funding Fee to employment-based applicants when USCIS had operated with a surplus.

71.     The Proposed Rule at Appendix Table 12 contained a multiyear comparison of "touch-times" required to process each type of benefit request. 88 Fed. Reg. at 448-49, *Appendix Table 12*.

**C.     Unexplained Calculation of "Touch Times" to Justify Fee Increases**

72.     With regard to EB-5 filings, a senior USCIS official admitted touch time for immigrant investor petitions was not tracked and based on assumed metrics casting doubt on the proposal's data. *See Nadhar v. Renaud*, ECF Doc. No. 39-1 CV-21-00275-PHX-DLR (June 8, 2021).

73.     Regardless, in almost every category the touch time had substantially increased even as the number of petitions or applications decreased.

74.     Notably touch times for Form I-129, Petition for Nonimmigrant Worker, H-1B increased by 39% in 2022/2023 for H-1B nonimmigrants.

75.     Nothing in the fee regulation explains this substantial increase in touch time.

76.     The Form I-539, *Application to Extend/Change Nonimmigrant Status*, is one of the agency's highest volume forms.

77.     The agency attributes at least 10% of adjudication time for this form to fraud detection and biometrics. However, the agency's Proposed Rule failed to consider that biometrics are no longer required for this form.

78.     In 2019, the agency ceased concurrent processing of H1/H4/EAD and L1/L2/EAD resulting in the benefit requests to be separated and adjudicated sequentially by different adjudicators. This practice abandoned what prior fee rules considered substantial efficiency. USCIS has now returned to concurrent processing of these applications. Yet current touch times have increased in the face of streamlined processing.

79.     DHS failed to address why touch times have increased and USCIS has become less efficient despite increasing payroll and headcount.

80.     DHS did not address policies it adopted that contribute to longer adjudication times and increased backlog.

### D.     Failure to Comply With The Required Fee Study for EB-5 Investors

81.     In the Proposed Rule, DHS admitted that it had not complied with the fee study required by the RIA. 88 Fed. Reg. at 420.

82.     DHS stated, "[D]espite the changes in the law and program, DHS has proposed fees in this rule based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022." 88 Fed. Reg. at 557.

83.     Congress instructed USCIS to set the Forms I-526/I-526E fees to cover "the cost of completing adjudications, on average, not later than . . . 240 days after receiving a petition." *RIA* at § 106(b)(4).

84.     Since the passage of the RIA in March 2022, USCIS has yet to publish Form I-526E processing times. See https://egov.uscis.gov/processing-times/ (last accessed March 19, 2024, no data for Form I-526E).

85.     DHS "propose[d] new fees for the EB-5 program forms in this rule using the full cost recovery model  .  .  . that we have used to calculate those fees since the program's inception and not the fee study parameters and processing time frames required by the EB-5 Reform and Integrity Act of 2022."  88 Fed. Reg. at 420.

## III.    THE FINAL RULE

86.     Notwithstanding multiple commenters advised USCIS that it had disallowed access to the data that it invited the public to access, 88 Fed. Reg. at 419, the agency promulgated the Final Rule without first allowing access to the record upon which it relied.

87.     The Final Rule represents arbitrary reversal of past practice.

88.     It changed past practice of a shared responsibility to fund asylum adjudications to target a select portion of employment-based actors.

89.     The Final Rule openly ignored a mandatory fee study that was due March 15, 2023, for EB-5 investors and Regional Center related filers but imposed fee increases 100% or more.

90.     While  the final rule "generally limits newly established fees to no more than the increase in the Consumer Price Index since 2016, which is 26%." and "many such fees will

increase by well under 26%," select employment-based applicants and immigrant investors will see increases of 100% or more.

91.    In the Final Rule, DHS lowered the Asylum Program Fee from $600 to $300 for small employers (25 or fewer full-time equivalent employees) filing Form I-129.

92.    DHS stated that under the Final Rule "the Form I-129 fee and the Form I-129CW fee, nonprofits and small employers will pay a discounted fee of up to 50% off. *We continue to emphasize that Congress could reduce the burden on our fee-paying customers by fully funding our humanitarian mission, as it does for other agencies*." https://www.uscis.gov/forms/filing-fees/frequently-asked-questions-on-the-uscis-fee-rule (last accessed March 19, 2024).

93.    DHS essentially decided to take funds from employers, large and small, because DHS disagreed with Congress' budget and appropriations. *Id*.

94.    Regarding the increases to the EB-5 investor program, DHS stated "The final rule increases EB-5 program fees consistent with the fees for other benefit requests. As explained in the final rule, the fee amounts indicated by the full cost recovery model for the immigrant investor forms are not capped or decreased below the estimated full cost recovery as with some other forms, and DHS believes that the requirements for financial wherewithal in the program are inconsistent with shifting the costs of the EB-5 program to be funded by the fees paid for other requests." *Id*.

95.    DHS stated it had "begun the fee study required by the EB-5 Reform and Integrity Act of 2022 to meet the additional fee guidelines and processing time requirements" and openly admitted "[t]he law requires DHS to set fees for EB-5 program-related immigration benefit requests at a level sufficient to recover the costs of providing such services and completing the adjudications within certain time frames." *Id*.; 89 Fed. Reg. at 6286-87.

96.     The Final Rule's fee increases did not consider Congress's methodology to set the fees or conduct the fee study that was due March 15, 2023. *Id.*

**A.     The Final Rule's Reasoning Is Incomplete, Inconsistent, and Irrational**

       **1.     Underlying Assumptions about USCIS Budget Needs Remain Unknown and Incoherent**

97.     USCIS has asserted that its financial situation necessitates fee increases.

98.     "In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), codified at 31 U.S.C. 901-03, and Office of Management and Budget (OMB) Circular A-25, USCIS conducted a comprehensive fee review for the Fiscal Year (FY) 2022/2023 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of services provided." 89 Fed. Reg. at 6195.

99.     By its own admission, however "Congress provided much-needed support in fiscal year 2022, appropriating $275 million specifically to reduce current backlogs and advance our humanitarian mission. Congress supported out Refugee and Asylum activities with appropriations of $133 million in fiscal year 2023 and $145 million in fiscal year 2024." https://www.uscis.gov/forms/filing-fees/frequently-asked-questions-on-the-uscis-fee-rule (last accessed March 19, 2024).

100.     DHS claims "the final fee rule would generate an additional average $1.14 billion per year in agency revenue compared with the previous fee schedule baseline. This is the amount necessary to match agency capacity with projected workloads, so that backlogs do not accumulate in the future." *Id.*

101.     However, the Final Rule's methodology for these financial assumptions is absent and inconsistent with USCIS's recent reports to Congress about their anticipated surplus. USCIS Fiscal Year 2022 Report,

https://www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf (Dec. 22, 2022).

102.    DHS accounted for purported cost-savings measures and any measures to reduce waste, but maintained the fee increases and the Asylum Program fee in the Final Rule without providing the data it used to create the extra fee.

103.    For instance, DHS stated that it "has accounted for the direct costs of the Asylum Program Fee, and our data indicates that the Asylum Program Fee will not have the deleterious effects on multiple parts of U.S. economy that the commenters state that it will." 89 Fed. Reg. at 6285.

104.    DHS never disclosed the basis or "data" for making this speculative assumption.

### 2.    The Final Rule Is Based on A False Premise About Immigrant Investors and Employment Based Petitioners' Ability to Pay

105.    Plaintiff AIIA's constituency includes immigrant investors, immigration attorneys, regional centers, investment issuers, and other EB-5 related professionals.

106.    The EB-5 community is hardly one of uniformly multimillionaires. Many EB-5 investors have leveraged  substantially all of their net worth to meet the EB-5 investment threshold. Notwithstanding already being the most expensive forms to file in the entire immigration system, the EB-5 program is fraught with delays and agency incompetence. *See, e.g., Lyons v. United States Citizenship & Immigr. Servs.,* No. 21-CV-3661 (JGK), 2023 WL 144879, at *3 (S.D.N.Y. Jan. 10, 2023) (discussing longer processing times despite lower volume; Defendants not improving on their processing goals despite publicly calling for improvements "[s]ince at least 2012").

107.    More fees do not mean more productivity. In FY 2016, Form I-526, Petition for Immigrant Investor (the principal form to begin the EB-5 process) cost $1,500 to file. In

Defendants 2016 rulemaking, this amount was raised to $3,675. However, productivity fell

sharply. A Form I-526 was adjudicated, on average, in 16 months in FY2016. By FY2020, that

ballooned to 31.1 months. *See* https://egov.uscis.gov/processing-times/historic-pt. (last accessed

March 19, 2024).

108.    Higher fees have seemingly led to slower processing. This is not an unfounded

idea -- it was advanced nearly two decades ago by the USCIS Ombudsman. In his June 2006

report to Congress, former Ombudsman Prakash Khatri warned Congress that, because of the

statutory requirement that USCIS be self-funded, the agency "often makes decisions that

compromise operational efficiency to ensure revenue flow[.]" Citizenship and Immigration

Services Ombudsman, Annual Report to Congress June 2006, available at

https://trac.syr.edu/immigration/library/P857.pdf.

109.    A year later, the Ombudsman made a similar critique, arguing that "The lack of an

adequate funding source and requirements to provide for unfunded mandates force USCIS

leaders to make management decisions that can be inconsistent with efficiency in processing

immigration benefits." Citizenship and Immigration Services Ombudsman, Annual Report to

Congress June 2006, available at

https://www.dhs.gov/xlibrary/assets/CISOMB_Annual_Report_2007.pdf.  In this context, it does

make sense that USCIS spends more time adjudicating EB-5 related benefit requests than ever

before *because it must justify receiving higher fees on each related application*.

110.    AIIA's constituency has become increasingly frustrated amidst exploding

processing times and lack of progress in rectifying the lack of progress on the backlog.

111.    Furthermore, much of AIIA's constituency are in substantially similar positions as

Plaintiff Moody, *i.e.,* having secured conditional permanent at one fee level but will be forced to

pay higher fees to remove those conditions (i.e., a Form I-829 filing today costs $3,750, as of April 1, 2024, it will cost $9,525). The penalty for not filing Form I-829 is termination of permanent residency status and removal proceedings. *See* 8 C.F.R. 216.6(a)(5).

112.    Defendants' unlawful actions – picking the pockets of current and future EB-5 stakeholders – is likely to depress AIIA's donations and cash flow, adversely affecting its overall mission. Furthermore, its professional constituency, immigration attorneys and other professionals, are likely to see lower incomes due to depressed future EB-5 demand.

113.    Plaintiff ITServe's member companies are largely involved in IT consulting. This business model places employees at a client's location.

114.    The structure of the IT industry as a whole is more complex than one might assume and is comprised of three tiers. The industry could best be analogized to professional baseball. First, there are the major leagues which would be comprised of major IT "product companies" (Apple, Google, etc.). These product companies, for a variety of reasons do not possess all the talent that is required for a given project, so they often contract with a "vendor company" (Triple A companies) for the right mix of professionals. The vendor then contracts with small and medium sized "consulting companies" who provide the actual professionals (Double and Single A companies).

115.    To meet the demands of steady state projects the product companies typically utilize their full-time employees. However, it is not economically feasible for product companies to hire full time employees for shorter term projects. Therefore, the product companies' short term and transient needs are typically met through contracts with vendor companies.

116.    The industry standard for these contracts is six months, typically with an option to extend which the product company may exercise. This relatively short time period allows

executives in product companies the chance to monitor the need and profitability of a project and can easily end the project if cost cutting is required.

117.    The vendor negotiates with the product company for the right mix of professionals for a project. Vendor companies have extensive networks of consulting companies, which they leverage to find the most talented professionals for a given project. The professionals on a given project may be employed by several different consulting companies.

118.    In summary, the product company identifies requirements and contracts with vendors for professionals with the right skill sets. The vendor then negotiates with consulting companies who are the actual employer of the professionals.

119.    Consulting companies provide their employees with the typical benefits of full-time employment (insurance and retirement plans).

120.    The structure of the IT industry is not sustainable without consulting companies. They provide the necessary "flex" that allows product companies to meet their needs.

121.    Thousands of Indian nationals work on H-1B visas as IT professionals for staffing companies associated with ITServe. Each fiscal year the H-1B visa has "cap" of 65,000 (for those with a bachelor's degree) and 20,000 (for those with a qualifying master's degree). The visas may be active no earlier than the first day of the next fiscal year.

122.    The standard duration of contracts between ITServe member companies and vendors/end clients is six to twelve months long.

123.    At the end of these contracts the employer is required to file an amended petition with USCIS if the location of the employee's work changes. Employers may also find better business opportunities that require short notices changes.

124.    Filing fees represent a major cost of doing business for ITServe's member companies.

125.    Below is a list of required fees an employer with 25 or more employees must pay for an H-1B and the final's rules changes:

- Petition Filing Fee: $460 ($780);
- Asylum Program Fee $600;
- Premium Processing Fee: $2,500 ($2,805);
- Statutory USCIS Anti-Fraud Fee: $500;
- Statutory ACWIA Education and Training Fee: $1,500;
- Public Law 114-113 Fee: $4,000.

126.    The agency has increased the fees set by regulation (Petition Filing Fee and Premium Processing Fee) from $2,960 in 2023 to $4,185 by the time the final rule is implemented (with the new Asylum Program Fee).

127.    It would not be uncommon for an ITServe member company to file 4 to 6 petitions over the course of the 3-year H-1B visa for each H-1B employee. Using only the fees set by regulation an employer in 2023 would have paid $11,840 to $17,760 expense per employee over the course of the 3-year visa. However, under the Final Rule an employer will likely see regulatory fees rise to $16,740 to $25,1100 per employee.

128.    The massive increase in fees per employee puts many IT consulting companies in an existential crisis. This harms not only the business owners but their client companies' ability to accomplish their missions.

### 3.    Irrational Cost Modeling Results In Unjustified Conclusions

129.    The Final Rule maintained an "Activity-Based Cost" ("ABC") model to assign fees to different benefit applications, based on the average cost to USCIS to adjudicate a given type of form.

130.    This modeling relies on unexplained and irrational economic assumptions that are contradicted by data.

131.    First, the agency's total budget amount is an input into the ABC model. Nothing in the model explains how USCIS arrived at the total budget number. DHS appears to determine the total budget for the agency and then uses the undisclosed ABC model to determine how to allocate that budget to the various fees. The entire cost model and data was kept from the public's view.

132.    Second, DHS's belief that the demand for immigration services is inelastic means that the ABC model does not consider price elasticity. Thus, the rule fails to account for the likelihood that the volume of applications will go down as prices rise, rendering the model's results without analytical support.

133.    The Final Rule fails to explain why USCIS costs have changed so dramatically and inconsistently across different form types.

134.    In particular, USCIS has not explained its source for data on hourly cost projections that it entered into the ABC model, a key driver of the fees.

135.    There is no reasoned explanation of USCIS inputs into the cost model that it provides a reasoned basis for the generated fee increases in the Final Rule.

**B.    The Final Rule Is Contrary to Law Because It Increases Fees Intended for the Adjudication of Applications In Order To Fund Other Activities and Programs**

136.    The Final Rule's recovery of its costs for performing ICE and CBP functions is contrary to law.

137.    USCIS cannot recover costs through IEFA that it incurs in assisting ICE or engaging in enforcement.

23

138.    Congress established a separate Fraud Prevention and Detection Account over which the agency has no discretion to adjust fees, and which is entirely separate from the IEFA.

139.    The INA prescribes a fee for the Fraud Detection and Prevention Account in the amount $500 and $150 for non-U.S. citizens applying for certain employment-related visas. 8 U.S.C. § 1184(c)(12)-(13). Congress expressly provided these amounts for fraud prevention and detection services.

140.    Despite this unambiguous statutory provision with set dollar amounts, DHS charges additional fees to cover its costs for training staff on fraud detection and prevention well beyond what can be recovered through these funds.

141.    Because administrative work performed for ICE is not USCIS work providing adjudication services, the related costs cannot be recovered through the IEFA under INA § 286(m).

142.    Furthermore, DHS explains the high staffing needs and cost increases have arisen from receiving greater volumes of applications, but historical figures show there is no correlation between volume of applications and volume of adjudications.

### 1.    The Final Rule Dramatically Increases Fees for Immigrant Investors and Regional Centers

143.    The Final Rule arbitrarily imposes fee increases. The fees are now structured to expropriate fees from employment-based and investor-based petitioners by allocating increases to fees well in excess of the 26.37% increase (or lower) applied for other types:  89 Fed. Reg. at 6212.

| Form | Application Type | Percentage Change | Total Cost |
|------|------------------|-------------------|------------|
| Form I-526/526E | Immigrant Petition by Standalone/Regional Center | +204% | $11,160 |

| Form I-829 | Petition by Investor to Remove Conditions | +154% | $9525 |
|---|---|---|---|
| Form I-956 | Application for Regional Center Designation | +168% | $47,695 |
| Form I-129 | H-1B Petition for Specialty Worker | +70 | $780 |
| Form I-129 | Petition for L Nonimmigrant workers | +201% | $1,385 |
| Form I-956G | Regional Center Annual Statement | +47% | $4470 |

144.    DHS "believes that this combination of limiting certain fee increases for policy reasons, setting fees using the ABC model, and adjusting fees by inflation, in addition to being responsive to public comments, provides a logical, reasonable, and balanced approach. For the proposed rule, and consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at activity-based costing (ABC) model output levels."  89 Fed. Reg. at 6212.

145.    The Final Rule also imposes these dramatic increases despite DHS's failure to complete the statutorily required fee study for EB-5 investors on or before March 15, 2023.

146.    Comments to the proposed rule identified that DHS must complete the fee study prior to resetting fees.

147.    DHS admitted that it ignored the RIA and had not completed the fee study or structured fees based on the congressionally required timelines for adjudications.

## 2.    The Final Rule Arbitrarily Assigned A New Asylum Program Fee

148.    For the first time in U.S. history, the Final Rule imposes a non-waivable fee Asylum Program Fee from employment-based petitioners to fund asylum applications.

149.    This charge is between $300 and $600 per petition in addition to the increase in fees for the adjudication of the benefit requested.

150. "In the final rule, DHS exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers." 89 Fed. Reg. at 6195 (*citing* 8 C.F.R. § 106.2(c)(13)).

151. "The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE employees); and $600 for all other filers of Forms I-129 and I-140." 89 Fed. Reg at 6195-96 (*citing* 8 C.F.R. § 106.1(f) and 106.2(c)(13)).

152. DHS did not disclose why it chose to target select types in lieu of spreading the burden on all types as they had previously.

153. The Final Rule does not offer a reasoned explanation for the Asylum Program Fee amount and why it chose to base it on a revenue-based model for businesses.

154. The Final Rule is dismissive of the burden placed on individuals who will be charged what amounts to be a penalty each time they seek an employment-based immigration benefit.

155. DHS did not have sufficient explanation to support its decision to have employment-based applicants fund the adjudication of asylum applications.

156. Congress cannot delegate its power of the purse to DHS.

<u>**CAUSES OF ACTION**</u>

**COUNT I**
**Violation of the Antideficiency Act**

157. Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

158. The Antideficiency Act prohibits an executive agency from spending money on anything that is not authorized by statute.

159.    When drafting the HSA, Congress created separate roles between the new bureaus and their funding mechanisms.

160.    Congress prohibited DHS from comingling or recombining the functions of bureaus, including USCIS and ICE.

161.    Congress unambiguously stated that ICE was delegated the investigative function and was to be funded by congressional appropriation.

162.    In contrast, USCIS was charged with the primary responsibility for immigration benefit adjudication.

163.    The funding for this activity was to be based on fees collected with each application.

164.    DHS has unlawfully allowed USCIS to divert funds from benefit adjudication to investigation and enforcement.

165.    In the final rule, DHS makes an unambiguous statement that it will allow USCIS to spend immigration application fees on enforcement and investigation. One dollar taken from the IFEA Account for anything, but adjudication is one dollar more than Congress authorized.

166.    Because the agency will spend funds for a purpose not authorized by statute it is in violation of the Anti-Deficiency Act.

## COUNT II
### Violation of Administrative Procedure Act, 5 U.S.C. §706
### Agency Action Not in Accordance with Law

167.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

168.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

169.    Because Congress has the primary role in immigration law, the Executive's power is at its "lowest ebb." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-40 (1952).

170.    The Final Rule contravenes APA § 553(b)(3) because it does not adequately provide the terms or substance of the Proposed Rule, or a description of the subjects and issues involved.

171.    The Final Rule contravenes APA § 553(c) because it fails to give persons adequate opportunity to participate in the rulemaking.

172.    The Final Rule contravenes INA § 286(m) because it recovers costs for providing staffing and administrative assistance to ICE that does not constitute providing adjudication and naturalization services consistent with the statute's plain language. 8 USC § 1356(m).

173.    The Final Rule recovers costs for fraud prevention and detection above the statutory limits for fraud prevention and detection as set forth in statutorily established Fraud Prevention and Detection Account, INA §§ 214(c)(12)–(13), 286(v); 8 U.S.C. § 1184(c)(12)–(13), 1356(v).

174.    The Final Rule contravenes the HSA, which keeps the accounts of USCIS and ICE separate and prohibits transfers of fees for purposes not authorized by 8 USC § 1356. 6 USC § 296.

175.    The Final Rule contravenes the *Emergency Supplemental Appropriations Act*, which prohibits reimbursement between agencies. Pub. L. No. 116-26, 133 Stat. 1018 (Dec. 27, 2020).

176.    The Final Rule contravenes the EB-5 Reform and Integrity Act because it imposes fees prior to the fee study required in the RIA and Congress' decision to tie fees to case-processing timelines. RIA § 106(a), (b).

## COUNT III
### Violation of Administrative Procedure Act, 5 U.S.C. § 706
### Arbitrary and Capricious Action

177.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

178.    The APA states that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . (D) without observance of procedure required by law . . ." or "(E) unsupported by substantial evidence." 5 U.S.C. § 706(2). Courts will invalidate agency determinations that fail to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

179.    Furthermore, when an agency substantially alters a position, it must "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

180.    The Final Rule is unlawful under the APA for several independent reasons, each of which is sufficient to set the rule aside.

181.    The Final Rule does not adequately provide the terms or substance of the Proposed Rule, or a description of the subjects and issues involved. APA § 553(b)(3).

182.    The Final Rule failed to give persons adequate opportunity to participate in the rulemaking and specifically denied access to the record and data requested despite inviting the public access to such data. APA § 553(c).

183.    DHS fails to adequately justify the change from prior practice to require a select portion of employment-based applicants to pay an extra charge on top of fees for the adjudication of benefits.

184.    DHS fails to adequately justify its legal authority or provide a reasoned basis for creation of a "toll" or "tax" on select groups to fund operations for asylum adjudications.

185.    DHS fails to adequately justify that it is recovering costs authorized under 8 U.S.C. § 1356(m). DHS's budget for USCIS rests on unexplained assumptions and fails to account for efficiencies already realized.

186.    The Final Rule fails to explain the model in a rational or objective manner.

187.    The Final Rule instead repeats its statement that it "believes" its chosen conclusions are correct, without analysis or data to support its conclusions.

188.    The Final Rule is arbitrary and capricious because it rests on ungrounded assumptions without support to justify the quantified harms to those arbitrarily targeted for charges and fees increases far above other fee increases on a percentage basis.

189.    The Final Rule is arbitrary and capricious because DHS relied on and considered factors that Congress did not intend for DHS to consider, including charging supplemental "transfer fees" to select applicants to fund the adjudication for asylum because Congress did not provide adequate funding in DHS's estimation.

190.    Defendants' actions are thus arbitrary and capricious, within the meaning proscribed by 5 U.S.C. §§ 705 and 706.

191.    Defendants' violation is causing ongoing harm to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare Defendants have acted arbitrary, capricious, and not in accordance with the law and procedure in violation of the Administrative Procedure Act.

B.    Declare the Final Rule unlawful and invalid.

C.    Enter a preliminary and permanent injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Final Rule.

D.    Stay the implementation or enforcement of the Final Rule that is scheduled to become effective on April 1, 2024.

E.    Award Plaintiffs reasonable counsel fees and costs pursuant to 28 U.S.C. § 2412; and

F.    Order such other relief as the Court deems just and equitable.

Dated: March 19, 2024                                    Respectfully submitted,

_s/ Jonathan D. Wasden_
Jonathan D. Wasden
Wasden Law
9427 Goldfield Lane
Burke, VA 22015
Phone: (843) 872-4978
Email: jon@wasden.law

_s/ Jesse M. Bless_
Jesse M. Bless
Bless Litigation LLC
6 Vineyard Lane
Georgetown MA 01833
Phone: (781) 704-3897
Email: jesse@blesslitigation.com

<u>*s/ Matthew T. Galati*</u>
Matthew T. Galati
The Galati Law Firm, LLC
8080 Old York Road, Suite 225
Elkins Park, PA 19027
Phone: (215) 310-0231
Email: matt@galati.law

*Attorneys for the Plaintiffs*