## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264 and 274a**

[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]

**RIN 1615–AC68**

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) proposes to adjust certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). USCIS conducted a comprehensive biennial fee review and determined that its costs have increased considerably since its previous fee adjustment due to expanded humanitarian programs, higher demand, increased processing times, and a need for more USCIS employees. USCIS cannot maintain adequate service levels with the effects of the budget cuts and its current level of spending without lasting impacts on operations. DHS proposes to adjust USCIS fees, add new fees for certain benefit requests, establish distinct fees for petitions for nonimmigrant workers, and limit the number of beneficiaries on certain forms. DHS is also proposing additional fee exemptions for certain humanitarian categories and changes to certain other immigration benefit request requirements. If DHS does not adjust USCIS fees it will not have the resources it needs to provide adequate service to applicants and petitioners or be able to keep pace with incoming benefit request workload, and USCIS processing times and backlogs will not improve. DHS intends for this rulemaking to provide the funding required for USCIS to improve service levels.

**DATES:** Written comments must be submitted on this proposed rule on or before March 6, 2023. The electronic Federal Docket Management System will accept comments before midnight eastern time at the end of that day.

*Listening session date:* DHS will hold virtual public listening sessions during which the public may speak directly to USCIS on the questions raised in this proposed rule. A session will be held on January 11, 2023 at 2:00 p.m. ET.

*Listening sessions registration date:* For an opportunity to provide oral comments during the virtual public listening sessions, you must register before the listening session in question. For registration instructions, see the Public Participation section below.

**ADDRESSES:** You may submit comments on the entirety of this proposed rule package, identified by DHS Docket No. USCIS–2021–0010, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS or USCIS officials, will not be considered comments on the proposed rule and may not receive a response from DHS. Please note that DHS and USCIS cannot accept any comments that are hand delivered or couriered. In addition, USCIS cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. Due to Coronavirus Disease (COVID–19), USCIS is also not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (202) 658–9621 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Summary of Economic Impacts
  B. Summary of Proposed Provisions
  C. Summary of Current and Proposed Fees
III. Basis for the Fee Review
  A. Legal Authority and Guidance
  B. Effect of FY 2022 Appropriations
  C. Immigration Examinations Fee Account
  D. Full Cost Recovery
  E. The Use of Premium Processing Funds Under the Emergency Stopgap USCIS Stabilization Act
  F. Fee Review History
  1. Current State of USCIS Fee Schedule Regulations
  2. Previous Fee Rules
  3. Current Fees
IV. Fee-Setting Approach—Reversal of 2020 Fee Rule
V. FY 2022/2023 Immigration Examinations Fee Account Fee Review
  A. USCIS Projected Costs and Revenue
  1. USCIS Budget History
  2. FY 2022/2023 Cost Projections
  a. General Expenses
  b. Payroll
  c. Related Rulemakings
  d. Cost Summary
  3. FY 2022/2023 Revenue Projections
  4. Projected Cost and Revenue Differential
  B. Methodology
  1. Volume
  a. Workload Volume and Volume Projection Committee
  b. Fee-Paying Volume
  2. Completion Rates
  3. Assessing Proposed Fees
  4. Funding the Asylum Program With Employer Petition Fees
  C. Exclusion of Temporary or Uncertain Programs
  D. Consideration of DACA Rulemaking
  E. Fee-Related Issues for Consideration
  1. Accommodating E-filing and Form Flexibility
  2. Processing Time Outlook
VI. Fee Waivers
  A. Background
  B. The 2020 Fee Rule Fee Waiver Changes
  C. Inability To Pay
  D. USCIS Director's Discretionary Fee Waivers and Exemptions
  E. Requirements To Submit Fee Waiver Form
  F. Form and Policy Changes
  G. Request for Comments
VII. Fee Exemptions
  A. Codification of Benefit Requests With No Fees and Exemptions of Certain Categories or Classifications From Fees
  B. Proposed Fee Exemptions
  1. Victims of Severe Form of Trafficking (T Nonimmigrants)
  2. Victims of Qualifying Criminal Activity (U Nonimmigrants)
  3. VAWA Form I–360 Self-Petitioners Derivatives
  4. Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty
  5. Abused Spouses and Children Seeking Benefits Under CAA and HRIFA
  6. Abused Spouses and Children Seeking Benefits Under NACARA
  7. Abused Spouses and Children of LPRs or U.S. Citizens Under INA Sec. 240A(b)(2)
  8. Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Force and Derivative Beneficiaries
  9. Special Immigrant Juveniles
  10. Temporary Protected Status
  11. Asylees
  12. Refugees
  13. Person Who Served Honorably on Active Duty in the U.S. Armed Forces Filing Under INA Sec. 101(A)(27)(K)

14. Summary of Proposed Fee Exemptions
C. Request for Comments
VIII. Other Proposed Changes in the FY 2022/2023 Fee Schedule
A. Clarifying Dishonored Fee Check Re-Presentment Requirement and Fee Payment Method
B. Payment Method
C. Non-Refundable Fees
D. Eliminating $30 Returned Check Fee
E. Changes to Biometric Services Fee
1. Incorporating Biometric Activities Into Immigration Benefit Request Fees
2. Retaining the Separate Biometric Services Fee for Temporary Protected Status
3. Executive Office for Immigration Review Biometric Services Fee
F. Naturalization and Citizenship-Related Forms
1. Application for Naturalization (Form N–400) Fee
2. Request for Reduced Fee (Form I–942)
3. Military Naturalization and Certificates of Citizenship
4. Application for Certificate of Citizenship (Form N–600) and Application for Citizenship and Issuance of Certificate Under Section 322 (Form N–600K)
5. Proposed Changes to Other Naturalization-Related Application Fees
6. Request for Comments
G. Fees for Online Filing
H. Form I–485, Application to Register Permanent Residence or Adjust Status
1. Interim Benefits
2. Form I–485 Fee for Child Under 14, Filing With Parent
3. INA Sec. 245(i) Statutory Sum
I. Continuing To Hold Refugee Travel Document Fee for Asylees to the Department of State Passport Fee
J. Form I–131A, Carrier Documentation
K. Separating Fees for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification
1. Form I–129, Petition for Nonimmigrant Worker: H–1 Classifications
2. Form I–129, Petitions for H–2A or H–2B Classifications
3. Form I–129, Petition for Nonimmigrant Worker: L Classification
4. Form I–129, Petition for Nonimmigrant Worker: O Classifications
5. Form I–129, Petition for Nonimmigrant Worker: E and TN Classifications
6. Form I–129, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classifications
7. Separating Form I–129 Into Multiple Forms
8. Commonwealth of the Northern Mariana Islands Fees
9. H–1B Electronic Registration Fee
L. Premium Processing—Business Days
M. Permitting Combined Payment of the Premium Processing Fee
N. Intercountry Adoptions
1. Adjustment to Proposed Fees for Certain Intercountry Adoption-Specific Forms
2. Clarification of Fee Exception for Birth Siblings
3. Suitability and Eligibility Approval Validity Period
4. Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600

a. Suitability and Eligibility Extensions
b. New Approval Notices
c. Change of Country
d. Duplicate Approval Notices
e. Hague Adoption Convention Transition Cases
5. Form I–800A, Supplement 3, Request for Action on Approved Form I–800A
O. Immigrant Investors
1. Immediate Effects of the EB–5 Reform and Integrity Act of 2022
2. Background of the EB–5 Program
3. Proposed EB–5 Program Fees
P. Genealogy and Records
1. Genealogy Search and Records Requests
2. Request for a Certificate of Non-Existence
Q. Fees Shared by CBP and USCIS
R. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))
S. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
T. Adjusting Fees for Inflation
U. Miscellaneous Technical and Procedural Changes
IX. Proposed Fee Adjustments to IEFA Immigration Benefits
A. Impact of Fees
B. USCIS Fiscal Health
C. Planned Increases in Efficiency
X. Statutory and Regulatory Requirements
A. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
B. Regulatory Flexibility Act
C. Unfunded Mandates Reform Act
D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
E. Executive Order 13132 (Federalism)
F. Executive Order 12988 (Civil Justice Reform)
G. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
H. Paperwork Reduction Act
I. National Environmental Policy Act
J. Family Assessment

## List of Acronyms and Abbreviations

AAPA   Afghan Allies Protection Act of 2009
ABC   Activity-Based Costing
ACWIA   American Competitiveness and Workforce Improvement Act
AFM   Adjudicator's Field Manual
APEC   U.S. Asia-Pacific Economic Cooperation
ASC   Application Support Center
ASVVP   Administrative Site Visit and Verification Program
BLS   Bureau of Labor Statistics
CAA   Cuban Adjustment Act
CBP   U.S. Customs and Border Protection
CEQ   Council on Environmental Quality
CFO   Chief Financial Officer
CFO   Act Chief Financial Officers Act of 1990
CNMI   Commonwealth of the Northern Mariana Islands
COVID   Coronavirus Disease
CPI   Consumer Price Index

CPI–U   Consumer Price Index for All Urban Consumers
CPR   Conditional Permanent Residents
CRA   Congressional Review Act
DACA   Deferred Action for Childhood Arrivals
DCL   Dedicated Commuter Lane
DHS   Department of Homeland Security
DoD   Department of Defense
DOJ   Department of Justice
DOL   Department of Labor
DOS   Department of State
EAD   Employment Authorization Document
EB–5   Employment-Based Immigrant Visa, Fifth Preference
EIN   Employer Identification Number
E.O.   Executive Order
EOIR   Executive Office for Immigration Review
FBI   Federal Bureau of Investigation
FDNS   Fraud Detection and National Security Directorate
FOIA   Freedom of Information Act
FPG   Federal Poverty Guidelines
FY   Fiscal Year
GAO   U.S. Government Accountability Office
GE   General Expenses
GPO   Government Publishing Office
HHS   U.S. Department of Health and Human Services
HRIFA   Haitian Refugee Immigration Fairness Act
IEFA   Immigration Examinations Fee Account
ILRC   *Immigrant Legal Resource Center* v. *Wolf*
INA   Immigration and Nationality Act of 1952
INS   Immigration and Naturalization Service
IOAA   Independent Offices Appropriations Act
IPO   Immigrant Investor Program Office
IRFA   Initial Regulatory Flexibility Analysis
IRIS   Immigration Records and Identity Services
ISAF   International Security Assistance Force
LPR   Lawful Permanent Resident
NACARA   Nicaraguan Adjustment and Central American Relief Act
NAFTA   North American Free Trade Agreement
NAICS   North American Industry Classification System
NATO   North Atlantic Treaty Organization
NCE   New Commercial Enterprise
NEPA   National Environmental Policy Act
NPRM   Notice of Proposed Rulemaking
NRC   National Records Center
NWIRP   *Northwest Immigration Rights Project* v. *United States Citizenship and Immigration Services*
OAW   Operation Allies Welcome
OIG   DHS Office of Inspector General
OMB   Office of Management and Budget
OP   Operating Plan
OPQ   Office of Performance and Quality
OPT   Optional Practical Training
PRA   Paperwork Reduction Act
PRC   Permanent Resident Card
RAIO   Refugee, Asylum, and International Operations Directorate
RAP   Resource Allocation Plan
RFA   Regulatory Flexibility Act
RFE   Request for Evidence

RIA   Regulatory Impact Analysis
SAM   Staffing Allocation Model
SAVE   Systematic Alien Verification for Entitlements
SBA   Small Business Administration
SBREFA   Small Business Regulatory Enforcement Fairness Act of 1996
SCOPS   Service Center Operations
SEA   Small Entity Analysis
SEVP   Student and Exchange Visitor Program
SIJ   Special Immigrant Juvenile
SOFA   Status of Forces Agreement
STEM OPT   Science, Technology, Engineering, and Mathematics Optional Practical Training
TEA   Targeted Employment Area
TECRO   Taipei Economic and Cultural Representative Office
TPS   Temporary Protected Status
TVPRA   William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UMRA   Unfunded Mandates Reform Act
USCIS   U.S. Citizenship and Immigration Services
USMCA   U.S. Mexico-Canada Agreement
VAWA   Violence Against Women Act
VPC   Volume Projection Committee

## I. Public Participation

DHS invites you to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this proposed rule. Comments providing the most assistance to DHS will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that supports the recommended change.

*Instructions:* All submissions should include the agency name and DHS Docket No. USCIS–2021–0010 for this rulemaking. Providing comments is entirely voluntary. Regardless of how you submit your comment, DHS will post all submissions, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov* and will include any personal information you provide. Because the information you submit will be publicly available, you should consider limiting the amount of personal information in your submission. DHS may withhold information provided in comments from public viewing if it determines that such information is offensive or may affect the privacy of an individual. For additional information, please read the Privacy Act notice available through the link in the footer of *https://www.regulations.gov.*

*Registration for listening session:* To register and receive information on how to attend the virtual public listening sessions, please go to: *https://www.uscis.gov/outreach/upcoming-national-engagements.*

*Docket:* For access to the docket, go to *https://www.regulations.gov* and enter

this rulemaking's eDocket number: USCIS–2021–0010. The docket includes additional documents that support the analysis contained in this proposed rule to determine the specific fees that are proposed. These documents include:

• Fiscal Year (FY) 2022/2023 Immigration Examinations Fee Account (IEFA) Fee Review Supporting Documentation (supporting documentation);

• FY 2022/2023 IEFA Fee Schedule Documentation (fee schedule documentation);

• FY 2022/2023 IEFA Fee Review Model Documentation (model documentation);

• FY 2022/2023 Fee Review Regulatory Impact Analysis (RIA); and

• FY 2022/2023 Fee Review Small Entity Analysis (SEA).

You may review these documents on the electronic docket. The software [1] used to compute the immigration benefit request [2] fees and biometric fees [3] is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling 240–721–6080.[4]

*FAQ:* To provide maximum transparency and clarity to the public on this proposed rule, DHS has provided a list of frequently asked questions and answers (FAQ) that summarize the content and context of this rule in an easily readable and understandable summary fashion. We have placed the FAQ in the eDocket USCIS–2021–0010, as well as on the USCIS website at *https://www.uscis.gov/proposed-fee-rule-faqs.*

## II. Executive Summary

DHS proposes to adjust the USCIS fee schedule, which specifies the fee amount charged for each immigration and naturalization benefit request.[5] DHS

last adjusted the fee schedule on December 23, 2016, by a weighted average increase of 21 percent. *See* 81 FR 73292 (Oct. 24, 2016) (final rule) (FY 2016/2017 fee rule). USCIS budget and revenue estimates at the time indicated there would be an average annual deficit of $560 million without adjusting fees. DHS issued a final rule to adjust the USCIS fee schedule on August 3, 2020, by a weighted average of 20 percent, reflecting the results of the FY 2019/2020 USCIS fee review. *See* 85 FR 46788 (2020 fee rule). DHS estimated an average annual USCIS deficit of $1,035.9 million. The rule was scheduled to become effective on October 2, 2020. However, that rule was preliminarily enjoined, and USCIS has not implemented the fees set out in the 2020 fee rule.[6] In this rule, DHS proposes to replace the 2020 fee rule in its entirety by revising the regulatory changes codified by the enjoined 2020 fee rule. Certain changes in the 2020 fee rule are proposed to be retained by being republished.

USCIS is primarily funded by fees charged to applicants and petitioners for immigration and naturalization benefit requests. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA). These fee collections fund the cost of fairly and efficiently adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants or petitioners. The focus of this fee review is the fees that DHS has established and is authorized by INA section 286(m), 8 U.S.C 1356(m), to establish or change, collect, and deposit into the IEFA, which comprised approximately 96 percent of USCIS' total FY 2021 enacted spending authority; this fee review does not focus on fees that USCIS is required to collect but cannot change. This rule also proposes to revise the genealogy program fees established under INA section 286(t), 8 U.S.C. 1356(t), and those funds are also deposited into the IEFA. Premium processing funds

---

[1] USCIS uses commercially available activity-based costing (ABC) software, CostPerform, to create financial models as described in the supporting documentation.

[2] Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose. *See* 8 CFR 1.2.

[3] DHS uses the terms biometric fees, biometric services fees, and biometric fee synonymously in this rule to describe the cost and process for capturing, storing, or using biometrics.

[4] This proposed rule describes key inputs to the ABC model (for example, budget, workload forecasts, staffing, and completion rates), both here and in the supporting documentation.

[5] For the purposes of this rulemaking, DHS is including all requests finalized from the IEFA in the term ''benefit request'' or ''immigration benefit request'' although the form or request may not technically relate to an immigration or naturalization benefit. For example, Deferred

---

Action for Childhood Arrivals (DACA) is solely an exercise of prosecutorial discretion by DHS, is not an immigration benefit, and is called a ''benefit request'' solely for purposes of this rule. Likewise, a request for genealogy records is not a request for an immigration benefit. For historic receipts and completion information, *see* USCIS immigration and citizenship data available at *https://www.uscis.gov/tools/reports-studies/immigration-forms-data.*

[6] *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020) (*ILRC*); *Nw. Immigrant Rights Project* v. *USCIS,* 496 F. Supp. 3d 31 (D.D.C. 2020) (*NWIRP*).

established under INA section 286(u), 8 U.S.C. 1356(u) are also IEFA fees, but premium processing fees are not proposed to be changed in this rule.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), codified at 31 U.S.C. 901–03, and Office of Management and Budget (OMB) Circular A–25, USCIS conducts biennial reviews of the non-statutory fees deposited into the IEFA. Following such reviews, DHS proposes fee adjustments, if necessary, to ensure that USCIS fees recover the full cost of operating USCIS as authorized by INA section 286(m), 8 U.S.C. 1356(m). USCIS has completed a fee review for the FY 2022/2023 biennial period. The primary objective of any IEFA fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund the anticipated operating costs associated with administering the nation's legal immigration system. The results indicate that current fee levels are insufficient to recover the full cost of operations funded by the IEFA. Therefore, DHS proposes to adjust USCIS fees.

In addition to the requirements of the CFO Act, there are other important reasons for conducting the FY 2022/2023 fee review. The fee review:

• Allows for an assessment of USCIS policy changes, staffing levels, costs, and revenue and other assessments. USCIS evaluates operational requirements and makes informed decisions concerning program scaling, resource planning, and staffing allocations; and

• Provides those served by USCIS with an opportunity to submit comments on the effect of fee changes.

USCIS calculates its fees to recover the full cost of operations funded by the IEFA. These costs do not include limited appropriations provided by Congress. If USCIS continues to operate at current fee levels, it would experience an average annual shortfall (the amount by which expenses exceed revenue) of $1,868.2 million. This projected shortfall poses a risk of degrading USCIS operations funded by the IEFA.

Although this fee schedule represents a 40-percent overall weighted average increase to ensure full cost recovery, more than a million immigration benefit requestors each year would see no increase or a decrease in costs because their benefit requests have no fee, are fee exempt, or are fee waived.[7] In FY

2022/2023, USCIS estimates approximately 8 million annual average receipts for workload with fees. Of those, USCIS estimates approximately 7 million may pay fees. DHS proposes to maintain the current fee waiver policy which was established in 2011.[8]

The proposed fees would ensure that IEFA revenue covers USCIS' costs associated with adjudicating immigration benefit requests. The proposed fee schedule accounts for increased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and vet applicants, petitioners, and beneficiaries. See section V.A. of this preamble for a discussion of IEFA budget history and cost projections for this rulemaking. DHS also proposes to expand fee exemptions for certain applicants and petitioners for humanitarian benefits. Additionally, DHS proposes to establish distinct fees for different categories of petitions for nonimmigrant workers. DHS proposes to set a range of fees that vary by the nonimmigrant classification and to limit petitions for nonimmigrant workers to 25 named beneficiaries. DHS believes the proposed fees more accurately reflect the differing burdens of adjudication and will enable USCIS to adjudicate these petitions more effectively.

*A. Summary of Economic Impacts*

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, would result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2023 through FY 2032), DHS estimates the annualized net costs to the public would be $532,379,138 discounted at 3- and 7-percent. Estimated total net costs over 10 years

would be $4,541,302,033, discounted at 3-percent and $3,739,208,286 discounted at 7-percent.

The proposed changes in this rule would also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the Government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, USCIS' expansion of the electronic filing system to include more forms, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases and other changes in this proposed rule would result in annualized transfer payments from applicants/petitioners to USCIS of approximately $1,612,133,742 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from applicants/petitioners to USCIS would be $13,751,827,819 at a 3-percent discount rate and $11,322,952,792 at a 7-percent discount rate.

Fee reductions and exemptions in this proposed rule would result in annualized transfer payments from USCIS to applicants/petitioners of approximately $116,372,429 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners would be $992,680,424 at a 3-percent discount rate and $817,351,244 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS would be approximately $222,145 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS would be $1,894,942 at a 3-percent discount rate and $1,560,254 at a 7-percent discount rate.

*B. Summary of Proposed Provisions*

This proposed rule includes the following proposals:

• Adjusting fees according to the schedule in Tables 1 and 26.

• Adding new fee exemptions for certain humanitarian programs and preserving the fee waiver requirements that are currently being followed.

• Removing fee exemptions that are based only on the age of the person submitting the request.

---

[7] USCIS uses a weighted average instead of a straight average because of the difference in volume

by immigration benefit type and the resulting effect on fee revenue. The 40-percent weighted average increase is a change in the average fee for a form that currently requires a fee compared to the average proposed fee per form. The sum of the current fees, multiplied by the projected FY 2022/2023 fee-paying receipts for each immigration benefit type, divided by the total fee-paying receipts, is $518. The sum of the proposed fees, multiplied by the projected FY 2022/2023 receipts for each immigration benefit type, divided by the fee-paying receipts, is $725. There is a $207, or approximately 40-percent, difference between the two averages. These averages exclude fees that do not receive cost reallocation, such as the separate biometric services fee and the proposed genealogy fees.

[8] *See* Policy Memorandum, Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26, available at *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf*) (last viewed March 23, 2022).

• Eliminating the $30 returned check fee.

• Incorporating biometrics costs into the main benefit fee and removing the separate biometric services fee.

• Requiring separate filing fees for Form I–485 and associated Form I–131 and Form I–765 filings.

• Establishing separate fees for Form I–129, Petition for Nonimmigrant Worker, by nonimmigrant classification.

• Revising the premium processing timeframe interpretation from calendar days to business days.

• Revising adoption-related requirements, including adding a Request for Action on Approved Form I–600A/I–600 (Form I–600A/I–600, Supplement 3), and associated fees.

• Revising regulations related to genealogy searches, including establishing a fee for Form G–1566, Request for Certificate of Non-Existence.

• Miscellaneous technical and procedural changes.

• Creating lower fees for forms filed online.

*C. Summary of Current and Proposed Fees*

Table 1 summarizes the current and proposed fees. In addition, the proposed fees and exemptions are incorporated into the draft version of USCIS Form G–1055 as part of the docket for this rulemaking. In some cases, the current or proposed fee may be the sum of several fees. For example, several immigration benefit requests require an additional biometric services fee under the current fee structure. The table includes rows with and without the additional biometric services fee added to the Current Fee(s) column. The Current Fee(s) column represents the current fees in effect rather than the enjoined fees from the 2020 fee rule.[9] Throughout this proposed rule, the phrase ''current fees'' refers to the fees

---

[9] USCIS provides filing fee information on the All Forms page at *https://www.uscis.gov/forms/all-forms*. You can use the Fee Calculator to determine the exact filing and biometric services fees for any form processed at a USCIS Lockbox facility. *See* USCIS, Fee Calculator, *https://www.uscis.gov/feecalculator*. For a complete list of all USCIS fees, see Form G–1055, Fee Schedule, available from *https://www.uscis.gov/g-1055*.

in effect and not the enjoined fees. In this proposal, DHS would eliminate the additional biometric services fee in most cases by including the costs in the underlying immigration benefit request fee. As such, the Proposed Fees(s) column does not include an additional biometric services fee. Some other benefit requests are listed several times because in some cases DHS proposes distinct fees based on filing methods, online or paper. DHS proposes to require fees for Forms I–131 and I–765 when filed with Form I–485. As such, Table 1 includes rows that compare the current fee for Form I–485 to various combinations of the proposed fees for Forms I–485, I–131, and I–765. We grouped the fees into different categories, such as Citizenship and Nationality, Humanitarian, Family-Based, Employment-Based, and Other. We included immigration benefit requests without fees in a No Fees category. DHS proposes to codify these no fee immigration benefit requests. *See, e.g.,* proposed 8 CFR 106.2(a)(58) through (60).

**BILLING CODE 9111–97–P**

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| Citizenship and Naturalization | | | | |
| N-4 　Monthly Report on Naturalization Papers | No Fee | No Fee | N/A | N/A |
| N-300 　Application to File Declaration of Intention | $270 | $320 | $50 | 19% |
| N-336 　Request for Hearing on a Decision in Naturalization Proceedings - Online or Paper | $700 | $830 | $130 | 19% |
| N-400 　Application for Naturalization - Online or Paper | $640 | $760 | $120 | 19% |
| N-400 　Application for Naturalization - Online or Paper (with biometric services) | $725 | $760 | $35 | 5% |
| N-400 　Application for Naturalization - Reduced Fee | $320 | $380 | $60 | 19% |
| N-400 　Application for Naturalization - Reduced Fee (with biometric services) | $405 | $380 | -$25 | -6% |
| N-470 　Application to Preserve Residence for Naturalization Purposes | $355 | $425 | $70 | 20% |
| N-565 　Application for Replacement Naturalization/Citizenship Document - Online or Paper | $555 | $555 | $0 | 0% |
| N-600 　Application for Certificate of Citizenship - Online or Paper | $1,170 | $1,385 | $215 | 18% |
| N-600K 　Application for Citizenship and Issuance of Certificate - Online or Paper | $1,170 | $1,385 | $215 | 18% |
| N-644 　Application for Posthumous Citizenship | No Fee | No Fee | N/A | N/A |
| N-648 　Medical Certification for Disability Exceptions | No Fee | No Fee | N/A | N/A |
| Humanitarian | | | | |
| 　Credible Fear | No Fee | No Fee | N/A | N/A |
| I-589 　Application for Asylum and for Withholding of Removal | No Fee | No Fee | N/A | N/A |
| I-590 　Registration for Classification as a Refugee | No Fee | No Fee | N/A | N/A |
| I-602 　Application by Refugee for Waiver of Inadmissibility Grounds | No Fee | No Fee | N/A | N/A |

[10] These are fees that USCIS is currently charging and not those codified by the 2020 fee rule.

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-687 | Application for Status as a Temporary Resident Under Section 245A of the INA | $1,130 | $1,240 | $110 | 10% |
| I-687 | Application for Status as a Temporary Resident Under Section 245A of the INA (with biometric services) | $1,215 | $1,240 | $25 | 2% |
| I-694 | Notice of Appeal of Decision | $890 | $1,155 | $265 | 30% |
| I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $0 | 0% |
| I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | -$85 | -5% |
| I-730 | Refugee/Asylee Relative Petition | No Fee | No Fee | N/A | N/A |
| I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | No Fee | No Fee | N/A | N/A |
| I-817 | Application for Family Unity Benefits | $600 | $875 | $275 | 46% |
| I-817 | Application for Family Unity Benefits (with biometric services) | $685 | $875 | $190 | 28% |
| I-821 | Application for Temporary Protected Status - Online or Paper | $50 | $50 | $0 | 0% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $55 | 19% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | -$30 | -8% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | -$230 | -40% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $740 | $340 | -$400 | -54% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by Executive Office for Immigration Review) | $165 | $165 | $0 | 0% |
| I-914 | Application for T Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I-914A | Application for Family Member of T-1 Recipient | No Fee | No Fee | N/A | N/A |
| I-918 | Petition for U Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I-918A | Petition for Qualifying Family Member of U-1 Recipient | No Fee | No Fee | N/A | N/A |
| I-918B | U Nonimmigrant Status Certification | No Fee | No Fee | N/A | N/A |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $270 | $40 | 17% |
|  | Reasonable Fear | No Fee | No Fee | N/A | N/A |
| Family-Based | | | | | |
| I-129F | Petition for Alien Fiancé(e) | $535 | $720 | $185 | 35% |
| I-130 | Petition for Alien Relative - Online | $535 | $710 | $175 | 33% |
| I-130 | Petition for Alien Relative - Paper | $535 | $820 | $285 | 53% |
| I-600 | Petition to Classify Orphan as an Immediate Relative | $775 | $920 | $145 | 19% |
| I-600 | Petition to Classify Orphan as an Immediate Relative (with biometric services for one adult) | $860 | $920 | $60 | 7% |
| I-600A | Application for Advance Processing of an Orphan Petition | $775 | $920 | $145 | 19% |
| I-600A | Application for Advance Processing of an Orphan Petition (with biometric services for one adult) | $860 | $920 | $60 | 7% |
| I-600A/I-600 Supp. 3 | Request for Action on Approved Form I-600A/I-600 | N/A | $455 | N/A | N/A |
| I-601A | Application for Provisional Unlawful Presence Waiver | $630 | $1,105 | $475 | 75% |
| I-601A | Application for Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $390 | 55% |
| I-751 | Petition to Remove Conditions on Residence | $595 | $1,195 | $600 | 101% |
| I-751 | Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $515 | 76% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-800 — Petition to Classify Convention Adoptee as an Immediate Relative | $775 | $920 | $145 | 19% |
| I-800A — Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $920 | $145 | 19% |
| I-800A — Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $920 | $60 | 7% |
| I-800A Supp. 3 — Request for Action on Approved Form I-800A | $385 | $455 | $70 | 18% |
| I-800A Supp. 3 — Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | -$15 | -3% |
| Employment-Based | | | | |
| Asylum Program Fee | N/A | $600 | N/A | N/A |
| H-1B Pre-Registration Fee | $10 | $215 | $205 | 2050% |
| I-129 — Petition for a Nonimmigrant Worker: H-1 Classifications | $460 | $780 | $320 | 70% |
| I-129 — H-2A Petition - Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| I-129 — H-2B Petition - Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| I-129 — Petition for L Nonimmigrant Worker | $460 | $1,385 | $925 | 201% |
| I-129 — Petition for O Nonimmigrant Worker | $460 | $1,055 | $595 | 129% |
| I-129CW, and I-129 — Petition for a CNMI-Only Nonimmigrant Transitional Worker; Application for Nonimmigrant Worker: E and TN Classifications; and Petition for Nonimmigrant Worker: H-3, P, Q, or R Classification | $460 | $1,015 | $555 | 121% |
| I-129CW, and I-129 — Petition for a CNMI Nonimmigrant Worker (with biometric services fee) | $545 | $1,055 | $595 | 129% |
| I-129 — H-2A Petition - Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| I-129 — H-2B Petition - Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| I-140 — Immigrant Petition for Alien Worker | $700 | $715 | $15 | 2% |
| I-526 — Immigrant Petition by Standalone Investor | $3,675 | $11,160 | $7,485 | 204% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-526E | Immigrant Petition by Regional Center Investor | $3,675 | $11,160 | $7,485 | 204% |
| I-765 | Application for Employment Authorization - Online | $410 | $555 | $145 | 35% |
| I-765 | Application for Employment Authorization - Paper | $410 | $650 | $240 | 59% |
| I-765 | Application for Employment Authorization - Online (with biometric services) | $495 | $650 | $240 | 59% |
| I-765 | Application for Employment Authorization - Paper (with biometric services) | $495 | $650 | $155 | 31% |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | $3,750 | $9,525 | $5,775 | 154% |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status (with biometric services) | $3,835 | $9,525 | $5,690 | 148% |
| I-907 | Request for Premium Processing Service when filing: Form I-129 requesting E-1, E-2, E-3, H-1B, H-3, L (including blanket L-1), O, P, Q, or TN nonimmigrant classification; or Form I-140 requesting EB-1, EB-2, or EB-3 immigrant visa classification | $2,500 | $2,500 | $0 | 0% |
| I-907 | Request for Premium Processing Service when filing Form I-129 requesting H-2B or R nonimmigrant classification | $1,500 | $1,500 | $0 | 0% |
| I-956 | Application For Regional Center Designation | $17,795 | $47,695 | $29,900 | 168% |
| I-956G | Regional Center Annual Statement | $3,035 | $4,470 | $1,435 | 47% |
| Other | | | | | |
| I-90 | Application to Replace Permanent Resident Card - Online | $455 | $455 | $0 | 0% |
| I-90 | Application to Replace Permanent Resident Card - Paper | $455 | $465 | $10 | 2% |
| I-90 | Application to Replace Permanent Resident Card - Online (with biometric services) | $540 | $455 | -$85 | -16% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-90 | Application to Replace Permanent Resident Card - Paper (with biometric services) | $540 | $465 | -$75 | -14% |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $235 | 53% |
| I-131 | Application for Travel Document | $575 | $630 | $55 | 10% |
| I-131 | Application for Travel Document (with biometric services) | $660 | $630 | -$30 | -5% |
| I-131 | I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $30 | 22% |
| I-131 | I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | -$55 | -25% |
| I-131 | I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $30 | 29% |
| I-131 | I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | -$55 | -29% |
| I-131A | Application for Carrier Documentation | $575 | $575 | $0 | 0% |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $0 | 0% |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant (filed with USCIS) | $930 | $1,100 | $170 | 18% |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant (filed with CBP) | $585 | $1,100 | $515 | 88% |
| I-193 | Application for Waiver of Passport and/or Visa | $585 | $695 | $110 | 19% |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $465 | 50% |
| I-290B | Notice of Appeal or Motion | $675 | $800 | $125 | 19% |
| I-360 | Petition for Amerasian Widow(er) or Special Immigrant | $435 | $515 | $80 | 18% |
| I-485 | Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $400 | 35% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-485 Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $315 | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $790 | 105% |
| I-485 Forms I-485 and I-131 with biometric services | $1,225 | $2,170 | $945 | 77% |
| I-485 Forms I-485 and I-765 (filed on paper) with biometric services | $1,225 | $2,190 | $965 | 79% |
| I-485 Forms I-485, I-131, and I-765 (filed on paper) with biometric services | $1,225 | $2,820 | $1,595 | 130% |
| I-485A Supplement A, Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | $1,000 | $1,000 | $0 | 0% |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $370 | $525 | $155 | 42% |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $370 | $620 | $250 | 68% |
| I-539 Application to Extend/Change Nonimmigrant Status - Online (with biometric services) | $455 | $525 | $70 | 15% |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper (with biometric services) | $455 | $620 | $165 | 36% |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $120 | 13% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $170 | 18% |
| I-690 Application for Waiver of Grounds of Inadmissibility | $715 | $985 | $270 | 38% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $675 | $210 | 45% |
| I-905 Application for Authorization to Issue Certification for Health Care Workers | $230 | $230 | $0 | 0% |
| I-910 Application for Civil Surgeon Designation | $785 | $1,230 | $445 | 57% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $0 | 0% |
| I-941 Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | -$85 | -7% |

| Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| Biometric Services (in most cases) | $85 | $0 | -$85 | -100% |
| Biometric Services (TPS and EOIR only) | $85 | $30 | -$55 | -65% |
| USCIS Immigrant Fee | $220 | $235 | $15 | 7% |
| Genealogy and Records | | | | |
| G-1041 — Genealogy Index Search Request - Online | $65 | $100 | $35 | 54% |
| G-1041 — Genealogy Index Search Request - Paper | $65 | $120 | $55 | 85% |
| G-1041A — Genealogy Records Request - Online | $65 | $240 | $175 | 269% |
| G-1041A — Genealogy Records Request - Paper | $65 | $260 | $195 | 300% |
| G-1041 and G-1041A — Genealogy Index Search Request and Records Request - Online (digital records) | $130 | $100 | -$30 | -23% |
| G-1566 — Certificate of Non-Existence | $0 | $330 | $330 | N/A |
| No Fee | | | | |
| I-134 — Declaration of Financial Support | No Fee | No Fee | N/A | N/A |
| I-361 — Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97-359 Amerasian | No Fee | No Fee | N/A | N/A |
| I-363 — Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97-359 Amerasian | No Fee | No Fee | N/A | N/A |
| I-407 — Record of Abandonment of Lawful Permanent Resident Status | No Fee | No Fee | N/A | N/A |
| I-485J — Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | No Fee | No Fee | N/A | N/A |
| I-508 — Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities | No Fee | No Fee | N/A | N/A |
| I-566 — Interagency Record of Request – A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status | No Fee | No Fee | N/A | N/A |
| I-693 — Report of Medical Examination and Vaccination Record | No Fee | No Fee | N/A | N/A |

| | Table 1: Comparison of Current[10] and Proposed Fees | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-854 | Inter-Agency Alien Witness and Informant Record | No Fee | No Fee | N/A | N/A |
| I-864 | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |
| I-864A | Contract Between Sponsor and Household Member | No Fee | No Fee | N/A | N/A |
| I-864EZ | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |
| I-864W | Request for Exemption for Intending Immigrant's Affidavit of Support | No Fee | No Fee | N/A | N/A |
| I-865 | Sponsor's Notice of Change of Address | No Fee | No Fee | N/A | N/A |
| I-912 | Request for Fee Waiver | No Fee | No Fee | N/A | N/A |
| I-942 | Request for Reduced Fee | No Fee | No Fee | N/A | N/A |

BILLING CODE 9111–97–C

## III. Basis for the Fee Review

### A. Legal Authority and Guidance

DHS is issuing this proposed rule consistent with INA sec. 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants"),[11] and the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees).

This proposed rule is also consistent with non-statutory guidance on fees, the budget process, and Federal accounting principles.[12] DHS uses OMB Circular

A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in section III.B of this preamble. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of Immigration Examinations Fee Account (IEFA) costs.[13]

Finally, this rulemaking accounts for, and is consistent with, congressional appropriations for specific USCIS programs. FY 2021 appropriations for USCIS provided funding for the E-Verify employment eligibility verification program. Congress provided E-Verify with $117.8 million for operations and support. *See* Consolidated Appropriations Act, 2021, Pub. L. 116–

260, div. F, tit. IV (Dec. 27, 2020). DHS provides this information only for comparison to the IEFA. E-Verify is not included in this fee review budget because, generally, appropriations, not fees, fund E-Verify. In addition, Congress appropriated $10 million for the Citizenship and Integration Grant Program. *Id.* Together, the total FY 2021 appropriations for USCIS are $127.8 million. For the last several years, USCIS has not had the authority to spend more than $10 million for citizenship grants. Until recently, grant program funding came from the IEFA fee revenue or a mix of appropriations and fee revenue.[14] Because Congress appropriated funds for grants in FY 2021, the $10 million budgeted for citizenship grants is not part of the FY 2022/2023 IEFA fee review budget.

### B. Effect of FY 2022 Appropriations

In FY 2022, Congress provided USCIS additional appropriations for very specific purposes. *See* Consolidated Appropriations Act, 2022, Public Law 117–103 (Mar. 15, 2022) ("Pub. L. 117–103"). USCIS received approximately $389.5 million for E-Verify, application processing, backlog reduction, and the refugee program. *See id* at div. F, title IV. Of that amount, approximately $87.6

---

[11] The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

[12] *See* OMB Circular A–25, "User Charges," 58 FR 38142, available at *https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf* (July 15, 1993) (revising Federal policy guidance regarding fees assessed by Federal agencies for Government services). *See also* Federal Accounting Standards Advisory Board Handbook, Version 17 (06/18), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, available at *http://*

*files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (July 31, 1995). *See also* OMB Circular A–11, Preparation, Submission, and Execution of the Budget, section 20.7(d), (g) (June 29, 2018), available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf* (June 29, 2018). (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees).

[13] OMB Circulars A–25 and A–11 provide nonbinding internal executive branch direction for the development of fee schedules under the Independent Offices Appropriations Act, 1952 (IOAA) and appropriations requests, respectively. *See* 5 CFR 1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS understands they reflect best practices and used the activity-based costing (ABC) methodology supported in Circulars A–25 and A–11 to develop the proposed fee schedule.

[14] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113–6) and FY 2014 (Pub. L. 113–76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018. Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116–6) and FY 2020 (Pub. L. 116–93).

AR_000014

million is available until the end of FY 2023. *Id.* These funds will be in a separate appropriated account. *Id.* USCIS will use $275 million to reduce USCIS application and petition backlogs and delays, support refugee admissions up to a ceiling of 125,000, and invest in enterprise infrastructure improvements such as case file management and video interviewing capabilities.[15] USCIS will use the remaining amount, approximately $114.5 million, to fund E-Verify. In addition, Congress provided $20 million for Federal Assistance for the Immigrant Citizenship and Integration Grants program. *Id.* This is $10 million more than in a typical year.[16] USCIS also received $193 million for Operation Allies Welcome (OAW). *See* Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021) ("Pub. L. 117–43") at div. C. title V, sec. 2501. In FY 2022, approximately $119.7 million is available for use in the Immigration Examinations Fee Account, which is a no-year account. The remaining OAW amount will be available in FY 2023 or until expended. In all of these cases, the laws provide that the funds are only to be used for the specified purposes, and DHS is not required to reduce any current IEFA fee.[17]

The FY 2022/2023 fee review budget that is the basis for this proposed rule excludes all appropriated funding, including the approximately $529.2 million provided so far in FY 2022. USCIS will use the appropriated funding for the purposes provided by Congress. The appropriations support several DHS priorities, for example, decreasing USCIS application processing times, reducing the backlog of requests already on hand and being adjudicated (and for which a fee may

have already been paid). USCIS may also use the appropriations to expand refugee processing efforts, and support vulnerable Afghans, including those who worked alongside Americans in Afghanistan for the past two decades, as they safely resettle in the United States. These appropriations do not overlap with the fee review budget, which will fund immigration adjudication and naturalization services for future incoming receipts. The full costs of operating USCIS that are included in the fee model do not include separate line items budgeted directly for backlog reduction and OAW. Had the appropriation not been received, DHS and USCIS would have been required to use funds budgeted for other uses to fund the costs of OAW. While DHS and USCIS are very focused on reducing backlogs, our efforts to reduce the backlog did not include a significant shift of IEFA non-premium funds from normal operations to that effort. USCIS funded previous backlog reduction efforts with IEFA premium processing revenue and supplemental appropriations.[18] The backlog represents uncompleted work which USCIS already received, but did not complete, and the appropriated funds will assist in clearing that workload. In the absence of appropriations, USCIS may continue to fund backlog reduction efforts with premium processing revenue.

DHS received appropriations to fund some of the additional spending that USCIS will require for the refugee ceiling increase to 125,000 beginning in FY 2022, as described in section V.A.2.b.[19] This is a significant increase over recent years. The refugee admission ceiling was 62,500 for FY 2021 and 18,000 for FY 2020.[20] DHS is

including this amount in its total costs to be recovered by the fees proposed in this rule because the appropriations in Public Law 117–103 will be used to cover the FY 2022 expenses for the refugee program, while this rule is unlikely to be effective until FY 2023. The approximately $87.6 million appropriated for application processing that is available until the end of FY 2023 may be insufficient to fund backlog reduction and refugee processing. For example, the President's budget request for FY 2023 included $765 million for increasing asylum caseloads, backlog reduction, and refugee processing.[21] While USCIS is committed to seeking Congressional appropriations for refugee processing costs in the future, USCIS cannot presume such appropriations, especially given the lack of appropriations in the past. If this fee rule does not account for the possibility of no Congressional funding in future years and Congress fails to fund the program, either the program cannot continue or USCIS will be forced to reallocate resources assigned to another part of the agency for this purpose. However, if USCIS is certain to receive additional appropriations to fund the FY 2023 refugee program at the time of the final rule, then USCIS may reduce the estimated budget requirements funded by IEFA fees accordingly in the final rule.

The FY 2022 appropriation laws also require additional services and impose reporting, processing, and monitoring requirements that will add costs for USCIS. *See, e.g.,* Public Law 117–43 at secs. 2502–2503. The reporting requirements of Public Law 117–43 are quarterly and extend through September 30, 2023, although the amounts appropriated are only available for fiscal year 2022. *Id* at secs. 2503(a) and 2506. DHS will fund these reporting costs with the appropriated funds for FY 2022 and thus has excluded most of them from this rule. *Id.* at secs. 2502–2503. Congress also added reporting requirements when it reauthorized and revised the Employment-Based Immigrant Visa, Fifth Preference (EB–5) authority. *See* Public Law 117–103, div. BB and section III.F of this preamble for more information. IEFA fees will fund

---

[15] This $275 million includes $250 million that USCIS received in an earlier continuing resolution. *See* Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021) at div. A, sec. 132. USCIS received an additional $25 million in the Consolidated Appropriations Act, 2022, Public Law 117–103 (Mar. 15, 2022) at div. F, title IV.

[16] For example, Congress appropriated $10 million in FY 2021. See section III.A of this preamble for more information.

[17] Public Law 117–43, at section 132, states, "That such amounts shall be in addition to any other funds made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." Likewise, Public Law 117–43, at section 2501, states "That such amounts shall be in addition to any other amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." USCIS has a long history of funding citizenship and integration grants from IEFA revenue, appropriations, or a mix of both.

[18] The last time USCIS received appropriations for the backlog was in FY 2008. *See* Consolidated Appropriations Act, 2008, Public Law 110–161, Title IV (Dec. 26, 2007). USCIS received $20 million "to address backlogs of security checks associated with pending applications and petitions." More recently, Congress authorized USCIS to use premium processing revenue to address the backlog. *See* Emergency Stopgap USCIS Stabilization Act, Public Law 116–159, Div. D, Title IV (Oct. 1, 2020).

[19] *See* White House, "Memorandum for the Secretary of State on Presidential Determination on Refugee Admissions for Fiscal Year 2022" (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/ statements-releases/2021/10/08/memorandum-for- the-secretary-of-state-on-presidential- determination-on-refugee-admissions-for-fiscal- year-2022/.*

[20] *See* White House, "Memorandum for the Secretary of State on the Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2021" (May 3, 2021), *https:// www.whitehouse.gov/briefing-room/presidential- actions/2021/05/03/memorandum-for-the-secretary- of-state-on-the-emergency-presidential- determination-on-refugee-admissions-for-fiscal-*

*year-2021-2/; see* also Trump White House, "Presidential Determination on Refugee Admissions for Fiscal Year 2020" (Nov. 1, 2019), *https:// trumpwhitehouse.archives.gov/presidential-actions/ presidential-determination-refugee-admissions- fiscal-year-2020/.*

[21] *See* White House, *Budget of the United States, Fiscal Year 2023,* p. 20, *https:// www.whitehouse.gov/wp-content/uploads/2022/03/ budget_fy2023.pdf* (last visited April 20, 2022).

operational expenses as needed in FY 2022/2023, including the reporting requirements imposed by Public Law 117–43 and Public Law 117–103 that are not funded by appropriated funds. DHS describes the FY 2022/2023 fee review budget in section V.A. of this preamble.

### C. Immigration Examinations Fee Account

USCIS manages three fee accounts:
• The IEFA (includes premium processing revenues),[22]
• The Fraud Prevention and Detection Account,[23] and
• The H–1B Nonimmigrant Petitioner Account.[24]

In 1988, Congress established the IEFA in the Treasury of the United States. *See* Public Law 100–459, sec. 209, 102 Stat. 2186 (Oct. 1, 1988) (codified as amended at INA sec. 286(m) and (n), 8 U.S.C. 1356(m) and (n)). Fees deposited into the IEFA fund the provision of immigration adjudication and naturalization services. In subsequent legislation, Congress directed that the IEFA fund the full costs of providing all such services, including services provided to immigrants at no charge. *See* Public Law 101–515, sec. 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990). Consequently, the immigration benefit fees were increased to recover these additional costs. *See* 59 FR 30520 (June 14, 1994). The IEFA accounted for approximately 96 percent of total funding for USCIS in FY 2021 and is the focus of this proposed rule. IEFA non-premium funding represents 83 percent and IEFA premium funding represents 13 percent of USCIS FY 2021 total funding. The remaining USCIS funding comes from appropriations (approximately 3 percent) or other fee accounts (approximately 1 percent) in FY 2021. The Fraud Prevention and Detection Account and H–1B Nonimmigrant Petitioner Account are both funded by fees for which the dollar amount is set by statute.[25] DHS has no authority to adjust the fees for these accounts.

### D. Full Cost Recovery

USCIS receives millions of requests each year for immigration benefits. These benefits are funded by DHS,

generally, by charging fees for USCIS services. In recent times, however, and as fully explained in this rule preamble and its supporting documents, USCIS costs have surpassed the fees it collects.

As stated earlier, DHS publishes this proposed rule under the Immigration and Nationality Act ("INA"), which establishes the "Immigration Examinations Fee Account" ("IEFA") for the receipt of fees it charges. INA section 286(m), 8 U.S.C. 1356(m). The INA allows DHS to set "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* The INA further provides that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

DHS proposes this rule to address the projected deficits and unsustainable fiscal situation of USCIS that are explained in this proposal and in the supporting documentation in the docket. *See* section IX.A of this preamble; see also IEFA Non-Premium Carryover Projections in the supporting documentation included in the docket to this rulemaking. Carryover is unobligated or unexpended fee revenue accumulated from previous fiscal years. Because USCIS is primarily fee-funded, it must ensure that it maintains a carryover balance to continue operating, and INA section 286(m), 8 U.S.C. 1356(m) authorizes DHS to set fees at a level to recover "the *full* costs" of providing "*all*" "adjudication and naturalization services," and "the administration of the fees collected." (emphasis added.) This necessarily includes support costs such as physical overhead, information technology, management and oversight, human resources, national security vetting and investigations,[26] accounting and budgeting, and legal, for example. USCIS' current budget forecasts a deficit based on fully funding all of its operations, and DHS must make up that

difference either by cutting costs, curtailing operations, or increasing revenue. DHS has examined USCIS recent budget history, service levels, and immigration trends to forecast its costs, revenue, and operational metrics in order to determine whether USCIS fees would generate sufficient revenue to fund anticipated operating costs. As explained in this rule and the supporting documents, USCIS costs are projected to be considerably higher than projected fee revenue should fees remain at their current levels. The primary cost driver responsible for this increase is payroll, including the need to hire additional staff due to an increase in the volume of applications that USCIS receives and the increase in time per adjudication for USCIS to process many applications, petitions, and requests. *See* section V.B. for a discussion of USCIS workload and the time to adjudicate applications, petitions, and requests. *See also* section IX.C for planned increases in efficiency. USCIS has already curtailed its own costs and implemented cost-cutting measures, and any further reductions would adversely affect the services USCIS provides to applicants including adjudications time and processes. *See* section V.A.2. and section IX.B. of this preamble.

Consistent with these authorities, sources, and needs, this proposed rule would ensure that USCIS recovers its full operating costs and maintains an adequate level of service in two ways:

First, where possible, the proposed rule would set fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests.

DHS generally follows OMB Circular A–25, which "establishes federal policy regarding fees assessed for Government services and for sale or use of Government goods or resources." OMB Circular A–25, section 1, 58 FR 38144. A primary objective of OMB Circular A–25 is to ensure that Federal agencies recover the full cost of providing specific services to users and associated costs. *See id.*, section 5. Full costs include, but are not limited to, an appropriate share of:

• Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

• Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment;

• Management and supervisory costs; and

---

[22] INA sec. 286(m), (n), and (u); 8 U.S.C. 1356(m), (n), and (u).

[23] INA secs. 214(c)(12) and (13), 286(v); 8 U.S.C. 1184(c)(12) and (13), 1356(v).

[24] INA secs. 214(c)(9) and (11), 286(s); 8 U.S.C. 1184(c)(9) and (11), 1356(s).

[25] See the supporting documentation included in the docket of this rulemaking. There is additional information on these accounts in Appendix II—USCIS Funding and Account Structure.

[26] Congress recommended that DHS establish an organization "responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner prior to granting immigration benefits." *See* Conference Report to accompany H.R. 4567 [Report 108–774], "Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005," p. 74, available at *https://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf.*

• Costs of enforcement, collection, research, establishment of standards, and regulation.

*Id.,* section 6, 58 FR 38145. Second, this proposed rule would set fees at a level sufficient to fund overall requirements and general operations related to USCIS IEFA programs. The current and proposed IEFA fees fund programs that are not associated with specific statutory fees or funded by annual appropriations. The proposed fees would also recover the difference between the full cost of adjudicating benefit requests and the revenue generated when such requests are fee exempt, in whole or in part, when the fees for such requests are set at a level below full cost by statute or policy, and when fees are waived, consistent with past fee calculation methodology. As noted, Congress provided that USCIS may set fees for providing adjudication and naturalization services at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. *See* INA sec. 286(m), 8 U.S.C. 1356(m).[27] DHS has long interpreted this statutory fee-setting authority, including the authorization to collect ''full costs'' for providing ''adjudication and naturalization services,'' as granting DHS broad discretion to include costs other than OMB Circular A–25 generally provides. *See* OMB Circular A–25, section 6d(1); INA sec. 286(m), 8 U.S.C. 1356(m). *See, e.g.,* 66 FR 65811 at 65813 (Dec. 21, 2001) (responding to commenters opposed to the use of IEFA fees to pay expenses for unrelated services by stating that those costs must be recovered from the fees charged to other applicants for immigration and naturalization benefits.). In short, DHS may charge fees at a level that will ensure recovery of all direct and indirect costs associated with providing immigration adjudication and naturalization services.[28]

Consistent with the historical position and practice of DHS, this proposed rule would set fees at a level that ensures recovery of the full operating costs of USCIS, the component within DHS that provides almost all immigration adjudication and naturalization services. *See* Homeland Security Act of 2002, Public Law 107–296, sec. 451, 116 Stat. 2142 (Nov. 26, 2002) (6 U.S.C. 271). Congress has historically relied on the IEFA to support the vast majority of USCIS programs and operations conducted as part of adjudication and naturalization service delivery. This conclusion is supported by Congress' limited historical appropriations to USCIS. The agency typically receives only a small annual appropriation for specific uses. USCIS must use fee revenues, as a matter of both discretion and necessity, to fund all operations associated with activities that USCIS is charged by law to administer that are not funded by other means.

Certain functions, including the Systematic Alien Verification for Entitlements (SAVE) program[29] and the Office of Citizenship,[30] which USCIS has administered since DHS's inception, are integral parts of fulfilling USCIS' statutory responsibility to provide immigration adjudication and naturalization services. They are not associated with specific fees, but they may be, and are, funded by the IEFA. Similarly, when a filing fee for an immigration benefit request, such as Temporary Protected Status (TPS), is capped by statute and does not cover the cost of adjudicating these benefit requests, DHS may recover the difference with fees charged to other immigration benefit requests. *See* INA sec. 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B) (capping TPS registration fee at $50); 8 CFR 103.7(b)(1)(i)(NN); proposed 8 CFR 106.2(a)(48)(i). Also, when DHS exempts certain benefit requests from filing fees, such as applications or

petitions from qualifying victims who assist law enforcement in the investigation or prosecution of human trafficking (T nonimmigrant status) or certain other crimes (U nonimmigrant status), USCIS recovers the cost of providing those fee-exempt or no-fee services through fees charged to other applicants and petitioners. *See, e.g.,* 8 CFR 103.7(b)(1)(i)(UU) and (VV) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(59) and (60).

OMB guidance gives agencies discretion to interpret when additional statutory requirements apply to user fees. *See* Circular A–25, section 4, 58 FR 38144. In that regard, in INA sec. 286(m), 8 U.S.C. 1356(m), Congress imposed on DHS an additional obligation—to recover the full cost of USCIS operations—over and above the advice in OMB Circular A–25 concerning the direct correlation or connection between costs and fees. Nevertheless, DHS follows OMB Circular A–25 to the extent possible while complying with Congress's directive, including directing that fees should be set to recover the costs of an agency's services in their entirety and that full costs are determined based upon the best available records of the agency. *See* OMB Circular A–25, section 6d(1). DHS applies the discretion provided in INA sec. 286(m), 8 U.S.C. 1356(m), to: (1) use activity-based costing (ABC) to establish a model for assigning costs to specific benefit requests in a manner reasonably consistent with OMB Circular A–25; (2) allocate costs for programs for which a fee is not charged or a law limits the fee amount, (3) distribute costs that are not attributed to, or driven by, specific adjudication and naturalization services; and (4) make additional adjustments to effectuate specific policy objectives.[31]

The ABC model distributes indirect costs. Indirect costs are not specifically identifiable with one output because they may contribute to several outputs. The ABC model uses a cause-and-effect relationship to distribute most indirect costs. *See* the supporting documentation included in this docket for information on direct and indirect costs. Costs that are not assigned to specific fee-paying immigration benefit requests are reallocated to other fee-paying immigration benefit requests outside the

---

[27] Congress has provided separate, but similar, authority for establishing USCIS genealogy program fees. *See* INA sec. 286(t), 8 U.S.C. 1356(t). The statute requires that genealogy program fees be deposited into the IEFA and that the fees for such research and information services may be set at a level that will ensure the recovery of the full costs of providing all such services. *Id.* The methodology for calculating the genealogy program fees is discussed in a separate section later in this preamble.

[28] Congress has not defined either term with any degree of specificity for purposes of paragraphs (m) and (n). *See, e.g., Barahona* v. *Napolitano,* No. 10–1574, 2011 WL 4840716, at \*\*6–8 (S.D.N.Y. Oct. 11, 2011) (''While the term 'full costs' appears self-explanatory, section 286(m) contains both silence and ambiguity concerning the precise scope that 'full costs' entails in this context.'').

[29] USCIS funds the SAVE program by user fees and IEFA funds, as Congress has not provided any direct appropriated funds for the program since FY 2007. SAVE provides an ''immigration adjudication . . . service'' under INA sec. 286(m) and (n) to Federal, state, and local agencies that require immigration adjudication information in administering their benefits.

[30] The Homeland Security Act created the Office of Citizenship at the same time as several other mission-essential USCIS offices, such as those for legal, budget, and policy. Like those offices, the Office of Citizenship has always been considered an essential part of the ''adjudication and naturalization services'' USCIS provides under section 286(m) and (n) of the INA. As Congress recognized in creating the Office of Citizenship in section 451(f) of the Homeland Security Act (6 U.S.C. 271(f)), providing information to potential applicants for naturalization regarding the process of naturalization and related activities. is an integral part of providing ''such services''

[31] DHS may reasonably adjust fees based on value judgments and public policy reasons consistent with its statutory authority and where a rational basis for the methodology is propounded in the rulemaking. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

model in a spreadsheet. The fee schedule spreadsheet adjusts the model results to effectuate a desired result such as a lower fee to encourage or not discourage the filing of a specific benefit request. For example, the model determines the direct and indirect costs for refugee workload. The costs associated with processing workload without fees or where fees do not recover full cost must be reallocated outside the ABC model. USCIS reallocates these costs to fee-paying immigration benefit requests, either among the same request, among all fee-paying requests or among certain unrelated fee-paying requests. For example, the costs of Form I–485 filings that are fee-waived are shifted to the Form I–485 filings that pay the fee. All immigration benefit request fees that recover their full cost also recover the cost of workloads without fees, such as refugee workload. In this proposal, USCIS is allocating more asylum costs to Forms I–129 and I–140 than the forms would receive without additional intervention. The supporting documentation in the docket contains an in-depth explanation of the ABC model and DHS has included documentation for the fee schedule spreadsheet in the docket for public review. USCIS acknowledges that its ABC model and fee schedule are complex, but both are necessary to allocate the costs of an agency with the size and breadth of purpose as USCIS. DHS invites the public to request a demonstration of how the fee calculations are affected by the direct and indirect cost allocation, shifting costs from free immigration benefits to others, and capping certain fees at decided-upon levels.

Typically, Congressional appropriations and two other small fee accounts represent between 2–5 percent (combined) of USCIS' annual budget.[32] Each has statutory limits for both amounts and uses. Appropriations are typically limited to use for E-Verify employment status verification and the Citizenship and Integration grant program. Congress authorizes or requires USCIS to carry out seemingly non-adjudicatory functions and approves the DHS budget, knowing that USCIS must use IEFA funds to cover those expenses which Congress does not otherwise fund through appropriations and statutory fees. Therefore, by approving the use of the IEFA every year to fund seemingly non-adjudicatory

functions, Congress acknowledges our construction.

### E. The Use of Premium Processing Funds Under the Emergency Stopgap USCIS Stabilization Act

On October 1, 2020, the Continuing Appropriations Act, 2021 and Other Extensions Act (Continuing Appropriations Act) was signed into law. Public Law 116–159 (Oct. 1, 2020). The Continuing Appropriations Act included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), which allows USCIS to establish and collect additional premium processing fees and to use premium processing funds for expanded purposes. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u). That statute is expected to result in continued increases to USCIS premium processing revenue. USCIS can now use premium processing revenue, if necessary, to provide the infrastructure needed to carry out a broader range of activities than previously authorized. Importantly for the purposes of this proposed rule, the USCIS Stabilization Act permits USCIS to make infrastructure improvements in adjudication processes and the provision of information and services to immigration and naturalization benefit requestors. 8 U.S.C. 1356(u)(4). The USCIS Stabilization Act also establishes higher fees for existing premium processing services and permits USCIS to expand premium processing to certain additional benefits. 8 U.S.C. 1356(u)(2) and (3). It also exempts the agency from the requirements of the Administrative Procedure Act (5 U.S.C. 553) when instituting section 4102(b)(1) of the USCIS Stabilization Act. In addition, it provides that the required processing timeframe for the newly designated benefits will not commence until all prerequisites for adjudication are received, which would include biometrics and background check results. *See* section 4102(b)(2) of the USCIS Stabilization Act.

On March 30, 2022, DHS published a final rule, "Implementation of the Emergency Stopgap USCIS Stabilization Act," implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule). The USCIS Stabilization Act requires that when DHS implements the expansion of immigration benefit types that are designated for premium processing, it must not result in an increase in

processing times for immigration benefit requests not designated for premium processing or an increase in regular processing of immigration benefit requests so designated.[33] For this reason, DHS did not make premium processing immediately available for all immigration benefit requests newly designated in the premium processing rule. *Id.* Rather, premium processing will be made available for a newly designated immigration benefit requests only when DHS determines that it will have the resources in place to adjudicate the requests within the time required, and that the availability of premium processing for that immigration benefit request will not adversely affect other immigration benefit requests not designated for premium processing or the regular processing of immigration benefit requests so designated.[34] Nevertheless, while acknowledging its peripheral impacts as an overlapping or interrelated rulemaking, DHS has determined that, at this time, premium processing revenue is not sufficient to appreciably affect non-premium fees. Thus, this proposed rule does not include changes directly resulting from the USCIS Stabilization Act or premium processing rule, except to conform 8 CFR 106.4 to the USCIS Stabilization Act's requirements. DHS recognizes, however, that it will have more information about the revenue collected from premium processing services by the time DHS publishes a final rule. If appropriate, DHS will consider including premium processing revenue and costs in the final rule. USCIS' forecasted demand for premium processing, revenue projections, and spending plans for the premium processing rule are discussed in greater detail in the premium processing rule. *See* 87 FR 18227 (Mar. 30, 2022). While DHS estimates that the premium processing rule will increase USCIS annual revenues over the next ten years, as stated previously, because of the resources required for expanding the availability of premium processing to newly designated immigration benefit requests, full implementation of expanded premium processing is estimated to be complete around FY 2025. This timeline for full implementation will allow current premium processing revenue to fund other authorized uses and strategic improvements until adequate revenues exist to cover the costs of providing expedited processing of the new

---

[32] This does not include the appropriations received for FY 2022 as discussed in detail earlier in this preamble.

[33] *See* Public Law 116–159, sec. 4102(c) (Oct. 1, 2020).

[34] *See* Public Law 116–159, sec. 4102(c) (Oct. 1, 2020).

requests. USCIS plans to use premium processing revenue to provide premium processing service, improve our information technology infrastructure, and reduce backlogs. Accordingly, although the revenue from premium processing is not considered in this proposed rule as previously indicated, the *costs* for USCIS to provide premium processing service, improve our information technology infrastructure, and reduce the backlog are also not considered in the proposed fees. Examples of premium processing costs include:

• Realignment of $25.1 million for IRIS Directorate information technology (IT) functions and support contracts in FY 2021.

• Office of Information Technology GE costs of $363.6 million and $497 million for FY 2021 and FY 2022 respectively.

• $57.5 million in FY 2021 and $58.1 million in FY 2022 for Service Center Operations general expenses.

Therefore, the projected revenue to be collected from future premium processing services established by the premium processing rule is too attenuated to be considered in the current biennial fee study and the ABC full cost recovery model used for this rule without placing USCIS at risk of revenue shortfalls if that revenue did not materialize. DHS has historically excluded premium processing revenue and costs from its IEFA fee reviews and rulemakings to ensure that premium processing funds are available for infrastructure investments largely related to information technology, are available to provide staff for backlog reduction, and to ensure that non-premium fees were set at a level sufficient to cover the base operating costs of USCIS. As noted above, if the revenue collected from premium processing services becomes more significant and certain before DHS publishes a final rule, DHS will consider including premium processing revenue and costs in the final rule. In the next USCIS biennial fee study, DHS will take into consideration the future effects of the premium processing rule and the USCIS Stabilization Act allowing for premium processing revenue to be used for more general uses than what was previously authorized.

*F. EB–5 Reform and Integrity Act of 2022*

On March 15, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022, Public Law 117–103. The EB–5 Reform and Integrity Act of 2022 immediately repealed the Regional Center Pilot Program created by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act 1993, Public Law 102–395, 106 Stat. 1828, sec. 610(b). The law also authorizes a new EB–5 Regional Center Program, effective May 14, 2022, and is authorized through FY 2026 and makes various changes to the program. As discussed more fully in section VIII.O. of this preamble, DHS proposes new fees for the forms used in the EB–5 program in this rule.

The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and completing the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). Further, the law provides that the fee adjustments that it requires are notwithstanding the requirements of INA section 286(m), 8 U.S.C. 1356(m), the authority under which we are publishing this rule. *Id.* The law also provides that the fee study required by 106(a) does not preclude DHS from adjusting its fees in the interim. *Id.* sec. 106(f). Therefore, DHS proposes new fees for the EB–5 program forms in this rule using the full cost recovery model described herein that we have used to calculate those fees since the program's inception and not the fee study parameters and processing time frames required by the EB–5 Reform and Integrity Act of 2022. USCIS will collect fees established under INA section 286(m), 8 U.S.C. 1356(m), for the EB–5 program, including as may be effected by a final rule for this proposed rule, until the fees established under section 106(a) of the EB–5 Reform and Integrity Act of 2022 take effect.

*G. Fee Review History*

1. Current State of USCIS Fee Schedule Regulations

On August 3, 2020, DHS published the 2020 fee rule, with an effective date of October 2, 2020, to adjust the USCIS fee schedule and make changes to certain other immigration benefit request requirements. On September 29, 2020, the United States District Court for the Northern District of California granted a motion for a preliminary injunction of the 2020 fee rule in its entirety and stayed the final rule's effective date in *ILRC*. On October 8, 2020, the United States District Court for the District of Columbia also granted a motion for a preliminary injunction and stay of the effective date of the final rule in *NWIRP*. DHS subsequently issued a notification of preliminary injunction on January 29, 2021, to inform the public of the two preliminary injunctions. *See* 86 FR 7493. The Department continues to comply with the terms of those orders and is not enforcing the regulatory changes set out in the 2020 fee rule. In addition to the changes made in the 2020 fee rule, in 2019 DHS revised USCIS fee waiver policies and USCIS Form 1–912, including by requiring fee waiver applicants to use the revised Form I–912, requiring waiver applicants to submit tax transcripts to demonstrate income, and not accepting evidence of receipt of a means-tested public benefit as evidence of inability to pay as described (''the 2019 Fee Waiver Revisions''). *See* USCIS Policy Manual Volume 1: General Policies and Procedures, Part B, Submission of Benefit Requests, Chapter 3, Fees and Chapter 4, Fee Waivers which were issued on October 25, 2019 and took effect on December 2, 2019 *City of Seattle* v. *Dep't of Homeland Sec.*, No. 3:19–CV–07151–MMC (N.D. Cal. Dec.; *see also* 84 FR 26137 (June 5, 2019) (30-day notice announcing changes to USCIS fee waiver polices and USCIS Form I–912, submission to OMB, and requesting public comment). On December 11, 2019, the United States District Court for the Northern District of California preliminarily enjoined the 2019 Fee Waiver Revisions in11, 2019) (''City of Seattle''). USCIS continues to accept the fees that were in place before October 2, 2020, and follow the guidance in place before October 25, 2019, to adjudicate fee waiver requests.

DHS and the parties in *ILRC, NWIRP, City of Seattle*, and the related cases agreed to, and the courts have approved, a stay of those cases while the agency undertook this fee review and prepared this notice of proposed rulemaking.

While DHS is enjoined from implementing or enforcing the 2020 fee rule, the revisions set out in that rule were codified. While 8 CFR part 106 and the other revisions set out in the 2020 fee rule are found in the CFR, DHS did not implement them and continues to charge the fees and follow the fee waiver policies that were, for the most part, in 8 CFR 103.7 as it existed before October 2, 2020. By this rulemaking, DHS will replace the enjoined regulations and correct the currently incorrect USCIS fee regulations in the CFR.

Because the 2020 fee rule was codified, this rule proposes to amend the text of certain changes made by the

2020 fee rule and codified in the CFR. However, because DHS did not implement the 2020 fee rule, this preamble discusses substantive changes that refer to the requirements of the regulations that existed before October 2, 2020. Likewise, the regulatory impact analysis (RIA) for this proposed rule analyzes the impacts of the changes between the pre-2020 fee rule regulations that DHS is following under the injunctions and those proposed in this rule.

This rule proposes relatively minor wording changes to the changes codified by the 2020 fee rule, and, in most cases, DHS is only proposing a new fee amount. However, because DHS could not implement the regulations codified on October 2, 2020, DHS does not believe that describing only the amendments to those sections is adequate to provide the affected public with what it needs to adequately review, understand, and comment on what is being proposed in this rule. Therefore, DHS has published entire portions of the regulatory text being proposed in this rule to provide a clear picture of what DHS is proposing, including sections that are codified in the CFR but were not implemented by USCIS.

Many of the proposed provisions in this rule are verbatim or close to verbatim to what is already codified, although enjoined. However, because those provisions are enjoined, DHS will address them as if they are newly proposed and cite to, for example, "proposed 8 CFR 106.2." When this preamble discusses the no longer codified but still in effect provisions of title 8 of the CFR, the standard of citing to the CFR print edition date [35] may be inaccurate because title 8 was amended by a number of rules during calendar year 2020. Therefore, when citing fee regulations as they existed on October 1, 2020, the regulatory citation will be followed by that date. For example, the citation for the Biometric Services fee that was removed by the 2020 fee rule but is still in effect would be written, "*See* 8 CFR 103.7(b)(1)(i)(C) (Oct. 1, 2020)." [36] When citing to a provision that was codified by the 2020 fee rule that is not proposed in this rule, the regulatory citation will be followed by the effective date of the 2020 fee rule. For example, the citation for the separate fees for different versions of

Form I–129 is cited as "8 CFR 106.2(a)(3) (Oct. 2, 2020)."

As stated previously, this rule would replace the changes about which the plaintiffs in *ILRC*, *NWIRP*, and *City of Seattle* brought suit. For clarity and to avoid unnecessary length in this rule, DHS is not repeating the amendatory instructions and regulatory text for certain changes that were made by the 2020 fee rule if the provision is ministerial, procedural, or otherwise non-substantive, such as a regulation cross reference, form number or form name. Specifically, DHS proposes to make no changes to the following provisions that were codified in the 2020 fee rule:

1. Replace "§ 103.7(b)(1) of this chapter" with "8 CFR 103.7(d)(4)" in 8 CFR 217.2.

2. Replace "§ 103.7(b)(1) of this chapter" with "8 CFR 103.7(d)(4)" in 8 CFR 217.2.

3. Remove "8 CFR 103.7," "8 CFR 103.7(b)" and "8 CFR 103.7(b)(1)" and "§ 103.7 of this chapter" and replace it with "8 CFR 106.2" in 8 CFR 204.6, 204.310, 204.311, 204.313, 211.1, 211.2, 212.2, 212.3, 212.4, 212.7, 212.15, 212.18, 214.1, 214.3, 214.6, 214.11, 214.16. 216.4, 216.5, 216.6, 223.2, 236.14, 236.15, 245.7, 245.10, 245.15, 245.18, 245.21, 245.23, 245a.12, 245a.13, 245a.20, 245a.33, 248.3, 264.2, 264.5, 264.6, 286.9, 301.1, 319.11, 320.5, 322.3, 322.5, 324.2, 334.2, 341.1, 341.5, 343a.1, 343b.1, 392.4.

4. Replace all references to "Form I–129" and any supplements, and adding in its place either "the form prescribed by USCIS," "application or petition," as appropriate in 8 CFR 214.1 and 214.2.

5. Replace "§ 103.7(b)(1) of this chapter" with "8 CFR 103.7(d)(4)" in 8 CFR 217.2.

6. In 8 CFR part 235, replace "§ 103.7(b)(1) of this chapter" and § "103.7(b)(1)" with "8 CFR 103.7(d)(3)" in 8 CFR 235.1, with "8 CFR 103.7(d)(7)" in 8 CFR 235.7, "8 CFR 103.7(d)(13)" in 8 CFR 235.12, and "8 CFR 103.7(d)(14)" in 8 CFR 235.13.

7. Remove the second sentence of § 245.21(b) and remove and reserve §§ 245.15(c)(2)(iv)(B) and (h)(2), 245.23(e)(1)(iii), and 245.24(d)(3) and (i)(1)(iv).

8. Replace "Missouri Service Center" with "National Benefit Center" in 8 CFR 245a.18, 245a.19, and 245a.33.

## 2. Previous Fee Rules

The USCIS IEFA fee schedule that is in effect was published in the DHS FY 2016/2017 fee rule. *See* 81 FR 73292 (Oct. 24, 2016).[37] That rule and associated rules became effective on December 23, 2016. With that rule, DHS adjusted the USCIS immigration benefits fee schedule for the first time in more than six years, increasing fees by

a weighted average of 21 percent. The fee schedule adjustment recovered all projected costs for FY 2016/2017, including the costs of the Refugee, Asylum, and International Operations Directorate (RAIO), SAVE, and the Office of Citizenship. *See* 81 FR 26911 and 73293.

The fee schedule had been adjusted previously as well, as follows:

• Before the creation of DHS, the Department of Justice (DOJ) Immigration and Naturalization Service (INS) [38] adjusted fees incrementally in 1994. *See* 59 FR 30520 (June 14, 1994).

• DOJ conducted a comprehensive fee review using ABC and adjusted most IEFA fees in 1998. *See* 63 FR 1775 (Jan. 12, 1998) (proposed rule); 63 FR 43604 (Aug. 14, 1998) (final rule).

• DOJ implemented fees for Nicaraguan Adjustment and Central American Relief Act (NACARA) between 1998 and 1999. *See* 63 FR 64895 (Nov. 24, 1998) (proposed rule); 64 FR 27856 (May 21, 1999) (final rule). DOJ adjusted fees for small volume workloads in 2000. *See* 64 FR 26698 (May 17, 1999) (proposed rule); 64 FR 69883 (Dec. 15, 1999) (final rule). DOJ implemented premium processing in 2001. *See* 66 FR 29682 (June 1, 2001). DOJ adjusted fees for inflation in 2002. *See* 66 FR 65811 (Dec. 21, 2001).

• Following the creation of DHS in 2002, the agency adjusted fees in 2004 and 2005. *See* 69 FR 20528 (Apr. 15, 2004); 70 FR 50954 (Aug. 29, 2005) (increasing the fee for Form I–290B from $110 to $385); 70 FR 56182 (Sept. 26, 2005).

• After those incremental changes, DHS published a comprehensive FY 2008/2009 fee rule in 2007. *See* 72 FR 29851 (May 30, 2007).

• DHS further amended USCIS fees in the FY 2010/2011 fee rule. *See* 75 FR 58962 (Sept. 24, 2010). This rule removed the costs of RAIO, SAVE, and the Office of Citizenship from the fee schedule, in anticipation of appropriations from Congress that DHS requested. *See* 75 FR 58961, 58966. These resources did not fully materialize, requiring USCIS to use other fee revenue to support these programs in the time between the FY 2010/2011 fee rule and the FY 2016/ 2017 fee rule. *See* 81 FR 26910–26912.

The supporting documentation accompanying this proposed rule in the

---

[35] The soft bound print edition of the CFR is revised on a quarterly basis. Titles 1 through 16 are revised as of January 1 each year.

[36] Readers may find the OFR's eCFR a useful tool to review historic regulatory text. For more information on viewing historical versions of the eCFR, *see https://www.ecfr.gov/reader-aids/using-ecfr/ecfr-changes-through-time.*

[37] The phrase "FY 2016/2017 fee rule," as used in this proposed rule, encompasses the fee review, proposed rule, final rule, and all supporting documentation associated with the regulations effective as of December 23, 2016.

[38] The Homeland Security Act of 2002 abolished the INS and transferred the INS's immigration administration and enforcement responsibilities from DOJ to DHS. The INS's immigration and citizenship services functions were specifically transferred to the Bureau of Citizenship and Immigration Services, later renamed U.S. Citizenship and Immigration Services. *See* Public Law 107–296, sec. 451 (6 U.S.C. 271).

rulemaking docket at *https://www.regulations.gov* contains a historical fee schedule that shows the immigration benefit fee history since October 2005.[39]

3. Current Fees

Table 2 summarizes the IEFA and biometric services fee schedule that took effect on December 23, 2016. DHS is proposing to change the current fee

schedule as a result of the FY 2022/2023 fee review. The table excludes statutory fees that DHS cannot adjust or can only adjust for inflation.

BILLING CODE 9111–97–P

| Table 2: Current Non-Statutory IEFA Immigration Benefit Request Fees | | |
|---|---|---|
| **Form No.[40]** | **Title** | **Fee** |
| G-1041 | Genealogy Index Search Request | $65 |

| Table 2: Current Non-Statutory IEFA Immigration Benefit Request Fees | | |
|---|---|---|
| **Form No.[40]** | **Title** | **Fee** |
| G-1041A | Genealogy Records Request | $65 |
| I-90 | Application to Replace Permanent Resident Card | $455 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 |
| I-129/ 129CW | Petition for a Nonimmigrant Worker | $460 |
| I-129F | Petition for Alien Fiancé(e) | $535 |
| I-130 | Petition for Alien Relative | $535 |
| I-131[41] | Application for Travel Document | $575 |
| I-131A | Application for Carrier Documentation | $575 |
| I-140 | Immigrant Petition for Alien Worker | $700 |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)[42] | $930 |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant | $930/585[43] |
| I-193 | Application for Waiver of Passport and/or Visa | $585 |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 |
| I-290B | Notice of Appeal or Motion | $675 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | $435 |
| I-485 | Application to Register Permanent Residence or Adjust Status | $1,140 |
| I-485 | Application to Register Permanent Residence or Adjust Status (certain applicants under the age of 14 years)[44] | $750 |
| I-526 | Immigrant Petition by Standalone Investor | $3,675 |
| I-526E | Immigrant Petition by Regional Center Investor | $3,675 |
| I-539 | Application to Extend/Change Nonimmigrant Status | $370 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | $775 |
| I-600A | Application for Advance Processing of an Orphan Petition | $775 |
| I-601 | Application for Waiver of Grounds of Inadmissibility | $930 |

[39] For IEFA fee history before 2005, see USCIS, "FY 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum" (Oct 25, 2016), *https://www.regulations.gov/document/USCIS-2016-0001-0466*. Appendix VIII—IEFA Fee History, page 56, provides fees from FY 1985 to Nov. 2010.

| Form No.[40] | Title | Fee |
|---|---|---|
| I-601A | Application for Provisional Unlawful Presence Waiver | $630 |
| I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 |
| I-687 | Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | $1,130 |
| I-690 | Application for Waiver of Grounds of Inadmissibility | $715 |
| I-694 | Notice of Appeal of Decision under Section 210 or 245A | $890 |
| I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 |
| I-751 | Petition to Remove the Conditions on Residence | $595 |
| I-765 | Application for Employment Authorization | $410 |
| I-800 | Petition to Classify Convention Adoptee as an Immediate Relative | $775 |
| I-800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 |
| I-800A Supp. 3 | Request for Action on Approved Form I-800A | $385 |
| I-817 | Application for Family Unity Benefits | $600 |
| I-824 | Application for Action on an Approved Application or Petition | $465 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | $3,750 |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal[45] | $285/570 |
| I-905 | Application for Authorization to Issue Certification for Health Care Workers[46] | $230 |
| I-910 | Application for Civil Surgeon Designation | $785 |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 |
| I-941 | Application for Entrepreneur Parole[47] | $1,200 |

**Table 2: Current Non-Statutory IEFA Immigration Benefit Request Fees**

| Form No.[40] | Title | Fee |
|---|---|---|
| I-956 | Application for Regional Center Designation (formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program) | $17,795 |
| I-956G | Regional Center Annual Statement (formerly Form I-924A, Annual Certification of Regional Center) | $3,035 |
| N-300 | Application to File Declaration of Intention | $270 |
| N-336 | Request for a Hearing on a Decision in Naturalization Proceedings | $700 |
| N-400 | Application for Naturalization | $640 |
| N-400 | Application for Naturalization (Reduced Fee) | $320 |
| N-470 | Application to Preserve Residence for Naturalization Purposes | $355 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | $555 |
| N-600 | Application for Certification of Citizenship | $1,170 |
| N-600K | Application for Citizenship and Issuance of Certificate Under Section 322 | $1,170 |
| Other | USCIS Immigrant Fee | $220 |
| Other | Biometric Services Fee | $85 |
| Other | H-1B Electronic Registration Fee (per beneficiary) | $10 |

**Table 2: Current Non-Statutory IEFA Immigration Benefit Request Fees**

BILLING CODE 9111–97–C

## IV. Fee-Setting Approach—Reversal of 2020 Fee Rule

In the 2020 fee rule NPRM, DHS explained that it was shifting its fees away from an ability-to-pay model to a beneficiary-pays model. *See* 84 FR 62298 (Nov. 14, 2019); *see also* 85 FR 46795 (Aug. 3, 2020) (final rule stating that DHS had proposed shifting to a beneficiary-pays model). As described by the U.S. Government Accountability Office (GAO), under the beneficiary-pays principle, the beneficiaries of a service pay for the cost of providing that service.[48] Under the ability-to-pay principle, those who are more capable of bearing the burden of fees pay more for the service than those with less ability to pay. *Id.* Before the 2020 fee rule, DHS engaged in a balance of these two fee-setting principles when setting USCIS fees. Generally, DHS has given more weight to the ability-to-pay than the beneficiary-pays principle when setting USCIS fees, and has made affordability a central consideration.[49] At the same time, DHS has not wholly rejected the beneficiary-pays principle, including when the agency made clear that it would not authorize fee waivers

[40] Form, when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in a paper format or, when DHS does not set these fees. *See* 8 CFR 103.7(b)(1)(i)(M)(*1*) and (*2*) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(7)(i) and (ii).

[41] As described in this notice of proposed rulemaking (NPRM), the United States' obligations under the 1967 Protocol relating to the Status of Refugees (incorporating Article 28 of the 1951 Convention relating to the Status of Refugees) guide the Application for Travel Document fees for a Refugee Travel Document. The USCIS ABC model does not set these fees. *See* 8 CFR 103.7(b)(1)(i)(O) (Oct. 1, 2020).

[42] Form I-191 was previously titled Application for Advance Permission to Return to Unrelinquished Domicile. *See* 8 CFR 103.7(b)(1)(i)(O) (Oct. 1, 2020).

[43] The Form I-192 fee remained $585 when filed with and processed by U.S. Customs and Border Protection (CBP). *See* 8 CFR 103.7(b)(1)(i)(P) (Oct. 1, 2020).

[44] This reduced fee is applied to "an applicant under the age of 14 years when [the application] is:

(*i*) Submitted concurrently with the Form I-485 of a parent; (*ii*) The applicant is seeking to adjust status as a derivative of his or her parent; and (*iii*) The child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." 8 CFR 103.7(b)(1)(i)(U)(*2*) (Oct. 1, 2020).

[45] Currently there are two USCIS fees for Form I-881: $285 for individuals and $570 for families. *See* 8 CFR 103.7(b)(1)(i)(QQ)(*1*) (Oct. 1, 2020). DOJ's Executive Office for Immigration Review (EOIR) has a separate $165 fee, which applies when one or more applicants file in the immigration court.

[46] USCIS excluded Form I-905, Application to Issue Certification for Health Care Workers, from the FY 2022/2023 fee review. As such, it will not appear in any tables in this NPRM that display results of the FY 2022/2023 fee review. USCIS does not have a FY 2022/2023 forecast for Form I-905 because it has a five-year renewal cycle and only four applicants file it. USCIS adjudicates it manually, meaning it does not track the filings in any case management system. Future fee reviews may evaluate this fee if more information is available.

[47] USCIS excluded Form I-941, Application for Entrepreneur Parole, from the FY 2022/2023 fee review. As such, it will not appear in tables for workload, in tables for fee-paying volume, or elsewhere in this NPRM. DHS published a separate NPRM that proposed to terminate the program. *See* 83 FR 24415 (May 29, 2018). However, DHS withdrew that NPRM. *See* 86 FR 25809 (May 11, 2021). As of Sep. 30, 2021, there are 24 FY 2021 receipts and only 54 receipts since the beginning of the program. DHS does not believe it has sufficient information to review this fee at this time. DHS does not propose any changes to this fee but may evaluate the fee in future fee reviews when more information is available.

[48] *See* GAO, "Federal User Fees: A Design Guide" (May 29, 2008), *https://www.gao.gov/products/GAO-08-386SP*, at 7–12.

[49] *See* 81 FR 26934 (May 4, 2016) (stating, "The lower fee would help ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means.").

where such a waiver is inconsistent with the benefit requested, which may require establishing financial stability. *See* 75 FR 58974 (Sept. 24, 2010). In addition, in past fee rules, DHS has declined to expand USCIS fee waivers to benefits for which the eligibility requires financial stability because that would contradict the rationale for shifting costs related to those applications to others through fee waivers. *See* 72 FR 29863 (May 30, 2007). DHS has also previously declined suggestions that it reduce the burden on low-income requestors by setting USCIS fees based on income using a tiered fee system, because the benefits from such a scenario would not justify the administrative costs added by requiring officers to adjudicate the documentation of the applicant's income and eligibility for the requested fee level before processing the request. *Id.* In the 2020 fee rule, DHS was concerned that the level of USCIS annual forgone revenue from fee waivers and exemptions had increased markedly from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review. *See* 85 FR 46807 (Aug. 3, 2020) (citing 81 FR 26922 and 73307). DHS estimated in the 2020 fee rule supporting documentation that, without changes to fee waiver policy, it would forgo revenue of almost $1.5 billion and believed that the fees necessary to recoup that foregone revenue [50] were too high to support the continuation of the existing fee waiver policy.[51] DHS notes, however, that in the 2020 fee rule, the agency did not abandon the ability-to-pay principle altogether, and still provided for fee exemptions and statutorily mandated fee waivers in certain circumstances.

In this new fee rule, DHS proposes to return the focus of its fee-setting away from emphasizing the beneficiary-pays principle towards the historical balance between the beneficiary-pays and ability-to-pay principles. DHS proposes this for several reasons.

First, DHS has been directed by the President to reduce barriers and promote accessibility to the immigration benefits that it administers. *See* Executive Order 14012, 86 FR 8277 (Feb. 2, 2021) (E.O. 14012). As the President noted in section 1 of the Executive order, new Americans and their children fuel our economy; contribute to our arts, culture, and

government; and have helped the United States lead the world in science, technology, and innovation. DHS agrees with the President's goals of E.O. 14012, and that our laws and policies must encourage full participation by immigrants, including refugees, in our civic life, and that immigration benefits must be delivered effectively and efficiently. More specifically, sections 3(a)(i) and 5(a)(iii) of E.O. 14012, respectively, instruct the Secretary of Homeland Security to identify barriers that impede access to immigration benefits and make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee and restoration of the fee waiver process. *Id.* USCIS has already taken crucial steps towards ensuring fair access and removing unnecessary barriers and bureaucracy. *See, e.g.,* Preserving Continuous Residence and Physical Presence for Purposes of Naturalization while Engaged in Religious Duties Outside the United States (May 25, 2021);[52] Naturalization Eligibility and Voter Registration Through a State's Benefit Application Process (May 27, 2021);[53] Veterans Residing Outside the United States and Naturalization (May 28, 2021);[54] Assisted Reproductive Technology and In-Wedlock Determinations for Immigration and Citizenship Purposes (August 5, 2021);[55] Clarifying Guidance on Military Service Members and Naturalizing (November 12, 2021);[56] Demonstrating Eligibility for

Modification under Section 337 (November 19, 2021).[57]

As part of implementing Executive Order 14012, USCIS published a Request for Public Input [58] (RPI) on reducing barriers and burdens across USCIS benefits and services as part of implementing Executive Order 14012. It received nearly 7,400 public comments as a result. USCIS analyzed these comments and incorporates actionable suggestions into this proposed rule including expanding fee exemptions, clarifying the financial hardship criteria for fee waivers, and maintaining the reduced fee for naturalization.

Second, DHS has read and considered the many comments that we received on the 2020 fee rule that stated that the increased fees and restrictions on fee waivers in that rule would result in many fewer residents accessing a desired immigration status for which they are eligible, simply because they cannot afford to apply. Others wrote that the proposed naturalization fee increase would make naturalization unaffordable. Thus, many public comments on the 2020 fee rule indicated a preference for DHS placing greater emphasis on the ability-to-pay principle in setting its fees. As a result of these comments, and to encourage full economic and civic participation by immigrants, DHS has also analyzed the effects of this rule in light of its impacts on low-income populations and organizations that assist them in section IX.A, Impact of Fees.

As stated earlier, DHS is operating under two injunctions that preclude it from implementing or following the changes made by the 2020 fee rule, as well as an injunction that precludes it from implementing the 2019 Fee Waiver Revisions. Thus, DHS must consider the concerns expressed and the courts' findings in those cases. For example, in *ILRC,* the order granting the injunction found that DHS failed to analyze the effect of that rule's fees on the demand for immigration benefit requests. The order also found that the rule's deviations from the beneficiary-pays principle conflict with the comments presented on the effects of these changes on low-income and vulnerable

---

[50] In this context, "foregone revenue" refers to the dollar value associated with an approved fee waiver or fee-exempt forms and benefits.

[51] *See, e.g.,* 85 FR 46799 (Aug. 3, 2020) (stating that the fee for Form N–400 would represent the estimated full cost to USCIS would be determined in the same manner as most other USCIS fees).

[52] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Preserving Residence, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210525-Preserving Residence.pdf* (last updated May 25, 2021).

[53] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Naturalization Eligibility and Voter Registration Through a State's Benefit Application Process, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210527-VoterRegistration.pdf* (last updated May 27, 2021).

[54] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Veterans Residing Outside the United States and Naturalization, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210528-MilitaryVeterans.pdf* (last updated May 28, 2021).

[55] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Assisted Reproductive Technology and In-Wedlock Determinations for Immigration and Citizenship Purposes, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210805-AssistedReproductive Technology.pdf* (last updated Aug 5, 2021).

[56] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Clarifying Guidance on Military Service Members and Naturalization, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20211112-Military Naturalization.pdf* (last updated Nov 12, 2021).

[57] This guidance allows children born to married legal parents, one of whom has a genetic or gestational link to the child, to acquire citizenship because these children are now considered born in wedlock. Immigration and Nationality Act. U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Demonstrating Eligibility for Modification under Section 337 of the Immigration and Nationality Act, *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20211119-ModificationUnderINA337.pdf* (last updated Nov 19, 2021).

[58] *See* 86 FR 20398 (Apr. 19, 2021).

immigrant populations. *See ILRC* at 27. Similarly, the court in *NWIRP* agreed with the plaintiffs that the fees and fee waiver regulations in the 2020 fee rule could cause harm to low-income immigrants. *See NWIRP* at 72.

DHS proposes to set USCIS fees at the level required to recover the full cost of providing immigration adjudication and naturalization services, as permitted or required by law, while providing certain fee exemptions and waivers for low-income immigrants. As USCIS estimates that the current fee structure will not generate sufficient revenue to cover the projected costs of providing immigration adjudication and naturalization services under the ABC methodology, the fees for many immigration benefit requests will by necessity increase. Nevertheless, where DHS has determined that this rule's approach would inequitably impact the ability of those who may be less able to afford the proposed fees to seek an immigration benefit for which they may be eligible, DHS proposes either to maintain the pre-2020 fee rule regulations, fee waivers, and reduced fees that USCIS is following, or to add new fee exemptions to address accessibility and affordability. For example, as detailed more fully later in this preamble, DHS proposes to maintain the fee waiver regulations and eligibility guidance that took effect in 2010. Consistent with previous fee rules, DHS also proposes to limit the fees for certain benefit requests in recognition that fees set at the ABC model output for these forms would be overly burdensome. For example, as detailed later in this preamble, both considering the affordability of naturalization, and to promote naturalization for the benefits it provides to the country, DHS proposes to set the fee for Form N–400 at a level below what is required to recover the estimated full cost of providing naturalization services. In addition, DHS proposes to expand fee exemptions for certain vulnerable populations, as described later in this preamble.[59]

DHS acknowledges that the ability-to-pay principle necessarily requires the shifting of costs. If some customers are exempt from paying fees or have their fees waived, total fee collections cannot cover the total program costs unless other users pay higher fees to cover the costs associated with processing the benefit requests of non-paying users. USCIS follows the principles in OMB Circular A–25 and uses an ABC model to align its fees closely with the estimated cost for the relevant service.

When DHS deviates from the ABC model to limit, waive, or exempt customers from fees because they are overly burdensome, or to advance a public policy priority, this results in the fees for particular services being set at a level that is higher than the estimated cost of providing those services to fee-paying users. That means that DHS examined each fee in this proposed rule, and the fees proposed represent the Department's best effort to balance of access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate services.

## V. FY 2022/2023 Immigration Examinations Fee Account Review

### A. USCIS Projected Costs and Revenue

The primary objective of the fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund anticipated operating costs associated with administering USCIS' role in the Nation's legal immigration system. USCIS examines its recent budget history, service levels, and immigration and naturalization trends to forecast costs, revenue, and operational metrics. These data help USCIS identify the difference between anticipated costs and revenue as well as calculate proposed fees. DHS provides a brief summary of how the USCIS budget has evolved from the projections included in the FY 2016/2017 fee rule for context before discussing the elements of the FY 2022/2023 fee review. The FY 2022/2023 fee review encompasses three core elements:

- Cost projections;
- Revenue projections; and
- Cost and revenue differential (the difference between cost and revenue projections).

#### 1. USCIS Budget History

USCIS' costs have grown beyond the levels projected in the FY 2016/2017 fee rule, which went into effect on December 23, 2016. This cost growth reflects increased USCIS workloads and staffing requirements during that time. The FY 2016/2017 fee rule estimated that an average annual IEFA non-premium cost projection of $3,037.8 million was required to meet USCIS' operational requirements.

Spending grew by $1 billion or 28 percent between FY 2016 and FY 2019, while revenue only grew by $406 million or 12 percent during the same period. Spending was driven by $943 million of one-time and recurring enhancements provided over the same time period due to a leadership

directive to reduce carryover to around $800 million. The majority of this increased spending was attributed to an additional 3,800 positions that were added between FY 2017 and FY 2019.[60] No enhancements were added in FY 2020 due to budget reductions. Increased spending in enhancements in FY 2019 were approved based on the assumption that the FY 2019/2020 fee rule would be implemented in the summer of FY 2019, however subsequent to those decisions the FY 2019/2020 fee rule was delayed until the end of FY 2020.

Despite the spending increases between FY 2016 and FY 2019, USCIS did not always spend as much as the plan called for, and carryover remained in a relatively strong position (about $1.2 billion) at the end of both FY 2017 and FY 2018. By the end of FY 2019, however, carryover had decreased to about $850 million. In first half of FY 2020, before the onset of the COVID–19 pandemic, the agency had substantially increased its first and second quarter spending, due to the timing of contracts and on-board levels; this drew carryover down to about $600 million at the end of February, with less than $200 million in non-premium carryover, which funded 80 percent of USCIS operations. Although USCIS had surplus premium funding of about $400 million, those funds were fenced due to statutory restrictions and could not be used to offset the deficit.

In the Spring of 2020, in the wake of the COVID–19 pandemic, USCIS revenue dropped by 40 percent in April and an additional 25 percent in May from the forecasted collections. That created a possibility that USCIS might violate statutory anti-deficiency requirements and led to dramatic cuts in spending through the last half of FY 2020, a hiring freeze, and planned furloughs if revenue did not increase.

Towards the end of June and July of 2020, revenue began to return to normal levels, and in conjunction with major budget cuts, allowed USCIS to avoid the furloughs. In FY 2021, USCIS instituted 32 percent cuts to non-payroll expenses, continued the hiring freeze through April 2021, and did not fund enhancements. While USCIS carryover has stabilized and is projected to be over $600 million from non-premium fees at the end of FY 2022, USCIS is still living with effects of those 32 percent budget cuts. USCIS has a minimum carryover

---

[59] *See* section VII, Fee Exemptions.

[60] See the supporting documentation in the docket for this rule for more information. Appendix Table 9 on page 49 shows on-board staffing by office and fiscal year. Please note that on-board staffing is a subset of authorized staffing.

threshold of $1,063.8 million in the non-premium IEFA.[61]

The FY 2021 non-premium IEFA cost projections, which USCIS uses as the base for its FY 2022/2023 fee review cost projections, totals $3,776.3 million.[62] As discussed later in greater detail, the FY 2022/2023 fee review projects costs of $5,150.7 million for USCIS to fulfill its IEFA non-premium operational needs on an average annual basis.

| **Table 3: FY 2016/2017 Fee Rule Cost Projections vs. FY 2021 Operating Plan (Dollars in Thousands)** | | | | |
|---|---|---|---|---|
| **Type** | **FY 2016/2017 Average** | **FY 2021 Operating Plan** | **Difference** | **Change** |
| Payroll | $1,631,320 | $2,309,288 | $677,967 | 41.6% |
| Non-Payroll | $1,406,466 | $1,467,050 | $60,584 | 4.3% |
| **Total** | **$3,037,786** | **$3,776,338** | **$738,552** | **24.3%** |

The combined average non-payroll or general expenses (GE)[63] budget for the FY 2016/2017 fee review of $1,406.5 million increased by only 4.3 percent to $1,467.0 million in the FY 2021 Operating Plan (OP), which is a detailed spend plan for the agency that is finalized in the summer before the start of the fiscal year. Typically, the operating plan is executed closely to the original plan and is indicative of the resources needed for each of the Directorates and Program Offices to execute throughout the year. Excluding increased contingency funding, the GE budget actually decreased from $1,406.5 million in the FY 2016/2017 fee review to $1,258.0 million in the FY 2021 OP, a decrease of $148.5 million or 10.6 percent. As evidenced by the financial strains placed on USCIS by the COVID–19 pandemic, however, USCIS must maintain additional contingency funding to deal with emergent operational needs and provide funding in the event of unforeseen financial shortfalls and seasonal fluctuations in filing volumes and revenues.[64] Additionally, GAO acknowledges that fee funded agencies may need to designate funds as operating reserves to weather periods when revenue collections are lower than costs.[65] Therefore, USCIS decided to increase its contingency cost projection in the FY 2021 OP and maintain the same level in the fee review cost budget in case of continued negative effects from the pandemic. USCIS may use contingency

funding to cover emergent costs from policy decisions, renegotiation of contracts, or new leases that were not included initially in the OP or in the projected biennial period's cost budget.

The limited growth in USCIS' GE budget is the result of actions taken by USCIS to constrain cost growth. In response to reduction in applicant volume and associated revenues during the COVID–19 pandemic, USCIS implemented significant GE cost-saving measures in FY 2020 and FY 2021. These cuts enabled USCIS to redirect resources to fund payroll and ensure that USCIS did not have to furlough any employees. These cuts included GE reductions of up to 32 percent across all USCIS offices, including a pause on new GE expenditure, reduced travel, implementing shorter periods of performance for contracts, and a freeze on implementing new contracts. Notable examples of GE budget decreases from FY 2016/2017 to FY 2021 include:

• $103.7 million (32 percent) decrease in IT equipment, software, and related contractor support;

• $36.8 million (52.2 percent) decrease in the USCIS Office of Citizenship and Applicant Information Services' (CAIS) GE budget, which included a reduction to the call center support contract and removal of Office of Citizenship grants that were included in the FY 2016/2017 fee rule budget;

• $27.3 million (59.9 percent) decrease in travel and training across all USCIS offices; and

• $52.4 million (83 percent) decrease in Service Center Operations (SCOPS) contractor support.

While USCIS will need to reverse some of the GE spending cuts it has made to ensure the continuation of its operations, USCIS projects that some of these cuts will be permanent, in an effort to limit cost growth and the increase in fees. Further details of restored GE budget cuts in the FY 2022/2023 fee review cost projections are found in section V.A.2.a of this preamble.

In contrast to the limited growth in non-payroll expenses relative to the FY 2016/2017 fee review budget, USCIS' payroll costs have increased substantially due to an increase in staffing. The combined average IEFA non-premium payroll budget for the FY 2016/2017 fee review of $1,631.3 million increased by 41.6 percent to $2,309.3 million in the FY 2021 OP. USCIS experienced a significant increase in application volume during the FY 2016/2017 to FY 2021 period and adjusted its staffing requirements accordingly. The FY 2016/2017 fee review accounted for 14,543 fully funded positions, while as of pay period 6 of FY 2021 (March 27, 2021) USCIS had 18,840 positions authorized to be funded with IEFA non-premium funds (an increase of 29.5 percent). This greater number of positions reflects increased operational demands on USCIS, including growth in workload volumes, growth in the time required

---

[61] See the IEFA Non-Premium Carryover Projections section of the supporting documentation for how and why USCIS requires a minimum carryover balance.

[62] The USCIS FY 2021 Annual Operating Plan amount of $3,776 million was reported in the FY 2022 Congressional Budget Justification and USCIS used this amount for cost projections to develop the proposed new fee structure. In March 2021, the USCIS FY 2023 Congressional Budget Justification

reported a different total FY 2021 Annual Operating Plan of $3,524 million. This fee review uses the earlier FY 2021 operating plan amount, which was a reasonable assumption at the time.

[63] General expenses (GE) refers to non-pay expenses, such as office equipment, technology, training, and travel.

[64] See USCIS, ''Deputy Director for Policy Statement on USCIS' Fiscal Outlook'' (June 25, 2020), https://www.uscis.gov/news/news-releases/

deputy-director-for-policy-statement-on-uscis-fiscal-outlook. See also USCIS, ''USCIS Averts Furlough of Nearly 70% of Workforce (Aug. 25, 2020), https://www.uscis.gov/news/news-releases/uscis-averts-furlough-of-nearly-70-of-workforce.

[65] See U.S. Government Accountability Office, Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability (Sept. 30, 2013), https://www.gao.gov/assets/gao-13-820.pdf.

per case which is in part driven by a combination of changing adjudication policy and length of the forms, and expanded responsibilities for other offices, such as Fraud Detection and National Security (FDNS), including social media vetting.[66] Payroll budget increases from FY 2016/2017 to FY 2021 include:

• New positions across all USCIS offices: $324.2 million (19.9 percent). Due to the operational impact of the COVID–19 pandemic and potential furlough of USCIS employees, FY 2020 and FY 2021 did not have any new authorized positions;

• Pay raises: $167.7 million (10.0 percent). Pay raises were 1.3 percent in FY 2016 and 1.0 percent in FY 2021.[67] The highest annual pay raise of 3.1 percent occurred in FY 2020; and

• Significant payroll increases due to an increase in staffing levels in these USCIS offices and directorates:
  ○ Asylum Division: $49.7 million (40.2 percent);
  ○ Field Office Directorate: $150.5 million (24.7 percent);
  ○ FDNS: $91.4 million (73.6 percent); and
  ○ SCOPS: $184.6 million (68.7 percent).

### 2. FY 2022/2023 Cost Projections

In developing projected program needs for FY 2022/2023, USCIS used the FY 2021 operating plan (OP) as the starting point. Actual and anticipated changes from the FY 2021 OP are discussed in this section. Enacted funds from FY 2022 are not included in the projections. In addition, there are standard pay adjustments and increases to programs to maintain current services that are fairly standard in budget development. Examples of necessary adjustments include:

• Pay inflation and within-grade pay step increases ($2.67 billion in FY 2022 and an additional $2.76 billion in FY 2023). The assumed Government-wide pay inflation rate for FY 2022 and FY 2023 is 2.7 percent and 1.6 percent respectively.

• Staffing requirements ($315.7 million in FY 2022 and an additional $34.8 million in FY 2023). USCIS models staffing allocations and costs based on projected workload volumes. See section V.B. of this preamble for information on how workload and completion rates affect staffing. Staffing allocation model cost estimates are also influenced by position type, grade level and locality.

Overall, the IEFA cost baseline increases by 35.3 percent in FY 2022 and 37.4 percent in FY 2023 both relative to the FY 2021 OP. A detailed summary of adjustments to the FY 2021 OP that resulted in the projected budget requirements for FY 2022 and FY 2023 follows.

Despite the growth in USCIS' IEFA non-premium budget from the levels projected in the FY 2016/2017 fee review to the levels in the FY 2021 OP, USCIS remains underfunded to accomplish its operational objectives, and processing backlogs continue to grow. See section III.A of this preamble for information on supplemental appropriations for the backlog.[68] USCIS projects that its IEFA non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. This increase in funding will ensure that USCIS is able to meet its operational needs during the biennial period. The following subsections provide more details on the required increases for the FY 2022/2023 cost projections.

**Table 4: FY 2021 Operating Plan vs. FY 2022/2023 Fee Review Cost Projections (Dollars in Thousands)**

| Type | FY 2021 Operating Plan | FY 2022/2023 Average | Difference | Change | Percent of Total Change |
|---|---|---|---|---|---|
| Payroll | $2,309,288 | $3,347,853 | $1,038,565 | 45.0% | 75.6% |
| Non-Payroll | $1,467,050 | $1,802,854 | $335,805 | 22.9% | 24.4% |
| **Total** | **$3,776,338** | **$5,150,708** | **$1,374,370** | **36.4%** | **100.0%** |

#### a. General Expenses

In the USCIS cost projections, GE represent all costs that are not related to pay or benefits of employees. USCIS

estimates that its GE budget must increase by $335.8 million (22.9 percent) from $1,467.0 million in FY 2021 to a combined average of $1,802.9

million in the FY 2022/2023 fee review cost projections. Excluding contingency funding, USCIS projects the GE budget must increase from $1,258.0 million in

---

[66] In 2004, USCIS established the Fraud Detection and National Security Directorate (FDNS) in response to a Congressional recommendation to establish an organization "responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner prior to granting immigration benefits." See, Conference Report to accompany H.R. 4567 [Report 108–774], "Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005," p. 74, available at https://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf. The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are funded by statutorily set fees, and divided among USCIS (for fraud detection

and prevention), the National Science Foundation, and the U.S. Department of Labor. See 8 U.S.C. 1356(v)(2)(B). FDNS is funded out of both the IEFA and the fraud detection and prevention account because the fees fixed by the statute are insufficient to cover the full costs of FDNS. The Fraud fee account revenue collections are divided in three thirds, one for the Department of State, one for the Department of Labor, and one for USCIS. https://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf. The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are funded by statutorily set fees, and divided among USCIS (for fraud detection and prevention), the National Science Foundation, and the U.S. Department of Labor. See 8 U.S.C. 1356(v)(2)(B). FDNS is funded out of both the IEFA and the fraud detection and prevention account because the fees fixed by the statute are insufficient

to cover the full costs of FDNS. The Fraud fee account revenue collections are divided in three thirds, one for the Department of State, one for the Department of Labor, and one for USCIS.

[67] For a history of Federal salary data, see Office of Personnel Management (OPM), Policy, Data, Oversight: Pay and Leave available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/. OPM sets Federal salary levels, not DHS.

[68] The appropriated funds will be focused mainly on reducing current backlogs and not on processing future requests. If USCIS does not increase revenue to meet the costs of timely adjudicating all incoming receipts as proposed in this rule, USCIS will not be able to keep up with demand and backlogs are likely to rematerialize despite the funds provided for clearing those requests on hand.

FY 2021 to $1,592.7 million in FY 2022/2023, or 26.6 percent. This increase in GE is primarily the result of the planned reversal of reductions made in FY 2020 and FY 2021 due to the COVID–19 pandemic. These reductions were necessary at the time to preserve the financial stability of USCIS, but some of them must be reversed to ensure that USCIS can adequately perform the adjudication and naturalization services that it is statutorily charged to administer. Notable examples of increases in the GE budget from FY 2021 to the FY 2022/2023 fee review average are projected to occur for these directorates and programs:

• SCOPS contractor support is projected to increase $41 million (386.4 percent) above the FY 2021 level. The funding for SCOPS contractor support would revert close to the level projected in the FY 2016/2017 fee rule because the FY 2021 level had been reduced due to funding constraints associated with the COVID–19 pandemic.

• GE is projected to increase by $35 million to support increased refugee processing associated with a proposed increase to the refugee ceiling.

• Immigration Records and Identity Services (IRIS) is projected to have additional FY 2022/2023 Federal Bureau of Investigation (FBI) fingerprint and background check service costs of $16.7 million based on FBI fees and workload estimates.

• In addition to the restoration of $13 million for Application Support Center (ASC) contract support, costs increase as USCIS restores ASC capacity following the COVID–19 pandemic. USCIS temporarily suspended in-person services between March 18, 2020 until June 4, 2020.[69] ASC appointments that were cancelled due to the temporary office closure were rescheduled causing some individuals to experience significant processing delays. To reduce costs, the annual contract was deferred to nine months. The remaining three months were added to the 12-month optional period to resume in FY 2022.

• The Office of the Chief Information Officer's GE budget is projected to increase by $35.3 million (16 percent) to support the USCIS staffing requirements in the FY 2022/2023 fee review. The additional funding is required to provide IT support, equipment, and network services. This excludes projects funded from premium processing. As stated earlier, non-premium IEFA cost projections are the basis for the fee review budget.

• The budget includes an increase of $9.8 million at the National Records Center (NRC) to reduce the Freedom of Information Act (FOIA) backlog at the NRC in FY 2022/2023. DHS has requested appropriations to fund this additional spending. If USCIS receives appropriations, USCIS may be able to revise downward the cost projections funded by IEFA fees.

**b. Payroll**

USCIS projects that it must increase its IEFA non-premium pay budget by $1,038.6 million (45 percent) from $2,309.3 million in FY 2021 to $3,347.9 million in the FY 2022/2023 fee review period to meet its operational requirements. The payroll growth includes:

• *Pay and benefit adjustments for onboard staff:* $313.1 million. USCIS budget projections include increased costs associated with the Government-wide cost of living adjustment (COLA) assumption of 2.7 percent for FY 2022 and 1.6 percent for FY 2023.[70]

• *Pay and benefits for new staff:* $590.0 million. Projected FY 2022 and FY 2023 workloads exceed current workload capacity by 10.2 percent, thereby requiring additional staff. The FY 2022 and FY 2023 Staffing Allocation Models (SAMs)[71] estimated an additional 1,921 positions are necessary to meet adjudicative processing goals and other USCIS mission objectives, including administrative functions. This additional staffing requirement reflects the fact that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes and operational needs have grown. *See* section V.B. for information on how workload and completion rates affect staffing forecasts. Outside of the SAMs, USCIS has identified the need for another 2,035 new positions to accommodate the Asylum Processing interim final rule (IFR) and the proposed increase in the refugee admissions ceiling to 125,000. See section V.2.c. of this preamble for more information on how the Asylum Processing IFR, 87 FR 18078 (Mar. 29, 2022), and other rulemakings affect the fee review budget.[72]

• *Realignment of 1,157 positions into the non-premium IEFA budget:* $135.5 million. This realignment includes moving 1,127 positions from IEFA premium processing funding ($129.8 million) and 30 positions that were previously funded by appropriated funds for the E-Verify program ($5.7 million) to IEFA non-premium funding. The 1,127 positions were temporarily funded out of the premium processing budget in the FY 2021 OP due to financial constraints. Funding these positions with IEFA non-premium resources will allow USCIS to redirect premium processing funds to infrastructure improvements, including investments in USCIS' digital capabilities, as well as backlog reduction efforts. USCIS is also realigning 30 positions from appropriated E-Verify program funding to IEFA non-premium funding to reflect the appropriate distribution of positions as identified in the Verification Division SAM. The SAM identified that the 30 positions are better attributed to the SAVE program, which is funded with IEFA non-premium funds. Therefore, USCIS accounts for these 30 positions as increased IEFA non-premium costs.

---

[69] USCIS temporarily suspended in-person office services to help slow the spread of COVID–19 and ensure the safety of our staff and communities. These temporary closures and capacity limitations led to a substantial backlog of cases awaiting biometrics appointments. USCIS has since extended operating hours at high-volume ASCs and adjusted biometrics submission requirements for certain applicants to address the backlogs. *See* USCIS, USCIS Temporarily Closing Offices to the Public March 18–April 1, *https://www.uscis.gov/news/alerts/uscis-temporarily-closing-offices-to-the-public-march-18-april-1* (last updated Mar. 17, 2020); *see also* USCIS, USCIS Preparing to Resume Public Services on June 4, *https://www.uscis.gov/newsroom/alerts/uscis-preparing-to-resume-public-services-on-june-4* (last updated Sept. 16, 2001). At the date of publication of this proposed rule, ASC backlogs have mostly been eliminated.

[70] The FY 2022 COLA assumption is based on President Biden's ''Letter to the Speaker of the House and the President of the Senate on the Alternative Plan for Pay Adjustments for Civilian Federal Employment'', issued on August 27, 2021. *See* White House, ''Letter to the Speaker of the House and the President of the Senate on the Alternative Plan for Pay Adjustments for Civilian Federal Employees'' (Aug. 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/27/letter-to-the-speaker-of-the-house-and-the-president-of-the-senate-on-the-alternative-plan-for-pay-adjustments-for-civilian-federal-employees/*. The FY 2023 COLA assumption is based on the available DHS Resource Allocation Plan (RAP) guidance as of March 29, 2021.

[71] The SAMs are SAS-based workforce planning tools that estimate the staffing requirements necessary to adjudicate the projected volume of workload receipts (in other words, applications and petitions).

[72] On March 29, 2022, DHS and DOJ issued an interim final rule, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers (Asylum Processing IFR), to improve and expedite processing of asylum claims made by noncitizens subject to expedited removal, ensuring that those who are eligible for protection are granted protection quickly, and those who are not are promptly removed. The rule authorizes asylum officers within USCIS to consider the asylum applications of individuals subject to expedited removal who assert a fear of persecution or torture and pass the required credible fear screening. *See* 87 FR 18078.

c. Related Rulemakings

As stated elsewhere in this preamble with regard to the premium processing rule and the DACA NPRM, simultaneously with this rule, DHS is engaging in multiple rulemaking actions that are in various stages of development.[73] *See* 86 FR 53736. DHS has considered and analyzed each of these other rules for peripheral, overlapping, or interrelated effects on this rule and has incorporated their effects, if any, into the supporting documentation, fee calculations, policies, and regulatory text for this proposed rule.

DHS is proposing changes to the USCIS fee schedule in this rule that may be necessary to implement the rule titled ''Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers.'' *See* 87 FR 18078 (Mar. 29, 2022) (Asylum Processing IFR). In the Asylum Processing IFR, DOJ and DHS amended the regulations governing the determination of certain protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture. The changes are expected to improve the Departments' ability to consider the protection claims of individuals encountered at or near the border and placed into expedited removal more promptly while ensuring fundamental fairness.

DHS includes an estimated cost of the Asylum Processing IFR in our calculation of the proposed fees to recover full costs of USCIS implementation of the rule. Consistent with the reasoning described in the Asylum Processing IFR, DHS has used the primary estimate of annual costs in the model used to calculate the fees in this rule.[74] Use of this figure results in costs of an average $425.9 million per fiscal year during the biennial period.[75] This funding, which is reflected in the figures above, would support 2,035 new staff and associated GE. These expenses constitute approximately 31 percent of the total projected increase in budgetary requirements from FY 2021 to FY 2022/2023.

DHS proposes to include the middle of the three Asylum Processing IFR estimates to plan for these additional staff and other resources. Implementation of this rulemaking is subject to resource constraints, including available IEFA non-premium funding and revenue. When USCIS does not have the resources that it needs to meet its goals, processing times increase and the case processing backlog grows. USCIS evaluates its budget and revenue for operational purposes annually, separate from the fee review process. For example, as mentioned above, the OP is a budget for the current year and is separate from the fee review budget estimates for future years. If actual revenue in FY 2022 or FY 2023 is higher than the estimates included in this proposal, then USCIS may dedicate additional staff and resources to the Asylum Processing IFR. If actual revenue is lower than the estimates in this proposal, then USCIS may dedicate fewer resources to implementing the Asylum Processing IFR. Relatedly, if the ultimate costs of implementing the Asylum Processing IFR exceed the estimates included in this proposal, this will strain the resources available to USCIS and processing backlogs may grow. Future fee review budget estimates will consider current and planned DHS and USCIS policies.

If USCIS identifies alternative funding mechanisms or resources for the Asylum Processing IFR other than IEFA non-premium funds, the fee review budget projections may be reduced accordingly. Therefore, with the implementation realities of the Asylum Processing IFR and possible congressional appropriations to fund that rule, DHS may reduce USCIS' estimated resource requirements for FY 2022/2023 and the fees necessary to generate those resources in a final fee rule.

d. Cost Summary

Table 5 below is a crosswalk summary of the FY 2021 OP to the FY 2022 and FY 2023 cost projections. It accounts for payroll and non-payroll for on-board and new staff, other resource requirements or adjustments, and the removal of costs associated with temporary programs. The FY 2022/2023 IEFA non-premium average annual budget requirement is estimated to be $5,150.7 million. This represents a $1,374.4 million, or 36.4 percent, increase over the FY 2021 IEFA non-premium budget of $3,776.3 million. As previously discussed, the primary cost driver is payroll, which accounts for 76 percent of the increase.

---

[73] *See* Spring 2022 Unified Agenda of Regulatory and Deregulatory Actions, Agency Rule List-Spring 2022, Department of Homeland Security at *https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=1600* (last accessed July 26, 2022).

[74] *See* 87 FR 18078 (Mar. 29, 2022), at 18206.

[75] DHS acknowledges that, by using the middle of the range of costs, if actual costs are higher than that, then the USCIS fee schedule will be set at a level that is less than what will be required to recover all of the costs added by the Asylum Processing IFR, all other factors remaining the same. Estimated annual costs of the Asylum Processing IFR (mid-range estimate): FY 2022 total costs of $438.2 million plus USCIS total costs of $413.6 million equals $851.8. *See* 86 FR 46933–46934. Average total costs of FY 2022/2023 equal $425.9 million.

| Table 5: Cost Projections | |
|---|---|
| **FY 2022/2023 Fee Review IEFA Non-Premium Cost Projection (in Millions)** | |
| **Total Adjusted FY 2021 IEFA Non-Premium Cost Projection (Base)** | **$3,776.3** |
| Plus: Pay Inflation and Promotions/Within-Grade Increases | $397.5 |
| Plus: FY 2022 SAM | $315.7 |
| Plus: Asylum Processing IFR | $438.2 |
| Plus: Refugee Ceiling Increase | $82.2 |
| Plus: Realignment of Positions | $134.0 |
| Plus: Net Additional Costs | -$32.4 |
| **Total Adjusted FY 2022 IEFA Non-Premium Cost Projection** | **$5,111.5** |
| Plus: Additional Pay Inflation and Promotions/Within-Grade Increases | $132.7 |
| Plus: Net additional FY 2023 SAM | $34.8 |
| Plus: Additional Net Additional Costs | -$89.0 |
| **Total Adjusted FY 2023 IEFA Non-Premium Cost Projection** | **$5,190.0** |
| **FY 2022/2023 Average Non-Premium Cost Projection** | **$5,150.7** |

3. FY 2022/2023 Revenue Projections

USCIS' revenue projections are informed by internal immigration benefit request receipt forecasts agreed to by the USCIS Volume Projection Committee (VPC). *See* section V.B.1.a of this preamble for more information on the VPC.[76] USCIS also uses 12 months of historical actual fee-paying receipts to account for fee-waiver and fee-exemption trends. To project USCIS IEFA non-premium revenue, USCIS develops application volume projections using all available data. USCIS then considers the fee-paying rate for each application and petition type to reflect the fact that not all applicants and petitioners pay fees due to fee waivers and fee exemptions.

USCIS uses actual revenue collections from August 2019 to July 2020 as a basis for the fee-paying assumptions in the FY 2022/2023 revenue projections. *See* section V.B.1 of this preamble for a more detailed discussion of USCIS volume projections and fee-paying rates.

USCIS' current fee schedule is expected to yield $3.28 billion of average annual revenue during the FY 2022/2023 biennial period. This represents an increase of $0.80 billion, or 32 percent, from the FY 2016/2017 fee rule projection of $2.48 billion. *See* 81 FR 26911 (May 4, 2016). The projected revenue increase is based on the fees established by the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted 5,870,989 total workload receipts and 5,140,415 fee-paying receipts. *See* 81 FR 26923–26924. However, the FY 2022/2023 fee review forecasts 7,601,200 total workload receipts and 6,510,442 fee-paying receipts. *See* section V.B.1. of this preamble for more information on the workload and fee-paying receipt forecasts. This represents a 29 percent increase to workload and 26 percent increase to fee-paying receipt volume

assumptions. Despite the increase in projected revenue above the FY 2016/2017 fee rule projection, this additional revenue is projected to be insufficient to recover USCIS' increased costs, as discussed in the next section.

4. Projected Cost Revenue Differential

USCIS identifies the difference between anticipated costs and revenue, assuming no changes in fees, to determine whether the existing fee schedule is sufficient to recover the projected full cost of providing immigration adjudication and naturalization services or whether a fee adjustment is necessary. Table 6 summarizes the projected cost and revenue differential. Non-Premium Revenue represents a revenue forecast using the current fees. Non-Premium Cost represents a budget forecast. In any fee review, if the revenue forecast is less than the budget forecast, then USCIS may propose new or increased fees to cover the budget-revenue shortfall. Otherwise, USCIS may reduce certain costs or services to cover the difference. Summary values may vary due to rounding.

---

[76] USCIS has developed the VPC, a panel of agency experts, for systematic immigration benefit request filing volume forecasting for use in fee studies. USCIS has considered other business forecasting and structured forecasting approaches and models but has found that the VPC has a reliably accurate history of filing volume prediction. Two annual VPC meetings consider draft and final volume projections for several years ahead. One of three annual VPC meetings reviews the forecasts for the previous year, compares them to actual receipts, and discusses future improvements for greater accuracy.

| Table 6: IEFA Non-Premium Cost and Revenue (at FY 2021 levels) Comparison (Dollars in Millions) | | | |
|---|---|---|---|
| **Point of Comparison** | **FY 2022** | **FY 2023** | **FY 2022/2023 Average** |
| Non-Premium Revenue with Current Fees | $3,280.3 | $3,284.8 | $3,282.5 |
| Non-Premium Cost Projection | $5,111.5 | $5,190.0 | $5,150.7 |
| **Difference** | **-$1,831.2** | **-$1,905.2** | **-$1,868.2** |

Historically, and for the purpose of the fee review, USCIS reports costs and revenue as an average over the 2-year period. In Table 6, USCIS averages FY 2022 and FY 2023 costs and revenue to determine the projected amounts to be recovered through this rule. Based on current immigration benefit and biometric services fees and projected volumes, USCIS expects that if fees remained at their current levels, those fees would generate $3.28 billion in average annual revenue in FY 2022 and FY 2023. For the same period, the average annual cost of processing those immigration benefit requests and providing biometric services is $5.15 billion. This yields an average annual deficit of $1,868.2 million. In other words, USCIS expects the costs of fulfilling its operation requirements in FY 2022/2023 will exceed projected total revenue under its current fee structure.

Because projected costs are higher than projected revenue, USCIS has several options to address the shortfall:

1. Reduce projected costs;
2. Use carryover funds or revenue from the recovery of prior year obligations; or
3. Adjust fees with notice-and-comment rulemaking.

Although USCIS continues to pursue efforts to increase agency efficiency, DHS believes that reducing the projected costs to equal the projected revenue would degrade USCIS operations funded by the IEFA; therefore, this is not a viable alternative to the proposed rule. The projected amount of funding necessary to meet USCIS' operational requirements would exceed USCIS' projected carryover in both FY 2022 and FY 2023, so USCIS is not able to rely on those funds to cover the difference between projected revenue and costs.[77] Likewise, USCIS estimates that recovered revenue from prior year obligations will be

insufficient. USCIS estimates that it may recover $91.9 million in FY 2022 and $94.2 million in FY 2023 for the non-premium IEFA. Therefore, DHS proposes to increase revenue through the fee adjustments described in detail throughout this rule. To the extent USCIS is successful in measurably reducing completion rates or achieving other productivity gains, DHS will re-evaluate the fee schedule in subsequent fee rules.

*B. Methodology*

When conducting a fee review, USCIS reviews its recent operating environment to determine the appropriate method to assign costs to immigration benefit requests, including biometric services. USCIS uses ABC, a business management tool that assigns resource costs to operational activities and then to products, services, or both. USCIS uses commercially available ABC software to create financial models. These models determine the cost of each major step toward processing immigration benefit requests and providing biometric services. This is the same methodology that USCIS used in the last five fee reviews, and it is the basis for the current fee structure. Following the FY 2016/2017 fee rule, USCIS identified several key methodology changes to improve the accuracy of its ABC model. For more information on these changes, please refer to the Changes Implemented in the FY 2022/2023 Fee Review section of the supporting documentation in the docket of this rule.

1. Volume

USCIS uses two types of volume data in the fee review: workload and fee-paying volume. Workload volume is a projection of the total number of immigration benefit requests that USCIS will receive in a fiscal year. Fee-paying volume is a projection of the number of customers that will pay a fee when filing requests for immigration benefits. Not all customers pay a fee. Those customers to whom a fee exemption

applies or for whom USCIS grants a fee waiver are represented in the workload volume, but not the fee-paying volume. Customers who pay a fee fund the cost of processing requests for fee-waived or fee-exempt immigration benefit requests. Tables 7 and 8 compare the FY 2016/2017 fee rule volume forecasts to the volume forecasts for this rulemaking similar to previous fee rules. *See e.g.,* 81 FR 26922–26924. Actual receipts from prior years inform those forecasts, but they may not be the only reason for differences. We explain some of the larger differences in the paragraphs that follow Tables 7 and 8. For information on actual receipts from previous fiscal years, see Appendix Table 13 in the supporting documentation.

a. Workload Volume and Volume Projection Committee

USCIS uses statistical modeling, immigration receipt data, and internal assessments of future developments (such as planned immigration policy initiatives)[78] to develop workload volume projections. All relevant USCIS directorates and program offices are represented on the VPC. The VPC forecasts USCIS workload volume using statistical forecasts and subject-matter expertise from various directorates and program offices, including the service centers, National Benefits Center, RAIO, and regional, district, and field offices. Input from these offices helps refine the

---

[77] In the docket for this proposed rule, the supporting documentation has more information on carryover estimates. *See* the section titled IEFA Non-Premium Carryover Projections and Targets.

[78] DHS has considered the effects on this rule of all intervening legislation, related rulemakings, and policy changes that USCIS knows have occurred or will occur by the time the rule is signed. However, DHS does not and cannot assert that it knows and has considered every policy change that is planned or that may occur at all levels and agencies of the U.S. Government that may directly or indirectly affect this rule. Immigration policy changes frequently and USCIS must use the best cost data available at a point in time. Initiatives may come about without being incorporated in the proposed and final fees simply due to the time required for rule development and finalization. That necessary shortcoming is ameliorated by the CFO Act requirement that DHS address the effects of the constantly evolving immigration policy environment on its fees, costs, and services every 2 years, as DHS has done through its biennial fee reviews.

statistical volume projections. The VPC reviews short- and long-term volume trends. In most cases, time series models provide volume projections by form type. Time series models use historical receipt data to determine patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. When possible, other, more detailed models are also used to determine relationships within and between different benefit request types. At VPC meetings, the committee members deliberate on the provided forecast, consider alternatives, and agree to a forecast by group consensus.

Workload volume is a key element used to determine the USCIS resources needed to process benefit requests within established adjudicative processing goals. It is also the primary cost driver for assigning activity costs to immigration benefits and biometric services [79] in the USCIS ABC model.

___

[79] As fully explained later in this preamble, DHS is removing biometric services as a separate fee in this rule, except as associated with an Application for Temporary Protected Status and certain other programs. Accordingly, N/A is included in the average annual FY 2022/2023 projected workload receipts and difference columns for biometrics in Table 7.

Previous fee reviews also relied on VPC forecasts. [80] DHS explains some of the larger differences in the paragraphs after Table 7. Values below are the average of 2 years, rounded to whole numbers. There may be slight differences because of rounding.

**BILLING CODE 9111–97–P**

___

[80] The FY 2010/2011 fee rule was the first to use VPC workload estimates in a fee review. *See*, USCIS, FY 2010/2011 Immigration and Examinations Fee Account Fee Review (June 11, 2010), available at *https://www.regulations.gov/document/USCIS-2009-0033-0007*. All subsequent fee reviews and fee rules used VPC estimates.

| Table 7: Workload Volume Comparison | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Projected Workload Receipts** | **FY 2022/2023 Fee Review's Average Annual Projected Workload Receipts** | **Difference** |
| I-90 Application to Replace Permanent Resident Card | 810,707 | 740,000 | -70,707 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 10,143 | 5,020 | −5,123 |
| I-129 Petition for a Nonimmigrant Worker Subtotal: | 432,156 | 568,630 | 136,474 |
| For H-1 nonimmigrants | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L nonimmigrants | N/A | 42,350 | N/A |
| For O nonimmigrants | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| For H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| For H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 45,351 | 44,700 | -651 |
| I-130 Petition for Alien Relative | 911,349 | 880,900 | -30,449 |
| I-131/I-131A Application for Travel Document Subtotal | 256,622 | 354,416 | 97,794 |
| I-131 Application for Travel Document | N/A | 329,000 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Carrier Documentation | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602 | 140,000 | 51,398 |
| I-290B Notice of Appeal or Motion | 24,706 | 36,423 | 11,717 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 26,428 | 43,028 | 16,600 |

| **Table 7: Workload Volume Comparison** | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Projected Workload Receipts** | **FY 2022/2023 Fee Review's Average Annual Projected Workload Receipts** | **Difference** |
| I-485 Application to Register Permanent Residence or Adjust Status | 593,717 | 608,750 | 15,033 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor[81] | 14,673 | 3,900 | -10,773 |
| I-539 Application to Extend/Change Nonimmigrant Status | 172,001 | 472,000 | 299,999 |
| I-600/600A; I-800/800A Intercountry Adoption-Related Petitions and Applications | 15,781 | 4,447 | -11,335 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 60 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident | 18 | 1 | -17 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 21 | 21 | 0 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence on Permanent Resident Status | 173,000 | 154,000 | -19,000 |
| I-765 Application for Employment Authorization | 747,825 | 1,666,500 | 918,675 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 1,585 | 933 | -653 |
| I-817 Application for Family Unity Benefits | 2,069 | 517 | -1,552 |
| I-824 Application for Action on an Approved Application or Petition | 10,921 | 10,596 | -325 |

[81] Combines both Forms I–526 and I–526E. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

| Table 7: Workload Volume Comparison | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Projected Workload Receipts** | **FY 2022/2023 Fee Review's Average Annual Projected Workload Receipts** | **Difference** |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 3,250 | -312 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 575 | 1,150 | 575 |
| I-956 Application For Regional Center Designation | 400 | 62 | -338 |
| I-956G Regional Center Annual Statement | 882 | 728 | -154 |
| N-300 Application to File Declaration of Intention | 41 | 17 | -24 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | 4,666 | 6,140 | 1,474 |
| N-400 Application for Naturalization | 830,673 | 831,700 | 1,027 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 362 | 138 | -224 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 28,914 | 26,900 | -2,014 |
| N-600/600K Application for Certificate of Citizenship Subtotal | <u>69,723</u> | <u>33,900</u> | <u>-35,823</u> |
| N-600 Application for Certificate of Citizenship | N/A | 30,000 | N/A |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 | N/A | 3,900 | N/A |
| Inadmissibility Waiver Subtotal | <u>71,527</u> | <u>86,210</u> | <u>14,683</u> |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |

| Table 7: Workload Volume Comparison | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Projected Workload Receipts** | **FY 2022/2023 Fee Review's Average Annual Projected Workload Receipts** | **Difference** |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 41,481 | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,815 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 10,693 | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | N/A | 19,750 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 7,360 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 273,990 | N/A |
| **Subtotal** | **5,870,989** | **7,601,200** | **1,730,211** |
| Biometric Services | 3,028,254 | N/A | N/A |
| **Total** | **8,899,243** | **7,601,200** | **-1,298,043** |

BILLING CODE 9111–97–C

Differences between the two sets of workload estimates may be unrelated to any proposed fee or policy change. As mentioned earlier, these estimates are based on historical data, statistical analysis, and subject matter and policy input. For example, the Form I–90 forecast consists of two combined forecasts: renewals and replacements. Both Form I–90 forecasts use a time series model that allows for seasonality. As another example, the VPC establishes two Form N–400 forecasts: civilian and military. The statistical model that the VPC considers for the civilian Form N–400 forecast leverages survival analysis to include individual microdata and reflects the differences in application patterns of previous naturalization applicants. USCIS' statistical model uses multiple factors to determine the likelihood of naturalization of members of the pool of potential applicants, including the length of time an individual has been a lawful permanent resident (LPR), as well as an individual's country of origin, visa type, and age. In contrast, the military naturalization forecast is a time series model that does not use survival analysis. USCIS evaluates a variety of models and methods to determine the best forecast for each workload based on the available data and historical trends.

Some differences in workload are the result of proposed changes, in whole or in part. Part of the large differences for Forms I–131 and I–765 relate to a proposed change to Form I–485 fees and interim benefits. *See* section VIII.H.1 for more information. In the FY 2016/2017 fee review, USCIS determined the workload volume for Forms I–765 and I–131 that are not associated with Forms I–485 (in other words, interim benefits). *See* 81 FR 26918 and 73300. The FY 2016/2017 column in Table 7 represents only the standalone workload for Forms I–131 and I–765 because all the interim benefit workloads bundled with Form I–485 are counted in the row for Form I–485. The FY 2022/2023 column of Table 7 includes workloads for Forms I–131 and I–765 that are either standalone or interim benefits concurrently filed with Form I–485. Other factors contributed to

the differences, such as historical trends. There is no biometric services workload forecast for FY 2022/2023 (apart from the TPS workload, as discussed in section E.2 below) because of the proposal to incorporate the cost of providing biometric services in the underlying form fees, as explained in section VIII.E of this preamble.

A comparison of the two sets of forecasts, in isolation, may not illustrate USCIS trends in the several years between fee reviews. For example, when USCIS estimated workload for the FY 2016/2017 fee rule, it had been several years since receipts for Form I–140 were over 100,000. As such, the receipt estimate was reasonable at the time and consistent with receipts from FY 2009 to 2014. Since FY 2015, Form I–140 receipts are routinely over 100,000. There could be a number of reasons for this change, such as availability of employment-based visas or increased demand following economic or policy changes in the intervening years. As another example, filing trends for Form I–539 have changed significantly since the FY 2016/2017 fee rule. The forecast for FY 2022/2023 is based on Student and Exchange Visitor Information System data, which included 225,000 Form I–539 filings annually beginning in January 2021. DHS expects the vast majority of this workload to be optional practical training (OPT) and science, technology, engineering, and

mathematics optional practical training (STEM OPT) extensions. As yet another example, the adoption workload has been trending downward for many years. Comparing only two data points in Table 7 does not show that the difference is just the continuation of a gradual trend over many years. Finally, Table 7 does not represent the entirety of USCIS workload. It excludes some workloads without fees. For example, asylum and refugee workloads (credible fear, reasonable fear, Forms I–589 and I–590) and other humanitarian workloads (for example, Forms I–914 and I–918) are excluded from the tables 7 and 8. These omitted workloads are part of the ABC model so that USCIS can estimate their total cost. However, only fee-paying volumes generate revenue for USCIS. *See* section III.C, Full Cost Recovery, of this preamble for more information. As explained later in this preamble, the proposed fees exclude temporary or uncertain workloads, such as TPS and DACA. *See* sections V.C. and V.D of this preamble.

**b. Fee-Paying Volume**

USCIS uses historical revenue and receipt data to determine the number of individuals who paid a fee for each immigration or naturalization benefit request. Fee-paying percentages by form are usually steady year over year. USCIS uses monthly fee-paying percentages in its forecasts to capture seasonality during the year. Additionally, policy

changes, legislation, and executive orders are frequently some of the factors that affect fee-paying percentages, so older historical data to calculate the percentages can be counter-productive. In this proposed rule, USCIS therefore referenced revenue and receipts data from August 2019 to July 2020 for fee-paying figures. Total revenue for an immigration benefit request is divided by its fee to determine the historical number of fee-paying immigration benefit requests. Fee-paying receipts are compared to the total number of receipts (workload volume) to determine a fee-paying percentage for each immigration benefit request. When appropriate, projected fee-paying volume is adjusted to reflect filing trends and anticipated policy changes. These projections include the effects of changes that DHS is proposing in this rule.[82] DHS explains some of the larger differences in the paragraphs after Table 8. Values below are the average of two years, rounded to whole numbers. There may be slight differences because of rounding.

**BILLING CODE 9111–97–P**

---

[82] Table 8 compares the projections from the FY 2016/2017 fee rule with the projections of the FY 2022/2023 fee review. As discussed, these projections are based on a number of factors, including historical data of actual receipts. Although the FY 2016/2017 Fee Review differs to some degree from the actual receipts since the 2016 fee rule, USCIS compares fee projections against each other, rather than against actual receipts, to ensure consistency.

| **Table 8: Fee-Paying Projection Comparison by Fee Review** | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Fee-Paying Projection** | **FY 2022/2023 Fee Review's Average Annual Fee-Paying Projection** | **Difference** |
| I-90 Application to Replace Permanent Resident Card | 718,163 | 648,758 | -69,405 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 9,499 | 4,623 | -4,876 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | <u>427,778</u> | <u>568,630</u> | <u>140,852</u> |
| For H-1 | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L | N/A | 42,350 | N/A |
| For O | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 39,277 | 41,432 | 2,155 |
| I-130 Petition for Alien Relative | 907,512 | 857,514 | -49,999 |

| Table 8: Fee-Paying Projection Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Fee-Paying Projection** | **FY 2022/2023 Fee Review's Average Annual Fee-Paying Projection** | **Difference** |
| I-131/I-131A Application for Travel Document Subtotal | <u>194,461</u> | <u>279,078</u> | <u>84,617</u> |
| I-131 Application for Travel Document | N/A | 253,662 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Carrier Documentation | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602 | 140,000 | 51,398 |
| I-290B Notice of Appeal or Motion | 20,955 | 33,803 | 12,848 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 8,961 | 4,107 | -4,854 |
| I-485 Application to Register Permanent Residence or Adjust Status | 473,336 | 572,497 | 99,161 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor[83] | 14,673 | 3,900 | -10,773 |
| I-539 Application to Extend/Change Nonimmigrant Status | 171,616 | 462,380 | 290,764 |
| I-600/600A; I-800/800A Orphan Petitions and Applications | 5,811 | 2,438 | -3,373 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 29 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident | 0 | 1 | 1 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 17 | 21 | 4 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence | 162,533 | 130,274 | -32,260 |
| I-765 Application for Employment Authorization | 397,954 | 1,084,740 | 686,786 |

[83] Combines both Forms I–526 and I–526E. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

| Table 8: Fee-Paying Projection Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Fee-Paying Projection** | **FY 2022/2023 Fee Review's Average Annual Fee-Paying Projection** | **Difference** |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 746 | 448 | -298 |
| I-817 Application for Family Unity Benefits | 1,988 | 505 | -1,483 |
| I-824 Application for Action on an Approved Application or Petition | 10,828 | 10,292 | -536 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 3,250 | -312 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 257 | 1,027 | 770 |
| I-956 Application For Regional Center Designation | 400 | 62 | -338 |
| I-956G Regional Center Annual Statement | 882 | 728 | -154 |
| N-300 Application to File Declaration of Intention | 36 | 17 | -19 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | 3,593 | 5,137 | 1,544 |
| N-400 Application for Naturalization (including reduced fee) | 631,655 | 693,820 | 62,165 |
| N-470 Application to Preserve Residence for Naturalization purposes | 360 | 138 | -222 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 23,491 | 21,508 | -1,983 |
| N-600/600K Naturalization Certificate Application Subtotal | 46,870 | 18,936 | -27,934 |
|    N-600 Application for Certificate of Citizenship | N/A | 16,041 | N/A |
|    N-600K Application for Citizenship and Issuance of Certificate Under Section 322 | N/A | 2,895 | N/A |
| Inadmissibility Waiver Subtotal | 41,902 | 44,211 | 2,309 |
|    I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |
|    I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 10,954 | N/A |

| **Table 8: Fee-Paying Projection Comparison by Fee Review** | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Average Annual Fee-Paying Projection** | **FY 2022/2023 Fee Review's Average Annual Fee-Paying Projection** | **Difference** |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,772 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 7,260 | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | N/A | 18,560 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 554 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 273,990 | N/A |
| **Subtotal** | **4,929,707** | **6,510,467** | **1,580,760** |
| Biometric Services | 2,598,639 | N/A | N/A |
| **Grand Totals** | **7,528,346** | **6,510,467** | **-1,017,879** |

All fee-paying workload is a subset of total workload, as discussed in the previous section. As such, changes to workload may affect the fee-paying projections. As explained above, USCIS estimates fee-paying receipts by applying a percentage of fee-paying receipts to the workload forecast. For a general explanation on how fee-paying volumes affect fees, *see* section VI, Fee Waivers, of this preamble. Some differences in fee-paying projections are the result of proposed changes, in whole or in part. For example, part of the large differences between the past and current projections for Forms I–131 and I–765 relate to the proposed change to Form

I–485 fees and interim benefits. *See* section VIII.H.1 for more information. In the FY 2016/2017 fee review, USCIS determined the fee-paying volume for Forms I–765 and I–131 that are not associated with Forms I–485. *See* 81 FR 26918 and 73300. The FY 2016/2017 column in Table 8 represents the forecasted standalone fee-paying receipts only for Forms I–131 and I–765 because all interim benefit fee-paying receipts bundled with Form I–485 are counted in the row for Form I–485. *See* 81 FR 26919 and 26924. The FY 2022/2023 column of Table 8 includes fee-paying receipts for Forms I–131 and I–765 that are either standalone or interim

benefits concurrently filed with Form I–485. Other factors contributed to the differences, such as historical trends. There is no workload forecast for biometric services for FY 2022/2023 because of the proposed elimination of the discrete biometric services fee for most benefit requestors, as explained in section VIII.E of this preamble.

Table 9 is a comparison of fee-paying percentages in the FY 2016/2017 fee rule and this proposed rule. It divides the fee-paying volumes in Table 8 by the workload volumes in Table 7 to calculate the fee-paying percentages. There may be slight differences because of rounding.

| Table 9: Fee-Paying Percentage Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Fee-Paying Percentage** | **FY 2022/2023 Fee Review's Fee-Paying Percentage** | **Difference** |
| I-90 Application to Replace Permanent Resident Card | 89% | 88% | -1% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 94% | 92% | -2% |
| I-129 Petition for a Nonimmigrant Worker Subtotal | <u>99%</u> | <u>100%</u> | <u>1%</u> |
| For H-1 | N/A | 100% | N/A |
| For H-2A - Named Beneficiaries | N/A | 100% | N/A |
| For H-2B - Named Beneficiaries | N/A | 100% | N/A |
| For L | N/A | 100% | N/A |
| For O | N/A | 100% | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 100% | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 100% | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 100% | N/A |
| I-129F Petition for Alien Fiancé(e) | 87% | 93% | 6% |
| I-130 Petition for Alien Relative | 100% | 97% | 3% |
| I-131/I-131A Application for Travel Document Subtotal | <u>76%</u> | <u>79%</u> | <u>3%</u> |

| Table 9: Fee-Paying Percentage Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Fee-Paying Percentage** | **FY 2022/2023 Fee Review's Fee-Paying Percentage** | **Difference** |
| I-131 Application for Travel Document | N/A | 77% | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 100% | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 100% | N/A |
| I-131A Application for Carrier Documentation | N/A | 100% | N/A |
| I-140 Immigrant Petition for Alien Worker | 100% | 100% | 0% |
| I-290B Notice of Appeal or Motion | 85% | 93% | 8% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 34% | 10% | -24% |
| I-485 Application to Register Permanent Residence or Adjust Status | 80% | 94% | 14% |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 100% | 100% | 0% |
| I-539 Application to Extend/Change Nonimmigrant Status | 100% | 98% | -2% |
| I-600/600A; I-800/800A Orphan Petitions and Applications | 37% | 55% | 18% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 48% | N/A |
| I-601A Provisional Unlawful Presence Waiver | 100% | 100% | 0% |
| I-687 Application for Status as a Temporary Resident | N/A | 100% | N/A |
| I-690 Application for Waiver of Grounds of Inadmissibility | 81% | 100% | 19% |
| I-694 Notice of Appeal of Decision | 100% | 100% | 0% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 100% | 100% | 0% |
| I-751 Petition to Remove Conditions on Residence | 94% | 85% | -9% |
| I-765 Application for Employment Authorization | 53% | 65% | 12% |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 47% | 48% | 1% |
| I-817 Application for Family Unity Benefits | 96% | 98% | 2% |

| Table 9: Fee-Paying Percentage Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Fee-Paying Percentage** | **FY 2022/2023 Fee Review's Fee-Paying Percentage** | **Difference** |
| I-824 Application for Action on an Approved Application or Petition | 99% | 97% | -2% |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 100% | 100% | 0% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 100% | N/A |
| I-910 Application for Civil Surgeon Designation | 100% | 100% | 0% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 45% | 89% | 44% |
| I-956 Application For Regional Center Designation | 100% | 100% | 0% |
| I-956G Regional Center Annual Statement | 100% | 100% | 0% |
| N-300 Application to File Declaration of Intention | 88% | 100% | 12% |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | 77% | 84% | 7% |
| N-400 Application for Naturalization (including reduced fee) | 76% | 83% | 7% |
| N-470 Application to Preserve Residence for Naturalization purposes | 99% | 100% | 1% |
| N-565 Application for Replacement Naturalization/Citizenship Document | 81% | 80% | -1% |
| N-600/600K Naturalization Certificate Application Subtotal | <u>67%</u> | <u>56%</u> | <u>-11%</u> |
| N-600 Application for Certificate of Citizenship | N/A | 53% | N/A |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 | N/A | 74% | N/A |
| Inadmissibility Waiver Subtotal | <u>59%</u> | <u>51%</u> | <u>-8%</u> |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 100% | N/A |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 26% | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 99% | N/A |

| Table 9: Fee-Paying Percentage Comparison by Fee Review | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee Review's Fee-Paying Percentage** | **FY 2022/2023 Fee Review's Fee-Paying Percentage** | **Difference** |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 68% | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | N/A | 94% | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 8% | N/A |
| USCIS Immigrant Fee | 100% | 100% | 0% |
| G-1041 Genealogy Index Search Request | 100% | 100% | 0% |
| G-1041A Genealogy Records Request | 100% | 100% | 0% |
| Request for Certificate of Non-Existence | N/A | 100% | N/A |
| H-1B Registration Process | N/A | 100% | N/A |
| **Subtotal** | **84%** | **86%** | **2%** |
| Biometric Services | 86% | N/A | N/A |
| **Grand Totals** | **85%** | **86%** | **1%** |

## 2. Completion Rates

USCIS completion rates are the average hours per adjudication of an immigration benefit request. They identify the adjudicative time required to complete (render a decision on) specific immigration benefit requests. The completion rate for each benefit type represents an average. Completion rates reflect what is termed "touch time," or the time an employee with adjudicative responsibilities actually handles the case. This does not reflect "queue time," or time spent waiting, for example, for additional evidence or supervisory approval. Completion rates do not reflect the total processing time applicants, petitioners, and requestors can expect to wait for a decision on their case after USCIS accepts it.

USCIS requires most employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. The reported hours and counts are aggregate information that does not allow USCIS to estimate effects of individual policy changes. USCIS calculates completion rates by dividing the adjudication hours by the number of completions for the same period. As such, completion rates

represent an average hours per completion. In addition to using these data to determine fees, completion rates help determine appropriate staffing allocations to handle projected workload. The USCIS Office of Performance and Quality (OPQ), field offices, regional management, and service centers continually review the data to capture updates or implementation of new processes and ensure continued accuracy. The continual availability of the information enables USCIS to update cost information for each fee review. The completion rates may change between fee reviews based on more recently reported hours and counts. Possible reasons for completion rate changes include changes to a form, policy changes, and more recently, effects of the pandemic. USCIS relied on completion rates before the pandemic to remove this effect from the fee review. When employees who adjudicate immigration benefit requests do not report adjudication hours, USCIS uses subject-matter expertise to estimate completion rates.

USCIS does not list completion rates for the following immigration benefit

requests, forms, or other services, due to the special nature of their processing, as explained below:

• *I–131A, Application for Carrier Documentation.* In this proposed rule, DHS anticipates that the Department of State (DOS) Bureau of Consular Affairs, located outside of the United States, would process all Form I–131A workload. Thus, USCIS projects it will have no hours or workload for Form I–131A in FY 2022/2023 and does not calculate a completion rate for this proposed rule.

• *H–1B Registration Process.* Before a petitioner is eligible to file an H–1B cap-subject petition (including those eligible for the 20,000-petition advanced degree exemption), the prospective petitioner must register electronically through the USCIS website and have their registration selected. *See* 84 FR 888 (Jan. 31, 2019). USCIS does not adjudicate registrations received through the H–1B registration process because the process is automated.

• *USCIS Immigrant Fee.* USCIS does not adjudicate applications for an immigrant visa. Rather, individuals located outside of the United States apply with a DOS consular officer for an

immigrant visa. If DOS issues the immigrant visa, the individual may apply with a Customs and Border Protection (CBP) officer at a port of entry for admission to the United States as an immigrant. This fee represents USCIS' costs to create and maintain files and to issue permanent resident cards (also known as ''Green Cards'') to individuals who go through this process. *See* 8 CFR 103.7(b)(1)(i)(D) (Oct. 1, 2020), proposed 8 CFR 106.2(c)(3).

• *TPS.* DHS proposes not to rely on TPS fee revenue for recovering USCIS' operational expenses, consistent with previous fee rules. *See* 81 FR 73312–73313. TPS designations may be terminated under current law or may decrease due to a reduction in the eligible population. Termination of the program, in whole or in part, after the fees are set would result in unrealized revenue and a commensurate budgetary shortfall. After the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice-and-comment rulemaking. Thus, temporary programs subject to termination based on changed circumstances are generally not included in the fee-setting model. Therefore, USCIS excludes the completion rate, as well as workload volumes and marginal costs, for Form I–821, Application for Temporary Protected Status, and associated Form I–765 filings from discussion in this proposed rule. DHS cannot increase the $50 initial statutory registration fee permitted under INA sec. 244(c)(1)(B) or establish a re-registration fee for TPS. Therefore, to recover some of the costs of administering the TPS program, USCIS will continue to charge the biometric services fee, where required, and the fee for an employment authorization document (EAD), as permitted under 8 U.S.C. 1254b.

| Table 10: Completion Rates per Benefit Request (Hours/Completions) | |
|---|---|
| **Immigration Benefit Request** | **Service-Wide Completion Rate** |
| Credible Fear[84] | 3.68 |
| G-1041 Genealogy Index Search Request | 0.42 |
| G-1041A Genealogy Records Request | 1.00 |
| Request for Certificate of Non-Existence | 1.07 |
| H-1B Registration Process | N/A |
| I-90 Application to Replace Permanent Resident Card | 0.15 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 0.84 |
| I-129 H-1B Nonimmigrant Worker or H-1B1 Free Trade Nonimmigrant Worker | 1.53 |
| I-129 H-2A - Named Beneficiaries | 2.36 |
| I-129 H-2B - Named Beneficiaries | 2.33 |
| I-129 L Nonimmigrant Worker | 3.57 |
| I-129 O Nonimmigrant Worker | 2.32 |
| I-129CW, Petition or Application for E, H-3, P, Q, R, or TN Nonimmigrant Worker | 1.87 |
| I-129 H-2A - Unnamed Beneficiaries | 0.70 |
| I-129 H-2B - Unnamed Beneficiaries | 0.89 |
| I-129F Petition for Alien Fiancé(e) | 0.91 |
| I-130 Petition for Alien Relative | 1.11 |
| I-131 Application for Travel Document | 0.29 |
| I-131 Refugee Travel Document[85] | 0.28 |
| I-131A Application for Carrier Documentation | N/A |
| I-140 Immigrant Petition for Alien Worker | 1.41 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 1.96 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | 1.46 |
| I-193 Application for Waiver of Passport and/or Visa | 0.52 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 1.43 |
| I-290B Notice of Appeal or Motion | 1.50 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 2.54 |
| I-485 Application to Register Permanent Residence or Adjust Status | 2.08 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 20.69 |

---

[84] *See* USCIS, Questions and Answers: Credible Fear Screening available at *https://www.uscis.gov/ humanitarian/refugees-and-asylum/asylum/ questions-and-answers-credible-fear-screening* (last updated July 15, 2015).

[85] USCIS does not track distinct refugee travel document completion rates, nor does it track rates by applicant age group. The completion rate here is for a re-entry permit, a similar travel document.

| Table 10: Completion Rates per Benefit Request (Hours/Completions) ||
|---|---|
| **Immigration Benefit Request** | **Service-Wide Completion Rate** |
| I-539 Application to Extend/Change Nonimmigrant Status | 0.70 |
| I-589 Application for Asylum and for Withholding of Removal | 5.02 |
| I-590 Registration for Classification as Refugee | 1.29 |
| I-600/600A; I-800/800A Orphan Petitions and Applications | 2.14 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | 2.03 |
| I-601 Application for Waiver of Grounds of Inadmissibility | 2.06 |
| I-601A Provisional Unlawful Presence Waiver | 2.76 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 0.69 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 3.01 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 2.04 |
| I-694 Notice of Appeal of Decision | 2.62 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 3.91 |
| I-730 Refugee/Asylee Relative Petition (and Travel Eligibility) | 1.06 |
| I-751 Petition to Remove Conditions on Residence | 1.54 |
| I-765 Application for Employment Authorization | 0.22 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 2.03 |
| I-817 Application for Family Unity Benefits | 0.88 |
| I-824 Application for Action on an Approved Application or Petition | 0.88 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 15.86 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | 2.00 |
| I-910 Application for Civil Surgeon Designation | 1.37 |
| I-914 T Nonimmigrant Status | 4.88 |
| I-918 U Nonimmigrant Status | 4.50 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 1.69 |
| I-956 Application For Regional Center Designation | 108.50 |
| I-956G Regional Center Annual Statement | 4.60 |
| N-300 Application to File Declaration of Intention | 1.10 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) | 3.01 |
| N-400 Application for Naturalization | 1.51 |

| Table 10: Completion Rates per Benefit Request (Hours/Completions) | |
|---|---|
| **Immigration Benefit Request** | **Service-Wide Completion Rate** |
| N-470 Application to Preserve Residence for Naturalization purposes | 4.01 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 0.51 |
| N-600 Application for Certificate of Citizenship | 1.16 |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 | 1.16 |
| Reasonable Fear[86] | 5.30 |
| USCIS Immigrant Fee | N/A |

BILLING CODE 9111–97–C

3. Assessing Proposed Fees

Historically, as a matter of policy, DHS has used its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. Previous proposed IEFA fee schedules referred to limited fee increases as "low volume reallocation" or "cost reallocation."[87] Despite the two separate phrases, the calculation for both is the same. In this proposed rule, DHS will use the phrase "cost reallocation." In the FY 2016/2017 fee rule, USCIS calculated an 8 percent limited fee increase for certain immigration benefit request fees.[88] For this proposed rule, USCIS calculated a limited fee increase of approximately 18 percent using a similar methodology as the FY 2016/2017 fee rule.[89] The 18 percent is approximately the difference between the average current fee compared to the average ABC model output. The sum of the current fees, multiplied by the projected FY 2022/2023 fee-paying receipts for each immigration benefit type, divided by the total fee-paying receipts, is $518. The model output is the total cost determined by the ABC model by fee-paying receipts to determine a fee-paying unit cost. The sum of the ABC model outputs, multiplied by the projected FY 2022/2023 receipts for each immigration benefit type, divided by the fee-paying receipts, is $614. There is a $96 or approximate 18 percent difference between the two averages. These averages exclude fees that do not receive cost reallocation, such as the separate biometric services fee and the proposed genealogy fees. When DHS proposes to maintain the current fee, it affects this calculation. In those cases, the formula multiplies the current fee by fee-paying receipts instead of using the model output. Except for Form I–90 filed online, the estimated volumes are low for the fees that DHS proposes to maintain at the current level. As such, if DHS did not propose to maintain those current fees, the result would round to 17 percent. Thus, DHS has determined that 18 percent is a reasonable figure at which to cap those requests for which USCIS proposes to limit fee increases using the cost reallocation calculation method.

Accordingly, in consideration of the need to balance the beneficiary-pays and ability-to-pay principles and to achieve important policy outcomes (for example, promoting naturalization, funding asylum and other humanitarian programs, and making immigration benefits affordable and accessible), DHS proposes that the increase in the following immigration benefit request fees is limited to 18 percent for the current fees:

• Form I–192, Application for Advance Permission to Enter as Nonimmigrant.

• Form I–193, Application for Waiver of Passport and/or Visa.

• Form I–290B, Notice of Appeal or Motion.

• Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant.

• Form I–600, Petition to Classify Orphan as an Immediate Relative.

• Form I–600A, Application for Advance Processing of an Orphan Petition.

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600.[90]

• Form I–612, Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended).

• Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative.

• Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country.

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

• Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal.

• Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant.

• Form N–300, Application to File Declaration of Intention.

• Form N–336, Request for Hearing on a Decision in Naturalization Proceedings.

• Form N–400, Application for Naturalization.

• Form N–470, Application to Preserve Residence for Naturalization Purposes.

• Form N–600, Application for Certificate of Citizenship.

• Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322.

The proposed increase of approximately 18 percent may vary slightly due to rounding. DHS rounds

---

[86] See USCIS, Questions and Answers: Reasonable Fear Screening, available at https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-reasonable-fear-screenings (last updated June 18, 2013).

[87] The FY 2016/2017 proposed fee schedule used both phrases. See 81 FR 26915. The FY 2010/2011 and FY 2008/2009 proposed fee schedules used the phrase "low volume reallocation." See 75 FR 33461 and 72 FR 4910, respectively.

[88] The 8-percent increase was the percentage difference between the current fees and the model output before reallocation, weighted by fee-paying volume. See 81 FR 73296. The model output is a projected fee-paying unit cost from the ABC model. It is projected total cost divided by projected fee-paying receipts. While each fee review may calculate a different percentage, the formula for the calculation remains the same.

[89] In the docket for this proposed rule, the supporting documentation has more information on the proposed cost reallocation and the ABC model output. See the Cost Reallocation column of Appendix Table 4: Proposed Fees by Immigration Benefit Request. The docket also includes documentation for the fee schedule.

[90] DHS explains the purpose of this proposed form in section VIII.N.4 of this preamble.

all IEFA non-premium fees to the nearest $5 increment.

For many of these form types, DHS and DOJ have a long history of special consideration for these immigration and naturalization fees. For example, DOJ did not change fees for Forms I–290B, I–360, N–300, N–336, N–470 in the first IEFA fee rule that used ABC modeling. *See* 63 FR 1775 (Jan. 12, 1998) at 1784 (proposed rule); 63 FR 43604 (final rule). DOJ maintained the prior fee for these forms until it could capture sufficient information for these low (less than 10,000 per year) volume forms to change the fees in a separate rulemaking. *See* 64 FR 69883 (Dec. 15, 1999). DHS has a history of setting adoption-related fees lower than the amount suggested by the fee-setting methodology, as discussed in section VIII.N.1 of this proposed rule. DHS also has a long history of special consideration for naturalization fees, as discussed in section VIII.F. of this preamble.

To allow the proposed fee schedule to recover full cost, DHS proposes that other fees be increased to offset the difference between the projected cost of adjudicating these benefit requests and the revenue generated by the 18 percent limited fee increase. Similarly, DHS proposes that other fees increase to offset a projected increase in workloads that are exempt from paying fees or that are capped at a fee less than what the ABC model indicates. In this proposed rule, DHS refers to the process of recovering full cost for workloads without fees or the shifting of cost burdens among benefit request fees due to other policy considerations as cost reallocation.

DHS proposes to maintain the current fee for several benefit requests. These proposed fees would have decreased based on the ABC model results. However, DHS proposes to maintain the current fees. This will allow these forms to fund some of the costs of other forms and may limit the fee increase suggested by the fee calculation model for those other forms. In this proposed rule, DHS proposes to not change the following fees:

• Form I–90, Application to Replace Permanent Resident Card when filed online.

• Form I–131A, Application for Travel Document (Carrier Documentation).

• Form I–191, Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA).

• Form I–698, Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA).

• Form N–565, Application for Replacement Naturalization/Citizenship Document.

Some proposed fees are significantly higher than the current fees. In some cases, this is because DHS proposes to not limit those fee increases, as it has done in the past, for policy reasons, as explained below. For example, previous fee schedules limited the increase for the immigration benefit requests associated with Forms I–212, I–601, I–601A, and I–765.[91] *See* 81 FR 26915–26916. In the FY 2016/2017 fee rule, DHS stopped limiting the fee increase for inadmissibility waivers like Forms I–212 and I–601. *See* 81 FR 73306–73307. In addition, in this proposed rule, DHS proposes not to limit the fee increase to 18 percent for the following immigration benefit requests:

• Form I–601A, Provisional Unlawful Presence Waiver; and

• Form I–765, Application for Employment Authorization.

DHS is not proposing to limit the fee increases for these two immigration benefit requests because, if we did, then other proposed fees would have to increase to recover full cost. For example, DHS limited the fee increase for Form I–765 in the FY 2016/2017 fee rule for humanitarian and practical reasons. *See* 81 FR 26916. Many individuals seeking immigration benefits face financial obstacles and cannot earn money through lawful employment in the United States until they receive an EAD. In this rule, DHS proposes additional fee exemptions instead of limiting the proposed fee for Form I–765. If DHS were to propose limited fee increases for all of the immigration benefit request fees that were limited in the FY 2016/2017 fee rule, then some proposed fees could increase by as much as $2,855, with the average of those changes being an increase of $79 per immigration benefit request. The rationale for some of these proposed changes is further discussed later in this preamble. *See* section VIII,

Other Proposed Changes in the FY 2022/2023 Fee Schedule.

Later in this preamble, DHS discusses the proposal for separate online and paper filing fees. See section VIII.G. DHS bases the proposed separate online and paper fees on ABC model results. When DHS proposes limited fee increases or to continue using the current fee, the calculation is based on the current fee instead of ABC model results. As such, there are not separate proposed fees for online and paper filing for immigration benefit requests with limited fee increases or for those held to the current fee.

### 4. Funding the Asylum Program With Employer Petition Fees

DHS proposes a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–140, Immigrant Petition for Alien Worker. Proposed 8 CFR 106.2(c)(13). DHS proposes this new fee as a way to mitigate the scope of the proposed fee increases in this rule for individual applicants and petitioners. DHS has determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. DHS arrived at the amount of the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Worker, to collect the Asylum Processing IFR estimated annual costs.[92] See Table 11 for details on the calculation. The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay using USCIS' standard costing and fee calculation methodologies.

BILLING CODE 9111–97–P

---

[91] *See* section VIII.F, Naturalization and Citizenship-Related Forms (discussion on the proposed naturalization fees).

[92] DHS notes that in section V.A.2.c of this preamble it identified the costs of the Asylum Processing IFR as averaging $425.9 million annually over FY 2022/2023. That figure represents the estimated costs that are directly attributable to the implementation of that rule. DHS divided this cost estimate by the estimated fee-paying volume for Forms I–129 and I–140 to determine the $600 Asylum Program Fee. Calculation: $425,900,395/708,630 = $601.02. DHS rounded to the nearest $5, consistent with other proposed fees.

| Table 11: Asylum Program Fee Calculation | |
|---|---|
| **Estimated Costs** | |
| Asylum Processing IFR Costs | Total Estimated Cost (150K) |
| Asylum Processing IFR (150K) Cost Estimate FY 2022 | $438,200,000 |
| Asylum Processing IFR (150K) Cost Estimate FY 2023 | $413,600,790 |
| Two-year Average | $425,900,395 |
| | |
| **Estimated Fee-Paying Receipts** | |
| Immigration Benefit Requests | Projected Fee-Paying Receipts |
| I-129 Petition for a Nonimmigrant Worker Subtotal | 568,630 |
| For H-1 nonimmigrants | 430,000 |
| For H-2A - Named Beneficiaries | 4,020 |
| For H-2B - Named Beneficiaries | 2,460 |
| For L nonimmigrants | 42,350 |
| For O nonimmigrants | 27,300 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | 40,850 |
| For H-2A - Unnamed Beneficiaries | 17,650 |
| For H-2B - Unnamed Beneficiaries | 4,000 |
| I-140 Immigrant Petition for Alien Worker | 140,000 |
| Employment-based Petition Total | 708,630 |
| | |
| **Asylum Program Fee Calculation** | |
| Estimated cost divided by estimated fee-paying receipts | $601 |
| Asylum Program Fee (above row rounded to nearest $5) | $600 |
| Asylum Program Fee Estimated Revenue (above row multiplied by fee-paying receipts) | $425,178,000 |

BILLING CODE 9111–97–C

This Asylum Program Fee adds a fee for Form I–129 and Form I–140 petitioners of $600 while maintaining lower proposed fees for other immigration benefit requestors than would be proposed if the costs were spread among all other fee payers. For example, charging the Asylum Program Fee only to employer petitions reduces the proposed Form I–485 fee by $170 compared to a fee schedule without the cost shift. Similarly, the proposed fee to file Form I–765 on paper is $70 less than it would be absent the proposed Asylum Program Fee. The proposed fees for Forms I–485, I–765, and others are lower in a scenario with the shift of asylum program costs to employers through the new fee because all IEFA

non-premium fees are related. Each fee helps recover the cost of work without fees (Forms I–589, I–590, I–914, I–918, etc.) or work with fees that do not recover full cost (Forms N–400, I–600, I–800, etc.). If Forms I–129 and I–140 recover more of those costs, then that means other forms need not recover as much, resulting in lower proposed fees for Forms I–485, I–765, and others that recover more than full cost in this proposal. Table 12 shows the proposed IEFA non-premium fees for Forms I–129 and I–140, including the Asylum Program Fee. The table excludes additional statutory or premium-

processing fees that petitioners may pay for these immigration benefit requests.[93]

[93] Most petitioners using Forms I–129 and I–140 may request expedited processing for an additional $2,500 or $1,500 premium processing fee. *See* USCIS, I–907, Request for Premium Processing Service, *https://www.uscis.gov/i-907* (last updated Sep. 30, 2021). Certain H–1B and L petitions may have to pay up to $6,000 in additional statutory fees, which DHS is unable to adjust. USCIS does not keep most of the revenue of these fees. CBP receives 50 percent of the $4,000 9–11 Response and Biometric Entry-Exit fee and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains 5 percent of the $1,500 or $750 American Competitiveness and Workforce Improvement Act (ACWIA) fee. The remainder goes to the Department of Labor and the National Science Foundation. USCIS keeps one third of the $500 Fraud Detection and Prevention fee, while the remainder is split between the Department of State and the Department of Labor. These statutory fees are in addition to the current Form I–129 fee of

## Table 12: Proposed IEFA Non-Premium Fees for Forms I-129 and I-140

| Immigration Benefit Request | Proposed Fee | Asylum Program Fee | Total Proposed Fee |
|---|---|---|---|
| I-129 Petition for a Nonimmigrant Worker | | | |
| For H-1B | $780 | $600 | $1,380 |
| For H-2A - Named Beneficiaries | $1,090 | $600 | $1,690 |
| For H-2B - Named Beneficiaries | $1,080 | $600 | $1,680 |
| For L | $1,385 | $600 | $1,985 |
| For O | $1,055 | $600 | $1,655 |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | $1,015 | $600 | $1,615 |
| H-2A - Unnamed Beneficiaries | $530 | $600 | $1,130 |
| H-2B - Unnamed Beneficiaries | $580 | $600 | $1,180 |
| I-140 Immigrant Petition for Alien Worker | $715 | $600 | $1,315 |

BILLING CODE 9111–97–C

The proposed $600 Asylum Program Fee would apply to all fee-paying receipts for Forms I–129, I–129CW, and I–140. For example, it would apply to all initial petitions, changes of status, and extensions of stay that use Form I–129.

DHS acknowledges that the scope of the proposed fee increases in this rule is significant. DHS proposes this cost shifting approach with the Asylum Program Fee to place greater emphasis on the ability-to-pay principle for determining user fees. Petitioners for immigrant and nonimmigrant workers generally are required to have the resources necessary to pay the worker(s) for whom the petition is filed, and the fees that the employer must pay USCIS to file a petition are not significant compared to even a small [94] petitioner's revenue and profit. That determination is not changed by the proposed Asylum Program Fee.

DHS considered proposing to transfer the costs of other humanitarian programs, such as the T, U, VAWA, SIJ, and refugee programs, to those who file benefit requests that may be able to better afford to pay fees. DHS recognizes, however, that we have always spread costs of free services that USCIS provides across all other fee-paying requests in the past and we have never directly transferred the costs of one program to another. *See, e.g.,* 85 FR 46869 (stating, "For the fees that DHS does not limit, we use the total cost for

each form to reallocate the cost of limited fee increases or workload without fees."); 75 FR 58973 (Stating, "To the extent not supported by appropriations, the cost of providing free or reduced services must be transferred to all other fee-paying applicants."); 72 FR 29865 (stating, "As with any other waiver, the loss of that fee revenue would necessarily be spread across all other benefit applications and petitions, having the potential to increase those fees."). After considering the impact on all of the fees calculated by the model, DHS is proposing that the Asylum Program Fee for Forms I–129 and I–140 is the appropriate place to shift some of the costs of the asylum.

DHS does not propose this Asylum Program Fee without having carefully considered its implications and effects. DHS realizes that some petitioners will object to funding the costs of USCIS-administered programs to which they have no connection or from which they receive no direct benefit. DHS is committed to reducing barriers and promoting accessibility to immigration benefits, and knows that the beneficiaries of Forms I–129 and I–140 fuel our economy, contribute to our arts, culture, and government, and have helped the United States lead the world in science, technology, and innovation. DHS is also aware that Forms I–129 and I–140 are submitted by non-profit entities, organizations performing research for government agencies, as

well as farms, small businesses, and individuals. DHS appreciates that non-profit or small entities may not have the same level of financial resources as many large, for-profit corporations that also submit petitions for foreign workers. In our Small Entity Analysis (SEA) for this proposed rule, we provide samples of the I–129 and I–140 forms, and how the fees may impact the small entities with the Asylum Program Fee. Within the SEA, DHS determined the average impacts to employers who file a petition based on their total revenue and profits. For Form I–129, approximately 90 percent of the small entities in the sample experienced an economic impact of less than 1 percent of their reported revenue. For Form I–140, approximately 98 percent of the small entities in the sample experienced an economic impact of less than 1 percent of their reported revenue. USCIS acknowledges that those small entities with greater than 1 percent impact may file fewer petitions as a result of this proposed rule. As previously indicated, the success of the USCIS fee model and this rulemaking in generating the necessary revenue depends on the filing volumes not falling short of those projected herein. At the same time, USCIS is charged with administering the asylum program using fee revenue and must make considered judgments about how to fund it using available and appropriate means. Balancing both of those goals, and

$460 and optional premium processing fee. *See* USCIS, H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker, *https://www.uscis.gov/*

*forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated Feb. 20, 2018).

[94] Small is defined by U.S. Small Business Administration Guidelines. *See* Small Entity

Analysis for the FY22/23 U.S. Citizenship and Immigration Services Fee Schedule Proposed Rule in Supporting Documents.

considering the resources of the Form I–129 and I–140 filing communities, DHS decided to phase out this surcharge. DHS will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and any funding appropriated for it when DHS develops its final fee rule.

## C. Exclusion of Temporary or Uncertain Programs

As stated in section V.B.1.b. of this preamble, the success of the fees established by this rulemaking in providing the funding necessary to sustain USCIS service levels depends on the projected volume of fee-paying requests filed after this rule takes effect being at or near the level projected. If a program is ended, is partially curtailed, or substantially declines, USCIS is at risk of not achieving the projected and necessary revenue. Therefore, USCIS excludes from the fee calculation model the costs and revenue associated with programs that are temporary by definition or where it is possible that the program will diminish or cease to exist. This exclusion includes Form I–821, Application for Temporary Protected Status, and Form I–821D, Consideration of Deferred Action for Childhood Arrivals, as well as the Form I–765 filings and biometrics fees associated with both programs.

DHS excludes projected revenue from expiring or temporary programs in setting the fees required to support baseline operations due to the uncertainty associated with such programs. For example, the Secretary may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances where the country is temporarily unable to adequately handle the return of its nationals. TPS, however, is a temporary benefit, and TPS designations may be terminated. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). Likewise, DACA allows certain individuals who meet specific guidelines to request consideration of deferred action from USCIS for a specified period unless terminated. DACA is an administrative exercise of enforcement discretion and is implemented at the discretion of DHS, given that it has insufficient resources to enforce the immigration laws against every noncitizen without lawful immigration status. Because DACA is temporary act of enforcement discretion and may be terminated, it is excluded from this fee review, as discussed further in the next section.

DHS excludes the costs and revenue associated with these programs because

program eligibility is subject to the discretion of the Department. Because the future of these programs is difficult to predict, as discussed later in this section, USCIS has excluded the cost and workload of these programs from the fee review and does not propose to allocate overhead and other fixed costs to these workload volumes. This mitigates an unnecessary revenue risk. In other words, if DHS established the USCIS fee schedule based on revenue from these programs, and the eligible programs diminish or cease to exist, USCIS will not realize the projected revenue and would not have enough revenue to recover full cost of overhead and other fixed costs. USCIS analyzes variable unit costs associated with processing these benefit types and uses volume forecasts to exclude their costs from the fee review budget and ABC model.

All fee revenue deposited into the IEFA is pooled and collectively used to finance USCIS operations including DACA, TPS, and other temporary programs. USCIS also responds to surges in customer demand for services by realigning resources to cover the cost of processing. Consequently, USCIS is capable of funding these programs even though their costs are not included in the fee review budget or ABC model. By excluding programs that are temporary by nature, DHS maintains the integrity of the ABC model, better ensures recovery of full costs, and mitigates revenue risk from unreliable sources. This approach is consistent with prevailing guidance on the subject as stated by Principle 6 of the Government Accountability Office (GAO) Greenbook, Standards for Internal Control in the Federal Government ("The Greenbook").[95] Principle 6 provides guidance on objectives and risks and advises managers to determine the acceptable level of variation in performance relative to the achievement of objectives. For example, in FY 2020, there were 647,278 active DACA recipients. *See* 86 FR 53785. DHS estimates that there will be 720,093 active DACA recipients in FY 2023.[96] If DHS were to include the DACA renewals in the fee review, it would be one of the larger populations. For example, in FY 2023, USCIS estimates

that 573,563 individuals will request either initial or renewal DACA.[97] However, on October 5, 2022, the U.S. Court of Appeals for the Fifth Circuit affirmed, in part, a July 2021 decision of the U.S. District Court for the Southern District of Texas declaring the 2012 DACA policy unlawful, but remanded the case to the District Court for further consideration of the recently published DACA final rule.[98] TPS volumes can vary significantly by fiscal year. In FY 2022, USCIS collected approximately $5.6 million in revenue for Form I–821, and USCIS forecasts 626,770 receipts for Form I–821 in FY 2023. Nevertheless, DHS cannot predict the disasters or crises that lead to new TPS designations. DHS can reliably predict TPS renewals if existing designations are not terminated; however, renewals are often on an 18-month cycle that does not align with Federal fiscal years. Including volume forecasts that are so variable by fiscal year may result in inaccurate fee calculations, especially over a long term. As such, DHS determined that including temporary or uncertain programs in the fee structure would exceed an acceptable level of risk for the success of this fee rule. Adding TPS and DACA costs, volumes, and revenue to the fee review would lower the fee for Form I–765 if its fee is calculated to recover full cost. However, if a certain country's TPS designation is terminated or if DACA ceases, basing the Form I–765 fee on that projected value leaves USCIS at a risk of not achieving projected revenue and the objectives of this proposed rule. Thus, consistent with four previous fee rules, DHS proposes to exclude from this rule the costs and revenue from programs that are susceptible to large reductions in filing volume.

## D. Consideration of DACA Rulemaking

On August 30, 2022, DHS published a final rule, Deferred Action for Childhood Arrivals, 87 FR 53152 (DACA rule). DHS has considered this rule and the DACA rule's possible effects on each other when developing this proposed rule. Because the specific costs and revenue associated with DACA are not separately identified in this proposed rule, each rule is

---

[95] The Green Book sets internal control standards for Federal entities. Internal control is a process used by management to help an entity achieve its objectives, run its operations efficiently and effectively, report reliable information about its operations and comply with applicable laws and regulations. See GAO, Standards for Internal Control in the Federal Government (Sep. 10, 2014), *https://www.gao.gov/products/gao-14-704g*.

[96] 87 FR 53275 (Aug. 30, 2022).

[97] 87 FR 53277 (Aug. 30, 2022).

[98] *Texas* v. *United States,* 50 F.4th 498 (*5th* Cir. 2022). The Fifth Circuit, however, preserved the partial stay issued by the district court in July 2021 (*Texas* v. *United States,* 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021) while the case is on remand to the District Court for further proceedings regarding the new DACA rule. While the stay remains in place, current grants of DACA and related Employment Authorization Documents are valid. USCIS will accept and process renewal DACA requests but not process initial DACA requests.

independent and DHS estimates that the DACA rule will have no effects on this rule or vice versa. The DACA rule interacts with this rule only to the extent that the DACA rule established an $85 fee for Form I–821D at 8 CFR 106.2(a)(38) and this rule proposes to move that fee to 8 CFR 106.2(a)(49).

### E. Fee-Related Issues for Consideration

DHS identified a number of issues that do not affect the FY 2022/2023 fee review but do merit some discussion. DHS does not propose any changes related to the issues discussed in this section. USCIS may discuss these issues in future biennial fee reviews or in conjunction with other USCIS fee rules. To better inform this and future fee-setting policies and rules, DHS welcomes comments on all facets of the FY 2022/2023 fee review, this proposed rule, and USCIS fees in general, regardless of whether changes have been proposed here.

#### 1. Accommodating E-Filing and Form Flexibility

DHS attempts, as it did in the FY 2010/2011 fee rule, FY 2016/2017 fee rule, and the 2020 fee rule, to propose fees based on form titles instead of form numbers to avoid prescribing fees in a manner that could undermine the adoption by USCIS of electronic processing. *See* proposed 8 CFR part 106. Form numbers are included for informational purposes but are not intended to restrict the ability of USCIS to collect a fee for a benefit request that falls within the parameters of the adjudication for which the fee is published. DHS has worked for over a decade to remove unnecessary administrative and procedural provisions from title 8 of the CFR so as not to face restrictions such as using a certain form number for a benefit request codified with the force of law. As USCIS modernizes its processes and systems to allow more applicants, petitioners, and requestors to file benefit requests online, the agency may collect fees for immigration benefit requests that do not have a form number or do not have the same form number as described in regulations. This could occur, for example, if USCIS developed an online version of a request that individuals often submit with applications for employment authorization. In this situation, USCIS may find it best to consolidate the two requests without separately labeling the different sections related to the relevant form numbers. DHS would still collect the required fee for the underlying immigration benefit request as well as the request for employment

authorization, but the actual online request would not necessarily contain form numbers corresponding to each separate request.

Similarly, USCIS may determine that efficiency would be improved by breaking a paper form into separate paper forms. For instance, USCIS could separate Form I–131, Application for Travel Document, into a separate form and form number each for advance parole, humanitarian parole, refugee travel documents, or re-entry permits. In this example, USCIS could continue to charge the current Form I–131 fee for each separate form. This structure permits USCIS to change forms more easily without having to perform a new fee review each time the agency chooses to do so.

#### 2. Processing Time Outlook

As discussed in the Projected Cost and Revenue Differential section of this preamble, USCIS anticipates having insufficient resources to process its projected workload absent this fee rule. For FY 2022/2023, USCIS estimates that backlogs will continue to grow in the absence of additional resources. Although USCIS has implemented measures to reduce the backlog as described in section IX.C., USCIS net processing backlogs have grown from approximately 1.4 million cases in December 2016, when DHS last adjusted IEFA non-premium fees, to approximately 8.0 million cases at the end of September 2021.[99] On top of these pre-existing strains on USCIS, the COVID–19 pandemic constrained USCIS adjudication capacity by limiting the ability of USCIS to schedule normal volumes of interviews and biometrics appointments while maintaining social distancing standards, contributing to the backlog. Further, USCIS believes that the growing complexity of case adjudications in past years, including prior increases in the number of interviews required and request for evidence (RFE) volumes, has contributed to higher completion rates and growing backlogs. *See* section V.B.2, Completion Rates.

USCIS is reviewing its adjudication and administrative policies to find efficiencies, while strengthening the integrity of the immigration system. This entails evaluating the utility of interview requirements, biometrics submission requirements, RFEs, deference to previous decisions, and other efforts that USCIS believes may,

when implemented, reduce the amount of adjudication officer time required, on average, per case. Any improvements in these completion rates would, all else equal, reduce the number of staff and financial resources USCIS requires. Furthermore, USCIS is actively striving to use its existing workforce more efficiently, by investigating ways to devote a greater share of adjudication officer time to adjudications, rather than administrative work. All else being equal, increasing the average share of an officer's time spent on adjudication (that is, utilization rate) would increase the number of adjudications completed per officer and reduce USCIS' overall staffing and resource requirements. USCIS based its fee review largely on existing data that do not presume the outcome of these initiatives. USCIS cannot assume significant efficiency gains in this rule, in advance of such efficiency gains being measurably realized. Establishing more limited fees to account for estimated future efficiency could result in a deficient funding, and USCIS would not be able to meet its operational requirements. In contrast, if USCIS ultimately receives the resources identified in this proposed rule and subsequently achieves significant efficiency gains, this could result in backlog reductions and shorter processing times. Those efficiency improvements would then be considered in future fee reviews.

As explained in the FY 2022/2023 Cost Projections section of this preamble, projected workloads for FY 2022 and FY 2023 exceed current processing capacity. Therefore, USCIS requires additional resources and staff to increase its processing capacity to match projected receipt volumes and ensure that backlogs do not continue to grow. Through the adjustments to the fee schedule proposed in this rule, USCIS expects to collect sufficient fee revenue to fund additional staff who will support the estimated FY 2022/2023 processing capacity requirements. While USCIS is committed to reducing processing times and the current backlog, DHS will not compromise the integrity of the immigration system and safeguarding national security.

### VI. Fee Waivers

#### A. Background

The fee-setting authority in INA sec. 286(m), 8 U.S.C. 1356(m), states that "[f]ees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum

---

[99] *See* USCIS, Number of Service wide Forms By Quarter, Form Status, and Processing Time Fiscal Year 2021, Quarter 4, *https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2021Q4.pdf* (last visited Jan. 11, 2022).

applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.'' That provision does not require that USCIS charge a fee for all of its services, and it provides that USCIS may set fees at less than full cost or provide services for free. DHS has long understood this provision to authorize DHS to fund or subsidize discounted or free USCIS operations through the fees charged to other unrelated filings. DHS has exercised its discretion to provide free services in a number of ways, such as providing that a fee may be waived for eligible filers upon request, by codifying ''no fee,'' setting a $0 fee, or simply leaving the fee regulations silent and not codifying a fee for a particular service that it provides.

Currently, USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee. *See* 8 CFR 103.7(c) (Oct. 1, 2020). To request a fee waiver, the individual must submit a written waiver request for permission to have their benefit request processed without payment. Under the current regulation, the waiver request must state the person's belief that they are entitled to or deserving of the benefit requested and the reasons for their inability to pay and include evidence to support the reasons indicated. *See* 8 CFR 103.7(c)(2) (Oct. 1, 2020). There is no appeal of the denial of a fee waiver request. *See id.* However, Form I–912 may be resubmitted with additional evidence if the fee waiver request is denied.

Following the 2010 fee rule, USCIS also issued guidance to the field to streamline fee waiver adjudications and make them more consistent among offices and form types nationwide. *See* Policy Memorandum, PM–602– 0011.1,[100] Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011) (''Fee Waiver Policy''). This guidance clarifies what measures of income can be used and the types of documentation that are acceptable for individuals to present as demonstration that they are unable to pay a fee when requesting a fee waiver. In June 2011, USCIS issued the Request for Fee Waiver, Form I–912, which is an optional standardized form with instructions that can be used to request

a fee waiver in accordance with the fee waiver guidance.[101]

DHS has always implemented fee waivers for USCIS applicants based on need, and since 2007, has rejected the filing of fee waivers by individuals that have the financial means to pay required fees for the status or benefit sought. *See* 72 FR 4912 (Feb. 1, 2007). The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)[102] requires DHS to permit certain categories of applicants to apply for fee waivers for ''any fees associated with filing an application for relief through final adjudication of the adjustment of status.''[103] DHS interprets ''any fees associated with filing an application for relief through final adjudication of the adjustment of status''[104] to mean that, in addition to the main immigration benefit request (such as Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, Form I–914, Application for T Nonimmigrant Status, or Form I–918, Petition for U Nonimmigrant Status), these categories of applicants must have the opportunity to request a fee waiver for any form associated with the main benefit application up to and including the adjustment of status application.[105]

*B. The 2020 Fee Rule Waiver Changes*

As stated in section IV of this preamble, each fee review plans for a certain level of fee waivers, fee exemptions, and other fee-paying policy decisions. DHS sets IEFA fees to recover estimated full cost, including the estimated cost of fee-waived and fee-exempt work. Applicants, petitioners, and requestors who pay a fee cover the cost of processing their own requests plus the costs of requests that are fee exempt, fee waived, or fee reduced. In prior years, USCIS fees have given significant weight to the ability-to-pay principle. However, on October 25, 2019, DHS revised USCIS fee waiver policies and Form I–912, including by requiring fee waiver applicants to use the revised Form I–912, requiring waiver applicants to submit tax transcripts to demonstrate income, and not accepting evidence of receipt of a means-tested public benefit as evidence of inability to pay as described (''the 2019 Fee Waiver Revisions''). *See*

USCIS Policy Manual Alert, Fee Submission of Benefit Requests, PA 2019–06 (October 25, 2019).[106] This guidance was effective December 2, 2019. Form I–912 was updated and submitted for a 30-day comment period on June 5, 2019,[107] and subsequently approved by OMB on October 24, 2019.[108] While the 2019 Fee Waiver Revisions took effect on December 2, 2019, the United States District Court for the Northern District of California preliminarily enjoined them in *City of Seattle,* No. 3:19–CV–07151–MMC, on December 11, 2019. USCIS then reverted to using the previous policy and form.

Subsequently, in the FY 2019/2020 fee review, DHS limited fee waivers in the 2020 fee rule to immigration benefit requests for which USCIS is required by law to consider a fee waiver or where the USCIS Director exercised favorable discretion. 8 CFR 106.3(a)(1) (Oct. 2, 2020). The 2020 fee rule also limited fee waivers to individuals who have an annual household income of less than 125 percent of the Federal Poverty Guidelines (FPG) as defined by the U.S. Department of Health and Human Services (HHS). 8 CFR 106.3(c) (Oct. 2, 2020). In addition, the USCIS Director's discretion to grant a waiver was limited to: (1) an individual who had an annual household income at or below 125 percent of the FPG as defined by HHS; (2) was seeking an immigration benefit for which they were not required to submit an affidavit of support under INA sec. 213A, 8 U.S.C. 1183a, or were not already a sponsored immigrant as defined in 8 CFR 213a.1; and (3) was seeking an immigration benefit for which they were not subject to the public charge inadmissibility ground under INA sec. 212(a)(4), 8 U.S.C. 1182(a)(4). 8 CFR 106.3(b) (Oct. 2, 2020). The 2020 fee rule required that a person must submit a request for a fee waiver on the form prescribed by USCIS. 8 CFR 106.3(d) (Oct. 2, 2020). Finally, the 2020 fee rule prescribed the acceptable documentation of gross household income that a person submitting a request for a fee waiver must submit. 8 CFR 106.3(f) (Oct. 2, 2020). As noted above, the 2020 fee rule was preliminarily enjoined before its effective date.

As stated in Section IV, DHS has determined that the 2020 fee rule's changes to fee waiver and fee exemption requirements would adversely impact

---

[100] USCIS, PM 602.0011.1 (March 13, 2011) available at *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

[101] The form and its instructions may be viewed at *http://www.uscis.gov/i-912.*

[102] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[103] *See id.*

[104] *See id.*

[105] Certain USCIS forms are not listed in 8 CFR 103.7(b) and therefore have no fee. *See* proposed 8 CFR 106.2 for proposed fees.

[106] Available at *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20191025-FeeWaivers.pdf.*

[107] *See* 84 FR 26137 (June 5, 2019).

[108] *See* OMB Notice of Action available at *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201910-1615-006#.*

AR_000055

the ability of those who may be less able to afford the proposed fees to seek an immigration benefit for which they may be eligible. Therefore, in this rule, DHS is proposing to maintain previous regulations for fee waivers and add fee exemptions to address accessibility and affordability. DHS acknowledges that shifting away from the beneficiary-pays approach taken in the 2020 fee rule and reverting to the agency's historical practice of emphasizing the ability-to-pay principle allocates costs away from individuals who are exempt from paying fees or have their fees waived, and results in some fees being higher than the estimated cost of providing the associated service. Nevertheless, DHS has determined that these proposed fee waiver regulations are reasonable, authorized by statute, and consistent with the policy goal of making immigration benefits affordable to the public while providing USCIS with adequate funding for its services.

### C. Inability To Pay

DHS does not propose to change fee waiver eligibility based on an inability to pay, and will maintain the 2011 Fee Waiver Policy criteria that established a streamlined process where USCIS could waive the entire fee and the biometric services fee (if applicable) for forms listed in 8 CFR 103.7(c)(3) (Oct. 1, 2020).[109] Applicants would still be eligible for fee waivers if the form is listed in proposed 8 CFR 106.3(a)(3) and the applicant demonstrates that they meet at least one of the following criteria:

• Is receiving a means-tested benefit;
• Had a household income at or below 150 percent of the FPG; or
• Is experiencing extreme financial hardship, such as unexpected medical bills or emergencies.

The FPG, as annually published by the U.S. Department of Health and Human Services [110] increases the latest updated Census Bureau poverty thresholds by the relevant percentage change in the Consumer Price Index for All Urban Consumers (CPI–U). Census Bureau income thresholds vary by family size and composition. If a family's total income is less than the family's threshold, then every individual in that family is considered to be living in poverty. The official poverty definition uses money income before taxes and does not include capital gains or noncash benefits (public benefits).[111] The 2020 Poverty Guidelines for the 48 Contiguous States and the District of Columbia was $12,760 for a household of one and $26,200 for a household of four.[112]

DHS considered the use of other measures of ability to pay for administration of its fee waiver policies based on input provided by stakeholders and due to concerns about the continued upward trend in the number and dollar amounts of fee waivers approved since the three-step eligibility process and Form I–912 were introduced. For example, besides the FPG and increasing the percentage reviewed, DHS looked at using the United States Department of Housing and Urban Development (HUD) Median Family Income (MFI) [113] estimates. The median household income for 2020 was $67,521 in the United States.[114] HUD Income Limits calculations include the median family incomes for each area. HUD uses the Section 8 (housing choice voucher) program's Fair Market Rent (FMR) [115] area definitions in developing median family incomes.[116] After careful consideration, DHS proposes to maintain the use of the FPG for determining income thresholds for USCIS fee waiver purposes for several reasons. First, the FPG ensures a consistent national standard for income thresholds as HHS is required to update the FPG at least annually, adjusting them based on the Consumer Price Index for All Urban Consumers (CPI–U). The MFI and other thresholds vary greatly by area and require a specific calculation by state and county and, accordingly, relying on them would increase administrative costs. Second, it promotes consistency between fee waivers and numerous other Federal programs that utilize the FPG as an eligibility criterion, including Medicaid. The MFI is specifically used for HUD benefits and the calculation changes based on the area, so additional calculations would need to be done in order to determine eligibility. Thirdly, USCIS has used the FPG since putting the streamlined fee waiver request and approval process in place over a decade ago, has been effectively used, and its continued use would limit confusion.[117] In addition, DHS believes that the using FPG minimizes confusion for the public and USCIS employees in determining income thresholds for fee waiver eligibility. DHS has determined that use of the FPG for determining income thresholds affords consistency for administering a nationwide benefits program that other income guidelines do not, preserves the accessibility and affordability of immigration benefits for those who are eligible and may be less able to afford the proposed fees, and does not result in unmanageable levels of unfunded immigration services that must be borne by other fees.

### D. USCIS Director's Discretionary Fee Waivers and Exemptions

The FY 2010/2011 fee rule also authorized the USCIS Director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in the 8 CFR 103.7(c) (Oct. 1, 2020). *See* 75 FR 58990 (Sept. 24, 2010); 8 CFR 103.7(d) (Oct. 1, 2020). DHS proposes to retain the authority in regulations for the Director of USCIS to provide exemptions from or waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law. *See* 8 CFR 103.7(d)

---

[109] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf;* AFM Chapter 10.9(b).

[110] *See* Annual Update of the HHS Poverty Guidelines (87 FR 3315, Jan 21, 2022), available at *https://www.federalregister.gov/documents/2022/01/21/2022-01166/annual-update-of-the-hhs-poverty-guidelines.*

[111] *See* How the Census Bureau Measures Poverty, available at *https://www.census.gov/topics/income-poverty/poverty/guidance/poverty-measures.html#:~:text=Poverty%20Thresholds%3A%20Measure%20of%20Need,and%20age%20of%20the%20members* (last visited April 19, 2022).

[112] *See* Annual Update of the HHS Poverty Guidelines (86 FR 3060, Jan 17, 2020), available at *https://www.federalregister.gov/documents/2020/01/17/2020-00858/annual-update-of-the-hhs-poverty-guidelines.*

[113] See HHS, Office Of Policy Development And Research (Pd&R), Income Limits, available at *https://www.huduser.gov/portal/datasets/il.html* (last visited 10/26/2021). USCIS fee waiver eligibility for receipt of a means-tested benefit includes through HUD-related housing public benefits.

[114] *See* U.S. Census Bureau, Income and Poverty in the United States: 2020 (September 14, 2021) available at *https://www.census.gov/library/publications/2021/demo/p60-273.html* (last visited 04/19/2022).

[115] See 24 CFR 888.113 are estimates of 40th percentile gross rents for standard quality units within a metropolitan area or nonmetropolitan county. See Fair Market Rents (40th Percentile Rents) available at *https://www.huduser.gov/portal/datasets/fmr.html* (last visited 4/19/2022).

[116] See Methodology for Determining Section 8 Income Limits available at *https://www.huduser.gov/portal/datasets/il//il21/IncomeLimitsMethodology-FY21.pdf* (last visited 4/19/2022).

[117] As noted in the FY 2016/2017 fee rule, estimates of foregone revenue from fee waivers and exemptions increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 Fee Review. *See* 81 FR 73307. Since 2017, the upward trend in the amount of fee revenue foregone has since subsided. *See* Appendix V—Fee Waivers of the supporting documentation in this docket for historical trends from FY 2014 to FY 2020; the graph excludes the cost of fee exemptions.

**458** **Federal Register** / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

(Oct. 1, 2021); proposed 8 CFR 106.3(c). Previous USCIS Directors have used this authority to permit fee waivers or provide fee exemptions for specific categories and groups of immigrants.[118] DHS further proposes to maintain the current provision's limitation on the delegation of this authority to waive or exempt fees to the Deputy Director. *Id.* In the 2020 fee rule, DHS had proposed to limit the USCIS' Director's authority to issue fee waivers and exemptions based on categories of applicants such as asylee, refugees, national security or emergencies or natural disasters. *See* 8 CFR 106.3(b) and (e).[119] DHS believes that maintaining the authority for this extraordinary relief with the leaders of USCIS will ensure that it is consistently administered and not handled in a way that could impair USCIS fee revenue or shift significant costs among benefit requests by policy outside of rulemaking.

*E. Requirement To Submit Fee Waiver Form*

In addition, DHS proposes that fee waiver requests must be submitted on the form prescribed by USCIS, Form I–912, Request for Fee Waiver. Proposed 8 CFR 106.3(a)(2). Currently, requests for fee waivers may be made via a written request submitted with evidence of eligibility. Less than one percent of the fee waivers requests are submitted through a written request instead of Form I–912.[120] Some written fee waiver requests may be denied because they do not provide sufficient information for USCIS to adjudicate the request. DHS believes that requiring Form I–912 will ensure that the information required to make a fee waiver determination is provided and may result in fewer rejections due to insufficient or incomplete requests.

DHS realizes that requiring the form instead of allowing a written statement with documentation may be an additional burden. Adjudicating ad hoc fee waiver requests, however, has proven to be difficult for USCIS due to the varied quality and information provided in such standalone letter requests. Form I–912 has an estimated time of completion of one hour and ten minutes, and it provides standardization that will assist USCIS in review of requests. Because DHS has determined that requiring the form will reduce rejections, DHS believes that any added burden is warranted and in the long term will assist applicants and limit future burdens.

*F. Form and Policy Changes*

As discussed in the Paperwork Reduction Act section of this rule, DHS is proposing changes to the information collection requirements [121] associated with Form I–912 to clarify the following policies:

• The burden of proof for inability to pay is based on a preponderance of the evidence. An officer may grant a request for fee waiver in the absence of some of this documentation so long as the available documentation supports that the requestor is more likely than not to be unable to pay the fee.

• A child's receipt of public housing assistance, such as public housing or Section 8, will be acceptable as required evidence of the parent's eligibility for a fee waiver when the parent resides in the same residence.

• The documentary requirements for humanitarian categories of fee waiver requestors will include that:

○ Requestors seeking a fee waiver for any immigration benefit associated with or based on a pending or approved petition or application for VAWA benefits or T or U nonimmigrant status do not need to list the following people as household members or provide income information for:

▪ Any person in the household who is or was the requestor's abuser, human trafficker, or perpetrator; or

▪ A person who is or was a member of the abuser, human trafficker, or perpetrator's household.

○ Financial hardships that qualify an applicant for a fee waiver may result from, but are not limited to the following examples:

▪ A medical emergency or catastrophic illness affecting the noncitizen or the noncitizen's dependents;

▪ Unemployment;

▪ Significant loss of work hours and wages (change in employment status);

▪ Eviction;

▪ Homelessness;

▪ Military deployment of spouse or parent;

▪ Natural disaster;

▪ Loss of home (destruction such as fire, water, or collapse);

▪ Inability to pay basic utilities and rent or mortgage (payments and bills for each month are more than the monthly wages);

▪ Substantial financial losses to a small business that affect personal income;

▪ Victimization;

▪ Divorce or death of a spouse that affects overall income; or

▪ Situations that could not normally be expected in the regular course of life events.

○ A requestor may submit tax returns, a W–2, or pay stubs to establish household income.

○ If the requestor has no income due to unemployment, homelessness, or other factors, the requestor may provide, as applicable:

▪ A detailed description of the financial situation that demonstrates eligibility for the fee waiver;

▪ Hospital bills, or bankruptcy documents;

▪ If the requestor is receiving support services, an affidavit from a religious institution, non-profit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation; or

▪ Evidence of unemployment, such as a termination letter or unemployment insurance receipt.

These proposed policy changes are aimed at reducing the public burden and clarifying the types of documents and applicant can provide with the form. These changes are also responsive to the comments and suggestions provided by the public in the RPI. DHS believes that making these policy changes will provide additional guidance to the public on eligibility and will clarify requirements for vulnerable populations.

*G. Request for Comments*

DHS welcomes comment on the proposed changes to additional fee waivers which may include additional categories of petitioners, applicants or forms.

In addition, while DHS proposes no changes to the fee waiver criteria, the Department specifically requests comments on the appropriate level of income that should be used by an applicant who is unable to pay their fee and data to support that suggested level or measure.

DHS also welcomes comments on requiring Form I–912 for all fee requests and on alternatives for reducing

---

[118] For example, *See,* DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S. (Nov. 8, 2021), available at *https://www.uscis.gov/newsroom/news-releases/dhs-announces-fee-exemptions-streamlined-processing-for-afghan-nationals-as-they-resettle-in-the-us* (last visited 04/19/2022). An individual is not permitted to independently submit a request to the USCIS Director to exempt or waive a fee.

[119] See 85 FR 46920 (Aug 3, 2020).

[120] See the Regulatory Impact Analysis, sec. O, Fee Waivers, for further discussion. A total of 29 letters were submitted in lieu of Form I–912 in 2017, .07 percent of the total.

[121] DHS is proposing these policy changes in guidance and in in form instructions and not codifying them in this rule as regulations but marks those changes in the supporting documents in the docket for the public to review.

rejections based on lack of information or documentation with a written request.

## VII. Fee Exemptions

As stated in section VI.A., DHS may provide services for free and fund those free services with the fees charged to other, unrelated filings. DHS has exercised its discretion to provide free services by providing that a fee may be waived upon request, or by codifying "no fee," setting a $0 fee, or not codifying a fee for a particular service that USCIS administers. DHS is proposing to maintain fee exemptions currently being applied and provide new fee exemptions in this rule as follows.

### A. Codification of Benefit Requests With No Fees and Exemptions of Certain Categories or Classifications From Fees

DHS proposes to codify several longstanding fee exemptions that are currently provided through policy guidance documents, such as form instructions, the USCIS policy manual, or similar directives, but not in regulations, including the following: [122]

• Form I–90, Application to Replace Permanent Resident Card. No fee if the applicant was issued a card but never received it, or if the applicant's card was issued with incorrect information because of DHS error. Proposed 8 CFR 106.2(a)(1)(iv).

• Form I–102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. No fee for initial filings for a nonimmigrant member of the U.S. armed forces, for a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component; for a nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement; and for replacement for DHS error. Proposed 8 CFR 106.2(a)(2)(i) through (iv).

• Form I–129CWR, Semiannual Report for CW–1 Employers. Proposed 8 CFR 106.2(a)(4)(ii).

• Form I–131, Application for Travel Document. Proposed 8 CFR 106.2(a)(7)(v). No fees for parole requests from current or former U.S. armed forces service members.

• Form I–134, Declaration of Financial Support. Proposed 8 CFR 106.2(a)(9).

• Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant. DHS proposes no fee for the following:

○ A petition for Special Immigrant Juvenile (SIJ) classification, Proposed 8 CFR 106.2(a)(16)(iii); and

○ A petition for a person who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K). Proposed 8 CFR 106.2(a)(16)(v).

• Form I–361, Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian. Proposed 8 CFR 106.2(a)(17).

• Form I–363, Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian. Proposed 8 CFR 106.2(a)(18).

• Form I–407, Record of Abandonment of Lawful Permanent Resident Status. Proposed 8 CFR 106.2(a)(19).

• Form I–485J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j). Proposed 8 CFR 106.2(a)(22).

• Form I–508, Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities. Proposed 8 CFR 106.2(a)(23).

• Form I–539, Application to Extend/Change Nonimmigrant Status for nonimmigrant A, G, and NATO and T nonimmigrant. Proposed 8 CFR 106.2(a)(25)(iii)(A).

• Form I–566, Interagency Record of Request—A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status. Proposed 8 CFR 106.2(a)(26).

• Form I–589, Application for Asylum and for Withholding of Removal. Proposed 8 CFR 106.2(a)(27).

• Form I–590, Registration for Classification as a Refugee. Proposed 8 CFR 106.2(a)(28).

• Form I–600, Petition to Classify Orphan as an Immediate Relative. DHS proposes no fee for the first Form I–600 filed for a child based on an approved Form I–600A, Application for Advance Processing of an Orphan Petition, during the Form I–600A approval or extended approval period. Proposed 8 CFR 106.2(a)(29)(i).

• Form I–601, Application for Waiver of Grounds of Inadmissibility. DHS proposes to move the current fee exemption for concurrently filing a Form I–601 for certain reasons in 8 CFR 245.1(f) to the fee provision for the Form I–601. Proposed 8 CFR 106.2(a)(32).

• Form I–602, Application by Refugee for Waiver of Grounds of Inadmissibility. Proposed 8 CFR 106.2(a)(34).

• Form I–693, Report of Medical Examination and Vaccination Record. Proposed 8 CFR 106.2(a)(38).

• Form I–730, Refugee/Asylee Relative Petition. Proposed 8 CFR 106.2(a)(41).

• Form I–765, Application for Employment Authorization. DHS proposes that no fee will be charged for an initial EAD for the following:

○ Dependents of certain Government and international organizations or NATO personnel. Proposed 8 CFR 106.2(a)(43)(iii)(B).

○ N–8 (Parent of noncitizen classified as SK3) and N–9 (Child of N–8) nonimmigrants; Proposed 8 CFR 106.2(a)(43)(iii)(C).

○ Persons granted asylee status (AS1, AS6). Proposed 8 CFR 106.2(a)(43)(iii)(D).

○ Citizens of Micronesia, Marshall Islands, or Palau. Proposed 8 CFR 106.2(a)(43)(iii)(E).

○ Persons Granted Withholding of Deportation or Removal. Proposed 8 CFR 106.2(a)(43)(iii)(F).

○ Applicants for Asylum and Withholding of Deportation or Removal including derivatives. Proposed 8 CFR 106.2(a)(43)(iii)(G).

○ Taiwanese dependents of Taipei Economic and Cultural Representative Office E–1 employees. Proposed 8 CFR 106.2(a)(43)(iii)(H).

○ A Request for replacement EAD based on USCIS error. Proposed 8 CFR 106.2(a)(43)(iv).

○ For a renewal or replacement EAD for the following:

■ Dependents of certain foreign government, international organization, or NATO personnel. Proposed 8 CFR 106.2(a)(43)(v)(B);

■ Citizens of Micronesia, Marshall Islands, or Palau. Proposed 8 CFR 106.2(a)(43)(v)(C); and

■ Persons Granted Withholding of Deportation or Removal. Proposed 8 CFR 106.2(a)(43)(v)(D).

• Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse. Proposed 8 CFR 106.2(a)(43)(vi) and 8 CFR 106.3(a)(3)(iii).

• Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative, for the first Form I–800 filed for a child based on an approved Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, during the Form I–800A approval period or extended approval period. Proposed 8 CFR 106.2(a)(44)(i)(A).

• Form I–821, Application for Temporary Protected Status. There is no fee for re-registration. Proposed 8 CFR 106.2(a)(48)(ii).

---

[122] Application for Commonwealth of the Northern Mariana Islands (CNMI) Long-Term Resident Status (Form I–955) is not included in this list because USCIS only accepted applications for initial CNMI long-term resident status between February 19, 2020 and August 17, 2020. As of August 17, 2020, USCIS no longer accepts any Forms I–955.

• Form I–854, Inter-Agency Alien Witness and Informant Record. Proposed 8 CFR 106.2(a)(52).

• Form I–864, Affidavit of Support Under Section 213A of the INA. Proposed 8 CFR 106.2(a)(53).

• Form I–864A, Contract Between Sponsor and Household Member. Proposed 8 CFR 106.2(a)(53)(i).

• Form I–864EZ, Affidavit of Support Under Section 213A of the INA. Proposed 8 CFR 106.2(a)(53)(ii).

• Form I–864W, Request for Exemption for Intending Immigrant's Affidavit of Support. Proposed 8 CFR 106.2(a)(53)(iii).

• Form I–865, Sponsor's Notice of Change of Address. Proposed 8 CFR 106.2(a)(53)(iv).

• Form I–912, Request for Fee Waiver. Proposed 8 CFR 106.2(a)(58).

• Supplement A to Form I–914, Application for Immigrant Family Member of a T–1 Recipient, and Supplement B to Form I–914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons. Proposed 8 CFR 106.2(a)(59).

• Supplement A to Form I–918, Petition for Qualifying Family Member of U–1 Recipient, and Supplement B to Form I–918, U Nonimmigrant Status Certification. Proposed 8 CFR 106.2(a)(60).

• Form I–942, Request for Reduced Fee, requesting a reduced fee for the naturalization application Form N–400. Proposed 8 CFR 106.2(a)(65).

• Form N–4, Monthly Report on Naturalization Papers. Proposed 8 CFR 106.2(b)(1).

• Form N–476, Request for Certification of Military or Naval Service. Proposed 8 CFR 106.2(b)(5).

• Form N–644, Application for Posthumous Citizenship. Proposed 8 CFR 106.2(b)(10).

• Form N–648, Medical Certification for Disability Exceptions. Proposed 8 CFR 106.2(b)(11).

• Claimant under INA sec. 289. Proposed 8 CFR 106.2(c)(9).

## B. Proposed Fee Exemptions

The TVPRA [123] requires DHS to permit certain categories of requestors filing petitions and applications to apply for fee waivers, including for "any fees associated with filing an application for relief through final adjudication of the adjustment of status." [124] This provision generally is limited to VAWA self-petitioners, as defined in INA sec. 101(a)(51), and

noncitizens applying for certain other immigration benefits available to battered spouses and children or for T or U nonimmigrant status. DHS interprets this language to mean that, in addition to the main benefit request, individuals must have the opportunity to request a fee waiver for any form associated with the main benefit request up to and including the adjustment of status application. *See* 8 CFR 103.7(c)(3)(xviii) (Oct. 1, 2020); proposed 8 CFR 106.3(a)(3)(iii). Although DHS is authorized to establish and collect a fee for that benefit request under INA sec. 286(m), 8 U.S.C. 1356(m), several humanitarian benefit requests have been exempted from fees because of the humanitarian nature of these programs and the likelihood that individuals who file requests in these categories will qualify for a fee waiver if they request it. [125] DHS is proposing to provide additional fee exemptions for the following humanitarian-based immigration benefit requests under proposed 8 CFR 106.3(b) for the reasons listed below. These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. These fee exemptions are in addition to the forms listed under proposed 8 CFR 106.2 for which DHS proposes to codify that there is "no fee." Table 13C below provides a summary of the categories and the forms eligible for fee exemptions and fee waivers. In this proposed rule, DHS estimates that the increase in fee exemptions accounts for 1 percent of the 40-percent weighted average fee increase. [126]

### 1. Victims of Severe Form of Trafficking (T Nonimmigrants)

There is no fee for filing Form I–914, Application for T Nonimmigrant Status; Form I–914, Supplement A, Application for Family Member of T–1 Recipient; and Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons; under former 8 CFR 103.7(b)(1)(i)(UU) (Oct. 1, 2020), and DHS will continue to have no filing fee for these forms under proposed 8 CFR 106.2(a)(59). Principal applicants for T nonimmigrant status currently also do not file Form I–765 or pay a fee when an EAD is requested on Form I–914 and is issued incident to status. Any principal applicant who does not request employment authorization on Form I–914 must file

Form I–765 but is fee exempt. Derivative beneficiaries must file Form I–765 and must submit a fee or fee waiver request. Currently, T nonimmigrants may request fee waivers for all forms up to and including a Form I–485 and associated forms. [127]

In this proposed rule, DHS is proposing to expand fee exemptions for all persons seeking or granted T nonimmigrant status, including principals and derivatives, for all forms associated with an initial application for T nonimmigrant status through final adjudication of the T nonimmigrant's application for adjustment of status to LPR. *See* proposed 8 CFR 106.3(b)(2). Applicants for T nonimmigrant status are a small and especially vulnerable population that has historically underused the T visa program; DHS has never come close to reaching the annual statutory cap of 5,000 visas allocated to principal victims since the creation of the T visa program. Many T visa applicants are also eligible for fee waivers. To encourage eligible victims of trafficking to use the T visa program, DHS is proposing to expand fee exemptions for this population.

### 2. Victims of Qualifying Criminal Activity (U Nonimmigrants)

There is no fee for filing Form I–918, Petition for U Nonimmigrant Status; Form I–918, Supplement A, Petition for Qualifying Family Member of U–1 Recipient; or Form I–918, Supplement B U Nonimmigrant Status Certification. *See* 8 CFR 103.7(b)(1)(i)(VV) (Oct. 1, 2020). DHS proposes to continue having no fee for these forms. Proposed 8 CFR 106.2(a)(60). Principal U nonimmigrants who are in the United States are also currently fee exempt for fees associated with employment authorization when it is issued incident to status and are not required to file Form I–765 to receive an EAD under 8 CFR 214.14(c)(7). Principal U nonimmigrants outside the United States are fee exempt for fees associated with employment authorization issued incident to status once they enter the United States and file Form I–765. Derivative beneficiaries requesting employment authorization, however, must file Form I–765 with the appropriate fee or fee waiver request. U nonimmigrants may also request a fee waiver for any forms filed up to and including a Form I–485 and associated forms. [128]

DHS is now proposing to expand fee exemptions for persons seeking or granted U nonimmigrant status for all

---

[123] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[124] *See* INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[125] *See, e.g.,* previous 8 CFR 103.7(b)(1)(i)(UU) and (VV) (codifying no fee for, respectively, the Application for T Nonimmigrant Status, Form I–914, and the Petition for U Nonimmigrant Status, Form I–918).

[126] Office of the Chief Financial Officer (OCFO), September 13, 2021.

[127] *See* INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7); 8 CFR 103.7(c) (Oct. 1, 2020).

[128] *See* INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

forms filed before filing a Form I–485. Proposed 8 CFR 106.3(b)(5). Form I–765 would only be fee exempt, however, for an initial request under 8 CFR 274a.12(a)(19) and (20) and an initial request under 8 CFR 274a.12(c)(14).

DHS is proposing that any form associated with U nonimmigrant status be fee exempt up until the filing of a Form I–485. A fee would be due (or a fee waiver requested) for a U nonimmigrant to file a Form I–485 and any Form I–929, Petition for Qualifying Family Member. The fee exemption for U nonimmigrants would not extend to the Form I–485, unlike the fee exemption proposed for a Form I–485 filed by T nonimmigrants. DHS acknowledges that, like T nonimmigrants, U nonimmigrants are a particularly vulnerable population as victims of crimes and may have similar financial resources or employment prospects. However, DHS is proposing to treat them differently with regard to their respective Form I–485 fees. U nonimmigrants may have a longer time with work authorization than T nonimmigrants given the ability of U nonimmigrant petitioners to receive work authorization as part of the bona fide determination (BFD) process or with placement on the waiting list and the lengthy waiting period before a U visa becomes available. While some T nonimmigrant applicants may have work authorization during the pendency of their application pursuant to a grant of Continued Presence by U.S. Immigration and Customs Enforcement (ICE), there has not been a BFD process implemented in the T visa program, nor has a waiting list ever been used. The annual cap of 5,000 visas for the T visa program has also never been met, whereas the annual cap of 10,000 visas for the U visa program is consistently reached. Given current T nonimmigrant status processing times, which are much shorter than in the U visa context, the issuance of T nonimmigrant status may occur before a U petitioner is issued a BFD or waiting list-based work authorization. Some T nonimmigrants are also able to adjust much more quickly than a U visa petitioner given their ability to adjust upon the completion of the trafficking investigation or prosecution if certified by the U.S. Attorney General. In some cases, the investigation or prosecution is already complete at the time the individual receives T nonimmigrant status, rendering them immediately eligible to adjust status. For all of these reasons, U nonimmigrants are likely to have had work authorization much longer than T nonimmigrants, and thus

are less likely to need a fee exemption for filing Form I–485.

In addition, USCIS receives a large number of petitions for U nonimmigrant status each year and the cost of administering the U nonimmigrant program is already largely funded by other fee-paying requests. The T nonimmigrant program is also funded by other fee-paying requests, but the costs of the T program are much lower because the volume of T-based requests that USCIS must adjudicate is significantly lower. DHS has determined that extending fee exemptions to the low volume of T nonimmigrants filing Form I–485 could be absorbed with very little impact. In contrast, providing a fee exemption for U nonimmigrants filing Form I–485 would result in substantial adjudication costs being shifted to fee payers because of the much larger number of U nonimmigrants who file Form I–485. Thus, while the populations have many similar characteristics, because of the different levels of cost shifting required, DHS decided that the different treatments for the Form I–485 fee were justified as proposed in this rule.

### 3. VAWA Form I–360 Self-Petitioners and Derivatives

Violence Against Women Act (VAWA) self-petitioners currently pay no fee for filing Form I–360 and would continue to not pay a fee under this proposed rule. *See* 8 CFR 106.2(a)(16)(ii) (Oct. 1, 2020); proposed 8 CFR 106.3(b)(6). VAWA self-petitioners also currently are not required to file Form I–765 or pay a fee when employment authorization is requested on Form I–360. VAWA self-petitioners who do not request employment authorization on Form I–360, however, and all derivative beneficiaries must file Form I–765 and submit the fee or request a fee waiver to obtain employment authorization. VAWA self-petitioners and derivatives are currently eligible for fee waivers for any forms filed up to and including a Form I–485 and associated forms.[129]

DHS is now proposing to expand fee exemptions for persons seeking or granted immigrant classification as VAWA self-petitioners. *See* proposed 8 CFR 106.3(b)(6). VAWA self-petitioners and derivatives are eligible to concurrently file Form I–360 and Form I–485 if a visa would be immediately available after approval of Form I–360.[130] Therefore, when a VAWA Form I–360 is concurrently filed or pending

with Form I–485, DHS proposes that VAWA self-petitioners be fee exempt for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application, including the filing of Form I–290B. *Id.* When a VAWA Form I–360 is filed as a standalone self-petition, however, the VAWA self-petitioner would only be fee exempt for Form I–290B, if filed as a motion to reopen or reconsider or an appeal of the Form I–360 denial. Proposed 8 CFR 106.3(b)(6)(ii). All separately filed Form I–485s and associated forms would require a fee or fee waiver request. Additionally, only initial requests for employment authorization under 8 CFR 274a.12(c)(14) and initial requests under INA sec. 204(a)(1)(K) for the beneficiary of an approved VAWA self-petition would be fee exempt. Requests for employment authorization approved under INA sec. 204(a)(1)(K) are issued as a category (c)(31) EAD. A fee or fee waiver request will be required to replace or renew the initial, free EAD. For VAWA self-petitioners filing Form I–360, all fee exemptions will also apply to derivative beneficiaries. Proposed 8 CFR 106.3(b)(6).

Like T and U nonimmigrants, VAWA self-petitioners are a particularly vulnerable population as victims of abuse and may not have the financial resources or employment authorization needed to pay for fees when initially filing for immigrant classification as VAWA self-petitioners. When passing VAWA, Congress gave individuals the ability to independently seek immigrant classification without the abusive U.S. citizen or LPR's participation or knowledge. VAWA self-petitioners may still be living with their abuser or may have recently fled their abusive relationship when filing the self-petition. According to the National Network to End Domestic Violence, abusers often maintain control over financial resources to further the abuse, and victims may have to choose between staying in an abusive relationship and poverty and homelessness.[131] Therefore, victims of abuse may not have access to their finances or the financial means to pay for fees when filing VAWA Form I–360, Form I–485, and associated forms. DHS, however, must weigh these difficult considerations against the number of VAWA self-petition filings it receives each year and the transfer of costs to other petitions and applications if these

---

[129] *See* INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[130] *See* INA sec. 204(a)(1)(A)(iii)(II)(cc), (iv), (v), and (vii); 8 U.S.C. 1154(a)(1)(A)(iii)(II)(cc), (iv), (v), and (vii). *See* 8 CFR 245.2(a)(i)(2)(B).

[131] *See* "About Financial Abuse," Nat'l Network to End Domestic Violence, *https://nnedv.org/content/about-financial-abuse/* (last viewed June 2, 2021).

filings were fee exempt through final adjudication of the adjustment of status application. Therefore, DHS is proposing to limit the new fee exemptions for these populations to forms associated with the VAWA self-petition filing that are filed at the same time as or while the VAWA Form I–360 self-petition is pending before the adjustment of status applicant is filed. DHS is not proposing to exempt VAWA self-petitioners from the Form I–485 fee when it is filed after their I–360 is approved because the approval of the Form I–360 authorizes employment of the self-petitioner and the ability to either obtain the funds to pay the fee or request a fee waiver.

### 4. Conditional Permanent Residents Filing a Waiver of Joint Filing Requirement Based on Battery or Extreme Cruelty

Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty (abuse waiver) are considered VAWA self-petitioners as defined in INA sec. 101(a)(51)(C) and currently may request a fee waiver when filing Form I–751. *See* 8 CFR 103.7(c)(3)(vii) (Oct. 1, 2020). DHS proposes that a CPR requesting an abuse waiver continue to be eligible to request a fee waiver when filing Form I–751. *See* proposed 8 CFR 106.3(a)(3)(i)(C). Because CPRs filing Form I–751 may file for more than one basis when seeking any waiver of the joint filing requirement, USCIS is unable to provide a fee exemption for Form I–751 abuse waivers. However, because CPRs requesting abuse waivers are a relatively small population and are particularly vulnerable as victims of abuse as stated above, DHS is proposing to exempt them from the fee for Form I–290B to file a motion to reopen or reconsider the decision after a Form I–751 abuse waiver request is denied. *See* proposed 8 CFR 106.2(a)(15).

### 5. Abused Spouses and Children Adjusting Status Under CAA or HRIFA

Abused spouses and children seeking benefits under the Cuban Adjustment Act (CAA) and the Haitian Refugee Immigration Fairness Act (HRIFA) are considered VAWA self-petitioners as defined in INA sec. 101(a)(51)(D) and (E). As such, they are currently eligible for fee waivers for any forms filed through adjustment of status to LPR, including associated forms.[132] *See* 8 CFR 103.7(c)(3)(xviii) (Oct. 1, 2020).

DHS proposes to provide fee exemptions for these persons for all forms filed through final adjudication for adjustment of status to LPR, including Form I–485 and associated forms. Proposed 8 CFR 106.3(b)(4). For abused spouses and children filing under CAA and HRIFA, they will be fee exempt for Form I–485 and associated forms, as they file for VAWA benefits on Form I–485. Proposed 8 CFR 106.3(b)(4). Associated forms include any forms filed before the individual adjusts their status to LPR, such as a Form I–131; Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal; Form I–290B, Form I–601, and Form I–765. *Id.* Like VAWA self-petitioners filing Form I–360, these abused spouses and children are particularly vulnerable populations as victims of abuse. As there were fewer than 50 applications filed for these 2 populations combined in FY 2020, and the applicant files for VAWA benefits when filing for adjustment of status to LPR, DHS proposes to provide fee exemptions for the VAWA-based filing (such as for Form I–485) as well as associated forms. *Id.*

### 6. Abused Spouses and Children Seeking Benefits Under NACARA

Abused spouses and children seeking benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA) are considered VAWA self-petitioners as defined in INA sec. 101(a)(51)(F). As such, they are currently eligible for fee waivers for any forms filed through adjustment of status, including associated forms.[133] *See* 8 CFR 103.7(c)(3)(xviii) (Oct. 1, 2020).

DHS proposes to provide fee exemptions for abused spouses and children seeking benefits under NACARA for all forms filed through final adjudication for adjustment of status to LPR, including the Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)) (Form I–881) and associated forms. Proposed 8 CFR 106.3(b)(7). For abused spouses and children under NACARA, they must file for VAWA benefits while in immigration proceedings, so they will be fee exempt for the Form I–881, Form I–601, and Form I–765, which are forms that may be filed with USCIS. Victims of abuse who file for VAWA benefits in immigration court proceedings are a particularly vulnerable population of

applicants as mentioned previously. Therefore, DHS proposes to provide fee exemptions for Form I–881 and Form I–765, which are forms that may be filed with USCIS. *Id.*

### 7. Abused Spouses and Children of LPRs or U.S. Citizens Under INA Sec. 240A(b)(2)

Currently, abused spouses and children of LPRs and U.S. citizens seeking cancellation of removal and adjustment of status under INA sec. 240A(b)(2) are eligible for fee waivers for any forms filed with USCIS through adjustment of status to LPR, including associated forms.[134] *See* 8 CFR 103.7(c)(3)(xviii) (Oct. 1, 2020). In this rule, DHS proposes that this population be exempt from the fee for an Application for Waiver of Grounds of Inadmissibility (Form I–601) and an initial Application for Employment Authorization (Form I–765) when filed under 8 CFR 274a.12(c)(10). *See* Proposed 8 CFR 106.3(b)(8). Abused spouses and children of LPRs and U.S. citizens seeking cancellation of removal and adjustment of status in immigration proceedings are a particularly vulnerable population. Therefore, DHS proposes to provide fee exemptions for the only forms that this population may file with USCIS, Forms I–601 and an initial I–765. *Id.*

### 8. Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Force and Derivative Beneficiaries

The National Defense Authorization Act for FY 2008 [135] and Omnibus Appropriations Act [136] prohibit DHS from charging any fees in connection with an application for, or issuance of, a special immigrant visa for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF). These applicants do not currently pay fees for Form I–360.

---

[132] *See* INA sec. 245(l)(7); 8 U.S.C. 1255(l)(7).

[133] *See* INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[134] *See* INA sec. 245(l)(7); 8 U.S.C. 1255(l)(7).
[135] *See* Public Law 110–181 (Jan. 28, 2008).
[136] *See* Public Law 111–8 (Mar. 11, 2009).

As part of Operation Allies Welcome, beginning in July 2021, DHS authorized filing fee exemptions, including for Form I–485, Form I–601, and Form I–765, for certain Afghan nationals and their derivative beneficiaries meeting certain criteria, who were evacuated from Afghanistan due to the humanitarian crisis in that country.[137] DHS is proposing to expand fee exemptions for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi Nationals Employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF to all forms associated with filings from initial status filing through final adjudication of the adjustment of status application. Proposed 8 CFR 106.3(b)(3). In addition, DHS is clarifying that surviving spouses and children of certain principal applicants who may file a petition for classification as a special immigrant under to section 403 of the Emergency Security Supplemental Appropriations Act, 2021, Public Law 117–31, 135 Stat. 309, 318 (July 30, 2021), are exempt from paying the filing fee for Form I–360.[138] DHS believes this population, who assisted the United States Government often at risk to themselves and their families, should benefit from an immigration process that imposes a minimal financial burden. In addition, because the statutes provide that the special immigrant visa petition is fee exempt, DHS believes that it is consistent with those laws to provide fee exemptions for these additional forms that are generally filed with or associated with the special immigrant visa petition.

## 9. Special Immigrant Juveniles

DHS currently fee exempts Form I–360[139] for Special Immigrant Juveniles (SIJs) and provides them eligibility to file a fee waiver for Form I–485 and associated forms[140] as well as for a naturalization application.[141] Upon classification as an SIJ, a noncitizen may be eligible to apply for adjustment of status to LPR if an immigrant visa number is immediately available. See INA sec. 245(h), 8 U.S.C. 1255(h). DHS is now proposing to fee exempt SIJs for all forms through final adjudication of the adjustment of status application, which will include Form I–485 and associated forms. Proposed 8 CFR 106.3(b)(1). SIJ petitioners and recipients are youth who have suffered abuse, neglect, or abandonment by one or both parents, and DHS believes that most SIJs have no means to pay the fees for these forms. Congress, in recognizing the vulnerability of these youth, has afforded special protections to this population, including access to federally funded assistance through the Unaccompanied Refugee Minors program.[142] Currently, SIJs are not required to provide evidence of household income when applying for a fee waiver, and many are in the foster care system or full-time students or both, without an ability to work.[143] For these reasons, most SIJs are eligible for a fee waiver. DHS is proposing to fee exempt SIJs through final adjudication of Form I–485 to recognize the financial and personal situation of most SIJs, to reduce the burden on SIJs to request a fee waiver, and to reduce the burden on USCIS of adjudicating SIJ fee waivers that are generally approved.

## 10. Temporary Protected Status

The fee for an Application for Temporary Protected Status (Form I–821) for TPS registrations is limited to $50 by statute. See INA sec. 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). In addition, TPS applicants are eligible for fee waivers for any forms submitted based on the TVPRA.[144] DHS is not proposing any additional fee exemptions or fee waivers for this population.

DHS, however, is proposing to remove the fee exemption for Form I–765 filed by initial TPS applicants under age 14 and over age 65 for initial EAD requests. See proposed 8 CFR 244.6(b). Currently, initial TPS applicants under age 14 and over age 65 are exempt from paying the fee for Form I–765 for initial EAD requests. See 8 CFR 244.6(b) (Oct. 1, 2020).[145] When the regulations implementing TPS were first published in 1991, the INS required all TPS applicants to file Form I–765 for information collection purposes, even if an applicant did not wish to request employment authorization.[146] At that time, INS did not issue EADs to minor children or persons over age 65.[147] TPS applicants who did not wish to request employment authorization were not required to pay the fee for Form I–765. Initially, only nationals of El Salvador ages 14–65 who requested employment authorization were required to pay the fee for Form I–765. However, on April 25, 1995, INS revised Form I–765 to remove the El Salvador specific language from the form instructions and required all TPS applicants ages 14–65 who were requesting employment authorization to pay the fee for Form I–765, regardless of nationality, although fee waivers were available. The regulatory language was updated to reflect this change in 1999.[148]

USCIS no longer requires TPS applicants to file Form I–765 for information collection purposes, and only requires it if the TPS applicant wants an EAD. Persons applying for TPS who do not wish to request employment authorization need only file Form I–821.[149] The reason that the INS fee exempted a Form I–765 filed by initial TPS applicants under age 14 and over age 65 from a fee no longer exists. Thus, DHS is proposing that all TPS applicants requesting employment authorization must pay the filing fee for Form I–765 or request a fee waiver.

---

[137] See U.S. Dep't of Homeland Security, "DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S." (Nov. 8, 2021), available at https://www.dhs.gov/news/2021/11/08/dhs-announces-fee-exemptions-streamlined-processing-afghan-nationals-they-resettle.

[138] The Emergency Security Supplemental Appropriations Act, 2021, Public Law 117–31, 135 Stat. 309, 318 (July 30, 2021), removed the requirement that the principal noncitizen have a petition for special immigrant visa (SIV) classification approved, in order for the surviving spouse and/or children of the principal noncitizen to apply to obtain SIVs, and replaced it with the requirement that the principal noncitizen must have submitted an application for Chief of Mission (COM) approval under section 1244 of Public Law 110–181, 122 Stat. 3 (Jan. 28, 2008), section 602(b) of the Afghan Allies Protection Act of 2009, Title VI of Public Law 111–8, 123 Stat. 524, 807 (Mar. 11, 2009), or section 1059 of the National Defense Authorization Act for Fiscal Year 2006, Public Law 109–163, 119 Stat. 3136 (Jan. 6, 2006) which included the noncitizen as an accompanying spouse or child, or the principal noncitizen had completed the special immigrant employment requirements at the time of their death.

[139] 8 CFR 103.7(b)(1)(i)(T)(3) (Oct. 1, 2020).

[140] 8 CFR 103.7(c)(4)(iii) (Oct. 1, 2020).

[141] 8 CFR 103.7(c)(3)(xiii) (Oct. 1, 2020).

[142] See 8 U.S.C. 1232(d)(4)(A).

[143] See USCIS, Instructions for Request for Fee Waiver, page 7, available at https://www.uscis.gov/sites/default/files/document/forms/i-912instr.pdf (last viewed June 1, 2021).

[144] See title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7); 8 CFR 103.7(c)(3)(xviii) (Oct. 1, 2020).

[145] The exemption is not codified, except by implication by 8 CFR 244.6, which states that applicants between the ages of 14 and 65 who are not requesting authorization to work will not be charged a fee for an application for employment authorization.

[146] See 56 FR 619 (Jan. 7, 1991), as amended at 56 FR 23497 (May 22, 1991) (codifying 8 CFR 240.6 that provided that the fee for Form I–765 was not charged except for nationals from El Salvador between the ages of 14 to 65 who requested an EAD).

[147] See 56 FR 23495 (May 22, 1991).

[148] See 64 FR 4780–4781 (Feb. 1, 1999).

[149] The October 17, 2017, revision of Form I–821 made concurrent filing of Form I–765 optional. The May 31, 2018, revision of Form I–765 removed the instruction appearing on earlier iterations indicating that Form I–765 must be filed with Form I–821 to register for TPS, regardless of whether the applicant was requesting employment authorization.

**11. Asylum Seekers and Asylees**

DHS is not proposing any changes to fee exemptions or fee waivers for asylum seekers or asylees and is proposing to codify that there is no fee for an Application for Asylum and for Withholding of Removal (Form I–589). Proposed 8 CFR 106.2(a)(27). *See* Table 13C, Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes). In the 2020 fee rule DHS proposed a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, for when that form is filed with USCIS ("affirmative asylum applications"). *See* 8 CFR 106.2(a)(20) (Oct. 2, 2020). The U.S. Government had never previously charged a fee for an asylum request and used fees from other form types to fund the operations involved in processing asylum claims. However, in the 2020 fee rule DHS decided to impose an asylum fee of $50, and provided that the fee would not be waivable but exempted an unaccompanied child in removal proceedings from the fee. 8 CFR 106.2(a)(20) (Oct. 2, 2020). A large number of commenters on the 2020 fee rule generally opposed charging asylum applicants a fee. *See* 85 FR 46844. Commenters stated that asylum applicants have few economic resources, the few resources that they do have are necessary for survival, and they are often financially dependent on their family members. Thus, the commenters stated that the asylum fee would create an additional burden on asylum applicants and their families, be detrimental to survivors of torture, and further endanger asylum seekers' health and safety.

After further consideration of the comments received on the 2020 fee rule's asylum fee, and asylum applicants' lack of resources and the burdens that they face, DHS proposes to remove the $50 fee for Form I–589. Proposed 8 CFR 106.2(a)(27). DHS currently does not collect the $50 fee for Form I–589 as a result of the injunction against the 2020 Fee Rule discussed above. While INA sec. 208(d)(3), 8 U.S.C. 1158(d)(3), specifically authorizes a fee for the consideration of an asylum application in the discretion of the Secretary, it does not require such fees, and further provides that the Secretary may set adjudication and naturalization fees in accordance with INA sec. 1356(m), 8 U.S.C. 1356(m). DHS believes that the fee could deter asylum seekers from seeking protection because of an inability to pay the fee. Asylum

applicants, many of whom arrive in the United States with few resources and lack financial support, may be unable to pay the fee (particularly considering that most are unable to legally seek employment until after the approval of their application for employment authorization based on their pending asylum application, which cannot be filed together), or would choose between paying the fee and paying for basic needs with the few resources they may have arrived with or can attain before being allowed to legally seek employment in the United States. DHS recognizes the vulnerable situations of individuals who apply for asylum and has decided not to impose an asylum application fee, so as to not make affordability a consideration for a person requesting asylum.

DHS will also continue to provide a fee exemption for the initial filing of Form I–765 for persons with pending asylum applications and those who were granted asylum (asylees). Proposed 8 CFR 106.2(a)(43)(iii)(D) and (G).[150] In the 2020 fee rule, DHS required applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum), to pay the fee for initial filings of Form I–765. *See* 8 CFR 106.2(a)(32) (Oct. 2, 2020). Previously, USCIS had exempted applicants with pending asylum applications who are filing their first EAD application under the 8 CFR 274a.12(c)(8) eligibility category from the Form I–765 fee if the applicant submitted evidence of a pending asylum application and followed other instructions. However, in the 2020 fee rule, DHS determined that continuing to exempt this population from paying the Form I–765 fee would increase the proposed fee by $10 to fund the cost of EADs for asylum applicants, and required initial applicants with pending asylum claims to pay a $490 Form I–765 fee to keep the fee lower for all fee-paying EAD applicants.

Many commenters on the 2020 fee rule opposed the change to charge asylum applicants for their first Form I–765, Application for Employment Authorization. 85 FR 46851–46853. The commenters wrote that: people who cannot work cannot afford to pay their asylum fees and may work illegally; charging individuals who are not authorized to work to pay a fee to acquire work authorization is counterintuitive; asylum seekers are in

dire financial situations; requiring a fee for authorization to work will worsen the already precarious situation of a vulnerable population; and the fee will act as an unjust deterrent for asylum seekers. As a result of the economic challenges faced by asylum seekers, DHS has determined that it agrees that charging asylum seekers for an initial work authorization application could prevent them from obtaining lawful employment, and that the EAD fee is unduly burdensome for asylum seekers. Therefore, DHS proposes to retain the fee exemption for applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum) for initial filings of Form I–765. *See* proposed 8 CFR 106.2(a)(43)(iii)(D) and (G).

As explained below, DHS also proposes that the fee for refugee travel documents for asylees and LPRs who obtained such status as asylees will be linked to the DOS fee for a U.S. passport. Proposed 8 CFR 106.2(a)(7)(i) and (ii). DHS also proposes to continue charging a fee for asylees with pending adjustment of status applications who are requesting advance parole. Proposed 8 CFR 106.2(a)(7)(iii). Although asylees and refugees are in some respects similarly situated populations, certain differences justify DHS's decision not to exempt asylees from paying the fee for refugee travel documents or advance parole. Unlike refugees, who are required to apply to adjust status after they have been physically present in the United States for at least one year, asylees are not required to apply for adjustment of status, although they may do so. In addition, because asylees are a larger population than refugees, DHS determined that transferring to other applicants and petitioners the costs of adjudicating requests from asylees for refugee travel documents and advance parole would be overly burdensome to other fee payers. DHS believes that asylees are better able to time the filing of Form I–485 for adjustment of status to LPR or an associated benefit request with their ability to pay the fees or request a fee waiver.

DHS proposes to continue fee waiver eligibility for asylees filing Forms I–290B, I–765 for EAD renewal, and I–485. Proposed 8 CFR 106.3(a)(3)(ii)(C) and (E) and (a)(3)(iv)(C). DHS does not propose new fee exemptions or fee waivers for asylum applicants or asylees in this rulemaking because most forms used by this population are already fee exempt or fee waiver eligible. DHS also considered the number of asylum-based filings made each year and decided that the transfer of the costs of such filings

---

[150] Except for individuals applying under special procedures pursuant to the settlement agreement reached in *American Baptist Churches* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991).

to other petitions and applications if these filings were fee exempt resulted in too excessive a shift to fee payers to justify.

### 12. Refugees

DHS is continuing to provide a fee exemption for the initial filing of Form I–765 for persons who were admitted or paroled as refugees. Proposed 8 CFR 106.3(b)(9)(iii). This long-standing policy is consistent with Article 17(1) of the 1951 Convention Relating to the Status of Refugees (as incorporated in the 1967 Protocol Relating to the Status of Refugees), which states, "The Contracting State shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment." [151]

DHS also proposes to provide a fee exemption for persons admitted or paroled as refugees who submit Form I–765 to renew or replace their EAD. Proposed 8 CFR 106.3(b)(9)(iii). Currently, refugees may request a fee waiver for such renewal and replacement filing applications. EAD renewal and replacement filing volume is low, and DHS must expend effort to adjudicate fee waiver requests, which are generally approved. DHS believes that exempting all refugee Form I–765 filings is consistent with the principles of the 1951 Refugee Convention cited above.

DHS further proposes to provide a fee exemption for the filing of Form I–131, Application for Travel Document, for persons admitted or paroled as refugees, including LPRs who obtained such status as refugees in the United States. Proposed 8 CFR 106.3(b)(9)(i). Refugees are by definition a vulnerable population.[152] Congress has recognized

that many refugees are more likely than other immigrant populations to lack economic security and determined that it is in the interests of the United States to provide them with support and assistance on their path to self-sufficiency. For example, INA sec. 207(c)(3) specifies that the public charge ground of inadmissibility in INA sec. 212(a)(4) does not apply to refugees. And section 412 of the INA, 8 U.S.C. 1522, authorizes the provision of a variety of benefits and support services to refugees, including employment training and placement, English language training, cash assistance, and medical assistance. In light of these considerations, DHS has historically exempted refugees from paying fees for most applications and petitions for immigration benefits, excluding naturalization, for which a fee waiver is available. DHS now proposes to align Form I–131 with this long-standing policy. For the same reasons, DHS also proposes to fee exempt the Application for Carrier Documentation (Form I–131A) for refugees, persons paroled as refugees (*see* INA sec. 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B)), and LPRs who obtained such status as refugees. *See* 8 CFR 106.3(b)(9)(ii).

### 13. Person Who Served Honorably on Active Duty in the U.S. Armed Forces Filing Under INA Sec. 101(A)(27)(K)

An immigrant who has served honorably on active duty in the U.S. armed forces of the United States after October 15, 1978, after original lawful enlistment outside the United States (under a treaty or agreement in effect on October 1, 1991) for a certain period of time and the spouses and children of such immigrants may be granted special immigrant status upon recommendation under the executive department. INA sec. 101(a)(27)(K), 8 U.S.C. 1101(a)(27). These applicants may file for naturalization under INA sec. 328, 8 U.S.C 1439. USCIS does not charge a fee to military naturalization applicants because such fees are prohibited by statute. *See* INA sec. 328(b)(4), 8 U.S.C. 1439(b)(4). Other forms for active or former military service members are

also exempt from fees. *See, e.g.,* 8 CFR 103.7(b)(1)(i)(AAA) and (EEE) (Oct. 1, 2020).

On July 2, 2021, Secretary Mayorkas and Secretary of Veterans Affairs Denis McDonough announced a new initiative to support our Nation's noncitizen service members, veterans, and the immediate family members of service members. The initiative recognizes the profound commitment and sacrifice that service members and their families have made to the United States and that DHS agencies would review the policies to remove barriers to naturalization for those eligible, and improve access to immigration services.[153]

As part of this initiative on November 19, 2021, USCIS issued guidance to provide fee exemptions for Form I–131 concurrently filed with N–400 for applicants who are residing outside the United States and seeking naturalization.[154] Because this population submits a low number of forms, and to be consistent with other fees related to military applicants, DHS is proposing to codify a fee exemption for Forms I–131 (parole requests). In addition, DHS is proposing to add fee exemptions for Forms I–360, I–485, and I–765 (initial request) for military applicants.

### 14. Summary of Proposed Fee Exemptions

The following Table 13A provides a summary of current fee exemptions under INA sec. 245(l)(7). Table 13B provides a list of proposed additional fee exemptions, and the impact on forms that no longer require a fee waiver for these categories of requestors because they will be fee exempt. Table 13C provides a list of all fee exemptions and waivers that includes both the current provisions and the proposed additions.

**BILLING CODE 9111–97–P**

---

[151] Convention Relating to the Status of Refugees, art. 17(1), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150. The United States is not a party to the 1951 Refugee Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, which incorporates Articles 2 to 34 of the 1951 Convention. *See INS* v. *Stevic,* 467 U.S. 407, 416 & n.9 (1984).

[152] *See* INA sec. 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining the term "refugee" as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable

or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion").

---

[153] *See* DHS, VA Announce Initiative to Support Noncitizen Service Members, Veterans, and Immediate Family Members (July 2, 2021), available at *https://www.dhs.gov/news/2021/07/02/dhs-va-announce-initiative-support-noncitizen-service-members-veterans-and-immediate.*

[154] *See* USCIS Policy Manual, Volume 12, Citizenship and Naturalization, Part I Military Members and their Families, Chapter 5, Application and Filing for Service Members (INA sections 328 and 329) [12 USCIS–PM I.5], available at *https://www.uscis.gov/policy-manual/volume-12-part-i-chapter-5.*

**Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions**

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| **Victims of severe form of trafficking** (T nonimmigrants)[155] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(16) fee exempt for principals only) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal** | • Form I-918 | • Form I-131<br>• Form I-192 |

---

[155] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

| Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **activity** (U nonimmigrants)[156] | • Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(19) fee exempt for principals only)[157] | • Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[158] | • Form I-360<br>• Form I-765 (initial category (c)(31) generally fee exempt for principals only)[159] | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing** | none | • Form I-751<br>• Form I-290B |

---

[156] *See* INA sec. 101(a)(15)(U) 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[157] No initial fee for principals who receive an EAD incident to status.

[158] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for

immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51); 8 U.S.C. 1101(a)(51). *See* INA sec. 204(a); 8 U.S.C. 1154(a).

[159] Currently, VAWA self-petitioners may check a box on Form I–360 requesting a category (c)(31) EAD upon approval of the self-petition. This EAD is currently fee exempt. If the self-petitioner does not check this box, they must file a Form I–765 to request work authorization under 8 CFR

274a.12(c)(14) designation or under 8 CFR 274a.12(c)(9) if applicable. The self-petitioner may also file a Form I–765 to request a category (c)(31) EAD if not initially requested on the Form I–360. All self-petitioners and derivatives filing a renewal or replacement request must file a Form I–765 with a fee or fee waiver request.

**Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions**

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| requirement based on battery or extreme cruelty[160] | | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children adjusting status under CAA and HRIFA[161] | none | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children seeking benefits under NACARA[162] | none | • Form I-601<br>• Form I-765<br>• Form I-881<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children of LPRs or U.S. citizens under | none | • Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

[160] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[161] *See* INA sec. 101(a)(51)(D) and (E); 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption

for Form I–765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[162] *See* INA sec. 101(a)(51)(F); 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for

Form I–765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

| Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **INA sec. 240A(b)(2)**[163] | | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[164] | • Form I-765V[165] | Not Applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-360<br>• Form I-485 (for certain Special Immigrant Afghans)[166]<br>• Form I-765 (initial filing for certain Afghans)[167]<br>• Form I-601 (for certain Special Immigrant Afghans)[168] | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-360 | • Form I-131<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300 |

---

[163] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4); 8 U.S.C. 1229b(b)(4).

[164] See INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I–765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E–3, G, and H Nonimmigrants are able to file under another eligible category, the applicant may be eligible for a fee waiver.

[165] The fee exemption for Form I–765V for this category includes all initial, renewal, and replacement EADs.

[166] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021 and applying to adjust status to permanent residence based on classification as Afghan special immigrants as part of the temporary Operation Allies Welcome (OAW) program.

[167] Afghan nationals and their derivative beneficiaries who were paroled into the United States on or after July 30, 2021. This is part of the temporary OAW program.

[168] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021 who file Form I–601 associated with Form I–485, if filing as an Afghan Special Immigrant.

**Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions**

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| TPS[169] | • Form I-765 (initial TPS applicant, under 14 and over 65 who is requesting an initial EAD.)[170]<br>• Form I-821 (only re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| Asylees | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request by asylees and initial request by asylum | • Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[169] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

[170] Note DHS is proposing to end the fee exemption for Form I–765 initial EAD requests filed by initial TPS applicants under age 14 and over age 65.

[171] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

| Table 13A: Current Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
|  | applicants with a pending Form I-589) |  |
| **Refugees** | • Form I-590<br>• Form I-485<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request) | • Form I-290B<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[171]** | • Form N-400<br>• Form N-336<br>• Form N-600<br>• Form N-600K<br>• Form I-131 (for service members filing concurrently with an N-400) | • Form N-300<br>• Form N-470<br>• Form N-565 |

| Table 13B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes)[172] | | |
|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions**[173] | **Proposed Fee Waivers**[174] |
| **Victims of severe form of trafficking (T nonimmigrants)**[175] | <ul><li>Form I-131</li><li>Form I-192</li><li>Form I-193</li><li>Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)</li><li>Form I-485</li><li>Form I-539</li><li>Form I-601</li><li>Form I-765[176]</li></ul> | <ul><li>Form I-290B</li><li>Form N-300</li><li>Form N-336</li><li>Form N-400</li><li>Form N-470</li><li>Form N-565</li><li>Form N-600</li><li>Form N-600K</li></ul> |
| **Victims of qualifying criminal activity (U nonimmigrants)**[177] | <ul><li>Form I-192 (only if filed before Form I-485 is filed)</li><li>Form I-193 (only if filed before Form I-485 is filed)</li><li>Form I-290B (only if filed before Form I-485 is filed)</li><li>Form I-539 (only if filed before Form I-485 is filed)</li><li>Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485)</li></ul> | <ul><li>Form I-131</li><li>Form I-192 (only if filed with or after Form I-485 is filed)</li><li>Form I-193 (only if filed with or after Form I-485 is filed)</li><li>Form I-290B (only if filed with or after Form I-485 is filed)</li><li>Form I-485</li><li>Form I-601</li><li>Form I-765 (renewal and replacement requests)</li><li>Form I-929</li><li>Form N-300</li></ul> |

[172] This table includes exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS is proposing additional fee exemptions. This table includes only those exemptions that DHS is required to provide under this statute, and it does not include all USCIS benefit requests or groups for which DHS currently provides or is proposing to provide an exemption in this rule or by policy. See regulatory text for all other fee exemptions and fee waivers.

[173] This column lists all the additional fee exemptions that are being proposed. DHS would continue to maintain all the fee exemptions currently provided under Table 13A, column "Current Fee Exemptions."

[174] This column lists all the fee waivers that would still be available after some forms will be fee exempt as listed in "Current Fee Exemptions" column.

[175] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

[176] The proposed fee exemption for T nonimmigrants filing Form I–765 includes all initial, renewal and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[177] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

**Table 13B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes)[172]**

| Category | Proposed Additional Fee Exemptions[173] | Proposed Fee Waivers[174] |
|---|---|---|
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives[178]** | • Form I-131 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360)<br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial category (c)(31) fee exempt for principals and derivatives)[179] | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty[180]** | • Form I-290B (only when filed for Form I-751) | • Form I-751<br>• Form I-290B<br>• Form N-300 |

---

[178] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51); 8 U.S.C. 1101(a)(51). *See* INA sec. 204(a); 8 U.S.C. 1154(a).

[179] Under this proposed rule, the category (c)(31) EAD provided through Form I–360 will continue to be fee exempt. In addition, all Form I–765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[180] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

**Table 13B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes)[172]**

| Category | Proposed Additional Fee Exemptions[173] | Proposed Fee Waivers[174] |
|---|---|---|
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA**[181] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under NACARA**[182] | • Form I-765 (submitted under 8 CFR 274a.12(c)(10))<br>• Form I-881<br>• Form I-601 | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[183] | • Form I-601<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[181] See INA sec. 101(a)(51)(D) and (E); 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I–765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[182] See INA sec. 101(a)(51)(F); 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I–765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[183] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4); 8 U.S.C. 1229b(b)(4).

**Table 13B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes)[172]**

| Category | Proposed Additional Fee Exemptions[173] | Proposed Fee Waivers[174] |
|---|---|---|
| **Abused Spouses of A, E-3, G, and H Nonimmigrants[184]** | | |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial) | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS[185]** | Not applicable | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | Not Applicable | • Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470 |

---

[184] *See* INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E–

3, G, and H Nonimmigrants are able to file under another eligible category, the applicant may be eligible for a fee waiver.

[185] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

**Table 13B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions (Includes Current Eligibility and Proposed Changes)[172]**

| Category | Proposed Additional Fee Exemptions[173] | Proposed Fee Waivers[174] |
|---|---|---|
| | | • Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[186]** | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial request for service member) | • Form N-300<br>• Form N-470<br>• Form N-565 |

**Table 13C: Forms Eligible for Fee Waivers under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and Fee Exemptions, as of Effective Date of this Proposed Rule**

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| **Victims of severe form of trafficking** (T nonimmigrants)[187] | • Form I-914<br>• Form I-914, Supplement A | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

---

[186] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

[187] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T)(T nonimmigrant status for victims of severe forms of trafficking in persons).

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| | • Form I-914, Supplement B<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765 (initial, renewal and replacement requests) | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[188] | • Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed)<br>• Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485) | • Form I-192 (only if filed with or after Form I-485 is filed)<br>• Form I-193 (only if filed with or after Form I-485 is filed)<br>• Form I-290B (only if filed with or after Form I-485 is filed)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[189] | • Form I-360<br>• Form I-131 (only when Form I-360 and Form I- | • Form I-131<br>• Form I-212 |

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| | 485 are concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360)<br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial category (c)(31) fee exempt for principals and derivatives)[190] | • Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty[191]** | • Form I-290B (only when filed for Form I-751) | • Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| **Abused spouses and children adjusting status under CAA and HRIFA**[192] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under NACARA**[193] | • Form I-765 (submitted under 8 CFR 274a.12(c)(10))<br>• Form I-881<br>• Form I-601 | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[194] | • Form I-601<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[195] | • Form I-765V[196] | Not applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| **the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | filed before adjusting status or for Form I-485)<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial)<br>• Form I-601<br>• | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-360<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS**[197] | • Form I-821 (only re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | • Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-131<br>• Form I-131A<br>• Form I-485<br>• Form I-590 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| | • Form I-602<br>• Form I-730<br>• Form I-765 (initial, renewal, and replacement request)<br>• | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)**[198] | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial request for service member)<br>• Form N-336<br>• Form N-400<br>• Form N-600<br>• Form N-600K | • Form N-300<br>• Form N-470<br>• Form N-565 |

BILLING CODE 9111–97–C

---

[188] See INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[189] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). See INA sec. 101(a)(51); 8 U.S.C. 1101(a)(51). See INA sec. 204(a); 8 U.S.C. 1154(a).

[190] Under this proposed rule, the category (c)(31) EAD provided through Form I–360 will continue to be fee exempt. In addition, all Form I–765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[191] See INA secs. 101(a)(51)(C) and 216(C)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[192] See INA sec. 101(a)(51)(D) and (E); 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I–765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[193] See INA sec. 101(a)(51)(F); 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I–765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[194] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4); 8 U.S.C. 1229b(b)(4).

[195] See INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I–765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E–3, G, and H Nonimmigrants are able to file under another eligible category, the applicant may be eligible for a fee waiver.

[196] The fee exemption for Form I–765V for this category includes all initial, renewal, and replacement EADs.

[197] See INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

[198] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military

## C. Request for Comments

DHS welcomes comment on the proposed changes to which categories of petitioners and applicants are exempt from the fees or which forms should be fee exempt, the annual and cumulative estimated transfer cost, requests to which costs should be shifted, and the reason as to why the particular group should be fee exempt.

## VIII. Other Proposed Changes in the FY 2022/2023 Fee Schedule

### A. Clarifying Dishonored Fee Check Re-Presentment Requirement and Fee Payment Method

USCIS is proposing to clarify that it will not redeposit financial instruments returned as unpayable for a reason other than insufficient funds. See proposed 8 CFR 103.2(a)(7)(ii)(D). In the FY 2016/2017 fee rule, DHS amended the regulations regarding how USCIS treats a benefit request accompanied by fee payment (in the form of check or another financial instrument) that is subsequently returned as not payable. See 81 FR 73313–73315 (Oct. 24, 2016); 8 CFR 103.2(a)(7)(ii) and 103.7(a)(2). If a financial instrument used to pay a fee is returned as unpayable after one representment, USCIS rejects the filing and imposes a standard $30 charge. Id. In the preamble to the FY 2016/2017 fee rule, DHS stated that, to make sure a payment rejection is the result of insufficient funds and not due to USCIS

applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

error or network outages, USCIS (through the U.S. Department of the Treasury (Treasury)) will resubmit rejected payment instruments to the appropriate financial institution one time. See 8 CFR 103.2(a)(7)(ii)(D). DHS's intent was to submit only checks that were dishonored due to insufficient funds because the Treasury check clearance regulations only permit an agency to redeposit a check that was dishonored due to insufficient funds.[199] Although Treasury does not permit redeposit of checks dishonored for any other reason, some stakeholders have interpreted 8 CFR 103.2(a)(7)(ii)(D) as requiring DHS to redeposit any check that is returned as unpayable. Several petitioners have had fee payment checks dishonored because the petitioner (or law firms paying the fee on the petitioner's behalf) have placed a fraud hold on their checking account, stopped payment on the check, or the check failed a third-party validation process. DHS appreciates the concerns about fraudulent or counterfeit checks and the impacts on petitioners and beneficiaries when the petitioner or their bank accidently or erroneously stop payments or dishonor checks. In the few cases where checks to USCIS have been dishonored due to anti-fraud mechanisms, USCIS has not seen an

---

[199] See 31 CFR 210.3(b)(1)(i); National Automated Clearing House Association, 2019 NACHA Operating Rules & Guidelines: The Guide to the Rules Governing the ACH Network, Subsection 2.5.13.3 (limiting redepositing a check to those that are returned due to "Not Sufficient Funds," "NSF," "Uncollected Funds," or comparable).

instance where the account was frozen as a result of actual, fraudulent activity, and the remitting institution has acknowledged its fault or error in dishonoring the fee checks. Nevertheless, USCIS is not responsible for ensuring that a petitioner's or financial institution's check writing procedures do not go awry and allowing resubmission of correctly rejected requests adds work to an already burdened USCIS intake system. In addition to most redeposits being impracticable and in violation of Treasury regulations, the reason DHS provided the check representment requirement in § 103.2(a)(7)(ii)(D) did not materialize, because in the almost five years since the requirement was codified, DHS has rejected no payment because of USCIS error or network outages. *See* 81 FR 73314.[200] Therefore, to comply with the Treasury regulations, because representment of other dishonored checks is not permitted and futile, and representment has proven to not be necessary to protect the public from the Government failings that were feared when the provision was implemented, DHS is proposing in this rule that if a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the remitter institution returns the instrument used to pay a fee as unpayable a second time, USCIS will reject the filing. *See* proposed 8 CFR 103.2(a)(7)(ii)(D).

In addition, DHS proposes two changes to address stale or expired checks. First, DHS proposes that that it may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date. Proposed 8 CFR 103.2(a)(7)(ii)(D). Second, DHS proposes that it will not be responsible for financial instruments that expire before they are deposited and USCIS may reject any filing for which a required payment cannot be processed due to expiration of the financial instrument. Proposed 8 CFR 106.1(d).

Currently, USCIS policy is to reject a check that is dated more than a year before it is submitted. However, that policy is not codified, and DHS has been sued or threatened with litigation multiple times when a check that was dated more than a year before it was submitted was the basis of a rejection that caused the requestor to miss an

important deadline. For example, USCIS has permitted an applicant to submit Form I–821 after the deadline[201] and adjudicated a Form I–485 filed after the applicant's U nonimmigrant status had expired because the initial, timely filing was rejected because the applicant submitted a fee check that was more than one year old.[202] While most personal and business checks do not expire, they become what is known as "stale dated" 6 months after they are written.[203] In addition, many business entities provide that their checks expire after a certain period, such as 90 days, if not cashed, because they are concerned about the timeliness and accuracy of their accounting records if checks that they issue are valid for a longer period, notwithstanding that the Uniform Commercial Code (UCC) provides that a bank may delay access to the funds from or is not obligated to deposit, cash, honor, or pay a stale check.[204] USCIS projects that it will receive an average of 6,510,442 IEFA non-premium fee payments per year.[205] It is important that its requirements for payment instruments provide certainty and minimize the likelihood of a payment being dishonored. And, while USCIS has experienced delays in receipting requests due to the COVID pandemic, many requests have been received with checks that are very close to the check expiration date.[206] To reduce dishonored payments and to alert those who submit fee checks to USCIS to monitor their expiration dates, DHS proposes to codify its policy of rejecting 365-day-old checks and checks where the expiration date on their face has passed to provide requestors with a reasonable amount of flexibility in case there are delays with their filing. Proposed 8 CFR 103.2(a)(7)(ii)(D);

106.1(d). Although commercial banks use a guideline of 6 months, rejecting a check that is dated more than a year earlier is also consistent with the time limit for a check issued by the U.S. Treasury. *See* 31 CFR 245.3(a) (Any claim on account of a Treasury check must be presented to the agency that authorized the issuance of such check within 1 year after the date of issuance of the check or within 1 year after October 1, 1989, whichever is later.). Rejection of a stale or expired check will not be mandatory, so USCIS will still have the authority to waive the check date requirements in exigent circumstances or on a per case basis, such as when surges in volume reduce USCIS' ability to timely intake requests and deposit checks. For example, USCIS offered flexibility to lockbox filers whose initial filings were rejected solely because a filing fee payment that expired while the benefit request was awaiting processing between Oct. 1, 2020, and April 1, 2021.[207]

*B. Payment Method*

Currently, USCIS uses the following payment methods:
• For forms accepted at USCIS lockboxes[208]—Check, money order, or credit card.[209]
• For online filing—*Pay.gov* payment submission which includes credit cards, debit cards and Electronic Funds Transfer using routing and account numbers.
• For fees paid at a field office—*Pay.gov* only.
• For immigrant fees paid by immigrants seeking entry into the United States with a visa—*Pay.gov* only.

DHS also proposes to codify that USCIS may require that certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method. Proposed 8 CFR 106.1(b). For example, USCIS may require that a request be submitted by using *Pay.gov*, a secure portal that transmits an applicant's payment information directly to the U.S. Treasury for processing, or may preclude the use of certain payment

---

[200] The final FY 2016/2017 fee rule stated, "To make sure that a payment rejection is the result of insufficient funds and not due to USCIS error or network outages, USCIS (through Treasury) will resubmit rejected payment instruments to the appropriate financial institution one time."

[201] *See* 8 CFR 244.17(a) ("Applicants for periodic re-registration must apply during the registration period provided by USCIS.").

[202] *See* 8 CFR 245.24(b)(2)(ii) (requiring the applicant to hold U nonimmigrant status at the time of application).

[203] A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than 6 months after its date, but it may charge its customer's account for a payment made thereafter in good faith. *See* UCC 4–404 (2002).

[204] *Id. See also Aliaga Medical Center, S.C.* v. *Harris Bank N.A.*, 21 NE3d 1203 (IL App (1st), Nov. 10, 2014) (holding that check expiration is generally governed by the account agreement between the bank and customer and the preprinted term "void" or phrase "void after 90 days," on a check does not mean that the check cannot be presented, paid, and accounted for as a check in the normal course of the account's regular operation).

[205] *See* section V.B.1.b, Fee-Paying Volume, of this preamble.

[206] *See, e.g., USCIS Lockbox Updates*, at *https://www.uscis.gov/news/alerts/uscis-lockbox-updates* (Jan. 8, 2021).

[207] *See* USCIS, "USCIS Announces Lockbox Filing Flexibilities," available at *https://www.uscis.gov/news/alerts/uscis-announces-lockbox-filing-flexibilities* (June 10, 2021).

[208] Lockboxes that specialize in the intake and deposit of multiple payment types receive about 53 percent of all USCIS filings.

[209] USCIS recently launched a pilot program to test the acceptance of credit cards for payment of fees for benefit requests filed at service centers. *See* USCIS, "USCIS Announces Pilot Program for Credit Card Payments Using Form G–1450 When Filing Form I–485," available at *https://www.uscis.gov/news/alerts/uscis-announces-pilot-program-for-credit-card-payments-using-form-g-1450-when-filing-form-i-485* (June 2, 2021).

types, such as cashier's check and money orders for the payment of a particular form or when payments are made at certain offices. The proposed change provides that the payment method will be described in the form instructions (including for online filing) or by individual notice (a bill, invoice, appointment confirmation, etc.); thereby, requestors will be clearly notified of any limitations on the payment method for the request they are filing. However, this proposed change provides the authority prospectively, and USCIS is proposing no forms changes with this rule that will impose any specific limits on acceptable payments on the date this rule would take effect. The payment method for a particular form will be changed in the future only after the subject form instructions are revised in accordance with the Paperwork Reduction Act (PRA).

For the 2020 fee rule, commenters wrote that requiring online or electronic payments would restrict immigration benefits for individuals who lack computer and internet access, that it is important to permit cashier's checks and money orders because they are available to individuals without banking services such as a credit card, and that many immigrant households lack access to checking and savings accounts or they are unbanked or underbanked. 85 FR 46877. DHS has determined that any person who can purchase a cashier's check or money order from a retailer can similarly purchase a prepaid debit card that can be used to pay their benefit request fee using USCIS Form G–1450 or the *Pay.gov* online payment platform. In addition, filers may split the fees between more than one credit card, and the credit card does not have to be the applicant's if the owner of the credit card authorizes its use. Therefore, DHS believes that requiring the use of a check, credit, or debit card will not prevent applicants or petitioners from paying the required fees. While DHS does not permit the use of gift cards that cannot be reloaded, reloadable debit cards are available for purchase at most convenience, pharmacy, department, and grocery stores, or online.[210] In addition, resources such as libraries offer free online services, access to information, and computers that the public may use to access forms and complete, print or submit them. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

Lockboxes that specialize in the intake and deposit of multiple payment types receive about 53 percent of all USCIS filings. However, the requirements and circumstances for the filing of some requests do not permit lockbox submission and intake, and the request must be filed at a particular office or in person. Various offices, such as field offices, embassies, and consulates, are limited in the method of payment that they can receive or process. Additionally, certain payment methods, such as checks or cash, require time-intensive procedures for cashiers and their supervisors to input, reconcile, and verify their daily receipts and deposits. Generally, Federal agency offices must deposit money that they receive on the same day that it is received. *See* 31 U.S.C. 3720(a); 31 CFR 206.5; U.S. Treasury, "Treasury Financial Manual" Vol. 1, Part 5, Chapter 2000, Section 2055.[211] There are additional requirements and guidance for timely record keeping and redundancy in personnel that similarly increase workload and processing costs. *See* 31 U.S.C. 3302(e); U.S. Treasury, "Treasury Financial Manual" Vol 1, Part 5, Chapter 2000, Section 2030; *see also* GAO, GAO–14–704G "Standards for Internal Control in the Federal Government" (2014).[212] The time that USCIS spends complying with payment processing requirements could be used to adjudicate cases. This proposed change to codify that fees must be paid using the method that USCIS prescribes, as provided in the form instructions or by individual notice, would also permit USCIS to reduce administrative burdens and processing errors associated with fee payments.

*C. Non-Refundable Fees*

Currently, USCIS filing fees generally are non-refundable and must be paid when the benefit request is filed. *See* 8 CFR 103.2(a)(1). DHS is proposing to clarify that fees are non-refundable regardless of the result of the immigration benefit request or how much time passes between USCIS' receipt of the request and completion of the adjudication process.[213] As previously discussed, DHS is authorized to establish fees to recover the costs of providing USCIS adjudication and naturalization services. *See* INA sec. 286(m) and (n); 8 U.S.C. 1356(m) and (n). Although fees are set to recover the cost of processing an immigration benefit request, they must be paid in advance of the request being processed. Therefore, fees are due at the time of filing and are required in order for USCIS to receipt the request and issue a receipt date. *See* 8 CFR 103.2(a)(7)(ii)(D). A benefit request will be rejected if it is not submitted with the correct fee(s), and the fee is not refundable, regardless of how much time is required to complete adjudication or the decision that USCIS makes on the case.

Because fees are non-refundable, DHS further proposes to clarify that fees paid to USCIS using a credit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS. USCIS continues to expand the acceptance of credit cards for the payment of USCIS fees. The increased acceptance of credit cards for the payment of USCIS fees has resulted in a sizeable increase in the number of disputes filed with credit card companies challenging USCIS' retention of the fee. Disputes are generally filed by requestors whose request was denied, who have changed their mind about the request, or assert that the service was not provided or was unreasonably delayed. USCIS records show that credit card companies generally side with their cardholders in these disputes and they determine that USCIS fails to adequately warn the cardholder that the fee is not refundable and due regardless of the result of the case or the time required to adjudicate it.[214] In those instances, USCIS has not received payment for adjudication of the request.

When USCIS performs services for which a fee has not been paid, such as when the fee is charged-back by a credit card company, the costs incurred must

---

[210] *See,* for example, "Visa Prepaid Cards Easy to use and reloadable, Visa Prepaid cards go everywhere you go. No credit check or bank account needed." *https://usa.visa.com/pay-with-visa/find-card/get-prepaid-card* (last viewed June 15, 2021).

[211] Agencies may accumulate deposits less than $5,000 until they reach $5,000 or a given Thursday. U.S. Treasury, "Treasury Financial Manual" Vol 1, Part 5, Chapter 2000, *https://tfm.fiscal.treasury.gov/v1/p5/c200.html.*

[212] Principle 10, Design Control Activities, states that management should control information processing and segregation of duties to reduce risk, and it should correctly and promptly record transactions. GAO, "Standards for Internal Control in the Federal Government" (Sept. 10, 2014), *https://www.gao.gov/assets/670/665712.pdf.*

[213] In USCIS parlance, rejection of a receipt happens in the initial filing stage. USCIS provides a receipt notice for accepted requests and a rejection notice for rejected requests. *See* 8 CFR 103.2(a)(7). For example, Form I–797C, Notice of Action, will state if a request was accepted or rejected. A denial, on the other hand, is a decision that the request is not eligible for immigration benefits for which it was filed after adjudication. Fees are not returned when a request is denied.

[214] In FY 2020, credit card issuers revoked the fee from USCIS in 855 of 1,182 disputes filed, or roughly 72 percent.

be funded by other fee payers. As the dollar amount of fees paid with credit cards continues to increase, an increase in the number of credit card disputes and chargebacks has the potential to have a significant negative fiscal effect on USCIS. Therefore, DHS is proposing to provide that fees paid to USCIS for immigration benefit requests will not be refunded regardless of the result of the benefit request or how much time the adjudication requires, and that fees paid to USCIS using a credit card are not subject to dispute by the cardholder or charge-back by the issuing financial institution. *See* proposed 8 CFR 103.2(a)(1); 8 CFR 106.1(e). If the institution that issues the credit card rescinds the payment of the fee to USCIS, USCIS may reject the request if adjudication is not complete, or revoke the approval or convert the denial to rejection, and invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fee in accordance with 31 CFR parts 900 through 904 (Federal Claims Collection Standards) if the adjudication is complete.[215]

### D. Eliminating $30 Returned Check Fee

DHS also proposes to amend its regulations to remove the $30 charge for dishonored payments. *See* 8 CFR 103.7(a)(2)(i) (Oct. 1, 2020). USCIS data indicate that the cost of collecting the $30 fee outweighs the benefits to the Government derived from imposing and collecting the fee. For example, in FY 2016, USCIS collected a total of $416,541 from the $30 returned check fee while the financial service provider billed $508,770 to collect the $30 fee. In FY 2020, USCIS recovered only $199,829 from the returned check fee. Although USCIS no longer discretely tracks the costs associated with processing returned checks, USCIS is at a net loss when processing returned checks. USCIS also bears the cost and time of processing the returned check. Furthermore, USCIS does not retain the $30 fee for deposit into the IEFA with other immigration benefit request fees. USCIS deposits the fee in Treasury's general fund; thus the $30 fee does not provide revenue to USCIS. As such, USCIS would not benefit from DHS proposing changes to this fee.

Although agencies may prescribe regulations establishing the charge for a service or thing of value provided by the agency [216] Federal agencies are not required to impose fees as a general

matter, nor does DHS or USCIS have a specific statutory authorization or requirement to do so. Therefore, DHS is not required to charge a returned check fee. Based on the cost to USCIS and that the bad check fees add nothing to USCIS revenue, DHS proposes to remove the $30 fee from regulations.

### E. Changes to Biometric Services Fee

#### 1. Incorporating Biometric Activities Into Immigrant Benefit Request Fees

DHS proposes to incorporate the biometric services cost into the underlying immigration benefit request fees based on the applicable biometric services for each benefit request and the associated costs as estimated in the ABC model. Currently, a separate $85 biometric services fee may apply depending on the immigration benefit request [217] or other circumstances. *See* 8 CFR 103.7(b)(1)(i)(C) (Oct. 1, 2020). USCIS currently provides web content, form instructions, and other information to help individuals assess whether they need to pay the biometric services fee. USCIS rejects an application, petition, or request that fails to pay the separate biometric services fee, if it applies. *See* 8 CFR 103.17(b) (Oct. 1, 2020). DHS proposes to incorporate the cost of biometric services into the underlying immigration benefit request fees using its ABC model to simplify the fee structure, reduce rejections of benefit requests for failure to include a separate biometric services fee, and better reflect how USCIS uses biometric information.

DHS has broad statutory authority to collect biometric information when such information is ''necessary'' or ''material and relevant'' to the administration and enforcement of the INA. *See, e.g.,* INA secs. 103(a), 235(d)(3), 264(a); 8 U.S.C. 1103(a), 1225(d)(3), 1304(a). The collection, use, and reuse of biometric data are integral to identity management, criminal background checks, investigating and addressing national security concerns, and maintaining program integrity.

In previous fee rules, USCIS evaluated the biometric activity cost as a single biometric services fee separate from the underlying application, petition, or request. In the FY 2016/2017 fee review, USCIS called the activity Perform Biometric Services. *See* 81 FR 26913. USCIS clarified that persons filing a benefit request may be required to submit biometrics or be interviewed and pay the biometric services fee. *See* 81

FR 26917 and 81 FR 73325. For many years, there has been a single biometric services fee that includes four separate costs:

• FBI Name Checks;
• FBI fingerprints;
• Application Support Center (ASC) contractual support; and
• Biometric service management overall, including Federal employees at the ASC locations.

In the FY 2022/2023 fee review, USCIS identified each of these four costs as distinct activities in the ABC model. These four activities replace the single biometric activity that USCIS used in previous fee reviews.[218] USCIS used volume estimates to allocate these costs to the proposed immigration benefit requests to which they generally apply. The biometric volume estimates were specific to the projected workload for FBI Name Checks, FBI fingerprints, and contractual support at the ASC locations. In most cases, these estimates used the average proportion of workload for each immigration benefit request. The data on ASC Production and FBI Name Checks are from FY 2015 to FY 2017. The FBI Fingerprints data used FY 2016 to FY 2018. While the information does not cover the most recent years, USCIS believes it is the most appropriate information to use for this calculation because it reflects biometric collection rates before the pandemic and before increased collection of biometrics for certain populations. For example, the data excludes higher biometric service rates for Form I–539 after a 2019 form revision.[219] USCIS temporarily suspended biometric collection for Form I–539 during the pandemic.[220] Thus, the information considered will more closely reflect the annual volume of biometrics submissions that USCIS expects during FY 2022/2023. These proportions of each biometric service to receipts can vary, because there is not always a one-to-one relationship between a specific benefit request and a biometric service. For example, USCIS may not require submission of

---

[215] USCIS may also prohibit the payment of fees using a credit card from a financial institution that routinely rescinds fee payments due to disputes.

[216] *See* 31 U.S.C. 9701.

[217] For a quick reference of the immigration benefit requests that currently require biometric services with the initial submission, *see* USCIS, Form G–1055, Fee Schedule, available at *https:// www.uscis.gov/g-1055.*

[218] The single biometric service activity was called Perform Biometric Services in the FY 2016/ 2017 fee review. *See* 81 FR 26913–26914. Previously, USCIS called the activity Capture Biometrics. *See* 75 FR 33459 (June 11, 2010) and 72 FR 4897 (Feb. 1, 2007).

[219] *See* USCIS, ''UPDATE: USCIS to Publish Revised Form I–539 and New Form I–539A on March 8'' available at *https://www.uscis.gov/news/ alerts/update-uscis-to-publish-revised-form-i-539- and-new-form-i-539a-on-march-8* (last updated March 5, 2019).

[220] *See* USCIS, ''USCIS Temporarily Suspends Biometrics Requirement for Certain Form I–539 Applicants'' available at *https://www.uscis.gov/ news/alerts/uscis-temporarily-suspends-biometrics- requirement-for-certain-form-i-539-applicants* (last updated May 13, 2021).

biometrics if it resubmits existing, stored biometric information to the FBI. As another example, some immigration benefit requests, like adoption petitions and applications, require that all adults in a household submit biometric information. *See, e.g.,* 8 CFR 204.310(a)(3)(ii) and (b). As such, a single adoption petition or application may require more than one adult to submit biometric information. Using biometric volumes specific to individual biometric activities enables USCIS to better forecast biometric costs and attribute them to specific benefit requests. DHS proposes to incorporate biometric costs into IEFA immigration benefit request fees by using this biometric activity-specific information in the proposed fees. *See* proposed 8 CFR 106.2.

The proposed changes in this rule may assist USCIS as it shifts to enterprise-wide person-centric identity management. A person-centric view of the data allows adjudicators to see relevant information for an individual across multiple benefits requests and systems. USCIS aims to improve how it acquires, stores, manages, shares, and uses identity data—making all relevant information accessible and usable in support of adjudications. For example, if USCIS modifies the types of background checks conducted, then DHS may propose to increase the fee as appropriate for the affected immigration benefit requests. This approach may ensure that the affected customers would pay the appropriate fee rather than pass the cost burden of all other biometric services to other unrelated customers.

USCIS forecasts biometric workload volumes by immigration benefit request type in order to assign biometrics costs to the appropriate immigration benefit request. Assigning costs to the underlying immigration benefit request type may reduce the administrative burden on USCIS to administer the separate fee and make it easier for applicants, petitioners, and beneficiaries to calculate the total payment that is due. However, USCIS proposes to retain the separate biometric services fee for specific workloads, as described in the next section.

## 2. Retaining the Separate Biometric Services Fee for Temporary Protected Status

DHS has excluded from USCIS' ABC model for this proposed rule the costs and revenue associated with TPS, consistent with the previous fee rule. *See* 81 FR 73312–73313. In addition, as noted above, DHS proposes generally to eliminate a separate biometric services

fee and fund biometric services from the revenue received from the underlying immigration benefit request fees. However, DHS proposes to retain a separate biometric services fee for TPS. *See* proposed 8 CFR 106.2(a)(48)(iii).

While the TPS registration fee is capped by INA sec. 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B) at $50, DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b. USCIS collects biometrics for TPS registrants. USCIS requires certain TPS initial applicants and re-registrants to pay the biometric services fee in addition to the fees for Form I–821, Application for Temporary Protected Status, and for Form I–765, Application for Employment Authorization, if they want an employment authorization document. *See* Instructions for Form I–821. The model output of other fees indicates that the $50 amount provided by statute does not recover the full cost of adjudicating these benefit requests.

To reduce the costs of TPS that USCIS must recover from fees charged to other immigration benefit requests, DHS proposes to require a $30 biometric services fee for TPS initial applications and re-registrations. *See* proposed 8 CFR 106.2(a)(48)(iii). As stated previously, while DHS follows OMB Circular A–25, we are not required to set specific fees at the costs of the benefit request or adjudication or naturalization service for which the fee is being charged. Nevertheless, DHS based the proposed $30 biometric services fee on the direct costs of collecting, storing, and using biometric information for TPS initial applications and re-registrations. Currently, USCIS pays approximately $11.25 to the FBI for fingerprinting results. USCIS calculated that biometric collection, storage, and use at an ASC costs approximately $19.50. These same ASC and FBI rates apply to TPS and all other requests that use these services. The sum of these costs is approximately $31. DHS rounded the proposed fee to the nearest $5 increment, similar to other IEFA fees, making the proposed fee $30. The proposed fee is less than the current $85 biometric services fee because the current fee includes indirect costs. The FY 2016/2017 fee rule held the biometric services fee to $85, which has not changed since the FY 2010/2011 fee rule.

## 3. Executive Office for Immigration Review Biometric Services Fee

Similarly, DHS is maintaining the current requirement that applicants

filing certain requests with EOIR [221] submit a biometric services fee. *See* proposed 8 CFR 103.7(a)(2). DHS, including USCIS, handles all aspects of biometrics collection for EOIR and conducts background security checks for individuals in immigration proceedings.[222] This fee is necessary to recover the costs USCIS incurs performing that service for EOIR. When individuals in immigration proceedings before EOIR seek to file an application for relief or protection from removal with the immigration court they are instructed to pay any applicable biometrics and application fees to DHS. *See* 8 CFR 1103.7(a)(3).[223] As previously explained, while DHS proposes to incorporate the costs of biometric services into its underlying immigration benefit request fees, DHS has no authority to change the amounts it receives from any EOIR fees to recover the costs it incurs for biometric services (which includes background checks).

Under this proposed rule, DHS proposes to adjust the biometric services fee for those requests filed with and processed by USCIS. DHS proposes to use the same $30 fee using the same estimates as described for the proposed TPS biometrics fee above. Consequently, DHS proposes a biometric services fee of $30 for certain forms for which it performs intake and biometrics services on behalf of EOIR. *See* proposed 8 CFR 103.7(a)(2).

## F. Naturalization and Citizenship-Related Forms

Aside from updating the fees for naturalization and citizenship-related forms, DHS proposes to continue offering fee waivers for the naturalization forms. *See* section VI.E of this preamble. For a general discussion on how fee waivers, limited fee increases, and fee exemptions affect proposed fees, see section IV of this preamble.

The fee-paying unit costs represent the estimated cost per fee-paying applicant as calculated in the USCIS

---

[221] EOIR is a component of the DOJ and includes the Office of the Director, the Board of Immigration Appeals, the Office of the Chief Immigration Judge, the Office of the Chief Administrative Hearing Officer, the Office of Policy, and other staff as the Attorney General or the Director may provide. *See* 8 CFR 1003.0. USCIS provides intake services for several requests filed with, and adjudicated by, EOIR, for which biometrics may be required.

[222] Guidance is available at "Immigration Benefits in EOIR Removal Proceedings," at *https://www.uscis.gov/laws/immigration-benefits-eoir-removal-proceedings* (last updated Aug. 5, 2020).

[223] This regulation provides that, except as provided in 8 CFR 1003.8, EOIR does not accept fees, and that fees relating to EOIR proceedings are paid to DHS.

ABC model.[224] However, as to Forms N–565 and N–600K, both the current fees and the proposed fees are less than the estimated cost (fee-paying unit cost) for each naturalization form. For example, the current fee for Form N–400 is $231 less than the fee-paying unit cost estimated in the FY 2016/2017 fee rule. *See* Table 14. The proposed fee for Form N–400 is $296 less than the estimated FY 2022/2023 fee-paying unit cost. *Id.* As such, while DHS proposes to increase the fee for Form N–400, DHS likewise proposes to recover a smaller percentage of the estimated cost for adjudicating Form N–400 than it does in

its current fee structure. If the two difference columns in Table 14 are negative, then DHS proposes to maintain the current practice by keeping the proposed fee below the estimated cost. If the two difference columns are positive, then DHS proposes to recover more than full cost in order to fund operations and policy objectives, like offering fee waivers and charging less than full cost for other naturalization fees.

DHS further proposes separate online and paper fees for some benefit types. Proposed online filing fees are lower than proposed paper filing fees, when

available. *See* section VIII.G of this preamble. However, DHS does not propose separate online and paper filing fees for naturalization services because the proposed naturalization fees are based on the current fees instead of ABC model results. Specifically, as a general matter, the proposed fees are approximately 18 percent more than the current fees, based on a calculation described in section V.B.3 of this preamble. However, for Forms N–565 and N–600K, the proposed fees are below the estimated cost from the ABC model, thus DHS proposes no discount for online filing of the N-forms.

| Table 14: Naturalization Fees and Cost Estimates Compared | | | | | | |
|---|---|---|---|---|---|---|
| **Immigration Benefit Request** | **FY 2016/2017 Fee-Paying Unit Cost** | **Current Fee** | **Difference Between Current Fees and Cost Estimate (Current Fee minus FY 2016/2017 Cost)** | **FY 2022/2023 Fee-Paying Unit Cost** | **Proposed Fee** | **Difference Between Proposed Fees and Cost Estimate (Proposed Fee minus FY 2022/2023 Unit Cost)** |
| N-300 Application to File Declaration of Intention | $840 | $270 | -$570 | $789 | $320 | -$469 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) | $1,294 | $700 | -$594 | $1,537 | $830 | -$707 |
| N-400 Application for Naturalization | $871 | $640 | -$231 | $1,056 | $760 | -$296 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $792 | $355 | -$437 | $1,511 | $420 | -$1,091 |
| N-565 Application for Replacement Naturalization/Citizenship Document | $399 | $555 | $156 | $375 | $555 | $180 |
| N-600 Application for Certificate of Citizenship | $841 | $1,170 | $329 | $1,474 | $1,385 | -$89 |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 | $841 | $1,170 | $329 | $1,048 | $1,385 | $337 |

1. Application for Naturalization (Form N–400) Fee

DHS proposes to increase the fee for Form N–400, Application for Naturalization, from $640 to $760, a $120 or 19 percent increase. *See* 8 CFR 103.7(b)(1)(i)(BBB) (Oct. 1, 2020); proposed 8 CFR 106.2(b)(4). Most

naturalization applicants pay an additional $85 biometric services fee, making the current total fees for Form N–400 total $725. This rule proposes to add the cost of biometric services to the underlying form fee. *See* section VIII.E of this preamble. As such, the proposed fee for Form N–400 is only $35 or

approximately 5 percent more than the current Form N–400 and biometric service fees that most applicants currently pay. For comparison, the inflation since the current fees became effective is approximately 19.75 percent.[225] If DHS adjusted the Form N–400 and biometric services fees by

---

[224] For more information, see the FY Immigration Examinations Fee Account Fee Review Supporting Documentation (supporting documentation).

[225] Current fees became effective on Dec. 23, 2016. *See* 81 FR 73292. The consumer price index

for all urban consumers (CPI–U) was 241.432 in Dec. 2016 and 289.109 in Mar. 2022. The change in the Index over these two periods was 47.68 or 19.75 percent. *See* U.S. Department of Labor, Bureau of Labor Statistics, All Urban Consumers

(CPI–U) tables, available at *https://data.bls.gov/timeseries/CUUR0000SA0.* DHS has not recently adjusted IEFA fees by CPI–U inflation, but provides this figure as a point of comparison.

inflation, then the proposed fees would total $865, $140 more than the current fees for Form N–400.[226] DHS provides this inflation-adjusted fee amount only as a point of comparison.

Prior fee rules shifted a portion of the Form N–400 cost to other fee-paying immigration benefit requestors, and DHS proposes to maintain that approach. In the FY 2010/2011 and the FY 2016/2017 fee rules, the Form N–400 fee was set below the ABC model output; in other words, the fee was less than the estimated cost per fee-paying receipt. The FY 2010/2011 fee rule held the fee to $595, the amount set in the FY 2008/2009 fee rule. See 75 FR 58975. The FY 2016/2017 fee rule limited the fee to only $640, a $45 or eight percent increase. See 81 FR 73307.

The FY 2010/2011 proposed rule explained that holding the fee for the Form N–400 to the FY 2008/2009 fee raised all other proposed fees by approximately $8 each. See 75 FR 33462 (June 11, 2010). For DHS to recover the full cost of adjudicating the Form N–400, the FY 2010/2011 proposed fee would have been $655, a $60 or roughly a 10 percent increase. See 75 FR 33462–33463. In the FY 2016/2017 fee rule supporting documentation, USCIS estimated that each Form N–400 may cost $871 to complete, plus the cost for biometric services of $75, for a total of $946.[227] In this proposed rule, the estimated cost of Form N–400, including biometrics, is $1,003 when filed online and $1,135 when filed on paper. If DHS were to maintain the current $640 fee, then all other proposed fees would increase by an additional average $12.

In crafting prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[228] In the 2020 fee rule, DHS increased the fee for Form N–400,

Application for Naturalization, from $640 to $1,170. See 8 CFR 103.7(b)(1)(i)(BBB); 8 CFR 106.2(b)(3) (Oct. 2, 2020). DHS determined that shifting costs to other applicants in the manner that it had in previous fee rules was ''not equitable'' given the significant increase in Form N–400 filings in recent years. See 84 FR 62316. Therefore, to mitigate the fee increase of other immigration benefit requests and to emphasize the beneficiary-pays principle, DHS did not limit the Form N–400 fee and set a $1,170 fee to recover the full cost of adjudicating the Form N–400, as well as a proportion of costs not recovered by other forms for which fees are limited or must be offered a waiver by statute. As stated earlier, DHS proposes to shift away from emphasizing the beneficiary-pays principle and return towards the historical balance between the beneficiary-pays and ability-to-pay principles. DHS has determined that shifting costs to other applicants in this manner is rational considering the significant value that the United States obtains from the naturalization of new citizens. Many commenters on the 2020 fee rule stated that the fee would deter eligible applicants, and cited peer-reviewed studies indicating that cost can be a prohibitive barrier for would-be naturalization applicants. DHS is committed to promoting naturalization and immigrant integration and making sure that naturalization is readily accessible. Thus, DHS proposes setting the Form N–400 fee at an amount less than its estimated costs and shifting those costs to other fee payers using the cost reallocation methodology.[229] Therefore, DHS proposes to limit the Form N–400 fee at $760 to partially recover the full cost of the Form N–400 and biometrics services while promoting naturalization and integration. If the full costs of administering USCIS programs to be recovered under this rule decrease due to increases in revenue or gains in efficiency between this proposed rule and the final rule, DHS will consider using those cost reductions in to further reduce the Form N–400 fee, considering the value of naturalization and immigrant integration, or to reduce other fees based on policy considerations.

## 2. Request for Reduced Fee (Form I–942)

In addition to updating the Form N–400 fee waiver requests, as previously

explained, DHS proposes to keep the reduced fee option for those naturalization applicants with family incomes not more than 200 percent of the FPG. See 8 CFR 103.7(b)(1)(i)(BBB)(*1*) (Oct. 1, 2020). The current N–400 reduced fee is $320 plus the $85 biometrics fee. The proposed N–400 reduced fee is $380, a $60 or approximately 19 percent increase from the current $320 fee but less than the current total cost ($405) with added $85 separate biometrics fee. See proposed 106.2(b)(4)(ii). Like the proposed Form N–400 fee, the proposed reduced fee is a limited 18 percent increase from the current fee ($320), rounded to the nearest $5. See Section V.B.3 of this preamble. Like most proposed fees, it includes the cost of biometric services. See section VIII.E. of this preamble. However, the biometric services fee was not part of the calculation for the proposed fee. DHS calculated the proposed fee for the reduced fee option the same way as the full fee option, as described in section V.B.3 of this preamble.

Currently, qualifying applicants pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. To qualify for a reduced fee, the eligible applicant must submit Form I–942, Request for Reduced Fee, along with their Form N–400. Form I–942 requires the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200 percent of the FPG.

DHS eliminated the Form I–942 and reduced fee in the 2020 fee rule to recover the estimated full cost for naturalization services and to reduce the administrative burden on the agency to process the Form I–942. See 84 FR 62317; 85 FR 46860. Commenters on the change wrote that eliminating the reduced fee would make it difficult for immigrants with income between 150 percent and 200 percent of the poverty level to afford citizenship. DHS acknowledges that eliminating the reduced fee for Form N–400 would block people from receiving a reduced fee, increase the number of people who are required to pay the full Form N–400 fee, and could result in fewer people applying for naturalization.

DHS implemented this reduced fee option in the FY 2016/2017 fee rule to limit potential economic disincentives that some eligible naturalization applicants may face when deciding whether to seek U.S. citizenship. See 81 FR 73307. DHS only proposes that the income level for the reduced fee is not limited to start at 150 percent of the

---

[226] The inflation adjusted amounts using this example would be as follows: N–400: $640 multiplied by 1.1975, which is approximately $766.38; biometric services fee: $85 multiplied by 1.1975, which is approximately $101.79. DHS rounds fees to the nearest $5. Rounded to the nearest $5, the inflation adjusted fees would be $765 and $100, totaling $865.

[227] See the Model Output column of Appendix Table 4: Final Fees by Immigration Benefit Request in the docket of the FY 2016/2017 fee rule. The model output is the projected total cost from the ABC model divided by projected fee-paying volume. It is only a forecast unit cost (using a budget) and not the actual unit cost (using spending from prior years). USCIS does not track actual costs by immigration benefit request. See Appendix VI of the supporting documentation included in this docket for more information.

[228] See, for example, 75 FR 33461; 81 FR 26916.

[229] Based on filing volume trends in recent years, USCIS forecasts an increase of 62,165 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. See Table 7, Workload Volume Comparison.

FPG. Instead, any applicant who has an income under 200 percent of the FPG can request a naturalization application with a reduced fee if eligible.[230] DHS had originally proposed the reduced fee option for low-income applicants in support of 2015 immigration integration policies and the USCIS mission to support aspiring citizens.[231] The reduced fee helps ensure that many immigrants whose goal it is to apply for naturalization are not unnecessarily limited by their economic means. Other fee payers are required to bear the cost of the reduced fee, but the importance of naturalization justifies the slight shift of burden.[232] Similarly, in keeping the reduced fee for the naturalization application, DHS is supporting and complying with Executive Order 14012 to reduce barriers and promote accessibility to the immigration benefits that it administers. *See* 86 FR 8277 (Feb. 2, 2021) (E.O. 14012). Although receipts of I–942 have remained relatively low, the overall lower cost for a reduced N–400 application may increase access to naturalization applications.

In FY 2020, 3,430 people submitted a reduced fee Form N–400.[233] This represents approximately 0.47 percent of the people who paid for Form N–400 in FY 2020. USCIS forecasts 3,763 average annual receipts for the reduced

Form N–400 in this proposed rule. As such, DHS estimates that the reduced fee option for N–400 may provide approximately $1.4 million in revenue with the proposed fee. If DHS were to propose ending the reduced fee option, it would have almost no effect on the resulting fee schedule. Two proposed fees would increase by $5 and one would increase by $10, but all other proposed fees would remain the same. DHS proposes to maintain the reduced fee [234] to further promote naturalization and limit a barrier to naturalization.

3. Military Naturalization and Certificates of Citizenship

DHS does not propose any changes to fee exemptions for current and former military service members who file a Form N–400 under the military naturalization provisions.[235] Military naturalization applications will continue to be fee exempt. *See* 8 CFR 103.7(b)(1)(i)(BBB)(*2*) (Oct. 1, 2020); proposed 8 CFR 106.2(b)(4)(i).[236] USCIS does not charge a fee to military naturalization applicants because such fees are prohibited by statute. *See* INA secs. 328(b)(4), 329(b)(4), 8 U.S.C. 1439 (b)(4), 8 U.S.C. 1440(b)(4). Applicants who request a hearing on a naturalization decision under INA sec. 328 or 329 with respect to military service will continue to be fee exempt. *See* 8 CFR 103.7(b)(1)(i)(AAA) (Oct. 1, 2020); proposed 8 CFR 106.2(b)(3). Current or former military members of any branch of the U.S. armed forces will continue to be exempt from paying the fee for an Application for Certificate of Citizenship, Form N–600. *See* 8 CFR 103.7(b)(1)(i)(EEE) (Oct. 1, 2020); proposed 8 CFR 106.2(b)(8). While the statute prohibits fees for military naturalization applicants themselves, DoD currently reimburses USCIS for costs related to such applications.[237] Accordingly, USCIS does not propose to

increase other fees to subsidize the costs of military naturalization applications.

4. Application for Certificate of Citizenship (Form N–600) and Application for Citizenship and Issuance of Certificate Under Section 322 (Form N–600K)

As discussed earlier in this preamble, DHS bases most proposed fees on fee-paying unit costs from the ABC model. *See* section V.B.3., Assessing Proposed Fees. Other proposed fees, such as those for naturalizations forms, are based the current fees plus a limited fee increase. *Id.* The current fee for Forms N–600 and N–600K was based on USCIS data that showed approximately one-third of Form N–600 filers received fee waivers. *See* 81 FR 73298. In fact, the substantial fee increase in the FY 2016/2017 fee rule was primarily due to the availability of fee waivers for other N–600s and N–600Ks. *Id.* In the 2010 final rule, DHS assumed that every applicant would pay the fee for Forms N–600 and N–600K.[238] However, the fee-paying volume estimate for Forms N–600 and N–600K decreased from 100 percent in FY 2010/2011 to 67 percent in FY 2016/2017 to reflect USCIS data, showing an increased share of applicants receiving fee waivers. *See* 81 FR 73298. In addition, the FY 2016/2017 fee rule removed the difference in fees between forms filed for biological children versus forms filed for adopted children. *See* 81 FR 73297–73298. In response to the FY 2016/2017 fee rule NPRM, some commenters stated that the proposed fee increases would result in a significant additional burden for applicants, including adoptive families. Nevertheless, DHS increased the fees to recover the cost of adjudications.

In the 2020 fee rule, fees for Forms N–600 and N–600K decreased. *See* 85 FR 46792. However, that fee decrease was the result of limitations on fee waivers that were included in that enjoined rule. *See* 85 FR 46861. DHS is not proposing to similarly restrict fee waivers in this rule. Therefore, fee waivers continue to contribute to the proposed fee increases. Recent USCIS data indicate that approximately 53 percent of Form N–600 applicants and approximately 74 percent of Form N–600K applicants pay the respective fees, and the fees

---

[230] In 2018, Congress also encouraged USCIS ''to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the FPG, who are not currently eligible for a fee waiver.'' H. Rept. 115–948 at 61.

[231] *See* The White House Task Force on New Americans, ''Strengthening Communities by Welcoming All Residents'', at 28–29 (2015), available at *https://obamawhitehouse.archives.gov/sites/default/files/docs/final_tf_newamericans_report_4-14-15_clean.pdf*.

[232] DHS previously stated that adjusting fee levels based on income would be administratively complex and would require higher costs to administer. *See* 75 FR 58971. Specifically, in 2010, DHS stated that a tiered fee system would impose an unreasonable cost and administrative burden, because it would require staff dedicated to income verification and necessitate significant information system changes to accommodate multiple fee scenarios. *See id.* DHS will need to reprogram intake operations for Form N–400 to recognize the new fee and documentation. Staff must be added to review the income documentation provided to determine if the applicant qualifies for the new fee. DHS has determined that the change proposed here, because it applies only to Form N–400 and the act of acquiring citizenship, is of sufficient value from a public policy standpoint to justify USCIS incurring the additional administrative and adjudicative burden, and the cost of such covered by other fee payers, which as explained below is limited.

[233] Based on actual FY 2020 revenue collections, 3,430 people filed Form N–400 with Form I–942. In the same year, 726,519 paid the full fee for Form N–400. Thus, the total fee-paying volume for both is 729,949. Reduced fee applicants represented approximately 0.47 percent of total Form N–400 applicants.

[234] This includes a reversal of the 2020 fee rule's removal of the Form I–942.

[235] DHS notes that no other applicant is exempt from the Form N–400 fee but any other applicant submitting a Form N–400 may request a fee waiver.

[236] DHS made no changes to the fee exemptions for military members and veterans in the 2020 fee rule. *See* 84 FR 62317.

[237] The proposed fee would increase the reimbursable agreement between USCIS and DoD by $199,500. The current fees for Form N–400 ($640) and biometric services ($85) total $725 per military naturalization. In FY 2022/2023, USCIS forecasts an average of 5,700 military naturalizations per year. Under the current fees, this would cost DoD $4,132,500 on average each year. With the proposed $760 Form N–400 fee (which includes the cost of biometrics), the same volume would cost $4,332,000, a $199,500 or approximately 5 percent increase.

[238] Compare Forms N–600 and N–600K between Tables 10 and 11 in the 2010 proposed rule. *See* 75 FR 33468–33469 (June 11, 2010). The 2010 proposed rule assumed no fee waivers for Forms N–600 and N–600K because workload volumes are equal to fee-paying volumes for the two respective forms. The 2010 final rule adopted the proposed fees for Forms N–600 and N–600K. *See* 75 FR 58964 (Sept. 24, 2010).

proposed in this rule reflect that.[239] This means that every fee-paying Form N–600 applicant would need to pay almost double the estimated unit cost of the application in order to accommodate applicants that received a fee waiver or qualified for a fee exemption for Form N–600 if the burden were limited to Form N–600 filers.

The current fees represent a combined fee for both Forms N–600 and N–600K.[240] The proposed fees for Forms N–600 and N–600K are calculated and proposed separately. USCIS estimated separate workload and fee-paying volumes for each in this proposed rule. By determining separate volumes and fee-paying percentages for Forms N–600 and N–600K, these proposed fees better reflect the fee-paying percentage of each respective benefit request.

DHS recognizes that increasing fees for Forms N–600 and N–600K to account for the full cost of adjudication may adversely impact applicants who are generally children and are already citizens by law. DHS has determined that the combined effect of high cost and low fee-paying volume would otherwise place an inordinate fee burden on individuals requesting certificates of citizenship. Also, DHS has decided that limiting the fee increase will promote citizenship and immigrant integration.

Therefore, DHS proposes to limit the increase of the fee for these forms and apply the cost reallocation methodology as described in section VIII.F.5., Proposed Changes to Other Naturalization-Related Application Fees. This proposed fee remains below the estimated cost from the USCIS ABC model. By limiting the fee increase, DHS may reduce the financial burden on these applicants. In addition, limiting the N–600 fees does not appreciably increase other fees by shifting an inordinate amount of costs of adjudicating the N–600 to them. The increase to other forms is only $5 in many cases, compared to an increase of hundreds of dollars to the N–600 and N–600K fees to recover full cost. For example, if DHS proposed to recover full cost on Form N–600 and N–600K, then proposed fees for Form N–600 would range from $1,835 when filed

online to $2,080 when filed on paper. These hypothetical proposed fees are $450 and $695 more than the respective proposed fees in this rulemaking. Thus, DHS concludes that the proposed Form N–600 and N–600K fees represent a reasonable balance between the beneficiary-pays and ability-to-pay fee-setting models being employed to calculate the fees in this proposed rule.

5. Proposed Changes to Other Naturalization-Related Application Fees

There are other naturalization and citizenship related forms that may be submitted in coordination with the naturalization or certificate of citizenship application. Other forms may be submitted before or after such applications for other benefits. In some cases, such as Form N–565, DHS proposes to recover full cost; however, proposed fees for most naturalization services remain below estimated cost. See Table 14.

DHS uses its fee setting discretion to adjust certain immigration request fees that would be overly burdensome on applicants, petitioners, and requestors. Historically, as a matter of policy, DHS has chosen to limit USCIS fee adjustments for certain benefit requests to the weighted average fee increase represented by the model output costs for fee-paying benefit types. See 75 FR 33461.[241] Any additional costs from these benefit request types beyond this calculated weighted average increase figure would be reallocated to other benefit types.

DHS has continuously limited the fees for the following forms:

• Form N–300, Application to File Declaration of Intention;

• Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA); and

• Form N–470, Application to Preserve Residence for Naturalization Purposes.

DHS recognizes that charging less than the full cost of adjudicating an immigration benefit request requires USCIS to increase fees for other immigration benefit requests to ensure full cost recovery.[242] Nevertheless, DHS proposes to continue limiting the fees for these forms as they are related to naturalization benefits and some have low receipt numbers.

DHS further proposes to maintain the current fee for Form N–565, Application

for Replacement Naturalization/ Citizenship Document despite the FY 2022/2023 USCIS ABC model calculating a lower fee for it. The current fee for Form N–565 is $555. There is no fee when this application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error. DHS considered lowering the fee as provided in the model, but decided that the revenue above the costs of adjudicating that would be generated by maintaining the current N–565 fee would help to mitigate the fee increases for other forms.[243] DHS weighed a number of factors in deciding to keep the current fee, which is $180 higher than the FY 2022/2023 fee-paying unit cost. See Table 14. DHS recognizes that obtaining a replacement Naturalization/ Citizenship Document may be necessary at times; however, a U.S. passport is an available alternative to proof of U.S. citizenship. The number of individuals who would file Form N–565 is limited, a fee waiver is still available, and the fee is not increasing from the FY 2016/2017 fee rule. Therefore, DHS determined that keeping the fee at the amount that it has been for the last 5 years would not be unduly burdensome on applicants or limit access to a replacement certificate. Thus, DHS decided that applicants for a replacement naturalization/citizenship document would pay the current fee although the amount is above the fee-paying unit cost calculated by the ABC model.

6. Request for Comments

While DHS proposes no changes to the Request for Reduced Fee (Form I–942) income threshold for the naturalization application, DHS specifically requests comments on the appropriate level of income that USCIS should use to determine eligibility for the reduced fee and data to support that suggested level or measure. DHS also requests comments on limiting the increase of some fees and applying the cost reallocation methodology.

G. Fees for Online Filing

The June 2018 OMB report, "Delivering Government Solutions in the 21st Century," recognized that an overarching source of Government inefficiency is the outdated reliance on paper-based processes, and prioritized the transition of Federal agencies' business processes and recordkeeping to a fully electronic environment.[244] The

---

[239] See Section V.B.1 earlier in this NPRM. Compare the workload to the fee-paying volume for Forms N–600 and N–600K. Divide the fee-paying receipts by the workload for the fee-paying percentage. For example, Form N–600 estimated workload is 30,000. The estimated fee-paying volume is 16,041. Estimated fee-paying divided by estimated workload equals 53.47 percent as the fee-paying percentage.

[240] See 103.7(b)(1)(i)(EEE) and (FFF) (Oct. 1, 2020). Both used the same $1,070 fee; see also 81 FR 73295 (Oct. 24, 2016).

[241] See also FY 2008/2009 Fee Rule. 72 FR 4910.

[242] This complies with INA sec. 286(m), 8 U.S.C. 1356(m), which authorizes DHS to set USCIS fees at a level required to cover the costs of providing applicants, petitioners, or requestors a service or part of a service "without charge."

[243] See section V.B.3. of this preamble for more information on assessing proposed fees.

[244] OMB, "Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization

Continued

report noted that Federal agencies collectively spend billions of dollars on paper management, including processing, moving, and maintaining large volumes of paper records, and highlighted the key importance of data, accountability, and transparency.[245] Significantly, it cites USCIS' electronic processing efforts as an example of an agency initiative that aligns with the prioritized reforms.[246]

The FY 2022 President's Budget also noted the need for effective, efficient, and modern Federal information technology to improve service delivery.[247] USCIS will continue to expand upon the current level of operational digital filing platforms and encourage filers to utilize these online resources for a simpler, faster, and more responsive filing experience.[248]

DHS understands that while USCIS has embraced technology in adjudication and recordkeeping, it remains bound to the significant administrative and operational burdens associated with benefit requests that are submitted on paper. The intake, storage, and handling of paper require tremendous operational resources, and information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. However, technological advances have allowed USCIS to develop accessible, digital alternatives to traditional paper methods for intaking and adjudicating benefit requests. Every benefit request submitted online instead of on paper provides direct and immediate cost savings and operational efficiencies to both USCIS and filers—benefits that

will increase throughout an individual's immigration lifecycle as more benefit requests become available for online filing and case management.

Even as benefit requests become available for online filing, USCIS continues to provide the option of engaging with USCIS on paper. DHS recognizes that people adopt new technology at varying rates and have different levels of access to technology resources.[249] In this case, the complexity of the immigration benefit request system may exacerbate the tendency toward the status quo. Those familiar with paper-based forms and interactions may feel there is no reason to change a method that has worked for them in the past.

DHS agrees that transitioning to online filing for benefit requests is an important step in improving USCIS service and financial stewardship while promoting the objectives of the Government Paperwork Elimination Act[250] and the E-Government Act.[251] Therefore, USCIS has calculated the fee-paying unit cost (model output) for paper filing and online filing separately. USCIS modified its ABC model to distinguish between paper and online filing costs when both options exist for an immigration benefit request.[252] USCIS used domestic receipt data from April 2020 to March 2021 to estimate

the percentage of receipts by filing method (online or paper) for each type of immigration benefit request available for online filing. USCIS applied those percentages to the total receipt forecasts by fiscal year to estimate online and paper filing volumes for immigration benefit requests for which both filing options are available.[253] The ABC model assigned costs differently to the two filing methods. For example, the model assigned the Intake activity to only paper workloads. The Intake activity represents mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and lockbox operations.

DHS recognizes that the international COVID–19 pandemic may have increased the level of online filing versus paper filing for benefit requests where online filing is available. To encourage continued use of online filing at the same or a higher rate after the pandemic, DHS proposes a lower fee for online filing of immigration benefit requests for which both paper and online filing options are available.[254] *See* proposed 8 CFR 106.2.[255] *See* Table 15, Fees for Online Filing, for a comparison of paper and online filing fees. In some cases, DHS proposes to not change the fee. *See* section V.B.3., Assessing Proposed Fees, for more information.

---

Recommendations'' (2018), available at *https:// www.whitehouse.gov/wp-content/uploads/2018/06/ Government-Reform-and-Reorg-Plan.pdf.*

[245] *Id.* at 100.

[246] *Id.* at 101–02.

[247] OMB, "Budget of the U.S. Government: Fiscal Year 2022'' (2021), available at *https:// www.whitehouse.gov/wp-content/uploads/2021/05/ budget_fy22.pdf.*

[248] OMB, "12. Information Technology and Cybersecurity Funding'' (2021), available at *https:// www.whitehouse.gov/wp-content/uploads/2021/05/ ap_12_it_fy22.pdf.*

[249] *See* Brian Kennedy & Cary Funk, Pew Research Group, "28 percent of Americans are 'strong' early adopters of technology'' (July 12, 2016), available at *http://www.pewresearch.org/ fact-tank/2016/07/12/28-of-americans-are-strong- early-adopters-of-technology. See also* Emily Vowels, Pew Research Group, "Digital divide persists even as Americans with lower incomes make gains in tech adoption'' (June 22, 2021), available at *https://www.pewresearch.org/fact-tank/ 2021/06/22/digital-divide-persists-even-as- americans-with-lower-incomes-make-gains-in-tech- adoption/.*

[250] *See* Pub. L. 105–227, 112 Stat. 2681 (Oct. 21, 1998).

[251] *See* Pub. L. 107–347, 116 Stat. 2899 (Dec. 17, 2002).

[252] USCIS uses commercially available ABC software, CostPerform, to create financial models to implement ABC, as described in the Methodology section of this preamble and the supporting documentation in the docket for this proposed rule. The supporting documentation also provides additional information on activities and their assignments in the ABC model.

[253] USCIS did not use online filing data for Form I–765 during this timeframe. Online filing for certain applicants filing Form I–765 became available on April 12, 2021. *See* USCIS, "F–1 Students Seeking Optional Practical Training Can Now File Form I–765 Online,'' available at *https:// www.uscis.gov/news/news-releases/f-1-students- seeking-optional-practical-training-can-now-file- form-i-765-online* (last revised Apr. 12, 2021). USCIS used the online filing rates for Form I–539 as a proxy for the online filing rates for the eligible categories of I–765 filers.

[254] DHS codified a fee for forms currently available for online filing with USCIS and filed online that was $10 lower than the fee for the same paper. 8 CFR 106.2(d) (Oct. 2, 2020). In this rule, DHS also proposes separate fees for filing forms online.

[255] CBP accepts USCIS Forms I–192 and I–212 online. Available at *https://www.cbp.gov/travel/ international-visitors/e-safe* (last modified Oct. 28, 2020). However, USCIS has no data on the cost of online filing with CBP. Therefore, DHS proposes that USCIS online and paper fees apply to USCIS forms submitted to USCIS only.

AR_000089

| Table 15: Proposed Fees for Online Filing | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **Online Filing Fee** | **Paper Filing Fee** | **Difference** |
| I-90 Application to Replace Permanent Resident Card | $455 | $465 | $10 |
| I-130 Petition for Alien Relative | $710 | $820 | $110 |
| I-539 Application to Extend/Change Nonimmigrant Status | $525 | $620 | $95 |
| I-765 Application for Employment Authorization | $555 | $650 | $95 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | $830 | $830 | $0 |
| N-400 Application for Naturalization | $760 | $760 | $0 |
| N-565 Application for Replacement Naturalization/Citizenship Document | $555 | $555 | $0 |
| N-600 Application for Certificate of Citizenship | $1,385 | $1,385 | $0 |
| N-600K Application for Citizenship and Issuance of Certificate | $1,385 | $1,385 | $0 |
| G-1041 Genealogy Index Search Request | $100 | $120 | $20 |
| G-1041A Genealogy Records Request | $240 | $260 | $20 |

DHS bases the proposed separate online and paper fees on ABC model results. When DHS proposes limited fee increases or to continue using the current fee, the calculation is based on the current fee instead of ABC model results. As such, there are not separate proposed fees for online and paper filing for immigration benefit requests with limited fee increases or held to the current fee.

USCIS will further evaluate the effects of these changes in future biennial fee reviews. For example, if the level of online filing increases or as more benefit requests become available for online filing, then USCIS will incorporate that information into future fee reviews.

### H. Form I–485, Application To Register Permanent Residence or Adjust Status

#### 1. Interim Benefits

Usually, a primary immigration benefit request must be approved before an applicant can receive associated benefits such as employment authorization or a travel document or both. That is, USCIS only grants associated benefits after or at the same time as it grants the primary immigration benefit request. However, in some situations, an applicant may qualify for an associated immigration benefit while the primary benefit request is still pending adjudication. For example, in certain instances, a person with a pending adjustment of status application may apply for employment authorization or a travel document or both. *See* 8 CFR 274a.12(c)(9). When associated benefits are issued while a primary benefit request is pending, USCIS refers to them as "interim" benefits.

DHS proposes to require separate filing fees for Form I–765, Application for Employment Authorization, and Form I–131, Application for Travel Document, when filed concurrently with Form I–485, Application to Register Permanent Residence or Adjust Status, or as interim benefit requests on the basis of a pending Form I–485 filed on or after the effective date of this rule.

Before the FY 2008/2009 fee rule, applicants paid separate fees for Form I–765 and Form I–131 while waiting for USCIS to adjudicate Form I–485. Applicants who had not yet received a permanent residence card (PRC, also known as a "Green Card" or Form I–551), but who had to renew these interim benefits, paid any associated fees for the renewals. *See* 72 FR 4894.

Since the FY 2008/2009 fee rule, USCIS has allowed applicants who properly file and pay the required fee for Form I–485 to file Forms I–765 and I–131 without paying the fees for those forms. Form I–765 or Form I–131, or both, may be filed concurrently with Form I–485 or as standalone interim benefit requests while Form I–485 is still pending. Applicants who have not yet received a PRC but who have to renew these interim benefits also do not have to pay the associated fees. For the FY 2008/ 2009 fee rule, USCIS determined that calculating fees for Form I–485 at an amount that would include interim benefits would improve efficiency and save most applicants money. *See* 72 FR 4894 and 29861–29862. By providing that the fees for interim benefits would be included in the fee for Form I–485, USCIS addressed the perception that it benefits from increased revenue by processing Form I–485 more slowly. *See* 72 FR 4894 and 72 FR 29861–29862 (May 30, 2007). The FY 2010/2011 fee rule continued the practice of "bundling" the fees for interim benefits and Form I–485. *See* 75 FR 58968.

In the FY 2016/2017 fee review, USCIS calculated the workload volume and fee-paying percentage for Forms I–

765 and I–131 that were not associated with a Form I–485. This enabled USCIS to derive a fee-paying percentage for Forms I–765 and I–131 not filed concurrently with a Form I–485. *See* 81 FR 26918 (May 4, 2016) and 81 FR 73300. By isolating standalone Form I–765 and Form I–131 interim benefit applications from those filed concurrently with Form I–485, USCIS more accurately assessed fee-paying percentages, fee-paying volumes, and fees for all three benefit types. *Id.*

DHS proposes to charge separate fees for Form I–765 and Form I–131 when filed concurrently with Form I–485 or as interim benefit requests while Form I–485 is pending adjudication. *See* proposed 8 CFR 106.2(a)(16); 8 CFR 106.2(a)(32); 8 CFR 106.2(a)(7)(iii).[256] The proposed change would be subject to phased implementation. Specifically, individuals who filed a Form I–485 after July 30, 2007 (the FY 2008/2009 fee rule), and before this change proposed in this rule takes effect will continue to

be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending and would, therefore, be unaffected by this change. Individuals who filed Form I–485 before the FY 2008/2009 fee rule and those who file Form I–485 on or after the date the proposed change becomes effective would pay separate fees for the interim benefits. The proposed changes are summarized in Table 16. The date the proposed changes would take effect is not yet available.

| Table 16: Form I-485 Filing Dates and Interim Benefits | |
|---|---|
| **Form I-485 Filing Date** | **Bundled Fee Applies?** |
| Before July 30, 2007 | No |
| After July 30, 2007, but before implementation of this change via final rule | Yes |
| After implementing this proposed change with a final rule | No |

DHS proposes this change to reduce the proposed fee increases for Form I–485 and other forms. For example, in the FY 2016/2017 fee rule, USCIS isolated the workload volume and fee-paying percentage of Forms I–765 and I–131 that are not associated with Form I–485. *See* 81 FR 26918. Isolating the volumes for interim benefits reduced the overall volume on the fee schedule because USCIS only counted interim benefit volumes as part of the Form I–485 forecast instead of counting them twice (for Form I–485 and the interim benefit). USCIS expects approximately 500,000 new fee-paying annual interim benefit applications in the FY 2022/2023 forecast as a result of the proposed change.

In the proposed fee schedule, USCIS assumes these interim benefit applicants will pay the applicable fees for Forms I–485, I–765, and I–131. If applicants continued to only pay a bundled fee, then the proposed fee for Form I–485 would be $1,715, which is $175 or approximately 37 percent more than the actual proposed fee of $1,540. *See* 8 CFR 103.7(b)(1)(i)(U) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(16). Other proposed fees would also change on this hypothetical fee schedule including Form I–765, Application for Employment Authorization. If USCIS continued to

allow free interim benefits, the proposed Form I–765 fee would be $825 when filed on paper. This would be $415 or approximately 101 percent more than the current $410 fee. By proposing that the Form I–765 require the fee when filing as an interim benefit, the proposed Form I–765 fee is $650, which is $240 or approximately 59 percent more than the current $410 fee. *See* 8 CFR 103.7(b)(1)(i)(II) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(43)(ii). By having one fee for Form I–485 and interim benefits, the weighted average fee increase would be 51-percent compared to the 40-percent average fee increase in the proposed fee schedule.[257]

In a bundled scenario, USCIS only counts Form I–485 as a fee-paying receipt. In a scenario without bundled interim benefits, USCIS may count Forms I–485, I–765, and I–131 each as up to three fee-paying receipts. In general, fees are higher in a fee schedule with bundled fee interim benefits because it has lower fee-paying volumes than the proposed fee schedule. This means there are fewer immigration benefit requests from which USCIS can recover projected costs in a fee schedule with bundled fee interim benefits. For example, USCIS estimates that approximately 65 percent of Form I–765 applicants may pay the Form I–765 fee

in a scenario without bundled interim benefits; this is the proposed fee scenario with higher fee-paying volumes overall. In a bundled scenario, approximately 45 percent of Form I–765 applicants may pay the fee for Form I–765. While Form I–485 applicants would not have to pay the fee for Form I–765 in a bundled scenario, the fee for all other Form I–765 applicants would be higher because a bundled scenario reduces fee-paying receipts overall. In the bundled scenario, people would pay more to recover the cost of Form I–765 because of the approximate 20 percent difference between the two scenarios. These points of comparison ignore additional fee exemptions that are also part of the proposed fees. Put another way, if USCIS performs less bundled work, then applicants pay lower fees for that work because it will increase fee-paying volumes for Forms I–485, I–765, and I–131. If USCIS continues to offer bundled interim benefits, then other immigration benefit request fees will be higher. DHS proposes separate fees for interim benefit applications and Form I–485 applications in order to lower the proposed fees for most other applicants, petitioners, and requestors, and to tailor applicants' costs more directly to the benefits for which they apply.

---

[256] In the 2020 fee rule, DHS required separate filing fees when filing Form I–765, Application for Employment Authorization, and Form I–131, Application for Travel Document, concurrently with a Form I–485, Application to Register Permanent Residence or Adjust Status, or after USCIS accepts their Form I–485 and while it is still pending. DHS is not proposing to reverse that

change and is proposing it again in this rule for the reasons stated.

[257] USCIS uses a weighted average instead of a straight average because of the difference in volume by immigration benefit type and the resulting effect on fee revenue. In a fee schedule with free interim benefits, the sum of the current fees multiplied by the projected FY 2022/2023 fee-paying receipts for each immigration benefit type, divided by the total

fee-paying receipts is $522. This is $4 higher than in the proposed fee schedule because the fee-paying volumes are lower when DHS assumes free interim benefits. The weighted average proposed fee is $790, $65 or approximately 16 percent higher than the weighted average current fee of $522 in this hypothetical fee schedule that assumes free interim benefits.

DHS proposes to increase the Form I–485 fee to $1,540, which is $400 or 35 percent more than the current $1,140 fee that includes interim benefits. USCIS did not realize the efficiency gains anticipated when it originally bundled interim benefits in the FY 2008/2009 fee rule. *See* 72 FR 4894. This is due to a number of reasons. Mainly, annual numerical visa limits established by Congress and high demand have created long wait times for some visa categories, known as retrogression. Some Form I–485 applicants must wait years for visas to become available again after they file their adjustment of status applications.[258] While USCIS has some control over its own allocation of resources to address processing times and backlogs, USCIS has no direct control over delays caused by the DOS's allocation of visa numbers and Congress' annual visa numerical limits. USCIS has taken some actions to alleviate the filing burden and fees on those individuals whose Form I–485 applications are still pending due to the lack of available immigrant visas. For example, DHS, as of June 9, 2021, provides EADs with 2-year rather than 1-year validity periods to decrease the burden on both the Department and applicants caused by long waits for visa availability.[259]

As a result of this proposal, new Form I–485 applicants would only pay for the benefits that they request. In the FY 2008/2009 and FY 2010/2011 fee rules, some commenters stated they did not want to pay for additional benefits they did not want, need, or receive, which was a consequence of the bundled fee approach. *See* 72 FR 29861–29863 (May 30, 2007) and 75 FR 58968. In previous fee rules, bundled interim benefit fees were only associated with a pending Form I–485. However, other applications may also warrant interim benefits.[260] DHS has decided it is more equitable to treat all petitioners and applicants who apply for interim benefits the same, regardless of the pending primary request that may grant interim benefits, even though some applicants would pay significantly more to adjust status and apply for one or more interim benefits. If USCIS continues offering bundled interim benefits, then other customers may bear the burden of higher fees as a result of bundled interim benefits that do not benefit them. For example, DHS believes it would present unfair barriers for unrelated applicants with limited financial resources (like asylum renewals or students) for Form I–765 to pay higher fees so that Form I–485 applicants would pay lower fees. Table 17 compares the current fees for Form I–485 applicants that may bundle interim benefits to the proposed fees without bundling.

| Table 17: Current and Proposed Fees for Adjustment of Status with Interim Benefits | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | **Current Fees** | **Proposed Fees** | **Difference** | **Percentage Difference** |
| I-485, Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $400 | 35 percent |
| I-765, Application for Employment Authorization - Paper | $410 | $650 | $240 | 59 percent |
| I-131, Application for Travel Document | $575 | $630 | $55 | 10 percent |
| Biometric Services Fee | $85 | $0 | ($85) | -100 percent |
| Total Fees for Form I-485 and biometric services | $1,225 | $1,540 | $315 | 26 percent |
| Total Fees for Forms I-485 and I-765 and biometric services | | $2,190 | $965 | 79 percent |
| Total Fees for Forms I-485 and I-131 and biometric services | | $2,170 | $945 | 77 percent |
| Total Fees for Form I-485, all interim benefits, and biometric services | | $2,820 | $1,595 | 130 percent |

DHS acknowledges that applicants and petitioners may face additional difficulties in paying the proposed fees, and may be required to request a fee waiver if eligible, save money longer to afford the fees, or resort to credit cards or borrowing to pursue their or their family members' immigration benefit. DHS has weighed these impacts and interests and considered alternatives to the proposals in this rule as described in this preamble. DHS is committed to affordability and access for all and acknowledges that the increase in some fees may appear contrary to this commitment. As discussed above, however, bundled interim benefits are currently making other immigration

---

[258] See USCIS, "Visa Retrogression," available at *https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression* (last updated Mar. 8, 2018).

[259] See USCIS, "USCIS Policy Manual" (Vol. 10), Employment Authorization, Part B, Specific Categories, Chapter 4, Adjustment Applicants Under INA sec. 245, Policies to Improve

Immigration Services at *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210609-EmploymentAuthorization.pdf* (last updated June 9, 2021). USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an individual's authorization to work in the United States. *See* 8 CFR 274a.12(b).

[260] Individuals may derive interim benefits from an Application for Temporary Protected Status, Form I–821. Unless otherwise stated in this proposed rule preamble, DHS uses interim benefits to refer to benefits associated with Form I–485, Application to Register Permanent Residence or Adjust Status.

benefits less affordable. DHS requests comments on the proposed change to Form I–485 and interim benefits.

2. Form I–485 Fee for Child Under 14, Filing With Parent

Currently, Form I–485 has two fees: the fee for an adult is $1,140, and the fee for a child under the age of 14 concurrently filing with a parent is $750. *See* 8 CFR 103.7(b)(1)(i)(U) (Oct. 1, 2020). DHS proposes to require payment of the proposed $1,540 fee for all applicants, including children under the age of 14 years concurrently filing Form I–485 with a parent.[261] *See* 8 CFR 103.7(b)(1)(i)(U)(*2*) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(16).[262]

DHS no longer believes there is a cost basis for the two different Form I–485 fees. As explained in the FY 2016/2017 fee rule, USCIS does not track the adjudication time for Form I–485 based on the age of the applicant, so there are no data showing a cost difference correlated to the difference in applicant age. *See* 81 FR 73301. The FY 2016/2017 fee rule calculated the $750 fee using the model output to comply more closely with the ABC methodology for full cost recovery. *See* 81 FR 26919. USCIS assumed that the $750 fee would not include the cost of an EAD. *Id.* As such, the completion rate for the $750 fee was lower than for most adults. However, because DHS proposes to charge separate fees for interim benefits, there are no longer any Form I–765 adjudication costs included in the calculation of the fee, meaning that the previous rationale for providing a discount no longer exists. However, children under the age of 14 do not typically pay the $85 biometric services fee required for adults that apply to adjust status, which this rule proposes to bundle into the fee for Form I–485.

In the proposed Form I–485 fee, USCIS assumes the same completion rate and biometric services for adults and children to reflect USCIS data and processes, and because DHS proposes to separate interim benefit request fees from the fee for Form I–485. DHS believes that a single fee for Form I–485 will reduce the burden of administering separate fees and better reflect the cost of adjudication. This proposal will affect a small percentage of Form I–485 applicants. In FY 2019 and FY 2020, approximately five to six percent of Form I–485 applicants paid the $750 fee. *See* Table 18 for Form I–485 fee-paying receipts and percentages for the 2 years.

| Table 18: Form I-485 Fee-Paying Receipts | | | | | |
|---|---|---|---|---|---|
| **Form I-485 Applicant Type** | **Current Fee** | **FY 2019 Fee-Paying Receipts** | **Percent of FY 2019** | **FY 2020 Fee-Paying Receipts** | **Percent of FY 2020** |
| Applicant under the age of 14 years who submits the application concurrently with the Form I-485 of a parent | $750 | 26,437 | 5 | 30,166 | 6 |
| All other fee-paying applicants for Form I-485 | $1,140 | 462,844 | 95 | 446,980 | 94 |
| **Total** | **N/A** | **489,281** | **100** | **477,146** | **100** |

3. INA Sec. 245(i) Statutory Sum

In addition, DHS is proposing to clarify the statutory sum for applicants for adjustment of status under INA sec. 245(i).[263] Such applicants are required to properly file Form I–485 with fee along with Form I–485 Supplement A and the $1,000 statutory sum, unless exempted by the statute. USCIS proposes that the statutory sum for Form I–485 Supplement A, Adjustment of Status Under Section 245(i), be revised to clarify that Form I–485 Supplement A and the $1,000 statutory sum must be submitted when Form I–485 is filed or still pending. *See* proposed 8 CFR 106.2(a)(21). DHS is also proposing to remove the additional reference from the Form I–485 Supplement A that states there is no required statutory sum when the applicant is an unmarried child under 17 or the spouse or the unmarried child under 21 of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program. *See* 8 CFR 103.7(b)(1)(i)(V) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(17). Those exemptions from the required statutory sum are explicitly provided by statute and will be included in the applicable form instructions. *See* INA sec. 245(i)(1)(C), 8 U.S.C. 1255(i)(1)(C). Therefore, it is unnecessary to codify them in the CFR.

---

[261] The parent may be seeking classification as an immediate relative of a U.S. citizen, a family-sponsored preference immigrant, or a family member accompanying or following to join a spouse or parent under sections 201(b)(2)(A)(i), 203(a)(2)(A), or 203(d) of the INA; 8 U.S.C. 1151(b)(2)(A)(i), 1153(a)(2)(A), or 1153(d).

[262] DHS made this change in the 2020 fee rule and is proposing that it not be reversed for the reasons stated.

[263] The additional $1,000 sum is required to be submitted with each INA sec. 245(i), 8 U.S.C. 1255(i), adjustment of status application, unless the applicant is (1) an unmarried child under age 17, or (2) the spouse or unmarried child of a legalized alien who satisfies the requirements for an exemption in 8 CFR 245.10(c).

## I. Continuing To Hold Refugee Travel Document Fee for Asylees to the Department of State Passport Fee

Consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees,[264] DHS proposes to continue to link the fee charged for Form I–131, Application for Travel Document, to the DOS's fee for a first time United States passport book when Form I–131 is filed by asylees, or by LPRs who obtained such status as asylees, to request a refugee travel document.[265] In previous fee rules, DHS aligned the refugee travel document fees to the sum of the U.S. passport book application fee plus the additional execution fee that DOS charges for first time applicants. *See* 81 FR 73301 and 75 FR 58972. Since the FY 2016/2017 fee rule, DOS increased the execution fee from $25 to $35, which is a $10 or 40 percent increase. *See* DOS, ''Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates—Passport Services Fee Changes,'' 83 FR 4425 (Jan. 31, 2018). In addition, DOS increased the passport book security surcharge from $60 to $80, a $20 or 33 percent increase. *See* DOS, ''Schedule of Fees for Consular Services-Passport Security Surcharge,'' 86 FR 59613 (Oct. 27, 2021). Together, these two DOS rules represent a $30 increase in passport book fees since DHS last changed the refugee travel document fees. Under this proposal, DHS would increase refugee travel document fees by a conforming amount for asylees and LPRs who obtained such status as asylees. DHS refugee travel document fees for this population would be $165 for adults and $135 for children under the age of 16 years, consistent with U.S. passport fees. *See* proposed revised and republished 8 CFR 106.2(a)(7)(i) and (ii). As discussed in section VII.B.12. of this preamble, DHS proposes to exempt refugees from paying the fee for refugee travel documents. DHS estimates that the cost to USCIS of processing refugee travel documents exceeds the fee for a U.S.

passport book. Consistent with past and current practice, DHS proposes to set other fees marginally higher to recover the difference between the cost of adjudicating Form I–131 for refugee travel documents and the revenue generated from the fees in light of the considerations and policy reasons described above relating to refugees.

## J. Form I–131A, Carrier Documentation

DHS proposes to separate the fee for Form I–131A, Application for Carrier Documentation, from other travel document fees and maintain the current Form I–131A fee. *See* 8 CFR 103.7(b)(1)(i)(M)(*3*) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(8). The proposed fee for Form I–131A is the same as the current $575 fee. *Id.* USCIS began using Form I–131A, Application for Carrier Documentation, in 2016. *See* 80 FR 59805 (Oct. 2, 2015). In the FY 2016/2017 fee rule, DHS implemented a fee that was calculated using the total Form I–131 and I–131A workload. *See* 81 FR 73294–73295.

Currently, certain LPRs may use Form I–131A to apply for a travel document (carrier documentation) if their PRC, also known as a ''Green Card'' or Form I–551, or their re-entry permit is lost, stolen, or destroyed while outside of the United States. Carrier documentation allows an airline or other transportation carrier to board the LPR without any penalty for permitting an individual to board without a visa or travel document. *See* INA sec. 273, 8 U.S.C. 1323 (providing for a fine of $3,000 for each noncitizen without proper documentation). In order to be eligible for carrier documentation, an LPR who was traveling on a PRC must have been outside the United States for less than 1 year, and an LPR who was traveling on a re-entry permit must have been outside the United States for less than 2 years. Form I–131A is not an application for a replacement PRC or re-entry permit.

DHS proposes that the fee for Form I–131A does not change. While the result of the ABC model indicated that the fee should decrease, Form I–131A requires a different adjudicative process than Form I–131, including processing by DOS personnel outside of the United States, which affects the projected cost for Form I–131A. Other travel documents may be adjudicated inside or outside of the United States, while the DOS Bureau of Consular Affairs, located outside of the United States, will process Form I–131A following the closure of most USCIS international

offices.[266] The proposed fee includes direct costs to account for the fee DOS charges USCIS to adjudicate Form I–131A applications, which is approximately $337 per application.[267] In the FY 2020 interagency agreement and in this proposed rule, USCIS projects that DOS will receive approximately 8,000 Forms I–131A each year. In addition, the proposed fee includes a portion of the cost of RAIO staff. Among other duties, RAIO oversees the interagency agreement with the DOS. USCIS may also process some Form I–131A requests at the remaining offices abroad. However, USCIS is uncertain how many. USCIS is unable to estimate a workload forecast because the COVID–19 pandemic forced the remaining USCIS locations abroad to close to the public shortly after the reorganization. In light of this uncertainty, DHS decided to maintain the current fee to generate more revenue. DHS will reassess the fee in future fee reviews.

## K. Separating Fees for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification

Currently, employers and other qualified filers, such as agents, sponsoring organizations and investors (collectively referred to as a ''benefit requestor'' or separately referred to as a ''petitioner'' or ''applicant,'' as applicable) may use Form I–129, Petition for a Nonimmigrant Worker, to submit a benefit request on behalf of a current or future nonimmigrant worker to temporarily perform services or labor, or to receive training in the United States.[268] Using this single form, petitioners or applicants can file petitions or applications for many different types of nonimmigrant workers.[269] Some classifications also

---

[264] The United States is party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, 606 U.N.T.S. 267 (1968), which incorporates articles 2 through 34 of the 1951 Convention. The United States is not party to the 1951 Convention. *See Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) (''Although the United States is not a signatory to the Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951.'').

[265] *See* 75 FR 58972 (Sept. 24, 2010) (discussing Article 28 standards for assessing charges for a refugee travel document).

[266] *See* USCIS, ''USCIS Will Adjust International Footprint to Seven Locations,'' available at *https:// www.uscis.gov/news/news-releases/uscis-will-adjust-international-footprint-seven-locations* (last updated Aug. 9, 2019).

[267] The FY 2020 interagency agreement between DOS and USCIS uses an Economy Act rate of $313.11 for the adjudication. Additionally, State charges a $23.82 cashiering fee for each Form I–131A. USCIS used FY 2020 rates when calculating the proposed fees. The total of these two fees is $336.93.

[268] *See* USCIS, ''Temporary (Nonimmigrant) Workers,'' available at *https://www.uscis.gov/ working-united-states/temporary-nonimmigrant-workers* (last updated Sept. 7, 2011). *See also* 8 CFR 214.2(h)(2)(i)(A) (Oct. 1, 2020) (stating that ''A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on Form I–129, Petition for Nonimmigrant Worker, as provided in the form instructions.'').

[269] For example, nonimmigrants workers in the following classifications: E–1, E–2, E–2C, H–1B, H–
Continued

**496** Federal Register / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

allow nonimmigrants to "self-petition" or file a petition or application on their own behalf. Some nonimmigrant classifications require use of Form I–129 supplemental forms, such as the H Classification Supplement, or additional separate forms, such as Form I–129S, Nonimmigrant Petition Based on Blanket L Petition. In some cases, certain petitioners or applicants must pay statutory fees in addition to a base filing fee. For example, several statutory fees exist for H and L nonimmigrant workers.[270] In some cases, petitioners or applicants pay a single fee for multiple nonimmigrant beneficiaries. USCIS provides several optional checklists to help navigate the specific requirements of some nonimmigrant classifications.

In the 2020 fee rule, DHS separated Form I–129 into the following forms: Form I–129E&TN, Petition for Nonimmigrant Worker: E and TN Classifications; Form I–129H1, Petition for Nonimmigrant Worker: H–1 Classifications; Form I–129H2A, Petition for Nonimmigrant Worker: H–2A Classification; Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification; Form I–129L, Petition for Nonimmigrant Worker: L Classifications; Form I–129O, Petition for Nonimmigrant Worker: O Classifications; and Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classifications. 8 CFR 106.2(a)(3) (Oct. 2, 2020). DHS and USCIS believed that splitting the form and proposing several different fees would simplify or consolidate the information requirements for petitioners and applicants as well as better reflect the cost to adjudicate each specific nonimmigrant classification. 84 FR 62307.

2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, R–1, TN1, and TN2. *See* Form I–129, Petition for a Nonimmigrant Worker, at *https://www.uscis.gov/i-129* (last updated April 23, 2021).

[270] Various statutory fees apply to H and L nonimmigrants. For more information on the fees and statutory authority, *see* USCIS, "H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker," available at *https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018).

In the 2020 fee rule, DHS also limited the number of multiple beneficiaries that could be requested on a single petition for nonimmigrant worker, provided a different fee for petitions for up to 25 named beneficiaries versus petitions for more than 25 named beneficiaries, and required that if a petition includes more than 25 beneficiaries, an additional petition is required. 8 CFR 214.2(h)(2)(ii) (Oct. 2, 2020). DHS estimated that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. USCIS runs background checks on named workers, but it cannot do so for unnamed workers. After a petition for unnamed workers is approved, the petitioner finds workers and then the workers apply for nonimmigrant visas with DOS, who will then vet the worker before adjudicating the visa application. Therefore, USCIS believes that it takes less time for USCIS immigration services officers to adjudicate a petition with unnamed workers. 84 FR 62309.

In this rule, DHS proposes different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. The proposed fees are calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. The current base filing fee for Form I–129 is $460. *See* 8 CFR 103.7(b)(1)(i)(I) (Oct. 1, 2020). This base filing fee is paid regardless of how many nonimmigrant workers will benefit from the petition or application, the type of worker (for example, landscaper, chef, scientist, computer programmer, physician, athlete, musician, etc.), whether an employee is identified, and without differentiating the amount of time it takes to adjudicate the different nonimmigrant classifications. In order to reflect these differences, DHS is proposing a range of fees for petitions and applications for nonimmigrant workers, listed in Table 19 and explained in the subsequent sections. USCIS believes the proposed

different fees will better reflect the cost to adjudicate each specific nonimmigrant classification.

In 2017, the DHS Office of Inspector General (OIG) released a report on H–1B visa participants.[271] It discussed how USCIS verifies H–1B visa participants through the Administrative Site Visit and Verification Program (ASVVP). ASVVP includes site visits on all religious worker petitioners, including petitioners for R nonimmigrants, as well as randomly selected site visits for certain H–1B and L workers to assess whether petitioners and beneficiaries comply with applicable immigration laws and regulations. As a result of the OIG audit, USCIS began to collect better information on the costs associated with ASVVP. For example, ASVVP now uses unique project and task codes in the USCIS financial system to track spending. Based on FY 2020 spending, USCIS estimates that it may spend $8.4 million for ASVVP payroll in the FY 2022/2023 fee review budget. Additionally, USCIS tracks ASVVP hours by form type in the FDNS Data System, which USCIS uses to identify fraud and track potential patterns. In the FY 2022/2023 fee review, USCIS used some of this new information to identify distinct costs for these site visits. USCIS used the ASVVP hours by immigration benefit request to assign the costs of site visits to Forms I–129, I–360, and I–829. The proposed fees would result in the cost of ASVVP being covered by the fees paid by the petitioners in proportion to the extent to which ASVVP is being used for that benefit request.

Additionally, USCIS now captures adjudication hours for nonimmigrant worker petitions based on the classification for which the petition is filed (*see* discussion of Completion Rates in section V.B.2.). Therefore, the proposed fees include the costs associated with the estimated adjudication hours for each of the new petitions being proposed in this rule.

**BILLING CODE 9111–97–P**

[271] DHS OIG, *USCIS Needs a Better Approach to Verify H–1B Visa Participants* (Oct. 20, 2017), *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-18-03-Oct17.pdf*.

| Table 19: Proposed Form I-129CW Fee and Form I-129 Fees by Nonimmigrant Classification | | | | | |
|---|---|---|---|---|---|
| **Form Number** | **Nonimmigrant Classification** | **Current Fee(s)** | **Proposed Fee(s)** | **Change** | **Percent Change** |
| I-129 | H-1 Classification | $460 | $780 | $320 | 70% |
| I-129 | H-2A Classification | $460 | $1,090 (named); $530 (unnamed) | $630 (named); $70 (unnamed) | 137% (named); 15% (unnamed) |
| I-129 | H-2B Classification | $460 | $1,080 (named); $580 (unnamed) | $620 (named); $120 (unnamed) | 135% (named); 26% (unnamed) |
| I-129 | L Classification | $460 | $1,385 | $925 | 201% |
| I-129 | H-3, P, Q, or R Classifications | $460 | $1,015 | $555 | 121% |
| I-129 | O Classification | $460 | $1,055 | $595 | 129% |
| I-129 | E or TN Classifications | $460 | $1,015 | $555 | 121% |
| I-129CW | CNMI-Only Nonimmigrant Transitional Worker | $460 | $1,015 | $555 | 121% |
|  | H-1B Electronic Registration Fee | $10 | $215 | $205 | 2050% |

BILLING CODE 9111–97–C

1. Form I–129, Petition for Nonimmigrant Worker: H–1 Classification

The H–1B nonimmigrant program is for individuals who will perform services in a specialty occupation, services relating to a Department of Defense cooperative research and development project or coproduction project, or services as a fashion model who is of distinguished merit and ability, while the H–1B1 nonimmigrant program is for nationals of Singapore or Chile engaging in specialty occupations. *See* INA sec. 101(a)(15)(H)(i)(b) and (a)(15)(H)(i)(b1); 8 U.S.C. 1101(a)(15)(H)(i)(b) and (a)(15)(H)(i)(b1).[272] DHS proposes a fee of $780 for Form I–129 petitions when filed for H–1B and H–1B1 nonimmigrant classifications. The

proposed fee more accurately incorporates the direct cost of USCIS fraud prevention efforts for H–1B workers and other planned changes. DHS does not propose any changes to statutory fee amounts for certain H–1B petitioners where it does not have the authority to change the amount of these fees.[273]

2. Form I–129, Petitions for H–2A or H–2B Classifications

The H–2A visa program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary agricultural jobs.[274] The H–2B visa program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary nonagricultural jobs.[275] On March 6, 2017, the OIG issued an

---

[272] *See* USCIS, "H–1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models," available at *https://www.uscis.gov/working-united-states/temporary-workers/h-1b-specialty-occupations-dod-cooperative-research-and-development-project-workers-and-fashion-models* (last updated Feb. 5, 2021).

[273] Certain H–1B petitions may have to pay up to $6,000 in statutory fees. DHS does not have the authority to adjust the amount of these statutory fees. USCIS does not keep most of the revenue. CBP receives 50 percent of the $4,000 9–11 Response and Biometric Entry-Exit fee and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains five percent of the $1,500 or $750 American Competitiveness and Workforce Improvement Act fee. The remainder goes to the Department of Labor (DOL) and the National Science Foundation. USCIS keeps one-third of the $500 Fraud Detection and Prevention fee, while the remainder is split between the DOS and the DOL. These statutory fees are in addition to the current Form I–129 fee of $460 and optional premium processing fee of $1,500 or $2,500. *See* USCIS, "H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker," available at *https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018). Premium processing fees are available at *https://www.uscis.gov/i-907* (last updated Dec. 21, 2020).

[274] *See* USCIS, "H–2A Temporary Agricultural Workers," available at *https://www.uscis.gov/working-united-states/temporary-workers/h-2a-temporary-agricultural-workers* (last updated Jan. 12, 2021).

[275] *See* USCIS, "H–2B Temporary Non-Agricultural Workers," available at *https://www.uscis.gov/working-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers* (last updated Feb. 2, 2021). H–2B petitioners who file with USCIS are required to pay a $150 Fraud Detection and Prevention fee per petition regardless of the number of beneficiaries to which the petition pertains. DHS does not propose any change to this statutory fee because it lacks the authority to do so by rulemaking. *See* INA sec. 214(c)(13), 286(v); 8 U.S.C. 1184(c)(13), 1356(v). This statutory fee is in addition to the current Form I–129 fee of $460 and optional premium processing fee of $1,500.

audit report after reviewing whether the fee structure associated with H–2 petitions is equitable and effective.[276] OIG identified a number of issues and provided recommendations to address the issues. In response to OIG recommendations, USCIS proposes the following changes:

• Separate fees for petitions with named workers and petitions with unnamed workers;

• Limit the number of named workers that may be included on a single petition to 25.

DHS proposes separate H–2A and H–2B fees for petitions with named workers and unnamed workers. Currently, petitions for H–2A or H–2B workers may include named or unnamed workers. Petitioners must name workers when: (1) the petition is filed for a worker who is a national of a country not designated by the Secretary of Homeland Security as eligible to participate in the H–2A or H–2B programs; or (2) the beneficiary is in the United States. *See* 8 CFR 214.2(h)(2)(iii) (Oct. 1, 2020). In addition, USCIS may require the petitioner to name H–2B workers where the name is needed to establish eligibility for H–2B nonimmigrant status. USCIS estimates that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. USCIS runs background checks on named workers but cannot do so for unnamed workers. After the petition is approved, the petitioner finds workers and the worker applies for a nonimmigrant visa with DOS, who will then vet the worker. The 2020 fee rule relied on separate USCIS estimated hours per petition for named or unnamed beneficiaries. In FY 2021, USCIS began tracking Form I–129 adjudication hours by petitions for named or unnamed beneficiaries. This proposal is based on those hours for the first 6 months of FY 2021, which was the most recent available at the time of the FY 2022/2023 fee review. USCIS data indicate that it takes less time for a USCIS immigration services officer to adjudicate a petition with unnamed workers. The proposed fees reflect the average adjudication time estimated by USCIS.

USCIS proposes to implement a limit of 25 named beneficiaries per petition. Proposed 8 CFR 214.2(h)(2)(ii), (h)(5)(i)(B). Currently, there is no limit on the number of named or unnamed workers that may be on a single petition.

USCIS currently charges a flat fee regardless of whether a petition includes one or hundreds of named temporary nonimmigrant workers. However, because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. In one case, a petitioner included more than 600 named workers in one petition.[277] OIG observed that the flat fee structure (meaning the same fee regardless of the number of nonimmigrants included in the petition) disproportionally costs more per nonimmigrant for petitions with few beneficiaries compared to those with large numbers of beneficiaries. In other words, petitioners filing petitions with low named beneficiary counts subsidize the cost of petitioners filing petitions with high named beneficiary counts.

OIG's interviews of USCIS immigration services officers indicated that a maximum of 10 nonimmigrant workers could usually be processed within a normal workday.[278] DHS estimates the proposed change will increase H–2A and H–2B petition filing volume by approximately 1,800 after comparing our H–2A and H–2B petition forecasts for FY 2022/2023 with or without the proposed change. DHS assumes that the total number of named beneficiaries requested by an employer would remain the same, so that an employer petitioning for more than 25 named beneficiaries would file multiple petitions.

The proposed fees would address the imbalances in the current fee structure identified by the OIG audit. For example, the proposed $530 fee for an H–2A petition without named workers is $560 less than the proposed $1,090 fee for an H–2A petition with named workers because the adjudication of petitions requesting unnamed workers requires less time.

### 3. Form I–129, Petition for Nonimmigrant Worker: L Classification

Under current requirements, petitioners sponsoring L nonimmigrant workers, who are intracompany transferees,[279] may be required to

submit additional statutory fees or other additional forms to USCIS along with Form I–129. For example, two statutory fees may apply for L nonimmigrant workers.[280] Some petitions require the additional Form I–129S, Nonimmigrant Petition Based on Blanket L Petition. DHS is not proposing different fees for managers and executives, because the agency has no records on the difference in completion rates or costs for processing petitions for managers and executives. USCIS captures completion rates for H–1B, L, and other types of classifications, but not for subgroups within classifications, such as managers and executives. The $1,385 proposed fee is based partly on the average completion rate for L–1 petitions. The proposed fees also assign the direct costs of ASVVP site visits, currently used for certain H–1B, L, and all religious workers, to the specific form for the classification.

### 4. Form I–129, Petition for Nonimmigrant Worker: O Classification

DHS proposes a fee of $1,055 for Form I–129 petitions filed to request O classifications. Similar to some other proposed changes to Form I–129, DHS proposes to limit each Form I–129 filed for O classifications to 25 named beneficiaries.[281] Proposed and republished 8 CFR 214.2(o)(2)(iv)(F). As previously discussed in the H–2A and H–2B section above, limiting the number of named beneficiaries simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named

---

[276] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

[277] *Id.* at 13.

[278] *Id.* at 17.

[279] The L–1 intracompany transferee nonimmigrant classification permits a multinational organization to transfer certain employees from one of its foreign entities to one of its affiliated entities in the United States. The L–1A classification is for employees coming to the United States temporarily to perform services in a managerial or executive

capacity. The L–1B classification is for employees coming to the United States temporarily to perform services that require specialized knowledge. *See* INA sec. 101(a)(15)(L), 8 U.S.C. 1101(a)(15)(L).

[280] Certain L petitioners may have to pay up to $5,000 in statutory fees. DHS does not have the authority to adjust the amount of these statutory fees. USCIS does not keep most of the revenue derived from these fees. CBP receives 50 percent of the $4,500 9–11 Response and Biometric Entry-Exit fee revenue and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains one-third of the $500 Fraud Detection and Prevention fee revenue, while the remainder is split between the DOS and the DOL. These statutory fees are in addition to the current Form I–129 fee of $460 and optional premium processing fee of $2,500. *See* USCIS, "H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker," available at *https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated Feb. 2, 2018).

[281] While O–1 petitions are limited to a single named beneficiary, a petition for O–2 nonimmigrant workers may include multiple named beneficiaries in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity to petitioners filing petitions with low beneficiary counts of effectively subsidizing the cost of petitioners filing petitions with high beneficiary counts. USCIS currently captures adjudication hours for these types of petitions. As stated in section V.B.2., Completion Rates, the proposed fee is partly based on these data.

5. Form I–129, Petition for Nonimmigrant Worker: E and TN Classifications

DHS proposes a fee of $1,015 for Form I–129 petitions filed for Treaty Trader (E–1), Treaty Investor (E–2), E–3, and TN classifications. The Treaty Trader (E–1) and Treaty Investor (E–2) classifications are for citizens of countries with which the United States maintains treaties of commerce and navigation. The applicant must be coming to the United States to engage in substantial trade principally between the United States and the treaty country (E–1), to develop and direct the operations of an enterprise in which the applicant has invested or is in the process of investing a substantial amount of capital (E–2), or to work in the enterprise as an executive, supervisor, or essentially skilled employee. *See* INA sec. 101(a)(15)(E), 8 U.S.C. 1101(a)(15)(E); 8 CFR 214.2(e). An E–2 CNMI or E–2C investor is a noncitizen who seeks to enter or remain in the CNMI in order to maintain an investment in the CNMI that was approved by the CNMI government before November 28, 2009. This classification allows an eligible noncitizen to be lawfully present in the CNMI in order to maintain the investment during the transition period from CNMI to Federal immigration law, which was extended by Public Law 115–218, sec. 3(a) on July 24, 2018, and will expire on December 31, 2029. *See* 48 U.S.C 1806; proposed and republished 8 CFR 214.2(e)(23). The E–3 classification applies to nationals of Australia who are coming to the United States solely to perform services in a specialty occupation requiring theoretical and practical application of a body of highly specialized knowledge and at least the attainment of a bachelor's degree, or its equivalent, as a minimum for entry into the occupation in the United States. *See* INA secs. 101(a)(15)(E) and 214(i)(1); 8 U.S.C. 1101(a)(15)(E) and 1184(i)(1). The TN classification was originally created to implement part of the trilateral North American Free Trade Agreement (NAFTA) between Canada, Mexico, and the United States. NAFTA was replaced by the U.S.-Mexico-Canada Agreement (USMCA). The USMCA entered into force on July 1, 2020. The USMCA did not make any changes to the Immigration chapter of NAFTA that have significance for this proposed rule. The USMCA retains all substantive elements of the former NAFTA, and the TN designation continues to be used for NAFTA/USMCA professionals.[282] TN admissions under NAFTA were governed by the list of Professionals in Appendix 1603.D.1 to Annex 1603 of NAFTA. Under the USMCA, TN admissions are governed by the (identical) list of Professionals now found in USMCA Chapter 16 Appendix 2. For the purposes of discussing TN classification, this document uses the term "USMCA" but applies to nonimmigrants under both the former "NAFTA" and "USMCA" interchangeably. In accordance with the USMCA, a citizen of Canada or Mexico who seeks temporary entry as a businessperson to engage in certain business activities at a professional level may be admitted to the United States. *See* INA sec. 214(e), 8 U.S.C. 1184(e); 8 CFR 214.6; proposed 8 CFR 106.2(a)(3)(viii). USCIS does not have separate completion rates for the E and TN classifications. Currently, USCIS adjudicators report hours on these classifications in a catch-all Form I–129 category.

6. Form I–129, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classifications

DHS proposes to create a fee of $1,015 for the remaining nonimmigrant worker classifications: H–3, P, Q, and R. *See* proposed 8 CFR 106.2(a)(3)(viii). The costs used to determine the proposed fee for these classifications aggregate all identifiable costs associated with the adjudication of these different visa classifications, including the costs of administering site visits for R visa workers under the ASVVP.[283] As previously discussed in sections 2 and 4, DHS proposes to limit petitions for H–3, P, Q, or R classifications that allow 1 petition to be filed for multiple beneficiaries to 25 named beneficiaries. Proposed 8 CFR 214.2(h)(2)(ii), 8 CFR 214.2(p)(2)(iv)(F), and 8 CFR 214.2(q)(5)(ii). As stated previously, this change is expected to simplify and optimize the adjudication of these petitions, which is expected to lead to reduced processing times and reduced completion rates. Because USCIS completes a background check for each named beneficiary, petitions with more beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity to petitioners filing petitions with low beneficiary counts of effectively subsidizing the cost of petitioners filing petitions with high beneficiary counts. USCIS does not have separate completion rates for the H–3, P, Q, or R classifications. Currently, USCIS adjudicators report hours on these classifications in a catch-all Form I–129 category. As such, DHS lacks the information to propose separate fees for each of these classifications.

DHS proposes to republish a paragraph of regulatory text that incorporates statutory changes and longstanding practices that allow petitions for multiple P nonimmigrants. *See* proposed republished 8 CFR 214.2(p)(2)(iv)(F). Specifically, DHS proposes and republishes a reference to "team" to account for INA sec. 214(c)(4)(G), 8 U.S.C. 1184(c)(4)(G) (The Secretary of Homeland Security shall permit a petition under this subsection to seek classification of more than one alien as a nonimmigrant under section 1101(a)(15)(P)(i)(a) of this title), which was added in 2006 and mandates DHS to allow a petitioner to include multiple P–1A athletes in one petition. *See id.* and Public Law 109–463, 120 Stat. 3477 (2006). DHS also proposes to retain the revisions from the 2020 final fee rule as set out in proposed 8 CFR 214.2(p)(2)(iv)(F) because certain athletic teams applying for P–1 nonimmigrant classification and groups applying for P–2 or P–3 nonimmigrant classification are not necessarily required to establish reputation of the team or group as an entity. *Id.*

7. Separating Form I–129 Into Multiple Forms

DHS is not separating Form I–129 into multiple forms in this rule as it did in the 2020 fee rule, but may take that action separately as a revision of the currently approved Form I–129 information collection under the PRA. *See* 86 FR 46260, 86 FR 46261, and 86 FR 46263 (August 18, 2021). Although DHS separated Form I–129 into different forms in the 2020 fee rule, the form and its instructions can be revised in that same way using the procedures

---

[282] *See* United States-Mexico-Canada Agreement Implementation Act, Public Law 116–113 (2020).

[283] The estimated cost of ASVVP for this proposed fee is $69. See the Direct Costs column of Appendix Table 6 in the supporting documentation in the docket.

provided in 5 CFR part 1320 and obtaining approval from the OMB.[284] As stated in section V.E.1 of this preamble, form numbers are included for informational purposes, but USCIS may collect fees for immigration benefit requests regardless of the assigned form number. If the Form I–129 is separated into smaller forms with different names in the future, then the new, separate forms for nonimmigrant petitions will each have the same fee that is established for that nonimmigrant classification if this rule is final. Finally, as previously noted in the preamble, DHS proposes to remove references to "Form I–129" from 8 CFR. *See e.g.* 8 CFR 214.1 and 214.2 (Oct. 1, 2020); proposed 8 CFR 214.1 and 214.2.

8. Commonwealth of the Northern Mariana Islands Fees

DHS proposes to create a fee of $1,015 for Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. *See* proposed 8 CFR 106.2(a)(4). Two recent public laws affected statutory fees for the CNMI. The Northern Mariana Islands Economic Expansion Act, Public Law 115–53, section 2, 131 Stat. 1091, 1091 (2017) (2017 CNMI Act) increased the CNMI education funding fee from $150 to $200. *See* 48 U.S.C. 1806(a)(6)(A)(i). USCIS began accepting this increased fee on August 23, 2017.[285] DHS proposes to make conforming edits to the fee for the Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW, because of this statutory change. *See* 8 CFR 103.7(b)(1)(i)(J) (Oct. 1, 2020); proposed 8 CFR 106.2(c)(7). Employers must pay the fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee must be paid at the time the petition is filed. By statute, since the fee is for each worker approved, USCIS refunds the CNMI education funding fee if the petition is not approved. The fee is a recurring fee that petitioners must pay every year. A prospective employer requesting issuance of a permit with a validity period longer than 1 year must pay the fee for each year of requested validity. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational

education, apprenticeships, or other training programs for United States workers. The Northern Mariana Islands U.S. Workforce Act of 2018, Public Law 115–218, sec. 3, 132 Stat. 1547 (2018) (2018 CNMI Act), granted DHS the authority to adjust the fee for inflation. *See* 48 U.S.C. 1806(a)(6)(A)(ii).

DHS proposes a $10 adjustment to the $200 CNMI education funding fee based on the methodology described in the authorizing statute.[286] Beginning in FY 2020, DHS may adjust the CNMI education funding fee once per year by notice in the **Federal Register**.[287] The adjustment must be based on the annual change in the CPI–U published by the BLS. *See* proposed 8 CFR 106.2(c)(7)(iii). Therefore, the CNMI education funding fee would be $210 (rounded to the nearest $5 increment). Although the law provides DHS with explicit authority to adjust the fee for inflation based on the CPI–U, DHS includes this proposed increase along with other fees that USCIS collects. DHS took a similar approach when it first increased the premium processing fee in 2010. *See* 75 FR 33477. The final rule will establish an amount based upon the latest published annual CPI–U before the final rule publication. DHS may revisit inflation increases to the CNMI education funding fee in future fee rules or separately.

In addition to authorizing inflation adjustments for the CNMI education funding fee, the 2018 CNMI Act created a new $50 CNMI fraud prevention and detection fee. 2018 CNMI Act, sec. 3 (amending 48 U.S.C. 1806(a)(6)(A)(iv)). The new $50 fraud prevention and detection fee is in addition to other fees that employers must pay for petitions to employ CNMI-only transitional workers. *See* proposed 8 CFR 106.2(c)(6). USCIS began accepting the fee on July 25, 2018.[288] The new fee is only due at the

time of filing and is a single $50 fee per petition, not a fee charged per beneficiary like the CNMI education funding fee. USCIS must use the revenue for preventing immigration benefit fraud in the CNMI, in accordance with INA sec. 286(v)(2)(B), 8 U.S.C. 1356(v)(2)(B). *See also* 48 U.S.C. 1806(a)(6)(A)(iv), as amended by 2018 CNMI Act, sec. 3.

DHS also proposes conforming edits to CNMI regulations regarding fee waivers and biometric services. Currently, some CNMI applicants and beneficiaries may qualify for a fee waiver based on inability to pay or other reasons. *See* 8 CFR 214.2(e)(23)(xv), (w)(5), and (w)(14)(iii). Generally, fee waivers are not available for employment-based applications and petitions. However, when DHS established the CW–1 petition fees, it decided to treat the CNMI with more flexibility in this regard. *See* 76 FR 55513–55514 (Sept. 7, 2011). DHS proposes in this rule to continue to offer fee waivers for CNMI applicants filing Form I–129CW and Form I–539. *See* proposed 8 CFR 106.3. Currently, CNMI beneficiaries may pay a biometric services fee when seeking a grant or extension of CW–1 status in the CNMI. *See* 76 FR 55513–55514; 8 CFR 214.2(e)(23)(viii) and (w)(16). As explained in section VIII.E., Changes to Biometric Services Fee, DHS proposes to incorporate the cost of biometric services into the underlying immigration benefit request fees. This proposed change would place the entire financial burden for CNMI petition fees on the employer, eliminating any fees paid by the beneficiary. *See* proposed 8 CFR 106.2, 214.2(v)(23)(viii) and (w)(16).

DHS does not propose to limit the number of named beneficiaries included in a single I–129CW filing. USCIS does not have separate completion rates for CNMI petitions. Currently, USCIS adjudicators report hours for Form I–129CW in a catch-all Form I–129 category.

9. H–1B Electronic Registration Fee

In 2019, DHS established a $10 registration fee per beneficiary for H–1B petitions. *See* "Registration Fee Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap Subject Aliens," 84 FR 60307 (Nov. 8, 2019). The $10 registration fee is separate from and in addition to the H–1B petition filing fee. *See* 84 FR 60309. USCIS requires the registration fee regardless of whether the potential petitioner's registration is selected. USCIS lacked sufficient data to precisely estimate the costs of the

---

[284] The Administrative Procedure Act excepts ". . . rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A); *James* v. *Hurson Assocs., Inc.* v. *Glickman,* 229 F.3d 277, 280 (D.C. Cir. 2000).

[285] USCIS, "New Legislation Increases Availability of Visas for CNMI Workers for Fiscal Year 2017," available at *https://www.uscis.gov/ news/news-releases/new-legislation-increases-availability-visas-cnmi-workers-fiscal-year-2017* (last updated on Aug. 28, 2017).

[286] The unadjusted annual average CPI–U for 2019 was 255.657. *See* BLS, CPI for All Urban Consumers (CPI–U) 1982–84=100 (Unadjusted)— CUUR0000SA0, available at *https://data.bls.gov/ cgi-bin/surveymost?bls* (last visited Feb. 18, 2022). In 2021, it was 270.97, a 15.313 or approximately a 5.99 percent increase. *Id.* The $200 fee adjusted for inflation is approximately $212, a $12 increase. When rounded to the nearest $5, the inflation adjusted fee would be $210.

[287] Beginning in FY 2020, the Secretary of Homeland Security, through notice in the **Federal Register**, may annually adjust the supplemental fee imposed under clause (i) by a percentage equal to the annual change in the Consumer Price Index for All Urban Consumers (CPI–U) published by the Bureau of Labor Statistics (BLS). 48 U.S.C. 1806(a)(6)(A)(ii).

[288] USCIS, "New Law Extends CNMI CW–1 Program, Mandates New Fraud Fee, and Will Require E-Verify Participation," available at *https:// www.uscis.gov/news/alerts/new-law-extends-cnmi-cw-1-program-mandates-new-fraud-fee-and-will-require-e-verify-participation* (last updated on Oct. 23, 2018).

registration process at the time, but implemented the $10 fee to provide an initial stream of revenue to fund part of the costs to USCIS of operating the registration program. *Id.* DHS stated that USCIS would review the fee in the future. *Id.* DHS proposes $215 based on the results of the FY 2022/2023 fee review. *See* proposed 8 CFR 106.2(c)(11).

USCIS lacks information on the direct cost of H–1B registration, but USCIS estimated the indirect costs of the H–1B registration program using the same methods as it did to calculate other fees. The methodology for estimating the cost provides results that are similar to the USCIS Immigrant Fee, which was established as part of the FY 2010/2011 fee rule. *See* 75 FR 58979. However, the H–1B registration fee contains and funds fewer activities. DHS bases the proposed fee on the activity costs for the following activities:

• Inform the Public
• Management and Oversight

As such, the proposed fee is based on the estimated cost of these two activities. See the supporting documentation included in the docket for this rulemaking for more information on USCIS fee review activities. The proposed fee does not include activity costs for paper intake because registration is only available online. It does not include the cost of any adjudication activities because the fee is only for registration, not a decision. If selected, the petitioner must file Form I–129 separately.

DHS understands that an increase from $10 to $215 may appear to be exorbitant at first glance. However, the $10 fee was established simply to cover a small portion of the costs of the program rather than perpetually leaving 100 percent of those costs to be funded by the fees paid for other unrelated requests. As stated in the fee setting rule, "DHS proposed a $10 fee to provide an initial stream of revenue to mitigate potential fiscal effects on USCIS. Following implementation of the registration fee provided for in this rule, USCIS will gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery." 84 FR 60309. DHS sees no reasons why U.S. employers who wish to temporarily employ foreign workers in specialty occupations should not cover the expenses of the H–1B registration program, which is a prerequisite to being able to file a nonimmigrant petition for a foreign worker in the H–1B nonimmigrant

classification. Even with the higher registration fee requirement, the registration process is still expected to result in a net cost-savings to USCIS and petitioners due to cost savings associated with unselected petitions in DHS' Registration Requirement for Petitioners Seeking to File H–1B Petitions on Behalf of Cap-Subject Aliens.[289]

### L. Premium Processing—Business Days

DHS proposes to define the premium processing timeframe for all immigration benefit request types designated for premium processing to only include business days.[290] DHS is proposing to define business days as days that the Federal Government is open for business, which do not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons.[291] The closure may be nationwide or in the region where the adjudication of the benefit for which premium processing is sought will take place. The former INS established the current premium processing timeframe interpretation in June 2001. *See* "Establishing Premium

Processing Service for Employment-Based Petitions and Applications," 66 FR 29682. The rule's preamble stated that the District of Columbia Appropriations Act of 2001 (Pub. L. 106–553) "specified that the Service was required to process applications under the Premium Processing Service in 15 calendar days," as part of a general description of the statute. 66 FR 29682.

DHS has re-examined the District of Columbia Appropriations Act of 2001 and found that it did not define the timeframe by which INS was required to process applications under the Premium Processing Service and was, in fact, silent on the issue.[292] Thus, DHS has determined that the June 1, 2001, interim rule stating a 15 calendar day processing timeframe was required by the District of Columbia Appropriations Act of 2001 was incorrect because there is nothing in that statute establishing a timeframe in which premium processing must occur, let alone how that timeframe is to be calculated. Without a specific timeframe or an explanation of how that timeframe is to be calculated, DHS may interpret its authority under INA sec. 286(u), 8 U.S.C. 1356(u), to define the timeframe in which premium processing must occur. Thus, DHS has reevaluated its old statutory interpretation to see if the premium processing program and premium processing timeframes can be revised to make the program more serviceable for USCIS while continuing to provide an expedited level of processing for their immigration petitions and applications.[293]

When USCIS is unable to complete premium processing within the required timeframe, USCIS must suspend premium processing. When USCIS suspends premium processing, it must refund the fees for the premium processing requests it cannot complete. In recent years, USCIS has suspended for certain categories of employment-based petitions when it determines that it has inadequate resources to devote to premium processing requests, and might otherwise refund a large number of Form I–907 fees for failure to meet the required processing timeframe.[294]

---

[289] *See* 84 FR 940.

[290] *See* 8 CFR 106.4(e). DHS lengthened the timeframe for USCIS to take an adjudicative action on petitions filed with a request for premium processing from 15 calendar days to 15 business days in the 2020 fee rule. *See* 8 CFR 106.4 (Oct. 2, 2020). However, on March 30, 2022, USCIS published the Implementation of the Stopgap USCIS Stabilization Act rule (Premium Processing Rule), which amended USCIS premium processing regulations by updating the regulations to include the fees established by the Emergency Stopgap USCIS Stabilization Act for immigration benefit requests that were designated for premium processing on August 1, 2020, and established new fees and processing timeframes consistent with section 4102(b) of the Emergency Stopgap USCIS Stabilization Act. *See* 87 FR 18227. The Premium Processing Rule explained that USCIS was not calculating premium processing timeframes in business days because at that time 8 CFR 106.4 was not being administered as a result of the injunction staying the 2020 Fee Rule in *ILRC* and *NWIRP*. The Premium Processing rule explained that by removing the reference to business days in the premium processing regulations, the premium processing regulations will be clear and consistent with current practices and requirements and not be a source of confusion to the public. *Id.* at 18233.

[291] DHS recognizes that calculating premium processing timeframes in business days is inconsistent with the definition of "day" in 8 CFR 1.2, which provides that when computing the period of time for taking any action [in chapter I of title 8 of the CFR] including the taking of an appeal, [it] shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday. However, having recognized the definition of "day" in 8 CFR 1.2, DHS believes for the reasons stated and explained in the preamble that it is necessary for DHS to define premium processing timelines in business days.

[292] *See* Public Law 106–553 (2000) sec. 112.

[293] DHS also notes that section 4102(b) of the USCIS Stabilization Act provides premium processing times of 30 and 45 days, indicating that Congress considers periods that are two and three times longer than 15 days to be premium service.

[294] USCIS has not suspended premium processing for any requests since the USCIS Stabilization Act became law. That law provides that DHS may suspend the availability of premium processing for designated immigration benefit requests only if circumstances prevent the completion of processing of a significant number of such requests within the
Continued

In certain instances, USCIS has been unable to maintain existing premium processing timeframes due to the high volume of incoming petitions and a significant surge in premium processing requests.[295] For example, USCIS twice suspended premium processing before cap-subject H–1B season, which is the largest premium processing workload. In one such circumstance, USCIS initially announced it expected the suspension to last up to 6 months then extended it for several more months.[296] The suspension not only lasted longer than USCIS initially announced, but it also lasted well past the start date (October 1) for H–1B cap employees. As a result, this led to uncertainty for both employers and employees, because the employees were not able to timely start when the employers requested and neither party could predict when the employees would ultimately begin their employment. In addition to the harm and uncertainty that suspensions cause employers, when premium processing must be suspended, USCIS is not able to obtain the revenue from premium processing to offset its costs and for other uses. USCIS currently shifts adjudicators and other resources to address seasonal increases in filings. USCIS will also transfer files to offices with more processing capacity as needed. However, shifting adjudicators or files to focus on premium processing does not achieve the efficiency needed as higher volumes of incoming petitions or applications limit USCIS' ability to complete processing within the required processing timeframe.

USCIS also had to suspend premium processing due to the COVID–19 pandemic.[297] At that time, all the petitions eligible for premium processing were filed on paper at the service centers. Service centers needed time to adapt workspace configurations and procedures to ensure physical distancing and other safety protocols for employees working on site and picking up and dropping off files. Contracted employees had to be in the building to receive the petitions, data enter them into the system, put the files together, and deliver the files to the adjudicators. The adjudicators had to come into the building to pick up and drop off the files. The requirement of physical presence in the building greatly inhibited USCIS' ability to process petitions within the allotted timeframe. Irrespective of the COVID–19 pandemic, many of the benefit requests eligible for premium processing are still filed manually on paper, which necessarily requires USCIS employees and contractors to physically handle such benefit requests. If something should occur, such as a natural or manmade disaster, that interferes or prevents USCIS employees or contractors from being able to adjudicate benefit requests seeking premium processing, those workdays lost should not count against the premium processing timeframe.

USCIS employees are limited in the hours they are available to work by collective bargaining agreements and contracted staff are limited to the hours provided by contract, and both Federal employees and contracted staff are prohibited from working outside regular business hours or while not in a pay status. If USCIS needs its employees to work overtime to process these petitions and applications within a certain timeframe, it must of course pay them the applicable overtime pay rate. Because USCIS adjudication operations are fee funded, USCIS does not always have sufficient funds to support overtime; therefore, it must calculate the premium processing timeframes based on the days in which it can actually process petitions and applications (business days). USCIS is not asserting that all adjudications will increase to the full allowance of business days, however this change provides needed flexibility for holidays, weather emergencies, and other circumstances outside the agency's control.

In addition, the USCIS Stabilization Act prohibits USCIS from making premium processing available if it adversely affects processing times for immigration benefit requests not designated for premium processing or the regular processing of immigration benefit requests so designated. *See* USCIS Stabilization Act, sec. 4102(c), Public Law 116–159 (Oct. 1, 2020). The USCIS Stabilization Act allows for expansion of premium processing to certain EB–1 and EB–2 (NIW) petitions, which are more complex adjudications typically containing voluminous evidence and generally requiring more time to adjudicate than benefit types previously afforded premium processing. *See* 8 U.S.C. 1356(u)(2)(B). It also allows for expansion to Forms I–539 and I–765, which, while less complex, constitute an exceptionally large filing volume which necessitates a longer processing time. *See* 8 U.S.C. 1356(u)(2)(C) and (D). USCIS must have sufficient staff able to process premium processing cases during the allotted timeframe.

USCIS cannot expand premium processing, which was specifically requested by many commentors in the previous fee rule, until it has sufficient staff to consistently adjudicate within the timeframes. However, it is difficult to estimate the staff needed to process petitions during a certain timeframe using calendar days. In 2018, premium processing was suspended in April, then the suspension was extended until after the Federal holidays in December and January. In the last 2 weeks of December 2018, USCIS lost 3 days of processing to Federal holidays and 4 days to weekends. USCIS cannot hire additional staff in short periods of time, nor can it reallocate staff without affecting other processing times. DHS's proposed solution to consistently offer and expand (as Congress has authorized) premium processing services is to calculate the timeframe in business days. Calculating the premium processing timeframes based on the days in which USCIS is actually processing petitions and applications (business days) will enable USCIS to make premium processing more consistently available and expand it to the newly designated classifications and categories as intended by the USCIS Stabilization Act. This avoids USCIS having to suspend premium processing, which limits access to more applicants and petitioners and extends the pending period for adjudication.

DHS has determined that it is more appropriate for the premium processing timeframes to be calculated using business days rather than calendar days and proposes to apply this interpretation to all premium processing timeframes.[298] USCIS considers

---

[295] See USCIS, "USCIS Will Temporarily Suspend Premium Processing for All H–1B Petitions," available at *https://www.uscis.gov/archive/uscis-will-temporarily-suspend-premium-processing-all-h-1b-petitions* (last updated March 3, 2017); *see also* "USCIS Will Temporarily Suspend Premium Processing for Fiscal Year 2019 H–1B Cap Petitions," available at *https://www.uscis.gov/news/alerts/uscis-will-temporarily-suspend-premium-processing-fiscal-year-2019-h-1b-cap-petitions* (last updated March 20, 2018).

[296] See USCIS, "USCIS Resumes Premium Processing for Fiscal Year 2019 H–1B Cap Petitions," available at *https://www.uscis.gov/news/alerts/uscis-resumes-premium-processing-for-fiscal-year-2019-h-1b-cap-petitions* (last updated Jan. 25, 2019).

[297] See USCIS, "USCIS Announces Temporary Suspension of Premium Processing for All I–129 and I–140 Petitions Due to the Coronavirus Pandemic," available at *https://www.uscis.gov/news/alerts/uscis-announces-temporary-suspension-of-premium-processing-for-all-i-129-*

required period. 8 U.S.C. 1356(u)(5)(A). While that law reiterates the standard that USCIS has generally followed in suspending premium processing, DHS does not know if that provision will reduce future suspensions by itself.

*and-i-140-petitions-due-to* (last updated Mar. 27, 2020).

[298] On October 1, 2020, the USCIS Stabilization Act amended section 286(u) of the INA, 8 U.S.C. 1356(u), and did not define how to calculate the

calculating premium processing timeframes in business days appropriate because: (1) USCIS can only process petitions and applications on business days; (2) using calendar days results in inconsistent and varying timeframes for USCIS to process requests for premium processing based on holidays and weather emergencies; and (3) using calendars days causes particular operational challenges when trying to meet the shorter 15-day premium processing timeframe applicable to certain immigration benefits. By changing to business days instead of calendar days, USCIS avoids having to suspend premium processing more frequently which therefore alleviates the waiting time for applicants and petitioners.

Separate from this rulemaking, USCIS is providing more flexibility in paying the premium processing fee. For example, USCIS piloted and expanded credit card payments for Forms I–129, I–140, and I–907.[299] USCIS will continue to evaluate options that give employers more options and flexibility when using premium processing and when filing petitions in general.

*M. Permitting Combined Payment of the Premium Processing Fee*

DHS proposes to permit the fee to request premium processing service to be paid with the same remittance as other filing fees. Proposed 8 CFR 106.4(b). DHS currently requires the fee to request premium processing service to be paid in a separate remittance from other filing fees. 8 CFR 106.4(b). DHS has found in its application of the new premium processing regulations (87 FR 18260) that mandating a separate payment in all premium processing submissions may impose unnecessary

<hr>

timeframe by which USCIS must process applications under the Premium Processing Service, with section 286(u) of the INA, 8 U.S.C. 1356(u), still remaining silent on the issue.

[299] *See* USCIS, "USCIS Expands Credit Card Payment Pilot Program to California Service Center", available at *https://www.uscis.gov/ newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-california-service-center* (last updated Nov. 5, 2021); *see also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Vermont Service Center", available at *https:// www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-vermont-service-center* (last updated Oct 21, 2021); *see also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Form I–140 When Requesting Premium Processing", available at *https://www.uscis.gov/ news/alerts/uscis-expands-credit-card-payment-pilot-program-for-form-i-140-when-requesting-premium-processing* (last updated July 20, 2021); *see also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Texas Service Center", available at *https://www.uscis.gov/newsroom/ alerts/uscis-expands-credit-card-payment-pilot-program-to-texas-service-center* (last updated Sept 9, 2021).

burdens on petitioners, applicants and DHS. For example, any limitation on fee intake that must be enforced by USCIS adds a business requirement for the immigration benefit to be accepted. Each rule requires system programming and may result in unnecessary rejections. Thus, DHS proposes, instead of mandating the separate payment, to provide that USCIS may require the fee to request premium processing service to be paid in a separate remittance from other filing fees. Proposed 8 CFR 106.4(b). DHS will maintain the authority to require separate payments when combined payments need to be precluded because they cause intake and acceptance problems. USCIS may require the premium processing service fee be paid in a separate remittance from other filing fees and preclude combined payments in the applicable form instructions. *Id.*

*N. Intercountry Adoptions*

DHS made several changes in the 2020 fee rule related to intercountry adoptions. *See* 8 CFR 204.3 and 204.312 (Oct. 2, 2020). As discussed elsewhere, DHS and USCIS are enjoined from following the regulations codified by that rule and DHS is proposing this rule to replace the 2020 fee rule. Nevertheless, commenters supported the changes to the handling of Hague Adoption Convention transition cases and the adoption process improvements in that rule. *See* 85 FR 46850. Therefore, in the following sections of this preamble, DHS generally repeats the rationale that we provided for all of the adoption related changes from the 2019 proposed rule. *See* 84 FR 62313–62315.

1. Adjustment to Proposed Fees for Certain Intercountry Adoption-Specific Forms

DHS proposes to limit the increase of adoption-related fees in this rule consistent with previous fee rules. *See, e.g.,* 81 FR 73598. DHS will continue its policy of reducing fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications (Forms I–600/600A/800/ 800A) through the fees collected from other immigration benefit requests. If DHS used the estimated fee-paying unit cost from the ABC model for Form I–600A, then this benefit request would have a fee of at least $1,454.[300] DHS believes that it would be contrary to public and humanitarian interests to

<hr>

[300] Model output from Appendix Table 4 in the FY 2022/2023 Immigration Examinations Fee Account Fee Review Supporting Documentation (supporting documentation) in the docket.

impose a fee of this amount on prospective adoptive parents seeking to adopt a child from another country. Therefore, DHS proposes to apply the 18 percent weighted average increase to the current fee of $775, which represents a $145 increase to $920 for Forms I–600/ 600A/800/800A. Proposed 8 CFR 106.2(a)(29), (30), (44), and (45). The percentage increase is not specific to adoption application and petition fees. It is the same percentage that DHS uses for all USCIS fees that DHS proposes to keep below full cost. *See* section V.B.3. It is worth noting that the proposed fee would include the cost of biometric services under this proposal. *See* section VIII.E. of this preamble. As such, the $920 proposed fee is less than the current $775 plus the separate $85 fees for biometric services for two adults in a household. Two adults in a household would pay $945 with the current fee structure for intercountry adoption. Thus, the proposed fees are $25 less than the current fees for two adults in a household who file an intercountry adoption-based application or petition to adopt a single child or birth siblings.

DHS greatly values its role in intercountry adoptions and places high priority on the accurate and timely processing of immigration applications and petitions that enable U.S. families to provide permanent homes for adopted children from around the world. It also recognizes that the financial costs, both foreign and domestic, involved in intercountry adoptions can have significant impacts on these families. DHS has a history of modifying policies to ease burdens associated with international adoption. Before 2007, USCIS required prospective adoptive parents who had not found a suitable child for adoption within 18 months after approval of their Application for Advance Processing of an Orphan Petition, Form I–600A, to submit a fee with their request to extend their approval. Since 2007, USCIS has permitted adoptive parents to request one extension of their Form I–600A approval without charge, including the biometric fee. *See* 72 FR 29864; 8 CFR 103.7(b)(1)(i)(Z) (Oct. 1, 2020). Finally, DHS does not charge an additional filing fee for an adoption petition filed on behalf of the first beneficiary child or birth siblings. *See* 8 CFR 103.7(b)(1)(i)(Z) and (b)(1)(i)(JJ)(*1*) (Oct. 1, 2020).

DHS also has a history of setting adoption-related fees lower than the amount suggested by the fee-setting methodology. In the 2010 fee rule, the calculated fee for adoption petitions and applications (Forms I–600/I–600A and I–800/I–800A) was $1,455, based on

projected costs. *See* 75 FR 33461; 8 CFR 103.7(b)(1)(i)(Y), (Z), (II), (JJ) (Oct. 1, 2020). In the FY 2016/2017 fee review, DHS set the Form I–600 fee at $775 despite the estimated cost of $2,258. *See* 81 FR 73299. Shifting the adoption application and petition costs to other fees is consistent with past DHS efforts and is in the public interest to support parents of children adopted abroad.

### 2. Clarification of Fee Exemption for Birth Siblings

DHS proposes to revise and republish amendments to 8 CFR 106.2, 204.3, and 204.313 to clarify the regulations and align them with current practice that prospective adoptive parents with a valid Form I–600A or Form I–800A approval are not required to pay a fee for the first Form I–600 or Form I–800 petition. If they are approved to adopt more than one child, they are required to pay the filing fee for additional Form I–600 or Form I–800 petitions unless the beneficiaries are birth siblings.

To align with current and historical practice, DHS proposes to clarify in the regulations that this exception is limited to "birth" siblings. This approach is consistent with the special treatment afforded in the INA to "natural siblings," which allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than up to age 16, only if the beneficiary is the "natural sibling" of another foreign-born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. INA sec. 101(b)(1)(F)(ii) and (G)(iii); 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term "natural sibling," DHS generally uses the term "birth sibling" synonymously, which includes half-siblings but does not include adoptive siblings.

DHS also proposes to remove fee-related language from 8 CFR 204.3(h)(3)(i)(C) and (D) because this language will be covered in 8 CFR 106.2.

### 3. Suitability and Eligibility Approval Validity Period

DHS proposes to revise and republish the amendments to 8 CFR 204.3 relating to orphan cases under INA sec. 101(b)(1)(F), 8 U.S.C. 1101(b)(1)(F) (non-Convention cases). The proposed revised and republished revisions to the orphan regulations are necessary to eliminate disparity between the 18-month approval period for the Form I–600A, Application for Advance Processing of an Orphan Petition, the 15-month validity period of FBI fingerprint clearances, and the 15-month approval period for a Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, and any proposed extension.

Currently, the approval of a Form I–600A in an orphan case is valid for 18 months. *See* 8 CFR 204.3(h)(3)(i) (Oct. 1, 2020). However, standard USCIS policy has been that the FBI's clearance of a person's fingerprints is valid for 15 months, thereby creating inconsistency between the 15-month fingerprint clearance validity and the 18-month approval validity period for the Form I–600A. This inconsistency was partially resolved with the ratification of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (Hague Adoption Convention) and subsequent codification of 8 CFR 204.312(e)(1), whereby the initial approval period for a Form I–800A in a Convention case is 15 months from the date USCIS received the initial FBI response for the fingerprints of the prospective adoptive parent(s) and any adult members of the household. This 15-month period also applies to the extension of the Form I–800A approval period for an additional 15 months from the date USCIS receives the new FBI response on the fingerprints. Creating parity in the approval periods for suitability and eligibility determinations provides additional protections for adopted children and provides consistency and alignment of the orphan and Hague regulations. Having a standardized 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to manage and monitor multiple expiration dates. Therefore, DHS proposes to alter the validity period for a Form I–600A approval in an orphan case to 15 months. *See* proposed 8 CFR 204.3(b), (d), and (h)(7) and (13). *See* proposed 8 CFR 204.3(h)(3).[301]

DHS proposes to remove fee-related language from 8 CFR 204.3(h)(3)(ii) because that language would be unnecessarily redundant with the fee language in proposed 8 CFR 106.2.

---

[301] In addition to changing the 18-month period to 15 months, DHS is removing the internal procedure from 8 CFR 204.3(h)(3)(i) that provides where documents will be forwarded and how notification of overseas offices of the approval is handled. DHS is also correcting a reference to the number of children the prospective adoptive parents are approved for in the home study to refer to the number of children the prospective adoptive parents are approved for in the Form I–600A approval. Finally, DHS is also adding a reference to proposed 8 CFR 106.2(a)(31) in § 204.3(h)(3)(i), relating to Form I–600A extension requests.

### 4. Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600

DHS proposes to revise and republish the regulation that creates a new form[302] to further align the processes for adoptions from countries that are not party to the Hague Adoption Convention (Hague or Convention) with the processes for adoptions from countries that are party to that Convention. The proposed form name is Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600. The proposed fee is $455. Proposed 8 CFR 106.2(a)(31). As discussed in the PRA section of this preamble, the draft Supplement 3 is posted in the docket of this rulemaking for the public to review and provide comments.

Currently, prospective adoptive parents face different processes for requests for action on approved suitability applications in Hague cases than they do in non-Hague cases. USCIS uses Forms I–800, I–800A, and I–800A Supplement 3 for Hague cases. USCIS uses Forms I–600 and I–600A for orphan cases. A fee for Form I–600A/I–600 Supplement 3 would further align the Form I–600A/I–600 request for action process with the existing Form I–800A process in four key areas:

1. Suitability and eligibility extensions.
2. New approval notices.
3. Change of country; and
4. Duplicate approval notices.

USCIS adjudicators must reassess whether prospective adoptive parents are still suitable and eligible to adopt if the prospective adoptive parents' circumstances have changed after the initial USCIS suitability determination. The proposed fee would help recover some of the cost for this work.

Requirements related to a prospective adoptive parent's change in marital status for the orphan process are similar to the Hague process, but not identical. This is because the orphan process provides an option for combination filing, unlike the Hague process. In the orphan process, a prospective adoptive parent can file their Form I–600 petition on behalf of a specific child together with the supporting documents for Form I–600A, Application for Advance Processing of an Orphan Petition, to request that USCIS decide their suitability and eligibility to adopt at the same time as the child's eligibility. This is referred to as combination filing.

For Hague cases, prospective adoptive parents cannot use Form I–800 Supplement 3 if their marital status

---

[302] As defined in 8 CFR 1.2.

changes. If the prospective adoptive parent's marital status changes before they complete the intercountry adoption process, their Form I–800A approval is automatically revoked. This is because a change in marital status considerably changes the facts supporting a prior suitability approval and who the adoptive parents will be. The prospective adoptive parent must submit a new Form I–800A with an updated home study. If the prospective adoptive parent had already filed a Form I–800 based on the approval of the prior Form I–800A, they must also file a new Form I–800. The prospective adoptive parent must pay a new application fee unless their Form I–800A is still pending. *See* 8 CFR 204.312(e)(2).

Similarly, a prospective adoptive parent will not be able to use Form I–600A/I–600 Supplement 3 for the orphan process if their marital status changes. If the prospective adoptive parent's marital status changes before they complete the intercountry adoption process, they must submit a new a Form I–600A or Form I–600 combination filing (referred to in this preamble as a "suitability application") with an updated home study. If the prospective adoptive parent already filed a Form I–600 based on the approval of the prior Form I–600A, they must also file a new Form I–600. They must pay a new application or petition fee unless their suitability application is still pending. This is consistent with longstanding practices, as reflected in prior versions

of the Form I–600A and Form I–600 instructions, which has required that prospective adoptive parents file a new suitability application with an updated home study if their marital status changes, rather than relying on the previously filed suitability application, regardless of whether the suitability application is pending or approved. With the addition in this proposed rule of the Supplement 3 for the orphan process, DHS proposes to codify this longstanding practice at 8 CFR 204.3(h)(14), consistent with the Hague process at 8 CFR 204.312(e)(2).

Table 20 and the following sections summarize the current process and the proposed changes.

BILLING CODE 9111–97–P

| **Table 20: Summary of Current and Proposed Adoption Processes Related to Proposed Form I-600A/I-600 Supplement 3** | | |
|---|---|---|
| **Type of Change** | **Current Process** | **Proposed Process** |
| Suitability & Eligibility Extensions | The Form I-600A approval notice reflects a validity period for the prospective adoptive parents' suitability and eligibility determination. Currently, prospective adoptive parents may request one initial extension of their Form I-600A approval without fee by submitting a request in writing. Prospective adoptive parents are not able to request a second or subsequent extension of their Form I-600A approval. An applicant may not request an extension more than 90 days before their Form I-600A suitability approval expires but must do so on or before its expiration date. | DHS proposes to require prospective adoptive parents to submit Form I-600A/I-600, Supplement 3 to request the initial no-fee extension. Form I-600A/I-600 Supplement 3 would allow prospective adoptive parents to request second or subsequent extensions with the proposed fee. An applicant must file a Supplement 3 to seek an extension before their Form I-600A suitability approval expires. However, a Supplement 3 seeking an extension that is filed more than 90 days before the Form I-600A suitability approval expires may be denied. |

| Table 20: Summary of Current and Proposed Adoption Processes Related to Proposed Form I-600A/I-600 Supplement 3 | | |
|---|---|---|
| **Type of Change** | **Current Process** | **Proposed Process** |
| New Approval Notices | Currently, prospective adoptive parents can request a new approval notice based on a significant change and updated home study with no fee. New approvals require adjudicators to reassess whether prospective adoptive parents remain suitable and eligible to adopt after the significant change in circumstances. (For example, significant decreases in finances, change of residence, change in household composition, etc.) | DHS proposes to require prospective adoptive parents to submit Form I-600A/I-600, Supplement 3 to request a new approval notice. The prospective adoptive parent must pay the fee unless they are also filing a first-time request for either an extension or change of country. Second or subsequent requests would require the proposed fee. |
| Change of Country | Currently, prospective adoptive parents may change their proposed country of adoption once without fee. For example, if they are matched with an eligible orphan in a country other than the country initially identified on their Form I-600A. For subsequent country changes, prospective adoptive parents file Form I-824, Application for Action on an Approved Application or Petition, with fee. | DHS proposes to require prospective adoptive parents to submit Form I-600A/I-600, Supplement 3 to request the initial no-fee change of proposed country of adoption.[303] Form I-600A/I-600 Supplement 3 would allow prospective adoptive parents to request a second or subsequent change in the proposed country of adoption with the proposed fee. |
| Duplicate Approval Notices | For duplicate approval notices, prospective adoptive parents file Form I-824, Application for Action on an Approved Application or Petition, with fee. | DHS proposes to require prospective adoptive parents to submit Form I-600A/I-600, Supplement 3, with the proposed fee, to request a duplicate approval notice. |

BILLING CODE 9111–97–C

a. Suitability and Eligibility Extensions

Currently, prospective adoptive parents pursuing an intercountry adoption from non-Hague countries may request a no-fee initial extension of their Form I–600A approval.[304] Requests are submitted in writing and second or subsequent requests to extend their

approval are not allowed. See 8 CFR 103.7(b)(1)(i)(Z)(3) (2020) (Oct. 1, 2020). DHS proposes that prospective adoptive parents be allowed to request more than one extension of their Form I-600A approval, if necessary, by filing the proposed Form I-600A/I-600 Supplement 3. The first request would be free under this proposal. Second or subsequent requests would require the proposed fee of $455. See proposed 8 CFR 106.2(a)(31).

Currently, if an applicant needs to extend their Form I–600A approval, they may file a written request for an extension no more than 90 days before

their Form I–600A suitability approval expires, but on or before its expiration date. DHS now proposes that an applicant must file a Supplement 3 to seek an extension before their Form I–600A suitability approval expires. A Supplement 3 seeking an extension cannot be filed more than 90 days before the Form I–600A suitability approval expires and must be filed before the approval expires if they need to extend their validity period. A Supplement 3 may be denied if filed sooner.[305] This

---

[303] See section VIII.N.4.e for limitations in Hague Adoption Convention transition cases and countries.

[304] The Form I–600A approval notice reflects the validity period of the prospective adoptive parents' suitability and eligibility determination.

[305] This is current practice that DHS is codifying with the creation of Supplement 3 and a fee. See

codifies the administrative efficiencies created by ensuring applicants timely file their extensions and mirrors the existing time frames for requesting an extension. In addition, this further aligns the processes for requesting extensions for adoptions from countries that are not party to the Hague Adoption Convention (Hague) with the processes for countries that are a party to that Convention. *See* proposed 8 CFR 204.3(h)(3)(ii).

DHS proposes to remove 8 CFR 204.3(h)(3)(ii) (Oct. 1, 2020). This regulation that provides for DHS to extend suitability approvals without the prospective adoptive parents requesting one in certain scenarios would no longer be necessary because applicants would have a form (Supplement 3) they can file to request unlimited extension requests for non-Hague cases. Currently, DHS does not have a form for applicants to request extensions for non-Hague cases, and only allows one written extension request. In association with this rule, DHS proposes to create a form that prospective adoptive parents can use to file unlimited extension requests for non-Hague cases. In addition, this proposed change also aligns the non-Hague adoptions regulations with the Hague Adoption Convention regulations, which do not contain a parallel provision that provides DHS authority to extend suitability approvals in the event of such emergency because prospective adoptive parents can file a form to request an extension and can do so an unlimited number of times. Finally, DHS has an obligation to ensure applicants remain suitable for intercountry adoption and must update our suitability determination before extending approvals. For this reason, DHS proposes to remove 8 CFR 204.3(h)(3)(ii) (Oct. 1, 2020).[306]

### b. New Approval Notices

Currently, prospective adoptive parents using the non-Hague process may request a new approval notice based on a significant change in circumstances at no cost. *See* 8 CFR 103.7(b)(1)(i)(Z) (Oct. 1, 2020). DHS proposes that prospective adoptive parents must file the proposed Form I–600A/I–600 Supplement 3, and an updated home study, to notify USCIS of a significant change and request a new approval notice. *See* proposed 8 CFR 106.2(a)(31). The prospective adoptive parent must pay the proposed fee of $455 unless they are also filing either a first-time request for an extension or first-time change of country on the same Supplement 3.

### c. Change of Country

Currently, prospective adoptive parents may change the proposed country of adoption once without fee. They may make subsequent country changes by filing Form I–824, Application for Action on an Approved Application or Petition, with fee. *See* 8 CFR 103.7(b)(1)(i)(OO) (Oct. 1, 2020). DHS proposes that prospective adoptive parents be allowed to change the proposed country of adoption by filing the proposed Form I–600A/I–600 Supplement 3. The first request to change countries would remain free. Second or subsequent requests would require the proposed fee of $455. *Id.*

### d. Duplicate Approval Notices

Currently, prospective adoptive parents may request a duplicate approval notice by filing Form I–824, Application for Action on an Approved Application or Petition, with its $465 fee. DHS proposes that prospective adoptive parents make duplicate approval notice requests by filing the proposed Form I–600A/I–600 Supplement 3, with the proposed fee of $455. *See* proposed 8 CFR 106.2(a)(31).

### e. Hague Adoption Convention Transition Cases

DHS proposes to clarify the processes for requesting an extension of the Form I–600A approval and other actions on an approved Form I–600A or Form I–600 as they pertain to adoptions from countries that newly become a party to the Hague Adoption Convention. When the Hague Adoption Convention enters into force for a country, cases that meet certain criteria are generally permitted by the new Convention country to proceed as "transition cases" under the non-Hague Adoption Convention process (Form I–600A and Form I–600 process). Provided that the new Convention country agrees with the transition criteria, USCIS will generally consider a case to be a transition case if, before the date the Convention entered into force for the country, the prospective adoptive parents: (1) filed a Form I–600A that designated the transition country as the intended country of adoption or did not designate a specific country and filed the Form I–600 while the Form I–600A approval was still valid; (2) filed a Form I–600 on behalf of a beneficiary from the transition country; or (3) completed the adoption of a child from the transition country. If the case does not qualify as a transition case, the prospective adoptive parents will generally need to follow the Hague Adoption Convention process with the filing of Form I–800A and Form I–800. With the addition of the new Form I–600A/I–600 Supplement 3, DHS proposes to codify certain limitations on when the Supplement 3 can be used in the context of transition cases.

### i. Suitability and Eligibility Extensions

If a case qualifies as a transition case based on the filing of Form I–600A before the entry into force date, to continue as a transition case, the prospective adoptive parents must file the Form I–600 petition while the Form I–600A approval remains valid. Currently, prospective adoptive parents are permitted to request a one-time, no-fee extension of their Form I–600A approval to remain a transition case. As discussed in section a.) above, DHS proposes that prospective adoptive parents may request more than one extension of their Form I–600A approval outside of the transition context. DHS proposes that prospective adoptive parents may only be permitted to request a one-time extension of their Form I–600A approval as a qualified transition case. *See* proposed 8 CFR 106.2(a)(31). Generally, transition countries have requested that DHS limit the ability of transition cases to continue indefinitely to limit the confusion that having two simultaneously running processes causes to its administrative bodies and judicial systems. This will provide prospective adoptive parents who have taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force additional time to complete the adoption process under the non-Hague process, but reasonably limits the ability to indefinitely extend the validity period of the Form I–600A approval and the processing of transition cases under the non-Hague process.

### ii. Change of Country

The transition criteria were generally designed to permit prospective adoptive parents who had taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force to be able to continue under the non-Hague process, rather than requiring them to begin again

USCIS Policy Manual Volume 5, Adoptions, Part B, Adoptive Parent Suitability Determinations Chapter 5, Action on Pending or Approved Suitability Determinations [5 USCIS–PM B.5] available at *https://www.uscis.gov/policy-manual/volume-5-part-b-chapter-5*.

[306] This provision was changed by the 2020 fee rule, to remove language specific to SARS, and to replace with more general language about a public health or other emergency. 85 FR 46921; 8 CFR 204.3(h)(3)(ii) (Oct. 2, 2020). DHS now proposes to remove that provision altogether for the reasons stated here.

under the Hague process, which has different processing requirements. If the prospective adoptive parents already designated a country of intended adoption other than the transition country on their Form I–600A or previously changed countries to a non-transition country, they generally would not fall into the category of families the transition criteria were intended to reach because the designation is an indication that they have begun the intercountry adoption process with the designated country and not with the transition country. Therefore, in the transition context, prospective adoptive parents who designated a non-transition country on their Form I–600A or previously changed countries to a non-transition country generally have not been permitted to change their Form I–600A approval to a transition country for purposes of being considered a transition case. DHS proposes to codify this limitation in this rule. *See* proposed 8 CFR 106.2(a)(31).

iii. Request To Increase the Number of Children Approved To Adopt

Outside of the transition context, prospective adoptive parents are generally permitted to request an updated Form I–600A approval notice to increase the number of children they are approved to adopt. In the transition context, however, prospective adoptive parents with transition cases generally have not been permitted to request an increase in the number of children they are approved to adopt from a transition country.[307] However, unless prohibited by the new Convention country, DHS will permit prospective adoptive parents to request an updated Form I–600A approval notice to increase the number of children they are approved to adopt as a transition case only in order to pursue the adoption of a birth sibling, provided the birth sibling(s) is (are) identified and the Form I–600 petition is filed before the Form I–600A approval expires. *See* proposed 8 CFR 106.2(a)(31). This approach is consistent with the special treatment afforded in the INA to "natural siblings," which allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than age 16, only if the beneficiary is the "natural sibling" of another foreign-born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. INA sec. 101(b)(1)(F)(ii) and (G)(iii); 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii).

While the INA uses the term "natural sibling," DHS generally uses the term "birth siblings" synonymously, which includes half-siblings but does not include adoptive siblings.

5. Form I–800A, Supplement 3, Request for Action on Approved Form I–800A

DHS also proposes a fee of $455 at 8 CFR 106.2 and revises and republishes a clarification to 8 CFR 204.312 to align with the current process for adjudicating Form I–800A Supplement 3. Currently, prospective adoptive parents may request a first extension of the Form I–800A approval, and a first-time change in the proposed country of adoption, by filing Form I–800A Supplement 3 without a fee. Second or subsequent requests for an extension, change of country, or duplicate approval notice can currently be made by filing Form I–800A Supplement 3 with a fee. Additionally, prospective adoptive parents can currently request a new approval notice based on a significant change and updated home study by filing Form I–800A Supplement 3. A request for a new approval notice must be submitted with a fee unless the prospective adoptive parents are also filing a first-time request for either an extension or change of country on the same Supplement 3. When DHS implemented the Hague Adoption Convention, as a matter of operational efficiency USCIS decided to accept Form I–800A Supplement 3 extension requests regardless of whether the Form I–800 petition was already filed, rather than requiring prospective adoptive parents to file a new Form I–800A to begin the process anew. That procedure generally shortens the subsequent suitability and eligibility adjudication process for prospective adoptive parents seeking an extension of their Form I–800A approval, as Supplement 3 adjudications are generally prioritized over new Form I–800A filings, allowing for a new decision on the prospective adoptive parents' suitability and eligibility to occur more quickly. Therefore, DHS proposes to republish 8 CFR 204.312(e)(3)(i) to permit the filing of Form I–800A Supplement 3 regardless of whether Form I–800 has been filed.

DHS proposes to revise 8 CFR 204.312(e)(3)(ii) to clarify the evidentiary requirements for updates due to significant changes. The Supplement 3 can be filed for an extension request, a change of country, a duplicate approval notice, or an update due to a significant change. The evidentiary requirements are the same regardless of which type of request the applicant makes. However, the current

regulation only describes the evidence required for a Supplement 3 for an extension request or a change of country. The current regulations do not include updates when listing evidentiary requirements for Supplement 3. This proposed clarification mirrors current practices and form instructions. *See* proposed 8 CFR 204.312(e)(3)(ii).

DHS proposes to remove the fee language from 8 CFR 204.312(e)(3)(i), including amending paragraph (e)(3)(i)(A) and striking paragraphs (e)(3)(i)(C) and (D), because this language is unnecessarily redundant with the fees in 8 CFR 106.2.

*O. Immigrant Investors*

1. Immediate Effects of the EB–5 Reform and Integrity Act of 2022

DHS proposes changes to various fees for regional centers and related immigration benefit requests related to Employment-Based Immigrant Visa, Fifth Preference (EB–5). As explained in section III.F. above, on March 15, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Public Law 117–103). The EB–5 Reform and Integrity Act of 2022 repealed the prior authorizing statute for the EB–5 "regional center program" and codified a substantially reformed regional center program in the INA, effective 60 days after enactment on May 14, 2022. The EB–5 Reform and Integrity Act of 2022 has no immediate impact on the staffing levels of the USCIS Immigrant Investor Program Office. Nevertheless, and despite the changes in the law and program, DHS has proposed fees in this rule based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB–5 Reform and Integrity Act of 2022.

2. Background of the EB–5 Program

Congress created the EB–5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB–5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat. 1828 (Oct. 6, 1992). As amended by the EB–5 Reform and Integrity Act of 2022, the EB–5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,000 or a

---

[307] *See* USCIS, "Transition Cases", available at *https://www.uscis.gov/adoption/immigration-through-adoption/transition-cases* (last viewed Jun. 21, 2022).

discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. *See* INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5); 8 U.S.C. 11538 U.S.C. 1153. Investors may satisfy up to 90 percent of the job creation requirements with jobs that are estimated to be created indirectly through qualifying investments within a commercial enterprise associated with a regional center approved by USCIS for participation in the regional center program. INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). In FY 2013, USCIS created the Immigration Investor Program Office (IPO) in Washington, DC, to handle EB–5 matters, hiring staff with expertise in economics, law, business, finance, securities, and banking to enhance consistency, timeliness, and integrity within the program.

USCIS is committed to strengthening the integrity and improving the overall administration of the EB–5 program. There is perennial and increasing media attention around the EB–5 program, largely created around the exploitation of the program by abusive actors.[308] Since the FY 2016/2017 fee rule, IPO added staff positions to focus both on managing the program and identifying fraud, national security, public safety, and non-compliance concerns within the program. For example, IPO hired auditors to complete regional center

compliance reviews associated with the review of the annual certification filings. *See* INA section 203(b)(5)(G), 8 U.S.C. 1153(b)(5)(G). On March 20, 2017, USCIS instituted EB–5 regional center compliance reviews to enhance the EB–5 program integrity and verify information in regional center applications and annual certifications. USCIS designed this program to verify the information provided by designated regional centers and verify compliance with applicable laws and authorities to ensure continued eligibility for the regional center designation. These compliance reviews are full-file reviews and include contact via written correspondence, telephone, interviews, and onsite assessments conducted by IPO auditors.

3. Proposed EB–5 Program Fees

The proposed fee for Forms I–526, Immigrant Petition by Alien Entrepreneur, and Form I–526E, Immigrant Petition by Regional Center Investor, is $11,160, a $7,485 or 204 percent increase from the current $3,675 fee. *See* 8 CFR 103.7(b)(1)(i)(W) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(24). The proposed fee for Form I–829, Petition by Investor to Remove Conditions on Permanent Resident Status, is $9,525, a $5,775 or 154 percent increase from the current $3,750 fee. *See* 8 CFR 103.7(b)(1)(i)(PP) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(51). The proposed fee for Form I–956, Application for Regional Center Designation, is $47,695, a $29,900 or 168-percent increase from the $17,795 fee for Form I–924, Application for Regional Center Designation under the Immigrant Investor Program. *See* 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(64). DHS also proposes a $47,695 fee for Form I–956F, Application for Approval of Investment in a Commercial Enterprise, because the information it collects and the benefit that results was previously an optional submission that was adjudicated on Form I–924, when included. Section 103(b)(1)(F) of the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117–103) now requires a regional center, once designated with an approved Form I–956, to submit an application for approval of an investment in a commercial enterprise (Form I–956F). The proposed fee for Form I–956G, Regional Center Annual Statement, is $4,470, a $1,435 or 47 percent increase from the $3,035 fee for Form I–924A, Annual Certification of Regional Center. *See* 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(66). The EB–5

program encompasses Forms I–526, I–526E, I–829, I–956, I–965F, and I–956G.[309]

In the FY 2016/2017 fee rule, USCIS planned for 204 positions in IPO. In the FY 2022/2023 fee review, USCIS estimates an annual average requirement of 245 positions in IPO. As discussed earlier, projected volumes and completion rates are two of the main drivers in the fee review.[310] Staffing requirements and costs change as volume or completion rate estimates change. Generally, EB–5 volume estimates decreased since the FY 2016/2017 fee rule while completion rate estimates increased.[311] For example, the FY 2022/2023 workload volume estimate for Forms I–526 and I–526E decreased by 10,773 or −73 percent compared to Form I–526 in FY 2016/2017. Estimated workload for Form I–924 decreased by 338 or −85 percent. Overall, EB–5 actual receipts declined consistently year-over-year from FY 2016 to FY 2020. *See* Table 21, EB–5 Receipts from FY 2016 to FY 2020. However, completion rates increased. For example, the estimated completion rate for Form I–526 was 6.5 hours in the FY 2016/2017 fee rule. *See* 81 FR 26925. In the FY 2022/2023 fee review, USCIS estimates that the completion rate for Forms I–526 and I–526E is 20.69 hours, a 14.19 hour or 218 percent increase. The estimated completion rate for Form I–924 was 40 hours in the current fee structure. *Id.* In the FY 2022/2023 fee review, USCIS is using the methodology for Forms I–924 and I–924A and applying it to Forms I–956 and I–956G respectively. USCIS estimates that the completion rate for Form I–956 (formerly Form I–924) is 108.50 hours, a 68.50 hour or 171 percent increase. The work associated with Form I–956 adjudications includes reaffirmations and terminations; therefore, the time requirements associated with these subsequent actions is factored into the overall completion rate for Form I–956. The number of approved regional centers decreased from 2016 to 2020 by over 200, significantly increasing the number of hours spent on the terminations of those regional centers. Increased work associated with terminations contributed to the overall increase in the completion rates.

---

[308] Michelle Hackman & Konrad Putzier, "Cash-for-Visa Program Looks to Be in Jeopardy," The Wall Street Journal (June 15, 2021), available at *https://www.wsj.com/articles/cash-for-visa-program-looks-to-be-in-jeopardy-11623758401; see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Hearing on ''Citizenship for Sale: Oversight of the EB–5 Investor Visa Program'' before the Senate Committee on the Judiciary on June 19, 2018" (last updated June 19, 2018), available at *https://www.uscis.gov/tools/resources-for-congress/testimonies/hearing-on-citizenship-for-sale-oversight-of-the-eb-5-investor-visa-program-before-the-senate;* U.S. Dep't of Justice, Office of Public Affairs, "Chinese National Pleads Guilty to Illegal Exports to Northwest Polytechnical University'' (Apr. 28, 2021), available at *https://www.justice.gov/opa/pr/chinese-national-pleads-guilty-illegal-exports-northwestern-polytechnical-university;* U.S. Dep't of Justice, U.S. Attorney's Office, Eastern District of Louisiana, "Ex-White House Military Aide and Maryland Businessman Found Guilty for Operating Fraudulent EB–5 Visa Scheme (Sept. 6, 2019), available at *https://www.justice.gov/usao-edla/pr/ex-white-house-military-aide-and-maryland-businessman-found-guilty-operating-fraudulent;* U.S. Dep't of Justice, U.S. Attorney's Office, Western District of Wisconsin, "Developer Sentenced to 4 Years in Prison for Defrauding Investors seeking Permanent Residency under Federal Immigration Program (Aug. 4, 2017), available at *https://www.justice.gov/usao-wdwa/pr/developer-sentenced-4-years-prison-defrauding-investors-seeking-permanent-residency.*

[309] DHS has also created Forms I–956H, Bona Fides of Persons Involved with Regional Center Program, and I–956K Registration for Direct and Third-Party Promoters, for the new EB–5 program. DHS proposes no fee for those forms in this rule.

[310] *See* section V.B, Methodology, earlier in this preamble for workload volumes and completion rates in the FY 2022/2023 fee review.

[311] *Id.*

IPO staffing did not decrease from the levels estimated in the FY 2016/2017 fee rule despite lower workload volumes because the amount of work required per form increased (in other words, completion rates increased) and USCIS increased the number of other positions to strengthen the program integrity, resulting in increased staffing overall. In some cases, there was adjudicative work that was required even if there was no petition and associated filing fee filed. In addition to reviewing Form I–956G (formerly Form I–924A), USCIS also incurs costs associated with regional centers that fail to file Form I–956G. USCIS will sanction or terminate the designation of a regional center in the program if a regional center fails to submit information annually. *See* INA section 203(b)(5)(G), 8 U.S.C. 1153(b)(5)(G). Therefore, USCIS must take adjudicative action on regional centers that fail to file this form, and there is a cost involved even if no fee is filed to cover the cost.

The reduced EB–5 workload volume contributes to significantly higher fee-paying unit costs in the ABC model because there are fewer paying customers from whom USCIS recovers the cost of processing the EB–5 workloads. As discussed in earlier in this preamble, DHS bases most proposed fees on fee-paying unit costs from the ABC model. *See* section V.B.3., Assessing Proposed fees. In a separate rulemaking, DHS may reevaluate EB–5 proposed fees to meet the timely processing goals of Public Law 117–103. *See* Public Law 117–103 at div. BB, sec. 106.

| Table 21: EB-5 Receipts from FY 2016 to FY 2020 | | | | | |
|---|---|---|---|---|---|
| **Form** | **FY 2016** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** |
| I-526/I-526E | 14,147 | 12,165 | 6,424 | 4,194 | 4,378 |
| I-829 | 3,474 | 2,625 | 3,283 | 3,756 | 3,096 |
| I-956 (former I-924) | 436 | 280 | 122 | 79 | 34 |
| I-956G (former I-924A) | 785 | 842 | 787 | 808 | 702 |
| **EB-5 Total** | **18,842** | **15,912** | **10,616** | **8,837** | **8,210** |

The proposed fees represent consistent application of the methodology discussed earlier in this preamble. In each case, the EB–5 proposed fees are based on the ABC model outputs. As explained earlier in the preamble, the fees for benefit requests with higher fee-paying volume or model outputs, such as the EB–5 forms, are set higher than the model outputs via the process called cost reallocation. *See* section V.B.3. Consistent with the practice and the treatment of similar forms in this proposed rule, the proposed fees for the EB–5 forms exceed the estimated full cost of adjudication because, under the model, the fees include amounts needed to recover the costs associated with processing other workloads where fees are insufficient to recover full cost. Id.

DHS may reevaluate EB–5 proposed fees to meet the additional fee guidelines of EB–5 Reform and Integrity Act of 2022 sec. 106(c). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers. In addition, compared to the amount of capital required and the required investment levels for an immigrant investor, the amount of the USCIS fees are an insignificant amount. Thus, DHS proposes that the fee amounts indicated by the ABC full cost recovery model for the four immigrant investor forms are not capped or decreased. DHS believes that immigrant investors and regional centers are able to pay the fees and the requirements for financial wherewithal in the program are inconsistent with shifting its costs to other requests and requiring others to subsidize its share of the costs of USCIS. While the proposed EB–5 fees are some of the highest on the fee schedule, the revenue from them is still a small part of the total revenue forecast because the volumes are low. See Table 22. The EB–5 average annual revenue forecast is approximately $80.7 million for the FY 2022/2023 period. As such, the EB–5 revenue forecast is only approximately 2 percent of the total average annual FY 2022/2023 revenue forecast with the proposed fees.

### Table 22: FY 2022/2023 Average Annual EB-5 Revenue Forecast with Proposed Fees

| Immigration Benefit Request | Revenue with Proposed Fees (in Millions) |
|---|---|
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $43.52 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $30.96 |
| I-956, Application for Regional Center Designation | $2.96 |
| I-956G, Regional Center Annual Statement | $3.25 |
| **EB-5 Subtotal** | **$80.69** |
| Asylum Program Fee | $425.18 |
| All other IEFA non-premium revenue | $4,657.85 |
| **Grand Total** | **$5,163.72** |

*P. Genealogy and Records*

1. Genealogy Search and Records Requests

DHS revised the regulations governing genealogical research requests in the 2020 fee rule. *See* 85 FR 46915. The changes were intended to allow USCIS to send pre-existing digital records as part of a response to requestors who have filed Form G–1041, Genealogy Index Search Request, and otherwise help USCIS improve genealogy processes. DHS also proposed a fee for a Genealogy Index Search Request, Form G–1041, of $240, and for a Genealogy Records Request, Form G–1041A, of $385. 84 FR 62362. Numerous commenters generally opposed increasing fees for genealogy search and records requests for various reasons. 85 FR 46834. For the 2020 final rule, USCIS refined the methodology used to estimate genealogy program costs and DHS established a fee for Form G–1041 when filed online as $160 and $170 when filed on paper. DHS established a fee for Form G–1041A when filed online as $255 and $265 when filed by paper. These fees were enjoined and not implemented.

The FY 2022/2023 IEFA fee review has determined that USCIS needs additional funds for its Genealogy Search and Records Requests program. Therefore, DHS again proposes changes to the genealogy search and request program. These proposals will allow USCIS to send pre-existing digital records as part of a response to requestors who have filed Form G–1041, Genealogy Index Search Request, recover the costs of the genealogy program, and may otherwise help USCIS improve genealogy processes.

Congress provided specific authority for establishing USCIS genealogy program fees. *See* INA sec. 286(t), 8 U.S.C. 1356(t). The statute requires that genealogy program fees be deposited into the IEFA and provides that the fees for such research and information services may be set at a level that will ensure the recovery of the full costs of providing all such services. *Id.* USCIS does not receive appropriations for genealogy workloads, and genealogy revenue does not augment Government tax revenue. USCIS only receives appropriations for E-Verify, the Citizenship and Integration Grant Program, and other specific purposes, as explained in section III.B. of this preamble.

The USCIS genealogy program processes requests for historical records of deceased individuals. *See* Establishment of a Genealogy Program, 73 FR 28026 (May 15, 2008) (final rule). Before creating a genealogy program, USCIS processed the requests as FOIA request workload, which resulted in delays. *See* Establishment of a Genealogy Program, 71 FR 20357 (Apr. 20, 2006) (proposed rule). Requestors use the USCIS website [312] or Form G–1041, Genealogy Index Search Request, to request an index search of USCIS historical records. *See* 8 CFR 103.7(b)(1)(i)(E) (Oct. 1, 2020). USCIS informs the requestor whether any records are available by mailing a response letter. Requestors use the Form G–1041A, Genealogy Records Request, to obtain copies of USCIS historical records, if they exist. *See* 8 CFR 103.7(b)(1)(i)(F) (Oct. 1, 2020).

In the FY 2016/2017 fee rule, USCIS adopted the first change to the

genealogy search and records requests fees since they had been established. *See* 81 FR 73304. DHS set both genealogy search and records requests fees at $65. *Id.* At the time, genealogy fees were insufficient to cover the full costs of the genealogy program. DHS increased the fee to meet the estimated cost of the program and permit USCIS to respond to requests for such historical records and materials.

After more than ten years of operating the genealogy program, DHS proposes to make several changes to the process. Ultimately, DHS expects these changes may allow USCIS to provide genealogy search results and historic records more quickly when pre-existing digital records exist.

First, DHS proposes to revise genealogy regulations to encourage requestors to submit the electronic versions of Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Records Request, through the online portal at *https://www.uscis.gov/records/genealogy*. *See* proposed 8 CFR 103.40(b). Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requestor data into its systems. Requestors that cannot submit the forms electronically may still submit paper copies of both forms with the required filing fees.

Second, DHS proposes to change the search request process so that USCIS may provide requestors with pre-existing digital records, if they exist, in response to a Form G–1041, Genealogy Index Search Request. When requestors submit Form G–1041, Genealogy Index Search Request, on paper or electronically, USCIS searches for available records. If no record is found,

---

[312] USCIS, "Genealogy," available at *https://www.uscis.gov/records/genealogy*.

then USCIS notifies the requestor by mail or email. If USCIS identifies available records, then USCIS provides details on the available records, but does not provide the copies of the actual records. Under current regulations, a requestor must file Form G–1041A, Genealogy Records Request, with a fee for each file requested, before USCIS provides any records that it found as a result of the search request. DHS proposes to provide the requestor with those pre-existing digital records, if they exist, via email in response to the initial search request. *See* proposed 8 CFR 103.40(f). If only paper copies of the records exist, or if the requestor wants a physical copy of the digitized record, then the requestor must follow the current process and file Form G–1041A. Consistent with current practices, requestors must still pay the Form G–1041A request fee to request a paper record. In short, the proposal may allow some customers to file a single search request with a single fee and still receive the genealogy information that they requested. USCIS forecasts that records requests may be approximately 30 percent of index search requests. *See* section V.B.1. of this preamble for immigration benefit request volumes. Meaning, for approximately 70 percent of index searches, USCIS may provide electronic copies of digital records, USCIS may not identify any records, or customers may not follow-up with a records request for hardcopies.

Lastly, DHS proposes to change the genealogy fees to reflect these operational changes and recover the full cost of providing genealogical services. *See* 8 CFR 103.7(b)(1)(i)(E) and (F) (Oct. 1, 2020); proposed 8 CFR 106.2(c)(1) and (2). USCIS estimated the workload volume based on these proposed changes and historic information. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget. Maintaining a separate genealogy program budget would be administratively burdensome because it is such a small portion of

USCIS staffing, as explained later in this section.

The proposed fees are based on results from the same ABC model used to calculate other immigration benefit request fees proposed in this NPRM. However, the proposed increase reflects changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. *See* 81 FR 26919. It did not separate genealogy from the other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *Id.* This methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS proposes to correct that.

In the 2020 fee rule, USCIS created a new activity for this workload, called Research Genealogy, in the ABC model.[313] Previous fee reviews captured this work as part of the Records Management activity. The same office that researches genealogy requests, the National Records Center (NRC), also performs other functions, such as FOIA operations, retrieving, storing, and moving files. To improve efficiency and decrease wait times for USCIS Genealogy Program customers, processing of USCIS genealogy requests transitioned from Washington, DC, to USCIS NRC in Lee's Summit, Missouri. This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staff devoted to the genealogy program. USCIS estimates that there are

---

[313] The current FY 2022/2023 fee review continues to use this new activity. *See* the supporting documentation accompanying this proposed rule for more information on the activities in the ABC model.

approximately 6 genealogy positions out of the total 24,266 positions in the fee review.

USCIS used historical information to calculate completion rates for genealogy search and records requests. The completion rates allow for separate search and record request fees based on the average time to complete a request. As such, the proposed fees each represent the average staff time required to complete the request, similar to most other fees proposed in this rule. The completion rates in the 2020 fee rule documentation did not reflect the workload transfer. Updated data that reflects the change were used for this fee review and shows that completion rates decreased.

In addition to genealogy staffing, USCIS also incurs overhead costs associated with storing and managing genealogy records, including the cost of facilities and information technology. The projected costs included a portion of these overhead costs. The paper filing fee includes a portion of lockbox costs for genealogy requests filed on paper. Requests filed online do not include lockbox costs. USCIS estimates that over 90 percent of genealogy customers may file online.

The proposed fees for Form G–1041 are $100 for online and $120 for paper filing. The proposed fees for Form G–1041A are $240 for online and $260 for paper filing. See Table 23 for a summary of current and proposed genealogy fees. As explained earlier in this section, the proposal may allow some customers to file a single search request with a single fee and still receive the genealogy information that they requested. The proposal to include pre-existing digital records, if they exist, via email in response to the initial search request would also be more efficient than the current process, as described earlier in this section. USCIS estimates that genealogy fees may provide $1.9 million in revenue or approximately 0.04 percent of the USCIS total $5,163.7 million in revenue from the proposed fee structure.

AR_000111

| Table 23: Genealogy Fee Comparison | | | | | |
|---|---|---|---|---|---|
| Form No. | Form Description | Current Fee(s) | Proposed Fee | Difference | Percentage Difference |
| G-1041 | Genealogy Index Search Request - Online | $65 | $100 | $35 | 54% |
| G-1041 | Genealogy Index Search Request - Paper | $65 | $120 | $55 | 85% |
| G-1041A | Genealogy Records Request - Online | $65 | $240 | $175 | 269% |
| G-1041A | Genealogy Records Request - Paper | $65 | $260 | $195 | 300% |
| G-1041 and G-1041A | Genealogy Index Search Request and Records Request - Online (digital records) | $130 | $100 | -$30 | -23% |

## 2. Request for a Certificate of Non-Existence

USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. *See* 8 CFR 103.7(f) (Oct. 1, 2020) (stating, "The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records."). This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. Historically, USCIS has operated the Certificate of Non-Existence request process informally and at no cost to individuals requesting a Certificate. USCIS has now proposed to create USCIS Form G–1566, Request for a Certificate of Non-Existence to enable customers to request the Certificate. A Request for a Certificate of Non-Existence is mailed to and processed at the NRC. USCIS is currently seeking public comment and OMB approval for creation of Form G–1566, Request for a Certificate of Non-Existence, in compliance with the requirements of the PRA. *See* 86 FR 68680 (December 3, 2021) (requesting public comments on the information collection instrument for 30 days).[314]

DHS proposes a fee of $330 for a request for a Certificate of Non-Existence. DHS calculated the fee to recover the estimated full cost of processing these requests. If finalized, the fee will be established in this rule and will be required for submission of Form G–1566 if it is approved before this rule takes effect. If the form is not approved before this rule is to take effect, the fee will be due with the submission of a non-form request until the form is prescribed as provided in 8 CFR 299.1. DHS proposes this fee consistent with the full cost recovery model used for this rule to generate revenue to mitigate the need for other fee payers to fund the costs of providing certificates.

The proposed fee for a request for a Certificate of Non-Existence is based on the same ABC model used to calculate the other proposed fees. USCIS created a new activity for this workload, called Certify Nonexistence, in the ABC model. Similar to the genealogy fee, previous fee reviews captured this work as part of the Records Management activity. *See* the supporting documentation accompanying this proposed rule for more information on the activities in the ABC model. Additionally, USCIS used subject matter expert input to determine a completion rate for reviewing and responding to requests for a Certificate of Non-Existence. Therefore, the proposed fee represents the average staff time required to complete a request,

similar to most other fees proposed in this rule. The fee DHS proposes does not reflect cost reallocation from other non-paying workloads to processing requests for a Certificate of Non-Existence, because DHS determined that including such costs would disproportionately affect the small number of requestors.

### Q. Fees Shared by CBP and USCIS

CBP shares the workload with USCIS in adjudicating the following immigration benefit requests:
- Form I–192, Application for Advance Permission to Enter as a Nonimmigrant.
- Form I–193, Application for Waiver of Passport and/or Visa.
- Form I–212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal.
- Form I–824, Application for Action on an Approved Application or Petition.

USCIS and CBP each keep the revenue for the applications that they adjudicate. Tables 20 and 21 summarize CBP and USCIS information for these shared workloads. Table 24 provides revenue information for both DHS components. CBP provided revenue collections from FY 2014 to FY 2020 for these immigration benefit requests. Travel restrictions in FY 2020 likely lowered revenue collections. DHS believes that pre-pandemic data is likely to be more representative of reasonable expectations for FY 2022 and FY 2023 and so DHS decided to use FY 2019 amounts to reflect costs and revenue before the pandemic. USCIS divided the

---

[314] See Notice by USCIS, Agency Information Collection Activities; New Collection: Request for a Certificate of Non-Existence, available at *https://www.federalregister.gov/documents/2021/12/03/2021-26245/agency-information-collection-*

*activities-new-collection-request-for-a-certificate-of-non-existence.*

revenue collections by the fee for each immigration benefit request to derive the fee-paying volume for each immigration benefit request. CBP did not provide total workload counts for these immigration benefit requests.

Table 24 summarizes the USCIS and CBP revenue collections, current fees, and fee-paying actuals.

| Table 24: USCIS and CBP FY 2019 Revenue Actuals | | | |
|---|---|---|---|
| **Form** | **Revenue Collections** | **Current Fee** | **Fee-Paying Receipts** |
| **I-192** | **$24,678,675** | **N/A** | **28,569** |
| I-192 USCIS Total | $21,472,270 | $930 | 23,088 |
| I-192 CBP Total | $3,206,405 | $585 | 5,481 |
| **I-193** | **$3,980,339** | **N/A** | **6,804** |
| I-193 USCIS Total | $26,325 | $585 | 45 |
| I-193 CBP Total | $3,954,014 | $585 | 6,759 |
| **I-212** | **$7,877,160** | **N/A** | **8,470** |
| I-212 USCIS Total | $7,697,670 | $930 | 8,277 |
| I-212 CBP Total | $179,490 | $930 | 193 |
| **I-824** | **$4,944,135** | **N/A** | **10,633** |
| I-824 USCIS Total | $4,920,945 | $465 | 10,583 |
| I-824 CBP Total | $23,190 | $465 | 50 |
| **USCIS and CBP Total** | **$41,490,034** | | **54,476** |
| **USCIS Total** | **$34,117,210** | | **41,993** |
| **CBP Total** | **$7,363,099** | | **12,483** |

DHS proposes to move to a single fee for each of these four immigration benefit requests. The proposed fee is the same whether CBP or USCIS adjudicates the application. To calculate the proposed fees for these four forms, DHS combined the estimated cost and volume information for these applications that both USCIS and CBP adjudicate. DHS adds together the fee-paying receipt and cost data for both components, as shown in Table 25, when calculating overall estimated costs and projected receipts. USCIS calculated proposed fees using the same methodology as other proposed fees and then added information from CBP into the USCIS fee schedule. CBP estimated the total cost for Forms I–192 and I–193 in FY 2019. As stated earlier, DHS used FY 2019 CBP data because it is likely more representative of a typical year than more recent data. CBP did not estimate the total cost of Forms I–212 or I–824 in FY 2019. Based on CBP revenue collections in Table 24, fee-paying receipts for Forms I–212 and I–824 appear to be very low. USCIS incorporated the total costs and derived fee-paying volume for the respective CBP workloads into the USCIS fee schedule and added the CBP estimated costs to the USCIS estimated total cost from the ABC model. USCIS added the CBP-derived fee-paying volume to the USCIS fee-paying volume estimates. We divided the combined total cost by the combined total fee-paying volumes for these immigration benefits. Table 25 details the estimated cost data, fee-paying receipts, fee-paying unit cost, and proposed fees for combined USCIS and CBP workloads.

| Table 25: USCIS and CBP FY 2022/2023 Estimated Costs | | | | |
|---|---|---|---|---|
| **Form** | **Cost Data** | **Estimated Fee-Paying Receipts** | **FY 2022/2023 Fee-Paying Unit Cost** | **Proposed Fee** |
| **I-192** | **$23,143,825** | **10,954** | **$2,113** | **$1,100** |
| I-192 USCIS Total | $20,829,436 | 5,473 | $3,806 | |
| I-192 CBP Total | $2,314,389 | 5,481 | $422 | |
| **I-193** | **$19,478,943** | **6,772** | **$2,876** | **$695** |
| I-193 USCIS Total | $17,020 | 13 | $1,309 | |
| I-193 CBP Total | $19,461,923 | 6,759 | $2,879 | |
| **I-212** | **$7,457,101** | **7,260** | **$1,027** | **$1,395** |
| I-212 USCIS Total | $7,457,101 | 7,067 | $1,055 | |
| I-212 CBP Total | - | 193 | - | |
| **I-824** | **$5,106,968** | **10,633** | **$480** | **$675** |
| I-824 USCIS Total | $5,106,968 | 10,242 | $499 | |
| I-824 CBP Total | - | 50 | - | |
| **USCIS and CBP Total** | **$55,186,837** | **35,278** | | |
| **USCIS Total** | **$33,410,525** | **22,795** | | |
| **CBP Total** | **$21,776,312** | **12,483** | | |

The proposed fees represent single DHS fees for each of these workloads by combining the estimated costs and fee-paying volumes of USCIS and CBP. DHS believes that a single fee for each of these shared workloads will reduce confusion for individuals interacting with CBP and USCIS. DHS used the combined CBP and USCIS fee-paying unit cost to calculate the proposed fees. DHS proposes to limit the fee increases for Forms I–192 and I–193. *See* section V.B.3 for information on how DHS assesses fees. The proposed fees for Forms I–212 and I–824 would recover full cost. Under this proposal, CBP and USCIS will each continue to keep the revenue that they collect for these fees.

*R. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))*

DHS proposes to adjust the fee for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)). The IEFA fees for this application have not changed since 2005. The proposed fee remains less than USCIS' estimated costs associated with adjudicating the application. Additionally, DHS proposes to combine the current multiple fees into a single Form I–881 fee because we have no data that supports limiting the amount charged to a family.

INS implemented two fees for this benefit request in 1999. *See* 63 FR 64895 (Nov. 24, 1998) (proposed rule) and 64 FR 27856 (May 21, 1999) (interim final rule). The two IEFA fees were $215 for an individual and $430 as a maximum per family. *See* 64 FR 27867–27868. EOIR collected a separate $100 fee. *Id.* INS used ABC to determine the proposed IEFA fees. *See* 63 FR 64900. The IEFA NACARA fees have only changed by inflation since creation of the NACARA program. *See* 69 FR 20528 (Apr. 15, 2004) and 70 FR 56182 (Sept. 26, 2005). The current fees are as follows:

1. $285 for individuals,
2. $570 maximum for families, and
3. $165 at EOIR, whether an individual or family.

In FY 2020, Form I–881 fees generated $107,640 in IEFA revenue. Approximately 53 percent of applicants paid the $285 fee. *See* Table 26. EOIR provided receipt information for FY 2016 to FY 2018. EOIR received 339 applications in FY 2016, 326 in FY 2017, and 277 in FY 2018. DHS proposes no changes to the EOIR fee because it lacks the authority to change DOJ fees.

| Table 26: FY 2020 I-881 Revenue and Fee-Paying Data | | | | |
|---|---|---|---|---|
| **Description** | **Fee** | **FY 2020 Revenue** | **FY 2020 Fee-Paying Receipts** | **FY 2020 Percentage of Receipts Volume** |
| I-881 Individual | $285 | $68,685 | 241 | 53 percent |
| I-881 Family | $570 | $5,130 | 9 | 2 percent |
| I-881 EOIR | $165 | $33,825 | 205 | 45 percent |

| Table 26: FY 2020 I-881 Revenue and Fee-Paying Data | | | | |
|---|---|---|---|---|
| Description | Fee | FY 2020 Revenue | FY 2020 Fee-Paying Receipts | FY 2020 Percentage of Receipts Volume |
| **Total** | **N/A** | **$107,640** | **455** | **100 percent** |

In prior fee rules, DHS has not changed the Form I–881 fees. *See* 72 FR 29854, 75 FR 58964, and 75 FR 73312. DHS excluded this immigration benefit request from previous fee rules, essentially treating it like other temporary programs or policies such as TPS and DACA. *See* 81 FR 73312. DHS expects the population will be exhausted eventually due to relevant eligibility requirements. *Id.*

DHS proposes a single $340 fee for any Form I–881 filed with USCIS. *See* proposed 8 CFR 106.2(a)(54). DHS estimated the fee-paying unit cost (model output) for Form I–881 is $2,382. USCIS forecasts an average of 385 annual Form I–881 receipts in the FY 2022/2023 biennial period. Given the low volume and high model output, DHS proposes a fee that is far less than the estimated cost to adjudicate the form. DHS believes that the fee that the ABC model calculates for this form would be overly burdensome and could result in an eligible applicant being unable to file a request. Considering both its affordability and that the estimated volume is so small, recovering full cost for this workload would not significantly affect other fees. USCIS does not track the different level of effort required to adjudicate Form I–881 applications filed by an individual compared to a family. However, because DHS is proposing a fee that is only 14 percent of the relative cost to USCIS to adjudicate the from, DHS is not providing a multiple filing discount to applicants in the same family who file their Form I–881 simultaneously.

### S. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)

In section 402(g) of Div. O of the Consolidated Appropriations Act, 2016 (Pub. L.114–113)[315] enacted December 18, 2015, Congress required the

submission of an additional fee of $4,000 for certain H–1B petitions and $4,500 for certain L–1A and L–1B petitions. The language in Public Law 114–113 is ambiguous and, as a result, DHS had to determine whether the fee applied to all extension petitions by covered employers, or just those for which the fraud fee was also charged (extension of stay with change of employer). DHS interpreted the Public Law 114–113 fee to apply only when the fraud fee, described in INA sec. 214(c)(12), 8 U.S.C. 1184(c)(12), is also required and issued guidance accordingly. *See* 8 CFR 103.7(b)(1)(i)(III) and (JJJ) (Oct. 1, 2020). However, in the 2020 fee rule, DHS revisited the issue and interpreted Public Law 114–113 fee as applying to all extension of stay petitions even when the fraud fee is not applicable. DHS still believes that the language in the subject statute is ambiguous and could be interpreted as provided in the 2020 fee rule. However, DHS is not including the 9–11 Response and Biometric Entry-Exit Fees for H–1B and L–1 Nonimmigrant Workers in this rulemaking. Thus, 8 CFR 106.2(c)(7) and (8) as codified effective October 2, 2020, are proposed to be revised in this rulemaking with the text that existed immediately before the 2020 fee rule. See proposed 8 CFR 106.2(c)(8) and (9) (setting out the text of 8 CFR 103.7(b)(1)(i)(III) and (JJJ) as of October 1, 2020, except providing that the fee is scheduled to end on September 30, 2027, as required by section 30203 of Public Law 115–123 (Feb. 9, 2018)). DHS may address the 9–11 Response and Biometric Entry-Exit Fees for H–1B and L–1 Nonimmigrant Workers in a separate rulemaking in the future.

### T. Adjusting USCIS Fees for Inflation

DHS is proposing to codify a provision that will authorize it to adjust the fees prescribed in proposed 8 CFR 106.2 by the rate of inflation. Proposed 8 CFR 106.2(c). Before DHS removed it with the 2020 fee rule, 8 CFR 103.7(b)(3)(Oct. 1, 2020) provided that DHS may adjust USCIS immigration benefit fees annually by publication of an inflation adjustment notice in the **Federal Register**. The adjustment was based on Federal employee salary inflation figures issued by the Office of Management and Budget. *Id.* DHS last adjusted fees by inflation in 2005. *See,*

70 FR 56182 (Sept. 26, 2005). In the 2020 fee rule, DHS removed that provision for a number of reasons. First, an agency cannot publish a document in the Notices category of the **Federal Register** that provides that regulated parties ignore the CFR and follow what the Notice provides instead. That violates the Federal Register Act, 44 U.S.C. 1510, and its implementing regulations, 1 CFR part 21. Thus, 8 CFR 103.7(b)(3) did not provide the authorization for which it was intended. In addition, DHS felt that adjusting USCIS fees by inflation or social security cost of living adjustments would be insufficient to recover the full cost of providing adjudication and naturalization services. *See* 85 FR 46867.

DHS has reconsidered the value of codifying an inflationary adjustment provision. Regardless of the CFO Act requirements, and although DHS has completed its biennial fee reviews as required, the time required to propose and finalize new full cost recovery fee schedules does not allow DHS to make timely adjustments to USCIS fees to keep up with the effects of changes in immigration laws, policy, or the costs of services. DHS has not calculated what the effects of an inflation adjustment of fees in intervening years between fee rules would have been. However, while we assume that inflationary adjustments would not have provided USCIS with sufficient revenue to fully cover costs, we think intermittent adjustments would have ameliorated the size of fee adjustments when they were made via rulemaking.

DHS proposes to use the Consumer Price Index for All Urban Consumers (CPI–U), as published by the U.S. Department of Labor, U.S. Bureau of Labor Statistics, as the inflation index for these fee adjustments.[316] Proposed 8 CFR 106.2(c). In recognition of the rapid growth in the size of transfers between a growing number of stakeholders affected by the past three fee rules, adjusting USCIS fees for inflation as measured by the CPI–U may insure future revenues against the gradual erosion of real fee revenue dollars in the event that future rulemakings are

---

[315] Section 402(g) of Div. O of Public Law 114–113 added a new section 411 to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note. Section 411 provided that the fees collected thereunder would be divided 50/50 between general Treasury and a new "9–11 Response and Biometric Exit Account," until deposits into the latter amounted to $1 billion, at which point further collections would go only to general Treasury. Deposits into the 9–11 account are available to DHS for a biometric entry-exit screening system as described in 8 U.S.C. 1365b.

[316] See, Consumer Price Index, at *https://www.bls.gov/news.release/cpi.toc.htm* (last viewed July 27, 2022).

slowed by intensive, careful consideration of complex competing interests and impacts. Consistent with the FPG, this approach may also base fees on the constant-dollar value to consumers, generally, rather than more opaque estimates of Government costs or the salaries of Federal employees. Finally, using the CPI–U as our inflation index for all fees is consistent with various statutes that have provided that USCIS will use the CPI to adjust certain fees. *See, e.g.,* Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000) (premium processing fee adjustment); 48 U.S.C. 1806(a)(6)(A)(ii) (Authority to adjust the CNMI education fee for inflation), and; 8 U.S.C. 1356(u)(3)(C) (adjustment of premium processing fees on a biennial basis).

The impacts of such an adjustment would be analyzed in a future rule should DHS decide to use this proposed authority. In such a case, the inflation adjusted fees may be higher or lower than proposed here. For example and as a point of comparison only, if DHS adjusted the Form N–400 and biometric services fee by inflation as of March 22, 2022, then the inflation-adjusted fees would be at least $865, $140 more than the current fees for Form N–400 of $725 ($640 + $85), and $105 more than the proposed N–400 fee of $760, but less than the fee set in the 2020 fee rule of $1,170.[317] Other inflation adjusted fees, such as those for Forms I–129 or I–485, would likely be less than the fees proposed in this rule. Future inflation-based fee increases would not include policy changes. They would only adjust fees. It is unlikely that DHS would pursue an inflation-based fee adjustment until FY 2025 or at least one year after DHS finalizes the fees it proposes in this rule.

---

[317] Current fees became effective on Dec. 23, 2016. *See* 81 FR 73292. The current fees for Form N–400 ($640) and biometric services ($85) total $725 for most applicants. The consumer price index for all urban consumers (CPI–U) was 241.432 in Dec. 2016 and 289.109 in Mar. 2022. The change in the index between these two periods was 47.68 or 19.75 percent. *See* U.S. Department of Labor, Bureau of Labor Statistics, All Urban Consumers (CPI–U) tables, available at *https://data.bls.gov/timeseries/CUUR0000SA0.* The inflation adjusted amounts using this example would be as follows: N–400: $640 multiplied by 1.1975, which is approximately $766.38; biometric services fee: $85 multiplied by 1.1975, which is approximately $101.79. DHS rounds fees to the nearest $5. Rounded to the nearest $5, the inflation adjusted fees would be $765 and $100, totaling $865. The proposed fee for Form N–400 (including the cost of biometric services) is $760, which is $35 or 5 percent more than the total current fees of $725 for Form N–400 and biometric services.

## U. Miscellaneous Technical and Procedural Changes

DHS proposes several technical or procedural changes. This rule proposes to move the fee regulations for USCIS to a separate part of chapter I of title 8 of the CFR. It moves them from 8 CFR part 103 to 8 CFR part 106 to reduce the length and density of part 103 as well as to make it easier to locate specific fee provisions. In addition to the renumbering and redesignating of paragraphs, this proposed rule has reorganized and reworded some sections to improve readability. However, as noted earlier in this preamble, DHS is proposing to adopt the changes made by the 2020 fee rule as proposed for revision or republication in this rule.

DHS also proposes to republish the amended title of 8 CFR part 103 to make it more descriptive of its contents. *See* proposed republished 8 CFR part 103. The title of part 103 before October 2, 2020, was "Immigration Benefits; Biometric Requirements; Availability of Records." Part 103 contains several significant requirements for filing requests, forms, and documents with USCIS, especially in 8 CFR 103.2, which should be made clearer to the users of that part. Therefore, DHS proposes to revise the title of the part to include a reference to filing requirements. The proposed title is "Part 103— Immigration Benefit Requests; USCIS Filing Requirements; Biometric Requirements; Availability of Records."

In addition, DHS is proposing and republishing a severability provision in new 8 CFR part 106. As stated repeatedly in this preamble, the fees DHS is proposing in this rule are essential to USCIS being able to fund its operations without further deterioration of its services. While all of the proposed fees and other changes in this rule are needed to ensure adequate resources, partially achieving the objectives of this rule is preferable to achieving none of them. DHS believes that some of the provisions of each new part can function sensibly independent of other provisions. As explained in this preamble, ABC and the full cost recovery fee model that DHS uses to calculate the fees in this rule results in most of the fees being dependent on policy decisions that affect the level of other fees. For example, when DHS shifts the cost of benefit request fees due to policy considerations, exempts requests from fees, or if fees are capped by law, most other fees must/then increase to compensate to recover full cost. On the other hand, certain fees, like the Asylum Program Fee and

genealogy fees, could be removed entirely without affecting all other fees generally, although they would reduce USCIS projected revenue or carryover balances. For example, absent the Asylum Program Fee or appropriations, USCIS may continue to implement the Asylum Processing IFR, perhaps at a reduced level. Such a funding decision may be similar to when USCIS anticipated appropriations to fund RAIO, SAVE, and the Office of Citizenship when it finalized fees in the FY 2010/2011 fee rule. *See* 75 FR 58961, 58966. When appropriations resources did not fully materialize, USCIS used other fee revenue to support these programs in the time between the FY 2010/2011 fee rule and the FY 2016/2017 fee rule. *See* 81 FR 26910–26912. If Congress provides full or partial appropriations to fund the Asylum Processing IFR, then DHS may be able to remove or reduce the proposed $600 Asylum Program Fee in a final rule. If a court ruling were to enjoin the Asylum Processing IFR or the Asylum Program Fee, then other USCIS operations could continue to benefit from the increased revenue from other proposed fees while halting or reducing implementation of the Asylum Processing IFR. Therefore, to protect the goals for which this rule is being proposed DHS is codifying our intent that the provisions be severable so that, if necessary, the regulations can continue to function should a provision be stricken. *See* proposed republished 8 CFR 106.6.

## IX. Proposed Fee Adjustments to IEFA Immigrant Benefits

At current fee levels, projected USCIS costs for FY 2022 and FY 2023 exceed projected revenue by an average of $1,262.3 million each year. *See* Table 6, IEFA Non-Premium Cost and Revenue Comparison. Therefore, DHS proposes to adjust the fee schedule to recover the full cost of processing immigration benefit requests and to continue to maintain or improve current service delivery standards.

After resource costs are identified, the ABC model distributes them to USCIS' primary processing activities. Table 27 outlines total IEFA costs by activity. See the supporting documentation in the docket of this rulemaking for more information on the ABC model, activities, and results described in this section. While not an activity, the table lists the Asylum Processing IFR as a separate row to be transparent.

| Table 27: Projected IEFA Costs by Activity (Dollars in Millions) | | | |
|---|---|---|---|
| **Activity** | **FY 2022** | **FY 2023** | **FY 2022/2023 Average** |
| Certify Nonexistence | $1.3 | $1.4 | $1.4 |
| Conduct TECS Check | $129.6 | $133.2 | $131.4 |
| Direct Costs | $117.0 | $116.7 | $116.8 |
| Fraud Detection and Prevention | $328.6 | $342.1 | $335.4 |
| Inform the Public | $315.9 | $323.6 | $319.8 |
| Intake | $126.5 | $128.4 | $127.5 |
| Issue Document | $47.2 | $46.4 | $46.8 |
| Make Determination | $1,852.4 | $1,901.1 | $1,876.8 |
| Management and Oversight | $1,256.7 | $1,275.8 | $1,266.3 |
| Perform Biometrics Services Subtotal | $190.4 | $193.5 | $191.9 |
|     Manage Biometric Services | $45.9 | $46.9 | $46.4 |
|     Collect Biometric Data | $38.1 | $39.2 | $38.7 |
|     Check Fingerprints | $39.3 | $39.9 | $39.6 |
|     Check Name | $67.0 | $67.4 | $67.2 |
| Records Management | $255.0 | $260.5 | $257.8 |
| Research Genealogy | $1.9 | $1.9 | $1.9 |
| Systematic Alien Verification for Entitlements | $50.6 | $51.7 | $51.1 |
| **Subtotal before Asylum Processing IFR** | **$4,673.3** | **$4,776.4** | **$4,724.8** |
| Asylum Processing IFR | $438.2 | $413.6 | $425.9 |
| **Total with Asylum Processing IFR** | **$5,111.5** | **$5,190.0** | **$5,150.7** |

Next, the ABC model distributes activity costs to immigration benefit requests. Each total cost result is based on the resources, activities, and various drivers which contribute to the estimated cost of its completion. The ABC model estimates total cost before calculating unit costs. For total cost by activity as unit costs, see Appendix VIII of the supporting documentation included in this docket. Table 28 summarizes total cost estimates by immigration benefit request based on the ABC model results. As explained earlier in the preamble, the ABC model excludes costs for TPS and DACA. The table includes benefit requests without fees. This table includes USCIS costs in the 2-year average for FY 2022/2023. It also includes CBP costs; as such, the total in Table 28 is higher than in Table 27. *See* Table 25 in section VIII.Q. for CBP total costs separately.

| Table 28: Projected FY 2022/2023 Average Annual Total Cost per Immigration Benefit with Proposed Fees (Dollars in Millions) | |
|---|---|
| **Immigration Benefit Request** | **Total Cost** |
| I-90 Application to Replace Permanent Resident Card Subtotal | $213.56 |
| I-90 Application to Replace Permanent Resident Card - Online | $131.23 |
| I-90 Application to Replace Permanent Resident Card - Paper | $82.33 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $2.31 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $355.89 |
| H-1 Classification | $247.11 |
| H-2A - Named Beneficiaries | $3.22 |
| H-2B - Named Beneficiaries | $1.96 |
| L Classification | $43.24 |
| O Classification | $21.17 |
| I-129CW, E, H-3, TN, P, Q, or R Classifications | $30.59 |
| H-2A - Unnamed Beneficiaries | $6.89 |
| H-2B - Unnamed Beneficiaries | $1.71 |
| I-129F Petition for Alien Fiancé(e) | $22.01 |
| I-130 Petition for Alien Relative Subtotal | $500.49 |
| I-130 Petition for Alien Relative - Online | $112.4 |
| I-130 Petition for Alien Relative - Paper | $388.09 |
| I-131 Application for Travel Document | $117.37 |
| I-131 Refugee Travel Document | $9.58 |
| I-131A Application for Carrier Documentation | $2.70 |
| I-140 Immigrant Petition for Alien Worker | $73.87 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $0.08 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $23.14 |

| Table 28: Projected FY 2022/2023 Average Annual Total Cost per Immigration Benefit with Proposed Fees (Dollars in Millions) | |
|---|---|
| **Immigration Benefit Request** | **Total Cost** |
| I-193 Application for Waiver of Passport and/or Visa | $19.48 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $7.46 |
| I-290B Notice of Appeal or Motion | $47.76 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $36.1 |
| I-407 Abandonment of Lawful Permanent Resident Status | $0.03 |
| I-485 Application to Register Permanent Residence or Adjust Status | $648.53 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $32.06 |
| I-539 Application to Extend/Change Nonimmigrant Status Subtotal | $197.43 |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $71.58 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $125.85 |
| I-589 Application for Asylum and for Withholding of Removal | $275.94 |
| I-590 Registration for Classification as Refugee | $205.38 |
| I-600/600A; I-800/800A Intercountry Adoption-Related Petitions and Applications | $3.54 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | $0.03 |
| I-601 Application for Waiver of Grounds of Inadmissibility | $14.33 |
| I-601A Provisional Unlawful Presence Waiver | $32.4 |
| I-602 Application By Refugee For Waiver of Grounds of Inadmissibility | $0.07 |
| I-604 Determination on Child for Adoption | $0.36 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $3.19 |
| I-687 Application for Status as a Temporary Resident | $0.00 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $0.02 |
| I-694 Notice of Appeal of Decision | $0.00 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $0.02 |
| I-730 Refugee/Asylee Relative Position (and Travel Eligibility) | $17.83 |
| I-751 Petition to Remove Conditions on Residence | $114.73 |

| Table 28: Projected FY 2022/2023 Average Annual Total Cost per Immigration Benefit with Proposed Fees (Dollars in Millions) | |
|---|---|
| **Immigration Benefit Request** | **Total Cost** |
| I-765 Application for Employment Authorization Subtotal | $517.71 |
| I-765 Application for Employment Authorization - Online | $16.72 |
| I-765 Application for Employment Authorization - Paper | $501. |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $0.67 |
| I-817 Application for Family Unity Benefits | $0.33 |
| I-824 Application for Action on an Approved Application or Petition | $5.11 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $22.79 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $0.87 |
| I-910 Application for Civil Surgeon Designation | $0.51 |
| I-914 T Nonimmigrant Status | $3.16 |
| I-918 U Nonimmigrant Status | $53.82 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $0.67 |
| I-956 Application For Regional Center Designation | $2.18 |
| I-956G Regional Center Annual Statement | $2.4 |
| N-300 Application to File Declaration of Intention | $0.01 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings Subtotal | $7.89 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $2.58 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $5.32 |
| N-400 Application for Naturalization Subtotal | $732.98 |
| N-400 Application for Naturalization - Online | $381.16 |
| N-400 Application for Naturalization - Paper | $351.82 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $0.21 |
| N-565 Application for Replacement Naturalization/Citizenship Document Subtotal | $8.07 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $4.87 |

**Table 28: Projected FY 2022/2023 Average Annual Total Cost per Immigration Benefit with Proposed Fees (Dollars in Millions)**

| Immigration Benefit Request | Total Cost |
|---|---|
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $3.20 |
| N-600 Application for Certificate of Citizenship Subtotal | $23.64 |
| N-600 Application for Certificate of Citizenship - Online | $7.33 |
| N-600 Application for Certificate of Citizenship - Paper | $16.31 |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 Subtotal | $3.03 |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $1.24 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $1.79 |
| USCIS Immigrant Fee | $93.75 |
| H-1B Registration Process | $43.25 |
| Request for Certificate of Non-Existence | $1.35 |
| G-1041 Genealogy Index Search Request Subtotal | $1.10 |
| G-1041 Genealogy Index Search Request - Online | $1.03 |
| G-1041 Genealogy Index Search Request - Paper | $0.07 |
| G-1041A Genealogy Records Request Subtotal | $0.79 |
| G-1041A Genealogy Records Request - Online | $0.74 |
| G-1041A Genealogy Records Request - Paper | $0.05 |
| Automatic Certificate of Citizenship | $1.39 |
| Credible Fear | $157.16 |
| DNA Collection | $0.48 |
| Overseas Verifications | $0.46 |
| Reasonable Fear | $31.96 |
| SAVE reimbursable workload | $51.13 |
| **Subtotal** | $4,746.58 |
| Asylum Program Fee | $425.90 |
| **Total** | $5,172.48 |

Table 29 depicts the current and proposed USCIS fees for immigration benefit requests and biometric services. Current USCIS fees are available to the public as part of the current Form G–1055, Fee Schedule, available at *https://*

*www.uscis.gov/g-1055;* individual web pages for each form are available from *https://www.uscis.gov/forms/all-forms;* and the USCIS Fee Calculator is available at *https://www.uscis.gov/feecalculator.* In addition, the proposed fees are available in the draft version of Form G–1055 as part of the docket for

this rulemaking. For a more detailed description of the basis for the changes described in this table, *see* Appendix Table 3 in the supporting documentation accompanying this proposed rule. See Table 1 in the Executive Summary of this preamble for a comparison of current and proposed

fees that includes additional contributing factors, like the proposal to remove the separate biometric services fee in most cases. Table 1 may more accurately reflect how the proposed fees affect users.

| Table 29: Proposed Fees by Immigration Benefit | | Current Fee | Proposed Fee | Delta ($) | Percent Change |
|---|---|---|---|---|---|
| | **Immigration Benefit Request** | | | | |
| I-90 | Application to Replace Permanent Resident Card - Online | $455 | $455 | $0 | 0% |
| I-90 | Application to Replace Permanent Resident Card - Paper | $455 | $465 | $10 | 2% |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $235 | 53% |
| I-129 | Petition for a Nonimmigrant Worker: H-1 Classifications | $460 | $780 | $320 | 70% |
| I-129 | H-2A - Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| I-129 | H-2B - Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| I-129 | Petition for L Nonimmigrant Worker | $460 | $1,385 | $925 | 201% |
| I-129 | Petition for O Nonimmigrant Worker | $460 | $1,055 | $595 | 129% |

| Table 29: Proposed Fees by Immigration Benefit | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | | Current Fee | Proposed Fee | Delta ($) | Percent Change |
| I-129CW, and I-129 | Petition for a CNMI-Only Nonimmigrant Transitional Worker; Application for Nonimmigrant Worker: E and TN Classifications; and Petition for Nonimmigrant Worker: H-3, P, Q, or R Classification. | $460 | $1,015 | $555 | 121% |
| I-129 | H-2A - Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| I-129 | H-2B - Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| I-129F | Petition for Alien Fiancé(e) | $535 | $720 | $185 | 35% |
| I-130 | Petition for Alien Relative - Online | $535 | $710 | $175 | 33% |
| I-130 | Petition for Alien Relative - Paper | $535 | $820 | $285 | 53% |
| I-131 | Application for Travel Document | $575 | $630 | $55 | 10% |
| I-131 | Refugee Travel Document for an individual age 16 or older | $135 | $165 | $30 | 22% |
| I-131 | Refugee Travel Document for a child under the age of 16 | $105 | $135 | $30 | 29% |
| I-131A | Application for Carrier Documentation | $575 | $575 | $0 | 0% |
| I-140 | Immigrant Petition for Alien Worker | $700 | $715 | $15 | 2% |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $0 | 0% |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant | $585/ $930[318] | $1,100 | $515/$170 | 88%/18% |
| I-193 | Application for Waiver of Passport and/or Visa | $585 | $695 | $110 | 19% |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $465 | 50% |
| I-290B | Notice of Appeal or Motion | $675 | $800 | $125 | 19% |

| Table 29: Proposed Fees by Immigration Benefit | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee** | **Proposed Fee** | **Delta ($)** | **Percent Change** |
| I-360 | Petition for Amerasian Widow(er) or Special Immigrant | $435 | $515 | $80 | 18% |
| I-485 | Application to Register Permanent Residence or Adjust Status | $1,140/ $750[319] | $1,540 | $400/$790 | 35%/105% |
| I-526/I-526E | Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $7,485 | 204% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Online | $370 | $525 | $155 | 42% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Paper | $370 | $620 | $250 | 68% |
| I-600/ 600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of an Orphan Petition | $775 | $920 | $145 | 19% |
| I-600A/I-600 Supp. 3 | Request for Action on Approved Form I-600A/I-600 | N/A | $455 | $70 | 18% |
| I-601 | Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $120 | 13% |
| I-601A | Application for Provisional Unlawful Presence Waiver | $630 | $1,105 | $475 | 75% |
| I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $170 | 18% |
| I-687 | Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | $1,130 | $1,240 | $110 | 10% |
| I-690 | Application for Waiver of Grounds of Inadmissibility | $715 | $985 | $270 | 38% |

| Table 29: Proposed Fees by Immigration Benefit | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | | Current Fee | Proposed Fee | Delta ($) | Percent Change |
| I-694 | Notice of Appeal of Decision | $890 | $1,155 | $265 | 30% |
| I-698 | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $0 | 0% |
| I-751 | Petition to Remove Conditions on Residence | $595 | $1,195 | $600 | 101% |
| I-765 | Application for Employment Authorization - Online | $410 | $555 | $145 | 35% |
| I-765 | Application for Employment Authorization - Paper | $410 | $650 | $240 | 59% |
| I-800/ 800A | Petition to Classify Convention Adoptee as an Immediate Relative/Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $920 | $145 | 19% |
| I-800A Supp. 3 | Request for Action on Approved Form I-800A | $385 | $455 | $70 | 18% |
| I-817 | Application for Family Unity Benefits | $600 | $875 | $275 | 46% |
| I-824 | Application for Action on an Approved Application or Petition | $465 | $675 | $210 | 45% |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | $3,750 | $9,525 | $5,775 | 154% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | $285/ 570[320] | $340 | $55/-$230 | 19%/-40% |
| I-910 | Application for Civil Surgeon Designation | $785 | $1,230 | $445 | 57% |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $270 | $40 | 17% |
| I-941 | Application for Entrepreneur Parole | $1,200 | $1,200 | $0 | 0% |
| I-956 | Application for Regional Center Designation | $17,795 | $47,695 | $29,900 | 168% |

| | **Table 29: Proposed Fees by Immigration Benefit** | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee** | **Proposed Fee** | **Delta ($)** | **Percent Change** |
| I-956G | Regional Center Annual Statement | $3,035 | $4,470 | $1,435 | 47% |
| N-300 | Application to File Declaration of Intention | $270 | $320 | $50 | 19% |
| N-336 | Request for a Hearing on a Decision in Naturalization Proceedings - Online | $700 | $830 | $130 | 19% |
| N-336 | Request for a Hearing on a Decision in Naturalization Proceedings - Paper | $700 | $830 | $130 | 19% |
| N-400 | Application for Naturalization - Online | $640 | $760 | $120 | 19% |
| N-400 | Application for Naturalization - Paper | $640 | $760 | $120 | 19% |
| N-400 | Application for Naturalization - Reduced Fee | $320 | $380 | $60 | 19% |
| N-470 | Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $65 | 18% |
| N-565 | Application for Replacement Naturalization/Citizenship Document - Online | $555 | $555 | $0 | 0% |
| N-565 | Application for Replacement Naturalization/Citizenship Document - Paper | $555 | $555 | $0 | 0% |
| N-600 | Application for Certificate of Citizenship - Online | $1,170 | $1,385 | $215 | 18% |
| N-600 | Application for Certificate of Citizenship - Paper | $1,170 | $1,385 | $215 | 18% |
| N-600K | Application for Citizenship and Issuance of Certificate Under Section 322 - Online | $1,170 | $1,385 | $215 | 18% |
| N-600K | Application for Citizenship and Issuance of Certificate Under Section 322 - Paper | $1,170 | $1,385 | $215 | 18% |
| | USCIS Immigrant Fee | $220 | $235 | $15 | 7% |
| H-1B Registration Tool (OMB-64) | H-1B Registration Process Fee | $10 | $215 | $205 | 2050% |
| G-1566 | Request for Certificate of Non-Existence | $0 | $330 | $330 | N/A |
| G-1041 | Genealogy Index Search Request - Online | $65 | $100 | $35 | 54% |

| Table 29: Proposed Fees by Immigration Benefit | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee** | **Proposed Fee** | **Delta ($)** | **Percent Change** |
| G-1041 | Genealogy Index Search Request - Paper | $65 | $120 | $55 | 85% |
| G-1041A | Genealogy Records Request - Online | $65 | $240 | $175 | 269% |
| G-1041A | Genealogy Records Request - Paper | $65 | $260 | $195 | 300% |
| | Biometric Services | $85 | $30 | -$55 | -65% |
| | Asylum Program Fee | N/A | $600 | N/A | N/A |

*A. Impact of Fees*

For some immigration benefits and services, fees are increasing substantially. DHS recognizes that this may be challenging for some customers and stakeholders, especially those that may be taking actions or making decisions with the expectation that USCIS fees remain unchanged or increase more modestly. DHS acknowledges that applicants and petitioners may face additional difficulties in paying the fees, and may be required to request a fee waiver, save money longer to afford the fees, or resort to credit cards or borrowing to pursue their or their family members' immigration benefit. DHS has weighed these impacts and interests and considered alternatives to the proposals in this rule as described in this preamble. DHS examined each fee in this proposed rule and adjusted the fees computed by the fee model where appropriate and as discussed herein. It is DHS's view that the fees proposed represent the best balance of access, affordability, and benefits to the public interest while providing USCIS with the funding necessary to maintain adequate services.

DHS notes that the success of this rulemaking in funding USCIS services depends on the fee-paying request filing volume meeting or exceeding the projections used in the fee model as described in section V.B.1.b of this preamble and the supporting documents. Many commenters on the FY 2020 Fee Rule stated that DHS was increasing USCIS fees to deter demand for immigration benefits and to discourage immigration in general. As stated earlier with regard to E.O. 14012, DHS is committed to encouraging access to immigration benefits. DHS appreciates the concerns of these earlier commenters, and sincerely hopes that this rulemaking does not discourage or impede individuals from obtaining the benefits for which they are eligible. This is true not only as a policy matter but as a practical necessity. If a USCIS fee rule were to cause a significant reduction in the demand for USCIS services in its administration of the legal immigration system, it would not meet DHS objectives and would cause USCIS serious fiscal problems. A large reduction in the number of immigration benefit filings on USCIS caused by the COVID–19 pandemic had enormous detrimental effects on the fiscal health of USCIS. Thus, taking any actions that could result in fewer requests being filed would be self-defeating to the purposes of a rule that adjusts USCIS fees.[321]

DHS also acknowledges that USCIS fees and fee policies affect the operations of organizations that assist applicants and petitioners with the preparation and submission of USCIS benefit requests. Assistance organizations generally do not pay the fees that would be established by this rule (unless they independently apply to hire a foreign national employee), and aside from those organizations to which USCIS provides citizenship and integration grants, DHS has no role in regulating the functions of such groups. Nonetheless, this rule could indirectly affect the population and mix of the people who will want to avail themselves of the services of such organizations; thus, these groups may choose to obtain additional funding or alter their programs. As discussed earlier in this proposed rule, absent a fee increase, USCIS anticipates having insufficient resources to process its projected workload. Providing USCIS with the funding necessary to maintain adequate services would benefit our customers and stakeholders with more timely processing. After considering the impacts on the affected groups and the objectives of this proposed rule, DHS has decided to move forward with this rulemaking despite such groups choosing to adjust their business model to the proposed fees and policies.[322]

*B. USCIS Fiscal Health*

As a fee-funded agency, USCIS was directly and adversely affected by the global pandemic.[323] This contrasts with congressionally appropriated agencies, whose budgets are not directly impacted by fluctuations in fee revenue. To address its deteriorating fiscal situation when the pandemic compelled a temporary closure of USCIS offices and led to a plunge in filing and fee receipts, USCIS tightened its budget while continuing mission critical operations.

---

[318] The current fee for Form I–192 is $585 when filed with and processed by CBP. When filed with USCIS, the fee is $930. *See* 8 CFR 103.7(b)(1)(i)(P) (Oct. 1, 2020).

[319] The $750 fee applies to "an applicant under the age of 14 years when [the application] is: (*i*) Submitted concurrently with the Form I–485 of a parent; (*ii*) The applicant is seeking to adjust status as a derivative of his or her parent; and (*iii*) The child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." *See* 8 CFR 103.7(b)(1)(i)(U)(*2*) (Oct. 1, 2020).

[320] Currently there are two USCIS fees for Form I–881: $285 for individuals and $570 for families. *See* 8 CFR 103.7(b)(1)(i)(QQ)(*1*) (Oct. 1, 2020). EOIR has a separate $165 fee. DHS proposes no changes to the EOIR fee.

[321] DHS has considered, but not identified any direct impacts on any state government because it is not projected to increase or decrease the number of immigrants who enter or leave the United States, or result in a shift of immigrants between or among the states. To the extent that states, cities, counties or municipal governments (or organizations that they maintain) serve as advocacy organizations or submit immigration benefit requests to USCIS, the impacts on those groups are addressed in the relevant sections of this rule or the supporting documentation in the docket.

[322] See section X.B.1 of this preamble for a discussion of the impacts of this rule on small entities.

[323] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Deputy Director for Policy Statement on USCIS' Fiscal Outlook, Available at *https://www.uscis.gov/news/news-releases/deputy-director-for-policy-statement-on-uscis-fiscal-outlook* (last viewed Jun 25, 2020).

USCIS froze hiring and terminated contracts. *See* section V.A.2. of this preamble. When USCIS does not have the resources that it needs to meet its goals, processing times increase and the case processing backlog grows. Congress authorized an immediate increase in certain premium processing fees and gave USCIS wider authority to spend the premium processing revenue. *See* section III.D. of this preamble. More recently, USCIS received appropriations from Congress for processing workloads stemming from the agency backlog, refugee admissions, and Operation Allies Welcome. *See* section III.A. of this preamble. USCIS may continue to seek appropriations to supplement fee-funded operations. If USCIS is certain to receive appropriations to fund the FY 2023 refugee program at the time of the final rule, then USCIS may reduce the estimated budget requirements funded by IEFA fees accordingly. USCIS will still face resource challenges just in keeping pace with incoming receipts if its fees do not recover full costs.

### C. Planned Increases in Efficiency

USCIS is pursuing efficiencies that will streamline the adjudication of immigration benefits along with increasing adjudication capacity without adding additional costs. It is important to note that these efficiencies are not included in this fee rule; however, they will be reflected in future fee rules. USCIS expects that future customers will be able to see the benefits in more quickly adjudicated cases. DHS plans to address the challenge of the large volume of pending cases and the associated growth in processing times by focusing the efforts of the USCIS workforce to process pending cases and by using policy and operational improvements to reduce both the number of pending cases and overall processing times.

The USCIS Stabilization Act requires a five-year plan to (1) establish electronic filing procedures for all applications and petitions for immigration benefits, (2) accept electronic payment of fees at all filing locations, (3) issue correspondence, including decisions, requests for evidence, and notices of intent to deny, to immigration benefit requestors electronically, and (4) improve processing times for all immigration and naturalization benefit requests. *See* USCIS Stabilization Act, sec. 4103, Public Law 116–159 (Oct. 1, 2020). USCIS provided an implementation plan to Congress and has begun moving from a primarily paper-based adjudication and correspondence to an electronic-based process.[324] Throughout the implementation of the plan, USCIS expects that efficiencies through the use of electronic processing will improve future processing times. Since this is a five-year plan, the results of improving processing times may not be immediately evident as there are many interconnected processes associated with adjudicating immigration applications and petitions. As such, USCIS is not forecasting any financial efficiencies in this rule.[325]

There are multiple factors that contribute to calculating the number of staff needed to adjudicate projected receipt volume. One such factor is the utilization rate, the amount of time throughout a fiscal year that an officer spends doing core adjudicative work. Further, USCIS has broken down utilization rates to "manageable" and "un-manageable" time; un-manageable time includes weekends, Federal holidays, sick and annual leave, while manageable time includes meetings, reporting, training, and other non-adjudicative work an officer is required to complete. Since FY 2015, USCIS has seen utilization rates decrease to below 60 percent. Beginning in FY 2022, USCIS has set a target utilization rate of 60 percent. While this certainly provides for more adjudications without the need for additional staff, it is not factored into this rule because of a nearly year-long hiring freeze at USCIS, which ended in April of 2021. USCIS is working to staff back up. Given the efforts within USCIS to staff up for current vacancies, it is imprudent to account for efficiencies that USCIS may not realize, because a goal of this rule is to achieve full cost recovery. However, USCIS expects to achieve a 60 percent utilization rate as it reduces vacancies by hiring and training the new staff.

While the volume of immigration benefit requests that USCIS receives has increased substantially in recent years, DHS recognizes that USCIS fees have increased at a higher rate than have the annual number of workload receipts that USCIS receives. In the short run, absent funding from other sources such as Congressional appropriations, USCIS must obtain the fees that will result

from this proposed rule to maintain an acceptable level of service. In the longer term, USCIS is implementing several measures that are intended to assist in increasing efficiency and reducing costs.

USCIS has examined our processes and begun making changes to improve efficiency and allow officers to devote more time to work that requires their expertise and provides the greatest value to the public. For example, USCIS has taken the following actions:

• Made interviews more efficient and effective by ensuring we are interviewing cases only where an interview will add appreciative value to the adjudication, and relying on officer judgment to decide when an interview is necessary to determine eligibility and admissibility and should not be waived.

• Eliminated the need for individuals who have applied for a change of status (COS) to F–1 student to apply to change or extend their nonimmigrant status while their initial F–1 COS application is pending.[326]

• Suspended the biometrics submission requirement for certain applicants filing Form I–539, Application To Extend/Change Nonimmigrant Status, requesting an extension of stay in or change of status to H–4, L–2, and E nonimmigrant status.[327]

• Allowed fingerprint and photograph reuse while ASC services and/or operations were at reduced capacity as a result of the COVID–19 pandemic and when there was no need for an in-person identity verification at an ASC.[328]

• Extended the time that receipt notices can be used to show evidence of status from 18 months to 24 months for petitioners who properly file Form I–751, Petition to Remove Conditions on Residence, or Form I–829, Petition by

---

[324] *See* USCIS, "Section 4103 Plan Pursuant to the Emergency Stopgap USCIS Stabilization Act: Fiscal Year 2021 Report to Congress" (Sep. 7, 2021), *https://www.uscis.gov/sites/default/files/document/reports/SIGNED-Section-4103-FY2021-Report-9-7-21.pdf* (last reviewed Jan. 19, 2022).

[325] If USCIS is able to clearly identify reductions in the costs of USCIS to be recovered under this rule between the proposed and final rule, DHS may consider those cost reductions to either reduce the proposed fees, or certain fees based on policy considerations, in the final rule.

[326] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Applicants for Change of Status to F–1 Student No Longer Need to Submit Subsequent Applications to 'Bridge the Gap', *https://www.uscis.gov/news/alerts/applicants-for-change-of-status-to-f-1-student-no-longer-need-to-submit-subsequent-applications-to* (last viewed Dec 1, 2021).

[327] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, USCIS Temporarily Suspends Biometrics Requirement for Certain Form I–539 Applicants, *https://www.uscis.gov/news/alerts/uscis-temporarily-suspends-biometrics-requirement-for-certain-form-i-539-applicants* (last viewed Dec 1, 2021).

[328] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, USCIS to Continue Processing Applications for Employment Authorization Extension Requests Despite Application Support Center Closures, *https://www.uscis.gov/news/alerts/uscis-to-continue-processing-applications-for-employment-authorization-extension-requests-despite* (last viewed Dec 1, 2021).

Investor to Remove Conditions on Permanent Resident Status.[329]

• Returned to adjudicating asylum workload on a last-in-first-out basis.[330]

In addition, USCIS has transitioned non-adjudicative work from adjudicators to other staff, has centralized the delivery of information services through the policies and processes in place to allow USCIS Contact Center, and is leveraging electronic processing and automation. Applicants, petitioners, and requestors also can track the status of their immigration benefit requests online by using their receipt number or by creating an online account at *https://uscis.gov/casestatus*. Applicants may make an ''outside normal processing time'' case inquiry for any benefit request pending longer than the time listed for the high end of the range by submitting a service request online at *https://egov.uscis.gov/e-request/* or calling the USCIS Contact Center at 1–800–375–5283.

USCIS expects to improve the user experience as it continues to transition to online filing and electronic processing of immigration applications and petitions. With a new person-centric electronic case processing environment, USCIS will possess the data necessary to provide near-real-time processing updates on the status of a case and the time that has elapsed between actions for each individual case. This provides greater transparency to the public on how long it will take to process each case effective as it moves from stage to stage (for example, biometrics submission, interview, decision). In addition, USCIS has adjusted how it calculates and posts processing time information to improve the timeliness of such postings, and to achieve greater transparency. USCIS

will continue to provide processing times in an accurate and transparent fashion.

Finally, as discussed in section V.A.2.b., DHS proposes to fund with IEFA non-premium funds 1,127 staff positions currently supported by premium processing funds. Realigning the cost of these staff to non-premium funds will free up an equivalent amount of premium processing funding for use by USCIS as it pursues additional investments in its online filing and electronic processing capabilities. Furthermore, these premium processing funds also may fund additional staff for backlog reduction efforts, which may result in reduced backlog sizes and decreased processing times.

## X. Statutory and Regulatory Requirements

### A. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Order (E.O.) 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Information and Regulatory Affairs (OIRA), within the Office of Management and Budget (OMB), has designated this proposed rule a significant regulatory action that is economically significant under section 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, would result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2023 through FY 2032), DHS estimates the annualized net costs to the public would be $532,379,138 discounted at 3- and 7-percent. Estimated total net costs over 10 years would be $4,541,302,033 discounted at

3-percent and $3,739,208,286 discounted at 7-percent.

The proposed changes in this rule would also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the Government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include simplification of the fee payment process for some forms, elimination of the $30 returned check fee, USCIS' expansion of the electronic filing system to include more forms, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases and other changes in this proposed rule would result in annualized transfer payments from applicants/petitioners to USCIS of approximately $1,612,133,742 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from applicants/petitioners to USCIS of approximately $13,751,827,819 at a 3-percent discount rate and $11,322,952,792 at a 7-percent discount rate.

Fee reductions and exemptions in this proposed rule would result in annualized transfer payments from USCIS to applicants/petitioners of approximately $116,372,429 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners would be $992,680,424 at a 3-percent discount rate and $817,351,244 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS would be approximately $222,145 at 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS would be $1,894,942 at a 3-percent discount rate and $1,560,254 at a 7-percent discount rate. These costs, transfers, and cost savings (qualitative benefits) are briefly described below in Table 30, and in more detail in a separate Regulatory Impact Analysis.

**BILLING CODE 9111–97–P**

---

[329] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, USCIS Extends Evidence of Status for Conditional Permanent Residents to 24 Months with Pending Form I–751 or Form I–829, *https://www.uscis.gov/newsroom/alerts/uscis-extends-evidence-of-status-for-conditional-permanent-residents-to-24-months-with-pending-form* (last viewed Dec 1, 2021).

[330] USCIS, *USCIS to Take Action to Address Asylum Backlog*, available at *https://www.uscis.gov/news/news-releases/uscis-take-action-address-asylum-backlog* (last updated Feb. 2, 2018). See section III.B of this preamble for a discussion of the FY 2022 appropriation for backlog reduction.

**Table 30.  Summary of Proposed Provisions and Other Fee Adjustments - Costs, Cost Savings, Transfer Payments and Benefits**

| Proposed Rule Provisions | Description of Change | Estimated Annual Costs and Transfer Payments | Estimated Annual Cost Savings and Benefits |
|---|---|---|---|
| 1.  **Dishonored Check Re-presentment Requirement, Fee Payment Method, and Non-refundability** | • DHS proposes that if a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br><br>• If the remitter institution returns the instrument used to pay a fee as | **Quantitative: Applicants-**<br><br>• Transfer payments from applicants/petitioners to USCIS of approximately $546,286 (annual average amount USCIS refunds to applicant's/petitioner's) due to non-refundable fees.<br><br>**Qualitative: Applicants –**<br><br>• None. | **Quantitative: Applicants –**<br><br>• None.<br><br>**Qualitative:**<br><br>**Applicants –**<br><br>• None.<br><br>**DHS/USCIS –**<br><br>• Clarifying dishonored fee check re-presentment non-refundability policies, |

| | | | |
|---|---|---|---|
| | unpayable, USCIS will re-deposit the financial instrument if it is returned for insufficient funds. If it is returned a second time, USCIS will reject the filing. Checks returned for another reason will not be re-deposited and such filings will be rejected immediately. <br><br> • In addition, DHS may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date. <br><br> • DHS is also proposing to codify its authority to limit payment options so that it may require that certain fees must be paid using a specific payment method. <br><br> • DHS is also proposing to clarify that fees are non-refundable regardless of the result of the request or how much time the request requires to be adjudicated. <br><br> • DHS proposes to provide that fees paid to USCIS using a credit card cannot be disputed. | **DHS/USCIS –** <br> • None. | limiting the age of checks to be presented and limiting payment options would reduce administrative burdens and fee processing errors for USCIS. <br><br> • USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment. <br><br> • USCIS will lose fewer credit card disputes. |
| 2. **Eliminate $30 Returned Check Fee** | • USCIS is proposing to eliminate the $30 charge for | **Quantitative: Applicants-** <br> • None. | **Quantitative: Applicants –** |

| | | | |
|---|---|---|---|
| | dishonored payments. | **Qualitative: Applicants –** • None. **DHS/USCIS –** • There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | • DHS estimates the annual cost savings to applicants/petitioners would be $356,370. **Qualitative:** **Applicants –** • The current $30 charge and the potential of having a benefit request rejected encourages applicants to provide the correct filing fees when submitting an application or petition. • Applicants who submit bad checks will no longer have to pay a fee. **DHS/USCIS –** • This proposed change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |
| **3.**  **Changes to Biometric Services Fee** | • For nearly all benefit types, DHS proposes to incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable. | **Quantitative: Applicants-** • As a result of the $55 reduction in the biometric services fee, TPS, and Executive Office for Immigration Review (EOIR) an agency within the Department of Justice, applicants will experience a total of $9,447,570 in reduced fees annually. This | **Quantitative: Applicants –** • None. **Qualitative:** **Applicants –** • Incorporating the biometric services fee into the underlying benefit request filing fee would benefit applicants by |

| | | | |
|---|---|---|---|
| | • DHS proposes to retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | represents transfer payments from USCIS to the fee payers as USCIS would now incur the indirect costs of providing the biometric services.<br><br>**Qualitative: Applicants –**<br><br>• None.<br><br>**DHS/USCIS –**<br><br>• Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. | simplifying the payment process.<br><br>• This measure may also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>**DHS/USCIS –**<br><br>• Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| 4. **Naturalization and Citizenship Related Forms** | • DHS proposes to limit the increase of the fee to $760 for Form N-400, Application for Naturalization, to partially recover the full cost of adjudicating the Form N-400 while still promoting naturalization and integration.<br><br>• DHS is also proposing to keep the reduced fee option of $380 for naturalization applicants with family incomes not exceeding 200-percent of the Federal poverty guidelines (FPG). | **Quantitative:**<br><br>**Applicants-**<br><br>• Increase in fees to the following naturalization and citizenship related forms: Forms N-300, N-336, N-400, N-470, N-600 and N-600K. This would result in transfer payments from the fee-paying applicants to USCIS of $46,991,905 annually.<br><br>**Qualitative:**<br><br>**Applicants –**<br><br>• None<br><br>**DHS/USCIS –**<br><br>• Transfer payments from DoD to USCIS of $222,145 annually for | **Qualitative: Applicants-**<br><br>• Limited fee increase allows more residents, especially those with financial and income constraints to seek citizenship. |

| | | | | |
|---|---|---|---|---|
| | | • DHS is keeping the existing statutory fee exemptions for military members and veterans who file a Form N-400, Application for Naturalization and Form N-600, Application for Certificate of Citizenship, under the military naturalization provisions. | N-400 (military only) reimbursements.<br><br>• The proposal to expand eligibility to request reduced fees would benefit qualified applicants. DHS estimates that the fee decrease would result in transfer payments from USCIS to Form I-942 approved applicants of $103,225 per year.<br><br>• Expanding the population of applicants using Form I-942 would increase the administrative burden on the agency to process these forms. | |
| 5. | **Fees for Filing Online** | • In recognition of the lower marginal costs to USCIS from online filling, DHS intends to lower fees for online filing of immigration benefit requests for which both paper and online filing options are available. The forms include:<br><br>• Form I-90, Application to Replace Permanent Resident Card<br><br>• Form I-130, Petition for Alien Relative<br><br>• Form I-539, Application to Extend/Change Nonimmigrant Status<br><br>• Form I-765, Application for Employment Authorization | **Quantitative:**<br><br>**Petitioners -**<br><br>• Transfer payments of $52,954,120 annually from Forms I-90, I-130, I-539 and I-765 online filers to USCIS.<br><br>**DHS/USCIS-**<br><br>• None.<br><br>**Qualitative:**<br><br>**Petitioners –**<br><br>• None.<br><br>**DHS/USCIS –**<br><br>• None. | **Quantitative:**<br>**Petitioners-**<br><br>Online filing of Forms I-90, I-130, I-539 and I-765 would provide estimated annual cost savings of $29,974,655 to applicants. The societal cost savings would come about if more people opted to apply online as a result of the fee differential between online and paper that is introduced in this proposed rule.<br><br>**Qualitative:**<br>**Petitioners-**<br><br>• Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases. |

| | | | | |
|---|---|---|---|---|
| | | • Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)<br><br>• Form N-400, Application for Naturalization<br><br>• Form N-565, Application for Replacement Naturalization/Citizenship Document<br><br>• Form N-600, Application for Certificate of Citizenship<br><br>• Form N-600K, Application for Citizenship and Issuance of Certificate Under Section 322<br><br>• Form G-1041, Genealogy Index Search Request<br><br>• Form G-1041A, Genealogy Records Request | | **DHS/USCIS –**<br><br>• USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.<br><br>• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records would not be physically moved around to different adjudication offices.<br><br>• Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |
| 6. | **Form I-485, Application to Register Permanent Residence or Adjust Status** | • DHS is proposing separate filing fees for applicants filing Form I-765, Application for Employment Authorization, and Form I-131, Application for Travel Documentation concurrently with Form I-485, Application to Register Permanent Residence or Adjust | **Quantitative: Applicants-**<br>• This increase in the Form I-485 fee would result in approximately $22,860,810 in transfer payments annually from applicants filing I-485 (only) to USCIS.<br><br>• DHS estimates that requiring separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I- | **Quantitative: Applicants-**<br>• Not estimated.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• DHS believes that unbundling the fee for Form I-485 from Forms I-131 and I-765 would reduce the burden of |

|  |  |  | Status or after USCIS accepts their Form I-485 and while it is still pending.<br>• DHS is proposing that all applicants, including children under the age of 14 years concurrently filing Form I-485 with a parent, pay the full fee. | 485 would result in transfer payments from applicants to USCIS of $597,439,512 annually.<br>• DHS estimates transfer payments from applicants to USCIS of $19,339,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent.<br><br>**Qualitative: Applicants –**<br>• None.<br><br><br>**DHS/USCIS –**<br>• None. | administering separate fees and better reflect the cost of adjudication. |
| 7. | **Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • DHS proposes to separate the fee for Form I-131A, Application for Carrier Documentation, from other travel document fees. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS -**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Allows USCIS to assess the cost of providing services for this immigration benefit and propose better aligned fees in future fee reviews |
| 8. | **Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • DHS proposes to charge different fees for Form I-129, Petitioner for a Nonimmigrant Worker based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to | **Quantitative: Applicants –**<br>• The annual increase in transfer payments from Form I-129 visa classification petitions to USCIS is expected to be $273,101,915.<br><br>• The total costs of the Asylum Program fee to petitioners would be | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –** |

**538**     **Federal Register** / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

| | | | |
|---|---|---|---|
| | whether the petition includes named or unnamed beneficiaries.<br><br>• DHS also proposes to limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers.<br><br>• DHS is also proposing a new Asylum Program fee of $600 to be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Worker. | approximately $574,884,600 annually.<br><br>**DHS/USCIS –**<br>• Not estimated.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | • A benefit of the different fees for the Form I-129 classifications is that it would allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification.<br><br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |
| 9.   **Adjustments to Premium Processing** | • DHS is proposing to change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Qualitative: Applicants –**<br>• The additional days would increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated<br><br>**DHS/USCIS –**<br>• The additional days would increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS would have additional time to process petitions which would allow USCIS to avoid |

| | | | |
|---|---|---|---|
| | | | • suspending premium processing service as often as has recently been required when premium processing request volumes are high. |
| | | | • This change would enable USCIS to make premium processing more consistently available and expand this service to the newly designated classifications and categories allowed by the USCIS Stabilization Act. |
| | • Currently, DHS mandates separate payments to request premium processing services. Instead of mandating the separate payments, DHS proposes that USCIS *may* require premium processing service fees be paid in a separate remittance from other filing fees. <br><br>• DHS is also proposing to permit combined payments of the premium processing service fee with the remittance of other filing fees. | **Quantitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• None. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• None. | **Qualitative: Applicants and DHS/USCIS --** <br>• DHS has found in its application of the new premium processing regulations (87 FR 18260) that mandating a separate payment in all premium processing submissions may impose unnecessary burdens on petitioners, applicants, and DHS. Hence, not mandating a separate payment in all premium processing submissions reduces unnecessary burdens on petitioners, applicants, and DHS. |
| **10.  Intercountry Adoptions** | • DHS proposes to clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form | **Quantitative: Applicants-** <br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 would cost $ 215,590 annually. | **Quantitative: Applicants –** <br>• None. <br><br>**Qualitative: Applicants –** <br>• Limiting the fee increase helps to |

| | | |
|---|---|---|
| I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for a Form I-600A approval in an orphan case from 18 to 15 months to remove inconsistencies between Form I-600A approval periods and validity of the Federal Bureau of Investigation (FBI) background check.<br><br>• DHS is also proposing to create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600. | • The increase to the current fees for the existing adoption-related forms would result in transfer payments from applicants to USCIS of approximately \$ 246,060 annually.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS-**<br>• None. | reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates.<br><br>• These proposed changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>**DHS/USCIS –**<br>• Standardizes USCIS process and provides for the ability to collect a fee. |

|  |  |  | • Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
|---|---|---|---|
| **11. Immigrant Investors** | • DHS proposes to increase fees across the forms including Forms I-526/I-526E,[331] I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the EB-5 program. | **Quantitative: Applicants-**<br>• Annual transfer payments from EB-5 investors and regional centers to USCIS would be approximately $61,841,070 for Form I-526/526E, $18,751,425 for I-829, $5,681,000 for I-956, and $1,173,830 for I-956G.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. |
| **12. Changes to Genealogy Search and Records Requests** | • DHS proposes to revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• DHS also proposes to change the index search request process so that USCIS may provide requesters with digital records via email in response to | **Quantitative: Applicants-**<br>• Annual transfer payments from fee paying applicants of Forms G-1041, G-1041A and G-1566 to USCIS of $1,198,890.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>**DHS/USCIS –**<br>• Reduce costs for mailing, records processing, and storage |

**542**   **Federal Register** / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

| | | | |
|---|---|---|---|
| | the initial search request.<br>• DHS intends to lower the proposed fees for the online filing of Forms G-1041 and G-1041A to reflect the lower marginal costs to USCIS from online filing.<br>• DHS is proposing to charge a fee for requests for a Certificate of Non-Existence. | | costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |
| **13. Fees Shared by CBP and USCIS** | • DHS proposes to adjust fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP):<br>*Form I-192,* Application for Advance Permission to Enter as a Nonimmigrant<br>*Form I-193,* Application for Waiver of Passport and/or Visa<br>*Form I-212,* Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal<br>*Form I-824,* Application for Action on an Approved Application or Petition. | **Quantitative: Applicants-**<br>• Annual transfer payments of $12,705,970 from fee payers to USCIS.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• A single fee for each shared form would reduce confusion for individuals interacting with CBP and USCIS.<br><br>**DHS/USCIS –**<br>• None. |
| **14. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public** | • DHS is combining the current multiple fees charged for an individual or family into a single fee for each filing of Form | **Quantitative: Applicants-**<br>• Transfer payments of $1,529 annually from I-881 individual filers to USCIS. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative:** |

| | | | |
|---|---|---|---|
| **Law 105-100 [NACARA])** | I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, the Nicaraguan Adjustment and Central American Relief Act [NACARA]). | • $184 annually in transfer payments from USCIS to I-881 family applicants since this fee is less than the cost to adjudicate the application<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting.<br><br>• A Single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15. Fee Waivers** | • DHS proposes that fee waiver requests must be submitted only on the form prescribed by USCIS, which is the Request for Fee Waiver (Form I-912). | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• More simplified and streamlined system to process fee waivers. |
| **16. Fee Exemptions** | • DHS is proposing to provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries:[332]<br><br>• Victims of Severe Form of Trafficking (T Nonimmigrants) | **Quantitative: Applicants-**<br>• Transfer payment of approximately $106,821,450 annually from USCIS to the public.<br><br>**Qualitative: Applicants –**<br>• None. | **Quantitative: Applicants-**<br>• Average of $12,390,027 in cost savings to the public for no longer having to complete and submit Form I-912.<br><br>**Qualitative:** |

| | | |
|---|---|---|
| | • Victims of Qualifying Criminal Activity (U Nonimmigrants) <br> • VAWA Form I-360 Self-Petitioners and Derivatives <br> • Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty <br> • Abused Spouses and Children Adjusting Status under CAA and HRIFA <br> • Abused Spouses and Children Seeking Benefits under NACARA <br> • Abused Spouses and Children of LPRs or U.S. Citizens under INA Section 240A(b)(2) <br> • Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the ISAF (SI1 and SI2) <br> • Special Immigrant Juveniles (SIJs) <br> • Temporary Protected Status (TPS) <br> • Asylees <br> • Refugees <br> • Person Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | **DHS/USCIS –** <br> • DHS expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that would no longer require a fee waiver because they will be fee exempt | **Applicants -** <br> • Individuals who are unable to afford immigration benefit request fees would benefit from filing a request with no fees. <br><br> **DHS/USCIS –** <br> • None. |

| | | | |
|---|---|---|---|
| **17. Additional Fee Adjustments** | DHS proposes to increase fees for the following forms:<br><br>• I-90 (paper)<br>• I-102<br>• I-130 (paper)<br>• I-131<br>• I-140<br>• I-601<br>• I-612<br>• I-290B<br>• I-360<br>• I-539 (paper)<br>• I-601A<br>• I-687/I-690/I-694<br>• I-751<br>• I-765 (paper)<br>• I-817<br>• I-910<br>• I-929 | **Quantitative: Applicants-**<br>• Transfer payment from fee payers to USCIS of approximately $674,215,570 annually.<br><br>**Qualitative: Applicants –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. |
| **18. Adjusting USCIS Fees for Inflation** | • DHS proposes to use the CPI-U as the inflation index for fee adjustments between comprehensive fee rules. The actual impacts of such adjustments would be analyzed in a future rule should DHS exercise this proposed authority. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Qualitative: Applicants**<br>• None.<br><br>**Qualitative: DHS/USCIS –**<br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |
| Source: USCIS analysis.<br><br>Note: The dollar amounts in this table are undiscounted. | | | |

DHS has prepared a full analysis according to E.O. 12866 and E.O. 13563, which can be found in the docket for this rulemaking or by searching for RIN 1615–AC18 on *www.regulations.gov*. In addition to the impacts summarized above, Table 31 presents the accounting statement as required by Circular A–4.[333]

[331] Combines both Forms I–526, Immigrant Petition by Standalone Investor and I–526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

[332] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under proposed 8 CFR 106.2 for which DHS proposes to codify that there is no fee.

[333] OMB Circular A–4 is available at *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf* (last viewed on September 22, 2022).

**Table 31: OMB A-4 Accounting Statement ($ in millions, 2021; period of the analysis: FY 2023 through FY 2032)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The proposed changes in this rule would provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the Government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services which allows for better aligned fees.  Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules would allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation.<br><br>The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced re-applications for premium processing and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens. | | | Regulatory Impact Analysis (RIA) |
| **COSTS** | | | | |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$532 | | | RIA |
| Annualized quantified, but un-monetized, costs | N/A | | | |
| Qualitative (unquantified) costs | Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that would no longer require a fee waiver because they will be fee exempt.<br><br>Expanding the population of applicants using Form I-942 (reduced fee request) would increase the administrative burden on the agency to process these forms. | | | |
| **TRANSFERS** | | | | |

| | | |
|---|---|---|
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%) $1,612 | RIA |
| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%) $116 | RIA |
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%) $0.22 | RIA |
| ***Miscellaneous Analyses/Category*** | ***Effects*** | |
| ***Effects on state, local, and/or tribal governments*** | ***None*** | Preamble |
| ***Effects on small businesses*** | DHS does not believe that the increase in fees proposed in this rule would have a significant economic impact on a substantial number of small entities that file I-140, I-910, or I-360.

DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I-924) or Form I-956G (formerly I-924A).

DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G-1041 and G-1041A, to determine whether such filings were made by entities or individuals and thus unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Initial Regulatory Flexibility Analysis (IRFA) and Small Entity Analysis (SEA) |
| ***Effects on wages*** | ***None*** | None |
| ***Effects on Growth*** | ***None*** | None |

BILLING CODE 9111–97–C

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. DHS nonetheless welcomes comments regarding potential impacts on small entities, which DHS may consider as appropriate in a final rule.

In addition, the courts have held that the RFA requires an agency to perform an initial regulatory flexibility analysis (IRFA) of small entity impacts only when a rule directly regulates small entities. Below is a summary of the Small Entity Analysis (SEA). The complete detailed SEA[334] is available in the rulemaking docket at *https://www.regulations.gov.*

Individuals, rather than small entities, submit the majority of immigration and naturalization benefit applications and petitions, but this proposed rule would affect entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a small entity analysis for this proposed rule: Petition for a Nonimmigrant

[334] DHS, USCIS Small Entity Analysis (SEA) for the USCIS Fee Schedule Proposed Rule dated May 24, 2022.

Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–956, and the Regional Center Annual Statement, Form I–956GA.

DHS does not believe that the increase in fees proposed in this rule would have a significant economic impact on a substantial number of small entities that file I–140, I–910, or I–360. DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I–956 or Form I–956G.

DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and, thus, is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities.

DHS is publishing this IRFA to aid the public in commenting on the small entity impact of its proposed adjustment to the USCIS fee schedule. In particular, DHS requests information and data that would help to further assess the impact of the fee changes on the genealogy forms or the regional center forms on small entities.

1. Initial Regulatory Flexibility Analysis (IRFA)

a. A Description of the Reasons Why the Action by the Agency Is Being Considered

DHS proposes to adjust fees USCIS charges for certain immigration and naturalization benefits. DHS has determined that current fees would not recover the full costs of services provided. Adjustment to the fee schedule is necessary to recover costs and maintain adequate service.

b. A Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

DHS's objectives and legal authority for this proposed rule are discussed in the preamble.

c. Description and, Where Feasible, an Estimate of the Number of Small Entities to Which the Proposed Rule Would Apply

As noted above, below is a summary of the Small Entity Analysis (SEA). The complete detailed SEA is available in the rulemaking docket at *https:// www.regulations.gov.* The SEA has a full analysis of all samples for each small entity form described below, in the Initial Regulatory Flexibility Act Analysis.

Entities affected by this proposed rule are those that file and pay fees for certain immigration benefit applications and petitions on behalf of a foreign national. These applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; Form I–956 (formerly Form I–924), Application for Regional Center Designation Under the EB–5 Regional Pilot Program, and Form I–956G (formerly Form I–924A), Regional Center Annual Statement. Annual numeric estimates of the small entities impacted by this fee increase total (in parentheses): Form I–129 (75,269 entities), Form I–140 (17,417 entities), Form I–910 (382 entities), and Form I–360 (465 entities).[335] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities and; therefore, does not provide numeric estimates for Form I–956, Form I–956G, or Form G–1041 and G–1041A.[336]

This rule applies to small entities, including businesses, non-profit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140 would see a number of industry clusters impacted by this rule (see Appendix A of the Small Entity Analysis (SEA) for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360). The fee for civil surgeon designation would apply to physicians requesting such designation. The fee for Amerasian, widow(er), or special immigrants would apply to any entity

petitioning on behalf of a religious worker. Finally, DHS is creating these new forms as stated above, as part of the EB–5 Reform and Integrity Act of 2022. Since Form I–956/I–956G will be new forms and historical data does not exist; therefore, DHS will use historical data of the previous Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program and Form I–924A, Annual Certification of Regional Center as a proxy for the analysis. The Form I–956 would impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–956 is also Form I–956G, which regional centers must file annually to establish continued eligibility for regional center designation for each fiscal year.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[337] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS assumes genealogists have access to a computer and the internet. DHS is unable to estimate the online number of index searches and records requests; however, some will receive a reduced fee and cost savings, by filing online. Therefore, DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

1. Petition for a Nonimmigrant Worker, Form I–129

Funding the Asylum Program With Employer Form I–129 by Visa Classification Petition Fees

In this proposed rule, DHS proposes a new Asylum Program Fee of $600 be paid by any employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–140, Immigrant Petition for Alien Worker. Proposed 8 CFR 106.2(c)(13). DHS has determined that the Asylum Program

---

[335] Calculation: 86,715 Form I–129 * 86.8 percent = 75,269 small entities; 25,279 Form I–140 * 68.9 percent = 17,417 small entities; 428 Form I–910 * 89.3 percent = 382 small entities; 489 Form I–360 * 95.0 percent = 465 small entities.

[336] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

[337] *See Establishment of a Genealogy Program,* 73 FR 28026 (May 15, 2008).

Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers applications/petitioners. DHS determined the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I–129 and Form I–140 to collect the Asylum Processing IFR estimated annual costs.[338] The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay under USCIS' standard costing and fee

collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS is not separating Form I–129 into multiple forms in this proposed rule as it did in the 2020 fee rule, but it is taking that action separately as a revision of the currently approved Form I–129 information collection under the Paperwork Reduction Act. In this proposed rule, DHS proposes different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. The proposed fees are calculated to better reflect the costs

associated with processing the benefit requests for the various categories of nonimmigrant worker. The current base filing fee for Form I–129 is $460. DHS proposes separate H–2A and H–2B fees for petitions with named workers and unnamed workers.

In Table 32a, as stated above, the Asylum Program Fee of $600 would be included with each Form 1–129 Petition for a Nonimmigrant Worker classification. It would apply to all fee-paying receipts for Forms I–129, I–129CW, and I–140. For example, it would apply to all initial petitions, changes of status, and extensions of stay that use Form I–129.

BILLING CODE 9111–9–P

| Table 32a. USCIS Fees for Form I-129 Petition for Nonimmigrant Worker by Classification for FY 2022/2023 | | | | |
|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Current Fee** | **Proposed Fee** | **Asylum Program Fee** | **Total Proposed Fee** |
| H-1B | $460 | $780 | $600 | $1,380/$1,595[339] |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 |
| O-1/O-2 | $460 | $1.055 | $600 | $1,655 |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 |
| CW, H-3, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 |

Source: *See* sections II.C., Summary of Current and Proposed Fees, and V.B.4., Funding the Asylum Program with Employer Petition Fees of the NPRM, of this preamble.

Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.

For petitioners filing Form I–129, DHS proposes increasing the fee filed for all worker types. The fee adjustments and percentage increases are summarized, shown in Table 32b. For petitioners filing Form I–129, DHS proposes increasing the fee filed for all worker types. The fee adjustments and

percentage increases are summarized below. H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Non-cap subject petitions (*e.g.*, extension petitions or cap-exempt filer petitions) would not have to pay the registration fee. This

registration fee is added to the fee increase and results in an overall increase for cap-subject H–1B classification petitions of $920 ($215 + $705).

---

[338] DHS acknowledges that, by using the middle of the range of costs, if actual costs are higher than that, then the USCIS fee schedule will be set at a level that is less than what will be required to recover all of the costs added by the Asylum Processing IFR, all other factors remaining the same. Estimated annual costs of the Asylum Processing IFR (mid-range estimate): FY 2022 total costs of $438.2 million plus FY 2023 total costs of $413.6 million equals $851.8. Average total costs of FY 2022/2023 equal $425.9 million. That figure represents the estimated costs that are directly attributable to the implementation of that rule.

[339] USCIS in this SEA used the H–1B, Petition for Nonimmigrant Worker: H–1B Classification fee of

$1,595 = The fee includes the $1,380 proposed for H–1B Classification + $215 initial mandatory for cap-subject H–1B Registration Fee (current $10 to proposed $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H–1B registration fee for each beneficiary before beng eligible to submit a registration for that beneficiary for the H–1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H–1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the

$1,380 propoosed fee. *See Registration Fee Requirement for Petitioners Seeking to File H–1B Petitions on Behalf of Cap Subject Aliens, Final Rule* (84 FR 60307, November 8, 2019). Available at *https://www.govinfo.gov/content/pkg/FR-2019-11-08/pdf/2019-24292.pdf. See* Regulatory Impact Analysis in the docket on regulations.gov, section (3)(H), Separate Fees, for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition, Table 22 and 23, for further detail on the cap and non-cap H–1B petitions.

| Table 32b. USCIS Fees for Form I-129 Classifications for FY 2022/2023 | | | | |
| --- | --- | --- | --- | --- |
| **Visa Classification Immigration Benefit Request** | **Current Fee** | **Total Proposed Fee** | **Difference in Fee Increase** | **Percent Change** |
| H-1B | $460 | $1,380/$1,595[340] | $920/$1,135 | 200%/247% |
| H-2A – Named Beneficiaries | $460 | $1,690 | $1,230 | 267% |
| H-2B – Named Beneficiaries | $460 | $1,680 | $1,220 | 265% |
| H-2A – Unnamed Beneficiaries | $460 | $1,130 | $670 | 146% |
| H-2B – Unnamed Beneficiaries | $460 | $1,180 | $720 | 157% |
| O-1/O-2 | $460 | $1,655 | $1,195 | 260% |
| L-1A/L-1B/LZ Blanket | $460 | $1,985 | $1,525 | 332% |
| CW, H-3, E, TN, Q, P, and R | $460 | $1,615 | $1,155 | 251% |

Source: *See* sections II.C., Summary of Current and Proposed Fees, and V.B.4., Funding the Asylum Program with Employer Petition Fees of the NPRM, of this preamble.

Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.

To calculate the impact of this increase, DHS estimated the total costs associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity.[341] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall increase for H–1B classification petitions of $920 ($215 + $705). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Based on the proposed fee increases for Form I–129, this will amount to average impacts on all 353 small entities with revenue data as summarized in Table 32c.[342] DHS determined that 289 of the 353 entities searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule.[343]

[340] USCIS in this SEA used the H–1B, Petition for Nonimmigrant Worker: H–1B Classification fee of $1,595 = The fee includes the $1,380 proposed fee for H–1B Classification + $215 initial mandatory for cap-subject H–1B Registration Fee (current $10 to proposed $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H–1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H–1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H–1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $1,380 propoposed fee. *See Registration Fee Requirement for Petitioners Seeking to File H–1B Petitions on Behalf of Cap Subject Aliens, Final Rule* (84 FR 60307, November 8, 2019). Available at *https://www.govinfo.gov/content/pkg/FR-2019-11-08/pdf/2019-24292.pdf. See Regulatory Impact Analysis in the docket on regulations.gov, section (3)(H), Separate Fees, for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition, Table 22 and 23, for further detail on the cap and non-cap H–1B petitions.

[341] Total Impact to Entity = (Number of Petitions Submitted per Entity × $X Amount of Fee Increase)/ Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[342] Random sample of small entities with revenue data selected to estimate impacts is described in Table 1 of the SEA.

[343] Entities that were considered small based on employee count with missing revenue data were excluded.

| Table 32c: Form I-129 Classifications Economic Impacts on Small Entities with Revenue Data | | |
| --- | --- | --- |
| **Visa Classification Immigration Benefit Request** | **Fee Increase** | **Average Impact Percentage\*** |
| H-1B | $920/$1,135** | 0.66/0.73% |
| H-2A – Named Beneficiaries | $1,230 | 0.37% |
| H-2B – Named Beneficiaries | $1,220 | 0.75% |
| H-2A – Unnamed Beneficiaries | $670 | 0.37% |
| H-2B – Unnamed Beneficiaries | $720 | 0.75% |
| L-1A/L-1B/LZ Blanket | $1,525 | 0.42% |
| O-1/O-2 | $1,195 | 0.57% |
| CW, H-3, E, TN, Q, P, and R | $1,155 | 0.25% |

Source: USCIS calculation.

Note: There is no distinction between named and unnamed beneficiaries. Each average impact percentage calculation for H-2A—Named Beneficiaries required assuming each H-2A request is for named beneficiaries while each average impact percentage calculation for H-2A—Unnamed Beneficiaries required assuming that each H-2A request is for unnamed beneficiaries. The same process applied to H-2B requests.

Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.

\*These figures are percentages, not proportions.

\*\*$920 includes the fee increase ($705) and the increase in registration fee for H-1B cap-subject petitions ($215).

BILLING CODE 9111–97–C

Using a 12-month period of data on the number of Form I–129 petitions filed from October 1, 2019, through September 31, 2020, DHS collected internal data for each filing organization including the name, Employer Identification Number (EIN), city, state, zip code, and number/type of filings. Each entity may make multiple filings. For instance, there were receipts for 553,889 Form I–129 petitions, but only 86,715 unique entities that filed those petitions. Since the filing statistics do not contain information such as the revenue of the business, DHS used third-party sources of data to collect this information. DHS used a business provider database—Data Axle—as well as three open-access databases—Manta, Cortera, and Guidestar—to help determine an organization's small entity status and then applied Small Business Administration (SBA) size standards to the entities under examination.[344]

The method DHS used to conduct the SEA was based on a representative sample of the impacted population with respect to each form. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 384 entities, which included using a 95 percent confidence level and a 5 percent confidence interval for a population of 86,715 unique entities filing Form I–129 petitions. Based on previous experience conducting small entity analyses, DHS expects to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 69 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 650 randomly selected entities from a population of 86,715 unique entities that filed Form I–129 petitions.

Of the 650 searches for small entities that filed Form I–129 petitions, 439 searches returned a successful match of a filing entity's name in one of the databases and 211 searches did not match a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing entities not found in the online database are likely to be small entities. As a result, to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 439 matches for Form I–129, DHS determined 353 to be small entities based on revenue or employee count and according to their assigned North American Industry Classification System (NAICS) code. Therefore, DHS was able to classify 564 of 650 entities

as small entities that filed Form I–129 petitions, including combined non-matches (211), matches missing data (0), and small entity matches (353). Using the online databases mentioned above (Data Axle, Manta, Cortera, and Guidestar), the 0 matches missing data found in the databases lacked applicable revenue or employee count data.

DHS determined that 564 of 650 (86.8 percent) of the entities filing Form I–129 petitions were small entities. Furthermore, DHS determined that 353 of the 650 entities searched were small entities based on sales revenue or employee data, which were needed to estimate the economic impact of the proposed rule. Since these 353 small entities were a subset of the random sample of 650 entity searches, they were considered statistically significant in the context of this research. To calculate the economic impact of this rule, DHS estimated the total costs associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity.[345]

Among the 353 matched small entities, 289 small entities had reported revenue data, 90.4 percent experienced

[344] Office of Advocacy, SBA, Size Standards Table. Available at *https://www.sba.gov/document/support--table-size-standards.*

[345] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity * $X Amount of Fee Increase)/Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided. Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

an economic impact of less than 1 percent with the exception of 9.6 of the small entities. Those small entities with greater than 1 percent impact filed multiple petitions and had a low reported revenue. Therefore, these small entities may file fewer petitions as a result of this proposed rule. Depending on the immigration benefit request, the average impact on all 289 small entities with revenue data ranges from 0.25 to 0.75 percent as shown above in Table 29c. In other words, no matter which version of the separated Form I–129 is applicable, the greatest economic impact proposed by this fee change was 19.04 percent and the smallest was 0.005 percent per entity. The average impact on all 289 small entities with revenue data was 0.57 percent.

Small Entity Classifications

With an aggregated total of 564 out of a sample size of 650, DHS inferred that a majority, or 86.8 percent, of the entities filing Form I–129 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit. The NAICS code 611 (Educational Services) may have for-profit entities. Most of the sample consisted of small businesses when looked at by type of small entity. There are no small governmental jurisdictions in the sample and 38 small not-for-profits.

2. Immigrant Petition for an Alien Worker, Form I–140

Funding the Asylum Program With Form I–140 Petition Fees

As explained in section X.B.1., Petition for a Nonimmigrant Worker, Form I–129 Funding the Asylum Program with Employer Form I–129 by Visa Classification Petition Fees, DHS proposes a new Asylum Program Fee of $600 to be paid by any Form I–140, Immigrant Petition for Alien Worker. This Asylum Program Fee adds a fee for Form I–140 petitioners of $600 while maintaining the fees other immigration benefit requestors that this rule proposes lower than would be proposed

if the costs were spread among all other fee payers. For example, by charging the Asylum Program Fee to I–140 petitioners as well as the I–129 petitioners, it helps recover the cost of the Asylum Program work while minimizing fee increases on forms that do not recover full cost (Forms N–400, I–600, I–800, etc.), or without adding a fee to forms that currently have none (Forms I–589, I–590, I–914, I–918, etc.). If Forms I–129 and I–140 recover more of those costs, then that means other forms need not recover as much. This results in lower proposed fees for certain forms, and others that recover more than full cost in this proposal. It would apply to all fee-paying receipts for Form I–140 and Form I–129.

DHS proposes to increase the fee to file Immigrant Petition for an Alien Worker, Form I–140, from $700 to $715, an increase of $15 (2 percent). The total proposed fee would include the $600 Asylum Program Fee for a total of $1,315, an overall increase of $615 (88 percent) per petition. Using a 12-month period of data on the number of Form I–140 petitions filed from October 1, 2019, through September 31, 2020, DHS collected internal data similar to that of Form I–129. The total number of Form I–140 petitions was 129,531, with 25,279 unique entities that filed petitions. DHS used the same databases previously mentioned to search for information on revenue and employee count.

DHS used the same method as with Form I–129 to conduct the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 383 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 25,279 unique entities for Form I–140 petitions. Based on previous experience conducting small entity analyses, DHS expected to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 44 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 550 randomly selected entities from a population of 25,279 unique entities that filed Form I–140 petitions.

Of the 550 searches for small entities that filed Form I–140 petitions, 464 searches successfully matched the name of the filing entity to names in the databases and 86 searches did not match

the name of a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing entities not found in the online databases are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 464 matches for Form I–140, DHS determined 292 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 379 of 550 entities as small entities that filed Form I–140 petitions, including combined non-matches (86), matches missing data (1), and small entity matches (292). Using the online databases mentioned above (Data Axle, Manta, Cortera, and Guidestar), one matched revenue found in the databases lacked applicable revenue statistics.

DHS determined that 379 out of 550 (68.9 percent) entities filing Form I–140 petitions were small entities. Furthermore, DHS determined that 292 of the 550 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since these 292 were a small entity subset of the random sample of 550 entity searches, they were considered statistically significant in the context of this research based on sales revenue information. Similar to Form I–129, DHS calculated the economic impact of this rule on entities that filed Form I–140 by estimating the total costs associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity.[346]

Among the 292 small entities with reported revenue data, 98 percent experienced an economic impact of less than 1 percent, with the exception of 2 percent of the small entities. Using the above methodology, the greatest economic impact proposed by this fee change was 2.71 percent and the smallest was 0.006 percent per entity. Because of the fee increase, these small entities would see a cost increase per application in filing fees based on petitions. The average impact on all 292 small entities with revenue data was 0.16 percent.

Small Entity Classification

With an aggregated total of 379 out of a sample size of 550, DHS inferred that

---

[346] Total Impact to Entity = (Number of Petitions Submitted per Entity * $615 Fee amount Increase)/ Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

a majority, or 68.9 percent, of the entities filing Form I–140 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit. The NAICS code 611 (Educational Services) may have for-profit entities. Similar to the Form I–129 small entity types, the sample of Form I–140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 15 small not-for-profits.

Cumulative Impact of Form I–129 and Form I–140 Petitions

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine if there were any impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN and revenue. Only 1 entity had an EIN that overlapped in both samples; this was a large entity that submitted 3 Form I–129 petitions and 1 Form I–140 petition. Due to little overlap in entities in the samples, and the relatively minor impacts on revenue of fee increases of Forms I–129 and I–140, USCIS does not expect the combined impact of these 2 forms to be an economically significant burden on a number of small entities.

3. Civil Surgeon Designation, Form I–910

DHS proposes to increase the fee for Civil Surgeon Designations, Form I–910, from $785 to $1,230, an increase of $445 (57 percent). To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[347] Using a 12-month period of data from October 1, 2019, to September 31, 2020,[348] DHS collected internal data on filings of Form I–910. The total number of Form I–910 applications was 639, with 428 unique entities that filed applications. The third-party databases mentioned previously were used again to search for revenue and employee count information.

Using the same methodology as for the Forms I–129 and I–140, USCIS conducted the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 203 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 428 unique entities for Form I–910. USCIS conducted searches on 300 randomly selected entities from a population of 428 unique entities for Form I–910 petitions, a sample size approximately 48-percent larger than the minimum necessary.

Of the 300 searches for small entities that filed Form I–910 petitions, 244 searches successfully matched the name of the filing entity to names in the databases and 56 searches did not match the name of a filing entity. DHS assumes filing entities not found in the online databases are likely to be small entities. DHS also considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 244 matches for Form I–910, DHS determined 207 to be small entities based on their revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 268 of 300 entities as small entities that filed Form I–910 petitions, including combined non-matches (5), matches missing data (56), and small entity matches (207). DHS also used the online databases mentioned above (Data Axle, Manta, Cortera, and Guidestar), and the five matches missing data that were found in the databases lacked revenue data and associated employment threshold.

DHS determined that 268 out of 300 (89.3 percent) entities filing Form I–910 applications were small entities. Furthermore, DHS determined that 207 of the 300 entities searched were small

entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since these 207 were a small entity subset of the random sample of 300 entity searches, they were considered statistically significant in the context of this research, based on sales revenue information.

Similar to the Forms I–129 and I–140, DHS calculated the economic impact of this rule on entities that filed Form I–910 by estimating the total impact associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity. Among the 207 small entities with reported revenue data, 97.6 percent experienced an economic impact considerably less than 1 percent, with the exception of 2.4 percent of the small entities. The greatest economic impact imposed by this proposed fee change was 1.85 percent and the smallest was 0.004 percent per entity. The average impact on all 207 small entities with revenue data was 0.15 percent. The increased fee will increase individual applicants' cost by $445.

Small Entity Classification

With an aggregated total of 268 out of a sample size of 300, DHS inferred that a majority, or 89.3 percent, of the entities filing Form I–910 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit. The NAICS code 611 (Educational Services) may have for-profit entities. The sample of Form I–910 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 5 small not-for-profits.

4. Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS proposes to increase the fee for entities petitioning on behalf of foreign religious workers who file using Form I–360 from $435 to $515, an increase of $80 (18 percent), including entities who petition on behalf of foreign religious workers. To calculate the impact of the increase, DHS estimated the total costs

---

[347] Total Impact to Entity = (Number of Petitions Submitted per Entity * $445 Fee Amount Increase) Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

[348] DHS acknowledges the broad effects of the COVID–19 international pandemic on the United States and the populations affected by this rule. However, while most forms were impacted as a result of COVID, Form I–129 receipts increased in line with recent years. Thus, we decided to use the most recent fiscal year data from FY 20 for the samples to complete the supplemental Small Entity Analysis to maintain consistency across IRFAs regardless of the general effect of COVID–19 on filings, because that effect is not applicable to the forms discussed in this section.

associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[349]

Using a 12-month period of data on the number of Form I–360 petitions filed from October 1, 2019, to September 31, 2020, DHS collected internal data on filings of Form I–360 for religious workers. The total number of Form I–360 petitions was 2,388, with 489 unique entities that filed petitions. DHS used the same databases mentioned previously to search for information on revenue and employee count.

DHS used the same method as with Forms I–129 and I–140 to conduct the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 215 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 489 unique entities for Form I–360 petitions. To account for missing organizations in the online subscription and public databases, DHS selected a sample size that was approximately 95 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 420 randomly selected entities from a population of 489 unique entities that filed Form I–360 petitions.

Of the 420 searches for small entities that filed Form I–360 petitions, 248 searches successfully matched the name of the filing entity to names in the databases and 172 searches did not match the name of a filing entity in the databases. DHS assumes that filing entities not found in the online databases are likely to be small entities. As a result, to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 248 matches for Form I–360, DHS determined 208 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 399 of 420 entities as small entities that filed Form I–360 petitions, including combined non-matches (172), matches missing data (19), and small entity matches (208). DHS also used the online databases mentioned above (Data Axle, Manta, Cortera, and Guidestar), and the 19 matches missing data that

were found in the databases lacked revenue or employee count data.

DHS determined that 399 out of 420 (95.0 percent) entities filing Form I–360 petitions were small entities. Furthermore, DHS determined that 208 of the 420 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since these 208 small entities were a subset of the random sample of 420 entity searches, they were considered statistically significant in the context of this research.

Similar to other forms analyzed in this IRFA, DHS calculated the economic impact of this rule on entities that filed Form I–360 on behalf of religious workers by estimating the total costs associated with the proposed fee increase for each entity. Among the 208 small entities with reported revenue data, 99.5 percent experienced an economic impact of less than 1 percent, with the exception of 0.5 percent of the small entities. The greatest economic impact imposed by this proposed fee change was 4.11 percent and the smallest was 0.0008 percent per entity. The average impact on all 208 small entities with revenue data was 0.08 percent.

DHS also analyzed the proposed costs of this rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA's Office of Advocacy indicate that the impact of a rule could be significant if cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[350] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $57,230 for clergy,[351] $52,880 for directors of religious activities and education,[352] and $43,290 for other religious workers.[353] Based on an average of 1.59 religious workers[354]

petitioned for per entity, the additional average annual cost would be $127.20 per entity.[355] The additional costs per entity proposed by this rule represent only 0.22 percent of the average annual salary for clergy, 0.24 percent of the average annual salary for directors of religious activities and education, and 0.29 percent of the average annual salary for all other religious workers.[356]

Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that a large majority, or 95.0 percent, of the entities filing Form I–360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit. The NAICS code 611 (Educational Services) may have for-profit entities. The sample of Form I–360 consists of a majority not-for-profit entities, primarily composed of religious institutions. There were no small governmental jurisdictions in the sample and 221 small not-for-profits.

5. Genealogy Requests—Genealogy Index Search Request, Form G–1041, and Genealogy Records Request, Form G–1041A

In this proposed rule, DHS establishes an increase in the fee for the Genealogy Index Search Request, Form G–1041, from $65 to $120, an increase of $55 (85 percent) for those who mail in this request on paper. This proposed rule increases the fee for requestors who use the online electronic Form G–1041 version from the current $65 to $100, an increase of $35 (54 percent).

In this proposed rule, DHS establishes a fee for Form G–1041A that would increase from $65 to $260, an increase of $195 (300 percent) for those who mail

---

[349] Total Impact to Entity = (Number of Petitions Submitted per Entity * $80 Fee Amount Increase)/ Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

[350] Office of Advocacy, Small Business Administration "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," page 19: Available at *https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf*.

[351] BLS, "Occupational Employment Statistics, May 2021, "Clergy": *https://www.bls.gov/oes/2021/may/oes212011.htm*.

[352] BLS, "Occupational Employment Statistics, May 2021, "Directors of Religious Activities and Education": Available at *https://www.bls.gov/oes/2021/may/oes212021.htm*.

[353] BLS, "Occupational Employment Statistics, May 2021, "Religious Workers, All Other": Available at *https://www.bls.gov/oes/2021/may/oes212099.htm*.

[354] USCIS calculated the average filing per entity of 1.6 religious, from the Form I–360 Sample with Petition Totals in Appendix E of the SEA for this NPRM. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–

360 petitions) = 667/420 = 1.59 average petitions filed per entity.

[355] Calculation: 1.59 average petitions per entity * $80 increase in petition fees = $127.20 additional total cost per entity.

[356] Calculation: $127.20 additional cost per entity/$57,230 clergy salary × 100 = 0.22 percent; $127.20 additional cost per entity/$52,880 directors of religious activities and education × 100 = 0.24 percent; $127.20 additional cost per entity/$43,290 other religious workers × 100 = 0.29 percent.

AR_000153

in this request on paper. In this proposed rule, the fee for requestors who use the online electronic Form G–1041A will increase from the current $65 to $240, an increase of $175 (269 percent).

Finally, DHS is proposing to charge a fee for requests for a Certificate of Non-Existence. Currently, USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. USCIS operates the Certificate of Non-Existence request process informally and at no cost to individuals while absorbing the costs to provide this service.[357] DHS proposes a fee of $315 for individuals to recover the estimated full cost of processing these requests, which will require submission of Form G–1566, Request for a Certificate of Non-Existence, once approved by OMB.

The population affected by this provision includes individuals who use Form G–1041 to request a search of USCIS historical indices and individuals who use Form G–1041A to obtain copies of USCIS historical records found through an index request.

---

[357] See 8 CFR 103.7(f) as of October 1, 2020, which provides that the Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

The affected population also includes individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. Based on the DHS records, Table 33 shows the estimated number of genealogy index search requests and historical records requests that were submitted to USCIS using Forms G–1041 and G–1041A for FY 2016 through FY 2020. DHS estimates that an annual average of 5,250 Form G–1041 index search requests and 3,352 Form G–1041A records requests were received during that time. For both forms, more than 90 percent of the requests were submitted electronically.

**BILLING CODE 9111–97–P**

**Table 33. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2016 through FY 2020**

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2016 | 321 | 5,192 | 5,513 | 94% |
| 2017 | 274 | 3,036 | 3,310 | 92% |
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| **5-year Total** | **1,359** | **24,889** | **26,248** | |
| **5-year Annual Average** | **272** | **4,978** | **5,250** | 95% |
| | **Form G-1041A (Paper Filing)** | **Form G-1041A (Online Filing)** | **Total** | **Percentage Filed Online** |
| 2016 | 290 | 2,220 | 2,510 | 88% |
| 2017 | 364 | 2,262 | 2,626 | 86% |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 33 | 3,407 | 3,440 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| **5-year Total** | **1,329** | **15,429** | **16,758** | |
| **5-year Annual Average** | **266** | **3,086** | **3,352** | 92% |
| | **Certificate of Non-Existence Form G-1566** | | | |
| 2016 | 679 | | | |
| 2017 | 909 | | | |
| 2018 | 1,442 | | | |
| 2019 | 1,516 | | | |
| 2020 | 1,784 | | | |
| **5-year Total** | **6,330** | | | |
| **5-year Annual Average** | **1,266** | | | |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB). August 19, 2021.
Note: IRIS tracks the online percentage of index searches and records requests.

BILLING CODE 9111–97–C

Table 33 depicts the FY 2016 through FY 2020 filing receipts of the certificate of non-existence. DHS bases the estimate for the Form G–1566 on these receipts and estimates that the average annual receipts for Form G–1566 would be approximately 1,266.

DHS has previously determined that requests for historical records are usually made by individuals.[358] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS assumes genealogists have access to a computer and the internet. DHS is unable to estimate the online number of index searches and records requests; however, some will receive a reduced fee and cost savings, by filing online. Therefore, DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests. However, DHS must still recover the full costs of this program. As stated in the preamble to this proposed rule, reducing the filing fee for any one benefit request submitted to DHS simply transfers the additional cost to process this request to other immigration and naturalization filing fees.

For this proposed rule, DHS is expanding the use of electronic genealogy requests to encourage requestors to use the electronic versions of Form G–1041 and Form G–1041A. DHS is also changing the search request process so that USCIS may provide requestors with electronic records, if they exist, in response to the initial index request. These changes may reduce the time it takes to request and receive genealogy records, and, in some cases, it will eliminate the need to make multiple search requests and submit separate fees. Moreover, DHS notes that providing digital records in response to a Form G–1041 request may reduce the number of Form G–1041A requests that

[358] *See Establishment of a Genealogy Program*, 73 FR 28026 (May 15, 2008).

will be filed since there would already be a copy of the record if it was previously digitized. DHS proposes to provide the requestor with those preexisting digital records, if they exist, via email in response to the initial search request. Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requestor data into its systems. Requestors that cannot submit the forms electronically may still submit paper copies of both forms with the required filing fees. DHS recognizes that some small entities may be impacted by these proposed increased fees but cannot determine how many or the exact impact. DHS requests comments from the public on the impacts to small entities of the proposed fee increases to the genealogy forms.

6. Application for Regional Center Designation Under the EB–5 Regional Center Pilot Program, Form I- 956 (Formerly Form I–924) and I–956G (Formerly Form I–924A)

Congress created the EB–5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB–5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). As amended, the EB–5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,00 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. *See* INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5); 8 U.S.C. 11538 U.S.C. 1153. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 5, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117–103). The EB–5 Reform and Integrity Act of 2022 immediately repealed the Regional Center (RC) Pilot Program created by the Departments of Commerce, Justice, and State, the

Judiciary, and Related Agencies Appropriations Act 1993, Public Law 102–395, 106 Stat. 1828, sec. 610(b). The law also authorizes a new EB–5 Regional Center Program, which will become effective May 14, 2022 and is authorized through FY 2026 and makes various changes to the program. As discussed more fully in section VIII.N. of the NPRM, DHS proposes new fees for the forms used in the EB–5 program in this proposed rule.

DHS proposes changes to various fees for regional centers and related immigration benefit requests related to Employment-Based Immigrant Visa, Fifth Preference (EB–5). The EB–5 Reform and Integrity Act of 2022 immediately repealed and replaced the prior EB–5 ''regional center program.'' The EB–5 Reform and Integrity Act of 2022 has no immediate impact on the staffing levels of the USCIS Immigrant Investor Program Office, although each existing Regional Center will be required to submit a request to be re-approved under the law, which could greatly increase the program workload initially. Nevertheless, and despite the changes in the law and program, DHS has proposed fees in this rule based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB–5 Reform and Integrity Act of 2022. Thus, the annual filing volume projections in this rule are based on historical volumes and trends because the EB–5 Reform and Integrity Act of 2022 is too new for DHS to accurately estimate its impacts on filing volumes. DHS welcomes comments from the public on the number of forms for the EB–5 program that will be submitted annually and how that number will be changed by the recent legislation. DHS may adjust the estimated filing volumes in the final rule based on additional analysis and comments on this rule.

DHS is proposing a fee for Form I–956, Application for Regional Center Designation, is $47,695 a $29,900 (168 percent) increase from the $17,795 fee for Form I–924, Application for Regional Center Designation under the Immigrant Investor Program. *See* 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(64). DHS also proposes a $47,695 fee for Form I–956F, Application for Approval of Investment in a Commercial Enterprise, because its adjudicative burden is nearly identical to that of the Form I–956. The proposed fee for Form I–956G, Regional Center Annual Statement, is $4,470, a $1,435 (47 percent) increase from the current $3,035 fee for Form I–924A, Annual

Certification of Regional Center. *See* 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(66). The EB–5 program encompasses Forms I–526, I–829, I–956, I–965F, and I–956G.[359]

DHS is creating these new forms as stated above, as part of the EB–5 Reform and Integrity Act of 2022. Since Form I–956/I–956A will be new forms and historical data does not exist. Because the immigration benefit adjudications previously performed using Form I–924 will now be administered using Forms I–956 and I–956G, DHS will use historical data of the previous Form I–956 (formerly Form I–924) Application for Regional Center Designation and Form I–956G (formerly Form I–924A), Annual Certification of Regional Center as a proxy for the analysis. Under the Regional Center Program, foreign nationals based their EB–5 petitions on investments in new commercial enterprises located within ''regional centers.'' DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. *See* 8 CFR 204.6(e). Requests for regional center designation must be filed with USCIS on Form I–956 (formerly Form I–924), Application for Regional Center Designation Under the Immigrant Investor Program. *See* 8 CFR 204.6(m)(3) and (4). Once designated, regional centers must provide USCIS with updated information to demonstrate continued eligibility for the designation by submitting Form I–956G (formerly Form I–924A), Annual Certification of Regional Center on an annual basis or as otherwise requested. *See* 8 CFR 204.6(m)(6)(i)(B).

The application process would require the same information from applicants that is currently required. As shown in Table 34, during the 5-year period from FY 2016 through FY 2020, USCIS received a total of 951 annual Form I–956 (formerly Form I–924) regional centers applications and 4,091

---

[359] The Supplement to Form I–956G is used to certify a Regional Center's continued eligibility for the Regional Center designation through an annual certification. Each designated Regional Center entity must file a Form I–956G for each fiscal year within 90 days after the end of the fiscal year of the calendar year in which the fiscal year ended. DHS has also created Forms I–956H, Bona Fides of Persons Involved in Regional Center Program, and I–956K Registration for Direct and Third-Party Promoters, for the new EB–5 program. DHS proposes no fee for those forms in this proposed rule.

Form I–956G (formerly Form I–924A)

annual statements, with annual averages 190 and 818 respectively.

| **Table 34. Annual Receipts for Form I-956, Application For Regional Center Designation Under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2016 through FY 2020** | | |
|---|---|---|
| **Fiscal Year** | **Form I-956\*** | **Form I-956G\*\*** |
| 2016 | 436 | 863 |
| 2017 | 280 | 843 |
| 2018 | 122 | 887 |
| 2019 | 79 | 820 |
| 2020 | 34 | 678 |
| **5-year Total** | **951** | **4,091** |
| **5-year Annual Average** | **190** | **818** |

\*Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, May 5, 2021.

\*\*Source: USCIS, Immigrant Investor Office (IPO), INFACT database, January 6, 2022.

Note: I-956G are the annual statements to be submitted by these approved regional centers.

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking investor funds to NCEs and job-creating projects or entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above-market return differentials.

While DHS attempted to treat regional centers similar to the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB–5

program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $500,000 if the investment is in a TEA project, which includes certain rural areas and areas of high unemployment, or $1 million for a non-TEA project per investor, in a U.S. business that will create or preserve at least 10 full-time jobs in the United States for qualifying employees) [360] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I–956 (formerly Form I–924) and I–956G (formerly Form I–924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions in an attempt to analyze the small entity status of regional centers. In the DHS proposed rule ''EB–5 Immigrant Investor Program Modernization,'' DHS analyzed estimated administrative fees and revenue amounts for regional centers.[361] DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be

[360] U.S. Department of Homeland Security, USCIS—EB–5 Immigrant Investor Program Modernization, Proposed rule. *See* 84 FR 35750 (July 24, 2019). Available at *https://www.govinfo.gov/content/pkg/FR-2019-07-24/pdf/2019-15000.pdf.* This amount by investor is determined between a designated Target Employment Area and non-Target Employment Area.

[361] Id.

$1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this proposed rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[362]

DHS welcomes comments from the public on the impacts to small entities of the proposed fee increases to Form I–956G (formerly Form I–924A) and requests information from the public on data sources on the average revenues collected by regional centers in the form of administrative fees and the extent to which regional centers may pass along the fee increases to the individual investors.

d. A description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirement and the types of professional skills necessary for preparation of the report or record.

The proposed rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Form I–129, I–140, I–910, I–360, G–1041, G–1041A, I–956 (formerly Form I–924), or I–956G (formerly I–924A). The proposed rule does not require any new professional skills for reporting.

e. An identification, to the extent practical, of all relevant Federal rules that may duplicate, overlap, or conflict with the proposed rule.

DHS is unaware of any duplicative, overlapping, or conflicting Federal rules, but invites any comment and information regarding any such rules.

f. Description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and that minimize any significant economic impact of the proposed rule on small entities, including alternatives considered as:

[362] Calculation: 1 percent of $447,000 = $4,470 (the new fee for Form I–956G; formerly Form I–924A).

(1) Establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) Clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) Use of performance rather than design standards; and

(4) Any exemption from coverage of the rule, or any part thereof, for such small entities.

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigrant applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees that are collected for other immigration benefits. Without an adjustment in fees, USCIS would not be able to sustain the current level of service for immigration and naturalization benefits. While most immigration benefit fees are paid by individuals, as described above, some also are paid by small entities. USCIS seeks to minimize the impact on all parties, and in particular small entities. An alternative to the increased economic burden of the proposed rule is to maintain fees at their current level for small entities. The strength of this alternative is that it assures no additional fee burden is placed on small entities; however, this alternative also would cause negative impacts to small entities.

Without the fee adjustments proposed in this proposed rule, significant operational changes would be necessary in order for USCIS to provide current immigration and naturalization benefits to the public. These changes would include reductions in Federal and contract staff, infrastructure spending on information technology and facilities, travel, and training. Depending on the actual level of workload received, these operational changes could result in longer application processing times, a degradation in service to applicants and petitioners, and reduced efficiency over time. DHS is therefore not proposing to exempt small entities from the fee increases outlined in this proposed rule.

g. Questions for Comment to Assist Regulatory Flexibility Analysis.

• DHS seeks comment on the numbers of small entities that may be impacted by this proposed rulemaking.

• DHS seeks comment on any or all of the provisions in the proposed rule with regard to the economic impact of

this proposed rule, paying specific attention to the effect of the rule on small entities in light of the above analysis, as well as the full small entity analysis on regulations.gov.

• DHS seeks comment on any significant alternatives DHS should consider in lieu of the changes proposed by this proposed rule.

• DHS seeks ways in which the rule could be modified to reduce burdens for small entities consistent with the Immigration and Nationality Act and the Chief Financial Officers Act requirements.

• Please identify all relevant Federal, State, or local rules that may duplicate, overlap, or conflict with the proposed rule.

### C. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.[363]

While this proposed rule is expected to exceed the $100 million in 1995 expenditure in any one year when adjusted for inflation ($178 million in 2021 dollars based on the Consumer Price Index for All Urban Consumers (CPI–U)),[364] DHS does not believe this proposed rule would impose any unfunded Federal mandates on State, local, and Tribal governments, in the aggregate, or on the private sector. It does not contain a Federal mandate as

[363] *See* 2 U.S.C. 1532(a).

[364] *See* U.S. Department of Labor, BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," available at *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf* (last visited Jan. 13, 2022). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2021); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)]*100=[(270.970 − 152.383)/152.383]*100=(118.587/152.383)*100=0.77821673*100=77.82 percent=78 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars*1.78=$178 million in 2021 dollars.

the term is defined under UMRA.[365] The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a written statement.

### D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* This proposed rule, if finalized, would be a major rule as defined by section 804 of SBREFA because the aggregate amount of additional fees to be collected will exceed $100 million. *See* 5 U.S.C. 804(2)(A) (providing that a rule is a major rule if it is likely to result in an annual effect on the economy of $100 million or more). Accordingly, absent exceptional circumstances, this proposed rule if enacted as a final rule would be effective at least 60 days after the date on which Congress receives a report submitted by DHS as required by 5 U.S.C. 801(a)(1).

### E. Executive Order 13132 (Federalism)

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This proposed rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This proposed rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities to minimize litigation and undue burden on the Federal court system. DHS has determined that this proposed rule meets the applicable standards provided in section 3(a) and 3(b)(2) of E.O. 12988.

### G. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This proposed rule would not have "Tribal implications" under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

### H. Paperwork Reduction Act

Under the PRA of 1995, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instruments. Please see the accompanying PRA documentation for the full analysis. The Information Collection table below shows the summary of forms that are part of this rulemaking.

BILLING CODE 9111–97–P

| Table 35: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0096 | G-1041 | Genealogy Index Search Request | |

---

[365] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

| | | Table 35: Information Collection | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| | G-1041A | Genealogy Records Request (For each microfilm or hard copy file) | Revision of a Currently Approved Collection |
| 1615-0156 | G-1566 | Request for a Certificate of Non-Existence | Revision of a Currently Approved Collection |
| 1615-0079 | I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | Revision of a Currently Approved Collection |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0001 | I-129F | Petition for Alien Fiancé(e) | Revision of a Currently Approved Collection |
| 1615-0010 | I-129S | Nonimmigrant Petition Based on Blanket L Petition | Revision of a Currently Approved Collection |
| 1615-0012 | I-130 | Petition for Alien Relative | Revision of a Currently Approved Collection |
| | I-130A | Supplemental Information for Spouse Beneficiary | |
| 1615-0013 | I-131 | Application for Travel Document | Revision of a Currently Approved Collection |
| 1615-0135 | I-131A | Application for Travel Document (Carrier Documentation) | Revision of a Currently Approved Collection |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0016 | I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | Revision of a Currently Approved Collection |
| 1615-0017 | I-192 | Application for Advance Permission to Enter as Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0018 | I-212 | Application for Permission to Reapply for Admission into the United States After Deportation or Removal | Revision of a Currently Approved Collection |
| 1615-0095 | I-290B | Notice of Appeal or Motion | Revision of a Currently Approved Collection |
| 1615-0020 | I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Revision of a Currently Approved Collection |
| 1615-0023 | I-485 | Application to Register Permanent Residence or Adjust Status | Revision of a Currently Approved Collection |
| | I-485A | Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | |
| | I-485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | |
| 1615-0003 | I-539 | Application to Extend/Change Nonimmigrant Status | Revision of a Currently Approved Collection |

| Table 35: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0027 | I-566 | Interagency Record of Request – A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status | Revision of a Currently Approved Collection |
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600/A Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600/A Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600/A Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0029 | I-601 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0123 | I-601A | Application for Provisional Unlawful Presence Waiver | Revision of a Currently Approved Collection |
| 1615-0069 | I-602 | Application by Refugee for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0030 | I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | Revision of a Currently Approved Collection |
| 1615-0032 | I-690 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0035 | I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | Revision of a Currently Approved Collection |
| 1615-0038 | I-751 | Petition to Remove Conditions on Residence | Revision of a Currently Approved Collection |
| 1615-0040 | I-765 | Application for Employment Authorization | Revision of a Currently Approved Collection |
| 1615-0137 | I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | Revision of a Currently Approved Collection |
| 1615-0005 | I-817 | Application for Family Unity Benefits | Revision of a Currently Approved Collection |
| 1615-0043 | I-821 | Application for Temporary Protected Status | Revision of a Currently Approved Collection |
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0044 | I-824 | Application for Action on an Approved Application or Petition | Revision of a Currently Approved Collection |
| 1615-0046 | I-854A | Inter-Agency Alien Witness and Informant Record | No material or nonsubstantive change to a currently approved collection |
| 1615-0072 | I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | Revision of a Currently Approved Collection |
| 1615-0082 | I-90 | Application to Replace Permanent Resident Card | Revision of a Currently Approved Collection |

| Table 35: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0048 | I-907 | Request for Premium Processing Service | Revision of a Currently Approved Collection |
| 1615-0114 | I-910 | Application for Civil Surgeon Designation | Revision of a Currently Approved Collection |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |
| 1615-0099 | I-914 | Application for T nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0104 | I-918 | Application for U nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0106 | I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0136 | I-941 | Application for Entrepreneur Parole | Revision of a Currently Approved Collection |
| 1615-0050 | N-336 | Request for a Hearing on a Decision in Naturalization Proceedings | Revision of a Currently Approved Collection |
| 1615-0052 | N-400 | Application for Naturalization | Revision of a Currently Approved Collection |
| 1615-0056 | N-470 | Application to Preserve Residence for Naturalization Purposes | Revision of a Currently Approved Collection |
| 1615-0091 | N-565 | Application for Replacement of Naturalization/Citizenship Document | Revision of a Currently Approved Collection |
| 1615-0057 | N-600 | Application for Certification of Citizenship | Revision of a Currently Approved Collection |
| 1615-0087 | N-600K | Application for Citizenship and Issuance of Certificate under Section 322. | Revision of a Currently Approved Collection |
| 1615-0144 | OMB-64 | H-1B Registration Tool | Revision of a Currently Approved Collection |

**BILLING CODE 9111–97–C**

USCIS is consolidating all information related to Form fees, fee exemptions, and how to submit fee payments into Form G–1055, Fee Schedule. Most fee-related language, including language from sections *What is the Filing Fee, How To Check If the Fees Are Correct, Fee Waiver,* and *Premium Processing* content is being removed from individual Form Instructions documents, which results in a per-response hour burden reduction for many USCIS information collections and an overall total hour burden reduction for the USCIS information collection inventory. In accordance with the PRA, the information collection notice is published in the **Federal Register** and will include the proposed edits to the information collection instruments.

This rulemaking will also require non-substantive edits to some USCIS information collections, which are indicated in Table 35 as ''No material/non-substantive change to a currently approved collection'' in the Type of PRA Action column. The USCIS Form I–854A, Inter-Agency Alien Witness and Informant Record, edits include updating general instructions language. As stated previously in this preamble, DHS has recently created Forms I–526, Immigrant Petition by Alien Entrepreneur, and Form I–526E, Immigrant Petition by Regional Center Investor, Form I–956, Application for Regional Center Designation, Form I–956F, Application for Approval of Investment in a Commercial Enterprise, Form I–956G, Regional Center Annual Statement, Form I–956H, Bona Fides of Persons Involved with Regional Center Program, and Form I–956K Registration for Direct and Third-Party Promoters, to implement the EB–5 Reform and Integrity Act of 2022. USCIS continues to use Form I–829, Petition by Investor to Remove Conditions on Permanent Resident Status, to adjudicate requests from investors under the previous statute and regulations, and as authorized by the EB–5 Reform and Integrity Act of 2022. Those forms are not subject to the Paperwork Reduction Act. *See* Public Law 117–103, div. BB, sec. 106(d) (providing that for a 1-year period the requirements of the PRA do not apply to any collection of information required to implement the EB–5 Reform and Integrity Act of 2022). Thus, those forms are not discussed in this section although new fees are proposed for them in this rule. If the applicable forms are approved by OMB before the final rule is published, the final rule will be updated accordingly.

USCIS Form G–1041; G1041A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information

collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0096 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Genealogy Index Search Request; Genealogy Records Request (For each microfilm or hard copy file).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* G–1041; G–1041A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. The Genealogy Program is necessary to provide a more timely response to requests for genealogical and historical records. Form G–1041 is provided as a convenient means for persons to provide data necessary to perform a search of historical agency indices. Form G–1041A provides a convenient means for persons to identify a particular record desired under the Genealogy Program. The forms provide rapid identification of such requests and ensures expeditious handling. Persons such as researchers, historians, and social scientists seeking ancestry information for genealogical, family history and their location purposes will use Forms G–1041 and G–1041A.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form G–1041 is 3,847 and the estimated hour burden per response is 0.317 hours; the estimated total number of respondents for Form G–1041A is 2,920 and the estimated hour burden per response is 0.317 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,146 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $25,376.

## USCIS Form G–1566

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0156 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for a Certificate of Non-Existence.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* G–1566; USCIS.

(4) Affected public who will be asked or required to respond, as well as a brief abstract: *Primary:* Individuals or households. USCIS will use the information collected on Form G–1566 to determine whether any immigration records about the subject of record listed on the form exist. If no records about the subject of record exist, USCIS will provide a Certificate of Nonexistence. If USCIS finds records related to the subject of record, a Certificate of Non-Existence will not be issued, but the requestor will be notified that records were found.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection G–1566 is 2,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,000 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $122,000.

## USCIS Form I–102

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0079 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the

validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Replacement/Initial Nonimmigrant Arrival/Departure Document.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–102; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Nonimmigrants temporarily residing in the United States can use this form to request a replacement of a lost, stolen, or mutilated Form I–94, Arrival/Departure Record, or to request a new Arrival/Departure Record, if one was not issued when the nonimmigrant was last admitted but the nonimmigrant is now in need of such a record. USCIS uses the information provided by the requester to verify eligibility, as well as his or her status, process the request, and issue a new or replacement Arrival/Departure Record. If the application is approved, USCIS will issue a Form I–94, Arrival/Departure Record.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–102 is 4,100 and the estimated hour burden per response is 0.567 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,325 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,182,440.

### USCIS Form I–129

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information

collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0009 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a Nonimmigrant Worker.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–129; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine the eligibility of a business to petition for a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training, as an H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, or R–1 nonimmigrant worker. Petitioners may also use this form to request an extension of stay in or change of status to E–1, E–2, E–3, H–1B1 or TN, or one of the above classifications for an alien.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129 is 572,606 and the estimated hour burden per response is 2.157 hours; the estimated total

number of respondents for the information collection E–1/E–2 Classification Supplement is 12,050 and the estimated hour burden per response is 0.67; the estimated total number of respondents for the information collection Trade Agreement Supplement to Form I–129 is 12,945 and the estimated hour burden per response is 0.67; the estimated total number of respondents for the information collection H Classification Supplement to Form I–129 is 417,983 and the estimated hour burden per response is 2; the estimated total number of respondents for the information collection H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement is 398,936 and the estimated hour burden per response is 1; the estimated total number of respondents for the information collection L Classification Supplement to Form I–129 is 40,358 and the estimated hour burden per response is 1.34; the estimated total number of respondents for the information collections O and P Classifications Supplement to Form I–129 is 28,434 and the estimated hour burden per response is 1; the estimated total number of respondents for the information collection Q–1 Classification Supplement to Form I–129 is 54 and the estimated hour burden per response is 0.34; the estimated total number of respondents for the information collection R–1 Classification Supplement to Form I–129 is 6,782 and the estimated hour burden per response is 2.34.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,693,162 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $294,892,090.

### USCIS Form I–129CW; I–129CWR

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0079 in the body of the letter and the agency

name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a CNMI-Only Nonimmigrant Transitional Worker; Semiannual Report for CW–1 Workers.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–129CW; I–129CWR; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business and other for-profit. USCIS uses the data collected on Form I–129CW to determine eligibility for the requested immigration benefits. An employer uses Form I–129CW to petition USCIS for a noncitizen to temporarily enter as a nonimmigrant into the CNMI to perform services or labor as a CW–1 worker. An employer also uses Form I–129CW to request an extension of stay or change of status on behalf of the noncitizen worker. Form I–129CW serves the purpose of standardizing requests for these benefits and ensuring that the basic information required to determine eligibility is provided by the petitioners. Form I–129CWR, Semiannual Report for CW–1 Employers, is used by employers to comply with the reporting requirements imposed by the Workforce Act. Form I–129CWR captures data USCIS requires to help verify the continuing employment and payment of the CW–1 worker. DHS may provide such semiannual reports to other Federal partners, including the U.S. Department of Labor (DOL) for investigative or other use as DOL may deem appropriate. Congress expressly

provided for these semiannual reports to be shared with DOL. 48 U.S.C. 1806(d)(3)(D)(ii).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129CW is 5,975 and the estimated hour burden per response is 3.317 hours; the estimated total number of respondents for the information collection Form I–129CWR is 5,975 and the estimated hour burden per response is 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 34,757 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $3,809,063.

## USCIS Form I–129F

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0001 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Alien Fiancé(e).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–129F; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and Households. Form I–129F must be filed with U.S. Citizenship and Immigration Services (USCIS) by a citizen of the United States in order to petition for an alien spouse, fiancé(e), or child.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129F is 47,700 and the estimated hour burden per response is 3.067 hours; the estimated total number of respondents for biometrics processing is 47,700 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 202,105 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $5,412,004.

## USCIS Form I–129S

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0010 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Nonimmigrant Petition Based on Blanket L Petition.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–129S; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit. Employers seeking to classify employees outside the United States as executives, managers, or specialized knowledge professionals, as nonimmigrant intra-company transferees pursuant to a previously approved blanket petition under sections 214(c)(2) and 101(a)(15)(L) of the Act, may file this form. USCIS uses the information provided through this form to assess whether the employee meets the requirements for L–1 classification under blanket L petition approval. Submitting this information to USCIS is voluntary. USCIS may provide the information provided through this form to other Federal, State, local, and foreign government agencies and authorized organizations, and may also be made available, as appropriate, for law enforcement purposes or in the interest of national security.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129S is 75,000 and the estimated hour burden per response is 2.817 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 211,275 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $36,750,000.

USCIS Form I–130; I–130A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0012 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Alien Relative; Supplemental Information for Spouse Beneficiary.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–130; I–130A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–130 allows U.S. citizens or lawful permanent residents of the United States to petition on behalf of certain alien relatives who wish to immigrate to the United States. Form I–130A allows for the collection of additional information for spouses of the petitioners necessary to facilitate a decision.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–130 paper filing is 437,500 and the estimated hour burden per response is 1.817 hours; the estimated total number of respondents for the information collection Form I–130A is 40,775 and the estimated hour burden per response is 0.833 hours; and the estimated total number of respondents for the information collection Form I–130 online filing is 437,500 and the estimated hour burden per response is 1.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,485,154 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $350,000,000.

USCIS Form I–131

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0013 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Travel Document, Form I–131; Extension, Without Change, of a Currently Approved Collection.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–131; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Certain noncitizens, principally permanent or conditional residents, refugees or asylees, applicants for adjustment of status, noncitizens in TPS, DACA recipients, and noncitizens abroad seeking humanitarian parole who need to apply for a travel document to lawfully enter or re-enter the United States. Lawful permanent residents may now file requests for travel permits (transportation letter or boarding foil).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–131 is 483,920 and the estimated hour burden per response is 1.717 hours; the estimated total number of respondents for biometrics processing is 84,000 and the estimated hour burden per response is 1.17 hours, the estimated total number of respondents for passport-style photos is 380,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,119,171 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $146,072,480.

USCIS Form I–131A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0135 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Carrier Documentation.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–131A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses the information provided on Form I–131A to verify the status of permanent or conditional residents and determine whether the applicant is eligible for the requested travel document.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–131A is 5,100 and the estimated hour burden per response is 0.837 hours; biometrics processing is 5,100 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 10,236 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $919,275.

USCIS Form I–140

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0015 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Immigrant Petition for Alien Workers.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–140; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit; Not-for-profit institutions. The information collected on this form will be used by USCIS to determine eligibility for the requested immigration benefits under section 203(b)(1), 203(b)(2), or 203(b)(3) of the Immigration and Nationality Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–140 is 143,000 and the estimated hour burden per response is 0.897 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 128,223 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $62,598,250.

USCIS Form I–191

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0016 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–191; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS and EOIR use the information on the form to properly assess and determine whether the applicant is eligible for a waiver under former section 212(c) of INA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–191 is 116 and the estimated hour burden per response is 1.567 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 182 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $59,740.

USCIS Form I–192

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0017 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Advance Permission to Enter as Nonimmigrant (Pursuant to Section 212(d)(3)(A)(ii) of the INA).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–192; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. The data collected will be used by CBP and USCIS to determine whether the applicant is eligible to enter the United States temporarily under the provisions of section 212(d)(3), 212(d)(13), and 212(d)(14) of the INA. The respondents for this information collection are certain inadmissible nonimmigrant aliens who wish to apply for permission to enter the United States and applicants for T nonimmigrant status or petitioners for U nonimmigrant status. CBP has developed an electronic filing system, called Electronic Secured Adjudication Forms Environment (e-SAFE), through which Form I–192 can be submitted when filed with CBP.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–192 is 61,050 and the estimated hour burden per response is 1.317 hours; the estimated total number of respondents for the information collection e-SAFE is 7,000 and the estimated hour burden per response is 1.25 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 89,153 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $17,522,875.

USCIS Form I–212

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0018 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the

collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Permission to Reapply for Admission into the United States After Deportation or Removal.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–212; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses the data collected on Form I–212 to determine whether an alien is eligible for and should be granted the benefit of consent to reapply for admission into the United States. This form standardizes requests for consent to reapply and its data collection requirements ensure that, when filing the application, the alien provides the basic information that is required to assess eligibility for consent to reapply.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–212 paper filing is 7,000 and the estimated hour burden per response is 1.817 hours. The estimated total number of respondents for the information collection I–212 (online filing via CBP e-SAFE) is 1,200 and the estimated hour burden per response is 1.817 hours. The estimated total number of respondents for the information collection biometric submission is 350 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 15,309 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $370,650.

USCIS Form I–290B

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0095 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Notice of Appeal or Motion.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–290B; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–290B standardizes requests for appeals and motions and ensures that the basic information required to adjudicate appeals and motions is provided by applicants and petitioners, or their attorneys or representatives. USCIS uses the data collected on Form I–290B to determine whether an applicant or petitioner is eligible to file an appeal or motion, whether the requirements of an appeal or motion have been met, and whether the applicant or petitioner is eligible for the requested immigration benefit. Form

I–290B can also be filed with ICE by schools appealing decisions on Form I–17 filings for certification to ICE's Student and Exchange Visitor Program (SEVP).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–290B is 28,000 and the estimated hour burden per response is 1.317 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 36,876 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $8,652,000.

USCIS Form I–360

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0020 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Amerasian, Widow(er), or Special Immigrant.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–360; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The Form I–360 may be used by an Amerasian; a widow or widower; a battered or abused spouse or child of a U.S. citizen or lawful permanent resident; a battered or abused parent of a U.S. citizen son or daughter; or a special immigrant (religious worker, Panama Canal company employee, Canal Zone government employee, U.S. Government employee in the Canal Zone; physician, international organization employee or family member, juvenile court dependent; armed forces member; Afghanistan or Iraq national who supported the U.S. Armed Forces as a translator; Iraq national who worked for the or on behalf of the U.S. Government in Iraq; or Afghan national who worked for or on behalf of the U.S. Government or the International Security Assistance Force [ISAF] in Afghanistan) who intend to establish their eligibility to immigrate to the United States. The data collected on this form is reviewed by U.S. Citizenship and Immigration Services (USCIS) to determine if the petitioner may be qualified to obtain the benefit. The data collected on this form will also be used to issue an employment authorization document upon approval of the petition for battered or abused spouses, children, and parents, if requested.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Petition for Amerasian, Widower, or Special Immigration (Form I–360): *Iraqi & Afghan Petitioners* is 1,916 and the estimated hour burden per response is 2.917 hours; the estimated total number of respondents for the information collection Petition for Amerasian, Widower, or Special Immigration (Form I–360): *Religious Workers* is 2,393 and the estimated hour burden per response is 2.167 hours; the estimated total number of respondents for the information collection Petition for Amerasian, Widower, or Special Immigration (Form I–360): *All Others* is 14,362 and the estimated hour burden per response is 1.917 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 38,307 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $2,287,320.

USCIS Form I–485; I–485A; I–485J

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0023 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Register Permanent Residence or Adjust Status; Supplement A to Form I–485, Adjustment of Status Under Section 245(i); Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–485; I–485A; I–485J; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–485 is used by all applicants seeking to adjust status to lawful permanent resident under INA section 245(a). Supplement A to Form I–485 is used by a subset of applicants seeking to adjust status under INA section 245(i). Supplement J is used by applicants whose adjustment of status is based on an approved employment-based immigrant visa petition that requires a job offer.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–485 is 690,837 and the estimated hour burden per response is 7.087 hours; the estimated total number of respondents for the information collection Form I–485A is 29,213 and the estimated hour burden per response is 1.067 hours; the estimated total number of respondents for the information collection Form I–485J is 37,358 and the estimated hour burden per response is 0.917 hours; the estimated total number of respondents for the information collection biometrics submission is 690,837 and the estimated hour burden per response is 1.17.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,700,585 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,093,101,980.

USCIS Form I–539; I–539A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0003 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the

**572** Federal Register / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Extend/Change Nonimmigrant Status; Supplement A to Form I–539A.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–539; I–539A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. This form is used by nonimmigrants to apply for an extension of stay, for a change to another nonimmigrant classification, or to obtain V nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–539 (paper) is 174,289 and the estimated hour burden per response is 1.817 hours, the estimated total number of respondents for the information collection I–539 (electronic) is 74,696 and the estimated hour burden per response is 1.083 hours; and the estimated total number of respondents for the information collection I–539A is 54,375 and the estimated hour burden per response is 0.5 hours; biometrics processing is 186,738 total respondents requiring an estimated 1.17 hours per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 643,250 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $42,700,928.

USCIS Form I–566

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0027 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Interagency Record of Request—A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–566; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The data on this form is used by Department of State (DOS) to certify to USCIS eligibility of dependents of A or G principals requesting employment authorization, as well as for NATO/Headquarters, Supreme Allied Commander Transformation (NATO/HQ SACT) to certify to USCIS similar eligibility for dependents of NATO principals. DOS also uses this form to certify to USCIS that certain A, G, or NATO nonimmigrants may change their status to another nonimmigrant status. USCIS, on the other hand, uses data on this form in the adjudication of change or adjustment of status applications from aliens in A, G, or NATO classifications and following any such adjudication informs DOS of the results by use of this form. The information provided on this form continues to ensure effective interagency communication among the three governmental departments—the Department of Homeland Security (DHS), DOS, and the Department of Defense (DOD)—as well as with NATO/HQ SACT. These departments and organizations utilize this form to facilitate the uniform collection and review of information necessary to determine an alien's eligibility for the requested immigration benefit. This form also ensures that the information collected is communicated among DHS, DOS, DOD, and NATO/HQ SACT regarding each other's findings or actions.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–566 is 5,800 and the estimated hour burden per response is 1.337 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 7,755 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $710,500.

USCIS Form I–600; I–600A; Supplement 1; Supplement 2; Supplement 3

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0028 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition to Classify Orphan as an Immediate Relative; Application for Advance Processing of an Orphan Petition; Supplement 1, Listing of an Adult Member of the Household; Supplement 2, Consent to Disclose Information; and Supplement 3, Request for Action on Approved Form I–600A/I–600.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* Form I–600, Form I–600A, Form I–600A/I–600 Supplement 1, Form I–600A/I–600 Supplement 2, Form I–600A/I–600 Supplement 3; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. A U.S. citizen adoptive parent may file a petition to classify an orphan as an immediate relative through Form I–600 under section 101(b)(1)(F) of the INA. A U.S. citizen prospective adoptive parent may file Form I–600A in advance of the Form I–600 filing and USCIS will determine the prospective adoptive parent's eligibility to file Form I–600A and their suitability and eligibility to properly parent an orphan. If there are other adult members of the U.S. citizen prospective/adoptive parent's household, as defined at 8 CFR 204.301, the prospective/adoptive parent must include Form I–600A/I–600 Supplement 1 when filing both Form I–600A and Form I–600. A Form I–600A/I–600 Supplement 2, Consent to Disclose Information, is an optional form that a U.S. citizen prospective/adoptive parent may file to authorize USCIS to disclose case-related information that would otherwise be protected under the Privacy Act, 5 U.S.C. 552a, to adoption service providers or other individuals. Form I–600A/I–600 authorized disclosures will assist USCIS in the adjudication of Forms I–600A and I–600. USCIS has created a new Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600, for this

information collection. Form I–600A/I–600 Supplement 3 is a form that prospective/adoptive parents must use if they need to request action such as an extended suitability determination; updated suitability determination based upon a significant change in their circumstances or change in the number or characteristics of the children they intend to adopt or a change in their intended country of adoption; or a request for a duplicate notice of their approved Form I–600A suitability determination.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–600 is 1,200 and the estimated hour burden per response is 0.817 hours; the estimated total number of respondents for the information collection Form I–600A is 2,000 and the estimated hour burden per response is 0.817 hours; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 1 is 301 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 2 is 1,260 and the estimated hour burden per response is 0.25 hours; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 3 is 1,286 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the Home Study information collection is 2,500 and the estimated hour burden per response is 25 hours; the estimated total number of respondents for the Biometrics information collection is 2,520 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the Biometrics—DNA information collection is 2 and the estimated hour burden per response is 6 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 69,977 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,759,232.

USCIS Form I–601

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information

collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0029 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Waiver of Grounds of Inadmissibility.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–601; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and households. Form I–601 is necessary for USCIS to determine whether the applicant is eligible for a waiver of inadmissibility under section 212 of the Act. Furthermore, this information collection is used by individuals who are seeking Temporary Protected Status (TPS).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–601 is 17,000 and the estimated hour burden per response is 1.567 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 26,639 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,311,250.

## USCIS Form I–601A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0123 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Provisional Unlawful Presence Waiver.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–601A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Section 212(a)(9)(B)(i)(I) and (II) of the Immigration and Nationality Act (INA or the Act) provides for the inadmissibility of certain individuals who have accrued unlawful presence in the United States. There is also a waiver provision incorporated into section 212(a)(9)(B)(v)

of the Act, which allows the Secretary of Homeland Security to exercise discretion to waive the unlawful presence grounds of inadmissibility on a case-by-case basis. The information collected from an applicant on an Application for Provisional Unlawful Presence Waiver of Inadmissibility, Form I–601A, is necessary for U.S. Citizenship and Immigration Services (USCIS) to determine not only whether the applicant meets the requirements to participate in the streamlined waiver process provided by regulation, but also whether the applicant is eligible to receive the provisional unlawful presence waiver.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–601A is 63,000 and the estimated hour burden per response is 1.317 hours: the estimated total number of respondents for the collection of biometrics is 63,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 156,681 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $3,212,390.

## USCIS Form I–602

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0069 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application by Refugee for Waiver of Grounds of Excludability.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–602; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The data collected on the Application by Refugee for Waiver of Inadmissibility Grounds, Form I–602, will be used by USCIS to determine eligibility for waivers, and to report to Congress the reasons for granting waivers.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–602 is 240 and the estimated hour burden per response is 7.917 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,900 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $30,900.

## USCIS Form I–612

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0030 in the body of the letter and the agency name. Comments on this information

collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–612; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. This information collection is necessary and may be submitted only by an alien who believes that compliance with foreign residence requirements would impose exceptional hardship on his or her spouse or child who is a citizen of the United States, or a lawful permanent resident; or that returning to the country of his or her nationality or last permanent residence would subject him or her to persecution on account of race, religion, or political opinion. Certain aliens admitted to the United States as exchange visitors are subject to the foreign residence requirements of section 212(e) of the Immigration and Nationality Act (the Act). Section 212(e) of the Act also provides for a waiver of the foreign residence requirements in certain instances.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–612 is 7,200 and the estimated hour burden per response is 0.15 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,080 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $882,000.

USCIS Form I–690; Supplement A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0032 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Waiver of Grounds of Inadmissibility; Supplement A: Applicants with a Class A Tuberculosis Condition (As Defined by HHS Regulations).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–690; Supplement A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Applicants for lawful permanent residence under INA sections 210 or 245A who are inadmissible under certain grounds of inadmissibility at INA section 212(a) would use Form I–690 to seek a waiver of inadmissibility. USCIS uses the information provided through Form I–690 to adjudicate waiver requests from individuals who are inadmissible to the United States. Based upon the instructions provided, a respondent can gather and submit the required documentation to USCIS for consideration of an inadmissibility waiver.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–690 is 30 and the estimated hour burden per response is 2.817 hours; the estimated total number of respondents for the information collection Supplement A is 11 and the estimated hour burden per response is 2 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 107 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $4,523.

USCIS Form I–698

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0035 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–698; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The data collected on Form I–698 is used by USCIS to determine the eligibility to adjust an applicant's residence status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–698 is 100 and the estimated hour burden per response is 1.067 hours; the estimated total number of respondents for biometrics processing is 100 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 224 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $49,000.

USCIS Form I–751

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0038 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition to Remove Conditions on Residence.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–751; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The information collected on Form I–751 is used by U.S. Citizenship and Immigration Services (USCIS) to verify the alien's status and determine whether he or she is eligible to have the conditions on his or her status removed. Form I–751 serves the purpose of standardizing requests for benefits and ensuring that basic information required to assess eligibility is provided by petitioners.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–751 is 153,000 and the estimated hour burden per response is 4.387 hours; the estimated total number of respondents for the information collection biometrics is 306,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,029,231 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $19,698,750.

USCIS Form I–765; I–765WS

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0040 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization; I–765 Worksheet.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–765; I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of work authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to*

*respond:* The estimated total number of respondents for the information collection I–765 paper filing is 1,830,347 and the estimated hour burden per response is 4.317 hours; the estimated total number of respondents for the information collection I–765 online filing is 455,653 and the estimated hour burden per response is 4 hours; the estimated total number of respondents for the information collection I–765WS is 302,000 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection biometrics submission is 302,535 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection passport photos is 2,286,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 11,372,186 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

USCIS Form I–765V

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0137 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the

use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization for Abused Nonimmigrant Spouse.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–765V; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. U.S. Citizenship and Immigration Services (USCIS) will use Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse, to collect the information that is necessary to determine if the applicant is eligible for an initial EAD or renewal EAD as a qualifying abused nonimmigrant spouse. Aliens are required to possess an EAD as evidence of work authorization. To be authorized for employment, an alien must be lawfully admitted for permanent residence or authorized to be so employed by the INA or under regulations issued by DHS. Pursuant to statutory or regulatory authorization, certain classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes. USCIS may determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States. USCIS also collects biometric information from EAD applicants to verify the applicant's identity, check or update their background information, and produce the EAD card.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–765V is 350 and the estimated hour burden per response is 3.567 hours; the estimated total number of respondents for the information collection biometric submission is 350 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual

hour burden associated with this collection is 1,658 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $87,500.

USCIS Form I–817

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0005 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Benefits Under the Family Unity Program Application.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–817; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The information collected will be used to determine whether the applicant meets the eligibility requirements for benefits under 8 CFR 236.14 and 245a.33.

(5) *An estimate of the total number of respondents and the amount of time*

*estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–817 is 1,000 and the estimated hour burden per response is 1.817 hours; the estimated number of respondents providing biometrics is 1,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,987 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $122,500.

USCIS Form I–821

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0043 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Temporary Protected Status.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–821; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Form I–821 used by USCIS to gather information necessary to determine if an applicant is eligible for Temporary Protected Status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–821 (paper filed) is 453,600 and the estimated hour burden per response is 2.227 hours; the estimated total number of respondents for the information collection Form I–821 (online filed) is 113,400 and the estimated hour burden per response is 1.92 hours; the estimated total number of respondents for the information collection Biometrics Submission is 567,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,891,285 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $69,457,500.

USCIS Form I–821D

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0124 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Consideration of Deferred Action for Childhood Arrivals.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* Form I–821D; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. As part of the administration of its programs, certain noncitizens may use this form to request that USCIS exercise its prosecutorial discretion on a case-by-case basis to defer action in their case.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–821D Initial Request (paper) is 112,254 and the estimated hour burden per response is 2.817 hours. The estimated total number of respondents for the information collection I–821D Renewal Request (paper) is 221,167 and the estimated hour burden per response is 2.817 hours. The estimated total number of respondents for the information collection I–821D Renewal Request (Online) is 55,292 and the estimated hour burden per response is 2.482 hours. The estimated total number of respondents for the information collection I–821D Biometrics submission is 388,713 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,531,259 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $33,040,605.

USCIS Form I–824

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed

collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0044 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Action on an Approved Application.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–824; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. This information collection is used to request a duplicate approval notice, as well as to notify and to verify with the U.S. Consulate that a petition has been approved or that a person has been adjusted to permanent resident status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–824 is 10,571 and the estimated hour burden per response is 0.237 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,505 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,361,016.

## USCIS Form I–881

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0072 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

**OVERVIEW OF INFORMATION COLLECTION:**

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Sec. 203 of Pub. L. 105–100).

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–881; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The data collected on the Form I–881 is used by Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) asylum officers, Department of

Justice (DOJ), EOIR immigration judges, and Board of Immigration Appeals board members. The Form I–881 is used to determine eligibility for suspension of deportation or special rule cancellation of removal under Section 203 of NACARA. The form serves the purpose of standardizing requests for the benefits and ensuring that basic information required for assessing eligibility is provided by the applicants.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–881 is 520 and the estimated hour burden per response is 11.817 hours; the estimated total number of respondents for the information collection Biometrics Submission is 858 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 7,149 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $258,505.

## USCIS Form I–90

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0082 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the

use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Replace Permanent Resident Card.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–90; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Form I–90 is used by USCIS to determine eligibility to replace a Lawful Permanent Resident Card.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–90 (paper filed) is 444,601 and the estimated hour burden per response is 1.817 hours; the estimated total number of respondents for the information collection I–90 (electronic) is 296,400 and the estimated hour burden per response is 1.59 hours; and the estimated total number of respondents for the information collection biometrics is 741,001 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with Form I–90 is 2,146,087 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $254,163,343.

## USCIS Form I–907

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0048 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for Premium Processing Service.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–907; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. USCIS uses the data collected through this form to process a request for premium processing. The form serves the purpose of standardizing requests for premium processing and will ensure that basic information required to assess eligibility is provided by the employers/petitioners.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–907 is 815,773 and the estimated hour burden per response is 0.397 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 323,862 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $202,923,534.

## USCIS Form I–910

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0114 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Civil Surgeon Designation.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–910; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Businesses or nonprofits. This information collection is required to determine whether a physician meets the statutory and regulatory requirements for civil surgeon designation. For example, all documents are reviewed to determine whether the physician has a currently valid medical license and whether the physician has had any disciplinary action taken against him or her by the medical licensing authority of the U.S. state(s) or U.S. territories in which he or she practices. If the Application for Civil Surgeon Designation (Form I–910) is approved, the physician is included in USCIS's public Civil Surgeon Locator and is authorized to complete Form I–

693 (OMB Control Number 1615–0033) for an applicant's adjustment of status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–910 is 470 and the estimated hour burden per response is 1.817 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 854 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $24,205.

USCIS Form I–912

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0116 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Fee Waiver.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–912; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the data collected on this form to verify that the applicant is unable to pay for the immigration benefit being requested. USCIS will consider waiving a fee for an application or petition when the applicant or petitioner demonstrates that they are unable to pay the fee. Form I–912 standardizes the collection and analysis of statements and supporting documentation provided by the applicant with the fee waiver request. Form I–912 also streamlines and expedites USCIS' review, approval, or denial of the fee waiver request by clearly laying out the most salient data and evidence necessary for the determination of inability to pay. Officers evaluate all factors, circumstances, and evidence supplied in support of a fee waiver request when making a final determination. Each case is unique and is considered on its own merits. If the fee waiver is granted, the application will be processed. If the fee waiver is not granted, USCIS will notify the applicant and instruct them to file a new application with the appropriate fee.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–912 is 602,400 and the estimated hour burden per response is 1.17. The estimated total number of respondents for the information collection 8 CFR 103.7(d) Director's Exception Request is 128 and the estimated hour burden per response is 1.17.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 704,958 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $2,259,480.

USCIS Form I–914; I–914A; I–914B

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0099 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for T nonimmigrant status; Supplement A, Application for Family Member of T–1 Recipient; Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–914; I–914A; I–914B; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households; Federal Government; State, local or Tribal Government. The information on all three parts of the form will be used to determine whether applicants meet the eligibility requirements for benefits. This application incorporates information pertinent to eligibility under the Victims of Trafficking and Violence Protection Act (VTVPA), Public Law 106–386, and a request for employment authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–914 is 1,310 and the estimated hour burden per response is 2.63 hours; the estimated total number of respondents for the information

collection Form I–914A is 1,120 and the estimated hour burden per response is 1.083 hour; the estimated total number of respondents for the information collection Form I–914B Law Enforcement Officer completion activity is 459 and the estimated hour burden per response is 3.58 hour; the estimated total number of respondents for the information collection Form I–914B Contact by Respondent to Law Enforcement is 459 and the estimated hour burden per response is 0.25 hour; the estimated total number of respondents for the information collection biometrics submission is 2,430 and the estimated hour burden per response is 1.17 hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 9,259 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.

## USCIS Form I–918; I–918A; I–918B

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0104 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for U Nonimmigrant Status; Supplement A, Petition for Qualifying Family Member of a U–1 Recipient; Supplement B, U Nonimmigrant Status Certification.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–918; I–918A; I–918B; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households; Federal Government; or State, local or Tribal Government. This petition permits victims of certain qualifying criminal activity and their immediate family members to apply for temporary nonimmigrant classification. This nonimmigrant classification provides temporary immigration benefits, potentially leading to permanent resident status, to certain victims of criminal activity who: suffered substantial mental or physical abuse as a result of having been a victim of criminal activity; have information regarding the criminal activity; and assist Government officials in investigating and prosecuting such criminal activity.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–918 is 29,400 and the estimated hour burden per response is 5 hours. The estimated total number of respondents for the information collection I–918A is 17,900 and the estimated hour burden per response is 1.5 hour. The estimated total number of respondents for the information collection I–918B is 29,400 and the estimated hour burden per response is 1 hour. The estimated total number of respondents for the information collection biometrics submission is 47,300 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 258,591 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $201,025.

## USCIS Form I–929

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0106 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Qualifying Family Member of a U–1 Nonimmigrant.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–929; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and Households. Section 245(m) of the Immigration and Nationality Act (Act) allows certain qualifying family members who have never held U nonimmigrant status to seek lawful permanent residence or apply for immigrant visas. Before such family members may apply for adjustment of status or seek immigrant visas, the U–1 nonimmigrant who has been granted adjustment of status must file an immigrant petition on behalf of the qualifying family member using Form I–929. Form I–929 is necessary for USCIS

to determine whether the eligibility requirements and conditions for a qualifying family member are met.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–929 is 1,500 and the estimated hour burden per response is 0.817 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,226 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $183,750.

USCIS Form I–941

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0136 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Entrepreneur Parole.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–941; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Entrepreneurs can use this form to make an initial request for parole based upon significant public benefit; make a subsequent request for parole for an additional period; or file an amended application to notify USCIS of a material change.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–941 is 2,940 and the estimated hour burden per response is 4.517 hours; the estimated total number of respondents for the information collection biometrics submission is 2,940 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 16,720 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,440,600.

USCIS Form N–336

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0050 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* N–336; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form N–336 is used by an individual whose Form N–400, Application for Naturalization was denied, to request a hearing before an immigration officer on the denial of the N–400. USCIS uses the information submitted on Form N–336 to locate the requestor's file and schedule a hearing in the correct jurisdiction. It allows USCIS to determine if there is an underlying Form N–400, Application for Naturalization that was denied, to warrant the filing of Form N–336. The information collected also allows USCIS to determine if a member of the U.S. armed forces has filed the appeal.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form N–336 (paper filed) is 3,788 and the estimated hour burden per response is 2.567 hours; the estimated total number of respondents for the information collection Form N–336 (online filed) is 1,263 and the estimated hour burden per response is 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 12,882 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $2,601,265.

USCIS Form N–400

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance

with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0052 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Naturalization.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* N–400; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form N–400, Application for Naturalization, allows USCIS to fulfill its mission of fairly adjudicating naturalization applications and only naturalizing statutorily eligible individuals. Naturalization is the process by which U.S. citizenship is granted to a foreign citizen or national after he or she fulfills the requirements established by Congress in the INA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form N–400 (paper filed) is 567,314 and the estimated hour burden per response is 8.987 hours; the estimated total number of respondents for the information collection N–400

(online filed) is 214,186 and the estimated hour burden per response is 3.5 hours; the estimated total number of respondents for the information collection biometrics submission is 778,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 6,758,362 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $346,768,928.

USCIS Form N–470

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0056 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Preserve Residence for Naturalization Purposes.

(3) *Agency form number, if any, and the applicable component of DHS*

*sponsoring the collection:* N–470; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. The information collected on Form N–470 will be used to determine whether an alien who intends to be absent from the United States for a period of one year or more is eligible to preserve residence for naturalization purposes.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form N–470 is 120 and the estimated hour burden per response is 0.417 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 50 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $14,700.

USCIS Form N–565

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0091 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or

other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Replacement of Naturalization/Citizenship Document.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* N–565; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. U.S. Citizenship and Immigration Services (USCIS) uses Form N–565 to determine the applicant's eligibility for a replacement document. An applicant may file for a replacement if they were issued one of the documents described above and it was lost, mutilated, or destroyed; if the document is incorrect due to a typographical or clerical error by USCIS; if the applicant's name was changed by a marriage, divorce, annulment, or court order after the document was issued and the applicant now seeks a document in the new name; or if the applicant is seeking a change of the gender listed on their document after obtaining a court order, a government-issued document, or a letter from a licensed health care professional recognizing that the applicant's gender is different from that listed on their current document. The only document that can be replaced on the basis of a change to the applicant's date of birth, as evidenced by a court order or a document issued by the U.S. Government or the government of a U.S. state, is the Certificate of Citizenship. If the applicant is a naturalized citizen who desires to obtain recognition as a citizen of the United States by a foreign country, he or she may apply for a special certificate for that purpose.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection N–565 (paper-filed) is 13,270 and the estimated hour burden per response is 1.147 hours; the estimated total number of respondents for the information collection N–565 (online filed) is 13,270 and the estimated hour burden per response is 0.917 hours; the estimated total number of respondents for the photograph appointment is 26,340 (accounts for an estimated 200 respondents that file from overseas and do not need to attend a photo appointment) and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 58,207 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $3,417,026.

USCIS Form N–600

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0057 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Certification of Citizenship.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* N–600; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Form N–600 collects information from applicants who are requesting a Certificate of Citizenship

because they acquired United States citizenship either by birth abroad to a U.S. citizen parent(s), adoption by a U.S. citizen parent(s), or after meeting eligibility requirements including the naturalization of a foreign-born parent. Form N–600 can also be filed by a parent or legal guardian on behalf of a minor child. The form standardizes requests for the benefit and ensures that basic information required to assess eligibility is provided by applicants.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection N–600 (paper filing) is 27,500 and the estimated hour burden per response is 1.397 hours; the estimated total number of respondents for the information collection N–600 (online filed) is 27,500 and the estimated hour burden per response is 0.75 hours; the estimated total number of respondents for the information collection biometrics submission is 36,500 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 101,748 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,081,250.

USCIS Form N–600K

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0087 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Citizenship and Issuance of Certificate under Section 322.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* N–600K; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals and households. Form N–600K is used by children who regularly reside in a foreign country to claim U.S. citizenship based on eligibility criteria met by their U.S. citizen parent(s) or grandparent(s). The form may be used by children under age 18. USCIS uses information collected on this form to determine that the child has met all of the eligibility requirements for naturalization under section 322 of the Immigration and Nationality Act (INA). If determined eligible, USCIS will naturalize and issue the child a Certificate of Citizenship before the child reaches age 18.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form N–600K (paper filed) is 1,300 and the estimated hour burden per response is 1.897 hours; the estimated total number of respondents for the information collection Form N–600K (online filed) is 1,700 and the estimated hour burden per response is 1.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,016 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $386,250.

USCIS Form OMB–64

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0144 in the body of the letter and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* H–1B Registration Tool.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* OMB–64; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit. USCIS will use the data collected through the H–1B Registration Tool to select a sufficient number of registrations projected to meet the applicable H–1B cap allocations and to notify registrants whether their registration was selected.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of business or other for-profit respondents for the information collection H–1B Registration Tool is 35,500 with an estimated 3 responses per respondents and an estimated hour burden per response of 0.5167 hours. The estimated total number of attorney respondents for the information collection H–1B Registration Tool is 4,500 with an estimated 38 responses per respondents and an estimated hour burden per response of 0.5167 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 143,384 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.00. Any costs to respondents are captured in the Form I–129 information collection (OMB control number 1615–009).

Differences in Information Collection Request Respondent Volume and Fee Model Filing Volume Projections

DHS notes that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the model used to calculate the fee amounts proposed in this rule. For example, the fee calculation model projects 1,666,500 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,179,494. As stated in section V.B.1.a of this preamble, the VPC forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality), or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 of 5-year period, with less consideration of the volume effects on planned or past policy changes. Nevertheless, when the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this proposed rule within a relatively short period after a final rule takes effect.

*I. National Environmental Policy Act*

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures that DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1507.3(e)(2)(ii), 1501.4.

The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect. *See* Appendix A, Table 1. Under DHS NEPA implementing procedures, for a proposed action to be categorically excluded it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Instruction Manual section V.B(2)(a)–(c).

This proposed rule implements the authority in the INA to establish fees to fund immigration and naturalization services of USCIS.

DHS has determined that this proposed rule does not individually or cumulatively have a significant effect on the human environment because it clearly fits within categorical exclusions A3(a) and (d) in Appendix A of the Instruction Manual established for rules of a strictly administrative or procedural nature and actions that interpret or amend an existing regulation without changing its environmental effect.

This proposed rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this proposed rule is categorically excluded from further NEPA review.

*J. Family Assessment*

Section 654 of the Treasury and General Government Appropriations Act, 1999 (Pub. L. 105–277) requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether the regulatory action: (1) Impacts the

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) if the regulatory action financially impacts families, are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the determination is affirmative, then the Agency must prepare an impact assessment to address criteria specified in the law. DHS has no data that indicate that this proposed rule will have any impacts on disposable income or the poverty of certain families and children, including U.S. citizen children. DHS acknowledges that this proposal would increase the fees that families must submit and thus it may affect the disposable income for certain families. DHS has provided a process to waive fees for immigration benefits when the person submitting the request is unable to pay the fee. In addition, the proposed rule may provide USCIS with the funds necessary to provide free services to certain disadvantaged populations, including abused children and spouses, refugees, and victims of criminal activity or human trafficking. DHS believes that the benefits of the new fees justify the financial impact on the family, that this rulemaking's impact is justified, and no further actions are required. DHS also determined that this proposed rule will not have any impact on the autonomy or integrity of the family as an institution.

List of Subjects

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 106*

Immigration, User fees.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 240*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Immigration.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS proposes to amend chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); Pub. L. 112–54, 125 Stat 550 (8 U.S.C. 1185 note); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 2. Section 103.2 is amended by revising the fourth sentence of paragraph (a)(1) and paragraphs (a)(7)(ii)(D) and (b)(19)(iii)(A) to read as follows:

**§ 103.2   Submission and adjudication of benefit requests.**

(a) * * *

(1) * * * Filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS. * * *

*     *     *     *     *

(7) * * *

(ii) * * *

(D) Submitted with the correct fee(s). If a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is returned as unpayable a second time, the filing may be rejected. Financial instruments returned as unpayable for a reason other than insufficient funds will not be redeposited. Credit cards that are declined will not be submitted a second time. If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

\* \* \* \* \*

(b) \* \* \*

(19) \* \* \*

(iii) \* \* \*

(A) USCIS will send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent or their attorney or accredited representative of record, as specified on the form instructions.

\* \* \* \* \*

■ 3. Section 103.7 is revised and republished to read as follows:

### § 103.7  Fees.

(a) *Department of Justice (DOJ) fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted with the fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of court fees.* An immigration judge may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8, 1003.24, and 1103.7.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the ''United States Department of Justice,'' in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL system costs fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00; or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable, but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student (Form I–17).* (i) For filing a petition for school certification: $3,000 plus, a site visit fee of $655 for each location required to be listed on the form.

(ii) For filing a petition for school recertification: $1,250, plus a site visit fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00; or

(ii) $32 for a family (applicant, spouse, and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00. The application fee may be waived by DHS.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00; or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If fingerprints are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting fingerprint checks before accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) *Fee Remittance for F, J, and M Nonimmigrants (Form I–901).* The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations.* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual ''Passenger Travel Reports via Sea and Air'' tables.* (i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation, Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities pursuant to section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement).* $50.00.

(12) *Request for authorization for parole of an alien into the United States.* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 4. Section 103.17 is revised and republished to read as follows:

### § 103.17  Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. When a biometric services fee is required, USCIS may reject a benefit request submitted without the correct biometric services.

■ 5. Section 103.40 is revised and republished to read as follows:

### § 103.40   Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* USCIS provides on its website at *https://www.uscis.gov/records/genealogy* the required forms in electronic versions: Genealogy Index Search Request or Genealogy Records Request.

(c) *Required information.* Genealogical research requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for each individual searched. All requests for records or index searches must include the individual's:

(1) Full name (including variant spellings of the name and/or aliases, if any).

(2) Date of birth, at least as specific as a year.

(3) Place of birth, at least as specific as a country and preferably the country name at the time of the individual's immigration or naturalization.

(d) *Optional information.* To better ensure a successful search, a genealogical research request may include each individual's:

(1) Date of arrival in the United States.

(2) Residence address at time of naturalization.

(3) Names of parents, spouse, and children if applicable and available.

(e) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(1) C-Files must be identified by a naturalization certificate number.

(2) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(3) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(f) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(g) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(h) *Processing of paper record copy requests.* This service is designed for requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

■ 6. Part 106 is revised and republished to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec. 106.1   Fee requirements.
106.2   Fees.
106.3   Fee waivers and exemptions.
106.4   Premium processing service.
106.5   Authority to certify records.
106.6   DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; 48 U.S.C. 1806; Pub. L. 107- 296, 116 Stat. 2135 (6 U.S.C. 101 note); Pub. L. 115–218, 132 Stat. 1547; Pub. L. 116–159, 134 Stat. 709.

### § 106.1   Fee requirements.

(a) Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2.

(b) Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location, as provided in the form instructions or by individual notice.

(c) If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice. If the approved benefit request requires multiple fees, this paragraph (c) would apply if any fee submitted is not honored. Other fees that were paid for a benefit request that is revoked under this paragraph (c) will be retained and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed to the USCIS Administrative Appeals Office, in accordance with 8 CFR 103.3 and the applicable form instructions.

(d) DHS is not responsible for financial instruments that expire before they are deposited. USCIS may reject any filing for which required payment cannot be processed due to expiration of the financial instrument.

(e) Fees paid to USCIS using a credit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

### § 106.2   Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name.

(i) When filed online: $455.

(ii) When filed on paper: $465.

(iii) If the applicant was issued a card but never received it: No fee.

(iv) If the applicant's card was issued with incorrect information because of DHS error and the applicant is filing for a replacement: No fee.

(v) If the applicant has reached their 14th birthday and their existing card will expire after their 16th birthday: No fee.

(2) *Application for Replacement/Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $680.

(i) For nonimmigrant member of the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing; and

(iv) For replacement for DHS error: No fee.

(3) *Petition or Application for a Nonimmigrant Worker, Form I–129.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker: $780.

(ii) Petition for H–2A Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,090.

(iii) Petition for H–2A Nonimmigrant Worker with only unnamed beneficiaries: $530.

(iv) Petition for H–2B Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,080.

(v) Petition for H–2B Nonimmigrant Worker with only unnamed beneficiaries: $580.

(vi) Petition for L Nonimmigrant Worker: $1,385.

(vii) Petition for O Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,055.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,015.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.* For an employer to petition on behalf of beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $1,015.

(i) Additional fees in paragraph (c) of this section may apply.

(ii) Semiannual Report for CW–1 Employers (Form I–129CWR): No fee.

(5) *Petition for Alien Fiancé(e), Form I–129F.* (i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $720.

(ii) For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a ''Petition for Alien Relative,'' Form I–130: No fee.

(6) *Petition for Alien Relative, Form I–130.* For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act.

(i) When filed online: $710.

(ii) When filed on paper: $820.

(7) *Application for Travel Document, Form I–131.* (i) Refugee Travel

Document for asylee and lawful permanent resident who obtained such status as an asylee 16 years or older: $165.

(ii) Refugee Travel Document for asylee and lawful permanent resident who obtained such status as an asylee under the age of 16: $135.

(iii) Advance Parole, Reentry Permit, and other travel documents: $630.

(iv) There are no fees for a travel document for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before [EFFECTIVE DATE OF THE FINAL RULE], and paid the Form I–485 fee.

(v) There are no fees for parole requests from current or former U.S. armed forces service members.

(8) *Application for Carrier Documentation, Form I–131A.* For filing an application to allow a lawful permanent resident to apply for a travel document (carrier documentation) to board an airline or other transportation carrier to return to the United States: $575.

(9) *Declaration of Financial Support, Form I–134.* No fee.

(10) *Immigrant Petition for Alien Worker, Form I–140.* For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act: $715.

(11) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for discretionary relief under section 212(c) of the Act: $930.

(12) *Application for Advance Permission to Enter as a Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (13), or (14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,100.

(13) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $695.

(14) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported, or removed alien; an alien who has fallen into distress; an alien who has been removed as an alien enemy; or an alien who has been removed at Government expense: $1,395.

(15) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction, and for filing a

motion to review or reconsider a USCIS decision: $800. The fee will be the same for appeal of or motion on a denial of a benefit request with one or multiple beneficiaries. There is no fee for conditional permanent residents who filed a waiver of the joint filing requirement based on battery or extreme cruelty and filed a ''Notice of Appeal or Motion (Form I–290B) when their Petition to Remove the Conditions on Residence'' (Form I–751) was denied.

(16) *Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360.* $515. There is no fee for the following:

(i) A petition seeking classification as an Amerasian;

(ii) A petition seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner;

(iii) A petition for Special Immigrant Juvenile classification;

(iv) A petition seeking special immigrant classification as Afghan or Iraqi translator or interpreter, Iraqi national employed by or on behalf of the U.S. Government, or Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or a surviving spouse or child of such a person; or

(v) A petition for a person who served honorably on active duty in the U.S. armed forces filing under section 101(a)(27)(K) of the Act.

(17) *Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–361.* No fee.

(18) *Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–363.* No fee.

(19) *Record of Abandonment of Lawful Permanent Resident Status, Form I–407.* No fee.

(20) *Application to Register Permanent Residence or Adjust Status, Form I–485.* For filing an application for permanent resident status or creation of a record of lawful permanent residence: $1,540. There is no fee for the following:

(i) An applicant who is in deportation, exclusion, or removal proceedings before an immigration judge, and the court waives the application fee.

(ii) An applicant who served honorably on active duty in the U.S. armed forces who is filing under section 101(a)(27)(K) of the Act.

(21) *Application to Adjust Status under Section 245(i) of the Act, Form I–485 Supplement A.* Supplement A to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act: A sum of $1,000 must

be paid while the applicant's "Application to Register Permanent Residence or Adjust Status" is pending, unless payment of the additional sum is not required under section 245(i) of the Act, including:

(i) If applicant is unmarried and under 17 years of age: No fee.

(ii) If the applicant is the spouse or unmarried child under 21 years of age of a legalized alien and attaches a copy of a USCIS receipt or approval notice for a properly filed Form I–817, "Application for Family Unity Benefits": No fee.

(22) *Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–485J.* No fee.

(23) *Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities, Form I–508.* No fee.

(24) *Immigrant Petition by Standalone or Regional Center Investor, Forms I–526 and I–526E.* (i) Immigrant Petition by Standalone Investor, Form I–526: $11,160.

(ii) Immigrant Petition by Regional Center Investor, Form I–526E: $11,160.

(25) *Application To Extend/Change Nonimmigrant Status, Form I–539.* (i) When filing online: $525.

(ii) When filing on paper: $620.

(iii) There is no fee for the following:

(A) Nonimmigrant A, G, and NATO;

(B) T nonimmigrant; and

(C) U nonimmigrant if filed before the petitioner files an Application to Register Permanent Residence or Adjust Status (Form I–485).

(26) *Interagency Record of Request— A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status, Form I–566.* No fee.

(27) *Application for Asylum and for Withholding of Removal, Form I–589.* No fee.

(28) *Registration for Classification as a Refugee, Form I–590.* No fee.

(29) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa: $920.

(i) There is no fee for the first Form I–600 filed for a child on the basis of an approved Application for Advance Processing of an Orphan Petition, Form I–600A, during the Form I–600A approval or extended approval period.

(ii) Except as specified in paragraph (a)(29)(iii) of this section, if more than one Form I–600 is filed during the Form I–600A approval period, the fee is $920 for the second and each subsequent Form I–600 petition submitted.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(30) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $920.

(31) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3.* $455.

(i) This filing fee:

(A) Is not charged if Form I–600A/I–600 Supplement 3 is filed to obtain a first-time extension of the approval of the Form I–600A or to obtain a first-time change of non-Hague Adoption Convention country during the Form I–600A approval period.

(B) Is charged if Form I–600A/I–600 Supplement 3 is filed to request a new approval notice based on a significant change and updated home study unless a first-time extension of the Form I–600A approval or first-time change of non-Hague Adoption Convention country is also being requested on the same Supplement 3.

(C) Is charged for second or subsequent extensions of the approval of the Form I–600A, second or subsequent changes of non-Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice permitted with Form I–600A/I–600 Supplement 3 with the filing fee.

(ii) Form I–600A/I–600 Supplement 3 cannot be used to:

(A) Extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country.

(B) Request a change of country to a Hague Adoption Convention transition country for purposes of becoming a transition case if another country was already designated on the Form I–600A or the applicant previously changed countries.

(iii) Form I–600A/I–600 Supplement 3 may only be used to request an increase in the number of children the applicant/petitioner is approved to adopt from a transition country if the additional child is a birth sibling of a child whom the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(32) *Application for Waiver of Ground of Inadmissibility, Form I–601.* $1,050. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

(33) *Application for Provisional Unlawful Presence Waiver, Form I–601A.* $1,105.

(34) *Application by Refugee for Waiver of Grounds of Inadmissibility, Form I–602.* No fee.

(35) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I–612.* $1,100.

(36) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* $1,240.

(37) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under section 210 or 245A of the Act, or a petition under section 210A of the Act: $985.

(38) *Report of Medical Examination and Vaccination Record (Form I–693).* No fee.

(39) *Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act (or a petition under section 210A of the Act), Form I–694.* For appealing the denial of an application under section 210 or 245A of the Act, or a petition under section 210A of the Act: $1,155.

(40) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,670. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

(41) *Refugee/Asylee Relative Petition, Form I–730.* No fee.

(42) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $1,195.

(43) *Application for Employment Authorization, Form I–765.* (i) When filed online: $555.

(ii) When filed on paper: $650.

(iii) There is no fee for an initial Employment Authorization Document for the following:

(A) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before [EFFECTIVE DATE OF THE FINAL RULE], and paid the Form I–485 fee;

(B) Dependents of certain government and international organizations or NATO personnel;

(C) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(D) Persons granted asylee status (AS1, AS6);

(E) Citizen of Micronesia, Marshall Islands, or Palau;

(F) Granted Withholding of Deportation or Removal;

(G) Applicant for Asylum and Withholding of Deportation or Removal including derivatives;

(H) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E–1 employees; and

(I) Current or former U.S. armed forces service members.

(iv) Request for replacement Employment Authorization Document based on USCIS error: No fee.

(v) There is no fee for a renewal or replacement Employment Authorization Document for the following:

(A) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before [EFFECTIVE DATE OF THE FINAL RULE], and paid the appropriate Form I–485 filing fee;

(B) Dependent of certain foreign government, international organization, or NATO personnel;

(C) Citizen of Micronesia, Marshall Islands, or Palau; and

(D) Granted withholding of deportation or removal.

(vi) There is no fee for the *Application for Employment Authorization for Abused Nonimmigrant Spouse,* Form I–765V.

(44) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* For filing a petition to classify a Hague Convention adoptee as an immediate relative for issuance of an immigrant visa.

(i) There is no fee for the first Form I–800 filed for a child on the basis of an approved *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A, during the Form I–800A approval period.

(ii) Except as specified in paragraph (a)(44)(iii) of this section, if more than one Form I–800 is filed during the Form I–800A approval period, the fee is $920 for the second and each subsequent Form I–800 petition submitted.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(45) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For

filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $920.

(46) *Request for Action on Approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, Supplement 3.* $455. This filing fee:

(i) Is not charged if Form I–800A Supplement 3 is filed to obtain a first-time extension of the approval of the Form I–800A or to obtain a first-time change of Hague Adoption Convention country during the Form I–800A approval period.

(ii) Is charged if Form I–800A Supplement 3 is filed to request a new approval notice based on a significant change and updated home study unless a first-time extension of the Form I–800A approval or first-time change of Hague Adoption Convention country is also being requested on the same Supplement 3.

(iii) Is $455 for second or subsequent extensions of the Form I–800A approval, second or subsequent changes of Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice, permitted with the filing of a Form I–800A, Supplement 3 and the required filing fee.

(47) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $875.

(48) *Application for Temporary Protected Status, Form I–821.* (i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services.

(49) *Consideration of Deferred Action for Childhood Arrivals, Form I–821D.* $85.

(50) *Application for Action on an Approved Application or Petition, Form I–824.* $675.

(51) *Petition by Investor to Remove Conditions on Permanent Resident Status, Form I–829.* $9,525.

(52) *Inter-Agency Alien Witness and Informant Record, Form I–854.* No fee.

(53) *Affidavit of Support Under Section 213A of the INA, Form I–864.* No fee.

(i) *Contract Between Sponsor and Household Member, Form I–864A.* No fee.

(ii) *Affidavit of Support Under Section 213A of the INA, Form I–864EZ.* No fee.

(iii) *Request for Exemption for Intending Immigrant's Affidavit of Support, Form I–864W.* No fee.

(iv) *Sponsor's Notice of Change of Address, Form I–865.* No fee.

(54) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.* (i) $340 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS: No fee.

(iii) If filing Form I–881 as a VAWA self-petitioner, including derivatives, as defined under section 101(a)(51)(F) of the Act: No fee.

(55) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905.* $230.

(56) *Request for Premium Processing Service, Form I–907.* The *Request for Premium Processing Service* fee will be as provided in § 106.4.

(57) *Request for Civil Surgeon Designation, Form I–910.* No fee.

(58) *Request for Fee Waiver, Form I–912.* No fee.

(59) *Application for T Nonimmigrant Status, Form I–914.* No fee.

(i) *Supplement A to Form I–914, Application for Immigrant Family Member of a T–1 Recipient.* No fee.

(ii) *Supplement B to Form I–914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.* No fee.

(60) *Petition for U Nonimmigrant Status, Form I–918.* No fee.

(i) *Supplement A to Form I–918, Petition for Qualifying Family Member of U–1 Recipient.* No fee.

(ii) *Supplement B to Form I–918, U Nonimmigrant Status Certification.* No fee.

(61) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status: $270.

(62) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur: $1,200.

(63) *Request for Reduced Fee, Form I–942.* Requesting a reduced fee for the naturalization application Form N–400: No fee.

(64) *Application for Regional Center Designation, Form I–956.* $47,695.

(65) *Application for Approval of Investment in a Commercial Enterprise, Form I–956F.* $47,695.

(66) *Regional Center Annual Statement, Form I–956G.* To provide updated information and certify that a Regional Center under the Immigrant

Investor Program has maintained its eligibility: $4,470.

(b) *N Forms*—(1) *Monthly Report on Naturalization Papers, Form N–4.* No fee.

(2) *Application to File Declaration of Intention, Form N–300.* $320.

(3) *Request for a Hearing on a Decision in Naturalization Proceedings (under section 336 of the Act), Form N–336.* $830. There is no fee for an applicant who has filed an *Application for Naturalization* under section 328 or 329 of the Act with respect to military service and whose application has been denied.

(4) *Application for Naturalization, Form N–400.* $760. With the following exceptions:

(i) No fee is charged an applicant who meets the requirements of section 328 or 329 of the Act with respect to military service.

(ii) The fee for an applicant with an approved *Request for Reduced Fee*, Form I–942, whose documented income is less than 200 percent of the Federal poverty level: $380.

(5) *Request for Certification of Military or Naval Service, Form N–476.* No fee.

(6) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* $420.

(7) *Application for Replacement Naturalization/Citizenship Document, Form N–565.* $555. There is no fee when this application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error.

(8) *Application for Certificate of Citizenship, Form N–600.* $1,385. There is no fee for any application filed by a current or former member of any branch of the U.S. armed forces on their own behalf.

(9) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* $1,385.

(10) *Application for Posthumous Citizenship, Form N–644.* No fee.

(11) *Medical Certification for Disability Exceptions, Form N–648.* No fee.

(c) *G Forms, statutory fees, and non-form fees*—(1) *Genealogy Index Search Request, Form G–1041.* The fee is due regardless of the search results.

(i) When filed online: $100.

(ii) When filed on paper: $120.

(2) *Genealogy Records Request, Form G–1041A.* USCIS will refund the records request fee when it is unable to locate any file previously identified in response to the index search request.

(i) When filed online: $240.

(ii) When filed on paper: $260.

(3) *USCIS immigrant fee.* For DHS domestic processing and issuance of

required documents after an immigrant visa is issued by the U.S. Department of State: $235.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing certain H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for CNMI.* For employer petitions in CNMI as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *CNMI education funding fee.* The fee amount will be as prescribed in the form instructions and:

(i) The fee amount must be paid in addition to, and in a separate remittance from, other filing fees;

(ii) Every employer who is issued a permit must pay the education funding fee every year;

(iii) An employer who is issued a permit with a validity period of longer than 1 year must pay the fee for each year of requested validity at the time the permit is requested; and

(iv) Beginning in FY 2020, the fee may be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index for All Urban Consumers (CPI–U) since the fee was set by law at $200 on July 24, 2018.

(8) *9–11 response and biometric entry-exit fee for H–1B Visa.* For certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,000. Collection of this fee is scheduled to end on September 30, 2027.

(9) *9–11 response and biometric entry-exit fee for L–1 Visa.* For certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,500. This fee will be collected through September 29, 2027.

(10) *Claimant under section 289 of the Act.* No fee.

(11) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $215. This fee will not be refunded if the

registration is not selected or is withdrawn.

(12) *Request for Certificate of Non-Existence, G–1566.* $330. For a certification of non-existence of a naturalization record.

(13) *Asylum Program Fee.* $600. The Asylum Program Fee must be paid by any petitioner filing a *Petition or Application for a Nonimmigrant Worker*, Form I–129, *Petition for a CNMI-Only Nonimmigrant Transitional Worker*, Form I–129CW, or an *Immigrant Petition for Alien Worker*, Form I–140.

(d) *Inflationary adjustment.* The fees prescribed in this section may be adjusted once per year by publication of a rule in the **Federal Register** based on the amount of inflation as measured by the difference in the CPI–U as published by the U.S. Department of Labor, U.S. Bureau of Labor Statistics in [MONTH FINAL RULE IS EFFECTIVE] of the year of the last fee rule and the year of the adjustment under this section. The fee calculated under this paragraph (d) will be rounded to the nearest $5 increment.

## § 106.3 Fee waivers and exemptions.

(a) *Waiver of fees*—(1) *Eligibility for a fee waiver.* Discretionary waiver of the fees provided in paragraph (b)(1)(i) of this section are limited as follows:

(i) The party requesting the benefit is unable to pay the prescribed fee.

(ii) A waiver based on inability to pay is consistent with the status or benefit sought, including benefits that require demonstration of the applicant's ability to support himself or herself, or individuals who seek immigration status based on a substantial financial investment.

(2) *Requesting a fee waiver.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form.

(3) *USCIS fees that may be waived.* Only the following fees may be waived:

(i) The following fees for the following forms may be waived without condition:

(A) Application to Replace Permanent Resident Card (Form I–90);

(B) Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (Form I–191);

(C) Petition to Remove the Conditions of Residence (Form I–751);

(D) Application for Family Unity Benefits (Form I–821);

(E) Application for Temporary Protected Status (Form I–821);

(F) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881)

**594** **Federal Register** / Vol. 88, No. 2 / Wednesday, January 4, 2023 / Proposed Rules

(pursuant to section 203 of Pub. L. 105–110);

(G) Application to File Declaration of Intention (Form N–300);

(H) Request for a Hearing on a Decision in Naturalization Proceedings (Form N–336) (under section 336 of the INA);

(I) Application for Naturalization (Form N–400);

(J) Application to Preserve Residence for Naturalization Purposes (N–470);

(K) Application for Replacement Naturalization/Citizenship Document (N–565);

(L) Application for Certificate of Citizenship (N–600); and

(M) Application for Citizenship and Issuance of Certificate under section 322 of the Act (N–600K).

(ii) The following form fees may be waived based on the conditions described in paragraphs (a)(3)(iii)(A) through (F) of this section:

(A) Petition for a CNMI-Only Nonimmigrant Transitional Worker, or an Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for CW–2 nonimmigrant status;

(B) Application for Travel Document (Form I–131), when filed to request humanitarian parole;

(C) Notice of Appeal or Motion (Form I–290B), when there is no fee for the underlying application or petition or that fee may be waived;

(D) Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act (Form I–694), if the underlying application or petition was fee exempt, the filing fee was waived, or was eligible for a fee waiver;

(E) Application for Employment Authorization (Form I–765), except persons filing under category (c)(33), Deferred Action for Childhood Arrivals (DACA); and

(F) Petition for Nonimmigrant Worker (Form I–129) or Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of an alien applying for E–2 CNMI Investor for an extension of stay.

(iii) Any fees associated with the filing of any benefit request under 8 U.S.C. 1101(a)(51) and those otherwise self-petitioning under 8 U.S.C. 1154(a)(1) (VAWA self-petitioners), 8 U.S.C. 1101(a)(15)(T) (T visas), 8 U.S.C. 1101(a)(15)(U) (U visas), 8 U.S.C. 1105a (battered spouses of A, G, E–3, or H nonimmigrants), 8 U.S.C. 1229(b)(2) (special rule cancellation for battered spouse or child), and 8 U.S.C. 1254a(a) (Temporary Protected Status).

(iv) The following fees may be waived only if the person is exempt from the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4):

(A) Application for Advance Permission to Enter as Nonimmigrant (Form I–192);

(B) Application for Waiver for Passport and/or Visa (Form I–193);

(C) Application to Register Permanent Residence or Adjust Status (Form I–485); and

(D) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(4) *Immigration Court fees.* The provisions relating to the authority of the immigration judges or the Board to waive fees prescribed in paragraph (b) of this section in cases under their jurisdiction can be found at 8 CFR 1003.8 and 1003.24.

(5) *Fees under the Freedom of Information Act (FOIA).* FOIA fees may be waived or reduced if DHS determines that such action would be in the public interest because furnishing the information can be considered as primarily benefiting the general public.

(b) *Humanitarian fee exemptions.* Persons in the following categories are exempt from paying certain fees as follows:

(1) Persons seeking or granted Special Immigrant Juvenile classification who file the following forms related to the Special Immigrant Juvenile classification or adjustment of status pursuant to section 245(h) of the Act, 8 U.S.C. 1255(h):

(i) Application for Travel Document (Form I–131).

(ii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485).

(iii) Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application for Waiver of Ground of Inadmissibility (Form I–601).

(v) Application for Employment Authorization (Form I–765).

(2) Persons seeking or granted T nonimmigrant status who file the following forms related to the T nonimmigrant classification or adjustment of status pursuant to INA section 245(l), 8 U.S.C. 1255(l):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) if applicable.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(3) Persons seeking or granted special immigrant visa or status as Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the ISAF and their derivative beneficiaries, who file the following forms related to the Special Immigrant classification or adjustment of status pursuant to such classification:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for initial Employment Authorization (Form I–765).

(4) Persons seeking or granted adjustment of status as abused spouses and children under the Cuban Adjustment Act (CAA) and the Haitian Refugee Immigration Fairness Act (HRIFA) are exempt from paying the following fees for forms related to those benefits:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application for an Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for Employment Authorization (Form I–765).

(5) Persons seeking U nonimmigrant status who file the following forms related to the U nonimmigrant status are exempt from paying fees if filed before the petitioner files an Application to Register Permanent Residence or Adjust Status (Form I–485):

(i) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(ii) Application for Waiver of Passport and/or Visa (Form I–193).

(iii) Notice of Appeal or Motion (Form I–290B).

(iv) Application to Extend/Change Nonimmigrant Status (Form I–539).

(v) Application for Employment Authorization (Form I–765) for their initial request for principals and derivatives submitted under 8 CFR 274a.12(a)(19) and (20) and (c)(14).

(6) Person seeking or granted immigrant classification as VAWA self-petitioners and derivatives as defined in section 101(a)(51)(A) and (B) of the Act or those otherwise self-petitioning for immigrant classification under section 204(a)(1) of the Act, 8 U.S.C. 1154(a)(1), are exempt from paying the following fees for forms related to the benefit:

(i) When the Petition for Amerasian, Widow(er), or Special Immigrant (Form I–360) and Application to Register Permanent Residence or Adjust Status (Form I–485) are concurrently filed or pending:

(A) Application for Travel Document (Form I–131).

(B) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(C) Notice of Appeal or Motion (Form I–290B) if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485).

(D) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(E) Application for Employment Authorization (Form I–765) for initial requests submitted under 8 CFR 274a.12(c)(9) and (14) and section 204(a)(1)(K) of the Act.

(ii) When the Petition for Amerasian, Widow(er), or Special Immigrant (Form I–360) is filed as a standalone self-petition:

(A) Notice of Appeal or Motion (Form I–290B) for a motion or appeal of a Petition for Amerasian, Widow(er), or Special Immigrant (Form I–360).

(B) Application for Employment Authorization (Form I–765) for initial requests submitted under 8 CFR 274a.12(c)(14) and section 204(a)(1)(K) of the Act, 8 U.S.C 1154(a)(1)(K).

(7) Abused spouses and children applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA) are exempt from paying the following fees for forms related to the benefit:

(i) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)) (Form I–881).

(ii) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(iii) Application for Employment Authorization (Form I–765) submitted under 8 CFR 274a.12(c)(10).

(8) Battered spouses and children of a lawful permanent resident (LPR) or U.S. citizen applying for cancellation of removal and adjustment of status under section 240A(b)(2) of the Act are exempt from paying the following fees for forms related to the benefit:

(i) Application for Waiver of Ground of Inadmissibility (Form I–601).

(ii) Application for Employment Authorization (Form I–765) for their initial request under 8 CFR 274a.12(c)(10).

(9) Refugees, persons paroled as refugees, or lawful permanent residents who obtained such status as refugees in the United States are exempt from paying the following fees:

(i) Application for Travel Document (Form I–131).

(ii) Application for Carrier Documentation (Form I–131A).

(iii) Application for Employment Authorization (Form I–765).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(c) *Director's waiver or exemption exception.* The Director of USCIS may authorize the waiver of or exemption from, in whole or in part, a form fee required by § 106.2 that is not otherwise waivable under this section, if the Director determines that such action is in the public interest and consistent with the applicable law. This discretionary authority may be delegated only to the USCIS Deputy Director.

## § 106.4  Premium processing service.

(a) *General.* A person may submit a request to USCIS for premium processing of certain immigration benefit requests, subject to processing timeframes and fees, as described in this section.

(b) *Submitting a request.* A request must be submitted on the form and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying

immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to other filing fees. USCIS may require the premium processing service fee be paid in a separate remittance from other filing fees and preclude combined payments in the applicable form instructions.

(c) *Designated benefit requests and fee amounts.* Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the INA, 8 U.S.C. 1101(a)(15)(E)(i), (ii), or (iii): $2,500.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), or section 222(a) of the Immigration Act of 1990, Public Law 101–649: $2,500.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(ii)(b): $1,500.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the INA, 8 U.S.C. 1101(a)(15)(H)(iii): $2,500.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the INA, 8 U.S.C. 1101(a)(15(L): $2,500.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the INA, 8 U.S.C. 1101(a)(15)(O)(i): $2,500.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the INA, 8 U.S.C. 1101(a)(15)(P)(i): $2,500.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the INA, 8 U.S.C. 1101(a)(15)(Q): $2,500.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the INA, 8 U.S.C. 1101(a)(15)(R): $1,500.

(10) Application for classification of a nonimmigrant described in section 214(e) of the INA, 8 U.S.C. 1184(e): $2,500.

(11) Petition for classification under section 203(b)(1)(A) of the INA, 8 U.S.C. 1153(b)(1)(A): $2,500.

(12) Petition for classification under section 203(b)(1)(B) of the INA, 8 U.S.C. 1153(b)(1)(B): $2,500.

(13) Petition for classification under section 203(b)(2)(A) of the INA, 8 U.S.C. 1153(b)(2)(A) not involving a waiver under section 203(b)(2)(B) of the INA, 8 U.S.C. 1153(b)(2)(B): $2,500.

(14) Petition for classification under section 203(b)(3)(A)(i) of the INA, 8 U.S.C. 1153(b)(3)(A)(i): $2,500.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the INA, 8 U.S.C. 1153(b)(3)(A)(ii): $2,500.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the INA, 8 U.S.C. 1153(b)(3)(A)(iii): $2,500.

(17) Petition for classification under section 203(b)(1)(C) of the INA, 8 U.S.C. 1153(b)(1)(C): $2,500.

(18) Petition for classification under section 203(b)(2) of the INA, 8 U.S.C. 1153(b)(2), involving a waiver under section 203(b)(2)(B) of the INA, 8 U.S.C. 1153(b)(2)(B): $2,500.

(19) Application under section 248 of the INA, 8 U.S.C. 1258, to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the INA, 8 U.S.C. 1101(a)(15)(F), (J), or (M): $1,750.

(20) Application under section 248 of the INA, 8 U.S.C. 1258, to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the INA, 8 U.S.C. 1101(a)(15)(E), (H), (L), (O), (P), or (M), or to extend stay in such classification: $1,750.

(21) Application for employment authorization: $1,500.

(d) *Fee adjustments.* The fee to request premium processing service may be adjusted by notification in the **Federal Register** on a biennial basis based on the percentage by which the Consumer Price Index for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the second preceding calendar year.

(e) *Processing timeframes.* The processing timeframes for a request for premium processing are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the INA: 15 business days.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA or section 222(a) of the Immigration Act of 1990, Public Law 101–649: 15 business days.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the INA: 15 business days.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the INA: 15 business days.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the INA: 15 business days.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the INA: 15 business days.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the INA: 15 business days.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the INA: 15 business days.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the INA: 15 business days.

(10) Application for classification of a nonimmigrant described in section 214(e) of the INA: 15 business days.

(11) Petition for classification under section 203(b)(1)(A) of the INA: 15 business days.

(12) Petition for classification under section 203(b)(1)(B) of the INA: 15 business days.

(13) Petition for classification under section 203(b)(2)(A) of the INA not involving a waiver under section 203(b)(2)(B) of the INA: 15 business days.

(14) Petition for classification under section 203(b)(3)(A)(i) of the INA: 15 business days.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the INA: 15 business days.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the INA: 15 business days.

(17) Petition for classification under section 203(b)(1)(C) of the INA: 45 business days.

(18) Petition for classification under section 203(b)(2) of the INA involving a waiver under section 203(b)(2)(B) of the INA: 45 business days.

(19) Application under section 248 of the INA to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the INA: 30 business days.

(20) Application under section 248 of the INA to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the INA, or to extend stay in such classification: 30 business days.

(21) Application for employment authorization: 30 business days.

(22) For the purpose of this section a business day is a day that the Federal Government is open for business, and does not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons. The closure may be nationwide or in the region where the adjudication

of the benefit for which premium processing is sought will take place.

(f) *Processing requirements and refunds.* (1) USCIS will issue an approval notice, denial notice, a notice of intent to deny, or a request for evidence within the premium processing timeframe.

(2) Premium processing timeframes will commence:

(i) For those benefits described in paragraphs (e)(1) through (16) of this section, on the date the form prescribed by USCIS, together with the required fee(s), are received by USCIS.

(ii) For those benefits described in paragraphs (e)(17) through (21) of this section, on the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

(3) In the event USCIS issues a notice of intent to deny or a request for evidence, the premium processing timeframe will stop and will recommence with a new timeframe as specified in paragraphs (e)(1) through (21) of this section on the date that USCIS receives a response to the notice of intent to deny or the request for evidence.

(4) Except as provided in paragraph (f)(5) of this section, USCIS will refund the premium processing service fee but continue to process the case if USCIS does not take adjudicative action described in paragraph (f)(1) of this section within the applicable processing timeframe as required in paragraph (e) of this section.

(5) USCIS may retain the premium processing fee and not take an adjudicative action described in paragraph (f)(1) of this section on the request within the applicable processing timeframe, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the immigration benefit request.

(g) *Availability.* (1) USCIS will announce by its official internet website, currently *https:// www.uscis.gov,* the benefit requests described in paragraph (c) of this section for which premium processing may be requested, the dates upon which such availability commences or ends, or any conditions that may apply.

(2) USCIS may suspend the availability of premium processing for immigration benefit requests designated for premium processing if circumstances prevent the completion of processing of a significant number of such requests within the applicable processing timeframe.

## § 106.5 Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

## § 106.6 DHS severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions will continue in effect.

## PART 204—IMMIGRANT PETITIONS

■ 7. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 8. Section 204.3 is amended by:
■ a. Revising and republishing the definitions of "Advanced processing application" and "Orphan petition" in paragraph (b);
■ b. Revising and republishing paragraph (d) introductory text; and
■ c. Revising paragraphs (h)(3), (7), (13), and (14).

The revisions and republications read as follows:

## § 204.3 Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

\* \* \* \* \*

(b) \* \* \*

*Advanced processing application* means Form I–600A (Application for Advanced Processing of Orphan Petition) completed in accordance with the form's instructions and submitted with the required supporting documentation and the fee as required in 8 CFR 106.2. The application must be signed in accordance with the form's instructions by the married petitioner and spouse, or by the unmarried petitioner.

\* \* \* \* \*

*Orphan petition* means Form I–600 (Petition to Classify Orphan as an Immediate Relative). The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. The petition must be signed in accordance with the form's instructions by the married petitioner and spouse, or the unmarried petitioner.

\* \* \* \* \*

(d) *Supporting documentation for a petition for an identified orphan.* Any document not in the English language

must be accompanied by a certified English translation. If an orphan has been identified for adoption and the advanced processing application is pending, the prospective adoptive parents may file the orphan petition at the USCIS office where the application is pending. The prospective adoptive parents who have an approved advanced processing application must file an orphan petition and all supporting documents within 15 months of the date of the approval of the advanced processing application. If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned pursuant to paragraph (h)(7) of this section. If the prospective adoptive parents file the orphan petition after the approval period of the advanced processing application has expired, the petition will be denied pursuant to paragraph (h)(13) of this section. Prospective adoptive parents who do not have an advanced processing application approved or pending may file the application and petition concurrently on one Form I–600 if they have identified an orphan for adoption. An orphan petition must be accompanied by full documentation as follows:

\* \* \* \* \*

(h) \* \* \*

(3) *Advanced processing application approved.* If the advanced processing application is approved:

(i) The prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the date on which USCIS received the Federal Bureau of Investigation (FBI) response on the applicant's, and any additional adult member of the household's, biometrics, unless approval is revoked. If USCIS received the responses on different days, the 15-month period begins on the earliest response date. The notice of approval will specify the expiration date.

(ii) USCIS may extend the validity period for the approval of a Form I–600A if requested in accordance with 8 CFR 106.2(a)(31). An applicant may not file a Form I–600A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–600A approval but must do so on or before the date on which the validity period expires if the applicant seeks an extension.

(iii) If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for

each of the additional children, to the maximum number approved.

(iv) It does not guarantee that the orphan petition will be approved.

\* \* \* \* \*

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within 15 months of the approval date of the advanced processing application:

(i) The application will be deemed abandoned;

(ii) Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the biometric checks;

(iii) The director will dispose of documentation relating to biometrics checks in accordance with current policy; and

(iv) Such abandonment will be without prejudice to a new filing at any time with fee.

\* \* \* \* \*

(13) *Orphan petition denied: petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied. This action will be without prejudice to a new filing at any time with fee.

(14) *Revocation.* (i) The approval of an advanced processing application or an orphan petition shall be automatically revoked in accordance with 8 CFR 205.1 if an applicable reason exists. The approval of an advanced processing application or an orphan petition shall be revoked if the director becomes aware of information that would have resulted in denial had it been known at the time of adjudication. Such a revocation or any other revocation on notice shall be made in accordance with 8 CFR 205.2.

(ii) The approval of a Form I–600A or Form I–600 combination filing is automatically revoked if before the final decision on a beneficiary's application for admission with an immigrant visa or for adjustment of status:

(A) The marriage of the applicant terminates; or

(B) An unmarried applicant marries.

(iii) Revocation is without prejudice to the filing of a new Form I–600A or Form I–600 combination filing, with fee, accompanied by a new or updated home study, reflecting the change in marital status. If a Form I–600 had already been

filed based on the approval of the prior Form I–600A, a new Form I–600 must also be filed with the new Form I–600A under this paragraph (h)(14). The new Form I–600 will be adjudicated only if the new Form I–600A is approved.

* * * * *

■ 9. Section 204.5 is amended by republishing paragraphs (p)(4) heading and (p)(4)(i) to read as follows:

### § 204.5 Petitions for employment-based immigrants.

* * * * *

(p) * * *

(4) *Application for employment authorization.* (i) To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must:

(A) File an application for employment authorization (Form I–765), with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions.

(B) Submit biometric information as may be provided in the applicable form instructions.

* * * * *

■ 10. Section 204.312 is amended by revising and republishing paragraph (e)(3)(i) and paragraph (e)(3)(ii) introductory text to read as follows:

### § 204.312 Adjudication of the Form I–800A.

* * * * *

(e) * * *

(3)(i) If the 15-month validity period for a Form I–800A approval is about to expire, the applicant:

(A) May file Form I–800A Supplement 3 as described in 8 CFR 106.2(a)(31) to request an extension.

(B) May not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval, but must do so on or before the date on which the validity period expires if the applicant seeks an extension.

(ii) Any Form I–800A Supplement 3 that is filed to obtain an extension or update of the approval of a Form I–800A or to change of Hague Convention countries must be accompanied by:

* * * * *

■ 11. Section 204.313 is amended by revising and republishing paragraph (a) to read as follows:

### § 204.313 Filing and adjudication of a Form I–800.

(a) *When to file.* Once a Form I–800A has been approved and the Central Authority has proposed placing a child for adoption by the petitioner, the petitioner may file the Form I–800. The petitioner must complete the Form I–

800 in accordance with the instructions that accompany the Form I–800 and sign the Form I–800 personally. In the case of a married petitioner, one spouse cannot sign for the other, even under a power of attorney or similar agency arrangement. The petitioner may then file the Form I–800 with the stateside or overseas USCIS office or the visa issuing post that has jurisdiction under § 204.308(b) to adjudicate the Form I–800, together with the evidence specified in this section and the filing fee specified in 8 CFR 106.2, if more than one Form I–800 is filed for children who are not birth siblings.

* * * * *

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 12. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2. Section 212.1(q) also issued under sec. 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 13. Section 212.19 is amended by revising and republishing paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

### § 212.19 Parole for entrepreneurs.

* * * * *

(b) * * *

(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

* * * * *

(c) * * *

(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file an application for entrepreneur parole with USCIS on the form prescribed by USCIS with the required fee and supporting documentation in accordance with the form instructions, demonstrating

eligibility as provided in paragraph (c)(2) of this section.

* * * * *

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information.

* * * * *

(h) * * *

(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

* * * * *

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if they will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

* * * * *

## PART 214—NONIMMIGRANT CLASSES

■ 14. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 15. Section 214.1 is amended by republishing paragraph (c)(5) to read as follows:

### § 214.1 Requirements for admission, extension, and maintenance of status.

* * * * *

(c) * * *

(5) *Decision on application for extension or change of status.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of USCIS. The denial of an application for extension of stay may not be appealed.

* * * * *

■ 16. Section 214.2 is amended by:
■ a. Revising and republishing paragraphs (e)(8)(iii) through (v), (e)(23)(viii), (h)(2)(i)(A), (h)(2)(ii), (h)(5)(i)(B), and (h)(19)(i) introductory text;
■ b. Revising paragraph (m)(14)(ii) introductory text;
■ c. Revising and republishing paragraphs (o)(2)(iv)(F), (p)(2)(iv)(F), and (q)(5)(iii);
■ d. Republishing the definition for "Petition" in paragraph (r)(3);
■ e. Revising paragraph (r)(5);
■ f. Republishing paragraph (w)(5) and (w)(15)(iii); and
■ g. Revising paragraph (w)(16).

The revisions and republications read as follows:

### § 214.2  Special requirements for admission, extension, and maintenance of status.

* * * * *

(e) * * *

(8) * * *

(iii) *Substantive changes.* Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) *Non-substantive changes.* Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment that would affect the alien's eligibility for E classification. Further, prior approval is not required if corporate changes occur which do not affect the previously approved employment relationship, or are otherwise non-

substantive. To facilitate admission, the alien may:

(A) Present a letter from the treaty-qualifying company through which the alien attained E classification explaining the nature of the change;

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change; or

(C) Apply directly to Department of State for a new E visa reflecting the change. An alien who does not elect one of the three options contained in paragraphs (e)(8)(iv)(A) through (C) of this section, is not precluded from demonstrating to the satisfaction of the immigration officer at the port-of-entry in some other manner, his or her admissibility under section 101(a)(15)(E) of the Act.

(v) *Advice.* To request advice from USCIS as to whether a change is substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

* * * * *

(23) * * *

(viii) *Information for background checks.* USCIS may require an applicant for E–2 CNMI Investor status, including but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

* * * * *

(h) * * *

(2) * * *

(i) * * *

(A) *General.* A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

* * * * *

(ii) *Multiple beneficiaries.* Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance

with paragraph (h)(6)(i)(E) of this section must be filed separately.

* * * * *

(5) * * *

(i) * * *

(B) *Multiple beneficiaries.* The total number of beneficiaries of a petition or series of petitions based on the same temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or less and does not exceed the number of positions indicated on the relating temporary labor certification.

* * * * *

(19) * * *

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

* * * * *

(m) * * *

(14) * * *

(ii) *Application.* An M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but not more than 90 days before the program end date. The designated school official must certify on Form I–538 that:

* * * * *

(o) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

* * * * *

(p) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3

beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

\* \* \* \* \*

(q) \* \* \*

(5) \* \* \*

(ii) *Petition for multiple participants.* The petitioner may include up to 25 named participants on a petition. The petitioner shall include the name, date of birth, nationality, and other identifying information required on the petition for each participant. The petitioner must also indicate the United States consulate at which each participant will apply for a Q–1 visa. For participants who are visa-exempt under 8 CFR 212.1(a), the petitioner must indicate the port of entry at which each participant will apply for admission to the United States.

\* \* \* \* \*

(r) \* \* \*

(3) \* \* \*

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

\* \* \* \* \*

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period of time spent in R–1 status does not exceed a maximum of 5 years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

\* \* \* \* \*

(w) \* \* \*

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

\* \* \* \* \*

(15) \* \* \*

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(16) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant or extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

\* \* \* \* \*

■ 17. Section 214.14 is amended by revising and republishing paragraph (c)(1) introductory text to read as follows:

### § 214.14  Alien victims of certain qualifying criminal activity.

\* \* \* \* \*

(c) \* \* \*

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit a Petition for U Nonimmigrant Status on the form prescribed by USCIS, and initial evidence to USCIS in accordance with this paragraph (c)(1) and the form instructions. A petitioner who received interim relief is not required to submit initial evidence with a Petition for U Nonimmigrant Status if he or she wishes to rely on the law enforcement certification and other evidence that was submitted with the request for interim relief.

\* \* \* \* \*

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 18. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681); 8 CFR part 2.

■ 19. Section 240.63 is amended by revising and republishing paragraph (a) to read as follows:

### § 240.63  Application process.

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed, Application for Suspension of Deportation, before the effective date of

the form prescribed by USCIS may apply with USCIS by submitting the completed Application for Suspension of Deportation attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

\* \* \* \* \*

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 20. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

■ 21. Section 244.6 is revised and republished to read as follows:

### § 244.6  Application.

(a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

(b) An applicant for TPS may also request an employment authorization document pursuant to 8 CFR part 274a by filing an Application for Employment Authorization in accordance with the form instructions and in accordance with 8 CFR 106.2 and 106.3.

■ 22. Section 244.17 is amended by republishing paragraph (a) to read as follows:

### § 244.17  Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional

supporting documents unless USCIS requests that they do so.

\* \* \* \* \*

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 23. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1252, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 24. Section 245.1 is amended by:
■ a. Revising paragraph (f); and
■ b. Removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

### § 245.1   Eligibility.

\* \* \* \* \*

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States.

\* \* \* \* \*

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 25. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 26. Section 245a.2 is amended by republishing paragraph (e)(3) to read as follows:

### § 245a.2   Application for temporary residence.

\* \* \* \* \*

(e) \* \* \*

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\* \* \* \* \*

■ 27. Section 245a.3 is amended by republishing paragraph (d)(3) to read as follows:

### § 245a.3   Application for adjustment from temporary to permanent resident status.

\* \* \* \* \*

(d) \* \* \*

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\* \* \* \* \*

■ 28. Section 245a.4 is amended by republishing paragraph (b)(5)(iii) to read as follows:

### § 245a.4   Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

\* \* \* \* \*

(b) \* \* \*

(5) \* \* \*

(iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\* \* \* \* \*

■ 29. Section 245a.12 is amended by republishing paragraph (d) introductory text to read as follows:

### § 245a.12   Filing and applications.

\* \* \* \* \*

(d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

\* \* \* \* \*

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 30. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

■ 31. Section 264.5 is amended by revising and republishing paragraph (a) to read as follows:

### § 264.5   Application for a replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 106.2.

\* \* \* \* \*

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 32. The authority citation for part 274a is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 114–74, 129 Stat. 599 (28 U.S.C. 2461 note); 8 CFR part 2.

■ 33. Section 274a.12 is amended by revising and republishing paragraphs (b)(9), (13), and (14) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\* \* \* \* \*

(b) \* \* \*

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker pursuant to section 101(a)(15)(H)(i)(b)(1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H).

\* \* \* \* \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new

Case No. 1:24-cv-00762-CNS   Document 22-1   filed 06/24/24   USDC Colorado   pg 201 of 1835

organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

\*    \*    \*    \*    \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–27066 Filed 1–3–23; 8:45 am]

**BILLING CODE 9111–97–P**

NMFS–2022–0141, by any of the following methods:

*Electronic Submission:* Submit all electronic public comments via the Federal e-Rulemaking Portal. Go to, click the ''Comment Now!'' icon, complete the required fields, and enter or attach your comments.

*Mail:* Submit written comments to *WCR.HMS@noaa.gov.*

*Instructions:* Comments must be submitted by one of the above methods to ensure they are received, documented, and considered by NMFS. Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, *etc.*) submitted voluntarily by the sender will be publicly accessible. Do not submit confidential business information, or otherwise sensitive or protected information. NMFS will accept anonymous comments (enter ''N/A'' in the required fields if you wish to remain anonymous).

Copies of the draft Amendment 6 and other supporting documents are available via the Federal eRulemaking Portal: *https://www.regulations.gov,* docket NOAA–NMFS–2022–0141, or contact the Acting Regional Administrator, Scott M. Rumsey, NMFS West Coast Region, 1201 NE Lloyd Blvd., Suite 1100, Portland, OR 97232– 1274, or *WCR.HMS@noaa.gov.*

**FOR FURTHER INFORMATION CONTACT:** Amber Rhodes, NMFS, (202) 936–6162, *Amber.Rhodes@noaa.gov* or Rachael Wadsworth, NMFS, (206) 526–6152, *Rachael.Wadsworth@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** DSBG was initially developed off the U.S. West Coast through a series of research trials which began in 2011 and continued under exempted fishing permits (EFPs) beginning in 2015. The information collected indicated that DSBG was an effective gear type for selectively targeting swordfish with minimal bycatch and that the gear was potentially profitable to fishermen. These promising results led the Council to recommend that NMFS authorize DSBG as a legal gear type for targeting HMS in the U.S. West Coast Exclusive Economic Zone (EEZ) off California and Oregon.

The Council developed this draft amendment over a series of public meetings. The process began with the adoption of a range of alternatives

(ROA) for federally authorized DSBG fishing in June of 2018. Later, in November 2018, the Council refined its ROA and adopted a preliminary preferred alternative (PPA) to authorize DSBG off the coasts of California and Washington, with a limited entry (LE) permitting system for use of the gear within the Southern California Bight (SCB). In September 2019, the Council adopted its final preferred alternative (FPA) after making a few minor clarifications to its PPA, including amending the tiered criteria of swordfish fishing experience necessary to qualify for an LE permit. At its March 2021 Meeting, the Council modified its FPA to clarify terms, such as ''EFP holders,'' in the recommended tiered criteria, and specified data sources for qualifying LE permit applicants under those tiers. The Council also provided additional input on the permit qualification procedures (*i.e.,* a one-time ranking of permit qualifiers according to tiers), and clarified its intent to issue permits to entities, including corporations, while prohibiting permit transfers through changes in entity ownership. During its November 2021 meeting, the Council adopted a standardized bycatch reporting methodology for an authorized DSBG fishery. Finally, during its March 2022 meeting, the Council considered additional measures for an authorized DSBG fishery related to compliance with the Endangered Species Act, and procedures for monitoring and management of the proposed fishery, including LE permit ownership.

The proposed changes to the HMS FMP are described in further detail below.

Section 6.1 would be amended to include the definition of DSBG as a legal gear type. Both ''standard'' and ''linked'' configurations of DSBG are described and would be authorized. Additionally, the section would be amended to clarify that DSBG must be actively tended, in contrast to surface hook and line gear, which does not require active tending.

Section 6.2 would be amended to describe the LE permitting regime for fishing DSBG within the SCB (*i.e.,* Federal waters east of 120°28′18″ W longitude). This includes language outlining the timing and pace of permit issuance, tiered qualifying criteria (including definitions for permit holders and vessel owners), procedures for permit renewals, and restrictions on permit transfers. Up to 50 permits would be issued for the first year, and up to 25 additional permits would be issued annually in subsequent years until a maximum of 300 permits are issued. The draft amendment also

describes scenarios in which the Council or NMFS may determine that a fewer number of permits should be issued than 300. In such a scenario, the Council could recommend NMFS publish new regulations restricting permit issuance based on applicable law or other considerations. Finally, Section 6.2.1.1 describes the tiered criteria that NMFS will use to issue permits to potential DSBG fishermen based on industry participation history and swordfish fishing experience.

Section 6.3 would be amended to include DSBG-specific language related to standardized bycatch reporting methodology (SBRM). This language includes a synopsis of the gear's documented bycatch performance, and considerations related to logbook reporting and observer coverage in the authorized fishery. DSBG vessels would be subject to logbook reporting requirements in the same manner as other HMS fisheries. As an addendum to this section, Section 8.0 would also be amended to include a reference to the Draft Environmental Impact Statement (DEIS) analyzing the environmental and socioeconomic impacts of DSBG authorization, which NMFS published in August 2021.

The preamble to Section 6.6 would be amended to include DSBG when referring to HMS fishery conservation and management measures. Section 6.6.4 would also be amended to reference pending Federal regulations on the maximum amount of gear deployed, gear tending requirements, timing of gear deployment/retrieval, and simultaneous use of DSBG and other gear types on a single trip.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: January 3, 2023.

**Jennifer M. Wallace,**

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2023–00053 Filed 1–6–23; 8:45 am]

**BILLING CODE 3510–22–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

**[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]**

**RIN 1615–AC68**

**U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Proposed Rules **1173**

**ACTION:** Proposed rule; correction.

**SUMMARY:** On January 4, 2023, the Department of Homeland Security (DHS) published a proposed rule that proposed adjustments to certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). While DHS was able to work with the Office of the Federal Register to correct two typographical errors in the public inspection version of the proposed rule that posted on January 3, 2023, the published version of the proposed rule contain the errors in Table 1. In this document, we are correcting those two typographical errors.

**DATES:** Written comments are due on March 6, 2023. Please refer to the instructions and guidance in the published proposed rule in the **Federal Register** on January 4, 2023, at 88 FR 402, FR Doc. 2022–27066, for more information on how to submit public comment.

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

### Need for Correction

On January 4, 2023, DHS published a proposed rule in the **Federal Register** at 88 FR 402 proposing amendments to certain immigration and naturalization benefit request fees charged by USCIS (FR Doc. 2022–27066). There were two typographical errors in the proposed fees listed in Table 1 that were noticed after the document was scheduled for publication. DHS was able to work with the Office of the Federal Register to correct these typographical errors in the version of the proposed rule that posted for public inspection on January 3, 2023. However, the printing of the January 4, 2023 edition of the **Federal Register** was too far along in production and the errors were not corrected in the official publication. First in Table 1 on page 410, fifth row from the bottom for I–129CW and I–129, Petition for a CNMI Nonimmigrant Worker (with biometric services fee), the proposed fee needs to change from ''$1,055'' to ''$1,015'' in the 4th column, and the difference values need to change from ''$595'' to ''$470'' and from ''129%'' to ''86%'' in the 5th and 6th columns, respectively. Second, in Table 1 on page 411, sixth row from the top for I–765, Application for Employment Authorization—Online (with biometric services), the proposed fee needs to from ''$650'' to ''$555'' in the 4th column, and the difference values need to change from ''$240'' to ''$60'' and ''59%'' to ''12%'' in the 5th and 6th columns, respectively.

### Correction of Publication

Accordingly, Table 1 beginning on page 407 of the proposed rule, FR Doc. 2022–27066, published on January 4, 2023, at 88 FR 402, is corrected and republished as follows:

TABLE 1—COMPARISON OF CURRENT [1] AND PROPOSED FEES

| Immigration benefit request | | Current fee(s) | Proposed fee(s). | Difference | |
|---|---|---|---|---|---|
| Citizenship and Naturalization: | | | | | |
| N–4 | Monthly Report on Naturalization Papers | No Fee | No Fee | N/A | N/A |
| N–300 | Application to File Declaration of Intention | $270 | $320 | $50 | 19% |
| N–336 | Request for Hearing on a Decision in Naturalization Proceedings—Online or Paper. | $700 | $830 | $130 | 19% |
| N–400 | Application for Naturalization—Online or Paper | $640 | $760 | $120 | 19% |
| N–400 | Application for Naturalization—Online or Paper (with biometric services). | $725 | $760 | $35 | 5% |
| N–400 | Application for Naturalization—Reduced Fee | $320 | $380 | $60 | 19% |
| N–400 | Application for Naturalization—Reduced Fee (with biometric services). | $405 | $380 | −$25 | −6% |
| N–470 | Application to Preserve Residence for Naturalization Purposes | $355 | $425 | $70 | 20% |
| N–565 | Application for Replacement Naturalization/Citizenship Document—Online or Paper. | $555 | $555 | $0 | 0% |
| N–600 | Application for Certificate of Citizenship—Online or Paper | $1,170 | $1,385 | $215 | 18% |
| N–600K | Application for Citizenship and Issuance of Certificate—Online or Paper. | $1,170 | $1,385 | $215 | 18% |
| N–644 | Application for Posthumous Citizenship | No Fee | No Fee | N/A | N/A |
| N–648 | Medical Certification for Disability Exceptions | No Fee | No Fee | N/A | N/A |
| Humanitarian: | | | | | |
| | Credible Fear | No Fee | No Fee | N/A | N/A |
| I–589 | Application for Asylum and for Withholding of Removal | No Fee | No Fee | N/A | N/A |
| I–590 | Registration for Classification as a Refugee | No Fee | No Fee | N/A | N/A |
| I–602 | Application by Refugee for Waiver of Inadmissibility Grounds | No Fee | No Fee | N/A | N/A |
| I–687 | Application for Status as a Temporary Resident Under Section 245A of the INA. | $1,130 | $1,240 | $110 | 10% |
| I–687 | Application for Status as a Temporary Resident Under Section 245A of the INA (with biometric services). | $1,215 | $1,240 | $25 | 2% |
| I–694 | Notice of Appeal of Decision | $890 | $1,155 | $265 | 30% |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA). | $1,670 | $1,670 | $0 | 0% |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services). | $1,755 | $1,670 | −$85 | −5% |
| I–730 | Refugee/Asylee Relative Petition | No Fee | No Fee | N/A | N/A |
| I–765V | Application for Employment Authorization for Abused Non-immigrant Spouse. | No Fee | No Fee | N/A | N/A |
| I–817 | Application for Family Unity Benefits | $600 | $875 | $275 | 46% |
| I–817 | Application for Family Unity Benefits (with biometric services) | $685 | $875 | $190 | 28% |
| I–821 | Application for Temporary Protected Status—Online or Paper | $50 | $50 | $0 | 0% |

TABLE 1—COMPARISON OF CURRENT [1] AND PROPOSED FEES—Continued

| | | | | | |
|---|---|---|---|---|---|
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS). | $285 | $340 | $55 | 19% |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services). | $370 | $340 | −$30 | −8% |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS). | $570 | $340 | −$230 | −40% |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people). | $740 | $340 | −$400 | −54% |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by Executive Office for Immigration Review). | $165 | $165 | $0 | 0% |
| I–914 | Application for T Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I–914A | Application for Family Member of T–1 Recipient | No Fee | No Fee | N/A | N/A |
| I–918 | Petition for U Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I–918A | Petition for Qualifying Family Member of U–1 Recipient | No Fee | No Fee | N/A | N/A |
| I–918B | U Nonimmigrant Status Certification | No Fee | No Fee | N/A | N/A |
| I–929 | Petition for Qualifying Family Member of a U–1 Nonimmigrant | $230 | $270 | $40 | 17% |
| | Reasonable Fear | No Fee | No Fee | N/A | N/A |
| Family-Based: | | | | | |
| I–129F | Petition for Alien Fiancé(e) | $535 | $720 | $185 | 35% |
| I–130 | Petition for Alien Relative—Online | $535 | $710 | $175 | 33% |
| I–130 | Petition for Alien Relative—Paper | $535 | $820 | $285 | 53% |
| I–600 | Petition to Classify Orphan as an Immediate Relative | $775 | $920 | $145 | 19% |
| I–600 | Petition to Classify Orphan as an Immediate Relative (with biometric services for one adult). | $860 | $920 | $60 | 7% |
| I–600A | Application for Advance Processing of an Orphan Petition | $775 | $920 | $145 | 19% |
| I–600A | Application for Advance Processing of an Orphan Petition (with biometric services for one adult). | $860 | $920 | $60 | 7% |
| I–600A/I–600 Supp. 3. | Request for Action on Approved Form I–600A/I–600 | N/A | $455 | N/A | N/A |
| I–601A | Application for Provisional Unlawful Presence Waiver | $630 | $1,105 | $475 | 75% |
| I–601A | Application for Provisional Unlawful Presence Waiver (with biometric services). | $715 | $1,105 | $390 | 55% |
| I–751 | Petition to Remove Conditions on Residence | $595 | $1,195 | $600 | 101% |
| I–751 | Petition to Remove Conditions on Residence (with biometric services). | $680 | $1,195 | $515 | 76% |
| I–800 | Petition to Classify Convention Adoptee as an Immediate Relative. | $775 | $920 | $145 | 19% |
| I–800A | Application for Determination of Suitability to Adopt a Child from a Convention Country. | $775 | $920 | $145 | 19% |
| I–800A | Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services). | $860 | $920 | $60 | 7% |
| I–800A Supp. 3 | Request for Action on Approved Form I–800A | $385 | $455 | $70 | 18% |
| I–800A Supp. 3 | Request for Action on Approved Form I–800A (with biometric services). | $470 | $455 | −$15 | −3% |
| Employment-Based: | | | | | |
| | Asylum Program Fee | N/A | $600 | N/A | N/A |
| | H–1B Pre-Registration Fee | $10 | $215 | $205 | 2050% |
| I–129 | Petition for a Nonimmigrant Worker: H–1 Classifications | $460 | $780 | $320 | 70% |
| I–129 | H–2A Petition—Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| I–129 | H–2B Petition—Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| I–129 | Petition for L Nonimmigrant Worker | $460 | $1,385 | $925 | 201% |
| I–129 | Petition for O Nonimmigrant Worker | $460 | $1,055 | $595 | 129% |
| I–129CW, and I–129. | Petition for a CNMI-Only Nonimmigrant Transitional Worker; Application for Nonimmigrant Worker: E and TN Classifications; and Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification. | $460 | $1,015 | $555 | 121% |
| I–129CW, and I–129. | Petition for a CNMI Nonimmigrant Worker (with biometric services fee). | $545 | $1,015 | $470 | 86% |
| I–129 | H–2A Petition—Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| I–129 | H–2B Petition—Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| I–140 | Immigrant Petition for Alien Worker | $700 | $715 | $15 | 2% |
| I–526 | Immigrant Petition by Standalone Investor | $3,675 | $11,160 | $7,485 | 204% |
| I–526E | Immigrant Petition by Regional Center Investor | $3,675 | $11,160 | $7,485 | 204% |
| I–765 | Application for Employment Authorization—Online | $410 | $555 | $145 | 35% |
| I–765 | Application for Employment Authorization—Paper | $410 | $650 | $240 | 59% |
| I–765 | Application for Employment Authorization—Online (with biometric services). | $495 | $555 | $60 | 12% |
| I–765 | Application for Employment Authorization—Paper (with biometric services). | $495 | $650 | $155 | 31% |
| I–829 | Petition by Investor to Remove Conditions on Permanent Resident Status. | $3,750 | $9,525 | $5,775 | 154% |
| I–829 | Petition by Investor to Remove Conditions on Permanent Resident Status (with biometric services). | $3,835 | $9,525 | $5,690 | 148% |
| I–907 | Request for Premium Processing Service when filing: Form I–129 requesting E–1, E–2, E–3, H–1B, H–3, L (including blanket L–1), O, P, Q, or TN nonimmigrant classification; or Form I–140 requesting EB–1, EB–2, or EB–3 immigrant visa classification. | $2,500 | $2,500 | $0 | 0% |

### TABLE 1—COMPARISON OF CURRENT [1] AND PROPOSED FEES—Continued

| Form | Description | Current | Proposed | Difference | Percent |
|---|---|---|---|---|---|
| I–907 | Request for Premium Processing Service when filing Form I–129 requesting H–2B or R nonimmigrant classification. | $1,500 | $1,500 | $0 | 0% |
| I–956 | Application For Regional Center Designation | $17,795 | $47,695 | $29,900 | 168% |
| I–956G | Regional Center Annual Statement | $3,035 | $4,470 | $1,435 | 47% |
| **Other:** | | | | | |
| I–90 | Application to Replace Permanent Resident Card—Online | $455 | $455 | $0 | 0% |
| I–90 | Application to Replace Permanent Resident Card—Paper | $455 | $465 | $10 | 2% |
| I–90 | Application to Replace Permanent Resident Card—Online (with biometric services). | $540 | $455 | –$85 | –16% |
| I–90 | Application to Replace Permanent Resident Card—Paper (with biometric services). | $540 | $465 | –$75 | –14% |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. | $445 | $680 | $235 | 53% |
| I–131 | Application for Travel Document | $575 | $630 | $55 | 10% |
| I–131 | Application for Travel Document (with biometric services) | $660 | $630 | –$30 | –5% |
| I–131 | I–131 Refugee Travel Document for an individual age 16 or older. | $135 | $165 | $30 | 22% |
| I–131 | I–131 Refugee Travel Document for an individual age 16 or older (with biometric services). | $220 | $165 | –$55 | –25% |
| I–131 | I–131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $30 | 29% |
| I–131 | I–131 Refugee Travel Document for a child under the age of 16 (with biometric services). | $190 | $135 | –$55 | –29% |
| I–131A | Application for Carrier Documentation | $575 | $575 | $0 | 0% |
| I–191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA). | $930 | $930 | $0 | 0% |
| I–192 | Application for Advance Permission to Enter as Nonimmigrant (filed with USCIS). | $930 | $1,100 | $170 | 18% |
| I–192 | Application for Advance Permission to Enter as Nonimmigrant (filed with CBP). | $585 | $1,100 | $515 | 88% |
| I–193 | Application for Waiver of Passport and/or Visa | $585 | $695 | $110 | 19% |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal. | $930 | $1,395 | $465 | 50% |
| I–290B | Notice of Appeal or Motion | $675 | $800 | $125 | 19% |
| I–360 | Petition for Amerasian Widow(er) or Special Immigrant | $435 | $515 | $80 | 18% |
| I–485 | Application to Register Permanent Residence or Adjust Status .. | $1,140 | $1,540 | $400 | 35% |
| I–485 | Application to Register Permanent Residence or Adjust Status (with biometric services). | $1,225 | $1,540 | $315 | 26% |
| I–485 | Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions). | $750 | $1,540 | $790 | 105% |
| I–485 | Forms I–485 and I–131 with biometric services | $1,225 | $2,170 | $945 | 77% |
| I–485 | Forms I–485 and I–765 (filed on paper) with biometric services | $1,225 | $2,190 | $965 | 79% |
| I–485 | Forms I–485, I–131, and I–765 (filed on paper) with biometric services. | $1,225 | $2,820 | $1,595 | 130% |
| I–485A | Supplement A, Supplement A to Form I–485, Adjustment of Status Under Section 245(i). | $1,000 | $1,000 | $0 | 0% |
| I–539 | Application to Extend/Change Nonimmigrant Status—Online | $370 | $525 | $155 | 42% |
| I–539 | Application to Extend/Change Nonimmigrant Status—Paper | $370 | $620 | $250 | 68% |
| I–539 | Application to Extend/Change Nonimmigrant Status—Online (with biometric services). | $455 | $525 | $70 | 15% |
| I–539 | Application to Extend/Change Nonimmigrant Status—Paper (with biometric services). | $455 | $620 | $165 | 36% |
| I–601 | Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $120 | 13% |
| I–612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended). | $930 | $1,100 | $170 | 18% |
| I–690 | Application for Waiver of Grounds of Inadmissibility | $715 | $985 | $270 | 38% |
| I–824 | Application for Action on an Approved Application or Petition | $465 | $675 | $210 | 45% |
| I–905 | Application for Authorization to Issue Certification for Health Care Workers. | $230 | $230 | $0 | 0% |
| I–910 | Application for Civil Surgeon Designation | $785 | $1,230 | $445 | 57% |
| I–941 | Application for Entrepreneur Parole | $1,200 | $1,200 | $0 | 0% |
| I–941 | Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | –$85 | –7% |
| | Biometric Services (in most cases) | $85 | $0 | –$85 | –100% |
| | Biometric Services (TPS and EOIR only) | $85 | $30 | –$55 | –65% |
| | USCIS Immigrant Fee | $220 | $235 | $15 | 7% |
| **Genealogy and Records:** | | | | | |
| G–1041 | Genealogy Index Search Request—Online | $65 | $100 | $35 | 54% |
| G–1041 | Genealogy Index Search Request—Paper | $65 | $120 | $55 | 85% |
| G–1041A | Genealogy Records Request—Online | $65 | $240 | $175 | 269% |
| G–1041A | Genealogy Records Request—Paper | $65 | $260 | $195 | 300% |
| G–1041 and G–1041A. | Genealogy Index Search Request and Records Request—Online (digital records). | $130 | $100 | –$30 | –23% |
| G–1566 | Certificate of Non-Existence | $0 | $330 | $330 | N/A |
| **No Fee:** | | | | | |
| I–134 | Declaration of Financial Support | No Fee | No Fee | N/A | N/A |
| I–361 | Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian. | No Fee | No Fee | N/A | N/A |
| I–363 | Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian. | No Fee | No Fee | N/A | N/A |

TABLE 1—COMPARISON OF CURRENT [1] AND PROPOSED FEES—Continued

| I–407 | Record of Abandonment of Lawful Permanent Resident Status | No Fee | No Fee | N/A | N/A |
|---|---|---|---|---|---|
| I–485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j). | No Fee | No Fee | N/A | N/A |
| I–508 | Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities. | No Fee | No Fee | N/A | N/A |
| I–566 | Interagency Record of Request—A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status. | No Fee | No Fee | N/A | N/A |
| I–693 | Report of Medical Examination and Vaccination Record | No Fee | No Fee | N/A | N/A |
| I–854 | Inter-Agency Alien Witness and Informant Record | No Fee | No Fee | N/A | N/A |
| I–864 | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |
| I–864A | Contract Between Sponsor and Household Member | No Fee | No Fee | N/A | N/A |
| I–864EZ | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |
| I–864W | Request for Exemption for Intending Immigrant's Affidavit of Support. | No Fee | No Fee | N/A | N/A |
| I–865 | Sponsor's Notice of Change of Address | No Fee | No Fee | N/A | N/A |
| I–912 | Request for Fee Waiver | No Fee | No Fee | N/A | N/A |
| I–942 | Request for Reduced Fee | No Fee | No Fee | N/A | N/A |

[1] These are fees that USCIS is currently charging and not those codified by the 2020 fee rule.

**Christina E. McDonald,**
*Federal Register Liaison, U.S. Department of Homeland Security.*

[FR Doc. 2023–00274 Filed 1–6–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**National Park Service**

**36 CFR Part 13**

**[NPS–AKRO–33913; PPAKAKROZ5, PPMPRLE1Y.L00000]**

**RIN 1024–AE70**

**Alaska; Hunting and Trapping in National Preserves**

**AGENCY:** National Park Service, Interior.

**ACTION:** Proposed rule.

**SUMMARY:** The National Park Service (NPS) proposes to amend its regulations for sport hunting and trapping in national preserves in Alaska. This proposed rule would prohibit certain harvest practices, including bear baiting; and prohibit predator control or predator reduction on national preserves.

**DATES:** Comments on the proposed rule must be received by 11:59 p.m. ET on March 10, 2023.

**ADDRESSES:** You may submit comments, identified by Regulation Identifier Number (RIN) 1024–AE70, by either of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail or Hand Deliver to:* National Park Service, Regional Director, Alaska Regional Office, 240 West 5th Ave., Anchorage, AK 99501. *Comments delivered on external electronic storage devices (flash drives, compact discs, etc.) will not be accepted.*

• *Instructions:* Comments will not be accepted by fax, email, or in any way other than those specified above. Comments delivered on external electronic storage devices (flash drives, compact discs, etc.) will not be accepted. All submissions received must include the words "National Park Service" or "NPS" and must include the docket number or RIN (1024–AE70) for this rulemaking. Comments received will be posted without change to *https://www.regulations.gov,* including any personal information provided.

• *Docket:* For access to the docket to read background documents or comments received, go to *https:// www.regulations.gov* and search for "1024–AE70."

**FOR FURTHER INFORMATION CONTACT:** Regional Director, Alaska Regional Office, 240 West 5th Ave., Anchorage, AK 99501; phone (907) 644–3510; email: *AKR_Regulations@nps.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

**Background**

The Alaska National Interest Lands Conservation Act (ANILCA) allows harvest of wildlife in national preserves in Alaska for subsistence purposes by local rural residents under Federal regulations. ANILCA also allows harvest of wildlife for sport purposes by any individual under laws of the State of Alaska (referred to as the State) that do not conflict with federal laws. ANILCA requires the National Park Service (NPS) to manage national preserves consistent with the NPS Organic Act of 1916, which directs the NPS "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. 100101(a).

On June 9, 2020, the NPS published a final rule (2020 Rule; 85 FR 35181) that removed restrictions on sport hunting and trapping in national preserves in Alaska that were implemented by the NPS in 2015 (2015 Rule; 80 FR 64325). These included restrictions on the following methods of taking wildlife that were and continue to be authorized by the State in certain locations: taking black bear cubs, and sows with cubs, with artificial light at den sites; harvesting bears over bait; taking wolves and coyotes (including pups) during the denning season (between May 1 and August 9); taking swimming caribou; taking caribou from motorboats under power; and using dogs to hunt black bears. The 2015 Rule prohibited other harvest practices that were and continue to be similarly prohibited by the State. These prohibitions were also removed by the 2020 Rule. The 2020 Rule also removed a statement in the 2015 Rule that State laws or management actions that seek to, or have the potential to, alter or manipulate natural predator populations or processes in order to increase harvest of ungulates by humans are not allowed in national preserves in Alaska. The NPS based the 2020 Rule in part on direction from the Department of the Interior (DOI) to expand recreational hunting opportunities and align hunting opportunities with those established by states. Secretarial Orders 3347 and 3356. The 2020 Rule also responded to direction from the

pound of tart cherries to cover administrative expenses.

**Erin Morris,**
*Associate Administrator, Agricultural Marketing Service.*
[FR Doc. 2023–03751 Filed 2–23–23; 8:45 am]
**BILLING CODE P**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

**[CIS No. 2687–21; DHS Docket No USCIS–2021–0010]**

**RIN 1615–AC68**

### U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Extension of Comment Period

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Proposed rule; extension of the comment period.

**SUMMARY:** On January 4, 2023, DHS published a proposed rule in the **Federal Register** proposing amendments to certain immigration and naturalization benefit request fees charged by USCIS. DHS is announcing the comment period will be extended an additional 5 business days. As part of this rulemaking, DHS will consider comments received during the entire public comment period, including comments received since publication on January 4, 2023.

**DATES:** The comment period for the proposed rule published on January 4, 2023, at 86 FR 402 is extended. Written comments and related material must be submitted on or before March 13, 2023. Please refer to the instructions and guidance in the published proposed rule in the **Federal Register** on January 4, 2023, at 88 FR 402, FR Doc. 2022–27066, for more information on how to submit public comment.

**FOR FURTHER INFORMATION CONTACT:**
Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## Need for Extension of the Comment Period

On January 4, 2023, DHS published a proposed rule in the **Federal Register** at 88 FR 402 proposing amendments to certain immigration and naturalization benefit request fees charged by USCIS. On February 14, 2023, an error occurred on the General Service Administration's (GSA) eRulemaking Portal: *https://www.regulations.gov.* This error caused a technical issue so that the public could not review or submit comments on the proposed rule. GSA corrected the technical issue as soon as they identified it. In the process, the public was unable to review or submit comments for almost 24 hours. Due to this technical issue, accompanied by technical issues that had delayed the upload of several supporting documents by two days at the start of the comment period by 5 business days until March 13, 2023. Please submit written comments and related material on or before March 13, 2023. Please refer to the instructions and guidance in the proposed rule (88 FR 402, January 4, 2023) for more information on how to submit public comment. DHS will consider comments received during the entire public comment period.

**Christina E. McDonald,**
*Associate General Counsel for Regulatory Affairs, Office of the General Counsel, U.S. Department of Homeland Security.*
[FR Doc. 2023–03906 Filed 2–22–23; 11:15 am]
**BILLING CODE 9111–97–P**

## DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2023–0170; Project Identifier MCAI–2022–00974–T]**

**RIN 2120–AA64**

### Airworthiness Directives; Bombardier, Inc., Airplanes

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** The FAA proposes to adopt a new airworthiness directive (AD) for certain Bombardier, Inc., Model BD–700–2A12 airplanes. This proposed AD was prompted by a report that certain environmental control system (ECS) pre-cooler clamp assemblies may not conform to specifications. This proposed AD would require an inspection of the pre-cooler clamps and replacement of non-conforming pre-cooler clamps. The FAA is proposing this AD to address the unsafe condition on these products.

**DATES:** The FAA must receive comments on this proposed AD by April 10, 2023.

**ADDRESSES:** You may send comments, using the procedures found in 14 CFR 11.43 and 11.45, by any of the following methods:

• *Federal eRulemaking Portal:* Go to *regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–493–2251.

• *Mail:* U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

• *Hand Delivery:* Deliver to Mail address above between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

*AD Docket:* You may examine the AD docket at *regulations.gov* under Docket No. FAA–2023–0170; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this NPRM, the mandatory continuing airworthiness information (MCAI), any comments received, and other information. The street address for Docket Operations is listed above.

*Material Incorporated by Reference:*

• For service information identified in this NPRM, contact Bombardier Business Aircraft Customer Response Center, 400 Côte-Vertu Road West, Dorval, Québec H4S 1Y9, Canada; telephone 514–855–2999; email *ac.yul@aero.bombardier.com;* website *bombardier.com.*

• You may view this service information at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

**FOR FURTHER INFORMATION CONTACT:**
Elizabeth Dowling, Aerospace Engineer, Mechanical Systems and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7300; email *9-avs-nyaco-cos@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Comments Invited

The FAA invites you to send any written relevant data, views, or arguments about this proposal. Send your comments to an address listed under **ADDRESSES.** Include "Docket No.

# FY 2022-2023

# Immigration Examinations Fee Account

**Fee Review Supporting Documentation**

January 2023



**U.S. Citizenship and Immigration Services**

# TABLE OF CONTENTS

Executive Summary ................................................................................................................. 4

Fee Review Basis ................................................................................................................... 6

    Purpose ............................................................................................................................... 6

    Summary Basis for Fee Adjustments ................................................................................ 7

Methodology for the FY 2022/2023 Fee Review ................................................................. 7

    Activity-Based Cost (ABC) Model ................................................................................... 7

        Resources ...................................................................................................................... 9

        Resource Drivers and Resource Assignment ............................................................. 10

        Activities .................................................................................................................... 10

        Activity Drivers and Activity Assignment ............................................................... 12

        Cost Objects ............................................................................................................... 14

    Changes Implemented in the FY 2022/2023 Fee Review ............................................... 15

        Additional Immigration Benefit Requests and Other Workloads ............................. 16

        Methodology Changes ............................................................................................... 17

        Organizational Changes ............................................................................................. 18

Special Topics ..................................................................................................................... 21

    IEFA Non-Premium Carryover Projections .................................................................... 21

    Imputed Benefits Cost Estimate – OMB Circular A-25 Compliance .............................. 24

    FASAB Compliance Justification ................................................................................... 25

        Direct Trace ............................................................................................................... 25

        Cause-and-Effect ....................................................................................................... 26

        Reasonable and Consistent Allocation ...................................................................... 26

Appendices .......................................................................................................................... 27

    Appendix I – USCIS Offices ........................................................................................... 27

        Appendix Figure 1: USCIS Organizational Chart ..................................................... 27

    Appendix II – USCIS Funding and Account Structure .................................................... 28

        Immigration Examinations Fee Account (IEFA) ....................................................... 28

        Appendix Table 1: FY 2019 – 2020 Enacted IEFA by Program/Activity ................. 29

        Other Fee Accounts ................................................................................................... 29

Appendix III – USCIS Activity-Based Costing Terminology ................................................... 31
   Appendix Figure 2: ABC Concept and Terminology ........................................................... 31

Appendix IV – Costs by Activity ..................................................................................... 32
   Appendix Table 2: Projected IEFA Costs by Activity (Dollars in Millions) ....................... 32

Appendix V – Fee Waivers ............................................................................................. 33
   Appendix Figure 3: Historical Fee Waiver Summary ........................................................ 33

Appendix VI – Projected Total Cost by Immigration Benefit Request ................................... 34
   Appendix Table 3: Projected Total Cost by Immigration Benefit Request........................... 34

Appendix VII – Proposed Fees by Immigration Benefit Request ........................................... 37
   Appendix Table 4: Proposed Fees by Immigration Benefit Request ................................... 37

Appendix VIII – Activity Unit Costs by Immigration Benefit Request ................................... 40
   Appendix Table 5: USCIS Fee-Paying Unit Cost by Activity ............................................ 40
   Appendix Table 6: USCIS Activity Unit Costs Per Projected Receipt ................................ 43
   Appendix Table 7: USCIS Activity Unit Costs for Genealogy, Records, and Verifications 46

Appendix IX –IEFA Non-Premium Positions by USCIS Office ............................................ 47
   Appendix Table 8: IEFA Fee Review Staffing Estimates by Office..................................... 47
   Appendix Table 9: IEFA Non-Premium On-Board Positions by Office and Fiscal Year .... 48
   Appendix Figure 3: IEFA Non-Premium On-Board Positions by Office and Fiscal Year ... 49

Appendix X – Operational Metrics in the Fee Review ......................................................... 50
   Appendix Table 10: Workload Volume Comparison.......................................................... 50
   Appendix Table 11: Fee-Paying Projection Comparison .................................................... 52
   Appendix Table 12: Completion Rates per Benefit Request................................................ 54
   Appendix Table 13: Historic Receipts from Previous Fiscal Years ..................................... 57

Appendix XI – IEFA History ........................................................................................... 61
   Appendix Table 14: IEFA Non-Premium Fee History........................................................ 63
   Appendix Table 15: Premium Processing Fees ................................................................. 65

## EXECUTIVE SUMMARY

U.S. Citizenship and Immigration Services (USCIS) is primarily funded by immigration and naturalization benefit fees charged to applicants and petitioners.[1] Fees collected from applicants and petitioners are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the cost of processing immigration benefit requests. USCIS reviews its fees biennially and adjusts them to recover the full operating costs associated of providing immigration adjudication and naturalization services.

In accordance with the principles and guidance of the Chief Financial Officers Act of 1990 (CFO Act) and the Office of Management and Budget's (OMB) Circular A-25, USCIS completed a biennial fee review for Fiscal Years (FY) 2022/2023. The results indicate that current fee levels are insufficient to recover the estimated full cost of activities funded by the IEFA. The Department of Homeland Security (DHS) is adjusting USCIS' current fee schedule to recover full cost.

The fee review is based on a snapshot in time. The FY 2022/2023 fee review started in early FY 2021. The results represent reasonable estimates for FY 2022/2023. This study considers the effects on this rule of intervening legislation, related rulemakings, and policy changes that USCIS knows have occurred or is reasonably certain will occur shortly when this fee review was prepared. However, immigration policy is constantly changing and it is impossible to include every policy change that is planned or that may occur at all levels and agencies of the U.S. government that may indirectly affect USCIS costs. While more recent information may generate different results, USCIS believes these results are the best available at the time. Delaying the fee rule to use more recent information may require additional assumptions which would only increase uncertainty. USCIS generally requires a year or more to gather the necessary data and conduct any given fee review. The rulemaking process takes significantly longer. Solidifying budget and policy decisions, writing the preamble and regulation, conducting economic analysis, 60-day comment periods, and addressing comments in a final rule often takes three years. See Table 1 for a comparison to the last two completed fee rules. Some tasks may run concurrently. If a task overlaps with another in the table, then the start date for a task is the next business day after the end date of the previous task. The table excludes the overlap to reflect the total time without double counting. Each Duration (Years) column divides a number of days by 365. There may be slight differences because of rounding.

---

[1] This study includes all non-premium processing requests funded from the IEFA and programs administered by USCIS and encompasses the terms application, applicant, petition, petitioner, requester, benefit request, immigration benefit request, and form. DHS and USCIS may use the terms interchangeably, although the form, request, program or office may not directly relate to an immigration or naturalization benefit.

Table 1: Fee Rule Timelines Compared

| Task Description | FY 2019/2020 | | | FY 2016/2017 | | | Increase or Decrease |
|---|---|---|---|---|---|---|---|
| | Start | End | Duration (Years) | Start | End | Duration (Years) | Duration (Years) |
| Conduct fee review. Brief USCIS leadership. | 1/11/2017 | 3/5/2018 | 1.15 | 4/4/2014 | 12/7/2015 | 1.68 | (0.53) |
| Draft NPRM. Internal Clearance. Form revisions. | 3/6/2018 | 5/1/2019 | 1.15 | 12/8/2015 | 1/15/2016 | 0.10 | 1.05 |
| NPRM DHS OGC Clearance | 5/2/2019 | 10/1/2019 | 0.42 | 1/18/2016 | 4/1/2016 | 0.20 | 0.21 |
| NPRM OMB Clearance | 10/2/2019 | 10/31/2019 | 0.08 | 4/4/2016 | 4/26/2016 | 0.06 | 0.02 |
| Publish NPRM. Comment period ends. | 11/1/2019 | 2/10/2020 | 0.28 | 4/27/2016 | 7/3/2016 | 0.18 | 0.09 |
| Draft final rule in USCIS | 2/11/2020 | 4/10/2020 | 0.16 | 7/4/2016 | 8/5/2016 | 0.09 | 0.07 |
| Final rule DHS clearance | 4/13/2020 | 5/26/2020 | 0.12 | 8/8/2016 | 9/16/2016 | 0.11 | 0.01 |
| Final rule OMB clearance | 5/27/2020 | 7/23/2020 | 0.16 | 9/19/2016 | 10/12/2016 | 0.06 | 0.09 |
| Final rule Federal Register clearance and public inspection | 7/24/2020 | 7/31/2020 | 0.02 | 10/13/2016 | 10/23/2016 | 0.03 | (0.01) |
| Final rule published/effective | 8/3/2020 | 10/2/2020 | 0.16 | 10/24/2016 | 12/23/2016 | 0.16 | - |
| **Total time** | **1/11/2017** | **10/2/2020** | **3.73** | **4/4/2014** | **12/23/2016** | **2.72** | **1.01** |

USCIS calculates its fees to cover the estimated full cost of its operations.[2] DHS follows the guidance provided by OMB Circular A-25, which establishes policy guidance regarding fees assessed by Federal agencies for government services.[3] USCIS projects fee-paying receipt volume to be approximately 32 percent higher for FY 2022/2023 than the levels projected in the FY 2016/2017 fee rule. Most of the increase is the result of increased staffing requirements, as

---

[2] The Immigration and Nationality Act (INA) section 286(m), 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception from the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA); *See Seafarers Intern. Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179 (D.C. Cir. 1996) (IOAA provides that expenses incurred by the agency to serve some independent public interest cannot be included in the cost basis for a user fee, although the agency is not prohibited from charging the applicant full cost of services rendered to applicant, which also results in some incidental public benefits). Congress initially enacted immigration fee authority under the IOAA. *See Ayuda, Inc. v. Att'y General*, 848 F.2d 1298 (D.C. Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into a separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations and broadened the fee setting authority. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub. L. 101-515, sec. 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting Immigration Examinations Fee Account fees that would not be considered in setting fees under the IOAA. *See* 72 FR at 29866-7.
[3] OMB Circular A-25, User Charges (Revised), par. 6, 58 FR 38142 (July 15, 1993).

described in the proposed rule. USCIS anticipates that the current fee structure will yield an average annual deficit of approximately $1,868.2 million in the IEFA.[4] To ensure full cost recovery, DHS proposes to adjust USCIS' fee schedule as described below.

## FEE REVIEW BASIS

This document provides supplemental information associated with the FY 2022/2023 fee review results and corresponding proposed rule. All summary values in this document may vary due to rounding.

USCIS conducted a biennial fee review to determine whether the current fee structure is projected to be sufficient to recover full cost for FY 2022/2023, consistent with 31 U.S.C. 902(a)(8).[5] As a result of the FY 2022/2023 fee review, DHS will adjust IEFA non-statutory, non-premium processing fees to recover the estimated full operating costs associated with USCIS' role in administering the nation's lawful immigration system.

### PURPOSE

A primary objective of the FY 2022/2023 fee review was to ensure immigration and naturalization benefit fees provide sufficient funding to recover costs. The main focus was the IEFA, which comprised approximately 96 percent of USCIS' FY 2021 total funding.[6]

In addition to the requirements of the CFO Act, there are several important reasons for conducting biennial fee reviews. They offer the following benefits:

- Allows for an assessment of USCIS policies, staffing levels, costs, and revenue. USCIS evaluates its performance and makes informed decisions concerning program scaling, resource planning, and staffing allocations.
- Affords an opportunity for USCIS to account for the latest operational changes including efficiencies, workload trends, information technology improvements, etc.
- Provides internal DHS and USCIS stakeholders with an opportunity to review and evaluate anticipated costs, revenue, and their potential effect on operations, service levels, and fees.

---

[4] Excludes Premium Processing, Temporary Protected Status (TPS), and Consideration of Deferred Action for Childhood Arrivals (DACA) revenue and budget forecasts.

[5] Providing that, "An agency Chief Financial Officer shall review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value."

[6] IEFA non-premium funding represents 83 percent, and IEFA premium funding represents 13 percent of USCIS FY 2021 total funding. The remaining USCIS funding comes from appropriations (approximately 3 percent) or other fee accounts (approximately 1 percent) in FY 2021.

**SUMMARY BASIS FOR FEE ADJUSTMENTS**

The IEFA non-premium cost baseline has increased year-over-year since the FY 2016/2017 fee rule. USCIS forecasts that it will increase further in FY 2022/2023. The non-premium cost baseline represents the fee review budget. Figure 1 compares over a decade of fee review information. If fully funded over the FY 2022/2023 biennial period, USCIS estimates that it would experience an average annual deficit of $1,868.2 million (*See* Table 6 in the proposed rule). DHS proposes to adjust USCIS' fee schedule by a weighted average increase of 40 percent to address the anticipated deficit. *See* section V.A. 2. FY 2022/2023 Cost Projections of the NPRM preamble for more information on the cost baseline that we use in this fee review.

Figure 1: IEFA Non-Premium Cost Baseline



# METHODOLOGY FOR THE FY 2022/2023 FEE REVIEW

When conducting the FY 2022/2023 fee review, USCIS examined its recent cost history, operating environment, and current service levels to determine the appropriate method to assign costs to particular immigration benefit requests.

**ACTIVITY-BASED COST (ABC) MODEL**

USCIS uses activity-based costing (ABC) to determine the full cost of processing immigration benefit requests. This is the same methodology used in the previous six fee reviews and is the basis for the current fee structure. ABC is a business management tool that assigns resource costs

to operational activities and then to products or services. These assignments provide an accurate cost assessment of each major step toward producing the individual outputs of an organization.

ABC includes direct and indirect costs that contribute to an output. Direct costs are costs that can be specifically identified with an output. For example, card stock for permanent residence cards and employment authorization documents are a direct cost at USCIS. Indirect costs are costs of resources that are jointly or commonly used to produce two or more types of outputs but are not specifically identifiable with any of the outputs. Almost all costs in the USCIS model are indirect costs. Most offices, even those that adjudicate, produce more than a single output. For example, a district office might adjudicate Forms I-485, N-400, and N-600. A service center may adjudicate Forms I-131, I-485, I-765 and employment-based petitions, such as Forms I-129 or I-140. As such, USCIS uses a cause-and-effect basis to assign most indirect costs. This is consistent with the federal standards for managerial accounting.[7]

USCIS uses commercially available ABC software[8] to create financial models that calculate the projected total cost and unit cost of immigration benefit requests. DHS uses this projected cost information to propose and finalize immigration benefit request fees. The previous software vendor ended support for the financial modeling software that USCIS used in the FY 2010/2011 and subsequent fee reviews. As such, USCIS switched software. USCIS successfully recreated the FY 2019/2020 fee review model in our new software before building the FY 2022/2023 fee review model. USCIS continues to refine these models with the most current information available (to the extent possible) to ensure they accurately depict USCIS operations.

USCIS assigns costs (resources) to immigration benefit and biometric service processing activities (activities) and then to individual immigration benefit requests (cost objects). ABC integrates these three components using a two-step cost assignment process. The first step assigns resources to processing activities using resource drivers. The second step assigns activities to cost objects using activity drivers. USCIS determines resource drivers by analyzing which offices and job titles perform which activities. USCIS determines activity drivers by analyzing which activity costs contribute to each cost object. Figure 2 illustrates the ABC cost assignment methodology.

---

[7] *See* Federal Accounting Standards Advisory Board Handbook, Version 17 (06/21), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf*. It generally describes cost accounting concepts and standards, and defines "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities. It defines direct and indirect costs.

[8] CostPerform. For information from the vendor on this commercial off-the-shelf application, visit https://www.costperform.com. Previous fee reviews used SAP Business Objects Profitability and Cost Management (PCM). SAP ended support for PCM on Dec. 31, 2020. USCIS disclosed the name of the software in previous fee rules. *See* 81 FR 26905. However, comments from some public commenters indicated that they were not aware of its name, usage, or existing documentation.

Figure 2: Activity-Based Costing Diagram



**Resources**

Resources equal the projected FY 2022/2023 average annual cost baseline of $5,150.7 million. *See* section V.A.2. FY 2022/2023 Cost Projections of the proposed rule preamble. USCIS designed the FY 2022/2023 ABC model to look like the structure of the FY 2021 operating plan (OP). The OP is a detailed budget execution plan that USCIS establishes at the beginning of the fiscal year. It is consistent with the annual spending authority enacted by Congress. USCIS adjusts the OP for future years, as described in the proposed rule.[9] Figure 3 compares fee review budgets from the current and previous two fee rules. The current model only uses forecasts for FY 2022 and 2023.

Figure 3: Fee Review Budgets and FY 2021 OP Compared



---

[9] For example, the OP includes costs and revenue for TPS and DACA. USCIS excludes these from the fee review budget, as explained in section V.C. of the preamble.

**Resource Drivers and Resource Assignment**

ABC uses resource drivers to assign resources to activities (see the next section, Activities, for more information). We assign all resource costs to activities so the total resources in the ABC model equal the total cost of activities.

A common resource driver in ABC is the number of employees in an organization and the percentage of time they spend performing various activities. The FY 2022/2023 ABC model uses employee counts and activity information to assign resources to activities. USCIS refers to this process as the payroll title analysis. This analysis determines how employees contribute to the 13 activities in the fee review. When an office engages in more than one activity, USCIS uses operational information to prorate that office's resources to multiple activities.[10] The result is a percentage of staffing by office and activity. We apply this result to projected staffing levels in the FY 2022/2023 fee review model. The model assigns resources to activities using this activity information by office.

USCIS assigns some costs directly to activities. For example, the contract awarded to support USCIS Application Support Center (ASC) operations only pertains to the Collect Biometric Data activity. Therefore, USCIS assigns the costs of this contract to that activity only. As another example, Field Operations and Service Center Operations have large contracts for intake, records management, and other support services. USCIS evaluates these contracts to separate them by activity. Other overhead costs, including the Office of Information Technology (OIT), service-level agreements, and the DHS working capital fund contributions are prorated to each office based on their number of authorized positions so that each office pays a proportionate share.

The allocation methods in the FY 2022/2023 review align with the Federal Accounting Standards Advisory Board's (FASAB's) Statement of Federal Financial Accounting Standards (SFFAS) Number 4 on managerial cost accounting concepts.[11] This fulfills the guideline for agencies to directly trace costs when feasible and to either assign costs on a cause-and-effect basis or allocate them in a reasonable and consistent way.

**Activities**

In ABC, activities are the critical link between resources and cost objects. Activities represent work performed by an organization. USCIS allocates the FY 2022/2023 cost baseline (resources) to the following 13 activities:

---

[10] Because of the pandemic, in most cases USCIS used operational information from FY 2019 for the payroll title analysis since FY 2020 or FY 2021 information would be affected by the pandemic. USCIS expects a return to normal operations in FY 2022/2023.

[11] *See* Federal Accounting Standards Advisory Board Handbook, Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, available at http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf (June 2021).

1. **Conduct TECS[12] Check** involves the process of comparing information on applicants, petitioners, requestors, beneficiaries, derivatives, and household members who apply for an immigration benefit request against various Federal Government systems, and information databases.

2. **Direct Costs** support a specific immigration benefit request. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefits processing, to the application for naturalization.

3. **Fraud Detection and Prevention** involves activities performed by the Fraud Detection and National Security (FDNS) Directorate in detecting, combating, and deterring immigration benefit fraud, as well as addressing national security and intelligence concerns.

4. **Inform the Public** involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives.

5. **Intake** involves mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and lockbox operations.

6. **Issue Document** involves producing, distributing, and destroying secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization. For example, this includes issuing an employment authorization document (EAD) or permanent resident card (PRC) as well as destroying PRCs that have been surrendered to USCIS by individuals who file Form I-407, Record of Abandonment of Permanent Resident Status.

7. **Make Determination** involves adjudicating immigration benefit requests; making and recording adjudicative decisions; requesting and reviewing additional evidence; interviewing applicants, petitioners, or requestors; consulting with supervisors or legal counsel; and researching applicable laws and decisions on non-routine adjudications.

8. **Management and Oversight** involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.

9. **Records Management** involves searching for and requesting files; creating temporary and/or permanent individual files; consolidating files; appending evidence submitted by applicants, petitioners, and requestors to existing immigration files; retrieving, storing, and moving files upon request; auditing and updating systems that track the location of files; and archiving inactive files.

10. **Systematic Alien Verification for Entitlements** (SAVE) represents the cost of an intergovernmental information-sharing program that helps Federal, state, and local benefit-issuing agencies, institutions, and licensing agencies (such as an individual state's department of motor vehicles) determine the immigration status of applicants. SAVE helps these agencies ensure that only those eligible for benefits and licenses receive them. USCIS enters into reimbursable agreements with Federal, state, and local government agencies under the authority of the Economy Act and the Intergovernmental Cooperation Act 31 U.S.C. 6505. These reimbursable agreements recover only a portion of the total program cost. The SAVE reimbursable revenue estimate for FY 2022/2023 is $10.09

---

[12] In previous reviews, USCIS called the Conduct TECS Check activity by different names, such as Conduct Interagency Border Inspection System Checks (IBIS) or Conduct Treasury Enforcement Communication System (TECS) Check. The system changed names. USCIS updated the ABC model to reflect this change.

million. The estimated total cost of SAVE in the FY 2022/2023 fee review is approximately $50.72 million. As such, SAVE reimbursable revenue may recover approximately 20% of the total cost SAVE in the fee review period.

Since the FY 2016/2017 fee rule, USCIS added two new activities and separated one activity into several subordinate activities in the FY 2022/2023 fee review:

11. **Research Genealogy** provides researchers with access to historical immigration and naturalization records of deceased immigrants.
    a) In the FY 2016/2017 fee rule, USCIS did not track this workload distinctly from the rest of the Records Management activity.
12. **Certify Nonexistence** provides requestors with a certificate of non-existence (CNE) of a naturalization record.
    a) In the FY 2016/2017 fee rule, USCIS did not track this workload distinctly from the rest of the Records Management activity.
13. **Perform Biometric Services** involves the management of electronic biometric information, background checks performed by the Federal Bureau of Investigation (FBI), and the collection, use, and reuse of biometric information to verify the identity of individuals seeking an immigration benefit. USCIS aggregates the following subordinate activities into this activity:
    a) **Collect Biometric Data**: ASC contractual support for collection of biometric modalities (currently fingerprints, photographs, and signatures).
    b) **Check Fingerprints**: Send fingerprints to the FBI for identity confirmation, background, and security checks.
    c) **Check Name**: Send information to the FBI for personnel, administrative, applicant, and criminal files compiled for law enforcement purposes. Generally, USCIS requests this additional service for naturalization and adjustment of status applicants.
    d) **Manage Biometric Services**: Storage of biometrics and oversight of biometric services, including Federal employees at ASC locations.

**Activity Drivers and Activity Assignment**

The final stage in the ABC process assigns activity costs to immigration benefit requests (cost objects). See Table 2 for the general assignments in the ABC model. See Appendix X – Operational Metrics in the Fee Review for more information on the completion rates and other activity drivers.

Table 2: General Activity and Activity Driver Assignments

| Activity | Most Common Activity Driver |
|---|---|
| Conduct TECS Check | Completions |
| Direct Costs | Varies (Assigned by Resource) |
| Fraud Detection and Prevention | Completions |
| Inform the Public | Completions |
| Intake | Incoming Records (Receipts – Shredded Receipts) |
| Issue Document | Completions |

| Activity | Most Common Activity Driver |
|---|---|
| Make Determination | Calculated Hours (Completions * Completion Rate) |
| Management and Oversight | Completions |
| Records Management | Incoming Records |
| Systematic Alien Verification for Entitlements | Verifications |
| Research Genealogy | Calculated Hours |
| Certify Nonexistence | Calculated Hours |
| Perform Biometric Services | Varies. See below. |
|     Collect Biometric Data | ASC Production |
|     Check Fingerprints | FBI Fingerprints |
|     Check Name | FBI Name Checks |
|     Manage Biometric Services | ASC Production |

Completions and receipts represent projected workload volumes. For most activities, USCIS assigns activity costs to cost objects based on the percentage of total projected workload volume. For these activities, similar time and effort are involved for each immigration benefit request. The ABC model reflects which offices contribute to each workload. For example, the Management and Oversight activity in the Director's Office is spread by all completions because they oversee all USCIS operations. However, the Management and Oversight activity in adjudicative offices, like Field Operations Directorate (FOD), Service Center Operations (SCOPS), and Refugee, Asylum, and International Operations (RAIO), is only assigned to completions in their offices.

USCIS allocates the Make Determination activity costs across immigration benefit requests by calculated hours. USCIS calculates hours by multiplying projected volumes by completion rates for most benefit types. Completion rates are the average time that an immigration services officer (ISO) requires to adjudicate immigration benefit requests.[13] In general, the more time spent adjudicating a request, the more cost assigned to that request and, therefore, the higher the total cost and unit cost.

USCIS also uses completion rates and calculated hours for two other production oriented activities at the USCIS National Records Center (NRC). The Research Genealogy activity uses estimated production hours for genealogy searches and records requests. USCIS assigns all costs associated with this activity to the genealogy forms, Forms G-1041, Genealogy Index Search Request. and G-1041A, Genealogy Records Request. The Certify Non-Existence activity uses calculated hours to assign costs to Form G-1566, Request for Certificate of Non-Existence.

---

[13] Refers to the amount of time a USCIS immigration service officer spends on an adjudication. This is different than cycle or processing time, the amount of time a customer waits for an output.

New to this fee review is an activity driver called Incoming Records. This represents paper receipts less documents that we shred after data collection and fee collection. We use this activity driver for the Intake and Records Management activities to better represent the cost of paper filing. For example, online filing does not receive the Intake activity cost because the model only allocates it to paper workloads. As another example, if USCIS shreds the paper that it receives for a benefit request, then that benefit request receives less of the Records Management activity cost because the Incoming Records driver does not include shredded paper. Currently, USCIS shreds the following paper requests after entering the data into our case management systems:

- I-90, Application to Replace Permanent Resident Card;
- I-765, Application for Employment Authorization, for some specific categories; and
- N-565, Application for Replacement Naturalization/Citizenship Document.

The ABC model allocates activity costs to immigration benefit requests by the locations (Service Centers, Field Offices, etc.) that process them. USCIS uses data from the USCIS Performance Reporting Tool (PRT), including volumes and hours by various activities, as well as assumptions or data points from other systems. For the FY 2022/2023 fee review, USCIS aligned its fee review metrics with the PRT metrics used in the FY 2021 Staffing Allocation Model (SAM) to ensure organizational consistency.

**Cost Objects**

In the ABC model, cost objects are immigration benefit requests and other work products that USCIS produces. Table 3 shows which activity drivers link specific activities to groupings of cost objects.

Table 3: Cost Object Assignments

| Activity | Activity Driver | Cost Object Grouping |
|---|---|---|
| Perform Biometric Services | N/A (See rows below) | N/A (See rows below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Conduct TECS Check | Completions | Grouping where TECS Checks are Required |
| Fraud Detection and Prevention | Completions | Grouping where TECS Check are Required |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests not filed online |

| Activity | Activity Driver | Cost Object Grouping |
|---|---|---|
| Issue Document | Completions | Grouping where USCIS issues documents, such as an employment authorization document (EAD) or a permanent residence card (PRC) |
| Make Determination | Calculated Hours | Immigration Benefit Requests |
| Management and Oversight | Completions | Immigration Benefit Requests |
| Records Management | Incoming Records | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Reimbursable Workload |

Figure 4 illustrates how the ABC model works. It displays each of the terms in this section and shows their connections.

Figure 4: USCIS Specific ABC Diagram



USCIS estimates costs for most immigration benefit requests, including those provided without charge to asylum applicants and certain other applicants and petitioners. The IEFA cost of immigration benefit requests for which no revenue is recovered is later reallocated to other immigration benefit requests that generate revenue. In other words, fees must recover the estimated full cost of workloads for which fees are not collected.

## CHANGES IMPLEMENTED IN THE FY 2022/2023 FEE REVIEW

The preamble to this proposed rule discusses all major policy changes. The following sections below highlight changes to the ABC model, fee schedule, or other fee review information that may or may not be in the preamble.

**Additional Immigration Benefit Requests and Other Workloads**

USCIS included several new immigration benefit requests in the ABC model or proposed fee structure that were not fully considered in the FY 2016/2017 fee rule. USCIS incorporated cost and operational metrics for the following immigration benefit requests:

- Calculated several different Form I-129, Petition for a Nonimmigrant Worker, fees based on the visa classification petitioned for, and whether the petition requests named or unnamed workers. Also limited the number of named beneficiaries to 25 per petition.
- Added H-1B registration fee to the ABC model as a SCOPS workload.
  - Assigned the following activity costs to the workload:
    - Inform the Public
    - Management and Oversight
  - This approach is a similar to methodology that DHS used to establish the USCIS Immigrant Fee in 2010, except the H-1B registration fee contains and funds fewer activities.
- Incorporated cost and fee-paying volume from U.S. Customs and Border Protection (CBP).
  - When available, incorporated CBP cost and revenue information into the USCIS fee schedule. We include the information to calculate combined CBP/USCIS fees. Then we subtract CBP revenue from the total revenue to calculate separate USCIS revenue. Only USCIS revenue funds IEFA operations.
  - USCIS and CBP share the following workloads:
    - I-192, Application for Advance Permission to Enter as Nonimmigrant
    - I-193, Application for Waiver of Passport and/or Visa
    - I-212, Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
    - I-824, Application for Action on an Approved Application or Petition
- Incorporated volume estimates from the interagency agreement with Department of State (DOS) Bureau of Consular Affairs to allocate the estimated cost for the following workloads that USCIS and DOS share:
  - I-130, Petition for Alien Relative
  - I-131, Application for Travel Document
  - I-131A, Application for Travel Document (Carrier Documentation)
  - I-360, Petition for Amerasian Widow(er) or Special Immigrant
  - I-407, Abandonment of Lawful Permanent Resident Status
  - I-600/600A/800/800A Adoption Petitions and Applications
  - I-604, Determination on Child for Adoption
  - I-730, Refugee/Asylee Relative Petition
  - DNA Collection
  - Overseas Verifications
- New Form I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600.
- New Form G-1566, Request for Certificate of Non-Existence.
- Added other cost objects to the ABC model. These enable USCIS to estimate the total cost of several low volume workloads. DHS does not propose fees for the following because of various policy or operational constraints:

- o Automatic certificate of citizenship for certain adopted children
- o DNA collection abroad
- o I-914 Supplement A, Application for Family Member of T-1 Recipient
- o I-918 Supplement A, Petition for Qualifying Family Member of U-1 Recipient

**Methodology Changes**

This section describes key methodology changes in the FY 2022/2023 fee review that were not reflected in the FY 2016/2017 fee rule. In some instances, USCIS used new data, varying levels of detail, or changed assignments in the ABC model. Examples include, but are not limited to, the following:

- Created the Research Genealogy and Certify Non-Existence activities and split the Perform Biometric Services activities into several subordinate activities, as described in the Activities section.
- Used estimated hours to allocate the Research Genealogy and Certify Non-Existence activity costs to each genealogy and certificate of non-existence (CNE) request.
  - o The FY 2016/2017 fee rule used completions to allocate the Records Management activity to all immigration benefit requests (including genealogy workload) and calculated a single genealogy fee.
  - o Now, proposed fees may better represent the level of effort required for each genealogy form. There is only one CNE workload. As such, weighing by level of effort does not affect the fee calculation for CNE.
- Used estimated completion rates for asylum workloads to approximate adjudication hours. Used adjudication hours as an activity driver for the Make Determination activity, similar to most other cost objects in the ABC model. Now, the ABC model more accurately assigns costs to the asylum workloads that require more adjudication time.
  - o Previous fee rules used completions to assign Make Determination activity costs to asylum workloads. As such, previous ABC models did not show that some asylum adjudications require more time than others. The FY 2016/2017 fee rule ABC model included asylum cost objects for Forms I-589 and I-881 even though DHS did not propose or change these fees.
- Added hours for Administrative Site Visit and Verification Program (ASVVP) to allocate the payroll dollars for the program.
  - o Used FY 2019 ASVVP hours to distribute approximately $8.4 million of payroll in the FY 2022/2023 fee review budget. As such, the distribution is weighted so that workloads requiring more time receive a larger share of the cost.
  - o Affects only the following forms or fees:
    - ▪ I-129 H-1 Classifications
    - ▪ I-129 L Classification
    - ▪ I-129 H-3, P, Q, or R Classification
    - ▪ I-360 Petition for Amerasian Widow(er) or Special Immigrant

- I-829 Petition by Investor to Remove Conditions on Permanent Resident Status

- Separated most FDNS staffing by the directorate, region, or service center that they support. With this change, the ABC model assigns approximately 80% of FDNS to the workload completed by the respective location. This way, the ABC model better represents FDNS contributions to each location's cost.
  - For example, with this change, the ABC model allocates the cost of FDNS employees at a service center to the workload for that service center.
  - The ABC model still assigns headquarters employees, which indirectly support all of FDNS, to all immigration benefit requests that FDNS might investigate. This represents approximately 20% of FDNS employees.
  - Previous fee review models more or less assigned a single Fraud Detection and Prevention activity cost to all immigration benefit requests that FDNS might investigate, instead of assigning FDNS costs more directly to the offices in which they were incurred as this rule does.

- Added filing method (online or paper) to cost objects that allow online filing.
  - Added the Incoming Records activity driver.
  - We discuss both the filing method and the new driver in the Activity Drivers and Activity Assignment section.

- Modified the fee schedule to switch between bundled and unbundled ABC model results more easily. Also allowed the fee schedule to switch fee-paying receipts with or without additional humanitarian exemptions. This allowed USCIS to evaluate alternatives more easily.

- Calculated the Asylum Program Fee. See the NPRM preamble for more information.

**Organizational Changes**

Since the FY 2016/2017 fee rule, USCIS has reorganized several offices.[14] While reorganization of employee assignments and workflow does not by itself affect agency costs, this section explains some of those changes in the context of the USCIS fee review. Some organizational changes may not affect the fee review results. For example, if an office performed the same activity before and after the reorganization, then it may not affect our results. However, this section highlights some of the larger changes. It would be difficult for USCIS to determine how much any of these changes affected fees. To compare the change to fees, we would need to rebuild the FY 2016/2017 fee review model in our new software with the new organizational structure. Doing so would be a significant undertaking without significant benefit to our operations.

---

[14] For the current organizational structure of USCIS, see Appendix I – USCIS Offices or visit http://www.uscis.gov/about-us. For a staffing comparison by office, see Appendix IX – Authorized IEFA Positions by USCIS Office.

### *External Affairs Directorate (EXA)*

USCIS combined several offices into a new directorate, External Affairs (EXA), as summarized in Table 4. In the FY 2022/2023 fee review, EXA has 660 authorized positions.

Table 4: EXA Reorganization

| Old Office Name | New Office Name |
|---|---|
| Communications | Public Affairs |
| Legislative Affairs | Legislative Affairs |
| Customer Service Directorate | Citizenship and Applicant Information Services |
| Office of Citizenship | Citizenship and Applicant Information Services |

This organizational change was not part of the FY 2016/2017 fee review. It was part of the FY 2019/2020 fee review. The new directorate may affect some activity cost comparisons. For example, both Legislative Affairs and Citizenship Office were part of the Management and Oversight activity in the FY 2016/2017 fee review. However, all EXA offices are part of the Inform the Public activity in the FY 2019/2020 and FY 2022/2023 fee reviews. The organizational change may also affect the estimated cost of Form N-400. The FY 2016/2017 fee rule ABC model allocated the Office of Citizenship to Form N-400 only. The FY 2022/2023 fee review model assigns the new combined Citizenship and Applicant Information Services to all immigration benefit requests. By spreading the estimated cost of Citizenship and Applicant Information Services to other benefit requests, the estimated cost for Form N-400 may be lower than without making this change. The model does not include $10-20 million for citizenship grants. USCIS anticipates appropriations for citizenship grants. Appropriated funds are not part of the IEFA fee review budget.

### *Fraud Detection and National Security (FDNS)*

As explained in the Activities section, FDNS is the main contributor to the Fraud Detection and Prevention activity. FDNS staffing increased during both the Obama and Trump administrations. (The FY 2016/2017 fee rule included a 93% increase in FDNS staffing compared to the FY 2010/2011 fee rule.) The FY 2016/2017 fee rule used the FY 2015 OP as its starting point. The FY 2022/2023 fee review used FY 2021 OP as its starting point. While the current fee review does not increase FDNS staffing significantly over FY 2021 levels, it reflects staffing increases since the FY 2016/2017 fee rule. The FY 2022/2023 fee review does not plan for a decrease or reduction in force in FDNS. Staffing increases for FDNS resulted from new or expanded workloads including:

1. Implemented Targeted Site Visit Program.
2. Established new work units including Social Media Division and Immigration Intelligence Watch Branch.

3. Increased staffing in FOD, SCOPS, and RAIO to support the increase in overall field staffing. For example, establishment of the Potomac Service Center and expansion of prescreening and enhanced vetting requirements in RAIO.
4. Increased headquarters staff to support the increase in field personnel.

### *Immigration Records and Identity Services (IRIS) Reorganization*

Identity and Information Management Division (IIMD)

Immigration Records and Identity Services (IRIS) combined two divisions, Records and Biometric Services, into a new Identity and Information Management Division (IIMD). There are approximately 100 positions in the new group. Previous fee reviews assigned Records Division to the Records Management activity. Likewise, we assigned Biometric Services Division to the Manage Biometric Services activity, which is part of a larger Perform Biometric Services activity from previous reviews.

In this current fee review, we assign the new IIMD to the Management and Oversight activity. As a result of this change, the activity costs for Records Management and Manage Biometric Services may decrease. We continue to assign Application Support Center (ASC) and FBI contracts for biometric services to the appropriate activities.

The National Records Center is separate from the new division. We continue to assign the overwhelming majority of its employees and contracts to Records Management activity. For example, in this fee review, we assign approximately 400 positions and 97% of NRC's costs to Records Management. We assign approximately 6 positions to the Research Genealogy activity and approximately 4 positions to the Certify Nonexistence activity.

E-Verify and SAVE

We realigned the staffing in both E-Verify and SAVE as a result of improved staffing forecasts. IRIS provided the SAM for FY 2021-2029 to OCFO. The SAM identified 30 positions that were better attributed to the SAVE program, which is funded with IEFA non-premium funds. We account for these 30 positions as increased IEFA non-premium costs. In the FY 2022/2023 fee review, SAVE has 250 authorized positions.

### *Refugee, Asylum, and International Operations (RAIO)*

Asylum

As noted in the NPRM preamble, the FY 2022/2023 fee review includes staffing and costs for the Asylum Processing IFR. While not a reorganization, it is a significant increase when comparing the current fee rule to the proposed rule. In the proposed rule, Asylum has 3,876 authorized positions in total, including new positions for the Asylum Processing IFR.

International and Refugee Affairs Division (IRAD)

RAIO combined two divisions, Refugee Affairs and International Operations, into a new International and Refugee Affairs Division (IRAD). The decision to close most USCIS offices abroad was not part of the analysis for the enjoined fee rule.[15] While the enjoined NPRM discussed the office closure, USCIS did not have sufficient information to incorporate it into the fee review.[16] The FY 2022/2023 fee review includes only the offices that remain open. In the FY 2022/2023 fee review, the newly combined IRAD has 771 authorized positions, including some positions in RAIO HQ.

### *Service Center Operations (SCOPS)*

Potomac Service Center

The Potomac Service Center (PSC) was not part of the FY 2016/2017 fee rule. It was part of the enjoined FY 2019/2020 fee review. In other words, USCIS added a service center since planning for the current fee structure in FY 2015. In the FY 2022/2023 fee review, PSC has 731 authorized positions. The largest workload at PSC is Form I-90.

## SPECIAL TOPICS

This section addresses specific topics not discussed elsewhere in the supporting documentation.

## IEFA NON-PREMIUM CARRYOVER PROJECTIONS

Carryover is unobligated/unexpended fee revenue accumulated from previous fiscal years. For federal entities such as USCIS that rely almost entirely on fee revenue, it is important to maintain a sufficient carryover balance and critical that they maintain adequate available funds to meet daily obligation and outlay requirements. USCIS' IEFA requires a positive carryover balance to ensure that sufficient funds are available to maintain operations at the start of each new FY until it collects and deposits current year fee revenue. Most federal programs are financed by discretionary appropriations that receive an annual Treasury warrant, which establishes a cash balance in their accounts after enactment of appropriations. USCIS' IEFA possesses permanent/indefinite warrant authority that allows for immediate access to carryover balances and revenue collections subject to the annual spending limits established by Congress. Additionally, GAO acknowledges that fee funded agencies may need to designate funds as operating reserves to whether periods when revenue collections are lower than costs.[17] USCIS actively monitors the IEFA carryover balance each month. Historically, fee revenue in the first

---

[15] *See USCIS Will Adjust International Footprint to Seven Locations* at https://www.uscis.gov/news/news-releases/uscis-will-adjust-international-footprint-seven-locations (last reviewed/updated Aug. 9, 2019). *See also* 84 FR 62306-62307 and 85 FR 46839.

[16] Id.

[17] *See* U.S. Government Accountability Office, Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability (Sep. 30, 2013), *https://www.gao.gov/assets/gao-13-820.pdf* (last visited Dec. 2, 2021).

quarter of the FY is low due to seasonal filing patterns. Therefore, USCIS requires carryover funds to pay Federal salaries and award certain contracts at the beginning of the FY.

Applicants and petitioners pay IEFA fees when filing immigration benefit requests. USCIS rejects immigration benefit requests that do not include the appropriate filing fee (unless a fee exemption applies or USCIS approves a fee waiver request). For accounting purposes, USCIS cannot recognize revenue as earned until work is completed. This means that USCIS recognizes revenue when it renders a decision on an immigration benefit request.[18] Consequently, USCIS manages its fee accounts to ensure that adequate carryover balances are generated and retained to:

- Cover the cost of processing applications and petitions that are pending adjudication at the end of the fiscal year;
- Serve as contingency funding in the event of an unexpected decline in fee collections;
- Cover the start-up costs of new or expanded programs before sufficient fee revenues from such programs are collected (if a fee is to be collected), and;
- Cover other valid contingencies.

USCIS evaluated the FY 2022/2023 IEFA non-premium year-end carryover balance projections for the budget scenario described in this proposed rule. The evaluation projected a negative year-end carryover balance, which confirmed that the current fee structure is not sufficient to cover the estimated cost of operations and maintain adequate carryover balances. In other words, if IEFA non-premium funding was exhausted, then USCIS would need to stop operations to avoid violating the Anti-Deficiency Act.[19] This would pose a significant fiscal risk that may further increase current backlogs unless DHS adjusts USCIS' fee schedule. Therefore, DHS is adjusting USCIS' fees in this proposed rule to meet its operational requirements and ensure a sufficient carryover balance.

---

[18] Deferred revenue is revenue that USCIS has received for work that has not been completed and constitutes an outstanding liability for the agency. Deferred revenue and pending caseloads do not impact fee adjustments.

[19] The Anti-Deficiency Act prohibits federal employees from:

- Making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341(a)(1)(A).
- Involving the government in any obligation to pay money before funds have been appropriated for that purpose unless otherwise allowed by law. 31 U.S.C. § 1341(a)(1)(B).
- Accepting voluntary services for the United States, or employing personal services not authorized by law, except in cases of emergency involving the safety of human life or the protection of property. 31 U.S.C. § 1342.
- Making obligations or expenditures in excess of an apportionment or reapportionment, or in excess of the amount permitted by agency regulations. 31 U.S.C. § 1517(a).

Figure 5 depicts historical (FY 2019-2021) actual and FY 2022-2023 projected year-end carryover balances.[20]

Figure 5: IEFA Non-Premium Year-End Carryover Balances



A minimum carryover balance threshold enables USCIS to effectively monitor and maintain the fiscal health of the IEFA. By comparing planned spending to projected revenue, USCIS evaluates the potential operating surplus or deficit at the start of the respective FY to determine whether the IEFA will maintain an appropriate level of funding to ensure continuity of operations at the start of the following fiscal year. If DHS cannot implement the fee rule before FY 2022, then USCIS will need to reduce the FY 2022 operating plan to be less than the FY 2022 fee review budget in order to avoid a negative carryover balance. Similarly, the FY 2019 and 2020 operating plans were less than the FY 2019/2020 fee review budgets because the 2020 fee rule was enjoined and revenue was less than estimated because of the pandemic and the various injunctions.

USCIS establishes a minimum carryover balance threshold that, when combined with new fee receipts, ensures IEFA obligations will not exceed available funding. USCIS considers historical obligation patterns and revenue trends to determine the minimum carryover threshold needed to sustain agency operations. Revenue collections do not necessarily cover obligations at a given time during the biennial period. Thus, USCIS may experience cash flow deficits at certain times during the fiscal year. USCIS calculates its minimum carryover threshold using the planned total

---

[20] FY 2022-2023 year-end carryover projections assume the revenue and budget reflected in Table 4 of the proposed rule. They also account for a recurring annual transfer of funds to the Executive Office for Immigration Review (EOIR), SAVE and other offsetting collections, and the recovery of prior year obligations (namely, recoveries). USCIS forecasts recoveries by evaluating historical actual data from the most recent five FYs. An average annual recovery rate is calculated as a proportion of actual recoveries relative to the OP for the applicable FY. USCIS applies a recovery rate to the anticipated annual budget (namely, cost baseline) to forecast recoveries.

first quarter spending plus the annual net sequestration difference. Ensuring that USCIS maintains cash reserves no less than this amount enables the agency to sustain equivalent levels of obligations during periods of cash flow deficits. USCIS estimates its FY 2022/2023 IEFA non-premium minimum carryover threshold to be $1,063.8 million.

The FY 2022/2023 IEFA non-premium year-end carryover balance projections reflected in Figure 4 are significantly below USCIS' minimum carryover threshold of $1,063.8 million. Therefore, DHS proposes to adjust USCIS' fees in an effort to bridge the cost/revenue differential and mitigate the fiscal risk.

## IMPUTED BENEFITS COST ESTIMATE – OMB CIRCULAR A-25 COMPLIANCE

OMB Circular A-25 establishes Federal policy regarding fees assessed for government services and for sale or use of government services, products, and facilities. It also establishes the underlying policy that user fees should recover the full cost to the Federal Government including direct and indirect costs. However, Circular A-25 provides exceptions for including certain costs if, in the opinion of the agency head or their designee, the costs justify an exception. The OMB Director can approve exceptions. OMB approved two USCIS exemption requests on 6/1/2020 for the FY 2019/2020 fee review.  The OMB approval is valid for a period of 4 years.

1. Retirement, health, and life insurance costs paid by OPM for USCIS employees and retirees. The cost is approximately $152.9 million in FY 2022 and $162.3 million in FY 2023. USCIS used guidance from the OPM Benefits Administration Letter 21-301, Fiscal Year 2021 Cost Factors for Calculating Imputed Costs to estimate the imputed cost.
2. Lockbox costs that are paid by the Department of the Treasury's Financial Management Service that are in addition to the costs that USCIS reimburses Treasury. USCIS pays for part, but not all, of the Lockbox cost. USCIS estimates Treasury's costs to be $135.0 million in FY 2022 and $144.4 million in FY 2023. The USCIS portion of the lockbox costs, specifically, the amount that USCIS reimburses Treasury, is included in the USCIS fee structure.

Table 5: Imputed Cost Estimate (Dollars in Millions)

| Imputed Cost Description | FY 2022 | FY 2023 | FY 2022/2023 Estimated Cost |
|---|---|---|---|
| OPM retirement, health, and life insurance | $152.9 | $162.3 | $157.6 |
| Treasury's portion of Lockbox contract | $135.0 | $144.4 | $139.7 |
| **Grand Total** | **$287.9** | **$306.7** | **$297.3** |

USCIS believes that adding these costs to the fee structure would be overly burdensome to fee-paying applicants and petitioners. Therefore, OMB approved USCIS' request to exclude these imputed costs from its proposed fee schedule. OMB's approval is valid for up to 4 years.

**FASAB COMPLIANCE JUSTIFICATION**

The cost methodology section of FASAB's SFFAS recommends performing cost assignments using the following order of preference:

1. Directly tracing costs wherever feasible and economically practicable;
2. Assigning costs on a cause-and-effect basis; or
3. Allocating costs on a reasonable and consistent basis.

According to FASAB SFFAS Number 4, "an activity is considered a linkage between the cause and the effect." USCIS uses ABC to assign resources to outputs (immigration benefit requests). Most immigration benefit requests require multiple activities to complete a request. USCIS assigns costs to requests by cause-and-effect with some exceptions. In some cases, USCIS directly traces costs dedicated to particular outputs. USCIS allocates overhead on a reasonable and consistent basis using staffing by activity. We summarize cost assignments by FASAB preference below. These lists identify some of the notable examples.

**Direct Trace**

USCIS directly assigns approximately $1,049.5 million, or 20 percent, of the $5,150.7 million average annual cost projection. The following costs are examples of direct trace:

- $425.9 million for the Asylum Processing IFR.
- $233.0 million to the Management and Oversight activity.
  - $204.7 million for increases in rent, contracts, postage, utilities, supplies, or federal guard services because of inflation.
  - $28.3 million for federal employee awards.
- $152.7 million to various biometric activities:
  - $74.4 million for ASC contractual services and biometrics services software,
  - $39.6 million for FBI name checks, and
  - $38.7 million for FBI fingerprints.
- $82.2 million for planned increase to the refugee ceiling.
- $75.9 million to the Intake activity for the USCIS lockbox provider and related supplies.
- $43.0 million to the Issue Document activity for USCIS card production services, supplies, and secure delivery of PRCs and EADs.
- $10.2 million to the Records Management activity for records systems, scanning, and other contractual services.
- $10.1 million for services from the DOS Bureau of Consular Affairs.[21]
- $8.4 million for ASVVP payroll and travel.
- $3.2 million for naturalization ceremonies, certificates, and travel.
- $2.4 million to the Inform the Public activity for various customer service systems.
- $2.5 million for other direct costs to various immigration benefit requests.

---

[21] USCIS used Consular Affairs cost estimates by immigration benefit request in the FY 2022/2023 fee review. We add these costs to the immigration benefit requests that Consular Affairs processes on behalf of USCIS.

**Cause-and-Effect**

A cause-and-effect relationship assigns approximately $3,101.4 million, or 60 percent, of the $5,150.7 million average annual cost projection. USCIS assigns resources to each fee review activity based on operational data, records, statistics, and estimates by subject matter experts. It then assigns activity costs to outputs by a prorated share of immigration benefit request volume or immigration benefit request volume weighted by adjudication processing time.

**Reasonable and Consistent Allocation**

USCIS uses reasonable and consistent allocation to assign approximately $999.9 million, or 19 percent, of the $5,150.7 million average annual cost projection. These costs are mostly attributable to service-wide information technology, rent, and guard services. They include the following:

- $342.3 million for mission support costs, which are reassigned to other activities in the same office as the costs originate;
- $336.3 million for information technology costs, which are reassigned to other fee review activities across USCIS;
- $271.7 million in rent and guard services;
- $46.6 million for DHS working capital fund costs, which are reassigned to other fee review activities across USCIS; and
- $2.9 million for mail services costs, which are reassigned to other fee review activities across USCIS.

# APPENDICES

## APPENDIX I – USCIS OFFICES

Below is USCIS' organizational chart as of the publication date of this proposed rule. For additional information on the offices within USCIS, visit http://www.uscis.gov/about-us.

### Appendix Figure 1: USCIS Organizational Chart



## APPENDIX II – USCIS FUNDING AND ACCOUNT STRUCTURE

Per the FY 2021 enacted DHS budget authority, USCIS receives funding authority through four accounts as identified below.

1. Discretionary Appropriations[22]
2. Immigration Examinations Fee Account (mandatory fees)[23]
3. Fraud Prevention and Detection Account (mandatory fees)
4. H-1B Nonimmigrant Petitioner Account (mandatory fees)

**Discretionary Appropriations**

USCIS' Discretionary Appropriations include the Operations and Support (O&S) and the Procurement, Construction, and Improvements (PC&I) accounts. The O&S appropriation provides funding for ongoing mission operations, mission support, and associated management and administration (M&A) costs for the E-Verify program. The PC&I appropriation funds the planning and acquisition/development costs for the E-Verify program. USCIS also received a Federal Assistance appropriation in FY 2019, FY 2020, and FY 2021 for the Citizenship and Integration Grant Program.

**Immigration Examinations Fee Account (IEFA)**

The IEFA is the primary funding source for USCIS. It accounts for approximately 96 percent of USCIS's FY 2021 total funding. Fees collected from the filing of immigration benefit requests are deposited into the IEFA and used to fund the cost for providing adjudication and naturalization services including the costs of services provided without charge to asylum applicants and other immigrants whose fees are waived or to whom a fee exemption applies.

Certain IEFA fees are set by statute:

- The filing fee for Temporary Protected Status (TPS) is limited to $50 for initial registration; renewals are free of charge.[24] DHS may impose separate, additional fees for conducting biometrics services or providing employment authorization documentation.[25]
- Premium processing service is available for certain employment-based petitions. Congress originally set the fee at $1,000 and authorized USCIS to adjust the fee by inflation as measured by the Consumer Price Index (CPI). Congress revised the premium processing authority with the Continuing Appropriations Act, 2021 and Other Extensions Act, Pub. L. No. 116-159. The current premium processing fees are $1,500 for H-2B or R-1 nonimmigrant status and $2,500 in all other cases. Employers requesting premium processing for their petitions pay this fee in addition to the regular petition fee. USCIS currently only offers premium processing service to filers of Forms I-129 and I-140, but may expand it in the future.

---

[22] Discretionary spending is the budget authority provided by annual appropriations acts and the outlays that result from that budget authority. For example, the budget authority and outlays for the salaries and other operating expenses of Government agencies are usually provided by annual appropriations acts and, therefore, are often discretionary.

[23] Mandatory spending is budget authority and outlays provided by permanent laws. For example, permanent laws authorize payments for Medicare and Medicaid, unemployment insurance benefits, and farm price supports. Therefore, the budget authority and outlays for these programs are mandatory. In addition, budget authority provided in annual appropriations acts for certain programs is treated as mandatory because the authorizing legislation directs that the Government make or beneficiaries receive payment.

[24] Section 244(c)(1)(B) of the INA, 8 U.S.C. 1254a(c)(1)(b).

[25] *See* 8 U.S.C. 1254b.

- CNMI education funding fee of $200. DHS has the authority to adjust this fee by inflation, similar to the premium processing service fee, starting in 2020.[26] DHS proposes an inflation-only increase in the NPRM.[27] Per statute, USCIS transfers the revenue for this fee to CNMI.
- LIFE Act penalty fee of $1,000.

**Appendix Table 1: FY 2019 – 2020 Enacted IEFA by Program/Activity**

| Program, Project, and Activity | FY 2019 Enacted | FY 2020 Enacted |
|---|---|---|
| **Adjudication Services** | | |
| District Operations | $1,883,816,000 | $1,934,033,000 |
| Service Center Operations | $731,654,000 | $746,687,000 |
| Asylum, Refugee, and International Ops | $337,544,000 | $349,295,000 |
| Records Operations | $152,649,000 | $155,150,000 |
| Premium Processing (including Transformation) | $648,007,000 | $658,190,000 |
| **Subtotal** | **$3,753,670,000** | **$3,843,355,000** |
| | | |
| **Information and Customer Services** | **$119,450,000** | **$125,335,000** |
| | | |
| **Administration** | **$616,622,000** | **$651,808,000** |
| | | |
| **Systematic Alien Verification for Entitlements (SAVE)** | **$35,112,000** | **$34,868,000** |
| | | |
| **Grand Total** | **$4,524,854,000** | **$4,655,366,000** |

The enacted amounts above represent the planned budget while preparing the FY 2021 Congressional Justification for DHS.[28] It serves as a planning document that the administration submits to Congress. Operating plans for any given year may be different as a result of reprograming, available revenue, or appropriations from Congress. Fee review budgets may differ from enacted budgets or operating plans because of timing or different assumptions. For example, USCIS may prepare a fee review budget before finalizing requested amounts in Congressional Justifications. Additionally, USCIS fee reviews may use a different methodology. For example, fee review budgets excludes costs and revenue from TPS and DACA, as explained in the preamble.

**Other Fee Accounts**

DHS does not have the authority to adjust fees for the Fraud Prevention and Detection or H-1B Nonimmigrant Petitioner accounts. As such, DHS cannot increase the fees to meet changing needs or costs without assistance from Congress.

---

[26] The Northern Mariana Islands U.S. Workforce Act of 2018, Pub. L. No. 115-218, Sec. 3, 132 Stat. 1547 (2018) codified at 48 USC 1806(a)(6)(A)(ii) (2018).

[27] *See* VIII.K.8. Commonwealth of the Northern Mariana Islands Fees of the preamble.

[28] *See* Department of Homeland Security, United States Citizenship and Immigration Services, Budget Overview, Fiscal Year 2021 Congressional Justification available at
https://www.dhs.gov/sites/default/files/publications/united_states_citizenship_and_immigration_services.pdf (visited Jan. 13, 2022).

### Fraud Prevention and Detection Account

The Fraud Prevention and Detection fees charged to certain employers petitioning for nonimmigrant workers in the H-1B, H-2B, and L-1 visa classifications are set by statute. Revenue is used for activities related to preventing and detecting fraud in immigration benefit requests as stipulated in the H-1B Visa Reform Act of 2004, and later amended by Public Law 109-13, Section 403. *See* 8 U.S.C. 1356(v)(2)(B). Revenue is shared equally among USCIS, Department of State (DOS), and Department of Labor (DOL). Effective July 25, 2018, USCIS also collects and retains the $50 CNMI fraud fee, as stipulated in the Northern Mariana Island U.S. Workforce Act of 2018. *See* 48 U.S.C. 1806(a)(6)(iv).

DHS interprets Fraud Prevention and Detection Account authority as providing supplemental funding to cover activities related to fraud prevention and detection and not prescribing that only those funds may be used for that purpose. FDNS is funded out of both the IEFA and the Fraud Prevention and Detection Account. The fees deposited in the Fraud Prevention and Detection Account are fixed by statute are insufficient to cover the full costs of FDNS. Therefore, USCIS uses both Fraud Prevention and Detection Account and IEFA funds for FDNS costs.

### H-1B Nonimmigrant Petitioner Account

Certain H-1B fees are established by the American Competitiveness and Workforce Improvement Act (ACWIA) of 1998, as amended by the H-1B Visa Reform Act of 2004. Revenue is shared among USCIS, DOL, and National Science Foundation. USCIS receives 5 percent of these funds. USCIS uses the H-1B Nonimmigrant Petitioner Account as supplemental funding to SCOPS for the limited H-1B petition adjudication activities authorized by statute. *See* 8 U.S.C. 1356(s)(5).  The H-1B Nonimmigrant Petitioner Account is not sufficient to fund an appreciably level of the costs to USCIS of administering the H-1B program but, to the extent it does, IEFA fees are not required for those limited purposes authorized or required by section 1356(s)(5).

## APPENDIX III – USCIS ACTIVITY-BASED COSTING TERMINOLOGY

The various terms used throughout this document to discuss ABC are defined as follows:

- **Resource** – An economic element applied or used to perform activities. For example, labor, equipment, supplies, and facilities. Resources include direct and indirect costs. Generally, the term "indirect" includes overhead items or costs requiring a resource driver to spread them to activities. USCIS resources for the FY 2022/2023 fee review are outlined in section V.A.2. FY 2022/2023 Cost Projections of the proposed rule.

- **Resource Driver** – A measure of the amount of resources consumed by an activity. For example, the amount of time spent on an activity.

- **Activity** – The work performed within an organization. For example, accepting and adjudicating immigration benefit requests, entering data, updating records, etc. These activities consume resources. They ultimately produce outputs (cost objects).

- **Activity Driver** – A measure of the frequency and intensity of the demands for activities by cost objects. For the FY 2022/2023 fee review, activity drivers are projected immigration benefit request volumes, projected adjudication hours, completion rates, and other information. They link activities to cost objects.

- **Cost Object** – The primary output of an activity or series of activities. A cost object may be a product, service, or project. For the purposes of the FY 2022/2023 fee review, cost objects are the various immigration benefit requests that USCIS adjudicates.

### Appendix Figure 2: ABC Concept and Terminology



## APPENDIX IV – COSTS BY ACTIVITY

Appendix Table 2 summarizes the ABC model activity costs. See the Activities section for definitions of these activities. While not an activity, the table lists the Asylum Processing IFR as a separate row for easier comparison to the FY 2016/2017 results.

**Appendix Table 2: Projected IEFA Costs by Activity (Dollars in Millions)**

| Activity | FY 2016/2017 Average | FY 2022/2023 Average | Difference | % Difference |
|---|---|---|---|---|
| Certify Nonexistence | N/A | $1.4 | N/A | N/A |
| Conduct TECS Check | $53.4 | $131.4 | $78.0 | 146% |
| Direct Costs | $57.5 | $116.8 | $59.4 | 103% |
| Fraud Detection and Prevention | $178.5 | $335.4 | $156.9 | 88% |
| Inform the Public | $284.9 | $319.8 | $34.8 | 12% |
| Intake | $93.9 | $127.5 | $33.5 | 36% |
| Issue Document | $32.3 | $46.8 | $14.5 | 45% |
| Make Determination | $1,285.5 | $1,876.8 | $591.2 | 46% |
| Management and Oversight | $590.2 | $1,266.3 | $676.1 | 115% |
| Perform Biometrics Services | $196.3 | $191.9 | -$4.3 | -2% |
|    Manage Biometric Services | N/A | $46.4 | N/A | N/A |
|    Capture Biometric Data | N/A | $38.7 | N/A | N/A |
|    Check Fingerprints | N/A | $39.6 | N/A | N/A |
|    Check Name | N/A | $67.2 | N/A | N/A |
| Records Management | $239.5 | $257.8 | $18.3 | 8% |
| Research Genealogy | N/A | $1.9 | N/A | N/A |
| Systematic Alien Verification for Entitlements | $25.7 | $51.1 | $25.4 | 99% |
| **Subtotal before Asylum Processing IFR** | **$3,037.8** | **$4,724.8** | **$1,683.8** | **55%** |
| Asylum Processing IFR | N/A | $425.9 | N/A | N/A |
| **Total with Asylum Processing IFR** | **$3,037.8** | **$5,150.7** | **$2,112.9** | **70%** |

## Appendix V – Fee Waivers

USCIS did not propose any changes to existing fee waiver policy in this rulemaking. Under the current fee waiver policy, USCIS developed Form I-912, Request for Fee Waiver.[29] Applicants and petitioners may request that certain filing and biometrics (if applicable) fees be waived if the form being filed is eligible for a fee waiver and the applicant or petitioner is able to demonstrate one of the following criteria:

- Current receipt of a means-tested benefit;
- Household income at or below 150 percent of the Federal poverty level; or
- Extreme financial hardship.[30]

The 2010 fee rule also authorized the USCIS Director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c).[31]

While USCIS tracks some fee waiver data (such as request, approval, and denial volumes) fees waived for biometric services are not adequately collected and are underreported in financial estimates. Additionally, USCIS fee waiver data lacks the granularity necessary to identify waived fee amounts for forms with multiple filing fees. In order to estimate the dollar value of approved fee waiver requests, USCIS applies the higher fee in these cases. USCIS calculates these estimates by multiplying the approved fee waiver volume for a particular form by the form filing fee.[32] Appendix Figure 3 is a historical summary of USCIS fee waiver information.

**Appendix Figure 3: Historical Fee Waiver Summary**



---

[29] *See* 8 CFR 103.7(c). *See also* Policy Memorandum, PM-602-0011.1 "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11-26" (March 13, 2011) ("Fee Waiver Policy").

[30] For detailed fee waiver guidance, visit https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver.

[31] *See* 75 FR 58990; 8 CFR 103.7(d).

[32] Since USCIS includes a projection for fee waivers/fee exemptions when setting its fees to recover full cost, it does not forgo revenue unless the total dollar amount of actual fee waivers/fee exemptions exceeds the projected amount that was included in the fee setting process. The dollar amount of actual fee waivers/fee exemptions in excess of the projected amount included in the fee setting process is considered foregone revenue.

## APPENDIX VI – PROJECTED TOTAL COST BY IMMIGRATION BENEFIT REQUEST

USCIS uses specialized software to estimate the total cost for each of the cost objects below. See the Activity-Based Cost (ABC) Model section for more information. Total cost represents a portion of direct and indirect costs. USCIS divides the total cost by fee-paying receipts to determine a fee-paying unit cost. The fee-paying unit cost informs the USCIS fee schedule. Appendix Table 3 lists all cost objects in the ABC model, including workloads without fees.

This table also includes total cost and fee-paying receipt estimates from CBP. As stated in the NPRM, CBP provided cost information for Forms I-192 and I-193. The table also includes CBP fee-paying receipt forecasts for Forms I-192, I-193, I-212, and I-824.

These are only estimates. They are not prior year actual expenses. USCIS does not track actual costs by immigration benefit request. Each fee review uses forecasts for two future years. These include budget and workload forecasts. As such, actual cost information is not available at the time for those future years. USCIS has considered using activity-based costing models based on prior year obligations and workloads for individual fiscal years. However, due to resource constraints, USCIS has not created an ABC model using actuals because the prospective fee review that is required by the CFO Act takes priority.

Model Output is the projected total cost from the ABC model divided by projected fee-paying volume. It is only a forecast unit cost (using a budget forecast) and not the actual unit cost (using prior year actual expenses).

### Appendix Table 3: Projected Total Cost by Immigration Benefit Request

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card Subtotal | $213,558,605 | 648,758 | $329 |
| I-90 Application to Replace Permanent Resident Card - Online | $131,230,957 | 409,622 | $320 |
| I-90 Application to Replace Permanent Resident Card - Paper | $82,327,648 | 239,136 | $344 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $2,308,782 | 4,623 | $499 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $355,885,721 | 568,630 | $626 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $30,593,602 | 40,850 | $749 |
| I-129 H1 - Named Beneficiaries | $247,107,719 | 430,000 | $575 |
| I-129 H-2A - Named Beneficiaries | $3,223,361 | 4,020 | $802 |
| I-129 H-2B - Named Beneficiaries | $1,957,678 | 2,460 | $796 |
| I-129 L | $43,240,895 | 42,350 | $1,021 |
| I-129 O | $21,169,404 | 27,300 | $775 |
| I-129 H-2A - Unnamed Beneficiaries | $6,887,597 | 17,650 | $390 |
| I-129 H-2B - Unnamed Beneficiaries | $1,705,465 | 4,000 | $426 |
| I-129F Petition for Alien Fiance(e) | $22,007,382 | 41,432 | $531 |
| I-130 Petition for Alien Relative Subtotal | $500,486,284 | 857,514 | $584 |
| I-130 Petition for Alien Relative - Online | $112,395,883 | 214,232 | $525 |
| I-130 Petition for Alien Relative - Paper | $388,090,400 | 643,282 | $603 |
| I-131 Application for Travel Document | $117,372,207 | 253,662 | $463 |
| I-131 Refugee Travel Document | $9,583,588 | 17,416 | $550 |
| I-131A Application for Travel Document (Carrier Documentation) | $2,703,067 | 8,000 | $338 |
| I-140 Immigrant Petition for Alien Worker | $73,867,657 | 140,000 | $528 |
| I-290B Notice of Appeal or Motion | $47,763,060 | 33,803 | $1,413 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $36,099,065 | 4,107 | $8,790 |
| I-407 Abandonment of Lawful Permanent Resident Status | $31,380 | 0 | N/A |

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| I-485 Application to Register Permanent Residence or Adjust Status | $648,525,797 | 572,497 | $1,133 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $32,058,488 | 3,900 | $8,220 |
| I-539 Application to Extend/Change Nonimmigrant Status Subtotal | $197,429,161 | 462,380 | $427 |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $71,575,693 | 185,912 | $385 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $125,853,468 | 276,468 | $455 |
| I-589 Application for Asylum and for Withholding of Removal | $275,940,790 | 0 | N/A |
| I-590 Registration for Classification as Refugee | $205,376,600 | 0 | N/A |
| I-600/600A/800/800A Adoption Petitions and Applications | $3,543,841 | 2,438 | $1,454 |
| I-600A Supplement 3 Request for Action on Approved Form I-600A | $28,665 | 29 | $988 |
| I-601A Provisional Unlawful Presence Waiver | $32,402,199 | 39,800 | $814 |
| I-604 Determination on Child for Adoption | $357,636 | 0 | N/A |
| I-687 Application for Status as a Temporary Resident | $915 | 1 | $915 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $15,233 | 21 | $725 |
| I-694 Notice of Appeal of Decision | $3,397 | 4 | $849 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $22,972 | 20 | $1,149 |
| I-730 Refugee/Asylee Relative Petition (and Travel Eligibility) | $17,834,037 | 0 | N/A |
| I-751 Petition to Remove Conditions on Residence | $114,733,150 | 130,274 | $881 |
| I-765 Application for Employment Authorization Subtotal | $517,714,830 | 1,084,740 | $477 |
| I-765 Application for Employment Authorization - Online | $16,718,216 | 40,828 | $409 |
| I-765 Application for Employment Authorization - Paper | $500,996,614 | 1,043,912 | $480 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $672,910 | 448 | $1,502 |
| I-817 Application for Family Unity Benefits | $325,756 | 505 | $645 |
| I-824 Application for Action on an Approved Application or Petition | $5,106,968 | 10,292 | $496 |
| I-829 Petition by Investor to Remove Conditions | $22,793,302 | 3,250 | $7,013 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $865,137 | 385 | $2,247 |
| I-910 Application for Civil Surgeon Designation | $514,538 | 568 | $906 |
| I-914 T Nonimmigrant Status | $3,157,292 | 0 | N/A |
| I-918 U Nonimmigrant Status | $53,820,509 | 0 | N/A |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $668,609 | 1,027 | $651 |
| I-956 Application for Regional Center Designation | $2,177,846 | 62 | $35,127 |
| I-956G Regional Center Annual Statement | $2,395,284 | 728 | $3,290 |
| N-300 Application to File Declaration of Intention | $13,411 | 17 | $789 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Subtotal | $7,894,764 | 5,137 | $1,537 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $2,577,935 | 1,740 | $1,482 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $5,316,829 | 3,397 | $1,565 |
| N-400 Application for Naturalization Subtotal | $732,984,616 | 693,820 | $1,056 |
| N-400 Application for Naturalization - Online | $381,160,367 | 380,205 | $1,003 |
| N-400 Application for Naturalization - Paper | $351,824,248 | 313,615 | $1,122 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $208,490 | 138 | $1,511 |
| N-565 Application for Replacement Naturalization/Citizenship Document Subtotal | $8,074,184 | 21,508 | $375 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $4,872,607 | 13,331 | $366 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $3,201,578 | 8,177 | $392 |
| N-600 Application for Certificate of Citizenship Subtotal | $23,639,025 | 16,041 | $1,474 |
| N-600 Application for Certificate of Citizenship - Online | $7,328,855 | 5,414 | $1,354 |
| N-600 Application for Certificate of Citizenship - Paper | $16,310,170 | 10,627 | $1,535 |
| N-600K Application for Citizenship and Issuance of Certificate Subtotal | $3,033,687 | 2,895 | $1,048 |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $1,241,630 | 1,273 | $975 |

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $1,792,057 | 1,622 | $1,105 |
| N-644 Application for Posthumous Citizenship | $0 | 0 | N/A |
| H-1B Registration Fee | $43,249,259 | 273,990 | $158 |
| USCIS Immigrant Fee | $93,752,029 | 543,000 | $173 |
| Waiver Form Subtotal | $67,752,283 | 56,644 | $1,196 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $75,756 | 111 | $682 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $23,143,825 | 10,954 | $2,113 |
| I-193 Application for Waiver of Passport and/or Visa | $19,478,943 | 6,772 | $2,876 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $7,457,101 | 7,260 | $1,027 |
| I-601 Application for Waiver of Ground of Inadmissibility | $14,333,518 | 18,560 | $772 |
| I-602 Application By Refugee For Waiver of Grounds of Inadmissibility | $69,739 | 0 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $3,193,402 | 554 | $5,764 |
| Certificate of Existence | $1,353,773 | 4,103 | $330 |
| G-1041 Genealogy Index Search Request Subtotal | $1,103,588 | 10,994 | $100 |
| G-1041 Genealogy Index Search Request - Online | $1,029,805 | 10,380 | $99 |
| G-1041 Genealogy Index Search Request - Paper | $73,783 | 614 | $120 |
| G-1041A Genealogy Records Request Subtotal | $789,841 | 3,301 | $239 |
| G-1041A Genealogy Records Request - Online | $742,174 | 3,117 | $238 |
| G-1041A Genealogy Records Request - Paper | $47,667 | 184 | $259 |
| Auto Cert Citz (No Fee) | $1,392,363 | 0 | N/A |
| Credible Fear | $157,158,118 | 0 | N/A |
| DNA Collection | $484,057 | 0 | N/A |
| Overseas Verifications | $457,895 | 0 | N/A |
| Reasonable Fear | $31,962,097 | 0 | N/A |
| SAVE reimbursable workload | $51,127,192 | 20,801,225 | $2 |
| **Subtotal** | $4,746,583,333 | 27,324,150 | $174 |
| Asylum Program Fee | $425,900,395 | N/A | N/A |
| **Total** | $5,172,483,728 | | |

# APPENDIX VII – PROPOSED FEES BY IMMIGRATION BENEFIT REQUEST

The table below compares the current fees to proposed fees. It also shows the results from the ABC model. This table includes CBP data in the Model Output column because the proposed fees include both USCIS and CBP estimates. See the previous appendix for more information on the Model Output.

USCIS rounds amounts in these appendix tables to the nearest dollar. There may be slight differences due to rounding. DHS rounds all IEFA proposed fees to the nearest $5 increment.[33] See Table 1 of the NPRM preamble for a more detailed comparison of current and proposed fees that customers may pay. The Current Fees column represents the current fees in effect rather than the enjoined fees from the 2020 fee rule.[34] Throughout this proposed rule, the phrase "current fees" refers to the fees in effect and not the enjoined fees.

### Appendix Table 4: Proposed Fees by Immigration Benefit Request

| Immigration Benefit Request | Current Fees | Model Output | Cost Reallocation[35] | Proposed Fees | Proposed Change in Fees | Percent Change in Proposed Fees |
|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card - Online | $455 | $320 | $135 | $455 | $0 | 0% |
| I-90 Application to Replace Permanent Resident Card - Paper | $455 | $344 | $121 | $465 | $10 | 2% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $499 | $181 | $680 | $235 | 53% |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $460 | N/A | N/A | N/A | N/A | N/A |
| I-129 H1 - Named Beneficiaries | $460 | $575 | $205 | $780 | $320 | 70% |
| I-129 H-2A - Named Beneficiaries | $460 | $802 | $288 | $1,090 | $630 | 137% |
| I-129 H-2B - Named Beneficiaries | $460 | $796 | $284 | $1,080 | $620 | 135% |
| I-129 L | $460 | $1,021 | $364 | $1,385 | $925 | 201% |
| I-129 O | $460 | $775 | $280 | $1,055 | $595 | 129% |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $460 | $749 | $266 | $1,015 | $555 | 121% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $390 | $140 | $530 | $70 | 15% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $426 | $154 | $580 | $120 | 26% |
| I-129F Petition for Alien Fiancé(e) | $535 | $531 | $189 | $720 | $185 | 35% |
| I-130 Petition for Alien Relative - Online | $535 | $525 | $185 | $710 | $175 | 33% |
| I-130 Petition for Alien Relative - Paper | $535 | $603 | $217 | $820 | $285 | 53% |
| I-131 Application for Travel Document | $575 | $463 | $167 | $630 | $55 | 10% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $589 | ($424) | $165 | $30 | 22% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $589 | ($454) | $135 | $30 | 29% |

---

[33] *See* section V.B.3. Assessing Proposed Fees of the NPRM preamble for information on how DHS uses its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels.

[34] USCIS provides filing fee information on the All Forms page at https://www.uscis.gov/forms/all-forms. You can use the Fee Calculator to determine the exact filing and biometric services fees for any form processed at a USCIS Lockbox facility. *See* USCIS, Fee Calculator, https://www.uscis.gov/feecalculator. For a complete list of all USCIS fees, see Form G-1055, Fee Schedule, available from https://www.uscis.gov/g-1055.

[35] The final step in the USCIS fee-setting methodology is Cost Reallocation, which determines the additional cost that USCIS adds to each fee to ensure full cost recovery. Cost Reallocation proportionally assigns costs incurred to provide services for which USCIS does not receive revenue (for example, workloads without fees) and from forms for which the fees are held below projected cost (for example, to the 19% weighted average increase) or other policy decisions (for example, limited increases for adoption fees are below projected cost). The column is negative when the proposed fee is less than the model output. Finally, this column represents the difference from rounding proposed fees to the nearest $5.

| Immigration Benefit Request | Current Fees | Model Output | Cost Reallocation[35] | Proposed Fees | Proposed Change in Fees | Percent Change in Proposed Fees |
|---|---|---|---|---|---|---|
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $338 | $237 | $575 | $0 | 0% |
| I-140 Immigrant Petition for Alien Worker | $700 | $528 | $187 | $715 | $15 | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $682 | $248 | $930 | $0 | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $930 | $2,113 | ($967) | $1,110 | $180 | 19% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $2,876 | $(2,171) | $705 | $120 | 21% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,027 | $449 | $1,455 | $525 | 56% |
| I-290B Notice of Appeal or Motion | $675 | $1,413 | ($613) | $800 | $125 | 19% |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $435 | $8,790 | ($8,275) | $515 | $80 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,133 | $407 | $1,540 | $400 | 35% |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $3,675 | $8,220 | $2,940 | $11,160 | $7,485 | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $370 | $385 | $140 | $525 | $155 | 42% |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $370 | $455 | $165 | $620 | $250 | 68% |
| I-600/600A/800/800A Adoption Petitions and Applications | $775 | $1,454 | ($534) | $920 | $145 | 19% |
| I-600A Supplement 3 Request for Action on Approved Form I-600A | $385 | $988 | ($533) | $455 | $70 | 18% |
| I-601 Application for Waiver of Ground of Inadmissibility | $930 | $772 | $278 | $1,050 | $120 | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $814 | $291 | $1,105 | $475 | 75% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $5,764 | ($4,664) | $1,100 | $170 | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $915 | $325 | $1,240 | $110 | 10% |
| I-690 Application for Waiver of Grounds of Inadmissibility | $715 | $725 | $260 | $985 | $270 | 38% |
| I-694 Notice of Appeal of Decision | $890 | $849 | $306 | $1,155 | $265 | 30% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,149 | $521 | $1,670 | $0 | 0% |
| I-751 Petition to Remove Conditions on Residence | $595 | $881 | $314 | $1,195 | $600 | 101% |
| I-765 Application for Employment Authorization - Online | $410 | $409 | $146 | $555 | $145 | 35% |
| I-765 Application for Employment Authorization - Paper | $410 | $480 | $170 | $650 | $240 | 59% |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $385 | $1,502 | ($1,047) | $455 | $70 | 18% |
| I-817 Application for Family Unity Benefits | $600 | $645 | $230 | $875 | $275 | 46% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $496 | $209 | $675 | $210 | 45% |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $3,750 | $7,013 | $2,512 | $9,525 | $5,775 | 154% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $285 | $2,247 | ($1,907) | $340 | $55 | 19% |
| I-910 Application for Civil Surgeon Designation | $785 | $906 | $324 | $1,230 | $445 | 57% |

| Immigration Benefit Request | Current Fees | Model Output | Cost Reallocation[35] | Proposed Fees | Proposed Change in Fees | Percent Change in Proposed Fees |
|---|---|---|---|---|---|---|
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $651 | ($381) | $270 | $40 | 17% |
| I-956 Application for Regional Center Designation | $17,795 | $35,127 | $12,568 | $47,695 | $29,900 | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $3,290 | $1,180 | $4,470 | $1,435 | 47% |
| N-300 Application to File Declaration of Intention | $270 | $789 | ($469) | $320 | $50 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $700 | $1,482 | ($652) | $830 | $130 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $700 | $1,565 | ($735) | $830 | $130 | 19% |
| N-400 Application for Naturalization - Online | $640 | $1,003 | ($243) | $760 | $120 | 19% |
| N-400 Application for Naturalization - Paper | $640 | $1,122 | ($362) | $760 | $120 | 19% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $1,511 | ($1,091) | $420 | $65 | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $555 | $366 | $189 | $555 | $0 | 0% |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $555 | $392 | $163 | $555 | $0 | 0% |
| N-600 Application for Certificate of Citizenship - Online | $1,170 | $1,354 | $31 | $1,385 | $215 | 18% |
| N-600 Application for Certificate of Citizenship - Paper | $1,170 | $1,535 | ($150) | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $1,170 | $975 | $410 | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $1,170 | $1,105 | $280 | $1,385 | $215 | 18% |
| USCIS Immigrant Fee | $220 | $173 | $62 | $235 | $15 | 7% |
| H-1B Registration Fee | $10 | $158 | $57 | $215 | $205 | 2050% |
| Biometric Services (Other Programs such as TPS and EOIR) | $85 | N/A | N/A | $30 | -$55 | -65% |
| Certificate of Non-Existence | $0 | $330 | $0 | $330 | $330 | N/A |
| G-1041 Genealogy Index Search Request - Online | $65 | $99 | $1 | $100 | $35 | 54% |
| G-1041 Genealogy Index Search Request - Paper | $65 | $120 | $0 | $120 | $55 | 85% |
| G-1041A Genealogy Records Request - Online | $65 | $238 | $2 | $240 | $175 | 269% |
| G-1041A Genealogy Records Request - Paper | $65 | $259 | $1 | $260 | $195 | 300% |
| SAVE Initial Electronic Queries | $0.50 | $2.46 | N/A | N/A | N/A | N/A |
| Asylum Program Fee | N/A | N/A | N/A | $600 | N/A | N/A |

# APPENDIX VIII – ACTIVITY UNIT COSTS BY IMMIGRATION BENEFIT REQUEST

The tables in this section provide more detail on the total cost and unit costs from the ABC model results. Each table provides total cost by cost object and activity. The total costs are the same as in Appendix Table 3. To provide unit costs by cost object and activity, we divide total cost by different divisors.

There may be some variation between Appendix Table 5 and Appendix Table 6 because they use two different divisors. Appendix Table 5 divides the total cost by projected fee-paying receipts to calculate the model output by activity. Fee-paying receipts are a subset of total workload when not everyone pays the fee. [36] In other words, if an immigration benefit request allows for fee waivers and exceptions, then unit costs will be higher in Appendix Table 5 than in Appendix Table 6. For example, Form I-129 costs in both tables are largely the same. This is because, except for some Form I-129CW fee waivers, Form I-129 petitioners and applicants should always pay the fees. Form I-90 varies between the two tables because of fee waivers and exemptions. Both workloads are processed by SCOPS and the ABC model reflects their contributions to the activity unit costs. If a workload has high rates of fee waivers approved or fee exemptions, then there may be significant differences between Appendix Table 5 and Appendix Table 6. For example, we estimate that approximately 65% of Form I-765 workload is fee-paying. The unit cost for Form I-765 in Appendix Table 5 is significantly higher than in Appendix Table 6 because of fee waivers and exemptions. In other words, when an immigration benefit request is fee waivable or fee-exempt, it increases unit costs based on fee-paying receipts. In cases where an immigration benefit request is fee waivable or fee-exempt, the requester would pay more than the unit cost based on workload unless DHS manually intervenes in the fee schedule calculation.

This table also includes total cost and fee-paying receipt estimates from CBP. As stated in the NPRM, CBP provided cost information for Forms I-192 and I-193. The table also includes CBP fee-paying receipt forecasts for Forms I-192, I-193, I-212, and I-824. CBP cost information was not part of the USCIS ABC model. However, we added it to the Direct Costs column in the tables below. Additionally, both Appendix Table 5 and Appendix Table 6 do not include costs associated with the Asylum Processing IFR.

## Appendix Table 5: USCIS Fee-Paying Unit Cost by Activity

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-90 Application to Replace Permanent Resident Card Subtotal** | **$329** | **$4** | **$3** | **$13** | **$28** | **$9** | **$14** | **$34** | **$167** | **$57** | **$0** |
| I-90 Application to Replace Permanent Resident Card – Online | $320 | $4 | $3 | $13 | $28 | $0 | $14 | $34 | $167 | $57 | $0 |
| I-90 Application to Replace Permanent Resident Card – Paper | $344 | $4 | $3 | $13 | $28 | $24 | $14 | $34 | $167 | $57 | $0 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $499 | $22 | $0 | $26 | $37 | $30 | $0 | $182 | $154 | $0 | $48 |
| **I-129 Petition for a Nonimmigrant Worker Subtotal** | **$602** | **$15** | **$13** | **$22** | **$32** | **$6** | **$0** | **$334** | **$140** | **$0** | **$40** |

AR_000247

---

[36] See Section V.B.1 Volume in the proposed rule for more information on the distinction between workload and fee-paying volume and how we estimated each.

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-129 H-1B – Named Beneficiaries | $575 | $16 | $8 | $23 | $36 | $6 | $0 | $300 | $147 | $0 | $41 |
| I-129 H-2A – Named Beneficiaries | $802 | $11 | $0 | $23 | $34 | $7 | $0 | $537 | $147 | $0 | $43 |
| I-129 H-2B - Named Beneficiaries | $796 | $15 | $0 | $24 | $36 | $7 | $0 | $522 | $148 | $0 | $44 |
| I-129 L1A/L1B/LZ Blanket | $1,021 | $17 | $24 | $22 | $35 | $7 | $0 | $728 | $147 | $0 | $42 |
| I-129 O1/O2 | $775 | $15 | $0 | $24 | $36 | $7 | $0 | $502 | $148 | $0 | $44 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $749 | $15 | $69 | $24 | $36 | $7 | $0 | $406 | $148 | $0 | $44 |
| I-129 H-2A – Unnamed Beneficiaries | $390 | $0 | $0 | $0 | $34 | $7 | $0 | $159 | $147 | $0 | $43 |
| I-129 H-2B – Unnamed Beneficiaries | $426 | $0 | $0 | $0 | $36 | $7 | $0 | $192 | $148 | $0 | $44 |
| I-129F Petition for Alien Fiance(e) | $531 | $12 | $0 | $25 | $37 | $30 | $0 | $221 | $161 | $0 | $46 |
| **I-130 Petition for Alien Relative Subtotal** | **$584** | **$12** | **$1** | **$47** | **$47** | **$21** | **$0** | **$274** | **$144** | **$0** | **$39** |
| I-130 Petition for Alien Relative - Online | $525 | $12 | $0 | $45 | $46 | $0 | $0 | $275 | $146 | $0 | $0 |
| I-130 Petition for Alien Relative - Paper | $603 | $11 | $2 | $47 | $47 | $28 | $0 | $274 | $143 | $0 | $51 |
| I-131 Application for Travel Document | $463 | $28 | $1 | $35 | $40 | $33 | $3 | $81 | $173 | $12 | $58 |
| I-131 Refugee Travel Document | $550 | $19 | $0 | $32 | $40 | $36 | $18 | $67 | $212 | $74 | $53 |
| I-131A Application for Travel Document (Carrier Documentation) | $338 | $0 | $329 | $0 | $0 | $0 | $0 | $0 | $9 | $0 | $0 |
| I-140 Immigrant Petition for Alien Worker | $528 | $18 | $0 | $21 | $32 | $16 | $0 | $254 | $147 | $0 | $39 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $682 | $0 | $0 | $0 | $40 | $6 | $0 | $461 | $123 | $11 | $41 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $2,113 | $55 | $211 | $79 | $108 | $20 | $0 | $904 | $485 | $117 | $134 |
| I-193 Application for Waiver of Passport and/or Visa | $2,876 | $0 | $2,874 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $1,027 | $20 | $0 | $76 | $68 | $36 | $0 | $575 | $187 | $0 | $65 |
| I-290B Notice of Appeal or Motion | $1,413 | $51 | $0 | $75 | $58 | $28 | $0 | $991 | $153 | $0 | $57 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $8,790 | $240 | $105 | $281 | $324 | $278 | $0 | $5,733 | $1,334 | $2 | $493 |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,133 | $7 | $3 | $88 | $70 | $30 | $13 | $634 | $138 | $82 | $66 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $8,220 | $0 | $0 | $724 | $67 | $21 | $0 | $6,339 | $950 | $0 | $119 |
| **I-539 Application to Extend/Change Nonimmigrant Status Subtotal** | **$427** | **$15** | **$0** | **$22** | **$33** | **$17** | **$0** | **$140** | **$151** | **$24** | **$25** |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $385 | $15 | $0 | $22 | $33 | $0 | $0 | $140 | $151 | $24 | $0 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $455 | $15 | $0 | $22 | $33 | $28 | $0 | $140 | $151 | $24 | $42 |
| I-600/600A/800/800A Adoption Petitions and Applications | $1,454 | $40 | $90 | $43 | $46 | $40 | $0 | $858 | $195 | $62 | $80 |
| I-600A Supplement 3 Request for Action on Approved Form I-600A | $988 | $52 | $0 | $55 | $59 | $9 | $0 | $461 | $249 | $0 | $103 |
| I-601 Application for Waiver of Ground of Inadmissibility | $772 | $16 | $0 | $47 | $44 | $27 | $0 | $451 | $143 | $0 | $45 |
| I-601A Provisional Unlawful Presence Waiver | $814 | $11 | $0 | $20 | $28 | $26 | $0 | $483 | $151 | $57 | $39 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $5,764 | $258 | $0 | $334 | $496 | $105 | $0 | $2,007 | $1,966 | $0 | $600 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | $915 | $25 | $0 | $27 | $29 | $4 | $0 | $660 | $120 | $0 | $50 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $725 | $24 | $0 | $26 | $29 | $25 | $0 | $448 | $123 | $1 | $49 |
| I-694 Notice of Appeal of Decision | $849 | $25 | $0 | $27 | $29 | $25 | $0 | $573 | $120 | $0 | $50 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,149 | $25 | $3 | $27 | $29 | $25 | $12 | $858 | $120 | $0 | $50 |
| I-751 Petition to Remove Conditions on Residence | $881 | $16 | $3 | $50 | $50 | $32 | $14 | $458 | $161 | $43 | $52 |
| **I-765 Application for Employment Authorization Subtotal** | **$477** | **$28** | **$5** | **$34** | **$45** | **$35** | **$19** | **$68** | **$210** | **$1** | **$32** |
| I-765 Application for Employment Authorization - Online | $409 | $28 | $5 | $34 | $45 | $0 | $19 | $68 | $210 | $1 | $0 |
| I-765 Application for Employment Authorization - Paper | $480 | $28 | $5 | $34 | $45 | $37 | $19 | $68 | $210 | $1 | $34 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $1,502 | $53 | $0 | $55 | $59 | $52 | $0 | $928 | $250 | $0 | $104 |
| I-817 Application for Family Unity Benefits | $645 | $26 | $3 | $22 | $37 | $28 | $12 | $274 | $149 | $51 | $43 |
| I-824 Application for Action on an Approved Application or Petition | $497 | $19 | $0 | $31 | $36 | $27 | $0 | $199 | $139 | $0 | $46 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $7,013 | $0 | $228 | $724 | $67 | $21 | $12 | $4,859 | $950 | $33 | $119 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $2,247 | $363 | $0 | $306 | $79 | $17 | $0 | $336 | $994 | $0 | $152 |
| I-910 Application for Civil Surgeon Designation | $906 | $0 | $380 | $0 | $29 | $25 | $0 | $302 | $121 | $0 | $50 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $651 | $0 | $0 | $0 | $42 | $9 | $0 | $384 | $166 | $0 | $51 |
| I-956 Regional Center Designation | $35,127 | $0 | $0 | $724 | $67 | $21 | $0 | $33,244 | $950 | $2 | $119 |
| I-956G Regional Center Annual Statement | $3,290 | $0 | $0 | $724 | $67 | $21 | $0 | $1,409 | $950 | $0 | $119 |
| N-300 Application to File Declaration of Intention | $789 | $20 | $0 | $44 | $39 | $25 | $0 | $475 | $122 | $14 | $50 |
| **N-336 Request for Hearing on a Decision in Naturalization Proceedings Subtotal** | **$1,537** | **$5** | **$0** | **$114** | **$88** | **$19** | **$0** | **$1,122** | **$150** | **$3** | **$36** |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $1,482 | $5 | $0 | $113 | $88 | $0 | $0 | $1,122 | $150 | $3 | $0 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $1,565 | $5 | $0 | $114 | $88 | $29 | $0 | $1,122 | $150 | $3 | $54 |
| **N-400 Application for Naturalization Subtotal** | **$1,056** | **$5** | **$6** | **$112** | **$90** | **$15** | **$0** | **$549** | **$150** | **$91** | **$37** |
| N-400 Application for Naturalization - Online | $1,003 | $5 | $6 | $112 | $90 | $0 | $0 | $547 | $150 | $91 | $0 |
| N-400 Application for Naturalization - Paper | $1,122 | $5 | $6 | $112 | $90 | $34 | $0 | $552 | $150 | $91 | $82 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N-470 Application to Preserve Residence for Naturalization Purposes | $1,511 | $4 | $0 | $95 | $75 | $29 | $0 | $1,110 | $127 | $1 | $69 |
| N-565 Application for Replacement Naturalization/Citizenship Document Subtotal | $375 | $17 | $0 | $27 | $34 | $10 | $0 | $103 | $184 | $0 | $0 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $366 | $17 | $0 | $27 | $34 | $0 | $0 | $103 | $184 | $0 | $0 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $392 | $17 | $0 | $27 | $34 | $26 | $0 | $103 | $184 | $0 | $0 |
| N-600 Application for Certificate of Citizenship Subtotal | $1,474 | $6 | $0 | $206 | $136 | $35 | $0 | $769 | $237 | $0 | $85 |
| N-600 Application for Certificate of Citizenship – Online | $1,354 | $6 | $0 | $206 | $136 | $0 | $0 | $769 | $237 | $0 | $0 |
| N-600 Application for Certificate of Citizenship – Paper | $1,535 | $6 | $0 | $206 | $136 | $53 | $0 | $769 | $237 | $0 | $128 |
| N-600K Application for Citizenship and Issuance of Certificate Subtotal | $1,048 | $4 | $0 | $149 | $98 | $21 | $0 | $554 | $170 | $0 | $51 |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $975 | $4 | $0 | $149 | $98 | $0 | $0 | $554 | $170 | $0 | $0 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $1,105 | $4 | $0 | $148 | $98 | $38 | $0 | $554 | $170 | $0 | $92 |
| USCIS Immigrant Fee | $173 | $0 | $4 | $0 | $21 | $0 | $12 | $0 | $109 | $0 | $27 |
| H-1B Registration Fee | $158 | $0 | $0 | $0 | $28 | $0 | $0 | $0 | $129 | $0 | $0 |

Appendix Table 6 divides total cost by projected receipts. If an immigration benefit request allows fee waivers or exemptions, then the unit costs in this table will be lower than in the previous table.

**Appendix Table 6: USCIS Activity Unit Costs Per Projected Receipt**

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card Subtotal | $289 | $4 | $3 | $12 | $25 | $8 | $12 | $29 | $147 | $50 | $0 |
| I-90 Application to Replace Permanent Resident Card – Online | $281 | $4 | $3 | $12 | $25 | $0 | $12 | $29 | $147 | $50 | $0 |
| I-90 Application to Replace Permanent Resident Card – Paper | $302 | $4 | $3 | $12 | $25 | $21 | $12 | $29 | $147 | $50 | $0 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $460 | $21 | $0 | $24 | $34 | $27 | $0 | $168 | $142 | $0 | $44 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $602 | $15 | $13 | $22 | $32 | $6 | $0 | $334 | $140 | $0 | $40 |
| I-129 H-1B – Named Beneficiaries | $575 | $16 | $8 | $23 | $33 | $6 | $0 | $300 | $147 | $0 | $41 |
| I-129 H-2A – Named Beneficiaries | $802 | $11 | $0 | $23 | $34 | $7 | $0 | $537 | $147 | $0 | $43 |
| I-129 H-2B – Named Beneficiaries | $796 | $15 | $0 | $24 | $36 | $7 | $0 | $222 | $148 | $0 | $44 |
| I-129 L1A/L1B/LZ Blanket | $1,021 | $17 | $24 | $22 | $35 | $7 | $0 | $728 | $147 | $0 | $42 |
| I-129 O1/O2 | $775 | $15 | $0 | $24 | $36 | $7 | $0 | $502 | $148 | $0 | $44 |

AR_000250

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $749 | $15 | $69 | $24 | $36 | $7 | $0 | $406 | $148 | $0 | $44 |
| I-129 H-2A – Unnamed Beneficiaries | $390 | $0 | $0 | $0 | $34 | $7 | $0 | $159 | $147 | $0 | $43 |
| I-129 H-2B – Unnamed Beneficiaries | $426 | $0 | $0 | $0 | $36 | $7 | $0 | $192 | $148 | $0 | $44 |
| I-129F Petition for Alien Fiance(e) | $492 | $11 | $0 | $24 | $34 | $28 | $0 | $205 | $149 | $0 | $42 |
| **I-130 Petition for Alien Relative Subtotal** | **$568** | **$11** | **$1** | **$45** | **$45** | **$21** | **$0** | **$267** | **$140** | **$0** | **$38** |
| I-130 Petition for Alien Relative - Online | $511 | $12 | $0 | $44 | $45 | $0 | $0 | $268 | $142 | $0 | $0 |
| I-130 Petition for Alien Relative - Paper | $587 | $11 | $1 | $46 | $46 | $28 | $0 | $266 | $139 | $0 | $50 |
| I-131 Application for Travel Document | $357 | $22 | $1 | $27 | $31 | $25 | $2 | $62 | $133 | $9 | $45 |
| I-131 Refugee Travel Document | $550 | $19 | $0 | $32 | $40 | $36 | $18 | $67 | $212 | $74 | $53 |
| I-131A Application for Travel Document (Carrier Documentation) | $338 | $0 | $329 | $0 | $0 | $0 | $0 | $0 | $9 | $0 | $0 |
| I-140 Immigrant Petition for Alien Worker | $528 | $18 | $0 | $21 | $32 | $16 | $0 | $254 | $147 | $0 | $39 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $682 | $0 | $0 | $0 | $40 | $6 | $0 | $461 | $123 | $11 | $41 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $558 | $14 | $56 | $21 | $28 | $5 | $0 | $239 | $128 | $31 | $35 |
| I-193 Application for Waiver of Passport and/or Visa | $2,858 | $0 | $2,856 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $697 | $14 | $0 | $52 | $46 | $25 | $0 | $390 | $127 | $0 | $44 |
| I-290B Notice of Appeal or Motion | $1,311 | $47 | $0 | $70 | $53 | $26 | $0 | $920 | $142 | $0 | $53 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $839 | $23 | $10 | $27 | $31 | $27 | $0 | $547 | $127 | $0 | $47 |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,065 | $7 | $3 | $83 | $66 | $28 | $12 | $596 | $130 | $77 | $62 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $8,220 | $0 | $0 | $724 | $67 | $21 | $0 | $6,339 | $950 | $0 | $119 |
| **I-539 Application to Extend/Change Nonimmigrant Status Subtotal** | **$418** | **$14** | **$0** | **$22** | **$32** | **$16** | **$0** | **$138** | **$148** | **$23** | **$25** |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $377 | $14 | $0 | $22 | $32 | $0 | $0 | $138 | $148 | $23 | $0 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $446 | $14 | $0 | $22 | $32 | $27 | $0 | $138 | $148 | $23 | $42 |
| I-600/600A/800/800A Adoption Petitions and Applications | $797 | $22 | $49 | $23 | $25 | $22 | $0 | $470 | $107 | $34 | $44 |
| I-600A Supplement 3 Request for Action on Approved Form I-600A | $478 | $25 | $0 | $27 | $29 | $4 | $0 | $223 | $120 | $0 | $50 |
| I-601 Application for Waiver of Ground of Inadmissibility | $726 | $15 | $0 | $44 | $41 | $25 | $0 | $424 | $134 | $0 | $42 |
| I-601A Provisional Unlawful Presence Waiver | $814 | $11 | $0 | $20 | $28 | $26 | $0 | $483 | $151 | $57 | $39 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $434 | $19 | $0 | $25 | $37 | $8 | $0 | $151 | $148 | $0 | $45 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | $915 | $25 | $0 | $27 | $29 | $4 | $0 | $660 | $120 | $0 | $50 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-690 Application for Waiver of Grounds of Inadmissibility | $725 | $24 | $0 | $26 | $29 | $25 | $0 | $448 | $123 | $1 | $49 |
| I-694 Notice of Appeal of Decision | $849 | $25 | $0 | $27 | $29 | $25 | $0 | $573 | $120 | $0 | $50 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,149 | $25 | $3 | $27 | $29 | $25 | $12 | $858 | $120 | $0 | $50 |
| I-751 Petition to Remove Conditions on Residence | $745 | $14 | $3 | $42 | $42 | $27 | $12 | $388 | $137 | $36 | $44 |
| I-765 Application for Employment Authorization Subtotal | $311 | $18 | $3 | $22 | $30 | $23 | $12 | $45 | $137 | $0 | $21 |
| I-765 Application for Employment Authorization - Online | $267 | $18 | $3 | $22 | $30 | $0 | $12 | $45 | $137 | $0 | $0 |
| I-765 Application for Employment Authorization - Paper | $312 | $18 | $3 | $22 | $30 | $24 | $12 | $45 | $137 | $0 | $22 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $722 | $25 | $0 | $27 | $29 | $25 | $0 | $446 | $120 | $0 | $50 |
| I-817 Application for Family Unity Benefits | $630 | $25 | $3 | $22 | $36 | $27 | $12 | $268 | $146 | $50 | $42 |
| I-824 Application for Action on an Approved Application or Petition | $482 | $19 | $0 | $30 | $35 | $26 | $0 | $193 | $134 | $0 | $45 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $7,013 | $0 | $228 | $724 | $67 | $21 | $12 | $4,859 | $950 | $33 | $119 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $2,247 | $363 | $0 | $306 | $79 | $17 | $0 | $336 | $994 | $0 | $152 |
| I-910 Application for Civil Surgeon Designation | $906 | $0 | $380 | $0 | $29 | $25 | $0 | $302 | $121 | $0 | $50 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $581 | $0 | $0 | $0 | $37 | $8 | $0 | $343 | $148 | $0 | $45 |
| I-956 Application for Regional Center Designation | $35,127 | $0 | $0 | $724 | $67 | $21 | $0 | $33,244 | $950 | $2 | $119 |
| I-956G Regional Center Annual Statement | $3,290 | $0 | $0 | $724 | $67 | $21 | $0 | $1,409 | $950 | $0 | $119 |
| I-300 Application to File Declaration of Intention | $789 | $20 | $0 | $44 | $39 | $25 | $0 | $475 | $122 | $14 | $50 |
| **N-336 Request for Hearing on a Decision in Naturalization Proceedings Subtotal** | **$1,286** | **$4** | **$0** | **$95** | **$74** | **$16** | **$0** | **$939** | **$125** | **$2** | **$30** |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $1,239 | $4 | $0 | $95 | $74 | $0 | $0 | $939 | $125 | $2 | $0 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $1,310 | $4 | $0 | $95 | $74 | $24 | $0 | $939 | $125 | $2 | $46 |
| **N-400 Application for Naturalization Subtotal** | **$881** | **$4** | **$5** | **$93** | **$75** | **$13** | **$0** | **$458** | **$125** | **$76** | **$31** |
| N-400 Application for Naturalization - Online | $835 | $4 | $5 | $94 | $75 | $0 | $0 | $456 | $125 | $76 | $0 |
| N-400 Application for Naturalization - Paper | $937 | $4 | $5 | $93 | $75 | $28 | $0 | $461 | $125 | $76 | $69 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $1,511 | $4 | $0 | $95 | $75 | $29 | $0 | $1,110 | $127 | $1 | $69 |
| **N-565 Application for Replacement Naturalization/Citizenship Document Subtotal** | **$300** | **$13** | **$0** | **$22** | **$28** | **$8** | **$0** | **$82** | **$147** | **$0** | **$0** |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $292 | $13 | $0 | $22 | $28 | $0 | $0 | $82 | $147 | $0 | $0 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $313 | $13 | $0 | $22 | $27 | $21 | $0 | $82 | $147 | $0 | $0 |
| **N-600 Application for Certificate of Citizenship Subtotal** | **$788** | **$3** | **$0** | **$110** | **$73** | **$19** | **$0** | **$411** | **$127** | **$0** | **$45** |
| N-600 Application for Certificate of Citizenship - Online | $724 | $3 | $0 | $110 | $73 | $0 | $0 | $411 | $126 | $0 | $0 |
| N-600 Application for Certificate of Citizenship - Paper | $821 | $3 | $0 | $110 | $73 | $28 | $0 | $411 | $127 | $0 | $68 |
| **N-600K Application for Citizenship and Issuance of Certificate Subtotal** | **$778** | **$3** | **$0** | **$110** | **$73** | **$16** | **$0** | **$411** | **$127** | **$0** | **$38** |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $724 | $3 | $0 | $110 | $73 | $0 | $0 | $411 | $127 | $0 | $0 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $820 | $3 | $0 | $110 | $73 | $28 | $0 | $411 | $126 | $0 | $68 |
| USCIS Immigrant Fee | $173 | $0 | $4 | $0 | $21 | $0 | $12 | $0 | $109 | $0 | $27 |
| H-1B Registration Fee | $158 | $0 | $0 | $0 | $28 | $0 | $0 | $0 | $129 | $0 | $0 |

Appendix Table 7 divides the total cost for genealogy, record, and verification requests by receipts. We provide a separate table for these requests because they use different activities than in the previous tables. The additional activity columns would not fit in the previous tables. We provide only one table because these requests are not fee waivable or fee exempt. As such, there is no reason to show two different divisors because receipts are equal to fee-paying receipts for these requests.

**Appendix Table 7: USCIS Activity Unit Costs for Genealogy, Records, and Verifications**

| Genealogy, Records, and Verifications | Total | Intake | Certify Nonexistence | Research Genealogy | Systematic Alien Verification for Entitlements |
|---|---|---|---|---|---|
| Certificate of Non-Existence | $330 | $0 | $330 | $0 | $0 |
| **G-1041 Genealogy Index Search Request Subtotal** | **$100** | **$1** | **$0** | **$99** | **$0** |
| G-1041 Genealogy Index Search Request - Online | $99 | $0 | $0 | $99 | $0 |
| G-1041 Genealogy Index Search Request - Paper | $120 | $21 | $0 | $99 | $0 |
| **G-1041A Genealogy Records Request Subtotal** | **$239** | **$1** | **$0** | **$238** | **$0** |
| G-1041A Genealogy Records Request - Online | $238 | $0 | $0 | $238 | $0 |
| G-1041A Genealogy Records Request - Paper | $259 | $21 | $0 | $238 | $0 |
| SAVE Initial Electronic Queries | $2 | $0 | $0 | $0 | $2 |

# APPENDIX IX – IEFA NON-PREMIUM POSITIONS BY USCIS OFFICE

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. Appendix Table 8 compares staffing estimates used in the FY 2016/2017 fee rule and this proposed rule. As noted elsewhere in this document and the NPRM, the FY 2022/2023 fee review includes additional positions to support the Asylum Processing IFR and estimated workload.

**Appendix Table 8: IEFA Fee Review Staffing Estimates by Office**

| Directorate or Program Office | FY 2016/2017 | FY 2022/2023 | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 6,990 | 1,044 | 18% |
| Fraud Detection and National Security Directorate | 920 | 1,898 | 978 | 106% |
| Refugee Asylum and International Operations Directorate | 1,648 | 4,647 | 2,999 | 182% |
| Service Center Operations Directorate | 2,866 | 6,208 | 3,342 | 117% |
| External Affairs Directorate | 438 | 660 | 222 | 51% |
| Immigration Records and Identity Services Directorate | 666 | 788 | 122 | 18% |
| Management Directorate | 1,352 | 2,052 | 700 | 52% |
| Program Offices | 707 | 1,025 | 318 | 45% |
| Administrative Appeals | 133 | 94 | -39 | -29% |
| Chief Counsel | 251 | 347 | 96 | 38% |
| Chief Financial Officer | 97 | 149 | 52 | 54% |
| Director | 20 | 18 | -2 | -10% |
| Equal Opportunity and Inclusion | 24 | 32 | 8 | 33% |
| Executive Secretariat | 20 | 24 | 4 | 20% |
| Investigations | - | 104 | 104 | N/A |
| Performance and Quality | 42 | 96 | 54 | 127% |
| Policy and Strategy | 100 | 133 | 33 | 33% |
| Privacy | 20 | 28 | 8 | 40% |
| **USCIS Total** | **14,543** | **24,266** | **9,723** | **67%** |

USCIS tracks on-board positions in our personnel and payroll systems. Appendix Table 9 lists on-board permanent positions that were funded by the IEFA non-premium account in each fiscal year. It uses pay period 19, which is typically the last full pay period in a fiscal year. It excludes temporary positions and those funded from other sources, like premium processing and E-Verify.

**Appendix Table 9: IEFA Non-Premium On-Board Positions by Office and Fiscal Year**

| Directorate or Program Office | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|---|
| Field Operations Directorate | 5,646 | 5,955 | 6,348 | 6,216 | 6,595 | 6,385 |
| Fraud Detection and National Security Directorate | 861 | 989 | 1,170 | 1,291 | 1,323 | 1,272 |
| Refugee Asylum and International Operations Directorate | 1,357 | 1,391 | 1,420 | 1,398 | 1,599 | 1,666 |
| Service Center Operations Directorate | 3,387 | 3,209 | 3,585 | 3,679 | 3,731 | 3,535 |
| External Affairs Directorate | 454 | 480 | 533 | 524 | 536 | 498 |
| Immigration Records and Identity Services | 581 | 608 | 633 | 642 | 633 | 633 |
| Management Directorate | 1,307 | 1,443 | 1,445 | 1,472 | 1,569 | 1,549 |
| Program Offices | 628 | 669 | 781 | 821 | 841 | 846 |
| Administrative Appeals | 101 | 92 | 94 | 95 | 101 | 93 |
| Chief Counsel | 248 | 271 | 285 | 305 | 304 | 320 |
| Chief Financial Officer | 91 | 103 | 116 | 112 | 118 | 132 |
| Equal Opportunity and Inclusion | 23 | 24 | 28 | 30 | 31 | 32 |
| Director | 18 | 7 | 11 | 15 | 10 | 7 |
| Executive Secretariat | 16 | 19 | 18 | 17 | 13 | 14 |
| Investigations | 0 | 0 | 72 | 60 | 53 | 54 |
| Performance and Quality | 35 | 52 | 43 | 61 | 67 | 73 |
| Policy and Strategy | 80 | 81 | 93 | 102 | 126 | 104 |
| Privacy | 16 | 20 | 21 | 24 | 18 | 17 |
| **USCIS Total** | **14,221** | **14,744** | **15,915** | **16,043** | **16,827** | **16,384** |

Appendix Figure 3 displays the same information as the previous table in stacked columns. We group some smaller offices together to simply the graphic. Other Offices consists of External Affairs Directorate (EXA), Immigration Records and Identity Services (IRIS), and Program Offices in the previous table.

**Appendix Figure 3: IEFA Non-Premium On-Board Positions by Office and Fiscal Year**



# APPENDIX X – OPERATIONAL METRICS IN THE FEE REVIEW

The IEFA fee review depends on various operational metrics to allocate the cost baseline to activities and then to cost objects. Operational metrics include workload volume and completion rates. The Methodology for the FY 2022/2023 Fee Review section of this document and the NPRM explain how USCIS uses this information. This document repeats some tables from the NPRM preamble. See section V.B. Methodology in the proposed rule for more information on how we determine these operational metrics and why some of them changed significantly.

Appendix Table 10 compares the average annual workload forecasts for the current fees compared to the forecasts for the proposed rule. The ABC model uses workload to calculate total costs. Values below are the average of two years, rounded to whole numbers. There may be slight differences because of rounding.

## Appendix Table 10: Workload Volume Comparison

| Immigration Benefit Request | Average Annual FY 2016/2017 Projected Workload Receipts | Average Annual FY 2022/2023 Projected Workload Receipts | Difference |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card | 810,707 | 740,000 | -70,707 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 10,143 | 5,020 | -5,123 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | 432,156 | 568,630 | 136,474 |
| For H-1B | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L | N/A | 42,350 | N/A |
| For O | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 45,351.0 | 44,700 | -651 |
| I-130 Petition for Alien Relative | 911,349.0 | 880,900 | -30,449 |
| I-131/I-131A Application for Travel Document Subtotal | 256,622.0 | 354,416 | 97,794.0 |
| I-131 Application for Travel Document | N/A | 329,000 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Travel Document (Carrier Documentation) | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602.0 | 140,000 | 51,398.0 |
| I-290B Notice of Appeal or Motion | 24,706.0 | 36,423 | 11,717 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | 26,428 | 43,028 | 16,600 |
| I-485 Application to Register Permanent Residence or Adjust Status | 593,717 | 608,750 | 15,033 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 14,673 | 3,900 | -10,773 |
| I-539 Application to Extend/Change Nonimmigrant Status | 172,001 | 472,000 | 299,999 |
| I-600/600A; I-800/800A Adoption Petitions and Applications | 15,781 | 4,447 | -11,335 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 60 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 18 | 1 | -17 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 21 | 21 | 0 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence | 173,000 | 154,000 | -19,000 |
| I-765 Application for Employment Authorization | 747,825 | 1,666,500 | 918,675 |

| Immigration Benefit Request | Average Annual FY 2016/2017 Projected Workload Receipts | Average Annual FY 2022/2023 Projected Workload Receipts | Difference |
|---|---|---|---|
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 1,585 | 933 | -653 |
| I-817 Application for Family Unity Benefits | 2,069 | 517 | -1,552 |
| I-824 Application for Action on an Approved Application or Petition | 10,921 | 10,621 | -300 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 3,250 | -312 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 575 | 1,150 | 575 |
| I-956 Application for Regional Center Designation[37] | 400 | 62 | -338 |
| I-956G Regional Center Annual Statement[38] | 882 | 728 | -154 |
| N-300 Application to File Declaration of Intention | 41 | 17 | -24 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 4,666 | 6,140 | 1,474 |
| N-400 Application for Naturalization | 830,673 | 826,000 | -4,673 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 362 | 138 | -224 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 28,914 | 26,900 | -2,014 |
| N-600/600K Naturalization Certificate Application Subtotal | 69,723 | 33,900 | -35,823 |
| N-600 Application for Certificate of Citizenship | N/A | 30,000 | N/A |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 3,900 | N/A |
| Inadmissibility Waiver Subtotal | 71,527 | 86,210 | 14,683 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 41,481 | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,815 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 10,693 | N/A |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | 19,750 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 7,360 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 273,990 | N/A |
| **Subtotal** | **5,870,989** | **7,601,225** | **1,730,236** |
| Biometric Services | 3,028,254 | N/A | N/A |
| **Total** | **8,899,243** | **7,601,225** | **-1,298,018** |

---

[37] Formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program
[38] Formerly Form I-924A, Annual Certification of Regional Center

Appendix Table 11 compares the average annual fee-paying forecasts for the current fees compared to the forecasts for the proposed rule. The fee schedule divides total costs by fee-paying forecasts to calculate the model output. Values below are the average of two years, rounded to whole numbers. There may be slight differences because of rounding.

**Appendix Table 11: Fee-Paying Projection Comparison**

| Immigration Benefit Request | Average Annual FY 2016/2017 Fee Paying Projection | Average Annual FY 2022/2023 Fee Paying Projection | Difference |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card | 718,163 | 648,758 | -69,405 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 9,499 | 4,623 | -4,876 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | 427,778 | 568,630 | 140,852 |
| For H-1B | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L | N/A | 42,350 | N/A |
| For O | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 39,277 | 41,432 | 2,155 |
| I-130 Petition for Alien Relative | 907,512 | 857,514 | -49,999 |
| I-131/I-131A Application for Travel Document Subtotal | 194,461 | 279,078 | 84,617 |
| I-131 Application for Travel Document | N/A | 253,662 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Travel Document (Carrier Documentation) | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602 | 140,000 | 51,398 |
| I-290B Notice of Appeal or Motion | 20,955 | 33,803 | 12,848 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | 8,961 | 4,107 | -4,854 |
| I-485 Application to Register Permanent Residence or Adjust Status | 473,336 | 572,497 | 99,161 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 14,673 | 3,900 | -10,773 |
| I-539 Application to Extend/Change Nonimmigrant Status | 171,616 | 462,380 | 290,764 |
| I-600/600A; I-800/800A Orphan Petitions | 5,811 | 2,438 | -3,373 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 29 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident | 0 | 1 | 1 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 17 | 21 | 4 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence | 162,533 | 130,274 | -32,260 |
| I-765 Application for Employment Authorization | 397,954 | 1,084,740 | 686,786 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 746 | 448 | -298 |
| I-817 Application for Family Unity Benefits | 1,988 | 505 | -1,483 |
| I-824 Application for Action on an Approved Application or Petition | 10,828 | 10,292 | -536 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 3,250 | -312 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 257 | 1,027 | 770 |
| I-956 Application for Regional Center Designation | 400 | 62 | -338 |

| Immigration Benefit Request | Average Annual FY 2016/2017 Fee Paying Projection | Average Annual FY 2022/2023 Fee Paying Projection | Difference |
|---|---|---|---|
| I-956G Regional Center Annual Statement | 882 | 728 | -154 |
| N-300 Application to File Declaration of Intention | 36 | 17 | -19 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 3,593 | 5,137 | 1,544 |
| N-400 Application for Naturalization | 631,655 | 693,820 | 56,465 |
| N-470 Application to Preserve Residence for Naturalization purposes | 360 | 138 | -222 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 23,491 | 21,508 | -1,983 |
| N-600/600K Naturalization Certificate Application Subtotal | 46,870 | 18,936 | -27,934 |
| N-600 Application for Certificate of Citizenship | N/A | 16,041 | N/A |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 2,895 | N/A |
| Inadmissibility Waiver Subtotal | 41,902 | 44,211 | 2,309 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 10,954 | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,772 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 7,260 | N/A |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | 18,560 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 554 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 273,990 | N/A |
| **Subtotal** | **4,929,707** | **6,510,467** | **1,580,760** |
| Biometric Services | 2,598,639 | N/A | N/A |
| **Grand Totals** | **7,528,346** | **6,510,467** | **-1,017,880** |

Appendix Table 12 shows average hours per completion, called completion rates. Completion rates are historic adjudication hours divided by completions or subject matter expert estimates. As an example, a value of 1.25 equals one hour and fifteen minutes. It represents average "touch time" for an adjudication. The ABC model uses completion rates to calculate total cost in some cases. See the section on <u>Activity Drivers and Activity Assignment</u> for more information.

### Appendix Table 12: Completion Rates per Benefit Request

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| Credible Fear[39] | N/A | N/A | N/A | 3.68 | | |
| I-90 Application to Replace Permanent Resident Card | 0.22 | 0.21 | 0.19 | 0.15 | (0.06) | (28%) |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 0.36 | 0.48 | 0.77 | 0.84 | 0.35 | 72% |
| I-129 Petition for a Nonimmigrant Worker Subtotal | <u>0.51</u> | <u>0.83</u> | <u>1.07</u> | <u>1.73</u> | <u>0.89</u> | <u>107%</u> |
| I-129 H-1B | N/A | N/A | 1.10 | 1.53 | | |
| I-129 H-2A - Named Beneficiaries | N/A | N/A | 1.92 | 2.36 | | |
| I-129 H-2B - Named Beneficiaries | N/A | N/A | 2.00 | 2.33 | | |
| I-129 L1A/L1B/LZ Blanket | N/A | N/A | 2.23 | 3.57 | | |
| I-129 O1/O2 | N/A | N/A | 1.90 | 2.32 | | |
| I-129CW, I-129E&TN, and I-129MISC | N/A | N/A | 1.62 | 1.87 | | |
| I-129 H-2A - Unnamed Beneficiaries | N/A | N/A | 0.50 | 0.70 | | |
| I-129 H-2B - Unnamed Beneficiaries | N/A | N/A | 0.58 | 0.89 | | |
| I-129F Petition for Alien Fiance(e) | 0.41 | 0.65 | 0.67 | 0.91 | 0.26 | 41% |
| I-130 Petition for Alien Relative | 0.62 | 0.75 | 0.86 | 1.11 | 0.36 | 49% |
| I-131/I-131A Application for Travel Document | 0.16 | 0.23 | 0.25 | 0.29 | 0.06 | 24% |
| I-140 Immigrant Petition for Alien Worker | 1.13 | 1.68 | 1.46 | 1.41 | (0.27) | (16%) |
| I-290B Notice of Appeal or Motion | 1.11 | 1.22 | 1.32 | 1.50 | 0.28 | 23% |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | 2.39 | 1.97 | 1.65 | 2.54 | 0.57 | 29% |
| I-485 Application to Register Permanent Residence or Adjust Status | 1.27 | 1.63 | 1.63 | 2.08 | 0.45 | 27% |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 5.03 | 6.50 | 8.65 | 20.69 | 14.19 | 218% |
| I-539 Application to Extend/Change Nonimmigrant Status | 0.35 | 0.40 | 0.51 | 0.70 | 0.30 | 74% |
| I-589 Application for Asylum and for Withholding of Removal | N/A | N/A | 4.10 | 5.02 | | |
| I-590 Registration for Classification as Refugee | N/A | N/A | N/A | 1.29 | | |
| I-600/600A/800/800A Adoption Petitions and Applications | 1.81 | 2.14 | 2.22 | 2.14 | 0.00 | 0% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | N/A | 1.90 | 1.02 | | |
| I-601A Provisional Unlawful Presence Waiver | N/A | 2.84 | 2.64 | 2.76 | (0.08) | (3%) |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 2.20 | 4.12 | N/A | 3.01 | (1.11) | (27%) |

---

[39] *See* USCIS, Questions and Answers: Credible Fear Screening available at <u>https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening</u> (last reviewed/updated July 15, 2015).

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| I-690 Application for Waiver of Grounds of Inadmissibility | 2.59 | 0.89 | 1.05 | 2.04 | 1.14 | 128% |
| I-694 Notice of Appeal of Decision | 1.60 | 2.10 | 1.10 | 2.62 | 0.51 | 24% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1.77 | 3.80 | 3.76 | 3.91 | 0.11 | 3% |
| I-730 Refugee/Asylee Relative Petition (and Travel Eligibility) | N/A | N/A | N/A | 1.06 | | |
| I-751 Petition to Remove Conditions on Residence | 0.77 | 0.99 | 1.30 | 1.54 | 0.55 | 56% |
| I-765 Application for Employment Authorization | 0.14 | 0.20 | 0.20 | 0.22 | 0.03 | 13% |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | N/A | 1.10 | 1.90 | 2.03 | 0.94 | 85% |
| I-817 Application for Family Unity Benefits | 0.64 | 0.92 | 0.91 | 1.40 | 0.49 | 53% |
| I-824 Application for Action on an Approved Application or Petition | 0.58 | 0.59 | 0.78 | 0.88 | 0.29 | 49% |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 5.98 | 5.50 | 8.15 | 15.86 | 10.36 | 188% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | N/A | 2.00 | 2.00 | | |
| I-910 Application for Civil Surgeon Designation | 1.12 | 1.81 | 1.81 | 1.37 | (0.43) | (24%) |
| I-914 T Nonimmigrant Status | N/A | N/A | N/A | 4.88 | | |
| I-918 U Nonimmigrant Status | N/A | N/A | N/A | 4.50 | | |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | N/A | N/A | 2.60 | 1.69 | | |
| I-956 Application for Regional Center Designation | 37.33 | 40.00 | 34.95 | 108.50 | 68.50 | 171% |
| I-956G Regional Center Annual Statement | N/A | 5.00 | 10.00 | 4.60 | (0.40) | (8%) |
| N-300 Application to File Declaration of Intention | 1.84 | 1.64 | 2.68 | 1.40 | (0.24) | (15%) |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 1.60 | 2.60 | 3.05 | 3.01 | 0.40 | 15% |
| N-400 Application for Naturalization | 1.08 | 1.25 | 1.57 | 1.51 | 0.25 | 20% |
| N-470 Application to Preserve Residence for Naturalization Purposes | 1.75 | 1.83 | 4.02 | 4.01 | 2.17 | 119% |
| N-565 Application for Replacement Naturalization/Citizenship Document | 0.36 | 0.59 | 0.89 | 0.51 | (0.08) | (14%) |
| N-600/N-600K Application for Certificate of Citizenship Subtotal | 0.90 | 1.00 | 1.10 | 1.16 | 0.16 | 16% |
| N-600 Application for Certificate of Citizenship | N/A | 0.98 | 1.08 | 1.16 | 0.18 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 1.30 | 1.57 | 1.16 | (0.14) | (11%) |
| N-644 Application for Posthumous Citizenship | N/A | N/A | N/A | N/A | | |
| Inadmissibility Waiver Subtotal | 1.42 | 1.18 | 1.61 | 1.54 | 0.37 | 31% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | N/A | 2.10 | 1.96 | | |

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | N/A | 0.97 | 1.46 | | |
| I-193 Application for Waiver of Passport and/or Visa | N/A | N/A | 0.30 | 0.52 | | |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | N/A | 2.71 | 1.43 | | |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | N/A | 3.29 | 2.06 | | |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | N/A | 0.53 | 0.69 | | |
| Reasonable Fear[40] | N/A | N/A | N/A | 5.30 | | |
| USCIS Immigrant Fee | N/A | N/A | N/A | N/A | | |
| Genealogy Form Subtotal | N/A | N/A | 1.59 | 0.55 | | |
| G-1041 Genealogy Index Search Request | N/A | N/A | 1.27 | 0.42 | | |
| G-1041A Genealogy Records Request | N/A | N/A | 2.16 | 1.00 | | |
| Request for Certificate of Non-Existence | N/A | N/A | N/A | 1.07 | | |

---

[40] *See* USCIS, Questions and Answers: Reasonable Fear Screening available at https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-reasonable-fear-screenings (last reviewed/updated June 18, 2013).

Fee reviews use receipt forecasts for future years to estimate costs and propose new fees. We base workload forecasts on actual receipts and anticipated changes, as explained in the NPRM. Appendix Table 13 shows actual receipts from FY 2007 to FY 2020. This table does not represent the entirety of USCIS or IEFA workload. For example, it excludes CBP and DOS workload for the same immigration benefit requests. However, we believe providing these receipts illustrates that the workload forecasts in this fee review are reasonable estimates. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. USCIS pulled most of this data in January 2022. For additional USCIS reports, studies, and immigration data, see https://www.uscis.gov/tools/reports-and-studies. For a complete list of USCIS forms and descriptions, see https://www.uscis.gov/forms.

**Appendix Table 13: Historic Receipts from Previous Fiscal Years**

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credible Fear | 5,171 | 4,940 | 5,387 | 8,846 | 11,178 | 13,676 | 35,591 | 50,185 | 47,498 | 93,495 | 78,263 | 98,760 | 105,151 | 30,781 |
| I-90 Application to Replace Permanent Resident Card | 601,966 | 466,102 | 462,064 | 650,973 | 850,209 | 721,109 | 571,974 | 781,701 | 771,724 | 760,486 | 782,967 | 701,210 | 724,553 | 699,591 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 23,475 | 17,375 | 16,381 | 16,719 | 17,460 | 16,616 | 13,715 | 9,679 | 7,932 | 7,489 | 7,358 | 5,592 | 4,978 | 4,098 |
| I-129 Petition for a Nonimmigrant Worker | 433,635 | 404,781 | 347,987 | 337,258 | 353,185 | 409,142 | 404,520 | 432,987 | 483,643 | 509,636 | 526,435 | 551,021 | 551,201 | 551,907 |
| I-129F Petition for Alien Fiance(e) | 62,442 | 54,368 | 50,218 | 47,892 | 46,936 | 45,471 | 45,360 | 48,394 | 49,066 | 53,116 | 49,831 | 47,495 | 45,274 | 38,735 |
| I-130 Petition for Alien Relative | 891,783 | 584,297 | 644,613 | 688,943 | 746,550 | 722,863 | 813,382 | 788,633 | 768,641 | 869,304 | 914,484 | 835,972 | 748,664 | 712,044 |
| I-131 Application for Travel Document | 550,374 | 390,562 | 374,502 | 362,564 | 338,940 | 374,215 | 381,119 | 375,568 | 419,214 | 457,079 | 499,144 | 485,048 | 493,550 | 437,950 |
| I-131A Application for Carrier Documentation | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 9,084 | 10,021 | 9,862 | 5,570 |
| I-140 Immigrant Petition for Alien Worker | 234,592 | 103,805 | 57,012 | 77,280 | 81,678 | 72,964 | 69,921 | 81,658 | 101,545 | 147,581 | 139,566 | 136,585 | 142,451 | 128,178 |
| Waivers[41] | 14,452 | 13,338 | 23,910 | 30,295 | 32,134 | 45,523 | 64,164 | 102,288 | 103,814 | 117,368 | 76,302 | 76,522 | 72,266 | 62,186 |
| I-290B Notice of Appeal or Motion | 27,310 | 30,137 | 45,439 | 38,926 | 28,305 | 25,698 | 24,265 | 24,544 | 21,779 | 23,835 | 23,510 | 28,033 | 31,714 | 32,325 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 15,544 | 17,874 | 17,464 | 15,547 | 18,767 | 19,193 | 20,161 | 20,270 | 26,489 | 39,407 | 38,927 | 38,511 | 40,208 | 38,529 |
| I-485 Application to Register Permanent Residence or Adjust Status | 110,960 | 509,473 | 501,466 | 535,649 | 565,180 | 564,067 | 546,651 | 588,756 | 604,367 | 663,226 | 732,605 | 655,416 | 548,939 | 519,676 |

[41] Forms I-191, I-192, I-193, I-212, and I-612. Before FY 2017, most of this data was not separated by individual form in the system that we used for most domestic receipts.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor[42] | 776 | 1,258 | 1,031 | 1,953 | 3,805 | 6,041 | 6,346 | 10,950 | 14,373 | 14,147 | 12,165 | 6,424 | 4,194 | 4,378 |
| I-539 Application to Extend/Change Nonimmigrant Status | 222,673 | 191,195 | 172,916 | 162,318 | 157,443 | 157,735 | 169,248 | 182,184 | 199,820 | 214,772 | 233,430 | 230,975 | 221,566 | 442,808 |
| I-589 Application for Asylum and for Withholding of Removal | 25,062 | 24,740 | 24,021 | 28,133 | 34,647 | 41,429 | 44,123 | 56,853 | 83,310 | 115,702 | 140,111 | 106,260 | 97,278 | 93,593 |
| I-590 Registration for Classification as Refugee (Individuals Interviewed) | N/A | N/A | N/A | 95,435 | 76,773 | 78,850 | 73,982 | 68,758 | 67,810 | 125,495 | 49,736 | 26,306 | 43,990 | 1,222 |
| I-600/A Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of an Orphan Petition | 30,313 | 21,283 | 15,836 | 13,389 | 13,112 | 10,801 | 9,070 | 7,743 | 4,924 | 3,817 | 2,922 | 2,284 | 2,039 | 1,315 |
| I-601A Provisional Unlawful Presence Waiver | N/A | N/A | N/A | N/A | N/A | N/A | 19,085 | 37,592 | 48,733 | 51,210 | 65,729 | 60,748 | 52,506 | 49,491 |
| Legalization/ SAW[43] | 8,167 | 2,711 | 1,380 | 1,243 | 1,631 | 543 | 210 | 144 | 130 | 116 | 81 | 58 | 37 | 46 |
| I-730 Refugee/Asylee Relative Petition | 23,469 | 19,845 | 17,804 | 17,524 | 17,295 | 18,771 | 18,458 | 16,768 | 15,756 | 13,708 | 13,031 | 13,917 | 15,607 | 12,952 |
| I-751 Petition to Remove Conditions on Residence on Permanent Resident Status | 154,338 | 214,326 | 181,973 | 166,392 | 211,876 | 172,831 | 171,651 | 178,359 | 165,785 | 144,648 | 166,431 | 177,674 | 187,414 | 171,851 |
| I-765 Application for Employment Authorization[44] | 1,553,906 | 1,144,431 | 1,232,718 | 1,280,726 | 923,351 | 1,238,930 | 1,346,073 | 1,132,773 | 1,584,619 | 1,851,366 | 1,873,189 | 1,804,219 | 1,757,003 | 1,653,418 |
| I-800/A Petition to Classify Convention Adoptee as an Immediate Relative/Application for Determination of Suitability to Adopt a Child from a Convention Country | N/A | N/A | 4,385 | 5,868 | 6,282 | 6,978 | 6,401 | 6,502 | 6,836 | 6,892 | 6,194 | 4,990 | 3,900 | 2,460 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | N/A | N/A | 277 | 1,507 | 1,556 | 1,438 | 1,479 | 1,529 | 1,494 | 1,461 | 1,383 | 1,267 | 1,214 | 980 |
| I-817 Application for Family Unity Benefits | 3,971 | 2,817 | 2,163 | 2,489 | 3,103 | 2,525 | 2,378 | 2,067 | 1,444 | 916 | 1,356 | 707 | 340 | 549 |
| I-824 Application for Action on an Approved Application or Petition | 34,526 | 24,283 | 18,231 | 17,161 | 14,289 | 11,863 | 12,227 | 12,151 | 11,627 | 10,888 | 11,494 | 10,894 | 10,490 | 9,525 |

[42] Combines both Forms I-526 and I-526E. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022. The system that we used for most domestic receipts has not always made the distinction between standalone and regional center petitions, so we combined both here.
[43] Includes the following applications for persons applying for benefits under the Immigration Reform and Control Act of 1986: Forms I-687, I-690, I-694, I-695, and I-698.
[44] Includes Form I-765 for TPS because the system that we used for most domestic receipts in this table does not track Form I-765 applications for TPS separately. Excludes Form I-765 for DACA. A separate row shows I-765 DACA receipts, which we track separately.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 194 | 391 | 437 | 768 | 2,345 | 712 | 1,217 | 2,516 | 2,767 | 3,474 | 2,625 | 3,283 | 3,756 | 3,096 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | 4,493 | 2,712 | 1,450 | 1,836 | 1,907 | 1,585 | 1,101 | 785 | 727 | 681 | 560 | 505 | 487 | 279 |
| I-910 Application for Civil Surgeon Designation | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 514 | 571 | 538 | 362 | 465 | 452 |
| I-914/I-914A Application for T Nonimmigrant Status | 293 | 526 | 710 | 1,037 | 1,762 | 1,680 | 1,820 | 1,869 | 2,224 | 1,848 | 2,259 | 2,979 | 2,253 | 2,076 |
| I-918/I-918A Petition for U Nonimmigrant Status | N/A | N/A | 10,937 | 17,160 | 26,801 | 39,894 | 43,695 | 45,268 | 52,666 | 60,710 | 61,686 | 58,664 | 47,225 | 36,448 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | N/A | N/A | N/A | N/A | 195 | 129 | 397 | 679 | 933 | 1,084 | 1,511 | 1,192 | 1,078 | 919 |
| I-956/I-956G Application For Regional Center Designation / Regional Center Annual Statement[45] | N/A | N/A | N/A | N/A | N/A | 240 | 436 | 642 | 803 | 436 | 1,122 | 909 | 887 | 736 |
| N-300 Application to File Declaration of Intention | 111 | 47 | 73 | 81 | 47 | 66 | 43 | 22 | 30 | 31 | 10 | 29 | 33 | 17 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | 10,865 | 7,112 | 8,232 | 5,098 | 4,302 | 4,528 | 4,406 | 4,307 | 4,300 | 4,329 | 4,398 | 5,345 | 6,118 | 5,245 |
| N-400 Application for Naturalization | 1,382,993 | 525,786 | 570,442 | 710,544 | 756,008 | 899,162 | 772,623 | 773,824 | 783,062 | 734,874 | 986,412 | 837,423 | 830,877 | 967,755 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 582 | 622 | 477 | 506 | 455 | 393 | 354 | 311 | 285 | 202 | 200 | 172 | 163 | 101 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 38,680 | 30,027 | 28,548 | 27,611 | 26,712 | 27,034 | 27,204 | 27,732 | 27,612 | 27,465 | 27,226 | 24,170 | 27,800 | 24,997 |
| N-600/600K Application for Certificate of Citizenship/Application for Citizenship and Issuance of Certificate Under Section 322 | 96,572 | 55,225 | 57,690 | 59,157 | 61,375 | 66,099 | 66,882 | 60,863 | 63,312 | 71,235 | 67,711 | 53,059 | 57,341 | 54,569 |
| Reasonable Fear | 572 | 720 | 1,160 | 2,161 | 3,211 | 4,941 | 7,627 | 9,004 | 7,905 | 9,464 | 10,167 | 11,103 | 13,191 | 8,721 |
| USCIS Immigrant Fee | N/A | N/A | 454,364 | 472,500 | 481,475 | 475,283 | 458,541 | 486,347 | 484,347 | 597,301 | 554,200 | 516,743 | 474,509 | 269,599 |
| G-1041 Genealogy Index Search Request | N/A | N/A | 3,837 | 4,925 | 3,594 | 3,487 | 3,343 | 4,120 | 4,785 | 5,510 | 3,598 | 3,847 | 4,498 | 7,780 |
| G-1041A Genealogy Records Request | N/A | N/A | 1,597 | 2,044 | 2,536 | 2,154 | 2,158 | 2,057 | 2,358 | 2,506 | 2,132 | 2,920 | 4,341 | 4,684 |

[45] Formery Forms I-924, Application For Regional Center Designation Under the Immigrant Investor Program, and I-924A, Annual Certification of Regional Center. We group these two together because the data source did not always tack them both seperately.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G-1566 Request for Certificate of Non-Existence | N/A | N/A | 586 | 681 | 860 | 730 | 717 | 705 | 745 | 679 | 909 | 1,442 | 1,516 | 1,784 |
| **Subtotal** | **6,540,498** | **4,846,738** | **5,330,267** | **5,875,418** | **5,883,412** | **6,247,044** | **6,200,145** | **6,376,182** | **6,981,102** | **7,743,294** | **7,849,924** | **6,880,955** | **7,235,809** | **6,862,424** |
| I-821 Application for Temporary Protected Status | 253,080 | 83,246 | 307,544 | 325,640 | 63,447 | 286,216 | 328,022 | 54,617 | 286,034 | 302,611 | 61,248 | 260,216 | 5,585 | 13,611 |
| I-821D Consideration of Deferred Action for Childhood Arrivals | N/A | N/A | N/A | N/A | N/A | 152,424 | 427,603 | 238,895 | 448,834 | 58,097 | 472,873 | 260,129 | 386,192 | 335,249 |
| I-765 Application for Employment Authorization (DACA) | N/A | N/A | N/A | N/A | N/A | 144,107 | 435,508 | 237,631 | 446,277 | 60,906 | 476,495 | 265,057 | 389,545 | 316,536 |
| Subtotal Temporary or Uncertain Programs | 253,080 | 83,246 | 307,544 | 325,640 | 63,447 | 582,747 | 1,191,133 | 531,143 | 1,181,145 | 421,614 | 1,010,616 | 785,402 | 781,322 | 665,396 |
| **Total** | **6,793,578** | **4,929,984** | **5,637,811** | **6,201,058** | **5,946,859** | **6,829,791** | **7,391,278** | **6,907,325** | **8,162,247** | **8,164,908** | **8,407,298** | **7,719,351** | **7,584,891** | **7,211,284** |

## APPENDIX XI – IEFA HISTORY

USCIS is a component of DHS. It is the Federal entity responsible for granting or denying immigration benefits to individuals seeking to reside in, work in, or become citizens of the U.S., as well as for U.S. citizens, permanent residents, and employers seeking to sponsor individuals for immigrant or nonimmigrant benefits. As one of the largest fee-funded agencies in the Federal Government, USCIS processes a multitude of immigrant and nonimmigrant benefit requests, including:

- **Family-based requests** - facilitating the process for close relatives to immigrate, gain permanent residency, travel, and work;
- **Employment-based requests** - facilitating the process for current and prospective employees to immigrate or work in the U.S. temporarily;
- **Asylum and refugee processing** - adjudicating requests for asylum and refugee status;
- **Naturalization** - approving naturalization of eligible persons who wish to become U.S. citizens;
- **Special status programs** - adjudicating eligibility for U.S. immigration status as a form of humanitarian aid to foreign nationals; and
- **Document issuance and renewal** - verifying eligibility as well as producing and issuing immigration documents.

Before the creation of the DHS on March 1, 2003, the Immigration and Naturalization Service (INS) performed the duties of USCIS. The sections below will refer to USCIS even when it was part of INS at the time.

Before the establishment of the IEFA, immigration application and petition fees were deposited into the General Fund of the Treasury and were available to fund general government expenditures made in consequence of appropriations made by Congress; they were not available exclusively to USCIS. In 1988, Congress established the IEFA. Fees collected from persons filing immigration benefit requests are deposited into the IEFA and fund the following:

1. full cost of processing immigration and naturalization applications and petitions,
2. cost of providing similar benefits to asylum and refugee applicants for which a fee is not charged,
3. cost of providing similar benefits to others at no charge (in other words, fee waivers and fee exemptions).

On April 4, 1989, USCIS published a final rule in the Federal Register establishing the IEFA fee schedule for the first time since enactment of legislation authorizing use of fee revenues to fund immigration benefit processing activities. It instituted fees that "more nearly reflect the current cost of providing the benefits and services…" The changes were "necessary to place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients." Since 1989, fees deposited into the IEFA have been the primary source of funding for the processing of immigration and naturalization benefits.

On March 27, 1991, USCIS revised the IEFA fee schedule. Fees were increased by as much as 100 percent for several immigration benefits. USCIS stated several reasons for this increase:

- Increased workloads, data and communications costs, and computer hardware costs;
- Absorption of asylum and refugee processing costs, previously funded with discretionary appropriations, into the IEFA;
- Costs of an enhanced asylum review process;
- Costs of fingerprint and name checks, which the FBI began billing USCIS; and
- Costs of acquiring larger facilities and additional staffing for increased benefit requests.

In 1994, USCIS revised the fee schedule again. USCIS explained that these increases were necessary to reflect "inflation since the last general fee increase in April 1991, the assignment of certain additional costs to the IEFA for services that support adjudications and naturalization functions, and the costs of investments to improve services to users." While preparing the NPRM to revise fees in 1994, USCIS recognized the need for improving its "management of the finances of the fee accounts and the development of fee schedules."

USCIS adjusted the fee schedule again on October 13, 1998. This was the result of a comprehensive cost study conducted in FY 1997 based on FY 1996 processes and the FY 1998 budget. USCIS conducted a thorough review of the resources, activities, and costs of processing immigration benefits and biometric services funded through the IEFA. This fee review introduced ABC as the methodology for determining costs associated with services for which fees are charged.

The FY 2008/2009 fee review followed nearly a decade without a comprehensive review of IEFA fees. On July 30, 2007, fees increased by a weighted average of 86% to recover base and additional costs for improving operations and service-wide performance needs. Following the FY 2008/2009 fee review, USCIS committed to reviewing IEFA fees every 2 years, consistent with the biennial review standard of the CFO Act of 1990 and OMB Circular A-25.

In November 2010, USCIS adjusted the fee schedule based on its comprehensive fee review for the FY 2010/2011 biennial period. Overall, USCIS kept base costs steady and adjusted for inflation, thereby minimizing program changes that would increase costs. Fees increased by a weighted average of 10 percent. However, the fees did not recover the full cost of RAIO, SAVE, and the Office of Citizenship, in anticipation of congressional appropriations to fund these programs. USCIS did not receive the appropriations that it anticipated when DHS set the fees. USCIS did not receive any substantial appropriations for these programs since FY 2011, except for citizenship grants, until FY 2022.[46] Because Congress did not provide appropriations, USCIS used other fee revenue to support these programs and was unable to maintain its minimum carryover and reserves that it had projected was required to sustain its obligations during periods of cash flow deficits.

USCIS subsequently completed two fee reviews without pursuing notice and comment rulemaking to revise the fee schedule. They were the FY 2012/2013 and FY 2014/2015 fee reviews. Both fee reviews indicated that fee levels were not sufficient to recover the full cost of activities funded by the IEFA; however, USCIS was able to mitigate the projected shortfall by realigning funds within its budget and postponing planned improvements.

DHS published an NPRM for the FY 2016/2017 fee review in May 2016. DHS published a final rule in October 2016. The new fees became effective in December 2016. The weighted average fee increase was 21%. The fees were estimated to recover the full cost of RAIO, SAVE, and the Office of Citizenship. The FY 2016/2017 fee rule established a new $3,035 fee for Form I-924A, Annual Certification of Regional Center, now called Form I-956G, Regional Center Annual Statement. It established a reduced fee of $320 for some applicants filing Form N-400, Application for Naturalization. The reduced Form N-400 fee was for naturalization applicants with a family income greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. The

---

[46] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113-6) and FY 2014 (Pub. L. 113-76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018. Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116-6), FY 2020 (Pub. L. 116-93), and FY 2021 (Pub. L. 116-260). See section III.B. Effect of FY 2022 Appropriations in the preamble for a discussion on FY 2022 appropriations.

final rule also removed regulatory provisions that prevented USCIS from rejecting an immigration or naturalization benefit request fee paid with a dishonored check or lacking the required biometric services fee.

To review historical fees, see Appendix XI – IEFA History. The table does not include fees that were enjoined, vacated, or otherwise removed.[47] In order to save space, this document shows IEFA fees from 2005 to now.[48] These represent the USCIS IEFA fees under DHS. It may exclude some IEFA fees that CBP or ICE collect.

## Appendix Table 14: IEFA Non-Premium Fee History

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|------|---------------------|-----------|-----------|-----------|-----------|----------------------|
| G-1041 | Genealogy Index Search Request[49] | | | $20 | $65 | |
| G-1041A | Genealogy Records Request (Microfilm Copy) | | | $20 | $65 | |
| G-1041A | Genealogy Records Request (Textual Record Copy) | | | $35 | $65 | |
| I-90 | Application to Replace Permanent Resident Card | $190 | $290 | $365 | $455 | |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $160 | $320 | $330 | $445 | |
| I-129/ I-129CW | Petition for a Nonimmigrant Worker | $190 | $320 | $325 | $460 | |
| I-129F | Petition for Alien Fiancé(e) | $170 | $455 | $340 | $535 | |
| I-130 | Petition for Alien Relative | $190 | $355 | $420 | $535 | |
| I-131 | Application for Travel Document | $170 | $305 | $360 | $575 | |
| I-131 | Application for Refugee Travel Document (16 or older) | | | $135 | $135 | |
| I-131 | Application for Refugee Travel Document (under 16) | | | $105 | $105 | |
| I-131A | Application for Travel Document (Carrier Documentation) | | | | $575 | |
| I-140 | Immigrant Petition for Alien Worker | $195 | $475 | $580 | $700 | |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $265 | $545 | $585 | $930 | |
| I-192 | Application for Advance Permission to Enter as a Nonimmigrant | $265 | $545 | $585 | $930 | |
| I-193 | Application for Waiver of Passport and/or Visa | $265 | $545 | $585 | $585 | |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $265 | $545 | $585 | $930 | |
| I-290B | Notice of Appeal or Motion | $385 | $585 | $630 | $675 | |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | $190 | $375 | $405 | $435 | |
| I-485 | Application to Register Permanent Residence or Adjust Status | $325 | $930 | $985 | $1,140 | |
| I-485 (Child) | Application to Register Permanent Residence or Adjust Status (under the age of 14 years) | $225 | $600 | $635 | $750 | |
| I-526/I-526E | Immigrant Petition by Standalone/Regional Center Investor[50] | $480 | $1,435 | $1,500 | $3,675 | |
| I-539 | Application to Extend/Change Nonimmigrant Status | $200 | $300 | $290 | $370 | |

[47] The FY 2019/2020 fee rule is enjoined. *See* 86 FR 7493. As such, we do not list the enjoined fees in the table. In Aug. 2019, DHS published a final rule establishing Forms I-356 and I-945 each with $25 fees. *See* 84 FR 41292. In March 2021, DHS removed the regulations, which a Federal district court vacated. *See* 86 FR 14221. As such, we do not list the vacated fees in the table.

[48] For IEFA fee history before 2005, see USCIS, "FY 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum" (Oct 25, 2016), *https://www.regulations.gov/document/USCIS-2016-0001-0466*. In that document, Appendix VIII - IEFA Fee History, page 56, provides fees from FY 1985 to Nov. 2010.

[49] Genealogy fees (Forms G-1041 and G-1041A) became effective in Aug. 2008 without changing any other IEFA fees. *See* 73 FR 28026. These fees did not change until the FY 2016/2017 fee rule.

[50] Combines both Forms I-526 and I-526E. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022. Previously named Form I-526, Immigrant Petition by Alien Entrepreneur.

AR_000270

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|---|---|---|---|---|---|---|
| I-600/ I-800 | Petition to Classify Orphan as an Immediate Relative/ Petition to Classify Convention Adoptee as an Immediate Relative | $545 | $670 | $720 | $775 | |
| I-600A/ I-800A | Application for Advance Processing of an Orphan Petition/ Application for Determination of Suitability to Adopt a Child from a Convention Country | $545 | $670 | $720 | $775 | |
| I-601 | Application for Waiver of Grounds of Inadmissibility | $265 | $545 | $585 | $930 | |
| I-601A | Application for Provisional Unlawful Presence Waiver | | | $585 | $630 | |
| I-612 | Application for Waiver of the Foreign Residence Requirement | $265 | $545 | $585 | $930 | |
| I-687 | Application for Status as a Temporary Resident under Section 245A of the INA | $255 | $710 | $1,130 | $1,130 | |
| I-690 | Application for Waiver of Grounds of Inadmissibility | $95 | $185 | $200 | $715 | |
| I-694 | Notice of Appeal of Decision under Section 210 or 245A of the Immigration and Nationality Act | $110 | $545 | $755 | $890 | |
| I-695 | Application for Replacement Employment Authorization or Temporary Residence Card | $65 | $130 | N/A | N/A | |
| I-698 | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | $180 | $1,370 | $1,020 | $1,670 | |
| I-751 | Petition to Remove the Conditions on Residence | $205 | $465 | $505 | $595 | |
| I-765 | Application for Employment Authorization | $180 | $340 | $380 | $410 | |
| I-800A | Supplement 3, Request for Action on Approved Form I-800A | | | $360 | $385 | |
| I-817 | Application for Family Unity Benefits | $200 | $440 | $435 | $600 | |
| I-821 | Application for Temporary Protected Status | $50 | $50 | $50 | $50 | |
| I-824 | Application for Action on an Approved Application or Petition | $200 | $340 | $405 | $465 | |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status[51] | $475 | $2,850 | $3,750 | $3,750 | |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA))[52] | $285; $585 | $285; $585 | $285; $585 | $285; $585 | |
| I-905 | Application for Authorization to Issue Certification for Health Care Workers | $230 | $230 | $230 | $230 | |
| I-907 | Request for Premium Processing Service | $1,000 | $1,000 | $1,225 | $1,225 | See Appendix Table 15 |
| I-910 | Application for Civil Surgeon Designation | | | $615 | $785 | |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | | | $215 | $230 | |
| I-941 | Application for Entrepreneur Parole[53] | | | | | $1,200 |
| I-956 | Application for Regional Designation Center[54] | | | $6,230 | $17,795 | |
| I-956G | Regional Center Annual Statement[55] | | | | $3,035 | |
| N-300 | Application to File Declaration of Intention | $120 | $235 | $250 | $270 | |

[51] Previously named Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status.
[52] There are two USCIS fees for Form I-881: $285 for individuals and $570 for families. EOIR has a separate $165 fee.
[53] DHS published a final rule for establishing Form I-941, International Entrepreneur Parole Program. *See* 82 FR 5238 (Jan. 25, 2017). DHS proposed to terminate the program. *See* 83 FR 24415 (May 29, 2018). DHS withdrew that separate NPRM. *See* 86 FR 25809 (May 11, 2021). DHS does not propose to change the fee in this NPRM. USCIS may evaluate the fee in future fee reviews.
[54] Formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program
[55] Formerly Form I-924A, Annual Certification of Regional Center

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|------|---------------------|-----------|-----------|-----------|-----------|----------------------|
| N-336 | Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 | $265 | $605 | $650 | $700 | |
| N-400 | Application for Naturalization | $330 | $595 | $595 | $640 | |
| N-400 | Application for Naturalization with Form I-942, Request for Reduced Fee | | | | $320 | |
| N-470 | Application to Preserve Residence for Naturalization Purposes | $155 | $305 | $330 | $355 | |
| N-565 | Application for Replacement Naturalization/Citizenship Document | $220 | $380 | $345 | $555 | |
| N-600 | Application for Certificate of Citizenship | $255 | $460 | $600 | $1,170 | |
| N-600K | Application for Citizenship and Issuance of Certificate Under Section 322 | $255 | $460 | $600 | $1,170 | |
| | Biometrics Fee | $70 | $80 | $85 | $85 | |
| | H-1B Registration Process Fee[56] | | | | | $10 |
| | USCIS Immigrant Fee (Formerly Immigrant Visa) | | | $165 | $220 | |

**Appendix Table 15: Premium Processing Fees**

| From | To | Form I-907 Fee(s) | Reference |
|------|-----|-------------------|-----------|
| 10/1/05 | 11/22/10 | $1,000 | INA section 286(u), 8 U.S.C. 1356(u) |
| 11/23/10 | 9/30/18 | $1,225 | 75 FR 58961 (Sep. 24, 2010) |
| 10/1/18 | 12/1/19 | $1,410 | 83 FR 44449 (Aug. 31, 2018) |
| 12/2/19 | 10/18/20 | $1,440 | 84 FR 58303 (Oct. 31, 2019) |
| 10/19/20 | Current | $2,500 or $1,500 | USCIS Stabilization Act, Pub. L. No: 116-159, div. D, tit. I |

---

[56] DHS published a final rule establishing a $10 registration fee for H-1B petitions in Nov. 2019. *See* 84 FR 60307.





U.S. Citizenship and
Immigration Services

AR_000273

**FY 2022-2023**

# Immigration Examinations Fee Account

## Fee Schedule Documentation

January 2023





**U.S. Citizenship and Immigration Services**

AR_000274

**NOTE:** This fee schedule documentation is for the **internal use** of the Department of Homeland Security only to advise USCIS operations on the establishment of fees as stated hereafter. It is provided to the public in the rulemaking docket for the USCIS fee rule to provide more precise explanations for how fees are calculated than what is necessary for the rule. The procedure it contains, while followed by USCIS employees and contractors, generally, is **not binding** on USCIS or its employees. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, entities, officers, employees, agents, or any other person.

## TABLE OF CONTENTS

Introduction ................................................................................................................. 4

Data Sources for the Fee Schedule ............................................................................. 4

  Final VPC Projections (Domestic and RAIO) ......................................................... 4

  Fee-Paying Percentages ............................................................................................ 4

  Fee Review Model .................................................................................................... 4

  Online Filing ............................................................................................................ 4

    Various Adjustments ............................................................................................ 5

Worksheets in the Fee Schedule ................................................................................. 5

  Fees ............................................................................................................................ 5

    CBP Fees ............................................................................................................. 6

    Rows and Color Coding ....................................................................................... 6

    Column Walkthrough ........................................................................................... 6

    Cost Reallocation Calculation .......................................................................... 11

    Verify Fees Calculations ................................................................................... 14

  Change Items .......................................................................................................... 14

  Adjustments ............................................................................................................ 15

  VPC Forecasts ........................................................................................................ 15

  Fee-Paying .............................................................................................................. 16

  Filing Methods ....................................................................................................... 17

  Model Output ......................................................................................................... 17

    Input cells .......................................................................................................... 18

  Biometric Fee ......................................................................................................... 18

CBP Example ................................................................................................. 19

SAVE Revenue ............................................................................................. 20

Update the Model Output Results .................................................................... 20

Model Output Budget .................................................................................. 20

Model Output by Filing Type ....................................................................... 21

Model Output for I-129 ............................................................................... 22

Additional Steps for Bundled scenarios ...................................................... 24

Fee Schedule Scenarios .................................................................................. 24

Modify Total Cost for Budget Scenarios ..................................................... 24

Add or Remove Cost Reallocation to a Row ................................................ 25

Hold to Current Fee .................................................................................. 25

Limit A Fee Increase (Add Cost Reallocation) ........................................... 26

Remove Cost Reallocation and Allow a Fee to Change ............................... 26

Creating Appendixes for the Supporting Documentation and NPRM ............... 26

Current and Proposed Fees .......................................................................... 27

# Fee Schedule Documentation

## Introduction

USCIS uses the fee schedule to compare current and proposed fees, make decisions on fee adjustments, and calculate final fees. USCIS limits the manipulation of fees and discourages arbitrary adjustment of individual fees. The fee structure is interdependent. A change to one fee affects all other fees, except for those USCIS holds constant as a policy decision. There are several different folders on the shared drive, each with different versions of the fee schedule.

- Draft fee schedule
- Fee schedule options
- Proposed fee schedule
- Final fee schedule (TBD)

Typically, column headers differ between an NPRM and a final rule. For example, a column named *Proposed Fees* in an NPRM may become *Final Fees* in a final rule. The fee schedule calculations may change between the NPRM and the final rule. This documentation refers to the column letters from a proposed rule.

## Data Sources for the Fee Schedule

### Final VPC Projections (Domestic and RAIO)

The FY 2022/2023 fee review uses the June 2020 (FY 2020) VPC projections for FY 2022 and FY 2023. USCIS copied and pasted the text into the VPC Forecasts worksheet in the fee schedule. These are available on the ECN or the OCFO budget shared drive.

### Fee-Paying Percentages

The fee schedule required fee-paying percentages by form to calculate fees and revenue. The FY 2021 revenue forecast provided the starting point for the fee schedule. From there, RCA made bundled and debundled versions. The changes only affected Forms I-131 and I-765. In addition, RCA calculated volumes for proposed fee exemptions. The fee schedule can toggle between the various fee-paying percentages.

### Fee Review Model

The fee schedule requires three sets of data from the CostPerform fee review model. See the model documentation for more information. The model provides data on the Model Output worksheet. We discuss the requirements in the section for that worksheet.

### Online Filing

OCFO used an OPQ receipts dashboard to determine online and paper filing rates for forms that were eligible for both. We incorporated this information into the fee schedule and fee review model to help determine separate fees by filing type (online or paper).

4

AR_000277

## Various Adjustments

The Adjustments worksheet requires several additional data sources.

- CBP provided revenue and cost information from the workloads that they share with USCIS.
- The Department of State FY 2020 IAA provided workloads that State adjudicates on our behalf.
- SAVE revenue and volume information that came from IRIS

## Worksheets in the Fee Schedule

### Fees

The *Fees* worksheet is the main output of the fee schedule. This compares current fees to proposed fees, measures the effect of cost changes to the fee structure, and calculates final fees. See Figure 1. While the screenshot does not show every fee, this document offers a comprehensive overview of every column (including hidden ones) on this worksheet. This section offers a comprehensive overview of every significant calculation in the worksheet.

Figure 1: Print preview of the Fees worksheet

| Immigration Benefit Request | Projected Workload Receipts | Projected Fee-Paying Receipts | Current Fee-FY 2016/2017 | Model Output FY 2022/2023 | Proposed Fee-FY 2022/2023 | $ Difference from Current Fees | % Difference from Current Fees | Revenue with Proposed Fees |
|---|---|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card-Subtotal | 740,000 | 648,758 | $455 | $520 | $455 | $0 | 0% | $297,576,250 |
| I-90 Application to Replace Permanent Resident Card - Online | 467,232 | 409,622 | $455 | $344 | $465 | $10 | 2% | $186,578,010 |
| I-90 Application to Replace Permanent Resident Card - Paper | 272,768 | 239,136 | $455 | $499 | $680 | $235 | 53% | $111,198,240 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 5,020 | 4,633 | $445 | | | | | $3,143,640 |
| I-129 Petition for a Nonimmigrant Worker-Subtotal | 568,630 | 568,630 | | | | | | $483,032,100 |
| I-129 H-1B - Named Beneficiaries | 430,000 | 430,000 | $460 | $575 | $780 | $320 | 70% | $335,400,000 |
| I-129 H-2A - Named Beneficiaries | 4,020 | 4,020 | $460 | $802 | $1,090 | $630 | 137% | $4,381,800 |
| I-129 H-2B - Named Beneficiaries | 2,460 | 2,460 | $460 | $796 | $1,080 | $620 | 135% | $2,656,800 |
| I-129 L-1A/L-1B/LZ Blanket - Named Beneficiaries | 42,350 | 42,350 | $460 | $1,021 | $1,385 | $925 | 201% | $58,654,750 |
| I-129 O/O2 | 27,300 | 27,300 | $460 | $775 | $1,055 | $595 | 129% | $28,801,500 |
| I-129 All Other | 40,850 | 40,850 | $460 | $749 | $1,015 | $555 | 121% | $41,462,750 |
| I-129 H-2A - Unnamed Beneficiaries | 17,650 | 17,650 | $460 | $390 | $530 | $70 | 15% | $9,354,500 |
| I-129 H-2B - Unnamed Beneficiaries | 4,000 | 4,000 | $460 | $426 | $580 | $120 | 26% | $2,320,000 |
| I-129F Petition for Alien Fiancé(e) | 44,700 | 41,412 | $535 | $531 | $720 | $185 | 35% | $29,830,680 |
| I-130 Petition for Alien Relative-Subtotal | 880,000 | 857,514 | | | | | | $679,595,550 |
| I-130 Petition for Alien Relative - Online | 220,075 | 214,232 | $535 | $525 | $710 | $175 | 33% | $152,104,720 |
| I-130 Petition for Alien Relative - Paper | 660,825 | 643,282 | $535 | $603 | $820 | $285 | 53% | $527,490,850 |
| I-131 Application for Travel Document | 329,900 | 253,662 | $575 | $463 | $630 | $55 | 10% | $159,806,745 |
| I-131 Refugee Travel Document for an individual age 16 or older | 16,260 | 16,260 | $135 | $589 | $165 | $30 | 22% | $2,682,818 |
| I-131 Refugee Travel Document for a child under the age of 16 | 1,157 | 1,157 | $105 | $589 | $135 | $30 | 29% | $156,128 |
| I-131A Application for Travel Document (Carrier Documentation) | 8,000 | 8,000 | $575 | $538 | $575 | $0 | 0% | $4,600,000 |
| I-140 Immigrant Petition for Alien Worker | 140,000 | 140,000 | $700 | $528 | $715 | $15 | 2% | $100,100,000 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 111 | 111 | $930 | $682 | $930 | $0 | 0% | $103,230 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | 41,481 | 10,954 | $930 | $2,194 | $1,100 | $170 | 18% | $12,049,400 |
| I-193 Application for Waiver of Passport and/or Visa | 6,815 | 6,772 | $585 | $586 | $695 | $110 | 19% | $4,706,540 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 10,693 | 7,260 | $930 | $1,027 | $1,395 | $465 | 50% | $10,127,700 |
| I-290B Notice of Appeal or Motion | 36,423 | 33,803 | $675 | $1,413 | $800 | $125 | 19% | $27,042,400 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | 43,028 | 4,107 | $435 | $8,790 | $515 | $80 | 18% | $2,115,105 |
| I-485 Application to Register Permanent Residence or Adjust Status | 608,750 | 572,497 | $1,140 | $1,133 | $1,540 | $400 | 35% | $881,645,380 |

5

AR_000278

## CBP Fees

Combined fees for forms shared by CBP and USCIS are new to the FY 2022/2023 fee rule. On the *Fees* worksheet, these forms appear twice. First, the fee schedule uses the combined volumes and cost estimates to calculate combined fees for the following forms:

- I-192 Application for Advance Permission to Enter as Nonimmigrant
- I-193 Application for Waiver of Passport and/or Visa
- I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
- I-824 Application for Action on an Approved Application or Petition

On the last page of the fee schedule, there are negative amounts for these fees. These rows used only CBP volumes. By making these rows negative, USCIS guarantees that it does not rely on CBP revenue to recover USCIS costs. The *CBP Revenue* worksheet shows examples of the net effect of this adjustment. It also shows the cost information that CBP provided.

## Rows and Color Coding

Most rows on the fee schedule represent different immigration benefit request fees (except headers, subtotals, and a key). The list below describes the color coding in the rows of the fee schedule. Descriptions are also at the bottom of the *Fees* worksheet.

1. Black rows subsidize rows in red or green. They subsidize workload that does not recover full cost (adoption, appeals, naturalization, etc.) and work without fees (asylum, refugee, T/U visas, etc.). The Reallocation Difference columns (one with dollars and another with a percentage) indicate how much these fees increase as a result; these are hidden columns, as described in Table 1.

2. Green indicates that the fee is held to the current fee or the US passport fees for first time passport book. In the FY 2010/2011 fee rule, USCIS held the N-400 Application for Naturalization constant. In the FY 2016/2017 fee rule, we held two immigration benefits, I-829 and biometrics services, to then current fees. In the FY 2022/2023 fee rule, we proposed holding several fees to the current fee (Forms I-131A, I-698, N-565, etc.).

3. Red rows were held to the weighted average increase in the FY 2016/2017 fee rule, and USCIS leadership, as part of the standard policy process, decided to continue limiting these fee increases. Rows in black and blue subsidize these decisions.

4. Blue rows were held to the weighted average increase in the last fee rule, but USCIS leadership, as part of the standard policy process, decided to not hold the fee down any longer. These work like other black rows and subsidize other fees that are artificially low. For example, the FY 2016/2017 fee rule limited the fee increase for Form I-765, but the proposed fees for FY 2022/2023 do not limit the increase.

Should you need to change the color for a row, do it manually. While some Boolean columns may use conditional formatting to change their color, it is easier to change the color for an entire row manually than with conditional formatting.

## Column Walkthrough

There are several hidden columns and columns outside of the print area. We hide columns for presentation purposes; some columns are used to calculate final fees. Table 1 below describes each column and indicates whether or not it is hidden. If you need to hide or unhide cells to the left of column F, see the instructions on page 25 for Figure 23.

Table 1: Columns in the Fees worksheet

| Letter | Column Label | Description | Hidden Column? |
|---|---|---|---|
| A | Limit Fee in FY 2010/2011? | This Boolean column labels whether or not the FY 2010/2011 fee rule limited the fee to less than full cost. This means the rule held the form to the current fee at the time (N-400), some other fee (I-131 refugee travel documents), or limited the amount of the increase (I-290B, I-360, I-600/600A, etc.) This column does not affect any calculations. | Yes |
| B | Limit Fee in FY 2016/2017? | This Boolean column labels whether or not the FY 2016/2017 fee rule limited the fee to less than full cost. This column does not affect any calculations. | No |
| C | Limit Fee in FY 2019/2020? | This Boolean column labels whether or not the FY 2019/2020 fee rule limited the fee to less than full cost. This column does not affect any calculations. | No |
| D | Limit Fee Now? | This Boolean column determines whether or not to limit the fee increase to an overall percentage increase. (See % Difference.) Unlike the previous columns, this column affects the cost reallocation calculations. Conditional formatting will make the font color red if it is true. | No |
| E | Keep Current Fee? | This Boolean column indirectly determines whether or not to hold the current fee. Meaning, if true, then this column sets the *Use Current Fees* column to be true. The cost reallocation calculation uses the *Use Current Fees* column, not this one. (Separating the two columns prevented a circular reference.) This affects the cost reallocation calculations. If true, conditional formatting will make this column green. | No |
| F | Immigration Benefit Request | Number and name of the immigration benefit request. Sometimes this includes a subtotal where the current fee schedule separates one fee into several new fees. Sometimes it includes separate fees by online or paper filing. | No |
| G | Projected Workload Receipts | This is the projected count of receipts during the fee review period. The projections come from the Volume Projection Committee (VPC) estimates. In most cases, the values are from the VPC Forecasts worksheet.<br><br>In some cases, the workload estimate comes from other sources. In those cases, the workload estimates are on the Adjustments worksheet. For example:<br>• Shared USCIS and CBP workloads (Forms I-192, I-193, I-212, and I-824)<br>• H-1B Pre-Registration Fee<br>• I-131A Application for Travel Document (Carrier Documentation) and other DOS IAA workload | No |
| H | Projected Fee-Paying Receipts | These are the projected receipts that will pay fees during the fee review. It is an average of the two years in the fee review. In some cases, this column uses the Adjustments worksheet. For example, the bullets in the previous row. | No |
| I | Projected Fee-Paying Receipts (No subtotals for formulas) | This is the same as the previous column, but without any subtotals. Cost reallocation uses this column instead of the one with subtotals. (Subtotals complicated the cost reallocation formula. It was easier to use a column without them.) | Yes |

| Letter | Column Label | Description | Hidden Column? |
|---|---|---|---|
| J | Current Fees (FY 2016/2017) | These are the current fees for immigration benefits. At several points, the fee schedule compares proposed fees to the current fees.<br><br>The *Subtotal (Non-Premium)* row of this column represents the average current fee. It multiplies each row of this column by the total *Projected Fee-Paying Receipts*, and then divides by the total *Projected Fee-Paying Receipts*. As such, we consider it a weighted average for current fees. Functionally, you can think of this subtotal as an average current fee.[1] | No |
| K | Use Current Fees | This Boolean column determines whether or not to hold the current fee. Meaning, if true, then the *Model Output or Current Fee* column will use the current fee instead of the model output. This affects the cost reallocation calculations. | Yes |
| L | Unit Cost (FY 2022/2023) | This divides the total cost from PCM by Projected Workload Receipts to calculate a cost per receipt. If a workload is eligible for fee waivers or exemptions, then this column will be lower than the next column. | Yes |
| M | Model Output (FY 2022/2023) | CostPerform provides the total cost. This column divides by fee-paying volume to determine a fee-paying unit cost.[2]<br><br>The *Subtotal (Non-Premium)* row of this column represents the average current fee. It multiplies each row of this column by the total *Projected Fee-Paying Receipts*, and then divides by the total *Projected Fee-Paying Receipts*. As such, we consider it a weighted average. Functionally, you can think of this subtotal as an average fee-paying unit cost. | No |
| N | Model Output or Current Fee | If *Use Current Fees* is true, then it will equal the current fee. Otherwise, it equals the model output column. | Yes |
| O | $ Difference | *Model Output or Current Fee* minus *Current Fees (FY 2016/2017)*. Used in the *% Difference* column.<br><br>The *Subtotal (Non-Premium)* row compares the weighted average in the *Current Fees (FY 2016/2017)* column to the weighted average in the *Model Output (FY 2019/2020)* column. | Yes |

AR_000281

---

[1] Please note that if you change the *Projected Fee-Paying Receipts* then the result for the *Subtotal (Non-Premium)* row may change even if the *Current Fees* do not change. This is because of the weighting by fee-paying volume. As such, the value in this row may be different than in the spreadsheet that determined the current fee schedule because the volumes will be different in each spreadsheet.

[2] Previous versions of this spreadsheet took the fee-paying unit cost (Model Output) straight from the model. By using the fee-paying volumes in the spreadsheet, it can calculate different fee-paying unit costs without changing data in the model. This helps OCFO provide economists with alternative fee schedules, like an alternative without additional fee exemptions.

| Letter | Column Label | Description | Hidden Column? |
|---|---|---|---|
| P | % Difference | The percentage difference between the Current Fees and the new Model Output. (Model Output - Current Fees)/Current Fees.<br><br>This column is important because some fees only change by the percentage in the *Subtotal (Non-Premium)* row. Rows where *Limit Fee Now?* is TRUE use the result here to calculate the fee. This row represents the increase in estimated cost (Model Output) over current fees, weighted by volume for each row. It is not exactly a change over current fees because fees are often more than the model output. | Yes |
| Q | Exempt from Model Output? | A column of Boolean values that the *Back-Calculation* uses. If true, then the current fee will either not change, or it will change by the overall weighted average. If false, then the back-calculation will add addition cost to offset those rows that were true. | Yes |
| R | Back-Calculation | This is the model output multiplied by the fee-paying volume. This represents the total cost of the row.<br><br>There is a hidden row (#85) that represents the difference between the total fee review budget and total cost. This difference represents the cost of forms that are not on the fee schedule (such as refugee and asylum workload). The difference is the revenue that the fee schedule must redistribute to other forms. The additional revenue pays for workload that is not on the fee schedule. This document, and fee rule documents, refer to this cost recovery as cost reallocation.<br><br>If a row is in a black or blue font color, then we base the proportion of additional costs a row will receive on its proportion of the *Subtotal (Non-Premium)*.<br><br>Some other rows have specialized calculations:<br>If the *Change Items* worksheet can toggle a policy item off or on, then the calculation here or in adjacent rows may change. Examples include bundling, refugee travel document fees, and additional fee exemptions.<br><br>The *Biometric Services (Other Programs such as TPS and EOIR)* row is blank in this column because this fee was calculated outside of CostPerform. The fee review budget backed out the contractual costs for TPS and EOIR. By leaving this column blank, the row does not factor into any cost reallocation or revenue calculations.<br><br>The *SAVE Initial Electronic Queries* row uses the *SAVE Revenue* worksheet to add that reimbursable revenue into the fee schedule calculations. | Yes |

| Letter | Column Label | Description | Hidden Column? |
|---|---|---|---|
| S | Model Output with Reallocation | There are different formulas for these rows. See the Rows and Color Coding section.<br><br>If *Exempt from Model Output?* column is false, then this adds a portion of the Back-Calculation column to the value in the *Model Output* or *Current Fee* column.<br><br>If *Exempt from Model Output?* column is true, then this adds the "% Difference" from the "Subtotal (Non-Premium)" row to the current fee. | No |
| T | Reallocation $ Difference | This column is the difference between *Model Output with Reallocation* and the current fees. It shows the additional cost that red and green rows add to other fees. This column will be negative if a fee is less than the model output. (Meaning, USCIS holds the immigration benefit request to the weighted average increase in the *% Difference* from the *Subtotal (Non-Premium).*) | Yes |
| U | Reallocation % Revenue Difference | As mentioned in the *Back-Calculation* section, the fee schedule covers the cost of forms that are not on the fee schedule. The percentage in this column shows how much of this amount each form funds. Meaning, it shows the forms affected most by cost reallocation. USCIS only has a few high volume forms (I-90, I-130, I-485, I-765, N-400, etc.). The percentage will be higher on high volume forms. | Yes |
| V | Eligible for Online Filing? | Not used for any calculations, but it flags workloads that are eligible for online filing. Boolean. | Yes |
| W | Proposed Fees (FY 2022/2023) | This column rounds the *Model Output with Reallocation* column to the nearest $5 increment. In fee rules this is often the proposed fee or final fee. | No |
| X | $ Difference from Current Fees | This is the difference between the current fees and the proposed fees. | No |
| Y | % Difference from Current Fees | This is the percentage difference between the proposed and current fees. | No |
| Z | Revenue Delta (Fee Waivers, Exemptions, etc.) | This is model output multiplied by the difference between workload and fee-paying volumes. It represents the estimated cost of fee waived or fee exempt work. | Yes |
| AA | Revenue with Revised Unrounded Fees | This is the total revenue by form if USCIS did not round to the nearest $5 increment.<br><br>The *Grand Total* row of this column represents the total in the USCIS fee review budget. An error check makes sure that it matches the total budget in CostPerform. | Yes |
| AB | Revenue with Proposed Fees | This is the total revenue using the *Proposed Fees (FY 2022/2023)* column. | No |
| AD | Difference from Rounding | This is the total difference as a result of rounding to $5 increments. USCIS may gain or lose revenue as a result of the policy decision to round fees. | Yes |
| AE | Revenue with FY 2016/2017 Fees | This multiplies the current fee by the fee-paying volume to assess revenue without implementing new fees. | Yes |
| AF | Dollar Difference | This compares revenue with current fees versus new fees. | Yes |
| AG | Fee Waivers and Exemption Count | This is the difference between workload and fee-paying volumes. | Yes |
| AH | Fee Waiver and Exemption Value | This is the *Fee Waivers and Exemption Count* multiplied by new fees. It represents foregone revenue from fee waivers and exemptions. | Yes |

10

AR_000283

| Letter | Column Label | Description | Hidden Column? |
|---|---|---|---|
| A1+ | Various pasted value and difference columns | This and similar columns exist to compare various fee scenarios. For example, these could be comparisons to the different versions of proposed fees. This lets DHS or USCIS leadership see the effect of decisions on fees as they compare different fee setting scenarios. | Outside print area |

## Cost Reallocation Calculation

USCIS does not charge fees for every output in the ABC model. For example, refugee and asylum workload are in the ABC model, but USCIS does not charge fees for some of the workload. In addition, DHS or USCIS may decide not to change or limit the change of some fees. We increase fees to offset for the cost of these decisions. This is called cost reallocation. The reallocation ensures USCIS recovers the full fee review budget through immigration benefit fees.

This is the final step in creating the fee schedule. On the *Fees* worksheet (Figure 1), model outputs serve as the baseline for most fees. Exceptions are color coded in red or green fonts. See the *Rows and Color Coding* section for more information.

## Items Below Full Cost (Red)

A red font indicates fees held below the model output. USCIS holds other fees to the total weighted average increase in the *% Difference* column. This column is the difference between current fees and model output. Essentially, it is the difference between current fees and projected costs. The *Exempt from Model Output* column equals TRUE for these rows. The following immigration benefits are held below the model output in the proposed fee schedule:

- I-192 Application for Advance Permission to Enter as Nonimmigrant
- I-193 Application for Waiver of Passport and/or Visa
- I-290B Notice of Appeal or Motion
- I-360 Petition for Amerasian Widow(er) or Special Immigrant
- I-600/600A/800/800A Adoption Petitions and Applications
- I-600A Supplement 3 Request for Action on Approved I-600A
- I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA as Amended)
- I-800A Supplement 3 Request for Action on Approved I-800A
- I-881, Application for Suspension of Deportation or Special Rule Cancellation
- I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant
- N-300 Application to File Declaration of Intention
- N-336 Request for Hearing on a Decision in Naturalization Proceedings
- N-400 Application for Naturalization
- N-470 Application to Preserve Residence for Naturalization Purposes
- N-600 Application for Certificate of Citizenship
- N-600K Application for Citizenship and Issuance of Certificate

11

AR_000284

See the *Add or Remove Cost Reallocation to a Row* section to change the affected forms.

### Items Held to the Current Fee or U.S. Passport Book Fee (Green)

Green rows are held to the current fees or fees beyond DHS control. Refugee travel documents are held to U.S. passport fees per U.S. obligations under Article 28 of the 1951 Convention Relating to the Status of Refugees. The *Exempt from Model Output* column equals TRUE for these rows, plus any rows where the fee is held below full cost (red). The following immigration benefits are held below the model output in the proposed fee schedule:

- I-90 Application to Replace Permanent Resident Card - Online
- I-131 Refugee Travel Document for an individual age 16 or older
- I-131 Refugee Travel Document for a child under the age of 16
- I-131A Application for Travel Document (Carrier Documentation)
- I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)
- I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
- N-565 Application for Replacement Naturalization/Citizenship Document - Online
- N-565 Application for Replacement Naturalization/Citizenship Document – Paper

There may be times when the proposed fee is coincidently equal to the current fee without any other intervention. There is not an example in the proposed fee schedule, but it did occur in earlier drafts of proposed fees.

### Formula Walkthrough

These reallocations ensure full cost recovery. The *Back-Calculation* column determines the cost that each row needs to recover. There is also a hidden row (#85) to recover the additional cost of items in the budget but not in the fee schedule. These items include cost objects in CostPerform for RAIO and other workload without fees. The formula multiplies fee-paying receipts by model output.

*Model Output with Reallocation* distributes the costs that USCIS must recover in the hidden row (#85). If a row is red (and *Exempt from Model Output* is TRUE), then the fee will only change by the *% Difference* between the current fee and the model output. If *Exempt from Model Input* is FALSE, then it will receive additional costs. It redistributes these additional costs from the *Back-Calculation* column by the proportion of the total cost in the *Subtotal (Non-Premium)* row. (USCIS does not burden the biometric or genealogy fees with additional costs.) The proportion represents the percentage of total revenue that the immigration benefit will recover.

The formula for the *Model Output with Reallocation* is especially complex. For example, Equation 1 below is the formula for I-90 Application to Replace Permanent Resident Card - Online:

Equation 1: Model Output with Reallocation formula

=IF($D5=FALSE,IFERROR(IF(K5,J5,(((R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$85)/I5)*$R$85)/I5)+N5),0),I5*(1+$P$84))

See Figure 2 for the names of columns and rows the formula bar. The top of the screenshot shows Equation 1 in the formula bar.

**Figure 2: Hidden rows and formulas in Fees worksheet**

Formula bar: `=IF($D5=FALSE,IFERROR(IF(K5,J5,(((R5)/$R$84+SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))/J5))),0),J5*(1+$P$84))`

| Immigration Benefit Request | Projected Workload Receipts | Projected Fee-Paying Receipts | Projected Fee Paying Receipts (No subtotals for formulas) | Current Fee (FY 2016/2017) | Use Current Fees | Unit Cost Fee (FY 2022/2023) | Model Output (FY 2022/2023) | Model Output or Current Fee | $ Difference | % Difference | Exempt from Model Output? | Back-Calculation | Model Output with Reallocation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card Subtotal | 740,000 | 648,758 | | $455 | TRUE | $281 | $320 | $455 | $0 | 0% | TRUE | $186,378,010 | $455 |
| I-90 Application to Replace Permanent Resident Card - Online | 467,232 | 409,622 | 409,622 | $455 | FALSE | $302 | $344 | $344 | ($111) | -24% | FALSE | $82,327,648 | $467 |
| I-90 Application to Replace Permanent Resident Card - Paper | 272,768 | 239,136 | 239,136 | | | | | | | | | | |

Table 2 below breaks the formula down into steps to make it more manageable. New parts of the formula are in red.

**Table 2: Steps in the *Model Output with Reallocation* formula**

| # | Formula | Result | Description |
|---|---|---|---|
| 1 | =IF($D5=FALSE, …, J5*(1+$P$84)) | Varies | If *Limit Fee Now?* = FALSE, then proceed to calculate the fee using the rest of the formula. If TRUE, then skip to the end of the formula, J5*(1+$P$84), which limits the fee increase by the average in the *% Difference* column. |
| 2 | = IFERROR(IF(K5,J5, …),0) | Varies | If *Use Current Fees*= TRUE, then the current fee is the end result. If FALSE, then proceed to calculate the fee based on the model output plus cost reallocation. Return 0 if there is an error. |
| 3 | =R5 | $186,378,010 | Back-Calculation for the row. |
| 4 | =$R$84 | $3,683,332,001 | *Subtotal (Non-Premium)* in the *Back-Calculation* column. |
| 5 | =SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78) | $810,288,333 | Subtotal of subsidized forms, where *Except from Model Output* = TRUE. |
| 6 | =($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78)) | $2,873,043,668 | Step 4 minus step 5 above. |
| 7 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78)) | ~6% | Percent of total *Back-Calculation* for that row. |
| 8 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85) | $66,696,613 | This row's share of costs not recovered by other fees. (Meaning, workload without fees or below cost.) $R$85 is a hidden row that subtracts the *Back-Calculations* from the total budget. |
| 9 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85)/J5 | $163 | The above divided by fee-paying volume. Fee-paying unit cost of above.[4] |

---

[3] *Reallocation % Revenue Difference* will show the same result for that row, though it calculates it differently. It breaks out the percentage after determining the *Model Output with Reallocation*.

[4] *Reallocation $ Difference* will show the same result for that row, though it calculates it differently. It breaks out the dollar amount after determining the *Model Output with Reallocation*.

| # | Formula | Result | Description |
|---|---------|--------|-------------|
| 1<br>0 | =((R5/($R$84-<br>SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85)/I5)+N5) | $455 | Model output plus the above unit cost. |

Finally, USCIS rounds all fees to the nearest five dollar increment in the *Proposed Fees (FY 2022/2023)* column. This simplifies the fee that customers may have to pay.

Please note that the percentage in the *Subtotal (Non-Premium)* row of the *% Difference from Current Fees* column is a frequently misunderstood metric. This is the change between an average current fee and an average new fee. It uses a weighted average change from the *$ Difference from Current Fees* column. You can think of this as the change in fees at the end of the fee schedule, after considering all changes to cost and fee setting policy. However, it does not represent a fee that any customer will pay. Likewise, it does not represent a percentage increase to the USCIS budget or revenue. As such, it may confuse customers because the percentage change to our budget or revenue may be different.

## Verify Fees Calculations

There are two error checking cells on the Fees worksheet. See Figure 3. Both should always equal zero. Check these cells after adding new rows and data to the Fees worksheet, after updating the Model Output worksheet, or periodically as needed.



**Figure 3: Error check cells on Fees worksheet**

If the cells do not equal zero, undo or review recent changes, especially to the formulas for the following columns or worksheets:

- Fees worksheet:
  - o *Exempt from Model Output?* column
  - o *Back-Calculation* column
  - o *Model Output with Reallocation* column
- Model Output, Change Items, or VPC worksheets

## Change Items

The FY 2022/2023 fee schedule includes a number of policy items. These policy items may affect one or more fees. They may mean changing a fee-paying volume or changing a formula. We added this worksheet in order to turn various changes on or off. This allows us to show leadership the effect of policy items by comparing results with the policy enabled or disabled.

## Figure 4: Change Items worksheet

| # | Form(s) | Name | Enabled? | Fee Schedule Notes | Cost/Perform Notes | Output value |
|---|---------|------|----------|--------------------|--------------------|--------------|
| 1 | I-485, I-131, and I-765 | Bundling | FALSE | If true, assume free interim benefits (I-131 and I-765) with a paid I-485. Changes the fee-paying percentages on the Fee-Paying worksheet | Affects fee paying volume only. Separate periods in the model for bundled and debunded | 5 |
| 2 | Many | Humanitarian exemptions | TRUE | If true, assume additional humanitarian fee exemptions | Affects fee paying volume only. True = default values in the model | 4 |
| 3 | Many | Subtotal | TRUE | Column number for fee-paying percentages on the VPC and Fees worksheets | None | 9 |
| 4 | Many | Online Filing Fee-Paying Percentages | TRUE | If true, use the same fee-paying percentages for online and paper. Currently, most fee waivers and exemptions require paper filing. As such, online fee-paying percentages are higher than paper. If false, use different fee-paying percentages for online vs paper filing. | None | |
| 5 | I-192 | I-192 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-192 | Outside of the model. In the fee schedule only | |
| 6 | I-193 | I-193 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-193 | See above. | |
| 7 | I-212 | I-212 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-212 | See above. | |
| 8 | I-824 | I-824 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-824 | See above. | |
| 9 | N/A | Current SAVE Fee | TRUE | If true, assume current SAVE fees. If false, SAVE uses a single fee to recover full cost | | |
| 10 | Refugee Travel Doc fees | DOS finalizes final rule | TRUE | If true, increase refugee travel doc fees by $50 to match State's proposed fees. If false, increase by $10 to match passport fees as of the 19/20 rule | | |

## Figure 5: Adjustment worksheet



## Adjustments

In cases where the *Fees* worksheet does not use a VPC forecast, this worksheet provides the workload and fee-paying information. See the Various Adjustments section for information on the data sources that this worksheet requires. Some of the volumes on this sheet may change because of policy items on the *Change Items* worksheet.

## VPC Forecasts

These are the workload projections for the fee review period. See Figure 6. Any rows or columns that we inserted use the *Input* style in Excel. For example, the columns for the two-year average, fee-paying volumes, and fee-paying percentages were all added to the worksheet. Fee-paying percentages come from the Fee-Paying worksheet. We added subtotal rows for forms with more than one VPC projection but only one fee. We also added a row to identify column numbers for the VLOOKUP function that the *Fees* worksheet uses to find the workload and fee-paying volumes.

We also added rows for online and paper filing. These summarize information above and calculate separate online and paper filing volumes using information form the Filing Methods worksheet. These additional rows appear at the end of the worksheet.

In most cases, the *Fees* worksheet uses the workload and fee-paying volumes from this worksheet. Exceptions are on the *Adjustment* worksheet. The *Fees* worksheet calculates the fee-paying unit cost (Model Output) using these volumes as the divisor.

## Fee-Paying

These are the fee-paying percentages that we apply to the VPC volume forecasts. See Figure 7. There may be more than one set of percentages. For example, bundled and debunded versions affect the fee-paying percentage for interim benefits, Forms I-765 and I-131. There may also be additional fee exemptions to add. Change Items will turn these on or off. Orange rows and columns represent places where we added space to match names to the fee schedule. The VPC forecast worksheet pulls this information to calculate the fee-paying volumes that the Fees worksheet uses to calculate fees.

**Figure 6: VPC Forecast worksheet**

### FY 2021-27 Volume Projection Worksheet — June 2020

| Fee Schedule Name | FORMID | CP Symbol | DBS_SHORTNAME | Immigration Benefit | Final FY 2019 Actuals | VPC June Projection FY2022 | VPC June Projection FY2023 | Fee Review Average | FY 2022 Fee Paying % | FY 2022 Fee Paying | FY 2023 Fee Paying % | FY 2023 Fee Paying | FY 2022/2023 Fee Paying | VPC June Projection FY2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-102 Application for Re | 146000 | Credible Fe | Credible Fear | | 105,439 | 75,000 | 75,000 | 75,000 | 0% | 0 | 0% | 0 | 0 | 75,000 |
| | 118000 | I242 | I-102 | | 5,161 | 5,020 | 5,020 | 5,020 | 92% | 4,623 | 92% | 4,623 | 4,623 | 5,020 |
| I-129 All Other | 101009 | I137H | | | 39,089 | 40,900 | 40,900 | 40,850 | 100% | 40,900 | 100% | 40,900 | 40,850 | 40,900 |
| I-129 H-1B - Named Beer | 101001 | I137O | | I-129 1B | 420,652 | 430,000 | 430,000 | 430,000 | 100% | 430,000 | 100% | 430,000 | 430,000 | 430,000 |
| I-129 H-2A - Named Beer | 101004 | I137I | | I-129 2A Named | 3,484 | 4,010 | 4,010 | 4,010 | 100% | 4,010 | 100% | 4,010 | 4,010 | 4,040 |
| I-129 H-2A - Unnamed | 101005 | I137I | | I-129 2A Unnamed | 12,048 | 18,400 | 18,400 | 18,400 | 100% | 18,400 | 100% | 18,400 | 17,650 | 20,000 |
| I-129 H-2B - Named Beer | 101002 | I137E | | I-129 2B Named | 3,789 | 2,460 | 2,460 | 2,460 | 100% | 2,460 | 100% | 2,460 | 2,460 | 2,460 |
| I-129 H-2B - Unnamed B | 101003 | I137E | | I-129 2B Unnamed | 3,685 | 4,000 | 4,000 | 4,000 | 100% | 4,000 | 100% | 4,000 | 4,000 | 4,000 |
| I-129 L/A/1/B/1/2 Blanke | 101006 | I137K | | I-129 L | 42,761 | 42,400 | 42,400 | 42,350 | 100% | 42,400 | 100% | 42,350 | 42,350 | 42,200 |
| I-125 O/O2 | 101007 | I137O | | I-129 O | 26,568 | 27,300 | 27,300 | 27,300 | 100% | 27,300 | 100% | 27,300 | 27,300 | 27,300 |
| I-129F Petition for Alier | 101008 | I348 | | I-129F Fiancé(e) | 45,458 | 45,200 | 44,200 | 44,700 | 93% | 41,855 | 93% | 40,968 | 41,432 | 43,300 |
| I-130 Immediate Relative | 101009 | I344A | | I-130 Immediate Relative | 561,314 | 576,000 | 581,000 | 578,500 | 0% | 0 | 0% | 0 | 0 | 586,000 |
| I-130 Petition for Alier | 101010 | I344O | | I-130 Petition for Alien | 253,607 | 300,000 | 300,000 | 300,000 | 0% | 0 | 0% | 0 | 0 | 300,000 |
| I-130 Preference | | | | | 814,921 | 876,000 | 881,000 | 878,500 | 97% | 832,744 | 97% | 857,611 | 855,178 | |

**Figure 7: Fee-Paying worksheet**

### Fee-Paying Volumes (Debunded)
FY 2022/2023 Average Values

| Form Name | Average Projection Volume | Fee Projection Volume | Fee-paying Percentage | FY 2022 Revenue Forecast | Humanitarian Exemption Volume | Revised fee-paying volume | revised fee-paying percentage |
|---|---|---|---|---|---|---|---|
| Biometric Volume and Revenue (Including TPS Volumes) | 2,639,522 | 2,147,133 | 88.0% | $178,559,657 | | 2,147,133 | 88% |
| G-1041 Genealogy Records Request | 4,543 | 4,543 | 100.0% | $295,295 | | 4,543 | 100% |
| G-1041A Genealogy Records Request | 3,696 | 3,696 | 100.0% | $260,240 | | 3,696 | 100% |
| G-1450 Application to Repayment Annual(Departure Record) | 4,620 | 4,620 | 100.0% | $27,013 | | 4,620 | 100% |
| I-129 Petition for a Nonimmigrant Worker | 366,630 | 366,630 | 100.0% | $261,385,900 | | 366,630 | 100% |

### Fee-Paying Volumes (Bundled)

| Form Name |
|---|
| Biometric Volume and Revenue (Including TPS Volumes) |
| G-1041 Genealogy Records Request |
| G-1041A Genealogy Records Request |
| G-1450 Application for Repayment Annual(Departure... |
| I-129 Petition for a Nonimmigrant Worker |

## Filing Methods

These are the filing rates for online and paper when both options are available to customers. The information came from the OPQ domestic receipts dashboard in Tableau. The VPC forecast and Adjustments worksheets use this information to distinguish between paper and online filing volumes. It is necessary for separate fees by filing method.

**Figure 8: Filing Methods worksheet**

## Model Output

This worksheet feeds the total cost of an immigration benefit request to the *Fees* worksheet. The *Fees* worksheet pulls from the blue area in columns A-E. See Figure 9. The names the fee schedule uses are in column A. The corresponding CostPerform name for the same object is in column B.

**Figure 9: Model Output for the Fees worksheet**

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | **Model Output** | | | | |
| 2 | Non-Premium Fees | | | | |
| 3 | Total Cost by Immigration Benefit Request | | | | |
| 4 | **Fee Schedule Name** | **CostPerform Name** | **Online (Filing Method)** | **Paper (Filing Method)** | **Total Cost for Fees** |
| 5 | Certificate of Non-Existence | G-1566 Certificate of Nc | $ | $ | $ 1,353,773.22 |
| 6 | G-1041 Genealogy Index Search Request - Online | G-1041 Genealogy Inde: | $ 1,029,804.67 | $ | $ 1,029,804.67 |
| 7 | G-1041 Genealogy Index Search Request - Paper | G-1041 Genealogy Inde: | $ | $ 73,783.00 | $ 73,783.00 |
| 8 | G-1041A Genealogy Records Request - Online | G-1041A Genealogy Rec | $ 742,173.67 | $ | $ 742,173.67 |
| 9 | G-1041A Genealogy Records Request - Paper | G-1041A Genealogy Rec | $ | $ 47,667.48 | $ 47,667.48 |
| 10 | H-1B Pre-registration Fee | H-1B Pre-registration Fi | $ 26,580,493.24 | $ | $ 43,249,259.49 |
| 11 | I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | I-102 Application for Re | $ | $ | $ 2,308,782.22 |
| 12 | I-129 All Other | I-129 All Other | $ | $ | $ 30,593,601.89 |
| 13 | I-129 H-1B | I-129 H-1B | $ | $ | $ 247,107,718.66 |
| 14 | I-129 H-2A | I-129 H-2A | $ | $ | $ 10,110,958.36 |
| 15 | I-129 H-2B | I-129 H-2B | $ | $ | $ 3,663,142.84 |
| 16 | I-129 L1A/L1B/L2 Blanket | I-129 L1A/L1B/L2 Blanke | $ | $ | $ 43,240,894.60 |
| 17 | I-129 O/Q1/O2 | I-129 O/Q1/O2 | $ | $ | $ 21,169,404.42 |
| 18 | I-129F Petition for Alien Fiance(e) | I-129F Petition for Alien | $ | $ | $ 22,007,381.55 |
| 19 | I-130 Petition for Alien Relative - Online | I-130 Petition for Alien | $ 112,395,883.08 | $ | $ 112,395,883.08 |
| 20 | I-130 Petition for Alien Relative - Paper | I-130 Petition for Alien | $ | $ 388,090,400.45 | $ 388,090,400.45 |
| 21 | I-131 Application for Travel Document | I-131 Application for Tra | $ | $ | $ 117,372,207.11 |

17

AR_000290

Several formulas format the information for the *Fees* worksheet.

- When forms have both an online and paper filing fee in the proposed rule, it separates the total cost for each filing method (paper or online). For each row with two filing methods, the total cost for that filing method appears in the Total Cost for Fees column.

- If the proposed fee schedule has separate names for named and unnamed petitions, then it separates the total cost by beneficiary type (named or unnamed). Currently, this only applies to fees for Form I-129.

- It pulls total cost information from the CBP Example worksheet for the workloads that USCIS and CBP share. This affects Forms I-192, I-193, I-212, and I-824.

The next section covers several inputs from CostPerform that the spreadsheet requires.

## Input cells

As the title suggests, here you paste the model outputs from CostPerform. See *Update the Model Output Results* section for how to change this and the next worksheet. Styles and color coding indicate where to paste information.

Several sets of columns to the far right provide the cost information to the blue cells on the left (in the previous figure). There are two areas, all with similar formatting. They all use the orange Input style in Excel. See Figure 10 for an example.

**Figure 10: Input cells for CostPerform results**

| CostPerform Model Output | Debundled | | Total Costs |
|---|---|---|---|
| **Name** | Online (Filing Method) | Paper (Filing Method) | Total Costs |
| G-1041 Genealogy Index Search Request | $ 1,023,461.84 | $ 73,373.53 | $ 1,096,835.37 |
| G-1041A Genealogy Records Request | $ 739,276.14 | $ 47,489.42 | $ 786,765.56 |
| G-1566 Certificate of Non-Existence | $ - | $ - | $ 1,346,705.75 |
| H-1B Pre-registration Fee | $ 26,075,380.11 | $ - | $ 42,323,999.18 |
| I-102 Application for Replacement/Initial Noni | $ - | $ - | $ 2,260,392.42 |
| I-129 All Other | $ - | $ - | $ 30,106,351.04 |
| I-129 H-1B | $ - | $ - | $ 242,465,556.93 |

At the bottom left of the Model Output worksheet, the green area (with the *Budget Set* style) provides the total budget to the *Fees* worksheet. See Figure 11.

**Figure 11: Model Output Budget**

| | EX |
|---|---|
| Pick from below | Average |
| FY 2022/2023 Fee Review Budget | 5,150,707,521.00 |

See the Update the Model Output Results section (see page 20) for how to update both sections of this worksheet.

## Biometric Fee

In the proposed fee schedule, USCIS incorporated the cost of biometric services into other form fees. However, there are some cases, such as TPS, where the forms are out of scope for the fee review. In these cases, this worksheet uses biometric volumes and costs from IRIS to calculate a stand-alone biometric fee. The *Fees*

worksheet pulls the total volume and rounded fee from this worksheet. Average annual volume at the bottom of the worksheet comes from the VPC worksheet. The unit costs and biometric factors come from IRIS.

As noted in the *Column Walkthrough* and *Cost Reallocation Calculation* sections, the *Fees* worksheet uses this information for display only. The biometric fee does not recover costs in the *Fees* worksheet for the following reasons:

- These costs are outside of the fee review budget, the fee schedule does not need to recover these costs; and
- USCIS does not burden the biometric fees with cost reallocation.

## CBP Example

This worksheet pulls information from the *Fees* worksheet to demonstrate the net effect of combined fees for CBP and USCIS. See the *CBP Fees* section of the *Fees* worksheet for more information on how the fee schedule uses this information. In addition, it provides CBP cost information to the *Model Output* worksheet and volume information to the *Adjustments* worksheet.

**Figure 12: CBP Example worksheet**

| Immigration Benefit Request | Projected Workload Receipts | Projected Fee Paying Receipts | Current Fees (FY 2016/2017) | Proposed Fees (FY 2019/2020) | $ Difference from Current Fees | % Difference from Current Fees | Revenue with Proposed Fees |
|---|---|---|---|---|---|---|---|
| I-192 Application for Advance Permission to Enter as | 41,481 | 10,574 | $930 | $2,158 | $1,110 | $180 | 19% | $32,158,940 |
| I-193 Application for Waiver of Passport and/or Visa | 6,815 | 6,772 | $585 | $586 | $700 | $115 | 20% | $4,740,400 |
| I-212 Application for Permission to Reapply for Admission into the | 10,693 | 7,260 | $930 | $1,006 | $1,455 | $525 | 56% | $10,563,300 |
| U.S. After Deportation or Removal | | | | | | | | |
| I-824 Application for Action on an Approved Application or | 10,596 | 10,267 | $465 | $487 | $705 | $240 | 52% | $7,238,235 |
| CBP & USCIS Non-Premium Subtotal | 69,585 | 35,253 | | | | | | $54,700,875 |
| Adjustment for CBP Volumes, Fees, and Revenue | (12,458) | (12,458) | | | | | | ($11,133,650) |
| I-192 Application for Advance Permission to Enter as | (3,481) | (3,481) | $930 | $2,158 | $1,110 | $180 | 19% | ($6,083,910) |
| I-193 Application for Waiver of Passport and/or Visa | (6,759) | (6,759) | $585 | $586 | $700 | $115 | 20% | ($4,731,300) |
| I-212 Application for Permission to Reapply for Admission into | (193) | (193) | $930 | $1,006 | $1,455 | $525 | 56% | ($320,815) |
| the U.S. After Deportation or Removal | | | | | | | | |
| I-824 Application for Action on an Approved Application or | (25) | (25) | $465 | $487 | $705 | $240 | 52% | ($17,625) |
| Net Total (USCIS Volumes Only) | $57,127 | 22,795 | | | | | | $23,587,225 |

### USCIS Volumes

| From VPC worksheet: | Projected Workload Receipts | Projected Fee Paying Receipts |
|---|---|---|
| I-192 Application for Advance Permission to Enter as Nonimmigrant | 38,000 | 5,473 |
| I-193 Application for Waiver of Passport and/or Visa | 56 | 13 |
| I-212 Application for Permission to Reapply for Admission into the | 10,500 | 7,067 |
| I-824 Application for Action on an Approved Application or Petition | 10,571 | 10,242 |
| USCIS Total | 57,127 | 22,795 |
| Check USCIS | - | |

### CBP FY 2019 Cost and Revenue Data

| Fee Schedule Name | Collections | Fee | Derived Fee-Paying Volume | Notes |
|---|---|---|---|---|
| I-212 Application for Permission to Reapply for Admission into the U.S. | $179,490.00 | $930.00 | 193.00 | Rounded value copies to Adjustments worksheet |
| I-824 Application for Action on an Approved Application or Petition | 23,190.00 | 930.00 | 25.00 | Same as above |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | 3,206,403.00 | 5,481.00 | 5,481.00 | Same as above |
| I-193 Application for Waiver of Passport and/or Visa | 3,954,634.30 | 585.00 | 6,759.00 | Same as above |
| CBP Total | | | 12,458.00 | |
| Check CBP Adjustment | | | | |

| Fee Schedule Name | CBP Cost Data | CBP Cost Per Derived Fee-Paying Volume | Notes |
|---|---|---|---|
| I-212 Application for Permission to Reapply for Admission into the U.S. | $ - | | |
| I-824 Application for Action on an Approved Application or Petition | $ - | | |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $ 2,314,389.00 | $ 422.26 | Copy total cost to Model Output |
| I-193 Application for Waiver of Passport and/or Visa | $ 19,451,932.00 | $ 2,879.41 | Same as above |

## SAVE Revenue

In the *Fees* worksheet, the row for SAVE Initial Electronic Queries pulls the total revenue from this worksheet. As noted in the *Column Walkthrough* section, the *Fees* worksheet uses this reimbursable revenue in the fee schedule calculations.

**Figure 13: SAVE Revenue**

**SAVE Revenue Forecast with Current Fees**

| Revenue | | | Volume | |
|---|---|---|---|---|
| Revenue Type | | FY 2023 ▾ | FY | Volume |
| Initial | | | 2022 | 20,442,526 |
| IAV | | | 2023 | 21,159,924 |
| 3rd Step | | | Average | **20,801,225** |
| Manual | | | | |
| Minimum Fee | | | | |
| Total Revenue Forecast | | $10,090,000 | | |
| | | | | |
| Notes | | | | |
| Amount from draft memo recommending a SAVE fee increase in FY 2023 | | | | |

## Update the Model Output Results

A CostPerform user will need to copy and paste from three object sets from the model. Paste each individually into the orange input sections of the Model Output worksheet in the fee schedule. Below are instructions to follow. See the fee review model documentation for more information on how to use the software. The process is the same regardless of the fiscal year or dollar amounts involved.

## Model Output Budget

Follow the steps below to paste the fee review budget from CostPerform into the fee schedule.

1. Open the *Average* period in the appropriate CostPerform model.
   a. Alternatively, you can use the average two-year budget from the budget build spreadsheet.
2. Select the total for the Line Items Layer.
3. Right-click it and select Copy or use Ctrl + C. See Figure 14.
   a. You could also copy from any other layer, except Reassigned Activities, because they should all be equal.

**Figure 14: Copy Line Items total**



AR_000293

4. In the right-hand corner of your browser, select Copy to Clipboard. See Figure 15.

   a. If the number did not copy into your clipboard, then select the number from the copied content and use Ctrl + C again.



**Figure 15: Copy to Clipboard button**

5. Paste into the green *Budget Set* area. See Figure 11 on page 18 for a screenshot of the completed area.

A calculation on the *Fees* worksheet will adjust fees to make the necessary revenue to offset the cost reallocation and hold some fees constant. Use the error checking cells on the *Fees* worksheet to verify that the grand total of the *Revenue with Revised Unrounded Fees* column matches the Model Output Budget. (Ignore the different *Revenue with Proposed Fees* column, which is rounded to the nearest $5. It will not match the model budget. See the *Difference from Rounding* column for the revenue gained or lost by rounding.)

## Model Output by Filing Type

Use object sets in CostPerform for the next two sections. For how to edit object sets, see the model documentation. Follow the steps below to paste information from the model that provides the fee schedule information that it needs for separate fees by online and paper filing methods.

1. Open the Average period of the appropriate model.

   a. For the proposed rule, use FY 2022/2023 Fee Review: Low.

2. In the left navigation panel, select Sets and then Model Output by Filing Type.



**Figure 16: Model Output by Filing Type object set**

21

AR_000294

3. Click in the Object View and use Ctrl + A to select all of the objects.



**Figure 17: Model Output by Filing Type results**

4. To copy the information without the header, use Ctrl + C. Otherwise, right click for options that include the header. See Figure 14 on page 20.
5. Click the button in the bottom right corner of your browser to copy the information to your clipboard, as shown in Figure 15 on page 21.
6. Paste with Ctrl + V into the first orange Input style area in the Model Output worksheet.

**Figure 18: Paste Model Output by Filing Type in the spreadsheet**

| CostPerform Model Output | Debundled | | |
|---|---|---|---|
| **Name** | **Online (Filing Method)** | **Paper (Filing Method)** | **Total Costs** |
| G-1041 Genealogy Index Search Request | $  1,029,804.67 | $      73,783.00 | $  1,103,587.67 |
| G-1041A Genealogy Records Request | $     742,173.67 | $      47,667.48 | $     789,841.16 |
| G-1566 Certificate of Non-Existence | $                - | $                - | $  1,353,773.22 |
| H-1B Pre-registration Fee | $                - | $                - | $  43,249,259.49 |
| I-102 Application for Replacement/Initial Nonl | $ 26,580,493.24 | $                - | $  2,308,782.22 |

7. Verify that you did not paste over area for I-129 fees described in the next section.
   a. If the model contains new cost objects for fees, then add additional rows to the worksheet.
   b. Add the cost object and fee schedule names for the new object to the blue area for in Figure 9 on page 17.
   c. Verify that the formulas in the blue area select the appropriate range with the new rows.
8. Verify that the values in columns C-E pull information from the pasted area.
   a. If the cost object name ends with "Online" then the amount will appear in the *Online (Filing Method)* and *Total Cost for Fees* columns. Likewise, if it the object name ends in Paper, then it will appear in the column for that filing method and *Total Cost for Fees*.
   b. If there are not separate filing methods for the cost object, then it will appear in the *Total Cost for Fees* column.
9. Verify that the *Fees* worksheet pulls information into the *Model Output with Surcharge* column.
   a. Change the VLOOKUP functions to use the entire blue area for model outputs, if necessary.

## Model Output for I-129

Continue using object sets in CostPerform for this section. Follow the steps below to copy and paste information for separate fees for named and unnamed beneficiary types.

1. In CostPerform, use the left navigation panel to select the Model Output for I-129 object set. See Figure 19.

2. Click in the Object View.

3. Select all with Ctrl + A or by highlighting the whole set of results.

4. Use Ctrl + C to copy without headers or right-click. See Figure 14 on page 20.

5. Click the Copy to Clipboard button in the bottom right corner of your browser to copy the information to your clipboard, as shown in Figure 15 on page 21.

6. Paste with Ctrl + V into the second orange Input style area.

7. Verify that information copies into the blue area of the worksheet.

   a. Add new rows if necessary.

**Figure 19: Model Output for I-129 object set in CostPerform**

**Figure 20: Paste I-129 Model Output in the spreadsheet**

| Name | Named Beneficiaries [Be | Unnamed Beneficiaries [Be | Total Costs |
|---|---|---|---|
| I-129 All Other | $ 30,593,601.89 | $ - | $ 30,593,601.89 |
| I-129 H-1B | $ 247,107,718.66 | $ - | $ 247,107,718.66 |
| I-129 H-2A | $ 3,223,361.06 | $ - | $ 3,223,361.06 |
| I-129 H-2B | $ 1,957,677.73 | $ 6,887,597.31 | $ 10,110,958.36 |
| I-129 L1A/L1B/L2 Blanket | $ 43,240,894.60 | $ 1,705,465.11 | $ 3,663,142.84 |
| I-129 O1/O2 | $ 21,169,404.42 | $ - | $ 21,169,404.42 |

**Figure 21: I-129 information for the Fees worksheet**

| Fee Schedule Name | CostPerform Name | Beneficiary Type | Column # | Total Cost |
|---|---|---|---|---|
| I-129 All Other | I-129 All Other | Named Beneficiaries | 2 | $ 30,593,601.89 |
| I-129 H-1B - Named Beneficiaries | I-129 H-1B | Named Beneficiaries | 2 | $ 247,107,718.66 |
| I-129 H-2A - Named Beneficiaries | I-129 H-2A | Named Beneficiaries | 2 | $ 3,223,361.06 |
| I-129 H-2B - Named Beneficiaries | I-129 H-2B | Named Beneficiaries | 2 | $ 1,957,677.73 |
| I-129 L1A/L1B/L2 Blanket - Named Beneficiaries | I-129 L1A/L1B/L2 Blanket | Named Beneficiaries | 2 | $ 43,240,894.60 |
| I-129 O1/O2 | I-129 O1/O2 | Named Beneficiaries | 2 | $ 21,169,404.42 |
| | I-129 All Other | Unnamed Beneficiaries | 3 | $ - |
| | I-129 H-1B | Unnamed Beneficiaries | 3 | $ - |
| I-129 H-2A - Unnamed Beneficiaries | I-129 H-2A | Unnamed Beneficiaries | 3 | $ 6,887,597.31 |
| I-129 H-2B - Unnamed Beneficiaries | I-129 H-2B | Unnamed Beneficiaries | 3 | $ 1,705,465.11 |
| | I-129 L1A/L1B/L2 Blanket | Unnamed Beneficiaries | 3 | $ - |
| | I-129 O1/O2 | Unnamed Beneficiaries | 3 | $ - |

AR_000296

## Additional Steps for Bundled scenarios

In a scenario with bundled fees, use different periods of a CostPerform model to provides results that include bundled interim benefits for fee-paying I-485 applicants. USCIS economists may use this to analyze an alternative fee schedule.

1. Open the average period with the bundled results.
   a. In the NPRM, these are named Average Bundled.
2. Repeat the steps in the previous sections using different columns of the Model Output worksheet.
   a. Repeat the following sections:
      i. Model Output by Filing Type
      ii. Model Output for I-129
   b. Use the orange Input style cells farthest to the right:
      i. Start with the section identified in Figure 22 and then work your way down.

**Figure 22: Bundled input area**

| CostPerform Model Output | Bundled | | |
|---|---|---|---|
| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
| G-1041 Genealogy Index Search Request | $ 1,027,858.62 | $ 75,136.67 | $ 1,102,995.29 |
| G-1041A Genealogy Records Request | $ 744,140.59 | $ 48,251.43 | $ 792,392.02 |
| G-1566 Request for Certificate of Non-Existenc | $ - | $ - | $ 1,353,773.22 |
| H-1B Pre-registration Fee | $ 27,977,396.36 | $ - | $ 45,810,851.64 |
| I-102 Application for Replacement/Initial Noni | $ - | $ - | $ 2,428,640.01 |
| I-129 All Other | $ - | $ - | $ 31,036,245.97 |

## Fee Schedule Scenarios

USCIS and DHS leadership may request several different scenarios. For example, DHS or USCIS leadership may wish to assess several possible fee review budgets. This might mean creating a scenario with a lower or higher total cost than in the ABC model and the fee review budget. See the Modify Total Cost for Budget Scenarios in the next section to make this change. As another example, DHS leadership may decide not to change some fees or to limit the increase of some fees. Change formulas in the rows to add cost reallocation to those immigration benefit requests. See the Add or Remove Cost Reallocation to a Row section beginning on page 25 to make both types of changes.

## Modify Total Cost for Budget Scenarios

To modify the total cost that the fee schedule uses, you will need to replace the Model Output Budget with a calculated value. Doing so may provide a rough estimate of how changes to the budget might affect fees. For example, modify the total budget on the *Model Output* worksheet. See Figure 11 on page 18 for a screenshot of the amount to change.

To truly see the effect of budget change, you will need to modify the CostPerform model. See the model documentation for more information on how to change values in the model.

## Add or Remove Cost Reallocation to a Row

### Hold to Current Fee

To hold the current fee, follow these steps on the *Fees* worksheet:

1. Set the Keep Current Fee? Column to TRUE. Data validation only allows TRUE or FALSE in this column.
   a. If this column is hidden, unhide all columns between columns A to F.
   b. Use Ctrl + G to go to cell A1 or enter A1 into the Name Box to the left of the formula bar
   c. In the ribbon, go to Home.
   d. Select Format, then Hide & Unhide, then Unhide Columns.



**Figure 23: Hide & unhide columns**

   e. If you need to hide a column later, select the column, repeat these steps, and select Hide Columns.

2. Validate that the Use Current Fees column equals true. The two are set to equal each other.
   a. If these cells are hidden, unhide column K.
   b. If no to this or any of the following steps, then verify that the formulas in the affected row are the same as other rows.

3. Verify that the *Current Fees (FY 2016/2017)* column equals the following columns:
   a. *Model Output or Current Fee* and
   b. *Proposed Fees (FY 2022/2023)*.

4. Verify that the check cells are equal to zero.
   a. See Figure 3 on page 14 for screenshots.

5. Copy formatting for a row with a green font color and paste formatting on the cell.
   a. Only the Boolean values use conditional formatting to change color.

25
AR_000298

b.   See the Rows and Color Coding section for a color key.

Using this method, the Model Output column reports the proper value, and *Model Output or Current Fee* shows the current fee. Cost reallocation calculations use the *Model Output or Current Fee* column.

### Limit A Fee Increase (Add Cost Reallocation)

Follow the steps below to limit the amount of a fee increase, called cost reallocation at USCIS.

1.  Set the *Limit Fee Now?* column to TRUE. Data validation only allows TRUE or FALSE in this column.
    a.   If this column is hidden, unhide all columns between columns A to F using the instructions on the previous page.
2.  Validate that the *Model Output with Reallocation* column is **less** than the Model Output or Current Fee.
    a.   If the column is hidden, unhide columns between M and W.
    b.   If no to this or the following step, then verify that the formulas in the affected row are the same as other rows.
3.  Verify that the check cells are equal to zero.
    a.   See Figure 3 on page 14 for screenshots.
4.  Copy formatting for a row with a red font color and paste formatting on the cell.
    a.   Only the Boolean values use conditional formatting to change color.
    b.   See the Rows and Color Coding section for a color key.

### Remove Cost Reallocation and Allow a Fee to Change

Follow these steps to stop holding a fee to the weighted average change.

1.  Set the *Limit Fee Now?* column to FALSE. Data validation only allows TRUE or FALSE in this column.
2.  Validate that the *Model Output with Reallocation* column is **more** than the Model Output or Current Fee.
    a.   If the column is hidden, unhide columns between M and W.
    b.   If no to this or the following step, then verify that the formulas in the affected row are the same as other rows.
3.  Verify that the Back-Calculation check cells (Figure 3 on page 14) are equal to zero.
4.  Copy formatting for a row with a black or blue font color and paste formatting on the cell.
    a.   Only the Boolean values use conditional formatting to change color.
    b.   See the Rows and Color Coding section for a color key.

# Creating Appendixes for the Supporting Documentation and NPRM

There are several worksheets in the fee schedule that contribute to the supporting documentation for the fee review. Should USCIS pursue a fee rule, then some of the same tables will go into the preamble for the NPRM and final rule. This section explains how to use them to create the tables for both documents.

## Current and Proposed Fees

In the supporting documentation, this is part of Appendix VII, Proposed Fees by Immigration Benefit Request. A similar table may be in the NPRM. Other tables in the NPRM may show current fees or proposed fees, possibly in multiple scenarios.[5] Follow the steps below to update this information.

1. If you have not already done so, update the Model Output worksheet, as described on page 17.
2. Create a copy of the *Fees* worksheet.
3. Hide all columns except these columns:
   a. Immigration Benefit Request (column E).
   b. Columns in the Table 3.

Table 3: Renamed Columns for Proposed Fees

| Column Letter | Default Column Name | Appendix Column Name | Preamble? | Documentation? |
|---|---|---|---|---|
| J | Current Fees (FY 2016/2017) | Current Fees | Yes | Yes |
| M | Model Output (FY 2022/2023) | Model Output | No | Yes |
| T | Reallocation $ Difference | Cost Reallocation | No | Yes |
| W | Proposed Fees (FY 2022/2023) | Proposed Fees | Yes | Yes |
| X | $ Difference from Current Fees | Proposed Change in Fee | Yes | Yes |
| Y | % Difference from Current Fees | Percent Change in Proposed Fee | Yes | Yes |

4. Rename the columns using Table 3.
   a. If updating for an NPRM, use "Proposed" instead of "Final" in the headers.
   b. In a final rule, use "Final" instead of "Proposed" in the headers.
5. Format as necessary to match the destination (supporting documentation or NPRM).
   a. See the supporting documentation example in Figure 24.

Figure 24: Example Current and Proposed Fees

Appendix Table 4: Proposed Fees by Immigration Benefit Request

| Immigration Benefit Request | Current Fees | Model Output | Cost Reallocation[34] | Proposed Fees | Proposed Change in Fees | Percent Change in Proposed Fees |
|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card - Online | $455 | $320 | $135 | $455 | $0 | 0% |
| I-90 Application to Replace Permanent Resident Card - Paper | $455 | $344 | $121 | $465 | $10 | 2% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $499 | $181 | $680 | $235 | 53% |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $460 | N/A | N/A | N/A | N/A | N/A |

27

---

[5] The FY 2019/2020 NPRM included six different fee scenarios. The FY 2016/2017 NPRM included one set of proposed fees.





U.S. Citizenship and
Immigration Services

AR_000301

# FY 2022-2023

# Immigration Examinations Fee Account

**Fee Review Model Documentation**

January 2023



**U.S. Citizenship and Immigration Services**

AR_0003029

**NOTE:** This fee schedule documentation is for the internal use of the Department of Homeland Security only to advise USCIS operations on the establishment of fees as stated hereafter. The procedure it contains, while followed by USCIS employees and contractors, generally, is not binding on USCIS or its employees. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, entities, officers, employees, agents, or any other person.

# Table of Contents

BACKGROUND .................................................................................................................. 2
  PURPOSE ....................................................................................................................... 2
  PROCESS SUMMARY ....................................................................................................... 2
  PARTIES INVOLVED ........................................................................................................ 3
FUNCTIONAL DESCRIPTION OF USCIS ACTIVITY-BASED COSTING MODEL ......................... 3
  OVERVIEW OF ACTIVITY-BASED COSTING .......................................................................... 3
  RESOURCES (LINE ITEMS AND USCIS OFFICES) .................................................................. 5
  RESOURCE DRIVERS ....................................................................................................... 6
  ACTIVITIES (REASSIGNED ACTIVITIES AND TARGET ACTIVITIES) ........................................ 8
  ACTIVITY DRIVERS ....................................................................................................... 11
  COST OBJECTS (IMMIGRATION BENEFIT REQUESTS) ......................................................... 15
TECHNICAL DESCRIPTION OF THE FY 2022/2023 FEE REVIEW MODEL ............................. 16
  OVERVIEW .................................................................................................................. 16
  METAMODEL ............................................................................................................... 17
  MODEL LAYERS ............................................................................................................ 19
  MODEL ALLOCATIONS ................................................................................................... 26
  DATA VALIDATION AND MODEL OUTPUTS ...................................................................... 32
APPENDIX 1: GLOSSARY .............................................................................................. 37
APPENDIX 2: USCIS COST OBJECTS 1 LAYER MEMBERS ............................................... 40
  COST OBJECT 1 MAIN HIERARCHY ................................................................................. 40
  COST OBJECT 1 ATTRIBUTE HIERARCHY ......................................................................... 42
APPENDIX 3: CONTACT LIST ......................................................................................... 47
APPENDIX 4: COSTPERFORM ASSIGNMENTS ................................................................. 48
APPENDIX 5: FEE REVIEW MODEL CHECKLIST ............................................................... 48

# Background

## Purpose

U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), conducts a fee review to determine if its fee structure and resulting revenue align with projected costs. This is in accordance with the Chief Financial Officers Act of 1990 and the Office of Management and Budget's Circular A-25. The USCIS Office of the Chief Financial Officer (OCFO) conducts the fee review and evaluates a two year period. The fee review is a budget formulation exercise that allows USCIS to adequately plan and fund immigration benefit request processing. For a detailed description of the most recent review, see the FY 2022/2023 fee review supporting documentation or preambles to the rulemaking.

This model documentation supplements the fee review supporting documentation. This document focuses on the inputs, outputs, and mechanics of the activity-based cost (ABC) model that USCIS uses in the fee review process. USCIS uses CostPerform to create the model. [1] For information from the vendor on this commercial off-the-shelf application, visit https://www.costperform.com. Software documentation is on the budget shared drive (███████████████████) and https://www.costperform.com/support. [2]

## Process Summary

The following bullets provide an overview of the fee review process. This document contains links to help navigate the document and provide an understanding of the process. Fee review and modeling terminology are in the glossary appendix.

- Use ABC to allocate costs to immigration benefit requests.
  - See ABC Overview.
- Uses operating plan (OP) to develop the fee review cost baseline.
  - See Resources.
- Performs a resource analysis to split labor by operational activity using employee job titles.
  - See Resource Drivers for the assignment process.
  - See Activities for work performed by USCIS.
- Considers other operational requirements, such as anticipated immigration benefit request volumes and adjudicative time.
  - See Activity Drivers.
- Divide total immigration benefit request costs are by projected fee-paying volume to determine unit costs.
  - See Data Validation and Model Outputs.
- Adjust unit costs in a fee schedule spreadsheet to determine final fees.
  - See the separate Fee Schedule documentation in the docket.

---

[1] Previous fee reviews used SAP Profitability and Cost Management (PCM). SAP ended support for PCM on Dec. 31, 2020.

[2] Access to the vendor's support page requires an account with the vendor. Contact OIT software licensing if you do not have access to the account.

## Parties Involved

Below are the key groups involved in the USCIS fee review. See the appendix for a list of individual contacts.

### Office of the Chief Financial Officer

The Office of the Chief Financial Officer (OCFO), Budget and Planning Division, Revenue and Cost Analysis (RCA) Branch conducts the USCIS fee review. RCA coordinates with other units of the OCFO and USCIS to gather information. OCFO contractors build an ABC model in CostPerform. The Program Execution Branch is responsible for daily budget execution activities and for creating the annual operating plan (OP), which serves as the cost baseline for the fee review. The Coordination and Reporting Branch is responsible for creating budget reports that track the OP, spending, or staffing. These reports may help RCA budget analysts estimate future year spending.

### Office of Performance and Quality

The Office of Performance and Quality (OPQ) provides several inputs to the fee review. OPQ provides draft volume projections to the Volume Projection Committee (VPC). OPQ also calculates staffing requirements for USCIS using several Staffing Allocation Model (SAM) spreadsheets. The SAMs use projected workload, based on VPC estimates, and actual or estimated completion rates (hours per completion). The fee review model uses the staffing requirement, completion rates, and workload (receipts and completions by location) from the SAM. The FY 2022/2023 fee review model uses the FY 2021 SAM, which spans FY 2021 through FY 2027.

### Office of the Chief Information Officer

The Office of the Chief Information Officer manages, maintains, and hosts the CostPerform servers at the USCIS HQ.

### Volume Projection Committee

OCFO and OPQ co-chair a Volume Projection Committee (VPC). OPQ prepares initial volume projections for immigration benefit requests using statistical modeling techniques. OPQ runs statistical models using Microsoft Excel or SAS business analytics software and a variety of forecast methods. OPQ submits volume projections to the VPC as a starting point for determining out-year volumes. The group discusses the forecasts and accepts it or proposes alternatives. Alternatives include different forecasting methods or estimates from upcoming policy changes. The VPC determines projections for immigration benefit requests that determine staffing requirements, annual budgets, and metrics for activity-based costing.

All relevant USCIS directorates and program offices are represented on the VPC, including Service Center Operations (SCOPS) Directorate, Field Operations Directorate (FOD), and Refugee, Asylum, and International Operations (RAIO) Directorate. Individual offices, like National Benefits Center (NBC), regional, district, and field offices, may also attend. Input from these offices helps refine the statistical volume projections.

## Functional Description of USCIS Activity-Based Costing Model

### Overview of Activity-Based Costing

USCIS uses ABC to determine the full cost of immigration benefit requests. The FY 2008/2009, FY 2010/2011, FY 2012/2013, FY 2014/2015, FY 2016/2017, and FY 2019/2020 fee reviews use the same methodology. It is the basis for the current fee structure. ABC is a business management tool that assigns resource costs to operational activities and then to products and services. These assignments provide a cost assessment of each process that produces outputs. The

Federal Accounting Standards Advisory Board (FASAB) encourages evaluating ABC as a cost accounting method. [3] "[A]ctivity-based costing has gained broad acceptance by manufacturing and service industries as an effective managerial tool. Federal entities are encouraged to study its potential within their own operations."[4] USCIS conforms to FASAB Standard 4: Managerial Cost Accounting Standards and Concepts by using ABC.

This review follows a two-step, cost assignment process. First, USCIS assigns costs (resources) to immigration benefit processing activities using resource drivers. Second, we assign activities to individual immigration benefit requests (cost objects) using activity drivers.[5] Figure 1 illustrates the cost assignment methodology used in ABC.

<div align="center">Figure 1: Activity-Based Costing General Diagram</div>



At each step of ABC, the total cost remains the same. Meaning, Resources = Activities = Cost Objects. We use different drivers to prorate costs between each step. This smooths out indirect costs and allows us to allocate costs based on the level of effort or requirements of each workload. First, we prorate resources (the budget) by resource drivers. We determine resource drivers (usually federal positions or contracts) by analyzing which resources perform each activity and to what degree. This results in costs by activity. Next, we prorate activity costs by activity drivers. We analyze what portions of activity costs to associate with each cost object using activity drivers. Our activity drivers are usually estimated units (receipts, completions, biometric services, etc.) or estimated hours (based on historic average hours per

---

[3] Federal Accounting Standards Advisory Board (FASAB), Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government (July 31, 1995) available at https://files.fasab.gov/pdffiles/handbook_sffas_4.pdf.

[4] Id at page 42.

[5] Activity-based costing typically uses the terminology in Figure 1, but there are some variations. For instance, some authors may refer to activity drivers as cost drivers. In our CostPerform model, resources consist of values in the Line Items and USCIS Offices layers.

completion) of an immigration benefit request. Determining the proper cost assignment method is critical to producing accurate results.

The two-step allocation process smooths out the effect of indirect costs. In traditional cost accounting, all indirect cost might be pooled together as overhead. Then you would divide the overhead by a single volume to calculate an overhead rate. You would apply the overhead rate uniformly to all workloads. The overhead rate would be the same for all workload, regardless of the level of effort or individual requirements of each workload. This often leads to high costs even for relatively small or simple workloads.

We illustrate USCIS specific assignments in Figure 2. Feel free to refer back to this graphic as we describe the objects in it. See the fee review supporting documentation for more detailed information on the USCIS ABC methodology.

**Figure 2: USCIS Specific ABC Diagram**



## Resources (Line Items and USCIS Offices)

USCIS resources are the cost baseline established for the review. The cost baseline includes the resources necessary for individual USCIS offices to sustain operations and deliver services. The FY 2021 USCIS operating plan (OP) is the starting point for developing the FY 2022/2023 baseline estimates with necessary updates applied to employee payroll and general expenses (GE) categories. See the FY 2022/2023 fee review supporting documentation for detailed information on the USCIS cost baseline.

USCIS designs the ABC model structure to resemble the structure of the OP. Meaning, the model uses the same accounting strings as the OP in most cases. The fee review model includes the same USCIS offices and project/task codes (line items) with some exceptions. Exceptions include when the fee review needs more detailed task codes than the OP. It could also mean that the fee review distributes large contracts (like rent) to individual offices instead of leaving the

5

whole contract in a single office like the OP does. Retaining the OP structure allows analysts to trace the path of OP budget line items all of the way through to activities and cost objects in the fee review model.

USCIS made the following adjustments and alignments to the OP for the fee review:

- Updated payroll to reflect the full year cost of all authorized positions.
- Analyzed payroll and GE costs for future years, such as staffing changes and contracts with variable costs driven by the volume of immigration benefit requests.
- Added enhancements that recur in the fee review years, such as new positions.
- Performed a resource analysis to align certain USCIS organization, project, or task codes to specific activities or immigration benefit requests. For example, we align IT systems that only support certain ABC activities or specific immigration benefit requests to those activities or cost objects in the model.
- Removed projected costs, volumes, and revenue for the programs outside of the fee review scope. For example:
  - Temporary Protected Status (TPS) and
  - Deferred Action for Childhood Arrivals (DACA).
- Changed the fund code for some costs currently in the business transformation fund (EP) and program (2005) to the non-premium fund (EX).
- Allocated rent and Federal Protective Service (FPS) guard service costs to fund, program, and office based on building occupancy.

In the CostPerform model, the Line Items and USCIS Offices layers represent resources. The technical description section of this document will go into more detail.

## Resource Drivers

Resources drivers spread resources by activity. For example, a common resource driver in ABC is the number of employees or full-time equivalents (FTE). The number of employees or FTE that perform an activity spread the cost of salaries to the activities that the employees perform. It makes sense to use different drivers in some cases. If contractors perform different duties than the employees in the same office, then you can evaluate the contract to spread it to the appropriate activities. If an IT system only supports specific activities or cost objects, then assign it appropriately. See Table 1 below for a list of resource drivers and the percentage of dollars that each receives in the model.[6]

**Table 1: Resource Drivers**

| Description | Resource Driver | Information Source(s) | FY 2022/2023 Average | % of Average |
|---|---|---|---|---|
| Positions or FTE by activity | FTE | Payroll Title Analysis (Staffing Proportion) and Staffing Total | $3,912,872,052 | 82% |
| Large intake and records contracts prorated differently than federal employees | Large Contracts | Resource Analysis | $127,089,341 | 3% |

---

[6] Table 1 excludes costs directly attributable to the Asylum Processing IFR.

| Description | Resource Driver | Information Source(s) | FY 2022/2023 Average | % of Average |
|---|---|---|---|---|
| Assign costs to specific activities, besides the Direct Costs activity | Allocations to a Specific Activity | Resource Analysis | $568,011,367 | 12% |
| Assign costs to the Direct Costs activity | Allocations to a Specific Activity | Resource Analysis | $116,834,261 | 2% |
| **Total** | | | **$4,724,807,021** | **100%** |

In the CostPerform model, resource drivers may be attributes to the Target Activity layer or common attributes shared between layers. The technical description section of this document will go into more detail.

## FTE

The fee review model uses a resource driver, called FTE, for the number of future positions or FTE dedicated to an activity. Most of the fee review model uses this resource driver. The model calculates FTE by multiplying two other drivers: Staffing Proportion and Staffing Total. By using these two pieces of information, FTE combines an analysis of historical information and a plan for future staffing.

## Staffing Proportion

The Staffing Proportion represents the number of positions or FTE dedicated to an activity based on historical data. It is the result of a detailed analysis that quantifies employee time by fee review activity. USCIS determines it by assigning one or more activities to each combination of fund, program, office, and position title. We assign some entire offices to an activity. If an office performs more than one activity, then we prorate positions to one or more activity based on data calls or reported hours. See the separate Payroll Title Analysis Documentation for more information, including step-by-step instructions.

The payroll title analysis can only use onboard positions because vacant positions do not have all of the required information in personnel systems, such as job title. Therefore, total staffing (including vacant positions and new positions planned as part of the fee review) are in a separate field.

## Staffing Total

The staffing total for the model is the sum of positions in the current OP plus any new positions planned as part of the fee review.

We assume the new hires will not change the results of the payroll analysis. The SAM is the largest source of new authorized positions. The SAM uses existing ratios, such as administrative and supervisory staff in relation to adjudicative positions, to forecast new staffing requirements for adjudicative offices. (The SAM also uses other information such as volume projections and completion rates.) In offices that do not adjudicate, existing positions perform the same function as new hires because the purpose of an office stays the same. Based on these assumptions, USCIS believes additional hiring has an immaterial effect on resource drivers from the payroll title analysis.

## Large Contracts

Contract support in some offices perform only a few activities. For example, they intake forms, deposit fees, create and move files. The federal employees in these offices may perform different duties, like adjudicating immigration benefit requests. This resource driver ensures that the model allocates the contracts to only the appropriate activities.

In the resource analysis, RCA worked with other offices to identify costs (or percentages of costs) by activity for some of the largest contracts in USCIS. For example, Field Operations (including the National Business Center or NBC) has three large contracts for support staff. Unlike the federal employees in Field Operations, contractors do not perform adjudications. Instead, they perform only two or more other activities.

### Allocations to a Specific Activity

In some cases, OCFO determines that a project directly benefits an activity or a cost object. OCFO discusses these with offices during the resource analysis. For example, the line item for the USCIS lockbox contract is fully dedicated to the Intake activity. Another example is the contract for USCIS Application Support Centers (ASC). We allocate it the Collect Biometric Data activity because ASC contractors are only responsible for collecting biometrics. In these cases, the model allocates a line item directly to an activity.

We assign some resources directly to an immigration benefit. For example, we assign the Department of State (DOS) reimbursable agreement to the workloads that DOS adjudicates on behalf of USCIS. We assign the line item for the project code to the Direct Costs activity first so that the total for each layer is equal. We also assign line items related to naturalization ceremonies to the Direct Cost activity before ultimately assigning them to naturalization applications.

## Activities (Reassigned Activities and Target Activities)

In ABC, activities are the critical link between resources and cost objects. USCIS spreads projected operating costs (resources) to the following activities:

- **Certify Non-Existence** provides requestors with a certificate of non-existence (CNE) of a naturalization record.

- **Conduct TECS Checks** involves the process of comparing information on applicants, petitioners, requestors, beneficiaries, derivatives, and household members who apply for an immigration benefit request against various Federal Government systems, and information databases. [7]

- **Direct Costs** support a specific immigration benefit request. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefits processing, to the application for naturalization.

- **Fraud Detection and Prevention** involves activities performed by the Fraud Detection and National Security (FDNS) Directorate in detecting, combating, and deterring immigration benefit fraud, as well as addressing national security and intelligence concerns.

- **Inform the Public** involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives.

- **Intake** involves mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and lockbox operations.

- **Issue Document** involves producing, distributing, and destroying secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization. For example

---

[7] In previous reviews, USCIS called the Conduct TECS Check activity by different names, such as Conduct Interagency Border Inspection System Checks (IBIS) or Conduct Treasury Enforcement Communication System (TECS) Check. The system has changed names. The ABC model and the fee review were updated to reflect this change.

this includes, issuing an employment authorization document (EAD) or permanent residence card (PRC) as well as destroying PRCs that have been surrendered to USCIS by individuals who file Form I-407, Record of Abandonment of Permanent Resident Status.

- **Make Determination** involves adjudicating immigration benefit requests; making and recording adjudicative decisions; requesting and reviewing additional evidence; interviewing applicants, petitioners, or requestors; consulting with supervisors or legal counsel; and researching applicable laws and decisions on non-routine adjudications.

- **Management and Oversight** involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.

- **Perform Biometric Services** involves the management of electronic biometric information, background checks performed by the Federal Bureau of Investigation (FBI), and the collection, use, and reuse of biometric information to verify the identity of individuals seeking an immigration benefit. USCIS aggregates the following subordinate activities into this activity:
  - **Collect Biometric Data**: ASC contractual support for collection of biometric modalities (currently fingerprints, photographs, and signatures).
  - **Check Fingerprints**: Send fingerprints to the FBI for identity confirmation, background, and security checks.
  - **Check Name**: Send information to the FBI for personnel, administrative, applicant, and criminal files compiled for law enforcement purposes. Generally, USCIS requests this additional service for naturalization and adjustment of status applicants.
  - **Manage Biometric Services**: Storage of biometrics and oversight of biometric services, including Federal employees at ASC locations.

- **Records Management** involves searching for and requesting files; creating temporary and/or permanent individual files; consolidating files; appending evidence submitted by applicants, petitioners, and requestors to existing immigration files; retrieving, storing, and moving files upon request; auditing and updating systems that track the location of files; and archiving inactive files.

- **Research Genealogy** provides researchers with access to historical immigration and naturalization records of deceased immigrants. It involves all work associated with the genealogy program in processing Forms G-1041 and G-1041A.

- **Systematic Alien Verification for Entitlements** (SAVE) captures costs for the program of the same name. USCIS charges federal, state, and local agencies through reimbursable agreements for this program. However, these agreements do not recover the full cost of the program; immigration fees continue to subsidize it. In FY 2013 and FY 2016, USCIS performed a standalone fee study to determine the total cost of the program. OCFO created this activity to determine the total cost of the program, including a share of the Service-wide Costs activity, as part of the biennial fee review.

The previous activities are the ones that USCIS publicly reports. In the model, these are the activities in the Target Activities layer. Within that layer, we group all Target Activities except for Direct Costs into a separate folder, called Exam Activities (Except Direct Costs). Figure 3 shows the various activity levels work in the USCIS ABC model. The screenshot shows both the names and symbols of layers and objects in the model.

9

**Figure 3: Activities in the ABC Model**



In addition to the Target Activities, there are two internal activities in the model. We refer to these as reassigned activities and they have their own layer in CostPerform.

- **Mission Support** represent an office's administrative or generalized staff that assist the rest of the office. OCFO created this activity because adjudication offices use administrative positions, such as Immigration Service Analysts, as supporting roles for different activities. To represent these supporting roles, the model allocates the cost of this activity to all other activities in the same office. For example, we reassign Immigration Service Analysts at the NBC to the rest of the NBC activities because they support adjudication and other activities in that office. Only offices that perform multiple other activities use this activity.

- **Service-wide Costs** represents resources that support USCIS as a whole. This activity reassigns costs to other activities, called Exam Activities except Direct Costs in the model. For example, we assign most USCIS information technology staff and other costs to this activity because laptops, network infrastructure, and cloud services support all other activities. (IT costs specific to only one activity or immigration benefit request are not service-wide costs.)

Figure 4 illustrates how reassigned activities work. The model reallocates the cost of the reassigned activities to all of the other activities, except for Direct Costs and reassigned activities. It uses the same FTE value to reassign the costs proportionately. Meaning, offices with higher staffing receive more of the Service-wide Costs. Within an office, the activity with the highest staffing receives the largest portion of Mission Support costs.

AR_000312

**Figure 4: USCIS Reassigned Activities**



## Activity Drivers

Activity drivers allocate activity costs to cost objects. They prorate the work performed (activities) into the outputs produced (cost objects) by that work. In the fee review model, USCIS primarily allocates activity costs to immigration benefit requests using workload volume estimates. This allocation makes sense for activities when similar time and effort are involved for each request.

The VPC forecasts workload volumes based on historical filing trends, upcoming policy changes, and statistical models developed by OPQ. See the Parties Involved section for more information on the VPC and OPQ. The sections below provide functional explanations for each of the activity drivers in the model.

Workload volume projections represent the total number of immigration benefits (cost objects) that USCIS expects to receive in a fiscal year. While individual assignments for some offices may differ, Table 2 below summarizes the general activity and activity driver assignments used in the fee review model. See Appendix 4: CostPerform Assignments for the specific drivers by office and activity.

**Table 2: General Activity Driver Assignments**

| Activity | Most Common Activity Driver |
| --- | --- |
| Certify Nonexistence | Calculated Hours (Completions * Completion Rate) |
| Conduct TECS Check | Completions |
| Direct Costs | Varies by Office and Line Item. |
| Fraud Detection and Prevention | Completions |

11

| Activity | Most Common Activity Driver |
|---|---|
| Inform the Public | Completions |
| Intake | Incoming Records (Receipts - Shredded Receipts) |
| Issue Document | Completions |
| Make Determination | Calculated Hours |
| Management and Oversight | Completions |
| Records Management | Incoming Records |
| Research Genealogy | Calculated Hours |
| Systematic Alien Verification for Entitlements | Verifications |
| Perform Biometric Services | Varies. See below. |
|     Collect Biometric Data | ASC Production |
|     Check Fingerprints | FBI Fingerprints |
|     Check Name | FBI Name Checks |
|     Manage Biometric Services | ASC Production |
| Service-wide Costs | N/A (Reassigned Activity) |
| Mission Support | N/A (Reassigned Activity) |

Activity drivers are attributes of the cost object layer in the CostPerform model. The technical description section of this document will go into more detail.

### Completions, Receipts, and Transfers

USCIS uses workload volume forecast to help forecast costs. Receipts are the front-end of USCIS workload. Receipts distribute the intake of forms, data entry, and fee receipting work covered by the Intake activity. Receipts are the activity driver for the Intake activity for Office of Intake and Document Production (OIDP), the office responsible for USCIS lockboxes. The lockboxes receive paper benefit requests, enter data, and often ship the paper to offices that will adjudicate the benefit request.

Completions represent the final decision by USCIS. It can be an approval or a denial. USCIS often completes work at a different location than the receipts. USCIS centralizes adjudications in service centers and the NBC as much as possible. For example, these centers adjudicate forms that do not require interviews or process as much of the work as they can before Field Operations performs an interview to complete the adjudication.

Workload forecasts come from the VPC. There forecasts are in aggregate across all of USCIS. USCIS prorates projected workload volume to USCIS locations in order to assign costs to the locations where we adjudicate benefit requests and incur costs. These locations are the individual service centers SCOPS, FOD regional areas, NBC, and the divisions within the RAIO.

OPQ uses historical data on receipts and completions to distribute workload forecasts to locations. Meaning, we forecast workloads for the NBC, FOD regions, and individual service centers. Historic information is in the Performance Reporting Tool (PRT), which domestic adjudicative offices use to report hours and counts. OPQ uses the data to determine staffing levels by location in the SAM. OCFO uses both the SAM and historic information to prorate workload by location in the FY 2022/2023 fee review. Ultimately, an office's budget gets distributed by the forecasted workload

for that the office. Workload volume by location provides a more accurate cost allocation for adjudicative activities in the ABC model. Location is an attribute of the cost object layer, as described later in this document.

### Completion Rates

USCIS uses completion rates to identify the adjudicative time required to complete each specific form type. The rate for each form type represents the average time required for an Immigration Service Officer (ISO) to adjudicate that form type. The rate is the average hours per completion as a decimal. For example, if it takes 45 minutes to adjudicate a form, then the completion rate is 0.75 (45/60 = 0.75).

Completion rates reflect the time an ISO handles or touches the case or touch time. It does not reflect queue time or time spent waiting for additional information or supervisory approval. Nor does it reflect the total time applicants and petitioners can expect to wait for a decision on their case once USCIS receives it (also known as cycle time). OPQ calculated the domestic office completion rates for the FY 2021 SAM using PRT data for the 12-month period from FY 2019 or March 2019 to February 2020.[8] OFO used these completion rates in the fee review model.

In some cases, the SAM combines immigration benefits together, even though they have different fees. From a workload perspective, it may not matter. For the fee review, OCFO uses OPQ data in the PRT to calculate completion rates using March 2019 to February 2020, some other 12-month period, or EOY FY 2019 or FY 2020.

RAIO does not report completion rates to OPQ. Instead, OCFO used data calls for responses. International and Refugee Affairs Division (IRAD) provided an FY 2019 end of year performance report generated from a case management system, CAMINO.[9] They calculated international completion rates from the hours and completions in the report. OPQ estimated a completion rate for the main refugee workload (I-590). Previous models did not need a refugee completion rate because it was the only output for the former Refugee Affairs Division. Now that IRAD combines international offices with refugee workload, the model needed a refugee completion rate for consistent cost allocations. Asylum provided completion rates using the FY 2021 SAM. Before the FY 2019/2020 fee review, USCIS ABC models did not have Asylum completion rates that allowed the model to weigh Asylum costs by workload complexity. Previous models used completions to distribute Asylum Division costs evenly between their workloads.

We also requested completion rates from Immigration Records and Identity Services (IRIS) for three workloads at the National Records Center (NRC). These allow the model to weigh the cost of genealogy and CNE requests by the level of effort.

### Calculated Hours

The Make Determination activity assigns costs to specific benefit requests by multiplying completion rate by the projected completions. CostPerform calculates these hours using an attribute in the cost object layer.

The hours can vary significantly by request. The general premise is that the more time spent on a request, the higher portion of the Make Determination activity cost. Thus, higher the fee. Exceptions to this rule occur when volumes skew unit costs (for example, high-volume applications tend to have lower unit costs because costs are allocated over a higher

---

[8] Because of the coronavirus pandemic, we often used pre-pandemic information. We anticipate things may return to normal by FY 2022/2023.

[9] CAMINO G-23.35A is the name for the report, also known as the Mabel report.

volume base) or additional activities are performed (for example, naturalization requires interview and ceremony hours).

While not adjudications, the model uses calculated hours to distribute the Research Genealogy and Certify Nonexistence activity costs to their respective cost objects.

### Biometric Activity Drivers (ASC Production, FBI Fingerprints and Name Checks)

There are three biometric drivers for the four biometric activities. Each of the driver values comes from IRIS, which forecasts them by applying three-year average rates to VPC forecasts. ASC Production represents the count of biometric data collections by USCIS contactors at the application support centers. FBI Fingerprints and FBI Name Checks both represent services that USCIS pays for by reimbursable agreements. USCIS only use FBI Name Checks for about ten immigration benefit requests, like permanent residence and naturalization forms.

### Department of State Driver

IRAD provided estimates for the cost of work performed by the Department of State for USCIS. In the resource analysis, OCFO determined dollar amounts for each form that State adjudicates overseas. This activity driver spreads the total resources for the State interagency agreement (in the DOSIAA0 project code) to the individual forms using the estimated dollar amounts from the resource analysis.

### Fee-Paying Receipts

USCIS may waive fees, or allow an exemption, for certain classes of applicants. In other cases, USCIS performs a service but does not charge a fee, such as asylum or refugee processing. Fee-paying receipts are an estimate of how many customers will pay a fee for immigration benefit requests. The model uses estimates from revenue forecasts or the fee schedule.

Fee-paying volume is not part of the cost calculations in the model. However, it is the divisor in a unit cost that the fee schedule uses. Resources, activity costs, and workload volumes determine the total cost to process each cost object. USCIS divides the total cost by fee-paying volume to determine the fee-paying unit cost. The USCIS fee schedule spreadsheet turns this unit cost into proposed fees. The model and the fee schedule divide total cost by fee-paying volume to determine a fee-paying unit cost, called the Model Output. The Model Output informs the fee schedule. It helps determine the proposed fee unless some other policy decision intervenes. For example, holding naturalization and adoption fees below full cost.

Low fee-paying volume is often one of the main reasons for high fee-paying unit costs. For example, if only 25% of a benefit request is fee-paying volume, then the fee-paying unit cost for that immigration benefit is the unit cost of four completed applications. In general, if fee-paying volume is low, then customers seeking the same benefit bear the burden of the additional cost when they pay the fee unless there is a policy intervention. The ability-to-pay principal allows for policy interventions to keep fees affordable for those with less ability-to-pay.[10] .

### Incoming Records and Shredded Receipts

Incoming Records represents paper receipts less documents that we shred after data collection and fee collection. We use this activity driver for the Intake and Records Management activities to better represent the cost of paper filing. For example, online filing does not receive the Intake activity cost because the model only allocates it to paper workloads.

---

[10] GAO, Federal User Fees: A Design Guide (May 29, 2008), available at https://www.gao.gov/products/GAO-08-386SP.

As another example, if USCIS shreds the paper that it receives for a benefit request, then that benefit request receives less of the Records Management activity cost because the Incoming Records driver does not include shredded paper. Currently, USCIS shreds the following paper requests after entering the data into our case management systems:

- I-90, Application to Replace Permanent Resident Card;
- I-765, Application for Employment Authorization, for some specific categories; and
- N-565, Application for Replacement Naturalization/Citizenship Document.

In our model, FOD and SCOPS generally use Incoming Records to allocate Intake and Records Management activity costs.

### Verifications

IRIS provided estimates for SAVE workload as part of the OCFO resource analysis. The model includes these as activity drivers for SAVE activity costs. The model can determine a unit cost per verification by including the volume.

## Cost Objects (Immigration Benefit Requests)

Generally, a cost object can be any kind of output, such as a product in the private sector. In the fee review model, cost objects are the immigration benefits that USCIS processes or adjudicates, such as naturalization. As mentioned above, USCIS does not charge a fee for all immigration benefit requests. However, the model determines the total cost of completing each immigration benefit request based on the total resources, activities, and workload volume involved in each request. See the appendix for a full list of cost objects used in the fee review model.

USCIS omits temporary programs, such as Deferred Action for Childhood Arrivals (DACA) and Temporary Protective Status (TPS). These are not outputs in the fee review model and OCFO removes the costs from the resources in the fee review.

In the CostPerform, cost objects have several different properties, called attributes, that allow the model to allocate costs based on complex business rules. For example, all of the counts or hours in the Activity Drivers section are numeric or calculated attributes in the model. In addition, the model uses several alphanumeric or listed attributes. The following subsections will describe some of these in more detail. Below is a quick overview of some additional attributes.

- ASVVP Hours: Hours by cost object that help distribute the estimated cost for these site visits. Only affects the following forms: I-129, I-360, and I-829.
- Beneficiary Types: Named, Unnamed, or N/A. The model uses this distinction for only one form, I-129. There are separate cost assignments and completion rates for named and unnamed petitions. This allows the model to provide unit costs by named or unnamed beneficiaries on Form I-129.
- CLAIMS3 Forms: Yes/No field that designates whether or not a form is part of the CLAIMS 3 case management system. The model only distributes the cost of the system to the forms in it.
- Location: the model adds this short code, signifying the places that processes the cost objects, to the string for each cost object. It allows the model to distribute the cost of a place to the work that it touches.
- Lockbox Application: Yes/No field that designates whether or not a cost object is initially mailed to the OIDP lockboxes. By using this field, OIDP Intake costs only distribute to forms that go to a lockbox.
- Filing Method: Online, Paper, or N/A. Similar to the Location attribute, this adds text to the string for some cost objects. When online filing is available, there will be paper and online cost objects. This allows the model to assign Intake and Records Management costs differently for each filing method. For example, receipts filed on paper require the Intake activity, but receipts filed online do not.

15

- TECS Check Required: this is a grouping of benefit requests that require a basic security check. FDNS maintains the list on the USCIS intranet. FDNS will not conduct a more thorough investigation unless the form is on this list. As such, this list controls the assignments for both the Conduct TECS Check and Fraud Detection and Prevention activities.
- Documents Issued: Yes/No field that lists forms which result in an EAD, PRC, or travel document. It controls which forms receive the Issue Document activity.
- EAD and Green Cards: Yes/No field that lists forms which result in an EAD or PRC. It controls which forms receive the cost of card stock purchased with the NEXTGEN project code. It is an OIDP direct cost in the model.

Cost object assignments may use the listed attributes to allocate costs to the items on the list. Or they may use a numeric activity driver that distributes the costs to any cost object with a value for that activity driver. Meaning, objects with a zero value do not receive part of the cost. See Table 3 for some general cost object assignments. There may be individual exceptions based on the business requirements of an office, line item, or set of line items. For example, the OIDP Intake activity uses Receipts as its activity driver. However, we list Incoming Records as the activity driver because FOD, NBC, and SCOPS Intake uses it as the driver.

**Table 3: General Cost Object Assignments**

| Activity | Activity Driver | Cost Object Assignment |
|---|---|---|
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Conduct TECS Check | Completions | TECS Check Required = Yes |
| Fraud Detection and Prevention | Completions | TECS Check Required = Yes |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests where Filing Method is not Online |
| Issue Document | Completions | Documents Issued = Yes |
| Make Determination | Calculated Hours | Immigration Benefit Requests |
| Management and Oversight | Completions | Immigration Benefit Requests |
| Perform Biometric Services | N/A (See rows below) | N/A (See rows below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Records Management | Incoming Records | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Reimbursable Workload |

## Technical Description of the FY 2022/2023 Fee Review Model

### Overview

CostPerform uses multiple calculations to perform activity-based costing. It provides a framework that model builders can use to meet the requirements of an organization. The software has two functions for creating an activity-based cost model: the Meta Model Explorer and the Cost Model Explorer. Access each on the left side of the CostPerform home screen.

16

**Figure 5: Meta Model and Cost Model Explorer**



The Meta Model Explorer allows the CostPerform user to create the high-level structure that the cost model uses. The meta model contains model layers, attributes, definitions for their behaviors. (See more information on metamodels in the Metamodel section.) The Cost Model Explorer is where the user builds the cost model from the structure created in the meta model. When creating a cost model, the user must define which metamodel the cost model will use.

Each cost model has multiple periods, which include different calculations or values. Individuals periods are where the CostPerform user uploads and edits cost data information. Each period in the cost model will adopt the same underlying layer and attribute behaviors. In each USCIS cost model, there are periods for both fiscal years in the fee review as well as an average of the two. The fee schedule spreadsheet ultimately uses the average period to calculate fees. The models include periods bundled and debundled activity drivers. The data for Forms I-485, I-131, and I-765 is different in the bundled periods because I-485 cost objects include free interim benefits (I-131 and I-765). The two sets of periods help USCIS analysis of alternatives.

**Figure 6: CostPerform Periods**



Users can create layers that have built-in relationships to facilitate ABC modeling. Model developers must define some relationships, such as the resource drivers used to spread a resource to an activity or how to drive activities to outputs. CostPerform calls these relationships allocations. Layers and allocations help CostPerform automatically calculate results.

## Metamodel

Users must sign in to the administrative CostPerform account to create or make changes to a metamodel. Once signed in, if editing an existing metamodel, they must change it to a work in progress to perform the edits. Right click on the desired metamodel and choose *Move to work in progress meta models*. Doing so will lock all cost models tied to the metamodel so that other users cannot make edits. Once the user finishes editing the metamodel and reverts it to a *Published* state, they can update the model periods in the Cost Model Explorer without being in the administrative account.

17

Model administrators or super users can add, delete, or edit all layers by accessing the Meta Model Explorer. Layers represent dimensions in the metamodel.

**Figure 7: Layers in CostPerform**



After creating each of the layers, the user can then create attributes which inform how CostPerform calculates and distributes costs. Attributes represent different measures or properties of objects in the metamodel. A user can create attributes to both model objects and allocations. Additionally, attributes can either be specific to a layer or can move between layers. CostPerform refers to attributes that can move between layers as Common Attribute Definitions or shadow attributes. Examples of Common Attribute Definitions within the model are FTE and Staffing Total.

An attribute can take on any of the following classifications:

- Alphanumeric: text, like a name or code.
  - For example, Location is an alphanumeric attribute because it mostly uses 3 character codes to represent USCIS locations
- Numeric: numbers, like counts or hours.
  - For example, Receipts, Completions, Completion Rates, etc.
- Calculated: simple arithmetic formulas, like A+B, A-B, A*B, and A/B.
  - For example, Calculated Hours
- Listed: any predefined list. Could be a list of custom or Boolean values.
  - For example, Documents Issued, Lockbox Application, and TECS Check Required are all listed attributes where the list values are Yes or No.
  - Filing Method and Beneficiary Types use their own custom lists of three values, where one is N/A.
- Reference: these refer to another value in the model. There are no examples in the USCIS model.
- Formula: more complex calculations, like (A + B) * C or testing for an alphanumeric or listed attribute as a parameter in a calculation.
  - Incoming Receipts is a formula attribute in the USCIS model, but it could just as easily be a calculated attribute. The formular is Receipts – Shredded Receipts.

AR_000320

## Model Layers

CostPerform has a powerful calculation engine that allows it to allocate resources various ways using a shared structure, called layers. Layers represent a dimension in the metamodel. Model developers define the records allowed in each layer by creating objects within them. While the user creates and defines layers in the Meta Model Explorer, they add to each layer's structure in the Cost Model Explorer in each individual period.

**Figure 8: Layer Structure Logic**



The model hierarchy has a nesting structure, meaning that each subsequent level in each layer has a parent child relationship. For example, in Figure 8: Layer Structure Logic, Parent 2 is a child to Parent 1. Objects 1 and 2 are children to Parent 2. The amount of levels in the hierarchy differs for every layer. Generally, child level objects will consolidate (sum) to parent level objects. If a child object will consolidate, then the icon to its left is grayed out. Objects with negative cost totals can also consolidate.

When the model allocates costs between layers, the sum of a parent level may distribute to a child level in the next layer. For example, the costs of a USCIS Office may allocate to a Target Activity layer.

**Figure 9: Layer Aggregation Logic**

19

Below is an example within the CostPerform model for Immigration Records and Identity Services (IRIS).

**Figure 10: Child Objects Roll-up**



In the Line Items layer, the structure allows for a breakdown of general expenses, payroll, and overhead costs by each project code and task code (line item) combination. For the USCIS Office layer, the model distributes the cost of each office by accounting strings that include organization codes and fields from the Line Items layer. In both Activity layers (Reassigned Activities and Target Activities), the model calculates costs by each combination of activity and organization code. Finally, the Cost Objects layer structure shows costs by immigration benefit and location string combinations. Some benefit request will include additional fields, like paper or online filing methods.

The following sections describe the layers in the FY 2022/2023 fee review model in detail.

## Line Items

This layer contains a string of codes that USCIS uses in the OP within its structured hierarchy. USCIS uses this string of codes to manage the budget. The string combines project codes, task codes, and sub-object (also known as allotment type). Table 4 below illustrates the different fields that comprise the string.

**Table 4: Line Item Names**

| Line Item Name | Project Code | Task Code | Sub-object |
|----------------|--------------|-----------|------------|
| EXFD000-X01 AW | EXFD000 | X01 | AW |

20

**Figure 11: Line Items Layer**



In addition, the parent item for each line item comes from combining the project description and the task description. If there is no task description, then the model omits it. Descriptions come from a Federal Financial Management System (FFMS) report labeled CM107 or a reference database on the budget shared drive.

By default, the Line Items layer ignores a specific line item's fund and program in the structure of the budget data. By default, the model uses the sum of all programs and funds for each line item to calculate an overall cost to use in allocations to the USCIS layer. However, the models makes exceptions for RAIO (EX2003) and a select few SAVE (EX6001) objects. These receive their own line item that resides one level lower in the layer hierarchy. In previous iterations of the model, these exceptions were allocated differently throughout the model layers. As such, it's a best practice to keep them separate as business rule changes can differ slightly between the non-exceptions and exceptions.

**Figure 12: Line Items Exceptions**



The fee review limits itself to IEFA non-premium costs. The USCIS budget contains other funds. However, they are out of scope of the IEFA fee review because they are statutory fees (HP and HB) or appropriated (OS and P1). The fee review model only includes funds that are within scope of the IEFA fee review.

In many cases, the combination of fields in the OP matches those in the model. In some cases, USCIS splits costs into additional categories by modifying the task code. For example, the fee review may need details by several task codes but the OP only uses one for a project code. In some cases, the model contains a project code that is not in the OP. For example, the REFUGEE project code includes the cost of increasing the refugee ceiling, which was not in the original OP.

To assign a line item directly to a cost object, a model builder allocates the dollar amount to the USCIS Offices layer, and then to Direct Costs in the Activities layer before allocating those dollars to specific forms. See the Cost Object Allocations section for more detail.

21

## USCIS Offices

The USCIS Offices layer contains the organization names used in the FY 2021 operating plan and the dollar amounts tied to each. While the model contains an object for Customs and Border Patrol, it does not contain any cost information.

**Figure 13: USCIS Offices Layer**



The model distributes Line Item costs to each organization code connected to the line item in the fee review budget. Figure 14 provides an example for EXFD000-X01 AW. Similar distributions exist for all other line items.

**Figure 14: Line Items to USCIS Offices**

Underneath each organization a new object is created, which links the line item string with their respective organization codes. Figure 15 outlines the USCIS Office strings under the Office of the Chief Information Officer. With this structure, CostPerform can track the costs attributed to each organization and the line items strings in each.

22

**Figure 15: Example USCIS Office Structure**



## Reassigned Activities

As outlined earlier, activities link resources and cost objects. The Resource Driver Allocations section discusses how to do this in CostPerform.

**Figure 16: Reassigned Activities Layer**



USCIS reassigns some activities in the model. Mission Support and Service-wide Costs are in the Reassigned Activities layer. The model redistributes Service-wide costs to all USCIS offices and Target Activities, except Direct Costs. The model redistributes Mission Support to the activities within the same office, except for Direct Costs. The object string changes from a breakdown of organization codes and line items to organizations codes and activity name. (See Figure 16.)

23

## Target Activities

The Target Activities layer includes both Direct Costs and Exam Activities, which are indirect activities. This layer receives costs from both the USCIS Offices layer and the Reassigned Activities layer. See the Resource Driver section for more information on this process.

**Figure 17: Target Activities Layer**



## Cost Objects (Immigration Benefit Requests)

Cost objects are the outputs of ABC, typically products and services. In the fee review model, this layer contains the immigration benefit requests. As noted earlier, USCIS does not charge a fee for every cost object. In addition, USCIS may waive the fee for some immigration benefits. The cost objects represent the total cost of each immigration request in the fee review whether or not it is part of the fee schedule.

**Figure 18: Cost Objects Layer**



At the lowest level, each cost object may combine several attributes. For example, each contains location. It may also include beneficiary type or filing method where applicable.

24

The location code, generally 3 letters, is used to designate the location, division, or organizational unit where an action occurs on an immigration benefit. This attribute allows business rules so the cost of an office is distributed by the workload for that location. Likewise, it allows the model to distribute the cost of a parent office to its children in a hierarchy.

**Figure 19: Cost Objects Locations**



There is a catch-all location, called Other, which we use for values where location data is unavailable or does not matter. For example, genealogy search and records requests use it. Domestic fee-paying volumes also use "Other" because the revenue estimates do not distinguish by location.

The beneficiary type (named and unnamed) only affects Form I-129 cost objects. The fee rule proposes to several fees, including separate H-2A and H-2B fees for named or unnamed beneficiaries.

**Figure 20: Cost Objects Beneficiary Types**



The filing method (paper and online) affects several cost objects where online filing is available. In certain circumstances, costs allocating from activities only flow to paper workloads.

**Figure 21: Cost Objects Filing Method**



25

## Model Allocations

Allocations are how costs flow from one layer to the next in CostPerform. CostPerform visualizes them with a line between objects in different layers. It allows you to follow links from line items to cost objects to discover the source or destination of various costs.

A regular allocation is a direct relationship between objects in different layers. It assigns costs from one object to the next without any intermediary objects between them. The figure below depicts three separate allocations from the same source object.

**Figure 22: Standard Allocation Logic**

The other allocation logic used within the model is distribution. Instead of individually writing allocations to each object to which costs flow, the user allocates an object to a folder in the destination layer. The costs then flow downward from the parent in the folder to its allocating children. The user can also define the source object's attributes, and the costs flow down to the resulting objects in the destination layer based on those parameters.

**Figure 23: Distribution Allocation Logic**

In CostPerform, a solid line shows the level at which the allocation is made within a layer's structure. A dotted line details where the costs ultimately drill down or roll up to in the hierarchy. For example, a solid line may at a parent level and a dotted line at child levels implies that the allocation was to the parents and each child inherited a portion of the

26

cost. A blue line indicates the allocation is based on certain rules, and a black line marks a regular allocation without distribution.

**Figure 24: Allocation Example**



As an example, in the figure above, CDOSTRG-000 GE allocates to 41-00-0000-00-00-00-00_CDOSTRG-000 GE. However, because 41-00-0000-00-00-00-00_CDOSTRG-000 GE is grayed out, the costs flow up to the parent level at 41-00-0000-00-00-00 and will be allocated to the next level from there.

Based on predetermined business rules, model builders assign a Value to Use to each allocation or allocate to an entire folder structure and distribute costs based on a set of rules and attributes. In an allocation, the top number represents the dollar value for that specific allocation, and the bottom represents the Value to Use. For a set of allocations leaving one object, think of the Value to Use as the percentage breakout for how costs from one object should allocate to many. Figure 25 provides an example for the Administrative Appeals Office.

**Figure 25: Allocation Value to Use**



In this figure, the Administrative Appeals object has seven separate allocations flowing from it (based on the resource driver splits). In the topmost allocation, 0.79 is the Value to Use. Because the Value to Use figures for the set of allocations sums to 1, this Value to Use indicates that 79% of the costs from the Asylum Division Office should flow to the Make Determination Activity. Although the Value to Use figures add up to 1 in this example, note that this is not always the case.

The fee review model uses four kinds of allocations:

1. Line Item Allocations
2. Resource Driver Allocations
3. Activity Reassignment Allocations
4. Cost Object Allocations

## Line Item Allocations

Line Item Allocations determine the movement of costs from the Line Items Layer to the USCIS Offices Layer. The fee review budget build determines the amount of allocations per line item and the Value to Use for each allocation. Because we already know the costs for each combination organization code and line item string, the Value to Use should equal the dollar amount that flows to that specific organization.

**Figure 26: Line Item Allocation Example**



## Resource Driver Allocations

Resource Driver Allocations determine which Resource Drivers allocates each Line Item to the Activities. USCIS uses the following information for this set of allocations:

- FTE (Staffing Total * Staffing Proportion)
- Large Contracts
- Direct Activity Drivers
- Direct Cost Object Drivers

Refer back to the Resource Drivers section for a functional description and percentage breakdown of each.

As previously mentioned, FTE uses the payroll title analysis to match the work completed in each USCIS office to their corresponding activities. For FTE allocations, the payroll title analysis determines the activities that an office uses and, if they use more than one activity, the percentage for each activity they perform. Aside from a few exceptions, costs roll up from the organization-line item string level of the structure to the organization level. The Value to Use for these allocations is FTE, which is the calculated activity percentages from the payroll title analysis (Staffing Proportion) multiplied by the Staffing Total. The Figure 27 below shows an example for Administrative Appeals.

**Figure 27: FTE Allocation Example**



The large contract allocations follow a similar structure to the FTE allocations, but only apply to the few contracts requiring a different driver in the cost model. Instead of costs rolling up to the organization level, the combination organization and line item strings for the corresponding large contract allocate to their respective activities. RCA determines the amounts for the allocations and the Value to Use during the resource analysis, where they work with the contract owners to determine the cost of the contract and its percentages by activity. The example below is for the National Records contract.

**Figure 28: Large Contract Allocation Example**



Direct Activity Driver and Direct Cost Object Driver allocations differ slightly, but each has the same configuration within CostPerform. Each have one-to-one relationships. Meaning, they have one source object and one destination object. Each has a Value to Use of 1. Direct Activity Driver allocations are assigned to one of the Exam Activities. Direct Cost Object Driver allocations are assigned to Direct Cost objects. Therefore, Direct Cost Object driver allocation totals are not included in the model's activity totals. Certain SAVE and biometric service costs are Direct Activity Driver allocations. Different OIT line items are included in both Direct Activity Driver and Direct Cost Object Driver allocations. Below is an example of multiple objects allocating directly to Collect Biometric Data activity.

**Figure 29: Direct Activity Driver Allocation Example**



Next is an example of the OIT line item associated with CLAIMS3 Forms allocating to its respective direct cost object.

**Figure 30: Direct Cost Object Driver Allocation Example**



## Activity Reassignment Allocations

Mission Support and Service-wide Costs are reassigned activities. The model requires and extra step to assign these activities to the activities that USCIS uses for cost object outputs. Figure 31: Service-wide Costs Activity Reassignment shows OIT service-wide costs redistributed to all USCIS offices and the Exam Activities (Except Direct Costs). Each office receives their share of the cost based on overall staffing.

29

**Figure 31: Service-wide Costs Activity Reassignment**



For the Mission Support activity objects, the model reassigns the costs to only target activity objects with the same office designation. The model bases the proportion on all of the other activities that the office performs. The activity with highest non-reassigned activities total will receive the largest share. In the example below, notice how the Asylum Mission Support costs only go to the Asylum sections of Exam Activities.

**Figure 32: Mission Support Activity Reassignment**



These objects use the distribution function in CostPerform. To edit these attributes, right click on an object and navigate to the Properties option and select the System Attributes tab. Figure 33 is an example for the Mission Support Asylum object.

**Figure 33: Mission Support System Attributes**



Here, the user assigns the Driver for the object. In this case, the Driver is all target activity objects with the same organization code (04-10-0000-00-00-00-00). The user should also make sure the Object Distributes option is toggled to green for the distribution to work properly. Service-wide Costs follow the same logic, except the Driver is staffing totals. The user only needs to link the source reassigned activity to the target activity folder.

30

## Cost Object Allocations

The Cost Object Allocations allow the user to select which activities USCIS performed for each form and which Activity Driver distributes the costs. These allocations once again use the distribution property. The figure below details the CFO Management and Oversight activity object.

<p align="center"><strong>Figure 34: Activity Object Attribute Definition</strong></p>



Table 5: General Cost Object Allocations details the most common driver for each activity. In the Advance options section, the user can choose Conditional Driver and Conditional Driver Value information. The "!" symbol next to value indicates a negation. The figure above details that the costs for this activity object will only go to forms with location codes not associated with CBP or Department of State, and the amount of costs flowing to each is based on that locations proportion of completions. If the user only needs to specify which locations a target activity object should or should not distribute to, choose Locations as the Conditional Driver. If a combination of locations and other attributes are needed (Filing Method, TECS Check, etc.), choose the Composition Condition option. Figure 35 shows an example of Composite Condition convention for FDNS HQ.

<p align="center"><strong>Figure 35: Composite Condition Example</strong></p>



For writing the most allocations, the user sets the activity object flow to a high-level folder. In most cases, this is simply Immigration Benefit Requests, but they are numerous exceptions. For example, the model allocates the Research Genealogy activity to the folder for the genealogy workloads, which is separate from other immigration benefit requests.

<div align="center">31</div>

Table 5 below shows the default cost object driver information for each activity. Immigration Benefit Requests is a parent level that omits Additional Revenue Types such as genealogy forms.

**Table 5: General Cost Object Allocations**

| Activity | Activity Driver | Cost Object |
|---|---|---|
| Perform Biometric Services | N/A (See below) | N/A (See below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Conduct TECS Check | Completions | TECS Check Required attribute |
| Fraud Detection and Prevention | Completions | TECS Check Required attribute |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests not filed online |
| Issue Document | Completions | Documents Issued attribute |
| Make Determination | Calculated Hours | Immigration Benefit Requests |
| Management and Oversight | Completions | Immigration Benefit Requests |
| Records Management | Incoming Records | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Initial Electronic Queries |

## Data Validation and Model Outputs

### Data Validation Views

There are several ways to conduct data validation based on the information needed. We compare model inputs to the source files to validate the results of the model. Appendix 5: Fee Review Model Checklist requires USCIS to validate model data using some of these screens. This list is not exhaustive. There may be more items to check on the checklist than described in this section. In those cases, the checklist provides notes such as the objects or fields to use.

Some validation steps or model outputs require using object sets in CostPerform. To select an existing object set, use the navigation panel on the left. Select Sets and then the object set that you want to use. To return to all items, select the empty set at the top of the window.

**Figure 36: Object Sets**



To edit an existing object set or to create a new one in CostPerform, go to Tools. Select Object Sets. From that window, select the cost model and period that you want to work with. From there, select an existing object set from the drop down list or make a new one by clicking the icon that looks like a piece of paper. Use the list on the bottom left to select

32

the objects that you want to include in the set. On the right, click Select Attributes to add attributes like name or total cost to include them in the object set. Click the floppy disk icon to save the object set. Export the object set as XML in case you need to import it into future models or periods.

**Figure 37: Object/Allocation Set Editing**



### Validate Budget Total

This is the total budget for the fee review model. It is visible once you open the model period. Each layer should match the fee review budget build except for the Reassigned Activities.

**Figure 38: Validate Budget Total**



| | Symbol | Name | Total Costs |
|---|---|---|---|
| 1 | Line Items | Line Items | 4,724,807,021.13 |
| 2 | Responsibility Centers | USCIS Offices | 4,724,807,021.13 |
| 3 | Reassigned Activities | Reassigned Activities | 767,388,399.85 |
| 4 | Target Activities | Target Activities | 4,724,807,021.13 |
| 5 | Cost Objects 1 | Immigration Benefits | 4,724,807,021.13 |

### Validate IT Line Items

Individually check Line Item allocations in the Office of the Chief Information Officer. Check the IT portfolios and systems that the model assigns directly to an activity or treats as a direct code. Use the Properties View to validate the IT project and task codes that USCIS allocates directly to an activity or a cost object. We compare this to a master list from the resource analysis which details how each line item should function.

**Figure 39: Validation - IT Line Items**



### Validate Large Contract Resource Drivers

Navigate to the large contract line items and use the Properties View to validate the data for three large contracts and their resource driver information. Compare the Value to Use figures to the percentage breakdowns in the source documents that USCIS prepared as part of the resource analysis.

**Figure 40: Large Contract Resource Drivers**



*Validate Department of State Interagency Agreement*

Navigate to the Department of State IAA line item and use the Properties View to compare the dollar amounts by immigration benefit that USCIS determined during the resource analysis using an estimate from the State.

<div align="center"><strong style="color:#1F6BB5">Figure 41: Department of State Activity Driver</strong></div>



*Validate FTE and Staffing Totals*

Navigate to the Exam Activities folder in the Target Activities Layer and use the Object View. If not already selected, right click on one of the table column and headers and select "add column(s) before this column" and choose both FTE and Staffing Total. One can also drill down to a specific office when necessary.

<div align="center"><strong style="color:#1F6BB5">Figure 42: FTE and Staffing Totals</strong></div>



| Symbol | Name | FTE | Staffing Total |
|---|---|---|---|
| Certify Nonexistence | Certify Nonexistence | 4.57 | 4.57 |
| Conduct TECS Check | Conduct TECS Check | 926.69 | 926.69 |
| Fraud Detection and Prevention | Fraud Detection and Prevention | 1,815.66 | 1,815.66 |
| Inform the Public | Inform the Public | 1,722.88 | 1,722.88 |
| Intake | Intake | 134.62 | 134.62 |
| Issue Document | Issue Document | 79.42 | 79.42 |
| Make Determination | Make Determination | 12,451.99 | 12,451.99 |
| Management and Oversight | Management and Oversight | 3,964.17 | 3,964.17 |
| Perform Biometric Services | Perform Biometric Services | 224.10 | 224.10 |
| Records Management | Records Management | 635.12 | 635.12 |
| Research Genealogy | Research Genealogy | 6.34 | 6.34 |
| Systematic Alien Verification for Entitlements | Systematic Alien Verification for Entitlements | 265.43 | 265.43 |

*Validate Receipts and Completions Equal VPC Forecasts*

Navigate to the Cost Objects Layer and use the Object View to validate that receipts match VPC projections. Add Fee-Paying Receipts and Receipts columns if necessary. Alternatively, you can also use the Receipts and Completions object set, which provides a predefined list of objects and attributes for easy comparison. VPC projections include workload that is outside of the fee review scope, like DACA and TPS volumes. As such, some items in the VPC forecast will not be in the model. Additionally, the model includes items that are not in the VPC forecast, like Department of State volumes or policy decisions made after the VPC forecast. Use the model values a crosswalk to validate the model data.

<div align="center"><strong style="color:#1F6BB5">Figure 43: Receipts and Completions Object Set</strong></div>



| | Symbol | Name | Receipts | Completions | Transfers |
|---|---|---|---|---|---|
| 1 | Credible Fear | Credible Fear | 150,000 | 150,000 | |
| 2 | LI42 | I-102 Application for Replacement/Initial Nonimm... | 5,020 | 5,020 | |
| 3 | LI37H | I-129 All Other | 40,850 | 40,850 | |
| 4 | LI37D | I-129 H-1B | 430,000 | 430,000 | |
| 5 | LI37I | I-129 H-2A | 21,670 | 21,670 | |
| 6 | LI37E | I-129 H-2B | 6,460 | 6,460 | |
| 7 | LI37F | I-129 L1A/L1B/LZ Blanket | 42,350 | 42,350 | |
| 8 | LI37G | I-129 O1/O2 | 27,300 | 27,300 | |
| 9 | LI34B | I-129F Petition for Alien Fiance(e) | 44,700 | 45,144 | |

*Validate Completion Rates*

Navigate to the Cost Objects Layer and use the Object View to validate completion rates, so that you can compare them to the source document, such as the SAM. Add the Completion Rates column if necessary. Alternatively, you can also use the Completion Rates object set, which provides a predefined list of objects and attributes for easy comparison.

<div align="center">34</div>

**Figure 44: Completion Rates**

| Symbol | Name | Completion Rates |
|---|---|---|
| L142_COR | L142_COR | 0.97 |
| L142_CSC | L142_CSC | 0.88 |
| L142_NBC | L137D | 0.67 |
| L142_NER | L142_NER | 0.97 |
| L142_NSC | L142_NSC | 0.88 |

## Model Outputs for Fee Schedule

CostPerform provides multiple inputs to the fee schedule. Use a set of objects to select the appropriate objects and attributes for each. The names in CostPerform are the same as the headers below. Validate the data using the CostPerform checklist and the screens in the previous section before using these in the fee schedule.

### Model Output by Filing Type

USCIS divides total cost by fee-paying volume to determine unit costs. Total cost information comes from CostPerform. Outside of the model, the fee schedule spreadsheet calculates the cost per fee-paying immigration benefit or Model Output.[11] This Model Output help calculate proposed and final fees in the fee schedule spreadsheet. The Model Output by Filing Type object set provides most of the information that the fee schedule needs. It distinguishes between online and paper, allowing the fee schedule to calculate separate fees for each filing method.

**Figure 45: Model Output by Filing Type**



| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
|---|---|---|---|
| G-1041 Genealogy Index Search Request | 1,029,804.67 | 73,783.00 | 1,103,587.67 |
| G-1041A Genealogy Records Request | 742,173.67 | 47,667.48 | 789,841.16 |
| G-1566 Certificate of Non-Existence | | | 1,353,773.22 |
| H-1B Pre-registration Fee | 26,980,493.24 | | 43,249,259.49 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Dep... | | | 2,308,782.22 |
| I-129 All Other | | | 30,593,601.89 |
| I-129 H-1B | | | 247,107,718.66 |
| I-129 H-2A | | | 10,110,958.36 |
| I-129 H-2B | | | 3,663,142.84 |
| I-129 L1A/L1B/LZ Blanket | | | 43,240,894.60 |
| I-129 O1/O2 | | | 21,169,404.42 |
| I-129F Petition for Alien Fiance(e) | | | 22,007,381.55 |

### Model Output for I-129

The fee schedule propose different fees for Form I-129. The form includes an attribute, Beneficiary Type, that other cost objects do not use. To distinguish total costs by named and unnamed beneficiaries, we created an object set that includes the attribute.

**Figure 46: Model Output for I-129**



| Name | Named Beneficiaries (Beneficiary Types) | Unnamed Beneficiaries (Beneficiary Types) | Total Costs |
|---|---|---|---|
| I-129 All Other | 30,593,601.89 | | 30,593,601.89 |
| I-129 H-1B | 247,107,718.66 | | 247,107,718.66 |
| I-129 H-2A | 3,223,361.06 | 6,887,597.31 | 10,110,958.36 |
| I-129 H-2B | 1,957,677.73 | 1,705,465.11 | 3,663,142.84 |
| I-129 L1A/L1B/LZ Blanket | 43,240,894.60 | | 43,240,894.60 |
| I-129 O1/O2 | 21,169,404.42 | | 21,169,404.42 |

### Asylum Cost Objects

Some versions of the draft fee schedule compared costs for asylum with and without the Asylum Processing IFR. Use the object set for Asylum Cost Objects to get the information.

---

[11] Previous ABC models calculated the Model Output in the software. More recent iterations of the ABC model only provide total cost. We divide total cost by the fee-paying receipts in the fee schedule. By doing so, USCIS leadership can evaluate the effect of changes to fee-paying policies in the fee schedule without new cost model results. The model calculates total cost with workload volumes, not fee-paying receipts. Fee-paying receipts are a subset of receipts that we only use to calculate the Model Output.

**Figure 47: Asylum Cost Objects**



## CostPerform Outputs for Preamble and Supporting Documentation

The supporting documentation also require information from CostPerform. The section below describes those screens.

### Activity Costs

One of the model outputs in the fee review documentation is the activity costs. End users can get the information from navigating to the Target Activity Layer and using the Object View. We format the CostPerform information in Excel or Word for the NPRM preamble and supporting documentation tables that use the information.

**Figure 48: Activity Costs**



### Model Output by Activity

One of the model outputs in the fee review supporting documentation is the activity unit costs. To access these reports, click the Rollup/Drilldown icon on the Home tab and choose the correct report in the top left corner of the next screen. The report includes total cost information. Similar to the Model Output report, the per-activity unit cost is calculated in Excel. We pull the total activity cost per immigration benefit request from CostPerform.

**Figure 49: Model Output by Activity**



# Appendix 1: Glossary

| | |
|---|---|
| ABC | Activity-based costing. See the overview of activity-based costing. |
| Activity | The work an organization performs. For example, USCIS accepts applications, enters and updates records, performs background checks, and adjudicates immigration benefit requests. |
| Activity Driver | A measure of the frequency or intensity of demands for activities by cost objects. For the IEFA fee review, activity drivers are projected immigration benefit application volume, projected adjudication hours, or other information |
| Administrator | A CostPerform user and group in the software license. These are super users with full access to every aspect of a model, including security. Only they can edit the metamodel, create new cost models, edit security settings, and delete or create periods. |
| ASC | Application Support Centers, where USCIS provides biometric services for applicants. |
| Attribute | In CostPerform, a property, value, or calculation in one or more layers. They may be text, numeric, or list. Only administrators can create or delete attributes. |
| Cost Object | The primary output of an activity or series of activities. A cost object may be a product, service, or project. For the purposes of the fee review, the cost objects are the various immigration benefit requests for which USCIS adjudicates, usually for a fee. |
| DACA | Deferred Action for Childhood Arrivals, a program out of scope in the fee review. |
| Development user | These CostPerform users have write access to most aspects of a model, excluding security. They can enter data, create allocations and objects. They cannot edit the metamodel or security settings, nor delete or create periods. |
| DHS | Department of Homeland Security |
| Direct costs | Resources attributable to only one (or a select few) cost object(s). An activity in the USCIS ABC model. |
| EAD | Employment Authorization Document |
| FBI | Federal Bureau of Investigation |
| FOD | Field Operations Directorate |
| FPS | Federal Protective Service, a DHS agency that provides guard and security services for federal buildings. |
| FTE | Full-time equivalent, a statistic representing an employee that works full time for an entire fiscal year. |
| GE | General expenses. Basically, anything except pay and benefits in the budget. |
| Indirect costs | Resources not directly attributable to a cost object, such as an activity cost or overhead. Almost all values in the USCIS ABC model are indirect costs. |
| IRIS | Immigration Records and Identity Services Directorate |

37

| | |
|---|---|
| ISO | Immigration Services Officer |
| Line Items | A layer in the fee review model. Members of the dimension are resources that a model builder assigns to an activity (by a resource driver). In the model, the line items consist of the project code, task code, and allotment type for a budgeted value. |
| Model Output | The total cost from the ABC model divided by projected fee-paying receipts. One of the main inputs for the USCIS fee schedule. |
| NBC | National Benefits Center. It performs centralized front-end processing of applications and petitions that require field office interviews (primarily family-based I-485s and N-400s). In addition, the NBC adjudicates some form types to completion including civil surgeon requests and international adoption cases. |
| NRC | National Records Center. It provides records storage, management, and information retrieval services, including genealogy and Freedom of Information Act (FOIA) requests. |
| OIDP | Office of Intake and Document Production is part of the USCIS Management Directorate that is responsible for the lockboxes, card production facilities, and designs and maintains various USCIS forms for internal and external use. |
| OP | Operating Plan, the budget for USCIS |
| RAIO | Refugee Asylum and International Operations Directorate |
| RCA | USCIS Office of the Chief Financial Officer Revenue and Cost Analysis Branch, which is responsible for the fee review. |
| Resource | An economic element applied or used in the performance of activities. For example, costs for labor, supplies, and facilities. Resources include direct and indirect resources costs. The term "indirect" typically includes overhead items or costs requiring a resource driver to spread them to activities. |
| Resource Analysis | An effort to define the work performed by an organization, usually with the goal of process improvement or activity-based costing. For process improvement, it may be very detailed and define activities as "value added" or "non-value added." Value added means it creates or improves an output for a customer. For ABC and fee setting purposes, the activities may be at a higher level than in process improvement. |
| Resource Driver | A measure of the amount of resources consumed by an activity. For example, amount of time spent on an activity, number of transactions processed. |
| OCFO | USCIS Office of the Chief Financial Officer |
| OPQ | USCIS Office of Performance and Quality |
| Overheads | Centralized USCIS costs managed by the OCFO, OIT, or other administrative offices. OCFO maintains a database table of overhead project and task codes. Overhead resources have their own grouping in the line items layer. |
| Publish | In CostPerform, make a metamodel available to users |
| PPA | Program, project, or activity for OMB reporting of budgetary resources |

| | |
|---|---|
| PRC | Permanent Resident Card. More commonly known as a green card. |
| PRT | Performance Reporting Tool, the new tool that OPQ uses to store immigration benefit receipts, completions, and officer hours. |
| SAM | Staffing Allocation Model; OPQ creates these forecasts of personnel requirements based on completions rates and projected volumes. |
| SAVE | Systematic Alien Verification for Entitlements. An intergovernmental initiative designed to aid federal, state, and local benefit granting agencies determine a benefit applicant's immigration status, thereby ensuring that only entitled applicants receive public benefits and licenses. In the model, this is a service-wide reassigned cost. |
| SCOPS | Service Center Operations Directorate |
| TECS | A system that USCIS and other DHS components use for background checks. Mainly managed by CBP. Formerly an acronym for Treasury Enforcement Communication System, the system formerly known as Interagency Border Inspection System (IBIS). |
| Total Cost | The sum of all direct and indirect resource requirements in activity-based costing. Usually this refers to the total cost of an activity or cost object. For example, it can be the full USCIS resource requirement to adjudicate a benefit request in a fiscal year. |
| Unit Cost | The resource requirement to create one item of output. For example, the cost of collecting biometric services once per immigration benefit request. At USCIS, unit cost is determined by dividing total cost for a cost object by the projected fee paying volume for that cost object. |
| USCIS | U.S. Citizenship and Immigration Services |
| VPC | Volume Projection Committee |

Back to the table of contents

# Appendix 2: USCIS Cost Objects 1 Layer Members

The list below contains the Cost Object 1 hierarchy in CostPerform. This displays the parent/child relationship of the Applications/Petitions used in the fee review model. The main hierarchy contains every cost object in CostPerform. The attribute hierarchies contain alternative groupings for cost object assignments and reports. There are no data or costs associated with some of the cost objects on these lists.

## Cost Object 1 Main Hierarchy

All Applications/Petitions
    Additional Revenue Types
        G-1566 Certificate of Non-Existence
        Genealogy Forms
            G-1041 Genealogy Index Search Request
            G-1041A Genealogy Records Request
        SAVE Initial Electronic Queries
        Temporary Protected Status (TPS)
            I-821 Application for Temporary Protected Status
    Immigration Benefit Requests
        Auto Cert Citz (No Fee)
        Credible Fear
        Cuban Medical Professional Parole
        DNA Collection
        H-1B Registration Process Fee
        I-90 Application to Replace Permanent Resident Card
            I-90 ELIS
            I-90 Replace Permanent Resident Card
        I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
        I-129 Petition for a Nonimmigrant worker
            I-129 Nonimmigrant Petition
            I-129 All Other
            I-129 H-1B
            I-129 H-2A
            I-129 H-2B
            I-129 L1A/L1B/LZ Blanket
            I-129 O1/O2
        I-129F Petition for Alien Fiance(e)
        I-130 Petition for Alien Relative
            I-130 All Other Relative (Preference)
            I-130 Immediate Relative
        I-131 Application for Travel Document
            I-131 Advance Parole
            I-131 Parole in Place
            I-131 Reentry Permit
            I-131 Humanitarian Parole
                Cuban Family Reunification Parole
                Filipino WWII Parole
                Haitian Family Reunification Parole
                Humanitarian Parole
                Significant Public Benefit Parole
        I-131 Refugee Travel Document
            I-131 Refugee Travel Document for a child under the age of 16
            I-131 Refugee Travel Document for an individual age 16 or older

40

I-131A Application for Travel Document (Carrier Documentation)

I-140 Immigrant Petition for Alien Worker

I-290B Notice of Appeal or Motion

I-360 Petition for Amerasian Widow(er) or Special Immigrant

I-407 Abandonment of Lawful Permanent Resident Status

I-485 Application to Register Permanent Residence or Adjust Status

       I-485 All Other Adjustments

       I-485 Asylee Adjustment

       I-485 Cuban Refugee Adjustment

       I-485 Employment Adjustment

       I-485 Family Adjustment

       I-485 Refugee Adjustment

I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor

       I-526 Immigrant Petition by Standalone Investor

       I-526E Immigrant Petition by Regional Center

I-539 Application to Extend/Change Nonimmigrant Status

I-589 Application for Asylum and for Withholding of Removal

I-590 Registration for Classification as Refugee

I-600/600A/800/800A Adoption Petitions and Applications

       I-600 Petition to Classify Orphan as an Immediate Relative

       I-600A Application for Advance Processing of an Orphan Petition

       I-800 Convention Country Adoptee Immediate Relative

       I-800A Determine Suitability for Adoption

I-600A Supplement 3 Request for Action on Approved Form I-600A

I-601A Provisional Unlawful Presence Waiver

I-604 Determination on Child for Adoption

I-687 Application for Status as a Temporary Resident

I-690 Application for Waiver of Grounds of Inadmissibility

I-694 Notice of Appeal of Decision

I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)

I-730 Refugee/Asylee Relative Petition (and Travel Eligibility)

       I-730 Refugee/Asylee Relative Position

       I-730 Refugee/Asylee Relative Position Petition Following to Join Travel Eligibility

I-751 Petition to Remove Conditions on Residence

I-765 Application for Employment Authorization

I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse

I-800A Supplement 3 Request for Action on Approved Form I-800A

I-817 Application for Family Unity Benefits

I-824 Application for Action on an Approved Application or Petition

I-829 Petition by Entrepreneur to Remove Conditions

I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal

I-910 Application for Civil Surgeon Designation

I-914 T Nonimmigrant Status

       I-914 Application for T Nonimmigrant Status

       I-914A Family Member

I-918 U Nonimmigrant Status

       I-918 Petition for U Nonimmigrant Status

       I-918 Supplement A

I-56 Application For Regional Center Designation

       I-956 (Initial) Application for Regional Center

       I-956 (Amendment) Application for Regional Center

I-956G Regional Center Annual Statement

I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant

N-300 Application to File Declaration of Intention

41

N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Application for Naturalization
    N-400 Military Service
    N-400 Naturalization
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600/N-600K Application for Certificate of Citizenship
    N-600 Application for Certificate of Citizenship
    N-600K Application for Citizenship and Issuance of Certificate
N-644 Application for Posthumous Citizenship
Overseas Verifications
Reasonable Fear
USCIS Immigrant Fee
Waiver Forms
    I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)
    I-192 Application for Advance Permission to Enter as Nonimmigrant
    I-193 Application for Waiver of Passport and/or Visa
    I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
    I-601 Application for Waiver of Ground of Inadmissibility
    I-602 Application By Refugee For Waiver of Grounds of Inadmissibility
    I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)

## Cost Object 1 Attribute Hierarchy

### CLAIMS3 Forms

I-129F Petition for Alien Fiance(e)
I-601A Provisional Unlawful Presence Waiver
I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
I-140 Immigrant Worker Petition
I-290B Notice of Appeal or Motion
I-526E Immigrant Petition by Regional Center
I-687 Application for Status as a Temporary Resident
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-730 Refugee/Asylee Relative Position
N-565 Application for Replacement Naturalization/Citizenship Document
I-129 Nonimmigrant Petition
I-765 Application for Employment Authorization
I-131 Reentry Permit
I-131 Advance Parole
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-485 Asylee Adjustment
I-485 Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-817 Application for Family Unity Benefits
I-130 Immediate Relative
I-130 All Other Relative (Preference)
I-539 Application to Extend/Change Nonimmigrant Status
I-824 Application for Action on an Approved Application or Petition

I-407 Abandonment of Lawful Permanent Resident Status

I-193 Application for Waiver of Passport and/or Visa

I-485 with I-765 only

I-485 stand alone

I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)

I-192 Application for Advance Permission to Enter as Nonimmigrant

I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal

I-601 Application for Waiver of Ground of Inadmissibility

I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)

I-821 Application for Temporary Protected Status

I-129 H1B

I-129 H-2B

I-129 L1A/L1B/LZ Blanket

I-129 O1/O2

I-129 All Other

I-129 H-2A

I-526 Immigrant Petition by Standalone Investor

I-131 Parole in Place

Cuban Family Reunification Parole

Filipino WWII Parole

Haitian Family Reunification Parole

I-129 All Other Premium Processing

I-129 H1B Premium Processing

I-129 H2A Premium Processing

I-129 H2B Premium Processing

I-129 L1A/L1B/LZ Blanket Premium Processing

I-129 O1/O2 Premium Processing

I-140 All Other Premium Processing

I-140 E-12 Premium Processing

I-140 E-21 Premium Processing

I-140 E-31/32 Premium Processing

I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse

I-131 Refugee Travel Document for a child under the age of 16

I-131 Refugee Travel Document for an individual age 16 or older

## Documents Issued

I-90 Replace Permanent Resident Card

I-131 Reentry Permit

I-485 Asylee Adjustment

I-485 Refugee Adjustment

I-485 Employment Adjustment

I-485 Family Adjustment

I-485 Cuban Refugee Adjustment

I-485 All Other Adjustments

I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)

I-751 Petition to Remove Conditions on Residence

I-765 Application for Employment Authorization

I-817 Application for Family Unity Benefits

I-829 Petition by Entrepreneur to Remove Conditions

I-914 Application for T Nonimmigrant Status

I-485 with I-765 only

I-485 stand alone

I-821 Application for Temporary Protected Status

I-90 ELIS

43

I-131 Refugee Travel Document for an individual age 16 or older

USCIS Immigrant Fee

I-131 Refugee Travel Document for a child under the age of 16

I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse

I-918 Petition for U Nonimmigrant Status

## EAD and Green Cards

I-90 ELIS

I-90 Replace Permanent Resident Card

I-485 All Other Adjustments

I-485 Asylee Adjustment

I-485 Cuban Refugee Adjustment

I-485 Employment Adjustment

I-485 Family Adjustment

I-485 Refugee Adjustment

I-485 stand alone

I-485 with I-765 only

I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)

I-751 Petition to Remove Conditions on Residence

I-765 Application for Employment Authorization

I-817 Application for Family Unity Benefits

I-829 Petition by Entrepreneur to Remove Conditions

I-914 Application for T Nonimmigrant Status

I-918 Petition for U Nonimmigrant Status

USCIS Immigrant Fee

I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse

## File Online

I-90 ELIS

I-765 Application for Employment Authorization

N-400 Naturalization

H-1B Registration Process Fee

## Lockbox Applications

G-1041 Genealogy Index Search Request

G-1041A Genealogy Records Request

I-90 Replace Permanent Resident Card

I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document

I-129F Petition for Alien Fiance(e)

I-130 Immediate Relative

I-130 All Other Relative (Preference)

I-131 Reentry Permit

I-131 Advance Parole

I-140 Immigrant Worker Petition

I-290B Notice of Appeal or Motion

I-360 Petition for Amerasian Widow(er) or Special Immigrant

I-485 Asylee Adjustment

I-485 Refugee Adjustment

I-485 Employment Adjustment

I-485 Family Adjustment

I-485 Cuban Refugee Adjustment

I-485 All Other Adjustments

44

I-485 with I-765 only
I-485 stand alone
I-526E Immigrant Petition by Regional Center
I-526 Immigrant Petition by Standalone Investor
I-539 Application to Extend/Change Nonimmigrant Status
I-600 Petition to Classify Orphan as an Immediate Relative
I-601 Application for Waiver of Ground of Inadmissibility
I-601A Provisional Unlawful Presence Waiver
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-765 Application for Employment Authorization
I-800 Convention Country Adoptee Immediate Relative
I-800A Determine Suitability for Adoption
I-800A Supplement 3 Request for Action on Approved Form I-800A
I-817 Application for Family Unity Benefits
I-824 Application for Action on an Approved Application or Petition
N-300 Application to File Declaration of Intention
N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Naturalization
N-400 Military Service
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600 Application for Certificate of Citizenship
N-600K Application for Citizenship and Issuance of Certificate
I-910 Application for Civil Surgeon Designation
I-821 Application for Temporary Protected Status
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-600A Application for Advance Processing of an Orphan Petition
Haitian Family Reunification Parole
Humanitarian Parole
Cuban Family Reunification Parole
Filipino WWII Parole
I-131 Refugee Travel Document for a child under the age of 16
I-131 Refugee Travel Document for an individual age 16 or older

## Shared with CBP

I-192 Application for Advance Permission to Enter as Nonimmigrant
I-193 Application for Waiver of Passport and/or Visa
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-824 Application for Action on an Approved Application or Petition

## TECS Check Required

I-90 Replace Permanent Resident Card
I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
I-129 Nonimmigrant Petition
I-129F Petition for Alien Fiance(e)
I-130 Immediate Relative
I-130 All Other Relative (Preference)
I-131 Reentry Permit
I-131 Advance Parole
I-140 Immigrant Worker Petition
I-485 Asylee Adjustment
I-485 Refugee Adjustment

AR_000347

I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-526E Immigrant Petition by Regional Center
I-539 Application to Extend/Change Nonimmigrant Status
I-589 Application for Asylum and for Withholding of Removal
I-590 Registration for Classification as Refugee
I-800 Convention Country Adoptee Immediate Relative
I-800A Determine Suitability for Adoption
I-687 Application for Status as a Temporary Resident
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-730 Refugee/Asylee Relative Position
I-765 Application for Employment Authorization
I-800A Supplement 3 Request for Action on Approved Form I-800A
I-817 Application for Family Unity Benefits
I-824 Application for Action on an Approved Application or Petition
I-829 Petition by Entrepreneur to Remove Conditions
I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal
I-918 Petition for U Nonimmigrant Status
N-300 Application to File Declaration of Intention
N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Naturalization
N-400 Military Service
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600 Application for Certificate of Citizenship
N-600K Application for Citizenship and Issuance of Certificate
N-644 Application for Posthumous Citizenship
I-751 Petition to Remove Conditions on Residence
I-290B Notice of Appeal or Motion
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-914 Application for T Nonimmigrant Status
I-131A Application for Travel Document (Carrier Documentation)
I-956 (Initial) Application for Regional Center
I-956G Regional Center Annual Statement
I-601A Provisional Unlawful Presence Waiver
I-485 with I-765 only
I-485 stand alone
I-192 Application for Advance Permission to Enter as Nonimmigrant
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-601 Application for Waiver of Ground of Inadmissibility
I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)
I-821 Application for Temporary Protected Status
I-600 Petition to Classify Orphan as an Immediate Relative
I-600A Application for Advance Processing of an Orphan Petition
I-604 Determination on Child for Adoption
I-90 ELIS
Humanitarian Parole
I-131 Refugee Travel Document for an individual age 16 or older
Significant Public Benefit Parole
I-914A Family Member

AR_000348

I-918 Supplement A
I-129 H1B
I-129 H-2B
I-129 L1A/L1B/LZ Blanket
I-129 O1/O2
I-129 All Other
I-129 H-2A
I-602 Application By Refugee For Waiver of Grounds of Inadmissibility
I-131 Refugee Travel Document for a child under the age of 16
I-956 (Amendment) Application for Regional Center
I-526 Immigrant Petition by Standalone Investor
I-600A Supplement 3 Request for Action on Approved Form I-600A
I-129 All Other Premium Processing
I-129 H1B Premium Processing
I-129 H2A Premium Processing
I-129 H2B Premium Processing
I-129 L1A/L1B/LZ Blanket Premium Processing
I-129 O1/O2 Premium Processing
I-140 All Other Premium Processing
I-140 E-12 Premium Processing
I-140 E-21 Premium Processing
I-140 E-31/32 Premium Processing
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse
I-131 Parole in Place
Cuban Family Reunification Parole
Filipino WWII Parole
Haitian Family Reunification Parole

Back to the table of contents

## Appendix 3: Contact List

Below is contact information for various points of contact (POC) involved in the fee review and ABC model.

| Name | Office | Title | Contribution | Email |
|------|--------|-------|--------------|-------|
|  | OCFO | OCFO Contractor | ABC model lead |  |
|  | OPQ | Workload Analysis and Resource Modeling Division Chief | Historical knowledge and operational metrics |  |
|  | OCFO | Financial Program Analyst | FFMS, authorized FTE, payroll projection tool contact |  |
|  | OCFO | Revenue and Cost Analysis Branch Chief | Manages branch in charge of fee review |  |
|  | OCFO | OCFO Contractor | ABC model builder |  |
|  | OCFO | Management Analyst | Budget data contributor |  |
|  | OIT | EID Data Center DevOps, Middle Tier Support | IT support for CostPerform servers on USCIS network |  |
|  | OPQ | Staffing Analysis and Modeling Branch Chief | Operational metrics, like SAM data |  |
|  | N/A | N/A | CostPerform help desk for general support |  |

47

Back to the [table of contents](#)

## Appendix 4: CostPerform Assignments

The CostPerform Assignments spreadsheet (attached) contains exports of the CostPerform model structure table. Additional columns provide descriptions and/or context.



CostPerform
Assignments.xlsx

Back to the [table of contents](#)

## Appendix 5: Fee Review Model Checklist

USCIS uses this file to verify the CostPerform inputs, outputs, and model assignments.



Model checklist for
CostPerform.xlsx

Back to the [table of contents](#)





U.S. Citizenship and
Immigration Services

# Regulatory Impact Analysis

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

## Proposed Rule

**(8 CFR Parts 103, 106, 204, 211, 212, 214, 240, 244, 245, 245a, 264 and 274a)**

**RIN: 1615 – AC68**

**CIS No. 2687-21**

**DHS Docket No. USCIS-2021-0010**

**January 4, 2023**

# Table of Contents

Executive Summary ........................................................................................................................ 3

    A.   Summary Table of the Economic Impacts of the Fee Schedule ........................................ 7

1. Introduction ............................................................................................................................. 23

  A. Background ........................................................................................................................... 23

  B. Purpose ................................................................................................................................. 24

  C. Statement of Need ............................................................................................................... 25

2. Fee Schedule ............................................................................................................................ 26

  A. Summary of Methodology Used to Calculate Fees............................................................. 26

  B. Proposed Fees by Immigration Benefit ............................................................................... 27

3. Proposed Amendments and Other Fee Adjustments ................................................................ 35

  A. Clarify Dishonored Fee Check Re-presentment Requirement, Fee Payment Method, and Non-refundability ......................................................................................................................... 37

  B. Eliminate $30 Returned Check Fee ..................................................................................... 42

  C. Changes to Biometric Services Fee ..................................................................................... 44

  D. Naturalization and Citizenship Related Forms.................................................................... 48

  E. Fees for Online Filing.......................................................................................................... 55

  F. Form I-485, Application to Register Permanent Residence or Adjust Status...................... 61

  G. Form I-131A, Application for Travel Document (Carrier Documentation) ........................ 67

  H.  Separating Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification.......................................................................................................................... 68

      *I.*    *Asylum Program Fee* .................................................................................................... 79

  I. Adjustments to Premium Processing ................................................................................... 80

  J. Intercountry Adoptions........................................................................................................ 84

  K. Immigrant Investors ............................................................................................................ 92

  L. Genealogy Search and Records Requests............................................................................ 95

  M. Fees Shared by CBP and USCIS ........................................................................................ 100

  N. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA) ............................. 103

  O. Fee Waivers......................................................................................................................... 106

  P. Fee Exemptions ................................................................................................................... 109

  Q. Additional Fee Adjustments................................................................................................ 131

  R. Adjusting USCIS Fees for Inflation ................................................................................... 135

4. Total Quantified Net Costs and Transfer Payments of the Proposed Regulatory Changes .................. 138

   A. Discounted Net Costs ................................................................................................................ 139

   B. Discounted Transfer Payments ................................................................................................ 140

5. Price Elasticity ................................................................................................................................ 143

   A. Price Response to Form N-400, Application for Naturalization Changes ...................................... 144

   B.    Price Response to Form I-129, Petition for a Nonimmigrant Worker and Form I-140, Immigrant Petition for Alien Workers ................................................................................................................ 153

6. Alternatives ..................................................................................................................................... 161

   A. Alternative 1: No New Fee Exemptions ..................................................................................... 161

   B. Alternative 2: Fee Bundling ...................................................................................................... 162

# Executive Summary

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Information and Regulatory Affairs (OIRA), within the Office of Management and Budget (OMB), has designated this proposed rule a significant regulatory action that is economically significant under section 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

This Regulatory Impact Analysis (RIA) provides an assessment of the potential impacts to society from the proposed FY 2022/2023 U.S. Citizenship and Immigration Services Fee

Schedule and Changes to Certain Other Immigration Benefit Request Requirements.[1]  The RIA is a supplement to the proposed NPRM.

In 2021, U.S. Citizenship and Immigration Services (USCIS) conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. The proposed rule would adjust certain immigration and naturalization benefit request fees charged by USCIS and would establish a new fee schedule for these immigration benefit requests. The proposed rule seeks to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners. As a result, the Department of Homeland Security (DHS) is proposing to adjust its fees, adding new fees for certain immigration benefit requests, codifying use of the CPI-U as the inflation index for future fee adjustments between comprehensive fee rules, establish multiple fees for nonimmigrant worker petitions, and limit the number of beneficiaries for certain employment-based forms. DHS also proposes changes related to setting, collecting, and administering fees as well as expanding fee exemptions to certain humanitarian groups, updating the filing requirements for nonimmigrant workers, revising the premium processing timeframe, and revising other administrative requirements. Under this proposed rule, USCIS would increase its annual revenue by approximately $0.80 billion.[2] This is a 32 percent increase from the Fiscal Year (FY) 2016/2017 fee rule projection of $2.48 billion.

To establish the fees in the fee schedule, USCIS uses two major steps for a fee cost calculation based on the fully burdened cost of providing adjudication and naturalization

---

[1] See FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements NPRM. DHS Docket No. USCIS 2021-0010

[2] *See* the NPRM Preamble Section (V)(A)(3) FY2022/2023 Revenue Projections.

services. The first step is activity-based costing (ABC), a method of cost allocation that assigns resource costs to operational activities and then to products and/or services. A commercially available ABC software is used to create financial models that determine the cost of each major activity involved in processing immigration benefit requests and providing biometric services. The second step is cost re-allocation, which USCIS refers to as the process of recovering full cost for workloads without fees or the shifting of cost burdens among benefit request fees due to other policy decisions. In order for the proposed fee schedule to recover the full cost, DHS proposes that other fees be increased to offset a projected increase in workloads that are exempt from paying fees or capped at a fee less than what the ABC model indicates is their fully allocated cost.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, would result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2023 through FY 2032), DHS estimates the annualized net costs to the public would be $532,379,138 discounted at 3-and 7-percent. Estimated total net costs over 10 years would be $4,541,302,033 discounted at 3-percent and $3,739,208,286 discounted at 7-percent.

The proposed changes in this rule would also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30

returned check fee, USCIS' expansion of the electronic filing system to include more forms, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases and other changes in this proposed rule would result in annualized transfer payments from applicants/petitioners to USCIS of approximately $1,612,127,862 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from applicants/petitioners to USCIS would be $13,751,777,662 at a 3-percent discount rate and $11,322,911,493 at a 7-percent discount rate.

Fee reductions and exemptions in this proposed rule would result in annualized transfer payments from USCIS to applicants/petitioners of approximately $116,372,429 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners would be $992,680,424 at a 3-percent discount rate and $817,351,244 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS would be approximately $222,145 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS would be $1,894,942 at a 3-percent discount rate and $1,560,254 at a 7-percent discount rate. Table 1 provides a more detailed summary of the economic impacts of the proposed rule.

DHS refers to transfers both to and from USCIS throughout this analysis. As a fee funded agency, this does not dismiss the broad and complex distributional effects of this proposed rule. The additional revenue associated with proposed fee increases for some services, which is a transfer from applicants/petitioners to USCIS, is expected to  more than fully compensate for the reduced revenue associated with proposed fee decreases for other services, which is a transfer

from USCIS to the estimated populations of fee-exempt or fee adjustment-limited

applicants/petitioners, as shown, in Table 1. Form fees that required no change in time burden,

documentation, or biographical information will be a transfer from current fee-paying applicants

and/or petitioners to those filing for a particular immigration benefit using a form with a revised

form fee.

| Table 1. Quantified Economic Impacts of the Proposed FY 2022 Fee Schedule | | | | |
|---|---|---|---|---|
| Category | Undiscounted | Annualized at 3% and 7% | Total over 10-year Period of Analysis | |
| | | | 3% | 7% |
| Total Costs | $575,051,621 | | | |
| Total Cost Savings | $42,721,052 | | | |
| **Net Costs** | **$532,379,138** | **$532,379,138** | **$4,541,302,033** | **$3,739,208,286** |
| **Transfer Payments from applicants/petitioners to USCIS (fee increases)** | **$1,612,127,862** | **$1,612,127,862** | **$13,751,777,662** | **$11,322,911,493** |
| **Transfer Payments from USCIS to applicants/petitioners (exemptions, limited fee adjustments)** | **$116,372,429** | **$116,372,429** | **$992,680,424** | **$817,351,244** |
| **Transfer Payments from DoD to USCIS (Military N-400 reimbursements)** | **$222,145** | **$222,145** | **$1,894,942** | **$1,560,254** |
| Source: USCIS Analysis | | | | |

### A. Summary Table of the Economic Impacts of the Fee Schedule

Table 2 provides a detailed summary of the proposed provisions and fee adjustments of this

proposed rule and their impacts.

| Table 2. Summary of Proposed Provisions and Other Fee Adjustments - Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| Proposed Rule Provisions | Description of Change | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
| 1. **Dishonored Check Re-presentment Requirement, Fee Payment Method, and Non-refundability** | • DHS proposes that if a check or other financial instrument used to pay a fee is returned as | **Quantitative: Applicants-** • Transfer payments from applicants/petitioners | **Quantitative: Applicants –** • None. **Qualitative: Applicants –** • None. |

| | | | |
|---|---|---|---|
| | unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br><br>• If the remitter institution returns the instrument used to pay a fee as unpayable, USCIS will re-deposit the financial instrument if it is returned for insufficient funds. If it is returned a second time, USCIS will reject the filing. Checks returned for another reason will not be re-deposited and such filings will be rejected immediately.<br><br>• In addition, DHS may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date.<br><br>• DHS is also proposing to codify its authority to limit payment options so that it may require that certain fees must be paid using a specific payment method.<br><br>• DHS is also proposing to clarify | to USCIS of approximately $546,286 (annual average amount USCIS refunds to applicant's/petitioner's) due to non-refundable fees.<br><br>**Qualitative:**<br>**Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **DHS/USCIS –**<br>• Clarifying dishonored fee check re-presentment non-refundability policies, limiting the age of checks to be presented and limiting payment options would reduce administrative burdens and fee processing errors for USCIS.<br><br>• USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment.<br><br>• USCIS will lose fewer credit card disputes. |

| | | | |
|---|---|---|---|
| | that fees are non-refundable regardless of the result of the request or how much time the request requires to be adjudicated.<br><br>• DHS proposes to provide that fees paid to USCIS using a credit card cannot be disputed. | | |
| **2. Eliminate $30 Returned Check Fee** | • USCIS is proposing to eliminate the $30 charge for dishonored payments. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | **Quantitative: Applicants –**<br>• DHS estimates the annual cost savings to applicants/petitioners would be $356,370.<br><br>**Qualitative: Applicants –**<br>• The current $30 charge and the potential of having a benefit request rejected encourages applicants to provide the correct filing fees when submitting an application or petition.<br>• Applicants who submit bad checks will no longer have to pay a fee.<br><br>**DHS/USCIS –**<br>• This proposed change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |
| **3. Changes to Biometric Services Fee** | • For nearly all benefit types, DHS proposes to incorporate the biometric services cost into the underlying | **Quantitative: Applicants-**<br>• As a result of the $55 reduction in the biometric services fee, TPS, and Executive Office for | **Quantitative: Applicants –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• Incorporating the biometric services fee into the underlying benefit |

| | | immigration benefit request fees for which biometric services are applicable.<br><br>• DHS proposes to retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | Immigration Review (EOIR) an agency within the Department of Justice, applicants will experience a total of $9,447,570 in reduced fees annually. This represents transfer payments from USCIS to the fee payers as USCIS would now incur the indirect costs of providing the biometric services.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. | request filing fee would benefit applicants by simplifying the payment process.<br><br>• This measure may also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>**DHS/USCIS –**<br>• Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| 4. | **Naturalization and Citizenship Related Forms** | • DHS proposes to limit the increase of the fee to $760 for Form N-400, Application for Naturalization, to partially recover the full cost of adjudicating the Form N-400 while still promoting | **Quantitative: Applicants-**<br>• Increase in fees to the following naturalization and citizenship related forms: Forms N-300, N-336, N-400, N-470, N-600 and N-600K. This would result in transfer payments from the | **Qualitative: Applicants-**<br><br>• Limited fee increase allows more residents, especially those with financial and income constraints to seek citizenship. |

| | | | |
|---|---|---|---|
| | naturalization and integration.<br><br>• DHS is also proposing to keep the reduced fee option of $380 for naturalization applicants with family incomes not exceeding 200-percent of the Federal poverty guidelines (FPG).<br><br>• DHS is keeping the existing statutory fee exemptions for military members and veterans who file a Form N-400, Application for Naturalization and Form N-600, Application for Certificate of Citizenship, under the military naturalization provisions. | fee-paying applicants to USCIS of $46,991,905 annually.<br><br>**Qualitative: Applicants –**<br>• None<br><br>**DHS/USCIS –**<br>• Transfer payments from DoD to USCIS of $222,145 annually for N-400 (military only) reimbursements.<br><br>• The proposal to expand eligibility to request reduced fees would benefit qualified applicants. DHS estimates that the fee decrease would result in transfer payments from USCIS to Form I-942 approved applicants of $103,225 per year.<br><br>• Expanding the population of applicants using Form I-942 would increase the administrative burden on the agency to process these forms. | |
| 5.  **Fees for Filing Online** | • In recognition of the lower marginal costs to USCIS from online filing, DHS intends to lower fees for online filing of | **Quantitative: Petitioners -**<br>• Transfer payments of $52,954,120 annually from Forms I-90, I-130, I-539 and I-765 | **Quantitative: Petitioners-**<br>• Online filing of Forms I-90, I-130, I-539 and I-765 would provide estimated annual cost savings of $29,974,655 to applicants.   The societal cost savings would come about if more people opted to |

| | | |
|---|---|---|
| | immigration benefit requests for which both paper and online filing options are available. The forms include: | online filers to USCIS. |

apply online as a result of the fee differential between online and paper that is introduced in this proposed rule.

**DHS/USCIS-**
- None.

**Qualitative: Petitioners –**
- None.

**DHS/USCIS –**
- None.

**Qualitative: Petitioners-**

- Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.

**DHS/USCIS –**
- USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.

- Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records would not be physically moved around to different adjudication offices.

- Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities.

- Form I-90, Application to Replace Permanent Resident Card

- Form I-130, Petition for Alien Relative

- Form I-539, Application to Extend/Change Nonimmigrant Status

- Form I-765, Application for Employment Authorization

- Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)

- Form N-400, Application for Naturalization

- Form N-565, Application for Replacement Naturalization/Citizenship Document

- Form N-600, Application for Certificate of Citizenship

- Form N-600K, Application for Citizenship and

| | | | |
|---|---|---|---|
| | Issuance of Certificate Under Section 322<br><br>• Form G-1041, Genealogy Index Search Request<br><br>• Form G-1041A, Genealogy Records Request | | |
| **6.** **Form I-485, Application to Register Permanent Residence or Adjust Status** | • DHS is proposing separate filing fees for applicants filing Form I-765, Application for Employment Authorization, and Form I-131, Application for Travel Documentation concurrently with Form I-485, Application to Register Permanent Residence or Adjust Status or after USCIS accepts their Form I-485 and while it is still pending.<br><br>• DHS is proposing that all applicants, including children under the age of 14 years concurrently filing Form I-485 with a parent, pay the full fee. | **Quantitative: Applicants-**<br>• This increase in the Form I-485 fee would result in approximately $22,860,810 in transfer payments annually from applicants filing I-485 (only) to USCIS.<br><br>• DHS estimates that requiring separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I-485 would result in transfer payments from applicants to USCIS of $597,439,512 annually.<br><br>• DHS estimates transfer payments from applicants to USCIS of $19,339,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –** | **Quantitative: Applicants-**<br>• Not estimated.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• DHS believes that unbundling the fee for Form I-485 from Forms I-131 and I-765 would reduce the burden of administering separate fees and better reflect the cost of adjudication. |

| | | • None. | |
|---|---|---|---|
| 7. **Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • DHS proposes to separate the fee for Form I-131A, Application for Carrier Documentation, from other travel document fees.. | **Quantitative: Applicants-** <br>• None. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS -** <br>• None. | **Quantitative: Applicants-** <br>• None. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• Allows USCIS to assess the cost of providing services for this immigration benefit and propose better aligned fees in future fee reviews |
| 8. **Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • DHS proposes to charge different fees for Form I-129, Petitioner for a Nonimmigrant Worker based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries. <br><br>• DHS also proposes to limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers. <br><br>• DHS is also proposing a new Asylum Program fee of $600 to be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I- | **Quantitative: Applicants –** <br>• The annual increase in transfer payments from Form I-129 visa classification petitions to USCIS is expected to be $273,101,915. <br><br>• The total costs of the Asylum Program fee to petitioners would be approximately $574,884,600 annually. <br><br>**DHS/USCIS –** <br>• Not estimated. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• None. | **Quantitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• None. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• A benefit of the different fees for the Form I-129 classifications is that it would allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification. <br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |

| | | | | |
|---|---|---|---|---|
| | | 140, Immigrant Petition for Alien Worker. | | |
| **9.** | **Adjustments to Premium Processing** | • DHS is proposing to change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service. | **Quantitative: Applicants –** • None.<br><br>**DHS/USCIS –** • None.<br><br>**Qualitative: Applicants –** • None.<br><br>**DHS/USCIS –** • None. | **Qualitative: Applicants –** • The additional days would increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated.<br><br>**DHS/USCIS –** • The additional days would increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS would have additional time to process petitions which would allow USCIS to avoid suspending premium processing service as often as has recently been required when premium processing request volumes are high.<br><br>• This change would enable USCIS to make premium processing more consistently available and expand this service to the newly designated classifications and categories allowed by the USCIS Stabilization Act. |
| | | • Currently, DHS mandates separate payments to request premium processing services. Instead of mandating the separate payments, DHS proposes that USCIS *may* require premium processing service fees be paid in a separate remittance from other filing fees.<br><br>• DHS is also proposing to permit combined payments of the premium processing service | **Quantitative: Applicants –** • None.<br><br>**DHS/USCIS –** • None.<br><br>**Qualitative: Applicants –** • None.<br><br>**DHS/USCIS –** • None. | **Qualitative: Applicants and DHS/USCIS --** • DHS has found in its application of the new premium processing regulations (87 FR 18260) that mandating a separate payment in all premium processing submissions may impose unnecessary burdens on petitioners, applicants, and DHS. Hence, not mandating a separate payment in all premium processing submissions reduces unnecessary burdens on petitioners, applicants, and DHS. |

| | | | |
|---|---|---|---|
| | fee with the remittance of other filing fees. | | |
| 10. **Intercountry Adoptions** | • DHS proposes to clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for a Form I-600A approval in an orphan case from 18 to 15 months to remove inconsistencies between Form I-600A approval periods and validity of the Federal Bureau of Investigation (FBI) background check.<br><br>• DHS is also proposing to create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600. | **Quantitative: Applicants-**<br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 would cost $215,590 annually.<br><br>• The increase to the current fees for the existing adoption-related forms would result in transfer payments from applicants to USCIS of approximately $246,060 annually.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS-**<br>• None. | **Quantitative: Applicants –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates.<br><br>• These proposed changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>**DHS/USCIS –**<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br><br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
| 11. **Immigrant Investors** | • DHS proposes to increase fees across the forms including Forms  I-526/I- | **Quantitative: Applicants-**<br>• Annual transfer payments from EB-5 | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative:** |

| | | | |
|---|---|---|---|
| | 526E[3] , I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the EB-5 program. | investors and regional centers to USCIS would be approximately $61,841,070 for Form I-526/526E, $18,751,425 for I-829, $5,681,000 for I-956, and $1,173,830 for I-956G.<br><br>**Qualitative:**<br>**Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. |
| **12. Changes to Genealogy Search and Records Requests** | • DHS proposes to revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• DHS also proposes to change the index search request process so that USCIS may provide requesters with digital records via email in response to the initial search request.<br><br>• DHS intends to lower the proposed fees for the online filing of Forms G-1041 and G-1041A to reflect the lower marginal costs to | **Quantitative:**<br>**Applicants-**<br>• Annual transfer payments from fee paying applicants of Forms G-1041, G-1041A and G-1566 to USCIS of $1,198,890.<br><br>**Qualitative:**<br>**Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative:**<br>**Applicants –**<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>**DHS/USCIS –**<br>• Reduce costs for mailing, records processing, and storage costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |

---

[3] Combines both Forms I-526, Immigrant Petition by Standalone Investor and I-526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022.

| | | | |
|---|---|---|---|
| | USCIS from online filing.<br><br>• DHS is proposing to charge a fee for requests for a Certificate of Non-Existence. | | |
| **13. Fees Shared by CBP and USCIS** | • DHS proposes to adjust fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP):<br>  *Form I-192,* Application for Advance Permission to Enter as a Nonimmigrant<br>  *Form I-193,* Application for Waiver of Passport and/or Visa<br>  *Form I-212,* Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal<br>  *Form I-824,* Application for Action on an Approved Application or Petition. | **Quantitative: Applicants–**<br>• Annual transfer payments of $12,705,970 from fee payers to USCIS.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants–**<br>• None.<br><br>**Qualitative: Applicants –**<br>• A single fee for each shared form would reduce confusion for individuals interacting with CBP and USCIS.<br><br>**DHS/USCIS –**<br>• None. |
| **14. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 [NACARA])** | • DHS is combining the current multiple fees charged for an individual or family into a single fee for each filing of Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105- | **Quantitative: Applicants–**<br>• Transfer payments of $1,529 annually from I-881 individual filers to USCIS.<br><br>• $184 annually in transfer payments from USCIS to I-881 family applicants since this fee is less than the cost to | **Quantitative: Applicants–**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting. |

| | | | |
|---|---|---|---|
| | 100, the Nicaraguan Adjustment and Central American Relief Act [NACARA]). | adjudicate the application<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | • A Single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15. Fee Waivers** | • DHS proposes that fee waiver requests must be submitted only on the form prescribed by USCIS, which is the Request for Fee Waiver (Form I-912). | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• More simplified and streamlined system to process fee waivers. |
| **16. Fee Exemptions** | • DHS is proposing to provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries[4]:<br>• Victims of Severe Form of Trafficking (T Nonimmigrants)<br>• Victims of Qualifying Criminal Activity (U Nonimmigrants)<br>• VAWA Form I-360 Self-Petitioners and Derivatives<br>• Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement | **Quantitative: Applicants-**<br>• Transfer payment of approximately $106,821,450 annually from USCIS to the public.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• DHS expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that would no longer require a fee waiver because | **Quantitative: Applicants-**<br>• Average of $12,390,027 in cost savings to the public for no longer having to complete and submit Form I-912.<br><br>**Qualitative: Applicants -**<br>• Individuals who are unable to afford immigration benefit request fees would benefit from filing a request with no fees.<br><br>**DHS/USCIS –**<br>• None. |

---

[4] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under proposed 8 CFR 106.2 for which DHS proposes to codify that there is no fee.

| | Based on Battery or Extreme Cruelty | they will be fee exempt | |
|---|---|---|---|
| | • Abused Spouses and Children Adjusting Status under CAA and HRIFA | | |
| | • Abused Spouses and Children Seeking Benefits under NACARA | | |
| | • Abused Spouses and Children of LPRs or U.S. Citizens under INA Section 240A(b)(2) | | |
| | • Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the ISAF (SI1 and SI2) | | |
| | • Special Immigrant Juveniles (SIJs) | | |
| | • Temporary Protected Status (TPS) | | |
| | • Asylees | | |
| | • Refugees | | |
| | • Person Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | | |
| **17. Additional Fee Adjustments** | DHS proposes to increase fees for the following forms: <br> • I-90 (paper) <br> • I-102 <br> • I-130 (paper) <br> • I-131 <br> • I-140 | **Quantitative: Applicants-** <br> • Transfer payment from fee payers to USCIS of approximately $674,215,570 annually. | **Quantitative: Applicants-** <br> • None. <br><br> **Qualitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** |

| | | Qualitative: Applicants – <br>• None. | • None. |
|---|---|---|---|
| | • I-601 <br>• I-612 <br>• I-290B <br>• I-360 <br>• I-539 (paper) <br>• I-601A <br>• I-687/I-690/I-694 <br>• I-751 <br>• I-765 (paper) <br>• I-817 <br>• I-910 <br>• I-929 | | |
| **18. Adjusting USCIS Fees for Inflation** | • DHS proposes to use the CPI-U as the inflation index for fee adjustments between comprehensive fee rules. The actual impacts of such adjustments would be analyzed in a future rule should DHS exercise this proposed authority. | **Quantitative: Applicants-** <br>• None. <br><br>**Qualitative: Applicants –** <br>• None. <br><br>**DHS/USCIS –** <br>• None. | **Qualitative: Applicants** <br>• None. <br><br>**Qualitative:** <br>**DHS/USCIS –** <br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |
| Source: USCIS analysis. Note: The dollar amounts in this table are undiscounted. | | | |

In addition to the impacts summarized above,  Table 3 presents the accounting statement showing the costs and benefits associated with this regulation, as required by OMB Circular A-4.[5]

| Table 3: *OMB A-4 Accounting* Statement - ($ in millions, 2021; period of analysis: FY 2023 through FY 2032) | | | | |
|---|---|---|---|---|
| **Category** | **Primary Estimate** | **Minimum Estimate** | **Maximum Estimate** | **Source Citation** |
| **BENEFITS** | | | | |

---

[5] OMB Circular A-4 is available at https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf (last viewed on September 22, 2022).

| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The proposed changes in this rule would provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees. Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules would allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation.<br><br>The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced re-applications for premium processing and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens. | | | Regulatory Impact Analysis ("RIA") |

| **COSTS** | | | | |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$532 | | | RIA |
| Annualized quantified, but un-monetized, costs | N/A | | | |
| Qualitative (unquantified) costs | Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that would no longer require a fee waiver because they will be fee exempt.<br><br>Expanding the population of applicants using Form I-942 (reduced fee request) would increase the administrative burden on the agency to process these forms. | | | |

| **TRANSFERS** | | | | |
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%)<br><br>$1,612 | | | RIA |

| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%)  $116 | RIA |
|---|---|---|
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%)  $0.22 | RIA |
| *Miscellaneous Analyses/Category* | *Effects* | |
| *Effects on state, local, and/or tribal governments* | *None* | Preamble |
| *Effects on small businesses* | DHS does not believe that the increase in fees proposed in this rule would have a significant economic impact on a substantial number of small entities that file I-140, I-910, or I-360.  DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I–924) or Form I-956G (formerly I-924A).  DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Initial Regulatory Flexibility Analysis and Small Entity Analysis |
| *Effects on wages* | *None* | None |
| *Effects on Growth* | *None* | None |

# 1. Introduction

## A. Background

USCIS administers the nation's lawful immigration system, through which millions of individuals and entities file applications and petitions each year for various types of immigration benefits. These immigration benefit requests include applications for lawful permanent residence, employment authorization, and naturalization. USCIS is mainly funded by

immigration and naturalization benefit request fees charged to applicants and petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the IEFA. In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901-03 and OMB Circular A-25, USCIS conducts biennial reviews of the non-statutory fees deposited into the IEFA. The fee schedule is adjusted periodically to ensure that fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions. It accounts for increased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and thoroughly vet applicants, petitioners, and beneficiaries. The fee schedule was last adjusted on December 23, 2016, by a weighted average increase of 21-percent. *See* 81 FR 73292 (Oct. 24, 2016).

This Regulatory Impact Analysis (RIA) is a supplement to the proposed FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements.[6]

### B. Purpose

DHS proposes to adjust certain immigration and naturalization benefit request fees charged by USCIS to ensure that USCIS can recover the full costs of providing immigration services. DHS also proposes additional changes related to setting, collecting, and administering fees. More specifically, the proposed fee schedule will address the following:

- Dishonored Fee Check Re-Presentment Requirement

---

[6] See FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements NPRM for a detailed discussion of proposed changes and fee setting methodology. DHS Docket No. USCIS 2021-0010

- $30 Returned Check Fee
- Biometric Services Fee
- Naturalization and Citizenship Related Forms (N-300/336/400/470/475/565/600/600K)
- Online Filing Fees
- Application to Register Permanent Residence or Adjust Status (Form I-485)
- Carrier Documentation (Form I-131A)
- Petition for a Nonimmigrant Worker (Form I-129)
- Premium Processing (Form I-907)
- Intercountry Adoptions (Forms I-600/600A/800/800A)
- Immigrant Investors (Forms I-526/526E/829/956 (former 924)/956G (former 924A)
- Genealogy Search and Records Requests (Forms G-104/104A)
- Fees Shared with CBP and USCIS (Forms I-192/193/212/824)
- Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA) (Form I-881)
- Existing Fee Waivers
- Fee Exemptions

This Regulatory Impact Analysis (RIA) presents a benefit-cost analysis as required by E. O. 12866 and 13563, which direct agencies to assess regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and equity).

## C. Statement of Need

USCIS oversees lawful immigration to the United States and administers the nation's lawful immigration system. USCIS is primarily funded by immigration and naturalization benefit request fees charged to applicants and petitioners. These fee collections fund the cost to adjudicate millions of immigration benefit requests each year, including those adjudicated without fees. The collected fees are deposited into the IEFA, which comprised approximately 96-percent of USCIS' total FY 2021 enacted spending authority. The USCIS IEFA fee schedule that

is in effect was published in the DHS FY 2016/2017 fee rule. *See* 81 FR 73292 (Oct. 24, 2016).[7]

That rule and associated fees became effective on December 23, 2016. As stated in the preamble

of the proposed rule, USCIS estimates that an average IEFA non-premium budget of $5,150.7

million (36.4-percent increase over the FY 2021 IEFA non-premium budget of $3,776.3 million)

will be required for USCIS to fulfill its operational objectives and maintain current processing

timetables of immigration benefit requests.  If USCIS continues to operate at current fee levels, it

will experience an average annual shortfall (the amount by which expenses exceed revenue) of

$1,262.3 million. This projected shortfall poses a risk of reducing USCIS operations funded by

the IEFA.[8]  The results of USCIS's fee review indicate that current fee levels are insufficient to

recover the full cost of operations funded by the IEFA.  Therefore, DHS proposes to adjust the

fee schedule to recover the full cost of processing immigration benefit requests and to continue

to maintain or improve current service delivery standards.

## 2. Fee Schedule

### A. Summary of Methodology Used to Calculate Fees

USCIS uses a two-prong approach for a fee cost calculation based on the fully burdened

cost of providing adjudication and naturalization services. The first approach is activity-based

costing (ABC), a method of cost allocation that assigns resource costs to operational activities

and then to products and/or services. A commercially available ABC software is used to create

---

[7] The phrase "FY 2016/2017 fee rule," as used in this proposed rule, encompasses the fee review, proposed rule, final rule, and all supporting documentation associated with the regulations effective as of December 23, 2016.

[8] *See* the "IEFA Non-Premium Carryover Projections" section and discussion of carryover balances and the Anti-Deficiency Act in the FY 2022/2023 Immigration Examinations Fee Account Fee Review Supporting Documentation for more detail.

financial models that determine the cost of each major activity involved in processing immigration benefit requests and providing biometric services. The second approach is cost re-allocation (Low Volume Reallocation), which USCIS refers to as the process of recovering full cost for workloads without fees or the shifting of cost burdens among benefit request fees due to other policy decisions. In order for the proposed fee schedule to recover full cost, DHS proposes that other fees be increased to offset a projected increase in workloads that are exempt from paying fees or that are capped at a fee less than what the ABC model indicates that they should pay. DHS recognizes that charging less than the full cost of adjudicating an immigration benefit request requires USCIS to increase fees for other immigration benefit requests to ensure full cost recovery. This complies with section 286(m) of the Immigration and Nationality Act (INA), which permits fees to cover those costs of providing applicants, petitioners, or requestors a service or part of a service "without charge." Therefore, DHS intends to continue to apply the Low Volume Reallocation methodology. *See* 75 FR 33461 (June 11, 2010) and 81 FR 26915 (Oct. 24, 2016). The fee schedule accounts for increased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and thoroughly vet applicants, petitioners, and beneficiaries.

### B. Proposed Fees by Immigration Benefit

Table 4 shows the current[9] and proposed USCIS fees for immigration benefit requests and biometric services.[10]

---

[9] Current fees are the fees set out in the FY 2016/2017 Fee Rule that USCIS is charging applicants and petitioners. *See*, generally, 8 CFR 103.7(b)(1) (Oct. 1, 2020).

[10] The DACA fee is not incorporated into the fee model and is therefore excluded from this fee schedule.

| Table 4: Comparison of Current and Proposed Fees | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | Current Fee(s) | Proposed Fee(s) | **Difference** | |
| | | | | Amount | Percent |
| Citizenship and Naturalization | | | | | |
| N-4 | Monthly Report on Naturalization Papers | No Fee | No Fee | N/A | N/A |
| N-300 | Application to File Declaration of Intention | $270 | $320 | $50 | 19% |
| N-336 | Request for Hearing on a Decision in Naturalization Proceedings - Online or Paper | $700 | $830 | $130 | 19% |
| N-400 | Application for Naturalization - Paper | $640 | $760 | $120 | 19% |
| N-400 | Application for Naturalization - Online | $640 | $760 | $120 | 19% |
| N-400 | Application for Naturalization - Reduced Fee | $320 | $380 | $60 | 19% |
| N-470 | Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $65 | 18% |
| N-565 | Application for Replacement Naturalization/Citizenship Document - Online or Paper | $555 | $555 | $0 | 0% |
| N-600 | Application for Certificate of Citizenship - Online or Paper | $1,170 | $1,385 | $215 | 18% |
| N-600K | Application for Citizenship and Issuance of Certificate - Online or Paper | $1,170 | $1,385 | $215 | 18% |
| N-644 | Application for Posthumous Citizenship | No Fee | No Fee | N/A | N/A |
| N-648 | Medical Certification for Disability Exceptions | No Fee | No Fee | N/A | N/A |
| Humanitarian | | | | | |
| | Credible Fear | No Fee | No Fee | N/A | N/A |
| I-589 | Application for Asylum and for Withholding of Removal | No Fee | No Fee | N/A | N/A |
| I-590 | Registration for Classification as a Refugee | No Fee | No Fee | N/A | N/A |
| I-602 | Application by Refugee for Waiver of Inadmissibility Grounds | No Fee | No Fee | N/A | N/A |
| I-687 | Application for Status as a Temporary Resident Under Section 245A of the INA | $1,130 | $1,240 | $110 | 10% |
| I-687 | Application for Status as a Temporary Resident Under Section 245A of the INA (with biometric services) | $1,215 | $1,240 | $25 | 2% |
| I-694 | Notice of Appeal of Decision | $890 | $1,155 | $265 | 30% |
| I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $0 | 0% |

**Table 4: Comparison of Current and Proposed Fees**

| Immigration Benefit Request | | Current Fee(s) | Proposed Fee(s) | Difference | |
|---|---|---|---|---|---|
| I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | -$85 | -5% |
| I-730 | Refugee/Asylee Relative Petition | No Fee | No Fee | N/A | N/A |
| I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | No Fee | No Fee | N/A | N/A |
| I-817 | Application for Family Unity Benefits | $600 | $875 | $275 | 46% |
| I-817 | Application for Family Unity Benefits (with biometric services) | $685 | $875 | $190 | 28% |
| I-821 | Application for Temporary Protected Status | $50 | $50 | $0 | 0% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $55 | 19% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | -$30 | -8% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | -$230 | -40% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $740 | $340 | -$400 | -54% |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by Executive Office of Immigration Review) | $165 | $165 | $0 | 0% |
| I-914 | Application for T Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I-914A | Application for Family Member of T-1 Recipient | No Fee | No Fee | N/A | N/A |
| I-918 | Petition for U Nonimmigrant Status | No Fee | No Fee | N/A | N/A |
| I-918A | Petition for Qualifying Family Member of U-1 Recipient | No Fee | No Fee | N/A | N/A |
| I-918B | U Nonimmigrant Status Certification | No Fee | No Fee | N/A | N/A |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $275 | $40 | 17% |

| Table 4: Comparison of Current and Proposed Fees | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | Current Fee(s) | Proposed Fee(s) | Difference | |
| | Reasonable Fear | No Fee | No Fee | N/A | N/A |
| Family-Based | | | | | |
| I-129F | Petition for Alien Fiancé(e) | $535 | $720 | $185 | 35% |
| I-130 | Petition for Alien Relative - Online | $535 | $710 | $175 | 33% |
| I-130 | Petition for Alien Relative - Paper | $535 | $820 | $285 | 53% |
| I-600 | Petition to Classify Orphan as an Immediate Relative | $775 | $920 | $145 | 19% |
| I-600 | Petition to Classify Orphan as an Immediate Relative (with biometric services) | $860 | $920 | $60 | 7% |
| I-600A | Application for Advance Processing of an Orphan Petition | $775 | $920 | $145 | 19% |
| I-600A | Application for Advance Processing of an Orphan Petition (with biometric services) | $860 | $920 | $60 | 7% |
| I-600A/I-600 Supp. 3 | Request for Action on Approved Form I-600A/I-600 | N/A | $455 | N/A | N/A |
| I-601A | Application for Provisional Unlawful Presence Waiver | $630 | $1,105 | $475 | 75% |
| I-601A | Application for Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $390 | 55% |
| I-751 | Petition to Remove Conditions on Residence | $595 | $1,195 | $600 | 101% |
| I-751 | Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $515 | 76% |
| I-800 | Petition to Classify Convention Adoptee as an Immediate Relative | $775 | $925 | $150 | 19% |
| I-800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $925 | $150 | 19% |
| I-800A | Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $920 | $60 | 7% |
| I-800A Supp. 3 | Request for Action on Approved Form I-800A | $385 | $455 | $70 | 18% |
| I-800A Supp. 3 | Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | -$15 | -3% |
| Employment-Based | | | | | |
| | Asylum Program Fee | N/A | $600 | N/A | N/A |
| | H-1B Pre-Registration | $10 | $215 | $205 | 2050% |

| Table 4: Comparison of Current and Proposed Fees | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** | |
| I-129 | Petition for a Nonimmigrant Worker: H-1 Classifications | $460 | $780 | $320 | 70% |
| I-129 | H-2A Petition - Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| I-129 | H-2B Petition - Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| I-129 | Petition for L Nonimmigrant Worker | $460 | $1,385 | $925 | 201% |
| I-129 | Petition for O Nonimmigrant Worker | $460 | $1,055 | $595 | 129% |
| I-129CW, and I-129 | Petition for a CNMI-Only Nonimmigrant Transitional Worker; Application for Nonimmigrant Worker: E and TN Classifications; and Petition for Nonimmigrant Worker: H-3, P, Q, or R Classification | $460 | $1,015 | $555 | 121% |
| I-129CW, and I-129 | Petition for a CNMI Nonimmigrant Worker (with biometric services fee) | $545 | $1,015 | $470 | 86% |
| I-129 | H-2A Petition - Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| I-129 | H-2B Petition - Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| I-140 | Immigrant Petition for Alien Worker | $700 | $715 | $15 | 2% |
| I-526 | Immigrant Petition by Alien Entrepreneur | $3,675 | $11,160 | $7,485 | 204% |
| I-526E | Immigrant Petition by Regional Center Investor | $3,675 | $11,160 | $7,485 | 204% |
| I-765 | Application for Employment Authorization - Online | $410 | $555 | $145 | 35% |
| I-765 | Application for Employment Authorization - Paper | $410 | $650 | $240 | 59% |
| I-765 | Application for Employment Authorization - Online (with biometric services) | $495 | $555 | $60 | 12% |
| I-765 | Application for Employment Authorization - Paper (with biometric services) | $495 | $650 | $155 | 31% |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | $3,750 | $9,525 | $5,775 | 154% |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status (with biometric services) | $3,835 | $9,525 | $5,690 | 148% |
| I-907 | Request for Premium Processing Service when filing: Form I-129 requesting E-1, E-2, E-3, H-1B, H-3, L (including blanket L-1), O, P, Q, or TN nonimmigrant classification; or Form I-140 requesting EB-1, EB-2, or EB-3 immigrant visa classification | $2,500 | $2,500 | $0 | 0% |

| Table 4: Comparison of Current and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | | Current Fee(s) | Proposed Fee(s) | **Difference** |
| I-907 | Request for Premium Processing Service when filing Form I-129 requesting H-2B or R nonimmigrant classification | $1,500 | $1,500 | $0 | 0% |
| I-956 (formerly I-924) | Application For Regional Center Designation | $17,795 | $47,695 | $29,900 | 168% |
| I-956G (formerly I-924A) | Regional Center Annual Statement | $3,035 | $4,470 | $1,435 | 47% |
| Other | | | | | |
| I-90 | Application to Replace Permanent Resident Card - Online | $455 | $455 | $0 | 0% |
| I-90 | Application to Replace Permanent Resident Card - Paper | $455 | $465 | $10 | 2% |
| I-90 | Application to Replace Permanent Resident Card - Online (with biometric services) | $540 | $455 | -$85 | -16% |
| I-90 | Application to Replace Permanent Resident Card - Paper (with biometric services) | $540 | $465 | -$75 | -14% |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $235 | 53% |
| I-131 | Application for Travel Document | $575 | $630 | $55 | 10% |
| I-131 | Application for Travel Document (with biometric services) | $660 | $630 | -$30 | -5% |
| I-131 | I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $30 | 22% |
| I-131 | I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | -$55 | -25% |
| I-131 | I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $30 | 29% |
| I-131 | I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | -$55 | -29% |
| I-131A | Application for Carrier Documentation | $575 | $575 | $0 | 0% |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $0 | 0% |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant (filed with USCIS) | $930 | $1,100 | $170 | 18% |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant (filed with CBP) | $585 | $1,100 | $515 | 88% |

| Table 4: Comparison of Current and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** |
| I-193 | Application for Waiver of Passport and/or Visa | $585 | $695 | $110 | 19% |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $465 | 50% |
| I-290B | Notice of Appeal or Motion | $675 | $800 | $125 | 19% |
| I-360 | Petition for Amerasian Widow(er) or Special Immigrant | $435 | $515 | $80 | 18% |
| I-485 | Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $400 | 35% |
| I-485 | Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $315 | 26% |
| I-485 | Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $790 | 105% |
| I-485A | Supplement A, Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | $1,000 | $1,000 | $0 | 0% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Online | $370 | $525 | $155 | 42% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Paper | $370 | $620 | $250 | 68% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Online (with biometric services) | $455 | $525 | $70 | 15% |
| I-539 | Application to Extend/Change Nonimmigrant Status - Paper (with biometric services) | $455 | $620 | $165 | 36% |
| I-601 | Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $120 | 13% |
| I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $170 | 18% |
| I-690 | Application for Waiver of Grounds of Inadmissibility | $715 | $985 | $270 | 38% |
| I-824 | Application for Action on an Approved Application or Petition | $465 | $675 | $210 | 45% |
| I-905 | Application for Authorization to Issue Certification for Health Care Workers | $230 | $230 | $0 | 0% |
| I-910 | Application for Civil Surgeon Designation | $785 | $1,230 | $445 | 57% |
| I-941 | Application for Entrepreneur Parole | $1,200 | $1,200 | $0 | 0% |
| I-941 | Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | -$85 | -7% |
| | Biometric Services (in most cases) | $85 | $0 | -$85 | -100% |

| Table 4: Comparison of Current and Proposed Fees | | | | |
|---|---|---|---|---|
| **Immigration Benefit Request** | | **Current Fee(s)** | **Proposed Fee(s)** | **Difference** |
| | Biometric Services (TPS and EOIR only) | $85 | $30 | -$55 | -65% |
| | USCIS Immigrant Fee | $220 | $235 | $15 | 7% |
| Genealogy and Records | | | | | |
| G-1566 | Certificate of Non-Existence | $0 | $330 | $330 | N/A |
| G-1041 | Genealogy Index Search Request - Online | $65 | $100 | $35 | 54% |
| G-1041 | Genealogy Index Search Request - Paper | $65 | $120 | $55 | 85% |
| G-1041A | Genealogy Records Request - Online | $65 | $240 | $175 | 269% |
| G-1041A | Genealogy Records Request - Paper | $65 | $260 | $195 | 300% |
| G-1041 and G-1041A | Genealogy Index Search Request and Records Request - Online (digital records) | $130 | $100 | -$30 | -23% |
| No Fee | | | | | |
| I-134 | Declaration of Financial Support | No Fee | No Fee | N/A | N/A |
| I-361 | Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian | No Fee | No Fee | N/A | N/A |
| I-363 | Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian | No Fee | No Fee | N/A | N/A |
| I-407 | Record of Abandonment of Lawful Permanent Resident Status | No Fee | No Fee | N/A | N/A |
| I-485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | No Fee | No Fee | N/A | N/A |
| I-508 | Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities | No Fee | No Fee | N/A | N/A |
| I-566 | Interagency Record of Request – A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status | No Fee | No Fee | N/A | N/A |
| I-693 | Report of Medical Examination and Vaccination Record | No Fee | No Fee | N/A | N/A |
| I-854 | Inter-Agency Alien Witness and Informant Record | No Fee | No Fee | N/A | N/A |
| I-864 | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |
| I-864A | Contract Between Sponsor and Household Member | No Fee | No Fee | N/A | N/A |
| I-864EZ | Affidavit of Support Under Section 213A of the INA | No Fee | No Fee | N/A | N/A |

| Table 4: Comparison of Current and Proposed Fees | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | | Current Fee(s) | Proposed Fee(s) | **Difference** | |
| I-864W | Request for Exemption for Intending Immigrant's Affidavit of Support | No Fee | No Fee | N/A | N/A |
| I-865 | Sponsor's Notice of Change of Address | No Fee | No Fee | N/A | N/A |
| I-912 | Request for Fee Waiver | No Fee | No Fee | N/A | N/A |
| I-942 | Request for Reduced Fee | No Fee | No Fee | N/A | N/A |

# 3. Proposed Amendments and Other Fee Adjustments

The proposed amendments would create costs, cost savings, transfer payments, or benefits to applicants/petitioners. Only provisions that will result in real resource costs to the economy are characterized as costs. Many of the provisions in the proposed rule do not impose new real resource costs but are transfer payments. Transfer payments are monetary payments from one group to another that do not affect total resources available to society.[11] For example, if applicants were previously required to pay a fee and that fee is increased, this is considered a transfer payment from the applicant/petitioner to the government because the costs of providing the existing immigration service are currently being paid by the Federal Government. Hence, no new costs to the economy as a whole are being created as this fee increase only transfers the payments to cover the existing costs of service from the government to the applicant.

DHS notes that the estimates of annual filing volume in the RIA are not the same used in the Notice of Proposed Rulemaking's (NPRM's) preamble. The USCIS Volume Projection Committee (VPC) forecasts USCIS workload volume based on short- and long-term volume

---

[11] "Regulatory Impact Analysis: A Primer," page 8, https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf (last viewed on September 22, 2022)

trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. This is described in further detail in the NPRM.  In this RIA, DHS uses a different method for estimating the annual filing volume and/or individuals that would be impacted by the changes in the proposed rule. It mainly uses a 5-year average of annual receipts data from FY 2016 through FY 2020 to forecast receipts. The current fees for the immigration benefits are used to estimate the baseline costs throughout the analysis. DHS considers this to be a reasonable baseline estimate because these fees comprise the fee schedule currently being followed and reflect the world without this proposed regulation.

DHS acknowledges the broad effects of the COVID-19 global pandemic on the United States and the populations affected by this proposed rule. For example, USCIS saw a dramatic decline in applications and petitions during the COVID-19 pandemic, which also resulted in an unprecedented, if temporary, decline in revenue.[12] DHS has no comparable historical data that can be used to project the scope, duration, and total effect this will have on USCIS' revenue. Thus, DHS proceeds with this rulemaking on the basis of the FY 2021 USCIS fee review and associated projections. Consistent with past practice and as required by the CFO Act, USCIS will evaluate all available data at the time it conducts future fee reviews, including data related to the

---

[12] *See* USCIS, "Deputy Director for Policy Statement on USCIS' Fiscal Outlook, available at *https://www.uscis.gov/news/news-releases/deputy-director-for-policy-statement-on-uscis-fiscal-outlook* (June 25, 2020), last viewed on Sep 22, 2022. *See also* USCIS, USCIS Averts Furlough of Nearly 70% of Workforce, available at *https://www.uscis.gov/news/news-releases/uscis-averts-furlough-of-nearly-70-of-workforce* (Aug. 25, 2020), last viewed on Sep 22, 2022

*See* NPRM Preamble Section (V)(A)(3) USCIS Budget History.

COVID-19 pandemic and any potential effects on USCIS workload volumes, revenue, or costs. DHS will consider these effects in future fee rules.

This section presents the amendments being made in the proposed fee schedule and their economic impacts.

### A. Clarify Dishonored Fee Check Re-presentment Requirement, Fee Payment Method, and Non-refundability

**Changes**

In the FY 2016/2017 fee rule, USCIS amended the regulations regarding how it treats a benefit request accompanied by fee payment (in the form of check or other financial instruments) that is subsequently returned as not payable.[13]  If a financial instrument used to pay a fee is returned as unpayable after one re-presentment, USCIS rejects the filing and imposes a standard $30 charge. In the preamble to the FY 2016/2017 fee rule, USCIS stated that to ensure a payment rejection is the result of insufficient funds and not USCIS error or network outages, USCIS (through the U.S. Department of the Treasury (Treasury)) will resubmit rejected payment instruments to the appropriate financial institution one time. While DHS's intent was to submit only checks that were dishonored due to insufficient funds, some stakeholders have interpreted the re-presentment[14] as applying to any check DHS has deposited that is returned as unpayable. Although the Treasury check clearance regulations permit an agency to re-deposit a check

---

[13] *See* 81 FR 73313-15 (Oct. 24, 2016); 8 CFR 103.2(a)(7)(ii) and 8 CFR 103.7(a)(2) (Oct. 1, 2020).
[14] 8 CFR 103.2(a)(7)(ii)(D)

dishonored due to insufficient funds[15], they prohibit submitting checks dishonored for other reasons for clearance a second time.

To comply with the Treasury regulations, DHS intends to specify that if a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds (as opposed to a closed account, fraud, or stop payment), USCIS will resubmit the payment to the remitter institution one time. If the remitter institution returns the instrument used to pay a fee as unpayable a second time, USCIS will reject the filing. USCIS will not re-deposit financial instruments returned as unpayable for a reason other than insufficient funds. *See* proposed 8 CFR 103.2(a)(7)(ii)(D).

DHS may also reject a request that is accompanied by a check that is dated more than 365 days before the receipt date. Currently, USCIS policy is to reject a check that is dated more than a year before it is submitted. However, that policy is not codified, and DHS has been sued or threatened with litigation multiple times when a check that was dated more than a year before it was submitted was the basis of a rejection that caused the requestor to miss an important deadline. This proposed provision would codify DHS current practice.

DHS is also proposing to codify its authority to limit payment options so that certain fees are paid using a specific payment method. For example, USCIS may require that specific benefit requests be submitted via Pay.gov, a secure portal that transmits an applicant's payment information directly to the Treasury for processing. USCIS may also prevent the use of certain

---

[15] *See* 31 CFR 210.3(b)(1)(i); National Automated Clearing House Association, *2019 NACHA Operating Rules & Guidelines: The Guide to the Rules Governing the ACH Network*, Subsection 2.5.13.3 (limiting redepositing a check to those that are returned due to "Not Sufficient Funds," "NSF," "Uncollected Funds," or comparable).

payment types such as cashier's check and money orders for particular forms or when payments are made at certain offices.

DHS is also clarifying that fees are non-refundable regardless of the result of the request or how much time the request requires to be adjudicated. As provided in 8 CFR 103.2(a)(1), USCIS filing fees generally are non-refundable and must be paid when the benefit request is filed. Finally, DHS proposes to clarify that fees paid to USCIS using a credit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

**Affected Population**

USCIS allows credit card payments through the secure Pay.gov portal. Payments go to the Treasury account for processing, and the data are from their financial management system. U.S. Immigration and Customs Enforcement (ICE) processes the credit card transactions on behalf of USCIS using a different financial system. Due to data limitations and access permissions from the Treasury financial management system, DHS was only able to obtain data for fiscal year (FY) 2018 through FY 2020. Only the N-400 permitted a credit card from FY 2014 through FY 2018. USCIS has recently expanded acceptance of credit cards for the payment of USCIS fees.[16]

---

[16] *See* USCIS, "USCIS Expands Credit Card Payment Pilot Program to California Service Center", available at https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-california-service-center (last viewed on September 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Vermont Service Center", available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-vermont-service-center* (last viewed on September 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Form I-140 When Requesting Premium Processing", available at *https://www.uscis.gov/news/alerts/uscis-expands-credit-card-payment-pilot-program-to-form-i-140-when-*

Table 4 shows the total estimated population of individuals who paid using credit card from FY 2018 through FY 2020. DHS estimated this population based on receipts of credit card transactions accepted from fees in each fiscal year. From FY 2018 through FY 2020, the annual number of credit card transactions, amount of fees collected, and chargebacks all increased. As a result of the greater number of transactions in FY 2020, USCIS also had a greater number of credit card chargebacks (successful disputes by applicants and petitioners filed with credit card companies challenging the retention of the fee by USCIS).

| Table 4. Estimated Number of Credit Card Transactions, for payment of Form fees, for Fiscal Years 2018 through 2020 | | | | |
|---|---|---|---|---|
| Fiscal Year | Number of Credit Card Transactions | Amount of Credit Card Payments | Credit Card Chargebacks to Applicant/Petitioner | Amount of Credit Card Chargebacks to Applicant/Petitioner |
| 2018 | 822,477 | $415,886,222 | 720 | $392,549 |
| 2019 | 1,122,029 | $613,266,755 | 898 | $535,749 |
| 2020 | 1,503,667 | $835,011,608 | 1,298 | $710,561 |
| **3-year Total** | **3,448,173** | **$1,864,164,585** | **2,916** | **$1,638,859** |
| **3-year Annual Average** | **1,149,391** | **$621,388,195** | **972** | **$546,286** |
| Source: Department of Homeland Security, Financial Operations Branch, CIR System, May 5, 2021. | | | | |

**Cost-Benefit-Transfer Payments Analysis**

Disputes are generally filed by requestors whose request was denied, who have changed their minds about the request, or assert that the service was not provided or unreasonably delayed. USCIS loses many of these disputes and has to return the money back to the applicant/petitioner. Table 4 estimates that $546,286 is the annual average amount USCIS is

---

*requesting-premium-processing* (last viewed on September 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Texas Service Center", available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-texas-service-center* (last viewed on September 22, 2022)

refunding to the applicant's/petitioner's credit card, due to customer disputes, stop payments, or service-related matters. Because the credit card companies agree with the cardholder and have determined that USCIS fails to adequately warn the cardholder that the fee is not refundable regardless of the result or time required, DHS is providing in this rulemaking that USCIS fees must be paid when the request is filed or submitted, and they are non-refundable whether or not the benefit request or other service is approved, denied, or selected, or how much time the adjudication or processing requires.

This rule proposes to prevent a bank that issues the credit card from cancelling the payment of the fee to USCIS.  Should the bank do so regardless of the prohibition, USCIS will invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fee in accordance with 31 CFR parts 900 through 904 (Federal Claims Collection Standards). Clarifying that fees are due regardless of the result or how long the decision takes, and that USCIS fees paid by credit card are not subject to credit card disputes would result in USCIS losing less fee revenue from requests that falsely claim they are due a refund and result in less of a need to pursue collections.

Overall, clarifying dishonored fee check re-presentment and non-refundability policies, limiting the age of checks to be presented, limiting payment options and precluding credit card disputes would reduce administrative burdens, fee processing errors, and lost revenue for USCIS. They would also result in transfer payments from applicants/petitioners to the government of approximately $546,286 (annual average amount USCIS refunds to applicants/petitioners) due to customer disputes, stop payments, or service-related matters. USCIS would also now be able to

retain the fees for adjudicative services provided, which is included in the amount USCIS refunds to applicants/petitioners credit cards, $546,286.

### B. Eliminate $30 Returned Check Fee

**Changes**

Currently, USCIS charges a $30 returned check fee if a check or other financial instrument used to pay a USCIS fee is returned as unpayable. USCIS then rejects the associated benefit request as improperly filed.[17] In this proposed rule, USCIS is eliminating the $30 charge for dishonored payments because the cost of collecting the $30 fee outweighs the benefits to the government derived from collecting the fee. *See* 8 CFR 103.7(a)(2)(i) (Oct. 1, 2020). For example, in FY 2016, USCIS collected a total of $416,541 from the $30 returned check fee while the financial service provider billed $508,770 to collect the $30 fee. In FY 2020, USCIS recovered only $199,829 from the returned check fee. USCIS will continue to reject dishonored payments and the associated benefit requests for nonpayment. However, no fees will be imposed to applicants/petitioners for dishonored payments.

**Affected Population**

DHS used historical data from FY 2016 through FY 2020 to calculate the average total returned payments for FY 2016 through FY 2020 (see Table 5). DHS estimates that an annual average of 11,879 payments are returned each year.

| Table 5. Estimated Number of Returned Credit Card or Check Payments, for Fiscal Years 2016 through 2020 |
| --- |

---

[17] *See* USCIS, "Filing Fees", available at *https://www.uscis.gov/forms/paying-uscis-fees.* *(last viewed on September 22, 2022).*

| Fiscal Year | Number of Returned Payments |
|---|---|
| 2016 | 12,201 |
| 2017 | 13,001 |
| 2018 | 9,632 |
| 2019 | 11,939 |
| 2020 | 12,622 |
| **5- year Total** | **59,395** |
| **5-year Annual Average** | **11,879** |
| Source: Department of Homeland Security, Financial Operations Branch, CIR System, April 2021. | |

**Cost-Benefit-Transfer Payments Analysis**

DHS estimates that this provision will result in cost savings for applicants since there will no longer be a $30 charge for rejected benefit requests due to returned checks.[18] Using the estimated average number of returned payments subject to the $30 service charge of 11,879, DHS estimates the annual cost savings to applicants/petitioners would be $356,370.[19]

This provision will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. This expense would no longer be necessary with this change.DHS estimates that USCIS spends at least $356,370 to recover fees, based on the average amount of fees recovered.[20] This estimate is understated as USCIS spends more to collect the $30 returned payment fees than it receives in fees. DHS recognizes that

---

[18] DHS resubmits payments one time after a check or financial instrument is first returned as unpayable to counter the possibility of processing errors from financial institutions. DHS recognizes the number of returned payments may include multiple payments that were submitted by the same applicant. DHS assumes the number of returned payments is a reasonable estimate of the affected population.

[19] Calculation: 11,879 (Estimated average annual number of returned payments) x $30 (Returned payment fee) = $356,370 annual cost of returned payment fees.

[20] Ibid. p. 48

removing the $30 charge may increase the number of applicants who file an application with an incorrect fee because the $30 charge could be a deterrent. However, DHS does not think that this deterrent outweighs the administrative costs to USCIS of charging and collecting this fee.

DHS welcomes public comments on the anticipated costs to applicants or the government as a result of eliminating the $30 returned check fee for dishonored payments. In addition, DHS welcomes public comments on the anticipated cost savings to applicants or the government as a result of eliminating the $30 returned payments fee in this proposed provision.

### C. Changes to Biometric Services Fee

1. Incorporating Biometric Activities into Immigration Benefit Request Fees

2. Retaining a Separate Biometric Services Fee for Temporary Protective Status (TPS)

3. Retaining a Separate Biometric Services Fee for Executive Office for Immigration Review (EOIR)

**Changes**

In previous fee rules, USCIS evaluated the biometric activity cost as a single biometric service fee separate from the underlying application, petition, or request. Currently, a separate $85 biometric services fee may apply depending on the immigration benefit request or other circumstances.[21] In this proposed rule, DHS intends to incorporate the biometric services cost

---

[21] For a quick reference of the immigration benefit requests that currently require a biometric services fee with the initial submission, see USCIS, Form G-1055, *Fee Schedule*, available at https://www.uscis.gov/g-1055 (last viewed on September 22, 2022).

into the underlying immigration benefit request fees for which biometric services are applicable. The cost to provide biometric services is not a fixed cost across all immigration benefit requests so modifying this cost to each benefit type allows USCIS to recover full cost of providing such services. This is in line with the ABC methodology USCIS uses. This proposed provision would eliminate separate payments of the biometric services fee paid with certain immigration benefit requests.[22]

DHS proposes to retain a separate biometric services fee for TPS and intends to charge $30 for TPS initial applications and re-registrations. While the TPS registration fee is capped at $50 for initial TPS applicants and $0 for re-registrants (*see* INA sec. 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B)), DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b. USCIS based the proposed $30 biometric services fee on the direct costs of collecting, storing, and using biometric information. This proposed fee is less than the current $85 biometric services fee because the existing fee includes the recovery of indirect costs.

DHS also proposes to keep the current requirement that applicants filing certain requests with EOIR submit a biometric services fee. This fee is necessary to recover the costs USCIS incurs from handling parts of biometrics collection and conducting background security checks for individuals in immigration proceedings. Therefore, USCIS is amending the current biometric

---

[22] See section VIII E of the preamble of the NPRM for the list of forms associated with TPS and EOIR applicants as well as more detail on retaining separate biometric services fees for TPS and EOIR. DHS proposes that TPS applicants or re-registrants would pay $30 for biometric services unless exempted in the applicable form instructions.

services fees of $85 and charging $30 for certain forms for which it performs intake and biometric services on behalf of EOIR.[23]

**Affected Population**

The elimination of the separate biometric services fee will impact individuals applying for immigration benefits for which biometric services are applicable.[24] To estimate this impacted population, DHS used data from FY 2016 through FY 2020 for the biometric services fee receipts accompanying the forms in Table 6. DHS estimates that the annual average number of applicants who would no longer pay a separate biometric service fee is 1,930,886.[25]

| Table 6. Annual Receipts for Fee Paying Biometric Services Applicants, for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Form | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Total | 5-Year Annual Average Receipts |
| Form I-90 | 623,416 | 109,915 | 1,665 | 169,057 | 219,732 | 1,123,785 | 224,757 |
| Form I-129CW | 89 | 11 | 46 | 25 | 8 | 179 | 36 |
| Form I-131 | 76,190 | 72,265 | 76,523 | 80,838 | 55,055 | 360,871 | 72,174 |
| Form I-485 | 468,597 | 502,449 | 475,779 | 460,142 | 451,156 | 2,358,123 | 471,625 |
| Form I-539 | 954 | 986 | 636 | 120,166 | 275,549 | 398,291 | 79,658 |
| Form I-600 | 438 | 458 | 458 | 466 | 303 | 2,123 | 425 |
| Form I-600A | 2,898 | 2,325 | 2,084 | 1,878 | 1,346 | 10,531 | 2,106 |
| Form I-601A | 33,569 | 64,171 | 60,327 | 52,351 | 52,467 | 262,885 | 52,577 |
| Form I-698 | 41 | 45 | 22 | 8 | 16 | 132 | 26 |
| Form I-751 | 128,042 | 153,015 | 167,174 | 165,224 | 142,117 | 755,572 | 151,114 |
| Form I-765 | 129,360 | 42,404 | 1,010 | 254,738 | 327,678 | 755,190 | 151,038 |
| Form I-800A | 7,060 | 6,210 | 4,938 | 3,829 | 2,720 | 24,757 | 4,951 |
| Form I-817 | 885 | 1,271 | 659 | 367 | 576 | 3,758 | 752 |
| Form I-829 | 709 | 522 | 654 | 801 | 786 | 3,472 | 694 |
| Form I-881 | 642 | 560 | 505 | 487 | 279 | 2,473 | 495 |
| Form N-400 | 733,942 | 734,773 | 623,945 | 653,740 | 845,890 | 3,592,290 | 718,458 |
| **Totals** | **2,206,832** | **1,691,380** | **1,416,425** | **1,964,117** | **2,375,678** | **9,654,432** | **1,930,886** |
| Source: USCIS, Office of Performance and Quality (OPQ), C3 Consolidated data, May 2021 | | | | | | | |

---

[23] *See* proposed 8 CFR 103.7(a)(2).

[24] For a quick reference of the immigration benefit requests that currently require biometric services with the initial submission, see USCIS, Form G-1055, "Fee Schedule," available at *https://www.uscis.gov/g-1055*.

[25] Data are unavailable for Form I-687. The first, original, statutory filing period for Form I-687 closed on May 4, 1988.  There have been several subsequent filing periods as a result of federal litigation or class actions but there is no open period or basis for which to file it currently.

The retention of a separate biometric services fee for TPS impacts all TPS applicants and re-registrants aged 14 years and older who are subject to the $85 biometric services fee, in addition to any applicable fees for Forms I-821 and I-765. In Table 7 below, DHS used data for the biometric services fee receipts for TPS and EOIR from FY 2016 through FY 2020. DHS estimates that 171,774 TPS and EOIR annual applicants who pay the $85 biometric services fee and would now pay $30.

| Table 7. Annual Receipts for TPS and EOIR applicants, for Fiscal Years 2016 through 2020 | | | |
|---|---|---|---|
| Fiscal Year | TPS | EOIR | Total |
| 2016 | 288,843 | 28,796 | 317,639 |
| 2017 | 54,668 | 26,394 | 81,062 |
| 2018 | 306,973 | 40,370 | 347,343 |
| 2019 | 5,278* | 55,916 | 61,194 |
| 2020 | 12,636* | 38,994 | 51,630 |
| 5- year Total | 668,398 | 190,470 | 858,868 |
| 5-year Annual Average | 133,680 | 38,094 | 171,774 |
| Source: USCIS, Office of Performance and Quality (OPQ), C3 Consolidated data, May 2021<br>*Due to administration policy and COVID-19. DHS is aware that the outbreak of COVID–19 will likely impact these estimates in the short run.[26] See Preamble Section (V)(B)(1) Workload Volume and Volume Projection Committee and Section (V)(C) Exclusion of Temporary or Uncertain Programs. | | | |

## Cost-Benefit-Transfer Payments Analysis

Adjusting the biometric services fee for TPS applicants and re-registrants to $30 represents a $55 reduction per filing in the biometric services fee that these individuals may pay. As a result of the $55 reduction in the biometric services fee, TPS and EOIR applicants will experience a total of $9,447,570 in reduced fees annually.[27] This represents transfer payments from the government to the fee payers as USCIS would now incur the indirect costs of providing

---

[26] On March 13, 2020, the President declared that the COVID–19 outbreak in the United States constitutes a national emergency. *See* "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak" (Mar. 13, 2020),) available at *https://www.whitehouse.gov/presidential-actions/proclamation-declaringnational-emergency.*

[27] Calculation: 171,774 annual average TPS and EOIR applicants × $55 reduction in fee = $9,447,570.

the biometric services. DHS does not anticipate that applicants or the Federal Government would incur additional costs because of this amendment.

The changes in the proposed rule would provide qualitative benefits to applicants. Incorporating the biometric services fee into the underlying benefit request filing fee would benefit applicants by simplifying the payment process. Approximately 1,930,886 applicants per year would benefit from this change. It might also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee. USCIS currently rejects a benefit request if it is received without the correct biometric services fee specified in the form instructions. USCIS does not have data on which applications were rejected upon receipt due to a missing biometric services fee. However, DHS assumes that some applications would no longer be rejected because the biometric services fee is no longer a separate requirement. Eliminating the separate payment of the biometric services fee would decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.

### D. Naturalization and Citizenship Related Forms

1. Form N-400 Fee

2. N-400 Reduced Fee

3. Military Naturalization and Certificates of Citizenship

4. Proposed Changes to Other Naturalization-Related Application and Certificate of Citizenship Application Fees

**Changes**

DHS proposes to increase the fee for Form N-400, Application for Naturalization, from $640 to $760 (19-percent increase), to recover the cost of adjudicating the Form N-400 while still promoting naturalization and integration.  DHS is keeping the reduced fee option for naturalization applicants with family incomes not exceeding 200-percent of the Federal Poverty Guidelines (FPG).[28] Currently, qualifying applicants pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. DHS intends to adjust that fee to $380 (-6-percent)[29]. To qualify for a reduced fee, the eligible applicant must submit a Form I-942, Request for Reduced Fee, along with their Form N-400. Currently, Form I-942 requires the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200-percent of the FPG. DHS proposes that the request for a reduced fee be available to any applicant who has an income under 200-percent of the FPG instead of only applicants that fall within the range of 150 to 200-percent of the FPG.

DHS is also keeping the existing statutory fee exemptions for military members and veterans who file a Form N-400, Application for Naturalization and Form N-600, Application for Certificate of Citizenship, under the military naturalization provisions. Applicants who request a hearing on a naturalization decision under INA sections 328 or 329 with respect to military service will continue to be fee exempt. Currently, USCIS does not charge a fee to military naturalization applicants because such fees are prohibited by statute. However, DoD reimburses USCIS for costs related to such applications.

---

[28]  8 CFR 103.7(b)(1)(i)(BBB)(*1*) (Oct. 1, 2020).
[29] Calculation: ($380-$405)/$405 = -6 percent

Finally, DHS proposes to increase fees to Form N-300, Application to File Declaration of Intention, Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), and Form N-470, Application to Preserve Residence for Naturalization Purposes, to cover the costs of applicants, petitioners, or requestors who are receiving a service or part of a service "without charge." Additional fee increases are being proposed for Form N-600, Application for Certificate of Citizenship, and Form N-600K, Application for Citizenship and Issuance of Certificate, to keep recovering the full cost of providing service.

**Affected Population**

Table 8 shows the receipts of naturalization and citizenship related forms for FY 2016 through FY 2020. DHS estimates that the average annual number of applicants (non-military) who would be impacted by the fee increase to Form N-400 is 912,578.[30] DHS is unable to estimate the average number of applicants with incomes under 150-percent of the FPG, who would now be eligible to request reduced fees under the proposed changes. The annual average receipts of Forms N-400 and N-600 from military members and veterans who would continue to be exempt is 6,347 and 362 respectively. The annual average number of applicants who would be impacted by the proposed changes to naturalization and citizenship related forms including Forms N-300, N-336, N-400, N-470, N-565, N-600 and N-600K is approximately 1,017,649.

---

[30] Calculation: 604,982 average N-400 paper receipts + 307,596 average N-400 online receipts = 912,578 total receipts.

**Table 8. Receipts of Naturalization Related Forms, for Fiscal Years 2016 through 2020**

| Immigration Benefit Request | 2016 | 2017 | 2018 | 2019 | 2020 | 5- Year Total | 5-Year Annual Average |
|---|---|---|---|---|---|---|---|
| N-300 Application to File Declaration of Intention | 31 | 10 | 20 | 33 | 17 | **111** | **22** |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Paper filing) | 4,191 | 1,347 | 9,191 | 5,268 | 3,853 | **23,850** | **4,770** |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (online filing) | *674* | *218* | *1,484* | *850* | *1,392* | **4,618** | **924** |
| N-400 Application for Naturalization *(Military)* | 8,677 | 11,199 | 3,172 | 3,598 | 5,087 | **31,733** | **6,347** |
| N-400 Application for Naturalization *(All other paper filing)* | 689,329 | 697,045 | 620,520 | 530,320 | 487,694 | **3,024,908** | **604,982** |
| N-400 Application for Naturalization *(All other online filing)* | *274,147* | *278,168* | *213,731* | *296,959* | *474,974* | **1,537,979** | **307,596** |
| N-470 Application to Preserve Residence for Naturalization Purposes | 202 | 200 | 172 | 163 | 101 | **838** | **168** |
| N-565 Application for Replacement Naturalization/ Citizenship Document (paper filing) | 19,872 | 19,684 | 17,475 | 20,099 | 13,017 | **90,147** | **18,029** |
| N-565 Application for Replacement Naturalization/ Citizenship Document (online filing) | *7,614* | *7,542* | *6,695* | *7,701* | *11,960* | **41,512** | **8,302** |
| N-600 Application for Certificate of Citizenship *(Military)* | N/A | N/A | N/A | 333 | 390 | **723** | **362*** |
| N-600 Application for Certificate of Citizenship *(All other online)* | *7,067* | *6,756* | *5,180* | *5,574* | *12,926* | **37,503** | **7,501** |
| N-600 Application for Certificate of Citizenship *(All other paper)* | 67,303 | 64,340 | 49,331 | 53,087 | 37,861 | **271,922** | **54,384** |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | *574* | *494* | *544* | *621* | 932 | **3,165** | **633** |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | 3,932 | 3,383 | 3,728 | 4,254 | 2,849 | **18,146** | **3,629** |
| **Totals** | | | | | | **5,087,155** | **1,017,649** |

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), C3 Consolidated, National Performance Report and PASEXEC, April 20, 2021.

*Calculations are done for only the last 2 years due to limited data for previous years.

If applicants believe they are eligible for a reduced fee, they may file Form I-942 with their Form N-400. Table 9 shows that the total number of reduced fee requests received from FY 2016 through FY 2020 was 20,020. On average, DHS estimates the annual number of requests for a reduced Form N-400 fee is 5,005, including an annual average of 4,129 that are accepted each year.

| Table 9. Form I-942, Request for Reduced Fee for Form N-400, Application for Naturalization, for Fiscal Years 2017 through 2020 | | | |
|---|---|---|---|
| **Fiscal Year** | **Accepted** | **Rejected** | **Total** |
| 2017 | 3,624 | 733 | 4,357 |
| 2018 | 4,688 | 1,060 | 5,748 |
| 2019 | 4,700 | 879 | 5,579 |
| 2020 | 3,504 | 832 | 4,336 |
| **4- year Total** | **16,516** | **3,504** | **20,020** |
| **4-year Annual Average** | **4,129** | **876** | **5,005** |
| Source: USCIS, Office of the Chief Financial Officer (OCFO), August 2, 2021. | | | |

DHS is proposing that an applicant for naturalization who has an income under 200-percent of the FPG can request a reduced fee. This will increase the population eligible to apply for a reduced fee. However, DHS is unable to quantify the number of applicants with incomes under 150-percent of the FPG who would now benefit from reduced fees and would now apply to USCIS to request a reduced fee. DHS requests comments from the public on estimating the new population who would be impacted by this proposed rule.

**Cost-Benefit-Transfer Payments Analysis**

DHS is proposing to increase fees to the following naturalization and citizenship related forms: Forms N-300, N-336, N-400, N-470, N-600 and N-600K. This would result in annual

transfer payments from the fee-paying applicants to the government of $47,214,050 and transfer payments from DoD to USCIS of $222,145 for N-400 (military only) reimbursements (see Table 10). The current fees for Form N-400 ($640) and biometric services ($85) total $725 per military naturalization. USCIS estimates that there is an annual average of 6,347 military naturalizations per year. The baseline costs for this population are $4,601,575 each year. Therefore, the proposed fee of $760 to the Form N-400 (which includes the cost of biometric services) would increase the reimbursable agreement between DHS and DoD by approximately $222,145. This 5-percent increase is the estimated annual transfer payments from DoD to USCIS. The transfer payments this provision would create is the difference between the current fees (baseline fees) and the new proposed fees to file Form N-400.

| Table 10. Economic Impacts of Fee Adjustments to Naturalization and Citizenship Related Forms | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | **5-Year Annual Average** *(A)* | **Baseline Fees** *(B)* | **Proposed Fees** *(C)* | **Difference per Form** *D = C-B* | **Transfer Payments** *E = D×A* |
| N-300 Application to File Declaration of Intention | 22 | $270 | $320 | $50 | $1,100 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) (paper filing) | 4,770 | $700 | $830 | $130 | $620,100 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) (online filing) | 924 | $700 | $830 | $130 | $120,120 |
| N-400 Application for Naturalization (Military) | 6,347 | $725* | $760 | $35 | $222,145 |
| N-400 Application for Naturalization (All other, paper filing) | 604,982 | $725* | $760 | $35 | $21,174,370 |
| N-400 Application for Naturalization (All other, online filing) | 307,596 | $725 | $760 | $35 | $10,765,860 |

| Table 10. Economic Impacts of Fee Adjustments to Naturalization and Citizenship Related Forms | | | | | |
|---|---|---|---|---|---|
| **Immigration Benefit Request** | **5-Year Annual Average** *(A)* | **Baseline Fees** *(B)* | **Proposed Fees** *(C)* | **Difference per Form** *D = C-B* | **Transfer Payments** *E = D×A* |
| N-470 Application to Preserve Residence for Naturalization Purposes | 168 | $355 | $420 | $65 | $10,920 |
| N-565 Application for Replacement Naturalization/ Citizenship Document (paper filing) | 18,029 | $555 | $555 | $0 | $0 |
| N-565 Application for Replacement Naturalization/ Citizenship Document (online filing) | 8,302 | $555 | $555 | $0 | $0 |
| N-600 Application for Certificate of Citizenship (Military) | 362 | $1,170 | $1,385 | $215 | $77,830 |
| N-600 Application for Certificate of Citizenship (All other paper filing) | 54,384 | $1,170 | $1,385 | $215 | $11,692,560 |
| N-600 Application for Certificate of Citizenship (All other, online filing) | 7,501 | $1,170 | $1,385 | $215 | $1,612,715 |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 (paper filing) | 3,629 | $1,170 | $1,385 | $215 | $780,235 |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 (online filing) | 633 | $1,170 | $1,385 | $215 | $136,095 |
| **Grand Total** | | | | | **$47,214,050** |
| **Total** (excludes Form N-400 for military) | | | | | **$46,991,905** |
| Source: USCIS Analysis<br><br>Note: * Includes $85 biometric services fee | | | | | |

The proposal to expand the range of applicants who would be eligible to request reduced fees would benefit qualified applicants. However, DHS is unable to quantify the number of applicants with incomes under 150-percent of the FPG who would now benefit from reduced fees and would now apply to USCIS to request a reduced fee. DHS anticipates that expanding

the population of applicants using Form I-942 would increase the administrative burden on the agency to process these forms.

Currently, applicants who file Form I-942 with their Form N-400 pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. DHS intends to reduce fees by 6-percent to $380.[31] Using the average annual number of approved reduced fee requests of 4,129, DHS estimates the current annual filing fee costs for Form N-400 with a reduced fee is approximately $1,672,245 annually (baseline costs) and the proposed filing fee costs would be $1,569,020 annually.[32] DHS estimates that the fee decrease would result in transfer payments from USCIS to Form I-942 approved applicants of $103,225 per year.[33]

DHS welcomes public comments on the impact of changing the FPG from 150 to 200-percentas well as the anticipated costs or other results of the naturalization and citizenship related forms.

### E. Fees for Online Filing

**Changes**

As stated in the proposed rule, DHS believes that transitioning to online filing for benefit requests is an important step in improving USCIS service and financial stewardship while promoting the objectives of the Government Paperwork Elimination Act[34] and the E-

---

[31] Biometric services are incorporated into the cost of the underlying immigration benefit request fees. Calculation: $380 proposed fee - $405 current fee = -$25; ($25/$405) × 100 = 6%.

[32] Calculation: 4,129 approved reduced fee requests × $405 current fee = $1,672,245 (baseline costs) 4,129 approved reduced fee requests × $380 proposed fee = $1,569,020 (proposed costs).

[33] $1,569,020 proposed costs - $1,672,245 baseline costs = ($103,225) transfer payments from USCIS to approved Form I-942 applicants.

[34] *See* Pub. L. 105–227, 112 Stat. 2681 (Oct. 21, 1998).

Government Act.[35]  In recognition of cost savings to the agency from online filing of immigration benefit requests for which both paper and online filing options are available, DHS intends to introduce commensurately lower fees for online filing. USCIS modified its ABC model to distinguish between paper and online filing costs when both options exist for an immigration benefit request. As a result, USCIS was able to calculate the fee-paying unit cost for paper filing and online filing separately. Online filing is available for the following forms:

- Form I-90, Application to Replace Permanent Resident Card
- Form I-130, Petition for Alien Relative
- Form I-539, Application to Extend/Change Nonimmigrant Status
- Form I-765, Application for Employment Authorization
- Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)
- Form N-400, Application for Naturalization
- Form N-565, Application for Replacement Naturalization/Citizenship Document
- Form N-600, Application for Certificate of Citizenship
- Form N-600K, Application for Citizenship and Issuance of Certificate Under Section 322
- Form G-1041, Genealogy Index Search Request[36]
- Form G-1041A, Genealogy Records Request[37]

USCIS does not require that immigration benefit requests be filed online and filing on paper remains a valid option.[38]

---

[35] *See* Pub. L. 107–347, 116 Stat. 2899 (Dec. 17, 2002).
[36] Form G-1041 Genealogy Index Search Request can only be filed through the online portal available at https://www.uscis.gov/records/genealogy  (last viewed August 3, 2021).
[37] *Ibid.* Footnote for G-1041A Genealogy Records Request.
[38] CBP accepts USCIS Forms I-192 and I-212 online. Electronic Secured Adjudication Forms Environment (e-SAFE), available at *https://www.cbp.gov/travel/international-visitors/e-safe* last viewed on September 22, 2022.

While USCIS has embraced technology in adjudication and recordkeeping, it remains bound to the significant administrative and operational burdens associated with paper submissions. The intake, storage, and handling of paper require tremendous operational resources, and the information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. Technological advances have allowed USCIS to develop accessible, digital alternatives to traditional paper methods for handling requests. As various online functions are developed, USCIS makes them available to the public, providing the option of engaging with USCIS either online or on paper.   USCIS will further evaluate the effects of these changes in future biennial fee reviews. For example, if the level of online filing increases or more benefit requests become available for online filing, then USCIS will incorporate that information into future fee reviews.

**Affected Population**

Table 11 shows the annual volume of forms from FY 2016 through FY 2020 for paper and online filing, 5-year average volumes, and the percentage of forms filed online. For the analysis in this proposed rule, DHS uses the average volume of online and paper filings and the fees associated with each form. DHS estimates that the annual average population who could file online is 4,904,058. Currently, approximately 14-percent of this population file their applications online.

| Table 11. USCIS Total Volume of Electronically Available Forms Filed and Percentage Filed Online, for Fiscal Years 2016 through 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Form | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Total | 5-Year Annual Average | Percentage Filed Online |
| I-90 (all) | 751,357 | 782,967 | 701,210 | 724,553 | 699,591 | 3,659,678 | 731,936 | |
| I-90 (online) | 347,127 | 361,731 | 323,959 | 334,743 | 395,657 | 1,763,217 | 352,643 | 48.18% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **I-130 (all)*** | 869,292 | 914,484 | 835,972 | 748,664 | 712,044 | 4,080,456 | 816,091 | N/A |
| **I-539 (all)*** | 214,785 | 233,430 | 230,975 | 221,566 | 442,808 | 1,343,564 | 268,713 | N/A |
| **I-765 (all)*** | 2,111,906 | 2,326,431 | 1,751,225 | 2,189,243 | 1,969,954 | 10,348,759 | 2,069,752 | N/A |
| **N-336 (all)** | 4,851 | 1,566 | 10,675 | 6,118 | 5,245 | 28,455 | 5,691 | |
| *N-336 (online)* | *674* | *218* | *1,484* | *850* | *1,392* | *4,618* | *924* | 16.23% |
| **N-400 (all)** | 972,153 | 986,412 | 837,423 | 830,877 | 967,755 | 4,594,620 | 918,924 | |
| *N-400 (online)* | *274,147* | *278,168* | *213,731* | *296,959* | *474,974* | *1,537,979* | *307,596* | 21.45% |
| **N-565 (all)** | 27,486 | 27,226 | 24,170 | 27,800 | 24,997 | 131,679 | 26,336 | |
| *N-565 (online)* | *7,614* | *7,542* | *6,695* | *7,701* | *11,960* | *41,512* | *8,302* | 31.53% |
| **N-600 (all)** | 67,303 | 64,340 | 49,331 | 53,087 | 37,861 | 271,922 | 54,384 | |
| *N-600 (online)* | *7,067* | *6,756* | *5,180* | *5,574* | *12,926* | *37,503* | *7,501* | 13.79% |
| **N-600K (all)** | 3,932 | 3,383 | 3,728 | 4,254 | 2,849 | 18,146 | 3,629 | |
| *N-600K (online)* | *574* | *494* | *544* | *621* | *932* | *3,165* | *633* | 17.44% |
| **G-1041 (all)** | 5,513 | 3,310 | 3,830 | 5,513 | 8,082 | 26,248 | 5,250 | |
| *G-1041 (online)* | *5,192* | *3,036* | *3,602* | *5,295* | *7,764* | *24,889* | *4,978* | 94.82% |
| **G-1041A(all)** | 2,510 | 2,626 | 2,943 | 3,440 | 5,239 | 16,758 | 3,352 | |
| *G-1041A (online)* | *2,220* | *2,262* | *2,645* | *3,407* | *4,895* | *15,429* | *3,086* | 92.07% |
| ***Sub-Total (Online)*** | | | | | | *3,428,312* | *685,663*** | 13.98% |
| **Grand Total** | **5,031,088** | **5,346,175** | **4,451,482** | **4,815,115** | **4,876,425** | **24,520,285** | **4,904,058** | |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD) Computer-Linked Application Information Management System (CLAIMS) 3 database, and Electronic Immigration System (ELIS) Database, April 2021.

Notes:
*USCIS does not have historical online data for these particular forms.
**Data in italics are for online only and not included in grand total.

## Cost-Benefit-Transfer Payments Analysis

DHS is proposing to adjust fees for electronically filed forms and make them lower than equivalent paper-submitted forms. The 5-year annual average online filings of Form I-90 is used to calculate the estimated impacts of this change. For Forms I-130, I-539 and I-765 that have no historical data for online filing, DHS uses the projected online fee-paying receipts in the fee schedule model to estimate the number of applicants/petitioners who would file online.

Due to the overlapping of some provisions, DHS only captures the economic impacts of the fee adjustments for the online filing of Forms I-90, I-130, I-539, and I-765 in this section. The economic impacts of the proposed fees for both online and paper filings have been captured separately in the analysis of Forms N-336, N-400, N-565, N-600, and N-600K[39] and in the analysis for G-1041 and G-1041A[40]. In Table 13, DHS estimates that USCIS would collect approximately $52,954,120 in additional revenue based on the proposed fee adjustments to Forms I-130, I-539 and I-765. This amount represents the annual transfer payments from online filers to USCIS.

Table 13 also shows that applicants filing Form I-90 online would save approximately $29,974,655 per year.   The societal cost savings would come about if more people opted to apply online as a result of the fee differential between online and paper that is introduced in this proposed rule.. Currently, applicants who file Form I-90 pay a fee of $455 plus an additional $85 for biometric services, for a total of $540. DHS intends to adjust fees to $455 inclusive of the biometric service fee, which would result in a reduction in fees of $85 per applicant.[41]

| Table 12. Economic Impacts of Fee Adjustments to Online Filing Forms | | | | | |
|---|---|---|---|---|---|
| Online Forms | Estimated Average Population of Online Filers (A) | Current Fees (B) | Proposed Online Fees (C) | Fee Difference D = C - B | Transfer Payment E = D×A |
| I-90 | 352,643 | $540* | $455 | -$85 | -$29,974,655 |
|  |  |  |  |  |  |
| I-130** | 214,232 | $535 | $710 | $175 | $37,490,600 |
| I-539** | 185,912 | $455* | $525 | $70 | $13,013,840 |
| I-765** | 40,828 | $495* | $555 | $60 | $2,449,680 |
| Sub-Total | 793,615 |  |  |  | $52,954,120 |

[39] *See* Section D of this analysis

[40] *See* Section L of this analysis

[41] Calculation: $540 in total current fees - $455 proposed fees = $85 cost savings per applicant.

| Net Transfer Payment | | | | | $22,979,465 |
|---|---|---|---|---|---|
| Source: USCIS Analysis<br><br> *Current fees (baseline costs) include $85 biometric services fee<br> **These forms use the projected online fee receipts in the fee schedule; Source: USCIS, Office of the Chief Financial Officer, July 2021. | | | | | |

USCIS intends to make online filing available voluntarily for additional forms as DHS shifts to a more electronic immigration system for increased efficiency. This would provide many benefits to applicants/petitioners. By encouraging online filing, DHS allows requestors to:

• Engage in interactive information collection where the system maximizes the quality and completeness of the request by prompting users to fill in missing data fields and informing them about what data and supporting documents may be necessary, based on the benefit sought. This could reduce the instances of rejection due to filing deficiencies or missing information, reducing the need for requests for evidence or additional clarifying information from USCIS, resulting in saving a requestor's time and resources.

• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records would not be physically moved around to different adjudication offices.

• Increase access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities.

• Enhance data integrity, as requestors enter their information directly into the USCIS system, minimizing data entry errors when manually transferring or converting

paper requests into electronic format. Avoiding errors saves time and money as delays and other processing interruptions associated with errors are eliminated.

- Facilitate electronic processing and adjudications, which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases. Results in more accurately prepared and supported requests accompanied by necessary evidence and documentation. Reduces the need for USCIS to request additional data, clarifying information, or documents.

- Reduce the collection of unnecessary or duplicative information as the system guides requestors to provide responses that comply with requirements and instructions that are pertinent to their benefit requests.

### F. Form I-485, Application to Register Permanent Residence or Adjust Status

1. Interim Benefits

2. Form I-485 Fee for Child Under 14, Filing with Parent

**Changes**

DHS is proposing separate filing fees for applicants filing Form I-765, Application for Employment Authorization, and Form I-131, Application for Travel Documentation concurrently with Form I-485, Application to Register Permanent Residence or Adjust Status or after USCIS accepts their Form I-485 and while it is still pending.[42] Form I-485 is used to apply for lawful permanent resident (LPR) status in the United States. An applicant typically needs approval of a

---

[42] Form I-765, Application for Employment Authorization; Form I-131, Application for Travel Document Form I-485, Application to Register Permanent Residence or Adjust Status.

primary immigration benefit request before receiving secondary benefits such as employment authorization and a travel document. These secondary benefits are allowed at the same time or after the primary immigration status or benefit. In some situations, an individual may qualify for a temporary secondary benefit when a benefit request is pending adjudication. For example, a person who applies for adjustment of status (primary benefit), in certain instances, would be able to apply for employment authorization and/or a travel document (secondary benefits) based on the pending immigration benefit request. *See* proposed 8 CFR 274a.12(c)(9). When this occurs, these secondary benefits are generally referred to as "interim benefits."[43] Currently, an individual filing Form I-485 may file a Form I-765 to request employment authorization and/or a Form I-131 to apply for advance parole without paying any additional filing fees. DHS proposes to return to charging separate fees for Forms I-485, I-765, and I-131. Finally, DHS proposes to increase the current fee of Form I-485 from $1,140 to $1,540.

There are currently two fees for Form I-485: $1,140 for an adult and $750 for a child under the age of 14 concurrently filing with a parent. DHS is proposing that all applicants, including children under the age of 14 years concurrently filing Form I-485 with a parent, pay the proposed $1,540 fee. DHS does not have evidence that there is a cost basis for the two different fees, because USCIS does not track the adjudication time for Form I-485 based on the age of the applicant.

**Affected Population**

---

[43] Individuals may also derive interim benefits from an Application for Temporary Protected Status, Form I-821. Unless otherwise stated in the proposed rule preamble, DHS uses interim benefits to refer to benefits associated with Form I-485, Application to Register Permanent Residence or Adjust Status.

The population affected by this provision includes individuals that submit Form I-765 and/or Form I-131 concurrently with Form I-485 or after a Form I-485 is filed and is pending. DHS estimates that the average annual population of applicants seeking to register permanent residence or adjust status to become LPRs of the United States with interim benefits (employment authorization and/or advance parole) is 479,020. The estimation of affected population is based on the total number of Form I-485 applications that were filed with Forms I-131 and/or I-765 for FY 2016 through FY 2020 or filed in conjunction with a pending Form I-485. (see Table 13). In addition, DHS estimates that an average of 26,906 applicants file Form I-131 with Form I-485 and an average of 202,951 applicants file Form I-765 with Form I-485, or while it is pending.

| **Table 13. Annual Receipts When Filing Form I-765 and/or Form I-131 Concurrently with Form I-485 or After a Form I-485 is Filed and is Pending, for Fiscal Years 2016 through 2020** | | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year** | **Form I-485, Filed with both Forms I-765 and I-131** | **Form I-485, Filed with Form I-131** | **Form I-485, Filed with Form I-765** | **Total Form I-485, Filed with Forms I-765 and/or I-131** | **Form I-485 (No Interim Benefits)** | **Total Forms I-485 Filed** |
| 2016 | 240,989 | 27,217 | 214,932 | 483,138 | 120,866 | 604,004 |
| 2017 | 264,954 | 26,365 | 220,401 | 511,720 | 126,972 | 638,692 |
| 2018 | 255,025 | 21,519 | 194,800 | 471,344 | 56,761 | 528,105 |
| 2019 | 249,188 | 13,244 | 175,965 | 438,397 | 29,775 | 468,172 |
| 2020 | 235,661 | 46,184 | 208,656 | 490,501 | 28,496 | 518,997 |
| **5 – year Total** | **1,245,817** | **134,529** | **1,014,754** | **2,395,100** | **362,870** | **2,757,970** |
| **5-year Annual Average** | **249,163** | **26,906** | **202,951** | **479,020** | **72,574** | **551,594** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, May 5, 2021. | | | | | | |
| Notes:<br>Form I-765, Application for Employment Authorization,<br>Form I-131, Application for Travel Document,<br>Form I-485, Application to Register Permanent Residence or Adjust Status | | | | | | |

DHS estimates that the 5-year average annual population of children under the age of 14 years concurrently filing Form I-485 with a parent is 24,480. This is approximately 4 percent of the 5-year annual average of Form I-485 applications filed.[44] This is based on the annual number of applications of children under the age of 14 years concurrently filing Form I-485 with a parent, from FY 2016 through FY 2020.

| Table 14. Annual Receipts of Applicants under the age of 14 years Filing Form I-485 with a Parent, for Fiscal Years 2016 through 2020 | |
| --- | --- |
| **Fiscal Year** | **Applicant under the age of 14 years filing Form I-485 with a parent** |
| 2016 | 14 |
| 2017 | 23,658 |
| 2018 | 33,126 |
| 2019 | 26,437 |
| 2020 | 39,166 |
| **5-year Total** | **122,401** |
| **5-year Annual Average** | **24,480** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, May 5, 2021. | |

## Cost-Benefit-Transfer Payments Analysis

The proposed rule requires separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. For the impacted population, this would increase the amount of fees to attain the interim benefits as separate fees would be charged for Forms I-485, I-765, and I-131. Currently, separates fee are not required for Form I-765 and Form I-131 when filed concurrently with Form

---

[44] Calculation: (24,480 children under the age of 14 years concurrently filing Form I-485 with a parent / 551,594 Total Forms I-485 Filed) × 100 = 4-percent.

I-485 and while it is still pending. USCIS incurs the additional adjudication costs for these interim benefits. DHS believes that a single fee for Form I-485 would reduce the burden of administering separate fees and better reflect the cost of adjudication.

Table 15 presents the baseline costs (current fees) as well as the proposed costs. The difference between the two costs are the additional fees that would be imposed on the affected populations. The baseline costs of $1,225 for all impacted populations consist of the filing fee for Form I-485 of $1,140 plus the $85 biometric services fee. DHS is increasing the filing fee to apply for adjustment of status using Form I-485 from $1,140 to $1,540, an increase of $400 (approximately 35-percent). This increase in the Form I-485 fee would result in approximately $22,860,810 in transfer payments annually from applicants filing I-485 only (no interim benefits) to the government.

The proposed fees are $630 for Form I-131, $650 for paper filing of Form I-765 and $555 for online filing of I-765. In this analysis, DHS uses the average of online and paper filing fees for I-765, which is $603. DHS estimates the cost of filing Form I-485 concurrently with Forms I-765 and I-131 would be approximately $2,773 per applicant.[45] The costs of filing Form I-485 concurrently with Form I-131 would be $2,170, and the costs of filing Form I-485 concurrently with Form I-765 would be $2,143.[46] DHS estimates that requiring separate filing fees for applicants filing interim benefits concurrently with Form I-485 would result in transfer payments from applicants to USCIS of $597,439,512.

---

[45] Calculation: $1,540 (Form I-485) + $603 (Form I-765) + $630 (Form I-131) = $2,773.
[46] Calculation: $1,540 (Form I-485) + $630 (Form I-131) = $2,170 and $1,540 (Form I-485) + $603 (Form I-765) = $2,143.

**Table 15. Economic Impacts of Applicants Filing Form I-485 Only and Applicants Filing Separate Fees for Interim Benefits Concurrently with Form I-485 or After a Form I-485 is Filed and is Pending**

| Affected Population | 5-Year Annual Average (A) | Current Fees (B) | Proposed Fees (C) | Fee Difference D = C-B | Percent Change | Transfer Payments E = D×A |
|---|---|---|---|---|---|---|
| Form I-485, Filed Concurrently with Forms I-765 and I-131 | 249,163 | $1,225* | $2,773 | $1,548 | 126% | $385,704,324 |
| Form I-485, Filed Concurrently with Form I-131 | 26,906 | $1,225* | $2,170 | $945 | 77% | $25,426,170 |
| Form I-485, Concurrently Filed with Form I-765 | 202,951 | $1,225* | $2,143 | $918 | 75% | $186,309,018 |
| **Sub-Total** | **479,020** | | | | | **$597,439,512** |
| Form I-485, Only (No Interim Benefits) | 72,574 | $1,225 | $1,540 | $315 | 26% | $22,860,810 |
| **Grand Total** | **551,594** | | | | | **$620,300,322** |

Source: USCIS Analysis

Notes:
*Current fees include the Form I-485 of $1,140 plus the $85 biometric services

Individual Proposed Form Fees**: I-485** is $1,540; **I-131** is $630 and **I-765** is $603 (Average of Paper and Online fees of $650+$555)

DHS is also proposing that all applicants, including children under the age of 14 years concurrently filing Form I-485 with a parent pay the same proposed fee of $1,540. Currently, children under the age of 14 concurrently filing Form I-485 with a parent pay $750. DHS estimates that this $790 fee increase (105-percent) would result in transfer payments from applicants to USCIS of $19,339,200 (see Table 16). DHS is currently absorbing part of the adjudication costs of providing this service and this proposed change would allow DHS to fully recover those costs.

**Table 16. Economic Impacts of Same Fees for Children Under the Age of 14 years Concurrently Filing Form I-485 with a parent**

| Affected Population | 5-Year Annual | Current Fees (B) | Proposed Fees (C) | Fee Difference D=C–B | Percentage Change | Transfer Payments E=D×A |
|---|---|---|---|---|---|---|

| | Average (A) | | | | | |
|---|---|---|---|---|---|---|
| Applicant under the age of 14 years filing Form I-485 with a parent | 24,480 | $750 | $1,540 | $790 | 105% | **$19,339,200** |
| Source: USCIS Analysis | | | | | | |

In sum, the changes in this provision would result in $639,639,522 in annual transfer payments from applicants to USCIS.[47]

### G. Form I-131A, Application for Travel Document (Carrier Documentation)

### Changes

DHS is proposing to separate the fee for Form I-131A, Application for Travel Document (Carrier Documentation), from Form 1-131, Application for Travel Document. Currently, certain LPRs may use Form I-131A to apply for a travel document (carrier documentation) if their Permanent Resident Card (PRC)[48] or their reentry permit is lost, stolen, or destroyed while outside of the United States. Carrier documentation allows an airline or other transportation carrier to board the LPR without any penalty to the airline or transportation carrier for permitting an individual to board without a visa or travel document. The current filing fee for Form I-131A is $575 per applicant. There is no biometric services fee. An applicant may pay the fee from anywhere in the world. DHS intends to keep this same fee in the proposed rule. Hence, this provision creates no new costs or transfer payments. Separating Form I-131A from other travel

---

[47] Calculation: $22,860,810 *(Form I-485, Only (No Interim Benefits))* + $597,439,512 *(Separate Filing Fees for Applicants Filing Interim Benefits Concurrently with Form I-485)* + $19,339,200 *(Same Fees for Children Under the Age of 14 years Concurrently Filing Form I-485 with a parent)* = $639,639,522.
[48] Permanent Resident Card is also known as a "Green Card" or Form I-551.

documents allows USCIS to better assess the cost of providing services for this immigration benefit and propose better aligned fees in future fee reviews.

### H. Separating Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification

**Changes**

DHS proposes to charge different fees for Form I-129, Petitioner for a Nonimmigrant Worker, based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, petitioners or applicants can file petitions or applications for many different types of nonimmigrant workers. USCIS believes the proposed establishment of different fees would better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification. DHS also proposes to limit the number of named beneficiaries to 25 that may be included on a single petition for H-2A, H-2B, O,[49] H-3, P, Q and R workers. Currently, there is no limit on the number of named beneficiaries a petitioner can have on those petitions. Limiting the number of named beneficiaries simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named

---

[49] While O-1 petitions are limited to a single named beneficiary, a petition for O-2 nonimmigrant workers may include multiple named beneficiaries in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts. USCIS estimates that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers.

**Affected Population**

The population affected by this provision includes employers and other qualified filers, such as agents, sponsoring organizations and investors that use Form I-129 to petition USCIS for a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training. Employers may use Form I-129 to petition for nonimmigrant workers under the following visa classifications: CW, E, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN. See Table 17 for a description of each of these visa classifications.

| Table 17. Description of Visa Classifications for Nonimmigrant Workers Who May Have a Form I-129 Petition Filed on Their Behalf by an Employer | |
|---|---|
| **Visa Classification** | **Description of Visa Classification** |
| CW-1 | CNMI-Only transitional worker |
| E-1 | Treaty Traders and qualified employees for citizens of countries with which the United States maintains treaties of commerce and navigation. The applicant must be coming to the United States to engage in substantial trade principally between the United States and the treaty country |
| E-2 | Treaty Investor and qualified employees for citizens of countries with which the United States maintains treaties of commerce and navigation. To develop and direct the operations of an enterprise in which the applicant has invested or is in the process of investing a substantial amount of capital. |
| E-2C | CNMI-Only transitional worker; is a noncitizen who seeks to enter or remain in the Commonwealth of the Northern Mariana Islands (CNMI) in order to maintain an investment in the CNMI that was approved by the CNMI government before November 28, 2009. |
| E-3 | Certain "specialty occupation" professionals from Australia. |
| H-1B | Specialty occupation worker; a noncitizen coming to perform services of an exceptional nature that relate to a DoD-administered project; or a fashion model of distinguished merit and ability. |
| H-2A | Temporary agricultural worker. |

| H-2B | Temporary non-agricultural worker |
|------|-----------------------------------|
| H-3 | Trainees other than medical or academic. |
| L-1 | Intracompany transferees in managerial or executive positions, or in positions utilizing specialized knowledge. |
| O-1 | Persons with extraordinary ability in sciences, arts, education, business, or athletics and motion picture or TV production. |
| O-2 | Persons accompanying an O-1 nonimmigrant artist or athlete solely to assist in the artistic or athletic performance. |
| P-1 | Internationally recognized athletes, entertainers, or members of internationally recognized entertainment groups. |
| P-1S | Essential support personnel for a P-1 nonimmigrant. |
| P-2 | Individual performer or part of a group entering to perform under a reciprocal exchange program. |
| P-2S | Essential support personnel for a P-2 nonimmigrant. |
| P-3 | Artists or entertainers, either an individual or group, to perform, teach, or coach under a program that is culturally unique. |
| P-3S | Essential support personnel for a P-3 nonimmigrant. |
| Q-1 | Persons participating in an international cultural exchange program to provide practical training or employment, and to share the history, culture, and traditions of the nonimmigrant's home country. |
| R-1 | Religious workers. |
| TN | Created to implement part of a trilateral North American Free Trade Agreement (NAFTA) between Canada, Mexico, and the United States.[50] In accordance with the NAFTA, a citizen of Canada or Mexico who seeks temporary entry as a business person to engage in business activities at a professional level may be admitted to the United States |

Source: USCIS, available at *https://www.uscis.gov/working-united-states/temporary-nonimmigrant-workers* (last accessed on August 12, 2021)

To estimate the total population affected by this provision, DHS uses data from receipts of Form I-129 petitions that employers have filed on behalf of nonimmigrant workers. These receipts are categorized by worker type to estimate the affected population of this rule. Table 18 shows total receipts of Form I-129 by visa classification for FY 2016 through FY 2020. DHS estimates that 543,002 is the 5-year average annual number of Form I-129 petitions filed by

---

[50] NAFTA was replaced by the U.S.-Mexico-Canada Agreement (USMCA) which entered into force on July 1, 2020. The USMCA did not make any substantive changes to the Immigration chapter of NAFTA and retains all substantive elements of the former NAFTA including the TN designation for certain professionals.

employers. DHS proposes different fees for Form I-129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries.

In FY 2020, DHS implemented an electronic registration process for the H-1B cap-subject petitions. Prospective petitioners seeking to file H-1B cap-subject petitions, including for beneficiaries eligible for the advanced degree exemption, first must electronically register and pay the associated $10 H-1B registration fee for each beneficiary.[51]  In FY 2020, for the FY 2021 H-1B cap season, DHS received 274,237 H-1B registrations. DHS only has one year of data for registration data and estimates that 274,237 will be the average annual number of registrations filed by employers.

| Table 18. Receipts by Classification for Form I-129, Petition for a Nonimmigrant Worker, for Fiscal Years 2016 through 2020 | | | | | |
|---|---|---|---|---|---|
| **Fiscal Year** | **H-1B** *(A)* | **H-2A Named Beneficiaries** *(B)* | **H-2A – Unnamed Beneficiaries** *(C)* | **H-2B Named Beneficiaries** *(D)* | **H-2B – Unnamed Beneficiaries** *(E)* |
| 2016 | 398,803 | 2,559 | 7,704 | 3,139 | 3,414 |
| 2017 | 403,157 | 2,571 | 9,057 | 1,827 | 4,291 |
| 2018 | 418,606 | 2,878 | 10,581 | 1,720 | 4,393 |
| 2019 | 420,577 | 3,484 | 12,047 | 3,789 | 3,679 |
| 2020 | 427,272 | 4,289 | 12,758 | 2,267 | 3,157 |
| **5- year Total** | **2,068,415** | **15,781** | **52,147** | **12,742** | **18,934** |
| **5-year Annual Average** | **413,683** | **3,156** | **10,429** | **2,548** | **3,787** |
| **Percent of Total receipts** | **76.18%** | **0.58%** | **1.92%** | **0.47%** | **0.70%** |
| | | | | | |
| | | | | | |
| **Fiscal Year** | **O –** | | **L-1A / L-1B / LZ** | | |

---

[51] H-1B Electronic Registration Process located at https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process (last viewed September 22, 2022).

| | Named Beneficiaries (F) | O – Unnamed Beneficiaries (G) | (H) | H-3/P/Q/R – Named Beneficiaries (I) | H-3/P/Q/R – Unnamed Beneficiaries (J) |
|---|---|---|---|---|---|
| 2016 | 23,876 | 0 | 43,077 | 21,967 | 0 |
| 2017 | 24,294 | 0 | 44,185 | 21,512 | 0 |
| 2018 | 25,202 | 0 | 42,704 | 21,991 | 0 |
| 2019 | 26,509 | 0 | 42,695 | 23,190 | 0 |
| 2020 | 22,300 | 0 | 41,248 | 16,481 | 0 |
| **5-year Total** | **122,181** | **0** | **213,909** | **105,141** | **0** |
| **5-year Annual Average** | **24,436** | **0** | **42,782** | **21,028** | **0** |
| **Percent of Total receipts** | **4.5%** | **0.0%** | **7.88%** | **3.87%** | **0.0%** |

| **Fiscal Year** | **E / TN** (K) | **CW-1** (L) | **Total** $M = A + B + C + D + E + F + G + H + I + J + K + L$ |
|---|---|---|---|
| 2016 | 12,527 | 11,247 | **528,313** |
| 2017 | 13,052 | 6,866 | **530,812** |
| 2018 | 13,554 | 7,321 | **548,950** |
| 2019 | 11,636 | 4,234 | **551,840** |
| 2020 | 20,883 | 4,438 | **555,093** |
| **5-year Total** | **71,652** | **34,106** | **2,715,008** |
| **5-year Annual Average** | **14,330** | **6,821** | **543,002** |
| **Percent of Total receipts** | **2.64%** | **1.26%** | **100.0%** |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD)), CLAIMS 3 database, April 9, 2021.
For H-2A and H-2B classifications, any petition with at least one named beneficiary is classified as "Named." Petitions with no named beneficiaries are classified as "Unnamed."

DHS proposes to limit the number of named beneficiaries per nonimmigrant worker petition to 25 for H-2A, H-2B, H-3, O-2, P, Q, and R visa classifications. USCIS currently charges a single fee to file Form I-129 regardless of the number of beneficiaries an employer petitions for as nonimmigrant workers. Limiting the number of named beneficiaries on a petition would increase the number of petitions filed for some petitioners, and thus the fees paid. Below,

DHS demonstrates how this increase in petitions would occur when there is a limit of 25 named beneficiaries per nonimmigrant worker petition.[52] Table 20 shows the 5-year annual average from FY 2016 to FY 2020 of the petitions filed for each range of named beneficiaries listed on each petition. Table 21 shows the annual average number of petitions that would now be filed for each range of named beneficiaries listed on each petition, when there is a limit of 25 named beneficiaries per petition.

Table 19 presents the 5-year annual average receipts of Form I-129 petitions with named beneficiaries for H-2A, H-2B, O, H-3, P, Q, and R visa classifications within incremental ranges of 25 beneficiaries per petition during FY 2016 through FY 2020. For example, when considering increments of 25 beneficiaries per petition, DHS estimates the average annual number of Form I-129 petitions filed with named beneficiaries for H-2A and H-2B visa classifications was 3,159 and 2,551 petitions, respectively, over this period. Additionally, DHS estimates an average of 2,750 Form I-129 petitions with named beneficiaries under the H-2A classification are filed annually that include 1 to 25 beneficiaries per petition.

| Table 19. Current Average Annual Petitions for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications with Named Beneficiaries within Ranges, for Fiscal Years 2016 through 2020 | | |
|---|---|---|
| | **Named Beneficiaries per Petition** | |

---

[52] As noted below in Table 20, 87 percent of H-2A, 91 percent of H-2B, 99.7 percent of O named petitions and remaining named classifications request less than 25 named beneficiaries.  Limiting the number of named beneficiaries is responsive to DHS OIG's recommendations to USCIS (see H-2 Petition Fee Structure is Inequitable and Contributes to Processing Errors, OIG-17-42, Mar. 6, 2017 located at https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf, last viewed on September 22, 2022). USCIS also believes that limiting the number of named beneficiaries in a petition may help employers receive their workers sooner.  For example, if a petitioner files one petition for 50 workers, and USCIS requires additional information for 1 of the workers, the entire H-2 petition for 50 workers will be placed on hold until the petitioner responds to the request for evidence.  On the other hand, if the petitioner submits two H-2 petitions for 25 workers each, only one petition would be affected.  USCIS believes the proposed fees more accurately reflect the differing burdens of adjudication and enable USCIS to adjudicate these petitions more effectively.

| Visa Classification | 01-25 | 26-50 | 51-75 | 76-100 | 101-125 | 126-150 | 151-175 | 176-200 | 201-225 | 226-250 | 250+ | Annual Average Number of Petitions* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H-2A Named | 2,750 | 221 | 77 | 46 | 20 | 12 | 9 | 5 | 5 | 5 | 10 | **3,159** |
| | 87.0% | 7.0% | 2.4% | 1.4% | 0.6% | 0.4% | 0.3% | 0.2% | 0.2% | 0.2% | 0.3% | 100% |
| H-2B Named | 2,321 | 170 | 33 | 12 | 6 | 4 | 1 | 2 | 0 | 1 | 1 | **2,551** |
| | 91.0% | 6.7% | 1.3% | 0.5% | 0.2% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 100% |
| O Named | 24,425 | 54 | 8 | 2 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | **24,493** |
| | 99.7% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100% |
| H3 Named | 1,035 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1,038** |
| | 99.7% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100% |
| P Named | 11,354 | 156 | 31 | 19 | 12 | 8 | 2 | 2 | 2 | 4 | 2 | **11,591** |
| | 98.0% | 1.3% | 0.3% | 0.2% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100% |
| Q Named | 169 | 10 | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **189** |
| | 89.6% | 5.1% | 2.6% | 2.1% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100% |
| R Named | 8,290 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **8,290** |
| | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100% |
| **Total Number of Current Petitions** | | | | | | | | | | | | **51,311** |

Source: USCIS, Office of Policy & Strategy, Policy Research Division, CLAIMS 3 and ELIS via SAS, May 14, 2021.

*The data reflect the most up-to-date data available at the time the database is queried. This table was queried on May 14, 2021, and counts in Table 20 may differ from Table 19 (queried April 9, 2021) for H2A, H3, and P classifications due to rounding, system updates, and post-adjudicative outcomes. Receipts include only named beneficiaries.

Table 20 presents the estimated number of Form I-129 petitions with named beneficiaries under each of the visa classifications that employers would be required to file under this proposed rule. For employers requesting 1 to 25 H-2A nonimmigrants, only one petition is necessary under this change. Employers that file a petition for 26-50 named beneficiaries would be required to file two separate petitions, one for the first 25 named beneficiaries and a second petition for any remaining number of named beneficiaries up to 50.[53] As a result, for the H-2A

---

[53] Calculation: 50 H-2A nonimmigrants / 25 beneficiary limit per form = 2 required petitions.

visa classification where DHS estimates an average of 221 petitions are filed annually that include 26 to 50 beneficiaries per petition, this would increase to 442 petitions under the proposed rule.[54] DHS calculates this as 50 beneficiaries divided by the 25-beneficiary limit, and multiplies the result of 2 by the annual average from FY 2016 through 2020 of petitions reported in Table 20. DHS applies this method to the other ranges to estimate the increase in petitions employers would have to file. The proposed rule would increase the number of petitions filed annually by approximately 1,889.[55] The proposed fees are based on these additional estimated number of Form I-129 petitions employers would be required to file according to the new provision to limit named beneficiaries to 25 per petition under the H-2A, H-2B, O-2, H-3, P, Q, and R visa classifications. Currently, an employer is only required to file one Form I-129 petition for an unlimited number of named beneficiaries.

| Table 20. Proposed New Average Annual Petitions for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications with Named Beneficiaries within Ranges, for Fiscal Year 2016 through 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Named Beneficiaries per Petition** | | | | | | | | | | |
| **Visa Classification** | **01-25** | **26-50** | **51-75** | **76-100** | **101-125** | **126-150** | **151-175** | **176-200** | **201-225** | **226-250** | **250+** | **Average Annual Number Of Petitions** |
| Number of Petitions to file for each range of named beneficiaries | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | At least 11 | |
| **H-2A Named** | 2,750 | 442 | 231 | 184 | 100 | 72 | 63 | 40 | 45 | 50 | 110 | **4,087** |
| **H-2B Named** | 2,321 | 340 | 99 | 48 | 30 | 24 | 7 | 16 | 0 | 10 | 11 | **2,906** |
| **O Named** | 24,425 | 108 | 24 | 8 | 5 | 0 | 7 | 8 | 0 | 10 | 0 | **24,595** |
| **H-3 Named** | 1,035 | 6 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1,044** |
| **P Named** | 11,354 | 312 | 93 | 76 | 60 | 48 | 14 | 16 | 18 | 40 | 22 | **12,053** |

[54] Calculation: 221 petitions × 2 required petitions = 442 required petitions.
[55] Calculation: 53,200 total projected annual petitions – 51,311 total current annual petitions = 1,889 additional petitions.

| Q Named | 169 | 20 | 15 | 16 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 225 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R Named | 8,290 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,290 |
| **Total Number of Projected Petitions** | | | | | | | | | | | | **53,200** |
| Source: USCIS, Office of Policy & Strategy, Policy Research Division, CLAIMS 3 and ELIS via SAS, May 14, 2021 | | | | | | | | | | | | |

**Cost-Benefit-Transfer Payments Analysis**

DHS proposes to have different fees for Form I-129 based on the nonimmigrant classification being requested in the petition and, in some cases, according to whether the petition includes named or unnamed beneficiaries. A benefit of the different fees for the Form I-129 classifications is that it would allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification in future fee reviews. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts.

This analysis also captures the economic impacts of the proposed fees associated with filing the benefit requests for each nonimmigrant worker classification. The current fee to file Form I-129 is $460, regardless of the number of nonimmigrant workers for whom the employer is submitting a petition, the type of nonimmigrant worker they seek to employ, and whether or

not the employer identifies a specific worker.[56] With the proposed rule, DHS would adjust fees to the amounts listed in Table 21. H-1B classification cap-subject petitions will include a $215[57] registration fee, an increase of $205 from the original $10 fee. Non-cap subject petitions (e.g., extension petitions or cap-exempt filer petitions) would not have to pay the registration fee. There are no additional processing costs to DHS due to the changes in the filing fees of each specific nonimmigrant classification.

| Table 21. Current and Proposed Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications | | | | |
|---|---|---|---|---|
| Form I-129 Classification | Current Fees | Proposed Fees | Fee Difference | Percent Change |
| H-1B | $460 | $780 | $320 | 70% |
| H-1B Registration | $10 | $215 | $205 | 2050% |
| H-2A – Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| H-2B – Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| O | $460 | $1,055 | $595 | 129% |
| L-1A / L-1B / LZ | $460 | 1,385 | $925 | 201% |
| H-3/P/Q/R | $460 | $1,015 | $555 | 121% |

[56] DHS recognizes there are other fees associated with Form I-129 petitions, such as the American Competitiveness and Workforce Improvement Act fee, the fraud fee, and the Pub. L. 114-113 fee. These fees generally vary depending on the size of the petitioning entity. Therefore, DHS has not specifically included these fees in these calculations though DHS acknowledges that these fees are statutorily required and by increasing the number of petitions filed, this rule would increase the number of statutory fees that must be paid. More importantly, these fees are not included in the IEFA and DHS has no authority to adjust them.

[57] This pre-registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H-1B registration fee, for each beneficiary before being eligible to submit a registration for that beneficiary for the H-1 cap. The fee will not be refunded if the registration is not selected or is withdrawn. *See Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, Final Rule,* 84 FR 60307 (Nov. 8, 2019). Available at https://www.govinfo.gov/content/pkg/FR-2019-11-08/pdf/2019-24292.pdf (last viewed September 22, 2022).

| | | | | |
|---|---|---|---|---|
| **E / TN** | $460 | $1,015 | $555 | 121% |
| **CW** | $460 | $1,015 | $555 | 121% |
| **CW Education Funding Fee**[58] | $200 | $210 | $10 | 5% |
| Source: USCIS Analysis | | | | |

In Table 22, DHS estimates the baseline costs associated with filing Form I-129 petitions is approximately $253,886,570 and the proposed costs from the fee increases would be $526,988,485. The transfer payments would be the difference between the current filing fees (baseline) and the proposed filing fees. Therefore, the annual increase in transfer payments from Form I-129 visa classification petitions to USCIS is expected to be $273,101,915.

---

[58] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers. The proposed $10 fee adjustment is based on the annual change in the CPI-U published by BLS. The final rule will establish an amount based upon the latest published annual CPI-U before the final rule publication. See NPRM Preamble Section VIII.K.8: Commonwealth of Northern Mariana Islands Fees for further detail.

**Table 22. Economic Impacts of Separate Filing Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications**

| Form I-129 Classification | 5-Year Annual Average (historical)* (A) | 5-Year Annual Average (proposed rule)** (B) | Current Fees (C) | Proposed Fees (D) | Baseline Costs $E = A \times C$ | Proposed Costs $F = B \times D$ | Transfer Payments $G = F\text{-}E$ |
|---|---|---|---|---|---|---|---|
| H-1B | 413,683 | 413,683 | $460 | $1,150 | $190,294,180 | $322,672,740 | $132,378,560 |
| H-1B Registration*** | 274,237 | 274,237 | $10 | $215 | $2,742,370 | $58,960,955 | $56,218,585 |
| H-2A – Named Beneficiaries | 3,156 | 4,087** | $460 | $1,605 | $1,451,760 | $4,454,830 | $3,003,070 |
| H-2A – Unnamed Beneficiaries | 10,429 | 10,429 | $460 | $780 | $4,797,340 | $5,527,370 | $730,030 |
| H-2B – Named Beneficiaries | 2,548 | 2,906** | $460 | $1,595 | $1,172,080 | $3,138,480 | $1,966,400 |
| H-2B – Unnamed Beneficiaries | 3,787 | 3,787 | $460 | $855 | $1,742,020 | $2,196,460 | $454,440 |
| O | 24,436 | 24,595** | $460 | $1,555 | $11,240,560 | $25,947,725 | $14,707,165 |
| L-1A / L-1B / LZ | 42,782 | 42,782 | $460 | $2,050 | $19,679,720 | $59,253,070 | $39,573,350 |
| H-3/P/Q/R | 21,028 | 21,612** | $460 | $1,500 | $9,672,880 | $21,936,180 | $12,263,300 |
| E / TN | 14,330 | 14,330 | $460 | $1,500 | $6,591,800 | $14,544,950 | $7,953,150 |
| CW | 6,821 | 6,821 | $460 | $1,500 | $3,137,660 | $6,923,315 | $3,785,655 |
| CW Education Funding Fee | 6,821 | 6,821 | $200 | $210 | $1,364,200 | $1,432,410 | $68,210 |
| **Total** | **817,237** | **819,269** | | | **$253,886,570** | **$526,988,485** | **$273,101,915** |

Source: USCIS Analysis
Note:
* Totals are from Table 19 annual averages of the visa classifications.
**Annual averages for named beneficiaries are from Table 21.
***H-1B Registration began in FY 2020, data is based off of FY 2020 actual registrations

1. *Asylum Program Fee*

DHS is proposing a new Asylum Program Fee of $600 to be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Worker.  This new fee that may be used to fund part of the costs of administering the entire

asylum program and would be charged in addition to the fees petitioners would pay for their Form I-129 and Form I-140 benefit requests.[59]  DHS believes that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. For Form I-129 petitioners, the estimated costs of this policy would be $491,561,400 annually.[60]  For Form 1-140 petitioners, the estimated costs would be $83,323,200 annually.[61]  The annual costs of the asylum program fee to petitioners would be approximately $574,884,600.

### I. Adjustments to Premium Processing

**Changes**

Employers may use Form I-907, Request for Premium Processing Service to request faster processing of certain employment-based petitions and applications. Currently, petitioners and applicants use Form I-907 and pay the $1,500 or $2,500 fee to request 15-day processing. The 15-calendar day period begins when USCIS receives a properly filed Form I-907 at the correct filing address. USCIS then issues an approval notice, a request for evidence (where appropriate), a notice of intent to deny, a denial notice, or opens an investigation for suspected fraud or misrepresentation on the related petition or application. USCIS considers the processing

---

[59] In Section V.A.2.c of the FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements NPRM. DHS Docket No. USCIS 2021-0010, DHS estimates the costs to implement the Asylum Processing IFR would be approximately $425.9 million annually over FY 2022/2023.  DHS divided this cost estimate by the estimated fee-paying volume for Forms I-129 and I-140 to determine the $600 Asylum Program Fee. Calculation: $425,900,395 / 708,630 = $601.02. DHS rounded to the nearest $5, consistent with other proposed fees.

[60] Calculations: 5- year annual average (proposed rule) I-129 population of 819,269 (Table 23) * $600 asylum program fee = $491,561,400

[61] Calculations: 5-year annual average I-140 population of 138,872 (Table 42) * $600 asylum program fee = $83,323,200.

time met if the agency issues an approval, a request for evidence, notice of intent to deny, or a denial notice within 15 calendar days of receipt or if the case is referred for investigation of suspected fraud or misrepresentation. USCIS refunds the premium processing service fee if the agency does not take action on the related case within 15 calendar days of receiving a properly filed Form I-907. Otherwise, the filing fee is not refundable, regardless of any action USCIS takes on a request.

DHS is proposing to change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service. DHS intends to define business days as the days on which the Federal Government is open for business, which do not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons. USCIS believes that calculating premium processing timeframes in business days is appropriate because USCIS can only process petitions and applications on business days. Therefore, using calendar days results in inconsistent and varying timeframes that have resulted in operational challenges when trying to meet the current 15 calendar day timeframe to process a request for premium processing. It is costly and disruptive to continually suspend and then extend the suspension of premium processing or offer it and then fail to meet the processing time because it cannot process the petitions on weekends or Federal holidays.

DHS is proposing to permit combined payments of the premium processing service fee with the remittance of other filing fees. Currently, DHS mandates separate payments to request premium processing services.  Instead of mandating the separate payments, DHS proposes that

USCIS *may* require premium processing service fees be paid in a separate remittance from other filing fees.

**Affected Population**

USCIS currently offers premium processing to employment-based petitions including Form I-129, Petition for Nonimmigrant Worker, and Form I-140, Immigrant Petition for Alien Worker, in certain visa classifications. Table 23 shows the total Form I-907 receipts received and refunds issued by USCIS for inaction on Premium Processing requests within 15 days, for FY 2016 through FY 2020. Form I-907 refund data are presented to illustrate the increase in refunds over the years, which indicates that USCIS is struggling to meet the 15-calendar day premium processing requirement. USCIS refunds the premium processing service fee if the agency does not act on the related case within 15 calendar days of receiving a properly filed Form I-907. Based on a 5-year annual average, DHS estimates that 362,595 Form I-907 receipts are submitted to USCIS and 456 (0.13 percent) Form I-907 refunds are issued to petitioners annually.

| Table 23. Form I-907, Request for Premium Processing Service, Receipts and Refunds Issued, for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Fiscal Year** | **Form I-907 Receipts** | | | **Form I-907 Refunds** | | | |
| | **Form I-129** | **Form I-140** | **Total** | **Form I-129** | **Form I-140** | **Total** | **Percent** |
| 2016 | 312,023 | 70,834 | 382,857 | 120 | 37 | 157 | 0.04% |
| 2017* | 236,499 | 71,482 | 307,981 | 968 | 87 | 1,055 | 0.34% |
| 2018 | 292,296 | 78,206 | 370,502 | 123 | 100 | 223 | 0.06% |
| 2019 | 333,160 | 79,659 | 412,819 | 255 | 48 | 303 | 0.07% |
| 2020 | 274,864 | 63,951 | 338,815 | 494 | 49 | 543 | 0.16% |
| **5-year Total** | **1,448,842** | **364,132** | **1,812,974** | **1,960** | **321** | **2,281** | 0.13% |
| **5-year Annual Average** | **289,768** | **72,826** | **362,595** | **392** | **64** | **456** | **0.13%** |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD), CLAIMS 3 database, April 23, 2021.

Notes:
Any duplicate case information has been removed.
* The receipts were lower and the refunds were higher in 2017 because starting April 3, 2017, USCIS temporarily suspended premium processing for all H-1B petitions. While premium processing was suspended, any Form I-907 filed with an H-1B petition was rejected. If the petitioner submitted one combined check for both the Form I-907 and Form I-129 H-1B fees, both forms were rejected.[62]

## Cost-Benefit-Transfer Payments Analysis

Due to the unique needs of employers requesting premium processing, DHS is unable to estimate the quantitative costs or benefits to petitioners that would result from extending the premium processing timeframe from 15 calendar days to 15 business days. By extending the processing time from calendar to business days, the processing timeframe would be extended by 4 days (potentially more if there is a Federal holiday). The additional days would increase the time frame to adjudicate, which in turn might reduce the refunds issued by USCIS. This would benefit both USCIS and petitioners. USCIS would adjudicate more requests and petitioners would not experience delays reapplying. Another benefit is that USCIS would have additional time to process petitions, which would allow USCIS to avoid suspending premium processing service as often as has recently been required when premium processing request volumes are high. Finally, extending the premium processing timeframe from 15 calendar days to 15 business days would enable USCIS to make premium processing more consistently available and expand this service to the newly designated classifications and categories allowed by the USCIS Stabilization Act.

---

[62] *See* "USCIS Will Temporarily Suspend Premium Processing for All H-1B Petitions. (March 3, 2017), available at *https://www.uscis.gov/archive/uscis-will-temporarily-suspend-premium-processing-all-h-1b-petitions.(last viewed on September 26, 2022).*

DHS acknowledges that the proposed increase in processing time may cause work or productivity delays for some petitioners. However, USCIS could still act on the petition in less than 15 business days as the proposed regulatory change increases the adjudication timeframe and not approval processes. In many cases evidence may be insufficient such that the petition may require additional evidence or may be denied.  The change will have no impact on those petitioners.  DHS welcomes public comments on any costs employers could incur for potentially having to wait 15 business days instead of 15 calendar days for their petitions to be approved.

DHS has found in its application of the new premium processing regulations (87 FR 18260) that mandating a separate payment in all premium processing submissions may impose unnecessary burdens on petitioners, applicants, and DHS.  Hence, not mandating a separate payment in all premium processing submissions is beneficial to USCIS, applicants and petitioners as it would reduce unnecessary burdens on petitioners, applicants, and DHS.

### J. Intercountry Adoptions

1. Clarification of Fee Exception for Birth Siblings

2. Suitability and Eligibility Approval Validity Period

3. Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600

    a. Suitability and Eligibility Extensions

    b. New Approval Notices

    c. Change of Country

    d. Hague Adoption Convention Transition Cases

4. Form I-800A, Supplement 3, Request for Action on Approved Form I-800A

5. Adjustment to Proposed Fees for Certain Intercountry Adoption-Specific Forms

**Changes**

DHS proposes to clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions. Currently, prospective adoptive parents with a valid Form I-600A, Application for Advance Processing of an Orphan Petition or Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country approval are not required to pay a fee for the first Form I-600 or Form I-800 petition. If they are approved to adopt more than one child, they are required to pay the Form I-600 or Form I-800 filing fee for additional Form I-600 or Form I-800 petitions unless the beneficiaries are birth siblings. If the beneficiaries are not birth siblings, the Form I-600 or Form I-800 fee is required for each petition after the first. To align with current and historical practice, DHS proposes to clarify in the regulations that this exception is limited to "birth" siblings.

DHS proposes to alter the validity period for a Form I-600A approval in an orphan case to 15 months. Currently, there is a disparity between the 18-month approval period for Form I-600A and the 15-month validity period of FBI fingerprint clearances. Having a standardized 15-month validity period provides additional protections for adopted children and provides consistency and alignment of the orphan and Hague regulations.

DHS is also proposing to create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600, to align the processes for adoptions from countries that are party to the Hague Convention on Protection of Children and Co-operation in

Respect of Intercountry Adoption (Hague Adoption Convention) with the process for adoptions from countries that are not party to the Hague Adoption Convention. This form and fee will help the adoption process in 4 key areas: (1) suitability and eligibility extensions; (2) new approval notices; (3) change of country; and (4) duplicate approval notices. Currently, USCIS uses Forms I-800, I-800A, and I-800A Supplement 3 for Hague Adoption Convention processing and Forms I-600 and I-600A for orphans or non-Hague Adoption Convention processing. With the proposed changes, an individual would be required to submit Form I-600A/I-600 Supplement 3 to request the following: (1) an extension of an approved Form I-600A; (2) a new approval notice based on a significant change or change in circumstances and updated home study of the child or children intended for adoption since a Form I-600A was approved; (3) a change in the non-Hague Adoption Convention country; and/or (4) a duplicate approval notice.

Finally, DHS is proposing to limit the increase of adoption-related fees and continue its policy of reducing fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications. Therefore, DHS proposes to apply a 19-percent average increase to the current fee of $775. This new fee of $920 represents a $145 increase to Forms I-600/600A/800/800A.

**Affected Population**

The population impacted by this provision are adoptive parents and their adopted children. Due to the steady decline in applications, DHS used historical data to get a percent change and forecasted out for 4 years in Table 24, to show the estimated total receipts for Form I-600A for FY 2021 through FY 2024. Since Form I-600A/I-600 Supplement 3 will be a new

form and; therefore, historical data do not exist, DHS used the total number of Form I-600A filings for the analysis. DHS surmises that the population that might file Form I-600A/I-600 Supplement 3 could be the number of total receipts for Form I-600A and therefore provides an upper bound estimate for Form I-600A/I-600.

The forecast predicted the future receipt totals by using a linear regression based on historical data from FY 2016 through FY 2020. Table 24 shows the total receipts of Form I-600A for FY 2016 through FY 2023. Based on a 5-year annual average from FY 2019 through FY 2023, DHS anticipates it would receive approximately 435 applications for Advance Processing of an Orphan Petitions using Form I-600A annually.

| Table 24. Form I-600A, Application for Advance Processing of an Orphan Petition, Receipts for Fiscal Years 2016 through 2020 | |
|---|---|
| **Fiscal Year** | **I-600A Total Receipts** |
| 2016 | 1,361 |
| 2017 | 1,076 |
| 2018 | 950 |
| 2019 | 827 |
| 2020 | 550 |
| 2021* | 392 |
| 2022* | 268 |
| 2023* | 136 |
| **5-year Total** | **2,173** |
| **5-year Annual Average Forecast*** | **435*** |
| Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD) PAS-SQL Dashboard, April 2021. Note: 5-year average was calculated based on 5-year totals of FY 2019 through FY 2023 receipts. *Forecasted numbers using linear regression based on historical data from FY 2016 through FY 2020. ** Total includes receipts for FY 2019 through 2023. | |

Table 25 shows a steady decline in applications, so DHS used historical data to get a percent change and forecasted out for 3 years to show the estimated total receipts for Form I-800A for FY 2021 through FY 2022. DHS forecasted the numbers using linear regression based

on historical data from FY 2016 through FY 2020. DHS estimates that 3,666 is the forecasted average annual number of applicants for Application for Determination of Suitability to Adopt a Child from a Convention Country, from the 5-year annual average from FY 2018 through FY 2022. The annual average affected population for the existing adoption-related forms (Forms I-600/600A/800/800A) that would be impacted by the proposed fee increase is 4,101.[63]

| Table 25. Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, Receipts for Fiscal Years 2016 through 2020 | |
|---|---|
| **Fiscal Year** | **I-800A Total Receipts** |
| 2016 | 8,353 |
| 2017 | 7,577 |
| 2018 | 6,257 |
| 2019 | 5,114 |
| 2020 | 3,440 |
| 2021* | 2,462 |
| 2022* | 1,056 |
| **5-year Total** | **18,329** |
| **5-year Annual Average*** | **3,666*** |
| Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD) PAS-SQL Dashboard, May 2021. Note: 5-year average was calculated based on 5-year totals of FY 2018 through FY 2022 receipts. *Forecasted numbers using linear regression based on historical data from FY 2016 through FY 2020. | |

**Cost-Benefit-Transfer Payments Analysis**

The proposed filing fee for the new Form I-600A/I-600 Supplement 3 is $455. Using the estimated average annual filings of 435, DHS estimates the total filing fee cost is $197,925 annually.[64] In addition, DHS estimates the time burden to complete Form I-600A/I-600 Supplement 3 would be an hour per applicant. In this analysis, DHS uses the Bureau of Labor

---

[63] Calculation: 435 Form I-600/600A receipts + 3,666 Form I-800/800A receipts = 4,101 total affected population
[64] Calculation: (Form I-600A/I-600 Supplement 3 filing fee) x (Estimated total population filing form) = $455×435 = $197,925 annual cost to file new Form I-600A/I-600 Supplement 3.

Statistics (BLS) mean hourly wage of $28.01 for all occupations[65] as the basis to estimate the opportunity cost of time an affected party incurs preparing and submitting a Form I-600A/I-600 Supplement 3. This wage is used instead of the Federal minimum wage because studies show that adoptive parents of international orphans have higher than average incomes.[66] Using the most recent BLS report, DHS calculated a benefits-to-wage multiplier of 1.45 to estimate the total opportunity cost to filers, including the full cost of benefits such as paid leave, insurance, and retirement.[67] The loaded wage per hour is $40.61 for an affected party.[68] DHS estimates the opportunity cost of time for completing and submitting Form I-600A/I-600 Supplement 3 would be $40.61 per applicant.[69] Using the annual average affected population estimate of 435 for Form I-600A/I-600 Supplement 3, DHS estimates the total opportunity cost of time associated with completing and submitting Form I-600A/I-600 Supplement 3 would be approximately $17,665 annually.[70] In sum, DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 would cost applicants $215,590  annually.[71]

---

[65] U.S. Department of Labor, Bureau of Labor Statistics (BLS, May 2021 National Occupational Employment and Wage Estimates, Mean Hourly Wage (All Occupations)," available at: https://www.bls.gov/oes/2021/may/oes_nat.htm (last visited September 26, 2022).

[66] Hellerstedt, W.L. et al., "The International Adoption Project: Population-based Surveillance of Minnesota Parents Who adopted Children Internationally," "Maternal Child and Health," 12:162-171 (2008), Available at *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2398719/* (last visited September 26, 2022).

[67] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour) / (Wages and Salaries per hour). = $40.35/$27.83 =1.45 (rounded). *See* BLS, "Economic News Release," Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: civilian workers, by major occupational and industry group (December 2021), https://www.bls.gov/news.release/archives/ecec_03182022.htm (last visited September 26, 2022).

[68] Calculation: Average hourly wage rate of all occupations × multiplier = $28.01×1.45=$40.61 per hour (rounded).

[69] Calculation: Opportunity cost of time for completing Form I-600A/I-600 Supplement 3 = $40.61per hour×1.0 hour = $40.61 per applicant.

[70] Calculation: (Opportunity cost of time for completing Form I-600A/I-600 Supplement 3 per applicant)*(Estimated annual population filing Form I-600A/I-600 Supplement 3) = $40.61×435=$17,665  (rounded).

[71] Calculation: $197,925(Estimated total filing fees for Form I-600A/I-600 Supplement 3) + $$17,665  (Estimated total opportunity cost of time to complete Form I-600A/I-600 Supplement 3) = $215,590 (rounded).

DHS is also proposing to the increase fees for each of the existing adoption-related forms (Forms I-600/600A/800/800A) from $775 to $920. This increase to the current fee would result in transfer payments from applicants to USCIS of approximately $ 246,060.[72]

In summary, DHS estimates this provision would result in annual transfer payments from Forms I-600/600A/800/800A fee-paying applicants to USCIS of approximately $ 246,060 due to the proposed fee increases. It would also create new costs of approximately $215,590 due to the creation of a new form (Form I-600A/I-600 Supplement 3). DHS welcomes public comments on the costs or proxy methodology used to derive the costs of this proposed change.

This provision provides several benefits. Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications. DHS is proposing to clarify the regulations to align them with current practice regarding when prospective adoptive parents are required to pay the Form I-600 or Form I-800 filing fee for multiple petitions. DHS is also proposing to alter the validity period for a Form I-600A approval in an orphan case from 18 to 15 months. This would make the Form I-600A approval periods consistent with the validity of FBI biometric-related background checks. The uniform 15-month validity period would also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates. Another benefit of this proposed provision is that it clarifies the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.

---

[72] Calculation:  $775 current fees + $85 biometric services = $860 baseline costs
($920 Proposed Fees – $860 baseline costs) × 4,101 Total Affected Population = $246,060.

When the Hague Adoption Convention enters into force for a country, cases that meet certain criteria are generally permitted by the new Convention country to proceed as "transition cases" under the non-Hague Adoption Convention process (Form I-600A and Form I-600 process). Another benefit of the proposed changes to the adoption regulations is that, if the case does not qualify as a transition case,[73] the prospective adoptive parents will generally need to follow the Hague Adoption Convention process with the filing of Form I-800A and Form I-800. With the addition of the new Form I-600A/I-600 Supplement 3, DHS is proposing to codify certain limitations on when the Supplement 3 can be used in the context of transition cases. USCIS would accept Form I-800A Supplement 3 extension requests regardless of whether the Form I-800 petition was already filed, rather than requiring prospective adoptive parents to file a new Form I-800A to begin the process anew. Accepting the Form I-800A Supplement 3 extension requests will make the subsequent suitability and eligibility adjudication process faster for prospective adoptive parents seeking an extension of their Form I-800A approval. Supplement 3 adjudications are generally prioritized over new Form I-800A filings, allowing for new decisions on prospective adoptive parents' suitability and eligibility to occur more quickly. DHS welcomes public comments on the benefits of the I-600/I-600A/I-800/I-800A Supplement 3, and the proposed policy associated with the provision.

---

[73] The Hague Adoption Convention (Convention) entered into force for the United States on April 1, 2008. The Convention governs all adoptions between the United States and other countries party to the Convention. If a prospective adoptive parent began their adoption from a Convention country before the Convention entered into force for either the United States or the other Convention country, but the adoption has not been completed, the case may be considered to be a transition case. Source: Department of State, "Transition Cases", available at *https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/how-to-adopt/hague-transition-cases.html* (last viewed September 26, 2022).

### *K. Immigrant Investors*

**Changes**

DHS proposes to change various fees for regional centers and related immigration benefit requests related to Employment-Based Immigrant Visa, Fifth Preference (EB-5). The EB-5 program was created in 1990 by Congress to stimulate the U.S. economy through job creation and capital investment by immigrant investors (foreign nationals and/or their dependents). The EB-5 program has historically included four immigrant investor/regional center forms: (1a) Forms I-526, Immigrant Petition by Alien Entrepreneur; (2) I-829, Petition by Investor to Remove Conditions on Permanent Resident Status; (3) I-924, Application for Regional Center Designation under the Immigrant Investor Program; and (4) I-924A, Annual Certification of Regional Center.

On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. No. 117-103).  The EB-5 Reform and Integrity Act of 2022 repealed the prior authorizing statue for the EB-5 "regional center program" and codified a substantially reformed regional center program in the INA, effective 60 days after enactment on, May 14, 2022.  The new EB-5 program now includes five immigrant investor/regional center forms: (1a) Forms I-526, Immigrant Petition by Alien Entrepreneur; (1b)  I-526E, Immigrant Petition by Regional Center Investor; (2) I-829, Petition by Investor to Remove Conditions on Permanent Resident Status; (3) I-956, Application for Regional Center Designation (former I-924);  (4) I-956G, Regional Center Annual Statement (former I-924A) and (5) Form I-956F, Application for Approval of Investment in a Commercial Enterprise.

Despite the changes in the law and program, DHS has proposed fees based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022. The proposed fee for Form I-526/526E is $11,160, an $7,485 or 204-percent increase from the current $3,675 fee. The proposed fee for Form I-829 is $9,525, a $5,775 or 154 percent increase from the current $3,750 fee. The proposed fee for Form I-956 is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee (set when it was Form I-924). The proposed fee for Form I-956G is $4,470, a $1,435 or 47 percent increase from the current $3,035 fee (that was established for Form I-924A). The proposed fee for Form I-956F is $47,695.[74]

**Affected Population**

The population affected by these provisions are immigrant investors and regional centers. Table 26 presents data on annual EB-5 requests received for FY 2016 through FY 2020.

| Table 26. Annual Receipts for Fee Paying EB-5 Applicants for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Form | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Total Receipts | 5-Year Annual Average Receipts |
| I-526, Immigrant Petition by Alien Entrepreneur, I-526E, Immigrant Petition by Regional Center Investor | 14,147 | 12,165 | 6,424 | 4,194 | 4,378 | 41,308 | 8,262 |
| I-829, Petition by Investor to Remove Conditions on Permanent Resident Status | 3,474 | 2,625 | 3,283 | 3,756 | 3,096 | 16,234 | 3,247 |
| *I-956, Application for Regional Center Designation (formerly I-924) | 436 | 280 | 122 | 79 | 34 | 951 | 190 |

---

[74] The EB-5 Reform and Integrity Act of 2022 authorized the same fee for Form I-956F as Form I-956.

| Form I-956F, Application for Approval of Investment in a Commercial Enterprise | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
|---|---|---|---|---|---|---|---|
| **Form I-956G, Regional Center Annual Statement (formerly I-924A) | 863 | 843 | 887 | 820 | 678 | 4,091 | 818 |
| **Total** | **18,920** | **15,913** | **10,716** | **8,849** | **8,186** | **62,584** | **12,517** |

*Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, May 5, 2021.
**Source: USCIS, Immigrant Investor Office (IPO), INFACT database, January 6, 2022.
Note: I-956G are the annual statements to be submitted by these approved regional centers.

The annual filing volume projections in this proposed rule are based on historical volumes and trends.  The EB-5 Reform and Integrity Act of 2022 is too new for DHS to accurately estimate its impacts on filing volumes.  DHS may address additional changes resulting from the EB-5 Reform and Integrity Act of 2022 in a future rulemaking[75].  DHS welcomes comments from the public on the number of forms for the EB-5 program that may be submitted annually and how that number will be changed by the recent legislation.  DHS may adjust the estimated filing volumes in the final rule based on additional analysis and comments on this rule.

**Cost-Benefit-Transfer Payments Analysis**

DHS proposes to increase fees across  the four forms associated with the EB-5 program. DHS estimates the annual transfer payments from EB-5 investors and regional centers to USCIS would be approximately  $87,447,325 (see Table 27). The transfer payments are the difference between the proposed and current fees.

---

[75] DHS may reevaluate EB-5 proposed fees to meet the additional fee guidelines of EB-5 Reform and Integrity Act of 2022 sec. 106(c).  Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

| Table 27. Economic Impacts of Fee Adjustment to EB-5 Forms | | | | | | |
|---|---|---|---|---|---|---|
| Immigration Benefit Request | 5-Year Annual Average | Current Fees | Proposed Fees | Fee Difference | Percent Change | Transfer Payments |
| | *(A)* | *(B)* | *(C)* | *D=C-B* | | *E=D×A* |
| I-526/I-526E | 8,262 | $3,675 | $11,160 | $7,485 | 204% | $61,841,070 |
| I-829 | 3,247 | $3,750 | $9,525 | $5,775 | 154% | $18,751,425 |
| I-956 | 190 | $17,795 | $47,695 | $29,900 | 168% | $5,681,000 |
| I-956G | 818 | $3,035 | $4,470 | $1,435 | 47% | $1,173,830 |
| **Total** | **12,517** | | | | | **$87,447,325** |

### L. Genealogy Search and Records Requests

      1. Genealogy Search and Records Request

      2. Request for a Certificate of Non-Existence

**Changes**

USCIS Genealogy Search and Records Requests program processes requests for historical records of deceased individuals. Requestors use the USCIS website[76] or Form G-1041, Genealogy Index Search Request, to request an index search of USCIS historical records. USCIS then informs the requestor whether any records are available by mailing a response letter. Requestors use the Form G-1041A, Genealogy Records Request, to obtain paper copies of USCIS historical records, if they exist.

DHS is proposing several changes to the Genealogy Search and Records Requests program that would allow USCIS to provide genealogy search results and historic records more

---

[76] USCIS, "Genealogy," *https://www.uscis.gov/records/genealogy* (last visited August 12, 2021).

quickly when pre-existing digital records exist. These changes may reduce the time it takes to request and receive genealogy records, and, in some cases, eliminate the need to make multiple search requests and submit separate fees. The proposed changes include:

- Revising genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.
- Changing the index search request process so that USCIS may provide requesters with digital records via email in response to the initial search request.
- Changing the genealogy fees for Forms G-1041 and G-1041A to reflect the above-mentioned proposed operational changes in recognition of cost savings to the agency from online filing, DHS intends to lower the proposed fees for the online filing of Forms G-1041 and G-1041A.
  - For requestors who use the electronic version of Form G-1041, the fee would increase from $65 to $100, an increase of $35 (54 percent). For those who submit Form G-1041 via mail, DHS is proposing to increase the fee from $65 to $120, an increase of $55 (85-percent).
  - For requestors who use the electronic version of Form G-1041A, the fee would increase from $65 to $240, an increase of $175 (269-percent). For those who submit Form G-1041A via mail, DHS is proposing to increase the fee from $65 to $260, an increase of $195 (300-percent).

Finally, DHS is proposing to charge a fee for requests for a Certificate of Non-Existence. Currently, USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. USCIS operates the Certificate of Non-Existence request process

informally and at no cost to individuals while absorbing the costs to provide this service.[77] DHS proposes a fee of $330 to recover the estimated full cost of processing these requests, which will require submission of Form G-1566, Request for a Certificate of Non-Existence once approved by OMB. If finalized, the fee will be established in the FY22/23 rule and will be required with the submission of Form G-1566[78] if it is approved before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed as provided in 8 CFR 299.1.

**Affected Population**

The population affected by this proposed rule includes individuals who use Form G-1041 to request a search of USCIS historical indices and individuals who use Form G-1041A to obtain copies of USCIS historical records found through an index request. The affected population also includes individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. Table 28 shows the estimated number of genealogy index search requests and historical records requests that were submitted to USCIS using Forms G-1041 and G-1041A for FY 2016 through FY 2020. DHS estimates that an annual average of 5,250 Form G-1041 index search requests and 3,352 Form G-1041A records requests were received during that time. For both forms, more than 90-percent of the requests were submitted electronically.

| Table 28. Receipts of Forms G-1041, G-1041A and G-1566, for Fiscal Years 2016 through 2020 |
|---|

---

[77] *See* 8 CFR 103.7(f) as of October 1, 2020. *Authority to certify records.* The Director of USCIS, or such officials as they may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.
[78] Form G-1566 is pending approval with OIRA.

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2016 | 321 | 5,192 | 5,513 | 94% |
| 2017 | 274 | 3,036 | 3,310 | 92% |
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 5-year Total | 1,359 | 24,889 | 26,248 | |
| 5-year Annual Average | 272 | 4,978 | 5,250 | 95% |
| | | | | |
| Fiscal Year | Form G-1041A (Paper Filing) | Form G-1041A (Online Filing) | Total | Percentage Filed Online |
| 2016 | 290 | 2,220 | 2,510 | 88% |
| 2017 | 364 | 2,262 | 2,626 | 86% |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 33 | 3,407 | 3,440 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 5- year Total | 1,329 | 15,429 | 16,758 | |
| 5-year Annual Average | 266 | 3,086 | 3,352 | 92% |
| Fiscal Year | Certificate of Non-Existence/ Form G-1566 | | | |
| 2016 | 679 | | | |
| 2017 | 909 | | | |
| 2018 | 1,442 | | | |
| 2019 | 1,516 | | | |
| 2020 | 1,784 | | | |
| 5- year Total | 6,330 | | | |
| 5-year Annual Average | 1,266 | | | |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch. August 19, 2021.
Note: IRIS tracks the online percentage of index searches and records requests.

Table 28 above also depicts the FY 2016 through FY 2020 filing receipts of the certificate of non-existence. DHS bases the estimate for the Form G-1566 on these receipts and estimates that the average annual receipts for Form G-1566 would be approximately 1,266. DHS notes that providing digital records in response to a Form G-1041 request may reduce the number of Form G-1041A requests that would be filed because requestors would now be given a digital copy of records with this request if it was previously digitized. Hence, Form G-1041A

requests would only be used by requestors seeking hard copy records. As a result, the volume of Form G-1041A requests USCIS receives may decrease, though DHS is unable to speculate by how much because DHS does not know how many individuals may continue to submit G-1041 requests by mail. DHS also does not have sufficient data on the requestors for the genealogy forms to determine if entities or individuals submit these requests. The case management tracking system used by DHS for genealogy requests does not allow for requestor data to be readily pulled.

**Cost-Benefit-Transfer Payments Analysis**

DHS is improving the genealogy online process and creating separate fees for the online and paper filing options of Forms G-1041 and G-1041A. Using the 5-year annual average, the increase in fees for paper filing Form G-1041 would result in transfer payments to the government of $14,960 and $51,870 for Form G-1041A (see Table 29). For requestors filing electronically, the fee increase would result in annual transfer payments of $174,230 for Form G-1041 and $540,050 for Form G-1041A. The annual increase in transfer payments from Form G-1041 is expected to be $189,190 and $591,920 from Form G-1041A.

| Table 29. Economic Impacts of Fee Increase to Forms G-1041 and G-1041A | | | | | |
|---|---|---|---|---|---|
| Forms | Estimated Annual Average (A) | Current Fees (B) | Proposed Fees (C) | Fee Difference D=C-B | Transfer Payments E=D×A |
| G-1041 (paper filing) | 272 | $65 | $120 | $55 | $14,960 |
| G-1041 (online filing) | 4,978 | $65 | $100 | $35 | $174,230 |
| *Sub-total* | *5,250* | | | | *$189,190* |
| G-1041A (paper filing) | 266 | $65 | $260 | $195 | $51,870 |
| G-1041A (online filing) | 3,086 | $65 | $240 | $175 | $540,050 |
| *Sub-total* | *3,352* | | | | *$591,920* |
| **Total** | | | | | **$781,110** |
| Source: USCIS Analysis | | | | | |

DHS is also proposing a fee of $330 for individuals submitting a Form G-1566. Currently, requestors receive this service for free. The annual transfer payments are expected to be $417,780.[79] This would allow DHS to recover the estimated full cost of processing these requests.

In sum, DHS estimates that the fee adjustments in this provision would result in annual transfer payments from fee paying applicants of Forms G-1041, G-1041A and G-1566 to USCIS of $1,198,890.[80] The proposed fees would allow DHS to recover the full costs of the genealogy program and improve the genealogy processes. No additional time burden to complete forms would be created by this provision.

One of the benefits of this provision is that streamlining the genealogy search and records request process increases accuracy and reduces the administrative burden on USCIS by eliminating the need to manually enter requesters' data into its systems. In addition, USCIS would save on mailing costs as well as records processing and storage costs because electronic versions of search requests would reduce the administrative costs of handling paper. [81]

### M. Fees Shared by CBP and USCIS

**Changes**

---

[79] Calculation: (Form G-1566 fee) × (Estimated total population filing) = $330×1,266 = $417,780 transfer payments from Form G-1566.

[80] Calculation: Form G-1041 ($189,190) + Form G-1041A ($591,920) + Form G-1566 ($417,780) = $1,198,890 total transfer payments to USCIS.

[81] *See* "Establishment of a Genealogy Program; Proposed Rule," 71 FR 20357 – 20368 (April 20, 2006), Available at: *https://www.regulations.gov/document?D=USCIS-2006-0013-0001* (last viewed on September 26, 2022).

DHS proposes to adjust fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP):

- Form I-192, Application for Advance Permission to Enter as a Nonimmigrant

- Form I-193, Application for Waiver of Passport and/or Visa

- Form I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal

- Form I-824, Application for Action on an Approved Application or Petition.

DHS proposes to move to a single fee for each of those four immigration benefit requests. The proposed fee is the same whether CBP or USCIS adjudicates the application. The proposed fees in Table 30 represent single DHS fees for the workloads of both agencies by combining the estimated costs and fee-paying volumes of USCIS and CBP. Under this proposal, CBP and USCIS will each continue to keep the revenue that they collect for these fees.

| Table 30. Fee Adjustments for Immigration Benefit Requests Shared with CBP | | | | | |
|---|---|---|---|---|---|
| **Form** | **CBP Current Fees** | **USCIS Current Fees** *(A)* | **Proposed Fees** *(B)* | **Fee Difference from the USCIS current fee** *C = B - A* | **Percent Change from the USCIS Current Fee to the Proposed Fee** |
| I-192, Application for Advance Permission to Enter as a Nonimmigrant | $585 | $930 | $1,100 | $170 | 18% |
| I-193, Application for Waiver of Passport and/or Visa | $585 | $585 | $695 | $110 | 19% |
| I-212, Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $930 | $1,395 | $465 | 50% |
| I-824, Application for Action on an Approved Application or Petition | $465 | $465 | $675 | $210 | 45% |
| Source: USCIS Analysis | | | | | |

**Affected Population**

The proposed fee increases would impact Forms I-192, I-193, I-212 and I-824 applicants seeking admission into the U.S. Table 31 depicts the total receipts to USCIS for these forms, for FY 2016 through FY 2020. DHS estimates that an annual average of 38,841 applicants would file Form I-192, 116 would file Form I-193, 8,284 would file I-212, and 10,658 would file Form I-824. Therefore, the annual average receipts for the forms shared with CBP is approximately 57,899.

| Table 31. Annual Receipts of Applicants Filing Forms I-192, I-193, I-212, and I-824, for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Form | 2016 | 2017 | 2018 | 2019 | 2020 | 5-year Total | 5-Year Annual Average Receipts |
| I-192 | 44,924 | 47,356 | 40,573 | 34,295 | 27,056 | 194,204 | 38,841 |
| I-193 | 219 | 144 | 99 | 87 | 32 | 581 | 116 |
| I-212 | N/A | N/A | N/A | 7,320 | 9,248 | 16,568 | 8,284 |
| I-824 | 10,888 | 11,494 | 10,894 | 10,490 | 9,525 | 53,291 | 10,658 |
| **Total** | **56,031** | **58,994** | **51,566** | **52,192** | **45,861** | **264,644** | **57,899** |

Sources:
Forms I-824 and I-193: USCIS, Office of Policy & Strategy, Policy Research Division (PRD), C3 Consolidated, April 20, 2021.
Forms I-192 and I-212: USCIS, Office of Performance and Quality (OPQ), National Performance Report (NPR), June 8, 2021

**Cost-Benefit-Transfer Payments Analysis**

DHS intends to increase fees for shared USCIS and CBP Forms I-192, I-193, I-212 and I-824. Table 32 illustrates that these increases would result in annual transfer payments of $12,705,970 from fee payers to USCIS and CBP. A benefit of this provision is that a single fee for each shared form would reduce confusion for individuals interacting with CBP and USCIS. The proposed fee is the same whether CBP or USCIS adjudicates the application.

| Table 32. Economic Impacts of Fee Adjustment to Forms Shared with CBP |
|---|

| Form | 5-Year Annual Average (A) | Current Fees (B) | Proposed Fees (C) | Fee Difference D=C-B | Transfer Payments E=D×A |
|---|---|---|---|---|---|
| I-192 | 38,841 | $930 | $1,100 | $170 | $6,602,970 |
| I-193 | 116 | $585 | $695 | $110 | $12,760 |
| I-212 | 8,284 | $930 | $1,395 | $465 | $3,852,060 |
| I-824 | 10,658 | $465 | $675 | $210 | $2,238,180 |
| Total | 57,899 | | | | $12,705,970 |

### N. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)

**Changes**

DHS is proposing to adjust the fee for Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA), and combine the current multiple fees charged for an individual or family into a single fee of $340 for each filing of Form I-881 to reduce the administrative burden for USCIS for a small workload.[82] The current fees are $285 for individuals, $570 maximum for families and $165 at EOIR for both individuals and families. DHS proposes no changes to the EOIR fee.

**Affected Population**

The population that would be affected by this provision includes non-citizens who are eligible for suspension of deportation or special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA). USCIS data do not differentiate between Form I-881 applications filed by individuals and applications filed by families. However, based on the average annual revenue data for Form I-881 for FY 2016

---

[82] This change does not affect individual or family-based applicants who file the same form with the Department of Justice, Executive Office for Immigration Review (EOIR). To file this form directly with EOIR, there is a separate $165 fee. The number of Forms I-881 filed with EOIR and the associated costs are not estimated in this RIA.

through FY 2020, approximately 98 percent of applicants paid the individual filing fee of $285 for Form I-881 and about 2-percent of applicants paid the family filing fee of $570.[83] DHS uses these percentages to estimate the average number of receipts for individuals and families.

DHS expects the population will be exhausted eventually due to relevant eligibility requirements and has excluded this immigration benefit request from previous fee rules, essentially treating it like other temporary programs or policies such as TPS and Deferred Action for Childhood Arrivals. Based on this and the steady decline in applications, DHS used historical data to get a percent change and forecasts 5 years out to show the estimated total receipts for Form I-881 for FY 2021 through FY 2025. The forecast predicts future receipt totals using a linear regression based on historical data from FY 2016 through FY 2020. Table 33 shows the receipts of Form I-881 for FY 2016 through FY 2025 for individuals and families.

| Table 33. Receipts of Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA), for Fiscal Years 2016 through 2020 | | | |
|---|---|---|---|
| **Fiscal Year** | **Individuals** | **Families** | **Total Receipts** |
| 2016 | 629 | 13 | 642 |
| 2017 | 549 | 11 | 560 |
| 2018 | 495 | 10 | 505 |
| 2019 | 477 | 10 | 487 |
| 2020 | 273 | 6 | 279 |
| 2021* | 249 | 6 | 255 |
| 2022* | 171 | 4 | 175 |
| 2023* | 93 | 3 | 96 |
| 2024* | 14 | 1 | 15 |
| 2025* | 0 | 0 | 0 |
| Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD) CLAIMS 3 database, April 20, 2021.<br><br>*Note: Forecasted numbers based on historical data FY 2016 through FY 2020 receipts. | | | |

**Cost-Benefit-Transfer Payments Analysis**

---

[83] *See* Section VIII Q. of the preamble of the NPRM of this rule. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA).

The proposed rule adjusts the filing fees for Form I-881. DHS proposes a single $340 fee for any Form I-881 filed with USCIS. The current fees to file Form I-881 with USCIS is $285 for per individual application submitted and $570 per family application where all members of a family submit their applications together in a single package. The proposed fee is less than USCIS' estimated costs associated with adjudicating the application.

Creating the same fee for the two I-881 forms would provide qualitative benefits of simplifying USCIS' revenue collections and reporting requirements for USCIS, thus reducing the administrative burden of the program. In Table 34, DHS calculates that the increase in fees for individuals filing would result in annual transfer payments of $15,290 from I-881 individual filers to USCIS over the 10-year time period of this analysis. Conversely, the decrease in fees for families would result in $1,840 in annual transfer payments from USCIS to I-881 family applicants since this fee is less than the cost to adjudicate the application, and USCIS would now incur the full adjudication costs.

| Table 34. Economic Impacts of Adjusted Filing Fees, for Form I-881 | | | | | | |
|---|---|---|---|---|---|---|
| Affected Population | Estimated Population *(A)* | Current Fees *(B)* | Proposed Fees *(C)* | Fee Difference *D=C-B* | Percent Change | Transfer Payments *E=D×A* |
| Form I-881 -Individuals by Fiscal Year | | | | | | |
| 2022 | 171 | $285 | $340 | $55 | 19% | **$9,405** |
| 2023 | 93 | $285 | $340 | $55 | 19% | **$5,115** |
| 2024 | 14 | $285 | $340 | $55 | 19% | **$770** |
| 2025 and after | 0 | $285 | $340 | $55 | 19% | **$0** |
| **Total** | | | | | | **$15,290** |
| Form I-881- Families by Fiscal Year | | | | | | |
| 2022 | 4 | $570 | $340 | -$230 | -40% | **-$920** |
| 2023 | 3 | $570 | $340 | -$230 | -40% | **-$690** |
| 2024 | 1 | $570 | $340 | -$230 | -40% | **-$230** |
| 2025 and after | 0 | $570 | $340 | -$230 | -40% | **$0** |
| **Total** | | | | | | **-$1,840** |

| Source: USCIS Analysis |
|---|

### O. Fee Waivers

**Changes**

DHS proposes that fee waiver requests must be submitted only on the form prescribed by USCIS, Request for Fee Waiver (Form I-912). Currently, USCIS can waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee.[84] To request a fee waiver, an individual is required to submit a fee waiver request for permission to have their benefit request processed without payment. The fee waiver request is made by filing Form I-912, Request for Fee Waiver or by submitting a letter to explain the reasons why one is unable to pay. *See* 8 CFR 103.7(c)(2). The waiver request must state the person's belief that they are entitled to or deserving of the benefit requested and the reasons for their inability to pay. Whether an applicant submits the request by using Form I-912 or by a written statement, the applicant must submit additional documentation showing evidence of an inability to pay as provided in the Form I-912 instructions. USCIS adjudicates fee waiver requests based on information submitted in the request and considers each fee waiver request on its own merits. USCIS will reject the fee waiver request and the applicable benefit request if it lacks documentation. Fee waiver requests are required to be submitted with the benefit request for which the applicant is requesting the fee waived. There is no required fee for filing a fee-waiver request.

---

[84] 8 CFR 103.7(c) (Oct. 1, 2020) (listing requests for which the fee may be waived).

An applicant can request a fee waiver, and if approved, the fees would be waived for the entire immigration benefit and the biometric services fee provided the applicant meets the criteria below:

- Had a household income at or below 150 percent of the FPG;[85]

- Currently receives a means-tested benefit;[86] or

- Is experiencing extreme financial hardship such as unexpected medical bills or emergencies.[87]

**Affected Population**

The population impacted by this provision includes individuals that submit fee waiver requests by letter. The proportion of fee waiver requests submitted by letter are very low. In October of 2017, the USCIS Office of Intake and Documentation Production (OIDP) collected data on approved waivers over a 6-week period, and the data showed that only 29 (0.7 percent) requests out of the 4,409 surveyed, of all approved waivers, came via letter request.[88] Since DHS typically does not keep track of fee waiver requests by letter, DHS used the 0.7 percent result in

---

[85] The Secretary of the Department of Health and Human Services (HHS), Office of the Assistant Secretary for Planning and Evaluation, establishes the FPG annually. Available at *https://aspe.hhs.gov/poverty-guidelines*. The Federal Register notice for the 2019 Poverty Guidelines was published at 84 FR 1167 (Feb. 1, 2019). Available at https://www.federalregister.gov/documents/2022/01/21/2022-01166/annual-update-of-the-hhs-poverty-guidelines (last viewed September 26, 2022).

[86] "Means-tested benefits" are benefits funded by government agencies through programs available only to individuals whose income is below a certain level. Examples of means-tested benefit programs include the Supplemental Nutrition Assistance Program (SNAP), Medicaid, Supplemental Security Income (SSI), and Temporary Assistance for Needy Families (TANF).

[87] This may include medical expenses of family members, unemployment, eviction, and homelessness as described on Form I-912 instructions.

[88] See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Regulatory Impact Analysis, Final Rule, Appendix 2: Use of Form I-912 among Fee Waiver Requests. DHS Docket No.: USCIS-2019-0010

the survey and the 5-year annual average of requests approved to estimate the impacted population. DHS estimates that approximately 3,180 approved fee waiver requests were submitted by letter annually.[89]

| Table 35. Applications Received, Approvals, and Denials for Form I-912, Request for Fee Waiver, for Fiscal Years 2016 through 2020 | | | | |
|---|---|---|---|---|
| Fiscal Year | Applications Received* | Approvals | Denials | Approval Rate (Percent)** |
| 2016 | 753,402 | 627,959 | 125,118 | 83% |
| 2017 | 684,675 | 588,732 | 95,200 | 86% |
| 2018 | 535,412 | 460,821 | 74,616 | 86% |
| 2019 | 481,068 | 410,485 | 70,583 | 85% |
| 2020 | 406,112 | 329,571 | 76,543 | 81% |
| 5-year Total | 2,860,669 | 2,417,568 | 442,060 | 85% |
| 5-year Annual Average | 572,134 | 483,514 | 88,412 | |

Source: USCIS Office of Performance and Quality (OPQ), CLAIMS 3 database; Forgone Revenue Estimate data calculated by DHS Office of the Chief Financial Officer (CFO), May 2021.

*Note: Not all fee waiver applications are adjudicated in the same fiscal year that they are received. Likewise, not all approvals and denials occur in the same fiscal year in which a fee waiver request is filed. Thus, the number of approvals and denials does not equal fee waiver request receipts.

**Note: Approval Rate percentage is the number of approvals granted in a particular year divided by the number of applications received, in that same year (i.e., FY 2016 = 627,959/753,402=83% approved).

## Cost-Benefit-Transfer Payments Analysis

The proposed rule requires that fee waiver requests be submitted only on the form prescribed by USCIS, Request for Fee Waiver (Form I-912). Submitting a letter to explain the reasons why one is unable to pay would no longer be allowed. The benefit of this change is that it would allow USCIS staff to process forms more efficiently and ensure that they are in better compliance with the form instructions.  DHS does not expect the proposed rule to create any significant change in time burden for applicants who submit via letter as DHS estimates the time

---

[89] Calculation: 0.7% of 483,514 = 3,180

burden for both a letter submission and Form I-912 submission to be about the same. Whether an applicant submits the request by using Form I-912 or by a written statement, the applicant must submit additional documentation showing evidence of an inability to pay as provided in the Form I-912 instructions.

DHS welcomes any public comments on fee waiver requests submitted by letter, maintaining fee waiver eligibility based on an inability to pay and maintain the 2011 Fee Waiver Policy criteria, and DHS's proposal to retain the authority in regulations for the Director of USCIS to waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law, and the anticipated costs to the government as a result of fee waivers, as described in this proposed provision.

### P. Fee Exemptions

1. Codification of Benefit Requests with No Fees and Exemptions of Certain Categories or Classifications from Fees

2. Proposed New Fee Exemptions

**Changes**

DHS intends to codify several longstanding fee exemptions that are currently provided through policy guidance documents, such as form instructions, the USCIS policy manual, or similar directives, but not in regulations. This includes the following:

- Form I-90, Application to Replace Permanent Resident Card. No fee if the applicant was issued a card but never received it, or if the applicant's card was issued with incorrect information because of DHS error.

- Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. No fee for initial filings for nonimmigrant member of in the U.S. armed forces, for a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component; for nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement; and replacement for DHS error.
- Form I-129CWR, Semiannual Report for CW-1 Employers.
- Form I-131, Application for Travel Document. No fees for parole requests from current or former U.S. armed forces service members and their parents, spouse, or children.
- Form I-134, Declaration of Financial Support.
- Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. DHS proposes no fee for the following:
  - A petition for Special Immigrant Juvenile (SIJ) classification, and
  - A petition for a person who served honorably on active duty in the U.S. Armed Forces filing under INA section 101(a)(27)(K).
- Form I-361, Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian.
- Form I-363, Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian.
- Form I-407, Record of Abandonment of Lawful Permanent Resident Status.
- Form I-485J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j).
- Form I-508, Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities.
- Form I-539, Application to Extend/Change Nonimmigrant Status for nonimmigrant A, G, and NATO and T nonimmigrant.
- Form I-566, Interagency Record of Request – A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status.
- Form I-589, Application for Asylum and for Withholding of Removal.
- Form I-590, Registration for Classification as a Refugee.
- Form I-600, Petition to Classify Orphan as an Immediate Relative. DHS proposes no fee for the first Form I-600 filed for a child on the basis of an approved Form I-600A, Application for Advance Processing of an Orphan Petition, during the Form I-600A approval or extended approval period.
- Form I-602, Application by Refugee for Waiver of Grounds of Inadmissibility.
- Form I-693, Report of Medical Examination and Vaccination Record.
- Form I-730, Refugee/Asylee Relative Petition.
- Form I-765, Application for Employment Authorization. DHS proposes that no fee will be charged for an initial Employment Authorization Document (EAD) for the following:

- o Dependents of certain government and internal organizations or NATO personnel.
- o N-8 (Parent of noncitizen classified as SK3) and N-9 (Child of N-8) nonimmigrants.
- o Persons granted asylee status (AS1, AS6).
- o Citizen of Micronesia, Marshall Islands, or Palau.
- o Persons Granted Withholding of Deportation or Removal.
- o Applicant for Asylum and Withholding of Deportation or Removal including derivatives.
- o Taiwanese dependents of Taipei Economic and Cultural Representative Office E-1 employees.
- A request for replacement Employment Authorization Document based on USCIS error.
- For a renewal or replacement Employment Authorization Document for the following:
  - o Dependent of certain foreign government, international organization, or NATO personnel.
  - o Citizen of Micronesia, Marshall Islands, or Palau.
  - o Granted Withholding of Deportation or Removal and
  - o Dependents of certain government and internal organizations or NATO personnel.
- Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse.
- Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative, for the first Form I-800 filed for a child on the basis of an approved Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, during the Form I-800A approval period or extended approval period.
- Form I-821, Application for Temporary Protected Status. There is no fee for re-registration.
- Form I-854, Inter-Agency Alien Witness and Informant Record.
- Form I-864, Affidavit of Support Under Section 213A of the INA.
- Form I-864A, Contract Between Sponsor and Household Member.
- Form I-864EZ, Affidavit of Support Under Section 213A of the INA.
- Form I-864W, Request for Exemption for Intending Immigrant's Affidavit of Support.
- Form I-865, Sponsor's Notice of Change of Address.
- Form I-912, Request for Fee Waiver.
- Supplement A to Form I-914, Application for Immigrant Family Member of a T-1 Recipient, and Supplement B to Form I-914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.
- Supplement A to Form I-918, Petition for Qualifying Family Member of U-1 Recipient, and Supplement B to Form I-918, U Nonimmigrant Status Certification.

- Form I-942, Request for Reduced Fee, requesting a reduced fee for the naturalization application Form N-400.
- Form N-4, Monthly Report on Naturalization Papers.
- N-476, Request for Certification of Military or Naval Service.
- N-644, Application for Posthumous Citizenship.
- N-648, Medical Certification for Disability Exceptions.
- Claimant under INA section 289.

Currently, several benefit requests are exempted from paying fees because of the humanitarian nature of their programs and the likelihood that individuals who file will qualify for a fee waiver if they request it. DHS is proposing to provide additional fee exemptions for the following humanitarian-based categories of requestors:[90]

- Victims of Severe Form of Trafficking (T Nonimmigrants)
- Victims of Qualifying Criminal Activity (U Nonimmigrants)
- VAWA Form I-360 Self-Petitioners and Derivatives
- Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty
- Abused Spouses and Children Adjusting Status under CAA and HRIFA
- Abused Spouses and Children Seeking Benefits under NACARA
- Abused Spouses and Children of LPRs or U.S. Citizens under INA Section 240A(b)(2)
- Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the ISAF[91] (SI1 and SI2)
- Special Immigrant Juveniles
- Temporary Protected Status
- Asylees
- Refugees
- Person Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K)

---

[90] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under proposed 8 CFR 106.2, for which DHS proposes to codify that there is no fee.
[91] DHS is not making any assumptions about the additional Afghani special immigrant visas or Afghani Evacuees in this proposed rule.

Table 36 below provides a summary of current fee exemptions under INA sec. 245(l)(7), proposed additional fee exemptions, and the impact on forms that no longer require a fee waiver for these categories of requestors because they will be fee exempt.

| Table 36. Proposed Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions[92] | | | | |
|---|---|---|---|---|
| Category | Current Fee Exemptions | Current Fee Waiver Eligibility | Proposed Additional Fee Exemptions[93] | Proposed Fee Waiver Eligibility |
| Victims of severe form of trafficking (T nonimmigrants)[94] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-765 (initial, renewal and replacement) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[95] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Victims of qualifying criminal activity (U nonimmigrants)[96] | • Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601 | • Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed) | • Form I-131<br>• Form I-192 (only if filed with or after Form I-485 is filed)<br>• Form I-193 (only if filed with or after Form I-485 is filed) |

---

[92] This table includes exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS is proposing additional fee exemptions. This table includes only those exemptions that DHS is required to provide under this statute, and it does not include all USCIS benefit requests or groups for which DHS currently provides or is proposing to provide an exemption in this rule or by policy. See regulatory text for all other fee exemptions and fee waivers.

[93] This column lists all the additional fee exemptions that are being proposed. DHS would continue to maintain all the fee exemptions current provided under the second column "Current Fee Exemptions."

[94] See INA 101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).
[95] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal and replacement EADs filed at the nonimmigrant and adjustment of status stages.
[96] See INA 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

| | | | | |
|---|---|---|---|---|
| | | • Form I-765<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives) | • Form I-290B (only if filed with or after Form I-485 is filed)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| VAWA Form I-360 self-petitioners and derivatives[97] | • Form I-360 | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-131 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360) | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-824<br>• N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[97] This category includes VAWA self-petitioners and derivatives as defined in INA 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA 204(a)(1). *See* INA 101(a)(51); 8 U.S.C. 1101(a)(51). *See* INA 204(a); 8 U.S.C. 1154(a).

| | | | | |
|---|---|---|---|---|
| | | | • Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9),initial 8 CFR 274a.12(c)(14), and initial category (c)(31) fee exempt for principals and derivatives)[98] | |
| Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty[99] | | • Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-290B (only when filed for Form I-751) | • Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children adjusting status under CAA and HRIFA[100] | | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children seeking benefits | | • Form I-601<br>• Form I-765<br>• Form I-881<br>• Form N-300 | • Form I-765 (submitted under 8 CFR 274a.12(c)(10)) | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470 |

---

[98] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12 (c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[99] *See* INA 101(a)(51)(C) and INA 216(c)(4)(C) and (D; 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[100] *See* INA sec. 101(a)(51)(D) and (E); 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

| | | | | |
|---|---|---|---|---|
| under NACARA[101] | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-881<br>• Form I-601 | • Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children of LPRs or U.S. citizens under INA 240A(b)(2)[102] | | • Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-601<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused Spouses of A, E-3, G, and H Nonimmigrants[103] | • Form I-765V | | | |
| Special immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the U.S. government | • Form I-360<br>• Form I-485 (for certain Special Immigrant Afghans)[104]<br>• Form I-765 (initial filing for certain Afghans)[105]<br>Form I-601 (for certain Special Immigrant Afghans)[106] | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[101] See INA 101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[102] Also includes children of battered spouses and children of an LPR or a U.S. citizen and parents of battered children of an LPR or a U.S. citizen under INA 240A(b)(4).

[103] See INA 106. ; 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants are able to file under another eligible category, the applicant may be eligible for a fee waiver.

[104] Afghan nationals and their derivative beneficiaries applying to adjust status to permanent residence based on classification as Afghan special immigrants as part of the temporary Operation Allies Welcome (OAW) program.

[105] Afghan nationals and their derivative beneficiaries who were paroled into the United States. This is part of the temporary OAW program.

[106] Afghan nationals and their derivative beneficiaries who file their application from a U.S. military installation in the United States as part of the temporary OAW program.

| or employed by the International Security Assistance Force (ISAF) and their derivative beneficiaries | | • Form N-600K | | |
|---|---|---|---|---|
| Special Immigrant Juveniles (SIJs) | • Form I-360 | • Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Temporary protected status (TPS)[107] | • Form I-821 (only re-registration) | • Biometric Services Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 | | • Biometric Services Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| Asylees | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and the I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request by asylees and initial request by asylum applicants with a | • Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | | • Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[107] *See* INA 244 and 245(l)(7). This category includes applicants and recipients of TPS.

| | pending Form I-589) | | | |
|---|---|---|---|---|
| Refugees | • Form I-590<br>• Form I-485<br>• Form I-602<br>• Form I-730 | • Form I-290B<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing section 101(a)(27)(K) of the Act[108] | • Form N-400<br>• Form N-336<br>• Form N-600<br>• Form N-600K | • Form N-300<br>• Form N-470<br>• Form N-565 | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial request for service member, spouse, or children) | • Form N-300<br>• Form N-470<br>• Form N-565 |

**Affected Population**

The population impacted by this provision includes individuals that currently receive fee exemptions provided through USCIS' policy guidance documents and individuals that can currently submit fee waiver requests. The latter individuals will no longer require a fee waiver for certain categories of requestors because they will now be fee exempt. For the purposes of this analysis, DHS uses the volume of fee waiver requests received to estimate the impact to populations affected by this rule.

---

[108] These applicants are eligible for naturalization under INA 328. Most military applicants are eligible for naturalization without lawful permanent residence under INA 329.

Table 37 presents data on the annual receipts of fee waiver requests associated with various categories of immigrants' filing of specific forms for FY 2016 through FY 2020. During this period, USCIS received an annual average of 145,604 fee waiver requests. Individuals with approved fee waivers may submit applications to USCIS without providing the corresponding application fee and may receive immigration benefits from USCIS.

| Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
| | | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Annual Average Receipts |
| Victims of severe form of trafficking (T nonimmigrants) | Form I-131 | 662 | 477 | 545 | 548 | 581 | 563 |
| | Form I-192 | 991 | 1,332 | 1,493 | 1,226 | 1,321 | 1,273 |
| | Form I-193 | 11 | 9 | 8 | 6 | 5 | 8 |
| | Form I-290B* (only if filed for any benefit request filed before adjusting status or for Form I-485) | 103 | 105 | 168 | 205 | 410 | 198 |
| | Form I-485 | 1,626 | 1,479 | 1,308 | 1,450 | 1,304 | 1,433 |
| | Form I-539 | 93 | 72 | 80 | 79 | 89 | 83 |
| | Form I-601 | 13 | 21 | 8 | 29 | 33 | 21 |
| | Form I-765 | 3,243 | 3,588 | 3,212 | 3,184 | 3,352 | 3,316 |
| *Total* | | | | | | | *6,895* |
| Victims of qualifying criminal activity (U nonimmigrants) | Form I-192 (only if filed before Form I-485 is filed) | 43,361 | 48,258 | 41,804 | 33,664 | 27,896 | 38,997 |

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2016** | **2017** | **2018** | **2019** | **2020** | **5-Year Annual Average Receipts** |
| | Form I-193 (only if filed before Form I-485 is filed) | 199 | 114 | 70 | 52 | 29 | 93 |
| | Form I-290B (only if filed before Form I-485 is filed) | 803 | 819 | 819 | 1,186 | 1,324 | 990 |
| | Form I-539 (only if filed before Form I-485 is filed) | 1,268 | 1,300 | 1,127 | 1,117 | 846 | 1,132 |
| | Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives) | 37,419 | 42,628 | 38,821 | 27,763 | 20,784 | 33,483 |
| *Total* | | | | | | | *74,695* |
| VAWA Form I-360 self-petitioners and derivatives | Form I-131 (only when Form I-360 and Form I-485 are concurrently filed or pending) | N/A | 2,820 | 5,334 | 6,041 | 8,437 | 5,658 |
| | Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending) | | 15 | 25 | 90 | 178 | 77 |
| | Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360) | | 142 | 158 | 153 | 109 | 141 |
| | Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485) | | 126 | 106 | 209 | 300 | 185 |

**Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020**

**Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020**

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2016** | **2017** | **2018** | **2019** | **2020** | **5-Year Annual Average Receipts** |
| | Form I-485 (only if filed concurrently with Form I-360) | | | | | | |
| | Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending) | | 60 | 144 | 195 | 376 | 194 |
| | | | | | | | |
| *Total* | | | | | | | *6,255* |
| Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty | Form I-290B (only when filed for Form I-751) | - | - | 5 | 7 | 11 | 8 |
| *Total* | | | | | | | *8* |
| Abused spouses and children adjusting status under CAA and HRIFA | Form I-131 | 385 | 352 | 218 | 177 | 140 | 254 |
| | Form I-212 | 4 | 6 | 12 | 9 | 10 | 8 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 55 | 39 | 31 | 40 | 30 | 39 |
| | Form I-485 | 907 | 336 | 296 | 88 | 45 | 334 |
| | Form I-601 | 44 | 23 | 22 | 16 | 22 | 25 |
| | Form I-765 | 1,243 | 806 | 804 | 512 | 341 | 741 |
| *Total* | | | | | | | *1,401* |
| | Form I-765 | N/A | | | | | |

| Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
| | | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Annual Average Receipts |
| Abused spouses and children seeking benefits under NACARA | Form I-881 | | | | | | |
| | Form I-601 | | | | | | |
| Abused spouses and children of LPRs or U.S. citizens under INA 240A(b)(2) | Form I-601 | N/A | | | | | |
| | Form I-765 (initial 8 CFR 274a.12(c)(10) only) | | | | | | |
| Special immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the U.S. government or employed by the ISAF[109] | Special immigrant Afghan or Iraqi form I-360 Totals | 644 | 2,234 | 1,159 | 1,470 | 1,037 | 1,309 |
| | Form I-131 | 22 | 13 | 15 | 7 | 9 | 13 |
| | Form I-212 | 2 | - | 1 | - | - | 2 |

[109] DHS is not making any assumptions about additional Afghani special immigrant visas.

**Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020**

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Annual Average Receipts |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 1 | 2 | 3 | 4 | 2 | 2 |
| | Form I-485 | 3 | 30 | 41 | 34 | 65 | 35 |
| | Form I-601 | 2 | 1 | 2 | - | - | 2 |
| | Form I-765 | 58 | 44 | 34 | 25 | 22 | 37 |
| *Total* | | | | | | | **1,400** |
| Special Immigrant Juveniles (SIJs) | SIJ Form I-360 Totals | 19,572 | 22,154 | 21,899 | 20,783 | 18,788 | 20,639 |
| | Form I-131 | 694 | 469 | 311 | 539 | 706 | 544 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 267 | 352 | 776 | 1,871 | 976 | 848 |
| | Form I-485 | 1,260 | 1,875 | 1,972 | 3,756 | 6,547 | 3,082 |
| | Form I-601 | 49 | 27 | 18 | 51 | 40 | 37 |
| | Form I-765 | 15,995 | 18,841 | 15,021 | 19,820 | 23,006 | 18,537 |
| *Total* | | | | | | | *43,687* |
| Temporary protected status (TPS) | None | N/A | | | | | |
| Asylees | None | N/A | | | | | |
| Refugees | Form I-765 (renewal and replacement request) | 823 | 1,063 | 1,154 | 1,397 | 868 | 1,061 |
| | Form I-131 | 9,893 | 8,971 | 11,329 | 12,533 | 8,278 | 10,201 |

**Table 37. Annual Receipts of Fee Waiver Requests Associated with Various Categories of Immigrants' filing of Specific Forms, for Fiscal Years 2016 through 2020**

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | Receipts | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Annual Average Receipts |
| | Form I-131A | N/A | | | | | |
| *Total* | | | | | | | *11,262* |
| Person who served honorably on active duty in the U.S. Armed Forces filing under section 101(a)(27)(K) of the Act | Form I-360 | 1 | 2 | 2 | 1 | 1 | 1 |
| | Form I-485 | N/A | | | | | |
| *Total* | | | | | | | *1* |
| **Grand Total** | | | | | | | **145,604** |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD), CLAIMS 3 and ELIS databases, June 24, 2021.

## Cost-Benefit-Transfer Payments Analysis

DHS is proposing to exempt the fees for certain humanitarian requestors instead of requiring a fee waiver. In Table 38, DHS shows the proposed fees and the estimated annual average fee waiver requests accompanying several forms. DHS estimates the forgone revenue from exempted fees would result in annual transfer payments from USCIS to

applicants/petitioners of approximately $106,821,450.[110] This is the estimated annual amount of fees that would now be exempt.

| **Table 38. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants** | | | | | |
|---|---|---|---|---|---|
| **Classification Category** | **Receipts for the following Proposed Fee Exemptions Forms** | **5-Year Annual Average Receipts** *(A)* | **Current Fees** *(B)* | **Proposed Fees** *(C)* | **Transfer Payments** *D = C x A* |
| Victims of severe form of trafficking (T nonimmigrants) | · Form I-131 | 563 | $575 | $630 | $354,690 |
| | · Form I-192 | 1,273 | $930 | $1,100 | $1,400,300 |
| | · Form I-193 | 8 | $585 | $695 | $5,560 |
| | · Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 198 | $675 | $800 | $158,400 |
| | · Form I-485 | 1,433 | $1,140 | $1,540 | $2,206,820 |
| | · Form I-539 | 83 | $370 | $573 | $47,559 |
| | · Form I-601 | 21 | $930 | $1,050 | $22,050 |
| | · Form I-765 | 3,316 | $410 | $603 | $1,999,548 |
| *Total* | | *6,895* | | | *$6,194,927* |
| Victims of qualifying criminal activity (U nonimmigrants) | · Form I-192 (only if filed before Form I-485 is filed) | 38,997 | $930 | $1,100 | $42,896,700 |
| | · Form I-193 (only if filed before Form I-485 is filed) | 93 | $585 | $695 | $64,635 |
| | · Form I-290B (only if filed before Form I-485 is filed) | 990 | $675 | $800 | $792,000 |
| | · Form I-539 (only if filed before Form I-485 is filed) | 1,132 | $370 | $573 | $648,636 |
| | · Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives) | 33,483 | $410 | $603 | $20,190,249 |

---

[110] This estimate might be overstated as many users who cannot pay the regular fees would probably not file absent a fee exemption.

**Table 38. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants**

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | 5-Year Annual Average Receipts (A) | Current Fees (B) | Proposed Fees (C) | Transfer Payments D = C x A |
|---|---|---|---|---|---|
| *Total* | | *74,695* | | | *$64,592,220* |
| VAWA Form I-360 self-petitioners and derivatives | · Form I-131 (only when Form I-360 and Form I-485 are concurrently filed or pending) | 5,658 | $575 | $630 | $3,564,540 |
| | · Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending) | 77 | $930 | $1,395 | $107,415 |
| | · Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360) | 141 | $675 | $800 | $112,800 |
| | · Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485) | 185 | $675 | $800 | $148,000 |
| | · Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending) | 194 | $930 | $1,050 | $203,700 |
| *Total* | | *6,255* | | | *$4,136,455* |
| Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty | · Form I-290B (only when filed for Form I-751) | 8 | $675 | $800 | $6,400 |
| *Total* | | *8* | | | *$6,400* |
| | · Form I-131 | 254 | $575 | $630 | $160,020 |

**Table 38. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants**

| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | 5-Year Annual Average Receipts (A) | Current Fees (B) | Proposed Fees (C) | Transfer Payments D = C x A |
|---|---|---|---|---|---|
| Abused spouses and children adjusting status under CAA and HRIFA | · Form I-212 | 8 | $930 | $1,395 | $11,160 |
| | · Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 39 | $675 | $800 | $31,200 |
| | · Form I-485 | 334 | $1,140 | $1,540 | $514,360 |
| | · Form I-601 | 25 | $930 | $1,050 | $26,250 |
| | · Form I-765 | 741 | $410 | $603 | $446,823 |
| *Total* | | *1,401* | | | *$1,189,813* |
| Special immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the U.S. government or employed by the ISAF | Special immigrant Afghan or Iraqi form I-360 Totals | 1,309 | $435 | $515 | $674,135 |
| | · Form I-131 | 13 | $575 | $630 | $8,190 |
| | · Form I-212 | 2 | $930 | $1,395 | $2,790 |
| | · Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 2 | $675 | $800 | $1,600 |
| | · Form I-485 | 35 | $1,140 | $1,540 | $53,900 |
| | · Form I-601 | 2 | $930 | $1,050 | $2,100 |
| | · Form I-765 | 37 | $410 | $603 | $22,311 |
| *Total* | | *1,400* | | | *$765,026* |
| Special Immigrant Juveniles (SIJs) | . Form I-360 Totals | 20,639 | $435 | $515 | $10,629,085 |
| | · Form I-131 | 544 | $575 | $630 | $342,720 |
| | · Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | 848 | $675 | $800 | $678,400 |
| | · Form I-485 | 3,082 | $1,140 | $1,540 | $4,746,280 |
| | · Form I-601 | 37 | $930 | $1,050 | $38,850 |
| | · Form I-765 | 18,537 | $410 | $603 | $11,177,811 |
| *Total* | | *43,690* | | | *$27,613,146* |

| Table 38. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants | | | | | |
|---|---|---|---|---|---|
| Classification Category | Receipts for the following Proposed Fee Exemptions Forms | 5-Year Annual Average Receipts *(A)* | Current Fees *(B)* | Proposed Fees *(C)* | Transfer Payments *D = C x A* |
| Refugees | · Form I-765 (renewal and replacement request) | 1,061 | $410 | $603 | $639,783 |
| | · Form I-131 | 10,201 | $135 | $165 | $1,683,165 |
| *Total* | | *11,262* | | | *$2,322,948* |
| Person who served honorably on active duty in the U.S. Armed Forces filing section 101(a)(27)(K) of the Act | · Form I-360 | 1 | $435 | $515 | $515 |
| **Grand Total** | | **145,607** | | | **$106,821,450** |

In addition to increased foregone revenue for DHS, this proposed rule would create cost savings for individuals who would no longer have to complete the fee waiver application (Form I-912). The various individuals who could complete Form I-912 include the applicant, interpreter, accredited representative, in-house lawyer, and outsourced lawyer. DHS uses the effective minimum wage of $11.80 for the applicant as the basis for estimating the opportunity cost of the time for preparing and submitting Form I-912.[111] Additionally, DHS uses the mean hourly wages of $18.08 for the interpreter, $27.03 for the accredited representative and $71.17 for in-house and outsourced lawyers to estimate the opportunity cost of the time for preparing

---

[111] "Americans Are Seeing Highest Minimum Wage in History (Without Federal Help)" Ernie Tedeschi, The New York Times, April 24, 2019. Accessed at https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html (last visited September 27, 2022).

and submitting Form I-912.[112] DHS estimates that the benefits-to-wage multiplier is 1.45[113] and multiplies that by the average hourly wage rates to account for the full cost of employee benefits. The resulting loaded hourly wage rates are $17.11 for an applicant, $26.22 for an interpreter, $39.19 for an accredited representative, and $103.20 for an in-house lawyer.[114] DHS recognizes that a firm may choose, but is not required, to outsource the preparation of these petitions and, therefore, presents two wage rates for lawyers. DHS multiplied the average hourly U.S. wage rate for lawyers by 2.5 for a total of $177.93 to approximate an hourly billing rate for an outsourced lawyer.[115,116]

---

[112] *See* Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment and Wage Statistics, May 2021" *See profiles for Lawyers, Social and Human Service Assistants (Interpreters) and Paralegals/Legal Assistants (Accredited Representative. )*." Available at: https://www.bls.gov/oes/2021/may/oes_nat.htm#13-0000. (last visited September 27, 2022, 2022).

[113] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour) / (Wages and Salaries per hour) ($40.35 Total Employee Compensation per hour) / ($27.83 Wages and Salaries per hour) = 1.45 (rounded). See U.S. Department of Labor, Bureau of Labor Statistics, Economic News Release, Employer Cost for Employee Compensation (December 2021), Table 1. Employer Costs for Employee Compensation by ownership (Dec. 2021), available at https://www.bls.gov/news.release/archives/ecec_03182022.htm. (last visited September 26, 2022)

[114] Calculation: *Applicant:* (Effective Minimum Wage Rate) $11.80 x (Benefits-to-wage multiplier) 1.45 = $17.11 per hour; *Interpreter:* (Mean hourly wage of Social/Human Service Assistants) $18.08 × (Benefits-to-wage multiplier) 1.45 = $26.22 per hour; *Accredited Representative*: (Mean hourly wage of Paralegals/Legal Assistants) $27.03 x (Benefits-to-wage multiplier) 1.45 = $39.19 per hour; *In-house Lawyer*: (Mean hourly wage of Lawyers) $71.17 x (Benefits-to-wage multiplier) 1.45 = $103.20 per hour.

[115] The DHS analysis in "Exercise of Time-Limited Authority to Increase the Fiscal Year 2018 Numerical Limitation for the H-2B Temporary Nonagricultural Worker Program" (May 31, 2018), available at *https://www.federalregister.gov/documents/2018/05/31/2018-11732/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2018-numerical-limitation-for-the*, used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney wages (last visited September 27, 2022).

Also, the analysis in the ICE rule "Final Small Entity Impact Analysis: Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," at G-4 (Aug 25, 2008), *https://www.regulations.gov/document/ICEB-2006-0004-0922,* (last viewed on September 27, 2022) used 2.5 as a multiplier for outsourced labor wages.

[116] Calculation: (Mean hourly wage of Lawyers) $71.17 × (Benefits-to-wage multiplier) 2.5 = $177.93 per hour for an outsourced lawyer.

DHS estimates the opportunity cost of time for completing and submitting Form I-912 ranges from $20.02 to $208.18 per fee waiver request.[117] Table 39 shows that the current opportunity cost of time for completing and submitting Form I-912 ranges from $2,914,992 to $30,311,841 annually, depending on who is completing the form. This amounts to an annual average of $12,390,027 in cost savings to individuals who would not have to complete and submit a Form I-912.[118]

| Table 39. Annual Opportunity Cost of Time to Complete Form I-912 | | | | |
|---|---|---|---|---|
| | Annual Average Affected Population | Time Burden to complete Form I-912 per hour (1 hour 10 mins) | Opportunity Cost = *Time Burden to complete Form I-912 x Loaded Wage Rate (per hour)* | Annual Opportunity Cost = *Opportunity Cost x Affected Population* |
| Applicants | 145,604 | 1.17 | $20.02 | $2,914,992 |
| Interpreter | 145,604 | 1.17 | $30.68 | $4,467,131 |
| Accredited Representative | 145,604 | 1.17 | $45.85 | $6,675,943 |
| In-house Attorney | 145,604 | 1.17 | $120.74 | $17,580,227 |
| Outsourced Attorney | 145,604 | 1.17 | $208.18 | $30,311,841 |
| **Average Cost Savings** | | | | **$12,390,027** |

In sum, this provision would result in annual transfer payments from USCIS to the public of $106,821,450 and an annual average of $12,390,027 in cost savings to the public in

---

[117] Calculation: *Applicant*: 1.17 × $17.11 per hour = $20.02; *Interpreter*: 1.17 × $26.22 per hour = $30.68; *Accredited Representative*: 1.17 × $39.19 per hour = $45.85; *In-house Lawyer*: 1.17 × $103.20 per hour = $120.74; *Outsourced Lawyer:* 1.17 × $177.93 per hour = $208.18.
[118] Calculation: ($2,914,992+$4,467,131+$6,675,943+$17,580,227+$30,311,841)/5 = $12,390,027.

opportunity costs for not completing and submitting a fee waiver request. Individuals who are

unable to afford the immigration benefit request fees would benefit from this proposed provision.

USCIS does not capture the time burden for its officers to process fee waiver requests, thus, due

to limited data, DHS has not quantified the cost savings to USCIS associated with processing of

the I-912.

### Q. Additional Fee Adjustments

**Changes and Affected Population**

In addition to the immigration benefit forms discussed in the provisions above, DHS

proposes to adjust other form fees. Table 40 show the estimated number of requests made to

USCIS and projected receipts for Forms I-90, I-102, I-130, I-131, I-140, I-191, I-601, I-612, I-

290B, I-360, , I-539, 601A, I-687/690/694/698, I-751, I-765, I-817, , I-910, and I-929 for FY

2016 through FY 2020.

| Table 40. Receipts of Immigration Benefit Forms, for Fiscal Years 2016 through 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Form** | **Description** | **2016** | **2017** | **2018** | **2019** | **2020** | **5-Year Total** | **5-Year Annual Average** | **VPC*** |
| **I-90 (paper)** | Application to Replace Permanent Resident Card | 404,230 | 421,236 | 377,251 | 389,810 | 303,934 | **1,896,461** | **379,292** | |
| **I-102** | Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document | 7,489 | 7,358 | 5,592 | 4,978 | 4,098 | **29,515** | **5,903** | |
| **I-130 (paper)** | Petition for Alien Relative | N/A | N/A | N/A | N/A | N/A | **N/A** | **N/A** | 643,282 |
| **I-131** | Application for Travel Document | 447,951 | 499,144 | 485,048 | 493,550 | 437,950 | **2,363,643** | **472,729** | |

| Table 40. Receipts of Immigration Benefit Forms, for Fiscal Years 2016 through 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Form | Description | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Total | 5-Year Annual Average | VPC* |
| I-131 | Refugee Travel Document for an individual age 16 or older | 21,121 | 17,843 | 22,017 | 25,383 | 21,375 | **107,739** | **21,548** | |
| I-131 | Refugee Travel Document for a child under the age of 16 | 1,774 | 1,487 | 1,659 | 1,954 | 1,652 | **8,526** | **1,705** | |
| I-140 | Immigrant Petition for Alien Worker | 147,581 | 139,566 | 136,585 | 142,451 | 128,178 | **694,361** | **138,872** | |
| I-601 | Application for Waiver of Ground of Inadmissibility | N/A | N/A | N/A | 19,153 | 19,256 | **38,409** | **19,205** | |
| I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | N/A | N/A | 7,544 | 554 | **8,098** | **4,049** | |
| I-290B | Notice of Appeal or Motion | 23,015 | 21,844 | 21,849 | 21,763 | 32,325 | **120,796** | **24,159** | |
| I-360 | Petition for Amerasian Widow(er) or Special Immigrant | 39,407 | 38,927 | 38,511 | 40,208 | 38,529 | **195,582** | **39,116** | |
| I-539 (paper) | Application to Extend/ Change Nonimmigrant Status | N/A | N/A | N/A | N/A | N/A | **N/A** | **N/A** | 276,468 |
| I-601A | Application for Provisional Unlawful Presence Waiver | 51,213 | 65,729 | 60,748 | 52,506 | 49,491 | **279,687** | **55,937** | |
| I-687** | Application for Status as a Temporary Resident under | 116 | 81 | 58 | 37 | 46 | **338** | **68** | |

| Table 40. Receipts of Immigration Benefit Forms, for Fiscal Years 2016 through 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Form | Description | 2016 | 2017 | 2018 | 2019 | 2020 | 5-Year Total | 5-Year Annual Average | VPC* |
| | Section 245A of the Immigration and Nationality Act | | | | | | | | |
| I-690** | Application for Waiver of Grounds of Inadmissibility | | | | | | | | |
| I-694** | Notice of Appeal of Decision | | | | | | | | |
| I-751 | Petition to Remove Conditions on Residence | 144,648 | 166,431 | 177,674 | 187,414 | 171,851 | 848,018 | 169,604 | |
| I-765 (paper) | Application for Employment Authorization | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1,043,912 |
| I-817 | Application for Family Unity Benefits | 916 | 1,356 | 707 | 340 | 549 | 3,868 | 774 | |
| I-910 | Application for Civil Surgeon Designation | 571 | 538 | 362 | 465 | 452 | 2,388 | 478 | |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | 1,084 | 1,511 | 1,192 | 1,078 | 919 | 5,784 | 1,157 | |
| Total | | | | | | | | 1,334,596 | 1,963,662 |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD) C3 Consolidated, National Performance Report and PASEXEC, April 20, 2021

Notes:
* DHS uses the VPC projections for these paper filings because there are no historical estimates for both options in use at the same time. Source: *USCIS, Office of the Chief Financial Officer, July 2021*
**Individual receipts data are not available for these forms.

**Cost-Benefit-Transfer Payments Analysis**

In Table 41, DHS estimates that the fee increases to the listed benefit request forms would result in an annual transfer payment from fee payers to USCIS of approximately $497,300,220.

| Forms | Estimated Annual Average Receipts (A) | Current Fees (B) | Proposed Fees (C) | Fee Difference D=C-B | Percent Change | Transfer Payments E = D×A |
|---|---|---|---|---|---|---|
| **Table 41. Economic Impacts of Fee Adjustments to Immigration and Benefit Requests** | | | | | | |
| I-90 (paper)*** | 379,292 | $540 | $465 | -$75 | -14% | -$28,446,900 |
| I-102 | 5,903 | $445 | $680 | $235 | 53% | $1,387,205 |
| I-130 (paper) | 643,282 | $535 | $820 | $285 | 53% | $183,335,370 |
| I-131 (Application for Travel Document)*** | 472,729 | $660 | $630 | -$30 | -5% | -$14,181,870 |
| I-131 (Refugee Travel Document for an individual age 16 or older)*** | 21,548 | $220 | $165 | -$55 | -25% | -$1,185,140 |
| I-131 (Refugee Travel Document for a child under the age of 16)*** | 1,705 | $190 | $135 | -$55 | -29% | -$93,775 |
| I-140 | 138,872 | $700 | $715 | $15 | 2% | $2,083,080 |
| I-601 | 19,205 | $930 | $1,050 | $120 | 13% | $2,304,600 |
| I-612 | 4,049 | $930 | $1,100 | $170 | 18% | $688,330 |
| I-290B | 24,159 | $675 | $800 | $125 | 19% | $3,019,875 |
| I-360 | 39,116 | $435 | $515 | $80 | 18% | $3,129,280 |
| I-539 (paper) | 276,468 | $370 | $620 | $250 | 68% | $69,117,000 |
| I-601A | 55,937 | $630 | $1,105 | $475 | 75% | $26,570,075 |

| Table 41. Economic Impacts of Fee Adjustments to Immigration and Benefit Requests | | | | | | |
|---|---|---|---|---|---|---|
| Forms | Estimated Annual Average Receipts *(A)* | Current Fees *(B)* | Proposed Fees *(C)* | Fee Difference *D=C-B* | Percent Change | Transfer Payments *E = D×A* |
| I-687, I-690, I-694 | 68 | $912* | $1,127** | $215 | 24% | $14,620 |
| I-751*** | 169,604 | $680 | $1,195 | $515 | 76% | $87,346,060 |
| I-765 (paper)*** | 1,043,912 | $495 | $650 | $155 | 31% | $161,806,360 |
| I-817*** | 774 | $685 | $875 | $190 | 28% | $147,060 |
| I-910 | 478 | $785 | $1,230 | $445 | 57% | $212,710 |
| I-929 | 1,157 | $230 | $270 | $40 | 17% | $46,280 |
| Total | | | | | | $497,300,220 |

Source: USCIS Analysis

Notes:
Individual receipts data are not available for Forms I-687, I-690, and I-694. Therefore, DHS uses the average current and proposed fees to estimate the transfer payments to USCIS.
*Calculation: Average Current Fees = ($1,130 for *I-687* + $715 for *I-690*+ $890 for *I-694*) / 3 = $912
**Calculation: Average Proposed Fees = ($1,240 for *I-687* + $985 for *I-690* + $1,155 for *I-694*) / 3 = $1,127
***Current fees (baseline costs) include $85 biometric services fee.

### R. Adjusting USCIS Fees for Inflation

### Changes and Affected Population

DHS is proposing to use the Consumer Price Index for All Urban Consumers (CPI-U), as published by the U.S Department of Labor, U.S. Bureau of Labor Statistics (BLS), as the inflation index for future fee adjustments between comprehensive fee rules.[119]  Codifying this

---

[119] See, Consumer Price Index, available at https://www.bls.gov/news.release/cpi.toc.htm (last viewed September 27, 2022).

provision would authorize DHS to adjust all immigration fees by the BLS estimate of inflation for all urban consumers as measured since the effective date.

Currently, DHS regulations state that USCIS may adjust fees for immigration benefit annually by publication of notice in the Federal Register. However, the current adjustment is based on the federal employee salary inflation assumptions issued by the Office of Management and Budget. If Congress enacts a different Federal civilian pay raise percentage than the assumption used by Office of Management and Budget for formulation of the President's Budget, DHS would be obligated to adjust the fees during that year or in the following year to reflect the different between the assumed and enacted levels. In addition to the unnecessary effort, this could result in additional confusion about correct fee amounts. This rule proposes instead that future inflation-based fee increases be based on the change in prices paid by urban consumers for a market basket of goods and services. This change, measured since the month of the effective date of the most current fee schedule, would be applied to all fees. The CPI-U is used for the Census Bureau's annual update of poverty thresholds and Health and Human Services Department's Federal Poverty Guidelines (see 87 FR 3315), which determine eligibility for USCIS fee waivers on income grounds at the time of filing. Consequently, this approach promotes coordination, simplification, and harmonization. In implementing such increases, USCIS would publish analysis of the impacts from these CPI-U adjustments and would not include policy changes more appropriate for comprehensive fee rules. Specifically, such analysis would consider how much more fee-paying applicants would contribute, in nominal dollars, in order to maintain the real value of each fee revenue dollar in the intervening years between comprehensive fee rules.

The population affected by this proposed provision includes fee-paying applicants and petitioners applying for USCIS immigration benefits.

**Costs, Benefits and Transfer Payments Analysis**

Changing the methodology for adjusting fees by inflation would provide several benefits to DHS. DHS would be able to publish timely USCIS fee schedule adjustments that insure the real value of USCIS fee revenue dollars against future inflation. Unlike the OMB annual inflation assumption methodology, individuals may have more reasonable expectations about changes in the value of their consumer dollar and the official BLS-published monthly estimates can be easily and transparently applied to the fee schedule. Additionally, using the CPI-U as the inflation index for all fees would be consistent with various statutes that currently provide that USCIS apply CPI adjustments to certain fees. HHS adjusts the federal poverty guidelines used by USCIS to determine fee waiver eligibility using the CPI-U. While this authority to maintain the real value of USCIS fee revenue dollars through regular inflation-adjustment-only rules constitutes an important benefit, the actual impacts of such an adjustment would be analyzed in future rules should DHS exercise this proposed authority. Such analyses would estimate a transfer payment consisting of additional nominal revenue to USCIS and a countervailing disbenefit to fee-paying populations no longer able to enjoy constant nominal prices for immigration services in the years between comprehensive fee rules.

# 4. Total Quantified Net Costs and Transfer Payments of the Proposed Regulatory Changes

In this section DHS summarizes the quantified economic impacts of the proposed regulatory changes. Table 42 shows the undiscounted annual costs, cost savings and transfer payments for the relevant provisions.

| Table 42. Summary of Annual Quantified Economic Impacts for Each Provision | | | | | |
|---|---|---|---|---|---|
| **Proposed Provisions** | **Costs to Applicants/Petitioners** | **Cost Savings to Applicants/ Petitioners** | **Transfer Payments from Applicants/Petitioners to USCIS** *(fee increases)* | **Transfer Payments from USCIS to Applicants/Petitioners** *(fee decreases and exemptions)* | **Transfer Payments from DoD to USCIS** *(reimbursement)* |
| 1: Clarify Dishonored Fee Check Re-presentment Requirement and Fee Payment Method | | | $546,286 | | |
| 2: Eliminate $30 Returned Check Fee | | $356,370 | | | |
| 3: Changes to Biometric Services Fee | | | | $9,447,570 | |
| 4: Naturalization and Citizenship Related Forms | | | $46,991,905 | $103,225 | $222,145 |
| 5: Reduced Fees for Filing Online | | $29,974,655 | $52,954,120 | | |
| 6: Form I-485 Application to Register Permanent Residence or Adjust Status | | | $639,639,522 | | |
| 7: Form I-131A Carrier Documentation | | | $0 | | |
| 8: Separating Form I-129 Petition for a Nonimmigrant Worker into Different Forms + Asylum Program Fee | $574,884,600 | | $273,101,915 | | |
| 9: Premium Processing | | | $0 | | |
| 10: Intercountry Adoptions | $215,590 | | $240,180 | | |
| 11: Immigrant Investors | | | $87,447,325 | | |
| 12: Changes to Genealogy Search and Records Requests | | | $1,198,890 | | |
| 13: Fees Shared by CBP and USCIS | | | $12,705,970 | | |
| 14: Form I-881, Application for Suspension of Deportation or | | | $1,529 | $184 | |

| | | | | |
|---|---|---|---|---|
| Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)* | | | | |
| 15: Fee Waivers | | | | $0 |
| 16: Fee Exemptions | | $12,390,027 | | $106,821,450 |
| 17: Fee Adjustments to Other Benefit Request Forms | | | $497,300,220 | |
| **Total** | **$575,100,190** | **$42,721,052** | **$1,612,127,862** | **$116,372,429** | **$222,145** |

USCIS Analysis

### A. Discounted Net Costs

DHS estimates this proposed rule would create annual costs to petitioners of $574,884,600 due to the new Asylum Program fee of $600 to be paid by employers who file either a Form I-129 or Form I-140, and $215,590 from applicants due to the filing fees and opportunity costs of time to complete and submit the new Form I-600A/I-600 Supplement 3. This amounts to $575,100,190 in total costs to the applicants/petitioners.[120]

The total cost savings of $42,721,052 is the sum of the cost savings to the applicants/petitioners due to the elimination of the $30 returned check fee ($356,370), reduced fees for filing online ($29,974,655) and opportunity costs for no longer completing and submitting Form I-912 due to the new fee exemptions ($12,390,027). Net costs to the public of $532,379,138 are the total costs minus cost savings.[121] Table 43 illustrates that over a 10-year period of analysis from fiscal year 2023 through 2032, annualized net costs would be $532,379,138 using 7- percent and 3- percent discount rates.

**Table 43. Discounted Net Costs Over a 10-Year Period of Analysis**

---

[120] Calculations: $574,884,600 (Asylum Fees) + $215,590 (new Form I-600A/I-600 Supplement 3) = $575,100,190 Total Costs

[121] Calculations: $575,100,190Total Costs – $42,721,052 Total Cost Savings = $532,379,138  Net Costs

| Year | $532,379,138 (Undiscounted) | |
|---|---|---|
| | Discounted at 3% | Discounted at 7% |
| 2023 | $516,872,950 | $497,550,596 |
| 2024 | $501,818,398 | $465,000,557 |
| 2025 | $487,202,328 | $434,579,960 |
| 2026 | $473,011,969 | $406,149,495 |
| 2027 | $459,234,921 | $379,578,968 |
| 2028 | $445,859,147 | $354,746,699 |
| 2029 | $432,872,958 | $331,538,971 |
| 2030 | $420,265,008 | $309,849,505 |
| 2031 | $408,024,279 | $289,578,977 |
| 2032 | $396,140,077 | $270,634,558 |
| **10-year Total** | **$4,541,302,033** | **$3,739,208,286** |
| **Annualized Costs** | **$532,379,138** | **$532,379,138** |
| USCIS Analysis | | |

## B. Discounted Transfer Payments

Transfer payments are monetary payments from one group to another that do not affect total resources available to society. OMB guidance cites fees to government agencies for goods or services provided by the agency are an example of transfer payments.[122] Additionally, OMB Circular A-4 discusses the importance of distinguishing between real costs and transfer payments and states that transfer payments should be addressed in a separate discussion of the regulation's distributional effects.

**Transfer Payments from Fee-Paying Applicants/Petitioners to USCIS**

---

[122] *See* OMB Circular A-4, available at https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf (last viewed Sep. 22, 2022).

Table 44 shows the transfer payments from specific form fee-paying applicants/petitioners to USCIS over a 10-year period of analysis. DHS estimates the annualized transfer payments would be $1,612,127,862 discounted at both 3 percent and 7 percent.

| Table 44. Discounted Transfer Payments from Fee-Paying Applicants/Petitioners to USCIS Over a 10-Year Period of Analysis | | |
|---|---|---|
| Year | $1,612,127,862 (Undiscounted) | |
| | Discounted at 3% | Discounted at 7% |
| 2023 | $1,565,172,682 | $1,506,661,553 |
| 2024 | $1,519,585,128 | $1,408,094,910 |
| 2025 | $1,475,325,367 | $1,315,976,551 |
| 2026 | $1,432,354,725 | $1,229,884,627 |
| 2027 | $1,390,635,655 | $1,149,424,885 |
| 2028 | $1,350,131,704 | $1,074,228,865 |
| 2029 | $1,310,807,480 | $1,003,952,210 |
| 2030 | $1,272,628,621 | $938,273,093 |
| 2031 | $1,235,561,768 | $876,890,742 |
| 2032 | $1,199,574,532 | $819,524,057 |
| **10-year Total** | **$13,751,777,662** | **$11,322,911,493** |
| **Annualized Transfers** | **$1,612,127,862** | **$1,612,127,862** |
| USCIS Analysis | | |

**Transfer Payments from USCIS to Applicants/Petitioners**

Table 45 shows the transfer payments from USCIS to applicants/petitioners over a 10-year period of analysis. DHS estimates the annualized transfer payments would be $116,372,429 discounted at both 3-percent and 7-percent.

| Table 45. Discounted Transfer Payments from USCIS to Applicants/Petitioners Over a 10-Year Period of Analysis | | |
|---|---|---|
| Year | $116,372,429 (Undiscounted) | |
| | Discounted at 3% | Discounted at 7% |
| 2023 | $112,982,941 | $108,759,279 |
| 2024 | $109,692,176 | $101,644,186 |
| 2025 | $106,497,258 | $94,994,567 |
| 2026 | $103,395,396 | $88,779,969 |
| 2027 | $100,383,880 | $82,971,934 |
| 2028 | $97,460,077 | $77,543,863 |
| 2029 | $94,621,434 | $72,470,900 |

| | | |
|---|---|---|
| 2030 | $91,865,470 | $67,729,813 |
| 2031 | $89,189,777 | $63,298,891 |
| 2032 | $86,592,016 | $59,157,842 |
| **10-year Total** | **$992,680,424** | **$817,351,244** |
| **Annualized Transfers** | **$116,372,429** | **$116,372,429** |
| USCIS Analysis | | |

**Transfer Payments from the Department of Defense (DoD) to USCIS**

Table 46 shows the transfer payments from DoD to USCIS for N-400 military reimbursements over a 10-year period of analysis. DHS estimates the annualized transfer payments would be $222,145 discounted at both 3-percent and 7-percent.

| Table 46. Discounted Transfer Payments from DoD to USCIS Over a 10-Year Period of Analysis | | |
|---|---|---|
| **Year** | **$222,145 (Undiscounted)** | |
| | Discounted at 3% | Discounted at 7% |
| 2023 | $215,675 | $207,612 |
| 2024 | $209,393 | $194,030 |
| 2025 | $203,294 | $181,336 |
| 2026 | $197,373 | $169,473 |
| 2027 | $191,624 | $158,386 |
| 2028 | $186,043 | $148,025 |
| 2029 | $180,624 | $138,341 |
| 2030 | $175,363 | $129,290 |
| 2031 | $170,256 | $120,832 |
| 2032 | $165,297 | $112,927 |
| **10-year Total** | **$1,894,942** | **$1,560,254** |
| **Annualized Transfers** | **$222,145** | **$222,145** |
| USCIS Analysis | | |

## 5. Price Elasticity

Commenters in previous USCIS Fee Rules have raised concerns about affected populations' responses to fee increases.[123] This section describes obstacles to estimating affected populations' response to the specific fee changes proposed in this rule before describing known impacts of past fee increases on the behavior of fee-paying applicants and petitioners. This section focuses on the N-400, Application for Naturalization (naturalization and citizenship), I-129, Petition for a Nonimmigrant Worker Visa Classifications and I-140, Immigrant Petition for Alien Workers (employment-based forms). USCIS chose these forms because they encompass a significant share of annual receipt volumes and because this proposed rule transfers additional costs to the population of employers filing Forms I-129 and I-140. This proposed rule would increase fees for I-129 petitioners by 5 percent to 2050 percent based on the visa classifications (see Table 4). Economists refer to the change in quantity of a good demanded in response to a change in the price for that good as price elasticity of demand.  DHS acknowledges that demand for a given good generally does respond to changes in price to some extent, and further recognizes that price elasticity of demand can vary greatly from one type of good to another. Efforts to isolate the change in the quantity of USCIS benefits demanded in response to ten past fee schedule increases since 1991 are limited by confounding effects, or significant changes in the quantity demanded that are unrelated to their price.[124] For example, global geopolitical

---

[123] *See* 85 FR 46797 (Aug. 3, 2020) "4. Rule Will Have Negative Effects on Applicants", 81 FR 73326 (October 24, 2016) "b. Impact on Low-Income Individuals; Low Volume Reallocation", 72 FR 29859 (May 30, 2007) "5. Increases Relative to Other Standards."

[124] See *Immigrant Legal Resource Center et al v. Wolf*, 491 F Supp 3d 520, 540, (N.D. Cal 2020) noting absence of USCIS-gathered data about the impact of price increases on applications for immigration benefits.  In preliminarily enjoining the 2020 Fee Rule, the court determined that USCIS's claim that the agency "does not know the price

instability might increase demand for naturalization around the time of a fee increase, leading to an incorrect assessment that the fee increase caused an increase in the quantity of naturalizations demanded.

### A. Price Response to Form N-400, Application for Naturalization Changes

The chart below shows fee changes and annual filings for Form N-400, Application for Naturalization, from 1989-2019.  This data illustrates past increases in the N-400 fee have not been associated with straightforward, consistent  reductions in the number of Form N-400 applications filed over time.   It is also evident from this data that significant changes in the number of N-400 applications filed occur even in years with no changes to the fee.

---

elasticity of demand for immigration benefits" was contradicted by studies comparing responses to USCIS fees versus no fee (a fee of $0)).  Id. On treatment of unobserved confounders in causal inference, see p221 of *Mostly Harmless Econometrics* by Angrist and Pischke (2009).



**Chart 1: Form N-400 Filings and Fees from FY 1989 through FY 2019**

Sources: Data on petitions for naturalization filed from DHS, Office of Immigration Statistics; data on N-400 fees from 58 FR 30699 ($90) (May 27, 1993), 59 FR 30519 ($95) (June 14, 1994), 63 FR 43605 ($225) (Aug. 18, 1998), 66 FR 246 (Jan. 3, 2001) and 68 FR 8989 ($260) (Feb. 27, 2003), 69 FR 20532 ($320) (Apr. 15, 2004), 70 FR 56182 ($330) (Aug. 26, 2005), 72 FR 29861 ($595) (May 30, 2007), 75 FR 58975 ($595) (Sept. 24, 2010), 81 FR 73293 ($640 if above 200% of the FPG) (Oct. 24, 2016).

As one example of why confounding effects complicate the estimation of price elasticities, in February of 2007, USCIS published a proposed rule to increase the fee for naturalization from $330 to $595.[125] Around the same time, public debate over undocumented immigrants culminated in efforts to educate and assist eligible immigrants with naturalizing. In testimony to Congress, then-USCIS Director Gonzalez stated that the 350-percent increase in naturalization applications received in June and July 2007 relative to the prior year exceeded the

---

[125] *See* 72 FR 4911 n.21 (February 1, 2007).

magnitude of response to any past Presidential election, immigration debate, legislation or announcement of proposed fee increases.[126] Ignoring outside factors' potential effects on demand for naturalization would result in overstating the change in quantity demanded caused by the fee increase.

One unique property of price elasticities in the USCIS fee context is that increases are proposed and presented for public comment months before implementation and again in the final rule before the increases go into effect, affording some with an opportunity to accelerate the timing of their application to avoid the increased fees. Chart 2 shows that in the short-run, N-400 volumes spiked in the month before October 2, 2020 fee increases would have been effective and declined in the following months. Given that these fee increases never went into effect, the lower receipt volumes observed in the four months after October could not be a price response, but may instead be the result of those people submitting their applications early to avoid the fee increase.

---

[126] *See* "Written Testimony Prepared for Emilio T. Gonzalez," Director, USCIS, before House Judiciary Committee Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law (Jan. 17, 2008), *https://www.govinfo.gov/content/pkg/CHRG-110hhrg40282/html/CHRG-110hhrg40282.htm* (last visited September 28, 2022).



Chart 2: Monthly Form N-400 Receipts from FY 2019 through FY 2021 (Before and After August 2020 Fee Rule)

*The FY2020 Fee Rule would have been effective on October 2, 2020, depicted by the black bar. It was enjoined on September 29,2020.

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD), C4 and ELIS Consolidated, May 17, 2022

This substitution effect is not a decrease in the demand for the benefit. Failing to account for this effect would overstate the decrease in the quantity demanded caused by a fee increase. Looking at annual values in Chart 1 helps to smooth away these spikes and dips in the months around fee changes (depicted in Chart 2) to demonstrate that, on average, demand for the N-400 (shown by blue bars) has not appreciably decreased in response to the ten past increases in the N-400 fee (shown by the red line).  Thus, we might describe the N-400 or the citizenship benefit that it confers to be an inelastic good, because a large increase in the price has a smaller change on the quantity demanded.  This is consistent with what is known about necessity goods like medicine, for which few cheaper alternatives exist.

USCIS estimated four regression models to test the relationship between N-400 receipts (dependent variable) and N-400 fees (independent variable).  Multiple models were estimated to

attempt to account for events that lead to  sharp increases in volumes observed in 1996, 1997 and 2007. Possible reasons for these spikes include the Immigration Reforms and Control Act (IRCA) of 1986 which created a pathway to naturalization by creating legal permanent status for 2.7 million long-term residents.[127] Additionally, past USCIS analyses show wide variation in naturalization rates over time based on region or country of birth, and class of admission.[128] The 1997 Statistical Yearbook of the Immigration and Naturalization Service identified factors such as the 1992 Green Card Replacement Program, which required replacing Permanent Resident cards, and a 1995 INS Citizenship USA initiative to streamline the naturalization process as contributing the increased naturalizations observed in 1996 and 1997.[129]

Potential contributory factors to the spike in 2007 include Congressional appropriations received that year to address backlogs.[130]  Other reports have speculated that the 2008 election

---

[127] See *Surge Seen in Applications for Citizenship, The New York Times* available at https://www.nytimes.com/2007/07/05/us/05citizenship.html  (last accessed onSeptember 28, 2022). Also, s*ee Immigration History: Immigration Reform and Control Act of 1986.  Available at* https://immigrationhistory.org/item/1986-immigration-reform-and-control-act/ (last accessed on September 28, 2022).

[128]  See p.5 of USCIS Trends in Naturalization Rates FY2018 Update. Available at https://www.uscis.gov/sites/default/files/document/reports/Trends_In_Naturalization_Rates_FY18_Update_Report.pdf (last accessed on September 28, 2022).

[129] See age 135 of the U.S. Department of Justice *1997 Statistical Yearbook of the Immigration and Naturalization Service. https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1997.pdf*  (last accessed September 28, 2022).

[130] See 72 FR 4892

may have encouraged people to apply for naturalization in order to vote. In January 2007, Univision began a grassroots effort to encourage people to get naturalized.[131]

While intuitively, we might expect that increases in fees result in a decrease in the number of immigration benefits demanded, however, the results in Table 49 indicate that there is a positive relationship between N-400 receipts and fees across all four regression models despite efforts to control for these confounding factors. Given that the direction of this relationship is opposite what basic theory would suggest, these results suggest there is no evidence of a causal relationship between past fee increases and volumes.  The Department makes the data series used in these regressions accessible through the docket and welcomes public comments on valid model specifications to identify the true relationship between fees and filings.

| Table 49.  Summary of Results for Form N-400 Regression Models | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Variables** | **Model 1** | | **Model 2** | | **Model 3** | | **Model 4** | |
| | | | | | | | | |
| **Model Description** | N-400 Filings and Fees from 1989-2019 | | Lag N-400 fees by a year | | Dummy Variables for events that occurred in 1996, 1997 and 2007 | | Lagging Legal Permanent Residents (LPRs) by 5 years | |
| **Observations** | 32 | | 32 | | 32 | | 32 | |
| **R Square** | 0.118 | | 0.064 | | 0.685 | | 0.502 | |
| **Adjusted R Square** | 0.088 | | 0.033 | | 0.638 | | 0.467 | |
| **Std. Error of the Estimate** | 286,071.496 | | 294,652.145 | | 180,202.670 | | 218,709.403 | |
| **Significance F** | 0.054 | | 0.162 | | 0.0000017 | | 0.000041* | |
| **Intercept** | 569,991.972 | | 618,091.956 | | 428,817.087 | | -4,373.290 | |
| **Dependent Variable** | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| N-400 Fees | 444.694 | 0.054 | | | 637.915 | 0.00021 | 219.259* | 0.223 |

---

[131] See *"Surge Seen in Applications for Citizenship"* - The New York Times.  Available at https://www.nytimes.com/2007/07/05/us/05citizenship.html (last accessed September 28, 2022).  See "Univision Gives Citizenship An Unusual Lift" – Wall Street Journal.  Available at https://www.wsj.com/articles/SB117876675523098194 (last accessed September 28, 2002).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| N-400 Fees lagged 1 year | | | 327.896 | 0.162* | 787,983.992 | 0.00026 | | |
| 1996 event(s) | | | | | 923,292.992 | 0.00004 | | |
| 1997 event(s) | | | | | 574,616.516 | 0.00467 | | |
| 2007 event(s) | | | | | 637.915 | 0.00021 | | |
| Legal Permanent Residents (LPRs) lagged 5 years | | | | | | | 0.692 | 0.00005 |
| *Denotes <= 5% level of statistical significance* *Source: USCIS Analysis* | | | | | | | | |

Income elasticity is a related metric for the change in quantity of a certain good demanded in response to the change in real income of consumers who buy this good. While this proposed rule doesn't change income levels, data describing how individuals with varying income levels have responded to fees can be useful in measuring the degree to which certain fees create barriers or give rise to concerns about affordability. Although income elasticity is of interest in considering the affordability of USCIS-granted benefits, the agency has limited data on the incomes of applicants and petitioners, nor does it know the incomes of those who may be prevented from applying or petitioning due to affordability.

Although USCIS has limited data describing affordability of immigration benefits, research findings in other contexts may be instructive. A study of household income, expenditures on food and home fuel, nutrition and temperature data describes the "heat or eat" phenomenon in which both poor and rich households' expenditures to heat their household rise in response to extremely cold weather.[132] Unlike richer households however, those households

---

[132] *See* Bhattacharya, J., DeLeire, T., Haider, S. and Currie, J, "Heat or Eat? Cold-Weather Shocks and Nutrition in Poor American Families," "American Journal of Public Health," 93:1149-1154 (2003), *https://ajph.aphapublications.org/doi/epub/10.2105/AJPH.93.7.1149* (last visited Sept. 3, 2021).

with incomes below 150 percent of the FPG responded to the budgetary shock of cold weather by decreasing spending on food in order to afford subsequent utility bills. Adults and children in poorer households were observed to reduce their own caloric intake even further to insulate their children from the budget shock. The findings are important for USCIS because they show that a higher cost for an inelastic good can inflict direct harms like nutritional deficiency even when individuals were able to afford the necessity good. Unlike with home fuel expenses during periods of extreme cold, households may delay the expense of some USCIS benefits for weeks, months or even years while they save money, but there is reason to believe that, if demand for certain immigration benefits is relatively inelastic, households below 150 percent of the FPG may incur harm such as foregoing other necessity goods like adequate nutrition in order to afford the cost of immigration benefits.

USCIS is unable to estimate the extent to which prices and other requirements induce certain immigrants to prefer one benefit over another, or changes in the demand for complementary immigration benefits, a metric called cross-price elasticity. Where immigrants are provided with a choice between two or more immigration benefits, decisions such as whether to pursue higher education on an F visa or seek employment on an H-1 visa are complex, difficult, and often made with imperfect information about the future.  For instance, if USCIS set the Form I-90, Application for Replacement Permanent Resident Card, fee above that of the Form N-400, Application for Naturalization, this might induce some individuals to prefer renewing their legal permanent resident status rather than becoming naturalized citizens who are no longer closely regulated by USCIS. In contrast to complementary goods, publication of

proposed fee increases creates a temporary opportunity for petitioners to substitute away from the fees they would have paid in the future for the current fees.

Finally, while most of the discussion of price elasticity has focused on the impact of price changes on quantity demanded, the quantity demanded also impacts the full costs to USCIS which must be recovered through fee revenue.  OMB Circular A-25 advises agencies to establish fees that are sustainable and recover the full direct and indirect costs to any part of the Federal Government of providing a good, resource, or service unless other conditions exist to justify an exception. The analysis of this proposed rule's impacts includes estimation of numerous transfer payments arising when certain direct and indirect costs are redistributed to other fee-paying populations due to affordability or other efficacy concerns, such as when charging a fee is believed to present a barrier to an initial employment authorization.

DHS has reviewed and considered research on naturalization rates of low-income immigrants by Hainmueller, Lawrence, Gest, Hotard, Koslowski and Laitin (2018) as well as Yasenov, Hotard, Lawrence and Laitin (2019).[133],[134] Both papers, referenced in public comments received on the 2020 USCIS fee rule, leverage natural experiments yielding suggestive evidence that fees constitute a barrier to some lower-income immigrants naturalizing.[135]  It is important to recognize, however, that the observed increase in naturalizations in response to lowering fees to $0 cannot be directly extrapolated to yield  estimates of price or income elasticity for the increases proposed in these fee rules. Yasenov et al. consider the extent to which full fee-waivers

---

[133] *See* Hainmueller et al. (2018), *https://www.pnas.org/content/115/5/939* (last visited September 28,  2022).
[134] *See* Yasenov et al. (2019), *https://www.pnas.org/content/116/34/16768* (last visited September 28, 2022).
[135] *See* 85 FR 46797 (Aug. 3, 2020) "4. Rule Will Have Negative Effects on Applicants",

(borne by other fee-paying populations) induce individuals who would have paid the full fee, perhaps after years of saving, to instead forgo payment to USCIS. DHS is unable to quantify the transfer effects of such forgone revenue without more detailed data on the ability or willingness to pay for various immigration benefits, particularly among populations that have not historically requested them. While Hainmueller et al. show that expanded access to naturalization is a social benefit of eliminating fees, DHS is similarly unable to quantify this social benefit without more granular data describing a direct, fee-correlated, decreasing, or increasing willingness to pay. In the context of fee setting, even if USCIS possessed the knowledge that some populations are sensitive to a fee increase for a given form, a decision to spread USCIS's fixed costs among a smaller, remaining fee-paying population, would result in higher fees and greater transfer payments from the population bearing the fixed costs. In other words, USCIS could not optimize its fee schedule to minimize the effect on demand without comprehensive quantitative estimates of all relevant populations' sensitivity to fee increases for all immigration benefits..

B. *Price Response to Form I-129, Petition for a Nonimmigrant Worker and Form I-140, Immigrant Petition for Alien Workers*

While prior discussion of price elasticity has focused on the affordability of immigration benefits like the N-400, this proposed rule transfers additional costs to the population of employers filing Forms I-129 and I-140.  Thus, DHS has analyzed the possible sensitivity of the demand for those requests to the fees. The fee paying populations for Form I-129 include employers petitioning for nonimmigrant workers under the following visa classifications: CW, E, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN. See

Table 18 for a description of each of these visa classifications. The fee paying populations for Form I-140 include employers petitioning for alien workers in the first-preference EB1, second-preference EB-2 and third-preference EB-3 programs. Economists refer to changes in the number of employees relative to a change in their underlying price as own-wage price elasticity of labor demand.

Using Table 23, DHS estimates that the proposed fees for Form I-129, coupled with the proposed limitation of 25 beneficiaries on certain petitions results in a 107 percent increase in the cost these employers would pay for the same number of beneficiaries as before.[136] While the Regulatory Impact Analysis assumes the total number of beneficiaries does not respond to this price increase, here we consider how own-wage price elasticity of labor demand estimates would be used in forecasting how much Form I-129 filing petitioners might reduce their quantity of workers requested.

Chart 3 shows that over the years, as fees increase, so has the number of Form I-129 receipts. Most notably, in 2016 volumes increased when the fee increased and remained around the same level in the following years.

---

[136] From Table 23, baseline total fees of $253,886,570 / 817,237 petitions = $301.66 per beneficiaries-requested. Proposed total fees of $526,988,485 / 819,269 petitions = $643.24 per same quantity of beneficiaries-requested. ($643.24 - $301.66)/$301.66 = 107% increase. This average is a weighted by the number of beneficiaries (workers) an employer receives for the relative costs paid.



Source: USCIS, Office of Performance and Quality (OPQ), PASEXEC, May 16, 2022.  Data on I-129 fees from 81 FR 732294 ($460) (Oct. 24, 2016), 75 FR 58964 ($325) (Sept. 24, 2010), 72 FR 29854 ($320) (May 30, 2007).

USCIS estimated a simple linear regression to test the relationship between I-129 receipts (dependent variable) and I-129 fees (independent variable).  The results in Table 50 show that there is a significant positive relationship between I-129 receipts and fees. Approximately 78 percent of the variability in the I-129 receipts can be explained by fees alone. While the results are statistically significant, the positive correlation between fees and volumes contradicts conventional theory that quantities demanded decrease in response to price increases. DHS welcomes public comments on valid model specifications to identify the true relationship between fees and filings.

| Table 50. Summary of Results for Form I-129 Regression Model | |
|---|---|
| **Variables** | **Model Results** |

| Model Description | I-129 Filings and Fees from 2004-2020 | |
|---|---|---|
| **Observations** | 17 | |
| **R Square** | 0.779 | |
| **Adjusted R Square** | 0.764 | |
| **Std. Error of the Estimate** | 36687.957 | |
| **Significance F** | 0.00000277 | |
| **Intercept Coefficient** | 68719.092 | |
| **Dependent Variable** | I-29 Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* |
| I-129 Fees | 1031.017 | 0.00000277 |
| *Source: USCIS Analysis* | | |

Chart 4 shows the fees and receipts for Form I-140. The chart indicates a moderate positive correlation between I-140 receipts and fees. Note that the outlier receipt volume in 2007 may be the result of several factors including the anticipated fee rule that was published that same year[137].  USCIS  had significant backlogs in 2007 and received appropriations to assist in increasing adjudications.[138] Lastly, USCIS terminated its premium processing service for Form I-140 petitions that request labor certification substitution.  USCIS announced the end of the premium processing for these petitions in anticipation of a substantial increase in the number of

---

[137] See 72 FR 29851

[138] See 72 FR 4892

Form I-140 petitions requesting premium processing and seeking labor certification substitution prior to that summer of 2007.[139]



Source: USCIS, Office of Performance and Quality (OPQ), PASEXEC, May 16, 2022.  Data on I-140 fees from 81 FR 732294 ($700) (Oct. 24, 2016), 75 FR 58964 ($580) (Sept. 24, 2010), 72 FR 29854 ($475) (May 30, 2007) and 70 FR 56182 ($195) (Sept. 26, 2005).

USCIS calculated a simple linear regression to estimate the relationship between I-140 receipts (dependent variable) and I-140 fees (independent variable).  The results in Table 51 below show that there is a positive relationship between I-140 receipts and fees. Approximately 22 percent of the variability in the I-140 receipts can be explained by fees when the fee is the

---

[139] See USCIS suspends Premium Processing of I-140s Requesting Labor Certification Substitution.  Dated May 17, 2007.  Available at https://www.jackson-hertogs.com/uscis-suspends-premium-processing-of-i-140s-requesting-labor-certification-substitution/ (last accessed September 28, 2022).

only variable used in the analysis. While USCIS has identified some of the potential drivers of demand for 2007 there are other increases in demand that USCIS has not yet been able to identify (for example the increases starting in 2016 and continuing through 2020).  As such, DHS welcomes public comments on valid model specifications to identify the true relationship between fees and filings.

| Table 51. Summary of Results for Form I-140 Regression Model | | |
|---|---|---|
| **Variables** | **Model Results** | |
| | | |
| **Model Description** | I-140 Filings and Fees from 1992-2020 | |
| **Observations** | 29 | |
| **R Square** | 0.220 | |
| **Adjusted R Square** | 0.191 | |
| **Std. Error of the Estimate** | 36889.306 | |
| **Significance F** | 0.010 | |
| **Intercept Coefficient** | 53143.007 | |
| **Dependent Variable** | I-140 Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* |
| I-140 Fees | 98.562 | 0.010 |
| *Source: USCIS Analysis* | | |

In addition to discussion of small entities including businesses in this proposed rule's IRFA, USCIS has considered the impact of past fee increases using the available samples of Forms I-129 and I-140 petitioners in the 2010 Fee Rule Final Rule/SEA 75 FR 58983 (Sep. 24, 2010), the 2016 Fee Rule NPRM/SEA 81 FR 73292 (Oct. 24, 2016) and comparable samples drawn for this proposed rule's SEA. A comparison of the Small Entity Analyses from the 2010, 2016 and this IRFA's samples shows that as the filing fee for all Form I-129 petitions increased

41.5-percent from $325 to $460 in 2016, the percentage of small entities increased from 83.1-percent to 86.8-percent. As the filing fee for Form I-140 petitions increased 21-percent from $580 to $700 in 2016, the percentage of small entities decreased from 76.5-percent to 68.9-precent. Between the 2010 and 2016 analyses, as the filing fee for Form I-129/I-129CW petitions increased from $320 to $325 and the filing fee for Form I-140 petitions increased from $475 to $580 in 2010, the share of small entities filing Form I-129 and Form I-140 declined from 88.6-percent (aggregated across both forms) to the 2016 rates mentioned. These varied relationships do not permit USCIS to conclude that the 2010 or 2016 Rules' fee increases caused increases or decreases in the share of small businesses choosing to request H-visa workers, however, it does affirm that USCIS's experience has not clearly demonstrated a measurable impact of these proposed fee increases on small entities' access to workers.

Given the limited information available to USCIS on the price responsiveness of I-129 and I-140 petitioners and applicants, the Department has considered generalizable empirical estimates of how firms' employment numbers respond to wage changes. Two relevant findings emerge: first, there is little consensus amongst economists as to what one true measure of own-wage price elasticity of labor demand should be used to best explain and predict responses given the diversity of employers and structural changes to industries, the workforce, and the economy over the time periods and populations analyzed. Second, meta-analyses observe that more published studies using more data, on average, have actually reduced our ability to explain and predict this elasticity.[140]  Consequently, we consider Hamermesh's "best guess" estimate of -

---

[140] *See The Own-Wage Elasticity of Labor Demand: A Meta-Regression Analysis,* IZA Discussion paper No. 7958 (Feb 2014).  Available at https://ftp.iza.org/dp7958.pdf  (last accessed September 28, 2022).

0.30.[141]   Applied to the 107% weighted-average increase in I-129 costs, this own-wage elasticity of demand estimate would suggest a 32-percent decrease in the volume of I-129 petitions filed.

Commenters concerned about this impact should be aware of two important considerations. First, some of the I-129s submitted are for capped visas that are typically oversubscribed, or slack. In the Department's analysis of FY20 cap-subject H-1B petitions (86 FR 1717), USCIS estimated that only 48-percent of the 211,797 cap-subject petitions submitted were selected under the cap. Similarly, in analysis of FY21 H-2B 2nd half cap-subject petitions (86 FR 28205), DOL and USCIS identified demand for 96,641 workers despite a 2nd half statutory cap of 33,000. Consequently, even a 32-percent decrease in the quantity demanded of these H visa categories – which comprise approximately two-fifths of all I-129 receipts shown in Table 19 – would have no impact on USCIS's revenue.

Secondly, DHS has identified significant uncertainty around how individual employers may respond to price increases to the Form I-129 and I-140. If the true own-wage elasticity of labor demand for all firms was more elastic than -0.30, the Departments would finalize a larger fee increase for these populations. In consideration of this uncertainty, the Department has avoided speculation resulting in higher proposed fees.  Rather, the evidence considered suggests that these fees are reasonable estimates of the full costs for USCIS and any ex post evidence of price sensitivity would be incorporated in future USCIS fee rules.

---

[141] *See Labor Demand* (Hamermesh, 1993) p135. Economists may further decompose own-wage elasticity into substitution effects (concerning how various inputs are used holding output constant) and scale effects (concerning how output responds holding inputs constant). Holding scale effects constant, Hamermesh finds that various studies observe a wide range in possible values for own-wage elasticity of labor demand from -0.15 to -0.75.

With these two clarifications, and consideration of impacts to small entities, DHS acknowledges that despite past evidence discussed, the proposed increases in fees may act to reduce some employers' willingness to hire in ways not observed in past trends. Some commenters might provide knowledge that their own firms, industries, occupations, or regions labor demands are more elastic; but these commenters would lack knowledge of other firms, industries, occupations and regions from meta-regressions that are more inelastic, given that some firms may substitute to other production inputs and a minority of firms studied in meta-analyses have responded to increasing employment costs by hiring more workers.

DHS welcomes public comments from employers sharing data on both the marginal benefit of each worker as well as the impact of the proposed change in fees on the marginal cost for each worker.

## 6. Alternatives

Pursuant to Executive Order 12866, USCIS considered alternatives to the proposed fee schedule. This section explores the costs, benefits, and transfer payments of regulatory alternatives considered during the rulemaking process.

### A. Alternative 1: No New Fee Exemptions

Under this alternative, DHS would not add any new fee exemptions to the fee schedule. DHS notes that the estimated annual forgone revenue from fee waivers and exemptions has increased from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review to $756 million in the FY 2022/2023 proposed fee review. *See* 81 FR 26922 (May 4, 2016) and 81 FR 73307 (Oct. 24, 2016). The forgone revenue dollar value estimate represents the total fees that fee waived or fee exempt applicants, petitioners, and

requestors would have paid if they had paid the fees. In the FY 2022/2023 proposed rule, DHS estimates that the increase in fee exemptions accounts for 1-percent of the 40-percent weighted average fee increase.[142] DHS also estimates that the increase in fee exemptions would result in transfer payments of $106,821,450 (see Table ) from USCIS to applicants. DHS rejected this alternative because it believes that would be contrary to humanitarian interests to impose a fee on vulnerable populations.

### B. Alternative 2: Fee Bundling

In this scenario, USCIS would maintain its bundling policy for Form I-485 filed with interim benefits. Currently, USCIS allows applicants to "bundle" I-485 filings with associated I-131s and I-765s (interim benefits). Filing an I-131 or I-765 concurrently with or with a pending Form I-485 is optional, but if an applicant chooses to do so, they do not pay any additional fee. DHS rejected this alternative because this bundling system benefits individuals who file all 3 applications (because they pay only the price of the I-485) and burdens individuals who file only the I-485 (they pay more than they would otherwise to subsidize the costs of processing the free interim benefits of other applicants). Furthermore, under the current bundling policy, an individual who renews their interim benefits does so without charge so USCIS is processing many renewals at no cost to the applicants. USCIS charges other I-131 and I-765 filers more to recover the costs associated with processing bundled I-131s and I-765s without charge.

In the proposed rule, USCIS intends to end the bundling policy (aka "debundling"). This change would require individuals to pay a separate fee for each application they file. This means

---

[142] OCFO, March 4, 2022.

that individuals who want to file an I-765 and I-131 with their I-485 or while it is pending would pay substantially more (they would now pay three separate fees instead of one and must also pay for renewals and replacements that are now free). However, because more people are paying the fees, each proposed individual fee would be less than what it would have been under the current policy. DHS forecasts that the fee-paying population would increase by 513,618 under a debundled option.[143] DHS also estimates a 51-percent overall weighted-average fee increase for all fees under a bundled policy versus a 40-percent increase under a debundled policy.

| Table 52. Bundled vs Debundled Options | | | | |
|---|---|---|---|---|
| Fee Paying Population | Receipts when Debundled (A) | Receipts when Bundled (B) | Difference C = (A-B) | Percent Difference |
| I-131 | 253,662 | 69,570 | 184,092 | 265% |
| I-765 | 1,043,912 | 714,386 | 329,526 | 46% |
| I-485 | 572,497 | 572,497 | 0 | 0% |
| Overall Weighted-Average Fee Increase for All Fees | 40% | 51% | 11% | N/A |

DHS rejected this alternative because it believes debundling assigns the cost burden appropriately based on the benefits being requested.

---

[143] Calculation: 184,092 (Form I-131) + 329,526 (Form I-765) = 513,618 total fee-paying population.

# Department of Homeland Security
# U.S. Citizenship and Immigration Services

## Small Entity Analysis (SEA) for the U.S. Citizenship and Immigration Services Fee Schedule Proposed Rule

January 4, 2023

0

# Table of Contents

Table of Contents ................................................................................................................1

1. Introduction .....................................................................................................................2

2. Sources and Sample Methodology .................................................................................3

   **A. Forms I-129, I-140, I-910, and I-360** ......................................................................3

   **B. Forms** I- 956 (formerly Form I-924) and I-956G (formerly I-924A), **G-1041 and G-1041A** ......................5

3. Petition for a Nonimmigrant Worker, Form I-129 Data Research Population and Sampling Statistics ............5

   **A. Funding the Asylum Program with Form I-129 by Visa Classification Petition Fees** .............................10

   **B. Discussion of Impacts** ...............................................................................................10

   **C. Small Entity Classification** .......................................................................................13

   **D. Issues with Data** .......................................................................................................14

4. Immigrant Petition for Alien Worker, Form I-140 Data Research Population and Sampling Statistics ...........14

   **A. Funding the Asylum Program with Form I-140 Petition Fees** .................................17

   **B. Discussion of Impacts** ...............................................................................................18

   **C. Small Entity Classification** .......................................................................................18

   **D. Issues with Data** .......................................................................................................19

   **E. Cumulative Impact of Form I-129 and Form I-140 Petitions** ..................................20

5. Application for Civil Surgeon Designation, Form I-910 Data Research Population and Sampling Statistics..20

   **A. Discussion of Impacts** ...............................................................................................23

   **B. Small Entity Classification** .......................................................................................24

6. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360 Research Population and Sampling Statistics ...............................................................................24

   **A. Discussion of Impacts** ...............................................................................................28

   **B. Small Entity Classification** .......................................................................................29

7. Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Records Request).............30

8. Regional Center Designation Under the EB-5 Regional Center Pilot Program, Form I- 956 (formerly Form I-924) and Annual Statements of Regional Center, Form I-956G (formerly Form I-924A) ...................................32

   **A. Discussion of Impacts** ...............................................................................................34

   Appendix A: Small Business Administration (SBA) NAICS Size Standards for I-129, I-140, I-910 and I-360 Petitions in Sample Dataset...........................................................36

   Appendix B: Form I-129 Sample with Petition Totals ....................................................68

   Appendix C: Form I-140 Sample with Petition Totals ....................................................74

   Appendix D: Form I-910 Sample with Petition Totals ....................................................79

   Appendix E: Form I-360 Sample with Petition Totals.....................................................82

1

## 1. Introduction

The Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS), as a U.S. Government agency primarily funded by user fees, periodically revisits whether its fees are adequate to appropriately fund its operations. In advance of a revision to the fees it levies, USCIS has reviewed the fees that would potentially affect small entities as defined by the U.S. Small Business Administration (SBA) guidelines and in accordance with the Regulatory Flexibility Act (RFA).

The term small entity means a small business, small organization, or small governmental jurisdiction.[1] The term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, unless an agency, after consulting with the SBA's Office of Advocacy and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register.[2] In addition:

- A "small business":
    - is organized for profit,
    - has a place of business in the United States,
    - operates primarily within the United States or makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials, or labor,
    - is independently owned and operated, and
    - is not dominant in its field on a national basis.[3]

- A "small organization" is any not-for-profit enterprise that is independently owned and operated and not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the **Federal Register**.[4]

- A "small governmental jurisdiction" includes governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than 50,000, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the **Federal Register**.[5]

---

[1] The RFA in a Nutshell, p.18: https://cdn.advocacy.sba.gov/wp-content/uploads/2019/07/30111439/The-RFA-in-a-Nutshell-2013-ed.pdf

[2] **Ibid.**

[3] SBA small entity definition: The SBA operates in accordance with Pub. L. 85- 536, called the "Small Business Act," to help protect the interests of small businesses, strengthen the economy, and preserve free enterprise. The definition of a small business is available at https://www.sba.gov/content/am-i-small-business-concern.

[4] "The RFA in a Nutshell," p. 18.

[5] **Ibid.**

2

According to the SBA, for most industries a small business may be defined either in terms of the average number of employees over the past 12 months or the average annual receipts over the past 3 years.[6]

A majority of immigration benefit requests are submitted by individuals who do not meet the definition of "entity" under the SBA rules. Entities affected by this proposed rule are those that file and pay fees for certain immigration benefit requests on behalf of a foreign national. The petitions or applications filed by entities include the following:

a. Petition for a Nonimmigrant Worker, Form I-129 – authorizes foreign workers for temporary employment, services, or to receive training in the United States.
b. Immigrant Petition for Alien Worker, Form I-140 – authorizes foreign workers to become permanent residents in the United States.
c. Application for Civil Surgeon Designation, Form I-910 – authorizes physicians to become designated providers of medical exams for individuals in the United States applying for immigration benefits with DHS.
d. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360 – authorizes foreign workers for full time employment by a bona fide nonprofit religious organization in the United States (as defined by 501(c)(3) of the Internal Revenue Service (IRS) Code).
e. Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Record Request).
f. Application for Regional Center Designation Under the EB-5 Regional Center Pilot Program, Form I-956 (formerly Form I-924)[7] authorizes designation as a Regional Center under the Immigrant Investor Program.

The goal of this review was to analyze the economic impact of fee changes by DHS on small entities. DHS used a baseline threshold of 1 percent of revenues to determine if the proposed rule would have a significant economic impact on affected small entities.[8] The forms mentioned above represent those entities that petition or file on behalf of individuals and therefore, were the focus of this analysis. Form I-129 and Form I-140 comprised the vast majority of the petitions applicable to this study. DHS also analyzed Forms I-910, I-360, G-1041, G-1041A, and I-956 (formerly Form I-924).

## 2. Sources and Sample Methodology
### A. Forms I-129, I-140, I-910, and I-360

DHS obtained petitioner data filed for Forms I-129, I-140, I-910, and I-360 from internal databases for Fiscal Year (FY) 2020, spanning from October 1, 2019 to September 31, 2020.[9]

---

[6] The SBA has developed size standards to carry out the purposes of the Small Business Act and those size standards can be found in 13 CFR 121.201.

[7] Supplemental Form I-956G (formerly I-924A), Regional Center Annual Statement, is discussed further in this section also.

[8] Office of Advocacy, SBA "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act", Determination of "Significant Impact" p 18 – 19.   Available at https://cdn.advocacy.sba.gov/wp-content/uploads/2019/06/21110349/How-to-Comply-with-the-RFA.pdf

[9] Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), CLAIMS 3 database April 28, 2021.

This petitioner data included the employer firm name, city, state, ZIP code, employer identification number (EIN)[10], number/type of filing, and petitioner or beneficiary name. DHS devised a methodology to conduct the small entity analysis (SEA) based on a representative sample[11] of the potentially impacted population. To create and test a sample, DHS followed this approach for each benefit request type:

- DHS aggregated a USCIS working database for each form type comprised of receipts from FY 2020.
- DHS identified unique EINs submitted with petitions and unique petitioner names from petitions that did not include an EIN.
- DHS used this list of unique identifiers as the population from which the sample was taken. DHS determined the sample size using a standard statistical formula of the population total for each form type with a 95 percent confidence level and a 5 percent confidence interval.[12]
- DHS selected a random sample from the population by assigning a randomly generated identification (ID) number to each record.
- DHS then sorted the population so the entities with the smallest random ID numbers were selected as sample entities.

Filing data did not include information needed to classify the entity according to size standards, such as revenue or number of employees, so DHS used third party sources to obtain this information. For the analysis of the effects on Forms I-129, I-140, I-910 and I-360, DHS used several data sources to capture information on the characteristics of entities required to pay these fees.

- Data Axle, a business data provider of U.S. entities
    - http://www.data-axle.com/
- Open-access (free) databases of public and private entities
    - http://www.cortera.com/
    - http://www.manta.com/
    - http://www.guidestar.org/

From these sources, DHS determined the North American Industry Classification System (NAICS) code,[13] revenue, and employee count for each entity in the sample. A list of NAICS codes for each entity matched in Forms I-129, I-140, I-910 and I-360 can be found in Appendix A, along with the SBA threshold for each industry cluster.[14] To determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or

---

[10] An EIN is a nine-digit number that U.S. Internal Revenue Service assigns in the following format: XX-XXXXXXX. It is used to identify the tax accounts of employers. EIN Number, p 2. https://www.irs.gov/pub/irs-pdf/p1635.pdf.

[11] DHS determined sample size using a standard statistical formula based on the population total for each form type with a 95 percent confidence level and a 5 percent confidence interval. This means that there is a 95 percent chance that parameters descriptive of the population (e.g., the percent of entities that are small) are no more than 5 percent different from the statistic obtained by the sample).

[12] This means that there is a 95 percent chance that parameters descriptive of the population (e.g., the percent of entities that are small) are no more than 5 percent different from the statistic obtained by the sample.

[13] U.S. Census Bureau, NAICS code listing: http://www.census.gov/eos/www/naics/.

[14] SBA size standards effective May 2, 2022, (last visited May 2,2022). https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf

4

employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue, and some based on the number of employees. In cases where the matched entity was a direct subsidiary, DHS recorded data for the parent organization. In cases where the entity was a single-location franchise, DHS recorded the single location's data.

Once as many entities as possible were matched, those that had relevant data were compared to the size standards provided by the SBA to determine whether they were small or not. Those that could not be matched or compared were assumed to be small under the presumption that non-small entities would have been identified by one of the databases at some point in their existence.

### B. Forms I-956 (formerly Form I-924), I-956G (formerly Form I-924A), G-1041 and G-1041A

Data for Forms I-956, I-956G, G-1041 and G-1041A were treated differently than the data for Forms I-129, I-140, I-910 and I-360 in this analysis. Although applicant data for Forms I-956, I-956G, G-1041 and G-1041A were available for analysis, issues in identifying entities and obtaining revenue and employee count due to the structure of these entities made it difficult to conduct a similar analysis. The structure of these entities and issues with data are discussed further in this analysis.

### 3. Petition for a Nonimmigrant Worker, Form I-129 Data Research Population and Sampling Statistics

DHS collected internal data for Form I-129 were provided by OPQ from the Computer-Linked Application Information Management System (CLAIMS)3/Citizenship and Immigration Services Common Operational Repository (CISCOR) database.  There were 553,889 Form I-129 petitions submitted in FY 2020. Of these, 548,350 (99 percent) were submitted with an EIN, also known as a petitioner tax number; the remaining 5,539 were recorded with a blank or incomplete EIN field.

Many employers submitted more than one petition over the course of the year. Those petitions that were submitted with an EIN produced 86,715 unique EINs. Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

Table 1 outlines total receipts or population (553,889 petitions) for Form I-129 from FY 2020 represented a population of 86,715 unique petitioners requesting foreign workers, with many of these entities submitting multiple petitions. From this population, DHS drew a random sample of 650 petitioning entities. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 564, or 86.8 percent, of these petitioners met the definition of small entities.[15] Of those that we determined could be classified as small entities and for which we could find revenue and employee data, 49.6 percent[16] had annual revenues of less than a million and approximately 8.5

---

[15] Calculation: 564 total small entities / 650 total entities = 86.8 percent.

[16] Calculation: 175 small entities with annual revenues of less than $1 million / 353 matched small entities = 49.6 percent.

AR_000520

percent[17] of them had petitioned for five or more workers over that year.

---

[17] Calculation: 48 small entities petitioning for five or more workers / 564 total small entities = 8.5 percent.

| Table 1: Outline of Form I-129 Statistics, FY 2020. | | | |
|---|---|---|---|
| **Parameter** | **Quantity** | **Proportion of Sample (Percent)** | **Comments** |
| Population—petitions | 553,889 | - | Total number of petitions. |
| Population—unique entities | 86,715 | - | Overstated number of unique employers. |
| Minimum Required Sample | 384 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 650 | 100.0 | Sample selected to match 384 entities. |
| Non-matched Sample Segment (S)* | **211** | **32.5** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |
| Matched Sample Segment | 439 | 67.5 | Entities matched in databases from 650 searches. This exceeds the established sample goal of 384. |
| Sub-Sample Missing Data (S) | **0** | **0.0** | Entities among the 439 matches lacking revenue or employee count data. |
| Matched Small Entities (S) | **353** | **54.3** | Entities among 439 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 86 | 13.2 | Number of non-small entities out of the 439 matches. |
| **Number of small entities discovered in research** | **564** | **86.8** | **211** + 0 + **353** = 564 |
| Source: USCIS analysis. *(S) Sample numbers used to calculate the totals, for each column. | | | |

Within the sample shown in Table 2, 62 percent of entities had submitted just one petition in the 12-month timeframe; over 78 percent submitted only one or two petitions. At the other end of the scale, less than 7 percent of entities submitted 10 or more petitions.

| Table 2: Total Form I-129 Petitions per Entity, FY 2020. | | | | |
|---|---|---|---|---|
| **Petitions per Entity** | **Entity Count** | **Cumulative Entities** | **Percentage of Sample[1]** | **Cumulative Percentage[1]** |
| 1 | 403 | 403 | 62.0 | 62.0 |
| 2 | 105 | 508 | 16.2 | 78.2 |
| 3 | 38 | 546 | 5.8 | 84.0 |
| 4 | 19 | 565 | 2.9 | 86.9 |
| 5 | 17 | 582 | 2.6 | 89.5 |
| 6 | 5 | 587 | 0.8 | 90.3 |
| 7 | 7 | 594 | 1.1 | 91.4 |
| 8 | 9 | 603 | 1.4 | 92.8 |
| 9 | 5 | 608 | 0.8 | 93.5 |
| 10 - 143 | 42 | 650 | 6.5 | 100.0 |
| **Total** | **650** | | **100.0** | |
| Source: USCIS analysis. [1]Note: Figures may not sum to 100 percent due to rounding. | | | | |

7

Table 3 details when small and non-small entities are treated separately, the distributions are different. More than 90 percent of identified or assumed small entities submitted four or fewer petitions, whereas only about 59.3 percent of non-small entities did. Looked at another way, submitting four or more petitions would put a company in the top 10 percent of most active small entities but by comparison, a non-small entity would have had to submit almost 20 petitions to be in the top 10 percent of all petitioners. Although the petition counts per entity ranged from 1 to 143, a majority of small entities submitted only one petition while the majority of non-small entities submitted two or more petitions. While a large majority of the entities submitting petitions are considered small, most of these small entities file few petitions. A full table of petitions per sample entity is available in Appendix B.

| Table 3: Form I-129 Petitions per Entity, Non-small and Small Distributions, FY 2020. | | | | | | |
|---|---|---|---|---|---|---|
| **Petitions per Entity** | **Non-small Entities** | | | **Small Entities** | | |
| | **Entities** | **Percentage of Total** | **Cumulative Percentage** | **Entities** | **Percentage of Total[1]** | **Cumulative Percentage[1]** |
| 1 | 31 | 36.0 | 36.0 | 369 | 65.4 | 65.4 |
| 2 | 15 | 17.4 | 53.5 | 90 | 16.0 | 81.4 |
| 3 | 1 | 1.2 | 54.7 | 37 | 6.6 | 88.0 |
| 4 | 4 | 4.7 | 59.3 | 15 | 2.7 | 90.7 |
| 5 | 6 | 7.0 | 66.3 | 11 | 2.0 | 92.7 |
| 6 to 10 | 10 | 11.6 | 77.9 | 18 | 3.2 | 95.9 |
| 11 to 20 | 8 | 9.3 | 87.2 | 7 | 1.2 | 97.1 |
| 21 to 50 | 7 | 8.1 | 95.3 | 13 | 2.3 | 99.4 |
| 51+ | 4 | 4.7 | 100.0 | 3 | 0.6 | 100.0 |
| **Total** | **86** | **100.0** | | **564** | **100.0** | |
| Source: USCIS analysis. | | | | | | |
| [1]Note: Figures may not sum to 100 percent due to rounding. | | | | | | |

Table 4 shows the distribution of annual revenues of matched small entities in the sample is weighted toward the low end. The majority of these entities reported revenues of less than $1 million per year and about 80 percent brought in less than $5 million. At the lowest end, a little more than 35 percent of entities with records in the databases had revenue of less than $500,000 per year.[18]

8

---

[18] Numbers reported in Data Axle were a mix of point and range figures; Manta, Cortera, and Guidestar report wage ranges and thus, to estimate the number of small entities that maybe impacted, USCIS used the lower end of the wage range for this analysis.

| Revenue Range of Matched Small Entities | Identified in Data Axle | Identified via Manta, Cortera, or Guidestar | Total | Percentage[1] | Cumulative Percentage[1] |
|---|---|---|---|---|---|
| < $100K | 6 | 0 | 6 | 1.7 | 1.7 |
| $100K to < $500K | 47 | 71 | 118 | 33.4 | 35.1 |
| $500K to < $1M | 51 | 10 | 61 | 17.3 | 52.4 |
| $1M to < $5M | 82 | 15 | 97 | 27.5 | 79.9 |
| $5M to < $10M | 30 | 4 | 34 | 9.6 | 89.5 |
| $10M to < $50M | 18 | 2 | 20 | 5.7 | 95.2 |
| $50M to < $100M | 4 | 1 | 5 | 1.4 | 96.6 |
| > $100M | 0 | 0 | 0 | 0 | 96.6 |
| Missing revenue data[2] | 11 | 1 | 12 | 3.4 | 100.0 |
| **Total** | **249** | **104** | **353** | **100.0** | |

**Table 4: Form I-129 Revenue Distribution of Matched Small Entities, FY 2020.**

Source: USCIS analysis.
[1] Figures may not sum to 100 percent due to rounding.
[2] Some entities found in the databases either did not contain revenue data or were determined to be small based on employee count thresholds.

The plurality of petitioners in the sample were located in California, with 117 (or 18 percent of 650), followed by New York, Texas, Florida, and New Jersey. Together, these top five states accounted for 325 petitioners—exactly half of the 650 sample, (50 percent of 650 total petitions), shown in Table 5.

**Table 5: Form I-129 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2020.**

| Rank | State | Number of Petitioners | Proportion of Sample (Percentage) |
|---|---|---|---|
| 1 | California (CA) | 117 | 18.0 |
| 2 | New York (NY) | 91 | 14.0 |
| 3 | Texas (TX) | 56 | 8.6 |
| 4 | Florida (FL) | 34 | 5.2 |
| 5 | New Jersey (NJ) | 27 | 4.2 |
| 6 | Massachusetts (MA) | 23 | 3.5 |
| 7 | Virginia (VA) | 21 | 3.2 |
| 8 | Georgia (GA) | 18 | 2.8 |
| 9 | Illinois (IL) | 17 | 2.6 |
| 10 | Washington (WA) | 16 | 2.5 |

Source: USCIS analysis.

## A. Funding the Asylum Program with Form I-129 by Visa Classification Petition Fees

In this proposed rule, DHS proposes a new Asylum Program Fee of $600 be paid by any employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Worker.  Proposed 8 CFR 106.2(c )(13).  DHS has determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers applicants/petitioners. DHS determined the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I-129 and Form I-140 to collect the Asylum Processing IFR estimated annual costs.[19] The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I-129 and Form I-140 benefit requests.

## B. Discussion of Impacts

DHS is not separating Form I-129 into multiple forms in this proposed rule as it did in the 2020 fee rule, but it is taking that action separately as a revision of the currently approved Form I-129 information collection under the Paperwork Reduction Act.  In this proposed rule, DHS proposes different fees for Form I-129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. The proposed fees are calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. The current base filing fee for Form I-129 is $460. DHS proposes separate H-2A and H-2B fees for petitions with named workers and unnamed workers.  Table 6a shows that, as stated above, the Asylum Program Fee of $600 would be included with each Form 1-129 Petition for a Nonimmigrant Worker classification.  It would apply to all fee-paying receipts for Forms I-129 and I-129CW.  For example, it would apply to all initial petitions, changes of status, and extensions of stay that use Form I-129.

---

10

[19] DHS acknowledges that, by using the middle of the range of costs, if actual costs are higher than that, then the USCIS fee schedule will be set at a level that is less than what will be required to recover all of the costs added by the Asylum Processing IFR, all other factors remaining the same. Estimated annual costs of the Asylum Processing IFR (mid-range estimate): FY 2022 total costs of $438.2 million plus FY 2023 total costs of $413.6 million equals $851.8.  Average total costs of FY 2022/2023 equal $425.9 million.  That figure represents the estimated costs that are directly attributable to the implementation of that rule.

| Table 6a. USCIS Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, FY 2022/2023. | | | | |
|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Current Fee | Proposed Fee | Asylum Program Fee | Total Proposed Fee |
| H-1B | $460 | $780 | $600 | $1,380/$1,595[20] |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 |
| O-1/O-2 | $460 | $1,055 | $600 | $1,655 |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 |
| CW, H-3, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 |
| Source: USCIS FY 2022/2023 Proposed Fee Schedule (**see** preamble Sections (II)(C) Summary of Current and Proposed Fees and (V)(B)(4) Funding the Asylum Program with Employer Petition Fees of the NPRM). Note: Employers may apply using Form I-129 also for P—1, P—1S, P—2, P—2S, P—3, P—3S, R1, E—1, E—2, E—3 | | | | |

For petitioners filing Form I-129, DHS proposes increasing the fee filed for all worker types. The fee adjustments and percentage increases are summarized, shown in Table 6b.  For petitioners filing Form I-129, DHS proposes increasing the fee filed for all worker types. The fee adjustments and percentage increases are summarized below. H-1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Non-cap subject petitions (e.g., extension petitions or cap-exempt filer petitions) would not have to pay the registration fee.  This registration fee is added to the fee increase and results in an overall increase for cap-subject H-1B classification petitions of $920 ($215 + $705).

---

[20] USCIS in this SEA used the H-1B, Petition for Nonimmigrant Worker: H-1B Classification fee of $1,595 = The fee includes the $1,380 proposed fee for H-1B Classification + $215 initial mandatory for cap-subject H-1B Registration Fee (current $10 to proposed $215; $205 dollar increase).  This registration fee of $215 is for each registration, each registration is for a single beneficiary.  Registrants or their representative are required to pay the $215 non-refundable H-1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H-1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated.  H-1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $1,380 proposed fee.  **See** Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, **Final Rule** dated November 8, 2019.  Available at https://www.govinfo.gov/content/pkg/FR-2019-11-08/pdf/2019-24292.pdf.  See Regulatory Impact Analysis in the docket on regulations.gov, Section (3)(H) Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H-1B petitions.

| Table 6b. USCIS Fees for Form I-129 Classifications, FY 2022/2023. | | | | |
|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Current Fee | Total Proposed Fee | Difference in Fee Increase | Percent Change |
| H-1B | $460 | $1,380/$1,595[21] | $920/$1,135 | 200%/247% |
| H-2A – Named Beneficiaries | $460 | $1,690 | $1,230 | 267% |
| H-2B – Named Beneficiaries | $460 | $1,680 | $1,220 | 265% |
| H-2A – Unnamed Beneficiaries | $460 | $1,1,130 | $670 | 146% |
| H-2B – Unnamed Beneficiaries | $460 | $1,180 | $720 | 157% |
| O-1/O-2 | $460 | $1,655 | $1,195 | 260% |
| L-1A/L-1B/LZ Blanket | $460 | $1,985 | $1,525 | 332% |
| CW, H-3, E, TN, Q, P, and R | $460 | $1,615 | $1,155 | 251% |

Source: USCIS FY 2022/2023 Proposed Fee Schedule (see preamble Sections (II)(C) Summary of Current and Proposed Fees and (V)(B)(4) Funding the Asylum Program with Employer Petition Fees of the NPRM).
Note: Employers may apply using Form I-129 also for P—1, P—1S, P—2, P—2S, P—3, P—3S, R1, E—1, E—2, E—3

To calculate the impact of this increase, DHS estimated the total costs associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity.[22] H-1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall increase for H-1B classification petitions of $920 ($215 + $705). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 289 of the 353 entities searched, were small entities based on sales revenue data.[23]

| Table 7: Form I-129 Classifications Economic Impacts on Small Entities with Revenue Data. | | |
|---|---|---|
| Visa Classification Immigration Benefit Request | Fee Increase | Average Impact Percentage* |
| H-1B | $920/$1,135** | 0.66/0.73% |
| H-2A – Named Beneficiaries | $1,230 | 0.37% |
| H-2B – Named Beneficiaries | $1,220 | 0.75% |

12

[21] USCIS in this SEA used the H-1B, Petition for Nonimmigrant Worker: H-1B Classification fee of $1,595 = The fee includes the $1,380 proposed fee for H-1B Classification + $215 initial mandatory for cap-subject H-1B Registration Fee (current $10 to proposed $215; $205 dollar increase).  This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H-1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H-1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated.  H-1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $1,380 proposed fee.  See Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, **Final Rule** dated November 8, 2019.  Available at **https://www.govinfo.gov/content/pkg/FR-2019-11-08/pdf/2019-24292.pdf**.  See Regulatory Impact Analysis in the docket on regulations.gov, Section (3)(H) Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H1B petitions.

[22] Total Impact to Entity = (Number of Petitions Submitted per Entity x $X Amount of Fee Increase) / Entity Sales Revenue.  DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[23] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

| H-2A – Unnamed Beneficiaries | $670 | 0.37% |
|---|---|---|
| H-2B – Unnamed Beneficiaries | $720 | 0.75% |
| L-1A/L-1B/LZ Blanket | $1,525 | 0.42% |
| O-1/O-2 | $1,195 | 0.57% |
| CW, H-3, E, TN, Q, P, and R | $1,155 | 0.25% |

Source: USCIS calculation.
Note: There is no distinction between named and unnamed beneficiaries. Each average impact percentage calculation for H-2A—Named Beneficiaries required assuming each H-2A request is for named beneficiaries while each average impact percentage calculation for H-2A—Unnamed Beneficiaries required assuming that each H-2A request is for unnamed beneficiaries. The same process applied to H-2B requests.
Note: Employers may apply using Form I-129 also for P-–1, P-–1S, P-–2, P-–2S, P-–3, P-–3S, R1, E-–1, E-–2, E-–3

*These figures are percentages, not proportions.
**$920 includes the fee increase ($705) and the increase in registration fee for H-1B cap-subject petitions ($215).

Depending on the immigration benefit request, the average impact on the 289 small entities with revenue data ranges from 0.25 to 0.75 percent as shown in Table 7. Among the 289 small entities with reported revenue data, 90.4 percent experienced an economic impact of less than 1 percent with the exception of 9.6 percent of the small entities. Those small entities with greater than 1 percent impact filed multiple petitions and had low reported revenues. Therefore, these small entities may file fewer petitions as a result of this proposed rule. The average impact on the 289 small entities with revenue data was 0.57 percent. The greatest economic impact proposed by the fee change was 19.04 percent and the smallest was 0.005 percent per entity.

### C. Small Entity Classification

With an aggregated total of 564 out of a sample size of 650, DHS inferred that a majority, or 86.8 percent, of the entities filing Form I-129 petitions were small entities.  Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services)were not-for-profit.  The NAICS code 611 (Educational Services) may have for-profit entities.

Table 9 shows the composition of the small entities by entity type. Most of the sample consisted of small businesses when looked at by type of small entity. There are no small governmental jurisdictions in the sample and 38 small not-for-profits.

| Table 9: Form I-129 Small Entity Classification, FY 2020. | | | |
|---|---|---|---|
| Classification | Small Entity Status | Sample Size | Sample Size (Percentage)[1] |
| **Small Entity** | **Yes** | **564** | **86.8** |
| Small not-for-profit entity | Segment | 38 | 5.8 |
| Small governmental jurisdiction | Segment | 0 | 0 |
| Small business | Segment | 526 | 80.9 |
| **Non-small Entities** | **No** | **86** | **13.2** |

13

| Total | - | 650 | 100.0 |

Source: USCIS analysis.

[1] Note: Figures may not sum to 100 percent due to rounding.

### D. Issues with Data

In selecting a sample, DHS intends to be as inclusive as possible of all petitioners. However, due to peculiarities in the database, some petitioners would necessarily be entered multiple times in the random sort. Some of this is due to error. Some of these variations featured digits that were transposed and others mis-keyed, while other petitions for this entity were submitted without an EIN.

Manual data-cleaning is impractical in a situation where hundreds of thousands of records must be sorted; worse, it could lead to introducing new inaccuracy into the database if some duplicates are removed and others are not. Using employer names is not a better solution, as there is even less consistency in their formatting.

The data errors that may lead to overrepresentation of some petitioners do not clearly favor either small or non-small entities. The best DHS can do is to construct a sample larger than necessary, eliminate any duplicates within that sample, and proceed with the analysis as normal. There were no duplicates detected within the sample, indicating that irregularities in the data received were not large enough as to skew understanding of the underlying parameters of the petitioner population.

### 4. Immigrant Petition for Alien Worker, Form I-140 Data Research Population and Sampling Statistics

USCIS internal data for Form I-140 were provided by OPQ from the CLAIMS3/CISCOR database. There were 129,531 foreign worker Form I-140 petitions submitted in FY 2020. Of these, 108,806 (84 percent) were submitted with an EIN; the remaining 20,725 were recorded either with a blank or a "0" in the EIN field. Many employers submitted more than one petition over the course of the year, as each petition is for an individual worker.  Those petitions that were submitted with an EIN provided 25,279 unique EINs.

Table 10 has data from the 12-month period submissions of I-140 petitions were aggregated to create a total of 129,531 foreign worker petitions. This total represented a population of 25,279 entities petitioning for workers, with such entities submitting multiple petitions. From this population, DHS selected a random sample of 550 petitioning entities. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 379, or 68.9 percent, of these petitioners met the definition of small entities, that the majority of these small entities had annual revenues of less than $5 million[24], and that approximately 6.6 percent[25] of them had

14

[24] Calculation: 237 small entities with annual revenues of less than $5 million/ 292 matched small entities = 81 percent.
[25] Calculation: 25 small entities petitioning for five or more workers / 379 total small entities = 6.6 percent.

petitioned for 5 or more workers over that year.

| Table 10: Outline of Form I-140 Statistics, FY 2020. | | | |
|---|---|---|---|
| Parameter | Quantity | Proportion of Sample (Percentage) | Comments |
| Population—petitions | 129,531 | - | Total number of petitions. |
| Population—unique entities | 25,279 | - | Overstated number of unique employers. |
| Minimum Required Sample | 383 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 550 | 100.0 | Sample selected to match 383 entities. |
| Non-matched Sample Segment (S)* | **86** | **15.6** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |
| Matched Sample Segment | 464 | 84.4 | Entities matched in databases, from 550 searches. This exceeds the established sample goal of 383. |
| Sub-Sample Missing Data (S) | **1** | **0.2** | Entities among the 464 matches lacking revenue data and NACIS employment size threshold. |
| Matched Small Entities (S) | **292** | **53.1** | Entities among 464 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 171 | 31.1 | Number of non-small entities out of the 464 matches. |
| **Number of small entities discovered in research** | **379** | **68.9** | **292** + **1** + **86** = 379 |
| Source: USCIS analysis. *(S) Sample numbers used to calculate the totals, for each column. | | | |

Within the sample, nearly two-thirds of entities had submitted just one petition in the 12-month timeframe; over 66 percent—very close to the proportion of small entities—submitted only 1 or 2 petitions. At the other end of the scale, less than 5 percent of entities submitted 11 or more petitions, as shown in Table 11.

| Table 11: Total Form I-140 Petitions per Entity, FY 2020. | | | | |
|---|---|---|---|---|
| Petitions per Entity | Entity Count | Cumulative Entities | Percentage of Sample[1] | Cumulative Percentage[1] |
| 1 | 364 | 364 | 66.2 | 66.2 |
| 2 | 79 | 443 | 14.4 | 80.5 |
| 3 | 41 | 484 | 7.5 | 88.0 |
| 4 | 14 | 498 | 2.5 | 90.5 |
| 5 | 17 | 515 | 3.1 | 93.6 |
| 6 | 4 | 519 | 0.7 | 94.4 |
| 7 | 2 | 521 | 0.4 | 94.7 |
| 8 | 2 | 523 | 0.4 | 95.1 |
| 9 | 2 | 525 | 0.4 | 95.5 |
| 10 - 56 | 25 | 550 | 4.5 | 100.0 |

15

| | | | | |
|---|---|---|---|---|
| **Total** | **550** | | **100.0** | |
| Source: USCIS analysis. | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | |

When small and non-small entities are treated separately, the distributions are different. More than 90 percent of identified or assumed small entities submitted 3 or fewer petitions, whereas only about 79 percent of non-small entities did. Looked at another way, submitting 3 or more petitions would put a company in the top 10 percent of most active small entities but by comparison a non-small entity would have to have submitted between 6 to 10 or more petitions to be in the top 10 percent of petitioners. Although the number of petition counts per entity ranged from 1 to 56, the majority of small entities submitted only one petition. This leads DHS to determine that most of the small entities file fewer petitions, shown in Table 12. A full table of petitions per sample entity is available in Appendix C.

| Table 12: Form I-140 Petitions per Entity, Non-small and Small, FY 2020. | | | | | | |
|---|---|---|---|---|---|---|
| **Petitions per Entity** | **Non-small Entities** | | | **Small Entities** | | |
| | **Entities** | **Percentage of Total[1]** | **Cumulative Percentage[1]** | **Entities** | **Percentage of Total[1]** | **Cumulative Percentage[1]** |
| 1 | 97 | 56.7 | 56.7 | 267 | 70.4 | 70.4 |
| 2 | 23 | 13.5 | 70.2 | 56 | 14.8 | 85.2 |
| 3 | 16 | 9.4 | 79.5 | 25 | 6.6 | 91.8 |
| 4 | 8 | 4.7 | 84.2 | 6 | 1.6 | 93.4 |
| 5 | 7 | 4.1 | 88.3 | 10 | 2.6 | 96.0 |
| 6 to 10 | 9 | 5.3 | 93.6 | 8 | 2.1 | 98.2 |
| 11 to 20 | 7 | 4.1 | 97.7 | 4 | 1.1 | 99.2 |
| 21 to 50 | 3 | 1.8 | 99.4 | 3 | 0.8 | 100.0 |
| 51+ | 1 | 0.6 | 100.0 | 0 | 0.0 | 100.0 |
| **Total** | **171** | **100.0** | | **379** | **100.0** | |
| Source: USCIS analysis. | | | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | | | |

Table 13 shows the distribution of annual revenues of matched small entities in the sample is weighted toward the low end. The majority of these entities reported revenues of less than $5 million per year and about 93 percent brought in less than $10 million. About 16 percent of the firms with revenue records in Data Axle and other databases had revenue of less than $500,000 per year.[26]

---

16

[26] Numbers reported in Data Axle were a mixture of ranges and point figures; Cortera, Manta, and Guidestar report wages and ranges and thus, USCIS used the lower end of the wage range for this analysis.

| Revenue Range of Matched Small Entities[1] | Identified in Data Axle | Identified via Manta, Cortera, or Guidestar | Total | Percentage[2] | Cumulative Percent[3] |
|---|---|---|---|---|---|
| <$100K | 1 | 0 | 1 | 0.3 | 0.3 |
| $100K to < $500K | 45 | 0 | 45 | 15.4 | 15.8 |
| $500K to < $1M | 42 | 56 | 98 | 33.6 | 49.3 |
| $1M to < $5M | 77 | 16 | 93 | 31.8 | 81.2 |
| $5M to < $10M | 25 | 8 | 33 | 11.3 | 92.5 |
| $10M to < $50M | 12 | 4 | 16 | 5.5 | 97.9 |
| $50M to < $100M | 3 | 0 | 3 | 1.0 | 99.0 |
| >= $100M | 3 | 0 | 3 | 1.0 | 100.0 |
| Missing revenue data | 0 | 0 | 0 | | |
| **Total** | **208** | **84** | **292** | **100.0** | |

**Table 13: Form I-140 Revenue Distribution of Matched Small Entities, FY 2020.**

Source: USCIS analysis.
[1] Note: 1K=1,000, 1M=1,000,000.
[2] Note: Figures may not sum to 100 percent due to rounding.
[3] Some entities found in the databases either did not contain revenue data or were determined to be small based on employee count thresholds

The largest number of petitions in the sample were submitted by businesses in California, with 123 (or 22.4 percent of 550 total petitioners), followed by New York, Texas, Florida, and New Jersey. Together, these top five States accounted for 326 petitioners—more than half of the sample (59.2 percent of 550 total petitions), shown in Table 14.

**Table 14: Form I-140 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2020.**

| Rank | State | Number of Petitioners | Proportion of Sample (Percentage) |
|---|---|---|---|
| 1 | California (CA) | 123 | 22.4 |
| 2 | New York (NY) | 62 | 11.3 |
| 3 | Texas (TX) | 56 | 10.2 |
| 4 | Florida (FL) | 49 | 8.9 |
| 5 | New Jersey (NJ) | 36 | 6.5 |
| 6 | Virginia (VA) | 25 | 4.5 |
| 7 | Illinois (IL) | 24 | 4.4 |
| 8 | Georgia (GA) | 19 | 3.5 |
| 9 | Pennsylvania (PA) | 15 | 2.7 |
| 10 | Massachusetts (MA) | 15 | 2.7 |

Source: USCIS analysis.

### A.  Funding the Asylum Program with Form I-140 Petition Fees

DHS proposes a new Asylum Program Fee of $600 be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien

17

Worker.  DHS has determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. DHS determined the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I-129 and Form I-140 to collect the Asylum Processing IFR estimated annual costs.  The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be charged in addition to the fees petitioners would pay for their Form I-129 and Form I-140 benefit requests.

### B.  Discussion of Impacts

USCIS is proposing a fee increase for Form I-140, from $700 to $715, an increase of $15 (2 percent). The total proposed fee would include the $600 Asylum Program Fee for a total of $1,315, an overall increase of $615 (88 percent) per petition.  To calculate the impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[27] Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. Among the 292 small entities with reported revenue data, 98 percent experienced an economic impact considerably less than 1 percent, with the exception of 2 percent of the small entities. As a result of the fee increase, these small entities will see a cost increase ($615 per petition) in filing fees based on petitions. The average impact on all 292 small entities with revenue data was 0.16 percent. The greatest economic impact imposed by this proposed fee change was 2.71 percent. and the smallest was 0.006 percent per entity.

### C. Small Entity Classification

With an aggregated total of 379 out of a sample size of 550, DHS inferred that a majority, or 68.9 percent, of the entities filing Form I-140 petitions were small entities.  Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit.  The NAICS code 611 (Educational Services) may have for-profit entities.

Table 15 shows the composition of the small entities by type. Similar to the Form I-129 small entity types, the sample of Form I-140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 15 small not-for-profits.

| Table 15: Form I-140 Small Entity Classification, FY 2020. | | | |
|---|---|---|---|
| **Classification** | **Small Entity Status** | **Sample Size** | **Sample Size (Percentage)[1]** |

18

---

[27]  Total Impact to Entity = (Number of Petitions Submitted per Entity x $615 Fee Amount Increase) / Entity Sales Revenue.  USCIS used the lower end of sales revenue range for those entities where ranges were provided.

| Small Entity | Yes | 379 | 68.9 |
|---|---|---|---|
| Small not-for-profit entity | Segment | 15 | 2.7 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 364 | 66.2 |
| **Non-small Entities** | **No** | **171** | **31.1** |
| **Total** | **-** | **550** | **100.0** |
| Source: USCIS analysis. | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | |

### D. Issues with Data

DHS attempted to be as inclusive as possible of all petitioners that filed Form I-140. However, the database contained some submitted petitions where the EIN number was left blank or "0." Instructions for Form I-140 state that except for foreign workers of extraordinary ability or those petitioning under national interest waivers, all other Form I-140 petitions must require proof of a permanent job offer. Therefore, an EIN number must be coded on the form or it will be rejected. The blanks in the database could trace to these beneficiaries or not, many of those petitions submitted with a blank or "0" EIN did not provide an entity name. Manual data-cleaning was again impractical in a situation where thousands of records must be sorted.

The sample constructed was larger than necessary, weeding out any duplicates within that sample. There were no duplicates detected within the sample, indicating that irregularities in the data received were not large enough as to skew understanding of the underlying parameters of the petitioner population.

19

### E. Cumulative Impact of Form I-129 and Form I-140 Petitions

In addition to the individual Form I-129 and Form I-140 analyses, USCIS analyzed any cumulative impacts of these form types to determine if there were any impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that overlapped in both samples of Forms I-129 and I-140 by EIN and revenue. In Table 16, only 1 entity had an EIN that overlapped in both samples; this was a large entity that submitted 3 Form I-129 petitions and 1 Form I-140 petition. Due to little overlap in entities in the samples and the relatively minor impacts on revenue of fee increases or surcharges of Forms I-129 and I-140, USCIS does not expect the combined impact of these 2 forms to be an economically significant burden on a number of small entities.

| Table 16: Entities in Both Form I-129 and Form I-140 Samples, FY 2020. | | | |
|---|---|---|---|
| Entity | Number of Form I-129 Petitions | Number of Form I-140 Petitions | Small Entity Status |
| Overlapping Sample Entity | 3 | 1 | Large |
| Source: USCIS analysis. | | | |

### 5. Application for Civil Surgeon Designation, Form I-910 Data Research Population and Sampling Statistics

By law, a civil surgeon is a physician designated by USCIS to conduct immigration medical examinations for individuals applying for an immigration benefit in the United States. Form I-910 is used by a physician to request that USCIS designate them as a civil surgeon to perform immigration medical examinations in the United States and complete USCIS Form I- 693, Report of Medical Examination and Vaccination Record.

USCIS internal data for submissions of Form I-910 were provided by the USCIS National Benefits Center from the National Processing Workflow Repository for FY 2020. These applications contain many duplicates as an individual can apply for multiple clinic practices and a practice can have multiple individual applicants. There were 428 distinct entities identified based on medical license entries and 424 individual doctors associated with these requests.

Table 17, as with the employee petitions described for Form I-129 and Form I-140, DHS selected a random sample of 300 entities and successfully matched 244 of those entities, exceeding the sample-accuracy threshold of 213.[28] In the sample, 207 entities matched and were considered small, 5 entities were found in the databases but did not provide applicable revenue data and did not have an associated employment size threshold, and 32 entities were considered non-small. The remaining 56 entities were not found in any of the databases. From the revenue and employment information on these entities, we determined that 268, or 89.3 percent, of the applicants met the definition of small entities, that over half of these small entities had annual

---

[28] To accurately characterize a population of 428 entities, a sample of 203 entities is required to project findings on the population with a 95 percent confidence level and a 5 percent confidence interval.

revenues of less than $1 million,[29] and that approximately 9 percent of them had requested a civil surgeon designation for 3 or more of their employee doctors over that year.[30]

| Table 17: Outline of Form I-910 Statistics, FY 2020. | | | |
|---|---|---|---|
| Parameter | Quantity | Proportion of Population (Percentage) | Comments |
| Population—applications | 639 | | Total number of applications. |
| Population—unique entities | 428 | | Unique entities submitting applications. |
| Minimum Required Sample | 203 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 300 | 100.0 | Sample selected to match 203 entities. |
| Non-matched Entities (S)** | **56** | **18.7** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |
| Matched Entities | 244 | 81.3 | Entities matched in all databases. |
| Sub-Sample Missing Data (S) | **5** | **1.7** | Entities among the 239 matches lacking revenue or employee count data* |
| Matched Small Entities (S) | **207** | **69.0** | Entities among 239 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 32 | 10.7 | Number of non-small entities out of the 239 matches. |
| **Number of small entities discovered in research** | **268** | **89.3** | **56** + **5** + **207** = 268 |
| Source: USCIS analysis. Note: Includes no local government jurisdictions. **(S) Sample numbers used to calculate the totals, for each column. | | | |

Within the sample, 75 percent of entities had submitted just one request in the 12-month timeframe; 91 percent of entities submitted only 1 or 2 requests. In Table 18, at the other end of the scale, only 3 percent of entities submitted more than 4 petitions.

| Table 18: Total Form I-910 Applications per Entity, FY 2020. | | | | |
|---|---|---|---|---|
| Applications per Entity | Entity Count | Cumulative Entities | Percentage of Sample[1] | Cumulative Percentage[1] |
| 1 | 225 | 225 | 75.0 | 75.0 |
| 2 | 48 | 273 | 16.0 | 91.0 |
| 3 | 13 | 286 | 4.3 | 95.3 |
| 4 | 5 | 291 | 1.7 | 97.0 |
| 5 | 3 | 294 | 1.0 | 98.0 |
| 6 | 3 | 297 | 1.0 | 99.0 |

[29] Calculation: 106 small entities with revenue less than $1 million / 268 total small entities = 39.5 percent.
[30] Calculation: 27 small entities petitioned for 3 or more workers / 268 total small entities = 10 percent.

| Table 18: Total Form I-910 Applications per Entity, FY 2020. | | | | |
|---|---|---|---|---|
| Applications per Entity | Entity Count | Cumulative Entities | Percentage of Sample[1] | Cumulative Percentage[1] |
| 7 | 0 | 297 | 0.0 | 99.0 |
| 8 | 2 | 299 | 0.7 | 99.7 |
| 9 | 1 | 300 | 0.3 | 100.0 |
| 10-143 | 0 | 300 | 100.0 | 100.0 |
| Source: USCIS analysis. | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | |

In Table 19, when small and non-small entities are treated separately, the distributions are similar. However, those entities identified or assumed to be small were more likely to submit multiple requests per entity, whereas those entities identified as non-small only submitted two or fewer requests per entity. A full table of requests for civil surgeon designations per sample entity is available in Appendix D.

| Table 19: Form I-910 Applications per Entity, Non-small and Small, FY 2020. | | | | | | |
|---|---|---|---|---|---|---|
| | Non-small Entities | | | Small Entities | | |
| Applications per Entity | Entities | Percentage of Total[1] | Cumulative Percentage[1] | Entities | Percentage of Total[1] | Cumulative Percentage[1] |
| 1 | 20 | 62.5 | 62.5 | 205 | 76.5 | 76.5 |
| 2 | 5 | 15.6 | 78.1 | 43 | 16.0 | 92.5 |
| 3 | 3 | 9.4 | 87.5 | 10 | 3.7 | 96.3 |
| 4 | 1 | 3.1 | 90.6 | 4 | 1.5 | 97.8 |
| 5 | 0 | 0.0 | 90.6 | 3 | 1.1 | 98.9 |
| 6 to 10 | 3 | 9.4 | 100.0 | 3 | 1.1 | 100.0 |
| 11 to 20 | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| 21 to 50 | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| 51+ | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| Total | 32 | 100.0 | | 268 | 100.0 | |
| Source: USCIS analysis. | | | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | | | |

In Table 20, among small entities in the population, revenues were generally lower than in the Form I-129 and Form I-140 samples; over 96 percent of applicants reported less than 5 million dollars in revenue. Only 2 entities (about 1 percent) made over $10 million in revenue.

| Table 20: Form I-910 Revenue Distribution of Matched Small Entities, FY 2020. | | | | | |
|---|---|---|---|---|---|
| Revenue Range of Matched Small Entities | Identified in Data Axle | Identified via Manta, Cortera, or Guidestar | Total | Percentage[1] | Cumulative Percentage[1] |
| < $100K | 7 | 8 | 15 | 7.1 | 7.1 |
| $100K to < $500K | 18 | 6 | 24 | 11.3 | 18.4 |
| $500K to < $1M | 81 | 1 | 82 | 38.7 | 57.1 |
| $1M to < $5M | 81 | 1 | 82 | 38.7 | 95.8 |
| $5M to < $10M | 2 | 0 | 2 | 0.9 | 96.7 |
| $10M to < $50M | 2 | 0 | 2 | 0.9 | 97.6 |
| $50M to < $100M | 0 | 0 | 0 | 0.0 | 97.6 |
| >= $100M | 0 | 0 | 0 | 0.0 | 97.6 |
| Missing revenue data | 5 | 0 | 5 | 2.4 | 100.0 |
| **Total** | **196** | **16** | **212** | **100.0** | |
| Source: USCIS analysis. | | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | | |

The largest number of applicants (Table 21) in the sample were submitted by businesses in Florida, with 39 (or 13.0 percent of 300 total sample requesters/applicants), followed by California, New York, Texas, and New Jersey. Together, these top five States accounted for 157 applicants, more than half of the sample (52.3 percent of 300 total applicants), shown in Table 21.

| Table 21: Form I-910 Geographic Distribution of Applicants in Sample, Top 10 States, FY 2020. | | | |
|---|---|---|---|
| Rank | State | Number of Applicants | Percent of Sample |
| 1 | Florida (FL) | 39 | 13.0 |
| 2 | California (CA) | 38 | 12.7 |
| 3 | New York (NY) | 36 | 12.0 |
| 4 | Texas (TX) | 26 | 8.7 |
| 5 | New Jersey (NJ) | 18 | 6.0 |
| 6 | Illinois (IL) | 13 | 4.3 |
| 7 | Georgia (GA) | 11 | 3.7 |
| 8 | Virginia (VA) | 9 | 3.0 |
| 9 | Indiana (IN) | 8 | 2.7 |
| 10 | Oregon (OR) | 7 | 2.0 |
| Source: USCIS analysis. | | | |

## A. Discussion of Impacts

USCIS is proposing a fee increase for Form I-910 to $1,230, an increase of $445 (57 percent) from the current $785 fee.  To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that

amount by the sales revenue of that entity.[31] Because entities can file multiple requests, the analysis considers the number of requests submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. Among the 207 small entities with reported revenue data, 97.6 percent experienced an economic impact considerably less than 1 percent, with the exception of 2.4 percent of the small entities. The greatest economic impact by this proposed fee change was 1.85 percent and the smallest was 0.004 percent per entity. The average impact on all 207 small entities with revenue data was 0.15 percent.

### B.  Small Entity Classification

With an aggregated total of 268 out of a sample size of 300, DHS inferred that a majority, or 89.3 percent, of the entities filing Form I-910 petitions were small entities.  Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit.  The NAICS code 611 (Educational Services) may have for-profit entities.

Table 22 shows the composition of the small entities by type. The sample of Form I-910 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 5 small not-for-profits.

| Table 22: Form I-910 Small Entity Classification, FY 2020. | | | |
|---|---|---|---|
| **Classification** | **Small Entity Status** | **Sample Size** | **Sample Size (Percentage)[1]** |
| **Small Entity** | **Yes** | **268** | **89.3** |
| Small not-for-profit entity | Segment | 5 | 1.7 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 263 | 87.7 |
| **Non-small Entities** | **No** | **32** | **10.7** |
| **Total** | **-** | **300** | **100.0** |
| Source: USCIS analysis. | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | |

### 6. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360 Research Population and Sampling Statistics

USCIS collected internal data for Form I-360 for religious workers were provided by the OPQ from the CLAIMS3/CISCOR database. There were 2,388 religious foreign worker Form I-360 petitions submitted in FY 2020 by 489 unique entities with such entities submitting multiple

---

[31] Total Impact to Entity = (Number of Petitions Submitted per Entity x $445 Fee Amount Increase) / Entity Sales Revenue.

petitions.  Of these 489 unique entities, DHS selected a random sample of 420 petitioning entities to analyze. In the sample using the business provider databases identified previously, 208 entities matched and were considered small, 19 entities were found in the databases but did not provide applicable revenue or employee count data. The remaining 172 entities were not found in any of the databases. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 399, or 95.0 percent, of these petitioners met the definition of small entities, that the majority of these small entities had annual revenues of less than $1 million[32], and that approximately 3.0 percent[33] of them had petitioned for 5 or more foreign workers over that year, shown in Table 23.

| Table 23: Outline of Form I-360 Statistics, FY 2020. | | | |
|---|---|---|---|
| Parameter | Quantity | Proportion of Population | Comments |
| Population—petitions | 2,388 | - | Total number of petitions. |
| Population—unique entities | 489 | - | Overstated number of unique employers. |
| Minimum Required Sample | 215 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 420 | 100.0 | Sample selected to match 215 entities. |
| Non-matched Sample Segment (S)* | **172** | **41.0** | Entities without data in Data Axle, Manta.com, Cortera.com, or Guidestar.org |
| Matched Sample Segment | 248 | 59.0 | Entities matched in Data Axle, et al, from 420 searches. This exceeds the established sample goal of 215. |
| Sub-Sample Missing Data (S)* | **19** | **4.5** | Entities among the 248 matches lacking revenue or employee count data. |
| Matched Small Entities (S) | **208** | **49.5** | Entities among 248 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 21 | 5.0 | Number of non-small entities out of the 248 matches. |
| **Number of small entities discovered in research** | **399** | **95.0** | **172** + **19** + **208** = 399 |
| Source: USCIS analysis. *(S) Sample numbers used to calculate the totals, for each column. | | | |

Within the sample in Table 24, approximately 80 percent of entities had submitted just one petition in the 12-month timeframe; over 92 percent entities submitted only one or two petitions. At the other end of the scale, less than 4 percent of entities submitted more than 4 petitions. The average filings per entity are estimated to be 1.59 petitions.[34]

[32] Calculation: 167 small entities with annual revenues of less than $1 million / 208 matched small entities = 80 percent.

[33] Calculation: 12 small entities petitioning for five or more workers / 399 total small entities = 3.0 percent.

[34] USCIS calculated the average filing per entity of 1.59 petitions, from the Form I-360 Sample with Petition Totals in Appendix E, of this analysis. Calculation: (total number of petitions from each sample id) / (total number of sample Form I-360 petitions) = 667/420 = 1.59 average petitions filed per entity.

| Table 24: Total Form I-360 Petitions per Entity, FY 2020. | | | | |
|---|---|---|---|---|
| Petitions per Entity | Entity Count | Cumulative Entities | Percentage of Sample[1] | Cumulative Percentage[1] |
| 1 | 339 | 339 | 80.7 | 80.7 |
| 2 | 47 | 386 | 11.2 | 91.9 |
| 3 | 13 | 399 | 3.1 | 95.0 |
| 4 | 7 | 406 | 1.7 | 96.7 |
| 5 | 4 | 410 | 1.0 | 97.6 |
| 6 | 2 | 412 | 0.5 | 98.1 |
| 7 | 1 | 413 | 0.2 | 98.3 |
| 8 | 1 | 414 | 0.2 | 98.6 |
| 9+ | 2 | 416 | 0.5 | 99.0 |
| 10+ | 4 | 420 | 1.0 | 100 |
| Total | 420 | | 100.0 | |
| Source: USCIS analysis. | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | |

Below in Table 25, when small and non-small entities are treated separately, the distributions are different. Those entities identified or assumed to be small were much more likely to submit fewer petitions per entity (approximately 82 percent of entities only submitted 1 petition), compared to approximately 57 percent of entities identified as non-small only submitted 1 petition. A full table of petitions per sample entity is available in Appendix E.

**Table 25: Form I-360 Petitions per Entity, Non-small and Small, FY 2020.**

| Petitions per Entity | Non-small Entities | | | Small Entities | | |
|---|---|---|---|---|---|---|
| | Entities | Percentage of Total[1] | Cumulative Percentage[1] | Entities | Percentage of Total[1] | Cumulative Percentage[1] |
| 1 | 12 | 57.1 | 57.1 | 327 | 82.0 | 82 |
| 2 | 4 | 19.0 | 76.1 | 43 | 10.8 | 92.8 |
| 3 | 2 | 9.5 | 85.7 | 11 | 2.8 | 95.5 |
| 4 | 1 | 4.8 | 90.4 | 6 | 1.5 | 97.0 |
| 5 | 0 | 0.0 | 90.4 | 4 | 1.0 | 98.0 |
| 6 to 10 | 1 | 4.8 | 95.2 | 6 | 1.5 | 99.5 |
| 11 to 20 | 0 | 0.0 | 95.2 | 0 | 0.0 | 99.5 |
| 21 to 50 | 1 | 4.8 | 100 | 2 | 0.5 | 100 |
| 51+ | 0 | 0.0 | 100 | 0 | 0.0 | 100 |
| **Total** | **21** | **100.0** | | **399** | **100.0** | |

Source: USCIS analysis.
[1] Note: Figures may not sum to 100 percent due to rounding.

Among small entities in the population, revenues were generally lower than in the Form I-129 and Form I-140 samples; approximately 90 percent of applicants reported less than $5 million in revenue. 4 entities (about 1.8 percent) made over $5 million in revenue, shown in Table 26.

**Table 26: Form I-360 Revenue Distribution of Matched Small Entities, FY 2020.**

| Revenue Range of Matched Small Entities | Identified in Data Axle | Identified via Cortera, Manta, or Guidestar | Total | Percentage[2] | Cumulative Percentage[2] |
|---|---|---|---|---|---|
| <$100K | 40 | 1 | 41 | 18.1 | 18.1 |
| $100K to < $500K | 30 | 0 | 30 | 13.2 | 31.3 |
| $500K to < $1M | 11 | 85 | 96 | 42.3 | 73.6 |
| $1M to < $5M | 15 | 22 | 37 | 16.3 | 89.9 |
| $5M to < $10M | 3 | 1 | 4 | 1.8 | 91.6 |
| $10M to < $50M | 0 | 0 | 0 | 0.0 | 91.6 |
| $50M to < $100M | 0 | 0 | 0 | 0.0 | 91.6 |
| >= $100M | 0 | 0 | 0 | 0.0 | 91.6 |
| Missing revenue data | 19 | 0 | 19 | 8.4 | 100.0 |
| **Total** | **118** | **109** | **227** | **100.0** | |

Source: USCIS analysis.
[1] Note: 1K=100,000, 1M=1,000,000.
[2] Note: Figures may not sum to 100 percent due to rounding.

The largest number of petitions in the sample were submitted by businesses in California, with 56 (or 13.3 percent of 420 entities), followed by Texas, New York, Florida and New Jersey. As with the I-129 and I-140 petitions, these top five States accounted for 203 petitions, which is nearly half of the sample (48.3 percent of 420 total petitions), shown in Table 27.

**Table 27: Form I-360 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2020.**

| Rank | State | Number of Petitioners | Percentage of Sample |
|------|-------|----------------------|---------------------|
| 1 | California (CA) | 56 | 13.3 |
| 2 | Texas (TX) | 47 | 11.2 |
| 3 | New York (NY) | 41 | 9.8 |
| 4 | Florida (FL) | 31 | 7.4 |
| 5 | New Jersey (NY) | 28 | 6.7 |
| 6 | Massachusetts (MA) | 21 | 5.0 |
| 7 | Illinois (IL) | 19 | 4.5 |
| 8 | Pennsylvania (PA) | 13 | 3.1 |
| 9 | Georgia (GA) | 13 | 3.1 |
| 10 | Maryland (MD) | 12 | 2.9 |

Source: USCIS analysis.

### A. Discussion of Impacts

DHS proposes to increase the fee for entities petition on behalf of foreign workers who file Form I-360 from $435 to $515, an increase of $80 (18 percent), including entities who petition on behalf of foreign religious workers. To calculate the impact of the increase, DHS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[35]

Similar to Forms I-129, I-140, and I-910, DHS estimated the total costs associated with the fee increase for each entity. Among the 208 small entities with reported revenue data, 99.5 percent experienced an economic impact less than 1 percent, with the exception of 0.5 percent of the small entities. The greatest economic impact imposed by this proposed fee change was 4.11 percent and the smallest was 0.0008 percent per entity. The average impact on all 208 small entities with revenue data was 0.08 percent.

DHS also analyzed the costs of the proposed rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[36] According to the Bureau of Labor Statistics (BLS),

---

[35] Total Impact to Entity = (Number of Petitions Submitted per Entity x $80 Fee Amount Increase) / Entity Sales Revenue.  USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

[36] Office of Advocacy, SBA, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," p. 19 https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with- the-RFA-WEB.pdf.

the mean annual salary is $57,230 for clergy,[37] $52,880 for directors of religious activities and education,[38] and $43,290 for other religious workers.[39] Based on an average of 1.59 religious workers[40] petitioned-for per entity, the additional average annual cost will be $127.20 per entity.[41] The additional costs per entity in this proposed rule represents only 0.22 percent of the average annual salary for clergy, 0.24 percent of the average annual salary for directors of religious activities and education, and 0.29 of the average annual salary for all other religious workers.[42]

## B. Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that a majority, or 95.0 percent, of the entities filing Form I-360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 712 (Museums, Historical Sites, and Similar Institutions), 813 (Religious, Grantmaking, Civic, Professional, and Similar Organizations), and 6241 (Family Social Services) were not-for-profit. The NAICS code 611 (Educational Services) may have for-profit entities.

Table 28 shows the composition of the small entities by type. The sample of Form I-360 consists of a majority not-for-profit entities, primarily composed of religious institutions. There were no small governmental jurisdictions in the sample and 221 small not-for-profits.

| Table 28: Form I-360 Small Entity Classification, FY 2020. | | | |
|---|---|---|---|
| Classification | Small Entity Status | Sample Size | Sample Size (Percentage)[1] |
| **Small Entity** | **Yes** | **399** | **95.0** |
| Small not-for-profit entity | Segment | 221 | 52.6 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 178 | 42.4 |
| **Non-small Entities** | **No** | **21** | **5.0** |
| **Total** | **–** | **420** | **100.0** |

[37] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2021, "Clergy", https://www.bls.gov/oes/2021/may/oes212011.htm .

[38] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2021, "Directors of Religious Activities and Education", https://www.bls.gov/oes/2021/may/oes212021.htm .

[39] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2021, "Religious Workers, All Other", https://www.bls.gov/oes/2021/may/oes212099.htm.

[40] USCIS calculated the average filing per entity of 1.59 petitions, from the Form I-360 Sample with Petition Totals in Appendix E of this analysis. Calculation: (total number of petitions from each sample id) / (total number of sample Form I-360 petitions) = 667/420 = 1.59 average petitions filed per entity.

[41] Calculation: 1.59 average petitions per entity x $80 increase in petition fees = approximately $127.20 additional total cost per entity.

[42] Calculation: ($127.20 additional cost per entity / $57,230 clergy salary) x 100 = 0.22 percent;
($127.20 additional cost per entity / $52,880 directors of religious activities and education) x 100 = 0.24 percent;
($127.20 additional cost per entity / $43,290 other religious workers) x 100 =0.29 percent.

Source: USCIS analysis.
[1] Note: Figures may not sum to 100 percent due to rounding.

### 7. Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Records Request)

In this proposed rule, DHS establishes a fee for the Genealogy Index Search Request, Form G-1041 to increase from $65 to $120, an increase of $55 (85 percent) for those who mail in this request on paper. This proposed rule increases the fee for requestors who use the online electronic Form G-1041 version from the current $65 to $100, an increase of $35 (54 percent).

In this proposed rule, DHS establishes a fee for Form G-1041A would increase from $65 to $260, an increase of $195 (300 percent) for those who mail in this request on paper. In this proposed rule, requestors who use the online electronic Form G-1041A will pay from the current $65 to $240, an increase of $175 (269 percent).

Finally, DHS is proposing to charge a fee for requests for a Certificate of Non-Existence. Currently, USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. USCIS operates the Certificate of Non-Existence request process informally and at no cost to individuals while absorbing the costs to provide this service.[43] DHS proposes a fee of $315 for individuals to recover the estimated full cost of processing these requests, which will require submission of Form G-1566, Request for a Certificate of Non-Existence once approved by the Office of Management and Budget (OMB)[44].

The population affected by this provision includes individuals who use Form G-1041 to request a search of USCIS historical indices and individuals who use Form G-1041A to obtain copies of USCIS historical records found through an index request. The affected population also includes individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. Based on the DHS records, Table 29 shows the estimated number of genealogy index search requests and historical records requests that were submitted to USCIS using Forms G-1041 and G-1041A for FY 2016 through FY 2020. DHS estimates that an annual average of 5,250 Form G-1041 index search requests and 3,352 Form G-1041A records requests were received during that time. For both forms, more than 90 percent of the requests were submitted electronically.

---

[43] See 8 CFR 103.7(f) as of October 1, 2020. Authority to certify records. The Director of USCIS, or such officials as they may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

[44] If finalized, the fee will be established in the FY22/23 rule and will be required with the submission of Form G-1566 if it is approved by OIRA before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed as provided in 8 CFR 299.1.

**Table 29. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2016 through FY 2020.**

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2016 | 321 | 5,192 | 5,513 | 94% |
| 2017 | 274 | 3,036 | 3,310 | 92% |
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| **5- year Total** | **1,359** | **24,889** | **26,248** | |
| **5-year Annual Average** | **272** | **4,978** | **5,250** | 95% |

| Fiscal Year | Form G-1041A (Paper Filing) | Form G-1041A (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2016 | 290 | 2,220 | 2,510 | 88% |
| 2017 | 364 | 2,262 | 2,626 | 86% |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 33 | 3,407 | 3,440 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| **5-year Total** | **1,329** | **15,429** | **16,758** | |
| **5-year Annual Average** | **266** | **3,086** | **3,352** | 92% |

| Fiscal Year | Certificate of Non-Existence Form G-1566 |
|---|---|
| 2016 | 679 |
| 2017 | 909 |
| 2018 | 1,442 |
| 2019 | 1,516 |
| 2020 | 1,784 |
| **5-year Total** | **6,330** |
| **5-year Annual Average** | **1,266** |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB). August 19, 2021
Note: USCIS, IRIS tracks the online percentage of index searches and records requests.

Table 29 above depicts the FY 2016 through FY 2020 filing receipts of the certificate of non-existence. DHS bases the estimate for the Form G-1566 on these receipts and estimates that the average annual receipts for Form G-1566 would be approximately 1,266.

DHS has previously determined that requests for historical records are usually made by individuals.[45] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requesters and, therefore, could not be separated within the data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS assumes genealogists have access to a computer and the Internet. DHS is unable to estimate the online number of index searches and records requests; however, some will receive a reduced fee and cost savings, by filing

---

[45]See, **Establishment of a Genealogy Program**, 73 FR 28026 (May 15, 2008).

online.  Therefore, DHS does not currently have sufficient data to definitively assess the impact on small entities for these requests. However, DHS must still recover the full costs of this program. As stated in the preamble to this proposed rule, reducing the filing fee for any one benefit request submitted to DHS simply transfers the additional cost to process this request to other immigration and naturalization filing fees.

For this proposed rule, DHS is expanding the use of electronic genealogy requests to encourage requesters to use the electronic versions of Form G-1041 and Form G–1041A.  DHS is also changing the search request process so that USCIS may provide requesters with electronic records, if they exist, in response to the initial index request. These changes may reduce the time it takes to request and receive genealogy records, and, in some cases, it will eliminate the need to make multiple search requests and submit separate fees. Moreover, DHS notes that providing digital records in response to a Form G-1041 request may reduce the number of Form G-1041A requests that will be filed since there would already be a copy of the record if it was previously digitized.  DHS proposes to provide the requestor with those preexisting digital records, if they exist, via email in response to the initial search request. Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requestor data into its systems. Requestors that cannot submit the forms electronically may still submit paper copies of both forms with the required filing fees.  DHS recognizes that some small entities may be impacted by these proposed increased fees but cannot determine how many or the exact impact.

## 8. Application for Regional Center Designation Under the EB-5 Regional Center Pilot Program, Form I- 956 (formerly Form I-924) and Annual Statements of Regional Center, Form I-956G (formerly I-924A)

Congress created the EB-5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB-5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Pub. L. 102-395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). As amended, the EB-5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,00 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. **See** INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5); 8 U.S.C. 11538 U.S.C. 1153.   Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117-103).   The EB-5 Reform and Integrity Act of 2022 immediately repealed the Regional Center (RC) Pilot Program created by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act 1993, Pub. L. 102-395, 106 Stat. 1828, § 610(b).  The law also authorizes a new EB-5 Regional Center Program, which will become effective May 14, 2022 and is authorized through FY 2026 and makes various changes to the program.  As discussed more fully in section VIII.N. of the NPRM, DHS proposes new

fees for the forms used in the EB-5 program in this proposed rule.

DHS proposes changes to various fees for regional centers and related immigration benefit requests related to Employment-Based Immigrant Visa, Fifth Preference (EB-5). The EB-5 Reform and Integrity Act of 2022 immediately repealed the prior EB-5 "regional center program." And replaced it with a new regional center program effective 60 days after the enactment, May 14, 2002. The EB-5 Reform and Integrity Act of 2022 has no immediate impact on the staffing levels of the USCIS Immigrant Investor Program Office, although each formerly designated regional center that desires to participate in the new regional center program must submit a request to be approved under the new statutory requirements (Form I-956), which could greatly increase the program workload initially.  Nevertheless, and despite the changes in the law and program, DHS has proposed fees in this rule based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022.  Thus, the annual filing volume projections in this proposed rule are based on historical volumes and trends because the EB-5 Reform and Integrity Act of 2022 is too new for DHS to accurately estimate its impacts on filing volumes.

DHS welcomes comments from the public on the number of forms for the EB-5 program that may be submitted annually and how that number will be changed by the recent legislation.  DHS may adjust the estimated filing volumes in the final rule based on additional analysis and comments on this proposed rule.

DHS is proposing a fee for Form I-956 (formerly Form I-924), Application for Regional Center Designation under the Immigrant Investor Program, is $47,695, a $29,900 (168 percent) increase from the $17,795 fee for Form I-956, Application for Regional Center Designation under the Immigrant Investor Program. See 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(64).  DHS also proposes a $47,695 fee for Form I-956F, Application for Approval of Investment in a Commercial Enterprise, because its adjudicative burden is nearly identical to that of the Form I-956.  The proposed fee for Form I-956G (formerly Form I-924A), Regional Center Annual Statement, is $4,470, a $1,435 (47 percent) increase from the current $3,035 fee Form I-956G, Annual Certification of Regional Center. See 8 CFR 103.7(b)(1)(i)(WW) (Oct. 1, 2020); proposed 8 CFR 106.2(a)(66). The EB-5 program encompasses Forms I-526, I-829, I-956, I-965F, and I-956G.[46]

DHS is creating these new forms as stated above, as part of the EB-5 Reform and Integrity Act of 2022.  Since Form I-956/I-956G will be new forms and historical data does not exist.  Because the immigration benefit adjudications previously performed using Form I-924 will now be administered using Forms I-956 and I-956G, DHS will use historical data of the previous Form I-924, Application for Regional Center Designation Under the Immigrant Investor Program and Form I-924A, Annual Certification of Regional Center as a proxy for the analysis. Under the Regional Center Program, foreign nationals based their EB-5 petitions on investments in new commercial enterprises located within "regional centers." DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, regional

---

[46] The Supplement to Form I-956G is used to certify a Regional Center's continued eligibility for the Regional Center designation through an annual certification. Each designated Regional Center entity must file a Form I-956G for each fiscal year within 90 days after the end of the fiscal year of the calendar year in which the fiscal year ended.  DHS has also created Forms I-956H, Bona Fides of Persons Involved with Regional Center Program, and I-956K Registration for Direct and Third-Party Promoters, for the new EB-5 program.  DHS proposes no fee for those forms in this proposed rule.

productivity, job creation, and increased domestic capital investment. **See** 8 CFR 204.6(e). Requests for regional center designation must be filed with USCIS on Form I-956 (formerly Form I-924), Application for Regional Center Designation Under the Immigrant Investor Program. **See** 8 CFR 204.6(m)(3)-(4). Once designated, regional centers must provide USCIS with updated information to demonstrate continued eligibility for the designation by submitting Form I-956G (formerly Form I-924A), Annual Certification of Regional Center on an annual basis or as otherwise requested. **See** 8 CFR 204.6(m)(6)(i)(B).

The application process would require the same information from applicants that is currently required. As shown in Table 30, during the 5-year period from FY 2016 through FY 2020, USCIS received a total of 951 annual Form I-956 (formerly Form I-924) regional centers applications and 4,091 Form I-956G (formerly Form I-924A) annual statements, with annual averages of 190 and 818 respectively.

| Table 30. Annual Receipts for Form I-956, Application for Regional Center Designation Under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2016 through FY 2020. | | |
|---|---|---|
| **Fiscal Year** | **Form I-956*** | **Form I-956G**** |
| 2016 | 436 | 863 |
| 2017 | 280 | 843 |
| 2018 | 122 | 887 |
| 2019 | 79 | 820 |
| 2020 | 34 | 678 |
| **5-year Total** | **951** | **4,091** |
| **5-year Annual Average** | **190** | **818** |
| *Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, May 5, 2021. | | |
| **Source: USCIS, Immigrant Investor Office (IPO), INFACT database, January 6, 2022. | | |
| Note: I-956G are the annual statements to be submitted by these approved regional centers. | | |

## A. Discussion of Impacts

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking investor funds to NCEs and job-creating projects or entities (JCEs). Regional centers also pose a challenge for analysis as the structure is often complex and can involve many related business and financial activities not directly involved with EB-5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above market return differentials.

While DHS attempted to treat regional centers similar to the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB-5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $500,000 if the investment is in targeted employment area (TEA) project(s), which includes certain rural areas and areas of high unemployment or $1 million for a non- TEA projects per investor, in a U.S. business that will create or preserve at least 10 full-time jobs in the United States for qualifying employees)[47] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I-956 (formerly Form I-924) and I-956G (formerly Form I-924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions in an attempt to analyze the small entity status of regional centers. In the DHS proposed rule "EB-5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers.[48] DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this proposed rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[49]

---

[47]USCIS, "EB-5 Immigrant Investor Program Modernization, Proposed Rule." **See** 84 FR 35750. (July 24, 2019). https://www.govinfo.gov/content/pkg/FR-2019-07- 24/pdf/2019-15000.pdf. This amount by investor is determined between a designated Target Employment Area and non-Target Employment Area.

[48] **Ibid.**

[49] Calculation: 1 percent of $447,000 = $4,470 (the new fee for Form I-956G).

**Appendix A: SBA NAICS Size Standards for I-129, I-140, I-910 and I-360 Petitions in Sample Dataset**

| NAICS Code | NAICS Industry Description | Size Standards in millions of dollars ($) | Size standards in number of employees |
|:---:|---|:---:|:---:|
| Sector 11 – Agriculture, Forestry, Fishing and Hunting | | | |
| 111110 | Soybean Farming | 2 | |
| 111120 | Oilseed (except Soybean) Farming | 2 | |
| 111130 | Dry Pea and Bean Farming | 2.5 | |
| 111140 | Wheat Farming | 2 | |
| 111150 | Corn Farming | 2.25 | |
| 111160 | Rice Farming | 2.25 | |
| 111191 | Oilseed and Grain Combination Farming | 2 | |
| 111199 | All Other Grain Farming | 2 | |
| 111211 | Potato Farming | 3.75 | |
| 111219 | Other Vegetable (except Potato) and Melon Farming | 3.25 | |
| 111310 | Orange Groves | 3.5 | |
| 111320 | Citrus (except Orange) Groves | 3.75 | |
| 111331 | Apple Orchards | 4 | |
| 111332 | Grape Vineyards | 3.5 | |
| 111333 | Strawberry Farming | 4.75 | |
| 111334 | Berry (except Strawberry) Farming | 3.25 | |
| 111335 | Tree Nut Farming | 3.25 | |
| 111336 | Fruit and Tree Nut Combination Farming | 4.5 | |
| 111339 | Other Non-citrus Fruit Farming | 3 | |
| 111411 | Mushroom Production | 4 | |
| 111419 | Other Food Crops Grown Under Cover | 4 | |
| 111421 | Nursery and Tree Production | 2.75 | |
| 111422 | Floriculture Production | 3.25 | |
| 111910 | Tobacco Farming | 2.25 | |
| 111920 | Cotton Farming | 2.75 | |
| 111930 | Sugarcane Farming | 4.5 | |
| 111940 | Hay Farming | 2.25 | |
| 111991 | Sugar Beet Farming | 2.25 | |
| 111992 | Peanut Farming | 2.25 | |
| 111998 | All Other Miscellaneous Crop Farming | 2.25 | |
| 112111 | Beef Cattle Ranching and Farming | 2.25 | |
| 112112 | Cattle Feedlots | 19.5 | |
| 112120 | Dairy Cattle and Milk Production | 3.25 | |
| 112210 | Hog and Pig Farming | 3.5 | |

| | | | |
|---|---|---|---|
| 112310 | Chicken Egg Production | 16.5 | |
| 112320 | Broilers and Other Meat Type Chicken Production | 3 | |
| 112330 | Turkey Production | 3.25 | |
| 112340 | Poultry Hatcheries | 3.5 | |
| 112390 | Other Poultry Production | .3.25 | |
| 112410 | Sheep Farming | 3 | |
| 112420 | Goat Farming | 2.25 | |
| 112511 | Finfish Farming and Fish Hatcheries | 3.25 | |
| 112512 | Shellfish Farming | 3.25 | |
| 112519 | Other Aquaculture | 3.25 | |
| 112910 | Apiculture | 2.75 | |
| 112920 | Horses and Other Equine Production | 2.5 | |
| 112930 | Fur-Bearing Animal and Rabbit Production | 3.25 | |
| 112990 | All Other Animal Production | 2.5 | |
| 113110 | Timber Tract Operations | 16.5 | |
| 113210 | Forest Nurseries and Gathering of Forest Products | 18 | |
| 113310 | Logging | | 500 |
| 114111 | Finfish Fishing | 22 | |
| 114112 | Shellfish Fishing | 12.5 | |
| 114119 | Other Marine Fishing | 10 | |
| 114210 | Hunting and Trapping | 7.5 | |
| 115111 | Cotton Ginning | 14 | |
| 115112 | Soil Preparation, Planting, and Cultivating | 8.5 | |
| 115113 | Crop Harvesting, Primarily by Machine | 12 | |
| 115114 | Postharvest Crop Activities (except Cotton Ginning) | 30 | |
| 115115 | Farm Labor Contractors and Crew Leaders | 16.5 | |
| 115116 | Farm Management Services | 13.5 | |
| 115210 | Support Activities for Animal Production | 9.5 | |
| 115310 | Support Activities for Forestry | 10 | |
| 115310 (Exception 1) | Forest Fire Suppression | 30 | |
| 115310 (Exception 2) | Fuels Management Services | 30 | |
| **Sector 21 – Mining, Quarrying, and Oil and Gas** | | | |
| 211120 | Crude Petroleum Extraction | | 1,250 |
| 211130 | Natural Gas Extraction | | 1,250 |
| 212111 | Bituminous Coal and Lignite Surface Mining | | 1,250 |
| 212112 | Bituminous Coal Underground Mining | | 1,500 |
| 212113 | Anthracite Mining | | 250 |
| 212210 | Iron Ore Mining | | 750 |
| 212221 | Gold Ore Mining | | 1,500 |

| | | | |
|---|---|---|---|
| 212222 | Silver Ore Mining | | 250 |
| 212230 | Copper, Nickel, Lead, and Zinc Mining | | 750 |
| 212291 | Uranium-Radium-Vanadium Ore Mining | | 250 |
| 212299 | All Other Metal Ore Mining | | 750 |
| 212311 | Dimension Stone Mining and Quarrying | | 500 |
| 212312 | Crushed and Broken Limestone Mining and Quarrying | | 750 |
| 212313 | Crushed and Broken Granite Mining and Quarrying | | 750 |
| 212319 | Other Crushed and Broken Stone Mining and Quarrying | | 500 |
| 212321 | Construction Sand and Gravel Mining | | 500 |
| 212322 | Industrial Sand Mining | | 500 |
| 212324 | Kaolin and Ball Clay Mining | | 750 |
| 212325 | Clay and Ceramic and Refractory Minerals Mining | | 500 |
| 212391 | Potash, Soda, and Borate Mineral Mining | | 750 |
| 212392 | Phosphate Rock Mining | | 1,000 |
| 212393 | Other Chemical and Fertilizer Mineral Mining | | 500 |
| 212399 | All Other Nonmetallic Mineral Mining | | 500 |
| 213111 | Drilling Oil and Gas Wells | | 1,000 |
| 213112 | Support Activities for Oil and Gas Operations | 41.5 | |
| 213113 | Support Activities for Coal Mining | 24 | |
| 213114 | Support Activities for Metal Mining | 36 | |
| 213115 | Support Activities for Nonmetallic Minerals (except Fuels) | 18 | |
| 221111 | Hydroelectric Power Generation | | 500 |
| 221112 | Fossil Fuel Electric Power Generation | | 750 |
| 221113 | Nuclear Electric Power Generation | | 750 |
| 221114 | Solar Electric Power Generation | | 250 |
| 221115 | Wind Electric Power Generation | | 250 |
| 221116 | Geothermal Electric Power Generation | | 250 |
| 221117 | Biomass Electric Power Generation | | 250 |
| 221118 | Other Electric Power Generation | | 250 |
| 221121 | Electric Bulk Power Transmission and Control | | 500 |
| 221122 | Electric Power Distribution | | 1,000 |
| 221210 | Natural Gas Distribution | | 1,000 |
| 221310 | Water Supply and Irrigation Systems | 36 | |
| 221320 | Sewage Treatment Facilities | 31 | |
| 221330 | Steam and Air-Conditioning Supply | 26.5 | |
| **Sector 23 – Construction** | | | |
| 236115 | New Single-family Housing Construction (Except For-Sale Builders) | 39.5 | |

| | | | |
|---|---|---|---|
| **236116** | New Multifamily Housing Construction (except For-Sale Builders) | 39.5 | |
| **236117** | New Housing For-Sale Builders | 39.5 | |
| **236118** | Residential Remodelers | 39.5 | |
| **236210** | Industrial Building Construction | 39.5 | |
| **236220** | Commercial and Institutional Building Construction | 39.5 | |
| **237110** | Water and Sewer Line and Related Structures Construction | 39.5 | |
| **237120** | Oil and Gas Pipeline and Related Structures Construction | 39.5 | |
| **237130** | Power and Communication Line and Related Structures Construction | 39.5 | |
| **237210** | Land Subdivision | 30 | |
| **237310** | Highway, Street, and Bridge Construction | 39.5 | |
| **237990** | Other Heavy and Civil Engineering Construction | 39.5 | |
| **237990 (Exception)** | Dredging and Surface Cleanup Activities | 32.5 | |
| **238110** | Poured Concrete Foundation and Structure Contractors | 16.5 | |
| **238120** | Structural Steel and Precast Concrete Contractors | 16.5 | |
| **238130** | Framing Contractors | 16.5 | |
| **238140** | Masonry Contractors | 16.5 | |
| **238150** | Glass and Glazing Contractors | 16.5 | |
| **238160** | Roofing Contractors | 16.5 | |
| **238170** | Siding Contractors | 16.5 | |
| **238190** | Other Foundation, Structure, and Building Exterior Contractors | 16.5 | |
| **238210** | Electrical Contractors and Other Wiring Installation Contractors | 16.5 | |
| **238220** | Plumbing, Heating, and Air-Conditioning Contractors | 16.5 | |
| **238290** | Other Building Equipment Contractors | 19.5 | |
| **238310** | Drywall and Insulation Contractors | 16.5 | |
| **238320** | Painting and Wall Covering Contractors | 16.5 | |
| **238330** | Flooring Contractors | 16.5 | |
| **238340** | Tile and Terrazzo Contractors | 16.5 | |
| **238350** | Finish Carpentry Contractors | 16.5 | |
| **238390** | Other Building Finishing Contractors | 16.5 | |
| **238910** | Site Preparation Contractors | 16.5 | |
| **238990** | All Other Specialty Trade Contractors | 16.5 | |
| **311111** | Dog and Cat Food Manufacturing | | 1,000 |
| **311119** | Other Animal Food Manufacturing | | 500 |
| **311211** | Flour Milling | | 1,000 |

AR_000554

| 311212 | Rice Milling | | 500 |
|---|---|---|---|
| 311213 | Malt Manufacturing | | 500 |
| 311221 | Wet Corn Milling | | 1,250 |
| 311224 | Soybean and Other Oilseed Processing | | 1,000 |
| 311225 | Fats and Oils Refining and Blending | | 1,000 |
| 311230 | Breakfast Cereal Manufacturing | | 1,000 |
| 311313 | Beet Sugar Manufacturing | | 750 |
| 311314 | Cane Sugar Manufacturing | | 1,000 |
| 311340 | Nonchocolate Confectionery Manufacturing | | 1,000 |
| 311351 | Chocolate and Confectionery Manufacturing from Cacao Beans | | 1,250 |
| 311352 | Confectionery Manufacturing from Purchased Chocolate | | 1,000 |
| 311411 | Frozen Fruit, Juice and Vegetable Manufacturing | | 1,000 |
| 311412 | Frozen Specialty Food Manufacturing | | 1,250 |
| 311421 | Fruit and Vegetable Canning[3] | | 1,000 |
| 311422 | Specialty Canning | | 1,250 |
| 311423 | Dried and Dehydrated Food Manufacturing | | 750 |
| 311511 | Fluid Milk Manufacturing | | 1,000 |
| 311512 | Creamery Butter Manufacturing | | 750 |
| 311513 | Cheese Manufacturing | | 1,250 |
| 311514 | Dry, Condensed, and Evaporated Dairy Product Manufacturing | | 750 |
| 311520 | Ice Cream and Frozen Dessert Manufacturing | | 1,000 |
| 311611 | Animal (except Poultry) Slaughtering | | 1,000 |
| 311612 | Meat Processed from Carcasses | | 1,000 |
| 311613 | Rendering and Meat Byproduct Processing | | 750 |
| 311615 | Poultry Processing | | 1,250 |
| 311710 | Seafood Product Preparation and Packaging | | 750 |
| 311811 | Retail Bakeries | | 500 |
| 311812 | Commercial Bakeries | | 1,000 |
| 311813 | Frozen Cakes, Pies, and Other Pastries Manufacturing | | 750 |
| 311821 | Cookie and Cracker Manufacturing | | 1,250 |
| 311824 | Dry Pasta, Dough, and Flour Mixes Manufacturing from Purchased Flour | | 750 |
| 311830 | Tortilla Manufacturing | | 1,250 |
| 311911 | Roasted Nuts and Peanut Butter Manufacturing | | 750 |
| 311919 | Other Snack Food Manufacturing | | 1,250 |
| 311920 | Coffee and Tea Manufacturing | | 750 |
| 311930 | Flavoring Syrup and Concentrate Manufacturing | | 1,000 |

| | | |
|---|---|---:|
| 311941 | Mayonnaise, Dressing and Other Prepared Sauce Manufacturing | 750 |
| 311942 | Spice and Extract Manufacturing | 500 |
| 311991 | Perishable Prepared Food Manufacturing | 500 |
| 311999 | All Other Miscellaneous Food Manufacturing | 500 |
| 312111 | Soft Drink Manufacturing | 1,250 |
| 312112 | Bottled Water Manufacturing | 1,000 |
| 312113 | Ice Manufacturing | 750 |
| 312120 | Breweries | 1,250 |
| 312130 | Wineries | 1,000 |
| 312140 | Distilleries | 1,000 |
| 312230 | Tobacco Manufacturing | 1,500 |
| 313110 | Fiber, Yarn, and Thread Mills | 1,250 |
| 313210 | Broad woven Fabric Mills | 1,000 |
| 313220 | Narrow Fabric Mills and Schiffli Machine Embroidery | 500 |
| 313230 | Nonwoven Fabric Mills | 750 |
| 313240 | Knit Fabric Mills | 500 |
| 313310 | Textile and Fabric Finishing Mills | 1,000 |
| 313320 | Fabric Coating Mills | 1,000 |
| 314110 | Carpet and Rug Mills | 1,500 |
| 314120 | Curtain and Linen Mills | 750 |
| 314910 | Textile Bag and Canvas Mills | 500 |
| 314994 | Rope, Cordage, Twine, Tire Cord, and Tire Fabric Mills | 1,000 |
| 314999 | All Other Miscellaneous Textile Product Mills | 500 |
| 315110 | Hosiery and Sock Mills | 750 |
| 315190 | Other Apparel Knitting Mills | 750 |
| 315210 | Cut and Sew Apparel Contractors | 750 |
| 315220 | Men's and Boys' Cut and Sew Apparel Manufacturing | 750 |
| 315240 | Women's, Girls', and Infants' Cut and Sew Apparel Manufacturing | 750 |
| 315280 | Other Cut and Sew Apparel Manufacturing | 750 |
| 315990 | Apparel Accessories and Other Apparel Manufacturing | 500 |
| 316110 | Leather and Hide Tanning and Finishing | 500 |
| 316210 | Footwear Manufacturing | 1,000 |
| 316992 | Women's Handbag and Purse Manufacturing | 750 |
| 316998 | All Other Leather Good and Allied Product Manufacturing | 500 |
| 321113 | Sawmills | 500 |
| 321114 | Wood Preservation | 500 |

| 321211 | Hardwood Veneer and Plywood Manufacturing | | 500 |
|---|---|---|---|
| 321212 | Softwood Veneer and Plywood Manufacturing | | 1,250 |
| 321213 | Engineered Wood Member (except Truss) Manufacturing | | 750 |
| 321214 | Truss Manufacturing | | 500 |
| 321219 | Reconstituted Wood Product Manufacturing | | 750 |
| 321911 | Wood Window and Door Manufacturing | | 1,000 |
| 321912 | Cut Stock, Resawing Lumber, and Planning | | 500 |
| 321918 | Other Millwork (including Flooring) | | 500 |
| 321920 | Wood Container and Pallet Manufacturing | | 500 |
| 321991 | Manufactured Home (Mobile Home) Manufacturing | | 1,250 |
| 321992 | Prefabricated Wood Building Manufacturing | | 500 |
| 321999 | All Other Miscellaneous Wood Product Manufacturing | | 500 |
| 322110 | Pulp Mills | | 750 |
| 322121 | Paper (except Newsprint) Mills | | 1,250 |
| 322122 | Newsprint Mills | | 750 |
| 322130 | Paperboard Mills | | 1,250 |
| 322211 | Corrugated and Solid Fiber Box Manufacturing | | 1,250 |
| 322212 | Folding Paperboard Box Manufacturing | | 750 |
| 322219 | Other Paperboard Container Manufacturing | | 1,000 |
| 322220 | Paper Bag and Coated and Treated Paper Manufacturing | | 750 |
| 322230 | Stationery Product Manufacturing | | 750 |
| 322291 | Sanitary Paper Product Manufacturing | | 1,500 |
| 322299 | All Other Converted Paper Product Manufacturing | | 500 |
| 323111 | Commercial Printing (except Screen and Books) | | 500 |
| 323113 | Commercial Screen Printing | | 500 |
| 323117 | Books Printing | | 1,250 |
| 323120 | Support Activities for Printing | | 500 |
| 324110 | Petroleum Refineries[4] | | 1,500 |
| 324121 | Asphalt Paving Mixture and Block Manufacturing | | 500 |
| 324122 | Asphalt Shingle and Coating Materials Manufacturing | | 750 |
| 324191 | Petroleum Lubricating Oil and Grease Manufacturing | | 750 |
| 324199 | All Other Petroleum and Coal Products Manufacturing | | 500 |
| 325110 | Petrochemical Manufacturing | | 1,000 |
| 325120 | Industrial Gas Manufacturing | | 1,000 |
| 325130 | Synthetic Dye and Pigment Manufacturing | | 1,000 |
| 325180 | Other Basic Inorganic Chemical Manufacturing | | 1,000 |
| 325193 | Ethyl Alcohol Manufacturing | | 1,000 |

| 325194 | Cyclic Crude, Intermediate, and Gum and Wood Chemical Manufacturing | | 1,250 |
|---|---|---|---|
| 325199 | All Other Basic Organic Chemical Manufacturing | | 1,250 |
| 325211 | Plastics Material and Resin Manufacturing | | 1,250 |
| 325212 | Synthetic Rubber Manufacturing | | 1,000 |
| 325220 | Artificial and Synthetic Fibers and Filaments Manufacturing | | 1,000 |
| 325311 | Nitrogenous Fertilizer Manufacturing | | 1,000 |
| 325312 | Phosphatic Fertilizer Manufacturing | | 750 |
| 325314 | Fertilizer (Mixing Only) Manufacturing | | 500 |
| 325320 | Pesticide and Other Agricultural Chemical Manufacturing | | 1,000 |
| 325411 | Medicinal and Botanical Manufacturing | | 1,000 |
| 325412 | Pharmaceutical Preparation Manufacturing | | 1,250 |
| 325413 | In-Vitro Diagnostic Substance Manufacturing | | 1,250 |
| 325414 | Biological Product (except Diagnostic) Manufacturing | | 1,250 |
| 325510 | Paint and Coating Manufacturing | | 1,000 |
| 325520 | Adhesive Manufacturing | | 500 |
| 325611 | Soap and Other Detergent Manufacturing | | 1,000 |
| 325612 | Polish and Other Sanitation Good Manufacturing | | 750 |
| 325613 | Surface Active Agent Manufacturing | | 750 |
| 325620 | Toilet Preparation Manufacturing | | 1,250 |
| 325910 | Printing Ink Manufacturing | | 500 |
| 325920 | Explosives Manufacturing | | 750 |
| 325991 | Custom Compounding of Purchased Resins | | 500 |
| 325992 | Photographic Film, Paper, Plate and Chemical Manufacturing | | 1,500 |
| 325998 | All Other Miscellaneous Chemical Product and Preparation Manufacturing | | 500 |
| 326111 | Plastic Bag and Pouch Manufacturing | | 750 |
| 326112 | Plastics Packaging Film and Sheet (including Laminated) Manufacturing | | 1,000 |
| 326113 | Unlaminated Plastics Film and Sheet (except Packaging) Manufacturing | | 750 |
| 326121 | Unlaminated Plastics Profile Shape Manufacturing | | 500 |
| 326122 | Plastics Pipe and Pipe Fitting Manufacturing | | 750 |
| 326130 | Laminated Plastics Plate, Sheet (except Packaging), and Shape Manufacturing | | 500 |
| 326140 | Polystyrene Foam Product Manufacturing | | 1,000 |
| 326150 | Urethane and Other Foam Product (except Polystyrene) Manufacturing | | 750 |

| 326160 | Plastics Bottle Manufacturing | | 1,250 |
|---|---|---|---|
| 326191 | Plastics Plumbing Fixture Manufacturing | | 750 |
| 326199 | All Other Plastics Product Manufacturing | | 750 |
| 326211 | Tire Manufacturing (except Retreading)[5] | | 1,500 |
| 326212 | Tire Retreading | | 500 |
| 326220 | Rubber and Plastics Hoses and Belting Manufacturing | | 750 |
| 326291 | Rubber Product Manufacturing for Mechanical Use | | 750 |
| 326299 | All Other Rubber Product Manufacturing | | 500 |
| 327110 | Pottery, Ceramics, and Plumbing Fixture Manufacturing | | 1,000 |
| 327120 | Clay Building Material and Refractories Manufacturing | | 750 |
| 327211 | Flat Glass Manufacturing | | 1,000 |
| 327212 | Other Pressed and Blown Glass and Glassware Manufacturing | | 1,250 |
| 327213 | Glass Container Manufacturing | | 1,250 |
| 327215 | Glass Product Manufacturing Made of Purchased Glass | | 1,000 |
| 327310 | Cement Manufacturing | | 1,000 |
| 327320 | Ready-Mix Concrete Manufacturing | | 500 |
| 327331 | Concrete Block and Brick Manufacturing | | 500 |
| 327332 | Concrete Pipe Manufacturing | | 750 |
| 327390 | Other Concrete Product Manufacturing | | 500 |
| 327410 | Lime Manufacturing | | 750 |
| 327420 | Gypsum Product Manufacturing | | 1,500 |
| 327910 | Abrasive Product Manufacturing | | 750 |
| 327991 | Cut Stone and Stone Product Manufacturing | | 500 |
| 327992 | Ground or Treated Mineral and Earth Manufacturing | | 500 |
| 327993 | Mineral Wool Manufacturing | | 1,500 |
| 327999 | All Other Miscellaneous Nonmetallic Mineral Product Manufacturing | | 500 |
| 331110 | Iron and Steel Mills and Ferroalloy Manufacturing | | 1,500 |
| 331210 | Iron and Steel Pipe and Tube Manufacturing from Purchased Steel | | 1,000 |
| 331221 | Rolled Steel Shape Manufacturing | | 1,000 |
| 331222 | Steel Wire Drawing | | 1,000 |
| 331313 | Alumina Refining and Primary Aluminum Production | | 1,000 |
| 331314 | Secondary Smelting and Alloying of Aluminum | | 750 |
| 331315 | Aluminum Sheet, Plate and Foil Manufacturing | | 1,250 |
| 331318 | Other Aluminum Rolling, Drawing, and Extruding | | 750 |

| 331410 | Nonferrous Metal (except Aluminum) Smelting and Refining | | 1,000 |
|---|---|---|---|
| 331420 | Copper Rolling, Drawing, Extruding, and Alloying | | 1,000 |
| 331491 | Nonferrous Metal (except Copper and Aluminum) Rolling, Drawing and Extruding | | 750 |
| 331492 | Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum) | | 750 |
| 331511 | Iron Foundries | | 1,000 |
| 331512 | Steel Investment Foundries | | 1,000 |
| 331513 | Steel Foundries (except Investment) | | 500 |
| 331523 | Nonferrous Metal Die-Casting Foundries | | 500 |
| 331524 | Aluminum Foundries (except Die-Casting) | | 500 |
| 331529 | Other Nonferrous Metal Foundries (except Die-Casting) | | 500 |
| 332111 | Iron and Steel Forging | | 750 |
| 332112 | Nonferrous Forging | | 750 |
| 332114 | Custom Roll Forming | | 500 |
| 332117 | Powder Metallurgy Part Manufacturing | | 500 |
| 332119 | Metal Crown, Closure, and Other Metal Stamping (except Automotive) | | 500 |
| 332215 | Metal Kitchen Cookware, Utensil, Cutlery, and Flatware (except Precious) Manufacturing | | 750 |
| 332216 | Saw Blade and Hand tool Manufacturing | | 750 |
| 332311 | Prefabricated Metal Building and Component Manufacturing | | 750 |
| 332312 | Fabricated Structural Metal Manufacturing | | 500 |
| 332313 | Plate Work Manufacturing | | 750 |
| 332321 | Metal Window and Door Manufacturing | | 750 |
| 332322 | Sheet Metal Work Manufacturing | | 500 |
| 332323 | Ornamental and Architectural Metal Work Manufacturing | | 500 |
| 332410 | Power Boiler and Heat Exchanger Manufacturing | | 750 |
| 332420 | Metal Tank (Heavy Gauge) Manufacturing | | 750 |
| 332431 | Metal Can Manufacturing | | 1,500 |
| 332439 | Other Metal Container Manufacturing | | 500 |
| 332510 | Hardware Manufacturing | | 750 |
| 332613 | Spring Manufacturing | | 500 |
| 332618 | Other Fabricated Wire Product Manufacturing | | 500 |
| 332710 | Machine Shops | | 500 |
| 332721 | Precision Turned Product Manufacturing | | 500 |
| 332722 | Bolt, Nut, Screw, Rivet and Washer Manufacturing | | 500 |

| 332811 | Metal Heat Treating | | 750 |
|---|---|---|---|
| 332812 | Metal Coating, Engraving (except Jewelry and Silverware), and Allied Services to Manufacturers | | 500 |
| 332813 | Electroplating, Plating, Polishing, Anodizing and Coloring | | 500 |
| 332911 | Industrial Valve Manufacturing | | 750 |
| 332912 | Fluid Power Valve and Hose Fitting Manufacturing | | 1,000 |
| 332913 | Plumbing Fixture Fitting and Trim Manufacturing | | 1,000 |
| 332919 | Other Metal Valve and Pipe Fitting Manufacturing | | 750 |
| 332991 | Ball and Roller Bearing Manufacturing | | 1,250 |
| 332992 | Small Arms Ammunition Manufacturing | | 1,250 |
| 332993 | Ammunition (except Small Arms) Manufacturing | | 1,500 |
| 332994 | Small Arms, Ordnance, and Ordnance Accessories Manufacturing | | 1,000 |
| 332996 | Fabricated Pipe and Pipe Fitting Manufacturing | | 500 |
| 332999 | All Other Miscellaneous Fabricated Metal Product Manufacturing | | 750 |
| 333111 | Farm Machinery and Equipment Manufacturing | | 1,250 |
| 333112 | Lawn and Garden Tractor and Home Lawn and Garden Equipment Manufacturing | | 1,500 |
| 333120 | Construction Machinery Manufacturing | | 1,250 |
| 333131 | Mining Machinery and Equipment Manufacturing | | 500 |
| 333132 | Oil and Gas Field Machinery and Equipment Manufacturing | | 1,250 |
| 333241 | Food Product Machinery Manufacturing | | 500 |
| 333242 | Semiconductor Machinery Manufacturing | | 1,500 |
| 333243 | Sawmill, Woodworking, and Paper Machinery Manufacturing | | 500 |
| 333244 | Printing Machinery and Equipment Manufacturing | | 750 |
| 333249 | Other Industrial Machinery Manufacturing | | 500 |
| 333314 | Optical Instrument and Lens Manufacturing | | 500 |
| 333316 | Photographic and Photocopying Equipment Manufacturing | | 1,000 |
| 333318 | Other Commercial and Service Industry Machinery Manufacturing | | 1,000 |
| 333413 | Industrial and Commercial Fan and Blower and Air Purification Equipment Manufacturing | | 500 |
| 333414 | Heating Equipment (except Warm Air Furnaces) Manufacturing | | 500 |

| 333415 | Air-Conditioning and Warm Air Heating Equipment and Commercial and Industrial Refrigeration Equipment Manufacturing | | 1,250 |
|---|---|---|---|
| 333511 | Industrial Mold Manufacturing | | 500 |
| 333514 | Special Die and Tool, Die Set, Jig and Fixture Manufacturing | | 500 |
| 333515 | Cutting Tool and Machine Tool Accessory Manufacturing | | 500 |
| 333517 | Machine Tool Manufacturing | | 500 |
| 333519 | Rolling Mill and Other Metalworking Machinery Manufacturing | | 500 |
| 333611 | Turbine and Turbine Generator Set Unit Manufacturing | | 1,500 |
| 333612 | Speed Changer, Industrial High-Speed Drive and Gear Manufacturing | | 750 |
| 333613 | Mechanical Power Transmission Equipment Manufacturing | | 750 |
| 333618 | Other Engine Equipment Manufacturing | | 1,500 |
| 333912 | Air and Gas Compressor Manufacturing | | 1,000 |
| 333914 | Measuring, Dispensing, and Other Pumping Equipment Manufacturing | | 750 |
| 333921 | Elevator and Moving Stairway Manufacturing | | 1,000 |
| 333922 | Conveyor and Conveying Equipment Manufacturing | | 500 |
| 333923 | Overhead Traveling Crane, Hoist and Monorail System Manufacturing | | 1,250 |
| 333924 | Industrial Truck, Tractor, Trailer and Stacker Machinery Manufacturing | | 750 |
| 333991 | Power-Driven Hand Tool Manufacturing | | 500 |
| 333992 | Welding and Soldering Equipment Manufacturing | | 1,250 |
| 333993 | Packaging Machinery Manufacturing | | 500 |
| 333994 | Industrial Process Furnace and Oven Manufacturing | | 500 |
| 333995 | Fluid Power Cylinder and Actuator Manufacturing | | 750 |
| 333996 | Fluid Power Pump and Motor Manufacturing | | 1,250 |
| 333997 | Scale and Balance Manufacturing | | 500 |
| 333999 | All Other Miscellaneous General Purpose Machinery Manufacturing | | 500 |
| 334111 | Electronic Computer Manufacturing | | 1,250 |
| 334112 | Computer Storage Device Manufacturing | | 1,250 |
| 334118 | Computer Terminal and Other Computer Peripheral Equipment Manufacturing | | 1,000 |
| 334210 | Telephone Apparatus Manufacturing | | 1,250 |

| | | |
|---|---|---|
| **334220** | Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing | 1,250 |
| **334290** | Other Communications Equipment Manufacturing | 750 |
| **334310** | Audio and Video Equipment Manufacturing | 750 |
| **334412** | Bare Printed Circuit Board Manufacturing | 750 |
| **334413** | Semiconductor and Related Device Manufacturing | 1,250 |
| **334416** | Capacitor, Resistor, Coil, Transformer, and Other Inductor Manufacturing | 500 |
| **334417** | Electronic Connector Manufacturing | 1,000 |
| **334418** | Printed Circuit Assembly (Electronic Assembly) Manufacturing | 750 |
| **334419** | Other Electronic Component Manufacturing | 750 |
| **334510** | Electromedical and Electrotherapeutic Apparatus Manufacturing | 1,250 |
| **334511** | Search, Detection, Navigation, Guidance, Aeronautical, and Nautical System and Instrument Manufacturing | 1,250 |
| **334512** | Automatic Environmental Control Manufacturing for Residential, Commercial and Appliance Use | 500 |
| **334513** | Instruments and Related Products Manufacturing for Measuring, Displaying, and Controlling Industrial Process Variables | 750 |
| **334514** | Totalizing Fluid Meter and Counting Device Manufacturing | 750 |
| **334515** | Instrument Manufacturing for Measuring and Testing Electricity and Electrical Signals | 750 |
| **334516** | Analytical Laboratory Instrument Manufacturing | 1,000 |
| **334517** | Irradiation Apparatus Manufacturing | 1,000 |
| **334519** | Other Measuring and Controlling Device Manufacturing | 500 |
| **334613** | Blank Magnetic and Optical Recording Media Manufacturing | 1,000 |
| **334614** | Software and Other Prerecorded Compact Disc, Tape, and Record Reproducing | 1,250 |
| **335110** | Electric Lamp Bulb and Part Manufacturing | 1,250 |
| **335121** | Residential Electric Lighting Fixture Manufacturing | 750 |
| **335122** | Commercial, Industrial and Institutional Electric Lighting Fixture Manufacturing | 500 |
| **335129** | Other Lighting Equipment Manufacturing | 500 |
| **335210** | Small Electrical Appliance Manufacturing | 1,500 |
| **335220** | Major Household Appliance Manufacturing | 1,500 |

| 335311 | Power, Distribution and Specialty Transformer Manufacturing | | 750 |
|---|---|---|---|
| 335312 | Motor and Generator Manufacturing | | 1,250 |
| 335313 | Switchgear and Switchboard Apparatus Manufacturing | | 1,250 |
| 335314 | Relay and Industrial Control Manufacturing | | 750 |
| 335911 | Storage Battery Manufacturing | | 1,250 |
| 335912 | Primary Battery Manufacturing | | 1,000 |
| 335921 | Fiber Optic Cable Manufacturing | | 1,000 |
| 335929 | Other Communication and Energy Wire Manufacturing | | 1,000 |
| 335931 | Current-Carrying Wiring Device Manufacturing | | 500 |
| 335932 | Noncurrent-Carrying Wiring Device Manufacturing | | 1,000 |
| 335991 | Carbon and Graphite Product Manufacturing | | 750 |
| 335999 | All Other Miscellaneous Electrical Equipment and Component Manufacturing | | 500 |
| 336111 | Automobile Manufacturing | | 1,500 |
| 336112 | Light Truck and Utility Vehicle Manufacturing | | 1,500 |
| 336120 | Heavy Duty Truck Manufacturing | | 1,500 |
| 336211 | Motor Vehicle Body Manufacturing | | 1,000 |
| 336212 | Truck Trailer Manufacturing | | 1,000 |
| 336213 | Motor Home Manufacturing | | 1,250 |
| 336214 | Travel Trailer and Camper Manufacturing | | 1,000 |
| 336310 | Motor Vehicle Gasoline Engine and Engine Parts Manufacturing | | 1,000 |
| 336320 | Motor Vehicle Electrical and Electronic Equipment Manufacturing | | 1,000 |
| 336330 | Motor Vehicle Steering and Suspension Components (except Spring) Manufacturing | | 1,000 |
| 336340 | Motor Vehicle Brake System Manufacturing | | 1,250 |
| 336350 | Motor Vehicle Transmission and Power Train Parts Manufacturing | | 1,500 |
| 336360 | Motor Vehicle Seating and Interior Trim Manufacturing | | 1,500 |
| 336370 | Motor Vehicle Metal Stamping | | 1,000 |
| 336390 | Other Motor Vehicle Parts Manufacturing | | 1,000 |
| 336411 | Aircraft Manufacturing | | 1,500 |
| 336412 | Aircraft Engine and Engine Parts Manufacturing | | 1,500 |
| 336413 | Other Aircraft Part and Auxiliary Equipment Manufacturing[7] | | 1,250 |
| 336414 | Guided Missile and Space Vehicle Manufacturing | | 1,250 |

| | | | |
|---|---|---|---|
| **336415** | Guided Missile and Space Vehicle Propulsion Unit and Propulsion Unit Parts Manufacturing | | 1,250 |
| **336419** | Other Guided Missile and Space Vehicle Parts and Auxiliary Equipment Manufacturing | | 1,000 |
| **336510** | Railroad Rolling Stock Manufacturing | | 1,500 |
| **336611** | Ship Building and Repairing | | 1,250 |
| **336612** | Boat Building | | 1,000 |
| **336991** | Motorcycle, Bicycle and Parts Manufacturing | | 1,000 |
| **336992** | Military Armored Vehicle, Tank and Tank Component Manufacturing | | 1,500 |
| **336999** | All Other Transportation Equipment Manufacturing | | 1,000 |
| **337110** | Wood Kitchen Cabinet and Countertop Manufacturing | | 750 |
| **337121** | Upholstered Household Furniture Manufacturing | | 1,000 |
| **337122** | Non-upholstered Wood Household Furniture Manufacturing | | 750 |
| **337124** | Metal Household Furniture Manufacturing | | 750 |
| **337125** | Household Furniture (except Wood and Metal) Manufacturing | | 750 |
| **337127** | Institutional Furniture Manufacturing | | 500 |
| **337211** | Wood Office Furniture Manufacturing | | 1,000 |
| **337212** | Custom Architectural Woodwork and Millwork Manufacturing | | 500 |
| **337214** | Office Furniture (Except Wood) Manufacturing | | 1,000 |
| **337215** | Showcase, Partition, Shelving, and Locker Manufacturing | | 500 |
| **337910** | Mattress Manufacturing | | 1,000 |
| **337920** | Blind and Shade Manufacturing | | 1,000 |
| **339112** | Surgical and Medical Instrument Manufacturing | | 1,000 |
| **339113** | Surgical Appliance and Supplies Manufacturing | | 750 |
| **339114** | Dental Equipment and Supplies Manufacturing | | 750 |
| **339115** | Ophthalmic Goods Manufacturing | | 1,000 |
| **339116** | Dental Laboratories | | 500 |
| **339910** | Jewelry and Silverware Manufacturing | | 500 |
| **339920** | Sporting and Athletic Goods Manufacturing | | 750 |
| **339930** | Doll, Toy, and Game Manufacturing | | 500 |
| **339940** | Office Supplies (except Paper) Manufacturing | | 750 |
| **339950** | Sign Manufacturing | | 500 |
| **339991** | Gasket, Packing, and Sealing Device Manufacturing | | 500 |
| **339992** | Musical Instrument Manufacturing | | 1,000 |
| **339993** | Fastener, Button, Needle and Pin Manufacturing | | 750 |

| 339994 | Broom, Brush and Mop Manufacturing | | 500 |
|---|---|---|---|
| 339995 | Burial Casket Manufacturing | | 1,000 |
| 339999 | All Other Miscellaneous Manufacturing | | 500 |
| **Sector 42 – Wholesale Trade** | | | |
| 423110 | Automobile and Other Motor Vehicle Merchant Wholesalers | | 250 |
| 423120 | Motor Vehicle Supplies and New Parts Merchant Wholesalers | | 200 |
| 423130 | Tire and Tube Merchant Wholesalers | | 200 |
| 423140 | Motor Vehicle Parts (Used) Merchant Wholesalers | | 100 |
| 423210 | Furniture Merchant Wholesalers | | 100 |
| 423220 | Home Furnishing Merchant Wholesalers | | 100 |
| 423310 | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | | 150 |
| 423320 | Brick, Stone, and Related Construction Material Merchant Wholesalers | | 150 |
| 423330 | Roofing, Siding, and Insulation Material Merchant Wholesalers | | 200 |
| 423390 | Other Construction Material Merchant Wholesalers | | 100 |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | | 200 |
| 423420 | Office Equipment Merchant Wholesalers | | 200 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | | 250 |
| 423440 | Other Commercial Equipment Merchant Wholesalers | | 100 |
| 423450 | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | | 200 |
| 423460 | Ophthalmic Goods Merchant Wholesalers | | 150 |
| 423490 | Other Professional Equipment and Supplies Merchant Wholesalers | | 150 |
| 423510 | Metal Service Centers and Other Metal Merchant Wholesalers | | 200 |
| 423520 | Coal and Other Mineral and Ore Merchant Wholesalers | | 100 |
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | | 200 |
| 423620 | Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | | 200 |
| 423690 | Other Electronic Parts and Equipment Merchant Wholesalers | | 250 |
| 423710 | Hardware Merchant Wholesalers | | 150 |

| | | | |
|---|---|---|---|
| 423720 | Plumbing and Heating Equipment and Supplies (Hydronics) Merchant Wholesalers | | 200 |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | | 150 |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | | 100 |
| 423810 | Construction and Mining (except Oil Well) Machinery and Equipment Merchant Wholesalers | | 250 |
| 423820 | Farm and Garden Machinery and Equipment Merchant Wholesalers | | 100 |
| 423830 | Industrial Machinery and Equipment Merchant Wholesalers | | 100 |
| 423840 | Industrial Supplies Merchant Wholesalers | | 100 |
| 423850 | Service Establishment Equipment and Supplies Merchant Wholesalers | | 100 |
| 423860 | Transportation Equipment and Supplies (except Motor Vehicle) Merchant Wholesalers | | 150 |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | | 100 |
| 423920 | Toy and Hobby Goods and Supplies Merchant Wholesalers | | 150 |
| 423930 | Recyclable Material Merchant Wholesalers | | 100 |
| 423940 | Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | | 100 |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | | 100 |
| 424110 | Printing and Writing Paper Merchant Wholesalers | | 200 |
| 424120 | Stationary and Office Supplies Merchant Wholesalers | | 150 |
| 424130 | Industrial and Personal Service Paper Merchant Wholesalers | | 150 |
| 424210 | Drugs and Druggists' Sundries Merchant Wholesalers | | 250 |
| 424310 | Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | | 100 |
| 424320 | Men's and Boys' Clothing and Furnishings Merchant Wholesalers | | 150 |
| 424330 | Women's, Children's, and Infants' Clothing and Accessories Merchant Wholesalers | | 100 |
| 424340 | Footwear Merchant Wholesalers | | 200 |
| 424410 | General Line Grocery Merchant Wholesalers | | 250 |
| 424420 | Packaged Frozen Food Merchant Wholesalers | | 200 |

| | | | |
|---|---|---|---|
| 424430 | Dairy Product (except Dried or Canned) Merchant Wholesalers | | 200 |
| 424440 | Poultry and Poultry Product Merchant Wholesalers | | 150 |
| 424450 | Confectionery Merchant Wholesalers | | 200 |
| 424460 | Fish and Seafood Merchant Wholesalers | | 100 |
| 424470 | Meat and Meat Product Merchant Wholesalers | | 150 |
| 424480 | Fresh Fruit and Vegetable Merchant Wholesalers | | 100 |
| 424490 | Other Grocery and Related Products Merchant Wholesalers | | 250 |
| 424510 | Grain and Field Bean Merchant Wholesalers | | 200 |
| 424520 | Livestock Merchant Wholesalers | | 100 |
| 424590 | Other Farm Product Raw Material Merchant Wholesalers | | 100 |
| 424610 | Plastics Materials and Basic Forms and Shapes Merchant Wholesalers | | 150 |
| 424690 | Other Chemical and Allied Products Merchant Wholesalers | | 150 |
| 424710 | Petroleum Bulk Stations and Terminals | | 200 |
| 424720 | Petroleum and Petroleum Products Merchant Wholesalers (except Bulk Stations and Terminals) | | 200 |
| 424810 | Beer and Ale Merchant Wholesalers | | 200 |
| 424820 | Wine and Distilled Alcoholic Beverage Merchant Wholesalers | | 250 |
| 424910 | Farm Supplies Merchant Wholesalers | | 200 |
| 424920 | Book, Periodical, and Newspaper Merchant Wholesalers | | 200 |
| 424930 | Flower, Nursery Stock, and Florists' Supplies Merchant Wholesalers | | 100 |
| 424940 | Tobacco and Tobacco Product Merchant Wholesalers | | 250 |
| 424950 | Paint, Varnish, and Supplies Merchant Wholesalers | | 150 |
| 424990 | Other Miscellaneous Nondurable Goods Merchant Wholesalers | | 100 |
| 425110 | Business to Business Electronic Markets | | 100 |
| 425120 | Wholesale Trade Agents and Brokers | | 100 |
| 441110 | New Car Dealers | | 200 |
| 441120 | Used Car Dealers | 27 | |
| 441210 | Recreational Vehicle Dealers | 35 | |
| 441222 | Boat Dealers | 35 | |
| 441228 | Motorcycle, ATV, and All Other Motor Vehicle Dealers | 35 | |
| 441310 | Automotive Parts and Accessories Stores | 16.5 | |

| 441320 | Tire Dealers | 16.5 | |
| 442110 | Furniture Stores | 22 | |
| 442210 | Floor Covering Stores | 8 | |
| 442291 | Window Treatment Stores | 8 | |
| 442299 | All Other Home Furnishings Stores | 22 | |
| 443141 | Household Appliance Stores | 12 | |
| 443142 | Electronics Stores | 35 | |
| 444110 | Home Centers | 41.5 | |
| 444120 | Paint and Wallpaper Stores | 30 | |
| 444130 | Hardware Stores | 8 | |
| 444190 | Other Building Material Dealers | 22 | |
| 444210 | Outdoor Power Equipment Stores | 8 | |
| 444220 | Nursery and Garden Centers | 12 | |
| 445110 | Supermarkets and Other Grocery (except Convenience) Stores | 35 | |
| 445120 | Convenience Stores | 32 | |
| 445210 | Meat Markets | 8 | |
| 445220 | Fish and Seafood Markets | 8 | |
| 445230 | Fruit and Vegetable Markets | 8 | |
| 445291 | Baked Goods Stores | 8 | |
| 445292 | Confectionery and Nut Stores | 8 | |
| 445299 | All Other Specialty Food Stores | 8 | |
| 445310 | Beer, Wine and Liquor Stores | 8 | |
| 446110 | Pharmacies and Drug Stores | 30 | |
| 446120 | Cosmetics, Beauty Supplies and Perfume Stores | 30 | |
| 446130 | Optical Goods Stores | 22 | |
| 446191 | Food (Health) Supplement Stores | 16.5 | |
| 446199 | All Other Health and Personal Care Stores | 8 | |
| 447110 | Gasoline Stations with Convenience Stores | 32 | |
| 447190 | Other Gasoline Stations | 16.5 | |
| 448110 | Men's Clothing Stores | 12 | |
| 448120 | Women's Clothing Stores | 30 | |
| 448130 | Children's and Infants' Clothing Stores | 35 | |
| 448140 | Family Clothing Stores | 41.5 | |
| 448150 | Clothing Accessories Stores | 16.5 | |
| 448190 | Other Clothing Stores | 22 | |
| 448210 | Shoe Stores | 30 | |
| 448310 | Jewelry Stores | 16.5 | |
| 448320 | Luggage and Leather Goods Stores | 30 | |
| 451110 | Sporting Goods Stores | 16.5 | |
| 451120 | Hobby, Toy and Game Stores | 30 | |

| | | | |
|---|---|---|---|
| 451130 | Sewing, Needlework and Piece Goods Stores | 30 | |
| 451140 | Musical Instrument and Supplies Stores | 12 | |
| 451211 | Book Stores | 30 | |
| 451212 | News Dealers and Newsstands | 8 | |
| 452210 | Department Stores | 35 | |
| 452311 | Warehouse Clubs and Supercenters | 32 | |
| 452319 | All Other General Merchandise Stores | 35 | |
| 453110 | Florists | 8 | |
| 453210 | Office Supplies and Stationery Stores | 35 | |
| 453220 | Gift, Novelty and Souvenir Stores | 8 | |
| 453310 | Used Merchandise Stores | 8 | |
| 453910 | Pet and Pet Supplies Stores | 22 | |
| 453920 | Art Dealers | 8 | |
| 453930 | Manufactured (Mobile) Home Dealers | 16.5 | |
| 453991 | Tobacco Stores | 8 | |
| 453998 | All Other Miscellaneous Store Retailers (except Tobacco Stores) | 8 | |
| 454110 | Electronic Shopping and Mail-Order Houses | 41.5 | |
| 454210 | Vending Machine Operators | 12 | |
| 454310 | Fuel Dealers | | 100 |
| 454390 | Other Direct Selling Establishments | 8 | |
| 481111 | Scheduled Passenger Air Transportation | | 1,500 |
| 481112 | Scheduled Freight Air Transportation | | 1,500 |
| 481211 | Nonscheduled Chartered Passenger Air Transportation | | 1,500 |
| 481212 | Nonscheduled Chartered Freight Air Transportation | | 1,500 |
| 481219 | Other Nonscheduled Air Transportation | 16.5 | |
| 482111 | Line-Haul Railroads | | 1,500 |
| 482112 | Short Line Railroads | | 1,500 |
| 483111 | Deep Sea Freight Transportation | | 500 |
| 483112 | Deep Sea Passenger Transportation | | 1,500 |
| 483113 | Coastal and Great Lakes Freight Transportation | | 750 |
| 483114 | Coastal and Great Lakes Passenger Transportation | | 500 |
| 483211 | Inland Water Freight Transportation | | 750 |
| 483212 | Inland Water Passenger Transportation | | 500 |
| 484110 | General Freight Trucking, Local | 30 | |
| 484121 | General Freight Trucking, Long-Distance, Truckload | 30 | |
| 484122 | General Freight Trucking, Long-Distance, Less Than Truckload | 38 | |
| 484210 | Used Household and Office Goods Moving | 30 | |

| 484220 | Specialized Freight (except Used Goods) Trucking, Local | 30 | |
| 484230 | Specialized Freight (except Used Goods) Trucking, Long-Distance | 30 | |
| 485111 | Mixed Mode Transit Systems | 25.5 | |
| 485112 | Commuter Rail Systems | 41.5 | |
| 485113 | Bus and Other Motor Vehicle Transit Systems | 28.5 | |
| 485119 | Other Urban Transit Systems | 33 | |
| 485210 | Interurban and Rural Bus Transportation | 28 | |
| 485310 | Taxi Service | 16.5 | |
| 485320 | Limousine Service | 16.5 | |
| 485410 | School and Employee Bus Transportation | 26.5 | |
| 485510 | Charter Bus Industry | 16.5 | |
| 485991 | Special Needs Transportation | 16.5 | |
| 485999 | All Other Transit and Ground Passenger Transportation | 16.5 | |
| 486110 | Pipeline Transportation of Crude Oil | | 1,500 |
| 486210 | Pipeline Transportation of Natural Gas | 36.5 | |
| 486910 | Pipeline Transportation of Refined Petroleum Products | | 1,500 |
| 486990 | All Other Pipeline Transportation | 40.5 | |
| 487110 | Scenic and Sightseeing Transportation, Land | 18 | |
| 487210 | Scenic and Sightseeing Transportation, Water | 12.5 | |
| 487990 | Scenic and Sightseeing Transportation, Other | 22 | |
| 488111 | Air Traffic Control | 35 | |
| 488119 | Other Airport Operations | 35 | |
| 488190 | Other Support Activities for Air Transportation | 35 | |
| 488210 | Support Activities for Rail Transportation | 30 | |
| 488310 | Port and Harbor Operations | 41.5 | |
| 488320 | Marine Cargo Handling | 41.5 | |
| 488330 | Navigational Services to Shipping | 41.5 | |
| 488390 | Other Support Activities for Water Transportation | 41.5 | |
| 488410 | Motor Vehicle Towing | 8 | |
| 488490 | Other Support Activities for Road Transportation | 16 | |
| 488510 | Freight Transportation Arrangement[10] | 17.5 | |
| 488991 | Packing and Crating | 30 | |
| 488999 | All Other Support Activities for Transportation | 22 | |
| 491110 | Postal Service | 8 | |
| 492110 | Couriers and Express Delivery Services | | 1,500 |
| 492210 | Local Messengers and Local Delivery | 30 | |
| 493110 | General Warehousing and Storage | 30 | |
| 493120 | Refrigerated Warehousing and Storage | 32 | |

| | | | |
|---|---|---|---|
| **493130** | Farm Product Warehousing and Storage | 30 | |
| **493190** | Other Warehousing and Storage | 32 | |
| **Sector 51 - Information** | | | |
| **511110** | Newspaper Publishers | | 1,000 |
| **511120** | Periodical Publishers | | 1,000 |
| **511130** | Book Publishers | | 1,000 |
| **511140** | Directory and Mailing List Publishers | | 1,250 |
| **511191** | Greeting Card Publishers | | 1,500 |
| **511199** | All Other Publishers | | 500 |
| **511210** | Software Publishers[20] | 41.5 | |
| **512110** | Motion Picture and Video Production | 35 | |
| **512120** | Motion Picture and Video Distribution | 34.5 | |
| **512131** | Motion Picture Theaters (except Drive-Ins) | 41.5 | |
| **512132** | Drive-In Motion Picture Theaters | 11 | |
| **512191** | Teleproduction and Other Postproduction Services | 34.5 | |
| **512199** | Other Motion Picture and Video Industries | 25 | |
| **512230** | Music Publishers | | 750 |
| **512240** | Sound Recording Studios | 9.5 | |
| **512250** | Record Production and Distribution | | 250 |
| **512290** | Other Sound Recording Industries | 20 | |
| **515111** | Radio Networks | 41.5 | |
| **515112** | Radio Stations | 41.5 | |
| **515120** | Television Broadcasting | 41.5 | |
| **515210** | Cable and Other Subscription Programming | 41.5 | |
| **517311** | Wired Telecommunications Carriers | | 1,500 |
| **517312** | Wireless Telecommunications Carriers (except Satellite) | | 1,500 |
| **517410** | Satellite Telecommunications | 38.5 | |
| **517911** | Telecommunications Resellers | | 1,500 |
| **517919** | All Other Telecommunications | 35 | |
| **518210** | Data Processing, Hosting, and Related Services | 35 | |
| **519110** | News Syndicates | 32 | |
| **519120** | Libraries and Archives | 18.5 | |
| **519130** | Internet Publishing and Broadcasting and Web Search Portals | | 1,000 |
| **519190** | All Other Information Services | 30 | |
| **Sector 52 – Finance and Insurance** | | | |
| **522110** | Commercial Banking[8] | 750 million in assets[8] | |

| 522120 | Savings Institutions[8] | 750 million in assets[8] | |
|---|---|---|---|
| 522130 | Credit Unions[8] | 750 million in assets[8] | |
| 522190 | Other Depository Credit Intermediation[8] | 750 million in assets[8] | |
| 522210 | Credit Card Issuing[8] | 750 million in assets[8] | |
| 522220 | Sales Financing | 41.5 | |
| 522291 | Consumer Lending | 41.5 | |
| 522292 | Real Estate Credit | 41.5 | |
| 522293 | International Trade Financing | 41.5 | |
| 522294 | Secondary Market Financing | 41.5 | |
| 522298 | All Other Nondepository Credit Intermediation | 41.5 | |
| 522310 | Mortgage and Nonmortgage Loan Brokers | 13 | |
| 522320 | Financial Transactions Processing, Reserve, and Clearinghouse Activities | 41.5 | |
| 522390 | Other Activities Related to Credit Intermediation | 25 | |
| 523110 | Investment Banking and Securities Dealing | 41.5 | |
| 523120 | Securities Brokerage | 41.5 | |
| 523130 | Commodity Contracts Dealing | 41.5 | |
| 523140 | Commodity Contracts Brokerage | 41.5 | |
| 523210 | Securities and Commodity Exchanges | 41.5 | |
| 523910 | Miscellaneous Intermediation | 41.5 | |
| 523920 | Portfolio Management | 41.5 | |
| 523930 | Investment Advice | 41.5 | |
| 523991 | Trust, Fiduciary and Custody Activities | 41.5 | |
| 523999 | Miscellaneous Financial Investment Activities | 41.5 | |
| 524113 | Direct Life Insurance Carriers | 41.5 | |
| 524114 | Direct Health and Medical Insurance Carriers | 41.5 | |
| 524126 | Direct Property and Casualty Insurance Carriers | | 1,500 |
| 524127 | Direct Title Insurance Carriers | 41.5 | |
| 524128 | Other Direct Insurance (except Life, Health and Medical) Carriers | 41.5 | |
| 524130 | Reinsurance Carriers | 41.5 | |
| 524210 | Insurance Agencies and Brokerages | 13 | |
| 524291 | Claims Adjusting | 22 | |
| 524292 | Third Party Administration of Insurance and Pension Funds | 40 | |
| 524298 | All Other Insurance Related Activities | 27 | |

| 525110 | Pension Funds | 35 | |
| 525120 | Health and Welfare Funds | 35 | |
| 525190 | Other Insurance Funds | 35 | |
| 525910 | Open-End Investment Funds | 35 | |
| 525920 | Trusts, Estates, and Agency Accounts | 35 | |
| 525990 | Other Financial Vehicles | 35 | |
| 531110 | Lessors of Residential Buildings and Dwellings[9] | 30 | |
| 531120 | Lessors of Nonresidential Buildings (except Miniwarehouses)[9] | 30 | |
| 531130 | Lessors of Miniwarehouses and Self-Storage Units[9] | 30 | |
| 531190 | Lessors of Other Real Estate Property[9] | 30 | |
| 531210 | Offices of Real Estate Agents and Brokers[10] | 13 | |
| 531311 | Residential Property Managers | 11 | |
| 531312 | Nonresidential Property Managers | 17 | |
| 531320 | Offices of Real Estate Appraisers | 8.5 | |
| 531390 | Other Activities Related to Real Estate | 17 | |
| 532111 | Passenger Car Rental | 41.5 | |
| 532112 | Passenger Car Leasing | 41.5 | |
| 532120 | Truck, Utility Trailer, and RV (Recreational Vehicle) Rental and Leasing | 41.5 | |
| 532210 | Consumer Electronics and Appliances Rental | 41.5 | |
| 532281 | Formal Wear and Costume Rental | 22 | |
| 532282 | Video Tape and Disc Rental | 31 | |
| 532283 | Home Health Equipment Rental | 36 | |
| 532284 | Recreational Goods Rental | 8 | |
| 532289 | All Other Consumer Goods Rental | 11 | |
| 532310 | General Rental Centers | 8 | |
| 532411 | Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing | 40 | |
| 532412 | Construction, Mining and Forestry Machinery and Equipment Rental and Leasing | 35 | |
| 532420 | Office Machinery and Equipment Rental and Leasing | 35 | |
| 532490 | Other Commercial and Industrial Machinery and Equipment Rental and Leasing | 35 | |
| 533110 | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | 41.5 | |
| 541110 | Offices of Lawyers | 13.5 | |
| 541191 | Title Abstract and Settlement Offices | 17 | |
| 541199 | All Other Legal Services | 18 | |
| 541211 | Offices of Certified Public Accountants | 23.5 | |

| 541213 | Tax Preparation Services | 22 | |
| 541214 | Payroll Services | 34.5 | |
| 541219 | Other Accounting Services | 22 | |
| 541310 | Architectural Services | 11 | |
| 541320 | Landscape Architectural Services | 8 | |
| 541330 | Engineering Services | 22.5 | |
| 541330 (Exception 1) | Military and Aerospace Equipment and Military Weapons | 41.5 | |
| 541330 (Exception 2) | Contracts and Subcontracts for Engineering Services Awarded Under the National Energy Policy Act of 1992 | 41.5 | |
| 541330 (Exception 3) | Marine Engineering and Naval Architecture | 41.5 | |
| 541340 | Drafting Services | 8 | |
| 541350 | Building Inspection Services | 10 | |
| 541360 | Geophysical Surveying and Mapping Services | 25 | |
| 541370 | Surveying and Mapping (except Geophysical) Services | 16.5 | |
| 541380 | Testing Laboratories | 16.5 | |
| 541410 | Interior Design Services | 8 | |
| 541420 | Industrial Design Services | 15 | |
| 541430 | Graphic Design Services | 8 | |
| 541490 | Other Specialized Design Services | 12 | |
| 541511 | Custom Computer Programming Services | 30 | |
| 541512 | Computer Systems Design Services | 30 | |
| 541513 | Computer Facilities Management Services | 32.5 | |
| 541519 | Other Computer Related Services | 30 | |
| 541519 (Exception) | Information Technology Value Added Resellers | | 150 |
| 541611 | Administrative Management and General Management Consulting Services | 21.5 | |
| 541612 | Human Resources Consulting Services | 25.5 | |
| 541613 | Marketing Consulting Services | 16.5 | |
| 541614 | Process, Physical Distribution and Logistics Consulting Services | 17.5 | |
| 541618 | Other Management Consulting Services | 16.5 | |
| 541620 | Environmental Consulting Services | 16.5 | |
| 541690 | Other Scientific and Technical Consulting Services | 16.5 | |
| 541713 | Research and Technology in Nanotechnology[11] | | 1,000 |
| 541714 | Research and Technology in Biotechnology (except Nanobiotechnology)[11] | | 1,000 |

| | | | |
|---|---|---|---|
| **541715** | Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)[11] | | 1,000 |
| **541715 (Exception 1)** | Aircraft, Aircraft Engine and Engine Parts | | 1,500 |
| **541715 (Exception 2)** | Other Aircraft Parts and Auxiliary Equipment | | 1,250 |
| **541715 (Exception 3)** | Guided Missiles and Space Vehicles, Their Propulsion Units and Propulsion Parts | | 1,250 |
| **541720** | Research and Development in the Social Sciences and Humanities | 24.5 | |
| **541810** | Advertising Agencies[10] | 22.5 | |
| **541820** | Public Relations Agencies | 16.5 | |
| **541830** | Media Buying Agencies | 28.5 | |
| **541840** | Media Representatives | 18.5 | |
| **541850** | Outdoor Advertising | 30.5 | |
| **541860** | Direct Mail Advertising | 19.5 | |
| **541870** | Advertising Material Distribution Services | 25 | |
| **541890** | Other Services Related to Advertising | 16.5 | |
| **541910** | Marketing Research and Public Opinion Polling | 20 | |
| **541921** | Photography Studios, Portrait | 14 | |
| **541922** | Commercial Photography | 8 | |
| **541930** | Translation and Interpretation Services | 20 | |
| **541940** | Veterinary Services | 9 | |
| **541990** | All Other Professional, Scientific and Technical Services | 17 | |
| **551111** | Offices of Bank Holding Companies | 34 | |
| **551112** | Offices of Other Holding Companies | 40 | |
| **Sector 56 – Administrative and Support and Waste Management and Remediation Services** | | | |
| **561110** | Office Administrative Services | 11 | |
| **561210** | Facilities Support Services[12] | 41.5 | |
| **561311** | Employment Placement Agencies | 30 | |
| **561312** | Executive Search Services | 30 | |
| **561320** | Temporary Help Services | 30 | |
| **561330** | Professional Employer Organizations | 36.5 | |
| **561410** | Document Preparation Services | 16.5 | |
| **561421** | Telephone Answering Services | 16.5 | |
| **561422** | Telemarketing Bureaus and Other contact Centers | 22.5 | |

| 561431 | Private Mail Centers | 16.5 | |
| 561439 | Other Business Service Centers (including Copy Shops) | 23.5 | |
| 561440 | Collection Agencies | 17 | |
| 561450 | Credit Bureaus | 36 | |
| 561491 | Repossession Services | 16.5 | |
| 561492 | Court Reporting and Stenotype Services | 16.5 | |
| 561499 | All Other Business Support Services | 19 | |
| 561510 | Travel Agencies[10] | 22 | |
| 561520 | Tour Operators[10] | 22 | |
| 561591 | Convention and Visitors Bureaus | 22 | |
| 561599 | All Other Travel Arrangement and Reservation Services | 28.5 | |
| 561611 | Investigation Services | 22 | |
| 561612 | Security Guards and Patrol Services | 22.5 | |
| 561613 | Armored Car Services | 38 | |
| 561621 | Security Systems Services (except Locksmiths) | 22 | |
| 561622 | Locksmiths | 22 | |
| 561710 | Exterminating and Pest Control Services | 15.5 | |
| 561720 | Janitorial Services | 19.5 | |
| 561730 | Landscaping Services | 8.5 | |
| 561740 | Carpet and Upholstery Cleaning Services | 7.5 | |
| 561790 | Other Services to Buildings and Dwellings | 8 | |
| 561910 | Packaging and Labeling Services | 17 | |
| 561920 | Convention and Trade Show Organizers[10] | 17.5 | |
| 561990 | All Other Support Services | 14.5 | |
| 562111 | Solid Waste Collection | 41.5 | |
| 562112 | Hazardous Waste Collection | 41.5 | |
| 562119 | Other Waste Collection | 41.5 | |
| 562211 | Hazardous Waste Treatment and Disposal | 41.5 | |
| 562212 | Solid Waste Landfill | 41.5 | |
| 562213 | Solid Waste Combustors and Incinerators | 41.5 | |
| 562219 | Other Nonhazardous Waste Treatment and Disposal | 41.5 | |
| 562910 | Remediation Services | 22 | |
| 562910 (Exception) | Environmental Remediation Services | | 750 |
| 562920 | Materials Recovery Facilities | 22 | |
| 562991 | Septic Tank and Related Services | 8 | |
| 562998 | All Other Miscellaneous Waste Management Services | 14.6 | |
| **61 – Educational Services** | | | |
| 611110 | Elementary and Secondary Schools | 17.5 | |

| | | | |
|---|---|---|---|
| **611210** | Junior Colleges | 28.5 | |
| **611310** | Colleges, Universities and Professional Schools | 30.5 | |
| **611410** | Business and Secretarial Schools | 18 | |
| **611420** | Computer Training | 14 | |
| **611430** | Professional and Management Development Training | 13 | |
| **611511** | Cosmetology and Barber Schools | 11.5 | |
| **611512** | Flight Training | 30 | |
| **611513** | Apprenticeship Training | 10 | |
| **611519** | Other Technical and Trade Schools | 18.5 | |
| **611519 (Exception)** | Job Corps Centers | 41.5 | |
| **611610** | Fine Arts Schools | 8 | |
| **611620** | Sports and Recreation Instruction | 8 | |
| **611630** | Language Schools | 18 | |
| **611691** | Exam Preparation and Tutoring | 11 | |
| **611692** | Automobile Driving Schools | 9 | |
| **611699** | All Other Miscellaneous Schools and Instruction | 14.5 | |
| **611710** | Educational Support Services | 21 | |
| **Sector 62 – Health Care and Social Assistance** | | | |
| **621111** | Offices of Physicians (except Mental Health Specialists) | 14 | |
| **621112** | Offices of Physicians, Mental Health Specialists | 12 | |
| **621210** | Offices of Dentists | 8 | |
| **621310** | Offices of Chiropractors | 8 | |
| **621320** | Offices of Optometrists | 8 | |
| **621330** | Offices of Mental Health Practitioners (except Physicians) | 8 | |
| **621340** | Offices of Physical, Occupational and Speech Therapists and Audiologists | 11 | |
| **621391** | Offices of Podiatrists | 8 | |
| **621399** | Offices of All Other Miscellaneous Health Practitioners | 9 | |
| **621410** | Family Planning Centers | 16.5 | |
| **621420** | Outpatient Mental Health and Substance Abuse Centers | 16.5 | |
| **621491** | HMO Medical Centers | 39 | |
| **621492** | Kidney Dialysis Centers | 41.5 | |
| **621493** | Freestanding Ambulatory Surgical and Emergency Centers | 16.5 | |
| **621498** | All Other Outpatient Care Centers | 22.5 | |
| **621511** | Medical Laboratories | 36.5 | |
| **621512** | Diagnostic Imaging Centers | 16.5 | |
| **621610** | Home Health Care Services | 16.5 | |

| 621910 | Ambulance Services | 20 | |
| 621991 | Blood and Organ Banks | 35 | |
| 621999 | All Other Miscellaneous Ambulatory Health Care Services | 18 | |
| 622110 | General Medical and Surgical Hospitals | 41.5 | |
| 622210 | Psychiatric and Substance Abuse Hospitals | 41.5 | |
| 622310 | Specialty (except Psychiatric and Substance Abuse) Hospitals | 41.5 | |
| 623110 | Nursing Care Facilities (Skilled Nursing Facilities) | 30 | |
| 623210 | Residential Intellectual and Developmental Disability Facilities | 16.5 | |
| 623220 | Residential Mental Health and Substance Abuse Facilities | 16.5 | |
| 623311 | Continuing Care Retirement Communities | 30 | |
| 623312 | Assisted Living Facilities for the Elderly | 20.5 | |
| 623990 | Other Residential Care Facilities | 14 | |
| 624110 | Child and Youth Services | 13.5 | |
| 624120 | Services for the Elderly and Persons with Disabilities | 13 | |
| 624190 | Other Individual and Family Services | 14 | |
| 624210 | Community Food Services | 17 | |
| 624221 | Temporary Shelters | 12 | |
| 624229 | Other Community Housing Services | 16.5 | |
| 624230 | Emergency and Other Relief Services | 36.5 | |
| 624310 | Vocational Rehabilitation Services | 13 | |
| 624410 | Child Day Care Services | 8.5 | |
| **Sector 71 – Arts, Entertainment and Recreation** | | | |
| 711110 | Theater Companies and Dinner Theaters | 22 | |
| 711120 | Dance Companies | 16 | |
| 711130 | Musical Groups and Artists | 13 | |
| 711190 | Other Performing Arts Companies | 30 | |
| 711211 | Sports Teams and Clubs | 41.5 | |
| 711212 | Racetracks | 41.5 | |
| 711219 | Other Spectator Sports | 14.5 | |
| 711310 | Promoters of Performing Arts, Sports and Similar Events with Facilities | 35 | |
| 711320 | Promoters of Performing Arts, Sports and Similar Events without Facilities | 19.5 | |
| 711410 | Agents and Managers for Artists, Athletes, Entertainers and Other Public Figures | 15.5 | |
| 711510 | Independent Artists, Writers, and Performers | 8 | |
| 712110 | Museums | 30 | |

| | | | |
|---|---|---|---|
| 712120 | Historical Sites | 11.5 | |
| 712130 | Zoos and Botanical Gardens | 30 | |
| 712190 | Nature Parks and Other Similar Institutions | 17 | |
| 713110 | Amusement and Theme Parks | 41.5 | |
| 713120 | Amusement Arcades | 8 | |
| 713210 | Casinos (except Casino Hotels) | 30 | |
| 713290 | Other Gambling Industries | 35 | |
| 713910 | Golf Courses and Country Clubs | 16.5 | |
| 713920 | Skiing Facilities | 31 | |
| 713930 | Marinas | 9.5 | |
| 713940 | Fitness and Recreational Sports Centers | 15.5 | |
| 713950 | Bowling Centers | 11 | |
| 713990 | All Other Amusement and Recreation Industries | 8 | |
| | **Sector 72 – Accommodation and Food Services** | | |
| 721110 | Hotels (except Casino Hotels) and Motels | 35 | |
| 721120 | Casino Hotels | 35 | |
| 721191 | Bed-and-Breakfast Inns | 8 | |
| 721199 | All Other Traveler Accommodation | 8 | |
| 721211 | RV (Recreational Vehicle) Parks and Campgrounds | 9 | |
| 721214 | Recreational and Vacation Camps (except Campgrounds) | 8 | |
| 721310 | Rooming and Boarding Houses, Dormitories, and Workers' Camps | 12.5 | |
| 722310 | Food Service Contractors | 41.5 | |
| 722320 | Caterers | 8 | |
| 722330 | Mobile Food Services | 8 | |
| 722410 | Drinking Places (Alcoholic Beverages) | 8 | |
| 722511 | Full-Service Restaurants | 10 | |
| 722513 | Limited-Service Restaurants | 12 | |
| 722514 | Cafeterias, Grill Buffets, and Buffets | 30 | |
| 722515 | Snack and Nonalcoholic Beverage Bars | 20 | |
| 811111 | General Automotive Repair | 8 | |
| 811112 | Automotive Exhaust System Repair | 8 | |
| 811113 | Automotive Transmission Repair | 8 | |
| 811118 | Other Automotive Mechanical and Electrical Repair and Maintenance | 8 | |
| 811121 | Automotive Body, Paint and Interior Repair and Maintenance | 8 | |
| 811122 | Automotive Glass Replacement Shops | 15.5 | |
| 811191 | Automotive Oil Change and Lubrication Shops | 9.5 | |
| 811192 | Car Washes | 8 | |

| 811198 | All Other Automotive Repair and Maintenance | 9 | |
| 811211 | Consumer Electronics Repair and Maintenance | 22.5 | |
| 811212 | Computer and Office Machine Repair and Maintenance | 30 | |
| 811213 | Communication Equipment Repair and Maintenance | 19.5 | |
| 811219 | Other Electronic and Precision Equipment Repair and Maintenance | 22 | |
| 811310 | Commercial and Industrial Machinery and Equipment (except Automotive and Electronic) Repair and Maintenance | 11 | |
| 811411 | Home and Garden Equipment Repair and Maintenance | 8 | |
| 811412 | Appliance Repair and Maintenance | 16.5 | |
| 811420 | Reupholstery and Furniture Repair | 8 | |
| 811430 | Footwear and Leather Goods Repair | 8 | |
| 811490 | Other Personal and Household Goods Repair and Maintenance | 8 | |
| 812111 | Barber Shops | 8.5 | |
| 812112 | Beauty Salons | 8.5 | |
| 812113 | Nail Salons | 8 | |
| 812191 | Diet and Weight Reducing Centers | 24 | |
| 812199 | Other Personal Care Services | 8 | |
| 812210 | Funeral Homes and Funeral Services | 11 | |
| 812220 | Cemeteries and Crematories | 22 | |
| 812310 | Coin-Operated Laundries and Drycleaners | 11.5 | |
| 812320 | Dry-cleaning and Laundry Services (except Coin-Operated) | 7 | |
| 812331 | Linen Supply | 35 | |
| 812332 | Industrial Launderers | 41.5 | |
| 812910 | Pet Care (except Veterinary) Services | 8 | |
| 812921 | Photofinishing Laboratories (except One-Hour) | 26 | |
| 812922 | One-Hour Photofinishing | 16.5 | |
| 812930 | Parking Lots and Garages | 41.5 | |
| 812990 | All Other Personal Services | 13 | |
| 813110 | Religious Organizations | 11.5 | |
| 813211 | Grantmaking Foundations | 35 | |
| 813212 | Voluntary Health Organizations | 30 | |
| 813219 | Other Grantmaking and Giving Services | 41.5 | |
| 813311 | Human Rights Organizations | 30 | |
| 813312 | Environment, Conservation and Wildlife Organizations | 17 | |
| 813319 | Other Social Advocacy Organizations | 16 | |

| 813410 | Civic and Social Organizations | 8.5 | |
| 813910 | Business Associations | 13.5 | |
| 813920 | Professional Organizations | 20.5 | |
| 813930 | Labor Unions and Similar Labor Organizations | 14.5 | |
| 813940 | Political Organizations | 12.5 | |
| 813990 | Other Similar Organizations (except Business, Professional, Labor, and Political Organizations) | 12 | |

**Appendix B: Form I-129 Sample with Petition Totals**

| Sample ID | Petitions |
|-----------|-----------|
| 1 | 54 |
| 2 | 1 |
| 3 | 1 |
| 4 | 2 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1 |
| 10 | 28 |
| 11 | 6 |
| 12 | 25 |
| 13 | 2 |
| 14 | 1 |
| 15 | 1 |
| 16 | 1 |
| 17 | 2 |
| 18 | 3 |
| 19 | 4 |
| 20 | 8 |
| 21 | 11 |
| 22 | 4 |
| 23 | 33 |
| 24 | 1 |
| 25 | 2 |
| 26 | 2 |
| 27 | 2 |
| 28 | 2 |
| 29 | 1 |
| 30 | 1 |
| 31 | 2 |
| 32 | 1 |
| 33 | 1 |
| 34 | 1 |
| 35 | 4 |
| 36 | 3 |
| 37 | 1 |
| 38 | 1 |
| 39 | 2 |

| Sample ID | Petitions |
|-----------|-----------|
| 40 | 1 |
| 41 | 2 |
| 42 | 1 |
| 43 | 1 |
| 44 | 2 |
| 45 | 47 |
| 46 | 1 |
| 47 | 1 |
| 48 | 4 |
| 49 | 2 |
| 50 | 1 |
| 51 | 8 |
| 52 | 1 |
| 53 | 1 |
| 54 | 1 |
| 55 | 1 |
| 56 | 1 |
| 57 | 1 |
| 58 | 1 |
| 59 | 21 |
| 60 | 2 |
| 61 | 1 |
| 62 | 15 |
| 63 | 1 |
| 64 | 1 |
| 65 | 25 |
| 66 | 2 |
| 67 | 1 |
| 68 | 1 |
| 69 | 1 |
| 70 | 1 |
| 71 | 2 |
| 72 | 1 |
| 73 | 2 |
| 74 | 1 |
| 75 | 1 |
| 76 | 1 |
| 77 | 4 |
| 78 | 1 |
| 79 | 1 |

| Sample ID | Petitions |
|-----------|-----------|
| 80 | 1 |
| 81 | 1 |
| 82 | 1 |
| 83 | 1 |
| 84 | 1 |
| 85 | 5 |
| 86 | 1 |
| 87 | 2 |
| 88 | 1 |
| 89 | 1 |
| 90 | 1 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 1 |
| 95 | 9 |
| 96 | 1 |
| 97 | 2 |
| 98 | 1 |
| 99 | 1 |
| 100 | 8 |
| 101 | 1 |
| 102 | 1 |
| 103 | 1 |
| 104 | 2 |
| 105 | 1 |
| 106 | 1 |
| 107 | 1 |
| 108 | 1 |
| 109 | 5 |
| 110 | 1 |
| 111 | 2 |
| 112 | 2 |
| 113 | 2 |
| 114 | 1 |
| 115 | 1 |
| 116 | 2 |
| 117 | 3 |
| 118 | 1 |
| 119 | 8 |

| | | | | | | |
|---|---|---|---|---|---|
| 120 | 2 | 161 | 1 | 202 | 1 |
| 121 | 1 | 162 | 4 | 203 | 1 |
| 122 | 1 | 163 | 1 | 204 | 3 |
| 123 | 1 | 164 | 56 | 205 | 1 |
| 124 | 8 | 165 | 4 | 206 | 1 |
| 125 | 1 | 166 | 1 | 207 | 2 |
| 126 | 3 | 167 | 1 | 208 | 3 |
| 127 | 5 | 168 | 3 | 209 | 1 |
| 128 | 1 | 169 | 11 | 210 | 1 |
| 129 | 1 | 170 | 1 | 211 | 1 |
| 130 | 1 | 171 | 1 | 212 | 5 |
| 131 | 2 | 172 | 1 | 213 | 2 |
| 132 | 1 | 173 | 22 | 214 | 1 |
| 133 | 1 | 174 | 2 | 215 | 1 |
| 134 | 1 | 175 | 4 | 216 | 1 |
| 135 | 23 | 176 | 1 | 217 | 1 |
| 136 | 1 | 177 | 2 | 218 | 1 |
| 137 | 2 | 178 | 7 | 219 | 1 |
| 138 | 1 | 179 | 17 | 220 | 1 |
| 139 | 1 | 180 | 1 | 221 | 1 |
| 140 | 28 | 181 | 1 | 222 | 2 |
| 141 | 1 | 182 | 3 | 223 | 1 |
| 142 | 1 | 183 | 24 | 224 | 1 |
| 143 | 1 | 184 | 2 | 225 | 3 |
| 144 | 1 | 185 | 4 | 226 | 1 |
| 145 | 1 | 186 | 1 | 227 | 2 |
| 146 | 1 | 187 | 1 | 228 | 20 |
| 147 | 2 | 188 | 2 | 229 | 1 |
| 148 | 13 | 189 | 4 | 230 | 1 |
| 149 | 4 | 190 | 1 | 231 | 1 |
| 150 | 1 | 191 | 3 | 232 | 2 |
| 151 | 1 | 192 | 1 | 233 | 2 |
| 152 | 2 | 193 | 1 | 234 | 1 |
| 153 | 3 | 194 | 100 | 235 | 6 |
| 154 | 1 | 195 | 1 | 236 | 1 |
| 155 | 3 | 196 | 1 | 237 | 1 |
| 156 | 2 | 197 | 1 | 238 | 1 |
| 157 | 1 | 198 | 1 | 239 | 1 |
| 158 | 1 | 199 | 5 | 240 | 2 |
| 159 | 1 | 200 | 1 | 241 | 1 |
| 160 | 1 | 201 | 1 | 242 | 1 |

| | |
|---|---|
| 243 | 1 |
| 244 | 6 |
| 245 | 1 |
| 246 | 1 |
| 247 | 2 |
| 248 | 1 |
| 249 | 2 |
| 250 | 3 |
| 251 | 1 |
| 252 | 1 |
| 253 | 2 |
| 254 | 2 |
| 255 | 1 |
| 256 | 1 |
| 257 | 3 |
| 258 | 1 |
| 259 | 1 |
| 260 | 1 |
| 261 | 1 |
| 262 | 1 |
| 263 | 1 |
| 264 | 2 |
| 265 | 1 |
| 266 | 1 |
| 267 | 1 |
| 268 | 1 |
| 269 | 1 |
| 270 | 1 |
| 271 | 3 |
| 272 | 2 |
| 273 | 1 |
| 274 | 1 |
| 275 | 8 |
| 276 | 1 |
| 277 | 1 |
| 278 | 3 |
| 279 | 28 |
| 280 | 1 |
| 281 | 1 |
| 282 | 1 |
| 283 | 1 |

| | |
|---|---|
| 284 | 1 |
| 285 | 1 |
| 286 | 22 |
| 287 | 2 |
| 288 | 2 |
| 289 | 1 |
| 290 | 1 |
| 291 | 1 |
| 292 | 1 |
| 293 | 1 |
| 294 | 1 |
| 295 | 1 |
| 296 | 2 |
| 297 | 1 |
| 298 | 1 |
| 299 | 4 |
| 300 | 24 |
| 301 | 1 |
| 302 | 35 |
| 303 | 2 |
| 304 | 2 |
| 305 | 1 |
| 306 | 2 |
| 307 | 1 |
| 308 | 1 |
| 309 | 1 |
| 310 | 1 |
| 311 | 1 |
| 312 | 2 |
| 313 | 1 |
| 314 | 2 |
| 315 | 2 |
| 316 | 1 |
| 317 | 1 |
| 318 | 1 |
| 319 | 14 |
| 320 | 2 |
| 321 | 3 |
| 322 | 1 |
| 323 | 1 |
| 324 | 5 |

| | |
|---|---|
| 325 | 1 |
| 326 | 1 |
| 327 | 1 |
| 328 | 3 |
| 329 | 2 |
| 330 | 2 |
| 331 | 19 |
| 332 | 2 |
| 333 | 1 |
| 334 | 1 |
| 335 | 1 |
| 336 | 1 |
| 337 | 1 |
| 338 | 5 |
| 339 | 1 |
| 340 | 2 |
| 341 | 1 |
| 342 | 1 |
| 343 | 2 |
| 344 | 1 |
| 345 | 2 |
| 346 | 1 |
| 347 | 4 |
| 348 | 1 |
| 349 | 1 |
| 350 | 1 |
| 351 | 2 |
| 352 | 2 |
| 353 | 1 |
| 354 | 1 |
| 355 | 2 |
| 356 | 1 |
| 357 | 1 |
| 358 | 1 |
| 359 | 1 |
| 360 | 1 |
| 361 | 1 |
| 362 | 3 |
| 363 | 1 |
| 364 | 1 |
| 365 | 11 |

| | | | | | |
|---|---|---|---|---|---|
| 366 | 1 | 407 | 1 | 448 | 1 |
| 367 | 1 | 408 | 1 | 449 | 1 |
| 368 | 1 | 409 | 1 | 450 | 1 |
| 369 | 1 | 410 | 1 | 451 | 2 |
| 370 | 3 | 411 | 1 | 452 | 1 |
| 371 | 1 | 412 | 1 | 453 | 3 |
| 372 | 50 | 413 | 1 | 454 | 2 |
| 373 | 1 | 414 | 1 | 455 | 4 |
| 374 | 2 | 415 | 1 | 456 | 2 |
| 375 | 1 | 416 | 2 | 457 | 3 |
| 376 | 1 | 417 | 1 | 458 | 2 |
| 377 | 21 | 418 | 1 | 459 | 1 |
| 378 | 5 | 419 | 1 | 460 | 1 |
| 379 | 1 | 420 | 1 | 461 | 2 |
| 380 | 1 | 421 | 1 | 462 | 1 |
| 381 | 1 | 422 | 1 | 463 | 2 |
| 382 | 1 | 423 | 2 | 464 | 1 |
| 383 | 1 | 424 | 3 | 465 | 1 |
| 384 | 3 | 425 | 3 | 466 | 3 |
| 385 | 2 | 426 | 2 | 467 | 1 |
| 386 | 1 | 427 | 1 | 468 | 1 |
| 387 | 1 | 428 | 1 | 469 | 2 |
| 388 | 1 | 429 | 1 | 470 | 1 |
| 389 | 3 | 430 | 1 | 471 | 1 |
| 390 | 1 | 431 | 3 | 472 | 1 |
| 391 | 5 | 432 | 1 | 473 | 1 |
| 392 | 5 | 433 | 1 | 474 | 1 |
| 393 | 1 | 434 | 9 | 475 | 2 |
| 394 | 16 | 435 | 2 | 476 | 1 |
| 395 | 5 | 436 | 1 | 477 | 1 |
| 396 | 9 | 437 | 1 | 478 | 1 |
| 397 | 1 | 438 | 1 | 479 | 1 |
| 398 | 1 | 439 | 3 | 480 | 2 |
| 399 | 1 | 440 | 5 | 481 | 25 |
| 400 | 1 | 441 | 1 | 482 | 1 |
| 401 | 1 | 442 | 1 | 483 | 1 |
| 402 | 1 | 443 | 1 | 484 | 1 |
| 403 | 14 | 444 | 1 | 485 | 5 |
| 404 | 2 | 445 | 2 | 486 | 2 |
| 405 | 1 | 446 | 1 | 487 | 7 |
| 406 | 1 | 447 | 1 | 488 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 489 | 1 | 530 | 22 | 571 | 1 |
| 490 | 1 | 531 | 8 | 572 | 1 |
| 491 | 5 | 532 | 1 | 573 | 2 |
| 492 | 21 | 533 | 2 | 574 | 2 |
| 493 | 1 | 534 | 1 | 575 | 1 |
| 494 | 1 | 535 | 2 | 576 | 2 |
| 495 | 8 | 536 | 1 | 577 | 2 |
| 496 | 1 | 537 | 6 | 578 | 3 |
| 497 | 1 | 538 | 143 | 579 | 1 |
| 498 | 8 | 539 | 1 | 580 | 1 |
| 499 | 5 | 540 | 1 | 581 | 1 |
| 500 | 3 | 541 | 2 | 582 | 7 |
| 501 | 4 | 542 | 1 | 583 | 3 |
| 502 | 1 | 543 | 1 | 584 | 1 |
| 503 | 1 | 544 | 10 | 585 | 3 |
| 504 | 4 | 545 | 3 | 586 | 1 |
| 505 | 1 | 546 | 6 | 587 | 1 |
| 506 | 1 | 547 | 1 | 588 | 2 |
| 507 | 3 | 548 | 1 | 589 | 2 |
| 508 | 1 | 549 | 1 | 590 | 1 |
| 509 | 1 | 550 | 3 | 591 | 1 |
| 510 | 2 | 551 | 2 | 592 | 1 |
| 511 | 9 | 552 | 1 | 593 | 1 |
| 512 | 2 | 553 | 1 | 594 | 1 |
| 513 | 1 | 554 | 1 | 595 | 4 |
| 514 | 1 | 555 | 2 | 596 | 1 |
| 515 | 1 | 556 | 36 | 597 | 1 |
| 516 | 7 | 557 | 1 | 598 | 1 |
| 517 | 10 | 558 | 1 | 599 | 1 |
| 518 | 1 | 559 | 1 | 600 | 1 |
| 519 | 1 | 560 | 88 | 601 | 2 |
| 520 | 1 | 561 | 1 | 602 | 1 |
| 521 | 1 | 562 | 1 | 603 | 1 |
| 522 | 1 | 563 | 2 | 604 | 1 |
| 523 | 1 | 564 | 9 | 605 | 1 |
| 524 | 1 | 565 | 5 | 606 | 1 |
| 525 | 2 | 566 | 1 | 607 | 1 |
| 526 | 1 | 567 | 1 | 608 | 1 |
| 527 | 1 | 568 | 1 | 609 | 7 |
| 528 | 2 | 569 | 2 | 610 | 3 |
| 529 | 1 | 570 | 15 | 611 | 3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **612** | 1 | **625** | 1 | **638** | 1 |
| **613** | 4 | **626** | 1 | **639** | 1 |
| **614** | 1 | **627** | 60 | **640** | 2 |
| **615** | 2 | **628** | 2 | **641** | 7 |
| **616** | 1 | **629** | 1 | **642** | 1 |
| **617** | 5 | **630** | 7 | **643** | 1 |
| **618** | 2 | **631** | 2 | **644** | 1 |
| **619** | 1 | **632** | 1 | **645** | 1 |
| **620** | 4 | **633** | 1 | **646** | 33 |
| **621** | 1 | **634** | 2 | **647** | 91 |
| **622** | 1 | **635** | 1 | **648** | 1 |
| **623** | 1 | **636** | 3 | **649** | 2 |
| **624** | 1 | **637** | 1 | **650** | 16 |

## Appendix C: Form I-140 Sample with Petition Totals

| Sample ID | Petitions |
|---|---|
| 1 | 3 |
| 2 | 1 |
| 3 | 2 |
| 4 | 1 |
| 5 | 2 |
| 6 | 2 |
| 7 | 6 |
| 8 | 1 |
| 9 | 1 |
| 10 | 1 |
| 11 | 2 |
| 12 | 2 |
| 13 | 1 |
| 14 | 1 |
| 15 | 1 |
| 16 | 1 |
| 17 | 1 |
| 18 | 1 |
| 19 | 1 |
| 20 | 4 |
| 21 | 1 |
| 22 | 1 |
| 23 | 1 |
| 24 | 1 |
| 25 | 1 |
| 26 | 1 |
| 27 | 1 |
| 28 | 1 |
| 29 | 5 |
| 30 | 10 |
| 31 | 1 |
| 32 | 1 |
| 33 | 1 |
| 34 | 9 |
| 35 | 36 |
| 36 | 1 |
| 37 | 2 |
| 38 | 1 |

| Sample ID | Petitions |
|---|---|
| 39 | 1 |
| 40 | 1 |
| 41 | 1 |
| 42 | 1 |
| 43 | 1 |
| 44 | 1 |
| 45 | 3 |
| 46 | 3 |
| 47 | 1 |
| 48 | 12 |
| 49 | 3 |
| 50 | 1 |
| 51 | 1 |
| 52 | 1 |
| 53 | 3 |
| 54 | 2 |
| 55 | 1 |
| 56 | 2 |
| 57 | 1 |
| 58 | 1 |
| 59 | 5 |
| 60 | 1 |
| 61 | 1 |
| 62 | 1 |
| 63 | 1 |
| 64 | 1 |
| 65 | 2 |
| 66 | 1 |
| 67 | 5 |
| 68 | 4 |
| 69 | 1 |
| 70 | 1 |
| 71 | 2 |
| 72 | 3 |
| 73 | 1 |
| 74 | 1 |
| 75 | 4 |
| 76 | 1 |
| 77 | 1 |

| Sample ID | Petitions |
|---|---|
| 78 | 1 |
| 79 | 2 |
| 80 | 1 |
| 81 | 1 |
| 82 | 1 |
| 83 | 1 |
| 84 | 1 |
| 85 | 1 |
| 86 | 1 |
| 87 | 1 |
| 88 | 2 |
| 89 | 1 |
| 90 | 1 |
| 91 | 2 |
| 92 | 3 |
| 93 | 2 |
| 94 | 5 |
| 95 | 2 |
| 96 | 1 |
| 97 | 1 |
| 98 | 1 |
| 99 | 2 |
| 100 | 1 |
| 101 | 1 |
| 102 | 2 |
| 103 | 1 |
| 104 | 1 |
| 105 | 1 |
| 106 | 1 |
| 107 | 1 |
| 108 | 1 |
| 109 | 2 |
| 110 | 3 |
| 111 | 1 |
| 112 | 2 |
| 113 | 1 |
| 114 | 13 |
| 115 | 1 |
| 116 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 117 | 1 | 158 | 1 | 199 | 2 |
| 118 | 14 | 159 | 1 | 200 | 1 |
| 119 | 40 | 160 | 1 | 201 | 1 |
| 120 | 1 | 161 | 1 | 202 | 1 |
| 121 | 1 | 162 | 1 | 203 | 5 |
| 122 | 1 | 163 | 3 | 204 | 1 |
| 123 | 14 | 164 | 2 | 205 | 1 |
| 124 | 3 | 165 | 2 | 206 | 1 |
| 125 | 1 | 166 | 2 | 207 | 2 |
| 126 | 1 | 167 | 1 | 208 | 2 |
| 127 | 3 | 168 | 1 | 209 | 1 |
| 128 | 1 | 169 | 1 | 210 | 2 |
| 129 | 1 | 170 | 3 | 211 | 4 |
| 130 | 1 | 171 | 1 | 212 | 2 |
| 131 | 1 | 172 | 1 | 213 | 21 |
| 132 | 3 | 173 | 20 | 214 | 6 |
| 133 | 1 | 174 | 1 | 215 | 5 |
| 134 | 1 | 175 | 2 | 216 | 9 |
| 135 | 1 | 176 | 1 | 217 | 6 |
| 136 | 1 | 177 | 2 | 218 | 4 |
| 137 | 2 | 178 | 1 | 219 | 2 |
| 138 | 3 | 179 | 1 | 220 | 1 |
| 139 | 1 | 180 | 1 | 221 | 1 |
| 140 | 1 | 181 | 1 | 222 | 56 |
| 141 | 1 | 182 | 1 | 223 | 2 |
| 142 | 2 | 183 | 4 | 224 | 1 |
| 143 | 1 | 184 | 2 | 225 | 2 |
| 144 | 2 | 185 | 3 | 226 | 3 |
| 145 | 5 | 186 | 1 | 227 | 1 |
| 146 | 1 | 187 | 1 | 228 | 7 |
| 147 | 3 | 188 | 1 | 229 | 1 |
| 148 | 1 | 189 | 1 | 230 | 1 |
| 149 | 1 | 190 | 1 | 231 | 1 |
| 150 | 1 | 191 | 2 | 232 | 1 |
| 151 | 1 | 192 | 1 | 233 | 2 |
| 152 | 1 | 193 | 3 | 234 | 2 |
| 153 | 2 | 194 | 1 | 235 | 3 |
| 154 | 2 | 195 | 1 | 236 | 1 |
| 155 | 1 | 196 | 1 | 237 | 1 |
| 156 | 2 | 197 | 1 | 238 | 3 |
| 157 | 4 | 198 | 1 | 239 | 11 |

| | | | | | |
|---|---|---|---|---|---|
| 240 | 1 | 281 | 10 | 322 | 1 |
| 241 | 1 | 282 | 1 | 323 | 1 |
| 242 | 1 | 283 | 4 | 324 | 1 |
| 243 | 1 | 284 | 1 | 325 | 1 |
| 244 | 1 | 285 | 1 | 326 | 1 |
| 245 | 1 | 286 | 2 | 327 | 1 |
| 246 | 1 | 287 | 1 | 328 | 1 |
| 247 | 1 | 288 | 2 | 329 | 1 |
| 248 | 2 | 289 | 10 | 330 | 1 |
| 249 | 1 | 290 | 1 | 331 | 1 |
| 250 | 4 | 291 | 1 | 332 | 5 |
| 251 | 1 | 292 | 1 | 333 | 1 |
| 252 | 3 | 293 | 1 | 334 | 4 |
| 253 | 32 | 294 | 1 | 335 | 8 |
| 254 | 1 | 295 | 1 | 336 | 2 |
| 255 | 3 | 296 | 2 | 337 | 1 |
| 256 | 1 | 297 | 1 | 338 | 3 |
| 257 | 1 | 298 | 3 | 339 | 1 |
| 258 | 1 | 299 | 1 | 340 | 1 |
| 259 | 1 | 300 | 2 | 341 | 5 |
| 260 | 1 | 301 | 1 | 342 | 1 |
| 261 | 1 | 302 | 2 | 343 | 2 |
| 262 | 1 | 303 | 2 | 344 | 1 |
| 263 | 2 | 304 | 1 | 345 | 1 |
| 264 | 2 | 305 | 1 | 346 | 1 |
| 265 | 1 | 306 | 1 | 347 | 3 |
| 266 | 1 | 307 | 1 | 348 | 1 |
| 267 | 1 | 308 | 1 | 349 | 1 |
| 268 | 3 | 309 | 1 | 350 | 1 |
| 269 | 1 | 310 | 1 | 351 | 1 |
| 270 | 22 | 311 | 3 | 352 | 1 |
| 271 | 3 | 312 | 4 | 353 | 1 |
| 272 | 1 | 313 | 1 | 354 | 5 |
| 273 | 8 | 314 | 1 | 355 | 1 |
| 274 | 1 | 315 | 1 | 356 | 5 |
| 275 | 4 | 316 | 5 | 357 | 1 |
| 276 | 3 | 317 | 1 | 358 | 10 |
| 277 | 2 | 318 | 1 | 359 | 1 |
| 278 | 10 | 319 | 1 | 360 | 2 |
| 279 | 1 | 320 | 1 | 361 | 1 |
| 280 | 1 | 321 | 1 | 362 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 363 | 1 | | 404 | 3 | | 445 | 5 |
| 364 | 1 | | 405 | 1 | | 446 | 16 |
| 365 | 7 | | 406 | 1 | | 447 | 1 |
| 366 | 1 | | 407 | 1 | | 448 | 1 |
| 367 | 2 | | 408 | 1 | | 449 | 2 |
| 368 | 5 | | 409 | 1 | | 450 | 1 |
| 369 | 1 | | 410 | 1 | | 451 | 1 |
| 370 | 1 | | 411 | 2 | | 452 | 1 |
| 371 | 1 | | 412 | 1 | | 453 | 1 |
| 372 | 1 | | 413 | 1 | | 454 | 10 |
| 373 | 1 | | 414 | 1 | | 455 | 4 |
| 374 | 3 | | 415 | 1 | | 456 | 1 |
| 375 | 1 | | 416 | 1 | | 457 | 1 |
| 376 | 2 | | 417 | 3 | | 458 | 1 |
| 377 | 1 | | 418 | 1 | | 459 | 11 |
| 378 | 2 | | 419 | 1 | | 460 | 2 |
| 379 | 1 | | 420 | 2 | | 461 | 1 |
| 380 | 1 | | 421 | 1 | | 462 | 2 |
| 381 | 1 | | 422 | 1 | | 463 | 1 |
| 382 | 1 | | 423 | 1 | | 464 | 3 |
| 383 | 31 | | 424 | 3 | | 465 | 5 |
| 384 | 3 | | 425 | 1 | | 466 | 10 |
| 385 | 1 | | 426 | 1 | | 467 | 1 |
| 386 | 1 | | 427 | 1 | | 468 | 1 |
| 387 | 1 | | 428 | 2 | | 469 | 3 |
| 388 | 1 | | 429 | 1 | | 470 | 1 |
| 389 | 2 | | 430 | 1 | | 471 | 1 |
| 390 | 6 | | 431 | 1 | | 472 | 1 |
| 391 | 18 | | 432 | 1 | | 473 | 1 |
| 392 | 5 | | 433 | 3 | | 474 | 1 |
| 393 | 2 | | 434 | 1 | | 475 | 2 |
| 394 | 2 | | 435 | 1 | | 476 | 1 |
| 395 | 2 | | 436 | 1 | | 477 | 1 |
| 396 | 1 | | 437 | 1 | | 478 | 3 |
| 397 | 1 | | 438 | 1 | | 479 | 1 |
| 398 | 2 | | 439 | 1 | | 480 | 1 |
| 399 | 1 | | 440 | 1 | | 481 | 1 |
| 400 | 2 | | 441 | 1 | | 482 | 1 |
| 401 | 1 | | 442 | 1 | | 483 | 1 |
| 402 | 1 | | 443 | 1 | | 484 | 1 |
| 403 | 5 | | 444 | 2 | | 485 | 1 |

| | | | | | | |
|---|---|---|---|---|---|
| **486** | 2 | **508** | 1 | **530** | 1 |
| **487** | 1 | **509** | 1 | **531** | 1 |
| **488** | 4 | **510** | 1 | **532** | 2 |
| **489** | 1 | **511** | 1 | **533** | 1 |
| **490** | 1 | **512** | 1 | **534** | 1 |
| **491** | 1 | **513** | 1 | **535** | 1 |
| **492** | 1 | **514** | 20 | **536** | 1 |
| **493** | 1 | **515** | 1 | **537** | 1 |
| **494** | 2 | **516** | 1 | **538** | 1 |
| **495** | 1 | **517** | 1 | **539** | 12 |
| **496** | 3 | **518** | 1 | **540** | 1 |
| **497** | 1 | **519** | 2 | **541** | 1 |
| **498** | 1 | **520** | 1 | **542** | 1 |
| **499** | 1 | **521** | 1 | **543** | 1 |
| **500** | 1 | **522** | 1 | **544** | 1 |
| **501** | 3 | **523** | 1 | **545** | 1 |
| **502** | 1 | **524** | 2 | **546** | 1 |
| **503** | 1 | **525** | 1 | **547** | 1 |
| **504** | 2 | **526** | 1 | **548** | 1 |
| **505** | 1 | **527** | 1 | **549** | 1 |
| **506** | 3 | **528** | 1 | **550** | 2 |
| **507** | 1 | **529** | 1 | | |

## Appendix D: Form I-910 Sample with Petition Totals

| Sample ID | Petitions |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 2 |
| 8 | 2 |
| 9 | 1 |
| 10 | 1 |
| 11 | 1 |
| 12 | 1 |
| 13 | 1 |
| 14 | 1 |
| 15 | 1 |
| 16 | 1 |
| 17 | 1 |
| 18 | 1 |
| 19 | 1 |
| 20 | 2 |
| 21 | 1 |
| 22 | 1 |
| 23 | 1 |
| 24 | 1 |
| 25 | 1 |
| 26 | 2 |
| 27 | 2 |
| 28 | 9 |
| 29 | 1 |
| 30 | 1 |
| 31 | 1 |
| 32 | 1 |
| 33 | 1 |
| 34 | 2 |
| 35 | 1 |
| 36 | 1 |
| 37 | 4 |
| 38 | 5 |

| Sample ID | Petitions |
|---|---|
| 39 | 1 |
| 40 | 2 |
| 41 | 1 |
| 42 | 1 |
| 43 | 1 |
| 44 | 1 |
| 45 | 1 |
| 46 | 1 |
| 47 | 1 |
| 48 | 1 |
| 49 | 1 |
| 50 | 3 |
| 51 | 5 |
| 52 | 1 |
| 53 | 1 |
| 54 | 1 |
| 55 | 1 |
| 56 | 1 |
| 57 | 1 |
| 58 | 2 |
| 59 | 1 |
| 60 | 1 |
| 61 | 1 |
| 62 | 2 |
| 63 | 1 |
| 64 | 1 |
| 65 | 3 |
| 66 | 1 |
| 67 | 1 |
| 68 | 1 |
| 69 | 4 |
| 70 | 1 |
| 71 | 6 |
| 72 | 1 |
| 73 | 1 |
| 74 | 2 |
| 75 | 1 |
| 76 | 3 |
| 77 | 4 |

| Sample ID | Petitions |
|---|---|
| 78 | 1 |
| 79 | 1 |
| 80 | 1 |
| 81 | 1 |
| 82 | 1 |
| 83 | 2 |
| 84 | 1 |
| 85 | 2 |
| 86 | 1 |
| 87 | 2 |
| 88 | 1 |
| 89 | 1 |
| 90 | 4 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 1 |
| 95 | 1 |
| 96 | 2 |
| 97 | 1 |
| 98 | 1 |
| 99 | 1 |
| 100 | 1 |
| 101 | 1 |
| 102 | 1 |
| 103 | 1 |
| 104 | 1 |
| 105 | 1 |
| 106 | 1 |
| 107 | 1 |
| 108 | 1 |
| 109 | 1 |
| 110 | 5 |
| 111 | 1 |
| 112 | 2 |
| 113 | 1 |
| 114 | 1 |
| 115 | 2 |
| 116 | 1 |
| 117 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 118 | 1 | 159 | 1 | 200 | 1 |
| 119 | 1 | 160 | 1 | 201 | 1 |
| 120 | 1 | 161 | 2 | 202 | 1 |
| 121 | 6 | 162 | 1 | 203 | 2 |
| 122 | 1 | 163 | 1 | 204 | 1 |
| 123 | 1 | 164 | 1 | 205 | 2 |
| 124 | 2 | 165 | 1 | 206 | 1 |
| 125 | 1 | 166 | 1 | 207 | 1 |
| 126 | 1 | 167 | 1 | 208 | 1 |
| 127 | 8 | 168 | 1 | 209 | 1 |
| 128 | 1 | 169 | 1 | 210 | 1 |
| 129 | 1 | 170 | 1 | 211 | 1 |
| 130 | 2 | 171 | 1 | 212 | 1 |
| 131 | 1 | 172 | 1 | 213 | 1 |
| 132 | 1 | 173 | 1 | 214 | 1 |
| 133 | 1 | 174 | 1 | 215 | 1 |
| 134 | 1 | 175 | 3 | 216 | 1 |
| 135 | 2 | 176 | 1 | 217 | 1 |
| 136 | 1 | 177 | 1 | 218 | 1 |
| 137 | 1 | 178 | 2 | 219 | 1 |
| 138 | 1 | 179 | 1 | 220 | 1 |
| 139 | 1 | 180 | 2 | 221 | 2 |
| 140 | 1 | 181 | 2 | 222 | 4 |
| 141 | 2 | 182 | 3 | 223 | 1 |
| 142 | 1 | 183 | 1 | 224 | 2 |
| 143 | 3 | 184 | 6 | 225 | 3 |
| 144 | 1 | 185 | 1 | 226 | 1 |
| 145 | 2 | 186 | 2 | 227 | 1 |
| 146 | 1 | 187 | 1 | 228 | 1 |
| 147 | 2 | 188 | 1 | 229 | 1 |
| 148 | 1 | 189 | 1 | 230 | 1 |
| 149 | 1 | 190 | 3 | 231 | 1 |
| 150 | 3 | 191 | 1 | 232 | 1 |
| 151 | 2 | 192 | 2 | 233 | 1 |
| 152 | 2 | 193 | 2 | 234 | 2 |
| 153 | 1 | 194 | 1 | 235 | 1 |
| 154 | 1 | 195 | 1 | 236 | 2 |
| 155 | 1 | 196 | 2 | 237 | 2 |
| 156 | 1 | 197 | 1 | 238 | 1 |
| 157 | 1 | 198 | 1 | 239 | 1 |
| 158 | 3 | 199 | 1 | 240 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 241 | 1 | 261 | 2 | 281 | 1 |
| 242 | 1 | 262 | 1 | 282 | 1 |
| 243 | 1 | 263 | 1 | 283 | 1 |
| 244 | 1 | 264 | 2 | 284 | 1 |
| 245 | 1 | 265 | 1 | 285 | 1 |
| 246 | 1 | 266 | 1 | 286 | 1 |
| 247 | 1 | 267 | 1 | 287 | 2 |
| 248 | 1 | 268 | 2 | 288 | 1 |
| 249 | 1 | 269 | 1 | 289 | 1 |
| 250 | 1 | 270 | 1 | 290 | 1 |
| 251 | 1 | 271 | 1 | 291 | 1 |
| 252 | 1 | 272 | 1 | 292 | 1 |
| 253 | 1 | 273 | 1 | 293 | 2 |
| 254 | 3 | 274 | 1 | 294 | 1 |
| 255 | 1 | 275 | 1 | 295 | 3 |
| 256 | 1 | 276 | 8 | 296 | 1 |
| 257 | 1 | 277 | 1 | 297 | 1 |
| 258 | 1 | 278 | 2 | 298 | 1 |
| 259 | 1 | 279 | 1 | 299 | 1 |
| 260 | 2 | 280 | 1 | 300 | 2 |

**Appendix E: Form I-360 Sample with Petition Totals**

| Sample ID | Petitions |
|---|---|
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 23 |
| 5 | 1 |
| 6 | 4 |
| 7 | 1 |
| 8 | 2 |
| 9 | 2 |
| 10 | 9 |
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 5 |
| 15 | 3 |
| 16 | 1 |
| 17 | 3 |
| 18 | 1 |
| 19 | 1 |
| 20 | 4 |
| 21 | 1 |
| 22 | 2 |
| 23 | 1 |
| 24 | 1 |
| 25 | 1 |
| 26 | 1 |
| 27 | 2 |
| 28 | 1 |
| 29 | 1 |
| 30 | 2 |
| 31 | 1 |
| 32 | 2 |
| 33 | 1 |
| 34 | 1 |
| 35 | 1 |
| 36 | 1 |
| 37 | 1 |
| 38 | 1 |

| | |
|---|---|
| 39 | 1 |
| 40 | 2 |
| 41 | 1 |
| 42 | 3 |
| 43 | 5 |
| 44 | 1 |
| 45 | 1 |
| 46 | 3 |
| 47 | 1 |
| 48 | 1 |
| 49 | 1 |
| 50 | 4 |
| 51 | 1 |
| 52 | 1 |
| 53 | 1 |
| 54 | 2 |
| 55 | 5 |
| 56 | 1 |
| 57 | 1 |
| 58 | 1 |
| 59 | 1 |
| 60 | 1 |
| 61 | 1 |
| 62 | 1 |
| 63 | 2 |
| 64 | 1 |
| 65 | 1 |
| 66 | 4 |
| 67 | 1 |
| 68 | 1 |
| 69 | 2 |
| 70 | 1 |
| 71 | 1 |
| 72 | 1 |
| 73 | 1 |
| 74 | 2 |
| 75 | 1 |
| 76 | 1 |
| 77 | 1 |

| | |
|---|---|
| 78 | 1 |
| 79 | 1 |
| 80 | 1 |
| 81 | 2 |
| 82 | 1 |
| 83 | 1 |
| 84 | 1 |
| 85 | 1 |
| 86 | 1 |
| 87 | 1 |
| 88 | 1 |
| 89 | 1 |
| 90 | 1 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 3 |
| 95 | 1 |
| 96 | 2 |
| 97 | 1 |
| 98 | 1 |
| 99 | 1 |
| 100 | 1 |
| 101 | 1 |
| 102 | 3 |
| 103 | 1 |
| 104 | 1 |
| 105 | 1 |
| 106 | 1 |
| 107 | 41 |
| 108 | 1 |
| 109 | 1 |
| 110 | 2 |
| 111 | 4 |
| 112 | 2 |
| 113 | 1 |
| 114 | 1 |
| 115 | 1 |
| 116 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 117 | 1 | | 158 | 1 | | 199 | 1 |
| 118 | 1 | | 159 | 8 | | 200 | 1 |
| 119 | 1 | | 160 | 1 | | 201 | 1 |
| 120 | 1 | | 161 | 1 | | 202 | 1 |
| 121 | 28 | | 162 | 1 | | 203 | 2 |
| 122 | 1 | | 163 | 1 | | 204 | 1 |
| 123 | 1 | | 164 | 1 | | 205 | 1 |
| 124 | 1 | | 165 | 1 | | 206 | 1 |
| 125 | 1 | | 166 | 1 | | 207 | 1 |
| 126 | 1 | | 167 | 1 | | 208 | 1 |
| 127 | 1 | | 168 | 1 | | 209 | 1 |
| 128 | 1 | | 169 | 1 | | 210 | 1 |
| 129 | 1 | | 170 | 1 | | 211 | 1 |
| 130 | 1 | | 171 | 1 | | 212 | 1 |
| 131 | 1 | | 172 | 1 | | 213 | 1 |
| 132 | 1 | | 173 | 1 | | 214 | 1 |
| 133 | 1 | | 174 | 1 | | 215 | 1 |
| 134 | 1 | | 175 | 2 | | 216 | 1 |
| 135 | 1 | | 176 | 1 | | 217 | 1 |
| 136 | 3 | | 177 | 2 | | 218 | 2 |
| 137 | 1 | | 178 | 1 | | 219 | 1 |
| 138 | 3 | | 179 | 7 | | 220 | 2 |
| 139 | 1 | | 180 | 1 | | 221 | 2 |
| 140 | 1 | | 181 | 1 | | 222 | 1 |
| 141 | 3 | | 182 | 2 | | 223 | 1 |
| 142 | 1 | | 183 | 1 | | 224 | 1 |
| 143 | 1 | | 184 | 1 | | 225 | 2 |
| 144 | 1 | | 185 | 2 | | 226 | 2 |
| 145 | 1 | | 186 | 1 | | 227 | 1 |
| 146 | 1 | | 187 | 1 | | 228 | 1 |
| 147 | 1 | | 188 | 1 | | 229 | 3 |
| 148 | 1 | | 189 | 1 | | 230 | 1 |
| 149 | 1 | | 190 | 1 | | 231 | 3 |
| 150 | 1 | | 191 | 2 | | 232 | 1 |
| 151 | 1 | | 192 | 1 | | 233 | 1 |
| 152 | 1 | | 193 | 1 | | 234 | 1 |
| 153 | 1 | | 194 | 1 | | 235 | 1 |
| 154 | 1 | | 195 | 1 | | 236 | 1 |
| 155 | 1 | | 196 | 1 | | 237 | 1 |
| 156 | 1 | | 197 | 1 | | 238 | 2 |
| 157 | 1 | | 198 | 1 | | 239 | 2 |

| | | | | | |
|---|---|---|---|---|---|
| 240 | 1 | 281 | 1 | 322 | 1 |
| 241 | 1 | 282 | 1 | 323 | 1 |
| 242 | 1 | 283 | 1 | 324 | 1 |
| 243 | 1 | 284 | 1 | 325 | 1 |
| 244 | 1 | 285 | 1 | 326 | 1 |
| 245 | 1 | 286 | 1 | 327 | 1 |
| 246 | 1 | 287 | 1 | 328 | 1 |
| 247 | 1 | 288 | 2 | 329 | 1 |
| 248 | 1 | 289 | 1 | 330 | 1 |
| 249 | 1 | 290 | 1 | 331 | 1 |
| 250 | 1 | 291 | 1 | 332 | 2 |
| 251 | 1 | 292 | 1 | 333 | 2 |
| 252 | 1 | 293 | 1 | 334 | 1 |
| 253 | 1 | 294 | 6 | 335 | 1 |
| 254 | 1 | 295 | 1 | 336 | 2 |
| 255 | 1 | 296 | 1 | 337 | 2 |
| 256 | 1 | 297 | 1 | 338 | 1 |
| 257 | 1 | 298 | 1 | 339 | 1 |
| 258 | 1 | 299 | 1 | 340 | 1 |
| 259 | 1 | 300 | 1 | 341 | 2 |
| 260 | 1 | 301 | 1 | 342 | 5 |
| 261 | 1 | 302 | 1 | 343 | 9 |
| 262 | 1 | 303 | 1 | 344 | 1 |
| 263 | 2 | 304 | 1 | 345 | 2 |
| 264 | 1 | 305 | 1 | 346 | 1 |
| 265 | 1 | 306 | 1 | 347 | 1 |
| 266 | 1 | 307 | 1 | 348 | 1 |
| 267 | 1 | 308 | 2 | 349 | 2 |
| 268 | 1 | 309 | 1 | 350 | 10 |
| 269 | 1 | 310 | 1 | 351 | 1 |
| 270 | 1 | 311 | 1 | 352 | 1 |
| 271 | 1 | 312 | 1 | 353 | 1 |
| 272 | 1 | 313 | 1 | 354 | 1 |
| 273 | 3 | 314 | 1 | 355 | 2 |
| 274 | 1 | 315 | 1 | 356 | 1 |
| 275 | 2 | 316 | 1 | 357 | 1 |
| 276 | 1 | 317 | 1 | 358 | 1 |
| 277 | 1 | 318 | 4 | 359 | 3 |
| 278 | 1 | 319 | 1 | 360 | 1 |
| 279 | 1 | 320 | 1 | 361 | 1 |
| 280 | 1 | 321 | 1 | 362 | 1 |

| | |
|---|---|
| **363** | 1 |
| **364** | 1 |
| **365** | 1 |
| **366** | 1 |
| **367** | 1 |
| **368** | 1 |
| **369** | 1 |
| **370** | 1 |
| **371** | 1 |
| **372** | 1 |
| **373** | 1 |
| **374** | 1 |
| **375** | 1 |
| **376** | 1 |
| **377** | 1 |
| **378** | 4 |
| **379** | 1 |
| **380** | 6 |
| **381** | 1 |
| **382** | 1 |

| | |
|---|---|
| **383** | 1 |
| **384** | 1 |
| **385** | 2 |
| **386** | 1 |
| **387** | 1 |
| **388** | 1 |
| **389** | 1 |
| **390** | 1 |
| **391** | 2 |
| **392** | 1 |
| **393** | 1 |
| **394** | 1 |
| **395** | 1 |
| **396** | 1 |
| **397** | 1 |
| **398** | 1 |
| **399** | 1 |
| **400** | 1 |
| **401** | 1 |
| **402** | 1 |

| | |
|---|---|
| **403** | 1 |
| **404** | 1 |
| **405** | 1 |
| **406** | 1 |
| **407** | 1 |
| **408** | 1 |
| **409** | 1 |
| **410** | 1 |
| **411** | 1 |
| **412** | 1 |
| **413** | 1 |
| **414** | 1 |
| **415** | 1 |
| **416** | 1 |
| **417** | 1 |
| **418** | 1 |
| **419** | 1 |
| **420** | 1 |

*df*

Form I-140, Immigrant Petition for Alien Workers   egression    odel   1

| | Dependent Variable (Y) | Independent /Explanatory Variable (X) |
|---|---|---|
| | I-140 Receipts | I-140 Fees |
| 1992 | 66,465 | $195 |
| 1993 | 50,340 | $195 |
| 1994 | 47,105 | $195 |
| 1995 | 50,724 | $195 |
| 1996 | 61,042 | $195 |
| 1997 | 68,804 | $195 |
| 1998 | 67,511 | $195 |
| 1999 | 78,879 | $195 |
| 2000 | 96,001 | $195 |
| 2001 | 137,695 | $195 |
| 2002 | 104,361 | $475 |
| 2003 | 96,578 | $475 |
| 2004 | 80,348 | $475 |
| 2005 | 75,009 | $475 |
| 2006 | 140,158 | $475 |
| 2007 | 234,592 | $475 |
| 2008 | 103,805 | $475 |
| 2009 | 57,012 | $475 |
| 2010 | 77,280 | $580 |
| 2011 | 81,678 | $580 |
| 2012 | 72,964 | $580 |
| 2013 | 69,921 | $580 |
| 2014 | 81,658 | $580 |
| 2015 | 101,545 | $580 |
| 2016 | 147,581 | $700 |
| 2017 | 139,566 | $700 |
| 2018 | 136,585 | $700 |
| 2019 | 142,451 | $700 |
| 2020 | 128,178 | $700 |



| Observations | 29 | | | | |
|---|---|---|---|---|---|
| ANOVA | | | | | |
| | df | SS | MS | F | Significance F |
| Regression | 1 | 10351831022 | 10351831022 | 7.60704883 | 0.010303959 |
| Residual | 27 | 36742164276 | 1360820899 | | |
| Total | 28 | 47093995297 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 53143.007 | 17117.11197 | 3.104671343 | 0.00443844 | 18021.59432 | 88264.42 |
| I-140 Fees | 98.561571 | 35.73547133 | 2.758087893 | 0.01030396 | 25.23844023 | 171.8847 |

Table 51. Summary of Results for I-140 Regression Model

| Variables | Model |
|---|---|
| | |
| Model Description | I-140 Filings and Fees from 1992-2020 |
| Observations | 29 |
| R Square | 0.220 |
| Adjusted R Square | 0.191 |
| Std. Error of the Estimate | 36889.306 |
| Significance F | 0.010 |
| Intercept Coefficient | 53143.007 |
| | |
| Dependent Variable | I-140 Receipts |

| Independent Variable(s) | Coefficients | P-value |
|---|---|---|
| I-140 Fees | 98.562 | 0.010 |

**Table 49. Summary of Results for N-400 Regression Models**

| Variables | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| Model Description | N-400 Filings and Fees from 1989-2019 | | Lag N-400 fees by a year | | Dummy Variables for events that occurred in 1996, 1997 and 2007 | | Lagging Legal Permanent Residents (LPRs) by 5 years | |
| Observations | 32 | | 32 | | 32 | | 32 | |
| R Square | 0.118 | | 0.064 | | 0.685 | | 0.502 | |
| Adjusted R Square | 0.088 | | 0.033 | | 0.638 | | 0.467 | |
| Std. Error of the Estimate | 286071.496 | | 294652.145 | | 180202.670 | | 218709.403 | |
| Significance F | 0.054 | | 0.162 | | 0.0000017 | | 0.000041 | |
| Intercept | 569991.971 | | 618091.956 | | 428817.087 | | -4373.290 | |
| Dependent Variable | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | |
| Independent Variable(s) | Coefficients | P-value | Coefficients | P-value | Coefficients | P-value | Coefficients | P-value |
| N-400 Fees | 444.694 | 0.054 | 327.896 | 0.162 | 637.915 | 0.00021 | 219.259 | 0.2238 |
| 1996 event(s) | | | | | 787983.992 | 0.00026 | | |
| 1997 event(s) | | | | | 923292.992 | 0.00004 | | |
| 2007 event(s) | | | | | 574616.516 | 0.00467 | | |
| Legal Permanent Residents (LPRs) | | | | | | | 0.692 | 0.00005 |

Form N-400, Application for Naturalization   egression   DE   I

Method: N-400 Filings and Fees from 1989-2020

| | Dependent/Outcome Variable (Y) | Independent/Explan atory/Predictor Variable (X) |
|---|---|---|
| | N-400 Receipts (Y) | N-400 Fees (X) |
| 1989 | 227,692 | $60 |
| 1990 | 233,843 | $60 |
| 1991 | 206,668 | $90 |
| 1992 | 342,238 | $90 |
| 1993 | 521,866 | $90 |
| 1994 | 543,353 | $95 |
| 1995 | 959,963 | $95 |
| 1996 | 1,277,403 | $95 |
| 1997 | 1,412,717 | $95 |
| 1998 | 932,957 | $225 |
| 1999 | 765,346 | $225 |
| 2000 | 460,916 | $225 |
| 2001 | 501,643 | $225 |
| 2002 | 700,649 | $260 |
| 2003 | 523,370 | $260 |
| 2004 | 662,796 | $260 |
| 2005 | 602,972 | $260 |
| 2006 | 730,642 | $330 |
| 2007 | 1,382,993 | $595 |
| 2008 | 525,786 | $595 |
| 2009 | 570,442 | $595 |
| 2010 | 710,544 | $595 |
| 2011 | 756,008 | $595 |
| 2012 | 899,162 | $595 |
| 2013 | 777,623 | $595 |
| 2014 | 773,874 | $595 |
| 2015 | 783,062 | $595 |
| 2016 | 972,151 | $595 |
| 2017 | 986,851 | $640 |
| 2018 | 837,168 | $640 |
| 2019 | 830,560 | $640 |
| 2020 | 967,755 | $640 |

Sources: Data on petitions for naturalization filed from DHS, Office of Immigration Statistics; data on N-400 fees from 58 FR 30699 (590) (May 27, 1993), 59 FR 30519 (595) (June 14, 1994), 63 FR 43605 (5225) (Aug. 18, 1998), 66 FR 246 (Jan. 3, 2001) and 68 FR 8989 (5260) (Feb. 27, 2003), 69 FR 20532 (5320) (Apr. 15, 2004), 70 FR 5618Z (5330) (Aug. 26, 2005), 72 FR 29861 (5595) (May 30, 2007), 75 FR 58975





SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.34335191 |
| R Square | 0.11789053 |
| Adjusted R Square | 0.08849688 |
| Standard Error | 286071.496 |
| Observations | 32 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 328115504079.00 | ############ | 4.00938409 | 0.054359 |
| Residual | 30 | 2455107023321.87 | 81836900784 | | |
| Total | 31 | 2783222617600.87 | | | |

| | Coefficients | Standard Error | t Stat | P-value | ower 95% | pper 95% | | | ower 95.0% | pper 95.0% |
|---|---|---|---|---|---|---|---|---|---|---|
| Intercept | 569991.971 | 94778.31861 | 6.013948969 | 0.000001341 | 376478.822 | | 763555.121 | 376478.822 | 763555.12 |
| N-400 Fees (x) | 444.693932 | 222.0863996 | 2.002544728 | 0.054359008 | -8.8674135 | | 898.2552771 | -8.86741345 | 898.255328 |

Form N-400, Application for Naturalization   egression MODEL #2

**Method: Lag N-400 fees by a year**

| | Dependent Outcome e Variable (Y) | Independent/Explan atory Predictor Variable (X) (x) t-1 |
|---|---|---|
| | N-400 Receipts (Y) | N-400 Fees (X) |
| 1989 | 227,692 | 560 |
| 1990 | 233,843 | 560 |
| 1991 | 206,668 | 560 |
| 1992 | 342,238 | 590 |
| 1993 | 521,866 | 590 |
| 1994 | 543,353 | 590 |
| 1995 | 959,963 | 595 |
| 1996 | 1,277,403 | 595 |
| 1997 | 1,412,712 | 595 |
| 1998 | 932,957 | 595 |
| 1999 | 765,346 | 5225 |
| 2000 | 460,916 | 5225 |
| 2001 | 501,641 | 5225 |
| 2002 | 700,649 | 5225 |
| 2003 | 523,370 | 5260 |
| 2004 | 662,796 | 5260 |
| 2005 | 602,972 | 5260 |
| 2006 | 730,642 | 5260 |
| 2007 | 1,382,993 | 5330 |
| 2008 | 525,786 | 5595 |
| 2009 | 570,442 | 5595 |
| 2010 | 710,544 | 5595 |
| 2011 | 736,008 | 5595 |
| 2012 | 899,142 | 5595 |
| 2013 | 772,623 | 5595 |
| 2014 | 773,824 | 5595 |
| 2015 | 783,062 | 5595 |
| 2016 | 972,151 | 5595 |
| 2017 | 986,851 | 5595 |
| 2018 | 837,168 | 5640 |
| 2019 | 830,560 | 5640 |
| 2020 | 967,755 | 5640 |

SUMMARY OUTPUT

*Regression Statistics*

| Multiple R | 0.253336866 |
|---|---|
| R Square | 0.064179568 |
| Adjusted R Square | 0.032985553 |
| Standard Error | 294652.1448 |
| Observations | 32 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 17862602393.67 | 17862602393.67 | 2.05743213 | 0.161807919 |
| Residual | 30 | ############ | 86819886455 | | |
| Total | 31 | ############ | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | ower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | 618091.9559 | 94097.846 | 6.568608977 | 0.000000288 | 425918.5168 | 810265.395 | 425919 | 810265.39 |
| N-400 Fees (X) | 327.895662 | 228.5982557 | 1.434375171 | 0.161807919 | -138.9642591 | 794.7555831 | -138.964 | 794.75558 |

Form N-400, Application for Naturalization   egression MODEL #3

**Method: Dummy Variables for events that occurred in 1996, 1997 and 2007 (No Lag)**

| | Dependent Outcome/a riable (Y) N-400 Receipts (Y) | Independent /Explanatory /Predictor Variable (X) N-400 Fees (x1) | Dummy variables for events 1996 event (x2) | 1997 event (x3) | Y=B,C,D,E 2007 event (x4) |
|---|---|---|---|---|---|
| 1989 | 227,692 | $60 | 0 | 0 | 0 |
| 1990 | 233,843 | $60 | 0 | 0 | 0 |
| 1991 | 206,668 | $90 | 0 | 0 | 0 |
| 1992 | 342,238 | $90 | 0 | 0 | 0 |
| 1993 | 521,866 | $90 | 0 | 0 | 0 |
| 1994 | 543,353 | $95 | 0 | 0 | 0 |
| 1995 | 959,963 | $95 | 0 | 0 | 0 |
| 1996 | 1,277,403 | $95 | 1 | 0 | 0 |
| 1997 | 1,412,712 | $95 | 0 | 1 | 0 |
| 1998 | 932,957 | $225 | 0 | 0 | 0 |
| 1999 | 765,346 | $225 | 0 | 0 | 0 |
| 2000 | 460,916 | $225 | 0 | 0 | 0 |
| 2001 | 501,643 | $225 | 0 | 0 | 0 |
| 2002 | 700,649 | $260 | 0 | 0 | 0 |
| 2003 | 523,370 | $260 | 0 | 0 | 0 |
| 2004 | 662,796 | $260 | 0 | 0 | 0 |
| 2005 | 602,972 | $260 | 0 | 0 | 0 |
| 2006 | 730,642 | $330 | 0 | 0 | 0 |
| 2007 | 1,382,993 | $595 | 0 | 0 | 1 |
| 2008 | 523,786 | $595 | 0 | 0 | 0 |
| 2009 | 570,442 | $595 | 0 | 0 | 0 |
| 2010 | 710,544 | $595 | 0 | 0 | 0 |
| 2011 | 756,008 | $595 | 0 | 0 | 0 |
| 2012 | 899,162 | $595 | 0 | 0 | 0 |
| 2013 | 772,623 | $595 | 0 | 0 | 0 |
| 2014 | 773,824 | $595 | 0 | 0 | 0 |
| 2015 | 783,062 | $595 | 0 | 0 | 0 |
| 2016 | 972,151 | $595 | 0 | 0 | 0 |
| 2017 | 986,851 | $640 | 0 | 0 | 0 |
| 2018 | 837,168 | $640 | 0 | 0 | 0 |
| 2019 | 830,560 | $640 | 0 | 0 | 0 |
| 2020 | 967,755 | $640 | 0 | 0 | 0 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.82763513 |
| R Square | 0.6849799 |
| Adjusted R Square | 0.63831026 |
| Standard Error | 180202.67 |
| Observations | 32 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 4 | 1906451554569.35 | 476612888642.34 | 14.6772043 | 0.00000173 |
| Residual | 27 | 876771063031.53 | 32473002334.50 | | |
| Total | 31 | 2783222617600.87 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | 428817.087 | 64689.23004 | 6.628879136 | 0.00000041 | 296085.751 | 561548.4 | 296085.7511 | 561548.42 |
| N-400 Fees (x1) | 637.914953 | 149.1402254 | 4.277283015 | 0.00021177 | 331.904487 | 943.9254 | 331.9044872 | 943.92542 |
| 1996 event (x2) | 787983.992 | 187855.4506 | 4.194629379 | 0.00026399 | 402536.446 | 1173432 | 402536.4459 | 1173431.5 |
| 1997 event (x3) | 923292.992 | 187855.4506 | 4.914911913 | 0.00003828 | 537845.446 | 1308741 | 537845.4459 | 1308740.5 |
| 2007 event (x4) | 574616.516 | 186297.4916 | 3.084402859 | 0.00466706 | 192365.637 | 956867.4 | 192365.6373 | 956867.39 |

Form N-400, Application for Naturalization   egression MODEL #4

**Method: Lagging Legal Permanent Residents (LPRs) by 5 years**

| | | B Independent/ Explanatory/ Predictor Variable | C Y=B.C |
| --- | --- | --- | --- |
| | Dependent/Outcome Variable (Y) | | |
| | N-400 Receipts (Y) | N-400 Fees (x1) | Legal Permanent Residents-LPR lag5 (x2) |
| 1989 | 227,692 | $60 | 541,811 |
| 1990 | 233,843 | $60 | 568,149 |
| 1991 | 206,668 | $90 | 600,077 |
| 1992 | 342,238 | $90 | 599,889 |
| 1993 | 521,866 | $90 | 641,346 |
| 1994 | 543,353 | $95 | 1,090,172 |
| 1995 | 959,963 | $95 | 1,535,872 |
| 1996 | 1,277,403 | $95 | 1,826,595 |
| 1997 | 1,412,717 | $95 | 973,445 |
| 1998 | 932,957 | $225 | 903,916 |
| 1999 | 765,346 | $225 | 803,993 |
| 2000 | 460,916 | $225 | 770,177 |
| 2001 | 501,643 | $225 | 915,560 |
| 2002 | 700,649 | $260 | 797,847 |
| 2003 | 523,370 | $260 | 653,206 |
| 2004 | 662,796 | $260 | 644,787 |
| 2005 | 602,972 | $260 | 841,002 |
| 2006 | 730,642 | $330 | 1,058,902 |
| 2007 | 1,382,993 | $595 | 1,059,356 |
| 2008 | 525,786 | $595 | 703,542 |
| 2009 | 570,442 | $595 | 957,883 |
| 2010 | 710,544 | $595 | 1,122,257 |
| 2011 | 756,008 | $595 | 1,266,129 |
| 2012 | 899,162 | $595 | 1,052,415 |
| 2013 | 772,823 | $595 | 1,107,126 |
| 2014 | 773,824 | $595 | 1,130,818 |
| 2015 | 783,062 | $595 | 1,042,625 |
| 2016 | 972,151 | $595 | 1,062,040 |
| 2017 | 986,851 | $640 | 1,031,631 |
| 2018 | 837,168 | $640 | 990,553 |
| 2019 | 830,560 | $640 | 1,016,518 |
| 2020 | 967,755 | $640 | 1,051,031 |

SUMMARY OUTPUT

*Regression Statistics*

| | |
| --- | --- |
| Multiple R | 0.70823163 |
| R Square | 0.50159205 |
| Adjusted R Square | 0.46721909 |
| Standard Error | 218709.403 |
| Observations | 32 |

ANOVA

| | df | SS | MS | F | Significance F |
| --- | --- | --- | --- | --- | --- |
| Regression | 2 | 1396042331313.06 | 698021165656.53 | 14.59263371 | 0.0000412 |
| Residual | 29 | 1387180286287.82 | 47833802975 | | |
| Total | 31 | 2783222617600.87 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Intercept | -4373.29029 | 141516.69987 | -0.030902998 | 0.975558605 | -293807.437 | 285060.857 | -293807.4374 | 285060.86 |
| N-400 Fees (x1) | 219.259471 | 176.367178 | 1.24319884 | 0.223751943 | -141.451909 | 579.970852 | -141.4519093 | 579.97085 |
| Legal Permanent Residents-LPR lag5 (x2) | 0.69228067 | 0.146513935 | 4.725015905 | 0.000054448 | 0.39262603 | 0.99193532 | 0.39262603 | 0.99193S3 |

# FAQs on the USCIS Fee Schedule Proposed Rule

> **Alert:** USCIS encourages public comment on this proposed rule. The 60-day public comment period will begin on Jan. 4, 2023, and will end on March 6, 2023. The public should visit https://www.regulations.gov, and type "Docket No. USCIS-2021-0010" in the search bar and follow the prompts to submit comments. Note that the comment period closes at 11:59 pm, Eastern Time, on the last day of the comment period.

U.S. Citizenship and Immigration Services (USCIS) receives approximately 96 percent of its funding from its customers in the form of filing fees, not from taxpayers in the form of Congressional appropriations. The last fee adjustment occurred in 2016.

USCIS conducted a comprehensive fee review as we are required to do every two years by federal law and determined that current fees do not recover the full cost of providing adjudication and naturalization services. Therefore, the Department of Homeland Security (DHS) is publishing a proposed rule that would adjust the USCIS fee schedule to fully recover our operational costs, in order to reestablish and maintain timely USCIS service levels as well as improve the customer experience.

As explained in greater detail below, core elements of the proposed rule include:

- Preserving existing fee waiver eligibility for low-income and vulnerable populations;

- Adding new fee exemptions for certain humanitarian programs;

- Limiting the fee increase for naturalization applicants; and

- Distributing fees based primarily on the filers' ability to pay.

Note that this is a proposed rule, with a 60-day public comment period that begins on the date specified in the Federal Register. The USCIS fee schedule will not change until a final rule is ultimately published and goes into effect.

## Frequently Asked Questions

### Q. Why does USCIS need a new fee schedule?
A. Current fees do not cover operational costs to timely adjudicate USCIS immigration and naturalization benefits. Stated simply, USCIS requires higher fees to cover the cost of doing business and avoid the accumulation of future backlogs.

### Q. What about funding from Congress?
A. USCIS generally receives 96 percent of its funding from its customers in the form of filing fees, not from taxpayers in the form of Congressional appropriations.

Fortunately, Congress did provide much-needed support in Fiscal Year 2022, appropriating $275 million specifically to reduce *current* backlogs and advance our humanitarian mission.

Going forward, USCIS will require continued Congressional support to eliminate our current backlogs, and USCIS' intention is that the new fee rule will allow USCIS to keep pace with incoming inventories and avoid future backlogs.

**Q. How did current backlogs accumulate in the first place?**
A. As described in our recent progress report, receipts decreased dramatically in the wake of the COVID-19 pandemic and revenue temporarily dropped by 40 percent. A hiring freeze and workforce attrition reduced the agency's capacity to complete cases, even as incoming caseloads rebounded to pre-COVID levels.

The hiring freeze was lifted in March 2021, and USCIS is working to fill current vacancies by recruiting and training new staff—we are hiring!

To stay on a strong fiscal footing and continue improving our delivery of timely decisions, USCIS needs the resources that this proposed fee rule would provide.

**Q. How much revenue does USCIS expect to receive under the current fee schedule compared with the proposed fee schedule?**
A. USCIS' current fee schedule is expected to yield an average of $3.28 billion (Table 6, NPRM *Section V. A. 4)* per year during FY 2022 and 2023. (With the addition of premium processing, total fee revenue is expected to be $4.5 billion per year on average.)

Under the fee schedule in the proposed rule, USCIS would expect to receive an average of $5.2 billion per year during FY 2022 and 2023. (With the addition of premium processing, total fee revenue would be projected as $6.4 billion per year on average.)

Thus, the proposed fee rule would generate an additional $1.9 billion per year on average compared with the current baseline. This is the amount necessary to match agency capacity with projected workloads, so that backlogs do not accumulate in the future.

**Q. What does USCIS plan to do with this additional revenue?**
A. The proposed FY2022/2023 Fee Rule Budget, of $5.2 billion, is needed in order for USCIS to fully recover the cost of all expenses and meet projected demand for services. This budget used the FY 2016/2017 Fee Rule Budget as a baseline and added the following additional costs that are required for USCIS to operate:

- Staffing Updates, to increase personnel by 7,778 in order to meet demands for service;
- Annual Federal Employee Pay raises approved by Congress;
- Contract Cost Increases, due to rising costs over the past six years as well as projected demand;
- Technology Maintenance and Refresh, to fund upgraded information technology resources for USCIS employees, operations and maintenance of USCIS systems, and Help Desk improvements;
- Customer Service/Communications, due to increases in the cost of Call Center operations and investments in customer relationship management that allows USCIS to better support public inquiries and provide information to applicants;

- Other Operations, including new officer training, FOIA responses, Lockbox activity and contract increases, and Secure Mail enhancements;
- Asylum Processing Rule, to fund more asylum officers adjudicating credible fear and reasonable fear claims at the border; and
- Refugee Processing, to cover the cost of refugee resettlement.

The following table provides a summary of this FY2022/2023 Fee Rule Budget build-up from the FY2016/2017 Fee Rule Budget:

| Description | Budget ($M) | Comments |
|---|---|---|
| FY 2016/2017 Fee Rule Budget | $ 3,037.8 | |
| Staffing | 1,165.7 | To increase personnel by 7,778 in order to meet demands for service |
| Pay Raises | 149.0 | Annual Federal Employee Pay raises approved by Congress |
| Contract Cost Increases | 102.2 | Due to rising costs over the past six years as well as projected demand |
| Technology Maintenance and Refresh | 102.8 | To fund upgraded information technology resources for USCIS employees, operations and maintenance of USCIS systems, and Help Desk improvements |
| Customer Service/Communications | 63.5 | Due to increases in the cost of Call Center operations and investments in customer relationship management that allows USCIS to better support public inquiries and provide information to applicants |
| Other Operations | 21.6 | Including new officer training, FOIA responses, Lockbox activity and contract increases, and Secure Mail enhancements |
| Asylum Processing Rule | 425.9 | To fund more asylum officers adjudicating credible fear and reasonable fear claims at the border |
| Refugee Budget Increase | 82.2 | To cover the cost of refugee resettlement |
| FY2016/2017 Fee Rule Budget + Operations Costs + FY 2022/2023 Additional Activities | $ 5,150.7 | |

**Q. When was the last time USCIS increased fees?**
A. The current USCIS fee schedule was published in a fee rule that went into effect more than six years ago, on Dec. 23, 2016.

**Q. When will DHS issue a final fee rule?**
A. DHS will accept public comments on the proposed rule for 60 days following publication of the proposed rule in the Federal Register. DHS will then carefully review and consider each comment before drafting and publishing a final rule to implement a new fee schedule.

**Q. How would this proposed rule change the USCIS fee schedule, in summary?**
A. Core principles of the proposed rule include:
- Preserving existing fee waiver eligibility for low-income and vulnerable populations;
- Adding new fee exemptions for certain humanitarian programs;
- Limiting the fee increase for naturalization applicants; and
- Distributing fees based on filers' ability to pay.

Specific changes in the proposed rule include:
- Adjusting fees according to the schedule in Table 1 of the proposed rule.

- Adding new fee exemptions for certain humanitarian programs and preserving the fee waiver requirements that are currently in effect.
- Removing fee exemptions that are based only on the age of the person submitting the request.
- Eliminating the $30 returned check fee.
- Incorporating biometrics costs into the main benefit fee and removing the separate biometric services fee in most cases. (Temporary Protected Status and the filings accepted on behalf of the Executive Office for Immigration Review are exceptions, where the rule proposes a separate biometric services fee of $30 instead of the current $85.)
- Requiring separate filing fees for Form I-485 and associated Form I-131 and Form I-765 filings.
- Establishing separate fees for Form I-129, Petition for a Nonimmigrant Worker, by nonimmigrant classification.
- Limiting the number of named beneficiaries on certain petitions for nonimmigrant workers.
- Revising the premium processing timeframe interpretation from calendar days to business days.
- Clarifying that USCIS will not redeposit payments returned as unpayable for a reason other than insufficient funds.
- Stating that fees paid to USCIS using a credit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.
- Revising certain processes for adoptions from countries that are not party to the Hague Adoption Convention (orphan cases) to align them with the processes for adoptions from countries that are party to that Convention.
- Revising regulations related to genealogy searches, including establishing a fee for Form G-1566, Request for Certificate of Non-Existence.
- Instituting lower fees for certain forms filed online.

**Q. What does the proposed rule say about fee waivers?**
A. DHS does not propose to change fee waiver eligibility based on an inability to pay and will maintain the 2011 Fee Waiver Policy criteria that established a streamlined process where USCIS can waive applicable fees for certain forms. However, DHS proposes that fee waiver requests must be submitted on Form I-912, Request for Fee Waiver, and would no longer allow for a non-form written request. (Such non-form requests are relatively rare at present.) Fee waivers will continue to be available for applicants who receive public benefits, have income at or below 150% of the Federal Poverty Guidelines, or who demonstrate a financial hardship.

**Q. How is DHS proposing to expand fee exemptions?**
A. Currently, DHS provides fee exemptions, as authorized under the INA section 286(m), 8 U.S.C. 1356(m), through policy guidance documents, such as form instructions, the USCIS policy manual, or similar directives, but not in regulations.  In this proposed rule, DHS proposes to codify several humanitarian benefit requests as exempt from fees because of the humanitarian nature of these programs and the likelihood that individuals who file requests related to these categories will qualify for a fee waiver if they request it. In addition, DHS is proposing to provide additional fee exemptions for certain humanitarian-based immigration benefit requests, including, but not limited to:

- All forms associated with an application for T nonimmigrant status through final adjudication of the T nonimmigrant's application for adjustment of status to lawful permanent resident (LPR).

- All forms associated with U nonimmigrant status up until (but not including) the filing of a Form I-485.
- All forms associated with a VAWA-based Form I-360 filing through final adjudication of the adjustment of status application, including the filing of Form I-290B.
- Abused spouses and children seeking benefits under NACARA for all forms filed through final adjudication for adjustment of status to LPR, including the Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA)) (Form I-881) and associated forms.
- Special Immigrant Juveniles (SIJs) for all forms through final adjudication of the adjustment of status application, which will include Form I-485 and associated forms.
- Filing of Form I-131, Application for Travel Document, for persons admitted or paroled as refugees, including LPRs who obtained such status as refugees in the United States.

You can find a complete list of current and proposed additional fee exemptions in the NPRM in Tables 13A, B, and C.

**Q. Is DHS proposing to increase the fee for naturalization applications?**
A. Yes. The proposed fees represent a $35 increase, setting the total naturalization fee at $760, compared to the current total fees of $725 ($640 application fee plus $85 biometric services fee). USCIS proposes to combine the application fee with the biometric services fee to make the filing process easier.

The increase remains below the Consumer Price Index price calculation, which if followed would have increased fees to a total $865, a $140 increase over current fees. This adjustment in the fee is done to support access for all eligible immigrants interested applying for naturalization.

**Q. How did DHS calculate the various fee increases in the proposed rule?**
A. Stated simply, the total fees received by USCIS must cover the agency's total operational costs.
This means that the fees for a particular form may include the unit cost of adjudicating that form, plus an additional fixed percentage to cover the agency's non-adjudication overhead expenses. As part of that coverage, filers who pay the full fee may cover the agency's costs to adjudicate fee-exempt, fee-reduced, and fee-waived cases. In many cases, DHS proposes to limit fees to be less than the cost of adjudicating them. The NPRM discusses these limited fee increases in section V.B.3. Assessing Proposed Fees and various places throughout the preamble.

In addition, the proposed rule would institute a new Asylum Program Fee surcharge of $600 to be paid by employers who file either Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Workers to cover some of the costs associated with asylum processing, which does not include a fee. DHS proposes this fee increase for employer petitioners as a way to mitigate the size of the proposed fee increases for individual applicants and petitioners. DHS arrived at the proposed Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I-129 and Form I-140 in order to cover the estimated annual cost of the Asylum Processing Rule.

USCIS continues to emphasize that Congress could reduce the burden on our fee-paying customers by fully funding our humanitarian mission, as it does for other agencies.

**Q. Does DHS propose to reduce any fees?**

A. Yes, DHS has proposed to reduce the fees of select immigration benefits requests. You can find a complete list of the proposed fees in Table 1 in the proposed rule.

**Q. How would the proposed rule change adoption processes for orphan cases?**
A. The proposed rule would change the validity period for a Form I-600A approval in an orphan case to 15 months. Another key change would be creating a USCIS form supplement that prospective adoptive parents can use for requests for action on approved suitability determinations for orphan cases (instead of prospective adoptive parents having to draft their own letter). Both of these changes would help align processes for adoptions from countries that are not party to the Hague Adoption Convention (orphan cases) with the processes for adoptions from countries that are party to that Convention.

**Q. Why are some proposed fees for the same form different for online vs. paper filing?**
A. USCIS encourages online filing—where available—to allow for a more efficient electronic submission and adjudication process. Intaking, storing, and handling paper require significant operational resources, and information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. Every benefit request submitted online instead of on paper provides direct and immediate cost savings and operational efficiencies to both USCIS and filers—benefits that will increase throughout an individual's immigration journey as more benefit requests become available for online filing and case management.

**Q.  Why does the proposed rule state that USCIS may require that certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method?**
A. This proposed change would allow USCIS to reduce administrative burdens and processing errors associated with certain fee payments. Lockboxes, which specialize in intaking and depositing multiple payment types, receive about 53% of all USCIS filings. However, the requirements and circumstances for some filing requests do not allow lockbox submission and intake, and such requests must be filed at a particular office or in person. Various offices, such as field offices, embassies, and consulates, are limited in the method of payment that they can receive or process. Additionally, certain payment methods, such as checks or cash, require time-intensive procedures for cashiers and their supervisors to input, reconcile, and verify their daily receipts and deposits. Generally, federal agency offices must deposit money that they receive on the same day that it is received. There are additional requirements and guidance for timely record keeping and redundancy in personnel that similarly increase workload and processing costs. The time that USCIS currently spends complying with payment processing requirements could be used to adjudicate cases.

**Q. Why would the proposed rule increase the H-1B registration fee?**
A. In 2019, DHS established a $10 registration fee per beneficiary for H-1B petitions. The $10 registration fee is separate from and in addition to the H-1B petition filing fee. USCIS requires the registration fee regardless of whether the petitioner's registration is selected. At the time, USCIS lacked sufficient data to precisely estimate the costs of the registration process and implemented the $10 fee to provide an initial stream of revenue to fund part of the costs to USCIS of operating the registration program. DHS stated that USCIS would review the fee in the future.

DHS now proposes a $215 registration fee based on the results of the FY 2022/2023 fee review. Although an increase from $10 to $215 may appear dramatic at first glance, the $10 fee was

established simply to cover a small portion of the costs of the program, as opposed to no fee at all. As stated in the 2019 rule setting the registration fee, "DHS proposed a $10 fee to provide an initial stream of revenue to mitigate potential fiscal effects on USCIS. Following implementation of the registration fee provided for in this rule, USCIS will gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery."

**Q. Why has DHS proposed to increase EB-5 program fees?**
A. DHS proposes to increase EB-5 program fees consistent with the fees proposed for other benefit requests. DHS proposes that the fee amounts indicated by the full cost recovery model for the immigrant investor forms are not capped or decreased below the estimated full cost recovery as with some other forms. DHS believes that the requirements for financial wherewithal in the program are inconsistent with shifting the costs of the EB-5 program to be funded by the fees paid for other requests.

Notwithstanding the EB-5 program fees that DHS has proposed, DHS is also gathering the information necessary to evaluate the EB-5 fees to meet the additional fee guidelines and processing time requirements provided in the EB-5 Reform and Integrity Act of 2022. The law requires DHS to conduct a fee study no later than one year after the date of its enactment (i.e. March 15, 2023), and then, no later than 60 days after completing the study, to set fees for EB-5 program-related immigration benefit requests at a level sufficient to recover the costs of providing such services and completing the adjudications within certain time frames.

**Q. Why is DHS proposing to prohibit filers from getting their fees back by filing a dispute of their USCIS fee charges with their credit card company?**
A. The increased acceptance of credit card payments for USCIS fees has resulted in a sizeable increase in the number of disputes filed with credit card companies challenging USCIS' retention of the fee. USCIS has a process where a filer may request a fee refund in the very uncommon instance of a fee being paid or collected erroneously. Disputes are generally filed when the fee is due, but we denied the filer's request, they have changed their mind about the request, or they assert that the service was not provided or was unreasonably delayed. Because credit card companies usually withdraw the fee in the case of disputes, abuse of the credit card dispute process could have negative fiscal effects on USCIS. Therefore, DHS is proposing that fees paid to USCIS by credit card are not subject to a chargeback by the issuing financial institution.

**Q. Does the proposed rule consider USCIS' expansion of premium processing services?**
A. Consistent with past practice, the current fee review and proposed rule exclude premium processing revenue *and* costs, to ensure that premium processing funds are reserved to cover the full cost of providing premium processing service, as well as infrastructure investments largely related to information technology and backlog reduction.

**Q. What happened to the 2020 fee rule?**
A. On Aug. 3, 2020, DHS published the 2020 final fee rule, with an effective date of Oct. 2, 2020, to adjust the USCIS fee schedule and make changes to certain other immigration benefit request requirements. On Sept. 29, 2020, the United States District Court for the Northern District of California granted a motion for a preliminary injunction of the 2020 fee rule in its entirety and stayed the final rule's effective date. On Oct. 8, 2020, the United States District

Court for the District of Columbia also granted a motion for a preliminary injunction and stay of the effective date of the final rule.

DHS subsequently issued a notification on Jan. 29, 2021, to inform the public of the two preliminary injunctions. DHS continues to comply with the terms of those orders and is not enforcing the regulatory changes set out in the 2020 fee rule. USCIS continues to accept the fees that were in place before Oct. 2, 2020, and to follow the guidance in place before Oct. 25, 2019, to adjudicate fee waiver requests.

At the conclusion of the current rulemaking, DHS will address how the new rule affects the lawsuits against the 2020 fee rule and the applicable preliminary injunctions.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]

RIN 1615–AC68

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Final rule.

**SUMMARY:** This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. This rule also provides additional fee exemptions for certain humanitarian categories and makes changes to certain other immigration benefit request requirements. USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. DHS is adjusting the fee schedule to fully recover costs and maintain adequate service. This final rule also responds to public comments received on the USCIS proposed fee schedule published on January 4, 2023.

**DATES:** This final rule is effective April 1, 2024. Any benefit request postmarked on or after this date must be accompanied with the fees established by this final rule.

*Public Engagement date:* DHS will hold a virtual public engagement session during which USCIS will discuss the changes made in this final rule. The session will be held at 2 p.m. Eastern on Feb. 22, 2024. Register for the engagement here: *https://public.govdelivery.com/accounts/USDHSCIS/subscriber/new?topic_id=USDHSCIS_1081.*

USCIS will allot time during the session to answer questions submitted in advance. Please email questions to *public.engagement@uscis.dhs.gov* by 4 p.m. Eastern on Thursday, Feb. 8, 2024, and use ''Fee Rule Webinar'' in the subject link. Please note that USCIS cannot answer case-specific inquiries during the session.

**ADDRESSES:** *Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2021–0010 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Dr., Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Changes From the Proposed Rule
  D. Summary of Final Fees
  E. Summary of Costs and Benefits
  F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking
II. Background
  A. History
  B. Authority and Guidance
  C. Changes From the Proposed Rule
  D. Corrections
  E. Status of Previous USCIS Fee Regulations
  F. Severability
III. Related Rulemakings and Policies
  A. New Processes
  B. Effects of Temporary Programs or Discretionary Programs and Processes
  C. Lawful Pathways Rule
  D. Premium Processing—Emergency Stopgap USCIS Stabilization Act
  E. Premium Processing Inflation Adjustment
  F. EB–5 Reform and Integrity Act of 2022 and Related Rules
  G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers
  H. Citizenship and Naturalization and Other Related Flexibilities
  I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
IV. Response to Public Comments on the Proposed Rule
  A. Summary of Comments on the Proposed Rule
  B. General Feedback on the Proposed Rule
  C. Basis for the Fee Review
  D. FY 2022/2023 IEFA Fee Review
  E. Fee Waivers
  F. Fee Exemptions
  G. Fee Changes by Benefit Category
  H. Statutory and Regulatory Requirements
  I. Out of Scope
V. Statutory and Regulatory Requirements
  A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)
  B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)
  C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
  D. Unfunded Mandates Reform Act
  E. Executive Order 12132 (Federalism)
  F. Executive Order 12988 (Civil Justice Reform)
  G. Executive Order 13175 (Consultation and Coordination With Tribal Governments)
  H. Family Assessment
  I. National Environmental Policy Act (NEPA)
  J. Paperwork Reduction Act

## List of Acronyms and Abbreviations

AAO  Administrative Appeals Office
ABC  Activity-Based Costing
ACWIA  American Competitiveness and Workforce Improvement Act
APA  Administrative Procedure Act
APD  Advance Parole Documents
ASVVP  Administrative Site Visit and Verification Program
BFD  Bona Fide Determination
CAA  Cuban Adjustment Act of 1966
CBP  U.S. Customs and Border Protection
CFO  Chief Financial Officer
CFR  Code of Federal Regulations
CIS  The Office of the Citizenship and Immigration Services
COVID  Coronavirus Disease
CPI–U  Consumer Price Index for All Urban Consumers
DACA  Deferred Action for Childhood Arrivals
DHS  Department of Homeland Security
DOD  Department of Defense
DOJ  Department of Justice
DOL  Department of Labor
DOS  Department of State
EAD  Employment Authorization Document
EB–5  Employment-Based Immigrant Visa, Fifth Preference
EIN  Employer Identification Number
E.O.  Executive Order
EOIR  Executive Office for Immigration Review
FDNS  Fraud Detection and National Security Directorate
FOIA  Freedom of Information Act
FPG  Federal Poverty Guidelines
FR  Federal Register
FRFA  Final Regulatory Flexibility Analysis
FTE  Full-Time Equivalent
FY  Fiscal Year
GAO  Government Accountability Office
HHS  Department of Health and Human Services
HRIFA  Haitian Refugee Immigration Fairness Act
ICE  U.S. Immigration and Customs Enforcement
IEFA  Immigration Examinations Fee Account
IFR  Interim final rule
INA  Immigration and Nationality Act of 1952
INS  Immigration and Naturalization Service
IPO  Immigrant Investor Program Office
IRS  Internal Revenue Service
ISAF  International Security Assistance Forces
IT  information technology
IOAA  Independent Offices Appropriations Act
LPR  Lawful Permanent Resident
NACARA  Nicaraguan Adjustment and Central American Relief Act
NAICS  North American Industry Classification System
NARA  National Archives and Records Administration

NEPA    National Environmental Policy Act
NOID    Notice of Intent to Deny
NPRM    Notice of Proposed Rulemaking
NRC    National Records Centers
OAW    Operation Allies Welcome
OIG    DHS Office of the Inspector General
OIRA    Office of Information and Regulatory Affairs
OMB    Office of Management and Budget
OPT    Optional Practical Training
PRA    Paperwork Reduction Act of 1995
PRC    Permanent Resident Card or Green Card [1]
Pub. L.    Public Law
RFA    Regulatory Flexibility Act
RFE    Requests for Evidence
RIA    Regulatory Impact Analysis
SBA    Small Business Administration
SEA    Small Entity Analysis
Secretary    Secretary of Homeland Security
SIJ    Special Immigrant Juvenile
SNAP    Supplemental Nutrition Assistance Program
SSI    Supplemental Security Income
SSN    Social Security number
Stat.    U.S. Statutes at Large
STEM    Science, Technology, Engineering, and Mathematics
TPS    Temporary Protected Status
TVPRA    William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UMRA    Unfunded Mandates Reform Act of 1995
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
USDA    U.S. Department of Agriculture
VAWA    Violence Against Women Act
VTVPA    Victims of Trafficking and Violence Protection Act of 2000

## I. Executive Summary

### A. Purpose of the Regulatory Action

DHS is adjusting the fee schedule for U.S. Citizenship and Immigration Services (USCIS) immigration benefit requests.[2] As stated in the proposed rule, USCIS is primarily funded by fees charged to applicants and petitioners for immigration and naturalization benefit requests. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA). These fee collections fund the cost of fairly and efficiently adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants or petitioners. The focus of this fee review is the fees that DHS has established and is authorized by INA section 286(m), 8 U.S.C. 1356(m), to establish or change, collect, and deposit into the IEFA, which comprised approximately 96 percent of USCIS' total FY 2021 enacted spending authority; this fee review does not focus on fees that USCIS is required to collect but cannot change. Most of these fees have not changed since 2016 despite increased costs of federal salaries and inflation costs for other goods and services. This rule also revises the genealogy program fees established under INA section 286(t), 8 U.S.C. 1356(t), and those funds are also deposited into the IEFA. Premium processing funds established under INA section 286(u), 8 U.S.C. 1356(u) are also IEFA fees, but premium processing fees do not change in this rule.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), codified at 31 U.S.C. 901–03, and Office of Management and Budget (OMB) Circular A–25, USCIS conducted a comprehensive fee review for the Fiscal Year (FY) 2022/2023 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of services provided. DHS determined that adjusting USCIS' fee schedule is necessary to fully recover costs and maintain adequate service. This final rule also increases the populations that are exempt from certain fees and clarifies filing requirements for nonimmigrant workers, requests for premium processing, and other administrative requirements.

### B. Legal Authority

DHS's authority is in several statutory provisions. Section 102 of the Homeland Security Act of 2002,[3] 6 U.S.C. 112, and section 103 of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.

Specific authority for establishing multiple USCIS fees is found in INA sec. 286, 8 U.S.C. 1356, and more specifically section 286(m), 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants").[4]

### C. Changes From the Proposed Rule

As explained more fully in part II.C. of this preamble, DHS is making several changes in this final rule based on comments received on the proposed rule or in exercising its authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on adequately funding USCIS, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. The changes are as follows:

#### 1. Reduced Costs and Fees

DHS proposed to recover $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million. DHS removes approximately $726.7 million of average annual estimated costs by transferring costs to premium processing revenue, reducing the work to be funded by the Asylum Program Fee, and considering the budget effects of improved efficiency measures.

#### 2. Changes in the Asylum Program Fee

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. In the final rule, DHS exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13). The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE

---

[1] DHS uses the informal term "Green Card" interchangeably with or to refer to a Permanent Resident Card, USCIS Form I–551. See, *e.g.*, Green Card, at *https://www.uscis.gov/green-card* (last viewed Dec. 5, 2023).

[2] DHS uses the term "benefit request" throughout this rule as defined in 8 CFR 1.2 to mean any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit. The term benefit request applies regardless of if the title of the request uses the term petition (*e.g.*, Petition for Nonimmigrant Worker), application (*e.g.*, Application for Naturalization) or request (*e.g.*, Request for Fee Waiver). Accordingly, "requestor" is a synonym for applicant or petitioner. Immigration benefit request or benefit request is also used even if USCIS approval of the request does not result in an immigration benefit, status, visa, or classification, such as requests related to inadmissibility waivers and the USCIS genealogy program. Using the term benefit request reduces the ambiguity and confusion resulting from the repetitive use of application, petition, applicant, and petitioner, and improves readability without substantive legal effect. 76 FR 53764, 53767 (Aug. 11, 2011).

[3] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

[4] The longstanding interpretation of this is that the "including" clause in INA sec. 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* INA sec. 286(m), 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

employees); and $600 for all other filers of Forms I–129 and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

### 3. Changes to Employment-Based Immigrant Visa, Fifth Preference (EB–5) Fees

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

### 4. Changes to H–1B Registration Fees

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). This change increases the estimated revenue generated by the H–1B registration fees in the final rule.

### 5. Online Filing Fees

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. *See* 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. *See* 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

### 6. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. In this final rule, (a) DHS holds several fees to the rate of inflation since the previous fee increase in 2016, and (b) if the proposed fee was less than the current fee adjusted for inflation, then DHS sets the fee in this rule at the level proposed. Except for certain employment-based benefit request fees, if proposed fees were less than the rate of inflation, then DHS finalizes the proposed fee or a lower fee. A comparison of current, proposed, and final fees can be found in Table 1.

### 7. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402, 459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings. *See* section II.C.; 8 CFR 106.3(b). The final rule also codifies the 2011 Fee Waiver Policy[5] criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the Federal Poverty Guidelines (FPG), or extreme financial hardship. *See* 8 CFR 106.3(a)(1).

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020).

DHS also decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because the child's eligibility for these means-tested benefits is dependent on household income.

### 8. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making five procedural changes in the final rule to address issues that it has experienced with fee-exempt and low-fee filings. First, the final rule provides that a duplicate filing that is materially identical to a pending immigration benefit request will be rejected. *See* 8 CFR 103.2(a)(7)(iv). Second, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). Third, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Fourth, the first sentence of proposed 8 CFR 106.1(c)(2), stated, "If the benefit request was approved, the approval may be revoked upon notice." DHS is revising the first sentence to read, "If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory

---

[5] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

requirements applicable to the immigration benefit request." Reference to applicable statutes and regulations is also added to the last sentence of section 106.1(c)(2). Finally, this final rule provides that USCIS may grant an appeal for which the fee may be waived or exempt for adjudication without requiring a review by the official who made the unfavorable decision. 8 CFR 103.3(a)(2)(ii).

### 9. Adjustment of Status (Form I–485) and Family-Based Fees

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status, applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i).

The proposed rule also would have ($1,540). *See* 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay a lesser fee of $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii).

### 10. Adoption Forms

In the final rule, DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for second extensions, second change of country requests, and duplicate approval notices for both the orphan and the Hague process. These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. The final rule also provides that Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

### 11. Naturalization and Citizenship Fees

This final rule expands eligibility for paying half of the regular fee for Form N–400, Application for Naturalization. An applicant with household income at or below 400 percent of Federal Poverty Guidelines (FPG) may pay half price for

their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii).

12. Additional Changes

In the final rule:

• DHS deletes proposed 8 CFR 106.3(a)(5), ''Fees under the Freedom of Information Act (FOIA),'' because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).

• Removes the fee exemption for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–*, 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i).

• Provides a 30-day advance public notification requirement before a payment method will be changed. 8 CFR 106.1(b).

• Provides that an inflation only rule must adjust all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute).

*D. Summary of Final Fees*

The fees established in this rule are summarized in the Final Fee(s) column in Table 1. Table 1 compares the current fees to the fees established in this rule. In addition, the new fees and exemptions are incorporated into the Form G–1055, Fee Schedule, as part of the docket for this rulemaking.

The Current Fee(s) column in Table 1 represents the current fees in effect rather than the enjoined fees from the 2020 fee rule.[6] Throughout this final rule, the phrase ''current fees'' refers to the fees in effect and not the enjoined fees.

In some cases, the current or final fees may be the sum of several fees. For example, several immigration benefit requests require an additional biometric services fee under the current fee structure. The table includes rows with

---

[6] USCIS provides filing fee information on the All Forms page at *https://www.uscis.gov/forms/all-forms*. You can use the Fee Calculator to determine the exact filing and biometric services fees for any form processed at a USCIS Lockbox facility. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Fee Calculator, *https://www.uscis.gov/feecalculator*. For a complete list of all USCIS fees, see Form G–1055, Fee Schedule, available from *https://www.uscis.gov/g-1055*.

and without the additional biometric services fee added to the Current Fee(s) column. In this final rule, DHS would eliminate the additional biometric services fee in most cases by including the costs in the underlying immigration benefit request fee. As such, the Final Fee(s) column does not include an additional biometric services fee in most cases.

Some other benefit requests are listed several times because in some cases DHS proposes distinct fees based on filing methods, online or paper. DHS will require fees for Form I–131, Application for Travel Document, and Form I–765, Application for Employment Authorization, when filed with Form I–485, Application to Register Permanent Residence or Adjust Status, in most cases. As such, Table 1 includes rows that compare the current fee for Form I–485 to various combinations of the final fees for Forms I–485, I–131, and I–765.

The table excludes statutory fees that DHS cannot adjust or can only adjust for inflation. Instead, the table focuses on the IEFA non-premium fees that DHS is changing in this rule.

**BILLING CODE 9111–97–P**

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-90 Application to Replace Permanent Resident Card (online filing) | $455 | $455 | $415 | -$40 | -9% |
| I-90 Application to Replace Permanent Resident Card (online filing) (with biometric services) | $540 | $455 | $415 | -$125 | -23% |
| I-90 Application to Replace Permanent Resident Card (paper filing) | $455 | $465 | $465 | $10 | 2% |
| I-90 Application to Replace Permanent Resident Card (paper filing) (with biometric services) | $540 | $465 | $465 | -$75 | -14% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $560 | $115 | 26% |
| I-129 Petition for a Nonimmigrant worker[7] | $460 | N/A | N/A | N/A | N/A |
| I-129 H-1 Classifications | $460 | $780 | $780 | $320 | 70% |
| I-129 H-1 Classifications (small employers and nonprofits)[8] | $460 | $780 | $460 | $0 | 0% |
| I-129 H-2A - Named Beneficiaries | $460 | $1,090 | $1,090 | $630 | 137% |
| I-129 H-2A - Named Beneficiaries (small employers and nonprofits) | $460 | $1,090 | $545 | $85 | 18% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $530 | $530 | $70 | 15% |
| I-129 H-2A - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $530 | $460 | $0 | 0% |
| I-129 H-2B - Named Beneficiaries | $460 | $1,080 | $1,080 | $620 | 135% |
| I-129 H-2B - Named Beneficiaries (small employers and nonprofits) | $460 | $1,080 | $540 | $80 | 17% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $580 | $580 | $120 | 26% |
| I-129 H-2B - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $580 | $460 | $0 | 0% |
| I-129 Petition for L Nonimmigrant workers | $460 | $1,385 | $1,385 | $925 | 201% |
| I-129 Petition for L Nonimmigrant workers (small employers and nonprofits) | $460 | $1,385 | $695 | $235 | 51% |

[7] The Form I-129 fees in this table are for the underlying form. Certain additional fees may be required by other regulations or statutes depending on factors such as the size of the business and the classification of the nonimmigrant beneficiary. *See* 8 CFR 106.2(c).

[8] The H-1B Registration Process Fee must be paid before this form is filed and fee is paid.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-129 Petition for O Nonimmigrant workers | $460 | $1,055 | $1,055 | $595 | 129% |
| I-129 Petition for O Nonimmigrant workers (small employers and nonprofits) | $460 | $1,055 | $530 | $70 | 15% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications[9] | $460 | $1,015 | $1,015 | $555 | 121% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (with biometric services)[10] | $545 | $1,015 | $1,015 | $470 | 85% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits)[11] | $460 | $1,015 | $510 | $50 | 11% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) (with biometric services)[12] | $545 | $1,015 | $510 | -$35 | -6% |
| I-129F Petition for Alien Fiancé(e) | $535 | $720 | $675 | $140 | 26% |
| I-130 Petition for Alien Relative (online filing) | $535 | $710 | $625 | $90 | 17% |
| I-130 Petition for Alien Relative (paper filing) | $535 | $820 | $675 | $140 | 26% |
| I-131 Application for Travel Document | $575 | $630 | $630 | $55 | 10% |
| I-131 Application for Travel Document (with biometric services) | $660 | $630 | $630 | -$30 | -5% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $165 | $30 | 22% |

[9] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[10] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[11] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[12] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

**6200**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | |
|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | $165 | -$55 | -25% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $135 | $30 | 29% |
| I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | $135 | -$55 | -29% |
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $575 | $575 | $0 | 0% |
| I-140 Immigrant Petition for Alien Workers[13] | $700 | $715 | $715 | $15 | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $930 | $0 | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) | $585 | $1,100 | $1,100 | $515 | 88% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $695 | $695 | $110 | 19% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $1,175 | $245 | 26% |
| I-290B Notice of Appeal or Motion | $675 | $800 | $800 | $125 | 19% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $435 | $515 | $515 | $80 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $1,440 | $300 | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $1,440 | $215 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $950 | $200 | 27% |
| I-526/526E Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $11,160 | $7,485 | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) | $370 | $525 | $420 | $50 | 14% |

[13] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) (with biometric services) | $455 | $525 | $420 | -$35 | -8% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) | $370 | $620 | $470 | $100 | 27% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) (with biometric services) | $455 | $620 | $470 | $15 | 3% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition | $775 | $920 | $920 | $145 | 19% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition (with biometric services for one adult) | $860 | $920 | $920 | $60 | 7% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600[14] | N/A | $455 | $455 | $455 | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $1,050 | $120 | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $1,105 | $795 | $165 | 26% |
| I-601A Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $795 | $80 | 11% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $1,240 | $1,240 | $110 | 10% |
| I-687 Application for Status as a Temporary Resident (with biometric services) | $1,215 | $1,240 | $1,240 | $25 | 2% |
| I-690 Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act | $715 | $985 | $905 | $190 | 27% |
| I-694 Notice of Appeal of Decision | $890 | $1,155 | $1,125 | $235 | 26% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $1,670 | $0 | 0% |

[14] This form is being created by this rule and did not previously exist.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | $1,670 | -$85 | -5% |
| I-751 Petition to Remove Conditions on Residence | $595 | $1,195 | $750 | $155 | 26% |
| I-751 Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $750 | $70 | 10% |
| I-765 Application for Employment Authorization (online filing) | $410 | $555 | $470 | $60 | 15% |
| I-765 Application for Employment Authorization (online filing) (with biometric services) | $495 | $555 | $470 | -$25 | -5% |
| I-765 Application for Employment Authorization (paper filing) | $410 | $650 | $520 | $110 | 27% |
| I-765 Application for Employment Authorization (paper filing) (with biometric services) | $495 | $650 | $520 | $25 | 5% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $925 | $920 | $145 | 19% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $925 | $920 | $60 | 7% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A | $385 | $455 | $455 | $70 | 18% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | $455 | -$15 | -3% |
| I-817 Application for Family Unity Benefits | $600 | $875 | $760 | $160 | 27% |
| I-817 Application for Family Unity Benefits (with biometric services) | $685 | $875 | $760 | $75 | 11% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $675 | $590 | $125 | 27% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | $9,525 | $5,775 | 154% |
| I-829 Petition by Investor to Remove Conditions (with biometric services) | $3,835 | $9,525 | $9,525 | $5,690 | 148% |

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $340 | $55 | 19% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | $340 | -$30 | -8% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | $340 | -$230 | -40% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $740 | $340 | $340 | -$315 | -48% |
| I-910 Application for Civil Surgeon Designation | $785 | $1,230 | $990 | $205 | 26% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $275 | $0 | -$230 | -100% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $1,200 | $0 | 0% |
| I-941 Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | $1,200 | -$85 | -7% |
| I-956 Application for Regional Center Designation | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | $4,470 | $1,435 | 47% |
| N-300 Application to File Declaration of Intention | $270 | $320 | $320 | $50 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (online filing) | $700 | $830 | $780 | $80 | 11% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (paper filing) | $700 | $830 | $830 | $130 | 19% |
| N-400 Application for Naturalization (online filing) | $640 | $760 | $710 | $70 | 11% |

**6204**　　**Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| N-400 Application for Naturalization (online filing) (with biometric services) | $725 | $760 | $710 | -$15 | -2% |
| N-400 Application for Naturalization (paper filing) | $640 | $760 | $760 | $120 | 19% |
| N-400 Application for Naturalization (paper filing) (with biometric services) | $725 | $760 | $760 | $35 | 5% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) | $320 | $380 | $380 | $60 | 19% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) (with biometric services) | $405 | $380 | $380 | -$25 | -6% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $420 | $65 | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document (online filing) | $555 | $555 | $505 | -$50 | -9% |
| N-565 Application for Replacement Naturalization/Citizenship Document (paper filing) | $555 | $555 | $555 | $0 | 0% |
| N-600 Application for Certificate of Citizenship (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600 Application for Certificate of Citizenship (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| USCIS Immigrant Fee | $220 | $235 | $235 | $15 | 7% |
| H-1B Registration Process Fee | $10 | $215 | $215 | $205 | 2,050% |
| Biometric Services | $85 | $30 | $30 | -$55 | -65% |
| G-1041 Genealogy Index Search Request (online filing) | $65 | $100 | $30 | -$35 | -54% |
| G-1041 Genealogy Index Search Request (paper filing) | $65 | $120 | $80 | $15 | 23% |
| G-1041A Genealogy Records Request (online filing) | $65 | $240 | $30 | -$35 | -54% |
| G-1041A Genealogy Records Request (paper filing) | $65 | $260 | $80 | $15 | 23% |
| G-1566 Request for Certificate of Non-Existence | $0 | $330 | $330 | $330 | N/A |

**BILLING CODE 9111–97–C**

## E. Summary of Costs and Benefits

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate. The annualized transfer payments from the Department of Defense (DOD) to USCIS for Form N–400 filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DOD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

## F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking

DHS acknowledges the broad effects of the Coronavirus Disease (COVID–19) international pandemic on the United States broadly and the populations affected by this rule. Multiple commenters on the proposed rule wrote that increasing USCIS fees at this time would exacerbate the negative economic impacts that the United States has experienced from the COVID–19 pandemic.

DHS realizes the effects of COVID–19, and USCIS, specifically, is still dealing with the effects of COVID–19 on its workforce and processing backlog. COVID–19 affected the demand for immigration benefits and USCIS services, and, as all employers did, USCIS was required to adjust its workplaces to mitigate the impacts of the disease. DHS has procedures in place to deal with emergency situations as they arise but is no longer providing special accommodations associated with the pandemic.[15] USCIS considered the effects of COVID–19 on its workload volumes, revenue, or costs, along with all available data, when it conducted its fee review. DHS will also consider these effects in future fee rules. However, no changes were made in the fees and regulations codified in this final rule to address the effects of COVID–19. Further, Census data indicates that impacts of COVID–19 showed a dip in estimated sales, revenue, and value of shipments in 2020 followed by a recovery through the fourth quarter of 2021.[16] CDC ended the public health emergency due to the COVID–19 pandemic on May 11, 2023.[17] Although there may be some lingering economic impacts from COVID–19, DHS does not believe these would have an impact on the number of filings by requestors. DHS notes that for certain forms and categories fee waivers may be available for people with financial hardship. *See* 8 CFR 106.3(a); Table 4B.

## II. Background

### A. History

On January 4, 2023, DHS published a proposed rule in the **Federal Register** (docket USCIS–2021–0010) at 88 FR 402. DHS published a correction on January 9, 2023, at 88 FR 1172.[18] On February 24, 2023, DHS extended the comment period an additional 5 days, to March 13, 2023, for a total comment period of 68 days. *See* 88 FR 11825. USCIS also held a public engagement event on January 11, 2023, and a software demonstration on March 1, 2023, to provide additional avenues for the interested public to hear about and provide feedback on the proposed fee rule.[19] In this final rule, DHS will refer to the initial proposed rule, correction, and extension collectively as the proposed rule.

### B. Authority and Guidance

DHS publishes this final rule under the Immigration and Nationality Act ("INA"), which establishes the Immigration Examinations Fee Account ("IEFA") for the receipt of fees it charges. INA section 286(m), 8 U.S.C. 1356(m). The INA allows DHS to set "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* The INA further provides that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* DHS also issues this final rule consistent with the Chief Financial Officer Act, 31 U.S.C. 901–03903 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees).

This final rule is also consistent with non-statutory guidance on fees, the budget process, and Federal accounting principles.[20] DHS uses Office of

---

[15] *See* USCIS, Immigration Relief in Emergencies or Unforeseen Circumstances available at *https://www.uscis.gov/newsroom/immigration-relief-in-emergencies-or-unforeseen-circumstances* (last reviewed/updated Aug. 16, 2023); USCIS, USCIS Announces End of COVID-Related Flexibilities available at *https://www.uscis.gov/newsroom/alerts/uscis-announces-end-of-covid-related-flexibilities* (last reviewed/updated Mar. 23, 2023).

[16] *See https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[17] *See* CDC, COVID–19 End of Public Health Emergency, available at *https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html* (last updated May 5, 2023).

[18] The document corrected two typographical errors in Table 1 of the proposed rule.

[19] *https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[20] *See* 58 FR 38142 (July 15, 1993) (revising Federal policy guidance regarding fees assessed by
Continued

Management and Budget (OMB) Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in this section. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of Immigration Examinations Fee Account (IEFA) costs.[21]

Finally, this final rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. In the proposed rule, DHS outlined the effects of appropriations for FY 2021 and FY 2022.[22] As explained in the proposed rule, Congress provided USCIS additional appropriations for very specific purposes in FY 2022.[23] Shortly before publication of the proposed rule, Congress passed a full year appropriation bill for FY 2023. Together, the total FY 2023 appropriations for USCIS were approximately $268.0 million. Congress appropriated approximately $243.0 million for E-Verify and refugee processing in FY 2023.[24] Approximately $133.4 million of the $243.0 million was for refugee processing, and the remainder was for E-Verify. In addition, Congress appropriated $25 million for the Citizenship and Integration Grant Program, which is available until September 30, 2024, the end of FY 2024. *Id.* This means that USCIS received $5 million more than in FY 2022, and it has 2 years to spend the full $25 million. Because USCIS anticipated appropriated funds for citizenship grants in both FY 2022 and FY 2023, the $20 million in FY 2022 and the $25 million in FY 2023 for citizenship grants are not part of the FY 2022/2023 IEFA fee review budget. For several years, USCIS had the authority to spend

no more than $10 million for citizenship grants.[25] Until recently, grant program funding came from the IEFA fee revenue or a mix of appropriations and fee revenue.[26] If USCIS does not receive appropriations for citizenship grants for FY 2024, then it could use any remaining amount from the $25 million appropriation in the Consolidated Appropriations Act, 2023.

In these cases, appropriation laws for FY 2022 and FY 2023 provide that the funds are only to be used for the specified purposes, and DHS is not required to reduce any current IEFA fee.[27] As explained in the proposed rule, these appropriations do not overlap with the fee review budget, which will fund immigration adjudication and naturalization services for future incoming receipts. USCIS cannot and does not presume congressional appropriations, especially given the lack of appropriations in the past. If this fee rule does not account for the possibility of no congressional funding in future years and Congress fails to fund a program, either the program cannot continue or USCIS will be forced to reallocate resources assigned to another part of the agency for this purpose. As such, DHS makes no changes to the final rule based on the appropriations for FY 2022 and FY 2023.

*C. Changes From the Proposed Rule*

This final rule adopts, with appropriate changes, the regulatory text in the proposed rule published in the **Federal Register** on January 4, 2023. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Proposed rule, 88 FR 402. DHS is making several changes in this final rule based on

comments received on the proposed rule or as required by the effects of those changes. As explained throughout this preamble, DHS exercises its discretionary authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on numerous factors, including adequately funding USCIS operations, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. This final rule also relies on the justifications articulated in the proposed rule, except as modified and explained throughout this rule in response to public comments, intervening developments, and new information. As stated in the proposed rule, DHS is not repeating the amendatory instructions and regulatory text for ministerial, procedural, or otherwise non-substantive changes adopted from the 2020 fee rule. 88 FR 421. A description of each change is as follows:

1. Reduced Costs and Fees

DHS has revised the USCIS budget underlying the final rule. In the proposed rule, USCIS projected that its IEFA non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/ 2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million, a $726.7 million or 14.1 percent decrease compared to the proposed rule. *See* Table 2 of this preamble.

---

Federal agencies for Government services); Federal Accounting Standards Advisory Board Handbook, Version 17 (06/18), "Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts," SFFAS 4, available at *http://files.fasab.gov/pdffiles/ handbook_sffas_4.pdf* (generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (July 31, 1995); OMB Circular A–11, "Preparation, Submission, and Execution of the Budget," section 20.7(d), (g) (June 29, 2018), available at *https://www.whitehouse.gov/ wp-content/uploads/2018/06/a11.pdf* (June 29, 2018) (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees).

[21] OMB Circulars A–25 and A–11 provide nonbinding internal executive branch direction for the development of fee schedules under IOAA and appropriations requests, respectively. *See* 5 CFR

1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS understands their reflect best practices and used the activity-based costing (ABC) methodology supported in Circulars A–25 and A– 11 to develop the proposed fee schedule.

[22] *See* 88 FR 402, 415–417 (Jan. 4, 2023); *see also* Consolidated Appropriations Act, 2021 (Dec. 27, 2020), Public Law 116–260, at div. F, tit. IV; Consolidated Appropriations Act, 2022, Public Law 117–103 (Mar. 15, 2022) ("Pub. L. 117–103") at div. F. tit. 4; Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021) ("Pub. L. 117–43") at div. C. title V, sec. 2501.

[23] *See* 88 FR 402, 415–416 (Jan. 4, 2023); *see also* Public Law 117–103.

[24] *See* Consolidated Appropriations Act, 2023, Public Law 117–328, div. F, tit. IV (Dec. 29, 2022).

[25] Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116–6), FY 2020 (Pub. L. 116–93), and FY 2021 (Pub. L. 116–260).

[26] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113– 6) and FY 2014 (Pub. L. 113–76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018.

[27] Public Law 117–43, at section 132, states, "That such amounts shall be in addition to any other funds made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." Likewise, Public Law 117–43, at section 2501, states "That such amounts shall be in addition to any other amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." Similar wording is in Public Law 117– 328 in div F. tit. IV. USCIS has a long history of funding citizenship and integration grants from IEFA revenue, appropriations, or a mix of both.

| | Table 2: FY 2022/2023 Proposed vs. Final FY 2022/2023 Fee Review Cost Projections (Dollars in Thousands) | | | | |
|---|---|---|---|---|---|
| **Type** | **Proposed Rule Average** | **Final Rule Average** | **Difference** | **Change** | **Percent of Total Change** |
| Payroll | $3,347,853 | $3,186,683 | ($161,170) | -4.8% | 22% |
| Non-Payroll | $1,802,854 | $1,237,348 | ($565,506) | -31.4% | 78% |
| **Total** | **$5,150,707** | **$4,424,031** | **($726,676)** | **-14.1%** | **100%** |

DHS is authorized by INA section 286(m), 8 U.S.C. 1356(m), to set USCIS fees at a level to recover "the full costs" of providing "all" "adjudication and naturalization services," and "the administration of the fees collected." This necessarily includes support costs, and USCIS' current budget forecasts a deficit based on fully funding all of its operations. DHS must make up that difference either by cutting costs, curtailing operations, or increasing revenue. DHS examined USCIS recent budget history, service levels, and immigration trends to forecast its costs, revenue, and operational metrics in order to determine whether USCIS fees would generate sufficient revenue to fund anticipated operating costs. This increase in funding ensures that USCIS can meet its operational needs during the biennial period.

| Table 3: IEFA Non-Premium Cost and Revenue (at FY 2021 Levels) Dollars in Millions | | | |
|---|---|---|---|
| **Point of Comparison** | **FY 2022** | **FY 2023** | **FY 2022/2023 Average** |
| Non-Premium Revenue with Current Fees | $3,280.3 | $3,284.8 | $3,282.5 |
| Non-Premium Cost Projection | $4,422.0 | $4,426.1 | $4,424.0 |
| **Difference** | **$1,141.7** | **$1,141.3** | **$1,141.5** |

Reducing the budget allows DHS to finalize some fees that are lower than in the proposed rule and offer additional fee exemptions in response to public comments requesting lower fees. In this final rule, DHS removes approximately $726.7 million of average annual estimated costs by making the following changes:

• Transferring costs to Premium Processing revenue;

• Reducing the estimated marginal costs of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers Interim Final Rule to be funded; [28] and

• Including efficiency estimates based on improved efficiency measures.

DHS revises the estimated cost and revenue differential to $1,141.5 million in this final rule. *See* Table 3 of this preamble. DHS issues this final rule to adjust USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services.

a. Transferring Costs to Premium Processing Revenue

DHS has historically excluded premium processing revenue and costs from its IEFA fee reviews and rulemakings to ensure that premium processing funds are available for infrastructure investments largely related to information technology, to provide staff for backlog reduction, and to ensure that non-premium fees were set at a level sufficient to cover the base operating costs of USCIS. This was done because the INA, as amended by the District of Columbia Appropriations Act of 2001 provided that premium processing revenue shall be used to fund the cost of offering premium service, as well as the cost of infrastructure improvements in adjudications and customer service processes. *See* 87 FR 1832. In the proposed rule at 88 FR 420, USCIS outlined its planned uses of premium processing revenue to provide premium processing service, improve information technology infrastructure, and reduce backlogs. Therefore, revenue from premium processing, the costs for USCIS to provide premium processing service, the costs to improve information technology infrastructure, and the costs directed at reducing the backlog were not considered in the proposed fees.

On October 1, 2020, the Continuing Appropriations Act, which included the USCIS Stabilization Act, was signed into law, codifying new section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A). Among other things, the USCIS Stabilization Act established new premium processing fees and expanded the permissible uses of revenue from the collection of premium processing fees, including improvements to adjudication process infrastructure, responses to adjudication demands, and to otherwise offset the cost of providing adjudication and naturalization services. Then, on March 30, 2022, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

---

[28] 87 FR 18078 (Mar. 29, 2022).

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4.

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule, as DHS was still in the early stages of implementation. It stated that DHS would consider including premium processing revenue and costs in the final rule., as appropriate, as DHS would have more information about the revenue collected from premium processing services by the time DHS publishes a final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). As a result of additional information gathered over the passage of time since the proposed rule and the December 28, 2023 Adjustment to Premium Processing Fees final rule, 88 FR 89539, in this final rule, DHS has transferred $129.8 million in costs to premium processing to account for future premium processing revenue projections.

b. Reducing the Work To Be Funded by the Asylum Program Fee.

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. DHS has begun implementation of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers (Asylum Processing IFR) (87 FR 18078 Mar. 29, 2022) rulemaking, but full implementation of the IFR is delayed while DHS resolves litigation around the Circumvention of Lawful Pathways rule. *See* 88 FR 31314 (May 16, 2023). Therefore, DHS needs to generate less revenue from the Asylum Program Fee than we estimated was needed in the proposed rule. Accordingly, we have provided a lower fee in this final rule for certain small employers and nonprofits in response to comments requesting lower fees for

these groups. Businesses with 25 or fewer full-time equivalent employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Nonprofits will pay $0. How DHS determined which businesses would receive such relief from the full fee is discussed later in this section. DHS estimates the revised Asylum Program Fee will generate approximately $313 million in revenue, compared to the $425 million that was estimated in the proposed rule from charging $600 with no exemptions or discounts.

DHS recognizes that reducing the USCIS budget due to the lower projected revenue from the Asylum Program Fee risks a revenue shortfall if the Asylum Processing IFR is fully implemented and the associated costs incurred. However, DHS's Asylum Processing IFR workload is somewhat flexible because DOJ can share some—though not all—of the workload. On the other hand, if the Asylum Processing IFR is not fully implemented, USCIS still has a significant need for the revenue. Although the amount of the fee was based on the costs of the Asylum Processing IFR, it was proposed ". . . to fund part of the costs of administering the entire asylum program . . ." 88 FR 849. USCIS Asylum Division expense estimates are over $400 million a year before adding the costs of the Asylum Processing IFR, and USCIS is regularly adding new asylum offices and capabilities. Thus, DHS projects that the total costs of the asylum program will exceed the revenue from the new fee even before any new capacity is added to implement the Asylum Processing IFR.

Further, DHS notes that USCIS cannot direct the revenue from the Asylum Program Fee precisely to the marginal costs that result from the implementation of the Asylum Processing IFR, as the Asylum Program Fee, like other fees, will be deposited into the general IEFA and not an account specific to the IFR or to the asylum program. In addition, if Asylum Division expenses are greatly reduced or funded by a Congressional appropriation, and USCIS determines the Asylum Program Fee is not needed, USCIS can pause collection of the Asylum Program Fee using the authority in 8 CFR 106.3(c). The costs for administering the asylum program not funded by the revenue collected from the Asylum Program Fee will continue to be funded by other fees.

c. Including Processing Efficiency Estimates Based on Improved Efficiency Measures

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[29] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing to achieve these goals.

2. Changes in the Asylum Program Fee

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. *See* 88 FR 402, 451 (Jan. 4, 2023). As explained in the proposed rule, DHS determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS arrived at the amount of the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and Form I–140, Immigrant Petition for Alien Worker, to collect the Asylum Processing IFR estimated annual costs. *Id.* The Asylum Program Fee adds a fee, only for Form I–129, I–129CW, and Form I–140 petitioners, in order to maintain lower fees for other immigration benefit requestors than if these asylum costs were spread among all other fee payers. The proposed rule provided examples of alternative Form I–485, Application to Register Permanent Residence or Adjust Status, and I–765, Application for Employment Authorization, proposed fees if those applications were burdened with the Asylum Processing IFR estimated annual costs. *Id* at 452. The proposed fees for Forms I–485, I–765, and others were lower with the shift of asylum program costs to employers through the new fee. If Forms I–129, I–129CW, and I–140 recover more of those

---

[29] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders" (Mar. 29, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

costs, then that means other forms need not recover as much, resulting in lower proposed fees for Forms I–485, I–765, and others that recovered more than full cost in the proposed rule. DHS stands by this approach to lower fees for other immigration benefit requestors less able to pay by limiting the Asylum Program Fee to Forms I–129, I–129CW, and I–140.

DHS summarizes and responds to the comments on the Asylum Program Fee in more detail in section IV.Q.2.a. of this preamble. After considering public comments, in the final rule, DHS exercises its discretionary authority to establish fees, balancing the beneficiary-pays and ability-to-pay principles, and to address the negative effects that commenters stated would result, by exempting the Asylum Program Fee for nonprofit petitioners and reducing it by half for small employers. *See* 8 CFR 106.2(c)(13).[30] The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE employees); and $600 for all other filers of Forms I–129, I–129CW, and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

### 3. Defining Small Employer

DHS did not propose to provide any fee exemptions or discounts based on employer size. Many commenters, however, wrote that the proposed new fees for employment-based immigration benefit requests could make it difficult for small companies to pay the fees or it may hinder their ability to hire the workers they need. Balancing the need to shift the costs of services, adequately fund USCIS operations, and balance the beneficiary-pays and ability-to-pay principles, DHS determined that a discount based on the size of the business is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023).

The final rule defines "small employer" as having 25 or fewer full-time equivalent (FTE). *See* 8 CFR 106.1(f). When determining which employers should be considered small, DHS considered what definition could be administered to provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. The volume of

forms submitted to USCIS requires that benefit request intake be automated to the extent possible, including the analysis of whether the correct fee has been paid based on if the petitioner meets the criteria for the fee they have submitted with their request. DHS also considered other exemptions provided for the same or similar forms and how the term "small employer" is defined in other contexts. DHS reviewed INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), which provides that the ACWIA fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). Because the ACWIA fee and the Asylum Program fee are both applied to the Form I–129, DHS decided that using a consistent definition was preferable. DHS also determined that defining small employer as 25 or fewer full time equivalent employees was appropriate because: (1) it is consistent with what Congress has provided in statute that it considers small with regard to the applicability of certain fees for employment-based petitions submitted to USCIS; (2) DHS has a long history of administering the ACWIA fee, and (3) determining if the petitioner is eligible for the fee discount requires minimal additional evidence.[31] This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

### 4. Defining Nonprofit

DHS did not propose any relief from any fee in the proposed rule for nonprofit entities. Many commenters, however, wrote that the proposed new fees for nonprofits could make it difficult for the nonprofits to pay the fees or it may hinder their ability to hire the workers they need. DHS agrees that the type of organizations that qualify as a nonprofit generally provide a service to the public.[32] Nonprofit organizations may include religious, educational, or charitable organizations and may not be

required to pay federal taxes.[33] DHS understands that organizations that do not pursue monetary gain or profit must use funds for USCIS fees that they would otherwise use in pursuit of public and private service. Therefore, balancing the need to shift the costs of services, adequately funding USCIS operations, and the beneficiary-pays and ability-to-pay principles, DHS determined that a discount for nonprofits is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023). DHS acknowledges that allowing this discount for certain large non-profits, such as universities and hospitals, may seem inconsistent with the ability-to-pay principle. However, DHS notes that this treatment is consistent with their tax-exempt status and believes that the public service performed by these entities further justifies the fee discount.

DHS determined that the most appropriate definition for nonprofit is the definition in the Internal Revenue Code (IRC), specifically 26 U.S.C. 501(c)(3) (2023). 8 CFR 106.1(f)(2). As with the definition of small employer, DHS considered costs to USCIS, burden on petitioners, and intake and processing requirements. DHS also considered how the term nonprofit is defined in other contexts. Commenters that requested relief for nonprofits did not suggest an alternative definition for nonprofit than that used for Federal income tax purposes or as provided for the ACWIA fee reduction in 8 CFR 214.2(h)(19)(iv). The INA provides for a reduced ACWIA fee if a petitioner is "a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization." INA section 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A). The INA does *not* define "nonprofit" in terms of the IRC and the definitions of "institution of higher education" and "government research organization" in 8 CFR 214.2(h)(19)(iv)(B) are not tied to the IRC.

For ease of administration, DHS will not require that the petitioner nonprofit

---

[30] DHS recognizes that many small employers and nonprofits submit USCIS Form I–907, Request for Premium Processing, with their Form I–129. Because premium processing is an optional request for faster processing and not required to obtain an immigration benefit, DHS makes no changes to premium processing fees for those groups.

[31] As noted in the Paperwork Burden Act section of this final rule, and in the final form instructions for Forms I–129 and 140 provided in the docket, DHS will require that petitioners submit the first page of their most recent IRS Form 941, Employer's QUARTERLY Federal Tax Return. We will determine at intake if the petitioner has submitted the lower fee or no fee based on the number indicated in Part 1, question 1, Number of employees who received wages, tips, or other compensation for the pay period.

[32] *See* U.S. Department of the Treasury, U.S. Internal Revenue Service, Exempt Organization Types, *https://www.irs.gov/charities-non-profits/exempt-organization-types* (Page Last Reviewed or Updated: 05–Dec–2023).

[33] Nonprofits may be required to pay certain other taxes. *See,* U.S. Department of the Treasury, U.S. Internal Revenue Service, Federal Tax Obligations of Non-Profit Corporations at *https://www.irs.gov/charities-non-profits/federal-tax-obligations-of-non-profit-corporations.* (Page Last Reviewed or Updated: 05–Dec–2023).

status be limited to research or educational purposes, as in 8 CFR 214.2(h)(19)(iv)(B). DHS has decided that eligibility for fee reductions and fee exemptions for nonprofits provided in this final rule will be limited to nonprofit organizations approved by the Internal Revenue Service as a nonprofit entity under section 501(c)(3) of the IRC or as a government research organization, and that USCIS will not impose the burden on petitioners of demonstrating an educational or research purpose. This approach will ensure that the primary types of organizations eligible for the ACWIA fee reduction in the INA—educational institutions, nonprofit research organizations, and governmental research organizations—will also be eligible for the fee reductions and exemptions under this rule, as will other nonprofit entities with a charitable purpose under section 501(c)(3).

DHS considered including but will not include entities organized under 501(c)(4) and 501(c)(6) of the IRC in the definition of nonprofit in this rule. Tax-exempt organizations under section 501(c)(4) include social welfare organizations and local associations of employees, while tax-exempt organizations under 501(c)(6) include business leagues, chambers of commerce, real estate boards, boards of trade, and professional football leagues. *See* 26 U.S.C. 501(c)(4) & (6). Both types of entities, unlike public charities under 501(c)(3), may engage in lobbying activities. Although 8 CFR 214.2(h)(19)(iv)(A) includes nonprofit or tax-exempt organizations under 501(c)(3), 501(c)(4), and 501(c)(6) for purposes of the ACWIA fee reduction, this eligibility is further cabined by 8 CFR 214.2(h)(19)(iv)(B), requiring that such entities have been ''approved as a tax-exempt organization *for research or educational purposes* by the Internal Revenue Service'' (emphasis added). As a practical matter, DHS experience indicates that few 501(c)(4) or 501(c)(6) entities are likely to be organized for research or educational purposes *and* meet the definition of ''affiliated or related nonprofit entity'' under 8 CFR 214.2(h)(19)(iii), which requires a close tie to an institution of higher education. Therefore, DHS has determined that in defining eligibility for nonprofit fee reductions and exemptions under this rule, it is appropriate to include 501(c)(3) entities while excluding 501(c)(4) and 501(c)(6) entities. This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

### 5. Changes to EB–5 Volume Forecasts

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by the EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

For the proposed rule, DHS estimated the EB–5 workload based on statistical modeling, immigration receipt data, and internal assessments, like other workload forecasts. 88 FR 402, 432–438. The proposed rule discussed that EB–5 receipts decreased from FY 2016 to FY 2020. 88 FR 402, 509–510. At the time of the proposed rule, DHS had very limited information upon which to base estimates of the new workload required by the EB–5 Reform and Integrity Act of 2022. *See id.* at 557. In this final rule, DHS updated the EB–5 workload estimates to account for the effect of the EB–5 Reform and Integrity Act of 2022. USCIS believes these estimates better represent the EB–5 filing receipts it can expect. Increasing the volume forecasts for EB–5 also increases the amount of revenue generated by the EB–5 workload for the final rule budget. As explained elsewhere, DHS has revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the EB–5 fees in the final rule. 88 FR 72870.

| Table 4: EB-5 Workload Forecast | | | |
|---|---|---|---|
| Immigration Benefit Request | Proposed Rule Average Annual Projected Receipts | Final Rule Average Annual Projected Receipts | Difference |
| I-526 Immigrant Petition by Alien Investor | 3,900 | 4,050 | 150 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,250 | 4,500 | 1,250 |
| I-956 Application for Regional Center Designation | 62 | 400 | 338 |
| I-956F Application for Approval of Investment in a Commercial Enterprise | N/A | 600 | 600 |
| I-956G Regional Center Annual Statement | 728 | 875 | 147 |
| I-956H Bona Fides of Persons Involved with Regional Center Program | N/A | 2,000 | 2,000 |
| I-956K Registration for Direct and Third-Party Promoters | N/A | 500 | 500 |
| EB-5 Receipts Forecast | 7,940 | 12,925 | 9,435 |

**6. Changes to H–1B Registration Fee Volume Forecasts**

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule is close to the 274,237 total registrations in the FY 2021 cap year.[34] However, after the proposed rule was published, a total of 780,884 petitioners registered for an FY 2024 cap-subject H–1B employee. This final rule forecast of 424,400, based on more recent data, is closer to the total registrations for the FY 2023 cap year. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the H–1B registration fees in the final rule. 88 FR 72870.

**7. Online Filing Fees**

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

As described in the proposed rule and supporting documentation, the cost savings USCIS experiences from online filing differs from form to form depending on many factors. Many commenters wrote that USIS was penalizing those who still filed on paper by making paper filing more expensive. The commenters misunderstand the policy goal of the online discount because DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. If the online discount was not provided, paper form fees would not decrease accordingly. DHS wants to incentivize online filing, but we proposed fees

based on the costs savings calculated in the ABC model.

In response to comments, DHS reevaluated the difference between online and paper fees. In the proposed rule, the proposed fee differences ranged from $0 to $110. In this final rule, DHS again has determined that online filing provides costs savings to USCIS and requestors, increases flexibility and efficiency in adjudications, and those benefits should be reflected in lower fees. However, in the final rule DHS takes the expected savings from online filing and divides it among all online filed forms by establishing that the fees for online filing will be $50 less than for the same request filed on paper.[35] Furthermore, DHS believes that the $50 reduced cost can be reasonably anticipated to be consistent for future USCIS online filing capabilities and has decided to provide that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g). DHS emphasizes it establishes the $50 difference because

---

[34] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

[35] DHS applies this discount to USCIS online filings only and does not apply this provision to fees set in this rule for immigration benefit requests that are submitted to either USCIS or CBP when the request is submitted to and fee collected by CBP online. *See, e.g.,* 8 CFR 106.2(a)(13)—(15).

USCIS experiences moderately reduced costs from online filing. Additionally, applying a uniform $50 reduced cost for online filing to all forms will make the reduced fee easier for USCIS to administer and be less confusing to the public when calculating the fee. Although DHS believes that it should encourage online filing as a matter of sound policy, contrary to the suggestions of some commenters, DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. For applicants who experience a lack of access to computers or the internet, paper filing will generally remain an option.[36]

### 8. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. Consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 88 FR 402, 450–451. The proposed rule also included a provision to adjust fees by inflation in the future. 88 FR 402, 516.

DHS received many comments about the method that USCIS used to calculate how its costs should be dispersed among the requests for which fees are charged. Some commenters wrote that DHS should limit the increase in USCIS fees by the amount of inflation. DHS analyzed the suggestion and determined that from December 2016 (the month FY 2016/2017 fee rule went into effect) to June 2023,[37] the CPI–U increased by 26.37 percent.[38] Using the CPI–U as the measure for cost and fee increases is consistent with statutes that authorize DHS to adjust USCIS fees. *See, e.g.* section 286(u)(3)(C) of the INA, 8 U.S.C.

1356(u)(3)(C) (providing that DHS may adjust the premium fees based on the change in the CPI–U). DHS then calculated what the fees would be if adjusted by 26.37 percent, rounded to the nearest $5 increment, consistent with other fees (and reducing online filing fees by $50 as explained earlier). After considering the amount of the increase, as well as the impacts of the applicable fees on individual filers, DHS determined (1) that the additional revenue that would be generated by increasing the subject forms by inflation would be appropriate for expected revenue from those requests in the final rule, (2) increasing the fees by only inflation as suggested in public comments balanced the need to recover increased USCIS costs with the impacts of the fees on individuals and families, and (3) to the extent that an inflation adjustment did not recover the relative costs of the applicable requests, either other fees could be increased to make up the unrecovered costs using the ability to pay principle or USCIS could reduce its budget. In the final rule, except for certain employment-based benefit request fees, DHS finalized the fees at either the proposed fee level or the current fee adjusted for inflation, whichever was lower. A comparison of current, proposed, and final fees can be found in Table 1.

Some of the proposed fees set to increase less than inflation are the fees for Form N–400, Application for Naturalization, certain adoption-related forms (*e.g.,* Form I–600, Petition to Classify Orphan as an Immediate Relative and Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative), and other immigration benefit requests where DHS limited the proposed fee increase to 18 percent increase (not including biometrics fees), as described in the proposed rule. *See* 88 FR 402, 450–451, 486–487 (Jan. 4, 2023).

This final rule additionally holds several fees to the rate of inflation since the previous fee increase in 2016. For example, DHS adjusts the paper filing fees for Forms I–130, I–485, I–539, and I–751 by inflation.

DHS notes that an increase of a straight 26.37 percent based solely on inflation deviates from the ABC model that OMB Circular A–25 recommends, and the method generally used by DHS in past USCIS fee rules. However, as stated in past fee rules, the proposed rule, and in responses to comments in this rule, DHS is not strictly bound by A–25; nor is it limited to setting fees based on the costs of the service under 31 U.S.C. 9701. For public policy reasons, DHS may use and has used its

discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 81 FR 73308 (the 2016 final rule noted that the Application for Naturalization fee has not changed in nearly a decade and was being set at less than it would be if the 2007 fee were simply adjusted for inflation). DHS believes that this combination of limiting certain fee increases for policy reasons, setting fees using the ABC model, and adjusting fees by inflation, in addition to being responsive to public comments, provides a logical, reasonable, and balanced approach. For the proposed rule, and consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at activity-based costing (ABC) model output levels. 88 FR 402, 450–451. DHS is doing the same in the final rule.

### 9. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402, 459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings and adoptions. *See* Tables 5B, 7; 8 CFR 106.3(b). Many commenters requested that DHS provide more fee exemptions for humanitarian related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide more related fee exemptions. Normally, expanding fee waivers or exemptions may increase fees, as explained in the proposed rule. 88 FR 402, 450–451. However, in this final rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and fee-paying receipts. As such, DHS is implementing these fee exemptions without increasing fees for other benefit requests.

#### a. No New Fee Waivers

DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits while changing some fee waivers to fee exemptions. Additional fee waivers

---

[36] USCIS Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, must be filed online, but no fee is required. See, *https://www.uscis.gov/i-134a,* last Reviewed/Updated: 08/11/2023.

[37] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 89539. DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

[38] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent.

would require USCIS to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

### b. New Fee Exemptions

Many commenters requested that DHS provide more fee exemptions and free services for humanitarian-related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide fee exemptions for several additional forms. A summary of the current and new exemptions is provided below in Table 5A and 5B. The adoption related fee exemptions are in Table 7. Balancing beneficiary-pays and ability-to-pay and the funding needs of USCIS, DHS has determined that these additional fee exemptions are warranted for the following reasons.

#### Victims of Severe Form Of Trafficking (T Nonimmigrants)

In the proposed rule, DHS offered a fee exemption for T nonimmigrant status ("T visa") applicants, T nonimmigrants, and their derivatives for Form I–290B, Notice of Appeal or Motion, only if filed for any benefit request filed before adjusting status or for Form I–485, Application to Register Permanent Residence or Adjust Status. In this final rule, DHS expands the exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824, Application for Action on an Approved Application or Petition, for this population in this final rule. As stated in the proposed rule, the T visa program is historically underused and the annual statutory cap of 5,000 has never been reached. *See* 88 FR 460. DHS aims to further encourage participation of eligible victims of trafficking in the T visa program by expanding fee exemptions as provided in this final rule. DHS believes that these expanded fee exemptions advance the humanitarian goals of the T visa program by reducing barriers for this particularly vulnerable population while meeting the agency's funding needs because of the relatively low receipts and cost transfer for these forms.[39] Also, providing these fee

exemptions helps to ensure parity of access to immigration relief for T visa applicants, T nonimmigrants, and their derivatives with similarly situated humanitarian categories of requestors. Finally, these additional exemptions will help account for the trauma and financial difficulties that T nonimmigrants may endure long after escaping their traffickers.

#### Victims of Qualifying Criminal Activity (U Nonimmigrants)

DHS provided fee exemptions in the proposed rule for U nonimmigrant status ("U visa") petitioners and U nonimmigrants filing Form I–192, Form I–193, Form I–290B, and Form I–539 in limited circumstances. DHS expands these fee exemptions in this final rule such that Form I–192, Form I–193, and Form I–539 are fee exempt when filed by a U visa petitioner or U nonimmigrant at any time, and Form I–290B is also fee exempt if filed for ancillary forms associated with Form I–485. DHS also expands the fee exemption for Form I–765 to include initial, renewal, and replacement requests. Furthermore, DHS provides additional fee exemptions for Form I–131, Form I–485, Form I–601, Form I–824 and Form I–929 for this population. Providing these fee exemptions helps to ensure parity of access to immigration relief for U nonimmigrants with similarly situated humanitarian categories of requestors. These additional fee exemptions are provided in this final rule for the reasons stated in Section IV.F of this preamble where DHS responds to the public comments provided on the fees proposed for U nonimmigrants.

#### VAWA Form I–360 Self-Petitioners and Derivatives

DHS offered fee exemptions in the proposed rule for VAWA self-petitioners and derivatives filing Forms I–131, I–212 and I–601 depending on whether Forms I–360 and I–485 are filed concurrently or currently pending adjudication. Additionally, exemptions were proposed for Forms I–290B and I–485 when the I–485 is filed concurrently with the Form I–360, and for initial filers of I–765 for VAWA self-petitioners and derivatives. For the reasons stated in Section IV.F of this preamble in response to the public comments provided on VAWA self-petitioners, this final rule expands fee exemptions to include when Form I–360

and Form I–485 are filed separately and for some ancillary forms, when the I–485 is not pending. DHS also expands the fee exemption for Form I–290B filed by VAWA self-petitioners to include any benefit request filed before adjusting status or for Form I–485 and associated ancillary forms. Additionally, this final rule provides VAWA self-petitioners fee exemptions for Form I–601A, Form I–824, and Form I–765 renewal and replacement requests. Providing these fee exemptions helps to improve parity of access to immigration relief for VAWA self-petitioners with similarly situated humanitarian categories of requestors. On balance, the reduction of barriers to immigration relief for VAWA self-petitioners when compared with the relatively low transfer payment from the government to other benefit requestors supports DHS's decision to provide these fee exemptions.[40]

Conditional Permanent Residents filing an application for a waiver of the joint filing requirement based on battery or extreme cruelty.

For conditional permanent residents (CPRs) seeking a waiver of the Form I–751 joint-filing requirement based on battery or extreme cruelty, DHS provides an additional fee exemption in this final rule. DHS believes that CPRs filing under this exception are similarly situated to other VAWA requestors, for whom DHS has created new fee exemptions in the proposed rule and final rule. As the proposed rule noted with regards to VAWA self-petitioners, *see* 88 FR 402, 461 (Jan. 4, 2023), abused CPRs may still be living with their abuser or have recently fled their abusive relationship when filing Form I–751. Abusers often maintain control over financial resources to further the abuse, and victims may have to choose between staying in an abusive relationship and poverty and homelessness. *Id.* Therefore, CPRs who are victims of abuse may lack financial resources or access to their finances. DHS acknowledges that the proposed rule stated that it could not provide this fee exemption because Form I–751 petitioners can seek a joint-filing waiver on multiple grounds at once. *Id.* at 462. Upon reconsideration, however, DHS sees no reason that providing the fee exemption for CPRs who also request

---

[39] From FY 2018 through FY 2022, T nonimmigrants filed a five-year annual average of 311 Forms I–290B and a five-year annual average of 4 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from

the government to benefit requestors is calculated to be $171,672 for Form I–290B and $2,242 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

[40] From FY 2018 through FY 2022, VAWA self-petitioners filed an annual average of 1,273 Forms I–290B and an annual average of 314 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from the government to benefit requestors is calculated to be $1,550,128 for Form I–290B and $36,769 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

multiple waivers would be infeasible operationally. DHS further notes that CPRs requesting abuse waivers are a relatively small population, *id.;* RIA Table 47; so even without the budget reductions described earlier, this additional fee exemption would have minimal effect on USCIS revenue and other fees.

Abused Spouses and Children Adjusting Status Under CAA and HRIFA

In the proposed rule, DHS proposed a fee exemption for abused spouses and children adjusting status under CAA and HRIFA for Form I–290B only if filed for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824 for this population. DHS has determined that these new exemptions are warranted because these applicants can face many of the ongoing financial obstacles as other VAWA requestors, as discussed earlier. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories. Given the very low number of applicants for these two populations (*see* 88 FR 402, 402, Jan. 4, 2023), DHS anticipates that these additional fee exemptions will have a negligible impact on its budget.

Abused Spouses and Children Seeking Benefits Under NACARA and Abused Spouses and Children of LPRs or U.S. Citizens Under INA sec. 240A(b)(2)

For abused spouses and children seeking benefits under NACARA as well as abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2), DHS proposed fee exemptions for Form I–765 initial requests submitted under 8 CFR 274A.12(c)(10). In this final rule, DHS expands these fee exemptions to include Form I–I–765 renewal and replacement requests, as well as Form I–824 for both categories of requestors. DHS determined that these new exemptions are warranted because abused NACARA applicants may face many of the ongoing financial obstacles as other VAWA requestors, as discussed previously. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories.

Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries.

DHS proposed fee exemptions in the proposed rule for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries filing Form I–290B for any benefit request filed before adjusting status or Form I–485 and Form I–765 initial requests. In this final rule, DHS expands these fee exemptions for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485 and Form I–765 replacement and renewal requests. DHS also exempts the fee for Form I–824 for this population. DHS echoes the reasoning provided in the proposed rule as to why this population merits additional fee exemptions. *See* 88 FR 463. DHS believes that it is an inefficient use of USCIS resources to adjudicate individual fee waiver requests for this group when such requests will likely be granted. DHS also believes that the time saved in the adjudication process for these individuals will demonstrate the agency's "full and prompt cooperation, resources, and support" for this population as directed by the President.[41] Also, DHS experience indicates that many in the OAW population move often, and have experienced challenges in securing employment authorization documents (EADs) that have resulted in USCIS receiving many EADs back as undeliverable (for example, needing to relocate after being resettled in the United States, or not having their initial EAD properly transferred to their new address), which would have required them to submit additional requests such as Form I–765 with the fee to request a replacement EAD. DHS acknowledges that these challenges faced by this population result from circumstances beyond their control, and therefore provides expanded fee exemptions to improve their access to immigration benefits for which they are eligible.

Special Immigrant Juveniles (SIJs)

In the proposed rule, DHS proposed a fee exemption Form I–290B filed by SIJs for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this fee exemption to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also provides a fee exemption for SIJs filing Form I–601A and Form I–824. Notwithstanding that SIJs adjust status in the United States and do not generally need to use Form I–601A, some individuals in this category do file the form. Given the very small number of receipts, DHS provides a fee exemption for SIJs filing Form I–601A. DHS believes that these expanded fee exemptions align with the reasoning for exempting fees for this population given in the proposed rule (*see* 88 FR 463) and improves the parity of fee exemptions among similarly situated humanitarian and protection-based immigration categories.

Current and Former U.S. Armed Forces Service Members, Including Persons Who Served Honorably on Active Duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)

For current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K), 8 U.S.C. 1101(a)(27(K), DHS proposed a fee exemption for Form I–765 initial requests for the service member in the proposed rule. DHS expands this fee exemption in the final rule to include Form I–765 renewal and replacement requests for the service member. DHS provides these additional fee exemptions in furtherance of our commitment to reduce barriers and improve access to immigration benefits for individuals who served in the U.S. Armed Forces, as described in the proposed rule.[42] DHS also believes that providing a fee exemption for this population for Form I–765 renewal and replacement requests improves parity with similarly situated immigration categories like special immigrant Afghan and Iraqi translators and interpreters.

1. Summary Tables of Fee Exemption Changes in the Final Rule

Tables 5A, 5B, and 5C compare fee exemptions and fee waiver eligibility at three points in time: those currently in effect, those provided in the proposed

---

[41] *See* Memorandum on the Designation of the Department of Homeland Security as Lead Federal Department for Facilitating the Entry of Vulnerable Afghans into the United States, Aug. 29, 2021.

[42] *See* 88 FR 465 (noting DHS's involvement in the initiative to support service members, veterans, and their immediate family members in recognition of their commitment and sacrifice).

rule, and those provided in this final rule. These tables include fee exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and other immigration categories for which DHS is providing additional fee exemptions and waivers. These tables do not include all USCIS benefit requests or groups for which DHS currently provides or will provide

a fee exemption or waiver in this rule or by policy.[43]

• Table 5A illustrates the fee exemptions and fee waiver eligibility existing before the effective date of this final rule ("current").

• Table 5B lists forms eligible for fee waivers as provided in the proposed rule, additional fee exemptions

provided in the proposed rule, and additional fee exemptions provided in this final rule.

• Table 5C summarizes the available fee exemptions and fee waiver eligibility as of the effective date of this final rule, which includes currently available fee exemptions and the additional fee exemptions provided in the proposed rule.

**BILLING CODE 9111–97–P**

[43] For all other fee exemptions and fee waiver eligibility, *see* 8 CFR 106.2, 106.3.

### Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| **Victims of severe form of trafficking** (T nonimmigrants)[45] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(16) fee exempt for principals only)[46] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B[47]<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[48] | • Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(19) fee exempt for principals only and (c)(14) fee exempt for principals and derivatives)[49] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form I-929<br>• Form N-300 |

---

[44] "Current" refers to fee exemptions and forms eligible for fee waiver in effect before the effective date of this final rule.

[45] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

[46] No initial fee for principals who receive an EAD incident to status.

[47] In general, USCIS may waive the fee for Form I-290B, Notice of Appeal or Motion, under 8 CFR 103.7(c) if the noncitizen shows an inability to pay and (1) the appeal or motion is from a denial of an immigration benefit request for which no fee was required, or (2) the fee for the underlying application or petition could have been waived.

[48] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[49] There is no initial fee for principals who receive an EAD incident to status. *See* Form G-1055, Fee Schedule, available at *https://www.uscis.gov/g-1055*. There is also no fee associated with initial (c)(14) EADs issued based on a bona fide determination for principals and derivatives when the Form I-765 is filed. USCIS, "USCIS Policy Manual," Vol. 3, "Humanitarian Protection and Parole," Part C, "Victims of Crimes," Chp. 5, "Bona Fide Determination Process," available at *https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5* (last visited Oct. 27, 2023).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[50] | • Form I-360<br>• Form I-765 (initial category (c)(31) generally fee exempt for principals only)[51] | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[52] | None | • Form I-90<br>• Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[50] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA secs. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

[51] Currently, VAWA self-petitioners may check a box on Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, requesting a category (c)(31) EAD upon approval of the self-petition. This EAD is currently fee exempt. If the self-petitioner does not check this box, they must file a Form I-765 to request employment authorization under 8 CFR 274a.12(c)(14) designation or under 8 CFR 274a.12(c)(9) if applicable. The self-petitioner may also file a Form I-765 to request a category (c)(31) EAD if not initially requested on the Form I-360. All self-petitioners and derivatives filing a renewal or replacement request must file a Form I-765 with a fee or fee waiver request.

[52] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Abused spouses and children adjusting status under CAA and HRIFA**[53] | None | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)**[54] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form I-881<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[55] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[53] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[54] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765, Application for Employment Authorization, for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[55] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[56] | • Form I-765V[57] | Not Applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Forces (ISAF) and their derivative beneficiaries** | • Form I-130 (for certain Special Immigrant Afghans)[58]<br>• Form I-290B (if filed to appeal Form I-360)<br>• Form I-360<br>• Form I-485 (for certain Special Immigrant Afghans)[59]<br>• Form I-765 (initial filing for certain Afghans)[60]<br>• Form I-601 (for certain Special Immigrant Afghans)[61]<br>• Form I-824 (for certain Special Immigrant Afghans)[62] | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-360 | • Form I-90<br>• Form I-131<br>• Form I-290B<br>• Form I-485 |

[56] *See* INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[57] The fee exemption for Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse, for this category includes all initial, renewal, and replacement EADs.

[58] Filed with USCIS in the United States on behalf of any Afghan national (beneficiary) with a visa immediately available. Available through September 30, 2023.

[59] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, and applying to adjust status to permanent residence based on classification as Afghan special immigrants. Available through September 30, 2023.

[60] Afghan nationals and their derivative beneficiaries who were paroled into the United States on or after July 30, 2021 (eligibility category (c)(11)). Available through September 30, 2023.

[61] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, who file Form I-601, Application for Waiver of Grounds of Inadmissibility, associated with Form I-485, Application to Register Permanent Residence or Adjust Status, if filing as an Afghan Special Immigrant or any Afghan national with an approved Form I-130, Petition for Alien Relative, with a visa immediately available. Available through September 30, 2023.

[62] Filed for an Afghan holding a Special Immigrant Visa.

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS**[63] | • Form I-765 (initial TPS applicant, under 14 and over 65 who is requesting an initial EAD.)[64]<br>• Form I-821 (no fee for re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-590<br>• Form I-485<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request) | • Form I-90<br>• Form I-290B<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

[63] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

[64] Note the fee exemption for Form I-765 initial EAD requests filed by initial TPS applicants under age 14 and over age 65 is removed by this rule.

**Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions**

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| | | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[65]** | • Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600<br>• Form I-131 (for service members filing concurrently with an N-400) | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K<br>• Form I-765 |

**Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]**

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| **Victims of severe form of trafficking (T** | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request before | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and | • Form I-90<br>• Form I-290B[71]<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470 |

[65] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[66] This table includes exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS is proposing additional fee exemptions. This table includes only those exemptions that DHS is required to provide under this statute, and it does not include all USCIS benefit requests or groups for which DHS currently provides or is proposing to provide an exemption in this rule or by policy. See regulatory text for all other fee exemptions and fee waivers.

[67] This column lists the additional fee exemptions that were provided in the proposed rule. all of which are maintained in the final rule. In addition, DHS will maintain all the current fee exemptions.

[68] This column lists the forms eligible for fee waivers from the proposed rule. The final rule exempts the fee for some of these forms, and the rest remain as fee waivers. There are no additional fee waivers in the final rule.

[71] Fee waivable for other forms including naturalization and citizenship related forms.

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| nonimmigrants)[69] | adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[70] | associated ancillary forms)<br>• Form I-824 | • Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[72] | • Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed)<br>• Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[73] (initial, renewal, and replacement request)<br>• Form I-824<br>• Form I-929 | • Form I-90<br>• Form I-131<br>• Form I-192 (only if filed with or after Form I-485 is filed)<br>• Form I-193 (only if filed with or after Form I-485 is filed)<br>• Form I-290B (only if filed with or after Form I-485 is filed)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-** | • Form I-131 (only when Form I-360 and Form I-485 are | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B |

[69] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[70] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[72] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[73] The proposed fee exemption for U nonimmigrants or applicants for U not filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **petitioners and derivatives[74]** | concurrently filed or pending) <br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending) <br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360) <br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485) <br>• Form I-485 (only if filed concurrently with Form I-360) <br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending) <br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial category | benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) <br>• Form I-485 <br>• Form I-601 <br>• Form I-601A[76] <br>• Form I-765 (renewal, and replacement request) <br>• Form I-824 | • Form I-485 <br>• Form I-601 <br>• Form I-765 (renewal and replacement requests) <br>• Form I-824 <br>• Form N-300 <br>• Form N-336 <br>• Form N-400 <br>• Form N-470 <br>• Form N-565 <br>• Form N-600 <br>• Form N-600K |

[74] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a), 8 U.S.C. 1101(a)(51), 1154(a).

[76] Note that while it is theoretically possible for a VAWA self-petitioner to use Form I-601A, Application for Provisional Unlawful Presence Waiver, it would be highly unlikely. Form I-601A is used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions for VAWA applicants, and so they typically choose to adjust status.

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
| | (c)(31) fee exempt for principals and derivatives)[75] | | |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[77] | • Form I-290B (only when filed for Form I-751) | • Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA**[78] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under NACARA**[79] | • Form I-765 (submitted under 8 CFR 274.12(c)(10) initial request)<br>• Form I-881<br>• Form I-601 | Form I-765 (renewal and replacement request)<br>Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[75] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[77] See INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D), 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[78] See INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

[79] See INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)[80]** | • Form I-601[81]<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial) | • Form I-765 (renewal, and replacement request)<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 |

[80] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[81] This proposed fee exemption has been removed from the final rule.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| | • Form I-765 (initial, renewal, and replacement). | • Form I-601A[82]<br>• Form I-824 | • Form N-600K |
| **TPS[83]** | Not applicable | none | • Biometrics Fee<br>• Form I-90<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | Not Applicable | none | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | none | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. Armed Forces service** | • Form I-131<br>• Form I-360<br>• Form I-485 | • Form I-765 (renewal, and replacement | • Form I-90<br>• Form N-300<br>• Form N-470 |

[82] Although SIJs do not need to use Form I-601A, some do file the form. Form I-601A is typically used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions as well as certain inadmissibility grounds for SIJs, and as a result, SIJs adjust status in the United States and do not file Form I-601A.

[83] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

**Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]**

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| **members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)[84]** | • Form I-765 (initial request for service member) | request for service members) | • Form N-565<br>• Form N-600K |

**Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule**

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| **Victims of severe form of trafficking** (T nonimmigrants)[85] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[84] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[85] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765 (initial, renewal and replacement requests)[86]<br>• Form I-824 | |
| **Victims of qualifying criminal activity** (U nonimmigrants)[87] | • Form I-131<br>• Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial, renewal, and replacement request)[88]<br>• Form I-929<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form I-290B<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[89] | • Form I-360<br>• Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

[86] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[87] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[88] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[89] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
|  | filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A<br>• Form I-765 (initial, renewal, and replacement request) (8 CFR 274a.12(c)(9), 8 CFR 274a.12 (c)(14), and (c)(31) fee exempt for principals and derivatives)[90]<br>• Form I-824 | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[91] | • Form I-290B (only when filed for Form I-751)<br>• Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA**[92] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[90] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[91] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[92] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765(initial, renewal, and replacement request)<br>• Form I-824 | |
| **Abused spouses and children seeking benefits under NACARA**[93] | • Form I-765 (initial, renewal, and replacement request) (submitted under 8 CFR 274a.12(c)(10))<br>• Form I-881<br>• Form I-601<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[94] | • Form I-765 (initial, renewal, and replacement request) (8 CFR 274a.12(c)(10))<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[95] | • Form I-765V[96] | Not applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 |

[93] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[94] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[95] *See* INA sec. 106, 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[96] The fee exemption for Form I-765V for this category includes all initial, renewal, and replacement EADs.

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| **on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-601<br>• Form I-824 | • Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-360<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS**[97] | • Form I-821 (only re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730 | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[97] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

**Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule**

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| | • Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | |
| Refugees | • Form I-131<br>• Form I-131A<br>• Form I-485<br>• Form I-590<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial, renewal, and replacement request) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[98] | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request for service member)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600 | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K |

BILLING CODE 9111–97–C

c. Codifying Fee Waiver Eligibility Criteria

The proposed rule specified that discretionary waiver of fees requires that a waiver based on inability to pay be consistent with the status or benefit sought, including benefits that require demonstration of the applicant's ability to support himself or herself, or individuals who seek immigration status based on a substantial financial investment. *See* 88 FR 402, 593 (proposed 8 CFR 106.3(a)(1)(ii)). The final rule removes this regulatory text because it is redundant and unnecessary, as the forms eligible for fee waiver are enumerated at 8 CFR 106.3(a)(3). The final rule codifies that a person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

• Receipt of a means-tested benefit as defined in 8 CFR 106.1(f)(3) at the time of filing;

• Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

• Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.

*See* 8 CFR 106.3(a).

This change codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship.[99] While not a change

---

[98] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

[99] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, ''Fee Waiver Guidelines as Established by the final rule of the USCIS Fee

to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the concerns of many commenters.

### d. No Mandatory Use of Form I–912

In the proposed rule, 8 CFR 106.3(a)(2) stated, "*Requesting a fee waiver.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form." In this final rule, USCIS will maintain the status quo of accepting either Form I–912 or a written request. The final rule will revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020), which states, "Requesting a fee waiver. To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request."

After considering public comments in response to the proposed requirement to submit Form I–912, DHS agrees with multiple points made by commenters. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors. *See* 88 FR 402, 458 (Jan. 4, 2023). Due to the multiple ways of establishing one's inability to pay, *see* 8 CFR 106.3(a)(1), Form I–912 may be complex for some requestors. DHS also recognizes that some requestors, particularly those who are struggling financially, may face difficulty accessing printing and internet services. DHS believes that flexibility is important in dealing with these populations, and allowing requestors to seek fee waivers via written request will improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers are requested by written request instead of Form I–912, continuing to allow written requests will not significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to

obtain a fee waiver by written request without filing Form I–912.

### e. Child's Means-Tested Benefit Is Evidence of Parent's Inability To Pay

After considering the comments on the proposed rule DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. Such benefits would include public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[100] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means-tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 instructions.

### 10. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making procedural changes in the final rule to address issues that it has experienced with fee-exempt and low fee-filings. DHS appreciates the concerns of commenters and is making changes to address those concerns by lowering many fees below the amount that was proposed, establishing discounts for small employers and nonprofits, and adding multiple fee exemptions. However, to provide the requested changes, DHS must make some adjustments to codified procedural requirements to mitigate some of the unintended consequences of providing limited discounts and free services and some of the actions for which those changes may provide an incentive.

### a. Duplicate Filings

The final rule provides that a duplicate filing that is materially identical to a pending immigration benefit request may be rejected. *See* 8

CFR 103.2(a)(7)(iv). DHS did not initially propose to prohibit multiple filings of identical requests to deter multiple filings of requests that have no or minimal fee, to reduce backlogs, and to improve processing times.

DHS is concerned that the new fee exemptions listed above will lead to the filing of multiple or simultaneous filing of requests that could create jurisdictional conflicts between DHS offices or individual immigration service officers who adjudicate the same types of requests. For example, filing multiple Forms I–290B, Notice of Appeal or Motion, may lead to the filing of multiple motions, multiple appeals, or the simultaneous filing of motions and appeals that would create jurisdictional conflicts between the Administrative Appeals Office (AAO) and other DHS offices. USCIS must intake the request, process or reject the request, and incur the associated costs for each duplicate, multiple or original request even when no fee is required. Multiple filings increase costs to USCIS to reject or process and it may exacerbate backlogs because free services or those with minimal fees do not provide revenue that can be used to fund new processing capacity. Requesters who file multiple requests consume excessive USCIS resources to the detriment of those who file one legitimate request.

Although it seems self-evident that USCIS can reject a materially identical filing of the exact same form while a previous request for the same benefit for the same person is still pending, that authority is not codified. Historically, USCIS has accepted duplicate filings of certain forms assuming the fee would cover the duplicate adjudication effort, if any. USCIS experience in administering OAW, U4U, the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, and FRP has found that applicants submit multiple parole requests when they are fee exempt (as they are for OAW), as well as multiple Forms I–134A, Online Request to be a Supporter and Declaration of Financial Support, for the same prospective beneficiary. USCIS also receives duplicate Forms I–730, Refugee/Asylee Relative Petition, and Forms I–918, Petition for U Nonimmigrant Status, which do not have a filing fee. For some of these cases USCIS will adjudicate the initial and duplicate petitions on the merits, increasing costs to USCIS. Others are administratively closed, rejected, or consolidated with the duplicate request. All of these actions take time away from processing other requests. DHS is concerned that the reduction of fees for the additional

---

Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

[100] Soc. Sec. Admin., "Understanding Supplemental Security Income, What Is Income?" (2023), *https://www.ssa.gov/ssi/text-income-ussi.htm* (last visited Aug. 21, 2023).

forms provided in this rule, *see* Table 5B, will in the same way cause applicants to submit multiples of the same request.

This change is necessitated by DHS's decision to provide the additional free services in the fee rule as requested by commenters. As explained above, USCIS experience is that when a full cost recovery fee is charged, duplicate, identical filings are very uncommon, but when the request is free or minimal (such as with the $10 H–1B Registration Fee) they are submitted more frequently. Because this problem results from fee exempt filings, and this rule provides additional fee exemptions as requested by commenters, codifying this restriction as a related change to offset the possible negative effects of the relief is a logical outgrowth of the proposed rule.[101] USCIS already rejects or administratively closes a request that is materially identical to a request that is being adjudicated because a requester generally cannot receive two or more identical immigration statuses, classifications, visas, or benefits. Individuals generally do not have a substantive right to receive multiple issuances of identical immigration benefits, which by their nature are only of value at first issuance (*e.g.,* two green cards or two travel documents). Thus, DHS will only approve document replacement requests under certain circumstances such as when the document is lost, stolen, or destroyed. In addition, after employees have already processed one request and made a decision, requiring the same or another agency employee to process the same request all over again, while a backlog of requesters remain waiting for attention, is not an efficient use of agency resources, especially when the request has no fee. This minor change to USCIS intake procedures is procedural in nature and does not alter the substantive rights of individuals. DHS is codifying this practice to ameliorate unintended consequences that may logically flow from the actions we are taking to provide more fee relief in this rule. These changes are made in the final rule as a procedural change and thus public comment is not required. *See* 5 U.S.C. 553(b)(A). Therefore, DHS is adding new 8 CFR 103.2(a)(7)(iv) to provide that a request that is materially identical to a pending request may be rejected.

[101] An agency may make changes that follow logically from or reasonably develop the rules the agency proposed. *See, Air Transport Ass'n of America* v. *C.A.B.,* 732 F.2d 219 (D.C. Cir. 1984).

**b. Revocations**

The final rule changes to a minor extent the handling of an approved benefit request if an incorrect fee is submitted or if the fee payment instrument is dishonored. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*) and 106.1(c)(2).

DHS is authorized to charge fees and inherent in that authority is the authority to enforce the payment of the fee and sanction failure to pay the fee. Payment of a codified fee is a fundamental eligibility criterion for any immigration benefit request. Failure to pay the correct fee by falsifying or misrepresenting eligibility for a fee waiver, exemption, or discount, as well as a dishonored check, stop payment, credit card dispute, or closed account, renders the requester ineligible for the approved benefit. Without enforcement capability, failure to pay fees would have no ramifications and possibly cause considerable damage to the ability of USCIS to fund its operations. Regarding the fee discounts, DHS foresees the situation where a petitioner may submit a lower fee for which they may not qualify and USCIS may not catch that error at intake. For example, in the five fiscal years preceding the FY 2016/2017 fee rule, an average of 231 petitions per year were submitted with a Request for Premium Processing Service, Form I–907, accompanied by a check that was dishonored by the remitting bank. 81 FR 73292, 73314. For fiscal year 2023, as of July 15, 2023, USCIS received between 30 to 43 dishonored payments per month that were associated with a Form I–129 filing, with approximately 10 of those being dishonored for stop-payment. If a benefit approved under these circumstances is not revoked, petitioners would have the incentive to request premium processing services in order to receive a swift approval, knowing they would not face any consequences once the bank dishonors the premium processing payment. *Id.*

Accordingly, balancing the need to provide relief to those requesters who have less ability to pay with the need to fully fund DHS, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). This change will insulate USCIS against the falsification of fee discount eligibility and the negative revenue impacts that would cause. Further, many of the discounted fee requests will include a request for premium processing and USCIS may approve them in a few days. The alternative to

revocation on notice would be for USCIS to hold each benefit request until the financial instrument used to pay the fee has finally cleared or been rejected. In the interest of administrative efficiency and prompt processing of benefit requests, DHS has rejected that alternative. Thus, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Sending a Notice of Intent to Revoke (NOIR) will be more effective than billing for the unpaid fee because the requestor may simply ignore the bill while confident that it would cost USCIS more to attempt collection through litigation or other means. In most cases, the NOIR will be cured by payment of the correct amount.

The first sentence of proposed 8 CFR 106.1(c)(2), stated, "If the benefit request was approved, the approval may be revoked upon notice." DHS is revising 106.1(c)(2) to clarify that if the benefit request was approved, the approval may be revoked, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. 8 CFR 106.1(c)(2). DHS does not in all cases have authority to revoke an approval upon notice. For example, DHS cannot administratively revoke naturalization and must use proceedings in a Federal district court following INA section 340(a), 8 U.S.C. 1451(a). Similarly, cancellation under INA section 342, 8 U.S.C. 1453, is the only route to pursue revocation if a certificate of citizenship or naturalization has already been issued. Accordingly, while these authorities already exist in statute and rulemaking is not required to implement them, in the final rule DHS is revising 8 CFR 106.1(c)(2) to explicitly acknowledge that USCIS' right to revoke an approval upon notice in cases where a fee payment is not honored may be subject to statutory limitations.

**c. No Initial Field Review for Fee Exempt Form I–290B**

When an affected party files an appeal of an initial USCIS decision, the USCIS officer who made the initial decision reviews the appeal case and decides whether the case warrants favorable action. *See* 8 CFR 103.3(a)(2)(ii). During their review, the officer decides whether the case warrants favorable action and if warranted, may reverse the initial unfavorable decision. If the officer determines that favorable action is not warranted, he or she must "promptly" forward the appeal to the AAO. *See* 8 CFR 103.3(a)(2)(iv). DHS did not propose exceptions to 8 CFR

103.3(a)(2)(ii) in the proposed rule. However, as outlined previously in this section, the final rule makes Form I–290B, Notice of Appeal or Motion, fee exempt for several new populations. *See* Table 48, in Section F. Fee Expenditures of RIA. To avoid fee exempt requests consuming excessive USCIS resources, in the case of a fee waived or fee exempt appeal under 8 CFR 106.3, this rule provides that USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision. *See* 8 CFR 103.3(a)(2)(ii) (providing that USCIS may forward the appeal for adjudication without a review by the official who made the unfavorable decision).

As stated previously in this section, free services do not provide revenue that can be used to fund new processing capacity. In addition, making an immigration benefit request free may increase the volume of those filings. The review by the official who made the unfavorable decision is a step in the appeal process that costs USCIS time and money and exacerbates backlogs by requiring officers to review already decided cases. To minimize the workload on USCIS officers who are required to review a denied request after appeal that may be caused by free appeals, DHS is eliminating the regulatory requirement to review appeals before forwarding them to the AAO if the appeal was fee exempt or the fee was waived. Elimination of mandatory field review is likely to decrease appeal processing times. Based on the FY 2017 average time for the AAO to receive an appeal from the field, the elimination of mandatory field review could save up to 113 days in processing time, on average, for cases requiring AAO review. This change will expedite the appeals process and provide the affected party a quicker decision. This change is both a logical outgrowth of the proposed rule and a logical extension of changes made in the final rule at the request of commenters. In addition, affected parties would not incur costs from this change because it is a procedural matter of internal agency management. DHS does not anticipate any cost savings for USCIS from this change, as any savings will be offset by a full appellate review at the AAO.

**11. Adjustment of Status (Form I–485) and Family-Based Fees**

**a. Bundling of Fees for Form I–765 and I–131**

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status, applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. Instead, DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their Employment Authorization Document (EAD) while their Form I–485 is pending. *Id.* DHS is unbundling the forms to make USCIS processing times more efficient by eliminating Forms I–765 filed for individuals who are not in need of employment authorization or Forms I–131 for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need.

Nevertheless, after considering the public comments DHS decided to provide the half price Form I–765 to reduce the burden on low, middle-income, or working-class requesters. DHS acknowledges that many prospective applicants for lawful permanent resident (LPR) status may lack work authorization and therefore struggle to pay the filing fee for Form I–765. An applicant may request a fee waiver for Form I–765. *See* 8 CFR 106.3(a)(3)(ii)(F). In addition, Forms I–131 and I–765 are fee exempt for certain categories of applicants. *See* 8 CFR 106.3(b).

**b. Child Discount for Form I–485**

DHS initially proposed that children filing Form I–485 with their parents pay the same fee as adults, $1,540. 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii). The current $750 fee went into effect in December 2016 and the new $950 fee is based on the increase in the CPI–U (the amount of inflation) between December 2016 and June 2023, like other inflation adjusted fees in this rule. DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. DHS also understands the social benefit of family immigration and the potential impacts the proposed fee could have on children and families. Therefore, after reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950. Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for the Form I–765 and Form I–131. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

**12. Adoption Forms Changes**

After considering public comments, in the final rule DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for:

- Second extensions.
- Second change of country requests.
- Duplicate approval notices for both the orphan and the Hague process.

These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. Providing a second free extension will provide another 15 months of suitability approval validity at no additional cost to the applicants. DHS recognizes that intercountry adoptions may take an increasing amount of time because of factors outside the control of adoptive families, such as country conditions, and believes this will help reduce related burdens on adoptive families.

The final rule fee for the Supplement 3 for the orphan and Hague process will be $455. Petitioners will pay less under the final rule for most scenarios where they request action on a suitability application for the orphan or Hague process. Therefore, DHS believes the fees and new fee exemptions properly align with the needs of the adoption community while not unnecessarily shifting the USCIS adoption program costs by increasing fees for others.

**13. Naturalization and Citizenship Fees**

**a. Half Fee for Form N–400**

In the proposed rule, applicants with household incomes not more than 200 percent of the Federal Poverty Guidelines (FPG) would be eligible for the reduced fee for Form N–400, Application for Naturalization. *See* 88 FR 402, 487–488 (Jan. 4, 2023). However, DHS notes that in recent years only one third of new lawful permanent residents (LPR) naturalized within 6

years of obtaining LPR status,[102] and stakeholders have identified the fee for Form N–400 as a significant obstacle to naturalization.[103]

In response to public comments and additional stakeholder feedback, and in recognition of the financial gains immigrants obtain with naturalization and the benefits that the United States obtains from new naturalized citizens, this final rule expands eligibility for paying half of the regular fee for Form N–400. An applicant with household income at or below 400 percent of FPG may pay half price for their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). DHS believes that this change will provide additional relief to longtime residents who struggle to pay naturalization fees without requiring further fee increases for other forms to offset the cost. The increased income threshold for a reduced naturalization fee will also enable the United States to further benefit from newly naturalized citizens, including their greater civic involvement and tax revenues.[104]

b. Fee Exemption for Adoption Related Form N–600

The final rule provides that Forms N–600, Application for Certificate of Citizenship and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

Multiple commenters asked USCIS to provide Certificates of Citizenship for all children immigrating based on adoption at no additional cost, as the fee would be an unfair burden on adoptive families. Commenters opposed the increase to the filing fees for adoptive families whose children enter the United States on certain types of visas, reasoning that the certificate should be provided at no additional cost, once all the necessary legal steps have been completed, just as it is provided at no cost for adopted children who enter on a different type of visa for children with final adoptions (IR–3 and IH–3 visas). Commenters indicated that if a Certificate of Citizenship is not obtained at the time of adoption, this becomes a further burden for adoptees.

USCIS already provides Certificates of Citizenship to certain adopted children who come to the United States with a final adoption (children with an IR–3 or IH–3 visa)[105] and meet the conditions of INA sec. 320, 8 U.S.C. 1431, without them having to file a Form N–600 and without paying a fee. USCIS can do this because children with an IR–3 or IH–3 visa generally automatically acquire U.S. citizenship upon their admission to the United States as lawful permanent residents and USCIS can make a citizenship determination based on their underlying immigration petition approval (Form I–600 or Form I–800) without any additional evidence. In addition, these children are in visa categories that are only for adopted children who generally automatically acquire citizenship upon admission, and therefore USCIS can easily identify these children based on their visa category. USCIS is not able to provide Certificates of Citizenship without a Form N–600 for other categories of children, because USCIS cannot make a citizenship determination without additional evidence or cannot identify the children based on their visa category. For example, USCIS cannot issue Certificates of Citizenship without a Form N–600 for children immigrating based on adoption who do not have final adoptions (IR–4s and IH–4s) because they do not automatically acquire citizenship upon their admission and need to submit additional evidence of a full and final adoption for a subsequent citizenship determination. USCIS also cannot automatically issue Certificates of Citizenship to adopted children who are issued IR–2 visas, because stepchildren are also issued IR–2 visas but do not automatically acquire U.S. citizenship upon their admission. USCIS cannot automatically determine which children in these visa categories automatically acquire citizenship and which do not, and thus additional evidence submitted with the N–600 application is required. DHS recognizes the unique vulnerability of adopted children and the overall costs that adoptive families face and wishes to reduce the burden on adoptive families. DHS also notes a passport is available to obtain proof of citizenship without filing Form N–600 for adopted children who automatically acquire or derive citizenship. If adoptive families wish to seek a Certificate of

Citizenship, DHS cannot eliminate the requirement to file a Form N–600 for additional categories of adopted children (such as IR–2, IR–4, and IH–4). However, after considering many comments requesting a free N–600 or N–600K for adopted children, DHS will exempt individuals who are the subject of a final adoption for immigration purposes and meet (or met before age 18) the definition of child under section 101(b)(1)(E), (F), or (G) of the INA from Form N–600 filing fees. 8 CFR 106.2(b)(7). This will include adoptees who are over age 18 at the time of filing or adjudication of the N–600, but who met the definition of child under section 101(b)(1)(E), (F), or (G) of the INA before turning 18. DHS will also exempt children who are the subject of a final adoption for immigration purposes and meet the definition of child under section 101(b)(1)(E), (F), or (G) of the Act from Form N–600K filing fees.

DHS realizes that this exemption seems to favor adopted over biological children in allowing the filing without a fee. DHS did not take this perception lightly when considering whether adopted children should be able to file a fee exempt Form N–600/600K. In the end, DHS reasoned that many adoptive families have already paid USCIS fees for the Form I–600A/I–600, Form I–800A/I–800, or Form I–130, Petition for Alien Relative, whereas the Form N–600 fee may be the only USCIS fee that families of biological children would pay if they acquired citizenship under INA 301 or 309. DHS also recognizes that families may also choose to apply for a passport to document their child's citizenship in cases where a biological child automatically acquired citizenship. The exemption fits logically within the structure of this rule, and results in a minimal loss of revenue from adoptee/adopted child Form N–600 and N–600K fees. Thus, DHS has decided to respond favorably to the request of many commenters and exempt certain adoptees from the N–600 fee and adopted children from the N–600K fee. 8 CFR 106.2(b)(7) and (8).

14. Additional Changes

In the final rule DHS:
• Deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).
• Removes the fee exemption for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a

---

[102] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Trends in Naturalization Rates: FY 2018 Update" (Sept. 2021), *https://www.uscis.gov/sites/default/files/document/reports/Trends_In_Naturalization_Rates_FY18_Update_Report.pdf.*

[103] *See, e.g.,* Comment Submitted by CASA, May 19, 2021, *https://www.regulations.gov/comment/USCIS-2021-0004-7122.*

[104] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, "U.S. Naturalization Policy," (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[105] *See* U.S. Citizenship & Immigr. Servs, U.S. Dep't of Homeland Security, "Your New Child's Immigrant Visa," *https://www.uscis.gov/adoption/bringing-your-internationally-adopted-child-to-the-united-states/your-new-childs-immigrant-visa/your-new-childs-immigrant-visa* (last updated Dec. 15, 2021), for visa categories for adopted children.

waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–*, 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(ii). Therefore, the form is not filed by that population, so the exemptions was not needed making the text superfluous.

• Codifies that USCIS will provide 30-day advance public notification before a currently acceptable payment method will be changed. 8 CFR 106.1(b). Commenters requested that advance notice be provided when a payment method is changed. As explained more fully in the responses to the comments on the subject, DHS is codifying this procedural requirement.

• Revises proposed 8 CFR 106.2(d)(2) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) may be increased by the rate of inflation by final rule. The change is limited only to clarify that all fees not fixed by statute are increased simultaneously. This change is explained more fully in the response to the public comments on this subject.

• Amends 8 CFR 204.5(p)(4)(ii) in this final rule by removing the clause "but not to exceed the period of the alien's authorized admission" so that the provision once again states that "Employment authorization under this paragraph may be granted solely in 1-year increments." The last clause in § 204.5(p)(4)(ii), which is being removed in this final rule, was added in the 2020 Fee Rule in a revision that was intended to remove "8 CFR 103.7(b)(1)" and replace it with "8 CFR 106.2." 85 FR 46922; 84 FR 62364. In neither the 2020 Fee Rule nor in the January 4, 2023, proposed rule did DHS explain why the rule added or retained the last clause, respectively. Although the proposed rule proposed to retain this clause, DHS has determined that the clause is unnecessary and potentially confusing. As explained in the 2016 final rule that created § 204.5(p), the 1-year grant of employment authorization is meant to be a stopgap measure for nonimmigrants facing compelling circumstances and, if granted, provides a period of authorized stay.[106]

### D. Corrections

DHS notes multiple non-substantive errors in the proposed rule as follows:

• The preamble to the proposed rule states, "However, as to Forms *N–565* and N–600K, both the current fees and the proposed fees are less than the estimated cost (fee-paying unit cost) for each naturalization form." 88 FR 402, 485–486 (Jan. 4, 2023) (emphasis added). "However, for Forms *N–565* and N–600K, the proposed fees are below the estimated cost from the ABC model, thus DHS proposes no discount for online filing of the N-forms." *Id.* at 486 (emphasis added). These statements were incorrect as to the Form N–565, Application for Replacement Naturalization/Citizenship Document, because the proposed fee was higher than its fee-paying unit cost. This error is immaterial to the final rule because the current N–565 fee is being increased by the rate of inflation as previously explained.

• DHS proposed to remove text from Form I–485, Supplement A, Supplement A to Form I–485, Adjustment of Status Under Section 245(i), regarding the statutory exemptions to the required INA sec. 245(i) statutory sum when the applicant is an unmarried child under 17 or the spouse or the unmarried child under 21 of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program. *See* 88 FR 402, 494 (Jan. 4, 2023). However, Form I–485, Supplement A, does not contain the language DHS proposed to remove. DHS further stated that it was unnecessary to codify the exemptions from the required INA sec. 245(i) sum into the CFR, but the proposed regulatory text did include the exemptions.

• The proposed regulatory text for 8 CFR 212.19(e) stated: "An alien seeking an initial grant of parole or re-parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information." The second sentence was included in error and has been removed from the final rule.

### E. Status of Previous USCIS Fee Regulations

DHS issued a final rule to adjust the USCIS fee schedule on August 3, 2020, at 85 FR 46788. The rule was scheduled to become effective on October 2, 2020. However, that rule was preliminarily enjoined. *Immigrant Legal Res. Ctr.* v. *Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rights Project* v. *USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020). Consequently, USCIS has not implemented the fees set out in the 2020 fee rule and is still using the fees set in the 2016 fee rule unless an intervening rulemaking has codified a different fee.[107] DHS discussed the effects of the injunctions and their relationship to this rule in detail in the proposed rule. *See* 88 FR 402, 420 (Jan. 4, 2023). This preamble discusses substantive changes that refer to the requirements of the regulations that existed before October 2, 2020.[108] Likewise, the regulatory impact analysis (RIA) for this proposed rule analyzes the impacts of the changes between the pre-2020 fee rule regulations that DHS is following under the injunctions and those codified in this rule.[109]

### F. Severability

In the approach that DHS adopts in this final rule, the new fees allow USCIS to recover full cost given projected volumes and all policy considerations. However, if DHS were prohibited from collecting any new fee for any reason, DHS believes this rule is structured so that a stay, injunction or vacatur of a fee set by this rule could be narrowly tailored to remedy the specific harm that a court may determine exists from the specific fee or fees challenged. USCIS would be able to continue operations, perhaps at a reduced level or by shifting resources in the absence of the fee until DHS is able to conduct new rulemaking to re-set fees and correct the deficiencies that resulted in the court order. Operating without one or a few of the new fees would be preferable to an invalidation of all the new fees, which would great disruption and deterioration of USCIS operations.

DHS believes that the provisions in this rule can function independently of each other. For example, the H–1B Registration Fee, Asylum Program Fee, and genealogy fees could be stalled while a new rule is undertaken without affecting all other fees generally. This would reduce USCIS projected revenue, carryover balances and require realignment of the USCIS budget and a reassessment of spending priorities. *See*

---

[106] See Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers Final Rule, 81 FR 82398, 82424–82425) (Nov. 18, 2016).

[107] *See* 86 FR 7493 (Jan. 29, 2021) (announcing that DHS is complying with the terms of the orders, not enforcing the regulatory changes set out in the 2020 rule, and accepting fees that were in place before October 2, 2020).

[108] As explained in the proposed rule, the effects of the injunction of the 2020 fee rule, intervening rules, and the codification but ineffectiveness of the 2020 fee rule may result in the standard of citing to the CFR print edition date being inaccurate because title 8 was amended by a number of rules in and since calendar year 2020. 88 FR 421. Therefore, regulations that existed on October 1, 2020 are followed by that date, and provisions that were codified by the 2020 fee rule are followed by the effective date of the 2020 fee rule, October 2, 2020.

[109] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, FY 2022–2023 Fee Review Regulatory Impact Analysis (Jan. 4, 2023), *https://www.regulations.gov/document/USCIS-2021-0010-0031.*

88 FR 402, 517 (Jan. 4, 2023). However, USCIS constantly assesses its budget and spending to avoid a deterioration in service considering its fees have not been increased since 2016. Additionally, the statutory authority for this rule provides that ''fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services'' and does not require that DHS *must* recover full costs. INA section 286(m), 8 U.S.C. 1356(m). Therefore, to protect the goals for which this rule is being proposed, DHS is codifying our intent that the provisions be severable so that, if necessary, the regulations overall can continue to function should a particular provision be stricken. *See* 8 CFR 106.6.

### III. Related Rulemakings and Policies

DHS is engaging in multiple rulemaking actions that are in various stages of development.[110] DHS realizes that policy and regulatory changes can affect staffing needs, costs, fee revenue, and processing times. DHS has considered each of these other rules for peripheral, overlapping, or interrelated effects on this rule, and has analyzed the potential effects of rules that may impact or substantively interact with this proposal, if any. *See* 88 FR 402, 432 n.78 (Jan. 4, 2023).

DHS has also, to the extent possible, considered the effects, if any, on this rule of all intervening or future legislation and policy changes of which USCIS is aware. Immigration policy changes frequently, and initiatives may come about without being incorporated in a proposed and final rule simply due to the time required for rule development and finalization. DHS, therefore, does not and cannot assert that it knows and has considered every policy change that is planned or that may occur at all levels and agencies of the U.S. Government that may directly or indirectly affect this rule. However, DHS believes that it has examined and considered all relevant aspects of the problems that this rulemaking solves, responded to all substantive public comments, articulated a satisfactory analysis and reasoned explanation for each change and the rule, and not relied on factors which Congress has not intended us to consider. Specific recent and planned DHS rules and major policy changes and their effects on this rule are as follows:

#### A. New Processes

##### 1. Uniting for Ukraine (U4U)

On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion.[111] Uniting for Ukraine (U4U) provides a pathway for Ukrainian citizens and their immediate family members who are outside the United States to come to the United States and stay temporarily for a 2-year period of parole. Ukrainians participating in U4U must have a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States.

##### 2. Operation Allies Welcome

On August 29, 2021, President Biden directed DHS to lead and coordinate ongoing efforts across the Federal Government to support vulnerable Afghans, including those who worked alongside the U.S. government in Afghanistan for the past 2 decades, as they safely resettle in the United States. USCIS is and has been responsible for large portions of the implementation of Operation Allies Welcome (OAW).[112]

##### 3. Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

Over the last year, DHS has implemented processes through which nationals of designated countries and their immediate family members may request to come to the United States in a safe and orderly way. DHS used emergency processing when implementing Uniting for Ukraine as well as new parole processes for certain Cubans,[113] Haitians,[114] Nicaraguans,[115] and Venezuelans.[116] Under these processes, qualified beneficiaries who are outside the United States and lack U.S. entry documents may be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

##### 4. Family Reunification Parole Processes

DHS also used emergency processing when establishing new family reunification parole (FRP) processes for certain Colombians,[117] Ecuadorians,[118] Salvadorans,[119] Guatemalans,[120] and Hondurans [121] and implementing procedural changes to the previously established Cuban [122] and Haitian [123] Family Reunification Parole processes. These FRP processes are available to certain petitioners who filed an approved Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary who is a national of Colombia, Cuba, El Salvador, Guatemala, Haiti, or Honduras, and their immediate family members. These processes allow an eligible beneficiary to be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

#### B. Effects of Temporary or Discretionary Programs and Processes

As stated elsewhere, and in the proposed rule, Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS) country designations are both administrative exercises of discretion that may be granted on a case-by-case basis for certain periods. *See* 88 FR 402, 447 (Jan. 4, 2023). DACA grants are subject to intermittent renewal, extension, or termination at DHS's discretion. TPS country designations must be periodically reviewed and are subject to termination if the conditions for the designation no longer exist. Likewise, OAW, U4U, and processes for Cubans, Haitians, Nicaraguans, and Venezuelans are temporary processes established to address exigent circumstances. The FRP processes require that the petitioner first receive an invitation to be able to initiate the process. The invitation requirement allows DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. Given that these processes are temporary by definition or may be paused at the discretion of DHS, USCIS excluded the associated costs and workload from the fee review and did not propose to allocate overhead and other fixed costs to these workloads.[124]

---

[110] *See* Office of Information and Regulatory Affairs, ''Fall 2023 Unified Agenda of Regulatory and Deregulatory Actions,'' *https://www.reginfo.gov/public/do/eAgendaMain* (last visited December 29, 2023).

[111] *See* USCIS, Uniting for Ukraine, at *https://www.uscis.gov/ukraine* (last visited Aug. 24, 2023).

[112] *See* U.S. Dep't of Homeland Sec, Operation Allies Welcome, *https://www.dhs.gov/alliceswelcome* (last updated Nov. 27, 2023).

[113] 88 FR 1266 (Jan. 9, 2023); *see also* 88 FR 26329 (Apr. 28, 2023).

[114] 88 FR 1243 (Jan. 9, 2023); *see also* 26 FR 327 (Apr. 28, 2023).

[115] 88 FR 1255 (Jan. 9, 2023).

[116] 87 FR 63507 (Oct. 19, 2023); *see also* 88 FR 1279 (Jan. 9, 2023).

[117] 88 FR 43591 (July 10, 2023).

[118] 88 FR 78762 (Nov. 16, 2023).

[119] 88 FR 43611 (July 10, 2023).

[120] 88 FR 43581 (July 10, 2023).

[121] 88 FR 43601 (July 10, 2023).

[122] 88 FR 54639 (Aug. 11, 2023).

[123] 88 FR 54635 (Aug. 11, 2023).

[124] USCIS has considered the number of immigration benefit requests it will receive from noncitizens from Afghanistan who will stay permanently and safely resettle in the United States over the fee review period.

Excluding these initiatives or processes that are temporary from the fee review mitigates an unnecessary revenue risk, by ensuring that USCIS will have enough revenue to recover full cost regardless of DHS's discretionary decision to continue or terminate these initiatives. This allows DHS to maintain the integrity of its activity-based cost (ABC) model, ensure recovery of full costs, and mitigate revenue risk from unreliable sources. While the operational costs of adjudicating requests associated with these policies are carefully considered on a day-to-day basis, the proposed rule and this final rule exclude from the ABC model the costs and revenue associated with these processes.

### C. Lawful Pathways Rule

DHS and the U.S. Department of Justice (DOJ) recently published a final rule, Circumvention of Lawful Pathways. *See* 88 FR 31314 (May 16, 2023). Under the final rule, certain noncitizens who cross the southwest land border or adjacent coastal borders without authorization, and without having availed themselves of existing lawful, safe, and orderly pathways are presumed ineligible for asylum unless they meet certain limited exceptions. *See id* at 31449–52. The rule is projected to increase USCIS costs for operating the asylum program. *See* 88 FR 11704 (Feb. 23, 2023). While the costs of this rule were not considered in the proposed rule, DHS believes that USCIS' budget may be sufficient to cover these costs in the near term. Much of the cost for the Circumvention of Lawful Pathways rule will occur beyond the 2-year study cycle for the fee revenue required to be generated by this rule. Future fee rules will use more recent information and estimates, when available.

### D. Premium Processing—Emergency Stopgap USCIS Stabilization Act

As explained in the proposed rule, on October 1, 2020, the Continuing Appropriations Act, 2021, and Other Extensions Act (Continuing Appropriations Act) was signed into law. Public Law 116–159 (Oct. 1, 2020). The Continuing Appropriations Act included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), which allows USCIS to establish and collect additional premium processing fees and to use premium processing funds for expanded purposes. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u). Then, on March 30, 2022, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule and stated that DHS will consider including premium processing revenue and costs in the final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). In this final rule, DHS has transferred $129.8 million in costs to premium processing because of premium processing revenue projections. *See* section II.B of this preamble.

### E. Premium Processing Inflation Adjustment

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4. The total projected revenue to be collected from the new premium processing fees established by the final rule premium processing rule is too attenuated to be considered for this rule without placing USCIS at risk of revenue shortfalls if that revenue did not materialize. However, as noted earlier, this final fee rule transfers additional costs to premium processing revenue. Premium revenue will be considered in future fee studies.

### F. EB–5 Reform and Integrity Act of 2022 and Related Rules

As stated in the proposed rule, on March 15, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new Regional Center Program.[125] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover

the costs of providing such services, and complete the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

### G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers

On October 23, 2023, DHS proposed to amend its regulations governing H–1B specialty occupation workers. 88 FR 72870. The rule proposed to modernize and improve the efficiency of the H–1B program by amending several requirements for the subject nonimmigrant classifications, including to improve the integrity of the H–1B program. *Id.* Specifically, that rule proposes that USCIS would select registrations by unique beneficiary rather than by individual registration to reduce the potential for gaming the H–1B cap system and make it more likely that each beneficiary would have the same chance of being selected, regardless of how many registrations are submitted on their behalf. If that proposal is finalized as proposed, the actual number of H–1B Registrations may not be as high as projected in this rule. For example, the proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule was similar to the 274,237 total registrations in the FY 2021 cap year.[126] This final rule revises the H–1B registrations forecast to 424,400 based on more recent data, such as the total registrations for the FY 2023 cap year. The effect of modernizing H–1B requirements may result in a different H–1B registration volume than we forecast here. If that occurs, DHS will address the resulting revenue shortfall in a future fee rule, or in a separate rulemaking that directly addresses the H–1B Registration Fee and the changes made by the Modernizing rule, the H–1B registration process, and the need to recover the costs of USCIS.

---

[125] Div. BB of the Consolidated Appropriations Act, 2022, Public Law 117–103.

[126] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

*H. Citizenship and Naturalization and Other Related Flexibilities*

DHS expects to soon publish a notice that will propose amendments of its regulations governing citizenship and naturalization.[127] The notice will propose changes to naturalization eligibility regulations and other immigration benefit provisions that affect naturalization and acquisition of citizenship, remove outdated provisions, and amend provisions that are inconsistent with intervening laws. DHS has not incorporated any changes in this final rule because the Citizenship and Naturalization notice has not yet been adopted, and whether USCIS needs to update form fees due to the changes would not be determined until after implementation. Future fee rules will consider the effects of the changes if the notice becomes final.

*I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)*

Congress requires the submission of an additional fee of $4,000 for certain H–1B petitions and $4,500 for certain L–1A and L–1B petitions in section 402(g) of Div. O of the Consolidated Appropriations Act, 2016 (Pub. L.114–113) enacted December 18, 2015.[128] DHS proposed to republish the regulatory text that existed immediately before the 2020 fee rule. *See* 88 FR 402, 516. DHS did not receive any comments on this proposal. As such, this final rule republishes the proposed text for these fees. *See* 8 CFR 106.2(c)(8) and (9). However, DHS is proposing to address the 9–11 Response and Biometric Entry-Exit Fees for H–1B and L–1 Nonimmigrant Workers language in a separate rulemaking in the future.[129]

[127] *See* Office of Info. and Regulatory Affairs, Office of Mgmt. and Budget, Exec. Office of the President, ''Fall 2023 Unified Agenda of Planned Regulatory Actions,'' RIN 1615–AC80, *https:// www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=1615-AC80* (last viewed Jan. 16, 2024).

[128] Section 402(g) of Div. O of Public Law 114–113 added a new section 411 to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note. Section 411 provided that the fees collected thereunder would be divided 50/50 between general Treasury and a new ''9–11 Response and Biometric Exit Account,'' until deposits into the latter amounted to $1 billion, at which point further collections would go only to general Treasury. Deposits into the 9–11 account are available to DHS for a biometric entry-exit screening system as described in 8 U.S.C. 1365b.

[129] See Department of Homeland Security, Fall 2023 Regulatory Agenda, *9–11 Response & Biometric Entry-Exit Fees for H–1B and L–1 Visas, https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=1651-AB48* (last visited Dec. 20, 2023).

## IV. Response to Public Comments on the Proposed Rule

*A. Summary of Comments on the Proposed Rule*

DHS provided a 65-day comment period following publication of the proposed rule. DHS received 7,973 public comment submissions in docket USCIS–2021–0010 in response to the proposed rule. Of the 7,973 submissions, 5,417 were unique submissions, 2,393 were form letter copies, 113 were duplicate submissions, 45 were not germane to the rule, and 5 contained comments and requests that were entirely outside of the scope of the rule. Most submissions [130] were anonymous or from individuals, schools or universities, advocacy groups, lawyers or law firms, legal assistance providers, community or social organizations, businesses, State and Federal elected officials, research organizations, religious organizations, local governments or tribes, unions, and business or trade associations. Some commenters expressed total support for the proposed rule or supported one or more specific provisions of the proposed rule without recommending changes. Most commenters opposed the rule and expressed unqualified opposition or opposition to one or more provisions without recommending changes. Many commenters provided mixed comments of both support for and opposition to various provisions of the proposed rule, provided general support with suggested revisions, provided general opposition with suggested revisions, or were unclear on whether the comment supported or opposed the proposed rule.

DHS reviewed all the public comments received in response to the proposed rule and addressed relevant comments in this final rule, grouped by subject area.

DHS also received several comments on subjects unrelated to the proposed fees that are outside of the proposed rule's scope. DHS has not individually responded to these comments but has summarized out of scope comments and provided a general response in Section IV.I of this preamble.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

*Comment:* Several commenters expressed general support for the

[130] The term ''submission'' refers to an entire submission letter submitted by a commenter. The term ''comments'' refers to parts or excerpts of the submission based on subject matter.

proposed rule. Some commenters expressed general support for the rule without providing additional rationale. Commenters expressed support for the rule reasoning that the fee adjustments would:

• Reduce processing times, increase staff, and reduce the backlog or wait times for decisions.

• Decrease fraud.

• Reflect USCIS' adjudication burden and need for sufficient financing to support effective processing of its vital services.

• Reduce USCIS' funding and operational issues that are caused by its status as a fee-funded agency.

A commenter urged USCIS to move forward with the proposed rule and respond forcefully to organizations that fail to acknowledge USCIS management has improved efficiencies despite lacking sufficient funds to sustain operations. The commenter stated that USCIS is capable of increasing efficiencies in a short period but said that it needs more congressional funding. Another commenter suggested that USCIS further increase its fees.

*Response:* DHS appreciates these commenters' support for the proposed rule and did not make any changes in this final rule based on them.

2. General Opposition to the Proposed Rule

Many commenters stated their general opposition to the proposed fees, the magnitude of the fee adjustments, charging fees in general, and specific proposed policy changes in the proposed rule. DHS summarizes and responds to these public comments in the following sections:

a. Immigration Policy Concerns

*Comment:* Many commenters opposed the proposed fee adjustments based on the burdens they would create. Commenters stated that the proposed fees would:

• Be a financial obstacle or prohibitively expensive, discourage people from immigrating to the United States, and be detrimental for the United States and immigrant communities.

• Encourage illegal immigration by creating significant barriers to and discouraging legal immigration.

• Strain resources with which immigrants can integrate into the United States.

*Response:* DHS's fee rule is not intended to reduce or limit immigration. These fee adjustments reflect DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate

services. Recognizing that fees impose a burden on fee-paying requestors and their communities, DHS is shifting its fee-setting approach away from sole emphasis on the beneficiary-pays principle toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 424–26 (Jan. 4, 2023). Nonetheless, USCIS filing fees are necessary to provide the resources required to perform the work associated with such filings. When fees do not fully recover costs, USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays in immigration request processing which can burden requestors, as well as their families, communities, and employers.

In this final rule, USCIS has made multiple adjustments to its budget to limit the extent of fee increases. Ordinarily, any decrease in the fee adjustments would require a decrease in USCIS' budget and a commensurate decrease in service levels. Rather than decrease service levels, in this final rule USCIS has shifted a portion of its budget from IEFA non-premium revenue to the IEFA premium processing revenue, in addition to current levels of premium processing in the overall USCIS budget. USCIS has also revised staffing estimates based on improved efficiency measures, which allowed a further reduction to the budget. Through these adjustments, DHS seeks to recover the full cost of the services provided by USCIS.

This final rule limits fee increases for several forms, including the Form I–130, Petition for Alien Relative, Form I–485, Application to Register Permanent Residence or Adjust Status, and Form I–765, Application for Employment Authorization, to an inflation-based increase. *See* Table 1. For reasons explained earlier in section II.C. of this preamble, the final rule also creates lower fees for certain small employers and nonprofits. Businesses with 25 or fewer employees will pay a $300 Asylum Program Fee instead of the $600 fee that larger businesses will pay, and nonprofits will pay no Asylum Program Fee. *See* 8 CFR 106.2(c)(13). In addition, many categories of Form I–129, Petition for Nonimmigrant Worker, now allow for half-price fees for businesses with 25 or fewer employees and nonprofits. *See* 8 CFR 106.2(a)(3)(ix); Table 1. The final rule also expands the number of forms that qualify for fee exemptions. *See* 8 CFR 106.3(b); Table 5B. Regarding integration concerns, the final rule increases the household income threshold to 400 percent of the FPG to enable more naturalization applicants to qualify for a reduced fee for Form N–

400, Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). These changes do not represent a change in fee policy or requirements. They are a continuation of the discretion that DHS typically exercises in setting USCIS fees. *See, e.g.,* 81 FR 73292, 73296–73297 (Oct. 24, 2016); 75 FR 58962, 58969–58970 (Sept. 24, 2010).

In addition to these changes in the final rule, DHS reiterates the steps it has taken to mitigate the burden of fee increases on fee-paying requestors. DHS has maintained some current fees and limited the increases for many others to levels at or below inflation. *See* Table 1. DHS includes a separate Asylum Program Fee to mitigate the scope of fee increases for individual requestors. *See* 8 CFR 106.2(c)(13); *see also* 88 FR 402, 451–454 (Jan. 4, 2023). For humanitarian immigration categories, DHS has expanded the availability of fee exemptions and waivers to ensure that the most vulnerable applicants are able to access protection-based relief. *See* 8 CFR 106.3; Table 5B; preamble sections IV.E. and IV.F. DHS is mindful that departures from the standard USCIS fee-setting methodology result in lower fees for some and higher fees for others. However, it believes that these fees balance access, affordability, equity, and benefits to the national interest while providing USCIS adequate funding.

DHS disagrees that the proposed fee increases are likely to incentivize irregular migration because the financial costs and other risks of irregular migration tend to be higher than USCIS fees,[131] and the economic benefits of lawful migration outweigh USCIS fees.[132] DHS believes that the consequences of not pursuing full cost recovery (processing delays, backlogs, and otherwise inadequate services) may be more likely to discourage lawful migration, since wait times may tend to have a stronger influence than financial costs on one's decision to pursue unlawful pathways of migration.[133] DHS

further notes that it focuses fee exemptions and waivers on humanitarian and protection-based immigration forms, where requestors are at a greater risk of pursuing irregular forms of migration. *See* 8 CFR 106.3; Table 5B.

*Comment:* Other commenters stated that the proposed rule would:
• Undermine U.S. national values.
• Be anti-immigrant, "tantamount to a threat to American democracy," unfair, or unethical.
• Unduly place the burden of funding USCIS on immigrants.
• Isolate the United States internationally, reflect poorly on Americans, harm U.S. relations with other countries, and lead to other countries increasing their fees.

*Response:* DHS strongly disagrees that this fee rule represents a departure from U.S. values or is anti-immigrant, unfair, or unethical. DHS recognizes that increased fees create burdens for fee-paying requestors and their communities. However, it would not be more fair, ethical, pro-immigrant, or consistent with U.S. values to maintain current fee levels if this results in decreases in USCIS productivity. Because DHS does not receive congressional appropriations for the great majority of its operations, DHS must charge fees for the services it provides to ensure that those seeking to live and work in the United States can efficiently receive their benefits. Since 1990, the INA has specified that the government may set immigration adjudication and naturalization fees at a level that will ensure full cost recovery,[134] and past fee rules have consistently followed this approach.[135] By shifting its fee-setting approach away from the beneficiary-pays principle toward the historical balance of ability-to-pay and beneficiary-pays principles, DHS has sought to reduce barriers and promote accessibility to immigration benefits. *See* 88 FR 402, 424–25 (Jan. 4, 2023). As noted in the prior response, DHS has limited the increases in many forms and instituted new fee waivers and exemptions to reduce financial barriers to U.S. immigration benefits.

DHS does not believe that this final fee schedule poses significant consequences for foreign relations. Commenters failed to cite any examples of other countries raising immigration fees or otherwise retaliating in response

---

[131] *See, e.g.,* U.N. Office on Drugs & Crime, "Smuggling of Migrants: The Harsh Search for a Better Life," *https://www.unodc.org/toc/en/crimes/migrant-smuggling.html#:~:text=The%20fees%20charged%20for%20smuggling,pay%20as%20much%20as%20%2410%2C000.* (last visited Sept. 5, 2023) (noting smuggling fees ranging from $2,000–$10,000 depending on point of origin).

[132] *See, e.g.,* California Immigrant Data Portal, "Median Hourly Wage," available at *https://immigrantdataca.org/indicators/median-hourly-wage* (last visited Sept. 7, 2023) (noting that "the median hourly wage for naturalized immigrants was $24, compared to $19 for lawful residents, and $13 for undocumented immigrants").

[133] *See, e.g.,* David J. Bier, "'Why Don't They Just Get in Line?' Barriers to Legal Immigration," Testimony, CATO Institute, Apr. 28, 2021, *https://www.cato.org/testimony/why-dont-they-just-get-line-barriers-legal-immigration* (identifying wait times as a primary driver of unlawful migration).

[134] *See* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, 104 Stat 2101 (1990).

[135] *See* 72 FR 4888, 4896 (Feb. 1, 2007); 75 FR 33446, 33472 (June 11, 2010); 81 FR 26904, 26905 (May 4, 2016); 88 FR 62280, 62282 (Nov. 14, 2019).

to fee increases by USCIS or the former Immigration and Naturalization Services (INS). DHS notes that other countries regularly charge fees for visas and other immigration benefits,[136] and only one foreign government entity submitted a comment on the proposed rule.[137] Unlike nonimmigrant visa fees set by the U.S. Department of State (DOS), the principle of reciprocity does not factor into USCIS fees. *Cf.* INA sec. 281, 8 U.S.C. 1351; 9 FAM 403.8.

*Comment:* A commenter stated USCIS should terminate "unlawful" special parole programs, as the creation of these unauthorized and unappropriated programs diverts agency resources from legitimate visa programs, resulting in fee increases and increased delays for many benefit requestors. The commenter stated that DHS should return to interpreting parole authority on a case-by-case basis to enhance DHS's ability to focus its resources on processing immigration benefits Congress has authorized and increase access to such benefits without unreasonable delays.

*Response:* DHS disagrees that the parole programs identified by this commenter are unlawful and believes that the legal authority for those programs has been adequately presented in their respective rules.[138] As stated earlier, the special parole processes mentioned by the commenter are necessary to address urgent humanitarian events and aid in the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage and reduce irregular migration that could have worsened without timely action by the United States. *See, e.g.,* 88 FR 1243 (Jan. 9, 2023); *see also* 88 FR 26327 (Apr. 28, 2023). DHS acknowledges that, apart from International Entrepreneur Parole, the special parole processes require the use of limited USCIS budget resources. However, the case-by-case parole into the United States of noncitizens under special parole processes aids in the United States' effort to deter irregular migration from those countries by providing lawful, safe, orderly pathways to travel to the United States. *Id.* Also, unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the

United States through these processes are immediately eligible to apply for employment authorization throughout the duration of their parole period, allowing them to support themselves and contribute to the U.S. economy through labor, taxes, consumption of goods, and payment of rent and utilities in their new U.S. communities.[139]

As stated in the proposed rule, DHS excluded Form I–941, Application for Entrepreneur Parole, from this rule. *See* 88 FR 402, 424 n.47. The fee for Form I–941 will remain at $1,200, the level previously set to recover its anticipated processing costs to DHS and will not impact fees or processing times for other immigration benefit requests. 82 FR 5238, 5280 (Jan. 17, 2017).

b. Impact on Specific Benefit Categories

*Comment:* Multiple commenters stated that the proposed fees would be discriminatory, disproportionately burdensome, or otherwise harmful toward the following immigration categories:

• Undocumented individuals.
• Applicants pursuing legal residency and citizenship.
• Nonimmigrants such as foreign artists.
• Family-based immigration. Commenters stated that the proposed rules would be a hindrance to family unity, and would have a large impact on families and U.S. citizens sponsoring immigrant relatives, children, partners, fiancées, or spouses.
• Vulnerable and humanitarian immigrants, including refugees, survivors, and victims of crime escaping violence.

*Response:* DHS recognizes the burden that immigration fees may pose for certain requestors. Nonetheless, USCIS filing fees are necessary to provide the resources required to do the work associated with such filings. When fees do not fully recover costs USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays or other lapses in immigration request processing, which can result in additional burdens to requestors.

In general, the fees in this final rule are set to ensure full cost recovery for

USCIS. With limited exceptions, as noted in the proposed rule and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This approach is consistent with DHS's legal authorities. *See* INA sec. 286(m), 8 U.S.C. 1356(m). In this final rule, USCIS reduced the fee review budget, as explained earlier in section II.C of this preamble.

In certain instances, DHS establishes fees that do not represent the estimated full cost of adjudication in the proposed rule. *See* 88 FR 402, 450–451. In many cases, this is a result of DHS's refocus on balancing the beneficiary-pays principle with the ability-to-pay principle, whereby DHS has reduced or limited fee increases where a full cost increase would be particularly burdensome for requestors. By limiting many of the final fees to an inflation-based adjustment of the current fee, DHS addresses some of these comments.

Regarding individuals seeking to naturalize or obtain proof of citizenship, DHS has maintained the fees for common forms like Form N–400, Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), and Form N–600, Application for Certificate of Citizenship, at levels below full cost recovery (*See* Table 1; 88 FR 402, 486 (Table 14), Jan. 4, 2023), and expanded the availability of reduced fee N–400s, *see* 8 CFR 106.2(b)(3)(ii). Regarding family-based residency, DHS has limited the increase for common family-based forms such as Form I–130 and Forms I–129F, Petition for Alien Fiancé(e), to levels at or below inflation. *See* Table 1. Regarding artists and other employment-based nonimmigrants, the final rule limits the fee increase for Form I–129s to a level below inflation for many small-employer and nonprofit petitioners, *see* Table 1, eliminates the Asylum Program fee for nonprofit petitioners, and halves the Asylum Program fee for small-employer petitioners, *see* 8 CFR 106.2(c)(13).

In addition, this final rule expands fee exemptions and fee waivers for certain humanitarian categories including survivors, victims of crime, and refugees. *See* 8 CFR 106.3; Table 5B; *see also* 88 FR 402, 459–482 (Jan. 4, 2023). The new exemptions created by this rule include exemptions for T and U nonimmigrants, VAWA self-petitioners, Special Immigrant Juveniles (SIJs), and other benefit requestors. 8 CFR 106.3(b). Also, the Director of USCIS may,

---

[136] *See* Duncan Madden, "The World's Most Expensive Passports and Visas," Forbes, July 10, 2023, available at *https://www.forbes.com/sites/duncanmadden/2023/07/10/travel-expenses-the-cheapest-and-most-expensive-passports-and-visas/?sh=5e5de6ff6f1e* (last visited Sept. 5, 2023).

[137] *See Regulations.gov,* Comment Submitted by ARTS, *https://www.regulations.gov/comment/USCIS-2021-0010-7354.*

[138] *See* 88 FR 21694 (Apr. 11, 2023); 88 FR 1266 (Jan. 9, 2023); 88 FR 1243 (Jan. 9, 2023); 88 FR 1255 (Jan. 9, 2023); 88 FR 1279 (Jan. 9, 2023).

[139] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration," (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse et al., The White House Blog: "The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants," (Sept. 17, 2021) *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

consistent with applicable law, authorize additional fee exemptions when in the public interest, such as when necessary to address incidents such as an earthquake, hurricane, or other natural disasters affecting localized populations. *See* 8 CFR 106.3(c).

c. Impact on Specific Demographic Characteristics

*Comment:* Several commenters wrote that certain proposed fees are discriminatory, disproportionately burdensome, or otherwise harmful to people based on:

• Race, ethnicity, skin color, national origin, country of birth, or country of citizenship.
• Gender.
• Sexual orientation or gender identity.
• Age.
• Disability.
• Language.

*Response:* DHS did not design this fee schedule with any intent to deter requests from or discriminate against any group of people. The final fees are set to ensure full cost recovery while accounting for filers' ability to pay, irrespective of their membership in one of the groups identified by the commenters. As stated in the proposed rule, where DHS has determined that a fee in this rule may inequitably impact those who may be less able to afford it, DHS sets the fees below the ABC model output. *See* 88 FR 402, 426 (Jan. 4, 2023). In addition, we codify the fee waiver eligibility guidance that took effect in 2010 and expand fee exemptions for vulnerable or low-income populations, as described elsewhere in this preamble.

*Comment:* Some commenters wrote that the proposed fees would be particularly burdensome for low-income or economically disadvantaged people. Several commenters stated that, due to low wages of many immigrants, higher fees would create a high burden for benefit requestors and contribute to their economic insecurity, forcing them to choose between applications and other necessities. Commenters stated that the proposed fees would create hardship for some applicants and their families, threaten immigrants' ability to pay for rent, food, and necessities, and potentially cause some to go into debt. Commenters also stated that, to pay fees, low-income applicants may become victims of predatory loan schemes that offer high interest loans. An advocacy group expressed concern that increased fees could cause immigrants to remain or become uninsured.

*Response:* DHS is aware of the potential impact of fee increases on low-income and economically disadvantaged individuals and is sympathetic to these concerns. As discussed in the proposed rule and consistent with past practice, USCIS has limited fee adjustments for certain benefit requests. DHS recognizes that immigration application fees may be burdensome for these filers, and that those who choose to finance application fees through debt may be responsible for additional interest. With these types of concerns in mind, DHS has shifted its fee-setting approach away from the beneficiary-pays principle that guided the 2019/2020 fee rule and more toward the ability-to-pay principle. *See* 88 FR 402, 424–26 (Jan. 4, 2023). To keep many common forms affordable, DHS has kept their fees at or below full cost recovery or the rate of inflation. *See* Table 1. The rule codifies USCIS' guidance on fee waivers for individuals who are unable to pay. *See* 8 CFR 106.3(a). It also expands the number of forms that are eligible for fee exemptions and waivers, *see* Table 5B, and includes several policy adjustments designed to make fee waivers more readily accessible. *See* 88 FR 402, 458 (Jan. 4, 2023). For naturalization applicants who do not meet the requirements for a full fee waiver, DHS has made N–400 fee reductions more available by increasing the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). DHS focuses fee exemptions on vulnerable populations and waiver availability on those with an inability to pay. *See* 8 CFR 106.3; Table 5B. DHS recognizes that that there are many forms for which fee exemptions or fee waivers are not available but notes that it is limited by congressional expectation that many immigrants and nonimmigrants would possess means of self-support. *See* INA sec. 212(a)(4), 8 U.S.C. 1182(a)(4). DHS believes that this rule substantially mitigates many of commenters' concerns while ensuring that USCIS can recover full costs and fund its ongoing operations. DHS also recognizes that the immigration process can be complex, and that benefit requestors may still risk becoming victims of scams or fraud. We encourage requestors to use the information on the USCIS website to avoid becoming victims of common scams, fraud, or misconduct.[140]

d. Impact Based on Geography

*Comment:* Several commenters stated that the proposed rule and certain form fees would have a disproportionate effect on benefit requestors and communities in various parts of the country, including:

• Rural areas or small towns, where individuals may lack access to technology.
• High cost-of-living areas, where individuals are forced to choose between meeting basic needs and pursuing immigration benefits.
• Particular states and cities that have large immigrant populations or high poverty rates, where immigrants have less access to technology, or where nonprofits may be burdened by COVID–19 and recent natural disasters.

*Response:* DHS recognizes that certain individuals may experience more difficulty paying filing fees partly due to the area of the country in which they live and that this may have secondary effects on their communities. This rule is in no way intended to limit access to immigration benefits based on geography. Like past rules, this fee rule generally does not factor requestors' geographic locations in setting fees. Geography is only one of many factors that affect an individual's ability to pay, and geography may impact on individual's ability to pay differently depending on their profession, family, and other factors. For example, individuals living in high-cost areas may also benefit from higher wages, whereas individuals living in low-cost areas may face more limited job prospects. DHS considers it more effective to accommodate filers' ability to pay in the manners described earlier in this preamble. See section IV.E.3.a. of this preamble for a discussion of using the U.S. Department of Housing and Urban Development's (HUD) Mean Family Income (MFI), which accounts for the costs of living in different parts of the country, to determine eligibility for fee waivers.

e. Impact on Economy/Employers

*Comment:* Some commenters stated that raising immigration fees would:

• Hamper U.S. population growth and the country's ability to innovate in technology and culture.
• Deter workers.
• Have negative effects on the labor market by discouraging employers from hiring foreign workers.
• Create problems for retail, agriculture, construction, manufacturing, hospitality, and the labor pool in general.

*Response:* DHS disagrees that these fees will negatively affect the labor

---

[140] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Scams, Fraud, and Misconduct," available at *https://www.uscis.gov/scams-fraud-and-misconduct/scams-fraud-and-misconduct* (last visited Sept. 25, 2023).

market or other sectors described in the comment. With previous fee increases in 2010 and 2016, DHS has continued to see a steady increase in filing and has not seen a reduction in filing based on fee increases. It is possible that USCIS observes no price response to past fee increases because the value of immigration benefits is greater than the fees USCIS assesses to recover costs. DHS has no data that would indicate the fees would limit employers' ability to hire foreign workers or negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. Growing demand in the period immediately after the 2010 and 2016 fee increases reveals that, in setting fees at levels to recover only USCIS costs, all applicants enjoyed some cost savings or surplus relative to what the immigration benefit was truly worth to them. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA. While DHS appreciates that an increase in prices for immigration benefits affects some individuals' choices to pursue or not pursue those benefits, DHS notes that demand may also decrease due to declines in service quality when USCIS programs are not properly funded. Lastly, DHS reiterates that this final rule lowers the Asylum Program Fee and certain Form I–129 fees for small employers and nonprofits. *See* 8 CFR 106.2(a)(3)(ix), (c)(13); Table 1. These changes further mitigate any risk that these fees will negatively impact the labor market or other sectors of the economy.

*Comment:* Multiple commenters stated that the proposed fees are disproportionately burdensome, or otherwise harmful to the following types of petitioners:
• Smaller and midsized businesses and organizations, by further increasing labor costs associated with hiring immigrants.
• Nonprofits.
• Religious organizations.

*Response:* DHS recognizes that the impacts that increased fees can have on smaller and midsized firms, as well as nonprofit and religious institutions. *See* Small Entity Analysis. However, DHS notes that these organizations are also impacted by delayed processing times, backlogs, and other lapses in service that result if USCIS' operations are not adequately funded. Mindful of the difficulties that smaller and midsized firms and nonprofits (including religious institutions) may face, DHS has discounted the proposed fee increases of the requests that many such entities submit in this final rule, as

discussed in section II.C of this preamble. For small-employer and nonprofit petitioners, this final rule limits the fee increases for Form I–129. *See* 8 CFR 106.2(a)(3); Table 1. In addition, the final rule reduces the Asylum Program Fee by $300 for small employers and eliminates the Asylum Program Fee for nonprofit petitioners. *See* 8 CFR 106.2(c)(13).

*Comment:* Commenters also stated that the proposed fees would be harmful to nonprofit legal service providers and other organizations that serve immigrant communities. A commenter specified that the increased fees would result in case-handling delays for their immigration clients, which will divert resources from other casework and advocacy priorities.

*Response:* DHS recognizes the value of legal service providers and other groups that assist individuals in navigating its regulations and forms, and that fee increases can impact their ability to serve their clients. However, DHS believes that inadequate funding for USCIS (resulting in processing delays, backlogs, and otherwise inadequate service) would also impact these organizations' ability to deliver timely and effective legal services for their clients. As discussed earlier in this rule, the final rule contains several provisions that make immigration fees more affordable to the immigrant communities (often indigent and disadvantaged) that nonprofits serve.

*Comment:* Multiple commenters stated that the proposed rules would exacerbate the negative economic effects of:
• The COVID–19 pandemic (*e.g.,* job loss, inability to pay rent, labor shortages).
• Inflation.
• The war in Ukraine.

*Response:* DHS acknowledges that the last few years have been difficult on immigrant communities due to the COVID–19 pandemic, inflation, and various international crises including the war in Ukraine. However, these events have impacted USCIS' financial stability as well.[141] Without increased fees to adequately fund services, USCIS will inevitably experience decreases in the quality of its services, and it will be in a substantially worse position to manage future crises of these sorts when

they arise. DHS notes that, during the COVID pandemic, USCIS implemented many policy changes to accommodate requestors.[142] Also, the fee increases in this final rule will help fund USCIS' Uniting for Ukraine program, as well as other zero-fee or fee-exempt programs that address international, humanitarian crises, including refugee and asylum processing and DHS's FRP processes. Applicants continue to have fee waivers available for specific forms where they can demonstrate an inability to pay. *See* 8 CFR 106.3(a).

*Comment:* A commenter stated that the increased fees further enhance the control that corporations and employers have over foreign workers, as any worker would require their employer's assistance to be able to afford the fees.

*Response:* USCIS disagrees with the comment's premise that the beneficiary's ability to pay is a relevant factor in determining the appropriate fee for most employment-based visa petitions. In general, for employment-based petitions such as Form I–129 and some Form I–140s, it is the employing petitioner's decision whether to file a petition on any beneficiary's behalf, and the petitioner is generally expected to pay the fees associated with the filing of the petition. In some instances, the petitioning employer is required to pay certain fees and/or is precluded from charging the beneficiary certain fees.[143] To the degree that the commenter is concerned that employers may place abusive conditions on their decision to file employment-based visa petitions, DHS encourages foreign workers to report any illegal practices. DHS and USCIS are committed to helping protect the rights of foreign workers in the United States.[144]

---

[141] 88 FR 402, 426–429 (Jan. 4, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Uniting for Ukraine," *https://www.uscis.gov/ukraine* (last updated Sept. 20, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "I–134A, Online Request to be a Supporter and Declaration of Financial Support," *https://www.uscis.gov/i-134a* (last updated Nov. 15, 2023) ($0 filing fee).

[142] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Response to COVID–19," *https://www.uscis.gov/archive/uscis-response-to-covid-19* (last updated Mar. 6, 2023).

[143] For example, employers are prohibited from charging job placement fees as a condition of employment for H–2 nonimmigrants, and H–2B beneficiaries are not permitted to pay any H–2B filing or Fraud Prevention and Detection fees. *See* 8 CFR 214.2(h)(5)(xi)(A), (6)(i)(B)–(D). Also, in some contexts, the employer is not authorized to deduct certain employer-related expenses, such as those related to preparation and filing of the Form I–129 petition, from the beneficiary's compensation. *See, e.g.,* 20 CFR 655.731(c)(9) (prohibiting H–1B petitioning employers from making certain wage deductions, such as deductions for employer-related fees associated with the preparation and filing of an H–1B petition). Finally, some fees are required by statute to be paid by the petitioning employer. *See* section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9) (imposing a fee on certain employers filing H–1B petitions).

[144] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Report Labor Abuses," *https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-*

### f. Other General/Mixed Feedback on the Rule

*Comment:* Multiple commenters expressed concerns regarding the timing of the rule. Some commenters suggested delaying the increase given the current economic situation. One commenter asked how the proposal would affect current immigration benefit requests. Another suggested that the fees only apply to those who have not yet initiated any immigration process to accommodate individuals currently affected by USCIS's backlog. Other commenters stated DHS should give 4 to 6 months' notice before the new fees go into effect.

*Response:* DHS declines to delay effectiveness of this rule beyond the 60 days announced in the proposed rule. Because the proposed rule was published on January 4, 2023, DHS believes that interested parties will have received adequate notice of the forthcoming changes before their effective date. The new fees apply to any immigration benefit request postmarked on or after the effective date of this rule and do not affect any benefit requests that have already been submitted.[145] USCIS may accept the prior fee for benefit requests postmarked before the new fees take effect.

While the fees in this final rule generally affect customers who apply on or after the effective date, there are some special circumstances for Forms I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, and I–131, Application for Travel Document, as explained in the proposed rule. *See* 88 FR 402, 492 (Jan. 4, 2023). Specifically, individuals who filed a Form I–485 after July 30, 2007, (the FY 2008/2009 fee rule) and before this final rule takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(iv)(A). Those who filed Form I–485 before the FY 2008/2009 fee rule, or on or after the

---

employees/report-labor-abuses (last updated Mar. 13, 2023).

[145] USCIS permits FedEx, UPS, DHL and USPS to deliver paper benefit requests. Generally, USCIS records the receipt date as the actual date it physically receives a request at the correct filing location. 8 CFR 103.2(a)(7). However, when USCIS issues new fees, it generally considers the postmark on the package as the date the request was filed or submitted. The shipping date printed on the shipping label will be considered the postmark date. If there is no shipping date on the label, USCIS considers the date you printed the label to be the postmark date. If the label does not have a shipping date or print date, USCIS will assume that the postmark date is 10 days before it received the package.

effective date of this final rule, would pay separate fees for the interim benefits. The final rule implements a reduced fee of $260 for those applicants that must pay a fee for Form I–765 while their adjustment of status application is pending. *See* 8 CFR 106.2(a)(44)(i). Applicants for Form I–131 will pay the full fee of $630. *See* 8 CFR 106.2(a)(7)(iii).

DHS disagrees with the commenter's recommendation to apply the new fees only to those who have not initiated any immigration processes before the rule's effective date. While DHS appreciates the commenter's concerns regarding backlogs, the commenter's proposal could apply indefinitely for individuals who choose to delay certain steps in the immigration process, such as adjusting from nonimmigrant to LPR status or filing for naturalization. Furthermore, DHS calculated the fees assuming that they would generally apply to all forms filed after the rule's effective date, so the commenter's proposal would require further fee increases to account for the numerous filers who would continue to pay the prior fees.

As for upcoming filing periods for petitions that are subject to annual numerical limitations, the 60-day effective date of this final rule should provide a sufficient period for petitioners to adjust to the new fees and form versions. The H–1B cap petition filing period generally begins on April 1 of each year. USCIS has not announced the specific H–1B registration dates for FY 2025, but it is expected to be a roughly 14-day period in early- to mid-March. Neither date is affected by this rule.

### C. Basis for the Fee Review

DHS received comments on the legal authority or rationale of the rule, the need for it, and its general approach, which we address in the following subsections.

*Comment:* Regarding full cost recovery and use of the "ability to pay" and "beneficiary pays" principles, commenters stated:

• The proposed rule violates 8 U.S.C. 1356(m) by waiving fees for some beneficiaries and shifting the cost of those services to other beneficiaries.

• Only Congress, not DHS, has the legal authority to create waivers and exemptions.

• Congress did not authorize USCIS to raise fees by 40 percent, update fees based on inflation, or shift the cost of programs.

• Federal law and policy do not require USCIS to recover full costs through fees, and these costs should not be the only basis for determining fees.

• A commenter disagreed with the suppression of fees for benefits not explicitly exempted by law, and suggested adjusting fees based on the actual cost of the service and providing only those exemptions and waivers that are statutorily mandated.

• USCIS has arbitrarily decided which applicants bear the fee burden.

• USCIS suppresses fees for certain immigration benefits based on political preference.

However, other commenters stated:

• USCIS must consider the public good that arises from applicants receiving immigration benefits and whether they are affordable for applicants when setting fees.

• Disregarding the ability-to-pay considerations would be "arbitrary and capricious" under the Administrative Procedure Act (APA).

Other commenters wrote that USCIS' proposed ability-to-pay model violates the CFO Act, 31 U.S.C. 9701(b), which requires fees charged by agencies to be uniform and based on actual costs. They stated that adjusting fees based on ability-to-pay violates the statute. They stated that DHS lacks the legal discretion to provide discounts and shift costs except when explicitly directed by Congress.

Other comments on the fee-setting approach supported USCIS' proposal to shift away from the beneficiary-pays principle toward an ability-to-pay principle balanced with a beneficiary-pays approach. Some stated that USCIS should further shift funding toward immigration services for lower income applicants who do not qualify for fee waivers or exemptions but nevertheless are unable to afford fee increases. Others stated that USCIS did not strike an appropriate balance between ability-to-pay and the beneficiary-pays principles. Some commenters stated USCIS should rely even more heavily on the beneficiary-pays model. For example, one stated that fees should be based on the cost of the provided service, and costs for subsidized services should be spread across all fee-paying beneficiaries.

*Response:* As stated in the proposed rule, DHS is permitted but not required by law to recover all USCIS operating costs through fees. DHS has broad discretion to set USCIS fees to recover costs, and we generally adhere to longstanding guidance in setting fees. The U.S. Government Accountability Office (GAO) guidance for federal user fees, like USCIS immigration benefit request fees, states that agencies must balance efficiency, equity, revenue

**6246** Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

adequacy, and administrative burden.[146] When discussing equity, GAO explains two different ways to ensure everyone pays their fair share. *Id.* As described by the GAO, under the beneficiary-pays principle, the beneficiaries of a service pay for the cost of providing that service. *Id.* Under the ability-to-pay principle, those who are more capable of bearing the burden of fees pay more for the service than those with less ability to pay. *Id.* A GAO audit of the 2007 fee rule found that the rule clearly described the trade-off between these two principles.[147]

In prior years, USCIS fees have given significant weight to the ability-to-pay principle. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request that someone else did not pay for. *See* 84 FR 62280, 62298 (Nov. 14, 2019). As we noted in the proposed rule, DHS appreciates that application of the ability-to-pay principle in immigration benefit fees may appear arbitrary because it results in certain fee payers funding the costs of USCIS-administered programs to which they receive no direct benefit. 88 FR 453. However, DHS determined that the fees did not result in a significant impact on a substantial number of small entities who file a request with USCIS. *Id.*

The final rule reverses some aspects of the 2020 fee rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). One change is a return to focusing fee-setting away from the beneficiary-pays principle back toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 425 (Jan. 4, 2023). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Requestors who pay a fee

cover the cost of processing requests that are fee exempt, waived, or reduced. This approach is consistent with previous fee rules, comments on the 2020 fee rule, current injunctions, Executive Order (E.O.) 14012,[148] and public feedback. *See* 88 FR 402, 425–426 (Jan. 4, 2023).

DHS is not publishing this rule or setting USCIS fees under the authority of 31 U.S.C. 9701(b).[149] While the Independent Offices Appropriations Act (IOAA), codified at 31 U.S.C. 9701, grants broad authority to Federal agencies to assess user fees, the fees collected under that law are deposited in the general fund of the U.S. Treasury and are not directly available to the agency. USCIS fees are not required to be tied to the costs or value of services provided, and the revenue from the IEFA fees are available to USCIS until expended and are not deposited in the general fund of the U.S. Treasury. As explained in the proposed rule, ''In that regard, in INA sec. 286(m), 8 U.S.C. 1356(m), Congress imposed on DHS an additional obligation—over and above the advice in OMB Circular A–25 concerning the direct correlation or connection between costs and fees.'' 88 FR 402, 418 (Jan. 4, 2023). In 2010 DHS also stated in a fee rule that, ''Additional values are considered in setting IEFA fees that could not be considered in setting fees under the IOAA.'' 75 FR 33449 (June 11, 2010) (internal cites omitted). The 2016 USCIS fee schedule proposed rule also described DHS latitude to set USCIS fees and such fees not being limited to the costs of the service. *See* 81 FR 26906–26907.

As for DHS using the ability-to-pay or beneficiary-pays principles in setting USCIS fees, INA sec. 286(m), 8 U.S.C. 1356(m), does not prescribe a precise framework, methodology, or philosophy for DHS to follow in setting USCIS fees, except to recover costs. DHS endeavors to set fees in a manner that is rational, fair, and based on the recommendations of fee setting experts. To that end, DHS generally adheres to OMB Circular A–25 and has followed the Activity-Based Costing (ABC) method. DHS has also considered the recommendations of the GAO, as described earlier.

DHS is authorized to recover the full cost of immigration adjudication and naturalization services, including similar services provided without charge to asylum applicants or other immigrants, through IEFA fees. *See* INA sec. 286(m), 8 U.S.C. 1356(m). There is a long history of using the ability-to-pay principle in USCIS fee-setting, as explained in the proposed rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). Other fee rules did not always use the term ability-to-pay but it has been a part of DHS and fee rules for a long time. For example, USCIS grants fee waivers based on demonstrated inability to pay, which is based on the ability-to-pay principle. *See* 8 CFR 103.7(c) (Oct. 1, 2020). In this final rule, DHS provides more fee exemptions, increases the income level for the reduced fee for Form N–400, Application for Naturalization, provides discounts for Form I–129, Petition for Nonimmigrant Worker, fees and the Asylum Program Fee, and exempts nonprofits from the Asylum Program Fee, all based on the ability-to-pay principle. *See new* 8 CFR 106.1(f), 106.2(a)(3), and 106(c)(13). Nothing in the DHS fee setting statute precludes DHS from providing discounts and shifting costs in such a manner.

*Comment:* DHS summarizes comments regarding the funding for the Fraud Detection and National Security Directorate (FDNS) as follows:

• General support for USCIS improving service levels and deterring fraud for nonimmigrant benefits.

• FDNS funding violates fiscal law principles and the APA.

• FDNS activities were delegated to Immigration and Customs Enforcement (ICE) and funded by specific congressional appropriations.

• Revenue should be used solely for adjudications and not for investigation functions more appropriate for ICE and U.S. Customs and Border Protection (CBP).

• Appropriated funding for ICE has increased by 150 percent while funding for immigration services has only increased modestly.

• While Congress gave USCIS limited investigative responsibilities when it created FDNS, its mission has expanded without statutory authority.

• Moving enforcement functions out of USCIS and into ICE and CBP would allow USCIS to redirect FDNS expenses into its core adjudicatory functions, improving efficiency, and reducing proposed fee increases.

• FDNS could be more efficient, for example, by curtailing frivolous referrals.

[146] *See* GAO, ''Federal User Fees: A Design Guide'' (May 29, 2008), *https://www.gao.gov/ products/GAO-08-386SP,* at 7–12.

[147] *See* GAO, ''Federal User Fees: Additional Analyses and Timely Reviews Could Improve Immigration and Naturalization User Fee Design and USCIS Operations'' (Jan. 2009), *https:// www.gao.gov/assets/gao-09-180.pdf,* at 12–15.

[148] Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 5, 2021).

[149] The statute cited by the commenters also permits discounts and shifting costs based on considerations of public policy or interests served and other relevant facts and does not require that fees charged by agencies be uniform and not deviate from actual costs. *See* 31 U.S.C. 9701(b)(2)(C)–(D).

• Most FDNS cases and investigations involve already adjudicated petitions, resulting in adjudicating H–1B petitions again.

• Requested clarification of whether administrative site visits that arise from premium processing cases are paid out of the general budget or the premium processing budget.

*Response:* USCIS appreciates the general support from the commenters who favored improving service levels and deterring fraud for nonimmigrant benefits. USCIS manages three fee accounts: (1) The IEFA (which includes premium processing revenues); (2) The Fraud Prevention and Detection Account, INA secs. 214(c)(12)–(13), 286(v), 8 U.S.C. 1184(c)(12)–(13), 1356(v); and (3) The H–1B Nonimmigrant Petitioner Account, INA secs. 214(c)(9), (11), 286(s), 8 U.S.C. 1184(c)(9), (11), 1356(s). The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are funded by statutorily set fees and divided among USCIS (for fraud detection and prevention), the National Science Foundation, and the Department of Labor (DOL). DHS does not have authority to adjust fees for these accounts; therefore, DHS cannot increase the fees to meet changing needs or costs. DHS interprets 8 U.S.C. 1356(v)(2)(B) as providing supplemental funding to cover activities related to fraud prevention and detection and not prescribing that only those funds may be used for that purpose. FDNS is funded from both the IEFA and the Fraud Prevention and Detection Account. The fees deposited in the Fraud Prevention and Detection Account that are fixed by statute are insufficient to cover the full costs of FDNS.

DHS disagrees that ensuring a petitioner is compliant with the terms and conditions of their petition through site visits or other FDNS workload is frivolous, a second adjudication, or duplicated by other DHS components. FDNS's work does not fall into ''intelligence'' and/or ''investigations'' work that the INA assigned to ICE. The Homeland Security Act of 2002 granted the Secretary of Homeland Security the authority to administer and enforce provisions of the INA, as amended, INA sec 101, 8 U.S.C. 1101 *et seq.* The Secretary, in Homeland Security Delegation No. 0150.1, delegated certain authorities to USCIS. One of many authorities delegated to USCIS in administering and enforcing immigration laws was the authority to ''investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged

fraud with respect to applications or determinations within the USCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.'' FDNS's activities fall squarely within this delegation. FDNS was established in 2004 in response to a congressional recommendation to establish an organization ''responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/ background checks on every applicant, beneficiary, and petitioner before granting immigration benefits.'' [150] FDNS fulfills the USCIS mission of enhancing both national security and the integrity of the legal immigration system by: (1) identifying threats to national security and public safety posed by those seeking immigration benefits; (2) detecting, pursuing, and deterring immigration benefit fraud; (3) identifying and removing systemic vulnerabilities in the process of the legal immigration system; and (4) acting as USCIS' primary conduit for information sharing and collaboration with other governmental agencies. FDNS also oversees a strategy to promote a balanced operation that distinguishes USCIS' administrative authority, responsibility, and jurisdiction from ICE's criminal investigative authority. The Secretary, in Homeland Security Delegation No. 0150.1, delegated several relevant authorities to USCIS, including the following:

• Authority under section 103(a)(1) of the INA, as amended, 8 U.S.C. 1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

• Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

• Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262–266 of the INA, 8 U.S.C. 1302–06.

• Authority to place noncitizens in removal proceeding by issuance of a Notice to Appear, and to cancel such

Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

• Authority to approve bonds issued under the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

• Authority to interrogate noncitizens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph noncitizens under section 287(a), (b), and (f) of the INA, 8 U.S.C. 1357, and under section 235(d) of the INA, 8 U.S.C. 1225(d).

• Authority under the immigration laws, including but not limited to section 310 and 341 of the INA (8 U.S.C. 1421 and 1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of noncitizens.

• Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. 1154 and 1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment-based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of EOIR.

• Authority to investigate suspected fraud by Regional Center and related entities and to take other actions to ensure the integrity of the Immigrant Investor (EB–5) Program.

• Authority under immigration laws to extend and change nonimmigrant status and to adjust the status of noncitizens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of noncitizens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

In 2017, the Secretary, in Homeland Security Delegation No. 15002, delegated the following certain law enforcement authorities to USCIS:

---

[150] *See* Conference Report to accompany H.R. 4567 [Report 108–774], ''Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005,'' p. 74, *available at http://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/ pdf/CRPT-108hrpt774.pdf.*

• In matters under the jurisdiction of USCIS, to protect the national security and public safety, to conduct law enforcement activities, including accessing internet and publicly available social media content using a fictitious account or identity, provided that such activities shall only be conducted by properly trained and authorized officers, and in a manner consistent with the Reservations set forth in DHS Delegation Number 0150.1 and consistent with the Department's obligations to protect privacy and civil rights and civil liberties.

Regarding the Administrative Site Visit and Verification Program (ASVVP), DHS explained in the proposed rule how USCIS collects information on the costs associated with ASVVP and assigns the distinct costs for these site visits to Forms I–129, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and I–829, Petition by Investor to Remove Conditions on Permanent Resident Status. *See* 88 FR 402, 496 (Jan. 4, 2023). Those costs are not paid directly from premium processing revenue.

Therefore, DHS has determined that the commenters misunderstand the nature of FDNS in USCIS. FDNS efforts are integral to determining an applicant's eligibility for a benefit, and to maintain the integrity of the immigration system. DHS makes no changes to these final fees as a result.

1. Background and Fee Review History

*Comment:* Many commenters requested that DHS formally withdraw the previously enjoined 2020 fee rule to ensure that USCIS fees and policies would default to the current fee schedule rather than the 2020 fee structure, should the proposed rule be found unlawful. Many commenters stated that USCIS should sever the 2020 fee rule from the remainder of the currently proposed rule to not jeopardize the withdrawal. Other commenters requested that DHS formally withdraw the 2020 fee rule, reasoning that the current proposal reflects a considered policy judgment on the part of USCIS that those features of the 2020 Fee Schedule are undesirable as a policy matter and are inconsistent with the goals of Federal immigration laws.

*Response:* DHS understands the concerns of the commenters because the fees in the 2020 fee rule have been codified for at least 2 years. However, as explained in the proposed rule, DHS is operating under two preliminary injunctions related to the 2020 fee rule. *See* 88 FR 402, 420 (Jan. 4, 2023). DHS continues to comply with the terms of

those orders and is not enforcing the regulatory changes set out in the 2020 fee rule. There is also a separate injunction related to fee waiver changes in 2019. *Id.* USCIS continues to accept the fees that were in place before October 2, 2020, and to follow the fee waiver guidance in place before October 25, 2019. DHS and the parties in *Immigrant Legal Resource Center* v. *Wolf, NWIRP, City of Seattle,* and the related cases agreed to, and the courts have approved, a stay of those cases while the agency undertook this fee review and prepared the proposed rule. These rulings did not vacate the 2020 fee rule as having been codified in contravention of the law; they only preliminarily enjoin them. Thus, to remove the 2020 fees from the Code of Federal Regulations, DHS must engage in notice and comment rulemaking. Because, as stated in this rule, DHS needs a new USCIS fee schedule forthwith, we have determined that it was more efficient to focus on replacing the 2020 fee regulations than to expend the additional effort required to revert the 2020 fees back to the October 1, 2020, fees in a separate rulemaking. DHS makes no changes to the rule based on these comments.

*Comment:* Commenters stated that USCIS' pattern of doubling the percentage increase of previous rules in each subsequent fee rule is not sustainable.[151] They stated that fees have already been raised enough and there should be a ceiling to USCIS' previous, current, or proposed fee structures. One commenter stated that USCIS filing fees continue to increase over time and there is no stopgap or ceiling in mind to maintain the affordability of these benefits.

*Response:* DHS examined each fee in the proposed rule and the proposed fees represent DHS's best effort to balance access, affordability, equity, and the national interest while providing USCIS with the funding necessary to maintain adequate services. As the cost of employees, services, buildings, and supplies increase, so must our fees. However, several public comments stated that the proposed fee increases greatly exceeded the rate of inflation, and others wrote that they could understand the need for USCIS to keep up with inflation.[152] After considering

the applicable comments, DHS has decided to reduce many fees in this rule from what were proposed and adopt the recommendations of commenters to increase the current fees only by the amount of inflation since the date those fees were established.

As stated in this rule and the proposed rule, DHS has generally adhered to ABC and cost reallocation to determine USCIS fees and has not adjusted IEFA non-premium fees by inflation since 2005. *See* Adjustment of the Immigration Benefit Application Fee Schedule, 70 FR 56182 (Sept. 26, 2005). After considering public comments, the amount inflation since the FY 2016/2017 fee rule, and the size of the fee increases, DHS has decided that adjusting certain fees by the rate of inflation strikes a balance between the need to increase revenue to recover USCIS costs and maintain affordability for some immigration benefit requests.[153]

2. Fee-Setting Approach

*Comment:* A commenter stated that recovering costs should not include USCIS having a ''carryover balance'' that exceeded the revenue necessary to adjudicate petitions.

*Response:* USCIS is primarily fee-funded, which means it must use carryover, or the unobligated or unexpended fee revenue accumulated from previous fiscal years, to continue operating at the beginning of each fiscal year or when costs otherwise exceed revenue. The INA authorizes DHS to set fees at a level to recover ''the full costs'' of providing ''all'' ''adjudication and naturalization services,'' and ''the administration of the fees collected.'' 8 U.S.C. 1356(m). Many USCIS administered immigration benefit requests, such as H–2B and H–1B petitions, see significant seasonal fluctuations in filings, which can result in seasonal fluctuations in USCIS revenue and spending. As GAO acknowledges, fee-funded agencies may need to designate funds as operating reserves to weather periods when

---

[151] One commenter compared the weighted average increase in the proposed rule with prior fee rules (in 2010 and 2016) and stated that these double every fee rule.

[152] Notwithstanding these comments, as discussed later in this preamble, other commenters wrote that they opposed DHS codifying authority to adjust fees based on the amount of inflation as

measured by the difference in the CPI–U. 8 CFR 106.2(d).

[153] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 88 FR 89539 (Dec. 28, 2023). DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

revenue collections are lower than costs.[154]

The proposed rule explained how USCIS uses and estimates carryover balances. *See* 88 FR 402, 417, 426–427 (Jan. 4, 2023); *see also* IEFA Non-Premium Carryover Projections in the supporting documentation included in the docket to this rulemaking. Most Federal programs are financed by discretionary appropriations that receive an annual Treasury warrant, which establishes a cash balance in their accounts after enactment of appropriations.[155] USCIS' IEFA has permanent or indefinite warrant authority that allows for immediate access to carryover balances and revenue collections subject to the annual spending limits established by Congress. *Id.*

Carryover balances give USCIS and other fee-funded agencies flexibility throughout the fiscal year if costs exceed revenues. Historically, fee revenue in the first quarter of the fiscal year is low due to seasonal filing patterns. Therefore, USCIS requires carryover funds to pay Federal salaries and award certain contracts at the beginning of the fiscal year. USCIS manages its fee accounts to ensure that adequate carryover balances are generated and retained to:

• Cover the cost of processing immigration benefit requests that are pending adjudication at the end of the fiscal year.

• Serve as contingency funding in the event of an unexpected decline in fee collections.

• Cover the start-up costs of new or expanded programs before sufficient fee revenues from such programs are collected (if a fee is to be collected).

• Cover other valid contingencies.

DHS declines to make changes based on this comment, except for budget and operational changes described elsewhere in this final rule, which may affect the forecast for carryover balances.

*D. FY 2022/2023 IEFA Fee Review*

1. Projected Costs, and Revenue

*Comment:* A commenter asked USCIS to explain and justify how the percentage increase or change for each fee was calculated. Another commenter stated that the proposed rule provided

no data point(s) on the cost of resource usage about each form category and reasoned that without establishing effort estimates, an increase in fees could be arbitrary. A few commenters wrote that USCIS' projected costs and revenue are not credible.

*Response:* In the proposed rule, DHS provided information on how it calculated the budget and revenue and estimated costs for the fee review. *See* 88 FR 402, 426–432 (Jan. 4, 2023). DHS described the methodology it uses to assign those estimated costs in an ABC model. *See* 88 FR 402, 432–451 (Jan. 4, 2023); *see also* FY 2022/2023 IEFA Fee Review Supporting Documentation (supporting documentation), and FY 2022/2023 IEFA Fee Schedule Documentation (fee schedule documentation) both included in the docket as numbers USCIS–2021–0010– 0028 and USCIS–2021–0010–0029 respectively for review and comment. DHS described how it assesses and proposed fees based on the ABC model results or policy decisions to maintain some current fees or limit some fee increases. *See* 88 402, FR 450–451. DHS describes changes to the fee review budget in sections II.C. and II.F. of this preamble.

Throughout the proposed rule, DHS referenced ABC model results, often called the model output, when discussing proposed fees. *See, e.g.,* 88 FR 402, 485–487, 503, 515–516 (Jan. 4, 2023). DHS included supplemental information associated with the FY 2022/2023 fee review results and corresponding proposed rule in the docket. The supporting documentation provided a functional overview of the fee review process and results. It includes estimated total cost and unit costs for each immigration benefit request in the fee review.[156] USCIS also demonstrated the ABC model software used for the fee review during the public comment period.[157]

DHS provides revised versions of the supplemental documents based on budget, staffing, or operational changes described elsewhere in this preamble but declines to make any other changes based on these comments.

DHS notes that fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The fees also cover the resources

required for intake of immigration benefit requests, customer support, fraud detection, accounting, human capital, legal counsel, training, and other administrative requirements.[158]

2. Methodology

Many commenters wrote with general concerns that the proposed increases to fees lack substantive support and transparency on how the agency calculates fee amounts based on workload and metrics used to review and adjust fees. More detailed comments on the methodology are in the following subsections.

a. Completion Rates (Average Hours per Adjudication of an Immigration Benefit Request)

*Comment:* Commenters expressed concern with growing adjudication times and increases in completion rates for forms and certain applications. Some commenters divided current or proposed fees by completion rates (average hours per adjudication of an immigration benefit request) to calculate hourly rates for immigration benefits. Commenters expressed concern with increasing hourly rates of their own determination, citing various forms. Commenters stated:

• USCIS' data shows a significant increase in completion rates without any corresponding change in statutory or regulatory requirements.

• Many forms have an increase in completion rates from 49 percent to 218 percent, despite the lack of statutory or regulatory changes.

• Many forms with increased completion rates show substantial proposed fee increases.

• They are concerned about completion rates for selected forms and suggested that USCIS work to eliminate or reduce inefficiencies.

• USCIS notes that they used pre-pandemic values for some, but not all, of the data used to project completion rates, and the lack of clarity on these differences raises questions about the validity of the data used in the ABC model.

• Most of the Form I–129F, Petition for Alien Fiancé(e), filings do not require applicant interviews or otherwise take up extreme officer

---

[154] See GAO, ''Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability,'' (Sept. 30, 2013), *https://www.gao.gov/assets/gao-13-820.pdf* (last visited May 3, 2023).

[155] *See generally* U.S. Department of the Treasury, Bureau of the Fiscal Service, ''Treasury Financial Manual,'' ''Chapter 2000.'' Available at *https://tfm.fiscal.treasury.gov/v1/p2/c200* (last viewed Aug. 27, 2023).

[156] For example, see Appendix Table 3: Projected Total Cost by Immigration Benefit Request in the supporting documentation for the proposed rule available at *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

[157] A transcript of the software demonstration is available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[158] In the supporting documentation for the proposed rule, see appendix tables 4–7 for details on how DHS proposed fees based on the ABC model results and results by fee review activity. Pages 10–12 define the activities in the appendix tables. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, *FY 2022/2023 IEFA Fee Review Supporting Documentation* (Jan. 2023). *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

resources that would justify this substantial of an increase.

• Touch times for Form I–539 have increased even though USCIS has reinstated concurrent processing of H1/H4/Employment Authorization Document (EAD) and L1/L2/EAD applications, which should result in gains in process efficiency.

• Changes brought about by recent litigation should have reduced touch times for many forms, but instead touch times have increased.

• How touch time would be tracked and calculated using the costing model and if USCIS includes FDNS activity in its calculation of touch time.

• Increased form length is a major reason why USCIS adjudicators are spending 3.3 million additional hours reviewing petitions and USCIS must stop requiring unnecessary renewals of work permits.

• Commenters provided recommendations for reducing completion rates.

• Some applicants are paying "over $1,000+/hour" despite an adjudication burden of only a few hours for completion.

• USCIS' "effective hourly rate" is four times the prevailing wage for an attorney.

*Response:* USCIS used the best completion rate data available at the time to conduct the FY 2022/2023 fee review. In its last four fee rules, DHS has used USCIS completion rates to assign costs from the Make Determination activity to individual cost objects (*i.e.,* forms). USCIS continued this approach in the FY 2022/2023 fee review. As explained in the proposed rule, USCIS relied on completion rates before the pandemic to remove this effect from the fee review. *See* 88 FR 402, 446. USCIS used online filing data that included pandemic months. *See* 88 FR 402, 490. The mix of two time periods for two different data points should not affect the results of the ABC model. When online filing is available, USCIS often uses the same case management system to adjudicate both online and paper filings. As such, USCIS used the same completion rates for both online and paper filings.

DHS limited many of the proposed fee increases (*i.e.,* adoption-related form fees, Forms I–290B, Notice of Appeal or Motion, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, N–400, Application for Naturalization, etc.), as done in previous fee rules. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In other cases, DHS proposed to maintain the current fee (*i.e.,* Forms I–90 when filing online, I–131A, N–565, etc.). *See* 88 FR 402, 451 (Jan. 4, 2023). Some

other fees do not use completion rates (*i.e.,* I–131A, H–1B Registration Fee, USCIS Immigrant Fee, etc.). *See* 88 FR 402, 446–447 (Jan. 4, 2023). As explained elsewhere in this rule, many of the final fees are lower than in the proposed rule. For example, DHS limits the fee increase to inflation since the 2016 rule for Forms I–130, Petition for Alien Relative, I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, etc.

DHS appreciates the commenters' concerns about increased form length, timely service, and higher fees. USCIS continually strives to minimize the burden on requesters, meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. The proposed rule highlighted areas where USCIS may be able to increase efficiency or reduce adjudication time or staffing. *See* 88 FR 402, 529 (Jan. 4, 2023). However, it may be too early for USCIS to see results from these planned changes or recently implemented changes. Future fee rules may use more recent completion rates, which may include efficiencies or reduced adjudication times. As noted previously, fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The hourly adjudication rates calculated by some commenters must fund the cost of relevant administrative costs, technical and technological facilitation, and similar services provided at no or reduced charge that are not recovered from other fees. By limiting many of the final fees to an inflation-based adjustment of the current fee, rather than one calculated based on a completion rate, DHS addresses the concerns of the commenters who disagree with fees being based on completion rates and the relative complexity of the adjudication. With this approach, USCIS may continue to improve efficiency and adjudication times without overburdening customers with fees that are higher than inflation for family-based and humanitarian workloads, in most cases.

b. Other Comments on Methodology (*e.g.,* ABC Software/Models, Age of Data)

*Comment:* Multiple commenters also stated that the ABC model is flawed, or the documentation is insufficient for the following reasons:

• Documentation of the fee review methodology and inputs does not provide a comprehensive understanding of the study's execution.

• USCIS chose not to use actual cost values and instead relied on projections, and it could not identify information in the documentation that either explained with specificity how the projected values were determined or addressed potential observational errors that may have impacted cost projections.

• Documents provided to the public did not provide the insight necessary to ascertain how the data in the model was compared across the FYs that USCIS examined.

• The ABC model has underestimated the number of petitions that will be filed and therefore underestimated the impact on small and seasonal American businesses, farmers, and the public.

• Because USCIS is proposing that employment-based applications cover the cost for other benefits, underestimation of H–2B and H–2A filings shows that other employment filings are also off, and the proposed fees and cost offsets need to be further reviewed with more adequate data.

• USCIS should be more transparent on USCIS' ABC model and into calculation and review of fee levels.

• USCIS should provide a public forum whereby it describes to stakeholders how the methodology and data used in the ABC model allowed it to reach its conclusions.

• USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether its conclusions are justified or reasonable.

*Response:* The INA authorizes DHS to recover the costs of USCIS by collecting fees and the CFO Act requires us to do a fee review every 2 years. Neither statute requires use of any particular methodology. As stated in the proposed rule and this rule, DHS strives to follow OMB Circular A–25, as appropriate for the programs we administer. In doing so, DHS strives to allocate fees using activity-based costing, adjust fees using considerations of public policy, interests served, and other relevant facts, and consider the recommendations of GAO regarding beneficiary-pays and ability-to-pay principles to shift costs and set our final fees. Our adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision. Nonetheless, the commenter's assertion that our calculations or fee determination is incorrect is misplaced. DHS explains in the supporting documentation in the docket for this rule how each fee in the proposed rule and this rule were calculated. DHS

engages in discretionary cost shifting and adjusts before arriving at a final fee schedule. DHS outlined how the ABC model works in the proposed rule preamble and supporting documentation, consistent with previous fee rules. In addition, it shared model and fee schedule documentation in the docket. USCIS also provided a demonstration of the model, as requested, and placed a transcript of the demonstration in the docket.[159] During the demonstration, USCIS often referred to information in the docket to show how the model uses it. The information used to calculate specific fees is the best and most complete information available at the time of the fee review. Requests that were only developed or authorized relatively recently (*e.g.,* separate fees for Form I–129; Employment Based Immigrant Visa, Fifth Preference (EB–5) workloads; Asylum Processing IFR costs) may have limited data, not be fully implemented, or require assumptions for the new fees. USCIS will be able to refine this data in the future as programs mature or data collection begins, which will be used for future fee reviews. Some fee changes in the proposed rule and this final rule are outside of the ABC model, as discussed in the preamble and fee schedule documentation. *See, e.g.,* 88 FR 402, 450–454 (Jan. 4, 2023).

Information provided in the ABC model includes the cost projections, volume, and completion rates discussed in the preamble. *See, e.g.,* 88 FR 402, 426–452 (Jan. 4, 2023). The supporting documentation discussed additional information, such as staffing levels, fee review activities, and a functional overview of ABC in general and the USCIS ABC model. The model documentation provided functional and technical details on how the model works. It included diagrams, screenshots, lists, and tables for various aspects of the ABC model. Thus, DHS believes that we have explained and justified our calculations of the fees in this final rule.

As for the filing volume estimates, USCIS uses a volume projection committee (VPC) with statistical and analytical experts who systematically examine filing volumes to produce forecasts used in fee studies. The VPC examines past trends, forecasts, and varying models, and USCIS has found that the VPC reliably minimizes forecast errors that might occur if forecasting were left to self-interested parties. The

VPC projects filing volume several years ahead. USCIS has reviewed the comments from H–2A and H–2B employers that misunderstood the 25 named beneficiaries per petition requirement as a limit on the overall number of beneficiaries and argued the ratio of initial to continuing requests to be a superior basis for modeling annual growth of at least 15 percent in both H–2A and H–2B volumes, in perpetuity. USCIS agrees with one commenter that nature is unpredictable and demand for seasonal agricultural workers is volatile but disagrees with unsupported arguments that higher H–2A and H–2B volumes and thus revenues are self-evident. In the event less likely volumes did occur, commenters overlook that this would cause changes in the activities driving ABC model estimates of average costs and impact the revenue the fee would generate. Thus, USCIS must take care to neither over nor underestimate future, unknowable volumes without bias.

3. TPS and DACA (*e.g.,* Exclusion From Cost Model, I–821, I–765 Exemption for Certain TPS Applicants, and DACA Rulemaking)

*Comment:* Commenters provided the following comments on how the proposed rule would affect DACA requests, fees, and grantees:

• Increased fees would create hardship for DACA students required to renew their paperwork every 2 years.

• Higher fees increase the vulnerability of DACA recipients by raising the costs to maintain their documentation.

• USCIS should set DACA application fees at current or lower levels to address financial disparities faced by immigrant communities and working families.

• DACA recipients already pay a filing fee that other protected groups do not, and fee waivers are not a solution to the proposed increase.

• Maintain current DACA fees because DACA recipients were not considered in the financial modeling for the proposed rule.

• Some disagreed with the exclusion of DACA recipients from filing fee relief regardless of their potential financial hardship.

• The DACA program diverts agency resources from lawful immigrant programs, resulting in fee increases and longer processing times for applicants to other visa programs.

• USCIS should increase processing fees for DACA because the fee is lower than other requests, yet the burden is higher.

• DACA requestors broke the law so their fees should be punitive.

• DACA recipients should be able to request advance parole based on any grounds and be allowed to request a fee waiver.

*Response:* This rule makes no changes to DACA, the validity period for approved DACA renewals or how often DACA must be renewed, policies regarding DACA recipients' ability to request advance parole, or any DACA-specific fees. As explained in the proposed rule, DACA is a temporary act of enforcement discretion, may be terminated at any time, and thus it is a source of revenue on which DHS does not want the fiscal condition of USCIS to depend. *See* 88 FR 402, 454–455 (Jan. 4, 2023).

To request DACA, an individual must file Form I–821D, Consideration of Deferred Action for Childhood Arrivals, which has an $85 filing fee. The applicant must also file Form I–765, Application for Employment Authorization, together with Form I–821D for the DACA request to be complete. Form I–765 is a general form used by millions outside of the DACA population. It has a filing fee of $410, which increases in this final rule to $470 when filed online or $520 when filed on paper. All Form I–765 applicants pay the same fee, unless they are fee exempt or request a fee waiver. DHS found no differences in the burden of adjudicating Form I–765 for DACA than for any other Form I–765 and we have no policy reasons for capping their fee at a lower amount. In DHS's 2022 DACA rule, the total fee to submit a DACA request of $495 ($85 plus $410) was a reasonable proxy for the Government's costs of processing these forms. *See* 87 FR 53152, 53278 (Aug. 30, 2022).[160] However, that rule also stated that DHS planned to propose new USCIS fees in a separate rulemaking, and that the fee for Form I–765, may need to be adjusted because it has not changed since 2016. *Id.*

In DHS's 2022 DACA rule, DHS considered allowing fee waivers or fee exemptions for DACA requestors. *See* 87 FR 53152, 53237–53238. In that rule DHS recognized that some DACA

---

[159] *See* USCIS, "USCIS Fee Rule Software Demonstration," Mar. 1, 2023, available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[160] On Sept. 13, 2023, the U.S. District Court for the Southern District of Texas issued a decision finding the DACA rule unlawful and expanding the original July 16, 2021 injunction and order of vacatur to cover the final rule. *See Texas* v. *United States,* No. 1:18–CV–00068 (S.D. Tex. Sept. 13, 2023), *appeal pending,* No. 23–40653 (5th Cir. filed Nov. 9, 2023); *see also* USCIS, "Important Update on Deferred Action for Childhood Arrivals," available at *https://www.uscis.gov/newsroom/alerts/important-update-on-deferred-action-for-childhood-arrivals* (last reviewed/updated Sept. 18, 2023).

requestors may face economic hardship that affects their ability to pay the required fees. However, it noted that DACA, as an exercise of prosecutorial discretion that allows DHS to focus limited resources on higher priority cases, is not an immigration benefit or associated filing for which DHS is required to allow a request for a fee waiver under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and that it is appropriate for beneficiaries of this enforcement discretion to cover the cost of adjudication. *Id.* DHS declines to reverse that decision in this rule. This final rule sets fees for Form I–765 that are increased only by the rate of inflation since they were last established, and less than the proposed fees, as explained elsewhere in in section II.C.8 of this rule's preamble.

*Comment:* A commenter wrote that USCIS could allocate more resources to TPS based on how much an applicant paid in fees, and that TPS could receive faster processing if they paid more.

*Response:* As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting the fees required to support baseline operations due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). DHS realizes that USCIS has processing backlogs for Form I–821, Application for Temporary Protected Status, and we are working to reduce those backlogs and approve requests quickly. DHS is precluded from charging more for faster processing of the Form I–821 by INA sec. 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B), which caps the TPS registration fee at $50. While USCIS has implemented premium processing for some Form I–765 categories in March 2023, a TPS related Form I–765 was not one of them.[161] USCIS may offer premium processing for TPS-related Form I–765 filings as provided in 8 CFR 106.4 in the future as we develop more capacity to offer premium service to more requests. Meanwhile, DHS makes no changes to this rule based on this comment.

4. Processing Time Outlook and Backlogs

*Comment:* Many of the commenters opposed fee increases because of delays in processing times and dissatisfaction

with customer service. Commenters wrote:

• Conditional support for the fee increases if such increases will improve or not cause any backlogs and only if USCIS can process cases quickly and accelerate processing.

• USCIS should improve efficiency and achieve long term structural improvements without increasing fees, should focus first on improving efficiency and service provision as opposed to raising fees, include a processing time guarantee, establish a "binding" processing timeframe with each fee increase, reverse the fee increases if USCIS fails to meet specific processing times, and USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters questioned what mechanisms would hold USCIS to higher efficiency standards.

• USCIS should clear the backlog and decrease processing times, the current backlog and long processing times are not reasonable, processing times are getting longer without any justifying policy or legal changes, USCIS has "record-high" processing delays and backlogs and is not meeting legal guidelines for processing times, processing times increased over the last 6 years by as much as 218 percent.

• USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters stated the growing length of USCIS forms is a "major contributor" to the backlog.

• Applicants are not responsible for the backlog and should not carry its burden, the backlog is harmful for low-income applicants awaiting permanent residency or naturalization, and immigrant and nonimmigrant fees should bear the burden of cost for the backlog rather than U.S. citizens or noncitizen relatives.

• The backlog has a negative impact on many non-immigrant workers, DACA recipients, TPS holders, and other EAD applicants seeking to maintain their employment status in their current jobs and seeking USCIS services, and applicants from higher education seeking employment or other opportunities.

• Raising fees and hiring additional staff would be a "band-aid" solution to a flawed processing model that has created the current backlog crisis.

• Processing delays may deter many touring artists from performing in the United States and processing delays force some petitioners to pay the premium fees for international artists,

particularly given the specific timing demands of performing arts schedules.

• USCIS should improve processing so fewer applicants need to pay for premium processing.

• USCIS requires some dependents of long-term temporary workers to file extensions of status separate from the worker, contributing to the backlog.

• USCIS should reduce Requests for Evidence (RFE) as unnecessary complications that cause delays in processing, publish RFE issuance rates by adjudicator, and establish stricter requirements for responding to evidence and issuing RFEs.

• Recent RFE reductions by USCIS should be considered in the proposed filing fees.

• In response to the statement in the proposed rule that part of the 2022 congressional appropriations would be used to reduce current backlogs and delays, USCIS has not shown the capacity to quickly address developing backlogs and USCIS should not rely solely on yearly appropriations.

• Recommendations of several means of reducing backlog, including requesting annual appropriations if needed and adjusting fees annually based on staffing factors.

• The processing times and backlogs for the Form I–600A and I–600 series and Form I–800A and I–800 series should be reduced, and adjudication of adoption cases should be prioritized.

• Concerns about specific forms, including Form I–129 processing times are three to five times longer than mandated by statute for L–1 petitions.

• Form I–539 processing times have ballooned despite process changes that should have streamlined adjudication, for Form I–485, USCIS should promise a period of fewer than 6 months to process the form and its underlying petitions; applicants must file concurrent Forms I–485, I–131, and Form I–765, given the increasing processing times.

• These delays increase backlogs for Form I–129F. Because the processing time has increased in recent years, USCIS should not propose to significantly increase fees for the fiancé and spousal applications.

• Lengthy processing times for Form I–131, result in increased congressional inquiries, Ombudsman's inquiries, and expedite requests, all of which create greater inefficiencies.

• Further, processing delays make it difficult for students to anticipate their start dates on their applications and are not warranted given that the Form I–765 duplicates information that USCIS has already collected.

---

[161] USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," available at *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/ updated Mar. 6, 2023).

• For Form I–824, the simple purpose of this form should not necessitate processing times of 2–4 years.

• Form N–400 commenters recommended a case processing goal of 4–6 months and stated that increased vetting policies have increased processing times, despite stable rates of approval of applications.

• USCIS has a 1-to-3-month processing time for O–1 petitions (although the statutory requirement for adjudication is 14 days), so USCIS should refund the filing fee if processing takes longer.

• For K–1 visa holders applying for Adjustment of Status, processing time varies greatly depending on the applicant's location of residency and review of interim benefit requests for such applicants should be shorter given that those applicants' relationships and backgrounds have already been reviewed.

• Processing delays for F–1 student visas impede registrations from international students, which can diminish the students' contribution to U.S. innovation and limits revenue streams for U.S. colleges and universities.

• Lengthy J–1 waiver approval processing has caused interruptions in income or necessitated priority processing.

• DHS should avoid any Form N–400 fee increase by pursuing greater efficiencies and cost savings using technology.

• USCIS should refund the higher proposed fees if the agency does not process the following forms within its processing time goal: I–290B, I–800A, I–824, I–140, N–400, I–526, I–102, I–130, I–129F, I–360, I–129, I–90, I–539, I–131, I–765, I–485.

• Increased processing times and the need to hire new employees are problems of USCIS' own making through unnecessary RFEs, biometrics, in-person interviews, site visits, audits, and failure to take advantage of technological advances that could lead to more streamlined and cost-effective procedures. It is prudent for USCIS to increase fees because it has been 6 years since the last increase and the United States is experiencing widespread inflation, but USCIS should ensure that any increase improve the efficiency of its services and customer support.

*Response:* USCIS appreciates that its processing backlogs have a negative impact on many stakeholders who submit and rely on immigration benefit requests. USCIS is committed to timely processing goals and reducing its backlog. DHS acknowledges that since it last adjusted fees in FY 2016, USCIS has experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29858–29859. Processing delays have contributed to case processing backlogs. USCIS total pending caseload has grown from approximately 4.7 million cases in December 2016, when DHS last adjusted IEFA non-premium fees, to approximately 8.9 million cases at the end of June 2023.[162] On top of these preexisting strains on USCIS, the COVID–19 pandemic constrained USCIS adjudication capacity by limiting the ability of USCIS to schedule normal volumes of interviews and biometrics appointments while maintaining social distancing standards. *See* 88 FR 402, 455 (Jan. 4, 2023). COVID flexibilities likely increased the time to respond to an RFE, as well as processing times.[163] Further, USCIS believes that the growing complexity of case adjudications in past years, including prior increases in the number of interviews required and RFE volumes, at the time contributed to higher completion rates and growing backlogs. *Id.*

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[164] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing in an effort to achieve these goals by the end of FY 2023. DHS automatically extended some EADs to help prevent renewal applicants from experiencing a lapse in employment authorization or documentation while their applications remain pending. *See* 87 FR 26614 (May 4, 2022). Automatic extension of employment authorization or documentation allows some immigrants, including asylees, refugees, and TPS holders, to maintain their employment status in their current jobs. *Id* at 26615–26617. To highlight other efforts toward reducing the backlog and processing times, USCIS published a progress report to demonstrate both how backlog reduction and humanitarian services were successfully supported by appropriations by Congress in FY 2022.[165] USCIS reduced the backlog for naturalization and the wait time for employment authorization, while expanding humanitarian efforts.[166] USCIS already delivered on one of the commitments in the progress report by implementing premium processing for all employer Form I–140 petitions for immigrant workers.[167] Since publishing the report, USCIS also announced that premium processing is available for certain students keeping Optional Practical Training (OPT) or Science, Technology, Engineering, and Mathematics (STEM) OPT extensions, as well as certain changes or extensions of nonimmigrant status.[168]

DHS appreciates the operational suggestions submitted by commenters regarding interviews, RFEs, online filing, prioritization of certain requests, USCIS office staffing, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find

---

[162] *See* USCIS, "Number of Service-wide Forms by Fiscal Year to Date, Quarter and Form Status 2017," available at *https://www.uscis.gov/sites/default/files/document/data/ECN_1893_-Quarterly_-_All_Forms_FY17Q1_Final.pdf* (last visited Sep. 29, 2023). USCIS, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, April 1, 2023—June 30, 2023," available at *https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2023_q3.pdf* (last visited Sep. 29, 2023).

[163] *See, e.g.,* USCIS, "USCIS Extends COVID–19-related Flexibilities" available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-covid-19-related-flexibilities-1* (last revised/updated Jan. 24, 2023).

[164] See USCIS, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work* (last visited Feb. 8, 2023).

[165] See USCIS, "USCIS Releases New Data on Effective Reduction of Backlogs, Support for Humanitarian Missions, and Fiscal Responsibility," *https://www.uscis.gov/newsroom/news-releases/uscis-releases-new-data-on-effective-reduction-of-backlogs-support-for-humanitarian-missions-and* (last visited Feb. 7, 2023).

[166] See USCIS, "Fiscal Year 2022 Progress Report," Dec. 2022, available at *https://www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf* (last visited Feb. 8, 2023).

[167] See USCIS, "USCIS Announces Final Phase of Premium Processing Expansion for EB–1 and EB–2 Form I–140 Petitions and Future Expansion for F–1 Students Seeking OPT and Certain Student and Exchange Visitors," *https://www.uscis.gov/newsroom/alerts/uscis-announces-final-phase-of-premium-processing-expansion-for-eb-1-and-eb-2-form-i-140-petitions* (last visited Feb. 7, 2023).

[168] See USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last visited Mar. 6, 2023); USCIS, "USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status," *https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last visited June 12, 2023).

efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). This entails evaluating the utility of interview requirements, biometrics submission requirements, RFEs, deference to previous decisions, and other efforts that USCIS believes may, when implemented, reduce the amount of adjudication officer time required, on average, per case. *Id.* Any improvements in these completion rates would, all else equal, reduce the number of staff and financial resources USCIS requires. Furthermore, USCIS is actively striving to use its existing workforce more efficiently, by investigating ways to devote a greater share of adjudication officer time to adjudications, rather than administrative work. All else being equal, increasing the average share of an officer's time spent on adjudication (that is, utilization rate) would increase the number of adjudications completed per officer and reduce USCIS' overall staffing and resource requirements.

USCIS based its fee review largely on existing data that do not presume the outcome of these efficiency initiatives. USCIS cannot assume significant efficiency gains in this rule in advance of such efficiency gains being measurably realized. Establishing more limited fees to account for estimated future efficiency could result in deficient funding, and USCIS would not be able to meet its operational requirements. USCIS also cannot refund fees if it does not meet its processing time goals as commenters suggest without incurring significant harm to its fiscal position, which would in turn only exacerbate backlogs. In contrast, if USCIS ultimately receives the resources identified in this rule and subsequently achieves significant efficiency gains, this could result in backlog reductions and shorter processing times. Those efficiency improvements would then be considered in future fee reviews, as indicated in the proposed rule. *See* 88 FR 402, 529–530 (Jan. 4, 2023).

Finally, regarding the current USCIS processing time for O–1 petitions, and the commenter's suggestion that USCIS should refund filing fees for O–1 petitions that take more than 14 days to adjudicate, DHS disagrees with the commenter's assertion that there is a generally applicable requirement to process O–1 petitions within 14 days. Rather, the statute and regulations refer to a non-binding 14-day processing time, after USCIS receives an advisory opinion, in the limited context where USCIS requests an advisory opinion from an appropriate labor organization. *See* 8 U.S.C. 1184(c)(6)(D); 8 CFR 214.2(o)(5)(i)(F). DHS will not adopt the

commenter's suggestion to refund O–1 petition filing fees in cases that take longer than 14 days to adjudicate. As with other filing fees, the O–1 petition filing fee is due at time of filing and is nonrefundable.

In sum, DHS understands the need for timely service, system improvements, and customer support. USCIS continually strives to meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. Fees have not been adjusted since 2016. Meanwhile, USCIS expanded its humanitarian efforts, often without appropriations or revenue to offset the additional cost.[169] This fee rule is intended to address such shortfalls and provide resources necessary to ensure adequate service. USCIS would be unable to adequately perform its mission if DHS allowed fee levels to remain insufficient while USCIS continued to explore and implement options for additional efficiencies.

*Comment:* Many of the commenters suggested operational improvements which they felt would reduce processing times or improve customer service. Commenters wrote:

• USCIS should add more electronic filing.

• USCIS should use interview waivers, evidence of employment authorization, the creation of a trusted filer program, remote interviews, phone appearances, grandfathering, penalty fees, extend validity periods of visas, and recapture and issue Green Card numbers that have gone unused to reduce costs and the backlog.

• Applicants should be given the name and email of their adjudicator to establish more transparent and efficient communication.

• USCIS should increase adjudicator hiring rates and training, and provide better training combined with managerial oversight and review of adjudications.

• USCIS should transparently include planned process improvements in its costing model.

• Form I–130, commenters recommended a simplified registration system to prevent USCIS from spending resources managing applications during lengthy waiting periods.

• USCIS should stop requiring unnecessary renewals of work permits, citing research that such renewals compose 20 percent of the case backlog.

• USCIS should stop printing Green Cards, and EAD cards for applicants who already have a Green Card.

• DHS should offer premium processing fees to alleviate long processing times for VAWA applicants coming from difficult situations.

• Combining the forms, fees, and adjudications for Forms N–400 and N–600 would save both families and USCIS considerable time and money.

• Effort to process Form I–751 has fallen by 11 percent over the past 6 years but processing time is increasing dramatically and does not comply with statutory timeframes. Fees for I–751 filers should be used to improve I–751 processing times and not for other higher priority forms.

*Response:* DHS appreciates the operational suggestions submitted by commenters regarding processing times, process improvement, customer service, interviews, streamlined filings, online filing, prioritization of certain requests, training, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). DHS considered these recommendations but declines to make changes in this rule. DHS may consider these changes again in future rulemakings.

*E. Fee Waivers*

1. General Comments

*Comment:* Multiple commenters expressed general support for the fee waiver provisions in the proposed rule, some without explanation and others for the following reasons:

• Fee waivers are important for immigration relief because they help families improve their stability, financially support themselves, and fully integrate into the workforce.

• The proposed rule would replace the enjoined 2019/2020 changes, which severely limited immigrants' access to fee waivers including the reduced fee option for low-income naturalization applicants. The proposed rule would revert to the inability to pay model for establishing eligibility for fee waivers, and avoid other issues in prior proposed fees.

• Many individuals apply for naturalization or a Certificate of Citizenship with a fee waiver.

• The proposed rule continues to allow fee waivers for forms associated with certain types of humanitarian benefits. The United States has a moral and legal obligation to protect persons fleeing persecution.

---

[169] For example, as described in section III.C. DHS established new parole processes for certain Cubans, Haitians, Nicaraguans, and Venezuelans, and new family reunification parole processes for certain Colombians, Salvadorans, Guatemalans, and Hondurans.

• The proposed rule would preserve existing fee waiver eligibility for low-income and vulnerable populations and ensure that the fee changes would not disproportionately impact people who are struggling financially. Fee waivers provide an opportunity for low-income individuals to become citizens of the United States and participate in the democratic process. Without fee waivers, many low-income individuals would not have an equal opportunity to access the pathway to citizenship.

• Many of the changes DHS proposed will prevent meritorious fee waiver requests from being denied on arbitrary bases, as is often now the case.

• Strengthening of fee waivers supports union efforts to uplift the rights and status of those in need of increased agency in the labor market.

*Response:* DHS agrees with commenters regarding the importance of fee waivers and will maintain their availability as explained in the proposed rule.

## 2. Eligible Categories and Forms

*Comment:* Several commenters asked USCIS to balance fee increases by significantly expanding fee waiver eligibility. One commenter stated that DHS should expand the categories of applications eligible for fee waivers without specifying which additional categories should receive fee waivers. Another commenter encouraged USCIS to expand fee waivers to further ensure that all vulnerable noncitizens who cannot afford to pay filing fees are able to obtain a fee waiver and access immigration benefits without unreasonable delay or undue difficulty. Another commenter requested that USCIS allow for individual determinations as to whether a fee waiver should be granted for all applications. The commenter reasoned that categorical restrictions placed on fee waivers for certain applications combined with the increase in fees proposed will pose obstacles for many immigrants, resulting in the delay of immigrants' ability to apply for immigration relief.

*Response:* DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b); Table 5B. DHS believes that these expanded fee exemptions offer more certainty to those who are unable to pay application fees and create less burden because they do not require filing or processing of a fee waiver request. In addition, DHS is

maintaining the household income level for assessing a requestor's ability to pay at 150 percent of the FPG instead of the 2019/2020 fee rule's lower threshold of 125 percent of the FPG. 8 CFR 106.3(a)(1)(i)(B). This fee rule also retains the authority for the Director of USCIS to provide exemptions from or waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law. *See* 8 CFR 106.3(c). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits. Additional fee waivers would limit USCIS' ability to fund necessary activities and would lead to additional backlogs and delays. Otherwise, USCIS would need to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

*Comment:* Multiple commenters wrote that USCIS should make additional family-related immigration benefits eligible for fee waivers. One commenter expressed concern that some Form I–129F petitioners and beneficiaries would have to go into debt to get married and recommended that DHS allow low-income individuals to request a waiver of the Form I–129F. Another commenter expressed opposition to the rule because fees cannot be waived for Forms I–130 and I–751.

*Response:* Contrary to the commenter's assertion, the fee for Form I–751, Petition to Remove Conditions on Residence, can be waived. 8 CFR 106.3(a)(3)(i)(C). In general, however, DHS does not consider Form I–129F, Petition for Alien Fiancé(e), and Form I–130, Petition for Alien Relative, appropriate for fee waivers because the petitioning U.S. citizen or LPR relative is statutorily required to demonstrate their ability to financially support the noncitizen beneficiary at the time of their admission as an LPR. *See* INA secs. 212(a)(4)(C)(ii) and 213A, 8 U.S.C. 1182(a)(4)(C)(ii) and 1183a. DHS does not believe that these USCIS fees represent an inordinate financial burden compared to the financial commitment required to fully support an immigrant relative.

*Comment:* A commenter expressed concern that the fee for Form I–539 is not waivable for T and U nonimmigrants when the form is filed concurrently with Form I–485. The

commenter remarked that this would cause significant financial burden to victims filing U-visa and T-visa based Form I–485 applications, who often cannot hire a private attorney to help them file an I–485 in timely fashion, and the additional I–539 fee would further delay the ability of survivors in this situation to reconcile their expired status with the filing of a *nunc pro tunc* Form I–539 and Form I–485 application.

*Response:* In the proposed rule, DHS proposed to fully exempt the fee for a Form I–539, Applicant to Extend/Change Nonimmigrant Status, filed by applicants who have been granted T nonimmigrant status or are seeking to adjust status under INA sec. 245(l), 8 U.S.C. 1255, regardless of whether the form is filed before or concurrently with Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 402, 594 (Jan. 4, 2023) (proposed 8 CFR 106.3(b)(2)(vi)). DHS has maintained this fee exemption in the final rule. 8 CFR 106.3(b)(2)(vi); Table 5C. Furthermore, in response to comments, DHS has decided to extend the fee exemption for Form I–539 to include applicants who have been granted U nonimmigrant status or are seeking to adjust status under INA sec. 245(m), 8 U.S.C. 1255(m), regardless of whether the form is filed before or concurrently with Form I–485. 8 CFR 106.3(b)(5)(vi). That limited, additional fee exemption did not increase the fees for other fee payers. As explained elsewhere, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. These fee exemptions will enable the vulnerable population of U nonimmigrants to maintain their nonimmigrant status while applying to adjust to LPR status.

*Comment:* A commenter stated that fee waivers and exemptions should be extended to other critical forms for asylees, reasoning that asylees are just as vulnerable and meet the same legal definition as refugees. The commenter did not identify specific forms that should be eligible for a fee waiver but asserted that the following forms should be fee exempt: Form I–485 for asylees, Form I–765 renewal and replacement for asylees and asylum applicants, and Form I–290B for asylees and refugees when filed for Forms I–730 or I–485.

*Response:* All the forms identified by this commenter are eligible for a fee waiver. 8 CFR 106.3(a)(3)(ii)(D), (F), (iv)(C); Table 5B. Comments concerning fee exemptions are addressed later in the Section IV.F of this preamble.

*Comment:* Commenters stated that the proposed fee changes would unfairly categorize athletes as a classification

that can afford the fee increases and requested that a broader spectrum of forms, including the Form I–129 and Form I–140 when not filed by an employer, be eligible for fee waivers or reductions. Another commenter encouraged USCIS to consider a waiver option for O and P petitions, combined with a tiered structure (possibly based on maximum planned venue size), which the commenter reasoned would benefit all interests without jeopardizing potential U.S. revenue streams and the socioeconomic contributions of small- and medium-sized artists.

*Response:* DHS recognizes commenters' concerns regarding the affordability of Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, and that not all athletes or artists are wealthy. As further discussed in Section II. C of this preamble, in response to public comments and stakeholder feedback, DHS is codifying a discounted Form I–129 fee for small employer and nonprofit filers in this final rule. 8 CFR 106.2(a)(3)(ix). However, while DHS recognizes the economic and cultural contributions made by O and P nonimmigrants and I–140 self-petitioners, DHS does not believe that these factors justify fee-waiver eligibility or fee exemptions for Form I–129 and Form I–140 petitions. USCIS can only allow a limited number of forms to be eligible for fee waivers, or else it would require even further increases in fees to offset lost revenue. DHS has chosen to prioritize fee waivers for humanitarian and protection-related immigration forms where the beneficiary may not have a reliable income or their safety or health is an issue, and naturalization and citizenship-related forms to make naturalization and citizenship accessible to all eligible individuals.[170] DHS notes that the process for assessing fee-waiver eligibility is generally designed for individuals, not organizational petitioners for O or P nonimmigrants because their ability to pay cannot be assessed under those guidelines (*e.g.,* receipt of a means-tested benefit, or household income below 150% of the FPG). *See* 8 CFR 106.3(a)(1)(i).

*Comment:* A commenter expressed concerns about the increasing frequency of fee waivers because it is possible for some applicants to obtain fee waivers through different forms and multiple filings. The commenter also asserted that applicants abuse fee waivers, reasoning that some individuals file multiple application types and request a fee waiver for each application to avoid

paying fees. Considering these concerns, the commenter recommended that no fee waivers be given for Forms N–400 and N–600.

*Response:* DHS believes the commenter's concern is unfounded. As discussed in Section IV.E.7 of this preamble, fees waiver requests, approvals, and foregone revenue have remained consistent over the last 10 years, and they are currently well below levels in FY 2015–17. *See* Table 6. DHS disagrees that an applicant seeking multiple fee waivers for different applications constitutes ''abuse'' because each subsequent form is required to be accompanied by its own fee waiver request, and each fee waiver request is considered on its own merits. Multiple fee waiver requests may reflect an ongoing inability to pay due to legitimate reasons such as low income or disability, which must be documented in each request.

*Comment:* A commenter stated that fee waivers should not be available for naturalization-related applications because U.S. citizenship is a privilege, not a right.

*Response:* DHS disagrees with the premise of this comment. The INA provides for the statutory, nondiscretionary right to apply for naturalization. *See* INA secs. 316, 319, 328, and 329; 8 U.S.C. 1427, 1430, 1439, and 1440. DHS acknowledges the advantages that new citizens obtain with naturalization, but also recognizes the significant benefits that the United States obtains from the naturalization of new citizens.[171] In maintaining fee waivers and reduced fees for naturalization-related applications, DHS seeks to promote naturalization and immigrant integration.[172] Because applicants may be unable to pay at the time of naturalization, USCIS believes that continuing to allow naturalization applicants to request fee waivers is in the best interest of the program and consistent with the statute.

*Comment:* One commenter stated there should be no full fee waivers for individuals who are not asylum, VAWA, T visa, or U visa-based requesters. The commenter expressed support for reduced fees but reasoned that it would cause USCIS to continue dedicating extra time and resources to verify and review the request for reduced fees. The commenter suggested that, if USCIS must keep fee waiver options for forms like the N–400 then it

should temporarily cancel the option for 1 year to see if it results in a decrease in filings. The commenter reasoned that, if there were a decrease, this would allow USCIS time to adjudicate current backlogs and recoup the full amount of fees for all new filings, and if there was a minimal decrease, it would inform future discussion of minimizing fee waivers.

*Response:* DHS disagrees with the commenter's proposal to limit full fee waivers to certain humanitarian categories and exclude others. DHS believes that there are equally deserving humanitarian categories, including refugees, Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA) adjustment applicants, Special Immigrant Afghans and Iraqis, SIJs, and TPS recipients. Furthermore, in recognition of the benefits that the United States receives when immigrants naturalize, DHS believes that waived and reduced fees should be available to all naturalization applicants regardless of class of admission. DHS disagrees with the commenter's rationale for temporarily suspending Form N–400, Application for Naturalization, fee waivers because this would arbitrarily burden immigrants who have recently become eligible for naturalization but do not have the funds to pay the fee. In FY 2021, USCIS waived 39,738 fees for Form N–400s and approved 2,606 reduced-fee requests, so DHS anticipates that a similar number of applicants would be prevented from applying for naturalization were it to temporarily suspend fee waivers and reductions for the Form N–400. Instead of limiting fee waivers for Form N–400, DHS has decided to raise the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). As for the commenter's assertion that suspending fee waivers and reductions would allow USCIS to decrease its backlog, we believe this would only result in a surge of Form N–400 filings once fee waivers and reductions were reinstituted. The commenter is correct that USCIS dedicates time and resources to review requests for fee waivers or reduced fees, but that effort is necessary and valuable for enabling low-income applicants to access immigration benefits, while also ensuring that only those who meet the requirements have their fees waived. On March 29, 2022, USCIS announced new actions to reduce backlogs, and announced that the Form N–400 cycle time goal is 6 months.[173] In FY 2023,

---

[170] *See* E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[171] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, ''U.S. Naturalization Policy,'' (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[172] This is also consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[173] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''USCIS Announces New Actions to Reduce Backlogs, Expand Premium

USCIS greatly improved Form N–400 processing times to 6.3 months from 11.5 months in FY 2021.[174]

3. Eligibility

a. Means-Tested Benefits

*Comment:* Noting that the proposed rule would accept a child's receipt of public housing assistance as evidence of the parent's eligibility for a fee waiver when the parent resides in the same residence, commenters wrote that the proposal is limiting and requested that USCIS include a child's receipt of other means-tested benefits, including Medicaid, Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), and Supplemental Security Income (SSI) as acceptable evidence. A couple of these commenters stated that all other qualifying means-tested benefits programs similarly screen for financial hardship and inquire about assets and income for the applicant's household, and therefore any household member's receipt of a means-tested benefits should have the same probative value as a child's receipt of public housing assistance for fee waiver eligibility. One commenter said broadening the criteria for fee-waiver eligibility based on means-tested benefits will save USCIS time and effort adjudicating fee waiver requests and training staff, as evidence of receipt of means-tested benefits is often simpler to review than evidence of an entire household's income or financial hardship. Another commenter concluded that DHS has not provided a reasoned explanation of its choice to treat various public benefits differently. One commenter stated that in many cases only the applicant's child meets the criteria for a public benefit.

*Response:* After considering the comments on the proposed rule, DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. That would entail public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits

and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[175] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 form instructions.

*Comment:* A commenter recommended that USCIS expand evidence of receipt of means-tested benefits to include a benefits card, in lieu of the current requirements for a formal letter, notice, or other official documents. The commenter said this change would alleviate the administrative burden to those who would have to otherwise spend hours struggling to obtain a formal notice of receipt.

*Response:* DHS already accepts a benefits card as evidence of a means-tested benefit if the card shows the name of the benefit recipient, the name of the agency granting the public benefit, the type of benefit, and that the benefit is currently being received.[176] While it is unfortunate that not all benefit cards provide information about dates of receipt for the benefit, DHS believes that without this information a benefits card is not sufficient evidence that the fee waiver requestor currently receives the benefit.

b. Household Income at or Below 150 Percent FPG, and Suggested Income Levels

*Comment:* Some commenters wrote that they supported that DHS will continue to use the FPG to determine income thresholds for fee waiver purposes because it is a recognized national standard also used by other Federal programs.

*Response:* DHS appreciates the support and will continue to use the FPG as one means of assessing inability to pay.

*Comment:* Some commenters generally stated that the income eligibility limit for a fee waiver at 150 percent of FPG is too low or should be reconsidered. Multiple commenters suggested that USCIS increase the income threshold to establish an inability to pay to at or below 200 percent of the FPG, with some providing the following rationale:

• This would expand eligibility for those who earn too much to qualify for a fee waiver but too little to be able to afford the proposed fees.

• This would more accurately reflect the realities of low-income individuals, particularly as this rule seeks significant increases for fees for integral applications, such as employment authorization, permanent residence, and family petitions.

• This would impact a significant portion of the community of low-income immigrants. In 2019, immigrants who were at 150 percent to 199 percent of the Federal poverty level constituted one-third, or 4,503,000, of all low-income immigrants in the country.

• This would take into consideration applicants in states such as California, where cost of living and the poverty threshold for public benefit programs are higher.

• Survivors of domestic violence, sexual assault, and human trafficking may have a household income that puts them over 150 percent of the FPG, but they may face economic obstacles due to their victimization that impede their ability to pay immigration filing fees.

• This would be consistent with the income guidelines that federally funded legal aid agencies use per the Legal Services Corporation's regulations.

Other commenters recommended that DHS increase the eligibility threshold to at or below at least 300 percent of FPG. The commenters said there are people who would not qualify under the proposed rule's criteria and examples for "financial hardship" and are excluded from waived or reduced fees because they make a little more than 200 percent of FPG, despite their

---

Processing, and Provide Relief to Work Permit Holders'' Mar. 29, 2022, *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-new- actions-to-reduce-backlogs-expand-premium- processing-and-provide-relief-to-work.*

[174] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year," *https:// egov.uscis.gov/processing-times/historic-pt* (last visited Aug. 18, 2023).

[175] Soc. Sec. Admin., "Understanding Supplemental Security Income, What Is Income?" (2023), *https://www.ssa.gov/ssi/text-income- ussi.htm* (last visited Aug. 21, 2023).

[176] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Fee Waiver," *https:// www.uscis.gov/forms/filing-fees/additional- information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26'' (Mar. 13, 2011], *https://www.uscis.gov/ sites/default/files/document/memos/ FeeWaiverGuidelines_Established_by_the_ Final%20Rule_USCISFeeSchedule.pdf;* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form I–912, Instructions for Request for Fee Waiver 5 (Sept. 3, 2021), *https:// www.uscis.gov/sites/default/files/document/forms/ i-912instr.pdf.*

economic struggles and bona fide "inability to pay" for current immigration fees, let alone the proposed fee increases for citizenship, adjustment of status, and other benefit requests.

*Response:* DHS acknowledges that certain individuals may continue to face difficulty paying immigration fees despite having a household income that is above 150 percent of the FPG. However, DHS declines to further raise the income limit for fee waivers because increasing the number of requests that do not pay fees would require even greater fee increases for other fee-paying individuals, many of whom already face significant increases in fees with this new rule. Otherwise, USCIS' ability to maintain services and improve backlogs would be limited. However, DHS notes that the current fee rule contains several provisions that lessen the burdens for low-income filers. First, there are other ways of demonstrating inability to pay besides household income. An individual may demonstrate inability to pay if they or their spouse or child living in the same household are currently receiving a means-tested benefit, despite having household income over 150 percent of the FPG. *See* 8 CFR 106.3(a)(1)(i)(A). DHS fee waiver guidance provides that USCIS will accept Federal, State, or locally funded mean-tested benefits. Income limits for certain means-tested benefits vary by State and account for different costs of living.[177] DHS also accepts various forms of financial hardship as evidence of inability to pay. *See* 8 CFR 106.3(a)(1)(i)(C). In addition, DHS has significantly expanded the forms that are now fee exempt, which includes benefits for victims of trafficking, violent crimes, and domestic violence. *See* Table 5B. These requestors will not be required to request a fee waiver for certain forms. Finally, as explained in section II.C.13 of this preamble, DHS has significantly expanded the income limit under which N–400 applicants qualify for a reduced fee from the originally proposed 200 percent limit to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii).

*Comment:* Some commenters recommended updating the Department of Housing and Urban Development (HUD)'s measure of Median Family Income (MFI) instead of the FPG to assess fee waiver eligibility based on household income. The commenters said HUD's approach is more realistic and equitable in determining who has an inability to pay because it considers how an individual's geographic location impacts their cost of living, whether they live in real poverty, and, ultimately, their ability to afford an immigration benefit. The commenters disagreed with DHS's rationales for using the FPG: (1) having a consistent national standard, (2) maintaining consistency between fee waiver eligibility and other Federal programs, and (3) avoiding confusion. Commenters asserted that having a consistent national standard "is not a justification but instead a reason for questioning its use;" that the MFI is consistent with HUD's Federal programs and benefits; that receipt of means-tested HUD benefits can demonstrate inability to pay under DHS's other criteria; and that any potential confusion of switching to MFI could be addressed through training and public education campaigns.

Other commenters did not specifically advocate for MFI, but generally stated that USCIS should assess inability to pay based on a requestor's location and the high cost of living in certain areas of the country. Another commenter stated that USCIS should use more accurate means-tested standards without identifying why the current standards are inaccurate or recommending specific alternative standards.

*Response:* DHS recognizes that the cost of living in certain areas of the country is greater than in others, and therefore people with equal household incomes may face varying difficulty paying immigration fees due to their geographic location. However, DHS believes that this concern is mitigated by allowing receipt of a means-tested benefit to show inability to pay since, as commenters note, the income thresholds for some means-tested benefits vary by State and locality. Therefore, individuals who qualify for a means-tested benefit due to their higher cost of living may still qualify for a fee waiver, even if their household income is above 150 percent of the FPG. This concern is also mitigated for residents of Alaska and Hawaii, who have unique FPG charts.[178]

DHS believes that the benefits of using FPG outweigh those of HUD's median family income (MFI) when assessing an individual's ability to pay. Despite comments to the contrary, DHS believes it is important to have a consistent national standard for the income threshold. Relying on a single, uniform standard reduces administrative costs in comparison to HUD's MFI, which would require requestors, legal service providers, and adjudicators to calculate fee waiver eligibility based on geographic area. Requestors often change their geographic location between filing for immigration benefits, and a consistent national standard would avoid potentially complicated inquiries into which geographic location is more appropriate in assessing their ability to pay. A consistent national standard also removes the incentive to misrepresent one's address to obtain a fee waiver. While DHS recognizes that MFI is used effectively for administering HUD's Federal programs and benefits, Department of Health and Human Services' (HHS) FPG is used more broadly throughout the Federal Government.[179] Using FPG also promotes internal consistency within USCIS since this measure is statutorily required for other eligibility determinations. *See* INA secs. 204(f)(4)(A)(ii) and 213A(h), 8 U.S.C. 1154(f)(4)(A)(ii) and 1183a(h). While DHS acknowledges that it is possible to mitigate confusion through training and public engagement, a more complicated legal determination will still tend to result in a higher rate of erroneous or lengthy filings and adjudications. Noting that many low-income requestors may lack access to legal assistance and face additional barriers to properly filing immigration forms, DHS believes that this population is better served by keeping the fee waiver process simple by using the FPG. Finally, DHS notes that using HUD MFI by State or county would not guarantee equitable results, since the cost of living can vary greatly within individual States and counties.

*Comment:* A commenter asked USCIS to begin using the Supplemental Poverty Measure (SPM) instead of the Federal Poverty Level (FPL) to determine who qualifies for a fee waiver, without explaining why the SPM is preferable. The commenter recommended that fee waivers be made available to any household earning less than 200 percent of the SPM.

*Response:* DHS declines to adopt the SPM for assessing eligibility for fee waivers because the SPM was not designed as a tool for assessing individual eligibility for public benefits. "The SPM is considered a research

---

[177] *See, e.g.,* Am. Council on Aging, "Medicaid Eligibility Income Chart by State", July 2023, *https://www.medicaidplanningassistance.org/medicaid-eligibility-income-chart/* (last updated July 10, 2023).

[178] U.S. Dept of Health & Human Servs., "HHS Poverty Guidelines for 2023," *https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines* (last visited Aug. 21, 2023).

[179] *See, e.g.,* Inst. for Research on Poverty, "What Are Poverty Thresholds And Poverty Guidelines?," *https://www.irp.wisc.edu/resources/what-are-poverty-thresholds-and-poverty-guidelines/* (last visited Aug. 14, 2023).

measure, because it is designed to be updated as techniques to quantify poverty and data sources improve over time, and because it was not intended to replace either official poverty statistics or eligibility criteria for anti-poverty assistance programs.'' [180] Determining whether a particular individual falls above or below the SPM would require a complex calculation of numerous factors that would increase administrative costs and be susceptible to error.[181]

*Comment:* A commenter noted that even though there is no requirement that an individual submit their taxes, USCIS routinely denies fee waivers based on applicants' statements, where taxes are unavailable, or where the taxes indicate the applicant is under the poverty threshold. Another commenter similarly stated that, in practice, fee waivers are mostly denied when sending in pay stubs or W–2 forms. The commenter further remarked that fee waiver adjudicators routinely request only a tax return be submitted to establish income. The commenter stated that the rule should more explicitly clarify that there is no requirement to submit a tax return to document fee waiver eligibility.

*Response:* DHS declines to modify the rule as recommended by the commenter because it is unnecessary. Per the revisions to Form I–912 published with this rule, an individual requesting a fee waiver may establish their household income through different forms of documentation, including Federal income tax returns, a W–2, or paystubs. USCIS denies fee waiver requests that are incomplete and does not issue RFEs for Form I–912. In FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6.

### c. Financial Hardship

*Comment:* A commenter remarked that fee waivers are ''almost impossible'' to obtain based on hardship, regardless of the quality or amount of documentation submitted to support such a request. Another commenter stated that requests for fee waivers

based on ''financial hardship'' for low-income and no-income individuals have been universally denied, without clarity provided as to the specific reasons for denial or what evidence would be considered sufficient.

*Response:* Although USCIS does not have approval or rejection data related to the specific criteria for fee waivers, DHS notes that in FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6. To help prevent erroneous denials of fee waiver requests based on financial hardship, the revised Form I–912 contains a non-exhaustive list of examples of causes of financial hardship. DHS intends to issue guidance clarifying that the burden of proof for inability to pay is a preponderance of the evidence, and that an officer may grant a request for fee waiver so long as the available documentation supports that the requestor is more likely than not unable to pay the fee. USCIS regularly trains its staff to avoid erroneous denials of fee waiver requests.

*Comment:* A commenter supported the proposal to provide USCIS officers a larger, non-exhaustive list of circumstances that may constitute a financial hardship. The commenter stated that its staff often receive fee waiver denials despite having provided evidence that clearly points to a significant financial hardship. The commenter said that, by adding such obvious forms of hardship as ''significant loss of work hours and wages,'' ''natural disaster,'' and ''victimization,'' DHS will provide much-needed guidance to both applicants and USCIS officers. In addition, the commenter stated that the proposal to include a catch-all category of hardship for ''[s]ituations that could not normally be expected in the regular course of life events'' will also provide applicants a more reliable basis on which to demonstrate that a particular event has led to hardship.

Another commenter also supported the proposed rule's suggested evidence of financial hardship, including an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation. The commenter recommended that such affidavits include those from legal aid agencies serving low-income populations, documenting their assessment that a requestor is low-income with minimal assets and consequently eligible for their free legal services. In addition, the commenter

said the term ''support services'' should be understood to include such legal services, as many legal aid agencies provide holistic services, which include helping clients access public benefits, health care, and housing. Moreover, the commenter said including legal services as ''support services'' would lead to more consistent adjudication of fee waiver requests for low-income applicants.

*Response:* DHS notes that, the current, proposed, and final instructions for Form I–912 permit that an affidavit describing the person's financial situation from a legal aid agency serving low-income populations may be acceptable evidence of a requestor's financial situation if they lack income. *See* 88 FR 402, 458 (Jan. 4, 2023) (''If the requestor is receiving support services, an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation.'').

*Comment:* One commenter suggested that mental or physical illness impacting an applicant's ability to work and pay the filing fee be explicitly included as a factor or incorporated into the proposed factors of ''victimization'' or ''situations that could not normally be expected in the regular course of life events.'' Otherwise, the rule could be read to exclude illnesses causing serious financial hardship and inability to pay filing fees if they are not an ''emergency or catastrophic.''

*Response:* Upon further review, DHS has incorporated this recommendation into the revised Form I–912 instructions. DHS believes that a mental or physical illness that impacts an individual's ability to work may amount to a similar level of financial hardship (depending on the individual's household income, financial assets, and other factors) as other examples listed in the form instructions, and therefore may qualify as a financial hardship with documentation of inability to work and information on income.

### d. Other/General Comments on Criteria and Burden of Proof

*Comment:* Several commenters stated that there are many people who do not qualify for fee waivers and do not have the financial means to afford the fees. Another commenter said, at a minimum, USCIS should offset the proposed fee increases by raising the eligibility threshold for fee waivers, and then provide means-tested fee waivers. Additionally, an individual commenter stated that underprivileged families

---

[180] Joseph Dalaker, Cong. Research Serv., R45031, ''The Supplemental Poverty Measure: Its Core Concepts, Development, and Use,'' (July 19, 2022), *https://crsreports.congress.gov/product/pdf/R/R45031#:~:text=The%20Supplemental%20Poverty%20Measure%20(SPM,a%20specified%20standard%20of%20living.*

[181] *See generally* Joseph Dalaker, Cong. Research Serv., R45031, ''The Supplemental Poverty Measure: Its Core Concepts, Development, and Use,'' (July 19, 2022), *https://crsreports.congress.gov/product/pdf/R/R45031#:~:text=The%20Supplemental%20Poverty%20Measure%20(SPM,a%20specified%20standard%20of%20living.*

should only have to pay a reduced fee or be given a fee waiver.

*Response:* DHS acknowledges commenters' concerns and believes that this final rule contains multiple provisions that increase the availability of fee waivers and reductions for those unable to pay. The rule codifies DHS policy guidance that a requestor will generally be found unable to pay if they receive a means-tested benefit, have a household income below 150 percent of the FPG, or are experiencing financial hardship. *See* 8 CFR 106.3(a)(1)(i). As discussed above, this rule broadens the ways that a requestor can establish eligibility through a fee waiver by allowing a household child's receipt of certain means-tested public benefits to demonstrate the parent's inability to pay. The final rule reduces the N–400 fee for applicants whose household income is less than or equal to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). The revised Form I–912 offers additional guidance on the types of evidence of financial hardship, which DHS believes will provide flexibility and reduce the burden for individuals seeking fee waivers. The form also clarifies when certain household members' income will not be considered in assessing whether a requestor is unable to pay. The final rule further addresses individuals' inability to pay by increasing the number of forms that are fee exempt. *See* Table 5B.

*Comment:* A couple of commenters supported DHS continuing to base inability to pay on a "range of evidentiary standards," including means-tested benefits, household income using the FPG, or financial hardship, but said such standards should not be applied categorically and must come with adequate guidance. The commenters said the current regulation provides insufficient guidance regarding evidence, given that many applicants for fee waivers are unlikely to have significant evidence, or the type of evidence USCIS requests to prove lack of income (as proving lack of income involves proving a negative). They said DHS should continue to allow officers to grant a request for a fee waiver in the absence of some of this documentation so long as the available documentation supports that the requestor is more likely than not unable to pay the fee, as allowed under the preponderance of the evidence standard. One of these commenters said more guidance should be provided regarding documentation, including training officers in the types of situations that, while they may not lend to written evidence that can be submitted to USCIS, support the need for a fee waiver as well as the

underlying humanitarian claim. The commenter said DHS should not only provide a list of possible evidence that includes both common proofs of financial need, such as taxes, pay stubs, and bills, but also informal types of acceptable evidence, such as written letters from roommates, affidavits from social or legal services organizations that condition services on lack of income, handwritten bills, and the like. Moreover, the commenter said DHS should also provide clear instructions that an officer can or should waive a fee upon a sworn statement from the applicant that they are a victim of abuse or exploitation. Another commenter said the rule should specify preferred and alternative types of evidence rather than mandatory evidence. Another commenter suggested USCIS clarify in the form instructions and guidance that these documents are non-exhaustive and that USCIS will consider other relevant evidence. A commenter stated fee waivers should be readily accessible with reasonable documentary requirements but did not specify what requirements they recommend.

*Response:* Under the current fee rule and USCIS policy, no type of evidence is categorically required to show eligibility for a fee waiver. The rule provides three different means of establishing eligibility to pay, *see* 8 CFR 106.3(a)(1)(i), and the Form I–912 instructions offer multiple examples of evidence that can be submitted in support of a fee waiver request. USCIS guidance will clarify that individuals seeking a fee waiver only have to establish eligibility by a preponderance of the evidence. *See* 88 FR 402, 458 (Jan. 4, 2023). However, DHS declines to adopt the commenter's recommended language that certain required documents are non-exhaustive, as this would be inappropriate for certain ways of proving inability to pay. For example, to confirm receipt of a means-tested benefit, a requestor is required to submit documentation that they are currently receiving a means-tested benefit that includes their name, the agency granting the benefit, type of benefit, and indication that the benefit is currently being received.

*Comment:* A couple of commenters wrote that they supported the implementation of more descriptive guidelines for the information collection requirements for the Form I–912. One commenter remarked that the new requirements are more realistic and flexible for applicants, reasoning that lower income applicants run into challenges when collecting documentation to support their fee waiver, for example by lacking a safe

place to store confidential information. The commenter further remarked that, coupled with the preponderance of the evidence standard, evidentiary guidance will also help potential applicants understand upfront whether they qualify for a fee waiver. Another commenter agreed with DHS broadening the list of documents that are sufficient to show that a person does not have any income—a circumstance that is frequently difficult to document—because it will reduce the documentary burden on applicants in the most precarious financial situations, while also reducing the burden on USCIS to review repeated fee waiver requests after denials.

*Response:* DHS appreciates the commenters' feedback.

*Comment:* A commenter stated that, while USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee, the rules provide no certainty even when the applicant provides the very types of inability-to-pay information identified in the regulations—applicants are merely "eligible" for a fee waiver if they meet the criteria. The commenter asked USCIS to modify the rule to clarify that "evidence of any of the three grounds is conclusive proof of eligibility for a fee waiver."

*Response:* DHS understands that the commenter wants more certainty for when a requestor will or will not have their fee waived, but we decline to adopt the commenter's proposal to treat any evidence of one of the three grounds as conclusive proof.

Even though the fee statute does not mention fee waivers, DHS has interpreted the discretion it vests in the agency to allow fee exemptions or waivers subject to certain conditions or criteria. Section 245(l)(7) of the INA requires DHS to permit certain requestors (those applying "for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of [Title 8]") to "*apply for*" fee waivers. 8 U.S.C. 1255(l)(7) (emphasis added). The statute, however, does not specify any standard for approving applications for such discretionary waivers.

In this rule, discretionary waivers of fees are limited to situations where the party requesting the benefit is unable to pay the prescribed fee. 8 CFR 106.3(a)(1)(i). A person can demonstrate an inability to pay the fee by establishing receipt of a means-tested benefit at the time of filing, household income at or below 150 percent of the

FPG at the time of filing, or extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee. 8 CFR 106.3(a)(1)(i). Finally, a person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form. 8 CFR 106.3(a)(2).

USCIS generally applies a burden of proof of preponderance of the evidence for the information provided with immigration benefit requests.[182] While DHS has increased the availability of fee waivers and clarified their requirements in this rule, it remains the requestor's burden to establish that they are more likely than not eligible for a fee waiver. *See* 88 FR 458. Because the fee statute does not specify any standard for approving applications for such discretionary waivers, DHS will retain the ability to determine that an individual who meets the eligibility requirements for a fee waiver does not merit a waiver in the exercise of discretion. *See* 8 CFR 106.3(a).

*Comment:* Commenters stated that DHS should modify its rules so that a fee waiver request would be automatically approved if not decided within 45 days.

*Response:* DHS declines to impose the commenter's deadline on USCIS adjudication of fee waiver requests. Imposing an arbitrary deadline on fee waiver reviews would require USCIS to allocate limited resources to prioritize fee waiver requests above most other adjudicative actions to prevent lost revenue and risk its ability to maintain adequate service levels. USCIS must retain the flexibility to assign resources where they are needed. Although USCIS received 532,417 fee waivers in FY 2022, an average of over 2,000 per workday, most fee waivers are adjudicated within 8 to 10 days at the Lockboxes and 90 percent are completed within 15 days. DHS acknowledges that some fee waiver requests took longer to adjudicate during the COVID–19 pandemic, but DHS is working diligently to deliver timely service.

*Comment:* Multiple commenters said fee waiver eligibility based on the stipulated bases should be incorporated into the regulatory text. A commenter said the preamble recites the current three grounds for fee waivers since 2010 but the actual proposed code section

only refers to inability to pay and does not specify these specific grounds. To prevent future confusion or interpretations, the commenter said the three grounds should be mentioned in the code itself since the preamble is not legally enforceable. Likewise, another commenter recommended that USCIS include the standards in the final rule so that they are codified and less susceptible to being modified by a future administration. The commenter said doing so would also formalize the adoption of such standards, which have been in use for over a decade. A commenter asked USCIS to incorporate the eligibility criteria into the Policy Manual at Volume 1, Part B, Chapter 4, as well as the proposed regulations.

*Response:* After considering the public comments, DHS has decided to codify the three means of demonstrating eligibility for a fee waiver at 8 CFR 106.3(a)(1)(i). USCIS intends to update the Policy Manual to reflect this when the final rule takes effect. However, while meeting any of the three criteria will make a requestor presumptively eligible for a fee waiver, USCIS will still retain the discretion to approve or deny a fee waiver. Denial of a fee waiver will result in rejection of a benefit request and neither the fee waiver denial nor the rejection may be appealed.

*Comment:* A commenter suggested that USCIS include receipt of financial aid through the Free Application for Federal Student Aid (FAFSA) as an additional way to prove eligibility for a fee waiver.

*Response:* DHS declines to adopt the commenter's proposal because there are many types of student financial aid obtainable by filing the FAFSA that do not reflect significant financial need and may not meet the definition of means-tested benefit as stated in this final rule, *see* 8 CFR 106.1(f)(3), such as grants, merit scholarships, and student loans.[183]

*Comment:* Multiple commenters recommended that USCIS adopt an appeals or formal review process for fee waiver denials.

*Response:* DHS also declines to adopt an appeals process for fee waiver denials because this would compound the time and costs of adjudicating fee-waivers and require that additional costs be transferred to fee-paying requestors. Those who believe that their fee waiver request was wrongfully denied may refile their request.

### 4. Authority

*Comment:* One commenter recommended that USCIS limit the Director of USCIS' discretion to authorize additional fee waivers, as put forth in the 2019/2020 fee rule. The commenter remarked that limiting such discretion is necessary to limit "politically motivated abuse" of fee waiver eligibility policies and protect fee-paying applicants from unfair cost increases to cover such abuse.

*Response:* This rule retains the feature of the prior 2019/2020 fee rule that permits the USCIS Director to delegate the discretionary fee waiver authority only to the USCIS Deputy Director.[184] USCIS declines to adopt the additional restrictions on discretionary waiver authority that were contained in the 2019/2020 fee rule. The commenter did not cite any past examples of "politically motivated abuse" of this discretionary authority. DHS believes that maintaining the authority for this extraordinary relief with the leaders of USCIS, coupled with the requirement that the authority only be exercised when consistent with the law, will ensure that it is administered consistently, timely, and responsibly.

### 5. Requiring Submission of Form I–912

*Comment:* Multiple commenters expressed concern that requiring the Form I–912 and not allowing applicants to make the request for a fee waiver via a written request would create an additional burden for applicants. One commenter requested that fee waivers remain expansive such that any written requests remain permitted. Some commenters asserted that, if an individual can successfully demonstrate the need for the fee waiver via a written request, USCIS should continue to accept them, and that requiring Form I–912 reduces flexibility for applicants with special circumstances. One commenter asserted that there would be a substantial time burden to complete the Form I–912 in lieu of an affidavit regarding their client's income and expenses, while another commented referred to fee waiver process as long and difficult." Another commenter said that printing, translating, completing, and sending the form requires additional costs that applicants who are in financial need likely do not have. Another commenter added that certain requestors may lack access to printers, internet services, or other infrastructure. The commenter also stated that the proposed Form I–912 is a complex nine-page form, with eleven pages of

[182] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual," Vol. 1, "General Policies and Procedures," Part E, "Adjudications," Chp. 4, "Burdens and Standards of Proof," *https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-4* (last updated Nov. 8, 2023).

[183] *See* U.S. Dep't of Educ., "Federal Student Aid, Types of Financial Aid: Loans, Grants, and Work-Study Programs," *https://studentaid.gov/understand-aid/types* (last visited Aug. 15, 2023).

[184] *Compare* 8 CFR 106.3(c), *with* 8 CFR 106.3(b) (Oct. 2, 2020).

instructions, and several of the form's questions may not apply to the requestor or require significant additional explanation that is better suited for an affidavit. The commenter added that requiring Form I–912 creates an unnecessary burden on pro se survivors, survivors with limited English proficiency, and high caseload service providers. A different commenter said the proposal places an undue burden especially on the most vulnerable groups who would otherwise qualify for immigration benefits. Other commenters said that requiring Form I–912 would disproportionally affect pro se applicants and those with limit English skills, and therefore allowing fee waiver requests without Form I–912 would align more closely with the "inability to pay" standard. Another commenter predicted that the proposed rule would require USCIS to scan and review extra pages of the Form I–912, and that USCIS would incur significant mailing costs due to rejections resulting from confusion around the complex form. One commenter asserted that allowing individuals to request a fee waiver via written request instead of Form I–912 would address the burden of COVID–19 on undocumented and immigrant communities that require access to forms to receive USCIS benefits.

*Response:* After considering public comments in response to the proposed requirement to submit Form I–912, DHS will continue to allow written statements in lieu of submitting Form I–912. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors, particularly those struggling financially. *See* 88 FR 402, 458 (Jan. 4, 2023).

DHS also recognizes that some requestors may experience an extra burden due to that printing, translating, completing, and sending the form requires additional costs that applicants, particularly those who are struggling financially. DHS also recognizes these applicants may need additional flexibilities, which may improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers currently are requested by written request instead of Form I–912, it is unlikely that continuing to allow written requests will significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to obtain a fee waiver by written request without filing Form I–912.

*Comment:* In response to the proposed rule's statement that more than 99 percent of fee waiver requested are submitted with Form I–912, multiple commenters stated it is preferable that the remaining requestors receive an RFE instead of a denial. These commenters suggested that these RFEs be accompanied by information related to the Form I–912 "as a means of proactively addressing potential confusion" regarding eligibility criteria. The commenters stated that this would be more consistent with E.O. 14012 and better facilitate access to immigration benefits.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. However, DHS will not issue RFEs in response to insufficient fee waiver requests. Holding and monitoring cases where an RFE was sent for a timely response would add burden to what is an already burdensome process for USCIS. USCIS will continue to review training and decision notices to improve adjudications of fee waivers and provide additional information for requestors.[185]

*Comment:* Multiple commenters recommended improvements to the Form I–912. One commenter stated that the form is inefficient and suggested reducing the number of unused pages by making them attachments rather than sections. Another commenter recommended that USCIS eliminate questions on the Form I–912 that are not relevant to fee waiver eligibility and ensure that supporting documentation is considered liberally. For example, the commenter suggested two questions be eliminated: Part 1, Question 2, which requests the applicant's immigrant or non-immigrant status; and Part 2, Question 6, which requests the applicant's Social Security number.

*Response:* DHS appreciates commenters' feedback regarding the length of Form I–912, Request for Fee Waiver. Depending on their ground of eligibility, as indicated on the form and instructions, requestors do not need to fill out every section of Form I–912. However, DHS does not believe that these unused sections, which can be easily skipped, create a substantial paperwork burden for requestors. Requiring requestors to locate and attach a separate addendum depending on their ground of eligibility could create a greater paperwork burden. DHS

notes that immigration status is relevant to eligibility because, for example, some fee waivers are specific to the requestor's immigration status. USCIS is revising the USCIS Form I–912 to reduce the time and cost burden to respondents. The Social Security number data field will be removed as part of those edits. DHS believes that a requestor's Social Security number no longer serves a purpose because Internal Revenue Service (IRS) tax return and tax account transcripts redact the filer's Social Security number. For further information on compliance with the Paperwork Reduction Act, see Section V.J of this preamble.

*Comment:* Another commenter wrote that low-income naturalization applicants who currently require a fee waiver are barred from applying for naturalization online because the Form I–912 cannot be filed online. The commenter stated as a matter of equity, both online and paper filings should be available to everyone, regardless of their income status. The commenter concluded that without an option for online filing of the Form I–912, paper filings for the Form N–400 would continue to cause inefficiencies.

*Response:* USCIS continues to work on incorporating Form I–912 and all forms into its online filing platforms.

*Comment:* A commenter stated that the Form I–912 is not statutorily required. The commenter further remarked that USCIS does not point to evidence that requiring Form I–912 for fee waiver requests produce more consistent results or relevant evidence in assisting fee waiver determinations.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. With regards to the assertions made by the commenter, DHS notes the following: The INA authorizes the Secretary to "prescribe such forms of [...] papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority." INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). The Form I–912 and other USCIS forms are used to solicit information relevant to benefit requests and facilitate standardized adjudication in a timely manner. As previously indicated, most requestors submit Form I–912 to request fee waivers. A 2019 paper showed that standardization of the fee waiver for citizenship applications in 2010 raised naturalization rates among low-income immigrants, and these gains were particularly sizable among those

---

[185] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Reduced Fee Request," *https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-reduced-fee-request* (last updated Oct. 31, 2023).

immigrants who typically face higher hurdles to accessing citizenship.[186]

*Comment:* A commenter recognized the need to create a more uniform policy for adjudicating requests for fee waivers. However, the commenter expressed concern that the list of expenses outlined in the Form I–912 fails to take into consideration necessary expenses often incurred by their clients and does not fairly represent their "inability to pay" the filing fees required. The commenter did not indicate what additional expenses should be included on the form.

*Response:* DHS interpreters this comment to refer to Part 6, Item 3 ("Total Monthly Expenses and Liabilities") of Form I–912. DHS notes that the list of expenses includes a check box for "other," and additional lines where requestors can list expenses not included in the list. Requestors can also include additional information about expenses in Part 11 ("Additional Information").

## 6. Evidence for VAWA, T, and U Requestors

*Comment:* Multiple commenters wrote in support of fee waivers for VAWA self-petitioners, as well as for T and U nonimmigrant status requestors. One commenter wrote that fee waivers help remove forms of coercion and control by human traffickers and abusive individuals by providing life-saving opportunities for victims of crime to escape these situations and access long-term stability. The commenter remarked that these benefits allow victims of crime to support law enforcement investigations that help prevent and punish serious crimes. Another commenter stated the importance of fee waivers as a tool for survivors to recover from financial abuse and that fee waivers make it possible for survivors to ensure their

safety or necessities when applying for immigration relief.

*Response:* DHS agrees that the availability of fee waivers and fee exemptions for vulnerable populations is important. DHS remains committed to the goals of its humanitarian programs and to providing fee waivers and fee exemptions for these populations as outlined in this final rule. *See* 8 CFR 106.3.

*Comment:* One commenter expressed support for USCIS' proposed clarification that an applicant is eligible for a fee waiver where they demonstrate inability to pay by a preponderance of the evidence. However, the commenter asked USCIS to adjudicate fee waiver requests for immigration benefits associated with or based on a pending or approved petition or application for VAWA benefits or T or U nonimmigrant status under the "any credible evidence" standard. The commenter concluded that the evidentiary standard for receipt of a fee waiver should not be more stringent than the evidentiary standard for the legal protections Congress created for survivors under VAWA and the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA).

*Response:* DHS acknowledges the difficulties that VAWA, T, and U requestors may face in obtaining evidence in support of fee waiver requests, which is why DHS has increased the number of fee-exempt forms for these groups in the final rule. *See* Table 5B; 8 CFR 106.3(b). For these fee-exempt requests, VAWA, T, and U requestors do not need to sustain any burden of proof to avoid paying a fee, which is consistent with the VTVPA. However, DHS believes that "preponderance of the evidence" remains the appropriate standard for adjudicating other fee waiver requests by VAWA, T, and U requestors. Most USCIS fee waiver requests involve naturalization and citizenship-based applications (N-Forms), which are filed multiple years after the requestor has received their protection-based form of relief and obtained LPR status. Mindful

of the difficulties that victim-based categories may continue to face in obtaining evidence to support fee waiver requests, DHS has provided flexibilities for VAWA, T, and U populations in requesting fee waivers. For example, the revised Form I–912 instructions issued with this rule provide that if a household member is an abuser or human trafficker, then their income will not be included in measuring the requestor's household income. In addition, the instructions also list victimization as an example of financial hardship causing a requestor to be unable to pay. Further, if a VAWA, T, or U requestor is unable to obtain documentation, they can explain why and submit other evidence to demonstrate their eligibility as provided in the Form I–912 instructions. However, the burden of proof remains on the individual who is requesting a fee waiver and DHS will not presume that a benefit request that is not already exempt from a fee should automatically receive a fee waiver.

## 7. Cost of Fee Waivers

*Comment:* One commenter stated that, in recent years, USCIS has transferred significant costs to fee-paying applicants and beneficiaries as the result of an overbroad fee waiver policy, and estimated foregone revenue has increased significantly. The commenter said that, in this proposed rule, DHS did not report how much revenue USCIS anticipates foregoing because of fee waiver projections.

*Response:* DHS believes that continued fee waivers for certain populations provides a crucial avenue for those who would have otherwise not been able to submit a request. Table 6 below summarizes historical fee waiver volume. Contrary to the commenter's assertion, waived fees as a proportion of IEFA revenue has been stable over time, and current levels are significantly below those in FYs 2015–2017. This does not demonstrate an overbroad fee waiver policy where waived fees have increased significantly.

---

[186] Vasil Yasenov, et al., "Standardizing the fee-waiver application increased naturalization rates of low-income immigrants," 116 (34) Proc. Nat'l Acad. Sci. U.S. 16768 (2019).

| FY | Receipts | Approvals | Denials | Waived Fees Estimate[188] | Percentage of IEFA Revenue |
|---|---|---|---|---|---|
| 2013 | 541,329 | 403,227 | 138,063 | $222,833,915 | 9% |
| 2014 | 572,835 | 457,576 | 115,163 | $248,726,775 | 10% |
| 2015 | 638,793 | 518,777 | 119,935 | $283,162,095 | 10% |
| 2016 | 753,402 | 627,959 | 125,118 | $344,293,760 | 12% |
| 2017 | 684,675 | 588,732 | 95,200 | $367,914,465 | 11% |
| 2018 | 535,412 | 460,821 | 74,616 | $293,494,715 | 9% |
| 2019 | 481,068 | 410,485 | 70,583 | $254,200,885 | 8% |
| 2020 | 406,112 | 329,571 | 76,543 | $207,677,895 | 6% |
| 2021 | 441,184 | 369,948 | 71,241 | $229,415,245 | 6% |
| 2022 | 532,417 | 448,702 | 83,616 | $246,603,960 | 7% |

Table 6. USCIS Fee Waiver Request Receipts, Approvals, and Denials, FY 2013 – FY 2022.[187]

*Comment:* A commenter requested that USCIS ensure that fee-paying applicants do not bear the costs of immigration benefit requests where fee waivers are inappropriate or unnecessary. The commenter recommended that USCIS adopt a different approach, consistent with the "beneficiary-pays" principle, that considers whether a fee waiver is either statutorily required or otherwise appropriate given the nature of the immigration benefit sought, particularly whether such beneficiaries are subject to the public charge ground of inadmissibility. The commenter wrote that INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, but that the

TVPRA requires DHS to permit fee waivers for certain applications. The commenter stated that USCIS should limit fee waivers to immigration benefits for which USCIS is required by law to consider a fee waiver, as was put forth in the 2019/2020 fee rule. They added that USCIS could allow fee waivers for humanitarian programs and applicants not subject to the public charge ground of inadmissibility or affidavit of support requirements under INA sec. 213A, 8 U.S.C. 1183a, including petitioners and recipients of Special Immigrant Juvenile (SIJ) classification and those classified as Special Immigrants based on an approved Form I–360. The commenter stated that USCIS should continue to preclude fee waivers from individuals that are required to have financial means for the status or benefit sought. Another commenter asserted that it is unfair that one out of eight petitions receive a fee exemption or waiver, and that humanitarian goals should be funded by Congress or DHS general appropriations rather than shifting lost revenue to other program fees.

*Response:* For reasons discussed in the proposed rule, *see* 88 FR 402, 424–426 (Jan. 4, 2023), and in section IV.C.4 of this preamble, DHS has decided to shift away from the beneficiary-pays model that was the primary objective of the 2019/2020 fee rule, and more toward the ability-to-pay approach that has historically guided USCIS fee schedules. While INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, the statute contemplates that DHS would

regularly do so for asylees and similarly situated classes of applicants. DHS considers this to be the more equitable approach in setting fees. In deciding which forms should be eligible for a fee waiver, DHS considered whether each waiver is statutorily required or otherwise appropriate given the nature of the immigration benefit sought, including whether the requestor would be subject to the public charge ground of inadmissibility. A fee waiver is unavailable in the case of immigration benefit requests that require demonstration of the applicant's ability to support themself, or that are based on a substantial financial investment by the petitioner.[189] Most fee-waivable forms involve humanitarian immigration categories in recognition of the financial difficulties faced by members of these groups.[190] DHS has generally made citizenship and naturalization forms eligible for waived and reduced fees in recognition of the social and economic benefits that the United States receives from new citizens.

---

[187] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Use of Fee Waivers, Fiscal Year 2023 Report to Congress" (June 20, 2023), *https://www.dhs.gov/sites/default/files/2023-08/23_0727_uscis_use_of_fee_waivers_q1.pdf.* Not all fee waiver applications are adjudicated in the same fiscal year that they are received. Likewise, not all approvals and denials occur in the same fiscal year in which a fee waiver request is filed. Thus, the number of approvals and denials does not equal fee waiver request receipts.

[188] Note that the budgetary impact of fee waivers is less than the total amount of waived fees, as it would be unreasonable to expect the same volume of filings absent the availability of fee waivers. Available USCIS fee waiver data lack the granularity necessary to delineate waived fees in cases of forms with multiple filing fees. The higher fee is assumed to estimate the waived fees. Additionally, the fee schedule change in December 2016 and the timing of fee waiver approvals may slightly skew FY 2017 waived fee estimates because of fee waiver adjudication timeframes (see footnote 16). Finally, automatic biometric services fee waivers associated with underlying forms that require biometrics are not captured adequately and are underreported.

[189] In 2007, regulations considerably limited which application types could apply for fee waivers from almost all of them to roughly one-third of them. *See* 72 FR 29851, 29874 (May 30, 2007). DHS made no changes to the types of applications that could apply for fee waivers in the 2010 and 2016 fee rules.

[190] While fee waivers are not generally available in employment-based cases, due to the unique circumstances present in the CNMI, an exception is Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, for an employer to petition on behalf of CW–1 nonimmigrant beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI). *See* 74 FR 55094, 55098 (Oct. 27, 2009).

## 8. Other Comments on Fee Waivers

*Comment:* A few commenters stated that the fee waiver process is lengthy or difficult. One commenter said that DHS should simplify the process for obtaining fee waivers to remove unnecessary barriers, without specifying how the process should be simplified or what barriers should be removed. Another commenter stated that the process of obtaining the requisite documentation to file a fee waiver request is difficult and delays the process of submitting applications by weeks or months. They also wrote that ability to work is often contingent upon obtaining certain immigration benefits, which creates financial hardship for applicants. Another commenter stated that fee waivers are not automatic and often add more time to an application, which negatively impacts immigrants in desperate situations.

*Response:* DHS acknowledges that obtaining a fee waiver requires the submission of evidence demonstrating the inability to pay that some requestors may find burdensome. Nevertheless, approving fee waivers without evidence of inability to pay would pose a fiscal risk to USCIS. Thus, DHS has decided that it will not approve fee waivers without determining the applicant is eligible under the fee waiver regulations. In this final rule, DHS has provided additional fee exemptions, *see* Table 5B, and updates to the Form I–912 for additional efficiencies and to minimize its burden, *see* 88 FR 402, 458 (Jan. 4, 2023). Form I–912 has an estimated time completion of one hour and ten minutes. USCIS strives to continually improve its case processing so that fee waivers can be adjudicated in a timely, effective manner while balancing access, affordability, and financial sustainability.

*Comment:* Multiple comments expressed concerns about the effect of denied fee waiver requests on application filing dates. One commenter recommended that USCIS treat the date that forms are received together with a fee waiver request as the official filing date ''for the Motion, Appeal or Case.'' The commenter asserted that current procedures and practices can result in denial of due process to indigent and low-income immigrants who seek fee waivers and recommended that USCIS should allow the applicant to recapture the initial filing date if they pay the required fee within 30 days of a fee waiver denial, which is similar to State courts' approach in civil or family cases. The commenter asserted that the USCIS' current approach violates VAWA confidentiality protections under 8 U.S.C. 1367 for immigrant crime victims because their cases are not logged as protected cases in USCIS systems until their fee waiver is granted. Another comment stated that USCIS' policy of not retaining a filing date for an application with a rejected fee waiver leads to low-income individuals facing difficult situations in which the only way to ensure an application will be filed before a relevant deadline is to pay a fee that they are financially unable to afford. Some commenters stated that denied Form I–730 petitioners often file the Form I–290B to seek reconsideration of erroneous denials. If the fee waiver for the Form I–290B is denied and the individual is unable to pay the fee, the individual is effectively denied the opportunity to contest the denial of the Form I–730, and the delay in process may result in the petitioner losing the option to resubmit the Form I–730 within the 2-year deadline.

*Response:* DHS considered all the suggestions made by these commenters but declines to adopt a policy of treating a denied fee waiver request as establishing a filing date for the underlying form for similar reasons that it does not accept an improperly filed Form I–130 or I–140 as establishing a priority date. *See* 8 CFR 204.1(b), 204.5(d). Were DHS to adopt such a policy, it would encourage the early filing of improperly completed forms to capture an advantageous filing or priority date. DHS regulations provide that the receipt date is the actual date of physical receipt at the location designated for filing such benefit request, with proper fee or approvable fee waiver request. 8 CFR 103.2(a)(7)(i). DHS disagrees that the regulation violates due process or 8 U.S.C. 1367 for a denied fee waiver request. In this final rule, DHS has further expanded the number of VAWA, T, and U-related forms that are fee exempt, *see* Table 5B, for which there will be no delay in applying protections under 8 U.S.C. 1367. For the remainder of VAWA, T, and U-related requests, the requestor should already be listed in USCIS systems as protected under 8 U.S.C. 1367. In the case of a Motion to Reopen for a denied Form I–730, Refugee/Asylee Relative Petition, if the original, timely-filed Form I–290B, Notice of Appeal or Motion, is rejected due to a denied fee waiver request, USCIS may exercise its discretion to accept a subsequent, untimely Motion to Reopen. *See* 8 CFR 103.5(a)(1)(i). However, in the case of a Motion to Reconsider for a denied Form I–730, if the original, timely-filed Form I–290B is rejected due to a denied fee waiver request, USCIS lacks discretion to accept a subsequent, untimely Motion to Reconsider. *See* 8 CFR 103.5(a)(1)(i).

*Comment:* Several commenters expressed concern over USCIS fee waiver denials, stating the following:

• Denials generally give no specific information as to why the applicant's evidence was deemed insufficient and is accompanied by boilerplate lists of evidence that may be submitted, even when the individual has submitted such evidence.

• Clearer fee waiver denials would decrease the volume of fee waiver requests and help with backlog and efficiency.

• Regulations should require fee waiver denials to provide some reasoning to specifically describe why the submitted evidence was not considered sufficient and what additional evidence would be deemed adequate for the application.

• Denials task the applicant with the impossibility of proving a negative by reiterating that tax filings and paystubs are proof of income, yet individuals with no income may have no income tax filings due to earning less than the IRS income tax filing threshold, nor paystubs during the period of unemployment.

*Response:* DHS acknowledges commenters' concerns that fee waiver denials do not receive a detailed, individualized denial letter. However, DHS must weigh this against the additional costs of individualized fee waiver denials and has decided to limit this cost in favor of the general expansion of fee exemptions and waivers contained in this rule. *See* Table 5B. As stated previously, USCIS receives over 2,000 fee waiver requests per workday and approves 84 percent of them. The current Form I–912 instructions allow requestors to provide evidence of lack of income by describing the situation that qualifies them for a fee waiver. The instructions also state that, if available, requestors may submit affidavits (*e.g.,* from religious institutions, nonprofits, community-based organizations, or similarly recognized organizations) indicating that the requestor is currently receiving some benefit or support from the organization verifying (or attesting) to their situation. DHS will continue to review the fee waiver process for areas that may be improved. In general, if a fee waiver request is denied, the form may be resubmitted without prejudice with additional documentation in support of the fee waiver or with the fees.

*Comment:* A few commenters said there is a lack of knowledge around fee

waiver eligibility and around the existence of fee waivers as a possibility for low-income individuals, which presents a barrier for those who are interested in applying for immigration benefits. The commenters stated that USCIS should accompany the proposed rule with public education efforts aimed at prospective applicants with clear, culturally sensitive, and multilingual information on fee waivers and the grounds for eligibility. The commenters further suggested USCIS include efforts used in the Interagency Strategy for Promoting Naturalization that was developed in E.O. 14012. Another commenter stated that creating more categories and avenues by which one can show proof for fee waivers does little if basic access and understanding on how to navigate forms is not there for the communities that need it most.

*Response:* DHS agrees that it is important to alert potential requestors to the existence of fee waivers. Every form instruction for which a fee waiver is possible notifies the requestor of their ability to request a fee waiver. USCIS is removing the option for a written request in this rule for the reasons stated earlier. However, USCIS will continue to provide information about fee waivers for all its forms and the reduced fee for Form N–400 on our website,[191] at stakeholder and public engagements and using other public education efforts. For example, USCIS routinely hosts local and virtual engagements on naturalization, in which we discuss fee waivers and the reduced N–400 fee.[192] The Form G–1055, Fee Schedule, also identifies which USCIS forms are eligible for a fee waiver.

*Comment:* A commenter asked USCIS to discontinue the different treatment of applications submitted with fees and with fee waivers. The commenter reasoned that their clients who request fee waivers often must wait noticeably longer than applicants who pay the filing fees to receive the receipt notices for their application. Moreover, the commenter stated, the delays in receipt notices has impeded their ability to

timely seek prosecutorial discretion for clients in removal proceedings based on their pending applications for relief before USCIS. The commenter concluded that this different treatment causes harm to their most vulnerable clients.

*Response:* USCIS strives to issue receipt notices in a timely manner for all forms. As discussed earlier in Section IV.E.4. of this preamble, USCIS adjudicates most fee waiver requests within days of receipt. However, it takes longer to issue a receipt for a form that is accompanied by a fee waiver request because fee payments clear almost immediately, while adjudicating the fee waiver request requires additional time to review the waiver request. This different treatment of fee waiver requests is justified by the additional processing steps that they require.

*Comment:* Commenters stated that USCIS should improve the fee waiver process by training adjudicators on fee waivers and otherwise addressing erroneous rejections and delays in issuing receipts.

*Response:* USCIS currently provides guidance and training to its officers on fee waivers. USCIS strives to continuously improve its training to reduce erroneous rejections and delays in receipts. DHS believes that codifying the rules for fee waiver eligibility and modifying the Form I–912 instructions will help to reduce erroneous rejections and delays.

### F. Fee Exemptions

As discussed in the Changes from the Proposed Rule section, many commenters requested that DHS provide more fee exemptions and free services for humanitarian related benefit requests and DHS is providing more fee exemptions in the final rule. A summary of the current and new exemptions is provided above in Table 5A, 5B, and 5C.

#### 1. Codification of Benefit Categories/ Classifications With Exemptions/No Fees

*Comment:* In the proposed rule DHS proposed to include several fee exemptions that are provided in guidance or form instructions or statute in the Code of Federal Regulations, although that action was not necessary for the exemptions to continue in effect. A couple of commenters generally expressed support for USCIS' proposal to codify fee exemptions in regulations without providing rationale to support this position. Another commenter wrote that the proposed codification of benefit requests with no fees and exemptions is in line with DHS's "best effort" to include the "benefits to the national

interest" when considering the fee schedule changes. Another commenter stated that codifying exemptions promotes stability and ease of access for applicants. One commenter further expressed appreciation for Tables 13A, B, and C in the proposed rule and suggested they be included in the final rule.

Some commenters welcomed the proposal to codify the fee exemption of Form I–360 for SIJs. The commenters reasoned that this population is particularly vulnerable, has no ability to work, and, therefore, lacks the financial means to pay fees for immigration benefit applications. The commenters further remarked that this codification would align with Congress' goal to protect vulnerable children when it created the SIJ classification.

A few commenters welcomed the codification of longstanding fee exemptions for those seeking humanitarian relief, including those applying for asylum, asylees, and refugees. Other commenters said the proposal to codify exemptions for these groups would be consistent with U.S. humanitarian values, as well as legal obligations under U.S. and international law to protect persons fleeing persecution. Multiple commenters welcomed DHS's proposal to codify in the regulations that there is no fee for Form I–589, Application for Asylum and for Withholding of Removal. A commenter wrote that they support the proposed codification, reasoning that it recognizes the importance of access to the asylum system, regardless of a person's financial situation. A couple of commenters stated that the codification would ensure that the United States remains among most parties to the 1951 Refugee Convention and 1967 Refugee protocol who do not charge a fee to apply for asylum. A few commenters wrote that the codification was welcome after the proposal to introduce a $50 asylum fee in the 2020 fee rule. A commenter stated that the previously proposed fee would have deterred those seeking protections afforded by Congress while creating vulnerabilities to trafficking and exploitation.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions in regulations and did not make any changes in this final rule based on these comments.

*Comment:* Several commenters welcomed DHS's plan to continue to provide a fee exemption for the initial filing of Form I–765 for asylees and those with pending asylum applications. One commenter agreed with DHS's determination that requiring a fee for the initial employment

---

[191] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Fee Waiver," *https:// www.uscis.gov/forms/filing-fees/additional- information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Fact Sheet: Request for Fee Waivers for Form N–400," *https:// www.uscis.gov/sites/default/files/document/fact- sheets/FactSheetI-912RequestforFeeWaiver ForFormN-400.pdf* (last visited Oct. 10, 2023).

[192] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Past Training Seminars," *https://www.uscis.gov/citizenship/ resources-for-educational-programs/register-for- training/uscis-past-training-seminars* (last updated Sept. 20, 2023).

authorization application would be unduly burdensome and would prevent some asylum seekers from obtaining lawful employment. Another commenter further reasoned that this approach aligns with the 1951 Convention Relating to the Status of Refugees, which requires ''sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals . . . .'' This commenter additionally wrote that providing fee-exempt access to employment authorization affords asylum seekers crucial opportunities to recover from trauma, pay for future immigration benefit fees, and access identification for physical and economic mobility. Another commenter further reasoned that access to employment authorization promotes children's health and well-being by providing protection from unsafe working conditions and exploitation as well as access to basic services.

Similarly, a couple of commenters expressed support for continued fee exemptions for persons admitted or paroled as refugees, including the proposed exemptions for EAD renewal and replacement, Form I–131, Application for Travel Document, and Form I–590, Registration for Classification as Refugee. One of the commenters agreed with DHS's reasoning that continuing to facilitate access to employment authorization and travel documents for those admitted or paroled as refugees is consistent with the 1951 Convention and 1967 Protocol. The commenter further reasoned that making travel documents accessible, which is not an overly costly or burdensome process for USCIS, reflects the reality of refugees who have a need to travel outside the United States for work or other purposes that support U.S. interests, but cannot do so if they unable to obtain a passport from the country from which they sought refuge.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions for refugee and asylees in regulation in this final rule.

*Comment:* A commenter wrote that Form G–1055 contains a typographical error that, if left uncorrected, would lead U nonimmigrants to erroneously believe they are fee exempt from an initial Form I–765 based on a concurrently filed or pending Form I–485. Specifically, the proposed Form G–1055 states that U nonimmigrants seeking to adjust status under INA sec. 245(m) will pay a $0 fee for an initial Form I–765 under category (c)(9), which the commenter said does not reflect the proposed regulation and preamble.

*Response:* Principal U nonimmigrants who are in the United States are exempt from fees associated with employment authorization when it is issued incident to status, and they are not required to file Form I–765, Application for Employment Authorization, to receive an EAD. *See* 88 FR 460; 8 CFR 214.14(c)(7). Principal U nonimmigrants who are outside the United States are fee exempt for fees associated with employment authorization issued incident to status once they enter the United States and file Form I–765 (initial request under 8 CFR 274a.12(a)(19) and (20)). *See* 88 FR 460. In the proposed rule, DHS proposed to expand fee exemptions for persons seeking or granted U nonimmigrant status for all forms filed before filing Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 460–461. As explained in section II.C.9 of this rule's preamble, DHS further expands fee exemptions in this final rule for persons seeking or granted U nonimmigrant status for all forms related to the U nonimmigrant status or adjustment of status under INA sec. 245(l), 8 U.S.C. 1255(l), including an initial Form I–765 for an EAD based on having a pending Form I–485. *See* 8 CFR 106.3(b)(5); Table 5B. DHS believes that these additional fee exemptions, as well as the publication of a final rule Form G–1055 Fee Schedule, mitigate the commenter's concerns.

*Comment:* A commenter discussed the current economic benefits of TPS, such as the tax revenue generated by TPS holders, and commended codifying the exemption for Form I–821 to secure the continuation of those benefits.

*Response:* DHS appreciates the commenter's support of the codification of the fee exemption for Form I–821, Application for Temporary Protected Status, when filed by a TPS holder seeking re-registration, *see* 8 CFR 106.2(a)(50)(ii), and did not make any changes in this final rule based on these comments.

2. Proposed Fee Exemptions

a. General Support of Proposed Exemptions

*Comment:* Some commenters expressed general support for the proposed expansion of fee exemptions for certain humanitarian programs without further rationale.

*Response:* DHS maintains the fee exemptions as listed in the proposed rule and provides additional fee exemptions for certain humanitarian populations in this final rule. *See* Table 5B.

*Comment:* Many commenters expressed broad support for the various proposed fee exemptions for VAWA self-petitioners, U nonimmigrant status petitioners and T nonimmigrant status applicants, petitioners for SIJ classification, and other vulnerable populations. One commenter reasoned that the proposed exemptions would increase access to immigration relief for low-income survivors, and thus more completely achieve the goals of humanitarian programs to provide stability and safety from abuse.

Another commenter agreed with USCIS' assessment in the proposed rule that survivors of violence often experience financial abuse and have limited resources, even once they flee from their abusers. The commenter went on to cite research from DOJ, the Bureau of Justice Statistics (BJS), the Borgen Project, and others describing the relationship between domestic violence and financial hardship. Another commenter similarly cited research on the mental, psychological, financial, and legal challenges that survivors of violence face and stated that ensuring survivors' access to immigration benefits is essential to help them escape abusive situations and gain self-sufficiency following victimization.

Citing the INA and the legislative history of VAWA and T and U nonimmigrant status, a commenter said the expanded fee exemptions would align with legislative trends and congressional intent in creating protections for certain victims of crime. The commenter added that expanded access to fee exemptions is consistent with E.O. 14012. Another commenter wrote that the proposed exemptions would align with congressional intent while citing an October 11, 2000, statement from Senator Hatch and TVPRA. Another commenter similarly suggested that the proposed exemptions would align with congressional actions to protect victims of trafficking and abuse and asked USCIS to retain the exemptions in the final rule.

*Response:* DHS agrees that these populations are particularly vulnerable as victims of abuse or violence, and that, because of this victimization, many will lack the financial resources or employment authorization needed to pay for fees related to immigration benefits. DHS has maintained the proposed fee exemptions and provided additional fee exemptions for certain humanitarian populations in this final rule. *See* 8 CFR 106.3(b); Table 5B.

*Comment:* Numerous commenters agreed that expanded fee exemptions would eliminate the need for groups that disproportionately experience

financial hardship, and therefore already require a fee waiver, to apply for such waivers. One commenter added that the proposed exemptions would reduce the length of time that applicants for survivor-specific forms of relief would have to wait for a fee waiver to be adjudicated and a receipt notice issued.

Many commenters further reasoned that applying for fee waivers places undue burdens on vulnerable and pro se applicants to produce evidence and meet the filing requirements to obtain a favorable decision and access protections. For example, one commenter stated that many T nonimmigrant applicants lack evidence to support their fee waiver application, including tax forms, pay stubs, and bills in their own name. The commenter also described the harms for victims associated with waiver denials for failing to file proper forms or submit the desired evidence. Another commenter wrote that SIJs without LPR status do not qualify for means-tested benefits, and obtaining proper documentation of the receipt of benefits can be challenging for non-English-speaking populations navigating complex systems. The commenter added that, while fee waiver applications cost legal services providers time and resources to prepare and resubmit when needed, exemptions free up capacity for legal practitioners to prepare the merits of the immigration benefit case and assist more individuals seeking protections. Another commenter further stated that, particularly for vulnerable children who are almost always found eligible for a fee waiver, requesting a fee waiver is an unnecessary step that adds uncertainty to the application process. Another commenter reasoned that fee exemptions would ensure that vulnerable noncitizens do not forgo the opportunity to apply for humanitarian forms of relief.

One commenter, citing a 2016 Citizenship and Immigration Services (CIS) Ombudsman report on inconsistent fee waiver adjudications, said that the exemptions would avoid "arbitrary" fee waiver decisions that disproportionately affect vulnerable immigrant populations. Another commenter wrote that, in addition to reducing burdens associated with fee waivers, fee exemptions provide clarity for applicants and their families and allow them to better anticipate the costs of applying for protections. Multiple commenters wrote that eliminating the need to apply for a fee waiver through exemptions would in turn reduce administrative burdens and resources expended for USCIS to adjudicate

applications or engage in litigation arising from waiver rejections. Some commenters suggested that these efficiencies would allow USCIS to redirect staff resources away from processing and reviewing fee waiver requests toward adjudicating applications for humanitarian protection, and the resulting decrease in administrative burden to USCIS would mitigate erroneous denials and subsequent delays for survivors.

*Response:* DHS notes that this final rule maintains and codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship. *See* 8 CFR 106.3(a)(3). While not a change to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the commenters' concerns.

DHS agrees that there are costs to USCIS in adjudicating fee waivers beyond foregone revenue (*i.e.,* the total fees that fee-waived or fee-exempt requestors would have paid if they had paid the fees). DHS believes that replacing fee waivers with additional fee exemptions removes barriers for applicants who are similarly situated in terms of financial resources and employment prospects. In the proposed rule, DHS proposed fee exemptions for humanitarian populations, including VAWA self-petitioners and requestors for T and U nonimmigrant status, without reducing fee waiver availability. In this final rule, DHS provides additional fee exemptions for these populations as explained in section II.C.9.b. of this preamble.

DHS likewise expects a decrease in administrative burden associated with the processing of requests for fee waivers for categories of requestors that would no longer require a fee waiver because they will be fee exempt. DHS has not quantified the cost savings to USCIS associated with processing fee waiver requests, namely Form I–912. Furthermore, DHS's Regulatory Impact Analysis (RIA) estimates that the fee exemptions and reduction in fee waiver requests will result in quantifiable annual transfer payments from USCIS to the public and opportunity cost savings to the public from not completing and submitting a fee waiver request. *See* Regulatory Impact Analysis 3.P.

In general, where DHS has determined that immigration fees would inequitably impact the ability of those who may be less able to afford the

proposed fees to seek an immigration benefit for which they may be eligible, DHS has maintained fee exemptions, waivers, and reduced fees, and provided new fee exemptions to address accessibility and affordability. *See* 88 FR 402, 460–81 (Jan. 4, 2023).

b. T Nonimmigrants

*Comment:* A few commenters expressed support for the proposed change to exempt fees for all forms for T visa applicants, T nonimmigrants, and their derivatives through adjustment of status. One commenter agreed with USCIS' assessment that the proposal would help more victims of trafficking pursue immigration relief afforded to them by Congress. Another commenter wrote that the proposed rule would align with congressional intent under the TVPRA and international obligations under the Palermo Protocol.

*Response:* DHS appreciates the commenters' support of the proposed fee exemptions for T visa applicants, T nonimmigrants, and their derivatives, and finalizes these fee exemptions in this final rule. *See* 8 CFR 106.3(b)(2); Table 5C.

c. U Nonimmigrants

*Comment:* Commenters expressed support for expanded fee exemptions for petitioners for U nonimmigrant status because the combined associated fees to obtain protection prohibit many otherwise eligible petitioners from pursuing U nonimmigrant status. The commenters said the proposed rule would allow petitioners to pursue U nonimmigrant status more expeditiously while saving nonprofit agencies' time.

Other commenters wrote that they had concerns about the effects on U-nonimmigrants, specifically:

• U-nonimmigrants applying for adjustment of status should also be eligible for the same fee exemptions as T and VAWA adjustment applicants.

• U nonimmigrants are similarly situated to T nonimmigrants and VAWA self-petitioners because U nonimmigrants are vulnerable and have suffered similar harm and abuse, which impacts their physical, mental, and financial health due to ongoing trauma. The increased I–485 fee will be even more difficult for U nonimmigrants to cover.

• The higher volume of petitioners for U nonimmigrant status did not justify fewer fee exemptions because both groups remain vulnerable populations, and there are many more refugees than either U visa petitioners or T visa applicants, and it undermines DHS's ability-to-pay philosophy and

perpetuates barriers for vulnerable applicants for humanitarian relief.

• The fees would be prohibitively expensive for U nonimmigrants and VAWA self-petitioners, and total filing fees (I–485, I–765, and I–131) for a family of four would be more than 25 percent of the median annual household income ($44,666), not counting the cost of medical exams or attorney fees.

• Requiring U nonimmigrants and VAWA self-petitioners to pay the filing fees or submit fee waiver requests would be a significant drain on USCIS's limited staff and resources. Providing additional fee exemptions only for certain categories of vulnerable populations is ''arbitrary'' or ''unjustified.''

• A maximum of 10,000 U–1 nonimmigrants become eligible to file Form I–485 each year, and therefore fee exemptions for U nonimmigrant adjustment of status applications would have a minimal impact when considering all the fee generating cases filed each year with USCIS.

• The longer period of employment authorization available to U nonimmigrants compared to T nonimmigrants did not justify their disparate treatment because U nonimmigrants may be unable to work because of trauma and physical injuries.

• USCIS should provide further explanation as to why U nonimmigrants would be treated differently than T nonimmigrants and VAWA self-petitioners with regards to adjustment of status fees.

• DHS has not provided information on the level of the costs that would need to be shifted to other paying applicants if Form I–485 were fee exempted for U nonimmigrants, or the policy considerations counseling against such a shift of costs.

• U nonimmigrants who are victims of domestic abuse may lack income or savings after leaving the abusive situation and may only be able to obtain employment in low-wage positions with no benefits due to language barriers, lack of education and work experience, and the impact of trauma.

• Most petitioners for U nonimmigrant status cannot afford the Form I–485 filing fee despite a bona fide determination (BFD) or a grant of U nonimmigrant status, particularly those adjusting as whole family groups (U–1 and derivatives).

• Not all U nonimmigrant petitioners receive employment authorization through the BFD process, and the absence of a BFD process for T nonimmigrant status applicants, contrary to the T nonimmigrant status regulations, does not support the failure

to extend similar fee exemptions to U nonimmigrants.

• T visa holders may qualify for ''continuous presence,'' which allows for employment authorization, and they may receive refugee services from resettlement agencies.

• Even after obtaining employment authorization, U visa victims experience barriers to securing long term employment and earning capacity to pay for adjustment of status fees, and that the criminal proceedings tied to a U visa holder's victimization may not be completed within the 15-year wait between the receipt of employment authorization and the ability to adjust status. Participation in the labor force does not guarantee a rise out of poverty, according to a 2022 study from the Migration Policy Institute finding that more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year in 2019.

• Fee waivers are an insufficient substitute for fee exemptions because the small amount of money saved by USCIS limiting fee exemptions in this respect would not be worth the harm imposed on applicants. U nonimmigrant applicants will also lack the evidence needed for fee waivers. Fee waivers will endanger victims and their children by delaying access to the confidentiality protections victims receive when cases are considered filed and given an 8 U.S.C. 1367 flag in the Central Index System, which does not occur until the fee waiver has been adjudicated.

• Requiring U nonimmigrants to file a fee waiver increases the time that pro bono attorneys must dedicate to their cases.

• Adjudicating fee waivers increases administrative burden on USCIS, and fee waivers for U nonimmigrants and their children applying for adjustment of status ignores dynamics of domestic violence, sexual assault, coercion, and child abuse.

• Victims experience physical, economic, and psychological abuse years after leaving their abuser, including during the adjustment of status stage.

*Response:* DHS acknowledges that T and U nonimmigrants are both vulnerable populations that merit special consideration. After considering the comments, comparing these two victim populations, and weighing options to recover the costs of USCIS, DHS has decided to no longer treat T and U nonimmigrants differently with regard to fee exemptions in this final rule. In addition, DHS has expanded fee exemptions for U petitioners and U nonimmigrants to include Forms I–131,

I–192, I–193, I–290B, I–485, I–539, I–601, I–765 (adding renewal and replacement requests), I–824, and I–929. *See* 8 CFR 106.3(b)(5); Table 5B.

Although U nonimmigrants may possess employment authorization for a longer time than T nonimmigrants (88 FR 402, 461, Jan. 4, 2023) the impact of victimization can be lasting and far-reaching, even after the events giving rise to U nonimmigrant status eligibility have concluded.[193] Due to victimization, T and U nonimmigrants face similar employment and financial challenges, which justify similar fee exemptions. Expanding fee exemptions for U nonimmigrants could have resulted in higher fees to other fee payers because of the large number of U nonimmigrants who file Form I–485 and related forms.[194] However, rather than increase fees further than in the proposed rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. DHS has determined that the humanitarian nature of these programs warrants special consideration when weighed against the transfer of costs to other petitioners and applicants. DHS acknowledges the administrative burden placed on U petitioners and U nonimmigrants, as well as USCIS, by requiring fee waiver requests for this sizeable population, of whom a significant portion may be eligible for fee waivers but struggle to produce supporting documentation due to circumstances resulting from victimization.[195] The changes made in this final rule account for the similar financial circumstances of T and U nonimmigrants, the likelihood that U nonimmigrants would qualify for fee waivers, and the burden reduction in providing fee exemptions to U

---

[193] However, DHS disagrees with the commenter's characterization of the results of the 2022 study from the Migration Policy Institute (MPI). The commenter wrote that in 2019 more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year. However, the MPI report showed that 20 percent of full-time, year-round working immigrants made less than $25,000 a year. *See* Gelatt, et. al, ''A Profile of Low-Income Immigrants in the United States,'' Figure 11, Migration Policy Institute (Nov. 2022) available at *https://www.migrationpolicy.org/sites/default/files/publications/mpi_low-income-immigrants-factsheet_final.pdf.*

[194] The fiscal year limit of 10,000 U visas only applies to U–1 principals and not to derivatives. *See* INA sec. 214(p)(2)(B), 8 U.S.C. 1184(p)(2)(B).

[195] However, with regards to certain forms, such as Form I–485, DHS disagrees that fee waivers may delay confidentiality protections for victims of crimes, since the applicant's protection will already be recognized in USCIS systems following approval of their Form I–918, Petition for U Nonimmigrant Status, or Form I–929.

nonimmigrants for Form I–485 and related forms.

d. VAWA Self-Petitioners

*Comment:* A commenter expressed support for maintaining fee waivers for survivors seeking adjustment of status such as VAWA self-petitioners who are not filing concurrent I–360s and I–485s and conditional residents seeking waivers of joint filing requirements based on battery or extreme cruelty. Similarly, another commenter expressed support for streamlining the application process for vulnerable populations by providing fee exemptions.

Commenters expressed support for DHS's proposal to exempt certain VAWA-related application fees. A commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status. Another commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status.

However, some commenters wrote of concerns about fee exemptions and waivers for VAWA-based applications as follows:

• USCIS should exempt VAWA applicants from all fees through adjustment of status, regardless of whether Form I–485 was filed concurrently with Form I–360.

• USCIS should provide consistent fee exemptions for Forms I–485, I–212, I–601, and I–131 because this would reduce the significant burden on immigrant survivors who may face risks in having to gather the documents needed to support fee waivers.

• The proposed categories of exemptions were arbitrary and would create confusion, especially amongst pro se applicants who may be unaware of their ability to file concurrently.

• The proposed I–485 fees would be prohibitively expensive for VAWA self-petitioners who file their I–485 separately, and paying the fees could leave them vulnerable to debt and victimization.

• Some VAWA self-petitioners are ineligible to file their I–485 concurrently with the I–360, including self-petitioning spouses and children of LPRs who do not have current priority dates. As a result, this population of self-petitioners would be unable to access a fee exemption for the I–485.

• Other situations exist where a VAWA self-petitioner may be unable to file or face difficulty filing their I–485 concurrently, including certain noncitizens who are in removal proceedings or have an outstanding order of removal; those with derivative children who will age out soon; those who need to file the I–360 quickly to obtain financial independence; or those whose I–130 was converted to a I–360 self-petition.

• It "strains logic" to deny fee exemptions and instead require fee waivers for VAWA self-petitioners where most will qualify for fee waivers.

• VAWA self-petitioners, VAWA cancellation of removal applicants, and battered spouse waiver applicants are amongst the victim cases that receive the most fee waivers and the fewest exemptions, and VAWA self-petitioner and derivative children should receive the same access to fee exemptions as SIJ children.

• Foreign-born spouses and children experience higher rates of abuse when the abuser is a U.S. citizen or LPR.

• Requiring some VAWA self-petitioners to pay the filing fees or submit fee waiver requests for form I–485 would drain USCIS' limited resources to investigate the status of the underlying I–360 to determine whether each form I–485 is fee exempt or if the application includes the proper filing fee or a fee waiver request.

*Response:* DHS acknowledges that VAWA self-petitioners are a particularly vulnerable population as victims of abuse who may not have the financial resources or access to their finances needed to pay for fees when initially filing for immigrant classification, adjustment of status, and associated forms.

DHS also acknowledges that for some VAWA self-petitioners, the ability to file Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and Form I–485 concurrently is beyond their control. As noted by the commenters, some VAWA self-petitioners are limited by visa priority dates, some are in removal proceedings or have an outstanding order of removal, and some may be the beneficiary of a Form I–130, Petition for Alien Relative, petition that was converted to a Form I–360 self-petition. DHS also acknowledges that in some situations the individual's need for safety puts them in a difficult position of deciding whether to pursue immigration benefits when they may not qualify for a fee exemption because they are not able to file Form I–360 and Form I–485 concurrently. Additionally,

VAWA self-petitioners may face challenges in obtaining evidence in support of fee waiver requests, adding a greater burden to the requestor in filing Form I–912. This burden to requestors, combined with the administrative burden to USCIS in processing a high volume of requests for these individuals, many of whom would qualify for a fee waiver, justify exempting VAWA self-petitioners from fees. Considering the benefit to VAWA self-petitioners and USCIS, as well as the humanitarian nature of this program, DHS has codified the fee exemptions in the proposed rule and incorporated additional fee exemptions in the final rule to include applications for adjustment of status and associated ancillary forms, regardless of whether they are filed concurrently with the VAWA Form I–360 self-petition. *See* 106.3(b)(6); Table 5B.

*Comment:* A commenter expressed concern that, under the new regulation, there would be no fee exemption for Form I–765s filed by a VAWA I–485 applicant. The commenter stated that, under current Form I–360 processing times, VAWA self-petitioners would have to wait 2 years and 8 months to obtain a fee exempt EAD. The commenter emphasized that these documents are often essential for a domestic violence survivor's recovery and future.

*Response:* DHS acknowledges the commenter's concerns regarding the availability employment authorization. For reasons discussed earlier, DHS has provided additional fee exemptions for VAWA self-petitioners in this final rule, including Form I–765 renewal and replacement requests after Form I–485 is filed. *See* 8 CFR 106.3(b)(6); Table 5B.

*Comment:* One commenter raised concerns that a fee exemption for Form I–601 Waiver of Inadmissibility in VAWA cases would only be available if the form is filed concurrently with Form I–485.

*Response:* DHS acknowledges the commenter's concerns regarding the availability of a fee exemption for Form I–601 for VAWA self-petitioners. As explained in section II.C.9 of this preamble, DHS expands fee exemptions in this final rule for VAWA self-petitioners to include Form I–601 filed by individuals who did not concurrently file Form I–360 and Form I–485. *See* 8 CFR 106.3(b)(6); Table 5B.

e. Iraqi and Afghan Special Immigrants

*Comment:* A commenter wrote that they supported fee exemptions for Iraqi and Afghan special immigrant visa (SIV) and military applicants. Another commenter welcomed the expanded fee

exemptions for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF to all forms associated with filings from initial status filing through final adjudication of the adjustment of status application. The commenter reasoned that Afghans face financial hardships that prevent them from accessing the benefits that Congress intended to provide this population. The commenter further wrote that the exemptions would reduce the burdens on those who support Afghans, including military, veteran, faith, and other communities.

*Response:* DHS appreciates the support for fee exemptions for Iraqi and Afghan SIV and military applicants. As explained in section II.C.9 DHS further notes that in this final rule it has expanded fee exemptions for this group to include Form I–765 (renewal, and replacement request); Form I–290B (only if filed for any benefit request filed before adjusting status or for Form I–485 and in associated ancillary forms) and Form I–824. *See* Table 5B and 8 CFR 106.3(b)(3).

On August 29, 2021, President Biden directed the DHS to lead implementation of ongoing efforts across the government to support vulnerable Afghan nationals, including those who worked alongside the U.S. government in Afghanistan for the past two decades, as they safely resettle in the United States. These coordinated efforts are known as OAW, now transitioning to Operation Enduring Welcome (OEW). CBP has exercised its discretion to parole many Afghan nationals, on a case-by-case basis, into the United States for urgent humanitarian reasons. Further, the Department of State (DOS) continues to coordinate the travel of Afghan nationals to the United States. Many Afghan nationals are also applying to USCIS for immigration benefits such as parole, employment authorization, Afghan special immigrant status, lawful permanent residence, waivers of inadmissibility, asylum, TPS, and family-based petitions.

As we transition into OEW, helping Afghan nationals who are now U.S. citizens and LPRs bring their family members who are still in grave danger in Afghanistan out and into safety is an Administration priority. USCIS will continue to support family reunification by exempting certain fees and using the funds Congress appropriated for efforts under OAW and OEW.

Form I–824 is used to request further action on a previously approved application or petition. A spouse or unmarried child younger than 21 years following to join a principal immigrant may receive the same special immigrant classification as a principal Afghan special immigrant. Some the Afghan LPRs who adjusted status as Afghan special immigrant (SIV LPRs) under the OAW effort are now seeking follow-to-join immigration benefits for their spouse and eligible children outside the United States. To permit a spouse and eligible children to apply for an immigrant visa with DOS, an Afghan SIV LPR must file a Form I–824 asking USCIS to notify DOS of the principal Afghan special immigrant's adjustment of status in the United States.

USCIS is legally required to exempt this fee for Afghan SIVs under section 602(b)(4)(C) of the Afghan Allies Protection Act (8 U.S.C. 1101 note), which prohibits any fees "in connection with an application for, or issuance of, an [Afghan SIV]." DHS believes allowing a fee exemption for all Afghan SIV LPRs' Form I–824 filing fee will also help the continuing resettlement efforts and reunite separated family members under OAW and OEW.

### f. Special Immigrant Juveniles (SIJs)

*Comment:* A few commenters expressed support for the proposed exemptions for all forms associated with SIJ classification through final adjudication of the adjustment of status application. Citing obligations under international agreements, one commenter concluded that the proposed exemptions would represent a crucial step toward upholding international best practices related to neglected, abused, or exploited children who lack the necessary permanence, benefits, and protections to thrive. Another commenter wrote that SIJs are court-dependent; that they have experienced abuse, neglect, or abandonment; and that such exemptions would help youth achieve stability and self-sufficiency. Finally, the commenter recommended that USCIS make it clear that the rule would eliminate SIJs' application fees for any forms filed by SIJ petitioners or recipients before adjustment of status, in the event of future changes to immigration law and policy.

*Response:* DHS appreciates the support for fee exemptions for SIJs. As DHS explains in section II.C.9, it has expanded fee exemptions for this group to include Form I–290B (if filed for any ancillary forms associated with Form I–485). *See* Table 5B; 8 CFR 106.3(b)(3). DHS believes these regulations as written address the commenter's

concerns, but we note that this rule does not preclude any future changes to immigration law and regulations. This rule therefore also does not prevent changes based on future changes in law or regulations.

*Comment:* Multiple commenters expressed support for the proposed fee exemptions for SIJ petitioners and SIJ classified noncitizens, but also recommended extending the fee exemption to any Form I–765 filed by an SIJ petitioner, even if not associated with a pending application to adjust status. The commenters stated that this would help children who have been granted SIJ-based deferred action who apply for or renew employment authorization under the (c)(14) category while awaiting visa availability. A commenter also stated that this would help mitigate delays and reduce burden on USCIS.

*Response:* DHS appreciates commenters' feedback regarding the rule's fee exemptions for those seeking or granted SIJ classification, but believes these comments are based on a misreading of the proposed rule. The proposed and final rule exempts fees for any Form I–765 filed by a person seeking or granted SIJ classification, regardless of whether they have filed a Form I–485. *Compare* 8 CFR 106.3(b)(1)(v), *with* proposed 8 CFR 106.3(b)(1)(v). DHS believes that the rule, as drafted, makes this sufficiently clear and has therefore not made any changes in this final rule.

### g. Asylees and Refugees

*Comment:* Commenters expressed appreciation for the proposed fee exemptions for refugees submitting Form I–131 and for refugees submitting Form I–765 to renew or replace their EAD because such exemptions are consistent with the 1951 Refugee Convention and Congress's recognition that refugees are more likely than other immigrant populations to lack economic security and require support on their path to self-sufficiency. Another commenter similarly expressed support for USCIS' proposed fee exemptions for Form I–131 for persons admitted or paroled as refugees. Another commenter wrote that the cost burden should not be shifted to account for additional exemptions, and DHS should eliminate the refugee fee exemption for Form I–131, because a refugee with an ability to travel internationally can pay for Form I–131. The commenter also wrote that there is less justification for the I–131 fee exemption for refugees because those who possess the means to travel internationally should be able to pay the I–131 fee.

*Response:* DHS makes no changes in the final rule based on these comments. Consistent with congressional intent to provide refugees with support and assistance on their path to self-sufficiency, DHS has a long history of offering refugee travel documents at reduced cost. *See* 75 FR 58972; *see also* INA sec. 207(c)(3) (public charge ground of inadmissibility in INA sec. 212(a)(4) does not apply to refugees); *see also* INA sec. 412, 8 U.S.C. 1522 (authorizing a variety of benefits and programs for refugees). DHS aligns with this long-standing policy in providing a fee exemption for refugees filing Form I–131. Furthermore, as explained in the proposed rule, the increase in other fees resulting from exempting refugees from paying the fee for Form I–131 is marginal. *See* 88 FR 495.

*Comment:* Regarding fees for asylum applicants and asylees, commenters wrote the following:

• Add fee exemption for asylum-based Form I–765 renewal and replacement requests.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–730. Form I–730 is the only vehicle for family reunification for asylees and refugees. I–730 petitioners have motion rights via the I–290B but no appellate rights and can only challenge a denied family reunification petition with an I–290B filed within 33 days of a denial. I–730 petitioners must file within two years of arrival as a refugee or grant of asylum and as a result are new arrivals to the United States and are categorically economically disadvantaged. The form I–730 itself is fee exempt. Most I–730 petitioners are likely to be fee waiver eligible, and so the I–290B form should be exempt from a fee in this category. Fee waiver eligibility for the I–290B is not sufficient because the asylee or refugee petitioner whose fee waiver application is denied is then time-barred from motioning to reopen or reconsider the I–730, since the rejection of an application for an insufficient fee or fee waiver application takes more than the 33-day period within which a petitioner can challenge the denial of the I–730. Considering that the proposed rule would make Form I–290B fee exempt for every other humanitarian category of noncitizen contemplated in the proposed rule, adding fee exemptions for asylees and refugees for these benefits in the final rule would constitute a logical outgrowth of the proposed regulation.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–485.

• Extend fee exemption for Form I–131 for asylees.

• Eliminate proposed fee exemption for refugees filing Form I–131.

• Asylees should not be treated differently from their humanitarian counterparts with respect to fee exemptions.

• DHS should exempt fees for all asylum-related benefits through adjustment of status.

• Add a fee exemption for Form I–485 for Asylum-based applicants. The same legal definition of a refugee applies to asylees, and that both vulnerable populations who face economic hardship, are eligible for public assistance, and are not subject to the public charge ground of inadmissibility. The proposed rule justifies new fee exemptions for refugees because refugees are not subject to the public charge ground of inadmissibility and because refugees have access to federally funded assistance. However, the same is true of asylees, and DHS does not explain why these justifications should not also lead to new fee exemptions for asylees.

• Justification for exempting fees related to humanitarian classifications—that the underlying status is fee-exempt and such applicants face economic hardships—apply equally to asylees.

• The proposed I–485 fee, along with the cost of a medical exam, would be prohibitively expensive.

• The rule "disingenuously" frames the I–589 fee exemption as a new benefit for asylum seekers even though this does not differ from the current fee schedule.

• Disagree that refugees are distinguishable from asylees because refugees are required to adjust status within one year while asylees are not required to do so, stating that most refugees do not in fact apply for adjustment one year after their admission.

• Asylees seek to adjust status as soon as possible to obtain stability for themselves and their family members.

• It is unfair to expect asylees to delay filing certain applications given the harmful impact that such delays will have on their ability to achieve stability, security, and family reunification; neither asylees nor refugees have gained sufficient financial security in their first year in such status in the United States to be able to afford the adjustment application fee.

• Asylum seekers often have little or no resources and experience ongoing financial hardship after a grant of asylum.

• Disagree that the large number of asylees justifies the differences in fee exemptions between refugees and asylees because the large number of asylees demonstrates a need to reduce barriers to permanent resident status for this vulnerable population.

• Providing fee exemptions for asylee I–485s could improve efficiency, since under the current rules some families can only afford to file one application at a time. This can cause derivatives to file *nunc pro tunc* I–589s before adjusting status if the principal asylee naturalizes or the derivatives ceases to meet the definition of a spouse or child before they adjust status.

• USCIS should reverse the 2020 rule and eliminate the asylum fee in the proposed rule which avoids the issues caused by prior proposed rules.

• DHS should codify fee exemptions for all forms filed by asylees through adjustment and family reunification because asylum seekers and recent asylees are vulnerable to exploitation and trafficking.

• DHS should exempt asylees from fees for a refugee travel document and that, if the I–131 fee was truly linked to the DOS fee for a U.S. passport, it would be one-tenth of the price because, unlike a ten-year passport, a refugee travel document is only valid for one year.

• Exempting fees for renewal Forms I–765 would benefit asylees and their communities through the ability to maintain employment and unexpired identity documents.

*Response:* Form I–589, Application for Asylum and for Withholding of Removal is fee exempt for all filers. *See* 8 CFR 106.2(a)(28). Asylees are exempted from the fees for Form I–602, Application by Refugee for Waiver of Inadmissibility Grounds, Form I–730, Refugee/Asylee Relative Petition and Form I–765, Application for Employment Authorization (initial request by asylees and initial request by asylum applicants). Most forms used by asylum applicants or asylees are already fee exempt or fee-waiver eligible. 8 CFR 106.3(b). DHS considered the views of the commenters, and the number of asylum-based filings made each year and decided that the transfer of the costs of such filings to other petitions and applications would result in an excessive shift to other fee payers. DHS acknowledges that additional fee exemptions for asylees could reduce financial burden on these applicants. DHS will continue to exempt the initial Form I–765 fee for persons with pending asylum applications. *See* 8 CFR 106.2(a)(43)(iii)(D) and (G).[196] DHS will

---

[196] Except for individuals applying under special procedures under the settlement agreement reached in *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991).

also fee exempt applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum) for initial filings of Form I–765. *See* proposed 8 CFR 106.2(a)(43)(iii)(D) and (G).

DHS has decided to not exempt asylees from paying the fee for Form I–131 for refugee travel documents or advance parole (although at the lower passport fee level) [197] and Form I–485 for adjustment of status. Although asylees and refugees are in some respects similarly situated populations, refugees are required to apply to adjust status after they have been physically present in the United States for at least one year, while asylees are not required to apply for adjustment of status within a certain period. Therefore, DHS decided to not shift the costs of adjudicating requests from asylees for adjustment of status, refugee travel documents and advance parole to all or certain other fee payers. Asylees filing Forms I–485 and I–131 have the option to either pay the fees or request a fee waiver. DHS disagrees that the sole considerations for providing a fee exemption are that the underlying status is fee exempt and the requestors historically face economic hardships. As explained throughout this preamble, DHS exercises its discretionary authority to provide fee exemptions for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to the requestor and to USCIS, as well as humanitarian considerations and other policy objectives as supported by data. Though DHS may consider the similar circumstances of different categories of requestors in providing a fee exemption, as with VAWA, T nonimmigrant status, and U nonimmigrant status, whether the benefit request is submitted by populations with similar characteristics is not solely determinative of whether DHS provides a fee exemption. DHS disagrees that refugees and asylees should be provided the same fee exemptions simply because the two groups share similar characteristics. There are distinguishing characteristics between refugees and asylees. *See* INA 209, 8 U.S.C. 1159. Also, the population of asylees has far outnumbered the population of refugees in recent

years.[198] DHS believes that these differences in circumstance, in conjunction with the transfer of costs to other fee-paying benefit requestors, justifies providing certain fee exemptions for refugees and not for asylees because, overall, asylees are better able to time the filing of Form I–485 or an associated benefit request with their ability to pay the fees or request a fee waiver. DHS maintains this position in this final rule.

DHS disagrees that any potential decrease in *nunc pro tunc* filings of Form I–589 would reduce burdens to USCIS to such a degree that would justify the cost of this fee exemption. In FY 2022, of the total 41,160 Form I–589 filings, approximately 92 applications (0.2 percent) were filed *nunc pro tunc.* In the same year, Form I–485s filed by asylees accounted for 57,029 of the annual total of 608,734 Form I–485s filed (9 percent). Considering the 5-year annual averages of total Form I–485 filings (551,594) and fee-paying Form I–485 filings (471,625), on average, 85 percent of all Form I–485s are fee-paying. While not a direct comparison, the commenter's suggestion would result in additional forgone revenue on tens of thousands of Form I–485s to reduce *nunc pro tunc* Form I–589 filings that number less than 100 annually. Thus, the commenter's assertion that the additional fee exemption would reduce burden to USCIS is not supported by data and DHS declines to adopt the commenter's suggestion.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–730. DHS recognizes that we are providing a fee exemption for a Form I–290B filed by other populations in this final rule that have characteristics that resemble the population that files Form I–730. However, USCIS Form I–290B fee payment data indicates that affordability or accessibility has not generally been a problem for this population. Most individuals filing Form I–290B in association with a Form I–730 during FY 2019 through FY 2022 paid the filing fee. During this period, USCIS received a total of 376 Form I–290Bs filed in association with a Form I–730. Of those, only 57 (15 percent) were fee waived

while 269 (72 percent) paid the full fee. Additionally, rejections were low and decreased over time. Of the 376 total filings, 50 (13 percent) were rejected, with no rejections occurring in FY 2021 and only two occurring in FY 2022. The demonstrably low demand for fee waivers, combined with the low incidence of rejection, does not support the need for a fee exemption for this population. Additionally, DHS addresses the public's concerns regarding fee waiver adjudication as discussed earlier in this preamble by codifying eligibility requirements and providing clarifying guidance.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–485. The commenters did not provide any explanation as to why specifically form I–485 filed by a refugee or asylee should be entitled to a fee-exempt I–290B. Refugee-based I–485s are fee exempt and asylum-based I–485s are eligible for fee waiver, such that re-filing does not pose economic obstacles to economically disadvantaged refugee and asylee adjustment applicants.

DHS does not adopt the commenter's recommendation that the fee for asylees filing Form I–131 be prorated in accordance with the validity period of the refugee travel document relative to the 10-year passport. Consistent with U.S. treaty obligations, DHS does not charge a fee for a Refugee Travel Document that is greater than the fee charged for a U.S. passport.[199] This final rule sets the fee for Refugee Travel Documents using Form I–131, Application for Travel Document, at an amount which is far less than the Refugee Travel Document fee-paying unit cost [200] and equivalent to the current U.S. passport fee.[201] The requirement to match the fees is not related to the effective period that a requestor may use either document. In

---

[197] The fee for refugee travel documents is set at the same level as the fee for a U.S. passport consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees. *See* 8 CFR 106.2(a)(7)(i) and (ii).

[198] For example, in fiscal years 2019–2021, 48,888, 30,964, and 17,692 individuals respectively received asylum status, whereas 29,916, 11,840, and 11,454 individuals were admitted as refugees. *See* U.S. Dep't of Homeland Security, Office of Immigration Statistics, Annual Flow Report, Refugees and Asylees: 2021, available at *https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.*

[199] *See* Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees; 8 CFR 106.2(a)(7)(i) and (ii).

[200] *Compare* Table 1, *with* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4. The fee-paying unit cost for I–131 Refugee Travel Document is $535.

[201] At the time of this rulemaking, the DOS passport fees for a U.S. Passport Book consist of a $130 application fee and a $35 execution (acceptance) fee, for a total of $165. Children under 16 applying for a U.S. Passport Book pay a $100 application fee and a $35 execution (acceptance) fee, for a total of $135. *See* U.S. Department of State—Bureau of Consular Affairs, "U.S. Passports," "Passport Fees," available at *https://travel.state.gov/content/travel/en/passports/how-apply/fees.html* (last viewed Sept. 15, 2023).

general, DHS does not set fees to reflect an estimated monetary value of a benefit during its validity period. As explained earlier in this preamble, DHS charges fees at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." [202] In this final rule, DHS maintains that the fee for asylees filing Form I–131 to request a refugee travel document will be kept below cost and consistent with the U.S. passport fee, increasing from $135 to $165. *See* Table 1.

h. TPS

*Comment:* Commenters asked USCIS to retain the fee exemption for Form I–765 filed by initial TPS applicants under age 14 and over age 65 because:

• An EAD might be the only identification available to an unaccompanied child and it plays a vital role in securing critical support.

• Increasing fees on children and retired or disabled adults is inconsistent with the balancing of equities cited throughout the proposed rule.

• These applicants would be required to seek a fee waiver with each application.

*Response:* DHS recognizes commenters' concerns but believes that our rationale in the proposed rule remains valid and not retaining the Form I–765 fee exemption for TPS applicants below age 14 and above age 65 is the best policy choice. There continues to be no fee for Form I–821 TPS re-registration and fee waivers are available for Form I–765 and initial Form I–821 for eligible applicants. *See* 8 CFR 106.3(a)(3).

As explained in the proposed rule, USCIS no longer requires TPS applicants to file Form I–765 for information collection purposes, and only requires it if the TPS applicant wants an EAD. Persons applying for TPS who do not wish to request employment authorization need only file Form I–821. The reason that the INS fee exempted a Form I–765 filed by initial TPS applicants under age 14 and over age 65 from a fee no longer exists. *See* 88 FR 463. Thus, DHS will maintain that all TPS applicants requesting employment authorization must pay the filing fee for Form I–765 or request a fee waiver.

i. Requests for Additional Fee Exemptions

*Comment:* Multiple commenters recommended that USCIS exempt fees for all survivor or victim-based applications because poverty and barriers to financial resources are felt across all survivor-based immigration categories. The commenter also stated that immigrant survivors often face additional financial burdens and safety risks when they try to gather documents needed to support fee waivers that might be controlled by abusers or exploitative employers.

One commenter recommended that DHS should exempt application fees for all forms of humanitarian relief through adjustment of status, since these populations face similar obstacles. The commenter added that DHS should provide a fee exemption for I–765 renewal and replacement applications for all humanitarian relief holders, including those based on a pending application for adjustment of status. The commenter stated that gaps in employment authorization can result in job loss. The commenter said that exempting humanitarian applicants from paying these fees would streamline the volume of fee waiver requests to adjudicate, lower personnel cost, and help ensure the continued economic independence of survivors.

*Response:* DHS acknowledges the commenters' concerns regarding the financial burden to individuals seeking survivor or victim-based immigration benefits. DHS weighed these considerations given the commenters' feedback against the number of VAWA-, T-, and U-related filings it receives each year and the transfer of costs to other petitions and applications if these filings were fee exempt through final adjudication of the adjustment of status application and emphasizes the benefit to survivors in providing additional fee exemptions, as well as the humanitarian nature of these programs, in this final rule. As a result, DHS provides additional fee exemptions in the final rule for VAWA, T nonimmigrant, and U nonimmigrant populations to include adjustment of status and associated forms. *See* 106.3(b)(6); *see also* Table 5B.

DHS declines to provide fee exemptions for all humanitarian categories of requestors for all forms filed through adjustment of status, as suggested by the commenter. DHS also notes that requests for humanitarian relief such as asylum (Form I–589), T nonimmigrant (Form I–914), U nonimmigrant (Form I–918), or VAWA self-petition (Form I–360), are fee

exempt. In this final rule DHS provides fee exemptions and fee waiver eligibility for forms filed through adjustment and associated ancillary forms by certain humanitarian categories of requestors consistent with our fee-setting approach as explained in this preamble.

DHS disagrees with the commenter's characterization of the provision of additional fee exemptions for certain humanitarian categories as "arbitrary" or "unjustified" as it applies to the proposed rule and this final rule. As described throughout this preamble, DHS maintains fee waivers, reduces fees, and provides new fee exemptions to address accessibility and affordability where DHS has determined that a different approach would inequitably impact the ability of those who may be less able to afford the fees to seek an immigration benefit for which they may be eligible. DHS believes this final rule represents our best effort to balance access, affordability, equity, and national interest while providing USCIS with the funding necessary to maintain adequate services.

*Comment:* One commenter stated that DHS should make I–765 applications filed under category (c)(14) fee exempt for victims and witnesses of workplace exploitation. The commenter said that applicants requesting employment authorization under this category will have either suffered or witnessed workplace abuse and will be at risk of termination or retaliation by their abusive employers, and some may also have recently lost their jobs or may be owed back wages. The commenter added that, because this basis for requesting deferred action and employment authorization is new, the anticipated volume of these requests will be low and will not materially burden USCIS if the fees for these Form I–765s are exempted.

*Response:* On October 12, 2021, DHS issued a Policy Statement in support of the worksite enforcement efforts being conducted by the Department of Labor (DOL) in conjunction with other government agencies. The goal of DHS's policy is to ensure that we maximize the impact through policy and practices that will reduce the demand for illegal employment and help noncitizens navigate the USCIS process. Noncitizens who fall within the scope of a labor agency investigation and have been granted deferred action may be eligible for deferred action-based employment authorization (Form I–765 (C14). However, the C14 employment classification is not unique to these applicants. For this reason, DHS declines to fee exempt the C14 classification for Form I–765. However,

---

[202] *See* INA sec. 286(m), 8 U.S.C. 1356(m). The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

DHS has expanded the availability of fee waivers to ensure that the most vulnerable applicants are able to access the relief that they need. *See* 8 CFR 106.3.(a)(3)(ii)(E).[203]

*Comment:* Some commenters stated that it is unclear if Form I–824 would be fee exempt for certain humanitarian categories, and USCIS should make it exempt for SIVs, U, T, VAWA, asylees, and refugees. Other commenters said that Form I–824 should be free because it is used when USCIS has made a mistake.

*Response:* DHS appreciates the commenters' concern that the proposed fee exemptions for Form I–824 lacked clarity. In this final rule, DHS provides a fee exemption for T visa applicants and T nonimmigrants, U visa petitioners and U nonimmigrants, VAWA, abused spouses and children categories, and SIVs for Form I–824. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide a fee exemption for Form I–824 for asylees and refugees as these populations may not use this form.

*Comment:* One commenter stated that for immigrant victims of crime and abuse eligible for humanitarian immigration relief, including T nonimmigrant status, U nonimmigrant status, relief under VAWA (including Form I–751s), CAA, HRIFA, and the Nicaraguan Adjustment and Central American Relief Act (NACARA), VAWA cancellation of removal, VAWA suspension of deportation, and SIJ classification, the Form I—290B should be fee exempt. The commenter explained that requiring indigent immigrants to file a fee waiver for this form highlights the problematic approach USCIS has historically taken to fee waiver requests that impedes due process and cuts off low-income immigrant crime victims from immigration relief they would otherwise be able to receive. Similarly, other commenters expressed concern with the exclusion of Form I–290B appeals of U-based adjustment of status from the fee exemption provisions. Another commenter stated that limiting fee exemptions for VAWA self-petitioners filing I–290Bs to when the I–485 and I–360 are concurrently filed limits due process and access to justice solely based on administrative technicality.

Multiple commenters stated that the Form I–290B should be exempt for refugees and asylees to the same extent that it is for other humanitarian immigration categories, though some also stated that Form I–290B need not be fee exempt for every benefit sought by an asylee or refugee. Commenters asserted that Form I–290B should be fee exempt when filed in connection Form I–730. One commenter emphasized that the I–730 is the only vehicle for family reunification for asylees and refugees, while another said that the lack of a fee exemption would result in numerous petitioners each year suffering the devastating consequences of family separation.

Additional commenters stated that adding fee exemptions for I–290Bs filed by asylees and refugees would constitute a logical outgrowth of the proposed regulation, which eases the fee burden on most humanitarian categories of requestors. The comments said that DHS should offset the cost of the I–290B fee exemption for refugees and asylees when filed in connection with the I–730 by retaining the fee requirement for I–131s filed by refugees because refugees with an ability to travel internationally presumably have an ability to pay for the I–131 and do not have the "presumptive" economic hardship that justifies other fee exemptions for this population.

*Response:* In this final rule, DHS provides a fee exemption for Form I–290B if it is filed for a motion or appeal of a denial of any benefit request before adjusting status or for Form I–485 and associated ancillary forms for the following humanitarian categories: T and U nonimmigrant status, VAWA, abused spouses and children adjusting status under CAA and HRIFA, SIV, and SIJ. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide additional fee exemptions for asylees and refugees in this final rule for the reasons discussed elsewhere in this preamble.

*Comment:* Some commenters recommended that DHS create fee exemptions for Form N–400s in certain situations, specifically:

• There should be an automatic fee waiver for all Form N–400 applicants with Form N–648 that meets the requirements for the medical certificate for disability exceptions.

• DHS should also provide fee exemptions for naturalization applications filed by refugees because the Refugee Convention calls on participants to facilitate the assimilation and naturalization of refugees as far as possible, and that DHS is obligated to ensure that the increased naturalization fees do not hinder the naturalization of refugees.

*Response:* DHS appreciates that many applicants filing Form N–648, Medical Certification for Disability Exceptions, may be unable to pay the Form N–400, Application for Naturalization, filing fee but declines to provide a general fee exemption in this situation. Fee-exemption eligibility must be determined at the time a form is received by USCIS. The adjudication of Form N–648 is performed at the time of the N–400 interview after an Immigration Services Officer (ISO) has verified that the N–648 relates to the applicant.[204] USCIS would be unable to determine whether the Form N–648 meets the requirements before exempting the Form N–400 fee. Furthermore, were USCIS to adjudicate Form N–648 at the time of receipt, before Form N–400, this would still require a full review of the applicant's A-file.[205] Because the ISO adjudicating the N–400 would be required to perform another full review of the applicant's A-file,[206] this would result in an inefficient duplication of USCIS efforts. In addition, not all applicants filing Form N–648 are unable to pay the Form N–400 fee. Form N–648 does not have any fee and applicants can still request a fee waiver or reduced-fee Form N–400 ($380) if they are unable to pay the online filing fee of $710, a $50 savings over the paper-based filing fee of $760.

Currently, refugees are provided fee exemptions for their immediate needs upon arrival and generally would not be eligible for naturalization until 5 years after entry into the United States. DHS believes that at the time refugees are for applying for naturalization they may be employed and able to pay fees. Additionally, the Refugee Convention calls on States to facilitate the assimilation and naturalization of refugees; however, fee exemptions are not a requirement under the Convention. Article 34 of the Refugee Convention states in part that States shall make every effort to reduce the cost of naturalization proceedings.[207]

---

[203] *See* DHS, "Policy Statement 065–06: Worksite Enforcement: The strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual," available at *https://www.dhs.gov/sites/default/files/publications/memo_from_secretary_mayorkas_on_worksite_enforcement.pdf* (last viewed Sept. 1, 2023).

[204] *See* USCIS, "USCIS Policy Manual," Vol. 12, "Citizenship & Naturalization," Part E, "English & Civics Testing & Exceptions," Chp. 3, "Medical Disability Exception (Form N–648)" [12 USCIS–PM E.3], available at *https://www.uscis.gov/policy-manual/volume-12-part-e-chapter-3* (last visited Aug. 25, 2023).

[205] *Id.*

[206] USCIS, "USCIS Policy Manual," Vol. 12, "Citizenship & Naturalization," Part B, "Naturalization Examination," Chp. 3, "Naturalization Interview," Section B, "Preliminary Review of Application" [12 USCIS–PM B.3(B)], available at *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-3* (last visited Aug. 25, 2023).

[207] While the United States is not a party to the 1951 Refugee Convention, it is party to the 1967
Continued

Although DHS has decided not to extend fee exemptions for naturalization to refugees, USCIS offers reduced fee options, and some applicants may be eligible for fee waivers.

*G. Fee Changes by Benefit Category*

1. General Fee Provisions

a. Fee Payment and Receipt Requirements

*Comment:* A commenter stated that applicants should retain the right to request credit card refunds, stating that this is one of the few means of recourse applicants have when facing apparently non-responsive government services. They stated that barring credit card disputes would diminish government transparency. A commenter stated that, where USCIS error prejudices individuals, filing fees should be refunded. A commenter wrote that the USCIS fee structure may confuse applicants and recommended that USCIS send a follow-up invoice rather than reject applications submitted with incomplete fees.

*Response:* USCIS is committed to meeting its processing time goals and reducing the immigration benefit request processing backlog. USCIS acknowledges that since it last adjusted fees in FY 2016, USCIS has experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29851, 29858–29859 (May 30, 2007). Processing delays have contributed to case processing backlogs. However, with the high volume of submissions that USCIS continues to experience, steps that may delay adjudication of a request or require special handling, such as holding cases while USCIS bills for unpaid or partially unpaid fees, would only exacerbate backlogs. Therefore, USCIS fees generally are non-refundable and must be paid when the benefit request is filed. *See* 8 CFR 103.2(a).

As explained in the proposed rule, credit card disputes are generally filed by requestors whose requests have been denied, who have changed their mind about their requests, or who have asserted that the service was not provided or was unreasonably delayed. *See* 88 FR 402, 483–484 (Jan. 4, 2023). USCIS makes its no-refund policy clear on its website.[208] Filing and biometric service fees are final and non-refundable, regardless of any action

USCIS takes on an application, petition, or request, or if requestors withdraw a request. However, when USCIS receives a payment in error, it may refund it. For example, USCIS refunds fees for Form I–131, Application for Travel Document, when erroneously paid for humanitarian parole on behalf of a beneficiary who is a Ukrainian citizen.[209] USCIS provides other examples on its website.[210] Often, USCIS has processed the request to completion and performed the work for which the fee was charged when the credit card dispute is lodged. DHS understands that no one wants to be determined ineligible and denied when they complete, submit, and pay for an immigration benefit request. However, DHS is authorized to charge fees to cover the cost of adjudicating requests and paying a fee is not a guarantee of a particular outcome.

USCIS also has fee payments withdrawn due to credit card disputes after the request is approved. When certain benefit request fee payments are dishonored or declined, or where an approved applicant successfully disputes their USCIS fee payment with their credit or debit card company, USCIS may send the requester an invoice for the unpaid fee. However, USCIS will generally send the requester a notice of intent to revoke (NOIR) the approval for the payment deficiency. The NOIR usually results in the amount due being paid, but if not, USCIS may revoke the approved benefit request. *See* 8 CFR 103.7(a)(2)(iii).

USCIS data indicates that the credit card dispute process defaults to the consumer, and it has become a popular method for credit card holders whose immigration benefit requests are denied and delayed getting their money back. When USCIS performs services for which a fee has not been paid, such as when a chargeback of the fee payment occurs, the costs incurred result in a drain on IEFA reserves that are meant for other uses. Longstanding DHS regulations at 8 CFR 103.2(a)(1) provide that fees paid to USCIS for immigration benefit requests will not be refunded regardless of the result of the benefit

request or how much time the adjudication requires. Consistent with that limitation, DHS proposed that fees paid to USCIS using a credit or debit card are not subject to dispute by the cardholder or charge-back by the issuing financial institution. *See* 8 CFR 106.1(e). USCIS is almost entirely fee funded. If every customer who experiences delays or is denied a benefit would be able to successfully dispute their USCIS fee payment with their credit card company, it could impose significant financial harm on USCIS. As stated elsewhere in this preamble, USCIS is working to reduce processing delays, and we have reduced the budget to be recovered by fees in this final rule as a result of increased efficiencies. DHS declines to make any changes to the final rule in response to these comments.

In addition, DHS is adding a clarifying provision to its regulations at 8 CFR 103.2(a)(7) governing the submission of benefit requests to ameliorate the risks that may result from the changes being made in the final rule. DHS is adding several fee discounts, fee waiver eligibility and fee exemptions in this final rule to address the concerns of commenters about the negative impacts of the new fees on low income, small employer, nonprofit, military, elderly, and young requestors. *See* 8 CFR 106.3(b) (new exemptions); 8 CFR 106.2(a)(3), (4), (11), and (c)(13) (discounts for small employers and nonprofits); 8 CFR 106.2(a)(3) & (4) (Form I–129 fee discounts); 8 CFR 106.2(a)(20)(ii) (child's fee for Form I–485, Application to Register Permanent Residence or Adjust Status); 8 CFR 106.2(b)(3)(ii) (discount for Form N–400, Application for Naturalization); 8 CFR 106.2(a)(32) and (46) (adoption fee exemptions); 8 CFR 106.2(b)(7)(ii) and (8) (adoption fee exemptions). USCIS will review the filing to determine if the requestor qualifies for a fee waiver, fee exemption, or lower fee when the request is received. However, to protect USCIS from requestors that may submit a lower fee for which they may not qualify and that USCIS may not catch at intake, DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied with the correct fee, USCIS may deny the request. 8 CFR 103.2(a)(7)(ii)(D)(1); *see also* 88 FR 402, 481–482. Further, because USCIS may adjudicate certain requests in a few days, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.*

*Comment:* Commenters opposed the proposal to allow USCIS to require that

---

Refugee Protocol, under which States agree to apply articles 2 through 34 of the Convention. *See* Protocol relating to the Status of Refugees art. 1, Dec. 16, 1966, 19 U.S.T. 6223.

[208] *See* USCIS, Filing Fees, available at *https://www.uscis.gov/forms/paying-uscis-fees* (last viewed on Sept. 22, 2022).

[209] *See* USCIS, Uniting for Ukraine, *https://www.uscis.gov/ukraine* (last reviewed/updated: June 1, 2023).

[210] *E.g.,* USCIS, USCIS Removes Biometrics Requirement for Form I–526E, Immigrant Petition by Regional Center Investor, petitioners, *https://www.uscis.gov/newsroom/alerts/uscis-removes-biometrics-requirement-for-form-i-526e-petitioners* (last reviewed/updated: Mar. 15, 2023); USCIS, Certain Petitioners for U Nonimmigrant Status May Receive a Refund for Applications for Employment Authorization Submitted Before Sept. 30, 2021, *https://www.uscis.gov/newsroom/alerts/certain-petitioners-for-u-nonimmigrant-status-may-receive-a-refund-for-applications-for-employment* (last reviewed/updated: Nov. 22, 2021).

certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method. *See* 8 CFR 106.1(b). The commenters stated that this could disallow payment methods such as cashier's checks or money orders, to the detriment of low-income applicants and petitioners who may not have internet access, U.S. bank accounts, established credit-scores, or access to reloadable debit cards necessary for some forms of payment. The commenters requested that USCIS accept cashier's checks and money orders as methods of payment for all applications, petitions, and requests. Some stated that access to internet and prepaid debit cards is limited for low-income applicants. Some stated that USCIS should not rely on public libraries to meet the need for internet access because of libraries' under-utilization. A commenter requested that any changes to acceptable payment methods should be accompanied with a widespread notice to the public of this change and a grace period to facilitate smooth processing and promote overall fairness.

A commenter stated that Form G–1450 payments are often improperly rejected even when all the information supplied is correct and legible and USCIS should allow submission of cashier's checks and money orders. Commenters also requested that Form I–140 and I–907 fees be payable from outside of the United States. A commenter suggested that a single check or money order be sufficient for all fees related to a single application to simplify returning funds from a money order.

*Response:* In this final rule, DHS does not restrict the method of payment for any immigration benefit request. This final rule clarifies the authority for DHS to prescribe certain types of payments for specific immigration benefits or methods of submission. DHS does not have data specific to USCIS benefit requestors' access to the internet or banking but understands that populations submitting requests may have attributes that make access to a bank account challenging. DHS acknowledges that some requestors may not use banks or use them on a limited basis for several reasons. It appears, however, that a person can alternatively purchase a pre-paid debit card, cashier check or money order that can be used to pay their benefit request fee.[211] In

addition, since 2018, requesters have been able to use a credit card to pay for a USCIS form filing fee that gets sent to and processed by one of the USCIS lockboxes or, for credit card transactions that do not exceed the limits set forth in the Treasury Financial Manual, split the fees between more than one credit card.[212] More recently, USCIS expanded a pilot program that allows credit card payments for service center filings.[213] The credit card used does not have to be the applicant's; however, the person who is the owner of the credit card must authorize use of his or her credit card. In addition, comments that libraries are underused indicate they remain available for free online services, access to information and computers that the public may use to read, complete, print or submit benefit requests. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

Regarding public notice, proposed changes to USCIS forms and instructions are typically published in the **Federal Register** for notice and comment. When USCIS finalizes a revised form, there is typically a grace period or advance notice before customers are required to use a revised version of the form. USCIS announces these changes on its website. When DHS expands or limits acceptable instruments locally, nationwide, or for certain USCIS benefit requests, it issues multiple communications and provides sufficient advance public notice to minimize adverse effects on any person who may have plans to pay using methods that may no longer be accepted.[214] Nevertheless, in response to the public comments and to provide more certainty to stakeholders, DHS has codified a 30-day advance public notification requirement before a

payment method will be changed. 8 CFR 106.1(b).

b. Biometric Services

*Comment:* A few commenters wrote support for eliminating the separation of biometrics fees from the fee associated with their underlying application. Commenters wrote:

• Combining fees would reduce confusion and promote efficiency.

• They supported including biometric fees but disagreed that doing so would lower fees overall.

• A commenter requested an online scheduling system for biometric appointments.

• They recommended reusing immutable or persistent biometrics, especially for highly iterative applications with shorter grant periods biometrics to mitigate administrative burdens.

• No fee should be paid when biometrics are reused.

A few commenters opposed absorbing the biometric services fee into other fees, stating:

• Not everyone is required to submit biometrics and people should not be required to pay for something that is not needed.

• It is disingenuous to suggest that integrating the biometrics fee into the required filing fee reduces fee burdens while simultaneously seeking to double the fees an individual would pay to adjust status.

• USCIS should eliminate the biometrics requirements for O–3 applicants, consistent with H and L applications to reduce confusion and streamline the application process because there is no reason to require biometrics information from O–3 applicants.

• USCIS could lower its costs by improving its communications with EOIR, especially for the purposes of coordinating asylum and I–94 grants.

*Response:* DHS agrees with the comments in favor of incorporating the cost of biometric services into the underlying immigration benefit request fees. This approach aims to simplify the fee structure, create a more user-friendly experience, reduce rejections of benefit requests for failure to include a separate biometric services fee, and better reflect how USCIS uses biometric information. As explained in the proposed rule, the biometric services information used to calculate the proposed fees included when USCIS may reuse information it already collected. *See* 88 FR at 484–485 (Jan. 4, 2023). As explained elsewhere in this rule, DHS limited the fee increases for some immigration benefit requests by inflation or a lower

---

[211] DHS understands that some commenters are concerned about the hidden fees of certain prepaid debit cards; however, many cards exist with no fees. *See, e.g.,* CardRates.com, 6 Best Prepaid Debit Cards with No Fees (Oct. 2023), available at *https://*

*www.cardrates.com/advice/best-prepaid-debit-cards-with-no-fees/* (last viewed Oct. 20, 2023).

[212] *See* USCIS Expands Credit Card Payment Option for Fees, *https://www.uscis.gov/news-releases/uscis-expands-credit-card-payment-option-fees* (last reviewed/updated Feb. 14, 2018).

[213] *See* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022).

[214] *See, e.g.,* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022); USCIS Updates Fee Payment System Used in Field Offices, available at *https://www.uscis.gov/news/news-releases/uscis-updates-fee-payment-system-used-field-offices* (last reviewed/updated Mar. 7, 2019).

percentage from the proposed rule. This includes benefit requests that typically require biometric services, such as Form I–90, Application to Replace Permanent Resident Card, Form I–485, and Form N–400. As such, the final fee for these forms is sometimes less than in the proposed rule.

The INA provides DHS with the specific authority to collect or require submission of biometrics in several sections. *See, e.g.,* INA section 235(d)(3), 8 U.S.C. 1225(d)(3) ("to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service"); INA section 287(b), 8 U.S.C. 1357(b) (powers of immigration officers and employees to administer oaths and take evidence); INA sections 333 and 335, 8 U.S.C. 1444 (requirement to furnish photographs for naturalization) and 1446 (investigation and examination of applicants for naturalization); INA section 262(a), 8 U.S.C. 1302(a) (requirement for noncitizens to register and be fingerprinted); INA section 264(a), 8 U.S.C. 1304(a) (authority to prescribe contents of forms required for alien registration); *see also* INA section 103(a)(3), 8 U.S.C. 1103(a)(3) (conferring broad authority on the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the" immigration laws). DHS regulations at 8 CFR 103.2(b)(9) accordingly provide that USCIS may require any applicant, petitioner, sponsor, beneficiary, or individual filing a benefit request, to submit biometrics, and pay the biometric services fee.

As USCIS has tried to adjust its biometrics policies over the years, it has been stymied by the separate fee requirement and how it would be collected. In addition, the separate fee results in many requests being rejected for failure of the preparer to accurately calculate the impact of the biometric services fee on the amount owed. This rule will provide DHS flexibility in its biometrics submission practices and policies to ensure that necessary adjustments can be made to meet emerging needs, conduct biometrics-based background checks, produce documents, and verify identities, while reducing filing rejections.

In June 2023, USCIS launched a new tool which allows customers to reschedule most biometric appointments before the date of the appointment.[215] USCIS periodically changes policies related to biometric collection, such as the forms requiring biometric services.[216] Removing the biometrics services fee as a separate requirement will streamline the ability of DHS and USCIS to change biometrics polices as need and workload dictates. However, those changes may be beyond the scope of the fee rule.

c. Online/Electronic Filing

*Comment:* Many comments were received on the proposed changes to online and electronic filing. The commenters who were opposed to the different fees for online and paper filing wrote:

• They opposed having separate fees for online filing and paper filings without providing additional rationale.

• Paper filing fees should not differ from online filing because it would result in financial and digital inequities, contravene the objectives of E.O. 14012, burden applicants with low financial inclusion, discriminate against individuals with lower income, certain disabilities, low literacy, inability to use technology, people living in rural or remote areas, who lack access to broadband and computers; citing a 2021 Pew Research Center research on race and access to internet and computers, and a 2022 study showing that one-in-five U.S. households including many racial and ethnic minority households are not connected to the internet.

• 2020 study on the "Digital Divide" during the COVID–19 pandemic; a 2020 DHS study on poverty and internet access indicating that one in six people living in poverty in the United States have no internet access, multiple sources on internet access in various locations, a 2021 Pew Research study of which older Americans seldom use the internet, and a 2022 publication on low rates of smartphone ownership among seniors.

• The fees would result in chaos and confusion for unrepresented people, including missed deadlines, rejected cases, and delays.

• Applicants should not be punished for being unable to file online.

• Many applicants cannot file online due to language barriers, lack of computer skills, as well as access and resources to submit online.

• The proposal would subject applicants with low tech literacy, such as seniors and people with lower education, to scams claiming to assist in digital filing.

• The proposal would disadvantage survivors of domestic violence, human trafficking, and other serious crimes who are not able to file applications for protected case types online.

• People with disabilities may require assistive technologies that they do not have access to, especially if they are survivors of violent crimes and research indicates higher rates of disabilities, varying needs, and the impact of violent crimes and abuse on persons with disabilities.

• Applicants who are most vulnerable and in need of assistance, such as lower income and the elderly who do not have the technology or savvy to handle a finicky electronic system, would be penalized.

• The system often is not compatible with immigration software used by attorneys to file for clients.

• Lower fees for online applications would discourage immigrants from seeking assistance from attorneys and legal representatives. Instead, applicants would try to complete the applications on their own eventually leading to errors.

• Low-income individuals may not be able to access representation to help them apply online for immigration benefits.

• USCIS should not rely on library access to provide for digital filing needs, citing a 2016 Pew Research Center study on underutilization in libraries and information security issues related to library computer reliance. USCIS did not account for varying resources and library computer availability, providing citations on different staffing issues and applicant needs that libraries may face.

• All online application forms should provide for fee waivers and exemptions. Because Form I–912 is not available online, many applicants must file paper and the proposal would impose an undue burden on low-income applicants.

• They do not support a tiered payment structure until online filing options were available to all applicants and forms.

• Expressed concerns for the equity impacts of the proposed electronic filing discount but supported the possible efficiency of using electronic filing.

• Paper filing costs no more than $20 more than electronic filing.

---

[215] USCIS, USCIS Launches Online Rescheduling of Biometrics Appointments, available at *https://www.uscis.gov/newsroom/news-releases/uscis-launches-online-rescheduling-of-biometrics-appointments* (last reviewed/updated July 6, 2023).

[216] *See, e.g.,* USCIS, USCIS Extends Temporary Suspension of Biometrics Submission for Certain Form I–539 Applicants, available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-temporary-suspension-of-biometrics-submission-for-certain-form-i-539-applicants* (last reviewed/updated Apr. 19, 2023).

• To charge less for an application or petition filed online is inappropriate, because USCIS' online filing system does not function properly and would only hinder proper filings and increase the backlog.

• The online filing system does not work properly, is difficult to use, and is not user-friendly.

• Recommended allowing applicants and their attorneys to log-in with the same account rather than using two separate computers and having separate logins, and that password reset, or lockout resolutions be simplified.

• Attorneys should be able to submit filings on behalf of their clients that the system should allow the use of Application Programming Interfaces.

• A glitch requires them to obtain a new USCIS attorney account for every filing they initiate.

• Expressed skepticism regarding how online filing would ensure that supporting documentation is properly received. They would prefer to file online, but that they cannot successfully do so as often information that is entered and submitted in the system is later lost or riddled with errors.

• Due to issues with the online system, they advise clients not to use it.

• Provided examples of how the system is not user friendly, prone to errors, and that USCIS' online account and filing software must be seriously improved.

• Form N–400 has exhibited poor data integrity when filed online.

• Filings, such as Form I–589, that require significant amounts of documentation organized in a particular manner are difficult to organize digitally rather than by an applicant's counsel.

• Recommended that USCIS provide both instructions and the ''online forms for discounted only benefit applications'' in several common foreign languages.

• USCIS should provide instructions and the online forms in at least several common foreign languages, and the proposal falls short of USCIS' own Language Access Plan. Many of the applications impacted under USCIS' proposed rule have not been translated into Chinese, Vietnamese, Tagalog, or Korean, or other languages.

• Expressed concern for the security of online filing and urged USCIS to ensure that applicants are not forced to use an unsafe system.

• Disagreed with fee increases without increases in service or efficiency and suggested improved and increased online-filing options.

• USCIS must explain an operational benefit to charging more for online filing, whether doing so would hasten a transition to online filing, and clearly explain the goal of the fee differential before proceeding with the proposal.

• Digital filing would increase processing time and cost any but the most complex applications.

• Because fees are higher for some of the online applications and that separate applications must be made for each family member, and that not all services are readily available online (such as rescheduling biometrics appointments) these are examples of an inefficient system.

• USCIS' platform cannot save data for more than 30 days and thus it is a poor site to enter data into.

• Allow Form I–485 to be filed online.

Commenters who supported different fees for online and paper filings wrote:

• Expressed support for a secure online portal that would enable online filings of all documents and forms so both USCIS and submitters could view and verify documents submitted and issued.

• Supported expanding online filing to reduce costs associated with H–2A filings.

• Supported the proposed online filing discount to support the transition to digital filing and related cost-savings.

• Expressed support for USCIS' current H–1B registration system and recommended that similar technological advancements be made for Form I–130 petitions.

• Improve the responsiveness of the e-Request tool to improve operational efficiency and address problem of principals separated from derivative applicants; handling requests to link family members together for more efficient adjudication; enabling counsel and applicants to address priority date issues, including inter-filing requests; and expediting requests.

• Make all filings available online and improve the USCIS online filing system, expand online filing to all immigrant and nonimmigrant benefits because this would improve efficiency.

Commenters requested online filing options for the following forms:

• All Form I–765 categories and applicants, especially those granted withholding of removal, T Nonimmigrants, U Nonimmigrants, VAWA self-petitioners, and people under an order of supervision.

• Form I–129.

• Form G–28. USCIS should update the G–28 to allow for electronic notifications and eliminate mailing of notices.

• Forms I–912 and I–942.

• Form I–485.

• Form I–539.

Commenters that wrote about USCIS online filing without commenting about the specific fees in the proposed rule, wrote:

• USCIS should improve its management of online accounts for immigration attorneys.

• USCIS should permit online filings for fee-waived and reduced N–400s.

• USCIS' digitization efforts have lagged those of other agencies and described ways that mail processing can be inefficient, including via erroneous rejections.

• The proposed incentives for digital filing are insufficient and recommended that USCIS develop an Application Programming Interface to facilitate a direct system-to-system data exchange with large volume filers.

• They hope for a fully digitized filing platform for every form that is fully compatible with attorney case management systems and capable of accepting attorney-filed forms.

• They recommend a system to accept scanned or uploaded application materials, to be funded by ''a dedicated funding stream'' separate from a fee increase.

• They recommend that USCIS install computers and scanners at USCIS Field Offices to assist applicants trying to electronically file applications and petitions.

• USCIS should confirm its continued provision to applicants of an option to use paper filing, and paper notices, especially Receipt Notices, RFEs, Notices of Intent to Deny (NOID), decisions and biometrics to ensure that applicants with temporary internet access are able to receive communications.

• They recommend that USCIS use email more often to provide notices as a cost-saving measure, and communicate via phone call, and video teleconference more often to improve operations, and to reduce delays and mistakes and ensure individuals receive the service they pay for.

• They request that USCIS adopt electronic signature technology to reduce administrative burdens on employers.

• USCIS should engage with stakeholders on a listening session to receive feedback on the online filing process and consult with immigration lawyers to determine how to improve electronic filing systems.

*Response:* DHS understands some commenters' desire for expansion of electronic filing. USCIS is actively planning the expansion of its online electronic filing platform for the submission and adjudication of immigration benefits. As of the end of

FY 2022, approximately 20 percent of USCIS intake was processed through online filing, and we are striving to increase that level. USCIS continues to improve the availability and user experience of online filing. The benefits of digital tools are not limited to customers that file online. Every submission completed online rather than through paper provides cost savings and operational efficiencies to both USCIS and our customers. USCIS scans some applications, petitions, and requests received on paper so that we can process them electronically. USCIS offers recommendations to avoid delays when filing paper; if more documents were filed electronically, it would reduce the time spent on scanning paper documents and free up more time for adjudication rather than administrative tasks.[217]

These benefits accrue throughout the immigration lifecycle of the individual and with the broader use of online filing. As such, DHS believes it should encourage online filing through discounted fees.

In response to comments, DHS reevaluated the difference between online and paper fees, as discussed earlier in this preamble. In this final rule, DHS provides that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g).

d. Premium Processing (*e.g.,* Business Days, Combined Payment, I–907, Expansion, Emergency Stopgap USCIS Stabilization Act)

*Comment:* DHS received the following comments on the proposed changes to premium processing:

• Many applicants need to use premium processing to avoid processing delays in standard processing services.

• Support for USCIS' goals of addressing backlog and processing delays with premium processing.

• They recommended providing expanded premium processing options because this change would both increase revenue and expedite processing.

• They described the proposed rule's approach as not sustainable and that it has caused standard processing delays.

• Premium processing email service is generally quite effective and more effective than the general USCIS E-request and telephone system.

[217] USCIS offers recommendations to avoid delays when filing paper. *See* USCIS, Recommendations for Paper Filings to Avoid Scanning Delays, *https:// www.uscis.gov/newsroom/alerts/recommendations-for-paper-filings-to-avoid-scanning-delays* (last visited Feb. 7, 2023).

• USCIS is creating an artificial backlog to generate more money off premium processing fees.

On the proposed change of premium processing times from calendar days to business days, commenters wrote:

• They support the change but also recommended clarifying the definition of business days as days on when USCIS service centers are open.

• The purpose and advantage of premium processing is its predictability, and it is appropriate to amend the 15-calendar day timeline to exclude predictable discrete events such as Federal holidays and weekends, but not unpredictable and unknown events such as building or weather-related closures, or "other days the Federal Government chooses to close its offices." If USCIS chooses to finalize a change to business days it should only exclude weekends and Federal holidays from the timeline, rather than also excluding weather emergencies and other regional or unanticipated closures.

• Changing premium processing from calendar days to business days is reasonable because it is unreasonable to expect USCIS to work weekends and holidays.

• The proposed change would violate Federal regulations requiring the use of calendar days for required actions.

• USCIS' new position that the original USCIS interpretation of "calendar day" was incorrect is inconsistent with decades of USCIS practice and other Federal agencies' interpretations of "day." USCIS' original interpretation of "day" as "calendar day" was not incorrect, and USCIS does not have legal support for the proposed change to a 15-business day processing timeframe.

• Congress did not change USCIS' use of calendar days for premium processing, which it could have done if that had been the congressional intent.

• The proposed change would mean processing would generally be completed after the 14-day timeframe required by statute.

• The longer timeframe would decrease the value of the premium service compared to standard processing.

• USCIS has proven it can successfully complete premium processing adjudications within 15 calendar days.

• The number of Federal holidays at the end of the year would complicate processing during one of the most active periods of the year for many U.S. arts agencies.

• The change to business days would reflect on DHS' inability to accommodate a quick service for a substantial fee.

• The proposed change would reward inefficiency and shows a lack of appetite to improve service.

• The change would impose a burden on petitioners, and individuals and make it difficult to secure visas.

• O and P petitioners often must apply for visas at the last minute and the proposed change would make it very difficult to complete the process in a workable period.

• Tight employment processing timelines with the Department of Labor (DOL) leave no spare time for lengthening the premium processing timeframe.

• A concern with the existing practice of resetting the premium processing timeframe whenever a RFE or NOID is issued and recommendation that instead the timeframe be tolled until the applicant responds to RFEs and NOIDs because this approach would promote efficiency, accountability, and align with congressional intent.

• They recommended that USCIS define how notices would be provided to petitioners, consider electronic notices, and review internal procedures and policies to ensure efficient adjudication, predictability, and reliability for petitioners.

• USCIS needs to move resources during peak filing times for certain visa categories, especially for H–2B visas as they have unique scheduling time pressures.

• The premium processing fee should be decreased considering the decreased value of the premium processing service, given the proposed longer processing period of business days.

• Premium processing fees have been increased in the past without any improvement in processing times.

• The Form I–907 fee is unreasonable.

• Premium processing should be offered and maintained without the service interruptions that have been problematic in the past.

• USCIS should respond promptly to requests for premium processing and criticized RFEs as the first responses from USCIS.

• Physician National Interest Waiver (PNIW) petitions should be adjudicated within the 15-day timeframe rather than the 45-day timeframe.

• Premium processing should be maintained without service interruptions for Form I–539 applications and Form I–129 petitions.

*Response:* DHS disagrees that adjusting the timeframe for adjudicative action on a petition for which premium processing service has been requested from 15 calendar days to 15 business

days would meaningfully harm petitioning entities.[218]

DHS is adjusting the timeframe for premium processing for multiple reasons. The current timeframe does not consider the days on which government offices are closed and USCIS staff are unavailable to adjudicate cases, such as a Federal holiday. Therefore, a surge in applications may coincide with a period when USCIS staff have substantially less than 15 working days to receive and adjudicate a petition with premium processing. In the past, there have been instances when USCIS was unable to adjudicate all the petitions for which petitioners requested premium processing within the 15-calendar day timeframe. This led USCIS to refund the premium processing fee for petitions that were not adjudicated within 15 calendar days and to temporarily suspend premium processing service. DHS believes that extending the premium processing timeframe from 15 calendar days to 15 business days will allow USCIS adequate time to take adjudicative action on petitions and will provide petitioners with a consistent and predictable experience.

DHS understands that sometimes a petitioning employer needs USCIS to take quick adjudicative action. DHS appreciates that some regular petitioners for foreign workers have built in the current 15-calendar day processing into their planning for projects and we have fully considered the impacts on such firms in making this change. As stated in the proposed rule and Regulatory Impact Analysis, DHS believes that changing from calendar days to business days may reduce the need for USCIS to suspend premium processing for applications and petitions during peak seasons, and thus impacts only a very small number of applications and petitions whose Form I–907, Request for Premium Processing Service, could not be processed within the 15-calendar day timeframe. This may permit USCIS to offer premium processing to more applicants and petitioning businesses each year. The change will only increase the maximum time USCIS has to complete the adjudication, and the average time for well-prepared requests may not increase as a result. However, DHS believes the possibility that a petitioner requesting premium

processing service may need to wait a few additional days for adjudicative action is a small cost to impose for being able to expand premium processing to more requests and reduce the likelihood of a refund or for future suspensions of premium processing service.

*Comment:* Commenters stated that premium processing should be expanded. A commenter recommended USCIS expand it to all applications across all categories. Other commenters recommended extending it to the following benefit requests:

• Form I–526 petitions.
• Form I–485 (asylum/refugee based).
• EADs and Form I–765 filings.
• Asylum seekers, to receive an interview and adjudication in a shorter period.
• Family-based immigration cases and all employment authorization applications.
• Naturalization interviews to recover costs.

*Response:* USCIS is working to expand premium processing services to all categories of Form I–539, Application to Extend/Change Nonimmigrant Status, and Form I–765, Application for Employment Authorization, by the end of FY 2025. *See* 87 FR 18227, 18228, 18235 (Mar. 30, 2022). In March 2023, USCIS began accepting premium processing requests for some students who had a pending Form I–765.[219] In June 2023, USCIS announced it would expand premium processing to some categories of Form I–539.[220] USCIS may expand premium processing service to other form types in future rulemakings. However, USCIS is also working to reduce processing times without the need for an additional premium processing service fee. *See* section III.D.4 of this preamble and 88 FR 402, 529–530 (Jan. 4, 2023). DHS has made no changes based on these comments.

**e. Adjusting Fees for Inflation, Proposed 8 CFR 106.2(c)**

*Comment:* Commenters discussed adjusting fees for inflation and the DHS proposed rule to codify the authority at 8 CFR 106.2(d) to increase fees using the

Consumer Price Index (CPI–U). Commenters wrote:

• While some fees need to increase due to normal inflation, there is no reason that applications should increase so significantly.
• Fees should not be raised more than the current rate of inflation or cost-of-living.
• The fee increases should be tied to 7 percent inflation instead of the proposed increases.
• USCIS should not use inflation to further increase fees before 2025.
• USCIS should reconsider automatically increasing fees based on inflation.
• Increasing the fee regularly establishes a "moving target" for applicants and imposes a financial burden on low-income, survivor applicants, and applicants in need of assistance.
• They supported a mechanism to allow for nominal increases in fees in between the biennial fee reviews.
• Adjusting for inflation can provide more predictable and moderate fee increases than those included in the proposed rule.
• Because total inflation since January 2016 was 26.28 percent. Any fee with an increase less than this amount is operating at a relative discount.
• Providing for regular fee increases would remove consideration of "ability to pay" in fee setting.
• Regular fee increases would decrease USCIS' incentive to reduce the immigration backlog and improve administrative efficiency.

*Response:* After reviewing the public comments on the subject, DHS has decided to retain a provision that provides that DHS may adjust IEFA non-premium fees by the rate of inflation. *See* 88 FR 402, 516–517 (Jan. 4, 2023); 8 CFR 106.2(d). While the CFO Act, 31 U.S.C. 901–03, requires agencies to review their fees on a biennial basis and recommend changes, fee changes can be delayed by competing policy consideration and other deliberative matters, whereas a fee increase that is based on a precise mathematical inflation formula might avoid such a delay. An adjustment that is based on inflation would allow DHS to keep USCIS IEFA revenue in pace with costs more regularly. In addition, if DHS can adjust USCIS fees on a timelier basis to match inflation, the fees will be more incremental and more predictable than larger increases every few years. 88 FR 402, 516. As a result, regular inflation rate increases using a basic mathematical calculation are expected to result in smoother fee increases and less sticker shock from new fee rules.

---

[218] DHS did not propose any changes in premium processing fees. Premium processing fees were established by law and in other rulemakings. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u); Implementation of the Emergency Stopgap USCIS Stabilization Act, 87 FR 18227 (Mar. 30, 2022); Adjustment to Premium Processing Fees, 88 FR 89539 (Dec. 28, 2023).

[219] *See* USCIS, USCIS Announces Premium Processing: New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions, available at *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/updated Mar. 6, 2023).

[220] *See* USCIS, USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status, available at *https:// www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last reviewed/updated 6/12/2023).

Nevertheless, in this final rule, DHS is revising proposed 8 CFR 106.2(d)(2) to provide that the inflation adjustment would affect all fees that are not set by statute. In response to comments that requested DHS adjust fees by inflation instead of using the proposed fees, DHS decided to limit some fees to the lesser of either the proposed fee or the current fee adjusted for inflation. *See* section II.C. Changes from the Proposed Rule of this preamble.

2. Employment and Immigrant Investors

a. Asylum Program Fee

*Comment:* Many commenters submitted comments on the Asylum Program Fee and proposed 8 CFR 106.2(c)(13). Some commenters supported the proposed Asylum Program Fee and funding the asylum process through employment petition fees. Other commenters stated that, although this fee will apply to Form I–129 petitions for H–2A workers, it does not raise the same concerns that they included in their comment letter about worker mobility because it applies equally to all applications and therefore does not disincentivize hiring of H–2A workers already in the United States. Other commenters suggesting that the proposed fee be increased to eliminate the backlogs in other humanitarian fee-exempt programs. Others wrote that they supported cost shifting provided that a greater share is covered by employer petitions as a means of ensuring asylum seekers and other vulnerable groups are not harmed by DHS's funding structure, by shifting asylum costs to those applicants who are more likely to be in a financial position to afford to pay. Other commenters supported the proposed Asylum Program Fee until congressional funding is secured for such purposes.

Most commenters on the subject wrote that they opposed the proposed Asylum Program Fee. DHS summarizes the commenters as follows:

• Raising fees on employment-based applicants to subsidize asylum applicants would be unfair.

• The surcharge would exacerbate the costs borne by employers, nonprofits, and small businesses in particular, while decreasing demand for employment-based visas.

• The fee would have a chilling or deterrent effect on employment stakeholders regarding hiring foreign nationals.

• The decrease in demand for employment-based visas could lead to less revenue, or a lack of funding necessary to adjudicate benefits and facilitate a long-term solution to case backlogs.

• The negative impact of the Asylum Program Fee on businesses would have a downstream impact on consumers that they cannot afford while battling historic inflation.''

• International touring artists and American businesses are still recovering from the worldwide pandemic shutdown and cannot bear the burden of funding of the asylum program.

• The proposed fee is well beyond a cost-of-living increase or even today's inflation rate.

• The fee would have a disproportionately onerous effect on small businesses who are seeking relief from the financially detrimental effects of COVID–19 followed by a labor shortage.

• Employers or petitioners should not bear the burden for a program that is not connected or relevant to employment benefits.

• The asylum program should not be funded by taxing or on the backs of other petitioners who are already struggling financially, such as agricultural employers, academic institutions, or international musicians. Commenters assert that USCIS acknowledges this issue in the rule, but it fails to offer a response to this anticipated objection, while the primary reason for charging separate fees for Forms I–485, I–765, and I–131 in adjustment of status applications is to prevent this same imbalance.

• DHS should adopt a consistent approach and properly weigh the burden of the cost of the asylum program on I–129 and I–140 petitioners. Instead, they seem to allow for petitioners to bear the cost of unrelated programs only when it means an increase to USCIS revenue.

• This proposal will have a materially adverse and arguably discriminatory impact on petitioners that are already bearing the largest burden in the proposed rule while USCIS is suffering unprecedented processing backlogs and inefficiencies. Asking these stakeholders to incur significant additional costs for unrelated services without any commitment to address their specific concerns sends a message of disregard that will discourage businesses from developing or expanding operations in the United States.

• USCIS arguing that it is necessary to impose this surcharge so that USCIS can limit fee increases on other filings provides requester's no real option and either requires paying the Asylum Program Fee or not filing a petition.

• USCIS could request appropriated funds or use premium processing program revenue to subsidize much of

the $425 million cost of the asylum program.

• Subjecting H–2A petitioners to multiple asylum program fees for a single job order is not fair or reasonable.

• These additional fees will significantly impact IT and engineering staffing firms, which file Form I–129 for extensions of stay or status changes like a new job site more often than other employers. This commenter provided detailed information about the cost impacts to its members.

• Employers with limited resources will be less likely to cover visa fees for a worker's spouse or dependents, affecting a foreign worker's willingness or ability to take on employment in the United States.

• Such drastic increases in fees may suppress wage growth in industries where foreign workers are legitimately needed to supplement the domestic workforce. Employers who hire foreign workers should incur higher costs than they would for hiring U.S. workers, but these costs should come in the form of higher pay proffered to both U.S. and foreign workers and not petition fees.

• The proposal does not consider religious entities, many of which are small with limited budgets. Nonprofits and religious organizations provide significant benefit to the United States and asylees through outreach programs.

• Many health care providers and hospitals in medically underserved areas will not be able to sponsor needed physicians, nurses, and other health care professionals.

• The Asylum Program Fee would have a negative impact on the higher education community. Many universities with limited funds would no longer be able to sponsor specialized international researchers and other diverse faculty and staff.

• The ability to pay principle does not recognize the impact that an extra fee will have on U.S. higher education and related nonprofits with limited funding, such as public funds and specific, limited research grants.

• Because of the financial ecosystem of some institutes of higher education, they would be challenged by the fee, because of funding inequity between departments, lack of large endowments or high tuition rates, and reliance on Federal grants. A university is composed of numerous, smaller departments and units, each of which has a budget and is responsible for bearing the cost of immigration filings for its international employees.

• The Asylum Program Fee would penalize employers for utilizing legal avenues to hire foreign workers.

• Regarding H–2A employers:

○ There are already more employment costs for H–2A employers from increased administration and costs to achieve compliance.

○ Employers hiring H–2A workers are already facing increased input costs with no commensurate market price increase from purchasers.

○ The Asylum Program Fee would be penalizing small and seasonal American businesses for trying to hire a legal workforce.

○ Farmers in the H–2A program face extraordinary cost and burdens for the requirements of a legal guest worker program.

○ The fact that many individuals living in foreign lands see the land of the free and the home of the brave as a safe and secure shelter to the too often unspeakable horror they may face at home is a testament to the beacon that the United States represents. However, taxing agricultural employers to fund the mechanisms for providing secure shelter is arbitrary and capricious and an abuse of discretion.

○ The DHS statement that H–2A employers have more ability to pay is arbitrary and completely inaccurate according to the U.S. Department of Agriculture (USDA) Economic Research Service report on Farm Household Well-being. Many households report negative farm income.

○ USDA data on the H–2A program indicates that the Asylum Program Fee increases the financial burden of the employer with no ability to recover these added costs.

○ Questioning the factual basis behind the ability to pay presumption, a commenter said many of the other visa classifications included in the proposed rule are for voluntary travel, but the use of H–2A workers is a necessary part of business.

○ The outlook for 2023 does not indicate that farmers will have income to pay additional fees.

○ USCIS should not put the U.S. food supply in jeopardy by requiring agricultural worker visas to include an unnecessary asylum fee.

○ Farm employers are having a very difficult time staying in business and this fee will create a financial burden upon the H–2A program that they rely upon for most of their labor resource.

○ The Asylum Program Fee is unreasonable and overburdensome and USCIS must realize that the program is what keeps labor-intensive agriculture afloat.

• When an international artist applies for an O or P visa they plan on touring and therefore are not reimbursed for visa costs. This change signals to the international arts community that their contribution to cultural influence is not welcome.

• The Asylum Program Fee would have a potentially discriminatory impact on beneficiaries from countries with severely backlogged immigrant visa quotas, such as India. The fee would have a disparate impact on individuals who are on the path to lawful permanent residence but are required to maintain nonimmigrant status for decades because of the lack of immigrant visa availability. Other commenters expressed similar concerns about the disparate treatment of foreign nationals, and their employers, from certain countries that are disproportionately affected by the visa backlog, like India and China, as employers must file more Form I–129 and Form I–140 petitions for the employee than for similarly situated individuals in order to maintain their status while they wait for an immigrant visa to become available.

• The Asylum Program Fee shows a lack of understanding and reinforces the stereotype that the arts, extraordinary ability, and business communities can afford such fee increases.

• The fee should be spread across all the applications, not just targeting what DHS seems to view as the most lucrative applications.

• DHS' ability to pay determination is conclusory and unsubstantiated, and therefore primed to be found arbitrary and capricious.

• The rule does not transfer the cost of asylum to all other fee-paying applicants but to business petitioners only, with the greatest impact on small businesses, nonprofits, start-ups, and religious organizations while also ignoring the ability to pay methodology announced in this rule.

• While it may be true that businesses in general have more ability to pay compared to asylum seekers, this fee increase is disproportionately burdensome to U.S. small and seasonal businesses.

• The Asylum Program Fee is arbitrary because it is based on an estimate, and USCIS failed to provide actual historical data on asylum claims and associated workload that the public can evaluate to determine if DHS's proposed fee amount and allocation of the fee on certain petition filers is warranted or reasonable.

• The added burden on business immigration applicants is unjustified because USCIS relied on a statistically insignificant sample to measure ability-to-pay. Forms I–129 and I–140 account for just 10 percent of fee-paying receipts, but would bear the burden of asylum case processing, along with other fee increases.

• Table 11 of the proposed rule provides estimated costs for FY 2022 and FY 2023; the proposed rule does not explain how it arrived at its total estimated costs since there is no list of itemized expenses. Without specific program cost data, the commenter said the $600 fee has no basis in fact.

• USCIS' Small Entity Analysis (SEA) of nonprofit institutions relies on unsupported assumptions about the burden to nonprofits and is silent on the benefits of nonprofits to the nation. The analysis does not fully discuss the impact on distributing asylum fees across all application types, so it is difficult to accept these assumptions without reviewing the impact for comparison.

• Until DHS acknowledges the distinction between for profit and nonprofit employers, DHS is asking nonprofit employers to fund what the U.S. Congress is unwilling to do.

• There is no justification for asking employers to pay an additional fee that may curb H–2B program participation at the very time that the administration seeks to expand pathways to legal employment for migrants. The premise that H–2B employers can absorb the cost of funding the asylum program and other processing activities is entirely flawed. The rule assumes, without evidence, that all H–2B employers have an ability to pay fees that are 200 percent higher than the current fees.

• There is no evidence in the record showing that companies currently using H–1B visas can more easily afford this fee than family-based petitioners.

• The fee does not take into consideration true ability to pay, particularly for H–1B employers.

• USCIS regulations require some Form I–129 fees, like the H–1B fees, to be paid by the employer rather than the beneficiary, so there is no leeway for the affected parties to negotiate among themselves on who is better able to pay the fee.

• Imposing a flat fee tied solely to asylum seekers suggests that such individuals are the sole factor in USCIS' challenges in processing employment-based applications, rather than challenges that USCIS faces because of policies instituted under the prior administration, increased volumes of applications, delays in staffing and staff retention, legislative inaction, and longstanding backlogs.

• It is unfair to impose costs on employers and workers that USCIS creates, as well as unnecessary since USCIS can reduce costs at any time.

**6284** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

• DHS should direct the limited pool of USCIS fees toward core adjudicative functions needed to keep it more efficient, rather than toward a flawed new asylum program whose truncated timeline deprives asylum seekers of a fair opportunity to present their cases.

• Congress did not provide DHS with the discretion to set fees based on the agency's apparent political agenda.

• Imposing a $600 surcharge on Form I–129 and Form I–140 petitioners is the wrong approach to funding this important national obligation, as well as an extraordinary and unparalleled overreach of authority by USCIS. Section 286(m) of the INA provides a statutory basis to recover the costs of the asylum program by setting adjudication and naturalization fees at a level sufficient to recover the costs of the asylum program, but never in the history of USCIS has there been a decision to impose a surcharge on a discrete group of filers to fund services to another discrete and distinct group of filers. This is a distortion of the statute and the ability to pay concept, upon which USCIS primarily justifies this decision.

• This fee is a gross overreach of authority and USCIS has never imposed a surcharge as significant as this upon a distinct population of stakeholders for the sole benefit of another group of stakeholders.

• The INA does not authorize the creation of new fee categories, nor is there ambiguity in INA section 286, 8 U.S.C. 1356 that would allow such a regulatory invention. Creation of the new proposed fee category would require a statutory authority, and the agency is on a path that courts will likely find impermissible.

• The current $30–$85 charges per asylum applicant paid into IEFA is all that is allowed per statute. Depositing fees into IEFA does not convert it to funds to adjudicate asylum cases. Using IEFA to adjudicate asylum will overwhelm the purpose of the IEFA.

• The fee is unjustified and USCIS should secure congressional funding to efficiently adjudicate asylum applications.

• The costs for any asylum program should be paid out of the Treasury instead of using a rulemaking undertaken by the Executive Branch.

• Congressional appropriations with a reduction in enforcement, detention, and deterrence costs, should be the priority.

Commenters suggested that the following entities be exempted from an Asylum Program Fee:

• U.S. higher education and related nonprofits (*e.g.,* cap-exempt employers)

following the same logic of exempting U.S. higher education and related nonprofit organizations from the ACWIA Training Fee.

• Government research organizations, also consistent with precedent afforded by ACWIA.

• Nonprofit entities.

• Religious organizations.

• Individual employers that cannot pay the fee.

• Certain small businesses.

• Healthcare facilities.

• H–2A and H–2B petitioners.

Other commenters suggested alternatives to the proposed Asylum Program Fee. Those commenters wrote:

• Instead of the proposed $600 fee, a small stipend from asylum cases ($50 per case) would seem conscionable to help with the border crisis. Another commenter suggested a $200 fee.

• USCIS should distribute the asylum fee across all types of fee payers.

• The Asylum Program Fee should be based on the size or revenue of the employer filing the petition.

• The asylum program should be supplemented by businesses that operate within the multimillion-dollar range.

• USCIS should use a sliding scale for employers based on net revenues and/or number of employees.

• USCIS should instead charge a fee to asylum applicants or their sponsors. Asylum seekers hire lawyers and other services to arrive in the United States, so they should be able to afford an additional fee.

• USCIS should adopt a model like the H–1B program, whereby asylum seekers would be required to obtain a U.S. sponsor, who would pay a small application or program fee.

• Many commenters suggested that, if the Asylum Program Fee must remain, employers should only be required to pay the fee one time.

• The Asylum Program Fee should only be assessed for the initial petition filed by an employer, like the Fraud Prevention and Detection and Public Law 114–113 fees, and not subsequent transfers, extensions, renewals, and changes of status.

• A $100 fee could be assessed once, like the H–1B Prevention and Detection Fee.

• The fee could be structured like the Fraud Fee, required once at a higher education institution when filing Form I–129.

• USCIS should implement a premium processing program for asylum interviews to recover case processing costs, reduced asylum division staffing, or fees for non-USCIS-certified immigration attorneys representing

asylum seekers or use premium processing fees to finance free asylum applications.

• USCIS should consider other funds in addressing asylum processing including premium processing fees.

• USCIS should take a more balanced approach to accommodate the costs of humanitarian processing, including by (1) considering projections for premium processing revenues in setting fees, and (2) expanding opportunities for employment authorization for migrants and asylum seekers on parole in the United States.

• The asylum fee should be divided between the Forms I–129, I–485, N–400, and Form I–90, which would decrease the Asylum Program Fee per application/petition to a more manageable $155.

• USCIS could implement a registration fee to provide an initial stream of revenue, like the H–1B Registration Fee.

• If asylum filings will be increasing, USCIS should consider implementing an "after you have been settled" filing fee for all asylum cases (like the Form I–751 for marriage-based Green Card cases) to recoup some of the costs from asylees.

To mitigate the impact of the Asylum Program Fee on small entities commenters suggested the following alternatives:

• USCIS should also reduce the amount for other small business entities like how the ACWIA fee is currently assessed.

• DHS should establish tiers of fee pricing based on revenue, number of employees, type of visa, or number of workers per petition.

• DHS should limit the frequency of asylum fee payments by small entities (*e.g.,* to once or twice per employee for H–1B, or once per worker per season for H–2A/H–2B). Meaning, the Asylum Program Fee would only apply to initial petitions. It would not apply to amendments or extensions using Form I–129, similar to ACWIA.

• DHS should establish a lower tier of fee pricing for small nonprofits, exempt nonprofits, or limit the frequency of paying this fee to once per worker category.

• USCIS should phase-in the new fee over at least 2–3 years.

• Should the number of people seeking asylum suddenly drop the NPRM indicates the Department will nonetheless continue to collect the fees. The Department instead should describe what fee will be charged based on different asylum workload levels.

• DHS should explain how the estimated costs were calculated and

how the potential impact on the employer community was assessed, including the potential of fees to decrease should the system become less burdened by asylum seekers. Commenters asserted that USCIS must explain how it has calculated this fee amount and inform the business community of the cadence and metrics by which the agency will review the fee, to determine whether it should decrease over a prescribed period, exist in perpetuity, or sunset on a specific date, or end if the asylum crisis ends.

• Regarding USCIS' statement that it will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and any funding appropriated for it when DHS develops its final fee rule, commenters supported the agency's humanitarian mission and encouraged USCIS to provide additional details regarding how it will determine the final fee amount and any future adjustments.

• Because DHS will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and funding appropriated for it in the final fee rule, the fee should be delayed until the funding is more certain and can be recalculated.

• USCIS should consider reviewing this fee more frequently than the others because of the variability of migration patterns and whether the fee should be distributed more uniformly amongst those seeking immigration benefits.

• The USCIS fee schedule proposal was published several weeks before DHS and DOJ published its Circumvention of Lawful Pathways proposed rule, thus USCIS' assumptions regarding future asylee flows will need to be reconsidered.

*Response:* As explained in the proposed rule, DHS calculated the Asylum Program Fee by dividing estimated annual costs by forecasted workload. *See* 88 FR 402, 451–454 (Jan. 4, 2023). The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay using USCIS' standard costing and fee calculation methodologies. *See* 88 FR 402, 451 (Jan. 4, 2023). DHS did not propose this Asylum Program Fee without having carefully considered its implications and effects, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023).

By law, USCIS is required to conduct a fee review every 2 years. Therefore, all fees, including the Asylum Program Fee, will be reviewed biennially. DHS is authorized to set fees at a level that will ensure full recovery of the costs of

providing services, including the costs of services provided without charge to asylum applicants or other immigrants. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Consistent with other immigration benefit requests where fees are waived or held below the cost of providing the service, the cost of the Asylum Program has always been incorporated into and spread across other immigration benefit requests for which a fee is paid. DHS considered the impact of spreading the cost of the Asylum Program across various requests, including Forms I–485 and I–765. However, DHS decided to assign these costs only to Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, as explained in the proposed rule. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS requested $375.4 million in appropriated funding for USCIS asylum adjudications in FY 2023.[221] However, USCIS did not receive the funding. In the absence of appropriations, USCIS must fund the asylum program through fee revenue.

As explained in section II.C. Changes from Proposed Rule of this preamble, after considering the public comments, DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 full-time equivalent (FTE) employees.

USCIS considered the various concerns raised by commenters that suggested that the $600 Asylum Program Fee would cause indirect secondary, tertiary, and downstream economic impacts on many facets of the U.S. Examples cited by the commenters included exacerbating the effects on consumers of inflation and the COVID–19 pandemic, increasing costs for already unprofitable farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, exacerbating the plight of nationals of certain countries such as India and China, and generally writing that DHS failed to analyze the effects of the new fee. DHS has accounted for the direct costs of the Asylum Program fee, and our data indicates that the Asylum Program Fee will not have the deleterious effects on multiple parts of U.S. economy that the commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing

relief to nonprofits and small employers in this final rule.

*Comment:* Multiple commenters, including a business association and a professional association, suggested USCIS create tiered levels for different types of fees. For example, a business association recommended tiered fee levels for the proposed asylum fee where smaller companies would pay a lesser amount for the asylum fee. The association further proposed tiered asylum fees that would apply to more immigration benefit requests aside from Forms I–129 and I–140, thus not placing this cost burden entirely on the business community. Additionally, the commenter requested a set limit on the number of times an entity must pay the asylum program fee for a specific beneficiary.

*Response:* As explained elsewhere in this final rule, DHS creates lower fees for certain small employers and nonprofits in this rule. Businesses with 25 or fewer FTE employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Non-profits will pay $0. DHS carefully considered the implications and effects of the Asylum Program Fee, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023). As explained above and in the RIA, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. In this final rule, DHS implements lower fees for certain small businesses and nonprofits using Form I–129. DHS believes this tiered approach accommodates these commenter's concerns by offering lower fees for some small employers and nonprofits. DHS considered the suggestion but declines to limit the number of times an entity must pay the Asylum Program Fee for a specific beneficiary because determining if the fee exemption applied at intake would require a check of systems to determine if the beneficiary had a fee paid for them in the past, and that would delay intake and processing and add to USCIS cost.

**b. EB–5 Program and Fees (I–526/526E, I–829, I–956/956F/956G), Reform and Integrity Act (Not Related to Small Entities/RFA/Quantitative Impacts)**

*Comment:* Many commenters submitted comments on the EB–5 Program and fees. Some commenters expressed support for increasing the EB–5 investment visa's filing fee reasoning the fee hike could rule out unqualified investors as well as ensure integrity and quality in applicants to a highly demanded visa. Others disapproved of the investor filing fees

---

[221] DHS, Budget-in-Brief Fiscal Year 2023 at 77, available from *https://www.dhs.gov/publication/fy-2023-budget-brief* (last updated Mar. 28, 2022).

but wrote that the proposed increase in fees for Regional Centers is arguably reasonable given the due diligence requirements imposed by new laws.

Many commenters wrote that they did not support the proposed EB–5 program fees including Forms I–956, I–956G, I–526E, and I–829. Those comments are summarized as follows:

• The increase in fees for EB–5 visas would make legal immigration to the United States more difficult, particularly the ability for investors to sponsor temporary workers.

• The fee increases associated with the EB–5 Immigrant Investor categories would have a chilling effect on an invaluable, job-creating visa category and would not provide adequate assurances for improved service or shorter processing timelines.

• The proposed rule will cause EB–5 program related applicants to shoulder an unsustainably high financial burden that could threaten the reputation and longevity of the program.

• Stakeholders might support the proposed fee increases for the EB–5 program if they were accompanied by improved case processing times.

• USCIS does not anticipate using the additional fees to provide additional resources or staff for EB–5 program related filing despite exceptionally high processing times.

• Before modifying fees for EB–5 services, USCIS must first conduct a fee study compliant with statutory provisions of the Reform and Integrity Act. Because the fee study has not been conducted, the proposed EB–5 program fees in the rule are premature and should therefore be withdrawn from the final rule, and EB–5 program fees must be set at levels that ensure full cost recovery of only the costs of providing its services.

• The proposed increase is unjustified for Form I–829 because it does not require a considerable number of staff.

• USCIS should retain the fee on the Form I–829 for investors who have already filed their Form I–526 petitions because they had not budgeted for a 154 percent fee increase when deciding to permanently move to the United States.

• The proposed fee for the Form I–526 increased despite a reduction in the Form I–526 adjudication burden, and USCIS does not claim to track adjudication times on Form I–526.

• The idea that a higher fee for Form I–526 may reduce adjudication times is not supported by historical precedent. Processing times for EB–5 related filings have increased year after year since 2016, without measurable increases to productivity.

• USCIS should institute expedited processing, specifically, for the Form I–526 to reduce the legal burden on investors and to avoid delaying positive impacts to the economy.

• The proposed fee increases for Form I–526 and Form I–526E should only apply in cases where petitions can be processed within 12 years or the proposed fee for these forms should reduce by at least 50 percent.

• Because filing Form I–526E does not require adjudication of the underlying project, its fee should be lower than the fee for Form I–526.

• The proposed fee for the first time filing a Form I–956 would be excessive if USCIS cannot guarantee adjudication time will be less than a year.

• USCIS should make a distinction between a Form I–956 filed for the first time for a Regional Center designation and a Form I–956 filed for amendments such as reporting a name or ownership change. The proposed fee would be more understandable for new designations but would be excessive for amendments. Requiring Form I–956 for making amendments to Regional Center Designation and requiring annual renewal of designation status contribute to a heightened overall filing volume for such form.

• The proposed rule relies on inaccurate inputs and inappropriately forecasts a small number of incoming EB–5 receipts to cover the cost.

• Prior fee increases did not improve processing speeds; commenters are concerned that this increase would not augment staffing levels sufficiently to create any change.

• Delayed processing can cause investors to lose their investment; adjudication times should be 3–6 months for Form I–956 applications and 1–2 years for Forms I–526, I–526E, and I–829 petitions.

Some commenters wrote in support of the proposed EB–5 program fees or provided additional suggestions. Those comments are summarized as follows:

• The price increase should lead to improved efficiencies, such as processing timelines of less than one year. USCIS should hire more staff to accelerate processing and decisions on Form I–829.

• The increase for Form I–526 is a fair cost for the adjudication required the first time USCIS processes an EB–5 investment project.

• USCIS should publish reduced adjudication timelines for the Form I–526 given its proposed filing bifurcation and the proposed increase in its fee.

*Response:* DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee methodology as much as possible, and to avoid overuse of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

DHS disagrees with commenters who suggest that the EB–5 Reform and Integrity Act of 2022 precludes DHS from adjusting EB–5 program fees in this rule. As mentioned in the proposed rule and acknowledged by many commenters, the EB–5 Reform and Integrity Act of 2022 requires DHS to complete a fee study not later than 1 year after the date of the law's enactment; and then, not later than 60 days after the completion of the study, set fees for EB–5 related immigration benefit requests to recover the costs of providing such services and completing the adjudications, on average, within certain time frames. DHS realizes that the EB–5 Reform and Integrity Act of 2022 instructs DHS to complete the required fee study within one year, but that law requires a fee calculation method that is different from what DHS generally uses, *see* INA 286(m), 8 U.S.C. 1356(m), OMB Circular A–25 suggests, and most agencies follow. 88 FR 402, 471 (discussing full cost recovery and relevant guidance). In its fee rulemakings DHS has set USCIS immigration benefit requests generally with the goal of improving or achieving reasonable processing times, but not with the relatively short and precise processing times aspired to in the EB–5 Reform and Integrity Act of 2022. *See, e.g.,* 72 FR at 29858–59 (discussing USCIS plans to reduce processing times for certain request by twenty percent by the end of FY 2009); 81 FR at 26910 (discussing the rule's goal to achieve processing times that are in line with the commitments in the FY 2007 Fee Rule). The EB–5 Reform and Integrity Act of 2022, on the other hand, requires DHS to set the fees at a level that will provide USCIS with the resources necessary to process EB–5 benefit

requests within certain time parameters, that are generally shorter than what USCIS currently achieves. The EB–5 Reform and Integrity Act of 2022 also differs from INA section 286(m), 8 U.S.C. 1356(m), in that it limits the costs of free or discounted USCIS immigration benefit requests that can be transferred or funded by the EB–5 fees.[222] DHS is actively engaged in the work required to determine the fees under that law. Meanwhile, DHS has not adjusted its fees since 2016, is obligated under the CFO Act to review is fees and is authorized by the INA to set fees to recover USCIS costs.

As DHS stated in the proposed rule, the EB–5 Reform and Integrity Act of 2022 provides that the fee study required by 106(a) does not require DHS to adjust USCIS fees in the interim. *See* 88 FR 402, 420, 508–511 (Jan. 4, 2023); *see also* Public Law 117–103, sec. 106(f). No legislative history exists to explain how that provision should be read in conjunction with section 106(a). More importantly, the statute does not *prohibit* the modification of fees under INA 286(m), 8 U.S.C. 1356(m), prior to the completion of the fee study and rulemaking contemplated by section 106. Stated differently, by suggesting that the section need not be construed to require modification of the fees before completion of the study, section 106(f) necessarily implies that fees may be modified (*i.e.*, what is not required is permitted). Therefore, DHS interprets the provision to mean that the provisions of the law are not effective until DHS takes the steps it requires to be implemented; and that any requirement for DHS to set fees to achieve the processing time goals under section 106(b) of the EB–5 Reform and Integrity Act of 2022 are dependent on completion of the fee study and rulemaking contemplated by section 106. A different interpretation would prevent DHS from adjusting fees to recover the costs of normal processing until the fee study and rulemaking under section 106 is complete, a result that would be inconsistent with the broad purpose of section 106, which is to accelerate adjudications. Accordingly, DHS interprets "[N]otwithstanding" in section 106(b) of the EB–5 Reform and Integrity Act of 2022 to mean that section 106 requires DHS to establish fees to achieve the processing time goals set out in section 106(b), but that authority and its

separate study requirements exist separately from (or "notwithstanding") INA section 286(m), 8 U.S.C. 1356(m), and therefore do not preclude USCIS from instituting new EB–5 program fees while that effort is undertaken. The fees that DHS sets in accordance with section 106 will go beyond normal cost recovery and effectively supersede section 286(m), 1356(m), to achieve processing time goals. Meanwhile, DHS establishes new fees for the EB–5 program forms in this rule using the same full cost recovery model used to calculate EB–5 fees since the program's inception and not the parameters required by the EB–5 Reform and Integrity Act of 2022. *See* 88 FR 402, 420 (Jan. 4, 2023). Accordingly, DHS will collect the fees established in this rule under INA sec. 286(m), 8 U.S.C. 1356(m), for the EB–5 program until the fees established under section 106(a) of the EB–5 Reform and Integrity Act of 2022 are codified and take effect.

Regarding concerns raised about processing times, DHS appreciates that USCIS is experiencing considerable backlogs in the processing of EB–5 related forms. USCIS is committed to adjudicate cases and reduce processing times, and USCIS continues to look for efficiencies in the EB–5 program, especially now as we implement the new legislation efficiently and effectively. Across our agency, we are working diligently to fill vacancies and IPO is no exception. While many of these positions remain unfilled due to attrition, prior budget constraints, and the prior hiring freeze, we are working to increase our staffing levels to support the mission. It is important to note too that in addition to adjudicating cases, IPO requires the time and subject matter expertise of our adjudications staff to address other necessary efforts, including implementation of the new legislation, litigation response, FOIA requests, public inquiries, and others.

USCIS understands the desire to receive prompt service, and the agency strives to provide the best level of service possible. USCIS also recognizes that lengthy processing times place a strain on EB–5 investors who are awaiting the adjudication of their immigration benefits. DHS proposed higher fees to fund additional USCIS staff generally and for EB–5 workload specifically, and other reasons identified in the proposed rule. *See, e.g.,* 88 FR 402, 417–419, 509–510 (Jan. 4, 2023). USCIS cannot commit to across-the-board processing time reductions as adjudications involve case-by-case review of complex applications and related supplementary information.

*Comment:* Commenters expressed the following concerns with EB–5 completion rates:

• USCIS' completion rates for processes related to the EB–5 classification are based on questionable data and are an inaccurate measure for proposing fees.

• USCIS officials have admitted under oath that the time to adjudicate Form I–526 is not actually tracked and instead based on assumed metrics, which calls into question many other adjudication figures cited by USCIS.

• Even assuming these adjudication figures are available and accurate, it is difficult to justify such a substantial increase in completion rates from FY 2017 to FY 2023 for some forms, including Forms I–526 and I–829, given no substantial changes in EB–5 regulations across that period.

• Commenters expressed confusion about the methodology used to determine the proposed fee increase for Form I–526 filings, given recent procedural changes and the lack of adjudication tracking for this form.

• A commenter asked the basis for the adjudication time for Form I–526 increasing by 240 percent, considering the reduced adjudication burdens after the shift of work from Form I–526 to other forms.

• A commenter stated that the manhours the proposed rule stated that officers spent on each application is nonsensical and that, if accurate, there would be no backlog.

• USCIS has not provided any statistics on the adjudication of Form I–956 and it is difficult to justify a completion rate significantly higher than the rate for Form I–924.

• USCIS should pursue a comprehensive study of the overall fee structure for EB–5 forms.

*Response:* DHS strives to make its fee schedules equitable, balancing the ability to pay and beneficiary pays principles, using the best information available. DHS is not required to precisely calculate the amount of time required to process all requests or the burden of one immigration benefit request or program relative to the entire realm of USCIS responsibilities. However, DHS follows OMB Circular A–25 to the extent possible and uses subject-matter expertise to estimate completion rates for the EB–5 program forms. The completion rates are estimates developed by Office of Performance Quality, using data and subject matter expert input from the Field Operations Directorate's (FOD's) IPO. Additionally, USCIS estimated the completion rates of the EB–5 forms by extrapolating from similarly complex

---

[222] EB–5 Reform and Integrity Act of 2022, Pub. L. 117–103, section 106(c)(1) (providing that the EB–5 fees may exceed the levels determined necessary in an amount equal to the amount paid by all other fee-paying requests to cover the costs of requests charged no or reduced fees).

**6288** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

adjudications, and by surveying personnel who were experts on EB–5 request processing. While INA section 286(m), 8 U.S.C. 1356(m), requires USCIS fees to be based on the total costs for USCIS to carry out adjudication and naturalization services, which could be affected by the amount of time required to process requests, it does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or perceived market rates and values. DHS has investigated the concerns of the commenters and believes the estimates used to determine the fees for Forms I–526, I–829, I–956, and other EB–5 workloads are reasonable.

c. H–1B Registration Fee

Numerous commenters expressed support for the proposed fee increase for H–1B registration. Commenters wrote:

• Employers should be willing to sponsor an employee with any reasonable fee.

• The fee increase would give more opportunities to talented foreign students in STEM fields; assist small and mid-size U.S. companies; and improve USCIS efficiencies and adjudicator wellbeing.

• The proposed increase of the H–1B pre-registration fee would help address ongoing H–1B lottery abuse, whereby companies can submit multiple, frivolous registrations for a single candidate.

• With H–1B lottery abuse and a 57-percent increase in registrations from 2020 to 2023, the fee increase would cover USCIS' operation costs and help to avoid false cap registrations. False registrations harm the legal rights of other applicants who are hired through standard processes and who later apply for the H–1B visa to continue working for the same company.

• The increased registration fee would discourage companies from enrolling potential employees in the lottery before they accept an offer or start working, which disadvantages existing employees.

• USCIS should raise the fee further to mitigate abuse and other related concerns to stop lottery abuse, suggesting fees ranging from $500 to $3,000.

• The increase in the H–1B fee to $215 is too low because if an employer sincerely wants to recruit highly skilled foreign nationals, they should be willing to pay more. A higher fee would fund USCIS operations and reduce abusive petitions.

• General agreement with the fee increase, but the proposed fee would not help to mitigate abuse.

• USCIS should consider duplicate registrations based on SSNs or passport IDs.

Multiple commenters expressed opposition to the proposed fee increase for H–1B pre-registration. Those comments are summarized as follows:

• The rule would negatively impact employers and small businesses.

• The registration fee would disincentivize registration, creating a chilling effect on recruitment and stifling technological innovation.

• The increase in filing fees would create an unequal system whereby small businesses would be unable to hire and retain H–1B workers, unlike Fortune 500 companies that can afford the higher fees.

• USCIS should foster a healthy and even-handed competition between small and large businesses that are interested in hiring H–1B workers.

• USCIS should consider a smaller, 100-percent increase to $20 instead of the proposed increase.

• The registration fee increase is unfair, unreasonable, or unjustified. The electronic registration program was designed to reduce costs and increase efficiencies in the H–1B process. If USCIS knew soon after the program's creation that it was not sufficiently recuperating costs, it should not have proceeded with implementation.

• The fee increase is in direct opposition to the justifications DHS lists in the **Federal Register** for the changes to the fee structure. The commenters provided the following reasoning:

○ The proposal is contrary to law and fails to meet the intended goal of the electronic H–1B registration program to eliminate unnecessary costs and mitigate the inefficient use of both government and petitioner resources.

○ The proposed H–1B registration fee is contrary to the implementing regulation, which stated that the registration fee was to be nominal. The proposed fee defies this stated goal and exceeds the amount necessary to run the annual selection process. The proposed fee is unlawful.

○ Increasing user fees rarely deter alleged misuse of a program, and instead adds unnecessary burdens to the legitimate use of the H–1B program. The fee would not likely dissuade any who may attempt to increase the odds, but instead would price some companies out of the market.

○ The proposed 2,050-percent increase to the H–1B registration fee is one of the only processing fees that does not cover processing, as DHS

specifically confirms that there are no costs associated with adjudicating an H–1B registration.

○ The proposal would not reduce barriers and promote accessibility but would amount to an unjustifiable mechanism for generating revenue without providing benefits to most companies paying the fee.

• The fee is unjustifiable and arbitrary, and DHS should conduct its promised review to calculate H–1B registration costs, beyond the vague existing references to costs to inform the public and conduct management and oversight before raising registration fees by more than 2,000 percent.

• DHS should provide additional transparency regarding how it arrives at a final fee amount and how it will allocate the additional funding to benefit the H–1B registration process.

• USCIS should reference activity costs for a) informing the public, and b) management and oversight with more specificity, and clarify the justification for the $129 component of the H–1B fee allocated to Management and Oversight.

• The registration fee is only slightly less than substantive Form I–129 ($147) and Form N–400 ($150) fees despite this being an automated, computer-generated selection with no adjudication involved.

• No fee should be required for informing the public and for management and oversight, because the activity is conducted online at effectively zero cost or only occurs during a short period of the year. Even if fees are required, the fees should drop when the number of registrations increases. The fee is unjustified and should be rescinded.

• USCIS is taking a narrow view in presuming employers can pay the increased registration fee because the H–1B registration system is a lottery and increasing the fee by over 2,000 percent would be unfair.

• USCIS has not considered the cumulative costs to employers or the actual budgets of a company. While companies may appear to have a high net income, the fee increase is substantial enough to affect whether a company can employ or continue to employ a foreign national.

• The proposed fee would not eliminate multiple registrations; USCIS should consider disregarding H–1B registrations from different organizations filed for the same candidate.

• USCIS should raise the registration fee for each additional entry, suggesting $200 for the first entry, $400 for the second, $800 for the third, and $1,600 for the fourth.

• Petitioners engaging in lottery abuse should face penalties.

• USCIS should not use fees as a mechanism to deter multiple entries in the H–1B lottery pool, because a higher fee would not assist in this effort. Instead, USCIS should keep fees low to encourage employers to sponsor international talent and place a cap on multiple (two to three) entries with the same passport number.

• USCIS should evaluate this fee carefully to promote fairness and efficiency in the lottery system. If selected, the applicant's registration fee should be counted toward the Form I–129 filing fee to reduce burdens for small businesses.

• USCIS must revise the *my.uscis.gov* website to allow registrants, applicants, and petitioners to pay filing fees directly and submit filings prepared by attorneys. The new fee coupled with the current system would yield unworkable results, such as credit card company penalties that would block large-scale registrations and unduly prejudice potential beneficiaries.

• USCIS should clarify the timeline for implementing the proposed H–1B registration fee, because it is unclear if the fee would go into effect before the next H–1B cap lottery.

• Reliance on application fees such as the one for the H–1B registration generates perverse incentives. Because the H–1B lottery is random, many large firms sponsor more migrants than they need, and these factors cause the H–1B visa program to subsidize other areas of the immigration process. Because USCIS lacks the funding to promptly review applications, that distortion is tolerable since the H–1B visas are profitable.

*Response:* When DHS established the current $10 fee, USCIS lacked sufficient data to precisely estimate the costs of the registration process, but we implemented the $10 fee as a measure to provide an initial stream of revenue to fund part of the costs to USCIS of operating the registration program. *See* 84 FR 60307 (Nov. 8, 2019). The electronic registration program has made the H–1B selection process more efficient, both for H–1B petitioners and USCIS, by no longer requiring the preparation and submission of Form I–129 for all petitioners before they knew it would be adjudicated. Form I–129 now need only be filed by petitioners with selected registrations who wish to petition for an H–1B worker. The implementing regulation specifically anticipated that this temporary, nominal fee would ultimately increase based on new data, stating, "Following implementation of the registration fee provided for in this rule, USCIS will

gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery." *See* 84 FR 888 (Jan. 31, 2019); *see also* 84 FR 60307, 60309 (Nov. 8, 2019). Given that $10 was an intentionally low and temporary fee, DHS disagrees with some commenters' characterization that the proposed fee should not increase substantially. DHS clearly explained in the proposed rule that the proposed $215 H–1B registration fee was based on empirical cost estimates, as anticipated in the implementing regulation. *See* 88 FR 402, 500–501 (Jan. 4, 2023). DHS based the proposed fee on the activity costs for two activities: Inform the Public and Management and Oversight. *Id.* The fee review supporting documentation provides definitions of these activities. Inform the Public involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives. As explained in the supporting documentation, Inform the Public includes the offices responsible for public affairs, legislative affairs, and customer service at USCIS. Management and Oversight involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals. The proposed rule stated that the registration selection was automated, but that does not mean that USCIS incurs no costs in operating and maintaining the system or that registration fees should not fund some of the costs of services provided without charge as permitted by the INA.

As explained in the proposed rule, DHS is authorized to fund all USCIS operating costs and absent other funding mechanisms we must adjust fees to maintain an adequate level of USCIS service. *See* 88 FR 402, 417–419 (Jan. 4, 2023). DHS does not establish the H–1B Registration Fee at $215 without having carefully considered the implications and effects of such an increase. DHS understands that the beneficiaries of H–1B petitions help the U.S. lead the world in science, technology, and innovation. At the same time, DHS is charged with establishing a fee schedule that will fund USCIS using authorized, available, and appropriate means. Faced with the imperative of adequately funding USCIS to ensure the fair and efficient functioning of the legal immigration system, DHS has determined that increasing the H–1B

Registration Fee to recover the costs of the registration system is the option that minimizes burden for the most individuals and entities overall.

DHS has limited data with which to estimate the impact of the increased H–1B Registration Fee upon the number of H–1B registrations. The Price Elasticity section of this rule's RIA shows H–1B petitioners did not reduce requests for H–1B workers in response to the 2016 Fee Rule's 42-percent increase of the Form I–129 fee from $325 to $460. In October of 2021, Congress increased the fee for premium processing of H–1B petitions from $1,440 to $2,500. In reports to Congress submitted before and after the $1,060 (74 percent) increase, although suspension of premium processing may have impacted pre-FY 2020 levels, USCIS observes the percentage of initial Form I–129 H–1B petitions requesting premium processing increased from 37 percent to 47 percent in the first year of higher fees and to 53 percent in FY 2022.[223] In addition to premium processing, the median H–1B registrant demonstrates the continued ability to pay for the assistance of an accredited representative as well as median annual compensation to beneficiaries of $118,000 in FY 2022 and benefits. In contrast to affordability concerns raised in public comments, USCIS observes the quantity of registrants and registrations increasing, including a constant share of small entities (as measured across SEAs for the FY10, FY16, FY20 and current rule), despite these cost increases that would be applicable when filing the subsequent petition. The price elasticity section of the RIA further describes that the registration fee increase comprises less than a 1-percent increase in the total cost to an H–1B employer, relative to the total costs of compensation, benefits, technical assistance, and premium processing fees. Lastly, the Final Regulatory Flexibility Act for this rule (and the separate more detailed SEA) describes the impacts on Forms I–129 for all classifications, I–140, I–360, I–910, genealogy forms, and immigrant investor forms in this final rule to minimize the magnitude and scope of adverse impacts to small entities, including the many small businesses

---

[223] *See* Characteristics of H–1B Specialty Occupation Workers FY22 Annual Report to Congress (Mar. 13, 2023), at *https://www.uscis.gov/sites/default/files/document/data/OLA_Signed_H-1B_Characteristics_Congressional_Report_FY2022.pdf* and FY20 Annual Report to Congress (Feb. 17, 2021), at *https://www.uscis.gov/sites/default/files/document/reports/Characteristics_of_Specialty_Occupation_Workers_H-1B_Fiscal_Year_2020.pdf* (last accessed Aug. 30, 2023).

that register and petition for H–1B workers.

A comment about fee increases "chilling demand" for H–1B workers cited since-published NBER research showing that winning the opportunity to file a cap-subject H–1B petition was associated with improved chances of winning a patent, improved chances of obtaining additional external funding, and improved chances of a successful initial public offering over the subsequent five years.[224] USCIS reviewed this research and agrees the findings underscore that the H–1B lottery facilitates employer access to highly valued foreign workers. The study's impacts are measured against many firms that registered for H–1B workers and were selected zero times. In conducting the Small Entity Analysis (SEA) for this final rule, USCIS observed that while some Small Business Administration (SBA)-classified small entities file hundreds of H–1B registrations to be selected to petition for a cap-subject visa, more than ten times that number had only one or two H–1B petitions. While it is not possible to know how each small entity may respond to the combined price increase of the H–1B Registration Fee, Form I–129 H–1B Fees, and the Asylum Program Fee, any such price response might reasonably be most pronounced among those small entities with the greatest number of valid H–1B workers and registrations. A direct impact of any reduction to the number of registrations submitted would be reducing the number of registrations that any one potential petitioner would need to submit for that petitioner's registrations to be selected and for them to be able to hire the same quantities of H–1B workers. Thus, small businesses that submit fewer H–1B registrations would see marginally increased likelihood of their registration being selected in the lottery, and roughly 85 percent of H–1B petitioners are also small entities.

DHS emphasizes that the H–1B Registration Fee is set at $215 to recover the costs of USCIS administering the legal immigration system. As stated in the proposed rule and multiple sections of this final rule, DHS appreciates the significant contributions of immigrants to the U.S., and this final rule is not intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and

contribute to the economy. DHS considered the comments that suggested that the $215 fee would result in far fewer registrations being submitted and those that wrote that the fee should be much higher than $215 to deter fraud. As stated in the proposed rule, USCIS's ability to generate the necessary revenue through this rule depends on the volumes of forms that pay fees not falling short of the total projected. 88 FR 402, 528 (Jan. 4, 2023). DHS notes the estimated burden of H–1B registration is 0.5 hours plus 0.17 hours for account creation and that this burden is 4.67 hours less than the full petition burden of 2.34 hours for Form I–129, 2 hours for the H Classification Supplement, and 1 hour for the H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement. Although this rule's RIA depicts a baseline with unchanged fees, DHS recognizes many employers seek assistance from outsourced attorneys who, at $196.85 per hour loaded wage, would cost $919 more if the random lottery selections were made on full petitions rather than registrations. Future fee rules will reconsider the H–1B registration fee and other rulemakings may consider operational changes to the H–1B registration process. In this final rule, DHS has decided to establish the H–1B Registration fee at a level needed to fund the costs of the registration system, but not at such a high dollar amount to present serious risk of disincentivizing valid registrations or chilling valid participation in the H–1B program, including by small businesses.

**d. I–129 Nonimmigrant Workers, Separate Fees (Not Related to Asylum Program Fee)**

*Comment:* Many commenters expressed general opposition to Form I–129 fee increases. Commenters wrote:

• USCIS should reconsider the proposed Form I–129 fees.

• The fee increases would have an adverse effect on cultural life in the United States, higher education institutions, nonprofits, non-major-league athletes, the agricultural community, highly skilled foreign workers and U.S. employers.

• The increase and separation of Form I–129 fees would compound confusion and lead to rejections.

• The proposed separation of forms, processes, and fees based on nonimmigrant classifications was overly complicated and USCIS should instead simplify these processes.

• They opposed all separate Form I–129 fee increases of over 7 percent, because employment-based immigration

offers a substantial source of revenue for the United States.

• The many changes proposed for Form I–129 petitions would have dire consequences for large and small businesses and firms, would deter recruitment of foreign talent, repel entrepreneurship, exacerbate labor shortages, lead to retaliatory actions from other countries, and amount to millions of dollars in additional costs for multiple large multinational firms.

• The fee increases are unprecedented with significant disparities among categories. For example, comments questioned the difference between H–1B and TN fees.

• H–2A and H–2B completion rates are based on the first six months of FY 2021, and it is not clear whether this is based on actual data collected or estimates of future projections.

• The proposed fees would disproportionately affect the hiring of Mexican citizens, for whom TN petitions are mandatory.

• The increased fees would incentivize employers to challenge RFEs and denials and litigate in Federal court to bypass the appeals process.

• Given the magnitude of the proposed fee increases, USCIS should consider whether it is accurately calculating the funding needed to adjudicate immigration benefit requests without imposing an unreasonable burden on employers.

*Response:* In this rule, DHS implements the fees for all types of Form I–129, as described in the proposed rule. *See* 88 FR 402, 495–500 (Jan. 4, 2023). DHS proposed different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries.

The fees established by this rule better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. Part of the proposed fee was based on the adjudication hours and completion rates for various Form I–129 categories. As explained in the proposed rule, USCIS does not have separate completion rates for the TN classification. *See* 88 FR 402, 499 (Jan. 4, 2023). Currently, USCIS adjudicators report TN hours on these classifications in a catch-all Form I–129 category. *Id.* However, USCIS adjudicators report hours for H–1B petitions separately. As such, DHS proposed separate fees for TN applications than H–1B petitions using different hours information, despite commenters' statements on the

[224] *See* Dimmock, S.G, et al (2021) Give Me Your Tired, Your Poor, Your High-Skilled Labor: H–1B Lottery Outcomes and Entrepreneurial Success. Management Science 68(9):6950–6970. *https://doi.org/10.1287/mnsc.2021.4152.*

similarities between the two workloads. If USCIS has more detailed information to further distinguish between Form I–129 categories in the future, then DHS may use it in establishing fees in subsequent fee rules. As explained in the proposed rule, USCIS began tracking Form I–129 adjudication hours by petitions for H–2A and H–2B petitions involving named or unnamed beneficiaries in FY 2021. *See* FR 402, 498 (Jan. 4, 2023). The FY 2022/2023 fee review considered the first 6 months of that data because it was the most recent available at the time of the FY 2022/2023 fee review. *Id.* DHS believes this 6 months of data is still reasonable to use. Future fee reviews will use a full year of information if it is available.

DHS does not believe that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners. However, DHS is implementing lower Form I–129 fees for small employers and nonprofits, as described in section II. C. *See* 8 CFR 106.2(a)(3). These lower fees should alleviate some of the concerns raised by commenters, such as the effect on nonprofits and small businesses. We broadly address concerns on other petitioners, such as agricultural or cultural employers, in section IV.B.2.e of this preamble.

Should a petitioner wish to appeal a decision after a denial, they may file Form I–290B. As explained in the proposed rule, DHS limited the proposed fee for Form I–290B, consistent with past fee rules, 88 FR 402, 450–451, and adopts the proposed fee for Form I–290B in this final rule.

DHS does not separate Form I–129 into different forms for different classifications in this rule. DHS disagrees with commenters that separate Form I–129 fees will create confusion and delays. Some petitioners or applicants already pay different fee amounts based on whether statutory fees apply or the services they choose. In some cases, certain petitioners must pay statutory fees in addition to a base filing fee. For example, several statutory fees exist for H and L nonimmigrant workers.[225] H–2B and R nonimmigrant classifications have a different premium processing fee from all other nonimmigrant classifications. USCIS provides several optional checklists to help navigate the specific requirements

of some nonimmigrant classifications. DHS makes no changes to this rule based on these comments.

*Comment:* Commenters raised the following concerns with the proposed fees and their effects on small businesses and nonprofits:

• The unnecessary and unjustified proposal would disproportionately increase economic burdens on small businesses.

• Small organizations and nonprofits that cannot absorb the fee increases would ultimately limit petitions submitted on behalf of foreign workers, which they said would result in the loss of a critical resource across various industries and decrease U.S. competitiveness.

• USCIS should reduce the proposed fees for ACWIA petitioners so that public institutions can better allocate limited funds to STEM professionals needed for patient care or health care research.

• USCIS should consider a tiered fee for the Form I–129 based on business size as a solution in the absence of comprehensive immigration reforms.

○ The increased fee for H–2A petitions with named beneficiaries makes sense, but USCIS should keep the fee for unnamed beneficiaries at $460 per petition.

Commenters wrote that USCIS should exempt Form I–129 petitions from a fee for the following types of petitioners:

• Governmental research organizations.
• Nonprofit institutions.
• Academic institutions.
• Religious institutions.
• Cap-exempt employers.
• Nonprofit organizations.
• Higher education institutions.
• Small businesses.
• Agricultural employers.
• If the beneficiary is a currently on a student work visa, an artist, or a performer.

*Response:* In response to these comments, DHS implements lower Form I–129 fees for qualifying petitioners. *See* section II.C of this preamble. To qualify for the lower fee, petitioners must be a nonprofit organization or a small employer of 25 or fewer FTE employees. *See new* 8 CFR 106.1(f). In many cases, these lower I–129 fees are approximately half of the proposed fee. *See* 8 CFR 106.2(a)(3). In some cases, DHS maintains the current $460 fee. *Id.* These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule. DHS has reviewed the comments and has decided not to provide any fee exemptions for Form I–129 because the petitioner would generally need to have

the capacity to employ the beneficiary and pay any applicable wages and benefits at the time of their admission or upon a grant of status based on the petition approval. Meaning, if an employer cannot afford USCIS fees, then it is unlikely that they would be able to afford to employ the beneficiary of their petition.

DHS considered the volume and content of the comments on this subject, many pointing out the cultural, economic, and scientific benefits that inure to the United States from the ability of institutions being able to hire talented foreign nationals to assist them in their pursuits. DHS agrees with the commenters and has decided that some accommodation should be made for Form I–129 petitioners, such as cultural or scientific employers, that may have very little revenue or profit or lack budgetary flexibility such that they would benefit from some relief from the increased fees. Therefore, DHS has decided to provide a reduced Form I–129 fee for small employers and nonprofits. DHS broadly addresses other comments from employers in section IV.B.2.e of this preamble.

*Comment:* Many commenters expressed opposition to the proposal to cap the number of beneficiaries on Form I–129 petitions at 25 beneficiaries. Comments in opposition to the proposal to limit petitions to 25 beneficiaries stated the following:

• They would have a serious adverse effect on O and P filings, increase the work of USCIS officers, and raising questions as to how O–2 and P petitions should be filed and will be adjudicated, based on the regulatory requirements.

• This proposal was based on an audit of H–2 petitions, and there is no evidence to suggest that this proposed rule would be equitable for the O or P classification or those who have only a few beneficiaries.

• The proposal would require numerous petitions for large ensembles, imposing additional financial burdens on nonprofits and performing arts groups.

• The proposed cap would negatively impact Australia's creative imports to the United States.

• The increase in fees would have a chilling effect on growers' ability to afford to transfer workers as allowed by the regulation.

• The proposal would penalize employers who have developed longstanding relationships with H–2 workers.

• Employers with few beneficiaries or employers that submit multiple petitions, would subsidize the costs of

---

[225] Various statutory fees apply to H and L nonimmigrants. For more information on the fees and statutory authority, see USCIS, ''H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker,'' available at *https://www.uscis.gov/forms/all-forms/h-and-l-filing-fees-for-form-i-129-petition-for-a-nonimmigrant-worker (last updated/reviewed Feb. 2, 2018).*

large employers with many beneficiaries.

• In the O–2 and P context, groups must include more beneficiaries than what may be needed for U.S. performances, and theatrical groups cannot perform with a limited subset of performers or crew.

• Limiting petitions to 25 named beneficiaries does not align with DHS's goal of accurately reflecting differing burdens of adjudication and adjudicating petitions more effectively. It is less efficient for USCIS to review multiple petitions, as opposed to reviewing one.

• The proposal generates unnecessary burdens and confusion for entities to file multiple petitions.

• The need to file multiple petitions would create complications with respect to meeting the requirement that 75 percent of the members of a group applying for a P–1B visa must have belonged to the group for at least 1 year.

• Confusion could lead to mistakes when applying to the Department of State due to individuals using the incorrect receipt number.

• A large group of individuals covered by various petitions may not be able to identify which petition number applies to them upon arriving at a consular office to obtain their visas.

• The proposal introduces increased risk of inconsistent adjudication and delays, and would create logistical problems such as one employer's petitions moving at different speeds or with different outcomes.

• This raises various questions around union consultations and principal petitions, and the increased separation of petitions from the principal petition could result in more RFEs.

• This is arbitrary and the fee structure impermissibly discriminates against employers with fewer workers on named petitions.

• DHS failed to provide the public with data regarding the number of names typically listed on named petitions.

• DHS has not afforded the public sufficient opportunity to comment on the rationale for limiting petitions to 25 named beneficiaries.

• USCIS should continue to process P petitions based on current practices, and instead consider an audit of the O and P classification to better determine the need or feasibility of increased fees or separation of petitions based on beneficiary numbers.

• USCIS should use a sliding scale for petitions with more than 40 beneficiaries.

• USCIS should determine a fee structure that allows all named beneficiaries to remain on a single petition, such as a cost per beneficiary or per group fee structure.

• Instead of capping petitions at 25 beneficiaries, USCIS should require a higher fee for petitions involving more than 25 workers on a per-worker basis as Department of Labor (DOL) does for H–2A fees.

• The new fees are arbitrary and capricious because it would have perverse consequences for returning workers who have been previously vetted by USCIS while petitioners recruiting new unnamed workers would pay lower USCIS fees to hire workers that were not previously vetted.

• USCIS is creating a substantial incentive for employers to submit petitions with unnamed beneficiaries.

• USCIS' reference to background checks as justification for higher fees for named beneficiaries is misplaced because visa applicants are already subject to background checks at consulates abroad.

• DHS fails to explain why it performs background checks on named beneficiaries listed in a petition and fails to consider the alternative to rely on DOS to conduct background checks or take public comment on such a proposal.

• Charging fees based on whether H–2A beneficiaries are named or unnamed is not necessary to address the disparity in resources required for processing petitions because unnamed beneficiaries are less resource intensive for USCIS to process.

• A disparity in government resources needed should not be dispositive in setting fees.

• The proposed fee structure already adopts the OIG's recommended solution to the resource disparity and places a cap on the number of beneficiaries that an employer may name in a single petition.

• USCIS could tie the fee to the number of workers requested—whether named or unnamed—to ensure small employers do not bear a disproportionate share of processing costs imposed by large employers.

• The proposed separation of fees for unnamed beneficiaries is unfair to H–2B users who are requesting returning workers through the H–2B supplemental cap allocation process that USCIS created, which requires naming workers.

*Response:* DHS disagrees with the commenters that stated a limit on the number of named beneficiaries would harm most petitioners. As explained in the proposed rule, a report by the DHS

Office of Inspector General (OIG) reviewed whether the fee structure associated with the filing of H–2 petitions is equitable and effective.[226] It made three recommendations. DHS adopts the first recommendation by implementing fees based on the time necessary to adjudication a petition. DHS adopts the second recommendation by implementing separate fees for petitions with named workers. We explained the cost differences in the proposed rule, how petitioners filing petitions with low named beneficiary counts subsidize the cost of petitioners filing petitions with high named beneficiary counts, and how the limit on the number of named beneficiaries results in a more equitable fee schedule. 88 FR 402, 498 (Jan. 4, 2023). We explained that USCIS would perform background checks on named workers. DHS agrees with commenters that DOS will perform background checks for the programs that DOS administers, in accordance with DOS's own policies. As explained in the proposed rule, DHS is expanding the limit to named workers to other Form I–129 petitions, such as the O classification, to make the fee structure more equitable like the OIG report recommended for H–2 petitions. 88 FR 402, 498–499.

DHS declines to implement a fee per named worker as an alternative to the 25 named beneficiary limit, as some commenters suggested. Creating and maintaining such as system would be administratively burdensome. DHS does not require additional per beneficiary fees for other multi-beneficiary benefit requests, such as Form I–539. Such a system would complicate intake and adjudication by requiring USCIS to determine the correct fee was paid for the number of beneficiaries requested.

Regarding the assertion that it is unfair to H–2B petitioners for returning workers through the H–2B supplemental cap allocation process to require naming beneficiaries in the supplemental process, naming beneficiaries on petitions has been required under the statutory cap exemption that was last in effect for FY 2016. Subsequent H–2B supplemental caps have permitted returning workers to be requested as unnamed beneficiaries in all iterations that have included this requirement, with eligibility of such workers determined by DOS in the visa application process. Thus, the limit on named beneficiaries in this rule will not

---

[226] DHS OIG, ''H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors'' (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf*.

have the effect the commenter suggested it will.

Commenters did not provide data to refute that petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. As shown in the RIA for this final rule, many petitions with named beneficiaries request 1–25 named beneficiaries. For example, 99.7 percent of O petitions from FY 2018 to FY 2022 requested 1–25 named beneficiaries. In the same timeframe, 98 percent P petitions requested 1–25 named beneficiaries. Meaning, the vast majority of these petitioners will only need to file one petition despite the limit on the named beneficiaries implemented in this rule. No changes were made based on these comments, except for the small employer discounts discussed earlier in this preamble. See section II.C. Changes from the Proposed Rule.

*Comment:* Many commenters in opposition to the proposal to limit petitions to 25 beneficiaries suggested policy or operational changes. Commenters stated the following:

• USCIS should create an online beneficiary submission option on a secure site where the petitioner would list each beneficiary's information and upon submission of the full list, would receive a confirmation page included with the petition filed with USCIS.

• DHS should review whether it is necessary to conduct a background check of named beneficiaries on every petition, given that in every extension or transfer request the named beneficiaries will have already cleared a background check and been admitted to the United States.

• If USCIS raises the fees for named workers, it must stop unnecessarily requiring naming in the supplemental process.

• USCIS should automatically approve unnamed petitions without a fee, and not raise fees for named beneficiaries, which would save employers time and money, preserve agency resources, and reduce the usual H–2 filing fees.

• USCIS should require DOL to certify H–2A and H–2B recurring jobs for up to 3 years to provide more visas under the H–2B annual cap, reduce unauthorized immigration, and foster employment and economic growth.

• The proposed fee changes for named beneficiaries would hinder H–2 worker mobility by discouraging U.S. employers from hiring H–2 workers already present in the United States and seeking to change employers. A 2015–2017 analysis of human trafficking on temporary work visas, a Farmworker

Justice report on worker abuse, and a survey of returned H–2A workers in Mexico, indicate that this lack of mobility would amplify existing power imbalances between employers and workers and lead to coercion, intimidation, legal violations, trafficking, and forced labor.

• USCIS should abandon its proposal to increase the Form I–129 fee for named beneficiaries to benefit H–2 workers by empowering them to leave unhealthy or illegal work environments and incentivize H–2 employers to provide competitive working conditions and wages.

• The lack of worker mobility is a core flaw of the H–2A program by tying workers to a single employer, and the proposed rule would create another obstacle for workers seeking other employment in the United States.

*Response:* DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through future guidance or rulemaking. For example, DHS proposed changes to H–2 program which may address some comments on worker mobility, if adopted in a future final rule. *See* 88 FR 65040 (Sept. 20, 2023). However, DHS declines to make any of these H–2-specific policy and procedure changes in this final fee rule. USCIS's fee study determined the agency's costs of processing petitions for named H–2 workers are greater than the costs of processing petitions for unnamed H–2 workers. While comments allege that studies indicated a causal link between DHS filing fees, lack of mobility and abuse, USCIS reviewed these studies and found that they contain no specific references to the fees set in this rule. While worker violations, including serious reports of trafficking of H–2 workers do occur, neither DHS nor the commenters can prescribe here what improvements in worker mobility reasonably would be achieved per dollar of subsidized named H–2 fee.

(1) H–1B Classification

*Comment:* Multiple commenters expressed general opposition to the proposed H–1B fee increases, with many citing impacts to U.S. companies, workers, and the economy. Commenters stated that increases in the H–1B fee would be detrimental to various U.S. employers, such as educational institutions, health care institutions, and technology companies limiting their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important

workers, thereby stifling innovation. Commenters wrote:

• The fee increase for H–1B visas would make legal immigration more difficult.

• The increased filing fees for H–1B visas would result in dire consequences for thousands of international students seeking employment in the United States and discourage small firms from hiring individuals on F–1 visas.

• USCIS should exclude petitions for H–1B workers from the proposed fee increases altogether, because high processing and legal fees make it difficult for applicants to find new employers.

• USCIS should further increase H–1B fees because H–1B jobs are generally much higher paying jobs than the H–2A or H–2B and are for a longer duration.

• USCIS should waive the H–1B requirement for individuals with an approved Form I–140 petition.

• USCIS should raise the cap on H–1B visas to increase revenue.

*Response:* DHS acknowledges that a higher fee may affect certain employers from hiring H–1B workers, but we have analyzed the impacts of the new fees (RIA and SEA) and there is no evidence that the H–1B fees in this rule are increased to the extent that U.S. industries and the U.S. economy may lose some the skilled workforce this program provides.[227] DHS acknowledges that some petitioners may incur additional legal fees. The economic analysis does not describe every immigrant's situation. Rather, DHS presents our best estimates of the effect of the rule. As stated earlier, USCIS is almost entirely fee funded, meaning that tax revenues from the salaries of H–1B workers do not indirectly provide funding for USCIS. As such, DHS sets USCIS fees without consideration for tax revenues from H–1B workers. In any event, an adjustment in immigration and naturalization benefit request fees is necessary because USCIS cannot maintain adequate service levels, at its current level of spending, without lasting impacts on operations. The new fee schedule was calculated by benefit request, as explained elsewhere. As explained throughout this preamble, DHS exercises its discretionary authority to set fees for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to

---

[227] *See* USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https:// www.regulations.gov/document/USCIS-2021-0010-0031; see also* USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https:// www.regulations.gov/document/USCIS-2021-0010-0033.*

the requestor and to USCIS. The price elasticity analysis for Form I–129 indicated that after the last fee increase, I–129 volumes increased when the fee increased and remained around the same level in the following years. While counterintuitive to conventional theory that quantities demanded decrease in response to price increases, DHS believes this data supports that H–1B petitioners will be willing to pay the higher fees set in this rule.

In this final rule, for nonprofits and businesses with 25 or fewer FTE employees (including any affiliates and subsidiaries) filing Form I–129 for the applicable nonimmigrant classification, DHS is setting the fee at either the current $460 fee or half of the new fee whichever is higher. *See* 8 CFR 106.2(a)(3)(i).

DHS declines to make the other changes suggested by these commenters.

*Comment:* Some commenters expressed support for the proposed H–1B fee increases. Commenters wrote:

• They supported the proposed increase in H–1B filing fees because the proposed fee increase would help USCIS process cases faster and hire more employees.

• The fee increase would be nominal relative to applicants' salaries, and any additional expense would not be noticeable as it would be spread over the duration of the visa status.

*Response:* DHS appreciates that some commenters support the proposed fees. DHS agrees with commenters that the fee increases may allow USCIS to hire more adjudicators. DHS believes that the final fees for H–1B petitions should remain affordable for employers.

(2) H–2 Classifications

*Comment:* Commenters stated that fee increases would particularly impact farms that rely on the H–2A program. Commenters stated:

• The fee will have a negative impact on agricultural employers, the food supply system, future generations of farmers, small businesses and hinder the ability of employers to move forward with capital improvements and hire additional workers.

• The H–2A fee increases fees above the pay that applicants receive for their labor.

• The significant added costs for H–2A workers in the rule would jeopardize the sustainability of U.S. farms and ranches.

• The 1,470-percent increase in fees is a cost agricultural employers would never be able to recover.

• Agriculture continues to absorb unpredictable costs outside of their control, including those associated with inflation, input costs, and depressed farm income. According to USDA data, compared to 2022, labor costs in 2023 will rise by 7 percent, and farm and ranch production expenses are expected to rise by 4 percent–24 percent and 18 percent higher than a decade ago, respectively.

*Response:* DHS understands the need for nonimmigrant workers to meet seasonal or agricultural demands, or both, in the United States and is mindful of the costs for employers involved in doing so. DHS appreciated the important role of farmers and ranches in our food supply system. However, the commenters did not supply any data to quantify how increased fees will jeopardize the U.S. food supply system for future generations of farmers and ranchers. As such, the filing fee for unnamed H–2A workers will be increasing from $460 to $530 per petition (15 percent increase from current fee) and the filing fee for named H–2A workers will be increasing from $460 to $1,090 per petition (137 percent increase from current fee), with a maximum of 25 named workers per each H–2A petition. The change in these filing fees, as provided in this final rule, is consistent with the proposed rule. A report by the DHS OIG [228] reviewed whether the fee structure associated with the filing of H–2 petitions is equitable and effective, and recommended separate fees for petitions with named workers, which, due to the need to verify eligibility of individually named workers, is more costly to USCIS than the costs associated with adjudicating petitions filed on behalf of unnamed workers. However, after considering the comments on the proposed rule, DHS has decided to provide lower fees to accommodate petitioners with 25 or fewer employees and nonprofits, as explained elsewhere in this rule. *See new* 8 CFR 106.1(f). Depending on the nonimmigrant classification for which it is filed, Form I–129 fees will be the proposed fee, $460, or half of the proposed fee. *See* 8 CFR 106.2(a)(3). These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule.

*Comment:* Additional comments on the H–2A and H–2B fee increases are as follows:

○ The proposed H–2B fee increases would price travel businesses out of the program entirely and employers would abandon the program due to increasing complexity and burdens. Thus, the program is likely to be used less, diminishing the fees collected by USCIS for visa services, as USCIS articulates in the proposed rule.

○ Based on a 2011 study on immigration and U.S. jobs, the proposed fees would reduce operations and services for businesses who cannot meet their workforce needs, particularly for seasonal operations. Instead of raising fees, USCIS should modernize its procedures for H–2B processing, adjudication, and job postings to reduce costs associated with compliance and application.

○ If small and seasonal businesses continue to experience rising costs, U.S. consumers would be left to foot the costs, leading to more inflation.

*Response:* DHS' prepared a price elasticity analysis for both the proposed and final rules and placed it in this rule's docket for the public to review and comment on. That analysis indicates that the proposed fees in the rule may not reduce program participation or affect an H–2B petitioner's ability to meet their workforce needs.[229] Nevertheless, to address the commenters' concerns, as described earlier in this rule, DHS implements lower fees for Form I–129 for petitioners with 25 or fewer employers and nonprofit organizations from what were in the proposed rule. *See new* 8 CFR 106.1(f) and 106.2(a)(3). DHS maintains the current fee for H–2A and H–2B petitions with only unnamed beneficiaries for petitioners with 25 or fewer employers and nonprofit organizations. *See* 8 CFR 106.2(a)(3)(iii) and 106.2(a)(3)(v).

DHS appreciates the suggestions of commenters for modernization and integration of the U.S. Department of Labor, DHS, and U.S. Department of State processes for requesting and issuing visas but most of the suggestions are not within DHS's statutory authority or this fee schedule rulemaking. DHS is working toward online filing for H–2B petitions, which we agree would benefit the agency and program users alike. However, such an enhancement may not result in the significant cost reductions that commenters assert will occur, particularly when it requires systems development and programming. When online filing becomes available for H–2B petitions, this rule provides that an "online filing discount" of $50 would generally apply. In addition, the

---

[228] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf*.

[229] See USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https://www.regulations.gov/document/USCIS-2021-0010-0031*. See also USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https://www.regulations.gov/document/USCIS-2021-0010-0033*.

reduced Form I–129 filing fee for small employers addresses most of the concerns about the impact on hospitality, amusement, recreation, and other seasonal industries.

*Comment:* Comments on the H–2 ABC model results were as follows:

• The estimates USCIS used for the H–2B program are vastly different than publicly available data. USCIS underestimated the H–2A and H–2B volumes. USCIS should update its ABC model with proper numbers and consider ways to reduce the cost of employers who are seeking to hire a legal workforce amid U.S. labor shortages. At a minimum, the H–2B fees should not exceed the revised ABC model's cost to perform the H–2B functions.

• The H–2A and H–2B program fees should not exceed the revised ABC model's cost.

*Response:* As explained in the proposed rule, DHS proposed H–2A and H–2B fees that are higher than the ABC model output to offset limited fee increases for some other benefits requests and workloads without fees. *See* 88 FR 402, 451 (Jan. 4, 2023).

Regarding comments on H–2A and H–2B volumes, USCIS used the best information available at the time of the fee review. The average annual estimates for the FY 2022/2023 Fee Review may be more or less than actual receipts in those years. The H–2B program may periodically receive supplemental visas based on joint rulemakings by DHS and DOL.[230] Those increases are temporary. As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting USCIS fees due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). While TPS designations and DACA are the largest such programs, the same rationale may apply to temporary increases in H–2B visas. DHS will evaluate these fees, volume forecasts and ABC model results in future fee reviews using all available data at that time.

### (3) L Classification

*Comment:* Commenters on the L-classification fee increases wrote the following:

• The fee increase for the L nonimmigrant worker petition cannot be

justified, because the same immigration benefit costs five times as much in the United States as it does in Canada. An increase of this magnitude runs contrary to the intent and spirit of free trade agreements between the United States and foreign countries.

• For intercompany transferees under the L–1 program, petitioners may prioritize applications administered by the DOS over USCIS.

• The burden of fee increases may divert limited resources of small- to medium-sized companies away from research and development initiatives, job growth, and other investments.

• They questioned whether the fee increase for L–1 petitions would allow USCIS to render decisions within 30 days in alignment with INA section 214(c)(2)(C), or whether petitioners would have to pay a premium processing fee to have petitions adjudicated within "a reasonable amount of time."

• USCIS should partner with CBP to return to allowing L–1 extensions at the port of entry for Canadian citizens. Before 2019, Canadian citizens could obtain a renewed L–1 at a U.S. port of entry, but CBP stopped processing such applications after a policy change by DHS. Reverting to the policy of allowing CBP to handle such applications would reduce the volume of Form I–129 applications.

*Response:* DHS disagrees with commenters that it did not provide justification for the proposed fee for L petitions using Form I–129. DHS provided the rationale in the proposed rule. *See* 88 FR 402, 495–496. DHS data relating to past fee increases and the small entity impact analysis that accompanies this rule indicate that the moderate fee increases in this rule will not appreciably affect the research, development, employee expansion, and investment budgets of the affected petitioners. *See* Small Entity Analysis, Section 4.C. DHS adjudicates all L-nonimmigrant petitions as expeditiously as possible, and the new fees provided in this rule will allow us to maintain or improve current service levels. In response to comments, DHS provides that L petitions filed by nonprofits and businesses with 25 or fewer employees will pay a $695 Form I–129 fee which is approximately half of the full fee of $1,385 for other L petitions. *See* 8 CFR 106.2(a)(3)(vi) and (ix). DHS has no control over the fees that Canada may charge for similar services. DHS appreciates the commenters' suggestions for policy and process improvements, such as partnering with CBP to allow L–1 extensions for Canadians. We fully considered them and may implement

them through future guidance or a rulemaking. DHS declines to make any other changes to this rule based on these comments.

### (4) O and P Classifications

Many commenters submitted comments about the increase in fees for O and P visas. The commenters oppose the fee increases, stating the following:

• The proposed fee increases would impose financial impacts on the arts, entertainment, and non-major-league sports industries while deterring companies and nonprofits from recruiting foreign talent to the United States.

• The proposed fee increases would deter foreign workers and artists from coming to the United States.

• The proposal would be mutually damaging to the United States and its foreign counterparts, as it would result in increased prices for U.S. audiences and foregone cultural, diplomatic, and economic opportunities. Furthermore, deterring foreign talent would stifle USCIS revenue.

• The negative ripple effect of the proposed fee increases would extend to U.S. cities and businesses that depend on the revenue generated by performances. Based on a 2021 study by Oxford Economics, in 2019 live entertainment supported 913,000 U.S. jobs and increased GDP by more than $130 billion. Furthermore, out-of-town visitors who attend local concerts spent more than $30 billion in U.S. communities in the same year.

• The proposal runs counter to the Administration's September 30, 2022, E.O. on "Promoting the Arts, the Humanities, and Museum and Library Services', which pledged to, "strengthen America's creative and cultural economy, including by enhancing and expanding opportunities for artists, humanities scholars, students, educators, and cultural heritage practitioners, as well as the museums, libraries, archives, historic sites, colleges and universities, and other institutions that support their work."

• The proposed rule contradicts the White House Fact Sheet issued on January 21, 2022, which states the belief that "one of America's greatest strengths is our ability to attract foreign talent."

• The proposed fee increases would be cruel, unjust, or arbitrary as they apply to orchestras and artists.

• The proposed fees would result in a system whereby O and P visas would only be accessible to the highest earners among international performers, venues, and performing arts companies.

• USCIS misapplied the ability-to-pay principle and fails to recognize that O

---

[230] *See, e.g.,* USCIS, USCIS Reaches H–2B Cap for Second Half of FY 2023 and Announces Filing Dates for the Second Half of FY 2023 Supplemental Visas, available from *https://www.uscis.gov/newsroom/alerts/uscis-reaches-h-2b-cap-for-second-half-of-fy-2023-and-announces-filing-dates-for-the-second-half-of* (last reviewed/updated Mar. 2, 2023).

and P petitioners are not necessarily employers, and in the case of the arts, the foreign national or group often pays the USCIS fees.

• The increased fees would be coupled with additional financial and administrative burdens, such as legal fees, RFEs, premium processing, and the cost of touring, itself. Furthermore, in some itinerary-based professions, the O visa is only granted for a short period, and extensions are costly.

• The O and P fee increases would result in a retaliatory increase in fees by other countries such as Canada and the U.K., generating negative impacts on U.S. artists and performers.

• The fees would limit the international touring industry with broad impacts on the U.S. economy, including decreased Federal and State tax revenue and decreased patronization of businesses by artists and audiences.

• The fee increases do not respect the USCIS-approved Reciprocal Exchange Agreement, covering the reciprocal exchange of U.S. and Canadian artists across respective borders.

• Most touring artists are engaged to perform in small venues, and the proposed increase in fees would block such venues from engaging international artists, leaving only larger employers, venues, and acts with access to cross-border diversity in programming.

• The proposed fees would compound the economic risks associated with inconsistent application processing times, uneven interpretation and implementation of the statute, and unwarranted requests for additional evidence.

• The increase in fees would compound the complexity of an already unpredictable petition process, making the process of petitioning for foreign artists beyond the reach of small- and mid-size organizations, which are most likely to serve communities of color and other marginalized groups.

• The Average Impact Percentage of the fee increase on P visa applicants was not realistically assessed and would likely exceed the estimate USCIS provided in Table 32 of the proposed rule. The Impact Percentage would represent 20.6 percent of the work completed with a P–2 visa. Unlike O visas, P visas are shorter in duration, generate less income, and are usually requested by self-employed artists or smaller organizations.

• The USCIS' SEA underestimated the impact of the proposed fees increase on nonprofit organizations and did not include any performing arts organization (North American Industry Classification System (NAICS) code 711).

• The impact on nonprofit performing arts organizations would be unconscionable should the fees increase to the proposed levels for O and P classifications coupled with the proposed cap on the number of beneficiaries on Form I–129 petitions.

Considering the above concerns related to O and P petition fees, several commenters offered alternatives to the proposed changes, including:

• Conduct an economic assessment of the impact of O and P petition fee increases on the music and entertainment industry before finalizing the rule.

• Postpone implementation of the new fees or give petitioners time to adapt to the change in fees to accommodate the time-sensitive nature of performing arts planning.

• Increase fees based on annual revenue, the number of visas requested, or the number of employees working at a petitioning company, so that larger companies would pay for the extra expenses covered by USCIS fees.

• Implement a tiered structure—based on revenue, length of stay, or venue size, or for individuals who are active in more lucrative industries—to increase accessibility and stability for lower-income applicants.

• Significantly reduce the proposed O and P visa fees such as at $500 or less or increase them by no more than $40 or 1 to 5 percent.

• USCIS should not assign ASVVP costs to H–3, P, or Q petitions when they do not require site visits.

• In the SEA, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by Employer Identification Number (EIN) and revenue. Only one entity had an EIN that overlapped in both samples; this was a large entity that submitted three Form I–129 petitions and a single Form I–140 petition. The commenter suggested this was not reflective of the experience of the commenter, which filed roughly 100 Form I–129 petitions, all for O and P status, between October 1, 2019, and September 30, 2020.

Numerous commenters objected to or expressed concern with the proposed fees and suggested corresponding policy or operational changes, including:

• U.S. stakeholders have already provided USCIS with detailed plans for improvements to USCIS processing of Form I–129 petitions for O and P visas, as outlined in its "Recommendations for Performing Arts Visa Policy."

• The unique nature of scheduling international guest artists requires that the visa process be efficient, affordable, and reliable so that U.S. audiences may experience artistic and cultural events.

Congress affirmed the time-sensitive nature of arts events when writing the 1991 Federal law regarding O and P visas, in which USCIS was instructed to process visas in 14 days.

• The requirement for P petitions that there be no gap in work of more than 1 month would require multiple filings, which further increases the fees paid by the foreign group to come to the United States. The maximum allowed gap of 5–6 months for O–1B petitions and a 1-year maximum classification period for P nonimmigrants would have a similar effect.

• USCIS should separate the P petition from the miscellaneous H–3, P, Q and R classifications, as the proposed combination includes 14 possible requested nonimmigrant classifications, 10 of which are P classifications. USCIS should separate the P classification for purposes of this proposal or add it to the O classification proposal.

• Keeping the O and P together, or separating the P classification out, would allow for better training of USCIS officers on the specific nuances of the O and P classifications given the similarities in the regulatory requirements for the two classifications (*i.e.,* advisory opinions from applicable union/labor organizations, agents as petitioners, etc.).

• Extend the 3-year authorized period of stay for O and P nonimmigrants to at least 5 years or lower processing fees in exchange for a shorter, 3-month validity period of stay for O an P nonimmigrants.

• Eliminate the unnecessary P visa requirement for Canadian musicians to save USCIS resources and mirror the Canadian policy for visiting U.S. musicians or adopt a system like the UK's Certificate of Sponsorship for performers from Visa Waiver Program countries.

• USCIS should retain information on file for those groups who tour the United States regularly to reduce the need to begin the visa application process anew each time.

• The United States should maintain and prolong the 48-month extension to the Interview Waiver Program, up to 4 years, to alleviate the burden of the visa process.

• USCIS' practice is to deny requests for expedited processing of O and P petitions, which leads to worthy organizations facing prohibitive and obscene filing fees.

• The proposed changes do not adequately address the underlying concerns related to USCIS processing of O and P petitions.

*Response:* DHS agrees with the commenters' views that the arts,

entertainment, and sports industries are vitally important and beneficial. However, DHS reiterates that the fees established in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. DHS does not intend to deter or unduly burden petitioners requesting workers in these, or other, industries but any preferential treatment provided to these petitioners is borne by other petitioners, applicants, and requestors.

USCIS conducted a comprehensive fee review and determined that its costs have increased considerably since its previous fee adjustment. As explained in the proposed rule, the fees for Form I–129 are calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. *See* 402, 495–500. At its current level of spending, USCIS cannot maintain adequate service levels without lasting impacts on operations. *See* 88 FR 402, 426–430, 528; *see also* section IV.D.4 of this preamble. Therefore, DHS needs to adjust fees. Nevertheless, after considering the comments from petitioners for O and P nonimmigrant workers who wrote that they are a small organization with few or no employees, or they are a nonprofit, DHS has decided to lower the fee for a Form I–129 and the Asylum Program Fee filed by either an employer with 25 or fewer employees or one that is a nonprofit entity. 8 CFR 106.2(a)(3) and 106.2(c)(13). As stated elsewhere in this rule, as with any free service or reduced fee provided in this rule, this change requires that DHS shift some of the costs of an employer with 25 or fewer employees or a nonprofit entity petitioning for O and P nonimmigrant workers to other applicants and petitioners.

DHS respectfully disagrees that an increase in fees contradicts the White House's January 21, 2022, Fact Sheet, would be mutually damaging to the United States and its foreign counterparts, or would lead to an increase in the complexities of the petition process. Nevertheless, the lower Form I–129 fees for small employers and nonprofits, as described earlier may alleviate this concern from some commenters.

DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through guidance or a future rulemaking.

(5) R Classification

*Comment:* Multiple commenters provided feedback in opposition to the proposed fee increases for R–1 workers. These commenters wrote:

• R–1 workers offer substantial benefits to the United States in the form of service, outreach, and diverse cultural perspectives and experiences. Considering existing financial barriers for R–1 workers, sponsoring religious organizations and nonprofits would struggle to retain these workers if the proposed fees were implemented.

• The proposed rule fails to recognize the unique role of clergy in society as essential workers and the impact that such fee increases would have on the ability of U.S. religious organizations to fill needed positions with foreign clergy. Based on data from the Bureau of Labor Statistics, 48 percent of U.S. clergy were at least 55 years old, and, between 2018 and 2016, growth in clergy employment opportunities would see an 8-percent growth.

• The fee increases for R–1 petitions would have a chilling effect on U.S. religious organizations and prevent them from carrying out their religious and social mission. The Religious Worker Visa Program is important for providing critical services and addressing the specific needs of ethnic groups, including the Hispanic, Asian, and African communities, as well as the needs of vulnerable populations. The program also assists religious organizations that face obstacles in using traditional employment-related categories, which historically have not fit their situations.

• The fees would disproportionately affect small religious organizations, parishes, and communities that share a charitable function in the United States.

• The proposal departs from prior practice by treating this category like other employment categories. The commenter wrote that fee adjustments for religious workers should weigh the nonprofit nature of the sponsor.

• USCIS should not increase the fee for R–1 visa petitions because the volume of R–1 petitions is low compared to other visa categories and the fee increase would not generate substantial revenue for USCIS but would hurt U.S. nonprofit religious organizations.

• USCIS grouped R–1 visas with the same increase in fees as E–2s (investors), P–1s (professional athletes and performers), and TNs (Mexican/Canadian professionals), but R–1 petitions are filed by nonprofit organizations on behalf of religious workers and neither the organizations nor workers can absorb the proposed increased costs.

• A 2- to 5-percent increase in R immigrant worker fees would be more understandable than the proposed increase from $460 to about $1,000.

*Response:* As explained in the proposed rule, DHS proposed a Form I–129 fee that included the cost of religious workers and other visa classifications. *See* 88 FR 402, 499 (Jan. 4, 2023). Past DHS rulemakings resulted in no decrease in the number of Form I–129 filings for any nonimmigrant classification, and our analysis for this rule indicates that the fees established will not result in any detectable effect on the number of petitioners who choose to petition for nonimmigrant religious workers. DHS has no data, and the commenters provide none, that supports their assertion that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners, churches, religious organizations, or small entities who wish to petition for a nonimmigrant religious worker. However, as many commenters noted, many petitioners for religious workers may be nonprofit organizations. Therefore, as explained more fully elsewhere in section II.C. of this preamble, after considering the comments, and, to alleviate any potential burden on nonprofit religious entities, DHS implements a lower Form I–129 fees for nonprofits in this rule. *See* 8 CFR 106.2(a)(3)(ix). DHS also exempts nonprofits from the Asylum Program Fee. *See* 8 CFR 106.2(c)(13)(i).

(6) H–3, E, Q, and TN Classifications

Several commenters expressed opposition to the fee increases for E and TN classifications. Commenters wrote:

• The fee increases would be antithetical to the special designation afforded to North American Free Trade Agreement countries and Australia.

• The fee for TN when filed with CBP is only $50 while a TN filed with USCIS is over $1,000.

*Response:* DHS recognizes that the E and TN nonimmigrant classifications are available to foreign nationals from certain countries with which the United States has entered into an international agreement, or with which the United States maintains a qualifying treaty of commerce and navigation. Typically, the opportunities accorded to certain noncitizens to obtain these visas are based insofar as practicable on the treatment accorded to U.S. nationals in similar classifications. While U.S. obligations under the international agreements or treaties, as implemented by the United States, permit qualifying nationals of the signatory countries to seek admission to the United States for a temporary period, the agreements do not include provisions that limit the U.S. government from recouping the full

cost of administering the E and TN programs. Furthermore, no provisions finalized in this rule would alter the existing general eligibility criteria for either the E or TN classifications, thus maintaining the special designations afforded to these countries.

The Form I–129 fees finalized in this rule are based on USCIS costs and not CBP costs. Although CBP charges fees for some services, most CBP funding comes from appropriations instead of fees, unlike USCIS. For example, CBP's FY 2021 enacted budget totaled approximately $16.3 billion, of which $14.7 billion came from discretionary appropriations.[231] The remaining approximate $1.6 billion or 10 percent came from a mix of discretionary and mandatory fee accounts. As such, CBP fees may not necessarily need to recover the full cost. DHS declines to make any changes to this rule based on these comments.

e. I–140 Immigrant Petition for Alien Worker (Not Related to Asylum Program Fee)

*Comment:* Commenters suggested process changes to Form I–140. A commenter, citing a USCIS memo, encouraged USCIS to issue an EAD after Form I–140 approval, reasoning that such an approach would advance efforts toward "continuous improvement at USCIS." A commenter expressed concern that some Form I–140 applications may be "duplicate" filings in cases where an applicant is downgrading from an EB–2 to an EB–3 classification due to changing visa availability. The commenter suggested creating a new form for a "request to transfer underlying basis of classification" wherein an applicant may provide proof of EB–2 approval to downgrade their employment visa classification to EB–3, to reduce overall receipt volumes for Form I–140.

*Response:* DHS may consider these comments in future rules or policy changes but declines to address these comments with changes in this rule. These comments focus on changes to the immigration process that are out of scope of this fee rule.

f. I–765 Employment Authorization/ EAD (Not Related to Other Bins/ Exemptions)

(1) General

Comments submitted regarding Form I–765 stated:

• EAD applicants are not employed, and they will struggle to afford the increase.

• USCIS should explain Form I–765 fee increase.

• Increasing costs for EAD renewal will disrupt employment for workers waiting to have their asylum case adjudicated.

• The proposed fee increase for Form I–765 will delay employment authorization for applicants, restricting their economic and civic participation.

• The fee would negatively impact families, international students, and low-income noncitizens who may be ineligible for public benefits and fee waivers.

• Increasing the fee for Form I–765 will exacerbate the current labor shortage.

• USCIS should continue the 180-day EAD status extension and apply the automatic extension to spouses of high-skilled workers.

• If DHS increases the I–765 fee, all EADs should have at minimum a 2-year validity period.

• DHS should issue an EAD to adjustment of status applicants for a period of 4–5 years or longer to reduce the need to adjudicate benefits.

• For humanitarian category applicants, USCIS should provide EADs more quickly and offer a fee waiver or a reduced fee option.

• The settlement agreement in *Edakunni* v. *Mayorkas* requires USCIS to grant an automatic extension to H–4 nonimmigrants who filed their H–4-based EAD renewal on time and extend employment authorization opportunities for L–2 nonimmigrants with valid nonimmigrant status.

• Employment authorization should be provided to J–2 spouses.

• USCIS should not require derivative applicants seeking an extension of status to request employment authorization separate from the principal's H–1B petition.

• USCIS should allow filing of Form I–765 by an approved Form I–140 beneficiary, because allowing noncitizens with approved immigrant petitions to work is an approach endorsed by Congress and statute and would reduce the number of H–1B renewals, saving USCIS time.

• USCIS should issue employment authorization cards without a formal expiration date. Instead, the card should say the application is pending and provide a link or QR code to check its status.

• USCIS should automatically issue EADs to adjustment of status applicants because the information required should already be on file or permit a Form I–

797C receipt notice to serve as an employment authorization.

• Increasing the Form I–765 fee while increasing fees for other employment related benefits forms will impose a disproportionate burden on the employer community because Form I–765 is fundamental to their feasibility to preserve jobs and livelihoods.

• The increased fee may deter eligible workers from utilizing USCIS' new Labor Agency Investigation-Based Deferred Action because of finances.

• Increasing the Form I–765 fee would burden nonimmigrant workers who need to maintain lawful employment and enjoy full labor rights.

• It is notable that there is a fee reduction in online filing for Form I–765 compared to paper filing, however, USCIS needs to improve its online system.

*Response:* DHS is sympathetic to the financial needs of low-income individuals. Thus, this rule maintains all existing fee waivers policies, including those for Form I–765. Individuals or families that meet specific criteria, including receiving a means-tested benefit, are eligible to request a fee waiver. USCIS is working on making the fee waiver process available online, but at this time, Form I–912, Request for Fee Waiver, must be mailed, along with the completed USCIS application or petition and supporting documentation, and cannot be submitted online. As explained elsewhere in this rule, DHS expands fee exemptions for certain populations, including some Form I–765 applicants. DHS notes that there is no fee for an initial Form I–765 filed by an asylum applicant, *see* 8 CFR 106.2(a)(44)(ii)(G), and the renewal fee requests can be waived for applicants who can demonstrate that they are unable to pay, *see* 8 CFR 106.2(a)(3)(ii)(E).

While the proposed rule did not have a specific section on Form I–765, it explained the general methodology for assessing proposed fees, including the proposed fee for Form I–765. *See* 88 FR 402, 450–451 (Jan. 4, 2023). However, the final rule uses a different approach for the Form I–765 implemented in this rule. As explained earlier, in this final rule DHS limits the increase for many fees by inflation and rounds to the nearest $5. The current fee is $410. When adjusted for inflation, it would be $518.[232] As such, DHS is setting the

---

[231] *See* DHS, U.S. Customs and Border Protection Budget Overview Fiscal Year 2023 Congressional Justification available at *https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Customs%20and%20Border%20Protection_Remediated.pdf* (last visited Sep. 20, 2023).

[232] DHS calculated inflation by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (1 + (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent. The current $410 fee

paper filing fee at $520, a 27 percent increase from the current $410 fee. *See* 8 CFR 106.2(a)(44). As explained earlier, DHS is implementing a $50 discount for online filing in most cases. *See* 8 CFR 106.1(g). Therefore, DHS is setting the online filing fee Form I–765 at $470, only $60 more than the current fee of $410. In addition, as explained in the proposed rule and later in this rule, DHS is setting separate filing fees for Form I–765 when filed concurrently with Form I–485 or as benefit requests based on a pending Form I–485 filed on or after the effective date of this rule. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their EAD while their Form I–485 is pending. *Id.*

DHS declines to codify a new validity period of employment authorization for any category in this rule because the length of EAD validity is not directly related to USCIS fees and the other changes proposed. In addition, 8 CFR 274a.12(a) and (c) provide that USCIS may, in its discretion, determine the validity period assigned to any EAD or document issued evidencing a noncitizen's authorization to work in the United States, thus EAD validity periods are generally not codified in regulations such as those being published by this rule. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.

DHS believes limiting the Form I–765 fee increase to the change in inflation, lowering fees for online filing or when filing with Form I–485, continuing to offer fee waivers, and expanding fee exemptions addresses concerns raised by commenters.

(2) Students

*Comment:* Increased fees would create hardships for foreign students, in part because they tend to be low-income and have difficulties finding sponsors.

*Response:* The commenters have not provided evidence that indicates foreign students tend to be low-income individuals or that increased fees would create hardships for foreign students, specifically. In addition, as explained throughout this rule, USCIS is fee funded, and absent another source of revenue to finance its operations, it must charge fees. When lower fees, fee waivers and exemptions are provided

for a population, the cost of the immigration benefit request for which the fee is lowered must either be recovered in the form of higher fees for another group, or USCIS' limited funding reserves must be depleted to cover those costs. DHS declines to provide discounts to Form I–765 on the basis that the applicant is a student. However, as explained elsewhere in this preamble, DHS is limiting the fee increase for Form I–765 to the change in inflation since the last fee rule. DHS also is setting an online filing fee for Form I–765 that is $50 less than the paper filing fee. Generally, students are eligible for online filing. These changes from the proposed rule will benefit students and all other Form I–765 applicants that will pay the new fee.

(3) DACA

*Comment:* DACA recipients should receive an exemption to the I–765 fee increase because DACA fees and costs were not considered in the fee model so the exemption should be granted without needing to alter USCIS' financial analysis. The fee would hinder DACA recipients from renewing their employment authorizations and exacerbate the burden of DACA status renewal fees and other costs for those with uncertain status.

*Response:* DHS does not believe the $520 fee will hinder DACA recipients from renewing their EADs that have allowed them to earn income in lawful employment in the United States. In addition, as DHS stated in the DACA rule, DHS believes that maintaining the existing fee structure with limited fee exemptions strikes the appropriate balance and declined to modify the rule to extend fee waivers or exemptions for DACA-related I–765s. 87 FR 53152, 53237 (Aug. 30, 2022). Likewise, DHS declines to make any changes based on these comments in this rule.

g. Other/General Comments on Employment-Based Benefits

Commenters on employment-based benefits generally stated:

• They are opposed to any increase in fees for employment-based visa holders and their employers because costs and timeline burdens are already high for this population.

• USCIS employment-based benefit request fees should be used to process H–1B and H–4 visas, rather than other visa categories.

• USCIS should commit to deciding normal applications in 1 month. RFEs and delays are tactics to generate more revenue. USCIS should commit to delivering a certain number of employment-based benefit request decisions each day.

• USCIS should increase the fees for family and humanitarian-based petitions and not for employment-based petitions. USCIS should allocate its resources to process each form according to how much revenue it generates.

• These fee increases will burden the business community rather than improve upon services render or save costs.

• Increased fees for employment-based petitions would further burden academic research employees whose grants specify a salary budget that includes visa costs. USCIS fees are an ineffective use of public grant funds aimed at research.

• USCIS should allow applicants awaiting an employment-based benefit decision to pay a one-time fee, suggesting $5,000 per applicant, and file for adjustment of status along with an EAD and travel documentation to provide stability for those who have been waiting in the queue for a decade or more.

• USCIS should restrict the EB–1C category because fraud is preventing researchers and scientists from moving to the United States.

• USCIS should not waste any Green Cards for employment-based categories because providing Green Cards increases the backlog.

• USCIS should reimplement the known employer program because the agency should possess sufficient information and data to establish a permanent program. The program could lower costs and increase efficiency for employers, particularly those who frequently file petitions in large volumes.

• USCIS should continue development and implementation of a trusted employer program that allows established and well-known employers to file their petitions more easily. USCIS expected a trusted employer program would promote simplicity and efficiency in the benefit application process for employers, while allowing USCIS to further protect benefit integrity, ensure consistency with respect to adjudications, and reduce the need for fraud detection at the individual level for such employers.

*Response:* DHS discusses processing times, backlog reduction, family-based fees versus employment-based fees, and the uses of fee revenue elsewhere in this rule. The other comments summarized above are about changes to programs and policies and not directly about the fees or changes that were proposed in the proposed rule; thus, DHS declines to make any changes based on these comments.

<hr>

multiplied by 126.37 percent is $518.12. DHS rounds all USCIS fees to the nearest $5 increment.

3. Citizenship and Naturalization

a. N–400 Application for Naturalization

*Comment:* Some commenters expressed support for the fee increase for Form N–400, writing:

• The fee increase was justified given inflation.

• The increase was minimal.

• The Form N–400 application should remain accessible based on applicants' ability to pay, which the proposed rule would accomplish.

*Response:* DHS appreciates commenters' feedback and has made no changes in the final rule based on these comments. DHS sets the Form N–400 fee as in the proposed rule, except that the final fee schedule now includes $50 discount for online filing.

*Comment:* Multiple commenters expressed opposition to the increased fee for Form N–400. Commenters indicated that increasing the Form N–400 fees would price out many immigrants who are often low-income or below the Federal poverty level. Some added that the increase would impact many applicants who face difficulty affording the current fee but do not qualify for a fee waiver or reduced fee. Several commenters reasoned that the fee increase would discourage immigrants from becoming citizens and contributing more to the country. Many commenters similarly urged USCIS to incentivize naturalization and make processing fees more affordable. The commenters added that naturalization increases earning potential and security so applicants can more fully participate in civic life.

*Response:* DHS appreciates these commenters' concerns regarding the affordability of naturalization and recognizes the benefits of naturalization for new citizens and the United States. However, DHS has only increased the fee for Form N–400 with biometrics by $35 (4.8 percent increase), which is substantially below the rate of inflation since the last fee increase (approximately 26 percent as of June 2023). Previously, most applicants had to pay a separate $85 fee for biometrics. The final rule also incorporates a $50 discount for online filing ($710), *see* 8 CFR 106.1(g), which is *below* the prior fee for a Form N–400 with biometrics. In addition, fee waivers are available to all naturalization applicants who are receiving means-tested public benefits, whose household incomes are at or below 150 percent of the Federal Poverty Guidelines (FPG), or who are experiencing extreme financial hardship such as unexpected medical bills or emergencies. *See* 8 CFR 106.3(a)(1)(i).

Nevertheless, in response to commenters' concerns about the affordability of applying for naturalization, DHS has broadened the availability of a reduced fee N–400 to applicants whose household incomes fall at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). Considering this change along with those accommodations already made for Applications for Naturalization, DHS does not believe that the new N–400 fee will prevent or discourage eligible noncitizens from applying for naturalization.

*Comment:* While expressing appreciation for the limited fee increase for Form N–400, a commenter stated that DHS should seeks ways to make Form N–400 more affordable and included as an example offering a discount for families who jointly file two or more Form N–400s. The commenter stated that eligible Green Card holders may opt to renew their status instead of naturalizing if application fees become unaffordable.

*Response:* DHS declines to adopt the commenter's recommended discount for family members who file N–400s simultaneously because joint N–400 filings would result in minimal, if any, processing efficiencies for USCIS. Unlike an application for adjustment of status, where the principal applicant's spouse and children may derive eligibility through the principal, *see* INA section 203(d), 8 U.S.C. 1153(d), every naturalization applicant must independently establish their eligibility for U.S. citizenship. *See* 8 CFR 316.2(b). Although each family member is required to submit their own Form N–400, fee waivers and the additional reduced-fee eligibility for household income less than or equal to 400 percent of the FPG should provide sufficient relief from the cost of fees for those who are unable to pay. *See* 8 CFR 106.2(b)(3)(ii), 106.3(a)(3)(i)(I). In addition, USCIS now extends Green Cards up to 24 months from expiration for those applicants who file Form N–400.[233] Therefore, DHS does not believe that the limited fee increase for Form N–400 will cause a significant number of naturalization-eligible applicants to renew their Green Cards instead of applying to naturalize.

*Comment:* Multiple commenters expressed concerns with the fact that the Form N–400 fee would be below full cost recovery. A research organization

stated that this would shift naturalization costs to visa applicants and reasoned that this would negatively impact integration since a Green Card is a prerequisite for naturalization and a non-immigrant visa is often itself a prerequisite for a Green Card. Another commenter urged USCIS to stop subsidizing the Form N–400 process by charging a fee that is below the cost of the benefit. The commenter stated that U.S. citizenship is a privilege with great value. The commenter also stated that immigrants do not need additional incentive to naturalize, and that by eliminating this subsidy USCIS could improve case processing for other stakeholders such as highly skilled workers, students with advanced degrees, or doctors and other work critical to the U.S. economy. The commenter also asserted that this "subsidy" is paid more by immigrants who have stayed in the country longer and must renew their visas multiple times, such as employment-based immigrants from China and India.

*Response:* DHS acknowledges these commenters' concerns but believes they are outweighed by the importance of naturalization to individual beneficiaries and the United States as a whole. Naturalization facilitates integration of immigrants into American society. Upon naturalizing, new citizens can vote in public elections, participate in jury duty, and run for elected office where citizenship is required. Moreover, there are proven, beneficial economic and civic outcomes for immigrants who become citizens, which include increased earnings and homeownership. These earning gains from naturalization may translate to greater city, State, and Federal tax revenues.[234] E.O. 14012 instructed DHS to "make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee." E.O. 14012, 86 FR 8277 (Feb. 5, 2021). DHS has held the fee for Form N–400 below the estimated cost to USCIS of adjudicating the form since 2010, as explained in the proposed rule. *See* 88 FR 402, 487 (Jan. 4, 2023). DHS has determined that shifting costs of naturalization to other applicants in this manner is desirable given the significant value that the United States obtains from the naturalization of new citizens. Many commenters on the 2020 fee rule stated that the fee would deter eligible applicants and cost can be a prohibitive

---

[233] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA2022–26 Policy Alert, "Extension of Permanent Resident Card for Naturalization Applicants" (Dec. 9, 2022), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20221209-ExtendingPRC.pdf.*

[234] *See* Holly Straut-Eppsteiner, Cong. Research Serv., R43366, "U.S. Naturalization Policy" (May 2021), at 2–3, *https://crsreports.congress.gov/product/pdf/R/R43366.*

barrier for would-be naturalization applicants. *See* 85 FR 46788, 46855 (Aug. 3, 2020). DHS is committed to promoting naturalization and immigrant integration and making sure that naturalization is readily accessible. For these reasons, DHS will continue to provide fees for naturalization applications on Form N–400 at an amount less than its estimated costs and recover some of its costs from other fee payers using the cost reallocation methodology.[235]

*Comment:* Multiple commenters wrote that USCIS should increase the income limitations for Form N–400 fee waivers to include more low-income applicants. By contrast, a different commenter asserted that fee waivers should not be available for Form N–400, since becoming a U.S. citizen is a privilege.

*Response:* DHS acknowledges commenters' concerns regarding the affordability of naturalization but believes that this fee schedule makes naturalization practically available to all eligible low-income applicants. Applicants whose household income is at or below 150 percent of the FPG, who are receiving a means-tested public benefit, or who are experiencing extreme financial hardship are eligible for a full waiver of the N–400 fee. *See* 8 CFR 106.3(a)(1)(i). Furthermore, the reduced N–400 fee ($320) will be available to applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). So, for example, members of a four-person household would qualify for the reduced fee if their household income was at or below $120,000 per year, which is greater than the median income for a household of four in most states.[236] Online N–400 filers are also eligible for a $50 discount. *See* 8 CFR 106.1(g). DHS believes that these measures are sufficient to ensure that naturalization is financially feasible for all eligible applicants. DHS disagrees with the assertion that fee waivers should not be available to naturalization applicants. DHS acknowledges that naturalization is a significant

immigration benefit, but, as noted earlier, believes that the United States also benefits significantly from newly naturalized citizens.

*Comment:* Many commenters expressed opposition to the increased fees for those filing a Form N–400 who do not need to provide biometrics, reasoning that this would burden elderly applicants. Another commenter likewise asserted that the fee increase would disproportionately impact the elderly and further urged USCIS to lower the cost for filing a reduced-fee Form N–400 without biometrics for the same reason.

*Response:* DHS disagrees that the N–400 fee increase disproportionately burdens elderly applicants because, since 2017, all naturalization applicants have been required to provide biometrics regardless of their age, unless they qualify for a fingerprint waiver due to certain medical conditions.[237] DHS acknowledges that commenters' concerns regarding Form N–400 fee increases may apply to applicants who do not require biometrics due to certain medical conditions. However, as discussed in the proposed rule, DHS believes that incorporating biometric service fees into immigration benefit requests will simplify the fee structure, reduce application rejections for failure to pay the correct fees, and better reflect how USCIS uses biometric information. *See* 88 FR 402, 484 (Jan. 4, 2023). These efficiencies will enable USCIS to maintain lower immigration benefit fees for applicants in general. In addition, the commenter presumes that being elderly equates with poor financial condition. Applicants who are low-income, receiving a means-tested public benefit, or experiencing extreme financial hardship are eligible for a waived or reduced N–400 fee. *See* 8 CFR 106.3(a)(1)(i), 106.2(b)(3)(ii). Also, the fee increase for applicants who do not require biometrics (19 percent) is less than the rate of inflation since the last fee increase (26 percent as of June 2023), and that this increase is mitigated for applicants who file online. *See* 8 CFR 106.1(g).

**b. Reduced Fee N–400, Reversal of 2020 Rule's Removal of the Reduced Fee N–400**

*Comment:* Multiple commenters expressed support for a reduced fee for Form N–400, under which qualifying applicants requiring biometric services would pay $25 less than under the previous fee schedule. However, multiple commenters recommended that USCIS increase the income limit for a reduced fee. A commenter wrote that many of its clients would not qualify for a waived or reduced fee or be able to afford the fee for Form N–400. Other commenters stated USCIS should consider increasing the percentage multiplier threshold for a reduced fee because the current poverty guidelines are outdated. A commenter opposed the 19 percent increase to the reduced fee for applicants who do not require biometric services.

*Response:* In response to public comments and additional stakeholder feedback, and in recognition of the enormous benefits that the United States obtains from new naturalized citizens, DHS has raised the income limits for a reduced fee Form N–400 to include applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). This change, coupled with the fee waiver for those who are unable to pay the Form N–400 fee, will make naturalization more available to all eligible applicants. The FPG are updated yearly by the U.S. Department of Health and Human Services (HHS).[238] And the fee increase for those who do not require biometric services applies to a small portion of Form N–400 filers since, as stated earlier, Form N–400 applicants require biometrics services regardless of age. Applicants who do not require biometrics due to a medical condition may also qualify for a full fee waiver if they are low income and receive a means-tested benefit due to their medical condition. *See* 8 CFR 106.3(a)(1)(i)(A).

**c. N–600/600K**

*Comment:* While one commenter expressed general support for increasing fees for Forms N–600 and N–600K, many commenters expressed strong opposition to these fee increases, reasoning that existing fees are already too high and that the increases may impose an undue burden on parents seeking evidence of citizenship or naturalization for their children.

[235] Based on filing volume trends in recent years, USCIS forecasts an increase of 62,165 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee fee forecast. *See* Table 7, Workload Volume Comparison.

[236] *Compare* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form I–864P, "2023 HHS Poverty Guidelines for Affidavit of Support," *https://www.uscis.gov/i-864p* (last updated Mar. 1, 2023), *with* U.S. Dep't of Justice, "Census Bureau Median Family Income By Family Size, Cases Filed Between May 15, 2022 and Oct 31, 2022," *https://www.justice.gov/ust/eo/bapcpa/20220515/bci_data/median_income_table.htm* (last visited Aug. 21, 2023).

[237] See U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA–2017–03, Policy Alert, "Biometrics Requirements for Naturalization" (July 26, 2017), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20170726-NaturalizationBiometrics.pdf* ; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual", Vol. 12, "Citizenship & Naturalization", Part B, "Naturalization Examination", Chp. 2, "Background and Security Checks", Sec. B, "Fingerprints" [12 USCIS–PM B.2(B)], *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-2* (last updated Nov. 8, 2023).

[238] *See* U.S. Dep't of Health & Human Servs, HHS Poverty Guidelines for 2023, *https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines* (last visited Aug. 21, 2023).

Another commenter stated that the fee increase for Forms N–600 and N–600K would have a significant negative impact on farmworkers, who are an economically disadvantaged segment of the population. A couple of commenters reasoned that the proposed fees would deter families from obtaining the documentation needed to prove the U.S. citizenship of foreign-born individuals.

*Response:* DHS recognizes commenters' concerns about the fee increases for Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. However, the Form N–600 fee remains significantly below its estimated cost under the USCIS ABC model. For example, had DHS proposed to recover full cost on Form N–600, the fee would have been $1,835 when filed online and $2,080 when filed on paper. *See* 88 FR 402, 489 (Jan. 4, 2023). The current fee increases for both forms are slightly less than the rate of inflation since the last fee schedule. Applicants may request a waiver of the Form N–600 and N–600K fees. *See* 8 CFR 106.3(a)(3)(i)(L), (M). Approximately 47 percent of Form N–600 filers and 26 percent of Form N–600K filers receive such fee waivers. *See* 88 FR 402, 488 (Jan. 4, 2023). Children of U.S. citizens may obtain evidence of citizenship by applying for a U.S. passport, which is a less expensive alternative to applying for a Certificate of Citizenship through Form N–600. Therefore, DHS maintains the Form N–600 and N–600K fees at the amounts that were proposed. 8 CFR 106.2(b)(7), (8).

For a discussion on fee exemptions for Form N–600 and Form N–600K for certain adoptees see section IV.G.5.d. of this preamble.

*Comment:* A couple of commenters expressed concern that the cost of a Certificate of Citizenship will be nearly twice the cost to apply for naturalization. Another commenter suggested that the fee amounts for Form N–600 should not exceed those for Form N–400 and the two fees should be reversed. A religious organization likewise suggested that the fee for Form N–600 be made comparable to the reduced fee for Form N–400, adding that Form N–600 should be reasonably affordable such that applicants do not have to struggle financially to obtain proof of citizenship.

*Response:* DHS appreciates these commenters' concerns but believes that the difference in fees for Forms N–400 and N–600 is justified by multiple factors. First, there is a significant difference in the fee-paying unit cost between Form N–400 ($1,150) and Form N–600 ($1,429).[239] Also, the fee difference is justified by the difference in urgency between these two groups of applicants. Individuals who derive citizenship from their parents are legally U.S. citizens and may access the benefits of citizenship without filing Form N–600. Such individuals may obtain proof of citizenship through less expensive means such as applying for a U.S. passport. By contrast, an applicant for naturalization cannot access the benefits of citizenship until their Form N–400 has been adjudicated and they have taken the oath of allegiance. Given the different stakes for these groups of applicants, it makes sense for DHS to lower barriers to filing Form N–400. As noted earlier, because of the importance of naturalization to individual applicants and American society, DHS has sought to keep the Form N–400 fee at an affordable level that is below full cost recovery. Finally, maintaining a low Form N–400 fee is consistent with E.O. 14012's goal to ''make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee.'' E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

*Comment:* Another commenter suggested that, as an alternative to the current fee waiver policy, USCIS create a fee exemption for Form N–600 and N–600K applicants who can verify they lack access to a birth certificate. The commenter stated that applicants who qualify for the waiver would often be children, who would otherwise apply for a passport if they possessed a birth certificate.

*Response:* DHS declines to adopt the commenter's proposal because it would diverge from both the ability-to-pay and the beneficiary-pays principles and these forms are currently eligible for fee waivers. DHS recognizes that some Form N–600 and N–600K applicants may be unable to afford the application fees due to the same reasons that they lack birth certificates, for example, because they were admitted to the United States as refugees. However, some applicants may still possess the means to pay these filing fees despite their lack of a birth certificate. The existing fee waiver criteria (receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship) are more directly related to an applicant's ability to pay. *See* 8 CFR 106.3(a)(1)(i).

**d. Other/General Comments on Fees, and Limiting Fee Increases (N–300, N–336, N–470, N–565)**

*Comment:* An individual commenter suggested that, in comparison to Form N–600, the Form N–565 fee should be increased as applicants tend to lose, laminate, or give the original document to a different agency or entity that never give it back.

*Response:* DHS believes that the current fee structure satisfies the commenter's concerns. The final fee for Form N–565, Application for Replacement Naturalization/Citizenship Document, ($505 online, $555 paper) recovers more than the full fee-paying unit cost of the application ($453), while the Form N–600 fee ($1,335 online, $1,385 paper) recovers less than the fee-paying unit cost ($1,429).[240] DHS believes that further increases to the Form N–565 fee would be excessively burdensome for applicants who need to obtain a new Certificate of Naturalization or Citizenship, Declaration of Intention, or Repatriation Certificate.

*Comment:* One commenter stated that USCIS should consider reducing the fee for Form N–565. The commenter said that a replacement naturalization certificate should be affordable, since an accurate and up-to-date certificate is necessary for accessing important government services. Multiple commenters stated that the fee for Form N–565 is unfair in comparison to the fees that U.S. born citizens pay for a replacement birth certificate. One of these commenters asserted that the Form N–565 fee treats naturalized citizens as ''second class citizens,'' and, without evidence, that naturalization certificates and birth certificates include the same safeguards and features against unlawful duplication. Finally, one commenter wrote that they supported the Form N–565 fee remaining the same without providing additional rationale.

*Response:* DHS acknowledges commenters' concerns about the affordability of Form N–565. Although DHS will maintain the proposed Form N–565 filing fee for paper applications, DHS will now offer a $50 discount for Form N–565 when filed online. DHS also notes that the paper-filed Form N–565 is now less expensive in terms of real dollars since the FY 2016/2017 fee rule, given the rate of inflation since then.[241] While DHS recognizes that

---

[239] *See* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[240] For fee-paying unit costs in this final rule, see Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[241] Inflating the current N–565 fee of $555 from December 2016 to June 2023 would raise the fee to $700 (rounded to the nearest $5).

having an up-to-date citizenship document is helpful for accessing government services, DHS believes it is also important for individuals to be able to access naturalization or proof of citizenship in the first place, which is why Forms N–400, N–600, and N–600K are priced less expensively relative to their fee-paying unit costs. As explained in the proposed rule, DHS decided to hold the current fee for Form N–565 to allow this form to fund some of the costs of other forms and limit the fee increase for other forms. *See* 88 FR 402, 450 (Jan. 4, 2023). Furthermore, DHS notes the number of Form N–565 filings is limited, applicants may request a fee waiver, and there is no fee when seeking to correct a certificate due to USCIS error. *See* 8 CFR 106.3(a)(3)(i)(K); 8 CFR 106.2(b)(6). Some new citizens may also possess other, less expensive means of obtaining proof of citizenship such as applying for a U.S. passport. DHS considers the cost for obtaining a replacement U.S. birth certificate irrelevant to the cost of filing Form N–565, as the primary purposes of these two forms are fundamentally different. Also, Certificates of Naturalization and Citizenship contain many security features that may not appear on birth certificates, making Certificates of Naturalization and Citizenship less susceptible to fraud.[242] Issuance of a replacement certificate of citizenship or naturalization may also require that the applicant appear for an interview or provide biometrics.[243] DHS will retain the proposed fee for a paper filing of Form N–565 of $555. Consistent with the general initiative to encourage online filing, DHS will reduce the fee for an electronically filed N–565 by $50, to $505. *See* 8 CFR 106.1(g).

*Comment:* A few commenters wrote that they opposed increasing the fee for Form N–336 because:

[242] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Commonly Used Immigration Documents", *https://www.uscis.gov/ save/commonly-used-immigration-documents* (last updated Mar. 23, 2023); *cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https:// oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting over 14,000 different versions of birth certificates in circulation, and varying security features among vital records offices).

[243] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form N–565, Instructions for Application for Replacement Naturalization/Citizenship Document (Dec. 8, 2021), *https://www.uscis.gov/sites/default/files/ document/forms/n-565instr.pdf; cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting that 85–90% for birth certificate fraud encountered by former INS and passport services is the result of genuine birth certificates held by imposters).

• It would impose a barrier for low-income and working-class applicants to appeal or obtain a hearing if USCIS denies their naturalization application.

• It could deter applicants from pursuing legitimate challenges to denials of their naturalization applications.

• It would limit access to appeals for these applicants, which is counter to USCIS' FY 2023–2026 Strategic Plan goals for promoting quality adjudications and reducing undue barriers to naturalization.

*Response:* DHS acknowledges commenters' concerns regarding the fee increase for Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), but the Department does not believe that the new filing fee would deter Form N–336 filings. The 19 percent fee increase is reasonable because it is below the 26 percent rate of inflation since the last fee rule. DHS has reduced the increase for some filers by including the N–336 amongst the benefits that receive a $50 discount for online filing. *See* 8 CFR 106.1(g). Applicants who are unable to pay the Form N–336 fee may request that it be waived. *See* 8 CFR 106.3(a)(3)(i)(H). Depending on the circumstances of their cases, some applicants may choose to refile Form N–400 at the reduced filing fee rather than file Form N–336. Also, N–336 filers may benefit from the other fees for naturalization-related forms, which received lower increases to reduce barriers for naturalization applicants in general.

*Comment:* A commenter agreed with the proposed fee increase for Form N–336 because higher naturalization fees will prevent those who need public assistance from seeking citizenship, preventing strain on U.S. public assistance systems.

*Response:* DHS appreciates the support for the N–336 fee. However, DHS disagrees with the commenter's premise that naturalization fees should be set at a level that limits access to public assistance and does not believe the increased fee for Form N–336 will further that goal. Applicants who receive a means-tested benefit are eligible for a waiver of the fees for naturalization-related forms. *See* 8 CFR 106.3(a)(1)(i)(A), (a)(3).

**4. Humanitarian**

**a. NACARA**

*Comment:* A commenter wrote that Guatemalans and Salvadorans who are eligible for NACARA rely on Form I–881 and therefore the proposal to increase fees would impose financial

burdens on Latino immigrants. Furthermore, while acknowledging the proposed reduction of fees for Form I–881 applications for families, the commenter said this reduction would not affect the significant number of Form I–881 applicants who are individuals.

*Response:* As explained in the proposed rule, the IEFA fees for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)), have not changed since 2005. *See* 88 FR 402, 515–516 (Jan. 4, 2023). DHS proposed to limit the fee increase for Form I–881, like adoption-related or naturalization fees. *See* 88 FR 402, 450–451 (Jan. 4, 2023). This rule combines the current individual and family tiered fee schedule into a single Form I–881 fee because there is no cost data to support limiting the amount charged to a family. Additionally, the new fee of $340 is less than the cost to adjudicate the form (approximately 14 percent of the cost of adjudication), and at a 19 percent increase to individual filers, the fee increase is below the CPI–U of 26.37 percent.[244] DHS is not setting any fees in this rule to deter requests from families, specific nationalities, or any immigrants based on their financial or family situation or demographics from accessing immigrant benefits and we have no evidence or experience in setting fees that indicates that the fees would have such an unintended effect. DHS acknowledges the commenter's concerns regarding the increased fee for Form I–881 for an individual adjudicated by DHS ($285 to $340). This fee in the final rule reflects a 19 percent increase in the filing fee for Form I–881 for an individual adjudicated by DHS, which is below the rate of inflation since the current IEFA fees for Form I–881 were last changed in 2005. All other IEFA fees for Form I–881 decreased, when compared to the current total fees including the fee for biometric services.

The proposed rule included a provision that would eliminate the separate biometric service fee requirement in most cases. *See* 88 FR 402, 484–485 (Jan. 4, 2023). For a family, the fee for Form I–881 adjudicated by EOIR remains at $165 (0 percent increase); for an individual, the fee for Form I–881 adjudicated by DHS with biometric services is 8 percent

[244] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent. *See* 88 FR 402, 515 (Jan. 4, 2023); Table 1.

lower; for a family, the fee for Form I–881 adjudicated by DHS is 40 percent lower; and for two people, the fee for Form I–881 adjudicated by DHS with biometric services is 54 percent lower in this rule. *See* 88 FR 402, 408–409 (Jan. 4, 2023). Furthermore, DHS recognizes that abused spouses and children under NACARA must file for VAWA benefits while in immigration proceedings, and they are a particularly vulnerable population. Therefore, DHS provides a fee exemption for abused spouses and children under NACARA filing Form I–881, as well as ancillary Form I–765 (submitted under 8 CFR 274a.12(c)(10)). *See* 8 CFR 106.3(b)(7). For other applicants who are unable to pay the fee, Form I–881 is also eligible for a fee waiver. *See* 8 CFR 106.3(a)(3)(i)(F).

b. Qualifying Family Member of a U–1 Nonimmigrant

*Comment:* Commenters wrote that USCIS' proposal to increase the fees for relief for family members of a U-visa petitioner would undermine the rights of survivors of crimes and the U.S. criminal legal system. Commenters requested that DHS keep derivative petitions for U-visa petitioners affordable to incentivize individuals to report when they have been a victim of crime and to prioritize public safety and family unity.

*Response:* DHS is committed to the goals of our humanitarian programs. In this final rule, DHS provides additional fee exemptions for petitioners for U nonimmigrant status because of the humanitarian nature of the program and the likelihood that individuals who would file requests in this category would qualify for fee waivers. *See* 8 CFR 106.3(b)(5). For example, DHS provides a fee exemption for Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant. DHS believes it is an important policy decision to provide a fee exemption for the Form I–929 to continue to provide for this vulnerable population and promote family unity in line with other humanitarian status requestors. Furthermore, a fee exemption for Form I–929 is consistent with the fee exemptions provided for most forms associated with U nonimmigrant status. *See* 8 CFR 106.3(b).

c. Other/General Comments on Humanitarian Benefits

*Comment:* A commenter stated that DHS should impose a fee for Form I–589, Application for Asylum and for Withholding of Removal. The commenter recommends that the fee represent the costs associated with an asylum application. They believe the INA authorizes fees "for the consideration of an asylum application, for employment authorization, and adjustment of status under section 209(b), not to exceed the costs in adjudicating the applications." A commenter generally supported USCIS' proposal to keep humanitarian fees the same.

*Response:* The enjoined 2020 rule included a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, despite opposition from many commenters. *See* 85 FR 46788 (Aug. 3, 2020). DHS acknowledges the commenters' concerns about asylum seekers' inability to pay the fees and humanitarian plight of legitimate asylum seekers. In recognition of the circumstances, the proposed rule withdraws the $50 fee imposed in the 2020 rule. DHS will continue to accept Form I–589, Application for Asylum and for Withholding of Removal with no fee. Furthermore, the initial filing of the applicant's Form I–765, Application for Employment Authorization, has no fee. *See* 88 FR 402, 464 (Jan. 4, 2023); 8 CFR 106.2(a)(44). Asylum seekers often come to the United States with limited economic resources and are dependent on family and charitable organizations for survival. DHS believes that these fee exemptions will eliminate the additional financial burden for asylum seekers and maintain accessibility of the affirmative asylum program, which provides eligible applicants critical humanitarian protection from return to persecution. DHS data indicates that this population would be eligible for fee waivers and requiring a fee for asylum applications and their Form I–765, but permitting fee waivers, would be costly and inefficient in creating a fee for asylum applicants who are not eligible for an EAD until their application has been pending for 150 days. *See* 8 CFR 208.7(a)(1). DHS declines to make any changes based on this comment.

5. Family-Based

a. Alien Fiancé

*Comment:* A commenter stated that the fee increases would force more U.S. citizens to travel to other countries and get married out of sheer desperation. One commenter also said that employers are more able to bear rising immigration costs than families. Another commenter stated after the pandemic, many have lost their jobs and find it difficult to pay rent, and that raising the cost of the fiancée visa goes against USCIS's humanitarian mission and the mission to reunite families.

*Response:* USCIS understands the economic situation that many families face today. DHS is authorized to set fees at a level that ensures recovery of the full cost of providing the adjudication services for the programs USCIS administers. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable able to sustain an adequate level of service. USCIS has not had a fee increase in the I–129F since 2016 to fund the processing of these applications. As noted earlier in Section I.D. of this preamble, DHS will raise the fee for Form I–129F, Petition for Alien Fiancé(e) from $535 to $675 (26 percent), which amounts to a decrease of $45 (6 percent) from the original proposed fee. *Compare* 8 CFR 106.2(a)(5) and Table 1, *with* 88 FR 402, 409 (Jan. 4, 2023). The final increase is consistent with a 26 percent rate of inflation since the last fee increase in December 2016, as of June 2023. The fee for the Form I–129F resulted from application of the standard USCIS fee methodology. DHS values its role in assisting U.S. citizens who wish to bring a foreign national fiancé to the United States to marry and is sensitive to the extra burden that the increased filing fee may impose. DHS understands that being separated from loved ones and having to wait to start a life together may be frustrating. However, DHS does not believe that the I–129F fee increase will encourage out-of-country marriages, since, if the couple marries abroad, instead of paying $675 to file the I–129F for their fiancé to immigrate, the petitioner would need to file Form I–130, Petition for Alien Relative, for their spouse to immigrate. This final rule increases the fee for online I–130 filings to $625 and paper filings to $675; therefore, out-of-country marriage would not result in a significant cost savings. *See* 8 CFR 106.2(a)(6), and 8 CFR 204.1; Table 1. Also, as a general matter, DHS does not waive fees where the petitioner will eventually need to complete an affidavit of support in order for the beneficiary to obtain LPR status. To adjust status, a K-visa applicant must demonstrate that they are not likely to become a public charge, *see* INA section 212(a)(4), 8 U.S.C. 1182(a)(4), which requires an affidavit of support from the petitioning spouse, *see* INA sections 212(a)(4)(C) and 213A, 8 U.S.C. 1182(a)(4)(C) and 1183A. Applicants may file a fee waiver request for Form I–751, Petition to Remove Conditions on Residence, *see* 8 CFR 106.3(a)(3)(c), which is required for most fiancé(e)s

after adjustment of status in order to remove the conditional basis of their LPR status, *see* INA section 216 and 245(d), 8 U.S.C. 1186a and 1255(d). However, because a fee waiver would be inconsistent with the financial support requirement and public charge ground of inadmissibility. Therefore, fee waivers for the Form I–129F will not be provided.

b. Petition for Alien Relative

*Comment:* Multiple comments expressed concern about the cost of the proposed fee increase for the Form I–130. Commenters wrote:

• The fee threatens to violate the right to family enshrined in the Universal Declaration of Human Rights and other human rights standards that the United States has agreed to uphold.

• The proposed Form I–130 fee would exclude immigrants from our workforce and our broader community.

• The fee increase could split families by forcing some petitioners to file for one family members at a time, which would further undermine family unity.

• Absence of fee waivers for I–130 petitions would worsen these effects.

*Response:* DHS appreciates the concerns of commenters but reiterates that USCIS is funded almost exclusively by fees, *see* INA section 286(m), 8 U.S.C. 1356(m), and without proper funding, USCIS will lack the resources to keep pace with incoming benefit requests. The increase in the I–130 fee is necessary to provide the resources required to do the work associated with such filings. The Form I–130 fee increase (electronically filed), from $535 to $625 (17 percent), has been reduced by $45 (6 percent) from the proposed rule. See 8 CFR 106.2(a)(6).

USCIS understands the importance of facilitating family unity, as well as the advantages that LPR status provide to new immigrants. However, by statute, Form I–130 petitioners must have access to sufficient financial resources to support all beneficiaries, in addition to the petitioner's entire household, for the beneficiary to obtain LPR status. *See* INA sections 1182(a)(4)(C) and 213A, 8 U.S.C. 1183(a)(4)(C) and 1183A. A petitioner seeking to file for several family members, may lack the financial resources for all the family members to adjust at the same time, forcing the petitioner to bring one beneficiary over at a time. However, the I–864, Affidavit of Support Under Section 213A of the INA, allows the petitioner to count the income and assets of members of the household who are related by birth, marriage or adoption, and allows the beneficiary to provide a joint sponsor to meet the minimum income

requirement.[245] As previously mentioned, USCIS's humanitarian mission is to provide protection to individuals in need of shelter or aid from disasters, oppression, emergency medical issues and other urgent circumstances as provided through specific humanitarian programs.[246] Although the 1948 Universal Declaration of Human Rights (UDHR) speaks to the right to marry, the UDHR does not prohibit fees for family-based visa petitions and, in any event, is only a nonbinding, aspirational document.[247] USCIS, moreover, is not limiting individuals' right to marry or build a family. USCIS also disagrees that an increase in the fee disrupts USCIS' humanitarian efforts under this rule.

DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. Acknowledging that downward adjustments for some groups may result in upward adjustments for other groups, DHS saw no decreases in benefit requests which it can attribute to the fee adjustments in 2016 and has no data that would indicate that the fees for family-based benefit requests in this final rule would prevent applicants from submitting petitions.[248] While DHS shifts some of the costs of humanitarian programs in this rule to other benefit requests based on the ability to pay, there are many benefit requests that are used by families and low-income individuals, and shifting all family-based benefit request costs to non-

family-based requests would increase non-family based fees to the point of being unbalanced and unsustainable. DHS recognizes the burden that fee increases may impose on some families and low-income individuals. As a general matter, DHS does not waive fees for petitions that require the petitioners to demonstrate that they will be able to support their beneficiary financially, or that eventually require the beneficiary to file of an affidavit of support. In order to consular process or adjust status, the Form I–130 beneficiary must submit Form I–864, Affidavit of Support Under Section 213A of the INA with their visa petitions or adjustment of status applications, to document the petitioner's or joint sponsor's ability to financially support the noncitizen beneficiary. A fee waiver would be inconsistent with this financial support requirement; therefore, DHS declines to allow fee waivers for the Form I–130. With that context in mind, and following review of the public comments received, DHS has determined that the final fee for Form I–130 is not inordinately high.

DHS acknowledges that it allows fee waivers for Form I–751, Petition to Remove Conditions on Residence, even though in most cases the petitioning relative's obligation to support the conditional permanent resident (CPR) will still exist when the CPR files Form I–751. However, there are multiple differences between these forms that justify the difference in fee-waiver availability. *Compare* INA 216, 8 U.S.C. 1186a, *with* INA 212(a)(4)(C), 8 U.S.C. 1182(a)(4)(C). Although the sponsor of Form I–864, Affidavit of Support Under Section 213A of the INA, has an ongoing responsibility to support the CPR, their inability or unwillingness to do so has no legal bearing on the CPR's eligibility to have their conditions removed. Also, there may be intervening circumstances after a noncitizen obtains CPR status that would make it impossible or impractical for them to obtain financial support from sponsor(s) of their Form I–864 (*e.g.,* death or divorce). Second, Form I–130 receipts are significantly larger than I–751 receipts. In fact, Form I–130 was the most common form received by USCIS in FY 2022.[249] For these reasons,

---

[245] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Affidavit of Support web page, *https://www.uscis.gov/green-card/green-card-processes-and-procedures/affidavit-of-support* (last updated Mar. 19, 2021).

[246] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Humanitarian web page, *https://www.uscis.gov/humanitarian* (last visited Aug. 22, 2023).

[247] *See* United Nations, "Universal Declaration of Human Rights," *https://www.un.org/en/about-us/universal-declaration-of-human-rights* (last visited Aug. 22, 2023). The Declaration is only a resolution of the U.N. General Assembly and thus is only a non-binding, aspirational document. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734 (2004) (observing that declarations like the UDHR are merely aspirational and that "do[ ] not of [their] own force impose obligations as a matter of international law," and thus are of "little utility" in discerning norms of customary international law).

[248] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "2020 USCIS Statistical Annual Report," *https://www.uscis.gov/sites/default/files/document/reports/2020-USCIS-Statistical-Annual-Report.pdf* (last visited Aug. 22, 2023).

[249] *See* U.S. Citizenship and Immigr. Servs, U.S. Dep't of Homeland Security, "Number of Service-
Continued

allowing a fee waiver for Form I–130 would likely result in a much higher level of uncollected fees that would have to be transferred to other fee payers. Finally, petitioners have greater flexibility in deciding when to file Form I–130, whereas in general Form I–751 must be filed within a specific 90-day window. *See* INA 216(d)(2)(A), 8 U.S.C. 1186a(d)(2)(A). Therefore, Form I–130 petitioners possess greater flexibility in accumulating funds to pay the fee for the petition. For these reasons, DHS makes Form I–751 eligible for a fee waiver but does not do so for Form I–130.

*Comment:* Another commenter stated that the proposed I–130 fee increase was disproportionate and that the fee should be kept at its current level, without providing further explanation.

*Response:* Fees do not merely cover the cost of adjudication time. The fees also cover the resources required for intake of immigration benefit requests, customer support, and administrative requirements. DHS recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, absent an alternative source of revenue, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. As noted in the final rule, the fee increases for an electronically filed Form I–130 has been reduced to $625 (17 percent increase). *See* Table 1; 8 CFR 106.2(a)(6).

*Comment:* Another comment said that an equitable way of raising revenue would be to increase the cost for Forms I–130 filed by an LPR and decrease the cost for Forms I–130 filed by citizens.

*Response:* Creating a separate fee schedule within the I–130 form based on the filer's status would create additional burden on processing time to validate the filer's status. In addition, the fee schedule suggested would be more regressive in nature since many LPR filers who seek to file for family members already have a longer wait time for the visa to become available than their U.S. citizen counterparts where an immediate relative under INA 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), would have a visa immediately available.[250] Placing additional financial

burden on LPR filers would be regressive because it may delay their ability to file and, together with the longer wait for visa availability for LPR filers, has the potential to extend the amount of time it will take to reunite with family members. Therefore, DHS declines to make any changes based on this comment.

c. Remove Conditions on Residence

Several commenters discussed the proposed fee increase for Form I–751. Those comments are summarized as follows:

• The proposed fee increase would create burdens for low-income individuals, immigrants, and their families, and particularly be a burden on applicants seeking to file Form I–751 on the grounds of divorce who are ineligible for fee waivers.

• The fee is cruel because an applicant must apply before the 2-year anniversary of their marriage to protect against deportation and separation from their spouse.

• The fee would be a barrier for victims of domestic violence who need to file Form I–751 on their own.

• The fee for Form I–751 along with other proposed fee increases undermines the rule's objective to balance the competing beneficiary-pays and ability-to-pay models, promote immigrant integration, and reduce barriers to immigration benefits.

• The fee would be a barrier to citizenship and lawful permanent residence.

• There is no rational basis for a fee increase that is 73 percent higher than the last proposed increase.

• The I–751 fee is unreasonable because applicants have already proven their eligibility for permanent residence and only must demonstrate that their family relationship has continued.

• A large fee increase is unreasonable because Form I–751 is only a reapproval of a previously successful application and is redundant when applicants are shortly afterwards applying for naturalization, and yet it requires USCIS an average of 18 months to complete.

• The proposed fee increase for Form I–751 is much greater than for other forms requiring similar levels of effort to adjudicate.

• The increase in the I–751 fee is too large and creates a large burden on petitioners.

• USCIS should extend the validity of conditional marriage-based Green Cards from 24 months to 36 months to streamline the Green Card process,

allow applicants to skip unnecessary paperwork required for the removal of conditions by directly applying for naturalization, and eliminate unnecessary work for USCIS and fees on families.

*Response:* DHS acknowledges the increased Form I–751 fee will render the process of removing conditions on residence more expensive and has considered the comments. As previously mentioned, USCIS is primarily fee based and therefore must recover operating costs through fees, including the cost of fee waived or exempt workloads. DHS acknowledges commenters' concerns about the proposed fee increase for the Form I–751 and has decreased the form fee from the proposed $1,195 to $750, capping it at approximately 26 percent for inflation. *See* 8 CFR 106.2(a)(43). Fees are created to cover the resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, administrative processing, and the Form I–751 interview by an officer if it is not waived. DHS offers fee waivers for Form I–751 petitioners who are unable to pay and there is no filing fee for conditional permanent residents seeking to remove conditions on their status by filing for battery or extreme cruelty waivers under INA section 216(c)(4). *See* 8 CFR 106.3(a)(3)(i)(C); 8 CFR 106.2(a)(43). In addition, DHS has recently reduced the financial burden on Form I–751 petitioners by automatically extending the validity period of conditional Green Cards for 48 months beyond the card's expiration date when the Form I–751 is properly filed.[251] This reduces potential fees for filing a Form I–90, Application to Replace Permanent Resident Card, ($415 online) while an applicant's Form I–751 is pending. DHS believes this policy addresses most of the commenter's concerns and declines to make any further changes.

*Comment:* Some commenters wrote that the Form I–751 fee should be less than the fee for Form I–130, Petition for Alien Relative. One commenter stated that Form I–751 is redundant, and the proposed fee is disproportionately expensive relative to the time that it takes to adjudicate Forms I–751 and I–130. Another commenter suggested that if the cost of filing the form is based on the level of effort required by DHS to process the form, then filing the form

---

wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022'', available at *https://www.uscis.gov/sites/ default/files/document/data/Quarterly_All_Forms_ FY2022_Q4.pdf* (last updated Oct. 2022) (In FY 2022, USCIS received 873,073 Form I–130s, but only 122,803 Form I–751s.).

[250] See Bureau of Consular Affairs, U.S. Dep't of State, ''Travel.State.Gov., The Visa Bulletin,''

*https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html* (last visited Sept. 8, 2023).

[251] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''USCIS Extends Green Card Validity for Conditional Permanent Residents with a Pending Form I–751 or Form I–829'' (Jan. 23, 2023), *https://www.uscis.gov/newsroom/alerts/ uscis-extends-green-card-validity-for-conditional-permanent-residents-with-a-pending-form-i-751-or.*

should only cost 28 percent more than Form I–130, rather than the proposed 41 percent difference.

*Response:* In passing the Immigration Fraud Amendments of 1986, Public Law 99–639, 100 Stat. 3537, Congress recognized short-duration marriages as presenting a higher risk for immigration fraud and requiring additional scrutiny.[252] The higher proposed fee for Form I–751 than Form I–130 was based in part on completion time for Form I–751 (1.54 hours) in comparison Form I–130 (1.11 hours).[253] As previously mentioned, DHS acknowledges commenters' concerns about the Form I–751 fee and has decreased the proposed $1,195 fee to $750, capping it at 26 percent for inflation; likewise, the Form I–130 paper-based filing has also

been capped at 26 percent ($675) and the discounted rate for online filing is $625 (17 percent). *See* 8 CFR 106.2(a)(6), 106.2(a)(43); Table 1. DHS notes that it limits most fees by inflation and offers a $50 online filing fee discount in most cases, as explained elsewhere in this rule.

d. Adoption-Related Forms

Some commenters requested that DHS provide more fee exemptions and free services for adoption related benefit requests. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be provided for free. Consistent with past fee rules, DHS proposed to limit the increase of adoption-related fees. *See* 88 FR 503; 81 FR 73298. DHS reduces fee burdens on adoptive families by covering some of the costs attributable to the adjudication

of certain adoption-related requests with fees collected from other immigration benefit requests. *Id.* In this rule, that includes a free first and second extension or change in country or a request for a duplicate notice. A summary of the new exemptions is listed in Table 8 below. Although other forms may not need to be filed by adoptees, fee waivers are available for adoptees for Forms I–90, N–400, N–336, N–565, N–600,[254] N–600K.

**BILLING CODE 9111–97–P**

---

[252] *See generally* INA section 216, 8 U.S.C. 1186a.

[253] *See* 88 FR 402, 448, Table 10 (Jan. 4, 2023).

---

[254] USCIS issues a Certificate of Citizenship to adopted children who are admitted to the United States with an IR–3 visa (visa category for children from non-Hague Adoption Convention countries adopted abroad by U.S. citizens) or an IH–3 visa (visa category for children from Hague Adoption Convention countries adopted abroad by U.S. citizens) without the filing of a Form N–600, Application for Certificate of Citizenship, and fee, if the child meets all requirements of section 320 of the Act, 8 U.S.C. 1431.

| Table 7: Adoption Fees | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee** | **Proposed Rule Fee** | **Final Fee** |
| • I-600 Petition to Classify Orphan as an Immediate Relative [255] | $775 ($860 with biometric services for one adult) | $920 (with all biometric) (19% increase) | $920 |
| ○ First Form I-600 with approved and valid Form I-600A | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are birth siblings before the proposed adoption | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are not birth siblings | $775 (for each additional petition) | $920 | $920 |

| | | | |
|---|---|---|---|
| before the proposed adoption | | | |
| ○ Form I-600 combination filing exemption: Change in marital status while Form I-600 combination filing suitability determination is pending | $0 | $0 | $0 |
| ○ Form I-600 combination filing change in marital status after suitability approval | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • I-600A Application for Advance Processing of an Orphan Petition | $775 ($860 with biometric services for one adult) | $920 (18% increase) | $920 |
| ○ Change in marital status while Form I-600A is pending | $0 | $0 | $0 |
| ○ Change in marital status after Form I-600A approval | $775 ($860 with biometric services) | $920 (18% increase) | $920 |
| • Form I-600A/I-600 Supplement 1 (Listing of Adult Member of the Household) | $0 | $0 | $0 |
| • Form I-600A/I-600 Supplement 2 (Consent to Disclose Information) | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| • Form I-600A/I-600 Supplement 3 (Request for Action on Approved Form I-600A/I-600) | (N/A)[256] | $455 | $455 |
| ○ First extension of Form I-600A approval or first change of country | (N/A) | $455 | $0 |
| ○ Second extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $0 |
| ○ Second change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $0 |
| ○ Third and subsequent extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $455 |
| ○ Third and subsequent change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $455 |

| | | | |
|---|---|---|---|
| Significant change and updated home study and there is no request for a first or second extension of Form I-600A approval or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.[257] | (N/A)[258] | $455[259] | $455[260] |
| Duplicate Approval Notice | (N/A – must use the Form I-824 with $465 fee) | $455 | $0 |
| • Form I-800 Petition to Classify Convention Adoptee as an Immediate Relative | $775 | $920 (19% increase) | $920 |
| o First Form I-800 with an approved and valid Form I-800A. | $0 | $0 | $0 |
| o If more than one Form I- | $0 | $0 | $0 |

**6312**      *Federal Register* / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| | | | |
|---|---|---|---|
| 800 is filed for an approved and valid Form I-800A for children who are birth siblings before the proposed adoption | | | |
| ○ If more than one Form I-800 is filed based on an approved and valid Form I-800A for children who are not birth siblings before the proposed adoption | $755 (for each additional petition) | $920 | $920 |
| ○ Form I-800 Supplement 1, Consent to Disclose Information. | $0 | $0 | $0 |
| • Form I-800A Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 ($860 with biometrics for one adult) | $920 (includes biometric fee) (18% increase) | $920 |
| ○ Change in marital status while Form I-800A is pending | $0 | $0 | $0 |
| ○ Change in marital status after approval of Form I-800A | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • Form I-800A Supplement 1 | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| Listing of Adult Member of the Household | | | |
| • Form I-800A Supplement 2, Consent to Disclose Information. | $0 | $0 | $0 |
| • Form I-800A Supplement 3 (Request for Action on Approved Form I-800A)<br>○ First extension of the approval of Form I-800A<br>○ First change in Convention country after the approval of Form I-800A | $0 | $0 | $0 |
| ○ Second extension of the approval of Form I-800A<br>○ Second change in Convention country after the approval of Form I-800A | $385<br><br>($470 with biometrics fee for 1) | $455 | $0 |
| ○ Third or subsequent extension of Form I-800A approval<br>○ Third or subsequent change in Convention country after the approval | $385<br>($470 with biometrics fee for 1) | $455 | $455 |

| | | | |
|---|---|---|---|
| of Form I-800A | | | |
| • Request for duplicate approval notice | $385 | $455 | $0 |
| • Significant change and updated home study and there is no request for a first or second extension of Form I-800A approval or first or second change of Hague Adoption Convention country on the same Supplement 3[261] | $385[262] | $455[263] | $455[264] |
| Form N-600, Application for Certificate of Citizenship • For certain adoptees | $1,170 | $1385 $1335 (online filing) | $0 |
| Form N-600K, Application for Citizenship and Issuance of | $1,170 | $1385 $1335 (online filing) | $0 |
| Certificate Under Section 322 • For certain adoptees | | | |

BILLING CODE 9111–97–C

[255] A biometric services fee is required for each petitioner, spouse, and any adult household member aged 18 or older unless you filed Form I-600A and any adult members of your household are within the 15-month biometric services validity period.

[256] Currently being submitted through a written request.
[257] The petitioner would be seeking a reissuance of the approval notice after the adjudication and review of the significant change and updated home study.

[258] Currently being submitted through written request.
[259] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request for an extension of Form I-600A approval or first change of country request.

The final rule also addresses the omission of concurrent filings under 8 CFR 204.3(d)(3) in two places. First, the final rule addresses a discrepancy between current 8 CFR 204.3(h)(13), which provides that an orphan petition will be denied if filed after the advanced processing application has expired, and current 8 CFR 204.3(d)(3), which permits concurrent filing of an orphan petition with an advanced processing application. Under current practice, concurrent filing is permitted even if a prior advanced processing application expired. Therefore, DHS is revising 8 CFR 204.3(h)(13) to clarify that an orphan petition filed after approval of the advanced processing application has expired will not be denied on that basis if the petition is a concurrent filing under 8 CFR 204.3(d)(3) with a new advanced processing application. Second, the final rule adds a reference to concurrent filing at 8 CFR 204.3(h)(14), acknowledging that after a Form I–600 petition is revoked, a new Form I–600A may be filed rather than a Form I–600 combination filing. See 8 CFR 204.3(h)(14)(iii).

*Comment:* Multiple commenters expressed opposition to the proposed fees for adoption-related Forms I–600A, I–600, I–800A, and I–800, indicating that the fees are an additional expense without an increase in services or efficiencies. Some commenters stated that adopted children should be considered vulnerable populations and granted fee exemptions just like other groups DHS considered vulnerable populations meriting fee exemptions. A few commenters suggested that DHS provide an additional fee exemption for non-related children being adopted by the same family. Some commenters

agreed with DHS' conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, but still had overall concerns with perceived fee increases.

*Response:* DHS has included additional fee exemptions in this final rule as discussed above. DHS notes that the proposed fees and final fees for adoption forms limit the increase of adoption-related fees in this rule consistent with previous fee rules. This fee increase is in part a result of inflation and being implemented with the intent to maintain current services. The average two-parent adoptive family will generally pay less for filing Form I–600A, Application for Advanced Processing of an Orphan Petition, Form I–600, Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, and Form I–800 than they pay now because the biometrics services fees will be incorporated into the filing fee. This continues the DHS policy of reducing the fee burden on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications through the fees collected from other immigration benefit requests. To reduce the burden on adoptive families, DHS applied the reduced weighted average increase of 18 percent, which may vary slightly because of rounding fees to the nearest $5. See 88 FR 402, 450–451 (Jan. 4, 2023).

If DHS used the estimated fee-paying unit cost from the ABC model, the Form I–600A, would have a fee of at least $1,333 in this final rule.[265] Applying the reduced weighted average of 18 percent to the current fee of $775 increases the main filing fee by just $145 to $920 for Forms I–600, I–600A, I–800 and I–800A. However, because the biometrics will be incorporated in the filing fee, most applicant households will experience a cost savings in their application filings. A two-parent household pays $945 under the current fee structure (for a suitability application, biometric services fees, and a petition for a child filed while the suitability approval is still valid). The $920 proposed fee with biometrics incorporated would be $25 less than the current fee of $775 plus two separate $85 biometrics fees for such household.

In addition, DHS already provides, and will continue to provide, the

following fee exemptions for Forms I–600A, I–600, I–800A, and I–800:

• First beneficiary for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Birth siblings for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Filing fee for a new I–600A, I–800A, or I–600 combination filing because the marital status of the applicant changed while their request for a suitability determination was pending.

The proposed rule and final rule approach of providing a fee exemption for birth siblings, but not for non-birth siblings, is consistent with the special treatment afforded in the INA to "natural siblings." The INA allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than up to age 16, only if the beneficiary is the "natural sibling" of another foreign-born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. See sections 101(b)(1)(F)(ii) and (G)(iii) of the INA; 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term "natural sibling," DHS generally uses the term "birth sibling" synonymously, which includes half-siblings but does not include adoptive siblings. The INA does not afford special treatment to non-birth siblings, and the proposed and final rule are consistent with the spirit of the INA. The adjudication of an adoption petition is extensive and unique to the circumstance of the child. The adjudication of an adoption petition is not less extensive for unrelated children because they are being adopted by the same adoptive parents and therefore a fee is required to recover costs. Otherwise, even more costs of adoption adjudications would have to be shifted to people applying for other immigration benefits.

Although DHS will not provide additional fee exemptions for the main Forms I–600A, I–600, I–800A or I–800, DHS will provide additional fee exemptions for:

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 (in certain scenarios).

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

• Form N–600, Application for Certificate of Citizenship (for certain adoptees).

• Form N–600K, Application for Citizenship and Issuance of Certificate (for adopted children).

---

[260] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I-600A approval or first or second change of country request.

[261] The petitioner would be seeking the issuance of an updated approval notice after the adjudication and review of the significant change and updated home study.

[262] Prospective adoptive parents currently must pay the $385 Supplement 3 fee to request a new approval notice unless they are also filing a first-time request for an extension of Form I-800A approval or change of country on the same Supplement 3.

[263] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request or first change of country request on the same Supplement 3.

[264] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I-800A approval or first or second change of country request on the same Supplement 3.

[265] See U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

**6316**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

We address these new few exemptions in the following discussion on specific adoption-related comments.

*Comment:* Commenters opposed the proposed Form I–600A/I–600 Supplement 3 fee for certain requests for action on suitability applications for the orphan process combined with the proposed reduction to suitability approval validity time on Form I–600A from 18 months to 15 months. Commenters disagreed with DHS's rationale that shortening the validity period would reduce the burden on adoptive parents and service providers who must deal with multiple expiration dates, reasoning that this would instead create a burden and that DHS should instead align all validity periods to an 18-month timeframe. Although some commenters agreed with DHS's conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, they stated that shortened suitability approval timeframes (from 18 months to 15 months) for orphan cases would impact the number of needed additional extensions and therefore fees. However, commenters expressed support for the proposed fee exemption for the initial extension, reasoning that it appropriately recognizes applicants' additional paperwork and the lighter workload of such cases.

*Response:* The proposed rule and the final rule create some efficiencies for the orphan process like efficiencies already in place for Hague Adoption Convention cases. The rule aligns the suitability approval validity periods for both Orphan and Hague adoptions to the suitability approval, therefore, limiting to only one date to review both for applicants and USCIS. It also creates a dedicated supplement (Form I–600A/Form I–600 Supplement 3) for requests for action on suitability applications so that adoptive parents do not have to draft their own written correspondence or use Form I–824, Application for Action on an Approved Application or Petition. The fee exemption has been expanded to the second extension as well.

Although this rule creates a new supplemental form for the orphan process, having a fee for certain requests for action on suitability applications will not be new. The proposed fee structure will be the same type of process and will be the same as the existing fee structure for the Hague Adoption Convention process. Adoptive parents have been required to use Form I–824 for certain requests for action for the orphan process, for which they paid a current fee of $465, and would have

paid the new $590 fee for Form I–824 set in this final rule. In comparison, the new Supplement 3 fee of $455 is $10 less than the current fee for Form I–824.

Under the proposed rule, the only scenario where adoptive families would have paid more was if they requested a new suitability determination separately from a first-time extension or a change of country request. Petitioners would have paid less under the proposed rule for many scenarios where they request action on a suitability application for the orphan process.

The proposed fees would have been a reduction in fees for petitioners for change of country requests for the orphan process. There would have been a $0 change in fee for a first-time change of county request because those have been, and would have continued to be, fee exempt. Petitioners would have paid $10 less for subsequent change of country requests.

The proposed fees would have also been a reduction in fees for petitioners for duplicate approval notices for the orphan process. Petitioners would have paid $10 less. The proposed fees would have also been a reduction in fees for extension requests. Even with reducing the validity period from 18 months to 15 months for the orphan process, provided petitioners filed their Form I–600 petition within 2.5 years (30 months) of their Form I–600A approval, they would not have had any extension fees. This is because USCIS does not require petitioners to continue to file extensions of their suitability application approval after they file the petition. Petitioners would also have paid less for a subsequent suitability approval. Currently, after a prospective adoptive parent has used the one-time, no fee extension, the prospective adoptive parent cannot further extend the orphan suitability approval and must begin with a new suitability application or combination filing, with a current fee of $775 plus a biometric services fee. Under the proposed process with the new Supplement 3, they would have the option to pay $320 less for a second extension ($455 to extend via new supplement instead of having to file a new Form I–600A with full fee of $775 plus the biometric services fee).

As explained in the section II.C. Changes from the Proposed Rule, DHS is providing additional fee exemptions for adoptive families in this final rule. Specifically, DHS will also provide fee exemptions for:

• Second extensions.
• Second change of country requests.
• Duplicate approval notices for both the orphan and the Hague process.

*Comment:* Some commenters stated that DHS should not place limitations on using the Supplement 3 to extend Form I–600A approval to use the orphan process when countries transition to the Hague Adoption Convention process.

*Response:* Generally, other countries have requested that DHS limit the ability of transition cases to continue indefinitely to limit the confusion that having two simultaneously running adoption processes causes to its administrative bodies and judicial systems. The DHS proposal and Final Rule allows adoptive parents who have taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force additional time to complete the adoption process under the non-Hague process. The final rule will also permit adoptive parents to use the Supplement 3 to request an increase in the number of children they are approved to adopt from a transition country, but only if the additional child is a birth sibling of a child they have already adopted or are in the process of adopting as a transition case and the birth sibling is identified and petitioned for before the Form I–600A approval expires, unless the Convention country prohibits such birth sibling cases from proceeding as transition cases. However, DHS reasonably limits the ability of adoptive parents to indefinitely request extensions of the validity period of the Form I–600A approval, the ability of adoptive parents to request an increase in the number of non-birth sibling children they are approved to adopt, and the processing of transition cases under the non-Hague process. DHS will maintain the provision as proposed.

*Comment:* A commenter opposed removing the regulation that provides for DHS to extend suitability approvals under the orphan process without the prospective adoptive parents requesting one in certain scenarios.

*Response:* DHS is responsible for ensuring adoptive parents are suitable throughout the intercountry adoption process, and therefore does not believe we should extend approvals without determining whether the prospective adoptive parents remain suitable. Furthermore, DHS does not have such a provision for the Hague Adoption Convention process. Removing this provision for the orphan process will help further align the orphan process with the Hague Adoption Convention process, a process which is designed to provide safeguards for all parties to an adoption.

f. Other Comments on Family-Based Benefits

*Comment:* Commenters stated that raising the fees for family-based applications will make it more difficult to reunite with family members abroad. The fee increases would undermine the well-being of immigrants and family unity, force families to choose between the peace, unity, and security that family-based immigration was created to support, and paying for more immediate necessities like food, housing, and healthcare. USCIS should distinguish between single and family applicants because family applications take more effort to process, and individual applications should be less expensive. Applicants should be made aware of how long the maximum wait time could be.

*Response:* DHS acknowledges the difficulties that come with being separated from family members abroad. However, case processing backlogs make it difficult for all family members to reunite. USCIS is funded by fees and it cannot make progress in alleviating backlogs without raising fees to at least keep up with the rate of inflation and recovering the costs to process applications with approved fee waivers. Additionally, creating and maintaining a new system of tiered pricing would be administratively complex and may require even higher costs than outlined in the proposed rule as well as delay intake and exacerbate backlogs. The fee increases for many family-based petitions (Forms I–129F, I–130, and all adoption-related petitioners/applications) are limited to inflation or less. *See* 8 CFR 106.2.

6. Adjustment of Status and Waivers

a. I–485: Application To Register Permanent Residence or Adjust Status

(1) Form I–485 and Separate Form I–131 and I–765 Fees

*Comment:* Many comments were submitted about the proposed fee increases for Forms I–485, I–765, and I–131 and the separation of fees for Forms I–131 and I–765 when filed with Form I–485. Many commenters expressed concern that the increased fees for Form I–485 and unbundled interim benefits would be unduly burdensome and render these benefits unaffordable to many eligible applicants, including those who are low or middle income or working class. Specifically, commenters stated the following:

• The Form I–485 fee is not waivable in most cases that do not involve humanitarian exemptions or exemptions from public charge inadmissibility.

• The fee changes run counter to the ability-to-pay principal and the President's directive to reduce barriers to immigration.

• The proposed fees would impede family unity and harm the public interest by forcing families to either exclude certain members (most likely children) from applying with the entire family, by delaying or foregoing applying altogether.

• The higher fees would force some adjustment of status applicants to forego or delay filing Form I–765, which would prevent them from working and supporting themselves, paying for basic human needs such as food, housing, medical care, and transportation, obtaining other government-issued documents (such as a driver's license, State identification card, or a Social Security number), or accessing public benefits and community services.

• Adjustment of status applicants who forego an EAD would be more likely to rely on public benefits or charity while their Form I–485 is pending, or pursue unauthorized employment where they would be vulnerable to exploitation.

• Without an EAD, employed adjustment of status applicants would have to endure the stress of potentially losing their job.

• Higher fees would result in more Form I–485 applicants being unable to afford legal representation, which would increase processing times and administrative costs due to RFEs, and in more applicants turning to unscrupulous lending institutions or relying on credit cards or other high-interest mechanisms to pay their expenses and benefit fees.

*Response:* DHS acknowledges the difficulty some individuals and families encounter in balancing paying for the rising costs of basic needs and benefits, and that employment authorization is often key to the success of immigrants in the United States. However, DHS believes that we have balanced the filing options with separate costs and discounts in this final rule to further mitigate the cost burden to applicants. *See* 8 CFR 106.2(a)(7), (21), (44). The new separate fees represent DHS's best effort to reduce barriers to immigration through balancing affordability, benefits, family unity, and ability to pay, while maintaining adequate services.[266]

DHS is not codifying the proposed fees about which the commenters are commenting, and the separate fees are only increased by inflation or less

[266] *See* 88 FR 402, 492, Table 16 (Jan. 4, 2023); 88 FR 402, 433–442, 491–495.

(which is less than the full cost of adjudicating these applications). DHS disagrees that an increase in fees proportionate to the level of inflation would necessarily result in more Form I–485 applicants being unable to afford legal representation. The inflation-only increase means that the Form I–485 fee is the same in real dollars as the current fee was when it was last updated in 2016. Thus, assuming that attorneys' fees increased consistent with inflation, an applicant who could have afforded to hire an attorney in 2016 would generally be able to afford an attorney today, all other things remaining equal. Furthermore, USCIS designs its forms with the goal of making them usable by the general public without the need to hire counsel. USCIS also continues to make efforts to reduce the frequency of RFEs, including revising forms and instructions using plain language to reduce the burden of information collections, and through rulemakings that clarify and modernize ambiguous definitions or inconsistent adjudication. Therefore, DHS disagrees that the fee increase for Form I–485 would directly result in an inability to pay for legal representation when necessary or borrowing from unscrupulous lenders, and finds no evidence to support commenters' contention that fewer applicants choosing to pay for legal representation would result in quantifiable impacts to RFEs or processing times. Currently, Form I–485 and interim benefits are separated and adjudicated by different units. USCIS's practice of adjudicating these forms is not expected to change with the separation of these benefits; therefore, it is not expected that requests will have any additional impact on processing times or administrative costs.

Based on the comments and further review of the fees, DHS has decided to:

• Reduce the fee for Form I–485 from $1,540 in the proposed rule to $1,440 in the final rule.

• Limit the Form I–765 fee for those who filed USCIS Form I–485 after the effective date of this rule to $260, half the cost for filing Form I–765 on paper.

• Provide a $490 discount for applicants (principal or derivative) under age 14 when they file Form I–485 concurrently with a parent.

• Continue to charge Form I–485 applicants who want an advance parole document a full fee for Form I–131 ($630).

*See* 8 CFR 106.2(a)(21); 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii) and (iv).

DHS has determined that unbundling the forms will assist USCIS making processing times more efficient by

eliminating Form I–765s filed for individuals who are not in need of employment authorization or Form I–131s for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need. Applicants who are unable to pay the fee and exempt from the public charge ground of inadmissibility may apply for a waiver of the fee for Form I–485. *See* 8 CFR 106.3(a)(3)(iv)(C). Many humanitarian and protection-based classifications pay no fee for Form I–485. *See* 8 CFR 106.3(b); Table 5C. DHS believes the discounted Form I–765 fee may limit burden for low, middle-income, or working-class members. DHS also notes that the fee for Form I–765 is waivable for any I–485 applicant who is unable to pay the fee, *see* 8 CFR 106.3(a)(3)(ii)(F), and Forms I–131 and I–765 are fee exempt for certain categories of applicants, *see* 8 CFR 106.3(b); Table 5C.

*Comment:* Commenters also expressed concern that adjustment of status applicants would forego or delay filing Form I–131. Specifically, commenters stated the following:

• Some wrote that these Form I–485 applicants would be trapped in the United States while their adjustment of status applications were pending, and be unable to travel to see family or leave the United States temporarily if they faced urgent issues.

• A commenter wrote that DHS should end the requirement that I–485 applicants obtain advance parole before travel if they possess lawful nonimmigrant status.

• A commenter said that advance parole is more critical than ever given increased Form I–485 processing times.

• Another stated it was "borderline extortion" to require Form I–485 applicants to pay for travel authorization given the long wait time for Form I–485.

• A commenter said the adjustment process is "illusory" because adjustment applications require several years for adjudication and associated applications for travel and employment authorization require over 15 months.

• Travel authorization would alleviate family separation for adjustment of status applicants who have been unable to travel outside the United States for many years.

• Unbundling of interim benefits would force more I–485 applicants to seek emergency travel requests if emergencies arose, which would put additional strain on USCIS field offices.

• USCIS should drop the requirement for lawful nonimmigrants to apply for advance parole.

• USCIS could better manage the process of providing advance parole by dropping the requirement for lawful nonimmigrants to apply for and receive advance parole incident to the filing of Form I–485, allowing for travel with a pending Form I–485, extending the validity of Advance Parole Documents (APDs) for individuals with a pending Form I–485 until USCIS can render a decision or to coincide with current processing times.

• Employment and travel authorization is important given long processing times for Form I–485, and the I–131 and I–765 should not be separated from the I–485 fee, as this will increase the filing costs and may make adjustment of status unattainable for some.

• Some I–485 applicants wait long periods of time to have their applications adjudicated due to processing times, backlogs, and visa retrogression, and these applicants must pay for I–765 and I–131 renewals.

• The proposed Form I–485 fee increases were unjustified considering USCIS backlogs and processing delays. Commenters said that, to justify the fee increases, USCIS would need to improve its processing of Form I–485 and related applications so that they are adjudicated within a reasonable timeframe.

*Response:* It is correct that some applicants must obtain advance parole before departing the United States with a pending Form I–485 to avoid abandoning the adjustment of status application. *See* 8 CFR 245.2(a)(4)(ii)(A). The advance parole document is generally issued for one year to allow for the processing of an applicant's Form I–485. USCIS does not have the ability to administratively track all Form I–131 applicants continually to determine whether the Form I–485, is still pending, has been abandoned, or denied. Therefore, USCIS cannot extend an Advance Parole Document validity to coincide with a pending Form I–485.

Separating the Form I–131 fee from the Form I–485 fee does not alter what has always been true—noncitizens requesting the benefit of advance parole are generally required to pay a fee to USCIS for the adjudication of the benefit request. While recovering the costs for the adjudication of that benefit request was previously accomplished through a bundled fee, the fee was still present. Separating the fees ensures that noncitizens are only paying for the benefits that they want or need. If an applicant has no need for an advance parole document, they would no longer be required to pay a bundled fee which includes a benefit they do not want or need. Continuing to provide the Form I–131, Application for Travel Document, with no fee increases I–131 processing times by creating incentive to apply for a benefit that an applicant may not need, leading to longer wait times to those who are truly in need and may be unable to leave. The approach taken by DHS in this final rule ensures that only those noncitizens who want or need advance parole pay the associated fee. Separating the fees and ensuring that only those who want or need the benefit pay the fee would not prevent individuals from traveling. It will provide an adequate cost recovery mechanism for USCIS and reduce unnecessary fee burdens on applicants who do not seek travel authorization. DHS strongly rejects the commenter's suggestion that charging a fee in association with the adjudication of a benefit request is "extortion," as USCIS has the statutory authority to establish and charge fees to ensure recovery of the full cost of providing services. *See* INA section 286(m) and 8 U.S.C. 1356(m). DHS declines to adopt the proposal not to require advance parole for Form I–485 applicants who possess nonimmigrant status, which could result in excessive continuances of Form I–485s for applicants who can freely travel outside the country while their applications are pending and who for good cause find themselves unable to return in time for their interview[267] DHS disagrees with the characterization of the adjustment process as "illusory," noting that USCIS adjudicated 608,734 Form I–485s in FY 2022.[268]

*Comment:* Commenters expressed concern for the effect that the increased fees for Forms I–485, I–765, and I–131 would have on certain groups, including:

• Asylees and other vulnerable groups, who tend to be low income or have limited financial resources, and require a refugee travel document to travel internationally and an EAD to obtain a REAL ID compliant form of identification.

• Victims of sexual and domestic violence and trafficking who do not pursue, or are ineligible for, survivor-

---

[267] *See* 8 CFR 103.2(b)(9)(ii), (13)(ii) (allowing interview continuances for good cause).

[268] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022," *https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2022_Q4.pdf* (last updated Oct. 2022).

specific adjustment of status or do not qualify for a fee exemption.

• Afghan applicants and their families, many of whom served alongside U.S. troops and have been paroled into the United States, whose adjustment of status and interim benefit fees would not be waived.

• Student applicants with limited financial resources.

• International religious workers.

• K–1 fiancé(e)s, who have already gone through a long review process before entry.

• Conflicts with DHS's goal of treating all who apply for interim benefits the same and conflicts with the INA, which "states a clear preference for family-based immigration by completely eliminating quotas for select family-based categories."

• Proposed fees for Form I–485 and interim benefits were unjustified or unreasonable.

• Many commenters expressed concern with the size of the fee increases, which some characterized as "exorbitant," particularly when filing Forms I–485, I–765, and I–131 together.

• Fee increases significantly outpace the rate of inflation since the last fee increase in 2016.

• Fees are already set at a level sufficient to cover the cost of adjudicating the Forms I–131 and I–765 filed with them.

• Filers are "shouldering the burden" of fee waivers and exemptions for other immigration forms.

*Response:* Although fee increases may impact individuals differently, DHS believes that it has balanced the new fee schedule by providing a reduced fee for Form I–765 when filed with Form I–485 and separating the fee for Form I–131, which some people may not need. As indicated in the proposed rule, continuing to combine the fees together would increase the fees dramatically. DHS in its fee review did not target specific groups and recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing.

*Comment:* One commenter stated that, if Congress were to pass the Dream Act, *see* S. 264, 117th Cong. (2021), or similar legislation, the Act's beneficiaries would have to pay these additional fees to obtain permanent resident status.

*Response:* As the commenter indicated, Congress has not passed the Dream Act and therefore DHS has not

made any changes based on this comment. Congress may choose to provide for specific fees in the Dream Act or similar legislation.

*Comment:* One commenter alleged that the new fees were "clear punishment" for employment-based applicants from India who filed Form I–485s during fiscal years 2021–22 but who have not been approved due to visa retrogression. Some commenters said that expecting employment-based adjustment applicants to pay a fee every time they renew their Form I–765 or Form I–131 is unfair because as they are stuck in this limbo due to visa date or retrogression and for no fault of their own. Others expressed concern that individuals who filed Forms I–485, I–765, and I–131 before the effective date of the fee change would be subject to additional fees for Form I–765 and I–131 renewals as a result of the unbundling.

*Response:* DHS disagrees that this fee is a punishment for any specific groups who have not been approved due to visa retrogression or membership in a class of individual and recognizes that many individuals of various nationalities filing the Form I–485 have experienced long wait times to be reunited with family. Congress determines the policy on visa limitations, and eliminating quotas is outside the purview of this rulemaking. DHS notes again that individuals who filed a Form I–485 after July 30, 2007 (the FY 2008/2009 fee rule), and before this change takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

*Comment:* A commenter wrote that USCIS was passing along the costs of mismanagement from prior administrations to current and future Form I–485 applicants. Another wrote that, by separating the Form I–485 from interim benefit fees, USCIS was getting extra income from its processing backlogs. Commenters questioned the rationale and assumptions underlying DHS's justification for unbundling the fees for Forms I–485, I–765, and I–131. Some asserted that these forms are usually filed concurrently, so the combined fee increase for those forms is more important than the increase for Form I–485 alone. Another commenter stated that raising the Form I–485 fee would bring no financial benefit to USCIS because adjustment applicants are relatively low compared to other visas and immigration applications.

*Response:* USCIS did not realize the operational efficiencies that DHS envisioned when it combined fees for Form I–485 and interim benefits, which

was implemented to address the same commenter accusation of a revenue incentive.[269] In fiscal year 2022, USCIS received 599,802 Form I–485s. USCIS has no data to indicate that it takes less time to adjudicate interim benefits bundled with a Form I–485 than it does to adjudicate standalone Form I–131 and I–765 filings. Individuals applying for adjustment of status are not required to request a travel document or employment authorization. With combined interim benefit fees, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price. Unbundling allows individuals to pay for only the services requested. Thus, many individuals may not pay the full combined price for Forms I–485, I–131, and I–765. DHS recently increased the maximum validity period to 5 years for initial and renewal Employment Authorization Documents (EADs) for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[270] This new policy could reduce the number of EAD extensions an applicant might need to file, further reducing an applicant's financial burden.[271]

*Comment:* A commenter asserted that applicants should not have to pay for an EAD or Advance Parole when they are entitled to them because of their pending Form I–485, while another stated that it makes no sense to charge separate fees for Form I–485 and interim benefits if they are all being processed as part of the same package.

*Response:* DHS notes that an EAD, when issued in connection with a pending I–485, and Advance Parole are discretionary benefits, and as such there is no "entitlement" to them under the statute or regulations. *See* 8 CFR 223.2(e); 8 CFR 274a.13(a)(1). Although applicants may submit forms together in one envelope or online, each receipt and adjudication have a different process and associated cost as they are separate

---

[269] *See* Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 72 FR 4888, 4894 (Feb. 1, 2007) (stating, "This creates the perception that USCIS gains by processing cases slowly.").

[270] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last updated Sept. 27, 2023).

[271] *See* Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants, 87 FR 26614 (May 4, 2022).

benefits and have separate eligibility requirements. To improve efficiency and reduce Form I–765 processing times for Form I–485 applicants, USCIS may decouple Form I–765s from Form I–131s filed at the same time. Since February 1, 2022, when possible, USCIS adjudicates an applicant's Form I–765 first. If approved, USCIS will issue an EAD without any notation about advance parole. Form I–131s are adjudicated separately and if approved, USCIS will issue an advance parole document.[272]

*Comment:* Some commenters stated that the DHS's rationale for the current fee increases conflict with is rationale for originally bundling the forms in 2007. Some said that DHS raised the Form I–485 fee in 2007 to include fees for Forms I–765 and I–131, yet DHS is now raising the fee for the Form I–485 while unbundling the other benefits. One commenter stated that DHS originally justified bundling these forms to allow applicants to work and travel during the long Form I–485 processing times, but these processing times are even longer now.

*Response:* In the FY 2008/2009 fee rule, the decision was made to allow applicants who properly file and pay for the Form I–485 to file for interim benefits for no additional fee. During the 2016/2017 fee review, DHS reviewed the cost of bundling the benefits with the Form I–485. *See* 81 FR 26903, 26918 (May 4, 2016). However, USCIS has determined that continuing the practice of bundling will further contribute to backlogs by incentivizing unnecessary filings, increase the cost of the Form I–485 for all filers, and increase the cost of Forms I–765 and I–131 for other filers. *See* 88 CFR 491–495.

By continuing to bundle the forms, the weighted average fee increases for Form I–485 and interim benefits would have been 51 percent. Therefore, applicants would have paid much more to bundle Forms I–485, I–131 and I–765. DHS is separating fees for interim benefit applications and Form I–485 applications to keep the fees lower for most the greatest number of applicants.

Based on the data and comments, DHS will provide for separate fees for each form to account for people who may not file for all three forms. However, DHS understands that most people would request an EAD with their Form I–485 filing and therefore has provided for a lower fee for Form I–765

that is concurrently filed with Form I–485.

*Comment:* Commenters claimed that maintaining a bundled fee for Forms I–485, I–765, and I–131 would be more efficient. A commenter claimed that DHS had not specified how a separate fee for the Forms I–765 and I–131 would decrease processing times. Another commenter stated that, by requiring separate benefit requests for interim benefits, the changes will increase processing times and result in inconsistent adjudications. Another commenter said that unbundling Forms I–485, I–765, and I–131 will cause applicants to file these forms at different times as needed, which reduces early, systematic processing of packets systematically in mail rooms and service centers. A commenter wrote that unbundling would require adjustment applicants to submit multiple individual applications, which would increase work and costs for USCIS and potentially negate the benefits sought by USCIS. A commenter asserted that keeping Forms I–485, I–765, and I–131 bundled would incentivize USCIS to process Form I–485s in a timely manner to avoid Forms I–131 and I–765 renewals, while another stated that separate fees would create a perverse incentive for USCIS to delay adjudication of benefits and Form I–485 applications as a financial reward for inefficiency.

*Response:* DHS maintains that the unbundling of Forms I–485, I–765, and I–131 would help decrease processing times. Currently, some applicants file all three forms without needing the benefits of advance parole or employment authorization while they await the adjudication of their adjustment of status application because of the one-fee model. This results in the adjudication of benefits that applicants may not otherwise want or need. By unbundling the forms, DHS is trying to limit the cost for certain benefits for those who do not need them. By limiting the number of individuals applying for unnecessary benefits, DHS will also decrease the total number of applications filed, direct resources toward adjudicating those benefit requests that are needed and decrease overall processing times for advance parole and employment authorization. DHS notes that separating the fees for Forms I–485, I–765, and I–131 would not prevent applicants from submitting these forms concurrently. DHS agrees that, in some cases, applicants may choose to file Forms I–765 or I–131 at different times as needed, which aligns with DHS's goal for applicants to only apply for those benefits they want or need without

having other fee-paying applicants subsidize those benefits. DHS disagrees that this will reduce orderly, systematic processing of these applications. Applicants are already required to submit individual forms for the different benefits of adjustment of status, employment authorization, and advance parole.

DHS disagrees that unbundling the Forms I–485, I–765, and I–131 creates an incentive for DHS to increase processing times. Rather, the fees listed in this rule reflect the cost of adjudication of the specific benefits requests, accounting for increased costs to USCIS since the publication of the last fee rule and limiting fees for those applicants who do not need certain ancillary benefits.

*Comment:* Some commenters said that the new unbundled fees would confuse applicants. One said that separating the fees would impact nonprofit organizations that help applicants by requiring them to retrain staff to adapt to the change.

*Response:* DHS understands changes in fees impact organizations that help applicants file forms and new fees may be confusing. Form G–1055 will provide a list of all fees, fee exemptions, reduced fees, and fee waiver eligible forms which should clarify all the fee provisions for applicants and nonprofit organizations. As previously indicated, DHS generally reviews fees every two years, as required by the CFO Act, 31 U.S.C. 901–03, but has not been able to increase fees since 2016 to keep up with increased costs. DHS did not make any changes based on this comment.

*Comment:* Commenters expressed concern that the increased fees for Forms I–485 and I–765 would adversely affect the U.S. workforce and economy. Commenters said it would cause fewer individuals to work, which would reduce tax revenues and otherwise harm the U.S. economy. A commenter stated that this could lead to more individuals working without authorization and decreased economic gains for the United States. Another commenter predicted that increased cost for these applications would encourage individuals to move to other countries and lead to brain drain. Another stated that the Form I–485 fee increase would hurt businesses' ability to sponsor highly skilled workers who are crucial to STEM-related sectors. More generally, one commenter cited research showing the economic gains and poverty reduction when migrants obtain LPR status.

*Response:* DHS understands the vital role our immigrant communities play in the workforce and economy. DHS

---

[272] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland, "I–765, Application for Employment Authorization" *https://www.uscis.gov/i-765* (last updated Mar. 8, 2022).

appreciates the comments and data provided which cited research depicting economic gains and poverty reduction when LPR status is obtained; however, there was no analysis or discussion provided by commentors how individuals and businesses make difficult trade-offs to afford valuable immigration benefits. DHS is aware of research suggesting that employment authorization, LPR status, and citizenship are associated with higher incomes despite little consensus concerning how much of these differences remain after controlling for abilities and other factors. DHS continues to follow research on high-skill migration but finds no basis supporting commenters' claims that fee increases under this rule could be reasonably expected to result in a "brain drain."

Before the FY 2008/2009 fee rule, applicants paid separate fees for Forms I–765 and I–131 benefits while waiting for their Form I–485 to be adjudicated. The 2008/2009 fee rule allowed applicants to pay for the I–485 and file the interim benefits at no additional cost. Due to inflation and the enjoined 2020 fee rule, USCIS recognized that the fee was insufficient to recover costs associated with these filings. In addition, with no filing fees for the interim benefits, it provided adverse incentive for filers who may not need the benefits and contributed to longer processing times. For these reasons, USCIS has calculated the fee for the Form I–485 to allow applicants to file and pay the interim benefits separately and as needed. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[273]

*Comment:* Commenters stated that the increased fees for adjustment of status and interim benefits undermine USCIS' goal of promoting naturalization by preventing or delaying people from obtaining permanent residency. Some commenters suggested that the increased fees for Forms I–485, I–765, and I–131 were intended to discourage immigration and naturalization. A commenter wrote that obtaining LPR status also facilitates deeper integration and allows migrants to more fully participate in civic life, and therefore fees for lawful permanent residence should be as low as possible. A commenter stated that, by delaying or preventing individuals from filing applications, the fee increases would negatively impact USCIS, which is primarily funded by application fees.

*Response:* DHS does not believe that the new fees undermine the goals of promoting naturalization or prevent people from obtaining lawful permanent residence. As previously indicated, USCIS is mostly dependent on form fees without appropriations. DHS must balance increased costs and burdens to applicants but does not intend to discourage immigration or naturalization. After recent fee increases, USCIS did not see a decrease in filings that it can attribute to fee increases. DHS notes that it continues to set the fee for Form N–400 below full cost recovery to promote naturalization and immigrant integration. *See* 88 FR 402, 487 (Jan. 4, 2023).

*Comment:* A few commenters expressed frustration with situations where the I–485 is adjudicated before the I–765 or I–131, potentially resulting in wasted applications fees if the applications are unbundled, and asked whether fees would be refunded in these situations.

*Response:* DHS understands that an applicant may receive the final notice that their Form I–765 or I–131 has been adjudicated after receiving a decision on their Form I–485; however, costs associated with each application begin at intake and continue through final adjudication. In this final rule, DHS has revised 8 CFR 103.2(a)(1) to provided that filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS.[274]

In general, USCIS does not refund a fee or application once it has made it through intake regardless of the decision on the application.[275] There are only a few exceptions, such as refund of the premium processing service fee under 8 CFR 106.4(f)(4), when USCIS made an error which resulted in the application being filed inappropriately, or when an incorrect fee was collected. DHS proposed to revise 8 CFR 103.2(a)(1) to provide that fees are "generally" not refunded. This would address concerns that the current regulatory text does not explicitly permit refunds at DHS discretion.

DHS declines to make further policy changes based on these comments.

*Comment:* Instead of the proposed fees for Form I–485 and interim benefits, commenters proposed the following alternatives:

• Maintain the current policy of allowing applicants to file their I–485 with applications for interim benefits at no additional cost.

• Automatically grant employment authorization and advance parole to applicants for adjustment of status, which USCIS already allows in different situations.

• Issue automatic interim EADs in times of processing delays.

• Restore the fee for Form I–485 to the true cost of processing the form.

• Set the fee for Form I–485 with interim benefits and biometrics fees at $1,540, which is a 35 percent difference from current fees of $1,140.

• Offer a discounted fee and streamlined approval processes for Forms I–765 and I–131 that are concurrently filed with Form I–485.

• Exempt fees for Forms I–765 and I–131 renewals while Form I–485 is pending.

• Maintain the bundled fees for the initial I–765 and I–131, and only charge separate fees for renewals; or at least allow the initial I–765 to remain bundled.

• Apply the fee increases only to I–485 applicants who had not filed their underlying petitions before the effective date.

• Extend EAD and Advance Parole validity periods to the compensate for increased fees for interim benefits.

• Cap the amount of fees paid by immediate family members applying together.

• Waive or reduce fees for Form I–485 and associated interim benefits for family-based petitions.

• Automatically grant interim benefits to K–1 fiancé(e)s.

*Response:* DHS has reviewed the proposals and determined that providing a lower fee for Form I–765 filed with Form I–485 and maintaining the full Form I–131 fee is appropriate and balances the cost to Form I–485 applicants who wish to also file Forms I–765 and I–131, while limiting the cost burden. Although work is authorized for some individuals because of their immigration status or circumstances, for example, asylees, parolees or U nonimmigrants, USCIS does not provide

---

[273] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last/updated Sept. 27, 2023).

[274] The entirety of 8 CFR 103.2(a)(1) is republished for ease of editing and context but only the fourth sentence in 8 CFR 103.2(a)(1) is revised.

[275] When USCIS rejects an immigration benefit request as required by 8 CFR 103.2(a)(7) the fee is returned to the requestor. DHS does not consider the act of returning a fee for a rejected request that is not provided a receipt number as a "refund" because the requestor's payment is not processed.

automatic EAD cards to Form I–485 applicants.[276] However, DHS is providing the following changes to mitigate some of the financial burden to applicants:

• DHS is providing a 50 percent filing discount on the Form I–765 when the I–485 is filed with a fee and the Form I–485 is still pending. *See* 8 CFR 106.2(a)(44)(i).

• Applicants who filed their Form I–485 on or after July 30, 2007, and before the effective date of the rule will not be subject to the new fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

• USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[277]

DHS believes that these changes mitigate the proposed fee increases. DHS declines to make any further adjustments based on these comments.

### (2) Fees for Children Under 14 Filing With Parent

*Comment:* Multiple commenters expressed opposition to the elimination of the lower filing fee for derivative children under 14 filing concurrently with a parent. Some commenters disagreed with the DHS's rationale for eliminating the lower fee for Form I–485 applicants under the age of 14. Commenters stated that:

• The increased fee would be significant and overly burdensome, with some remarking that the fee would more than double.

• Given the uncoupled fees for interim benefits and the inclusion of biometrics costs, applicants under 14 would be paying more for less benefits.

• The fee increase for a child's application in addition to unbundling the employment authorization and advance parole document request would

make adjustment of status unaffordable to some applicants.

• The fee increase would impede family reunification and runs contrary to other policy objectives.

• The fee increase would force some families to stagger or delay I–485 applications for certain family members.

• Fee changes for applicants under 14 would impose and increase burdens on groups or price out applicants who are low-income or experiencing poverty.

• A fee increase would threaten children's health, education, safety, security, and future.

• They disagreed that there is no cost basis for different I–485 fees for adults and derivative children.

• USCIS' failure to track the difference in adjudication times for I–485s based on the age of the applicant did not justify the assumption that there was no difference in adjudication time based on age.

• DHS failed to consider that young children are less likely to have inadmissibility and discretionary issues that would delay adjudications, such as immigration violations, criminal history, and misrepresentation.

• DHS did not address potential efficiencies in adjudicating two related I–485s submitted concurrently by family members.

• It should take less time to process a child's application after the agency has processed the parents concurrently filed one.

• The fee increase included unnecessary costs for biometrics services since children under 14 are exempt from these requirements.

• They disagreed with DHS' rationale that only a small percentage of adjustment applicants are children.

• DHS's rationale ignored the effects of the fee increase on other family members.

• The increased fee would reduce applications for adjustment of status by children.

• This would undermine DHS's goals of encouraging naturalization and family integration.

• The fee increase would undercut the social and economic benefits of family-based immigration.

*Response:* DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. After reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950 (27 percent increase over

the current fee). Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A). A child filing Form I–485 after the effective date of the final rule, concurrently with a parent or as a standalone, will pay $260 for Form I–765 (50 percent discount) and $630 for an advance parole document, if requested (10 percent increase). *See* 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii). Furthermore, applicants who are unable to pay the fee for Form I–485 and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C).

### (3) INA Sec. 245(i) Statutory Sum Clarification

*Comment:* Another commenter wrote that the penalty fee under INA section 245(i), 8 U.S.C. 1255(i), should be increased to $2,000, but acknowledged that this would require congressional action.

*Response:* The commenter correctly notes that the additional fee for adjustment of status under INA 245(i), 8 U.S.C. 1255(i), is determined by statute, and so can only be changed by Congress. *See* INA 245(i)(1), 8 U.S.C. 1255(i)(1).

### (4) Other Comments on Form I–485 Fees

*Comment:* One commenter stated that the fee increase was inconsistent with E.O. 14091 because it did not consider the disproportionate impact the change would have on lower income applicants of color, particularly larger families coming from Central and South America.

*Response:* DHS believes that this rule is consistent with E.O. 14091. DHS recognizes that fees may impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate consistent with the ability-to-pay principle. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. The proposed rule included a $1,540 fee for Form I–485. *See* 88 FR 402, 407 (Jan. 4, 2023). In recognition of comments and the impacts on applicants, DHS has decreased the filing fee to $1,440, limiting the fee increase to the change in inflation as of June 2023 (26 percent). To further mitigate the cost burden, the final rule will also continue to provide a discount for children aged 14 and under who concurrently file with a parent, which

---

[276] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Employment Authorization Document," *https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document* (last updated Feb. 11, 2022); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Certain Afghan and Ukrainian Parolees Are Employment Authorized Incident to Parole," *https://www.uscis.gov/newsroom/alerts/certain-afghan-and-ukrainian-parolees-are-employment-authorized-incident-to-parole* (last updated Nov. 21, 2022).

[277] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last updated Sept. 27, 2023).

will assist larger families seeking to adjust. *See* 8 CFR 106.2(a)(21)(ii). Under the final rule, applicants who are unable to pay the fee and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C). USCIS has also proposed additional fee exemptions for certain applicants seeking to adjust under humanitarian and protection-based immigration categories. *See* 8 CFR 106.3(b). DHS acknowledges that many applicants for adjustment of status are not eligible for fee waivers or exemptions. At the same time, various INA provisions contemplate that most adjustment of status applicants will have means of support. *See, e.g.,* INA section 212(a)(4), 8 U.S.C. 1182(a)(4); INA section 213A, 8 U.S.C. 1183a; *see also* E.O. 14019, 11(b) ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations.").

*Comment:* Asylee families would be particularly hurt if forced to stagger their Form I–485 filings due to the increase in fees, since the principal asylee would have to delay naturalization until the remaining family members adjust status, otherwise some derivative applicants would become ineligible to adjust status.

*Response:* DHS recognizes the potential difficulties that result when certain asylee family members decide to adjust and naturalize before others, which requires the remaining unadjusted family members to file *nunc pro tunc* asylum applications. However, DHS notes that the fee for Forms I–485 and I–765 may be waived for asylees (who are exempt from the public charge ground of inadmissibility) who are unable to pay. *See* 8 CFR 106.3(a)(iv)(C), (ii)(F). Therefore, asylee families who are unable to pay the fees for these forms should not have to stagger the adjustment applications of different family members. DHS has considered the comments regarding the Form I–485 and reduced the proposed fee to a 26 percent increase in the filing fee for Form I–485, *see* Table 1, and maintained a lower filing fee for children under the age of 14 filing concurrently with a parent, 8 CFR 106.2(a)(21)(ii). DHS has limited the Form I–485 fee increase by requiring fees for concurrently filed requests for interim benefits (Forms I–765 and I–131) but limited the fee for the Form I–765 while a Form I–485 is pending to $260. 8 CFR 106.2(a)(7), (21) & (44)(i). DHS believes that these changes in the final rule will limit staggering of Form I–485s for asylee families and *nunc pro tunc* asylum applications.

*Comment:* A commenter recommended narrowing and adding a fee for Supplement J when filed after Form I–485, such that Supplement J would not be required for re-assigning classifications on a pending Form I–485 and would not "restart the clock" for Form I–485 portability.

*Response:* DHS considered the commenter's suggestions concerning the use of Form I–485, Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), and the potential for charging a fee in a new context as described. USCIS has generally not required applicants to pay a fee for many forms that are supplemental in nature, for example, Form I–130A, Supplemental Information for Spouse Beneficiary. The Form I–485, Supplement J, is to confirm a bona fide job offer or transfer the underlying basis of their adjustment of status application to a different petition. Requesting applicants to pay a new fee to port to a new job would present a new financial burden for the applicant that could prevent some intending immigrants from being able to take advantage of the portability provisions in the American Competitiveness in the Twenty-First Century Act of 2000 (AC21). *See* INA section 204(j), 8 U.S.C. 1154(j). The commenter's other suggestions are outside the scope of this rulemaking; therefore, DHS makes no changes based on this comment.

b. Inadmissibility Waivers

*Comment:* Commenters opposed the proposed fee increase for Forms I–192, I–212, and I–601, writing:

• Fees for these forms are already high relative to other immigration fees.

• These forms are often used by individuals with criminal or immigration violations, the higher fees could exacerbate racial and economic inequities within the criminal and immigration systems.

• Increasing the Form I–192 fee could deter individuals from applying, including Canadian applicants who would continue to reside in Canada but contribute to the U.S. economy if not for the fee increase.

• Raising the fee for Form I–192 could cause many families who do not qualify for a fee waiver to not be able to apply due to limited resources.

• USCIS proposed fee increases for Form I–212 will harm mid- to low-income applicants and survivors of sexual violence and human trafficking.

• Increases in fees for Forms I–212 and I–192 are unreasonable due to the existing delays in processing and the

fees applicants must pay for other forms.

*Response:* As stated elsewhere, DHS examined each fee in the proposed rule and the fees proposed represent DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate services. DHS notes that the increased fees for Form I–192, Application for Advance Permission to Enter as a Nonimmigrant and Form I–601 are only $170 (18 percent increase) and $120 (13 percent increase), respectively, which are below the rate of inflation since the last fee increase (approximately 26 percent). For these forms, the fee increases (18 percent and 13 percent) remain below that for other benefits.

DHS acknowledges that some proposed fees are significantly higher than the current fees. This is the case for Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal, because DHS proposes to not limit the fee increase as it has done in the past, for policy reasons. *See* 81 FR 26904, 26915–26916 (May 4, 2016). In the FY 2016/2017 fee rule, DHS stopped limiting the fee increase for inadmissibility waivers like Forms I–212 and I–601. *See* 81 FR 73292, 73306–73307 (Oct. 24, 2016). DHS is not proposing to limit the fee increase for Form I–212 because other proposed fees would have to increase to recover the full costs. Additionally, DHS already provides fee exemptions for vulnerable populations, including survivors of sexual violence and human trafficking, for all forms filed through final adjudication for adjustment of status to LPR, including Form I–485 and associated forms. *See* 8 CFR 106.3(b); *see also* Preamble, Table 5C. For example, abused spouses and children filing under CAA and HRIFA are fee exempt for Form I–485 and associated forms, including Form I–212, as they file for VAWA benefits on Form I–485. *See* 8 CFR 106.3(b)(4).

c. Form I–601A, Application for Provisional Unlawful Presence Waiver

*Comment:* The comments received on the proposed fee for the Form I–601A, are as follows:

• In the absence of legislation, Form I–601A is imperative for mixed-status families to remain together. While a fee adjustment may be appropriate DHS should reconsider and reduce the proposed 75 percent increase.

• The proposed fee increase for Form I–601A is inappropriate given the current processing times and backlog.

• DHS failed to justify why Form I–601A warrants such a high fee because the number of cases and completion rates have decreased.

• The proposed fee increase for Form I–601A would discourage and delay individuals from consular processing and undermine the purpose of the provisional waiver.

• A 75-percent fee increase for Form I–601A is too high because applicants who need a Form I–601A also must pay fees for Form I–130, Form I–485, and consular processing.

• Because Form I–601A requires a demonstration of extreme hardship DHS should treat it like other humanitarian applications and raise its fee only 19 percent.

• The Form I–601A proposed fee increase would disproportionately impact minority communities, because BIPOC individuals are more affected by racial inequities in the immigration justice systems.

*Response:* DHS acknowledges the increased Form I–601A, Application for Provisional Unlawful Presence Waiver, fee would increase the costs for applicants and has considered the comments. As previously mentioned, USCIS is primarily fee-based and therefore must recover operating costs through fees which must incorporate cost to process forms which have fee waivers or exemptions. DHS notes that applicants filing Form I–601A are only consular processing and are not filing Form I–485 for adjustment of status. DHS does not have data indicating that the new Form I–601A fees would disproportionately impact BIPOC communities, and commenters offered no evidence indicating the form is disproportionately used by BIPOC communities. However, DHS has considered comments regarding the Form I–601A and reduced the proposed fee to the amount of inflation as described in section I.C. of this preamble. DHS agrees that Form I–601A is important for family unity and needed by certain noncitizens who have resided in the United States for a long time to normalize their status. DHS also recognizes that Form I–601A applicants tend to lack employment authorization and so may possess less means to pay a significant fee increase. Therefore, DHS proposes a 26 percent increase in the filing fee for Form I–601A to $795, which limits the fee increase to the change in inflation between December 2016 and June 2023.

7. Genealogy and Records Request Fees, Forms G–1041, Genealogy Index Search Request, G–1041A, Genealogy Records Requests, and G–1566, Request for a Certificate of Non-Existence

*Comment:* Numerous commenters generally opposed increasing fees for genealogy search and records requests. Some individual commenters expressed opposition to the proposed fees for genealogy records, without providing further rationale. Other commenters, many identifying themselves as professional genealogists or individual genealogists, opposed the proposed increased fees, stating that they oppose the fee increase for the following reasons:

• Current fees are already cost-prohibitive without further increase.

• They opposed the 2020 fee increase and they oppose the new proposed rule.

• The proposed fee increase would create a burden on or entirely deter individuals and amateur researchers seeking to learn more about their family histories.

• The proposed fees are too high or would otherwise be beyond the means of most Americans.

• The USCIS genealogy program is an illegal interpretation of the Freedom of Information Act (FOIA).

• USCIS has not demonstrated the need for its proposed increased fees on genealogy forms with information about the adjudication, other data, or its fee increase methodology.

• The proposed fee does not reflect the cost to USCIS of finding and providing a record or would otherwise effectively serve to shift the costs of other USCIS services to this program to help USCIS meet its budget shortfall.

• USCIS' estimated costs for the genealogy program are incorrect based on the commenter's own analysis and USCIS should provide clarification of the USCIS estimates.

• USCIS should reduce the proposed fee increases based on an hourly rate, in line with other agencies.

• USCIS should provide information on its records management processes and clarify which records have been digitized, the effort required to search the MiDAS system and the reasoning behind wait times for its genealogy records program.

• Commenters supported the proposed fee increase if it would reduce wait times for genealogical record requests.

• USCIS should not raise fees on genealogy records requests until it demonstrates an improvement in services.

• A commenter supported a smaller fee increases to account for inflation and staffing shortages.

• How will individuals who placed index orders before the implementation of the rule be charged for the actual records if they do not receive their index searches until after the rule has been implemented.

• The new fees would disproportionately burden professional genealogical and historical researcher communities, in some cases prevent them from doing their work entirely, harm genealogical businesses because of the high cost and long wait times.

• USCIS records are also important for accessing records in the homeland of an immigrant.

• The proposed fee increase in addition to long wait times would impact the repatriation of veterans' remains by limiting the ability of the U.S. military-hired genealogists to access documents related to kinship that are vital to the process and have a disproportionate impact on immigrant veterans.

• The fee increases would harm citizens seeking dual citizenship because foreign ministries require documents from USCIS. Individuals who cannot afford the fee would be unable to have their legal rights recognized in foreign countries.

• Many individuals undertaking genealogy research for legal purposes are financially constrained thus the proposed fee increases would block access to the records.

• The fee increase would interfere with access to records for kinship and lineage judgments in settling estates.

• Genealogy records are increasingly important in fields such as law and medicine, for racial justice projects, and for law enforcement forensic purposes.

• Moving the program to the National Records Center (NRC) has not helped, hampered efficiency, and added steps to obtain records not located at the NRC, such as for certain C-Files.

• Genealogy Index Search results are often filled with errors in need of correcting, due to inadequate staff training.

*Response:* DHS recognizes commenters' concerns regarding the scope of the fee increases for Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Records Request, in the proposed rule. The proposed increase reflected changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. *See* 88 FR 402, 512 (Jan. 4, 2023). The INA authorizes DHS to set the genealogy fee for providing genealogy

research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1). The INA is different and separate from the FOIA. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget, as explained in the proposed rule. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS does not discretely identify and track genealogy program expenditures. The same office that researches genealogy requests, the National Records Center, also performs other functions, such as FOIA operations, retrieving, storing, and moving files. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. At that time, the projected costs included a portion of lockbox costs and of other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *See* 81 FR 26903, 26919 (May 4, 2016). The estimation methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. *See* 88 FR 402, 512. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS proposed correcting that in this rule. USCIS estimates that there are approximately 6 genealogy positions out of the total 24,266 positions in the fee review. *Id.*

In the proposed rule and in the 2020 rule, USCIS incorporated a new activity in the ABC model, Research Genealogy, to estimate the cost of the program at the National Records Center (NRC). *See* 88 FR 402, 512. This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program. DHS estimated the costs of the genealogy program using this methodology and subsequently proposed to base the fees for Forms G–1041 and G–1041A on these revised cost estimates. *Id.* As explained in the proposed rule, the revised fees and regulations may allow some customers to file a single search request with a single fee and still receive the genealogy information that they requested. *See* 88 FR 402, 511–512. The proposal to include pre-existing digital records, if they exist, via email in response to the initial search request

would also be more efficient than the current process. *Id.*

As explained earlier, DHS limits many of the fee increases in this final rule by inflation, and after considering the above comments, we are including the fees for Forms G–1041 and G–1041A in that group of requests. DHS used the approximate 26 percent inflation between December 2016, the effective month of the FY 2016/2017 fee rule, and June 2023 to increase the current $65 fees. When adjusted for inflation, the fees would be $82.[278] DHS rounded inflation adjusted fees to the nearest $5 dollar increment, consistent with other fees, making them $80. Some online filing fees are $50 less than paper filing fees, as explained earlier in this rule. As such, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $30, the fee for a paper filed G–1041 as $80, the fee for Form G–1041A, Genealogy Records Request, when filed online as $30, and the fee for a paper filed G–1041A as $80. Therefore, DHS is setting the fees at less than the proposed fees, meaning they do not recover the relative cost to USCIS for operating the genealogy program as calculated in the proposed rule, and less than we are authorized to charge under INA section 286(t)(1), 8 U.S.C. 1356(t). The online Form G–1041 and G–1041A filing fees are less than the current fees, which means they do not recover full cost under the methodology that DHS used to calculate them in the FY 2016/2017 fee rule. As such, other immigration benefit request fees will continue to subsidize the genealogy program. DHS declines to make other changes in this final rule in response to these comments.

*Comment:* Commenters opposed the new records fees, currently stating the Request for a Certificate of Non-Existence is untimely, obtaining the required information often requires multiple requests, and there is no verifiable justification for these proposed increases and fee implementation.

*Response:* In the proposed rule, DHS proposed a new fee for Form G–1566, Request for a Certificate of Non-Existence. *See* 88 FR 402, 513. Individuals often use this service to gather genealogical records that allow them to claim the citizenship of another nation. Previously, USCIS operated the Certificate of Non-Existence request

process informally and at no cost to individuals requesting a certificate. DHS calculated the fee to recover the estimated full cost of processing these requests as $330. *Id.* The proposed fee for a request for a Certificate of Non-Existence is based on the same ABC model used to calculate the other proposed fees. USCIS created a new activity for this workload, called Certify Nonexistence, in the ABC model. *Id.* Previous fee reviews captured this work as part of the Records Management activity. See the supporting documentation accompanying this rule for more information on the activities in the ABC model.

DHS has reviewed our calculations in response to the public comments and determined that this fee is consistent with the full cost recovery model used for this rule to generate revenue to mitigate the need for other fee payers to fund the costs of providing certificates, as explained in the proposed rule. *See* 88 FR 402, 513 (Jan. 4, 2023). DHS appreciates the public's feedback the Form G–1566, Request for a Certificate of Non-Existence fee, but DHS declines to make changes in this final rule in response to these comments. DHS sets the fee for Form G–1566 at $330. *See* 8 CFR 106.2(c)(12).

*Comment:* Some commenters claimed that taxpayers have already paid to acquire, manage, and store these records. Some commenters felt that taxpayers already support the government substantially and should not be charged for access to records. Many commenters expressed opposition to paying any fees to access genealogical records, because the service is already funded by taxpayers, should be funded by taxpayers, or that the records already "belong to the American people."

*Response:* DHS understands the commenters' concerns regarding the potential for duplicative payment. However, as explained in the proposed rule, USCIS is primarily funded by fees. *See* 88 FR 402, 415–417, 512 (Jan. 4, 2023). USCIS does not receive taxpayer funds for the genealogy program, nor do taxes pay for the acquisition, management, or storage of records in USCIS' custody. Therefore, DHS must recover the estimated full cost of the genealogy and records programs through USCIS' fees. DHS has explicit authority to recover the costs of providing genealogical services via genealogy fees. *See* INA section 286(t), 8 U.S.C. 1356(t). As explained earlier, the fees for Forms G–1041 and G–1041A will not recover their full cost, but other USCIS fees will offset their cost.

*Comment:* Numerous commenters discussed turning the records over to

---

[278] DHS calculated the difference between December 2016 CPI–U (241.432) and June 2023 CPI–U (305.109), as 63.677 or 26.37 percent as explained earlier. Multiplying the current fees ($65) by 26.37 percent equals $82.14. Calculation: $65 *1.2637 = 82.1405.

the National Archives and Records Administration (NARA) so the public can access them for free or at a lesser cost. Some of these commenters elaborated further, and we summarize these comments as follows:

• NARA has demonstrated its ability to efficiently respond to records requests, much more quickly and at a lower cost.

• NARA could manage records more efficiently, access them more freely, and reproduce them more economically, as preserving and providing access to historical records of the Federal Government is one of NARA's core missions and areas of expertise.

• Transferring genealogy records to NARA would be a straightforward solution to USCIS' stated reason for raising fees on genealogy records requests, namely that the agency incurs overhead costs associated with storing and managing the records. The commenter additionally recommended that, where applicable, records disposition agreements should be updated to allow the transfer of records to NARA.

• USCIS needs to comply with its own retention schedules and send appropriate records to NARA.

• USCIS should develop a plan to ensure all A-Files are added to USCIS' Central Index System (CIS) to make them eligible for transfer to NARA. Similarly, USCIS records should be adjusted to meet NARA's specifications.

• By not transferring required files to NARA, USCIS is not only hurting individuals requesting documents, but also other Federal Government agencies.

• Commenters indicated general confusion as to why genealogical records are treated differently depending on when a citizen was naturalized, with older records being handled by NARA and newer records by USCIS.

• In addition to transferring additional records to NARA, USCIS has a restriction in place on some records currently possessed by NARA, such as Alien Registration forms, which the commenters recommended that the agency lift.

• NARA's fees are too expensive, without specifying any NARA fee amount.

*Response:* On June 3, 2009, USCIS signed an agreement to transfer records to NARA.[279] NARA's holdings of A-

Files will grow as USCIS continues to transfer records, as allowable under current retention schedules. USCIS strives to adhere to its records retention schedules and transfer files to NARA expeditiously when records are eligible for transfer. Unfortunately, issues such as incomplete or non-existent file indices and other operational difficulties may inhibit and delay such transfers. DHS agrees that NARA is the appropriate repository for permanently retained records as USCIS has deemed necessary. DHS declines to make any changes in this final rule in response to these comments. NARA is not operated or fully funded by USCIS. Therefore, fees and policy associated with NARA are out of scope in this rulemaking.

*Comment:* Some commenters opined on the relationship between the USCIS genealogy program and the FOIA. Commenters wrote that USCIS' genealogy program was instituted to reduce burdens on FOIA and speed up the records request process, but the genealogy program has failed in its effort and instead delays processing and increased fees. Others wrote that if USCIS considers genealogy records requests to be FOIA requests, they should not carry fees higher than standard FOIA fees. Commenters similarly wrote that USCIS' practices were inefficient because the genealogy program was created to alleviate burdens on FOIA staff, but still relies on FOIA staff to review requests, which results in increased wait times. A commenter wrote that if the genealogy program is intended to serve as an alternative to the standard FOIA process, USCIS should cease subjecting genealogy records requests to FOIA reviews.

Commenters stated that some of USCIS' record requests should be subject to the standard process for FOIA requests, but that instead, USCIS denies FOIA requests to collect revenue from the records requests. Commenters expressed concern that some A-Files are relegated to the genealogy program, where requestors are required to pay a fee for files created before May 1, 1951, while individuals requesting files after that date are not. The commenters added that USCIS places requestors in arbitrary categories and as a result, its processes are inconsistent with FOIA requirements. Similarly, a commenter stated that many genealogy program fees are not authorized by statute and that USCIS cannot force requesters to pay a fee for records that should be available under FOIA. The commenter added that USCIS' genealogy program was illegal on these grounds.

*Response:* There is no conflict between FOIA and DHS' operation of the USCIS genealogical program, nor is USCIS constrained in establishing fees for its genealogical services to the levels established under FOIA. As stated earlier, USCIS genealogy fees use specific legal authority separate from the FOIA. The INA authorizes DHS to set the genealogy fee for providing genealogy research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1).

USCIS formerly processed requests for historical records under FOIA or Privacy Act programs but the demand for historical records grew dramatically. USCIS determined a genealogy request would be a more suitable process as historical records requested through FOIA were usually released in full because the subjects of the requested documents are deceased and therefore no FOIA exemptions applied to withhold the information. *See* 71 FR 20357, 20368 (Apr. 20, 2006). As authorized by law, the USCIS genealogy program was established to relieve the FOIA and Privacy Act programs from burdensome requests that require no FOIA or Privacy Act expertise, place requesters and the Genealogy staff in direct communication, provide a dedicated queue and point of contact for genealogists and other researchers seeking access to historical records, cover expenses through fees for the program, and reduce the time to respond to requests. *Id.* at 20364.

DHS appreciates the commenters' concerns regarding differences between the FOIA process and the genealogical index search and records request processes. Before 2017, the USCIS staff who processed FOIA requests also processed some genealogical records requests, particularly records from 1951 or later. However, USCIS moved the genealogical program to the NRC in 2017. Since that time, dedicated USCIS genealogical staff process all genealogical records requests. Commenters are mistaken in stating that the genealogy program sends appropriately filed genealogy requests through the FOIA process. DHS acknowledges that both FOIA requests and genealogical records requests are subject to review under the Privacy Act of 1974 to ensure that USCIS does not inappropriately release information to third parties. However, USCIS' genealogy program is distinct from the FOIA program and the fees that DHS establishes for Forms G–1041 and G–

---

[279] *See* National Archives, Alien Files (A-Files) page, available at *https://www.archives.gov/research/immigration/aliens#:~:text=The%20United%20States%20Citizenship%20and%20Immigration%20Service%20%28USCIS%29,100%20years%20after%20the%20immigrant%27s%20year%20of%20birth* (last viewed on Aug. 22, 2023).

1041A are authorized by the INA, not FOIA. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Multiple commenters stated that the proposed fee increases for record requests seems to be a punishment for citizens who want access to ancestors' records. Multiple commenters stated that records would be "held hostage" by demanding exorbitant and unjustified fees to access documents on immigration ancestors. The commenters wrote that these records should already be publicly accessible under the law.

*Response:* DHS rejects the characterization of the proposed fees to punish or hold hostage individuals who seek records related to their ancestors via the USCIS genealogy program. Rather, and as explained earlier in this section, the fees for Forms G–1041 and G–1041A established by this rule will be set at a level lower than what it costs USCIS to administer them and lower than the INA authorizes. In addition, online filing fees will be less than the current fees. As such, users of these forms will continue to have access to USCIS records.

*Comment:* Many commenters stated that implementation of increased fees should not occur without careful explanation and discussion of alternatives. Commenters generally recommended digitizing and making genealogy records available free online or at conveniently located government offices. One commenter suggested making a public version of USCIS genealogy records and added that it would result in thousands of saved hours for USCIS and NARA employees. The commenter also stated that privacy concerns associated with USCIS transferring records to NARA are not based on any real risks. A different commenter stated that there is no reason to significantly redact information on such old immigration genealogy records.

A couple of commenters suggested licensing the digitization of these records to a repository, such as Ancestry.com, for the benefit of genealogists if the records must be monetized. A couple of commenters recommended making USCIS genealogy records available according to the same rules as those of the U.S. Census, in that the records can be released without review if they are 72 years old or older.

Multiple other commenters recommended allowing genealogy groups or companies to volunteer to digitize and upload USCIS' records to be made available for free online, or to otherwise rely on genealogists to digitize and publish the records for USCIS. A commenter recommended hiring additional staff to help respond to records requests more efficiently, such as archivists and librarians, or otherwise recruit volunteers to help respond to requests.

*Response:* DHS agrees with the commenters' reasoning that filing index search requests and records request online increases efficiency and, all else equal, reduces the cost to USCIS of providing the associated services. As explained earlier, DHS limited the fee increases for Forms G–1041 and G–1041A to inflation since the FY 2016/2016 fee rule. There is also $50 difference between the fee for a form filed online and a form filed on paper. DHS appreciates the alternatives suggested by commenters such as licensing the digitization of records, hiring librarians or archivists, or recruiting volunteers to help manage the requests. DHS may consider these alternatives in the future but declines to make any changes to the final rule in response to these comments.

*Comment:* Some commenters focused on genealogy request processing times. Many stated that USCIS should clear the backlog of genealogy requests or reduce processing times. A commenter stated that genealogists are only asking for fair and reasonable processing times, not expedited ones. Others stated that USCIS should offer specific data on processing times for this form and explain how it plans to reduce the backlog. Numerous commenters addressed frustrations with genealogy wait times and expressed concern for a fee increase without a commitment to service improvements. Other comments on the processing time for genealogical records include the following:

• The backlog is a huge burden on elderly Japanese Americans seeking to recover genealogical records that could explain their families' histories during WWII internment.

• The delays are harmful to the livelihoods of professional genealogists and to the projects of serious researchers.

• The genealogy backlog is because USCIS is tasking itself with a mission outside its purview.

• The longer time to process records during COVID would now become the new standard for service.

• Requestors cannot afford to request records when they do not have clarity of the wait times or process involved.

• Processing delays are unreasonably longer than the current processing times for Alien Files (A-Files) FOIA requests numbered above 8 million, particularly given that the genealogical records are shorter.

• Quicker processing time for A-File requests is court-mandated, leaving fewer USCIS resources available to process non-A-file FOIA requests, thus creating further backlog for those requests. Those backlogs violate FOIA requirements, and the commenter plans to litigate the violation.

*Response:* In addition to the proposed fee increase, the proposed rule proposes changes to genealogy processing. *See* 88 FR 402, 511–512 (Jan. 4, 2023). Ultimately, DHS expects these changes may allow USCIS to provide genealogy search results and historical records more quickly when pre-existing digital records exist. Currently, the genealogy process consists of two separate forms. When requestors submit Form G–1041, Genealogy Index Search Request, on paper or electronically, USCIS searches for available records. If no record is found, then USCIS notifies the requestor by mail or email. If USCIS identifies available records, then USCIS provides details on the available records, but does not provide the copies of the actual records. Under current regulations, a requestor must file Form G–1041A, Genealogy Records Request, with a fee for each file requested, before USCIS provides any records that it found because of the search request. As such, USCIS staff must search for the records previously identified in an index search to complete a records request. Under the proposed process, USCIS would provide requestors with preexisting digital records, if they exist, in response to a Form G–1041, Genealogy Index Search Request. *Id.* The USCIS process and regulations changes may decrease the time an applicant has to wait for records. For approximately 70 percent of index searches, USCIS may provide electronic copies of digital records, USCIS may not identify any records, or customers may not follow-up with a records request for hardcopies. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS anticipates that these changes will help to reduce processing times and reduce the backlog of genealogy requests. DHS declines to make any changes to the final rule in response to these comments.

8. Other Fees

a. Form I–90 Replace Permanent Resident Card

*Comment:* Commenters said that the proposed rule further discouraged naturalization by proposing a Form N–400 fee that is higher than the Form I–90 fee. Similarly, a commenter said fees for Forms I–90 and N–400 should be comparable instead of the proposed $295–305 difference between the two

fees. The commenter stated that potential applicants might decide which benefit to pursue based on fees, particularly those unable to qualify for a fee waiver or reduced fee request. The commenter added that making the Form N–400 fee comparable to the Form I–90 fee would also reduce financial barriers to naturalization. Another commenter expressed concern that, as fees increase over time, renewing permanent residency status is becoming more burdensome for long-term permanent residents.

*Response:* DHS acknowledges that this final rule establishes a Form N–400 fee which is higher than the Form I–90 fees. DHS does not intend to discourage naturalization and seeks to achieve full cost recovery. As explained in the proposed rule, DHS used its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In the case of Form I–90 when filed online, DHS maintained the current fee to some forms and limits the fee increase for those other forms. *See* 88 FR 402, 451 (Jan. 4, 2023). One of the forms with a limited fee increase is Form N–400. As such, if an applicant chooses to renew their permanent residence card, commonly called a Green Card, some part of their fee helps maintain a more affordable Form N–400 fee for others.[280] By keeping Form I–90 fees lower than Form N–400 fees, DHS avoids passing an additional burden to LPRs that may never wish to naturalize. Form N–400 also requires more adjudication time than Form I–90. Additionally, an LPR may need to pay the fee for Form I–90 every 10 years to renew their Green Card, whereas a naturalization applicant may only need to pay the fee once. DHS believes maintaining separate fees for both Forms I–90 and N–400 allows applicants to pay only the fee for the benefit they request. By limiting the fee for Form N–400, but allowing it to be higher than Form I–90, DHS believes it strikes the right balance of both the beneficiary pays and ability-to-pay

principles. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter commended USCIS for extending permanent residence cards for 2 years for LPRs who file Form N–400.[281] However, they urged USCIS to implement an automatic extension to all expiring Green Cards with a pending Form N–400, stating that this would improve efficiency in processing Forms N–400 and I–90. A commenter strongly encouraged USCIS to remove the proposed fee increase and eliminate the requirement to renew a Green Card.

*Response:* In December 2022, USCIS announced an automatic two-year extension of Green Cards for LPRs who have applied for naturalization.[282] The extension applies to all applicants who filed Form N–400 on or after December 12, 2022. LPRs who filed for naturalization before December 12, 2022, will not receive a Form N–400 receipt notice with the extension. If their Green Card expires, they generally must still file Form I–90 or receive an Alien Documentary Identification and Telecommunication (ADIT) stamp in their passport, to maintain valid evidence of their LPR status. While this was not retroactive and it does not apply to LPRs who did not apply for naturalization, DHS agrees that it improved efficiency in processing Forms N–400 and I–90 for LPRs who wish to naturalize.

DHS declines to automatically extend all Green Cards for an additional 2 years. LPRs who lose their Green Card generally must still file Form I–90, even if they have applied for naturalization and received the automatic extension under this updated policy. The INA requires that noncitizens carry within their personal possession proof of registration, such as the Green Card and any evidence of extensions or they may be subject to criminal prosecution. *See* INA sec. 264(e), 8 U.S.C. 1304(e).

DHS observes that a Green Card generally does not expire until 10 years after it is issued to the LPR. For individuals who are familiar with the

regulatory requirements,[283] this should be sufficient time for the applicant to take appropriate action, including renewing the card or naturalizing before the card expires.[284] Generally, LPRs become eligible to naturalize after 5 years of obtaining LPR status. *See, e.g.,* INA sec. 316(a), 8 U.S.C. 1427(a); 8 CFR 316.2(a)(3).

b. Form I–131, Application for Travel Document, Form I–131A, Request for Carrier Documentation

*Comment:* USCIS should charge sponsorship fees for the parole programs for additional revenue that USCIS could use to process EADs.

*Response:* DHS proposed no changes to the various parole programs which use Form I–131 and makes no changes based on these comments. DHS finalizes the fee exemption for Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, used to request to be a supporter and agree to provide financial support to a beneficiary and undergo background checks as part of certain special parole processes. *See* 8 CFR 106.2(a)(10). As indicated elsewhere in this preamble, DHS does not generally waive or exempt fees where the petitioner must demonstrate the ability to support a beneficiary. However, DHS has previously provided fee exemptions for humanitarian programs and DHS considers these new parole programs humanitarian programs. While being approved as a supporter requires a certain level of financial means, the objective is to establish the supporter for the parolee which is separate from the application. In addition, Form I–134A does not result in an immigration status. In the case of recently instituted FRP processes, the Form I–134A petitioner has already paid the full fee to file Form I–130 on behalf of the beneficiary. *See, e.g.,* 88 FR 43611, 43616 (July 10, 2023). Thus, DHS has decided to maintain a fee exemption for Form I–134A. If a fee becomes necessary, DHS will establish one in a future rulemaking.

---

[280] To reduce the risk of fraud and counterfeiting, USCIS redesigns the Permanent Resident Card every three to five years. Introduction of new card designs does not mean that cards with previous designs are invalid. Both current and previous cards remain valid until the expiration date shown on the card (unless otherwise noted, such as through an automatic extension of the validity period of a Permanent Resident Card as indicated on a Form I–797, Notice of Action, or in a **Federal Register** notice). These cards are also known as "Green Cards." We will use the term Green Cards when referring to Permanent Resident Cards throughout this rule because it may be clearer to the public.

[281] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https://www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[282] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https://www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[283] USCIS also provides educational products and resources to welcome immigrants, promote English language learning, educate on rights and responsibilities of citizenship, and prepare immigrants for naturalization and civic participation. In addition, USCIS provides grants, materials and technical assistance to organizations that prepare immigrants for citizenship. The USCIS Citizenship Resource Center helps users better understand the citizenship process and gain the necessary skills required to be successful during the naturalization interview and test. *See https://www.uscis.gov/citizenship.*

[284] *See* USCIS, *https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card.*

c. Form I–290B, Notice of Appeal or Motion

*Comment:* A commenter encouraged DHS to maintain the current fee for Form I–290B. They stated that that individuals should not have to pay a higher fee to resolve USCIS errors. They stated that USCIS retains the revenue whether the appeal or motion to reopen succeeds.

*Response:* DHS appreciates the concerns of the commenters and does not intend to hinder applicants, petitioners, or requestors from receiving benefits for which they are eligible. At the same time, DHS must recover the full costs of the services that USCIS provides. In this case, DHS proposed to limit the fee increase for Form I–290B, Notice of Appeal or Motion, as explained in the proposed rule. *See* 88 FR 402, 450–451 (Jan. 4, 2023). The formula DHS used for the Form I–290B proposed fee was the same as other limited fee increases, such as Form N–400. *Id.* The proposed fee was $800, $125 or 19 percent higher than the current fee of $675. While DHS did not propose the fee based on inflation, the proposed rule noted that the fee increases were less than inflation when discussing the proposed fee for Form N–400. *See* 88 FR 402, 486–487 (Jan. 4, 2023). Because DHS used the same formula to propose fees for Forms I–290B and N–400, the comparison applies here as well.

There is only one fee for Form I–290B regardless of the underlying petition, application, or request. In addition, the final rule has provided a fee exemption for Form I–290B for certain humanitarian forms, and fee waivers are available to some Form I–290B applicants who are receiving a means-tested public benefit, whose household incomes are at or below 150 percent of the FPG, or who are experiencing extreme financial hardship. *See* 8 CFR 106.3(a)(ii)(C) and 8 CFR 106.3(b). USCIS uses the fees to fund adjudication services regardless of whether the petition or application is approved. This applies to all forms and not just Form I–290B.

d. Form I–360 Petition for Amerasian, Widow(er) or Special Immigrant

*Comment:* Commenters stated that the increase in fees for Form I–360 would discourage individuals who are facing life-threatening events from seeking security and force victims to remain in abusive relationships.

*Response:* DHS notes that Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant, currently has no fees for noncitizens self-petitioning as a

battered or abused spouse, parent, or child of a U.S. citizen or LPR, SIJ, or Iraqi or Afghan national who worked for or on behalf of the U.S. Government in Iraq or Afghanistan. Therefore, DHS does not believe that victims seeking safety would be impacted by the fees as they are already exempt from the fees. *See* 8 CFR 106.3.

e. Form I–539 Extend/Change Nonimmigrant Status

*Comment:* Several commenters provided input on the proposed fee change for Form I–539. The commenters wrote:

• Form I–539 fee increases would negatively impact international students.

• USCIS should encourage international students to choose the United States for their studies, rather than potentially deter them with higher fees.

• Form I–539 fee increases are fair but suggested USCIS open this form to online filing.

• The Form I–539 application process is already confusing.

• USCIS should consider alternative proposed fees, such that the burden of increases would be shared more equitably among affected individuals.

*Response:* DHS recognizes the importance of encouraging international students and that attending school in the U.S. can be financially burdensome on students. In addition, DHS recognizes the need for flexibility in allowing other classes of nonimmigrants to change their status. For these reasons, this Final Rule lowers the proposed Form I–539 fee from $620 to $470 for paper filings, and from $525 to $470 for online filings. These final increases (27% paper, 14% online) are near or below the rate of inflation since the last fee increase (26% as of June 2023), and are consistent with one commenter's alternative proposal that all fees be raised by a minimum amount to ensure that everyone's costs have kept up with inflation.

However, before obtaining an F–1 visa, the student must provide documentary evidence of their ability to pay for their course of study and living expenses while enrolled.[285] The new fees include the biometric fees where applicable and the online application process is making filing less complicated with online payment option available.

*Comment:* An individual commenter said the Form I–539 fee increases are

fair. However, this commenter stated that Form I–539 cannot be filed online if it includes a Form I–539A, and that USCIS should allow these to be filed online.

*Response:* USCIS continues to improve the availability and user experience of online filing. However, recommended changes to USCIS's internal systems for form processing are outside the scope of this rulemaking.

*Comment:* USCIS should allow appeals of denials of extensions of stay for T and U nonimmigrants.

*Response:* The Form I–539 is outside the jurisdiction of the AAO and therefore applicants are not able to file an appeal the denials of Form I–539. However, applicants may file a motion to reopen or reconsider the decision within 30 days (33 days if the decision was mailed). Changes to this policy are outside the scope of this rulemaking.

f. Military-Related Benefits

*Comment:* One commenter asserted that there should be a fee exemption for all applications filed by children, and their mothers, who were fathered in East Asia by U.S. personnel during the Vietnam and Korean Wars, and that the costs for these applications should be charged to the Department of Defense. The commenter said that there should be similar fee exemptions for all children of U.S. military personnel born or conceived during deployment.

*Response:* Amerasians (born after Dec. 31, 1950, and before Oct. 23, 1982) may file Form I–360. Congress enacted the Amerasian Homecoming Act on October 22, 1982, to allow a person born in Korea, Vietnam, Laos, Kampuchea (Cambodia), or Thailand after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen, to seek admission to the United States and adjustment of status to LPR. There is currently no fee for petitioners seeking classification as an Amerasian. *See* 8 CFR 106.2(a)(17)(i). Those who qualify under the Amerasian Homecoming Act, who are not subject to the public charge ground of inadmissibility,[286] may also request a waiver of the Form I–485 fee if they are unable to pay. *See* 8 CFR 106.3(a)(iv)(C). Other Amerasians remain subject to the public charge ground of inadmissibility,[287] however, so DHS cannot exempt or waive their I–485 fee. Policy changes relating to

---

[285] *See* 22 CFR 41.61(b)(1)(ii); 9 FAM 402.5–5(G), Adequate Financial Resources (last updated Oct. 17, 2023); *see also* 8 CFR 214.2((f)(1)(i)(B).

[286] *See* USCIS Policy Manual, Vol. 7, Adjustment of Status, Part P, Other Adjustment Programs, Chp. 9, Amerasian Immigrants [7 USCIS–PM P.9], available at *https://www.uscis.gov/policy-manual/volume-7-part-p-chapter-9* (last visited Sept. 8, 2023).

[287] *Id.*

eligibility are outside the scope of this rulemaking.

9. Republished Conforming Amendments

As stated in the proposed rule at 88 FR 421, DHS proposed to retain many provisions that were codified in the 2020 fee rule although enjoined. No comments were received on those proposed changes. Thus, this rule codifies them as proposed. In addition, for clarity and to avoid unnecessary length in this rule, DHS is not repeating the amendatory instructions and regulatory text for certain changes that were made by the 2020 fee rule if the provision is ministerial, procedural, or otherwise non-substantive, such as a regulation cross reference, form number or form name.

*H. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* A commenter requested that USCIS ensure that implementation of any fee increase, and processing changes take place with adequate advance notice—months rather than days—to petitioners and provide for sufficient time for related adjudicator training. The commenter stated that, in the weeks surrounding the previous fee increases, petitions submitted with the appropriate fee were erroneously rejected by USCIS service centers, jeopardizing time-sensitive performing arts events. The commenter concluded that appropriate steps that must be taken to ensure that fee increases do not result in unwarranted petition rejections. One commenter asked for a postponement of the rulemaking to allow further analysis from the public and better justification from the agency. Another commenter said USCIS should also revise the proposed fee schedule rule so that it does not move away from the notice of public rulemaking and comment process, under APA. Another commenter said USCIS should not change immigration application fees outside of the Administrative Procedure Act (APA) notice of public rulemaking and public comment processes, and removing the public process from fee adjustment would subject USCIS to legal vulnerabilities.

*Response:* This final rule complies with the APA. DHS issued a proposed rule in the **Federal Register** on January 4, 2023, and accepted public comments on the proposed rule through March 13, 2023. DHS provided a comprehensive explanation in the proposed rule for why the new fees are required and the rationale for the fee adjustment. DHS

fully considered the issues raised in the public comments and made some adjustments in response, as detailed in responses throughout this final rule. DHS is unaware of petitions submitted with the appropriate fee being erroneously rejected by USCIS service centers when fees were previously changed. This final rule is effective 60 days from date of publication in the **Federal Register**, consistent with 5 U.S.C. 553(d) and 801(a)(3)(A)(ii), which should provide sufficient notice of the new fees before they are due. Any application, petition, or request postmarked on or after this rule's effective date must be accompanied with the fees established by this final rule.

*Comment:* Multiple commenters voiced concern that basing future fee increases on the CPI–U while forgoing the comment and rulemaking process would violate the APA and requested that USCIS remove this provision (Section VII, T. Adjusting Fees for Inflation) from the final rule.

*Response:* USCIS believes that reestablishing 8 CFR 103.7(b)(3) (Oct. 1, 2020), which was removed by the 2020 fee rule, is not in violation of the APA. As described in the proposed rule and reiterated in this final rule, an inflation-adjustment provision was part of the regulations for many years before the 2020 fee rule and, because the 2020 fee rule has been preliminarily enjoined, an inflation-adjustment provision is currently in effect, 8 CFR 103.7(b)(3) (Oct. 1, 2020). In this rule, USCIS is requiring that such future fee changes would be made in a rule that would document the rate of inflation to be applied and how the new fees are calculated. 8 CFR 106.2(d).

DHS disagrees that applying an inflation adjustment violates the APA. While raising a fee is arguably something the public would want to comment on, the public has had that chance to comment on the method and use of an inflation adjustment in the proposed rule. Notice and comment on future inflation-based adjustments would be unnecessary because DHS's actions would be limited to issuing a final rule that follows a mathematical calculation of an increase in costs and not policy considerations. Inflation affects the entire economy and effectively decreases USCIS's revenue by the rate of inflation for whatever period DHS does not adjust fees for CPI–U.

In this final rule, DHS has revised 8 CFR 106.2(d) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) must be adjusted by the rate of

inflation. That is, DHS would not shift costs from one payor to another for policy reasons by adjusting only some fees and not others, for instance. Such adjustments would simply use basic math to maintain the value of our revenue dollar and would be procedural, thus not requiring notice and comment.

*Comment:* Another commenter stated that, if DHS cannot credibly establish the amount of time required to process petitions according to the number of named beneficiaries on the petition, then DHS lacks a rational basis upon which to assign specific fees associated with processing various petitions. The commenter said DHS's assignment of costs and associated fees for petitions is, by definition, arbitrary and capricious in violation of the APA. The commenter also said USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether DHS's conclusions are justified or reasonable.

*Response:* DHS is not required to precisely calculate the amount of time required to process petitions according to the number of named beneficiaries on the petition. As stated in the proposed rule, OMB Circular A–25 reflects that activity-based costing (ABC) methodology is a best practice to develop government agency fee schedules, and DHS established a model for assigning costs to specific benefit requests in a manner reasonably consistent with A–25. 88 FR 402, 418 (Jan. 4, 2023). While DHS follows OMB Circular A–25 to the extent possible, INA sec. 286(m), 8 U.S.C. 1356(m), authorizes DHS to charge fees for adjudication and naturalization services at a level to ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Those costs may be affected by the amount of time required to process requests but the law does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or the perceived market rates and values of such services. DHS strives to make its fee schedules equitable, using the best information available, and USCIS will continue to monitor the time spent on specific adjudications to refine the fee setting model for future fee rules. However, while DHS tries to follow ABC (*i.e.,* assign USCIS costs through fees based on where its resources are expended), we do not assert that each of the fees in this rule precisely reflects the

relative time spent, nor are we required to do so.

DHS disagrees that it did not provide information used in the ABC model. As the commenter notes, USCIS used 6 months of FY 2021 adjudication hours in the completion rates that it provided. *See* 88 FR 402, 498 (Jan. 4, 2023). These are actual hours from FY 2021, the first year where USCIS began tracking Form I–129, Petition for Nonimmigrant Worker, adjudication hours by petitions for named or unnamed beneficiaries. *Id.* As explained in the proposed rule, USCIS requires most employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. *See* 88 FR 402, 446 (Jan. 4, 2023). USCIS used these reported actual hours from FY 2021 as a forecast for FY 2022 and FY 2023 because it was the best information available at the time of the fee review.

*Comment:* A commenter wrote that the administrative record for the rule is incomplete, and the rule does not contain sufficient data to allow informed comments. The commenter said the charts and tables included in the proposed rule's supporting documents are not illuminating on the need for the proposed fee increase, and a meaningful commentary is impossible without access to the true data the agency relied upon. The commenter also noted that the phone number referenced in the rule to call and make an appointment to view the data was never answered, and the only other number listed was incorrect. The commenter stated that, only after threats of litigation was an appointment gained, and even then, the commenter did not have access to the system, but were essentially limited to an ''infomercial'' on the system's features. The commenter concluded that the agency's conduct raises serious questions about the legitimacy of the data on which it claims to rely.

*Response:* DHS has posted all public comments and supporting documents for the proposed rule in the public docket for review, scrutiny, and comment. USCIS also used a software program and spreadsheets to perform certain calculations, and offered the public a chance to review the software, as we have historically done as a courtesy for fee rules.

It is unfortunate that a commenter had difficulty arranging an appointment to review the fee model. Despite those issues, DHS understands that the appointment with this specific commenter was still arranged, and the meeting occurred as requested. During the software demonstration, USCIS often asked whether there were any

questions or whether anything was unclear.[288] USCIS received very few questions during the meeting and demonstrated both how the ABC model software works and how it uses or produces the information in the docket. At one point, according to the transcript of the meeting in the docket, the attendees stated that ''So far everything is clearer than what we were expecting.'' USCIS cannot grant the public access to its USCIS financial systems directly including the USCIS ABC model software. USCIS pays for a limited license of the software and additional capacity for external stakeholder access would increase the cost of the software licenses, the number of servers required, and require additional support for managing access and security. Those costs would be paid from USCIS fee revenue, further increasing fees. Regardless, the software is highly technical, and public access may not be meaningful. DHS believes that the presentation provided on how USCIS uses the software, the model documentation and other supporting documentation available in the docket, and the explanations provided in the proposed rule and this rule, provide sufficient transparency for the public to review and comment on how USCIS fees are established.

The commenter's second assertion— that the proposed rule's supporting documents do not explain the need for the proposed fee increase—does not appear to be supported by the facts or the record. The operating budget of USCIS, as reflected in the supporting documents, the President's annual budget and the annual DHS appropriation bills, reflect that USCIS needs more money. The commenter may disagree with or not understand how the USCIS budget will be allocated among immigration benefit requests for which a fee will be paid, but how the USCIS budget will be funded by the total fee-paying requests is left to DHS discretion. While that discretion must be exercised in a rational manner as required by the APA, DHS has clearly explained in the proposed rule, and this final rule, how we have assigned and shifted USCIS operating costs based on relative complexity of the adjudication and value judgments about the specific benefit request.

*Comment:* A commenter stated that in the proposed rule, USCIS did not propose an increase to the current $85 filing fee for form I–821D. The

commenter stated that, if USCIS increases this fee in the final rule, DHS must engage in a new rulemaking and comment period because such a change would not be a logical outgrowth of the current proposed rule to satisfy the APA notice requirement.

*Response:* DHS has not changed the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, in this rule. *See* 8 CFR 106.2(a)(51).

### 2. Impacts and Benefits (E.O. 12866 and 13563)

#### a. Costs/Transfers

##### (1) Impacts on Applicants

*Comment:* A commenter stated that the increased fees would have a detrimental impact on their large immigrant population already struggling with the effect of the COVID–19 pandemic. One commenter stated the recent increases in rents (upwards of 10.6 percent year over year) and the rise in inflation and prices (consumer prices up 9.1 percent over the year ended June 2022) while salaries have not increased at the same rate or in some cases not at all (the federal minimum wage has remained stagnant at $7.25 since 2009 and a survey of U.S. companies reported an overall average salary increase of 3.4 percent in 2022). The commenter reported that it is unfair to immigrant applicants who are more financially burdened than they have been in the past to confront significant fee increases. It is especially unreasonable to expect that immigrants who do not currently have employment authorization would have the means to pay these heightened fees when they are unable to legally earn wages in the United States.

*Response:* DHS understands that inflation has had a profound effect on the U.S. economy and on the finances of immigrant populations and has carefully considered it throughout the final rule, especially when setting fees. Additionally, DHS understands that the federal minimum wage has been at $7.25 per hour since 2009. Nevertheless, many states also have minimum wage laws and in cases where an employee is subject to both state and federal minimum wage laws, the employee is entitled to the higher of the two minimum wages.[289] In the final rule, DHS will set USCIS fees at the level required to recover the full cost of providing immigration adjudication and naturalization services, as permitted or required by law, with adjustments to

---

[288] For a transcript of the meeting, see *Regulations.gov*, Comment Submitted by USCIS, available at *https://www.regulations.gov/comment/ USCIS-2021-0010-4141* (Mar. 2, 2023).

[289] DOL, ''Minimum Wage,'' available at *https:// www.dol.gov/general/topic/wages/minimumwage* (last visited Sept. 21, 2023).

provide certain fee exemptions and waivers for low-income immigrants. The final rule also provides for many requests that an applicant whose income is less than 150 percent of the FPG may request that their fee be waived. Furthermore, DHS is implementing new fee structures to mitigate some of the costs, making employment authorization more attainable. For example, DHS is providing a $50 discount for the Form I–765, Application for Employment Authorization, when filed online for most EAD classifications. Additionally, applicants who file Form I–485, Application to Register Permanent Residence or Adjust Status, will pay $260 (half of the regular Form I–765 fee) for their Form I–765 to request employment authorization when filed concurrently with their Form I–485 or while the Form I–485 is pending.

*Comment:* One commenter stated that the proposed fee structure potentially reinforces rather than eliminates barriers facing Denver's immigrant and refugee communities, particularly those who wish to apply for adjustment of status or naturalization. The commenter stated that Denver's immigrant and refugee communities work hard to navigate the immigration and naturalization processes, but often fall short due to numerous barriers, including the high cost of filing fees, where most of the nearly 60 processes USCIS listed fees for are over $400.00. This cost remains significant for many individuals who live on a fixed income and often must choose between caring for themselves, their families, or maintaining expenses. Seventeen percent of Denver's immigrant and refugee families were living below the federal poverty level in 2019. Denver's immigrant and refugee residents are still recovering financially from the COVID–19 pandemic, making the high cost of immigration paperwork and filing fees inaccessible to many.

*Response:* DHS is aware of the potential impact of fee increases on certain populations including low-income individuals and is sympathetic to these concerns. As a result, DHS not only offers fee waivers and fee exemptions, but also uses its fee-setting discretion to adjust certain immigration benefit request fees down if USCIS believes they may be overly burdensome on applicants, petitioners, and requestors (*e.g.,* Form N–400, Application for Naturalization, and the adoptions forms as discussed previously). As discussed in the final rule and consistent with past practice, USCIS will limit fee adjustments for certain benefit requests to a set

percentage increase above current fees and many other fees are adjusted only by the amount of inflation.

*Comment:* Citing research from the Cato Institute, a commenter wrote that the increase in fees will have a disproportionately harmful effect on communities and students of color, many of whom are already facing issues of food insecurity and homelessness.

*Response:* DHS recognizes that the fee increases may create an economic hardship for some families. Furthermore, DHS acknowledges the studies and data cited suggesting that many families struggle to afford healthcare and face other financial challenges relating to food and shelter. In the final rule, after considering public comments, DHS has increased the availability of fee waivers, has added fee exemptions, and has limited the fee increases for certain immigration benefit requests that we have determined may be overly burdensome.

### (2) Impacts on Employers/Sponsors

*Comment:* A trade association wrote that accumulated costs from filing repeated petitions for workers and their families would harm U.S. businesses. Citing statistics from the 2023 Envoy Immigration Trends Report, the commenter wrote that increased fees may cause U.S. companies to rethink their strategic planning and investment forecasts with respect to their U.S.-based operations and moved some of their operations offshore, which could hurt the U.S. economy.

*Response:* On page 31 of the cited report, the following question was presented to U.S. companies in the survey: ''In January 2023, the U.S. government proposed fee increases for several common immigration applications (H–1B, Adjustment of Status, etc.). What changes do you plan to make to your company's global immigration strategy in response to the planned increase in U.S. immigration filing fees?'' Seventy-two percent of respondents said they plan to reduce immigration-related costs for employees; 67 percent plan to look abroad to hire, transfer, or relocate foreign national employees; 48 percent plan to hire fewer employees requiring sponsorship; 23 percent had not assessed changes to company policies; and 23 percent reported no impact. The responses to this direct question do not clearly indicate that U.S. businesses will increase offshoring as a direct result of changes in the USCIS fee schedule. Further, the survey did not ask the financial burden that U.S. companies would experience from changes in the fee schedule. Thus, the survey does not

clearly indicate that the new fee schedule would have any negative impacts on U.S. companies. Additionally, DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values. DHS adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision.

*Comment:* A commenter wrote that the proposal to cap the number of beneficiaries on Form I–129 petitions to 25 beneficiaries, based on USCIS data from March 2023, would increase costs on H–2 employers by $30.1 million annually. The 25 named worker cap and the 2023 DOL rule requiring employers to file separately for each type of worker could increase that amount to over $40 million. Many employers, often small businesses, cannot pass these costs onto customers because of consumer preferences and the competition from employers that hire unauthorized labor.

*Response:* DHS acknowledges that the higher Form I–129 fees must be paid by U.S. companies that hire foreign nationals. However, USCIS must fund itself through fees unless DHS receives a congressional appropriation to do so. In the final rule, DHS sets the fees in this final rule for all nonimmigrant classifications petitioned for using Form I–129 after considering comments provided on the proposed rule based on the average cost of adjudication for the relevant visa classes. DHS data indicate (see RIA Section 3H, tables 23 through 25 and SEA, tables 6 through 9) that the limit of 25 named beneficiaries per petition established in this final rule will significantly limit the amount of cross-subsidization between petitions with few named workers and many named workers. Previously a single petition might contain a single named worker or hundreds of named workers, meaning that the fees paid for petitions for a few employees were covering the processing costs for petitions for many employees. Given the disparity between the cost of adjudicating a petition with a single named worker and the cost of adjudicating a petition with hundreds of named workers, limiting the number of named beneficiaries per petition to 25 effectively limits the amount of cross-subsidization per petition, and overall cost of adjudications between petitions.

Nevertheless, as described in section II.C, DHS is reducing the fees for Form I–129 for small employers and nonprofits in this final rule.

*Comment:* Commenters cited statistics, including a study from the USDA, demonstrating that the rise in H–2A fees would exacerbate the shift of agricultural production to foreign countries.

*Response:* While imports of fruits and vegetables have generally increased since the year 2000, no data directly or indirectly links immigration fees, such as for H–2A workers, to this rise. It is even more uncertain how the current fees would contribute to this rise, given many other factors in play, such as U.S. consumer demand for year-round availability of fresh fruits and vegetables and free trade agreements that provide access to increased supplies of fresh fruit and vegetables.[290]

*Comment:* Commenters involved in the agricultural industry wrote that the proposed rule does not account for already high costs of operation, including from new DOL regulations, that would be exacerbated by increased fees.

*Response:* DHS understands that farm production expenditures have generally increased in recent years and that farmers face numerous challenges in managing the costs of operations. Similarly, USCIS needs to manage its own operating expenditures and needs to adjust the fee schedule as necessary to fully recover increasing costs and maintain adequate service.

*Comment:* An advocacy group wrote that the fees would create barriers for research institutions to hire workers in STEM fields. The commenter cited studies to demonstrate the importance of foreign workers to STEM research in the United States.

*Response:* DHS recognizes that immigrants and international students make significant contributions to the U.S. technology industry and appreciates the concern that the fees might create hiring barriers. However, we do not believe there is an established causal relationship between higher fees and a decline in highly skilled foreign-born scientific researchers in academia. The SEA details the economic impact of the fees by classification, 25 or fewer, 25 or more FTE, non-profits, and by NAICS code, see Discussion on of Impact Section 4(C)(I–IV) tables 6 through 18.

---

[290] Davis, Wilma and Gary Lucier, Vegetable and Pulses Outlook: April 2021, VGS–366, U.S. Department of Agriculture, Economic Research Service, April 16, 2021. Kenner, Bart, Statistic: Macroeconomics & Agriculture, Amber Waves Magazine, U.S. Department of Agriculture, Economic Research Service, September 1, 2020.

## 3. Paperwork Reduction Act

*Comment:* USCIS received approximately 34 comments requesting a reduction in form length and reduced frequency of form revision changes. One commenter wrote that USCIS should return forms to their streamlined lengths, avoid collecting unnecessary quantities of information, and eliminate redundancies.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual information collection (IC) instructions by consolidating it into the USCIS Form G–1055, Fee Schedule, and placing it online on the USCIS website *www.uscis.gov/*. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those Paperwork Reduction Act (PRA) actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. Outside of this rule, USCIS continually analyzes all its collections of information to minimize the time and cost burden to respondents, confirms the utility of the content and requirements, and ensures compliance with the regulations, statutes, and policies that govern the benefit. Only the information needed to adjudicate the benefit properly and efficiently is collected. An imbalance of information collection has negative effects on both the applicant and adjudicators. USCIS information collections are analyzed on a scheduled basis, as technologies evolve, and as laws change. USCIS makes attempts to consolidate as many changes as possible into a single Paperwork Reduction Act of 1995 (PRA) action to limit the number of editions published. When a new edition is published—unless the new version is required immediately, for example, by statute or regulation—USCIS generally allows time for the previous edition of a request form submitted or in-transit to process, before enforcing a no prior edition rejection.

*Comment:* USCIS received three comments requesting fee waiver, reduced fee, and fee exemption information be retained in the individual information collection instructions.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual IC instructions by consolidating it into the USCIS Form G–1055, Fee Schedule. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those PRA actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. The USCIS Form G–1055 provides a centralized resource of information, accessible information, and promotes the use of innovative tools like the Fee Calculator for an enhanced user experience. DHS realizes that this change will require requestors to either have the current printed version of Form G–1055 or access to *www.uscis.gov/* to determine the fee for their request and if it is eligible for a fee waiver. However, all USCIS forms must either be accessed via the internet, or a paper version ordered by calling the USCIS Contact Center, including a paper Form G–1055.

*Comment:* USCIS received several comments requesting changes to content contained in specific ICs.

*Response:* The changes that USCIS is making to forms or instructions in conjunction with this final rule are limited to those that are related to this rulemaking. Changes to USCIS immigration benefit request forms requested by commenters that are outside of the scope of this rule will not be made at this time, but they may be considered for future form revisions.

## 4. Alternatives

*Comment:* A commenter stated that USCIS is increasing fees in a thoughtful manner but requested that USCIS earmark fee increases for H–1B and EB–5 applications to increase staffing for review of the backlog.

*Response:* As explained in the proposed rule, the FY 2022/2023 fee review budget does not include separate line items budgeted directly for backlog reduction. *See* 88 FR 402, 416 (Jan. 4, 2023). USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction that may be provided, such as in FY 2022. *Id.* DHS is aware of the problems that our backlog presents, and we are making a concerted effort to address them, but we make no changes to the rule in response to these comments.

*Comment:* A commenter requested that USCIS consider significant alternatives that would provide it with the funding it needs to operate

efficiently. The commenter stated the regulatory analyses needs to be republished by USCIS and provide stakeholders with both notice of revisions in their analysis and an opportunity for public comment on those revisions.

*Response:* DHS addressed planned increases in efficiency in the proposed rule and other alternatives to increasing fees. *See* 88 FR 402, 529 (Jan. 4, 2023). In this preamble, DHS addresses similar comments to this in section IV.D.4. DHS makes no changes to this final rule based on these comments.

*Comment:* A commenter stated that USCIS did not consider more modest alternatives at its disposal in developing the proposed rule. While citing case law, the commenter reasoned that agencies are required to "examine the relevant data and articulate a satisfactory explanation for [the] action, including a 'rational connection between the facts found and the choice made." The commenter went on to list several alternatives to the rule, such as allowing O–1B visa portability, modifying the O–1B visa validity period, allowing visa waiver requests, and allowing B–1 visa exceptions for promotional appearances and unscripted programming.

*Response:* The commenter's suggestions are beyond the scope of this fee rule or would be overly administratively burdensome to implement and would exacerbate costs and backlogs. As discussed previously, DHS prepared a fee study, analyzed all the relevant data, and has clearly articulated a rational basis for adjusting USCIS fees in this rule. However, as discussed elsewhere in this final rule, DHS sets lower fees for Form I–129 and the Asylum Program Fee that may reduce the burden for small businesses and nonprofits. DHS declines to make any other changes based on this comment.

*Comment:* Many commenters wrote that DHS should consider seeking appropriations for USCIS. Commenters opined that appropriations could reduce backlogs, subsidize costly fees, fund asylum processing, and generally support processing humanitarian applications. Similar comments about Federal appropriations as an alternative to increased fees include:

• Congress should fix USCIS operations and financial standing, funding backlog reduction efforts, hiring officers, and officer training.

• The biennial review process provides an important opportunity for Congress to review the IEFA.

• Transfer funding to USCIS from the budgets of other DHS components, like CBP.

• Redirect DoD funds to USCIS.

• Provide appropriations for the USCIS genealogy program.

• DHS should avoid any Form N–400 fee increase by seeking congressional appropriations for naturalization processing.

Similarly, commenters stated that USCIS should cut costs before proposing increased fees.

*Response:* DHS agrees that added congressional appropriation would lower USCIS fees. However, USCIS is currently mostly a fee-funded agency. Recent congressional appropriations for USCIS were limited to specific programs such as grants for promotion and education related to U.S. citizenship or E-Verify. DHS will continue seeking congressional appropriations where appropriate. In the meantime, DHS needs to establish fees for the continued operations of the USCIS. DHS believes that increased USCIS fees are necessary for it to effectively achieve its mission and fulfil statutory mandates. USCIS faithfully adheres to the immigration laws and carefully considers the pros, cons, costs, and ramifications of all policy initiatives it undertakes. In its FY 2022/2023 fee review, USCIS estimated total costs to the agency of providing immigration adjudication and naturalization services. As explained earlier in this preamble, DHS reduced the fee review budget but there is still a significant difference between revenue with current fees and estimated future costs. As such, DHS adjusts fees as explained in this rule.

*Comment:* Many commenters suggested alternative approaches to the proposed fee changes. Several commenters requested that USCIS consider phasing in fee increases over time, because the proposed fee changes would negatively impact artists and performing arts organizations. For example, a business association requested a phased-in approach for H–1B and O–1 applicants over the course of the next 3 to 5 years. Other commenters suggested that USCIS implement a progressive or "sliding scale" fee structure, including reduced fees for smaller, independent entities. A commenter suggested the genealogy fees increases be implemented over a 3-year period, reducing shock and impact to the genealogical community. The commenter went onto further suggest after a 3-year period establish a standard annual increase in the fees to cover increased operation costs.

*Response:* DHS understands the concept of rate shock, and we agree that

not having adjusted fees in 7 years makes the impact seem more severe. However, USCIS is risking a revenue deficit, and gradually adjusting the USCIS fee schedule over multiple years would ensure that USCIS would not recover full cost and would be unable to fully fund its operational requirements. DHS is addressing this concern in part by codifying the inflation adjustment provision in 8 CFR 106.2(d) so we can adjust USCIS fees on a timelier basis to match cost and provide smoother fee increases. In addition, because of the volume of requests that USCIS receives, intake must be automated and programming the system to search for multiple fees indexed based on varying characteristics (a sliding scale) would add delays and costs to USCIS intake of requests. Nevertheless, as stated earlier and as requested by these commenters, DHS has decided to provide a lower fee for Forms I–129, I–140, Immigrant Petition for Alien Workers, and Asylum Program Fee for small employers and nonprofit entities. In addition, DHS considered other reasonable alternatives to this final rule in response to comments, but we decline to make more changes in this final rule.

*Comment:* A few commenters suggested fee changes for musical artists be calculated by generated revenue, reasoning that higher income artists could afford the fees compared to independent artists. Similarly, an individual commenter proposed to raise the percentage of income taxes on higher earning workers; in the case of performing artists with major foreign corporate backing, the commenter said an additional fee or restrictions could be applied, such as a percentage guaranteed from the promoter or corporate entity in exchange for allowing operations or artists to enter the United States. Additionally, a company suggested, instead of increasing the visa fees, that USCIS collect fees on the back end by charging foreign bands a small percentage of their earnings, which would be withheld by the venues and sent to the government. Many commenters requested a minimum fee increase instead of the suggested increases, with the suggested amounts ranging from a 50 percent increase to a 10 percent increase or less.

*Response:* In this section we are responding to comments about the effects of the fees on different nonimmigrant categories. However, these comments may be addressed by the responses that we provided in section IV.G.2.d of this preamble where we address comments on the Form I–129 fees in general. DHS considered the commenters' suggestions for sliding

scales based on income, revenue, etc., and what would provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. USCIS intake must be automated and whether the petitioner meets the criteria for a fee must be instantaneously determined. Too complex of a sliding scale would add delays and costs to USCIS intake of requests. Therefore, as explained earlier in this preamble, DHS has decided to provide a reduced Form I–129 fee for small employer and nonprofits. *See* 8 CFR 106.1(f); 8 CFR 106.2(a)(3)(ix). In addition, this final rule exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13).

*Comment:* To minimize fee increases, a commenter suggested including the additional funds generated from premium processing and requested that USCIS consider all available and anticipated funds when determining final filing fees.

Many commenters wrote about the Emergency Stopgap USCIS Stabilization Act and USCIS premium processing fees. Commenters wrote:

• USCIS has not made a complete analysis of the revenue available to fund operations when setting fee levels, premium processing revenue must be included in the analysis.

• USCIS should consider more premium processing fees before adopting steep fee increases.

• USCIS has recently expanded premium processing and thus has greater resources to consider.

• USCIS should use revenue from premium processing to maintain the premium processing program before using it for other programs.

• Regarding USCIS' position that future revenues from premium processing are too attenuated to incorporate into the fee study requires that USCIS specify plans for such revenues once they are received.

• The USCIS Stabilization Act was passed during a unique point of congressional interaction with USCIS, and that the congressional intent was to avoid destabilization in the agency, such as the difference in the levels of service and processing times experienced between the applicants who can afford premium processing fees and the low-income applicants who cannot.

• USCIS should consider ways to use premium processing revenue to create a more equitable model.

• Revenues and data received from premium processing expansions in recent years provide USCIS sufficient certainty to include these revenues in fee determinations.

• DHS should delay the final rulemaking and fee determinations until it uses all potential streams of premium processing revenue and revenue predictions will be more stable.

• USCIS should use revenue generated by the premium processing program to maintain the program at its current levels of service and processing times.

• Commenters are encouraged that USCIS recognizes the exclusion and left open the possibility that USCIS will apply premium processing revenue to non-premium fees in the final rule.

• USCIS should reject modeling based on premium processing because it favors business immigration.

*Response:* DHS considered premium processing fees and revenue in the FY 2022/2023 fee review. DHS has determined that premium processing revenue was not sufficient to appreciably affect non-premium fees when it proposed fees. *See* 88 FR 402, 419 (Jan. 4, 2023). As shown in the supporting documentation for the proposed rule, the enacted premium processing budget was approximately $648 million in FY 2019 and approximately $658 million in FY 2020.[291] However, Table 6 of the proposed rule showed that the projected cost and revenue differential was approximately $1,868 million, significantly more than the enacted premium processing budget in FY 2019 or FY 2020. USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction in FY 2022. *See* 88 FR 402, 416 (Jan. 4, 2023). However, DHS revised the fee review budget in this final rule by transferring additional costs to premium processing revenue, as described earlier in this preamble. See section II.C.1. Reduced Costs and Fees.

*Comment:* Commenters suggested that USCIS incorporate recommendations from a June 2022 Office of the Ombudsman report into the final rule.

*Response:* The commenters are likely referring to the Citizenship and Immigration Services Ombudsman 2022 Annual Report to Congress.[292] USCIS

responses to the Ombudsman's annual reports are available online.[293] DHS notes that this final rule implements one recommendation from the 2022 report by adjusting fees for inflation. The CIS Ombudsman's 2023 Annual Report to Congress noted that an inflation-adjustment provision was part of the proposed rule.[294] DHS greatly appreciates the insight offered by the Citizenship and Immigration Services Ombudsman. USCIS works closely with the Ombudsman's office in addressing their concerns and improving our services, and we will consider including recommendations from that office in future rulemakings.

*Comment:* A couple of commenters requested that USCIS create a streamlined process for musician visas and suggested reducing the cost of reoccurring visas for musicians who have previously been granted a visa in the United States. One commenter suggested that USCIS review both O and P visas with the aim of establishing a new reciprocal arrangement between music exporting nations by creating a specific trade agreement that promotes an affordable and efficient system, that fosters access, and increases the mobility of touring musicians, crew, and industry professionals to work between Australia and the United States. Another commenter recommended that USCIS work with stakeholder groups, including immigration advocacy organizations, to develop fair and sustainable funding solutions. One commenter requested that USCIS create an international arts parole application. Others suggested an option for a 3-year visa be offered based on travel history and security profile for those artists who are in high demand reasoning that this would lower the administrative burden on USCIS and lower the overall cost for the artist.

*Response:* As we stated earlier, DHS greatly appreciates the contributions made to the U.S. by O and P nonimmigrants and we have made changes in the final rule to address comments from the O and P visa stakeholder community. However, the changes that these commenters suggest

---

[291] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, IEFA Fee Review Supporting Documentation (Jan. 2023), Appendix Table 1: FY 2019–2020 Enacted IEFA by Program/ Activity at page 29, available from *https:// www.regulations.gov/document/USCIS-2021-0010- 0028.*

[292] For this and other CIS Ombudsman annual reports, see DHS, Citizenship and Immigration

Services Ombudsman Annual Reports, available at *https://www.dhs.gov/publication/ombudsman- annual-reports* (last updated July 6, 2023).

[293] USCIS, USCIS Responses to Annual Reports to Congress, available at *https://www.uscis.gov/tools/ ombudsman-liaison/uscis-responses-to-annual- reports-to-congress* (last reviewed/updated May 5, 2023).

[294] CIS Ombudsman, Annual Report 2023, available at *https://www.dhs.gov/sites/default/files/ 2023-07/ 2023%20Annual%20Report%20to%20Congress_ 0.pdf* (June 30, 2023) at page 103 (page 113 of the PDF).

are largely beyond the scope of a USCIS fee rule. DHS may consider these suggestions in a future rulemaking but declines to make any changes in this final rule based on these comments.

*Comment:* To overcome budget shortfalls, an individual commenter recommended that USCIS increase visa fees for skilled international workers who earn over $100,000 annually.

*Response:* As discussed in multiple places in this final rule, DHS is increasing the fees for Forms I–129, I–140 and H–1B Registration from their current amounts in this rule and establishing an Asylum Program Fee, while providing discounts for small employers and nonprofits. DHS declines to base the fees on the salary of the beneficiary because doing so would be very difficult to administer.

*I. Out of Scope*

*Comment:* Commenters submitted several comments that suggested changes to immigration laws, policies, programs, and practices that are not related to fees or relevant to any changes proposed in the proposed rule. Thus, they are outside the scope of the rulemaking. The commenters stated:

• DHS should implement effective deterrence policies to enforce Federal law and reduce costs associated with mass undocumented immigration, rather than raise fees for U.S. businesses.

• Policies that deter mass undocumented immigration and related-mass asylum fraud will positively impact USCIS' budget and reduce the scale at which fee-paying applicants and petitioners must pay to support USCIS' asylum program.

• USCIS should broaden eligibility for EADs or reintroduce the automatic grant of EADs during case processing delays.

• USCIS should extend the validity date of benefits to address the financial burdens of renewals (*e.g.,* extending the validity period for EADs and advance parole to 3 years); USCIS should update their records so that FOIA requests or congressional reporting may provide accurate information on fee waiver grant rates for these humanitarian categories.

• DHS should eliminate the rule that adjustment of status applications is considered abandoned if an applicant leaves the country without obtaining advance parole, which contributes significantly to the backlog of advance parole applications.

• It is an ineffective use of USCIS resources to review each I–765 and I–131 petition filed by adjustment applicants as if they are independent applications.

• USCIS should implement simpler language in the Form N–400.

• USCIS should combine Forms N–400 and N–600 to reduce adjudication time and save costs.

• USCIS should adopt remote interviews for naturalization and adjustment applications and oath ceremonies to reduce expenses, delays, and difficulties for applicants.

• DHS should provide clear guidance to adjudicators and in policy that reflects the breadth of its interpretation of the TVPRA and update its records to reflect this for purposes of FOIA requests or congressional reporting.

• With regards to Systematic Alien Verification of Entitlements program fees, that leveraging State resources to fill the gap for agencies seeking to comply with Federal law places the states in the difficult position of satisfying a mandate in the absence of Federal appropriations.

• On Form I–485, question 61, regarding public charges, be changed such that, if an applicant has, or has had, an exempt status, they are not subject to the public charge rule, and allow such applicants to skip to question 69; additionally, the commenter recommended that the instructions be updated to include a list of exempt statuses.

• Change adjustment of status abandonment provisions to only apply to applicants who are not under exclusion, deportation, or removal proceedings.

• USCIS should stop requiring extensions of status when not legally required for dependents of temporary workers and should admit them to the end of the validity of principal applicants' extension as long as the qualifying relationship exists. USCIS already automatically terminates dependent children's status when they reach 21 years of age, and spouses can independently alert USCIS if a marriage ends.

• USCIS should reduce barriers to travel and improve the process of providing APDs and not consider a pending Form I–131 for advance parole to be abandoned by travel abroad.

• Waivers of filing fees should not be interpreted as a public charge admission because not everyone can raise funding for filing fees given that wages are not keeping up with the rate of inflation.

*Response:* DHS fully considered the comments in this rule and whether their suggestions could be adopted. The comments above request changes that go beyond fees and require either analysis of their impacts or public comment on their effects so that they exceed what DHS can include in this final rule under

the APA. DHS may consider the points raised by commenters in future policy changes or rulemakings.

**V. Statutory and Regulatory Requirements**

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)*

E.O. 12866, as amended by Executive Order 14094, and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of E.O. 12866, as amended by Executive Order 14094, because its annual effects on the economy exceed $200 million in any year of the analysis. Accordingly, OMB has reviewed this rule.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS for Form N–400, Application for Naturalization, filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

DHS has prepared a full analysis according to E.O. 12866 and E.O. 13563, which can be found in the docket for this rulemaking. Table 9 presents the accounting statement showing the transfers, costs, and benefits associated with this regulation as required by OMB Circular A–4.

OMB A–4 Accounting Statement

**BILLING CODE 9111–97–P**

**6338**      **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 9. OMB A-4 Accounting Statement - ($ in millions, 2022; period of analysis: FY 2024 through FY 2033) | | | | |
|---|---|---|---|---|
| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
| **BENEFITS** | | | | |
| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The changes in the final rule will provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees. Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules will allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation.<br><br>The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced fees for electronic filings, reduced reapplications for premium processing and for many applicants, limited fee increases and additional fee exemptions and fee waivers to reduce fee burdens.<br><br>Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. | | | RIA |
| **COSTS** | | | | |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$157 | | | RIA |
| Annualized quantified, but un-monetized, costs | N/A | | | |
| Qualitative (unquantified) costs | Expanding the population of applicants using eligible for N-400 reduced fees and applicants eligible for fee waivers and exemptions will increase the administrative burden on the agency | | | |

| | to process these forms. | |
|---|---|---|
| **TRANSFERS** | | |
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%) $888 | RIA |
| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%) $241 | RIA |
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%) $0.20 | RIA |
| *Miscellaneous Analyses/Category* | *Effects* | |
| *Effects on state, local, and/or tribal governments* | *None* | Preamble |
| *Effects on small businesses* | DHS does not believe that the increase in fees in the rule will have a significant economic impact on a substantial number of small entities that file Forms I-129, I-140, I-910, or I-360. DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I–924) or Form I-956G (formerly I-924A). DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Final Regulatory Flexibility Analysis (FRFA) and Small Entity Analysis (SEA) |
| *Effects on wages* | *None* | None |
| *Effects on Growth* | *None* | None |

Quantified Annual Economic Impacts of the Fee Schedule: NPRM vs Final Rule

| Table 10. Quantified Annual Economic Impacts of the Fee Schedule: NPRM vs Final Rule | | | | |
|---|---|---|---|---|
| **Category** | **NPRM** | **Final Rule** | **Difference** | **Percent Difference** |
| | **Undiscounted** | **Undiscounted** | | |
| Total Costs to Applicants/Petitioners | $575,100,190 | $302,692,154 | -$272,408,036 | -47% |
| Total Cost Savings to Applicants/Petitioners | $42,721,052 | $145,686,202 | $102,965,150 | 241% |
| **Net Costs** | **$532,379,138** | **$157,005,952** | **-$375,373,186** | -71% |
| **Transfer Payments from applicants/petitioners to USCIS (fee increases)** | **$1,612,127,862** | **$887,571,832** | **-$724,556,030** | -45% |
| **Transfer Payments from USCIS to applicants/petitioners (exemptions, waivers, discounts, reduced fees)** | **$116,372,429** | **$241,346,879** | **$124,974,450** | 107% |
| **Transfer Payments from DoD to USCIS (Military N-400 reimbursements)** | **$222,145** | **$197,260** | **-$24,885** | -11% |
| **Net Transfer Payments to USCIS** | **$1,495,977,578** | **$646,422,213** | **-$849,555,365** | -57% |
| Source: USCIS Analysis | | | | |

Table 10 above shows that total costs were reduced by 47 percent in the final rule. This is mainly a result of the discounted fees given to Form I–129 and I–140 petitioners who are employers with 25 or fewer full-time equivalent (FTE) workers or non-profit entities. There was a significant increase in cost savings mainly because of the lower fees for filing forms electronically as well as lower fees for filing Forms I–90 and I–131. Mainly because of the increase in cost savings, net costs were reduced by 71 percent in the final rule. Transfer payments from applicants/petitioners to USCIS were reduced by 45 percent mainly because of the lower fees for Form I–485 applicants concurrently filing a Form I–765, lower fees for applicant under the age of 14 years filing Form I–485 with a parent and lower fees for the online filing of forms. Transfer payments from USCIS to applicants/petitioners increased significantly by 107 percent. This increase is mainly attributable to changes to fee exemptions (see Table 48 in standalone RIA for additional information). Transfer payments from USCIS to applicants/petitioners as a result of fee exemptions increased by 70-percent ($181,225,564) from the NPRM estimates ($106,821,450). Transfer payments from DoD to USCIS were reduced by 11 percent. Finally, net transfer payments to USCIS were reduced by 57 percent in the final rule, from NPRM estimates. DHS notes that the variation in costs, cost savings and transfer payments from the proposed rule to the final rule is also influenced by the change in annual average populations used throughout the economic analysis. In the proposed rule, DHS generally used 5-year annual averages from FY 2016 through 2020 and in the final rule DHS uses 5-year annual averages from FY 2018 through 2022.

Summary Table of the Economic Impacts of the Final Fee Schedule

Table 11 provides a detailed summary of the final rule and its impacts.

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **1. Resubmission of Dishonored or Returned Payments, Fee Payment Method, and Non-Refundability** | If a check or other financial instrument used to pay a fee is dishonored or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br>• If the instrument used to pay a fee is dishonored or returned a second time, USCIS may reject or deny the filing. Financial instruments dishonored or declined or returned for any reason other than insufficient funds, will not be resubmitted, and such filings may be rejected or denied. Credit cards that are declined for any reason will not be resubmitted.<br><br>• DHS may reject a request that is accompanied by a check or other financial instrument that is dated more than one year before the request is received. | Quantitative: Applicants-<br>• An increase in transfer payments from applicants/petitioners to USCIS of approximately $658,396 (annual average amount USCIS refunds to applicants/petitioners) due to nonrefundable fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Clarifying dishonored or returned payment resubmission and non-refundability policies, limiting the age of checks to be presented and limiting payment options will reduce administrative burdens and fee processing errors for USCIS.<br><br>• USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment.<br><br>• USCIS will lose fewer credit card disputes. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Will codify authority to limit payment options so that USCIS may require certain fees be paid using a specific payment method. <br><br> • Clarifies that fees are generally nonrefundable regardless of the result of the request or how much time the request requires to be adjudicated. <br><br> • Clarifies that fees paid to USCIS using a credit or debit card cannot be disputed. | | |
| **2. Eliminate $30 Returned Check Fee** | • Eliminate the $30 charge for dishonored payments. | Quantitative: Applicants <br> • None. <br><br> Qualitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | Quantitative: Applicants – <br> • DHS estimates the annual cost savings to applicants/petitioners will be $414,150. <br><br> Qualitative: Applicants – <br> • Applicants who submit bad checks will no longer have to pay a fee. <br><br> DHS/USCIS – <br> • This change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **3. Changes to Biometric Services Fee** | • For nearly all benefit types, DHS will incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable.<br><br>• Retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | Quantitative: Applicants<br>• As a result of the $55 reduction in the biometric services fee, TPS and the Executive Office for Immigration Review (EOIR) applicants will experience a total of $10,007,965 in reduced fees annually. This represents transfer payments from USCIS to the fee payers as USCIS will now incur the indirect costs of providing the biometric services.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None | Quantitative: Applicants –<br>• None.<br><br>Qualitative: Applicants –<br>• Incorporating the biometric services fee into the underlying benefit request filing fee will benefit applicants by simplifying the payment process.<br><br>• May also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>DHS/USCIS –<br>• Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| **4. Naturalization and Citizenship Related Forms** | • Limit the increase of Form N-400 fees to $760 for paper filers and $710 for online filers.<br>• Increase fees to Forms N-300, N-336, N-400, N-470, N-600 and N-600K.<br><br>• Increase the Form N-400 reduced fee to $380.<br><br>• Make the request for a reduced fee available to applicants with incomes under 400 | Quantitative: Applicants<br>• Increase in fees to Forms N-300, N-336, N-400 (paper), N-470, N-565 (paper), N-600 and N-600K will result in an increase in transfer payments from the fee-paying applicants to USCIS of $30,182,790 annually.<br><br>• Increase in transfer payments from USCIS to Form N-400 reduced fee | Qualitative: Applicants-<br><br>• Limited fee increases allow more residents, especially those with financial and income constraints to seek citizenship.<br><br>• Cost savings of $5,981,330 to applicants filing Forms N-400 and N-565 online.<br><br>• Expanding the eligible population of N-400 reduced fee applicants will benefit an unknown number of applicants who could not afford the full fee, but can |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG.<br><br>• Keep the existing statutory fee exemptions for military members and veterans who file Forms N-400 and N-600. | applicants of $46,088,170 due to the change in reduced fee eligibility criteria to applicants with incomes under 400 percent of the FPG.<br><br>• Increase in transfer payments from DoD to USCIS of $197,260 annually for N-400 (military only) reimbursements.<br><br>Qualitative:<br>Applicants –<br>• None<br><br>DHS/USCIS –<br>• Expanding the population of N-400 reduced fee applicants will increase the administrative burden on the agency to process these additional forms with 50 percent less in fees. | now pay 50 percent less in fees. |
| 5. **Fees for Filing Online** | • Lower fees for online filings of immigration benefit requests for which both paper and online filing options are available. The forms include Form I-90, Form I-130, Form I-539, Form I-765, Form N-336, Form N-400, Form N-565, Form N-600, Form N-600K, Form G-1041, and Form G-1041A. | Quantitative:<br>Petitioners<br>• Increase in transfer payments of $17,706,510 from Form I-130 online filers to USCIS.<br><br>DHS/USCIS-<br>• None.<br><br>Qualitative:<br>Petitioners –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Petitioners-<br><br>• Cost savings of $56,796,180 to applicants filing Forms I-90, I-539 and I-765 online.<br><br>Qualitative:<br><br>Petitioners-<br>• Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.<br><br>DHS/USCIS – |

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | | • USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.<br><br>• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records will not be physically moved around to different adjudication offices.<br><br>• Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |
| **6. Form I-485, Application to Register Permanent Residence or Adjust Status** | • Increase Form I-485 fees for adults and children under the age of 14 concurrently filing with a parent.<br><br>• Charge separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. | Quantitative: Applicants-<br>• Total increase in transfer payments from applicants filing Form I-485 to USCIS of $391,920,525.<br><br>This includes the following:<br>• The increase in the Form I-485 fees will result in approximately $18,273,710 in transfer payments annually from applicants filing I-485 (only) to USCIS.<br><br>• Separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I-485 will result in transfer payments from applicants to USCIS of $367,192,615 annually.<br><br>• Transfer payments from applicants to | Quantitative: Applicants-<br>• Not estimated.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Unbundling the fee for Form I-485 from Forms I-131 and I-765 will better reflect the cost of adjudication. |

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | USCIS of $6,454,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent.<br><br>Qualitative: Applicants –<br><br>• None.<br><br>DHS/USCIS –<br>• None. | |
| 7. **Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • Separate the fee for Form I-131A from other travel document fees. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Allows USCIS to assess the cost of providing services for this immigration benefit and better align fees in future fee reviews. |
| 8. **Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • Charge different fees for Form I-129, based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries.<br>• Increase H-1B registration fees from $10 to $215<br><br>• Limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers. | Quantitative: Applicants –<br>• None.<br>• Increase in transfer payments from Form I-129/I-129CW petitioners to USCIS of $217,571,880. This includes transfer payments from H-1B registrants to USCIS of $71,428,355.<br><br>• Costs of $254,764,500 to Form I-129/I-129CW petitioners due to the new Asylum Program fees.<br><br>DHS/USCIS –<br>• Not estimated.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS – | Quantitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• A benefit of the different fees for the Form I-129 classifications is that it will allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification.<br><br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | • Charge a new Asylum Program fee to Form I-129/I-129CW petitioners.<br><br>• Provide reduced Form I-129/I-129CW fees and Asylum Program fees for businesses with 25 or less full-time equivalent employees and nonprofit businesses.<br><br>• The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer full-time equivalent employees, and $600 for all other I-129 filers. | • None. | |
| **9.  Adjustments to Premium Processing** | • Change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service.<br><br>• Permit combined payments of the premium processing service fee with the remittance of other filing fees. | Quantitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative: Applicants –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated.<br><br>DHS/USCIS –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS will have additional business days to process petitions when premium processing request volumes are high and the 15 calendar days include multiple non-business days such as weekends and holidays.<br><br>• USCIS will be able to make premium processing more consistently available and expand this service to the |

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | | newly designated classifications and categories allowed by the USCIS Stabilization Act.<br><br>Qualitative: Applicants and DHS/USCIS –<br>• Allowing combined payments reduces unnecessary burdens on petitioners, applicants, and DHS. |
| **10. Intercountry Adoptions** | • Clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for Forms I-600A and I-800A approvals in an orphan case from 18 to 15 months to remove inconsistencies between Forms I-600A and I-800A approval periods and validity of the U.S. Federal Bureau of Investigation (FBI) background check.<br><br>• Create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600.<br><br>• Provide fee exemptions for some applicants who file Form I-600A/I-600 | Quantitative: Applicants-<br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 will cost $146,954 annually.<br><br>• The increase to the current fees for Forms I-600/600A/800/800A will result in transfer payments from applicants to USCIS of approximately $265,440 annually.<br><br>• Transfer payments from USCIS to the public of $4,023,570 due to fee exemptions to Form I-600A/I-600 Supplement 3, Form I-800A Supplement 3 and adoption-based Forms N-600 and N-600K.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS-<br>• None. | Quantitative: Applicants –<br>• None.<br><br>Quantitative: Petitioners-<br><br>• Cost savings of $3,375 to applicants filing Form I-800A Supplement 3 due to a reduction in fees.<br><br>Qualitative: Applicants –<br>• Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates.<br><br>• These changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | Supplement 3, Form I-800A Supplement 3, Form N-600 or Form N-600K for newly adopted children. | | prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>DHS/USCIS –<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br><br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
| **11. Immigrant Investors** | • DHS will increase fees to Forms I-526/I-526E[295], I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the Employment-Based Immigrant Visa, Fifth Preference (EB-5) program. | Quantitative: Applicants-<br>• Annual transfer payments from EB-5 investors and regional centers to USCIS will be approximately $44,746,040.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| **12. Changes to Genealogy Search and Records Requests** | • Revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• Change the index search request process so that USCIS may provide requesters with digital records via | Quantitative: Applicants-<br>• Annual transfer payments from fee paying applicants to USCIS of $813,900 due to increased fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• Cost savings of $380,415 to applicants filing Forms G-1041, G-1041A online.<br>Qualitative: Applicants –<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>DHS/USCIS –<br>• Reduce costs for mailing, records processing, and |

The header at top.

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | email in response to the initial search request.<br><br>• Lower the fees for the online filing of Forms G-1041 and G-1041A, from $65 to $30 to reflect the lower marginal costs to USCIS from online filing.<br><br>• For requestors who choose to submit via mail option, DHS will increase the fee from $65 to $80, for G-1041 and G-1041A.<br><br>• Charge a fee of $330 for requests for a Certificate of Non-Existence. | | storage costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |
| **13. Fees Shared by CBP and USCIS** | • Increase fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP): Form I-192, Form I-193, Form I-212, and Form I-824. | Quantitative: Applicants-<br>• Increase in annual transfer payments of $11,826,730 from fee payers to USCIS and CBP.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• A single fee for each shared form will reduce confusion for individuals interacting with CBP and USCIS.<br><br>DHS/USCIS –<br>• None. |
| **14. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 [NACARA]** | • Adjust the fee for Form I-881 and combine the current multiple fees charged for an individual or family into a single fee of $340 for each filing of Form I-881. | Quantitative: Applicants-<br>• Transfer payments of $18,260 annually from I-881 individual filers to USCIS.<br><br>• Transfer payments from USCIS to I-881 family applicants of $1,610 since this fee is less than the cost to adjudicate the application. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | Qualitative: Applicants – <br>• None. <br><br>DHS/USCIS – <br>• None. | • A single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15. Fee Waivers** | • Expand the categories of requestors and related forms eligible for a fee waiver. <br><br>• Codify the existing criteria in USCIS guidance regarding eligibility requirements for a fee waiver. | Quantitative: Applicants – <br>• None. <br><br>DHS/USCIS – <br>• None. <br><br>Qualitative: Applicants – <br>• None. <br><br>DHS/USCIS – <br>• None. | Quantitative: Applicants – <br>• None. <br><br>DHS/USCIS – <br>• None. <br><br>Qualitative: Applicants – <br>• More simplified and streamlined system to process fee waivers. <br><br>DHS/USCIS – <br>• None |
| **16. Fee Exemptions** | • Will provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries[296]: <br>• Victims of Severe Form of Trafficking (T Nonimmigrants) <br>• Victims of Qualifying Criminal Activity (U Nonimmigrants) <br>• Violence Against Women Act (VAWA) Form I-360 Self-Petitioners and Derivatives <br>• Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty <br>• Abused Spouses and Children Adjusting Status under the | Quantitative: Applicants- <br>• Transfer payments of approximately $181,225,564annually from USCIS to the public. <br><br>Qualitative: Applicants – <br>• None. <br><br>DHS/USCIS – <br>• None. | Quantitative: Applicants- <br>• Cost savings of about $40,184,477 to the public for no longer having to complete and submit Form I-912. <br><br>Qualitative: Applicants – <br>• Individuals who are unable to afford immigration benefit request fees will benefit from filing a request with no fees. <br><br>DHS/USCIS – <br>• Decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. |

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA)<br>• Abused Spouses and Children Seeking Benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)<br>• Abused Spouses and Children of lawful permanent residents (LPRs) or U.S. Citizens under the Immigration and Nationality Act (INA) Section 240A(b)(2)<br>• Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Forces (ISAF) (SI1 and SI2)<br>• Special Immigrant Juveniles (SIJs)<br>• Temporary Protected Status (TPS)<br>• Asylees<br>• Refugees<br>• Persons Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | | |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations   **6353**

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **17. Additional Fee Adjustments** | DHS will increase fees for the following forms:<br>• I-90 (paper)<br>• I-102<br>• I-130 (paper)<br>• I-131<br>• I-140<br>• I-601<br>• I-612<br>• I-290B<br>• I-360<br>• I-539 (paper)<br>• I-601A<br>• I-687/I-690/I-694<br>• I-751<br>• I-765 (paper)<br>• I-817<br>• I-910<br>• I-929 | Quantitative:<br>Applicants-<br>• An increase in transfer payments from fee payers to USCIS of approximately $171,861,361 annually.<br><br>• Costs of $47,780,700 for Form I-140 petitioners due to the new Asylum Program fees.<br><br>Qualitative:<br>Applicants –<br>• None. | Quantitative:<br>Applicants-<br>• Cost savings of $41,926,275 to applicants filing Forms I-90 and I-131 as a result of lower fees.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| **18. Adjusting USCIS Fees for Inflation** | • DHS to use the CPI-U as the inflation index for fee adjustments between comprehensive fee rules. The actual impacts of such adjustments will be analyzed in a future rule should DHS exercise this authority. | Quantitative:<br>Applicants-<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative: Applicants<br><br>• None.<br><br><br>Qualitative:<br><br>DHS/USCIS –<br><br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |

Source: USCIS analysis.
Note: The dollar amounts in this table are undiscounted.

BILLING CODE 9111–97–C

---

[295] Combines both Forms I–526, Immigrant Petition by Standalone Investor and I–526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

[296] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under 8 CFR 106.2 for which DHS to codify that there is no fee.

*B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)*

1. Changes From the Proposed Rule's IRFA

Since the IRFA, the major changes made in the final rule that could affect entities are as follows:

• The Asylum Program Fee is $0 for nonprofits, $300 for employers with 25 or fewer full-time equivalent (FTE) workers, and $600 for all other Form I–129, I–129CW, Petition for a CNMI-Only

Nonimmigrant Transitional Worker, and those filing Form I–140, Immigrant Petition for Alien Workers. The proposed rule stated that the Asylum Program Fee would be $600 for all such filers.

• Employers with 25 or fewer FTE workers and nonprofits receive a discount on fees for Form I–129, Petition for Nonimmigrant Worker and Form I–129CW.

• A $50 reduced fee for forms filed online, except in limited circumstances,

such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. The proposed rule provided various reduced fees for each form filed online.

2. Overview of the FRFA

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. In accordance with the RFA, USCIS has prepared a FRFA that examines the impacts of the interim final rule on small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. In addition, the courts have held that the RFA requires an agency to perform a FRFA of small entity impacts only when a rule directly regulates small entities. The complete detailed SEA [297] is available in the rulemaking docket at *http://www.regulations.gov.*

Individuals, rather than small entities, submit most of the immigration and naturalization benefit applications and petitions. The final rule would affect small entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a small entity analysis for this final rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–956 (formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (formerly Form I–924 amendment) and the Regional Center Annual Statement, Form I–956G (formerly Form I–924A).

This FRFA contains the following:

• A statement of the need for, and objectives of, the rule.

• A statement of the significant issues raised by the public comments in response to the initial regulatory

flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule because of such comments.

• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule based on the comments.

• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

• A description of the steps the agency has taken to minimize significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

DHS is publishing this FRFA to respond to public comments and provide further information on the likely impact of this rule on small entities. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refers the reader to these analyses where additional detail is available.

a. Summary Findings of the FRFA

• The increase in fees may have a significant economic impact (greater than 1 percent) on some small entities that file I–129, I–140, I–910, or I–360.

During the FRFA, DHS found no comments that provided additional data for the forms below:

• For Forms I–956, I–956F and I–956G, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file these forms.

• For the genealogy forms, DHS also does not have sufficient data on the requestors that file Forms G–1041, Index Search Request and Form G–1041A, Genealogy Records Request, to determine whether such filings were made by entities or individuals. Thus,

DHS is unable to determine if the fee increases for genealogy searches are likely to have a significant economic impact on small entities.

Form I–129 Small Entities

• *Form I–129 Small Entities with More than 25 Full-Time Equivalent (FTE) Employees*

○ 302 of the 1,643 matched small entities searched were small entities with more than 25 employees.

○ Among the 302 small entities, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent.

○ The small entities with greater than 1 percent impact were mostly H–1B filers (18 of 327) that filed multiple petitions.

○ The greatest economic impact imposed by the fee changes was 7.06 percent and the smallest was 0.002 percent.

○ The average economic impact from the H–1B registration and petition fee increase on all 241 filers was 0.06 percent; the greatest economic impact was 1.35 percent and the smallest was 0.0004 percent.

• *Form I–129 Small Entities with 25 or Fewer Full-Time Equivalent (FTE) Employees*

○ 876 of the 1,643 entities searched, were small entities with 25 or fewer FTE employees.

○ Among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 95 (10.8 percent) experienced an economic impact greater than 1 percent.

○ The small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 95) that mostly filed multiple petitions.

○ The greatest economic impact imposed by the fee changes was 4.21 percent and the smallest was 0.003 percent.

○ The average economic impact from the H–1B registration and petition fee increase on all 682 filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent.

• *Form I–129 Nonprofit Small Entities*

○ 14 of the 1,643 entities searched were nonprofit small entities. All 14 of these nonprofit small entities petitioned for H–1B workers.

○ All 14 nonprofits small entities experienced an economic impact of less than 1 percent.

○ The greatest economic impact imposed by the fee changes was 0.82 percent and the smallest was 0.003 percent.

○ The average economic impact from the registration and petition fee

---

[297] DHS, USCIS SEA for the USCIS Fee Schedule Final Rule.

increases on all H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent.

**Form I–140 Small Entities**

• DHS identified 126 small entities with reported revenue data in the sample.

• Of the 126 small entities, 46 had more than 25 FTE employees and 80 had 25 or fewer FTE employees. There were no nonprofit small entities with reported revenue data in the sample.

• All 46 small entities with more than 25 FTE employees experienced an economic impact of less than 1 percent. The greatest economic impact imposed by the fees was 0.25 percent and the smallest was 0.0001 percent.

• For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent. The smallest economic impact imposed by the fee increase was 0.002 percent.

Form I–910 Small Entities

• 179 matched entities with reported revenues were considered small entities.

• All 179 small entities experienced an economic impact of less than 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.91 percent and the smallest was 0.001 percent.

Form I–360 Small Entities

• 174 entities with reported revenues were considered small entities.

• All 174 small entities experienced an economic impact below 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.08 percent and the smallest was 0.001 percent.

b. A Statement of Need for, and Objectives of the Rule

DHS issues the final rule consistent with INA sec. 286(m),[298] which authorizes DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and the CFO Act,[299] which requires each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees. DHS is adjusting the fee schedule for DHS immigration and naturalization benefit applications after conducting a comprehensive fee review for the FY 2022/2023 biennial period and determining that current fees do not recover the full costs of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

c. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, A Statement of the Assessment of the Agency of Such Issues, and A Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

DHS published the proposed rule along with the IRFA on January 4, 2023, with the comment period ending March 13, 2023. During the comment period, DHS received approximately 260 submissions from interested individuals and organizations on the proposed rule's impacts on small entities regarding the RFA. The comments did result in one major revision to the small entity analysis in the final rule that is relevant to the effects on small businesses, small organizations, and small governmental jurisdictions presented in this FRFA. More specifically, DHS agreed that the random sample size for Form I–129 could be larger due to the size of this population and expanded the sample from 650 entities to 4,746 entities in the FRFA. DHS summarizes and responds to the public comments in this Final Rule.

*Comment:* Numerous commenters generally opposed the rule on the grounds that it would negatively impact the U.S. economy.

*Response:* DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede or limit legal immigration. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, 2016, and 2020 and has no data that would indicate that the fees for family-based benefit requests, lawful permanent residence, and naturalization in this final rule would prevent applicants from filing.

DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, and almost all industries. Immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and welcoming new citizens helps the U.S. economy. DHS acknowledges in its analyses accompanying this rule that the higher fees must be paid by U.S. companies that hire foreign nationals, but DHS has no data that indicate that higher fees will affect the supply of lower skilled laborers, impede immigration to the detriment of the labor force, result in noncitizens being unable to work, cause employers to lay off employees, undermine the jobs and wages of domestic workers with limited education performing low-skill jobs, or increase unemployment among immigrant workers. DHS knows that immigrants make important contributions in research and science. However, we have no data that support the assertion that the increased fees would result in many fewer residents accessing a desired immigration status for which they are eligible.

*Comment:* One commenter stated that businesses would pass costs to consumers, contributing to inflation.

*Response:* DHS recognizes that some businesses may pass on these increased fees to their customers but cannot determine the exact impact this would have on overall inflation in the United States.

*Comment:* One commenter wrote that the proposed rule would create barriers to naturalization, which would limit the ability of immigrants to contribute to the economy.

*Response:* In recognition of the importance of naturalization and integration of new citizens in the U.S., since 2010 DHS has held the fee for Form N–400, Application for Naturalization, below the estimated cost to USCIS of adjudicating the form. DHS recognizes the importance of naturalization to new citizens and the U.S. economy. DHS also understands that the fee increase for the naturalization application may affect those applying. However, DHS continues to offer fee waivers to naturalization applicants who are unable to pay their fee. Additionally, in this rule DHS increases eligibility for the reduced fee N–400 from 200 percent to 400 percent of the FPG. Therefore, DHS does not believe that the fee

---

[298] See 8 U.S.C. 1356(m).

[299] See 31 U.S.C. 901–03.

increase to Form N–400 will create barriers to naturalization.

*Comment:* Several commenters generally opposed the rule on the grounds that it would negatively impact employers. Other commenters wrote that the proposed rule would have negative effects on the labor market by discouraging employers from hiring foreign workers. A trade association stated that most significant cost increases for various immigration benefits are targeted at American companies of all sizes and across all industries, and that the exorbitant fee increases would have a profoundly negative impact on the U.S. economy. The commenter adds that the fee hikes will exacerbate their current inability to adequately meet their workforce needs and hinder their ability to compete in the marketplace. The commenter also stated that USCIS failed to comply with the RFA requirements because it did not consider significant alternatives to the proposed rule that would have lessened the negative impact on the business community. The commenter adds that USCIS failed to properly analyze the employer data for companies that filed Form I–129 for needed workers by using a very small random sample.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016. Therefore, DHS has no data from previous fee schedules that would indicate that the fees would discourage employers from hiring foreign workers, which would negatively impact the labor market.

DHS disagrees that it failed to comply with the RFA requirements because DHS considered significant alternatives in the proposed rule. In terms of the random sample size for Form I–129, DHS agrees that the sample size could be larger due to the size of this population and for the final rule we have expanded the sample from 650 entities to 4,746 entities. DHS used a 95 percent confidence level and a 2 percent confidence level (margin of error) for the Form I–129 sample size. In the proposed rule, DHS used a 95 percent confidence level and a 5 percent confidence level. The impacts on small entities are discussed in detail in section d of the FRFA.

*Comment:* Several commenters wrote that the rule would create problems specifically for the labor pool in retail, agriculture, construction, manufacturing, and hospitality. Other commenters stated that the proposed fee increases would negatively impact small businesses by further increasing labor costs associated with hiring immigrants.

*Response:* DHS agrees that immigrants are crucial for many industries including retail, agriculture, construction, manufacturing, and hospitality. DHS does not believe the fees established in this rule will reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals, and that some businesses may pass on these increased fees to their customers. However, DHS must fund USCIS through fees. More importantly, DHS saw no significant or limited decreases in the number of I–129 benefit requests submitted, including H–2A and H–2B after its fee adjustments in 2010, and 2016 and has no data that indicate that increased fees will affect the supply of laborers in these industries. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses that are posted for public review as supporting documents in the rulemaking docket. In the SEA (see Table 7), DHS calculated the estimated economic impact of the fee increase on a sample of small entities. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [300] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[301] Among the sample of 1,192 small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 petitions to employ foreign nationals.

*Comment:* A couple of commenters stated that fees would be an added burden to nonprofits serving immigrant communities.

*Response:* DHS recognizes the value of the various groups including nonprofits, which assist individuals to navigate its regulations and immigration benefit requests. As previously stated, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. Nonetheless, DHS understands the importance of maintaining access to immigration benefit requests for individuals and organizations. DHS further notes that this final rule expands the availability of fee exemptions for humanitarian and protection-based immigration categories and fee waivers for individuals who are unable to pay request fees, which should reduce the burden on non-profits that assist individuals who are applying for humanitarian or protection-based status or who are low-income. *See* Tables 4B, 4C.

## Comments on Form I–129 (H–1B)

*Comment:* Several commenters stated that increases in the H–1B fee would be detrimental to employers like medical centers, universities, and technology companies as follows:

• The fees will limit their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important workers, creating an economic burden for those institutions and stifling innovation.

• The fee increases could have a significant impact on small businesses, nonprofit healthcare facilities, and educational institutions that hire employees on H–1B specialty occupation visas because these entities are not generally able to absorb these enormous increases.

• The fee increases would stifle innovation and hurt start-ups and small businesses, citing data from the U.S. Bureau of Labor Statistics demonstrating that these entities rely on immigrant workers due to labor shortages in the United States.

• The increased fees will decrease the demand for the H–1, O, E–3, and TN visas and create a financial hardship for its performing arts centers.

• The fee increases will make hiring highly skilled workers unaffordable.

• USCIS did not account for funding differences between a venture capital start-up and a university basic science lab in its SEA.

• DHS did not analyze impacts to government research organizations in the SEA for the proposed rule.

---

[300] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[301] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

Additional analyses on the number of nonimmigrant petitions filed by these organizations would help USCIS better understand the rule's impact on other government organizations.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS also acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016 and has no data that would indicate that the fees would limit employers' ability to hire foreign workers, which would negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities including nonprofits that submitted benefit requests (Form I–129). Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [302] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[303] Among the sample of 1,192 [304] small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create an economic burden and stifle innovation for a significant number of small entities that file H–1B benefit requests to employ foreign nationals.

*Comments on Form I–129 (O and P Nonimmigrants and Their Petitioners)*

*Comment:* Numerous commenters, mostly individuals, said the increase in fees for touring artists would have detrimental effects on the performing arts industry and the U.S. economy, including negative impacts to

employment within the music industry and financial losses for businesses that benefit from live performances. Commenters stated that music venues, record labels, and booking agencies would suffer financially, and increased fees for touring artists would increase the costs of tickets and merchandise. The proposed fee increases would have a negative impact on U.S. culture and diversity, by harming the performing arts sector. Many commenters expressed support of the arts without stating a position on the rule, requested that DHS keep prices affordable for artists, or structure fee increases in a way that benefits Americans and international artists.

*Response:* DHS acknowledges that the arts are important and beneficial to the economy. Nevertheless, the fees DHS establishes in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. Any preferential treatment provided to petitioners for performers and musicians would mean that the costs for their petitions are borne by other petitioners, applicants, and requestors.

For Form I–129 (O and P visa classifications), among the 48 small entities with reported revenue data identified in the SEA, 45 (94 percent) experienced an economic impact of considerably less than 1 percent of revenue in the analysis.[305] While DHS sympathizes with touring artists, small traveling musicians, and other entities in the performing arts industry, our analysis indicates that the additional fee imposed by this rule does not represent a significant economic impact on most of these types of small entities. Therefore, DHS has no data that would indicate that the fees in this rule would have a negative impact on U.S. culture and diversity by harming the performing arts sector.

*Comments on Form I–129 (H–2A)*

*Comment:* Some commenters stated that fee increases would impact farms that rely on the H–2A program. Another commenter stated that USCIS does not properly account for small farms in their analysis of costs on livestock producers. A couple of commenters stated that the proposed changes were unfair to farmers and expressed concern with the proposed use of a business's total revenue as the determining factor in how much a business or farm must pay in fees. The commenters added that the practice is "devoid of economic basis"

because some farms have little to no profit despite high total revenue.

*Response:* As noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. DHS respectfully disagrees with the commenter who stated that USCIS did not properly account for small farms in their analysis of costs on livestock producers. DHS used recent data to examine the direct impacts to small entities for Forms I–129 and has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities who file for H–2A visas. To determine if a final rule would have a significant economic impact on affected small entities, SBA suggests 1 percent of revenue as a measure for determining economic impacts.[306] DHS believes this measure is the most useful for the FRFA, based on the available data for the relevant small entities. All 36 small entities that submitted Form I–129 petitions for H–2A nonimmigrant workers and reported revenue data experienced an economic impact of less than 1 percent.[307] Therefore, the data that DHS has indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 for H–2A temporary agricultural employees.

*Comment:* Multiple commenters said the regulatory flexibility analysis is flawed because it does not distinguish between petitions for named and unnamed H–2B nonimmigrants in assessing the impact on small entities and it did not consider the 25 named worker limitation in calculating the regulatory impact.

*Response:* The commenter is correct that the IRFA did not capture the full fee increases to small entities that file for named beneficiaries because DHS did not consider the 25 named worker limitation in its analysis. DHS apologizes for this error. We have incorporated the full estimated fee increases to small entities in the FRFA. The full detailed analysis is found in the

---

[302] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[303] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

[304] H–1Bs accounted for about 79% of the entities in the random sample.

[305] The average economic impact on these 45 small entities was 0.11 percent.

[306] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19, SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[307] The average economic impact on these 36 small entities was 0.20 percent.

stand-alone SEA in the docket of this final rulemaking, tables 6 through 10 for all I–129 classifications impacts.

*Comment:* A commenter stated that the proposed fees will have a significant impact on small businesses and DHS incorrectly calculated impacts to small entities because:

• It used gross income of filers as reported on Forms I–129 and I–140 instead of net income.

• It does not consider the impact of additional fees that can be accumulated from premium processing or hiring temporary workers for seasonal jobs.

• Fees would impede small or nonprofit entities' ability to compete with larger entities, hiring and economic growth.

• Many small employers pay for immigration fees of the family members of workers.

• Small businesses will have to file multiple H–1B petitions for workers that move outside of a Metropolitan Statistical Area.

*Response:* DHS disagrees that its calculations to estimate the economic impacts of the fee increases on small entities are incorrect. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [308] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities. [309] [310] DHS believes this measure is the most useful for the FRFA, based on the available revenue data for the relevant small entities. Additionally, DHS has no data that would indicate that the fees in this rule would impede small or nonprofit entities' ability to compete with larger entities in their hiring and economic growth and the commenter provided no study or empirical data to support that assertion.

*Comment:* Several commenters opposing the proposed Asylum Program Fee wrote:

○ USCIS' analysis of the cumulative effect of the increased fees for the Form I–129 and Form I–140 on small

[308] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed Dec. 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[309] DHS has used this same measure of impact in previous fee rules. *See* 81 FR 73292 (Oct. 24, 2016); 85 FR 46900 (Aug. 3, 2020).

[310] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19. SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis.

businesses in Section X.B of the rule was done specifically in the context of small entities, and it does not assess the full scope of the cumulative effects of the proposed fee increases, which the commenter interpreted as a punitive effect on employers who file both forms.

○ Small businesses are less able to pay these fees than large firms, but this fee increase relies mostly on fees levied to small businesses, which contradicts the premise of the program by shifting the burden to those who cannot afford these new costs.

○ Many small businesses would not have the ability to pay for all the petitions they need to file to meet their workforce needs.

○ The Asylum Program Fee disproportionately impacts small and medium sized businesses that may experience staffing shortfalls, for which Congress designed temporary and permanent worker programs to fill.

○ Passing asylum program expenses to other immigrants would only reduce demand for immigration benefits. This would result in a decrease in funding sufficient to provide a long-term solution to the asylum backlog. Additionally, increasing fees will result in fewer immigrants with the necessary resources to obtain or rectify their status.

○ USCIS ignores the impact this fee would have on small businesses who will pay this fee, and thus risks creating an arbitrary and capricious rule.

○ DHS fails to address differences between large petitioners and smaller employers and relies on a false presumption that employers of all sizes are equally situated to bear the financial burden of the fee increases.

○ The proposal is arbitrary and capricious and an unreasonable action without consideration of the facts.

○ Small businesses are already struggling to support their immigrant employees and they may be unable to pay these filing fees, which in turn may raise questions related to hiring discrimination.

*Response:* DHS's rule in no way is intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS does not have data that would indicate that the fees in this rule would result in fewer immigrants being able to obtain or rectify their status. However, as explained in the preamble responding to comments specific to Forms I–129 and I–140, and the Asylum Program Fee, DHS has reduced fees for Forms I–129 and reduced the Asylum Program Fee for small employers and nonprofit entities. See 8 CFR 106.

c. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments.

A comment was submitted by the Chief Counsel for Advocacy of the U.S. Small Business Administration (Advocacy). Advocacy outlined several concerns and recommendations in its public comment:

• The IRFA erroneously states that small entities will not have significant costs from this rule. The IRFA is deficient and underestimates the economic impact of this rule on small entities, as the rule will be detrimental to thousands of small businesses, undermining their sustainability and competitiveness.

• The IRFA incorrectly averages all industries within a visa category and should identify and individually analyze the top industries that use the H–2B visa by six-digit NAICS code, such as landscaping, hotel, restaurant, and forestry industries. Advocacy further suggested that USCIS breakdown these industries by firm size to assess the impact of the rule on different sized small entities.

• The sample size used in the IRFA to analyze small businesses is too small and is not a representative sample across affected entities by industry. Further, the sample should be randomized based on clear stratification sectors. Advocacy also suggested that USCIS use publicly available economic data of small entities in affected industries from the U.S. Census Bureau to supplement its analysis.

• The number of small nonprofit entities is underestimated. Advocacy suggested that there are many more NAICS codes that could be used, which may include small nonprofits, including theater companies, dance companies, and performing arts.

• USCIS' economic analysis underestimates the compliance costs from the proposed rule, stating that small businesses are less able to pay the fees for temporary visas and the Asylum Program Fee, but the proposed fee increases rely mostly on fees levied to the small business community.

• An RFA analysis requires a detailed categorization of economic impacts by different sizes of small businesses within affected industries, but USCIS used average revenues of all small entities, which underestimates the impact of the proposed rule on the smallest businesses and nonprofits.

○ The proposed fees will be significant for smaller farm operations that rely upon the H–2A visa as their primary workforce.

○ Small seasonal H–2B employers with low revenues and profit margins will be unable to afford the proposed fees.

○ The proposed rule would hinder innovative start-ups that use the H–1B visa from obtaining needed staff in niche areas where there are few American workers.

○ Small nonprofit employers, such as arts groups, do not have the discretionary funds to pay the proposed fees and Asylum Program Fee surcharge.

• The cost estimates in the IRFA are underestimated because the proposed limit of 25 named workers per petition was not incorporated. For example, an H–2B employer who currently files one petition for 150 named workers would need to file 6 petitions in the proposed rule. The entity would also be paying the Asylum Program Fee surcharge six times.

○ The IRFA underestimates the number of petitions that H–2A visa employers could file including (a) additional petitions due to the 25 named workers limit, (b) duplicate fees for the same group of workers in the same season, (c) continuing yearly costs for employers, and (d) the impact of the conflicting recent DOL final rule on Adverse Effect Wage Rates [311] that would separate H–2A visa jobs and potentially require small farms and ranches to submit more petitions.

○ Small businesses utilizing the H–2B visa would be facing increased costs if they (a) file multiple petitions because of the lottery process, (b) filed for an extension of a few weeks for these workers, (c) obtain supplemental visa petitions to obtain returning workers, and (d) transfer workers between winter and summer seasons.

○ The cost estimates of the registration fee for the H–1B visa lottery are underestimated in the IRFA. USCIS does not adjudicate registrations received through the H–1B registration process because it is automated and the IRFA only estimated the registration costs for small businesses if they obtain a visa. However, the lottery selection rate was 26 percent in FY2023.

○ The IRFA fails to capture the cumulative yearly costs for an employer filing an H–1B petition for a worker because the petition allows a stay for up to 3 years and can be extended another

3 years with another petition. Further, an employer would face increased costs if it were to amend the employment terms of the worker or petition the same worker to stay permanently with an I–140 petition.

○ USCIS has failed to analyze the numbers of entities and economic impacts of this rule on O & P visa small employers and nonprofits. The proposed rule would significantly multiply the number and costs of obtaining these visas and shut out these small entities from international talent.

• The IRFA does not consider regulatory alternatives as required by the RFA sec. 603(c).

• USCIS should consider establishing tiered general fees and asylum fees, which can be based on revenue size or employees, to minimize the economic impact of the proposed rule on the smallest businesses.

• USCIS should consider limiting the frequency and number of asylum fee payments, particularly for the same worker.

• USCIS should consider establishing a lower tier of pricing for general fees and asylum fees for small nonprofit entities.

• For small employers utilizing the H–2A, H–2B, O, and P visas, USCIS should consider increasing the limit on the number of workers per petition to 50 instead of 25.

*Response:* DHS respectfully disagrees with Advocacy, that we failed to comply with the RFA requirements and should publish a Supplemental Initial Regulatory Flexibility Analysis. DHS emphasizes that it has followed the written requirements of the RFA when conducting both the IRFA and FRFA and also reviewed the guidelines [312] provided by the SBA Office of Advocacy to complete both the IRFA and FRFA. The RFA does not require highly prescriptive quantitative analysis. For example, when conducting an IRFA, the RFA simply requires "a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule [313]. . .". In addition, the RFA does not require quantification of impacts when preparing an IRFA or FRFA when the preparing agency believes such quantification is not practicable or reliable ,[314] although DHS did provide such quantification when possible. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS also acknowledges in this FRFA and supplemental SEA that the rule will

have a significant economic impact on some small entities. DHS analyzed and updated the FRFA using the same methodology as the IFRA, to analyze the economic impact of fee changes made in the final rule on small entities, for all I–129 classifications and forms listed above. DHS presented evidence through its IRFA analysis, in the NPRM by sampling and estimating the impacts compared to the threshold of 1 percent of revenue, to determine if the final rule will have a significant economic impact on affected small entities. DHS has no evidence, nor has Advocacy provided any evidence to show that this rule will be detrimental to thousands of small businesses by making it cost prohibitive for small businesses and small nonprofits to hire necessary staff, shut them out of vital immigration programs, or undermine their sustainability and competitiveness. DHS has discussed related issues in-depth in both the supplemental RIA (price elasticity) and the comprehensive economic impacts relating to the various fees in SEA and we refer Advocacy to these analyses where a detailed analysis is available. DHS's rule is not intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services because USCIS must fund itself through fees unless it receives a congressional appropriation to do so.

DHS disagrees with Advocacy that USCIS' IRFA failed to identify affected small business industries, underestimates the number of small nonprofit entities, underestimates the economic impact of this rule and that it did not consider regulatory alternatives that minimize the impact of this rule on small entities. DHS respectfully points Advocacy to the detailed SEA that clearly illustrates that DHS identified affected small businesses by NAICS code in its analysis. In the IRFA, USCIS used a statistically valid sample size that drew a large enough population to observe the impacts to small entities/industries with the associated fee increases. The statistically valid sample that DHS conducted (see SEA, Section 3—Source and Methodology) used business and open-access databases to match from NAICS code, revenue, and employee count for each entity in the sample. As a result of the Advocacy comments, USCIS increased the sample sizes to address concerns the IRFA samples were too small. A list of NAICS codes for each entity matched in Forms I–129, I–140, I–910 and I–360 can be

---

[311] U.S. Department of Labor, Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States, 88 FR 12760 (Feb. 28, 2023).

[312] SBA Guide How to Comply with the RFA.

[313] See Section 603(b)(4) of the RFA.

[314] See Section 607 of the RFA.

found in Appendix A, along with the SBA small entity threshold for each industry cluster.[315]

To determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue, and some based on the number of employees. In cases where the matched entity was a direct subsidiary, DHS recorded data for the parent organization. In cases where the entity was a single-location franchise, DHS recorded the single location's data. Once entities were matched, those that had relevant data were compared to the size standards provided by the SBA to determine whether they were small or not. Those that could not be matched or compared were assumed to be small under the presumption that non-small entities would have been identified by one of the databases at some point in their existence. As detailed in the proposed rule preamble, and IRFA section, USCIS stated alternatives to the proposed fees, and the likely impacts to applicant, petitioners, and to USCIS.

Based on public comments including Advocacy's, DHS has taken steps to further improve its analyses and has made changes to the final rule within the FRFA and SEA. DHS has increased (tripled) the sample size for the Form I–129 analysis. This expanded sample size will encompass even more small entities and nonprofits in the various visa classifications including H–2A, H–2B, H–3, O, P, L, Q, R, E, TN, and CW, in addition to the H–1B classification. DHS has also updated the Form I–129 section of the SEA by categorizing the economic impacts of small businesses within industries for the various visa classifications. In doing so, USCIS has identified the top industries that use the various visas by six-digit NAICS code. Additionally, DHS has revised the FRFA to incorporate the full estimated fee increases to small entities that file Form I–129 by accurately counting the number of petitions filed for petitions with named beneficiaries. The full analysis is found in the stand-alone SEA in the docket of the final rulemaking. The results of the final rule's SEA with a larger sample size are like the results of the proposed rule's SEA. In general, the fee increases are not economically significant to a substantial number of

small entities. However, DHS does recognize and acknowledges that the fee increases may affect some small entities.

USCIS considered the various concerns raised by Advocacy that suggested that the new fees in this rule would cause indirect secondary, tertiary and downstream economic impacts on many facets of the U.S. that were not accounted for in the analysis of the proposed rule. Advocacy repeated the concerns of many other commenters about the fees exacerbating the effects of inflation on consumers and the COVID–19 pandemic, increasing costs for farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, and exacerbating the plight of nationals of certain countries such as India and China. DHS analyzed the effects of the new fees and accounted for the direct costs of the fees as required by the RFA and applicable Executive Orders and our data indicates that the fees will not have the deleterious effects on multiple parts of U.S. economy that Advocacy and commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing relief to nonprofits and small employers in this final rule.

d. A Description of and an Estimate of the Number of Small Entities To Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available

Below is a summary of the SEA. The complete detailed SEA is available in the rulemaking docket at *https://www.regulations.gov*. The SEA has a full analysis of small entities sampled for each form described below, in the FRFA.

Entities affected by the final rule are those that file and pay fees for certain immigration benefit requests on behalf of a foreign national. These petitions/applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; Form I–956 (formerly Form I–924), Application for Regional Center Designation Under the EB–5 Regional Pilot Program, Form I–956F, Application for Approval of an Investment in a Commercial Enterprise (formerly Form I–924 amendment) and Form I–956G (formerly Form I–924A), Regional Center Annual Statement. Annual numeric estimates of the small entities impacted by this fee increase

total (in parentheses): Form I–129 (84,814 entities), Form I–140 (14,440 entities), Form I–910 (500 entities), and Form I–360 (1,566 entities).[316] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities and therefore, does not provide numeric estimates for Form I–956, Form I–956G, or Forms G–1041 and G–1041A.[317]

The rule applies to small entities, including businesses, nonprofit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140 would see a few industry clusters impacted by this rule (see Appendix B through E of the SEA for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360). The fee for civil surgeon designation would apply to physicians requesting such designation. Any entity petitioning on behalf of a religious worker and filing Form I–360 would pay a fee. Finally, DHS is creating new forms as stated above, as part of the EB–5 Reform and Integrity Act of 2022. Since Form I–956/I–956F/I–956G will be new forms and historical data does not exist; therefore, DHS will use historical data of the previous Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and Form I–924A, Annual Certification of Regional Center, as a proxy for the analysis. The Form I–956 would impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–956 is also Form I–956F and Form I–956G. I–956F regional centers must file to obtain approval of an Investment in a Commercial Enterprise. Approved regional centers must file I–956G annually to establish continued eligibility for regional center designation.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[318] If professional genealogists and researchers submitted

[315] SBA size standards effective May 2, 2022, located at *https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf* (last visited Oct. 1, 2023).

[316] Calculation: 100,135 Form I–129 × 84.7% = 84,814 small entities; 27,093 Form I–140 × 54.3% = 14,440 small entities; 500 Form I–910 × 100% = 500 small entities; 1,648 Form I–360 × 95.0% = 1,566 small entities.

[317] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

[318] See "Establishment of a Genealogy Program," 73 FR 28026 (May 15, 2008).

such requests in the past, they did not identify themselves as commercial requestors and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

(1) Petition for a Nonimmigrant Worker, Form I–129 Funding the Asylum Program With Additional Fee To Be Paid by Form I–129 Requestors

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[319] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the benefit request fee requestors must pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will have different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, requestors can file petitions or applications for many different types of nonimmigrant workers. DHS will have separate H–2A and H–2B fees for petitions with named workers and unnamed workers. DHS will limit the number of named beneficiaries that may be included on a single petition for H–2A, H–2B, O, H–3, P, Q and R workers to 25. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with fewer beneficiaries who effectively subsidize the cost of petitioners filing petitions with more beneficiaries. USCIS data indicate that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. Therefore, the establishment of different fees will better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification.

DHS will charge Form I–129 petitioners a form fee, registration fee (H–1B only), CNMI Educational Fund fee (I–129 CW only)[320] and an Asylum Program Fee. A summary of the fees in the final rule is shown in Table 12a,b below. DHS will establish new fees to be paid by employers who file either a Form I–129 or Form I–129CW based on the number of FTE workers the small entity employs and its nonprofit status. Small entities will pay the associated fee for the visa classification benefit request according to whether it is a:

(1) Small entity with greater than 25 FTE employees,

(2) Small entity with 25 or fewer FTE employees, or

(3) Nonprofit small entity.

| Table 12a. Form I-129 Entities by Visa Classifications (Matched and Unmatched) | | | | | |
|---|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Entities with 25 or fewer FTE Employees | Entities with more than 25 FTE Employees | Entities with Unknown Employees | Total Number of Entities | Total Nonprofit Entities |
| H-1B | 949 | 556 | 1,362 | 2,867 | 107 |
| H-2A | 43 | 2 | 106 | 151 | 1 |
| H-2B | 13 | 6 | 26 | 45 | 0 |
| O | 57 | 41 | 113 | 211 | 9 |
| L-1A / L-1B / LZ | 86 | 102 | 238 | 426 | 2 |
| H-3/P/Q/R/HSC/E/TN/CW | 92 | 69 | 161 | 322 | 7 |
| **Total Number of Entities** | **1,240** | **776** | **2,006** | **4,022** | **126** |

Source: USCIS Analysis

Note:
Matched entities have reported revenue and employment data, while unmatched entities have no reported revenue or employment data.

---

[319] *See* 8 CFR 106.2(c)(13).

[320] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers.

Each H–1B registration will require a $215 registration fee.[321] Petitioners filing H–1B petitions that are not subject to the annual H–1B numerical allocations (*e.g.*, extension petitions or cap-exempt filer petitions) would not have to submit a registration and thus would not pay the registration fee. The

Asylum Program Fee ($0 for nonprofits, $300 for small employers with 25 or fewer employees, and $600 for all others filing Forms I–129, Petition for a Nonimmigrant Worker, I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and I–140, Immigrant Petition for Alien Workers)

will be included with each Form I–129 classification (if applicable) and will apply to all fee-paying receipts for Forms I–129 and I–129CW. For example, it will apply to all initial petitions, changes of status, and extensions of stay that use Form I–129.

| Table 12b. Fee Summary Table for Form I-129 Petitioners (Matched Only) | | | | |
|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Small Entities with more than 25 FTE Employees** | **Small Entities with 25 or Fewer FTE Employees** | **Nonprofit Small Entities** | **Registration fee for cap-subject H-1B visas** |
| *Number of entities in impact analyses with reported revenue and employment data* | 302 | 876 | 14 | |
| H-1B | $995* | $675* | $675* | $215 |
| H-2A – Named Beneficiaries | $1,090 | $545 | $545 | |
| H-2B – Named Beneficiaries | $1,080 | $540 | $540 | |
| H-2A – Unnamed Beneficiaries | $530 | $460 | $460 | |
| H-2B – Unnamed Beneficiaries | $580 | $460 | $460 | |
| O-1/O-2 | $1,055 | $530 | $530 | |
| L-1A/L-1B/LZ Blanket | $1,385 | $695 | $695 | |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,015 | $510 | $510 | |
| Asylum Program Fee | $600 | $300 | $0 | |
| Note: *The H-1B fee includes the antecedent $215 registration fee that is paid before filing the Form I-129 for cap-subject H-1B visas. This H-1B Registration fee is separate from the I-129H-1B form fee. Note: The CW fee includes a $30 CNMI Educational Fund fee; however, the fee is not included in this analysis because the five entities in the sample that petitioned for a CW nonimmigrant worker visa had no reported revenue data and thus an economic impact could not be estimated. Note: Asylum Program Fee applies to all Form I-129 petition visa classifications. | | | | |

The fees are calculated below to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker by small entity size and nonprofit status.

(1) Small Entities With More Than 25 FTE Employees

DHS will increase the fees paid for all worker types for small entities with more than 25 FTE employees filing Form I–129 from the current filing fee of $460. For H–1B petitions, the registration fee ($215) is added to the base form fee ($780) to make $995. The

Asylum Program Fee of $600 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall fee for cap-subject H–1B classification petitions of $1,595 ($995+ $600). The fee adjustments and percentage increases are summarized in Table 13.

---

[321] USCIS in this SEA used the H–1B I–129, Petition for a Nonimmigrant Worker fee of $995. This fee includes the $780 proposed fee for H–1B Classification and the $215 fee for H–1B Registration (current $10 to $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H–1B registration fee for each beneficiary before being

eligible to submit a registration for that beneficiary for the H–1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H–1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $780 fee. *See* 84 FR 60307 (Nov. 8, 2019); Regulatory Impact Analysis in the docket on *regulations.gov*. Section (3)(H) Separate Fees for Form I–129, Petition for a

Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted up to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H–1B petitions. The H–1B registration applies to small entities and non-profits with no difference on employee size.

| Table 13. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with More than 25 FTE Employees | | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| **Visa Classification Immigration Benefit Request** | **Current Fee** | **Final Fee** | **Asylum Program Fee** | **Total Final Fee** | **Difference in Fee Increase** | **Percent Change** |
| | | | | D=B+C | E=D-A | F=(D−A)/A |
| H-1B | $470 | $995 | $600 | $1,595 | $1,125 | 239.4% |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 | $1,230 | 267.4% |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 | $1,220 | 265.2% |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 | $670 | 145.7% |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 | $720 | 156.5% |
| O-1/O-2 | $460 | $1,055 | $600 | $1,655 | $1,195 | 259.8% |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 | $1,525 | 331.5% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 | $1,155 | 251.1% |

Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $780 base fee and a $215 registration fee ($780 + $215 = $995).

To calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported sales revenue of that entity.[322] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee increase ($205) is added to the base form fee increase ($780) and results in an overall increase for H–1B classification petitioners of $995. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity.

DHS determined that 302 of the 1,643 matched small entities searched, were small entities with more than 25 FTE employees.[323] Depending on the immigration benefit request, the average economic impact on these 302 small entities with revenue and employment data ranges from 0.01 to 0.59 percent as shown in Table 14a. Among the 302 small entities with reported revenue and employment data, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent. Table 14b shows the count of small entities with more than 25 FTE employees by Form I–129 Classification and their economic impacts. Those small entities with

greater than 1 percent impact were mostly H–1B filers (18 of 27) that filed multiple petitions and collectively had well below average reported revenues compared to the average revenue for all 302 small entities.[324] The average economic impact from the registration fee on all 241 H–1B filers was 0.06 percent; the greatest economic impact was 1.35 percent, and the smallest was 0.0004 percent. The average impact on the 302 small entities with revenue data were 0.33 percent. The greatest economic impact imposed by the fee changes on all 302 small entities with more than 25 FTE employees was 7.06 percent and the smallest was 0.002 percent per entity.

---

[322] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[323] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

[324] The number of H–1B petitions filed by these 18 entities ranged from 4 to 411. The average annual revenue reported by these 18 entities was $4.9 million whereas the average annual revenue

for all 302 entities in the sample was $11.9 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 18 entities that filed multiple petitions.

AR_000785

**Table 14a: Form I-129 Classifications Economic Impacts on Small Entities with More than 25 FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $995 | 0.31% |
| H-2A – Named Beneficiaries | $1,230 | 0.02% |
| H-2B – Named Beneficiaries | $1,220 | 0.32% |
| H-2A – Unnamed Beneficiaries | $670 | 0.01% |
| H-2B – Unnamed Beneficiaries | $720 | 0.18% |
| L-1A/L-1B/LZ Blanket | $1,195 | 0.29% |
| O-1/O-2 | $1,525 | 0.38% |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,155 | 0.59% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $780 base fee increase and a $205 registration fee increase ($780 + $205 = $995).

**Table 14b: Count of Small Entities with More than 25 FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 223 | 18 | 241 |
| H-2A – Named Beneficiaries | 1 | 0 | 1 |
| H-2B – Named Beneficiaries | 3 | 1 | 4 |
| L-1A/L-1B/LZ Blanket | 23 | 3 | 26 |
| O-1/O-2 | 11 | 2 | 13 |
| CW, H-3, HSC, E, TN, Q, P, and R | 14 | 3 | 17 |
| **Total** | **275** | **27** | **302** |

Source: USCIS analysis.

(2) Small Entities With 25 or Fewer FTE Employees

DHS will increase the base form fee filed for all worker types for small entities with 25 or fewer FTE employees filing Form I–129 from the current base filing fee of $460, apart from H–1B, H–2A-Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries. For H–1B petitions, the registration fee ($215) is added to the base form fee ($460), totaling $675. The Asylum Program Fee of $300 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall increase for cap-subject H–1B classification petitions of $975 ($675 + $300). The fee adjustments and percentage increases are summarized, shown in Table 15.

**Table 15. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with 25 or Fewer FTE Employees**

| Visa Classification Immigration Benefit Request | A Current Fee | B Final Fee | C Asylum Program Fee | D Total Final Fee D=B+C | E Difference in Fee Increase E=D-A | F Percent Change F=(D–A)/A |
|---|---|---|---|---|---|---|
| H-1B | $470 | $675 | $300 | $975 | $505 | 107.4% |
| H-2A – Named Beneficiaries | $460 | $545 | $300 | $845 | $385 | 83.7% |
| H-2B – Named Beneficiaries | $460 | $540 | $300 | $840 | $380 | 82.6% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $300 | $830 | $370 | 80.4% |
| O-1/O-2 | $460 | $695 | $300 | $995 | $535 | 116.3% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $300 | $810 | $350 | 76.1% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increases, DHS estimated the total costs associated with the final fee increase for each small entity with 25 or fewer FTE employees and divided that amount by the sales revenue of that entity.[325] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall fee for H–1B classification petitions of $505 ($300 + $205). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 876 of the 1,643 entities searched, were small entities with fewer than 25 FTE employees.[326]

**Table 16a: Form I-129 Classifications Economic Impacts on Small Entities with 25 or Fewer FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $505 | 0.45% |
| H-2A – Named Beneficiaries | $385 | 0.21% |
| H-2B – Named Beneficiaries | $380 | 0.08% |
| H-2A – Unnamed Beneficiaries | $300 | 0.16% |
| H-2B – Unnamed Beneficiaries | $300 | 0.06% |
| L-1A/L-1B/LZ Blanket | $370 | 0.16% |
| O-1/O-2 | $535 | 0.21% |
| CW, H-3, HSC, E, TN, Q, P, and R | $350 | 0.14% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $300 base fee increase and a $205 registration fee increase ($300 + $205 = $505).

Depending on the immigration benefit request, the average economic impact on the 876 small entities with revenue and employment data ranges from 0.06 to 0.45 percent as shown in Table 16a. The average economic impact on all 876 small entities was 0.39 percent. Table 16b shows that among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 195 (10.8 percent) experienced an economic impact greater than 1 percent. Those small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 195) that mostly filed multiple petitions and collectively had well below average reported revenues compared to the

[325] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[326] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

average revenue for all 876 small entities.[327] The average economic impact from the registration fee on all 682 H–1B filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent. The greatest economic impact imposed by the fee changes on all 876 small entities with 25 or fewer FTE employees was 4.21 percent, and the smallest was 0.003 percent per entity.

**Table 16b: Count of Small Entities with 25 or Fewer FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 591 | 91 | 682 |
| H-2A – Named Beneficiaries | 35 | 0 | 35 |
| H-2B – Named Beneficiaries | 12 | 0 | 12 |
| L-1A/L-1B/LZ Blanket | 51 | 2 | 53 |
| O-1/O-2 | 31 | 1 | 32 |
| CW, H-3, HSC, E, TN, Q, P, and R | 61 | 1 | 62 |
| **Total** | **781** | **95** | **876** |
| Source: USCIS analysis. | | | |

(3) Nonprofit Small Entities

DHS will increase the base fee filed for all worker types for nonprofit small entities filing Form I–129 from the current base filing fee of $460, except for H–1B, H–2A-Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries.[328] For H–1B petitions, the registration fee ($215) is added to the base fee ($460) and results in an overall fee for cap-subject H–1B classification petitions of $675. Nonprofit small entities are exempt from paying the Asylum Program Fee. The fee adjustments and percentage increases are summarized, shown in Table 17.

**Table 17. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Nonprofit Small Entities**

| Visa Classification Immigration Benefit Request | A Current Fee | B Final Fee | C Asylum Program Fee | D Total Final Fee D=B+C | E Difference in Fee Increase E=D-A | F Percent Change F=(D–A)/A |
|---|---|---|---|---|---|---|
| H-1B | $470 | $675 | $0 | $675 | $305 | 43.6% |
| H-2A – Named Beneficiaries | $460 | $545 | $0 | $545 | $85 | 18.5% |
| H-2B – Named Beneficiaries | $460 | $540 | $0 | $540 | $80 | 17.4% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $0 | $530 | $70 | 15.2% |
| O-1/O-2 | $460 | $695 | $0 | $695 | $235 | 51.1% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $0 | $510 | $50 | 10.9% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P—1, P--1S, P—2, P--2S, P—3, P--3S, R1, E—1, E--2, E—3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increase, DHS estimated the total costs associated with the final fee increase for each nonprofit small entity and divided that amount by the sales revenue of that entity.[329] H–1B

---

[327] The number of H–1B petitions filed by these 91 entities ranged from 1 to 60 (86 of 91 entities filed five or more H–1B petition). The average annual revenue reported by these 91 entities was $0.6 million whereas the average annual revenue for all 876 entities in the sample was $2.5 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 91 entities.

[328] Nonprofits in this analysis include entities that identify with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations).

[329] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Since there was no increase in the H–1B form fee for nonprofit small entities, the $205 registration fee is the only increase for these petitioners. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 14 of the 1,643 entities searched were nonprofit small entities.[330]

All 14 of these nonprofit small entities petitioned for H–1B workers; there were no recorded petitions for the other classifications. Table 18 shows that the average economic impact on the 14 entities was 0.23 percent. All 14 nonprofit small entities experienced an economic impact of less than 1 percent. The average economic impact from the registration fee on all 14 H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent. The greatest economic impact imposed by the fee changes on all 14 nonprofit small entities was 0.82 percent and the smallest was 0.003 percent per entity.

| Table 18: Form I-129 Classifications Economic Impacts on Nonprofit Small Entities with Revenue Data. | | |
|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Fee Increase** | **Average Economic Impact Percentage\*** |
| H-1B | $205 | 0.23% |
| H-2A – Named Beneficiaries | $85 | N/A |
| H-2B – Named Beneficiaries | $80 | N/A |
| H-2A – Unnamed Beneficiaries | $0 | N/A |
| H-2B – Unnamed Beneficiaries | $0 | N/A |
| L-1A/L-1B/LZ Blanket | $70 | N/A |
| O-1/O-2 | $235 | N/A |
| CW, H-3, HSC, E, TN, Q, P, and R | $50 | N/A |
| Source: USCIS calculation. \*These figures are percentages, not proportions. Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3. Note: The H-1B fee increase only includes the $205 registration fee increase because the base fee was unchanged. | | |

(4) Impacts by NAICS Code

DHS analyzed the average economic impact imposed by the fee increases on the 1,643 small entities with reported sales revenue data by NAICS code. Table 19 shows the top 10 NAICS industries that use the Form I–129 for all classifications by the number of petitions filed during FY 2022 and the average impact on those entities. All the top 10 NAICS industries that use Form I–129 experienced an economic impact of less than 1.0 percent of revenue.

---

[330] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

| Table 19. Top 10 Industries that Use the Form I-129 by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 541618-Other Management Consulting Services | 303 | 0.87% |
| 541211-Offices of Certified Public Accountants | 748 | 0.82% |
| 541512-Computer Systems Design Services | 260 | 0.60% |
| 541511-Custom Computer Programming Services | 1,880 | 0.50% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 306 | 0.49% |
| 541611-Administrative Management and General Management Consulting Services | 227 | 0.35% |
| 541612-Human Resources Consulting Services | 422 | 0.35% |
| 518210-Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services | 258 | 0.26% |
| 513210-Software Publishers | 1,721 | 0.22% |
| 541330-Engineering Services | 309 | 0.17% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) database (Jan. 31, 2023). | | |

The top NAICS industries that utilize the Form I–129 for H–1B [331] classification experienced an economic impact of less than 1.0 percent of revenue in the analysis (Table 20).

---

[331] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., "H–1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models," *https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations* (last updated Sept. 15, 2023).

| Table 20. Top 10 Industries that Use the Form I-129 for H-1B by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 621111-Offices of Physicians (except Mental Health Specialists) | 15 | 0.38% |
| 541612-Human Resources Consulting Services | 7 | 0.29% |
| 541511-Custom Computer Programming Services | 28 | 0.20% |
| 541600-Management, Scientific, and Technical Consulting Services | 9 | 0.14% |
| 541330-Engineering Services | 20 | 0.11% |
| 541990-All Other Professional, Scientific and Technical Services | 6 | 0.06% |
| 621210-Offices of Dentists | 6 | 0.06% |
| 561400-Business Support Services | 17 | 0.05% |
| 541618-Other Management Consulting Services | 6 | 0.04% |
| 513210-Software Publishers | 9 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

The top NAICS industries that use Form I–129 H–2A [332] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 21).

| Table 21. Top Industries that Use the Form I-129 H-2A for Named Beneficiaries by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 445230-Fruit and Vegetable Retailers | 3 | 0.35% |
| 111998-All Other Miscellaneous Crop Farming | 26 | 0.30% |
| 112111-Beef Cattle Ranching and Farming | 4 | 0.15% |
| 111991-Sugar Beet Farming | 2 | 0.10% |
| 112990-All Other Animal Production | 1 | 0.08% |
| 115111-Cotton Ginning | 4 | 0.02% |
| 115113-Crop Harvesting, Primarily by Machine | 3 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

Most of the top NAICS industries that use the Form I–129 H–2B [333] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 22). One of the top NAICS industries experienced an impact of greater than 1.0 percent.

[332] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2A Temporary Agricultural Workers," available *https:// www.uscis.gov/working-in-the-united-states/ temporary-workers/h-2a-temporary-agricultural-workers* (last updated Nov. U.S. Dep't of Homeland Security, "H–2A Temporary Agricultural Workers," *https://www.uscis.gov/working-in-the-united-states/ temporary-workers/h-2a-temporary-agricultural-workers* (last updated Nov. 8, 2023).

[333] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2B Temporary Non-Agricultural Workers," *https://www.uscis.gov/ working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers* (last updated Jan. 12, 2024).

**6370**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

**Table 22. Top Industries that Use the Form I-129 H-2B for Named Beneficiaries by Six-Digit NAICS Code.**

| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
|---|---|---|
| 713930-Marinas | 3 | 1.14% |
| 112512-Shellfish Farming | 1 | 0.31% |
| 111421-Nursery and Tree Production | 2 | 0.26% |
| 541940-Veterinary Services | 1 | 0.05% |
| 561730-Landscaping Services | 11 | 0.06% |
| 236220-Commercial and Institutional Building Construction | 4 | 0.03% |
| 444240-Nursery, Garden Center, and Farm Supply Retailers | 1 | 0.01% |
| 561400-Specialized Design Services | 1 | 0.01% |
| 484110-General Freight Trucking, Local | 1 | 0.01% |

Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

For Form I–129 (O [334] and P [335] classifications), among the 1,643 small entities with reported revenue data identified in the SEA, most of the top industries by NAICS code experienced an economic impact of considerably less than 1.0 percent of revenue in the analysis. Three of the top NAICS industries experienced an impact of greater than 1.0 percent (Table 23).

[334] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "O–1 Visa: Individuals with Extraordinary Ability or Achievement," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/o-1-visa-individuals-with-extraordinary-ability-or-achievement* (last updated Mar. 3, 2023).

[335] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1A Athlete," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1a-athlete* (last updated Mar.

26, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1B A Member of an Internationally Recognized Entertainment Group," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1b-a-member-of-an-internationally-recognized-entertainment-group* (July 19, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–2 Individual Performer or Part of a Group Entering to Perform Under a Reciprocal Exchange Program," *https://www.uscis.gov/working-in-the-united-states/*

*temporary-workers/p-2-individual-performer-or-part-of-a-group-entering-to-perform-under-a-reciprocal-exchange-program* (Feb. 24, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–3 Artist or Entertainer Coming to Be Part of a Culturally Unique Program," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-3-artist-or-entertainer-coming-to-be-part-of-a-culturally-unique-program* (last visited Feb. 24, 2021).

| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
|---|---|---|
| 721310-Rooming and Boarding Houses, Dormitories, and Workers' Camps | 35 | 1.73% |
| 112120-Dairy Cattle and Milk Production | 6 | 1.55% |
| 541890-Other Services Related to Advertising | 4 | 1.05% |
| 236115-New Single-family Housing Construction (Except For-Sale Builders) | 18 | 0.54% |
| 622210-Psychiatric and Substance Abuse Hospitals | 7 | 0.37% |
| 621511-Medical Laboratories | 8 | 0.34% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 23 | 0.24% |
| 516120-Television Broadcasting Stations | 5 | 0.15% |
| 621493-Freestanding Ambulatory Surgical and Emergency Centers | 6 | 0.09% |
| 523940-Portfolio Management and Investment Advice | 5 | 0.08% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

**Table 23. Top Industries that Use the Form I-129 (O&P) by Six-Digit NAICS Code.**

*Small Entity Classifications*

With an aggregated total of 4,022 small entities out of a sample size of 4,746 entities, DHS inferred that 84.7 percent of the entities filing Form I–129 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations) were not-for-profit. Most of the sample consisted of small businesses when looked at by type of small entity. There are 4 small governmental jurisdictions in the sample and 126 small not-for-profits.

(2) Immigrant Petition for an Alien Worker, Form I–140

*a. Funding the Asylum Program With Form I–140 Petition Fees*

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file a Form I–140, Immigrant Petition for Alien Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[336] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will increase fees for Form I–140 from $700 to $715, an increase of 2 percent ($15). The total fees for each entity in the analysis will include the I–140 form fee and the relevant Asylum Program Fee. The Asylum Program Fee will be dependent on the number of FTE employees and nonprofit status of the entity. Hence, calculation of fees in this analysis will be as follows:

• The total fee for small entities that employ more than 25 FTE workers will include the $600 Asylum Program Fee

for a total of $1,315 ($715 + $600). This is an overall increase of $615 (88 percent) per petition, from current costs of $700.

• The total fee for small entities that employ 25 or fewer FTE employees will include the $300 Asylum Program Fee for a total of $1,015 ($715 + $300), an overall increase of $315 (45 percent) per petition, from current costs of $700.

• The total fee for nonprofit small entities will consist of only the I–140 form fee as there are no Asylum Program Fees to be paid by nonprofit entities. Total fees will be $715, an increase of $15 (2 percent).

To calculate the economic impact of the final rule fees, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[337] Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. DHS identified 126 small entities with reported revenue data in the sample. Of the 126 small entities, 46 had greater than 25 FTE employees and 80 had 25 or fewer FTE

---

[336] See 8 CFR 106.2(c)(13).

[337] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

employees. There were no nonprofit small entities with reported revenue data in the sample. All 46 small entities with greater than 25 FTE employees experienced an economic impact of less than 1 percent. The average impact on these 46 entities was 0.03 percent. The greatest economic impact imposed by the fees in the final rule was 0.25 percent and the smallest was 0.0001 percent.

For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent, which was the greatest economic impact imposed by the fees in the final rule. The smallest economic impact imposed by the fee increase was 0.002 percent.

a. Small Entity Classification

With an aggregated total of 299 out of a sample size of 550, DHS inferred that most, or 54.3 percent, of the entities filing Form I–140 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form, DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 712110 (Museums), 813319 (Other Social Advocacy Organizations), 813410 (Civic and Social Organizations), 813910 (Business Associations), and 813940 (Political Organizations) were not-for-profit. The sample of Form I–140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 13 small not-for-profits.

b. Cumulative Impact of Form I–129 and Form I–140 Petitions

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine the economic impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN and revenue. Ninety entities had an EIN that overlapped in both samples; there were

59 large entities and 31 small entities that submitted both Form I–129 petitions and Form I–140 petitions.[338] Of the 31 small entities, 8 entities had revenue data reported in databases Data Axle, *Manta.com, Cortera.com,* or *Guidestar.org.*

Three of the 8 overlapping sample entities with revenue data had Form I–129 economic impacts of greater than 1 percent. Of the sample entities that overlapped, 3 entities had Form I–129 economic impacts of 1.95 percent, 6.62 percent, and 6.92 percent, respectively. All 8 overlapping sample entities had Form I–140 economic impacts of less than 1 percent. Although 3 overlapping small entities had Form I–129 economic impacts of greater than 1 percent, USCIS does not expect the combined impacts of Form I–129 and Form I–140 to be an economically significant burden on most small entities. This is due to little overlap in entities in the samples and the mostly minor economic impacts from the Forms I–129 and I–140 fee increases and Asylum Program Fees.

(3) Application for Civil Surgeon Designation, Form I–910

USCIS will increase fees for Form I–910 to $990. This is an increase of 26 percent ($205) from the current fee of $785. To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[339] Because entities can file multiple requests, the analysis considers the number of requests submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. In the sample, 179 matched entities with reported revenues were considered small entities. All 179 small entities experienced an economic impact of less than 1 percent. The greatest economic impact of the increased fee was 0.91 percent, and the smallest was 0.001 percent per entity. The average impact on all 179 small entities with revenue data was 0.05 percent.

a. Small Entity Classification

With an aggregated total of 300 out of a sample size of 300, DHS inferred that most, or 100.0 percent, of the entities filing Form I–910 requests were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), and 813990 (Other Similar Organizations (except Business, Professional, Labor, and Political Organizations)) were not-for-profit. The sample of Form I–910 consisted of all small businesses, with no small governmental jurisdictions in the sample and no small not-for-profits.

(4) Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS will increase the fees for entities that file Form I–360 from $435 to $515, an increase of $80 (18.4 percent). Using the business provider databases, DHS determined that 174 entities matched and were considered small entities. To calculate the economic impact of the increase for each entity, DHS divided the costs associated with the fee increase by the sales revenue of that entity.[340] The results indicated that all 174 small entities with reported revenue data experienced an economic impact well below 1 percent. The greatest economic impact imposed by this final fee change was 0.08 percent and the smallest was 0.001 percent per entity. The average impact on all 174 small entities with revenue data was 0.01 percent.

DHS also analyzed the costs of the final rule on the petitioning small entities relative to the costs of the typical employee's salary. The SBA

---

[338] Total Impact to Entity = (Number of Petitions Submitted per Entity × Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

[339] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue.

[340] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/ Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

Guidelines provide that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the small entities in the sector.[341] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $60,180 for clergy,[342] $60,540 for directors of religious activities and education,[343] and $45,420 for other religious workers.[344] Based on an average of 1.29 religious workers[345] petitioned-for per entity, the additional average annual cost will be $103.20 per small entity.[346] The additional costs per small entity in this final rule represents only 0.17 percent of the average annual salary for clergy, 0.17 percent of the average annual salary for directors of religious activities and education, and 0.23 percent of the average annual salary for all other religious workers.[347]

a. Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that most, or 95 percent, of the entities filing Form I–360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 813110 (Religious Organizations), 813410 (Civic and Social Organizations), 813920 (Professional Organizations), and 813990 (Other Similar Organizations except Business, Professional, Labor, and Political Organizations) were not-for-profit. The sample population of Form I–360 consisted mainly of small businesses. There were no small governmental jurisdictions in the sample and 145 small not-for-profits primarily composed of religious institutions.

(5) Genealogy Requests—Genealogy Index Search Request, Form G–1041, Genealogy Records Request, Form G–1041A and Certificate of Non-Existence, Form G–1566

In the final rule, DHS increased the fee for the Genealogy Index Search Request, Form G–1041 and Form G–1041A, from $65 to $80, an increase of $15 (23 percent) for those who mail in this request on paper. The fee for requestors who use the online electronic Form G–1041 or G–1041A version decreased from $65 to $30, a decrease of $35 (−54 percent). DHS will also establish a fee of $330 for individuals submitting a Form G–1566, Request for a Certificate of Non-Existence, once approved by OMB.[348]

The affected population includes individuals who use Form G–1041 to request a search of USCIS historical indices, individuals who use Form G–1041A to obtain copies of USCIS historical records found through an index request, and individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. DHS estimates that an annual average of 6,755 Form G–1041 index search requests and 4,608 Form G–1041A records requests were received during FY 2018 through FY 2022 as shown in Table 24. For both forms, more than 90 percent of the requests were submitted electronically. DHS estimates that an annual average of 2,443 receipts for Form G–1566 will be made.

---

[341] Office of Advocacy, SBA, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," p. 19 *https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf* (last visited Aug. 22, 2023).

[342] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Clergy," *https://www.bls.gov/oes/2022/may/oes212011.htm* (last visited Aug. 22, 2023).

[343] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Directors of Religious Activities and Education," *https://www.bls.gov/oes/2022/may/oes212021.htm* (last visited Aug. 22, 2023).

[344] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Religious Workers, All Other," *https://www.bls.gov/oes/2022/may/oes212099.htm* (last visited Aug. 22, 2023).

[345] USCIS calculated the average filing per small entity of 1.29 petitions, from the Form I–360 Sample with Petition Totals in Appendix E of this analysis. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 224/174 = 1.29 average petitions filed per small entity. Note, this calculation includes only small entities with reported revenue data, *i.e.*, matched small entities.

[346] Calculation: 1.29 average filing per small entity × $80 increase in petition fees = approximately $103.20 additional total cost per small entity.

[347] Calculation: ($103.20 additional cost per small entity/$60,180 clergy salary) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$60,540 directors of religious activities and education) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$45,420 other religious workers) × 100 = 0.23 percent.

[348] The fee will be established in the FY 2022/2023 rule and will be required with the submission of Form G–1566 if it is approved by OIRA before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed by DHS as provided in 8 CFR 299.1.

**6374**        Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

**Table 24. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2018 through FY 2022**

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 2021 | 207 | 7,220 | 7,427 | 97% |
| 2022 | 124 | 8,901 | 9,025 | 99% |
| **5-year Total** | **1,095** | **32,782** | **33,877** | |
| **5-year Annual Average** | **219** | **6,556** | **6,775** | 97% |
| | **Form G-1041A (Paper Filing)** | **Form G-1041A (Online Filing)** | **Total** | **Percentage Filed Online** |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 333 | 3,407 | 3,740 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 2021 | 309 | 5,451 | 5,760 | 95% |
| 2022 | 190 | 5,168 | 5,358 | 96% |
| **5-year Total** | **1,474** | **21,566** | **23,040** | |
| **5-year Annual Average** | **295** | **4,313** | **4,608** | 94% |
| | **Certificate of Non-Existence Form G-1566** | | | |
| **Fiscal Year** | | | | |
| 2018 | 1,442 | | | |
| 2019 | 1,516 | | | |
| 2020 | 1,784 | | | |
| 2021 | 2,948 | | | |
| 2022 | 4,527 | | | |
| **5-year Total** | **12,217** | | | |
| **5-year Annual Average** | **2,443** | | | |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB). Feb. 2, 2023.
Note: IRIS tracks the online percentage of index searches and records requests.

DHS has previously determined that requests for historical records are usually made by individuals.[349] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests. DHS asked for comment on this in the proposed rule and received no comments or data. DHS recognizes that some small entities may be impacted by the increased fees but cannot determine how many or the exact impact.

(6) Application for Regional Center Designation Under the EB–5 Regional Center Pilot Program, Form I–956 (Formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (Formerly Form I–924 Amendment) and I–956G (Formerly Form I–924A)

Congress created the EB–5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB–5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). As amended, the EB–5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,000 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. See INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). Such investment amounts are not necessarily

[349] See 73 FR 28026 (May 15, 2008).

indicative of whether the regional center is characterized appropriately as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 5, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117–103). The EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new EB–5 Regional Center Program.[350] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and complete

the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

The various program fees and changes as a result of the EB–5 Reform Integrity Act of 2022 will be discussed in a separate future EB–5 rulemaking.

Despite the changes in the law and program, DHS' final fees are based on the currently projected staffing needs to meet the adjudicative and administrative burden of the IPO pending the fee study required by section 106(a) of the EB–5 Reform and Integrity Act of 2022.

The fee for Form I–956 (formerly Form I–924) and Form I–956F [351]

(formerly Form I–924 Amendment) is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee. The fee for Form I–956G (formerly Form I–924A) is $4,470, a $1,435 or 47 percent increase from the current $3,035 fee. During the 5-year period from FY 2018 through FY 2022, USCIS received a total of 249 annual Form I–956 (formerly Form I–924) regional centers applications and 3,260 Form I–956G (formerly Form I–924A) annual statements, with annual averages 62 and 652 respectively (see Table 25).

The annual filing volume projections in this rule are based on historical volumes and trends. Section 105(a) of the EB–5 Reform and Integrity Act of 2022 directs USCIS to conduct a study of the fees charged in the administration of the EB–5 program. Form I–956F and other changes are too new for DHS to accurately estimate impacts on filing volumes. DHS will address these additional impacts resulting from the EB–5 Reform and Integrity Act of 2022 in a future rulemaking.[352]

**Table 25. Annual Receipts for Form I-956, Application for Regional Center Designation under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2018 through FY 2022**

| Fiscal Year | Form I-956 | Form I-956G |
|---|---|---|
| 2018 | 122 | 787 |
| 2019 | 79 | 808 |
| 2020 | 34 | 702 |
| 2021 | 14 | 434 |
| 2022 | 0[353] | 529 |
| **5-year Total** | **249** | **3,260** |
| **5-year Annual Average** | **62** | **652** |

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, Consolidated/ELIS, PAS-SQL Dashboard, Updated Sept. 25, 2023.
Note: I-956G are the annual statements to be submitted by these approved regional centers. For Form I-956, DHS used a 4-year annual average.

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small

entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and

financial activities, some of which may play a direct or indirect role in linking

---

[350] Consolidated Appropriations Act, 2022, Public Law 117–103, Div. BB.

[351] *See* EB–5 Reform and Integrity Act of 2022, Public Law 117–103, Sec. 106(a) (Mar. 15, 2022) (authorizing the same fee for Form I–956F as Form I–956).

[352] DHS may reevaluate EB–5 fees to meet the additional fee guidelines of EB–5 Reform and

Integrity Act of 2022 sec. 106(c). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

[353] Zero reported receipts in FY2022 were due to EB–5 program and database system changes. DHS acknowledges that these changes may result in slightly lower annual average estimates for this form. There is a separate rulemaking pertaining to the EB–5 program that is currently being drafted and will elaborate more on the populations and various programs changes with the Eb–5 Integrity Act, volume projections and new forms.

investor funds to NCEs [354] and job-creating projects or entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above-market return differentials.

While DHS attempted to treat regional centers like the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB–5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $800,000 if the investment is in a TEA project(s) which includes certain rural areas and areas of high unemployment, or $1,050,000 for a non-TEA project per investor, in a U.S. business that will create or, in certain circumstances, preserve at least 10 full-time jobs in the United States for qualifying employees) [355] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I–956 (formerly Form I–924), I–956F (formerly Form I–924 Amendment), and I–956G (formerly Form I–924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information

provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions to analyze the small entity status of regional centers. In the DHS proposed rule "EB–5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers. [356] DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this Final Rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA. [357]

e. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary For Preparation of the Report or Record

The final rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Form I–129, I–140, I–910, I–360, G–1041, G–1041A, I–956 (formerly Form I–924), or I–956G (formerly I–924A). This final rule does not require any new professional skills for reporting.

f. A Description of the Steps the Agency has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees collected for other immigration benefits. Without an increase in fees, DHS will not be able to maintain the level of service for immigration and naturalization benefits that it now provides.

DHS has considered the alternative of maintaining fees at the current level with reduced services and increased processing times but has determined that this will not be in the interest of applicants and petitioners. Therefore, this alternative was rejected. While most immigration benefit fees apply to individuals, as described previously, some also apply to small entities. DHS seeks to minimize the impact on all parties, small entities in particular.

Another alternative to the increased economic burden of the fee adjustment is to maintain fees at their current level for small entities. The strength of this alternative is that it assures that no additional fee-burden is placed on small entities; however, small entities will experience negative effects due to the service reductions that will result in the absence of the fee adjustments in this final rule. Without the fee adjustments provided in this final rule, significant operational changes to USCIS would be necessary. Given current filing volume considerations, DHS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as Federal and contract staff, infrastructure spending on IT and facilities, and training. Depending on the actual level of workload received, these operational changes could result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would

---

[354] A "new commercial enterprise" is "any for-profit organization formed in the United States for the ongoing conduct of lawful business . . . that receives, or is established to receive, capital investment from [employment-based immigrant] investors." INA sec. 203(b)(5)(D)(vi), 8 U.S.C. 1153(b)(5)(D)(vi).

[355] *See* 84 FR 35750, 35808 (July 24, 2019). This amount by investor is determined between a designated Targeted Employment Area and non-Targeted Employment Area.

[356] *Id.*

[357] Calculation: 1% of $447,000 = $4,470 (the new fee for Form I–956G; formerly Form I–924A).

ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service. In the final rule, DHS will provide reduced fees for Form I–129 nonprofit entities and entities with 25 or less FTE workers. DHS will also reduce Asylum Program fees for Form I–129 and I–140 nonprofit entities and entities with 25 or less FTE workers. While making accommodations in the final rule for small employers and nonprofit entities, DHS is not codifying any exemption from coverage of the rule, or any part thereof, for small entities as that term is defined by the SBA. Determining if the petitioner would be "small" under the SBA definition would require USCIS to track many NAICS codes, review revenue, and require an adjudication of the fee discount eligibility before intake. DHS decided to define small employers as employers with 25 or fewer FTE workers because INA sec. 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), provides that the American Competitiveness and Workforce Improvement Act (ACWIA) fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). SBA has determined in accordance with 13 CFR 121.903(a) that the size standard adopted in this rule appropriate. Therefore, for the reasons explained more fully elsewhere in the preamble to the final rule, DHS chose this approach.

## C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* This final rule is covered by the definition provided in section 804 of SBREFA. *See* 5 U.S.C. 804(2)(A).

## D. Unfunded Mandates Reform Act

Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on state, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by state, local, and tribal governments, in the aggregate,

or by the private sector.[358] This final rule is not expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($192 million in 2022 dollars), based on the CPI–U.[359] DHS does not believe this proposed rule would impose any unfunded Federal mandates on state, local, and tribal governments, in the aggregate, or on the private sector. This final rule does not contain a Federal mandate as the term is defined under UMRA.[360] The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

## E. E.O. 12132 (Federalism)

E.O. 13132 was issued to ensure the appropriate division of policymaking authority between the States and the Federal Government and to further the policies of the Unfunded Mandates Act. This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, it is determined that this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## F. E.O. 12988 (Civil Justice Reform)

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3(a) and 3(b)(2) of E.O. 12988.

---

[358] *See* 2 U.S.C. 1532(a).

[359] *See* BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," available at *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202212.pdf* (last visited Jan. 19, 2023). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2022); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2022 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(292.655 − 152.383)/152.383] * 100 = (140.272/152.383) * 100 = 0.92052263 * 100 = 92.05% = 92%(rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.92 = $192 million in 2022 dollars.

[360] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

## G. E.O. 13175 (Consultation and Coordination with Tribal Governments)

This final rule will not have "Tribal implications" under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

## H. Family Assessment

DHS has reviewed this final rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[361] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[362] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this proposed regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by state or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

By increasing immigration benefit request fees, this action will impose a slightly higher financial burden on some families that petition for family members to join them in the United States. On the other hand, the rule will provide USCIS with the funds necessary to carry out adjudication and naturalization services and provide similar services for free to disadvantaged populations, including asylees, refugees, individuals with TPS, and victims of human trafficking. DHS also limits the fee increases in this rule to inflation for all fees submitted by

---

[361] See 5 U.S.C. 601 note.

[362] Public Law 105–277, 112 Stat. 2681 (1998).

individuals and sets fees for adoption and naturalization related forms at below their relative cost to USCIS. DHS has no data that indicate that this final rule will have any impacts on disposable income or the poverty of certain families and children, including U.S. citizen children. DHS has also added several fee exemptions in this final rule to what was proposed, and the rule contains a process to waive fees for immigration benefits when the person submitting the request is unable to pay the fee. DHS believes that the benefits of the new fees justify the financial impact on the family, that this rulemaking's impact is justified, and no further actions are required. DHS also determined that this rule will not have any impact on the autonomy or integrity of the family as an institution.

I. National Environmental Policy Act

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act (NEPA), applies to them and, if so, what degree of analysis is required. DHS's "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01 (Directive 023–01) [363] and "Instruction Manual 023–01–001–01 Revision 01, Implementation of the National Environmental Policy Act" (Instruction Manual) [364] establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ)

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("Categorical Exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d).

The Instruction Manual, Appendix A, Table 1 lists Categorical Exclusions that DHS has found to have no such effect. Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. [365]

This final rule implements the authority in the INA to establish fees to fund immigration and naturalization services of USCIS. DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from this final rule. DHS finds promulgation of the rule clearly fits within categorical exclusion A3,

established in the Department's NEPA implementing procedures.

This final rule is a standalone regulatory action and is not part of any larger action. In accordance with its NEPA implementing procedures, DHS has determined that the final rule would not result in any major Federal action that would significantly affect the quality of the human environment, nor any extraordinary circumstances exist that would create the potential for significant environmental effects requiring further analysis and review. Therefore, this final rule is categorically excluded and no further NEPA analysis or documentation is required.

J. Paperwork Reduction Act

Under the PRA, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. In compliance with the PRA, DHS published an NPRM on January 4, 2023, in which comments on the revisions to the information collections associated with this rulemaking were requested. Any comments received on information collection activities were related to the fees being established within the rulemaking. DHS responded to those comments in Section III. of this final rule. The Information Collection table below shows the summary of forms that are part of this rulemaking.

**BILLING CODE 9111–97–P**

| Table 26: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0096 | G-1041 | Genealogy Index Search Request | Revision of a Currently Approved Collection |
| | G-1041A | Genealogy Records Request (For each microfilm or hard copy file) | |
| 1615-0156 | G-1566 | Request for a Certificate of Non-Existence | Revision of a Currently Approved Collection |
| 1615-0079 | I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | Revision of a Currently Approved Collection |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |

[363] See DHS, "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01, Oct. 31, 2014, available at https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.

[364] See DHS, "Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)," Nov. 6, 2014, available at https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.

[365] Instruction Manual 023–01–001–01, Revision 1, at V.B(2)(a) through (c).

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| **Table 26: Information Collection** | | | |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0001 | I-129F | Petition for Alien Fiancé(e) | Revision of a Currently Approved Collection |
| 1615-0010 | I-129S | Nonimmigrant Petition Based on Blanket L Petition | Revision of a Currently Approved Collection |
| 1615-0012 | I-130 | Petition for Alien Relative | Revision of a Currently Approved Collection |
| | I-130A | Supplemental Information for Spouse Beneficiary | |
| 1615-0013 | I-131 | Application for Travel Document | Revision of a Currently Approved Collection |
| 1615-0135 | I-131A | Application for Travel Document (Carrier Documentation) | Revision of a Currently Approved Collection |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0016 | I-191 | Application for Relief Under Former Section 212(c) of the INA | Revision of a Currently Approved Collection |
| 1615-0017 | I-192 | Application for Advance Permission to Enter as Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0018 | I-212 | Application for Permission to Reapply for Admission into the United States After Deportation or Removal | Revision of a Currently Approved Collection |
| 1615-0095 | I-290B | Notice of Appeal or Motion | Revision of a Currently Approved Collection |
| 1615-0020 | I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Revision of a Currently Approved Collection |
| 1615-0023 | I-485 | Application to Register Permanent Residence or Adjust Status | Revision of a Currently Approved Collection |
| | I-485A | Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | |
| | I-485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | |
| 1615-0026 | I-526 | Immigrant Petition by Standalone Investor | Revision of a Currently Approved Collection |
| | I-526E | Immigrant Petition by Regional Center Investor | |
| 1615-0003 | I-539 | Application to Extend/Change Nonimmigrant Status | Revision of a Currently Approved Collection |
| 1615-0027 | I-566 | Interagency Record of Request – A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status | Revision of a Currently Approved Collection |

**Table 26: Information Collection**

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600A/I-600 Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600A/I-600 Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600A/I-600 Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0029 | I-601 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0123 | I-601A | Application for Provisional Unlawful Presence Waiver | Revision of a Currently Approved Collection |
| 1615-0069 | I-602 | Application by Refugee for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0030 | I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | Revision of a Currently Approved Collection |
| 1615-0032 | I-690 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0035 | I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | Revision of a Currently Approved Collection |
| 1615-0038 | I-751 | Petition to Remove Conditions on Residence | Revision of a Currently Approved Collection |
| 1615-0040 | I-765 | Application for Employment Authorization | Revision of a Currently Approved Collection |
| 1615-0137 | I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | Revision of a Currently Approved Collection |
| 1615-0005 | I-817 | Application for Family Unity Benefits | Revision of a Currently Approved Collection |
| 1615-0043 | I-821 | Application for Temporary Protected Status | Revision of a Currently Approved Collection |
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0044 | I-824 | Application for Action on an Approved Application or Petition | Revision of a Currently Approved Collection |
| 1615-0045 | I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Revision of a Currently Approved Collection |
| 1615-0046 | I-854A | Inter-Agency Alien Witness and Informant Record | No material or non-substantive change to a currently approved collection |

**Table 26: Information Collection**

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0072 | I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | Revision of a Currently Approved Collection |
| 1615-0082 | I-90 | Application to Replace Permanent Resident Card | Revision of a Currently Approved Collection |
| 1615-0048 | I-907 | Request for Premium Processing Service | Revision of a Currently Approved Collection |
| 1615-0114 | I-910 | Application for Civil Surgeon Designation | Revision of a Currently Approved Collection |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |
| 1615-0099 | I-914 | Application for T nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0104 | I-918 | Petition for U nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0106 | I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0136 | I-941 | Application for Entrepreneur Parole | Revision of a Currently Approved Collection |
| 1615-0159 | I-956 | Application for Regional Center Designation | Revision of a Currently Approved Collection |
|  | I-956F | Application for Approval of an Investment in a Commercial Enterprise |  |
|  | I-956G | Regional Center Annual Statement |  |
|  | I-956H | Bona Fides of Persons Involved with Regional Center Program |  |
|  | I-956K | Registration for Direct and Third-Party Promoters |  |
| 1615-0050 | N-336 | Request for a Hearing on a Decision in Naturalization Proceedings | Revision of a Currently Approved Collection |
| 1615-0052 | N-400 | Application for Naturalization | Revision of a Currently Approved Collection |
| 1615-0056 | N-470 | Application to Preserve Residence for Naturalization Purposes | Revision of a Currently Approved Collection |
| 1615-0091 | N-565 | Application for Replacement of Naturalization/Citizenship Document | Revision of a Currently Approved Collection |
| 1615-0057 | N-600 | Application for Certificate of Citizenship | Revision of a Currently Approved Collection |
| 1615-0087 | N-600K | Application for Citizenship and Issuance of Certificate under Section 322. | Revision of a Currently Approved Collection |
| 1615-0144 | OMB-64 | H-1B Registration Tool | Revision of a Currently Approved Collection |

BILLING CODE 9111–97–C

This final rule requires additional changes to the following OMB control numbers to collect information necessary to determine fees, fee waivers, and fee exemptions. These changes include updating instructions and data collections. Please see the accompanying PRA documentation for the full analysis. The table below shows

the summary of forms that required additional changes based on this rulemaking.

| Table 27: Information Collections Impacted by Final Rule | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600/A Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600/A Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600/A Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |

*Petition for a Nonimmigrant Worker, Form I–129*

USCIS received some comments on the Petition for a Nonimmigrant Worker, Form I–129 filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129 as part of this final rule. These changes required a reassessment of the Form I–129's the time burden.

*Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW*

USCIS received some comments on the CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129CW form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129CW as part of this final rule. These changes required a reassessment of the Form I–129CW's the time burden.

*Immigrant Petition for Alien Workers, Form I–140*

USCIS received some comments on the Immigrant Petition for Alien Workers, Form I–140 and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with 25 or fewer FTE employees. As a result of these changes, DHS has made changes to the Form I–140 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–140 as part of this final rule. These changes required a reassessment of the Form I–140's time burden.

*Petition To Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A*

USCIS received some comments on the Petition to Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A filling fee. DHS responded to those comments in Section III. of this final rule. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be

provided for free. As a result of these changes, DHS has made changes to the Forms I–600 and I–600A, and Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 form and instructions. To identify the impacted respondents and apply the appropriate fee amount; additional data collection elements and instructions were added to the Form I–600, I–600A and I–600A/I–600, Supplement 3 as part of this final rule. These changes required a reassessment of the Form I–600 and I–600A's the time burden. There was no impact to and I–600A/I–600, Supplement 3's time burden. Form I–600A/I–600 Supplement 1, Listing of Adult Member of the Household and Form I–600A/I–600 Supplement 2, Consent to Disclose Information.

*Request for Fee Waiver, Form I–912*

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020). Additionally, USCIS received some comments on the Application for Fee Waiver, Form I–912 requesting that USCIS expand the types of means-tested benefits received by a child as evidence for a fee waiver. DHS responded to those comments in Section III. of this final rule. After considering the comments on the proposed rule, DHS has decided to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. DHS has made changes to the I–912 instructions. DHS also made changes to the Forms I–912 form and instructions to streamline data collection and clarifying instruction contents as part of this final rule. These changes required a reassessment of the Form I–912's the time burden.

USCIS is consolidating all information related to Form fees, fee exemptions, and how to submit fee payments into Form G–1055, Fee Schedule. Most fee-related language, including language from sections *What is the Filing Fee, How to Check If the Fees Are Correct, Fee Waiver,* and *Premium Processing* content is being removed from individual Form Instructions documents, which results in a per-response hour burden reduction for many USCIS information collections and an overall total hour burden

reduction for the USCIS information collection inventory. In accordance with the PRA, DHS included an information collection notice in the proposed rule and each of the proposed, revised information collection instruments were posted for public comment.

Differences in information collection request respondent volume and fee model filing volume projections.

DHS notes that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the model used to calculate the fee amounts in this final rule. For example, the fee calculation model projects 1,666,500 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,179,494. As stated in section V.B.1.a of this preamble, the Volume Projection Committee forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality), changes in policies, economic conditions, or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 or 5-year period, with less consideration of the volume effects on planned or past policy changes. Although the RIA uses similar historic average volumes, RIAs isolate the impacts of proposed policy using models that may use different periods of analysis and often make simplifying assumptions about costs such as information collection burdens not caused by the regulation. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations

(Government agencies), Fees, Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 106*

Citizenship and naturalization, Fees, Immigration.

*8 CFR Part 204*

Administrative practice and procedure, Adoption and foster care, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 240*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Immigration.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); Pub. L. 112–54, 125

Stat 550 (8 U.S.C. 1185 note); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54; 125 Stat. 550; 31 CFR part 223.

■ 2. Section 103.2 is amended by revising and republishing paragraphs (a)(1), (a)(7), and (b)(19)(iii)(A) to read as follows:

### § 103.2 Submission and adjudication of benefit requests.

(a) * * *

(1) *Preparation and submission.* Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions referenced in a provision of 8 CFR chapter I to the contrary. Each form, benefit request, or other document must be filed with the fee(s) required by regulation. Filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS. Except as otherwise provided in this chapter I, fees must be paid when the request is filed or submitted.

* * * * *

(7) *Benefit requests submitted.* (i) USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii) A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:

(A) Signed with valid signature;

(B) Executed;

(C) Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and

(D) Submitted with the correct fee(s). Every form, benefit request, or other document that requires a fee payment must be submitted with the correct fee(s).

(*1*) If USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may reject or deny the request. If the benefit request was approved when USCIS determines the correct fee was not paid, the approval may be revoked upon notice.

(*2*) If a check or other financial instrument used to pay a fee is dishonored, declined, or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is dishonored, declined, or returned a second time, the filing may be rejected or denied.

(*3*) Financial instruments dishonored, declined, or returned for any reason other than insufficient funds, including but not limited to when an applicant, petitioner, or requestor places a stop payment on a financial instrument will not be resubmitted, and any immigration benefit request or request for action filed with USCIS may be rejected or denied regardless of whether USCIS has begun processing the request or already taken action on a case. Credit cards that are declined for any reason will not be resubmitted.

(*4*) If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

(iii) A rejection of a filing with USCIS may not be appealed.

(iv) Unless otherwise provided in this title, only one of the same benefit request as defined in 8 CFR 1.2 may be submitted at a time or while the same request is pending. If more than one materially identical requests are submitted, USCIS may reject one at its discretion. For purposes of this section, a motion to reopen or reconsider and an appeal that is filed on the same decision will be considered a duplicate request.

(b) * * *

(19) * * *

(iii) * * *

(A) USCIS will send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent or their attorney or accredited representative of record, as specified on the form instructions.

* * * * *

■ 3. Section 103.3 is amended by revising paragraph (a)(2)(ii) to read as follows:

### § 103.3 Denials, appeals, and precedent decisions.

(a) * * *

(2) * * *

(ii) *Reviewing official.* The official who made the unfavorable decision being appealed shall review the appeal unless the affected party moves to a new jurisdiction. In that instance, the official who has jurisdiction over such a proceeding in that geographic location shall review it. In the case of a fee waived or exempt appeal under 8 CFR 106.3, USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision.

* * * * *

■ 4. Section 103.7 is revised and republished to read as follows:

### § 103.7 Fees.

(a) *Department of Justice (DOJ) fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted with the fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of immigration court fees.* An immigration judge may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8, 1003.24, and 1103.7.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL system costs fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00; or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student (Form I–17).* (i) For filing a petition for school certification: $3,000 plus, a site visit fee of $655 for each location required to be listed on the form.

(ii) For filing a petition for school recertification: $1,250, plus a site visit

fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00; or

(ii) $32 for a family (applicant, spouse, and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00. The application fee may be waived by DHS.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00; or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If fingerprints are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting fingerprint checks before accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) *Fee Remittance for F, J, and M Nonimmigrants (Form I–901).* The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations.* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual ''Passenger Travel Reports via Sea and Air'' tables.*

(i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation,

Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities under section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement).* $50.00.

(12) *Request for authorization for parole of an alien into the United States.* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 5. Section 103.17 is revised and republished to read as follows:

### § 103.17   Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. When a biometric services fee is required, USCIS may reject a benefit request submitted without the correct biometric services fee.

■ 6. Section 103.40 is revised and republished to read as follows:

### § 103.40   Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* USCIS provides on its website at *https://www.uscis.gov/records/genealogy* the required forms in electronic versions: Genealogy Index Search Request or Genealogy Records Request.

(c) *Required information.* Genealogical research requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for everyone searched. All requests for records or index searches must include the individual's:

(1) Full name (including variant spellings of the name and/or aliases, if any).

(2) Date of birth, at least as specific as a year.

(3) Place of birth, at least as specific as a country and the country name at the time of the individual's immigration or naturalization if known.

(d) *Optional information.* To better ensure a successful search, a genealogical research request may include everyone's:

(1) Date of arrival in the United States.

(2) Residence address at time of naturalization.

(3) Names of parents, spouse, and children if applicable and available.

(e) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(1) C-Files must be identified by a naturalization certificate number.

(2) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(3) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(f) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(g) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(h) *Processing of paper record copy requests.* This service is designed for

**6386**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

■ 7. Part 106 is revised and republished to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec.
106.1   Fee requirements.
106.2   Fees.
106.3   Fee waivers and exemptions.
106.4   Premium processing service.
106.5   Authority to certify records.
106.6   DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 note); Pub. L. 115–218, 132 Stat. 1547; Pub. L. 116–159, 134 Stat. 709.

### § 106.1   Fee requirements.

(a) *General.* Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2.

(b) *Remittance source and method.* Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location. USCIS will provide at least a 30-day public notice before amending the payment method required for a fee.

(c) *Dishonored payments.* If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. If the approved benefit request requires multiple fees, this paragraph (c) would apply if any fee submitted is not honored, including a fee to request premium processing under § 106.4. Other fees that were paid for a benefit request that is revoked upon notice under this paragraph (c) will be retained

and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed in accordance with 8 CFR 103.3, the applicable form instructions, and other statutes or regulations that may apply.

(d) *Expired payments.* DHS is not responsible for financial instruments that expire before they are deposited. USCIS may reject any filing for which required payment cannot be processed due to expiration of the financial instrument.

(e) *Credit and debit card disputes.* Fees paid to USCIS using a credit or debit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

(f) *Definitions.* For the purposes of this part, the term:

(1) *Small employer* means a firm or individual that has 25 or fewer full-time equivalent employees in the United States, including any affiliates and subsidiaries.

(2) *Nonprofit* means organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. 501(c)(3), or governmental research organizations as defined under 8 CFR 214.2(h)(19)(iii)(C).

(3) *Means tested benefit* means, as determined by USCIS, a public benefit where the agency granting the benefit considers income and resources. Means-tested benefits may be federally, state, or locally funded. In general, for a benefit that was granted based on income, USCIS considers it a means-tested benefit.

(4) *Federal Poverty Guidelines* means the poverty guidelines updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2).

(g) *Online filing discount.* Unless otherwise provided in this part, the fee for forms filed online with USCIS, using the electronic system prescribed by USCIS, will be an amount that is $50 lower than the fee prescribed in § 106.2.

### § 106.2   Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name $465.

(i) If the applicant was issued a card but never received it: No fee.

(ii) If the applicant's card was issued with incorrect information because of DHS error and the applicant is filing for a replacement: No fee.

(iii) If the applicant has reached their 14th birthday and their existing card will expire after their 16th birthday: No fee.

(2) *Application for Replacement/Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $560.

(i) For nonimmigrant member of the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing; and

(iv) For replacement for DHS error: No fee.

(3) *Petition or Application for a Nonimmigrant Worker, Form I–129.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker: $780. For small employers and nonprofits: $460.

(ii) Petition for H–2A Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,090.

(iii) Petition for H–2A Nonimmigrant Worker with only unnamed beneficiaries: $530. For small employers and nonprofits: $460.

(iv) Petition for H–2B Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,080.

(v) Petition for H–2B Nonimmigrant Worker with only unnamed beneficiaries: $580. For small employers and nonprofits: $460.

(vi) Petition for L Nonimmigrant Worker: $1,385.

(vii) Petition for O Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,055.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,015.

(ix) For small employers and nonprofits as defined in § 106.1(f), the fees in paragraphs (a)(3)(ii), (a)(3)(iv), (a)(3)(vi), (a)(3)(vii), and (a)(3)(viii) of this section will be one-half the amount in those paragraphs rounded to the nearest $5 increment.

(x) Additional fees in paragraph (c) of this section may apply.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.*

(i) For an employer to petition on behalf of CW–1 nonimmigrant

beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $1,015.

(ii) For small employers and nonprofits: $460. For the Semiannual Report for CW–1 Employers (Form I–129CWR): No fee.

(iii) Additional fees in paragraph (c) of this section may apply.

(5) *Petition for Alien Fiancé(e), Form I–129F.* (i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $675.

(ii) For a K–3 spouse as designated in 8 CFR 214.1a(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130: No fee.

(6) *Petition for Alien Relative, Form I–130.* For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act. $675.

(7) *Application for Travel Document, Form I–131.* (i) Refugee Travel Document for asylee and lawful permanent resident who obtained such status as an asylee 16 years or older: $165.

(ii) Refugee Travel Document for asylee or lawful permanent resident who obtained such status as an asylee under the age of 16: $135.

(iii) Advance Parole, Reentry Permit, and other travel documents: $630.

(iv) There is no fee for a travel document for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee, while the I–485 remains pending.

(v) There is no fee for parole requests from current or former U.S. armed forces service members.

(vi) The discount in section 106.1(g) does not apply to paragraphs (a)(7)(i) and (ii) of this section.

(8) *Application for Carrier Documentation, Form I–131A.* For filing an application to allow an individual who loses their approved travel document to apply for a travel document (carrier documentation) to board an airline or other transportation carrier to return to the United States: $575.

(9) *Declaration of Financial Support, Form I–134.* To provide financial support to a beneficiary of certain immigration benefits for the duration of their temporary stay in the United States. No fee.

(10) *Online Request to be a Supporter and Declaration of Financial Support, Form I–134A.* To request to be a supporter and agree to provide financial support to a beneficiary and undergo background checks as part of certain special parole processes. No fee.

(11) *Immigrant Petition for Alien Worker, Form I–140.* For filing a petition to classify preference status of an alien based on profession or occupation under section 204(a) of the Act: $715.

(12) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for discretionary relief under section 212(c) of the Act: $930.

(13) *Application for Advance Permission to Enter as a Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (13), or (14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,100. The online filing discount in § 106.1(g) applies when this form is submitted to USCIS but does not apply to this paragraph when the form is submitted to CBP.

(14) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $695. The discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(15) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported, or removed alien; an alien who has fallen into distress; an alien who has been removed as an alien enemy; or an alien who has been removed at Government expense: $1,175. The online filing discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(16) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction, and for filing a motion to reopen or reconsider a USCIS decision: $800.

(i) The fee will be the same for appeal of or motion on a denial of a benefit request with one or multiple beneficiaries.

(ii) There is no fee for conditional permanent residents who filed a waiver of the joint filing requirement based on battery or extreme cruelty and filed a Notice of Appeal or Motion (Form I–290B) when their Petition to Remove the Conditions on Residence (Form I–751) was denied.

(17) *Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360:* $515. There is no fee for the following:

(i) A petition seeking classification as an Amerasian;

(ii) A petition seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner;

(iii) A petition for Special Immigrant Juvenile classification;

(iv) A petition seeking special immigrant classification as Afghan or Iraqi translator or interpreter, Iraqi national employed by or on behalf of the U.S. Government, or Afghan national employed by or on behalf of the International Security Assistance Force (ISAF); or a surviving spouse or child of such a person; or

(v) A petition for a person who served honorably on active duty in the U.S. armed forces filing under section 101(a)(27)(K) of the Act.

(18) *Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–361.* Filed in support of Form I–360, Petition to Classify Public Law 97–359 Amerasian as the Child, Son, or Daughter of a United States Citizen. No fee.

(19) *Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–363.* For a beneficiary of a petition for a Public Law 97–359 Amerasian to request enforcement of the guarantee of financial support and legal custody executed by the beneficiary's sponsor. No fee.

(20) *Record of Abandonment of Lawful Permanent Resident Status, Form I–407.* To voluntarily abandon status as a lawful permanent resident. No fee.

(21) *Application to Register Permanent Residence or Adjust Status, Form I–485.* For filing an application for permanent resident status or creation of a record of lawful permanent residence:

(i) $1,440 for an applicant 14 years of age or older; or

(ii) $950 for an applicant under the age of 14 years who submits the application concurrently with the Form I–485 of a parent.

(iii) There is no fee for the following:

(A) An applicant who is in deportation, exclusion, or removal proceedings before an immigration judge, and the court waives the application fee.

(B) An applicant who served honorably on active duty in the U.S. armed forces who is filing under section 101(a)(27)(K) of the Act.

(22) *Application to Adjust Status under Section 245(i) of the Act, Form I–*

*485 Supplement A.* Supplement A to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act a sum of $1,000 be paid while the applicant's, "Application to Register Permanent Residence or Adjust Status," is pending, unless payment of the additional sum is not required under section 245(i) of the Act, including:

(i) If applicant is unmarried and under 17 years of age: No fee.

(ii) If the applicant is the spouse or unmarried child under 21 years of age of a legalized alien and attaches a copy of a USCIS receipt or approval notice for a properly filed Form I–817, Application for Family Unity Benefits: No fee.

(23) *Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–485J.* To confirm that the job offered in Form I–140, Immigrant Petition for Alien Workers, remains a bona fide job offer that the beneficiary intends to accept once we approve the Form I–485, Application to Register Permanent Residence or Adjust Status, or request job portability under INA section 204(j) to a new, full-time, permanent job offer that the beneficiary intends to accept once we approve the Form I–485. No fee.

(24) *Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities, Form I–508.* To waive certain diplomatic rights privileges, exemptions, and immunities associated with your occupational status. No fee.

(25) *Immigrant Petition by Standalone or Regional Center Investor, Forms I–526 and I–526E.* To petition USCIS for status as an immigrant to the United States under section 203(b)(5) of the Act.

(i) Immigrant Petition by Standalone Investor, Form I–526: $11,160.

(ii) Immigrant Petition by Regional Center Investor, Form I–526E: $11,160.

(26) *Application To Extend/Change Nonimmigrant Status, Form I–539.* For certain nonimmigrants to extend their stay or change to another nonimmigrant status, CNMI residents applying for an initial grant of status, F and M nonimmigrants applying for reinstatement, and persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant. $470. There is no fee for Nonimmigrant A, G, and NATO.

(27) *Interagency Record of Request— A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status, Form I–566.* For dependent employment authorization as an eligible A–1, A–2, G–1, G–3, G–4, or NATO 1–6 dependent; or change or adjustment of status to, or from, A, G or NATO status. No fee.

(28) *Application for Asylum and Withholding of Removal, Form I–589.* To apply for asylum and withholding of removal. No fee.

(29) *Registration for Classification as a Refugee, Form I–590.* To determine eligibility for refugee classification and resettlement in the United States. No fee.

(30) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative: $920.

(i) There is no fee for the first Form I–600 filed for a child based on an approved *Application for Advance Processing of an Orphan Petition,* Form I–600A, during the Form I–600A approval period.

(ii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I–600 petition submitted.

(iv) This filing fee is not charged if a new Form I–600 combination filing is filed due to a change in marital status while the prior Form I–600A or Form I–600 combination filing is pending.

(v) This filing fee is charged if a new Form I–600 combination filing is filed due to a change in marital status after the Form I–600A or Form I–600 combination filing suitability determined is approved.

(31) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $920.

(i) This filing fee is not charged if a new Form I–600A is filed due to a change in marital status while the prior Form I–600A is pending.

(ii) This filing fee is charged if a new Form I–600A is filed due to a change in marital status after the Form I–600A is approved.

(32) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change of non-Convention country; or a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–600A, or to obtain a first or second change of non-Hague Adoption Convention country during the Form I–600A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is also a request for a first or second extension of the Form I–600A approval, or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the approval of the Form I–600A and third or subsequent changes of non-Hague Adoption Convention country.

(33) *Application for Waiver of Ground of Inadmissibility, Form I–601.* To seek a waiver of grounds of inadmissibility if you are inadmissible to the United States and are seeking an immigrant visa, adjustment of status, certain nonimmigrant statuses, or certain other immigration benefits. $1,050. For applicants for adjustment of status of Indochina refugees under Public Law 95–145. No fee.

(34) *Application for Provisional Unlawful Presence Waiver, Form I–601A.* To request a provisional waiver of the unlawful presence grounds of inadmissibility under section 212(a)(9)(B) of the Act. $795.

(35) *Application by Refugee for Waiver of Grounds of Inadmissibility, Form I–602.* For a refugee who has been found inadmissible to the United States to apply for a waiver of inadmissibility for humanitarian reasons, family unity, or national interest. No fee.

(36) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I–612.* For J–1 and J–2 visas holders and their families to apply for a waiver of the two-year foreign residence requirement. $1,100.

(37) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* To apply for a waiver of inadmissibility for an applicant for adjustment of status under section 245A or 210 of the Act. $1,240.

(38) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under section 210 or 245A of the Act: $905.

(39) *Report of Immigration Medical Examination and Vaccination Record (Form I–693).* For adjustment of status applicants to establish they are not inadmissible to the United States on health-related grounds. No fee.

(40) *Notice of Appeal of Decision under Sections 245A or 210 of the*

*Immigration and Nationality Act, Form I–694.* For appealing the denial of an application under section 210 or 245A of the Act, or a petition under section 210A of the Act: $1,125.

(41) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,670.

(42) *Refugee/Asylee Relative Petition, Form I–730.* For a refugee to request a spouse and unmarried child be approved to join them in the United States. No fee.

(43) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $750. There is no fee for a conditional permanent resident spouse or child who files a waiver of the joint filing requirement based on battery or extreme cruelty.

(44) *Application for Employment Authorization, Form I–765.* To request employment authorization and/or an Employment Authorization Document (EAD). $520.

(i) For an applicant who filed USCIS Form I–485 with a fee after April 1, 2024, and their Form I–485 is still pending: $260. The online filing discount in § 106.1(g) does not apply to this paragraph.

(ii) There is no fee for an initial Employment Authorization Document for the following:

(A) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee;

(B) Dependents of certain government and international organizations or NATO personnel;

(C) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(D) Persons granted asylee status (AS1, AS6);

(E) Citizen of Micronesia, Marshall Islands, or Palau;

(F) Persons granted Withholding of Deportation or Removal;

(G) Applicant for Asylum and Withholding of Deportation or Removal including derivatives;

(H) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E–1 employees; and

(I) Current or former U.S. armed forces service members.

(iii) Request for replacement Employment Authorization Document based on USCIS error: No fee.

(iv) There is no fee for a renewal or replacement Employment Authorization Document for the following:

(A) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and paid the appropriate Form I–485 filing fee;

(B) Dependent of certain foreign government, international organization, or NATO personnel;

(C) Citizen of Micronesia, Marshall Islands, or Palau; and

(D) Persons granted withholding of deportation or removal.

(45) *Application for Employment Authorization for Abused Nonimmigrant Spouse, Form I–765V.* Used for certain abused nonimmigrant spouses to request an employment authorization document (EAD). No fee.

(46) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* For filing a petition to classify a Convention adoptee as an immediate relative:

(i) There is no fee for the first Form I–800 filed for a child based on an approved *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A, during the Form I–800A approval period.

(ii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I–800 petition submitted.

(47) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $920.

(i) This filing fee is not charged if a new Form I–800A is filed due to a change in marital status while the prior Form I–800A is pending.

(ii) This filing fee is charged if a new Form I–800A is filed due to a change in marital status after the Form I–800A is approved.

(48) *Request for Action on Approved Form I–800A, Form I–800A Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change in Convention country; or a request for a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–800A, or to obtain a first or second change of Hague Adoption

Convention country during the Form I–800A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is a request for a first or second extension of the Form I–800A approval, or a first or second change of Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the Form I–800A approval and third or subsequent changes of Hague Adoption Convention country.

(49) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $760.

(50) *Application for Temporary Protected Status, Form I–821.* For an eligible national of a designated country or a person without nationality who last habitually resided in the designated country to apply for Temporary Protected Status (TPS).

(i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services.

(iv) The online filing discount in § 106.1(g) does not apply to paragraphs (a)(50)(i) and (a)(50)(ii) of this section.

(51) *Consideration of Deferred Action for Childhood Arrivals, Form I–821D.* To request that USCIS consider granting or renewing deferred action under 8 CFR 236.21–236.25. $85. The online filing discount in § 106.1(g) does not apply to this section.

(52) *Application for Action on an Approved Application or Petition, Form I–824.* To request additional action on a previously approved benefit request. $590.

(53) *Petition by Investor to Remove Conditions on Permanent Resident Status, Form I–829.* For a conditional permanent resident who obtained status through qualified investment to remove the conditions on their residence. $9,525.

(54) *Inter-Agency Alien Witness and Informant Record, Form I–854.* To request an alien witness and/or informant receive classification as an S nonimmigrant. No fee.

(55) *Affidavit of Support Under Section 213A of the INA, Form I–864.* For immigrants to show they have adequate means of financial support and are not likely to rely on the U.S. government for financial support. No fee.

(i) *Contract Between Sponsor and Household Member, Form I–864A.* For a household member to promise to support sponsored immigrants. No fee.

(ii) *Affidavit of Support Under Section 213A of the INA, Form I–864EZ.* To show that the applying immigrant has adequate means of financial support and is not likely to rely on the U.S. government for financial support. No fee.

(iii) *Request for Exemption for Intending Immigrant's Affidavit of Support, Form I–864W.* To establish that an applicant is exempt from the Form I–864 requirements. No fee.

(iv) *Sponsor's Notice of Change of Address, Form I–865.* To report a sponsor's new address and/or residence. No fee.

(56) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.* To apply for suspension of deportation or special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act.

(i) $340 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS: No fee.

(iii) If filing Form I–881 as a VAWA self-petitioner, including derivatives, as defined under section 101(a)(51)(F) of the Act: No fee.

(57) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905.* For an organization to apply for authorization to issue certificates to health care workers. $230.

(58) *Request for Premium Processing Service, Form I–907.* The Request for Premium Processing Service fee will be as provided in § 106.4. The online filing discount in § 106.1(g) does not apply to a request for premium processing.

(59) *Request for Civil Surgeon Designation, Form I–910.* To apply for civil surgeon designation. $990.

(60) *Request for Fee Waiver, Form I–912.* To request a fee waiver. No fee.

(61) *Application for T Nonimmigrant Status, Form I–914.* To request temporary immigration benefits for a victim of a severe form of trafficking in persons, also known as human trafficking. No fee.

(i) *Supplement A to Form I–914, Application for Immigrant Family Member of a T–1 Recipient.* To request temporary immigration benefits for eligible family members of a victim of a severe form of trafficking in persons. No fee.

(ii) *Supplement B to Form I–914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.* For a law enforcement agency to certify that a trafficking victim is being helpful to law enforcement during the detection, investigation, or prosecution of the trafficking. No fee.

(62) *Petition for U Nonimmigrant Status, Form I–918.* For a victim of qualifying criminal activity to petition for temporary immigration benefits. No fee.

(i) *Supplement A to Form I–918, Petition for Qualifying Family Member of U–1 Recipient.* To request temporary immigration benefits for qualifying family members of a victim of qualifying criminal activity. No fee.

(ii) *Supplement B to Form I–918, U Nonimmigrant Status Certification.* For a law enforcement agency to certify that an individual is a victim of qualifying criminal activity and has been, is being, or is likely to be helpful to law enforcement in the detection, investigation, or prosecution of the qualifying criminal activity. No fee.

(63) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status. No fee.

(64) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur. $1,200.

(65) *Application for Regional Center Designation, Form I–956.* To request designation as a regional center or to request an amendment to an approved regional center. $47,695.

(66) *Application for Approval of Investment in a Commercial Enterprise, Form I–956F.* To request approval of each particular investment offering through an associated new commercial enterprise. $47,695.

(67) *Regional Center Annual Statement, Form I–956G.* To provide updated information and certify that a Regional Center under the Immigrant Investor Program has maintained its eligibility. $4,470.

(68) *Bona Fides of Persons Involved with Regional Center Program, Form I–956H.* For each person involved with a regional center to attest to their compliance with section 203(b)(5)(H) of the Act. No fee.

(69) *Registration for Direct and Third-Party Promoters, Form I–956K.* For each person acting as a direct or third-party promoter (including migration agents) of a regional center, any new commercial enterprises, an affiliated job-creating entity, or an issuer of securities intended to be offered to immigrant investors in connection with a particular capital investment project. No fee.

(b) *N Forms.* (1) *Application to File Declaration of Intention, Form N–300.* For a permanent resident to declare their intent to become a U.S. citizen. $320.

(2) *Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336, Form N–336.* To request a hearing before an immigration officer on the denial of Form N–400, Application for Naturalization. $830. There is no fee for an applicant who has filed an *Application for Naturalization* under section 328 or 329 of the Act with respect to military service and whose application has been denied.

(3) *Application for Naturalization, Form N–400.* To apply for U.S. citizenship. $760. The following exceptions apply:

(i) No fee is charged an applicant who meets the requirements of section 328 or 329 of the Act with respect to military service.

(ii) The fee for an applicant whose documented household income is less than or equal to 400 percent of the Federal Poverty Guidelines: $380. The discount in section 106.1(g) does not apply to this section.

(4) *Request for Certification of Military or Naval Service, Form N–426.* To request that the Department of Defense verify military or naval service. No fee.

(5) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* Application for a lawful permanent resident who must leave the United States to preserve their residence to pursue naturalization. $420.

(6) *Application for Replacement Naturalization/Citizenship Document, Form N–565.* To apply for a replacement Declaration of Intention; Naturalization Certificate; Certificate of Citizenship; or Repatriation Certificate; or to apply for a special certificate of naturalization as a U.S. citizen to be recognized by a foreign country. $555. There is no fee when this application is submitted under 8 CFR 338.5(a) to request correction of a certificate that contains an error.

(7) *Application for Certificate of Citizenship, Form N–600.* To apply for a Certificate of Citizenship. $1,385.

(i) There is no fee for any application filed by a current or former member of any branch of the U.S. armed forces on their own behalf.

(ii) There is no fee for an application filed on behalf of an individual who is the subject of a final adoption for immigration purposes and meets (or met before age 18) the definition of child

under section 101(b)(1)(E), (F), or (G) of the Act.

(8) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* Application for children who regularly reside outside the United States to apply for citizenship based on a U.S. citizen parent. $1,385. There is no fee for an application filed on behalf of a child who is the subject of a final adoption for immigration purposes and meets the definition of child under section 101(b)(1)(E), (F), or (G) of the Act.

(9) *Application for Posthumous Citizenship, Form N–644.* To request citizenship for someone who died because of injury or disease incurred in or aggravated by service in an active-duty status with the U.S. armed forces during a specified period of military hostilities. No fee.

(10) *Medical Certification for Disability Exceptions, Form N–648.* For a naturalization applicant to request an exception to the English and civics testing requirements for naturalization because of physical or developmental disability or mental impairment. No fee.

(c) *G Forms, statutory fees, and non-form fees*—(1) *Genealogy Index Search Request, Form G–1041.* The fee is due regardless of the search results. $80.

(2) *Genealogy Records Request, Form G–1041A.* USCIS will refund the records request fee when it cannot find any file previously identified in response to the index search request. $80.

(3) *USCIS immigrant fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $235.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for Form I–129CW.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *CNMI education funding fee.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions. The fee amount will be as prescribed in the form instructions and:

(i) The employer must pay the fee for each beneficiary and for each year or partial year of requested validity; and

(ii) Beginning in FY 2020, the $200 fee may be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index for All Urban Consumers (CPI–U).

(8) *9–11 response and biometric entry-exit fee for H–1B Visa.* For certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,000. Collection of this fee is scheduled to end on September 30, 2027.

(9) *9–11 response and biometric entry-exit fee for L–1 Visa.* For certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,500. Collection of this fee is scheduled to end on September 30, 2027.

(10) *Claimant under section 289 of the Act.* For American Indians who are born in Canada and possess at least 50 percent American Indian blood to request lawful permanent resident status. No fee.

(11) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $215.

(iii) This fee is not subject to the online discount provided in § 106.1(g).

(12) *Request for Certificate of Non-Existence, G–1566.* For a certification of non-existence of a naturalization record. $330.

(13) *Asylum Program Fee.* In addition to the fees required by § 106.2(a)(3), (a)(4) and (a)(11), to fund the asylum program, the Asylum Program Fee must be paid by any petitioner filing a *Petition for a Nonimmigrant Worker,* Form I–129 under 8 CFR 214.2, *Petition for a CNMI-Only Nonimmigrant Transitional Worker,* Form I–129CW under 8 CFR 214.2(w), or an *Immigrant Petition for Alien Worker,* Form I–140 under 8 CFR 204.1(a). $600. For petitions:

(i) Filed by a nonprofit as defined in § 106.1(f): No fee.

(ii) Filed by a small employer as defined in § 106.1(f): $300.

(iii) The online filing discount provided in § 106.1(g) does not apply to this fee.

(d) *Inflationary adjustment.* The fees prescribed in this section that are not set or limited by statute may be adjusted, but not more often than once per year,

by publication of a rule in the **Federal Register** that:

(1) Is based on the amount of inflation as measured by the difference in the CPI–U as published by the U.S. Department of Labor, U.S. Bureau of Labor Statistics in April of the year of the last fee rule and the year of the adjustment under this section.

(2) Adjusts all fees that are not set by statute based on the amount of inflation.

(3) Rounds the fees calculated by the amount of inflation to the nearest $5 increment.

## § 106.3   Fee waivers and exemptions.

(a) *Waiver of fees.* (1) *Eligibility.* The party requesting the benefit must be unable to pay the prescribed fee. A person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

(i) Receipt of a means-tested benefit as defined in § 106.1(f)(3) at the time of filing;

(ii) Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

(iii) Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.

(2) *Requesting a fee waiver.* To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request.

(3) *USCIS fees that may be waived.* Only the following fees may be waived:

(i) The following fees for the following forms may be waived without condition:

(A) Application to Replace Permanent Resident Card (Form I–90);

(B) Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (Form I–191);

(C) Petition to Remove the Conditions of Residence (Form I–751);

(D) Application for Family Unity Benefits (Form I–817);

(E) Application for Temporary Protected Status (Form I–821);

(F) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881) (under section 203 of Pub. L. 105–110);

(G) Application to File Declaration of Intention (Form N–300);

(H) Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336 (Form N–336);

(I) Application for Naturalization (Form N–400);

(J) Application to Preserve Residence for Naturalization Purposes (N–470);

(K) Application for Replacement Naturalization/Citizenship Document (N–565);

(L) Application for Certificate of Citizenship (N–600); and

(M) Application for Citizenship and Issuance of Certificate under section 322 of the Act (N–600K).

(ii) The following form fees may be waived based on the conditions described in paragraphs (a)(3)(ii)(A) through (F) of this section:

(A) Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I–129CW) for a E–2 CNMI investor. Waiver of the fee for Form I–129CW does not waive the requirement for a E–2 CNMI investor to pay any fees in § 106.2(c) that may apply.

(B) An Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for CW–2 nonimmigrant status;

(C) Application for Travel Document (Form I–131), when filed to request humanitarian parole;

(D) Notice of Appeal or Motion (Form I–290B), when there is no fee for the underlying application or petition or that fee may be waived;

(E) Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act (Form I–694), if the underlying application or petition was fee exempt, the filing fee was waived, or was eligible for a fee waiver;

(F) Application for Employment Authorization (Form I–765), except persons filing under category (c)(33), Deferred Action for Childhood Arrivals; and

(G) Petition for Nonimmigrant Worker (Form I–129) or Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for E–2 CNMI Investor for an extension of stay.

(iii) Any fees associated with the filing of any benefit request under 8 U.S.C. 1101(a)(51) and those otherwise self-petitioning under 8 U.S.C. 1154(a)(1) (VAWA self-petitioners), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status), 8 U.S.C. 1105a (battered spouses of A, G, E–3, or H nonimmigrants), 8 U.S.C. 1229(b)(2) (special rule cancellation for battered spouse or child), and 8 U.S.C. 1254a(a) (Temporary Protected Status).

(iv) The following fees may be waived only if the person is exempt from the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4):

(A) Application for Advance Permission to Enter as Nonimmigrant (Form I–192);

(B) Application for Waiver for Passport and/or Visa (Form I–193);

(C) Application to Register Permanent Residence or Adjust Status (Form I–485); and

(D) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(4) *Immigration Court fees.* The provisions relating to the authority of the immigration judges or the Board to waive fees prescribed in paragraph (b) of this section in cases under their jurisdiction can be found at 8 CFR 1003.8 and 1003.24.

(b) *Humanitarian fee exemptions.* Persons in the following categories are exempt from paying certain fees as follows:

(1) Persons seeking or granted Special Immigrant Juvenile classification who file the following forms related to the Special Immigrant Juvenile classification or adjustment of status under section 245(h) of the Act, 8 U.S.C. 1255(h):

(i) Application for Travel Document (Form I–131).

(ii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iii) Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application for Waiver of Ground of Inadmissibility (Form I–601).

(v) Application for Employment Authorization (Form I–765).

(vi) Application for Action on an Approved Application or Petition (Form I–824).

(2) Persons seeking or granted T nonimmigrant status who file the following forms related to T nonimmigrant status or adjustment of status under INA section 245(l), 8 U.S.C. 1255(l):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an

Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824). (3) Persons seeking or granted special immigrant visa or status as Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries, who file the following forms related to the Special Immigrant classification or adjustment of status under such classification:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for initial Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(4) Persons seeking or granted adjustment of status as abused spouses and children under the Cuban Adjustment Act (CAA) and the Haitian Refugee Immigration Fairness Act (HRIFA) are exempt from paying the following fees for forms related to those benefits:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust

Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(5) Persons seeking or granted U nonimmigrant status who file the following forms related to U nonimmigrant status or adjustment of status under INA section 245(m), 8 U.S.C. 1255(m):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824).

(x) Petition for Qualifying Family Member of a U–1 Nonimmigrant (Form I–929).

(6) Persons seeking or granted immigrant classification as VAWA self-petitioners and derivatives as defined in section 101(a)(51)(A) and (B) of the Act or those otherwise self-petitioning for immigrant classification under section 204(a)(1) of the Act, 8 U.S.C. 1154(a)(1), are exempt from paying the following fees for forms related to the benefit:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B) if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(vi) Application for Provisional Unlawful Presence Waiver (Form I–601A).

(vii) Application for Employment Authorization (Form I–765) for initial, renewal, and replacement requests submitted under 8 CFR 274a.12(c)(9) and (14) and section 204(a)(1)(K) of the Act.

(viii) Application for Action on an Approved Application or Petition (Form I–824).

(7) Abused spouses and children applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA) are exempt from paying the following fees for forms related to the benefit:

(i) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)) (Form I–881).

(ii) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(iii) Application for Employment Authorization (Form I–765) submitted under 8 CFR 274a.12(c)(10).

(iv) Application for Action on an Approved Application or Petition (Form I–824).

(8) Battered spouses and children of a lawful permanent resident or U.S. citizen applying for cancellation of removal and adjustment of status under section 240A(b)(2) of the Act are exempt from paying the following fees for forms related to the benefit:

(i) Application for Employment Authorization (Form I–765) for their initial request under 8 CFR 274a.12(c)(10).

(ii) Application for Action on an Approved Application or Petition (Form I–824).

(9) Refugees, persons paroled as refugees, or lawful permanent residents who obtained such status as refugees in the United States are exempt from paying the following fees:

(i) Application for Travel Document (Form I–131).

(ii) Application for Carrier Documentation (Form I–131A).

(iii) Application for Employment Authorization (Form I–765).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(c) *Director's waiver or exemption exception.* The Director of USCIS may authorize the waiver of or exemption from, in whole or in part, a form fee required by § 106.2 that is not otherwise waivable or exempt under this section, if the Director determines that such action is in the public interest and consistent with the applicable law. This discretionary authority may be delegated only to the USCIS Deputy Director.

### § 106.4   Premium processing service.

(a) *General.* A person may submit a request to USCIS for premium processing of certain immigration benefit requests, subject to processing timeframes and fees, as described in this section.

(b) *Submitting a request.* A request must be submitted on the form and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to other filing fees. USCIS may require the premium processing service fee be paid in a separate remittance from other filing fees and preclude combined payments in the applicable form instructions.

(c) *Designated benefit requests and fee amounts.* Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: $2,805.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: $2,805.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: $1,685.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: $2,805.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: $2,805.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: $2,805.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: $2,805.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: $2,805.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: $1,685.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: $2,805.

(11) Petition for classification under section 203(b)(1)(A) of the Act: $2,805.

(12) Petition for classification under section 203(b)(1)(B) of the Act: $2,805.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: $2,805.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: $2,805.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: $2,805.

(17) Petition for classification under section 203(b)(1)(C) of the Act: $2,805.

(18) Petition for classification under section 203(b)(2) of the Act, involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: $1,965.

(20) Application under section 248 of the Act to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: $1,965.

(21) Application for employment authorization: $1,685.

(d) *Fee adjustments.* The fee to request premium processing service may be adjusted by notification in the **Federal Register** on a biennial basis based on the percentage by which the Consumer Price Index for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the second preceding calendar year.

(e) *Processing timeframes.* The processing timeframes for a request for premium processing are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: 15 business days.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: 15 business days.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: 15 business days.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: 15 business days.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: 15 business days.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: 15 business days.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: 15 business days.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: 15 business days.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: 15 business days.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: 15 business days.

(11) Petition for classification under section 203(b)(1)(A) of the Act: 15 business days.

(12) Petition for classification under section 203(b)(1)(B) of the Act: 15 business days.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: 15 business days.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: 15 business days.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: 15 business days.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: 15 business days.

(17) Petition for classification under section 203(b)(1)(C) of the Act: 45 business days.

(18) Petition for classification under section 203(b)(2) of the Act involving a waiver under section 203(b)(2)(B) of the Act: 45 business days.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: 30 business days.

(20) Application under section 248 of the Act I to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: 30 business days.

(21) Application for employment authorization: 30 business days.

(22) For the purpose of this section a business day is a day that the Federal Government is open for business, and does not include weekends, federally observed holidays, or days on which

Federal Government offices are closed, such as for weather-related or other reasons. The closure may be nationwide or in the region where the adjudication of the benefit for which premium processing is sought will take place.

(f) *Processing requirements and refunds.* (1) USCIS will issue an approval notice, denial notice, a notice of intent to deny, or a request for evidence within the premium processing timeframe.

(2) Premium processing timeframes will commence:

(i) For those benefits described in paragraphs (e)(1) through (16) of this section, on the date the form prescribed by USCIS, together with the required fee(s), are received by USCIS.

(ii) For those benefits described in paragraphs (e)(17) through (21) of this section, on the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

(3) In the event USCIS issues a notice of intent to deny or a request for evidence of the premium processing timeframe will stop and will recommence with a new timeframe as specified in paragraphs (e)(1) through (21) of this section on the date that USCIS receives a response to the notice of intent to deny or the request for evidence.

(4) Except as provided in paragraph (f)(5) of this section, USCIS will refund the premium processing service fee but continue to process the case if USCIS does not take adjudicative action described in paragraph (f)(1) of this section within the applicable processing timeframe as required in paragraph (e) of this section.

(5) USCIS may retain the premium processing fee and not take an adjudicative action described in paragraph (f)(1) of this section on the request within the applicable processing timeframe, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the immigration benefit request.

(g) *Availability.* (1) USCIS will announce by its official internet website, currently *https://www.uscis.gov,* the benefit requests described in paragraph (c) of this section for which premium processing may be requested, the dates upon which such availability commences or ends, or any conditions that may apply.

(2) USCIS may suspend the availability of premium processing for immigration benefit requests designated for premium processing if circumstances prevent the completion of processing of a significant number of

such requests within the applicable processing timeframe.

### § 106.5  Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

### § 106.6  DHS severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, or held unenforceable as to any person or circumstance, the remaining provisions and applications will continue in effect.

### PART 204—IMMIGRANT PETITIONS

■ 7. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 8. Section 204.3 is amended by:
■ a. Revising and republishing the definitions of ''Advanced processing application'' and ''Orphan petition'' in paragraph (b);
■ b. Revising and republishing paragraph (d) introductory text; and
■ c. Revising paragraphs (h)(3), (7), (13), and (14).

The revisions and republications read as follows:

### § 204.3  Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

*       *       *       *       *

(b) * * *

*Advanced processing application* means Form I–600A (Application for Advance Processing of an Orphan Petition) completed in accordance with the form's instructions and submitted with the required supporting documentation and the fee as required in 8 CFR 106.2. The application must be signed in accordance with the form's instructions by the married petitioner and spouse, or by the unmarried petitioner.

*       *       *       *       *

*Orphan petition* means Form I–600 (Petition to Classify Orphan as an Immediate Relative). The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. The petition must be signed in accordance with the form's instructions by the married

petitioner and spouse, or the unmarried petitioner.

*       *       *       *       *

(d) *Supporting documentation for a petition for an identified orphan.* Any document not in the English language must be accompanied by a certified English translation. If an orphan has been identified for adoption and the advanced processing application is pending, the prospective adoptive parents may file the orphan petition at the USCIS office where the application is pending. The prospective adoptive parents who have an approved advanced processing application must file an orphan petition and all supporting documents within 15 months of the date of the approval of the advanced processing application. If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned under paragraph (h)(7) of this section. If the prospective adoptive parents file the orphan petition after the approval period of the advanced processing application has expired, the petition will be denied under paragraph (h)(13) of this section. Prospective adoptive parents who do not have an advanced processing application approved or pending may file the application and petition concurrently on one Form I–600 if they have identified an orphan for adoption. An orphan petition must be accompanied by full documentation as follows:

*       *       *       *       *

(h) * * *

(3) *Advanced processing application approved.* If the advanced processing application is approved:

(i) The prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the approval date.

(ii) USCIS may extend the validity period for the approval of a Form I–600A if requested in accordance with 8 CFR 106.2(a)(32). Form I–600A/I–600 Supplement 3 cannot be used to:

(A) Seek extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–600A approval but must be filed on or before the date on which the validity period expires if the applicant seeks an extension.

(B) Extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country.

(C) Request a change of country to a Hague Adoption Convention transition

country for purposes of becoming a transition case if another country was already designated on the Form I–600A or the applicant previously changed countries.

(iii) Form I–600A/I–600 Supplement 3 may only be used to request an increase in the number of children the applicant/ petitioner is approved to adopt from a transition country if: the additional child is a birth sibling of a child whom the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(iv) If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for each of the additional children, to the maximum number approved.

(v) It does not guarantee that the orphan petition will be approved.

*       *       *       *       *

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within the validity period of the advanced processing application:

(i) The application will be deemed abandoned;

(ii) Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the biometric checks;

(iii) The director will dispose of documentation relating to biometrics checks in accordance with current policy; and

(iv) Such abandonment will be without prejudice to a new filing at any time with fee.

*       *       *       *       *

(13) *Orphan petition denied: petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied unless it is filed concurrently with a new advanced processing application under 8 CFR 204.3(d)(3). This action will be without prejudice to a new filing at any time with fee.

(14) *Revocation.* (i) The approval of an advanced processing application or an orphan petition shall be automatically revoked in accordance with 8 CFR 205.1

if an applicable reason exists. The approval of an advanced processing application or an orphan petition shall be revoked if the director becomes aware of information that would have resulted in denial had it been known at the time of adjudication. Such a revocation or any other revocation on notice shall be made in accordance with 8 CFR 205.2.

(ii) The approval of a Form I–600A or Form I–600 combination filing is automatically revoked if before the final decision on a beneficiary's application for admission with an immigrant visa or for adjustment of status:

(A) The marriage of the applicant terminates; or

(B) An unmarried applicant marries.

(iii) Revocation is without prejudice to the filing of a new Form I–600A or Form I–600 combination filing, with fee, accompanied by a new or updated home study, reflecting the change in marital status. If a Form I–600 had already been filed based on the approval of the prior Form I–600A and a new Form I–600A is filed under this paragraph (h)(14) rather than a Form I–600 combination filing, then a new Form I–600 must also be filed. The new Form I–600 will be adjudicated only if the new Form I–600A is approved.

* * * * *

■ 9. Section 204.5 is amended by revising and republishing paragraph (p)(4) to read as follows:

### § 204.5   Petitions for employment-based immigrants.

* * * * *

(p) * * *

(4) *Application for employment authorization.* (i) To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must:

(A) File an application for employment authorization with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions.

(B) Submit biometric information in accordance with the applicable form instructions.

(ii) Employment authorization under this paragraph may be granted solely in 1-year increments.

* * * * *

■ 10. Section 204.312 is amended by revising and republishing paragraphs (e)(1) and (e)(3) to read as follows:

### § 204.312   Adjudication of the Form I–800A.

* * * * *

(e) * * *

(1) A notice of approval expires 15 months after the date of the approval, unless approval is revoked. USCIS may

extend the validity period for the approval of a Form I–800A only as provided in paragraph (e)(3) of this section.

* * * * *

(3)(i) If the validity period for a Form I–800A approval is about to expire, the applicant:

(A) May file Form I–800A Supplement 3 as described in 8 CFR 106.2(a)(48) to request an extension.

(B) May not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval but must do so on or before the date on which the validity period expires if the applicant seeks an extension.

(ii) Any Form I–800A Supplement 3 that is filed to obtain an extension or update of the approval of a Form I–800A or to request a change of Hague Convention countries must be accompanied by:

(A) A statement, signed by the applicant under penalty of perjury, detailing any changes to the answers given to the questions on the original Form I–800A;

(B) An updated or amended home study as required under 8 CFR 204.311(u); and

(C) A photocopy of the Form I–800A approval notice.

(iii) If USCIS continues to be satisfied that the applicant remains suitable as the adoptive parent of a Convention adoptee, USCIS will extend the approval of the Form I–800A for the same period of validity as the initial filing.

(iv) There is no limit to the number of extensions that may be requested and granted under this section, so long as each request is supported by an updated or amended home study that continues to recommend approval of the applicant for intercountry adoption and USCIS continues to find that the applicant remain suitable as the adoptive parent(s) of a Convention adoptee.

■ 11. Section 204.313 is amended by revising and republishing paragraph (a) to read as follows:

### § 204.313   Filing and adjudication of a Form I–800.

(a) *When to file.* Once a Form I–800A has been approved and the Central Authority has proposed placing a child for adoption by the petitioner, the petitioner may file the Form I–800. The petitioner must complete the Form I–800 in accordance with the instructions that accompany the Form I–800 and sign the Form I–800 personally. In the case of a married petitioner, one spouse cannot sign for the other, even under a

power of attorney or similar agency arrangement. The petitioner may then file the Form I–800 with the stateside or overseas USCIS office or the visa issuing post that has jurisdiction under § 204.308(b) to adjudicate the Form I–800, together with the evidence specified in this section and the filing fee specified in 8 CFR 106.2, if more than one Form I–800 is filed for children who are not birth siblings.

* * * * *

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 12. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2. Section 212.1(q) also issued under sec. 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 13. Section 212.19 is amended by revising and republishing paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

### § 212.19   Parole for entrepreneurs.

* * * * *

(b) * * *

(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

* * * * *

(c) * * *

(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file an application for entrepreneur parole with USCIS on the form prescribed by USCIS with the required fee and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

* * * * *

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole will be

**Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations     **6397**

required to submit biometric information.

\* \* \* \* \*

(h) \* \* \*

(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

\* \* \* \* \*

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if they will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

\* \* \* \* \*

## PART 214—NONIMMIGRANT CLASSES

■ 14. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 15. Section 214.1 is amended by republishing paragraph (c)(5) to read as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(c) \* \* \*

(5) *Decision on application for extension or change of status.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of

USCIS. The denial of an application for extension of stay may not be appealed.

\* \* \* \* \*

■ 16. Section 214.2 is amended by:
■ a. Revising and republishing paragraphs (e)(8)(iii) through (v), (e)(23)(viii), (h)(2)(i)(A), (h)(2)(ii), (h)(5)(i)(B), and (h)(19)(i) introductory text;
■ b. Revising paragraph (m)(14)(ii) introductory text;
■ c. Revising and republishing paragraphs (o)(2)(iv)(F), (p)(2)(iv)(F), and (q)(5)(ii);
■ d. Republishing the definition for "Petition" in paragraph (r)(3);
■ e. Revising paragraph (r)(5);
■ f. Republishing paragraph (w)(5) and (w)(15)(iii); and
■ g. Revising paragraph (w)(16).
The revisions and republications read as follows:

### § 214.2   Special requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(e) \* \* \*

(8) \* \* \*

(iii) *Substantive changes.* Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) *Non-substantive changes.* Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment that would affect the alien's eligibility for E classification. Further, prior approval is not required if corporate changes occur which do not affect the previously approved employment relationship or are otherwise non-substantive. To facilitate admission, the alien may:

(A) Present a letter from the treaty-qualifying company through which the alien attained E classification explaining the nature of the change;

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change; or

(C) Apply directly to Department of State for a new E visa reflecting the change. An alien who does not elect one of the three options contained in paragraphs (e)(8)(iv)(A) through (C) of this section, is not precluded from demonstrating to the satisfaction of the immigration officer at the port-of-entry in some other manner, his or her admissibility under section 101(a)(15)(E) of the Act.

(v) *Advice.* To request advice from USCIS as to whether a change is substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

\* \* \* \* \*

(23) \* \* \*

(viii) *Information for background checks.* USCIS may require an applicant for E–2 CNMI Investor status, including but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

\* \* \* \* \*

(h) \* \* \*

(2) \* \* \*

(i) \* \* \*

(A) *General.* A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

\* \* \* \* \*

(ii) *Multiple beneficiaries.* Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance with paragraph (h)(6)(i)(E) of this section must be filed separately.

\* \* \* \* \*

(5) \* \* \*

(i) \* \* \*

(B) *Multiple beneficiaries.* The total number of beneficiaries of a petition or series of petitions based on the same

temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or fewer and does not exceed the number of positions indicated on the relating temporary labor certification.

*   *   *   *   *

(19) * * *

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

*   *   *   *   *

(m) * * *

(14) * * *

(ii) *Application.* An M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but not more than 90 days before the program end date. The designated school official must certify on Form I–538 that:

*   *   *   *   *

(o) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

*   *   *   *   *

(p) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3 beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

*   *   *   *   *

(q) * * *

(5) * * *

(ii) *Petition for multiple participants.* The petitioner may include up to 25

named participants on a petition. The petitioner shall include the name, date of birth, nationality, and other identifying information required on the petition for each participant. The petitioner must also indicate the United States consulate at which each participant will apply for a Q–1 visa. For participants who are visa-exempt under 8 CFR 212.1(a), the petitioner must indicate the port of entry at which each participant will apply for admission to the United States.

*   *   *   *   *

(r) * * *

(3) * * *

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

*   *   *   *   *

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period spent in R–1 status does not exceed a maximum of 5 years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

*   *   *   *   *

(w) * * *

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

*   *   *   *   *

(15) * * *

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(16) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant

or extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

*   *   *   *   *

■ 17. Section 214.14 is amended by revising and republishing paragraph (c)(1) introductory text to read as follows:

### § 214.14   Alien victims of certain qualifying criminal activity.

*   *   *   *   *

(c) * * *

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit a Petition for U Nonimmigrant Status on the form prescribed by USCIS, and initial evidence to USCIS in accordance with this paragraph (c)(1) and the form instructions. A petitioner who received interim relief is not required to submit initial evidence with a Petition for U Nonimmigrant Status if he or she is relying on the law enforcement certification and other evidence that was submitted with the request for interim relief.

*   *   *   *   *

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 18. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681); 8 CFR part 2.

■ 19. Section 240.63 is amended by revising and republishing paragraph (a) to read as follows:

### § 240.63   Application process.

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed, Application for Suspension of Deportation, before the effective date of the form prescribed by USCIS may apply with USCIS by submitting the completed Application for Suspension of Deportation attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

*   *   *   *   *

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 20. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

■ 21. Section 244.6 is revised and republished to read as follows:

### § 244.6   Application.

(a) An application for Temporary Protected Status (TPS) must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

(b) An applicant for TPS may also request an employment authorization document under 8 CFR part 274a by filing an Application for Employment Authorization in accordance with the form instructions and in accordance with 8 CFR 106.2 and 106.3.

■ 22. Section 244.17 is amended by republishing paragraph (a) to read as follows:

### § 244.17   Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests that they do so.

* * * * *

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 23. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1252, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 24. Section 245.1 is amended by:
■ a. Revising paragraph (f); and
■ b. Removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

### § 245.1   Eligibility.

* * * * *

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States.

* * * * *

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 25. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 26. Section 245a.2 is amended by republishing paragraph (e)(3) to read as follows:

### § 245a.2   Application for temporary residence.

* * * * *

(e) * * *

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

* * * * *

■ 27. Section 245a.3 is amended by republishing paragraph (d)(3) to read as follows:

### § 245a.3   Application for adjustment from temporary to permanent resident status.

* * * * *

(d) * * *

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

* * * * *

■ 28. Section 245a.4 is amended by republishing paragraph (b)(5)(iii) to read as follows:

### § 245a.4   Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

* * * * *

(b) * * *

(5) * * *

(iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

* * * * *

■ 29. Section 245a.12 is amended by republishing paragraph (d) introductory text to read as follows:

### § 245a.12   Filing and applications.

* * * * *

(d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

* * * * *

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 30. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

■ 31. Section 264.5 is amended by revising paragraph (a) to read as follows:

### § 264.5   Application for a replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 106.2.

* * * * *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 32. The authority citation for part 274a is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 114–74, 129 Stat. 599 (28 U.S.C. 2461 note); 8 CFR part 2.

■ 33. Section 274a.12 is amended by revising and republishing paragraphs (b)(9), (13), and (14) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

* * * * *

(b) * * *

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), under 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker under section 101(a)(15)(H)(i)(b)(1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another

organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H).

\*    \*    \*    \*    \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), under 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), under 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

\*    \*    \*    \*    \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–01427 Filed 1–30–24; 4:15 am]

**BILLING CODE 9111–97–P**

# Rules and Regulations

Federal Register

Vol. 89, No. 56

Thursday, March 21, 2024

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]

RIN 1615–AC68

### U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Final rule; correction.

**SUMMARY:** USCIS is correcting a final rule that appeared in the **Federal Register** on January 31, 2024. The final rule amended DHS regulations to adjust certain immigration and naturalization benefit request fees charged by USCIS and made certain changes.

**DATES:** Effective April 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Dr., Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

On January 31, 2024, the Department of Homeland Security (DHS) published a final rule in the **Federal Register** at 89 FR 6194 changing immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS), fee exemptions and fee waiver requirements, premium processing time limits, and intercountry adoption processing (FR Doc. 2024–01427). After review of the published document, DHS

identified a few errors in the preamble and regulatory text.

In the final rule, there were a number of technical and typographical errors that are identified and corrected by the Correction of Errors and Technical Amendments section of this correcting document. The provisions in this correcting document are effective as if they had been included in the final rule document that appeared in the January 31, 2024, **Federal Register**.

Accordingly, the corrections are effective on April 1, 2024, at 12 a.m. Eastern Time. This document, and the corrections included in this document, do not change how DHS will apply the final rule; *i.e.,* DHS will apply the corrected final rule only to applications and petitions postmarked (or, if applicable, submitted electronically) on or after April 1, 2024. Applications and petitions already pending with USCIS on April 1, 2024, (*i.e.,* postmarked before April 1, 2024) will not be subject to the final rule.

## II. Summary and Explanation of Corrections

### A. Fee Exemptions and Waivers

As discussed in the preamble, the final rule expands fee exemptions for certain filing categories.[1] DHS identified a number of places where these fee exemptions were not accurately contained in either the preamble or regulatory text:

Form I–765, Application for Employment Authorization

The final rule created fee exemptions for a renewal or replacement Form I–765, Application for Employment Authorization, when filed by the following groups:

• Persons seeking or granted special immigrant visa or status as an Afghan or Iraqi translator or interpreter, Iraqi nationals employed by or on behalf of the U.S. Government, Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF), and their derivatives.[2]

• Abused spouses and children of U.S. citizens and lawful permanent residents seeking cancellation of

removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2).[3]

• Current and former U.S. armed forces service members.[4]

The final rule's summary of changes (II.C), Tables 5B and 5C, and supporting documents all confirm these additional fee exemptions. However, DHS inadvertently omitted the exemptions for the above groups in the regulatory text, which only listed the fee exemptions for an initial I–765 as was provided in the proposed rule.[5] Therefore, DHS corrects the regulatory text portion of the final rule, 8 CFR 106.2(a)(44)(iv)(E) (on page 6389, first column); 8 CFR 106.3(b)(3)(vi) (on page 6392, third column); and 8 CFR 106.3(b)(8)(i) (on page 6393, second column), to provide that a replacement or renewal Form I–765 is fee exempt for the groups identified above.

Form I–290B, Notice of Appeal or Motion

The fee for Form I–290B is waivable for any benefit where the underlying form fee is free or waived.[6] However, in the preamble DHS inadvertently omitted a fee waiver for Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse, in Table 5C.[7] Therefore, in Table 5C in the preamble (page 6230) in the row entitled "Abused Spouses of A, E–3, G, and H Nonimmigrants," DHS adds the text "Form I–290B" to the third column to indicate that a requester can submit a request to waive the fee for filing a motion to reopen or reconsider the denial of their I–765V.

Form I–601A, Application for Provisional Unlawful Presence Waiver

The final rule also created an additional fee exemption for Form I–601A, Application for Provisional Unlawful Presence Waiver, when filed by a person seeking or granted Special Immigrant Juvenile (SIJ) classification.[8]

---

[1] *See* 89 FR at 6196; *id.* at 6212–32.
[2] *See* 89 FR at 6214; *id.* at 6227–32, Tables 5B, 5C; RIA Tables 46, 47.

[3] *See* 89 FR at 6214; *id.* at 6227–32, Tables 5B, 5C; RIA Tables 46, 47.
[4] *See* 89 FR at 6214; *id.* at 6227–32, Tables 5B, 5C; RIA Tables 46, 47.
[5] *Cf.* 88 FR 402, 592–95 (Jan. 4, 2023) (proposed 8 CFR 106.2(a)(43)(v), (b)(3)(vi), (b)(8)(ii)).
[6] *See* 8 CFR 106.3(a)(3)(ii)(D); *see also* 8 CFR 106.3(a)(3)(iii).
[7] *See* 89 FR 6230.
[8] *See* 89 FR 6214 ("DHS also provides a fee exemption for SIJs filing Form I–601A . . . ."); Table 5B; RIA Tables 46, 47.

However, DHS inadvertently omitted this fee exemption from the regulatory text and Table 5C. Therefore, in Table 5C in the preamble (on page 6231), in the row entitled "SIJs," DHS is adding the text "Form I–601A" to the second column. In the regulatory text portion of the final rule, DHS adds 8 CFR 106.3(b)(1)(vii) (on page 6392) in the first column to indicate that Form I–601A is fee exempt for persons seeking or granted SIJ classification.

Adoption Fees

The final rule provides fee exemptions for adoption-related forms and summarizes the new exemptions in Table 7: Adoption Fees.[9] However, this table was mistakenly referred to as "Table 8" in the preamble.[10] DHS corrects the preamble on page 6307, third column, of the final rule to include proper reference to Table 7.

Special Rule Cancellation of Removal

The final rule allows persons to request a waiver of any fee associated with a request for special rule cancellation of removal as a spouse or child that has been battered or subjected to extreme cruelty.[11] The regulation text cites 8 U.S.C. 1229(b)(2) as the statute for this underlying benefit; however, the proper statutory citation is 8 U.S.C. 1229b(b)(2). The final rule mistakenly repeats a typo that originated in the proposed rule.[12] Therefore, DHS corrects the regulatory text, 8 CFR 106.3(a)(3)(iii) (on page 6392, first column) with the proper legal citation for special rule cancellation of removal for spouses and children who have been battered or subjected to extreme cruelty.[13]

B. Online Filing Fee for Form I–539, Application To Extend/Change Nonimmigrant Status

In the preamble, DHS incorrectly stated the final online filing fee for Form I–539, Application to Extend/Change Nonimmigrant Status. The final rule preamble stated that the Form I–539 fee for paper filing was $470 and the online filing fee was also $470.[14] While DHS used the paper filing fee twice in the same sentence, it meant to include the $50 discount for online filing, making the Form I–539 fee $420 when filed online.[15] DHS used the correct online filing fee of $420 elsewhere in the preamble, including Table 1.[16] In the regulatory text, DHS did not exempt Form I–539 from the online filing discount.[17] DHS corrects the preamble of the final rule on page 6329, second column, to include the proper online filing fee for Form I–539.[18]

C. Corrections to Final Regulatory Flexibility Analysis Tables

DHS corrects three tables in the Final Regulatory Flexibility Analysis section of the preamble. DHS identified that the note under Table 12b, in the preamble, on page 6362, inadvertently states the CNMI Educational Fund fee is $30.[19] The note should have stated that the CNMI Educational Fund fee is $210. This correction does not impact the analysis of the regulation.

DHS corrects two rows in both Table 15 on page 6365, and Table 17 on page 6366. The dollar amount in the columns A through F in the row labeled "L–1A/ L–1B/LZ Blanket" and the dollar amounts in columns A through F in the row labeled O–1/O–2 petitions were transposed in both tables. The correct amounts are shown in Table 1 on page 6198 of the final rule. These corrections do not impact the analysis of the regulation.

D. Definition of Nonprofits

DHS defined the term "nonprofit" on page 6386, column 2, in the final rule to offer discounts to the Asylum Program Fee and Form I–129, Petition for Nonimmigrant Worker, and Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker.[20] DHS intended to administer the discount for petitioners in the final rule consistent with the discount provided from the American Competitiveness and Workforce Improvement Act (ACWIA).[21] As stated in the final rule preamble, the INA provides for a reduced ACWIA fee if a petitioner is a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization.[22] The INA does not define "nonprofit" in terms of the Internal Revenue Code (IRC) and the definitions of "institution of higher education" and "government research organization" in 8 CFR 214.2(h)(19)(iv)(B) are not tied to the IRC. However, DHS inadvertently omitted educational organizations from the definition in 8 CFR 106.1(f)(2). In this correction, DHS clarifies the definition to include not-for-profit primary or secondary educational institutions, or institutions of higher education, as defined in section 101(a) of the Higher Education Act of 1965, 20 U.S.C. 1001(a). This correction is consistent with the preamble and DHS' intent.[23]

E. Online Filing Fee for Small Employers and Nonprofits

The final rule implements various discounted fees, sometimes with exceptions. For example, DHS provides discounted fees to small employers and nonprofits for Forms I–129 and I–129CW and the Asylum Program Fee.[24] DHS also revised the range of online filing fees that were in the proposed rule to instead use a $50 discount for online filing in most cases.[25] DHS made exceptions to the $50 discount in limited circumstances, like when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee.[26]

DHS did not intend for customers to combine both the discounts for online filing and for small employer and nonprofit fees. DHS applies the same definition of small employers and nonprofits to both the Asylum Program Fee and the fees for Forms I–129 and I–129CW.[27] The preamble and regulatory text specify that the online filing discount does not apply to the H–1B registration fee and the Asylum Program Fee.[28] DHS did not intend to apply online filing discount in addition to providing small employer and nonprofit discounts for the fees for Forms I–129 and I–129CW. Various statements and tables in the preamble and supporting documentation support this assertion. Table 1 in the preamble lists online and paper filing fees for various benefit requests as well as the full fee and small employer and nonprofit fees for Forms I–129 and I–129CW, but it does not list

---

[9] See 89 FR 6308.

[10] See 89 FR at 6307 ("A summary of the new exemptions is listed in Table 8 below.")

[11] See 8 CFR 106.3(a)(3)(iii); 89 FR at 6392.

[12] See 88 FR at 594.

[13] See 88 FR at 6392, first column.

[14] See 89 FR 6329, second column.

[15] See 8 CFR 106.1(g).

[16] See, e.g., 89 FR 6200–6201.

[17] See 8 CFR 106.2(a)(26).

[18] See 89 FR 6329, second column.

[19] See 89 FR at 6362.

[20] See 89 FR 6209–6210, 8 CFR 106.1(f)(2).

[21] 89 FR 6209–10.

[22] Id.; INA section 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A).

[23] See 8 CFR 214.2(h)(19)(iii).

[24] See 89 FR 6195–6196, 6208–6210, 6196, 8 CFR 106.2(a)(3), 8 CFR 106.2(a)(4), 8 CFR 106.2(c)(13).

[25] See, e.g., 89 FR 6196, 6211–6212.

[26] See, e.g., 89 FR 6211, 8 CFR 106.2(a)(7)(vi), 8 CFR 106.2(a)(50)(iv).

[27] See, e.g., 89 FR 6195–6196, 6208–6210, 6291, 8 CFR 106.1(f). DHS clarifies the definition of small employer and nonprofit elsewhere in this notice.

[28] See 8 CFR 106.2(c)(11)(iii), 8 CFR 106.2(c)(13)(iii).

rows that combine both discounts.[29] In Table 5 of the Regulatory Impact Analysis, DHS identifies paper filing and online filing fees for various benefit requests and Form I–129 rows do not have this distinction.[30] The same table does have the distinct fees for small employers and nonprofits filing Form I–129.

DHS corrects the final rule to clarify the $50 online filing discount does not apply to the small employer and nonprofit petitions fees for Forms I–129, I–129CW and the Asylum Program Fee by amending 8 CFR 106.2(a)(3); adding 8 CFR 106.2(a)(3)(xi) to state, "The online filing discount in § 106.1(g) does not apply to the fee for small employers and nonprofits in paragraphs (a)(3)(i), (a)(3)(iii), (a)(3)(v), and (a)(3)(ix) of this section."; and clarifying 8 CFR 106.2(a)(4)(ii).

### F. Fee for Form I–129CW for a Small Employer and Nonprofit

As discussed in the preamble to the final rule, for nonprofits and businesses with 25 or fewer FTE employees (including any affiliates and subsidiaries) filing Forms I–129 and I–129CW for the applicable nonimmigrant classification, DHS is setting the fee at either the current $460 fee or half of the new fee whichever is higher.[31] The full fee for Form I–129CW is $1,015.[32] Half of $1,015 rounded to the nearest $5 is $510.

The final rule for filing Form I–129CW listed a small employer and nonprofit fee of $510 in various text and tables in the final rule preamble.[33] Various supporting documents in the docket likewise list the fee as $510. For example, Tables 5 and 27 of the Regulatory Impact Analysis (RIA) for the final rule lists the small employers and nonprofits fee for Form I–129CW as $510.[34] Likewise, Table 6 of the supporting documentation for the final rule lists the small employers and nonprofits fee for Form I–129CW as $510.[35] However, the regulatory text for Form I–129CW inadvertently listed the prior fee which was $460 at 8 CFR 106.2(a)(4)(ii). Therefore, DHS corrects the regulatory text portion of the final rule on page 6387, column 1, 8 CFR 106.2(a)(4)(ii), to indicate that small employers and nonprofits must submit a fee of $510 with Form I–129CW.

### G. References to Form Instructions

As stated in the final rule, USCIS is removing fee, fee waiver, fee exemption, and fee payment information from the individual information collection (IC) instructions by consolidating it into the USCIS Form G–1055, Fee Schedule, and placing it online on the USCIS website *www.uscis.gov*.[36] Form instructions will no longer list fees. However, DHS inadvertently provided regulatory text in parts of the final rule that stated or implied that the form instructions would include fees. For example, the final rule provided that the fraud detection and prevention fee for filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) "and USCIS form instructions" was $500. 89 FR 6391. Therefore, DHS corrects the regulatory text portion of the final rule to remove "and USCIS form instructions" and similar language indicating that the form instructions will contain fee information in the following places: (1) Page 6391, in the first column, 8 CFR 106.2 (c)(4); (2) Page 6391, in the first column, 8 CFR 106.2(c)(5)(i); (3) Page 6391, in the first column, 8 CFR 106.2 (c)(5)(ii); (4) Page 6391, in the first column, in 8 CFR 106.2(c)(6); (5) Page 6398, in the second column, 8 CFR 214.2 (w)(5). The reference to form instructions is not removed in 8 CFR(c)(7), on page 6391, first column, because the CNMI education funding fee will be included in the form instructions for Form I–129CW.

### H. H–1B Registration Fee Regulatory Text

DHS exempted the H–1B Registration Fee from the $50 online filing discount in the regulatory text.[37] However, it created an unnecessary third level paragraph without a (i) or (ii) preceding the (iii) at 8 CFR 106.2(c)(11)(iii). As such, DHS corrects the regulatory text to add the text from the third level at 8 CFR 106.2(c)(11)(iii) to the second level at 8 CFR 106.2(c)(11).

### I. Form I–800   Fee Regulatory Text

As discussed in the preamble to the final rule, DHS is setting the fee for Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative, at $920, unless an exemption applies. *See e.g.,* 89 FR 6311 (Table 7). However, the regulatory text at 8 CFR 106.2(a)(46) on page 6389, second column, inadvertently left blank the fee amount for this form. DHS corrects the final rule to indicate the fee for Form I–800 by amending the introductory paragraph to 8 CFR 106.2(a)(46) to state, "For filing a petition to classify a Convention adoptee as an immediate relative: $920."

## III. Administrative Procedure Act

Section 553(b) of the Administrative Procedure Act (APA) generally requires agencies to publish a notice of proposed rulemaking in the **Federal Register** to provide a period for public comment before the provisions of a rule take effect. 5 U.S.C. 553(b). In addition, section 553(d) of the APA requires agencies to delay the effective date of final rules by a minimum of 30 days after the date of their publication in the **Federal Register**. 5 U.S.C. 553(d). Both of these requirements can be waived if an agency finds, for good cause, that the notice and comment process and/or delayed effective date is impracticable, unnecessary, or contrary to the public interest, and incorporates a statement of the finding and the reasons therefore in the notice. 5 U.S.C. 553(b)(B), (d)(3).

DHS believes there is good cause for publishing this correction document without prior notice and opportunity for public comment and with an effective date of less than 30 days because DHS finds that such procedures are unnecessary. This document corrects technical and typographic errors in the preamble (including tables) and regulatory text, but does not make substantive changes to the policies that were adopted in the final rule. This document merely conforms erroneous portions of the final rule to the agency's clearly expressed contemporaneous intent. As a result, this correcting document's sole function is to ensure that the information in the January 31, 2024 final rule accurately reflects the policies adopted in that final rule, prior to which DHS issued a notice of proposed rulemaking and received public comment. Therefore, DHS believes that it has good cause to waive the notice and comment and effective date requirements of section 553 of the APA.

---

[29] *See* 89 FR 6198–6204.

[30] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Regulatory Impact Analysis (Jan. 2024), *https://www.regulations.gov/ document/USCIS-2021-0010-8179.*

[31] *See* 8 CFR 106.2(a)(3)(i), (a)(3)(iii), (a)(3)(ix), and (a)(4)(ii). See 89 FR 6194, 6386–7.

[32] *See* 8 CFR 106.2(a)(4)(i); 89 FR at 6386–7. See also 89 FR at 6198, Table 1; 89 FR at 6362, Table 12b.

[33] *See, e.g.,* 89 FR at 6199, Table 1, 89 FR at 6362, Table 12b.

[34] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Regulatory Impact Analysis (Jan. 2024), *https://www.regulations.gov/ document/USCIS-2021-0010-8179.*

[35] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[36] *See* 89 FR 6383.

[37] *See* 89 FR 6391, 8 CFR 106.2(c)(11)(iii).

## IV. Correction of Errors and Technical Amendments

Accordingly, the publication final rule at 89 FR 6194, (FR Doc. 2024–01427) is corrected as follows:

### A. Correction of Errors in the Preamble

1. On page 6230, in Table 5C: Forms for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule, the eighth row in the table labeled "Abused spouses of A, E–3, G, and H Nonimmigrants" and the third column (Fee Waiver Eligibility), Table 5C is corrected by removing "Not applicable" and inserting a new bullet reading "• Form I–290B."

2. On page 6231, in Table 5C: Forms for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule, the tenth row in the table labeled, SIJs, and the second column (Fee Exemptions),

Table 5C is corrected by inserting a new bullet reading "• Form I–601A" after the bullet reading "• Form I–601."

3. On page 6307, in the third column, line eight, the language "Table 8 below" is corrected by removing the number 8 and adding in its place the number 7.

4. On page 6329, in the second column, Section, e. Form I–539 Extend/Change Nonimmigrant Status, Response, line eight, remove the sentence "For these reasons, this Final Rule lowers the proposed Form I–539 fee from $620 to $470 for paper filings, and from $525 to $470 for online filings." and add in its place a sentence to read: "For these reasons, this Final Rule lowers the proposed Form I–539 fee from $620 to $470 for paper filings, and from $525 to $420 for online filings."

5. On page 6362, Table 12b. Fee Summary Table for Form I–129

Petitioners (Matched Only), row 12, Note, in Table 12b of the table, is corrected by removing "$30" and adding its place "$210."

6. On page 6365, in Table 15, USCIS Final Fees for Form I–129 Petition for Nonimmigrant Worker by Classification, for Small Entities with 25 or Fewer FTE Employees, correct the ninth and tenth rows of the table, labeled as "L–1A/L–1B/LZ Blanket" and "O–1/O–2", by removing the values in columns A through F of row nine labeled "L–1A/L–1B/LZ Blanket" and adding in their place the dollar amounts in columns A through F of the row labeled "O–1/O–2" and removing the dollar amounts in row ten labeled "O–1/O–2" with the dollar amounts in columns A through F of the row labeled "L–1A/L–1B/LZ Blankets." The corrected rows read as follows:

| L–1A/L–1B/LZ Blanket | $460 | $695 | $300 | $995 | $535 | 116.3% |
| O–1/O–2 | $460 | $530 | $300 | $830 | $370 | 80.4% |

7. On page 6366, in Table 17. USCIS Final Fees for Form 1–129 Petition for Nonimmigrant Worker by Classification, for Nonprofit Small Entities, correct the ninth and tenth rows of the table,

labeled as "L–1A/L–1B/LZ Blanket" and "O–1/O–2", by moving all the values in row nine labeled "L–1A/L–1B/LZ Blanket" to row ten, labeled "O–1/O–2" and moving all the values in row ten

labeled, "O–1/O–2" up to row nine, labeled "L–1A/L–1B/LZ Blanket.". The corrected rows read as follows:

| L–1A/L–1B/LZ Blanket | $460 | $695 | $0 | $695 | $235 | 51.1% |
| O–1/O–2 | $460 | $530 | $0 | $530 | $70 | 15.2% |

### B. Correction of Errors in the Regulatory Text

■ 1. On page 6386, in the second column, in instruction 7 in § 106.1, correct paragraph (f)(2) to read as follows:

### § 106.1 [Corrected]

\* \* \* \* \*

(f) \* \* \*

(2) Nonprofit means not-for-profit primary or secondary educational institutions, or institutions of higher education, as defined in section 101(a) of the Higher Education Act of 1965, 20 U.S.C. 1001(a); organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. 501(c)(3); or governmental research organizations as defined under 8 CFR 214.2(h)(19)(iii)(C).

\* \* \* \* \*

■ 2. Starting on page 6386, in the third column, in instruction 7 correct § 106.2 by:
■ a. Adding paragraph (a)(3)(xi);
■ b. On page 6387, in the first column, correcting paragraph (a)(4)(ii);

■ c. On page 6389, in the second column, adding paragraph (a)(44)(iv)(E);
■ d. Revising paragraph (a)(46) introductory text;
■ e. On page 6391, in the first column, in paragraph (c)(4) removing the words "and USCIS form instructions".
■ f. On page 6391, in the first column, in paragraph (c)(5)(i) removing the words "and USCIS form instructions".
■ g. On page 6391, in the first column, in paragraph (c)(5)(ii) removing the words "and USCIS form instructions".
■ h. On page 6391, in the first column, in paragraph (c)(6) removing the words "and USCIS form instructions".
■ i. On page 6391, in the second column, revising paragraph (c)(11).

The additions and revisions read as follows:

### § 106.2 [Corrected]

(a) \* \* \*

(3) \* \* \*

(xi) The online filing discount in § 106.1(g) does not apply to the fee for small employers and nonprofits in paragraphs (a)(3)(i), (a)(3)(iii), (a)(3)(v), and (a)(3)(ix) of this section."

(4) \* \* \*

(ii) For small employers and nonprofits: $510. For the Semiannual Report for CW–1 Employers (Form I–129CWR): No fee. The online filing discount in § 106.1(g) does not apply.

\* \* \* \* \*

(44) \* \* \*

(iv) \* \* \*

(E) Current or former U.S. armed forces service members.

\* \* \* \* \*

(46) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* For filing a petition to classify a Convention adoptee as an immediate relative: $920.

\* \* \* \* \*

(c) \* \* \*

(11) Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens. For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $215. This fee is not subject to the online discount provided in § 106.1(g).

\* \* \* \* \*

■ 3. Starting on page 6392, in the first column, in instruction 7, correct § 106.3 by:

■ a. In paragraph (a)(3)(iii) removing the citation to "8 U.S.C. 1229(b)(2) and adding in its place the citation "8 U.S.C. 1229b(b)(2)";

■ b. On page 6392, in the second column, adding paragraph (b)(1)(vii);

■ c. On page 6392, in the third column, in paragraph (b)(3)(vi) removing the word "initial";

■ d. On page 6393, in the second column, in paragraph (b)(8)(i) removing the words "for their initial request".

The addition reads as follows:

### § 106.3   [Corrected]

\*   \*   \*   \*   \*

(b)

(1)

(vii) Application for Provisional Unlawful Presence Waiver (Form I–601A).

\*   \*   \*   \*   \*

### § 214.2   [Corrected]

■ 4. On page 6398, in the second column, in § 214.2, paragraph (w)(5) is corrected by removing the words "the form instructions and".

**Christina E. McDonald,**

*Associate General Counsel for Regulatory Affairs, Department of Homeland Security.*

[FR Doc. 2024–05935 Filed 3–19–24; 4:15 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 71

**[Docket No. FAA–2024–0860; Airspace Docket No. 24–ASO–9]**

**RIN 2120–AA66**

### Establishment of Class E Airspace; Milton, FL

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action establishes Class E airspace that was inadvertently removed for Whiting Field Naval Air Station, Milton, FL.

**DATES:** Effective 0901 UTC, May 16, 2024. The Director of the Federal Register approves this incorporation by reference action under 1 CFR part 51, subject to the annual revision of FAA Order JO 7400.11 and publication of conforming amendments.

**ADDRESSES:** This final rule may be viewed online at *www.regulations.gov*

using the FAA Docket number. Electronic retrieval help and guidelines are available on the website. It is available 24 hours a day, 365 days a year.

FAA Order JO 7400.11H, Airspace Designations, and Reporting Points, as well as subsequent amendments, can be viewed online at *www.faa.gov/air_ traffic/publications/*. For further information, contact the Airspace Policy Group, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8783.

**FOR FURTHER INFORMATION CONTACT:** John Fornito, Operations Support Group, Eastern Service Center, Federal Aviation Administration, 1701 Columbia Avenue, College Park, GA 30337; telephone: (404) 305–6364.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority, as it establishes Class E airspace extending upward from 700 feet above the surface for Whiting Field Naval Air Station, Milton, FL. The FAA inadvertently removed this airspace in a previous action.

### Incorporation by Reference

Class E airspace is published in paragraph 6005 of FAA Order JO 7400.11, Airspace Designations and Reporting Points, incorporated by reference in 14 CFR 71.1 annually. This document amends the current version of that order, FAA Order JO 7400.11H, dated August 11, 2023, and effective September 15, 2023. FAA Order JO 7400.11H is publicly available as listed in the ADDRESSES section of this document. These amendments will be published in the next FAA Order JO 7400.11 update. FAA Order JO 7400.11H lists Class A, B, C, D, and E airspace areas, air traffic service routes, and reporting points.

### The Rule

This amendment to 14 CFR part 71 establishes Class E airspace extending

upward from 700 feet above the surface for Whiting Field Naval Air Station, Milton, FL, as this airspace was inadvertently removed in a previous action. Controlled airspace is necessary for the area's safety and management of instrument flight rules (IFR) operations.

### Regulatory Notices and Analyses

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore: (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this proposed rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

### Environmental Review

The FAA has determined that this action qualifies for categorical exclusion under the National Environmental Policy Act in accordance with FAA Order 1050.1F, "Environmental Impacts: Policies and Procedures," paragraph 5–6.5a. This airspace action is not expected to cause any potentially significant environmental impacts, and no extraordinary circumstances warrant the preparation of an environmental assessment.

### Lists of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

### The Amendment

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1   [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation

FY 2022-2023

# Immigration Examinations Fee Account

**Fee Review Supporting Documentation with Addendum**

November 2023





**U.S. Citizenship and Immigration Services**

AR_000828

# TABLE OF CONTENTS

Executive Summary .......................................................................................................... 4

Fee Review Basis ............................................................................................................. 6

   Purpose .......................................................................................................................... 6

   Summary Basis for Fee Adjustments ............................................................................ 6

Methodology for the FY 2022/2023 Fee Review .............................................................. 7

   Activity-Based Cost Model ........................................................................................... 7

      Resources .................................................................................................................. 9

      Resource Drivers and Resource Assignment ............................................................ 9

      Activities ................................................................................................................. 10

      Activity Drivers and Activity Assignment ............................................................. 12

      Cost Objects ............................................................................................................ 14

   Changes Implemented in the FY 2022/2023 Fee Review ............................................. 15

      Additional Immigration Benefit Requests and Other Workloads .......................... 15

      Methodology Changes ............................................................................................ 17

      Organizational Changes .......................................................................................... 18

Special Topics ................................................................................................................. 21

   IEFA Non-Premium Carryover Projections ............................................................... 21

   Imputed Benefits Cost Estimate – OMB Circular A-25 Compliance .......................... 24

   FASAB Compliance Justification ............................................................................... 25

      Direct Trace ............................................................................................................. 25

      Cause-and-Effect .................................................................................................... 26

      Reasonable and Consistent Allocation ................................................................... 26

Addendum ....................................................................................................................... 27

   Public Comments on the Proposed Rule ..................................................................... 27

   Changes in the Final Rule ............................................................................................ 27

   Corrections and Changes in this Document ................................................................. 28

   Summary of Final Fees ................................................................................................ 28

Appendices ...................................................................................................................... 34

Appendix I – USCIS Offices .................................................................. 34

    Appendix Figure 1: USCIS Organizational Chart ................................... 34

Appendix II – USCIS Funding and Account Structure ............................ 35

    Immigration Examinations Fee Account (IEFA) ................................... 35
    Appendix Table 1: FY 2019 – 2020 Enacted IEFA by Program/Activity ......................... 36
    Other Fee Accounts ............................................................................. 36

Appendix III – USCIS Activity-Based Costing Terminology .................. 38

    Appendix Figure 2: ABC Concept and Terminology ............................. 38

Appendix IV – Costs by Activity .......................................................... 39

    Appendix Table 2: Projected IEFA Costs by Activity (Dollars in Millions) ...................... 39

Appendix V – Fee Waivers .................................................................. 40

    Appendix Figure 3: Historical Fee Waiver Summary ............................ 40

Appendix VI – Projected Total Cost by Immigration Benefit Request .................... 41

    Appendix Table 3: Projected Total Cost by Immigration Benefit Request ...................... 41

Appendix VII – Activity Unit Costs by Immigration Benefit Request ..................... 46

    Appendix Table 4: USCIS Fee-Paying Unit Cost by Activity ............................. 46
    Appendix Table 5: USCIS Activity Unit Costs Per Projected Receipt ................................ 49
    Appendix Table 6: USCIS Activity Unit Costs for Genealogy, Records, and Verifications 52

Appendix VIII –IEFA Non-Premium Positions by USCIS Office .......................... 53

    Appendix Table 7: IEFA Fee Review Staffing Estimates by Office ..................... 53
    Appendix Table 8: IEFA Non-Premium On-Board Positions by Office and Fiscal Year .... 54
    Appendix Figure 3: IEFA Non-Premium On-Board Positions by Office and Fiscal Year ... 55

Appendix IX – Operational Metrics in the Fee Review .......................... 56

    Appendix Table 9: Workload Volume Comparison ................................. 56
    Appendix Table 10: Fee-Paying Projection Comparison ...................... 58
    Appendix Table 11: Completion Rates per Benefit Request ................... 60
    Appendix Table 12: Historic Receipts from Previous Fiscal Years ................... 63

Appendix XI – IEFA History .................................................................. 67

    Appendix Table 13: IEFA Non-Premium Fee History ........................... 69
    Appendix Table 14: Premium Processing Fees .................................... 71

## EXECUTIVE SUMMARY

U.S. Citizenship and Immigration Services (USCIS) is primarily funded by immigration and naturalization benefit fees charged to applicants and petitioners.[1] Fees collected from applicants and petitioners are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the cost of processing immigration benefit requests. USCIS reviews its fees biennially and adjusts them to recover the full operating costs associated of providing immigration adjudication and naturalization services.

In accordance with the principles and guidance of the Chief Financial Officers Act of 1990 (CFO Act) and the Office of Management and Budget's (OMB) Circular A-25, USCIS completed a biennial fee review for Fiscal Years (FY) 2022/2023. The results indicate that current fee levels are insufficient to recover the estimated full cost of activities funded by the IEFA. The Department of Homeland Security (DHS) is adjusting USCIS' current fee schedule to recover full cost.

The fee review is based on a snapshot in time. The FY 2022/2023 fee review started in early FY 2021. The results represent reasonable estimates for FY 2022/2023. This study considers the effects on this rule of intervening legislation, related rulemakings, and policy changes that USCIS knows have occurred or is reasonably certain will occur shortly when this fee review was prepared. However, immigration policy is constantly changing, and it is impossible to include every policy change that is planned or that may occur at all levels and agencies of the U.S. government that may indirectly affect USCIS costs. While more recent information may generate different results, USCIS believes these results are the best available at the time. Delaying the fee rule to use more recent information may require additional assumptions which would only increase uncertainty. USCIS generally requires a year or more to gather the necessary data and conduct any given fee review. The rulemaking process takes significantly longer. Solidifying budget and policy decisions, writing the preamble and regulation, conducting economic analysis, 60-day comment periods, and addressing comments in a final rule often takes three years. See Table 1 for a comparison to the last two completed fee rules. Some tasks may run concurrently. If a task overlaps with another in the table, then the start date for a task is the next business day after the end date of the previous task. The table excludes the overlap to reflect the total time without double counting. Each Duration (Years) column divides a number of days by 365. There may be slight differences because of rounding.

---

[1] This study includes all non-premium processing requests funded from the IEFA and programs administered by USCIS and encompasses the terms application, applicant, petition, petitioner, requester, benefit request, immigration benefit request, and form.  DHS and USCIS may use the terms interchangeably, although the form, request, program or office may not directly relate to an immigration or naturalization benefit.

Table 1: Fee Rule Timelines Compared

| Task Description | FY 2019/2020 | | | FY 2016/2017 | | | Increase or Decrease |
|---|---|---|---|---|---|---|---|
| | Start | End | Duration (Years) | Start | End | Duration (Years) | Duration (Years) |
| Conduct fee review. Brief USCIS leadership. | 1/11/2017 | 3/5/2018 | 1.15 | 4/4/2014 | 12/7/2015 | 1.68 | (0.53) |
| Draft proposed rule. Internal Clearance. Form revisions. | 3/6/2018 | 5/1/2019 | 1.15 | 12/8/2015 | 1/15/2016 | 0.10 | 1.05 |
| Proposed rule DHS OGC Clearance | 5/2/2019 | 10/1/2019 | 0.42 | 1/18/2016 | 4/1/2016 | 0.20 | 0.21 |
| Proposed rule OMB Clearance | 10/2/2019 | 10/31/2019 | 0.08 | 4/4/2016 | 4/26/2016 | 0.06 | 0.02 |
| Publish proposed rule. Comment period ends. | 11/1/2019 | 2/10/2020 | 0.28 | 4/27/2016 | 7/3/2016 | 0.18 | 0.09 |
| Draft final rule in USCIS | 2/11/2020 | 4/10/2020 | 0.16 | 7/4/2016 | 8/5/2016 | 0.09 | 0.07 |
| Final rule DHS clearance | 4/13/2020 | 5/26/2020 | 0.12 | 8/8/2016 | 9/16/2016 | 0.11 | 0.01 |
| Final rule OMB clearance | 5/27/2020 | 7/23/2020 | 0.16 | 9/19/2016 | 10/12/2016 | 0.06 | 0.09 |
| Final rule Federal Register clearance and public inspection | 7/24/2020 | 7/31/2020 | 0.02 | 10/13/2016 | 10/23/2016 | 0.03 | (0.01) |
| Final rule published/effective | 8/3/2020 | 10/2/2020 | 0.16 | 10/24/2016 | 12/23/2016 | 0.16 | - |
| **Total time** | **1/11/2017** | **10/2/2020** | **3.73** | **4/4/2014** | **12/23/2016** | **2.72** | **1.01** |

USCIS calculates its fees to cover the estimated full cost of its operations.[2] DHS follows the guidance provided by OMB Circular A-25, which establishes policy guidance regarding fees assessed by Federal agencies for government services.[3] USCIS projects fee-paying receipt volume to be approximately 32 percent higher for FY 2022/2023 than the levels projected in the FY 2016/2017 fee rule. Most of the increase is the result of increased staffing requirements, as described in the rule. USCIS anticipates that the current fee structure will yield an average

---

[2] The Immigration and Nationality Act (INA) section 286(m), 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception from the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA); *See Seafarers Intern. Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179 (D.C. Cir. 1996) (IOAA provides that expenses incurred by the agency to serve some independent public interest cannot be included in the cost basis for a user fee, although the agency is not prohibited from charging the applicant full cost of services rendered to applicant, which also results in some incidental public benefits). Congress initially enacted immigration fee authority under the IOAA. *See Ayuda, Inc. v. Att'y General*, 848 F.2d 1298 (D.C. Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into a separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations and broadened the fee setting authority. Departments of Commerce, Justice, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub. L. 101-515, sec. 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting Immigration Examinations Fee Account fees that would not be considered in setting fees under the IOAA. *See* 72 FR at 29866-7.
[3] OMB Circular A-25, User Charges (Revised), par. 6, 58 FR 38142 (July 15, 1993).

annual deficit of approximately $1,141.5 million in the IEFA.[4] To ensure full cost recovery, DHS is adjusting USCIS' fee schedule as described below.

## FEE REVIEW BASIS

This document provides supplemental information associated with the FY 2022/2023 fee review results and corresponding final rule. All summary values in this document may vary due to rounding.

USCIS conducted a biennial fee review to determine whether the current fee structure is projected to be sufficient to recover full cost for FY 2022/2023, consistent with 31 U.S.C. 902(a)(8).[5] As a result of the FY 2022/2023 fee review, DHS will adjust IEFA non-statutory, non-premium processing fees to recover the estimated full operating costs associated with USCIS' role in administering the nation's lawful immigration system.

### PURPOSE

A primary objective of the FY 2022/2023 fee review was to ensure immigration and naturalization benefit fees provide sufficient funding to recover costs. The main focus was the IEFA, which comprised approximately 96 percent of USCIS' FY 2021 total funding.[6]

In addition to the requirements of the CFO Act, there are several important reasons for conducting biennial fee reviews. They offer the following benefits:

- Allows for an assessment of USCIS policies, staffing levels, costs, and revenue. USCIS evaluates its performance and makes informed decisions concerning program scaling, resource planning, and staffing allocations.
- Affords an opportunity for USCIS to account for the latest operational changes including efficiencies, workload trends, information technology improvements, etc.
- Provides internal DHS and USCIS stakeholders with an opportunity to review and evaluate anticipated costs, revenue, and their potential effect on operations, service levels, and fees.

### SUMMARY BASIS FOR FEE ADJUSTMENTS

The IEFA non-premium cost baseline has increased year-over-year since the FY 2016/2017 fee rule. USCIS forecasts that it will increase further in FY 2022/2023. The non-premium cost

---

[4] Excludes Premium Processing, Temporary Protected Status (TPS), and Consideration of Deferred Action for Childhood Arrivals (DACA) revenue and budget forecasts.

[5] Providing that, "An agency Chief Financial Officer shall review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value."

[6] IEFA non-premium funding represents 83 percent, and IEFA premium funding represents 13 percent of USCIS FY 2021 total funding. The remaining USCIS funding comes from appropriations (approximately 3 percent) or other fee accounts (approximately 1 percent) in FY 2021.

baseline represents the fee review budget. Figure 1 compares over a decade of fee review information. If fully funded over the FY 2022/2023 biennial period, USCIS estimated that it would experience an average annual deficit of $1,868.2 million in the proposed rule. (*See* Table 6 in the proposed rule.) DHS proposed to adjust USCIS' fee schedule to address the anticipated deficit. *See* section V.A.2. FY 2022/2023 Cost Projections of the proposed rule preamble for more information on the cost baseline that we used. In the final rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. *See* section II.C. Reduced Costs and Fees for the cost baseline in the final rule. Figure 1 uses the final rule budget, including the Asylum Processing IFR. Other figures or tables in this document may exclude the Asylum Processing IFR.

Figure 1: IEFA Non-Premium Cost Baseline



## METHODOLOGY FOR THE FY 2022/2023 FEE REVIEW

When conducting the FY 2022/2023 fee review, USCIS examined its recent cost history, operating environment, and current service levels to determine the appropriate method to assign costs to specific immigration benefit requests.

### ACTIVITY-BASED COST MODEL

USCIS uses activity-based costing (ABC) to determine the full cost of processing immigration benefit requests. This is the same methodology used in the previous six fee reviews and is the basis for the current fee structure. ABC is a business management tool that assigns resource costs to operational activities and then to products or services. These assignments provide an accurate cost assessment of each major step toward producing the individual outputs of an organization.

ABC includes direct and indirect costs that contribute to an output. Direct costs are costs that can be specifically identified with an output. For example, card stock for permanent residence cards and employment authorization documents are a direct cost at USCIS. Indirect costs are costs of resources that are jointly or commonly used to produce two or more types of outputs but are not specifically identifiable with any of the outputs. Almost all costs in the USCIS model are indirect costs. Most offices, even those that adjudicate, produce more than a single output. For example, a district office might adjudicate Forms I-485, N-400, and N-600. A service center may adjudicate Forms I-131, I-485, I-765 and employment-based petitions, such as Forms I-129 or I-140. As such, USCIS uses a cause-and-effect basis to assign most indirect costs. This is consistent with the federal standards for managerial accounting.[7]

USCIS uses commercially available ABC software[8] to create financial models that calculate the projected total cost and unit cost of immigration benefit requests. DHS uses this projected cost information to propose and finalize immigration benefit request fees. The previous software vendor ended support for the financial modeling software that USCIS used in the FY 2010/2011 and subsequent fee reviews. As such, USCIS switched software. USCIS successfully recreated the FY 2019/2020 fee review model in our new software before building the FY 2022/2023 fee review model. USCIS continues to refine these models with the most current information available (to the extent possible) to ensure they accurately depict USCIS operations.

USCIS assigns costs (resources) to immigration benefit and biometric service processing activities (activities) and then to individual immigration benefit requests (cost objects). ABC integrates these three components using a two-step cost assignment process. The first step assigns resources to processing activities using resource drivers. The second step assigns activities to cost objects using activity drivers. USCIS determines resource drivers by analyzing which offices and job titles perform which activities. USCIS determines activity drivers by analyzing which activity costs contribute to each cost object. Figure 2 illustrates the ABC cost assignment methodology.

---

[7] *See* Federal Accounting Standards Advisory Board Handbook, Version 20 (06/21), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf*. It generally describes cost accounting concepts and standards, and defines "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities. It defines direct and indirect costs.

[8] CostPerform. For information from the vendor on this commercial off-the-shelf application, visit https://www.costperform.com. Previous fee reviews used SAP Business Objects Profitability and Cost Management (PCM). SAP ended support for PCM on Dec. 31, 2020. USCIS disclosed the name of the software in previous fee rules. *See* 81 FR 26905. However, comments from some public commenters indicated that they were not aware of its name, usage, or existing documentation.

Figure 2: Activity-Based Costing Diagram



**Resources**

Resources equal the projected FY 2022/2023 average annual cost baseline of $4,424.0 million. *See* section II.C. Reduced Costs and Fees of the final rule preamble. USCIS designed the FY 2022/2023 ABC model to look like the structure of the FY 2021 operating plan (OP). The OP is a detailed budget execution plan that USCIS establishes at the beginning of the fiscal year. It is consistent with the annual spending authority enacted by Congress. USCIS adjusts the OP for future years, as described in the rule.[9] Figure 3 compares fee review budgets from the current and previous two fee rules, including changes in the final rule and the Asylum Processing IFR. The current model only uses forecasts for FY 2022 and 2023 and excludes the Asylum Processing IFR in most cases.

Figure 3: Fee Review Budgets and FY 2021 OP Compared

**Fee Review Budgets and FY 2021 OP Compared
(Dollars in Millions)**

| | FY 2010/2011 Average | FY 2016/2017 Average | FY 2021 Operating Plan (Non-Premium only) | FY 2022/2023 Average |
|---|---|---|---|---|
| Total IEFA Non-Premium | $2,270.6 | $3,037.8 | $3,694.1 | $4,424.0 |
| Non-Pay | $1,250.4 | $1,406.5 | $1,366.6 | $1,237.3 |
| Pay | $1,020.2 | $1,631.3 | $2,327.5 | $3,186.7 |

Legend: Pay ▪ Non-Pay ▪ Total IEFA Non-Premium

**Resource Drivers and Resource Assignment**

ABC uses resource drivers to assign resources to activities (see the next section, Activities, for more information). We assign all resource costs to activities so the total resources in the ABC model equal the total cost of activities.

---

[9] For example, the OP includes costs and revenue for TPS and DACA. USCIS excludes these from the fee review budget, as explained in section V.C. of the proposed rule preamble.

A common resource driver in ABC is the number of employees in an organization and the percentage of time they spend performing various activities. The FY 2022/2023 fee review ABC model uses employee counts and activity information to assign resources to activities. USCIS refers to this process as the payroll title analysis. This analysis determines how employees contribute to the 13 activities in the fee review. When an office engages in more than one activity, USCIS uses operational information to prorate that office's resources to multiple activities.[10] The result is a percentage of staffing by office and activity. We apply this result to projected staffing levels in the FY 2022/2023 fee review model. The model assigns resources to activities using this activity information by office.

USCIS assigns some costs directly to activities. For example, the contract awarded to support USCIS Application Support Center (ASC) operations only pertains to the Collect Biometric Data activity. Therefore, USCIS assigns the costs of this contract to that activity only. As another example, Field Operations and Service Center Operations have large contracts for intake, records management, and other support services. USCIS evaluates these contracts to separate them by activity. Other overhead costs, including the Office of Information Technology (OIT), service-level agreements, and the DHS working capital fund contributions are prorated to each office based on their number of authorized positions so that each office pays a proportionate share.

The allocation methods in the FY 2022/2023 fee review align with the Federal Accounting Standards Advisory Board's (FASAB's) Statement of Federal Financial Accounting Standards (SFFAS) Number 4 on managerial cost accounting concepts.[11] This fulfills the guideline for agencies to directly trace costs when feasible and to either assign costs on a cause-and-effect basis or allocate them in a reasonable and consistent way.

**Activities**

In ABC, activities are the critical link between resources and cost objects. Activities represent work performed by an organization. USCIS allocates the FY 2022/2023 cost baseline (resources) to the following 13 activities:

1. **Conduct TECS[12] Check** involves the process of comparing information on applicants, petitioners, requestors, beneficiaries, derivatives, and household members who apply for an immigration benefit request against various Federal Government systems, and information databases.

---

[10] Because of the pandemic, in most cases USCIS used operational information from FY 2019 for the payroll title analysis since FY 2020 or FY 2021 information would be affected by the pandemic. USCIS expects a return to normal operations in FY 2022/2023.

[11] *See Federal Accounting Standards Advisory Board Handbook, Version 20 (06/21), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf (last viewed Sep. 20, 2022).*

[12] In previous reviews, USCIS called the Conduct TECS Check activity by different names, such as Conduct Interagency Border Inspection System Checks (IBIS) or Conduct Treasury Enforcement Communication System (TECS) Check. The system changed names. USCIS updated the ABC model to reflect this change.

2. **Direct Costs** support a specific immigration benefit request. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefits processing, to the application for naturalization.

3. **Fraud Detection and Prevention** involves activities performed by the Fraud Detection and National Security (FDNS) Directorate in detecting, combating, and deterring immigration benefit fraud, as well as addressing national security and intelligence concerns.

4. **Inform the Public** involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives.

5. **Intake** involves mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and lockbox operations.

6. **Issue Document** involves producing, distributing, and destroying secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization. For example, this includes issuing an employment authorization document (EAD) or permanent resident card (PRC) as well as destroying PRCs that have been surrendered to USCIS by individuals who file Form I-407, Record of Abandonment of Permanent Resident Status.

7. **Make Determination** involves adjudicating immigration benefit requests; making and recording adjudicative decisions; requesting and reviewing additional evidence; interviewing applicants, petitioners, or requestors; consulting with supervisors or legal counsel; and researching applicable laws and decisions on non-routine adjudications.

8. **Management and Oversight** involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.

9. **Records Management** involves searching for and requesting files; creating temporary and/or permanent individual files; consolidating files; appending evidence submitted by applicants, petitioners, and requestors to existing immigration files; retrieving, storing, and moving files upon request; auditing and updating systems that track the location of files; and archiving inactive files.

10. **Systematic Alien Verification for Entitlements** (SAVE) represents the cost of an intergovernmental information-sharing program that helps Federal, state, and local benefit-issuing agencies, institutions, and licensing agencies (such as an individual state's department of motor vehicles) determine the immigration status of applicants. SAVE helps these agencies ensure that only those eligible for benefits and licenses receive them. USCIS enters into reimbursable agreements with Federal, state, and local government agencies under the authority of the Economy Act and the Intergovernmental Cooperation Act 31 U.S.C. 6505. These reimbursable agreements recover only a portion of the total program cost. The SAVE reimbursable revenue estimate for FY 2022/2023 is $10.09 million. The estimated total cost of SAVE in the FY 2022/2023 fee review is approximately $53.5 million. As such, SAVE reimbursable revenue may recover approximately 19% of the total cost SAVE in the fee review period.

Since the FY 2016/2017 fee rule, USCIS added two new activities and separated one activity into several subordinate activities in the FY 2022/2023 fee review:

11. **Research Genealogy** provides researchers with access to historical immigration and naturalization records of deceased immigrants.
    a) In the FY 2016/2017 fee rule, USCIS did not track this workload distinctly from the rest of the Records Management activity.
12. **Certify Nonexistence** provides requestors with a certificate of non-existence (CNE) of a naturalization record.
    a) In the FY 2016/2017 fee rule, USCIS did not track this workload distinctly from the rest of the Records Management activity.
13. **Perform Biometric Services** involves the management of electronic biometric information, background checks performed by the Federal Bureau of Investigation (FBI), and the collection, use, and reuse of biometric information to verify the identity of individuals seeking an immigration benefit. USCIS aggregates the following subordinate activities into this activity:
    a) **Collect Biometric Data**: ASC contractual support for collection of biometric modalities (currently fingerprints, photographs, and signatures).
    b) **Check Fingerprints**: Send fingerprints to the FBI for identity confirmation, background, and security checks.
    c) **Check Name**: Send information to the FBI for personnel, administrative, applicant, and criminal files compiled for law enforcement purposes. Generally, USCIS requests this additional service for naturalization and adjustment of status applicants.
    d) **Manage Biometric Services**: Storage of biometrics and oversight of biometric services, including Federal employees at ASC locations.

**Activity Drivers and Activity Assignment**

The final stage in the ABC process assigns activity costs to immigration benefit requests (cost objects). See Table 2 for the general assignments in the ABC model. See Appendix X – Operational Metrics in the Fee Review for more information on the completion rates and other activity drivers.

Table 2: General Activity and Activity Driver Assignments

| Activity | Most Common Activity Driver |
|---|---|
| Conduct TECS Check | Completions |
| Direct Costs | Varies (Assigned by Resource) |
| Fraud Detection and Prevention | Completions |
| Inform the Public | Completions |
| Intake | Incoming Records (Receipts – Shredded Receipts) |
| Issue Document | Completions |
| Make Determination | Calculated Hours (Completions * Completion Rate) |
| Management and Oversight | Completions |
| Records Management | Completions |
| Systematic Alien Verification for Entitlements | Verifications |
| Research Genealogy | Calculated Hours |
| Certify Nonexistence | Calculated Hours |

| Activity | Most Common Activity Driver |
|---|---|
| Perform Biometric Services | Varies. See below. |
| Collect Biometric Data | ASC Production |
| Check Fingerprints | FBI Fingerprints |
| Check Name | FBI Name Checks |
| Manage Biometric Services | ASC Production |

Completions and receipts represent projected workload volumes. For most activities, USCIS assigns activity costs to cost objects based on the percentage of total projected workload volume. For these activities, similar time and effort are involved for each immigration benefit request. The ABC model reflects which offices contribute to each workload. For example, the Management and Oversight activity in the Director's Office is spread by all completions because they oversee all USCIS operations. However, the Management and Oversight activity in adjudicative offices, like Field Operations Directorate (FOD), Service Center Operations (SCOPS), and Refugee, Asylum, and International Operations (RAIO), is only assigned to completions in their offices.

USCIS allocates the Make Determination activity costs across immigration benefit requests by calculated hours. USCIS calculates hours by multiplying projected volumes by completion rates for most benefit types. Completion rates are the average time that an immigration services officer (ISO) requires to adjudicate immigration benefit requests.[13] In general, the more time spent adjudicating a request, the more cost assigned to that request and, therefore, the higher the total cost and unit cost.

USCIS also uses completion rates and calculated hours for two other production-oriented activities at the USCIS National Records Center (NRC). The Research Genealogy activity uses estimated production hours for genealogy searches and records requests. USCIS assigns all costs associated with this activity to the genealogy forms, Forms G-1041, Genealogy Index Search Request. and G-1041A, Genealogy Records Request. The Certify Non-Existence activity uses calculated hours to assign costs to Form G-1566, Request for Certificate of Non-Existence.

New to this fee review is an activity driver called Incoming Records. This represents paper receipts less documents that we shred after data collection and fee collection. We use this activity driver for the Intake activity to better represent the cost of paper filing. For example, online filing does not receive the Intake activity cost because the model only allocates it to paper workloads. As another example, if USCIS shreds the paper that it receives for a benefit request, then that benefit request receives less of the Records Management activity cost because the Incoming Records driver does not include shredded paper. Currently, USCIS shreds the following paper requests after entering the data into our case management systems:

---

[13] Refers to the amount of time a USCIS immigration service officer spends on an adjudication. This is different than cycle or processing time, the amount of time a customer waits for an output.

- I-90, Application to Replace Permanent Resident Card;
- I-765, Application for Employment Authorization, for some specific categories; and
- N-565, Application for Replacement Naturalization/Citizenship Document.

In the proposed rule, the ABC model used the Incoming Records activity driver for both the Intake and Records Management activities. However, in the final rule, we only use it for the Intake activity in most cases. Meaning, we revised the allocation for Records Management so that even online filings receive a portion of the Records Management costs. This may better reflect the cost of records systems that USCIS uses, even for online requests, as part of the total cost for benefit requests. Previous fee reviews used completions to allocate the Records Management activity to cost objects.

The ABC model allocates activity costs to immigration benefit requests by the locations (Service Centers, Field Offices, etc.) that process them. USCIS uses data from the Office of Performance and Quality, including volumes and hours by various activities, as well as assumptions or data points from other sources. For the FY 2022/2023 fee review, USCIS aligned its fee review metrics with the metrics used in the FY 2021 Staffing Allocation Model (SAM) to ensure organizational consistency.

**Cost Objects**

In the ABC model, cost objects are immigration benefit requests and other work products that USCIS produces. Table 3 shows which activity drivers link specific activities to groupings of cost objects.

Table 3: Cost Object Assignments

| Activity | Activity Driver | Cost Object Grouping |
|---|---|---|
| Perform Biometric Services | N/A (See rows below) | N/A (See rows below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Conduct TECS Check | Completions | Grouping where TECS Checks are Required |
| Fraud Detection and Prevention | Completions | Grouping where TECS Check are Required |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests not filed online |
| Issue Document | Completions | Grouping where USCIS issues documents, such as an employment authorization document (EAD) or a permanent residence card (PRC) |
| Make Determination | Calculated Hours | Immigration Benefit Requests |

| Activity | Activity Driver | Cost Object Grouping |
|---|---|---|
| Management and Oversight | Completions | Immigration Benefit Requests |
| Records Management | Completions | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Reimbursable Workload |

Figure 4 illustrates how the ABC model works. It displays each of the terms in this section and shows their connections.

Figure 4: USCIS Specific ABC Diagram



USCIS estimates costs for most immigration benefit requests, including those provided without charge to asylum applicants and certain other applicants and petitioners. The IEFA cost of immigration benefit requests for which no revenue is recovered is later reallocated to other immigration benefit requests that generate revenue. In other words, fees must recover the estimated full cost of workloads for which fees are not collected.

## CHANGES IMPLEMENTED IN THE FY 2022/2023 FEE REVIEW

The preamble to this rule discusses all major policy changes. The following sections below highlight changes to the ABC model, fee schedule, or other fee review information that may or may not be in the preamble.

### Additional Immigration Benefit Requests and Other Workloads

USCIS included several new immigration benefit requests in the ABC model or proposed fee structure that were not fully considered in the FY 2016/2017 fee rule. USCIS incorporated cost and operational metrics for the following immigration benefit requests:

- Calculated several different Form I-129, Petition for a Nonimmigrant Worker, fees based on the visa classification petitioned for, and whether the petition requests named or unnamed workers. Also limited the number of named beneficiaries to 25 per petition.
- Added H-1B registration fee to the ABC model as a SCOPS workload.
  - Assigned the following activity costs to the workload:
    - Inform the Public
    - Management and Oversight
  - This approach is similar to a methodology that DHS used to establish the USCIS Immigrant Fee in 2010, except the H-1B registration fee contains and funds fewer activities.
- Incorporated cost and fee-paying volume from U.S. Customs and Border Protection (CBP).
  - When available, incorporated CBP cost and revenue information into the USCIS fee schedule. We include the information to calculate combined CBP/USCIS fees. Then we subtract CBP revenue from the total revenue to calculate separate USCIS revenue. Only USCIS revenue funds IEFA operations.
  - USCIS and CBP share the following workloads:
    - I-192, Application for Advance Permission to Enter as Nonimmigrant
    - I-193, Application for Waiver of Passport and/or Visa
    - I-212, Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
    - I-824, Application for Action on an Approved Application or Petition
- Incorporated volume estimates from the interagency agreement with Department of State (DOS) Bureau of Consular Affairs to allocate the estimated cost for the following workloads that USCIS and DOS share:
  - I-130, Petition for Alien Relative
  - I-131, Application for Travel Document
  - I-131A, Application for Travel Document (Carrier Documentation)
  - I-360, Petition for Amerasian Widow(er) or Special Immigrant
  - I-407, Abandonment of Lawful Permanent Resident Status
  - I-600/600A/800/800A Adoption Petitions and Applications
  - I-604, Determination on Child for Adoption
  - I-730, Refugee/Asylee Relative Petition
  - DNA Collection
  - Overseas Verifications
- New Form I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600.
- New Form G-1566, Request for Certificate of Non-Existence.
- Added other cost objects to the ABC model. These enable USCIS to estimate the total cost of several low volume workloads. DHS does not propose fees for the following because of various policy or operational constraints:
  - Automatic certificate of citizenship for certain adopted children
  - DNA collection abroad
  - I-914 Supplement A, Application for Family Member of T-1 Recipient
  - I-918 Supplement A, Petition for Qualifying Family Member of U-1 Recipient

**Methodology Changes**

This section describes key methodology changes in the FY 2022/2023 fee review that were not reflected in the FY 2016/2017 fee rule. In some instances, USCIS used new data, varying levels of detail, or changed assignments in the ABC model. Examples include, but are not limited to, the following:

- Created the Research Genealogy and Certify Non-Existence activities and split the Perform Biometric Services activities into several subordinate activities, as described in the Activities section.
- Used estimated hours to allocate the Research Genealogy and Certify Non-Existence activity costs to each genealogy and certificate of non-existence (CNE) request.
    - The FY 2016/2017 fee rule used completions to allocate the Records Management activity to all immigration benefit requests (including genealogy workload) and calculated a single genealogy fee.
    - Now, proposed fees may better represent the level of effort required for each genealogy form. There is only one CNE workload. As such, weighing by level of effort does not affect the fee calculation for CNE.
    - In the final rule, DHS adjusts genealogy fees by inflation and offers a $50 discount for online filing instead of finalizing the proposed fees.
- Used estimated completion rates for asylum workloads to approximate adjudication hours. Used adjudication hours as an activity driver for the Make Determination activity, similar to most other cost objects in the ABC model. Now, the ABC model more accurately assigns costs to the asylum workloads that require more adjudication time.
    - Previous fee rules used completions to assign Make Determination activity costs to asylum workloads. As such, previous ABC models did not show that some asylum adjudications require more time than others. The FY 2016/2017 fee rule ABC model included asylum cost objects for Forms I-589 and I-881 even though DHS did not propose or change these fees.
- Added hours for Administrative Site Visit and Verification Program (ASVVP) to allocate the payroll dollars for the program.
    - Used FY 2019 ASVVP hours to distribute approximately $8.4 million of payroll in the FY 2022/2023 fee review budget. As such, the distribution is weighted so that workloads requiring more time receive a larger share of the cost.
    - Affects only the following forms or fees:
        - I-129 H-1 Classifications
        - I-129 L Classification
        - I-129 H-3, P, Q, or R Classification
        - I-360 Petition for Amerasian Widow(er) or Special Immigrant
        - I-829 Petition by Investor to Remove Conditions on Permanent Resident Status

- Separated most FDNS staffing by the directorate, region, or service center that they support. With this change, the ABC model assigns approximately 80% of FDNS to the workload completed by the respective location. This way, the ABC model better represents FDNS contributions to each location's cost.
    - For example, with this change, the ABC model allocates the cost of FDNS employees at a service center to the workload for that service center.
    - The ABC model still assigns headquarters employees, which indirectly support all FDNS, to all immigration benefit requests that FDNS might investigate. This represents approximately 20% of FDNS employees.
    - Previous fee review models mainly assigned a single Fraud Detection and Prevention activity cost to all immigration benefit requests that FDNS might investigate, instead of assigning FDNS costs more directly to the offices in which they were incurred as this rule does.
- Added filing method (online or paper) to cost objects that allow online filing.
    - Added the Incoming Records activity driver.
    - We discuss both the filing method and the new driver in the Activity Drivers and Activity Assignment section.
- Modified the fee schedule to switch between bundled and unbundled ABC model results more easily. Also allowed the fee schedule to switch fee-paying receipts with or without additional humanitarian exemptions. This allowed USCIS to evaluate alternatives more easily.
- Calculated the Asylum Program Fee. See the rule preamble for more information.

**Organizational Changes**

Since the FY 2016/2017 fee rule, USCIS has reorganized several offices.[14] While reorganization of employee assignments and workflow does not by itself affect agency costs, this section explains some of those changes in the context of the USCIS fee review. Some organizational changes may not affect the fee review results. For example, if an office performed the same activity before and after the reorganization, then it may not affect our results. However, this section highlights some of the larger changes. It would be difficult for USCIS to determine how much any of these changes affected fees. To compare the change to fees, we would need to rebuild the FY 2016/2017 fee review model in our new software with the new organizational structure. Doing so would be a significant undertaking without significant benefit to our operations.

---

[14] For the current organizational structure of USCIS, see Appendix I – USCIS Offices or visit http://www.uscis.gov/about-us. For a staffing comparison by office, see Appendix IX – Authorized IEFA Positions by USCIS Office.

### External Affairs Directorate (EXA)

USCIS combined several offices into a new directorate, External Affairs (EXA), as summarized in Table 4. In the FY 2022/2023 fee review, EXA has 660 authorized positions.

Table 4: EXA Reorganization

| Old Office Name | New Office Name |
| --- | --- |
| Communications | Public Affairs |
| Legislative Affairs | Legislative Affairs |
| Customer Service Directorate | Citizenship and Applicant Information Services |
| Office of Citizenship | Citizenship and Applicant Information Services |

This organizational change was not part of the FY 2016/2017 fee review. It was part of the FY 2019/2020 fee review. The new directorate may affect some activity cost comparisons. For example, both Legislative Affairs and Citizenship Office were part of the Management and Oversight activity in the FY 2016/2017 fee review. However, all EXA offices are part of the Inform the Public activity in the FY 2019/2020 and FY 2022/2023 fee reviews. The organizational change may also affect the estimated cost of Form N-400. The FY 2016/2017 fee rule ABC model allocated the Office of Citizenship to Form N-400 only. The FY 2022/2023 fee review model assigns the new combined Citizenship and Applicant Information Services to all immigration benefit requests. By spreading the estimated cost of Citizenship and Applicant Information Services to other benefit requests, the estimated cost for Form N-400 may be lower than without making this change. The model does not include $10-20 million for citizenship grants. USCIS anticipates appropriations for citizenship grants. Appropriated funds are not part of the IEFA fee review budget.

### Fraud Detection and National Security (FDNS)

As explained in the Activities section, FDNS is the main contributor to the Fraud Detection and Prevention activity. FDNS staffing increased during the last two administrations. (The FY 2016/2017 fee rule included a 93% increase in FDNS staffing compared to the FY 2010/2011 fee rule.) The FY 2016/2017 fee rule used the FY 2015 OP as its starting point. The FY 2022/2023 fee review used FY 2021 OP as its starting point. While the current fee review does not increase FDNS staffing significantly over FY 2021 levels, it reflects staffing increases since the FY 2016/2017 fee rule. The FY 2022/2023 fee review does not plan for a decrease or reduction in force in FDNS. Staffing increases for FDNS resulted from new or expanded workloads including:

1. Implemented Targeted Site Visit Program.
2. Established new work units including Social Media Division and Immigration Intelligence Watch Branch.

3. Increased staffing in FOD, SCOPS, and RAIO to support the increase in overall field staffing. For example, establishment of the Potomac Service Center and expansion of prescreening and enhanced vetting requirements in RAIO.
4. Increased headquarters staff to support the increase in field personnel.

### *Immigration Records and Identity Services (IRIS) Reorganization*

Identity and Information Management Division (IIMD)
Immigration Records and Identity Services (IRIS) combined two divisions, Records and Biometric Services, into a new Identity and Information Management Division (IIMD). There are approximately 100 positions in the new group. Previous fee reviews assigned Records Division to the Records Management activity. We assigned Biometric Services Division to the Manage Biometric Services activity, which is part of a larger Perform Biometric Services activity from previous reviews.

In this current fee review, we assign the new IIMD to the Management and Oversight activity. As a result of this change, the activity costs for Records Management and Manage Biometric Services may decrease. We continue to assign Application Support Center (ASC) and FBI contracts for biometric services to the appropriate activities.

The National Records Center is separate from the new division. We continue to assign the majority of its employees and contracts to Records Management activity. For example, in this fee review, we assign approximately 400 positions and 97% of NRC's costs to Records Management. We assign approximately 6 positions to the Research Genealogy activity and approximately 4 positions to the Certify Nonexistence activity.

E-Verify and SAVE
We realigned the staffing in both E-Verify and SAVE as a result of improved staffing forecasts. IRIS provided the SAM for FY 2021-2029 to OCFO. The SAM identified 30 positions that were better attributed to the SAVE program, which is funded with IEFA non-premium funds. We account for these 30 positions as increased IEFA non-premium costs. In the FY 2022/2023 fee review, SAVE has 247 authorized positions.

### *Refugee, Asylum, and International Operations (RAIO)*

Asylum
As noted in the rule preambles, the FY 2022/2023 fee review includes staffing and costs for the Asylum Processing IFR. While not a reorganization, it is a significant increase when comparing the FY 2016/2017 fee rule to the FY 2022/2023 rule. In the rule, Asylum has 3,800 authorized positions in total, including new positions for the Asylum Processing IFR.

International and Refugee Affairs Division (IRAD)

RAIO combined two divisions, Refugee Affairs and International Operations, into a new International and Refugee Affairs Division (IRAD). The decision to close most USCIS offices abroad was not part of the analysis for the enjoined fee rule.[15] While the enjoined rule discussed the office closure, USCIS did not have sufficient information to incorporate it into the fee review.[16] The FY 2022/2023 fee review includes only the offices that remain open. In the FY 2022/2023 fee review, the newly combined IRAD has an approximate 800 authorized positions, including some positions in RAIO headquarters.

***Service Center Operations (SCOPS)***

Potomac Service Center

The Potomac Service Center (PSC) was not part of the FY 2016/2017 fee rule. It was part of the enjoined FY 2019/2020 fee review. In other words, USCIS added a service center since planning for the current fee structure in FY 2015. In the FY 2022/2023 fee review, PSC has approximately 700 authorized positions. The largest workload at PSC is Form I-90.

## SPECIAL TOPICS

This section addresses specific topics not discussed elsewhere in the supporting documentation.

### IEFA NON-PREMIUM CARRYOVER PROJECTIONS

Carryover is unobligated/unexpended fee revenue accumulated from previous fiscal years. For federal entities such as USCIS that rely almost entirely on fee revenue, it is important to maintain a sufficient carryover balance and critical that they maintain adequate available funds to meet daily obligation and outlay requirements. USCIS' IEFA requires a positive carryover balance to ensure that sufficient funds are available to maintain operations at the start of each new FY until it collects and deposits current year fee revenue. Most federal programs are financed by discretionary appropriations that receive an annual Treasury warrant, which establishes a cash balance in their accounts after enactment of appropriations. USCIS' IEFA possesses permanent/indefinite warrant authority that allows for immediate access to carryover balances and revenue collections subject to the annual spending limits established by Congress. Additionally, GAO acknowledges that fee funded agencies may need to designate funds as operating reserves to whether periods when revenue collections are lower than costs.[17] USCIS actively monitors the IEFA carryover balance each month. Historically, fee revenue in the first

---

[15] *See USCIS Will Adjust International Footprint to Seven Locations* at https://www.uscis.gov/news/news-releases/uscis-will-adjust-international-footprint-seven-locations (last reviewed/updated Aug. 9, 2019). *See also* 84 FR 62306-62307 and 85 FR 46839.

[16] Id.

[17] *See* U.S. Government Accountability Office, Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability (Sep. 30, 2013), *https://www.gao.gov/assets/gao-13-820.pdf* (last visited Dec. 2, 2021).

quarter of the FY is low due to seasonal filing patterns. Therefore, USCIS requires carryover funds to pay Federal salaries and award certain contracts at the beginning of the FY.

Applicants and petitioners pay IEFA fees when filing immigration benefit requests. USCIS rejects immigration benefit requests that do not include the appropriate filing fee (unless a fee exemption applies or USCIS approves a fee waiver request). For accounting purposes, USCIS cannot recognize revenue as earned until work is completed. This means that USCIS recognizes revenue when it renders a decision on an immigration benefit request.[18] Consequently, USCIS manages its fee accounts to ensure that adequate carryover balances are generated and retained to:

- Cover the cost of processing applications and petitions that are pending adjudication at the end of the fiscal year;
- Serve as contingency funding in the event of an unexpected decline in fee collections;
- Cover the start-up costs of new or expanded programs before sufficient fee revenues from such programs are collected (if a fee is to be collected); and
- Cover other valid contingencies.

USCIS evaluated the FY 2022/2023 IEFA non-premium year-end carryover balance projections for the budget scenario described in this rule. The evaluation projected a negative year-end carryover balance, which confirmed that the current fee structure is not sufficient to cover the estimated cost of operations and maintain adequate carryover balances. In other words, if IEFA non-premium funding was exhausted, then USCIS would need to stop operations to avoid violating the Anti-Deficiency Act.[19] This would pose a significant fiscal risk that may further increase current backlogs unless DHS adjusts USCIS' fee schedule. Therefore, DHS is adjusting USCIS' fees in this rule to meet its operational requirements and ensure a sufficient carryover balance.

Figure 5 depicts historical (FY 2019-2023) actual carryover balances.[20]

---

[18] Deferred revenue is revenue that USCIS has received for work that has not been completed and constitutes an outstanding liability for the agency. Deferred revenue and pending caseloads do not impact fee adjustments.

[19] The Anti-Deficiency Act prohibits federal employees from:
- Making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341(a)(1)(A).
- Involving the government in any obligation to pay money before funds have been appropriated for that purpose unless otherwise allowed by law. 31 U.S.C. § 1341(a)(1)(B).
- Accepting voluntary services for the United States, or employing personal services not authorized by law, except in cases of emergency involving the safety of human life or the protection of property. 31 U.S.C. § 1342.
- Making obligations or expenditures in excess of an apportionment or reapportionment, or in excess of the amount permitted by agency regulations. 31 U.S.C. § 1517(a).

[20] FY 2022-2023 year-end carryover projections assume the revenue and budget reflected in Table 4 of the proposed rule. They also account for a recurring annual transfer of funds to the Executive Office for Immigration Review

Figure 5: IEFA Non-Premium Year-End Carryover Balances



A minimum carryover balance threshold enables USCIS to effectively monitor and maintain the fiscal health of the IEFA. By comparing planned spending to projected revenue, USCIS evaluates the potential operating surplus or deficit at the start of the respective FY to determine whether the IEFA will maintain an appropriate level of funding to ensure continuity of operations at the start of the following fiscal year. For example, if DHS cannot implement the fee rule before FY 2022, then USCIS will need to reduce the FY 2022 operating plan to be less than the FY 2022 fee review budget to avoid a negative carryover balance. Similarly, the FY 2019

---

(EOIR), SAVE and other offsetting collections, and the recovery of prior year obligations (namely, recoveries). USCIS forecasts recoveries by evaluating historical actual data from the most recent five FYs. An average annual recovery rate is calculated as a proportion of actual recoveries relative to the OP for the applicable FY. USCIS applies a recovery rate to the anticipated annual budget (namely, cost baseline) to forecast recoveries.

and 2020 operating plans were less than the FY 2019/2020 fee review budgets because the 2020 fee rule was enjoined and revenue was less than estimated because of the pandemic and the various injunctions.

USCIS establishes a minimum carryover balance threshold that, when combined with new fee receipts, ensures IEFA obligations will not exceed available funding. USCIS considers historical obligation patterns and revenue trends to determine the minimum carryover threshold needed to sustain agency operations. Revenue collections do not necessarily cover obligations at a given time during the biennial period. Thus, USCIS may experience cash flow deficits at certain times during the fiscal year. USCIS calculates its minimum carryover threshold using the planned total first quarter spending plus the annual net sequestration difference. Ensuring that USCIS maintains cash reserves no less than this amount enables the agency to sustain equivalent levels of obligations during periods of cash flow deficits. USCIS estimates its FY 2022/2023 IEFA non-premium minimum carryover threshold to be $1,163.7 million.

The FY 2022/2023 IEFA non-premium year-end carryover balance projections reflected in Figure 5 are significantly below USCIS' minimum carryover threshold of $1,163.7 million. Therefore, DHS adjusts USCIS' fees to bridge the cost/revenue differential and mitigate the fiscal risk.

## IMPUTED BENEFITS COST ESTIMATE – OMB CIRCULAR A-25 COMPLIANCE

OMB Circular A-25 establishes Federal policy regarding fees assessed for government services and for sale or use of government services, products, and facilities. It also establishes the underlying policy that user fees should recover the full cost to the Federal Government including direct and indirect costs. However, Circular A-25 provides exceptions for including certain costs if, in the opinion of the agency head or their designee, the costs justify an exception. The OMB Director can approve exceptions. OMB approved two USCIS exemption requests on 6/1/2020 for the FY 2019/2020 fee review.  The OMB approval is valid for a period of 4 years.

1. Retirement, health, and life insurance costs paid by OPM for USCIS employees and retirees. The cost is approximately $152.9 million in FY 2022 and $162.3 million in FY 2023. USCIS used guidance from the OPM Benefits Administration Letter 21-301, Fiscal Year 2021 Cost Factors for Calculating Imputed Costs to estimate the imputed cost.
2. Lockbox costs that are paid by the Department of the Treasury's Financial Management Service that are in addition to the costs that USCIS reimburses Treasury. USCIS pays for part, but not all, of the Lockbox cost. USCIS estimates Treasury's costs to be $135.0 million in FY 2022 and $144.4 million in FY 2023. The USCIS portion of the lockbox costs, specifically, the amount that USCIS reimburses Treasury, is included in the USCIS fee structure.

Table 5: Imputed Cost Estimate (Dollars in Millions)

| Imputed Cost Description | FY 2022 | FY 2023 | FY 2022/2023 Estimated Cost |
|---|---|---|---|
| OPM retirement, health, and life insurance | $152.9 | $162.3 | $157.6 |
| Treasury's portion of Lockbox contract | $135.0 | $144.4 | $139.7 |
| **Grand Total** | **$287.9** | **$306.7** | **$297.3** |

USCIS believes that adding these costs to the fee structure would be overly burdensome to fee-paying applicants and petitioners. Therefore, OMB approved USCIS' request to exclude these imputed costs from its fee schedule. OMB's approval is valid for up to 4 years.

## FASAB COMPLIANCE JUSTIFICATION

The cost methodology section of FASAB's SFFAS recommends performing cost assignments using the following order of preference:

1. Directly tracing costs wherever feasible and economically practicable;
2. Assigning costs on a cause-and-effect basis; or
3. Allocating costs on a reasonable and consistent basis.

According to FASAB SFFAS Number 4, "an activity is considered a linkage between the cause and the effect." USCIS uses ABC to assign resources to outputs (immigration benefit requests). Most immigration benefit requests require multiple activities to complete a request. USCIS assigns costs to requests by cause-and-effect with some exceptions. In some cases, USCIS directly traces costs dedicated to particular outputs. USCIS allocates overhead on a reasonable and consistent basis using staffing by activity. We summarize cost assignments by FASAB preference below. These lists identify some of the notable examples.

**Direct Trace**

USCIS directly assigns approximately $993.1 million, or 22 percent, of the $4,424.0 million average annual cost projection. The following costs are examples of direct trace:

- $312.9 million for the Asylum Processing IFR.
- $215.2 million for other RAIO adjudication activities.
- $153.4 million to various biometric activities:
    - $75.1 million for ASC contractual services and biometrics services software,
    - $39.6 million for FBI name checks, and
    - $38.7 million for FBI fingerprints.
- $120.0 million to the Records Management activity for records systems, scanning, and other contractual services.
- $58.0 million for planned increase to the refugee ceiling.
- $53.3 million to the Management and Oversight activity.
- $29.8 million to the Intake activity for the USCIS lockbox provider, service centers, and related supplies.

- $12.9 million to the Inform the Public activity for various customer service systems.
- $12.0 million to the Issue Document activity for USCIS card production services, supplies, and secure delivery of PRCs and EADs.
- $10.1 million for services from the DOS Bureau of Consular Affairs.[21]
- $8.4 million for ASVVP payroll and travel.
- $0.9 million for naturalization ceremonies, certificates, and travel.
- $6.3 million for other direct costs to various immigration benefit requests.

**Cause-and-Effect**

A cause-and-effect relationship assigns approximately $2,456.5 million, or 56 percent, of the $4,424.0 million average annual cost projection. USCIS assigns resources to each fee review activity based on operational data, records, statistics, and estimates by subject matter experts. It then assigns activity costs to outputs by a prorated share of immigration benefit request volume or immigration benefit request volume weighted by adjudication processing time.

**Reasonable and Consistent Allocation**

USCIS uses reasonable and consistent allocation to assign approximately $974.4 million, or 22 percent, of the $4,424.0 million average annual cost projection. These costs are mostly attributable to service-wide information technology, rent, and guard services. They include the following:

- $366.9 million for mission support costs, which are reassigned to other activities in the same office as the costs originate;
- $332.9 million for information technology costs, which are reassigned to other fee review activities across USCIS;
- $271.7 million in rent and guard services; and
- $2.9 million for mail services costs, which are reassigned to other fee review activities across USCIS.

---

[21] USCIS used Consular Affairs cost estimates by immigration benefit request in the FY 2022/2023 fee review. We add these costs to the immigration benefit requests that Consular Affairs processes on behalf of USCIS.

# ADDENDUM

DHS published a notice of proposed rulemaking (NPRM) on January 4, 2023.  See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 FR 402. USCIS provided the FY 2022/2022 Immigration Examinations Fee Account (IEFA) Fee Review Supporting Documentation (FY 2022/2023 supporting documentation) and its methodology, including budget and regulatory flexibility analyses, in the public docket. *See* http://www.regulations.gov, docket number USCIS 2021-0010.

## PUBLIC COMMENTS ON THE PROPOSED RULE

DHS provided a total of 65 days to comment on the proposed rule. In response to public comments, DHS provided additional information including:

- On March 1, 2023, USCIS presented the ABC software to public commenters who requested an appointment during the comment period. For a transcript of the meeting, see https://www.regulations.gov/comment/USCIS-2021-0010-4141.
- Other clarifying edits or additional context throughout this document.

## CHANGES IN THE FINAL RULE

DHS is adopting the proposed fees with changes, as discussed in the final rule. Below is a partial list of the changes. Some changes in the final rule may not affect this document or the analysis that it describes. The following items focus on changes that affect this document or fees in general:

- DHS removes $726.7 million of average annual estimated costs by transferring costs to Premium Processing revenue, reducing the work funded by the Asylum Program Fee, and including processing efficiency estimates and efficiency measures.
- DHS expands fee exemptions for humanitarian filings, adoption-related forms, and other reasons described in the final rule.
- The final rule provides that the Asylum Program Fee is $0 for nonprofits, $300 for employers with 25 or fewer employees, and $600 for all other Form I-129, I-129CW and I-140 filers.  The NPRM proposed that the Asylum Program Fee would be $600 for all such filers.
- DHS limits many fee increases by inflation since the previous fee increase.
- Except for some employment-based benefit request fees, if proposed fees were less than inflation, then DHS finalizes the proposed fee or a lower fee.
- Small employers and nonprofits receive a discount on fees for Forms I-129 and I-129CW.
- A $50 discount for forms filed online, except in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. The NPRM proposed various discounts for online filing.

- Form I-485 applicants will pay half of the regular Form I-765 fee for an employment authorization document (EAD) when it is submitted with a Form I-485 for which the fee is paid for as long as the adjustment application is pending.  DHS proposed requiring the full fee for such EADs.
- When filing with parents, children will pay $950 for Form I-485.  The NPRM proposed that such children pay the same fee as adults.
- Increase eligibility for the Form N-400 reduced fee option. An applicant with household income at or below 400% of Federal Poverty Guidelines (FPG) may pay half of the regular fee.

### CORRECTIONS AND CHANGES IN THIS DOCUMENT

DHS makes the following changes or corrections to this document:

- In the ABC model, we changed the most common activity driver for the Records Management activity. In the proposed rule version, we used the Incoming Records activity driver for both the Intake and Records Management activities. In the final rule version, we continue to use the Incoming Records activity driver for the Intake activity in most cases. However, in the final rule, we use completions for the Records Management activity, similar to previous fee rules. We revised text in the Activity Drivers and Activity Assignment section to explain the change. We made this change to reduce the difference between cost estimates for paper and online filing because some public comments opposed lower fees for online filing. In the proposed rule, fees for online filing ranged from $0 to $110 lower than paper filing fees. *See* Table 15 in the preamble of the proposed rule at 88 FR 402, 491. In the final rule, DHS sets a $50 difference between online and paper filing fees in most cases. See the final rule preamble for more information.
- Appendix Table 2 used the wrong name for an activity in the proposed rule version. What was called "Capture Biometric Data" should have been called "Collect Biometric Data."
- We removed Appendix VII – Proposed Fees By Immigration Benefit Request rather than update it for the final rule. It seemed redundant because of Table 6 below and Table 1 in the preamble to the final rule. We renumbered appendixes and their tables as a result.
- We updated workload and fee-paying volume forecasts in Appendix IX – Operational Metrics in the Fee Review. We revised the volumes for EB-5 workloads and the H-1B registration fee as discussed in the preamble of the final rule. See section II.C. Changes from the Proposed Rule in the preamble of the final rule.

### SUMMARY OF FINAL FEES

Table 6 summarizes the current USCIS fee schedule and the fees adopted in this final rule.  See the preamble of the final rule for more information on how DHS calculated these fees. The table excludes fees established and required by statute and those that DHS cannot adjust.

Table 6: Non-Statutory IEFA Immigration Benefit Request Fees

| Immigration Benefit Request | Current Fee(s) | Final Fee(s) | Difference | |
|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card (online filing) | $455 | $415 | -$40 | -9% |
| I-90 Application to Replace Permanent Resident Card (paper filing) | $455 | $465 | $10 | 2% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $560 | $115 | 26% |
| I-129 Petition for a Nonimmigrant worker | $460 | N/A | N/A | N/A |
| I-129 H-1 Classifications | $460 | $780 | $320 | 70% |
| I-129 H-1 Classifications (small employers and nonprofits) | $460 | $460 | $0 | 0% |
| I-129 H2-A - Named Beneficiaries | $460 | $1,090 | $630 | 137% |
| I-129 H2-A - Named Beneficiaries (small employers and nonprofits) | $460 | $545 | $85 | 18% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $530 | $70 | 15% |
| I-129 H-2A - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $460 | $0 | 0% |
| I-129 H2-B - Named Beneficiaries | $460 | $1,080 | $620 | 135% |
| I-129 H2-B - Named Beneficiaries (small employers and nonprofits) | $460 | $540 | $80 | 17% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $580 | $120 | 26% |
| I-129 H-2B - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $460 | $0 | 0% |
| I-129 Petition for L Nonimmigrant workers | $460 | $1,385 | $925 | 201% |
| I-129 Petition for L Nonimmigrant workers (small employers and nonprofits) | $460 | $695 | $235 | 51% |
| I-129 Petition for O Nonimmigrant workers | $460 | $1,055 | $595 | 129% |
| I-129 Petition for O Nonimmigrant workers (small employers and nonprofits) | $460 | $530 | $70 | 15% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E,  H-3, P, Q, R, or TN Classifications | $460 | $1,015 | $555 | 121% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) | $460 | $510 | $50 | 11% |
| I-129F Petition for Alien Fiancé(e) | $535 | $675 | $140 | 26% |

| Immigration Benefit Request | Current Fee(s) | Final Fee(s) | Difference | |
|---|---|---|---|---|
| I-130 Petition for Alien Relative (online filing) | $535 | $625 | $90 | 17% |
| I-130 Petition for Alien Relative (paper filing) | $535 | $675 | $140 | 26% |
| I-131 Application for Travel Document | $575 | $630 | $55 | 10% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $30 | 22% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $30 | 29% |
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $575 | $0 | 0% |
| I-140 Immigrant Petition for Alien Workers | $700 | $715 | $15 | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $0 | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) | $585 | $1,100 | $515 | 88% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | $930 | $1,100 | $170 | 18% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $695 | $110 | 19% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,175 | $245 | 26% |
| I-290B Notice of Appeal or Motion | $675 | $800 | $125 | 19% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $435 | $515 | $80 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,440 | $300 | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $950 | $200 | 27% |
| I-526/526E Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $7,485 | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) | $370 | $420 | $50 | 14% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) | $370 | $470 | $100 | 27% |
| I-600A Petition to Classify Orphan as an Immediate Relative Petition and I-600A Application for Advance Processing of an Orphan Petition Suitability Application | $775 | $920 | $145 | 19% |

AR_000857

| Immigration Benefit Request | Current Fee(s) | Final Fee(s) | Difference | |
|---|---|---|---|---|
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | $385 | $455 | $70 | 18% |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $120 | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $795 | $165 | 26% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $170 | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $1,240 | $110 | 10% |
| I-690 Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act | $715 | $905 | $190 | 27% |
| I-694 Notice of Appeal of Decision | $890 | $1,125 | $235 | 26% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $0 | 0% |
| I-751 Petition to Remove Conditions on Residence | $595 | $750 | $155 | 26% |
| I-765 Application for Employment Authorization (online filing) | $410 | $470 | $60 | 15% |
| I-765 Application for Employment Authorization (paper filing) | $410 | $520 | $110 | 27% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $920 | $145 | 19% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A | $385 | $455 | $70 | 18% |
| I-817 Application for Family Unity Benefits | $600 | $760 | $160 | 27% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $590 | $125 | 27% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | $5,775 | 154% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $55 | 19% |

| Immigration Benefit Request | Current Fee(s) | Final Fee(s) | Difference | |
|---|---|---|---|---|
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | -$230 | -40% |
| I-910 Application for Civil Surgeon Designation | $785 | $990 | $205 | 26% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $0 | -$230 | -100% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $0 | 0% |
| I-956 Application for Regional Center Designation | $17,795 | $47,695 | $29,900 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | $29,900 | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | $1,435 | 47% |
| N-300 Application to File Declaration of Intention | $270 | $320 | $50 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (online filing) | $700 | $780 | $80 | 11% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (paper filing) | $700 | $830 | $130 | 19% |
| N-400 Application for Naturalization (online filing) | $640 | $710 | $70 | 11% |
| N-400 Application for Naturalization (paper filing) | $640 | $760 | $120 | 19% |
| N-400 Application for Naturalization (applicants with household income below 400% of the FPG) | $320 | $380 | $60 | 19% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $65 | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document (online filing) | $555 | $505 | -$50 | -9% |
| N-565 Application for Replacement Naturalization/Citizenship Document (paper filing) | $555 | $555 | $0 | 0% |
| N-600 Application for Certificate of Citizenship (online filing) | $1,170 | $1,335 | $165 | 14% |
| N-600 Application for Certificate of Citizenship (paper filing) | $1,170 | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | $1,170 | $1,335 | $165 | 14% |

| Immigration Benefit Request | Current Fee(s) | Final Fee(s) | Difference | |
|---|---|---|---|---|
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | $1,170 | $1,385 | $215 | 18% |
| USCIS Immigrant Fee | $220 | $235 | $15 | 7% |
| H-1B Registration Process Fee | $10 | $215 | $205 | 2,050% |
| Biometric Services | $85 | $30 | -$55 | -65% |
| G-1041 Genealogy Index Search Request (online filing) | $65 | $30 | -$35 | -54% |
| G-1041 Genealogy Index Search Request (paper filing) | $65 | $80 | $15 | 23% |
| G-1041A Genealogy Records Request (online filing) | $65 | $30 | -$35 | -54% |
| G-1041A Genealogy Records Request (paper filing) | $65 | $80 | $15 | 23% |
| G-1566 Request for Certificate of Non-Existence | $0 | $330 | $330 | N/A |

# APPENDICES

## APPENDIX I – USCIS OFFICES

Below is USCIS' organizational chart as of the publication date of this rule. For additional information on the offices within USCIS, visit http://www.uscis.gov/about-us.

**Appendix Figure 1: USCIS Organizational Chart**



## APPENDIX II – USCIS FUNDING AND ACCOUNT STRUCTURE

Per the FY 2021 enacted DHS budget authority, USCIS receives funding authority through four accounts as identified below.

1. Discretionary Appropriations[22]
2. Immigration Examinations Fee Account (mandatory fees)[23]
3. Fraud Prevention and Detection Account (mandatory fees)
4. H-1B Nonimmigrant Petitioner Account (mandatory fees)

**Discretionary Appropriations**

USCIS' Discretionary Appropriations include the Operations and Support (O&S) and the Procurement, Construction, and Improvements (PC&I) accounts. The O&S appropriation provides funding for ongoing mission operations, mission support, and associated management and administration (M&A) costs for the E-Verify program. The PC&I appropriation funds the planning and acquisition/development costs for the E-Verify program. USCIS also received a Federal Assistance appropriation in FY 2019, FY 2020, FY 2021, and FY 2022 for the Citizenship and Integration Grant Program. In FY 2023, Congress appropriated $25 million for the Citizenship and Integration Grant Program, which is available until September 30, 2024, the end of FY 2024.

**Immigration Examinations Fee Account (IEFA)**

The IEFA is the primary funding source for USCIS. It accounts for approximately 96 percent of USCIS's FY 2021 total funding. Fees collected from the filing of immigration benefit requests are deposited into the IEFA and used to fund the cost for providing adjudication and naturalization services including the costs of services provided without charge to asylum applicants and other immigrants whose fees are waived or to whom a fee exemption applies.

Certain IEFA fees are set by statute:

- The filing fee for Temporary Protected Status (TPS) is limited to $50 for initial registration; renewals are free of charge.[24] DHS may impose separate, additional fees for conducting biometrics services or providing employment authorization documentation.[25]
- Premium processing service is available for certain employment-based petitions. Congress originally set the fee at $1,000 and authorized USCIS to adjust the fee by inflation as measured by the Consumer Price Index (CPI). Congress revised the premium processing authority with the Continuing Appropriations Act, 2021 and Other Extensions Act, Pub. L. No. 116-159. It set some initial fees at $1,500 or $2,500 and allowed DHS to adjust them for inflation. Since then, DHS expanded some of the eligible forms and adjusted the fees for inflation. The current premium processing fees range from $1,685 to $2,805. USCIS currently offers premium processing service for Forms I-129, I-140, I-539 and I-765.

---

[22] Discretionary spending is the budget authority provided by annual appropriations acts and the outlays that result from that budget authority. For example, the budget authority and outlays for the salaries and other operating expenses of Government agencies are usually provided by annual appropriations acts and, therefore, are often discretionary.

[23] Mandatory spending is budget authority and outlays provided by permanent laws. For example, permanent laws authorize payments for Medicare and Medicaid, unemployment insurance benefits, and farm price supports. Therefore, the budget authority and outlays for these programs are mandatory. In addition, budget authority provided in annual appropriations acts for certain programs is treated as mandatory because the authorizing legislation directs that the Government make or beneficiaries receive payment.

[24] Section 244(c)(1)(B) of the INA, 8 U.S.C. 1254a(c)(1)(b).

[25] *See* 8 U.S.C. 1254b.

- CNMI education funding fee of $200. DHS has the authority to adjust this fee by inflation, similar to the premium processing service fee, starting in 2020.[26] DHS increases this fee by inflation-only in the final rule.[27] Per statute, USCIS transfers the revenue for this fee to CNMI.
- LIFE Act penalty fee of $1,000.

**Appendix Table 1: FY 2019 – 2020 Enacted IEFA by Program/Activity**

| Program, Project, and Activity | FY 2019 Enacted | FY 2020 Enacted |
|---|---|---|
| **Adjudication Services** | | |
| District Operations | $1,883,816,000 | $1,934,033,000 |
| Service Center Operations | $731,654,000 | $746,687,000 |
| Asylum, Refugee, and International Ops | $337,544,000 | $349,295,000 |
| Records Operations | $152,649,000 | $155,150,000 |
| Premium Processing (including Transformation) | $648,007,000 | $658,190,000 |
| **Subtotal** | **$3,753,670,000** | **$3,843,355,000** |
| | | |
| **Information and Customer Services** | **$119,450,000** | **$125,335,000** |
| | | |
| **Administration** | **$616,622,000** | **$651,808,000** |
| | | |
| **Systematic Alien Verification for Entitlements (SAVE)** | **$35,112,000** | **$34,868,000** |
| | | |
| **Grand Total** | **$4,524,854,000** | **$4,655,366,000** |

The enacted amounts above represent the planned budget while preparing the FY 2021 Congressional Justification for DHS.[28] It serves as a planning document that the administration submits to Congress. Operating plans for any given year may be different due to reprograming, available revenue, or appropriations from Congress. Fee review budgets may differ from enacted budgets or operating plans because of timing or different assumptions. For example, USCIS may prepare a fee review budget before finalizing requested amounts in Congressional Justifications. Additionally, USCIS fee reviews may use a different methodology. For example, fee review budgets exclude costs and revenue from TPS and DACA, as explained in the preamble.

**Other Fee Accounts**

DHS does not have the authority to adjust fees for the Fraud Prevention and Detection or H-1B Nonimmigrant Petitioner accounts. As such, DHS cannot increase the fees to meet changing needs or costs without assistance from Congress.

---

[26] The Northern Mariana Islands U.S. Workforce Act of 2018, Pub. L. No. 115-218, Sec. 3, 132 Stat. 1547 (2018) codified at 48 USC 1806(a)(6)(A)(ii) (2018).

[27] As discussed in the proposed rule. *See* 88 FR 500; 8 CFR 106.2(c)(7).

[28] *See* Department of Homeland Security, United States Citizenship and Immigration Services, Budget Overview, Fiscal Year 2021 Congressional Justification available at https://www.dhs.gov/sites/default/files/publications/united_states_citizenship_and_immigration_services.pdf (visited Jan. 13, 2022).

### *Fraud Prevention and Detection Account*

The Fraud Prevention and Detection fees charged to certain employers petitioning for nonimmigrant workers in the H-1B, H-2B, and L-1 visa classifications are set by statute. Revenue is used for activities related to preventing and detecting fraud in immigration benefit requests as stipulated in the H-1B Visa Reform Act of 2004, and later amended by Public Law 109-13, Section 403. *See* 8 U.S.C. 1356(v)(2)(B). Revenue is shared equally among USCIS, Department of State (DOS), and Department of Labor (DOL). Effective July 25, 2018, USCIS also collects and retains the $50 CNMI fraud fee, as stipulated in the Northern Mariana Island U.S. Workforce Act of 2018. *See* 48 U.S.C. 1806(a)(6)(iv).

DHS interprets Fraud Prevention and Detection Account authority as providing supplemental funding to cover activities related to fraud prevention and detection and not prescribing that only those funds may be used for that purpose. FDNS is funded out of both the IEFA and the Fraud Prevention and Detection Account. The fees deposited in the Fraud Prevention and Detection Account are fixed by statute are insufficient to cover the full costs of FDNS. Therefore, USCIS uses both Fraud Prevention and Detection Account and IEFA funds for FDNS costs.

### *H-1B Nonimmigrant Petitioner Account*

Certain H-1B fees are established by the American Competitiveness and Workforce Improvement Act (ACWIA) of 1998, as amended by the H-1B Visa Reform Act of 2004. Revenue is shared among USCIS, DOL, and National Science Foundation. USCIS receives 5 percent of these funds. USCIS uses the H-1B Nonimmigrant Petitioner Account as supplemental funding to SCOPS for the limited H-1B petition adjudication activities authorized by statute. *See* 8 U.S.C. 1356(s)(5). The H-1B Nonimmigrant Petitioner Account is not sufficient to fund an appreciably level of the costs to USCIS of administering the H-1B program but, to the extent it does, IEFA fees are not required for those limited purposes authorized or required by section 1356(s)(5).

## APPENDIX III – USCIS ACTIVITY-BASED COSTING TERMINOLOGY

The various terms used throughout this document to discuss ABC are defined as follows:

- **Resource** – An economic element applied or used to perform activities. For example, labor, equipment, supplies, and facilities. Resources include direct and indirect costs. Generally, the term "indirect" includes overhead items or costs requiring a resource driver to spread them to activities. USCIS resources are the FY 2022/2023 fee review budget as outlined in the preambles of the proposed and final rules.

- **Resource Driver** – A measure of the amount of resources consumed by an activity. For example, the amount of time spent on an activity.

- **Activity** – The work performed within an organization. For example, accepting and adjudicating immigration benefit requests, entering data, updating records, etc. These activities consume resources. They ultimately produce outputs (cost objects).

- **Activity Driver** – A measure of the frequency and intensity of the demands for activities by cost objects. For the FY 2022/2023 fee review, activity drivers are projected immigration benefit request volumes, projected adjudication hours, completion rates, and other information. They link activities to cost objects.

- **Cost Object** – The primary output of an activity or series of activities. A cost object may be a product, service, or project. For the purposes of the FY 2022/2023 fee review, cost objects are the various immigration benefit requests that USCIS completes.

### Appendix Figure 2: ABC Concept and Terminology



# APPENDIX IV – COSTS BY ACTIVITY

Appendix Table 2 summarizes the ABC model activity costs. See the Activities section for definitions of these activities. While not an activity, the table lists the Asylum Processing IFR as a separate row for easier comparison to the FY 2016/2017 results. USCIS rounds amounts in these appendix tables to the nearest dollar. There may be slight differences due to rounding.

**Appendix Table 2: Projected IEFA Costs by Activity (Dollars in Millions)**

| Activity | FY 2016/2017 Average | FY 2022/2023 Average | Difference | % Difference |
|---|---|---|---|---|
| Certify Nonexistence | N/A | $1.1 | N/A | N/A |
| Conduct TECS Check | $53.4 | $134.5 | $81.0 | 152% |
| Direct Costs | $57.5 | $82.6 | $25.1 | 44% |
| Fraud Detection and Prevention | $178.5 | $334.6 | $156.1 | 87% |
| Inform the Public | $284.9 | $303.8 | $18.9 | 7% |
| Intake | $93.9 | $127.2 | $33.2 | 35% |
| Issue Document | $32.3 | $46.6 | $14.3 | 44% |
| Make Determination | $1,285.5 | $1,777.2 | $491.7 | 38% |
| Management and Oversight | $590.2 | $832.4 | $242.2 | 41% |
| Perform Biometrics Services | $196.3 | $184.8 | -$11.4 | -6% |
| Check Fingerprints | N/A | $39.3 | N/A | N/A |
| Check Name | N/A | $67.2 | N/A | N/A |
| Collect Biometric Data | N/A | $38.7 | N/A | N/A |
| Manage Biometric Services | N/A | $39.6 | N/A | N/A |
| Records Management | $239.5 | $236.5 | -$3.0 | -1% |
| Research Genealogy | N/A | $1.6 | N/A | N/A |
| Systematic Alien Verification for Entitlements | $25.7 | $48.1 | $22.4 | 87% |
| **Subtotal before Asylum Processing IFR** | **$3,037.8** | $4,111.1 | $1,070.6 | 35% |
| Asylum Processing IFR | N/A | $312.9 | N/A | N/A |
| **Total with Asylum Processing IFR** | **$3,037.8** | **$4,424.0** | **$1,386.2** | **46%** |

## APPENDIX V – FEE WAIVERS

USCIS did not make any changes to existing fee waiver policy in this rulemaking. Under the current fee waiver policy, USCIS developed Form I-912, Request for Fee Waiver.[29] Applicants and petitioners may request that certain filing and biometrics (if applicable) fees be waived if the form being filed is eligible for a fee waiver and the applicant or petitioner is able to demonstrate one of the following criteria:

- Current receipt of a means-tested benefit;
- Household income at or below 150 percent of the Federal poverty level; or
- Extreme financial hardship.[30]

The 2010 fee rule also authorized the USCIS Director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c).[31]

While USCIS tracks some fee waiver data (such as request, approval, and denial volumes) fees waived for biometric services are not adequately collected and are underreported in financial estimates. Additionally, USCIS fee waiver data lacks the granularity necessary to identify waived fee amounts for forms with multiple filing fees. To estimate the dollar value of approved fee waiver requests, USCIS applies the higher fee in these cases. USCIS calculates these estimates by multiplying the approved fee waiver volume for a particular form by the form filing fee.[32] Appendix Figure 3 is a historical summary of USCIS fee waiver information.

### Appendix Figure 3: Historical Fee Waiver Summary



---

[29] *See* 8 CFR 103.7(c). *See also* Policy Memorandum, PM-602-0011.1 "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11-26" (March 13, 2011) ("Fee Waiver Policy").

[30] For detailed fee waiver guidance, visit https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver.

[31] *See* 75 FR 58990; 8 CFR 103.7(d).

[32] Since USCIS includes a projection for fee waivers/fee exemptions when setting its fees to recover full cost, it does not forgo revenue unless the total dollar amount of actual fee waivers/fee exemptions exceeds the projected amount that was included in the fee setting process. The dollar amount of actual fee waivers/fee exemptions in excess of the projected amount included in the fee setting process is considered foregone revenue.

# APPENDIX VI – PROJECTED TOTAL COST BY IMMIGRATION BENEFIT REQUEST

USCIS uses specialized software to estimate the total cost for each of the cost objects below. See the Activity-Based Cost (ABC) Model section for more information. Total cost represents a portion of direct and indirect costs. USCIS divides the total cost by fee-paying receipts to determine a fee-paying unit cost. The fee-paying unit cost informs the USCIS fee schedule. Appendix Table 3 lists all cost objects in the ABC model, including workloads without fees.

This table also includes total cost and fee-paying receipt estimates from CBP. As stated in the proposed rule, CBP provided cost information for Forms I-192 and I-193.[33] The table also includes CBP fee-paying receipt forecasts for Forms I-192, I-193, I-212, and I-824.

These are only estimates. They are not prior year actual expenses. USCIS does not track actual costs by immigration benefit request. Each fee review uses forecasts for two future years. These include budget and workload forecasts. As such, actual cost information is not available at the time for those future years. USCIS has considered using activity-based costing models based on prior year obligations and workloads for individual fiscal years. However, due to resource constraints, USCIS has not created an ABC model using actuals because the prospective fee review that is required by the CFO Act takes priority.

Model Output is the projected cost from the ABC model divided by projected fee-paying volume. It is only a unit cost forecast (using a budget forecast) and not the actual unit cost (using prior year actual expenses).

While this table includes a row for the Asylum Program Fee, it was not part of the ABC model. The ABC model did not include costs associated with the Asylum Processing IFR.

**Appendix Table 3: Projected Total Cost by Immigration Benefit Request**

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card Subtotal | $170,581,086 | 648,758 | $263 |
| I-90 Application to Replace Permanent Resident Card – Online | $104,101,008 | 409,622 | $254 |
| I-90 Application to Replace Permanent Resident Card – Paper | $66,480,078 | 239,136 | $278 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $1,909,542 | 4,623 | $413 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $293,671,905 | 568,630 | $516 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $25,082,952 | 40,850 | $614 |
| I-129 H-1B - Named Beneficiaries | $211,740,531 | 430,000 | $492 |
| I-129 H-2A - Named Beneficiaries | $2,262,576 | 4,020 | $563 |

---

[33] See 88 FR 402, 513-515.

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| I-129 H-2B - Named Beneficiaries | $1,621,519 | 2,460 | $659 |
| I-129 L | $29,697,188 | 42,350 | $701 |
| I-129 O | $17,511,647 | 27,300 | $641 |
| I-129 H-2A - Unnamed Beneficiaries | $4,476,452 | 17,650 | $254 |
| I-129 H-2B - Unnamed Beneficiaries | $1,279,041 | 4,000 | $320 |
| I-129F Petition for Alien Fiance(e) | $15,317,423 | 41,432 | $370 |
| I-130 Petition for Alien Relative Subtotal | $425,465,438 | 855,493 | $497 |
| I-130 Petition for Alien Relative - Online | $101,689,676 | 214,232 | $475 |
| I-130 Petition for Alien Relative - Paper | $323,775,761 | 641,261 | $505 |
| I-131 Application for Travel Document | $97,449,465 | 252,721 | $386 |
| I-131 Refugee Travel Document | $8,860,969 | 17,416 | $509 |
| I-131A Application for Travel Document (Carrier Documentation) | $2,700,513 | 8,000 | $338 |
| I-140 Immigrant Petition for Alien Worker | $70,605,812 | 140,000 | $504 |
| I-290B Notice of Appeal or Motion | $44,049,114 | 32,067 | $1,374 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $32,788,997 | 4,107 | $7,984 |
| I-407 Abandonment of Lawful Permanent Resident Status | $31,347 | 0 | N/A |
| I-485 Application to Register Permanent Residence or Adjust Status | $552,754,543 | 558,291 | $990 |
| I-526 Immigrant Petition by Alien Investor | $30,326,274 | 4,050 | $7,488 |
| I-539 Application to Extend/Change Nonimmigrant Status | $171,783,585 | 462,380 | $372 |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $65,789,557 | 185,912 | $354 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $105,994,028 | 276,468 | $383 |
| I-589 Application for Asylum and for Withholding of Removal | $263,958,168 | 0 | N/A |
| I-590 Registration for Classification as Refugee | $156,930,495 | 0 | N/A |
| I-600/600A/800/800A Adoption Petitions and Applications | $3,152,523 | 2,438 | $1,293 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A | $36,478 | 29 | $1,258 |
| I-601A Provisional Unlawful Presence Waiver | $42,112,504 | 39,706 | $1,061 |
| I-604 Determination on Child for Adoption | $357,317 | 0 | N/A |
| I-687 Application for Status as a Temporary Resident | $806 | 1 | $806 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $13,069 | 21 | $622 |
| I-694 Notice of Appeal of Decision | $2,990 | 4 | $748 |

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $20,453 | 20 | $1,023 |
| I-730 Refugee/Asylee Relative Position (and Travel Eligibility) | $16,102,672 | 0 | N/A |
| I-751 Petition to Remove Conditions on Residence | $97,795,662 | 130,272 | $751 |
| I-765 Application for Employment Authorization | $432,554,385 | 1,060,746 | $408 |
| I-765 Application for Employment Authorization - Online | $14,763,351 | 39,925 | $370 |
| I-765 Application for Employment Authorization - Paper | $417,791,034 | 1,020,821 | $409 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $588,353 | 134 | $4,391 |
| I-817 Application for Family Unity Benefits | $227,995 | 505 | $451 |
| I-824 Application for Action on an Approved Application or Petition | $4,273,111 | 10,292 | $415 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $17,466,435 | 4,500 | $3,881 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $821,048 | 385 | $2,133 |
| I-910 Application for Civil Surgeon Designation | $470,859 | 568 | $829 |
| I-914 T Nonimmigrant Status | $3,290,742 | 0 | N/A |
| I-918 U Nonimmigrant Status | $69,214,411 | 0 | N/A |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $623,428 | 0 | N/A |
| I-956 Application for Regional Center Designation[34] | $14,059,092 | 1,000 | $14,060 |
| I-956G Regional Center Annual Statement | $673,573 | 875 | $770 |
| N-300 Application to File Declaration of Intention | $11,489 | 17 | $676 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | $6,497,783 | 5,137 | $1,265 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $2,167,494 | 1,740 | $1,246 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $4,330,289 | 3,397 | $1,275 |
| N-400 Application for Naturalization | $638,458,672 | 572,486 | $1,115 |
| N-400 Application for Naturalization – Online | $343,619,201 | 313,165 | $1,097 |
| N-400 Application for Naturalization – Paper | $294,839,470 | 259,321 | $1,137 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $175,411 | 138 | $1,271 |
| N-565 Application for Replacement Naturalization/Citizenship Document | $9,261,334 | 21,508 | $431 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $5,609,092 | 13,331 | $421 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $3,652,241 | 8,177 | $447 |

[34] Formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program. This rule sets the same fee for Forms I-956 and I-956F. This table, and other tables in this appendix, combines information for both Forms I-956 and I-956F.

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| N-600 Application for Certificate of Citizenship Subtotal | $19,461,879 | 14,107 | $1,380 |
| N-600 Application for Certificate of Citizenship - Online | $6,378,143 | 5,414 | $1,178 |
| N-600 Application for Certificate of Citizenship - Paper | $13,083,736 | 8,693 | $1,505 |
| N-600K Application for Citizenship and Issuance of Certificate Subtotal | $2,518,651 | 2,895 | $870 |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $1,080,540 | 1,273 | $849 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $1,438,112 | 1,622 | $887 |
| N-644 Application for Posthumous Citizenship | $0 | 0 | N/A |
| H-1B Registration Fee | $50,035,002 | 424,400 | $118 |
| USCIS Immigrant Fee | $62,400,873 | 543,000 | $115 |
| Waiver Form Subtotal | $68,993,305 | 11,065 | $6,235 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $62,333 | 111 | $562 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $24,303,092 | 10,954 | $2,219 |
| I-193 Application for Waiver of Passport and/or Visa | $19,478,828 | 6,772 | $2,876 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $6,667,807 | 7,178 | $929 |
| I-601 Application for Waiver of Ground of Inadmissibility | $16,028,908 | 18,310 | $875 |
| I-602 Application by Refugee for Waiver of Grounds of Inadmissibility | $54,117 | 0 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $2,398,219 | 554 | $4,329 |
| Certificate of Existence | $1,143,761 | 4,103 | $279 |
| G-1041 Genealogy Index Search Request Subtotal | $934,362 | 10,994 | $85 |
| G-1041 Genealogy Index Search Request – Online | $870,050 | 10,380 | $84 |
| G-1041 Genealogy Index Search Request – Paper | $64,312 | 614 | $105 |
| G-1041A Genealogy Records Request Subtotal | $667,904 | 3,301 | $202 |
| G-1041A Genealogy Records Request – Online | $627,039 | 3,117 | $201 |
| G-1041A Genealogy Records Request – Paper | $40,865 | 184 | $222 |
| Auto Cert Citz (No Fee) | $1,114,897 | 0 | N/A |
| Credible Fear | $148,807,487 | 0 | N/A |
| DNA Collection | $480,864 | 0 | N/A |
| Overseas Verifications | $376,634 | 0 | N/A |

| Cost Object | Total Cost | Fee-Paying Receipts | Model Output |
|---|---|---|---|
| Reasonable Fear | $30,410,491 | 0 | N/A |
| SAVE reimbursable workload | $48,091,685 | N/A | N/A |
| **Subtotal** | $4,132,885,951 | 7,350,919 | $562 |
| Asylum Program Fee | $312,921,300 | N/A | N/A |
| **Total (USCIS and CBP)** | $4,445,807,251 | | |
| USCIS Only Subtotal without Asylum Program Fee | $4,111,109,639 | | |

# APPENDIX VII – ACTIVITY UNIT COSTS BY IMMIGRATION BENEFIT REQUEST

The tables in this section provide more detail on the total cost and unit costs from the ABC model results. Each table provides unit costs by cost object and activity. The total costs are the same as in Appendix Table 3. To provide unit costs by cost object and activity, we divide total cost by different divisors.

There may be some variation between Appendix Table 4 and Appendix Table 5 because they use two different divisors. Appendix Table 4 divides the total cost by projected fee-paying receipts to calculate the model output by activity. Fee-paying receipts are a subset of total workload when not everyone pays the fee.[35] In other words, if an immigration benefit request allows for fee waivers and exceptions, then unit costs will be higher in Appendix Table 4 than in Appendix Table 5. For example, Form I-129 costs in both tables are largely the same. This is because, except for some Form I-129CW fee waivers, Form I-129 petitioners and applicants should always pay the fees. Form I-90 varies between the two tables because of fee waivers and exemptions. Both workloads are processed by SCOPS and the ABC model reflects their contributions to the activity unit costs. If a workload has high rates of approved fee waivers or fee exemptions, then there may be significant differences between Appendix Table 4 and Appendix Table 5. For example, we estimate that approximately 65% of Form I-765 workload is fee-paying. The unit cost for Form I-765 in Appendix Table 4 is significantly higher than in Appendix Table 5 because of fee waivers and exemptions. In other words, when an immigration benefit request is fee waivable or fee-exempt, it increases unit costs based on fee-paying receipts. In cases where an immigration benefit request is fee waivable or fee-exempt, the requester would pay more than the unit cost based on workload unless DHS manually intervenes in the fee schedule calculation.

This table also includes total cost and fee-paying receipt estimates from CBP. As stated in the proposed rule, CBP provided cost information for Forms I-192 and I-193. The table also includes CBP fee-paying receipt forecasts for Forms I-192, I-193, I-212, and I-824. CBP cost information was not part of the USCIS ABC model. However, we added it to the Direct Costs column in the tables below. Additionally, Appendix Table 4 and Appendix Table 5 do not include costs associated with the Asylum Processing IFR because the Asylum Program fee was not part of the ABC model.

**Appendix Table 4: USCIS Fee-Paying Unit Cost by Activity**

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-90 Application to Replace Permanent Resident Card Subtotal** | **$263** | **$4** | **$3** | **$13** | **$28** | **$9** | **$14** | **$35** | **$86** | **$54** | **$16** |
| I-90 Application to Replace Permanent Resident Card - Online | $254 | $4 | $3 | $13 | $28 | $0 | $14 | $35 | $86 | $54 | $16 |
| I-90 Application to Replace Permanent Resident Card - Paper | $278 | $4 | $3 | $13 | $28 | $24 | $14 | $35 | $86 | $54 | $16 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $413 | $22 | $0 | $26 | $36 | $29 | $0 | $184 | $86 | $0 | $29 |
| **I-129 Petition for a Nonimmigrant Worker Subtotal** | **$516** | **$16** | **$13** | **$22** | **$32** | **$6** | **$0** | **$326** | **$76** | **$0** | **$25** |
| I-129 H-1B – Named Beneficiaries | $492 | $17 | $8 | $22 | $32 | $6 | $0 | $305 | $77 | $0 | $24 |

[35] See section V.B.1 Volume in the proposed rule for more information on the distinction between workload and fee-paying volume and how we estimated each. 88 FR 402, 432.

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-129 H-2A – Named Beneficiaries | $563 | $8 | $0 | $23 | $29 | $7 | $0 | $395 | $76 | $0 | $25 |
| I-129 H-2B – Named Beneficiaries | $659 | $15 | $0 | $24 | $33 | $7 | $0 | $477 | $76 | $0 | $26 |
| I-129 L1A/L1B/LZ Blanket | $701 | $12 | $24 | $22 | $30 | $7 | $0 | $508 | $76 | $0 | $25 |
| I-129 O1/O2 | $641 | $15 | $0 | $24 | $34 | $7 | $0 | $459 | $77 | $0 | $26 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $614 | $15 | $69 | $24 | $34 | $7 | $0 | $362 | $77 | $0 | $26 |
| I-129 H-2A – Unnamed Beneficiaries | $254 | $0 | $0 | $0 | $29 | $7 | $0 | $117 | $76 | $0 | $25 |
| I-129 H-2B – Unnamed Beneficiaries | $320 | $0 | $0 | $0 | $33 | $7 | $0 | $177 | $76 | $0 | $26 |
| I-129F Petition for Alien Fiance(e) | $370 | $9 | $0 | $25 | $32 | $30 | $0 | $163 | $83 | $0 | $27 |
| **I-130 Petition for Alien Relative Subtotal** | **$497** | **$12** | **$1** | **$47** | **$43** | **$21** | **$0** | **$258** | **$84** | **$0** | **$31** |
| I-130 Petition for Alien Relative - Online | $475 | $12 | $0 | $45 | $42 | $0 | $0 | $261 | $84 | $0 | $29 |
| I-130 Petition for Alien Relative - Paper | $505 | $12 | $2 | $47 | $43 | $28 | $0 | $257 | $84 | $0 | $32 |
| I-131 Application for Travel Document | $386 | $30 | $1 | $35 | $40 | $33 | $3 | $87 | $110 | $12 | $36 |
| I-131 Refugee Travel Document | $509 | $37 | $0 | $31 | $48 | $36 | $18 | $127 | $111 | $70 | $30 |
| I-131A Application for Travel Document (Carrier Documentation) | $338 | $0 | $329 | $0 | $0 | $0 | $0 | $0 | $9 | $0 | $0 |
| I-140 Immigrant Petition for Alien Worker | $504 | $21 | $0 | $21 | $32 | $16 | $0 | $314 | $77 | $0 | $23 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $562 | $0 | $0 | $0 | $37 | $6 | $0 | $401 | $89 | $11 | $18 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $2,219 | $79 | $211 | $78 | $119 | $20 | $0 | $1,261 | $254 | $117 | $79 |
| I-193 Application for Waiver of Passport and/or Visa | $2,876 | $0 | $2,874 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $918 | $23 | $0 | $76 | $63 | $36 | $0 | $551 | $127 | $0 | $42 |
| I-290B Notice of Appeal or Motion | $1,374 | $54 | $0 | $80 | $56 | $29 | $0 | $1,010 | $104 | $0 | $41 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $7,984 | $233 | $105 | $285 | $316 | $278 | $0 | $5,593 | $894 | $2 | $278 |
| I-485 Application to Register Permanent Residence or Adjust Status | $990 | $8 | $3 | $91 | $63 | $30 | $13 | $560 | $98 | $82 | $42 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $7,488 | $0 | $0 | $1,034 | $143 | $21 | $0 | $4,570 | $1,533 | $0 | $187 |
| **I-539 Application to Extend/Change Nonimmigrant Status Subtotal** | **$372** | **$17** | **$0** | **$22** | **$33** | **$17** | **$0** | **$156** | **$78** | **$24** | **$25** |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $354 | $17 | $0 | $22 | $33 | $0 | $0 | $156 | $78 | $24 | $24 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $383 | $17 | $0 | $22 | $33 | $28 | $0 | $156 | $78 | $24 | $26 |
| I-600/600A/800/800A Adoption Petitions and Applications | $1,293 | $37 | $90 | $43 | $44 | $40 | $0 | $785 | $144 | $59 | $51 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A | $1,258 | $48 | $0 | $58 | $58 | $8 | $0 | $833 | $186 | $0 | $67 |
| I-601 Application for Waiver of Ground of Inadmissibility | $875 | $20 | $0 | $48 | $43 | $27 | $0 | $617 | $91 | $0 | $29 |
| I-601A Provisional Unlawful Presence Waiver | $1,061 | $21 | $0 | $20 | $32 | $26 | $0 | $804 | $79 | $55 | $25 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $4,329 | $291 | $0 | $332 | $504 | $105 | $0 | $1,715 | $1,024 | $0 | $358 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | $806 | $23 | $0 | $27 | $27 | $4 | $0 | $603 | $89 | $0 | $32 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $622 | $22 | $0 | $27 | $28 | $25 | $0 | $402 | $88 | $1 | $31 |
| I-694 Notice of Appeal of Decision | $748 | $23 | $0 | $27 | $27 | $25 | $0 | $524 | $89 | $0 | $32 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,023 | $23 | $3 | $27 | $27 | $25 | $12 | $784 | $89 | $0 | $32 |
| I-751 Petition to Remove Conditions on Residence | $751 | $16 | $3 | $50 | $46 | $32 | $14 | $416 | $98 | $41 | $34 |
| **I-765 Application for Employment Authorization Subtotal** | **$408** | **$29** | **$5** | **$35** | **$46** | **$36** | **$19** | **$70** | **$127** | **$1** | **$40** |
| I-765 Application for Employment Authorization - Online | $370 | $29 | $5 | $35 | $46 | $0 | $19 | $70 | $127 | $1 | $38 |
| I-765 Application for Employment Authorization - Paper | $409 | $29 | $5 | $35 | $46 | $38 | $19 | $70 | $127 | $1 | $40 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $4,391 | $161 | $0 | $189 | $190 | $174 | $0 | $2,839 | $617 | $0 | $221 |
| I-817 Application for Family Unity Benefits | $451 | $17 | $3 | $22 | $31 | $28 | $12 | $185 | $79 | $48 | $25 |
| I-824 Application for Action on an Approved Application or Petition | $415 | $19 | $0 | $32 | $34 | $27 | $0 | $191 | $85 | $0 | $28 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $3,881 | $0 | $165 | $271 | $37 | $21 | $12 | $2,901 | $402 | $23 | $49 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $2,133 | $359 | $0 | $308 | $77 | $17 | $0 | $332 | $903 | $0 | $137 |
| I-910 Application for Civil Surgeon Designation | $829 | $0 | $380 | $0 | $27 | $25 | $0 | $276 | $89 | $0 | $32 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| I-956F Application for Regional Center Designation | $14,060 | $0 | $0 | $224 | $43 | $10 | $0 | $13,364 | $370 | $0 | $49 |
| I-956G Regional Center Annual Statement | $770 | $0 | $0 | $271 | $37 | $10 | $0 | $0 | $402 | $0 | $49 |
| N-300 Application to File Declaration of Intention | $676 | $18 | $0 | $44 | $35 | $25 | $0 | $414 | $90 | $14 | $34 |
| **N-336 Request for Hearing on a Decision in Naturalization Proceedings Subtotal** | **$1,265** | **$4** | **$0** | **$114** | **$76** | **$19** | **$0** | **$908** | **$111** | **$2** | **$30** |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $1,246 | $4 | $0 | $114 | $76 | $0 | $0 | $908 | $111 | $2 | $30 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $1,275 | $4 | $0 | $114 | $76 | $29 | $0 | $908 | $111 | $2 | $30 |
| **N-400 Application for Naturalization Subtotal** | **$1,115** | **$5** | **$9** | **$136** | **$94** | **$19** | **$0** | **$548** | **$135** | **$107** | **$62** |
| N-400 Application for Naturalization - Online | $1,097 | $5 | $9 | $137 | $95 | $0 | $0 | $547 | $135 | $107 | $62 |
| N-400 Application for Naturalization - Paper | $1,137 | $5 | $9 | $136 | $94 | $41 | $0 | $550 | $134 | $106 | $62 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $1,271 | $4 | $0 | $95 | $65 | $29 | $0 | $940 | $94 | $1 | $43 |
| **N-565 Application for Replacement Naturalization/Citizenship Document Subtotal** | **$431** | **$32** | **$0** | **$27** | **$42** | **$10** | **$0** | **$197** | **$97** | **$0** | **$26** |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $421 | $32 | $0 | $27 | $42 | $0 | $0 | $197 | $97 | $0 | $26 |
| N-565 Application for Replacement Naturalization/Citizenship Document – Paper | $447 | $32 | $0 | $27 | $42 | $26 | $0 | $197 | $96 | $0 | $26 |
| **N-600 Application for Certificate of Citizenship Subtotal** | **$1,380** | **$6** | **$0** | **$235** | **$130** | **$40** | **$0** | **$680** | **$199** | **$0** | **$90** |
| N-600 Application for Certificate of Citizenship - Online | $1,178 | $5 | $0 | $207 | $114 | $0 | $0 | $598 | $175 | $0 | $79 |
| N-600 Application for Certificate of Citizenship – Paper | $1,505 | $6 | $0 | $253 | $139 | $65 | $0 | $731 | $214 | $0 | $97 |
| **N-600K Application for Citizenship and Issuance of Certificate Subtotal** | **$870** | **$4** | **$0** | **$149** | **$82** | **$21** | **$0** | **$431** | **$126** | **$0** | **$57** |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $849 | $4 | $0 | $149 | $82 | $0 | $0 | $431 | $126 | $0 | $57 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $887 | $4 | $0 | $149 | $82 | $38 | $0 | $431 | $126 | $0 | $57 |
| USCIS Immigrant Fee | $115 | $0 | $4 | $0 | $20 | $0 | $12 | $0 | $65 | $0 | $14 |
| H-1B Registration Fee | $118 | $0 | $0 | $0 | $27 | $0 | $0 | $0 | $71 | $0 | $20 |

Appendix Table 5 divides total cost by projected receipts. If an immigration benefit request allows fee waivers or exemptions, then the unit costs in this table will be lower than in the previous table.

**Appendix Table 5: USCIS Activity Unit Costs Per Projected Receipt**

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-90 Application to Replace Permanent Resident Card Subtotal** | **$231** | **$4** | **$3** | **$11** | **$25** | **$8** | **$12** | **$31** | **$75** | **$47** | **$14** |
| I-90 Application to Replace Permanent Resident Card - Online | $223 | $4 | $3 | $11 | $25 | $0 | $12 | $31 | $75 | $47 | $14 |
| I-90 Application to Replace Permanent Resident Card – Paper | $244 | $4 | $3 | $11 | $25 | $21 | $12 | $31 | $75 | $47 | $14 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $380 | $20 | $0 | $24 | $33 | $27 | $0 | $170 | $79 | $0 | $27 |
| **I-129 Petition for a Nonimmigrant Worker Subtotal** | **$516** | **$16** | **$13** | **$22** | **$32** | **$6** | **$0** | **$326** | **$76** | **$0** | **$25** |
| I-129 H-1B – Named Beneficiaries | $492 | $17 | $8 | $22 | $32 | $6 | $0 | $305 | $77 | $0 | $24 |
| I-129 H-2A – Named Beneficiaries | $563 | $8 | $0 | $23 | $29 | $7 | $0 | $395 | $76 | $0 | $25 |
| I-129 H-2B – Named Beneficiaries | $659 | $15 | $0 | $24 | $33 | $7 | $0 | $477 | $76 | $0 | $26 |
| I-129 L | $701 | $12 | $24 | $22 | $30 | $7 | $0 | $508 | $76 | $0 | $25 |
| I-129 O | $641 | $15 | $0 | $24 | $34 | $7 | $0 | $459 | $77 | $0 | $26 |
| Form I-129CW, or Form I-129 for E & TN, H-3, P, Q, or R Classifications | $614 | $15 | $69 | $24 | $34 | $7 | $0 | $362 | $77 | $0 | $26 |
| I-129 H-2A – Unnamed Beneficiaries | $254 | $0 | $0 | $0 | $29 | $7 | $0 | $117 | $76 | $0 | $25 |
| I-129 H-2B – Unnamed Beneficiaries | $320 | $0 | $0 | $0 | $33 | $7 | $0 | $177 | $76 | $0 | $26 |
| I-129F Petition for Alien Fiance(e) | $343 | $9 | $0 | $23 | $30 | $28 | $0 | $151 | $77 | $0 | $25 |
| **I-130 Petition for Alien Relative Subtotal** | **$483** | **$11** | **$1** | **$45** | **$42** | **$21** | **$0** | **$251** | **$81** | **$0** | **$30** |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-130 Petition for Alien Relative - Online | $462 | $12 | $0 | $44 | $41 | $0 | $0 | $254 | $82 | $0 | $28 |
| I-130 Petition for Alien Relative - Paper | $490 | $11 | $1 | $46 | $42 | $28 | $0 | $249 | $81 | $0 | $31 |
| I-131 Application for Travel Document | $296 | $23 | $1 | $27 | $31 | $25 | $2 | $67 | $84 | $9 | $27 |
| I-131 Refugee Travel Document | $509 | $37 | $0 | $31 | $48 | $36 | $18 | $127 | $111 | $70 | $30 |
| I-131A Application for Travel Document (Carrier Documentation) | $338 | $0 | $329 | $0 | $0 | $0 | $0 | $0 | $9 | $0 | $0 |
| I-140 Immigrant Petition for Alien Worker | $504 | $21 | $0 | $21 | $32 | $16 | $0 | $314 | $77 | $0 | $23 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $562 | $0 | $0 | $0 | $37 | $6 | $0 | $401 | $89 | $11 | $18 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | $586 | $21 | $56 | $21 | $31 | $5 | $0 | $333 | $67 | $31 | $21 |
| I-193 Application for Waiver of Passport and/or Visa | $2,858 | $0 | $2,856 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $624 | $16 | $0 | $52 | $43 | $25 | $0 | $374 | $86 | $0 | $28 |
| I-290B Notice of Appeal or Motion | $1,209 | $47 | $0 | $70 | $49 | $26 | $0 | $889 | $91 | $0 | $37 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | $762 | $22 | $10 | $27 | $30 | $27 | $0 | $534 | $85 | $0 | $27 |
| I-485 Application to Register Permanent Residence or Adjust Status | $908 | $7 | $3 | $83 | $58 | $28 | $12 | $513 | $90 | $75 | $38 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $7,488 | $0 | $0 | $1,034 | $143 | $21 | $0 | $4,570 | $1,533 | $0 | $187 |
| **I-539 Application to Extend/Change Nonimmigrant Status Subtotal** | **$364** | **$16** | **$0** | **$22** | **$32** | **$16** | **$0** | **$153** | **$77** | **$23** | **$24** |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | $347 | $16 | $0 | $22 | $32 | $0 | $0 | $153 | $77 | $23 | $23 |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | $376 | $16 | $0 | $22 | $32 | $27 | $0 | $153 | $77 | $23 | $25 |
| I-600/600A/800/800A Adoption Petitions and Applications | $709 | $20 | $49 | $24 | $24 | $22 | $0 | $430 | $79 | $32 | $28 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A | $608 | $23 | $0 | $28 | $28 | $4 | $0 | $402 | $90 | $0 | $32 |
| I-601 Application for Waiver of Ground of Inadmissibility | $812 | $18 | $0 | $44 | $40 | $25 | $0 | $572 | $84 | $0 | $27 |
| I-601A Provisional Unlawful Presence Waiver | $1,058 | $21 | $0 | $20 | $32 | $26 | $0 | $802 | $79 | $54 | $25 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $326 | $22 | $0 | $25 | $38 | $8 | $0 | $129 | $77 | $0 | $27 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | $806 | $23 | $0 | $27 | $27 | $4 | $0 | $603 | $89 | $0 | $32 |
| I-690 Application for Waiver of Grounds of Inadmissibility | $622 | $22 | $0 | $27 | $28 | $25 | $0 | $402 | $88 | $1 | $31 |
| I-694 Notice of Appeal of Decision | $748 | $23 | $0 | $27 | $27 | $25 | $0 | $524 | $89 | $0 | $32 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,023 | $23 | $3 | $27 | $27 | $25 | $12 | $784 | $89 | $0 | $32 |
| I-751 Petition to Remove Conditions on Residence | $635 | $14 | $3 | $43 | $39 | $27 | $12 | $352 | $83 | $35 | $28 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-765 Application for Employment Authorization Subtotal** | **$260** | **$18** | **$3** | **$22** | **$29** | **$23** | **$12** | **$45** | **$81** | **$0** | **$26** |
| I-765 Application for Employment Authorization - Online | $235 | $19 | $3 | $22 | $29 | $0 | $12 | $45 | $81 | $0 | $24 |
| I-765 Application for Employment Authorization - Paper | $261 | $18 | $3 | $22 | $29 | $24 | $12 | $45 | $81 | $0 | $26 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | $631 | $23 | $0 | $27 | $27 | $25 | $12 | $408 | $89 | $0 | $32 |
| I-817 Application for Family Unity Benefits | $441 | $17 | $3 | $22 | $31 | $27 | $12 | $181 | $77 | $47 | $25 |
| I-824 Application for Action on an Approved Application or Petition | $402 | $18 | $0 | $31 | $33 | $26 | $0 | $185 | $82 | $0 | $27 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | $3,881 | $0 | $165 | $271 | $37 | $21 | $12 | $2,901 | $402 | $23 | $49 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | $2,133 | $359 | $0 | $308 | $77 | $17 | $0 | $332 | $903 | $0 | $137 |
| I-910 Application for Civil Surgeon Designation | $829 | $0 | $380 | $0 | $27 | $25 | $0 | $276 | $89 | $0 | $32 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $542 | $0 | $0 | $0 | $38 | $8 | $0 | $391 | $77 | $0 | $27 |
| I-956 Application for Regional Center Designation | $14,060 | $0 | $0 | $224 | $43 | $10 | $0 | $13,364 | $370 | $0 | $49 |
| I-956G Regional Center Annual Statement | $770 | $0 | $0 | $271 | $37 | $10 | $0 | $0 | $402 | $0 | $49 |
| N-300 Application to File Declaration of Intention | $676 | $18 | $0 | $44 | $35 | $25 | $0 | $414 | $90 | $14 | $34 |
| **N-336 Request for Hearing on a Decision in Naturalization Proceedings Subtotal** | **$1,058** | **$4** | **$0** | **$95** | **$64** | **$16** | **$0** | **$760** | **$93** | **$2** | **$25** |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Online | $1,042 | $4 | $0 | $95 | $64 | $0 | $0 | $760 | $93 | $2 | $25 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings - Paper | $1,067 | $4 | $0 | $95 | $64 | $24 | $0 | $760 | $93 | $2 | $25 |
| **N-400 Application for Naturalization Subtotal** | **$768** | **$4** | **$6** | **$94** | **$65** | **$13** | **$0** | **$378** | **$93** | **$73** | **$43** |
| N-400 Application for Naturalization - Online | $753 | $4 | $6 | $94 | $65 | $0 | $0 | $375 | $93 | $73 | $43 |
| N-400 Application for Naturalization - Paper | $786 | $4 | $6 | $94 | $65 | $28 | $0 | $380 | $93 | $73 | $43 |
| N-470 Application to Preserve Residence for Naturalization Purposes | $1,271 | $4 | $0 | $95 | $65 | $29 | $0 | $940 | $94 | $1 | $43 |
| **N-565 Application for Replacement Naturalization/Citizenship Document Subtotal** | **$344** | **$26** | **$0** | **$22** | **$33** | **$8** | **$0** | **$157** | **$77** | **$0** | **$21** |
| N-565 Application for Replacement Naturalization/Citizenship Document - Online | $336 | $26 | $0 | $22 | $33 | $0 | $0 | $157 | $77 | $0 | $21 |
| N-565 Application for Replacement Naturalization/Citizenship Document - Paper | $357 | $26 | $0 | $22 | $33 | $21 | $0 | $157 | $77 | $0 | $21 |
| **N-600 Application for Certificate of Citizenship Subtotal** | **$649** | **$3** | **$0** | **$111** | **$61** | **$19** | **$0** | **$320** | **$93** | **$0** | **$42** |
| N-600 Application for Certificate of Citizenship - Online | $630 | $3 | $0 | $111 | $61 | $0 | $0 | $320 | $93 | $0 | $42 |

| Immigration Benefit Request | Total | Conduct TECS Check | Direct Costs | Fraud Detection and Prevention | Inform the Public | Intake | Issue Document | Make Determination | Management and Oversight | Perform Biometric Services | Records Management |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N-600 Application for Certificate of Citizenship - Paper | $658 | $3 | $0 | $111 | $61 | $28 | $0 | $320 | $93 | $0 | $42 |
| **N-600K Application for Citizenship and Issuance of Certificate Subtotal** | **$646** | **$3** | **$0** | **$111** | **$61** | **$16** | **$0** | **$320** | **$93** | **$0** | **$42** |
| N-600K Application for Citizenship and Issuance of Certificate - Online | $630 | $3 | $0 | $111 | $61 | $0 | $0 | $320 | $93 | $0 | $42 |
| N-600K Application for Citizenship and Issuance of Certificate - Paper | $658 | $3 | $0 | $111 | $61 | $28 | $0 | $320 | $93 | $0 | $42 |
| USCIS Immigrant Fee | $115 | $0 | $4 | $0 | $20 | $0 | $12 | $0 | $65 | $0 | $14 |
| H-1B Registration Fee | $118 | $0 | $0 | $0 | $27 | $0 | $0 | $0 | $71 | $0 | $20 |

Appendix Table 6 divides the total cost for genealogy, record, and verification requests by receipts. We provide a separate table for these requests because they use different activities than in the previous tables. We provide only one table because these requests are not fee waivable or fee exempt. As such, there is no reason to show two different divisors because receipts are equal to fee-paying receipts for these requests.

### Appendix Table 6: USCIS Activity Unit Costs for Genealogy, Records, and Verifications

| Genealogy, Records, and Verifications | Total | Intake | Certify Nonexistence | Research Genealogy | Systematic Alien Verification for Entitlements |
|---|---|---|---|---|---|
| Certificate of Non-Existence | $279 | $0 | $279 | $0 | $0 |
| **G-1041 Genealogy Index Search Request Subtotal** | | | | | |
| G-1041 Genealogy Index Search Request - Online | $84 | $0 | $0 | $84 | $0 |
| G-1041 Genealogy Index Search Request – Paper | $105 | $21 | $0 | $84 | $0 |
| **G-1041A Genealogy Records Request Subtotal** | | | | | |
| G-1041A Genealogy Records Request – Online | $201 | $0 | $0 | $201 | $0 |
| G-1041A Genealogy Records Request - Paper | $222 | $21 | $0 | $201 | $0 |
| SAVE Initial Electronic Queries | $2 | $0 | $0 | $0 | $2 |

# APPENDIX VIII –IEFA NON-PREMIUM POSITIONS BY USCIS OFFICE

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. Appendix Table 7 compares staffing estimates used in the FY 2016/2017 fee rule and this proposed rule. As noted elsewhere in this document and the final rule, the FY 2022/2023 fee review includes additional positions to support the Asylum Processing IFR and estimated workload.

**Appendix Table 7: IEFA Fee Review Staffing Estimates by Office**

| Directorate or Program Office | FY 2016/2017 | FY 2022/2023 | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 6,208 | 262 | 4% |
| Fraud Detection and National Security Directorate | 920 | 1,741 | 821 | 89% |
| Refugee Asylum and International Operations Directorate | 1,648 | 3,801 | 2,153 | 131% |
| Service Center Operations Directorate | 2,866 | 4,971 | 2,105 | 73% |
| External Affairs Directorate | 438 | 643 | 205 | 47% |
| Immigration Records and Identity Services Directorate | 666 | 779 | 113 | 17% |
| Management Directorate | 1,352 | 2,032 | 680 | 50% |
| Program Offices | 707 | 1,016 | 309 | 44% |
| Administrative Appeals | 133 | 93 | -40 | -30% |
| Chief Counsel | 251 | 343 | 92 | 37% |
| Chief Financial Officer | 97 | 148 | 51 | 53% |
| Director | 20 | 18 | -2 | -10% |
| Equal Opportunity and Inclusion | 24 | 32 | 8 | 33% |
| Executive Secretariat | 20 | 24 | 4 | 20% |
| Investigations | - | 103 | 103 | N/A |
| Performance and Quality | 42 | 95 | 53 | 126% |
| Policy and Strategy | 100 | 132 | 32 | 32% |
| Privacy | 20 | 28 | 8 | 40% |
| **USCIS Total** | **14,543** | **21,190** | **6,647** | **46%** |

USCIS tracks on-board positions in our personnel and payroll systems. Appendix Table 8 lists on-board permanent positions that were funded by the IEFA non-premium account in each fiscal year. It uses pay period 19, which is typically the last full pay period in a fiscal year. It excludes temporary positions and those funded from other sources, like premium processing and E-Verify.

**Appendix Table 8: IEFA Non-Premium On-Board Positions by Office and Fiscal Year**

| Directorate or Program Office | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 |
|---|---|---|---|---|---|---|---|
| Field Operations Directorate | 5,646 | 5,955 | 6,348 | 6,216 | 6,595 | 6,385 | 6,156 |
| Fraud Detection and National Security Directorate | 861 | 989 | 1,170 | 1,291 | 1,323 | 1,272 | 1,289 |
| Refugee Asylum and International Operations Directorate | 1,357 | 1,391 | 1,420 | 1,398 | 1,599 | 1,666 | 1,671 |
| Service Center Operations Directorate | 3,387 | 3,209 | 3,585 | 3,679 | 3,731 | 3,535 | 3,485 |
| External Affairs Directorate | 454 | 480 | 533 | 524 | 536 | 498 | 510 |
| Immigration Records and Identity Services | 581 | 608 | 633 | 642 | 633 | 633 | 691 |
| Management Directorate | 1,307 | 1,443 | 1,445 | 1,472 | 1,569 | 1,549 | 1,777 |
| Program Offices | 628 | 669 | 781 | 821 | 841 | 846 | 907 |
| Administrative Appeals | 101 | 92 | 94 | 95 | 101 | 93 | 83 |
| Chief Counsel | 248 | 271 | 285 | 305 | 304 | 320 | 345 |
| Chief Financial Officer | 91 | 103 | 116 | 112 | 118 | 132 | 142 |
| Equal Opportunity and Inclusion | 23 | 24 | 28 | 30 | 31 | 32 | 28 |
| Director | 18 | 7 | 11 | 15 | 10 | 7 | 17 |
| Executive Secretariat | 16 | 19 | 18 | 17 | 13 | 14 | 65 |
| Investigations | 0 | 0 | 72 | 60 | 53 | 54 | 19 |
| Performance and Quality | 35 | 52 | 43 | 61 | 67 | 73 | 66 |
| Policy and Strategy | 80 | 81 | 93 | 102 | 126 | 104 | 122 |
| Privacy | 16 | 20 | 21 | 24 | 18 | 17 | 20 |
| **USCIS Total** | **14,221** | **14,744** | **15,915** | **16,043** | **16,827** | **16,384** | **16,486** |

Appendix Figure 3 displays the same information as the previous table in stacked columns. We group some smaller offices together to simplify the graphic. Other Offices consists of External Affairs Directorate (EXA), Immigration Records and Identity Services (IRIS), and Program Offices in the previous table.

**Appendix Figure 3: IEFA Non-Premium On-Board Positions by Office and Fiscal Year**



# APPENDIX IX – OPERATIONAL METRICS IN THE FEE REVIEW

The IEFA fee review depends on various operational metrics to allocate the cost baseline to activities and then to cost objects. Operational metrics include workload volume and completion rates. The Methodology for the FY 2022/2023 Fee Review section of this document and the proposed rule explain how USCIS uses this information. This document repeats some tables from the proposed rule preamble. See section V.B. Methodology in the proposed rule for more information on how we determine these operational metrics and why some of them changed significantly.

Appendix Table 9 compares the average annual workload forecasts for the current fees compared to the forecasts for the final rule. The ABC model uses workload to calculate total costs. Values below are the average of two years, rounded to whole numbers. There may be slight differences because of rounding.

### Appendix Table 9: Workload Volume Comparison

| Immigration Benefit Request | Average Annual FY 2016/2017 Projected Workload Receipts | Average Annual FY 2022/2023 Final Rule Projected Workload Receipts | Difference |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card | 810,707 | 740,000 | -70,707 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 10,143 | 5,020 | -5,123 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | 432,156 | 568,630 | 136,474 |
| For H-1B | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L | N/A | 42,350 | N/A |
| For O | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 45,351.0 | 44,700 | -651 |
| I-130 Petition for Alien Relative | 911,349.0 | 880,900 | -30,449 |
| I-131/I-131A Application for Travel Document Subtotal | 256,622.0 | 354,416 | 97,794.0 |
| I-131 Application for Travel Document | N/A | 329,000 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Travel Document (Carrier Documentation) | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602.0 | 140,000 | 51,398.0 |
| I-290B Notice of Appeal or Motion | 24,706.0 | 36,423 | 11,717 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | 26,428 | 43,028 | 16,600 |
| I-485 Application to Register Permanent Residence or Adjust Status | 593,717 | 608,750 | 15,033 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 14,673 | 4,050 | -10,623 |
| I-539 Application to Extend/Change Nonimmigrant Status | 172,001 | 472,000 | 299,999 |
| I-600/600A; I-800/800A Adoption Petitions and Applications | 15,781 | 4,447 | -11,335 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 60 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 18 | 1 | -17 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 21 | 21 | 0 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence | 173,000 | 154,000 | -19,000 |

| Immigration Benefit Request | Average Annual FY 2016/2017 Projected Workload Receipts | Average Annual FY 2022/2023 Final Rule Projected Workload Receipts | Difference |
|---|---|---|---|
| I-765 Application for Employment Authorization | 747,825 | 1,666,500 | 918,675 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 1,585 | 933 | -653 |
| I-817 Application for Family Unity Benefits | 2,069 | 517 | -1,552 |
| I-824 Application for Action on an Approved Application or Petition | 10,921 | 10,621 | -300 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 4,500 | 938 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 575 | 1,150 | 575 |
| I-956 Application for Regional Center Designation[36] | 400 | 1,000 | 600 |
| I-956G Regional Center Annual Statement[37] | 882 | 875 | -7 |
| N-300 Application to File Declaration of Intention | 41 | 17 | -24 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 4,666 | 6,140 | 1,474 |
| N-400 Application for Naturalization | 830,673 | 826,000 | -4,673 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 362 | 138 | -224 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 28,914 | 26,900 | -2,014 |
| N-600/600K Naturalization Certificate Application Subtotal | 69,723 | 33,900 | -35,823 |
| N-600 Application for Certificate of Citizenship | N/A | 30,000 | N/A |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 3,900 | N/A |
| Inadmissibility Waiver Subtotal | 71,527 | 86,210 | 14,683 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 41,481 | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,815 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 10,693 | N/A |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | 19,750 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 7,360 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 424,400 | N/A |
| **Subtotal** | **5,870,989** | **7,782,322** | **1,448,483** |
| Biometric Services | 3,028,254 | N/A | N/A |
| **Total** | **8,899,243** | **7,782,322** | **-1,448,483** |

---

[36] Formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program. This rule sets the same fee for Forms I-956 and I-956F. This table combines the information for both Forms I-956 and I-956F.
[37] Formerly Form I-924A, Annual Certification of Regional Center.

Appendix Table 10 compares the average annual fee-paying forecasts for the current fees compared to the forecasts for the proposed rule. The fee schedule divides total costs by fee-paying forecasts to calculate the model output. Values below are the average of two years, rounded to whole numbers. There may be slight differences because of rounding.

### Appendix Table 4: Fee-Paying Projection Comparison

| Immigration Benefit Request | Average Annual FY 2016/2017 Fee Paying Projection | Average Annual FY 2022/2023 Final Rule Fee Paying Projection | Difference |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card | 718,163 | 648,758 | -69,405 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 9,499 | 4,623 | -4,876 |
| I-129 Petition for a Nonimmigrant Worker Subtotal | 427,778 | 568,630 | 140,852 |
| For H-1B | N/A | 430,000 | N/A |
| For H-2A - Named Beneficiaries | N/A | 4,020 | N/A |
| For H-2B - Named Beneficiaries | N/A | 2,460 | N/A |
| For L | N/A | 42,350 | N/A |
| For O | N/A | 27,300 | N/A |
| Form I-129CW, or Form I-129 for E or TN, H-3, P, Q, or R Classifications | N/A | 40,850 | N/A |
| H-2A - Unnamed Beneficiaries | N/A | 17,650 | N/A |
| H-2B - Unnamed Beneficiaries | N/A | 4,000 | N/A |
| I-129F Petition for Alien Fiancé(e) | 39,277 | 41,432 | 2,155 |
| I-130 Petition for Alien Relative | 907,512 | 857,514 | -49,999 |
| I-131/I-131A Application for Travel Document Subtotal | 194,461 | 279,078 | 84,617 |
| I-131 Application for Travel Document | N/A | 253,662 | N/A |
| I-131 Refugee Travel Document for an individual age 16 or older | N/A | 16,260 | N/A |
| I-131 Refugee Travel Document for a child under the age of 16 | N/A | 1,157 | N/A |
| I-131A Application for Travel Document (Carrier Documentation) | N/A | 8,000 | N/A |
| I-140 Immigrant Petition for Alien Worker | 88,602 | 140,000 | 51,398 |
| I-290B Notice of Appeal or Motion | 20,955 | 33,803 | 12,848 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | 8,961 | 4,107 | -4,854 |
| I-485 Application to Register Permanent Residence or Adjust Status | 473,336 | 572,497 | 99,161 |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 14,673 | 4,050 | -10,623 |
| I-539 Application to Extend/Change Nonimmigrant Status | 171,616 | 462,380 | 290,764 |
| I-600/600A; I-800/800A Orphan Petitions | 5,811 | 2,438 | -3,373 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | 29 | N/A |
| I-601A Provisional Unlawful Presence Waiver | 42,724 | 39,800 | -2,924 |
| I-687 Application for Status as a Temporary Resident | 0 | 1 | 1 |
| I-690 Application for Waiver of Grounds of Inadmissibility | 17 | 21 | 4 |
| I-694 Notice of Appeal of Decision | 39 | 4 | -35 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 20 | -71 |
| I-751 Petition to Remove Conditions on Residence | 162,533 | 130,274 | -32,260 |
| I-765 Application for Employment Authorization | 397,954 | 1,084,740 | 686,786 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | 746 | 448 | -298 |
| I-817 Application for Family Unity Benefits | 1,988 | 505 | -1,483 |
| I-824 Application for Action on an Approved Application or Petition | 10,828 | 10,292 | -536 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,562 | 4,500 | 938 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 385 | N/A |
| I-910 Application for Civil Surgeon Designation | 609 | 568 | -41 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | 257 | 0 | -257 |
| I-956 Application for Regional Center Designation | 400 | 1,000 | 600 |

| Immigration Benefit Request | Average Annual FY 2016/2017 Fee Paying Projection | Average Annual FY 2022/2023 Final Rule Fee Paying Projection | Difference |
|---|---|---|---|
| I-956G Regional Center Annual Statement | 882 | 875 | -7 |
| N-300 Application to File Declaration of Intention | 36 | 17 | -19 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 3,593 | 5,137 | 1,544 |
| N-400 Application for Naturalization | 631,655 | 693,820 | 56,465 |
| N-470 Application to Preserve Residence for Naturalization purposes | 360 | 138 | -222 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 23,491 | 21,508 | -1,983 |
| N-600/600K Naturalization Certificate Application Subtotal | 46,870 | 18,936 | -27,934 |
| N-600 Application for Certificate of Citizenship | N/A | 16,041 | N/A |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 2,895 | N/A |
| Inadmissibility Waiver Subtotal | 41,902 | 44,211 | 2,309 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 111 | N/A |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 10,954 | N/A |
| I-193 Application for Waiver of Passport and/or Visa | N/A | 6,772 | N/A |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 7,260 | N/A |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | 18,560 | N/A |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 554 | N/A |
| USCIS Immigrant Fee | 472,511 | 543,000 | 70,489 |
| G-1041 Genealogy Index Search Request | 3,605 | 10,994 | 7,389 |
| G-1041A Genealogy Records Request | 2,410 | 3,301 | 891 |
| Request for Certificate of Non-Existence | N/A | 4,103 | N/A |
| H-1B Registration Process | N/A | 424,400 | N/A |
| **Subtotal** | **4,929,707** | **6,662,338** | **1,098,167** |
| Biometric Services | 2,598,639 | N/A | N/A |
| **Grand Totals** | **7,528,346** | **6,662,338** | **-1,098,167** |

Appendix Table 11 shows average hours per completion, called completion rates. Completion rates are historic adjudication hours divided by completions or subject matter expert estimates. As an example, a value of 1.25 equals one hour and fifteen minutes. It represents average "touch time" for an adjudication. The ABC model uses completion rates to calculate total cost in some cases. See the section on <u>Activity Drivers and Activity Assignment</u> for more information.

**Appendix Table 5: Completion Rates per Benefit Request**

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| Credible Fear[38] | N/A | N/A | N/A | 3.68 | | |
| I-90 Application to Replace Permanent Resident Card | 0.22 | 0.21 | 0.19 | 0.15 | (0.06) | (28%) |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 0.36 | 0.48 | 0.77 | 0.84 | 0.35 | 72% |
| <u>I-129 Petition for a Nonimmigrant Worker Subtotal</u> | <u>0.51</u> | <u>0.83</u> | <u>1.07</u> | <u>1.73</u> | <u>0.89</u> | <u>107%</u> |
| I-129 H-1B | N/A | N/A | 1.10 | 1.53 | | |
| I-129 H-2A - Named Beneficiaries | N/A | N/A | 1.92 | 2.36 | | |
| I-129 H-2B - Named Beneficiaries | N/A | N/A | 2.00 | 2.33 | | |
| I-129 L1A/L1B/LZ Blanket | N/A | N/A | 2.23 | 3.57 | | |
| I-129 O1/O2 | N/A | N/A | 1.90 | 2.32 | | |
| I-129CW, I-129E&TN, and I-129MISC | N/A | N/A | 1.62 | 1.87 | | |
| I-129 H-2A - Unnamed Beneficiaries | N/A | N/A | 0.50 | 0.70 | | |
| I-129 H-2B - Unnamed Beneficiaries | N/A | N/A | 0.58 | 0.89 | | |
| I-129F Petition for Alien Fiance(e) | 0.41 | 0.65 | 0.67 | 0.91 | 0.26 | 41% |
| I-130 Petition for Alien Relative | 0.62 | 0.75 | 0.86 | 1.11 | 0.36 | 49% |
| I-131/I-131A Application for Travel Document | 0.16 | 0.23 | 0.25 | 0.29 | 0.06 | 24% |
| I-140 Immigrant Petition for Alien Worker | 1.13 | 1.68 | 1.46 | 1.41 | (0.27) | (16%) |
| I-290B Notice of Appeal or Motion | 1.11 | 1.22 | 1.32 | 1.50 | 0.28 | 23% |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | 2.39 | 1.97 | 1.65 | 2.54 | 0.57 | 29% |
| I-485 Application to Register Permanent Residence or Adjust Status | 1.27 | 1.63 | 1.63 | 2.08 | 0.45 | 27% |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | 5.03 | 6.50 | 8.65 | 5.01 | (1.49) | (30%) |
| I-539 Application to Extend/Change Nonimmigrant Status | 0.35 | 0.40 | 0.51 | 0.70 | 0.30 | 74% |
| I-589 Application for Asylum and for Withholding of Removal | N/A | N/A | 4.10 | 5.02 | | |
| I-590 Registration for Classification as Refugee | N/A | N/A | N/A | 1.29 | | |
| I-600/600A/800/800A Adoption Petitions and Applications | 1.81 | 2.14 | 2.22 | 2.14 | 0.00 | 0% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | N/A | N/A | 1.90 | 1.02 | | |
| I-601A Provisional Unlawful Presence Waiver | N/A | 2.84 | 2.64 | 2.76 | (0.08) | (3%) |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 2.20 | 4.12 | N/A | 3.01 | (1.11) | (27%) |

---

[38] *See* USCIS, Questions and Answers: Credible Fear Screening available at https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening (last reviewed/updated July 15, 2015).

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| I-690 Application for Waiver of Grounds of Inadmissibility | 2.59 | 0.89 | 1.05 | 2.04 | 1.14 | 128% |
| I-694 Notice of Appeal of Decision | 1.60 | 2.10 | 1.10 | 2.62 | 0.51 | 24% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1.77 | 3.80 | 3.76 | 3.91 | 0.11 | 3% |
| I-730 Refugee/Asylee Relative Petition (and Travel Eligibility) | N/A | N/A | N/A | 1.06 | | |
| I-751 Petition to Remove Conditions on Residence | 0.77 | 0.99 | 1.30 | 1.54 | 0.55 | 56% |
| I-765 Application for Employment Authorization | 0.14 | 0.20 | 0.20 | 0.22 | 0.03 | 13% |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | N/A | 1.10 | 1.90 | 2.03 | 0.94 | 85% |
| I-817 Application for Family Unity Benefits | 0.64 | 0.92 | 0.91 | 1.40 | 0.49 | 53% |
| I-824 Application for Action on an Approved Application or Petition | 0.58 | 0.59 | 0.78 | 0.88 | 0.29 | 49% |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 5.98 | 5.50 | 8.15 | 12.13 | 6.63 | 55% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | N/A | 2.00 | 2.00 | | |
| I-910 Application for Civil Surgeon Designation | 1.12 | 1.81 | 1.81 | 1.37 | (0.43) | (24%) |
| I-914 T Nonimmigrant Status | N/A | N/A | N/A | 4.88 | | |
| I-918 U Nonimmigrant Status | N/A | N/A | N/A | 4.50 | | |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | N/A | N/A | 2.60 | 1.69 | | |
| I-956 Application for Regional Center Designation | 37.33 | 40.00 | 34.95 | 56.07 | 16.07 | 29% |
| I-956G Regional Center Annual Statement | N/A | 5.00 | 10.00 | - | (5.00) | |
| N-300 Application to File Declaration of Intention | 1.84 | 1.64 | 2.68 | 1.40 | (0.24) | (15%) |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | 1.60 | 2.60 | 3.05 | 3.01 | 0.40 | 15% |
| N-400 Application for Naturalization | 1.08 | 1.25 | 1.57 | 1.51 | 0.25 | 20% |
| N-470 Application to Preserve Residence for Naturalization Purposes | 1.75 | 1.83 | 4.02 | 4.01 | 2.17 | 119% |
| N-565 Application for Replacement Naturalization/Citizenship Document | 0.36 | 0.59 | 0.89 | 0.51 | (0.08) | (14%) |
| N-600/N-600K Application for Certificate of Citizenship Subtotal | 0.90 | 1.00 | 1.10 | 1.16 | 0.16 | 16% |
| N-600 Application for Certificate of Citizenship | N/A | 0.98 | 1.08 | 1.16 | 0.18 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate | N/A | 1.30 | 1.57 | 1.16 | (0.14) | (11%) |
| N-644 Application for Posthumous Citizenship | N/A | N/A | N/A | N/A | | |
| Inadmissibility Waiver Subtotal | 1.42 | 1.18 | 1.61 | 1.54 | 0.37 | 31% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | N/A | 2.10 | 1.96 | | |

| Immigration Benefit Request | FY 2010/2011 | FY 2016/2017 | FY 2019/2020 | FY 2022/2023 | Difference (FY 16/17 vs. FY 22/23) | % Difference |
|---|---|---|---|---|---|---|
| I-192 Application for Advance Permission to Enter as Nonimmigrant | N/A | N/A | 0.97 | 1.46 | | |
| I-193 Application for Waiver of Passport and/or Visa | N/A | N/A | 0.30 | 0.52 | | |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | N/A | 2.71 | 1.43 | | |
| I-601 Application for Waiver of Ground of Inadmissibility | N/A | N/A | 3.29 | 2.06 | | |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | N/A | 0.53 | 0.69 | | |
| Reasonable Fear[39] | N/A | N/A | N/A | 5.30 | | |
| USCIS Immigrant Fee | N/A | N/A | N/A | N/A | | |
| Genealogy Form Subtotal | N/A | N/A | 1.59 | 0.55 | | |
| G-1041 Genealogy Index Search Request | N/A | N/A | 1.27 | 0.42 | | |
| G-1041A Genealogy Records Request | N/A | N/A | 2.16 | 1.00 | | |
| Request for Certificate of Non-Existence | N/A | N/A | N/A | 1.07 | | |

---

[39] *See* USCIS, Questions and Answers: Reasonable Fear Screening available at https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-reasonable-fear-screenings (last reviewed/updated June 18, 2013).

Fee reviews use receipt forecasts for future years to estimate costs and propose new fees. We base workload forecasts on actual receipts and anticipated changes, as explained in the proposed rule. Appendix Table 12 shows actual receipts from FY 2007 to FY 2020. This table does not represent the entirety of USCIS or IEFA workload. For example, it excludes CBP and DOS workload for the same immigration benefit requests. However, we believe providing these receipts illustrates that the workload forecasts in this fee review are reasonable estimates. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. USCIS pulled most of this data in January 2022. For additional USCIS reports, studies, and immigration data, see https://www.uscis.gov/tools/reports-and-studies. For a complete list of USCIS forms and descriptions, see https://www.uscis.gov/forms.

**Appendix Table 6: Historic Receipts from Previous Fiscal Years**

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credible Fear | 5,171 | 4,940 | 5,387 | 8,846 | 11,178 | 13,676 | 35,591 | 50,185 | 47,498 | 93,495 | 78,263 | 98,760 | 105,151 | 30,781 |
| I-90 Application to Replace Permanent Resident Card | 601,966 | 466,102 | 462,064 | 650,973 | 850,209 | 721,109 | 571,974 | 781,701 | 771,724 | 760,486 | 782,967 | 701,210 | 724,553 | 699,591 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 23,475 | 17,375 | 16,381 | 16,719 | 17,460 | 16,616 | 13,715 | 9,679 | 7,932 | 7,489 | 7,358 | 5,592 | 4,978 | 4,098 |
| I-129 Petition for a Nonimmigrant Worker | 433,635 | 404,781 | 347,987 | 337,258 | 353,185 | 409,142 | 404,520 | 432,987 | 483,643 | 509,636 | 526,435 | 551,021 | 551,201 | 551,907 |
| I-129F Petition for Alien Fiance(e) | 62,442 | 54,368 | 50,218 | 47,892 | 46,936 | 45,471 | 45,360 | 48,394 | 49,066 | 53,116 | 49,831 | 47,495 | 45,274 | 38,735 |
| I-130 Petition for Alien Relative | 891,783 | 584,297 | 644,613 | 688,943 | 746,550 | 722,863 | 813,382 | 788,633 | 768,641 | 869,304 | 914,484 | 835,972 | 748,664 | 712,044 |
| I-131 Application for Travel Document | 550,374 | 390,562 | 374,502 | 362,564 | 338,940 | 374,215 | 381,119 | 375,568 | 419,214 | 457,079 | 499,144 | 485,048 | 493,550 | 437,950 |
| I-131A Application for Carrier Documentation | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 9,084 | 10,021 | 9,862 | 5,570 |
| I-140 Immigrant Petition for Alien Worker | 234,592 | 103,805 | 57,012 | 77,280 | 81,678 | 72,964 | 69,921 | 81,658 | 101,545 | 147,581 | 139,566 | 136,585 | 142,451 | 128,178 |
| Waivers[40] | 14,452 | 13,338 | 23,910 | 30,295 | 32,134 | 45,523 | 64,164 | 102,288 | 103,814 | 117,368 | 76,302 | 76,522 | 72,266 | 62,186 |
| I-290B Notice of Appeal or Motion | 27,310 | 30,137 | 45,439 | 38,926 | 28,305 | 25,698 | 24,265 | 24,544 | 21,779 | 23,835 | 23,510 | 28,033 | 31,714 | 32,325 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | 15,544 | 17,874 | 17,464 | 15,547 | 18,767 | 19,193 | 20,161 | 20,270 | 26,489 | 39,407 | 38,927 | 38,511 | 40,208 | 38,529 |
| I-485 Application to Register Permanent Residence or Adjust Status | 110,960 | 509,473 | 501,466 | 535,649 | 565,180 | 564,067 | 546,651 | 588,756 | 604,367 | 663,226 | 732,605 | 655,416 | 548,939 | 519,676 |

---

[40] Forms I-191, I-192, I-193, I-212, and I-612. Before FY 2017, most of this data was not separated by individual form in the system that we used for most domestic receipts.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor[41] | 776 | 1,258 | 1,031 | 1,953 | 3,805 | 6,041 | 6,346 | 10,950 | 14,373 | 14,147 | 12,165 | 6,424 | 4,194 | 4,378 |
| I-539 Application to Extend/Change Nonimmigrant Status | 222,673 | 191,195 | 172,916 | 162,318 | 157,443 | 157,735 | 169,248 | 182,184 | 199,820 | 214,772 | 233,430 | 230,975 | 221,566 | 442,808 |
| I-589 Application for Asylum and for Withholding of Removal | 25,062 | 24,740 | 24,021 | 28,133 | 34,647 | 41,429 | 44,123 | 56,853 | 83,310 | 115,702 | 140,111 | 106,260 | 97,278 | 93,593 |
| I-590 Registration for Classification as Refugee (Individuals Interviewed) | N/A | N/A | N/A | 95,435 | 76,773 | 78,850 | 73,982 | 68,758 | 67,810 | 125,495 | 49,736 | 26,306 | 43,990 | 1,222 |
| I-600/A Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of an Orphan Petition | 30,313 | 21,283 | 15,836 | 13,389 | 13,112 | 10,801 | 9,070 | 7,743 | 4,924 | 3,817 | 2,922 | 2,284 | 2,039 | 1,315 |
| I-601A Provisional Unlawful Presence Waiver | N/A | N/A | N/A | N/A | N/A | N/A | 19,085 | 37,592 | 48,733 | 51,210 | 65,729 | 60,748 | 52,506 | 49,491 |
| Legalization/ SAW[42] | 8,167 | 2,711 | 1,380 | 1,243 | 1,631 | 543 | 210 | 144 | 130 | 116 | 81 | 58 | 37 | 46 |
| I-730 Refugee/Asylee Relative Petition | 23,469 | 19,845 | 17,804 | 17,524 | 17,295 | 18,771 | 18,458 | 16,768 | 15,756 | 13,708 | 13,031 | 13,917 | 15,607 | 12,952 |
| I-751 Petition to Remove Conditions on Residence on Permanent Resident Status | 154,338 | 214,326 | 181,973 | 166,392 | 211,876 | 172,831 | 171,651 | 178,359 | 165,785 | 144,648 | 166,431 | 177,674 | 187,414 | 171,851 |
| I-765 Application for Employment Authorization[43] | 1,553,906 | 1,144,431 | 1,232,718 | 1,280,726 | 923,351 | 1,238,930 | 1,346,073 | 1,132,773 | 1,584,619 | 1,851,366 | 1,873,189 | 1,804,219 | 1,757,003 | 1,653,418 |
| I-800A Petition to Classify Convention Adoptee as an Immediate Relative/Application for Determination of Suitability to Adopt a Child from a Convention Country | N/A | N/A | 4,385 | 5,868 | 6,282 | 6,978 | 6,401 | 6,502 | 6,836 | 6,892 | 6,194 | 4,990 | 3,900 | 2,460 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | N/A | N/A | 277 | 1,507 | 1,556 | 1,438 | 1,479 | 1,529 | 1,494 | 1,461 | 1,383 | 1,267 | 1,214 | 980 |
| I-817 Application for Family Unity Benefits | 3,971 | 2,817 | 2,163 | 2,489 | 3,103 | 2,525 | 2,378 | 2,067 | 1,444 | 916 | 1,356 | 707 | 340 | 549 |
| I-824 Application for Action on an Approved Application or Petition | 34,526 | 24,283 | 18,231 | 17,161 | 14,289 | 11,863 | 12,227 | 12,151 | 11,627 | 10,888 | 11,494 | 10,894 | 10,490 | 9,525 |

[41] Combines both Forms I-526 and I-526E. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022. The system that we used for most domestic receipts has not always made the distinction between standalone and regional center petitions, so we combined both here.

[42] Includes the following applications for persons applying for benefits under the Immigration Reform and Control Act of 1986: Forms I-687, I-690, I-694, I-695, and I-698.

[43] Includes Form I-765 for TPS because the system that we used for most domestic receipts in this table does not track Form I-765 applications for TPS separately. Excludes Form I-765 for DACA. A separate row shows I-765 DACA receipts, which we track separately.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 194 | 391 | 437 | 768 | 2,345 | 712 | 1,217 | 2,516 | 2,767 | 3,474 | 2,625 | 3,283 | 3,756 | 3,096 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | 4,493 | 2,712 | 1,450 | 1,836 | 1,907 | 1,585 | 1,101 | 785 | 727 | 681 | 560 | 505 | 487 | 279 |
| I-910 Application for Civil Surgeon Designation | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 514 | 571 | 538 | 362 | 465 | 452 |
| I-914/I-914A Application for T Nonimmigrant Status | 293 | 526 | 710 | 1,037 | 1,762 | 1,680 | 1,820 | 1,869 | 2,224 | 1,848 | 2,259 | 2,979 | 2,253 | 2,076 |
| I-918/I-918A Petition for U Nonimmigrant Status | N/A | N/A | 10,937 | 17,160 | 26,801 | 39,894 | 43,695 | 45,268 | 52,666 | 60,710 | 61,686 | 58,664 | 47,225 | 36,448 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | N/A | N/A | N/A | N/A | 195 | 129 | 397 | 679 | 933 | 1,084 | 1,511 | 1,192 | 1,078 | 919 |
| I-956/I-956G Application For Regional Center Designation / Regional Center Annual Statement[44] | N/A | N/A | N/A | N/A | N/A | 240 | 436 | 642 | 803 | 436 | 1,122 | 909 | 887 | 736 |
| N-300 Application to File Declaration of Intention | 111 | 47 | 73 | 81 | 47 | 66 | 43 | 22 | 30 | 31 | 10 | 29 | 33 | 17 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | 10,865 | 7,112 | 8,232 | 5,098 | 4,302 | 4,528 | 4,406 | 4,307 | 4,300 | 4,329 | 4,398 | 5,345 | 6,118 | 5,245 |
| N-400 Application for Naturalization | 1,382,993 | 525,786 | 570,442 | 710,544 | 756,008 | 899,162 | 772,623 | 773,824 | 783,062 | 734,874 | 986,412 | 837,423 | 830,877 | 967,755 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 582 | 622 | 477 | 506 | 455 | 393 | 354 | 311 | 285 | 202 | 200 | 172 | 163 | 101 |
| N-565 Application for Replacement Naturalization/Citizenship Document | 38,680 | 30,027 | 28,548 | 27,611 | 26,712 | 27,034 | 27,204 | 27,732 | 27,612 | 27,465 | 27,226 | 24,170 | 27,800 | 24,997 |
| N-600/600K Application for Certificate of Citizenship/Application for Citizenship and Issuance of Certificate Under Section 322 | 96,572 | 55,225 | 57,690 | 59,157 | 61,375 | 66,099 | 66,882 | 60,863 | 63,312 | 71,235 | 67,711 | 53,059 | 57,341 | 54,569 |
| Reasonable Fear | 572 | 720 | 1,160 | 2,161 | 3,211 | 4,941 | 7,627 | 9,004 | 7,905 | 9,464 | 10,167 | 11,103 | 13,191 | 8,721 |
| USCIS Immigrant Fee | N/A | N/A | 454,364 | 472,500 | 481,475 | 475,283 | 458,541 | 486,347 | 484,347 | 597,301 | 554,200 | 516,743 | 474,509 | 269,599 |
| G-1041 Genealogy Index Search Request | N/A | N/A | 3,837 | 4,925 | 3,594 | 3,487 | 3,343 | 4,120 | 4,785 | 5,510 | 3,598 | 3,847 | 4,498 | 7,780 |
| G-1041A Genealogy Records Request | N/A | N/A | 1,597 | 2,044 | 2,536 | 2,154 | 2,158 | 2,057 | 2,358 | 2,506 | 2,132 | 2,920 | 4,341 | 4,684 |

[44] Formerly Forms I-924, Application For Regional Center Designation Under the Immigrant Investor Program, and I-924A, Annual Certification of Regional Center. We group these two together because the data source did not always tack them both separately.

| Immigration Benefit Request | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G-1566 Request for Certificate of Non-Existence | N/A | N/A | 586 | 681 | 860 | 730 | 717 | 705 | 745 | 679 | 909 | 1,442 | 1,516 | 1,784 |
| Subtotal | 6,540,498 | 4,846,738 | 5,330,267 | 5,875,418 | 5,883,412 | 6,247,044 | 6,200,145 | 6,376,182 | 6,981,102 | 7,743,294 | 7,849,924 | 6,880,955 | 7,235,809 | 6,862,424 |
| I-821 Application for Temporary Protected Status | 253,080 | 83,246 | 307,544 | 325,640 | 63,447 | 286,216 | 328,022 | 54,617 | 286,034 | 302,611 | 61,248 | 260,216 | 5,585 | 13,611 |
| I-821D Consideration of Deferred Action for Childhood Arrivals | N/A | N/A | N/A | N/A | N/A | 152,424 | 427,603 | 238,895 | 448,834 | 58,097 | 472,873 | 260,129 | 386,192 | 335,249 |
| I-765 Application for Employment Authorization (DACA) | N/A | N/A | N/A | N/A | N/A | 144,107 | 435,508 | 237,631 | 446,277 | 60,906 | 476,495 | 265,057 | 389,545 | 316,536 |
| Subtotal Temporary or Uncertain Programs | 253,080 | 83,246 | 307,544 | 325,640 | 63,447 | 582,747 | 1,191,133 | 531,143 | 1,181,145 | 421,614 | 1,010,616 | 785,402 | 781,322 | 665,396 |
| Total | 6,793,578 | 4,929,984 | 5,637,811 | 6,201,058 | 5,946,859 | 6,829,791 | 7,391,278 | 6,907,325 | 8,162,247 | 8,164,908 | 8,407,298 | 7,719,351 | 7,584,891 | 7,211,284 |

66

AR_000893

## APPENDIX XI – IEFA HISTORY

USCIS is a component of DHS. It is the Federal entity responsible for granting or denying immigration benefits to individuals seeking to reside in, work in, or become citizens of the U.S., as well as for U.S. citizens, permanent residents, and employers seeking to sponsor individuals for immigrant or nonimmigrant benefits. As one of the largest fee-funded agencies in the Federal Government, USCIS processes a multitude of immigrant and nonimmigrant benefit requests, including:

- **Family-based requests** - facilitating the process for close relatives to immigrate, gain permanent residency, travel, and work;
- **Employment-based requests** - facilitating the process for current and prospective employees to immigrate or work in the U.S. temporarily;
- **Asylum and refugee processing** - adjudicating requests for asylum and refugee status;
- **Naturalization** - approving naturalization of eligible persons who wish to become U.S. citizens;
- **Special status programs** - adjudicating eligibility for U.S. immigration status as a form of humanitarian aid to foreign nationals; and
- **Document issuance and renewal** - verifying eligibility as well as producing and issuing immigration documents.

Before the creation of the DHS on March 1, 2003, the Immigration and Naturalization Service (INS) performed the duties of USCIS. The sections below will refer to USCIS even when it was part of INS at the time.

Before the establishment of the IEFA, immigration application and petition fees were deposited into the General Fund of the Treasury and were available to fund general government expenditures made in consequence of appropriations made by Congress; they were not available exclusively to USCIS. In 1988, Congress established the IEFA. Fees collected from persons filing immigration benefit requests are deposited into the IEFA and fund the following:

1. full cost of processing immigration and naturalization applications and petitions,
2. cost of providing similar benefits to asylum and refugee applicants for which a fee is not charged,
3. cost of providing similar benefits to others at no charge (in other words, fee waivers and fee exemptions).

On April 4, 1989, USCIS published a final rule in the Federal Register establishing the IEFA fee schedule for the first time since enactment of legislation authorizing use of fee revenues to fund immigration benefit processing activities. It instituted fees that "more nearly reflect the current cost of providing the benefits and services…" The changes were "necessary to place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients." Since 1989, fees deposited into the IEFA have been the primary source of funding for the processing of immigration and naturalization benefits.

On March 27, 1991, USCIS revised the IEFA fee schedule. Fees were increased by as much as 100 percent for several immigration benefits. USCIS stated several reasons for this increase:

- Increased workloads, data and communications costs, and computer hardware costs;
- Absorption of asylum and refugee processing costs, previously funded with discretionary appropriations, into the IEFA;
- Costs of an enhanced asylum review process;
- Costs of fingerprint and name checks, which the FBI began billing USCIS; and
- Costs of acquiring larger facilities and additional staffing for increased benefit requests.

In 1994, USCIS revised the fee schedule again. USCIS explained that these increases were necessary to reflect "inflation since the last general fee increase in April 1991, the assignment of certain additional costs to the IEFA for services that support adjudications and naturalization functions, and the costs of investments to improve services to users." While preparing the proposed rule to revise fees in 1994, USCIS recognized the need for improving its "management of the finances of the fee accounts and the development of fee schedules."

USCIS adjusted the fee schedule again on October 13, 1998. This was the result of a comprehensive cost study conducted in FY 1997 based on FY 1996 processes and the FY 1998 budget. USCIS conducted a thorough review of the resources, activities, and costs of processing immigration benefits and biometric services funded through the IEFA. This fee review introduced ABC as the methodology for determining costs associated with services for which fees are charged.

The FY 2008/2009 fee review followed nearly a decade without a comprehensive review of IEFA fees. On July 30, 2007, fees increased by a weighted average of 86% to recover base and additional costs for improving operations and service-wide performance needs. Following the FY 2008/2009 fee review, USCIS committed to reviewing IEFA fees every 2 years, consistent with the biennial review standard of the CFO Act of 1990 and OMB Circular A-25.

In November 2010, USCIS adjusted the fee schedule based on its comprehensive fee review for the FY 2010/2011 biennial period. Overall, USCIS kept base costs steady and adjusted for inflation, thereby minimizing program changes that would increase costs. Fees increased by a weighted average of 10 percent. However, the fees did not recover the full cost of RAIO, SAVE, and the Office of Citizenship, in anticipation of congressional appropriations to fund these programs. USCIS did not receive the appropriations that it anticipated when DHS set the fees. USCIS did not receive any substantial appropriations for these programs since FY 2011, except for citizenship grants, until FY 2022.[45] Because Congress did not provide appropriations, USCIS used other fee revenue to support these programs and was unable to maintain its minimum carryover and reserves that it had projected was required to sustain its obligations during periods of cash flow deficits.

USCIS subsequently completed two fee reviews without pursuing notice and comment rulemaking to revise the fee schedule. They were the FY 2012/2013 and FY 2014/2015 fee reviews. Both fee reviews indicated that fee levels were not sufficient to recover the full cost of activities funded by the IEFA; however, USCIS was able to mitigate the projected shortfall by realigning funds within its budget and postponing planned improvements.

DHS published a proposed rule for the FY 2016/2017 fee review in May 2016. DHS published a final rule in October 2016. The new fees became effective in December 2016. The weighted average fee increase was 21%. The fees were estimated to recover the full cost of RAIO, SAVE, and the Office of Citizenship. The FY 2016/2017 fee rule established a new $3,035 fee for Form I-924A, Annual Certification of Regional Center, now called Form I-956G, Regional Center Annual Statement. It established a reduced fee of $320 for some applicants filing Form N-400, Application for Naturalization. The reduced Form N-400 fee was for naturalization applicants with a family income greater than 150 percent and not more than 200 percent of the

---

[45] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113-6) and FY 2014 (Pub. L. 113-76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018. Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116-6), FY 2020 (Pub. L. 116-93), and FY 2021 (Pub. L. 116-260). See the proposed rule preamble for a discussion on FY 2022 appropriations. *See* 88 FR 402, 415-417. See section II.B. Authority and Guidance in the final rule preamble for a discussion of FY 2023 appropriations.

Federal Poverty Guidelines. The final rule also removed regulatory provisions that prevented USCIS from rejecting an immigration or naturalization benefit request fee paid with a dishonored check or lacking the required biometric services fee.

To review historical fees, see the two tables below. The tables do not include fees that were enjoined, vacated, or otherwise removed.[46] In order to save space, this document shows IEFA fees from 2005 to now.[47] These represent the USCIS IEFA fees under DHS. It may exclude some IEFA fees that CBP or ICE collect.

## Appendix Table 7: IEFA Non-Premium Fee History

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|------|---------------------|-----------|-----------|-----------|-----------|----------------------|
| G-1041 | Genealogy Index Search Request[48] | | | $20 | $65 | |
| G-1041A | Genealogy Records Request (Microfilm Copy) | | | $20 | $65 | |
| G-1041A | Genealogy Records Request (Textual Record Copy) | | | $35 | $65 | |
| I-90 | Application to Replace Permanent Resident Card | $190 | $290 | $365 | $455 | |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $160 | $320 | $330 | $445 | |
| I-129/ I-129CW | Petition for a Nonimmigrant Worker | $190 | $320 | $325 | $460 | |
| I-129F | Petition for Alien Fiancé | $170 | $455 | $340 | $535 | |
| I-130 | Petition for Alien Relative | $190 | $355 | $420 | $535 | |
| I-131 | Application for Travel Document | $170 | $305 | $360 | $575 | |
| I-131 | Application for Refugee Travel Document (16 or older) | | | $135 | $135 | |
| I-131 | Application for Refugee Travel Document (under 16) | | | $105 | $105 | |
| I-131A | Application for Travel Document (Carrier Documentation) | | | | $575 | |
| I-140 | Immigrant Petition for Alien Worker | $195 | $475 | $580 | $700 | |
| I-191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $265 | $545 | $585 | $930 | |
| I-192 | Application for Advance Permission to Enter as a Nonimmigrant | $265 | $545 | $585 | $930 | |
| I-193 | Application for Waiver of Passport and/or Visa | $265 | $545 | $585 | $585 | |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $265 | $545 | $585 | $930 | |
| I-290B | Notice of Appeal or Motion | $385 | $585 | $630 | $675 | |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | $190 | $375 | $405 | $435 | |
| I-485 | Application to Register Permanent Residence or Adjust Status | $325 | $930 | $985 | $1,140 | |
| I-485 (Child) | Application to Register Permanent Residence or Adjust Status (under the age of 14 years filing with parent) | $225 | $600 | $635 | $750 | |

[46] The FY 2019/2020 fee rule is enjoined. *See* 86 FR 7493 (Jan. 29, 2021). As such, we do not list the enjoined fees in the table. In Aug. 2019, DHS published a final rule establishing Forms I-356 and I-945 each with $25 fees. *See* 84 FR 41292 (Aug. 14, 2019). On March 15, 2021, DHS removed the regulations, which a Federal district court vacated. *See* 86 FR 14221. As such, we do not list the vacated fees in the table.

[47] For IEFA fee history before 2005, see USCIS, "FY 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum" (Oct 25, 2016), *https://www.regulations.gov/document/USCIS-2016-0001-0466*. In that document, Appendix VIII - IEFA Fee History, page 56, provides fees from FY 1985 to Nov. 2010.

[48] Genealogy fees (Forms G-1041 and G-1041A) became effective in Aug. 2008 without changing any other IEFA fees. *See* 73 FR 28026 (May 15, 2008). These fees did not change until the FY 2016/2017 fee rule.

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|---|---|---|---|---|---|---|
| I-526/I-526E | Immigrant Petition by Standalone/Regional Center Investor[49] | $480 | $1,435 | $1,500 | $3,675 | |
| I-539 | Application to Extend/Change Nonimmigrant Status | $200 | $300 | $290 | $370 | |
| I-600/ I-800 | Petition to Classify Orphan as an Immediate Relative/ Petition to Classify Convention Adoptee as an Immediate Relative | $545 | $670 | $720 | $775 | |
| I-600A/ I-800A | Application for Advance Processing of an Orphan Petition/ Application for Determination of Suitability to Adopt a Child from a Convention Country | $545 | $670 | $720 | $775 | |
| I-601 | Application for Waiver of Grounds of Inadmissibility | $265 | $545 | $585 | $930 | |
| I-601A | Application for Provisional Unlawful Presence Waiver | | | $585 | $630 | |
| I-612 | Application for Waiver of the Foreign Residence Requirement | $265 | $545 | $585 | $930 | |
| I-687 | Application for Status as a Temporary Resident under Section 245A of the INA | $255 | $710 | $1,130 | $1,130 | |
| I-690 | Application for Waiver of Grounds of Inadmissibility | $95 | $185 | $200 | $715 | |
| I-694 | Notice of Appeal of Decision under Section 210 or 245A of the Immigration and Nationality Act | $110 | $545 | $755 | $890 | |
| I-695 | Application for Replacement Employment Authorization or Temporary Residence Card | $65 | $130 | N/A | N/A | |
| I-698 | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | $180 | $1,370 | $1,020 | $1,670 | |
| I-751 | Petition to Remove the Conditions on Residence | $205 | $465 | $505 | $595 | |
| I-765 | Application for Employment Authorization | $180 | $340 | $380 | $410 | |
| I-800A | Supplement 3, Request for Action on Approved Form I-800A | | | $360 | $385 | |
| I-817 | Application for Family Unity Benefits | $200 | $440 | $435 | $600 | |
| I-821 | Application for Temporary Protected Status | $50 | $50 | $50 | $50 | |
| I-824 | Application for Action on an Approved Application or Petition | $200 | $340 | $405 | $465 | |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status[50] | $475 | $2,850 | $3,750 | $3,750 | |
| I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA))[51] | $285; $585 | $285; $585 | $285; $585 | $285; $585 | |
| I-905 | Application for Authorization to Issue Certification for Health Care Workers | $230 | $230 | $230 | $230 | |
| I-907 | Request for Premium Processing Service | $1,000 | $1,000 | $1,225 | $1,225 | See Appendix Table 15 |
| I-910 | Application for Civil Surgeon Designation | | | $615 | $785 | |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | | | $215 | $230 | |
| I-941 | Application for Entrepreneur Parole[52] | | | | | $1,200 |

[49] Combines both Forms I-526 and I-526E. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022. Previously named Form I-526, Immigrant Petition by Alien Entrepreneur.
[50] Previously named Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status.
[51] There are two USCIS fees for Form I-881: $285 for individuals and $570 for families. EOIR has a separate $165 fee.
[52] DHS published a final rule for establishing Form I-941, International Entrepreneur Parole Program. *See* 82 FR 5238 (Jan. 25, 2017). DHS proposed to terminate the program. *See* 83 FR 24415 (May 29, 2018). DHS withdrew that proposed rule. *See* 86 FR 25809 (May 11, 2021). DHS does not change the fee in this rule. USCIS may evaluate the fee in future fee reviews.

| Form | Title or Description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Other Recent Changes |
|---|---|---|---|---|---|---|
| I-956 | Application for Regional Designation Center[53] | | | $6,230 | $17,795 | |
| I-956G | Regional Center Annual Statement[54] | | | | $3,035 | |
| N-300 | Application to File Declaration of Intention | $120 | $235 | $250 | $270 | |
| N-336 | Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 | $265 | $605 | $650 | $700 | |
| N-400 | Application for Naturalization | $330 | $595 | $595 | $640 | |
| N-400 | Application for Naturalization with Form I-942, Request for Reduced Fee | | | | $320 | |
| N-470 | Application to Preserve Residence for Naturalization Purposes | $155 | $305 | $330 | $355 | |
| N-565 | Application for Replacement Naturalization/Citizenship Document | $220 | $380 | $345 | $555 | |
| N-600 | Application for Certificate of Citizenship | $255 | $460 | $600 | $1,170 | |
| N-600K | Application for Citizenship and Issuance of Certificate Under Section 322 | $255 | $460 | $600 | $1,170 | |
| | Biometrics Fee | $70 | $80 | $85 | $85 | |
| | H-1B Registration Process Fee[55] | | | | | $10 |
| | USCIS Immigrant Fee (Formerly Immigrant Visa) | | | $165 | $220 | |

**Appendix Table 8: Premium Processing Fees**

| From | To | Form I-907 Fee(s) | Reference |
|---|---|---|---|
| 10/1/05 | 11/22/10 | $1,000 | INA section 286(u), 8 U.S.C. 1356(u) |
| 11/23/10 | 9/30/18 | $1,225 | 75 FR 58961 (Sep. 24, 2010) |
| 10/1/18 | 12/1/19 | $1,410 | 83 FR 44449 (Aug. 31, 2018) |
| 12/2/19 | 10/18/20 | $1,440 | 84 FR 58303 (Oct. 31, 2019) |
| 10/19/20 | Current | $2,500, $1,750 or $1,500 | USCIS Stabilization Act, Pub. L. No: 116-159, div. D, tit. I |

---

[53] Formerly Form I-924, Application For Regional Center Designation Under the Immigrant Investor Program
[54] Formerly Form I-924A, Annual Certification of Regional Center
[55] DHS published a final rule establishing a $10 registration fee for H-1B petitions in Nov. 2019. *See* 84 FR 60307.





U.S. Citizenship and
Immigration Services

AR_000899

**FY 2022-2023**

# Immigration Examinations Fee Account

**Fee Schedule Documentation**

January 2024





**U.S. Citizenship and Immigration Services**

AR_000900

**NOTE:** This fee schedule documentation is for the **internal use** of the Department of Homeland Security only to advise USCIS operations on the establishment of fees as stated hereafter. It is provided to the public in the rulemaking docket for the USCIS fee rule to provide more precise explanations for how fees are calculated than what is necessary for the rule. The procedure it contains, while followed by USCIS employees and contractors, generally, is **not binding** on USCIS or its employees. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, entities, officers, employees, agents, or any other person.

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 4

Data Sources for the Fee Schedule .................................................................................... 4

  Final VPC Projections (Domestic and RAIO) ............................................................... 4

  Fee-Paying Percentages .................................................................................................. 4

  Fee Review Model ........................................................................................................... 4

  Online Filing ................................................................................................................... 5

  Inflation .......................................................................................................................... 5

  Various Adjustments ....................................................................................................... 5

Worksheets in the Final Rule Fee Schedule ..................................................................... 5

  Fees - Discount c9 (Tiered) ............................................................................................ 5

    **Rows and Color Coding** ........................................................................................... 6

    Column Walkthrough for Final Rule ........................................................................ 7

    **Verify Fees Calculations** ......................................................................................... 9

  Fee Budget ...................................................................................................................... 9

  Fee Categories ................................................................................................................ 9

  CPI-U .............................................................................................................................. 9

Worksheets in the Proposed Fee Schedule ....................................................................... 9

  Fees ................................................................................................................................. 9

    CBP Fees ................................................................................................................... 10

    Rows and Color Coding ........................................................................................... 10

    Column Walkthrough ............................................................................................... 11

    Cost Reallocation Calculation ................................................................................. 16

    Verify Fees Calculations .......................................................................................... 19

Model Output ........................................................................................................ 19

    Input cells ...................................................................................................... 20

CBP Example ....................................................................................................... 21

Worksheets in Both the Proposed and Final Rule Fee Schedules .............................. 21

    Adjustments ........................................................................................................ 21

    VPC Forecasts .................................................................................................... 22

    Fee-Paying.......................................................................................................... 22

    Filing Methods ................................................................................................... 23

    Change Items...................................................................................................... 23

    Biometric Fee ..................................................................................................... 24

    SAVE Revenue ................................................................................................... 24

Update the Model Output Results............................................................................. 24

    Model Output Budget.......................................................................................... 24

    Model Output by Filing Type.............................................................................. 25

    Model Output for I-129 ....................................................................................... 26

    Additional Steps for Bundled scenarios .............................................................. 27

Fee Schedule Scenarios........................................................................................... 28

    Modify Total Cost for Budget Scenarios ............................................................ 28

    Add or Remove Cost Reallocation to a Row ....................................................... 28

        Hold to Current Fee ....................................................................................... 28
        Limit A Fee Increase (Add Cost Reallocation) ................................................ 29
        Remove Cost Reallocation and Allow a Fee to Change.................................... 30

Creating Appendixes for the Supporting Documentation and Rulemaking Documents ............. 30

    Current and Proposed Fees.................................................................................. 30

# Fee Schedule Documentation

## Introduction

U.S. Citizenship and Immigration Services (USCIS) uses the fee schedule to compare current and proposed fees, make decisions on fee adjustments, and calculate final fees. USCIS limits the manipulation of fees and discourages arbitrary adjustment of individual fees. The fee structure is interdependent. A change to one fee affects all other fees, except for those USCIS holds constant as a policy decision. There are several different folders on the shared drive, each with different versions of the fee schedule.

- Draft fee schedule
- Fee schedule options
- Proposed fee schedule
- Final fee schedule

Typically, column headers differ between an NPRM and a final rule. For example, a column named *Proposed Fees* in a notice of proposed rulemaking (NPRM) may become *Final Fees* in a final rule. The fee schedule calculations may change between the NPRM and the final rule. We divided this document into proposed and final rule sections where there are differences in calculations or data between the FY 2022/2023 proposed rule and the subsequent final rule.

## Data Sources for the Fee Schedule

### Final VPC Projections (Domestic and RAIO)

The FY 2022/2023 fee review uses the June 2020 (FY 2020) VPC projections for FY 2022 and FY 2023. USCIS copied and pasted the text into the VPC Forecasts worksheet in the fee schedule. These are available on the Enterprise Collaboration Network (ECN) or the Office of the Chief Financial Officer (OCFO) budget shared drive.

### Fee-Paying Percentages

The fee schedule required fee-paying percentages by form to calculate fees and revenue. The FY 2021 revenue forecast provided the starting point for the fee schedule. From there, OCFO made bundled and debundled versions. The changes only affected Forms I-131 and I-765. In addition, OCFO calculated volumes for proposed fee exemptions.  We added addition columns to further adjust the fee-paying volumes for additional fee exemptions in the final rule. The fee schedule can toggle between the various fee-paying percentages.

### Fee Review Model

The proposed fee schedule required three sets of data from the CostPerform fee review model. See the model documentation for more information. The model provides data on the Model Output worksheet. We discuss the requirements in the section for that worksheet.

## Online Filing

OCFO used an OPQ receipts dashboard to determine online and paper filing rates for forms that were eligible for both. We incorporated this information into the fee schedule and fee review model to help determine separate fees by filing type (online or paper).

## Inflation

The final rule limits some fee increases to the change in the Consumer Price Index - All Urban Consumers (CPI-U) since December 2016, the effective date of the FY 2016/2017 fee rule. It uses the Bureau of Labor Statistics (BLS) series CUUR0000SA0 for index values. It calculates the difference and percentage difference between December 2016 and June 2023.

## Various Adjustments

The Adjustments worksheet requires several additional data sources.

- CBP provided revenue and cost information from the workloads that they share with USCIS.
- The Department of State FY 2020 interagency agreement (IAA) provided workloads that State adjudicates on our behalf.
- SAVE revenue and volume information that came from IRIS.

# Worksheets in the Final Rule Fee Schedule

The sections below describe the various worksheets of the spreadsheet. There may be additional worksheets, such as summaries for presentations in the file, which do not affect fee calculations.

## Fees - Discount c9 (Tiered)

Similar to the Fees worksheet in the proposed rule, this worksheet calculates most fees in the fee schedule. For the final rule, we grouped the fees into various tiers, which we summarize below:

- Employment-based tier
    - Use the proposed fee for most benefit request fees in this tier. For example, the final rule implements the proposed H-1B registration fee. However, USCIS adjusted the volume estimates for EB-5 and H-1B registration fees, as explained in the final rule preamble. USCIS adjusted the budget to accommodate the revenue generated by the fees and volumes in the final rule.
    - Discount Form I-129 fees for small business and non-profits by using higher of either the current fee or a 50% discount of proposed fee.
- Middle cap at 26% (CPI inflation)
    - If the proposed fee was higher than the change in inflation since December 2016, adjust the final fee by inflation instead.
    - If the proposed fee was less than inflation, then use the proposed fee instead.
    - Subtract $50 from the paper filing fee to calculate an online filing fee, if applicable.
    - Determine a fee for Form I-765 filed with Form I-485 which is a 50% discount of the Form I-765 paper filing.
- Use NPRM with online discount (if applicable)

5

- o Uses the proposed fee in all of these cases, except for online filing fees, which is $50 less than in the NPRM.
- Biometric Services, Genealogy, and Records Fees
  - o Biometric Services fee comes from the Biometric Fee worksheet.
  - o Certificate of Non-Existence uses the proposed fee.
  - o SAVE row uses the SAVE Revenue worksheet.

See the preamble of the final rule for additional information on these or additional changes. The column walkthrough in the next section provides information on the mechanics of the calculations described above.

**Figure 1: Print preview of the Fees - Discount c9 (Tiered) worksheet**

| Immigration Benefit Request | Projected Workload Receipts | Projected Fee-Paying Receipts | Current Fees (FY 2016/2017) | Final Fee (FY 2022/2023) | $ Difference from Current Fees | %Difference from Current Fees | Revenue with Final Fees | NPRM Proposed Fee | $ Difference from Current Fees | NPRM %Difference from Current Fees | Final $ Difference from NPRM | Final %Difference from NPRM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Employment and Tier** | **1,343,455** | **1,343,455** | | | | | | | | | | |
| H-1B Registration Fee | 424,000 | 424,400 | $10 | $215 | $205 | 2050% | $91,246,000 | $215 | $205 | 2050% | $0 | 0% |
| **I-129 Petition for a Nonimmigrant Worker Subtotal** | **568,630** | **568,630** | | | | | **$438,480,670** | | | | | |
| I-129 H-1B - Named Beneficiaries | 430,000 | 378,400 | $460 | $780 | $320 | 70% | $295,152,000 | $780 | $320 | 70% | $0 | 0% |
| I-129 H-1B - discounted fee (12% of above) | | 51,600 | $460 | $460 | $0 | 0% | $23,736,000 | $780 | $320 | 70% | ($320) | -41% |
| I-129 H-2A - Named Beneficiaries | 4,020 | 482 | $460 | $1,090 | $630 | 137% | $525,380 | $1,090 | $630 | 137% | $0 | 0% |
| I-129 H-2A - Named Beneficiaries - discounted fee (88% of below) | | 3,538 | $460 | $545 | $85 | 18% | $1,928,210 | $1,090 | $630 | 137% | ($545) | -50% |
| I-129 H-2B - Named Beneficiaries | 2,460 | 1,107 | $460 | $1,080 | $620 | 135% | $1,195,560 | $1,080 | $620 | 135% | $0 | 0% |
| I-129 H-2B - Named Beneficiaries - discounted fee (55% of above) | | 1,353 | $460 | $540 | $80 | 17% | $730,620 | $1,080 | $620 | 135% | ($540) | -50% |
| I-129 L/A/L1B/L2 Blanket - Named Beneficiaries | 42,350 | 31,339 | $460 | $1,385 | $925 | 201% | $43,404,515 | $1,385 | $925 | 201% | $0 | 0% |
| I-129 L/A/L1B/L2 Blanket - discounted fee (20% of above) | | 11,011 | $460 | $695 | $235 | 51% | $7,652,645 | $1,385 | $925 | 201% | ($690) | -50% |
| I-129 O/I/O2 | 27,300 | 14,469 | $460 | $1,055 | $595 | 129% | $15,264,795 | $1,055 | $595 | 129% | $0 | 0% |
| I-129 O/I/O2 - discounted fee (47% of above) | | 12,831 | $460 | $500 | $40 | 9% | $6,408,450 | $1,055 | $595 | 129% | ($555) | -53% |
| I-129 All Other | 40,850 | 21,651 | $460 | $1,015 | $555 | 121% | $21,975,765 | $1,015 | $555 | 121% | $0 | 0% |
| I-129 All Other - discounted fee (47% of above) | | 19,199 | $460 | $510 | $50 | 11% | $9,791,490 | $1,015 | $555 | 121% | ($505) | -50% |
| I-129 H-2A - Unnamed Beneficiaries | 17,650 | 2,118 | $460 | $530 | $70 | 15% | $1,122,540 | $530 | $70 | 15% | $0 | 0% |
| I-129 H-2A - Unnamed Beneficiaries - discounted fee (88% of above) | | 15,532 | $460 | $460 | $0 | 0% | $7,144,720 | $530 | $70 | 15% | ($70) | -13% |
| I-129 H-2B - Unnamed Beneficiaries | 4,000 | 1,800 | $460 | $580 | $120 | 26% | $1,044,000 | $580 | $120 | 26% | $0 | 0% |
| I-129 H-2B - Unnamed Beneficiaries - discounted fee (55% of above) | | 2,200 | $460 | $460 | $0 | 0% | $1,012,000 | $580 | $120 | 26% | ($120) | -21% |
| I-140 Immigrant Petition for Alien Worker | 140,000 | 140,000 | $700 | $715 | $15 | 2% | $100,100,000 | $715 | $15 | 2% | $0 | 0% |
| I-526 Immigrant Petition by Alien Investor | 4,050 | 4,050 | $3,675 | $11,160 | $7,485 | 204% | $45,198,000 | $11,160 | $7,485 | 204% | $0 | 0% |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 4,500 | 4,500 | $3,750 | $9,525 | $5,775 | 154% | $42,862,500 | $9,525 | $5,775 | 154% | $0 | 0% |
| I-956 Application For Regional Center Designation | 1,000 | 1,000 | $17,795 | $47,695 | $29,900 | 168% | $47,695,000 | $47,695 | $29,900 | 168% | $0 | 0% |
| I-956G Regional Center Annual Statement | 875 | 875 | $3,035 | $4,470 | $1,435 | 47% | $3,911,250 | $4,470 | $1,435 | 47% | $0 | 0% |
| **Middle cap at 26% (CPI inflation)** | **5,559,145** | **4,659,603** | | | | | **$2,796,008,375** | | | | | |
| G-1041 Genealogy Index Search Request | 10,994 | 10,994 | | | | | $360,520 | | | | | |
| G-1041 Genealogy Index Search Request - Online | 10,380 | 10,380 | $65 | $30 | ($35) | -54% | $311,400 | $100 | $35 | 54% | ($70) | -70% |
| G-1041 Genealogy Index Search Request - Paper | 614 | 614 | $65 | $80 | $15 | 23% | $49,120 | $120 | $55 | 85% | ($40) | -33% |
| G-1041A Genealogy Records Request | 3,301 | 3,301 | | | | | $108,230 | | | | | |
| G-1041A Genealogy Records Request - Online | 3,117 | 3,117 | $65 | $30 | ($35) | -54% | $93,510 | $240 | $175 | 269% | ($210) | -88% |
| G-1041A Genealogy Records Request - Paper | 184 | 184 | $65 | $80 | $15 | 23% | $14,720 | $260 | $195 | 300% | ($180) | -69% |
| I-90 Application to Replace Permanent Resident Card | 740,000 | 648,758 | | | | | $281,191,370 | | | | | |
| I-90 Application to Replace Permanent Resident Card - Online | 467,232 | 409,622 | $455 | $415 | ($40) | -9% | $169,993,130 | $455 | $0 | 0% | ($40) | -9% |
| I-90 Application to Replace Permanent Resident Card - Paper | 272,768 | 239,136 | $455 | $465 | $10 | 2% | $111,198,240 | $465 | $10 | 2% | $0 | 0% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 5,020 | 4,623 | $445 | $560 | $115 | 26% | $2,588,880 | $680 | $235 | 53% | ($120) | -18% |
| I-129F Petition for Alien Fiancé(e) | 44,700 | 41,432 | $535 | $675 | $140 | 26% | $27,966,263 | $720 | $185 | 35% | ($45) | -6% |
| I-130 Petition for Alien Relative | 880,900 | 855,483 | | | | | $566,745,533 | | | | | |
| I-130 Petition for Alien Relative - Online | 220,075 | 214,232 | $535 | $625 | $90 | 17% | $133,895,000 | $710 | $175 | 33% | ($85) | -12% |
| I-130 Petition for Alien Relative - Paper | 660,825 | 641,261 | $535 | $675 | $140 | 26% | $432,850,838 | $820 | $285 | 53% | ($145) | -18% |
| I-131 Application for Travel Document | 329,000 | 252,721 | $575 | $630 | $55 | 10% | $159,213,915 | $630 | $55 | 10% | $0 | 0% |
| I-131 Refugee Travel Document for an individual age 16 or older | 16,260 | 16,260 | $135 | $165 | $30 | 22% | $2,682,818 | $165 | $30 | 22% | $0 | 0% |
| I-131 Refugee Travel Document for a child under the age of 16 | 1,157 | 1,157 | $105 | $135 | $30 | 29% | $156,128 | $135 | $30 | 29% | $0 | 0% |
| I-131A Application for Travel Document (Carrier Documentation) | 8,000 | 8,000 | $575 | $575 | $0 | 0% | $4,600,000 | $575 | $0 | 0% | $0 | 0% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 111 | 111 | $930 | $930 | $0 | 0% | $103,230 | $930 | $0 | 0% | $0 | 0% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 10,500 | 6,985 | $930 | $1,175 | $245 | 26% | $8,207,375 | $1,395 | $465 | 50% | ($220) | -18% |
| I-485 Application to Register Permanent Residence or Adjust Status Subtotal | 608,750 | 558,291 | | | | | $787,251,600 | | | | | |
| I-485 Application to Register Permanent Residence or Adjust Status | 574,694 | 524,235 | $1,140 | $1,440 | $300 | 26% | $754,898,400 | $1,540 | $400 | 35% | ($100) | -6% |
| I-485 Application to Register Permanent Residence or Adjust Status | 34,056 | 34,056 | $750 | $950 | $200 | 27% | $32,353,200 | $1,540 | $790 | 105% | ($590) | -38% |
| I-539 Application to Extend/Change Nonimmigrant Status | 472,000 | 462,380 | | | | | $208,023,000 | | | | | |
| I-539 Application to Extend/Change Nonimmigrant Status - Online | 189,780 | 185,912 | $370 | $420 | $50 | 14% | $78,108,040 | $525 | $155 | 42% | ($105) | -20% |
| I-539 Application to Extend/Change Nonimmigrant Status - Paper | 282,220 | 276,468 | $370 | $470 | $100 | 27% | $129,939,960 | $620 | $250 | 68% | ($150) | -24% |
| I-601 Application for Waiver of Grounds of Inadmissibility | 19,750 | 18,339 | $930 | $1,050 | $120 | 13% | $19,225,500 | $1,050 | $120 | 13% | $0 | 0% |
| I-601A Provisional Unlawful Presence Waiver | 39,800 | 39,766 | $630 | $795 | $165 | 26% | $31,566,270 | $1,105 | $475 | 75% | ($310) | -28% |
| I-687 Application for Status as a Temporary Resident Under Section 245A of the INA | 1 | 1 | $1,130 | $1,240 | $110 | 10% | $1,240 | $1,240 | $110 | 10% | $0 | 0% |

## Rows and Color Coding

Most rows on the fee schedule represent different immigration benefit request fees (except headers, subtotals, and a key). The list below describes the color coding in the rows of the fee schedule. Descriptions are also at the bottom of the worksheet.

1. Black rows generally use NPRM fees, with some exceptions. This spreadsheet calculates all other fees independently from the ABC model. Generally black rows recover full cost. Thus, these subsidize other rows and workload without fees.

2. Red rows are held to the proposed fee. These rows may subtract $50 from the NPRM amount as an online filing discount.
3. Blue rows increase based on CPI, unless the NPRM had a lower fee. Includes a $50 discount for online filing in some cases.
4. Grey rows are 50% discounts which do not recover full cost.
5. **Bold** rows are subtotals.
6. Green rows are held to the current fees or fees beyond our control. Refugee travel documents are held to U.S. passport fees per U.S. obligations under Article 28 of the 1951 Convention Relating to the Status of Refugees. Currently, U.S. Passport fees are $30 more than our refugee travel document fees. State increased the fees twice ($10 and $20 changes) since the FY 2016/2017 fee rule.

## Column Walkthrough for Final Rule

There are several hidden columns and columns outside of the print area. We hide columns for presentation purposes; some columns are used to calculate fees. **Table 1** below describes each column.

Table 1: Columns in the Fees – Discount c9 (Tiered) worksheet

| Letter | Column Label | Description | Hidden Column? |
|--------|-------------|-------------|----------------|
| A | % Cap | Pulls the percentage increase from inflation to calculate inflation fees that are limited to the change in inflation since the current fees went into effect. | No |
| B | Fee Category | Labels the various tiers | No |
| C | Immigration Benefit Request | Number and name of the immigration benefit request. Sometimes this includes a subtotal where the current fee schedule separates one fee into several new fees. Sometimes it includes separate fees by online or paper filing. | No |
| D | Projected Workload Receipts | This is the projected count of receipts during the fee review period. It is an average of the two years in the fee review. Most projections come from the Volume Projection Committee (VPC) estimates. In most cases, the values are from the VPC Forecasts worksheet. In some cases, the workload estimate comes from other sources. In those cases, the workload estimates are on the Adjustments worksheet. For example:<br>• H-1B Pre-Registration Fee<br>• I-131A Application for Travel Document (Carrier Documentation) and other DOS IAA workload | No |
| E | Projected Fee-Paying Receipts | These are the projected receipts that will pay fees during the fee review period. It is an average of the two years in the fee review. Uses either the VPC Forecasts worksheet or the Adjustments worksheet. | No |

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| F | Current Fees (FY 2016/2017) | These are the current fees for immigration benefits. At several points, the fee schedule compares proposed fees to the current fees. The *Total* row of this column represents the average current fee. It multiplies each row of this column by the *Projected Fee-Paying Receipts*, and then divides by the total *Projected Fee-Paying Receipts*. As such, we consider it a weighted average for current fees. Functionally, you can think of this subtotal as an average current fee.[1] | No |
| G | Inflation Adjusted Amount | In the middle cap tier, this calculate the change from inflation to add to the current fee. | Yes |
| H | Amount to use (unrounded) | This column uses different formulas for benefit request fees based on the tier or other business rules. For example, it may use the lesser of either the proposed fee or the current fee plus inflation. | Yes |
| I | Back-Calculation | In most cases, this multiplies the *Amount to use (unrounded)* by the *Projected Fee-Paying Receipts* to estimate the revenue for the row. The SAVE copies the revenue estimate from the SAVE Revenue worksheet instead. | Yes |
| J | Final Fees (FY 2022/2023) | Rounds the *Amount to Use (unrounded)* column to the nearest $5 increment. | |
| K | $ Difference from Current Fees | This is the dollar difference between the current fees and the proposed fees. | |
| L | % Difference from Current Fees | This is the percentage difference between the proposed and current fees. | |
| M | Revenue with Revised Unrounded Fees | This is the total revenue by form if USCIS did not round to the nearest $5 increment. | |
| N | Revenue with Final Fees | This is the total revenue using the *Proposed Fees (FY 2022/2023)* column. | |
| O | Difference from Rounding | This is the total difference from rounding to $5 increments. USCIS may gain or lose revenue as a result of the policy decision to round fees. | |
| P | Revenue with FY 2016/2017 Fees | This multiplies the current fee by the fee-paying volume to assess revenue without implementing new fees. | |
| Q | Dollar Difference | This compares revenue with current fees versus new fees. | |
| R | Fee Waivers and Exemption Count | This is the difference between workload and fee-paying volumes. | |

---

[1] Please note that if you change the *Projected Fee-Paying Receipts* then the result for the *Subtotal (Non-Premium)* row may change even if the *Current Fees* do not change. This is because of the weighting by fee-paying volume. As such, the value in this row may be different than in the spreadsheet that determined the current fee schedule because the volumes will be different in each spreadsheet.

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| S | Fee Waiver and Exemption Value | This is the *Fee Waivers and Exemption Count* multiplied by new fees. It represents foregone revenue from fee waivers and exemptions. | |
| T | NPRM Proposed Fee | Proposed fee | |
| U | $ Difference from Current Fees | Dollar difference between the current and proposed fees. | |
| V | NPRM % Difference from Current Fees | Percentage difference between the current and proposed fees. | |

## Verify Fees Calculations

There are two error checking cells on the Fees worksheet. See Figure 3. Both should always equal zero. Check these cells after adding new rows and data to the Fees worksheet or periodically as needed.

Figure 2: Error check cells on Fees – Discount c9 (Tiered) worksheet

If the cells do not equal zero, undo or review recent changes.

## Fee Budget

This is the average two-year budget for the final rule that the fee schedule recovers.

## Fee Categories

Labels for the different tiers on the Fees – Discount c9 (Tiered) worksheet.

## CPI-U

The final rule limits some fee increases to the change in the CPI-U since December 2016, the effective date of the FY 2016/2017 fee rule. It uses the BLS series CUUR0000SA0 for index values. It calculates the difference and percentage difference between December 2016 and June 2023.

# Worksheets in the Proposed Fee Schedule

## Fees

The *Fees* worksheet is the main output of the fee schedule. This compares current fees to proposed fees, measures the effect of cost changes to the fee structure, and calculates final fees. See Figure 3. While the screenshot does not show every fee, this document offers a comprehensive overview of every column (including hidden ones) on this worksheet. This section offers a comprehensive overview of every significant calculation in the worksheet.

Figure 3: Print preview of the Fees worksheet from the NPRM

| Immigration Benefit Request | Projected Workload Receipts | Projected Fee-Paying Receipts | Current Fees (FY 2016/2017) | Model Output (FY 2022/2023) | Proposed Fees (FY 2022/2023) | $ Difference from Current Fees | % Difference from Current Fees | Revenue with Proposed Fees |
|---|---|---|---|---|---|---|---|---|
| **I-90 Application to Replace Permanent Resident Card Subtotal** | **740,000** | **648,758** | | | | | | **$297,576,250** |
| I-90 Application to Replace Permanent Resident Card - Online | 467,232 | 409,622 | $455 | $320 | $455 | $0 | 0% | $186,378,010 |
| I-90 Application to Replace Permanent Resident Card - Paper | 272,768 | 239,136 | $455 | $344 | $465 | $10 | 2% | $111,198,240 |
| I-102 Application for Replacement Initial Nonimmigrant Arrival-Departure Document | 5,020 | 4,623 | $445 | $499 | $680 | $235 | 53% | $3,143,640 |
| **I-129 Petition for a Nonimmigrant Worker Subtotal** | **568,630** | **568,630** | | | | | | **$483,032,100** |
| I-129 H-1B - Named Beneficiaries | 430,000 | 430,000 | $460 | $575 | $780 | $320 | 70% | $335,400,000 |
| I-129 H-2A - Named Beneficiaries | 4,020 | 4,020 | $460 | $802 | $1,090 | $630 | 137% | $4,381,800 |
| I-129 H-2B - Named Beneficiaries | 2,460 | 2,460 | $460 | $796 | $1,080 | $620 | 135% | $2,656,800 |
| I-129 L1A/L1B/LZ Blanket - Named Beneficiaries | 42,350 | 42,350 | $460 | $1,021 | $1,385 | $925 | 201% | $58,654,750 |
| I-129 O1/O2 | 27,300 | 27,300 | $460 | $775 | $1,055 | $595 | 129% | $28,801,500 |
| I-129 All Other | 40,850 | 40,850 | $460 | $749 | $1,015 | $555 | 121% | $41,462,750 |
| I-129 H-2A - Unnamed Beneficiaries | 17,650 | 17,650 | $460 | $390 | $530 | $70 | 15% | $9,354,500 |
| I-129 H-2B - Unnamed Beneficiaries | 4,000 | 4,000 | $460 | $426 | $580 | $120 | 26% | $2,320,000 |
| I-129F Petition for Alien Fiance(e) | 44,700 | 41,432 | $535 | $531 | $720 | $185 | 35% | $29,830,680 |
| **I-130 Petition for Alien Relative Subtotal** | **880,900** | **857,514** | | | | | | **$679,595,550** |
| I-130 Petition for Alien Relative - Online | 220,075 | 214,232 | $535 | $525 | $710 | $175 | 33% | $152,104,720 |
| I-130 Petition for Alien Relative - Paper | 660,825 | 643,282 | $535 | $603 | $820 | $285 | 53% | $527,490,830 |
| I-131 Application for Travel Document | 329,000 | 253,662 | $575 | $463 | $630 | $55 | 10% | $159,806,745 |
| I-131 Refugee Travel Document for an individual age 16 or older | 16,260 | 16,260 | $135 | $589 | $165 | $30 | 22% | $2,682,818 |
| I-131 Refugee Travel Document for a child under the age of 16 | 1,157 | 1,157 | $105 | $589 | $135 | $30 | 29% | $156,128 |
| I-131A Application for Travel Document (Carrier Documentation) | 8,000 | 8,000 | $575 | $338 | $575 | $0 | 0% | $4,600,000 |
| I-140 Immigrant Petition for Alien Worker | 140,000 | 140,000 | $700 | $528 | $715 | $15 | 2% | $100,100,000 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 111 | 111 | $930 | $682 | $930 | $0 | 0% | $103,230 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant | 41,481 | 10,954 | $930 | $2,194 | $1,100 | $170 | 18% | $12,049,400 |
| I-193 Application for Waiver of Passport and/or Visa | 6,815 | 6,772 | $585 | $586 | $695 | $110 | 19% | $4,706,540 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 10,693 | 7,260 | $930 | $1,027 | $1,395 | $465 | 50% | $10,127,700 |
| I-290B Notice of Appeal or Motion | 36,423 | 33,803 | $675 | $1,413 | $800 | $125 | 19% | $27,042,400 |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | 43,028 | 4,107 | $435 | $8,790 | $515 | $80 | 18% | $2,115,105 |
| I-485 Application to Register Permanent Residence or Adjust Status | 608,750 | 572,497 | $1,140 | $1,133 | $1,540 | $400 | 35% | $881,645,380 |

## CBP Fees

Combined fees for forms shared by CBP and USCIS are new to the FY 2022/2023 fee rule. On the *Fees* worksheet, these forms appear twice. First, the fee schedule uses the combined volumes and cost estimates to calculate combined fees for the following forms:

- I-192 Application for Advance Permission to Enter as Nonimmigrant
- I-193 Application for Waiver of Passport and/or Visa
- I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
- I-824 Application for Action on an Approved Application or Petition

On the last page of the fee schedule, there are negative amounts for these fees. These rows used only CBP volumes. By making these rows negative, USCIS guarantees that it does not rely on CBP revenue to recover USCIS costs. The *CBP Revenue* worksheet shows examples of the net effect of this adjustment. It also shows the cost information that CBP provided.

## Rows and Color Coding

Most rows on the fee schedule represent different immigration benefit request fees (except headers, subtotals, and a key). The list below describes the color coding in the rows of the fee schedule. Descriptions are also at the bottom of the *Fees* worksheet.

1. Black rows subsidize rows in red or green. They subsidize workload that does not recover full cost (adoption, appeals, naturalization, etc.) and work without fees (asylum, refugee, T/U visas, etc.). The Reallocation Difference columns (one with dollars and another with a percentage) indicate how much these fees increase as a result; these fees increase as a result; these are hidden columns, as described in Table 1.
2. Green indicates that the fee is held to the current fee or the US passport fees for first time passport book. In the FY 2010/2011 fee rule, USCIS held the N-400 Application for Naturalization constant. In the FY 2016/2017 fee rule, we held two immigration benefits, I-829 and biometrics services, to then current

fees. In the FY 2022/2023 fee rule, we proposed holding several fees to the current fee (Forms I-131A, I-698, N-565, etc.).

3. Red rows were held to the weighted average increase in the FY 2016/2017 fee rule, and USCIS leadership, as part of the standard policy process, decided to continue limiting these fee increases. Rows in black and blue subsidize these decisions.

4. Blue rows were held to the weighted average increase in the last fee rule, but USCIS leadership, as part of the standard policy process, decided to not hold the fee down any longer. These work like other black rows and subsidize other fees that are artificially low. For example, the FY 2016/2017 fee rule limited the fee increase for Form I-765, but the proposed fees for FY 2022/2023 do not limit the increase.

Should you need to change the color for a row, do it manually. While some Boolean columns may use conditional formatting to change their color, it is easier to change the color for an entire row manually than with conditional formatting.

## Column Walkthrough

There are several hidden columns and columns outside of the print area. We hide columns for presentation purposes; some columns are used to calculate proposed fees. Table 2 below describes each column and indicates whether or not it is hidden. If you need to hide or unhide cells to the left of column F, see the instructions on page 29 for Figure 25.

Table 2: Columns in the Fees worksheet

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| A | Limit Fee in FY 2010/2011? | This Boolean column labels whether the FY 2010/2011 fee rule limited the fee to less than full cost. This means the rule held the form to the current fee at the time (N-400), some other fee (I-131 refugee travel documents), or limited the amount of the increase (I-290B, I-360, I-600/600A, etc.) This column does not affect any calculations. | Yes |
| B | Limit Fee in FY 2016/2017? | This Boolean column labels whether the FY 2016/2017 fee rule limited the fee to less than full cost. This column does not affect any calculations. | No |
| C | Limit Fee in FY 2019/2020? | This Boolean column labels whether the FY 2019/2020 fee rule limited the fee to less than full cost. This column does not affect any calculations. | No |
| D | Limit Fee Now? | This Boolean column determines whether to limit the fee increase to an overall percentage increase. (See % Difference.) Unlike the previous columns, this column affects the cost reallocation calculations. Conditional formatting will make the font color red if it is true. | No |
| E | Keep Current Fee? | This Boolean column indirectly determines whether to hold the current fee. Meaning, if true, then this column sets the *Use Current Fees* column to be true. The cost reallocation calculation uses the *Use Current Fees* column, not this one. (Separating the two columns prevented a circular reference.) This affects the cost reallocation calculations. If true, conditional formatting will make this column green. | No |

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| F | Immigration Benefit Request | Number and name of the immigration benefit request. Sometimes this includes a subtotal where the current fee schedule separates one fee into several new fees. Sometimes it includes separate fees by online or paper filing. | No |
| G | Projected Workload Receipts | This is the projected count of receipts during the fee review period. It is an average of the two years in the fee review. The projections come from the Volume Projection Committee (VPC) estimates. In most cases, the values are from the VPC Forecasts worksheet.<br><br>In some cases, the workload estimate comes from other sources. In those cases, the workload estimates are on the Adjustments worksheet. For example:<br>• Shared USCIS and CBP workloads (Forms I-192, I-193, I-212, and I-824)<br>• H-1B Pre-Registration Fee<br>• I-131A Application for Travel Document (Carrier Documentation) and other DOS IAA workload | No |
| H | Projected Fee-Paying Receipts | These are the projected receipts that will pay fees during the fee review period. It is an average of the two years in the fee review. In some cases, this column uses the Adjustments worksheet. For example, the bullets in the previous row. | No |
| I | Projected Fee-Paying Receipts (No subtotals for formulas) | This is the same as the previous column, but without any subtotals. Cost reallocation uses this column instead of the one with subtotals. (Subtotals complicated the cost reallocation formula. It was easier to use a column without them.) | Yes |
| J | Current Fees (FY 2016/2017) | These are the current fees for immigration benefits. At several points, the fee schedule compares proposed fees to the current fees.<br><br>The *Subtotal (Non-Premium)* row of this column represents the average current fee. It multiplies each row of this column by the *Projected Fee-Paying Receipts*, and then divides by the total *Projected Fee-Paying Receipts*. As such, we consider it a weighted average for current fees. Functionally, you can think of this subtotal as an average current fee.[2] | No |
| K | Use Current Fees | This Boolean column determines whether to hold the current fee. Meaning, if true, then the *Model Output or Current Fee* column will use the current fee instead of the model output. This affects the cost reallocation calculations. | Yes |

---

[2] Please note that if you change the *Projected Fee-Paying Receipts* then the result for the *Subtotal (Non-Premium)* row may change even if the *Current Fees* do not change. This is because of the weighting by fee-paying volume. As such, the value in this row may be different than in the spreadsheet that determined the current fee schedule because the volumes will be different in each spreadsheet.

| Letter | Column Label | Description | Hidden Column? |
|--------|-------------|-------------|----------------|
| L | Unit Cost (FY 2022/2023) | This divides the total cost from PCM by Projected Workload Receipts to calculate a cost per receipt. If a workload is eligible for fee waivers or exemptions, then this column will be lower than the next column. | Yes |
| M | Model Output (FY 2022/2023) | CostPerform provides the total cost. This column divides by fee-paying volume to determine a fee-paying unit cost.[3] <br><br> The *Subtotal (Non-Premium)* row of this column represents the average current fee. It multiplies each row of this column by the *Projected Fee-Paying Receipts*, and then divides by the total *Projected Fee-Paying Receipts*. As such, we consider it a weighted average. Functionally, you can think of this subtotal as an average fee-paying unit cost. | No |
| N | Model Output or Current Fee | If *Use Current Fees* is true, then it will equal the current fee. Otherwise, it equals the model output column. | Yes |
| O | $ Difference | *Model Output or Current Fee* minus *Current Fees (FY 2016/2017)*. Used in the *% Difference* column. <br><br> The *Subtotal (Non-Premium)* row compares the weighted average in the *Current Fees (FY 2016/2017)* column to the weighted average in the *Model Output (FY 2019/2020)* column. | Yes |
| P | % Difference | The percentage difference between the Current Fees and the new Model Output. (Model Output - Current Fees)/Current Fees. <br><br> This column is important because some fees only change by the percentage in the *Subtotal (Non-Premium)* row. Rows where *Limit Fee Now?* is TRUE use the result here to calculate the fee. This row represents the increase in estimated cost (Model Output) over current fees, weighted by volume for each row. It is not exactly a change over current fees because fees are often more than the model output. | Yes |
| Q | Exempt from Model Output? | A column of Boolean values that the *Back-Calculation* uses. If true, then the current fee will either not change, or it will change by the overall weighted average. If false, then the back-calculation will add addition cost to offset those rows that were true. | Yes |

---

[3] Previous versions of this spreadsheet took the fee-paying unit cost (Model Output) straight from the model. By using the fee-paying volumes in the spreadsheet, it can calculate different fee-paying unit costs without changing data in the model. This helps OCFO provide economists with alternative fee schedules, like an alternative without additional fee exemptions.

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| R | Back-Calculation | This is the model output multiplied by the fee-paying volume. This represents the total cost of the row.<br><br>There is a hidden row (#85) that represents the difference between the total fee review budget and total cost. This difference represents the cost of forms that are not on the fee schedule (such as refugee and asylum workload). The difference is the revenue that the fee schedule must redistribute to other forms. The additional revenue pays for workload that is not on the fee schedule. This document, and fee rule documents, refer to this cost recovery as cost reallocation.<br><br>If a row is in a black or blue font color, then we base the proportion of additional costs a row will receive on its proportion of the *Subtotal (Non-Premium)*.<br><br>Some other rows have specialized calculations:<br>If the *Change Items* worksheet can toggle a policy item off or on, then the calculation here or in adjacent rows may change. Examples include bundling, refugee travel document fees, and additional fee exemptions.<br><br>The *Biometric Services (Other Programs such as TPS and EOIR)* row is blank in this column because this fee was calculated outside of CostPerform. The fee review budget backed out the contractual costs for TPS and EOIR. By leaving this column blank, the row does not factor into any cost reallocation or revenue calculations.<br><br>The *SAVE Initial Electronic Queries* row uses the *SAVE Revenue* worksheet to add that reimbursable revenue into the fee schedule calculations. | Yes |
| S | Model Output with Reallocation | There are different formulas for these rows. See the Rows and Color Coding section.<br><br>If *Exempt from Model Output?* column is false, then this adds a portion of the Back-Calculation column to the value in the *Model Output or Current Fee* column.<br><br>If *Exempt from Model Output?* column is true, then this adds the "% Difference" from the "Subtotal (Non-Premium)" row to the current fee. | No |

| Letter | Column Label | Description | Hidden Column? |
|--------|-------------|-------------|----------------|
| T | Reallocation $ Difference | This column is the difference between *Model Output with Reallocation* and the current fees. It shows the additional cost that red and green rows add to other fees. This column will be negative if a fee is less than the model output. (Meaning, USCIS holds the immigration benefit request to the weighted average increase in the *% Difference* from the *Subtotal (Non-Premium)* row.) | Yes |
| U | Reallocation % Revenue Difference | As mentioned in the *Back-Calculation* section, the fee schedule covers the cost of forms that are not on the fee schedule. The percentage in this column shows how much of this amount each form funds. Meaning, it shows the forms affected most by cost reallocation. USCIS only has a few high-volume forms (I-90, I-130, I-485, I-765, N-400, etc.). The percentage will be higher on high volume forms. | Yes |
| V | Eligible for Online Filing? | Not used for any calculations, but it flags workloads that are eligible for online filing. Boolean. | Yes |
| W | Proposed Fees (FY 2022/2023) | This column rounds the *Model Output with Reallocation* column to the nearest $5 increment. In fee rules this is often the proposed fee or final fee. | No |
| X | $ Difference from Current Fees | This is the difference between the current fees and the proposed fees. | No |
| Y | % Difference from Current Fees | This is the percentage difference between the proposed and current fees. | No |
| Z | Revenue Delta (Fee Waivers, Exemptions, etc.) | This is model output multiplied by the difference between workload and fee-paying volumes. It represents the estimated cost of fee waived or fee exempt work. | Yes |
| AA | Revenue with Revised Unrounded Fees | This is the total revenue by form if USCIS did not round to the nearest $5 increment.<br><br>The *Grand Total* row of this column represents the total in the USCIS fee review budget. An error check makes sure that it matches the total budget in CostPerform. | Yes |
| AB | Revenue with Proposed Fees | This is the total revenue using the *Proposed Fees (FY 2022/2023)* column. | No |
| AD | Difference from Rounding | This is the total difference from rounding to $5 increments. USCIS may gain or lose revenue as a result of the policy decision to round fees. | Yes |
| AE | Revenue with FY 2016/2017 Fees | This multiplies the current fee by the fee-paying volume to assess revenue without implementing new fees. | Yes |
| AF | Dollar Difference | This compares revenue with current fees versus new fees. | Yes |
| AG | Fee Waivers and Exemption Count | This is the difference between workload and fee-paying volumes. | Yes |
| AH | Fee Waiver and Exemption Value | This is the *Fee Waivers and Exemption Count* multiplied by new fees. It represents foregone revenue from fee waivers and exemptions. | Yes |

| Letter | Column Label | Description | Hidden Column? |
|--------|--------------|-------------|----------------|
| AI+ | Various pasted value and difference columns | This and similar columns exist to compare various fee scenarios. For example, these could be comparisons to the different versions of proposed fees. This lets DHS or USCIS leadership see the effect of decisions on fees as they compare different fee setting scenarios. | Outside print area |

## Cost Reallocation Calculation

USCIS does not charge fees for every output in the ABC model. For example, refugee and asylum workload are in the ABC model, but USCIS does not charge fees for some of the workload. In addition, DHS or USCIS may decide not to change or limit the change of some fees. We increase fees to offset for the cost of these decisions. This is called cost reallocation. The reallocation ensures USCIS recovers the full fee review budget through immigration benefit fees.

This is the final step in creating the fee schedule. On the *Fees* worksheet (Figure 3), model outputs serve as the baseline for most fees. Exceptions are color coded in red or green fonts. See the *Rows and Color Coding* section for more information.

### Items Below Full Cost (Red)

A red font indicates fees held below the model output. USCIS holds other fees to the total weighted average increase in the *% Difference* column. This column is the difference between current fees and model output. Essentially, it is the difference between current fees and projected costs. The *Exempt from Model Output* column equals TRUE for these rows. The following immigration benefits are held below the model output in the proposed fee schedule:

- I-192 Application for Advance Permission to Enter as Nonimmigrant
- I-193 Application for Waiver of Passport and/or Visa
- I-290B Notice of Appeal or Motion
- I-360 Petition for Amerasian Widow(er) or Special Immigrant
- I-600/600A/800/800A Adoption Petitions and Applications
- I-600A Supplement 3 Request for Action on Approved I-600A
- I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA as Amended)
- I-800A Supplement 3 Request for Action on Approved I-800A
- I-881, Application for Suspension of Deportation or Special Rule Cancellation
- I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant
- N-300 Application to File Declaration of Intention
- N-336 Request for Hearing on a Decision in Naturalization Proceedings
- N-400 Application for Naturalization
- N-470 Application to Preserve Residence for Naturalization Purposes
- N-600 Application for Certificate of Citizenship
- N-600K Application for Citizenship and Issuance of Certificate

See the *Add or Remove Cost Reallocation to a Row* section to change the affected forms.

### Items Held to the Current Fee or U.S. Passport Book Fee (Green)

Green rows are held to the current fees or fees beyond DHS control. Refugee travel documents are held to U.S. passport fees per U.S. obligations under Article 28 of the 1951 Convention Relating to the Status of Refugees. The *Exempt from Model Output* column equals TRUE for these rows, plus any rows where the fee is held below full cost (red). The following immigration benefits are held below the model output in the proposed fee schedule:

- I-90 Application to Replace Permanent Resident Card - Online
- I-131 Refugee Travel Document for an individual age 16 or older
- I-131 Refugee Travel Document for a child under the age of 16
- I-131A Application for Travel Document (Carrier Documentation)
- I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)
- I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
- N-565 Application for Replacement Naturalization/Citizenship Document - Online
- N-565 Application for Replacement Naturalization/Citizenship Document – Paper

There may be times when the proposed fee is coincidently equal to the current fee without any other intervention. There is not an example in the proposed fee schedule, but it did occur in earlier drafts of proposed fees.

### Formula Walkthrough

These reallocations ensure full cost recovery. The *Back-Calculation* column determines the cost that each row needs to recover. There is also a hidden row (#85) to recover the additional cost of items in the budget but not in the fee schedule. These items include cost objects in CostPerform for RAIO and other workload without fees. The formula multiplies fee-paying receipts by model output.

*Model Output with Reallocation* distributes the costs that USCIS must recover in the hidden row (#85). If a row is red (and *Exempt from Model Output* is TRUE), then the fee will only change by the *% Difference* between the current fee and the model output. If *Exempt from Model Input* is FALSE, then it will receive additional costs. It redistributes these additional costs from the *Back-Calculation* column by the proportion of the total cost in the *Subtotal (Non-Premium)* row. (USCIS does not burden the biometric or genealogy fees with additional costs.) The proportion represents the percentage of total revenue that the immigration benefit will recover.

The formula for the *Model Output with Reallocation* is especially complex. For example, Equation 1 below is the formula for I-90 Application to Replace Permanent Resident Card - Online:

<div align="center">

**Equation 1: *Model Output with Reallocation* formula**

=IF($D5=FALSE,IFERROR(IF(K5,J5,(((R5/($R$84-
SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85)/I5)+N5)),0),J5*(1+$P$84))

</div>

See Figure 4 for the names of columns and rows the formula bar. The top of the screenshot shows Equation 1 in the formula bar.

**Figure 4: Hidden rows and formulas in Fees worksheet**

Table 3 below breaks the formula down into steps to make it more manageable. New parts of the formula are in red.

**Table 3: Steps in the *Model Output with Reallocation* formula**

| # | Formula | Result | Description |
|---|---------|--------|-------------|
| 1 | =IF($D5=FALSE, … , J5*(1+$P$84)) | Varies | If *Limit Fee Now?* = FALSE, then proceed to calculate the fee using the rest of the formula. If TRUE, then skip to the end of the formula, J5*(1+$P$84), which limits the fee increase by the average in the *% Difference* column. |
| 2 | =IFERROR(IF(K5,J5, …),0) | Varies | If *Use Current Fees* = TRUE, then the current fee is the fee. If FALSE, then proceed to calculate the fee based on the model output plus cost reallocation. Return 0 if there is an error. |
| 3 | =R5 | $186,378,010 | Back-Calculation for the row. |
| 4 | =$R$84 | $3,683,332,001 | *Subtotal (Non-Premium)* in the *Back-Calculation* column. |
| 5 | =SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78) | $810,288,333 | Subtotal of subsidized forms, where *Except from Model Output* = TRUE. |
| 6 | =($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78)) | $2,873,043,668 | Step 4 minus step 5 above. |
| 7 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78)) | ~6% | Percent of total Back-Calculation for that row.[4] |
| 8 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85) | $66,696,613 | This row's share of costs not recovered by other fees. (Meaning, workload without fees or below cost). $R$85 is a hidden row that subtracts the *Back Calculations* from the total budget. |
| 9 | =(R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85)/I5 | $163 | The above divided by fee-paying volume. Fee-paying unit cost of above.[5] |

---

[4] *Reallocation % Revenue Difference* will show the same result for that row, though it calculates it differently. It breaks out the percentage after determining the *Model Output with Reallocation*.
[5] *Reallocation $ Difference* will show the same result for that row, though it calculates it differently. It breaks out the dollar amount after determining the *Model Output with Reallocation*.

18

| # | Formula | Result | Description |
|---|---------|--------|-------------|
| 1 0 | =(((R5/($R$84-SUMIF($Q$5:$Q$78,TRUE,$R$5:$R$78))*$R$85)/I5)+N5 | $455 | Model output plus the above unit cost. |

Finally, USCIS rounds all fees to the nearest $5 increment in the *Proposed Fees (FY 2022/2023)* column. This simplifies the fee that customers may have to pay.

Please note that the percentage in the *Subtotal (Non-Premium)* row of the *% Difference from Current Fees* column is a frequently misunderstood metric. This is the change between an average current fee and an average new fee. It uses a weighted average change from the *$ Difference from Current Fees* column. You can think of this as the change in fees at the end of the fee schedule, after considering all changes to cost and fee setting policy. However, it does not represent a fee that any customer will pay. Likewise, it does not represent a percentage increase to the USCIS budget or revenue. As such, it may confuse customers because the percentage change to our budget or revenue may be different.

## Verify Fees Calculations

There are two error checking cells on the Fees worksheet. See Figure 5. Both should always equal zero. Check these cells after adding new rows and data to the Fees worksheet, after updating the Model Output worksheet, or periodically as needed.

Figure 5: Error check cells on Fees worksheet



If the cells do not equal zero, undo or review recent changes, especially to the formulas for the following columns or worksheets:

- Fees worksheet:
  - *Exempt from Model Output?* column
  - *Back-Calculation* column
  - *Model Output with Reallocation* column
- Model Output, Change Items, or VPC worksheets

## Model Output

This worksheet feeds the total cost of an immigration benefit request to the *Fees* worksheet. The *Fees* worksheet pulls from the blue area in columns A-E. See Figure 6. The names the fee schedule uses are in column A. The corresponding CostPerform name for the same object is in column B.

Figure 6: Model Output for the Fees worksheet

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | **Model Output** | | | | |
| 2 | **Non-Premium Fees** | | | | |
| 3 | **Total Cost by Immigration Benefit Request** | | | | |
| 4 | **Fee Schedule Name** | CostPerform Name | Online (Filing Method) | Paper (Filing Method) | Total Cost for Fees |
| 5 | Certificate of Non-Existence | G-1566 Certificate of No | $ - | $ - | $ 1,353,773.22 |
| 6 | G-1041 Genealogy Index Search Request - Online | G-1041 Genealogy Inde | $ 1,029,804.67 | $ 73,783.00 | $ 1,029,804.67 |
| 7 | G-1041 Genealogy Index Search Request - Paper | G-1041 Genealogy Inde | $ 1,029,804.67 | $ 73,783.00 | $ 73,783.00 |
| 8 | G-1041A Genealogy Records Request - Online | G-1041A Genealogy Rec | $ 742,173.67 | $ 47,667.48 | $ 742,173.67 |
| 9 | G-1041A Genealogy Records Request - Paper | G-1041A Genealogy Rec | $ 742,173.67 | $ 47,667.48 | $ 47,667.48 |
| 10 | H-1B Pre-registration Fee | H-1B Pre-registration Fe | $ 26,580,493.24 | $ - | $ 43,249,259.49 |
| 11 | I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | I-102 Application for Re | $ - | $ - | $ 2,308,782.22 |
| 12 | I-129 All Other | I-129 All Other | $ - | $ - | $ 30,593,601.89 |
| 13 | I-129 H-1B | I-129 H-1B | $ - | $ - | $ 247,107,718.66 |
| 14 | I-129 H-2A | I-129 H-2A | $ - | $ - | $ 10,110,958.36 |
| 15 | I-129 H-2B | I-129 H-2B | $ - | $ - | $ 3,663,142.84 |
| 16 | I-129 L1A/L1B/LZ Blanket | I-129 L1A/L1B/LZ Blanke | $ - | $ - | $ 43,240,894.60 |
| 17 | I-129 O1/O2 | I-129 O1/O2 | $ - | $ - | $ 21,169,404.42 |
| 18 | I-129F Petition for Alien Fiance(e) | I-129F Petition for Alien | $ - | $ - | $ 22,007,381.55 |
| 19 | I-130 Petition for Alien Relative - Online | I-130 Petition for Alien | $ 112,395,883.08 | $ 388,090,400.45 | $ 112,395,883.08 |
| 20 | I-130 Petition for Alien Relative - Paper | I-130 Petition for Alien | $ 112,395,883.08 | $ 388,090,400.45 | $ 388,090,400.45 |
| 21 | I-131 Application for Travel Document | I-131 Application for Tra | $ - | $ - | $ 117,372,207.11 |

Several formulas format the information for the *Fees* worksheet.

- When forms have both an online and paper filing fee in the proposed rule, it separates the total cost for each filing method (paper or online). For each row with two filing methods, the total cost for that filing method appears in the Total Cost for Fees column.
- If the proposed fee schedule has separate names for named and unnamed petitions, then it separates the total cost by beneficiary type (named or unnamed). Currently, this only applies to fees for Form I-129.
- It pulls total cost information from the CBP Example worksheet for the workloads that USCIS and CBP share. This affects Forms I-192, I-193, I-212, and I-824.

The next section covers several inputs from CostPerform that the spreadsheet requires.

## Input cells

As the title suggests, here you paste the model outputs from CostPerform. See *Update the Model Output Results* section for how to change this and the next worksheet. Styles and color coding indicate where to paste information.

Several sets of columns to the far right provide the cost information to the blue cells on the left (in the previous figure). There are two areas, all with similar formatting. They all use the orange Input style in Excel. See Figure 7 for an example.

**Figure 7: Input cells for CostPerform results**

| CostPerform Model Output | Debundled | | |
|---|---|---|---|
| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
| G-1041 Genealogy Index Search Request | $ 1,023,461.84 | $ 73,373.53 | $ 1,096,835.37 |
| G-1041A Genealogy Records Request | $ 739,276.14 | $ 47,489.42 | $ 786,765.56 |
| G-1566 Certificate of Non-Existence | $ - | $ - | $ 1,346,705.75 |
| H-1B Pre-registration Fee | $ 26,075,330.11 | $ - | $ 42,323,999.18 |
| I-102 Application for Replacement/Initial Nonii | $ - | $ - | $ 2,260,392.42 |
| I-129 All Other | $ - | $ - | $ 30,106,351.04 |
| I-129 H-1B | $ - | $ - | $ 242,465,556.93 |

At the bottom left of the Model Output worksheet, the green area (with the *Budget Set* style) provides the total budget to the *Fees* worksheet. See Figure 8.

**Figure 8: Model Output Budget**

| | EX |
|---|---|
| Pick from below | Average |
| FY 2022/2023 Fee Review Budget | 5,150,707,521.00 |

See the Update the Model Output Results section (see page 24) for how to update both sections of this worksheet.

## CBP Example

This worksheet pulls information from the *Fees* worksheet to demonstrate the net effect of combined fees for CBP and USCIS. See the *CBP Fees* section of the *Fees* worksheet for more information on how the fee schedule uses this information. In addition, it provides CBP cost information to the *Model Output* worksheet and volume information to the *Adjustments* worksheet.

**Figure 9: CBP Example worksheet**

The final rule spreadsheet did not need this worksheet because of the decision to limit some fee increases to the change in inflation since the FY 2016/2017 fee rule.

## Worksheets in Both the Proposed and Final Rule Fee Schedules

### Adjustments

In cases where the *Fees* worksheet does not use a VPC forecast, this worksheet provides the workload and fee-paying information. See the Various Adjustments section for information on the data sources that this worksheet

requires. Some of the volumes on this sheet may change because of policy items on the *Change Items* worksheet.

Figure 10: Adjustment worksheet

## VPC Forecasts

These are the workload projections for the fee review period. See Figure 6. Any rows or columns that we inserted use the *Input* style in Excel. For example, the columns for the two-year average, fee-paying volumes, and fee-paying percentages were all added to the worksheet. Fee-paying percentages come from the Fee-Paying worksheet. We added subtotal rows for forms with more than one VPC projection but only one fee. We also added a row to identify column numbers for the VLOOKUP function that the *Fees* worksheet uses to find the workload and fee-paying volumes.

Figure 11: VPC Forecast worksheet

We also added rows for online and paper filing. These summarize information above and calculate separate online and paper filing volumes using information form the Filing Methods worksheet. These additional rows appear at the end of the worksheet.

In most cases, the *Fees* worksheet uses the workload and fee-paying volumes from this worksheet. Exceptions are on the *Adjustment* worksheet. The *Fees* worksheet calculates the fee-paying unit cost (Model Output) using these volumes as the divisor.

## Fee-Paying

These are the fee-paying percentages that we apply to the VPC volume forecasts. See Figure 7. There may be more than one set of percentages. For example, bundled and debundled versions affect the fee-paying percentage for interim benefits, Forms I-765 and I-131. There may also be additional fee exemptions to add. Change Items will turn these on or off. Orange rows and columns represent places where we added space to match names to the fee schedule. The VPC forecast worksheet pulls this information to calculate the fee-paying volumes that the Fees worksheet uses to calculate fees.

**Figure 12: Fee-Paying worksheet**



## Filing Methods

These are the filing rates for online and paper when both options are available to customers. The information came from the OPQ domestic receipts dashboard in Tableau. The VPC forecast and Adjustments worksheets use this information to distinguish between paper and online filing volumes. It is necessary for separate fees by filing method.

**Figure 13: Filing Methods worksheet**

## Change Items

The FY 2022/2023 fee schedule includes a number of policy items. These policy items may affect one or more fees. They may mean changing a fee-paying volume or changing a formula. We added this worksheet in order to turn various changes on or off. This allows us to show leadership the effect of policy items by comparing results with the policy enabled or disabled.

**Figure 14: Change Items worksheet**

| # | Form(s) | Name | Enabled? | Fee Schedule Notes | CostPerform Notes | Output value |
|---|---------|------|----------|--------------------|--------------------|--------------|
| 1 | I-485, I-131, and I-765 | Bundling | FALSE | If true, assume free interim benefits (I-131 and I-765) with a paid I-485. Changes the fee-paying percentages on the Fee-Paying worksheet | Affects fee paying volume only. Separate periods in the model for bundled and debundled | 5 |
| 2 | Many | Humanitarian exemptions | TRUE | If true, assume additional humanitarian fee exemptions | Affects fee paying volume only. True = default values in the model | 4 |
| 3 | Many | Subtotal | TRUE | Column number for fee-paying percentages on the VPC and Fees worksheets | None | 9 |
| 4 | Many | Online Filing Fee-Paying Percentages | TRUE | If true, use the same fee-paying percentages for online and paper. Currently, most fee waivers and exemptions require paper filing. As such, online fee-paying percentages are higher than paper. If false, use different fee-paying percentages for online vs paper filing. | None | |
| 5 | I-192 | I-192 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-192 | Outside of the model. In the fee schedule only | |
| 6 | I-193 | I-193 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-193 | See above. | |
| 7 | I-212 | I-212 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-212 | See above. | |
| 8 | I-824 | I-824 CBP | TRUE | Add CBP costs and fee paying volumes to Forms I-824 | See above. | |
| 9 | N/A | Current SAVE Fee | TRUE | If true, assume current SAVE fee. If false, SAVE uses a single fee to recover full cost | | |
| 10 | Refugee Travel Doc fees | DOS finalizes final rule | TRUE | If true, increase refugee travel doc fees by $30 to match State's proposed fees. If false, increase by $10 to match passport fees as of the 19/20 rule | | |

## Biometric Fee

In the proposed fee schedule, USCIS incorporated the cost of biometric services into other form fees. However, there are some cases, such as TPS, where the forms are out of scope for the fee review. In these cases, this worksheet uses biometric volumes and costs from IRIS to calculate a stand-alone biometric fee. The *Fees* worksheet pulls the total volume and rounded fee from this worksheet. Average annual volume at the bottom of the worksheet comes from the VPC worksheet. The unit costs and biometric factors come from IRIS.

As noted in the *Column Walkthrough* and *Cost Reallocation Calculation* sections, the *Fees* worksheet uses this information for display only. The biometric fee does not recover costs in the *Fees* worksheet for the following reasons:

- These costs are outside of the fee review budget, the fee schedule does not need to recover these costs; and
- USCIS does not burden the biometric fees with cost reallocation.

## SAVE Revenue

In the *Fees* worksheet, the row for SAVE Initial Electronic Queries pulls the total revenue from this worksheet. As noted in the *Column Walkthrough* section, the *Fees* worksheet uses this reimbursable revenue in the fee schedule calculations.

<p align="center"><strong>Figure 15: SAVE Revenue</strong></p>

## Update the Model Output Results

A CostPerform user will need to copy and paste from three object sets from the model. Paste each individually into the orange input sections of the Model Output worksheet in the fee schedule. Below are instructions to follow. See the fee review model documentation for more information on how to use the software. The process is the same regardless of the fiscal year or dollar amounts involved.

## Model Output Budget

Follow the steps below to paste the fee review budget from CostPerform into the fee schedule.

1. Open the *Average* period in the appropriate CostPerform model.
   a. Alternatively, you can use the average two-year budget from the budget build spreadsheet.
2. Select the total for the Line Items Layer.
3. Right-click it and select Copy or use Ctrl + C. See Figure 16.
   a. You could also copy from any other layer, except Reassigned Activities, because they should all be equal.

**Figure 16: Copy Line Items total**



4.  In the right-hand corner of your browser, select Copy to Clipboard. See Figure 17.
    a.  If the number did not copy into your clipboard, then select the number from the copied content and use Ctrl + C again.

**Figure 17: Copy to Clipboard button**



5.  Paste into the green *Budget Set* area. See Figure 8 on page 21 for a screenshot of the completed area.

A calculation on the *Fees* worksheet will adjust fees to make the necessary revenue to offset the cost reallocation and hold some fees constant. Use the error checking cells on the *Fees* worksheet to verify that the grand total of the *Revenue with Revised Unrounded Fees* column matches the Model Output Budget. (Ignore the different *Revenue with Proposed Fees* column, which is rounded to the nearest $5. It will not match the model budget. See the *Difference from Rounding* column for the revenue gained or lost by rounding.)

## Model Output by Filing Type

Use object sets in CostPerform for the next two sections. For how to edit object sets, see the model documentation. Follow the steps below to paste information from the model that provides the fee schedule information that it needs for separate fees by online and paper filing methods.

1.  Open the Average period of the appropriate model.
    a.  For the proposed rule, use FY 2022/2023 Fee Review: Low.
2.  In the left navigation panel, select Sets and then Model Output by Filing Type.

**Figure 18: Model Output by Filing Type object set**



3. Click in the Object View and use Ctrl + A to select all the objects.

Figure 19: Model Output by Filing Type results

4. To copy the information without the header, use Ctrl + C. Otherwise, right click for options that include the header. See Figure 16 on page 25.
5. Click the button in the bottom right corner of your browser to copy the information to your clipboard, as shown in Figure 17 on page 25.
6. Paste with Ctrl + V into the first orange Input style area in the Model Output worksheet.

Figure 20: Paste Model Output by Filing Type in the spreadsheet

| CostPerform Model Output | Debundled | | |
|---|---|---|---|
| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
| G-1041 Genealogy Index Search Request | $ 1,029,804.67 | $ 73,783.00 | $ 1,103,587.67 |
| G-1041A Genealogy Records Request | $ 742,173.67 | $ 47,667.48 | $ 789,841.16 |
| G-1566 Certificate of Non-Existence | $ - | $ - | $ 1,353,773.22 |
| H-1B Pre-registration Fee | $ 26,580,493.24 | $ - | $ 43,249,259.49 |
| I-102 Application for Replacement/Initial Nonim | $ - | $ - | $ 2,308,782.22 |

7. Verify that you did not paste over area for I-129 fees described in the next section.
   a. If the model contains new cost objects for fees, then add additional rows to the worksheet.
   b. Add the cost object and fee schedule names for the new object to the blue area for in Figure 6 on page 19.
   c. Verify that the formulas in the blue area select the appropriate range with the new rows.
8. Verify that the values in columns C-E pull information from the pasted area.
   a. If the cost object name ends with "Online" then the amount will appear in the *Online (Filing Method)* and *Total Cost for Fees* columns. Likewise, if the object name ends in Paper, then it will appear in the column for that filing method and *Total Cost for Fees*.
   b. If there are not separate filing methods for the cost object, then it will appear in the *Total Cost for Fees* column.
9. Verify that the *Fees* worksheet pulls information into the *Model Output with Surcharge* column.
   a. Change the VLOOKUP functions to use the entire blue area for model outputs, if necessary.

## Model Output for I-129

Continue using object sets in CostPerform for this section. Follow the steps below to copy and paste information for separate fees for named and unnamed beneficiary types.

1. In CostPerform, use the left navigation panel to select the Model Output for I-129 object set. See Figure 21.

**Figure 21: Model Output for I-129 object set in CostPerform**

| Name | Named Beneficiaries (Beneficiary Types) | Unnamed Beneficiaries (Beneficiary Types) | Total Costs |
|---|---|---|---|
| 1 I-129 All Other | 30,593,601.89 | | 30,593,601.89 |
| 2 I-129 H-1B | 247,107,718.66 | | 247,107,718.66 |
| 3 I-129 H-2A | 3,223,361.06 | 6,887,597.31 | 10,110,958.36 |
| 4 I-129 H-2B | 1,957,677.73 | 1,705,465.11 | 3,663,142.84 |
| 5 I-129 L1A/L1B/LZ Blanket | 43,240,894.60 | | 43,240,894.60 |
| 6 I-129 O1/O2 | 21,169,404.42 | | 21,169,404.42 |

2. Click in the Object View.
3. Select all with Ctrl + A or by highlighting the whole set of results.
4. Use Ctrl + C to copy without headers or right-click. See Figure 16 on page 25.
5. Click the Copy to Clipboard button in the bottom right corner of your browser to copy the information to your clipboard, as shown in Figure 17 on page 25.
6. Paste with Ctrl + V into the second orange Input style area.

**Figure 22: Paste I-129 Model Output in the spreadsheet**

| Name | Named Beneficiaries (Be | Unnamed Beneficiaries (Be | Total Costs |
|---|---|---|---|
| I-129 All Other | $ 30,593,601.89 | $ - | $ 30,593,601.89 |
| I-129 H-1B | $ 247,107,718.66 | $ - | $ 247,107,718.66 |
| I-129 H-2A | $ 3,223,361.06 | $ 6,887,597.31 | $ 10,110,958.36 |
| I-129 H-2B | $ 1,957,677.73 | $ 1,705,465.11 | $ 3,663,142.84 |
| I-129 L1A/L1B/LZ Blanket | $ 43,240,894.60 | $ - | $ 43,240,894.60 |
| I-129 O1/O2 | $ 21,169,404.42 | $ - | $ 21,169,404.42 |

7. Verify that information copies into the blue area of the worksheet.
   a. Add new rows if necessary.

**Figure 23: I-129 information for the Fees worksheet**

| Fee Schedule Name | CostPerform Name | Beneficiary Type | Column # | Total Cost |
|---|---|---|---|---|
| I-129 All Other | I-129 All Other | Named Beneficiaries | 2 | $ 30,593,601.89 |
| I-129 H-1B - Named Beneficiaries | I-129 H-1B | Named Beneficiaries | 2 | $ 247,107,718.66 |
| I-129 H-2A - Named Beneficiaries | I-129 H-2A | Named Beneficiaries | 2 | $ 3,223,361.06 |
| I-129 H-2B - Named Beneficiaries | I-129 H-2B | Named Beneficiaries | 2 | $ 1,957,677.73 |
| I-129 L1A/L1B/LZ Blanket - Named Beneficiaries | I-129 L1A/L1B/LZ Blanket | Named Beneficiaries | 2 | $ 43,240,894.60 |
| I-129 O1/O2 | I-129 O1/O2 | Named Beneficiaries | 2 | $ 21,169,404.42 |
| | I-129 All Other | Unnamed Beneficiaries | 3 | $ - |
| | I-129 H-1B | Unnamed Beneficiaries | 3 | $ - |
| I-129 H-2A - Unnamed Beneficiaries | I-129 H-2A | Unnamed Beneficiaries | 3 | $ 6,887,597.31 |
| I-129 H-2B - Unnamed Beneficiaries | I-129 H-2B | Unnamed Beneficiaries | 3 | $ 1,705,465.11 |
| | I-129 L1A/L1B/LZ Blanket | Unnamed Beneficiaries | 3 | $ - |
| | I-129 O1/O2 | Unnamed Beneficiaries | 3 | $ - |

## Additional Steps for Bundled scenarios

In a scenario with bundled fees, use different periods of a CostPerform model to provides results that include bundled interim benefits for fee-paying Form I-485 applicants. USCIS economists may use this to analyze an alternative fee schedule.

1. Open the average period with the bundled results.
   a. In the NPRM, these are named Average Bundled.
2. Repeat the steps in the previous sections using different columns of the Model Output worksheet.
   a. Repeat the following sections:
      i. Model Output by Filing Type
      ii. Model Output for I-129
   b. Use the orange Input style cells farthest to the right:

i. Start with the section identified in Figure 24 and then work your way down.

Figure 24: Bundled input area

| CostPerform Model Output | Bundled | | |
|---|---|---|---|
| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
| G-1041 Genealogy Index Search Request | $ 1,027,858.62 | $ 75,136.67 | $ 1,102,995.29 |
| G-1041A Genealogy Records Request | $ 744,140.59 | $ 48,251.43 | $ 792,392.02 |
| G-1566 Request for Certificate of Non-Existenc | $ - | $ - | $ 1,353,773.22 |
| H-1B Pre-registration Fee | $ 27,977,396.36 | $ - | $ 45,810,851.64 |
| I-102 Application for Replacement/Initial Noni | $ - | $ - | $ 2,428,640.01 |
| I-129 All Other | $ - | $ - | $ 31,036,245.97 |

## Fee Schedule Scenarios

USCIS and DHS leadership may request several different scenarios. For example, DHS or USCIS leadership may wish to assess several possible fee review budgets. This might mean creating a scenario with a lower or higher total cost than in the ABC model and the fee review budget. See the Modify Total Cost for Budget Scenarios in the next section to make this change. As another example, DHS leadership may decide not to change some fees or to limit the increase of some fees. Change formulas in the rows to add cost reallocation to those immigration benefit requests. See the Add or Remove Cost Reallocation to a Row section beginning on page 28 to make both types of changes.

### Modify Total Cost for Budget Scenarios

To modify the total cost that the fee schedule uses, you will need to replace the Model Output Budget with a calculated value. Doing so may provide a rough estimate of how changes to the budget might affect fees. For example, modify the total budget on the *Model Output* worksheet. See Figure 11 on page 21 for a screenshot of the amount to change.

To truly see the effect of budget change, you will need to modify the CostPerform model. See the model documentation for more information on how to change values in the model.

### Add or Remove Cost Reallocation to a Row

#### Hold to Current Fee

To hold the current fee, follow these steps on the *Fees* worksheet:

1. Set the Keep Current Fee? Column to TRUE. Data validation only allows TRUE or FALSE in this column.
    a. If this column is hidden, unhide all columns between columns A to F.
    b. Use Ctrl + G to go to cell A1 or enter A1 into the Name Box to the left of the formula bar.
    c. In the ribbon, go to Home.
    d. Select Format, then Hide & Unhide, then Unhide Columns.

**Figure 25: Hide & unhide columns**



e. If you need to hide a column later, select the column, repeat these steps, and select Hide Columns.

2. Validate that the Use Current Fees column equals true. The two are set to equal each other.
   a. If these cells are hidden, unhide column K.
   b. If no to this or any of the following steps, then verify that the formulas in the affected row are the same as other rows.

3. Verify that the *Current Fees (FY 2016/2017)* column equals the following columns:
   a. *Model Output or Current Fee* and
   b. *Proposed Fees (FY 2022/2023).*

4. Verify that the check cells are equal to zero.
   a. See Figure 3 on page 19 for screenshots.

5. Copy formatting for a row with a green font color and paste formatting on the cell.
   a. Only the Boolean values use conditional formatting to change color.
   b. See the Rows and Color Coding section for a color key.

Using this method, the Model Output column reports the proper value, and *Model Output or Current Fee* shows the current fee. Cost reallocation calculations use the *Model Output or Current Fee* column.

## Limit A Fee Increase (Add Cost Reallocation)

Follow the steps below to limit the amount of a fee increase, called cost reallocation at USCIS.

1. Set the *Limit Fee Now?* column to TRUE. Data validation only allows TRUE or FALSE in this column.
   a. If this column is hidden, unhide all columns between columns A to F using the instructions on the previous page.

2. Validate that the *Model Output with Reallocation* column is **less** than the Model Output or Current Fee.
   a. If the column is hidden, unhide columns between M and W.
   b. If no to this or the following step, then verify that the formulas in the affected row are the same as other rows.

3. Verify that the check cells are equal to zero.
   a. See Figure 5 on page 19 for screenshots.

4. Copy formatting for a row with a red font color and paste formatting on the cell.
   a. Only the Boolean values use conditional formatting to change color.

b. See the Rows and Color Coding section for a color key.

### Remove Cost Reallocation and Allow a Fee to Change

Follow these steps to stop holding a fee to the weighted average change.

1. Set the *Limit Fee Now?* column to FALSE. Data validation only allows TRUE or FALSE in this column.
2. Validate that the *Model Output with Reallocation* column is **more** than the Model Output or Current Fee.
   a. If the column is hidden, unhide columns between M and W.
   b. If no to this or the following step, then verify that the formulas in the affected row are the same as other rows.
3. Verify that the Back-Calculation check cells (Figure 5 on page 19) are equal to zero.
4. Copy formatting for a row with a black or blue font color and paste formatting on the cell.
   a. Only the Boolean values use conditional formatting to change color.
   b. See the Rows and Color Coding section for a color key.


## Creating Appendixes for the Supporting Documentation and Rulemaking Documents

There are several worksheets in the fee schedule that contribute to the supporting documentation for the fee review. Should USCIS pursue a fee rule, then some of the same tables will go into the preamble for the NPRM and final rule. This section explains how to use them to create the tables for both documents.

### Current and Proposed Fees

In the supporting documentation, this is part of Appendix VII, Proposed Fees by Immigration Benefit Request. A similar table may be in the NPRM. Other tables in the NPRM may show current fees or proposed fees, possibly in multiple scenarios.[6] Follow the steps below to update this information.

1. If you have not already done so, update the Model Output worksheet, as described on page 19.
2. Create a copy of the *Fees* worksheet.
3. Hide all columns except these columns:
   a. Immigration Benefit Request (column E).
   b. Columns in the Table 3.

Table 4: Renamed Columns for Proposed Fees

| Column Letter | Default Column Name | Appendix Column Name | Preamble? | Documentation? |
|---|---|---|---|---|
| J | Current Fees (FY 2016/2017) | Current Fees | Yes | Yes |
| M | Model Output (FY 2022/2023) | Model Output | No | Yes |
| T | Reallocation $ Difference | Cost Reallocation | No | Yes |
| W | Proposed Fees (FY 2022/2023) | Proposed Fees | Yes | Yes |

---

[6] The FY 2019/2020 NPRM included six different fee scenarios. The FY 2016/2017 NPRM included one set of proposed fees.

| Column Letter | Default Column Name | Appendix Column Name | Preamble? | Documentation? |
|---|---|---|---|---|
| X | $ Difference from Current Fees | Proposed Change in Fee | Yes | Yes |
| Y | % Difference from Current Fees | Percent Change in Proposed Fee | Yes | Yes |

4. Rename the columns using Table 3.
    a. If updating for an NPRM, use "Proposed" instead of "Final" in the headers.
    b. In a final rule, use "Final" instead of "Proposed" in the headers.
5. Format as necessary to match the destination (supporting documentation or NPRM).
    a. See the supporting documentation example in Figure 26.

Figure 26: Example Current and Proposed Fees

**Appendix Table 4: Proposed Fees by Immigration Benefit Request**

| Immigration Benefit Request | Current Fees | Model Output | Cost Reallocation[34] | Proposed Fees | Proposed Change in Fees | Percent Change in Proposed Fees |
|---|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card - Online | $455 | $320 | $135 | $455 | $0 | 0% |
| I-90 Application to Replace Permanent Resident Card - Paper | $455 | $344 | $121 | $465 | $10 | 2% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $499 | $181 | $680 | $235 | 53% |
| I-129 Petition for a Nonimmigrant Worker Subtotal | $460 | N/A | N/A | N/A | N/A | N/A |





U.S. Citizenship and
Immigration Services

AR_000931

**FY 2022-2023**

# Immigration Examinations Fee Account

**Fee Review Model Documentation**

January 2024





U.S. Citizenship and
Immigration Services

AR_000932

**NOTE:** This fee schedule documentation is for the internal use of the Department of Homeland Security only to advise USCIS operations on the establishment of fees as stated hereafter. The procedure it contains, while followed by USCIS employees and contractors, generally, is not binding on USCIS or its employees. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, entities, officers, employees, agents, or any other person.

# Table of Contents

**BACKGROUND** ..................................................................................................................................................**2**

    PURPOSE ......................................................................................................................................................2

    PROCESS SUMMARY .......................................................................................................................................2

    PARTIES INVOLVED ........................................................................................................................................3

**FUNCTIONAL DESCRIPTION OF USCIS ACTIVITY-BASED COSTING MODEL** .......................................................**3**

    OVERVIEW OF ACTIVITY-BASED COSTING .........................................................................................................3

    RESOURCES (LINE ITEMS AND USCIS OFFICES) .................................................................................................5

    RESOURCE DRIVERS ......................................................................................................................................6

    ACTIVITIES (REASSIGNED ACTIVITIES AND TARGET ACTIVITIES) ............................................................................8

    ACTIVITY DRIVERS ......................................................................................................................................11

    COST OBJECTS (IMMIGRATION BENEFIT REQUESTS) ........................................................................................15

**TECHNICAL DESCRIPTION OF THE FY 2022/2023 FEE REVIEW MODEL**..........................................................**16**

    OVERVIEW...................................................................................................................................................16

    METAMODEL ..............................................................................................................................................17

    MODEL LAYERS...........................................................................................................................................19

    MODEL ALLOCATIONS..................................................................................................................................26

    DATA VALIDATION AND MODEL OUTPUTS .....................................................................................................32

**APPENDIX 1: GLOSSARY** .................................................................................................................................**37**

**APPENDIX 2: USCIS COST OBJECTS 1 LAYER MEMBERS** ................................................................................**40**

    COST OBJECT 1 MAIN HIERARCHY.................................................................................................................40

    COST OBJECT 1 ATTRIBUTE HIERARCHY.........................................................................................................42

**APPENDIX 3: CONTACT LIST**............................................................................................................................**47**

**APPENDIX 4: COSTPERFORM ASSIGNMENTS** .................................................................................................**48**

**APPENDIX 5: FEE REVIEW MODEL CHECKLIST** ...............................................................................................**48**

# Background

## Purpose

U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), conducts a fee review to determine if its fee structure and resulting revenue align with projected costs. This is in accordance with the Chief Financial Officers Act of 1990 and the Office of Management and Budget's Circular A-25. The USCIS Office of the Chief Financial Officer (OCFO) conducts the fee review and evaluates a two year period. The fee review is a budget formulation exercise that allows USCIS to adequately plan and fund immigration benefit request processing. For a detailed description of the most recent review, see the FY 2022/2023 fee review supporting documentation or preambles to the rulemaking.

This model documentation supplements the fee review supporting documentation. This document focuses on the inputs, outputs, and mechanics of the activity-based cost (ABC) model that USCIS uses in the fee review process. USCIS uses CostPerform to create the model. [1] For information from the vendor on this commercial off-the-shelf application, visit https://www.costperform.com. Software documentation is on the budget shared drive (███████████████████) and https://www.costperform.com/support.[2]

## Process Summary

The following bullets provide an overview of the fee review process. This document contains links to help navigate the document and provide an understanding of the process. Fee review and modeling terminology are in the glossary appendix.

- Use ABC to allocate costs to immigration benefit requests.
  - See ABC Overview.
- Uses operating plan (OP) to develop the fee review cost baseline.
  - See Resources.
- Performs a resource analysis to split labor by operational activity using employee job titles.
  - See Resource Drivers for the assignment process.
  - See Activities for work performed by USCIS.
- Considers other operational requirements, such as anticipated immigration benefit request volumes and adjudicative time.
  - See Activity Drivers.
- Divide total immigration benefit request costs are by projected fee-paying volume to determine unit costs.
  - See Data Validation and Model Outputs.
- Adjust unit costs in a fee schedule spreadsheet to determine final fees.
  - See the separate Fee Schedule documentation in the docket.

---

[1] Previous fee reviews used SAP Profitability and Cost Management (PCM). SAP ended support for PCM on Dec. 31, 2020.

[2] Access to the vendor's support page requires an account with the vendor. Contact OIT software licensing if you do not have access to the account.

## Parties Involved

Below are the key groups involved in the USCIS fee review. See the appendix for a list of individual contacts.

### Office of the Chief Financial Officer

The Office of the Chief Financial Officer (OCFO), Budget and Planning Division, Revenue and Cost Analysis (RCA) Branch conducts the USCIS fee review. RCA coordinates with other units of the OCFO and USCIS to gather information. OCFO contractors build an ABC model in CostPerform. The Program Execution Branch is responsible for daily budget execution activities and for creating the annual operating plan (OP), which serves as the cost baseline for the fee review. The Coordination and Reporting Branch is responsible for creating budget reports that track the OP, spending, or staffing. These reports may help RCA budget analysts estimate future year spending.

### Office of Performance and Quality

The Office of Performance and Quality (OPQ) provides several inputs to the fee review. OPQ provides draft volume projections to the Volume Projection Committee (VPC). OPQ also calculates staffing requirements for USCIS using several Staffing Allocation Model (SAM) spreadsheets. The SAMs use projected workload, based on VPC estimates, and actual or estimated completion rates (hours per completion). The fee review model uses the staffing requirement, completion rates, and workload (receipts and completions by location) from the SAM. The FY 2022/2023 fee review model uses the FY 2021 SAM, which spans FY 2021 through FY 2027.

### Office of the Chief Information Officer

The Office of the Chief Information Officer manages, maintains, and hosts the CostPerform servers at the USCIS HQ.

### Volume Projection Committee

OCFO and OPQ co-chair a Volume Projection Committee (VPC). OPQ prepares initial volume projections for immigration benefit requests using statistical modeling techniques. OPQ runs statistical models using Microsoft Excel or SAS business analytics software and a variety of forecast methods. OPQ submits volume projections to the VPC as a starting point for determining out-year volumes. The group discusses the forecasts and accepts it or proposes alternatives. Alternatives include different forecasting methods or estimates from upcoming policy changes. The VPC determines projections for immigration benefit requests that determine staffing requirements, annual budgets, and metrics for activity-based costing.

All relevant USCIS directorates and program offices are represented on the VPC, including Service Center Operations (SCOPS) Directorate, Field Operations Directorate (FOD), and Refugee, Asylum, and International Operations (RAIO) Directorate. Individual offices, like National Benefits Center (NBC), regional, district, and field offices, may also attend. Input from these offices helps refine the statistical volume projections.

## Functional Description of USCIS Activity-Based Costing Model

### Overview of Activity-Based Costing

USCIS uses ABC to determine the full cost of immigration benefit requests. The FY 2008/2009, FY 2010/2011, FY 2012/2013, FY 2014/2015, FY 2016/2017, and FY 2019/2020 fee reviews use the same methodology. It is the basis for the current fee structure. ABC is a business management tool that assigns resource costs to operational activities and then to products and services. These assignments provide a cost assessment of each process that produces outputs. The

Federal Accounting Standards Advisory Board (FASAB) encourages evaluating ABC as a cost accounting method. [3] "[A]ctivity-based costing has gained broad acceptance by manufacturing and service industries as an effective managerial tool. Federal entities are encouraged to study its potential within their own operations."[4] USCIS conforms to FASAB Standard 4: Managerial Cost Accounting Standards and Concepts by using ABC.

This review follows a two-step, cost assignment process. First, USCIS assigns costs (resources) to immigration benefit processing activities using resource drivers. Second, we assign activities to individual immigration benefit requests (cost objects) using activity drivers.[5] Figure 1 illustrates the cost assignment methodology used in ABC.

<div align="center">Figure 1: Activity-Based Costing General Diagram</div>



At each step of ABC, the total cost remains the same. Meaning, Resources = Activities = Cost Objects. We use different drivers to prorate costs between each step. This smooths out indirect costs and allows us to allocate costs based on the level of effort or requirements of each workload. First, we prorate resources (the budget) by resource drivers. We determine resource drivers (usually federal positions or contracts) by analyzing which resources perform each activity and to what degree. This results in costs by activity. Next, we prorate activity costs by activity drivers. We analyze what portions of activity costs to associate with each cost object using activity drivers. Our activity drivers are usually estimated units (receipts, completions, biometric services, etc.) or estimated hours (based on historic average hours per

---

[3] Federal Accounting Standards Advisory Board (FASAB), Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government (July 31, 1995) available at https://files.fasab.gov/pdffiles/handbook_sffas_4.pdf.

[4] Id at page 42.

[5] Activity-based costing typically uses the terminology in Figure 1, but there are some variations. For instance, some authors may refer to activity drivers as cost drivers. In our CostPerform model, resources consist of values in the Line Items and USCIS Offices layers.

completion, which include all adjudicative activities such as approval, denial and request of evidence) of an immigration benefit request. Determining the proper cost assignment method is critical to producing accurate results.

The two-step allocation process smooths out the effect of indirect costs. In traditional cost accounting, all indirect cost might be pooled together as overhead. Then you would divide the overhead by a single volume (such as total workload) to calculate an overhead rate. You would apply the overhead rate uniformly to all workloads. The overhead rate would be the same for all workload, regardless of the level of effort or individual requirements of each workload. This often leads to high costs even for relatively small or simple workloads.

We illustrate USCIS specific assignments in Figure 2. Feel free to refer to this graphic as we describe the objects in it. See the fee review supporting documentation for more detailed information on the USCIS ABC methodology.

**Figure 2: USCIS Specific ABC Diagram**



## Resources (Line Items and USCIS Offices)

USCIS resources are the cost baseline established for the review. The cost baseline includes the resources necessary for individual USCIS offices to sustain operations and deliver services. The FY 2021 USCIS operating plan (OP) is the starting point for developing the FY 2022/2023 baseline estimates with necessary updates applied to employee payroll and general expenses (GE) categories. See the FY 2022/2023 fee review supporting documentation for detailed information on the USCIS cost baseline.

USCIS designs the ABC model structure to resemble the structure of the OP. Meaning, the model uses the same accounting strings as the OP in most cases. The fee review model includes the same USCIS offices and project/task codes (line items) with some exceptions. Exceptions include when the fee review needs more detailed task codes than the OP. It could also mean that the fee review distributes large contracts (like rent) to individual offices instead of leaving the

5

whole contract in a single office like the OP does. Retaining the OP structure allows analysts to trace the path of OP budget line items all of the way through to activities and cost objects in the fee review model.

USCIS made the following adjustments and alignments to the OP for the fee review:

- Updated payroll to reflect the full year cost of all authorized positions.
- Analyzed payroll and GE costs for future years, such as staffing changes and contracts with variable costs driven by the volume of immigration benefit requests.
- Added enhancements that recur in the fee review years, such as new positions.
- Performed a resource analysis to align certain USCIS organization, project, or task codes to specific activities or immigration benefit requests. For example, we align IT systems that only support certain ABC activities or specific immigration benefit requests to those activities or cost objects in the model.
- Removed projected costs, volumes, and revenue for the programs outside of the fee review scope. For example:
    - Temporary Protected Status (TPS) and
    - Deferred Action for Childhood Arrivals (DACA).
- Changed the fund code for some costs currently in the business transformation fund (EP) and program (2005) to the non-premium fund (EX).
- Allocated rent and Federal Protective Service (FPS) guard service costs to fund, program, and office based on building occupancy.

In the CostPerform model, the Line Items and USCIS Offices layers represent resources. The technical description section of this document will go into more detail.

## Resource Drivers

Resources drivers spread resources by activity. For example, a common resource driver in ABC is the number of employees or full-time equivalents (FTE). The number of employees or FTE that perform an activity spread the cost of salaries to the activities that the employees perform. It makes sense to use different drivers in some cases. If contractors perform different duties than the employees in the same office, then you can evaluate the contract to spread it to the appropriate activities. If an IT system only supports specific activities or cost objects, then assign it appropriately. See Table 1 below for a list of resource drivers and the percentage of dollars that each receives in the model.[6]

<div align="center">Table 1: Resource Drivers in the Proposed Rule</div>

| Description | Resource Driver | Information Source(s) | FY 2022/2023 Average | % of Average |
|---|---|---|---|---|
| Positions or FTE by activity | FTE | Payroll Title Analysis (Staffing Proportion) and Staffing Total | $3,912,872,052 | 82% |
| Large intake and records contracts prorated differently than federal employees | Large Contracts | Resource Analysis | $127,089,341 | 3% |

---

[6] Table 1 excludes costs directly attributable to the Asylum Processing IFR.

| Description | Resource Driver | Information Source(s) | FY 2022/2023 Average | % of Average |
|---|---|---|---|---|
| Assign costs to specific activities, besides the Direct Costs activity | Allocations to a Specific Activity | Resource Analysis | $568,011,367 | 12% |
| Assign costs to the Direct Costs activity | Allocations to a Specific Activity | Resource Analysis | $116,834,261 | 2% |
| **Total** | | | **$4,724,807,021** | **100%** |

In the CostPerform model, resource drivers may be attributes to the Target Activity layer or common attributes shared between layers. The technical description section of this document will go into more detail.

## FTE

The fee review model uses a resource driver, called FTE, for the number of future positions or FTE dedicated to an activity. Most of the fee review model uses this resource driver. The model calculates FTE by multiplying two other drivers: Staffing Proportion and Staffing Total. By using these two pieces of information, FTE combines an analysis of historical information and a plan for future staffing.

## Staffing Proportion

The Staffing Proportion represents the number of positions or FTE dedicated to an activity based on historical data. It is the result of a detailed analysis that quantifies employee time by fee review activity. USCIS determines it by assigning one or more activities to each combination of fund, program, office, and position title. We assign some entire offices to an activity. If an office performs more than one activity, then we prorate positions to one or more activity based on data calls or reported hours. See the separate Payroll Title Analysis Documentation for more information, including step-by-step instructions.

The payroll title analysis can only use onboard positions because vacant positions do not have all of the required information in personnel systems, such as job title. Therefore, total staffing (including vacant positions and new positions planned as part of the fee review) are in a separate field.

## Staffing Total

The staffing total for the model is the sum of positions in the current OP plus any new positions planned as part of the fee review.

We assume the new hires will not change the results of the payroll analysis. The SAM is the largest source of new authorized positions. The SAM uses existing ratios, such as administrative and supervisory staff in relation to adjudicative positions, to forecast new staffing requirements for adjudicative offices. (The SAM also uses other information such as volume projections and completion rates.) In offices that do not adjudicate, existing positions perform the same function as new hires because the purpose of an office stays the same. Based on these assumptions, USCIS believes additional hiring has an immaterial effect on resource drivers from the payroll title analysis.

## Large Contracts

Contract support in some offices perform only a few activities. For example, they intake forms, deposit fees, create and move files. The federal employees in these offices may perform different duties, like adjudicating immigration benefit requests. This resource driver ensures that the model allocates the contracts to only the appropriate activities.

In the resource analysis, RCA worked with other offices to identify costs (or percentages of costs) by activity for some of the largest contracts in USCIS. For example, Field Operations (including the National Business Center or NBC) has three large contracts for support staff. Unlike the federal employees in Field Operations, contractors do not perform adjudications. Instead, they perform only two or more other activities.

### Allocations to a Specific Activity

In some cases, OCFO determines that a project directly benefits an activity or a cost object. OCFO discusses these with offices during the resource analysis. For example, the line item for the USCIS lockbox contract is fully dedicated to the Intake activity. Another example is the contract for USCIS Application Support Centers (ASC). We allocate it the Collect Biometric Data activity because ASC contractors are only responsible for collecting biometrics. In these cases, the model allocates a line item directly to an activity.

We assign some resources directly to an immigration benefit. For example, we assign the Department of State (DOS) reimbursable agreement to the workloads that DOS adjudicates on behalf of USCIS. We assign the line item for the project code to the Direct Costs activity first so that the total for each layer is equal. We also assign line items related to naturalization ceremonies to the Direct Cost activity before ultimately assigning them to naturalization applications.

## Activities (Reassigned Activities and Target Activities)

In ABC, activities are the critical link between resources and cost objects. USCIS spreads projected operating costs (resources) to the following activities:

- **Certify Non-Existence** provides requestors with a certificate of non-existence (CNE) of a naturalization record.

- **Conduct TECS Checks** involves the process of comparing information on applicants, petitioners, requestors, beneficiaries, derivatives, and household members who apply for an immigration benefit request against various Federal Government systems, and information databases. [7]

- **Direct Costs** support a specific immigration benefit request. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefits processing, to the application for naturalization.

- **Fraud Detection and Prevention** involves activities performed by the Fraud Detection and National Security (FDNS) Directorate in detecting, combating, and deterring immigration benefit fraud, as well as addressing national security and intelligence concerns.

- **Inform the Public** involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives.

- **Intake** involves mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and lockbox operations.

- **Issue Document** involves producing, distributing, and destroying secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization. For

---

[7] In previous reviews, USCIS called the Conduct TECS Check activity by different names, such as Conduct Interagency Border Inspection System Checks (IBIS) or Conduct Treasury Enforcement Communication System (TECS) Check. The system has changed names. The ABC model and the fee review were updated to reflect this change.

example, this includes issuing an employment authorization document (EAD) or permanent residence card (PRC) as well as destroying PRCs that have been surrendered to USCIS by individuals who file Form I-407, Record of Abandonment of Permanent Resident Status.

- **Make Determination** involves adjudicating immigration benefit requests; making and recording adjudicative decisions; requesting and reviewing additional evidence; interviewing applicants, petitioners, or requestors; consulting with supervisors or legal counsel; and researching applicable laws and decisions on non-routine adjudications.

- **Management and Oversight** involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.

- **Perform Biometric Services** involves the management of electronic biometric information, background checks performed by the Federal Bureau of Investigation (FBI), and the collection, use, and reuse of biometric information to verify the identity of individuals seeking an immigration benefit. USCIS aggregates the following subordinate activities into this activity:
  - **Collect Biometric Data**: ASC contractual support for collection of biometric modalities (currently fingerprints, photographs, and signatures).
  - **Check Fingerprints**: Send fingerprints to the FBI for identity confirmation, background, and security checks.
  - **Check Name**: Send information to the FBI for personnel, administrative, applicant, and criminal files compiled for law enforcement purposes. Generally, USCIS requests this additional service for naturalization and adjustment of status applicants.
  - **Manage Biometric Services**: Storage of biometrics and oversight of biometric services, including Federal employees at ASC locations.

- **Records Management** involves searching for and requesting files; creating temporary and/or permanent individual files; consolidating files; appending evidence submitted by applicants, petitioners, and requestors to existing immigration files; retrieving, storing, and moving files upon request; auditing and updating systems that track the location of files; and archiving inactive files.

- **Research Genealogy** provides researchers with access to historical immigration and naturalization records of deceased immigrants. It involves all work associated with the genealogy program in processing Forms G-1041 and G-1041A.

- **Systematic Alien Verification for Entitlements** (SAVE) captures costs for the program of the same name. USCIS charges federal, state, and local agencies through reimbursable agreements for this program. However, these agreements do not recover the full cost of the program; immigration fees continue to subsidize it. In FY 2013 and FY 2016, USCIS performed a standalone fee study to determine the total cost of the program. OCFO created this activity to determine the total cost of the program, including a share of the Service-wide Costs activity, as part of the biennial fee review.

The previous activities are the ones that USCIS publicly reports. In the model, these are the activities in the Target Activities layer. Within that layer, we group all Target Activities except for Direct Costs into a separate folder, called Exam Activities (Except Direct Costs). Figure 3 shows the various activity levels work in the USCIS ABC model. The screenshot shows both the names and symbols of layers and objects in the model.

9

**Figure 3: Activities in the ABC Model**



In addition to the Target Activities, there are two internal activities in the model. We refer to these as reassigned activities and they have their own layer in CostPerform.

- **Mission Support** represent an office's administrative or generalized staff that assist the rest of the office. OCFO created this activity because adjudication offices use administrative positions, such as Immigration Service Analysts, as supporting roles for different activities. To represent these supporting roles, the model allocates the cost of this activity to all other activities in the same office. For example, we reassign Immigration Service Analysts at the NBC to the rest of the NBC activities because they support adjudication and other activities in that office. Only offices that perform multiple other activities use this activity.

- **Service-wide Costs** represents resources that support USCIS as a whole. This activity reassigns costs to other activities, called Exam Activities except Direct Costs in the model. For example, we assign most USCIS information technology staff and other costs to this activity because laptops, network infrastructure, and cloud services support all other activities. (IT costs specific to only one activity or immigration benefit request are not service-wide costs.)

Figure 4 illustrates how reassigned activities work. The model reallocates the cost of the reassigned activities to all of the other activities, except for Direct Costs and reassigned activities. It uses the same FTE value to reassign the costs proportionately. Meaning, offices with higher staffing receive more of the Service-wide Costs. Within an office, the activity with the highest staffing receives the largest portion of Mission Support costs.

**Figure 4: USCIS Reassigned Activities**



## Activity Drivers

Activity drivers allocate activity costs to cost objects. They prorate the work performed (activities) into the outputs produced (cost objects) by that work. In the fee review model, USCIS primarily allocates activity costs to immigration benefit requests using workload volume estimates. This allocation makes sense for activities when similar time and effort are involved for each request.

The VPC forecasts workload volumes based on historical filing trends, upcoming policy changes, and statistical models developed by OPQ. See the Parties Involved section for more information on the VPC and OPQ. The sections below provide functional explanations for each of the activity drivers in the model.

Workload volume projections represent the total number of immigration benefits (cost objects) that USCIS expects to receive in a fiscal year. While individual assignments for some offices may differ, Table 2 below summarizes the general activity and activity driver assignments used in the fee review model. See Appendix 4: CostPerform Assignments for the specific drivers by office and activity.

**Table 2: General Activity Driver Assignments**

| Activity | Most Common Activity Driver |
|---|---|
| Certify Nonexistence | Calculated Hours (Completions * Completion Rate) |
| Conduct TECS Check | Completions |
| Direct Costs | Varies by Office and Line Item. |
| Fraud Detection and Prevention | Completions |

11

| Activity | Most Common Activity Driver |
|---|---|
| Inform the Public | Completions |
| Intake | Incoming Records (Receipts - Shredded Receipts) |
| Issue Document | Completions |
| Make Determination | Calculated Hours |
| Management and Oversight | Completions |
| Records Management | Completions |
| Research Genealogy | Calculated Hours |
| Systematic Alien Verification for Entitlements | Verifications |
| Perform Biometric Services | Varies. See below. |
|    Collect Biometric Data | ASC Production |
|    Check Fingerprints | FBI Fingerprints |
|    Check Name | FBI Name Checks |
|    Manage Biometric Services | ASC Production |
| Service-wide Costs | N/A (Reassigned Activity) |
| Mission Support | N/A (Reassigned Activity) |

Activity drivers are attributes of the cost object layer in the CostPerform model. The technical description section of this document will go into more detail.

### Completions, Receipts, and Transfers

USCIS uses workload volume forecast to help forecast costs. Receipts are the front-end of USCIS workload. Receipts distribute the intake of forms, data entry, and fee receipting work covered by the Intake activity. Receipts are the activity driver for the Intake activity for Office of Intake and Document Production (OIDP), the office responsible for USCIS lockboxes. The lockboxes receive paper benefit requests, enter data, and often ship the paper to offices that will adjudicate the benefit request.

Completions represent the final decision by USCIS. It can be an approval or a denial. USCIS often completes work at a different location than the receipts. USCIS centralizes adjudications in service centers and the NBC as much as possible. For example, these centers adjudicate forms that do not require interviews or process as much of the work as they can before Field Operations performs an interview to complete the adjudication.

Workload forecasts come from the VPC. There forecasts are in aggregate across all of USCIS. USCIS prorates projected workload volume to USCIS locations in order to assign costs to the locations where we adjudicate benefit requests and incur costs. These locations are the individual service centers SCOPS, FOD regional areas, NBC, and the divisions within the RAIO.

OPQ uses historical data on receipts and completions to distribute workload forecasts to locations. Meaning, we forecast workloads for the NBC, FOD regions, and individual service centers. Historic information is in the Performance Reporting Tool (PRT), which domestic adjudicative offices use to report hours and counts. OPQ uses the data to determine staffing levels by location in the SAM. OCFO uses both the SAM and historic information to prorate workload by location in the FY 2022/2023 fee review. Ultimately, an office's budget gets distributed by the forecasted workload

12

for that the office. Workload volume by location provides a more accurate cost allocation for adjudicative activities in the ABC model. Location is an attribute of the cost object layer, as described later in this document.

## Completion Rates

USCIS uses completion rates to identify the adjudicative time required to complete each specific form type. The rate for each form type represents the average time required for an Immigration Service Officer (ISO) to adjudicate that form type. The rate is the average hours per completion as a decimal. For example, if it takes 45 minutes to adjudicate a form, then the completion rate is 0.75 (45/60 = 0.75).

Completion rates reflect the time an ISO handles or touches the case or touch time. It does not reflect queue time or time spent waiting for additional information or supervisory approval. Nor does it reflect the total time applicants and petitioners can expect to wait for a decision on their case once USCIS receives it (also known as cycle time). OPQ calculated the domestic office completion rates for the FY 2021 SAM using PRT data for the 12-month period from FY 2019 or March 2019 to February 2020.[8] OFO used these completion rates in the fee review model.

In some cases, the SAM combines immigration benefits together, even though they have different fees. From a workload perspective, it may not matter. For the fee review, OCFO uses OPQ data in the PRT to calculate completion rates using March 2019 to February 2020, some other 12-month period, or EOY FY 2019 or FY 2020.

RAIO does not report completion rates to OPQ. Instead, OCFO used data calls for responses. International and Refugee Affairs Division (IRAD) provided an FY 2019 end of year performance report generated from a case management system, CAMINO.[9] They calculated international completion rates from the hours and completions in the report. OPQ estimated a completion rate for the main refugee workload (I-590). Previous models did not need a refugee completion rate because it was the only output for the former Refugee Affairs Division. Now that IRAD combines international offices with refugee workload, the model needed a refugee completion rate for consistent cost allocations. Asylum Division provided completion rates using the FY 2021 SAM. Before the FY 2019/2020 fee review, USCIS ABC models did not have asylum completion rates that allowed the model to weigh asylum costs by workload complexity. Previous models used completions to distribute Asylum Division costs evenly between their workloads.

We also requested completion rates from Immigration Records and Identity Services (IRIS) for three workloads at the National Records Center (NRC). These allow the model to weigh the cost of genealogy and CNE requests by the level of effort.

## Calculated Hours

The Make Determination activity assigns costs to specific benefit requests by multiplying completion rate by the projected completions. CostPerform calculates these hours using an attribute in the cost object layer.

The hours can vary significantly by request. The general premise is that the more time spent on a request, the higher portion of the Make Determination activity cost. Thus, higher the fee. Exceptions to this rule occur when volumes skew unit costs (for example, high-volume applications tend to have lower unit costs because costs are allocated over a higher

---

[8] Because of the coronavirus pandemic, we often used pre-pandemic information. We anticipate things may return to normal by FY 2022/2023.

[9] CAMINO G-23.35A is the name for the report, also known as the Mabel report.

volume base) or additional activities are performed (for example, naturalization requires interview and ceremony hours).

While not adjudications, the model uses calculated hours to distribute the Research Genealogy and Certify Nonexistence activity costs to their respective cost objects.

### Biometric Activity Drivers (ASC Production, FBI Fingerprints and Name Checks)

There are three biometric drivers for the four biometric activities. Each of the driver values comes from IRIS, which forecasts them by applying three-year average rates to VPC forecasts. ASC Production represents the count of biometric data collections by USCIS contactors at the application support centers. FBI Fingerprints and FBI Name Checks both represent services that USCIS pays for by reimbursable agreements. USCIS only use FBI Name Checks for about ten immigration benefit requests, like permanent residence and naturalization forms.

### Department of State Driver

IRAD provided estimates for the cost of work performed by the Department of State for USCIS. In the resource analysis, OCFO determined dollar amounts for each form that State adjudicates overseas. This activity driver spreads the total resources for the State interagency agreement (in the DOSIAA0 project code) to the individual forms using the estimated dollar amounts from the resource analysis.

### Fee-Paying Receipts

USCIS may waive fees, or allow an exemption, for certain classes of applicants. In other cases, USCIS performs a service but does not charge a fee, such as asylum or refugee processing. Fee-paying receipts are an estimate of how many customers will pay a fee for immigration benefit requests. The model uses estimates from revenue forecasts or the fee schedule.

Fee-paying volume is not part of the cost calculations in the model. However, it is the divisor in a unit cost that the fee schedule uses. Resources, activity costs, and workload volumes determine the total cost to process each cost object. USCIS divides the total cost by fee-paying volume to determine the fee-paying unit cost. The USCIS fee schedule spreadsheet turns this unit cost into proposed fees. The model and the fee schedule divide total cost by fee-paying volume to determine a fee-paying unit cost, called the Model Output. The Model Output informs the fee schedule. It helps determine the proposed fee unless some other policy decision intervenes. For example, holding naturalization and adoption fees below full cost.

Low fee-paying volume is often one of the main reasons for high fee-paying unit costs. For example, if only 25% of a benefit request is fee-paying volume, then the fee-paying unit cost for that immigration benefit is the unit cost of four completed applications. In general, if fee-paying volume is low, then customers seeking the same benefit bear the burden of the additional cost when they pay the fee unless there is a policy intervention. The ability-to-pay principal allows for policy interventions to keep fees affordable for those with less ability-to-pay.[10]

### Incoming Records and Shredded Receipts

Incoming Records represents paper receipts less documents that we shred after data collection and fee collection. We use this activity driver for the Intake and Records Management activities to better represent the cost of paper filing. For example, online filing does not receive the Intake activity cost because the model only allocates it to paper workloads.

---

[10] GAO, Federal User Fees: A Design Guide (May 29, 2008), available at https://www.gao.gov/products/GAO-08-386SP.

As another example, if USCIS shreds the paper that it receives for a benefit request, then that benefit request receives less of the Records Management activity cost because the Incoming Records driver does not include shredded paper. Currently, USCIS shreds the following paper requests after entering the data into our case management systems:

- I-90, Application to Replace Permanent Resident Card;
- I-765, Application for Employment Authorization, for some specific categories; and
- N-565, Application for Replacement Naturalization/Citizenship Document.

In our model, FOD and SCOPS generally use Incoming Records to allocate Intake activity costs.

### Verifications

IRIS provided estimates for SAVE workload as part of the OCFO resource analysis. The model includes these as activity drivers for SAVE activity costs. The model can determine a unit cost per verification by including the volume.

## Cost Objects (Immigration Benefit Requests)

Generally, a cost object can be any kind of output, such as a product in the private sector. In the fee review model, cost objects are the immigration benefits that USCIS processes or adjudicates, such as naturalization. As mentioned above, USCIS does not charge a fee for all immigration benefit requests. However, the model determines the total cost of completing each immigration benefit request based on the total resources, activities, and workload volume involved in each request. See the appendix for a full list of cost objects used in the fee review model.

USCIS omits temporary programs, such as Deferred Action for Childhood Arrivals (DACA) and Temporary Protective Status (TPS). These are not outputs in the fee review model and OCFO removes the costs from the resources in the fee review.

In the CostPerform, cost objects have several different properties, called attributes, that allow the model to allocate costs based on complex business rules. For example, all of the counts or hours in the Activity Drivers section are numeric or calculated attributes in the model. In addition, the model uses several alphanumeric or listed attributes. The following subsections will describe some of these in more detail. Below is a quick overview of some additional attributes.

- ASVVP Hours: Hours by cost object that help distribute the estimated cost for these site visits. Only affects the following forms: I-129, I-360, and I-829.
- Beneficiary Types: Named, Unnamed, or N/A. The model uses this distinction for only one form, I-129. There are separate cost assignments and completion rates for named and unnamed petitions. This allows the model to provide unit costs by named or unnamed beneficiaries on Form I-129.
- CLAIMS3 Forms: Yes/No field that designates whether or not a form is part of the CLAIMS 3 case management system. The model only distributes the cost of the system to the forms in it.
- Location: the model adds this short code, signifying the places that processes the cost objects, to the string for each cost object. It allows the model to distribute the cost of a place to the work that it touches.
- Lockbox Application: Yes/No field that designates whether or not a cost object is initially mailed to the OIDP lockboxes. By using this field, OIDP Intake costs only distribute to forms that go to a lockbox.
- Filing Method: Online, Paper, or N/A. Similar to the Location attribute, this adds text to the string for some cost objects. When online filing is available, there will be paper and online cost objects. This allows the model to assign Intake and Records Management costs differently for each filing method. For example, receipts filed on paper require the Intake activity, but receipts filed online do not.

15

- TECS Check Required: this is a grouping of benefit requests that require a basic security check. FDNS maintains the list on the USCIS intranet. FDNS will not conduct a more thorough investigation unless the form is on this list. As such, this list controls the assignments for both the Conduct TECS Check and Fraud Detection and Prevention activities.
- Documents Issued: Yes/No field that lists forms which result in an EAD, PRC, or travel document. It controls which forms receive the Issue Document activity.
- EAD and Green Cards: Yes/No field that lists forms which result in an EAD or PRC. It controls which forms receive the cost of card stock purchased with the NEXTGEN project code. It is an OIDP direct cost in the model.

Cost object assignments may use the listed attributes to allocate costs to the items on the list. Or they may use a numeric activity driver that distributes the costs to any cost object with a value for that activity driver. Meaning, objects with a zero value do not receive part of the cost. See Table 3 for some general cost object assignments. There may be individual exceptions based on the business requirements of an office, line item, or set of line items. For example, the OIDP Intake activity uses Receipts as its activity driver. However, we list Incoming Records as the activity driver because FOD, NBC, and SCOPS Intake uses it as the driver.

**Table 3: General Cost Object Assignments**

| Activity | Activity Driver | Cost Object Assignment |
|---|---|---|
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Conduct TECS Check | Completions | TECS Check Required = Yes |
| Fraud Detection and Prevention | Completions | TECS Check Required = Yes |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests where Filing Method is not Online |
| Issue Document | Completions | Documents Issued = Yes |
| Make Determination | Calculated Hours | Immigration Benefit Requests |
| Management and Oversight | Completions | Immigration Benefit Requests |
| Perform Biometric Services | N/A (See rows below) | N/A (See rows below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Records Management | Completions | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Reimbursable Workload |

## Technical Description of the FY 2022/2023 Fee Review Model

### Overview

CostPerform uses multiple calculations to perform activity-based costing. It provides a framework that model builders can use to meet the requirements of an organization. The software has two functions for creating an activity-based cost model: the Meta Model Explorer and the Cost Model Explorer. Access each on the left side of the CostPerform home screen.

16

**Figure 5: Meta Model and Cost Model Explorer**



The Meta Model Explorer allows the CostPerform user to create the high-level structure that the cost model uses. The meta model contains model layers, attributes, definitions for their behaviors. (See more information on metamodels in the Metamodel section.) The Cost Model Explorer is where the user builds the cost model from the structure created in the meta model. When creating a cost model, the user must define which metamodel the cost model will use.

Each cost model has multiple periods, which include different calculations or values. Individual periods are where the CostPerform user uploads and edits cost data information. Each period in the cost model will adopt the same underlying layer and attribute behaviors. In each USCIS cost model, there are periods for both fiscal years in the fee review as well as an average of the two. The fee schedule spreadsheet ultimately uses the average period to calculate fees. The models include periods with bundled and debundled activity drivers. The data for Forms I-485, I-131, and I-765 is different in the bundled periods because I-485 cost objects include free interim benefits (I-131 and I-765). The two sets of periods help USCIS analysis of alternatives.

**Figure 6: CostPerform Periods**



Users can create layers that have built-in relationships to facilitate ABC modeling. Model developers must define some relationships, such as the resource drivers used to spread a resource to an activity or how to drive activities to outputs. CostPerform calls these relationships allocations. Layers and allocations help CostPerform automatically calculate results.

## Metamodel

Users must sign in to the administrative CostPerform account to create or make changes to a metamodel. Once signed in, if editing an existing metamodel, they must change it to a work in progress to perform the edits. Right click on the desired metamodel and choose *Move to work in progress meta models*. Doing so will lock all cost models tied to the metamodel so that other users cannot make edits. Once the user finishes editing the metamodel and reverts it to a *Published* state, they can update the model periods in the Cost Model Explorer without being in the administrative account.

17

Model administrators or super users can add, delete, or edit all layers by accessing the Meta Model Explorer. Layers represent dimensions in the metamodel.

**Figure 7: Layers in CostPerform**



After creating each of the layers, the user can then create attributes which inform how CostPerform calculates and distributes costs. Attributes represent different measures or properties of objects in the metamodel. A user can create attributes to both model objects and allocations. Additionally, attributes can either be specific to a layer or can move between layers. CostPerform refers to attributes that can move between layers as Common Attribute Definitions or shadow attributes. Examples of Common Attribute Definitions within the model are FTE and Staffing Total.

An attribute can take on any of the following classifications:

- Alphanumeric: text, like a name or code.
    - For example, Location is an alphanumeric attribute because it mostly uses 3-character codes to represent USCIS locations.
- Numeric: numbers, like counts or hours.
    - For example, Receipts, Completions, Completion Rates, etc.
- Calculated: simple arithmetic formulas, like A+B, A-B, A*B, and A/B.
    - For example, Calculated Hours
- Listed: any predefined list. Could be a list of custom or Boolean values.
    - For example, Documents Issued, Lockbox Application, and TECS Check Required are all listed attributes where the list values are Yes or No.
    - Filing Method and Beneficiary Types use their own custom lists of three values, where one is N/A.
- Reference: these refer to another value in the model. There are no examples in the USCIS model.
- Formula: more complex calculations, like (A + B) * C or testing for an alphanumeric or listed attribute as a parameter in a calculation.
    - Incoming Receipts is a formula attribute in the USCIS model, but it could just as easily be a calculated attribute. The formular is Receipts – Shredded Receipts.

18

## Model Layers

CostPerform has a powerful calculation engine that allows it to allocate resources various ways using a shared structure, called layers. Layers represent a dimension in the metamodel. Model developers define the records allowed in each layer by creating objects within them. While the user creates and defines layers in the Meta Model Explorer, they add to each layer's structure in the Cost Model Explorer in each individual period.

**Figure 8: Layer Structure Logic**



The model hierarchy has a nesting structure, meaning that each subsequent level in each layer has a parent and child relationship. For example, in Figure 8: Layer Structure Logic, Parent 2 is a child to Parent 1. Objects 1 and 2 are children to Parent 2. The number of levels in the hierarchy differs for every layer. Generally, child level objects will consolidate (sum) to parent level objects. If a child object will consolidate, then the icon to its left is grayed out. Objects with negative cost totals can also consolidate.

When the model allocates costs between layers, the sum of a parent level may distribute to a child level in the next layer. For example, the costs of a USCIS Office may allocate to a Target Activity layer.

**Figure 9: Layer Aggregation Logic**

| Layer 1 | Layer 2 |
|---------|---------|
| Parent 1 | Parent 2 |
| Parent 2 | Object 3 |
| Object 1 | |
| Object 2 | |

Below is an example within the CostPerform model for Immigration Records and Identity Services (IRIS).

**Figure 10: Child Objects Roll-up**



In the Line Items layer, the structure allows for a breakdown of general expenses, payroll, and overhead costs by each project code and task code (line item) combination. For the USCIS Office layer, the model distributes the cost of each office by accounting strings that include organization codes and fields from the Line Items layer. In both Activity layers (Reassigned Activities and Target Activities), the model calculates costs by each combination of activity and organization code. Finally, the Cost Objects layer structure shows costs by immigration benefit and location string combinations. Some benefit request will include additional fields, like paper or online filing methods.

The following sections describe the layers in the FY 2022/2023 fee review model in detail.

## Line Items

This layer contains a string of codes that USCIS uses in the OP within its structured hierarchy. USCIS uses this string of codes to manage the budget. The string combines project codes, task codes, and sub-object (also known as allotment type). Table 4 below illustrates the different fields that comprise the string.

**Table 4: Line Item Names**

| Line Item Name | Project Code | Task Code | Sub-object |
|---|---|---|---|
| EXFD000-X01 AW | EXFD000 | X01 | AW |

**Figure 11: Line Items Layer**



In addition, the parent item for each line item comes from combining the project description and the task description. If there is no task description, then the model omits it. Descriptions come from a Federal Financial Management System (FFMS) report labeled CM107 or a reference database on the budget shared drive.

By default, the Line Items layer ignores a specific line item's fund and program in the structure of the budget data. By default, the model uses the sum of all programs and funds for each line item to calculate an overall cost to use in allocations to the USCIS layer. However, the model makes exceptions for RAIO (EX2003) and a select few SAVE (EX6001) objects. These receive their own line item that resides one level lower in the layer hierarchy. In previous iterations of the model, these exceptions were allocated differently throughout the model layers. As such, it's a best practice to keep them separate as business rule changes can differ slightly between the non-exceptions and exceptions.

**Figure 12: Line Items Exceptions**



The fee review limits itself to Immigration Examinations Fee Account (IEFA) non-premium costs. The USCIS budget contains other funds. However, they are out of scope of the IEFA fee review because they are statutory fees (HP and HB) or appropriated (OS and P1). The fee review model only includes funds that are within scope of the IEFA fee review.

In many cases, the combination of fields in the OP matches those in the model. In some cases, USCIS splits costs into additional categories by modifying the task code. For example, the fee review may need details by several task codes but the OP only uses one for a project code. In some cases, the model contains a project code that is not in the OP. For example, the REFUGEE project code includes the cost of increasing the refugee ceiling, which was not in the original OP.

To assign a line item directly to a cost object, a model builder allocates the dollar amount to the USCIS Offices layer, and then to Direct Costs in the Activities layer before allocating those dollars to specific forms. See the Cost Object Allocations section for more detail.

21

## USCIS Offices

The USCIS Offices layer contains the organization names used in the FY 2021 operating plan and the dollar amounts tied to each. While the model contains an object for Customs and Border Patrol, it does not contain any cost information.

**Figure 13: USCIS Offices Layer**



The model distributes Line Item costs to each organization code connected to the line item in the fee review budget. Figure 14 provides an example for EXFD000-X01 AW. Similar distributions exist for all other line items.

**Figure 14: Line Items to USCIS Offices**

Underneath each organization a new object is created, which links the line item string with their respective organization codes. Figure 15 outlines the USCIS Office strings under the Office of the Chief Information Officer. With this structure, CostPerform can track the costs attributed to each organization and the line items strings in each.

22

**Figure 15: Example USCIS Office Structure**



## Reassigned Activities

As outlined earlier, activities link resources and cost objects. The Resource Driver Allocations section discusses how to do this in CostPerform.

**Figure 16: Reassigned Activities Layer**



USCIS reassigns some activities in the model. Mission Support and Service-wide Costs are in the Reassigned Activities layer. The model redistributes Service-wide costs to all USCIS offices and Target Activities, except Direct Costs. The model redistributes Mission Support to the activities within the same office, except for Direct Costs. The object string changes from a breakdown of organization codes and line items to organizations codes and activity name. (See Figure 16.)

23

## Target Activities

The Target Activities layer includes both Direct Costs and Exam Activities, which are indirect activities. This layer receives costs from both the USCIS Offices layer and the Reassigned Activities layer. See the Resource Driver section for more information on this process.

**Figure 17: Target Activities Layer**



## Cost Objects (Immigration Benefit Requests)

Cost objects are the outputs of ABC, typically products and services. In the fee review model, this layer contains the immigration benefit requests. As noted earlier, USCIS does not charge a fee for every cost object. In addition, USCIS may waive the fee for some immigration benefits. The cost objects represent the total cost of each immigration request in the fee review whether or not it is part of the fee schedule.

**Figure 18: Cost Objects Layer**



At the lowest level, each cost object may combine several attributes. For example, each contains location. It may also include beneficiary type or filing method where applicable.

24

The location code, generally 3 letters, is used to designate the location, division, or organizational unit where an action occurs on an immigration benefit. This attribute allows business rules so the cost of an office is distributed by the workload for that location. Likewise, it allows the model to distribute the cost of a parent office to its children in a hierarchy.

**Figure 19: Cost Objects Locations**



There is a catch-all location, called Other, which we use for values where location data is unavailable or does not matter. For example, genealogy search and records requests use it. Domestic fee-paying volumes also use "Other" because the revenue estimates do not distinguish by location.

The beneficiary type (named and unnamed) only affects Form I-129 cost objects. The fee rule proposes to several fees, including separate H-2A and H-2B fees for named or unnamed beneficiaries.

**Figure 20: Cost Objects Beneficiary Types**



The filing method (paper and online) affects several cost objects where online filing is available. In certain circumstances, costs allocating from activities only flow to paper workloads.

**Figure 21: Cost Objects Filing Method**



25

## Model Allocations

Allocations are how costs flow from one layer to the next in CostPerform. CostPerform visualizes them with a line between objects in different layers. It allows you to follow links from line items to cost objects to discover the source or destination of various costs.

A regular allocation is a direct relationship between objects in different layers. It assigns costs from one object to the next without any intermediary objects between them. The figure below depicts three separate allocations from the same source object.

**Figure 22: Standard Allocation Logic**



The other allocation logic used within the model is distribution. Instead of individually writing allocations to each object to which costs flow, the user allocates an object to a folder in the destination layer. The costs then flow downward from the parent in the folder to its allocating children. The user can also define the source object's attributes, and the costs flow down to the resulting objects in the destination layer based on those parameters.

**Figure 23: Distribution Allocation Logic**

In CostPerform, a solid line shows the level at which the allocation is made within a layer's structure. A dotted line details where the costs ultimately drill down or roll up to in the hierarchy. For example, a solid line may at a parent level and a dotted line at child levels implies that the allocation was to the parents and each child inherited a portion of the

26

cost. A blue line indicates the allocation is based on certain rules, and a black line marks a regular allocation without distribution.

**Figure 24: Allocation Example**



As an example, in the figure above, CDOSTRG-000 GE allocates to 41-00-0000-00-00-00-00_CDOSTRG-000 GE. However, because 41-00-0000-00-00-00-00_CDOSTRG-000 GE is grayed out, the costs flow up to the parent level at 41-00-0000-00-00-00 and will be allocated to the next level from there.

Based on predetermined business rules, model builders assign a Value to Use to each allocation or allocate to an entire folder structure and distribute costs based on a set of rules and attributes. In an allocation, the top number represents the dollar value for that specific allocation, and the bottom represents the Value to Use. For a set of allocations leaving one object, think of the Value to Use as the percentage breakout for how costs from one object should allocate to many. Figure 25 provides an example for the Administrative Appeals Office.

**Figure 25: Allocation Value to Use**

In this figure, the Administrative Appeals object has seven separate allocations flowing from it (based on the resource driver splits). In the topmost allocation, 0.79 is the Value to Use. Because the Value to Use figures for the set of allocations sums to 1, this Value to Use indicates that 79% of the costs from the Administrative Appeals Office should flow to the Make Determination Activity. Although the Value to Use figures add up to 1 in this example, note that this is not always the case.

The fee review model uses four kinds of allocations:

1. Line Item Allocations
2. Resource Driver Allocations
3. Activity Reassignment Allocations
4. Cost Object Allocations

## Line Item Allocations

Line Item Allocations determine the movement of costs from the Line Items Layer to the USCIS Offices Layer. The fee review budget build determines the amount of allocations per line item and the Value to Use for each allocation. Because we already know the costs for each combination organization code and line item string, the Value to Use should equal the dollar amount that flows to that specific organization.

**Figure 26: Line Item Allocation Example**



## Resource Driver Allocations

Resource Driver Allocations determine which Resource Drivers allocates each Line Item to the Activities. USCIS uses the following information for this set of allocations:

- FTE (Staffing Total * Staffing Proportion)
- Large Contracts
- Direct Activity Drivers
- Direct Cost Object Drivers

Refer back to the Resource Drivers section for a functional description and percentage breakdown of each.

As previously mentioned, FTE uses the payroll title analysis to match the work completed in each USCIS office to their corresponding activities. For FTE allocations, the payroll title analysis determines the activities that an office uses and, if they use more than one activity, the percentage for each activity they perform. Aside from a few exceptions, costs roll up from the organization-line item string level of the structure to the organization level. The Value to Use for these allocations is FTE, which is the calculated activity percentages from the payroll title analysis (Staffing Proportion) multiplied by the Staffing Total. The Figure 27 below shows an example for Administrative Appeals.

**Figure 27: FTE Allocation Example**



28

The large contract allocations follow a similar structure to the FTE allocations, but only apply to the few contracts requiring a different driver in the cost model. Instead of costs rolling up to the organization level, the combination organization and line item strings for the corresponding large contract allocate to their respective activities. RCA determines the amounts for the allocations and the Value to Use during the resource analysis, where they work with the contract owners to determine the cost of the contract and its percentages by activity. The example below is for the National Records contract.

<p align="center">**Figure 28: Large Contract Allocation Example**</p>



Direct Activity Driver and Direct Cost Object Driver allocations differ slightly, but each has the same configuration within CostPerform. Each have one-to-one relationships. Meaning, they have one source object and one destination object. Each has a Value to Use of 1. Direct Activity Driver allocations are assigned to one of the Exam Activities. Direct Cost Object Driver allocations are assigned to Direct Cost objects. Therefore, Direct Cost Object driver allocation totals are not included in the model's activity totals. Certain SAVE and biometric service costs are Direct Activity Driver allocations. Different OIT line items are included in both Direct Activity Driver and Direct Cost Object Driver allocations. Below is an example of multiple objects allocating directly to Collect Biometric Data activity.

<p align="center">**Figure 29: Direct Activity Driver Allocation Example**</p>



Next is an example of the OIT line item associated with CLAIMS3 Forms allocating to its respective direct cost object.

<p align="center">**Figure 30: Direct Cost Object Driver Allocation Example**</p>



## Activity Reassignment Allocations

Mission Support and Service-wide Costs are reassigned activities. The model requires and extra step to assign these activities to the activities that USCIS uses for cost object outputs. Figure 31: Service-wide Costs Activity Reassignment shows OIT service-wide costs redistributed to all USCIS offices and the Exam Activities (Except Direct Costs). Each office receives their share of the cost based on overall staffing.

<p align="center">29</p>

**Figure 31: Service-wide Costs Activity Reassignment**



For the Mission Support activity objects, the model reassigns the costs to only target activity objects with the same office designation. The model bases the proportion on all of the other activities that the office performs. The activity with highest non-reassigned activities total will receive the largest share. In the example below, notice how the Asylum Mission Support costs only go to the Asylum sections of Exam Activities.

**Figure 32: Mission Support Activity Reassignment**



These objects use the distribution function in CostPerform. To edit these attributes, right click on an object and navigate to the Properties option and select the System Attributes tab. Figure 33 is an example for the Mission Support Asylum object.

**Figure 33: Mission Support System Attributes**



Here, the user assigns the Driver for the object. In this case, the Driver is all target activity objects with the same organization code (04-10-0000-00-00-00-00). The user should also make sure the Object Distributes option is toggled to green for the distribution to work properly. Service-wide Costs follow the same logic, except the Driver is staffing totals. The user only needs to link the source reassigned activity to the target activity folder.

30

## Cost Object Allocations

The Cost Object Allocations allow the user to select which activities USCIS performed for each form and which Activity Driver distributes the costs. These allocations once again use the distribution property. The figure below details the CFO Management and Oversight activity object.

**Figure 34: Activity Object Attribute Definition**



Table 5: General Cost Object Allocations details the most common driver for each activity. In the Advance options section, the user can choose Conditional Driver and Conditional Driver Value information. The "!" symbol next to value indicates a negation. The figure above details that the costs for this activity object will only go to forms with location codes not associated with CBP or Department of State, and the amount of costs flowing to each is based on that locations proportion of completions. If the user only needs to specify which locations a target activity object should or should not distribute to, choose Locations as the Conditional Driver. If a combination of locations and other attributes are needed (Filing Method, TECS Check, etc.), choose the Composition Condition option. Figure 35 shows an example of Composite Condition convention for FDNS HQ.

**Figure 35: Composite Condition Example**



For writing the most allocations, the user sets the activity object flow to a high-level folder. In most cases, this is simply Immigration Benefit Requests, but they are numerous exceptions. For example, the model allocates the Research Genealogy activity to the folder for the genealogy workloads, which is separate from other immigration benefit requests.

Table 5 below shows the default cost object driver information for each activity. Immigration Benefit Requests is a parent level that omits Additional Revenue Types such as genealogy forms.

**Table 5: General Cost Object Allocations**

| Activity | Activity Driver | Cost Object |
|---|---|---|
| Perform Biometric Services | N/A (See below) | N/A (See below) |
| Collect Biometric Data | ASC Production | Immigration Benefit Requests |
| Check Fingerprints | FBI Fingerprints | Immigration Benefit Requests |
| Check Name | FBI Name Checks | Immigration Benefit Requests |
| Manage Biometric Services | ASC Production | Immigration Benefit Requests |
| Conduct TECS Check | Completions | TECS Check Required attribute |
| Fraud Detection and Prevention | Completions | TECS Check Required attribute |
| Inform the Public | Completions | Immigration Benefit Requests |
| Intake | Incoming Records | Immigration Benefit Requests not filed online |
| Issue Document | Completions | Documents Issued attribute |
| Make Determination | Calculated Hours | Immigration Benefit Requests |
| Management and Oversight | Completions | Immigration Benefit Requests |
| Records Management | Completions | Immigration Benefit Requests |
| Research Genealogy | Calculated Hours | Genealogy Forms |
| Certify Nonexistence | Calculated Hours | Certificate of Non-Existence |
| Systematic Alien Verification for Entitlements | SAVE Verifications | SAVE Initial Electronic Queries |

## Data Validation and Model Outputs

### Data Validation Views

There are several ways to conduct data validation based on the information needed. We compare model inputs to the source files to validate the results of the model. Appendix 5: Fee Review Model Checklist requires USCIS to validate model data using some of these screens. This list is not exhaustive. There may be more items to check on the checklist than described in this section. In those cases, the checklist provides notes such as the objects or fields to use.

Some validation steps or model outputs require using object sets in CostPerform. To select an existing object set, use the navigation panel on the left. Select Sets and then the object set that you want to use. To return to all items, select the empty set at the top of the window.

**Figure 36: Object Sets**



To edit an existing object set or to create a new one in CostPerform, go to Tools. Select Object Sets. From that window, select the cost model and period that you want to work with. From there, select an existing object set from the drop-down list or make a new one by clicking the icon that looks like a piece of paper. Use the list on the bottom left to select

the objects that you want to include in the set. On the right, click Select Attributes to add attributes like name or total cost to include them in the object set. Click the floppy disk icon to save the object set. Export the object set as XML in case you need to import it into future models or periods.

Figure 37: Object/Allocation Set Editing



### *Validate Budget Total*

This is the total budget for the fee review model. It is visible once you open the model period. Each layer should match the fee review budget build except for the Reassigned Activities.

**Figure 38: Validate Budget Total**



| Symbol | Name | Total Costs |
|---|---|---|
| 1 Line Items | Line Items | 4,724,807,021.13 |
| 2 Responsibility Centers | USCIS Offices | 4,724,807,021.13 |
| 3 Reassigned Activities | Reassigned Activities | 767,388,399.85 |
| 4 Target Activities | Target Activities | 4,724,807,021.13 |
| 5 Cost Objects 1 | Immigration Benefits | 4,724,807,021.13 |

### *Validate IT Line Items*

Individually check Line Item allocations in the Office of the Chief Information Officer. Check the IT portfolios and systems that the model assigns directly to an activity or treats as a direct code. Use the Properties View to validate the IT project and task codes that USCIS allocates directly to an activity or a cost object. We compare this to a master list from the resource analysis which details how each line item should function.

**Figure 39: Validation - IT Line Items**



### *Validate Large Contract Resource Drivers*

Navigate to the large contract line items and use the Properties View to validate the data for three large contracts and their resource driver information. Compare the Value to Use figures to the percentage breakdowns in the source documents that USCIS prepared as part of the resource analysis.

**Figure 40: Large Contract Resource Drivers**



## *Validate Department of State Interagency Agreement*

Navigate to the Department of State IAA line item and use the Properties View to compare the dollar amounts by immigration benefit that USCIS determined during the resource analysis using an estimate from the State.

**Figure 41: Department of State Activity Driver**



## *Validate FTE and Staffing Totals*

Navigate to the Exam Activities folder in the Target Activities Layer and use the Object View. If not already selected, right click on one of the table column and headers and select "add column(s) before this column" and choose both FTE and Staffing Total. One can also drill down to a specific office when necessary.

**Figure 42: FTE and Staffing Totals**



| Symbol | Name | FTE | Staffing Total |
|---|---|---|---|
| Certify Nonexistence | Certify Nonexistence | 4.57 | 4.57 |
| Conduct TECS Check | Conduct TECS Check | 926.69 | 926.69 |
| Fraud Detection and Prevention | Fraud Detection and Prevention | 1,815.66 | 1,815.66 |
| Inform the Public | Inform the Public | 1,722.88 | 1,722.88 |
| Intake | Intake | 134.62 | 134.62 |
| Issue Document | Issue Document | 79.42 | 79.42 |
| Make Determination | Make Determination | 12,451.99 | 12,451.99 |
| Management and Oversight | Management and Oversight | 3,964.17 | 3,964.17 |
| Perform Biometric Services | Perform Biometric Services | 224.10 | 224.10 |
| Records Management | Records Management | 635.12 | 635.12 |
| Research Genealogy | Research Genealogy | 6.34 | 6.34 |
| Systematic Alien Verification for Entitlements | Systematic Alien Verification for Entitlements | 265.43 | 265.43 |

## *Validate Receipts and Completions Equal VPC Forecasts*

Navigate to the Cost Objects Layer and use the Object View to validate that receipts match VPC projections. Add Fee-Paying Receipts and Receipts columns if necessary. Alternatively, you can also use the Receipts and Completions object set, which provides a predefined list of objects and attributes for easy comparison. VPC projections include workload that is outside of the fee review scope, like DACA and TPS volumes. As such, some items in the VPC forecast will not be in the model. Additionally, the model includes items that are not in the VPC forecast, like Department of State volumes or policy decisions made after the VPC forecast. Use the model values a crosswalk to validate the model data.

**Figure 43: Receipts and Completions Object Set**



| Symbol | Name | Receipts | Completions | Transfers |
|---|---|---|---|---|
| 1 Credible Fear | Credible Fear | 150,000 | 150,000 | |
| 2 LI42 | I-102 Application for Replacement/Initial Nonimm... | 5,020 | 5,020 | |
| 3 LI37H | I-129 All Other | 40,850 | 40,850 | |
| 4 LI37D | I-129 H-1B | 430,000 | 430,000 | |
| 5 LI37I | I-129 H-2A | 21,670 | 21,670 | |
| 6 LI37E | I-129 H-2B | 6,460 | 6,460 | |
| 7 LI37F | I-129 L1A/L1B/LZ Blanket | 42,350 | 42,350 | |
| 8 LI37G | I-129 O1/O2 | 27,300 | 27,300 | |
| 9 LI34B | I-129F Petiton for Alien Fiance(e) | 44,700 | 45,144 | |

## *Validate Completion Rates*

Navigate to the Cost Objects Layer and use the Object View to validate completion rates, so that you can compare them to the source document, such as the SAM. Add the Completion Rates column if necessary. Alternatively, you can also use the Completion Rates object set, which provides a predefined list of objects and attributes for easy comparison.

**Figure 44: Completion Rates**

| Symbol | Name | Completion Rates |
|---|---|---|
| L142_COR | L142_COR | 0.97 |
| L142_CSC | L142_CSC | 0.88 |
| L142_NBC | L142_NBC | 0.67 |
| L142_NER | L142_NER | 0.97 |
| L142_NSC | L142_NSC | 0.88 |

## Model Outputs for Fee Schedule

CostPerform provides multiple inputs to the fee schedule. Use a set of objects to select the appropriate objects and attributes for each. The names in CostPerform are the same as the headers below. Validate the data using the CostPerform checklist and the screens in the previous section before using these in the fee schedule.

### Model Output by Filing Type

USCIS divides total cost by fee-paying volume to determine unit costs. Total cost information comes from CostPerform. Outside of the model, the fee schedule spreadsheet calculates the cost per fee-paying immigration benefit or Model Output.[11] This Model Output help calculate proposed and final fees in the fee schedule spreadsheet. The Model Output by Filing Type object set provides most of the information that the fee schedule needs. It distinguishes between online and paper, allowing the fee schedule to calculate separate fees for each filing method.

**Figure 45: Model Output by Filing Type**



| Name | Online (Filing Method) | Paper (Filing Method) | Total Costs |
|---|---|---|---|
| G-1041 Genealogy Index Search Request | 1,029,804.67 | 73,783.00 | 1,103,587.67 |
| G-1041A Genealogy Records Request | 742,173.67 | 47,667.48 | 789,841.16 |
| G-1566 Certificate of Non-Existence | | | 1,353,773.22 |
| H-1B Pre-registration Fee | 26,980,493.24 | | 43,249,259.49 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Dep... | | | 2,308,782.22 |
| I-129 All Other | | | 30,593,601.89 |
| I-129 H-1B | | | 247,107,718.66 |
| I-129 H-2A | | | 10,110,958.36 |
| I-129 H-2B | | | 3,663,142.84 |
| I-129 L1A/L1B/LZ Blanket | | | 43,240,894.60 |
| I-129 O1/O2 | | | 21,169,404.42 |
| I-129F Petition for Alien Fiance(e) | | | 22,007,381.55 |

### Model Output for I-129

The fee schedule proposes different fees for Form I-129. The form includes an attribute, Beneficiary Type, that other cost objects do not use. To distinguish total costs by named and unnamed beneficiaries, we created an object set that includes the attribute.

**Figure 46: Model Output for I-129**



| Name | Named Beneficiaries (Beneficiary Types) | Unnamed Beneficiaries (Beneficiary Types) | Total Costs |
|---|---|---|---|
| I-129 All Other | 30,593,601.89 | | 30,593,601.89 |
| I-129 H-1B | 247,107,718.66 | | 247,107,718.66 |
| I-129 H-2A | 3,223,361.06 | 6,887,597.31 | 10,110,958.36 |
| I-129 H-2B | 1,957,677.73 | 1,705,465.11 | 3,663,142.84 |
| I-129 L1A/L1B/LZ Blanket | 43,240,894.60 | | 43,240,894.60 |
| I-129 O1/O2 | 21,169,404.42 | | 21,169,404.42 |

---

[11] Previous ABC models calculated the Model Output in the software. More recent iterations of the ABC model only provide total cost. We divide total cost by the fee-paying receipts in the fee schedule spreadsheet. By doing so, USCIS leadership can evaluate the effect of changes to fee-paying policies in the fee schedule without new cost model results. The model calculates total cost with workload volumes, not fee-paying receipts. Fee-paying receipts are a subset of receipts that we only use to calculate the Model Output.

## Asylum Cost Objects

Some versions of the draft fee schedule compared costs for asylum with and without the Asylum Processing IFR. Use the object set for Asylum Cost Objects to get the information.

**Figure 47: Asylum Cost Objects**



## CostPerform Outputs for Preamble and Supporting Documentation

The supporting documentation also require information from CostPerform. The section below describes those screens.

## Activity Costs

One of the model outputs in the fee review documentation is the activity costs. End users can get the information from navigating to the Target Activity Layer and using the Object View. We format the CostPerform information in Excel or Word for the NPRM preamble and supporting documentation tables that use the information.

**Figure 48: Activity Costs**



## Model Output by Activity

One of the model outputs in the fee review supporting documentation is the activity unit costs. To access these reports, click the Rollup/Drilldown icon on the Home tab and choose the correct report in the top left corner of the next screen. The report includes total cost information. Similar to the Model Output report, the per-activity unit cost is calculated in Excel. We pull the total activity cost per immigration benefit request from CostPerform.

**Figure 49: Model Output by Activity**



36

# Appendix 1: Glossary

| | |
|---|---|
| ABC | Activity-based costing. See the overview of activity-based costing. |
| Activity | The work an organization performs. For example, USCIS accepts applications, enters and updates records, performs background checks, and adjudicates immigration benefit requests, and provides customer service. |
| Activity Driver | A measure of the frequency or intensity of demands for activities by cost objects. For the IEFA fee review, activity drivers are projected immigration benefit application volume, projected adjudication hours, or other information. |
| Administrator | A CostPerform user and group in the software license. These are super users with full access to every aspect of a model, including security. Only they can edit the metamodel, create new cost models, edit security settings, and delete or create periods. |
| Allocation | In CostPerform, an allocation defines the relationship between two objects in a cost model. An allocation occurs when a source-object from one layer distributes to a destination-object in another layer. |
| ASC | Application Support Centers, where USCIS provides biometric services for applicants. |
| Attribute | In CostPerform, a property, value, or calculation in one or more layers. They may be text, numeric, or list. Only administrators can create or delete attributes. |
| Cost Object | The primary output of an activity or series of activities. A cost object may be a product, service, or project. For the purposes of the fee review, the cost objects are the various immigration benefit requests for which USCIS adjudicates, usually for a fee. |
| DACA | Deferred Action for Childhood Arrivals, a program out of scope in the fee review. |
| Development user | These CostPerform users have write access to most aspects of a model, excluding security. They can enter data, create allocations and objects. They cannot edit the metamodel or security settings, nor delete or create periods. |
| DHS | Department of Homeland Security |
| Direct costs | Resources attributable to only one (or a select few) cost object(s). An activity in the USCIS ABC model. |
| EAD | Employment Authorization Document |
| FBI | Federal Bureau of Investigation |
| FOD | Field Operations Directorate |
| FPS | Federal Protective Service, a DHS agency that provides guard and security services for federal buildings. |
| FTE | Full-time equivalent, a statistic representing an employee that works full time for an entire fiscal year. |
| GE | General expenses. Basically, anything except pay and benefits in the budget. |

37

| | |
|---|---|
| Indirect costs | Resources not directly attributable to a cost object, such as an activity cost or overhead. Almost all values in the USCIS ABC model are indirect costs. |
| IRIS | Immigration Records and Identity Services Directorate |
| ISO | Immigration Services Officer |
| Layer | In CostPerform, a high-level conceptual grouping of objects which may serve a similar purpose. In the USCIS model, layers represent line items, offices, activities, or cost objects. |
| Line Items | A layer in the fee review model. Members of the dimension are resources that a model builder assigns to an activity (by a resource driver). In the model, the line items consist of the project code, task code, and allotment type for a budgeted value. |
| Model Output | The total cost from the ABC model divided by projected fee-paying receipts. One of the main inputs for the USCIS fee schedule. |
| NBC | National Benefits Center. It performs centralized front-end processing of applications and petitions that require field office interviews (primarily family-based I-485s and N-400s). In addition, the NBC adjudicates some form types to completion including civil surgeon requests and international adoption cases. |
| NRC | National Records Center. It provides records storage, management, and information retrieval services, including genealogy and Freedom of Information Act (FOIA) requests. |
| Object | In CostPerform, an element in a cost model. It represents something measurable, such as a cost. Similar objects are grouped in a layer. |
| OIDP | Office of Intake and Document Production is part of the USCIS Management Directorate that is responsible for the lockboxes, card production facilities, and designs and maintains various USCIS forms for internal and external use. |
| OP | Operating Plan, the budget for USCIS |
| RAIO | Refugee Asylum and International Operations Directorate |
| RCA | USCIS Office of the Chief Financial Officer Revenue and Cost Analysis Branch, which is responsible for the fee review. |
| Resource | An economic element applied or used in the performance of activities. For example, costs for labor, supplies, and facilities. Resources include direct and indirect resources costs. The term "indirect" typically includes overhead items or costs requiring a resource driver to spread them to activities. |
| Resource Analysis | An effort to define the work performed by an organization, usually with the goal of process improvement or activity-based costing. For process improvement, it may be very detailed and define activities as "value added" or "non-value added." Value added means it creates or improves an output for a customer. For ABC and fee setting purposes, the activities may be at a higher level than in process improvement. |

| Resource Driver | A measure of the amount of resources consumed by an activity. For example, amount of time spent on an activity, number of transactions processed. |
| --- | --- |
| OCFO | USCIS Office of the Chief Financial Officer |
| OPQ | USCIS Office of Performance and Quality |
| Overheads | Centralized USCIS costs managed by the OCFO, OIT, or other administrative offices. OCFO maintains a database table of overhead project and task codes. Overhead resources have their own grouping in the line items layer. |
| Publish | In CostPerform, make a metamodel available to users. |
| PPA | Program, project, or activity for OMB reporting of budgetary resources |
| PRC | Permanent Resident Card. More commonly known as a green card. |
| PRT | Performance Reporting Tool, the new tool that OPQ uses to store immigration benefit receipts, completions, and officer hours. |
| SAM | Staffing Allocation Model; OPQ creates these forecasts of personnel requirements based on completions rates and projected volumes. |
| SAVE | Systematic Alien Verification for Entitlements. An intergovernmental initiative designed to aid federal, state, and local benefit granting agencies determine a benefit applicant's immigration status, thereby ensuring that only entitled applicants receive public benefits and licenses. In the model, this is a service-wide reassigned cost. |
| SCOPS | Service Center Operations Directorate |
| TECS | A system that USCIS and other DHS components use for background checks. Mainly managed by CBP. Formerly an acronym for Treasury Enforcement Communication System, the system formerly known as Interagency Border Inspection System (IBIS). |
| Total Cost | The sum of all direct and indirect resource requirements in activity-based costing. Usually this refers to the total cost of an activity or cost object. For example, it can be the full USCIS resource requirement to adjudicate a benefit request in a fiscal year. |
| Unit Cost | The resource requirement to create one item of output. For example, the cost of collecting biometric services once per immigration benefit request. At USCIS, unit cost is determined by dividing total cost for a cost object by the projected fee paying volume for that cost object. |
| USCIS | U.S. Citizenship and Immigration Services |
| VPC | Volume Projection Committee |

Back to the table of contents

# Appendix 2: USCIS Cost Objects 1 Layer Members

The list below contains the Cost Object 1 hierarchy in CostPerform. This displays the parent/child relationship of the Applications/Petitions used in the fee review model. The main hierarchy contains every cost object in CostPerform. The attribute hierarchies contain alternative groupings for cost object assignments and reports. There are no data or costs associated with some of the cost objects on these lists.

## Cost Object 1 Main Hierarchy

All Applications/Petitions
  Additional Revenue Types
    G-1566 Certificate of Non-Existence
    Genealogy Forms
      G-1041 Genealogy Index Search Request
      G-1041A Genealogy Records Request
    SAVE Initial Electronic Queries
    Temporary Protected Status (TPS)
      I-821 Application for Temporary Protected Status
  Immigration Benefit Requests
    Auto Cert Citz (No Fee)
    Credible Fear
    Cuban Medical Professional Parole
    DNA Collection
    H-1B Registration Process Fee
    I-90 Application to Replace Permanent Resident Card
      I-90 Renewal
      I-90 Replacement
    I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
    I-129 Petition for a Nonimmigrant worker
      I-129 Nonimmigrant Petition
      I-129 All Other
      I-129 H-1B
      I-129 H-2A
      I-129 H-2B
      I-129 L1A/L1B/LZ Blanket
      I-129 O1/O2
    I-129F Petition for Alien Fiance(e)
    I-130 Petition for Alien Relative
      I-130 All Other Relative (Preference)
      I-130 Immediate Relative
    I-131 Application for Travel Document
      I-131 Advance Parole
      I-131 Parole in Place
      I-131 Reentry Permit
      I-131 Humanitarian Parole
        Cuban Family Reunification Parole
        Filipino WWII Parole
        Haitian Family Reunification Parole
        Humanitarian Parole
        Significant Public Benefit Parole
    I-131 Refugee Travel Document
      I-131 Refugee Travel Document for a child under the age of 16
      I-131 Refugee Travel Document for an individual age 16 or older

40

I-131A Application for Travel Document (Carrier Documentation)
I-140 Immigrant Petition for Alien Worker
I-290B Notice of Appeal or Motion
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-407 Abandonment of Lawful Permanent Resident Status
I-485 Application to Register Permanent Residence or Adjust Status
   I-485 All Other Adjustments
   I-485 Asylee Adjustment
   I-485 Cuban Refugee Adjustment
   I-485 Employment Adjustment
   I-485 Family Adjustment
   I-485 Refugee Adjustment
I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor
   I-526 Immigrant Petition by Standalone Investor
   I-526E Immigrant Petition by Regional Center
I-539 Application to Extend/Change Nonimmigrant Status
I-589 Application for Asylum and for Withholding of Removal
I-590 Registration for Classification as Refugee
I-600/600A/800/800A Adoption Petitions and Applications
   I-600 Petition to Classify Orphan as an Immediate Relative
   I-600A Application for Advance Processing of an Orphan Petition
   I-800 Convention Country Adoptee Immediate Relative
   I-800A Determine Suitability for Adoption
I-600A Supplement 3 Request for Action on Approved Form I-600A
I-601A Provisional Unlawful Presence Waiver
I-604 Determination on Child for Adoption
I-687 Application for Status as a Temporary Resident
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-730 Refugee/Asylee Relative Position (and Travel Eligibility)
   I-730 Refugee/Asylee Relative Position
   I-730 Refugee/Asylee Relative Position Petition Following to Join Travel Eligibility
I-751 Petition to Remove Conditions on Residence
I-765 Application for Employment Authorization
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse
I-800A Supplement 3 Request for Action on Approved Form I-800A
I-817 Application for Family Unity Benefits
I-824 Application for Action on an Approved Application or Petition
I-829 Petition by Entrepreneur to Remove Conditions
I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal
I-910 Application for Civil Surgeon Designation
I-914 T Nonimmigrant Status
   I-914 Application for T Nonimmigrant Status
   I-914A Family Member
I-918 U Nonimmigrant Status
   I-918 Petition for U Nonimmigrant Status
   I-918 Supplement A
I-56 Application For Regional Center Designation
   I-956 (Initial) Application for Regional Center
   I-956 (Amendment) Application for Regional Center
I-956G Regional Center Annual Statement
I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant
N-300 Application to File Declaration of Intention

41

N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Application for Naturalization
      N-400 Military Service
      N-400 Naturalization
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600/N-600K Application for Certificate of Citizenship
      N-600 Application for Certificate of Citizenship
      N-600K Application for Citizenship and Issuance of Certificate
N-644 Application for Posthumous Citizenship
Overseas Verifications
Reasonable Fear
USCIS Immigrant Fee
Waiver Forms
      I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)
      I-192 Application for Advance Permission to Enter as Nonimmigrant
      I-193 Application for Waiver of Passport and/or Visa
      I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
      I-601 Application for Waiver of Ground of Inadmissibility
      I-602 Application By Refugee For Waiver of Grounds of Inadmissibility
      I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)

## Cost Object 1 Attribute Hierarchy

### CLAIMS3 Forms

I-129F Petition for Alien Fiance(e)
I-601A Provisional Unlawful Presence Waiver
I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
I-140 Immigrant Worker Petition
I-290B Notice of Appeal or Motion
I-526E Immigrant Petition by Regional Center
I-687 Application for Status as a Temporary Resident
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-730 Refugee/Asylee Relative Position
N-565 Application for Replacement Naturalization/Citizenship Document
I-129 Nonimmigrant Petition
I-765 Application for Employment Authorization
I-131 Reentry Permit
I-131 Advance Parole
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-485 Asylee Adjustment
I-485 Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-817 Application for Family Unity Benefits
I-130 Immediate Relative
I-130 All Other Relative (Preference)
I-539 Application to Extend/Change Nonimmigrant Status
I-824 Application for Action on an Approved Application or Petition

AR_000974

I-407 Abandonment of Lawful Permanent Resident Status
I-193 Application for Waiver of Passport and/or Visa
I-485 with I-765 only
I-485 stand alone
I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)
I-192 Application for Advance Permission to Enter as Nonimmigrant
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-601 Application for Waiver of Ground of Inadmissibility
I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)
I-821 Application for Temporary Protected Status
I-129 H1B
I-129 H-2B
I-129 L1A/L1B/LZ Blanket
I-129 O1/O2
I-129 All Other
I-129 H-2A
I-526 Immigrant Petition by Standalone Investor
I-131 Parole in Place
Cuban Family Reunification Parole
Filipino WWII Parole
Haitian Family Reunification Parole
I-129 All Other Premium Processing
I-129 H1B Premium Processing
I-129 H2A Premium Processing
I-129 H2B Premium Processing
I-129 L1A/L1B/LZ Blanket Premium Processing
I-129 O1/O2 Premium Processing
I-140 All Other Premium Processing
I-140 E-12 Premium Processing
I-140 E-21 Premium Processing
I-140 E-31/32 Premium Processing
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse
I-131 Refugee Travel Document for a child under the age of 16
I-131 Refugee Travel Document for an individual age 16 or older

## Documents Issued

I-90 Renewal
I-90 Replacement
I-131 Reentry Permit
I-485 Asylee Adjustment
I-485 Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-751 Petition to Remove Conditions on Residence
I-765 Application for Employment Authorization
I-817 Application for Family Unity Benefits
I-829 Petition by Entrepreneur to Remove Conditions
I-914 Application for T Nonimmigrant Status
I-485 with I-765 only
I-485 stand alone
I-821 Application for Temporary Protected Status

43

I-131 Refugee Travel Document for an individual age 16 or older
USCIS Immigrant Fee
I-131 Refugee Travel Document for a child under the age of 16
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse
I-918 Petition for U Nonimmigrant Status

## EAD and Green Cards

I-90 Renewal
I-90 Replacement
I-485 All Other Adjustments
I-485 Asylee Adjustment
I-485 Cuban Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Refugee Adjustment
I-485 stand alone
I-485 with I-765 only
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-751 Petition to Remove Conditions on Residence
I-765 Application for Employment Authorization
I-817 Application for Family Unity Benefits
I-829 Petition by Entrepreneur to Remove Conditions
I-914 Application for T Nonimmigrant Status
I-918 Petition for U Nonimmigrant Status
USCIS Immigrant Fee
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse

## File Online

G-1041 Genealogy Index Search Request
G-1041A Genealogy Records Request
H-1B Registration Process Fee
I-90 Application to Replace Permanent Resident Card
I-130 Petition for Alien Relative
I-539 Application to Extend/Change Nonimmigrant Status
I-765 Application for Employment Authorization
N-400 Application for Naturalization
N-600 Application for Certificate of Citizenship
N-600K Application for Citizenship and Issuance of Certificate

## Lockbox Applications

G-1041 Genealogy Index Search Request
G-1041A Genealogy Records Request
Haitian Family Reunification Parole
Humanitarian Parole
Cuban Family Reunification Parole
Filipino WWII Parole
I-90 Application to Replace Permanent Resident Card
I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
I-129F Petition for Alien Fiance(e)
I-130 Immediate Relative
I-130 All Other Relative (Preference)
I-131 Reentry Permit

I-131 Advance Parole
I-131 Refugee Travel Document for a child under the age of 16
I-131 Refugee Travel Document for an individual age 16 or older
I-140 Immigrant Worker Petition
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-290B Notice of Appeal or Motion
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-485 Asylee Adjustment
I-485 Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-485 with I-765 only
I-485 stand alone
I-526E Immigrant Petition by Regional Center
I-526 Immigrant Petition by Standalone Investor
I-539 Application to Extend/Change Nonimmigrant Status
I-600 Petition to Classify Orphan as an Immediate Relative
I-600A Application for Advance Processing of an Orphan Petition
I-601 Application for Waiver of Ground of Inadmissibility
I-601A Provisional Unlawful Presence Waiver
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-765 Application for Employment Authorization
I-800 Convention Country Adoptee Immediate Relative
I-800A Determine Suitability for Adoption
I-800A Supplement 3 Request for Action on Approved Form I-800A
I-817 Application for Family Unity Benefits
I-824 Application for Action on an Approved Application or Petition
I-910 Application for Civil Surgeon Designation
N-300 Application to File Declaration of Intention
N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Naturalization
N-400 Military Service
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600 Application for Certificate of Citizenship
N-600K Application for Citizenship and Issuance of Certificate

## Shared with CBP

I-192 Application for Advance Permission to Enter as Nonimmigrant
I-193 Application for Waiver of Passport and/or Visa
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-824 Application for Action on an Approved Application or Petition

## TECS Check Required

I-90 Renewal
I-90 Replacement
I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document
I-129 Nonimmigrant Petition
I-129F Petition for Alien Fiance(e)
I-130 Immediate Relative

I-130 All Other Relative (Preference)
I-131 Reentry Permit
I-131 Advance Parole
I-140 Immigrant Worker Petition
I-485 Asylee Adjustment
I-485 Refugee Adjustment
I-485 Employment Adjustment
I-485 Family Adjustment
I-485 Cuban Refugee Adjustment
I-485 All Other Adjustments
I-526E Immigrant Petition by Regional Center
I-539 Application to Extend/Change Nonimmigrant Status
I-589 Application for Asylum and for Withholding of Removal
I-590 Registration for Classification as Refugee
I-800 Convention Country Adoptee Immediate Relative
I-800A Determine Suitability for Adoption
I-687 Application for Status as a Temporary Resident
I-690 Application for Waiver of Grounds of Inadmissibility
I-694 Notice of Appeal of Decision
I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)
I-730 Refugee/Asylee Relative Position
I-765 Application for Employment Authorization
I-800A Supplement 3 Request for Action on Approved Form I-800A
I-817 Application for Family Unity Benefits
I-824 Application for Action on an Approved Application or Petition
I-829 Petition by Entrepreneur to Remove Conditions
I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal
I-918 Petition for U Nonimmigrant Status
N-300 Application to File Declaration of Intention
N-336 Request for Hearing on a Decision in Naturalization Proceedings
N-400 Naturalization
N-400 Military Service
N-470 Application to Preserve Residence for Naturalization Purposes
N-565 Application for Replacement Naturalization/Citizenship Document
N-600 Application for Certificate of Citizenship
N-600K Application for Citizenship and Issuance of Certificate
N-644 Application for Posthumous Citizenship
I-751 Petition to Remove Conditions on Residence
I-290B Notice of Appeal or Motion
I-360 Petition for Amerasian Widow(er) or Special Immigrant
I-914 Application for T Nonimmigrant Status
I-131A Application for Travel Document (Carrier Documentation)
I-956 (Initial) Application for Regional Center
I-956G Regional Center Annual Statement
I-601A Provisional Unlawful Presence Waiver
I-485 with I-765 only
I-485 stand alone
I-192 Application for Advance Permission to Enter as Nonimmigrant
I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal
I-601 Application for Waiver of Ground of Inadmissibility
I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)
I-821 Application for Temporary Protected Status
I-600 Petition to Classify Orphan as an Immediate Relative
I-600A Application for Advance Processing of an Orphan Petition

46

I-604 Determination on Child for Adoption
Humanitarian Parole
I-131 Refugee Travel Document for an individual age 16 or older
Significant Public Benefit Parole
I-914A Family Member
I-918 Supplement A
I-129 H1B
I-129 H-2B
I-129 L1A/L1B/LZ Blanket
I-129 O1/O2
I-129 All Other
I-129 H-2A
I-602 Application By Refugee For Waiver of Grounds of Inadmissibility
I-131 Refugee Travel Document for a child under the age of 16
I-956 (Amendment) Application for Regional Center
I-526 Immigrant Petition by Standalone Investor
I-600A Supplement 3 Request for Action on Approved Form I-600A
I-129 All Other Premium Processing
I-129 H1B Premium Processing
I-129 H2A Premium Processing
I-129 H2B Premium Processing
I-129 L1A/L1B/LZ Blanket Premium Processing
I-129 O1/O2 Premium Processing
I-140 All Other Premium Processing
I-140 E-12 Premium Processing
I-140 E-21 Premium Processing
I-140 E-31/32 Premium Processing
I-765V Application for Employment Authorization for Abused Nonimmigrant Spouse
I-131 Parole in Place
Cuban Family Reunification Parole
Filipino WWII Parole
Haitian Family Reunification Parole

Back to the <u>table of contents</u>

## Appendix 3: Contact List

Below is contact information for various points of contact (POC) involved in the fee review and ABC model.

| Name | Office | Title | Contribution | Email |
|------|--------|-------|--------------|-------|
|  | OCFO | OCFO Contractor | ABC model lead |  |
|  | OPQ | Workload Analysis and Resource Modeling Division Chief | Historical knowledge and operational metrics |  |
|  | OCFO | Financial Program Analyst | FFMS, authorized FTE, payroll projection tool contact |  |
|  | OCFO | Revenue and Cost Analysis Branch Chief | Manages branch in charge of fee review |  |
|  | OCFO | OCFO Contractor | ABC model builder |  |
|  | OCFO | Management Analyst | Budget data contributor |  |
|  | OIT | EID Data Center DevOps, Middle Tier Support | IT support for CostPerform servers on USCIS network |  |

47

| Name | Office | Title | Contribution | Email |
|------|--------|-------|--------------|-------|
|  | OPQ | Staffing Analysis and Modeling Branch Chief | Operational metrics, like SAM data |  |
|  | N/A | N/A | CostPerform help desk for general support |  |

Back to the [table of contents](#)

## Appendix 4: CostPerform Assignments

The CostPerform Assignments spreadsheet (attached) contains exports of the CostPerform model structure table. Additional columns provide descriptions and/or context.



CostPerform
Assignments.xlsx

Back to the [table of contents](#)

## Appendix 5: Fee Review Model Checklist

USCIS uses this file to verify the CostPerform inputs, outputs, and model assignments.



Model checklist for
CostPerform.xlsx

Back to the [table of contents](#)



U.S. Citizenship and
Immigration Services

49

# Regulatory Impact Analysis

**Department of Homeland Security**
**U.S. Citizenship and Immigration Services**

**Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements**

**Final Rule**

**(8 CFR Parts 103, 106, 204, 211, 212, 214, 240, 244, 245, 245a, 264 and 274a)**

**RIN: 1615 – AC68**

**CIS No. 2687-21**

**DHS Docket No. USCIS-2021-0010**

**January 2024**

# Table of Contents

Table of Contents ........................................................................................................................... 2

Executive Summary ....................................................................................................................... 4

    A. Summary of Changes from the NPRM to the Final Rule .......................................................... 8

    B. Summary Table of the Economic Impacts of the Final Fee Schedule ...................................... 12

    C. OMB A-4 Accounting Statement .......................................................................................... 25

1. Introduction .............................................................................................................................. 28

    A. Background ............................................................................................................................ 28

    B. Purpose .................................................................................................................................. 29

    C. Statement of Need .................................................................................................................. 30

2. Fee Schedule ............................................................................................................................. 31

    A. Summary of Methodology Used to Calculate Fees ................................................................. 31

    B.  Final Fees by Immigration Benefit Request ........................................................................... 32

3.  Amendments and Other Fee Adjustments ................................................................................. 41

    A. Resubmission of Declined or Returned Payments, Fee Payment Method, and Non-Refundability .. 43

    B. Eliminate $30 Returned Check Fee ........................................................................................ 48

    C. Changes to Biometric Services Fee ........................................................................................ 50

    D. Naturalization and Citizenship Related Forms ....................................................................... 54

    E. Fees for Online Filing ............................................................................................................. 63

    F. Form I-485, Application to Register Permanent Residence or Adjust Status ............................. 69

    G. Form I-131A, Application for Travel Document (Carrier Documentation) ............................... 75

    H.  Separating Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification ............................................................................................................................... 75

        i.    Asylum Program Fee ..................................................................................................... 91

    I. Adjustments to Premium Processing ........................................................................................ 94

    J. Intercountry Adoptions ........................................................................................................... 98

    K. Immigrant Investors ............................................................................................................. 109

    L. Changes to Genealogy Search and Records Requests ............................................................ 113

    M. Fees Shared by CBP and USCIS .......................................................................................... 118

    N. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA) ...................................................... 121

    O. Fee Waivers ......................................................................................................................... 124

    P. Fee Exemptions .................................................................................................................... 133

    Q. Additional Fee Adjustments ................................................................................................. 157

        i.    Form I-140 (Changes and Affected Population) ............................................................ 157

AR_000983

ii.     Form I-140 (Asylum Program Fees) ............................................................................ 161

R. Adjusting USCIS Fees for Inflation ................................................................................. 163

4. Total Quantified Net Costs and Transfer Payments of the Regulatory Changes ................................ 166

A. Discounted Net Costs ........................................................................................................ 167

B. Discounted Transfer Payments ......................................................................................... 168

5. Price Elasticity ....................................................................................................................... 171

A. Price Response to Form N-400, Application for Naturalization Changes ........................ 172

B. Price Response to Form I-129, Petition for a Nonimmigrant Worker and Form I-140, Immigrant Petition for Alien Workers ............................................................................... 181

i.     Form I-129, Petition for a Nonimmigrant Worker ...................................................... 181

ii.     Form I-140, Immigrant Petition for Alien Workers ................................................... 195

iii.     General Evidence of Price Responsiveness to Total Costs ....................................... 198

6. Alternatives .......................................................................................................................... 201

A. Alternative 1: No New Fee Exemptions .......................................................................... 201

B. Alternative 2: Fee Bundling ............................................................................................. 202

3

## Executive Summary

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of EO 12866, as amended by Executive Order 14094, because its annual effects on the economy exceed $200 million in any year of the analysis. Accordingly, OMB has reviewed this rule.

This Regulatory Impact Analysis (RIA) provides an assessment of the impacts to society from the Fiscal Year (FY) 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements.[1] The RIA is a supplement to the final rule.

DHS conducted a comprehensive fee review for the FY 2022/FY 2023 biennial period and determined that current fees do not recover the full cost of providing adjudication and naturalization services. The final rule will adjust certain immigration and naturalization benefit requests[2] fees charged by U.S. Citizenship and Immigration Services (USCIS), and will establish a new fee schedule for these immigration benefit requests. The final rule seeks to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners. As a

---

[1] *See* "FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" DHS Docket No. USCIS 2021-0010.

[2] Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose.

AR_000985

result, the Department of Homeland Security (DHS) will adjust its fees, adding new fees for certain immigration benefit requests, codifying use of the Consumer Price Index for All Urban Consumers (CPI-U) as the inflation index for future fee adjustments between comprehensive fee rules, establish multiple fees for nonimmigrant worker petitions, and limit the number of beneficiaries for certain employment-based forms. DHS will also make changes related to setting, collecting, and administering fees as well as expanding fee exemptions and fee waivers to certain humanitarian groups, updating the filing requirements for nonimmigrant workers, revising the premium processing timeframe, and revising other administrative requirements. In the final rule, USCIS revises the FY 2022/2023 operational cost projection to approximately $4,424.0 million ($4.4 billion).[3] This is a $726.7 million or 14.1 percent decrease compared to the proposed rule and an estimated 78-percent increase from the Fiscal Year (FY) 2016/2017 fee rule projection of $2.48 billion.

To establish the fees in the fee schedule, USCIS uses two major steps for a fee cost calculation based on the fully burdened cost of providing adjudication and naturalization services. The first step is activity-based costing (ABC), a method of cost allocation that assigns resource costs to operational activities and then to products and/or services. A commercially available ABC software is used to create financial models that determine the cost of each major activity involved in processing immigration benefit requests and providing biometric services. The second step is cost reallocation, which USCIS refers to as the process of recovering the full cost for workloads without fees or the shifting of cost burdens among benefit request fees due to other policy decisions. In order for the fee schedule to recover the full cost, DHS will increase

---

[3] *See* the Final Rule's Preamble, Section C: Reduced Costs and Fees.

other fees to offset a projected increase in workloads that are exempt from paying fees or capped at a fee less than what the ABC model indicates is their fully allocated cost.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners

will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS for Form N-400, Application for Naturalization, filed by military members will be approximately $197,260 at both 3 and 7 percent discount rates. The total 10-year transfer payments from DoD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule. Table 1 provides a summary of the quantified economic impacts of the final rule.

DHS refers to transfer payments both to and from USCIS throughout this analysis. As a fee funded agency, this does not dismiss the broad and complex distributional effects of this rule. The additional revenue associated with fee increases for some services, which is a transfer from applicants/petitioners to USCIS, is expected to more than fully compensate for the reduced revenue associated with fee decreases for other services, which is a transfer from USCIS to the estimated populations of fee-exempt or fee adjustment-limited applicants/petitioners, as shown, in Table 1.

| Table 1. Quantified Economic Impacts of the FY 2023 Final Fee Schedule | | | | | |
|---|---|---|---|---|---|
| Category | Undiscounted | Annualized at 3% | Annualized at 7% | Total over 10-year Period of Analysis | |
| | | | | 3% | 7% |
| Total Costs | $302,692,154 | | | | |
| Total Cost Savings | $145,686,202 | | | | |
| **Net Costs** | **$157,005,952** | **$157,005,952** | **$157,005,952** | **$1,339,292,617** | **$1,102,744,106** |

| | | | | | |
|---|---|---|---|---|---|
| **Transfer Payments from applicants/petitioners to USCIS (fee increases)** | $887,571,832 | $887,571,832 | $887,571,832 | $7,571,167,759 | $6,233,933,135 |
| **Transfer Payments from USCIS to applicants/petitioners (exemptions, limited fee adjustments)** | $241,346,879 | $241,346,879 | $241,346,879 | $2,058,737,832 | $1,695,119,484 |
| **Transfer Payments from DoD to USCIS (Military N-400 reimbursements)** | $197,260 | $197,260 | $197,260 | $1,682,668 | $1,385,472 |
| **Net Transfer Payments to USCIS** | $646,422,213 | $646,422,213 | $646,422,213 | $5,514,112,595 | $4,540,199,123 |
| Source: USCIS analysis. | | | | | |

## A. Summary of Changes from the NPRM to the Final Rule

DHS is making several significant changes from the Notice of Proposed Rulemaking (NPRM) to the final rule. The major changes impacting the RIA are as follows:

- DHS will continue to allow fee waiver requests via written letter.

- DHS will establish new fees to be paid by employers who file either a Form I-129 or Form I-129CW based on the number of full-time workers the entity employs and its nonprofit status.

- The Asylum Program Fee is $0 for nonprofits, $300 for employers with 25 or fewer full-time equivalent (FTE) workers, and $600 for all other Form I-129, I-129CW and I-140 filers. The NPRM proposed that the Asylum Program Fee would be $600 for all Form I-129 and I-140 filers. Employers with 25 or fewer FTEs and nonprofits receive a discount on fees for Forms I-129 and I-129CW.

- The H-1B registration fee will remain at $215 in the final rule.

- DHS is expanding fee exemptions for humanitarian filings.

- A $50 reduced fee for forms filed online, except in limited circumstances, such as when the form fee is already provided at a substantial discount, or USCIS is prohibited by law from charging a full cost recovery level fee. The NPRM proposed various reduced fees for each form filed online.

- Form I-485 applicants will pay half of the regular Form I-765 fee for an employment authorization document (EAD) when it is submitted with a Form I-485 for which the fee is paid for as long as the adjustment application is pending. The NPRM proposed paying the full fee for such EADs.

- Children under 14 filing Form I-485 concurrently with parents, will pay $950 for Form I-485. The NPRM proposed that such children pay the same fee as adults.

- Eligible N-400 reduced fee applicants with incomes at or below 400 percent of Federal Poverty Guidelines (FPG) pay half price for their Application for Naturalization.[4]

- Additional fee exemptions for Supplement 3 for Forms I-600/600A and I-800A for adoptions for second extensions, second changes in country, and duplicate approval notices. Forms N-600 and N-600K are fee exempt for newly adopted children.

- DHS has codified the fee waiver eligibility requirements previously in guidance, for individuals who are unable to pay.[5]

- DHS has increased the Commonwealth of the Northern Mariana Islands (CNMI) education fee by the amount of inflation from $200 to $230.

---

[4] For naturalization applicants who do not meet the requirements for a full fee waiver, DHS has made N-400 fee reductions more available by increasing the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(i)(B).

[5] *See* 8 CFR 106.3(a).

9

- Clarifies the handling of an approved benefit request if a fee submitted is dishonored to include a fee to request premium processing, and that the benefit request may be subject to rescission, judicial revocation, or cancellation. *See* 8 CFR 106.1(c)(2).

- Provides that a duplicate filing of a pending benefit request will be rejected, 8 CFR 103.2(a)(7)(iv), to deter multiple filings of requests that have no or minimal fee, to reduce backlogs, and to improve processing times.

- Deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary.  DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA and 5 U.S.C. 552(a)(4)(A)(iii).

- Modifies the instructions for Form I-912, Request for Fee Waiver, to allow receipt of a means-tested benefit by a child in one's household to serve as evidence of the parent's inability to pay.

- Removes the fee exemption for Form I-601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y-N-P-*, 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i).

- Fee exemptions for SIJs filing Form I-824.

| Table 2. Quantified Annual Economic Impacts of the Fee Schedule: NPRM vs Final Rule | | | | |
|---|---|---|---|---|
| Category | NPRM | Final Rule | Difference | Percent Difference |
| | Undiscounted | Undiscounted | | |
| Total Costs to Applicants/Petitioners | $575,100,190 | $302,692,154 | -$272,408,036 | -47% |
| Total Cost Savings to Applicants/Petitioners | $42,721,052 | $145,686,202 | **$102,965,150** | 241% |
| **Net Costs** | **$532,379,138** | **$157,005,952** | **-$375,373,186** | -71% |

| Transfer Payments from applicants/petitioners to USCIS (fee increases) | $1,612,127,862 | $887,571,832 | -$724,556,030 | -45% |
|---|---|---|---|---|
| Transfer Payments from USCIS to applicants/petitioners (exemptions, waivers, discounts, reduced fees) | $116,372,429 | $241,346,879 | $124,974,450 | 107% |
| Transfer Payments from DoD to USCIS (Military N-400 reimbursements) | $222,145 | $197,260 | -$24,885 | -11% |
| Net Transfer Payments to USCIS | $1,495,977,578 | $646,422,213 | -$849,555,365 | -57% |
| USCIS Analysis Notes: | | | | |

Table 2 shows that total costs were reduced by 47 percent in the final rule. This is mainly a result of the discounted fees given to Form I-129 and I-140 petitioners who are employers with 25 or fewer full-time equivalent (FTE) workers or non-profit entities. There was a significant increase in cost savings mainly because of the lower fees for filing forms electronically as well as lower fees for filing Forms I-90 and I-131. Net costs were reduced by 71 percent in the final rule as cost savings rose by about $103 million and costs fell by about $272 million. Transfer payments from applicants/petitioners to USCIS were reduced by 45 percent because of the lower fees, which reflect lower cost to USCIS for Form I-485 applicants concurrently filing a Form I-765, lower fees for applicant under the age of 14 years filing Form I-485 with a parent and lower fees for the online filing of forms. Transfer payments from USCIS to applicants/petitioners increased significantly by 107 percent. This increase is mainly attributable to changes to fee exemptions in Table 48. Transfer payments from USCIS to applicants/petitioners as a result of fee exemptions increased by 70-percent ($181,225,564) from the NPRM estimates ($106,821,450).  Transfer payments from DoD to USCIS were reduced by 11 percent. Finally, net transfer payments to USCIS were reduced by 57 percent in the final rule relative to NPRM estimates. DHS notes that the variation in costs, cost savings and transfer payments from the proposed rule to the final rule is also influenced by the change in annual average populations

11

used throughout the economic analysis. In the proposed rule, DHS generally used 5-year annual averages from FY 2016 through 2020 and in the final rule DHS uses 5-year annual averages from FY 2018 through 2022.

### B.  Summary Table of the Economic Impacts of the Final Fee Schedule

Table 3 provides a detailed summary of the changes in the final rule and their impacts.

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| **1.   Resubmission of Dishonored or Returned Payments, Fee Payment Method, and Non-refundability** | • If a check or other financial instrument used to pay a fee is dishonored or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br><br>• If the instrument used to pay a fee is dishonored or returned a second time USCIS may reject or deny the filing. Financial instruments dishonored or declined or returned for any reason other than insufficient funds, will not be resubmitted, and such filings may be rejected or denied. Credit cards that are declined for any reason will not be resubmitted. | **Quantitative: Applicants-**<br>• An increase in transfer payments from applicants/petitioners to USCIS of approximately $658,396 (annual average amount USCIS refunds to applicants/petitioners) due to nonrefundable fees.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Clarifying dishonored or returned payment resubmission and non-refundability policies, limiting the age of checks to be presented and limiting payment options will reduce administrative burdens and fee processing errors for USCIS.<br><br>• USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment.<br><br>• USCIS will lose fewer credit card disputes. |

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • DHS may reject a request that is accompanied by a check or other financial instrument that is dated more than one year before the request is received.<br><br>• Will codify authority to limit payment options so that USCIS may require certain fees be paid using a specific payment method.<br><br>• Clarifies that fees are generally nonrefundable regardless of the result of the request or how much time the request requires to be adjudicated.<br><br>• Clarifies that fees paid to USCIS using a credit or debit card cannot be disputed. | | |
| **2. Eliminate $30 Returned Check Fee** | • Eliminate the $30 charge for dishonored payments. | **Quantitative: Applicants**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• There may be an increase in insufficient payments | **Quantitative: Applicants –**<br>• DHS estimates the annual cost savings to applicants/petitioners will be $414,150.<br><br>**Qualitative: Applicants –**<br>• Applicants who submit bad checks will no longer have to pay a fee.<br><br>**DHS/USCIS –** |

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
| --- | --- | --- | --- |
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | • This change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |
| **3.   Changes to Biometric Services Fee** | • For nearly all benefit types, DHS will incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable.<br><br>• Retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | **Quantitative: Applicants**<br>• As a result of the $55 reduction in the biometric services fee, TPS and the Executive Office for Immigration Review (EOIR) applicants will experience a total of $10,007,965 in reduced fees annually. This represents transfer payments from USCIS to the fee payers as USCIS will now incur the indirect costs of providing the biometric services.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• Incorporating the biometric services fee into the underlying benefit request filing fee will benefit applicants by simplifying the payment process.<br><br>• May also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>**DHS/USCIS –**<br>• Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| **4.   Naturalization and Citizenship Related Forms** | • Limit the increase of Form N-400 fees to $760 for paper filers and $710 for online filers.<br>• Increase fees to Forms N-300, N-336, N-400, N-470, N-600 and N-600K. | **Quantitative: Applicants**<br>• Increase in fees to Forms N-300, N-336, N-400 (paper), N-470, N-565 (paper), N-600 and N-600K will result in an increase in transfer | **Qualitative: Applicants-**<br>• Limited fee increases allow more residents, especially those with financial and income constraints to seek citizenship. |

AR_000995

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Increase the Form N-400 reduced fee to $380.<br><br>• Make the request for a reduced fee available to applicants with incomes under 400 percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG.<br><br>• Keep the existing statutory fee exemptions for military members and veterans who file Forms N-400 and N-600. | payments from the fee-paying applicants to USCIS of $30,182,790 annually.<br><br>• Increase in transfer payments from USCIS to Form N-400 reduced fee applicants of $46,088,170 due to the change in reduced fee eligibility criteria to applicants with incomes under 400 percent of the FPG.<br><br>• Increase in transfer payments from DoD to USCIS of $197,260 annually for N-400 (military only) reimbursements.<br><br>**Qualitative:**<br>**Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Expanding the population of N-400 reduced fee applicants will increase the administrative burden on the agency to process these additional forms with 50 percent less in fees. | • Cost savings of $5,981,330 to applicants filing Forms N-400 and N-565 online.<br><br>• Expanding the eligible population of N-400 reduced fee applicants will benefit an unknown number of applicants who could not afford the full fee, but can now pay 50 percent less in fees. |
| 5.   **Fees for Filing Online** | • Lower fees for online filings of immigration benefit | **Quantitative:**<br>**Petitioners** | **Quantitative: Petitioners-** |

15

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | requests for which both paper and online filing options are available. The forms include Form I-90, Form I-130, Form I-539, Form I-765, Form N-336, Form N-400, Form N-565, Form N-600, Form N-600K, Form G-1041, and Form G-1041A. | • Increase in transfer payments of $17,706,510 from Form I-130 online filers to USCIS.<br><br>**DHS/USCIS-**<br>• None.<br><br>**Qualitative: Petitioners –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | • Cost savings of $56,796,180 to applicants filing Forms I-90, I-539 and I-765 online.<br><br>**Qualitative:**<br><br>**Petitioners-**<br>• Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.<br><br>**DHS/USCIS –**<br>• USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.<br><br>• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records will not be physically moved around to different adjudication offices.<br><br>• Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |
| **6. Form I-485, Application to Register Permanent Residence or Adjust Status** | • Increase Form I-485 fees for adults and children under the age of 14 concurrently filing with a parent.<br><br>• Charge separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. | **Quantitative: Applicants-**<br>• Total increase in transfer payments from applicants filing Form I-485 to USCIS of $391,920,525.<br><br>This includes the following:<br>• The increase in the Form I-485 fees will result in approximately $18,273,710 in transfer payments annually from applicants filing I-485 (only) to USCIS. | **Quantitative: Applicants-**<br>• Not estimated.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Unbundling the fee for Form I-485 from Forms I-131 and I-765 will better reflect the cost of adjudication. |

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | • Separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I-485 will result in transfer payments from applicants to USCIS of $367,192,615 annually. <br><br> • Transfer payments from applicants to USCIS of $6,454,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent. <br><br> **Qualitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** <br> • None. | |
| **7. Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • Separate the fee for Form I-131A from other travel document fees. | **Quantitative: Applicants-** <br> • None. <br><br> **Qualitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** <br> • None. | **Quantitative: Applicants-** <br> • None. <br><br> **Qualitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** <br> • Allows USCIS to assess the cost of providing services for this immigration benefit and better align fees in future fee reviews. |
| **8. Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • Charge different fees for Form I-129, based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to | **Quantitative: Applicants –** <br> • Increase in transfer payments from Form I-129/I-129CW petitioners to USCIS of $217,571,880. This includes transfer payments from H-1B | **Quantitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** <br> • None. <br><br> **Qualitative: Applicants –** <br> • None. <br><br> **DHS/USCIS –** |

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | whether the petition includes named or unnamed beneficiaries.<br>• Increase H-1B registration fees from $10 to $215<br><br>• Limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers.<br><br>• Charge a new Asylum Program fee to Form I-129/I-129CW petitioners.<br><br>• Provide reduced Form I-129/I-129CW fees and Asylum Program fees for businesses with 25 or less full-time equivalent employees and nonprofit businesses.<br><br>• The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer full-time equivalent employees, and $600 for all other I-129 filers. | registrants to USCIS of $71,428,355.<br><br>• Costs of $254,764,500 to Form I-129/I-129CW petitioners due to the new Asylum Program fees.<br><br>**DHS/USCIS –**<br>• Not estimated.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | • A benefit of the different fees for the Form I-129 classifications is that it will allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification.<br><br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |
| 9. **Adjustments to Premium Processing** | • Change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –** | **Qualitative: Applicants –**<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated.<br><br>**DHS/USCIS –** |

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Permit combined payments of the premium processing service fee with the remittance of other filing fees. | • None.<br><br>**DHS/USCIS –**<br>• None. | • The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS will have additional business days to process petitions when premium processing request volumes are high and the 15 calendar days include multiple non-business days such as weekends and holidays.<br><br>• USCIS will be able to make premium processing more consistently available and expand this service to the newly designated classifications and categories allowed by the USCIS Stabilization Act.<br><br>**Qualitative:**<br>**Applicants and DHS/USCIS –**<br>• Allowing combined payments reduces unnecessary burdens on petitioners, applicants, and DHS. |
| **10. Intercountry Adoptions** | • Clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for Forms I-600A and I-800A approvals in an orphan case from 18 to 15 months to remove inconsistencies between Forms I-600A and I-800A approval periods and validity of the U.S. Federal Bureau | **Quantitative: Applicants-**<br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 will cost $146,954 annually.<br><br>• The increase to the current fees for Forms I-600/600A/800/800A will result in transfer payments from applicants to USCIS of approximately $265,440 annually.<br><br>• Transfer payments from USCIS to the public of $4,023,570 due to fee exemptions to Form | **Quantitative: Applicants –**<br>• None.<br><br>**Quantitative: Petitioners-**<br><br>• Cost savings of $3,375 to applicants filing Form I-800A Supplement 3 due to a reduction in fees.<br><br>**Qualitative:**<br>**Applicants –**<br>• Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates. |

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | of Investigation (FBI) background check.<br><br>• Create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600.<br><br>• Provide fee exemptions for some applicants who file Form I-600A/I-600 Supplement 3, Form I-800A Supplement 3, Form N-600 or Form N-600K for newly adopted children. | I-600A/I-600 Supplement 3, Form I-800A Supplement 3 and adoption based Forms N-600 and N-600K.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS-**<br>• None. | • These changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>**DHS/USCIS –**<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br><br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
| **11.  Immigrant Investors** | • DHS will increase fees to Forms I-526/I-526E[6], I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the Employment-Based Immigrant Visa, Fifth Preference (EB-5) program. | **Quantitative: Applicants-**<br>• Annual transfer payments from EB-5 investors and regional centers to USCIS will be approximately $44,746,040.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. |

---

[6] Combines both Forms I-526, Immigrant Petition by Standalone Investor and I-526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I-526 and created Form I-526E as a result of the EB-5 Reform and Integrity Act of 2022.

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **12. Changes to Genealogy Search and Records Requests** | • Revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• Change the index search request process so that USCIS may provide requesters with digital records via email in response to the initial search request.<br><br>• Lower the fees for the online filing of Forms G-1041 and G-1041A, from $65 to $30 to reflect the lower marginal costs to USCIS from online filing.<br><br>• For requestors who choose to submit via mail option, DHS will increase the fee from $65 to $80, for G-1041 and G-1041A.<br><br>• Charge a fee of $330 for requests for a Certificate of Non-Existence. | **Quantitative: Applicants-**<br>• Annual transfer payments from fee paying applicants to USCIS of $813,900 due to increased fees.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• Cost savings of $380,415 to applicants filing Forms G-1041, G-1041A online.<br><br>**Qualitative: Applicants –**<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>**DHS/USCIS –**<br>• Reduce costs for mailing, records processing, and storage costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |
| **13. Fees Shared by CBP and USCIS** | • Increase fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP): Form I-192, Form I-193, Form I-212, and Form I-824. | **Quantitative: Applicants-**<br>• Increase in annual transfer payments of $11,826,730 from fee payers to USCIS and CBP.<br><br>**Qualitative: Applicants –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• A single fee for each shared form will reduce confusion for individuals interacting with CBP and USCIS.<br><br>**DHS/USCIS –** |

AR_001002

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | DHS/USCIS – <br>• None. | • None. |
| **14. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 [NACARA]** | • Adjust the fee for Form I-881 and combine the current multiple fees charged for an individual or family into a single fee of $340 for each filing of Form I-881. | **Quantitative: Applicants-**<br>• Transfer payments of $18,260 annually from I-881 individual filers to USCIS.<br><br>• Transfer payments from USCIS to I-881 family applicants of $1,610 since this fee is less than the cost to adjudicate the application.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting.<br><br>• A single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15. Fee Waivers** | • Expand the categories of requestors and related forms eligible for a fee waiver.<br><br>• Codify the existing criteria in USCIS guidance regarding eligibility requirements for a fee waiver. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Quantitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None.<br><br>**Qualitative: Applicants –**<br>• More simplified and streamlined system to process fee waivers.<br><br>**DHS/USCIS –**<br>• None. |
| **16. Fee Exemptions** | • Will provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries[7]: | **Quantitative: Applicants-**<br>• Transfer payments of approximately $181,225,564annually from USCIS to the public.<br><br>**Qualitative:** | **Quantitative: Applicants-**<br>• Cost savings of about $40,184,477 to the public for no longer having to complete and submit Form I-912.<br><br>**Qualitative: Applicants –**<br>• Individuals who are unable to afford immigration benefit request fees |

---

[7] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under 8 CFR 106.2 for which DHS to codify that there is no fee.

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | • Victims of Severe Form of Trafficking (T Nonimmigrants)<br>• Victims of Qualifying Criminal Activity (U Nonimmigrants)<br>• Violence Against Women Act (VAWA) Form I-360 Self-Petitioners and Derivatives<br>• Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty<br>• Abused Spouses and Children Adjusting Status under the Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA)<br>• Abused Spouses and Children Seeking Benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)<br>• Abused Spouses and Children of lawful permanent residents (LPRs) or U.S. Citizens under the Immigration and Nationality Act (INA) Section 240A(b)(2)<br>• Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. | **Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | will benefit from filing a request with no fees.<br><br>**DHS/USCIS –**<br>• Decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. |

23

| Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Forces (ISAF) (SI1 and SI2)<br>• Special Immigrant Juveniles (SIJs)<br>• Temporary Protected Status (TPS)<br>• Asylees<br>• Refugees<br>• Persons Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | | |
| **17. Additional Fee Adjustments** | DHS will increase fees for the following forms:<br>• I-90 (paper)<br>• I-102<br>• I-130 (paper)<br>• I-131<br>• I-140<br>• I-601<br>• I-612<br>• I-290B<br>• I-360<br>• I-539 (paper)<br>• I-601A<br>• I-687/I-690/I-694<br>• I-751<br>• I-765 (paper)<br>• I-817<br>• I-910<br>• I-929 | **Quantitative: Applicants-**<br>• An increase in transfer payments from fee payers to USCIS of approximately $171,861,361 annually.<br><br>• Costs of $47,780,700 for Form I-140 petitioners due to the new Asylum Program fees.<br><br>**Qualitative: Applicants –**<br>• None. | **Quantitative: Applicants-**<br>• Cost savings of $41,926,275 to applicants filing Forms I-90 and I-131 as a result of lower fees.<br><br>**Qualitative: Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. |
| **18. Adjusting USCIS Fees for Inflation** | • DHS to use the CPI-U as the inflation index for fee adjustments between comprehensive fee | **Quantitative: Applicants-**<br>• None.<br><br>**Qualitative:** | **Qualitative: Applicants**<br><br>• None. |

24

**Table 3. Summary of Final Rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | rules. The actual impacts of such adjustments will be analyzed in a future rule should DHS exercise this authority. | **Applicants –**<br>• None.<br><br>**DHS/USCIS –**<br>• None. | **Qualitative:**<br><br>**DHS/USCIS –**<br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |

Source: USCIS analysis.
Note: The dollar amounts in this table are undiscounted.

In addition to the impacts summarized above, Table 4 presents the accounting statement showing the transfers, costs and benefits associated with this regulation, as required by OMB Circular A-4.[8]

### C. *OMB A-4 Accounting Statement*

| Table 4. OMB A-4 Accounting Statement - ($ in millions, 2022; period of analysis: FY 2024 through FY 2033) | | | | |
|---|---|---|---|---|
| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
| **BENEFITS** | | | | |
| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | RIA |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The changes in the final rule will provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees. Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules will allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation. | | | |

---

[8] OMB Circular A-4 is available at *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf* (last visited Sept. 22, 2022).

|  | The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced fees for electronic filings, reduced reapplications for premium processing and for many applicants, limited fee increases and additional fee exemptions and fee waivers to reduce fee burdens.<br><br>Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. |  |
|---|---|---|
| **COSTS** |  |  |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$157 | RIA |
| Annualized quantified, but un-monetized, costs | N/A |  |
| Qualitative (unquantified) costs | Expanding the population of applicants using eligible for N-400 reduced fees and applicants eligible for fee waivers and exemptions will increase the administrative burden on the agency to process these forms. |  |
| **TRANSFERS** |  |  |
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%)<br><br>$888 | RIA |
| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%)<br><br>$241 | RIA |
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%)<br><br>$0.20 | RIA |
| *Miscellaneous Analyses/Category* | *Effects* |  |

| Effects on state, local, and/or tribal governments | *None* | Preamble |
|---|---|---|
| *Effects on small businesses* | DHS does not believe that the increase in fees in the rule will have a significant economic impact on a significant number of small entities that file Forms I-129, I-140, I-910, or I-360.<br><br>DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I–924) or Form I-956G (formerly I-924A).<br><br>DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Final Regulatory Flexibility Analysis (FRFA) and Small Entity Analysis (SEA) |
| *Effects on wages* | *None* | None |
| *Effects on Growth* | *None* | None |

# 1. Introduction

## A. Background

USCIS administers the nation's lawful immigration system, through which millions of individuals and entities file applications and petitions each year for various types of immigration benefits. These immigration benefit requests include applications for lawful permanent residence, employment authorization, and naturalization. USCIS is mainly funded by immigration and naturalization benefit request fees charged to applicants and petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the IEFA. In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901-03 and OMB Circular A-25, USCIS conducts biennial reviews of the non-statutory fees deposited into the IEFA. The fee schedule is adjusted periodically to ensure that fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions. It accounts for increased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and thoroughly vet applicants, petitioners, and beneficiaries. The fee schedule was last adjusted on December 23, 2016, by a weighted average increase of 21 percent. *See* 81 FR 73292 (Oct. 24, 2016).

This RIA is a supplement to the final FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements.[9]

---

[9] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" final rule), for a detailed discussion of changes and fee setting methodology.

### B. Purpose

DHS will adjust certain immigration and naturalization benefit request fees charged by USCIS to ensure that USCIS can recover the full costs of providing immigration services. DHS will also make additional changes related to setting, collecting, and administering fees. More specifically, the final fee schedule will address the following:

- Dishonored Fee Check Re-Presentment Requirement

- $30 Returned Check Fee

- Biometric Services Fee

- Naturalization and Citizenship Related Forms (N-300/336/400/470/475/565/600/600K)

- Online Filing Fees

- Application to Register Permanent Residence or Adjust Status (Form I-485)

- Carrier Documentation (Form I-131A)

- Petition for a Nonimmigrant Worker (Form I-129)

- Premium Processing (Form I-907)

- Intercountry Adoptions (Forms I-600/600A/800/800A)

- Immigrant Investors (Forms I-526/526E/829/956 (former 924)/956G (former 924A))

- Genealogy Search and Records Requests (Forms G-104/104A)

- Fees Shared with CBP and USCIS (Forms I-192/193/212/824)

- Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA) (Form I-881)

- Fee Waivers

- Fee Exemptions

- Asylum Program Fees

29

This RIA presents a benefit-cost analysis as required by E. O. 12866 and 13563, which direct agencies to assess regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and equity).

### C. Statement of Need

USCIS oversees lawful immigration to the United States and administers the nation's lawful immigration system. USCIS is primarily funded by immigration and naturalization benefit request fees charged to applicants and petitioners. These fee collections fund the cost to adjudicate millions of immigration benefit requests each year, including those adjudicated without fees. The collected fees are deposited into the IEFA, which comprised approximately 96 percent of USCIS' total FY 2021 enacted spending authority. The USCIS IEFA fee schedule that is in effect was published in the DHS FY 2016/2017 fee rule. *See* 81 FR 73292 (Oct. 24, 2016).[10] That final rule and the associated fees became effective on December 23, 2016. In the proposed rule, USCIS projected that its IEFA non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402 (Jan. 4, 2023).  As stated in the preamble of the final rule, USCIS estimates that an average IEFA non-premium budget of $4,424.0 million will be required for USCIS to fulfill its operational objectives and maintain current processing timetables of immigration benefit requests.[11] If USCIS continues to operate at current fee levels,

---

[10] The phrase "FY 2016/2017 fee rule," as used in the final rule, encompasses the fee review, proposed rule, final rule, and all supporting documentation associated with the regulations effective as of December 23, 2016.

[11] See Section C: Reduced Costs and Fees for Final Rule

it will experience a shortfall (the amount by which expenses exceed revenue). This projected shortfall poses a risk of reducing USCIS operations funded by the IEFA. The results of USCIS' fee review indicate that current fee levels are insufficient to recover the full cost of operations funded by the IEFA. Therefore, DHS will adjust the existing fee schedule to recover the full cost of processing immigration benefit requests and to continue to maintain or improve current service delivery standards.

## 2. Fee Schedule

### A. Summary of Methodology Used to Calculate Fees

USCIS uses a two-prong approach for a fee cost calculation based on the fully burdened cost of providing adjudication and naturalization services. The first approach is activity-based costing (ABC), a method of cost allocation that assigns resource costs to operational activities and then to products and/or services. A commercially available ABC software is used to create financial models that determine the cost of each major activity involved in processing immigration benefit requests and providing biometric services. The second approach is cost reallocation (Low Volume Reallocation), which USCIS refers to as the process of recovering full cost for workloads without fees or the shifting of cost burdens among benefit request fees due to other policy decisions. In order for the fee schedule to recover full cost, DHS will increase other fees to offset a projected increase in workloads that are exempt from paying fees or that are capped at a fee less than what the ABC model indicates that they should pay.[12]

---

[12] USCIS has considered possible changes in the number of filings and corresponding USCIS workload as a result of these fee increases. USCIS believes that the projected volumes described in the economic analysis in Section 5 support the modeling decisions made in the fee methodology.

DHS recognizes that charging less than the full cost of adjudicating an immigration benefit request requires USCIS to increase fees for other immigration benefit requests to ensure full cost recovery. This complies with section 286(m) of INA, which permits fees to cover those costs of providing applicants, petitioners, or requestors a service or part of a service "without charge." Therefore, DHS intends to continue to apply the Low Volume Reallocation methodology.[13] The fee schedule accounts for increased costs as well as decreased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and thoroughly vet applicants, petitioners, and beneficiaries. Consistent with OMB Circular A-4, this RIA endeavors to analyze impacts of each provision of this rule assessed against a no-action baseline describing the world, including previously codified fees, services, and exemptions.

### B. Final Fees by Immigration Benefit Request

Table 5 shows the current[14], the proposed fees in the NPRM, and final USCIS fees for immigration benefit requests and biometric services.[15]

Table 5: Non-Statutory IEFA Immigration Benefits Request Fees

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card (online filing) | $455 | $455 | $415 | 0% | -9% |
| I-90 Application to Replace Permanent Resident Card (online filing) (with biometric services) | $540 | $455 | $415 | -16% | -23% |

[13] See 75 FR 33446, 33461 (June 11, 2010) and 81 FR 26903, 26915 (May 4, 2016).

[14] Current fees are the fees set out in the FY 2016/2017 Fee Rule that USCIS is charging applicants and petitioners. *See*, generally, 8 CFR 103.7(b)(1) (Oct. 1, 2020).

[15] The DACA fee is not incorporated into the fee model and is therefore excluded from this fee schedule.

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card (paper filing) | $455 | $465 | $465 | 2% | 2% |
| I-90 Application to Replace Permanent Resident Card (paper filing) (with biometric services) | $540 | $465 | $465 | -14% | -14% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $560 | 53% | 26% |
| I-129 Petition for a Nonimmigrant worker | $460 | $1,015 | N/A | 121% | N/A |
| I-129 H-1 Classifications | $460 | $780 | $780 | 70% | 70% |
| I-129 H-1 Classifications (small employers and nonprofits) | $460 | $780 | $460 | 70% | 0% |
| I-129 H-2A - Named Beneficiaries | $460 | $1,090 | $1,090 | 137% | 137% |
| I-129 H-2A - Named Beneficiaries (small employers and nonprofits) | $460 | $1,090 | $545 | 137% | 18% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $530 | $530 | 15% | 15% |
| I-129 H-2A - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $530 | $460 | 15% | 0% |
| I-129 H-2B - Named Beneficiaries | $460 | $1,080 | $1,080 | 135% | 135% |
| I-129 H-2B - Named Beneficiaries (small employers and nonprofits) | $460 | $1,080 | $540 | 135% | 17% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $580 | $580 | 26% | 26% |
| I-129 H-2B - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $580 | $460 | 26% | 0% |
| I-129 Petition for L Nonimmigrant workers | $460 | $1,385 | $1,385 | 201% | 201% |

33

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-129 Petition for L Nonimmigrant workers (small employers and nonprofits) | $460 | $1,385 | $695 | 201% | 51% |
| I-129 Petition for O Nonimmigrant workers | $460 | $1,055 | $1,055 | 129% | 129% |
| I-129 Petition for O Nonimmigrant workers (small employers and nonprofits) | $460 | $1,055 | $530 | 129% | 15% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications | $460 | $1,015 | $1,015 | 121% | 121% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (with biometric services) | $545 | $1,015 | $1,015 | 94% | 86% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) | $460 | $1,015 | $510 | 129% | 11% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) (with biometric services) | $545 | $1,015 | $510 | 94% | -6% |
| I-129F Petition for Alien Fiancé(e) | $535 | $720 | $675 | 35% | 26% |
| I-130 Petition for Alien Relative (online filing) | $535 | $710 | $625 | 33% | 17% |
| I-130 Petition for Alien Relative (paper filing) | $535 | $820 | $675 | 53% | 26% |
| I-131 Application for Travel Document | $575 | $630 | $630 | 10% | 10% |

34

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-131 Application for Travel Document (with biometric services) | $660 | $630 | $630 | -5% | -5% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $165 | 22% | 22% |
| I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | $165 | -25% | -25% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $135 | 29% | 29% |
| I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | $135 | -29% | -29% |
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $575 | $575 | 0% | 0% |
| I-140 Immigrant Petition for Alien Workers | $700 | $715 | $715 | 2% | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $930 | 0% | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) | $585 | $1,100 | $1,100 | 88% | 88% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | $930 | $1,100 | $1,100 | 18% | 18% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $695 | $695 | 19% | 19% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $1,175 | 50% | 26% |

35

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-290B Notice of Appeal or Motion | $675 | $800 | $800 | 19% | 19% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $435 | $515 | $515 | 18% | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $1,440 | 35% | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $1,440 | 26% | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $950 | 105% | 27% |
| I-526/526E Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $11,160 | 204% | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) | $370 | $525 | $420 | 42% | 14% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) (with biometric services) | $455 | $525 | $420 | 15% | -8% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) | $370 | $620 | $470 | 68% | 27% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) (with biometric services) | $455 | $620 | $470 | 36% | 3% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition | $775 | $920 | $920 | 19% | 19% |

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition (with biometric services for one adult) | $860 | $920 | $920 | 7% | 7% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | $385 | $455 | $455 | 18% | 18% |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $1,050 | 13% | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $1,105 | $795 | 75% | 26% |
| I-601A Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $795 | 55% | 11% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $1,100 | 18% | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $1,240 | $1,240 | 10% | 10% |
| I-687 Application for Status as a Temporary Resident (with biometric services) | $1,215 | $1,240 | $1,240 | 2% | 2% |
| I-690 Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act | $715 | $985 | $905 | 38% | 27% |
| I-694 Notice of Appeal of Decision | $890 | $1,155 | $1,125 | 30% | 26% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $1,670 | 0% | 0% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | $1,670 | -5% | -5% |

37

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-751 Petition to Remove Conditions on Residence | $595 | $1,195 | $750 | 101% | 26% |
| I-751 Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $750 | 76% | 10% |
| I-765 Application for Employment Authorization (online filing) | $410 | $555 | $470 | 35% | 15% |
| I-765 Application for Employment Authorization (online filing) (with biometric services) | $495 | $555 | $470 | 31% | -5% |
| I-765 Application for Employment Authorization (paper filing) | $410 | $650 | $520 | 59% | 27% |
| I-765 Application for Employment Authorization (paper filing) (with biometric services) | $495 | $650 | $520 | 31% | 5% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $925 | $920 | 19% | 19% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $925 | $920 | 7% | 7% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A | $385 | $455 | $455 | 18% | 18% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | $455 | -3% | -3% |
| I-817 Application for Family Unity Benefits | $600 | $875 | $760 | 46% | 27% |

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-817 Application for Family Unity Benefits (with biometric services) | $685 | $875 | $760 | 28% | 11% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $675 | $590 | 45% | 27% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | $9,525 | 154% | 154% |
| I-829 Petition by Investor to Remove Conditions (with biometric services) | $3,835 | $9,525 | $9,525 | 148% | 148% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $340 | 19% | 19% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | $340 | -8% | -8% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | $340 | -40% | -40% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $655 | $340 | $340 | -48% | -48% |
| I-910 Application for Civil Surgeon Designation | $785 | $1,230 | $990 | 57% | 26% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $275 | $0 | 17% | -100% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $1,200 | 0% | 0% |

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| I-941 Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | $1,200 | -7% | -7% |
| I-956 Application for Regional Center Designation | $17,795 | $47,695 | $47,695 | 168% | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | $47,695 | 168% | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | $4,470 | 47% | 47% |
| N-300 Application to File Declaration of Intention | $270 | $320 | $320 | 19% | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (online filing) | $700 | $830 | $780 | 19% | 11% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (paper filing) | $700 | $830 | $830 | 19% | 19% |
| N-400 Application for Naturalization (online filing) | $640 | $760 | $710 | 19% | 11% |
| N-400 Application for Naturalization (online filing) (with biometric services) | $725 | $760 | $710 | 5% | -2% |
| N-400 Application for Naturalization (paper filing) | $640 | $760 | $760 | 19% | 19% |
| N-400 Application for Naturalization (paper filing) (with biometric services) | $725 | $760 | $760 | 5% | 5% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) | $320 | $380 | $380 | 19% | 19% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) (with biometric services) | $405 | $380 | $380 | -6% | -6% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $425 | $420 | 20% | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document (online filing) | $555 | $555 | $505 | 0% | -9% |

40

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Percent Change Current to NPRM | Percent Change Current to Final |
|---|---|---|---|---|---|
| N-565 Application for Replacement Naturalization/Citizenship Document (paper filing) | $555 | $555 | $555 | 0% | 0% |
| N-600 Application for Certificate of Citizenship (online filing) | $1,170 | $1,385 | $1,335 | 18% | 14% |
| N-600 Application for Certificate of Citizenship (paper filing) | $1,170 | $1,385 | $1,385 | 18% | 18% |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | $1,170 | $1,385 | $1,335 | 18% | 14% |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | $1,170 | $1,385 | $1,385 | 18% | 18% |
| USCIS Immigrant Fee | $220 | $235 | $235 | 7% | 7% |
| H-1B Registration Process Fee | $10 | $215 | $215 | 2050% | 2050% |
| Biometric Services | $85 | $30 | $30 | -65% | -65% |
| G-1041 Genealogy Index Search Request (online filing) | $65 | $100 | $30 | 54% | -54% |
| G-1041 Genealogy Index Search Request (paper filing) | $65 | $120 | $80 | 85% | 23% |
| G-1041A Genealogy Records Request (online filing) | $65 | $240 | $30 | 269% | -54% |
| G-1041A Genealogy Records Request (paper filing) | $65 | $260 | $80 | 269% | 23% |
| G-1566 Request for Certificate of Non-Existence | $0 | $330 | $330 | N/A | N/A |

## 3. Amendments and Other Fee Adjustments

The amendments will create costs, cost savings, transfer payments, and benefits to applicants/petitioners. Only provisions that will result in real resource costs to the economy are characterized as costs. Many of the provisions in this rule do not impose new real resource costs but are transfer payments. Transfer payments are monetary payments from one group to another

41

that do not affect total resources available to society.[16] For example, if applicants were previously required to pay a fee and that fee is increased, this is considered a transfer payment from the applicant/petitioner to the government because the costs of providing the existing immigration service are currently being paid by the Federal Government. Hence, no new costs to the economy as a whole are being created as this fee increase only transfers the payments to cover the existing costs of service from the government to the applicant.

DHS notes that the estimates of annual filing volume in the RIA are not the same used in the final rule's preamble. In this RIA, DHS uses a different method for estimating the annual filing volume and/or individuals that will be impacted by the changes in the rule. The USCIS Volume Projection Committee (VPC) forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. This is described in further detail in the FR's preamble. As indicated in table notes and footnotes throughout, DHS typically uses a 5-year average of annual receipts data from FY 2018 through FY 2022 to forecast baseline receipts, updated from the NPRM RIA's time period of FY 2016 through FY 2020. Using data from a more current time period has caused some differences in the estimated baseline costs from those estimated in the NPRM RIA, but reflect a more recent and accurate estimate for trends in applications for immigration benefits. DHS considers this to be a reasonable baseline estimate because these fees comprise the fee schedule currently being followed and reflect the world without this regulation.

---

[16] OIRA, OMB, "Regulatory Impact Analysis: A Primer," p. 8, available at *https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf* (last visited Sept. 22, 2022).

DHS acknowledges the broad effects of the COVID-19 global pandemic on the United States and the populations affected by this rule. For example, USCIS saw a dramatic decline in applications and petitions during the COVID-19 pandemic, which also resulted in an unprecedented, if temporary, decline in revenue.[17] DHS has no comparable historical data that can be used to project the scope, duration, and total effect this will have on USCIS' revenue. Thus, DHS proceeds with this rulemaking on the basis of the FY 2022/FY 2023 USCIS fee review and associated projections. Consistent with past practice and as required by the CFO Act, USCIS will evaluate all available data at the time it conducts future fee reviews, including data related to the COVID-19 pandemic and any potential effects on USCIS workload volumes, revenue, or costs. DHS will consider these effects in future fee rules.

This section presents the amendments being made in the final fee schedule and their economic impacts.

### A. Resubmission of Dishonored or Returned Payments, Fee Payment Method, and Non-Refundability

**Changes**

In the FY 2016/2017 fee rule, USCIS amended the regulations regarding how it treats a benefit request accompanied by fee payment (in the form of check or other financial instruments) that is subsequently returned as not payable.[18]  If a financial instrument used to pay a fee is returned as unpayable after one re-presentment, USCIS rejects the filing and imposes a standard

---

[17] *See* USCIS, "Deputy Director for Policy Statement on USCIS' Fiscal Outlook" (June 25, 2020), available at *https://www.uscis.gov/news/news-releases/deputy-director-for-policy-statement-on-uscis-fiscal-outlook* (last visited Sept. 22, 2022). *See also* USCIS, "USCIS Averts Furlough of Nearly 70% of Workforce" (Aug. 25, 2020), available at *https://www.uscis.gov/news/news-releases/uscis-averts-furlough-of-nearly-70-of-workforce* (last visited Sept. 22, 2022).

*See* NPRM Preamble Section (V)(A)(3) "USCIS Budget History."

[18] *See* 81 FR 73292, 73313-15 (Oct. 24, 2016); 8 CFR 103.2(a)(7)(ii) and 8 CFR 103.7(a)(2) (Oct. 1, 2020).

AR_001024

$30 charge. In the preamble to the FY 2016/2017 fee rule, USCIS stated that to ensure a payment rejection is the result of insufficient funds and not USCIS error or network outages, USCIS (through the U.S. Department of the Treasury (Treasury)) will resubmit rejected payment instruments to the appropriate financial institution one time. While DHS's intent was to submit only checks that were dishonored due to insufficient funds, some stakeholders have interpreted the re-presentment[19] as applying to any check DHS has deposited that is returned as unpayable. Although the Treasury check clearance regulations permit an agency to redeposit a check dishonored due to insufficient funds,[20] they prohibit submitting checks dishonored for other reasons for clearance a second time.

To comply with the Treasury regulations, DHS will specify that if a check or other financial instrument used to pay a fee is dishonored or returned because of insufficient funds (as opposed to a closed account, fraud, or stop payment), USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is declined or returned a second time a USCIS may reject or deny the filing. Financial instruments declined or returned for any other reason other than insufficient funds, will not be resubmitted, and such filings may be rejected or denied.  Credit cards that are declined for any reason will not be resubmitted. *See* 8 CFR 103.2(a)(7)(ii)(D).

DHS may also reject a request that is accompanied by a check or other financial instrument that is dated more than 1 year before the request is received.  Currently, USCIS policy is to reject a check that is dated more than a year before it is submitted. However, that policy is

---

[19] 8 CFR 103.2(a)(7)(ii)(D).

[20] *See* 31 CFR 210.3(b)(1)(i); National Automated Clearing House Association (NACHA), "2019 NACHA Operating Rules & Guidelines: The Guide to the Rules Governing the ACH Network," Subsection 2.5.13.3 (limiting redepositing a check to those that are returned due to "Not Sufficient Funds," "NSF," "Uncollected Funds," or comparable).

not codified, and DHS has been sued or threatened with litigation multiple times when a check that was dated more than a year before it was submitted was the basis of a rejection that caused the requestor to miss an important deadline. This provision will codify DHS current practice.

DHS is also codifying its authority to limit payment options so that certain fees are paid using a specific payment method. For example, USCIS may require that specific benefit requests be submitted via Pay.gov, a secure portal that transmits an applicant's payment information directly to the Treasury for processing. USCIS may also prevent the use of certain payment types such as cashier's check and money orders for particular forms or when payments are made at certain offices.

DHS is also clarifying that fees are generally nonrefundable regardless of the result of the request or how much time the request requires to be adjudicated. As provided in 8 CFR 103.2(a)(1), USCIS filing fees generally are nonrefundable and must be paid when the benefit request is filed. Finally, DHS will clarify that fees paid to USCIS using a credit card or debit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

**Affected Population**

USCIS allows credit card payments through the secure Pay.gov portal. Payments go to the Treasury account for processing, and the data are from their financial management system. U.S. Immigration and Customs Enforcement (ICE) processes the credit card transactions on

behalf of USCIS using a different financial system. USCIS has recently expanded acceptance of credit cards for the payment of USCIS fees.[21]

Table 6 shows the total estimated population of individuals who paid using a credit card from FY 2018 through FY 2022. DHS estimated this population based on receipts of credit card transactions accepted from fees in each fiscal year. From FY 2018 through FY 2022, the annual number of credit card transactions, amount of fees collected, and chargebacks all increased. As a result of the increased number of transactions over the years, USCIS also had a greater number of credit card chargebacks (successful disputes by applicants and petitioners filed with credit card companies challenging the retention of the fee by USCIS).

| Table 6. Estimated Number of Credit Card Transactions for Payment of Form Fees, for FY 2018 through FY 2022 | | | | |
|---|---|---|---|---|
| Fiscal Year | Number of Credit Card Transactions | Amount of Credit Card Payments | Credit Card Chargebacks to Applicant/Petitioner | Amount of Credit Card Chargebacks to Applicant/Petitioner |
| 2018 | 822,477 | $415,886,222 | 720 | $392,549 |
| 2019 | 1,122,029 | $613,266,755 | 898 | $535,749 |
| 2020 | 1,503,667 | $835,011,608 | 1,298 | $710,561 |
| 2021 | 1,637,130 | $879,422,136 | 1,446 | $837,364 |
| 2022 | 2,276,231 | $1,179,640,131 | 1,931 | $815,756 |
| **5-year Total** | **7,361,534** | **$3,923,226,852** | **6,293** | **$3,291,979** |
| **5-year Annual Average** | **1,472,307** | **$784,645,370** | **1,259** | **$658,396** |
| Source: Department of Homeland Security, Financial Operations Branch, CIR System, Feb. 2, 2023. | | | | |

---

[21] *See* USCIS, "USCIS Expands Credit Card Payment Pilot Program to California Service Center" (Nov. 5, 2021), available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-california-service-center* (last visited Sept. 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Vermont Service Center" (Oct. 22, 2021), available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-vermont-service-center* (last visited Sept. 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Form I-140 When Requesting Premium Processing" (July 20, 2021), available at *https://www.uscis.gov/news/alerts/uscis-expands-credit-card-payment-pilot-program-to-form-i-140-when-requesting-premium-processing* (last visited Sept. 22, 2022); *See also* USCIS, "USCIS Expands Credit Card Payment Pilot Program to Texas Service Center" (Sept. 16, 2021), available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-credit-card-payment-pilot-program-to-texas-service-center* (last visited Sept. 22, 2022).

**Cost-Benefit-Transfer Payments Analysis**

Disputes are generally filed by requestors whose request was denied, who have changed their minds about the request, or assert that the service was not provided or unreasonably delayed. USCIS loses many of these disputes and has to return the money back to the applicant/petitioner. DHS estimates that $658,396 is the annual average amount USCIS is refunding to the applicant's/petitioner's credit card, due to customer disputes, stop payments, or service-related matters. Because the credit card companies agree with the cardholder and have determined that USCIS fails to adequately warn the cardholder that the fee is not refundable regardless of the result or time required, DHS is providing in this rulemaking that USCIS fees must be paid when the request is filed or submitted, and they are nonrefundable whether or not the benefit request or other service is approved, denied, or selected, or how much time the adjudication or processing requires.

This rule will prevent a bank that issues the credit card from cancelling the payment of the fee to USCIS. Should the bank do so regardless of the prohibition, USCIS will invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fee in accordance with 31 CFR parts 900 through 904 (Federal Claims Collection Standards). Clarifying that fees are due regardless of the result or how long the decision takes, and that USCIS fees paid by credit card are not subject to credit card disputes will result in USCIS losing less fee revenue from requests that falsely claim they are due a refund and result in less of a need to pursue collections.

Overall, resubmission of declined or returned payments, re-presentment and non-refundability policies, limiting the age of checks to be presented, limiting payment options and precluding credit card disputes will reduce administrative burdens, fee processing errors, and lost revenue for USCIS. They will also result in transfer payments from applicants/petitioners to the

government of approximately $658,396 (annual average amount USCIS refunds to applicants/petitioners) due to customer disputes, stop payments, or service-related matters. USCIS will also now be able to retain the fees for adjudicative services provided, which is included in the amount USCIS refunds to applicants/petitioners credit cards, $658,396.

### B. Eliminate $30 Returned Check Fee

**Changes**

Currently, USCIS charges a $30 returned check fee if a check or other financial instrument used to pay a USCIS fee is returned as unpayable. USCIS then rejects the associated benefit request as improperly filed.[22] In the rule, USCIS is eliminating the $30 charge for dishonored payments because the cost of collecting the $30 fee outweighs the benefits to the government derived from collecting the fee. *See* 8 CFR 103.7(a)(2)(i) (Oct. 1, 2020). For example, in FY 2016, USCIS collected a total of $416,541 from the $30 returned check fee while the financial service provider billed $508,770 to collect the $30 fees. In FY 2020, USCIS recovered only $199,829 from the returned check fee. USCIS will continue to reject dishonored payments and the associated benefit requests for nonpayment. However, no fees will be imposed to applicants/petitioners for dishonored payments.

**Affected Population**

DHS used historical data from FY 2018 through FY 2022 to calculate the average total returned payments for FY 2018 through FY 2022 (*see* Table 7). DHS estimates that an annual average of 13,805 payments are returned each year.

---

[22] *See* USCIS, "Filing Fees," available at *https://www.uscis.gov/forms/paying-uscis-fees* (last visited Sept. 22, 2022).

| Table 7. Estimated Number of Returned Check Payments for FY 2018 through FY 2022 | |
|---|---|
| Fiscal Year | Number of Returned Payments |
| 2018 | 9,632 |
| 2019 | 11,939 |
| 2020 | 12,622 |
| 2021 | 18,549 |
| 2022 | 16,282 |
| 5-year Total | 69,024 |
| 5-year Annual Average | 13,805 |

Source: Department of Homeland Security, Financial Operations Branch, CIR System, Feb. 2, 2023.

**Cost-Benefit-Transfer Payments Analysis**

DHS estimates that this provision will result in cost savings for applicants since there will no longer be a $30 charge for rejected benefit requests due to returned checks.[23] Using the estimated average number of returned payments subject to the $30 service charge of 13,805, DHS estimates the annual cost savings to applicants/petitioners could be approximately $414,150.[24]

This provision will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. This expense will no longer be necessary with this change. DHS estimates that USCIS spends at least $414,150 to recover fees annually, based on the average amount of fees recovered. This estimate is understated as USCIS

---

[23] DHS resubmits payments one time after a check or financial instrument is first returned as unpayable to counter the possibility of processing errors from financial institutions. DHS recognizes the number of returned payments may include multiple payments that were submitted by the same applicant. DHS assumes the number of returned payments is a reasonable estimate of the affected population.

[24] Calculation: 13,805 (Estimated average annual number of returned payments) × $30 (Returned payment fee) = $414,150 annual cost of returned payment fees. DHS acknowledges that this cost savings may be overestimated as the amounts USCIS was able to recover in the past were at times lower than anticipated.

spends more to collect the $30 returned payment fees than it receives in fees. DHS recognizes that removing the $30 charge may increase the number of applicants who file an application with an incorrect fee because the $30 charge could be a deterrent. However, DHS does not think that this deterrent outweighs the administrative costs to USCIS of charging and collecting this fee.

### C. Changes to Biometric Services Fee

1. Incorporating Biometric Activities into Immigration Benefit Request Fees

2. Retaining a Separate Biometric Services Fee for Temporary Protective Status (TPS)

3. Retaining a Separate Biometric Services Fee for Executive Office for Immigration Review (EOIR)

**Changes**

In previous fee rules, USCIS evaluated the biometric activity cost as a single biometric service fee separate from the underlying application, petition, or request. Currently, a separate $85 biometric services fee may apply depending on the immigration benefit request or other circumstances.[25] In this rule, DHS will incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable. The cost to provide biometric services is not a fixed cost across all immigration benefit requests so modifying this cost to each benefit type allows USCIS to recover the full cost of providing such

---

[25] For a quick reference of the immigration benefit requests that currently require a biometric services fee with the initial submission, *see* USCIS, "Form G-1055, Fee Schedule," available at *https://www.uscis.gov/g-1055* (last visited Sept. 22, 2022).

services. This is in line with the ABC methodology USCIS uses. This provision will eliminate separate payments of the biometric services fee paid with certain immigration benefit requests.[26]

DHS will retain a separate biometric services fee for TPS and will charge $30 for TPS initial applications and re-registrations. While the TPS registration fee is capped at $50 for initial TPS applicants and $0 for re-registrants (*see* INA sec. 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B)), DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b. USCIS based the $30 biometric services fee on the direct costs of collecting, storing, and using biometric information. This fee is less than the current $85 biometric services fee because the existing fee includes the recovery of indirect costs.

DHS will also keep the current requirement that applicants filing certain requests with EOIR submit a biometric services fee. This fee is necessary to recover the costs USCIS incurs from handling parts of biometrics collection and conducting background security checks for individuals in immigration proceedings. Therefore, USCIS will amend the current biometric services fees of $85 and charge $30 for certain forms for which it performs intake and biometric services on behalf of EOIR.[27]

**Affected Population**

The elimination of the separate biometric services fee will impact individuals applying for immigration benefits for which biometric services are applicable.[28] To estimate this impacted

---

[26] See Section Part 103.7 Immigration Benefit Requests; USCIS Filing Requirements; Availability of Records and Section Part 106.2 -USCIS Fee Schedule  (50)(iii) the preamble of the final rule for the list of forms associated with TPS and EOIR applicants as well as more detail on retaining separate biometric services fees for TPS and EOIR. DHS states that TPS applicants or re-registrants will pay $30 for biometric services unless exempted in the applicable form instructions.

[27] *See* 8 CFR 103.7(a)(2).

[28] For a quick reference of the immigration benefit requests that currently require biometric services with the initial submission, *see* USCIS, "Form G-1055, Fee Schedule," available at *https://www.uscis.gov/g-1055.*

AR_001032

population, DHS used data from FY 2018 through FY 2022 for the biometric services fee

receipts accompanying the forms in Table 8. DHS estimates that the annual average number of

applicants who will no longer pay a separate biometric services fee is 2,120,902.[29]

| Table 8. Annual Receipts for Fee Paying Biometric Services Applicants, for FY 2018 through FY 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forms | 2018 | 2019 | 2020 | 2021 | 2022 | 5-Year Total | 5-Year Annual Average Receipts |
| Form I-90 | 1,665 | 169,057 | 219,732 | 247,323 | 224,764 | 862,541 | 172,508 |
| Form I-129CW | 46 | 25 | 8 | 3 | 10 | 92 | 18 |
| Form I-131 | 76,523 | 80,838 | 55,055 | 65,859 | 75,873 | 354,148 | 70,830 |
| Form I-485 | 475,779 | 460,142 | 451,156 | 601,371 | 555,805 | 2,544,253 | 508,851 |
| Form I-539 | 636 | 120,166 | 275,549 | 148,077 | 60,495 | 604,923 | 120,985 |
| Form I-600 | 822 | 809 | 374 | 265 | 331 | 2,601 | 520 |
| Form I-600A | 950 | 827 | 550 | 395 | 473 | 3,195 | 639 |
| Form I-601A | 60,327 | 52,351 | 52,467 | 41,833 | 36,237 | 243,215 | 48,643 |
| Form I-698 | 22 | 8 | 16 | 18 | 14 | 78 | 16 |
| Form I-751 | 167,174 | 165,224 | 142,117 | 173,173 | 106,921 | 754,609 | 150,922 |
| Form I-765 | 1,010 | 254,738 | 327,678 | 858,067 | 372,691 | 1,814,184 | 362,837 |
| Form I-800A | 6,257 | 5,114 | 3,440 | 2,121 | 2,571 | 19,503 | 3,901 |
| Form I-817 | 659 | 367 | 576 | 334 | 312 | 2,248 | 450 |
| Form I-829 | 654 | 801 | 786 | 3,211 | 1,239 | 6,691 | 1,338 |
| Form I-881 | 505 | 487 | 279 | 209 | 209 | 1,689 | 338 |
| Form N-400 | 623,945 | 653,740 | 845,890 | 636,414 | 630,540 | 3,390,529 | 678,106 |
| **Totals** | 1,416,974 | 1,964,694 | 2,375,673 | 2,778,673 | 2,068,485 | **10,604,499** | **2,120,902** |

Source: USCIS, Office of Performance and Quality (OPQ), C3 & Electronic Immigration System (ELIS) database (Feb. 8, 2023).
*For Forms I-600, I-600A, and I-800A
Source: USCIS Office of Policy and Strategy (OP&S), PASEXEC (Jan. 11, 2023).
*For Form I-881, Source: February 2023 National Performance Report (NPR).

The retention of a separate biometric services fee for TPS impacts all TPS applicants and

re-registrants aged 14 years and older who are subject to the $85 biometric services fee, in

addition to any applicable fees for Forms I-821 and I-765. In Table 9 below, DHS used data for

the biometric services fee receipts for TPS and EOIR from FY 2018 through FY 2022. DHS

---

[29] Data are unavailable for Form I-687. The first, original, statutory filing period for Form I-687 closed on May 4, 1988.  There have been several subsequent filing periods as a result of federal litigation or class actions but there is no open period or basis for which to file it currently.

estimates that 181,963 TPS and EOIR annual applicants who pay the $85 biometric services fee will now pay $30.

| Table 9. Annual Receipts for TPS and EOIR Applicants, for FY 2018 through FY 2022 | | | |
|---|---|---|---|
| **Fiscal Year** | **TPS** | **EOIR** | **Total** |
| 2018 | 306,973 | 40,370 | 347,343 |
| 2019 | 5,278* | 55,916 | 61,194 |
| 2020 | 12,636* | 40,043 | 52,679 |
| 2021 | 255,123 | 30,772 | 285,895 |
| 2022 | 141,339 | 21,363 | 162,702 |
| **5-year Total** | **721,349** | **188,464** | **909,813** |
| **5-year Annual Average** | **144,270** | **37,693** | **181,963** |
| Source: USCIS, Office of Performance and Quality (OPQ, C3 & Electronic Immigration System (ELIS) database for TPS receipts (Feb. 24, 2023). Source: September 2020 and February 2023 National Performance Reports (NPRs) for EOIR receipts. *Due to administration policy and COVID-19. DHS is aware that the outbreak of COVID–19 will likely impact these estimates in the short run.[30] See Preamble Section (V)(B)(1) Workload Volume and Volume Projection Committee and Section (V)(C) Exclusion of Temporary or Uncertain Programs. | | | |

**Cost-Benefit-Transfer Payments Analysis**

Adjusting the biometric services fee for TPS applicants and re-registrants to $30 represents a $55 reduction per filing in the biometric services fee that these individuals may pay. As a result of the $55 reduction in the biometric services fee, TPS and EOIR applicants will experience a total of $10,007,965 in reduced fees annually.[31] This represents transfer payments from the government to the fee payers as USCIS will now incur the indirect costs of providing the biometric services. DHS does not anticipate that applicants or the Federal Government will incur additional costs because of this amendment.

The changes in the rule will provide qualitative benefits to applicants. Incorporating the biometric services fee into the underlying benefit request filing fee will benefit applicants by simplifying the payment process. Approximately 2,120,902 applicants per year will benefit from

---

[30] On Mar. 13, 2020, the President declared that the COVID–19 outbreak in the United States constitutes a national emergency. *See* "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak" (Mar. 13, 2020), available at *https://www.whitehouse.gov/presidential-actions/proclamation-declaringnational-emergency.*

[31] Calculation: 181,963 annual average TPS and EOIR applicants × $55 reduction in fee = $10,007,965.

this change. It might also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee. USCIS currently rejects a benefit request if it is received without the correct biometric services fee specified in the form instructions. USCIS does not have data on which applications were rejected upon receipt due to a missing biometric services fee. However, DHS assumes that some applications will no longer be rejected because the biometric services fee is no longer a separate requirement. Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.

### D. Naturalization and Citizenship Related Forms

     1. Form N-400 Fee

     2. N-400 Reduced Fee

     3. Military Naturalization and Certificates of Citizenship

     4. Changes to Other Naturalization-Related Application and Certificate of Citizenship Application Fees

**Changes**

DHS will limit the fee increase for Form N-400, Application for Naturalization from $640 to $760 for paper filers (19 percent) and $710 for online filers (11 percent), to recover the cost of adjudicating the Form N-400 while still promoting naturalization and integration.

DHS will change the reduced fee option for naturalization to include applicants with family incomes not exceeding 400 percent of the Federal Poverty Guidelines (FPG).[32]

---

[32] 8 CFR 106.2(b)(3)(ii).

Currently, qualifying applicants pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. DHS will adjust that fee to $380 (-6 percent).[33] Currently, to qualify for a reduced fee, the eligible applicant must submit a Form I-942, Request for Reduced Fee, along with their Form N-400. Form I-942 requires the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200 percent of the FPG. DHS will make the request for a reduced fee available to any applicant who has an income at or under 400 percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG. Through a non-rule form revision independent from this rulemaking, DHS will also discontinue the Form I-942 and allow applicants to request a reduced fee using the Form N-400.

DHS will keep the existing statutory fee exemptions for military members and veterans who file a Form N-400, Application for Naturalization and Form N-600, Application for Certificate of Citizenship, under the military naturalization provisions. Applicants who request a hearing on a naturalization decision under INA section 336 with respect to military service will continue to be fee exempt. Currently, USCIS does not charge a fee to military naturalization applicants because such fees are prohibited by statute. However, DoD reimburses USCIS for costs related to such applications.

Finally, DHS will increase fees to the following citizenship related forms to keep recovering the full cost of providing services:

- Form N-300, Application to File Declaration of Intention, from $270 to $320 (19 percent).

---

[33] Calculation: ($380-$405)/$405 = -6 percent.

55

- Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), from $700 to $780 (11 percent) for online filers and $830 (19 percent) to paper filers.

- Form N-470, Application to Preserve Residence for Naturalization Purposes, from $355 to $420 (18 percent).

- Form N-600, Application for Certificate of Citizenship, from $1,170 to $1,335 (14 percent) for online filers and $1,385 (18 percent) for paper filers.

- Form N-600K, Application for Citizenship and Issuance of Certificate, from $1,170 to $1,335 (14 percent) for online filers and $1,385 (18 percent) for paper filers.

**Affected Population**

Table 10 shows the receipts of naturalization and citizenship related forms for FY 2018 through FY 2022. DHS estimates that the average annual number of applicants (non-military) who will be impacted by the fee increase to Form N-400 is 845,963.[34] The annual average receipts of Forms N-400 and N-600 from military members and veterans who will continue to be exempt is 5,636 and 340 respectively. The annual average number of applicants who will be impacted by the changes to naturalization and citizenship related forms including Forms N-300, N-336, N-400, N-470, N-565, N-600, and N-600K is approximately 945,969.

| Table 10. Receipts of Naturalization Related Forms, for FY 2018 through FY 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **Immigration Benefit Request** | **2018** | **2019** | **2020** | **2021** | **2022** | **5-Year Total** | **5-Year Annual Average** |

---

[34] Calculation: 490,361 average N-400 paper receipts + 355,602 average N-400 online receipts = 845,963 total receipts.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| N-300 Application to File Declaration of Intention | 29 | 33 | 17 | 0 | 0 | 79 | 16 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Paper filing) | 4,586 | 4,376 | 3,487 | 2,792 | 3,320 | 18,561 | 3,712 |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (online filing) | 321 | 1,270 | 1,446 | 1,534 | 2,311 | 6,882 | 1,376 |
| N-400 Application for Naturalization *(Military)* | 3,172 | 3,598 | 5,087 | 6,504 | 9,817 | 28,178 | 5,636 |
| N-400 Application for Naturalization *(All other paper filing)* | 625,730 | 539,606 | 520,819 | 393,300 | 372,351 | 2,451,806 | 490,361 |
| N-400 Application for Naturalization *(All other online filing)* | 213,641 | 296,682 | 475,265 | 383,840 | 408,582 | 1,778,010 | 355,602 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 172 | 163 | 101 | 0 | 0 | 436 | 87 |
| N-565 Application for Replacement Naturalization/ Citizenship Document (paper filing) | 22,729 | 16,327 | 12,038 | 11,743 | 11,406 | 74,243 | 14,849 |
| N-565 Application for Replacement Naturalization/ Citizenship Document (online filing) | 3,314 | 11,461 | 12,918 | 17,624 | 19,411 | 64,728 | 12,946 |
| N-600 Application for Certificate of Citizenship *(Military)* | 81 | 356 | 393 | 434 | 435 | 1,699 | 340 |
| N-600 Application for Certificate of Citizenship *(All other online)** | NA | 6,097 | 12,820 | 16,730 | 19,629 | 55,276 | 13,819 |
| N-600 Application for Certificate of Citizenship *(All other paper)* | 50,273 | 47,433 | 39,053 | 34,892 | 39,483 | 211,134 | 42,227 |
| N-600K Application for Citizenship and Issuance of Certificate (online filing)* | NA | 662 | 929 | 2,511 | 2,741 | 6,843 | 1,711 |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | 3,963 | 3,765 | 2,096 | 3,194 | 3,418 | 16,436 | 3,287 |
| **Totals** | | | | | | **4,714,311** | **945,969** |
| Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), C3, C4, Electronic Immigration System (ELIS) and PASEXEC Databases. Feb. 8, 2023. *Calculations are done for only the last 4 years due to limited data for previous years. | | | | | | | |

Table 11 shows that the total number of reduced fee requests received from FY 2018

through FY 2022 was 21,165. On average, DHS estimates the annual average number of requests

for a reduced Form N-400 fee is 4,233, including an annual average of 3,486 (82 percent) that are accepted each year.

| Table 51. Form I-942, Request for Reduced Fee for Form N-400, Application for Naturalization, for FY 2018 through FY 2022 | | | |
|---|---|---|---|
| **Fiscal Year** | **Accepted** | **Rejected** | **Total** |
| 2018 | 4,688 | 1,060 | 5,748 |
| 2019 | 4,700 | 879 | 5,579 |
| 2020 | 3,504 | 832 | 4,336 |
| 2021 | 2,576 | 572 | 3,148 |
| 2022 | 1,960 | 394 | 2,354 |
| **5-year Total** | **17,428** | **3,737** | **21,165** |
| **5-year Annual Average** | **3,486** | **747** | **4,233** |
| **Rate** | **82%** | **18%** | |
| Source: USCIS, Office of the Chief Financial Officer (OCFO) (Feb. 3, 2023). | | | |

In this final rule, DHS is stating that an applicant for naturalization who has a family income at or under 400 percent of the FPG can request a reduced fee. This will increase the population eligible to apply for a reduced fee. For reference, a family size of 2 that is currently eligible for a reduced N-400 fee (earning between 150 percent and 200 percent of the FPG) has an annual income range of $29,580 to $39,440. A similar family size earning below 400 percent of the FPG has an annual income up to $78,880.[35]  Relative to the baseline established by the enjoined, prior Fee Rule, which reduced this threshold to 125 percent, DHS is unable to quantify the number of applicants with incomes between 125 percent ($24,650)  and 150 percent of the FPG who, if the existing baseline were not enjoined, would now benefit from reduced fees and apply to USCIS to request a reduced fee. However, DHS estimates an annual average of

---

[35] The Secretary of the Department of Health and Human Services (HHS), Office of the Assistant Secretary for Planning and Evaluation (ASPE), "HHS 2023 Poverty Guidelines: 48 Contiguous States (all states except Alaska and Hawaii)," available at *https://aspe.hhs.gov/sites/default/files/documents/1c92a9207f3ed5915ca020d58fe77696/detailed-guidelines-2023.pdf.*  (last viewed Dec 5, 2023)

125,000[36] applicants with family incomes below 400 percent of the FPG will now apply for a reduced fee.

**Cost-Benefit-Transfer Payments Analysis**

Table 12 shows that applicants filing Forms N-400 and N-565 online will save approximately $5,981,330 per year. The cost savings are the result of the reduced costs to USCIS to process these forms submitted electronically. Thus, applicants will now pay less to reflect lower costs associated with processing these electronic applications.

DHS will increase fees to the following naturalization and citizenship related forms: Forms N-300, N-336, N-400 (paper), N-470, N-565 (paper), N-600, and N-600K. This will result in annual transfer payments from the fee-paying applicants to the government of $30,182,790 and transfer payments from DoD to USCIS of $197,260 for N-400 (military only) reimbursements (*see* Table 12). The current fees for Form N-400 ($640) and biometric services ($85) total $725 per military naturalization. USCIS estimates that there is an annual average of 5,636 military naturalizations per year. The baseline costs for this population are $4,086,100 each year.[37] Therefore, the fee of $760 to the Form N-400 (which includes the cost of biometric services) will increase the reimbursable agreement between DHS and DoD by approximately $197,260 (*see* Table 12). This 5-percent increase is the estimated annual transfer payments from DoD to USCIS. The transfer payments this provision will create is the difference between the current fees (baseline fees) and the new fees in the final rule.

---

[36] The 125,000 is a USCIS estimate. A document summarizing the estimation procedures using public Census American Communities Survey data has been placed in the rule's docket. *See* Estimation of FPG Threshold Impacts using Census ACS data.

[37] Calculation: 5,636 military naturalizations per year x $725 per military naturalization = $4,086,100.

**Table 62. Economic Impacts of Fee Adjustments to Naturalization and Citizenship Related Forms**

| Immigration Benefit Request | 5-Year Annual Average from Table 10 (A) | Baseline Fees (B) | New Fees (C) | Difference per Form D = C-B | Transfer Payments E = D×A | Cost Savings F = D ×A |
|---|---|---|---|---|---|---|
| N-300 Application to File Declaration of Intention | 16 | $270 | $320 | $50 | $800 | |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) (paper filing) | 3,712 | $700 | $830 | $130 | $482,560 | |
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) (online filing) | *1,376* | *$700* | *$780* | *$80* | *$110,080* | |
| N-400 Application for Naturalization (Military) | 5,636 | $725* | $760 | $35 | $197,260 | |
| N-400 Application for Naturalization (All other, paper filing) | 490,361 | $725* | $760 | $35 | $17,162,635 | |
| N-400 Application for Naturalization (All other, online filing) | *355,602* | $725 | *$710* | ($15) | | -$5,334,030 |
| N-470 Application to Preserve Residence for Naturalization Purposes | 87 | $355 | $420 | $65 | $5,655 | |
| N-565 Application for Replacement Naturalization/ Citizenship Document (paper filing) | 14,849 | $555 | $555 | $0 | $0 | |
| N-565 Application for Replacement Naturalization/ Citizenship Document (online filing) | *12,946* | $555 | *$505* | ($50) | | -$647,300 |
| N-600 Application for Certificate of Citizenship (Military) | 340 | $1,170 | $1,385 | $215 | $73,100 | |
| N-600 Application for Certificate of Citizenship (All other paper filing) | 42,227 | $1,170 | $1,385 | $215 | $9,078,805 | |
| N-600 Application for Certificate of Citizenship (All other, online filing) | *13,819* | $1,170 | *$1,335* | *$165* | *$2,280,135* | |
| N-600K Application for Citizenship and Issuance | 3,287 | $1,170 | $1,385 | $215 | $706,705 | |

| Table 62. Economic Impacts of Fee Adjustments to Naturalization and Citizenship Related Forms | | | | | | |
|---|---|---|---|---|---|---|
| Immigration Benefit Request | 5-Year Annual Average from Table 10 *(A)* | Baseline Fees *(B)* | New Fees *(C)* | Difference per Form *D = C-B* | Transfer Payments *E = D×A* | Cost Savings *F = D ×A* |
| of Certificate Under Section 322 (paper filing) | | | | | | |
| N-600K Application for Citizenship and Issuance of Certificate Under Section 322 (online filing) | *1,711* | $1,170 | *$1,335* | *$165* | *$282,315* | |
| **Total** (excludes Form N-400 for military) | **940,333** | | | | **$30,182,790** | **-$5,981,330** |
| Source: USCIS analysis. | | | | | | |
| Notes: * Includes $85 biometric services fee | | | | | | |

DHS will make the request for a reduced fee available to any applicant who has a family income at or under 400 percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG. The expansion of the range of applicants who will be eligible to request reduced fees will benefit the pool of qualified applicants seeking immigration benefits. DHS estimates that at minimum, 121,514 additional individuals will now qualify for a reduced fee due to the change in FPG thresholds (*see* Table 13). DHS anticipates that expanding the population of N-400 applicants who are eligible for a reduced fee will increase the administrative burden on USCIS to process these forms. DHS acknowledges the opportunity cost of time for an applicant to complete a reduced fee form. While this will result in additional burden to request reduced fees, these opportunity costs of time are not reflected here because, coincident to this final rule, USCIS will discontinue the use of Form I-942 by incorporating elements of this information collection into the Form N-400-012 non-rule revision. At this time, USCIS estimates these combined actions offset or reduce the total burden of requesting reduced fees under this rule.

| Table 73.  Economic Impacts of Expanded N-400 Reduced Fee Population | | | |
|---|---|---|---|
| **Current Reduced Fee Population (family income between 150% and 200% of FPG)** | | **New Expanded N-400 Reduced Fee Population (family income less than 400% of FPG)** | |
| Current Annual Average Reduced Fee Paying Population (*see* Table 10) | 3,486 | New Annual Average Fee-Paying Population | 125,000 |
| | | Difference between current and new population | 121,514 |
| Current Fees (includes $85 biometric services) | $405 | New N-400 Reduced Fee | $380 |
| | | N-400 Application for Naturalization (paper filing) | $760 |
| | | Difference between full fee (paper filing) and reduced fee. The amount USCIS will have to subsidize. | $380 |
| Annual Baseline Costs (current population × current fees) | **$1,411,830** | Final rule Costs (new population × difference in full fee and reduced fees) | **$47,500,000** |
| | | ***Annual Transfer Payments from USCIS to N-400 population requesting reduced fees*** *(New Costs - Baseline Costs)* | **$46,088,170** |
| Source: USCIS analysis. | | | |

Currently, reduced fee applicants who file Form I-942 with their Form N-400 pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. To qualify for the reduced fee, their documented annual household income must be greater than 150 percent and not more than 200 percent of the FPG, at the time of filing, based on their household size. Additionally, the eligible applicant must submit a Form I-942, Request for Reduced Fee, along with their Form N-400. In the final rule, DHS will reduce the total fees for N-400 reduced fee applicants by 6 percent to $380.[38] Using the average annual number of approved reduced fee requests of 3,486, DHS estimates the current annual filing fee costs for Form N-400 with a reduced fee is approximately $1,411,830 annually (baseline costs). Adjusting the N-400 fee to a lower fee of

---

[38] Biometric services are incorporated into the cost of the underlying immigration benefit request fees. Calculation: $380 fee - $405 current fee = -$25; ($25/$405) × 100 = 6 percent.

$380, down from paper filing fee of $760 (table 13), represents a $380 reduction per filing in the fee that applicants will pay. As a result of the $380 reduction in the N-400 fee, N-400 reduced fee applicants will experience approximately $47,500,000 in reduced fees annually. The difference between the final rule costs and baseline costs of $46,088,170 represents annual transfer payments from USCIS to approved Form N-400 reduced fee applicants, as USCIS will incur the full costs of providing the N-400 services.

### E. Fees for Online Filing

**Changes**

DHS believes that transitioning to online filing for benefit requests is an important step in improving USCIS service and financial stewardship while promoting the objectives of the Government Paperwork Elimination Act[39] and the E-Government Act.[40]  In recognition of cost savings to the agency from online filing of immigration benefit requests for which both paper and online filing options are available, DHS will introduce lower fees for online filing. USCIS modified its ABC model to distinguish between paper and online filing costs when both options exist for an immigration benefit request. As a result, USCIS was able to calculate the fee-paying unit cost for paper filing and online filing separately and will make online filing fees $50 less than paper filing fees. Online filing is available for the following forms:

- Form I-90, Application to Replace Permanent Resident Card
- Form I-130, Petition for Alien Relative
- Form I-539, Application to Extend/Change Nonimmigrant Status
- Form I-765, Application for Employment Authorization

---

[39] *See* Pub. L. 105–227, 112 Stat. 2681 (Oct. 21, 1998).

[40] *See* Pub. L. 107–347, 116 Stat. 2899 (Dec. 17, 2002).

- Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)
- Form N-400, Application for Naturalization
- Form N-565, Application for Replacement Naturalization/Citizenship Document
- Form N-600, Application for Certificate of Citizenship
- Form N-600K, Application for Citizenship and Issuance of Certificate Under Section 322
- Form G-1041, Genealogy Index Search Request[41]
- Form G-1041A, Genealogy Records Request

USCIS does not require that immigration benefit requests be filed online, and filing on paper remains a valid option.[42]

While USCIS has embraced technology in adjudication and recordkeeping, it remains bound to the significant administrative and operational burdens associated with paper submissions. The intake, storage, and handling of paper requires tremendous operational resources, and the information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. Technological advances have allowed USCIS to develop accessible, digital alternatives to traditional paper methods for handling requests. As various online functions are developed, USCIS makes them available to the public, providing the option of engaging with USCIS either online or on paper. USCIS will further evaluate the effects of these changes in future biennial fee reviews. For example, if the level of online filing increases or more benefit requests become available for online filing, then USCIS will incorporate that information into future fee reviews.

---

[41] Form G-1041 Genealogy Index Search Request can only be filed through the online portal at USCIS, "Genealogy," available at *https://www.uscis.gov/records/genealogy* (last visited Aug. 3, 2021).

[42] CBP accepts USCIS Forms I-192 and I-212 online. CBP, DHS, "Electronic Secured Adjudication Forms Environment (e-SAFE)," available at *https://www.cbp.gov/travel/international-visitors/e-safe* (last visited Sept. 22, 2022).

**Affected Population**

Table 14 shows the annual volume of forms from FY 2018 through FY 2022 for paper and online filing, the 5-year averages, and the percentage of forms filed online. For the analysis in this rule, DHS uses the average volume of online and paper filings and the fees associated with each form. For Forms I-130, I-539 and I-765 that have missing historical data for online filing[43], DHS estimated annual averages based on the number of years data were available. DHS calculated a 3-year annual average for Form I-130. Also, for Forms I-539, N-600 and N-600K, DHS calculated 4-year annual averages. Lastly, for Form I-765, a 2-year annual average was calculated. DHS estimates that the annual average population who could file online is 4,944,413. Currently, approximately 25 percent of this population (1,213,184) file their applications online (based on 5 year average estimates in table 14).

---

[43] These forms were recently made available for online filing, as you could only file paper prior.  See. U.S. Citizenship and Immigration Services: Forms Available to File Online, https://www.uscis.gov/file-online/forms-available-to-file-online (last accessed Dec. 1, 2013).

65

**Table 8. USCIS Total Volume of Electronically Available Forms Filed and Percentage Filed Online, for FY 2018 through FY 2022**

| Form | 2018 | 2019 | 2020 | 2021 | 2022 | Total | Annual Average | Percentage of Total Forms Filed Online |
|---|---|---|---|---|---|---|---|---|
| I-90 (all) | 701,210 | 724,553 | 699,591 | 798,373 | 809,110 | 3,732,837 | 746,567 | |
| *I-90 (online)* | *323,959* | *334,743* | *395,657* | *470,607* | *499,054* | *2,024,020* | *404,804* | *54%* |
| I-130 (all) | 835,972 | 748,664 | 712,044 | 744,518 | 908,442 | 3,949,640 | 789,928 | |
| *I-130 (online)\** | *NA* | *NA* | *107,572* | *200,551* | *282,093* | *590,216* | *196,739* | *15%* |
| I-539 (all) | 230,975 | 221,566 | 442,808 | 286,165 | 266,302 | 1,447,816 | 289,563 | |
| *I-539 (online)\** | *NA* | *4,910* | *165,277* | *80,104* | *74,800* | *325,091* | *81,273* | *22%* |
| I-765 (all) | 1,751,225 | 2,189,243 | 1,969,954 | 2,599,463 | 2,341,053 | 10,850,938 | 2,170,188 | |
| *I-765 (online)\** | *NA* | *NA* | *NA* | *45,890* | *222,199* | *268,089* | *134,045* | *2%* |
| N-336 (all) | 4,907 | 5,646 | 4,933 | 4,326 | 5,631 | 25,443 | 5,089 | |
| *N-336 (online)* | *321* | *1,270* | *1,446* | *1,534* | *2,311* | *6,882* | *1,376* | *27%* |
| N-400 (all) | 839,371 | 836,288 | 996,084 | 777,140 | 780,933 | 4,229,816 | 845,963 | |
| *N-400 (online)* | *213,641* | *296,682* | *475,265* | *383,840* | *408,582* | *1,778,010* | *355,602* | *42%* |
| N-565 (all) | 26,043 | 27,788 | 24,956 | 29,367 | 30,817 | 138,971 | 27,794 | |
| *N-565 (online)* | *3,314* | *11,461* | *12,918* | *17,624* | *19,411* | *64,728* | *12,946* | *46%* |
| N-600 (all) | 50,273 | 53,530 | 51,873 | 51,622 | 59,112 | 266,410 | 53,282 | |
| *N-600 (online)\** | *NA* | *6,097* | *12,820* | *16,730* | *19,629* | *55,276* | *13,819* | *21%* |
| N-600K (all) | 3,963 | 4,427 | 3,025 | 5,705 | 6,159 | 23,279 | 4,656 | |
| *N-600K (online)\** | *NA* | *662* | *929* | *2,511* | *2,741* | *6,843* | *1,711* | *29%* |
| G-1041 (all) | 3,830 | 5,513 | 8,082 | 7,427 | 9,025 | 33,877 | 6,775 | |
| *G-1041 (online)* | *3,602* | *5,295* | *7,764* | *7,220* | *8,901* | *32,782* | *6,556* | *97%* |
| G-1041A (all) | 2,943 | 3,740 | 5,239 | 5,760 | 5,358 | 23,040 | 4,608 | |
| *G-1041A (online)* | *2,645* | *3,407* | *4,895* | *5,451* | *5,168* | *21,566* | *4,313* | *94%* |
| **Subtotal (Online only)** | | | | | | 5,173,503 | 1,213,184 | 25% |
| **Grand Total (all only)** | | | | | | 24,722,067 | 4,944,413 | |

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD Computer-Linked Application Information Management System (CLAIMS 3) database, C4, and Electronic Immigration System (ELIS) database, Feb. 9, 2023.

Note:
-Data in bolded italics are for online only and not included in the grand total.
\*NA throughout the table means that DHS did not have historical online data for these particular forms. For Form I-130, a 3-year annual average was calculated. For Forms I-539, N-600 and N-600K 4-year annual averages were calculated. For Form I-765, a 2-year annual average was calculated.

**Cost-Benefit-Transfer Payments Analysis**

USCIS was able to calculate the fee-paying unit cost for paper filing and online filing separately. As a result, DHS will adjust fees for electronically filed forms and make them $50 less than paper-submitted forms. The 5-year annual average online filings of Form I-90 is used to calculate the estimated impacts of this change. For Forms I-130, I-539 and I-765 that have missing historical data for online filing, DHS estimated annual averages based on the number of years data were available.

Due to the overlapping of some provisions, DHS only captures the economic impacts of the fee adjustments for the online filing of Forms I-90, I-130, I-539, and I-765 in this section. The economic impacts of the final fees for both online and paper filings have been captured separately in the analysis of Forms N-336, N-400, N-565, N-600, and N-600K[44] and in the analysis for G-1041 and G-1041A.[45]

In Table 15 DHS estimates that USCIS will collect approximately $17,706,510 in additional transfers from fee paying applicants based on the fee increase to Form I-130. This amount represents the annual transfer payments from online filers of Form I-130 to USCIS. Table 15 also shows that applicants filing Forms I-90, I-539 and I-765 online will result in cost savings of approximately $56,796,180 per year. The cost savings are the result of the reduced costs to USCIS to process forms submitted electronically as well as reduced storage costs. Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requester data into its systems. Thus, applicants will now pay less to reflect the costs associated with processing the electronic applications. Additional cost savings

---

[44] *See* Section D of this analysis.

[45] *See* Section L of this analysis.

will come about if more people opt to apply online using Forms I-90, I-539 and I-765 as a result of the fee differential between online and paper that is introduced in this final rule.

| Table 9. Economic Impacts of Fee Adjustments to Online Filing Forms | | | | | | |
|---|---|---|---|---|---|---|
| Online Forms | * Estimated Annual Average Population of Online Filers *(A)* | Current Fees** *(B)* | New Online Fees *(C)* | Fee Difference $D = C - B$ | Transfer Payments to USCIS $E = D \times A$ | Cost Savings to Applicants $F = D \times A$ |
| I-90 | 404,804 | $540** | $415 | -$125 | | -$50,600,500 |
| I-130 | 196,739 | $535** | $625 | $90 | $17,706,510 | |
| I-539 | 81,273 | $455** | $420 | -$35 | | -$2,844,555 |
| I-765 | 134,045 | $495** | $470 | -$25 | | -$3,351,125 |
| Totals | 816,861 | | | | $17,706,510 | -$56,796,180 |
| Source: USCIS analysis. *Annual averages are estimated in table 14 using FY 2018 through FY 2022 data. **Current fees (baseline costs) include $85 biometric services fee | | | | | | |

USCIS intends to make online filing available voluntarily for additional forms as DHS shifts to a more electronic immigration system for increased efficiency. This will provide many benefits to applicants/petitioners. By encouraging online filing, DHS allows requestors to:

- Engage in interactive information collection where the system maximizes the quality and completeness of the request by prompting users to fill in missing data fields and informing them about what data and supporting documents may be necessary, based on the benefit sought. This could reduce the instances of rejection due to filing deficiencies or missing information, reducing the need for requests for evidence or additional clarifying information from USCIS, resulting in saving a requestor's time and resources.

- Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records will not be physically moved around to different adjudication offices.

68

- Increase access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities.

- Enhance data integrity, as requestors enter their information directly into the USCIS system, minimizing data entry errors when manually transferring or converting paper requests into electronic format. Avoiding errors saves time and money as delays and other processing interruptions associated with errors are eliminated.

- Facilitate electronic processing and adjudications, which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases. Results in more accurately prepared and supported requests accompanied by necessary evidence and documentation. Reduces the need for USCIS to request additional data, clarifying information, or documents.

- Reduce the collection of unnecessary or duplicative information as the system guides requestors to provide responses that comply with requirements and instructions that are pertinent to their benefit requests.

### F. Form I-485, Application to Register Permanent Residence or Adjust Status

1. Interim Benefits

2. Form I-485 Fee for Child Under 14, Filing with Parent

**Changes**

DHS will charge separate filing fees for applicants filing Form I-765, Application for Employment Authorization, and Form I-131, Application for Travel Documentation, concurrently with Form I-485, Application to Register Permanent Residence or Adjust Status, or

69

after USCIS accepts their Form I-485 and while it is still pending. Form I-485 is used to apply for lawful permanent resident (LPR) status in the United States. An applicant typically needs approval of a primary immigration benefit request before receiving secondary benefits such as employment authorization and a travel document. These secondary benefits are allowed at the same time or after the primary immigration status or benefit. In some situations, an individual may qualify for a temporary secondary benefit when a primary benefit request is pending adjudication. For example, a person who applies for adjustment of status (primary benefit), in certain instances, will be able to apply for employment authorization and/or a travel document (secondary benefits) based on the pending immigration benefit request. *See* 8 CFR 274a.12(c)(9). When this occurs, these secondary benefits are generally referred to as "interim benefits."[46]

Currently, an individual filing Form I-485 may concurrently file Form I-765 to request employment authorization and/or Form I-131 to apply for advance parole without paying additional filing fees. DHS will return to charging separate fees for Forms I-485, I-765, and I-131. DHS will increase the current fee of Form I-485 for an adult from $1,140 to $1,440. Form I-485 applicants will pay half the fee ($260 instead of the $520 paper filing fee) for Form I-765 to request employment authorization, and the full fee of $630 for Form I-131 when these forms are filed concurrently with a Form I-485 or while their Form I-485 is still pending. There are currently two fees for Form I-485: $1,140 for an adult which will increase to $1,440 and $750 for a child under the age of 14 concurrently filing with a parent. DHS will increase the fee for Form I-485 for children under the age of 14 years concurrently filing Form I-485 with a parent, from $750 to $950.

---

[46] Individuals may also derive interim benefits from an Application for Temporary Protected Status, Form I-821. Unless otherwise stated in the final rule's preamble, DHS uses interim benefits to refer to benefits associated with Form I-485, Application to Register Permanent Residence or Adjust Status.

**Affected Population**

The population affected by this provision includes individuals that submit Form I-765 and/or Form I-131 concurrently with Form I-485 or after a Form I-485 is filed and is pending. DHS estimates that the average annual population of applicants seeking to register permanent residence or adjust status to become LPRs of the United States with interim benefits (employment authorization and/or advance parole) is 463,216. The estimation of affected population is based on the total number of Form I-485 applications that were filed with Forms I-131 and/or I-765 for FY 2018 through FY 2022 or filed in conjunction with a pending Form I-485 ( Table 16). DHS estimates that an average of 210,604 applicants file all three forms concurrently, while 39,146 applicants file only Form I-131 with Form I-485 and an average of 213,467 applicants file only Form I-765 with Form I-485, or while it is pending. An average 84,994 applicants do not file Forms I-131 or I-765 concurrently with Form I-485 or while it is pending (see table 16).

| Fiscal Year | Form I-485, Filed with both Forms I-765 and I-131 | Form I-485, Filed with Form I-131 | Form I-485, Filed with Form I-765 | Total Form I-485, Filed with Forms I-765 and/or I-131 | Form I-485 (No Interim Benefits) | Total Forms I-485 Filed |
|---|---|---|---|---|---|---|
| **Table 10. Annual Receipts When Filing Form I-765 and/or Form I-131 Concurrently with Form I-485 or After a Form I-485 is Filed and is Pending, for FY 2018 through FY 2022** | | | | | | |
| 2018 | 255,025 | 21,519 | 194,800 | 471,344 | 56,761 | 528,105 |
| 2019 | 249,188 | 13,244 | 175,965 | 438,397 | 29,775 | 468,172 |
| 2020 | 235,661 | 46,184 | 208,656 | 490,501 | 28,496 | 518,997 |
| 2021 | 252,266 | 54,754 | 220,912 | 527,932 | 7,519 | 535,451 |
| 2022 | 60,880 | 60,028 | 267,000 | 387,908 | 302,421 | 690,329 |
| **5 – year Total** | **1,053,020** | **195,729** | **1,067,333** | **2,316,082** | **424,972** | **2,741,054** |
| **5-year Annual Average** | **210,604** | **39,146** | **213,467** | **463,216** | **84,994** | **548,211** |

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, Computer-Linked Application Information Management System (CLAIMS 3) & Electronic Immigration System (ELIS) databases Jan. 17, 2023.
Notes:
Form I-765, Application for Employment Authorization,

71

Form I-131, Application for Travel Document,
Form I-485, Application to Register Permanent Residence or Adjust Status

DHS estimates that the 5-year average annual population of children under the age of 14 years concurrently filing Form I-485 with a parent is 32,271. This is approximately 6 percent of the 5-year annual average of Form I-485 adult applications filed.[47]

| Table 11. Annual Receipts of Applicants under the age of 14 years Filing Form I-485 with a Parent, for FY 2018 through FY 2022 | |
|---|---|
| **Fiscal Year** | **Form I-485 filed with a parent** |
| 2018 | 33,126 |
| 2019 | 26,437 |
| 2020 | 30,166 |
| 2021 | 35,175 |
| 2022 | 36,449 |
| **5-year Total** | **161,353** |
| **5-year Annual Average** | **32,271** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, Computer-Linked Application Information Management System (CLAIMS 3) & Electronic Immigration System (ELIS) databases, April 27, 2023. | |

**Cost-Benefit-Transfer Payments Analysis**

The rule requires separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. For the impacted population, this will increase the cost to attain the interim benefits as separate fees will be charged for Forms I-485, I-765, and I-131. Currently, separate fees are not required for Form I-765 and Form I-131 when filed concurrently with Form I-485 and while it is still pending so USCIS incurs the additional adjudication costs for these interim benefits. DHS

---

[47] Calculation: (32,271 children under the age of 14 years concurrently filing Form I-485 with a parent / 548,211 Total Forms I-485 Filed) × 100 = 6 percent.

72

believes that collecting a fee for Form I-485 separate from fees for Form I-131 and Form I-765 will better reflect the cost of adjudication.

Table 18 presents the baseline costs (current fees) as well as the new costs (final fees). The difference between the two costs are the additional fees that will be imposed on the affected populations. The baseline costs of $1,225 for all impacted populations consist of the current filing fee for Form I-485 of $1,140 plus the $85 biometric services fee. DHS is increasing the filing fee to apply for adjustment of status using Form I-485 and pay the biometric services fee from $1,225 to $1,440, an increase of $215 (approximately 18 percent). This increase in the Form I-485 fee will result in approximately $18,273,710 in transfer payments annually from applicants filing I-485 only (no interim benefits) to the government.

Form I-485 applicants will pay half the fee ($260 instead of the $520 paper filing fee) for Form I-765 to request employment authorization, and the full fee of $630 for Form I-131 when these forms are filed concurrently with a Form I-485. DHS estimates the cost of filing Form I-485 concurrently with Forms I-765 and I-131 will be approximately $2,330 per applicant.[48] The cost of filing Form I-485 concurrently with Form I-131 will be $2,070, and the costs of filing Form I-485 concurrently with Form I-765 will be $1,700.[49] DHS estimates that requiring separate filing fees for applicants filing interim benefits concurrently with Form I-485 will result in transfer payments from applicants to USCIS of about $367,192,615.

| Table 12. Economic Impacts of Applicants Filing Form I-485 Only and Applicants Filing Separate Fees for Interim Benefits Concurrently with Form I-485 or After a Form I-485 is Filed and is Pending | | | | | | |
|---|---|---|---|---|---|---|
| **Affected Population** | ***5-Year Annual Average** *(A)* | **Current Fees** *(B)* | **Final rule Fees** *(C)* | **Fee Difference** *D = C-B* | **Percent Change** | **Transfer Payments** *E = D×A* |
| Form I-485, Filed Concurrently | 210,604 | $1,225* | $2,330 | $1,105 | 90% | **$232,717,420** |

[48] Calculation: $1,440 (Form I-485) + $260 (Form I-765) + $630 (Form I-131) = $2,330.

[49] Calculation: $1,440 (Form I-485) + $630 (Form I-131) = $2,070 and $1,440 (Form I-485) + $260 (Form I-765) = $1,700.

| | | | | | | |
|---|---|---|---|---|---|---|
| with Forms I-765 and I-131 | | | | | | |
| Form I-485, Filed Concurrently with Form I-131 | 39,146 | $1,225* | $2,070 | $845 | 69% | **$33,078,370** |
| Form I-485, Concurrently Filed with Form I-765 | 213,467 | $1,225* | $1,700 | $475 | 39% | **$101,396,825** |
| **Subtotal** | **463,217** | | | | | **$367,192,615** |
| Form I-485, Only (No Interim Benefits) | 84,994 | $1,225 | $1,440 | $215 | 18% | **$18,273,710** |
| **Grand Total** | **548,211** | | | | | **$385,466,325** |

Source: USCIS analysis.

Notes:
*Column A data from table 16, 5-year annual average for FY 2018 through FY 2022
*Current fees include the Form I-485 of $1,140 plus the $85 biometric services
Individual Form Fees: **I-485** is $1,440; **I-131** is $630 and **I-765** is $260 (when filed with I-485)

Currently, the fee for children under the age of 14 concurrently filing Form I-485 with a parent is $750. DHS will increase this fee to $950 (27 percent), which will result in transfer payments from applicants to USCIS of $6,454,200 (*see* Table 19).

**Table 13. Economic Impacts of Same Fees for Children Under the Age of 14 years Concurrently Filing Form I-485 with a parent**

| Affected Population | *5-Year Annual Average (A) | Current Fees (B) | Final rule Fees (C) | Fee Difference D = C–B | Percent Change | Transfer Payments E = D×A |
|---|---|---|---|---|---|---|
| Applicant under the age of 14 years filing Form I-485 with a parent | 32,271 | $750 | $950 | $200 | 27% | **$6,454,200** |

Source: USCIS analysis.
*Table 17, 5-year annual average for FY 2018 through FY 2022

In sum, the changes in this provision will result in approximately $391,920,525 in annual transfer payments from applicants to USCIS.[50]

---

[50] Calculation: $18,273,710 (Form I-485, Only (No Interim Benefits)) + $367,192,615 (Separate Filing Fees for Applicants Filing Interim Benefits for I-765 and I-131 Concurrently with Form I-485) + $6,454,200 (Children Under the Age of 14 years Concurrently Filing Form I-485 with a parent) = $391,920,525.

AR_001055

### G. Form I-131A, Application for Travel Document (Carrier Documentation)

**Changes**

DHS will separate the fee for Form I-131A, Application for Travel Document (Carrier Documentation), from Form 1-131, Application for Travel Document. Currently, certain LPRs may use Form I-131A to apply for a travel document (carrier documentation) if their Permanent Resident Card[51] or their reentry permit is lost, stolen, or destroyed while outside of the United States. Carrier documentation allows an airline or other transportation carrier to board the LPR without any penalty to the airline or transportation carrier for permitting an individual to board without a visa or travel document. The current filing fee for Form I-131A is $575 per applicant. There is no biometric services fee. DHS is keeping this same fee in the final rule. An applicant may pay the fee from anywhere in the world. Hence, this provision creates no new costs or transfer payments. Separating Form I-131A from other travel documents allows USCIS to better assess the cost of providing services for this immigration benefit and better aligned fees in future fee reviews. Form I-131A requires a different adjudicative process than Form I-131, including processing by personnel outside of the United States, which affects the projected costs for Form I-131A.

### H. Separating Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification

**Changes**

DHS will charge different fees for Form I-129, Petitioner for a Nonimmigrant Worker, based on the nonimmigrant classification being requested in the petition, the number of

---

[51] Permanent Resident Card is also known as a "Green Card" or Form I-551.

beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, petitioners or applicants can file petitions or applications for many different types of nonimmigrant workers. USCIS believes the establishment of different fees will better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification. DHS will also limit the number of named beneficiaries to 25 that may be included on a single petition for H-2A, H-2B, O,[52] H-3, P, Q and R workers.

Currently, there is no limit on the number of named beneficiaries a petitioner can have on their nonimmigrant worker petitions. Limiting the number of named beneficiaries simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts. USCIS estimates that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. Finally, DHS will charge a new Asylum Program Fee to be paid by employers who file a Form I-129, Petition for a Nonimmigrant Worker. This new fee that may be used to fund part of the costs of administering the entire asylum program and would be charged in addition to the fees petitioners would pay for their Form I-129 benefit requests. DHS will provide reduced Form I-129/I-129CW fees and Asylum Program fees for businesses with 25 or

---

[52] While O-1 petitions are limited to a single named beneficiary, a petition for O-2 nonimmigrant workers may include multiple named beneficiaries in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

less full-time equivalent (FTE) workers and nonprofit businesses (will be exempt from paying the Asylum Program Fee).

**Affected Population**

The population affected by this provision includes employers and other qualified filers, such as agents, sponsoring organizations, and investors that use Form I-129 to petition USCIS for a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training. Employers may use Form I-129 to petition for nonimmigrant workers under the following visa classifications: CW, E, H-1B (and sub-classifications), H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN. See Table 20 for a description of each of these visa classifications.

| Table 14. Description of Visa Classifications for Nonimmigrant Workers Who May Have a Form I-129 Petition Filed on Their Behalf by an Employer | |
|---|---|
| **Visa Classification** | **Description of Visa Classification** |
| CW-1 | CNMI-Only transitional worker. |
| E-1 | Treaty Traders and qualified employees for citizens of countries with which the United States maintains treaties of commerce and navigation. The applicant must be coming to the United States to engage in substantial trade principally between the United States and the treaty country. |
| E-2 | Treaty Investor and qualified employees for citizens of countries with which the United States maintains treaties of commerce and navigation. To develop and direct the operations of an enterprise in which the applicant has invested or is in the process of investing a substantial amount of capital. |
| E-2C | CNMI-Only transitional worker; is a noncitizen who seeks to enter or remain in the Commonwealth of the Northern Mariana Islands (CNMI in order to maintain an investment in the CNMI that was approved by the CNMI government before November 28, 2009. |
| E-3 | Certain "specialty occupation" professionals from Australia. |
| H-1B | Specialty occupation worker; a noncitizen coming to perform services of an exceptional nature that relate to a DoD-administered project; or a fashion model of distinguished merit and ability. |
| H-2A | Temporary agricultural worker. |
| H-2B | Temporary nonagricultural worker. |
| H-3 | Trainees other than medical or academic. |
| L-1 | Intracompany transferees in managerial or executive positions, or in positions utilizing specialized knowledge. |
| O-1 | Persons with extraordinary ability in sciences, arts, education, business, or athletics and motion picture or television production. |

| O-2 | Persons accompanying an O-1 nonimmigrant artist or athlete solely to assist in the artistic or athletic performance. |
| P-1 | Internationally recognized athletes, entertainers, or members of internationally recognized entertainment groups. |
| P-1S | Essential support personnel for a P-1 nonimmigrant. |
| P-2 | Individual performer or part of a group entering to perform under a reciprocal exchange program. |
| P-2S | Essential support personnel for a P-2 nonimmigrant. |
| P-3 | Artists or entertainers, either an individual or group, to perform, teach, or coach under a program that is culturally unique. |
| P-3S | Essential support personnel for a P-3 nonimmigrant. |
| Q-1 | Persons participating in an international cultural exchange program to provide practical training or employment, and to share the history, culture, and traditions of the nonimmigrant's home country. |
| R-1 | Religious workers. |
| TN | Created to implement part of a trilateral North American Free Trade Agreement (NAFTA) between Canada, Mexico, and the United States.[53] In accordance with the NAFTA, a citizen of Canada or Mexico who seeks temporary entry as a business person to engage in business activities at a professional level may be admitted to the United States. |
| Source: USCIS, "Temporary (Nonimmigrant) Workers," available at *https://www.uscis.gov/working-united-states/temporary-nonimmigrant-workers* (last accessed on Aug. 28, 2023). | |

In FY 2020, DHS implemented an electronic registration process for the H-1B cap-subject petitions. Prospective petitioners seeking to file H-1B cap-subject petitions, including for beneficiaries eligible for the advanced degree exemption, first must electronically register and pay the associated $10 H-1B registration fee for each beneficiary.[54]  In FY 2020, for the FY 2021 H-1B cap, DHS received 269,424 eligible H-1B registrations. In FY 2021, for the FY 2022 H-1B cap season, DHS received 301,447 eligible H-1B registrations and in FY 2022, for the FY 2023 H-1B cap, DHS received 474,421 eligible H-1B registrations. DHS estimates that based on

---

[53] NAFTA was replaced by the U.S.-Mexico-Canada Agreement (USMCA) which entered into force on July 1, 2020. The USMCA did not make any substantive changes to the Immigration chapter of NAFTA and retains all substantive elements of the former NAFTA including the TN designation for certain professionals.

[54] USCIS, "H-1B Electronic Registration Process," available at *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process* (last visited Dec. 6, 2023).

the 3-year average, there will be 348,431 annual eligible registrations filed by employers, however, recent results for the FY 2024 H-1B cap lottery show 758,994 eligible registrations.

Table 21 shows the number of cap registration receipts by year, as well as the number of eligible registrations that were selected to file I-129 H-1B petitions. The number of registrations has steadily increased over the past 3 years. DHS believes that this increase is partially due to the increase in multiple companies submitting registrations for the same beneficiary. USCIS received a low of 269,424 eligible H-1B Cap-Subject Registrations for cap year FY 2021, and a high of 474,421 eligible H-1B Cap-Subject Registrations for cap year 2023.[55] Over the 3-year period, DHS estimates that an annual average of 348,431 eligible H-1B Cap-Subject Registrations are submitted. Table 21 also shows that 67 percent of the growth in H-1B cap-subject registrations observed between 2021 and 2023 was attributable to growth in the number of eligible registrations for beneficiaries with multiple registrations.[56]

| Table 21. H-1B Cap-Subject Registrations Received and Selected by USCIS, Cap Year 2021 through FY 2023 | | | | |
|---|---|---|---|---|
| Cap Year | Eligible Registrations * | Eligible Registrations for Beneficiaries with No Other Eligible Registrations | Eligible Registrations for Beneficiaries with Multiple Eligible Registrations | Selections |
| 2021 | 269,424 | 241,299 | 28,125 | 124,415 |
| 2022 | 301,447 | 211,304 | 90,143 | 131,924 |
| 2023 | 474,421 | 309,241 | 165,180 | 127,600 |
| **3-Year Total** | **1,045,292** | **761,844** | **283,448** | **383,939** |
| **3-Year Average** | **348,431** | **253,948** | **94,483** | **127,980** |

[55] While the initial registration selection process has been completed, DHS is unable to determine at this time how many total petitions will be submitted within the filing period.

[56] (165,180-28,125)/(474,421-269,424) = 67 percent.

Source: USCIS, "H-1B Electronic Registration Process," available at *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process* (last updated July 31, 2023).

*Eligible H-1B Cap-Subject Registrations excludes duplicate registrations, those deleted by the prospective employer before the close of the registration period, and those with failed payments.

To estimate the total population affected by the changes in the final rule, DHS uses data from receipts of Form I-129 petitions that employers have filed on behalf of nonimmigrant workers. These receipts are categorized by worker type to estimate the affected population of this rule. Table 22 shows total receipts of Form I-129 by visa classification for FY 2018 through FY 2022. Using Table 22, DHS estimates that 563,380 is the 5-year average annual number of Form I-129 petitions filed by employers. DHS will have different fees for Form I-129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries.

**Table 152. Receipts by Classification for Form I-129, Petition for a Nonimmigrant Worker, for FY 2018 through FY 2022**

| Fiscal Year | H-1B *(A)* | H-2A Named Beneficiaries *(B)* | H-2A – Unnamed Beneficiaries *(C)* | H-2B Named Beneficiaries *(D)* | H-2B – Unnamed Beneficiaries *(E)* |
|---|---|---|---|---|---|
| 2018 | 418,596 | 2,837 | 10,607 | 1,697 | 4,451 |
| 2019 | 420,580 | 3,446 | 12,063 | 3,746 | 3,715 |
| 2020 | 427,289 | 4,210 | 12,802 | 2,253 | 3,169 |
| 2021 | 398,285 | 5,172 | 15,151 | 3,031 | 6,129 |
| 2022 | 474,308 | 6,122 | 18,248 | 4,307 | 8,083 |
| **5-year Total** | **2,139,058** | **21,787** | **68,871** | **15,034** | **25,547** |
| **5-year Annual Average** | **427,812** | **4,357** | **13,774** | **3,007** | **5,109** |
| **Percent of Total receipts** | **75.94%** | **0.77%** | **2.44%** | **0.53%** | **0.91%** |
| | | | | | |
| Fiscal Year | O – Named Beneficiaries | | L-1A / L-1B / LZ *(H)* | H-3/P/Q/R – Named Beneficiaries *(I)* | H-3/P/Q/R – Unnamed Beneficiaries *(J)* |

|  | (F) |  |  |  |  |
|---|---|---|---|---|---|
| 2018 | 25,202 |  | 42,704 | 21,991 | 4 |
| 2019 | 26,511 |  | 42,695 | 23,191 | 2 |
| 2020 | 22,304 |  | 41,252 | 16,482 | 0 |
| 2021 | 20,674 |  | 40,306 | 14,826 | 1 |
| 2022 | 28,190 |  | 43,267 | 20,208 | 1 |
| **5-year Total** | **122,881** |  | **210,224** | **96,698** | **8** |
| **5-year Annual Average** | **24,576** |  | **42,045** | **19,340** | **2** |
| **Percent of Total receipts** | **4.4%** |  | **7.46%** | **3.43%** | **0.0%** |

| Fiscal Year | E / TN (K) | CW-1 (L) | Grand Total $M = A + B + C + D + E + F + G + H + I + J + K + L$ |  |
|---|---|---|---|---|
| 2018 | 13,527 | 7,290 | 548,906 |  |
| 2019 | 11,609 | 4,229 | 551,787 |  |
| 2020 | 20,859 | 4,439 | 555,059 |  |
| 2021 | 24,945 | 3,328 | 531,848 |  |
| 2022 | 24,448 | 2,116 | 629,298 |  |
| **5-year Total** | **95,388** | **21,402** | **2,816,898** |  |
| **5-year Annual Average** | **19,078** | **4,280** | **563,380** |  |
| **Percent of Total receipts** | **3.39%** | **0.76%** | **100.0%** |  |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD, Computer-Linked Application Information Management System (CLAIMS 3) database (Jan. 9, 2023).
Note:
For H-2A and H-2B classifications, any petition with at least one named beneficiary is classified as "Named." Petitions with no named beneficiaries are classified as "Unnamed."

DHS will limit the number of named beneficiaries per nonimmigrant worker petition to 25 for H-2A, H-2B, H-3, O-2, P, Q, and R visa classifications.[57] USCIS currently charges a

---

[57] Limiting the number of named beneficiaries is responsive to DHS OIG's recommendations to USCIS. *See* Office of Inspector General, U.S. Dep't of Homeland Security, "H-2 Petition Fee Structure is Inequitable and Contributes to Processing Errors," OIG-17-42 (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf* (last visited Sept. 22, 2022). USCIS also believes that limiting the number of named beneficiaries in a petition may help employers receive their workers sooner.  For example, if a petitioner files one petition for 50 workers, and USCIS requires additional information for

single fee to file Form I-129 regardless of the number of beneficiaries an employer petitions for as nonimmigrant workers. Limiting the number of named beneficiaries on a petition will increase the number of petitions filed for some petitioners, and thus the fees paid. Below, DHS demonstrates how this increase in petitions will occur when there is a limit of 25 named beneficiaries per nonimmigrant worker petition. Table 23 shows the 5-year annual average from FY 2018 to FY 2022 of the petitions filed for each range of named beneficiaries listed on each petition. Table 24 shows the annual average number of petitions that will now be filed for each range of named beneficiaries listed on each petition, when there is a limit of 25 named beneficiaries per petition.

Table 23 presents the 5-year annual average receipts of Form I-129 petitions with named beneficiaries for H-2A, H-2B, O, H-3, P, Q, and R visa classifications within incremental ranges of 25 beneficiaries per petition during FY 2018 through FY 2022. DHS estimates that an annual average of 51,276 Form I-129 petitions with named beneficiaries are filed each year. For each of the visa classifications listed, most employers filed petitions with fewer than 26 named beneficiaries. Additionally, less than 2 percent of employers filed petitions with more than 100 named beneficiaries.

| Table 163. Current Average Annual Petitions Filed for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications with Named Beneficiaries within Ranges, for FY 2018 through FY 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Annual Average for Named Beneficiaries per Petition by Incremental Ranges | | | | | | | | | | | | |
| Visa Classification | 01-25 | 26-50 | 51-75 | 76-100 | 101-125 | 126-150 | 151-175 | 176-200 | 201-225 | 226-250 | 251+ | *Unknown number of beneficiaries | Total Annual Average Number of Petitions* |
| | 2,480 | 191 | 68 | 38 | 17 | 10 | 7 | 4 | 3 | 3 | 9 | 1,526 | 4,356 |

one of the workers, the entire H-2 petition for 50 workers will be placed on hold until the petitioner responds to the request for evidence.  On the other hand, if the petitioner submits two H-2 petitions for 25 workers each, only one petition will be affected.  USCIS believes the fees more accurately reflect the differing burdens of adjudication and enable USCIS to adjudicate these petitions more effectively.

| H-2A Named | 57% | 4% | 2% | 1% | 0.4% | 0.2% | 0.2% | 0.10% | 0.06% | 0.08% | 0.2% | 35% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **H-2B Named** | **2,735** | **195** | **41** | **18** | **8** | **4** | **2** | **1** | **0** | **1** | **1** | **0** | **3,006** |
| | 91% | 6.5% | 1.4% | 0.6% | 0.3% | 0.1% | 0.07% | 0.03% | 0.01% | 0.03% | 0.03% | | 100% |
| **O Named** | **24,503** | **59** | **8** | **3** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **24,574** |
| | 99.7% | 0.2% | 0.03% | 0.01% | 0.004% | | | | | | | | 100% |
| **H3 Named** | **674** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **676** |
| | 99.7% | 0.3% | 0.03% | | | | | | | | | | 100% |
| **P Named** | **10,450** | **125** | **25** | **14** | **8** | **6** | **1** | **1** | **1** | **1** | **1** | **0** | **10,633** |
| | 98% | 1% | 0.23% | 0.13% | 0.08% | 0.05% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | | 100% |
| **Q Named** | **135** | **7** | **4** | **3** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **150** |
| | 90% | 5% | 3% | 1.74% | 0.40% | | | | | | | | 100% |
| **R Named** | **7,881** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **7,881** |
| | 100% | | | | | | | | | | | | 100% |
| **Total Number of Current Petitions** | | | | | | | | | | | | | **51,276** |

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division, Computer-Linked Application Information Management System (CLAIMS 3) database and ELIS via SAS (Jan. 9, 2023).

Notes:
*The unknown number of beneficiaries column was added in the FR rule.

--The data reflect the most up-to-date data available at the time the database was queried. Counts in Table 23 may differ from Table 22 due to rounding, system updates, and post-adjudicative outcomes.

Table 24 presents the estimated number of Form I-129 petitions with named beneficiaries under each of the visa classifications that employers will be required to file under the final rule. The final rule will increase the number of petitions filed annually by approximately 1,628 or 3 percent.[58] For employers requesting 1 to 25 H-2A nonimmigrants, only one petition is necessary under this change. Employers that file a petition for 26-50 named beneficiaries will be required to file two separate petitions, one for the first 25 named beneficiaries and a second petition for

---

[58] Calculations: 52,904 total projected annual average petitions – 51,276 total current annual average petitions = 1,628 additional petitions. (1,628 additional petitions / 51,276 total current annual average petitions) x 100 = 3 percent (rounded).

any remaining number of named beneficiaries up to 50.[59] As a result, for the H-2A visa classification where DHS estimates an average of 191 petitions are filed annually that include 26 to 50 named beneficiaries per petition (*see* Table 23), this will increase to 382 petitions under the final rule.[60] DHS calculates this as 50 beneficiaries divided by the 25-beneficiary limit, and multiplies the result of 2 by the annual average from FY 2018 through FY 2022 of petitions reported in Table 24. DHS applies this method to the other ranges to estimate the increase in petitions employers will have to file. The fees are based on these additional estimated number of Form I-129 petitions employers will be required to file according to the new provision to limit named beneficiaries to 25 per petition under the H-2A, H-2B, O-2, H-3, P, Q, and R visa classifications. Currently, an employer is only required to file one Form I-129 petition for an unlimited number of named beneficiaries.

**Table 174.  New Average Annual Petitions for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications with Named Beneficiaries within Ranges, for Fiscal Year 2018 through 2022**

| Visa Classification | Named Beneficiaries per Petition by Incremental Ranges | | | | | | | | | | | Total Average Annual Number Of Petitions | Additional Petitions to File under FR** |
| | 01-25 | 26-50 | 51-75 | 76-100 | 101-125 | 126-150 | 151-175 | 176-200 | 201-225 | 226-250 | 251+ | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Number of petitions to file for each range of named beneficiaries* | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | At least 11 | | |
| **H-2A Named** | 4,006* | 382 | 204 | 152 | 85 | 60 | 49 | 32 | 27 | 30 | 99 | 5,126 | 770 |
| | *78%* | *7%* | *4%* | *3%* | *2%* | *1%* | *1%* | *1%* | *1%* | *1%* | *2%* | *100%* | |
| **H-2B Named** | 2,735 | 390 | 123 | 72 | 40 | 24 | 14 | 8 | 0 | 10 | 11 | 3,427 | 421 |
| | *80%* | *11%* | *4%* | *2%* | *1%* | *1%* | *0%* | *0%* | | *0.3%* | *0.3%* | *100%* | |
| **O Named** | 24,503 | 118 | 24 | 12 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 24,662 | 88 |
| | *99%* | *0.5%* | *0.1%* | *0.05%* | *0.02%* | | | | | | | *100%* | |
| **H-3 Named** | 674 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 678 | 2 |

[59] Calculation: 50 H-2A nonimmigrants / 25 beneficiary limit per form = 2 required petitions.

[60] Calculation: 191 petitions × 2 required petitions = 382 required petitions.

AR_001065

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *99%* | *1%* | | | | | | | | | | *100%* | |
| **P Named** | **10,450** | **250** | **75** | **56** | **40** | **36** | **7** | **8** | **9** | **10** | **11** | **10,952** | **319** |
| | *95%* | *2%* | *1%* | *1%* | *0.4%* | *0.3%* | *0.1%* | *0.1%* | *0.1%* | *0.1 %* | *0.1 %* | *100%* | |
| **Q Named** | **135** | **14** | **12** | **12** | **5** | **0** | **0** | **0** | **0** | **0** | **0** | **178** | **28** |
| | *76%* | *8%* | *7%* | *7%* | *3%* | | | | | | | *100%* | |
| **R Named** | **7,881** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **7,881** | **0** |
| | *100%* | | | | | | | | | | | *100%* | |
| **Total Number of Projected Petitions** | | | | | | | | | | | | **52,904** | **1,628** |

Source: USCIS analysis.

Notes:
*DHS assumes that for the 1,526 petitions with an unknown number of beneficiaries, at least one petition will be filed by employers. As such, these unknown petitions have been grouped into the 1-25 beneficiary range. The figure of 4,006 thus includes the petitions for the 2,480 known and the 1,526 unknown number of beneficiaries.
** Additional petitions estimated using the total averages in table 23 (the baseline estimates) and taking the difference from the new total averages in table 24.

DHS will establish new fees to be paid by employers who file either a Form I-129 or Form I-129CW based on the number of full-time workers the entity employs and its nonprofit status. Table 25 shows the estimated percentage of entities with more than 25 FTEs, 25 or less FTEs and nonprofits DHS believes submit Form I-129 petitions. These estimates are used to calculate the population breakout in Table 27.

| Table 25:  Form I-129  Entities by Size and Nonprofit Status | | | |
|---|---|---|---|
| **I-129 Categories** | **More than 25 FTEs** | **25 or less FTEs** | **Nonprofits** |
| H-1B | 73% | 12% | 15% |
| H-2A | 11% | 88% | 1% |
| H-2B | 30% | 55% | 15% |
| L | 59% | 26% | 15% |
| O, P, Q, R, TN | 38% | 47% | 15% |
| All other categories | 33% | 52% | 15% |

Source: OCFO estimates based on Form I-129 Section 2 American Competitiveness and Workforce Improvement Act (ACWIA) data for H1B and L (FY2021–22), Form I–129 Part 5 microdata (FY20–22), and U.S. Department of Agriculture's (USDA's), "2017 Census of Agriculture, Table 74. Summary by Legal Status For Tax Purposes: 2017," available at *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/st99_1_0074_0 074.pdf* (last accessed July 28, 2023).

**Cost-Benefit-Transfer Payments Analysis**

DHS will have different fees for Form I-129 based on the nonimmigrant classification being requested in the petition and, in some cases, according to whether the petition includes named or unnamed beneficiaries. A benefit of the different fees for the Form I-129 classifications is that it will allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification in future fee reviews. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may benefit petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts.

This analysis also captures the economic impacts of the final fees associated with filing the benefit requests for each nonimmigrant worker classification. The current fee to file Form I-129 is $460, regardless of the number of nonimmigrant workers for whom the employer is submitting a petition, the type of nonimmigrant worker they seek to employ, and whether or not the employer identifies a specific worker.[61]  In the final rule, DHS will charge Form I-129/I-129CW petitioners a form fee, a registration fee (H-1B only), CNMI Educational Fund fee (I-

---

[61] DHS recognizes there are other fees associated with Form I-129 petitions, such as the ACWIA fee, the fraud fee, and the Pub. L. 114-113 fee. These fees generally vary depending on the size of the petitioning entity. Therefore, DHS has not specifically included these fees in these calculations though DHS acknowledges that these fees are statutorily required and by increasing the number of petitions filed, this rule will increase the number of statutory fees that must be paid. More importantly, these fees are not included in the IEFA and DHS has no authority to adjust them.

129CW only) and an Asylum Program fee (all I-129 petitions except those submitted by nonprofits). DHS will establish new fees to be paid by employers who file either a Form I-129 or Form I-129CW based on the number of FTE workers the entity employs and its nonprofit status. Entities will pay the associated fees for the visa classification benefit requests according to whether they are:

1) entities with greater than 25 FTE workers,

2) entities with 25 or less FTE workers, or

3) nonprofit entities.

The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer FTE employees, and $600 for all other I-129 filers. H-1B classification cap-subject petitions will include a $215[62] registration fee, an increase of $205 (2,050 percent) from the original $10 fee. Non-cap subject petitions (e.g., extension petitions or cap-exempt filer petitions) will not have to pay the registration fee. There are no additional processing costs to DHS due to the changes in the filing fees of each specific nonimmigrant classification. A summary of the fees in the final rule is shown in Table 26 below.

| Table 26. Fee Summary Table for Form I-129 Petitioners | | | | | |
|---|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Current Fees | Proposed NPRM Fees | Final rule Fees | | |
| | | | Entities with more than 25 FTE Workers | Entities with 25 or Fewer FTE Workers | Nonprofit Entities |
| H-1B | $460 | $780 | $780 | $460 | $460 |
| H-1B Registration | $10 | $215 | $215 | $215 | $215 |
| H-2A – Named Beneficiaries | $460 | $1,090 | $1,090 | $545 | $545 |
| H-2A – Unnamed | $460 | $530 | $530 | $460 | $460 |

---

[62] This preregistration fee of $215 is for each registration and each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 nonrefundable H-1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H-1 cap. The fee will not be refunded if the registration is not selected or is withdrawn. *See* 84 FR 60307 (Nov. 8, 2019).

| | | | | | |
|---|---|---|---|---|---|
| Beneficiaries | | | | | |
| H-2B – Named Beneficiaries | $460 | $1,080 | $1,080 | $540 | $540 |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $580 | $460 | $460 |
| O-1/O-2 | $460 | $1,055 | $1,055 | $530 | $530 |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $1,385 | $695 | $695 |
| H-3/ P/Q/R | $460 | $1,015 | $1,015 | $510 | $510 |
| E/TN | $460 | $1,015 | | | |
| CW | $460 | $1,015 | | | |
| CW Education Funding Fee[63] | $200 | $210 | $230 | $230 | $230 |
| Asylum Program Fee | $0 | $600 | $600 | $300 | $0 |
| Source: USCIS analysis. | | | | | |

In Table 27, DHS estimates the baseline costs associated with filing Form I-129 petitions is approximately $263,496,030 and the costs from the fee increases will be $481,067,910. The transfer payments will be the difference between the current filing fees (baseline) and the new filing fees. The annual increase in transfer payments from Form I-129 visa classification petitions to USCIS is expected to be $217,571,880.

**Table 27. Economic Impacts of Separate Filing Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications**

| Form I-129 Classification | 5-Year Annual Average (historical)* (A) | 5-Year Annual Average (final rule) (B) | Current Fees (C) | FR Fees (D) | Baseline Costs E = A × C | Final rule Costs F = B × D | Transfer Payments G = F - E |
|---|---|---|---|---|---|---|---|
| **H-1B** | **427,812** | **427,812** | | | | | |
| More than 25 FTEs | 312,303 | 312,303 | $460 | $780 | $143,659,380 | $243,596,340 | **$99,936,960** |
| 25 or less FTEs | 51,337 | 51,337 | $460 | $460 | $23,615,020 | $23,615,020 | **$0** |
| Nonprofits | 64,172 | 64,172 | $460 | $460 | $29,519,120 | $29,519,120 | **$0** |
| **H-1B Registration** | **348,431** | **348,431** | $10 | $215 | $3,484,310 | $74,912,665 | **$71,428,355*** |

---

[63] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers.

| Form I-129 Classification | 5-Year Annual Average (historical)* (A) | 5-Year Annual Average (final rule) (B) | Current Fees (C) | FR Fees (D) | Baseline Costs E = A × C | Final rule Costs F = B × D | Transfer Payments G = F - E |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **H-2A – Named Beneficiaries** | **4,357** | **5,126**** | | | | | |
| More than 25 FTEs | 479 | 564 | $460 | $1,090 | $220,340 | $614,760 | **$394,420** |
| 25 or less FTEs | 3,834 | 4,511 | $460 | $545 | $1,763,640 | $2,458,495 | **$694,855** |
| Nonprofits | 44 | 51 | $460 | $545 | $20,240 | $27,795 | **$7,555** |
| **H-2A – Unnamed Beneficiaries** | **13,774** | **13,774** | | | | | |
| More than 25 FTEs | 1,515 | 1515 | $460 | $530 | $696,900 | $802,950 | **$106,050** |
| 25 or less FTEs | 12,121 | 12,121 | $460 | $460 | $5,575,660 | $5,575,660 | **$0** |
| Nonprofits | 138 | 138 | $460 | $460 | $63,480 | $63,480 | **$0** |
| **H-2B – Named Beneficiaries** | **3,007** | **3,427**** | | | | | |
| More than 25 FTEs | 902 | 1,028 | $460 | $1,080 | $414,920 | $1,110,240 | **$695,320** |
| 25 or less FTEs | 1,654 | 1,885 | $460 | $540 | $760,840 | $1,017,900 | **$257,060** |
| Nonprofits | 451 | 514 | $460 | $540 | $207,460 | $277,560 | **$70,100** |
| **H-2B – Unnamed Beneficiaries** | **5,109** | **5,109** | | | | | |
| More than 25 FTEs | 1,533 | 1,533 | $460 | $580 | $705,180 | $889,140 | **$183,960** |
| 25 or less FTEs | 2,810 | 2,810 | $460 | $460 | $1,292,600 | $1,292,600 | **$0** |
| Nonprofits | 766 | 766 | $460 | $460 | $352,360 | $352,360 | **$0** |
| **O – Named Beneficiaries** | **24,576** | **24,662**** | | | | | |

**Table 27. Economic Impacts of Separate Filing Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications**

89

| Form I-129 Classification | 5-Year Annual Average (historical)* (A) | 5-Year Annual Average (final rule) (B) | Current Fees (C) | FR Fees (D) | Baseline Costs E = A × C | Final rule Costs F = B × D | Transfer Payments G = F - E |
|---|---|---|---|---|---|---|---|
| More than 25 FTEs | 9,339 | 9,372 | $460 | $1,055 | $4,295,940 | $9,887,460 | **$5,591,520** |
| 25 or less FTEs | 11,551 | 11,591 | $460 | $530 | $5,313,460 | $6,143,230 | **$829,770** |
| Nonprofits | 3,686 | 3,699 | $460 | $530 | $1,695,560 | $1,960,470 | **$264,910** |
| **L-1A / L-1B / LZ** | **42,045** | **42,045** | | | | | |
| More than 25 FTEs | 24,807 | 24,807 | $460 | $1,385 | $11,411,220 | $34,357,695 | **$22,946,475** |
| 25 or less FTEs | 10,932 | 10,932 | $460 | $695 | $5,028,720 | $7,597,740 | **$2,569,020** |
| Nonprofits | 6,307 | 6,307 | $460 | $695 | $2,901,220 | $4,383,365 | **$1,482,145** |
| **H-3/P/Q/R** | **19,342** | **19,691***** | | | | | |
| More than 25 FTEs | 7,350 | 7,483 | $460 | $1,015 | $3,381,000 | $7,595,245 | **$4,214,245** |
| 25 or less FTEs | 9,091 | 9,255 | $460 | $510 | $4,181,860 | $4,720,050 | **$538,190** |
| Nonprofits | 2,901 | 2,954 | $460 | $510 | $1,334,460 | $1,506,540 | **$172,080** |
| **E / TN** | **19,078** | **19,078** | | | | | |
| More than 25 FTEs | 6,296 | 6,296 | $460 | $1,015 | $2,896,160 | $6,390,440 | **$3,494,280** |
| 25 or less FTEs | 9,921 | 9,921 | $460 | $510 | $4,563,660 | $5,059,710 | **$496,050** |
| Nonprofits | 2,862 | 2,862 | $460 | $510 | $1,316,520 | $1,459,620 | **$143,100** |
| **I-129CW** | **4,280** | **4,280** | | | | | |
| More than 25 FTEs | 1,412 | 1,412 | $460 | $1,015 | $649,520 | $1,433,180 | **$783,660** |
| 25 or less FTEs | 2,226 | 2,226 | $460 | $510 | $1,023,960 | $1,135,260 | **$111,300** |
| Nonprofits | 642 | 642 | $460 | $510 | $295,320 | $327,420 | **$32,100** |
| **CW Education Funding Fee** | **4,280** | **4,280** | $200 | $230 | $856,000 | $984,400 | **$128,400** |
| **Total** | **563,380** | **565,004** | | | **$263,496,030** | **$481,067,910** | **$217,571,880** |

**Table 27. Economic Impacts of Separate Filing Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications**

90

| Table 27. Economic Impacts of Separate Filing Fees for Form I-129, Petition for a Nonimmigrant Worker Visa Classifications | | | | | | | |
|---|---|---|---|---|---|---|---|
| Form I-129 Classification | 5-Year Annual Average (historical)* (A) | 5-Year Annual Average (final rule) (B) | Current Fees (C) | FR Fees (D) | Baseline Costs E = A × C | Final rule Costs F = B × D | Transfer Payments G = F - E |
| Source: USCIS analysis. | | | | | | | |
| Notes: -Totals may be off due to rounding. -The estimated percentage of entities with more than 25 FTEs, 25 or less FTEs and nonprofits from Table 25 is applied to the total population for each form.  * Annual averages for each visa classifications are from Table 22. **Annual averages for named beneficiaries are from Table 24. ***Total includes named beneficiaries annual average of 19,689 from Table 24 and unnamed beneficiaries annual average of 2 from Table 22. | | | | | | | |

### i.      *Asylum Program Fee*

DHS will charge a new Asylum Program Fee to be paid by employers who file a Form I-129, Petition for a Nonimmigrant Worker. The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer FTE workers, and $600 for all other I-129 filers. This new fee that may be used to fund part of the costs of administering the entire asylum program and would be charged in addition to the fees petitioners would pay for their Form I-129 benefit requests.[64]  DHS believes that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. This new fee will impact approximately 565,004 Form

---

[64] In Section V.A.2.c of 88 FR 402 (Jan. 4, 2023) ("FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" proposed rule), DHS estimates the costs to implement the Asylum Processing FR will be approximately $425.9 million annually over FY 2022/2023.  DHS divided this cost estimate by the estimated fee-paying volume for Forms I-129 and I-140 to determine the $600 Asylum Program Fee. Calculation: $425,900,395 / 708,630 = $601.02. DHS rounded to the nearest $5, consistent with other fees.  In this Final Rule, DHS adjusted estimates as detailed in the IEFA Supporting Statement and Preamble Sections II.C.1.b and IV.G.2.a. The lower fee for small employers and the fee exemption for nonprofits will reduce Asylum Program Fee revenue compared to the proposed rule. DHS estimates the revised Asylum Program Fee will generate approximately $312.9 million in revenue, compared to the $425.9 million that was estimated in the proposed rule from charging $600 with no exemptions or discounts.

I-129 petitioners annually. Table 28 shows that for Form 1-129 petitioners, the estimated costs of the new Asylum Program fee will be approximately $254,764,500 annually.

| Table 28. New Costs of Asylum Program Fees on Form I-129 Petitioners by Classification | | | |
|---|---|---|---|
| Form I-129 Classification | 5-Year Annual Average (final rule) (A) | Asylum Program Fee (B) | New Costs C = A × B |
| **H-1B** | **427,812** | | |
| More than 25 FTEs | 312,303 | $600 | **$187,381,800** |
| 25 or less FTEs | 51,337 | $300 | **$15,401,100** |
| Nonprofits | 64,172 | $0 | **$0** |
| **H2A – Named Beneficiaries** | **5,126** | | |
| More than 25 FTEs | 564 | $600 | **$338,400** |
| 25 or less FTEs | 4,511 | $300 | **$1,353,300** |
| Nonprofits | 51 | $0 | **$0** |
| **H-2A – Unnamed Beneficiaries** | **13,774** | | |
| More than 25 FTEs | 1,515 | $600 | **$909,000** |
| 25 or less FTEs | 12,121 | $300 | **$3,636,300** |
| Nonprofits | 138 | $0 | **$0** |
| **H-2B – Named Beneficiaries** | **3,427** | | |
| More than 25 FTEs | 1,028 | $600 | **$616,800** |
| 25 or less FTEs | 1,885 | $300 | **$565,500** |
| Nonprofits | 514 | $0 | **$0** |
| **H-2B – Unnamed Beneficiaries** | **5,109** | | |
| More than 25 FTEs | 1,533 | $600 | **$919,800** |

| Table 28. New Costs of Asylum Program Fees on Form I-129 Petitioners by Classification | | | |
|---|---|---|---|
| **Form I-129 Classification** | **5-Year Annual Average (final rule) (A)** | **Asylum Program Fee (B)** | **New Costs C = A × B** |
| 25 or less FTEs | 2,810 | $300 | **$843,000** |
| Nonprofits | 766 | $0 | **$0** |
| | | | |
| **O – Named Beneficiaries** | **24,662** | | |
| More than 25 FTEs | 9,372 | $600 | **$5,623,200** |
| 25 or less FTEs | 11,591 | $300 | **$3,477,300** |
| Nonprofits | 3,699 | $0 | **$0** |
| | | | |
| **L-1A / L-1B / LZ** | **42,045** | | |
| More than 25 FTEs | 24,807 | $600 | **$14,884,200** |
| 25 or less FTEs | 10,932 | $300 | **$3,279,600** |
| Nonprofits | 6,307 | $0 | **$0** |
| | | | |
| **H-3/P/Q/R** | **19,691** | | |
| More than 25 FTEs | 7,483 | $600 | **$4,489,800** |
| 25 or less FTEs | 9,255 | $300 | **$2,776,500** |
| Nonprofits | 2,954 | $0 | **$0** |
| | | | |
| **E / TN** | **19,078** | | |
| More than 25 FTEs | 6,296 | $600 | **$3,777,600** |
| 25 or less FTEs | 9,921 | $300 | **$2,976,300** |
| Nonprofits | 2,862 | $0 | **$0** |
| | | | |
| **I-129CW** | **4,280** | | |
| More than 25 FTEs | 1,412 | $600 | **$847,200** |
| 25 or less FTEs | 2,226 | $300 | **$667,800** |

93

| Table 28. New Costs of Asylum Program Fees on Form I-129 Petitioners by Classification | | | |
|---|---|---|---|
| Form I-129 Classification | 5-Year Annual Average (final rule) (A) | Asylum Program Fee (B) | New Costs C = A × B |
| Nonprofits | 642 | $0 | $0 |
| Total | 565,004 | | $254,764,500 |
| Source: USCIS analysis. | | | |

### I. Adjustments to Premium Processing

**Changes**

Employers may use Form I-907, Request for Premium Processing Service to request faster processing of certain employment-based petitions and applications. Currently, petitioners and applicants use Form I-907 and pay the $1,500 or $2,500 fee, respectively, to request 15-day processing. The 15-calendar day period begins when USCIS receives a properly filed Form I-907 at the correct filing address. USCIS then issues an approval notice, a request for evidence (where appropriate), a notice of intent to deny, a denial notice, or opens an investigation for suspected fraud or misrepresentation on the related petition or application. USCIS considers the processing time met if the agency issues an approval, a request for evidence, notice of intent to deny, or a denial notice within 15 calendar days of receipt or if the case is referred for investigation of suspected fraud or misrepresentation. USCIS refunds the premium processing service fee if the agency does not take action on the related case within 15 calendar days of receiving a properly filed Form I-907. Otherwise, the filing fee is not refundable, regardless of any action USCIS takes on a request.

DHS will change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service. DHS

94

will define business days as the days on which the Federal Government is open for business, which do not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons. USCIS believes that calculating premium processing timeframes in business days is appropriate because USCIS can only process petitions and applications on business days. Therefore, using calendar days results in inconsistent and varying timeframes that have resulted in operational challenges when trying to meet the current 15 calendar day timeframe to process a request for premium processing. It is costly and disruptive to continually suspend and then extend the suspension of premium processing or offer it and then fail to meet the processing time because DHS cannot process the petitions on weekends or Federal holidays.

Additionally, DHS will permit combined payments of the premium processing service fee with the remittance of other filing fees. Currently, DHS mandates separate payments to request premium processing services. Instead of mandating the separate payments, DHS will state that USCIS *may* require premium processing service fees be paid in a separate remittance from other filing fees.

**Affected Population**

USCIS currently offers premium processing to employment-based petitions including Form I-129, Petition for Nonimmigrant Worker, and Form I-140, Immigrant Petition for Alien Worker, in certain visa classifications.[65] Table 29 shows the total Form I-907 receipts received and refunds issued by USCIS for inaction on Premium Processing requests within 15 calendar days, for FY 2018 through FY 2022. Form I-907 refund data are presented to illustrate the

---

[65] USCIS has extended the premium processing service to include Forms I-539 as of June 2023, and I-765 as of March 2023. These forms are excluded from this table due to the lack of historical data.

increase in refunds over the years, which indicates that USCIS is struggling to meet the 15-calendar day premium processing requirement. USCIS refunds the premium processing service fee if the agency does not act on the related case within 15 calendar days of receiving a properly filed Form I-907. Based on a 5-year annual average, DHS estimates that 405,668 Form I-907 receipts are submitted to USCIS and 277 (0.07 percent) Form I-907 refunds are issued to petitioners annually.

**Table 189. Form I-907, Request for Premium Processing Service, Receipts and Refunds Issued, for FY2018 through FY 2022**

| Fiscal Year | Form I-907 Receipts | | | Form I-907 Refunds | | | |
|---|---|---|---|---|---|---|---|
| | Form I-129 | Form I-140 | Total | Form I-129 | Form I-140 | Total | Percent |
| 2018 | 292,296 | 78,206 | 370,502 | 110 | 91 | 201 | 0.05% |
| 2019 | 333,160 | 79,659 | 412,819 | 254 | 36 | 290 | 0.07% |
| 2020 | 274,864 | 63,951 | 338,815 | 495 | 29 | 524 | 0.15% |
| 2021 | 309,580 | 107,778 | 417,358 | 82 | 115 | 197 | 0.05% |
| 2022 | 393,118 | 95,728 | 488,846 | 153 | 18 | 171 | 0.03% |
| **5-year Total** | **1,603,018** | **425,322** | **2,028,340** | **1,094** | **289** | **1,383** | |
| **5-year Annual Average** | **320,604** | **85,064** | **405,668** | **219** | **58** | **277** | **0.07%** |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD), Computer-Linked Application Information Management System (CLAIMS 3) database (Jan. 12, 2023).
Notes:
Any duplicate case information has been removed.

**Cost-Benefit-Transfer Payments Analysis**

Due to the unique needs of employers requesting premium processing, DHS is unable to estimate the quantitative costs or benefits to petitioners that will result from extending the premium processing timeframe from 15 calendar days to 15 business days. By extending the processing time from calendar to business days, the processing timeframe will be extended by about 4 days (potentially more if there is a federal holiday). The additional days will increase the time frame to adjudicate, which in turn might reduce the refunds issued by USCIS. This will benefit both USCIS and petitioners because USCIS will adjudicate more requests and petitioners will not experience delays reapplying. Another benefit is that USCIS will have additional time to

96

process petitions, which will allow USCIS to avoid suspending the premium processing service as often as has recently been required when premium processing request volumes are high. Finally, extending the premium processing timeframe from 15 calendar days to 15 business days will enable USCIS to make premium processing more consistently available and expand this service to the newly designated classifications and categories allowed by the USCIS Stabilization Act.

DHS acknowledges that the increase in processing time may cause work or productivity delays for some petitioners. Public comments described obvious, general impacts of premium processing delays, however, no comments addressed the actual impact of the rule on premium processing requests that could not be completed in 15 calendar days in the absence of this rule but will be completed in 15 business days as a result of this rule. 99.93 percent of requestors who already receive processing within 15 calendar days, including weekends and federal holidays when adjudicators are not processing requests, will not be impacted by this change. Only the refunded 0.07 percent of total requests shown in Table 29 are impacted by having their premium processing request completed in more than 15 calendar days, but fewer than 15 business days, rather than having their premium processing request refunded. In some of these cases, evidence may be insufficient such that the petition may require additional evidence or may be denied. The change will have no impact on those petitioners.

DHS has found in its application of the new premium processing regulations (87 FR 18227, 18260 (Mar. 30, 2022)) that mandating a separate payment in all premium processing submissions may impose unnecessary burdens on petitioners, applicants, and DHS. Hence, not mandating a separate payment in all premium processing submissions is beneficial to USCIS, applicants and petitioners as it will reduce unnecessary burdens on petitioners, applicants, and DHS.

97

### J. Intercountry Adoptions

1. Clarification of Fee Exception for Birth Siblings

2. Suitability and Eligibility Approval Validity Period

3. Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600

4. Form I-800A, Supplement 3, Request for Action on Approved Form I-800A

5. Adjustment to Fees for Certain Intercountry Adoption-Specific Forms

**Changes**

DHS will clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the filing fees for multiple Form I-600, Petition to Classify Orphan as an Immediate Relative or Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative petitions. Currently, prospective adoptive parents with a valid Form I-600A, Application for Advance Processing of an Orphan Petition, Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, or Form I-800A Supplement 3, Request for Action on Approved Form I-800A approval are not required to pay a fee for the first Form I-600 or Form I-800 petition. If they are approved to adopt more than one child, they are required to pay the Form I-600 or Form I-800 filing fee for additional Form I-600 or Form I-800 petitions unless the beneficiaries are birth siblings. If the beneficiaries are not birth siblings, the Form I-600 or Form I-800 fee is required for each petition after the first. To align with current and historical practice, DHS will clarify in the regulations that this exception is limited to "birth" siblings.

98

DHS will alter the validity period for a Form I-600A approval in an orphan case to align with the validity period for the FBI response on the applicant's or any adult member of the household's biometrics. Currently, there is a disparity between the 18-month approval period for Form I-600A and the 15-month validity period of FBI fingerprint clearances. Having corresponding 15-month validity periods for the Form I-600A approval and the FBI fingerprint clearance provides additional protections for adopted children and provides consistency and alignment of the orphan and Hague regulations.

DHS will also create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600, to align the processes for adoptions from countries that are party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (Hague Adoption Convention) with the process for adoptions from countries that are not party to the Hague Adoption Convention. DHS will charge $455 to applicants filing this form. However, DHS will exempt fees for applicants who file a Form I-600A/I-600 Supplement 3 if the form is filed: to obtain a first or second extension of the approval of the Form I-600A; to obtain a first or second change of non-Hague Adoption Convention country during the Form I-600A or Form I-600A/I-600 Supplement 3 approval period; or for a request for a duplicate approval notice. Form I-600A/I-600 Supplement 3 and its corresponding fee will help the adoption process in 4 key areas: (1) suitability and eligibility extensions; (2) new approval notices; (3) changes of country; and (4) duplicate approval notices. Currently, USCIS uses Forms I-800, I-800A, and I-800A Supplement 3 for Hague Adoption Convention processing and Forms I-600 and I-600A for orphans or non-Hague Adoption Convention processing. With the changes, an individual will be required to submit Form I-600A/I-600 Supplement 3 to request the following: (1) an extension of an approved Form I-600A; (2) a new approval notice based on a significant change or change in circumstances and

updated home study since a Form I-600A or Form I-600A extension was approved; (3) a change in the non-Hague Adoption Convention country; and/or (4) a duplicate approval notice.

DHS will also alter the 18-month validity period for a Form I-800A approval to align with the 15-month validity period for the FBI response on the applicant's or any adult member of the household's biometrics. Like the corresponding change in validity period for Form I-600A, DHS makes this change for the Form I-800A validity period because it provides additional protections for adopted children and provides consistency and alignment of the orphan and Hague regulations.

Finally, DHS will limit the increase of adoption-related fees and continue its policy of reducing fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications. DHS will apply a 19-percent increase to the current fee of $775. This new fee of $920 represents a $145 increase to Forms I-600/600A/800/800A. DHS will also increase the fee for Form I-800A Supplement 3 from $385 to $455 (18 percent). However, DHS will exempt fees for applicants who file a Form I-800A Supplement 3 if the form is filed to obtain a second extension of the approval of the Form I-800A; to obtain a second change of country after the approval Form I-800A; or for a request for a duplicate approval notice. Finally, DHS will exempt fees for adopted children filing Form N-600 or Form N-600K.

**Affected Population**

The population impacted by this provision are adoptive parents and their adopted children. Table 30 shows the estimated annual average receipts of forms for Forms I-600A, I-600, I-600A/I-600 Supplement 3 from FY 2018 through FY 2022. DHS anticipates it will receive approximately 698 applications for Forms I-600A and 645 for Form I-600. In the NPRM, DHS

used a linear trend and forecasted out for 4 years. DHS departed from this forecasting method because those forecasted estimates and actual receipts varied greatly. The forecasted method also predicted that DHS will no longer receive form receipts by FY 2024. Since DHS has no plans to discontinue this service, it believes that using the 5-year average receipts method used throughout the rest of the RIA was a more reasonable methodology.

| Table 30. Forms I-600A, I-600, and I-600A Supplement 3, Receipts for FY 2018 through FY 2022 | | | |
|---|---|---|---|
| **Fiscal Year** | **I-600A, Application for Advance Processing of an Orphan Petition** | **I-600, Petition to Classify Orphan as an Immediate Relative** | **Calculated Population of I-600A/600 Supplement 3, Request for Action on Approved Forms I-600A/I-600** |
| 2018 | 955 | 1,079 | 2,034 |
| 2019 | 861 | 988 | 1,849 |
| 2020 | 605 | 413 | 1,018 |
| 2021 | 546 | 366 | 912 |
| 2022 | 524 | 379 | 903 |
| **5-year Total** | **3,491** | **3,225** | **6,716** |
| **5-year Annual Average** | **698** | **645** | **1,343** |
| Source: USCIS, Office of Performance and Quality (OPQ, National Benefits Center (NBC) and Refugee, Asylum and International Operations Directorate (Dec. 1, 2022). | | | |

Since Form I-600A/I-600 Supplement 3 will be a new form and, therefore, historical data do not exist, DHS used the annual numbers for both Form I-600A and I-600 filings to estimate a population. DHS surmises that the population that might file Form I-600A/I-600 Supplement 3 could be the population that file for Forms I-600A and I-600, and therefore provides an upper bound estimate for Form I-600A/I-600 Supplement 3. Using this method, DHS estimates that up to an annual average of 1,343 applicants could file for Form I-600A/I-600 Supplement 3.

Table 31 shows the estimated annual receipts for Forms I-800A, I-800, and I-800A Supplement 3 from FY 2018 through FY 2022. DHS estimates that an annual average of 1,513 applicants file a Form I-800A, 1,568 file a Form I-800 and 1,025 file a Form I-800A Supplement 3. In the NPRM, DHS used a linear trend and forecasted out for 4 years. DHS departed from this forecasting method because those forecasted estimates and actual receipts varied greatly. The forecasted method also predicted that DHS will no longer receive form receipts by FY 2024. Since DHS has no plans to discontinue this service, it believes that using the 5-year average receipts method used throughout the rest of the RIA was a more reasonable methodology.

103

| Table 31. Form I-800A, I-800, and I-800A Supplement 3, Receipts for FY 2018 through FY 2022 | | | |
|---|---|---|---|
| **Fiscal Year** | **I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country** | **I-800, Petition to Classify Convention Adoptee as an Immediate Relative** | **I-800A Supplement 3, Request for Action on Approved Form I-800A** |
| 2018 | 2,382 | 2,608 | 1,267 |
| 2019 | 1,849 | 1,999 | 1,214 |
| 2020 | 1,323 | 1,338 | 980 |
| 2021 | 1,080 | 970 | 711 |
| 2022 | 933 | 923 | 954 |
| **5-year Total** | **7,567** | **7,838** | **5,126** |
| **5-year Annual Average** | **1,513** | **1,568** | **1,025** |
| Source: USCIS, Office of Performance and Quality (OPQ), National Benefits Center (NBC) and Refugee, Asylum and International Operations Directorate (Dec. 1, 2022). | | | |

Table 32 shows the estimated annual receipts of adoption-based filings of Forms N-600 and N-600K from FY 2018 through FY 2022. DHS estimates that an average of 2,063 N-600 applications and 235 N-600K applications are filed annually.

| Table 32.  Adoption-based Forms N-600 and N-600K Receipts for FY 2018 through FY 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Form Number** | **2018** | **2019** | **2020** | **2021** | **2022** | **5-year Totals** | **5-year Annual Average** |
| N-600 | 2,614 | 2,470 | 2,011 | 1,710 | 1,511 | **10,316** | **2,063** |
| N-600K | 250 | 270 | 194 | 224 | 237 | **1,175** | **235** |
| Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), C4, Electronic Immigration System (ELIS)database (Aug. 18, 2023). | | | | | | | |

## Cost-Benefit-Transfer Payments Analysis

The filing fees for the new Form I-600A/I-600 Supplement 3 and Form I-800A Supplement 3 are $455. Based on USCIS data on Form I-800A Supplement 3 filings in the past, DHS anticipates that approximately 22 percent of the Form I-600A/I-600 Supplement 3 and Form I-800A Supplement 3 populations will pay the fee and 78 percent of the Form I-600A/I-600 Supplement 3 and Form I-800A Supplement 3 populations will be exempt from paying a

fee.[66]  Using these percentages and the estimated annual average filings of 1,343 for Form I-600A/I-600 Supplement 3 (see table 30), DHS estimates that approximately 1,048 applicants will be exempt from paying a fee for Form I-600A/I-600 Supplement 3 and that 295 applicants will pay the fee. Using the above percentages and the estimated annual average filings of 1,025 for Form I-800A Supplement 3 (see table 31), DHS estimates that approximately 800 applicants will be exempt from paying a fee and that 225 applicants will pay the fee.

DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 will cost applicants $146,954  annually.[67]  This cost includes the total filing fees and the opportunity cost of time to complete the form. DHS estimates the total filing fees for Form I-600A/I-600 Supplement 3 applicants to file are $134,225 annually.[68] In addition, DHS estimates the time burden to complete Form I-600A/I-600 Supplement 3 will be an hour per applicant. In this analysis, DHS uses the Bureau of Labor Statistics (BLS) mean hourly wage of $29.76 for all occupations[69] as the basis to estimate the opportunity cost of time an affected party incurs preparing and submitting a Form I-600A/I-600 Supplement 3. This wage is used instead of the Federal minimum wage because studies show that adoptive parents of international orphans have higher than average incomes.[70] Using the most recent BLS report, DHS calculated

---

[66]  USCIS, Performance Analysis System (PAS) (Feb. 2023). DHS estimates that approximately 249 out of 1,139 or 22 percent of individuals would not be exempt and would have to pay for a new approval notice based on changes since I-800 was approved annually.

[67] Calculation: $134,225  (Estimated total filing fees for Form I-600A/I-600 Supplement 3) + $12,729 (Estimated total opportunity cost of time to complete Form I-600A/I-600 Supplement 3) = $146,954 (rounded).

[68] Calculation: (Form I-600A/I-600 Supplement 3 filing fee) × (Estimated population filing form) = $455×295 = $134,225 annual cost to file new Form I-600A/I-600 Supplement 3.

[69] Bureau of Labor Stat., U.S. Dep't of Labor, "National Occupational Employment and Wage Estimates, May 2022, Mean Hourly Wage (All Occupations)," available at *https://www.bls.gov/oes/2022/may/oes_nat.htm* (last visited Aug. 17, 2023).

[70] Hellerstedt, W.L. et al., "The International Adoption Project: Population-based Surveillance of Minnesota Parents Who adopted Children Internationally," "Maternal Child and Health," 12:162-171 (2008), available at *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2398719/* (last visited Sept. 26, 2022).

a benefits-to-wage multiplier of 1.45 to estimate the total opportunity cost to filers, including the full cost of benefits such as paid leave, insurance, and retirement.[71] The loaded wage per hour is $43.15 for an affected party.[72] DHS estimates the opportunity cost of time for completing and submitting Form I-600A/I-600 Supplement 3 will be $43.15 per applicant.[73] Using the annual average affected population estimate of 255 for fee paying Form I-600A/I-600 Supplement 3, DHS estimates the total opportunity cost of time associated with completing and submitting Form I-600A/I-600 Supplement 3 will be approximately $12,729 annually.[74]

The fee exemptions for Form I-600A/I-600 Supplement 3 will result in transfer payments from USCIS to applicants of approximately $476,840 (*see* Table 33 below). The fee exemptions for Form I-800A Supplement 3 will result in transfer payments from USCIS to applicants of approximately $364,000.[75] The fee exemptions for adoption-based Forms N-600 and N-600K will result in total transfer payments from USCIS to applicants of approximately $3,182,730.[76]

DHS will also the increase fees for each of the existing adoption-related forms (Forms I-600/600A/800/800A) from $775 to $920. Table 33 shows that these increases will result in total transfer payments from fee paying applicants to USCIS of approximately $265,440. Fees for

---

[71] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour) / (Wages and Salaries per hour). = $42.48/$29.32 =1.45 (rounded). *See* Bureau of Labor Stat., U.S. Dep't of Labor, "Economic News Release Dec. 2022, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: civilian workers, by major occupational and industry group," available at *https://www.bls.gov/news.release/archives/ecec_03172023.htm* (last visited Aug. 17, 2023).

[72] Calculation: Average hourly wage rate of all occupations × multiplier = $29.76×1.45 = $43.15 per hour (rounded).

[73] Calculation: Opportunity cost of time for completing Form I-600A/I-600 Supplement 3 = $43.15 per hour×1.0 hour = $43.15 per applicant.

[74] Calculation: (Opportunity cost of time for completing Form I-600A/I-600 Supplement 3 per applicant) × (Estimated annual population filing Form I-600A/I-600 Supplement 3) = $43.15×295 = $12,729 (rounded).

[75] Calculation: (Estimated annual population filing Form I-800A Supplement 3) × (Form I-800A Supplement 3 filing fee) = 800 x $455 = $364,000.

[76] Calculation: $2,857,255 (N-600) + $325,475 (N-600K) = $3,182,730.

Form I-800A Supplement 3 will increase from $385 to $455. Since the baseline costs for Form I-800A Supplement 3 include an $85 biometric service, the total fees these applicants currently pay is $470. This fee is a $15 reduction in total fees for these applicants, resulting in $3,375 in annual cost savings to this population.

| Form | 5-Year Annual Average (A) | Current Fees (B) | Final Fees (C) | Fee Difference D =–C - B | Percent Change of Current to Final Rule Fees | Transfer Payments from Fee Payers to USCIS E = D × A | Transfer Payments from USCIS to Public F = C × A | Cost Savings to Fee Payers G = D × A |
|---|---|---|---|---|---|---|---|---|
| **Table 33. Economic Impacts of Fee Adjustment to Forms I-600/600A/800/800A, I-800A Supplement 3, and I-600A/600 Supplement 3** | | | | | | | | |
| I-600A | 698 | $860* | $920 | $60 | 7% | **$41,880** | -- | -- |
| I-600 | 645 | $860* | $920 | $60 | 7% | **$38,700** | -- | -- |
| I-600A/600 Supplement 3 *(fee exempt)* | 1,048 | $0 | $455 | $455 | -- | -- | **$476,840** | -- |
| I-800A Supplement 3 *(fee exempt)* | 800 | $385 | $455 | $70 | 18% | -- | **$364,000** | -- |
| N-600 *(fee exempt)* | 2,063 | $1,170 | $1385 | $215 | 18% | -- | **$2,857,255** | -- |
| N-600K *(fee exempt)* | 235 | $1,170 | $1,385 | $215 | 18% | -- | **$325,475** | -- |
| I-800A | 1,513 | $860* | $920 | $60 | 7% | **$90,780** | -- | -- |
| I-800 | 1,568 | $860* | $920 | $60 | 7% | **$94,080** | -- | -- |
| I-800A Supplement 3 (fee paying) | 225 | $470* | $455 | -$15 | -3% | -- | -- | **-$3,375** |
| **Total** | | | | | | **$265,440** | **$4,023,570** | **-$3,375** |

Source: USCIS analysis.

Notes
N-600 and N-600 fees are for paper filing.
*Current fees for these forms include an $85 biometric services fee.
*Forms I-600/600A/800/800A: $775 current fees + $85 biometric services = $860 baseline costs*
*Form I-800A Supplement 3: $385+ $85 = $470 baseline costs*

In summary, DHS estimates this provision will result in:

107

- Annual transfer payments from Forms I-600/600A/800/800A fee-paying applicants to USCIS of approximately $265,440  due to the fee increases,

- Annual transfer payments from USCIS to the public of approximately $4,023,570 due to fee exemptions to Form I-600A/I-600 Supplement 3, Form I-800A Supplement 3 and adoption-based Forms N-600 and N-600K,

- New costs of approximately $146,954 annually due to the creation of a new form (Form I-600A/I-600 Supplement 3) to file, and

- Cost savings of approximately $3,375 annually due to the lower total costs to file Form I-800A Supplement 3.

The changes in this provision provide several benefits. Limiting fee increases and expanding fee exemptions to applicants help to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications. DHS will clarify the regulations to align them with current practice regarding when prospective adoptive parents are required to pay the Form I-600 or Form I-800 filing fee for multiple petitions. DHS will alter the validity period for a Form I-600A approval in an orphan case from 18 to 15 months. This will make the Form I-600A approval periods consistent with the validity of FBI biometric-related background checks. The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates. Another benefit of this provision is that it clarifies the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.

When the Hague Adoption Convention enters into force for a country, cases that meet certain criteria are generally permitted by the new Convention country to proceed as "transition cases" under the non-Hague Adoption Convention process (Form I-600A and Form I-600

process). Another benefit of the changes to the adoption regulations is that, if the case does not qualify as a transition case,[77] the prospective adoptive parents will generally need to follow the Hague Adoption Convention process with the filing of Form I-800A and Form I-800. With the addition of the new Form I-600A/I-600 Supplement 3, DHS will codify certain limitations on when the Supplement 3 can be used in the context of transition cases. Providing additional fee exemptions to Form I-800A Supplement 3 applicants will provide 45 months of suitability approval validity at no additional cost to them. USCIS will accept Form I-800A Supplement 3 extension requests regardless of whether the Form I-800 petition was already filed, rather than requiring prospective adoptive parents to file a new Form I-800A to begin the process anew. Accepting the Form I-800A Supplement 3 extension requests will make the subsequent suitability and eligibility adjudication process faster for prospective adoptive parents seeking an extension of their Form I-800A approval. Supplement 3 adjudications are generally prioritized over new Form I-800A filings, allowing for new decisions on prospective adoptive parents' suitability and eligibility to occur more quickly.

### K. Immigrant Investors

**Changes**

DHS will change various fees for regional centers and related immigration benefit requests related to Employment-Based Immigrant Visa, Fifth Preference (EB-5). The EB-5 program was created in 1990 by Congress to stimulate the U.S. economy through job creation

---

[77] The Hague Adoption Convention (Convention) entered into force for the United States on April 1, 2008. The Convention governs all adoptions between the United States and other countries party to the Convention. If a prospective adoptive parent began their adoption from a Convention country before the Convention entered into force for either the United States or the other Convention country, but the adoption has not been completed, the case may be considered to be a transition case. Source: U.S. Department of State, "Transition Cases," available at *https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/how-to-adopt/hague-transition-cases.html* (last visited Sept. 26, 2022).

and capital investment by immigrant investors (foreign nationals and/or their dependents). The EB-5 program has historically included four immigrant investor/regional center forms: (1a) Forms I-526, Immigrant Petition by Alien Entrepreneur; (2) I-829, Petition by Investor to Remove Conditions on Permanent Resident Status; (3) I-924, Application for Regional Center Designation under the Immigrant Investor Program; and (4) I-924A, Annual Certification of Regional Center.

On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117-103). The EB-5 Reform and Integrity Act of 2022 repealed the prior authorizing statue for the EB-5 "regional center program" and codified a substantially reformed regional center program in the INA, effective 60 days after enactment on, May 14, 2022. The new EB-5 program now includes five immigrant investor/regional center forms: (1a) Forms I-526, Immigrant Petition by Alien Entrepreneur; (1b) I-526E, Immigrant Petition by Regional Center Investor; (2) I-829, Petition by Investor to Remove Conditions on Permanent Resident Status; (3) I-956, Application for Regional Center Designation (former I-924);  (4) I-956G, Regional Center Annual Statement (former I-924A); and (5) Form I-956F, Application for Approval of Investment in a Commercial Enterprise (former I-924 Amendment).

Despite the changes in the law and program, DHS's final fees are based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022. The final fee for Form I-526 is $11,160, an $7,485 or 204-percent increase from the current $3,675 fee. The fee for Form I-829 is $9,525, a $5,775 or 154-percent increase from the current $3,750 fee. The fee for Form I-956 is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee (set when it was Form I-924). The fee for Form I-

956G is $4,470, a $1,435 or 47-percent increase from the current $3,035 fee (that was established for Form I-924A). The fee for Form I-956F is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee which is the same increase as Form I-956.[78]

**Affected Population**

The population affected by these provisions are immigrant investors and regional centers. Table 34 presents data on annual EB-5 requests received for FY 2018 through FY 2022.  During this period, DHS estimates that an annual average of 7,000 immigrant investors applied to the program. DHS uses a 5-year annual average for Forms I-526, I-829 and I-956G. However, DHS uses a 4-year annual average for Form I-956 because the 0 reported receipts in 2022 was due to EB-5 program and database system changes.[79] DHS acknowledges that these changes may result in slightly lower annual average estimates for this form.

| Table 34. Estimated Annual Receipts for Fee Paying EB-5 Applicants for FY 2018 through FY 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Form** | **2018** | **2019** | **2020** | **2021** | **2022\*** | **5-Year Total Receipts** | **Annual Average Receipts** |
| I-526, Immigrant Petition by Alien Entrepreneur | 6,424 | 4,194 | 4,378 | 844 | 696 | **16,536** | **3,307** |
| I-829, Petition by Investor to Remove Conditions on Permanent Resident Status | 3,283 | 3,756 | 3,096 | 3,435 | 1,327 | **14,897** | **2,979** |
| I-956, Application for Regional Center Designation (formerly I-924) | 122 | 79 | 34 | 14 | 0 | **249** | **62** |
| Form I-956G, Regional Center Annual Statement (formerly I-924A) | 787 | 808 | 702 | 434 | 529 | **3,260** | **652** |
| **Total** | **10,616** | **8,837** | **8,210** | **4,727** | **2,552** | **34,942** | **7,000** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), Computer-Linked Application Information Management System (CLAIMS 3) database, Jan. 17, 2023 \*Claims 3 Consolidated/ELIS, PAS-SQL Dashboard (updated Sept. 25, 2023). Note: | | | | | | | |

---

[78] The EB-5 Reform and Integrity Act of 2022 authorized the same fee for Form I-956F as Form I-956.

[79] There is a separate rulemaking pertaining to the EB-5 program that is currently being drafted and will elaborate more on the populations and various programs changes with the EB-5 Integrity Act, volume projections and new forms.

> For Form I-956, DHS used a 4-year annual average.
> I-956G are the annual statements to be submitted by these approved regional centers.

The annual filing volume projections in this rule are based on historical volumes and trends. Section 105(a) of the EB-5 Reform and Integrity Act of 2022 directs USCIS to conduct a study of the fees charged in the administration of the EB-5 program. Form I-956F and other changes are too new for DHS to accurately estimate impacts on filing volumes. DHS will address these additional impacts resulting from the EB-5 Reform and Integrity Act of 2022 in a future rulemaking.[80]

**Cost-Benefit-Transfer Payments Analysis**

DHS will increase fees across the four forms associated with the EB-5 program. DHS estimates the annual transfer payments from EB-5 investors and regional centers to USCIS will be approximately $44,746,040 (*see* Table 35). The transfer payments are the difference between the final and current fees.

| Table 195. Economic Impacts of Fee Adjustment to EB-5 Forms | | | | | | |
|---|---|---|---|---|---|---|
| Immigration Benefit Request | 5-Year Annual Average<br>*(A)* | Current Fees<br>*(B)* | New Fees<br>*(C)* | Fee Difference<br>*D = C-B* | Percent Change | Transfer Payments<br>*E = D×A* |
| I-526 | 3,307 | $3,675 | $11,160 | $7,485 | 204% | $24,752,895 |
| I-829 | 2,979 | $3,750 | $9,525 | $5,775 | 154% | $17,203,725 |
| I-956 | 62 | $17,795 | $47,695 | $29,900 | 168% | $1,853,800 |
| I-956G | 652 | $3,035 | $4,470 | $1,435 | 47% | $935,620 |
| **Total** | **7,000** | | | | | **$44,746,040** |
| Source: USCIS analysis. | | | | | | |

---

[80] DHS may reevaluate EB-5 fees to meet the additional fee guidelines of EB-5 Reform and Integrity Act of 2022 sec. 106I. Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

### *L. Changes to Genealogy Search and Records Requests*

1. Genealogy Search and Records Request

2. Request for a Certificate of Non-Existence

**Changes**

USCIS Genealogy Search and Records Requests program processes requests for historical records of deceased individuals. Requestors use the USCIS website[81] or Form G-1041, Genealogy Index Search Request, to request an index search of USCIS historical records. USCIS then informs the requestor whether any records are available by mailing a response letter. Requestors use the Form G-1041A, Genealogy Records Request, to obtain paper copies of USCIS historical records, if they exist.

DHS will make several changes to the Genealogy Search and Records Requests program that will allow USCIS to provide genealogy search results and historic records more quickly when pre-existing digital records exist. These changes may reduce the time it takes to request and receive genealogy records, and, in some cases, eliminate the need to make multiple search requests and submit separate fees. The changes include:

- Revising genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.

- Changing the index search request process so that USCIS may provide requesters with digital records via email in response to the initial search request.

- Changing the genealogy fees for Forms G-1041 and G-1041A to reflect the above-mentioned operational changes in recognition of cost savings to the agency

---

[81] USCIS, "Genealogy," available at *https://www.uscis.gov/records/genealogy* (last visited Aug. 12, 2021).

from online filing. DHS will charge an online filing fee of $50 dollars less than the paper form for the online filing of Forms G-1041 and G-1041A.

- o For requestors who use the electronic version of Form G-1041, the fee will decrease from $65 to $30, a decrease of $35 (54 percent). For those who submit Form G-1041 via mail, DHS will increase the fee from $65 to $80, an increase of $15 (23 percent).

- o For requestors who use the electronic version of Form G-1041A, the fee will decrease from $65 to $30, a decrease of $35 (54 percent). For those who submit Form G-1041A via mail, DHS will increase the fee from $65 to $80, an increase of $15 (23 percent).

Finally, DHS will charge a fee for requests for a Certificate of Non-Existence. Currently, USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. USCIS operates the Certificate of Non-Existence request process informally and at no cost to individuals while absorbing the costs to provide this service.[82] DHS will charge a fee of $330 to recover the estimated full cost of processing these requests, which will require submission of Form G-1566, Request for a Certificate of Non-Existence once approved by OMB. If finalized, the fee will be established in the FY24 rule and will be required with the submission of Form G-1566[83] if it is approved before this rule takes effect. If the form is not

---

[82] *See* 8 CFR 103.7(f) (Oct. 1, 2020), *Authority to certify records.* The Director of USCIS, or such officials as they may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

[83] Form G-1566 is pending approval with OIRA. https://www.regulations.gov/document/USCIS-2021-0021-0014

approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed as provided in 8 CFR 299.1.

**Affected Population**

The population affected by this rule includes individuals who use Form G-1041 to request a search of USCIS historical indices and individuals who use Form G-1041A to obtain copies of USCIS historical records found through an index request. The affected population also includes individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. Table 36 shows the estimated number of genealogy index search requests and historical records requests that were submitted to USCIS using Forms G-1041 and G-1041A for FY 2018 through FY 2022. DHS estimates that an annual average of 6,775 Form G-1041 index search requests and 4,608 Form G-1041A records requests were received during that time. For both forms, more than 90 percent of the requests were submitted electronically.

| Table 206. Receipts of Forms G-1041, G-1041A and G-1566, for FY 2018 through FY 2022 | | | | |
|---|---|---|---|---|
| **Fiscal Year** | **Form G-1041 (Paper Filing)** | **Form G-1041 (Online Filing)** | **Total** | **Percentage Filed Online** |
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 2021 | 207 | 7,220 | 7,427 | 97% |
| 2022 | 124 | 8,901 | 9,025 | 99% |
| **5-year Total** | **1,095** | **32,782** | **33,877** | |
| **5-year Annual Average** | **219** | **6,556** | **6,775** | 97% |
| | | | | |
| **Fiscal Year** | **Form G-1041A (Paper Filing)** | **Form G-1041A (Online Filing)** | **Total** | **Percentage Filed Online** |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 333 | 3,407 | 3,740 | 91% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 2021 | 309 | 5451 | 5,760 | 95% |
| 2022 | 190 | 5168 | 5,358 | 96% |
| **5- year Total** | **1,474** | **21,566** | **23,040** | |
| **5-year Annual Average** | **295** | **4,313** | **4,608** | 94% |

| Fiscal Year | Certificate of Non-Existence/ Form G-1566 |
|---|---|
| 2018 | 1,442 |
| 2019 | 1,516 |
| 2020 | 1,784 |
| 2021 | 2,948 |
| 2022 | 4,527 |
| 5- year Total | 12,217 |
| 5-year Annual Average | 2,443 |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (Feb. 2, 2023).
Note: IRIS tracks the online percentage of index searches and records requests.

Table 36 above also depicts the FY 2018 through FY 2022 filing receipts of the

Certificate of Non-Existence. DHS bases the estimate for the Form G-1566 on these receipts and

estimates that the average annual receipts for Form G-1566 will be approximately 2,443. DHS

notes that providing digital records in response to a Form G-1041 request may reduce the

number of Form G-1041A requests that will be filed because requestors will now be given a

digital copy of records with this request if it was previously digitized. Hence, Form G-1041A

requests will only be used by requestors seeking hard copy records. As a result, the volume of

Form G-1041A requests USCIS receives may decrease, though DHS is unable to speculate by

how much because DHS does not know how many individuals may continue to submit G-1041A

requests by mail. DHS also does not have sufficient data on the requestors for the genealogy

forms to determine if entities or individuals submit these requests. The case management

tracking system used by DHS for genealogy requests does not allow for requestor data to be

readily pulled.

**Cost-Benefit-Transfer Payments Analysis**

DHS is improving the genealogy online process and creating separate fees for the online and paper filing options of Forms G-1041 and G-1041A. DHS will charge an online filing fee of $50 dollars less than the paper form for the online filing of Forms G-1041 and G-1041A. Using the 5-year annual average, the increase in fees for paper filing Form G-1041 and Form G-1041A will result in transfer payments to the government of $3,285 and $4,425 respectively (*see* Table 37). For requestors filing electronically, the fee decreases will result in cost savings to applicants of $229,460 for Form G-1041 and $150,955 for Form G-1041A. The lower online filing fees are a reflection of the time it takes USCIS to process forms submitted electronically.

| Table 217. Economic Impacts of Fee Adjustments to Forms G-1041, G-1041A and G-1566 | | | | | | |
|---|---|---|---|---|---|---|
| **Forms** | **Estimated Annual Average*** *(A)* | **Current Fees** *(B)* | **Final Fees** *(C)* | **Fee Difference** *D = C-B* | **Transfer Payments to USCIS** *E = D×A* | **Cost Savings to Applicants** F = D×A |
| G-1041 (paper filing) | 219 | $65 | $80 | $15 | **$3,285** | |
| G-1041 (online filing) | 6,556 | $65 | $30 | ($35) | | **-$229,460** |
| G-1041A (paper filing) | 295 | $65 | $80 | $15 | **$4,425** | |
| G-1041A (online filing) | 4,313 | $65 | $30 | ($35) | | **-$150,955** |
| G-1566 | 2,443 | $0 | $330 | $330 | **$806,190** | |
| **Total** | | | | | **$813,900** | **-$380,415** |
| Source: USCIS analysis. *Estimated annual average is based on 5-years of data, FY2018-FY2022 in table 36. | | | | | | |

DHS will also charge a fee of $330 for individuals submitting a Form G-1566. Currently, requestors receive this service for free. The annual transfer payments are expected to be $806,190 (*see* Table 37). This will allow DHS to recover the estimated full cost of processing these requests.

In summary, DHS estimates that the fee adjustments in this provision will result in total annual transfer payments from fee paying applicants (paper filers) of Forms G-1041, G-1041A and G-1566 to USCIS of $813,900. For Forms G-1041 and G-1041A requestors filing electronically, the fee decreases will result in total cost savings of $380,415. The fees will allow DHS to recover the full costs of the genealogy program and improve the genealogy processes. No additional time burden to complete forms will be created by this provision.

One of the benefits of this provision is that streamlining the genealogy search and records request process increases accuracy and reduces the administrative burden on USCIS by eliminating the need to manually enter requesters' data into its systems. In addition, USCIS will save on mailing costs as well as records processing and storage costs because electronic versions of search requests will reduce the administrative costs of handling paper.[84]

### M. Fees Shared by CBP and USCIS

**Changes**

DHS will adjust fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP):

- Form I-192, Application for Advance Permission to Enter as a Nonimmigrant

- Form I-193, Application for Waiver of Passport and/or Visa

---

[84] *See* 71 FR 20357, 20357-20368 (Apr. 20, 2006).

- Form I-212, Application for Permission to Reapply for Admission into the United
  States after Deportation or Removal

- Form I-824, Application for Action on an Approved Application or Petition.

DHS will move to a single fee for each of those four immigration benefit requests. The
fee will be the same whether CBP or USCIS adjudicates the application, including for Form I-
192 which currently has different fees depending on the adjudicating agency. The fees in Table
38 represent single DHS fees for the workloads of both agencies by combining the estimated
costs and fee-paying volumes of USCIS and CBP. Under the final rule, CBP and USCIS will
each continue to keep the revenue that they collect for these fees.

| Table 228. Fee Adjustments for Immigration Benefit Requests Shared with CBP | | | | | |
|---|---|---|---|---|---|
| Form | CBP Current Fees | USCIS Current Fees (A) | USCIS Final Fees (B) | Fee Difference from the current fee C = B - A | Percent Change from the Current Fee to the Final Fee |
| I-192, Application for Advance Permission to Enter as a Nonimmigrant (USCIS) | - | $930 | $1,100 | $170 | 18% |
| I-192, Application for Advance Permission to Enter as a Nonimmigrant (CBP) | $585 | - | $1,100 | $515 | 88% |
| I-193, Application for Waiver of Passport and/or Visa | $585 | $585 | $695 | $110 | 19% |
| I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal | $930 | $930 | $1,175 | $245 | 26% |
| I-824, Application for Action on an Approved Application or Petition | $465 | $465 | $590 | $125 | 27% |
| Source: USCIS analysis. | | | | | |

**Affected Population**

The fee increases will impact Forms I-192, I-193, I-212 and I-824 applicants seeking
admission into the United States. Table 39 depicts the total receipts to USCIS for these forms, for

119

FY 2018 through FY 2022. DHS estimates that an annual average of 35,278 applicants will file Form I-192. For this form, USCIS was unable to attain separate receipts for each fiscal year for both agencies. However, using the fee-paying receipts reported in the fee rule's NPRM[85], DHS estimates that approximately 81 percent of the I-192 receipts come from USCIS and 19 percent from CBP. DHS then applied the respective percent shares to the total Form I-192 receipts to estimate the receipts to each agency. Out of the 35,278 annual average applicants that file Form I-192, DHS estimates an annual average of 28,510 will come from USCIS and 6,768 will come from CBP. DHS calculates the separate share of Form I-192 receipts for each agency because this is the only form that currently has a different fee for each agency.

DHS estimates an annual average of 57 applicants will file Form I-193, 8,202 will file Form I-212, and 11,830 will file Form I-824. Therefore, the total annual average receipts for the forms shared with CBP is approximately 55,367.

| Table 239. Annual Receipts of Applicants Filing Forms I-192, I-193, I-212, and I-824 for FY 2018 through FY 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Form | 2018 | 2019 | 2020 | 2021 | 2022 | 5-year Total | 5-Year Annual Average Receipts |
| I-192 (USCIS- 81 percent) | 32,789 | 27,715 | 21,865 | 26,198 | 33,981 | 142,548 | **28,510** |
| I-192 (CBP- 19 percent) | 7,784 | 6,580 | 5,191 | 6,219 | 8,067 | 33,841 | **6,768** |
| Total I-192 | 40,573 | 34,295 | 27,056 | 32,417 | 42,048 | 176,389 | **35,278** |
| I-193 | 99 | 87 | 32 | 30 | 35 | 283 | **57** |
| I-212 | N/A | 7,320 | 9,248 | 7,992 | 8,246 | 32,806 | **8,202*** |
| I-824 | 10,894 | 10,490 | 9,525 | 11,253 | 16,989 | 59,151 | **11,830** |
| **Total** | **51,566** | **52,192** | **45,861** | **51,692** | **67,318** | **268,629** | 55,367 |

[85] See FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements NPRM. DHS Docket No. USCIS 2021-0010, Table 24. Total Form I-192 receipts of 28,569. USCIS' Form I-192 fee paying receipts of 23,088 (81 percent) and CBP's fee paying receipts of 5,481 (19 percent).

Source: USCIS, Office of Performance and Quality (OPQ), PASEXEC database (Feb. 9, 2023).
Notes:
*Represents a 4-year average

**Cost-Benefit-Transfer Payments Analysis**

DHS will increase fees for shared USCIS and CBP Forms I-192, I-193, I-212 and I-824.

Table 40 illustrates that these increases will result in annual transfer payments of $11,826,730

from fee payers to USCIS and CBP. A benefit of this provision is that a single fee for each

shared form will reduce confusion for individuals interacting with CBP and USCIS. The fee is

the same whether CBP or USCIS adjudicates the application.

| Table 40. Economic Impacts of Fee Adjustment to Forms Shared with CBP | | | | | |
|---|---|---|---|---|---|
| Form | 5-Year Annual Average* *(A)* | Current Fees *(B)* | Fees *(C)* | Fee Difference $D = C-B$ | Transfer Payments $E = D \times A$ |
| I-192 (USCIS) | 28,510 | $930 | $1,100 | $170 | **$4,846,700** |
| I-192 (CBP) | 6,768 | $585 | $1,100 | $515 | **$3,485,520** |
| I-193 | 57 | $585 | $695 | $110 | **$6,270** |
| I-212 | 8,202 | $930 | $1,175 | $245 | **$2,009,490** |
| I-824 | 11,830 | $465 | $590 | $125 | **$1,478,750** |
| **Total** | **55,367** | | | | **$11,826,730** |
| Source: USCIS analysis. | | | | | |
| **\*5-year annual average estimated in table 39 using data from FY2018 through FY 2022** | | | | | |

### *N. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)*

**Changes**

DHS will adjust the fee for Form I-881, Application for Suspension of Deportation or

Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100,

NACARA), and combine the current multiple fees charged for an individual or family into a

single fee of $340 for each filing of Form I-881 to reduce the administrative burden for USCIS

for a small workload.[86] The current fees are $285 for individuals, $570 maximum for families and $165 at EOIR for both individuals and families. DHS will make no changes to the EOIR fee.

**Affected Population**

The population that will be affected by this provision includes noncitizens who are eligible for suspension of deportation or special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA). USCIS data do not differentiate between Form I-881 applications filed by individuals and applications filed by families. However, based on the average annual revenue data for Form I-881 for FY 2018 through FY 2022, approximately 98 percent of applicants paid the individual filing fee of $285 for Form I-881 and about 2 percent of applicants paid the family filing fee of $570.[87] DHS uses these percentages to estimate the average number of receipts for individuals and families.

DHS expects the population will be exhausted eventually due to relevant eligibility requirements and has excluded this immigration benefit request from previous fee rules, essentially treating it like other temporary programs or policies such as TPS and Deferred Action for Childhood Arrivals. However, DHS cannot specify when this population will be exhausted as USCIS continues to receive and adjudicate this immigration benefit. Table 41 shows the receipts of Form I-881 for FY 2018 through FY 2022 for individuals and families.

| Table 41. Receipts of Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA), for FY 2018 through FY 2022 | | | |
|---|---|---|---|
| **Fiscal Year** | **Individuals** | **Families** | **Total Receipts** |
| 2018 | 495 | 10 | 505 |
| 2019 | 477 | 10 | 487 |

---

[86] This change does not affect individual or family-based applicants who file the same form with the Department of Justice, EOIR. To file this form directly with EOIR, there is a separate $165 fee. The number of Forms I-881 filed with EOIR and the associated costs are not estimated in this RIA.

[87] *See* the preamble of the rule. Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA).

AR_001103

| | | | |
|---|---|---|---|
| 2020 | 273 | 6 | 279 |
| 2021 | 210 | 4 | 214 |
| 2022 | 206 | 4 | 210 |
| **5-year Total** | **1,661** | **34** | **1,695** |
| **5-year Annual Average** | **332** | **7** | **339** |
| Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD,  Computer-Linked Application Information Management System (CLAIMS 3) database (Jan. 18, 2023). | | | |

## Cost-Benefit-Transfer Payments Analysis

The final rule adjusts the filing fees for Form I-881. DHS will use a single $340 fee for any Form I-881 filed with USCIS. The current fees to file Form I-881 with USCIS is $285 for per individual application submitted and $570 per family application where all members of a family submit their applications together in a single package. The final fee is less than USCIS' estimated costs associated with adjudicating the application.

Creating the same fee for the two I-881 forms will provide qualitative benefits of simplifying USCIS' revenue collections and reporting requirements for USCIS, thus reducing the administrative burden of the program. In Table 42, DHS calculates that the increase in fees for individuals filing will result in annual transfer payments of $18,260 from I-881 individual filers to USCIS. Conversely, the 40-percent decrease in fees for families will result in $1,610 in annual transfer payments from USCIS to I-881 family applicants since this fee is less than the cost to adjudicate the application, and USCIS will now incur the full adjudication costs.

| Table 42. Economic Impacts of Adjusted Filing Fees for Form I-881 | | | | | | |
|---|---|---|---|---|---|---|
| **Affected Population** | **5-Year Annual Average***<br>*(A)* | **Current Fees**<br>*(B)* | **New Fees**<br>*(C)* | **Fee Difference**<br>$D = C\text{-}B$ | **Percent Change** | **Transfer Payments**<br>$E = D{\times}A$ |
| Form I-881 - Individuals | 332 | $285 | $340 | $55 | 19% | **$18,260** |
| Form I-881- Families | 7 | $570 | $340 | -$230 | -40% | **-$1,610** |
| Source: USCIS analysis.<br>***5-year annual average estimated in table 41 using data from FY2018 through FY 2022** | | | | | | |

### *O. Fee Waivers*

**Changes**

DHS will codify the eligibility requirements for a fee waiver that currently exist criteria in USCIS guidance. An individual can request a fee waiver and, if approved, the fees will be waived for the entire immigration benefit and the biometric services fee, provided the applicant establishes an inability to pay the fee by meeting at least one of the criteria below:

- Had a household income at or below 150 percent of the FPG;[88]

- The applicant or a household spouse or child currently receives a means-tested benefit; or

- Is experiencing extreme financial hardship such as unexpected medical bills or emergencies.[89]

Finally, DHS will expand the categories of requestors and related forms eligible for a fee waiver. Table 43 below provides a summary of these categories and forms that will be eligible for a fee waiver.

---

[88] The Secretary of the Department of Health and Human Services (HHS), Office of the Assistant Secretary for Planning and Evaluation, establishes the FPG annually. Office of the Assistant Secretary for Planning and Evaluation (ASPE), HHS, "HHS Poverty Guidelines for 2023," available at *https://aspe.hhs.gov/poverty-guidelines*. The Federal Register notice for the 2019 Poverty Guidelines was published at 84 FR 1167 (Feb. 1, 2019).

[89] This may include, but is not limited to, medical expenses of family members, unemployment, eviction, and homelessness as described on Form I-912 instructions.

| Table 43. Forms Eligible for Fee Waivers, as of Effective Date of this Final Rule | |
|---|---|
| **Category** | **Fee Waiver Eligibility** |
| **Victims of severe form of trafficking** (T nonimmigrants)[90] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[91] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[92] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty**[93] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[90] *See* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T).

[91] *See* INA sec. 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U).

[92] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 8 U.S.C. 1101(a)(51)*;* INA sec. 204(a), 8 U.S.C. 1154(a).

[93] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D), 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

125

| Table 43. Forms Eligible for Fee Waivers, as of Effective Date of this Final Rule | |
|---|---|
| Category | Fee Waiver Eligibility |
| Abused spouses and children adjusting status under CAA and HRIFA[94] | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children seeking benefits under NACARA[95] | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)[96] | • Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Forces (ISAF) and their derivative beneficiaries | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| SIJs | • Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[94] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[95] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[96] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

126

| Table 43. Forms Eligible for Fee Waivers, as of Effective Date of this Final Rule | |
|---|---|
| **Category** | **Fee Waiver Eligibility** |
| **TPS**[97] | <ul><li>Biometrics Fee</li><li>Form I-131</li><li>Form I-290B</li><li>Form I-601</li><li>Form I-765</li><li>Form I-821</li></ul> |
| **Asylees** | <ul><li>Form I-290B</li><li>Form I-485</li><li>Form I-765 (renewal request)</li><li>Form N-300</li><li>Form N-336</li><li>Form N-400</li><li>Form N-470</li><li>Form N-565</li><li>Form N-600</li><li>Form N-600K</li></ul> |
| **Refugees** | <ul><li>Form I-290B</li><li>Form N-300</li><li>Form N-336</li><li>Form N-400</li><li>Form N-470</li><li>Form N-565</li><li>Form N-600</li><li>Form N-600K</li></ul> |
| **Current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)**[98] | <ul><li>Form N-300</li><li>Form N-470</li><li>Form N-565</li></ul> |

## Affected Population

The population impacted in this provision includes individuals who file certain humanitarian benefit requests that will now be eligible for fee waivers, and individuals that submit fee waiver requests by letter.

---

[97] *See* INA secs. 244 and 245(l)(7), 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

[98] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

127

In Table 44 below, DHS estimates that at least 832,756 more applicants will now be eligible for fee waivers annually.

| Table 44.  Annual Receipts for Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Classification Category | Form | FY18 | FY19 | FY20 | FY21 | FY22 | 5-Year Totals | 5-Year Average Receipts |
| **Victims of severe form of trafficking (T nonimmigrants)** | Form I-290B | 240 | 269 | 503 | 342 | 209 | **1,563** | **313** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 0 | 4 | 2 | 4 | 5 | **15** | **3** |
| | Form N-400 | 335 | 444 | 699 | 674 | 729 | **2,881** | **576** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 7 | 5 | 1 | 5 | 6 | **24** | **5** |
| | Form N-600 | 7 | 5 | 18 | 18 | 22 | **70** | **14** |
| | Form N-600K | 0 | 0 | 0 | 2 | 1 | **3** | **1** |
| **Total** | | | | | | | **4,556** | **912** |
| **Victims of qualifying criminal activity (U nonimmigrants)** | Form I-290B | 1,575 | 2,637 | 2,888 | 2,650 | 2,072 | **11,822** | **2,364** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 6 | 10 | 18 | 13 | 36 | **83** | **17** |
| | Form N-400 | 1,643 | 3,280 | 5,226 | 5,554 | 6,739 | **22,442** | **4,488** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 7 | 10 | 28 | 35 | 35 | **115** | **23** |
| | Form N-600 | 41 | 39 | 50 | 43 | 74 | **247** | **49** |
| | Form N-600K | 0 | 0 | 0 | 2 | 1 | **3** | **1** |
| **Total** | | | | | | | **34,712** | **6,942** |
| **VAWA Form I-360 self-petitioners and derivatives** | Form I-290B | 890 | 1,252 | 1,424 | 1,541 | 1,375 | **6,482** | **1,296** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 48 | 40 | 41 | 35 | 40 | **204** | **41** |
| | Form N-400 | 4,934 | 4,863 | 5,835 | 4,477 | 4,344 | **24,453** | **4,891** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 49 | 67 | 63 | 72 | 90 | **341** | **68** |

**Table 44.  Annual Receipts for Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022**

| Classification Category | Form | FY18 | FY19 | FY20 | FY21 | FY22 | 5-Year Totals | 5-Year Average Receipts |
|---|---|---|---|---|---|---|---|---|
| | Form N-600 | 18 | 21 | 16 | 20 | 17 | **92** | **18** |
| | Form N-600K | 1 | 1 | 1 | 0 | 0 | **3** | **1** |
| **Total** | | | | | | | **31,575** | **6,315** |
| CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty | Form I-290B | 42 | 87 | 95 | 90 | 74 | **388** | **78** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 5 | 4 | 6 | 7 | 7 | **29** | **6** |
| | Form N-400 | 792 | 934 | 1,506 | 1,592 | 1,889 | **6,713** | **1,343** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 4 | 7 | 8 | 10 | 19 | **48** | **10** |
| | Form N-600 | 3 | 4 | 2 | 6 | 8 | **23** | **5** |
| | Form N-600K | 0 | 0 | 0 | 0 | 1 | **1** | **0** |
| **Total** | | | | | | | **7,202** | **1,442** |
| Abused spouses and children adjusting status under CAA and HRIFA | Form I-290B | 33 | 42 | 29 | 19 | 15 | **138** | **28** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 15 | 47 | 21 | 15 | 19 | **117** | **23** |
| | Form N-400 | 2,336 | 2,149 | 2,545 | 1,355 | 1,058 | **9,443** | **1,889** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 4 | 7 | 8 | 10 | 19 | **48** | **10** |
| | Form N-600 | 331 | 386 | 407 | 371 | 213 | **1,708** | **342** |
| | Form N-600K | 2 | 3 | 1 | 3 | 0 | **9** | **2** |
| **Total** | | | | | | | **11,463** | **2,294** |
| Abused spouses and children seeking benefits under NACARA | Form N-300 | | | | | | | |
| | Form N-336 | | | | | | | |
| | Form N-400 | | | NA | | | | |
| | Form N-470 | | | | | | | |
| | Form N-565 | | | | | | | |
| | Form N-600 | | | | | | | |

129

| Table 44.  Annual Receipts for Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Classification Category | Form | FY18 | FY19 | FY20 | FY21 | FY22 | 5-Year Totals | 5-Year Average Receipts |
| | Form N-600K | | | | | | | |
| Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2) | Form N-300 | | | | | | | |
| | Form N-336 | | | | | | | |
| | Form N-400 | | | | | | | |
| | Form N-470 | | | NA | | | | |
| | Form N-565 | | | | | | | |
| | Form N-600 | | | | | | | |
| | Form N-600K | | | | | | | |
| Special immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the U.S. government or employed by ISAF and their derivative beneficiaries | Form I-290B | 4 | 4 | 1 | 2 | 3 | 14 | 3 |
| | Form N-336 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | Form N-400 | 27 | 38 | 19 | 41 | 35 | 160 | 32 |
| | Form N-300 | | | | | | | |
| | Form N-470 | | | | | | | |
| | Form N-565 | | | | | | | |
| | Form N-600 | | | NA | | | | |
| | Form N-600K | | | | | | | |
| Total | | | | | | | 175 | 35 |
| Special Immigrant Juveniles (SIJs) | Form I-290B | 780 | 1,880 | 995 | 706 | 343 | 4,704 | 941 |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 5 | 7 | 7 | 6 | 16 | 41 | 8 |
| | Form N-400 | 1,018 | 1,254 | 1,836 | 2,400 | 2,531 | 9,039 | 1,808 |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 9 | 24 | 17 | 18 | 23 | 91 | 18 |
| | Form N-600 | 50 | 62 | 41 | 44 | 45 | 242 | 48 |
| | Form N-600K | 1 | 1 | 0 | 0 | 0 | 2 | 0 |

| Classification Category | Form | FY18 | FY19 | FY20 | FY21 | FY22 | 5-Year Totals | 5-Year Average Receipts |
|---|---|---|---|---|---|---|---|---|
| **Table 44.  Annual Receipts for Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022** | | | | | | | | |
| **Total** | | | | | | | **14,119** | **2,823** |
| **TPS** | Biometrics Fee | 306,973 | 5,278 | 12,636 | 255,123 | 141,339 | **721,349** | **144,270** |
| | Form I-131 | 42,513 | 39,634 | 27,377 | 35,200 | 52,254 | **196,978** | **39,396** |
| | Form I-290B | 1,276 | 2,043 | 2,241 | 1,615 | 1,388 | **8,563** | **1,713** |
| | Form I-601 | 820 | 1,048 | 742 | 627 | 800 | **4,037** | **807** |
| | Form I-765 | 401,854 | 163,454 | 172,838 | 333,031 | 251,781 | **1,322,958** | **264,592** |
| **Total** | | | | | | | **2,253,885** | **450,778** |
| **Asylees** | Form I-290B | 828 | 1,231 | 1,412 | 1,175 | 1,170 | **5,816** | **1,163** |
| | Form I-485 | 40,462 | 61,575 | 61,705 | 53,260 | 47,511 | **264,513** | **52,903** |
| | Form I-765 (renewal request) | 81,378 | 302,178 | 241,701 | 354,728 | 294,230 | **1,274,215** | **254,843** |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 34 | 73 | 77 | 97 | 98 | **379** | **76** |
| | Form N-400 | 13,066 | 13,449 | 15,429 | 11,986 | 15,057 | **68,987** | **13,797** |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 35 | 50 | 52 | 99 | 111 | **347** | **69** |
| | Form N-600 | 388 | 572 | 640 | 652 | 692 | **2,944** | **589** |
| | Form N-600K | 5 | 4 | 4 | 12 | 4 | **29** | **6** |
| **Total** | | | | | | | **1,617,230** | **323,446** |
| **Refugees** | Form I-290B | 56 | 111 | 80 | 97 | 69 | 413 | 83 |
| | Form N-300 | NA | NA | NA | NA | NA | | |
| | Form N-336 | 23 | 155 | 182 | 168 | 217 | 745 | 149 |
| | Form N-400 | 19,970 | 31,048 | 31,959 | 36,486 | 39,771 | 159,234 | 31,847 |
| | Form N-470 | NA | NA | NA | NA | NA | | |
| | Form N-565 | 21 | 117 | 178 | 254 | 467 | 1,037 | 207 |
| | Form N-600 | 1,050 | 4,021 | 5,997 | 5,597 | 10,627 | 27,292 | 5,458 |

131

| Table 44. Annual Receipts for Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Classification Category | Form | FY18 | FY19 | FY20 | FY21 | FY22 | 5-Year Totals | 5-Year Average Receipts |
| | Form N-600K | 4 | 8 | 13 | 41 | 61 | 127 | 25 |
| Total | | | | | | | 188,848 | 37,769 |
| Current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K) | Form N-300 Form N-470 Form N-565 | | | NA | | | | |
| Grand Total | | | | | | | | 832,756 |

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), Computer-Linked Application Information Management System (CLAIMS 3), Electronic Immigration System (ELIS2), CIS2, SMART, GLOBAL databases (Aug. 25, 2023).

**Cost-Benefit-Transfer Payments Analysis**

In Table 45, DHS estimates that its current average annual forgone revenue from waived fees is about $246,278,540. The final rule will make several humanitarian forms eligible for a fee waiver. This expanded eligibility will increase the fee waiver eligible population by at least 832,756 applicants (see table 44). DHS is unable to estimate how many of these applicants will file or be approved for a fee waiver. Therefore, DHS is unable to quantify the resulting increase in annual transfer payments from USCIS to applicants/petitioners created in the interim final rule. DHS is also aware that the increase in fee waiver applications will increase the

132

administrative burden on the agency to process them. DHS is unable to quantify the resulting administrative costs to USCIS as it is unable to estimate how many applicants will file for a fee waiver.

| Table 45.  Forgone Revenue from Fee Waivers, for FY 2018 through FY 2022 | | | | | |
|---|---|---|---|---|---|
| Fiscal Year | Applications Received | Approval | Denials | Approval Rate | Forgone Revenue |
| 2018 | 535,412 | 460,821 | 74,616 | 86% | $293,494,715 |
| 2019 | 481,068 | 410,485 | 70,583 | 85% | $254,200,885 |
| 2020 | 406,112 | 329,571 | 76,543 | 81% | $207,677,895 |
| 2021 | 441,175 | 369,947 | 71,233 | 84% | $229,415,245 |
| 2022 | 594,638 | 503,411 | 91,128 | 85% | $246,603,960 |
| 5-year Total | 2,458,405 | 2,074,235 | 384,103 | 84% | 1,231,392,700 |
| 5-year Average | 491,681 | 414,847 | 76,821 | | $246,278,540 |
| Source: USCIS Office of Performance and Qualify (OPQ), CLAIMS 3 database on Feb. 9 2023. Forgone Revenue Estimate data calculated by DHS Office of the Chief Financial Officer (CFO) (Apr. 28, 2023). | | | | | |

DHS will codify the existing USCIS criteria regarding eligibility requirements for a fee waiver. This change in the regulatory text will benefit the public as it clarifies and specifies the "inability to pay" criteria, which is referenced in the regulatory text with regards to fee waiver eligibility requirements.

### P. Fee Exemptions

1. Codification of Benefit Requests with No Fees and Exemptions of Certain Categories or Classifications from Fees

2. New Fee Exemptions

**Changes**

DHS will codify several longstanding fee exemptions that are currently provided through policy guidance documents, such as form instructions, the USCIS Policy Manual, or similar directives, but not in regulations. This includes the following:

- Form I-90, Application to Replace Permanent Resident Card. No fee if the applicant was issued a card but never received it, or if the applicant's card was issued with incorrect information because of DHS error.

- Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. No fee for initial filings for nonimmigrant member of in the U.S. Armed Forces, for a nonimmigrant member of the North Atlantic Treaty Organization (NATO) Armed Forces or civil component; for nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement; and replacement for DHS error.

- Form I-129CWR, Semiannual Report for CW-1 Employers.

- Form I-131, Application for Travel Document. No fees for parole requests from current or former U.S. Armed Forces service members and their parents, spouse, or children.

- Form I-134, Declaration of Financial Support.

- Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. No fee for the following:
    - A petition for Special Immigrant Juvenile (SIJ) classification, and
    - A petition for a person who served honorably on active duty in the U.S. Armed Forces filing under INA section 101(a)(27)(K).

- Form I-361, Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian.

- Form I-363, Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian.

- Form I-407, Record of Abandonment of Lawful Permanent Resident Status.

- Form I-485J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j).

- Form I-508, Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities.

- Form I-539, Application to Extend/Change Nonimmigrant Status for nonimmigrant A, G,NATO, and T nonimmigrant.

134

- Form I-566, Interagency Record of Request – A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status.
- Form I-589, Application for Asylum and for Withholding of Removal.
- Form I-590, Registration for Classification as a Refugee.
- Form I-600, Petition to Classify Orphan as an Immediate Relative. No fee for the first Form I-600 filed for a child on the basis of an approved Form I-600A, Application for Advance Processing of an Orphan Petition, during the Form I-600A approval or extended approval period.
- Form I-602, Application by Refugee for Waiver of Grounds of Inadmissibility.
- Form I-693, Report of Medical Examination and Vaccination Record.
- Form I-730, Refugee/Asylee Relative Petition.
- Form I-765, Application for Employment Authorization. No fee will be charged for an initial Employment Authorization Document (EAD) for the following:
  - Dependents of certain government and internal organizations or NATO personnel.
  - N-8 (Parent of noncitizen classified as SK3) and N-9 (Child of N-8) nonimmigrants.
  - Persons granted asylee status (AS1, AS6).
  - Citizen of Micronesia, Marshall Islands, or Palau.
  - Persons Granted Withholding of Deportation or Removal.
  - Applicant for Asylum and Withholding of Deportation or Removal including derivatives.
  - Taiwanese dependents of Taipei Economic and Cultural Representative Office E-1 employees.
- A request for replacement Employment Authorization Document based on USCIS error.
- For a renewal or replacement Employment Authorization Document for the following:
  - Dependent of certain foreign government, international organization, or NATO personnel.

135

- o   Citizen of Micronesia, Marshall Islands, or Palau.
- o   Granted Withholding of Deportation or Removal and
- o   Dependents of certain government and internal organizations or NATO personnel.

- Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse.

- Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative, for the first Form I-800 filed for a child on the basis of an approved Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, during the Form I-800A approval period or extended approval period.

- Form I-821, Application for Temporary Protected Status. There is no fee for reregistration.

- Form I-854, Inter-Agency Alien Witness and Informant Record.

- Form I-864, Affidavit of Support Under Section 213A of the INA.

- Form I-864A, Contract Between Sponsor and Household Member.

- Form I-864EZ, Affidavit of Support Under Section 213A of the INA.

- Form I-864W, Request for Exemption for Intending Immigrant's Affidavit of Support.

- Form I-865, Sponsor's Notice of Change of Address.

- Form I-912, Request for Fee Waiver.

- Supplement A to Form I-914, Application for Immigrant Family Member of a T-1 Recipient, and Supplement B to Form I-914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.

- Supplement A to Form I-918, Petition for Qualifying Family Member of U-1 Recipient, and Supplement B to Form I-918, U Nonimmigrant Status Certification.

- Form N-4, Monthly Report on Naturalization Papers.

- N-476, Request for Certification of Military or Naval Service.

- N-644, Application for Posthumous Citizenship.

- N-648, Medical Certification for Disability Exceptions.

- Claimant under INA section 289.

Currently, several benefit requests are exempted from paying fees because of the humanitarian nature of their programs and the likelihood that individuals who file will qualify for a fee waiver if they request it. DHS will provide additional fee exemptions for the following humanitarian-based categories of requestors:[99]

- Victims of Severe Form of Trafficking (T Nonimmigrants)

- Victims of Qualifying Criminal Activity (U Nonimmigrants)

- VAWA Form I-360 Self-Petitioners and Derivatives

- Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty

- Abused Spouses and Children Adjusting Status under CAA and HRIFA

- Abused Spouses and Children Seeking Benefits under NACARA

- Abused Spouses and Children of LPRs or U.S. Citizens under INA Section 240A(b)(2)

- Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Forces ISAF[100] (SI1 and SI2)

- Special Immigrant Juveniles

- Temporary Protected Status

---

[99] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under 8 CFR 106.2, for which DHS has codified that there is no fee.

[100] DHS is not making any assumptions about the additional Afghani special immigrant visas or Afghani Evacuees in this rule.

- Asylees

- Refugees

- Person Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K)

Table 46 below provides a summary of current fee exemptions under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), additional fee exemptions, and the impact on forms that no longer require a fee waiver for these categories of requestors because they will be fee exempt.

| Table 46. Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions (Includes NPRM and Final Rule Changes)[101] | | |
|---|---|---|
| Category | Proposed Fee Exemptions In NPRM[102] | Additional Fee Exemptions Made In Final rule[103] |
| Victims of severe form of trafficking (T nonimmigrants)[104] | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[105] | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and in associated ancillary forms)<br>• Form I-824 |
| Victims of qualifying criminal activity (U nonimmigrants)[106] | • Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting |

---

[101] This table includes exemptions that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS will make additional fee exemptions.

[102] This column lists all the additional fee exemptions that were proposed in the NPRM. DHS would continue to maintain all the fee exemptions currently provided under Table 13A, column "Current Fee Exemptions."

[103] This column lists all additional fee exemptions made in the final rule. These fee exemptions are in addition to those listed in column "Proposed Additional Fee Exemptions NPRM."

[104] *See* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T).

[105] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[106] *See* INA sec. 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U).

138

**Table 46. Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions (Includes NPRM and Final Rule Changes)[101]**

| Category | Proposed Fee Exemptions In NPRM[102] | Additional Fee Exemptions Made In Final rule[103] |
|---|---|---|
| | • Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485) | status or for Form I-485 or in association with the I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[107] (initial, renewal, and replacement request)<br>• Form I-824<br>• Form I-929 |
| **VAWA Form I-360 self-petitioners and derivatives[108]** | • Form I-131 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360)<br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A[110]<br>• Form I-765 (renewal, and replacement request)<br>• Form I-824 |

---

[107] The proposed fee exemption for U nonimmigrants or applicants for U no filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[108] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 8 U.S.C. 1101(a)(51);INA sec. 204(a), 8 U.S.C. 1154(a).

[110] Note that Form I-601A is for people who are unable to adjust status and are unable to consular process and VAWA applicants can more easily adjust status within the United States because the "inspection and admitted or paroled" requirement does not apply to VAWA beneficiaries and other inadmissibility provisions barriers adjustment would not apply to them.

| Table 46. Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions (Includes NPRM and Final Rule Changes)[101] | | |
|---|---|---|
| **Category** | **Proposed Fee Exemptions In NPRM**[102] | **Additional Fee Exemptions Made In Final rule**[103] |
| | category (c)(31) fee exempt for principals and derivatives)[109] | |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[111] | • Form I-290B (only when filed for Form I-751) | • Form I-751 |
| **Abused spouses and children adjusting status under CAA and HRIFA**[112] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before) adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 |
| **Abused spouses and children seeking benefits under NACARA**[113] | • Form I-765 (submitted under 8 CFR 274a.12(c)(10) initial request)<br>• Form I-881<br>• Form I-601 | Form I-765 (renewal, and replacement request) Form I-824 |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[114] | •<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | Form I-765 (renewal, and replacement request) Form I-824 |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S.** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485) | • Form I-765 (renewal, and replacement request)<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and in associated ancillary forms) |

[109] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[111] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D), 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[112] *See* INA sec. 101(a)(51)(D) and (E); 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[113] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F).  The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[114] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

**Table 46. Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions (Includes NPRM and Final Rule Changes)[101]**

| Category | Proposed Fee Exemptions In NPRM[102] | Additional Fee Exemptions Made In Final rule[103] |
|---|---|---|
| **Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Forces (ISAF and their derivative beneficiaries** | • Form I-485<br>• Form I-601<br>• Form I-765 (initial) | • Form I-824 |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial, renewal, and replacement). | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-601A[115]<br>• Form I-824 |
| **Refugees** | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | |
| **Current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)[116]** | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial request for service member) | • Form I-765 (renewal, and replacement request for service members) |
| **Adoption[117]** | | Orphan Provision |

[115] Note that Form I-601A is for people who are unable to adjust status and are unable to consular process and SIJ applicants can more easily adjust status within the United States.

[116] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[117] This includes the three provisions for adoption-based immigration. *See* INA sec. 101(b)(1)(E), 8 U.S.C. 1101(b)(1)(E); INA sec. 101(b)(1)(F), 8 U.S.C. 1101(b)(1)(F); INA sec. 101(b)(1)(G), 8 U.S.C. 1101(b)(1)(G).  The analyses for these changes are presented in Provision J (Intercountry Adoptions) and not discussed in this provision's analysis below.

| Category | Proposed Fee Exemptions In NPRM[102] | Additional Fee Exemptions Made In Final rule[103] |
|---|---|---|
| **Table 46. Additional Categories of Requestors and Related Forms Eligible for Fee Exemptions (Includes NPRM and Final Rule Changes)[101]** | | |
| | | • I-600A/I-600 Supplement 3 (Request for Action on Approved Form I-600A/I-600)[118]<br>   ○ Second extension of the approval of Form I-600A<br>   ○ Second change of country after the approval of Form I-600A<br>   ○ Duplicate approval notice<br><br>Hague Provision<br>• I-800A Supplement 3 (Request for Action on Approved Form I-800A)<br>   ○ Second extension of the approval of Form I-800A<br>   ○ Second change of country after the approval of Form I-800A<br>   ○ Duplicate approval notice<br><br>Citizenship and Naturalization Forms[119]<br>• N-600 for adopted children[120]<br>• N-600K for adopted children. |

**Affected Population**

The population impacted by this provision includes individuals that currently receive fee exemptions provided through USCIS' policy guidance documents and individuals that can currently submit fee waiver requests. The latter individuals will no longer require a fee waiver for certain categories of requestors because they will now be fee exempt. For the purposes of this

---

[118] This is a new supplement created by the Fee Rule.

[119] These forms can be used for adopted children under any of the three provisions for adoption-based immigration.

[120] USCIS issues a Certificate of Citizenship to adopted children who are admitted to the United States with an IR-3 visa (visa category for children from non-Hague Adoption Convention countries adopted abroad by U.S. citizens) or an IH-3 visa (visa category for children from Hague Adoption Convention countries adopted abroad by U.S. citizens) without the filing of a Form N-600, Application for Certificate of Citizenship, and fee, if the child meets all requirements of sec. 320 of the Act.

analysis, DHS uses the volume of fee waiver requests received to estimate the impact to populations affected by this rule.

Table 47 presents data on the annual receipts of various categories of immigrants' filing of specific forms for FY 2018 through FY 2022. During this period, USCIS received an annual average of 426,261 requests associated with various categories of immigrants.

| Table 247. Annual Receipts of Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Classification Category** | **Receipts for the following Fee Exempt Forms** | **Receipts** | | | | | | |
| | | **2018** | **2019** | **2020** | **2021** | **2022** | **Total** | **5-Year Annual Average Receipts** |
| **Victims of severe form of trafficking (T nonimmigrants)** | Form I-131 | 561 | 572 | 634 | 992 | 1,498 | **4,257** | **851** |
| | Form I-192 | 1,502 | 1,235 | 1,355 | 2,004 | 3,322 | **9,418** | **1,884** |
| | Form I-193 | 9 | 6 | 5 | 5 | 0 | **25** | **5** |
| | Form I-290B* (only if filed for any benefit request filed before adjusting status or for Form I-485) | 240 | 267 | 502 | 341 | 207 | **1,557** | **311** |
| | Form I-485 | 1,384 | 1,523 | 1,373 | 1,376 | 1,440 | **7,096** | **1,419** |
| | Form I-539 | 83 | 88 | 96 | 118 | 87 | **472** | **94** |
| | Form I-601 | 9 | 36 | 51 | 157 | 103 | **356** | **71** |
| | Form I-765 | 3,553 | 3,647 | 3,839 | 4,600 | 4,393 | **20,032** | **4,006** |
| | Form I-824 | 3 | 5 | 3 | 6 | 4 | **21** | **4** |
| *Total* | | | | | | | **43,234** | **8,645** |
| **Victims of qualifying criminal activity (U nonimmigrants)** | Form I-131 | 6,292 | 6,649 | 5,460 | 8,894 | 10,749 | **38,044** | **7,609** |
| | Form I-192 | 42,852 | 34,763 | 28,950 | 31,723 | 38,881 | **177,169** | **35,434** |
| | Form I-193 | 89 | 78 | 30 | 29 | 24 | **250** | **50** |

143

**Table 247. Annual Receipts of Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022**

| Classification Category | Receipts for the following Fee Exempt Forms | Receipts | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 | Total | 5-Year Annual Average Receipts |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 or in association with the I-485 and associated ancillary forms) | 1,573 | 2,635 | 2,886 | 2,650 | 2,072 | **11,816** | **2,363** |
| | Form I-485 | 20,737 | 19,460 | 14,389 | 20,139 | 19,574 | **94,299** | **18,860** |
| | Form I-601 | 147 | 147 | 135 | 138 | 150 | **717** | **143** |
| | Form I-765 (renewal, and replacement request) | 31,384 | 36,184 | 30,193 | 36,119 | 29,963 | **163,843** | **32,769** |
| | Form I-765 (initials) | 103,899 | 92,095 | 73,438 | 102,532 | 117,881 | **489,845** | **97,969** |
| | Form I-824 | 76 | 61 | 50 | 72 | 71 | **330** | **66** |
| | Form I-929 | 225 | 164 | 150 | 142 | 131 | **812** | **162** |
| | Form I-539 (only if filed before Form I-485 is filed) | 1,365 | 1,301 | 980 | 1,157 | 1,123 | **5,926** | **1,185** |
| **Total** | | | | | | | **983,051** | **196,610** |
| | Form I-131 | 10,700 | 13,657 | 16,963 | 25,200 | 30,554 | **97,074** | **19,415** |
| | Form I-212 | 166 | 248 | 339 | 659 | 971 | **2,383** | **477** |
| **VAWA Form I-360 self-petitioners and derivatives** | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | 881 | 1,226 | 1,396 | 1,512 | 1,351 | **6,366** | **1,273** |

144

**Table 247. Annual Receipts of Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022**

| Classification Category | Receipts for the following Fee Exempt Forms | Receipts | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 | Total | 5-Year Annual Average Receipts |
| | Form I-485 | 16,273 | 16,506 | 15,806 | 18,615 | 25,420 | **92,620** | **18,524** |
| | Form I-601 | 575 | 686 | 846 | 1,556 | 2,391 | **6,054** | **1,211** |
| | Form I-601A | 826 | 773 | 644 | 331 | 121 | **2,695** | **539** |
| | Form I-765 (renewal, and replacement request) | 17,903 | 21,537 | 25,652 | 30,829 | 20,569 | **116,490** | **23,298** |
| | Form I-765 (initials) | 36,848 | 39,978 | 43,996 | 55,223 | 51,613 | **227,658** | **45,532** |
| | Form I-824 | 306 | 336 | 280 | 346 | 300 | **1,568** | **314** |
| *Total* | | | | | | | **552,908** | **110,583** |
| Conditional permanent residents (CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty | Form I-751 | 2,971 | 2,972 | 2,968 | 3,072 | 2,266 | **14,249** | **2,850** |
| | Form I-290B (only when filed for Form I-751) | 26 | 38 | 25 | 11 | 22 | **122** | **24** |
| *Total* | | | | | | | **14,371** | **2,874** |
| Abused spouses and children adjusting status under CAA and HRIFA | Form I-131 | 219 | 180 | 148 | 168 | 128 | **843** | **169** |
| | Form I-212 | 12 | 9 | 10 | 5 | 5 | **41** | **8** |
| | Form I-485 | 542 | 316 | 216 | 170 | 185 | **1,429** | **286** |
| | Form I-601 | 22 | 16 | 22 | 19 | 16 | **95** | **19** |
| | Form I-765 (initial, renewal, and replacement request) | 1,258 | 1,041 | 794 | 975 | 637 | **4,705** | **941** |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form | N/A | N/A | N/A | N/A | N/A | | |

145

| Classification Category | Receipts for the following Fee Exempt Forms | Receipts | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **2018** | **2019** | **2020** | **2021** | **2022** | **Total** | **5-Year Annual Average Receipts** |
| | I-485 and associated ancillary forms) | | | | | | | |
| | Form I-824 | N/A | N/A | N/A | N/A | N/A | | |
| *Total* | | | | | | | **7,113** | **1,423** |
| **Abused spouses and children of LPRs or U.S. citizens under INA 240A(b)(2)** | Form I-765 (initial, renewal, and replacement request) | 35,381 | 38,388 | 42,058 | 49,771 | 41,443 | **207,041** | **41,408** |
| | Form I-824 | 305 | 333 | 283 | 345 | 298 | **1,564** | **313** |
| *Total* | | | | | | | **208,605** | **41,721** |
| **Special immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the government or employed by ISAF** | Form I-131 | 19 | 8 | 7 | 168 | 202 | **404** | **81** |
| | Form I-212 | 1 | 0 | 0 | 0 | 0 | **1** | **0** |
| | Form I-485 | 9 | 9 | 5 | 10 | 944 | **977** | **195** |
| | Form I-601 | 2 | 0 | 0 | 0 | 0 | **2** | **0** |
| | Form I-765 (renewal, and replacement request) | 32 | 37 | 21 | 2,225 | 768 | **3,083** | **617** |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and in associated ancillary forms) | 4 | 4 | 1 | 2 | 3 | **14** | **3** |
| | Form I-824 | 0 | 1 | 0 | 0 | 3 | **4** | **1** |
| *Total* | | | | | | | **4,485** | **897** |
| **Special Immigrant Juveniles (SIJs)** | Form I-131 | 350 | 578 | 738 | 1,336 | 1,413 | **4,415** | **883** |
| | Form I-485 | 3,053 | 5,146 | 8,744 | 24,963 | 14,615 | **56,521** | **11,304** |
| | Form I-601 | 19 | 51 | 43 | 122 | 128 | **363** | **73** |
| | Form I-765 (initial) | 17,069 | 21,908 | 26,719 | 40,009 | 48,231 | **153,936** | **30,787** |

146

**Table 247. Annual Receipts of Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022**

| Classification Category | Receipts for the following Fee Exempt Forms | Receipts | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 | Total | 5-Year Annual Average Receipts |
| | Form I-765 (renewal and replacement) | 5,866 | 8,480 | 9,514 | 10,491 | 9,582 | **43,933** | **8,787** |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | 780 | 1,879 | 995 | 706 | 343 | **4,703** | **941** |
| | Form I-601A | 9 | 12 | 16 | 21 | 22 | **80** | **16** |
| | Form I-824 | 9 | 12 | 15 | 37 | 23 | **96** | **19** |
| *Total* | | | | | | | **264,047** | **52,810** |
| **Refugees** | Form I-765 (initial, renewal and replacement request) | 1,159 | 1,339 | 826 | 1,013 | 1,506 | **5,843** | **1,169** |
| | Form I-131 | 9,862 | 11,028 | 7,481 | 9,379 | 9,717 | **47,467** | **9,493** |
| | Form I-131A | N/A | N/A | N/A | N/A | N/A | | |
| *Total* | | | | | | | **53,310** | **10,662** |
| **Current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K** | Form I-360 | 2 | 1 | 1 | 0 | 2 | **6** | **1** |
| | Form I-131 | 4 | 3 | 8 | 12 | 11 | **38** | **8** |
| | Form I-485 | 7 | 10 | 5 | 10 | 8 | **40** | **8** |
| | Form I-765 (initial request for service member) | 11 | 22 | 18 | 22 | 23 | **96** | **19** |
| *Total* | | | | | | | **180** | **36** |
| | | | | | | | | |
| **Grand Total** | | | | | | | **2,131,304** | **426,261** |

| Table 247. Annual Receipts of Various Categories of Immigrants' filing of Specific Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Classification Category | Receipts for the following Fee Exempt Forms | Receipts | | | | | | |
| | | 2018 | 2019 | 2020 | 2021 | 2022 | Total | 5-Year Annual Average Receipts |

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), Computer-Linked Application Information Management System (CLAIMS 3), Electronic Immigration System (ELIS2), CIS2, SMART, GLOBAL databases (Feb. 16, 2023).

Notes:
-No data available for Abused spouses and children seeking benefits under NACARA, Abused Spouses of A, E-3, G, and H Nonimmigrants, TPS and Asylees.

## Cost-Benefit-Transfer Payments Analysis

DHS will exempt the fees for certain humanitarian requestors instead of requiring a fee waiver. In Table 48, DHS shows the fees and the estimated annual average fee waiver requests accompanying several forms to estimate the expected number of fee exemption recipients. DHS uses an updated methodology in the FR to estimate the transfer payments from USCIS to applicants/petitioners. In the NPRM, DHS estimated foregone revenue from exempting 145,604 expected receipts each year. These estimates were based on FY16 through FY20 averages and made no adjustments for the expected number of baseline fee waivers.

In the FR, DHS estimates annual averages impacted by the fee exemptions using FY18 through FY22 averages and expands the exemptions to include new forms such as Form I-485 and Form I-765 filed by U nonimmigrants and VAWA Form I-360 self petitioners and derivatives. While these additional exemptions result in larger transfer payments from USCIS to applicants/petitioners, these impacts subtract out a baseline fee waiver rate. This methodological improvement reflects the reality that exempting those filings which would have been fee waived has no impact on foregone revenues.

148

DHS estimates the forgone revenue from exempted fees will result in annual transfer payments from USCIS to applicants/petitioners of approximately $181,225,564. This is the estimated annual amount of fees that will now be exempt. DHS notes the increase of 70 percent from the NPRM is attributable to the expanded exemptions in this Final Rule, updated 5-year averages, and this new adjustment for fee waivers under the baseline.

| Table 48. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants | | | | | |
|---|---|---|---|---|---|
| Classification Category | Fee Exempt Forms | Annual Average Receipts (A) | Current Fee Waiver Rate (B) | New Fee (C) | Transfer Payment from Government to Applicants D=Ax(1-B)xC |
| Victims of severe form of trafficking (T nonimmigrants) | Form I-131 | 851 | 64% | $630 | $193,007 |
| | Form I-192 | 1,884 | 43% | $1,100 | $1,181,268 |
| | Form I-193 | 5 | 84% | $695 | $556 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and in associated ancillary forms) | 311 | 31% | $800 | $171,672 |
| | Form I-485 | 1,419 | 41% | $1,440 | $1,205,582 |
| | Form I-539 | 94 | N/A | $445 | $41,830 |
| | Form I-601 | 71 | 11% | $1,050 | $66,350 |
| | Form I-765(initial, renewal and replacement requests) | 4,006 | 56% | $495 | $872,507 |
| | Form I-824 | 4 | 5% | $590 | $2,242 |
| Total | | 8,645 | | | $3,735,014 |
| Victims of qualifying criminal activity (U nonimmigrants) | Form I-131 | 7,609 | 72% | $630 | $1,342,228 |
| | Form I-192 | 35,434 | 39% | $1,100 | $23,776,214 |
| | Form I-193 | 50 | 61% | $695 | $13,553 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status | 2,363 | 18% | $800 | $1,550,128 |

| Table 48. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants | | | | | |
|---|---|---|---|---|---|
| Classification Category | Fee Exempt Forms | Annual Average Receipts *(A)* | Current Fee Waiver Rate *(B)* | New Fee *(C)* | Transfer Payment from Government to Applicants *D=Ax(1-B)xC* |
| | or for Form I-485 or in association with the I-485 and associated ancillary forms) | | | | |
| | Form I-485 | **18,860** | 24% | $1,440 | $20,640,384 |
| | Form I-601 | **143** | 11% | $1,050 | $133,634 |
| | Form I-765 (renewal, and replacement request) | **32,769** | 22% | $495 | $12,652,111 |
| | Form I-765 (initial) | **97,969** | 52% | $495 | $23,277,434 |
| | Form I-824 | **66** | 5% | $590 | $36,993 |
| | Form I-929 | **162** | 21% | $270 | $34,555 |
| | Form I-539 (only if filed before Form I-485 is filed) | **1,185** | N/A | $445 | $527,325 |
| *Total* | | *196,610* | | | **$83,984,558** |
| VAWA Form I-360 self-petitioners and derivatives | Form I-131 | **19,415** | 66% | $630 | $4,158,693 |
| | Form I-212 | **477** | 8% | $1,175 | $515,637 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | **1,273** | 10% | $800 | $916,560 |
| | Form I-485 | **18,524** | 15% | $1,440 | $22,673,376 |
| | Form I-601 | **1,211** | 15% | $1,050 | $1,080,818 |
| | Form I-601A | **539** | 0% | $795 | $428,505 |
| | Form I-765 (renewal, and replacement request) | **23,298** | 33% | $495 | $7,726,782 |
| | Form I-765 (initial) | **45,532** | 50% | $495 | $11,269,170 |

150

| Classification Category | Fee Exempt Forms | Annual Average Receipts *(A)* | Current Fee Waiver Rate *(B)* | New Fee *(C)* | Transfer Payment from Government to Applicants *D=Ax(1-B)xC* |
|---|---|---|---|---|---|
| **Table 48. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants** ||||||
| | Form I-824 | **314** | 10% | $590 | $166,734 |
| *Total* | | *110,583* | | | **$48,936,274** |
| **Conditional permanent residents (CPRs) filing a waiver of the joint filing requirement based on battery or extreme cruelty** | Form I-751 | **2,850** | 12% | $750 | $1,881,000 |
| | Form I-290B (only when filed for Form I-751) | **24** | 4% | $800 | $18,432 |
| *Total* | | *2,874* | | | **$1,899,432** |
| **Abused spouses and children adjusting status under CAA and HRIFA** | Form I-131 | **169** | 65% | $630 | $37,265 |
| | Form I-212 | **8** | N/A | $1,175 | $9,400 |
| | Form I-485 | **286** | 23% | $1,440 | $317,117 |
| | Form I-601 | **19** | | $1,050 | $19,950 |
| | Form I-765 (initial, renewal, and replacement request) | **941** | 53% | $495 | $218,470 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | **NA** | N/A | | N/A |
| | Form I-824 | **NA** | N/A | | N/A |
| *Total* | | *1,423* | | | **$602,202** |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)** | Form I-765 (initial, renewal, and replacement request) | **41,408** | N/A | $495 | $20,496,960 |
| | Form I-824 | **313** | N/A | $590 | $184,670 |
| *Total* | | *41,721* | | | **$20,681,630** |
| **Special immigrant** | Form I-131 | **81** | N/A | $630 | $51,030 |
| | Form I-212 | **0** | N/A | $1,175 | $0 |

151

| Table 48. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants | | | | | |
|---|---|---|---|---|---|
| **Classification Category** | **Fee Exempt Forms** | **Annual Average Receipts** *(A)* | **Current Fee Waiver Rate** *(B)* | **New Fee** *(C)* | **Transfer Payment from Government to Applicants** *D=Ax(1-B)xC* |
| **Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. government, or Afghan nationals employed by or on behalf of the U.S. government or employed by the ISAF and their derivative beneficiaries** | Form I-485 | **195** | N/A | $1,440 | $280,800 |
| | Form I-601 | **0** | N/A | $1,050 | $0 |
| | Form I-765 (initial, renewal, and replacement request) | **617** | N/A | $495 | $305,415 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and in associated ancillary forms) | **3** | N/A | $800 | $2,400 |
| | Form I-824 | **1** | N/A | $590 | $590 |
| ***Total*** | | ***897*** | | | **$640,235** |
| **Special Immigrant Juveniles (SIJs)** | Form I-131 | **883** | 6% | $630 | $522,913 |
| | Form I-485 | **11,304** | 38% | $1,440 | $10,092,211 |
| | Form I-601 | **73** | 35% | $1,050 | $49,823 |
| | Form I-765 (renewal, and replacement) | **30,787** | 65% | $495 | $5,333,848 |
| | Form I-765 (initial) | **8,787** | 55% | $495 | $1,957,304 |
| | Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | **941** | 21% | $800 | $594,712 |
| | Form I-601A | **16** | 0% | $795 | $12,720 |
| | Form I-824 | **19** | 0% | $590 | $11,210 |

152

| Table 48. Economic Impacts of Fee Exemptions to Certain Humanitarian Applicants | | | | | |
|---|---|---|---|---|---|
| Classification Category | Fee Exempt Forms | Annual Average Receipts *(A)* | Current Fee Waiver Rate *(B)* | New Fee *(C)* | Transfer Payment from Government to Applicants *D=Ax(1-B)xC* |
| *Total* | | *52,810* | | | **$18,574,740** |
| Refugees | Form I-765 (initial, renewal and replacement request) | 1,169 | N/A | $495 | $578,655 |
| | Form I-131 | 9,493 | N/A | $165 | $1,566,345 |
| | Form I-131A | NA | N/A | $575 | N/A |
| *Total* | | *10,662* | | | $2,145,000 |
| Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K | Form I-360 | 1 | N/A | $515 | $515 |
| | Form I-131 | 8 | N/A | $630 | $5,040 |
| | Form I-485 | 8 | N/A | $1,440 | $11,520 |
| | Form I-765 (initial, renewal, and replacement request for service members) | 19 | N/A | $495 | $9,405 |
| *Total* | | *36* | | | **$26,480** |
| Grand Total | | 426,261 | | | **$181,225,564** |
| Source: USCIS analysis. Notes: Form I-485 and I-539 fees are the average of online and paper filing fees. Current fee waiver rates estimates based on 5-year averages. | | | | | |

In addition to increased foregone revenue for DHS, the rule will create cost savings for individuals who will no longer have to complete the fee waiver application (Form I-912). The

153

various individuals who could complete Form I-912 include the applicant, interpreter, accredited representative, in-house lawyer, and outsourced lawyer.

The federal minimum wage is currently $7.25 per hour, but many states have implemented higher minimum wage rates. However, the Federal Government does not track a nationwide population-weighted minimum wage estimate. Individuals in the population of interest for an analysis could be located anywhere within the United States and may be subject to a range of minimum wage rates depending on the state or city in which they live. DHS uses the most recent wage data from the U.S. Department of Labor (DOL), Bureau of Labor Statistics (BLS) National Occupational Employment and Wage Estimates. More specifically, DHS uses the 10th percentile hourly wage estimate for all occupations as a reasonable proxy for the effective minimum wage when estimating the opportunity cost of time for individuals in populations of interest who are likely to earn an entry-level wage.

The 10th percentile hourly wage estimate for all occupations is currently $13.14, not accounting for worker benefits.[121] DHS accounts for worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier. The benefits-to-wage multiplier is calculated using the most recent BLS report detailing average total employee compensation for all civilian U.S. workers.[122] DHS estimates the benefits-to-wage multiplier to be 1.45, which incorporates employee wages and salaries and the full cost of benefits, such as

---

[121] See BLS, Occupational Employment Statistics, Occupational Employment and Wage Estimates, United States. May 2022. Available at https://www.bls.gov/oes/2022/may/oes_nat.htm#00-0000 (last visited Dec 10, 2023). The 10th, 25th, 75th and 90th percentile wages are available in the downloadable XLS file link.

[122] See Bureau of Labor Stat., U.S. Dep't of Labor, "Economic News Release, Dec. 2022, Employer Costs for Employee Compensation,  Table 1. Employer costs for employer compensation by ownership," available at *https://www.bls.gov/news.release/archives/ecec_03172023.pdf* (last visited Aug. 27, 2023).

154

paid leave, insurance, and retirement.[123] Therefore, using the benefits-to-wage multiplier, DHS calculates the total rate of compensation for applicants as $19.05 per hour for the final rule, where the 10th percentile hourly wage estimate is $13.14 per hour and the average benefits are $5.91 per hour.[124] This estimate of $19.05 is used as the basis for estimating the opportunity cost of the time for preparing and submitting Form I-912.

Additionally, DHS uses the mean hourly wages of $20 for the interpreter, $30.21 for the accredited representative, and $78.74 for in-house and outsourced lawyers to estimate the opportunity cost of the time for preparing and submitting Form I-912.[125]  DHS estimates that the benefits-to-wage multiplier is 1.45 and multiplies that by the average hourly wage rates to account for the full cost of employee benefits. The resulting loaded hourly wage rates are $19.05 for an applicant, $29 for an interpreter, $43.80 for an accredited representative, and $114.17 for an in-house lawyer.[126] DHS recognizes that a firm may choose, but is not required, to outsource the preparation of these petitions and, therefore, presents two wage rates for lawyers. DHS

---

[123] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour) / (Wages and Salaries per hour) = $42.48 / $29.32 = 1.45 (rounded). *See* Bureau of Labor Stat., U.S. Dep't of Labor, "Economic News Release, Dec. 2022, Employer Costs for Employee Compensation,  Table 1. Employer costs for employer compensation by ownership," available at *https://www.bls.gov/news.release/archives/ecec_03172023.pdf* (last visited Aug. 27, 2023).

[124] The calculation of the benefits-weighted 10th percentile hourly wage estimate: $13.14 per hour × 1.45 benefits-to-wage multiplier = $19.053 = $19.05 (rounded) per hour.

[125] *See* Bureau of Labor Stat., U.S. Dep't of Labor "Occupational Employment and Wage Statistics, May 2022, Lawyers, Social and Human Service Assistants (Interpreters) and Paralegals/Legal Assistants (Accredited Representative)," available at *https://www.bls.gov/oes/2022/may/oes_nat.htm#23-1010* (last visited Aug. 28, 2023).

[126] Calculation: *Applicant:* (10th percentile hourly wage estimate) $13.14 × (Benefits-to-wage multiplier) 1.45 = $19.05 per hour; *Interpreter:* (Mean hourly wage of Social/Human Service Assistants) $20 × (Benefits-to-wage multiplier) 1.45 = $29 per hour; *Accredited Representative*: (Mean hourly wage of Paralegals/Legal Assistants) $30.21 × (Benefits-to-wage multiplier) 1.45 = $43.80 per hour; *In-house Lawyer*: (Mean hourly wage of Lawyers) $78.74 × (Benefits-to-wage multiplier) 1.45 = $114.17 per hour.

155

multiplied the average hourly U.S. wage rate for lawyers by 2.5 for a total of $196.85 to approximate an hourly billing rate for an outsourced lawyer.[127,128]

DHS estimates the opportunity cost of time for completing and submitting Form I-912 ranges from $22.29 to $230.31 per fee waiver request.[129] Table 49 shows that the current opportunity cost of time for completing and submitting Form I-912 ranges from $9,501,358 to $98,172,171 annually, depending on who is completing the form. This amounts to an annual average of $40,184,477 in cost savings to individuals who will not have to complete and submit a Form I-912.[130]

| Table 49. Annual Opportunity Cost of Time to Complete Form I-912 | | | | | |
|---|---|---|---|---|---|
| | Annual Average Affected Population | Time Burden to complete Form I-912 per hour (1 hour 10 mins) | Loaded Wage Rate (per hour) | Opportunity Cost = *Time Burden to complete Form I-912 × Loaded Wage Rate (per hour)* | Total Annual Opportunity Cost = *Opportunity Cost × Affected Population* |
| Applicants | 426,261 | 1.17 | $19.05 | $22.29 | $ 9,501,358 |
| Interpreter | 426,261 | 1.17 | $29.00 | $33.93 | $ 14,463,036 |
| Accredited Representative | 426,261 | 1.17 | $43.80 | $51.25 | $ 21,845,876 |

---

[127] The DHS analysis in "Exercise of Time-Limited Authority to Increase the Fiscal Year 2018 Numerical Limitation for the H-2B Temporary Nonagricultural Worker Program," 83 FR 24905, (May 31, 2018), used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney wages.

Also, the analysis in the ICE rule "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 72 FR 45611 (Aug. 15, 2007) ("Final Small Entity Impact Analysis: 'Safe-Harbor Procedures for Employers Who Receive a No-Match Letter,'" at G-4 (Aug. 25, 2008), available at *https://www.regulations.gov/document/ICEB-2006-0004-0922*) used 2.5 as a multiplier for outsourced labor wages.

[128] Calculation: (Mean hourly wage of Lawyers) $78.74 × (Benefits-to-wage multiplier) 2.5 = $196.85 per hour for an outsourced lawyer.

[129] Calculation: *Applicant*: 1.17 × $19.05 per hour = $22.29; *Interpreter*: 1.17 × $29 per hour = $33.93; *Accredited Representative*: 1.17 × $43.80 per hour = $51.25; *In-house Lawyer*: 1.17 × $114.17 per hour = $133.58; *Outsourced Lawyer:* 1.17 × $196.85 per hour = $230.31.

[130] Calculation: ($9,501,358+ $14,463,036+ $21,845,876+ $56,939,944+ $98,172,171)/5 = $40,184,477.

| In-house Attorney | 426,261 | 1.17 | $114.17 | $133.58 | $ 56,939,944 |
|---|---|---|---|---|---|
| Outsourced Attorney | 426,261 | 1.17 | $196.85 | $230.31 | $ 98,172,171 |
| **Average Cost Savings to Applicants** | | | | | **$ 40,184,477** |
| Source: USCIS analysis. | | | | | |

In sum, expanding fee exemptions to other forms will result in annual transfer payments from USCIS to the public of approximately $181,225,564 and an annual average of $40,184,477 in cost savings to the public in opportunity costs for not completing and submitting a fee waiver request. Individuals who are unable to afford the immigration benefit request fees will benefit from these fee exemptions. USCIS does not capture the time burden for its officers to process fee waiver requests due to limited data. Therefore, DHS has not quantified the cost savings to USCIS associated with not having to process the fee waivers (Form I-912).

## *Q. Additional Fee Adjustments*

### Changes and Affected Population

In addition to the immigration benefit forms discussed in the provisions above, DHS will adjust other form fees. Table 51 show the estimated number of requests made to USCIS for Forms I-90, I-102, I-130, I-131, I-140, I-191, I-601, I-612, I-290B, I-360, I-539, I-601A, I-687/690/694, I-751, I-765, I-817, I-910, and I-929 for FY 2018 through FY 2022.

#### *i.    Form I-140 (Changes and Affected Population)*

DHS will increase the fee for Form I-140, Immigrant Petition for Alien Worker, from $700 to $715 (2 percent). DHS will also charge a new Asylum Program Fee to be paid by employers who file a Form I-140. The Asylum Program Fee is $0 for nonprofits, $300 for

businesses that have 25 or fewer FTE workers, and $600 for all other I-140 filers. DHS estimates

that the annual average population who file a Form I-140 is 150,254 (see table 50). Of this

population, DHS estimates that 29 percent of the Form I-140 receipts are filed by nonprofits, 36

percent by businesses that have 25 or fewer FTE workers, and 35 percent by businesses with

more than 25 FTE workers.[131] Based on these percentages, DHS estimates that the annual

average population of nonprofits, businesses that have 25 or fewer FTE workers and businesses

that have more than 25 FTE workers who file a Form I-140 are 43,574, 54,091 and 52,589

respectively (*see* Table 50).

| Table 50. Receipts of Immigration Benefit Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Form | Description | 2018 | 2019 | 2020 | 2021 | 2022 | 5-Year Total | 5-Year Annual Average |
| I-90 (paper) | Application to Replace Permanent Resident Card | 376,304 | 345,055 | 295,674 | 327,766 | 310,056 | 1,654,855 | 330,971 |
| I-102 | Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document | 5,592 | 4,978 | 4,098 | 4,190 | 4,256 | 23,114 | 4,623 |
| I-130 (paper) | Petition for Alien Relative | 843,200 | 773,431 | 616,049 | 543,967 | 626,349 | 3,402,996 | 680,599 |
| I-131 | Application for Travel Document | 485,048 | 493,550 | 437,950 | 686,560 | 654,132 | 2,757,240 | 551,448 |
| I-131 | Refugee Travel Document for an individual age 16 or older | 6,570 | 8,467 | 9,465 | 10,792 | 12,001 | 47,295 | 9,459 |
| I-131 | Refugee Travel Document for a child under the age of 16 | 514 | 603 | 791 | 910 | 799 | 3,617 | 723 |
| I-140 | Immigrant Petition for Alien Worker | 136,585 | 142,451 | 128,178 | 178,789 | 165,269 | 751,272 | 150,254 |

---

[131] USCIS OCFO estimates based on 200 of 551 (36 percent) Form I-140s in this rule's randomly selected SEA sample. The 29 percent "nonprofit" assumption is based on I-129H-1B ACWIA Revenue data for FY21–2.

158

| Table 50. Receipts of Immigration Benefit Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Form | Description | 2018 | 2019 | 2020 | 2021 | 2022 | **5-Year Total** | **5-Year Annual Average** |
| I-140 (Asylum Fee, Non-Profits)*** | Immigrant Petition for Alien Worker | | | | | | | *43,574* |
| I-140 (Asylum Fee, 25 or fewer FTEs)*** | Immigrant Petition for Alien Worker | | | | | | | *54,091* |
| I-140 (Asylum Fee, More than 25 FTEs)*** | Immigrant Petition for Alien Worker | | | | | | | *52,589* |
| **I-601*** | Application for Waiver of Ground of Inadmissibility | N/A | 19,153 | 19,256 | 13,032 | 18,547 | **69,988** | **17,497** |
| **I-612*** | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 7,544 | 554 | 7,759 | 9,417 | **25,274** | **6,319** |
| **I-290B** | Notice of Appeal or Motion | 21,849 | 21,763 | 32,325 | 27,502 | 24,822 | **128,261** | **25,652** |
| **I-360** | Petition for Amerasian Widow(er) or Special Immigrant | 38,511 | 40,208 | 38,529 | 58,752 | 82,226 | **258,226** | **51,645** |
| **I-539 (paper)** | Application to Extend/ Change Nonimmigrant Status | 233,423 | 222,201 | 279,644 | 206,061 | 191,502 | **1,132,831** | **226,566** |
| **I-601A** | Application for Provisional Unlawful Presence Waiver | 60,748 | 52,506 | 49,491 | 41,839 | 36,246 | **240,830** | **48,166** |

159

| Table 50. Receipts of Immigration Benefit Forms, for FY 2018 through FY 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Form | Description | 2018 | 2019 | 2020 | 2021 | 2022 | 5-Year Total | 5-Year Annual Average |
| I-687** | Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | 58 | 37 | 46 | 54 | 63 | **258** | **52** |
| I-690** | Application for Waiver of Grounds of Inadmissibility | | | | | | | |
| I-694** | Notice of Appeal of Decision | | | | | | | |
| I-751 | Petition to Remove Conditions on Residence | 177,674 | 187,414 | 171,851 | 174,863 | 108,165 | **819,967** | **163,993** |
| I-765 (paper) | Application for Employment Authorization | 2,140,892 | 2,191,145 | 2,005,902 | 2,553,573 | 2,118,854 | **11,010,366** | **2,202,073** |
| I-817 | Application for Family Unity Benefits | 707 | 340 | 549 | 346 | 330 | **2,272** | **454** |
| I-910 | Application for Civil Surgeon Designation | 362 | 465 | 452 | 469 | 449 | **2,197** | **439** |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | 1,192 | 1,078 | 919 | 955 | 1,031 | **5,175** | **1,035** |
| **Total** | | | | | | | | **4,471,968** |

Source: USCIS, Office of Policy & Strategy, Policy Research Division (PRD, C3 Consolidated, Benefitmart, National Performance Report and PASEXEC (Mar. 7, 2023).

Notes
*4-year annual averages calculated due to limited data availability.
**Individual receipts data are not available for these forms.
***The Asylum Fee population estimates are not included in the total population.

I-140 (Asylum Fee, Non-Profits) 29% of 150,254= 43,574
I-140 (Asylum Fee, 25 or fewer FTEs) 36% of 150,254= 54,091
I-140 (Asylum Fee, More than 25 FTEs) 35% of 150,254= 52,589

**Cost-Benefit-Transfer Payments Analysis**

In Table 51, DHS estimates that the fee increases to the listed benefit request forms, including Form I-140 will result in an annual transfer payment from fee payers to USCIS of approximately $171,861,361. Applicants filing Forms I-90 and I-131 will save approximately $41,926,275 per year. The cost savings are the result of the reduced costs to USCIS to process these forms relative to current, baseline costs.  As Appendix Tables 4 and 5 of the IEFA Supporting Documentation show, applicants will now pay less to reflect the reduced real costs associated with processing these forms.

### ii.    *Form I-140 (Asylum Program Fees)*

DHS will also charge a new Asylum Program Fee of $0 for nonprofits, $300 for businesses that have 25 or fewer full-time employees, and $600 for all other I-140 filers. This new fee may be used to fund part of the costs of administering the entire asylum program and will be charged in addition to the fee of $715 petitioners will pay for their Form I-140 benefit requests.[132]  DHS believes that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. Table 51 shows that for Form I-140 petitioners, the estimated costs of this new fee will be $47,780,700 annually.

---

[132] DHS Docket No. USCIS 2021-0010, DHS estimates the costs to implement the Asylum Processing FR will be approximately $425.9 million annually over FY 2022/2023.  DHS divided this cost estimate by the estimated fee-paying volume for Forms I-129 and I-140 to determine the $600 Asylum Program Fee. Calculation: $425,900,395 / 708,630 = $601.02. DHS rounded to the nearest $5, consistent with other fees.

| Forms | Estimated Annual Average Receipts (A) | Current Fees (B) | New Fees (C) | Fee Difference D = C-B | Percent Change | Transfer Payments from Applicants to USCIS E = D×A | Cost Savings to Applicants F = D×A | Costs to Applicants G = D×A |
|---|---|---|---|---|---|---|---|---|
| **Table 51. Economic Impacts of Fee Adjustments to Immigration and Benefit Requests** | | | | | | | | |
| **I-90 (paper)*** | 330,971 | $540 | $465 | -$75 | -14% | | -$24,822,825 | |
| **I-102** | 4,623 | $445 | $560 | $115 | 26% | $531,645 | | |
| **I-130 (paper)** | 680,599 | $535 | $625 | $90 | 17% | $61,253,910 | | |
| **I-131 (Application for Travel Document)*** | 551,448 | $660 | $630 | -$30 | -5% | | -$16,543,440 | |
| **I-131 (Refugee Travel Document for an individual age 16 or older)*** | 9,459 | $220 | $165 | -$55 | -25% | | -$520,245 | |
| **I-131 (Refugee Travel Document for a child under the age of 16)*** | 723 | $190 | $135 | -$55 | -29% | | -$39,765 | |
| **I-140 (Form)** | 150,254 | $700 | $715 | $15 | 2% | $2,253,810 | | |
| *I-140 (Asylum Fee, Non-Profits)* | *43,574* | *$0* | *$0* | *$0* | | | | *$0* |
| *I-140 (Asylum Fee, Small Businesses)* | *54,091* | *$0* | *$300* | *$300* | | | | *$16,227,300* |
| *I-140 (Asylum Fee, Large Businesses)* | *52,589* | *$0* | *$600* | *$600* | | | | *$31,553,400* |
| **I-601** | 17,497 | $930 | $1,050 | $120 | 13% | $2,099,640 | | |
| **I-612** | 6,319 | $930 | $1,100 | $170 | 18% | $1,074,230 | | |
| **I-290B** | 25,652 | $675 | $800 | $125 | 19% | $3,206,500 | | |
| **I-360** | 51,645 | $435 | $515 | $80 | 18% | $4,131,600 | | |

| Forms | Estimated Annual Average Receipts (A) | Current Fees (B) | New Fees (C) | Fee Difference D = C-B | Percent Change | Transfer Payments from Applicants to USCIS E = D×A | Cost Savings to Applicants F = D×A | Costs to Applicants G = D×A |
|---|---|---|---|---|---|---|---|---|
| **Table 51. Economic Impacts of Fee Adjustments to Immigration and Benefit Requests** | | | | | | | | |
| **I-539 (paper)** | 226,566 | $370 | $470 | $100 | 27% | $22,656,600 | | |
| **I-601A** | 48,166 | $630 | $795 | $165 | 26% | $7,947,390 | | |
| **I-687, I-690, I-694** | 52 | $912* | $1,090 | $178 | 20% | $9,256 | | |
| **I-751\*\*\*** | 163,993 | $680 | $750 | $70 | 10% | $11,479,510 | | |
| **I-765 (paper)\*\*\*** | 2,202,073 | $495 | $520 | $25 | 5% | $55,051,825 | | |
| **I-817\*\*\*** | 454 | $685 | $760 | $75 | 11% | $34,050 | | |
| **I-910** | 439 | $785 | $990 | $205 | 26% | $89,995 | | |
| **I-929** | 1,035 | $230 | $270 | $40 | 17% | $41,400 | | |
| **Total** | **4,471,968** | | | | | **$171,861,361** | **-$41,926,275** | **$47,780,700** |

Source: USCIS analysis.

Notes:
Individual receipts data are not available for Forms I-687, I-690, and I-694. Therefore, DHS uses the average current and fees to estimate the transfer payments to USCIS.
*Calculation: Average Current Fees = ($1,130 for *I-687* + $715 for *I-690*+ $890 for *I-694*) / 3 = $912
**Calculation: Average New Fees = ($1,240 for *I-687* + $905 for *I-690* + $1,125 for *I-694*) / 3 = $1,090
***Current fees (baseline costs) include $85 biometric services fee.

### R. Adjusting USCIS Fees for Inflation

**Changes and Affected Population**

DHS will use the Consumer Price Index for All Urban Consumers (CPI-U), as published by

DOL, BLS, as the inflation index for future fee adjustments between comprehensive fee rules.[133]

Codifying this provision will authorize DHS to adjust all immigration fees by the BLS estimate

of inflation for all urban consumers as measured since the effective date. While the Fee Study

that informs this rulemaking is the most accurate measure of change in the costs of the USCIS's

---

[133] *See*, Bureau of Labor Stat., U.S. Dep't of Labor, "Consumer Price Index," available at *https://www.bls.gov/news.release/cpi.toc.htm* (last visited Sept. 27, 2022).

workload, rulemakings to adjust fees have become more complex, requiring more time between revenue-generating adjustments. Using the CPI-U for administering adjustments offers simplicity, objectivity and timeliness as a measure of the changes in the value of the fee revenue dollar the agency depends upon. Additionally, using the CPI-U as the measure for cost and fee increases is consistent with statutes that authorize DHS to adjust USCIS fees. *See, e.g.* section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C) (providing that DHS may adjust the premium fees based on the change in the CPI-U). Therefore, aligning all fees using the same basis adds consistency to fee adjustments across USCIS. From experience administering adjustments to other fees such as Premium Processing Fees using the CPI-U, USCIS believes it offers simplicity, objectivity, and timeliness as a measure of the changes in the value of the fee revenue dollar the agency depends upon are a benefit.

Currently, DHS regulations state that USCIS may adjust fees for immigration benefit annually by publication of notice in the Federal Register.[134] However, the current adjustment is based on the federal employee salary inflation assumptions issued by the Office of Management and Budget. If Congress enacts a different Federal civilian pay raise percentage than the assumption used by Office of Management and Budget for formulation of the President's Budget, DHS will be obligated to adjust the fees during that year or in the following year to reflect the difference between the assumed and enacted levels. In addition to the unnecessary effort, this could result in additional confusion about correct fee amounts. The final rule instead states that future inflation-based fee increases be based on the change in prices paid by urban consumers for a market basket of goods and services. This change, measured since the month of the effective date of the most current fee schedule, will be applied to all fees. The CPI-U is used

---

[134] 8 CFR 103.7(b)(3)(Oct. 1, 2020)

for the Census Bureau's annual update of poverty thresholds and Health and Human Services Department's Federal Poverty Guidelines (87 FR 3315 (Jan. 21, 2022)), which determine eligibility for USCIS fee waivers on income grounds at the time of filing. Consequently, this approach promotes coordination, simplification, and harmonization. In implementing such increases, USCIS will publish analysis of the impacts from these CPI-U adjustments and will not include policy changes more appropriate for comprehensive fee rules. Specifically, such analysis will consider how much more fee-paying applicants will contribute, in nominal dollars, in order to maintain the real value of each fee revenue dollar in the intervening years between comprehensive fee rules.

The population affected by this provision includes fee-paying applicants and petitioners applying for USCIS immigration benefits.

**Costs, Benefits and Transfer Payments Analysis**

Changing the methodology for adjusting fees by inflation will provide several benefits to DHS. DHS will be able to publish timely USCIS fee schedule adjustments that insure the real value of USCIS fee revenue dollars against future inflation. Unlike the OMB annual inflation assumption methodology, individuals may have more reasonable expectations about changes in the value of their consumer dollar and the official BLS-published monthly estimates can be easily and transparently applied to the fee schedule. Additionally, using the CPI-U as the inflation index for all fees will be consistent with various statutes that currently provide that USCIS apply CPI adjustments to certain fees. HHS adjusts the federal poverty guidelines used by USCIS to determine fee waiver eligibility using the CPI-U. While this authority to maintain the real value of USCIS fee revenue dollars through regular inflation-adjustment-only rules constitutes an important benefit, the actual impacts of such an adjustment will be analyzed in

future rules should DHS exercise this authority. Such analyses will estimate a transfer payment consisting of additional nominal revenue to USCIS and a countervailing disbenefit to fee-paying populations no longer able to enjoy constant nominal prices for immigration services in the years between comprehensive fee rules.

## 4. Total Quantified Net Costs and Transfer Payments of the Regulatory Changes

In this section DHS summarizes the quantified economic impacts of the regulatory changes. Table 52 shows the undiscounted annual costs, cost savings and transfer payments for the relevant provisions.

| Provisions | Costs to Applicants/Petitioners | Cost Savings to Applicants/Petitioners | Transfer Payments from Applicants/Petitioners to USCIS *(fee increases)* | Transfer Payments from USCIS to Applicants/Petitioners *(reduced fees and exemptions)* | Transfer Payments from DoD to USCIS *(reimbursement)* |
|---|---|---|---|---|---|
| **Table 52. Summary of Annual Quantified Economic Impacts for Each Provision** | | | | | |
| 1: Resubmission of Declined or Returned Payments, Fee Payment Method, and Non-Refundability | | | $658,396 | | |
| 2: Eliminate $30 Returned Check Fee | | $414,150 | | | |
| 3: Changes to Biometric Services Fee | | | | $10,007,965 | |
| 4: Naturalization and Citizenship Related Forms | | $5,981,330 | $30,182,790 | $46,088,170 | $197,260 |
| 5: Reduced Fees for Filing Online | | $56,796,180 | $17,706,510 | | |
| 6: Form I-485 Application to Register Permanent Residence or Adjust Status | | | $391,920,525 | | |
| 7: Form I-131A Carrier Documentation | | | | | |
| 8: Separating Form I-129 Petition for a Nonimmigrant | $254,764,500 | | $217,571,880 | | |

| Table 52. Summary of Annual Quantified Economic Impacts for Each Provision | | | | | |
|---|---|---|---|---|---|
| Provisions | Costs to Applicants/Petitioners | Cost Savings to Applicants/Petitioners | Transfer Payments from Applicants/Petitioners to USCIS (fee increases) | Transfer Payments from USCIS to Applicants/Petitioners (reduced fees and exemptions) | Transfer Payments from DoD to USCIS (reimbursement) |
| Worker into Different Forms + Asylum Program Fee | | | | | |
| 9: Premium Processing | | | | | |
| 10: Intercountry Adoptions | $146,954 | $3,375 | $265,440 | $4,023,570 | |
| 11: Immigrant Investors | | | $44,387,240 | | |
| 12: Changes to Genealogy Search and Records Requests | | $380,415 | $813,900 | | |
| 13: Fees Shared by CBP and USCIS | | | $11,826,730 | | |
| 14: Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)* | | | $18,260 | $1,610 | |
| 15: Fee Waivers | | | | | |
| 16: Fee Exemptions | | $40,184,477 | | $181,225,564 | |
| 17: Fee Adjustments to Other Benefit Request Forms + Form I-140 Asylum Program Fee | $47,780,700 | $41,926,275 | $171,861,361 | | |
| Total | $302,692,154 | $145,686,202 | $887,571,832 | $241,346,879 | $197,260 |
| USCIS analysis | | | | | |

## A. Discounted Net Costs

DHS estimates that the final rule will create annual costs to applicants/petitioners of $302,545,200 due to the new Asylum Program fees to be paid by employers who file either a Form I-129 or Form I-140[135] and $146,954 to applicants due to the filing fees and opportunity costs of time to complete and submit the new Form I-600A/I-600 Supplement 3. This amounts to $302,692,154 in total costs to the applicants/petitioners.[136]

---

[135] Calculation: $254,764,500 Form I-129 Asylum Program Fees + $47,780,700 Form I-140 Asylum Program Fees = $302,545,200.

[136] Calculations: $302,545,200 Asylum Fees + $146,954 new Form I-600A/I-600 Supplement 3 = $302,692,154 Total Costs.

The total cost savings of $145,686,202is the sum of the cost savings to the applicants/petitioners due to the elimination of the $30 returned check fee ($414,150), lower fees for filing online ($63,157,925),[137] lower fees to file Form I-800 A Supplement 3 ($3,375), opportunity costs for no longer completing and submitting Form I-912 due to the new fee exemptions ($40,184,477) and lower fees to file Forms I-90 and I-131 ($41,926,275). Net costs to the public of $157,005,952 are the total costs minus cost savings.[138] Table 53 illustrates that over a 10-year period of analysis from fiscal year 2024 through 2033, annualized net costs will be $157,005,952 using 7- percent and 3- percent discount rates.

| Table 53. Discounted Net Costs Over a 10-Year Period of Analysis | | |
|---|---|---|
| Year | $157,005,952 (Undiscounted) | |
| | Discounted at 3% | Discounted at 7% |
| 2024 | $152,432,963 | $146,734,535 |
| 2025 | $147,993,168 | $137,135,079 |
| 2026 | $143,682,687 | $128,163,625 |
| 2027 | $139,497,755 | $119,779,089 |
| 2028 | $135,434,713 | $111,943,074 |
| 2029 | $131,490,013 | $104,619,695 |
| 2030 | $127,660,207 | $97,775,416 |
| 2031 | $123,941,948 | $91,378,894 |
| 2032 | $120,331,989 | $85,400,835 |
| 2033 | $116,827,173 | $79,813,865 |
| **10-year Total** | **$1,339,292,617** | **$1,102,744,106** |
| **Annualized Net Costs** | **$157,005,952** | **$157,005,952** |
| Source: USCIS analysis. | | |

### B. Discounted Transfer Payments

Transfer payments are monetary payments from one group to another that do not affect total resources available to society. OMB guidance cites fees to government agencies for goods

---

[137] Calculations: $5,981,330 *Naturalization and Citizenship Online Forms* + $380,415 *Genealogy Online Forms* + $56,796,180 *other Online Forms* = $63,157,925.

[138] Calculations: $302,692,154 *Total Costs* – $145,686,202 *Total Cost Savings* = $157,005,952 *Net Costs*

168

or services provided by the agency are an example of transfer payments.[139] Additionally, OMB Circular A-4 discusses the importance of distinguishing between real costs and transfer payments and states that transfer payments should be addressed in a separate discussion of the regulation's distributional effects.

**Transfer Payments from Fee-Paying Applicants/Petitioners to USCIS**

Table 54 shows the transfer payments from specific form fee-paying applicants/petitioners to USCIS over a 10-year period of analysis. DHS estimates the annualized transfer payments will be $887,571,832 discounted at both 3-percent and 7-percent.

| **Table 54. Discounted Transfer Payments from Fee-Paying Applicants/Petitioners to USCIS Over a 10-Year Period of Analysis** | | |
|---|---|---|
| **Year** | **$887,571,832 (Undiscounted)** | |
| | Discounted at 3% | Discounted at 7% |
| 2024 | $861,720,225 | $829,506,385 |
| 2025 | $836,621,578 | $775,239,612 |
| 2026 | $812,253,959 | $724,523,002 |
| 2027 | $788,596,077 | $677,124,301 |
| 2028 | $765,627,259 | $632,826,450 |
| 2029 | $743,327,436 | $591,426,588 |
| 2030 | $721,677,122 | $552,735,129 |
| 2031 | $700,657,400 | $516,574,887 |
| 2032 | $680,249,903 | $482,780,268 |
| 2033 | $660,436,799 | $451,196,513 |
| **10-year Total** | **$7,571,167,759** | **$6,233,933,135** |
| **Annualized Transfers** | **$887,571,832** | **$887,571,832** |
| Source: USCIS analysis. | | |

**Transfer Payments from USCIS to Applicants/Petitioners**

---

[139] *See* OMB Circular A-4, available at *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf* (last visited Sept. 22, 2022).

Table 55 shows the transfer payments from USCIS to applicants/petitioners over a 10-year period of analysis. DHS estimates the annualized transfer payments will be $241,346,879 discounted at both 3-percent and 7-percent.

| Table 55. Discounted Transfer Payments from USCIS to Applicants/Petitioners Over a 10-Year Period of Analysis | | |
|---|---|---|
| Year | $241,346,879   (Undiscounted) | |
| | Discounted at 3% | Discounted at 7% |
| 2024 | $234,317,358 | $225,557,831 |
| 2025 | $227,492,581 | $210,801,711 |
| 2026 | $220,866,583 | $197,010,945 |
| 2027 | $214,433,576 | $184,122,378 |
| 2028 | $208,187,938 | $172,076,989 |
| 2029 | $202,124,212 | $160,819,616 |
| 2030 | $196,237,099 | $150,298,707 |
| 2031 | $190,521,455 | $140,466,081 |
| 2032 | $184,972,286 | $131,276,711 |
| 2033 | $179,584,744 | $122,688,515 |
| **10-year Total** | **$2,058,737,832** | **$1,695,119,484** |
| **Annualized Transfers** | **$241,346,879** | **$241,346,879** |
| Source: USCIS analysis. | | |

**Transfer Payments from the Department of Defense (DoD) to USCIS**

Table 56 shows the transfer payments from DoD to USCIS for N-400 military reimbursements over a 10-year period of analysis. DHS estimates the annualized transfer payments will be $197,260 discounted at both 3-percent and 7-percent.

| Table 56. Discounted Transfer Payments from DoD to USCIS Over a 10-Year Period of Analysis | | |
|---|---|---|
| Year | $197,260 (Undiscounted) | |
| | Discounted at 3% | Discounted at 7% |
| 2024 | $191,515 | $184,355 |
| 2025 | $185,936 | $172,295 |
| 2026 | $180,521 | $161,023 |
| 2027 | $175,263 | $150,489 |
| 2028 | $170,158 | $140,644 |

| | | |
|---|---|---|
| 2029 | $165,202 | $131,443 |
| 2030 | $160,390 | $122,844 |
| 2031 | $155,719 | $114,807 |
| 2032 | $151,183 | $107,296 |
| 2033 | $146,780 | $100,277 |
| **10-year Total** | **$1,682,668** | **$1,385,472** |
| **Annualized Transfers** | **$197,260** | **$197,260** |
| Source: USCIS analysis. | | |

**Net Transfer Payments to USCIS**

Adding total transfer payments from applicants/petitioners to USCIS ($887,571,832) and total transfer payments from DoD to USCIS ($197,260) and subtracting total transfer payments from USCIS to applicants/petitioners ($241,346,879) depicted in Table 52 yields estimated net transfer payments to USCIS of $646,422,213. Table 1 shows the net transfer payments from fee-paying applicants/petitioners to USCIS over a 10-year period of analysis. DHS estimates the annualized net transfer payments will be $646,422,213 discounted at both 3-percent and 7-percent.

## 5. Price Elasticity

Commenters in previous USCIS Fee Rules have raised concerns about affected populations' responses to fee increases.[140] This section describes obstacles to estimating affected populations' response to the specific fee changes in the final rule before describing known impacts of past fee increases on the behavior of fee-paying applicants and petitioners. This section focuses on the N-400, Application for Naturalization (naturalization and citizenship), I-129, Petition for a Nonimmigrant Worker Visa Classifications and I-140, Immigrant Petition for Alien Workers (employment-based forms). USCIS chose these forms because they encompass a

---

[140] *See* 85 FR 46788, 46797 (Aug. 3, 2020) ("4. Rule Will Have Negative Effects on Applicants"), 81 FR 73292, 73297 (Oct. 24, 2016) ("b. Impact on Low-Income Individuals; Low Volume Reallocation"), 72 FR 29851, 29859 (May 30, 2007) ("5. Increases Relative to Other Standards").

significant share of annual receipt volumes and because this rule transfers additional costs to the population of employers filing Forms I-129 and I-140. The final rule will increase fees for I-129 petitioners based on the visa classifications (*see* Table 26). Economists refer to the change in quantity of a good demanded in response to a change in the price for that good as price elasticity of demand. DHS acknowledges that demand for a given good generally does respond to changes in price to some extent, and further recognizes that price elasticity of demand can vary greatly from one type of good to another. Efforts to isolate the change in the quantity of USCIS benefits demanded in response to ten past fee schedule increases since 1991 are limited by confounding effects, or significant changes in the quantity demanded that are unrelated to their price.[141] For example, global geopolitical instability might increase demand for naturalization around the time of a fee increase, leading to an incorrect assessment that the fee increase caused an increase in the quantity of naturalizations demanded.

### A.  *Price Response to Form N-400, Application for Naturalization Changes*

The chart below shows fee changes and annual filings for Form N-400, Application for Naturalization, from FY 1989 through FY2022. This data illustrates past increases in the N-400 fee have not been associated with straightforward, consistent reductions in the number of Form N-400 applications filed over time. It is also evident from this data that significant changes in the number of N-400 applications filed occur even in years with no changes to the fee.

---

[141] *See Immigrant Legal Resource Center et al., v. Wolf*, 491 F Supp 3d 520, 540, (N.D. Cal 2020) noting absence of USCIS-gathered data about the impact of price increases on applications for immigration benefits.  In preliminarily enjoining the 2020 Fee Rule, the court determined that USCIS' claim that the agency "does not know the price elasticity of demand for immigration benefits" was contradicted by studies comparing responses to USCIS fees versus no fee (a fee of $0)).  *Id.* On treatment of unobserved confounders in causal inference, *see* J. D. Angrist & Jorn-Steffen Pischke, "Mostly Harmless Econometrics," p. 221, Princeton University Press (2009).



**Chart 1: Form N-400 Filings and Fees from FY 1989 through FY 2022**

Sources: Data on petitions for naturalization filed from DHS, Office of Immigration Statistics; data on N-400 fees from 58 FR 30698, 30699 ($90) (May 27, 1993), 59 FR 30516, 30519 ($95) (June 14, 1994), 63 FR 43604, 43605 ($225) (Aug. 14, 1998), 66 FR 246 (Jan. 3, 2001) and 68 FR 8989 ($260) (Feb. 27, 2003), 69 FR 20528, 20532 ($320) (Apr. 15, 2004), 70 FR 56182 ($330) (Aug. 26, 2005), 72 FR 29851, 29861 ($595) (May 30, 2007), 75 FR 58962, 58975 ($595) (Sept. 24, 2010), 81 FR 73292, 73293 ($640 if above 200% of the FPG) (Oct. 24, 2016).

As one example of why confounding effects complicate the estimation of price elasticities, in February of 2007, USCIS published a proposed rule to increase the fee for naturalization from $330 to $595.[142]   Around the same time, public debate over undocumented immigrants culminated in efforts to educate and assist eligible immigrants with naturalizing. In

---

[142] *See* 72 FR 4911 Vol. 72, No. 21 (February 1, 2007).   (The 2007 USCIS Fee Schedule final rule was published May 30, 2007, see 72 FR 29861 when the $595 became final then affective July 30, 2007.

testimony to Congress, then-USCIS Director Gonzalez stated that the 350-percent increase in naturalization applications received in June and July 2007 relative to the prior year exceeded the magnitude of response to any past Presidential election, immigration debate, legislation, or announcement of fee increases.[143] Ignoring outside factors' potential effects on demand for naturalization will result in overstating the change in quantity demanded caused by the fee increase.

One unique property of price elasticities in the USCIS fee context is that increases are presented for public comment months before implementation and again in the final rule before the increases go into effect, affording some with an opportunity to accelerate the timing of their application to avoid the increased fees. Chart 2 shows that in the short-run, N-400 volumes spiked in the month before October 2, 2020, fee increases would have been effective and declined in the following months. Given that these fee increases never went into effect, the lower receipt volumes observed in the four months after October may not be a price response, but may instead be the result of those people submitting their applications early to avoid the fee increase.

---

[143] *See* "Written Testimony Prepared for Emilio T. Gonzalez," Director, USCIS, before House Judiciary Committee Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law (Jan. 17, 2008), available at *https://www.govinfo.gov/content/pkg/CHRG-110hhrg40282/html/CHRG-110hhrg40282.htm* (last visited Sept. 28, 2022).

174



**Chart 2: Monthly Form N-400 Receipts from FY 2019 through FY 2021 (Before and After August 2020 Fee Rule)**

*The FY2020 Fee Rule will have been effective on Oct. 2, 2020, depicted by the black bar. It was enjoined on Sept. 29, 2020.

Source: USCIS, Office of Policy & Strategy (OP&S), Policy Research Division (PRD), C4 and Electronic Immigration System (ELIS) Consolidated (May 17, 2022).

This substitution effect is not a decrease in the demand for the benefit. Failing to account for this effect will overstate the decrease in the quantity demanded caused by a fee increase. Looking at annual values in Chart 1 helps to smooth away these spikes and dips in the months around fee changes (depicted in Chart 2) to demonstrate that, on average, demand for the N-400 (shown by blue bars) has not appreciably decreased in response to the ten past increases in the N-400 fee (shown by the red line). Thus, we might describe the N-400 or the citizenship benefit that it confers to be an inelastic good, because a large increase in the price has a smaller change on the quantity demanded. This is consistent with what is known about necessity goods like medicine, for which few cheaper alternatives exist.

USCIS estimated four regression models to test the relationship between N-400 receipts (dependent variable) and N-400 fees (independent variable). Multiple models were estimated to attempt to account for events that lead to sharp increases in volumes observed in 1996, 1997, and

175

2007. Possible reasons for these spikes include the Immigration Reforms and Control Act (IRCA) of 1986 which created a pathway to naturalization by creating LPR status for 2.7 million long-term residents.[144] Additionally, past USCIS analyses show wide variation in naturalization rates over time based on region or country of birth, and class of admission.[145] The 1997 Statistical Yearbook of the Immigration and Naturalization Service identified factors such as the 1992 Green Card Replacement Program, which required replacing Permanent Resident cards, and a 1995 Immigration and Naturalization Service Citizenship USA initiative to streamline the naturalization process as contributing the increased naturalizations observed in 1996 and 1997.[146]

Potential contributory factors to the spike in 2007 include Congressional appropriations received that year to address backlogs.[147]  Other reports have speculated that the 2008 election may have encouraged people to apply for naturalization in order to vote. In January 2007, Univision began a grassroots effort to encourage people to get naturalized.[148]

While intuitively we might expect that increases in fees result in a decrease in the number of immigration benefits demanded, however, the results in Table 57 indicate that there is a

---

[144] *See* Julia Preston, "Surge Seen in Applications for Citizenship," The New York Times, available at *https://www.nytimes.com/2007/07/05/us/05citizenship.html* (last accessed on Sept. 28, 2022). *See also,* Immigration History, "Immigration History: Immigration Reform and Control Act of 1986," available at *https://immigrationhistory.org/item/1986-immigration-reform-and-control-act/* (last accessed on Sept. 28, 2022).

[145]  *See* USCIS, "Trends in Naturalization Rates: FY2018 Update," p. 5 (Sept. 2021), available at *https://www.uscis.gov/sites/default/files/document/reports/Trends_In_Naturalization_Rates_FY18_Update_Report.p df* (last accessed on Sept. 28, 2022).

[146] See U.S. Department of Justice, "1997 Statistical Yearbook of the Immigration and Naturalization Service," p. 135 (Oct. 1999), available at*https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1997.pdf*  (last accessed Sept. 28, 2022).

[147] *See* 72 FR 4888, 4892 (Feb. 1, 2007).

[148] *See* Julia Preston, "Surge Seen in Applications for Citizenship," The New York Times, available at *https://www.nytimes.com/2007/07/05/us/05citizenship.html* (last accessed Sept. 28, 2022);  *See also,* Miriam Jordan, "Univision Gives Citizenship An Unusual Lift," Wall Street Journal, available at *https://www.wsj.com/articles/SB117876675523098194* (last accessed Sept. 28, 2002).

176

positive relationship between N-400 receipts and fees across all four regression models despite efforts to control for these confounding factors. Given that the direction of this relationship is opposite what basic theory will suggest, these results suggest there is no evidence of a causal relationship between past fee increases and volumes. The Department makes the data series used in these regressions accessible through the docket.

| Table 257.  Summary of Results for Form N-400 Regression Models | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Variables** | **Model 1** | | **Model 2** | | **Model 3** | | **Model 4** | |
| | | | | | | | | |
| **Model Description** | N-400 Filings and Fees from 1989-2022 | | Lag N-400 fees by a year | | Dummy Variables for events that occurred in 1996, 1997, and 2007 | | Lagging Legal Permanent Residents (LPRs by 5 years | |
| **Observations** | 34 | | 34 | | 34 | | 34 | |
| **R Square** | 0.116 | | 0.064 | | 0.683 | | 0.487 | |
| **Adjusted R Square** | 0.088 | | 0.035 | | 0.640 | | 0.454 | |
| **Std. Error of the Estimate** | 277544.403 | | 285520.189 | | 174449.675 | | 214784.203 | |
| **Significance F** | 0.049 | | 0.148 | | 0.000000624* | | 0.0000321* | |
| **Intercept Coefficient** | 573841.354 | | 620608.620 | | 432182.876 | | 15669.235 | |
| **Dependent Variable** | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | | N-400 Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| N-400 Fees | 422.714 | 0.049 | | | 619.614 | 0.00010* | 178.933 | 0.295 |
| N-400 Fees lagged 1 year | | | 312.926 | 0.148 | | | | |
| 1996 event(s) | | | | | 786356.769 | 0.00016* | | |
| 1997 event(s) | | | | | 921665.769 | 0.00002* | | |
| 2007 event(s) | | | | | 582139.635 | 0.00297* | | |
| Legal Permanent Residents (LPRs lagged 5 years | | | | | | | 0.678 | 0.00004* |
| *  Denotes <= 5% level of statistical significance* | | | | | | | | |
| Source: USCIS analysis. | | | | | | | | |

Income elasticity is a related metric for the change in quantity of a certain good demanded in response to the change in real income of consumers who buy this good. While the rule does not change income levels, data describing how individuals with varying income levels

have responded to fees can be useful in measuring the degree to which certain fees create barriers or give rise to concerns about affordability. Although income elasticity is of interest in considering the affordability of USCIS-granted benefits, the agency has limited data on the incomes of applicants and petitioners, nor does it know the incomes of those who may be prevented from applying or petitioning due to affordability.

Although USCIS has limited data describing affordability of immigration benefits, research findings in other contexts may be instructive. A study of household income, expenditures on food and home fuel, nutrition, and temperature data describes the "heat or eat" phenomenon in which both poor and rich households' expenditures to heat their household rise in response to extremely cold weather.[149] Unlike richer households, however, those households with incomes below 150 percent of the FPG responded to the budgetary shock of cold weather by decreasing spending on food in order to afford subsequent utility bills. Adults and children in poorer households were observed to reduce their own caloric intake even further to insulate their children from the budget shock. The findings are important for USCIS because they show that a higher cost for an inelastic good can inflict direct harms like nutritional deficiency even when individuals were able to afford the necessity good. Unlike with home fuel expenses during periods of extreme cold, households may delay the expense of some USCIS benefits for weeks, months or even years while they save money, but there is reason to believe that, if demand for certain immigration benefits is relatively inelastic, households below 150 percent of the FPG may incur harm such as foregoing other necessity goods like adequate nutrition in order to afford the cost of immigration benefits.

---

[149] *See* J. Bhattacharya et al., "Heat or Eat? Cold-Weather Shocks and Nutrition in Poor American Families," American Journal of Public Health, (2003).

USCIS is unable to estimate the extent to which prices and other requirements induce certain immigrants to prefer one benefit over another, or changes in the demand for complementary immigration benefits, a metric called cross-price elasticity. Where immigrants are provided with a choice between two or more immigration benefits, decisions such as whether to pursue higher education on an F visa or seek employment on an H-1 visa are complex, difficult, and often made with imperfect information about the future. For instance, if USCIS set the Form I-90, Application for Replacement Permanent Resident Card, fee above that of the Form N-400, Application for Naturalization, this might induce some individuals to prefer becoming naturalized citizens rather than renewing their LPR status. In contrast to complementary goods, the publication of fee increases creates a temporary opportunity for petitioners to substitute away from the fees they will pay in the future for the current fees.

Finally, while most of the discussion of price elasticity has focused on the impact of price changes on quantity demanded, the quantity demanded also impacts the full costs to USCIS which must be recovered through fee revenue. OMB Circular A-25 advises agencies to establish fees that are sustainable and recover the full direct and indirect costs to any part of the Federal Government of providing a good, resource, or service unless other conditions exist to justify an exception. The analysis of the final rule's impacts includes estimation of numerous transfer payments arising when certain direct and indirect costs are redistributed to other fee-paying populations due to affordability or other efficacy concerns, such as when charging a fee is believed to present a barrier to an initial employment authorization.

DHS has reviewed and considered research on naturalization rates of low-income immigrants by Hainmueller, Lawrence, Gest, Hotard, Koslowski and Laitin (2018) as well as

Yasenov, Hotard, Lawrence and Laitin (2019).[150,151] Both papers, referenced in public comments received on the 2020 USCIS fee rule, leverage natural experiments yielding suggestive evidence that fees constitute a barrier to some lower income immigrants naturalizing.[152]  It is important to recognize, however, that the observed increase in naturalizations in response to lowering fees to $0 cannot be directly extrapolated to yield estimates of price or income elasticity for the increases in these fee rules. Yasenov et al., consider the extent to which full fee-waivers (borne by other fee-paying populations) induce individuals who will have paid the full fee, perhaps after years of saving, to instead forgo payment to USCIS. DHS is unable to quantify the transfer effects of such forgone revenue without more detailed data on the ability or willingness to pay for various immigration benefits, particularly among populations that have not historically requested them. While Hainmueller et al., show that expanded access to naturalization is a social benefit of eliminating fees, DHS is similarly unable to quantify this social benefit without more granular data describing a direct, fee-correlated, decreasing, or increasing willingness to pay. In the context of fee setting, even if USCIS possessed the knowledge that some populations are sensitive to a fee increase for a given form, a decision to spread USCIS' fixed costs among a smaller, remaining fee-paying population, will result in higher fees and greater transfer payments from the population bearing the fixed costs. In other words, USCIS could not optimize its fee schedule to minimize the effect on demand without comprehensive quantitative estimates of all relevant populations' sensitivity to fee increases for all immigration benefits.

---

[150] *See* Hainmueller et al., "A randomized controlled design reveals barriers to citizenship for low-income immigrants," PNAS (2018).

[151] *See* Yasenov et al., "Standardizing the fee-waiver application increased naturalization rates of low-income immigrants," PNAS (2019).

[152] *See* 85 FR 46788, 46797 (Aug. 3, 2020) ("4. Rule Will Have Negative Effects on Applicants").

**B.  *Price Response to Form I-129, Petition for a Nonimmigrant Worker and Form I-140, Immigrant Petition for Alien Workers***

While prior discussion of price elasticity has focused on the affordability of immigration benefits like the N-400, the rule transfers additional costs to the population of employers filing Forms I-129 and I-140. Thus, DHS has analyzed the possible sensitivity of the demand for those requests to the fees. The fee paying populations for Form I-129 include employers petitioning for nonimmigrant workers under the following visa classifications: CW, E, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN. See Table 18 for a description of each of these visa classifications. The fee paying populations for Form I-140 include employers petitioning for alien workers in the first preference EB-1, second-preference EB-2 and third-preference EB-3 programs. Economists refer to changes in the number of employees relative to a change in their underlying price as own-wage price elasticity of labor demand.

### *i.       Form I-129, Petition for a Nonimmigrant Worker*

While the RIA assumes the total number of beneficiaries does not respond to this price increase, here we consider how own-wage price elasticity of labor demand estimates will be used in forecasting how much Form I-129 filing petitioners might reduce their quantity of workers requested.

Chart 3 shows that over the years, as fees increase, so has the number of Form I-129 receipts. Most notably, in 2016 volumes increased when the fee increased and remained around the same level in the following years.



Source: USCIS, Office of Performance and Quality (OPQ), PASEXEC, May 16, 2022. Data on I-129 fees from 81 FR 73292, 732294 ($460) (Oct. 24, 2016), 75 FR 58962, 58964 ($325) (Sept. 24, 2010), 72 FR 29851, 29854 ($320) (May 30, 2007).

USCIS estimated a simple linear regression to test the relationship between total I-129 receipts (dependent variable) and I-129 fees (independent variable). The results in Table 58 show that there is a significant positive relationship between I-129 receipts and fees. Approximately 79 percent of the variability in the I-129 receipts can be explained by fees alone. While the results are statistically significant, the positive correlation between fees and volumes contradicts conventional theory that quantities demanded decrease in response to price increases.

| Table 268. Summary of Results for Form I-129 Regression Model | | |
|---|---|---|
| **Variables** | **Model Results** | |
| | | |
| **Model Description** | I-129 Filings and Fees from 2004-2022 | |
| **Observations** | 19 | |
| **R Square** | 0.792 | |
| **Adjusted R Square** | 0.780 | |
| **Std. Error of the Estimate** | 39820.910 | |
| **Significance F** | 0.000000332* | |
| **Intercept Coefficient** | 43557.5361 | |
| **Dependent Variable** | I-129 Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* |
| I-129 Fees | 1109.048 | 0.000000332* |
| *\* Denotes <= 5% level of statistical significance* *USCIS analysis* | | |

## Form I-129 Visas

To further understand the Form I-129 populations' responses to fee increases, DHS ran additional simple linear regression models for visa filings and fees for the top 8 classifications of visas received by USCIS: L, O, P, Q, R, H-1B, H-2A and H-2B. Across the visa classifications, all the regression models but the H-2B model were found to be statistically significant. For most of these models, more than 60 percent of the variability of visa receipts can be explained by fees. Two regression models were done for the L, O, P and Q visas because these visas have been steadily declining since 2005. The second model for these visas was based on the percent change from the previous year for the variables in the model. Interestingly, none of the second regression models were found to be statistically significant as they had p-values greater than 0.05.

### *(1) Form I-129, L Classification Visas*

Chart 4 shows that over the years, the receipts of L classification visas have been steadily declining even when fees remain unchanged. Most interestingly, in 2016 when there was a noticeable increase in fees, there was no significant decrease in volume as a response.



USCIS estimated a simple linear regression to test the relationship between L visa receipts (dependent variable) and L visa fees (independent variable). The results in Table 59 show that there is a significant positive relationship between I-129 receipts and fees in Model 1, and no significant relationship between variables in Model 2. However, only about 21 percent of the variability in the receipts in Model 1 can be explained by fees alone.

| Table 59. Summary of Results for L Classification Visas Regression Models | | |
|---|---|---|
| **Variables** | **Model 1** | **Model 2** |
| | | |

| Model Description | L Visa Filings and Fees from 2004-2022 | | Percent Change from Prior Year | |
|---|---|---|---|---|
| **Observations** | 19 | | 18 | |
| **R Square** | 0.214 | | 0.013 | |
| **Adjusted R Square** | 0.168 | | -0.049 | |
| **Std. Error of the Estimate** | 4973.423 | | 2269.894 | |
| **Significance F** | 0.046* | | 0.652 | |
| **Intercept Coefficient** | 58462.451 | | -1173.076 | |
| **Dependent Variable** | L Visa Receipts | | L Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| L Visa Fees | -37.022 | 0.046* | 7.953 | 0.652 |
| *\* Denotes <= 5% level of statistical significance* *USCIS analysis* | | | | |

### (2) Form I-129, O Classification Visas

Chart 5 shows that over the years, the receipts of O classification visas have been steadily declining even when fees remain unchanged.



The results below in Table 60 shows that fees are significant for Model 1 because the p-value is less than 0.05 and not significant in Model 2 because the p-value is 0.157. The results in Model 1 indicate that there is a significant relationship between O visa receipts and fees. Additionally, 70 percent of the variability of receipts can be explained by fees.

| Table 60.  Summary of Results for O Classification Visas Regression Models | | |
|---|---|---|
| **Variables** | **Model 1** | **Model 2** |
| | | |
| **Model Description** | O Visa Filings and Fees from 2004-2022 | Percent Change from Prior Year |
| **Observations** | 19 | 18 |
| **R Square** | 0.699 | 0.121 |
| **Adjusted R Square** | 0.681 | 0.066 |
| **Std. Error of the Estimate** | 3412.647 | 666.870 |
| **Significance F** | 0.00000829* | 0.157 |

| Intercept Coefficient | 45748.053 | | -1115.506 | |
|---|---|---|---|---|
| **Dependent Variable** | O Visa Receipts | | O Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| O Visa Fees | -74.107 | 0.00000829* | 7.558 | 0.157 |
| *\* Denotes <= 5% level of statistical significance USCIS analysis* | | | | |

### (3) Form I-129, P Classification Visas

Chart 6 shows that over the years, the receipts of P classification visas have been steadily declining even when fees remain unchanged.



**Chart 6: Scatter Plot of P Visa Receipts and Fees from 2004 through 2022**

The results below in Table 61 shows that fees are significant for Model 1 because the p-value is less than 0.05 and not significant in Model 2 because the p-value is 0.317. The results in Model 1 indicate that there is a significant relationship between P classification visa receipts and fees. Additionally, 71 percent of the variability in receipts can be explained by fees.

187

| Table 61.  Summary of Results for P Classification Visas Regression Models | | | | |
|---|---|---|---|---|
| **Variables** | **Model 1** | | **Model 2** | |
| | | | | |
| **Model Description** | P Visa Filings and Fees from 2004-2022 | | Percent Change from Prior Year | |
| **Observations** | 19 | | 18 | |
| **R Square** | 0.709 | | 0.062 | |
| **Adjusted R Square** | 0.692 | | 0.004 | |
| **Std. Error of the Estimate** | 962.682 | | 319.079 | |
| **Significance F** | 0.00000617* | | 0.317 | |
| **Intercept Coefficient** | 18471.044 | | -347.893 | |
| **Dependent Variable** | P Visa Receipts | | P Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| P Visa Fees | -21.416 | 0.00000617* | 2.515 | 0.317 |
| *\* Denotes <= 5% level of statistical significance* *USCIS analysis* | | | | |

### (4) Form I-129, Q Classification Visas

Chart 7 shows that over the years, the receipts of Q classification visas have been steadily declining even when fees remain unchanged.



The results below in Table 62 shows that fees are significant for Model 1 because the p-value is less than 0.05 and not significant in Model 2 because the p-value is 0.510. The results in Model 1 indicate that there is a significant relationship between Q visa receipts and fees. However, only about 47 percent of the variability in receipts can be explained by fees.

| Table 62.  Summary of Results for Q Classification Visas Regression Models | | | | |
|---|---|---|---|---|
| **Variables** | **Model 1** | | **Model 2** | |
| | | | | |
| **Model Description** | Q Visa Filings and Fees from 2004-2022 | | Percent Change from Prior Year | |
| **Observations** | 19 | | 18 | |
| **R Square** | 0.468 | | 0.028 | |
| **Adjusted R Square** | 0.437 | | -0.033 | |
| **Std. Error of the Estimate** | 57.253 | | 20.939 | |
| **Significance F** | 0.00124* | | 0.510 | |
| **Intercept Coefficient** | 499.509 | | -19.170 | |
| **Dependent Variable** | Q Visa Receipts | | Q Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* | *Coefficients* | *P-value* |
| Q Visa Fees | -0.765 | 0.00124* | 0.108 | 0.510 |
| *  Denotes <= 5% level of statistical significance*<br>*USCIS analysis* | | | | |

*(5) Form I-129, R Classification Visas*

Chart 8 shows that R classification visa receipts have fluctuated over the past 18 years,

with steady increases observed from 2008 through 2013 despite an increase in fees in 2010.



**Chart 8: Scatter Plot of R Visa Receipts and Fees from 2004 through 2022**

The results in Table 63 below show that there is a significant positive relationship

between R visa receipts and fees. Notably, only 28 percent of the variability in receipts can be

explained by fees.

| Table 63. Summary of Results for R Classification Visas Regression Model | |
|---|---|
| **Variables** | **Model Results** |
| | |
| **Model Description** | R Visa Filings and Fees from 2004-2022 |
| **Observations** | 19 |
| **R Square** | 0.279 |
| **Adjusted R Square** | 0.237 |
| **Std. Error of the Estimate** | 1423.670 |
| **Significance F** | 0.02002* |

| Intercept Coefficient | | 2231.179 |
|---|---|---|
| Dependent Variable | R Visa Receipts | |
| Independent Variable(s) | *Coefficients* | *P-value* |
| R Visa Fees | 12.632 | 0.02002* |
| *\* Denotes <= 5% level of statistical significance USCIS analysis* | | |

### (6) Form I-129, H-1B Classification Visas

Chart 9 shows that receipts of H-1B classification visas have generally increased over the years, peaking in 2022 with a volume of 474,305 receipts. No noticeable decreases were observed in 2010 and 2016 when the fee increased.



The results in Table 64 below show that there is a significant relationship between H-1B receipts and fees. Additionally, 79 percent of the variability in receipts can be explained by fees.

191

| Table 64. Summary of Results for H-1B Classification Visas Regression Model | | |
|---|---|---|
| **Variables** | **Model Results** | |
| | | |
| **Model Description** | H-1B Visa Filings and Fees from 2004-2022 | |
| **Observations** | 19 | |
| **R Square** | 0.791 | |
| **Adjusted R Square** | 0.779 | |
| **Std. Error of the Estimate** | 35277.842 | |
| **Significance F** | 0.000000352* | |
| **Intercept Coefficient** | -29500.317 | |
| **Dependent Variable** | H-1B Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* |
| H-1B Visa Fees | 978.404 | 0.000000352* |
| *\* Denotes <= 5% level of statistical significance USCIS analysis* | | |

### *(7) Form I-129, H-2A Classification Visas*

Chart 10 shows that receipts of H-2A classification visas have increased over the years, with a steady incline in volume from 2011 through 2022.



The results in Table 65 below show that there is a significant relationship between H-2A receipts and fees. Additionally, 71 percent of the variability in receipts can be explained by fees.

| Table 65. Summary of Results for H-2A Classification Visas Regression Model | | |
|---|---|---|
| **Variables** | | **Model Results** |
| **Model Description** | H-2A Visa Filings and Fees from 2004-2022 | |
| **Observations** | | 19 |
| **R Square** | | 0.706 |
| **Adjusted R Square** | | 0.689 |
| **Std. Error of the Estimate** | | 3269.133 |
| **Significance F** | | 0.00000675* |
| **Intercept Coefficient** | | -17112.725 |
| **Dependent Variable** | H-2A Visa Receipts | |
| **Independent Variable(s)** | *Coefficients* | *P-value* |
| H-2A Visa Fees | 72.194 | 0.00000675* |
| *\* Denotes <= 5% level of statistical significance USCIS analysis* | | |

*(8) Form I-129, H-2B Classification Visas*

Chart 11 shows that although H-2B classification visa receipts have fluctuated over the past 18 years. Receipts were highest in 2006 and lowest in 2012.



The results in Table 66 below show that there is not a significant relationship between H-2B receipts and fees. Additionally, less than 1 percent of the variability in receipts can be explained by fees.

| Table 66. Summary of Results for H-2B Classification Visas Regression Model | |
|---|---|
| **Variables** | **Model Results** |
| | |
| **Model Description** | H-2B Visa Filings and Fees from 2004-2022 |
| **Observations** | 19 |
| **R Square** | 0.0018 |
| **Adjusted R Square** | -0.057 |
| **Std. Error of the Estimate** | 3417.873 |
| **Significance F** | 0.863 |
| **Intercept Coefficient** | 8469.257 |
| **Dependent Variable** | H-2B Visa Receipts |

194

| Independent Variable(s) | Coefficients | P-value |
|---|---|---|
| H-2B Visa Fees | -2.076 | 0.863 |
| Source: USCIS analysis. | | |

### ii. Form I-140, Immigrant Petition for Alien Workers

Chart 12 shows the fees and receipts for Form I-140. The chart indicates a moderate positive correlation between I-140 receipts and fees. Note that the outlier receipt volume in 2007 may be the result of several factors including the anticipated fee rule that was published that same year.[153] USCIS had significant backlogs in 2007 and received appropriations to assist in increasing adjudications.[154] Lastly, USCIS terminated its premium processing service for Form I-140 petitions that request labor certification substitution. USCIS announced the end of the premium processing for these petitions in anticipation of a substantial increase in the number of Form I-140 petitions requesting premium processing and seeking labor certification substitution before that summer of 2007.[155]

---

[153] *See* 72 FR 29851 (May 30, 2007).

[154] *See* 72 FR 4888, 4892 (Feb. 1, 2007).

[155] *See* Jackson and Hertogs, "USCIS suspends Premium Processing of I-140s Requesting Labor Certification Substitution," (May 17, 2007), available at *https://www.jackson-hertogs.com/news/2007/20070517b.shtml* (last accessed Sept. 28, 2022).

195



**Chart 12: Form I-140 Receipts and Fees from FY 1992 through FY 2022**

Source: USCIS, Office of Performance and Quality (OPQ, PASEXEC (May 16, 2022). Data on I-140 fees from 81 FR 73292, 73294 ($700) (Oct. 24, 2016), 75 FR 58962, 58964 ($580) (Sept. 24, 2010), 72 FR 29851, 29854 ($475) (May 30, 2007) and 70 FR 56182 ($195) (Sept. 26, 2005).

USCIS calculated a simple linear regression to estimate the relationship between I-140 receipts (dependent variable) and I-140 fees (independent variable). The results in Table 67 below show that there is a positive relationship between I-140 receipts and fees. Approximately 29 percent of the variability in the I-140 receipts can be explained by fees when the fee is the only variable used in the analysis. While USCIS has identified some of the potential drivers of demand for 2007 there are other increases in demand that USCIS has not yet been able to identify (for example the increases starting in 2016 and continuing through 2020).

| Table 277. Summary of Results for Form I-140 Regression Model | | |
|---|---|---|
| Variables | Model Results | |
| | | |
| Model Description | I-140 Filings and Fees from 1992-2022 | |
| Observations | 31 | |
| R Square | 0.292 | |
| Adjusted R Square | 0.267 | |
| Std. Error of the Estimate | 37597.371 | |
| Significance F | 0.0017* | |
| Intercept Coefficient | 47052.867 | |
| Dependent Variable | I-140 Receipts | |
| Independent Variable(s) | *Coefficients* | *P-value* |
| I-140 Fees | 118.985 | 0.0017* |
| *\* Denotes <= 5% level of statistical significance* Source: USCIS analysis. | | |

In addition to discussion of small entities including businesses in the final rule's FRFA, USCIS has considered the impact of past fee increases using the available samples of Forms I-129 and I-140 petitioners in the 2010 Final Fee Rule Rule/SEA (75 FR 58962, 58983 (Sept. 24, 2010)), the 2016 Fee Rule NPRM/SEA (81 FR 73292 (Oct. 24, 2016)) and comparable samples drawn for the rule's SEA. A comparison of the Small Entity Analyses from the 2010, 2016 and this FRFA's samples shows that as the filing fee for all Form I-129 petitions increased 41.5 percent from \$325 to \$460 in 2016, the percentage of small entities increased from 83.1 percent to 86.8 percent. As the filing fee for Form I-140 petitions increased 21 -percent from \$580 to \$700 in 2016, the percentage of small entities decreased from 76.5 percent to 68.9 precent. Between the 2010 and 2016 analyses, as the filing fee for Form I-129/I-129CW petitions increased from \$320 to \$325 and the filing fee for Form I-140 petitions increased from \$475 to

197

$580 in 2010, the share of small entities filing Form I-129 and Form I-140 declined from 88.6 percent (aggregated across both forms) to the 2016 rates mentioned. These varied relationships do not permit USCIS to conclude that the 2010 or 2016 Rules' fee increases caused increases or decreases in the share of small businesses choosing to request H-visa workers, however, it does affirm that USCIS' experience has not clearly demonstrated a measurable impact of these fee increases on small entities' access to workers.

### iii.     General Evidence of Price Responsiveness to Total Costs

Given the limited information available to USCIS on the price responsiveness of I-129 and I-140 petitioners and applicants, the Department has considered generalizable empirical estimates of how firms' demand for workers respond to changes in employment costs. Two relevant findings emerge: first, there is little consensus amongst economists as to what one true measure of own-wage price elasticity of labor demand should be used to best explain and predict responses given the diversity of employers and structural changes to industries, the workforce, and the economy over the time periods and populations analyzed. Second, meta-analyses observe that more published studies using more data, on average, have reduced our ability to explain and predict this elasticity.[156]

Consequently, DHS considered Hamermesh's "best guess" estimate of -0.30.[157] Consistent with regulatory impact analyses conducted by other agencies, USCIS estimates the total cost of employing an H-1B worker ($173,569, rounded) by summing FY23 median salary of approved H-1B beneficiaries adjusted by the benefits-to-wage multiplier ($118,000*1.45 =

---

[156] *See* A. Lichter, "The Own-Wage Elasticity of Labor Demand: A Meta-Regression Analysis," IZA Discussion paper No. 7958 (Feb. 2014), available at *https://ftp.iza.org/dp7958.pdf*.

[157] *See* D. Hamermesh, "Labor Demand" p. 135 (1993). Economists may further decompose own-wage elasticity into substitution effects (concerning how various inputs are used holding output constant) and scale effects (concerning how output responds holding inputs constant). Holding scale effects constant, Hamermesh finds various studies observe a wide range in possible values for own-wage elasticity of labor demand from -0.15 to -0.75.

$171,100), H-1B registration ($10) and I-129 H1B fee ($460), expected costs of premium processing (53 percent of petitions for initial employment requesting $2,500 premium processing = $1,325 average cost) and a weighted-OCT of (36 percent in-house attorney at $114.17/hr, 36 percent out-sourced attorney at $196.85/hr, 28 percent Human Resources (HR) specialists at $50.94/hr × 5.34 hr = $674.07).[158] Increasing the H-1B registration fee to $215 and the I-129 H-1B fee for petitioners with more than 25 employees to $780, thus increases the total cost of employing an H-1B worker to $174,094, a 0.3-percent increase. Applying own-wage-elasticity of demand estimates (0.3× -0.30 = -0.09 percent) yields an estimated reduction in FY24 cap season demand for H-1B workers from 758,994 eligible registrations of 683.[159]  Discussion in this RIA is limited to H-1B demand because the $1,255 combined increase in costs is greater than the only other response to similar H-1B fee increases in 2016, when the fee rose $135 (+41 percent) from $325 to $460.

Lastly, USCIS discusses reasonable inferences concerning the behavioral response of employers whose H-1B Lottery registrations are not selected. If a lottery is random, the behavioral responses to the expected costs described in the paragraph above are no different, on average, between those selected and those not selected. Selected and unselected registrants possess identical information and expectations about costs for an I-129, future I-140, premium processing, accredited representation, prevailing minimum wages and other inputs. With the

---

[158] For examples of RIAs applying own-wage-elasticity of demand estimates, *see* 84 FR 10900, 10938 (Mar. 22, 2019) and Environmental Protection Agency, "Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone" (Sept. 2015), available at *https://www3.epa.gov/ttnecas1/docs/20151001ria.pdf*. Similar to other OCT estimates, HR Specialists (13-1071) 2022 wages of $35.13 × 1.45 benefits-to-wages multiplier = $50.94. *See* Bureau of Labor Stat., Dep't of Labor, available at *https://www.bls.gov/oes/2022/may/oes_nat.htm#13-1070* (last accessed Aug. 25, 2023).

[159] H-1B Electronic Registration Process – FY2024 Cap Registration Process Update.  *See* USCIS, "H-1B Electronic Registration Process," available at *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process* (last accessed Aug. 25, 2023).  The table shows Eligible Registrations in FY2024 of 758,994 after excluding duplicate registrations, those deleted by prospective employers before close of the period, and registrations with failed payments.

notable exception of cases of fraud and collusion, selected and unselected registrants have equal information about their probability of selection in a random lottery. A selected registrant receives a benefit worth at least as much as the fee(s) they chose to pay.

Although commenters and this discussion of behavioral response use the term "costs," this is misleading because fees are voluntarily exchanged for something worth at least this amount to the entities that chose to pay for them. Unlike the Federal Communications Commission's experience with auctions, USCIS cannot compel employers to truthfully report their willingness to pay for a visa, or reveal their willingness to pay to avoid their next-best alternative to a visa.[160] Such information could be used to model the transfer payment from employers' surplus to USCIS. However, building upon the preceding paragraph, it would be inconsistent for this RIA to conclude that a population of businesses who on average choose to pay for accredited representatives, choose to pay for premium processing, choose to pay prevailing wage increases and efficiency wages, historically exhibit a positive correlation between volumes and past fee increases, choose to respond to declining odds of lottery selection by submitting greater numbers of registrations, and who increasingly choose to register for greater numbers of beneficiaries with multiple registrations, will choose not to pay a $205 price increase for H-1B registration.  For this reason, no reduction in registrations relative to a $10 baseline is projected. Though not USCIS's intention in promulgating a rule with the primary objective of achieving full-cost recovery, should an entity choose not to pay $215 in exchange for their fair chance of selection under the H-1B cap, this loss of a fair chance of selection is mitigated by their cost savings, the unknown value of their next-best alternative, and the

---

[160] *See* FCC Office of Economics and Analytics (OEA) Auction Division, charged  with "assuring all the Commission's auction processes allocate licenses, permits, or support in the most efficient manner possible and are fair and transparent for all participants and the public," at https://www.fcc.gov/about-auctions (Last accessed 12/18/2023).s

expectation that the lottery will still efficiently serve its purpose of selecting an adequate number of registrations to fully utilize the 85,000 visa annual cap.

## 6. Alternatives

Pursuant to Executive Order 12866, USCIS considered alternatives to the fee schedule. This section explores the costs, benefits, and transfer payments of regulatory alternatives considered during the rulemaking process.

### A. Alternative 1: No New Fee Exemptions

Under this alternative, DHS will not add any new fee exemptions to the fee schedule. DHS notes that the estimated annual forgone revenue from fee waivers and exemptions has increased from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review to $756 million in the FY 2022/2023 fee review. *See* 81 FR 26904, 26922 (May 4, 2016) and 81 FR 73292, 73307 (Oct. 24, 2016). The forgone revenue dollar value estimate represents the total fees that fee waived or fee exempt applicants, petitioners, and requestors will contribute if they had paid the fees. In the FY 2022/2023 rule, DHS estimates that the increase in fee exemptions accounts for 1 percent of the 40 percent weighted average fee increase.[161] DHS also estimates that the increase in fee exemptions will result in transfer payments of about $181,225,564 (*see* section 3.P) from USCIS to applicants. DHS rejected this alternative because it believes that will be contrary to humanitarian interests to impose a fee on vulnerable populations. Because fee waivers are available presently, USCIS does not anticipate quantifiable increases in volumes as a result of eliminating fees or the burdens of requesting fee waivers. Exempting vulnerable populations that commonly receive fee waivers (see Table 49)

---

[161] OCFO, Mar. 4, 2022.

will allow USCIS resources that would have gone toward fee waiver adjudications to go toward adjudication of these underlying benefits instead, although time dedicated to adjudication of waivers is not tracked and likely nominal in comparison to other adjudications. USCIS has considered that vulnerable populations eligible for fee waivers may routinely afford fees for necessary immigration benefits only by foregoing consumption of other necessity goods and services.

While USCIS collects limited information with which to directly observe how different populations with disparate resources afford fees of various immigration benefits, Section 5. Price Elasticity discusses some of the rationale for USCIS's difficult assessments concerning different group's ability to pay. Public comments suggested expanding exemptions to a broader "vulnerable" population, while other comments objected to fee paying populations shouldering a larger share of USCIS's costs. Qualitatively, opponents of higher costs were generally the direct beneficiaries of the lower fees requested, while proponents advocated on behalf of vulnerable populations.  In establishing fees that achieve full cost recovery, efforts to extend fee exemptions are constrained by USCIS's need to maintain or improve processing times as well as the challenge of identifying fee-paying populations evincing a greater ability to pay.

### B. Alternative 2: Fee Bundling

In this scenario, USCIS would maintain its bundling policy for Form I-485 filed with interim benefits. Currently, USCIS allows applicants to "bundle" I-485 filings with associated I-131s and I-765s (interim benefits). Filing an I-131 or I-765 concurrently with or with a pending Form I-485 is optional, but if an applicant chooses to do so, they do not pay any additional fee. DHS rejected this alternative because this bundling system benefits individuals who file all 3 applications (because they pay only the price of the I-485) and burdens individuals who file only

the I-485 (they pay more than they would otherwise to subsidize the costs of processing the free interim benefits of other applicants). Furthermore, under the current bundling policy, an individual who renews their interim benefits does so without charge, so USCIS is processing many renewals at no cost to the applicants. USCIS charges other I-131 and I-765 filers more to recover the costs associated with processing bundled I-131s and I-765s without charge.

In the final rule, USCIS ends the bundling policy (aka "debundling"). This change requires individuals to pay a separate fee for each application they file. This means that individuals who want to file an I-765 and I-131 with their I-485 or while it is pending will pay substantially more (they would now pay three separate fees instead of one and must also pay for renewals and replacements that are now free). However, because more people are paying the fees, each individual fee would be less than what it would have been under the current policy. DHS forecasts that the fee-paying population would increase by 513,618 under a debundled option.[162] DHS also estimates a 51 percent overall weighted-average fee increase for all fees under a bundled policy versus a 40-percent increase under a debundled[163] policy.

Many comments were submitted about the proposed fee increases for Forms I-485, I-765, and I-131 and the separation of fees for Forms I-131 and I-765 when filed with Form I-485.[164] Many commenters expressed concern that the increased fees for Form I-485 and unbundled interim benefits would be unduly burdensome and render these benefits unaffordable to many

---

[162] Calculation: 184,092 (Form I-131) + 329,526 (Form I-765) = 513,618 total fee-paying population.

[163] USCIS uses a weighted average instead of a straight average because of the difference in volume by immigration benefit type and the resulting effect on fee revenue. In a fee schedule with free interim benefits, the sum of the current fees multiplied by the projected FY 2022/2023 fee-paying receipts for each immigration benefit type, divided by the total fee-paying receipts is $522. This is $4 higher than in the proposed fee schedule because the fee-paying volumes are lower when DHS assumes free interim benefits. The weighted average proposed fee is $790, $65 or approximately 16 percent higher than the weighted average current fee of $522 in this hypothetical fee schedule that assumes free interim benefits.

[164] See Section G: Adjustment of Status and Waivers of the Final Fee Rule.

eligible applicants, including those who are low or middle income or working class. DHS acknowledges the difficulty some individuals and families encounter in balancing paying for the rising costs of basic needs and benefits, and that employment authorization is often key to the success of immigrants in the United States. However, DHS believes that it has balanced the filing options with separate costs and discounts in this final rule to further mitigate the cost burden to applicants. The new separate fees represent DHS's best effort to reduce barriers to immigration through balancing affordability, benefits, family unity, and ability to pay, while maintaining adequate services.

| Table 68. Bundled vs Debundled Options | | | | |
|---|---|---|---|---|
| Fee Paying Population | Receipts when Debundled *(A)* | Receipts when Bundled *(B)* | Difference *C = (A-B)* | Percent Difference |
| I-131 | 253,662 | 69,570 | 184,092 | 265% |
| I-765 | 1,043,912 | 714,386 | 329,526 | 46% |
| I-485 | 572,497 | 572,497 | 0 | 0% |
| Overall Weighted-Average Fee Increase for All Fees | 40% | 51% | 11% | N/A |

DHS rejected this alternative because it believes debundling assigns the cost burden

appropriately based on the benefits being requested.

205

# Department of Homeland Security
# U.S. Citizenship and Immigration Services

## Small Entity Analysis (SEA) for the U.S. Citizenship and Immigration Services Fee Schedule Final Rule

**January 2024**

0

# Table of Contents

**Table of Contents** ...................................................................................................................1

1. Background of Final Fee Schedule Rule ....................................................................................3

2. Introduction ................................................................................................................................3

3. Sources and Sample Methodology .............................................................................................5

   A. Forms I-129, I-140, I-910, and I-360 .....................................................................................5

   B. Forms I-956 (formerly Form I-924), I-956F, I-956G (formerly Form I-924A), G-1041 and G-1041A .........7

4. Petition for a Nonimmigrant Worker, Form I-129 ....................................................................7

   A. Data Research Population and Sampling Statistics .................................................................7

   B. Funding the Asylum Program with Form I-129 by Visa Classification Petition Fees ...................10

   C. Discussion of Impacts ..........................................................................................................10
      i.   Small Entities with More than 25 FTE Employees ...........................................................12
      ii.  Small Entities with 25 or Fewer FTE Employees .............................................................14
      iii. Nonprofit Small Entities ..................................................................................................16
      iv.  Impacts by NAICS Code ..................................................................................................17

   D. Small Entity Classification ..................................................................................................20

   E. Issues with Data ..................................................................................................................21

5. Immigrant Petition for Alien Worker, Form I-140 ..................................................................21

   A. Data Research Population and Sampling Statistics ...............................................................21

   B. Funding the Asylum Program with Form I-140 Petition Fees ...............................................25

   C. Discussion of Impacts ..........................................................................................................25

   D. Small Entity Classification ..................................................................................................26

   E. Issues with Data ..................................................................................................................26

   F. Cumulative Impact of Form I-129 and Form I-140 Petitions ...............................................26

6. Application for Civil Surgeon Designation, Form I-910 .........................................................27

   A. Data Research Population and Sampling Statistics ...............................................................27

   B. Discussion of Impacts ..........................................................................................................30

   C. Small Entity Classification ..................................................................................................30

7. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360 .................................31

   A. Data Research Population and Sampling Statistics ...............................................................31

   B. Discussion of Impacts ..........................................................................................................34

   C. Small Entity Classification ..................................................................................................35

8. Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Records Request) ...........36

   A. Data Research Population ....................................................................................................36

   B. Discussion of Impacts ..........................................................................................................37

9. Application for Regional Center Designation Under the EB-5 Regional Center Pilot Program, Form I-956 (formerly Form I-924), Application for Approval of an Investment in a Commercial Enterprise, Form I-956F, and I-956G (formerly I-924A) ...................................38

1

A. Data Research Population ........................................................................................................... 39

B. Discussion of Impacts ................................................................................................................ 40

Appendix A: SBA NAICS Size Standards for I-129, I-140, I-910 and I-360 Petitions in Sample Dataset .......... 41

Appendix C: Form I-140 Sample with Petition Totals ...................................................................... 112

Appendix D: Form I-910 Sample with Petition Totals ...................................................................... 117

Appendix E: Form I-360 Sample with Petition Totals ...................................................................... 120

## 1. Background of Final Fee Schedule Rule

The Department of Homeland Security (DHS) is adjusting the fee schedule for U.S. Citizenship and Immigration Services (USCIS). USCIS conducted a comprehensive fee review for the fiscal year (FY) 2022/2023 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of services provided. DHS determined that adjusting USCIS' fee schedule is necessary to fully recover costs and maintain adequate service. The final rule also makes certain adjustments to fee exemption eligibility, naturalization benefit request fees, filing requirements for nonimmigrant workers, premium processing service, and other administrative requirements.

DHS published a proposed fee schedule on January 4, 2023, where it projected that its Immigration Examinations Fee Account non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements.[1]  In the final rule, DHS revised the FY 2022/2023 cost projection to approximately $4,424.0 million, a $726.7 million or 14.1 percent decrease compared to the proposed rule.  The Small Entity Analysis (SEA) has been updated in this Final Rule to reflect reduced fees to many small entities resulting from these changes.

## 2. Introduction

USCIS is a government agency primarily funded by user fees. The agency periodically revisits whether its fees are adequate to appropriately fund its operations. In advance of a revision to the fees it levies, USCIS has reviewed the fees that would potentially affect small entities as defined by the U.S. Small Business Administration (SBA) guidelines and in accordance with the Regulatory Flexibility Act (RFA). This Small Entity Analysis (SEA) is a supplement to the final FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements. In accordance with the RFA, USCIS has also prepared a Final Regulatory Flexibility Analysis (FRFA) that examines the impacts of the final rule on small entities.[2]

The term small entity means a small business, small organization, or small governmental jurisdiction.[3]  The term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, unless an agency, after consulting with the SBA's Office of Advocacy and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register.[4]  In addition:

- A "small business":
    - is organized for profit,

---

[1] *See* 88 FR 402, 428 (Jan. 4, 2023).

[2] *See* USCIS, "FY 2022/2023 U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" Final Rule. Section X. DHS Docket No. USCIS 2021-0010.

[3] Office of Advocacy, SBA, "The RFA In A Nutshell: A Condensed Guide to The Regulatory Flexibility Act," p.18 (June 2013), available at *https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/rfa-in-a-nutshell-a-condensed-guide-to-the-regulatory-flexibility-act/.*

[4] *Ibid.*

- o has a place of business in the United States,
- o operates primarily within the United States or makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials, or labor,
- o is independently owned and operated, and
- o is not dominant in its field on a national basis.[5]

- A "small organization" is any not-for-profit enterprise that is independently owned and operated and not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the *Federal Register*.[6]

- A "small governmental jurisdiction" includes governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than 50,000, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the *Federal Register*.[7]

According to the SBA, for most industries a small business may be defined either in terms of the average number of employees over the past 12 months or the average annual receipts over the past 3 years.[8]

Most immigration benefit requests are submitted by individuals who do not meet the definition of "entity" under the SBA rules. Entities affected by the final rule are those that file and pay fees for certain immigration benefit requests on behalf of a foreign national. The petitions or applications filed by entities include the following:

- a. Petition for a Nonimmigrant Worker, Form I-129 – authorizes foreign workers for temporary employment, services, or to receive training in the United States.[9]
- b. Immigrant Petition for Alien Worker, Form I-140 – authorizes foreign workers to become permanent residents in the United States.
- c. Application for Civil Surgeon Designation, Form I-910 – authorizes physicians to become designated providers of medical exams for individuals in the United States applying for immigration benefits with DHS.
- d. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360 – authorizes

---

[5] SBA small entity definition: The SBA operates in accordance with Pub. L. 85- 536, called the "Small Business Act," to help protect the interests of small businesses, strengthen the economy, and preserve free enterprise.  The definition of a small business is available at Ijeoma S. Nwatu, "Does Your Small Business Qualify?," SBA (Sept. 9, 2016), available at *https://www.sba.gov/blog/does-your-small-business-qualify*.

[6] Office of Advocacy, SBA, "The RFA In A Nutshell: A Condensed Guide to The Regulatory Flexibility Act," p.18 (June 2013), available at *https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/rfa-in-a-nutshell-a-condensed-guide-to-the-regulatory-flexibility-act/*.

[7] *Ibid.*

[8] The SBA has developed size standards to carry out the purposes of the Small Business Act and those size standards can be found in 13 CFR 121.201.

[999] There is a larger population of registrants, for the H-1B lottery will not be selected for the 85k cap; therefore, some petitioners would not need to complete the Form I-129, Petition for a Nonimmigrant Worker.

foreign workers for full time employment by a bona fide nonprofit religious organization in the United States (as defined by 501(c) (3) of the Internal Revenue Service (IRS) Code).

e.  Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Record Request).

f.  Application for Regional Center Designation Under the Regional Center Pilot Program, Form I- 956 (formerly Form I-924),[10] Application for Approval of an Investment in a Commercial Enterprise, Form I-956F and I-956G (formerly I-924A).

The goal of this review is to analyze the economic impact of fee changes made in the final rule on small entities. DHS used a baseline threshold of 1 percent of revenues to determine if the final rule will have a significant economic impact on affected small entities.[11]   The forms mentioned above represent those entities that petition or file on behalf of individuals and therefore, were the focus of this analysis. Form I-129 and Form I-140 made up most of the petitions applicable to this study. DHS also analyzed Forms I-910, I-360, G-1041, G-1041A, I-956 (formerly Form I-924), and I-956 (formerly I-924A).

**3. Sources and Sample Methodology**

*A. Forms I-129, I-140, I-910, and I-360*

DHS obtained petitioner data filed for Forms I-129, I-140, I-910, and I-360 from internal databases for FY 2022, spanning from October 1, 2021, to September 30, 2022.[12]   This petitioner data included the employer firm name, city, state, ZIP code, employer identification number (EIN),[13] number/type of filing, and petitioner or beneficiary name. DHS devised a methodology to conduct the SEA based on a representative sample[14] of the potentially impacted population. To create and test a sample, DHS followed this approach for each benefit request type:

- DHS aggregated a USCIS working database for each form type comprised of receipts from FY 2022.
- DHS identified unique EINs submitted with petitions and unique petitioner names from petitions that did not include an EIN.
- DHS used this list of unique identifiers as the population from which the sample was

---

[10] Supplemental Form I-956G (formerly I-924A), Regional Center Annual Statement, is discussed further in this section also.

[11] Office of Advocacy, SBA "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," Determination of "Significant Impact," p. 18-21 (Aug. 2017),  available at *https://advocacy.sba.gov/wp-content/uploads/2019/06/How-to-Comply-with-the-RFA.pdf.*

[12] Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), CLAIMS 3 database (Jan. 31, 2023).

[13] An EIN is a nine-digit number that the IRS assigns in the following format: XX-XXXXXXX.  It is used to identify the tax accounts of employers.  IRS, "Employer Identification Number; Understanding Your EIN," p. 2 (2014), available at *https://www.irs.gov/pub/irs-pdf/p1635.pdf.*

[14] DHS determined sample size using a standard statistical formula based on the population total for each form type with a 95 percent confidence level and a 5 percent confidence interval. This means that there is a 95 percent chance that parameters descriptive of the population (e.g., the percent of entities that are small) are no more than 5 percent different from the statistic obtained by the sample).

taken. DHS determined the sample size for Forms I-140, I-910 and I-360 using a standard statistical formula of the FY 2022 population total for each form type with a 95 percent confidence level and a 5 percent confidence interval.[15]  For Form I-129, DHS determined the sample size using a standard statistical formula of the FY 2022 population total with a 95 percent confidence level and a 2 percent confidence interval.

- DHS selected a random sample from the population by assigning a randomly generated identification (ID) number to each record.

- DHS then sorted the population so the entities with the smallest random ID numbers were selected as sample entities.

Filing data did not include information needed to classify the entity according to size standards, such as revenue or number of employees, so DHS used third party sources to obtain this information. For the analysis of the effects on Forms I-129, I-140, I-910 and I-360, DHS used several data sources to capture information on the characteristics of entities required to pay these fees:

- Data Axle, a business data provider of U.S. entities
  - http://www.data-axle.com/

- Open-access (free) databases of public and private entities
  - *http://www.cortera.com/*
  - *http://manta.com/*
  - *http://www.guidestar.org/*

From these sources, DHS determined the North American Industry Classification System (NAICS) code,[16] revenue, and employee count for each entity in the sample. A list of NAICS codes for each entity matched in Forms I-129, I-140, I-910 and I-360 can be found in Appendix A, along with the SBA threshold for each industry cluster.[17]  To determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue, and some based on the number of employees. In cases where the matched entity was a direct subsidiary, DHS recorded data for the parent organization. In cases where the entity was a single-location franchise, DHS recorded the single location's data.

Once as many entities as possible were matched, those that had relevant data were compared to the size standards provided by the SBA to determine whether they were small or not. Those that could not be matched or compared were assumed to be small under the presumption that non-small entities would have been identified by one of the databases at some point in their existence.

---

[15] This means that there is a 95 percent chance that parameters descriptive of the population (e.g., the percent of entities that are small) are no more than 5 percent different from the statistic obtained by the sample. DHS used a 95 percent confidence level and a 2 percent confidence level (margin of error), for the Form I-129 sample size only, due to the size of the population explained in detail in Section 4 – Petition for a Nonimmigrant Worker, Form I-129 section/tables.

[16] U.S. Census Bureau, NAICS Code Listing, available at http://www.census.gov/naics/ (last reviewed Oct. 19, 2023).

[17] SBA size standards effective December 19, 2022, SBA, "U. S. Small Business Administration; Table of Small Business Size Standards; Matched to North American Industry Classification System Codes," (Dec. 19, 2022), available at *https://www.sba.gov/sites/default/files/2022-12/Table%20of%20Size%20Standards_Effective%20December%2019%2C%202022_508%20%281%29_0.pdf* (last visited Aug. 23, 2023).

### B. Forms I-956 (formerly Form I-924), I-956F, I-956G (formerly Form I-924A), G-1041 and G-1041A

Data for Forms I-956, I-956F, I-956G, G-1041 and G-1041A were treated differently than the data for Forms I-129, I-140, I-910 and I-360 in this analysis. Although applicant data for Forms I-956, I-956F, I-956G, G-1041 and G-1041A were available for analysis, issues in identifying entities and obtaining revenue and employee count due to the structure of these entities made it difficult to conduct a similar analysis. The structure of these entities and issues with data are discussed further in this analysis.

## 4. Petition for a Nonimmigrant Worker, Form I-129

### A. Data Research Population and Sampling Statistics

There were 629,350 Form I-129 petitions submitted in FY 2022.[18] Of these petitions, 623,057 (99 percent) were submitted with an EIN, also known as a petitioner tax number; the remaining 6,293 were recorded with a blank or incomplete EIN field. Many employers submitted more than one petition over the course of the year. Those petitions that were submitted with an EIN produced 100,135 unique EINs. Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

Table 1 outlines total receipts of petitions for Form I-129 during FY 2022. There were 100,135 unique petitioners requesting foreign workers, with many of these entities submitting multiple petitions. From the population of unique petitioners, DHS drew a random sample of 4,746 petitioning entities exceeding the minimum required. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 4,022, or 84.7 percent, of these petitioners met the definition of small entities.[19]

| Table 1: Outline of Form I-129 Statistics, FY 2022. | | | |
|---|---|---|---|
| **Parameter** | **Quantity** | **Proportion of Sample (Percent)** | **Comments** |
| Population—petitions | 629,350 | - | Total number of petitions. |
| Population—unique entities | 100,135 | - | Determined by business tax number |
| Minimum Required Sample | 2,345 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | **4,746** | 100.0 | Sample selected to match 2,345 entities. Sample includes matched small entities (1,643), matched non-small entities (724) and unmatched entities (2,379) |
| Nonmatched Sample Segment (S)* | **2,379** | **50.1** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |

[18] Source: USCIS, OP&S, PRD, CLAIMS 3 and ELIS database (Jan. 31, 2023).

[19] Calculation: Table 1 = 4,022 total small entities / 4,746 total entities = 84.7 percent.

| | | | |
|---|---|---|---|
| Matched Sample Segment | 2,367 | 49.9 | Entities matched in databases from 4,746 searches. This exceeds the established sample goal of 2,345. |
| Sub-Sample Missing Data (S) | **0** | **0.0** | Entities among the 2,367 matches lacking revenue or employee count data. |
| Matched Small Entities (S) | **1,643** | **34.6** | Entities among 2,367 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 724 | 15.3 | Number of non-small entities out of the 2,367 matches. |
| **Number of small entities discovered in research** | **4,022** | **84.7** | **2,379** + **0** + **1,643** = **4,022** |
| Source: USCIS analysis. *(S) Sample numbers used to calculate the totals, for each column. | | | |

Table 2 shows that for the selected sample of 4,746 entities, 30.6 percent submitted one petition and approximately 44 percent combined submitted 1 or 2 petitions. Most notably, about 25 percent of entities submitted 10 or more petitions.[20]

| Table 2: Total Form I-129 Petitions per Entity, FY 2022. | | | | |
|---|---|---|---|---|
| **Petitions per Entity** | **Entity Count** | **Cumulative Entities** | **Percentage of Sample[1]** | **Cumulative Percentage[1]** |
| 1 | 1,450 | 1,450 | 30.6 | 30.6 |
| 2 | 617 | 2,067 | 13.0 | 43.6 |
| 3 | 430 | 2,497 | 9.1 | 52.6 |
| 4 | 326 | 2,823 | 6.9 | 59.5 |
| 5 | 219 | 3,042 | 4.6 | 64.1 |
| 6 | 174 | 3,216 | 3.7 | 67.8 |
| 7 | 153 | 3,369 | 3.2 | 71.0 |
| 8 | 112 | 3,481 | 2.4 | 73.3 |
| 9 | 104 | 3,585 | 2.2 | 75.5 |
| 10+ | 1,161 | 4,746 | 24.5 | 100.0 |
| **Total** | **4,746** | | **100.0** | |

Source: USCIS analysis.
[1]Note: Figures may not sum to 100 percent due to rounding.
Sample population of 4,746 includes matched small entities (1,643), matched non-small entities (724) and unmatched entities (2,379).

Table 3 details that when small and non-small entities are treated separately, the distributions are different. Approximately 55 percent of identified or assumed small entities submitted three or fewer petitions, whereas about 39.5 percent of non-small entities did. Although the petition counts per entity ranged from 1 to 7,133, most small entities submitted three or fewer petitions (55 percent) while most non-small entities submitted five or fewer petitions (51.7 percent). While most of the entities submitting petitions are considered small, most of these small entities file few petitions. A full table of petitions per sample entity is available in Appendix B.

---

[20] The largest number of petitions per entity was 7,133.

| Table 3: Form I-129 Petitions per Entity, Non-small and Small Distributions, FY 2022. | | | | | | |
|---|---|---|---|---|---|---|
| | Non-small Entities | | | Small Entities | | |
| Petitions per Entity | Entities | Percentage of Total | Cumulative Percentage | Entities | Percentage of Total[1] | Cumulative Percentage[1] |
| 1 | 158 | 21.8 | 21.8 | 1,292 | 32.1 | 32.1 |
| 2 | 71 | 9.8 | 31.6 | 546 | 13.6 | 45.7 |
| 3 | 57 | 7.9 | 39.5 | 373 | 9.3 | 55.0 |
| 4 | 58 | 8.0 | 47.5 | 268 | 6.7 | 61.6 |
| 5 | 30 | 4.1 | 51.7 | 189 | 4.7 | 66.3 |
| 6 to 10 | 92 | 12.7 | 64.4 | 550 | 13.7 | 80.0 |
| 11 to 20 | 86 | 11.9 | 76.2 | 403 | 10.0 | 90.0 |
| 21 to 50 | 87 | 12.0 | 88.3 | 285 | 7.1 | 97.1 |
| 51+ | 85 | 11.7 | 100.0 | 116 | 2.9 | 100.0 |
| Total | 724 | 100.0 | | 4,022 | 100.0 | |

Source: USCIS analysis.
[1]Note: Figures may not sum to 100 percent due to rounding.

Table 4 shows that a majority of the entities with reported revenues make less than $5 million per year (52.3 percent) and about 72.6 percent brought in less than $50 million. At the lowest end, approximately 11.1 percent of entities had revenue of less than $500,000 per year.[21]

| Table 4: Form I-129 Revenue Distribution of Matched Small Entities, FY 2022. | | | | | |
|---|---|---|---|---|---|
| Revenue Range of Matched Small Entities | Identified in Data Axle | Identified via Manta, Cortera, or Guidestar | Total | Percentage[1] | Cumulative Percentage[1] |
| < $100K | 8 | 1 | 9 | 0.5 | 0.5 |
| $100K to < $500K | 164 | 10 | 174 | 10.6 | 11.1 |
| $500K to < $1M | 173 | 64 | 237 | 14.4 | 25.6 |
| $1M to < $5M | 349 | 90 | 439 | 26.7 | 52.3 |
| $5M to < $10M | 113 | 59 | 172 | 10.5 | 62.8 |
| $10M to < $50M | 123 | 38 | 161 | 9.8 | 72.6 |
| $50M to < $100M | 0 | 1 | 1 | 0.1 | 72.6 |
| > $100M | 1 | 0 | 1 | 0.1 | 72.7 |
| Missing revenue data[2] | 393 | 56 | 449 | 27.3 | 100.0 |
| Total | 1,324 | 319 | 1,643 | 100.0 | |

Source: USCIS analysis.
[1] Figures may not sum to 100 percent due to rounding.
[2] Some entities found in the databases either did not contain revenue data or were determined to be small based on employee count thresholds.

---

[21] Numbers reported in Data Axle were a mix of point and range figures; Manta, Cortera, and Guidestar report wage ranges and thus, to estimate the number of small entities that maybe impacted, USCIS used the lower end of the wage range for this analysis.

From the sample population of 4,746 petitions, most petitioners were in California, followed by Texas, New York, New Jersey, and Massachusetts (*see* Table 5). Together, these top five states accounted for 50.1 percent (2,376 petitioners) of the petitions in the sample.

| Table 5: Form I-129 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2022. | | | |
|---|---|---|---|
| **Rank** | **State** | **Number of Petitioners** | **Proportion of Sample (Percentage)** |
| 1 | California (CA) | 798 | 16.8 |
| 2 | Texas (TX) | 529 | 11.1 |
| 3 | New York (NY) | 462 | 9.7 |
| 4 | New Jersey (NJ) | 356 | 7.5 |
| 5 | Massachusetts (MA) | 231 | 4.9 |
| 6 | Illinois (IL) | 203 | 4.3 |
| 7 | Florida (FL) | 201 | 4.2 |
| 8 | Virginia (VA) | 174 | 3.7 |
| 9 | Michigan (MI) | 165 | 3.5 |
| 10 | Georgia (GA) | 160 | 3.4 |
| Source: USCIS analysis. | | | |

### B. Funding the Asylum Program with Form I-129 by Visa Classification Petition Fees

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file either a Form I-129 Petition for a Nonimmigrant Worker or Form I-129CW. However, if a small entity employs 25 or fewer full-time equivalent (FTE) workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[22] The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I-129 and Form I-140 benefit requests.

### C. Discussion of Impacts

DHS will have different fees for Form I-129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, petitioners or applicants can file petitions or applications for many different types of nonimmigrant workers. DHS will have separate H-2A and H-2B fees for petitions with named workers and unnamed workers. DHS will limit the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers to 25. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate

---

[22] *See* 8 CFR 106.2(c)(13).

than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with fewer beneficiaries who effectively subsidize the cost of petitioners filing petitions with more beneficiaries. USCIS estimates that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. Therefore, the establishment of different fees will better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification.

DHS will charge Form I-129 petitioners a form fee, registration fee (H-1B only), Commonwealth of the Northern Mariana Islands (CNMI) Educational Fund fee (I-129CW only)[23] and an Asylum Program fee. A summary of the fees in the final rule used in this analysis is shown in Table 6. DHS will establish new fees to be paid by employers who file either a Form I-129 or Form I-129CW based on the number of FTE workers the entity employs and its nonprofit status. In this analysis, small entities will pay the associated fee for the visa classification benefit request according to whether they are:

1) Small entity with greater than 25 FTE employees,

2) Small entity with 25 or fewer FTE employees, or

3) Nonprofit small entity.

| Table 6a. Form I-129 Entities by Visa Classifications (Matched and Unmatched) | | | | | |
|---|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Entities with 25 or fewer FTE Employees | Entities with more than 25 FTE Employees | Entities with Unknown Employees | Total Number of Entities | Total Nonprofit Entities |
| H-1B | 949 | 556 | 1,362 | 2,867 | 107 |
| H-2A | 43 | 2 | 106 | 151 | 1 |
| H-2B | 13 | 6 | 26 | 45 | 0 |
| O | 57 | 41 | 113 | 211 | 9 |
| L-1A / L-1B / LZ | 86 | 102 | 238 | 426 | 2 |
| H-3/P/Q/R/HSC/E/TN/CW | 92 | 69 | 161 | 322 | 7 |
| Total Number of Entities | 1,240 | 776 | 2,006 | 4,022 | 126 |

Source: USCIS Analysis

Note:
Matched entities have reported revenue and employment data, while unmatched entities have no reported revenue or employment data.

---

[23] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers.

Each H-1B registration will require a $215 registration fee.[24]  Petitioners filing H-1B petitions that are not subject to the annual H-1B numerical allocations (e.g., extension petitions or cap-exempt filer petitions) would not have to submit a registration and thus would not pay the registration fee. The Asylum Program Fee (provides that the Asylum Program Fee is $0 for nonprofits, $300 for small employers (with 25 or fewer employees), and $600 for all others filing Forms I-129, Petition for a Nonimmigration Worker, I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and I-140, Immigrant Petition for Alien Workers) will be included with each Form I-129 classification (if applicable) and will apply to all fee-paying receipts for Forms I-129 and I-129CW. For example, it will apply to all initial petitions, changes of status, and extensions of stay that use Form I-129.

| Table 6b. Fee Summary Table for Form I-129 Petitioners (Matched Only) | | | |
|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Entities with more than 25 FTE Employees** | **Entities with 25 or Fewer FTE Employees** | **Nonprofit Entities** | **Registration fee for cap-subject H-1B visas** |
| *Number of small entities in impact analyses with reported revenue and employment data* | 302 | 876 | 14 | |
| H-1B | $995* | $675* | $675* | $215 |
| H-2A – Named Beneficiaries | $1,090 | $545 | $545 | |
| H-2B – Named Beneficiaries | $1,080 | $540 | $540 | |
| H-2A – Unnamed Beneficiaries | $530 | $460 | $460 | |
| H-2B – Unnamed Beneficiaries | $580 | $460 | $460 | |
| O-1/O-2 | $1,055 | $530 | $530 | |
| L-1A/L-1B/LZ Blanket | $1,385 | $695 | $695 | |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,015 | $510 | $510 | |
| Asylum Program Fee | $600 | $300 | $0 | |
| Note: *The H-1B fee includes the antecedent $215 registration fee that is paid before filing the Form I-129 for cap-subject H-1B visas. This H-1B Registration fee is separate, from the H-1B form fee. | | | | |
| Note: The CW fee includes a $30 CNMI Educational Fund fee; however, the fee is not included in this analysis because the five entities in the sample that petitioned for a CW nonimmigrant worker visa had no reported revenue data and thus an economic impact could not be estimated. | | | | |
| Note: Asylum Program Fee applies to all Form I-129 petition visa classifications. | | | | |

The fees are calculated below to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker by small entity size and nonprofit status.

### i. Small Entities with More than 25 FTE Employees

DHS will increase the fees paid for all worker types for small entities with more than 25 FTE

---

[24] USCIS in this SEA used the H-1B I-129, Petition for a Nonimmigrant Worker fee of $995 = This fee includes the $780 proposed fee for H-1B Classification and the $215 fee for H-1B Registration (current $10 to $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 nonrefundable H-1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H-1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H-1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $780 fee. *See* 84 FR 60307 (Nov. 8, 2019). . See Regulatory Impact Analysis in the docket on regulations.gov, Section (3)(H) Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted up to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H-1B petitions. The H-1B registration applies to small entities and non-profits with no difference on employee size.

employees filing Form I-129 from the current filing fee of $460 ($470 with the current registration fee of $10). For H-1B petitions, the registration fee ($215) this is added to the base form fee ($780) to make $995. The Asylum Program Fee of $600 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall fee for cap-subject H-1B classification petitions of $1,595 ($995 + $600). The fee adjustments and percentage increases are summarized in Table 7.

| Table 7. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with More Than 25 FTE Employees | | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Visa Classification Immigration Benefit Request | Current Fee | Final Fee* | Asylum Program Fee | Total Final Fee | Difference in Fee Increase | Percent Change |
| | | | | D = B+C | E = D-A | F = (D–A)/A |
| H-1B | $470 | $995 | $600 | $1,595 | $1,125 | 239.4% |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 | $1,230 | 267.4% |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 | $1,220 | 265.2% |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 | $670 | 145.7% |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 | $720 | 156.5% |
| O-1/O-2 | $460 | $1,055 | $600 | $1,655 | $1,195 | 259.8% |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 | $1,525 | 331.5% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 | $1,155 | 251.1% |
| Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Sections (I)(D)). Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3. Note: *The H-1B final fee includes a $780 base fee and a $215 registration fee ($780 + $215 = $995). | | | | | | |

To calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported sales revenue of that entity.[25] H-1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee increase ($205) is added to the base form fee increase ($780) and results in an overall increase for H-1B classification petitioners of $1,125. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity.

DHS determined that 302 of the 1,643 matched small entities searched, were small entities with more than 25 FTE employees.[26] Depending on the immigration benefit request, the average economic impact on these 302 small entities with revenue and employment data ranges from 0.01 to 0.59 percent as shown in Table 8a. Among the 302 small entities with reported revenue and employment data, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent (Table 8b). Those small entities with greater than 1 percent impact were mostly H-1B filers (18 of 27) that filed multiple petitions and collectively had well below average reported revenues compared to the average revenue for all 302 small entities.[27]  The average economic impact from the registration and petition fee increase on all

---

[25] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) / Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[26] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

[27] The number of H-1B petitions filed by these 18 entities ranged from 4 to 411. The average annual revenue reported by these 18 entities was $4.9 million whereas the average annual revenue for all 302 entities in the sample was $11.9 million.

241 H-1B filers was 0.06 percent; the greatest economic impact was 1.35 percent and the smallest was 0.0004 percent. The average impact on the 302 small entities with revenue data was 0.33 percent. The greatest economic impact imposed by the fee changes on all 302 small entities with more than 25 employees was 7.06 percent and the smallest was 0.002 percent per entity.

**Table 8a: Form I-129 Classifications Economic Impacts on Small Entities with More than 25 FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $995 | 0.31% |
| H-2A – Named Beneficiaries | $1,230 | 0.02% |
| H-2B – Named Beneficiaries | $1,220 | 0.32% |
| H-2A – Unnamed Beneficiaries | $670 | 0.01% |
| H-2B – Unnamed Beneficiaries | $720 | 0.18% |
| L-1A/L-1B/LZ Blanket | $1,195 | 0.29% |
| O-1/O-2 | $1,525 | 0.38% |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,155 | 0.59% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R-1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $780 base fee increase and a $205 registration fee increase ($780 + $205 = $995).

**Table 8b: Count of Small Entities with More than 25 FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 223 | 18 | 241 |
| H-2A – Named Beneficiaries | 1 | 0 | 1 |
| H-2B – Named Beneficiaries | 3 | 1 | 4 |
| L-1A/L-1B/LZ Blanket | 23 | 3 | 26 |
| O-1/O-2 | 11 | 2 | 13 |
| CW, H-3, HSC, E, TN, Q, P, and R | 14 | 3 | 17 |
| **Total** | **275** | 27 | **302** |

Source: USCIS analysis.

### ii. Small Entities with 25 or Fewer FTE Employees

DHS will increase the base form fee filed for all worker types for small entities with 25 or fewer FTE employees filing Form I-129 from the current base filing fee of $460, apart from H-1B, H-2A-Unnamed Beneficiaries, and H-2B-Unnamed Beneficiaries. For H-1B petitions, the registration fee ($215) is added to the base form fee ($460) to make $675. The Asylum Program Fee of $300 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall increase for cap-subject H-1B classification petitions of $975 ($675 + $300). The fee adjustments and percentage increases are summarized, shown in Table 9.

---

Thus, the increase in the H-1B registration fee had a more pronounced economic impact on those 18 entities that filed multiple petitions.

**Table 9. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with 25 or Fewer FTE Employees**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Current Fee** | **Final Fee** | **Asylum Program Fee** | **Total Final Fee** | **Difference in Fee Increase** | **Percent Change** |
| | | | | D = B+C | E = D-A | F = (D–A)/A |
| H-1B | $470 | $675 | $300 | $975 | $505 | 107.4% |
| H-2A – Named Beneficiaries | $460 | $545 | $300 | $845 | $385 | 83.7% |
| H-2B – Named Beneficiaries | $460 | $540 | $300 | $840 | $380 | 82.6% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $300 | $830 | $370 | 80.4% |
| O-1/O-2 | $460 | $695 | $300 | $995 | $535 | 116.3% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $300 | $810 | $350 | 76.1% |

Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Sections (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increases, DHS estimated the total costs associated with the final fee increase for each small entity with 25 or fewer FTE employees and divided that amount by the sales revenue of that entity.[28] H-1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall fee for H-1B classification petitions of $505 ($300 + $205). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 876 of the 1,643 entities searched were small entities with less than 25 FTE employees.[29]

**Table 10a: Form I-129 Classifications Economic Impacts on Small Entities with 25 or Fewer FTE Employees with Revenue Data.**

| **Visa Classification Immigration Benefit Request** | **Fee Increase** | **Average Economic Impact Percentage\*** |
|---|---|---|
| H-1B | $505 | 0.45% |
| H-2A – Named Beneficiaries | $385 | 0.21% |
| H-2B – Named Beneficiaries | $380 | 0.08% |
| H-2A – Unnamed Beneficiaries | $300 | 0.16% |
| H-2B – Unnamed Beneficiaries | $300 | 0.06% |
| L-1A/L-1B/LZ Blanket | $370 | 0.16% |
| O-1/O-2 | $535 | 0.21% |
| CW, H-3, HSC, E, TN, Q, P, and R | $350 | 0.14% |

Source: USCIS calculation.
\*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $300 base fee increase and a $205 registration fee increase ($300 + $205 = $505).

Depending on the immigration benefit request, the average economic impact on the 876 small entities with revenue and employment data ranges from 0.06 to 0.45 percent as shown in Table 10a.

---

[28] *See* supra FN 24.

[29] *See* supra FN 25.

The average economic impact on all 876 small entities was 0.39 percent. Among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 95 (10.8 percent) experienced an economic impact greater than 1 percent (Table 10b). Those small entities with greater than 1 percent economic impact were mostly H-1B filers (91 of 95) that mostly filed multiple petitions and collectively had well below average reported revenues compared to the average revenue for all 876 small entities.[30] The average economic impact from the registration and petition fee increase on all 682 H-1B filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent. The greatest economic impact imposed by the fee changes on all 876 small entities with 25 or fewer FTE employees was 4.21 percent, and the smallest was 0.003 percent per entity.

| Table 10b: Count of Small Entities with 25 or Fewer FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact. | | | |
|---|---|---|---|
| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
| H-1B | 591 | 91 | 682 |
| H-2A – Named Beneficiaries | 35 | 0 | 35 |
| H-2B – Named Beneficiaries | 12 | 0 | 12 |
| L-1A/L-1B/LZ Blanket | 51 | 2 | 53 |
| O-1/O-2 | 31 | 1 | 32 |
| CW, H-3, HSC, E, TN, Q, P, and R | 61 | 1 | 62 |
| **Total** | **781** | **95** | **876** |
| Source: USCIS analysis. | | | |

### iii. Nonprofit Small Entities

DHS will increase the base fee filed for all worker types for nonprofit small entities filing Form I-129 from the current base filing fee of $460, except for  H-1B, H-2A-Unnamed Beneficiaries, and H-2B-Unnamed Beneficiaries.[31]  For H-1B petitions, the registration fee ($215) is added to the base fee ($460) and results in an overall fee for cap-subject H-1B classification petitions of $675. Nonprofit small entities are exempt from paying the Asylum Program Fee. The fee adjustments and percentage increases are summarized, shown in Table 11.

| Table 11. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Nonprofit Small Entities | | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Visa Classification Immigration Benefit Request | Current Fee | Final Fee | Asylum Program Fee | Total Final Fee | Difference in Fee Increase | Percent Change |
| | | | | D = B+C | E = D-A | F = (D–A)/A |

---

[30] The number of H-1B petitions filed by these 91 entities ranged from 2 to 60 (86 of 91 entities filed five or more  H-1B petitions). The average annual revenue reported by these 91 entities was $0.6 million whereas the average annual revenue for all 876 entities in the sample was $2.5 million. Thus, the increase in the H-1B registration fee had a more pronounced economic impact on those 91 entities.

[31] Nonprofits in this analysis include entities that identify with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations).

| H-1B | $470 | $675 | $0 | $675 | $305 | 43.6% |
| H-2A – Named Beneficiaries | $460 | $545 | $0 | $545 | $85 | 18.5% |
| H-2B – Named Beneficiaries | $460 | $540 | $0 | $540 | $80 | 17.4% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $0 | $530 | $70 | 15.2% |
| O-1/O-2 | $460 | $695 | $0 | $695 | $235 | 51.1% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $0 | $510 | $50 | 10.9% |

Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Sections (I)(D)).
Note: Employers may apply using Form I-129 also for P-–1, P-–1S, P-–2, P-–2S, P-–3, P-–3S, R1, E-–1, E-–2, E-–3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increase, DHS estimated the total costs associated with the final fee increase for each nonprofit small entity and divided that amount by the sales revenue of that entity.[32]  H-1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Since there was no increase in the H-1B form fee for nonprofit small entities, the $205 registration fee is the only increase for these petitioners. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 14 of the 1,643 entities searched were nonprofit small entities.[33]

All 14 of these nonprofit small entities petitioned for H-1B workers; there were no recorded petitions for the other classifications. Table 12 shows that the average economic impact on the 14 entities was 0.23 percent. All 14 nonprofit small entities experienced an economic impact of less than 1 percent.   The average economic impact from the registration and petition fee increases on all 14 H-1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent. The greatest economic impact imposed by the fee changes on all 14 nonprofit small entities was 0.82 percent and the smallest was 0.003 percent per entity.

| Table 12: Form I-129 Classifications Economic Impacts on Nonprofit Small Entities with Revenue Data. | | |
|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Fee Increase** | **Average Economic Impact Percentage\*** |
| H-1B | $205 | 0.23% |
| H-2A – Named Beneficiaries | $85 | N/A |
| H-2B – Named Beneficiaries | $80 | N/A |
| H-2A – Unnamed Beneficiaries | $0 | N/A |
| H-2B – Unnamed Beneficiaries | $0 | N/A |
| L-1A/L-1B/LZ Blanket | $70 | N/A |
| O-1/O-2 | $235 | N/A |
| CW, H-3, HSC, E, TN, Q, P, and R | $50 | N/A |
| Source: USCIS calculation. | | |
| *These figures are percentages, not proportions. | | |
| Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3. | | |
| Note: The H-1B fee increase only includes the $205 registration fee increase because the base fee was unchanged. | | |

### iv. Impacts by NAICS Code

DHS analyzed the average economic impact imposed by the fee increases on the 1,643 small entities with reported sales revenue data by NAICS code. Table 13 shows the top 10 NAICS industries

---

[32] *See* supra FN 24.

[33] *See* supra FN 25.

that use the Form I-129 for all classifications by the number of petitions filed during FY 2022 and the average impact on those entities. All 10 NAICS industries that use the Form I-129 experienced an economic impact of less than 1.0 percent of revenue.

| Table 13. Top 10 Industries that Use the Form I-129 by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 541618-Other Management Consulting Services | 303 | 0.87% |
| 541211-Offices of Certified Public Accountants | 748 | 0.82% |
| 541512-Computer Systems Design Services | 260 | 0.60% |
| 541511-Custom Computer Programming Services | 1,880 | 0.50% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 306 | 0.49% |
| 541611-Administrative Management and General Management Consulting Services | 227 | 0.35% |
| 541612-Human Resources Consulting Services | 422 | 0.35% |
| 518210-Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services | 258 | 0.26% |
| 513210-Software Publishers | 1,721 | 0.22% |
| 541330-Engineering Services | 309 | 0.17% |
| Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) database (Jan. 31, 2023). | | |

The top NAICS industries that use the Form I-129 for H-1B[34] classification experienced an economic impact of less than 1.0 percent of revenue in the analysis (Table 14).

| Table 14. Top 10 Industries that Use the Form I-129 for H-1B by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 621111-Offices of Physicians (except Mental Health Specialists) | 15 | 0.38% |
| 541612-Human Resources Consulting Services | 7 | 0.29% |
| 541511-Custom Computer Programming Services | 28 | 0.20% |
| 541600-Management, Scientific, and Technical Consulting Services | 9 | 0.14% |
| 541330-Engineering Services | 20 | 0.11% |
| 541990-All Other Professional, Scientific and Technical Services | 6 | 0.06% |
| 621210-Offices of Dentists | 6 | 0.06% |
| 561400-Business Support Services | 17 | 0.05% |
| 541618-Other Management Consulting Services | 6 | 0.04% |
| 513210-Software Publishers | 9 | 0.02% |
| Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

The top NAICS industries that use the Form I-129 H-2A[35] classification for named

---

[34] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., "H-1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models," available at *https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations* (last updated Sept. 15, 2023).

[35] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H-2A Temporary Agricultural Workers," "Form I-129, H-2A Temporary Agricultural Workers," available at *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers* (last updated Nov. 8, 2023).

beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 15).

| Table 15. Top Industries that Use the Form I-129 H-2A for Named Beneficiaries by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 445230-Fruit and Vegetable Retailers | 3 | 0.35% |
| 111998-All Other Miscellaneous Crop Farming | 26 | 0.30% |
| 112111-Beef Cattle Ranching and Farming | 4 | 0.15% |
| 111991-Sugar Beet Farming | 2 | 0.10% |
| 112990-All Other Animal Production | 1 | 0.08% |
| 115111-Cotton Ginning | 4 | 0.02% |
| 115113-Crop Harvesting, Primarily by Machine | 3 | 0.02% |
| Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

Most of the top NAICS industries that use the Form I-129 H-2B[36] for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 16). One of the top NAICS industries experienced an impact of greater than 1.0 percent.

| Table 16. Top Industries that Use the Form I-129 H-2B for Named Beneficiaries by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 713930-Marinas | 3 | 1.14% |
| 112512-Shellfish Farming | 1 | 0.31% |
| 111421-Nursery and Tree Production | 2 | 0.26% |
| 541940-Veterinary Services | 1 | 0.05% |
| 561730-Landscaping Services | 11 | 0.06% |
| 236220-Commercial and Institutional Building Construction | 4 | 0.03% |
| 444240-Nursery, Garden Center, and Farm Supply Retailers | 1 | 0.01% |
| 561400-Specialized Design Services | 1 | 0.01% |
| 484110-General Freight Trucking, Local | 1 | 0.01% |
| Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

For Form I-129 (O[37] and P[38] classifications), among the 1,643 small entities with reported

---

[36] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H-2B Temporary Non-Agricultural Workers," https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last updated Jan. 12, 2024).

[37] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, " O-1 Visa: Individuals with Extraordinary Ability or Achievement," https://www.uscis.gov/working-in-the-united-states/temporary-workers/o-1-visa-individuals-with-extraordinary-ability-or-achievement (last updated Mar. 3, 2023).

[38] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, " P-1A Athlete," https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1a-athlete (last updated Mar. 26, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P-1B A Member of an Internationally Recognized Entertainment Group," https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1b-a-member-of-an-internationally-recognized-entertainment-group (July 19, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P-2 Individual

revenue data identified in the SEA, most of the top industries by NAICS code experienced an economic impact of considerably less than 1.0 percent of revenue in the analysis. Three of the top NAICS industries experienced an impact of greater than 1.0 percent (Table 17).

| Table 17. Top Industries that Use the Form I-129 (O&P) by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 721310-Rooming and Boarding Houses, Dormitories, and Workers' Camps | 35 | 1.73% |
| 112120-Dairy Cattle and Milk Production | 6 | 1.55% |
| 541890-Other Services Related to Advertising | 4 | 1.05% |
| 236115-New Single-family Housing Construction (Except For-Sale Builders) | 18 | 0.54% |
| 622210-Psychiatric and Substance Abuse Hospitals | 7 | 0.37% |
| 621511-Medical Laboratories | 8 | 0.34% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 23 | 0.24% |
| 516120-Television Broadcasting Stations | 5 | 0.15% |
| 621493-Freestanding Ambulatory Surgical and Emergency Centers | 6 | 0.09% |
| 523940-Portfolio Management and Investment Advice | 5 | 0.08% |
| Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

### D. Small Entity Classification

With an aggregated total of 4,022 small entities out of a sample size of 4,746 entities, DHS inferred that 84.7 percent of the entities filing Form I-129 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations) were not-for-profit.

Table 18 shows the composition of the small entities by entity type. Most of the sample consisted of small businesses when looked at by type of small entity. There are 4 small governmental jurisdictions in the sample and 126 small not-for-profits.

| Table 18: Form I-129 Small Entity Classification, FY 2022. | | | |
|---|---|---|---|
| Classification | Small Entity Status | Sample Size | Sample Size (Percentage)[1] |
| **Small Entity** | **Yes** | **4,022** | **84.7** |
| Small not-for-profit entity | Segment | 126 | 2.7 |

Performer or Part of a Group Entering to Perform Under a Reciprocal Exchange Program," https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-2-individual-performer-or-part-of-a-group-entering-to-perform-under-a-reciprocal-exchange-program (Feb. 24, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P-3 Artist or Entertainer Coming to Be Part of a Culturally Unique Program," https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-3-artist-or-entertainer-coming-to-be-part-of-a-culturally-unique-program (last visited Feb. 24, 2021).

| Small governmental jurisdiction | Segment | 4 | 0.1 |
|---|---|---|---|
| Small business | Segment | 3,892 | 82.0 |
| **Non-small Entities** | **No** | **724** | **15.3** |
| **Total** | **-** | **4,746** | **100.0** |

Source: USCIS analysis.
Note: Figures may not sum to 100 percent due to rounding.

### E. Issues with Data

In selecting a sample, DHS intends to be as inclusive as possible of all petitioners. However, due to peculiarities in the database, some petitioners would necessarily be entered multiple times in the random sort. Some of this is due to error. Some of these variations featured digits that were transposed and others mis-keyed, while other petitions for this entity were submitted without an EIN.

Manual data-cleaning is impractical in a situation where hundreds of thousands of records must be sorted; worse, it could lead to introducing new inaccuracy into the database if some duplicates are removed and others are not. Using employer names is not a better solution, as there is even less consistency in their formatting.

The data errors that may lead to overrepresentation of some petitioners do not clearly favor either small or non-small entities. The best DHS can do is to construct a sample larger than necessary, eliminate any duplicates within that sample, and proceed with the analysis as normal. There were no duplicates detected within the sample, indicating that irregularities in the data received were not large enough as to skew understanding of the underlying parameters of the petitioner population.

## 5. Immigrant Petition for Alien Worker, Form I-140

### A. Data Research Population and Sampling Statistics

USCIS internal data for Form I-140 petitions were provided by The Office of Performance and Quality (OPQ) from the CLAIMS 3/Citizenship and Immigration Services Centralized Oracle Repository (CISCOR) database. There were 165,269 foreign worker Form I-140 petitions submitted in FY 2022. Of these, 81.2 percent (134,250) were submitted with an EIN while the remaining 18.8 percent (31,019) were recorded either with a blank or a "0" in the EIN field. Many employers submitted more than one petition over the course of the year, as each petition is for an individual worker. Those petitions that were submitted with an EIN provided 27,093 unique EINs (see Table 19). From this population of 27,093 unique entities, DHS selected a random sample of 550 petitioning entities exceeding the minimum required. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 54.3 percent (299) of the petitioners met the definition of small entities.

| Table 19: Outline of Form I-140 Statistics, FY 2022. | | | |
|---|---|---|---|
| **Parameter** | **Quantity** | **Proportion of Sample (Percentage)** | **Comments** |
| Population—petitions | 165,269 | - | Total number of petitions. |
| Population—unique entities | 27,093 | - | Determined by business tax number. |
| Minimum Required Sample | 379 | - | Sample size necessary to achieve confidence goals. |

| Selected Sample | 550 | 100.0 | Sample selected to match 379 entities. |
|---|---|---|---|
| Nonmatched Sample Segment (S)* | **<u>82</u>** | **<u>14.9</u>** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |
| Matched Sample Segment | 468 | 85.1 | Entities matched in databases, from 550 searches. This exceeds the established sample goal of 379. |
| Sub-Sample Missing Data (S) | **<u>59</u>** | **<u>10.7</u>** | Entities among the 468 matches lacking revenue data and NAICS employment size threshold. |
| Matched Small Entities (S) | **<u>158</u>** | **<u>28.7</u>** | Entities among 468 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 251 | 45.6 | Number of non-small entities out of the 468 matches. |
| **Number of small entities discovered in research** | **299** | **<u>54.3</u>** | **<u>158</u>** + **<u>59</u>** + **<u>82</u>** = **299** |

Source: USCIS analysis.
*(S) Sample numbers used to calculate the totals, for each column.

Table 20 shows that within the sample population of 550 petitioners, about one quarter of the entities (25.8 percent) had submitted one petition and about 34 percent combined submitted 1 or 2 petitions. Most notably, approximately 44 percent of entities had submitted 10 or more petitions.

| Table 20: Total Form I-140 Petitions per Entity, FY 2022. | | | | |
|---|---|---|---|---|
| **Petitions per Entity** | **Entity Count** | **Cumulative Entities** | **Percentage of Sample**[1] | **Cumulative Percentage**[1] |
| 1 | 142 | 142 | 25.8 | 25.8 |
| 2 | 47 | 189 | 8.5 | 34.4 |
| 3 | 26 | 215 | 4.7 | 39.1 |
| 4 | 23 | 238 | 4.2 | 43.3 |
| 5 | 21 | 259 | 3.8 | 47.1 |
| 6 | 14 | 273 | 2.5 | 49.6 |
| 7 | 17 | 290 | 3.1 | 52.7 |
| 8 | 9 | 299 | 1.6 | 54.4 |
| 9 | 11 | 310 | 2.0 | 56.4 |
| 10 - 56 | 240 | 550 | 43.6 | 100.0 |
| **Total** | **550** | | **100.0** | |

Source: USCIS analysis.
[1] Note: Figures may not sum to 100 percent due to rounding.

When small and non-small entities are treated separately, the distributions are different. Approximately 50 percent of the small entities submitted 2 petitions or fewer, whereas about 16 percent of non-small entities submitted 2 petitions or fewer. About 75 percent of the non-small entities submitted more than 5 petitions each.  Although the number of petition counts per entity ranged from 1 to 65 about half of small entities submitted only one or two petitions.  Therefore, DHS was able to

conclude that most of the small entities file fewer petitions, shown in Table 21. A full table of petitions per sample entity is available in Appendix C.

| Table 21: Form I-140 Petitions per Entity, Non-small and Small, FY 2022. | | | | | | |
|---|---|---|---|---|---|---|
| **Petitions per Entity** | **Non-small Entities** | | | **Small Entities** | | |
| | **Entities** | **Percentage of Total[1]** | **Cumulative Percentage[1]** | **Entities** | **Percentage of Total[1]** | **Cumulative Percentage[1]** |
| 1 | 29 | 11.6 | 11.6 | 113 | 37.8 | 37.8 |
| 2 | 11 | 4.4 | 15.9 | 36 | 12.0 | 49.8 |
| 3 | 9 | 3.6 | 19.5 | 17 | 5.7 | 55.5 |
| 4 | 9 | 3.6 | 23.1 | 14 | 4.7 | 60.2 |
| 5 | 6 | 2.4 | 25.5 | 15 | 5.0 | 65.2 |
| 6 to 10 | 27 | 10.8 | 36.3 | 29 | 9.7 | 74.9 |
| 11 to 20 | 34 | 13.5 | 49.8 | 25 | 8.4 | 83.3 |
| 21 to 50 | 53 | 21.1 | 70.9 | 26 | 8.7 | 92.0 |
| 51+ | 73 | 29.1 | 100.0 | 24 | 8.0 | 100.0 |
| **Total** | **251** | **100.0** | | **299** | **100.0** | |
| Source: USCIS analysis. | | | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | | | |

Table 22 shows the distribution of annual revenues for the matched small entities in the sample. About 41.1 percent of the small entities had annual revenues of less than $5 million.[39] About 50 percent of them reported revenues of less than $10 million per year, and about 63 percent of the entities reported revenues of less than $50 million.

---

[39] Calculation: Table 22 = 65 small entities with annual revenues of less than $5 million/ 158 matched small entities = 41.1 percent.

| Table 22: Form I-140 Revenue Distribution of Matched Small Entities, FY 2022. | | | | | |
|---|---|---|---|---|---|
| Revenue Range of Matched Small Entities[1] | Identified in Data Axle | Identified via Manta, Cortera, or Guidestar | Total | Percentage[2] | Cumulative Percent[3] |
| <$100K | 3 | 0 | 3 | 1.9 | 1.9 |
| $100K to < $500K | 13 | 5 | 18 | 11.4 | 13.3 |
| $500K to < $1M | 9 | 5 | 14 | 8.9 | 22.2 |
| $1M to < $5M | 15 | 15 | 30 | 19.0 | 41.1 |
| $5M to < $10M | 9 | 6 | 15 | 9.5 | 50.6 |
| $10M to < $50M | 10 | 9 | 19 | 12.0 | 62.7 |
| $50M to < $100M | 0 | 0 | 0 | 0.0 | 62.7 |
| >= $100M | 0 | 0 | 0 | 0.0 | 62.7 |
| Missing revenue data | 35 | 24 | 59 | 37.3 | 100.0 |
| **Total** | **94** | **64** | **158** | **100.0** | |

Source: USCIS analysis.
[1] Note: 1K = 1,000, 1M = 1,000,000.
[2] Note: Figures may not sum to 100 percent due to rounding.
[3] Some entities found in the databases either did not contain revenue data or were determined to be small based on employee count thresholds.

Out of the 550 petitioners in the sample, the largest number of petitions were submitted by businesses in California, New York, Illinois, Michigan and Texas. Together, these five states accounted for almost 68 percent (372 petitioners) of the petitions in the sample (*see* Table 23).

| Table 23: Form I-140 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2022. | | | |
|---|---|---|---|
| Rank | State | Number of Petitioners | Proportion of Sample (Percentage) |
| 1 | California (CA) | 201 | 36.5 |
| 2 | New York (NY) | 69 | 12.5 |
| 3 | Illinois (IL) | 50 | 9.1 |
| 4 | Michigan (MI) | 31 | 5.6 |
| 5 | Texas (TX) | 21 | 3.8 |
| 6 | Washington (WA) | 16 | 2.9 |
| 7 | Minnesota (MN) | 13 | 2.4 |
| 8 | Arizona (AZ) | 12 | 2.2 |
| 9 | Wisconsin (WI) | 12 | 2.2 |
| 10 | Massachusetts (MA) | 8 | 1.5 |

Source: USCIS analysis.

### B. *Funding the Asylum Program with Form I-140 Petition Fees*

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file a Form I-140, Immigrant Petition for Alien Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[40] The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I-129 and Form I-140 benefit requests.

### C. *Discussion of Impacts*

DHS will increase fees for Form I-140 from $700 to $715, an increase of 2 percent ($15). The total fees for each small entity in the analysis will include the I-140 form fee and the relevant Asylum Program Fee. The Asylum Program Fee will be dependent on the number of FTE employees and nonprofit status of the entity. Hence, calculation of fees in this analysis will be as follows:

- The total fee for entities that employ more than 25 FTE workers will include the $600 Asylum Program Fee for a total of $1,315 ($715 +$600). This is an overall increase of $615 (88 percent) per petition, from current costs of $700.
- The total fee for entities that employ 25 or fewer FTE employees will include the $300 Asylum Program Fee for a total of $1,015 ($715 +$300), an overall increase of $315 (45 percent) per petition, from current costs of $700.
- The total fee for nonprofit entities will consist of only the I-140 form fee as there are no Asylum Program Fees to be paid by nonprofit entities. Total fees will be $715, an increase of $15 (2 percent).

To calculate the economic impact of the final rule fees, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[41]  Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. DHS identified 126 small entities with reported revenue data in the sample. Of the 126 small entities, 46 had greater than 25 FTE employees and 80 had 25 or less FTE employees. There were no nonprofit small entities with reported revenue data in the sample. All 46 small entities with greater than 25 employees experienced an economic impact of less than 1 percent. The average impact on these 46 entities was 0.03 percent. The greatest economic impact imposed by the fees in the final rule was 0.25 percent and the smallest was 0.0001 percent.

For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent, which was the greatest economic impact imposed by the fees in the final rule. The smallest economic impact imposed by the fee increase was 0.002 percent.

---

[40] *See* 8 CFR 106.2(c)(13).

[41]  Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) / Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

### D. Small Entity Classification

With an aggregated total of 299 out of a sample size of 550, DHS inferred that a majority, or 54.4 percent, of the entities filing Form I-140 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form, DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 712110 (Museums), 813319 (Other Social Advocacy Organizations), 813410 (Civic and Social Organizations), 813910 (Business Associations), and 813940 (Political Organizations) were not-for-profit.

Table 24 shows the composition of the small entities by type. The sample of Form I-140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 13 small not-for-profits.

| Table 24: Form I-140 Small Entity Classification, FY 2022. | | | |
|---|---|---|---|
| **Classification** | **Small Entity Status** | **Sample Size** | **Sample Size (Percentage)[1]** |
| **Small Entity** | **Yes** | **299** | **54.4** |
| Small not-for-profit entity | Segment | 13 | 2.4 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 286 | 52.0 |
| **Non-small Entities** | **No** | **251** | **45.6** |
| **Total** | **-** | **550** | **100.0** |
| Source: USCIS analysis. [1] Note: Figures may not sum to 100 percent due to rounding. | | | |

### E. Issues with Data

DHS attempted to be inclusive of all petitioners that filed Form I-140. However, the database contained some submitted petitions where the EIN number was left blank or "0." Instructions for Form I-140 state that except for foreign workers of extraordinary ability or those petitioning under national interest waivers, all other Form I-140 petitions must require proof of a permanent job offer. Therefore, an EIN number must be coded on the form or it will be rejected. The blanks in the database could trace to these beneficiaries or not, many of those petitions submitted with a blank or "0" EIN did not provide an entity name. Manual data-cleaning was again impractical in a situation where thousands of records must be sorted.

The sample constructed was larger than necessary, weeding out any duplicates within that sample. There were no duplicates detected within the sample, indicating that irregularities in the data received were not large enough as to skew understanding of the underlying parameters of the petitioner population.

### F. Cumulative Impact of Form I-129 and Form I-140 Petitions

In addition to the individual Form I-129 and Form I-140 analyses, USCIS analyzed any cumulative impacts of these form types to determine the economic impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that

overlapped in both samples of Forms I-129 and I-140 by EIN and revenue. Ninety entities had an EIN
that overlapped in both samples; there were 59 large entities and 31 small entities that submitted both
Form I-129 petitions and Form I-140 petitions.[42] Of the 31 small entities, 8 entities had revenue data
reported in databases Data Axle, Manta.com, Cortera.com., or Guidestar.org (Table 25).

Three of the 8 overlapping sample entities with revenue data had Form I-129 economic
impacts of greater than 1 percent.  The sample entities that overlapped 2, 3, and 5 had Form I-129
economic impacts of 1.95%, 6.62%, and 6.92%, respectively.  All 8 overlapping sample entities had
Form I-140 economic impacts of less than 1 percent.  Although 3 overlapping small entities had Form
I-129 economic impacts of greater than 1 percent, USCIS does not expect the combined impacts of
Form I-129 and Form I-140 to be an economically significant burden on most of small entities. This is
due to little overlap in entities in the samples and the mostly minor economic impacts from the Forms
I-129 and I-140 fee increases and Asylum Program Fees.

| Table 25: Small Entities, with Reported Revenue Data, Identified in Both Form I-129 and Form I-140 Samples, FY 2022. | | | |
|---|---|---|---|
| Entity | Number of Form I-129 Petitions | Number of Form I-140 Petitions | Small Entity Status |
| Overlapping Sample Entity 1 | 11 | 5 | Small |
| Overlapping Sample Entity 2 | 4 | 3 | Small |
| Overlapping Sample Entity 3 | 28 | 14 | Small |
| Overlapping Sample Entity 4 | 28 | 3 | Small |
| Overlapping Sample Entity 5 | 28 | 8 | Small |
| Overlapping Sample Entity 6 | 21 | 2 | Small |
| Overlapping Sample Entity 7 | 3 | 5 | Small |
| Overlapping Sample Entity 8 | 9 | 5 | Small |
| Source: USCIS analysis. | | | |

## 6. Application for Civil Surgeon Designation, Form I-910

### A. Data Research Population and Sampling Statistics

By law, a civil surgeon is a physician designated by USCIS to conduct immigration medical
examinations for individuals applying for an immigration benefit in the United States. Form I-910 is
used by a physician to request that USCIS designate them as a civil surgeon to perform immigration
medical examinations in the United States and complete USCIS Form I-693, Report of Medical
Examination and Vaccination Record.

USCIS internal data for submissions of Form I-910 were provided by the USCIS National
Benefits Center from the National Processing Workflow Repository for FY 2022. These applications
contain many duplicates as an individual can apply for multiple clinic practices and a practice can
have multiple individual applicants. There were 500 distinct entities identified based on medical
license entries and 482 individual doctors associated with these requests.

DHS selected a random sample of 300 entities and successfully matched 219 of those entities,

---

[42] Total Impact to Entity = (Number of Petitions Submitted per Entity x Fee Increase) / Entity Sales Revenue. USCIS used
the lower end of sales revenue range for those entities where ranges were provided.

exceeding the minimum required sample threshold of 217 (Table 26).[43]  In the sample, 179 entities matched and were considered small, 40 entities were found in the databases but did not provide applicable revenue data and did not have an associated employment size threshold, and 0 entities were considered non-small. The remaining 81 entities were not found in any of the databases. From the revenue and employment information on these entities, DHS determined that all 300 of the applicants met the definition of small entities. Less than half of these small entities had annual revenues of less than $1 million,[44] and approximately 2 percent of them had requested a civil surgeon designation for 3 or more of their employee doctors over that year.[45]

| Table 26: Outline of Form I-910 Statistics, FY 2022. | | | |
|---|---|---|---|
| **Parameter** | **Quantity** | **Proportion of Population (Percentage)** | **Comments** |
| Population—applications | 746 | | Total number of applications. |
| Population—unique entities | 500 | | Determined by the clinic practice name. |
| Minimum Required Sample | 217 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 300 | 100.0 | Sample selected to match 217 entities. |
| Nonmatched Entities (S)** | **81** | **27.0** | Entities without data in Data Axle, Manta.com, Cortera.com., or Guidestar.org |
| Matched Entities | 219 | 73.0 | Entities matched in all databases. This exceeds established sample goal of 217. |
| Sub-Sample Missing Data (S) | **40** | **13.3** | Entities among the 219 matches lacking revenue or employee count data* |
| Matched Small Entities (S) | **179** | **59.7** | Entities among 219 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 0 | 0 | Number of non-small entities out of the 219 matches. |
| **Number of small entities discovered in research** | **300** | **100** | **81** + **40** + **179** = 300 |
| Source: USCIS analysis. Note: Includes no local government jurisdictions. **(S) Sample numbers used to calculate the totals, for each column. | | | |

Within the sample, 86 percent of entities had submitted one request; 98.3 percent of entities submitted 1 or 2 requests; and 1.7 percent of the entities submitted 3 or more petitions (Table 27). There were no non-small entities that had submitted Form I-910 applications in the sample. A full table of requests for civil surgeon designations per sample entity is available in Appendix D.

---

[43] The population with a 95 percent confidence level and a 5 percent confidence interval.

[44] Calculation: Table 28 = 123 small entities with revenue less than $1 million / 300 total small entities = 41.0 percent.

[45] Calculation: Table 27 = 5 small entities petitioned for 3 or more workers / 300 total small entities = 1.7 percent.

| Table 27: Total Form I-910 Applications per Entity, FY 2022. | | | | |
|---|---|---|---|---|
| **Applications per Entity** | **Entity Count** | **Cumulative Entities** | **Percentage of Sample[1]** | **Cumulative Percentage[1]** |
| 1 | 258 | 258 | 86.0 | 86.0 |
| 2 | 37 | 295 | 12.3 | 98.3 |
| 3 | 3 | 298 | 1.0 | 99.3 |
| 4 | 1 | 299 | 0.3 | 97.7 |
| 5 | 1 | 300 | 0.3 | 100.0 |
| 6 | 0 | 300 | 0.0 | 100.0 |
| 7 | 0 | 300 | 0.0 | 100.0 |
| 8 | 0 | 300 | 0.0 | 100.0 |
| 9 | 0 | 300 | 0.0 | 100.0 |
| 10+ | 0 | 300 | 100.0 | 100.0 |
| Source: USCIS analysis. | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | |

As shown in Table 28, approximately 98 percent of the small entities reported making less than $5 million in revenue annually. Only about 1 percent (2 entities) made over $5 million in revenue.

| Table 28: Form I-910 Revenue Distribution of Matched Small Entities, FY 2022. | | | | | |
|---|---|---|---|---|---|
| **Revenue Range of Matched Small Entities** | **Identified in Data Axle** | **Identified via Manta, Cortera, or Guidestar** | **Total** | **Percentage[1]** | **Cumulative Percentage[1]** |
| < $100K | 4 | 2 | 6 | 3.4 | 3.4 |
| $100K to < $500K | 27 | 1 | 28 | 15.6 | 19.0 |
| $500K to < $1M | 88 | 1 | 89 | 49.7 | 68.7 |
| $1M to < $5M | 52 | 0 | 52 | 29.1 | 97.8 |
| $5M to < $10M | 1 | 0 | 1 | 0.6 | 98.3 |
| $10M to < $50M | 1 | 1 | 2 | 1.1 | 99.4 |
| $50M to < $100M | 0 | 0 | 0 | 0.0 | 99.4 |
| >= $100M | 0 | 0 | 0 | 0.0 | 99.4 |
| Missing revenue data | 1 | 0 | 1 | 0.6 | 100.0 |
| **Total** | **174** | **5** | **179** | **100.0** | |
| Source: USCIS analysis. | | | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | | | |

From a total of 300 requesters/applicants, the largest number of applicants were submitted by businesses in Florida (16.7 percent), followed by New York, Texas, California and New Jersey (Table 29). Together, these top five states accounted for approximately 57.7 percent (173 applicants) of the applicants in the sample.

| Table 29: Form I-910 Geographic Distribution of Applicants in Sample, Top 10 States, FY 2022. | | | |
|------|------|------|------|
| Rank | State | Number of Applicants | Percent of Sample |
| 1 | Florida (FL) | 50 | 16.7 |
| 2 | New York (NY) | 39 | 13.0 |
| 3 | Texas (TX) | 36 | 12.0 |
| 4 | California (CA) | 30 | 10.0 |
| 5 | New Jersey (NJ) | 18 | 6.0 |
| 6 | Georgia (GA) | 12 | 4.0 |
| 7 | Pennsylvania (PA) | 11 | 3.7 |
| 8 | Illinois (IL) | 10 | 3.3 |
| 9 | Colorado (CO) | 7 | 2.3 |
| 10 | Michigan (MI) | 7 | 2.3 |
| Source: USCIS analysis. | | | |

### B. Discussion of Impacts

USCIS will increase fees for Form I-910 to $990. This is an increase of 26 percent ($205) from the current fee of $785. To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[46] Because entities can file multiple requests, the analysis considers the number of requests submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. In the sample, 179 matched entities with reported revenues were considered small entities. All 179 small entities experienced an economic impact of less than 1 percent. The greatest economic impact of the increased fee was 0.91 percent, and the smallest was 0.001 percent per entity. The average impact on all 179 small entities with revenue data was 0.05 percent.

### C. Small Entity Classification

With an aggregated total of 300 out of a sample size of 300, DHS inferred that most, or 100.0 percent, of the entities filing Form I-910 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), and (813990) Other Similar Organizations (except Business, Professional, Labor, and Political Organizations) were not-for-profit.

Table 30 shows the composition of the small entities by type. The sample of Form I-910 consisted of all small businesses, with no small governmental jurisdictions in the sample and no small not-for-profits.

---

[46] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) / Entity Sales Revenue.

| Table 30: Form I-910 Small Entity Classification, FY 2022. | | | |
|---|---|---|---|
| **Classification** | **Small Entity Status** | **Sample Size** | **Sample Size (Percentage)[1]** |
| **Small Entity** | **Yes** | **300** | **100.0** |
| Small not-for-profit entity | Segment | 0 | 0.0 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 300 | 100.0 |
| **Non-small Entities** | **No** | **0** | **0.0** |
| **Total** | **-** | **300** | **100.0** |
| Source: USCIS analysis. | | | |
| [1] Note: Figures may not sum to 100 percent due to rounding. | | | |

## 7. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360

### A. Data Research Population and Sampling Statistics

USCIS collected internal data for Form I-360 for religious workers only, provided by the OPQ from the CLAIMS 3/CISCOR database. Table 31 shows that there were 2,449 Form I-360 petitions submitted in FY 2022 by 1,648 unique entities. Of these 1,648 unique entities, DHS selected a random sample of 420 petitioning entities to analyze exceeding the minimum required. In the sample using the business provider databases identified previously, 174 entities matched and were considered small, 55 entities were found in the databases but did not provide applicable revenue or employee count data. The remaining 170 entities were not found in any of the databases. Using the business provider databases identified previously, DHS assembled revenue and employment information on these entities and determined that 399, or 95 percent of these petitioners met the definition of small entities.

| Table 31: Outline of Form I-360 Statistics, FY 2022. | | | |
|---|---|---|---|
| **Parameter** | **Quantity** | **Proportion of Population** | **Comments** |
| Population—petitions | 2,449 | - | Total number of petitions. |
| Population—unique entities | 1,648 | - | Determined by the firm name. |
| Minimum Required Sample | 312 | - | Sample size necessary to achieve confidence goals. |
| Selected Sample | 420 | 100.0 | Sample selected to match 312 entities. |
| Nonmatched Sample Segment (S)* | **170** | **40.5** | Entities without data in Data Axle, Manta.com, Cortera.com, or Guidestar.org |
| Matched Sample Segment | 250 | 59.5 | Entities matched in Data Axle, et al., from 420 searches. |
| Sub-Sample Missing Data (S)* | **55** | **13.1** | Entities among the 250 matches lacking revenue or employee count data. |
| Matched Small Entities (S) | **174** | **41.4** | Entities among 250 matches considered small based on revenue or employee data. |
| Matched Non-small Entities | 21 | 5.0 | Number of non-small entities out of the 250 matches. |

| | | | |
|---|---|---|---|
| **Number of small entities discovered in research** | **399** | **95.0** | **170** + **55** + **174** = **399** |

Source: USCIS analysis.
*(S) Sample numbers used to calculate the totals, for each column.

For the sample shown in Table 32, approximately 80 percent of entities had submitted one petition and about 91 percent of the entities submitted one or two petitions. Approximately 2 percent[47] of them had submitted for 5 or more petitions. Slightly less than 50 percent of the small entities had annual revenues of less than $1 million.[48]

| Table 32: Total Form I-360 Petitions per Entity, FY 2022. | | | | |
|---|---|---|---|---|
| **Petitions per Entity** | **Entity Count** | **Cumulative Entities** | **Percentage of Sample[1]** | **Cumulative Percentage[1]** |
| 1 | 334 | 334 | 79.5 | 79.5 |
| 2 | 50 | 384 | 11.9 | 91.4 |
| 3 | 25 | 409 | 6.0 | 97.4 |
| 4 | 4 | 413 | 1.0 | 98.3 |
| 5 | 3 | 416 | 0.7 | 99.0 |
| 6 | 3 | 419 | 0.7 | 99.8 |
| 7 | 0 | 419 | 0.0 | 99.8 |
| 8 | 1 | 420 | 0.2 | 100.0 |
| 9 | 0 | 420 | 0.0 | 100.0 |
| 10+ | 0 | 420 | 0.0 | 100.0 |
| **Total** | **420** | | **100.0** | |

Source: USCIS analysis.
[1] Note: Figures may not sum to 100 percent due to rounding.

Below in Table 33, when small and non-small entities are treated separately, the distributions are different. Those entities identified or assumed to be small were much more likely to submit fewer petitions per entity (approximately 80 percent of entities only submitted 1 petition), compared to approximately 57 percent of entities identified as non-small only submitted 1 petition. A full table of petitions per sample entity is available in Appendix E.

---

[47] Calculation: Table 33 = 7 small entities petitioning for five or more workers / 399 total small entities = 1.8 percent.

[48] Calculation: Table 34 = 78 small entities with annual revenues of less than $1 million / 174 matched small entities = 44.8 percent.

**Table 33: Form I-360 Petitions per Entity, Non-small and Small, FY 2022.**

| Petitions per Entity | Non-small Entities | | | Small Entities | | |
|---|---|---|---|---|---|---|
| | Entities | Percentage of Total[1] | Cumulative Percentage[1] | Entities | Percentage of Total[1] | Cumulative Percentage[1] |
| 1 | 12 | 57.1 | 57.1 | 322 | 80.7 | 80.7 |
| 2 | 2 | 9.5 | 66.7 | 48 | 12.0 | 92.7 |
| 3 | 4 | 19.0 | 85.7 | 21 | 5.3 | 98.0 |
| 4 | 0 | 0.0 | 85.7 | 4 | 1.0 | 99.0 |
| 5 | 1 | 4.8 | 90.5 | 2 | 0.5 | 99.5 |
| 6 to 10 | 2 | 9.5 | 100.0 | 2 | 0.5 | 100.0 |
| 11 to 20 | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| 21 to 50 | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| 51+ | 0 | 0.0 | 100.0 | 0 | 0.0 | 100.0 |
| **Total** | **21** | **100.0** | | **399** | **100.0** | |

Source: USCIS analysis.
[1] Note: Figures may not sum to 100 percent due to rounding.

For the small entities in the I-360 sample population, revenues were generally lower than in the Form I-129 and Form I-140 samples. Table 34 shows that approximately 67 percent of the small entities reported less than $5 million in revenue and about 10.3 percent made over $5 million in revenue.

**Table 34: Form I-360 Revenue Distribution of Matched Small Entities, FY 2022.**

| Revenue Range of Matched Small Entities | Identified in Data Axle | Identified via Cortera, Manta, or Guidestar | Total | Percentage[2] | Cumulative Percentage[2] |
|---|---|---|---|---|---|
| <$100K | 0 | 0 | 0 | 0.0 | 0.0 |
| $100K to < $500K | 0 | 0 | 0 | 0.0 | 0.0 |
| $500K to < $1M | 14 | 64 | 78 | 44.8 | 44.8 |
| $1M to < $5M | 12 | 27 | 39 | 22.4 | 67.2 |
| $5M to < $10M | 8 | 10 | 18 | 10.3 | 77.6 |
| $10M to < $50M | 0 | 0 | 0 | 0.0 | 77.6 |
| $50M to < $100M | 0 | 0 | 0 | 0.0 | 77.6 |
| >= $100M | 0 | 0 | 0 | 0.0 | 77.6 |
| Missing revenue data | 6 | 33 | 39 | 22.4 | 100.0 |
| **Total** | **40** | **134** | **174** | **100.0** | |

Source: USCIS analysis.
[1] Note: 1K = 100,000, 1M = 1,000,000.
[2] Note: Figures may not sum to 100 percent due to rounding.

Table 35 depicts the geographic distribution of the I-360 petitioners. Of the 420 entities sampled, the largest number of petitions were submitted by businesses in California (14.8 percent). This was followed by New York, Texas, Georgia, and Florida. Similarly to the I-129 and I-140 geographic distribution, these top five states accounted for about 47.9 percent (201 petitions) of the total petitions in the sample.

| Table 35: Form I-360 Geographic Distribution of Petitioners in Sample, Top 10 States, FY 2022. | | | |
|---|---|---|---|
| Rank | State | Number of Petitioners | Percentage of Sample |
| 1 | California (CA) | 62 | 14.8 |
| 2 | New York (NY) | 48 | 11.4 |
| 3 | Texas (TX) | 38 | 9.0 |
| 4 | Georgia (GA) | 29 | 6.9 |
| 5 | Florida (FL) | 24 | 5.7 |
| 6 | Maryland (MD) | 23 | 5.5 |
| 7 | Illinois (IL) | 21 | 5.0 |
| 8 | New Jersey (NJ) | 19 | 4.5 |
| 9 | Ohio (OH) | 15 | 3.6 |
| 10 | Pennsylvania (PA) | 13 | 3.1 |
| Source: USCIS analysis. | | | |

### B. Discussion of Impacts

DHS will increase the fees for entities that file Form I-360 from $435 to $515, an increase of $80 (18.4 percent). Using the business provider databases, DHS determined that 174 entities matched and were considered small entities. To calculate the economic impact of the fee increase for each entity, DHS divided the costs associated with the fee increase by the sales revenue of that entity.[49] The results indicated that all 174 small entities with reported revenue data experienced an economic impact well below 1 percent. The greatest economic impact imposed by this final fee change was 0.08 percent and the smallest was 0.001 percent per entity. The average impact on all 174 small entities with revenue data was 0.01 percent.

DHS also analyzed the costs of the final rule on the petitioning small entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the small entities in the sector.[50] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $60,180 for clergy,[51] $60,540 for directors of religious activities and education,[52] and $45,420

---

[49] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) / Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

[50] Office of Advocacy, SBA, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," p. 19 (Aug. 2017), available at *https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf* (last visited Aug. 22, 2023).

[51] Bureau of Labor Stat., U.S. Dep't of Labor, "Occupational Employment Statistics, May 2022, Clergy," available at https://www.bls.gov/oes/2022/may/oes212011.htm (last visited Aug. 22, 2023).

[52] Bureau of Labor Stat., U.S. Dep't of Labor, "Occupational Employment Statistics, May 2022, Directors of Religious Activities and Education," available at https://www.bls.gov/oes/2022/may/oes212021.htm (last visited Aug. 22, 2023).

for other religious workers.[53]  Based on an average of 1.29 religious workers[54] petitioned-for per entity, the additional average annual cost will be \$103.20 per small entity.[55]  The additional costs per small entity in this Final Rule represents only 0.17 percent of the average annual salary for clergy, 0.17 percent of the average annual salary for directors of religious activities and education, and 0.23 percent of the average annual salary for all other religious workers.[56]

### C. Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that most, or 95 percent, of the entities filing Form I-360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 813110 (Religious Organizations), 813410 (Civic and Social Organizations), 813920 (Professional Organizations), and 813990 (Other Similar Organizations except Business, Professional, Labor, and Political Organizations) were not-for-profit.

Table 36 shows the composition of the small entities by type. The sample population of Form I-360 consisted mainly of small businesses. There were no small governmental jurisdictions in the sample and 145 small not-for-profits primarily composed of religious institutions.

| Table 36: Form I-360 Small Entity Classification, FY 2022. | | | |
|---|---|---|---|
| Classification | Small Entity Status | Sample Size | Sample Size (Percentage)[1] |
| **Small Entity** | **Yes** | **399** | **95.0** |
| Small not-for-profit entity | Segment | 145 | 34.5 |
| Small governmental jurisdiction | Segment | 0 | 0.0 |
| Small business | Segment | 254 | 60.5 |
| **Non-small Entities** | **No** | **21** | **5.0** |
| **Total** | **-** | **420** | **100.0** |
| Source: USCIS analysis. [1] Note: Figures may not sum to 100 percent due to rounding. | | | |

---

[53] Bureau of Labor Stat., U.S. Dep't of Labor, "Occupational Employment Statistics, May 2022,Religious Workers, All Other," available at https://www.bls.gov/oes/2022/may/oes212099.htm (last visited Aug. 22, 2023).

[54] USCIS calculated the average filing per small entity of 1.29 petitions, from the Form I-360 Sample with Petition Totals in Appendix E of this analysis. Calculation: (total number of petitions from each sample id) / (total number of sample Form I-360 petitions) = 224/174 = 1.29 average petitions filed per small entity. Note, this calculation includes only small entities with reported revenue data, i.e., matched small entities.

[55] Calculation: 1.29 average petitions per small entity × \$80 increase in petition fees = approximately \$103.20 additional total cost per small entity.

[56] Calculation:

(\$103.20 additional cost per small entity / \$60,180 clergy salary) × 100 = 0.17 percent;

(\$103.20 additional cost per small entity / \$60,540 directors of religious activities and education) × 100 = 0.17 percent;

(\$103.20 additional cost per small entity / \$45,420 other religious workers) × 100 = 0.23 percent.

**8. Genealogy Requests, Form G-1041 (Index Search Request) and Form G-1041A (Records Request)**

In the final rule, DHS establishes a fee for the Genealogy Index Search Request, Form G-1041 and Form G-1041A to increase from $65 to $80, an increase of $15 (23 percent) for those who mail in this request on paper. This Final Rule decreases the fee for requestors who use the online electronic Form G-1041 or Form G-1041A version from the current $65 to $30, a decrease of $35 (-54 percent). DHS will charge a fee for requests for a Certificate of Non-Existence. Currently, USCIS allows individuals to request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. This service is often used by individuals gathering genealogical records to claim the citizenship of another nation. USCIS operates the Certificate of Non-Existence request process informally and at no cost to individuals while absorbing the costs to provide this service.[57] DHS is establishing a fee of $330 for individuals to recover the estimated full cost of processing these requests, which will require submission of Form G-1566, Request for a Certificate of Non-Existence once approved by the Office of Management and Budget.[58]

### A. Data Research Population

The population affected by the fee adjustments includes individuals who use Form G-1041 to request a search of USCIS historical indices and individuals who use Form G-1041A to obtain copies of USCIS historical records found through an index request. The affected population also includes individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. Based on the DHS records, Table 37 shows the estimated number of genealogy index search requests and historical records requests that were submitted to USCIS using Forms G-1041 and G-1041A for FY 2018 through FY 2022. DHS estimates that an annual average of 6,775 Form G-1041 index search requests and 4,608 Form G-1041A records requests were received during FY 2018 through FY 2022. For both forms, more than 90 percent of the requests were submitted electronically.

| | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| **Table 37. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2018 through FY 2022** | | | | |
| **Fiscal Year** | | | | |
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 2021 | 207 | 7,220 | 7,427 | 97% |
| 2022 | 124 | 8,901 | 9,025 | 99% |
| **5- year Total** | **1,095** | **32,782** | **33,877** | |
| **5-year Annual Average** | **219** | **6,556** | **6,775** | 97% |
| | | | | |

---

[57] *See* 8 CFR 103.7(f) (Oct. 1, 2020), *Authority to certify records*. The Director of USCIS, or such officials as they may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

[58] The fee will be established in the FY 2022/2023 rule and will be required with the submission of Form G-1566 if it is approved by OIRA before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed by DHS as provided in 8 CFR 299.1.

| Fiscal Year | Form G-1041A (Paper Filing) | Form G-1041A (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 333 | 3,407 | 3,740 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 2021 | 309 | 5,451 | 5,760 | 95% |
| 2022 | 190 | 5,168 | 5,358 | 96% |
| **5-year Total** | **1,474** | **21,566** | **23,040** | |
| **5-year Annual Average** | **295** | **4,313** | **4,608** | 94% |

| Fiscal Year | Certificate of Non-Existence Form G-1566 |
|---|---|
| 2018 | 1,442 |
| 2019 | 1,516 |
| 2020 | 1,784 |
| 2021 | 2,948 |
| 2022 | 4,527 |
| **5-year Total** | **12,217** |
| **5-year Annual Average** | **2,443** |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB), (Feb. 2, 2023).
Note: USCIS, IRIS tracks the online percentage of index searches and records requests.

Table 37 above depicts the FY 2018 through FY 2022 filing receipts of the Certificate of Non-Existence. DHS bases the estimate for the Form G-1566 on these receipts and estimates that the average annual receipts for Form G-1566 would be approximately 2,443.

### B. Discussion of Impacts

DHS has previously determined that requests for historical records are usually made by individuals.[59] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requesters and, therefore, could not be separated within the data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS assumes genealogists have access to a computer and the Internet. DHS is unable to estimate the online number of index searches and records requests; however, some will receive a reduced fee and cost savings, by filing online. Therefore, DHS does not currently have sufficient data to definitively assess the impact on small entities for these requests. DHS asked for comment on this in the proposed rule and received no comments or data.

For the final rule, DHS is expanding the use of electronic genealogy requests to encourage requesters to use the electronic versions of Form G-1041 and Form G–1041A. DHS is also changing the search request process so that USCIS may provide requesters with electronic records, if they exist, in response to the initial index request. These changes may reduce the time it takes to request and receive genealogy records, and, in some cases, it will eliminate the need to make multiple search requests and submit separate fees. Moreover, DHS notes that providing digital records in response to a Form G-1041 request may reduce the number of Form G-1041A requests that will be filed since there

---

[59] *See* "Establishment of a Genealogy Program," 73 FR 28026 (May 15, 2008).

would already be a copy of the record if it was previously digitized. DHS will provide the requestor with those preexisting digital records, if they exist, via email in response to the initial search request. Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requestor data into its systems. Requestors that cannot submit the forms electronically may still submit paper copies of both forms with the required filing fees. DHS recognizes that some small entities may be impacted by the increased fees but cannot determine how many or the exact impact.

**9. Application for Regional Center Designation Under the EB-5 Regional Center Pilot Program, Form I- 956 (formerly Form I-924), Application for Approval of an Investment in a Commercial Enterprise, Form I-956F, and I-956G (formerly I-924A)**

Congress created the EB-5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB-5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Pub. L. 102-395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). Under this program, investors (and their spouses and unmarried children under 21) are eligible to apply for lawful permanent residence (become a Green Card holder) if they make the necessary investment in a commercial enterprise in the United States and plan to create or preserve 10 permanent full-time jobs for qualified U.S. workers.

As amended, the EB-5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,00 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees.[60] Such investment amounts are not necessarily indicative of whether the regional center is characterized appropriately as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117-103). The EB-5 Reform and Integrity Act of 2022 immediately repealed the Regional Center Pilot Program and authorized a new EB-5 Regional Center Program.[61] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB-5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB-5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB-5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and complete the adjudications within certain time frames. *See* Pub. L. 117–103, sec. 106(b). DHS has begun the fee study required by the EB-5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages.  How the EB-5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.   The various program fees and changes as a result of the EB-5 Reform Integrity Act of 2022 will be discussed in a separate future EB-5 rulemaking.

Despite the changes in the law and program, DHS's final fees are based on the currently

---

[60] *See* INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5).

[61] Div. BB of the Consolidated Appropriations Act, 2022, Pub. L. 117-103.

projected staffing needs to meet the adjudicative and administrative burden of the IPO pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022. The fee for Form I-956 (formerly Form I-924) and Form I-956F[62] is $47,695, a $29,900 or 168-percent increase from the current Form I-924 fee of $17,795 fee. The fee for Form I-956G (formerly Form I-924A) is $4,470, a $1,435 or 47-percent increase from the current $3,035 fee.

### A. Data Research Population

The application process will require the same information from applicants that is currently required. As shown in Table 38, during the 5-year period from FY 2018 through FY 2022, USCIS received a total of 249 annual Form I-956 (formerly Form I-924) regional centers applications and 3,260 Form I-956G (formerly Form I-924A) annual statements, with annual averages of 50 and 652 respectively.

The annual filing volume projections in this rule are based on historical volumes and trends. Section 105(a) of the EB-5 Reform and Integrity Act of 2022 directs USCIS to conduct a study of the fees charged in the administration of the EB-5 program. Form I-956F and other changes are too new for DHS to accurately estimate impacts on filing volumes. DHS will address these additional impacts resulting from the EB-5 Reform and Integrity Act of 2022 in a future rulemaking.[63]

| Table 38. Annual Receipts for Form I-956, Application for Regional Center Designation under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2018 through FY 2022 | | |
|---|---|---|
| **Fiscal Year** | **Form I-956** | **Form I-956G** |
| 2018 | 122 | 787 |
| 2019 | 79 | 808 |
| 2020 | 34 | 702 |
| 2021 | 14 | 434 |
| 2022 | 0[64] | 529 |
| **5-year Total** | **249** | **3,260** |
| **Annual Average** | **62** | **652** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, Consolidated/ELIS, PAS-SQL Dashboard, Updated Sept. 25, 2023. Note: I-956G are the annual statements to be submitted by these approved regional centers. For Form I-956, DHS used a 4-year annual average. | | |

---

[62] . See "The EB-5 Reform and Integrity Act of 2022, Public Law No. 117-103 (Mar. 15, 2022), Sec. 106(a), https://https://www.congress.gov/bill/117th-congress/house-bill/2471/text, at Sec. 106(a), page 136, Stat.1104. Authorized the same fee for Form I-956F as Form I-956. (last accessed Nov. 29, 2023).

[63] DHS may reevaluate EB-5 fees to meet the additional fee guidelines of EB-5 Reform and Integrity Act of 2022 sec. 106(c). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

[64] Zero reported receipts in FY 2022 was due to EB-5 program and database system changes. DHS acknowledges that these changes may result in slightly lower annual average estimates for this form. There is a separate rulemaking pertaining to

**B. Discussion of Impacts**

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking investor funds to new commercial enterprise (NCEs)[65] and job-creating projects or entities. Regional centers also pose a challenge for analysis as the structure is often complex and can involve many related business and financial activities not directly involved with EB-5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above market return differentials.

While DHS attempted to treat regional centers like the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB-5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $800,000 if the investment is in TEA project(s), which includes certain rural areas and areas of high unemployment or $1.050,000 for a non- TEA projects per investor, in a U.S. business that will create or, in certain circumstances preserve at least 10 full-time jobs in the United States for qualifying employees)[66] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I-956 (formerly Form I-924), I-956F, and I-956G (formerly Form I-924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions in an attempt to analyze the small entity status of regional centers. In the DHS proposed rule "EB-5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers.[67] DHS found both the mean and median for administrative fees to be $50,000 and

---

[65] A "new commercial enterprise" is "any for-profit organization formed in the United States for the ongoing conduct of lawful business . . . that receives, or is established to receive, capital investment from [employment-based immigrant] investors". *See* INA sec. 203(b)(5)(D)(vi).

[66] *See* 84 FR 35750 (July 24, 2019).  This amount by investor is determined between a designated Target Employment Area and non-Target Employment Area. Federal Register/Vol. 84, No. 142/Wednesday, July 24, 2019/Rules and Regulations, pages 35750-35756.

[67] *Ibid.*

the EB-5 program that is currently being drafted and will elaborate more on the populations and various programs changes with the EB5 Integrity Act, volume projections and new forms.

the median revenue amount to be $1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this Final Rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[68]

**Appendix A: SBA NAICS Size Standards for I-129, I-140, I-910 and I-360 Petitions in Sample Dataset**

| NAICS Code | NAICS Industry Description | Size Standards in millions of dollars ($) | Size standards in number of employees |
|---|---|---|---|
| Sector 11 – Agriculture, Forestry, Fishing and Hunting | | | |
| 111110 | Soybean Farming | 2.25 | |
| 111120 | Oilseed (except Soybean) Farming | 2.25 | |
| 111130 | Dry Pea and Bean Farming | 2.75 | |
| 111140 | Wheat Farming | 2.25 | |
| 111150 | Corn Farming | 2.5 | |
| 111160 | Rice Farming | 2.5 | |
| 111191 | Oilseed and Grain Combination Farming | 2.25 | |
| 111199 | All Other Grain Farming | 2.25 | |
| 111211 | Potato Farming | 4.25 | |
| 111219 | Other Vegetable (except Potato) and Melon Farming | 3.75 | |
| 111310 | Orange Groves | 4 | |
| 111320 | Citrus (except Orange) Groves | 4.25 | |
| 111331 | Apple Orchards | 4.5 | |
| 111332 | Grape Vineyards | 4 | |
| 111333 | Strawberry Farming | 5.5 | |
| 111334 | Berry (except Strawberry) Farming | 3.75 | |
| 111335 | Tree Nut Farming | 3.75 | |
| 111336 | Fruit and Tree Nut Combination Farming | 5 | |
| 111339 | Other Noncitrus Fruit Farming | 3.5 | |
| 111411 | Mushroom Production | 4.5 | |
| 111419 | Other Food Crops Grown Under Cover | 4.5 | |
| 111421 | Nursery and Tree Production | 3.25 | |

---

[68] Calculation: 1 percent of $447,000 = $4,470 (the new fee for Form I-956G).

| 111422 | Floriculture Production | 3.75 | |
| 111910 | Tobacco Farming | 2.5 | |
| 111920 | Cotton Farming | 3.25 | |
| 111930 | Sugarcane Farming | 5 | |
| 111940 | Hay Farming | 2.5 | |
| 111991 | Sugar Beet Farming | 2.5 | |
| 111992 | Peanut Farming | 2.5 | |
| 111998 | All Other Miscellaneous Crop Farming | 2.5 | |
| 112111 | Beef Cattle Ranching and Farming | 2.5 | |
| 112112 | Cattle Feedlots | 22 | |
| 112120 | Dairy Cattle and Milk Production | 3.75 | |
| 112210 | Hog and Pig Farming | 4 | |
| 112310 | Chicken Egg Production | 19 | |
| 112320 | Broilers and Other Meat Type Chicken Production | 3.5 | |
| 112330 | Turkey Production | 3.75 | |
| 112340 | Poultry Hatcheries | 4 | |
| 112390 | Other Poultry Production | 3.75 | |
| 112410 | Sheep Farming | 3.5 | |
| 112420 | Goat Farming | 2.5 | |
| 112511 | Finfish Farming and Fish Hatcheries | 3.75 | |
| 112512 | Shellfish Farming | 3.75 | |
| 112519 | Other Aquaculture | 3.75 | |
| 112910 | Apiculture | 3.25 | |
| 112920 | Horses and Other Equine Production | 2.75 | |
| 112930 | Fur-Bearing Animal and Rabbit Production | 3.75 | |
| 112990 | All Other Animal Production | 2.75 | |
| 113110 | Timber Tract Operations | 19 | |
| 113210 | Forest Nurseries and Gathering of Forest Products | 20.5 | |
| 113310 | Logging | | 500 |
| 114111 | Finfish Fishing | 25 | |
| 114112 | Shellfish Fishing | 14 | |
| 114119 | Other Marine Fishing | 11.5 | |
| 114210 | Hunting and Trapping | 8.5 | |
| 115111 | Cotton Ginning | 16 | |
| 115112 | Soil Preparation, Planting, and Cultivating | 9.5 | |
| 115113 | Crop Harvesting, Primarily by Machine | 13.5 | |
| 115114 | Postharvest Crop Activities (except Cotton Ginning) | 34 | |
| 115115 | Farm Labor Contractors and Crew Leaders | 19 | |
| 115116 | Farm Management Services | 15.5 | |

| | | | |
|---|---|---|---|
| **115210** | Support Activities for Animal Production | 11 | |
| **115310** | Support Activities for Forestry | 11.5 | |
| **115310 (Exception 1)** | Forest Fire Suppression | 34 | |
| **115310 (Exception 2)** | Fuels Management Services | 34 | |
| **Sector 21 – Mining, Quarrying, and Oil and Gas** | | | |
| **211120** | Crude Petroleum Extraction | | 1,250 |
| **211130** | Natural Gas Extraction | | 1,250 |
| **212114** | Surface Coal Mining | | 1,250 |
| **212115** | Underground Coal Mining | | 1,500 |
| **212210** | Iron Ore Mining | | 750 |
| **212221** | Gold Ore Mining | | 1,500 |
| **212230** | Copper, Nickel, Lead, and Zinc Mining | | 750 |
| **212290** | Other Metal Ore Mining | | 750 |
| **212311** | Dimension Stone Mining and Quarrying | | 500 |
| **212312** | Crushed and Broken Limestone Mining and Quarrying | | 750 |
| **212313** | Crushed and Broken Granite Mining and Quarrying | | 750 |
| **212319** | Other Crushed and Broken Stone Mining and Quarrying | | 500 |
| **212321** | Construction Sand and Gravel Mining | | 500 |
| **212322** | Industrial Sand Mining | | 500 |
| **212323** | Kaolin, Clay, and Ceramic and Refractory Minerals Mining | | 500 |
| **212399** | All Other Nonmetallic Mineral Mining | | 500 |
| **213111** | Drilling Oil and Gas Wells | | 1,000 |
| **213112** | Support Activities for Oil and Gas Operations | 47 | |
| **213113** | Support Activities for Coal Mining | 27.5 | |
| **213114** | Support Activities for Metal Mining | 41 | |
| **213115** | Support Activities for Nonmetallic Minerals (except Fuels) Mining | 20.5 | |
| **221111** | Hydroelectric Power Generation | | 500 |
| **221112** | Fossil Fuel Electric Power Generation | | 750 |
| **221113** | Nuclear Electric Power Generation | | 750 |
| **221114** | Solar Electric Power Generation | | 250 |
| **221115** | Wind Electric Power Generation | | 250 |
| **221116** | Geothermal Electric Power Generation | | 250 |
| **221117** | Biomass Electric Power Generation | | 250 |
| **221118** | Other Electric Power Generation | | 250 |
| **221121** | Electric Bulk Power Transmission and Control | | 500 |

| 221122 | Electric Power Distribution | | 1,000 |
|---|---|---|---|
| 221210 | Natural Gas Distribution | | 1,000 |
| 221310 | Water Supply and Irrigation Systems | 41 | |
| 221320 | Sewage Treatment Facilities | 35 | |
| 221330 | Steam and Air-Conditioning Supply | 30 | |
| **Sector 23 – Construction** | | | |
| 236115 | New Single-family Housing Construction (Except For-Sale Builders) | 45 | |
| 236116 | New Multifamily Housing Construction (except For-Sale Builders) | 45 | |
| 236117 | New Housing For-Sale Builders | 45 | |
| 236118 | Residential Remodelers | 45 | |
| 236210 | Industrial Building Construction | 45 | |
| 236220 | Commercial and Institutional Building Construction | 45 | |
| 237110 | Water and Sewer Line and Related Structures Construction | 45 | |
| 237120 | Oil and Gas Pipeline and Related Structures Construction | 45 | |
| 237130 | Power and Communication Line and Related Structures Construction | 45 | |
| 237210 | Land Subdivision | 34 | |
| 237310 | Highway, Street, and Bridge Construction | 45 | |
| 237990 | Other Heavy and Civil Engineering Construction | 45 | |
| 237990 (Exception) | Dredging and Surface Cleanup Activities[2] | 37 | |
| 238110 | Poured Concrete Foundation and Structure Contractors | 19 | |
| 238120 | Structural Steel and Precast Concrete Contractors | 19 | |
| 238130 | Framing Contractors | 19 | |
| 238140 | Masonry Contractors | 19 | |
| 238150 | Glass and Glazing Contractors | 19 | |
| 238160 | Roofing Contractors | 19 | |
| 238170 | Siding Contractors | 19 | |
| 238190 | Other Foundation, Structure, and Building Exterior Contractors | 19 | |
| 238210 | Electrical Contractors and Other Wiring Installation Contractors | 19 | |
| 238220 | Plumbing, Heating, and Air-Conditioning Contractors | 19 | |
| 238290 | Other Building Equipment Contractors | 22 | |
| 238310 | Drywall and Insulation Contractors | 19 | |
| 238320 | Painting and Wall Covering Contractors | 19 | |
| 238330 | Flooring Contractors | 19 | |

| | | | |
|---|---|---|---|
| 238340 | Tile and Terrazzo Contractors | 19 | |
| 238350 | Finish Carpentry Contractors | 19 | |
| 238390 | Other Building Finishing Contractors | 19 | |
| 238910 | Site Preparation Contractors | 19 | |
| 238990 | All Other Specialty Trade Contractors | 19 | |
| **Sector 31 – 33 – Manufacturing** | | | |
| 311111 | Dog and Cat Food Manufacturing | | 1,000 |
| 311119 | Other Animal Food Manufacturing | | 500 |
| 311211 | Flour Milling | | 1,000 |
| 311212 | Rice Milling | | 500 |
| 311213 | Malt Manufacturing | | 500 |
| 311221 | Wet Corn Milling and Starch Manufacturing | | 1,250 |
| 311224 | Soybean and Other Oilseed Processing | | 1,000 |
| 311225 | Fats and Oils Refining and Blending | | 1,000 |
| 311230 | Breakfast Cereal Manufacturing | | 1,000 |
| 311313 | Beet Sugar Manufacturing | | 750 |
| 311314 | Cane Sugar Manufacturing | | 1,000 |
| 311340 | Nonchocolate Confectionery Manufacturing | | 1,000 |
| 311351 | Chocolate and Confectionery Manufacturing from Cacao Beans | | 1,250 |
| 311352 | Confectionery Manufacturing from Purchased Chocolate | | 1,000 |
| 311411 | Frozen Fruit, Juice and Vegetable Manufacturing | | 1,000 |
| 311412 | Frozen Specialty Food Manufacturing | | 1,250 |
| 311421 | Fruit and Vegetable Canning[3] | | 1,000 |
| 311422 | Specialty Canning | | 1,250 |
| 311423 | Dried and Dehydrated Food Manufacturing | | 750 |
| 311511 | Fluid Milk Manufacturing | | 1,000 |
| 311512 | Creamery Butter Manufacturing | | 750 |
| 311513 | Cheese Manufacturing | | 1,250 |
| 311514 | Dry, Condensed, and Evaporated Dairy Product Manufacturing | | 750 |
| 311520 | Ice Cream and Frozen Dessert Manufacturing | | 1,000 |
| 311611 | Animal (except Poultry) Slaughtering | | 1,000 |
| 311612 | Meat Processed from Carcasses | | 1,000 |
| 311613 | Rendering and Meat Byproduct Processing | | 750 |
| 311615 | Poultry Processing | | 1,250 |
| 311710 | Seafood Product Preparation and Packaging | | 750 |
| 311811 | Retail Bakeries | | 500 |
| 311812 | Commercial Bakeries | | 1,000 |

| 311813 | Frozen Cakes, Pies, and Other Pastries Manufacturing | | 750 |
|---|---|---|---|
| 311821 | Cookie and Cracker Manufacturing | | 1,250 |
| 311824 | Dry Pasta, Dough, and Flour Mixes Manufacturing from Purchased Flour | | 750 |
| 311830 | Tortilla Manufacturing | | 1,250 |
| 311911 | Roasted Nuts and Peanut Butter Manufacturing | | 750 |
| 311919 | Other Snack Food Manufacturing | | 1,250 |
| 311920 | Coffee and Tea Manufacturing | | 750 |
| 311930 | Flavoring Syrup and Concentrate Manufacturing | | 1,000 |
| 311941 | Mayonnaise, Dressing and Other Prepared Sauce Manufacturing | | 750 |
| 311942 | Spice and Extract Manufacturing | | 500 |
| 311991 | Perishable Prepared Food Manufacturing | | 500 |
| 311999 | All Other Miscellaneous Food Manufacturing | | 500 |
| 312111 | Soft Drink Manufacturing | | 1,250 |
| 312112 | Bottled Water Manufacturing | | 1,000 |
| 312113 | Ice Manufacturing | | 750 |
| 312120 | Breweries | | 1,250 |
| 312130 | Wineries | | 1,000 |
| 312140 | Distilleries | | 1,000 |
| 312230 | Tobacco Manufacturing | | 1,500 |
| 313110 | Fiber, Yarn, and Thread Mills | | 1,250 |
| 313210 | Broadwoven Fabric Mills | | 1,000 |
| 313220 | Narrow Fabric Mills and Schiffli Machine Embroidery | | 500 |
| 313230 | Nonwoven Fabric Mills | | 750 |
| 313240 | Knit Fabric Mills | | 500 |
| 313310 | Textile and Fabric Finishing Mills | | 1,000 |
| 313320 | Fabric Coating Mills | | 1,000 |
| 314110 | Carpet and Rug Mills | | 1,500 |
| 314120 | Curtain and Linen Mills | | 750 |
| 314910 | Textile Bag and Canvas Mills | | 500 |
| 314994 | Rope, Cordage, Twine, Tire Cord, and Tire Fabric Mills | | 1,000 |
| 314999 | All Other Miscellaneous Textile Product Mills | | 500 |
| 315120 | Apparel Knitting Mills | | 750 |
| 315210 | Cut and Sew Apparel Contractors | | 750 |
| 315250 | Cut and Sew Apparel Manufacturing (except Contractors) | | 750 |

| | | | |
|---|---|---|---|
| 315990 | Apparel Accessories and Other Apparel Manufacturing | | 500 |
| 316110 | Leather and Hide Tanning and Finishing | | 500 |
| 316210 | Footwear Manufacturing | | 1,000 |
| 316990 | Other Leather and Allied Product Manufacturing | | 500 |
| 321113 | Sawmills | | 500 |
| 321114 | Wood Preservation | | 500 |
| 321211 | Hardwood Veneer and Plywood Manufacturing | | 500 |
| 321212 | Softwood Veneer and Plywood Manufacturing | | 1,250 |
| 321215 | Engineered Wood Member Manufacturing | | 500 |
| 321219 | Reconstituted Wood Product Manufacturing | | 750 |
| 321911 | Wood Window and Door Manufacturing | | 1,000 |
| 321912 | Cut Stock, Resawing Lumber, and Planing | | 500 |
| 321918 | Other Millwork (including Flooring) | | 500 |
| 321920 | Wood Container and Pallet Manufacturing | | 500 |
| 321991 | Manufactured Home (Mobile Home) Manufacturing | | 1,250 |
| 321992 | Prefabricated Wood Building Manufacturing | | 500 |
| 321999 | All Other Miscellaneous Wood Product Manufacturing | | 500 |
| 322110 | Pulp Mills | | 750 |
| 322120 | Paper Mills | | 1,250 |
| 322130 | Paperboard Mills | | 1,250 |
| 322211 | Corrugated and Solid Fiber Box Manufacturing | | 1,250 |
| 322212 | Folding Paperboard Box Manufacturing | | 750 |
| 322219 | Other Paperboard Container Manufacturing | | 1,000 |
| 322220 | Paper Bag and Coated and Treated Paper Manufacturing | | 750 |
| 322230 | Stationery Product Manufacturing | | 750 |
| 322291 | Sanitary Paper Product Manufacturing | | 1,500 |
| 322299 | All Other Converted Paper Product Manufacturing | | 500 |
| 323111 | Commercial Printing (except Screen and Books) | | 500 |
| 323113 | Commercial Screen Printing | | 500 |
| 323117 | Books Printing | | 1,250 |
| 323120 | Support Activities for Printing | | 500 |
| 324110 | Petroleum Refineries[4] | | 1,500 |
| 324121 | Asphalt Paving Mixture and Block Manufacturing | | 500 |

| | | | |
|---|---|---|---|
| 324122 | Asphalt Shingle and Coating Materials Manufacturing | | 750 |
| 324191 | Petroleum Lubricating Oil and Grease Manufacturing | | 750 |
| 324199 | All Other Petroleum and Coal Products Manufacturing | | 500 |
| 325110 | Petrochemical Manufacturing | | 1,000 |
| 325120 | Industrial Gas Manufacturing | | 1,000 |
| 325130 | Synthetic Dye and Pigment Manufacturing | | 1,000 |
| 325180 | Other Basic Inorganic Chemical Manufacturing | | 1,000 |
| 325193 | Ethyl Alcohol Manufacturing | | 1,000 |
| 325194 | Cyclic Crude, Intermediate, and Gum and Wood Chemical Manufacturing | | 1,250 |
| 325199 | All Other Basic Organic Chemical Manufacturing | | 1,250 |
| 325211 | Plastics Material and Resin Manufacturing | | 1,250 |
| 325212 | Synthetic Rubber Manufacturing | | 1,000 |
| 325220 | Artificial and Synthetic Fibers and Filaments Manufacturing | | 1,000 |
| 325311 | Nitrogenous Fertilizer Manufacturing | | 1,000 |
| 325312 | Phosphatic Fertilizer Manufacturing | | 750 |
| 325314 | Fertilizer (Mixing Only) Manufacturing | | 500 |
| 325315 | Compost Manufacturing | | 500 |
| 325320 | Pesticide and Other Agricultural Chemical Manufacturing | | 1,000 |
| 325411 | Medicinal and Botanical Manufacturing | | 1,000 |
| 325412 | Pharmaceutical Preparation Manufacturing | | 1,250 |
| 325413 | In-Vitro Diagnostic Substance Manufacturing | | 1,250 |
| 325414 | Biological Product (except Diagnostic) Manufacturing | | 1,250 |
| 325510 | Paint and Coating Manufacturing | | 1,000 |
| 325520 | Adhesive Manufacturing | | 500 |
| 325611 | Soap and Other Detergent Manufacturing | | 1,000 |
| 325612 | Polish and Other Sanitation Good Manufacturing | | 750 |
| 325613 | Surface Active Agent Manufacturing | | 750 |
| 325620 | Toilet Preparation Manufacturing | | 1,250 |
| 325910 | Printing Ink Manufacturing | | 500 |
| 325920 | Explosives Manufacturing | | 750 |
| 325991 | Custom Compounding of Purchased Resins | | 500 |
| 325992 | Photographic Film, Paper, Plate, Chemical, and Copy Toner Manufacturing | | 1,500 |
| 325998 | All Other Miscellaneous Chemical Product and Preparation Manufacturing | | 500 |

| | | | |
|---|---|---|---|
| 326111 | Plastic Bag and Pouch Manufacturing | | 750 |
| 326112 | Plastics Packaging Film and Sheet (including Laminated) Manufacturing | | 1,000 |
| 326113 | Unlaminated Plastics Film and Sheet (except Packaging) Manufacturing | | 750 |
| 326121 | Unlaminated Plastics Profile Shape Manufacturing | | 500 |
| 326122 | Plastics Pipe and Pipe Fitting Manufacturing | | 750 |
| 326130 | Laminated Plastics Plate, Sheet (except Packaging), and Shape Manufacturing | | 500 |
| 326140 | Polystyrene Foam Product Manufacturing | | 1,000 |
| 326150 | Urethane and Other Foam Product (except Polystyrene) Manufacturing | | 750 |
| 326160 | Plastics Bottle Manufacturing | | 1,250 |
| 326191 | Plastics Plumbing Fixture Manufacturing | | 750 |
| 326199 | All Other Plastics Product Manufacturing | | 750 |
| 326211 | Tire Manufacturing (except Retreading)[5] | | 1,500 |
| 326212 | Tire Retreading | | 500 |
| 326220 | Rubber and Plastics Hoses and Belting Manufacturing | | 750 |
| 326291 | Rubber Product Manufacturing for Mechanical Use | | 750 |
| 326299 | All Other Rubber Product Manufacturing | | 500 |
| 327110 | Pottery, Ceramics, and Plumbing Fixture Manufacturing | | 1,000 |
| 327120 | Clay Building Material and Refractories Manufacturing | | 750 |
| 327211 | Flat Glass Manufacturing | | 1,000 |
| 327212 | Other Pressed and Blown Glass and Glassware Manufacturing | | 1,250 |
| 327213 | Glass Container Manufacturing | | 1,250 |
| 327215 | Glass Product Manufacturing Made of Purchased Glass | | 1,000 |
| 327310 | Cement Manufacturing | | 1,000 |
| 327320 | Ready-Mix Concrete Manufacturing | | 500 |
| 327331 | Concrete Block and Brick Manufacturing | | 500 |
| 327332 | Concrete Pipe Manufacturing | | 750 |
| 327390 | Other Concrete Product Manufacturing | | 500 |
| 327410 | Lime Manufacturing | | 750 |
| 327420 | Gypsum Product Manufacturing | | 1,500 |
| 327910 | Abrasive Product Manufacturing | | 750 |
| 327991 | Cut Stone and Stone Product Manufacturing | | 500 |
| 327992 | Ground or Treated Mineral and Earth Manufacturing | | 500 |
| 327993 | Mineral Wool Manufacturing | | 1,500 |

| | | | |
|---|---|---|---|
| 327999 | All Other Miscellaneous Nonmetallic Mineral Product Manufacturing | | 500 |
| 331110 | Iron and Steel Mills and Ferroalloy Manufacturing | | 1,500 |
| 331210 | Iron and Steel Pipe and Tube Manufacturing from Purchased Steel | | 1,000 |
| 331221 | Rolled Steel Shape Manufacturing | | 1,000 |
| 331222 | Steel Wire Drawing | | 1,000 |
| 331313 | Alumina Refining and Primary Aluminum Production | | 1,000 |
| 331314 | Secondary Smelting and Alloying of Aluminum | | 750 |
| 331315 | Aluminum Sheet, Plate and Foil Manufacturing | | 1,250 |
| 331318 | Other Aluminum Rolling, Drawing, and Extruding | | 750 |
| 331410 | Nonferrous Metal (except Aluminum) Smelting and Refining | | 1,000 |
| 331420 | Copper Rolling, Drawing, Extruding, and Alloying | | 1,000 |
| 331491 | Nonferrous Metal (except Copper and Aluminum) Rolling, Drawing and Extruding | | 750 |
| 331492 | Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum) | | 750 |
| 331511 | Iron Foundries | | 1,000 |
| 331512 | Steel Investment Foundries | | 1,000 |
| 331513 | Steel Foundries (except Investment) | | 500 |
| 331523 | Nonferrous Metal Die-Casting Foundries | | 500 |
| 331524 | Aluminum Foundries (except Die-Casting) | | 500 |
| 331529 | Other Nonferrous Metal Foundries (except Die-Casting) | | 500 |
| 332111 | Iron and Steel Forging | | 750 |
| 332112 | Nonferrous Forging | | 750 |
| 332114 | Custom Roll Forming | | 500 |
| 332117 | Powder Metallurgy Part Manufacturing | | 500 |
| 332119 | Metal Crown, Closure, and Other Metal Stamping (except Automotive) | | 500 |
| 332215 | Metal Kitchen Cookware, Utensil, Cutlery, and Flatware (except Precious) Manufacturing | | 750 |
| 332216 | Saw Blade and Handtool Manufacturing | | 750 |
| 332311 | Prefabricated Metal Building and Component Manufacturing | | 750 |
| 332312 | Fabricated Structural Metal Manufacturing | | 500 |
| 332313 | Plate Work Manufacturing | | 750 |
| 332321 | Metal Window and Door Manufacturing | | 750 |

| | | | |
|---|---|---|---|
| 332322 | Sheet Metal Work Manufacturing | | 500 |
| 332323 | Ornamental and Architectural Metal Work Manufacturing | | 500 |
| 332410 | Power Boiler and Heat Exchanger Manufacturing | | 750 |
| 332420 | Metal Tank (Heavy Gauge) Manufacturing | | 750 |
| 332431 | Metal Can Manufacturing | | 1,500 |
| 332439 | Other Metal Container Manufacturing | | 500 |
| 332510 | Hardware Manufacturing | | 750 |
| 332613 | Spring Manufacturing | | 500 |
| 332618 | Other Fabricated Wire Product Manufacturing | | 500 |
| 332710 | Machine Shops | | 500 |
| 332721 | Precision Turned Product Manufacturing | | 500 |
| 332722 | Bolt, Nut, Screw, Rivet and Washer Manufacturing | | 500 |
| 332811 | Metal Heat Treating | | 750 |
| 332812 | Metal Coating, Engraving (except Jewelry and Silverware), and Allied Services to Manufacturers | | 500 |
| 332813 | Electroplating, Plating, Polishing, Anodizing and Coloring | | 500 |
| 332911 | Industrial Valve Manufacturing | | 750 |
| 332912 | Fluid Power Valve and Hose Fitting Manufacturing | | 1,000 |
| 332913 | Plumbing Fixture Fitting and Trim Manufacturing | | 1,000 |
| 332919 | Other Metal Valve and Pipe Fitting Manufacturing | | 750 |
| 332991 | Ball and Roller Bearing Manufacturing | | 1,250 |
| 332992 | Small Arms Ammunition Manufacturing | | 1,250 |
| 332993 | Ammunition (except Small Arms) Manufacturing | | 1,500 |
| 332994 | Small Arms, Ordnance, and Ordnance Accessories Manufacturing | | 1,000 |
| 332996 | Fabricated Pipe and Pipe Fitting Manufacturing | | 500 |
| 332999 | All Other Miscellaneous Fabricated Metal Product Manufacturing | | 750 |
| 333111 | Farm Machinery and Equipment Manufacturing | | 1,250 |
| 333112 | Lawn and Garden Tractor and Home Lawn and Garden Equipment Manufacturing | | 1,500 |
| 333120 | Construction Machinery Manufacturing | | 1,250 |
| 333131 | Mining Machinery and Equipment Manufacturing | | 500 |
| 333132 | Oil and Gas Field Machinery and Equipment Manufacturing | | 1,250 |

| 333241 | Food Product Machinery Manufacturing | | 500 |
| 333242 | Semiconductor Machinery Manufacturing | | 1,500 |
| 333243 | Sawmill, Woodworking, and Paper Machinery Manufacturing | | 500 |
| 333248 | All Other Industrial Machinery Manufacturing | | 750 |
| 333310 | Commercial and Service Industry Machinery Manufacturing | | 1,000 |
| 333413 | Industrial and Commercial Fan and Blower and Air Purification Equipment Manufacturing | | 500 |
| 333414 | Heating Equipment (except Warm Air Furnaces) Manufacturing | | 500 |
| 333415 | Air-Conditioning and Warm Air Heating Equipment and Commercial and Industrial Refrigeration Equipment Manufacturing | | 1,250 |
| 333511 | Industrial Mold Manufacturing | | 500 |
| 333514 | Special Die and Tool, Die Set, Jig and Fixture Manufacturing | | 500 |
| 333515 | Cutting Tool and Machine Tool Accessory Manufacturing | | 500 |
| 333517 | Machine Tool Manufacturing | | 500 |
| 333519 | Rolling Mill and Other Metalworking Machinery Manufacturing | | 500 |
| 333611 | Turbine and Turbine Generator Set Unit Manufacturing | | 1,500 |
| 333612 | Speed Changer, Industrial High-Speed Drive and Gear Manufacturing | | 750 |
| 333613 | Mechanical Power Transmission Equipment Manufacturing | | 750 |
| 333618 | Other Engine Equipment Manufacturing | | 1,500 |
| 333912 | Air and Gas Compressor Manufacturing | | 1,000 |
| 333914 | Measuring, Dispensing, and Other Pumping Equipment Manufacturing | | 750 |
| 333921 | Elevator and Moving Stairway Manufacturing | | 1,000 |
| 333922 | Conveyor and Conveying Equipment Manufacturing | | 500 |
| 333923 | Overhead Traveling Crane, Hoist and Monorail System Manufacturing | | 1,250 |
| 333924 | Industrial Truck, Tractor, Trailer and Stacker Machinery Manufacturing | | 750 |
| 333991 | Power-Driven Hand Tool Manufacturing | | 500 |
| 333992 | Welding and Soldering Equipment Manufacturing | | 1,250 |
| 333993 | Packaging Machinery Manufacturing | | 500 |
| 333994 | Industrial Process Furnace and Oven Manufacturing | | 500 |

| | | | |
|---|---|---|---|
| 333995 | Fluid Power Cylinder and Actuator Manufacturing | | 750 |
| 333996 | Fluid Power Pump and Motor Manufacturing | | 1,250 |
| 333998 | All Other Miscellaneous General Purpose Machinery Manufacturing | | 500 |
| 334111 | Electronic Computer Manufacturing | | 1,250 |
| 334112 | Computer Storage Device Manufacturing | | 1,250 |
| 334118 | Computer Terminal and Other Computer Peripheral Equipment Manufacturing | | 1,000 |
| 334210 | Telephone Apparatus Manufacturing | | 1,250 |
| 334220 | Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing | | 1,250 |
| 334290 | Other Communications Equipment Manufacturing | | 750 |
| 334310 | Audio and Video Equipment Manufacturing | | 750 |
| 334412 | Bare Printed Circuit Board Manufacturing | | 750 |
| 334413 | Semiconductor and Related Device Manufacturing | | 1,250 |
| 334416 | Capacitor, Resistor, Coil, Transformer, and Other Inductor Manufacturing | | 500 |
| 334417 | Electronic Connector Manufacturing | | 1,000 |
| 334418 | Printed Circuit Assembly (Electronic Assembly) Manufacturing | | 750 |
| 334419 | Other Electronic Component Manufacturing | | 750 |
| 334510 | Electromedical and Electrotherapeutic Apparatus Manufacturing | | 1,250 |
| 334511 | Search, Detection, Navigation, Guidance, Aeronautical, and Nautical System and Instrument Manufacturing | | 1,250 |
| 334512 | Automatic Environmental Control Manufacturing for Residential, Commercial and Appliance Use | | 500 |
| 334513 | Instruments and Related Products Manufacturing for Measuring, Displaying, and Controlling Industrial Process Variables | | 750 |
| 334514 | Totalizing Fluid Meter and Counting Device Manufacturing | | 750 |
| 334515 | Instrument Manufacturing for Measuring and Testing Electricity and Electrical Signals | | 750 |
| 334516 | Analytical Laboratory Instrument Manufacturing | | 1,000 |
| 334517 | Irradiation Apparatus Manufacturing | | 1,000 |
| 334519 | Other Measuring and Controlling Device Manufacturing | | 500 |
| 334610 | Manufacturing and Reproducing Magnetic and Optical Media | | 1,250 |
| 335131 | Residential Electric Lighting Fixture Manufacturing | | 750 |

| 335132 | Commercial, Industrial, and Institutional Electric Lighting Fixture Manufacturing | | 500 |
|---|---|---|---|
| 335139 | Electric Lamp Bulb and Other Lighting Equipment Manufacturing | | 1,250 |
| 335210 | Small Electrical Appliance Manufacturing | | 1,500 |
| 335220 | Major Household Appliance Manufacturing | | 1,500 |
| 335311 | Power, Distribution and Specialty Transformer Manufacturing | | 750 |
| 335312 | Motor and Generator Manufacturing | | 1,250 |
| 335313 | Switchgear and Switchboard Apparatus Manufacturing | | 1,250 |
| 335314 | Relay and Industrial Control Manufacturing | | 750 |
| 335910 | Battery Manufacturing | | 1,250 |
| 335921 | Fiber Optic Cable Manufacturing | | 1,000 |
| 335929 | Other Communication and Energy Wire Manufacturing | | 1,000 |
| 335931 | Current-Carrying Wiring Device Manufacturing | | 500 |
| 335932 | Noncurrent-Carrying Wiring Device Manufacturing | | 1,000 |
| 335991 | Carbon and Graphite Product Manufacturing | | 750 |
| 335999 | All Other Miscellaneous Electrical Equipment and Component Manufacturing | | 500 |
| 336110 | Automobile and Light Duty Motor Vehicle Manufacturing | | 1,500 |
| 336120 | Heavy Duty Truck Manufacturing | | 1,500 |
| 336211 | Motor Vehicle Body Manufacturing | | 1,000 |
| 336212 | Truck Trailer Manufacturing | | 1,000 |
| 336213 | Motor Home Manufacturing | | 1,250 |
| 336214 | Travel Trailer and Camper Manufacturing | | 1,000 |
| 336310 | Motor Vehicle Gasoline Engine and Engine Parts Manufacturing | | 1,000 |
| 336320 | Motor Vehicle Electrical and Electronic Equipment Manufacturing | | 1,000 |
| 336330 | Motor Vehicle Steering and Suspension Components (except Spring) Manufacturing | | 1,000 |
| 336340 | Motor Vehicle Brake System Manufacturing | | 1,250 |
| 336350 | Motor Vehicle Transmission and Power Train Parts Manufacturing | | 1,500 |
| 336360 | Motor Vehicle Seating and Interior Trim Manufacturing | | 1,500 |
| 336370 | Motor Vehicle Metal Stamping | | 1,000 |
| 336390 | Other Motor Vehicle Parts Manufacturing | | 1,000 |
| 336411 | Aircraft Manufacturing | | 1,500 |
| 336412 | Aircraft Engine and Engine Parts Manufacturing | | 1,500 |

| 336413 | Other Aircraft Part and Auxiliary Equipment Manufacturing[7] | | 1,250 |
|---|---|---|---|
| 336414 | Guided Missile and Space Vehicle Manufacturing | | 1,250 |
| 336415 | Guided Missile and Space Vehicle Propulsion Unit and Propulsion Unit Parts Manufacturing | | 1,250 |
| 336419 | Other Guided Missile and Space Vehicle Parts and Auxiliary Equipment Manufacturing | | 1,000 |
| 336510 | Railroad Rolling Stock Manufacturing | | 1,500 |
| 336611 | Ship Building and Repairing | | 1,250 |
| 336612 | Boat Building | | 1,000 |
| 336991 | Motorcycle, Bicycle and Parts Manufacturing | | 1,000 |
| 336992 | Military Armored Vehicle, Tank and Tank Component Manufacturing | | 1,500 |
| 336999 | All Other Transportation Equipment Manufacturing | | 1,000 |
| 337110 | Wood Kitchen Cabinet and Countertop Manufacturing | | 750 |
| 337121 | Upholstered Household Furniture Manufacturing | | 1,000 |
| 337122 | Non-Upholstered Wood Household Furniture Manufacturing | | 750 |
| 337126 | Household Furniture (except Wood and Upholstered) Manufacturing | | 750 |
| 337127 | Institutional Furniture Manufacturing | | 500 |
| 337211 | Wood Office Furniture Manufacturing | | 1,000 |
| 337212 | Custom Architectural Woodwork and Millwork Manufacturing | | 500 |
| 337214 | Office Furniture (Except Wood) Manufacturing | | 1,000 |
| 337215 | Showcase, Partition, Shelving, and Locker Manufacturing | | 500 |
| 337910 | Mattress Manufacturing | | 1,000 |
| 337920 | Blind and Shade Manufacturing | | 1,000 |
| 339112 | Surgical and Medical Instrument Manufacturing | | 1,000 |
| 339113 | Surgical Appliance and Supplies Manufacturing | | 750 |
| 339114 | Dental Equipment and Supplies Manufacturing | | 750 |
| 339115 | Ophthalmic Goods Manufacturing | | 1,000 |
| 339116 | Dental Laboratories | | 500 |
| 339910 | Jewelry and Silverware Manufacturing | | 500 |
| 339920 | Sporting and Athletic Goods Manufacturing | | 750 |
| 339930 | Doll, Toy, and Game Manufacturing | | 500 |

| 339940 | Office Supplies (except Paper) Manufacturing | | 750 |
|---|---|---|---|
| 339950 | Sign Manufacturing | | 500 |
| 339991 | Gasket, Packing, and Sealing Device Manufacturing | | 500 |
| 339992 | Musical Instrument Manufacturing | | 1,000 |
| 339993 | Fastener, Button, Needle and Pin Manufacturing | | 750 |
| 339994 | Broom, Brush and Mop Manufacturing | | 500 |
| 339995 | Burial Casket Manufacturing | | 1,000 |
| 339999 | All Other Miscellaneous Manufacturing | | 500 |
| **Sector 42 – Wholesale Trade** | | | |
| 423110 | Automobile and Other Motor Vehicle Merchant Wholesalers | | 250 |
| 423120 | Motor Vehicle Supplies and New Parts Merchant Wholesalers | | 200 |
| 423130 | Tire and Tube Merchant Wholesalers | | 200 |
| 423140 | Motor Vehicle Parts (Used) Merchant Wholesalers | | 125 |
| 423210 | Furniture Merchant Wholesalers | | 100 |
| 423220 | Home Furnishing Merchant Wholesalers | | 100 |
| 423310 | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | | 150 |
| 423320 | Brick, Stone, and Related Construction Material Merchant Wholesalers | | 150 |
| 423330 | Roofing, Siding, and Insulation Material Merchant Wholesalers | | 225 |
| 423390 | Other Construction Material Merchant Wholesalers | | 100 |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | | 200 |
| 423420 | Office Equipment Merchant Wholesalers | | 200 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | | 250 |
| 423440 | Other Commercial Equipment Merchant Wholesalers | | 100 |
| 423460 | Ophthalmic Goods Merchant Wholesalers | | 175 |
| 423490 | Other Professional Equipment and Supplies Merchant Wholesalers | | 150 |
| 423510 | Metal Service Centers and Other Metal Merchant Wholesalers | | 200 |
| 423520 | Coal and Other Mineral and Ore Merchant Wholesalers | | 200 |
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | | 200 |

| | | |
|---|---|---|
| **423620** | Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | 225 |
| **423690** | Other Electronic Parts and Equipment Merchant Wholesalers | 250 |
| **423710** | Hardware Merchant Wholesalers | 150 |
| **423720** | Plumbing and Heating Equipment and Supplies (Hydronics) Merchant Wholesalers | 200 |
| **423730** | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | 175 |
| **423740** | Refrigeration Equipment and Supplies Merchant Wholesalers | 125 |
| **423810** | Construction and Mining (except Oil Well) Machinery and Equipment Merchant Wholesalers | 250 |
| **423820** | Farm and Garden Machinery and Equipment Merchant Wholesalers | 125 |
| **423830** | Industrial Machinery and Equipment Merchant Wholesalers | 100 |
| **423840** | Industrial Supplies Merchant Wholesalers | 125 |
| **423850** | Service Establishment Equipment and Supplies Merchant Wholesalers | 125 |
| **423860** | Transportation Equipment and Supplies (except Motor Vehicle) Merchant Wholesalers | 175 |
| **423910** | Sporting and Recreational Goods and Supplies Merchant Wholesalers | 100 |
| **423920** | Toy and Hobby Goods and Supplies Merchant Wholesalers | 175 |
| **423930** | Recyclable Material Merchant Wholesalers | 125 |
| **423940** | Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | 125 |
| **423990** | Other Miscellaneous Durable Goods Merchant Wholesalers | 100 |
| **424110** | Printing and Writing Paper Merchant Wholesalers | 225 |
| **424120** | Stationery and Office Supplies Merchant Wholesalers | 150 |
| **424130** | Industrial and Personal Service Paper Merchant Wholesalers | 150 |
| **424210** | Drugs and Druggists' Sundries Merchant Wholesalers | 250 |
| **424310** | Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | 100 |
| **424340** | Footwear Merchant Wholesalers | 200 |
| **424350** | Clothing and Clothing Accessories Merchant Wholesalers | 150 |
| **424410** | General Line Grocery Merchant Wholesalers | 250 |

| | | | |
|---|---|---|---|
| **424420** | Packaged Frozen Food Merchant Wholesalers | | 200 |
| **424430** | Dairy Product (except Dried or Canned) Merchant Wholesalers | | 200 |
| **424440** | Poultry and Poultry Product Merchant Wholesalers | | 150 |
| **424450** | Confectionery Merchant Wholesalers | | 225 |
| **424460** | Fish and Seafood Merchant Wholesalers | | 100 |
| **424470** | Meat and Meat Product Merchant Wholesalers | | 150 |
| **424480** | Fresh Fruit and Vegetable Merchant Wholesalers | | 100 |
| **424490** | Other Grocery and Related Products Merchant Wholesalers | | 250 |
| **424510** | Grain and Field Bean Merchant Wholesalers | | 200 |
| **424520** | Livestock Merchant Wholesalers | | 125 |
| **424590** | Other Farm Product Raw Material Merchant Wholesalers | | 175 |
| **424610** | Plastics Materials and Basic Forms and Shapes Merchant Wholesalers | | 150 |
| **424690** | Other Chemical and Allied Products Merchant Wholesalers | | 175 |
| **424710** | Petroleum Bulk Stations and Terminals | | 225 |
| **424720** | Petroleum and Petroleum Products Merchant Wholesalers (except Bulk Stations and Terminals) | | 200 |
| **424810** | Beer and Ale Merchant Wholesalers | | 200 |
| **424820** | Wine and Distilled Alcoholic Beverage Merchant Wholesalers | | 250 |
| **424910** | Farm Supplies Merchant Wholesalers | | 200 |
| **424920** | Book, Periodical, and Newspaper Merchant Wholesalers | | 200 |
| **424930** | Flower, Nursery Stock, and Florists' Supplies Merchant Wholesalers | | 100 |
| **424940** | Tobacco Product and Electronic Cigarette Merchant Wholesalers | | 250 |
| **424950** | Paint, Varnish, and Supplies Merchant Wholesalers | | 150 |
| **424990** | Other Miscellaneous Nondurable Goods Merchant Wholesalers | | 100 |
| **425120** | Wholesale Trade Agents and Brokers | | 125 |
| | **Sector** 44 - 45 – Retail Trade | | |
| **441110** | New Car Dealers | | 200 |
| **441120** | Used Car Dealers | 30.5 | |
| **441210** | Recreational Vehicle Dealers | 40 | |
| **441222** | Boat Dealers | 40 | |
| **441227** | Motorcycle, ATV, and All Other Motor Vehicle Dealers | 40 | |

| | | | |
|---|---|---|---|
| 441330 | Automotive Parts and Accessories Retailers | 28.5 | |
| 441340 | Tire Dealers | 25.5 | |
| 444110 | Home Centers | 47 | |
| 444120 | Paint and Wallpaper Retailers | 34 | |
| 444140 | Hardware Retailers | 16.5 | |
| 444180 | Other Building Material Dealers | 25 | |
| 444230 | Outdoor Power Equipment Retailers | 9.5 | |
| 444240 | Nursery, Garden Center, and Farm Supply Retailers | 21.5 | |
| 445110 | Supermarkets and Other Grocery Retailers (except Convenience Retailers) | 40 | |
| 445131 | Convenience Retailers | 36.5 | |
| 445132 | Vending Machine Operators | 21 | |
| 445230 | Fruit and Vegetable Retailers | 9 | |
| 445240 | Meat Retailers | 9 | |
| 445250 | Fish and Seafood Retailers | 9 | |
| 445291 | Baked Goods Retailers | 16 | |
| 445292 | Confectionery and Nut Retailers | 19.5 | |
| 445298 | All Other Specialty Food Retailers | 10 | |
| 445320 | Beer, Wine, and Liquor Retailers | 10 | |
| 449110 | Furniture Retailers | 25 | |
| 449121 | Floor Covering Retailers | 9 | |
| 449122 | Window Treatment Retailers | 11.5 | |
| 449129 | All Other Home Furnishings Retailers | 33.5 | |
| 449210 | Electronics and Appliance Retailers | 40 | |
| 455110 | Department Stores | 40 | |
| 455211 | Warehouse Clubs and Supercenters | 47 | |
| 455219 | All Other General Merchandise Retailers | 40 | |
| 456110 | Pharmacies and Drug Retailers | 37.5 | |
| 456120 | Cosmetics, Beauty Supplies, and Perfume Retailers | 34 | |
| 456130 | Optical Goods Retailers | 29.5 | |
| 456191 | Food (Health) Supplement Retailers | 22.5 | |
| 456199 | All Other Health and Personal Care Retailers | 9.5 | |
| 457110 | Gasoline Stations with Convenience Stores | 36.5 | |
| 457120 | Other Gasoline Stations | 33.5 | |
| 457210 | Fuel Dealers | | 100 |
| 458110 | Clothing and Clothing Accessories Retailers | 47 | |
| 458210 | Shoe Retailers | 34 | |
| 458310 | Jewelry Retailers | 20.5 | |
| 458320 | Luggage and Leather Goods Retailers | 38 | |
| 459110 | Sporting Goods Retailers | 26.5 | |

| | | | |
|---|---|---|---|
| 459120 | Hobby, Toy, and Game Retailers | 35 | |
| 459130 | Sewing, Needlework, and Piece Goods Retailers | 34 | |
| 459140 | Musical Instrument and Supplies Retailers | 22.5 | |
| 459210 | Book Retailers and News Dealers | 36 | |
| 459310 | Florists | 9 | |
| 459410 | Office Supplies and Stationery Retailers | 40 | |
| 459420 | Gift, Novelty, and Souvenir Retailers | 13.5 | |
| 459510 | Used Merchandise Retailers | 14 | |
| 459910 | Pet and Pet Supplies Retailers | 32 | |
| 459920 | Art Dealers | 16.5 | |
| 459930 | Manufactured (Mobile) Home Dealers | 19 | |
| 459991 | Tobacco, Electronic Cigarette, and Other Smoking Supplies Retailers | 11.5 | |
| 459999 | All Other Miscellaneous Retailers | 11.5 | |
| 481111 | Scheduled Passenger Air Transportation | | 1,500 |
| 481112 | Scheduled Freight Air Transportation | | 1,500 |
| 481211 | Nonscheduled Chartered Passenger Air Transportation | | 1,500 |
| 481212 | Nonscheduled Chartered Freight Air Transportation | | 1,500 |
| 481219 | Other Nonscheduled Air Transportation | 25 | |
| 482111 | Line-Haul Railroads | | 1,500 |
| 482112 | Short Line Railroads | | 1,500 |
| 483111 | Deep Sea Freight Transportation | | 500 |
| 483112 | Deep Sea Passenger Transportation | | 1,500 |
| 483113 | Coastal and Great Lakes Freight Transportation | | 750 |
| 483114 | Coastal and Great Lakes Passenger Transportation | | 500 |
| 483211 | Inland Water Freight Transportation | | 750 |
| 483212 | Inland Water Passenger Transportation | | 500 |
| 484110 | General Freight Trucking, Local | 34 | |
| 484121 | General Freight Trucking, Long-Distance, Truckload | 34 | |
| 484122 | General Freight Trucking, Long-Distance, Less Than Truckload | 43 | |
| 484210 | Used Household and Office Goods Moving | 34 | |
| 484220 | Specialized Freight (except Used Goods) Trucking, Local | 34 | |
| 484230 | Specialized Freight (except Used Goods) Trucking, Long-Distance | 34 | |
| 485111 | Mixed Mode Transit Systems | 29 | |
| 485112 | Commuter Rail Systems | 47 | |

| | | | |
|---|---|---|---|
| 485113 | Bus and Other Motor Vehicle Transit Systems | 32.5 | |
| 485119 | Other Urban Transit Systems | 37.5 | |
| 485210 | Interurban and Rural Bus Transportation | 32 | |
| 485310 | Taxi and Ridesharing Services | 19 | |
| 485320 | Limousine Service | 19 | |
| 485410 | School and Employee Bus Transportation | 30 | |
| 485510 | Charter Bus Industry | 19 | |
| 485991 | Special Needs Transportation | 19 | |
| 485999 | All Other Transit and Ground Passenger Transportation | 19 | |
| 486110 | Pipeline Transportation of Crude Oil | | 1,500 |
| 486210 | Pipeline Transportation of Natural Gas | 41.5 | |
| 486910 | Pipeline Transportation of Refined Petroleum Products | | 1,500 |
| 486990 | All Other Pipeline Transportation | 46 | |
| 487110 | Scenic and Sightseeing Transportation, Land | 20.5 | |
| 487210 | Scenic and Sightseeing Transportation, Water | 14 | |
| 487990 | Scenic and Sightseeing Transportation, Other | 25 | |
| 488111 | Air Traffic Control | 40 | |
| 488119 | Other Airport Operations | 40 | |
| 488190 | Other Support Activities for Air Transportation | 40 | |
| 488210 | Support Activities for Rail Transportation | 34 | |
| 488310 | Port and Harbor Operations | 47 | |
| 488320 | Marine Cargo Handling | 47 | |
| 488330 | Navigational Services to Shipping | 47 | |
| 488390 | Other Support Activities for Water Transportation | 47 | |
| 488410 | Motor Vehicle Towing | 9 | |
| 488490 | Other Support Activities for Road Transportation | 18 | |
| 488510 | Freight Transportation Arrangement[10] | 20 | |
| 488510 (Exception) | Non-Vessel Owning Common Carriers and Household Goods Forwarders | 34 | |
| 488991 | Packing and Crating | 34 | |
| 488999 | All Other Support Activities for Transportation | 25 | |
| 491110 | Postal Service | 9 | |
| 492110 | Couriers and Express Delivery Services | | 1,500 |
| 492210 | Local Messengers and Local Delivery | 34 | |
| 493110 | General Warehousing and Storage | 34 | |
| 493120 | Refrigerated Warehousing and Storage | 36.5 | |

| | | | |
|---|---|---|---|
| **493130** | Farm Product Warehousing and Storage | 34 | |
| **493190** | Other Warehousing and Storage | 36.5 | |
| **Sector 51 – Information** | | | |
| **512110** | Motion Picture and Video Production | 40 | |
| **512120** | Motion Picture and Video Distribution | 39 | |
| **512131** | Motion Picture Theaters (except Drive-Ins) | 47 | |
| **512132** | Drive-In Motion Picture Theaters | 12.5 | |
| **512191** | Teleproduction and Other Postproduction Services | 39 | |
| **512199** | Other Motion Picture and Video Industries | 28.5 | |
| **512230** | Music Publishers | | 750 |
| **512240** | Sound Recording Studios | 11 | |
| **512250** | Record Production and Distribution | | 250 |
| **512290** | Other Sound Recording Industries | 22.5 | |
| **513110** | Newspaper Publishers | | 1,000 |
| **513120** | Periodical Publishers | | 1,000 |
| **513130** | Book Publishers | | 1,000 |
| **513140** | Directory and Mailing List Publishers | | 1,000 |
| **513191** | Greeting Card Publishers | | 1,000 |
| **513199** | All Other Publishers | | 1,000 |
| **513210** | Software Publishers[15] | 47 | |
| **516110** | Radio Broadcasting Stations | 47 | |
| **516120** | Television Broadcasting Stations | 47 | |
| **516210** | Media Streaming Distribution Services, Social Networks, and Other Media Networks and Content Providers | 47 | |
| **517111** | Wired Telecommunications Carriers | | 1,500 |
| **517112** | Wireless Telecommunications Carriers (except Satellite) | | 1,500 |
| **517121** | Telecommunications Resellers | | 1,500 |
| **517122** | Agents for Wireless Telecommunications Services | | 1,500 |
| **517410** | Satellite Telecommunications | 44 | |
| **517810** | All Other Telecommunications | 40 | |
| **518210** | Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services | 40 | |
| **519210** | Libraries and Archives | 21 | |
| **519290** | Web Search Portals and All Other Information Services | | 1,000 |
| **Sector 52 – Finance and Insurance** | | | |
| **522110** | Commercial Banking | $850 million in assets | |

| | | | |
|---|---|---|---|
| **522130** | Credit Unions | $850 million in assets | |
| **522180** | Savings Institutions and Other Depository Credit Intermediation | $850 million in assets | |
| **522210** | Credit Card Issuing | $850 million in assets | |
| **522220** | Sales Financing | 47 | |
| **522291** | Consumer Lending | 47 | |
| **522292** | Real Estate Credit | 47 | |
| **522299** | International, Secondary Market, and All Other Non-depository Credit Intermediation | 47 | |
| **522310** | Mortgage and Nonmortgage Loan Brokers | 15 | |
| **522320** | Financial Transactions Processing, Reserve, and Clearinghouse Activities | 47 | |
| **522390** | Other Activities Related to Credit Intermediation | 28.5 | |
| **523150** | Investment Banking and Securities Intermediation | 47 | |
| **523160** | Commodity Contracts Intermediation | 47 | |
| **523210** | Securities and Commodity Exchanges | 47 | |
| **523910** | Miscellaneous Intermediation | 47 | |
| **523940** | Portfolio Management and Investment Advice | 47 | |
| **523991** | Trust, Fiduciary and Custody Activities | 47 | |
| **523999** | Miscellaneous Financial Investment Activities | 47 | |
| **524113** | Direct Life Insurance Carriers | 47 | |
| **524114** | Direct Health and Medical Insurance Carriers | 47 | |
| **524126** | Direct Property and Casualty Insurance Carriers | | 1,500 |
| **524127** | Direct Title Insurance Carriers | 47 | |
| **524128** | Other Direct Insurance (except Life, Health and Medical) Carriers | 47 | |
| **524130** | Reinsurance Carriers | 47 | |
| **524210** | Insurance Agencies and Brokerages | 15 | |
| **524291** | Claims Adjusting | 25 | |
| **524292** | Pharmacy Benefit Management and Other Third-Party Administration of Insurance and Pension Funds | 45.5 | |
| **524298** | All Other Insurance Related Activities | 30.5 | |
| **525110** | Pension Funds | 40 | |
| **525120** | Health and Welfare Funds | 40 | |
| **525190** | Other Insurance Funds | 40 | |

| | | |
|---|---|---|
| **525910** | Open-End Investment Funds | 40 |
| **525920** | Trusts, Estates, and Agency Accounts | 40 |
| **525990** | Other Financial Vehicles | 40 |
| **531110** | Lessors of Residential Buildings and Dwellings | 34 |
| **531110 (Exception)** | Leasing of Building Space to the Federal Government by Owners | 47 |
| **531120** | Lessors of Nonresidential Buildings (except Miniwarehouses) | 34 |
| **531120 (Exception)** | Leasing of Building Space to the Federal Government by Owners | 47 |
| **531130** | Lessors of Miniwarehouses and Self Storage Units | 34 |
| **531130 (Exception)** | Leasing of Building Space to the Federal Government by Owners | 47 |
| **531190** | Lessors of Other Real Estate Property | 34 |
| **531190 (Exception)** | Leasing of Building Space to the Federal Government by Owners | 47 |
| **531210** | Offices of Real Estate Agents and Brokers | 15 |
| **531311** | Residential Property Managers | 12.5 |
| **531312** | Nonresidential Property Managers | 19.5 |
| **531320** | Offices of Real Estate Appraisers | 9.5 |
| **531390** | Other Activities Related to Real Estate | 19.5 |
| **532111** | Passenger Car Rental | 47 |
| **532112** | Passenger Car Leasing | 47 |
| **532120** | Truck, Utility Trailer, and RV (Recreational Vehicle) Rental and Leasing | 47 |
| **532210** | Consumer Electronics and Appliances Rental | 47 |
| **532281** | Formal Wear and Costume Rental | 25 |
| **532282** | Video Tape and Disc Rental | 35 |
| **532283** | Home Health Equipment Rental | 41 |
| **532284** | Recreational Goods Rental | 9 |
| **532289** | All Other Consumer Goods Rental | 12.5 |
| **532310** | General Rental Centers | 9 |
| **532411** | Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing | 45.5 |
| **532412** | Construction, Mining and Forestry Machinery and Equipment Rental and Leasing | 40 |
| **532420** | Office Machinery and Equipment Rental and Leasing | 40 |
| **532490** | Other Commercial and Industrial Machinery and Equipment Rental and Leasing | 40 |
| **533110** | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | 47 |

| Sector 54 – Professional, Scientific and Technical Services | | |
|---|---|---|
| **541110** | Offices of Lawyers | 15.5 | |
| **541191** | Title Abstract and Settlement Offices | 19.5 | |
| **541199** | All Other Legal Services | 20.5 | |
| **541211** | Offices of Certified Public Accountants | 26.5 | |
| **541213** | Tax Preparation Services | 25 | |
| **541214** | Payroll Services | 39 | |
| **541219** | Other Accounting Services | 25 | |
| **541310** | Architectural Services | 12.5 | |
| **541320** | Landscape Architectural Services | 9 | |
| **541330** | Engineering Services | 25.5 | |
| **541330 (Exception 1)** | Military and Aerospace Equipment and Military Weapons | 47 | |
| **541330 (Exception 2)** | Contracts and Subcontracts for Engineering Services Awarded Under the National Energy Policy Act of 1992 | 47 | |
| **541330 (Exception 3)** | Marine Engineering and Naval Architecture | 47 | |
| **541340** | Drafting Services | 9 | |
| **541350** | Building Inspection Services | 11.5 | |
| **541360** | Geophysical Surveying and Mapping Services | 28.5 | |
| **541370** | Surveying and Mapping (except Geophysical) Services | 19 | |
| **541380** | Testing Laboratories and Services | 19 | |
| **541410** | Interior Design Services | 9 | |
| **541420** | Industrial Design Services | 17 | |
| **541430** | Graphic Design Services | 9 | |
| **541490** | Other Specialized Design Services | 13.5 | |
| **541511** | Custom Computer Programming Services | 34 | |
| **541512** | Computer Systems Design Services | 34 | |
| **541513** | Computer Facilities Management Services | 37 | |
| **541519** | Other Computer Related Services | 34 | |
| **541519 (Exception)** | Information Technology Value Added Resellers | | 150 |
| **541611** | Administrative Management and General Management Consulting Services | 24.5 | |
| **541612** | Human Resources Consulting Services | 29 | |
| **541613** | Marketing Consulting Services | 19 | |
| **541614** | Process, Physical Distribution and Logistics Consulting Services | 20 | |
| **541618** | Other Management Consulting Services | 19 | |
| **541620** | Environmental Consulting Services | 19 | |

| | | | |
|---|---|---|---|
| **541690** | Other Scientific and Technical Consulting Services | 19 | |
| **541713** | Research and Development in Nanotechnology | | 1,000 |
| **541714** | Research and Development in Biotechnology (except Nanobiotechnology) | | 1,000 |
| **541715** | Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology) | | 1,000 |
| **541715 (Exception 1)** | Aircraft, Aircraft Engine and Engine Parts | | 1,500 |
| **541715 (Exception 2)** | Other Aircraft Parts and Auxiliary Equipment | | 1,250 |
| **541715 (Exception 3)** | Guided Missiles and Space Vehicles, Their Propulsion Units and Propulsion Parts | | 1,250 |
| **541720** | Research and Development in the Social Sciences and Humanities | 28 | |
| **541810** | Advertising Agencies | 25.5 | |
| **541820** | Public Relations Agencies | 19 | |
| **541830** | Media Buying Agencies | 32.5 | |
| **541840** | Media Representatives | 21 | |
| **541850** | Indoor and Outdoor Display Advertising | 34.5 | |
| **541860** | Direct Mail Advertising | 22 | |
| **541870** | Advertising Material Distribution Services | 28.5 | |
| **541890** | Other Services Related to Advertising | 19 | |
| **541910** | Marketing Research and Public Opinion Polling | 22.5 | |
| **541921** | Photography Studios, Portrait | 16 | |
| **541922** | Commercial Photography | 9 | |
| **541930** | Translation and Interpretation Services | 22.5 | |
| **541940** | Veterinary Services | 10 | |
| **541990** | All Other Professional, Scientific and Technical Services | 19.5 | |
| **551111** | Offices of Bank Holding Companies | 38.5 | |
| **551112** | Offices of Other Holding Companies | 45.5 | |
| **Sector 56 – Administrative and Support and Waste Management and Remediation Services** | | | |
| **561110** | Office Administrative Services | 12.5 | |
| **561210** | Facilities Support Services[12] | 47 | |
| **561311** | Employment Placement Agencies | 34 | |
| **561312** | Executive Search Services | 34 | |
| **561320** | Temporary Help Services | 34 | |
| **561330** | Professional Employer Organizations | 41.5 | |
| **561410** | Document Preparation Services | 19 | |

| 561421 | Telephone Answering Services | 19 | |
| 561422 | Telemarketing Bureaus and Other contact Centers | 25.5 | |
| 561431 | Private Mail Centers | 19 | |
| 561439 | Other Business Service Centers (including Copy Shops) | 26.5 | |
| 561440 | Collection Agencies | 19.5 | |
| 561450 | Credit Bureaus | 41 | |
| 561491 | Repossession Services | 19 | |
| 561492 | Court Reporting and Stenotype Services | 19 | |
| 561499 | All Other Business Support Services | 21.5 | |
| 561510 | Travel Agencies | 25 | |
| 561520 | Tour Operators | 25 | |
| 561591 | Convention and Visitors Bureaus | 25 | |
| 561599 | All Other Travel Arrangement and Reservation Services | 32.5 | |
| 561611 | Investigation and Personal Background Check Services | 25 | |
| 561612 | Security Guards and Patrol Services | 29 | |
| 561613 | Armored Car Services | 43 | |
| 561621 | Security Systems Services (except Locksmiths) | 25 | |
| 561622 | Locksmiths | 25 | |
| 561710 | Exterminating and Pest Control Services | 17.5 | |
| 561720 | Janitorial Services | 22 | |
| 561730 | Landscaping Services | 9.5 | |
| 561740 | Carpet and Upholstery Cleaning Services | 8.5 | |
| 561790 | Other Services to Buildings and Dwellings | 9 | |
| 561910 | Packaging and Labeling Services | 19.5 | |
| 561920 | Convention and Trade Show Organizers | 20 | |
| 561990 | All Other Support Services | 16.5 | |
| 562111 | Solid Waste Collection | 47 | |
| 562112 | Hazardous Waste Collection | 47 | |
| 562119 | Other Waste Collection | 47 | |
| 562211 | Hazardous Waste Treatment and Disposal | 47 | |
| 562212 | Solid Waste Landfill | 47 | |
| 562213 | Solid Waste Combustors and Incinerators | 47 | |
| 562219 | Other Nonhazardous Waste Treatment and Disposal | 47 | |
| 562910 | Remediation Services | 25 | |
| 562910 (Exception) | Environmental Remediation Services | | 750 |
| 562920 | Materials Recovery Facilities | 25 | |

| | | | |
|---|---|---|---|
| **562991** | Septic Tank and Related Services | 9 | |
| **562998** | All Other Miscellaneous Waste Management Services | 16.5 | |
| **Sector 61 – Educational Services** | | | |
| **611110** | Elementary and Secondary Schools | 20 | |
| **611210** | Junior Colleges | 32.5 | |
| **611310** | Colleges, Universities and Professional Schools | 34.5 | |
| **611410** | Business and Secretarial Schools | 20.5 | |
| **611420** | Computer Training | 16 | |
| **611430** | Professional and Management Development Training | 15 | |
| **611511** | Cosmetology and Barber Schools | 13 | |
| **611513** | Apprenticeship Training | 11.5 | |
| **611519** | Other Technical and Trade Schools | 21 | |
| **611519 (Exception)** | Job Corps Centers[16] | 47 | |
| **611610** | Fine Arts Schools | 9 | |
| **611620** | Sports and Recreation Instruction | 9 | |
| **611630** | Language Schools | 20.5 | |
| **611691** | Exam Preparation and Tutoring | 12.5 | |
| **611692** | Automobile Driving Schools | 10 | |
| **611699** | All Other Miscellaneous Schools and Instruction | 16.5 | |
| **611710** | Educational Support Services | 24 | |
| **Sector 62 – Health Care and Social Assistance** | | | |
| **621111** | Offices of Physicians (except Mental Health Specialists) | 16 | |
| **621112** | Offices of Physicians, Mental Health Specialists | 13.5 | |
| **621210** | Offices of Dentists | 9 | |
| **621310** | Offices of Chiropractors | 9 | |
| **621320** | Offices of Optometrists | 9 | |
| **621330** | Offices of Mental Health Practitioners (except Physicians) | 9 | |
| **621340** | Offices of Physical, Occupational and Speech Therapists and Audiologists | 12.5 | |
| **621391** | Offices of Podiatrists | 9 | |
| **621399** | Offices of All Other Miscellaneous Health Practitioners | 10 | |
| **621410** | Family Planning Centers | 19 | |
| **621420** | Outpatient Mental Health and Substance Abuse Centers | 19 | |
| **621491** | HMO Medical Centers | 44.5 | |
| **621492** | Kidney Dialysis Centers | 47 | |

| 621493 | Freestanding Ambulatory Surgical and Emergency Centers | 19 | |
| 621498 | All Other Outpatient Care Centers | 25.5 | |
| 621511 | Medical Laboratories | 41.5 | |
| 621512 | Diagnostic Imaging Centers | 19 | |
| 621610 | Home Health Care Services | 19 | |
| 621910 | Ambulance Services | 22.5 | |
| 621991 | Blood and Organ Banks | 40 | |
| 621999 | All Other Miscellaneous Ambulatory Health Care Services | 20.5 | |
| 622110 | General Medical and Surgical Hospitals | 47 | |
| 622210 | Psychiatric and Substance Abuse Hospitals | 47 | |
| 622310 | Specialty (except Psychiatric and Substance Abuse) Hospitals | 47 | |
| 623110 | Nursing Care Facilities (Skilled Nursing Facilities) | 34 | |
| 623210 | Residential Intellectual and Developmental Disability Facilities | 19 | |
| 623220 | Residential Mental Health and Substance Abuse Facilities | 19 | |
| 623311 | Continuing Care Retirement Communities | 34 | |
| 623312 | Assisted Living Facilities for the Elderly | 23.5 | |
| 623990 | Other Residential Care Facilities | 16 | |
| 624110 | Child and Youth Services | 15.5 | |
| 624120 | Services for the Elderly and Persons with Disabilities | 15 | |
| 624190 | Other Individual and Family Services | 16 | |
| 624210 | Community Food Services | 19.5 | |
| 624221 | Temporary Shelters | 13.5 | |
| 624229 | Other Community Housing Services | 19 | |
| 624230 | Emergency and Other Relief Services | 41.5 | |
| 624310 | Vocational Rehabilitation Services | 15 | |
| 624410 | Child Care Services | 9.5 | |
| **Sector 71 – Arts, Entertainment and Recreation** | | | |
| 711110 | Theater Companies and Dinner Theaters | 25 | |
| 711120 | Dance Companies | 18 | |
| 711130 | Musical Groups and Artists | 15 | |
| 711190 | Other Performing Arts Companies | 34 | |
| 711211 | Sports Teams and Clubs | 47 | |
| 711212 | Race Tracks | 47 | |
| 711219 | Other Spectator Sports | 16.5 | |
| 711310 | Promoters of Performing Arts, Sports and Similar Events with Facilities | 40 | |

| | | |
|---|---|---|
| **711320** | Promoters of Performing Arts, Sports and Similar Events without Facilities | 22 |
| **711410** | Agents and Managers for Artists, Athletes, Entertainers and Other Public Figures | 17.5 |
| **711510** | Independent Artists, Writers, and Performers | 9 |
| **712110** | Museums | 34 |
| **712120** | Historical Sites | 13 |
| **712130** | Zoos and Botanical Gardens | 34 |
| **712190** | Nature Parks and Other Similar Institutions | 19.5 |
| **713110** | Amusement and Theme Parks | 47 |
| **713120** | Amusement Arcades | 9 |
| **713210** | Casinos (except Casino Hotels) | 34 |
| **713290** | Other Gambling Industries | 40 |
| **713910** | Golf Courses and Country Clubs | 19 |
| **713920** | Skiing Facilities | 35 |
| **713930** | Marinas | 11 |
| **713940** | Fitness and Recreational Sports Centers | 17.5 |
| **713950** | Bowling Centers | 12.5 |
| **713990** | All Other Amusement and Recreation Industries | 9 |
| **721110** | Hotels (except Casino Hotels) and Motels | 40 |
| **721120** | Casino Hotels | 40 |
| **721191** | Bed-and-Breakfast Inns | 9 |
| **721199** | All Other Traveler Accommodation | 9 |
| **721211** | RV (Recreational Vehicle) Parks and Campgrounds | 10 |
| **721214** | Recreational and Vacation Camps (except Campgrounds) | 9 |
| **721310** | Rooming and Boarding Houses, Dormitories, and Workers' Camps | 14 |
| **722310** | Food Service Contractors | 47 |
| **722320** | Caterers | 9 |
| **722330** | Mobile Food Services | 9 |
| **722410** | Drinking Places (Alcoholic Beverages) | 9 |
| **722511** | Full-Service Restaurants | 11.5 |
| **722513** | Limited-Service Restaurants | 13.5 |
| **722514** | Cafeterias, Grill Buffets, and Buffets | 34 |
| **722515** | Snack and Nonalcoholic Beverage Bars | 22.5 |
| **Sector 81 – Other Services (except Public Administration)** | | |
| **811111** | General Automotive Repair | 9 |
| **811114** | Specialized Automotive Repair | 9 |
| **811121** | Automotive Body, Paint and Interior Repair and Maintenance | 9 |
| **811122** | Automotive Glass Replacement Shops | 17.5 |

| 811191 | Automotive Oil Change and Lubrication Shops | 11 | |
| 811192 | Car Washes | 9 | |
| 811198 | All Other Automotive Repair and Maintenance | 10 | |
| 811210 | Electronic and Precision Equipment Repair and Maintenance | 34 | |
| 811310 | Commercial and Industrial Machinery and Equipment (except Automotive and Electronic) Repair and Maintenance | 12.5 | |
| 811411 | Home and Garden Equipment Repair and Maintenance | 9 | |
| 811412 | Appliance Repair and Maintenance | 19 | |
| 811420 | Reupholstery and Furniture Repair | 9 | |
| 811430 | Footwear and Leather Goods Repair | 9 | |
| 811490 | Other Personal and Household Goods Repair and Maintenance | 9 | |
| 812111 | Barber Shops | 9.5 | |
| 812112 | Beauty Salons | 9.5 | |
| 812113 | Nail Salons | 9 | |
| 812191 | Diet and Weight Reducing Centers | 27.5 | |
| 812199 | Other Personal Care Services | 9 | |
| 812210 | Funeral Homes and Funeral Services | 12.5 | |
| 812220 | Cemeteries and Crematories | 25 | |
| 812310 | Coin-Operated Laundries and Drycleaners | 13 | |
| 812320 | Drycleaning and Laundry Services (except Coin-Operated) | 8 | |
| 812331 | Linen Supply | 40 | |
| 812332 | Industrial Launderers | 47 | |
| 812910 | Pet Care (except Veterinary) Services | 9 | |
| 812921 | Photofinishing Laboratories (except One-Hour) | 29.5 | |
| 812922 | One-Hour Photofinishing | 19 | |
| 812930 | Parking Lots and Garages | 47 | |
| 812990 | All Other Personal Services | 15 | |
| 813110 | Religious Organizations | 13 | |
| 813211 | Grantmaking Foundations | 40 | |
| 813212 | Voluntary Health Organizations | 34 | |
| 813219 | Other Grantmaking and Giving Services | 47 | |
| 813311 | Human Rights Organizations | 34 | |
| 813312 | Environment, Conservation and Wildlife Organizations | 19.5 | |
| 813319 | Other Social Advocacy Organizations | 18 | |
| 813410 | Civic and Social Organizations | 9.5 | |
| 813910 | Business Associations | 15.5 | |

| 813920 | Professional Organizations | 23.5 | |
| 813930 | Labor Unions and Similar Labor Organizations | 16.5 | |
| 813940 | Political Organizations | 14 | |
| 813990 | Other Similar Organizations (except Business, Professional, Labor, and Political Organizations) | 13.5 | |

**Appendix B: Form I-129 Sample with Petition Totals**

| Sample ID | Petitions |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 1 |
| 4 | 1 |
| 5 | 2 |
| 6 | 8 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1 |
| 10 | 1 |
| 11 | 1 |
| 12 | 1 |
| 13 | 4 |
| 14 | 1 |
| 15 | 1 |
| 16 | 5 |
| 17 | 1 |
| 18 | 1 |
| 19 | 2 |
| 20 | 1 |
| 21 | 1 |
| 22 | 1 |
| 23 | 8 |
| 24 | 1 |
| 25 | 1 |
| 26 | 11 |
| 27 | 2 |
| 28 | 1 |
| 29 | 1 |
| 30 | 1 |
| 31 | 1 |
| 32 | 1 |
| 33 | 1 |
| 34 | 6 |
| 35 | 1 |
| 36 | 1 |
| 37 | 1 |
| 38 | 1 |
| 39 | 1 |

| Sample ID | Petitions |
|---|---|
| 40 | 1 |
| 41 | 154 |
| 42 | 1 |
| 43 | 2 |
| 44 | 1 |
| 45 | 1 |
| 46 | 2 |
| 47 | 12 |
| 48 | 1 |
| 49 | 4 |
| 50 | 1 |
| 51 | 1 |
| 52 | 2 |
| 53 | 1 |
| 54 | 1 |
| 55 | 1 |
| 56 | 11 |
| 57 | 1 |
| 58 | 9 |
| 59 | 1 |
| 60 | 1 |
| 61 | 8 |
| 62 | 10 |
| 63 | 1 |
| 64 | 2 |
| 65 | 1 |
| 66 | 1 |
| 67 | 6 |
| 68 | 6 |
| 69 | 9 |
| 70 | 1 |
| 71 | 3 |
| 72 | 1 |
| 73 | 2 |
| 74 | 1 |
| 75 | 154 |
| 76 | 1 |
| 77 | 1 |
| 78 | 1 |
| 79 | 1 |

| Sample ID | Petitions |
|---|---|
| 80 | 1 |
| 81 | 1 |
| 82 | 2 |
| 83 | 1 |
| 84 | 1 |
| 85 | 112 |
| 86 | 2 |
| 87 | 1 |
| 88 | 1 |
| 89 | 34 |
| 90 | 1 |
| 91 | 1 |
| 92 | 5 |
| 93 | 3 |
| 94 | 3 |
| 95 | 1 |
| 96 | 3 |
| 97 | 2 |
| 98 | 1 |
| 99 | 1 |
| 100 | 1 |
| 101 | 4 |
| 102 | 1 |
| 103 | 1 |
| 104 | 3 |
| 105 | 1 |
| 106 | 50 |
| 107 | 2 |
| 108 | 1 |
| 109 | 11 |
| 110 | 1 |
| 111 | 2 |
| 112 | 1 |
| 113 | 26 |
| 114 | 1 |
| 115 | 7 |
| 116 | 1 |
| 117 | 1 |
| 118 | 42 |
| 119 | 2 |

| | | | | | |
|---|---|---|---|---|---|
| 120 | 1 | 161 | 3 | 202 | 1 |
| 121 | 1 | 162 | 5 | 203 | 1 |
| 122 | 1 | 163 | 1 | 204 | 3 |
| 123 | 11 | 164 | 1 | 205 | 1 |
| 124 | 1 | 165 | 1 | 206 | 1 |
| 125 | 2 | 166 | 9 | 207 | 2 |
| 126 | 1 | 167 | 1 | 208 | 1 |
| 127 | 1 | 168 | 1 | 209 | 2 |
| 128 | 2 | 169 | 1 | 210 | 7 |
| 129 | 1 | 170 | 1 | 211 | 1 |
| 130 | 1 | 171 | 8 | 212 | 1 |
| 131 | 19 | 172 | 3 | 213 | 1 |
| 132 | 1 | 173 | 1 | 214 | 2 |
| 133 | 2 | 174 | 1 | 215 | 1 |
| 134 | 4 | 175 | 1 | 216 | 1 |
| 135 | 3 | 176 | 2 | 217 | 3 |
| 136 | 1 | 177 | 1 | 218 | 3 |
| 137 | 1 | 178 | 1 | 219 | 2 |
| 138 | 1 | 179 | 1 | 220 | 1 |
| 139 | 1 | 180 | 1 | 221 | 3 |
| 140 | 1 | 181 | 1 | 222 | 2 |
| 141 | 1 | 182 | 2 | 223 | 2 |
| 142 | 1 | 183 | 5 | 224 | 1 |
| 143 | 1 | 184 | 1 | 225 | 1 |
| 144 | 1 | 185 | 2 | 226 | 1 |
| 145 | 3 | 186 | 1 | 227 | 1 |
| 146 | 1 | 187 | 1 | 228 | 4 |
| 147 | 1 | 188 | 1 | 229 | 3 |
| 148 | 1 | 189 | 1 | 230 | 1 |
| 149 | 3 | 190 | 1 | 231 | 2 |
| 150 | 5 | 191 | 1 | 232 | 1 |
| 151 | 1 | 192 | 1 | 233 | 2 |
| 152 | 11 | 193 | 1 | 234 | 2 |
| 153 | 495 | 194 | 1 | 235 | 1 |
| 154 | 1 | 195 | 8 | 236 | 2 |
| 155 | 1 | 196 | 1 | 237 | 1 |
| 156 | 1 | 197 | 1 | 238 | 1 |
| 157 | 123 | 198 | 15 | 239 | 1 |
| 158 | 2 | 199 | 3 | 240 | 1 |
| 159 | 4 | 200 | 2 | 241 | 6 |
| 160 | 5 | 201 | 1 | 242 | 6 |

| | | | | | |
|---|---|---|---|---|---|
| 243 | 1 | 284 | 5 | 325 | 1 |
| 244 | 12 | 285 | 8 | 326 | 8 |
| 245 | 1 | 286 | 6 | 327 | 1 |
| 246 | 28 | 287 | 1 | 328 | 2 |
| 247 | 1 | 288 | 5 | 329 | 2 |
| 248 | 4 | 289 | 1 | 330 | 1 |
| 249 | 3 | 290 | 3 | 331 | 43 |
| 250 | 1 | 291 | 1 | 332 | 1 |
| 251 | 1 | 292 | 1 | 333 | 1 |
| 252 | 4 | 293 | 1 | 334 | 1 |
| 253 | 1 | 294 | 1 | 335 | 1 |
| 254 | 1 | 295 | 1 | 336 | 1 |
| 255 | 4 | 296 | 1 | 337 | 1 |
| 256 | 1 | 297 | 1 | 338 | 1 |
| 257 | 5 | 298 | 1 | 339 | 1 |
| 258 | 1 | 299 | 2 | 340 | 2 |
| 259 | 1 | 300 | 2 | 341 | 4 |
| 260 | 1 | 301 | 2 | 342 | 2 |
| 261 | 11 | 302 | 3 | 343 | 1 |
| 262 | 1 | 303 | 6 | 344 | 1 |
| 263 | 3 | 304 | 1 | 345 | 3 |
| 264 | 2 | 305 | 1 | 346 | 1 |
| 265 | 1 | 306 | 1 | 347 | 1 |
| 266 | 2 | 307 | 21 | 348 | 1 |
| 267 | 4 | 308 | 1 | 349 | 1 |
| 268 | 1 | 309 | 3 | 350 | 1 |
| 269 | 36 | 310 | 1 | 351 | 2 |
| 270 | 1 | 311 | 1 | 352 | 1 |
| 271 | 2 | 312 | 1 | 353 | 5 |
| 272 | 2 | 313 | 2 | 354 | 1 |
| 273 | 3 | 314 | 3 | 355 | 1 |
| 274 | 1 | 315 | 1 | 356 | 23 |
| 275 | 7 | 316 | 4 | 357 | 1 |
| 276 | 6 | 317 | 4 | 358 | 1 |
| 277 | 1 | 318 | 2 | 359 | 17 |
| 278 | 20 | 319 | 3 | 360 | 2 |
| 279 | 1 | 320 | 1 | 361 | 1 |
| 280 | 44 | 321 | 1 | 362 | 28 |
| 281 | 1 | 322 | 1 | 363 | 9 |
| 282 | 1 | 323 | 3 | 364 | 1 |
| 283 | 1 | 324 | 12 | 365 | 4 |

| | | | | | |
|---|---|---|---|---|---|
| 366 | 2 | 407 | 1 | 448 | 1 |
| 367 | 6 | 408 | 1 | 449 | 2 |
| 368 | 23 | 409 | 2 | 450 | 5 |
| 369 | 1 | 410 | 2 | 451 | 1 |
| 370 | 1 | 411 | 6 | 452 | 1 |
| 371 | 4 | 412 | 2 | 453 | 3 |
| 372 | 19 | 413 | 1 | 454 | 1 |
| 373 | 83 | 414 | 4 | 455 | 1 |
| 374 | 1 | 415 | 1 | 456 | 9 |
| 375 | 1 | 416 | 2 | 457 | 3 |
| 376 | 14 | 417 | 1 | 458 | 6 |
| 377 | 3 | 418 | 29 | 459 | 1 |
| 378 | 4 | 419 | 1 | 460 | 1 |
| 379 | 6 | 420 | 1 | 461 | 1 |
| 380 | 1 | 421 | 2 | 462 | 1 |
| 381 | 1 | 422 | 1 | 463 | 1 |
| 382 | 1 | 423 | 1 | 464 | 1 |
| 383 | 1 | 424 | 117 | 465 | 11 |
| 384 | 7 | 425 | 4 | 466 | 1 |
| 385 | 4 | 426 | 1 | 467 | 3 |
| 386 | 1 | 427 | 1 | 468 | 3 |
| 387 | 1 | 428 | 2 | 469 | 1 |
| 388 | 1 | 429 | 3 | 470 | 12 |
| 389 | 1 | 430 | 1 | 471 | 1 |
| 390 | 1 | 431 | 1 | 472 | 1 |
| 391 | 1 | 432 | 2 | 473 | 7 |
| 392 | 1 | 433 | 1 | 474 | 3 |
| 393 | 4 | 434 | 2 | 475 | 15 |
| 394 | 1 | 435 | 1 | 476 | 1 |
| 395 | 7 | 436 | 1 | 477 | 1 |
| 396 | 4 | 437 | 1 | 478 | 1 |
| 397 | 60 | 438 | 6 | 479 | 8 |
| 398 | 1 | 439 | 2 | 480 | 2 |
| 399 | 1 | 440 | 1 | 481 | 3 |
| 400 | 42 | 441 | 4 | 482 | 2 |
| 401 | 2 | 442 | 2 | 483 | 2 |
| 402 | 1 | 443 | 4 | 484 | 1 |
| 403 | 1 | 444 | 1 | 485 | 1 |
| 404 | 13 | 445 | 2 | 486 | 1 |
| 405 | 1 | 446 | 1 | 487 | 1 |
| 406 | 4 | 447 | 1 | 488 | 3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 489 | 1 | | 530 | 13 | | 571 | 5 |
| 490 | 2 | | 531 | 1 | | 572 | 1 |
| 491 | 2 | | 532 | 1 | | 573 | 1 |
| 492 | 1 | | 533 | 1 | | 574 | 2 |
| 493 | 3 | | 534 | 1 | | 575 | 6 |
| 494 | 1 | | 535 | 1 | | 576 | 1 |
| 495 | 1 | | 536 | 1 | | 577 | 1 |
| 496 | 36 | | 537 | 2 | | 578 | 1 |
| 497 | 1 | | 538 | 2 | | 579 | 1 |
| 498 | 1 | | 539 | 1 | | 580 | 1 |
| 499 | 1 | | 540 | 1 | | 581 | 2 |
| 500 | 1 | | 541 | 4 | | 582 | 1 |
| 501 | 27 | | 542 | 2 | | 583 | 1 |
| 502 | 2 | | 543 | 1 | | 584 | 3 |
| 503 | 3 | | 544 | 13 | | 585 | 1 |
| 504 | 2 | | 545 | 3 | | 586 | 2 |
| 505 | 1 | | 546 | 2 | | 587 | 1 |
| 506 | 2 | | 547 | 2 | | 588 | 26 |
| 507 | 1 | | 548 | 27 | | 589 | 12 |
| 508 | 1 | | 549 | 3 | | 590 | 2 |
| 509 | 7 | | 550 | 1 | | 591 | 3 |
| 510 | 1 | | 551 | 20 | | 592 | 6 |
| 511 | 1 | | 552 | 2 | | 593 | 9 |
| 512 | 2 | | 553 | 4 | | 594 | 6 |
| 513 | 1 | | 554 | 1 | | 595 | 2 |
| 514 | 1 | | 555 | 1 | | 596 | 2 |
| 515 | 1 | | 556 | 1 | | 597 | 67 |
| 516 | 1 | | 557 | 1 | | 598 | 13 |
| 517 | 1 | | 558 | 20 | | 599 | 2 |
| 518 | 3 | | 559 | 5 | | 600 | 1 |
| 519 | 1 | | 560 | 31 | | 601 | 1 |
| 520 | 1 | | 561 | 3 | | 602 | 1 |
| 521 | 3 | | 562 | 113 | | 603 | 1 |
| 522 | 1 | | 563 | 4 | | 604 | 2 |
| 523 | 9 | | 564 | 22 | | 605 | 14 |
| 524 | 5 | | 565 | 2 | | 606 | 6 |
| 525 | 1 | | 566 | 1 | | 607 | 1 |
| 526 | 3 | | 567 | 3 | | 608 | 1 |
| 527 | 2 | | 568 | 2 | | 609 | 2 |
| 528 | 1 | | 569 | 19 | | 610 | 1 |
| 529 | 4 | | 570 | 1 | | 611 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 612 | 3 | | 653 | 1 | | 694 | 1 |
| 613 | 1 | | 654 | 2 | | 695 | 1 |
| 614 | 1 | | 655 | 4 | | 696 | 1 |
| 615 | 1 | | 656 | 1 | | 697 | 30 |
| 616 | 1 | | 657 | 1 | | 698 | 1 |
| 617 | 3 | | 658 | 1 | | 699 | 2 |
| 618 | 31 | | 659 | 1 | | 700 | 1 |
| 619 | 2 | | 660 | 2 | | 701 | 1 |
| 620 | 1 | | 661 | 1 | | 702 | 1 |
| 621 | 3 | | 662 | 1 | | 703 | 21 |
| 622 | 6 | | 663 | 1 | | 704 | 2 |
| 623 | 4 | | 664 | 1 | | 705 | 9 |
| 624 | 4 | | 665 | 5 | | 706 | 6 |
| 625 | 1 | | 666 | 3 | | 707 | 1 |
| 626 | 7 | | 667 | 2 | | 708 | 6 |
| 627 | 2 | | 668 | 1 | | 709 | 4 |
| 628 | 1 | | 669 | 10 | | 710 | 1 |
| 629 | 3 | | 670 | 1 | | 711 | 1 |
| 630 | 8 | | 671 | 2 | | 712 | 1 |
| 631 | 2 | | 672 | 1 | | 713 | 13 |
| 632 | 42 | | 673 | 8 | | 714 | 3 |
| 633 | 1 | | 674 | 5 | | 715 | 2 |
| 634 | 1 | | 675 | 2 | | 716 | 7 |
| 635 | 6 | | 676 | 5 | | 717 | 3 |
| 636 | 11 | | 677 | 1 | | 718 | 1 |
| 637 | 3 | | 678 | 1 | | 719 | 1 |
| 638 | 1 | | 679 | 1 | | 720 | 1 |
| 639 | 3 | | 680 | 1 | | 721 | 1 |
| 640 | 1 | | 681 | 1 | | 722 | 1 |
| 641 | 2 | | 682 | 3 | | 723 | 6 |
| 642 | 4 | | 683 | 1 | | 724 | 1 |
| 643 | 1 | | 684 | 2 | | 725 | 1 |
| 644 | 6 | | 685 | 1 | | 726 | 1 |
| 645 | 1 | | 686 | 1 | | 727 | 1 |
| 646 | 1 | | 687 | 3 | | 728 | 1 |
| 647 | 67 | | 688 | 2 | | 729 | 3 |
| 648 | 2 | | 689 | 10 | | 730 | 1 |
| 649 | 14 | | 690 | 1 | | 731 | 5 |
| 650 | 32 | | 691 | 1 | | 732 | 2 |
| 651 | 4 | | 692 | 1 | | 733 | 1 |
| 652 | 1 | | 693 | 2 | | 734 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 735 | 37 | 776 | 4 | 817 | 256 |
| 736 | 1 | 777 | 3 | 818 | 3 |
| 737 | 1 | 778 | 34 | 819 | 87 |
| 738 | 1 | 779 | 4 | 820 | 5 |
| 739 | 1 | 780 | 3 | 821 | 11 |
| 740 | 2 | 781 | 1 | 822 | 1 |
| 741 | 1 | 782 | 1 | 823 | 2 |
| 742 | 19 | 783 | 35 | 824 | 5 |
| 743 | 1 | 784 | 1 | 825 | 1 |
| 744 | 1 | 785 | 1 | 826 | 21 |
| 745 | 3 | 786 | 7 | 827 | 1 |
| 746 | 1 | 787 | 10 | 828 | 15 |
| 747 | 1 | 788 | 7 | 829 | 3 |
| 748 | 1 | 789 | 5 | 830 | 2 |
| 749 | 1 | 790 | 6 | 831 | 83 |
| 750 | 1 | 791 | 5 | 832 | 6 |
| 751 | 24 | 792 | 2 | 833 | 1 |
| 752 | 3 | 793 | 1 | 834 | 2 |
| 753 | 6 | 794 | 2 | 835 | 4 |
| 754 | 1 | 795 | 5 | 836 | 4 |
| 755 | 3 | 796 | 2 | 837 | 25 |
| 756 | 3 | 797 | 6 | 838 | 1 |
| 757 | 1 | 798 | 210 | 839 | 4 |
| 758 | 4 | 799 | 1 | 840 | 43 |
| 759 | 1 | 800 | 1 | 841 | 1 |
| 760 | 10 | 801 | 158 | 842 | 1 |
| 761 | 4 | 802 | 74 | 843 | 1 |
| 762 | 15 | 803 | 2 | 844 | 4 |
| 763 | 1 | 804 | 2 | 845 | 56 |
| 764 | 3 | 805 | 25 | 846 | 14 |
| 765 | 4 | 806 | 1 | 847 | 1 |
| 766 | 17 | 807 | 1 | 848 | 2 |
| 767 | 2 | 808 | 114 | 849 | 24 |
| 768 | 1 | 809 | 51 | 850 | 7 |
| 769 | 17 | 810 | 2 | 851 | 1 |
| 770 | 33 | 811 | 6 | 852 | 6 |
| 771 | 18 | 812 | 2 | 853 | 5 |
| 772 | 7 | 813 | 6 | 854 | 7 |
| 773 | 1 | 814 | 2 | 855 | 6 |
| 774 | 41 | 815 | 20 | 856 | 1 |
| 775 | 24 | 816 | 23 | 857 | 20 |

| | | | | | |
|---|---|---|---|---|---|
| 858 | 2 | 899 | 4 | 940 | 129 |
| 859 | 14 | 900 | 56 | 941 | 4 |
| 860 | 12 | 901 | 1 | 942 | 4 |
| 861 | 2 | 902 | 87 | 943 | 20 |
| 862 | 6 | 903 | 2 | 944 | 4 |
| 863 | 133 | 904 | 12 | 945 | 8 |
| 864 | 9 | 905 | 1 | 946 | 55 |
| 865 | 26 | 906 | 3 | 947 | 4 |
| 866 | 3 | 907 | 2 | 948 | 1 |
| 867 | 1 | 908 | 5 | 949 | 17 |
| 868 | 24 | 909 | 6 | 950 | 128 |
| 869 | 27 | 910 | 3 | 951 | 7 |
| 870 | 3 | 911 | 7 | 952 | 3 |
| 871 | 7 | 912 | 1 | 953 | 1 |
| 872 | 1 | 913 | 194 | 954 | 21 |
| 873 | 3 | 914 | 13 | 955 | 2 |
| 874 | 2 | 915 | 23 | 956 | 3 |
| 875 | 1 | 916 | 1 | 957 | 20 |
| 876 | 1 | 917 | 3 | 958 | 2 |
| 877 | 3 | 918 | 1 | 959 | 10 |
| 878 | 1 | 919 | 1 | 960 | 2 |
| 879 | 3 | 920 | 7 | 961 | 3 |
| 880 | 14 | 921 | 5 | 962 | 16 |
| 881 | 132 | 922 | 91 | 963 | 10 |
| 882 | 12 | 923 | 1 | 964 | 27 |
| 883 | 2 | 924 | 248 | 965 | 5 |
| 884 | 11 | 925 | 2 | 966 | 9 |
| 885 | 37 | 926 | 13 | 967 | 6 |
| 886 | 13 | 927 | 6 | 968 | 3 |
| 887 | 4 | 928 | 2 | 969 | 1 |
| 888 | 1 | 929 | 1 | 970 | 92 |
| 889 | 240 | 930 | 5 | 971 | 1 |
| 890 | 1 | 931 | 5 | 972 | 3 |
| 891 | 2 | 932 | 37 | 973 | 1 |
| 892 | 1 | 933 | 2 | 974 | 5 |
| 893 | 9 | 934 | 3 | 975 | 2 |
| 894 | 6 | 935 | 3 | 976 | 4 |
| 895 | 1 | 936 | 1 | 977 | 1 |
| 896 | 22 | 937 | 21 | 978 | 4 |
| 897 | 7 | 938 | 5 | 979 | 2409 |
| 898 | 8 | 939 | 1 | 980 | 13 |

| | | | | | |
|---|---|---|---|---|---|
| 981 | 7 | 1022 | 4 | 1063 | 8 |
| 982 | 15 | 1023 | 26 | 1064 | 51 |
| 983 | 29 | 1024 | 14 | 1065 | 12 |
| 984 | 4 | 1025 | 1 | 1066 | 10 |
| 985 | 1 | 1026 | 5 | 1067 | 9 |
| 986 | 37 | 1027 | 4 | 1068 | 32 |
| 987 | 7 | 1028 | 2 | 1069 | 3 |
| 988 | 4 | 1029 | 3 | 1070 | 4 |
| 989 | 1 | 1030 | 2 | 1071 | 5 |
| 990 | 2 | 1031 | 2 | 1072 | 1 |
| 991 | 3 | 1032 | 24 | 1073 | 12 |
| 992 | 3 | 1033 | 2 | 1074 | 24 |
| 993 | 1 | 1034 | 2 | 1075 | 3 |
| 994 | 11 | 1035 | 6 | 1076 | 12 |
| 995 | 1 | 1036 | 12 | 1077 | 2 |
| 996 | 5 | 1037 | 17 | 1078 | 4 |
| 997 | 7 | 1038 | 15 | 1079 | 6408 |
| 998 | 3 | 1039 | 1 | 1080 | 10 |
| 999 | 3 | 1040 | 55 | 1081 | 3 |
| 1000 | 2 | 1041 | 7 | 1082 | 3 |
| 1001 | 35 | 1042 | 4 | 1083 | 1 |
| 1002 | 3 | 1043 | 65 | 1084 | 21 |
| 1003 | 1 | 1044 | 92 | 1085 | 1 |
| 1004 | 1 | 1045 | 2 | 1086 | 13 |
| 1005 | 1 | 1046 | 7 | 1087 | 5 |
| 1006 | 1 | 1047 | 1 | 1088 | 1 |
| 1007 | 1 | 1048 | 1 | 1089 | 4 |
| 1008 | 1 | 1049 | 3 | 1090 | 2 |
| 1009 | 2608 | 1050 | 2 | 1091 | 6 |
| 1010 | 3 | 1051 | 1 | 1092 | 1 |
| 1011 | 68 | 1052 | 1 | 1093 | 1 |
| 1012 | 131 | 1053 | 4 | 1094 | 1 |
| 1013 | 1 | 1054 | 2 | 1095 | 18 |
| 1014 | 4 | 1055 | 14 | 1096 | 3 |
| 1015 | 4 | 1056 | 6 | 1097 | 12 |
| 1016 | 26 | 1057 | 14 | 1098 | 7 |
| 1017 | 36 | 1058 | 1 | 1099 | 53 |
| 1018 | 1 | 1059 | 8 | 1100 | 66 |
| 1019 | 23 | 1060 | 4 | 1101 | 24 |
| 1020 | 2 | 1061 | 4 | 1102 | 31 |
| 1021 | 2 | 1062 | 1 | 1103 | 6 |

| | | | | | |
|---|---|---|---|---|---|
| 1104 | 1 | 1145 | 1 | 1186 | 10 |
| 1105 | 3 | 1146 | 7 | 1187 | 21 |
| 1106 | 9 | 1147 | 1 | 1188 | 7 |
| 1107 | 2 | 1148 | 1 | 1189 | 5 |
| 1108 | 1 | 1149 | 2 | 1190 | 1 |
| 1109 | 48 | 1150 | 5 | 1191 | 1 |
| 1110 | 2 | 1151 | 5 | 1192 | 5 |
| 1111 | 4 | 1152 | 24 | 1193 | 5 |
| 1112 | 67 | 1153 | 12 | 1194 | 22 |
| 1113 | 1 | 1154 | 6 | 1195 | 17 |
| 1114 | 2 | 1155 | 3 | 1196 | 5 |
| 1115 | 19 | 1156 | 35 | 1197 | 150 |
| 1116 | 1 | 1157 | 47 | 1198 | 20 |
| 1117 | 267 | 1158 | 23 | 1199 | 1 |
| 1118 | 16 | 1159 | 8 | 1200 | 1 |
| 1119 | 8 | 1160 | 4 | 1201 | 1 |
| 1120 | 14 | 1161 | 1 | 1202 | 1 |
| 1121 | 36 | 1162 | 2 | 1203 | 3 |
| 1122 | 3 | 1163 | 4 | 1204 | 1 |
| 1123 | 85 | 1164 | 3 | 1205 | 4 |
| 1124 | 4 | 1165 | 18 | 1206 | 4 |
| 1125 | 736 | 1166 | 21 | 1207 | 2 |
| 1126 | 5 | 1167 | 1 | 1208 | 1 |
| 1127 | 1 | 1168 | 1 | 1209 | 5 |
| 1128 | 8 | 1169 | 2 | 1210 | 22 |
| 1129 | 9 | 1170 | 17 | 1211 | 2 |
| 1130 | 5 | 1171 | 1 | 1212 | 1 |
| 1131 | 24 | 1172 | 1 | 1213 | 3 |
| 1132 | 88 | 1173 | 2 | 1214 | 3 |
| 1133 | 411 | 1174 | 2 | 1215 | 3 |
| 1134 | 40 | 1175 | 7 | 1216 | 1 |
| 1135 | 2 | 1176 | 1 | 1217 | 3 |
| 1136 | 1 | 1177 | 9 | 1218 | 16 |
| 1137 | 1 | 1178 | 33 | 1219 | 4 |
| 1138 | 41 | 1179 | 2 | 1220 | 3 |
| 1139 | 1 | 1180 | 30 | 1221 | 3 |
| 1140 | 3 | 1181 | 1 | 1222 | 1 |
| 1141 | 1 | 1182 | 1 | 1223 | 23 |
| 1142 | 3 | 1183 | 2 | 1224 | 1 |
| 1143 | 4 | 1184 | 8 | 1225 | 10 |
| 1144 | 60 | 1185 | 18 | 1226 | 2 |

| | | | | | |
|---|---|---|---|---|---|
| 1227 | 3 | 1268 | 6 | 1309 | 8 |
| 1228 | 6 | 1269 | 1 | 1310 | 1 |
| 1229 | 5 | 1270 | 2 | 1311 | 2 |
| 1230 | 1 | 1271 | 27 | 1312 | 1 |
| 1231 | 7 | 1272 | 1 | 1313 | 2 |
| 1232 | 16 | 1273 | 1 | 1314 | 9 |
| 1233 | 1 | 1274 | 9 | 1315 | 9 |
| 1234 | 17 | 1275 | 4 | 1316 | 277 |
| 1235 | 1 | 1276 | 2 | 1317 | 1 |
| 1236 | 15 | 1277 | 2 | 1318 | 19 |
| 1237 | 2 | 1278 | 2 | 1319 | 13 |
| 1238 | 9 | 1279 | 4 | 1320 | 1 |
| 1239 | 2 | 1280 | 3 | 1321 | 2 |
| 1240 | 1 | 1281 | 13 | 1322 | 2 |
| 1241 | 15 | 1282 | 75 | 1323 | 4 |
| 1242 | 5 | 1283 | 1 | 1324 | 13 |
| 1243 | 4 | 1284 | 2 | 1325 | 3 |
| 1244 | 4 | 1285 | 42 | 1326 | 2 |
| 1245 | 12 | 1286 | 7 | 1327 | 47 |
| 1246 | 2 | 1287 | 1 | 1328 | 28 |
| 1247 | 1 | 1288 | 1 | 1329 | 11 |
| 1248 | 3 | 1289 | 3 | 1330 | 4 |
| 1249 | 3 | 1290 | 2 | 1331 | 6 |
| 1250 | 1 | 1291 | 4 | 1332 | 1 |
| 1251 | 11 | 1292 | 2 | 1333 | 5 |
| 1252 | 15 | 1293 | 1 | 1334 | 5 |
| 1253 | 2 | 1294 | 2 | 1335 | 2 |
| 1254 | 2 | 1295 | 2 | 1336 | 1 |
| 1255 | 42 | 1296 | 8 | 1337 | 4 |
| 1256 | 8 | 1297 | 13 | 1338 | 1 |
| 1257 | 10 | 1298 | 1 | 1339 | 1 |
| 1258 | 3 | 1299 | 16 | 1340 | 3 |
| 1259 | 8 | 1300 | 1 | 1341 | 1 |
| 1260 | 6 | 1301 | 1 | 1342 | 58 |
| 1261 | 1 | 1302 | 19 | 1343 | 2 |
| 1262 | 3 | 1303 | 1 | 1344 | 28 |
| 1263 | 2 | 1304 | 1 | 1345 | 3 |
| 1264 | 1 | 1305 | 3 | 1346 | 1 |
| 1265 | 506 | 1306 | 1 | 1347 | 11 |
| 1266 | 6 | 1307 | 1 | 1348 | 7 |
| 1267 | 5 | 1308 | 7 | 1349 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 1350 | 13 | 1391 | 29 | 1432 | 9 |
| 1351 | 1 | 1392 | 40 | 1433 | 19 |
| 1352 | 3 | 1393 | 1 | 1434 | 2 |
| 1353 | 7 | 1394 | 6 | 1435 | 21 |
| 1354 | 1 | 1395 | 3 | 1436 | 1 |
| 1355 | 17 | 1396 | 12 | 1437 | 1 |
| 1356 | 9 | 1397 | 5 | 1438 | 8 |
| 1357 | 7 | 1398 | 21 | 1439 | 4 |
| 1358 | 10 | 1399 | 34 | 1440 | 5 |
| 1359 | 1 | 1400 | 28 | 1441 | 15 |
| 1360 | 4 | 1401 | 2 | 1442 | 1 |
| 1361 | 1 | 1402 | 2 | 1443 | 1 |
| 1362 | 20 | 1403 | 2 | 1444 | 13 |
| 1363 | 4 | 1404 | 4 | 1445 | 7 |
| 1364 | 3 | 1405 | 1 | 1446 | 1 |
| 1365 | 2 | 1406 | 5 | 1447 | 1 |
| 1366 | 10 | 1407 | 27 | 1448 | 2 |
| 1367 | 1 | 1408 | 7 | 1449 | 1 |
| 1368 | 1 | 1409 | 44 | 1450 | 16 |
| 1369 | 37 | 1410 | 2 | 1451 | 42 |
| 1370 | 12 | 1411 | 1 | 1452 | 3 |
| 1371 | 23 | 1412 | 1 | 1453 | 6 |
| 1372 | 21 | 1413 | 5 | 1454 | 3 |
| 1373 | 13 | 1414 | 3 | 1455 | 2 |
| 1374 | 1 | 1415 | 20 | 1456 | 2 |
| 1375 | 3 | 1416 | 1 | 1457 | 38 |
| 1376 | 9 | 1417 | 28 | 1458 | 2 |
| 1377 | 7 | 1418 | 1 | 1459 | 23 |
| 1378 | 21 | 1419 | 3 | 1460 | 5 |
| 1379 | 9 | 1420 | 5 | 1461 | 8 |
| 1380 | 4 | 1421 | 22 | 1462 | 19 |
| 1381 | 9 | 1422 | 3 | 1463 | 6 |
| 1382 | 4 | 1423 | 5 | 1464 | 9 |
| 1383 | 8 | 1424 | 23 | 1465 | 6 |
| 1384 | 54 | 1425 | 14 | 1466 | 2 |
| 1385 | 22 | 1426 | 2 | 1467 | 6 |
| 1386 | 5 | 1427 | 2 | 1468 | 6 |
| 1387 | 4 | 1428 | 5 | 1469 | 10 |
| 1388 | 16 | 1429 | 1 | 1470 | 5 |
| 1389 | 1 | 1430 | 17 | 1471 | 1 |
| 1390 | 5 | 1431 | 1 | 1472 | 22 |

| | | | | | |
|---|---|---|---|---|---|
| 1473 | 18 | 1514 | 2 | 1555 | 10 |
| 1474 | 1 | 1515 | 8 | 1556 | 6 |
| 1475 | 12 | 1516 | 4 | 1557 | 10 |
| 1476 | 1 | 1517 | 7 | 1558 | 3 |
| 1477 | 24 | 1518 | 19 | 1559 | 12 |
| 1478 | 9 | 1519 | 27 | 1560 | 7 |
| 1479 | 7 | 1520 | 4 | 1561 | 21 |
| 1480 | 144 | 1521 | 1 | 1562 | 3 |
| 1481 | 1 | 1522 | 6 | 1563 | 39 |
| 1482 | 1 | 1523 | 5 | 1564 | 2 |
| 1483 | 9 | 1524 | 7 | 1565 | 64 |
| 1484 | 114 | 1525 | 15 | 1566 | 1 |
| 1485 | 15 | 1526 | 1 | 1567 | 395 |
| 1486 | 1 | 1527 | 21 | 1568 | 2 |
| 1487 | 7 | 1528 | 5 | 1569 | 14 |
| 1488 | 13 | 1529 | 4 | 1570 | 8 |
| 1489 | 13 | 1530 | 71 | 1571 | 3 |
| 1490 | 15 | 1531 | 144 | 1572 | 4 |
| 1491 | 40 | 1532 | 15 | 1573 | 6 |
| 1492 | 2 | 1533 | 1 | 1574 | 17 |
| 1493 | 1 | 1534 | 1 | 1575 | 1 |
| 1494 | 5 | 1535 | 1 | 1576 | 4 |
| 1495 | 2 | 1536 | 37 | 1577 | 11 |
| 1496 | 36 | 1537 | 1 | 1578 | 4 |
| 1497 | 1 | 1538 | 8 | 1579 | 4 |
| 1498 | 2 | 1539 | 15 | 1580 | 7 |
| 1499 | 1 | 1540 | 6 | 1581 | 1 |
| 1500 | 5 | 1541 | 119 | 1582 | 25 |
| 1501 | 4 | 1542 | 9 | 1583 | 19 |
| 1502 | 5 | 1543 | 24 | 1584 | 2 |
| 1503 | 1 | 1544 | 116 | 1585 | 7 |
| 1504 | 3 | 1545 | 24 | 1586 | 3 |
| 1505 | 1 | 1546 | 4 | 1587 | 1 |
| 1506 | 5 | 1547 | 83 | 1588 | 57 |
| 1507 | 6 | 1548 | 4 | 1589 | 11 |
| 1508 | 103 | 1549 | 32 | 1590 | 4 |
| 1509 | 1 | 1550 | 30 | 1591 | 1 |
| 1510 | 8 | 1551 | 8 | 1592 | 70 |
| 1511 | 14 | 1552 | 5 | 1593 | 16 |
| 1512 | 6 | 1553 | 8 | 1594 | 15 |
| 1513 | 14 | 1554 | 1 | 1595 | 14 |

| | | | | | |
|---|---|---|---|---|---|
| 1596 | 13 | 1637 | 6 | 1678 | 6 |
| 1597 | 17 | 1638 | 3 | 1679 | 78 |
| 1598 | 2 | 1639 | 11 | 1680 | 1 |
| 1599 | 4 | 1640 | 6 | 1681 | 18 |
| 1600 | 5 | 1641 | 1 | 1682 | 2 |
| 1601 | 1 | 1642 | 3 | 1683 | 6 |
| 1602 | 9 | 1643 | 13 | 1684 | 11 |
| 1603 | 1 | 1644 | 2 | 1685 | 1 |
| 1604 | 3 | 1645 | 4 | 1686 | 41 |
| 1605 | 7 | 1646 | 7 | 1687 | 35 |
| 1606 | 3 | 1647 | 3 | 1688 | 4 |
| 1607 | 155 | 1648 | 12 | 1689 | 10 |
| 1608 | 5 | 1649 | 5 | 1690 | 14 |
| 1609 | 3 | 1650 | 2 | 1691 | 1 |
| 1610 | 16 | 1651 | 15 | 1692 | 47 |
| 1611 | 11 | 1652 | 1 | 1693 | 66 |
| 1612 | 9 | 1653 | 14 | 1694 | 17 |
| 1613 | 31 | 1654 | 1 | 1695 | 21 |
| 1614 | 2 | 1655 | 1 | 1696 | 2 |
| 1615 | 12 | 1656 | 4 | 1697 | 3 |
| 1616 | 1 | 1657 | 6 | 1698 | 29 |
| 1617 | 2 | 1658 | 1 | 1699 | 4 |
| 1618 | 7 | 1659 | 3 | 1700 | 9 |
| 1619 | 7 | 1660 | 1 | 1701 | 11 |
| 1620 | 1 | 1661 | 2 | 1702 | 93 |
| 1621 | 6 | 1662 | 1 | 1703 | 4 |
| 1622 | 2 | 1663 | 11 | 1704 | 29 |
| 1623 | 17 | 1664 | 20 | 1705 | 1 |
| 1624 | 3 | 1665 | 2 | 1706 | 14 |
| 1625 | 1 | 1666 | 3 | 1707 | 9 |
| 1626 | 1 | 1667 | 4 | 1708 | 173 |
| 1627 | 1 | 1668 | 91 | 1709 | 6 |
| 1628 | 1 | 1669 | 2 | 1710 | 123 |
| 1629 | 1 | 1670 | 4 | 1711 | 20 |
| 1630 | 9 | 1671 | 59 | 1712 | 3 |
| 1631 | 1 | 1672 | 1 | 1713 | 20 |
| 1632 | 3 | 1673 | 55 | 1714 | 9 |
| 1633 | 106 | 1674 | 4 | 1715 | 7 |
| 1634 | 549 | 1675 | 8 | 1716 | 1 |
| 1635 | 21 | 1676 | 6 | 1717 | 1 |
| 1636 | 4 | 1677 | 1 | 1718 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| **1719** | 6 | **1760** | 16 | **1801** | 1 |
| **1720** | 14 | **1761** | 28 | **1802** | 4 |
| **1721** | 1 | **1762** | 15 | **1803** | 12 |
| **1722** | 3 | **1763** | 1 | **1804** | 16 |
| **1723** | 2 | **1764** | 1 | **1805** | 54 |
| **1724** | 1 | **1765** | 5 | **1806** | 3 |
| **1725** | 1 | **1766** | 3 | **1807** | 3 |
| **1726** | 2 | **1767** | 3 | **1808** | 2 |
| **1727** | 1 | **1768** | 1 | **1809** | 6 |
| **1728** | 3 | **1769** | 9 | **1810** | 2 |
| **1729** | 1 | **1770** | 1 | **1811** | 27 |
| **1730** | 5 | **1771** | 2 | **1812** | 6 |
| **1731** | 3 | **1772** | 1 | **1813** | 4 |
| **1732** | 4 | **1773** | 1 | **1814** | 56 |
| **1733** | 10 | **1774** | 15 | **1815** | 2 |
| **1734** | 10 | **1775** | 2 | **1816** | 1 |
| **1735** | 5 | **1776** | 18 | **1817** | 36 |
| **1736** | 5 | **1777** | 17 | **1818** | 18 |
| **1737** | 2 | **1778** | 9 | **1819** | 9 |
| **1738** | 4 | **1779** | 11 | **1820** | 1 |
| **1739** | 2 | **1780** | 2 | **1821** | 2 |
| **1740** | 3 | **1781** | 3 | **1822** | 29 |
| **1741** | 6 | **1782** | 16 | **1823** | 1 |
| **1742** | 20 | **1783** | 1 | **1824** | 4 |
| **1743** | 1 | **1784** | 22 | **1825** | 2 |
| **1744** | 2 | **1785** | 7 | **1826** | 6 |
| **1745** | 3 | **1786** | 1 | **1827** | 11 |
| **1746** | 9 | **1787** | 1 | **1828** | 3 |
| **1747** | 2 | **1788** | 1 | **1829** | 9 |
| **1748** | 4 | **1789** | 1 | **1830** | 1 |
| **1749** | 1 | **1790** | 2 | **1831** | 9 |
| **1750** | 1 | **1791** | 11 | **1832** | 37 |
| **1751** | 17 | **1792** | 3 | **1833** | 6 |
| **1752** | 3 | **1793** | 5 | **1834** | 11 |
| **1753** | 3 | **1794** | 14 | **1835** | 12 |
| **1754** | 1 | **1795** | 4 | **1836** | 4 |
| **1755** | 43 | **1796** | 2 | **1837** | 2 |
| **1756** | 16 | **1797** | 4 | **1838** | 245 |
| **1757** | 2 | **1798** | 1 | **1839** | 40 |
| **1758** | 22 | **1799** | 4 | **1840** | 1 |
| **1759** | 1 | **1800** | 5 | **1841** | 62 |

| Year | Count |
|------|-------|
| 1842 | 7 |
| 1843 | 11 |
| 1844 | 6 |
| 1845 | 1 |
| 1846 | 8 |
| 1847 | 46 |
| 1848 | 15 |
| 1849 | 1 |
| 1850 | 3 |
| 1851 | 1 |
| 1852 | 1 |
| 1853 | 3 |
| 1854 | 1 |
| 1855 | 2 |
| 1856 | 40 |
| 1857 | 7 |
| 1858 | 24 |
| 1859 | 108 |
| 1860 | 2 |
| 1861 | 23 |
| 1862 | 7 |
| 1863 | 6 |
| 1864 | 5 |
| 1865 | 1 |
| 1866 | 61 |
| 1867 | 42 |
| 1868 | 2 |
| 1869 | 4 |
| 1870 | 3 |
| 1871 | 3 |
| 1872 | 1 |
| 1873 | 7 |
| 1874 | 3 |
| 1875 | 1 |
| 1876 | 5 |
| 1877 | 1 |
| 1878 | 1 |
| 1879 | 29 |
| 1880 | 5 |
| 1881 | 3 |
| 1882 | 1 |

| Year | Count |
|------|-------|
| 1883 | 1 |
| 1884 | 10 |
| 1885 | 1 |
| 1886 | 2 |
| 1887 | 7 |
| 1888 | 3 |
| 1889 | 6 |
| 1890 | 1 |
| 1891 | 2 |
| 1892 | 7 |
| 1893 | 28 |
| 1894 | 2 |
| 1895 | 3 |
| 1896 | 5 |
| 1897 | 6 |
| 1898 | 5 |
| 1899 | 4 |
| 1900 | 12 |
| 1901 | 10 |
| 1902 | 4 |
| 1903 | 12 |
| 1904 | 1 |
| 1905 | 3 |
| 1906 | 1 |
| 1907 | 2 |
| 1908 | 3 |
| 1909 | 1 |
| 1910 | 40 |
| 1911 | 2 |
| 1912 | 4 |
| 1913 | 6 |
| 1914 | 3 |
| 1915 | 7 |
| 1916 | 10 |
| 1917 | 7 |
| 1918 | 18 |
| 1919 | 39 |
| 1920 | 29 |
| 1921 | 1 |
| 1922 | 16 |
| 1923 | 5 |

| Year | Count |
|------|-------|
| 1924 | 3 |
| 1925 | 1 |
| 1926 | 7 |
| 1927 | 3 |
| 1928 | 4 |
| 1929 | 21 |
| 1930 | 2 |
| 1931 | 3 |
| 1932 | 21 |
| 1933 | 3 |
| 1934 | 2 |
| 1935 | 1 |
| 1936 | 30 |
| 1937 | 2 |
| 1938 | 1 |
| 1939 | 31 |
| 1940 | 7 |
| 1941 | 35 |
| 1942 | 4 |
| 1943 | 2 |
| 1944 | 15 |
| 1945 | 3 |
| 1946 | 1 |
| 1947 | 4 |
| 1948 | 3 |
| 1949 | 14 |
| 1950 | 12 |
| 1951 | 1 |
| 1952 | 1 |
| 1953 | 1 |
| 1954 | 4 |
| 1955 | 2 |
| 1956 | 1 |
| 1957 | 14 |
| 1958 | 2 |
| 1959 | 119 |
| 1960 | 31 |
| 1961 | 13 |
| 1962 | 1 |
| 1963 | 9 |
| 1964 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| 1965 | 1 | 2006 | 2 | 2047 | 1 |
| 1966 | 15 | 2007 | 64 | 2048 | 7 |
| 1967 | 1 | 2008 | 1 | 2049 | 13 |
| 1968 | 3 | 2009 | 3 | 2050 | 6 |
| 1969 | 4 | 2010 | 1 | 2051 | 1 |
| 1970 | 3 | 2011 | 1 | 2052 | 132 |
| 1971 | 10 | 2012 | 1 | 2053 | 12 |
| 1972 | 12 | 2013 | 1 | 2054 | 3 |
| 1973 | 48 | 2014 | 1 | 2055 | 9 |
| 1974 | 1 | 2015 | 3 | 2056 | 7 |
| 1975 | 9 | 2016 | 31 | 2057 | 6 |
| 1976 | 5 | 2017 | 1 | 2058 | 28 |
| 1977 | 1 | 2018 | 1 | 2059 | 26 |
| 1978 | 2 | 2019 | 1 | 2060 | 45 |
| 1979 | 2 | 2020 | 4 | 2061 | 8 |
| 1980 | 129 | 2021 | 4 | 2062 | 3 |
| 1981 | 6 | 2022 | 48 | 2063 | 11 |
| 1982 | 14 | 2023 | 44 | 2064 | 9 |
| 1983 | 2 | 2024 | 4 | 2065 | 39 |
| 1984 | 8 | 2025 | 2 | 2066 | 189 |
| 1985 | 1 | 2026 | 1 | 2067 | 9 |
| 1986 | 4 | 2027 | 4 | 2068 | 1 |
| 1987 | 3 | 2028 | 29 | 2069 | 5 |
| 1988 | 1 | 2029 | 3 | 2070 | 7 |
| 1989 | 1 | 2030 | 11 | 2071 | 1 |
| 1990 | 29 | 2031 | 1 | 2072 | 2 |
| 1991 | 1 | 2032 | 17 | 2073 | 11 |
| 1992 | 2 | 2033 | 15 | 2074 | 3 |
| 1993 | 82 | 2034 | 7 | 2075 | 1 |
| 1994 | 19 | 2035 | 1 | 2076 | 1 |
| 1995 | 5 | 2036 | 1 | 2077 | 1 |
| 1996 | 6 | 2037 | 2 | 2078 | 1 |
| 1997 | 13 | 2038 | 29 | 2079 | 4 |
| 1998 | 16 | 2039 | 12 | 2080 | 2 |
| 1999 | 3 | 2040 | 8 | 2081 | 2 |
| 2000 | 1 | 2041 | 19 | 2082 | 1 |
| 2001 | 1 | 2042 | 4 | 2083 | 3 |
| 2002 | 21 | 2043 | 1 | 2084 | 1 |
| 2003 | 4 | 2044 | 1 | 2085 | 1 |
| 2004 | 2 | 2045 | 6 | 2086 | 1 |
| 2005 | 3 | 2046 | 7 | 2087 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| 2088 | 4 | 2129 | 2 | 2170 | 1 |
| 2089 | 10 | 2130 | 1 | 2171 | 4 |
| 2090 | 73 | 2131 | 8 | 2172 | 1 |
| 2091 | 1 | 2132 | 2 | 2173 | 5 |
| 2092 | 1 | 2133 | 1 | 2174 | 1 |
| 2093 | 10 | 2134 | 2 | 2175 | 1 |
| 2094 | 33 | 2135 | 8 | 2176 | 29 |
| 2095 | 17 | 2136 | 4 | 2177 | 3 |
| 2096 | 6 | 2137 | 5 | 2178 | 10 |
| 2097 | 1 | 2138 | 6 | 2179 | 5 |
| 2098 | 2 | 2139 | 6 | 2180 | 21 |
| 2099 | 11 | 2140 | 3 | 2181 | 2 |
| 2100 | 16 | 2141 | 1 | 2182 | 4 |
| 2101 | 1 | 2142 | 1 | 2183 | 4 |
| 2102 | 1 | 2143 | 5 | 2184 | 1 |
| 2103 | 2 | 2144 | 10 | 2185 | 9 |
| 2104 | 1 | 2145 | 1 | 2186 | 2 |
| 2105 | 8 | 2146 | 3 | 2187 | 5 |
| 2106 | 13 | 2147 | 13 | 2188 | 9 |
| 2107 | 7 | 2148 | 1 | 2189 | 11 |
| 2108 | 2 | 2149 | 1 | 2190 | 1 |
| 2109 | 2 | 2150 | 3 | 2191 | 2 |
| 2110 | 21 | 2151 | 1 | 2192 | 3 |
| 2111 | 20 | 2152 | 1 | 2193 | 1 |
| 2112 | 5 | 2153 | 8 | 2194 | 2 |
| 2113 | 1 | 2154 | 1 | 2195 | 5 |
| 2114 | 2 | 2155 | 2 | 2196 | 1 |
| 2115 | 1 | 2156 | 1 | 2197 | 6 |
| 2116 | 3 | 2157 | 1 | 2198 | 46 |
| 2117 | 1 | 2158 | 1 | 2199 | 8 |
| 2118 | 2 | 2159 | 2 | 2200 | 3 |
| 2119 | 5 | 2160 | 13 | 2201 | 1 |
| 2120 | 8 | 2161 | 60 | 2202 | 28 |
| 2121 | 2 | 2162 | 17 | 2203 | 191 |
| 2122 | 30 | 2163 | 40 | 2204 | 193 |
| 2123 | 1 | 2164 | 4 | 2205 | 5 |
| 2124 | 36 | 2165 | 5 | 2206 | 5 |
| 2125 | 6 | 2166 | 40 | 2207 | 1 |
| 2126 | 2 | 2167 | 7 | 2208 | 3 |
| 2127 | 1 | 2168 | 3 | 2209 | 3 |
| 2128 | 1 | 2169 | 6 | 2210 | 66 |

| | | | | | |
|---|---|---|---|---|---|
| 2211 | 1 | 2252 | 2 | 2293 | 2 |
| 2212 | 8 | 2253 | 1 | 2294 | 1 |
| 2213 | 1 | 2254 | 7 | 2295 | 3 |
| 2214 | 1 | 2255 | 53 | 2296 | 1 |
| 2215 | 2 | 2256 | 11 | 2297 | 1 |
| 2216 | 4 | 2257 | 6 | 2298 | 1 |
| 2217 | 8 | 2258 | 45 | 2299 | 1 |
| 2218 | 1 | 2259 | 5 | 2300 | 1 |
| 2219 | 43 | 2260 | 9 | 2301 | 6 |
| 2220 | 4 | 2261 | 36 | 2302 | 3 |
| 2221 | 2 | 2262 | 1 | 2303 | 8 |
| 2222 | 132 | 2263 | 4 | 2304 | 7 |
| 2223 | 1 | 2264 | 5 | 2305 | 2 |
| 2224 | 35 | 2265 | 53 | 2306 | 2 |
| 2225 | 2 | 2266 | 4 | 2307 | 1 |
| 2226 | 4 | 2267 | 14 | 2308 | 8 |
| 2227 | 1 | 2268 | 1 | 2309 | 21 |
| 2228 | 1 | 2269 | 19 | 2310 | 2 |
| 2229 | 4 | 2270 | 1 | 2311 | 11 |
| 2230 | 2 | 2271 | 4 | 2312 | 28 |
| 2231 | 14 | 2272 | 5 | 2313 | 3 |
| 2232 | 3 | 2273 | 2 | 2314 | 1 |
| 2233 | 7 | 2274 | 3 | 2315 | 5 |
| 2234 | 1 | 2275 | 6 | 2316 | 1 |
| 2235 | 3 | 2276 | 12 | 2317 | 16 |
| 2236 | 5 | 2277 | 20 | 2318 | 5 |
| 2237 | 3 | 2278 | 2 | 2319 | 3 |
| 2238 | 6 | 2279 | 1 | 2320 | 3 |
| 2239 | 11 | 2280 | 1 | 2321 | 5 |
| 2240 | 12 | 2281 | 1 | 2322 | 17 |
| 2241 | 50 | 2282 | 21 | 2323 | 4 |
| 2242 | 11 | 2283 | 1 | 2324 | 8 |
| 2243 | 24 | 2284 | 6 | 2325 | 1 |
| 2244 | 2 | 2285 | 6 | 2326 | 2 |
| 2245 | 1 | 2286 | 8 | 2327 | 2 |
| 2246 | 8 | 2287 | 1 | 2328 | 1 |
| 2247 | 3 | 2288 | 1 | 2329 | 2 |
| 2248 | 3 | 2289 | 3 | 2330 | 2 |
| 2249 | 1 | 2290 | 2 | 2331 | 17 |
| 2250 | 1 | 2291 | 1 | 2332 | 7 |
| 2251 | 28 | 2292 | 4 | 2333 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| **2334** | 6 | **2375** | 4 | **2416** | 5 |
| **2335** | 7 | **2376** | 2 | **2417** | 2 |
| **2336** | 1 | **2377** | 80 | **2418** | 3 |
| **2337** | 1 | **2378** | 31 | **2419** | 12 |
| **2338** | 2 | **2379** | 6 | **2420** | 1 |
| **2339** | 1 | **2380** | 1 | **2421** | 3 |
| **2340** | 1 | **2381** | 29 | **2422** | 10 |
| **2341** | 13 | **2382** | 2 | **2423** | 1 |
| **2342** | 1 | **2383** | 8 | **2424** | 8 |
| **2343** | 3 | **2384** | 10 | **2425** | 3 |
| **2344** | 5 | **2385** | 6 | **2426** | 1 |
| **2345** | 7 | **2386** | 6 | **2427** | 6 |
| **2346** | 4 | **2387** | 36 | **2428** | 2 |
| **2347** | 2 | **2388** | 16 | **2429** | 3 |
| **2348** | 2 | **2389** | 1 | **2430** | 54 |
| **2349** | 2 | **2390** | 12 | **2431** | 133 |
| **2350** | 8 | **2391** | 6 | **2432** | 1 |
| **2351** | 4 | **2392** | 51 | **2433** | 22 |
| **2352** | 4 | **2393** | 7 | **2434** | 2 |
| **2353** | 1 | **2394** | 2 | **2435** | 4 |
| **2354** | 4 | **2395** | 1 | **2436** | 44 |
| **2355** | 2 | **2396** | 11 | **2437** | 3 |
| **2356** | 4 | **2397** | 3 | **2438** | 2 |
| **2357** | 8 | **2398** | 12 | **2439** | 1 |
| **2358** | 3 | **2399** | 4 | **2440** | 14 |
| **2359** | 1 | **2400** | 1 | **2441** | 3 |
| **2360** | 12 | **2401** | 1 | **2442** | 4 |
| **2361** | 1 | **2402** | 9 | **2443** | 1 |
| **2362** | 5 | **2403** | 2 | **2444** | 1 |
| **2363** | 17 | **2404** | 2 | **2445** | 2 |
| **2364** | 2 | **2405** | 8 | **2446** | 4 |
| **2365** | 1 | **2406** | 2 | **2447** | 3 |
| **2366** | 2 | **2407** | 11 | **2448** | 4 |
| **2367** | 97 | **2408** | 5 | **2449** | 405 |
| **2368** | 4 | **2409** | 4 | **2450** | 95 |
| **2369** | 28 | **2410** | 1 | **2451** | 1 |
| **2370** | 29 | **2411** | 2 | **2452** | 16 |
| **2371** | 1 | **2412** | 1 | **2453** | 3 |
| **2372** | 4 | **2413** | 1 | **2454** | 1 |
| **2373** | 1 | **2414** | 14 | **2455** | 1 |
| **2374** | 5 | **2415** | 10 | **2456** | 10 |

| | | | | | |
|---|---|---|---|---|---|
| 2457 | 59 | 2498 | 72 | 2539 | 2 |
| 2458 | 6 | 2499 | 1 | 2540 | 15 |
| 2459 | 2 | 2500 | 1 | 2541 | 2 |
| 2460 | 23 | 2501 | 1 | 2542 | 6 |
| 2461 | 10 | 2502 | 168 | 2543 | 1 |
| 2462 | 1 | 2503 | 11 | 2544 | 3 |
| 2463 | 2 | 2504 | 1 | 2545 | 18 |
| 2464 | 7 | 2505 | 12 | 2546 | 6 |
| 2465 | 2 | 2506 | 9 | 2547 | 21 |
| 2466 | 226 | 2507 | 2 | 2548 | 1 |
| 2467 | 10 | 2508 | 3 | 2549 | 5 |
| 2468 | 2 | 2509 | 4 | 2550 | 5 |
| 2469 | 17 | 2510 | 2 | 2551 | 10 |
| 2470 | 7 | 2511 | 5 | 2552 | 1 |
| 2471 | 2 | 2512 | 1 | 2553 | 4 |
| 2472 | 24 | 2513 | 22 | 2554 | 1 |
| 2473 | 5 | 2514 | 1 | 2555 | 20 |
| 2474 | 3 | 2515 | 1 | 2556 | 2 |
| 2475 | 2 | 2516 | 4 | 2557 | 3 |
| 2476 | 4 | 2517 | 3 | 2558 | 3 |
| 2477 | 9 | 2518 | 50 | 2559 | 2 |
| 2478 | 2 | 2519 | 12 | 2560 | 3 |
| 2479 | 1 | 2520 | 1 | 2561 | 2 |
| 2480 | 6 | 2521 | 1 | 2562 | 2 |
| 2481 | 12 | 2522 | 4 | 2563 | 10 |
| 2482 | 8 | 2523 | 10 | 2564 | 1 |
| 2483 | 1 | 2524 | 4 | 2565 | 13 |
| 2484 | 1 | 2525 | 97 | 2566 | 28 |
| 2485 | 3 | 2526 | 23 | 2567 | 6 |
| 2486 | 2 | 2527 | 10 | 2568 | 2 |
| 2487 | 6 | 2528 | 1 | 2569 | 2 |
| 2488 | 9 | 2529 | 2 | 2570 | 4 |
| 2489 | 11 | 2530 | 11 | 2571 | 3 |
| 2490 | 3 | 2531 | 20 | 2572 | 3 |
| 2491 | 2 | 2532 | 7 | 2573 | 29 |
| 2492 | 2 | 2533 | 2 | 2574 | 1 |
| 2493 | 4 | 2534 | 1 | 2575 | 1 |
| 2494 | 1 | 2535 | 19 | 2576 | 10 |
| 2495 | 2 | 2536 | 1 | 2577 | 7 |
| 2496 | 7 | 2537 | 1 | 2578 | 4 |
| 2497 | 2 | 2538 | 10 | 2579 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 2580 | 1 | 2621 | 44 | 2662 | 1 |
| 2581 | 6 | 2622 | 31 | 2663 | 56 |
| 2582 | 4 | 2623 | 17 | 2664 | 34 |
| 2583 | 1 | 2624 | 14 | 2665 | 23 |
| 2584 | 7 | 2625 | 2 | 2666 | 1 |
| 2585 | 5 | 2626 | 1 | 2667 | 6 |
| 2586 | 2 | 2627 | 2 | 2668 | 3 |
| 2587 | 3 | 2628 | 3 | 2669 | 3 |
| 2588 | 13 | 2629 | 48 | 2670 | 16 |
| 2589 | 3 | 2630 | 8 | 2671 | 1 |
| 2590 | 24 | 2631 | 1 | 2672 | 10 |
| 2591 | 29 | 2632 | 10 | 2673 | 7 |
| 2592 | 26 | 2633 | 19 | 2674 | 18 |
| 2593 | 4 | 2634 | 2 | 2675 | 3 |
| 2594 | 1 | 2635 | 4 | 2676 | 5 |
| 2595 | 3 | 2636 | 1 | 2677 | 2 |
| 2596 | 1 | 2637 | 10 | 2678 | 1 |
| 2597 | 10 | 2638 | 4 | 2679 | 18 |
| 2598 | 2 | 2639 | 1 | 2680 | 11 |
| 2599 | 1 | 2640 | 5 | 2681 | 5 |
| 2600 | 49 | 2641 | 40 | 2682 | 4 |
| 2601 | 14 | 2642 | 1 | 2683 | 16 |
| 2602 | 10 | 2643 | 3 | 2684 | 2 |
| 2603 | 9 | 2644 | 2 | 2685 | 1 |
| 2604 | 1 | 2645 | 11 | 2686 | 36 |
| 2605 | 11 | 2646 | 1 | 2687 | 28 |
| 2606 | 3 | 2647 | 4 | 2688 | 3 |
| 2607 | 1 | 2648 | 1 | 2689 | 4 |
| 2608 | 23 | 2649 | 28 | 2690 | 1 |
| 2609 | 1 | 2650 | 6 | 2691 | 1 |
| 2610 | 1 | 2651 | 1 | 2692 | 10 |
| 2611 | 5 | 2652 | 1 | 2693 | 21 |
| 2612 | 6 | 2653 | 4 | 2694 | 7 |
| 2613 | 4 | 2654 | 6 | 2695 | 7 |
| 2614 | 4 | 2655 | 1 | 2696 | 3 |
| 2615 | 15 | 2656 | 2 | 2697 | 2 |
| 2616 | 6 | 2657 | 2 | 2698 | 1 |
| 2617 | 7 | 2658 | 10 | 2699 | 1 |
| 2618 | 1 | 2659 | 10 | 2700 | 25 |
| 2619 | 5 | 2660 | 7 | 2701 | 20 |
| 2620 | 13 | 2661 | 43 | 2702 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| 2703 | 4 | 2744 | 9 | 2785 | 31 |
| 2704 | 8 | 2745 | 1 | 2786 | 4 |
| 2705 | 3 | 2746 | 3 | 2787 | 22 |
| 2706 | 68 | 2747 | 3 | 2788 | 9 |
| 2707 | 111 | 2748 | 2 | 2789 | 5 |
| 2708 | 6 | 2749 | 1 | 2790 | 2 |
| 2709 | 9 | 2750 | 1 | 2791 | 1 |
| 2710 | 1 | 2751 | 14 | 2792 | 23 |
| 2711 | 14 | 2752 | 9 | 2793 | 1 |
| 2712 | 6 | 2753 | 4 | 2794 | 2 |
| 2713 | 50 | 2754 | 11 | 2795 | 36 |
| 2714 | 2 | 2755 | 1 | 2796 | 1 |
| 2715 | 1 | 2756 | 1 | 2797 | 1 |
| 2716 | 39 | 2757 | 13 | 2798 | 21 |
| 2717 | 1 | 2758 | 41 | 2799 | 9 |
| 2718 | 29 | 2759 | 2 | 2800 | 196 |
| 2719 | 16 | 2760 | 5 | 2801 | 10 |
| 2720 | 4 | 2761 | 1 | 2802 | 1 |
| 2721 | 11 | 2762 | 10 | 2803 | 1 |
| 2722 | 12 | 2763 | 5 | 2804 | 4 |
| 2723 | 9 | 2764 | 33 | 2805 | 2 |
| 2724 | 3 | 2765 | 8 | 2806 | 18 |
| 2725 | 12 | 2766 | 11 | 2807 | 21 |
| 2726 | 24 | 2767 | 4 | 2808 | 2 |
| 2727 | 21 | 2768 | 32 | 2809 | 16 |
| 2728 | 1 | 2769 | 1 | 2810 | 1 |
| 2729 | 2 | 2770 | 2 | 2811 | 2 |
| 2730 | 1 | 2771 | 1 | 2812 | 8 |
| 2731 | 1 | 2772 | 18 | 2813 | 5 |
| 2732 | 7 | 2773 | 2 | 2814 | 12 |
| 2733 | 1 | 2774 | 15 | 2815 | 2 |
| 2734 | 6 | 2775 | 4 | 2816 | 1 |
| 2735 | 4 | 2776 | 1 | 2817 | 27 |
| 2736 | 5 | 2777 | 1 | 2818 | 9 |
| 2737 | 1 | 2778 | 4 | 2819 | 1 |
| 2738 | 19 | 2779 | 4 | 2820 | 5 |
| 2739 | 11 | 2780 | 1 | 2821 | 1 |
| 2740 | 14 | 2781 | 57 | 2822 | 27 |
| 2741 | 1 | 2782 | 1 | 2823 | 5 |
| 2742 | 6 | 2783 | 10 | 2824 | 19 |
| 2743 | 8 | 2784 | 41 | 2825 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 2826 | 3 | 2867 | 161 | 2908 | 7 |
| 2827 | 14 | 2868 | 3 | 2909 | 10 |
| 2828 | 7 | 2869 | 10 | 2910 | 1 |
| 2829 | 10 | 2870 | 2 | 2911 | 3 |
| 2830 | 2 | 2871 | 1 | 2912 | 44 |
| 2831 | 19 | 2872 | 32 | 2913 | 1 |
| 2832 | 2 | 2873 | 4 | 2914 | 13 |
| 2833 | 4 | 2874 | 1 | 2915 | 2 |
| 2834 | 2 | 2875 | 1 | 2916 | 1 |
| 2835 | 1 | 2876 | 10 | 2917 | 3 |
| 2836 | 2 | 2877 | 10 | 2918 | 4 |
| 2837 | 1 | 2878 | 1 | 2919 | 1 |
| 2838 | 13 | 2879 | 1 | 2920 | 59 |
| 2839 | 3 | 2880 | 3 | 2921 | 2 |
| 2840 | 1 | 2881 | 4 | 2922 | 2 |
| 2841 | 2 | 2882 | 1 | 2923 | 1 |
| 2842 | 6 | 2883 | 5 | 2924 | 16 |
| 2843 | 1 | 2884 | 1 | 2925 | 4 |
| 2844 | 1 | 2885 | 1 | 2926 | 8 |
| 2845 | 4 | 2886 | 1 | 2927 | 1 |
| 2846 | 6 | 2887 | 18 | 2928 | 26 |
| 2847 | 15 | 2888 | 26 | 2929 | 1 |
| 2848 | 9 | 2889 | 3 | 2930 | 30 |
| 2849 | 2 | 2890 | 4 | 2931 | 1 |
| 2850 | 14 | 2891 | 1 | 2932 | 6 |
| 2851 | 3 | 2892 | 2 | 2933 | 1 |
| 2852 | 6 | 2893 | 10 | 2934 | 31 |
| 2853 | 18 | 2894 | 2 | 2935 | 3 |
| 2854 | 15 | 2895 | 2 | 2936 | 1 |
| 2855 | 21 | 2896 | 8 | 2937 | 3 |
| 2856 | 7 | 2897 | 1 | 2938 | 5 |
| 2857 | 5 | 2898 | 13 | 2939 | 1 |
| 2858 | 2 | 2899 | 5 | 2940 | 18 |
| 2859 | 1 | 2900 | 38 | 2941 | 6 |
| 2860 | 7 | 2901 | 2 | 2942 | 1 |
| 2861 | 79 | 2902 | 2 | 2943 | 1 |
| 2862 | 1 | 2903 | 1 | 2944 | 41 |
| 2863 | 1 | 2904 | 4 | 2945 | 1 |
| 2864 | 9 | 2905 | 11 | 2946 | 1 |
| 2865 | 1 | 2906 | 4 | 2947 | 1 |
| 2866 | 4 | 2907 | 5 | 2948 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 2949 | 2 | 2990 | 10 | 3031 | 1 |
| 2950 | 2 | 2991 | 4 | 3032 | 1 |
| 2951 | 7 | 2992 | 16 | 3033 | 1 |
| 2952 | 3 | 2993 | 3 | 3034 | 2 |
| 2953 | 4 | 2994 | 1 | 3035 | 5 |
| 2954 | 11 | 2995 | 2 | 3036 | 4 |
| 2955 | 9 | 2996 | 8 | 3037 | 22 |
| 2956 | 6 | 2997 | 18 | 3038 | 1 |
| 2957 | 5 | 2998 | 31 | 3039 | 10 |
| 2958 | 7 | 2999 | 3 | 3040 | 1 |
| 2959 | 9 | 3000 | 1 | 3041 | 8 |
| 2960 | 2 | 3001 | 14 | 3042 | 19 |
| 2961 | 161 | 3002 | 1 | 3043 | 3 |
| 2962 | 1 | 3003 | 4 | 3044 | 2 |
| 2963 | 1 | 3004 | 1 | 3045 | 324 |
| 2964 | 1 | 3005 | 3 | 3046 | 3 |
| 2965 | 1 | 3006 | 20 | 3047 | 2 |
| 2966 | 11 | 3007 | 1 | 3048 | 1 |
| 2967 | 5 | 3008 | 5 | 3049 | 1 |
| 2968 | 4 | 3009 | 2 | 3050 | 9 |
| 2969 | 3 | 3010 | 5 | 3051 | 5 |
| 2970 | 57 | 3011 | 5 | 3052 | 54 |
| 2971 | 16 | 3012 | 3 | 3053 | 4 |
| 2972 | 2 | 3013 | 1 | 3054 | 2 |
| 2973 | 2 | 3014 | 2 | 3055 | 5 |
| 2974 | 17 | 3015 | 7 | 3056 | 30 |
| 2975 | 1 | 3016 | 15 | 3057 | 4 |
| 2976 | 11 | 3017 | 1 | 3058 | 5 |
| 2977 | 104 | 3018 | 8 | 3059 | 1 |
| 2978 | 31 | 3019 | 18 | 3060 | 17 |
| 2979 | 11 | 3020 | 7 | 3061 | 15 |
| 2980 | 20 | 3021 | 1 | 3062 | 15 |
| 2981 | 12 | 3022 | 5 | 3063 | 22 |
| 2982 | 10 | 3023 | 6 | 3064 | 1 |
| 2983 | 7 | 3024 | 2 | 3065 | 1 |
| 2984 | 3 | 3025 | 11 | 3066 | 221 |
| 2985 | 1 | 3026 | 14 | 3067 | 14 |
| 2986 | 16 | 3027 | 2 | 3068 | 1 |
| 2987 | 19 | 3028 | 3 | 3069 | 17 |
| 2988 | 7 | 3029 | 2 | 3070 | 1 |
| 2989 | 3 | 3030 | 1 | 3071 | 62 |

| | | | | | |
|---|---|---|---|---|---|
| 3072 | 1 | 3113 | 2 | 3154 | 3 |
| 3073 | 2 | 3114 | 15 | 3155 | 4 |
| 3074 | 119 | 3115 | 1 | 3156 | 23 |
| 3075 | 1 | 3116 | 17 | 3157 | 4 |
| 3076 | 1 | 3117 | 6 | 3158 | 124 |
| 3077 | 2 | 3118 | 2 | 3159 | 1 |
| 3078 | 3 | 3119 | 3 | 3160 | 1 |
| 3079 | 10 | 3120 | 4 | 3161 | 17 |
| 3080 | 11 | 3121 | 1 | 3162 | 3 |
| 3081 | 1 | 3122 | 2 | 3163 | 6 |
| 3082 | 1 | 3123 | 13 | 3164 | 7 |
| 3083 | 3 | 3124 | 1 | 3165 | 7 |
| 3084 | 1 | 3125 | 5 | 3166 | 1 |
| 3085 | 8 | 3126 | 2 | 3167 | 10 |
| 3086 | 1 | 3127 | 2 | 3168 | 2 |
| 3087 | 10 | 3128 | 2 | 3169 | 2 |
| 3088 | 49 | 3129 | 3 | 3170 | 8 |
| 3089 | 5 | 3130 | 34 | 3171 | 103 |
| 3090 | 31 | 3131 | 1 | 3172 | 30 |
| 3091 | 7 | 3132 | 10 | 3173 | 1 |
| 3092 | 1 | 3133 | 2 | 3174 | 1 |
| 3093 | 1 | 3134 | 5 | 3175 | 3 |
| 3094 | 14 | 3135 | 13 | 3176 | 2 |
| 3095 | 9 | 3136 | 43 | 3177 | 1 |
| 3096 | 4 | 3137 | 1 | 3178 | 10 |
| 3097 | 3 | 3138 | 36 | 3179 | 4 |
| 3098 | 5 | 3139 | 6 | 3180 | 3 |
| 3099 | 52 | 3140 | 7 | 3181 | 2 |
| 3100 | 3 | 3141 | 1 | 3182 | 22 |
| 3101 | 1 | 3142 | 45 | 3183 | 5 |
| 3102 | 9 | 3143 | 7 | 3184 | 4 |
| 3103 | 1 | 3144 | 1 | 3185 | 1 |
| 3104 | 2 | 3145 | 4 | 3186 | 4 |
| 3105 | 10 | 3146 | 1 | 3187 | 13 |
| 3106 | 1 | 3147 | 7 | 3188 | 9 |
| 3107 | 1 | 3148 | 2 | 3189 | 1 |
| 3108 | 1 | 3149 | 6 | 3190 | 4 |
| 3109 | 4 | 3150 | 1 | 3191 | 2 |
| 3110 | 8 | 3151 | 1 | 3192 | 1 |
| 3111 | 1 | 3152 | 4 | 3193 | 10 |
| 3112 | 1 | 3153 | 1 | 3194 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| **3195** | 18 | **3236** | 207 | **3277** | 3 |
| **3196** | 1 | **3237** | 27 | **3278** | 13 |
| **3197** | 7 | **3238** | 3 | **3279** | 12 |
| **3198** | 7 | **3239** | 1 | **3280** | 9 |
| **3199** | 8 | **3240** | 7 | **3281** | 75 |
| **3200** | 6 | **3241** | 3 | **3282** | 1 |
| **3201** | 3 | **3242** | 17 | **3283** | 5 |
| **3202** | 4 | **3243** | 1 | **3284** | 14 |
| **3203** | 1 | **3244** | 1 | **3285** | 3 |
| **3204** | 4 | **3245** | 1 | **3286** | 8 |
| **3205** | 1 | **3246** | 1 | **3287** | 2 |
| **3206** | 39 | **3247** | 2 | **3288** | 1 |
| **3207** | 39 | **3248** | 3 | **3289** | 4 |
| **3208** | 2 | **3249** | 20 | **3290** | 5 |
| **3209** | 2 | **3250** | 7 | **3291** | 1 |
| **3210** | 2 | **3251** | 7 | **3292** | 257 |
| **3211** | 1 | **3252** | 16 | **3293** | 1 |
| **3212** | 1 | **3253** | 1 | **3294** | 1 |
| **3213** | 7 | **3254** | 12 | **3295** | 21 |
| **3214** | 1 | **3255** | 2 | **3296** | 24 |
| **3215** | 2 | **3256** | 1 | **3297** | 1 |
| **3216** | 1 | **3257** | 1 | **3298** | 18 |
| **3217** | 3 | **3258** | 14 | **3299** | 23 |
| **3218** | 21 | **3259** | 2 | **3300** | 15 |
| **3219** | 1 | **3260** | 1 | **3301** | 17 |
| **3220** | 4 | **3261** | 1 | **3302** | 5 |
| **3221** | 2 | **3262** | 1 | **3303** | 2 |
| **3222** | 8 | **3263** | 2 | **3304** | 8 |
| **3223** | 3 | **3264** | 3 | **3305** | 8 |
| **3224** | 2 | **3265** | 3 | **3306** | 4 |
| **3225** | 4 | **3266** | 2 | **3307** | 1 |
| **3226** | 1 | **3267** | 4 | **3308** | 6 |
| **3227** | 1 | **3268** | 1 | **3309** | 20 |
| **3228** | 1 | **3269** | 5 | **3310** | 1 |
| **3229** | 12 | **3270** | 21 | **3311** | 1 |
| **3230** | 42 | **3271** | 6 | **3312** | 1 |
| **3231** | 18 | **3272** | 1 | **3313** | 22 |
| **3232** | 3 | **3273** | 8 | **3314** | 2 |
| **3233** | 10 | **3274** | 5 | **3315** | 4 |
| **3234** | 11 | **3275** | 14 | **3316** | 6 |
| **3235** | 4 | **3276** | 7 | **3317** | 81 |

| | | | | | |
|---|---|---|---|---|---|
| **3318** | 1 | **3359** | 22 | **3400** | 7 |
| **3319** | 4 | **3360** | 245 | **3401** | 10 |
| **3320** | 2 | **3361** | 8 | **3402** | 8 |
| **3321** | 4 | **3362** | 44 | **3403** | 1 |
| **3322** | 2 | **3363** | 1 | **3404** | 51 |
| **3323** | 3 | **3364** | 1 | **3405** | 6 |
| **3324** | 3 | **3365** | 4 | **3406** | 6 |
| **3325** | 5 | **3366** | 11 | **3407** | 8 |
| **3326** | 1 | **3367** | 4 | **3408** | 9 |
| **3327** | 1 | **3368** | 5 | **3409** | 7 |
| **3328** | 4 | **3369** | 1 | **3410** | 7 |
| **3329** | 8 | **3370** | 28 | **3411** | 486 |
| **3330** | 42 | **3371** | 15 | **3412** | 10 |
| **3331** | 1 | **3372** | 4 | **3413** | 9 |
| **3332** | 1 | **3373** | 1 | **3414** | 5 |
| **3333** | 5 | **3374** | 6 | **3415** | 6 |
| **3334** | 1 | **3375** | 1 | **3416** | 15 |
| **3335** | 15 | **3376** | 6 | **3417** | 16 |
| **3336** | 32 | **3377** | 138 | **3418** | 2 |
| **3337** | 15 | **3378** | 15 | **3419** | 2 |
| **3338** | 178 | **3379** | 1 | **3420** | 3 |
| **3339** | 13 | **3380** | 6 | **3421** | 232 |
| **3340** | 4 | **3381** | 4 | **3422** | 1 |
| **3341** | 1 | **3382** | 2 | **3423** | 3 |
| **3342** | 4 | **3383** | 4 | **3424** | 1 |
| **3343** | 9 | **3384** | 1 | **3425** | 4 |
| **3344** | 2 | **3385** | 12 | **3426** | 1 |
| **3345** | 2 | **3386** | 13 | **3427** | 1 |
| **3346** | 1 | **3387** | 4 | **3428** | 1 |
| **3347** | 2 | **3388** | 1 | **3429** | 1 |
| **3348** | 1 | **3389** | 1 | **3430** | 1 |
| **3349** | 1 | **3390** | 58 | **3431** | 59 |
| **3350** | 1 | **3391** | 66 | **3432** | 1 |
| **3351** | 2 | **3392** | 1 | **3433** | 15 |
| **3352** | 1 | **3393** | 1 | **3434** | 3 |
| **3353** | 1 | **3394** | 6 | **3435** | 3 |
| **3354** | 1 | **3395** | 20 | **3436** | 6 |
| **3355** | 30 | **3396** | 20 | **3437** | 6 |
| **3356** | 1132 | **3397** | 5 | **3438** | 3 |
| **3357** | 1 | **3398** | 2 | **3439** | 6 |
| **3358** | 24 | **3399** | 1 | **3440** | 6 |

| | | | | | |
|---|---|---|---|---|---|
| **3441** | 2 | **3482** | 167 | **3523** | 7 |
| **3442** | 10 | **3483** | 13 | **3524** | 11 |
| **3443** | 2 | **3484** | 3 | **3525** | 8 |
| **3444** | 1 | **3485** | 1 | **3526** | 2 |
| **3445** | 13 | **3486** | 89 | **3527** | 6 |
| **3446** | 7 | **3487** | 11 | **3528** | 1 |
| **3447** | 5 | **3488** | 33 | **3529** | 5 |
| **3448** | 3 | **3489** | 20 | **3530** | 47 |
| **3449** | 4 | **3490** | 2 | **3531** | 4 |
| **3450** | 1 | **3491** | 1 | **3532** | 4 |
| **3451** | 28 | **3492** | 36 | **3533** | 1 |
| **3452** | 1 | **3493** | 2 | **3534** | 5 |
| **3453** | 1 | **3494** | 2 | **3535** | 3 |
| **3454** | 3 | **3495** | 16 | **3536** | 52 |
| **3455** | 1 | **3496** | 4 | **3537** | 1 |
| **3456** | 21 | **3497** | 18 | **3538** | 24 |
| **3457** | 5 | **3498** | 6 | **3539** | 6 |
| **3458** | 7 | **3499** | 3 | **3540** | 11 |
| **3459** | 3 | **3500** | 1 | **3541** | 22 |
| **3460** | 33 | **3501** | 4 | **3542** | 20 |
| **3461** | 23 | **3502** | 10 | **3543** | 2 |
| **3462** | 50 | **3503** | 1 | **3544** | 1 |
| **3463** | 70 | **3504** | 1 | **3545** | 9 |
| **3464** | 179 | **3505** | 73 | **3546** | 1 |
| **3465** | 1 | **3506** | 17 | **3547** | 4 |
| **3466** | 1 | **3507** | 1 | **3548** | 4 |
| **3467** | 133 | **3508** | 1 | **3549** | 34 |
| **3468** | 14 | **3509** | 1 | **3550** | 37 |
| **3469** | 1 | **3510** | 1 | **3551** | 5 |
| **3470** | 1 | **3511** | 1 | **3552** | 2 |
| **3471** | 15 | **3512** | 39 | **3553** | 101 |
| **3472** | 1 | **3513** | 1 | **3554** | 4 |
| **3473** | 6 | **3514** | 1 | **3555** | 2 |
| **3474** | 12 | **3515** | 2 | **3556** | 5 |
| **3475** | 1 | **3516** | 3 | **3557** | 52 |
| **3476** | 9 | **3517** | 1 | **3558** | 3 |
| **3477** | 23 | **3518** | 2 | **3559** | 2 |
| **3478** | 1 | **3519** | 1 | **3560** | 1 |
| **3479** | 48 | **3520** | 8 | **3561** | 97 |
| **3480** | 2 | **3521** | 1 | **3562** | 1 |
| **3481** | 5 | **3522** | 1 | **3563** | 14 |

| | | | | | |
|---|---|---|---|---|---|
| 3564 | 2 | 3605 | 1 | 3646 | 1 |
| 3565 | 11 | 3606 | 6 | 3647 | 2 |
| 3566 | 2 | 3607 | 1 | 3648 | 22 |
| 3567 | 5 | 3608 | 2 | 3649 | 2 |
| 3568 | 13 | 3609 | 24 | 3650 | 3 |
| 3569 | 28 | 3610 | 2 | 3651 | 9 |
| 3570 | 2 | 3611 | 1 | 3652 | 17 |
| 3571 | 8 | 3612 | 8 | 3653 | 1 |
| 3572 | 7 | 3613 | 17 | 3654 | 15 |
| 3573 | 1 | 3614 | 11 | 3655 | 10 |
| 3574 | 16 | 3615 | 1 | 3656 | 2 |
| 3575 | 1 | 3616 | 1 | 3657 | 2 |
| 3576 | 1 | 3617 | 1 | 3658 | 25 |
| 3577 | 31 | 3618 | 2 | 3659 | 3 |
| 3578 | 21 | 3619 | 3 | 3660 | 20 |
| 3579 | 7 | 3620 | 8 | 3661 | 1 |
| 3580 | 39 | 3621 | 7 | 3662 | 29 |
| 3581 | 1 | 3622 | 1 | 3663 | 1 |
| 3582 | 13 | 3623 | 44 | 3664 | 173 |
| 3583 | 3 | 3624 | 4 | 3665 | 4 |
| 3584 | 3 | 3625 | 17 | 3666 | 3 |
| 3585 | 7 | 3626 | 341 | 3667 | 6 |
| 3586 | 2 | 3627 | 4 | 3668 | 1 |
| 3587 | 1 | 3628 | 9 | 3669 | 1 |
| 3588 | 49 | 3629 | 1 | 3670 | 2 |
| 3589 | 7 | 3630 | 3 | 3671 | 3 |
| 3590 | 3 | 3631 | 1 | 3672 | 1 |
| 3591 | 25 | 3632 | 8 | 3673 | 1 |
| 3592 | 2 | 3633 | 55 | 3674 | 9 |
| 3593 | 1 | 3634 | 13 | 3675 | 1 |
| 3594 | 5 | 3635 | 1 | 3676 | 1 |
| 3595 | 2 | 3636 | 15 | 3677 | 3 |
| 3596 | 5 | 3637 | 7 | 3678 | 1 |
| 3597 | 1 | 3638 | 5 | 3679 | 2 |
| 3598 | 1 | 3639 | 157 | 3680 | 5 |
| 3599 | 1 | 3640 | 1 | 3681 | 30 |
| 3600 | 1 | 3641 | 1 | 3682 | 22 |
| 3601 | 2 | 3642 | 1 | 3683 | 1 |
| 3602 | 3 | 3643 | 10 | 3684 | 2 |
| 3603 | 17 | 3644 | 7 | 3685 | 2 |
| 3604 | 23 | 3645 | 4 | 3686 | 29 |

| | | | | | |
|---|---|---|---|---|---|
| 3687 | 4 | 3728 | 9 | 3769 | 5 |
| 3688 | 30 | 3729 | 13 | 3770 | 2 |
| 3689 | 3 | 3730 | 3 | 3771 | 1 |
| 3690 | 3 | 3731 | 25 | 3772 | 11 |
| 3691 | 2 | 3732 | 1 | 3773 | 1 |
| 3692 | 19 | 3733 | 13 | 3774 | 9 |
| 3693 | 12 | 3734 | 2 | 3775 | 9 |
| 3694 | 3 | 3735 | 6 | 3776 | 1 |
| 3695 | 1 | 3736 | 12 | 3777 | 15 |
| 3696 | 4 | 3737 | 36 | 3778 | 1 |
| 3697 | 1 | 3738 | 1 | 3779 | 7 |
| 3698 | 627 | 3739 | 2 | 3780 | 6 |
| 3699 | 4 | 3740 | 1 | 3781 | 3 |
| 3700 | 211 | 3741 | 3 | 3782 | 1 |
| 3701 | 5 | 3742 | 2 | 3783 | 10 |
| 3702 | 21 | 3743 | 15 | 3784 | 2 |
| 3703 | 1 | 3744 | 3 | 3785 | 3 |
| 3704 | 4 | 3745 | 7 | 3786 | 103 |
| 3705 | 5 | 3746 | 30 | 3787 | 1 |
| 3706 | 28 | 3747 | 4 | 3788 | 1 |
| 3707 | 1 | 3748 | 2 | 3789 | 4 |
| 3708 | 2 | 3749 | 1 | 3790 | 12 |
| 3709 | 25 | 3750 | 2 | 3791 | 5 |
| 3710 | 3 | 3751 | 5 | 3792 | 1 |
| 3711 | 1 | 3752 | 1 | 3793 | 11 |
| 3712 | 18 | 3753 | 19 | 3794 | 4 |
| 3713 | 3 | 3754 | 1 | 3795 | 12 |
| 3714 | 23 | 3755 | 1 | 3796 | 3 |
| 3715 | 499 | 3756 | 1 | 3797 | 10 |
| 3716 | 9 | 3757 | 1 | 3798 | 3 |
| 3717 | 1 | 3758 | 8 | 3799 | 47 |
| 3718 | 50 | 3759 | 5 | 3800 | 2 |
| 3719 | 10 | 3760 | 3 | 3801 | 24 |
| 3720 | 23 | 3761 | 1 | 3802 | 4 |
| 3721 | 23 | 3762 | 6 | 3803 | 3 |
| 3722 | 126 | 3763 | 1 | 3804 | 14 |
| 3723 | 9 | 3764 | 8 | 3805 | 12 |
| 3724 | 3 | 3765 | 1 | 3806 | 7 |
| 3725 | 2 | 3766 | 4 | 3807 | 4 |
| 3726 | 3 | 3767 | 4 | 3808 | 16 |
| 3727 | 3 | 3768 | 17 | 3809 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| **3810** | 1 | **3851** | 2 | **3892** | 2 |
| **3811** | 1 | **3852** | 5 | **3893** | 5 |
| **3812** | 5 | **3853** | 2 | **3894** | 1 |
| **3813** | 2 | **3854** | 3 | **3895** | 1 |
| **3814** | 30 | **3855** | 17 | **3896** | 1 |
| **3815** | 1 | **3856** | 3 | **3897** | 2 |
| **3816** | 15 | **3857** | 2 | **3898** | 10 |
| **3817** | 9 | **3858** | 1 | **3899** | 1 |
| **3818** | 18 | **3859** | 1 | **3900** | 1 |
| **3819** | 21 | **3860** | 9 | **3901** | 1 |
| **3820** | 1 | **3861** | 1 | **3902** | 1 |
| **3821** | 1 | **3862** | 7 | **3903** | 1 |
| **3822** | 4 | **3863** | 8 | **3904** | 2 |
| **3823** | 17 | **3864** | 2 | **3905** | 10 |
| **3824** | 7 | **3865** | 1 | **3906** | 16 |
| **3825** | 2 | **3866** | 1 | **3907** | 1 |
| **3826** | 6 | **3867** | 2 | **3908** | 9 |
| **3827** | 2 | **3868** | 1 | **3909** | 2 |
| **3828** | 16 | **3869** | 3 | **3910** | 2 |
| **3829** | 1 | **3870** | 3 | **3911** | 8 |
| **3830** | 2 | **3871** | 30 | **3912** | 2 |
| **3831** | 2 | **3872** | 3 | **3913** | 1 |
| **3832** | 10 | **3873** | 1 | **3914** | 10 |
| **3833** | 1 | **3874** | 15 | **3915** | 5 |
| **3834** | 1 | **3875** | 8 | **3916** | 1 |
| **3835** | 51 | **3876** | 7 | **3917** | 3 |
| **3836** | 22 | **3877** | 1 | **3918** | 2 |
| **3837** | 5 | **3878** | 1 | **3919** | 14 |
| **3838** | 1 | **3879** | 4 | **3920** | 20 |
| **3839** | 3 | **3880** | 12 | **3921** | 8 |
| **3840** | 2 | **3881** | 9 | **3922** | 1 |
| **3841** | 10 | **3882** | 3 | **3923** | 30 |
| **3842** | 1 | **3883** | 149 | **3924** | 2 |
| **3843** | 12 | **3884** | 3 | **3925** | 4 |
| **3844** | 1 | **3885** | 2 | **3926** | 4 |
| **3845** | 25 | **3886** | 2 | **3927** | 6 |
| **3846** | 22 | **3887** | 5 | **3928** | 1 |
| **3847** | 3 | **3888** | 2 | **3929** | 3 |
| **3848** | 1 | **3889** | 1 | **3930** | 1 |
| **3849** | 4 | **3890** | 9 | **3931** | 7 |
| **3850** | 9 | **3891** | 1 | **3932** | 3 |

| | | | | | |
|---|---|---|---|---|---|
| 3933 | 2 | 3974 | 2 | 4015 | 6 |
| 3934 | 1 | 3975 | 11 | 4016 | 10 |
| 3935 | 14 | 3976 | 1 | 4017 | 4 |
| 3936 | 29 | 3977 | 1 | 4018 | 1 |
| 3937 | 18 | 3978 | 7 | 4019 | 2 |
| 3938 | 4 | 3979 | 1 | 4020 | 4 |
| 3939 | 8 | 3980 | 2 | 4021 | 1 |
| 3940 | 12 | 3981 | 3 | 4022 | 4 |
| 3941 | 1 | 3982 | 2 | 4023 | 9 |
| 3942 | 3 | 3983 | 4 | 4024 | 1 |
| 3943 | 18 | 3984 | 9 | 4025 | 76 |
| 3944 | 12 | 3985 | 1 | 4026 | 2 |
| 3945 | 1 | 3986 | 1 | 4027 | 2 |
| 3946 | 3 | 3987 | 1 | 4028 | 7 |
| 3947 | 1 | 3988 | 2 | 4029 | 3 |
| 3948 | 8 | 3989 | 5 | 4030 | 1 |
| 3949 | 11 | 3990 | 2 | 4031 | 31 |
| 3950 | 1 | 3991 | 52 | 4032 | 2 |
| 3951 | 1 | 3992 | 16 | 4033 | 1 |
| 3952 | 8 | 3993 | 7 | 4034 | 6 |
| 3953 | 1 | 3994 | 49 | 4035 | 16 |
| 3954 | 1 | 3995 | 12 | 4036 | 8 |
| 3955 | 1 | 3996 | 4 | 4037 | 2 |
| 3956 | 60 | 3997 | 1 | 4038 | 1 |
| 3957 | 8 | 3998 | 7 | 4039 | 1 |
| 3958 | 2 | 3999 | 2 | 4040 | 1 |
| 3959 | 6 | 4000 | 3 | 4041 | 2 |
| 3960 | 2 | 4001 | 1 | 4042 | 2 |
| 3961 | 3 | 4002 | 1 | 4043 | 16 |
| 3962 | 6 | 4003 | 1 | 4044 | 1 |
| 3963 | 1 | 4004 | 25 | 4045 | 1 |
| 3964 | 1 | 4005 | 15 | 4046 | 1 |
| 3965 | 3 | 4006 | 2 | 4047 | 2 |
| 3966 | 1 | 4007 | 1 | 4048 | 23 |
| 3967 | 28 | 4008 | 5 | 4049 | 2 |
| 3968 | 3 | 4009 | 2 | 4050 | 8 |
| 3969 | 2 | 4010 | 1 | 4051 | 1 |
| 3970 | 2 | 4011 | 1 | 4052 | 3 |
| 3971 | 2 | 4012 | 3 | 4053 | 6 |
| 3972 | 4 | 4013 | 41 | 4054 | 1 |
| 3973 | 13 | 4014 | 21 | 4055 | 4 |

| | | | | | |
|---|---|---|---|---|---|
| 4056 | 10 | 4097 | 1 | 4138 | 1 |
| 4057 | 1 | 4098 | 4 | 4139 | 10 |
| 4058 | 14 | 4099 | 4 | 4140 | 11 |
| 4059 | 2 | 4100 | 2 | 4141 | 1 |
| 4060 | 4 | 4101 | 1 | 4142 | 2 |
| 4061 | 34 | 4102 | 17 | 4143 | 1 |
| 4062 | 22 | 4103 | 17 | 4144 | 7 |
| 4063 | 1 | 4104 | 14 | 4145 | 1 |
| 4064 | 15 | 4105 | 11 | 4146 | 2 |
| 4065 | 4 | 4106 | 2 | 4147 | 7 |
| 4066 | 3 | 4107 | 10 | 4148 | 3 |
| 4067 | 4 | 4108 | 13 | 4149 | 1 |
| 4068 | 1 | 4109 | 11 | 4150 | 3 |
| 4069 | 10 | 4110 | 3 | 4151 | 7 |
| 4070 | 1 | 4111 | 1 | 4152 | 1 |
| 4071 | 1 | 4112 | 1 | 4153 | 1 |
| 4072 | 1 | 4113 | 2 | 4154 | 4 |
| 4073 | 3 | 4114 | 3 | 4155 | 1 |
| 4074 | 1 | 4115 | 1 | 4156 | 2 |
| 4075 | 10 | 4116 | 1 | 4157 | 2 |
| 4076 | 5 | 4117 | 8 | 4158 | 1 |
| 4077 | 1 | 4118 | 1 | 4159 | 1 |
| 4078 | 2 | 4119 | 1 | 4160 | 14 |
| 4079 | 8 | 4120 | 20 | 4161 | 1 |
| 4080 | 11 | 4121 | 20 | 4162 | 12 |
| 4081 | 3 | 4122 | 13 | 4163 | 22 |
| 4082 | 6 | 4123 | 1 | 4164 | 18 |
| 4083 | 2 | 4124 | 8 | 4165 | 5 |
| 4084 | 1 | 4125 | 36 | 4166 | 1 |
| 4085 | 1 | 4126 | 8 | 4167 | 17 |
| 4086 | 10 | 4127 | 44 | 4168 | 1 |
| 4087 | 3 | 4128 | 1 | 4169 | 8 |
| 4088 | 18 | 4129 | 1 | 4170 | 24 |
| 4089 | 121 | 4130 | 3 | 4171 | 3 |
| 4090 | 12 | 4131 | 1 | 4172 | 1 |
| 4091 | 1 | 4132 | 9 | 4173 | 2 |
| 4092 | 12 | 4133 | 2 | 4174 | 2 |
| 4093 | 1 | 4134 | 1 | 4175 | 5 |
| 4094 | 2 | 4135 | 14 | 4176 | 5 |
| 4095 | 1 | 4136 | 1 | 4177 | 1 |
| 4096 | 1 | 4137 | 12 | 4178 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| **4179** | 5 | **4220** | 4 | **4261** | 7 |
| **4180** | 2 | **4221** | 4 | **4262** | 5 |
| **4181** | 1 | **4222** | 1 | **4263** | 6 |
| **4182** | 2 | **4223** | 3 | **4264** | 2 |
| **4183** | 1 | **4224** | 16 | **4265** | 3 |
| **4184** | 73 | **4225** | 8 | **4266** | 13 |
| **4185** | 1 | **4226** | 2 | **4267** | 14 |
| **4186** | 4 | **4227** | 21 | **4268** | 8 |
| **4187** | 1 | **4228** | 1 | **4269** | 1 |
| **4188** | 1 | **4229** | 32 | **4270** | 8 |
| **4189** | 9 | **4230** | 6 | **4271** | 1 |
| **4190** | 2 | **4231** | 3 | **4272** | 22 |
| **4191** | 1 | **4232** | 2 | **4273** | 1 |
| **4192** | 3 | **4233** | 2 | **4274** | 2 |
| **4193** | 1 | **4234** | 3 | **4275** | 4 |
| **4194** | 6 | **4235** | 4 | **4276** | 5 |
| **4195** | 2 | **4236** | 4 | **4277** | 1 |
| **4196** | 10 | **4237** | 4 | **4278** | 18 |
| **4197** | 1 | **4238** | 5 | **4279** | 12 |
| **4198** | 22 | **4239** | 3 | **4280** | 2 |
| **4199** | 3 | **4240** | 29 | **4281** | 2 |
| **4200** | 15 | **4241** | 8 | **4282** | 2 |
| **4201** | 1 | **4242** | 1 | **4283** | 1 |
| **4202** | 17 | **4243** | 3 | **4284** | 3 |
| **4203** | 1 | **4244** | 1 | **4285** | 4 |
| **4204** | 4 | **4245** | 1 | **4286** | 1 |
| **4205** | 7 | **4246** | 2 | **4287** | 1 |
| **4206** | 1 | **4247** | 3 | **4288** | 1 |
| **4207** | 3 | **4248** | 11 | **4289** | 2 |
| **4208** | 3 | **4249** | 1 | **4290** | 3 |
| **4209** | 143 | **4250** | 4 | **4291** | 1 |
| **4210** | 1 | **4251** | 1 | **4292** | 2 |
| **4211** | 2 | **4252** | 1 | **4293** | 9 |
| **4212** | 9 | **4253** | 1 | **4294** | 1 |
| **4213** | 485 | **4254** | 7 | **4295** | 56 |
| **4214** | 1 | **4255** | 24 | **4296** | 4 |
| **4215** | 3 | **4256** | 3 | **4297** | 5 |
| **4216** | 5 | **4257** | 4 | **4298** | 9 |
| **4217** | 10 | **4258** | 2 | **4299** | 3 |
| **4218** | 10 | **4259** | 1 | **4300** | 14 |
| **4219** | 1 | **4260** | 5 | **4301** | 79 |

| | | | | | |
|---|---|---|---|---|---|
| 4302 | 6 | 4343 | 3 | 4384 | 20 |
| 4303 | 1 | 4344 | 2 | 4385 | 4 |
| 4304 | 2 | 4345 | 2 | 4386 | 1 |
| 4305 | 1 | 4346 | 10 | 4387 | 33 |
| 4306 | 3 | 4347 | 11 | 4388 | 30 |
| 4307 | 4 | 4348 | 2 | 4389 | 293 |
| 4308 | 1 | 4349 | 2 | 4390 | 4 |
| 4309 | 4 | 4350 | 3 | 4391 | 11 |
| 4310 | 2 | 4351 | 4 | 4392 | 5 |
| 4311 | 1 | 4352 | 1 | 4393 | 2 |
| 4312 | 1 | 4353 | 16 | 4394 | 2 |
| 4313 | 21 | 4354 | 3 | 4395 | 1 |
| 4314 | 10 | 4355 | 1 | 4396 | 13 |
| 4315 | 1 | 4356 | 1 | 4397 | 1 |
| 4316 | 2 | 4357 | 1 | 4398 | 1 |
| 4317 | 33 | 4358 | 1 | 4399 | 20 |
| 4318 | 1 | 4359 | 3 | 4400 | 1 |
| 4319 | 1 | 4360 | 1 | 4401 | 2 |
| 4320 | 5 | 4361 | 6 | 4402 | 39 |
| 4321 | 2 | 4362 | 12 | 4403 | 13 |
| 4322 | 2 | 4363 | 1 | 4404 | 4 |
| 4323 | 1 | 4364 | 11 | 4405 | 1 |
| 4324 | 7 | 4365 | 2 | 4406 | 1 |
| 4325 | 1 | 4366 | 1 | 4407 | 5 |
| 4326 | 1 | 4367 | 7 | 4408 | 5 |
| 4327 | 2 | 4368 | 1 | 4409 | 1 |
| 4328 | 21 | 4369 | 15 | 4410 | 9 |
| 4329 | 3 | 4370 | 2 | 4411 | 2 |
| 4330 | 3 | 4371 | 2 | 4412 | 1 |
| 4331 | 1 | 4372 | 3 | 4413 | 2 |
| 4332 | 3 | 4373 | 2 | 4414 | 12 |
| 4333 | 8 | 4374 | 2 | 4415 | 7 |
| 4334 | 1 | 4375 | 10 | 4416 | 8 |
| 4335 | 5 | 4376 | 1 | 4417 | 3 |
| 4336 | 14 | 4377 | 3 | 4418 | 1 |
| 4337 | 2 | 4378 | 5 | 4419 | 1 |
| 4338 | 21 | 4379 | 88 | 4420 | 4 |
| 4339 | 1 | 4380 | 8 | 4421 | 1 |
| 4340 | 1 | 4381 | 2 | 4422 | 1 |
| 4341 | 1 | 4382 | 6 | 4423 | 4 |
| 4342 | 5 | 4383 | 1 | 4424 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| **4425** | 7 | **4466** | 1 | **4507** | 1 |
| **4426** | 2 | **4467** | 1 | **4508** | 1 |
| **4427** | 2 | **4468** | 1 | **4509** | 3 |
| **4428** | 10 | **4469** | 3 | **4510** | 23 |
| **4429** | 3 | **4470** | 1 | **4511** | 5 |
| **4430** | 3 | **4471** | 4 | **4512** | 30 |
| **4431** | 3 | **4472** | 6 | **4513** | 1 |
| **4432** | 1 | **4473** | 1 | **4514** | 20 |
| **4433** | 1 | **4474** | 7 | **4515** | 9 |
| **4434** | 1 | **4475** | 1 | **4516** | 12 |
| **4435** | 7 | **4476** | 3 | **4517** | 9 |
| **4436** | 12 | **4477** | 3 | **4518** | 23 |
| **4437** | 2 | **4478** | 11 | **4519** | 5 |
| **4438** | 5 | **4479** | 8 | **4520** | 1 |
| **4439** | 9 | **4480** | 3 | **4521** | 2 |
| **4440** | 2 | **4481** | 1 | **4522** | 1 |
| **4441** | 1 | **4482** | 3 | **4523** | 3 |
| **4442** | 3 | **4483** | 1 | **4524** | 2 |
| **4443** | 1 | **4484** | 1 | **4525** | 47 |
| **4444** | 1 | **4485** | 3 | **4526** | 2 |
| **4445** | 1 | **4486** | 1 | **4527** | 147 |
| **4446** | 2 | **4487** | 26 | **4528** | 5 |
| **4447** | 9 | **4488** | 1 | **4529** | 11 |
| **4448** | 2 | **4489** | 1 | **4530** | 3 |
| **4449** | 4 | **4490** | 2 | **4531** | 4 |
| **4450** | 4 | **4491** | 3 | **4532** | 1 |
| **4451** | 1 | **4492** | 1 | **4533** | 16 |
| **4452** | 1 | **4493** | 1 | **4534** | 2 |
| **4453** | 7 | **4494** | 1 | **4535** | 40 |
| **4454** | 13 | **4495** | 24 | **4536** | 351 |
| **4455** | 1 | **4496** | 1 | **4537** | 1 |
| **4456** | 2 | **4497** | 1 | **4538** | 120 |
| **4457** | 2 | **4498** | 13 | **4539** | 6 |
| **4458** | 1 | **4499** | 25 | **4540** | 1 |
| **4459** | 4 | **4500** | 1 | **4541** | 162 |
| **4460** | 87 | **4501** | 3 | **4542** | 16 |
| **4461** | 1 | **4502** | 11 | **4543** | 126 |
| **4462** | 1 | **4503** | 2 | **4544** | 10 |
| **4463** | 3 | **4504** | 4 | **4545** | 2 |
| **4464** | 3 | **4505** | 4 | **4546** | 4 |
| **4465** | 4 | **4506** | 1 | **4547** | 17 |

| | | | | | |
|---|---|---|---|---|---|
| 4548 | 1 | 4589 | 5 | 4630 | 10 |
| 4549 | 38 | 4590 | 3778 | 4631 | 1 |
| 4550 | 2 | 4591 | 7 | 4632 | 1 |
| 4551 | 7 | 4592 | 6 | 4633 | 16 |
| 4552 | 3 | 4593 | 4 | 4634 | 38 |
| 4553 | 2 | 4594 | 18 | 4635 | 5 |
| 4554 | 23 | 4595 | 1 | 4636 | 2 |
| 4555 | 3 | 4596 | 2 | 4637 | 4 |
| 4556 | 1 | 4597 | 3 | 4638 | 2 |
| 4557 | 3 | 4598 | 1 | 4639 | 1 |
| 4558 | 8 | 4599 | 21 | 4640 | 4 |
| 4559 | 7 | 4600 | 2 | 4641 | 7 |
| 4560 | 1 | 4601 | 3 | 4642 | 1 |
| 4561 | 50 | 4602 | 8 | 4643 | 17 |
| 4562 | 3 | 4603 | 41 | 4644 | 57 |
| 4563 | 71 | 4604 | 1 | 4645 | 2 |
| 4564 | 63 | 4605 | 51 | 4646 | 15 |
| 4565 | 1 | 4606 | 1 | 4647 | 3 |
| 4566 | 6 | 4607 | 1 | 4648 | 3 |
| 4567 | 1 | 4608 | 2 | 4649 | 112 |
| 4568 | 1 | 4609 | 27 | 4650 | 3 |
| 4569 | 4 | 4610 | 264 | 4651 | 15 |
| 4570 | 4 | 4611 | 1 | 4652 | 2 |
| 4571 | 7 | 4612 | 12 | 4653 | 9 |
| 4572 | 1 | 4613 | 5 | 4654 | 2 |
| 4573 | 2 | 4614 | 2 | 4655 | 157 |
| 4574 | 370 | 4615 | 10 | 4656 | 1 |
| 4575 | 36 | 4616 | 1 | 4657 | 5 |
| 4576 | 5 | 4617 | 3 | 4658 | 54 |
| 4577 | 20 | 4618 | 23 | 4659 | 2 |
| 4578 | 6 | 4619 | 8 | 4660 | 4 |
| 4579 | 29 | 4620 | 33 | 4661 | 2 |
| 4580 | 1 | 4621 | 2 | 4662 | 19 |
| 4581 | 9 | 4622 | 36 | 4663 | 1 |
| 4582 | 4 | 4623 | 893 | 4664 | 4 |
| 4583 | 15 | 4624 | 1 | 4665 | 25 |
| 4584 | 120 | 4625 | 100 | 4666 | 3 |
| 4585 | 479 | 4626 | 2 | 4667 | 3 |
| 4586 | 2 | 4627 | 1 | 4668 | 386 |
| 4587 | 34 | 4628 | 13 | 4669 | 2 |
| 4588 | 2 | 4629 | 2 | 4670 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| 4671 | 4 | 4696 | 7 | 4721 | 5 |
| 4672 | 15 | 4697 | 1 | 4722 | 1 |
| 4673 | 1 | 4698 | 12 | 4723 | 1 |
| 4674 | 2 | 4699 | 6 | 4724 | 3 |
| 4675 | 5 | 4700 | 1 | 4725 | 9 |
| 4676 | 19 | 4701 | 1 | 4726 | 1974 |
| 4677 | 3 | 4702 | 1 | 4727 | 1 |
| 4678 | 68 | 4703 | 5 | 4728 | 3 |
| 4679 | 3 | 4704 | 2 | 4729 | 4 |
| 4680 | 2 | 4705 | 4 | 4730 | 1 |
| 4681 | 2 | 4706 | 1 | 4731 | 4 |
| 4682 | 72 | 4707 | 4 | 4732 | 1 |
| 4683 | 5 | 4708 | 9 | 4733 | 1 |
| 4684 | 2 | 4709 | 1 | 4734 | 7133 |
| 4685 | 1 | 4710 | 5 | 4735 | 2 |
| 4686 | 6 | 4711 | 31 | 4736 | 2 |
| 4687 | 1 | 4712 | 17 | 4737 | 1 |
| 4688 | 11 | 4713 | 2 | 4738 | 1 |
| 4689 | 2 | 4714 | 2 | 4739 | 1 |
| 4690 | 1 | 4715 | 1 | 4740 | 2 |
| 4691 | 7 | 4716 | 3 | 4741 | 1 |
| 4692 | 6 | 4717 | 1 | 4742 | 2 |
| 4693 | 33 | 4718 | 19 | 4743 | 3 |
| 4694 | 1 | 4719 | 2 | 4744 | 6 |
| 4695 | 3 | 4720 | 5 | 4745 | 1 |
| | | | | 4746 | 23 |

# Appendix C: Form I-140 Sample with Petition Totals

| Sample ID | Petitions |
|---|---|
| 1 | 4 |
| 2 | 10 |
| 3 | 1 |
| 4 | 75 |
| 5 | 3079 |
| 6 | 1 |
| 7 | 69 |
| 8 | 611 |
| 9 | 27 |
| 10 | 12 |
| 11 | 550 |
| 12 | 1 |
| 13 | 2 |
| 14 | 2453 |
| 15 | 88 |
| 16 | 14 |
| 17 | 6505 |
| 18 | 561 |
| 19 | 26 |
| 20 | 4 |
| 21 | 684 |
| 22 | 145 |
| 23 | 1878 |
| 24 | 50 |
| 25 | 4 |
| 26 | 7 |
| 27 | 103 |
| 28 | 62 |
| 29 | 1 |
| 30 | 213 |
| 31 | 1860 |
| 32 | 1 |
| 33 | 6 |
| 34 | 44 |
| 35 | 20 |
| 36 | 7 |
| 37 | 398 |
| 38 | 34 |

| Sample ID | Petitions |
|---|---|
| 39 | 14 |
| 40 | 4 |
| 41 | 407 |
| 42 | 1 |
| 43 | 1 |
| 44 | 7 |
| 45 | 1 |
| 46 | 17 |
| 47 | 188 |
| 48 | 124 |
| 49 | 12 |
| 50 | 716 |
| 51 | 14 |
| 52 | 22 |
| 53 | 24 |
| 54 | 381 |
| 55 | 5 |
| 56 | 1 |
| 57 | 38 |
| 58 | 1 |
| 59 | 9 |
| 60 | 1 |
| 61 | 1 |
| 62 | 24 |
| 63 | 3 |
| 64 | 15 |
| 65 | 1 |
| 66 | 6 |
| 67 | 77 |
| 68 | 1036 |
| 69 | 245 |
| 70 | 27 |
| 71 | 2 |
| 72 | 3 |
| 73 | 97 |
| 74 | 4 |
| 75 | 76 |
| 76 | 6 |
| 77 | 21 |

| Sample ID | Petitions |
|---|---|
| 78 | 26 |
| 79 | 73 |
| 80 | 85 |
| 81 | 2 |
| 82 | 8 |
| 83 | 2 |
| 84 | 1 |
| 85 | 9 |
| 86 | 3 |
| 87 | 1 |
| 88 | 2 |
| 89 | 81 |
| 90 | 1 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 26 |
| 95 | 18 |
| 96 | 102 |
| 97 | 114 |
| 98 | 1 |
| 99 | 99 |
| 100 | 2 |
| 101 | 5 |
| 102 | 7 |
| 103 | 2 |
| 104 | 466 |
| 105 | 10 |
| 106 | 131 |
| 107 | 1 |
| 108 | 136 |
| 109 | 44 |
| 110 | 141 |
| 111 | 4 |
| 112 | 5 |
| 113 | 7 |
| 114 | 2904 |
| 115 | 1 |
| 116 | 15 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 117 | 3 | | 158 | 43 | | 199 | 15 |
| 118 | 2 | | 159 | 84 | | 200 | 1 |
| 119 | 1 | | 160 | 7 | | 201 | 17 |
| 120 | 9 | | 161 | 41 | | 202 | 5 |
| 121 | 154 | | 162 | 9 | | 203 | 2 |
| 122 | 8 | | 163 | 45 | | 204 | 2 |
| 123 | 1 | | 164 | 4 | | 205 | 6 |
| 124 | 11 | | 165 | 54 | | 206 | 5 |
| 125 | 26 | | 166 | 6 | | 207 | 1 |
| 126 | 4 | | 167 | 72 | | 208 | 3 |
| 127 | 1 | | 168 | 13 | | 209 | 13 |
| 128 | 4 | | 169 | 7 | | 210 | 4 |
| 129 | 39 | | 170 | 2 | | 211 | 2 |
| 130 | 629 | | 171 | 19 | | 212 | 39 |
| 131 | 3 | | 172 | 62 | | 213 | 2 |
| 132 | 5 | | 173 | 3 | | 214 | 34 |
| 133 | 251 | | 174 | 74 | | 215 | 5 |
| 134 | 1 | | 175 | 20 | | 216 | 38 |
| 135 | 1 | | 176 | 1 | | 217 | 3 |
| 136 | 1 | | 177 | 67 | | 218 | 65 |
| 137 | 1 | | 178 | 9 | | 219 | 1 |
| 138 | 78 | | 179 | 33 | | 220 | 13 |
| 139 | 14 | | 180 | 121 | | 221 | 2 |
| 140 | 1 | | 181 | 2 | | 222 | 2 |
| 141 | 12 | | 182 | 27 | | 223 | 81 |
| 142 | 5 | | 183 | 22 | | 224 | 3 |
| 143 | 6 | | 184 | 7 | | 225 | 13 |
| 144 | 68 | | 185 | 33 | | 226 | 104 |
| 145 | 38 | | 186 | 6 | | 227 | 1 |
| 146 | 8 | | 187 | 42 | | 228 | 2 |
| 147 | 49 | | 188 | 1 | | 229 | 6 |
| 148 | 521 | | 189 | 1 | | 230 | 1 |
| 149 | 7 | | 190 | 1 | | 231 | 3 |
| 150 | 25 | | 191 | 1 | | 232 | 7 |
| 151 | 129 | | 192 | 2 | | 233 | 117 |
| 152 | 5 | | 193 | 1 | | 234 | 1 |
| 153 | 19 | | 194 | 1 | | 235 | 5 |
| 154 | 1 | | 195 | 2 | | 236 | 13 |
| 155 | 1 | | 196 | 1 | | 237 | 4 |
| 156 | 44 | | 197 | 1 | | 238 | 3 |
| 157 | 72 | | 198 | 1 | | 239 | 52 |

| | | | | | | |
|---|---|---|---|---|---|
| 240 | 15 | 281 | 35 | 322 | 15 |
| 241 | 8 | 282 | 3 | 323 | 2 |
| 242 | 1 | 283 | 56 | 324 | 1 |
| 243 | 32 | 284 | 13 | 325 | 7 |
| 244 | 34 | 285 | 74 | 326 | 4 |
| 245 | 611 | 286 | 10 | 327 | 1 |
| 246 | 11 | 287 | 312 | 328 | 25 |
| 247 | 138 | 288 | 12 | 329 | 1 |
| 248 | 110 | 289 | 11 | 330 | 25 |
| 249 | 4 | 290 | 62 | 331 | 14 |
| 250 | 13 | 291 | 43 | 332 | 2 |
| 251 | 10 | 292 | 71 | 333 | 45 |
| 252 | 9 | 293 | 65 | 334 | 2 |
| 253 | 2 | 294 | 14 | 335 | 2 |
| 254 | 33 | 295 | 169 | 336 | 1 |
| 255 | 1 | 296 | 1 | 337 | 9 |
| 256 | 19 | 297 | 32 | 338 | 22 |
| 257 | 46 | 298 | 1 | 339 | 21 |
| 258 | 31 | 299 | 1 | 340 | 92 |
| 259 | 2 | 300 | 12 | 341 | 1 |
| 260 | 128 | 301 | 5 | 342 | 84 |
| 261 | 92 | 302 | 748 | 343 | 1058 |
| 262 | 64 | 303 | 2 | 344 | 1 |
| 263 | 6 | 304 | 8 | 345 | 1 |
| 264 | 43 | 305 | 1 | 346 | 1 |
| 265 | 7 | 306 | 7 | 347 | 3 |
| 266 | 303 | 307 | 1 | 348 | 38 |
| 267 | 27 | 308 | 24 | 349 | 35 |
| 268 | 11 | 309 | 30 | 350 | 24 |
| 269 | 27 | 310 | 2 | 351 | 1 |
| 270 | 35 | 311 | 1 | 352 | 4 |
| 271 | 142 | 312 | 2 | 353 | 13 |
| 272 | 73 | 313 | 1 | 354 | 1 |
| 273 | 88 | 314 | 125 | 355 | 1 |
| 274 | 2 | 315 | 11 | 356 | 44 |
| 275 | 27 | 316 | 35 | 357 | 1 |
| 276 | 101 | 317 | 27 | 358 | 1 |
| 277 | 1 | 318 | 1 | 359 | 24 |
| 278 | 4 | 319 | 44 | 360 | 3 |
| 279 | 3 | 320 | 1 | 361 | 1 |
| 280 | 3 | 321 | 7 | 362 | 43 |

| | | | | | |
|---|---|---|---|---|---|
| 363 | 1 | 404 | 4 | 445 | 2 |
| 364 | 1 | 405 | 5 | 446 | 2 |
| 365 | 22 | 406 | 3 | 447 | 5 |
| 366 | 1 | 407 | 14 | 448 | 3 |
| 367 | 71 | 408 | 74 | 449 | 9 |
| 368 | 204 | 409 | 5 | 450 | 1 |
| 369 | 17 | 410 | 2 | 451 | 6 |
| 370 | 1 | 411 | 1 | 452 | 1 |
| 371 | 1 | 412 | 5 | 453 | 236 |
| 372 | 5 | 413 | 1 | 454 | 3 |
| 373 | 20 | 414 | 36 | 455 | 2 |
| 374 | 4 | 415 | 24 | 456 | 3 |
| 375 | 13 | 416 | 1 | 457 | 1 |
| 376 | 1 | 417 | 30 | 458 | 3 |
| 377 | 3 | 418 | 13 | 459 | 40 |
| 378 | 75 | 419 | 2 | 460 | 50 |
| 379 | 1 | 420 | 1 | 461 | 8 |
| 380 | 1 | 421 | 2 | 462 | 14 |
| 381 | 12 | 422 | 1 | 463 | 5 |
| 382 | 1 | 423 | 3 | 464 | 3 |
| 383 | 1 | 424 | 9 | 465 | 13 |
| 384 | 9 | 425 | 1 | 466 | 1 |
| 385 | 2 | 426 | 1 | 467 | 1 |
| 386 | 1 | 427 | 1 | 468 | 5 |
| 387 | 22 | 428 | 8 | 469 | 1 |
| 388 | 6 | 429 | 15 | 470 | 34 |
| 389 | 1 | 430 | 14 | 471 | 20 |
| 390 | 110 | 431 | 1 | 472 | 2 |
| 391 | 2 | 432 | 4 | 473 | 46 |
| 392 | 480 | 433 | 1 | 474 | 2 |
| 393 | 1 | 434 | 1 | 475 | 1 |
| 394 | 1 | 435 | 4 | 476 | 1 |
| 395 | 1 | 436 | 24 | 477 | 2 |
| 396 | 5 | 437 | 99 | 478 | 25 |
| 397 | 1 | 438 | 17 | 479 | 2 |
| 398 | 2 | 439 | 5 | 480 | 18 |
| 399 | 2 | 440 | 1 | 481 | 2 |
| 400 | 20 | 441 | 51 | 482 | 523 |
| 401 | 24 | 442 | 10 | 483 | 5 |
| 402 | 1 | 443 | 14 | 484 | 1 |
| 403 | 57 | 444 | 1 | 485 | 66 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 486 | 92 | 508 | 130 | 530 | 1 |
| 487 | 15 | 509 | 1 | 531 | 1 |
| 488 | 68 | 510 | 3 | 532 | 35 |
| 489 | 6 | 511 | 1 | 533 | 14 |
| 490 | 2 | 512 | 9 | 534 | 7 |
| 491 | 6 | 513 | 12 | 535 | 1 |
| 492 | 1 | 514 | 3 | 536 | 4 |
| 493 | 33 | 515 | 4 | 537 | 1 |
| 494 | 2 | 516 | 1 | 538 | 1 |
| 495 | 1 | 517 | 13 | 539 | 1 |
| 496 | 540 | 518 | 1 | 540 | 7 |
| 497 | 1 | 519 | 1 | 541 | 1 |
| 498 | 1 | 520 | 1 | 542 | 34 |
| 499 | 1 | 521 | 30 | 543 | 1 |
| 500 | 1 | 522 | 1 | 544 | 1 |
| 501 | 1 | 523 | 25 | 545 | 25 |
| 502 | 7 | 524 | 1 | 546 | 1 |
| 503 | 1 | 525 | 1 | 547 | 4 |
| 504 | 4 | 526 | 17 | 548 | 8 |
| 505 | 2 | 527 | 36 | 549 | 1 |
| 506 | 1 | 528 | 15 | 550 | 8 |
| 507 | 6 | 529 | 19 | | |

## Appendix D: Form I-910 Sample with Petition Totals

| Sample ID | Petitions |
|---|---|
| 1 | 5 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1 |
| 10 | 1 |
| 11 | 1 |
| 12 | 1 |
| 13 | 1 |
| 14 | 1 |
| 15 | 1 |
| 16 | 1 |
| 17 | 1 |
| 18 | 1 |
| 19 | 1 |
| 20 | 2 |
| 21 | 1 |
| 22 | 1 |
| 23 | 1 |
| 24 | 1 |
| 25 | 1 |
| 26 | 2 |
| 27 | 1 |
| 28 | 1 |
| 29 | 1 |
| 30 | 1 |
| 31 | 1 |
| 32 | 1 |
| 33 | 1 |
| 34 | 1 |
| 35 | 2 |
| 36 | 1 |
| 37 | 2 |
| 38 | 1 |

| Sample ID | Petitions |
|---|---|
| 39 | 1 |
| 40 | 1 |
| 41 | 1 |
| 42 | 1 |
| 43 | 1 |
| 44 | 1 |
| 45 | 1 |
| 46 | 2 |
| 47 | 1 |
| 48 | 1 |
| 49 | 1 |
| 50 | 1 |
| 51 | 2 |
| 52 | 1 |
| 53 | 1 |
| 54 | 1 |
| 55 | 1 |
| 56 | 2 |
| 57 | 1 |
| 58 | 1 |
| 59 | 1 |
| 60 | 1 |
| 61 | 2 |
| 62 | 1 |
| 63 | 2 |
| 64 | 1 |
| 65 | 1 |
| 66 | 1 |
| 67 | 1 |
| 68 | 1 |
| 69 | 3 |
| 70 | 1 |
| 71 | 1 |
| 72 | 1 |
| 73 | 1 |
| 74 | 1 |
| 75 | 1 |
| 76 | 1 |
| 77 | 1 |

| Sample ID | Petitions |
|---|---|
| 78 | 1 |
| 79 | 1 |
| 80 | 1 |
| 81 | 1 |
| 82 | 1 |
| 83 | 1 |
| 84 | 1 |
| 85 | 1 |
| 86 | 1 |
| 87 | 1 |
| 88 | 1 |
| 89 | 1 |
| 90 | 1 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 1 |
| 95 | 2 |
| 96 | 1 |
| 97 | 1 |
| 98 | 1 |
| 99 | 1 |
| 100 | 2 |
| 101 | 1 |
| 102 | 1 |
| 103 | 1 |
| 104 | 1 |
| 105 | 1 |
| 106 | 1 |
| 107 | 1 |
| 108 | 1 |
| 109 | 1 |
| 110 | 1 |
| 111 | 1 |
| 112 | 1 |
| 113 | 2 |
| 114 | 1 |
| 115 | 1 |
| 116 | 4 |
| 117 | 1 |

| | |
|---|---|
| 118 | 2 |
| 119 | 1 |
| 120 | 1 |
| 121 | 1 |
| 122 | 1 |
| 123 | 1 |
| 124 | 1 |
| 125 | 1 |
| 126 | 1 |
| 127 | 2 |
| 128 | 1 |
| 129 | 1 |
| 130 | 1 |
| 131 | 2 |
| 132 | 2 |
| 133 | 2 |
| 134 | 2 |
| 135 | 2 |
| 136 | 2 |
| 137 | 1 |
| 138 | 3 |
| 139 | 1 |
| 140 | 1 |
| 141 | 1 |
| 142 | 1 |
| 143 | 1 |
| 144 | 1 |
| 145 | 1 |
| 146 | 2 |
| 147 | 1 |
| 148 | 1 |
| 149 | 1 |
| 150 | 1 |
| 151 | 1 |
| 152 | 1 |
| 153 | 1 |
| 154 | 1 |
| 155 | 1 |
| 156 | 1 |
| 157 | 1 |
| 158 | 1 |

| | |
|---|---|
| 159 | 1 |
| 160 | 1 |
| 161 | 1 |
| 162 | 1 |
| 163 | 1 |
| 164 | 1 |
| 165 | 2 |
| 166 | 1 |
| 167 | 1 |
| 168 | 1 |
| 169 | 1 |
| 170 | 1 |
| 171 | 1 |
| 172 | 1 |
| 173 | 1 |
| 174 | 1 |
| 175 | 1 |
| 176 | 1 |
| 177 | 1 |
| 178 | 1 |
| 179 | 1 |
| 180 | 1 |
| 181 | 1 |
| 182 | 1 |
| 183 | 3 |
| 184 | 1 |
| 185 | 1 |
| 186 | 1 |
| 187 | 1 |
| 188 | 1 |
| 189 | 1 |
| 190 | 1 |
| 191 | 2 |
| 192 | 1 |
| 193 | 1 |
| 194 | 1 |
| 195 | 1 |
| 196 | 2 |
| 197 | 1 |
| 198 | 1 |
| 199 | 1 |

| | |
|---|---|
| 200 | 1 |
| 201 | 1 |
| 202 | 1 |
| 203 | 1 |
| 204 | 1 |
| 205 | 1 |
| 206 | 1 |
| 207 | 1 |
| 208 | 1 |
| 209 | 1 |
| 210 | 1 |
| 211 | 2 |
| 212 | 1 |
| 213 | 2 |
| 214 | 1 |
| 215 | 1 |
| 216 | 2 |
| 217 | 1 |
| 218 | 1 |
| 219 | 1 |
| 220 | 1 |
| 221 | 1 |
| 222 | 1 |
| 223 | 1 |
| 224 | 1 |
| 225 | 1 |
| 226 | 2 |
| 227 | 1 |
| 228 | 1 |
| 229 | 1 |
| 230 | 1 |
| 231 | 1 |
| 232 | 1 |
| 233 | 1 |
| 234 | 2 |
| 235 | 1 |
| 236 | 1 |
| 237 | 1 |
| 238 | 1 |
| 239 | 1 |
| 240 | 1 |

| | |
|---|---|
| 241 | 1 |
| 242 | 1 |
| 243 | 1 |
| 244 | 1 |
| 245 | 1 |
| 246 | 2 |
| 247 | 1 |
| 248 | 1 |
| 249 | 1 |
| 250 | 1 |
| 251 | 1 |
| 252 | 1 |
| 253 | 1 |
| 254 | 1 |
| 255 | 1 |
| 256 | 1 |
| 257 | 2 |
| 258 | 1 |
| 259 | 1 |
| 260 | 1 |

| | |
|---|---|
| 261 | 1 |
| 262 | 2 |
| 263 | 1 |
| 264 | 1 |
| 265 | 1 |
| 266 | 1 |
| 267 | 1 |
| 268 | 1 |
| 269 | 1 |
| 270 | 2 |
| 271 | 1 |
| 272 | 2 |
| 273 | 1 |
| 274 | 1 |
| 275 | 1 |
| 276 | 1 |
| 277 | 1 |
| 278 | 1 |
| 279 | 1 |
| 280 | 2 |

| | |
|---|---|
| 281 | 1 |
| 282 | 1 |
| 283 | 1 |
| 284 | 1 |
| 285 | 1 |
| 286 | 1 |
| 287 | 1 |
| 288 | 1 |
| 289 | 2 |
| 290 | 1 |
| 291 | 1 |
| 292 | 1 |
| 293 | 1 |
| 294 | 1 |
| 295 | 1 |
| 296 | 1 |
| 297 | 1 |
| 298 | 1 |
| 299 | 1 |
| 300 | 2 |

## Appendix E: Form I-360 Sample with Petition Totals

| Sample ID | Petitions |
|---|---|
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 2 |
| 9 | 1 |
| 10 | 1 |
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 3 |
| 15 | 1 |
| 16 | 1 |
| 17 | 1 |
| 18 | 1 |
| 19 | 1 |
| 20 | 1 |
| 21 | 1 |
| 22 | 1 |
| 23 | 1 |
| 24 | 1 |
| 25 | 2 |
| 26 | 2 |
| 27 | 1 |
| 28 | 1 |
| 29 | 2 |
| 30 | 1 |
| 31 | 1 |
| 32 | 1 |
| 33 | 1 |
| 34 | 1 |
| 35 | 1 |
| 36 | 3 |
| 37 | 1 |
| 38 | 1 |
| 39 | 1 |
| 40 | 3 |
| 41 | 1 |
| 42 | 1 |
| 43 | 1 |
| 44 | 2 |
| 45 | 1 |
| 46 | 1 |
| 47 | 1 |
| 48 | 2 |
| 49 | 2 |
| 50 | 1 |
| 51 | 1 |
| 52 | 1 |
| 53 | 1 |
| 54 | 2 |
| 55 | 2 |
| 56 | 2 |
| 57 | 5 |
| 58 | 1 |
| 59 | 1 |
| 60 | 3 |
| 61 | 1 |
| 62 | 1 |
| 63 | 1 |
| 64 | 1 |
| 65 | 1 |
| 66 | 1 |
| 67 | 1 |
| 68 | 1 |
| 69 | 1 |
| 70 | 1 |
| 71 | 1 |
| 72 | 1 |
| 73 | 1 |
| 74 | 1 |
| 75 | 3 |
| 76 | 1 |
| 77 | 1 |
| 78 | 1 |
| 79 | 1 |
| 80 | 1 |
| 81 | 1 |
| 82 | 1 |
| 83 | 1 |
| 84 | 1 |
| 85 | 1 |
| 86 | 1 |
| 87 | 1 |
| 88 | 1 |
| 89 | 1 |
| 90 | 1 |
| 91 | 1 |
| 92 | 1 |
| 93 | 1 |
| 94 | 1 |
| 95 | 1 |
| 96 | 1 |
| 97 | 2 |
| 98 | 1 |
| 99 | 1 |
| 100 | 2 |
| 101 | 1 |
| 102 | 1 |
| 103 | 1 |
| 104 | 1 |
| 105 | 2 |
| 106 | 1 |
| 107 | 1 |
| 108 | 3 |
| 109 | 1 |
| 110 | 1 |
| 111 | 1 |
| 112 | 1 |
| 113 | 3 |
| 114 | 8 |
| 115 | 1 |
| 116 | 5 |

| | | | | | |
|---|---|---|---|---|---|
| 117 | 1 | 158 | 1 | 199 | 1 |
| 118 | 1 | 159 | 1 | 200 | 1 |
| 119 | 1 | 160 | 1 | 201 | 1 |
| 120 | 1 | 161 | 1 | 202 | 1 |
| 121 | 1 | 162 | 1 | 203 | 1 |
| 122 | 1 | 163 | 1 | 204 | 1 |
| 123 | 1 | 164 | 1 | 205 | 1 |
| 124 | 1 | 165 | 1 | 206 | 1 |
| 125 | 1 | 166 | 1 | 207 | 1 |
| 126 | 1 | 167 | 1 | 208 | 1 |
| 127 | 1 | 168 | 6 | 209 | 4 |
| 128 | 1 | 169 | 1 | 210 | 3 |
| 129 | 1 | 170 | 1 | 211 | 1 |
| 130 | 1 | 171 | 1 | 212 | 1 |
| 131 | 2 | 172 | 1 | 213 | 1 |
| 132 | 2 | 173 | 3 | 214 | 1 |
| 133 | 1 | 174 | 1 | 215 | 1 |
| 134 | 1 | 175 | 1 | 216 | 1 |
| 135 | 2 | 176 | 2 | 217 | 1 |
| 136 | 2 | 177 | 1 | 218 | 2 |
| 137 | 1 | 178 | 1 | 219 | 1 |
| 138 | 1 | 179 | 1 | 220 | 2 |
| 139 | 1 | 180 | 1 | 221 | 1 |
| 140 | 1 | 181 | 2 | 222 | 1 |
| 141 | 1 | 182 | 1 | 223 | 1 |
| 142 | 1 | 183 | 1 | 224 | 1 |
| 143 | 2 | 184 | 1 | 225 | 1 |
| 144 | 1 | 185 | 1 | 226 | 1 |
| 145 | 1 | 186 | 1 | 227 | 2 |
| 146 | 1 | 187 | 1 | 228 | 1 |
| 147 | 1 | 188 | 1 | 229 | 1 |
| 148 | 1 | 189 | 1 | 230 | 3 |
| 149 | 1 | 190 | 1 | 231 | 2 |
| 150 | 1 | 191 | 1 | 232 | 1 |
| 151 | 1 | 192 | 1 | 233 | 1 |
| 152 | 2 | 193 | 1 | 234 | 1 |
| 153 | 1 | 194 | 1 | 235 | 1 |
| 154 | 1 | 195 | 1 | 236 | 1 |
| 155 | 6 | 196 | 1 | 237 | 1 |
| 156 | 1 | 197 | 2 | 238 | 1 |
| 157 | 1 | 198 | 3 | 239 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 240 | 1 | 281 | 1 | 322 | 2 |
| 241 | 1 | 282 | 1 | 323 | 2 |
| 242 | 1 | 283 | 3 | 324 | 1 |
| 243 | 1 | 284 | 1 | 325 | 1 |
| 244 | 1 | 285 | 1 | 326 | 3 |
| 245 | 2 | 286 | 1 | 327 | 1 |
| 246 | 1 | 287 | 1 | 328 | 1 |
| 247 | 1 | 288 | 1 | 329 | 3 |
| 248 | 1 | 289 | 1 | 330 | 1 |
| 249 | 3 | 290 | 5 | 331 | 3 |
| 250 | 1 | 291 | 1 | 332 | 1 |
| 251 | 2 | 292 | 1 | 333 | 1 |
| 252 | 2 | 293 | 1 | 334 | 2 |
| 253 | 1 | 294 | 1 | 335 | 1 |
| 254 | 1 | 295 | 1 | 336 | 1 |
| 255 | 1 | 296 | 3 | 337 | 3 |
| 256 | 1 | 297 | 1 | 338 | 1 |
| 257 | 1 | 298 | 1 | 339 | 1 |
| 258 | 1 | 299 | 2 | 340 | 1 |
| 259 | 2 | 300 | 1 | 341 | 1 |
| 260 | 3 | 301 | 1 | 342 | 1 |
| 261 | 1 | 302 | 1 | 343 | 1 |
| 262 | 1 | 303 | 1 | 344 | 1 |
| 263 | 1 | 304 | 2 | 345 | 1 |
| 264 | 1 | 305 | 1 | 346 | 1 |
| 265 | 2 | 306 | 3 | 347 | 1 |
| 266 | 1 | 307 | 3 | 348 | 2 |
| 267 | 1 | 308 | 1 | 349 | 1 |
| 268 | 1 | 309 | 1 | 350 | 3 |
| 269 | 1 | 310 | 1 | 351 | 1 |
| 270 | 1 | 311 | 1 | 352 | 4 |
| 271 | 1 | 312 | 1 | 353 | 1 |
| 272 | 1 | 313 | 1 | 354 | 1 |
| 273 | 1 | 314 | 2 | 355 | 1 |
| 274 | 1 | 315 | 2 | 356 | 1 |
| 275 | 1 | 316 | 1 | 357 | 1 |
| 276 | 1 | 317 | 1 | 358 | 1 |
| 277 | 1 | 318 | 1 | 359 | 1 |
| 278 | 1 | 319 | 6 | 360 | 1 |
| 279 | 1 | 320 | 3 | 361 | 1 |
| 280 | 1 | 321 | 1 | 362 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 363 | 1 | 383 | 1 | 403 | 2 |
| 364 | 2 | 384 | 1 | 404 | 1 |
| 365 | 1 | 385 | 3 | 405 | 1 |
| 366 | 1 | 386 | 1 | 406 | 4 |
| 367 | 1 | 387 | 4 | 407 | 1 |
| 368 | 3 | 388 | 1 | 408 | 1 |
| 369 | 1 | 389 | 1 | 409 | 1 |
| 370 | 1 | 390 | 2 | 410 | 1 |
| 371 | 1 | 391 | 1 | 411 | 2 |
| 372 | 1 | 392 | 1 | 412 | 1 |
| 373 | 1 | 393 | 1 | 413 | 1 |
| 374 | 1 | 394 | 1 | 414 | 1 |
| 375 | 2 | 395 | 1 | 415 | 1 |
| 376 | 1 | 396 | 2 | 416 | 1 |
| 377 | 2 | 397 | 1 | 417 | 2 |
| 378 | 1 | 398 | 1 | 418 | 1 |
| 379 | 2 | 399 | 1 | 419 | 2 |
| 380 | 1 | 400 | 1 | 420 | 1 |
| 381 | 1 | 401 | 1 | | |
| 382 | 1 | 402 | 1 | | |

## Form N-400, Application for Naturalization *Regression MODEL #1*

## Method: N-400 Filings and Fees from 1989-2022

|  | Dependent/OutcomeVariable (Y) | Independent/Explanatory/Predictor Variable (X) |
|---|---|---|
|  | **N-400 Receipts (Y)** | **N-400 Fees (X)** |
| 1989 | 227,692 | $60 |
| 1990 | 233,843 | $60 |
| 1991 | 206,668 | $90 |
| 1992 | 342,238 | $90 |
| 1993 | 521,866 | $90 |
| 1994 | 543,353 | $95 |
| 1995 | 959,963 | $95 |
| 1996 | 1,277,403 | $95 |
| 1997 | 1,412,712 | $95 |
| 1998 | 932,957 | $225 |
| 1999 | 765,346 | $225 |
| 2000 | 460,916 | $225 |
| 2001 | 501,643 | $225 |
| 2002 | 700,649 | $260 |
| 2003 | 523,370 | $260 |
| 2004 | 662,796 | $260 |
| 2005 | 602,972 | $260 |
| 2006 | 730,642 | $330 |
| 2007 | 1,382,993 | $595 |
| 2008 | 525,786 | $595 |
| 2009 | 570,442 | $595 |
| 2010 | 710,544 | $595 |
| 2011 | 756,008 | $595 |
| 2012 | 899,162 | $595 |
| 2013 | 772,623 | $595 |
| 2014 | 773,824 | $595 |
| 2015 | 783,062 | $595 |
| 2016 | 972,151 | $595 |
| 2017 | 986,851 | $640 |
| 2018 | 837,168 | $640 |
| 2019 | 830,560 | $640 |
| 2020 | 967,755 | $640 |
| 2021 | 777,140 | $640 |
| 2022 | 780,933 | $640 |



.

Immigration Statistics; data on N-400 fees from 58 FR 30699 ($90) (May 27, 1993), 59 FR 30519 ($95) (June 14, 1994), 63 FR 43605 ($225) (Aug. 18, 1998), 66 FR 246 (Jan. 3, 2001) and 68 FR 8989 ($260) (Feb. 27, 2003), 69 FR 20532 ($320) (Apr. 15, 2004), 70 FR 56182 ($330) (Aug. 26, 2005), 72 FR 29861 ($595) (May 30, 2007), 75 FR 58975 ($595) (Sept. 24, 2010), 81 FR 73293 ($640 if above 200% of the FPG) (Oct. 24, 2016).



**Form N-400 Filings and Fees from 1989 thr**

SUMMARY OUTPUT

| Regression Statistics | |
| --- | --- |
| Multiple R | 0.34022245 |
| R Square | 0.115751316 |
| Adjusted R Square | 0.088118544 |
| Standard Error | 277544.4025 |
| Observations | 34 |

ANOVA

| | df | SS | MS |
| --- | --- | --- | --- |
| Regression | 1 | 322675831753.95 | 322675831753.95 |
| Residual | 32 | 2464988650786.32 | 77030895337.07 |

| | | |
|---|---|---|
| Total | 33 | 2.78766E+12 |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 573841.3538 | 91322.49782 | 6.283680007 |
| N-400 Fees (X) | 422.7143392 | 206.5362245 | 2.046683773 |



**rough 2022 Scatter Plot**

| F | Significance F |
| --- | --- |
| 4.188914465 | 0.048976702 |

| P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|
| 0.000000479 | 387823.513 | 759859.1946 | 387823.513 | 759859.195 |
| 0.048976702 | 2.013816837 | 843.4148615 | 2.013816837 | 843.414861 |

## Form N-400, Application for Naturalization *Regression* MODEL #2

### Method: Lag N-400 fees by a year

| | Dependent/OutcomeVariable (Y) | Independent/Explanatory/Predictor Variable (X) (x) t-1 | | SUMMARY OUTPUT | |
|---|---|---|---|---|---|
| | **N-400 Receipts (Y)** | **N-400 Fees (X)** | | | *Regression Stat* |
| 1989 | 227,692 | $60 | | Multiple R | |
| 1990 | 233,843 | $60 | | R Square | |
| 1991 | 206,668 | $60 | | Adjusted R Square | |
| 1992 | 342,238 | $90 | | Standard Error | |
| 1993 | 521,866 | $90 | | Observations | |
| 1994 | 543,353 | $90 | | | |
| 1995 | 959,963 | $95 | | ANOVA | |
| 1996 | 1,277,403 | $95 | | | |
| 1997 | 1,412,712 | $95 | | Regression | |
| 1998 | 932,957 | $95 | | Residual | |
| 1999 | 765,346 | $225 | | Total | |
| 2000 | 460,916 | $225 | | | |
| 2001 | 501,643 | $225 | | | |
| 2002 | 700,649 | $225 | | Intercept | |
| 2003 | 523,370 | $260 | | N-400 Fees (X) | |
| 2004 | 662,796 | $260 | | | |
| 2005 | 602,972 | $260 | | | |
| 2006 | 730,642 | $260 | | | |
| 2007 | 1,382,993 | $330 | | | |
| 2008 | 525,786 | $595 | | | |
| 2009 | 570,442 | $595 | | | |
| 2010 | 710,544 | $595 | | | |
| 2011 | 756,008 | $595 | | | |
| 2012 | 899,162 | $595 | | | |
| 2013 | 772,623 | $595 | | | |
| 2014 | 773,824 | $595 | | | |
| 2015 | 783,062 | $595 | | | |
| 2016 | 972,151 | $595 | | | |
| 2017 | 986,851 | $595 | | | |
| 2018 | 837,168 | $640 | | | |
| 2019 | 830,560 | $640 | | | |
| 2020 | 967,755 | $640 | | | |

| | | |
|---|---|---|
| 2021 | 777,140 | $640 |
| 2022 | 780,933 | $640 |

*istics*

| |
|---|
| 0.25337685 |
| 0.064199828 |
| 0.034956073 |
| 285520.1888 |
| 34 |

| *df* | *SS* | *MS* | *F* |
|---|---|---|---|
| 1 | 178967580046.43 | 178967580046.43 | 2.195334596 |
| 32 | 2608696902493.84 | 81521778202.93 | |
| 33 | 2787664482540.27 | | |

| *Coefficients* | *Standard Error* | *t Stat* | *P-value* |
|---|---|---|---|
| 620608.6199 | 90487.16612 | 6.858526425 | 0.000000093 |
| 312.9255447 | 211.1984158 | 1.481666156 | 0.148210184 |

| Significance F |
| --- |
| 0.148210184 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
| --- | --- | --- | --- |
| 436292.2941 | 804924.9457 | 436292.294 | 804924.9457 |
| -117.2715504 | 743.1226399 | -117.27155 | 743.1226399 |

AR_001323

# Form N-400, Application for Naturalization *Regression* MODEL #3

## Method: Dummy Variables for events that occurred in 1996, 1997 and 2

| | *Y* | *B* | *C* | *D* | *E* | Y=B,C,D,E |
|---|---|---|---|---|---|---|
| | | Independent/ | \multicolumn{3}{c}{Dummy variables for events} | |
| | Dependent/Outcome Variable (Y) | Explanatory/Predictor Variable (X) | | | | |
| | **N-400 Receipts (Y)** | **N-400 Fees (x1)** | **1996 event (x2)** | **1997 event (x3)** | **2007 event (x4)** | |
| 1989 | 227,692 | $60 | 0 | 0 | 0 |
| 1990 | 233,843 | $60 | 0 | 0 | 0 |
| 1991 | 206,668 | $90 | 0 | 0 | 0 |
| 1992 | 342,238 | $90 | 0 | 0 | 0 |
| 1993 | 521,866 | $90 | 0 | 0 | 0 |
| 1994 | 543,353 | $95 | 0 | 0 | 0 |
| 1995 | 959,963 | $95 | 0 | 0 | 0 |
| 1996 | 1,277,403 | $95 | 1 | 0 | 0 |
| 1997 | 1,412,712 | $95 | 0 | 1 | 0 |
| 1998 | 932,957 | $225 | 0 | 0 | 0 |
| 1999 | 765,346 | $225 | 0 | 0 | 0 |
| 2000 | 460,916 | $225 | 0 | 0 | 0 |
| 2001 | 501,643 | $225 | 0 | 0 | 0 |
| 2002 | 700,649 | $260 | 0 | 0 | 0 |
| 2003 | 523,370 | $260 | 0 | 0 | 0 |
| 2004 | 662,796 | $260 | 0 | 0 | 0 |
| 2005 | 602,972 | $260 | 0 | 0 | 0 |
| 2006 | 730,642 | $330 | 0 | 0 | 0 |
| 2007 | 1,382,993 | $595 | 0 | 0 | 1 |
| 2008 | 525,786 | $595 | 0 | 0 | 0 |
| 2009 | 570,442 | $595 | 0 | 0 | 0 |
| 2010 | 710,544 | $595 | 0 | 0 | 0 |
| 2011 | 756,008 | $595 | 0 | 0 | 0 |
| 2012 | 899,162 | $595 | 0 | 0 | 0 |
| 2013 | 772,623 | $595 | 0 | 0 | 0 |
| 2014 | 773,824 | $595 | 0 | 0 | 0 |
| 2015 | 783,062 | $595 | 0 | 0 | 0 |
| 2016 | 972,151 | $595 | 0 | 0 | 0 |
| 2017 | 986,851 | $640 | 0 | 0 | 0 |

| 2018 | 837,168 | $640 | 0 | 0 | 0 |
| 2019 | 830,560 | $640 | 0 | 0 | 0 |
| 2020 | 967,755 | $640 | 0 | 0 | 0 |
| 2021 | 777,140 | $640 | 0 | 0 | 0 |
| 2022 | 780,933 | $640 | 0 | 0 | 0 |

**2007 (No Lag)**

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.826685876 |
| R Square | 0.683409538 |
| Adjusted R Square | 0.639741888 |
| Standard Error | 174449.6753 |
| Observations | 34 |

ANOVA

| | df | SS | MS |
|---|---|---|---|
| Regression | 4 | 1905116495291.44 | 476279123822.86 |
| Residual | 29 | 882547987248.83 | 30432689215 |
| Total | 33 | 2787664482540.27 | |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 432182.8756 | 62145.11049 | 6.954414791 |
| N-400 Fees (x1) | 619.6142679 | 138.1258268 | 4.485868302 |
| 1996 event (x2) | 786356.769 | 181819.737 | 4.324925237 |
| 1997 event (x3) | 921665.769 | 181819.737 | 5.069118372 |
| 2007 event (x4) | 582139.635 | 179520.3838 | 3.2427495 |

| F | Significance F |
|---|---|
| 15.65024768 | 0.0000006238 |

| P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|
| 0.000000121 | 305081.8535 | 559283.898 | 305081.8535 | 559283.8977 |
| 0.000105578 | 337.1152327 | 902.113303 | 337.1152327 | 902.1133031 |
| 0.00016454 | 414493.6534 | 1158219.88 | 414493.6534 | 1158219.885 |
| 0.000020932 | 549802.6534 | 1293528.88 | 549802.6534 | 1293528.885 |
| 0.002974407 | 214979.2246 | 949300.045 | 214979.2246 | 949300.0454 |

**Form N-400, Application for Naturalization *Regression* MODEL #4**

## Method: Lagging Legal Permanent Residents (LPRs) by 5 years

| | Y | B | C | Y=B,C |
|---|---|---|---|---|
| | Dependent/Outcome Variable (Y) | Independent/Explanatory/Predictor Variable (X1) | | |

| | N-400 Receipts (Y) | N-400 Fees (x1) | Legal Permanent Residents-LPR lag5 (x2) |
|---|---|---|---|
| 1989 | 227,692 | $60 | 541,811 |
| 1990 | 233,843 | $60 | 568,149 |
| 1991 | 206,668 | $90 | 600,027 |
| 1992 | 342,238 | $90 | 599,889 |
| 1993 | 521,866 | $90 | 641,346 |
| 1994 | 543,353 | $95 | 1,090,172 |
| 1995 | 959,963 | $95 | 1,535,872 |
| 1996 | 1,277,403 | $95 | 1,826,595 |
| 1997 | 1,412,712 | $95 | 973,445 |
| 1998 | 932,957 | $225 | 903,916 |
| 1999 | 765,346 | $225 | 803,993 |
| 2000 | 460,916 | $225 | 720,177 |
| 2001 | 501,643 | $225 | 915,560 |
| 2002 | 700,649 | $260 | 797,847 |
| 2003 | 523,370 | $260 | 653,206 |
| 2004 | 662,796 | $260 | 644,787 |
| 2005 | 602,972 | $260 | 841,002 |
| 2006 | 730,642 | $330 | 1,058,902 |
| 2007 | 1,382,993 | $595 | 1,059,356 |
| 2008 | 525,786 | $595 | 703,542 |
| 2009 | 570,442 | $595 | 957,883 |
| 2010 | 710,544 | $595 | 1,122,257 |
| 2011 | 756,008 | $595 | 1,266,129 |
| 2012 | 899,162 | $595 | 1,052,415 |
| 2013 | 772,623 | $595 | 1,107,126 |
| 2014 | 773,824 | $595 | 1,130,818 |
| 2015 | 783,062 | $595 | 1,042,625 |
| 2016 | 972,151 | $595 | 1,062,040 |

| | | | |
|---|---|---|---|
| 2017 | 986,851 | $640 | 1,031,631 |
| 2018 | 837,168 | $640 | 990,553 |
| 2019 | 830,560 | $640 | 1,016,518 |
| 2020 | 967,755 | $640 | 1,051,031 |
| 2021 | 777,140 | $640 | 1,183,505 |
| 2022 | 780,933 | $640 | 1,127,167 |

LPR data source:  https://www.dhs.gov/immigration-statistics/yearbook/2019 and downloaded the Lawful Permanent Residents 2019 Data Tables zip file. I open fy2019_table1 (attached here) and see the population of Lawful Permanent Residents from 1820 to 2019 by row.

*Data Source for LPRs*   Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Y

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.69784666 |
| R Square | 0.486989962 |
| Adjusted R Square | 0.45389254 |
| Standard Error | 214784.2025 |
| Observations | 34 |

ANOVA

| | df | SS |
|---|---|---|
| Regression | 2 | 1357564619062.81 |
| Residual | 31 | 1430099863477.46 |
| Total | 33 | 2787664482540.27 |

| | Coefficients | Standard Error |
|---|---|---|
| Intercept | 15669.23539 | 137414.6258 |
| N-400 Fees (x1) | 178.9334701 | 167.9158082 |
| Legal Permanent Residents-LPR lag5 (x2) | 0.677642093 | 0.143072402 |

| MS | F | Significance F |
|---|---|---|
| 678782309531.40 | 14.71 | 0.0000321 |
| 46132253660.56 | | |

| t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% |
|---|---|---|---|---|
| 0.114028876 | 0.909950229 | -264589.7416 | 295928.2124 | -264589.7416 |
| 1.065614203 | 0.294827672 | -163.5330786 | 521.4000189 | -163.5330786 |
| 4.736357823 | 0.000045666 | 0.385844004 | 0.969440181 | 0.385844004 |

| Upper 95.0% |
| --- |
| 295928.2124 |
| 521.4000189 |
| 0.969440181 |

**Form I-140, Immigrant Petition for Alien Workers** *Regression Model #1*

| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **I-140 Receipts** | **I-140 Fees** |
| **1992** | 66,465 | $195 |
| **1993** | 50,340 | $195 |
| **1994** | 47,105 | $195 |
| **1995** | 50,724 | $195 |
| **1996** | 61,042 | $195 |
| **1997** | 68,804 | $195 |
| **1998** | 67,511 | $195 |
| **1999** | 78,879 | $195 |
| **2000** | 96,001 | $195 |
| **2001** | 137,695 | $195 |
| **2002** | 104,361 | $475 |
| **2003** | 96,578 | $475 |
| **2004** | 80,348 | $475 |
| **2005** | 75,009 | $475 |
| **2006** | 140,158 | $475 |
| **2007** | 234,592 | $475 |
| **2008** | 103,805 | $475 |
| **2009** | 57,012 | $475 |
| **2010** | 77,280 | $580 |
| **2011** | 81,678 | $580 |
| **2012** | 72,964 | $580 |
| **2013** | 69,921 | $580 |
| **2014** | 81,658 | $580 |
| **2015** | 101,545 | $580 |
| **2016** | 147,581 | $700 |
| **2017** | 139,566 | $700 |
| **2018** | 136,585 | $700 |
| **2019** | 142,451 | $700 |
| **2020** | 128,178 | $700 |
| **2021** | 178,789 | $700 |
| **2022** | 165,269 | $700 |



SUMMARY OUTPUT

| *Regression Statistics* | |
|---|---|
| Multiple R | 0.540193611 |
| R Square | 0.291809137 |
| Adjusted R Square | 0.267388763 |
| Standard Error | 37597.37125 |
| Observations | 31 |

ANOVA

| | *df* |
|---|---|
| Regression | 1 |
| Residual | 29 |
| Total | 30 |

| | *Coefficients* |
|---|---|
| Intercept | 47052.86687 |
| I-140 Fees | 118.9847931 |

**Table XX. Summary of Results for I-140 Regression Model**

| Variables | Model | |
|---|---|---|
| | | |
| Model Description | I-140 Filings and Fees from 1992-2022 | |
| Observations | 31 | |
| R Square | 0.292 | |
| Adjusted R Square | 0.267 | |
| Std. Error of the Estimate | 37597.371 | |
| Significance F | 0.002 | |
| Intercept Coefficient | 47052.867 | |
| | | |
| Dependent Variable | I-140 Receipts | |
| Independent Variable(s) | *Coefficients* | *P-value* |
| I-140 Fees | 118.985 | 0.002 |



**of Form I-140 Receipts and Fees from FY 1992 through FY 2022**

| SS | MS | F | Significance F |
|---|---|---|---|
| 16891239771 | 16891239771 | 11.94941283 | 0.001707437 |
| 40993307412 | 1413562325 | | |
| 57884547183 | | | |

| Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% |
|---|---|---|---|---|---|
| 17080.61297 | 2.754752827 | 0.010039462 | 12119.09091 | 81986.64283 | 12119.09091 |
| 34.42057946 | 3.456792274 | 0.001707437 | 48.58680373 | 189.3827825 | 48.58680373 |



| Upper 95.0% |
| --- |
| 81986.64283 |
| 189.3827825 |

## Form I-129, Petition for a Nonimmigrant Worker *Regression Model #1*

| | Dependent Variable/response variable (Y) | Independent/Explanatory/predictor Variable (X) |
|---|---|---|
| | **I-129 Receipts** | **I-129 Fees** |
| **2004** | 418,125 | $320 |
| **2005** | 371,421 | $320 |
| **2006** | 417,925 | $320 |
| **2007** | 433,635 | $320 |
| **2008** | 404,781 | $320 |
| **2009** | 347,987 | $320 |
| **2010** | 337,258 | $325 |
| **2011** | 353,185 | $325 |
| **2012** | 409,142 | $325 |
| **2013** | 404,500 | $325 |
| **2014** | 432,987 | $325 |
| **2015** | 483,643 | $325 |
| **2016** | 528,313 | $460 |
| **2017** | 530,812 | $460 |
| **2018** | 548,950 | $460 |
| **2019** | 551,840 | $460 |
| **2020** | 555,093 | $460 |
| **2021** | 531,848 | $460 |
| **2022** | 629,298 | $460 |



SUMMARY OUTPUT

| *Regression Statistics* | |
|---|---|
| Multiple R | 0.890175505 |
| R Square | 0.792412429 |
| Adjusted R Square | 0.780201396 |
| Standard Error | 39820.91038 |
| Observations | 19 |

ANOVA

| | *df* |
|---|---|
| Regression | 1 |
| Residual | 17 |
| Total | 18 |

| | *Coefficients* |
|---|---|
| Intercept | 43557.5361 |
| I-129 Fees | 1109.047929 |

**Scatter Plot of I-129 Receipts Volume and Fees from 2004 through 2022**



| SS | MS | F | Significance F |
|---|---|---|---|
| 102901385554 | 102901385554 | 64.89314963 | 0.000000332 |
| 26956983356 | 1585704903 | | |
| 129858368911 | | | |

| Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|
| 52179.95539 | 0.834756101 | 0.41543234 | -66532.54665 | 153647.6188 |
| 137.6736696 | 8.055628444 | 0.000000332 | 818.5818759 | 1399.513981 |

**Fees**

500

450

400

350

300

250

200

150

100

50

0

| Lower 95.0% | Upper 95.0% |
|---|---|
| -66532.54665 | 153647.6188 |
| 818.5818759 | 1399.513981 |

| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **H1B Receipts** | **Fees** |
| 2004 | 258,286 | $320 |
| 2005 | 223,802 | $320 |
| 2006 | 294,954 | $320 |
| 2007 | 312,725 | $320 |
| 2008 | 284,599 | $320 |
| 2009 | 245,389 | $320 |
| 2010 | 247,553 | $325 |
| 2011 | 267,815 | $325 |
| 2012 | 307,616 | $325 |
| 2013 | 299,177 | $325 |
| 2014 | 325,384 | $325 |
| 2015 | 368,150 | $325 |
| 2016 | 398,789 | $460 |
| 2017 | 403,119 | $460 |
| 2018 | 418,593 | $460 |
| 2019 | 420,559 | $460 |
| 2020 | 427,285 | $460 |
| 2021 | 398,281 | $460 |
| 2022 | 474,305 | $460 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.889 |
| R Square | 0.791 |
| Adjusted R Square | 0.779 |
| Standard Error | 35277.842 |
| Observations | 19 |

ANOVA

| | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 80086140527 | 80086140527.50 | 64.35071126 |
| Residual | 17 | 21156943915 | 1244526113 | |
| Total | 18 | 1.01243E+11 | | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | -29500.317 | 46226.87395 | -0.638163787 | 0.531870293 |

| Fees | 978.404 | 121.9668227 | 8.021889507 | 0.000000352 |



| Significance F |
| --- |
| 0.000000352 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
| --- | --- | --- | --- |
| -127030.4957 | 68029.86182 | -127030.496 | 68029.86182 |

721.0768729    1235.731878    721.076873    1235.731878



| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **H-2A Receipts** | **Fees** |
| 2004 | 2,993 | $320 |
| 2005 | 3,279 | $320 |
| 2006 | 5,027 | $320 |
| 2007 | 6,312 | $320 |
| 2008 | 7,110 | $320 |
| 2009 | 6,698 | $320 |
| 2010 | 5,431 | $325 |
| 2011 | 5,856 | $325 |
| 2012 | 6,787 | $325 |
| 2013 | 7,331 | $325 |
| 2014 | 8,223 | $325 |
| 2015 | 9,158 | $325 |
| 2016 | 10,248 | $460 |
| 2017 | 11,602 | $460 |
| 2018 | 13,444 | $460 |
| 2019 | 15,509 | $460 |
| 2020 | 17,012 | $460 |
| 2021 | 20,323 | $460 |
| 2022 | 24,370 | $460 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.840 |
| R Square | 0.706 |
| Adjusted R Square | 0.689 |
| Standard Error | 3269.133 |
| Observations | 19 |

ANOVA

| | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 436035297.1 | 436035297.1 | 40.79964898 |
| Residual | 17 | 181682936.9 | 10687231.58 | |
| Total | 18 | 617718234 | | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | -17112.725 | 4283.759978 | -3.994790859 | 0.000938 |

| Fees | 72.194 | 11.3024427 | 6.387460292 | 0.000007 |



| Significance F |
| --- |
| 0.00000675 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
| --- | --- | --- | --- |
| -26150.66874 | -8074.781671 | -26150.66874 | -8074.781671 |

48.34783426   96.03997361   48.34783426      96.03997361



| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **H-2B Receipts** | **Fees** |
| **2004** | **9,484** | $320 |
| **2005** | **11,235** | $320 |
| **2006** | **15,461** | $320 |
| **2007** | **13,707** | $320 |
| **2008** | **7,796** | $320 |
| **2009** | **5,921** | $320 |
| **2010** | **4,944** | $325 |
| **2011** | **4,706** | $325 |
| **2012** | **4,282** | $325 |
| **2013** | **4,717** | $325 |
| **2014** | **5,309** | $325 |
| **2015** | **5,412** | $325 |
| **2016** | **6,527** | $460 |
| **2017** | **6,112** | $460 |
| **2018** | **6,148** | $460 |
| **2019** | **7,460** | $460 |
| **2020** | **5,422** | $460 |
| **2021** | **9,160** | $460 |
| **2022** | **12,391** | $460 |



SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.04257976 |
| R Square | 0.00181 |
| Adjusted R Square | -0.057 |
| Standard Error | 3417.873 |
| Observations | 19 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 360707.6597 | 360707.7 | 0.030878 | 0.863 |
| Residual | 17 | 198591561 | 11681857 | | |
| Total | 18 | 198952268.6 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% |
|---|---|---|---|---|---|
| Intercept | 8469.257 | 4478.663702 | 1.891023 | 0.076 | -979.8969841 |
| Fees | -2.076 | 11.81668443 | -0.17572 | 0.863 | -27.00745534 |

### Scatter Plot of H-2B Receipts Volume and Fees from 2004 throu



| Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|
| 17918.41191 | -979.8969841 | 17918.41191 |
| 22.85459446 | -27.00745534 | 22.85459446 |



# Model #1

|       | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|-------|-----------------------:|------------------------------------:|
|       | **L Receipts**         | **Fees**                            |
| 2004  | 60,309                 | $320                                |
| 2005  | 56,007                 | $320                                |
| 2006  | 52,867                 | $320                                |
| 2007  | 44,184                 | $320                                |
| 2008  | 43,776                 | $320                                |
| 2009  | 43,275                 | $320                                |
| 2010  | 43,182                 | $325                                |
| 2011  | 43,077                 | $325                                |
| 2012  | 42,718                 | $325                                |
| 2013  | 42,715                 | $325                                |
| 2014  | 42,704                 | $325                                |
| 2015  | 42,694                 | $325                                |
| 2016  | 42,556                 | $460                                |
| 2017  | 42,261                 | $460                                |
| 2018  | 41,674                 | $460                                |
| 2019  | 41,480                 | $460                                |
| 2020  | 41,267                 | $460                                |
| 2021  | 41,250                 | $460                                |
| 2022  | 40,307                 | $460                                |

SUMMARY OUTPUT

| *Regression Statistics* |          |
|-------------------------|---------:|
| Multiple R              | 0.463    |
| R Square                | 0.214    |
| Adjusted R Square       | 0.168    |
| Standard Error          | 4973.423 |
| Observations            | 19       |

ANOVA

|            | *df* | *SS*        | *MS*        | *F*         |
|------------|-----:|------------:|------------:|------------:|
| Regression | 1    | 114665395.6 | 114665395.6 | 4.635765968 |
| Residual   | 17   | 420493989.2 | 24734940.54 |             |
| Total      | 18   | 535159384.7 |             |             |

|  | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | 58462.451 | 6517.003501 | 8.970756437 | 0.0000000742 |
| Fees | -37.022 | 17.19472123 | -2.153082898 | 0.046 |

## Model #2

|  | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
|  | **L Receipts** | **Fees** |
| **2004** | **60,309** | $320 |
| **2005** | **56,007** | $320 |
| **2006** | **52,867** | $320 |
| **2007** | **44,184** | $320 |
| **2008** | **43,776** | $320 |
| **2009** | **43,275** | $320 |
| **2010** | **43,182** | $325 |
| **2011** | **43,077** | $325 |
| **2012** | **42,718** | $325 |
| **2013** | **42,715** | $325 |
| **2014** | **42,704** | $325 |
| **2015** | **42,694** | $325 |
| **2016** | **42,556** | $460 |
| **2017** | **42,261** | $460 |
| **2018** | **41,674** | $460 |
| **2019** | **41,480** | $460 |
| **2020** | **41,267** | $460 |
| **2021** | **41,250** | $460 |
| **2022** | **40,307** | $460 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.114 |
| R Square | 0.013 |
| Adjusted R Square | -0.049 |
| Standard Error | 2269.894 |
| Observations | 18 |

ANOVA

|  | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 1085345.161 | 1085345.161 | 0.21064767 |

| | | | |
|---|---|---|---|
| Residual | 16 | 82438711.95 | 5152419.497 |
| Total | 17 | 83524057.11 | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | -1173.076 | 551.7318911 | -2.12617051 | 0.049 |
| Fees | 7.953 | 17.32738024 | 0.458963691 | 0.652 |



| *Significance F* |
| --- |
| 0.046 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|
| 44712.7756 | 72212.12661 | 44712.7756 | 72212.12661 |
| -73.29935092 | -0.743969517 | -73.29935092 | -0.74396952 |

|  | % change from prior year for Dependent Variable (Y) | % change from prior year for Independent/Explanatory Variable (X) |
|---|---|---|
|  | **L Receipts** | **Fees** |
| **2005** | -4,302 | $0 |
| **2006** | -3,140 | $0 |
| **2007** | -8,683 | $0 |
| **2008** | -408 | $0 |
| **2009** | -501 | $0 |
| **2010** | -93 | $5 |
| **2011** | -105 | $0 |
| **2012** | -359 | $0 |
| **2013** | -3 | $0 |
| **2014** | -11 | $0 |
| **2015** | -10 | $0 |
| **2016** | -138 | $135 |
| **2017** | -295 | $0 |
| **2018** | -587 | $0 |
| **2019** | -194 | $0 |
| **2020** | -213 | $0 |
| **2021** | -17 | $0 |
| **2022** | -943 | $0 |

| Significance F |
|---|
| 0.652 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|
| -2342.695436 | -3.456716633 | -2342.695436 | -3.45671663 |
| -28.7797668 | 44.68504359 | -28.7797668 | 44.68504359 |



## Model #1

|      | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|------|-----------|------|
|      | **O Receipts** | **Fees** |
| 2004 | 28,193 | $320 |
| 2005 | 26,509 | $320 |
| 2006 | 25,202 | $320 |
| 2007 | 24,291 | $320 |
| 2008 | 23,876 | $320 |
| 2009 | 22,303 | $320 |
| 2010 | 21,490 | $325 |
| 2011 | 20,674 | $325 |
| 2012 | 19,830 | $325 |
| 2013 | 18,814 | $325 |
| 2014 | 16,433 | $325 |
| 2015 | 13,896 | $325 |
| 2016 | 13,791 | $460 |
| 2017 | 13,551 | $460 |
| 2018 | 12,881 | $460 |
| 2019 | 12,305 | $460 |
| 2020 | 11,098 | $460 |
| 2021 | 9,488 | $460 |
| 2022 | 9,172 | $460 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.836 |
| R Square | 0.699 |
| Adjusted R Square | 0.681 |
| Standard Error | 3412.647 |
| Observations | 19 |

ANOVA

|            | df | SS | MS | F |
|------------|----|----|----|----|
| Regression | 1  | 459446270.2 | 459446270.2 | 39.45044583 |
| Residual   | 17 | 197984748.5 | 11646161.67 | |
| Total      | 18 | 657431018.6 | | |

|           | Coefficients | Standard Error | t Stat | P-value |
|-----------|--------------|----------------|--------|---------|
| Intercept | 45748.053 | 4471.816008 | 10.2303076 | 0.00000001 |
| Fees      | -74.107 | 11.79861721 | -6.280958989 | 0.00000829 |

# Model #2

| Dependent Variable (Y) | Independent/Explanatory Variable (X) | | |
|---|---|---|---|
| **O Receipts** | **Fees** | | |
| 28,193 | $320 | | 2005 |
| 26,509 | $320 | | 2006 |
| 25,202 | $320 | | 2007 |
| 24,291 | $320 | | 2008 |
| 23,876 | $320 | | 2009 |
| 22,303 | $320 | | 2010 |
| 21,490 | $325 | | 2011 |
| 20,674 | $325 | | 2012 |
| 19,830 | $325 | | 2013 |
| 18,814 | $325 | | 2014 |
| 16,433 | $325 | | 2015 |
| 13,896 | $325 | | 2016 |
| 13,791 | $460 | | 2017 |
| 13,551 | $460 | | 2018 |
| 12,881 | $460 | | 2019 |
| 12,305 | $460 | | 2020 |
| 11,098 | $460 | | 2021 |
| 9,488 | $460 | | 2022 |
| 9,172 | $460 | | |



| Significance F |
| --- |
| 0.00000829 |

| Lower 95% | Upper 95% | ower 95.0% | Jpper 95.0% |
| --- | --- | --- | --- |
| 36313.34621 | 55182.76036 | 36313.35 | 55182.76 |
| -98.99953719 | -49.21372443 | -98.9995 | -49.2137 |

| % change from prior year for Dependent Variable (Y) | % change from prior year for Independent/Explanatory Variable (X) |
|---|---|
| **O Receipts** | **Fees** |
| -1,684 | $0 |
| -1,307 | $0 |
| -911 | $0 |
| -415 | $0 |
| -1,573 | $0 |
| -813 | $5 |
| -816 | $0 |
| -844 | $0 |
| -1,016 | $0 |
| -2,381 | $0 |
| -2,537 | $0 |
| -105 | $135 |
| -240 | $0 |
| -670 | $0 |
| -576 | $0 |
| -1,207 | $0 |
| -1,610 | $0 |
| -316 | $0 |

SUMMARY OUTPUT for O Receipts

| Regression Statistics | |
|---|---|
| Multiple R | 0.348 |
| R Square | 0.121 |
| Adjusted R Square | 0.066 |
| Standard Error | 666.870 |
| Observations | 18 |

ANOVA

| | df |
|---|---|
| Regression | 1 |
| Residual | 16 |
| Total | 17 |

| | Coefficients |
|---|---|
| Intercept | -1115.506 |
| Fees | 7.558 |



| SS | MS | F | Significance F |
|---|---|---|---|
| 980261.5993 | 980261.6 | 2.20424118 | 0.157 |
| 7115458.012 | 444716.1 | | |
| 8095719.611 | | | |

| Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% |
|---|---|---|---|---|---|
| 162.0928727 | -6.88189 | 0.000004 | -1459.127043 | -771.8839637 | -1459.127043 |
| 5.090597234 | 1.484669 | 0.157 | -3.233733615 | 18.34943449 | -3.233733615 |



| Upper 95.0% |
|---|
| -771.8839637 |
| 18.34943449 |

## Model #1

| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **P Receipts** | **Fees** |
| **2004** | **13,114** | $320 |
| **2005** | **12,263** | $320 |
| **2006** | **12,190** | $320 |
| **2007** | **12,154** | $320 |
| **2008** | **11,705** | $320 |
| **2009** | **11,583** | $320 |
| **2010** | **11,507** | $325 |
| **2011** | **11,296** | $325 |
| **2012** | **11,227** | $325 |
| **2013** | **10,674** | $325 |
| **2014** | **10,648** | $325 |
| **2015** | **10,288** | $325 |
| **2016** | **10,270** | $460 |
| **2017** | **10,155** | $460 |
| **2018** | **9,113** | $460 |
| **2019** | **8,502** | $460 |
| **2020** | **7,705** | $460 |
| **2021** | **7,510** | $460 |
| **2022** | **7,204** | $460 |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.842 |
| R Square | 0.709 |
| Adjusted R Square | 0.692 |
| Standard Error | 962.682 |
| Observations | 19 |

ANOVA

| | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 38371697.81 | 38371697.81 | 41.40427708 |
| Residual | 17 | 15754866.62 | 926756.8598 | |
| Total | 18 | 54126564.42 | | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | 18471.044 | 1261.465634 | 14.64252652 | 0.0000000000454 |
| Fees | -21.416 | 3.328301099 | -6.434615535 | 0.00000617 |

# Model #2

Marginal effects tells us how a dependent variable (outcome) changes when a specific independe

| Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|
| **P Receipts** | **Fees** |
| 13,114 | $320 |
| 12,263 | $320 |
| 12,190 | $320 |
| 12,154 | $320 |
| 11,705 | $320 |
| 11,583 | $320 |
| 11,507 | $325 |
| 11,296 | $325 |
| 11,227 | $325 |
| 10,674 | $325 |
| 10,648 | $325 |
| 10,288 | $325 |
| 10,270 | $460 |
| 10,155 | $460 |
| 9,113 | $460 |
| 8,502 | $460 |
| 7,705 | $460 |
| 7,510 | $460 |
| 7,204 | $460 |

shows declining trend of receipts

| | % change from prior year for Dependent Variable (Y) | % change from prior year for Independent/Explanatory Variable (X) |
|---|---|---|
| | **P Receipts** | **Fees** |
| 2005 | -851 | $0 |
| 2006 | -73 | $0 |
| 2007 | -36 | $0 |

SUMMARY OUTPUT

*Regression :*

Multiple R

R Square

| | | | | |
|---|---|---|---|---|
| **2008** | -449 | $0 | | Adjusted R Square |
| **2009** | -122 | $0 | | Standard Error |
| **2010** | -76 | $5 | | Observations |
| **2011** | -211 | $0 | | |
| **2012** | -69 | $0 | | ANOVA |
| **2013** | -553 | $0 | | |
| **2014** | -26 | $0 | | Regression |
| **2015** | -360 | $0 | | Residual |
| **2016** | -18 | $135 | | Total |
| **2017** | -115 | $0 | | |
| **2018** | -1,042 | $0 | | |
| **2019** | -611 | $0 | | Intercept |
| **2020** | -797 | $0 | | Fees |
| **2021** | -195 | $0 | | |
| **2022** | -306 | $0 | | |



| | Significance F |
| --- | --- |
| | 0.00000617 |

| Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
| --- | --- | --- | --- |
| 15809.58416 | 21132.50385 | 15809.58416 | 21132.50385 |
| -28.43843946 | -14.39423645 | -28.43843946 | -14.39423645 |

nt variable (explanatory variable) changes.

SUMMARY OUTPUT for P

| Regression Statistics | |
|---|---|
| Multiple R | 0.250 |
| R Square | 0.062 |
| Adjusted R Square | 0.004 |
| Standard Error | 319.079 |
| Observations | 18 |

ANOVA

| | df | SS | MS |
|---|---|---|---|
| Regression | 1 | 108530.145 | 108530.145 |
| Residual | 16 | 1628977.855 | 101811.1159 |
| Total | 17 | 1737508 | |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 347.8928456 | 77.55683524 | 4.485650356 |
| Fees | -2.514794432 | 2.435706176 | -1.03247036 |

| Statistics | |
|---|---|
| 0.2499262 | |
| 0.062463105 | |

0.003867049
319.078542
18

| df | SS | MS | F | Significance F |
|---|---|---|---|---|
| 1 | 108530.145 | 108530.145 | 1.065995044 | 0.317206719 |
| 16 | 1628977.855 | 101811.1159 | | |
| 17 | 1737508 | | | |

| Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|
| -347.893 | 77.55683524 | -4.485650356 | 0.000 | -512.3059916 | -183.4796996 |
| 2.515 | 2.435706176 | 1.03247036 | 0.317 | -2.648671997 | 7.678260861 |



| F | Significance F |
|---|---|
| 1.065995044 | 0.317 |

| P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|
| 0.000374492 | 183.4796996 | 512.306 | 183.4796996 | 512.3059916 |
| 0.317206719 | -7.678260861 | 2.648672 | -7.67826086 | 2.648671997 |

| Lower 95.0% | Upper 95.0% |
|---|---|
| -512.3059916 | -183.4796996 |
| -2.648671997 | 7.678260861 |





$1

## Model #1

| | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
| | **Q Receipts** | **Fees** |
| **2004** | **384** | $320 |
| **2005** | **340** | $320 |
| **2006** | **309** | $320 |
| **2007** | **261** | $320 |
| **2008** | **260** | $320 |
| **2009** | **259** | $320 |
| **2010** | **223** | $325 |
| **2011** | **213** | $325 |
| **2012** | **206** | $325 |
| **2013** | **192** | $325 |
| **2014** | **188** | $325 |
| **2015** | **187** | $325 |
| **2016** | **183** | $460 |
| **2017** | **182** | $460 |
| **2018** | **180** | $460 |
| **2019** | **164** | $460 |
| **2020** | **153** | $460 |
| **2021** | **127** | $460 |
| **2022** | **54** | $460 |



SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.684 |
| R Square | 0.468 |
| Adjusted R Square | 0.437 |
| Standard Error | 57.253 |
| Observations | 19 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 48993.19245 | 48993.19 | 14.94666454 | 0.00124 |
| Residual | 17 | 55723.75491 | 3277.868 | | |
| Total | 18 | 104716.9474 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% |
|---|---|---|---|---|---|
| Intercept | 499.509 | 75.02193215 | 6.658176 | 0.00000404 | 341.226791 |
| Fees | -0.765 | 0.19794085 | -3.86609 | 0.001239624 | -1.182876151 |

# Model #2

|  | Dependent Variable (Y) | Independent/Explanatory Variable (X) |  |  |
|---|---|---|---|---|
|  | Q Receipts | Fees |  |  |
| 2004 | 384 | $320 |  | 2005 |
| 2005 | 340 | $320 |  | 2006 |
| 2006 | 309 | $320 |  | 2007 |
| 2007 | 261 | $320 |  | 2008 |
| 2008 | 260 | $320 |  | 2009 |
| 2009 | 259 | $320 |  | 2010 |
| 2010 | 223 | $325 |  | 2011 |
| 2011 | 213 | $325 |  | 2012 |
| 2012 | 206 | $325 |  | 2013 |
| 2013 | 192 | $325 |  | 2014 |
| 2014 | 188 | $325 |  | 2015 |
| 2015 | 187 | $325 |  | 2016 |
| 2016 | 183 | $460 |  | 2017 |
| 2017 | 182 | $460 |  | 2018 |
| 2018 | 180 | $460 |  | 2019 |
| 2019 | 164 | $460 |  | 2020 |
| 2020 | 153 | $460 |  | 2021 |
| 2021 | 127 | $460 |  | 2022 |
| 2022 | 54 | $460 |  |  |

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.166 |
| R Square | 0.028 |
| Adjusted R Square | -0.033 |
| Standard Error | 20.939 |
| Observations | 18 |

ANOVA

|  | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 198.7154419 | 198.7154 | 0.453217121 | 0.510 |
| Residual | 16 | 7015.284558 | 438.4553 |  |  |
| Total | 17 | 7214 |  |  |  |

|  | Coefficients | Standard Error | t Stat | P-value | Lower 95% |
|---|---|---|---|---|---|
| Intercept | -19.170 | 5.08961738 | -3.76655 | 0.002 | -29.9597885 |
| Fees | 0.108 | 0.15984165 | 0.673214 | 0.510 | -0.23124152 |



| Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|
| 657.7916733 | 341.226791 | 657.7916733 |
| -0.347638775 | -1.182876151 | -0.347638775 |

| % change from prior year for Dependent Variable (Y) | % change from prior year for Independent/Explanatory Variable (X) |
|---|---|
| **Q Receipts** | **Fees** |
| -44 | $0 |
| -31 | $0 |
| -48 | $0 |
| -1 | $0 |
| -1 | $0 |
| -36 | $5 |
| -10 | $0 |
| -7 | $0 |
| -14 | $0 |
| -4 | $0 |
| -1 | $0 |
| -4 | $135 |
| -1 | $0 |
| -2 | $0 |
| -16 | $0 |
| -11 | $0 |
| -26 | $0 |
| -73 | $0 |

| Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|
| -8.380774789 | -29.9597885 | -8.380774789 |
| 0.4464568 | -0.23124152 | 0.4464568 |



AR_001393

|  | Dependent Variable (Y) | Independent/Explanatory Variable (X) |
|---|---|---|
|  | **R Receipts** | **Fees** |
| **2004** | 5,106 | $320 |
| **2005** | 4,996 | $320 |
| **2006** | 5,606 | $320 |
| **2007** | 4,249 | $320 |
| **2008** | 3,275 | $320 |
| **2009** | 5,968 | $320 |
| **2010** | 6,879 | $325 |
| **2011** | 7,310 | $325 |
| **2012** | 8,052 | $325 |
| **2013** | 8,151 | $325 |
| **2014** | 7,866 | $325 |
| **2015** | 8,515 | $325 |
| **2016** | 8,207 | $460 |
| **2017** | 8,366 | $460 |
| **2018** | 8,481 | $460 |
| **2019** | 8,909 | $460 |
| **2020** | 7,313 | $460 |
| **2021** | 6,755 | $460 |
| **2022** | 7,950 | $460 |



SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.528 |
| R Square | 0.279 |
| Adjusted R Square | 0.237 |
| Standard Error | 1423.670 |
| Observations | 19 |

ANOVA

|  | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 13349706.63 | 13349707 | 6.586476 | 0.02002 |
| Residual | 17 | 34456214.32 | 2026836 | | |
| Total | 18 | 47805920.95 | | | |

|  | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 2231.179 | 1865.528286 | 1.196004 | 0.248111 | -1704.741216 | 6167.1001 |
| Fees | 12.632 | 4.922084023 | 2.566413 | 0.02002 | 2.247410732 | 23.01679 |



**Scatter Plot of R Receipts Volume and Fees from 2004 through 2022**

| Lower 95.0% | Upper 95.0% |
|---|---|
| -1704.741216 | 6167.10006 |
| 2.247410732 | 23.01678983 |



## Estimation of FPG Threshold Effects using Census ACS data

Applicants for naturalization with <150%FPG or receiving a means-tested benefit (MTB) may request full N-400 fee waiver using Form I-912. An applicant for naturalization with 150-200%FPG may request partial (50%) N-400 fee waiver using Form I-942. Many applicants with incomes above 150%FPG receive MTBs.[1] Public comments on USCIS's proposed Fee Schedule asked USCIS to increase the FPG threshold.

Using Census Bureau-collected American Community Survey (ACS) samples of 1% of the US population conducted every year since 2000, USCIS examined all foreign-born ACS respondents (n=8,825,030) and data on their FPG percentile, naturalized or not, as well as data used to estimate family members' receipt of MTBs that might make them eligible for full fee waiver.[2]



Table: Estimating expansion factor using ACS 2000-2021 (unweighted)

|  |  | No predicted MTB | Predicted MTB |
|---|---|---|---|
| Not naturalized | 0-150%FPG | 918,035 | 609,568 |
|  | 151-400%FPG | 1,432,356 | 356,498 |
|  | >400%FPG | 1,160,314 | 85,676 |
| Naturalized | 0-150%FPG | 402,508 | 412,852 |
|  | 151-400%FPG | 1,245,751 | 329,645 |
|  | >400%FPG | 1,728,232 | 143,595 |



Chart: Share of FPGs who naturalized within last year, ACS 2011-2021 (perwt)

From the above table, we estimate expansion factor "η" as the ratio of the expanded eligible population to the population currently eligible for full fee exemption, based on FPG thresholds.

$$\eta = \frac{918{,}035 + 609{,}568 + 1{,}432{,}356 + 356{,}498 + 402{,}508 + 412{,}852 + 1{,}245{,}751 + 329{,}645}{918{,}035 + 609{,}568 + 356{,}498 + 402{,}508 + 412{,}852 + 329{,}645} = 1.8841$$

This expansion factor can be multiplied by the population of I-912 full fee waivers to estimate the expanded population. Using USCIS-known base of 137,880 full fee waivers, we may estimate that (1.88-1)*137,880= 121,903 N-400s (rounded to 125,000 to avoid false precision) will be made eligible for partial fee waivers for 200-400%FPG.[3]

One important contribution of the ACS data and expansion factor analysis is the knowledge that FPGs are bimodally distributed for naturalized, nonnaturalized, predicted MTB and no-MTB populations, with >500%FPG and lower FPGs being most common (see chart). From this, USCIS observes large increases in the percentage FPG threshold may result in modest expansion of fee waivers.

USCIS investigated other estimation approaches briefly outlined here.  Focusing on only naturalized respondents in the bottom half of the table yielded the highest η of 2.09; focusing on only unnaturalized respondents in the top half yielded lower η of 1.76; however, further analysis using only FPGs of ACS respondents naturalizing within the 12 months of the more recent surveys yielded estimates in line with 1.88. The 2.09 factor was influenced by older individuals who naturalized many years and even decades ago.

USCIS explored estimation approaches based on the population of I-942 partial fee waivers; however, this approach yielded inappropriately small expansion effects because USCIS receives only 4,000 partial fee waivers compared to 137,880 full fee waivers. As a practical matter, 150-200%FPG is a narrow range, just $7,290 for a single household. Young, newer immigrants' incomes may quickly move from below 150%FPG one year to above 200%FPG the next. By expanding the window, we may observe higher rates of partial fee waiver requests. FN1 and the chart above suggest three quarters of those eligible may be eligible for MTBs and thus prefer to file I-912 for a full waiver. Consequently, the estimator above, based on the known population of USCIS full fee waivers, is preferred.

---

[1] Using ACS person-weighted naturalizations reported in 2020, we estimate 105,764 of 137,714 (77%) with incomes between 150-200%FPG received an MTB and were eligible for complete fee waiver. Only 46% with incomes between 200-400%FPG and 14% with incomes above 400%FPG may have received a means-tested benefit.
[2] IPUMS USA, University of Minnesota, www.ipums.org (March 8, 2023 extract). The 1.88 estimate was subsequently discovered to have incorporated a 5% sample, effectively giving 2x weight to the most recent 5 years' observations. Dropping the 5% sample, n=6,870,185. Working with acsyear>2010, n=4,303,748.
[3] Actual I-942 partial fee waiver requests were backed out of USCIS Fee projections.

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208, 212, and 235**

[CIS No. 2692–21; DHS Docket No. USCIS–2021–0012]

**RIN 1615–AC67**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003, 1208, 1235, and 1240**

[A.G. Order No. 5369–2022]

**RIN 1125–AB20**

**Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** On August 20, 2021, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively "the Departments") published a notice of proposed rulemaking ("NPRM" or "proposed rule") that proposed amending regulations governing the procedures for determining certain protection claims and available parole procedures for individuals subject to expedited removal and found to have a credible fear of persecution or torture. After a careful review of the comments received, the Departments are now issuing an interim final rule ("rule" or "IFR") that responds to comments received in response to the NPRM and adopts the proposed rule with changes. Most significantly, the IFR provides that DHS's United States Citizenship and Immigration Services ("USCIS") will refer noncitizens whose applications are not granted to DOJ's Executive Office for Immigration Review ("EOIR") for streamlined removal proceedings. The IFR also establishes timelines for the consideration of applications for asylum and related protection by USCIS and, as needed, EOIR. This IFR responds to comments received in response to the NPRM and adopts the NPRM with changes as described in this rule. The Departments solicit further public comment on the IFR's revisions, which will be considered and addressed in a future rule.

**DATES:** *Effective Date:* This interim final rule is effective May 31, 2022.

*Submission of public comments:* Comments must be submitted on or before May 31, 2022. The electronic Federal Register Document Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on the entirety of this interim final rule package, identified by DHS Docket No. USCIS–2021–0012, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments also are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For USCIS:* Rená Cutlip-Mason, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009; telephone (240) 721–3000 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Executive Summary
  A. Background
  B. Legal Authority
  C. Changes in the IFR
  1. Revisions to the Proposed DHS Regulations
  2. Revisions to the Proposed DOJ Regulations
  D. Provisions of the IFR
  1. Credible Fear Screening Process
  2. Applications for Asylum
  3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
  4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
  5. Parole
  E. Summary of Costs and Benefits
  F. Effective Date
III. Discussion of the IFR
  A. Credible Fear Screening Process
  B. Applications for Asylum
  C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
  D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
  1. Schedule of Proceedings
  2. Pre-Hearing Procedures
  a. Merits Hearing(s)
  b. Evidentiary Standard
  3. Timeline for Proceedings
  4. Continuances and Filing Extensions
  5. Consideration of Statutory Withholding of Removal and CAT Protection
  6. Exceptions to Streamlined Procedures
  E. Other Amendments Related to Credible Fear
  F. Parole
  G. Putative Reliance Interests
IV. Response to Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. General Feedback on the Proposed Rule
  1. General Support for the Proposed Rule
  a. Immigration Policy Benefits
  b. Positive Impacts on Applicants, Their Support Systems, and the Economy
  2. General Opposition to the Proposed Rule
  a. Immigration Policy Concerns
  b. Negative Impacts on Applicants and Their Support Systems
  c. Negative Impacts on U.S. Citizens and the Economy
  d. Other General Opposition to the Proposed Rule
  C. Basis for the Proposed Rule
  1. DOJ and DHS Statutory/Legal Authority
  2. Need for the Proposed Rule/DOJ and DHS Rationale
  3. Prior Immigration Rulemakings
  D. Proposed Changes
  1. Applicability
  2. Parole
  a. General Comments on Parole
  b. Change in Circumstances Under Which Parole May Be Considered
  c. Availability of Employment Authorization for Those in Expedited Removal Who Have Been Paroled From Custody
  d. Other Comments on Proposed Approach to Parole
  3. Credible Fear Screening Process
  a. General Comments on Credible Fear Screening Process
  b. "Significant Possibility" Standard for Protection Claims
  c. Due Process in Credible Fear Screening
  d. Removal of Mandatory Bars From Consideration

e. Other Comments on the Proposed Credible Fear Screening Process
4. Applications for Asylum
a. Written Record of the Credible Fear Determination Created by USCIS, Together With the Service of the Credible Fear Determination, Treated as an Application for Asylum
b. Date Positive Credible Fear Determination Served as Date of Filing and Receipt
c. Inclusion of Applicant's Spouse and Children
d. Due Process in Asylum Applications
e. Other Comments on Proposed Provisions on Applications for Asylum
5. Adjudication of Applications for Asylum for Noncitizens With Credible Fear
a. DHS Interpretation of Statute in Creating a New Adjudication Process
b. Review of Asylum Claim by an Asylum Officer, Rather Than by an Immigration Judge, in Section 240 Removal Proceedings
c. Requirements for USCIS Asylum Merits Adjudication
d. Failure To Appear
e. Process for USCIS To Deny an Application for Asylum or Other Protection and Issue a Removal Order
f. Other Comments on Proposed Adjudication of Applications for Asylum
6. Application Review Proceedings Before an Immigration Judge
a. Creation of New Limited Proceedings in Lieu of Section 240 Removal Proceedings and Limitation on Relief to Asylum, Statutory Withholding of Removal, and Convention Against Torture Review Only
b. De Novo Review of Full Asylum Hearing Record and Consideration of Additional Testimony and Evidence
c. Immigration Judge's Discretion To Vacate Asylum Officer's Removal Order
d. Immigration Judge's Authority To Review All Asylum Officer Decisions
e. Appeal of Immigration Judge's Decision to the Board of Immigration Appeals
f. Other Comments on Proposed Application Review Proceedings before Immigration Judges
E. Other Issues Related to the Proposed Rulemaking
1. Public and Stakeholder Input
2. Severability
3. Discretion and Phased Implementation
a. Discretion
b. Phased Implementation
4. Comments on Immigration Court Inefficiencies and Bottlenecks
F. Statutory and Regulatory Requirements
1. Impacts and Benefits (E.O. 12866 and E.O. 13563)
a. Methodology
b. Population
c. Costs or Transfers
i. Impacts on the Credible Fear Asylum Population and Support Networks
ii. Impacts on U.S. Workers, Companies, Economy
iii. Impacts on Federal Government
iv. Other Comments on Costs or Transfers
d. Other Comments on Impacts and Benefits of the Proposed Rulemaking
2. Paperwork Reduction Act

3. Other Comments on Statutory and Regulatory Requirements
G. Comments Outside of the Scope of This Rulemaking
V. Statutory and Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
1. Summary of the Rule and Its Potential Impacts
2. Background and Purpose of the Rule
3. Population
4. Impacts of the Rule
a. Impacts to the Credible Fear Asylum Population
b. Impacts to USCIS
i. Total Quantified Estimated Costs of Regulatory Changes
ii. Intra-Federal Government Sector Impacts
c. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

## I. Public Participation

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this interim final rule by the deadline stated above. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this interim final rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the interim final rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the agency name and the DHS Docket No. USCIS–2021–0012 for this rulemaking. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or that is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2021–0012. You may also sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

## II. Executive Summary

### A. Background

On August 20, 2021, the Departments published an NPRM in the **Federal Register** proposing to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906 (Aug. 20, 2021).

The preamble discussion in the NPRM, including the detailed presentation of the need for reforming the system for processing asylum and related protection claims at the Southwest border, is generally adopted by reference in this IFR, except to the extent specifically noted in this IFR, or in the context of proposed regulatory text that is not contained in this IFR.

To reform and improve the process, the NPRM proposed revisions to 8 CFR parts 208, 235, 1003, 1208, and 1235. Those proposed revisions fell into five main categories. First, individuals subject to expedited removal and found to have a credible fear of persecution or torture would have their claims for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA" or "the Act") ("statutory withholding of removal"), or

Convention Against Torture ("CAT")[1] protection initially adjudicated by USCIS following a nonadversarial interview before an asylum officer. Second, individuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the CAT, as appropriate, without further adjudication. Third, individuals not granted protection would be ordered removed by the asylum officer but would have the ability to seek prompt, de novo review with an immigration judge ("IJ") in EOIR through a newly established procedure, with appeal available to the Board of Immigration Appeals ("BIA") and the Federal courts. Fourth, individuals placed in expedited removal framework would be eligible for consideration for parole from custody in accordance with section 212(d)(5) of the Act, if DHS determined, in the exercise of its discretion and on a case-by-case basis, that parole is warranted because, inter alia, detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities). Finally, the NPRM proposed to restore the expedited removal framework and credible fear screening processes that were in place before various regulatory changes made from late 2018 through late 2020. Specifically, the longstanding "significant possibility" screening standard would apply once more to all such protection claims arising from expedited removal proceedings initiated pursuant to section 235(b)(1) of the Act, and the mandatory bars to asylum and withholding of removal (with limited exception) would not apply at this initial screening stage.

The comment period for the NPRM opened on August 20, 2021, and closed on October 19, 2021, with 5,235 public comments received. The Departments summarize and respond to the public comments below in Section IV of this preamble.

*B. Legal Authority*

The Departments are publishing this IFR pursuant to their respective and joint authorities concerning asylum, statutory withholding of removal, and protection under the CAT. Section 235 of the INA provides that if an asylum officer determines that a noncitizen subject to expedited removal has a

credible fear of persecution, the noncitizen shall receive "further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). This IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur.

Section 208 of the INA authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen—including a noncitizen subject to expedited removal under section 235(b) of the INA—"who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section." INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); *see* INA 208(a)(1), 8 U.S.C. 1158(a)(1) (referencing asylum applications by noncitizens subject to expedited removal under section 235(b) of the INA, 8 U.S.C. 1225(b)); *see also* INA 208(d)(1), (d)(5)(B), 8 U.S.C. 1158(d)(1), (d)(5)(B) (further authorizing rulemaking concerning asylum applications).

These provisions of the INA reflect that the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. *See, e.g.,* HSA 101, 441, 451(b), 471, 1511(d)(2), 6 U.S.C. 111, 251, 271(b), 551(d)(2). By operation of the HSA, certain references to the "Attorney General" in the INA are understood to refer to the Secretary. HSA 1517, 6 U.S.C. 557. As amended by the HSA, the INA thus "charge[s]" the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and grants the Secretary the power to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary's authority thus includes the authority to publish regulations governing the apprehension, inspection and admission, detention and removal, withholding of removal, and release of noncitizens[2] encountered in the interior of the United States or at or between the U.S. ports of entry. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231. Certain

of the Secretary's authorities have been delegated within DHS to the Director of USCIS.[3] USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted. *See* 8 CFR 208.2(a), 208.9(a), 208.30.

In addition, under the HSA, the Attorney General retains authority to "establish such regulations . . ., issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his authorities under the INA. HSA 1102, INA 103(g)(2), 8 U.S.C. 1103(g)(2). The Attorney General also retains authority over certain individual immigration adjudications, including removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings," "section 240 proceedings," or "240 proceedings"), and certain adjudications related to asylum applications, conducted by IJs within DOJ's EOIR. *See* HSA 1101(a), 6 U.S.C. 521(a); INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within EOIR adjudicate asylum and withholding of removal applications filed by noncitizens during the pendency of section 240 removal proceedings, and IJs also adjudicate asylum applications referred by USCIS to the immigration court. 8 CFR 1208.2(b), 1240.1(a); *see* INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3).

The United States is a party to the 1967 United Nations Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention contains a qualified non-refoulement obligation to refrain from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T. at 6276. The United States implements its obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

[2] This rule uses the term "noncitizen" as equivalent to the statutory term "alien." *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).

[3] *See* DHS, *Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1* (June 5, 2003); *see also* 8 CFR 2.1, 208.2(a), 208.30.

provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where his or her life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.

The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681. In addition, FARRA includes the following policy statement: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." *Id.*, sec. 2242(a). DHS and DOJ have promulgated various regulations implementing U.S. obligations under Article 3 of the CAT, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through (f), 208.17, and 208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

Section 212 of the INA vests in the Secretary the discretionary authority to grant parole to applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit. INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Section 103 of the INA authorizes the Secretary to establish rules and regulations governing parole. INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

*C. Changes in the IFR*

After carefully reviewing the public comments received in response to the NPRM, this IFR makes 23 changes to the regulatory provisions proposed in the NPRM, many of which were recommended or prompted by commenters. The regulatory changes pertain to both the DHS and DOJ regulations. As also described below, procedurally, the Departments could issue a final rule. However, the Departments are publishing this IFR rather than proceeding to a final rule in order to provide the public with an additional opportunity to comment. Although not legally required, the additional opportunity to comment on the IFR's changes to the NPRM is

desirable given the new procedures and scheduling deadlines applicable to the IFR's streamlined EOIR process, the limited time between issuance of this IFR and when the first cases will be calendared for hearings, and the changes made to facilitate a shift from the proceedings proposed in the NPRM to the IFR's streamlined 240 proceedings. The Departments therefore solicit further public comment on the IFR's revisions, which will be considered and addressed in a final rule.

1. Revisions to the Proposed DHS Regulations

First, in new 8 CFR 208.30(g)(1)(i), this rule provides that USCIS may, in its discretion, reconsider a negative credible fear finding with which an IJ has concurred, provided such reconsideration is requested by the applicant or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS, however, will not accept more than one such request for reconsideration of a negative credible fear finding.

Second, this rule adds a new 8 CFR 208.4(b)(2) to clarify that noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum officer no later than 7 days prior to the scheduled asylum interview, or for documents submitted by mail, postmarked no later than 10 days prior to the interview. This rule further provides that, upon the asylum officer finding good cause in an exercise of USCIS discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in new 8 CFR 208.9(e)(2) and provided in new 8 CFR 208.4(b)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent a decision from being issued to the applicant within 60 days of service

of the positive credible fear determination.

Third, this rule provides in new 8 CFR 208.2(a)(1)(ii), 208.30(f), 1208.2, and 1208.30(g) that USCIS may further consider the asylum application of a noncitizen found to have a credible fear of persecution or torture through a nonadversarial merits interview conducted by an asylum officer when such application is retained by USCIS or referred to USCIS by an IJ after an IJ has vacated a negative credible fear determination. Such nonadversarial merits interviews are known as "Asylum Merits interviews" and are governed by the procedures in 8 CFR 208.9.

Fourth, this rule provides in new 8 CFR 208.9(b) that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule provides that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal in accordance with 8 CFR 208.16(b) or CAT protection pursuant to 8 CFR 208.16(c). *See* 8 CFR 208.16(a), (c). Even if the asylum officer determines that the applicant has established eligibility for statutory withholding of removal or protection under the CAT, the asylum officer shall proceed with referring the asylum application to the IJ for a hearing pursuant to 8 CFR 208.14(c)(1). *See* 8 CFR 208.16(a). If the asylum application includes a dependent (that is, a spouse or child who is in the United States and is included on the principal applicant's application as a dependent, *cf.* 8 CFR 208.30(a), 208.f(f)) who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b). If the asylum officer determines that there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for asylum, statutory withholding of removal, or protection under the CAT, the asylum officer shall inform the dependent of that determination. *See id.* USCIS also intends to inform dependents that they may request their own credible fear determination and

may separately file an asylum application if they choose to do so. If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2).

Fifth, this rule provides in 8 CFR 208.9(a)(1) that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen, subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1).

Sixth, this rule includes language from existing regulations, currently in effect, in 8 CFR 208.9(d), that was inadvertently not included in the NPRM's proposed regulatory text related to USCIS's discretion to limit the length of a statement or comment and require its submission in writing. *See* 8 CFR 208.9(d)(1).

Seventh, this rule removes language proposed in the NPRM in 8 CFR 208.9(f)(2) related to having the Asylum Merits record include verbatim audio or video recordings, and provides that the interview will be recorded and a verbatim transcript of the interview shall be included in the record. *See* 8 CFR 208.9(f)(2).

Eighth, this rule clarifies in 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of employment authorization pursuant to 8 CFR 208.7. The rule continues to provide that, for asylum applications retained by USCIS for further consideration, if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the Asylum Merits interview. *See* 8 CFR 208.9(g)(2).

Ninth, although the NPRM proposed to amend 8 CFR 208.10(a) to provide that, for noncitizens whose cases are retained by USCIS for further consideration of their asylum application after a positive credible fear determination, failure of a noncitizen to appear for an Asylum Merits interview might result in the issuance of an order of removal, no changes to 8 CFR

208.10(a) are being made in this IFR. Failure to appear may result in referral of the noncitizen to section 240 removal proceedings before an IJ as well as dismissal of the asylum application. *See* 8 CFR 208.10(a).

Tenth, in 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), this rule establishes the regulatory authority for consideration for parole of noncitizens in expedited removal or in expedited removal with pending credible fear determinations consistent with the current regulation at 8 CFR 212.5(b).

Eleventh, the rule includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b).

Twelfth, in 8 CFR 235.3(c)(2), this rule includes a technical amendment to establish the regulatory authority for consideration for parole of noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination consistent with the current regulation at 8 CFR 212.5(b).

Thirteenth, the IFR includes edits to 8 CFR 208.14 and 8 CFR 1208.14 to emphasize that asylum officers' decisions on approval, denial, referral, or dismissal of an asylum application remain subject to review within USCIS, and an edit to 8 CFR 208.14(c)(1) to make clear that an asylum applicant described in 8 CFR 208.14(c)(4)(ii)(A), if not granted asylum, may first be placed into expedited removal and receive a positive credible fear screening before being referred to an IJ.

## 2. Revisions to the Proposed DOJ Regulations

In the fourteenth change from the NPRM, this rule neither adopts the NPRM's proposal to create a new IJ review process when USCIS does not grant asylum nor requires the applicant to affirmatively request such review. Instead, this rule requires DHS to refer noncitizens whose applications for asylum are not granted to section 240 removal proceedings by issuing a Notice to Appear ("NTA"). However, this rule adds 8 CFR 1240.17 to DOJ's regulations, which will impose streamlining measures to enable such proceedings to be completed more expeditiously than ordinary section 240 proceedings involving cases that originate from the credible fear process. The rules and procedures that apply during all section 240 proceedings will generally apply to cases governed by the new 8 CFR 1240.17, but the rule's additional procedural requirements will further ensure efficient adjudication while preserving fairness.

Fifteenth, this rule does not adopt the NPRM's proposed evidentiary limitations, which would have required the noncitizen to demonstrate that any additional evidence or testimony to be considered by the IJ was not duplicative of that considered by the asylum officer and was necessary to fully develop the record. Instead, with the exception of time limits, the long-standing evidentiary standards for section 240 removal proceedings will apply as provided in new 8 CFR 1240.17(g)(1). To ensure expeditious adjudication, this rule imposes deadlines for the submission of evidence as specified in new 8 CFR 1240.17(f). In general, new 8 CFR 1240.17(f)(2) requires the respondent to submit any additional documentary evidence by the time of the status conference which, under new 8 CFR 1240.17(f)(1), is held 30 days, or the next available date no later than 35 days, after the master calendar hearing unless a continuance or a filing extension is granted. Under new 8 CFR 1240.17(f)(3)(i), DHS must file any documents 15 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 15 days following the status conference. New 8 CFR 1240.17(f)(3)(ii) allows the respondent to submit a supplemental filing replying to DHS and identifying any additional witnesses or documentation 5 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 25 days following the status conference. These deadlines may be extended in accordance with the continuances and extension provisions in new 8 CFR 1240.17(h), and an IJ may otherwise accept late-filed evidence pursuant to new 8 CFR 1240.17(g)(2) under certain circumstances, including if required to do so under statute or the Constitution.

Sixteenth, the rule provides that streamlined section 240 removal proceedings for cases covered by the new 8 CFR 1240.17, where the USCIS Asylum Merits interview record is transmitted to EOIR for review, will generally be adjudicated under an expedited timeline. The master calendar hearing will occur 30 to 35 days after DHS commences proceedings as provided in new 8 CFR 1240.17(b) and (f)(1). Any merits hearing will be held 60 days after the master calendar hearing, or on the next available date no later than 65 days after the master calendar hearing, *see* 8 CFR 1240.17(f)(2), subject to continuance and filing extension requests as outlined in new 8 CFR 1240.17(h). This rule also imposes time limits for an IJ to issue a decision as provided in new 8 CFR

1240.17(f)(5). To ensure expeditious adjudication, this rule adopts the NPRM's requirement that USCIS must file the complete record of proceedings for the Asylum Merits interview, including the transcript and decision, with the immigration court and serve it on the respondent pursuant to new 8 CFR 1240.17(c). Additionally, as in the NPRM, this rule does not require the respondent to complete and file a new asylum application, but instead provides that the record of the positive credible determination shall be treated as satisfying the application filing requirements subject to any supplementation or amendment, and shall further be deemed to satisfy EOIR's application filing requirements for any spouse or child included in the cases referred by USCIS and who has not separately filed an asylum application that was adjudicated by USCIS, as provided in new 8 CFR 1208.3(a)(2). *See* 8 CFR 1240.17(e).

Seventeenth, to prepare cases for expeditious adjudication, this rule requires IJs to hold status conferences to take place 30 days after the master calendar hearing, or if a hearing cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, as outlined in new 8 CFR 1240.17(f)(2). This rule requires both parties to participate at the status conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. At a minimum, as required by new 8 CFR 1240.17(f)(2)(i)(A), if the respondent will contest removal or seek any protection(s) for which the asylum officer did not determine the respondent eligible, the respondent shall indicate whether the respondent intends to testify, present any witnesses, or offer additional documentation. If a respondent thereafter obtains legal representation, nothing in the IFR prohibits respondent's counsel from supplementing statements or submissions made by the respondent during the status conference so long as there is no delay to the merits hearing or a filing deadline or, if the case will be delayed, the respondent satisfies the IFR's provisions governing continuances and filing extensions. Under new 8 CFR 1240.17(f)(2)(ii) and (f)(3), if DHS will participate in the case, DHS shall, at the status conference or in a written statement filed no later than 15 days prior to the scheduled merits hearing (or if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference), set forth its position on the respondent's

application and identify contested issues of law or fact, among other things. Where DHS has elected to participate in the case but does not timely provide its position as required under paragraph (f)(2)(ii), the IJ has authority pursuant to new 8 CFR 1240.17(f)(3)(i) to deem claims or arguments previously advanced by the respondent unopposed, subject to certain exceptions. The purpose of the status conference and these procedural requirements is to identify and narrow the issues and ready the case for a merits hearing.

Eighteenth, under new 8 CFR 1240.17(f)(2)(i)(B), a respondent may choose to concede removability and not seek asylum, in which case the IJ will issue an order of removal and deny asylum, but the IJ shall, with a limited exception, give effect to a determination by an asylum officer that the respondent is eligible for statutory withholding of removal or protection under the CAT. DHS may not appeal a grant of statutory withholding of removal or protection under the CAT in this context to the BIA except to argue that the IJ should have denied the application(s) based on certain evidence, as provided in new 8 CFR 1240.17(i)(2).

Nineteenth, new 8 CFR 1240.17(h) establishes standards for continuances during these streamlined section 240 removal proceedings. The rule adopts a "good cause" standard for respondent-requested continuances or filing extensions that would delay any merits hearing up to certain limits as detailed in new 8 CFR 1240.17(h)(2)(i). Any such continuance or extension generally shall not exceed 10 days. When the respondent has received continuances or filing extensions that cause a merits hearing to occur more than 90 days after the master calendar hearing, the rule requires the respondent to meet a heightened standard for further continuances or extensions as provided in new 8 CFR 1240.17(h)(2)(ii). Pursuant to new 8 CFR 1240.17(h)(2)(iii), any further continuances or extensions requested by the respondent that would cause a merits hearing to occur more than 135 days after the master calendar hearing may be granted only if the respondent demonstrates that failure to grant the continuance or extension would be contrary to statute or the Constitution. DHS may receive continuances or extensions based on significant Government need, as outlined in new 8 CFR 1240.17(h)(3), which will not count against the limits on respondent-requested continuances. Further, as provided in new 8 CFR 1240.17(h)(2)(iv) and (h)(4), any delay due to exigent circumstances shall not

count toward the limits on continuances or extensions.

Twentieth, new 8 CFR 1240.17(f)(4)(i) and (ii) provide that in certain circumstances the IJ may decide the respondent's application without holding a merits hearing, including where neither party has elected to provide testimony and DHS has declined to cross-examine the respondent or where the IJ intends to grant the application and DHS has not elected to examine the respondent or present evidence or witnesses. Under these provisions, the IJ shall still hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record.

Twenty-first, new 8 CFR 1240.17(i)(2) provides that, where the asylum officer does not grant asylum but determines the respondent is eligible for statutory withholding of removal or CAT relief, and where the IJ subsequently denies asylum and issues a removal order, the IJ shall generally give effect to the asylum officer's determination(s). In such circumstances, the IJ shall issue a removal order, but the IJ shall give effect to the asylum officer's determination by granting statutory withholding of removal or protection under the CAT unless DHS presents evidence or testimony that specifically pertains to the respondent, that was not in the record of proceedings for the USCIS Asylum Merits interview, and that demonstrates that the respondent is not eligible for the protection in question.

Twenty-second, this rule sets forth certain exceptions from the procedures and timelines summarized above. Under new 8 CFR 1240.17(k), such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member; the respondent has produced evidence demonstrating prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, voluntary departure, or CAT relief and the respondent is seeking to apply for, or has applied for, such relief or protection; the respondent has produced evidence supporting a prima facie showing that the respondent is not subject to removal, and the question of removability cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection; the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or

both in that alternative country or countries; the case is on remand or has been reopened following the IJ's order; or the respondent exhibits indicia of mental incompetency.

Finally, DOJ is making technical edits in 8 CFR 1003.42 to conform with changes to DHS regulations proposed in the NPRM and adopted in this rule related to the credible fear screening process in new 8 CFR 208.30(e).

*D. Provisions of the IFR*

The Departments carefully considered the 5,235 public comments received, and this IFR generally adopts the framework proposed in the NPRM with certain modifications as explained in this rule. This rule also relies on the justifications articulated in the NPRM, except as reflected in this preamble.

1. Credible Fear Screening Process

The Departments are generally returning to the regulatory framework governing the credible fear screening process in place before various regulatory changes were made from the end of 2018 through the end of 2020, which currently are not in effect.[4] As

[4] On November 9, 2018, the Departments issued an IFR that barred noncitizens who entered the United States in contravention of a covered presidential proclamation or order from eligibility for asylum, required that they receive a negative credible fear finding on their asylum claims, and required that their statutory withholding and CAT claims be considered under the higher reasonable fear screening standard. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55939, 55943 (Nov. 9, 2018) ("Presidential Proclamation Bar IFR"). A month later, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the IFR, *E. Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018), and the Ninth Circuit affirmed, *E. Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640, 680 (9th Cir. 2021).

On July 16, 2019, the Departments published another IFR, entitled "Asylum Eligibility and Procedural Modifications," 84 FR 33829 (July 16, 2019) ("Third Country Transit (TCT) Bar IFR"), which generally barred noncitizens from asylum eligibility if they entered or attempted to enter the United States across the Southwest border after failing to apply for protection from persecution or torture while in any one of the third countries through which they transited, required a negative credible fear finding for such noncitizens' asylum claims, and required their withholding and CAT claims be considered under the higher reasonable fear screening standard. *Id.* at 33837–38. The U.S. District Court for the District of Columbia vacated the TCT Bar IFR. *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25, 45–57 (D.D.C. 2020). The Departments issued a final rule on December 17, 2020, entitled "Asylum Eligibility and Procedural Modifications," 85 FR 82260 (Dec. 17, 2020) ("TCT Bar rule"), which again attempted to bar from asylum eligibility those noncitizens who transited through a third country before arriving at the border. The U.S. District Court for the Northern District of California subsequently issued a preliminary injunction against implementation of the TCT Bar rule, which remains in place as of this

provided in this IFR, DHS is amending 8 CFR 208.30(b) to return to providing that noncitizens subject to expedited removal who indicate an intention to apply for asylum, or who express a fear of persecution or torture, or a fear of return to the noncitizen's country, shall be screened by a USCIS asylum officer for a credible fear of persecution or torture (rather than a credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture). All references in 8 CFR 208.30 and 8 CFR 235.6 to a "credible fear of persecution, reasonable possibility of persecution, or a reasonable possibility of torture" are replaced with "credible fear of persecution or torture" or "credible fear."

DHS is further amending 8 CFR 208.30(b) to provide that the asylum officer to whom such a noncitizen is referred for a credible fear screening may, in USCIS's discretion and with supervisory concurrence, refer the noncitizen for proceedings under section 240 of the Act without making a credible fear determination.

DHS is amending 8 CFR 208.30(c) to provide for the inclusion of a noncitizen's concurrently arriving spouse or child in the noncitizen's positive credible fear evaluation and determination, unless the noncitizen declines such inclusion. Additionally, DHS is amending 8 CFR 208.30(c) to provide asylum officers with the discretion to include a noncitizen's other concurrently arriving family members in the noncitizen's positive credible fear evaluation and determination for purposes of family unity.

writing. *E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663, 668 (N.D. Cal. Feb. 2021).

Around the same time that the Departments issued the final TCT Bar rule, they also issued the final rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 FR 80274 (Dec. 11, 2020) ("Global Asylum rule"). That rule revised the credible fear screening process to require that all the mandatory bars to asylum and withholding be considered during the credible fear screening process and established a new screening standard for withholding of removal and CAT protection. On January 8, 2021, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the Global Asylum rule. *Pangea Legal Servs.* v. *DHS,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) ("*Pangea II*"). That preliminary injunction remains in place as of this writing.

Finally, the Departments also published a final rule entitled "Security Bars and Processing," 85 FR 84160 (Dec. 23, 2020) ("Security Bars rule"), which added an additional bar to asylum and withholding that would be applied to the credible fear screening process. The Departments have delayed the Security Bars rule's effective date to December 31, 2022, as the Departments consider possible action to rescind or revise the rule. *See* Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021).

DHS is amending 8 CFR 208.30(e) to return to defining "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the [asylum] officer, that the [noncitizen] can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." DHS is further amending 8 CFR 208.30(e) to return to defining "credible fear of torture" as "a significant possibility that the [noncitizen] is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to [8 CFR] 208.16 or [ ] 208.17."

Additionally, as provided in the NPRM, DHS is amending 8 CFR 208.30(e)(5) to return to the existing and two-decade-long practice of not applying at the credible fear screening the mandatory bars to applying for, or being granted, asylum that are contained in sections 208(a)(2)(B)–(D) and (b)(2) of the Act, including any bars established by regulation under section 208(b)(2)(C) of the Act, or bars to eligibility for statutory withholding of removal, with limited exceptions. DHS is maintaining the regulations related to the threshold screening under the safe third country agreement with Canada in 8 CFR 208.30(e)(6), but making technical edits to change "credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture" to "credible fear of persecution or torture" to align the terminology with the rest of this IFR. DHS will continue to require supervisory review of all credible fear determinations before they can become final. *See* 8 CFR 208.30(e)(8).

Consistent with the NPRM, this IFR amends 8 CFR 208.30(g) to return to providing that once an asylum officer has made a negative credible fear determination, if a noncitizen refuses or fails to either request or decline IJ review, such refusal or failure to make an indication will be considered a request for IJ review. In those instances, the noncitizen will be served with a Form I–863, Notice of Referral to Immigration Judge. If, upon review of an asylum officer's negative credible fear determination, the IJ finds the noncitizen possesses a credible fear of persecution or torture, the IJ shall vacate the Form I–860, Notice and Order of Expedited Removal, and remand the case to DHS for further consideration of the application for asylum. Alternatively, DHS may commence section 240 removal proceedings, during which the noncitizen may file an

application for asylum and withholding of removal. If the IJ concurs with the negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States.

In comparison to the NPRM, in this IFR, DHS is amending 8 CFR 208.30(g) to provide that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided such reconsideration is requested by the noncitizen or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first, and further provided that no previous request for consideration has already been made.[5] There is no change for noncitizens who do not elect to have their determination reviewed by an IJ. Any reconsideration request made prior to review by an IJ will be treated as an election for review by an IJ. See 8 CFR 208.30(g)(1).

2. Applications for Asylum

Under section 235(b)(1)(B)(ii) of the Act, noncitizens who receive a positive credible fear determination from a USCIS asylum officer are referred for "further consideration of the application for asylum." As provided in the NPRM, this rule establishes a new process by which such "further consideration" may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings. See 8 CFR 208.9(f).

In issuing both the NPRM and this IFR, the Departments concluded that the expedited removal process presented an opportunity for establishing a more efficient process for making protection determinations for those coming to our borders. The credible fear interview process creates a unique opportunity for the protection claim to be presented to a trained asylum officer and documented; that documentation can then initiate and facilitate a merits adjudication. Unlike those noncitizens who are placed directly into section 240 removal proceedings after apprehension at the border, noncitizens placed instead into expedited removal and who subsequently make a fear claim are referred to USCIS for an interview under oath. Rather than move noncitizens who

receive positive credible fear determinations directly into section 240 proceedings—which is what happens to noncitizens apprehended at the border who are not placed into expedited removal—the Departments have determined that it is appropriate to establish a more efficient process that includes the involvement of USCIS and the creation of a documented record of the noncitizen's protection claim during the credible fear screening process. By treating the record of the credible fear determination as an asylum application and by issuing a follow-up interview notice when the credible fear determination is served, USCIS will be able to promptly schedule and conduct an interview on the merits of the noncitizen's protection claims and issue a final decision. For those noncitizens not granted asylum by USCIS, the IFR's process will also create a more complete record of the principal applicant's protection claims, as well as those of their spouse or child included on the application and interviewed during the Asylum Merits interview. EOIR can then use the rationale of the USCIS determination in a streamlined section 240 removal proceeding. Consistent with the NPRM, DHS is amending 8 CFR 208.3 to address application and filing requirements for noncitizens over whom USCIS retains jurisdiction for further consideration of asylum applications pursuant to the Asylum Merits process established by this rule. DHS is amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the written record of a positive credible fear finding satisfies the asylum application filing requirements in 8 CFR 208.3(a)(1). DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(1) and (2), that noncitizens placed in the Asylum Merits process are subject neither to the general requirement in 8 CFR 208.3(a)(1) that asylum applicants file a Form I–589, Application for Asylum and for Withholding of Removal, nor to the benefit request submission requirements of 8 CFR 103.2.

Consistent with the NPRM, DHS is also amending 8 CFR 208.3(a) to provide that the written record of the positive credible fear determination shall be considered a complete asylum application for purposes of the one-year filing deadline at 8 CFR 208.4(a), requests for employment authorization based on a pending application for asylum under 8 CFR 208.7, and the completeness requirement at 8 CFR 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and

consequences in 8 CFR 208.3(c) upon signature at the Asylum Merits interview, as described in new 8 CFR 208.3(a)(2). DHS is amending 8 CFR 208.3(c)(3) to provide that receipt of a properly filed asylum application under 8 CFR 208.3(a) commences the period after which a noncitizen may file an application for employment authorization based on a pending asylum application. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the date that the positive credible fear determination is served on the noncitizen shall be considered the date of filing and receipt. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS and any subsequent immigration benefit.

DHS is amending current 8 CFR 208.4(c), rather than 8 CFR 208.3(a)(2) as provided in the NPRM, and redesignating it as 8 CFR 208.4(b), with certain modifications as compared to the NPRM, to provide the noncitizen the opportunity to subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, within a specified time frame (7 or 10 days, depending on the method of submission) prior to the scheduled Asylum Merits interview. DHS is further amending current 8 CFR 208.4(c) to provide, in new 8 CFR 208.4(b)(2), that, finding good cause in an exercise of USCIS's discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent an Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination, as described in new 8 CFR 208.9(e)(2).

---

[5] Reconsideration requests made by noncitizens of negative credible fear determinations already affirmed by an IJ are colloquially known as requests for reconsideration ("RFRs").

3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear

Under the framework in place prior to this rulemaking, if an asylum officer determined that a noncitizen subject to expedited removal had a credible fear of persecution or torture, DHS placed the noncitizen before an immigration court for adjudication of the noncitizen's claims by initiating section 240 removal proceedings. Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), however, authorizes a procedure for "further consideration of [an] application for asylum" that may commence outside of section 240 removal proceedings.

Consistent with the NPRM, DHS is amending 8 CFR 208.2(a) to provide that USCIS may take initial jurisdiction to further consider the application for asylum, in an Asylum Merits interview, of a noncitizen, other than a stowaway and a noncitizen physically present in or arriving in the Commonwealth of the Northern Mariana Islands ("CNMI"), found to have a credible fear of persecution or torture. DHS is amending 8 CFR 208.9(b) to provide that the purpose of the Asylum Merits interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. In comparison to the NPRM, DHS is further amending 8 CFR 208.9(b) to provide that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule further provides in 8 CFR 208.16(a) that, in the case of a noncitizen whose case is retained by or referred to USCIS for an Asylum Merits interview and whose asylum application is not approved, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or withholding or deferral of removal pursuant to the CAT under 8 CFR 208.16(c).

In comparison to the NPRM, DHS is amending 8 CFR 208.9(a) to provide that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the

noncitizen subject to the need to reschedule an interview due to exigent circumstances, as provided in new 8 CFR 208.9(a)(1). Consistent with the NPRM, DHS is amending 8 CFR 208.9 to specify the procedures for such interviews before an asylum officer. With limited exception, these amendments generally provide that the same procedures applicable to affirmative asylum interviews will also apply to interviews under this rule, such as the right to have counsel present, 8 CFR 208.9(b), at no expense to the Government.

In this IFR, DHS also includes language from existing regulations in 8 CFR 208.9(d) that was inadvertently not included in the NPRM's proposed regulatory text related to the USCIS's discretion to limit the length of a statement or comment and require its submission in writing. As was stated in the NPRM, DHS is amending 8 CFR 208.9(f) to provide, in new 8 CFR 208.9(f)(2), that for Asylum Merits interviews, a verbatim transcript of the interview will be included in the referral package to the immigration judge. However, DHS is removing the language proposed in the NPRM regarding the record also including a verbatim audio or video recording in new 8 CFR 208.9(f)(2). DHS believes that recording the interview in order to produce a verbatim transcript that will be included in the record is sufficient to meet the aims of the rule.[6]

DHS is amending 8 CFR 208.9(g) to provide, in new 8 CFR 208.9(g)(2), that if a noncitizen is unable to proceed effectively in English at an Asylum Merits interview, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. In comparison to the NPRM, this rule provides in new 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes eligibility for employment authorization.

In comparison to the revisions proposed in the NPRM, this IFR leaves existing 8 CFR 208.10 unchanged—thus providing that a noncitizen's failure to appear for an Asylum Merits interview may result in the referral of the application for consideration in section 240 removal proceedings before an IJ (as opposed to the issuance of an order of removal). *See* 8 CFR 208.10(a)(1).

In 8 CFR 208.14(b), USCIS continues to implement its authority to grant asylum in any case within its

jurisdiction. In comparison to the NPRM, DHS is amending 8 CFR 208.14(c) and 208.16(a) and (c) to provide that if an asylum officer conducting an Asylum Merits interview for further consideration of an asylum application after a positive credible fear determination does not grant asylum to an applicant, the asylum officer will determine whether the applicant is eligible for statutory withholding of removal or CAT protection. The asylum officer will not issue an order of removal as proposed in the NPRM, nor issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Instead, the asylum officer will refer the application—together with the appropriate charging document and written findings of, and the determination on, eligibility for statutory withholding of removal or CAT protection—to an IJ for adjudication in streamlined section 240 removal proceedings. *See* 8 CFR 208.14(c); 8 CFR 208.16(a), (b), (c)(4); 8 CFR 1208.14(c). The referral of the asylum application of a principal applicant to the IJ will also include any dependent of that principal applicant, as appropriate. *See* 8 CFR 208.3(a)(2), 208.14(c)(1). If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge

DOJ is adding 8 CFR 1240.17, which shall govern section 240 removal proceedings for respondents whose cases originate from the credible fear process and who have not been granted asylum after an initial adjudication by an asylum officer, pursuant to 8 CFR 208.14(c)(1). The general rules and procedures that govern all other removal proceedings under section 240 apply to removal proceedings covered by this

---

[6] The Departments may consider making available a process by which parties to EOIR proceedings under 8 CFR 1240.17 will be able to timely review, upon request, the recording of the USCIS Asylum Merits interview.

rule with certain exceptions designed to streamline the proceedings and account for the unique procedural posture of these cases.

Under new 8 CFR 1240.17(b), USCIS will issue an NTA to any noncitizen not granted asylum by USCIS after an Asylum Merits interview held pursuant to 8 CFR 208.2(a), with the master calendar hearing in these streamlined section 240 proceedings scheduled for 30 to 35 days after service of the NTA. Under new 8 CFR 1240.17(e), the record of the proceedings for the interview before the asylum officer and the asylum officer's decision shall be admitted as evidence and considered by the IJ. Moreover, this rule provides that a respondent is not required to separately prepare and file a Form I–589, Application for Asylum and for Withholding of Removal, and that the record of the positive credible fear determination satisfies the application filing requirements for the principal applicant as well as for any dependent included in the referral who did not separately file an asylum application that was adjudicated by USCIS. *See* 8 CFR 208.3(a), 1208.3(a), 1240.17(e). That is, any spouse or child included in the referral will be deemed to have satisfied EOIR's application filing requirements as a principal applicant.

The Departments have determined that it is appropriate for cases under this rule to proceed on a streamlined time frame before the IJ as claims will have been significantly developed and analyzed by USCIS before the IJ proceedings start, the record will be available for review by the IJ, and respondents will not be required to prepare and file an asylum application. Accordingly, the rule establishes timelines for certain hearings to occur as provided in new 8 CFR 1240.17(f)(1)– (4). As set forth in new 8 CFR 1240.17(h), the rule imposes limitations on the length of continuances and filing extensions that can be granted before a respondent must satisfy a heightened standard to receive additional continuances or filing extensions that have the effect of further delaying a hearing required under the rule. The rule also imposes certain procedural requirements and gives IJs additional tools designed to narrow the issues and ready the case for a merits hearing, if necessary. Under new 8 CFR 1240.17(f)(1) and (2), the rule requires the IJ to hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, and imposes obligations on both parties to participate

at the conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. If DHS indicates that it will participate in the case, DHS has an obligation under new 8 CFR 1240.17(f)(2)(ii) and (f)(3) to set forth its position on the respondent's application and identify contested issues of law or fact (including which elements, if any, of the respondent's claim(s) it is challenging), among other things. In certain circumstances, where DHS does not respond in a timely manner to the respondent's claims, the IJ has authority to deem those claims unopposed, as provided in new 8 CFR 1240.17(f)(3)(i). However, DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). Where DHS has indicated that it will not participate in a merits hearing, the rule allows DHS, in certain, limited instances, to retract this position prior to the merits hearing, as provided in new 8 CFR 1240.17(f)(2)(ii). The rule allows IJs to hold additional status conferences if the case is not ready for a merits hearing, as provided in new 8 CFR 1240.17(f)(2).

Under new 8 CFR 1240.17(f)(4), the IJ may forgo a merits hearing and decide the respondent's application on the documentary record (1) if neither party has requested to present testimony and DHS has indicated that it waives cross-examination, or (2) if the noncitizen has timely requested to present testimony, DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the application can be granted without further testimony. The rule preserves the IJ's ability to hold a merits hearing if the IJ decides that it is necessary to fulfill the IJ's duty to fully develop the record.

If the case cannot be decided on the documentary record, the new 8 CFR 1240.17(f)(2) requires the IJ to hold a merits hearing 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. At the merits hearing, the respondent may testify fully and offer any additional evidence that has been submitted in compliance with the time limits on evidentiary filings under the normal evidentiary standards that apply to 240 removal proceedings as provided in new 8 CFR 1240.17(f)(4)(iii)(A) and (g)(1). If the proceedings cannot be completed at the scheduled merits hearing, the IJ shall schedule any continued merits hearing as soon as possible but no later

than 30 days after the initial merits hearing except in case of a continuance or extension as provided in 8 CFR 1240.17(f)(4)(iii)(B). Under new 8 CFR 1240.17(f)(5), the IJ is required, wherever practicable, to issue an oral decision on the date of the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 30 days after the status conference. Where issuance of an oral decision on such date is not practicable, the IJ must issue an oral or written decision as soon as practicable, and in no case more than 45 days after the applicable date described in the preceding sentence. *See* 8 CFR 1240.17(f)(5).

Under new 8 CFR 1240.17(i)(2), if the IJ denies asylum but an asylum officer has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, then the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS demonstrates that evidence or testimony that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview establishes that the respondent is not eligible for such protection. Under new 8 CFR 1240.17(f)(2)(ii)(B), the rule similarly provides that where an asylum officer has declined to grant asylum but has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, the respondent may elect not to contest removal and not pursue a claim for asylum before the IJ but still receive statutory withholding of removal or CAT protection. In such a case, the rule provides that the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS makes a prima facie showing through evidence that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. Similarly, new 8 CFR 1240.17(d) further provides that an IJ must give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, even if the noncitizen is ordered removed in absentia, unless DHS makes a prima facie showing through evidence that specifically pertains to the

respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. In addition, new 8 CFR 1240.17(l) makes clear that DHS may, in keeping with existing regulations, seek to terminate such protection.[7]

Finally, the rule specifically exempts certain cases that cannot be expedited under the circumstances from the timelines and other expedited aspects of the streamlined 240 proceedings. *See* 8 CFR 1240.17(k). Such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member, 8 CFR 1240.17(k)(1); the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, protection under the CAT, and voluntary departure, and the respondent is seeking to apply for, or has applied for, such relief or protection, 8 CFR 1240.17(k)(2);[8] the respondent has produced evidence that supports a prima facie showing that the respondent is not removable and the IJ determines that the issue of whether the respondent is removable cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection, 8 CFR 1240.17(k)(3); the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or both in that alternative country or countries, 8 CFR 1240.17(k)(4); the case is on remand or has been reopened following the IJ's order, 8 CFR 1240.17(k)(5); or the respondent exhibits indicia of mental incompetency, 8 CFR 1240.17(k)(6). The provisions at 8 CFR 1240.17(f), (g), and (h), which pertain to the schedule of proceedings, to the consideration of evidence and testimony, and to continuances, adjournments, and filing

extensions, will not apply in such cases. The other provisions in 8 CFR 1240.17, however, will apply.

5. Parole

DHS is amending 8 CFR 235.3(b)(2)(iii) to permit parole of detained individuals whose inadmissibility is being considered in the expedited removal process, or who have been ordered removed under the expedited removal process, only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, which includes, as interpreted in longstanding regulations, *see* 8 CFR 212.5(b), circumstances in which continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. Similarly, DHS is amending 8 CFR 235.3(b)(4)(ii) to permit parole of detained individuals pending a credible fear interview and any review of an asylum officer's credible fear determination by an IJ only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. This rule further finalizes, as proposed, that such a grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under 8 CFR 274a.12(c)(11). *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). The IFR also includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b). Parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion; DHS also may impose reasonable conditions on parole such as periodic reporting to U.S. Immigration and Customs Enforcement ("ICE"). *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(d).[9]

Additionally, DHS is including in this rule a technical amendment to 8 CFR 235.3(c)(2) to provide that parole of noncitizens with positive credible fear determinations whose asylum applications are retained by USCIS for further consideration through the Asylum Merits process is permissible only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest,

provided that the noncitizen presents neither a security risk nor a risk of absconding. This technical amendment is necessary to clarify that the parole authority pertaining to noncitizens awaiting an Asylum Merits interview with USCIS under this rule will be consistent with 8 CFR 212.5, just as the parole authority pertaining to detained noncitizens subject to expedited removal who are placed in section 240 removal proceedings is consistent with 8 CFR 212.5. As noted above, parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion.

E. Summary of Costs and Benefits

The primary individuals and entities that this rule is expected to affect are: (1) Noncitizens who are placed into expedited removal and who receive a credible fear screening; (2) the support networks of asylum applicants who receive a positive credible fear determination; (3) USCIS; and (4) EOIR. The expected impacts to these individuals and entities and to others are detailed in Section V.B of this preamble. In brief, by reducing undue delays in the asylum adjudication system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness given that individuals who are eligible for asylum or other protection may receive that protection more promptly, while individuals who are ineligible may more promptly be ordered removed. In the Departments' judgment, these benefits—which are difficult or impossible to quantify—along with the benefits of the rule that are more amenable to quantification, amply justify the aggregate costs of the rule.

The rule's impact on affected noncitizens (and, in turn, on their support networks) may vary substantially from person to person depending on, among other things, whether the individual receives a positive credible fear determination and whether the individual's asylum claim is granted or not granted by USCIS. For example, some individuals may benefit more from an earlier grant of asylum because they may be able to enter the labor force sooner. And individuals who establish credible fear may benefit from cost savings associated with no longer having to file a Form I–589, Application for Asylum and for Withholding of Removal.

The Departments have estimated the human resource- and information-related expenditures required for USCIS to implement this rule. These estimates are developed along three population

---

[7] Nothing in this rule alters the existing regulatory provisions governing termination of withholding or deferral; these provisions apply to any noncitizen whose removal has been withheld or deferred, whether through the procedure established in this rule or otherwise. *See* 8 CFR 208.17(d), 208.24(f), 1208.17(d), 1208.24(f).

[8] The rule does not specify the particular type of evidence that must be produced in order to demonstrate prima facie eligibility for relief. Such evidence could include testimonial evidence as well as documentary evidence. The rule further does not require that a completed application for the relief at issue be filed with the immigration court.

[9] Noncitizens who are paroled are not considered to be "admitted" to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

bounds to account for possible variations in the number of credible fear screenings in future years. Implementation of the rule also is expected to reduce EOIR's workload, allowing EOIR to focus efforts on other priority work and to reduce the growth of its substantial current backlog. That expected reduction in workload would result from (1) cases in which USCIS grants asylum never reaching EOIR, resulting in a potential 15 percent reduction in EOIR's caseload originating from credible fear screening (assuming historic grant rates), and (2) many of the cases reaching EOIR being resolved with less investment of immigration court time and resources than they would have required if referred directly to EOIR in the first instance.

An important caveat to the Departments' estimates of the potential costs and benefits associated with this rule is that it will take time to fully implement the rule, as the Departments intend to take a phased approach to implementing the rule.

*F. Effective Date*

This IFR will be effective 60 days from the date of publication in the **Federal Register**.

This rule applies prospectively and only to adults and families who are placed in expedited removal proceedings and indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home country, after the rule's effective date. The rule does not apply to unaccompanied children, as they are statutorily exempt from expedited removal proceedings. *See* 8 U.S.C. 1232(a)(5)(D)(i) (providing that "any unaccompanied alien child" whom DHS seeks to remove "shall be . . . placed in removal proceedings under section 240" of the INA); *see also* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").[10] The rule also does not apply to individuals in the United States who are not apprehended at or near the border and subject to expedited removal.[11] Such individuals will

continue to have their asylum claims heard in section 240 removal proceedings in the first instance, or through an affirmative asylum application under section 208 of the INA, 8 U.S.C. 1158, if they have not yet been placed in immigration proceedings. The rule also does not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the CNMI who are determined to have a credible fear. Such individuals will continue to be referred to asylum-and-withholding-only proceedings before an IJ under 8 CFR 208.2(c).

**III. Discussion of the IFR**

The principal purpose of this IFR is to simultaneously increase the promptness, efficiency, and fairness of the process by which noncitizens who cross the border without appropriate documentation are either removed or, if eligible, granted protection. The IFR accomplishes this purpose both by instituting a new process for resolving the cases of noncitizens who have been found to have a credible fear of persecution or torture and by facilitating the use of expedited removal for more of those who are eligible, and especially for populations whose detention presents particular challenges. When individuals placed into the expedited removal process make a fear claim, they are referred to a USCIS asylum officer, who interviews them to determine whether they have a credible fear of persecution or torture. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 208.30. Under

procedures in place immediately prior to the effective date of this IFR, individuals who receive a positive credible fear determination are referred to an immigration court for section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal. *See* 8 CFR 208.30(f) (2018) (providing that if a noncitizen, other than a stowaway, "is found to have a credible fear of persecution or torture, the asylum officer will so inform the [noncitizen] and issue an NTA, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act"). As explained in the NPRM, it may take years before the individual's protection claim is first adjudicated by an IJ. This delay creates additional stress and uncertainty for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed, are unable to lawfully work until their asylum application has been granted or has remained pending for several months, and are unable to petition for qualified family members, some of whom may still be at risk of harm. Moreover, the ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim. Such additional entrants only further increase the backlog and lengthen the delays.

To respond to this problem, this rule at 8 CFR 208.2(a)(1)(ii) and 208.9 provides USCIS the authority to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination, and further provides that USCIS does so following a nonadversarial interview by an asylum officer. The rule also provides at 8 CFR 208.3(a)(2) that the record of a credible fear interview will serve as an asylum application for noncitizens whose cases are retained by or referred back to USCIS for adjudication after a positive credible fear determination, thereby allowing cases originating with a credible fear screening to be adjudicated substantially sooner. Both the Departments and the noncitizen can avoid the burden caused by delays associated with otherwise requiring the noncitizen to file a Form I–589, Application for Asylum and for Withholding of Removal. *See* Section IV.D.4.a of this preamble. By

---

[10] In lieu of being placed in section 240 removal proceedings, unaccompanied children from contiguous countries who meet special criteria may be permitted to withdraw their applications for admission and be voluntarily returned to their country of nationality or country of last habitual residence. *See* 8 U.S.C. 1232(a)(2).

[11] The former Immigration and Naturalization Service ("INS") initially implemented expedited removal processes only for certain noncitizens arriving at ports of entry. In 2002, DHS, by designation, expanded the application of expedited removal to certain noncitizens who (1) entered the United States by sea, either by boat or other means, (2) were not admitted or paroled into the United States, and (3) had not been continuously present in the United States for at least 2 years. Notice

Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 FR 68924 (Nov. 13, 2002). In 2004, DHS published an immediately effective notice in the **Federal Register** to expand the application of expedited removal to certain noncitizens encountered within 100 miles of the border and to noncitizens who entered the United States without inspection fewer than 14 days before they were encountered. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004). In 2019, DHS expanded the process to the full extent authorized by statute to reach certain noncitizens, not covered by prior designations, who entered the country without inspection less than two years before they were apprehended and who were encountered anywhere in the United States. Designating Aliens for Expedited Removal, 84 FR 35409 (July 23, 2019). President Biden has directed DHS to consider whether to modify, revoke, or rescind that 2019 expansion. Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 FR 8267, 8270–71 (Feb. 2, 2021). On March 21, 2022, DHS published a **Federal Register** Notice rescinding the 2019 designation. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 FR 16022 (Mar. 21, 2022).

**18090**   **Federal Register**/Vol. 87, No. 60/Tuesday, March 29, 2022/Rules and Regulations

authorizing USCIS to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination and by making it possible for this adjudication to be made promptly and independently of EOIR, the Departments predict that the rule will also help to stem the rapid growth of the EOIR caseload, described in greater detail in the NPRM. *See* 86 FR 46937. As for the noncitizen, this change reduces potential barriers to protection for eligible applicants by enabling asylum seekers to meet the statutory requirement to apply for asylum within one year of arrival, avoiding the risk of filing delays, and immediately beginning the waiting period of work authorization eligibility. *See id.* at 46916. Any spouse or child who arrived with the principal asylum applicant and is included as a dependent on the principal applicant's positive credible fear determination may make a separate claim for protection and submit their own principal asylum application to USCIS for consideration.

As noted in the NPRM, the current system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997. From 2018 through 2020, however, several attempts were made to change the credible fear screening process. Many of these attempts have been initially vacated or enjoined, and the implementation of others has been delayed pending consideration of whether they should be revised or rescinded.[12] The Global Asylum rule, which is enjoined, revised regulations to provide that noncitizens with positive credible fear determinations would be placed in asylum-and-withholding-only proceedings before an IJ. *See* 85 FR 80276. In the Global Asylum rule, the Departments explained their view that placing such noncitizens in asylum-and-withholding-only proceedings before an IJ would ''bring the proceedings in line with the statutory objective that the expedited removal process be streamlined and efficient,'' *id.*, and later noted that it would ''lessen the strain on the immigration courts by limiting the focus of such proceedings and thereby streamlining the process,'' *id.* at 80286. The Departments provided that these asylum-and-withholding-only proceedings would follow the same rules of procedure that apply in section 240 proceedings and that a noncitizen could appeal their case to the BIA and Federal circuit courts, as necessary. *See id.* at 80289. The Departments

acknowledged that IJs often adjudicate multiple forms of relief in a single removal proceeding, in addition to asylum, statutory withholding of removal, or CAT protection claims, and stated that those additional issues ''generally only serve to increase the length of the proceedings'' and that ''there may be rare scenarios in which [noncitizens] subject to expedited removal are eligible for a form of relief other than asylum.'' *Id.* In the Global Asylum rule, the Departments concluded that placing noncitizens with positive credible fear determinations into more limited asylum-and-withholding-only proceedings properly balanced the need to prevent noncitizens from being removed to countries where they may face persecution or torture with ensuring efficiency in the overall adjudication process. *See id.*

This rule offers another approach. It establishes a streamlined and simplified adjudication process for individuals encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of deciding protection claims in a more timely fashion while ensuring appropriate safeguards against error.[13] The rule authorizes USCIS to adjudicate in the first instance the asylum claims of individuals who receive positive credible fear determinations under the expedited removal framework in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). The procedures that USCIS asylum officers will use to adjudicate these claims will be nonadversarial, and the decisions will be made within time frames consistent with those established by Congress in section 208(d)(5)(A) of the INA, 8 U.S.C. 1158(d)(5)(A).[14]

The Departments believe that the approach in this rule, in contrast to the approach outlined in the Global Asylum rule, will allow for noncitizens' claims

to be heard more efficiently and fairly. As further explained in this rule, allowing noncitizens with positive credible fear determinations to have their asylum, statutory withholding, and CAT protection claims heard in a nonadversarial setting before an asylum officer capitalizes on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, saves investment of time and resources by EOIR and ICE. *See* Sections II.C. and IV.D.5 of this preamble. The extensive and well-rounded training that asylum officers receive is designed to enable them to conduct nonadversarial interviews in a fair and sensitive manner. This rule will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. If the asylum officer does not grant asylum following an Asylum Merits interview, the noncitizen will be referred to an IJ for streamlined section 240 removal proceedings, with a structure that provides for the prompt resolution of their claims and that allows the noncitizen to seek other forms of relief. If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. This will allow EOIR to consider all family members to have separately filed an asylum application once the family is placed into the streamlined section 240 removal proceedings.

This IFR will help more effectively achieve many of the goals outlined in the Global Asylum rule—including improving efficiency, streamlining the adjudication of asylum, statutory withholding of removal, and CAT protection claims, and lessening the strain on the immigration courts—albeit with a different approach. This rule helps meet the goal of lessening the strain on the immigration courts by having USCIS asylum officers adjudicate asylum claims in the first instance, rather than IJs. As explained further in this rule, the Departments anticipate that the number of cases USCIS refers to EOIR for adjudication will decrease. *See* Sections IV.F.1.a and V.B.4.b.ii of this preamble. In contrast to the Global Asylum rule, in this rule, the

---

[12] *See supra* note 4 (discussing recent regulations and their current status).

[13] Section 4(b)(i) of Executive Order 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, instructed the Secretary to review the procedures for individuals placed into expedited removal at or near the border and issue a report with recommendations ''for creating a more efficient and orderly process that facilitates timely adjudications [of asylum and protection claims] and adherence to standards of fairness and due process.'' 86 FR 8267, 8270 (Feb. 2, 2021).

[14] *See* INA 208(d)(5)(A)(ii)–(iii), 8 U.S.C. 1158(d)(5)(A)(ii)–(iii) (specifying that an initial interview or hearing on an asylum application should generally commence within 45 days after the filing of the application and that final administrative adjudication should generally be completed within 180 days after the filing of the application).

Departments are amending regulations to include several time frames for the adjudication process and particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer, while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims before an IJ. *See* Sections II.A.4 and III.D of this preamble. Accordingly, these changes better meet the Departments' goals of improving efficiency and streamlining the process. In addition, upon reconsideration, the Departments recognize that giving noncitizens the opportunity to seek other forms of relief within the context of streamlined section 240 removal proceedings helps reduce barriers to accessing other immigration benefits that may be available, and that the potential benefits to noncitizens of having such an opportunity outweigh efficiency concerns.

The Departments clarify that nothing in this rule is intended to displace DHS's (and, in particular, USCIS's) prosecutorial discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in ordinary section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See* 8 CFR 208.30(b), (f); *Matter of J–A–B– & I–J–V– A–*, 27 I&N Dec. 168, 171 (BIA 2017); *Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520, 523 (BIA 2011). Moreover, should any provision of the rule governing the USCIS process for cases covered by 8 CFR 208.2(a)(1)(ii) be enjoined or vacated, EOIR has the discretion to place into ordinary section 240 proceedings any case referred to EOIR under this section.

*A. Credible Fear Screening Process*

The credible fear screening regulations under this rulemaking generally recodify the current screening process, returning the regulatory language, in large part, to what was in place prior to the various regulatory changes made from the end of 2018 through the end of 2020. Noncitizens encountered at or near the border or ports of entry and determined to be inadmissible pursuant to INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), can be placed in expedited removal and provided a credible fear screening if they indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home countries. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C.

1225(b)(1)(A)(ii), (B); 8 CFR 235.3(b)(4), 1235.3(b)(4). Individuals claiming a fear or an intention to apply for protection are referred to USCIS asylum officers for an interview and consideration of their fear claims under the "significant possibility" standard, which presently applies to all relevant protection claims because the regulatory changes referenced above have been vacated or enjoined.[15]

The Departments are returning to codifying the historical practice of applying the "significant possibility" standard across all forms of protection screened in the credible fear process. This rule adopts the "significant possibility" standard for credible fear screening for purposes of asylum, statutory withholding of removal, and CAT protection. While the statutory text at INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), only defines "credible fear" for purposes of screening asylum claims, the Departments believe that the efficiency gained in screening the same or a closely related set of facts using the same legal standard at the same time is substantial and should not be overlooked. Moreover, the credible fear screening process is preliminary in nature; its objective is to sort out, without undue decision costs, which cases merit further consideration. *See generally* INA 235(b)(1)(B); 8 U.S.C. 1225(b)(1)(B). Efficiently using one standard of law at the preliminary step is consistent with that objective, even though the ultimate adjudication of a noncitizen's claim for each form of protection may require a distinct analysis.

The standard for establishing a credible fear of persecution under the INA requires "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under section 208" of the INA. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). While the "significant possibility" standard for the purpose of screening for asylum is established by statute, the statute does not specify a standard to be used in screening for statutory withholding of removal or CAT protection. In June 2020, the Departments proposed alternative standards for statutory withholding of removal and CAT protection. *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264,

36268 (June 15, 2020) ("Global Asylum NPRM"). Under that proposed rule, "asylum officers would consider whether [noncitizens] could establish a credible fear of persecution, a reasonable possibility of persecution, or a reasonable possibility of torture." *Id.* at 36269. In finalizing that rule, the Departments noted that in changing the standard of law for withholding of removal and deferral of removal, an individual's "screening burdens would become adequately analogous to the merits burdens, where the [individual's] burdens for statutory withholding of removal and protections under the CAT regulations are higher than the burden for asylum." Global Asylum rule, 85 FR 80277. However, pursuant to an Executive order and with the additional context of the court's injunction against the implementation of the Global Asylum rule in *Pangea II*,[16] the Departments have reviewed and reconsidered that rule. *See* Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 2, 2021) ("E.O. on Legal Immigration") (ordering review of existing regulations for consistency with the E.O. on Legal Immigration). In line with this review, the Departments have revisited the approach of having divergent standards applied during the credible fear screening and determined that keeping one standard in screening for asylum, statutory withholding, and CAT protection better promotes an efficient credible fear screening process.

In multiple rulemaking efforts, the Departments promulgated divergent standards for asylum and withholding of removal, along with variable standards for individuals barred from certain types of protection.[17] However, in working to create efficiencies within this process, as well as recognizing that the Departments have signaled their intention to either modify or rescind these rules,[18] adhering to the legal standard that was set by Congress in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v), is the logical

---

[15] *See supra* note 4 (discussing recent regulations and their current status).

[16] *See supra* note 4 (discussing recent regulations and their current status).

[17] *See supra* note 4 (describing the TCT Bar IFR, Presidential Proclamation Bar IFR, and Security Bars rule).

[18] *See* Executive Office of the President, Office of Management and Budget ("OMB"), Office of Information and Regulatory Affairs ("OIRA"), Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaHistory* (last visited Mar. 5, 2022) (select DHS or DOJ); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaMain* (last visited Mar. 5, 2022) (select DHS or DOJ).

choice. *See* 86 FR 46914. Upon reconsideration, the Departments believe that the varied legal standards created by different rulemakings, and enjoined or vacated by legal challenges, defeat their intended purpose, and complicate and extend the initial screening process provided for in INA section 235. Having asylum officers apply varied legal standards would generally lead to the need to elicit additional testimony from noncitizens at the time of the credible fear screening interview, which lengthens credible fear interviews and increases adjudication times. In the Departments' view, the delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection. For example, when the TCT Bar IFR was in effect,[19] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. This additional time spent developing the record when the higher reasonable fear standard applied decreased the efficiency of the screening interviews themselves and complicated the analysis asylum officers were required to perform, thus contributing to the overall lengthening of the entire process.

In the Global Asylum NPRM, the Departments stated that ''[r]aising the standards of proof to a 'reasonable possibility' for the screening of

[noncitizens] seeking statutory withholding of removal and CAT protection would allow the Departments to better screen out non-meritorious claims and focus limited resources on claims much more likely to be determined to be meritorious by an immigration judge.'' 85 FR 36271. However, based on the Departments' experience implementing divergent screening standards for asylum, statutory withholding of removal, and CAT protection while the TCT Bar IFR was in effect, no evidence has been identified that this approach resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its non-refoulement obligations.

The Departments also reasoned in the Global Asylum NPRM: ''Adopting a higher standard for statutory withholding and CAT screenings would not hinder the streamlined process envisioned for expedited removal. Asylum officers already receive extensive training and guidance on applying the 'reasonable possibility' standard in other contexts because they are determining whether a reasonable possibility of persecution or torture exists in reasonable fear determinations pursuant to 8 CFR 208.31. In some cases, asylum officers would need to spend additional time eliciting more detailed testimony from [noncitizens] to account for the higher standard of proof; however, the overall impact on the time asylum officers spend making screening determinations would be minimal.'' 85 FR 36271. However, the Departments have reconsidered these predictions, again based on the experience implementing divergent screening standards while the TCT Bar IFR was in effect. Beyond the additional time asylum officers themselves spent conducting these screening interviews, making determinations, and recording their assessments, supervisory asylum officers reviewing these cases spent additional time assessing whether the varying standards of proof were properly applied to the forms of relief for which asylum officers screened. This effort also required the additional investment of time and resources from Asylum Division headquarters, including training and quality assurance staff who had to develop and deliver guidance and trainings on the new process, monitor the work being conducted in the field to ensure compliance with regulations and administrative processes, and provide guidance to asylum officers and supervisory asylum officers on individual cases. Attorneys from the

USCIS Office of Chief Counsel had to spend time and resources reviewing and advising on training materials and guidance issued by the Asylum Division, as well as on individual cases on which legal advice was sought to ensure proper application of the divergent screening standards on various forms of relief. IJs reviewing negative determinations by asylum officers were also compelled to spend additional time ensuring the proper application of these screening standards, compared to the time spent reviewing determinations under a single standard in the status quo ante. The Departments failed to account in the relevant rulemakings for the necessity of expending these additional resources beyond time spent by asylum officers themselves making screening determinations.

The Departments also stated in the Global Asylum NPRM: ''The procedural aspects of making screening determinations regarding fear of persecution and of torture would remain largely the same. Moreover, using a higher standard of proof in the screening context for those seeking statutory withholding of removal or protection under the CAT regulations in the immigration courts allows the Departments to more efficiently and promptly distinguish between aliens whose claims are more likely or less likely to ultimately be meritorious.'' 85 FR 36271. However, for the reasons detailed above, the Departments' experience implementing divergent screening standards while the TCT Bar IFR was in effect demonstrated that these predictions of increased efficiency and promptness did not materialize, undermining congressional intent that the screening process in the expedited removal context operate nimbly and in a truly expedited manner.

In clarifying that the ''significant possibility'' standard applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will help ensure that the expedited removal process remains truly expedited, and will allow for asylum officers to adhere to a single legal standard in screening claims for protection from persecution and torture in the expedited removal process.

Similarly, through this rulemaking, the Departments are generally returning the regulatory text to codify the pre-2018, and current, practice of screening for eligibility for asylum and statutory withholding of removal while not applying most bars to asylum or withholding of removal in the credible

---

[19] The TCT Bar IFR went into effect on July 16, 2019, *see* 84 FR 33829, and was vacated on June 30, 2020, *see Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d at 45–57. The TCT Bar rule went into effect on January 19, 2021. *See* 85 FR 82260. However, it did not have an impact on credible fear processing. The TCT Bar rule did not directly make any amendments to the credible fear regulations at 8 CFR 208.30 and instead relied on changes to the credible fear regulations made by the Global Asylum rule in order to apply the TCT bar in credible fear. On January 8, 2021, the Global Asylum rule was preliminarily enjoined. *See Pangea II*, 512 F. Supp. 3d 966. As a result of the preliminary injunction in *Pangea II*, the amendments to 8 CFR 208.30 made by the Global Asylum rule were enjoined. Thus, the bar to asylum eligibility at 8 CFR 208.13(c)(4) established in the TCT Bar rule did not apply in credible fear while the Global Asylum rule remained enjoined. The TCT Bar rule itself was enjoined on February 16, 2021. *See E. Bay Sanctuary Covenant*, 519 F. Supp. 3d at 668. Therefore, only the TCT Bar IFR ever went into effect.

fear screening process. The Global Asylum rule, which has been enjoined, attempted to require the application of a significantly expanded list of mandatory bars during credible fear screenings and mandated a negative credible fear finding should any of the bars apply to the noncitizen at that initial stage. *See* 85 FR 80278; *supra* note 4. In the Global Asylum NPRM, the Departments justified this change by stating: ''From an administrative standpoint, it is pointless and inefficient to adjudicate claims for relief in section 240 proceedings when it is determined that an alien is subject to one or more of the mandatory bars to asylum or statutory withholding at the screening stage. Accordingly, applying those mandatory bars to aliens at the 'credible fear' screening stage would eliminate removal delays inherent in section 240 proceedings that serve no purpose and eliminate the waste of adjudicatory resources currently expended in vain.'' 85 FR 36272. However, upon reconsideration, the Departments have determined that, in most cases, the stated goal of promoting administrative efficiency can be better accomplished through the mechanisms established in this rulemaking rather than through applying mandatory bars at the credible fear screening stage. The Departments now believe that it is speculative whether, had the Global Asylum rule been implemented, a meaningful portion of the EOIR caseload might have been eliminated because some individuals who were found at the credible fear screening stage to be subject to a mandatory bar would not have been placed into section 240 proceedings. This is particularly true in light of the Global Asylum rule's preservation of a noncitizen's ability to request review of a negative credible fear determination (including the application of mandatory bars at the credible fear stage) by an IJ, as well as that rule's allowance for individuals found subject to a mandatory bar to asylum at the credible fear screen stage to nonetheless have their asylum claims considered by an IJ in asylum-and-withholding-only proceedings if they demonstrate a reasonable possibility of persecution or torture and are not subject to a bar to withholding of removal. Requiring asylum officers to broadly apply mandatory bars during credible fear screenings would have made these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious, and would further limit DHS's ability to use expedited removal

to an extent that is operationally advantageous.

Requiring asylum officers to broadly apply the mandatory bars at credible fear screening would increase credible fear interview and decision times because asylum officers would be expected to devote time to eliciting testimony, conducting analysis, and making decisions about all applicable bars. For example, when the TCT Bar IFR was in effect,[20] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. As another example, a ''particularly serious crime'' is not statutorily defined in detail, beyond an aggravated felony,[21] and offenses typically are designated as particularly serious crimes through case-by-case adjudication—the kind of fact-intensive inquiry requiring complex legal analysis that would be more appropriate in a full adjudication before an asylum officer or in section 240 proceedings with the availability of judicial review than in credible fear screenings.[22] Presently, asylum officers ask questions related to all mandatory bars to develop the record sufficiently and identify potential bars but, since mandatory bars are not currently being applied in the credible fear determination, the record does not need to be developed to the level of detail that would be necessary if the issue of a mandatory bar was outcome-determinative for the credible fear determination. If a mandatory bar were to become outcome determinative, it would be necessary to develop the

record sufficiently to make a decision about the mandatory bar such that, depending on the facts, the interview would go beyond its congressionally intended purpose as a screening for potential eligibility for asylum or related protection—and a fail-safe to minimize the risk of refoulement—and would instead become a decision on the relief or protection itself. The level of detailed testimony necessary in some cases to make such a decision would require asylum officers to spend significantly more time developing the record during the interview and conducting additional research following the interview.

IJs reviewing negative credible fear determinations where a mandatory bar was applied would, depending on the facts, similarly face a more complicated task, undermining the efficiency of that process as well. Applying a mandatory bar often involves a complex legal and factual inquiry. While asylum officers are trained to gather and analyze such information to determine the applicability of mandatory bars in affirmative asylum adjudications, they are currently instructed to assess whether certain bars may apply in the credible fear screening context. *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 42–43 (Feb. 13, 2017). The latter assessment is designed to identify any mandatory bar issues requiring further exploration for IJs and the ICE attorneys representing DHS in section 240 removal proceedings, *see* 6 U.S.C. 252(c), rather than to serve as a comprehensive analysis upon which a determination on the applicability of a bar may be based.[23] Because of the complexity of the inquiry required to develop a sufficient record upon which to base a decision to apply certain mandatory bars, such a decision is, in general and depending on the facts, most appropriately made in the context of a full merits interview or hearing, whether before an asylum officer or an IJ, and not in a screening context.

Furthermore, the Departments recognize that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process. In

---

[20] *See supra* note 19.

[21] *See* INA 208(b)(2)(A)(ii), (B)(i), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(i).

[22] *See Matter of Frentescu*, 18 I&N Dec. 244, 247 (BIA 1982) (setting out multi-factor test to determine whether a noncitizen has committed a particularly serious crime, including ''the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community''); *see also Matter of L–S–*, 22 I&N Dec. 645, 649 (BIA 1999) (en banc); *Matter of G–G–S–*, 26 I&N Dec. 339, 343–43 (BIA 2014) (''We have held that for an alien who has not been convicted of an aggravated felony or whose aggravated felony conviction did not result in an aggregate term of imprisonment of 5 years or more, it is necessary to examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction to determine whether the crime was particularly serious.'').

[23] *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 44 (Feb. 13, 2017) (''The officer must keep in mind that the applicability of these bars requires further evaluation that will take place in the full hearing before an immigration judge if the applicant otherwise has a credible fear of persecution or torture. In such cases, the officer should consult a supervisory officer follow procedures on 'flagging' such information for the hearing, and prepare the appropriate paperwork for a positive credible fear finding.'').

response to the Global Asylum NPRM, a commenter emphasized that each of the mandatory bars involves intensive legal analysis and asserted that requiring asylum officers to conduct this analysis during a screening interview would result in ''the return of many asylum seekers to harm's way.'' Global Asylum rule, 85 FR 80294. Another commenter expressed the concern that ''countless asylum-seekers could be erroneously knocked out of the process based on hasty decisions, misunderstandings, and limited information.'' *Id.* at 80295. Upon review and reconsideration, due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 removal proceedings provide.

In light of these concerns, the Departments have reconsidered their position stated in the preamble to the Global Asylum NPRM that any removal delays resulting from the need to fully consider the mandatory bars in section 240 proceedings ''serve no purpose'' and amount to ''adjudicatory resources currently expended in vain.'' 85 FR 36272. As stated above, the Departments now believe that in, many cases, especially when intensive fact-finding is required, the notion that consideration of mandatory bars at the credible fear screening stage would result in elimination of removal delays for individuals subject to the bars is speculative. Moreover, to the extent consideration of mandatory bars in section 240 proceedings does result in delays to removal, the Departments believe in light of the public comments cited above that such delays do serve important purposes—particularly in cases with complicated facts—namely, ensuring that the procedures and forum for determining the applicability of mandatory bars appropriately account for the complexity of the inquiry and afford noncitizens potentially subject to the mandatory bars a reasonable and fair opportunity to contest their applicability. Adjudicatory resources designed to ensure that noncitizens are not refouled to persecution due to the erroneous application of a mandatory bar are not expended in vain. Rather, the expenditure of such resources helps keep the Departments in compliance with Federal law and international treaty obligations.

Given the need to preserve the efficiencies Congress intended in

making credible fear screening part of the expedited removal process and to ensure procedural fairness for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar, the Departments have decided that the Global Asylum rule's broad-based application of mandatory bars at the credible fear screening stage should be rescinded.[24]

If an asylum officer determines that an individual does not have a credible fear of persecution or torture, the individual can request that an IJ review the asylum officer's negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g). The Departments also are re-codifying the treatment of a failure or refusal on the part of a noncitizen to request IJ review of a negative credible fear determination as a request for IJ review. *See* 8 CFR 208.30(g)(1), 1208.30(g)(2)(i). In the Global Asylum rule, the Departments amended regulations to treat a noncitizen's refusal to indicate whether they would like IJ review as declining IJ review. *See* 85 FR 80296. The Departments explained that treating refusals as requests for review serves to create unnecessary and undue burdens and that it is reasonable to require an individual to answer affirmatively when asked by an asylum officer if they would like IJ review. *See id.* In this rule, the Departments are reverting to the pre-existing regulations. Upon reconsideration, the Departments recognize that there may be numerous explanations for a noncitizen's refusal or failure to indicate whether they would like to seek IJ review—and indeed there will be cases in which a noncitizen wants review but fails to explicitly indicate it. The Departments now conclude that treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review. Treating such refusals or failures to elect review as requests for IJ review appropriately ensures that any noncitizen who may wish to pursue IJ

review (that is, any noncitizen who has not, in fact, declined IJ review) has the opportunity to do so. A noncitizen who genuinely wishes to decline review may of course withdraw the request for review before the IJ; in such a case, the IJ will return the noncitizen's case to DHS for execution of the expedited removal order. *See* 8 CFR 1208.30(g)(2).

In comparison to the NPRM, in this rule, the Departments are amending 8 CFR 208.30(g) to provide, in new 8 CFR 208.30(g)(1)(i), that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided the request for reconsideration is received from the noncitizen or their attorney or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS's reconsideration of any such request is discretionary. After an IJ has concurred with a negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States. Under no circumstances, however, will USCIS accept more than one request for reconsideration.

The Departments carefully considered the public comments received in response to the NPRM related to the proposal to foreclose any DHS reconsideration of negative credible fear determinations. Based on those comments, the Departments decided to retain the existing regulatory language related to DHS reconsideration, *see* 8 CFR 208.30(g), but to place reasonable procedural limits on the practice. Accordingly, the Departments are amending the regulation to include numerical and time limitations and clarify that DHS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred. These procedural limitations and clarifications are necessary to ensure that reconsideration requests to USCIS do not obstruct the streamlined process that Congress intended in creating expedited removal. These changes also are consistent with the statutory scheme of INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), under which it is the IJ review of the negative credible fear determination that serves as the check to ensure that noncitizens who have a credible fear of persecution or torture are not returned based on an erroneous screening determination by USCIS. The expedited removal statute and its implementing regulations generally prohibit any further administrative review or appeal of an IJ's decision made after review of a

---

[24] In addition to the proposed changes to the DOJ portions of the regulations in the NPRM related to the application of mandatory bars in the credible fear process, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). Both 8 CFR 1003.42 and 8 CFR 1208.30 relate to IJs' review of asylum officers' credible fear determinations, and the Departments intend for the regulations to be consistent with regard to the treatment of mandatory bars in the credible fear review process.

negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C); 8 CFR 1003.42(f)(2), 1208.30(g)(2)(iv)(A). Congress similarly has made clear its intent that expedited removal should remain a streamlined, efficient process by limiting judicial review of many determinations in expedited removal. *See* INA 242(a)(2)(A), (e), 8 U.S.C. 1252(a)(2)(A), (e). These statutory provisions limiting administrative and judicial review and directing expeditious determinations reflect clear congressional intent that expedited removal be a truly expedited process.

The numerical and time limitations promulgated in this rule are consistent with congressional intent and with the purpose of the current regulation allowing for such requests. The Departments believe that, over time, the general allowance for reconsideration by USCIS asylum offices came to be used beyond its original intended scope. Such requests have not used a formalized process, since there is currently no formal mechanism for noncitizens to request reconsideration of a negative credible fear determination before USCIS; instead, they are entertained on an informal, ad hoc basis whereby individuals contact USCIS asylum offices with their reconsideration requests after an IJ has affirmed the negative credible fear determination. This informal, ad hoc allowance for such requests, including multiple requests, has proven difficult to manage. To deal with these many requests, USCIS has had to devote time and resources that could more efficiently be used on initial credible fear and reasonable fear determinations, affirmative asylum cases, and now, Asylum Merits interviews with the present rule.

## B. Applications for Asylum

If the noncitizen is found to have a credible fear, this IFR changes the procedure as described above. Under this rule, rather than referring the individual to an IJ for an adversarial section 240 removal proceeding in the first instance, or, as provided for in a presently enjoined regulation, asylum-and-withholding-only proceedings before an IJ,[25] the individual's asylum application instead may be retained for further consideration by USCIS through a nonadversarial interview before an asylum officer. *See* 8 CFR 208.30(f). Similarly, if, upon review of an asylum officer's negative credible fear

determination, an IJ finds that an individual does have a credible fear of persecution or torture, the individual also can be referred back to USCIS for further consideration of the individual's asylum claim. *See* 8 CFR 1003.42, 1208.30(g). To eliminate delays between a positive credible fear determination and the filing of an application for asylum, the Departments are amending regulations to provide, in new 8 CFR 208.3(a)(2), that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, will be treated as an "application for asylum," with the date of service on the individual considered the date of filing. Every individual who receives a positive credible fear determination and whose case is retained by USCIS will be considered to have filed an application for asylum at the time the determination is served on them. The application will be considered filed or received as of the service date for purposes of the one-year filing deadline for asylum, *see* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the waiting period for eligibility to file for employment authorization based upon a pending asylum application, *see* 8 CFR 208.3(c)(3). The Departments are amending regulations to provide that this application for asylum will be considered a complete application for purposes of 8 CFR 208.4(a), 208.7, and 208.9(a) in order to qualify for an interview and adjudication, and will be subject to the other conditions and consequences provided for in 8 CFR 208.3(c) once the noncitizen signs the documentation under penalty of perjury and with notice of the consequences of filing a frivolous asylum application at the time of the Asylum Merits interview, as provided in new 8 CFR 208.3(a)(2).[26]

The Departments will implement these changes to the credible fear process by having the USCIS asylum officer conducting the credible fear interview advise the noncitizen of the consequences of filing a frivolous asylum application and capture the noncitizen's relevant information through testimony provided under oath. During the credible fear interview, as 8 CFR 208.30(d) already provides and will continue to provide under the IFR, the asylum officer will "elicit all relevant and useful information" for the credible fear determination, create a summary of the material facts presented by the noncitizen during the interview, review the summary with the noncitizen, and allow the noncitizen to correct any errors. The record created will contain the necessary biographical information and sufficient information related to the noncitizen's fear claim to be considered an application. As a matter of longstanding practice in processing families through credible fear screenings, the information captured by the asylum officer during the credible fear interview will contain information about the noncitizen's spouse and children, if any, including those who were not part of the credible fear determination—but under this rule only a spouse or child who was included in the credible fear determination pursuant to 8 CFR 208.30(c) or who has a pending asylum application with USCIS pursuant to 8 CFR 208.2(a)(1)(ii) can be included as a dependent on the request for asylum.[27] *See* 8 CFR 208.3(a)(2). Any spouse or child included as a dependent on the credible fear determination may request to file a separate asylum application as a

---

[25] *See* Global Asylum rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

[26] In addition, the Departments are amending 8 CFR 1208.3 and 1208.4 to account for changes made by this rule, including the provisions that will treat the record of the credible fear determination as an application for asylum in the circumstances addressed by the rule. The amendment at 8 CFR 1208.3(c)(3) affects language that was enacted in the rule entitled "Procedures for Asylum and Withholding of Removal," 85 FR 81698 (Dec. 16, 2020). The December 16, 2020, rulemaking made various changes to DOJ regulations, including 8 CFR 1208.3(c)(3). *Id.* at 81750–51. The December 16, 2020, rulemaking is preliminarily enjoined. *See* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *Exec. Office for Immigration Review*, No. 21–cv–56 (D.D.C. Jan. 14, 2021). This rule makes changes to the regulations only as necessary to effectuate its goals. The Departments anticipate that additional changes to the relevant regulations, including rescission of or revision to the language added by the preliminarily enjoined regulation, will be made through later rulemakings. *See* Executive Office of

the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=202110&RIN=1125-AB15* (last visited Feb. 28, 2022).

[27] While only a spouse or child included on the credible fear determination or who presently has an asylum application pending with USCIS after a positive credible fear determination can be included as a dependent on the subsequent asylum application under this process, the noncitizen granted asylum remains eligible to apply for accompanying or follow-to-join benefits for any qualified spouse or child not included on the asylum application, as provided for in 8 CFR 208.21. The Departments believe that it is procedurally impractical to attempt to include a spouse or child on the application when the spouse or child has not previously been placed into expedited removal and subsequently referred to USCIS after a positive credible fear determination. This is similar to the inability to include a spouse or child not in section 240 removal proceedings on the asylum application of a principal asylum applicant who is in such section 240 removal proceedings. Under such circumstances, there is no clear basis for issuing a final order of removal against such an individual spouse or child should the asylum application not be approved.

principal applicant with USCIS at any time while the principal's asylum application is pending with USCIS. *See* 8 CFR 208.3(a)(2). A copy of the principal applicant's application for asylum—the record of the credible fear determination, including the asylum officer's notes from the interview, the summary of material facts, and other materials upon which the determination was based—will be provided to the noncitizen at the time that the positive credible fear determination is served. *See* 8 CFR 208.30(f). As provided in new 8 CFR 208.4(b)(2), the noncitizen may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, up until 7 days prior to the scheduled Asylum Merits interview before a USCIS asylum officer, or for documents submitted by mail, postmarked no later than 10 days before the scheduled Asylum Merits interview. The asylum officer, finding good cause in an exercise of USCIS discretion, may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent the Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination. The Departments believe that such limitations are necessary to ensure that the process remains expeditious while maintaining fairness.

The information required to be gathered during the credible fear screening process is based on the noncitizen's own testimony under oath in response to questions from a trained USCIS asylum officer. Thus, the Departments believe that the screening would provide sufficient information upon which to ascertain the basis of the noncitizen's request for protection. Under this rule, noncitizens who receive a positive credible fear determination would have an asylum application on file with the Government within days of their credible fear screenings, thereby meeting the one-year asylum filing deadline, avoiding

the risk of filing delays, and expeditiously beginning the waiting period for employment authorization eligibility.

*C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear*

In this IFR, consistent with the NPRM, the Departments are amending regulations to authorize USCIS asylum officers to conduct Asylum Merits interviews for individuals whose cases are retained for further consideration by USCIS following a positive credible fear determination or returned to USCIS if an IJ vacates an asylum officer's negative credible fear finding.[28] The Departments carefully considered the comments received in response to the NPRM focused on timelines related to Asylum Merits interviews, and, in this IFR, are including regulatory language clarifying timelines for scheduling hearings and providing asylum decisions.

As provided in 8 CFR 208.9(a)(1), USCIS will not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination, unless the applicant requests in writing that an interview be scheduled sooner. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen—*i.e.,* the date the asylum application is considered filed, *see* 8 CFR 208.3(a)(2)—subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1). These timelines are consistent with the INA, which provides that, "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed." INA 208(d)(5)(A)(ii), 8 U.S.C. 1158(d)(5)(A)(ii).

The nonadversarial Asylum Merits interview process will provide several procedural safeguards, such as the following: (1) The applicant may have

counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence, 8 CFR 208.9(b); (2) the applicant or applicant's representative will have an opportunity to make a statement or comment on the evidence presented and the representative will also have the opportunity to ask follow-up questions of the applicant and any witness, 8 CFR 208.9(d)(1); (3) a verbatim transcript of the interview will be included in the referral package to the IJ, with a copy also provided to the noncitizen, 8 CFR 208.9(f)(2), 1240.17(c); (4) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes of eligibility for employment authorization, 8 CFR 208.9(g); and (5) the failure of a noncitizen to appear for an interview may result in the referral of the noncitizen to section 240 removal proceedings before an IJ, 8 CFR 208.10(a)(1)(iii), unless USCIS, in its own discretion, excuses the failure to appear, 8 CFR 208.10(b)(1). The Departments believe that these procedural safeguards will enhance efficiency and further the expeditious adjudication of noncitizens' asylum claims, while at the same time balancing due process and fairness concerns. The protection claims considered in Asylum Merits interviews will be adjudicated in a separate queue, apart from adjudications of affirmative asylum applications filed directly with USCIS.

Allowing the cases of individuals who receive a positive credible fear determination to remain with USCIS for the Asylum Merits interview, rather than initially referring the case to an IJ for an adversarial section 240 removal proceeding or, as provided for in a presently enjoined regulation, for an asylum-and-withholding-only proceeding,[29] will capitalize on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, save investment of time and resources by EOIR and ICE. It will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. The Asylum Merits interview process affords noncitizens a fair opportunity to present their claims. In addition, noncitizens

---

[28] In addition to the proposed changes to the DHS portion of the regulations in the NPRM, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). This edit is intended to ensure consistency with 8 CFR 1003.42 and the proposed edits to 8 CFR 1208.30(g)(2) so that both provisions properly direct that a case where an IJ vacates a negative credible fear finding will be referred back to USCIS as intended by both the NPRM and the IFR.

[29] *See* Global Asylum rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

who are not granted asylum will be referred to an immigration court for a streamlined section 240 removal proceeding, which means that an IJ will consider their asylum and, as necessary, statutory withholding and CAT protection claims. Overall, these ample procedural safeguards will ensure due process, respect human dignity, and promote equity.

Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), authorizes a procedure for "further consideration" of asylum applications that is separate from section 240 removal proceedings. As the Department of Justice recognized over two decades ago, "the statute is silent as to the procedures for those who . . . demonstrate a credible fear of persecution." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312, 10320 (Mar. 6, 1997) (interim rule). It "does not specify how or by whom this further consideration should be conducted." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997) (proposed rule).

By not specifying what "further consideration" entails, the statute leaves it to the Departments to determine. Under the familiar *Chevron* framework, it is well-settled that such "ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)); *see also Epic Sys. Corp.* v. *Lewis,* 138 S. Ct. 1612, 1629 (2018) (noting that *Chevron* rests on "the premise that a statutory ambiguity represents an implicit delegation to an agency to interpret a statute which it administers" (quotation marks and citation omitted)). An agency may exercise its delegated authority to plug the gap with any "reasonable interpretation" of the statute. *Chevron,* 467 U.S. at 844.

By its terms, the phrase "further consideration" is open-ended. The fact that Congress did not specify the nature of the proceedings for those found to have a credible fear, *see* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), contrasts starkly with two other provisions in the same section that expressly require or deny section 240 removal proceedings for certain other classes of noncitizens. In one provision, INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A), Congress provided that an applicant for admission who "is not

clearly and beyond a doubt entitled to be admitted" must be "detained for a proceeding under [INA 240]." And in another, INA 235(a)(2), 8 U.S.C. 1225(a)(2), Congress provided that "[i]n no case may a stowaway be considered . . . eligible for a hearing under [INA 240]." This shows that Congress knew how to specifically require or prohibit referral to a section 240 removal proceeding when it wanted to do so. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Salinas* v. *United States R.R. Ret. Bd.,* 141 S. Ct. 691, 698 (2021) (quotation marks and citation omitted).

The D.C. Circuit has "consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion." *Catawba Cnty., N.C.* v. *EPA,* 571 F.3d 20, 36 (D.C. Cir. 2009) (quotation marks and citation omitted). That Congress's silence in section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), permits the Departments discretion to establish procedures for "further consideration" is reinforced by the fact that the noncitizens whom DHS has elected to process using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A).

If, following an Asylum Merits interview described in this IFR, USCIS grants asylum, the individual may be allowed to remain in the United States indefinitely with the status of asylee and eventually may apply for lawful permanent residence. *See* INA 208(c)(1), 209(b), 8 U.S.C. 1158(c)(1), 1159(b). If asylum is not granted, the asylum officer will refer the application, together with the appropriate charging document and the record of the Asylum Merits interview, for adjudication in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 1240.17(a).

The Departments carefully considered the public comments received in response to the NPRM and reconsidered the proposals outlined in the NPRM related to having USCIS asylum officers make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders. *See* 86 FR 46917–19. In this IFR, DHS is amending 8 CFR 208.9(b) to

provide that, in the case of a noncitizen whose case is retained by or referred to USCIS for further consideration through an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal or CAT protection. This IFR further provides in 8 CFR 208.16(a) and (c) that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or CAT protection under 8 CFR 208.16(c). Asylum officers will not issue orders of removal to applicants who are not granted asylum as proposed in the NPRM, but rather will refer applicants who are not granted asylum to the immigration court for consideration of their protection claims in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 208.16(a). USCIS will not issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Rather, pursuant to new 8 CFR 1240.17(d), (f)(2)(i)(B), and (i)(2), if an asylum officer does not grant asylum but determines the noncitizen is eligible for statutory withholding of removal or CAT protection and the IJ does not grant asylum, the IJ will issue a removal order and, subject to certain exceptions, give effect to USCIS's determination.

If the asylum application includes a dependent who has not filed a separate application, the asylum officer will, as appropriate and prior to referring the family to streamlined section 240 proceedings before an IJ, elicit information sufficient to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2). This provision will allow any spouse or child in the streamlined procedure to exercise their right to seek protection on an independent basis without the need for delaying the proceedings to allow for the preparation and filing of an I–589, Application for Asylum and for Withholding of Removal. The

Departments have determined that these changes meet the goals of this rule, such as improving efficiency while allowing noncitizens to receive a full and fair opportunity to be heard, and are also responsive to commenters' concerns raised in response to the NPRM, as detailed in Sections IV.D.5 and 6 of this preamble. While USCIS will not make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders, it is appropriate for USCIS to make eligibility determinations regarding statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial Asylum Merits interview. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions, and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on the standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR 208.1(b).

While asylum officers will also not make final decisions regarding a dependent's eligibility for asylum, statutory withholding of removal, and CAT protection claims if the dependent has not received a prior separate positive credible fear determination or filed a separate principal asylum application with USCIS, it is appropriate for asylum officers to elicit sufficient information regarding each dependent's eligibility for protection in order to allow for those claims to be on the record and appropriately considered should the family be placed into streamlined section 240 removal proceedings. In many cases, the family members will likely substantially share the same set of operative facts that an asylum officer would have already elicited from the principal applicant, including through evidence and testimony, during the same

nonadversarial Asylum Merits interview. Accordingly, the additional questioning that will ordinarily be needed to develop the record enough to facilitate an IJ's adjudication of any claims through streamlined section 240 proceedings is expected to be modest. Moreover, any dependent who wishes to be adjudicated as a principal applicant by USCIS may file a separate application with USCIS prior to referral to removal proceedings.

Where a noncitizen's asylum application is not granted by USCIS, automatic referral to streamlined section 240 proceedings—as further discussed in Section III.D of this preamble—ensures that the application of the principal applicant and any family members may be reviewed by the IJ. In the streamlined section 240 proceedings, the IJ will adjudicate de novo the noncitizen's and any family members' applications for asylum and, if USCIS determined them ineligible for statutory withholding of removal or protection under the CAT, such claims as well. Statutory withholding of removal and CAT protection are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie* v. *Att'y Gen. United States,* 855 F.3d 509, 515–16 (3d Cir. 2017); *Benitez Ramos* v. *Holder,* 589 F.3d 426, 431 (7th Cir. 2009). Because an asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before generally giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C– S–,* 24 I&N Dec. 432, 433 (BIA 2008).

*D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge*

Upon careful consideration of the comments received in response to the NPRM, as discussed in Section IV of this preamble, this IFR does not adopt the IJ review proceedings proposed in the NPRM. *See* 86 FR 46946–47 (8 CFR 1003.48, 1208.2(c) (proposed)). Instead, the Departments will place noncitizens whose applications for asylum are not granted by USCIS, as well as any spouse or children included on the noncitizen's application, in section 240 proceedings that will be streamlined as provided in new 8 CFR 1240.17. *See* 8 CFR 1240.17(a), (b). As provided in new 8 CFR 1240.17(a), IJs must conduct these proceedings in accordance with the procedures and requirements set forth in section 208 of the Act, 8 U.S.C. 1158.

Currently, further consideration of an asylum application by an individual in

expedited removal is done through section 240 proceedings. *See, e.g.,* 8 CFR 208.30(f) (2020); [30] 8 CFR part 1240, subpart A (2020). Such proceedings follow issuance of an NTA, which informs the noncitizen of DHS's charges of inadmissibility or removability, INA 239(a)(1), 8 U.S.C. 1229(a)(1), and these proceedings provide an opportunity for the noncitizen to make his or her case to an IJ, INA 240(a)(1), 8 U.S.C. 1229a(a)(1). Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: The right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252.

Under the IFR, USCIS will have authority to adjudicate asylum claims brought by noncitizens subject to expedited removal and found to have a credible fear of persecution or torture rather than immediately referring such cases for adjudication by IJs in section 240 removal proceedings. The Departments have determined that noncitizens who subsequently are not granted asylum by USCIS should be referred to section 240 removal proceedings that will be streamlined as described in new 8 CFR 1240.17. The well-established rights that apply in section 240 proceedings will continue to apply during the 240 proceedings described in new 8 CFR 1240.17, but the latter will include new procedures designed to streamline the process while continuing to ensure fairness.

The Departments believe that these cases can be adjudicated more expeditiously than other cases in section 240 removal proceedings. Unlike other cases, noncitizens subject to this IFR will have had a full opportunity to present their protection claims to an asylum officer. Moreover, as established in new 8 CFR 1240.17(c) and (e), IJs and parties in any subsequent streamlined section 240 removal proceedings will have the benefit of a fully developed record and

---

[30] The Global Asylum rule would have revised the process, placing such noncitizens into asylum-and-withholding-only proceedings instead of section 240 proceedings, *see* 85 FR 80276, but it was enjoined, *see supra* note 4.

decision prepared by USCIS.[31] Because the USCIS Asylum Merits interview will create a record that includes testimony and documentary evidence, the Departments believe that less time will be needed in immigration court proceedings to build the evidentiary record. Thus, cases will be resolved more expeditiously before the IJ. The Departments recognize that, in some instances, IJs may need to take additional testimony and evidence— beyond what is contained in the USCIS record—to fully develop the record. *See, e.g.,* 8 CFR 1240.17(f)(4)(iii). By providing IJs with the ability to rely upon the previously developed record in most cases, while preserving the flexibility for IJs to take new evidence and testimony when warranted, without the additional motions practice contemplated by the NPRM's provisions, the IFR creates more streamlined, efficient adjudications overall. Accordingly, the Departments believe that it is possible to achieve the purposes of the NPRM—to increase efficiency and maintain procedural fairness—by making procedural changes to streamline existing 240 proceedings instead of establishing the IJ review proceedings proposed under the NPRM.

In keeping with this goal, the IFR provides that these section 240 proceedings will be subject to particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims. Where the IJ will not be able to take advantage of that record, the streamlining measures do not apply. Thus, new 8 CFR 1240.17(k) exempts certain cases from the streamlined process, including, for example, where the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, CAT protection, or voluntary departure, 8 CFR 1240.17(k)(2); where the respondent has raised a substantial defense to the removal charge,[32] 8 CFR

1240.17(k)(3); or where the designated country of removal is different from the one that the asylum officer considered in adjudicating the noncitizen's application for asylum or protection, 8 CFR 1240.17(k)(4).[33] New 8 CFR 1240.17(k) makes other exceptions for certain vulnerable noncitizens and it exempts cases that have been reopened or remanded. *See* 8 CFR 1240.17(k)(1), (5), (6). Accordingly, with these exceptions, the Departments believe that these proceedings can be expedited given the limited forms of relief and protection that will need to be adjudicated by the IJ and given that the IJ and the parties will benefit from the record developed before USCIS.

The IFR provides additional procedures that will contribute to efficient adjudication. As provided in revised 8 CFR 208.3(a)(2) and 8 CFR 1208.3(a)(2) and new 8 CFR 1240.17(e), the IFR treats the record underlying the positive credible fear determination as the noncitizen's asylum application, as well as an asylum application for any spouse or child included as a dependent on the application for purposes of EOIR's filing requirements if USCIS does not grant the principal applicant's application and if the spouse or child does not separately file an asylum application that is adjudicated by USCIS. This procedure obviates the need for the noncitizen and any dependent to prepare and file a new application before the IJ. IJs are also required to hold status conferences to identify and narrow issues under new 8 CFR 1240.17(f)(1), (2). The USCIS Asylum Merits interview record and decision will permit the parties and the

IJ to identify any errors or omissions in the record, narrow issues, and provide any additional bases for asylum or related protection. Specifically, the rule, as provided in new 8 CFR 1240.17(f)(2) and (3), imposes obligations on the parties to identify and narrow the issues prior to the merits hearing, although the obligations on the noncitizen depend on whether the noncitizen has representation. As provided by new 8 CFR 1240.17(f)(2)(ii)(A), DHS must state whether it intends to rest on the existing record, waive cross-examination of the respondent, otherwise participate in the proceedings before the IJ, or waive appeal in the event the IJ grants protection. This position may be retracted by DHS, orally or in writing, prior to the issuance of the IJ's decision, if DHS seeks consideration of evidence pursuant to the standard laid out in 8 CFR 1240.17(g)(2). *See* 8 CFR 1240.17(f)(2)(ii)(C). Moreover, if DHS indicates that it will participate in the case, at the status conference or via a subsequent written statement it shall state its position on the respondent's claim(s); state which elements of the respondent's claim(s) it is contesting and which facts it is disputing, if any, and provide an explanation of its position; identify any witnesses it intends to call; provide any additional non-rebuttal or non-impeachment evidence; and state the status of the identity, law enforcement, or security investigations or examinations required by section 208(d)(5)(A)(i) of the Act, 8 U.S.C. 1158(d)(5)(A)(i), and 8 CFR 1003.47. *See* 8 CFR 1240.17(f)(2)(ii), (f)(3). If DHS does not timely respond, either at the status conference or in its written statement, to one or more of the respondent's arguments or claimed bases for asylum, including which arguments raised by the respondent DHS is disputing and which facts it is contesting, the IJ has authority to deem those arguments or claims unopposed, provided, however, that DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). The IFR creates additional efficiencies by permitting IJs to decide applications on the documentary record in certain circumstances, including where neither party has elected to present testimony and DHS has not elected to cross-examine the noncitizen or where the IJ determines that the application can be granted without further testimony and DHS declines to cross-examine the noncitizen. *See* 8 CFR 1240.17(f)(4)(i), (ii). Notwithstanding these provisions,

---

[31] New 8 CFR 1240.17(c) provides that DHS will serve the record of proceedings for the Asylum Merits interview and the asylum officer's written decision on the respondent and on the immigration court no later than the date of the master calendar hearing; it further provides that, in the exceptional case in which service is not effectuated by that date, the schedule of proceedings pursuant to new 8 CFR 1240.17(f) will be delayed until service is effectuated.

[32] As stated in note 8, *supra,* the rule does not specify that a particular type of evidence is required in order to show prima facie eligibility for relief,

and such evidence could include testimonial evidence as well as documentary evidence.

[33] Under this IFR, a noncitizen's accompanying spouse and children may be included in the request for asylum if they were included in the credible fear determination. *See* 8 CFR 208.3(a)(2), 208.30(c). Where a noncitizen is accompanied by a spouse or children, and the noncitizen is found to have a credible fear of persecution or torture, the family has the choice to have the spouse and children be included as dependents on the asylum application or to separately seek asylum as principal applicants. *See* 8 CFR 208.3(a)(2), 208.30(c). Should the family choose to have the spouse and children proceed solely as dependents, the asylum officer will, as appropriate, elicit sufficient information to determine whether there is a significant possibility that the applicant's spouse or child has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

however, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See id.*

The IFR also gives appropriate effect to the asylum officer's determination of a noncitizen's eligibility for statutory withholding of removal or protection under the CAT. This serves to increase efficiency and provides a safeguard where an asylum officer has already found that the noncitizen could be subject to persecution or torture if removed. In general, in cases where the IJ denies asylum and issues a removal order, the IJ will give effect to the asylum officer's determination of eligibility for statutory withholding of removal or protection under the CAT; the IJ may not sua sponte review the asylum officer's determination. *See 8 CFR 1240.17(d), (f)(2)(i)(B), (i)(2).* However, these provisions account for the possibility that DHS may submit evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview in order to demonstrate that the respondent is not eligible for the protection(s) the asylum officer determined. *See id.* In such a case, the IJ will, based on the review of this new evidence or testimony, make a separate determination regarding the noncitizen's eligibility for statutory withholding of removal or protection under the CAT, as relevant.

### 1. Schedule of Proceedings

The Departments are imposing procedural adjudication time frames and limitations on continuances and filing extensions during streamlined section 240 removal proceedings under this IFR. The Departments believe that these time frames and limitations are justified given both the streamlining procedures discussed above and the fact that such cases will come to the IJ with a complete asylum application and following a nonadversarial interview before an asylum officer at which a comprehensive record, including a verbatim transcript and decision, has been assembled.

Under new 8 CFR 1240.17, the Departments will impose procedural time frames on IJs with respect to their hearing schedules. Specifically, an IJ will hold a master calendar hearing 30 days after service of the NTA or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. As provided by new 8 CFR 1240.17(f)(1) and (2), the IJ will hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that

date, on the next available date no later than 35 days after the master calendar hearing, followed by a merits hearing, if necessary, 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing.[34] If needed, under new 8 CFR 1240.17(f)(4)(iii), the IJ may hold a subsequent merits hearing to resolve any lingering issues or complete testimony no later than 30 days after the initial merits hearing. As further discussed below, the IJ may grant continuances and filing extensions under specified standards. *See 8 CFR 1240.17(h).* Finally, under 8 CFR 1240.17(f)(5), whenever practical, the IJ shall issue an oral decision on the date of the final merits hearing or, if the IJ determines that no such hearing is warranted, no more than 30 days after the status conference; and where issuance of an oral decision on such date is not practicable, the IJ shall issue an oral or written decision as soon as practicable, no later than 45 days after the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 75 days after the status conference.[35]

The combined effect of these provisions should fully achieve the NPRM's efficiency goals while allowing noncitizens to receive a full and fair hearing in streamlined section 240 removal proceedings rather than through the IJ review process contemplated by the NPRM. The well-established rights that apply in ordinary section 240 proceedings will continue to apply during the streamlined section 240 proceedings described in new 8 CFR 1240.17, but certain new procedures will streamline the process by taking advantage of the record created by the asylum officer and ensure a prompt, efficient, and fair hearing on the respondent's claim.

[34] Because the timing of the merits hearing is tied to the date that the status conference occurs, the Departments note that any delay of the status conference will necessarily result in a corresponding delay of the merits hearing. In other words, if the status conference occurs 45 days after the master calendar hearing rather than 30–35 days after it because, for example, the respondent requested a continuance to seek counsel on the immigration court had to close on the original date of the status conference, see 8 CFR 1240.17(h), the merits hearing would still occur 30–35 days after the status conference—on days 75–80.

[35] In other words, where it is not practicable to issue an oral decision on the date of the final merits hearing, the immigration judge has up to 45 days to issue a decision. Where an IJ has determined that a merits hearing is not necessary, and it is not practicable to issue a decision within 30 days after the status conference, the IJ has up to an additional 45 days within which to issue a decision.

### a. Pre-Hearing Procedures

In order to best prepare the case for adjudication, new 8 CFR 1240.17(f) establishes initial procedures to ensure that the IJ has a complete picture of the case and the relevant issues prior to conducting any merits hearing that may be needed. As provided in new 8 CFR 1240.17(f)(1), at the master calendar hearing, the IJ will perform the functions required by 8 CFR 1240.10(a), including advising the respondent of the right to be represented, at no expense to the Government, by counsel of the respondent's own choosing. *See 8 CFR 1240.17(f)(1).* Additionally, the IJ will advise as to the nature of the streamlined section 240 removal proceedings, including that the respondent has pending applications for asylum, statutory withholding of removal, and withholding or deferral of removal under the CAT, as appropriate; that the respondent has the right to testify, call witnesses, and present evidence in support of these applications; and of the deadlines that govern the submission of evidence. *See id.* Finally, except where the noncitizen is ordered removed in absentia, at the conclusion of the master calendar hearing the IJ will schedule a status conference to take place 30 days after the master calendar hearing or, if necessary, on the next available hearing date no later than 35 days after the master calendar hearing. *See id.* The IJ will also advise as to the requirements for the status conference. *See id.* The adjournment of the case until the status conference will not be considered a noncitizen-requested continuance under new 8 CFR 1240.17(h)(2). *See id.*

The purpose of the status conference is to take pleadings, identify and narrow any issues, and determine whether the case can be decided on the documentary record alone or, if a merits hearing before the IJ is needed, to ready the case for such a hearing. *See 8 CFR 1240.17(f)(2).* In general, the Departments expect that the parties will use the record of the Asylum Merits interview as a tool to prepare the proceeding for the IJ's adjudication. *See id.*

At the status conference, the noncitizen must indicate, orally or in writing, whether the noncitizen intends to contest removal or seek any protection(s) for which the asylum officer did not determine the noncitizen eligible. *See 8 CFR 1240.17(f)(2)(i).* The IJ will also advise the noncitizen that the respondent has the right to testify, call witnesses, and present evidence in support of the noncitizen's application; and of the deadlines that govern the

submission of evidence. If a noncitizen expresses an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the noncitizen must, orally or in writing: (1) Indicate whether the noncitizen plans to testify before the IJ; (2) identify any witnesses the noncitizen plans to call at the merits hearing; and (3) provide any additional documentation in support of the applications. *See* 8 CFR 1240.17(f)(2)(i)(A). A represented noncitizen is further required to: (4) Describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer; (5) articulate or confirm any additional bases for asylum and related protection, whether or not they were presented or developed before the asylum officer; and (6) state any additional requested forms of relief or protection. If a noncitizen is unrepresented, the IJ will ask questions and guide the proceedings in order to elicit relevant information from the noncitizen and otherwise fully develop the record. *See Quintero* v. *Garland,* 998 F.3d 612, 623–30 (4th Cir. 2021) (describing the general duty of the IJ to develop the record, which is ''especially crucial in cases involving unrepresented noncitizens''); *see also Matter of S–M–J–,* 21 I&N Dec. 722, 723–24, 729 (BIA 1997) (en banc) (also describing the general duty of the IJ to develop the record). If a noncitizen does not express an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the IJ will order the noncitizen removed and will not conduct further proceedings. *See* 8 CFR 1240.17(f)(2)(i)(B). In such cases, where the asylum officer determined the noncitizen eligible for statutory withholding of removal or protection under the CAT, the IJ will issue a removal order and will give effect to that protection, unless DHS makes a prima facie showing—through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview—that the noncitizen is not eligible for such protection. *See id.*

For its part, DHS must indicate at the status conference, orally or in writing, whether it intends to: (1) Rest on the record; (2) waive cross-examination of the noncitizen; (3) otherwise participate in the case; or (4) waive appeal if the IJ decides to grant the noncitizen's application. *See* 8 CFR 1240.17(f)(2)(ii). If DHS indicates that it will participate in the case, it then must, orally or in

writing: (1) State its position on each of the noncitizen's claimed grounds for asylum or related protection; (2) state which elements of the noncitizen's claim for asylum or related protection it is contesting and which facts it is disputing, if any, and provide an explanation of its position; (3) identify any witnesses it intends to call at any merits hearing; (4) provide any additional non-rebuttal or non-impeachment evidence; and (5) state whether the appropriate identity, law enforcement, or security investigations or examinations have been completed. *See id.* DHS can provide this information at the status conference or by submitting a written statement under 8 CFR 1240.17(f)(3)(i) as outlined below. *See id.*

At the status conference, as further detailed below, the IJ will determine whether further proceedings are warranted; if they are, the IJ will schedule the merits hearing to take place 60 days after the master calendar hearing or, if the merits hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). The IJ may also schedule additional status conferences prior to any merits hearing if the IJ determines such conferences will contribute to efficient resolution of the case. *See id.*

After the adjournment of the status conference, where DHS intends to participate in a case, DHS is required to file a written statement providing information required under 8 CFR 1240.17(f)(2)(ii) but that DHS did not provide at the status conference, as well as any other relevant information or argument in response to the noncitizen's submissions. *See* 8 CFR 1240.17(f)(3)(i). DHS's written statement is due no later than 15 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference. *See id.* The noncitizen may also submit a supplemental filing after the status conference to reply to any statement submitted by DHS, identify any additional witnesses, and provide any additional documentation in support of the respondent's application. *See* 8 CFR 1240.17(f)(3)(ii). Any such filing is due no later than 5 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 25 days following the status conference. *See id.*

The IFR's efficiencies and timeline are predicated on the parties' participation in the status conference and other procedural steps needed to narrow the issues and prepare the case for adjudication in advance of any merits

hearing before an IJ. This rule helps ''ensure efficient adjudication by focusing the immigration courts' limited resources on the issues that the parties actually contest.'' *Matter of A–C–A–A–,* 28 I&N Dec. 351, 352 (A.G. 2021). In this regard, as described above, DHS ICE Office of the Principal Legal Advisor attorneys representing DHS in immigration court (''DHS attorneys'') play a critical role in narrowing the issues during section 240 removal proceedings. The Departments believe that the rule's requirements will increase the overall efficiency of case adjudications and help parties better prepare their respective positions before the IJ.

b. Merits Hearing(s)

Based on the parties' statements and submissions at the status conference, the IJ will determine whether the noncitizen's application may be decided on the documentary record without a merits hearing or whether a merits hearing is required. *See* 8 CFR 1240.17(f)(4)(i)–(iii). Specifically, an IJ may decline to hold a merits hearing and decide the application on the documentary record if: (1) DHS has indicated that it waives cross-examination and neither the noncitizen nor DHS has requested to present testimony under the pre-hearing procedures described above, *see* 8 CFR 1240.17(f)(4)(i); or (2) the noncitizen has timely requested to present testimony and DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the asylum application can be granted without further testimony, *see* 8 CFR 1240.17(f)(4)(ii). Notwithstanding these provisions, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See* 8 CFR 1240.17(f)(4)(i), (ii).[36]

---

[36] The Departments emphasize that permitting the IJ to issue decisions in some cases without holding a hearing does not undermine the fairness or integrity of asylum proceedings because the respondent will already have testified, under oath, before the asylum officer. The IFR's framework only allows for the IJ to render a decision without scheduling a hearing in a manner that would not prejudice the noncitizen or undermine the integrity of asylum proceedings.

In *Matter of Fefe,* 20 I&N Dec. 116 (BIA 1989), the BIA held that ''[a]t a minimum . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct.'' *Id.* at 118. The BIA determined that the regulations required these procedures for fairness reasons and to maintain ''the integrity of the asylum process itself.'' *Id.* The provisions in this IFR that permit IJs to decide applications without a hearing in certain

Continued

**18102**   **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

If the IJ determines to hold a merits hearing, the IJ will conduct that hearing as in section 240 removal proceedings generally. The IJ will swear the noncitizen to the truth and accuracy of any information or statements, hear all live testimony requested by the parties, and consider the parties' submissions. *See* 8 CFR 1240.17(f)(4)(iii)(A).

The Departments' goal is for the IJ to issue an oral decision at the conclusion of a single merits hearing (when a merits hearing is required) whenever practicable, *see* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5), but the Departments recognize that not every case may be resolved in that fashion. The rule therefore allows the IJ flexibility in such circumstances to hold another status conference and take any other steps the IJ considers necessary and efficient for the resolution of the case. *See* 8 CFR 1240.17(f)(4)(iii)(B). In all circumstances, the IJ will be required to schedule any subsequent merits hearing no later than 30 days after the initial merits hearing. *Id.*

**2. Evidentiary Standard**

This IFR provides that, in the streamlined section 240 proceedings, noncitizens and DHS will have the opportunity to address alleged errors in the USCIS Asylum Merits record, present testimony, and submit additional evidence. The longstanding evidentiary standard for section 240 proceedings applies—evidence must be relevant and probative, and its use must be fundamentally fair. 8 CFR 1240.17(g)(1); *see* 8 CFR 1240.7(a) ("The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case . . . ."); *Nyama* v. *Ashcroft,* 357 F.3d 812, 816 (8th Cir. 2004) ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.' " (citations omitted) (citing *Henry* v. *INS,* 74 F.3d 1, 6 (1st Cir. 1996); quoting *Espinoza* v. *INS,* 45 F.3d 308, 310 (9th Cir. 1995))); *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (BIA 1980) (holding that evidence must be "relevant and probative and its use not fundamentally unfair"). In addition, any evidence submitted must be timely (after taking into account a timely request for a continuance or filing extension that is granted), *see* 8 CFR

1240.17(g)(1), subject to certain exceptions, *see* 8 CFR 1240.17(g)(2). Evidence submitted after the deadline set by the IJ but before the IJ issues a decision in the case may be considered only if it could not reasonably have been obtained and presented before the applicable deadline through the exercise of due diligence, or it its exclusion would violate a statute or the Constitution.[37] *See id.* As in all section 240 proceedings, the IJ will exclude evidence that does not meet the requirements described above. *See* 8 CFR 1240.17(g)(1).

The Departments are not adopting the NPRM's proposal that noncitizens seeking to submit additional evidence for IJ review would have to demonstrate that it was not duplicative and was necessary to develop the record. Instead, the Departments believe the IFR's provisions will promote efficiency and fairness by allowing the parties and adjudicators to apply longstanding, workable evidentiary standards. The Departments believe that the NPRM's efficiency goals can be achieved in the context of streamlined section 240 removal proceedings without the NPRM's evidentiary restrictions because, unlike individuals in ordinary section 240 removal proceedings, noncitizens whose cases are subject to this rule will already have received an initial adjudication by USCIS, and their case will come to the immigration court with a fully developed record.

**3. Timeline for Proceedings**

As noted in the NPRM, the Departments' purpose for conducting rulemaking on this topic is to develop a "better and more efficient" system for processing applications for asylum and related relief brought by individuals subject to expedited removal under section 235 of the Act, 8 U.S.C. 1225. 86 FR 46907. Under the current procedures, individuals who are first placed in the expedited removal process but who are subsequently found to have a credible fear of persecution or torture are placed in section 240 removal proceedings before the immigration court. 8 CFR 208.30(f) (2020). Under existing procedures, these proceedings often take several years to complete and can be highly protracted and inefficient. Further, as stated in the NPRM, the current system was created at a time when most noncitizens encountered at the border were single adults from

Mexico, relatively few of whom made asylum claims. *See* 86 FR 46908. In contrast, at present, a large share of noncitizens encountered at the border are families and unaccompanied children, a significant portion of whom express the intention to seek asylum. *See id.*

Given the above, the IFR establishes the timeline and procedures detailed below to apply in all cases subject to the streamlined section 240 removal proceedings. The Departments believe that these procedures serve important efficiency interests while still permitting noncitizens an appropriate amount of time to prepare for proceedings.

Immigration court proceedings commence when DHS files the NTA, and the master calendar hearing will take place 30 days after the date the NTA is served or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. *See* 8 CFR 1240.17(b). Except where the noncitizen is ordered removed in absentia, the IJ will then schedule a status conference 30 days after the initial master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(1). From there, if warranted, the merits hearing will be scheduled 60 days after the master calendar hearing or, if a hearing cannot be scheduled on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). If any subsequent merits hearing is necessary, the IJ will schedule it no later than 30 days after the initial merits hearing. *See* 8 CFR 1240.17(f)(4)(iii)(B). Finally, whenever practicable, the IJ shall issue an oral decision on the date of the final merits hearing or, if no such hearing is held, 30 days after the status conference. *See* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5). If the IJ cannot issue a decision on that date, the IJ must issue an oral or written decision as soon as practicable and no later than 45 days after the applicable date described in the previous sentence. *See* 8 CFR 1240.17(f)(5).

Under the default timeline set forth in the IFR, at least 90 days is provided from the service of the NTA before the merits hearing for the noncitizen to secure counsel, obtain evidence, and otherwise prepare—in addition to the time the noncitizen had to secure counsel and obtain evidence leading up to the Asylum Merits interview. *See Matter of C–B–,* 25 I&N Dec. 888, 889 (BIA 2012) (holding that "the [IJ] must grant a reasonable and realistic period of time to provide a fair opportunity for a

---

[37] In addition, as described below, under new 8 CFR 1240.17(h), a party may seek to have an extension of a filing deadline. For example, a party may seek to have a filing deadline extended if there is an unexpected delay in receipt of the evidence from a medical practitioner or other party.

noncitizen to seek, speak with, and retain counsel"). Moreover, as discussed below, 8 CFR 1240.17(h) contemplates continuances and filing extensions by request of the parties. The Departments believe these time frames, including the standards for continuances and extensions, ensure adequate time and protect procedural fairness while also meeting the Department's goal of creating efficient and streamlined proceedings. Unlike in ordinary section 240 removal proceedings, noncitizens in these streamlined section 240 proceedings will already have had an incentive and time to obtain representation prior to the commencement of immigration court proceedings. Similarly, noncitizens will not be appearing in immigration court on a totally blank slate; they will have had notice regarding what sort of evidence is needed and a prior opportunity to obtain any available evidence ahead of the Asylum Merits interview. In addition, where a noncitizen is placed in removal proceedings under the procedures in the IFR, the noncitizen will have already applied before USCIS for asylum, withholding of removal, and protection under the CAT, as relevant. The noncitizen will have had the opportunity to testify before, and submit evidence to, the asylum officer, and the asylum officer will have fully evaluated the noncitizen's eligibility for asylum, withholding of removal, and protection under the CAT. Moreover, any dependent would have also had the opportunity to testify before the asylum officer, and the asylum officer would have elicited testimony from the dependent for any independent basis for eligibility for asylum, withholding of removal, and protection under the CAT. The IJ will be provided with the record before USCIS, including the asylum officer's decision, the verbatim transcript of the Asylum Merits interview, and the evidence on which the asylum officer relied in reaching the decision. In the Departments' view, it is appropriate for cases under this IFR to proceed on an expedited time frame before the immigration courts as claims will have been significantly developed and analyzed before the proceedings start.

### 4. Continuances and Filing Extensions

The IFR establishes modified standards for continuances and filing extensions in streamlined 240 proceedings. Generally, in immigration proceedings, a noncitizen may file a motion for continuance for good cause shown. *See* 8 CFR 1003.29. The regulations have incorporated this

"good cause" standard since 1987, *see* 8 CFR 3.27 (1987),[38] and substantial case law and agency guidance have elaborated on its meaning, *see, e.g., Matter of L–A–B–R–,* 27 I&N Dec. 405, 413–19 (A.G. 2018) (clarifying the framework for applying the "good cause" standard when a noncitizen requests a continuance to pursue collateral relief); *Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (setting forth factors for consideration when determining whether there is good cause for a continuance so that a noncitizen may pursue adjustment of status before USCIS); *Matter of Garcia,* 16 I&N Dec. 653, 657 (BIA 1978) (holding that, in general, IJs should favorably exercise discretion to continue proceedings when a prima facie approvable visa petition and adjustment application are submitted); *Usubakunov* v. *Garland,* 16 F.4th 1299, 1305 (9th Cir. 2021) (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to a violation of his statutory right to counsel). The Departments believe that good cause remains an appropriate standard for most continuances because it provides IJs with sufficient guidance and discretion to manage their cases both fairly and efficiently, and the IFR adopts this standard as the default for continuance requests by noncitizens in streamlined section 240 proceedings, subject to certain restrictions described below.

Specifically, the IFR imposes limits on the length of continuances that may be granted for good cause. First, no individual continuance for good cause may exceed 10 days unless the IJ determines that a longer continuance would be more efficient. *See* 8 CFR 1240.17(h)(2)(i). This will ensure that continuances do not delay proceedings unnecessarily, either by being too long or too short. The Departments recognize that, on occasion, it may be appropriate and more efficient to grant one lengthier continuance to achieve its intended

purpose—for example, to gather evidence that will take time to obtain or to secure the availability of a witness—such that it would not be necessary to grant further continuances at the time that the proceedings are scheduled to reconvene. *Cf. Meza Morales* v. *Barr,* 973 F.3d 656, 665 (7th Cir. 2020) (Barrett, J.) ("'[T]imeliness' is not a hard and fast deadline; some cases are more complex and simply take longer to resolve. Thus, not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution. That is presumably why nobody appears to think that continuances conflict with the regulation's timeliness requirement."). Thus, this IFR provides IJs with sufficient flexibility to grant continuances for good cause to ensure fairness of proceedings while appropriately balancing efficiency considerations.

Second, the IFR also establishes two modified continuance procedures that govern in specific factual circumstances unique to streamlined section 240 removal proceedings. The Departments believe that the IFR's streamlined section 240 proceedings warrant modified standards for continuances under certain conditions because the IFR's streamlined section 240 proceedings occur after noncitizens have had a nonadversarial hearing before an asylum officer and have had a chance to present their claims for asylum and protection from removal. Additionally, the Departments have a considerable interest in developing an efficient process to fully and fairly adjudicate the claims of those noncitizens who were initially screened for expedited removal but have demonstrated a credible fear of persecution or torture. As noted in the NPRM, section 235 of the Act, 8 U.S.C. 1225, developed a system that "was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border." 86 FR 46909. Accordingly, the IFR's imposition of modified requirements for continuances in streamlined section 240 removal proceedings is in keeping with the NPRM's purpose to develop more fair and efficient processes to adjudicate the claims of individuals encountered at or near the border and found to have a credible fear of persecution or torture.

Specifically, the IFR provides that IJs should apply the "good cause" standard only where the aggregate length of all continuances and extensions requested by the noncitizen does not cause a merits hearing to take place more than 90 days after the master calendar hearing. 8 CFR 1240.17(h)(2)(i). The IFR then implements different criteria based

---

[38] *See also* Aliens and Nationality; Rules of Procedure for Proceedings Before Immigration Judges, 52 FR 2931, 2934, 2938 (Jan. 29, 1987) (final rule). The regulation at 8 CFR 3.27 has been redesignated twice—first to 8 CFR 3.29, second to its current location at 8 CFR 1003.29—without amending the regulatory text. *See* Executive Office for Immigration Review; Rules of Procedure, 57 FR 11568, 11569 (Apr. 6, 1992) (interim rule); Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824, 9830 (Feb. 28, 2003) (final rule). The regulatory text was recently amended by "Procedures for Asylum and Withholding of Removal," 85 FR 81698, 81699, 81750 (Dec. 16, 2020) (final rule), but that rule has been preliminarily enjoined, *see* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *EOIR,* No. 21–cv–56 (D.D.C. Jan. 14, 2021).

on the length of the resulting delay for deciding requests for continuances and extensions by the noncitizen that would cause a merits hearing to occur more than 90 days after the master calendar hearing. *See* 8 CFR 1240.17(h)(2)(ii)–(iii).

Where a noncitizen-requested continuance or filing extension would cause a merits hearing to take place between 91 and 135 days after the master calendar hearing, an IJ should grant a continuance or filing extension if the noncitizen demonstrates that it is necessary to ensure a fair proceeding and the need for it exists despite the noncitizen's exercise of due diligence. *See* 8 CFR 1240.17(h)(2)(ii). The length of continuances and extensions under this provision are, as a matter of procedure, limited to the time necessary to ensure a fair proceeding. *See id.*

Next, should the noncitizen request any continuances or filing extensions that would cause a merits hearing to take place more than 135 days after the master calendar hearing, the noncitizen must demonstrate that failure to grant the continuance or extension would be contrary to statute or the Constitution. 8 CFR 1240.17(h)(2)(iii).

Noncitizens in removal proceedings have the "right to a full and fair hearing," *Arrey* v. *Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) (collecting cases), which "derives from the Due Process Clause of the Fifth Amendment," *Cinapian* v. *Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009); *see also Matter of Sibrun*, 18 I&N Dec. 354, 356 (BIA 1983) ("It should be emphasized that the full panoply of procedural protections . . . are not mandated for [noncitizens] in these civil, administrative proceedings . . . . All that is required here is that the hearing be fundamentally fair." (citations omitted)). A full and fair hearing, "at a minimum, includes a reasonable opportunity to present and rebut evidence and to cross-examine witnesses." *Grigoryan* v. *Barr*, 959 F.3d 1233, 1240 (9th Cir. 2020) (citing *Cinapian*, 567 F.3d at 1074 (citing, in turn, section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B))). When adjudicating continuance and extension requests pursuant to the IFR's heightened standards, IJs should consider whether the request is related to the noncitizen's ability to reasonably present his or her case or implicates any of the rights found at section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B). Thus, continuance requests to present testimony and evidence, to rebut evidence, or to cross-examine witnesses may meet the standards set forth in new 8 CFR 1240.17(h)(2)(ii) and (iii).[39]

In addition to the foregoing, the Departments emphasize that the Act provides noncitizens in section 240 removal proceedings with the right to representation at no Government expense, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A), and that the noncitizen must be provided a reasonable opportunity to obtain counsel. *See Matter of C–B–*, 25 I&N Dec. 888, 889 (BIA 2012) ("In order to meaningfully effectuate the statutory and regulatory privilege of legal representation where it has not been expressly waived by a noncitizen, the Immigration Judge must grant a reasonable and realistic period of time to provide a fair opportunity for the noncitizen to seek, speak with, and retain counsel."). Federal courts have strictly reviewed IJ decisions to deny continuances for seeking counsel or take other actions that may impinge that right in proceedings. *See, e.g., Usubakunov*, 16 F.4th at 1305 (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to violation of his statutory right to counsel); *see also Leslie* v. *Att'y Gen. of U.S.*, 611 F.3d 171, 180–81 (3d Cir. 2010) (The "statutory and regulatory right to counsel is also derivative of the due process right to a fundamentally fair hearing."); *Hernandez Lara* v. *Barr*, 962 F. 3d 45, 54 (1st Cir. 2021) ("The statutory right to counsel is a fundamental procedural protection worthy of particular vigilance."). Accordingly, a continuance to seek representation would be sufficient to qualify for the heightened continuance standards in these streamlined 240 proceedings if denial would violate a noncitizen's right to representation or another statutory or constitutional right.[40]

The Departments emphasize that the time periods that determine the relevant continuance standard do not begin to run until the day after the master calendar hearing, at which the IJ will advise noncitizens of their rights in the streamlined section 240 proceedings, including their right to representation, at no expense to the Government, and of the availability of pro bono legal services, and will ascertain that noncitizens have received a list of such pro bono legal service providers. 8 CFR 1240.17(f)(1) (citing 8 CFR 1240.10(a)); *see* INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Furthermore, these calculations only pertain to delay of hearings and deadlines specifically included in this regulation, namely, the status conference hearing or a merits hearing and any filing deadline that, if extended, would have the effect of delaying a hearing. Any continuances with respect to interim hearings or deadlines that may be set by the IJ do not impact determination of the continuance standard that applies in this section.[41] Continuances or filing extensions granted due to exigent circumstances, such as court closures or

---

[39] The Departments note, however, that the decision to grant or deny a continuance or extension will depend on the individual facts and circumstances present in each case. *See, e.g., De Ren Zhang* v. *Barr*, 767 F. App'x 101, 104–05 (2d Cir. 2019) (collecting cases in which the Second Circuit upheld an IJ's denial of a continuance where a noncitizen "had already received multiple continuances, or had a significant amount of time in which to gather and submit evidence" but, under the particular circumstances of that case, concluding that the IJ's denial of a continuance was an abuse of the IJ's discretion); *Bondarenko* v. *Holder*, 733 F.3d 899, 906–08 (9th Cir. 2013) (holding that the denial of the noncitizen's request for a continuance to investigate the Government's forensic report was a violation of the noncitizen's right to due process); *Cruz Rendon* v. *Holder*, 603 F.3d 1104, 1111 (9th Cir. 2010) (determining that "the denial of the requested continuance" to obtain evidence that bore directly on the noncitizen's eligibility for relief, "in conjunction with the limitations placed upon her testimony, prevented [the noncitizen] from fully and fairly presenting her case").

[40] This does not mean that a request for a continuance to seek counsel can never be denied. *See Usubakunov*, 16 F.4th at 1304 ("We recognize that immigration courts bear a crushing caseload and an applicant cannot unreasonably delay the administrative process, which has various component parts and must be managed efficiently by the IJ."); *see also Arrey*, 916 F.3d at 1158 (explaining that a noncitizen "is not denied the right to counsel where continuing the hearing would have been futile or where the IJ had done everything he reasonably could to permit [the noncitizen] to obtain counsel" (quotation marks and citation omitted)). Such determinations are made on a case-by-case basis. *See Biwot* v. *Gonzales*, 403 F.3d 1094, 1099 (9th Cir. 2005) ("The inquiry is fact-specific and thus varies from case to case. We pay particular attention to the realistic time necessary to obtain counsel; the time frame of the requests for counsel; the number of continuances; any barriers that frustrated a [noncitizen's] efforts to obtain counsel, such as being incarcerated or an inability to speak English; and whether the [noncitizen] appears to be delaying in bad faith."); *see also Gonzalez-Veliz* v. *Garland*, 996 F.3d 942, 949 (9th Cir. 2021) (comparing cases granting and denying requests for continuances to seek counsel).

[41] In other words, the IJ would determine the appropriate standard to consider when reviewing a noncitizen's request for a continuance by considering how much the continuance would shift the merits hearing. For example, the IJ would apply the "good cause" standard under 8 CFR 1240.17(h)(2)(i) if a noncitizen requests an initial continuance of the status conference for 10 days, which would in turn cause the merits hearing to be delayed by 10 days (because the merits hearing will occur 30–35 days after the status conference). However, if the noncitizen later requests further continuances that would cause the status conference to occur later than day 60, and in turn would cause the merits hearing to occur later than day 90, the IJ would apply the heightened continuance standard under 8 CFR 1240.17(h)(2)(ii).

illness of a party, will not count against the aggregate limits on continuances, as further explained below and as set forth at new 8 CFR 1240.17(h)(4).

The Departments have also contemplated DHS's need for continuances and provided for them in appropriate situations. The IJ may grant DHS a continuance and extend filing deadlines based on significant Government need, as set forth at new 8 CFR 1240.17(h)(3). The Departments anticipate that significant Government need will only arise in exceptional cases. The IFR provides a nonexclusive list of examples of significant Government needs, including "confirming domestic or foreign law enforcement interest in the respondent" and "conducting forensic analysis of documents submitted in support of a relief application or other fraud-related investigations." 8 CFR 1240.17(h)(3). The Departments believe that requiring DHS to demonstrate a significant Government need for a continuance serves efficiency interests without undermining DHS's opportunity to present its case. First, DHS inherently possesses the subject-matter expertise to navigate section 240 proceedings in general and does not face the same obstacles as do noncitizens in exploring and securing competent representation. Second, noncitizens, not DHS, bear the burden of proof throughout the majority of streamlined section 240 proceedings. Of particular relevance, noncitizens generally bear the burden of demonstrating eligibility for protection-based relief. *See, e.g.,* INA 208(b)(1)(B), 8 U.S.C. 1158(b)(1)(B). Third, DHS does not face the same issues with respect to access to counsel, especially when taking into consideration the likelihood that some noncitizens will be detained during the course of proceedings. IJs must be able to take such factors under consideration when considering continuance requests made by noncitizens, but they are not relevant to such requests made by DHS.

In addition, these timelines and standards do not apply to an IJ's ability to continue a case, extend a filing deadline, or adjourn a hearing due to exigent circumstances, such as the unavailability of the IJ, the parties, or counsel due to illness, or the closure of the immigration court. *See* 8 CFR 1240.17(h)(4). Such continuances must be limited to the shortest time necessary and each must be justified. *See id.* The Departments recognize the magnitude and weight of asylum claims, and the importance of ensuring that asylum procedures do not undermine the fairness of proceedings. *See Quintero,* 998 F.3d at 632 ("[N]eedless to say,

these cases *per se* implicate extremely weighty interests in life and liberty, as they involve individuals seeking protection from persecution, torture, or even death."); *Xue* v. *BIA,* 439 F.3d 111, 113–14 (2d Cir. 2006) ("We should not forget, after all, what is at stake. For each time we wrongly deny a meritorious asylum [or withholding] application, . . . we risk condemning an individual to persecution. Whether the danger is of religious discrimination, extrajudicial punishment, forced abortion or involuntary sterilization, physical torture or banishment, we must always remember the toll that is paid if and when we err."); *Matter of O–M–O–,* 28 I&N Dec. 191, 197 (BIA 2021) ("The immigration court system has no more solemn duty than to provide refuge to those facing persecution or torture in their home countries, consistent with the immigration laws."). The Departments believe that this rule strikes the appropriate balance by providing noncitizens with a full and fair opportunity to present their claims—first before USCIS and then, if necessary, in streamlined section 240 removal proceedings—while ensuring that such claims are adjudicated in a timely and efficient manner.

### 5. Consideration of Statutory Withholding of Removal and CAT Protection

The NPRM proposed that, where USCIS denied asylum, IJs would reconsider the entire USCIS Asylum Merits record de novo, including grants of statutory withholding of removal and protection under the CAT. *See, e.g.,* 86 FR 46946 (8 CFR 1003.48(a) (proposed)). Upon further review, including the review of comments as discussed further below, the Departments have determined that IJs should generally give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT subject to certain exceptions.

Specifically, under new 8 CFR 1240.17(i)(1), if an asylum officer finds that the noncitizen is not eligible for asylum or other protection sought, IJs will adjudicate de novo all aspects of a noncitizen's application, including the noncitizen's eligibility for asylum and, if necessary, statutory withholding of removal or protection under the CAT. However, if an asylum officer does not grant asylum but finds that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, the noncitizen has two options.

First, the noncitizen may indicate that the noncitizen does not intend to contest removal or seek protection(s) for

which the asylum officer did not find the noncitizen eligible, as described at new 8 CFR 1240.17(f)(2)(i)(B). In that case, unless DHS makes a prima facie showing, through evidence that specifically pertains to the noncitizen and was not in the record of proceedings for the USCIS Asylum Merits interview, that the noncitizen is not eligible for such protection(s), the IJ will issue the removal order and give effect to any protection for which the asylum officer found the noncitizen eligible, and no further proceedings will be held.[42]

Second, and alternatively, the noncitizen may contest the asylum officer's decision to not grant asylum, in which case the IJ will adjudicate de novo the noncitizen's application for asylum. *See* 8 CFR 1240.17(i)(2). If the IJ subsequently denies asylum, then the IJ will enter an order of removal and give effect to the protections for which the asylum officer deemed the noncitizen eligible, unless DHS demonstrates through evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. *See id.*[43]

[42] In addition, at 8 CFR 1240.17(d), the IFR provides that a noncitizen who fails to appear and who is ordered removed in absentia under section 240(b)(5)(A) of the INA, 8 U.S.C. 1229a(b)(5)(A), will still receive the benefit of any protections from removal for which the asylum officer found that the noncitizen was eligible unless DHS makes a prima facie showing through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. Where USCIS has determined that an applicant is eligible for statutory withholding of removal or protection under the CAT, the United States would risk violating its nonrefoulement obligations by nonetheless removing the noncitizen to the country in which they more likely than not would be subject to persecution or torture due to the failure to appear. That would particularly be so if the noncitizen's failure to attend the hearing were due to misunderstanding, confusion, or a belief that no further steps were necessary to preserve the noncitizen's eligibility for statutory withholding of removal or protection under the CAT.

[43] The Departments emphasize that the evidence or testimony relied upon by DHS to demonstrate that the noncitizen is not eligible for withholding of removal or protection under the CAT must be evidence or testimony not considered by the asylum officer that pertains specifically to the noncitizen and establishes that the noncitizen is not eligible. For example, DHS could submit information that arose from background checks conducted after the asylum officer interview, but DHS cannot point to a statement by the noncitizen in the Form I–213, Record of Deportable/Inadmissible Alien. The evidence or testimony must demonstrate the noncitizen's ineligibility for the protection that the asylum officer determined the noncitizen was eligible for. The IJ's decision must be based on such new evidence or testimony; the IJ may not

Continued

The Departments have determined that these changes are advisable for several reasons. First, after reviewing comments, the Departments have declined to adopt certain provisions proposed in the NPRM and instead have set forth that after an asylum officer does not grant asylum, an individual will be automatically referred to streamlined section 240 removal proceedings. Automatic referral to streamlined section 240 proceedings means that every noncitizen whose application is not approved by the asylum officer will have the opportunity to have their case reviewed by the IJ, without first affirmatively requesting review. During streamlined 240 proceedings, the noncitizen may elect to have the IJ adjudicate de novo the noncitizen's asylum application, and any protection claim for which the asylum officer found the noncitizen ineligible. At the same time, the rule recognizes that an asylum officer's determination that a noncitizen is eligible for protection should generally be given effect in the interest of efficiency and to ensure that the noncitizen is not returned to a country where an immigration official has already determined that the noncitizen may be persecuted or tortured.

It is appropriate for USCIS to make eligibility determinations for statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial proceeding. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR

reconsider the asylum officer's determination or deny eligibility based merely on disagreement with the asylum officer's conclusions or evaluation of the record before the asylum officer.

208.1(b). Finally, statutory withholding of removal and protection under the CAT are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie,* 855 F.3d at 515–16; *Benitez Ramos,* 589 F.3d at 431. Because the asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C–S–,* 24 I&N Dec. at 433.

Thus, this IFR recognizes that applications for discretionary and mandatory forms of protection will be reviewed by IJs. However, determinations that a noncitizen is eligible for a mandatory form of protection will be given effect by the IJs, unless DHS demonstrates, through new evidence specifically pertaining to the noncitizen, that the noncitizen is not eligible for such protection.

Considering the comments received on the NPRM, the Departments recognize that this procedure is an intermediate approach between the NPRM and the commenters' suggestions described below in Section IV.D.6 of this preamble. Whereas the NPRM would have allowed the IJ to sua sponte review the asylum officer's statutory withholding and CAT determinations, the IFR instead places the burden on DHS to demonstrate, with new evidence specific to the noncitizen, that the noncitizen is not eligible for such protections. The Departments have determined that this process is most efficient, given that there may be particular instances, such as evidence of fraud or criminal activity, where overturning the asylum officer's eligibility determination is justified. If the Departments provided no mechanism in these streamlined section 240 removal proceedings through which the asylum officer's eligibility determinations could be overturned, DHS would have to follow the procedures set forth in 8 CFR 208.17(d) and 208.24(f) in instances where overturning the asylum officer's eligibility determinations is justified. Providing an exception where DHS demonstrates that evidence or testimony specifically pertaining to the noncitizen and not in the record of proceedings for the USCIS Asylum Merits interview establishes that the noncitizen is not eligible is substantially more efficient, consistent with the overall aims of this IFR.

### 6. Exceptions to Streamlined Procedures

The IFR provides specific exceptions that will allow certain noncitizens or situations to be exempted from these streamlined procedures and timelines despite originating in the expedited removal process and being referred to immigration court following an asylum officer's initial adjudication. *See* 8 CFR 1240.17(k). These exceptions ensure procedural fairness because not all cases that might otherwise be placed in streamlined section 240 removal proceedings would in fact be suitable for the expedited timeline.

At new 8 CFR 1240.17(k)(3), the IFR provides an exception to the expedited timeline if the noncitizen has raised a substantial challenge to the charge that the noncitizen is subject to removal— *e.g.,* if the noncitizen has a claim to U.S. citizenship or the charge that the noncitizen is subject to removal is not supported by the record—and that challenge cannot be resolved simultaneously with the noncitizen's applications for asylum, statutory withholding of removal, or withholding or deferral of removal under the CAT.

Because the IFR places noncitizens into section 240 proceedings, the noncitizen can affirmatively elect to apply for a wide range of relief in addition to asylum, statutory withholding of removal, and protection under the CAT. *See, e.g.,* 8 CFR 1240.1(a)(1)(ii) (providing IJs with the authority to adjudicate a wide range of applications for relief); 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."). The IFR therefore provides an exception to the timeline if the noncitizen produces evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, withholding or deferral of removal under the CAT, or voluntary departure, and is seeking to apply for, or has applied for, such relief or protection. *See* 8 CFR 1240.17(k)(2). For example, a noncitizen who also is eligible to seek adjustment of status under section 245 of the Act, 8 U.S.C. 1255, could provide the IJ with proof of prima facie eligibility and a copy of the submitted Form I–130, Petition for Alien Relative, and upon receipt of such evidence, the timeline in 8 CFR 1240.17(f)–(h) would not apply.[44] Testimonial evidence, and

[44] Although a submitted visa petition demonstrating prima facie eligibility for relief would be an optimal way to demonstrate

out-of-court written statements, could also be considered by immigration judges as evidence of prima facie eligibility for relief. The Departments believe this exception from the timeline is appropriate to allow effective adjudication of the new relief being sought because the IJ will not have the benefit of an already developed record regarding those forms of relief, which the IJ will have for the noncitizen's application for asylum or other protection.[45]

Similarly, the IFR provides an exception where the IJ finds the noncitizen subject to removal to a different country from the country or countries in which the noncitizen claimed a fear of persecution and torture before the asylum officer, and the noncitizen claims a fear of persecution or torture with respect to that alternative country. See 8 CFR 1240.17(k)(4). The Departments similarly believe the IFR's timeline should not apply in these circumstances because the record would need to be developed without the benefit of previous adjudication.

The Departments have also considered the effect of the streamlined 240 proceedings on vulnerable populations. To ensure procedural fairness, the Departments will exempt the following categories of noncitizens from these procedures: Noncitizens under the age of 18 on the date the NTA was issued, except noncitizens in section 240 proceedings with an adult family member, 8 CFR 1240.17(k)(1); and noncitizens who have exhibited indicia of mental incompetency, 8 CFR 1240.17(k)(6).

Finally, the expedited timeline does not apply to cases that have been reopened or remanded following the IJ's order. 8 CFR 1240.17(k)(5). Reopened and remanded cases may present unique

---

qualification for this exception, there may exist circumstances in which a filed petition would not be possible to present on an expedited timeline due to factors outside of a noncitizen's control. For example, a complaint for custody and motion for Special Immigrant Juvenile classification ("SIJ") findings, as filed with a State court, along with a statement and evidence as to other eligibility factors listed on the Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, could be sufficient to permit the IJ to assess a respondent's prima facie eligibility for SIJ classification.

[45] The Departments also note that this shift from the NPRM to streamlined section 240 removal proceedings addresses comments that the NPRM would have improperly burdened noncitizens by requiring them to file motions to vacate their removal orders and by limiting noncitizens to only one such motion. Further, by placing noncitizens into streamlined 240 proceedings—thereby allowing them to seek various forms of relief or protection for which they may be eligible—the IFR also addresses comments that the NPRM would have authorized the IJs to exercise discretion over whether to allow the respondent to apply for additional forms of relief or protection.

issues that are outside of the scope of these streamlined 240 proceedings.

### E. Other Amendments Related to Credible Fear

In addition to the new procedures at 8 CFR 1240.17, this IFR amends 8 CFR 1003.42, 1208.2, 1208.3, 1208.4, 1208.5, 1208.14, 1208.16, 1208.18, 1208.19, 1208.22, 1208.30, and 1235.6. Except for the amendments at 8 CFR 1003.42, the Departments proposed amendments to all of these sections in the NPRM in order to: (1) Effectuate the reestablishment of the "significant possibility" standard in credible fear review proceedings before EOIR; (2) ensure that IJs, like asylum officers, do not apply the mandatory bars at the credible fear screening process; and (3) ensure that the provisions providing for the USCIS Asylum Merits process are accurately reflected in EOIR's regulations where relevant, including confirmation that the written record of the positive credible fear determination will count as an asylum application. The IFR adopts these same changes with limited technical amendments where necessary to accord with the streamlined section 240 proceedings under new 8 CFR 1240.17.

The Departments also include amendments to 8 CFR 1003.42(d)(1) in this IFR. Although these amendments were not included in the NPRM, they are direct corollaries of the NPRM's proposed amendments and are necessary to ensure consistency, both internally within DOJ's regulatory provisions and more broadly between DHS's and DOJ's regulations. Specifically, the IFR amends 8 CFR 1003.42(d)(1) to ensure compliance with the revisions to 8 CFR 208.30(e) related to credible fear screening standards and treatment of mandatory bars in the credible fear screening process and with the revisions to 8 CFR 1208.30(g)(2) so that both provisions properly direct that when an IJ vacates a negative credible fear finding, the IJ will refer the case back to USCIS as intended by the NPRM and the IFR.

### F. Parole

This rule amends the DHS regulations governing the circumstances in which parole may be considered for individuals who are being processed under the expedited removal provisions of INA 235(b)(1), 8 U.S.C. 1225(b)(1). Expedited removal is a procedure that applies when an immigration officer "determines" that a noncitizen "arriving in the United States," or a noncitizen covered by a designation who has not been admitted or paroled into the United States, is inadmissible under

either INA 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C) (fraud or misrepresentation), or INA 212(a)(7), 8 U.S.C. 1182(a)(7) (lack of proper documents), and further determines that the noncitizen should be placed in expedited removal. INA 235(b)(1)(A)(i), (iii), 8 U.S.C. 1225(b)(1)(A)(i), (iii). Other noncitizens who are applicants for admission—and whom an immigration officer determines are not clearly and beyond a doubt entitled to be admitted—generally are referred for ordinary removal proceedings under INA 240, 8 U.S.C. 1229a. See INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A).

The statute generally provides for the detention of noncitizens subject to expedited removal pending a final credible fear determination and, if no such fear is found, until removed. See INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV) (noncitizens in the expedited removal process "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). The statute, likewise, provides that noncitizens determined to have a credible fear "shall be detained for further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). Congress has, however, expressly granted DHS the authority to release any applicant for admission from detention via parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). This includes DHS's authority to parole noncitizens detained under section 235 of the Act, 8 U.S.C. 1225. See Jennings v. Rodriguez, 138 S. Ct. 830, 837, 844 (2018).

The NPRM proposed to replace the current narrow parole standard with a standard that would permit parole "only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities)." 86 FR 46946 (8 CFR 235.3(b)(2)(iii) (proposed)); see id. at 46913–14. Having considered all comments received on this issue, DHS has determined that the current narrow standard should be replaced not with the standard proposed in the NPRM but with the longstanding parole standard applicable in other circumstances and described in 8 CFR 212.5(b), with which DHS officers and agents have substantial experience. That provision describes

five categories of certain noncitizens detained under 8 U.S.C. 1225(b) who may meet the parole standard of INA 212(d)(5), 8 U.S.C. 1182(d)(5), provided they present neither a security risk nor a risk of absconding: (1) Noncitizens who have serious medical conditions such that continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) noncitizens who will be witnesses in proceedings conducted by judicial, administrative, or legislative bodies in the United States; and (5) noncitizens whose continued detention is not in the public interest. *See* 8 CFR 212.5(b)(1)–(5). Consistent with the statute and the regulation, DHS will consider noncitizens covered by this rule for parole under this standard pending their credible fear interview "only on a case-by-case basis," 8 CFR 212.5(b), and may impose reasonable conditions on parole (including, for example, periodic reporting to ICE) to ensure that the noncitizen will appear at all hearings and for removal from the United States if required to do so, 8 CFR 212.5(c)–(d); *see* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

For purposes of making these case-by-case determinations concerning parole of noncitizens pending a credible fear interview, the Secretary recognizes that, in circumstances where DHS has determined that the continued detention of a noncitizen who has been found not to be a flight risk or a danger to the community is not in the public interest, the release of that noncitizen on parole may serve "urgent humanitarian reasons" or achieve "significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(b)(5).

The INA does not define these ambiguous terms, leaving them to the agency's reasonable construction.[46] In implementing the statutory parole authority, DHS and the former INS have long interpreted the statute to permit parole of noncitizens whose continued

detention is not in the public interest as determined by specific agency officials. Specifically, prior to the 1996 amendment to the INA that provided for parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104–208, div. C, tit. VI, subtit. A, sec. 602, 110 Stat. 3009, 3009–689, the former INS had paroled individuals "whose continued detention" was "not in the public interest," 8 CFR 212.5(b)(5) (1995); *see* Detention and Parole of Inadmissible Aliens; Interim Rule With Request for Comments, 47 FR 30044, 30045 (July 9, 1982) (interim rule). After the 1996 amendment, the agency incorporated the new "case-by-case" requirement into its regulation, while also providing, similar to prior regulatory authority, that parole of certain noncitizens, including those who pose neither a security risk nor a risk of absconding and whose "continued detention is not in the public interest" would generally be justified for "significant public benefit" or "urgent humanitarian reasons," consistent with the 1996 statutory amendment. 62 FR 10348; *see id.* at 10313.

Nothing in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), prohibits DHS from considering its resources and detention capacity when it determines, on a case-by-case basis, whether the parole of a noncitizen otherwise subject to detention under INA 235(b), 8 U.S.C. 1225(b), would have a significant public benefit or would advance urgent humanitarian reasons.[47] Rather, consistent with the statute, 8 CFR 212.5, and longstanding practice, DHS may take into account the important prerogative for it to use its detention resources for other individuals whose detention is in the public interest, including because of public safety or national security reasons. As has been the case for decades, DHS views detention as not being in the public interest where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular noncitizen would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the

community.[48] With regard to noncitizens detained pending a credible fear interview, whose inadmissibility was still being considered, or who had been ordered removed in expedited removal proceedings, the former INS, in a 1997 rule, restricted the regulatory authority for release on parole to where parole is required for a "medical emergency" or "a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (current); *see* 62 FR 10356. As the NPRM explained, this current narrow standard effectively prevents DHS from placing into expedited removal many noncitizens who would otherwise be eligible for this process, especially families, given the practical constraints and the legal limits of the *Flores* Settlement Agreement ("FSA").[49] *See* 86 FR 46910. These restrictions on DHS's ability to detain families in significant numbers and for an appreciable length of time, coupled with capacity constraints imposed by the COVID–19 pandemic, have effectively prevented the Government from processing more than a very limited number of families under expedited removal. Amending the regulation by which the former INS previously constrained itself (and now DHS) to considering parole for noncitizens in the expedited removal process far more narrowly than what the statute authorizes will advance the significant public benefit of allowing DHS to place more eligible noncitizens, particularly noncitizen families, in

---

[46] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if agency's reading differs from what the court believes is the best statutory interpretation." (citing *Chevron*, 467 U.S. at 843–44)); *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 515 (9th Cir. 2012) (en banc) ("We defer to an agency not because it is better situated to interpret statutes, but because we have determined that Congress created gaps in the statutory scheme that cannot be filled through interpretation alone, but require the exercise of policymaking judgment." (citing *Chevron*, 467 U.S. at 865)); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of 8 CFR 212.5).

[47] *See, e.g., New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D. N.M. 2020) ("This vague ['significant public benefit'] standard [in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A)] conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers . . . .").

[48] *See, e.g.,* ICE, *Interim Guidance for Implementation of* Matter of M–S–, *27 I&N Dec. 509 (A.G. 2019) During the Stay of the Modified Nationwide Preliminary Injunction in Padilla v. ICE, No. 18–298, 2019 WL 2766720 (W.D. Wash. July 2, 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture (July 15, 2019); Memorandum from DHS Secretary John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvement Policies 3 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf; Memorandum from Gene McNary, INS Commissioner, Parole Project for Asylum Seekers at Ports of Entry and INS Detention 1* (Apr. 20, 1992).

[49] Stipulated Settlement Agreement, *Flores v. Reno,* No. 85–cv–4544 (C.D. Cal. Jan. 17, 1997); *see also* 86 FR 46910 & n.27 (describing the FSA). The FSA provides for a general policy favoring release of minors and requires the expeditious transfer of minors who are not released from custody, including minors accompanied by their parents or legal guardians, to a non-secure, state-licensed program. *See* FSA ¶¶ 6, 12, 14, 19. When the former ICE family residential centers were operational, the court determined that such facilities were secure, unlicensed facilities; therefore, DHS generally released noncitizen children detained during their immigration proceedings within 20 days. *See Flores v. Sessions,* 394 F. Supp. 3d 1041, 1070–71 (C.D. Cal. 2017).

expedited removal proceedings, rather than processing them through lengthy and backlogged ordinary section 240 removal proceedings.

This approach will allow DHS to more efficiently obtain orders of removal for families who do not raise a fear claim or who are found not to possess a credible fear, thereby facilitating their expeditious removal without the need for lengthy immigration court proceedings, and will allow other families to have their fear claims adjudicated in a more timely manner. Accordingly, the flexibility of the 8 CFR 212.5(b) standard—subject, of course, to the limitations on the parole authority contained in INA 212(d)(5), 8 U.S.C. 1182(d)(5)—will allow DHS to achieve the significant public benefits of more effectively utilizing the expedited removal authority in response to changing circumstances and promoting border security. DHS expects that expedited removal of families who do not make a fear claim, or who are determined not to have a credible fear of persecution or torture, will reduce the incentives for abuse by those who will not qualify for protection and smugglers who exploit the processing delays that result from ordinary removal backlogs.

Finally, the contours of the category of noncitizens "whose continued detention is not in the public interest," 8 CFR 212.5(b)(5), have been developed through directives and guidance. For example, in 2009 ICE issued guidance stating that "when an arriving alien found to have a credible fear establishes to the satisfaction of [ICE Detention and Removal Operations (DRO)] his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described [later in the directive]), parole the alien on the basis that his or her continued detention is not in the public interest." ICE Policy No. 11002.1 ¶ 6.2, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009), *https://www.ice.gov/doclib/dro/pdf/ 11002.1-hd-parole_of_arriving_aliens_ found_credible_fear.pdf*. DHS intends to use further directives and guidance to apply the parole standard to noncitizens in expedited removal pending a credible fear interview. DHS emphasizes that any such directives or guidance will account for the fact that there are important and relevant differences between the population of noncitizens who have received a positive credible fear determination and the population of noncitizens in expedited removal who have not received a credible fear determination, including the expected length of time before such an individual

may be ordered removed and considerations relevant to assessing flight risk.

*G. Putative Reliance Interests*

In responses to comments below, the Departments have addressed the reliance interests in the status quo asserted by commenters. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (requiring agencies to consider "serious reliance interests" when changing policies); *see also Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 222 (2016) (referring to "significant" and "serious" reliance interests (quotation marks omitted)). The governmental commenters do not appear to have identified any reliance interests. Although some commenters identified what they believed would be burdens on or injuries to State, county, and local governments as a result of the proposed rule—claims that are addressed in the Departments' responses to comments—none clearly identified any significant reliance interests in the current state of affairs.

The Departments perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions the NPRM implicated or that are affected by this IFR. Even if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule.

## IV. Response to Public Comments on the Proposed Rule

*A. Summary of Public Comments*

In response to the proposed rule, the Departments received 5,235 comments during the 60-day public comment period. Approximately 1,347 of the comments were letters submitted through mass mailing campaigns, and 3,790 comments were unique submissions. Primarily, individuals and anonymous entities submitted comments, as did multiple State Attorneys General, legal service providers, advocacy groups, attorneys, religious and community organizations, elected officials, and research and educational institutions, among others.

Comments received during the 60-day comment period are organized by topic below. The Departments reviewed the public comments received in response to the proposed rule and address relevant comments in this IFR, grouped by subject area. The Departments do not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the changes to made by this rule. This IFR

does not resolve issues outside the scope of this rulemaking. A brief summary of comments the Departments deemed to be out of scope or unrelated to this rulemaking, making a substantive response unnecessary, is provided at the end of the section. Comments may be reviewed at *https:// www.regulations.gov,* docket number USCIS–2021–0012.

Following careful consideration of public comments received, the Departments in this IFR have made modifications to the regulatory text proposed in the NPRM. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to those regulatory amendments, except where a new or supplemental rationale is reflected in this IFR. As a general matter, the Departments believe that the IFR addresses concerns expressed by a majority of those who commented on the NPRM's proposed IJ review procedure by establishing that where the asylum officer denies a noncitizen's application for asylum, that noncitizen will be placed into streamlined section 240 proceedings, rather than the alternative procedure proposed in the NPRM. While the Departments found a number of the concerns raised by commenters to be persuasive in making this change, general statements that the IFR addresses commenters' concerns should not be read to mean that the Departments have adopted or agree with commenters' reasoning in whole or in part.

The Departments welcome comments on the IFR's revisions that are submitted in accordance with the instructions for public participation in Section I of this preamble. Among other topics, the Departments invite comment on the procedures for streamlined section 240 proceedings and whether any further changes to those procedures would be appropriate.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

a. Immigration Policy Benefits

*Comments:* Several commenters supported the proposed rule on the basis of immigration policy benefits, including: Reducing duplication of effort between USCIS asylum officers and IJs by allowing asylum officers to adjudicate claims that originated through the USCIS-administered credible fear screening process with less or no expenditure of immigration court time or resources; improving the process to better serve traumatized populations;

expediting the asylum application process and allowing covered asylum seekers to receive protection sooner; making the asylum application process more efficient and fair; helping to better manage migrant flows and increase security at the Southwest border; and providing due process, dignity, and equity within the system.

*Response:* The Departments acknowledge the commenters' support for the rule.

b. Positive Impacts on Applicants, Their Support Systems, and the Economy

*Comments:* A few commenters supported the proposed rule, without substantive rationale, on the basis of positive impacts on applicants, their support systems, and the U.S. economy. Some commenters supported the proposed rule and expressed gratitude for helping people who are in fear for their lives and encouraged facilitating a smoother pathway for noncitizens once they get through the initial process successfully. Another commenter stated that the rule represents a fundamental shift that will help eligible asylum applicants receive humanitarian protection and not keep asylum seekers in limbo for years while awaiting a final status determination. An individual commenter supporting the rule wrote that asylum seekers who have received a positive credible fear determination may be able to enter the labor force sooner. According to this commenter, enabling earlier access to employment for asylum-eligible individuals could reduce the public burden, reduce the burden on the asylum support network, and benefit those asylum seekers in terms of equity, human dignity, and fairness.

*Response:* The Departments acknowledge these commenters' support for the rule and agree the rule will benefit asylum seekers and their support systems, including public entities.

2. General Opposition to the Proposed Rule

a. Immigration Policy Concerns

*Comments:* Many commenters expressed general opposition to the rule out of a belief that this Administration is not committed to enforcing U.S. immigration law or deterring unauthorized migration into the United States, or out of a belief that the Administration intends to drive more irregular migration for political reasons. Several of these commenters pointed to the high numbers of Southwest border encounters that have occurred in 2021 as support for their beliefs.

*Response:* The Departments acknowledge the commenters'

frustration with the high rates of unauthorized entry into the United States between ports of entry on the Southwest border in 2021, a continuation of an increase that has been observed since April 2020.[50] However, the Departments disagree with the commenters' suggestion that the high numbers of border encounters imply either that the Administration supports or is indifferent to such unauthorized entries. To the contrary, maintaining an orderly, secure, and well-managed border and reducing irregular migration are priorities for the Departments and for the Administration. The Fiscal Year ("FY") 2022 President's Budget directs resources toward robust investments in border security and safety measures, including border technology and modernization of land ports of entry. *See* DHS, *FY 2022 Budget in Brief* 1–2, *https://www.dhs.gov/sites/default/files/publications/dhs_bib_-_web_version_-_final_508.pdf.* Under this Administration, the United States has also bolstered public messaging discouraging irregular migration and strengthened anti-smuggling and anti-trafficking operations, while at the same time investing in Central America to address the lack of economic opportunity, weak governance and corruption, and violence and insecurity that lead people to leave their homes in the first place and attempt the dangerous journey to our Southwest border. *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021) *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022). The Departments emphasize that the COVID–19 pandemic and associated economic downturn, along with two severe hurricanes that together impacted Nicaragua, Honduras, Guatemala, and El Salvador in November 2020, have added to those longstanding problems. *See* DHS, Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border (Mar. 16, 2021), *https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation;* USAID, Latin American

Storms—Fact Sheet #1, (FY) 2021 (Nov. 19, 2020), *https://www.usaid.gov/crisis/hurricanes-iota-eta/fy21/fs1* (last visited Mar. 14, 2022). Finally, misinformation—including the false message that our borders are "open"—has also driven irregular migration. *See* DHS, Secretary Mayorkas Delivers Remarks in Del Rio, TX (Sep. 20, 2021), *https://www.dhs.gov/news/2021/09/20/secretary-mayorkas-delivers-remarks-del-rio-tx.* The Departments reiterate that the borders of the United States are not open and that individuals should not put their own lives or the lives of their family members in the hands of smugglers or other criminals who represent otherwise.

*Comments:* Many commenters generally opposed the rule due to concerns that USCIS asylum officers would be more likely than IJs to grant asylum or other protection to individuals who should not be eligible for it or to otherwise "loosen" the requirements for asylum eligibility. Some commenters expressed, without providing details, that IJs are better trained, better qualified, or better equipped to "vet" applicants or detect fraudulent claims. Other commenters explained that they were concerned USCIS asylum officers would not apply the law or would not serve as impartial adjudicators. Commenters based this concern on at least two different rationales. Some commenters reasoned that asylum officers were subject to greater political control than IJs; other commenters reasoned that asylum officers are too "unaccountable" to the public. Finally, a few commenters expressed concern about USCIS being "fee-driven" and that having a "fee-driven" agency control the credible fear process removes it from congressional oversight.

While most comments that disapproved of authorizing asylum officers to adjudicate defensive asylum applications urged the Departments to continue to require that IJs within EOIR adjudicate all such applications, some comments urged that "Federal judges" or immigration judges "appointed by the judicial branch" should be hired to quickly and impartially adjudicate asylum claims.

*Response:* The Departments disagree with the assertion that USCIS asylum officers cannot appropriately vet or determine eligibility for protection. Asylum officers are career Government employees selected based on merit, they receive extensive training, and they possess expertise in determining eligibility for protection. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b); *see, e.g.,* USAJOBS,

---

[50] *See* U.S. Customs and Border Protection ("CBP"), Southwest Land Border Encounters, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

Asylum Officer, *https://www.usajobs.gov/job/632962200* (last visited Mar. 14, 2022) (specifying that asylum officers are members of the competitive service); *see also* 22 U.S.C. 6473(b) (requisite training on religious persecution claims). USCIS asylum officers must undergo "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 CFR 208.1(b); *see also* INA 235(b)(1)(E)(i), 8 U.S.C. 1225(b)(1)(E)(i) (requiring that asylum officers have "professional training in country conditions, asylum law, and interview techniques"). While IJs handle a broad swath of immigration-related matters, USCIS asylum officers are uniquely trained to adjudicate protection claims. Additionally, USCIS asylum officers have dedicated resources available to them to address fraud concerns, including Fraud Detection and National Security ("FDNS") officers embedded within the USCIS Asylum Division.[51] FDNS employs numerous measures to detect and deter immigration benefit fraud and aggressively pursues benefit fraud cases in collaboration with USCIS adjudication officers and Federal law enforcement agencies. Since 2004, FDNS and ICE have collaborated in a strategic partnership to combat immigration fraud. FDNS officers work closely with law enforcement and intelligence community partners to resolve potential fraud, national security, and public safety concerns and to ensure the mutual exchange of current and comprehensive information. They conduct administrative investigations into suspected benefit fraud and aid in the resolution of national security or criminal concerns. Administrative investigations may include compliance reviews, interviews, site visits, and requests for evidence, and they may also result in a referral to ICE for consideration of a criminal investigation. Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect. Regardless of whether it is an IJ or an asylum officer who adjudicates an application, no individual may be granted asylum or withholding of removal until certain vetting and identity checks have been made. INA 208(d)(5)(A)(i), 8 U.S.C. 1158(d)(5)(A)(i);

8 CFR 208.14(b), 1003.47. The Departments believe that commenters' concerns about USCIS having a financial incentive to "rubber-stamp" grant applications for asylum or lacking congressional oversight because it is primarily fee-funded are likewise misplaced. USCIS adjudicates asylum applications without charge, *see* 86 FR 46922, and is subject to congressional oversight.

Moreover, EOIR is currently burdened with a heavy case backlog, as described in the NPRM. Notably, EOIR's caseload includes a wide range of immigration and removal cases. *See EOIR Policy Manual,* Part II.1.4(a) (updated Dec. 30, 2020), *https://www.justice.gov/eoir-policy-manual* ("EOIR Policy Manual"). Allowing USCIS to take on cases originating in the credible fear process therefore is expected to reduce delays across all of EOIR's dockets, as well as reducing the time it takes to adjudicate these protection claims. The Departments believe that alleviating immigration court caseloads through the fair, efficient process articulated in this rule is a positive step forward. Suggestions asking for additional Federal judges within the judicial branch to handle the influx of asylum and protection-related cases should be directed to Congress.

*Comments:* Many commenters generally opposed the rule on the ground that a higher-priority or better way to address the overwhelmed U.S. asylum system would be to "regain control" over who enters the country by "tak[ing] steps to significantly reduce the number of people flowing across the border" and by not releasing individuals who have entered the United States without inspection or parole.

*Response:* The Departments acknowledge concerns raised by the commenters and note that this rulemaking is one part of a multifaceted whole-of-government approach to addressing irregular migration and ensuring that the U.S. asylum system is fair, orderly, and humane. This whole-of-government approach seeks to make better use of existing enforcement resources by investing in border security measures that will facilitate greater effectiveness in combatting human smuggling and trafficking and addressing the entry of undocumented migrants. The United States also is working with governments of nearby countries to facilitate secure management of borders in the region and to investigate and prosecute organizations involved in criminal

smuggling.[52] These and other efforts to address irregular migration are beyond the scope of this rule, which specifically concerns the procedures by which individuals who are encountered near the border and placed into expedited removal will receive consideration of their claims for asylum or other protection, as is required by law. INA 235(b)(1), 8 U.S.C. 1225(b)(1). However, to the extent that the significant delays in the adjudication of asylum claims today contribute to rates of irregular migration, the Departments believe that the efficiencies introduced by the rule will help to reduce any incentive to exploit the system and enhance the Government's efforts to address irregular migration. By limiting the amount of time a noncitizen may remain in the United States while a claim for relief or protection is pending, the rule stands to dramatically reduce potential incentives for noncitizens to make false claims for relief and protection.

Finally, the Departments emphasize that individuals who have entered the United States without inspection or parole and who are subsequently encountered and placed into expedited removal are presumptively detained, as the statute provides that such individuals are subject to mandatory detention. *See* INA 235(b)(1)(B)(ii), (iii)(IV), 8 U.S.C. 1225(b)(1)(B)(ii), (iii)(IV). Such individuals may be released on parole only in accordance with the statutory and regulatory standards. *See* INA 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5, 235.3(b)(2)(iii), (b)(4)(ii).

*Comments:* Many commenters generally opposed the rule on the ground that allowing USCIS to adjudicate the merits of asylum claims through a nonadversarial process would "take away the rights of the American people to be represented in court when migrants seek benefits that would place them on the path to citizenship" or "remov[e] . . . safeguards that are meant to protect the American population." Commenters asserted that allowing asylum claims to be adjudicated without a DHS attorney cross-examining the applicant and having the opportunity to offer impeachment evidence would give fewer rights to the American people, while the noncitizen applicant would

---

[51] *See* USCIS, Fraud Detection and National Security Directorate, *https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-national-security-directorate.*

[52] *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022).

still have the opportunity to be represented by counsel.

*Response:* The Departments do not agree with the premise of commenters' assertions. A nonadversarial process does not take away the rights of the American people, but rather it allows for the presentation and consideration of asylum and other protection claims in a manner that is fair and efficient. Asylum officers are Government officials who are well-trained in making credibility determinations and assessing evidence. The asylum officer position is a specialized position focusing on asylum and related relief and protection from removal; as explained in Section III.B of this preamble, asylum officers already adjudicate affirmative asylum claims through a nonadversarial process. An asylum officer can consider evidence relevant to an applicant's claim, including evidence that might be introduced as impeachment evidence in immigration court, and an asylum officer, where appropriate, can ask the applicant questions similar to those that a DHS attorney might ask in immigration court during a cross-examination. The Departments believe that the American public is better served if claims for asylum or related protection that originate through the credible fear screening process may be adjudicated—fairly and efficiently—not only within section 240 proceedings before IJs but also by asylum officers who specialize in such claims.

*Comment:* Several commenters generally opposed the rule out of a belief that it is being promulgated solely for the purpose of providing asylum or other immigration benefits faster or through an easier procedure and is thereby putting the interests of migrants ahead of the interests of U.S. persons or of the public interest.

*Response:* The Departments disagree with the view that the rule is not in the public interest. Rather, providing a process through which vulnerable populations may seek protection is the means by which the United States meets its obligations under both U.S. and international law. *See* Refugee Protocol, 19 U.S.T. 6223; INA 208, 241(b)(3), 8 U.S.C. 1158, 1231(b)(3); FARRA sec. 2242. Amending the existing process to allow adjudications—both those that end in grants and those that end in denials—to be made more promptly, while maintaining fundamental fairness, is a change that is in the public interest. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 424 (1987) (observing that the Refugee Act of

1980 established "a broad class of refugees who are eligible for a discretionary grant of asylum, and a narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger"); FARRA sec. 2242 (legislation implementing U.S. obligations under Article 3 of the CAT not to remove noncitizens to any country where there are substantial grounds for believing the person would be in danger of being subjected to torture). Ensuring that the Departments uphold these American values as enshrined in U.S. law is in the national interest. It is also in the public interest that the procedures by which the Departments administer the law and uphold these values not regularly result in years-long delays, which may be detrimental to both the U.S. public and those seeking protection. Efficient processing of cases is in the public interest, as cases that span years can consume substantially greater Government resources, including by contributing to delays in immigration court proceedings that hinder DHS's ability to swiftly secure the removal of noncitizens who are high priorities for removal. The process created by this rule therefore advances the public interest by authorizing the Departments to employ a fair and efficient procedure for individuals to seek protection as an appropriate alternative to the exclusive use of section 240 proceedings and by reducing immigration court backlogs that are detrimental to the public interest.

*Comments:* Some commenters generally opposed the rule on the ground that it allows noncitizens to seek review of any denial of asylum or other protection but does not allow an opportunity for correcting or reviewing erroneous grants of asylum or other protection.

*Response:* The Departments acknowledge the concern regarding error correction when asylum or other protection is granted, but the Departments believe this concern is addressed by existing statutory and regulatory provisions, as well as by DHS's longstanding practices regarding the supervision of asylum officers. To reiterate those longstanding supervision practices, the Departments have revised 8 CFR 208.14(b) and (c) and, correspondingly, 8 CFR 1208.14(b) and (c), to emphasize that asylum officers' decisions on approval, denial, dismissal, or referral of an asylum application remain subject to review within USCIS.

As noted above, the Secretary of Homeland Security is charged with the administration and enforcement of the

immigration laws and has the control, direction, and supervision of all employees and of all the files and records of USCIS. *See* INA 103(a)(1), (2), 8 U.S.C. 1103(a)(1), (2). Further, the asylum statute vests the Secretary of Homeland Security with the authority to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). The Secretary's broad authority includes the authority to review and modify immigration benefit decisions, including grants of asylum. Such authority has been delegated to the Director of USCIS. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); *see also* 8 CFR 2.1. Further, USCIS retains authority under this delegation to reopen or reconsider decisions (including asylum decisions) at any time on the agency's own motion, based upon any new facts or legal determinations. *See* 8 CFR 103.5(a)(5). Nothing in this IFR in any way detracts from or diminishes the authority and responsibility of the Secretary of Homeland Security and the Director of USCIS over any grant of asylum that is issued by USCIS.

Beyond these statutory and regulatory provisions, 100 percent of USCIS asylum officers' approvals, denials, referrals, or dismissals of an asylum application are currently subject to supervisory review before a final decision is made and served on the applicant. *See* Memorandum from Andrew Davidson, Chief, Asylum Div., USCIS, *Modifications to Supervisory Review of Affirmative Asylum Cases* (Mar. 31, 2021). The decision of the asylum officer on whether or not to grant asylum undergoes review by a supervisor, and may be further reviewed as USCIS deems appropriate, before finalization and service on the applicant. *Id.* The Departments have revised 8 CFR 208.14(b) and (c), and made corresponding revisions to 8 CFR 1208.14(b) and (c), to emphasize these longstanding review practices. The Asylum Division also as a matter of policy determines which cases should receive further review at the headquarters level before being finalized. *See, e.g.,* USCIS Asylum Division, *Affirmative Asylum Procedures Manual,* III.Q. Quality Assurance Review (May 2016), *https:// www.uscis.gov/sites/default/files/ document/guides/AAPM-2016.pdf.* Further, the Director of USCIS, or the Director's delegate, "may direct that any case or class of cases be certified" to another USCIS official, including the USCIS Director herself, for decision. *See* 8 CFR 103.4(a)(1). Accordingly, USCIS

**Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations **18113**

adjudicates each asylum claim, and the individual asylum officer is only empowered to grant asylum, as an exercise of the Secretary's authority. *See* 8 CFR 208.9(a).

If a grant of asylum or withholding of removal is not warranted, the grant may be terminated by USCIS or an immigration judge, as appropriate. *See* INA 208(c)(2), 8 U.S.C. 1158(c)(2); 8 CFR 208.24, 1208.24. A grant of CAT deferral of removal may also be terminated. *See* 8 CFR 208.17(d)–(f), 1208.17(d)–(f). The procedures for termination of a grant of asylum, withholding of removal, or deferral of removal is not changed by the rule. Any further judicial review may occur after the termination of asylum or other protection commences.

Moreover, with regard to individuals who are found eligible for withholding of removal but not granted asylum, the rule generally provides an opportunity for correcting an erroneous finding of eligibility through the streamlined section 240 proceeding. For example, if the DHS attorney becomes aware of new derogatory information indicating that the noncitizen is ineligible for that other protection, such information can be submitted and accounted for in the IJ's removal order. Finally, to the extent this IFR sets up a process under which, where an asylum officer declines to grant a noncitizen's asylum claim, that noncitizen can continue to pursue that claim before an IJ, the IFR does not break new ground. Rather, in these respects, the IFR mirrors the longstanding affirmative asylum process.

*Comments:* Several commenters generally opposed the rule on the ground that it would delay or otherwise make it harder for DHS to remove noncitizens by giving them more opportunities to appeal. Commenters expressed concern that delays in removal, coupled with more expeditious grants of asylum, would encourage irregular migration and incentivize individuals to make fraudulent claims for asylum to obtain parole from detention.

*Response:* The Departments acknowledge the commenters' concern but disagree with their conclusions. The rule intends to streamline adjudication of protection claims, whether granted or not. As noted in the NPRM, for claims involving non-detained individuals in section 240 removal proceedings, including asylum seekers encountered at the border and initially screened into expedited removal who establish a credible fear of persecution, the current average case completion time for EOIR is 3.75 years, and individuals who

arrive at the border and seek protection therefore often must wait several years for an initial adjudication by an IJ. *See* 86 FR 46909, 46928 tbl. 6. Any appeal after that adjudication adds even more time than an individual may expect to remain in the United States. Given the length of the process under the status quo and the streamlining procedures incorporated into the new process to promote prompt resolution of removal proceedings, it is unlikely that the new process allowed by the rule will result in further "delays in removal" that commenters fear may encourage further irregular migration or incentivize the filing of non-meritorious claims by individuals who do not need protection. The new process replaces a single section 240 removal proceeding in immigration court with a merits interview before an asylum officer, followed by a streamlined section 240 removal proceeding if USCIS does not grant asylum. Comments that assume this new two-step process will result in greater delays overlook that the new process is tailored specifically to adjudicate asylum and related protection claims, and individuals in the process will have been determined by an immigration officer to be inadmissible under section 235(b)(1)(A)(i) of the INA, 8 U.S.C. 1225(b)(1)(A)(i).[53] Additionally, as detailed in Section III.D of this preamble, the streamlined 240 removal proceeding will be governed by special procedural rules, including time frames and limits on continuances, that assure prompt completion. This streamlined process, as provided by the rule, thus addresses the commenters' underlying concern regarding delays. As explained in the NPRM, the Departments believe that this rule will substantially reduce the average time to adjudicate asylum claims—whether the final decision is a grant or a denial—thereby reducing any incentive for exploitation of the asylum system.

*Comments:* Several commenters generally opposed the rule based on the view that nearly all the migrants encountered at or near the Southwest border are economic migrants, not legitimate asylum seekers, and that all such individuals should therefore be removed without wasting resources on adjudications and appeals.

*Response:* The Departments acknowledge commenters' concern that legitimate asylum seekers be identified and distinguished from individuals seeking to enter the United States for other purposes, and the rule is indeed designed to more expeditiously and fairly distinguish the one group from the other. The Departments disagree with commenters' characterization that nearly all migrants encountered at the Southwest border are only seeking economic opportunity. Recent surveys of individuals seeking to migrate to the United States have found that individuals cite a variety of factors, often in combination, for leaving their country of origin. While economic concerns and a belief in American prosperity and opportunity are common reasons stated, violence and insecurity have been cited as reasons for migrating by majorities or near majorities of those surveyed.[54] And, regardless, Congress has instructed that individuals in expedited removal who claim a fear of persecution or indicate an intent to apply for asylum be given an individualized credible fear screening. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); *see also* 8 CFR 208.30. The purpose of these individualized screenings is to prevent the removal of individuals in need of protection to a country where they face persecution or torture. Under this IFR, as under current regulations, individuals who receive a positive credible fear determination are given a fair opportunity to pursue their claim for asylum or other protection. Individuals who receive a negative credible fear determination and individuals who are determined to not warrant a discretionary grant of asylum or to be otherwise ineligible for protection will be subject to removal. Moreover, by making changes to facilitate the more frequent use of expedited removal for broader classes of individuals and families, the IFR will enable the Departments to more quickly secure removal orders in cases in which no fear claim is asserted or no credible fear is established than if such individuals and families were instead placed directly in removal proceedings, as frequently occurs.

---

[53] To be sure, the IFR includes exceptions to these streamlined section 240 proceedings. One of those exceptions is for noncitizens who raise a substantial challenge to the charges of inadmissibility or removability. *See* 8 CFR 1240.17(k)(3). Certain streamlining provisions under 8 CFR 1240.17, including the deadlines, and the limits on continuances and extensions of deadlines, will not apply in cases involving such noncitizens.

[54] *See, e.g.,* Randy Capps et al., Migration Policy Institute, *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* 18–19 (Aug. 2019), *https://www.migrationpolicy.org/sites/default/files/publications/BorderSecurity-ControltoCrisis-Report-Final.pdf* (last visited Mar. 15, 2022); Medicins Sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 10–11 (May 2017), *https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf* (last visited Mar. 15, 2022).

*Comments:* Multiple individual commenters generally opposing the proposed rule asserted that the rule, contrary to its stated purpose, would most likely increase the backlog of asylum cases, either because of the multiple levels of appeal available whenever an individual's claim is not granted or because the rule would likely encourage more people to enter the United States and make a fear claim.

*Response:* The Departments agree that high rates of asylum applications relative to historic data are of concern for both USCIS asylum offices and the immigration courts. However, commenters misapprehend the nature of the review and appeal structure proposed in the NPRM and finalized, in modified form, in this IFR. The new process replaces a single section 240 removal proceeding in immigration court with an interview before an asylum officer, which is followed by a streamlined section 240 removal proceeding if the asylum officer does not grant asylum. Commenters assume that any new two-step process will increase the backlog of asylum cases, but the process this IFR establishes is tailored specifically to adjudicate asylum claims. Additionally, as detailed above in Section III.D of this preamble, unlike an ordinary section 240 removal proceeding, streamlined section 240 removal proceedings will be governed by special procedural rules, including limits on continuances, that assure prompt completion. As a result, the process established by this rule is expected to take less time and assist in stemming case backlogs relative to the current process of initially adjudicating all claims through an ordinary section 240 proceeding, followed by the possibility of appeal to the BIA and review by the U.S. Courts of Appeals. The Departments also disagree with commenters' predictions that the rule would increase the backlog of asylum cases by encouraging more individuals to seek asylum or related protection, as commenters have not identified any evident causal mechanism by which the rule as a whole, in context, would systematically and substantially incentivize more individuals to seek to enter the United States and pursue asylum. On the contrary, the Departments believe that, by enabling prompt adjudication of asylum claims—including the prompt rejection of claims that lack merit—the rule would discourage individuals who lack a basis for asylum or related protection to seek to enter the United States or claim protection.

*Comments:* A few commenters expressed opposition for each of the

following reasons: The proposed rule would change the substantive standard for asylum eligibility; the proposed rule would allow noncitizens who entered the United States without authorization to "cut the line" ahead of those who have been awaiting legal immigration and therefore will be unfair and harmful to those whose cases are delayed and will remove incentives for individuals to pursue legal immigration; and the proposed rule would automatically provide for "immediate" U.S. citizenship. A few commenters also expressed opposition on the ground that only elected officials should make asylum decisions or, alternatively, only voters should make asylum determinations. In addition, one commenter opposing the rule described it as "giving two chances at asylum" and another commenter described it as a proposal to "cut funding for the detention of asylum seekers."

*Response:* The concerns expressed by these commenters are based on apparent factual misunderstandings of the asylum standards, the asylum adjudications system, and the effect of an asylum grant. In that regard, the NPRM would not have changed, and the IFR does not change, the standards for qualifying for asylum. Further, the NPRM would not have provided, and the IFR does not provide, "immediate" U.S. citizenship to anyone. Rather, this rulemaking is concerned with the system for adjudicating asylum claims by noncitizens found to have credible fears of persecution or torture. While a noncitizen granted asylum may eventually apply for and receive citizenship if certain conditions are met, a grant of asylum on its own does not entitle the recipient to citizenship. The Departments believe that the changes suggested by these comments either are not within the scope of the rulemaking or would be impermissible under current U.S. law.

*Comments:* A commenter stated that the proposed rule would negatively affect individuals seeking asylum through the affirmative application process. The commenter noted that USCIS has more than 400,000 pending affirmative asylum cases, and most cases take more than 180 days to adjudicate. The commenter stated that the proposed rule would exacerbate this backlog by adding to the queue the asylum claims of individuals in expedited removal proceedings. While the commenter acknowledged that the Departments proposed in the NPRM to increase staffing levels in order to implement the new rule, the commenter stated that these additional resources should be used to adjudicate existing

cases in order within the 180-day period mandated by Congress. Other commenters stated that the Departments have not addressed whether the proposed rule will increase backlogs and wait times for affirmative cases.

*Response:* The Departments acknowledge the commenter's concern for individuals with affirmative asylum cases pending before USCIS but disagree that this rule will negatively affect them. As discussed in the NPRM, the Departments have planned for the new process described in this rule to be implemented in phases, as the necessary staffing and resources are put into place. A phased implementation will allow the Departments to begin employing the proposed process in a controlled manner for a limited number of cases, giving USCIS the opportunity to work through operational challenges and ensure that each noncitizen placed into the process is given a full and fair opportunity to have any protection claim presented, heard, and properly adjudicated in full conformance with the law. As the commenter acknowledged, USCIS plans to hire new employees and secure additional funding to implement this rule so that it will not be necessary to divert resources from existing caseloads, including affirmative asylum, to do so. USCIS has estimated that it will need to hire approximately 800 new employees and spend approximately $180 million to fully implement the proposed Asylum Merits interview and adjudication process to handle approximately 75,000 cases annually. While addressing the affirmative asylum backlog is outside the scope of the rulemaking, the Departments acknowledge the importance of doing so and note that USCIS has taken other actions to address this priority. These include expanding facilities; hiring and training new asylum officers; implementing operational changes to increase interviews and case completions and reduce backlog growth; establishing a centralized vetting center; and working closely with technology partners to develop several tools that streamline case processing and strengthen the integrity of the asylum process.[55] In addition, on September 30, 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provides dedicated backlog elimination funding to USCIS for "application

---

[55] *See* USCIS, *Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress* (Oct. 20, 2021), *https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf.*

processing, the reduction of backlogs within asylum, field, and service center offices, and support of the refugee program.'' Public Law 117–43, sec. 132, 135 Stat. 344, 351.

*Comments:* Some commenters generally proposed alternative ways to reduce delays and strain on the U.S. system for asylum adjudication and urged the Departments to implement these alternatives rather than the proposed rule. Proposed alternatives included the following actions:

• Taking unspecified actions to significantly reduce the number of people crossing the border;

• devoting more resources to the current asylum process, including hiring more IJs;

• adopting stricter substantive standards for demonstrating asylum eligibility;

• implementing the Migrant Protection Protocols ("MPP");

• criminally prosecuting anyone who makes a fraudulent asylum claim;

• denying all asylum requests; and

• denying asylum to noncitizens who cross the border between ports of entry.

*Response:* The Departments acknowledge the commenters' suggestions and recognize that building an immigration system that works and maintaining an orderly, secure, and well-managed border requires multiple coordinated lines of effort. High numbers of unauthorized border crossings, transnational criminal organizations seeking to profit from a range of illicit activities, and the ongoing impact of COVID–19 on the processing of migrants present significant challenges along the Southwest border. DHS has deployed unprecedented levels of personnel, technology, and resources and has made critical security improvements to secure and manage our borders. The Departments emphasize that this rule addresses specifically the way in which asylum and related protection claims of certain individuals encountered near the border are considered, with the aim of adjudicating those claims in a timelier manner while ensuring fundamental fairness. Comments advocating for other immigration policy changes that in theory could lead to fewer individuals making fear claims are outside the scope of this rulemaking.

The Departments agree that increasing the number of IJs is part of the solution to alleviating the current strain on the U.S. asylum system. The Fiscal Year 2022 President's Budget requests an additional 100 IJs and associated support staff to ensure the efficient and fair processing of cases, and EOIR will continue to request funding to add additional IJs. *See* DOJ, *FY 2022 Budget Request, https://www.justice.gov/jmd/page/file/1398846/download.* Given the increase in the number of immigration judges requested of and authorized by Congress during recent budget cycles, the Fiscal Year 2022 President's Budget also requests 100 additional ICE litigators to prosecute the removal proceedings initiated by DHS, consistent with 6 U.S.C. 252(c). *See* DHS, *ICE Budget Overview Fiscal Year 2022 Congressional Justification* ICE– O&S–22, *https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf* (explaining that the ICE Office of the Principal Legal Advisor currently faces a staffing budgetary shortfall of several hundred positions).

b. Negative Impacts on Applicants and Their Support Systems

*Comments:* A few commenters opposed the proposed rule based on generally stated concerns about negative consequences for asylum seekers. Commenters stated that the existing process for adjudicating asylum claims originating in credible fear screening is effective and provides strong legal protections for asylum seekers, including the opportunity for judicial review. Other commenters expressed concern that any streamlining of the existing process would result in asylum seekers being ordered removed without receiving full and fair consideration of their protection claims.

*Response:* The Departments disagree with the commenters' premise that any change from the existing procedure that seeks to determine relief or protection claims in a timelier manner will be detrimental to individuals who are seeking asylum. The procedure established by this rule gives individuals appropriate procedural protections, as well as an opportunity for those whose relief or protection claims are denied to seek judicial review after exhausting their administrative remedies. Moreover, as described above, the Departments are finalizing the rule with certain changes from the NPRM that are responsive to concerns about fairness, such as retaining USCIS's authority to entertain reconsideration of a negative credible fear determination that has been upheld by an IJ, specifying a minimum number of days between a positive credible fear determination and the Asylum Merits interview, and eliminating the restrictions on the evidence applicants may submit before IJs.

c. Negative Impacts on U.S. Citizens and the Economy

*Comments:* Many commenters generally opposed the rule due to concerns that it will lead to increases in unauthorized immigration, immigration benefits illegally obtained by fraud, or lawful immigration that the commenters perceived as illegitimate. Commenters expressed concern that such immigration would have negative effects on U.S. citizens and the U.S. economy, including with respect to availability of housing and other resources, wages and jobs, public health, costs of schools and healthcare, crime and safety, the deficit, and the environment, among other things. For the most part, commenters did not provide details about why they believed that the rule would result in increased immigration or increased rates of fraud or misrepresentation. Some commenters, however, explained that they believed the rule would drive increased unauthorized or fraudulent immigration "by promising aliens who have made bogus asylum claims freedom from detention." Other commenters explained that they believed the rule would drive increased unauthorized or fraudulent immigration by allowing for nonadversarial merits adjudications, without an ICE attorney assigned to cross-examine the applicant or present impeachment evidence.

*Response:* The Departments acknowledge the comments on the potential negative impacts of lawful immigration, including the impacts on wages, jobs, and the labor force. However, because the rule does not change the substantive standard for asylum or related protection, the Departments do not expect that the rule will lead to increases in legal immigration, although it may lead to some illegal noncitizens receiving asylum or related protection sooner than they otherwise would. Section V.B of this preamble estimates the effects, on a per-individual, per-day basis, of individuals receiving employment authorization earlier as a result of efficiencies introduced by the rule. Contrary to commenters' claims, as detailed in Section V.B of this preamble, the increased efficiencies of this IFR could also result in fewer individuals who are ineligible for protection receiving employment authorization, if their applications are not granted before the waiting period for employment authorization under 8 CFR 274a.12(c)(8) has run. Furthermore, even if there were reason to believe that the rule may lead to increases in legal immigration, the Departments note that commenters did not provide any data or studies

supporting negative net impacts of asylees on U.S. citizens or the U.S. economy.[56]

While the Departments acknowledge the commenters' concerns about the negative impacts of unauthorized immigration and unauthorized entrance into the United States without inspection or parole, the Departments disagree with the commenters that there is reason to believe that the rule will result in an increase in the number of individuals who enter the United States without inspection or parole, or in an increase in those who stay beyond their authorized period of admission. If anything, by more expeditiously ordering removed those who are ineligible for protection, this rule may send a stronger deterrent signal relative to the status quo. Moreover, as outlined above, the United States is undertaking a range of efforts to address irregular migration and promote security at the border. Without additional information about the mechanism by which commenters anticipate that this rule will lead to more unauthorized migration, the Departments cannot further evaluate these comments. The Departments note that the rule does not "promis[e] . . . freedom from detention," and the Departments disagree with the commenters' concern about the nonadversarial nature of the Asylum Merits interview, as previously explained.

Similarly, while the Departments appreciate commenters' concerns about individuals seeking to obtain asylum or related protection by fraud or misrepresentation, the Departments disagree that there is any reason to believe that the rule will result in an increase in either the incidence or success of such fraud or misrepresentation. As explained earlier in Section IV.B.2.a of this preamble, the Departments are confident that asylum

officers have the training, skills, and experience needed to assess credibility and appropriately determine asylum eligibility through a nonadversarial interview.[57] With respect to comments noting a negative impact of immigration (whether lawful or unauthorized) on availability of housing, public health, costs of schools and healthcare, the deficit, and the environment, the comments lacked specific information expanding on these statements and explaining how this rule would impact these areas. Environmental issues are addressed in Section V.J of this preamble.

*Comments:* Numerous commenters stated that the needs, interests, and protection of the American people should come first, and they asserted that the proposed rule would "elevate" asylum seekers and others who enter the United States without authorization above U.S. citizens. Many individual commenters stated that the asylum program should be halted, or not be changed, until the United States can support and help its own citizens who are in need.

*Response:* The Departments acknowledge the commenters' concern for U.S. citizens, and in particular for U.S. citizens in need. The Departments disagree, however, with the commenters' assumption that the rule either prioritizes the interests of asylum seekers over the interests of U.S. citizens or will be to the detriment of the needs, interests, or protection of U.S. citizens. An asylum system that more expeditiously determines whether individuals are or are not eligible for asylum or other protection in the United States, while providing due process, is in the public interest. It complies with Congress's instruction in INA 235, 8

U.S.C. 1225, that individuals in expedited removal be screened for credible fear of persecution and receive individualized consideration of their claims; it allows individuals who are not eligible for protection to be removed more promptly, thereby reducing any incentives to exploit the process; and it allows individuals who are eligible for asylum or other protection to sooner receive that assurance and integrate into their new community. Some commenters invoked particular categories of U.S. citizens in need, including persons experiencing unemployment or homelessness, veterans, persons with disabilities, and children in foster care, but the commenters did not provide any explanation or information to support the idea that this rule will operate to the detriment of these groups, or to support the idea that halting the asylum program—as some commenters proposed—would benefit these groups. The Departments note that the rule's potential and uncertain impacts on the U.S. labor force are analyzed in Section V.B of the preamble.

*Comments:* Multiple commenters stated generally that asylees' dependence on Government programs for support would lead to an undue burden on American taxpayers, exacerbation of the U.S. deficit, or increased costs of education and healthcare in the communities where asylees live.

*Response:* The Departments appreciate commenters' concern that public costs at the Federal, State, or local level might accompany increases in the number of individuals granted asylum in the United States. However, these general comments did not provide information or explanation to support either (1) the premise that this rule will lead to more individuals being granted asylum in the United States, or (2) the premise that increases in the number of individuals granted asylum in the United States would, on net, lead to increased public costs or costs of education or healthcare. The Departments believe that the IFR is unlikely to lead to significant increases in the number of individuals granted asylum in the United States, much less to increased public costs or costs of education or healthcare that outpace asylees' contributions in taxes and economic activity. A more detailed explanation of the possible impacts of this rule is provided in Section V.B of this preamble. Additionally, the Departments emphasize that estimating the fiscal impacts of immigration is a complex calculation. The first-order net fiscal impact of immigration is the

---

[56] Isolating immigration's effect on labor markets has been an ongoing task in the research. A 2017 National Academies of Sciences, Engineering, and Medicine ("NAS") publication synthesizes the current peer-reviewed literature on the effects of immigration and empirical findings from various publications. NAS, *The Economic and Fiscal Consequences of Immigration* (2017), *https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration* (last visited Mar. 5, 2022) ("2017 NAS Report"). Although this report is not specific to asylees, its analysis may be instructive. The report cautions that economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers. *Id.* at 4.

[57] The approval rate [total cases granted/total cases granted + total case denied + total cases referred (USCIS affirmative asylum processing only)] of asylum officers and IJs on the merits of asylum claims from Fiscal Years 2017 through 2021 show approval rates for asylum claims adjudicated by asylum officers to be in the 26–37 percent range, while IJ approval rates on asylum claims that started as credible fear screenings ranged from 31–39 percent and on all asylum claims (regardless of whether they began in the expedited removal or credible fear process) ranged from 26–37 percent. This information suggests that asylum officers are just as equipped to identify individuals not meeting asylum eligibility requirements as IJs who use the adversarial process with the participation of ICE's Office of the Principal Legal Advisor to reach a decision on asylum eligibility. USCIS, Refugee, Asylum and Int'l Operations Directorate, Asylum Division Workload Statistics for Affirmative Asylum 2009 to 2021 (2022); EOIR Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1062976/download;* EOIR Adjudications Statistics: Asylum Decision Rates (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1248491/download.*

difference between the various tax contributions the immigrants in question make to public finances and the Government expenditures on public benefits and services they receive. These first-order impacts are sensitive to immigrants' demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of Government programs.[58] In addition, second-order effects may also occur, and analysis of such effects presents methodological and empirical challenges. For example, as with the native-born population, the age structure of an immigrant population plays a major role in assessing any fiscal impacts. Children and young adults contribute less to society in terms of taxes and draw more in benefits by using public education, for example. On average, as people age and start participating in the labor market, they become net contributors to public finances, paying more in taxes than they draw from public benefit programs. Moreover, older adults could again become net users of public benefit programs. Compared to the native-born population, immigrants can also differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying fiscal impacts. Local and State economic conditions and laws that govern public finances or the availability of public benefits also vary and can influence the fiscal impacts of immigration.

### d. Other General Opposition to the Proposed Rule

*Comments:* Many commenters stated that asylum seekers should remain in Mexico during the pendency of their immigration hearings or otherwise generally referred to the Migrant Protection Protocols (''MPP''). Similarly, other commenters asked the Department to clarify how the rule may comply or conflict with MPP. Specifically, commenters raised concerns regarding implementation of the program, litigation surrounding MPP, as well as alternative proposals for MPP.

*Response:* Because MPP is decidedly separate from the expedited removal and credible fear process, comments concerning MPP are outside the scope of the changes made in this rule.[59] The

Departments appreciate engagement and concerns related to MPP, but discussion of the program, ongoing litigation, and DHS's efforts to terminate the program are outside the scope of this rulemaking. Moreover, the Secretary of DHS has already explained in detail his reasons for terminating MPP and his decision not to use the contiguous-territory-return authority on a programmatic basis.[60]

### C. Basis for the Proposed Rule

#### 1. DOJ and DHS Statutory/Legal Authority

*Comments:* Many individual commenters generally argued that the Departments do not have the statutory or legal authority to issue the rule, but the commenters did not provide a basis for their belief. Some individual commenters stated that the rule is unlawful, bypasses Congress, or cannot be issued as an executive decision.

*Response:* The Departments believe that these general comments misapprehend or misstate the legal authorities involved in this rulemaking. As noted above in Section II.B of this preamble, asylum, statutory withholding of removal, and protection under the CAT are established or required by statute. *See* INA 208, 8 U.S.C. 1158; INA 241(b)(3), 8 U.S.C. 1231(b)(3); FARRA sec. 2242. This rule does not seek to bypass Congress or otherwise act where Congress has not given the Departments authority. This

rule is consistent with statutory authority provided by Congress, and it is intended to create efficiencies in implementing a framework allowing for fair, consistent adjudications.

*Comments:* Commenters argued that the Homeland Security Act of 2002 expressed congressional intent that defensive asylum claims be adjudicated by IJs rather than asylum officers by granting EOIR the authority to adjudicate these claims but making no such provision for USCIS. Moreover, commenters noted that because the HSA specified the date on which powers would be vested in USCIS, Congress did not intend that the Departments be able to reallocate the authorities of IJs and asylum officers through regulations and that Congress has decided not to reallocate authorities relevant to the proposed rule since 2003. Another comment argued that the Illegal Immigration Reform and Immigrant Responsibility Act expressed congressional intent that asylum seekers found to have a credible fear of persecution have their cases adjudicated by IJs. One comment cited IIRIRA legislative history in arguing that the credible fear interview's purpose is to ''weed out non-meritorious cases'' and that asylum proceedings should be overseen by an IJ. One commenter asserted that legislative proposals under consideration in both the House and the Senate demonstrate Congress's interest in asylum policy and in immigration policy generally. The commenter argued that gridlock in Congress does not give executive agencies a ''free pass'' to overstep the legislative directives given to them by Congress.

*Response:* The Departments believe that these comments misapprehend or misstate the legal authorities involved in this rulemaking. This rule does not seek to bypass Congress or otherwise act where Congress has not given the Departments authority. If an asylum officer determines that a noncitizen has a credible fear of persecution, the noncitizen ''shall be detained for further consideration of the application for asylum.'' INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). The statute, however, ''does not specify how or by whom this further consideration should be conducted.'' Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997).

By not specifying what ''further consideration'' entails, the statute leaves it to the agency to determine. Under *Chevron,* it is well-settled that such ''ambiguity constitutes an implicit delegation from Congress to the agency

---

[58] *See generally* 2017 NAS Report at 323–27.

[59] Individuals processed for expedited removal are excluded from MPP, as that program is being implemented in compliance with the court order in *Texas* v. *Biden,* No. 2:21–cv–67, —F. Supp. 3d. —, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). By its terms, MPP applies only to noncitizens initially

placed into section 240 proceedings, not the noncitizens at issue here, who are initially placed into expedited removal proceedings. *See* Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, *Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols* 4 (Dec. 2, 2021), *https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf.* Nor does MPP eliminate expedited removal as an option for processing certain inadmissible noncitizens arriving in the United States. Some individuals—*e.g.,* Mexican nationals or nationals of countries outside the Western Hemisphere—may be eligible for processing through expedited removal but could not be considered for processing under MPP, which explicitly excludes certain categories of noncitizens. Additionally, the permanent injunction in *Texas* v. *Biden* specifically preserves the Secretary of DHS's discretion to make individual determinations about how to process a particular individual. *See Texas* v. *Biden,* 2021 WL 3603341, at *27. That discretion encompasses whether to process a specific noncitizen for 240 proceedings or expedited removal. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520 (BIA 2011).

[60] *See* Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), *https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-memo.pdf;* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), *https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.*

**18118**   **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

to fill in the statutory gaps.'' *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron,* 467 U.S. at 844); *see also Epic Sys. Corp.,* 138 S. Ct. at 1629 (noting that *Chevron* rests on ''the premise that a statutory ambiguity represents an implicit delegation to an agency to interpret a statute which it administers'' (quotation marks omitted)). An agency may exercise its delegated authority to plug the gap with any ''reasonable interpretation'' of the statute. *Chevron,* 467 U.S. at 844.

By its terms, the phrase ''further consideration'' is open-ended. The fact that Congress did not specify the nature of the proceedings for those found to have a credible fear contrasts starkly with two other provisions in the same section that expressly require or deny section 240 removal proceedings for certain other classes of noncitizens. In one provision, INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(a), Congress provided that an applicant for admission who ''is not clearly and beyond a doubt entitled to be admitted'' must be ''detained for a proceeding under section [INA 240].'' And in another, INA 235(a)(2), 8 U.S.C. 1225(a)(2), Congress provided that ''[i]n no case may a stowaway be considered . . . eligible for a hearing under section [INA 240].'' These examples show that Congress knew how to specifically require immediate referral to a section 240 removal proceeding when it wanted to do so. ''Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'' *Salinas,* 141 S. Ct. at 698 (quotation marks omitted).

The D.C. Circuit has ''consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion.'' *Catawba Cnty.,* 571 F.3d at 36 (quotation marks omitted). The suggestion that Congress's silence in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), permits the Departments discretion to establish procedures for ''further consideration'' is reinforced by the fact that the noncitizens whom DHS has elected to process using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A). *See* INA 235(b)(2)(B)(ii), 8 U.S.C. 1225(b)(2)(B)(ii).

The Departments disagree with the comments arguing that any statute requires asylum cases to be adjudicated through an adversarial process. The rule is designed to implement the statute, which does not specify that ''further consideration of [an] application for asylum'' entails and which thereby leaves it to the agency to determine what will occur when an individual placed in expedited removal is found to have demonstrated a credible fear of persecution. INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). Nothing in the asylum statute requires the Secretary of Homeland Security to establish an adversarial procedure to determine whether a noncitizen may be granted asylum.

The Departments also disagree with the comments that defensive asylum applications are statutorily required to be adjudicated by DOJ instead of by DHS. The asylum statute provides that specified noncitizens ''may apply for asylum,'' including ''in accordance with . . . [INA 235(b), 8 U.S.C. 1225(b)],'' INA 208(a)(1), 8 U.S.C. 1158(a)(1), and that ''[t]he Secretary of Homeland Security or the Attorney General may grant asylum to [a noncitizen] who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under [the asylum statute] if the Secretary of Homeland Security or the Attorney General determines that such [noncitizen] is a refugee,'' INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208(b)(1)(A) of the INA does not distinguish between affirmative and defensive asylum applications, and its text—''*may* grant asylum,'' indicating that the Secretary of Homeland Security, on considering an asylum application, may determine not to grant it—confers adjudicatory authority.

Cross-references between the asylum statute and the expedited removal statute provide further support for the conclusion that the asylum statute authorizes DHS to adjudicate defensive asylum applications. *See, e.g.,* INA 208(a)(1), 8 U.S.C. 1158(a)(1) (citing INA 235(b), 8 U.S.C. 1225(b)); INA 235(b)(1)(A)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(i), (ii) (citing INA 208, 8 U.S.C. 1158). The legislative history of the asylum statute supports this reading as well. Prior to 2005, section 208(b)(1)(A) referred only to the Attorney General. *See* INA 208(b)(1) (2000), 8 U.S.C. 1158(b)(1) (2000). Congress specifically added in certain references to the Secretary of Homeland Security in the REAL ID Act of 2005 and backdated the references' effectiveness to the HSA's effective date. Public Law

109–13, div. B, 101(a)(1), (2), (h)(1), 119 Stat. 231.[61] In addition, the REAL ID Act's conference report explains that the Act amended INA 208(b)(1) ''to clarify that the Secretary of Homeland Security and the Attorney General both have authority to grant asylum,'' ''[b]ecause both the Secretary of Homeland Security and the Attorney General may now exercise authority over asylum depending on the context in which asylum issues arise.'' H.R. Rep. No. 109– 72, at 162 (2005).

Last, although the Departments acknowledge that some statements in IIRIRA's legislative history could be read to suggest an expectation that noncitizens detained for ''further consideration'' would be placed in ''normal non-expedited removal proceedings,'' *see, e.g.,* H.R. Rep. No. 104–828, at 209 (1996), the legislative history is inconsistent and, in any event, ''legislative history is not the law,'' *Epic Sys.,* 138 S. Ct. at 1631. The Departments decline to read a limitation from the inconsistent legislative history into otherwise open-ended statutory text.

*Comments:* Several commenters remarked that the proposed rule would create a rushed adjudication process in violation of U.S. obligations under both domestic and international law and contrary to United Nations High Commissioner for Refugees (''UNHCR'') guidance. Pursuant to such guidance, commenters recommended that the Departments make efforts to maximize asylum seekers' access to counsel and argued that the detention of asylum seekers poses obstacles in this regard. Another commenter requested that no part of the asylum process, including the credible fear interview, should occur in a U.S. Customs and Border Protection facility. Similarly, another commenter cited UNHCR guidance and argued that accelerated procedures must, under international law, minimize risks of non-refoulement by giving asylum seekers guidance on the procedure itself and access to necessary facilities, including a competent interpreter, for submitting a protection claim, as well as the right to appeal a negative fear determination.

*Response:* The Departments disagree with the commenters that the procedures for considering protection claims promulgated in this rule violate U.S. or international law. As an initial

---

[61] That is not to say that the Secretary lacks other authorities in INA 208, 8 U.S.C. 1158, where Congress did not expressly add the Secretary in the REAL ID Act of 2005. Since enactment of the HSA, Congress has inserted piecemeal references to the Secretary in various provisions of the INA without doing so comprehensively.

note, while the Departments do consider and value UNHCR guidance in interpreting the United States' obligations under the 1967 Refugee Protocol, such guidance is not binding. The Departments agree with the commenters on the need to provide access to counsel to individuals making fear claims and have done so in this rule. For example, 8 CFR 235.3(b)(4)(ii) provides that prior to a credible fear interview, a noncitizen shall be given time to contact and consult with any person or persons of their choosing. In 8 CFR 208.30(d)(4), DHS provides that such person or persons may be present at the credible fear interview. In 8 CFR 208.9(b), DHS provides that individuals may have counsel or a representative present at affirmative asylum interviews or Asylum Merits interviews. In 8 CFR 1240.3 and 1240.10(a)(1), DOJ provides that noncitizens may have representation in section 240 proceedings before the IJ. The provisions at 8 CFR 1240.3 and 1240.10(a)(1) will apply in removal proceedings under this rule; though these proceedings are streamlined, noncitizens in them will have the right to representation at no expense to the Government. Furthermore, the Departments plan to ensure as part of the service of the positive credible fear determination, where an individual is placed in the Asylum Merits process, that they are provided with a fact sheet explaining the process and a contact list of free or low-cost legal service providers similar to what the individual would be provided if they were issued an NTA and placed into section 240 removal proceedings under EOIR.

The Departments agree with the commenters that individuals subject to an accelerated procedure, such as a credible fear screening within expedited removal, should be provided guidance about the procedure, including information about the right to review of a negative credible fear determination. In 8 CFR 235.3(b)(4)(i), DHS continues to provide that individuals referred for credible fear interviews receive a written disclosure on Form M–444, Information About Credible Fear Interview, describing "[t]he purpose of the referral and description of the credible fear interview process"; "[t]he right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government"; "[t]he right to request a review by an [IJ] of the asylum officer's credible fear determination"; and "[t]he consequences of failure to establish a credible fear of persecution or torture." Additionally, for every credible fear

interview, asylum officers are trained to explain the purpose of the interview and ensure the individual understands. In addition, 8 CFR 208.30(d)(2) requires asylum officers conducting credible fear interviews to verify that the noncitizen has received Form M–444, Information About Credible Fear Interview, and to determine that they understand the credible fear determination process. Under this rule, if an asylum officer determines an individual does not have a credible fear of persecution or torture, the asylum officer must refer the individual to an IJ if the individual requests review or refuses or fails to indicate whether he or she requests review of the asylum officer's credible fear determination. 8 CFR 208.30(g)(1), 1208.30(g)(2)(i). The process for IJ review of negative credible fear determinations involves the creation of a record of proceeding, the receiving of evidence, the provision of interpreters, and the right to consult with a person or persons of the individual's choosing prior to the review. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42.

The Departments further agree with commenters on the need to provide competent interpretation. In 8 CFR 208.30(d)(5), DHS continues to provide that asylum officers conducting credible fear interviews will arrange for the assistance of an interpreter for noncitizens unable to proceed effectively in English where the asylum officer is unable to proceed competently in a language the alien speaks and understands. The rule provides in 8 CFR 208.9(g)(2) that asylum officers conducting Asylum Merits interviews will arrange for interpreter services for applicants unable to proceed effectively in English. Similarly, EOIR will provide interpretation services in credible fear determinations and hearings before an IJ. 8 CFR 1003.42(c), 1240.5. The Departments have mechanisms in place to ensure the quality of interpretation, including the absence of improper bias. These include training adjudicators to recognize signs of potential problems with interpretation and taking appropriate remedial measures; channels to report interpretation issues to the contracting entities providing interpretation services; and the periodic review of the terms and conditions of interpretation services contracts.

Regarding the commenters' opposition to the detention of asylum seekers, the Departments note that INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV), provides that individuals receiving credible fear interviews "shall be detained pending a final determination of credible fear of

persecution and, if found not to have such a fear, until removed." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), further provides that noncitizens who receive a positive credible fear determination "shall be detained for further consideration of the application for asylum." However, the INA additionally authorizes the Secretary to parole into the United States temporarily, on a case-by-case basis, such individuals "for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). And as explained in more detail above, the Departments have provided in this rule for the reform of certain regulatory provisions implementing this statutory authority for individuals detained in the expedited removal process and for those pending a credible fear determination or any review thereof.

Similarly, the Departments disagree with commenters' proposal of disallowing credible fear interviews by USCIS asylum officers in CBP facilities during the credible fear process and note that this proposal is outside the scope of this rulemaking. Given the expedited nature of credible fear interviews and their role in initial processing of a covered noncitizen, CBP plays an important role in referral of claims of fear to a USCIS asylum officer. While the Departments have implemented safeguards to decouple law enforcement aims from the sensitive nature of protection screening, DHS and DOJ will remain flexible in how they use DHS facilities.

## 2. Need for the Proposed Rule/DOJ and DHS Rationale

*Comments:* A commenter stated that the rule would create stronger "pull factors" encouraging foreign nationals to take advantage of quick release on parole and with the expectation that they would be able to live and work in the United States indefinitely while seeking asylum through an even more extended process than now exists. Other commenters argued that the proposed rule would lead to granting more asylum applications and that such an outcome is inappropriate because most asylum applications are not meritorious. Another commenter similarly argued that requiring noncitizens to prove their worthiness for a "discretionary form of relief" is required under existing laws and consistent with congressional intent; the commenter faulted the proposal for, in the commenter's view, disregarding the requirements of the expedited removal statute.

Conversely, a commenter stated that the proposed rule wrongly assumes that

asylum seekers at the border are more likely to have fraudulent claims and suggested imposing section 240 proceedings as the mechanism for review of asylum officer adjudication. The commenter cited a statistic that found that ''83 percent of [affirmative asylum] cases that asylum officers did not grant after interview were subsequently granted asylum by the immigration courts in 2016.'' Another commenter noted that the increase in credible fear referrals in the past decade more likely resulted from the deterioration of human rights conditions in nearby countries rather than an increase in fraudulent claims.

*Response:* The Departments disagree with the generalized belief that the availability of parole in accordance with INA 212(d)(5), 8 U.S.C. 1182(d)(5), serves as a pull factor for individuals who would be covered by this process. As stated above in Section IV.B.2.a of this preamble, recent surveys of individuals seeking to migrate to the United States have found that individuals cite a variety of factors, often in combination, for leaving their country of origin. While economic concerns and a belief in American prosperity and opportunity are common reasons stated, violence and insecurity have been cited as reasons for migrating by majorities or near majorities of those surveyed.[62] To the extent that individuals are motivated by economic concerns, the mere possibility of parole out of custody marginally earlier—based on an individualized determination—is not expected to significantly increase or alter the incentives that lead an individual to journey to the United States or remain in their country of origin. Importantly, noncitizens in expedited removal who are paroled prior to a credible fear determination (that is, the noncitizens affected by this IFR's amendment to the regulations concerning parole) will not be eligible for employment authorization based on having been paroled.

As to the claim that the majority of asylum applications are fraudulent, the Departments disagree. This assertion is not supported by fact. Moreover, denied asylum claims are not necessarily fraudulent. If an individual is not granted asylum or related protection by a USCIS asylum officer, it may be because they are ineligible for protection or have not shown that they merit a discretionary grant of asylum. In addressing commenters' concern about the percentage of affirmative asylum applications that were not granted by USCIS but subsequently granted asylum

by EOIR, the Departments note that numerous factors may explain this difference in outcomes, including that the IJ may be presented with additional evidence and testimony beyond what was heard by the asylum officer, and that the IJ may consider the asylum claim in light of changed circumstances underlying the application since the asylum officer's decision. INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D).

*Comment:* Many commenters expressed concern for ensuring balance between fairness and efficiency. Commenters noted that addressing immigration backlogs should be the Departments' priority, but the commenters also stated that procedural safeguards must be retained. Other commenters supported the implementation of a nonadversarial hearing process but asserted that due process concerns related to the expedited removal process could undermine the Departments' goals of improving fairness or efficiency. Another commenter stated that compressed timelines may harm applicants who need time to develop trust in their attorneys and the asylum system.

*Response:* The Departments agree that addressing the backlog of cases should be a priority, and applicants for asylum and related protection must be given due process. The Departments anticipate this rule will divert certain cases from immigration court and will enhance efficient processing of noncitizens subject to the expedited removal process, thereby stemming the growth of EOIR's current backlog. The Departments also agree that ensuring fairness while being efficient may take time to execute on a national scale. It is for that reason that the Departments adopt a phased approach such that efficiencies can be developed while fairness is not lost due to administrative exigencies. While asylum applications are governed by a statutory timeline and this rule also uses a timeline to ensure applications stay on track, the Departments have incorporated safeguards to ensure that integrity is not compromised for the sake of administrative efficiency. Specifically, as noted in the regulatory text, the IFR provides for appropriate exceptions to the timelines at various stages of the asylum case, including submission of late-filed evidence and the timing of scheduled hearings.

*Comments:* Comments attributed the immigration court backlog to ''confusing and rapid fluctuations in the agencies' interpretation of the particular social group definition,'' changes in DHS prosecutorial discretion policies,

policies divesting IJs of authority to control their dockets, BIA and Attorney General opinions that preclude IJs from relying on parties' stipulations, and office and court closures resulting from the COVID–19 pandemic.

*Response:* The Departments recognize commenters' concerns that numerous factors may impact the pending caseload. Accordingly, there may be numerous individual and combined approaches for addressing this issue. The Departments will not discuss at length the potential factors identified by commenters, as they are largely outside of the scope of this rulemaking.

However, the Departments note that the goal of this IFR is to implement more efficient procedures for adjudicating certain protection-based claims. This will, in turn, help address the pending caseload while also ensuring that such cases are given appropriate full and fair consideration. To the extent that the IFR limits IJs' authority to fully control their dockets, for example by establishing a regulatory timeline for scheduling and adjudicating these claims, the Departments believe that this regulatory schedule will ensure efficient processing of such claims while also permitting sufficient flexibility for IJs to deviate from the schedule by granting continuances where appropriate.

*Comments:* One commenter stated that expediting the processing of asylum claims will not solve the current border crisis if the Administration also expands the categories of eligibility for asylum and stated that an improvement to asylum efficiency requires a combination of tightening the screening standards of eligibility for asylum and faster processing, including swift removal of those with meritless claims.

Another commenter asserted that the Departments must not only consider immigration through a national security perspective, but must also pay attention to ''humanitarian protection, legal immigration and naturalization, foreign student education and cultural exchange, and economic competitiveness.'' The commenter expressed approval of the proposal in light of the challenges posed by backlogs. Conversely, at least one other commenter stated that the Departments should focus more on national security.

*Response:* The Departments agree that fair and efficient processing of asylum claims is in the interest of the American people. Such a program of humanitarian protection not only speaks to American values of altruism, inclusiveness, and charity but is necessarily tied to our national security and economic interests. *See, e.g.,* Deborah E. Anker &

---

[62] *See supra* note 54.

Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980,* 19 San Diego L. Rev. 9 (1981) (noting that humanitarian protection speaks to American values). National security is a critical aspect of the asylum and refugee protection programs, not only because the Departments vet applicants to ensure they are not ineligible for asylum on national security grounds, but also because ensuring a safe haven for forcibly displaced persons around the world can promote national security. *See, e.g.,* Elizabeth Neumann, *Robust Refugee Programs Aid National Security* (Dec. 17, 2020), *https:// immigrationforum.org/wp-content/ uploads/2020/12/Robust-Refugee-Programs-Aid-National-Security12_16_ 20.pdf* (last visited Mar. 14, 2022). In this rule, the Departments are not expanding asylum eligibility, but putting forward procedures that will use their respective resources to more effectively and efficiently issue decisions on protection claims. The Departments believe that such efficiencies will allow meritorious claims to be granted more promptly and will facilitate removal of those individuals who do not warrant protection from removal.

3. Prior Immigration Rulemakings

*Comments:* Two commenters expressed support for the immigration rulemakings finalized during the prior Administration, stating that they kept borders safe and reduced the flow of unauthorized migrants. However, one commenter stated that the prior Administration destroyed the immigration system by overturning previously accepted legal interpretations and implementing procedures to deny people asylum. Another commenter expressed support for abandoning regulatory changes implemented under the prior Administration that obstructed access to asylum relief. One commenter stated that the proposed changes to the screening process for people in expedited removal proceedings are an important improvement over the previous regulatory changes implemented under the prior Administration.

A commenter asserted that neither the Global Asylum rule nor the Security Bars rule should be implemented, as their provisions are incompatible with international legal standards and could have risks for individuals seeking protection in the United States. Another commenter suggested that, to ensure cases move quickly through asylum offices and court systems without delay,

DHS and DOJ should reverse the prior rules and policies such as the TCT Bar rule, Presidential Proclamation Bar IFR, Global Asylum rule, and Security Bars rule.

A commenter stated that two asylum-related rules, the Global Asylum rule and Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) ("Criminal Bars to Asylum rule"), issued by the prior Administration were issued in violation of the HSA and the Federal Vacancies Reform Act ("FVRA") and did not provide sufficient time for public comment on their "complicated provisions." Therefore, the commenter said, both rules are null and void. The commenter also asserted that the provision of the Global Asylum rule that forced people into asylum-and-withholding-only proceedings was inconsistent with the INA, as Congress created a default rule that arriving individuals seeking asylum are to be placed in section 240 removal proceedings. The commenter also wrote that DHS and DOJ acted arbitrarily and capriciously by requiring individuals with credible fear findings to be placed in asylum-and-withholding-only proceedings.

Another commenter stated that DHS should continue to rescind employment authorization rules issued by the prior Administration because they were issued by agency officials in violation of the Administrative Procedure Act ("APA"). With respect to employment authorization based on a pending asylum application, the commenter said this Administration should immediately restore the 150-day waiting period and 30-day processing time requirement for asylum seekers.

*Response:* The Departments are revisiting and reconsidering numerous asylum-related rulemakings and policies in accordance with Executive Order 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border ("E.O. on Migration"), and the E.O. on Legal Immigration. The E.O. on Migration provides that the "United States will . . . restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering." 86 FR 8267. The E.O. on Migration directs the Departments to determine whether to rescind various rules, such as the Presidential Proclamation Bar IFR, the TCT Bar rule,

and other policies, which the Departments have been reviewing and reconsidering. *See* 86 FR 8269–70. In addition, the E.O. on Legal Immigration instructed the Secretary of State, Attorney General, and Secretary of Homeland Security to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers." 86 FR 8277. The Departments have outlined several rulemaking efforts in the Spring and Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, consistent with the E.O. on Migration and the E.O. on Legal Immigration.[63] The Departments plan to address the Presidential Proclamation Bar IFR, TCT Bar rule, Criminal Bars to Asylum rule, and other provisions of the Global Asylum rule in separate rulemakings.

The Departments acknowledge the commenter's concerns about the regulatory changes made in the Global Asylum rule, which are enjoined, related to placing noncitizens with positive credible fear determinations in asylum-and-withholding-only proceedings. As explained earlier in this IFR, the Departments are amending regulations to allow for USCIS to retain such noncitizens' asylum applications for a nonadversarial Asylum Merits interview before an asylum officer, rather than initially refer them to an IJ for asylum-and-withholding-only proceedings, as provided in the presently enjoined regulation. *See* 8 CFR 208.30(f). Meanwhile, DHS maintains the discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See* 8 CFR 208.30(b), (f); *Matter of J–A–B– & I–J–V–A–,* 27 I&N Dec. at 171; *Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523–24 (BIA 2011).

On December 23, 2020, the Departments published the Security Bars rule, which was scheduled to become effective on January 22, 2021. The effective date of the Security Bars rule has been delayed several times,

---

[63] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/ public/do/eAgendaHistory* (last visited Mar. 14, 2022) (select "Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions," then select DHS or DOJ); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https:// www.reginfo.gov/public/do/eAgendaMain* (last visited Mar. 14, 2022) (select DHS or DOJ).

most recently until December 31, 2022.[64] Thus, the Security Bars rule is not currently in effect. The Departments are reviewing and reconsidering the Security Bars rule and plan to publish a separate NPRM to solicit public comments on whether to modify or rescind the Security Bars rule.[65] The commenters' claims related to these rules, the rules related to employment authorization for noncitizens with pending asylum applications,[66] and the HSA, APA, and FVRA fall outside of the scope of this rulemaking, and thus are not being addressed.

*Comments:* A commenter expressed support for this Administration's decision to vacate an Attorney General ruling issued under the prior Administration that prohibited IJs from managing their own dockets through administrative closure. The commenter suggested that the Administration should promulgate clear rules on administrative closure, which can improve inefficiencies and backlogs.

*Response:* This comment is beyond the scope of this rule because the rule does not involve or impact administrative closure. DOJ plans, however, to initiate a rulemaking that provides general administrative closure authority to IJs and the BIA.[67]

---

[64] The Security Bars rule's effective date was first delayed by the rule, Security Bars and Processing; Delay of Effective Date, 86 FR 6847 (Jan. 25, 2021), until March 22, 2021. The effective date of the Security Bars rule was again delayed until December 31, 2021, Security Bars and Processing; Delay of Effective Date, 86 FR 15069 (Mar. 22, 2021), and further delayed until December 31, 2022, Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021).

[65] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC69* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC69* (last visited Mar. 14, 2022).

[66] On February 7, 2022, in *AsylumWorks* v. *Mayorkas,* No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled "Asylum Application, Interview, and Employment Authorization for Applicants," 85 FR 38532 (June 26, 2020) ("2020 Asylum EAD Rule"), and "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications," 85 FR 37502 (June 22, 2020).

[67] Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Appellate Procedures and Decisional Finality in Immigration Proceedings: Administrative Closure, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1125-AB18* (last visited Mar. 14, 2022).

## D. Proposed Changes

### 1. Applicability

*Comments:* A commenter asserted that it would be unfair for asylum seekers who have been issued an NTA to be unable to have a nonadversarial interview before an asylum officer or a review before an IJ. The commenter stated that if the Administration has determined that the USCIS interview process is the most efficient and fair, then it should also be accessible to noncitizens ICE places in section 240 proceedings, such as pregnant women and families.

A commenter asserted that the rule does not remedy the unequal treatment of affirmative and defensive cases, remarking that it instead goes halfway, by saying that some noncitizens in expedited removal—those referred for hearings before asylum officers—could seek a "partial review" with an IJ instead of the "full case review" that those in the affirmative asylum process would have if they were not granted asylum by USCIS. Additionally, a commenter remarked that it is unclear why the rule differentiates between "normal" cases and those of stowaways and asylum seekers physically present in or arriving in the Commonwealth of the Northern Mariana Islands.

*Response:* The Departments disagree that it is unfair for noncitizens who are placed in section 240 removal proceedings to continue to have their claims heard before IJs rather than in nonadversarial interviews before USCIS in the first instance. It is well established that DHS officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. *See Arizona* v. *United States,* 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." (citation omitted)). USCIS, in particular, has the prosecutorial discretion, as appropriate, to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See, e.g., Matter of E–R–M–& L–R–M–,* 25 I&N Dec. at 523–24. Such discretion is needed because there may be circumstances in which it may be more appropriate for a noncitizen's protection claims to be heard and considered in the adversarial process before an IJ in the first instance (for example, in cases where a noncitizen may have committed significant criminal activity, have engaged in past acts of harm to others, or pose a public safety or national security threat). In addition, the Departments anticipate that DHS will also need to continue to place many noncitizens receiving a positive credible fear determination into ordinary section 240 removal proceedings while USCIS takes steps needed to allow for full implementation of the new process for all cases. This rule establishes an appropriate alternative to the exclusive use of ordinary section 240 removal proceedings. Nevertheless, noncitizens who are placed into streamlined section 240 removal proceedings will continue to have access to the same procedural protections that have been in place for asylum adjudications for many years. This rule authorizes the Departments to employ a fair and efficient procedure for individuals to seek protection, which includes opportunities for applicants to present their claims fully and fairly before asylum officers in a nonadversarial setting and, if not granted asylum, before IJs in streamlined section 240 removal proceedings. The comment related to the processing of claims of stowaways and noncitizens arriving from the Commonwealth of the Northern Mariana Islands falls outside of the scope of this rulemaking and, therefore, is not being addressed. As noted in the NPRM, this IFR would not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the Commonwealth of the Northern Mariana Islands who are determined to have a credible fear. Such individuals would continue to be referred to asylum-and-withholding-only proceedings before an IJ under 8 CFR 208.2(c).

### 2. Parole

#### a. General Comments on Parole

*Comments:* Several commenters provided general comments on parole or the rule's proposed change to the regulations governing the circumstances in which individuals in expedited removal proceedings may be paroled. Many of these commenters expressed opposition to DHS loosening the parole requirements or paroling noncitizens "simply because they lack resources to detain them." Some of these commenters expressed doubt about the legality of paroling noncitizens simply because detention is unavailable or impractical.

*Response:* The Departments acknowledge and take seriously the concerns expressed. The Departments

note, however, that the comments suggesting that the Departments had proposed for parole to be automatically granted upon a determination that detention is ''unavailable or impracticable'' are mistaken; as proposed, parole would be ''in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter,'' 86 FR 46946 (8 CFR 235.3 (proposed)), which impose additional prerequisites to the exercise of parole authority. In this IFR, DHS is finalizing a change to the DHS regulations that will make even clearer that parole of noncitizens who are being processed under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), may be granted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is ''unavailable or impracticable,'' the Departments decline to address in detail commenters' arguments respecting that particular language. Nevertheless, the Departments have explained the longstanding regulatory and policy basis, consistent with the statutory authority, for taking detention resources into consideration when making parole determinations. *See supra* Section III.F of this preamble.

b. Change in Circumstances Under Which Parole May Be Considered

*Comments:* Many commenters either supported the proposed expansion of the circumstances under which parole may be considered or urged the adoption of what they characterize as a broader standard, consistent with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5). Some commenters urged DHS to adopt the long-standing parole standards applicable in other circumstances described in 8 CFR 212.5(b). Commenters stated that they welcomed a change that would allow families the possibility of parole—or that would allow for greater availability of parole in general—and help ensure the availability of detention space for those who pose the greatest threats to national security and public safety. One commenter stated that the proposed change would be an effective step toward a policy that, where possible, ensures noncitizens' compliance with appointments and court dates and timely departure from the United States, if ordered removed, through supervision and case management rather than through detention. Numerous commenters stated that, while they welcomed the proposed rule's expansion of the circumstances in

which parole may be considered, the proposed provisions were too narrow and should be amended to allow consideration of parole in a broader range of circumstances, consistent with the breadth of DHS's statutory parole authority under section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5). Commenters stated that adopting the standard of 8 CFR 212.5(b), which would allow parole consideration, among other things, when continued detention is not in the public interest, would give the agency more flexibility, achieve a uniform regulatory standard across the removal process, and promote family stability.

A few commenters requested that DHS establish a presumption of parole, with DHS bearing a burden of demonstrating by clear and convincing evidence that there is a need for detention based on the public interest. Commenters also suggested that this standard should apply to all asylum seekers who establish a credible fear during the credible fear interview, regardless of their manner of entry, and regardless of whether they are referred for section 240 proceedings or for an Asylum Merits interview. One commenter urged that the regulations should support a presumption that detention is not in the public interest in cases of survivors fleeing gender-based violence, as well as for others who have established a credible fear. Some commenters also asked the Departments to clarify that asylum seekers should only be detained as a last resort. Similarly, one commenter stated that detention should only be used when it is demonstrated that an individual is a danger to the community or a flight risk that cannot be mitigated by other conditions. Another commenter stated that ''detailing clear and consistent provisions for parole and detention'' would be more efficient than case-by-case determinations. One commenter urged that the regulations at 8 CFR 235.3(b) should be amended to emphasize release from custody at the earliest possible stage of proceedings and asserted that parole eligibility should not be contingent on the outcome of credible fear screening.

Other commenters opposed the proposed expansion of the circumstances under which parole may be considered. Some commenters opposed the NPRM on the ground that any policy that makes it more likely that noncitizens encountered at the border will be released from custody will, in the commenters' view, encourage illegal immigration and harm the integrity of the immigration system. In explanation, one commenter discussed past policy changes related to parole and stated that

the lesson to be learned is that as soon as a policy is enacted that makes it more likely that asylum seekers will be released from DHS custody, the number of asylum seekers who enter to exploit that policy ''balloons.'' Other commenters expressed concern that noncitizens who are aware they most likely will not be granted asylum will have a strong incentive to abscond. Citing the statistic that 38 percent of people who receive a positive credible fear determination and are released do not file an asylum application, a commenter expressed concern about a more permissive approach to parole, especially if individuals realize that their cases will no longer take years to resolve and thus their best chance for remaining in the United States would be to abscond.

*Response:* The Departments acknowledge the range of views expressed, from support for the proposed regulatory amendment, to support for adopting instead the standard of 8 CFR 212.5(b), to support for more expansive use of parole for noncitizens subject to INA 235, 8 U.S.C. 1225, to opposition to any change that would expand the circumstances under which parole may be considered for such individuals. As explained above, having considered all comments received, the Departments agree with those commenters who suggested that the standard of 8 CFR 212.5(b)—the standard already applicable to, *e.g.,* noncitizens who have received a positive credible fear determination and whose cases are pending—should replace the more constrained standard of 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), which allow for parole only for medical emergency or legitimate law enforcement objective. The Departments agree that the standard of 8 CFR 212.5(b), allowing for parole for urgent humanitarian reasons or significant public benefit, will give DHS more flexibility to delineate the circumstances in which parole may be considered, on a case-by-case basis and consistent with section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A), for this population. That said, the Departments emphasize that individuals who have not yet received a positive credible fear determination may not be similarly situated to individuals who have, as those pending a credible fear interview may shortly be subject to a final removal order. As a result, subsequent directives or guidance will clarify how officers and agents may determine whether ''continued detention is not in the public interest,'' 8 CFR 212.5(b)(5), for noncitizens who are being processed

under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and who have not yet received a positive credible fear determination for purposes of deciding whether parole for urgent humanitarian reasons or significant public benefit would be warranted. Thus, while the IFR establishes a uniform regulatory standard in the DHS regulations for consideration of parole for individuals described in 8 CFR 235.3(b) (*i.e.,* those in the expedited removal process) and 8 CFR 235.3(c) (*i.e.,* "arriving aliens" placed in section 240 removal proceedings), application of that standard on a case-by-case basis will appropriately account for individualized considerations particular to noncitizens who have not already been determined to have a credible fear of persecution or torture, as explained above in Section III.F of this preamble.

The Departments disagree with the commenters who urged that the regulations at issue should be amended to establish a presumption of parole, or to provide that detention will be used only as a last resort. These commenters did not explain how the standards they proposed would be permitted under section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A), and the Departments conclude that such options would be inconsistent with DHS's discretionary parole authority.

The Departments also disagree with the commenters who opposed loosening current regulatory restrictions on the exercise of parole authority on the ground that doing so would encourage illegal immigration and harm the integrity of the immigration system. These comments do not account for the fact that the amended standard for parole applies only to individuals being processed under the Departments' expedited removal authority under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), and that the effect of the amendment will be to allow DHS to process more individuals through expedited removal rather than referring them to lengthier section 240 removal proceedings. As a result, individuals who express no fear of persecution or torture or who are determined not to have a credible fear can be ordered removed more promptly, which should discourage such individuals from seeking to enter the United States and thereby improve the integrity of the immigration system. The Departments acknowledge commenters' contention that increases in the number of noncitizens at the border have been observed after various past policy changes. However, considering the many complex factors that may affect the rates of individuals seeking to enter

the United States and make a claim for asylum, the Departments disagree that this perceived correlation amounts to evidence of causation or to a compelling reason to depart from a policy change that is otherwise justified. The Departments acknowledge the concern expressed by some commenters about the risk that paroled individuals may abscond but emphasize that the regulations will continue to provide that parole is available only to those noncitizens who present "neither a security risk nor a risk of absconding." With regard to the commenter who suggested that noncitizens who do not file an asylum application after receiving a positive credible fear determination mean to abscond rather than pursue an asylum claim, the Departments note that failure to timely submit an asylum application after receiving a positive credible fear determination may be due to a lack of understanding or inability to obtain the language or other assistance needed to complete and file a Form I–589, Application for Asylum and for Withholding of Removal, or for other reasons not indicative of an intent to abscond. The Departments are unaware of, and commenters did not provide, any information showing that a noncitizen's intention to abscond can reasonably be inferred from a failure to timely submit an asylum application. In addition, DHS officials, in their discretion, may impose reasonable conditions on the grant of parole (including, *e.g.,* periodic reporting to ICE) to ensure that the individual will appear at all hearings and for removal from the United States when required to do so. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(c)–(d).

*Comments:* Some commenters stated that the NPRM would establish a subjective, ambiguous standard for when parole may be allowed. Specifically, commenters stated that the proposed rule did not address what condition or set of conditions would be sufficient for DHS to consider detention "impracticable" and recommended that the rule utilize more definite language. Commenters also remarked that "unavailable" is not clearly defined and within DHS's control to an extent that the proposed standard is "ripe for agency abuse."

*Response:* Although the Departments disagree that the standard proposed in the NPRM was "ripe for agency abuse," the Departments acknowledge commenters' uncertainty about the contours of the proposed standard. The Departments are not finalizing the proposed amendment that would have allowed parole consideration if

"detention is unavailable or impracticable" and, thus, need not further address that standard. Instead, DHS is finalizing an amendment that would allow for consideration of parole under the existing standards in 8 CFR 212.5(b), which, as explained in Section III.F above, includes parole on a case-by-case basis when continued detention is not in the public interest. The longstanding discretion for DHS to take its detention capacity into account when making parole determinations is explained above, and future directives and guidance will build upon existing directives and guidance documents that are well understood by DHS officers and agents even as they are applied to the populations affected by this rule.

*Comments:* At least one commenter offered the following specific suggestions: That 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii) be amended to clarify that DHS should parole people if continued detention is not in the public interest; that 8 CFR 235.3(c) be amended to clarify that any asylum seeker who is placed in section 240 removal proceedings may be released on parole in the public interest, regardless of their manner of entry, by deleting the phrase "arriving alien(s)" and replacing it with "noncitizen(s)"; and that regulatory language be revised to ensure that all asylum seekers who establish a credible fear of persecution or torture are eligible for parole under 8 CFR 212.5(b)(5), regardless of whether they are referred to ordinary section 240 removal proceedings or have their cases retained by USCIS for an Asylum Merits interview.

*Response:* DHS is amending 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii) to permit parole consideration in accordance with the longstanding regulation at 8 CFR 212.5(b), which includes parole in circumstances where continued detention is not in the public interest. The Departments emphasize that— consistent with INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), and 8 CFR 212.5(b)—parole will be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The Departments decline the commenter's other suggestions. First, the commenter's suggestion to amend 8 CFR 235.3(c) in the manner suggested is outside the scope of this rule. This rule concerns only noncitizens processed under the expedited removal provisions of INA 235(b)(1), 8 U.S.C. 1225(b)(1), whereas 8 CFR 235.3(c) generally pertains to "arriving aliens" who are placed in section 240 proceedings. Second, 8 CFR 208.30(f) already provides that "[i]f an alien, other than

an alien stowaway, is found to have a credible fear of persecution or torture,'' then ''[p]arole . . . may be considered only in accordance with section 212(d)(5) of the Act and 8 CFR 212.5'' to cover those who are placed directly into section 240 removal proceedings. DHS, moreover, is amending 8 CFR 212.5 to provide that the standard of 8 CFR 212.5(b) applies to noncitizens detained pursuant to 8 CFR 235.3(b), as well as 8 CFR 235.3(c). Finally, the Departments are adding language to 8 CFR 235.3(c) to allow for parole under the standard of 8 CFR 212.5(b) for noncitizens whose asylum cases are retained by or referred to USCIS for an Asylum Merits interview under this rule after a positive credible fear determination. Thus, regardless of whether the noncitizen's asylum case is retained by USCIS for adjudication on the merits or referred to immigration court, noncitizens who receive a positive credible fear determination are generally eligible for parole consideration under the standard of 8 CFR 212.5(b).

*Comments:* Some commenters stated that the proposed rule did not clearly indicate whether parole would be available (and if so, under what standard) for individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process. These commenters suggested specific revisions to the text of current 8 CFR 235.3(c). A few other commenters also expressed doubt that individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process would have access to parole.

*Response:* In the IFR, DHS is clarifying that parole will be available for individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process under the standard of 8 CFR 212.5(b)—that is, under the same standard as for individuals who receive a positive credible fear hearing and are referred to immigration court. *See* 8 CFR 208.30(f), 8 CFR 235.3(c).

*Comments:* Some commenters asserted that the proposed rule's expansion of parole would be unlawful and unauthorized by Congress. One commenter stated that the proposed rule is ultra vires, contending that INA 235(b)(1), 8 U.S.C. 1225(b)(1), provides for the detention of noncitizens in expedited removal proceedings throughout the entire process, from apprehension to a determination on any subsequent asylum claim. This commenter also discussed the statutory history of the parole provision and claimed that it shows a congressional

intent that parole be used in a restrictive manner. Other commenters urged that authorizing DHS to parole asylum seekers into the United States whenever DHS determines that detention is ''unavailable or impracticable'' would directly conflict with the INA and congressional intent to delegate only limited parole authority to DHS. One of these commenters stated that the rationale behind the proposed rule is ''pretextual at best'' and remarked that it simply provides a convenient, albeit ultra vires, reason to release asylum seekers from custody. Another commenter stated that, because current rates of migrant encounters mean that DHS will never have enough space to detain every person, detention would always be unavailable or impracticable, and more and more noncitizens would be released. Several commenters further stated that detention capacity is within DHS's control and that it can make space unavailable to effectively make the detention of any noncitizen unavailable or impractical, which would violate the INA.

*Response:* The Departments disagree that the expansion of the circumstances in which parole may be considered for a noncitizen in expedited removal proceedings proposed in the NPRM would be unlawful or ultra vires and also disagree with the unsupported assertion that the Departments' rationale is in any way ''pretextual.'' As explained above, Congress has given DHS discretion to ''parole'' a noncitizen who is an applicant for admission ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The Departments have always understood this parole authority to apply to individuals detained pursuant to the detention provisions of INA 235, 8 U.S.C. 1225, and the Supreme Court has endorsed this interpretation in *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 837, 844 (2018).

This rule amends DHS regulations to replace the exceptionally narrow standard governing the circumstances in which parole may be allowed for noncitizens being processed under expedited removal, and who have not yet received a credible fear determination, *see* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii), with the broader regulatory standard that already governs the circumstances in which parole may be allowed after a noncitizen has received a positive credible fear determination, *see* 8 CFR 208.30(f)(2), 212.5(b). This broader regulatory standard is fully consistent with DHS's statutory parole authority. While the

agency previously drew a distinction between the parole standard for those pending a credible fear determination (or whose inadmissibility is still being considered or subject to an expedited removal order) and those found to have a credible fear—perhaps as a matter of policy—there is no legal requirement for this distinction. The parole statute does not distinguish between the various procedural postures of noncitizens covered by INA 235(b), 8 U.S.C. 1225(b), or specifically reference any of the detention provisions at INA 235(b), 8 U.S.C. 1225(b). *See* INA 212(d)(5), 8 U.S.C. 1182(d)(5). There is, therefore, no reason on the face of the statute to read the detention provision at INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV), any differently from the identically worded detention provisions in INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), and INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A), which the Supreme Court has endorsed as subject to the Secretary's full statutory release-on-parole authority. *See Jennings,* 138 S. Ct. at 844; *see also Clark* v. *Martinez,* 543 U.S. 371, 378 (2005) (''To give these same words a different meaning for each category [of person it applied to] would be to invent a statute rather than interpret one.'').

This amendment would also allow DHS, in making parole determinations for individual noncitizens on a case-by-case basis, to utilize its limited detention bed space for noncitizens found to be a flight risk or danger to the community, as well as permit the DHS officers to devote more time to their handling of assigned detained cases—allowing for more efficient processing of issues, including responding to inquiries, requests for release, and securing travel documents for noncitizens subject to orders of removal. DHS would also be able to reallocate detention resources to other areas, such as alternatives to detention, which are not as cost prohibitive.

The Departments reject the contention that DHS's control over its detention capacity is so complete that it is capable of increasing the use of parole by artificially reducing available bedspace. The Department's capacity to detain an individual on any given day is determined by many different factors, including the availability of appropriated funds, the number and demographic characteristics of individuals in custody as well as those encountered at or near the border or within the interior of the United States, and the types of facilities with available bedspace. Capacity restrictions at individual facilities imposed for a variety of reasons ranging from public

health requirements to court-ordered limitations also constrain the availability of detention space.

Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is "unavailable or impracticable," the Departments decline to address in detail commenters' arguments respecting that particular language.

*Comments:* A few commenters that encouraged DHS to amend the regulations to provide for parole when continued detention is not in the public interest stated that this term should be interpreted to encompass, among other things, the impact of continued detention on an individual's or their family's physical or mental health, safety, well-being, family unity, and other considerations.

*Response:* As explained above, DHS intends to use further directives or guidance to promote fair and consistent determinations as to when "continued detention is not in the public interest" for noncitizens in expedited removal who have not yet received a credible fear determination. The Departments recognize that the term "public interest" is open to interpretation but note that the noncitizen's personal interests, while potentially relevant, are not determinative of whether continued detention is not in the public interest.

*Comments:* A few commenters stated that, although any change that increases DHS's ability to grant parole seems positive on its face, the proposed rule still leaves the decision of whether to parole an individual up to the discretion of a DHS officer. Commenters expressed concern about this discretion based on their experience with parole decisions they described as arbitrary or biased. Commenters recommended that the rule create accountability mechanisms and clear decision-making procedures to ensure parole requests are decided consistently, without bias or undue political influence, or in pro forma fashion without regard to the substance of the requests. For example, one commenter suggested there be a mandate that ICE provide a timely response in a language the applicant can understand that includes individualized analysis of the reasons why parole was denied. Another commenter recommended that DHS amend its regulations to include a specific time frame within which ICE officers must review parole requests and issue parole decisions, a mandate that parole interviews must take place before the issuance of a denial of a parole request, a requirement of detailed recordkeeping to help provide transparency and

oversight of parole decisions, and an independent department charged with routinely reviewing each ICE field office's parole grant and denial rates. A commenter asked that the rule specify to whom at the agency asylum seekers should submit their parole requests, which officers make these decisions, and what documentation should be included or can be provided as satisfactory alternatives.

*Response:* The NPRM proposed to amend, and this IFR will amend, the DHS regulations specifying the circumstances in which parole may be considered for noncitizens in expedited removal proceedings. Additionally, consistent with the INA, DHS's exercise of discretion will be conducted on a case-by-case basis, given the unique factual circumstances of each case and to ensure the requirements for parole have been thoroughly considered and addressed. Comments that suggest new regulatory provisions to establish accountability mechanisms and decision-making procedures are therefore beyond the scope of the current rulemaking.

*Comments:* One commenter urged that the rule should not include detention availability as a factor for parole, since the determination of whether to deprive an individual of their liberty "should never be contingent on or determined by the budget or physical infrastructure of a Federal agency." Another commenter expressed concern that the proposed rule's allowance for parole consideration when detention is unavailable or impracticable would lead to increased calls for detention beds, an outcome the commenter opposed. A commenter asserted that, under the expanded grounds for parole, detention should only be considered "practical" if asylum seekers are provided with the ability to access medical care, legal counsel, and language assistance.

*Response:* Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is "unavailable or impracticable," the Departments decline to address in detail commenters' arguments respecting that particular language. With regard to the comment premised on the idea that detention "should never be contingent on or determined by the budget or physical infrastructure of a Federal agency," the Departments disagree. By statute, a noncitizen who is being processed under the expedited removal provisions of section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), is subject to detention unless DHS exercises its discretion to "parole" the noncitizen "only on a case-by-case

basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS's resources may appropriately be considered in determining whether to exercise parole authority pursuant to section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A). Indeed, the availability of DHS detention resources is integral from an operational standpoint. For example, there may be a limited number of available detention beds in a particular facility or an insufficient number of DHS officers available to handle the volume of detainees, thereby hampering DHS's ability to promptly and efficiently process cases. DHS can focus its detention resources on those noncitizens found to be a flight risk or danger to the community, particularly when there are a limited number of detention beds.

*Comment:* A few commenters stated that the proposed rule's expansion of the circumstances in which parole may be allowed is a welcome development but requested clarification regarding how the changed parole standard will be integrated into the proposed adjudicative process. Specifically, a commenter inquired whether a paroled person would be subject to the new procedure established by the rule and, if so, when and where the credible fear interview and Asylum Merits interview would take place. The commenter also asked whether a paroled person would be forced to remain near where they were detained and what the process would be for changing the venue of the asylum interview.

*Response:* The procedure established by the rule is available to parolees. If the person or family unit is paroled prior to their credible fear interview, the Departments anticipate that their credible fear interview and Asylum Merits interview, if applicable, will take place at a USCIS Asylum Office near their destination within the United States and that such persons would not be required to remain in the vicinity of where they were detained. DHS anticipates that the credible fear interview will normally take place within 30 days of referral of the noncitizen to USCIS. DHS officials, in their discretion, may impose reasonable conditions on the grant of parole (including, *e.g.,* periodic reporting to ICE) to ensure that the individual will appear at all hearings and for removal from the United States when required to do so. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(c)–(d).

c. Availability of Employment Authorization for Those in Expedited Removal Who Have Been Paroled From Custody

*Comments:* Several commenters urged that the proposed regulations should be amended to provide for parole-based employment authorization eligibility for all people whom DHS paroles from detention, to respect the dignity of asylum seekers and ensure that they can support themselves and their families. Several commenters asserted that ensuring parole-based eligibility for an employment authorization document ("EAD") for asylum seekers released from detention would help them secure housing, food, health care, and other necessities. Commenters discussed how authorizing asylum seekers to work at the earliest practicable stage would offer a variety of benefits to both asylum seekers and host communities, including helping to reduce their social and economic exclusion; reduce the risk that they experience extreme poverty, food insecurity, or homelessness; and alleviate the loss of skills, low self-esteem, and mental health problems that often accompany prolonged periods of idleness. One commenter also stated that barriers to employment authorization often impede asylum seekers' access to counsel or other services, such as food assistance, and remarked that asylum seekers' inability to work may have long-term negative impacts on their economic prospects and mental health. A commenter asserted that forcing parolees to wait for months or years for an adjudication of their claim without any means to find legal employment lends itself to abusive and harmful employment arrangements that are marked by unscrupulous employers taking advantage of asylum seekers' desperation. A commenter stated that the denial of EADs to parolees would have a particularly negative impact on LGBT migrants, as they often travel alone with no support system.

A commenter noted that the EAD is often the only government-issued identification an asylum seeker may have in their possession, and individuals forced to wait to apply for employment authorization would thus likely be without a valid identification, leading to challenges when securing housing, opening bank and utility accounts, or encountering law enforcement. The commenter concluded that limiting employment authorization for individuals released under 8 CFR 235.3(b)(4)(ii) would endanger the lives of asylum seekers and their families.

On the other hand, another commenter noted that it supports the decision to restrict EAD eligibility "solely on the basis of receiving parole" and recommended that this decision be maintained. The commenter asserted that DHS does not have the authority to grant EADs to asylum seekers for whom the INA does not provide such eligibility or for whom the INA expressly grants the Secretary discretionary authority. The commenter argued that it would be unreasonable to conclude that Congress authorized DHS to use parole to permit an indefinite number of asylum seekers to enter the United States, in its discretion, and to allow them to engage in employment. The commenter also said providing EAD eligibility "solely on the basis of being paroled" would serve as a powerful pull factor for illegal immigration.

Several commenters addressed the waiting period for EAD eligibility for asylum seekers. Some commenters argued that the one-year waiting period for EAD eligibility based on a pending asylum application, pursuant to the current DHS regulations at 8 CFR 208.7, is excessive and inhumane. One commenter stated that individuals forced to wait a year to apply for employment authorization would likely be unable to secure necessities such as food, shelter, and medical care. However, another commenter maintained that, per section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), the Secretary cannot grant employment authorization to an asylum applicant until at least 180 days after the filing of the application for asylum. The commenter encouraged DHS to abide by the INA's 180-day restriction, arguing that failing to do so would encourage illegal immigration and fraud in the asylum system.

A commenter suggested that DHS require by regulation that parole-based EADs be adjudicated within 30 days of receipt, claiming that delays in USCIS adjudication force individuals to wait for months for parole-based employment authorization. A commenter, in asserting that the proposed rule's parole provision is an ultra vires application, stated that the proposed rule does not actually limit employment authorization. The commenter stated that, even though the proposed rule provides that parole would not serve as an independent basis for employment authorization, nothing in 8 CFR 274a.12(c)(8) prohibits applications filed after the asylum seeker files a completed asylum application.

*Response:* The Departments acknowledge the multiple comments both in support of and in opposition to the NPRM's provision restricting EAD-eligibility based on parole for this subset of parolees. The Departments have considered comments highlighting potential benefits that would accrue to asylum applicants and their support networks if they were to receive employment authorization earlier as well as the potential drawbacks of providing earlier employment authorization and balanced those benefits and drawbacks in light of the broader interests served in the rulemaking. On balance, the Departments believe that this rulemaking's overall framework promoting efficiency in the adjudication of protection-related claims and the overall statutory scheme with respect to obtaining employment authorization based on pending asylum applications is best served by finalizing the DHS regulatory language in the NPRM for several reasons.

First, the Departments note that the overall goal of the rulemaking is to ensure that noncitizens receive final decisions on their claims for protection as quickly and efficiently as possible, consistent with fundamental fairness, and ensuring that noncitizens appear for any interviews and hearings is key to this process. Providing parole-based employment authorization to noncitizens who are in expedited removal or in expedited removal with a pending credible fear determination (that is, employment authorization with no prerequisite waiting period) risks incentivizing more individuals to enter the United States and seek out this process in the hopes of obtaining parole under this framework while disincentivizing appearance. Moreover, individuals for whom employment authorization is the most salient benefit of securing asylum, if eligible, would have less of an incentive to appear for subsequent interviews and hearings. *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). Second, the Departments believe that their approach is consistent with the provisions in section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), regarding a waiting period for employment authorization for asylum applicants, which states that "[a]n applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum." INA 208(d)(2), 8 U.S.C. 1158(d)(2). The Departments recognize that the "otherwise eligible" language in section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), could be read to encompass employment authorization based on

parole. However, noncitizens paroled with a pending credible fear determination are all seeking asylum (or related protection) and are being paroled on a case-by-case basis for urgent humanitarian reasons or significant public benefit while they await a screening interview on their protection claims. The Departments note that potential benefits associated with more expeditious employment authorization are expected under the new process in that the waiting period will begin running sooner here as an application will be considered filed at the time of a positive credible fear determination. Additionally, eligible noncitizens will likely receive a final determination granting relief or protection, and employment authorization incident to status, prior to being eligible for an employment authorization under 8 CFR 274a.12(c)(8) based on a pending asylum application.

With respect to waiting periods for asylum-based EADs generally, the Departments note that on February 7, 2022, in *AsylumWorks* v. *Mayorkas*, No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled "Asylum Application, Interview, and Employment Authorization for Applicants," 85 FR 38532 (June 26, 2020), and "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications," 85 FR 37502 (June 22, 2020). Finally, the Departments disagree with the commenter that states that the Secretary of Homeland Security lacks the discretionary authority to grant employment authorization to those paroled. The Departments note that the Secretary of Homeland Security, as a matter of policy for the reasons outlined above, is exercising his discretionary authority narrowly as to noncitizens who are in expedited removal or in expedited removal with a pending credible fear determination and who are paroled from custody.

d. Other Comments on Proposed Approach to Parole

*Comments:* A few commenters urged that detained asylum seekers should have access to bond determination hearings, as well as regular opportunities to challenge continued detention. Another commenter stated that regulations should ensure meaningful access to counsel for those in immigration detention, readily accessible confidential attorney-client meeting spaces, confidential free telephone and televideo communication options, as well as minimum restrictions on visitation.

*Response:* These comments are beyond the scope of the current rulemaking, given that the rule neither addresses bond determinations nor conditions for those held in immigration detention.

*Comments:* One commenter stated that the proposed rule would essentially deny all individuals the right to have their custody reviewed by a neutral arbiter and urged that the regulations should require a neutral decisionmaker. The commenter suggested that IJs should be given the power to review and revise parole decisions made under the proposed regulations.

*Response:* These comments are beyond the scope of the current rulemaking, which amends only the regulatory provisions specifying the circumstances in which parole may be considered for noncitizens subject to expedited removal.

*Comments:* A commenter stated that the unprecedented surge in family unit migration, which the commenter attributed to the *Flores* Settlement Agreement, is endangering children at the border and that such migration will continue to soar unless the dynamics causing this trend are changed. The commenter asserted that the Departments should "address" the *Flores* Settlement Agreement before taking any steps to expand the availability of parole for asylum seekers and suggested that the agencies promulgate regulations that would enable DHS to detain adults and children entering illegally in family units, to comply with the detention provisions in the INA.

*Response:* The *Flores* Settlement Agreement requires the promulgation of the relevant and substantive terms of the FSA as regulations, FSA ¶ 9, and based on a 2001 Stipulation, the Agreement terminates "45 days following defendants' publication of final regulations implementing [the] Agreement," Stipulation Extending Settlement Agreement ¶ 40, *Flores* v. *Reno*, No. 85–cv–4544 (C.D. Cal. Dec. 7, 2001). In August 2019, DHS and the Department of Health and Human Services published a *Flores* final rule, Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 FR 44392 (Aug. 23, 2019); however, that rule was partially enjoined, *see Flores* v. *Rosen*, 984 F.3d 720 (9th Cir. 2020). While the FSA does impose restrictions on DHS's ability to detain family units, addressing the FSA by promulgating regulations to implement such

Agreement is outside the scope of this rule.

*Comments:* Several commenters supported expanding the circumstances in which parole may be granted to allow release of families from detention but opposed any expansion of the expedited removal system upon which the proposed asylum process is premised. A couple of commenters asserted that the expedited removal process is harmful and emphasized that DHS is not required to use expedited removal. These commenters recommended that the proposed rule be amended to avoid the use of expedited removal. Commenters argued that the expedited removal process does not provide due process, fails to comply with domestic refugee law and international commitments, and has led to mistreatment and the return of refugees to persecution.

Commenters also argued that the proposed changes to 8 CFR 235.3 to expand the possibility of parole would eliminate the barrier to placing families into expedited removal and would risk further cementing expedited removal as a primary tool to remove noncitizens, creating possibilities for use of the expedited removal structure to be expanded by future administrations.

*Response:* The Departments disagree that the expedited removal process does not comport with due process or U.S. refugee law. *See, e.g., DHS* v. *Thuraissigiam*, 140 S. Ct. 1959, 1963–64 (2020) (addressing the Due Process Clause of the Fifth Amendment). Comments expressing opposition to the Departments' use of expedited removal generally are also beyond the scope of this rulemaking, which amends certain procedures and standards applicable to noncitizens once they have already been placed into expedited removal.

*Comments:* Several commenters stated that detention is a harmful and punitive practice that should be reduced or eliminated completely and expressed disappointment that the proposed rule did not include systematic efforts to limit or eliminate the detention of asylum seekers. A couple of commenters added that detention is not necessary to achieve the goal of ensuring that people seeking asylum appear for their appointments. A few commenters remarked that detention makes it nearly impossible for asylum seekers to assert their protection claims effectively, as their ability to access legal resources and legal representation is often non-existent. One commenter stated that only 30 percent of detained immigrants receive legal representation and argued that the remote location of detention facilities, the inadequate

access to counsel and interpreters, and the frequent transfer of detainees present nearly insurmountable barriers to detainees seeking to obtain legal assistance. A few commenters asserted that detention of asylum seekers flouts U.S. legal obligations under the Refugee Convention and Protocol or that presumptive detention of asylum seekers violates international refugee and human rights law. Some commenters suggested that DHS invest its resources in housing, medical treatment, and travel expenses for asylum seekers, rather than expediting asylum interviews and moving people through detention faster. They stated that this would help ensure that those entering the United States are welcomed by a supportive community.

*Response:* Although the Departments acknowledge the commenters' concerns about access to legal services, the Departments disagree with the commenters who urged that the regulations at issue should be amended to systematically limit or eliminate the detention of anyone indicating an intention to seek asylum. The Departments believe that the standards proposed by these commenters would not be consistent with the detention provisions of section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), or DHS's parole authority under section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A). Proposals to change those detention provisions are properly directed to Congress, not to the Departments. The Departments also do not believe that commenters' requests are feasible. Commenters did not explain what budget authority DHS would have to invest resources in non-detention housing, medical treatment, and travel expenses for noncitizens arriving at the border and indicating an intention to apply for asylum in the United States.

3. Credible Fear Screening Process

a. General Comments on Credible Fear Screening Process

*Comments:* Some commenters indicated that the changes to the credible fear screening process in the NPRM are valuable and necessary and expressed general support for the changes. Other commenters expressed opposition to the procedural changes based on the belief that individuals in the expedited removal process are coached to lie and express fear. Several commenters described the credible fear process as a "loophole" to be exploited by dangerous people to get into the United States. Other commenters stated that the majority of asylum seekers are

not properly vetted, while another stated that individuals claim credible fear without any proof. Similarly, several commenters stated that documented proof should be submitted, and that testimony alone or a simple statement of credible fear is unacceptable.

Another commenter stated that credible fear should be established immediately after the individual is detained to avoid having U.S. persons suffer at the hands of criminals. Similarly, another commenter suggested that individuals who are national security threats or have "egregious criminal histories" should not be permitted to make credible fear claims. Some commenters stated that asylum officers should not be conducting credible fear interviews, asserting that the existing process lacks transparency and oversight, and another commenter recommended that IJs handle credible fear claims.

Several commenters expressed concern with conditions and due process in expedited removal and credible fear interviews in general, arguing that those factors would affect the case outcome in various stages of the asylum process.

*Response:* The Departments acknowledge the commenters' support for the changes to the credible fear screening process in this rule and acknowledge the other commenters' concerns about the credible fear screening process. The Departments disagree that the credible fear screening process is a loophole to be exploited by dangerous individuals and that the rule will only encourage more individuals to come to the border and request asylum. Expedited removal and the credible fear screening process were established by Congress. The credible fear process ensures that the U.S. Government adheres to its international obligations, as implemented through U.S. law, to refrain from removing a noncitizen to a country where the noncitizen would be persecuted or tortured. *See* Section II.B and II.C of this preamble. To the extent that commenters assert that noncitizens seeking protection generally are liars or criminals seeking to exploit a "loophole," the Departments reject that characterization as unfounded. This rulemaking is one part of a multifaceted whole-of-government approach to addressing irregular migration and ensuring that the U.S. asylum system is fair, orderly, and humane, and this rulemaking is consistent with the E.O. on Migration, which states that "[s]ecuring our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is

true." 86 FR 8267. This whole-of-government approach seeks to make better use of existing enforcement resources by investing in border security measures that are proven to work and that will facilitate greater effectiveness in combatting human smuggling and trafficking and the entry of undocumented individuals. This rule seeks to ensure that the Departments process the protection claims of individuals in the credible fear screening process promptly and efficiently, meaning that it allows individuals who are not eligible for protection to be removed more promptly.

The Departments recognize that the credible fear screening and review process involves eliciting testimony from individuals seeking protection and does not require noncitizens to provide written statements or documentation. Both asylum officers and IJs receive training and have experience with assessing evidence and the credibility of noncitizens who appear before them for interviews or hearings. Asylum officers and IJs have experience identifying and raising concerns surrounding inconsistencies and lack of detail, and thus are equipped to make well-reasoned decisions regarding credibility, even in the absence of written statements or other documentation. Moreover, requiring written statements or other documentation would likely limit the ability of certain asylum seekers to obtain protection, given that some may have fled their home countries without the ability to secure documentation, and obtaining documentation once they are in the United States may not be feasible. Indeed, the INA explicitly provides that "testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii).

Moreover, the Departments respectfully disagree with commenters' assertions that credible fear interviews are plagued with due process concerns. While some issues may arise due to the nature of credible fear interviews—which may be the first time or one of the first times an individual has provided testimony related to sensitive topics and which often occur remotely with an interpreter and with the individual in a detained setting—USCIS asylum officers are trained to conduct those interviews in a fair and sensitive manner, and

every credible fear determination is reviewed by a supervisory asylum officer and subject to additional IJ review if the applicant so chooses or, under this IFR, fails or refuses to decline such review. The Departments do not agree that potential issues with the credible fear determination, to the extent that any may exist, would necessarily affect case outcomes in the new process. Applicants will have ample opportunity to correct any biographic or informational errors in the Form I–870. Asylum officers will not be limited to considering only the testimony provided during the credible fear interview but will conduct a full nonadversarial interview to determine asylum eligibility for the principal applicant. Moreover, if the applicant fails to establish asylum eligibility before the asylum officer at the Asylum Merits interview under the IFR, they will have the opportunity to present their claims for asylum and withholding or deferral of removal before an IJ when they are placed in streamlined section 240 proceedings and the IJ will review their claims.

### b. "Significant Possibility" Standard for Protection Claims

*Comments:* Several commenters expressed general support for restoring the "significant possibility" standard. One commenter stated that clarifications at proposed 8 CFR 208.30(e)(2) provide important protections to individuals in expedited removal and comport with section 235(b)(1)(B) of the Act, 8 U.S.C. 1225(b)(1)(B).

Other commenters expressed general disapproval with the use of the "significant possibility" standard, either advocating for a higher standard or stating that the use of a less stringent standard may encourage frivolous claims or claims from individuals solely seeking employment authorization.

*Response:* The Departments acknowledge the support of commenters. The rule adopts the "significant possibility" standard for credible fear screenings for purposes of asylum, withholding of removal, and CAT protection. As explained above in Section III.A of this preamble, while the statutory text only defines "credible fear" for purposes of screening asylum claims, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v); *see also* 86 FR 46914, the Departments believe that the efficiency gained in screening the same set of facts using the same standard of law for all three forms of protection is substantial and should not be overlooked. Moreover, the credible fear screening process is preliminary in nature; its objective is to sort out,

without undue decision costs, which cases merit further consideration and to act as a fail-safe to minimize the risk of refoulement. Using one standard of law is consistent with those objectives, even though the ultimate adjudication of a noncitizen's claim for each form of protection may require a distinct analysis.

*Comments:* One commenter requested that the Departments elaborate upon the "significant possibility" test to make clear that the showing that must be made is not a "significant possibility" of persecution, but a "significant possibility" that the "claimant could make out a well-founded fear of such persecution where there exists as little as a one in ten chance of such serious harm occurring." The commenter argued that the "preponderance of the evidence" threshold is not applicable during this process. The commenter also stressed that nothing in the proposed rule requires the asylum officer to investigate all the possible avenues by which an applicant for protection may be able to access asylum. Similarly, some commenters said that more training and oversight is needed to ensure that asylum officers correctly apply the low bar standard and do not misinterpret it.

Alternatively, a commenter suggested that the standard "manifestly unfounded" be applied during the credible fear screening. That is, the commenter believes that unless an individual's claim is assessed to be manifestly unfounded, or unrelated to the criteria for granting asylum, they should have access to full proceedings. The commenter believes this would guard against the risk that an individual would be returned to a country where they face persecution. The commenter further stated that the "significant possibility" standard is a step in the right direction but still does not match international standards. Another commenter expressed the concern that the "significant possibility" standard proposed in the rule is largely impossible to meet in practice because "it virtually forces the non-citizen to produce at once all of the evidence necessary to gain success at trial."

*Response:* The Departments appreciate comments regarding further elaboration on the "significant possibility" standard, alternative standards, and the "significant possibility" standard's use in credible fear interviews. The "significant possibility" standard is a statutory standard found at INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and suggested use of the "manifestly unfounded" or other international standards

concerning refugee claims in screening for credible fear would require legislative change. As commenters have recognized, appropriate application of the "significant possibility" standard is nuanced and fact-intensive. The Departments therefore believe that further elaboration on the appropriate application of the standard is best accomplished through case law, training, and oversight, rather than through abstract discussion or further codification. Such training is an integral part of ensuring the appropriate application of this standard, but the Departments do not believe it is appropriate to codify such training or oversight in the regulatory text.

*Comments:* Some commenters stated that the return to the "significant possibility" standard is appropriate but observed that the proposed rule does not specify a choice of law rule, which is important for respecting the rights of asylum seekers, and commenters suggest that this language be added at 8 CFR 208.30. One commenter asked that DHS apply the law most favorable to the individual seeking protection when determining whether he or she meets the credible fear standard.

*Response:* The Departments agree that USCIS should apply the law most favorable to the individual seeking protection at the credible fear screening stage. DHS remains subject to the injunction in *Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 135–40, 146 (D.D.C. 2018), which found that a DHS policy memo applying only the law of the circuit where the credible fear interview occurs rather than the circuit law most favorable to the applicant's claim was unlawful. Therefore, USCIS continues to apply the choice of law most favorable to the applicant when screening for credible fear.

*Comment:* A few commenters generally opposed the rule on the ground that changing the standard for credible fear screening will delay removal of noncitizens with meritless claims for protection.

*Response:* The Departments disagree that the rule's changes to the credible fear screening process will, in the aggregate, contribute to delays in removal. Divergent standards for asylum and withholding of removal along with variable standards for individuals barred from certain types of relief were promulgated in multiple rulemaking efforts over the last few years.[68] However, in working to create efficiencies within this process, adopting the standard of law that was

---

[68] *See supra* note 4 (discussing recent regulations and their current status).

set by Congress for credible fear claims is the logical choice. The varied legal standards created by asynchronous rulemaking, and often enjoined or vacated by legal challenges, defeated their intended purpose by complicating and extending the initial screening process provided for in section 235 of the Act, 8 U.S.C. 1225. Use of different legal standards for asylum, statutory withholding of removal, and CAT protection required additional time for adjudicators to evaluate whether a mandatory bar to asylum or to statutory withholding of removal was present. Additionally, adjudicators were required to evaluate the same evidence twice for the same factual scenario. Notably, use of the different standards would require asylum officers to apply the mandatory bars to asylum in order to consider screening for statutory withholding of removal. In turn, this would inevitably increase credible fear interview and decision times, requiring analysis of the bars and then applying the higher evidentiary standard. For example, when the TCT Bar IFR was in effect, asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied and, if so, whether an exception to the bar might have applied. Then, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, asylum officers had to develop the record sufficiently such that a determination could be made according to the higher reasonable possibility standard. IJs reviewing negative credible fear determinations where a mandatory bar was applied would similarly be required to review the credible fear determination under two different standards, undermining the efficiency of that process as well.

In the Departments' view, the delays associated with complicating and extending each and every credible fear interview to use two different standards outweigh any efficiency that could be gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection. Commenters have not provided any data or information suggesting that the asylum caseload would be meaningfully reduced by evaluating the existence of bars to eligibility during the credible fear screening or by applying a "reasonable possibility" standard (rather than the "significant possibility" standard) in screening claims for statutory withholding of removal or CAT protection. In clarifying that the "significant possibility" standard

applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will continue to ensure that the expedited removal process remains expedited and will allow for asylum officers and, upon credible fear review, IJs, to adhere to a single standard of law in fulfilling the United States' nonrefoulement obligations.

### c. Due Process in Credible Fear Screening

*Comments:* Multiple commenters recommended that the Departments retain the language at 8 CFR 208.30(g)(2)(i) acknowledging USCIS's ability to reconsider a negative credible fear finding after it has been upheld by an IJ. Commenters expressed their belief that an additional option for review, even after a Supervisory Asylum Officer ("SAO") has reviewed the asylum officer's credible fear determination and an IJ has concurred with the determination, is still necessary to preserve the rights of noncitizens.

Commenters described a range of issues that they allege render the credible fear process systematically "unreliable," making the need for additional safeguards against refoulement—including USCIS reconsideration—more acute. Describing the negative effects of trauma and procedural limitations on credible fear outcomes, commenters suggested that the ability to file a request for reconsideration with USCIS has saved "countless" asylum seekers from refoulement. One commenter noted that reconsideration provides "an important safety net" and can address instances in which the credible fear process may not have provided a fair process, including where appropriate interpretation for indigenous language speakers and adequate accommodations for disabilities were not provided. Another commenter suggested that the reconsideration processes in place are "central to the American value of due process" and a second commenter, for similar reasons, expressed strong opposition to eliminating them through this rule.

Multiple commenters argued that revising this provision would eliminate a key procedural safeguard for asylum seekers, citing a September 2021 study by Human Rights First.[69] Several

commenters provided examples of individuals who successfully sought reconsideration and, as a result, won protection. These commenters concluded that reconsideration by USCIS is a means to avoid unlawful refoulement due to mishandled credible fear interviews, errors in the initial credible fear record, and barriers to adequate review by an IJ.

Adding to the above arguments, a commenter asserted that the factors distinguishing USCIS reconsideration from IJ review favor due process and administrative efficiency. The commenter said reconsideration allows for more time to access counsel, since asylum seekers can request reconsideration at any time following the credible fear determination and prior to removal. On the other hand, EOIR is required to schedule hearings within 7 business days of the credible fear determination. The commenter added that USCIS asylum officers will often provide asylum seekers time to explain errors with their initial interview, while IJ reviews move quickly and do not consider procedural errors in the credible fear interview. Furthermore, the commenter suggested that USCIS benefits from requests for reconsideration, as they serve as checks and balances for the agency while informing future asylum officer training. Given the differences between IJ review and USCIS reconsideration, an individual commenter argued that "[requests for reconsideration] are often our only recourse after a negative [credible fear interview] finding."

*Response:* The Departments acknowledge the comments related to whether an IJ should have sole jurisdiction to review negative credible fear determinations made by USCIS, or whether USCIS should retain the practice of entertaining requests for reconsideration even after a negative credible fear determination is served on the applicant and reviewed and affirmed by an IJ. Some context for the regulatory language at play and the way this practice has developed is helpful to frame this discussion. Prior to publication of the Global Asylum rule on December 11, 2020, the language related to reconsideration was located at 8 CFR 1208.30(g)(2)(iv)(A). With the Global Asylum rule, the Departments moved it from that section to 8 CFR 208.30(g)(2)(i).[70] The regulatory language recognizes USCIS's inherent discretionary authority to reconsider its own determination, but it was never meant to provide for a general process

---

[69] *See* Human Rights First, *Biden Administration Move to Eliminate Requests for Reconsideration Would Endanger Asylum Seekers, Deport Them to Persecution and Torture* (Sept. 2021), *https://www.humanrightsfirst.org/sites/default/files/RequestsforReconsideration.pdf* (last visited Mar. 14, 2022).

[70] *See* 85 FR 80275; *supra* note 4 (discussing recent regulations and their current status).

by which individuals could submit requests for reconsideration of negative credible determinations to USCIS that had already been reviewed and upheld by an IJ as a matter of course. In practice, however, this regulatory language has served as a basis for entertaining such requests and, over the years, they have become an ad hoc yet increasingly significant portion of the work of USCIS asylum offices. Because this was never meant to be a formalized process, there is no formal mechanism for individuals to request reconsideration of a negative credible fear determination before USCIS; instead, such requests are entertained on an informal ad hoc basis whereby individuals contact USCIS asylum offices with their requests for reconsideration after an IJ has affirmed the negative credible fear determination, and asylum offices have to quickly assign officers and supervisors to review those requests. This informal, ad hoc allowance for such requests has proven difficult to manage and led to the expenditure of significant USCIS resources to entertain such requests. Yet USCIS has continued to entertain these requests because, in line with what some commenters argued, IJ review has sometimes failed to address allegations of error or newly available evidence that may compel a positive credible fear determination, and individuals would otherwise have no other recourse.

The informal ad hoc approach of USCIS entertaining requests for review of negative credible fear determinations that has developed over time requires USCIS to devote resources to these requests that could more efficiently be used on initial credible fear and reasonable fear determinations, affirmative asylum adjudications, and now Asylum Merits interviews under the present rule. Because there is no formal mechanism by which to accept and review such requests, there can be no uniform procedure guiding their review. Likewise, because they are not applications, petitions, motions, or some other type of formal request, USCIS does not maintain comprehensive, official data in the Asylum Division's case management system on requests for reconsideration in a standardized manner that can be readily queried. In any event, the Departments agree with commenters that some type of data related to these requests, including how many are received, how often the negative credible fear determinations are reconsidered, and how often a positive decision is issued, would be helpful to inform this discussion. The Departments accordingly have attempted to gather the best data available related to these requests, based on informal tracking by some offices, which is not comprehensive or standardized.

The available data related to requests for reconsideration ("RFRs") of negative credible fear determinations already affirmed by an IJ is as follows:

Fiscal Year 2019 ("FY19")

During FY19, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); New Orleans, LA (ZOL); and San Francisco, CA (ZSF). The remaining offices (Arlington, VA (ZAR/ZAC); Chicago, IL (ZCH); and Miami, FL (ZMI)) did not track RFRs received.

| | |
|---|---|
| FY19: Total negative CF determinations by the offices that tracked RFRs. | 12,071. |
| FY19: Total RFRs submitted to offices that tracked RFRs ..................... | 2,086 (17 percent of negatives from the offices that tracked RFRs). |
| FY19: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 231 (11 percent of RFR submissions and 2 percent of all negatives from the offices that tracked RFRs). |

Fiscal Year 2020 ("FY20")

During FY20, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Boston, MA (ZBO); Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); New Orleans, LA (ZOL); and San Francisco, CA (ZSF). The remaining offices (Arlington, VA (ZAR/ZAC); Chicago, IL (ZCH); and Miami, FL (ZMI)) did not track RFRs received.

| | |
|---|---|
| FY20: Total negative CF determinations by the offices that tracked RFRs. | 7,698. |
| FY20: Total RFRs submitted to offices that tracked RFRs ..................... | 2,109 (27 percent of negatives from the offices that tracked RFRs). |
| FY20: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 150 (7 percent of RFR submissions and 2 percent of all negatives from the offices that tracked RFRs). |

Fiscal Year 2021 ("FY21")

During FY21, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Arlington, VA (ZAR/ZAC); Boston, MA (ZBO); Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); and New Orleans, LA (ZOL). The remaining offices (Chicago, IL (ZCH); Miami, FL (ZMI); and San Francisco, CA (ZSF)) did not track RFRs received.

| | |
|---|---|
| FY21: Total negative CF determinations by the offices that tracked RFRs. | 11,232. |
| FY21: Total RFRs submitted to offices that tracked RFRs ..................... | 1,213 (10.7 percent of negatives from the offices that tracked RFRs). |
| FY21: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 188 (15 percent of RFR submissions and 1.6 percent of all negatives from the offices that tracked RFRs). |

Although the above data do not account for every case in which a request for reconsideration of a negative credible fear determination was made, they demonstrate the significant number of requests for reconsideration that USCIS asylum offices have entertained. Anecdotally, offices report that given the sizeable number of requests received, it is not uncommon to have four or five senior asylum officers working on RFRs full-time, along with two supervisors dedicating half of each day to RFRs on a regular basis, with additional oversight (approximately one

hour per day) by upper management (such as a Section Chief). The number of hours required to review an RFR may vary, as the task includes reviewing the credible fear record in light of any allegations of clear error or the presentation of any newly available evidence that may change the decision from a negative to a positive and determining if another interview is necessary to make a decision. In cases in which another interview is provided, a single request could take upwards of four hours to complete. Moreover, given the time-sensitive nature of the request, considering the individual is in the process of being expeditiously removed, where offices exercise their discretion to review such requests, they have to act quickly to ensure the review takes place prior to removal. Where RFRs are entertained, to ensure the review takes place prior to removal, if an office does not already have full-time staff dedicated to RFR review at a given moment, they must pull asylum officers off their regular caseload of credible fear, reasonable fear, or affirmative asylum cases and require them to quickly shift gears to review RFRs, in addition to requiring SAOs to do the same. Furthermore, while offices have not tracked cases where multiple RFRs are received, anecdotally, they report that it is not uncommon to receive multiple RFRs from the same applicant, in some instances as many as two to three or more per case.

To channel USCIS's resources to where they can most efficiently be used, with the present rulemaking, the Departments first proposed revising 8 CFR 208.30(g)(1)(i) to eliminate USCIS reconsiderations and provide that an IJ has sole jurisdiction to review whether the individual has established a credible fear of persecution or torture once the asylum officer has made a negative credible fear determination and the individual is served with a Form I–863 (after the individual either requests IJ review or declines to request review and that declination is treated as a request for review). Once the Form I–863 was served, jurisdiction to review the credible fear determination would then have rested solely with EOIR. The Departments based this revision on the notion that requests to reconsider negative credible fear determinations where applicants have new, previously unavailable evidence, or where a clear procedural or substantive error in the determination is alleged, should properly take the form of motions to reopen before EOIR and be decided by an IJ.

Upon further consideration and after reflecting on the comments received on

this topic, however, the Departments agree with many of the commenters that even after a negative credible fear determination has been reviewed by an SAO, the individual has been served with the decision, and an IJ has reviewed and concurred with the negative determination, in some rare instances USCIS may still want to reconsider the determination as a matter of discretion. For example, if there is an allegation of procedural or substantive error in the original determination and the IJ did not address this issue during IJ review, it may be an appropriate exercise of USCIS's discretion to reconsider the case. While the Departments disagree with the commenters' characterization of credible fear interviews as rife with procedural errors, the Departments also recognize that errors sometimes occur given all the unique circumstances at play. In some instances, errors that may or may not have been avoidable will occur and should be corrected. In those instances, the Departments believe there should be some recourse for the noncitizens who are affected. The Departments do not take lightly the notion that, as referred to by commenters and as demonstrated by the above data, there are some cases where the negative credible fear determination is overturned and, absent such individuals requesting reconsideration and USCIS exercising its discretion to reconsider, these individuals may have been removed to a country where they were in fact ultimately able to demonstrate a credible fear of persecution or torture. Considering the gravity of the consequences of failing to address a potential clear error in the negative credible fear determination, including potentially violating the United States' non-refoulement obligations and returning the individual to a country where there is a significant possibility that the individual could be persecuted or tortured, the Departments agree that it is appropriate to allow an option for reconsideration as a last resort. While the NPRM framed that option as being best exercised by EOIR before the IJ, considering the many comments showing how USCIS is specially positioned to reconsider a decision even after an IJ has concurred with it, the Departments agree that potential reconsideration by USCIS should continue to be allowed. As such, instead of adopting the revisions to 8 CFR 208.30(g)(1)(i) that were proposed in the NPRM, in this IFR, DHS is retaining language at 8 CFR 208.30(g)(1)(i) recognizing that DHS may, in its discretion, reconsider a

negative credible fear finding with which an IJ has concurred.

At the same time, the Departments remain concerned that requests for reconsideration of negative credible fear determinations not be permitted to undermine the present rule's purpose to create a more efficient and streamlined process following a credible fear determination, while ensuring due process. As noted in the preamble to the NPRM, the original changes to 8 CFR 208.30(g) proposed in the NPRM were put forth to be consistent with the statutory scheme of INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii), under which IJ review of the credible fear determination serves as the check to ensure individuals are not returned to a country where they have demonstrated a credible fear. The Departments stand by that assertion from the NPRM's preamble and want to emphasize that even though they are recognizing the possibility that USCIS may, in its discretion, reconsider a negative credible fear determination, such an exercise of discretion is not the appropriate primary mechanism for review of a credible fear determination—that credible fear review, per statute, rests with the IJ once jurisdiction is transferred to EOIR. The recognition of USCIS's inherent discretionary authority to potentially reconsider a credible fear determination must not be used to undercut the statutory scheme of expedited removal, including the proper role of the IJ to review USCIS's negative credible fear determination, nor will DHS permit it to obfuscate the purpose of the present rule. Accordingly, while DHS is maintaining the regulatory reference to its inherent discretionary authority to reconsider a negative credible fear determination in the present rule, it is also placing a temporal and numerical limitation on allowances for reconsideration to ensure the exercise of such authority is consistent with the statutory expedited removal and credible fear framework. The present rule provides at 8 CFR 208.30(g)(1)(i) that any request for reconsideration must be received no more than 7 days after the IJ's concurrence with the negative credible fear determination, or prior to the individual's removal, whichever date comes first. This time limit is necessary to ensure the avenue of allowing USCIS reconsideration does not undercut the whole expedited removal process in cases where the applicant has already had an opportunity to present his or her claim before an asylum officer, the asylum officer has made a decision that was

concurred with by an SAO, and an IJ has reviewed the determination in accordance with the statutory scheme. Additionally, for the same reasons, it is necessary to limit any request for reconsideration of a negative credible fear determination before USCIS to one request only, which the Departments have also provided for at 8 CFR 208.30(g)(1)(i). Considering, as mentioned above, that asylum offices report receiving multiple RFRs for a single case and devoting significant resources that could more efficiently be spent adjudicating the cases of applicants who have not yet had any opportunity for their claims to be heard, this numerical limitation is also essential if USCIS is going to continue entertaining such requests. If unlimited requests were allowed, or if there were no limit on the time frame during which such requests may be lodged, the Departments would run the risk of endorsing an ad hoc process that would undermine the very purpose of the statutory scheme of expedited removal laid out by Congress, and indeed also the very purpose of the present rule. The Departments, after careful reflection, instead are providing the best balance to promote both due process and finality, consistent with the statutory scheme of expedited removal, including the statutory language that clearly directs that the IJ is the proper reviewer of any negative credible fear determination made by an asylum officer.

*Comments:* One commenter expressed support for the Departments' proposal to eliminate the regulatory text that describes USCIS's authority to reconsider negative credible fear determinations that have already been reviewed by a supervisory asylum officer and upheld by an IJ. This commenter agreed with the Departments' assessment that the proposal would increase efficiency, that it more closely aligns with the statutory scheme of section 235 of the Act, 8 U.S.C. 1225, and that it would be necessary to ensure that requests for reconsideration do not frustrate the streamlined process that Congress intended for expedited removal. The commenter asserted that requests for reconsideration have become "an overwhelmingly popular tactic" to delay removal among individuals without meritorious fear claims, diverting resources from those with legitimate claims.

*Response:* The Departments acknowledge the comment related to how the proposed changes align with the statutory scheme governing expedited removal and credible fear.

The Departments also agree that resources should be used efficiently and generally should not be diverted from those who have not yet had any interview or determination to those who have already had an opportunity to present their claim and who received a negative credible fear determination made by an asylum officer, reviewed by a supervisory asylum officer, and concurred with by an IJ. For these reasons, while the Departments are not maintaining the exact revisions to 8 CFR 208.30(g) proposed in the NPRM, the Departments are taking this opportunity to clarify that the statutorily-mandated review of any negative credible fear determination must take place by an IJ pursuant to INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and that IJ review is the appropriate method by which a negative credible fear determination made by USCIS is reviewed. Following IJ review, pursuant to USCIS's inherent discretionary authority to review its own decisions, USCIS may, as a matter of discretion, reconsider a negative credible fear determination that has already been concurred with by an IJ, 8 CFR 208.30(g), but the Departments agree with the comment that this exercise of discretion cannot be allowed to frustrate the underlying expedited removal process laid out by Congress. Accordingly, DHS is providing for revisions to 8 CFR 208.30(g) that place reasonable limits on when USCIS may entertain a request for reconsideration as a matter of discretion, including that any reconsideration be requested by the noncitizen or their attorney or initiated by USCIS no more than 7 days after the IJ concurrence with the negative credible fear determination, or prior to the noncitizen's removal, whichever date comes first, and that only one such request may be entertained per case. These reasonable limitations are necessary to ensure that USCIS's exercise of discretion in allowing any potential reconsideration of a negative credible fear determination is not inconsistent with Congress's instructions in establishing the expedited removal process and to ensure requests for reconsideration cannot be used as a tactic to delay removal for individuals with non-meritorious claims, which, as the commenter expressed, is a serious issue that diverts resources from USCIS hearing potentially meritorious claims.

d. Removal of Mandatory Bars From Consideration

*Comments:* A commenter stated that the NPRM did not provide a good enough rationale for rescinding the regulatory change that would require application of the "mandatory bars" against asylum claims during credible fear screening. The commenter expressed opposition to "ignoring" mandatory bars, such as if the applicant is a criminal, is a danger to the United States, or participated in the persecution of others. A number of commenters supported the Departments' proposal to not apply the mandatory bars to asylum and withholding of removal during the credible fear screening process. One comment stated that application of U.S. law relating to bars to asylum is so complex and often fact-intensive that it is simply not possible to make fair and accurate legal determinations on these issues in the context of credible fear screenings, which do not allow sufficient time to identify the factual information and legal arguments that may need to be raised on these points. Another commenter stated that exclusion from refugee protection is a complex inquiry into factual and legal questions involving not only international refugee law, but in many cases, international human rights, humanitarian law, and international criminal law. The commenter stated that this inquiry cannot be adequately assessed in a screening interview, particularly given truncated timelines, lack of legal assistance, lack of understanding about the procedure, challenges with translation and interpretation, and the prevalence of trauma.

*Response:* The Departments acknowledge the commenter's invitation to further explain their reasons for recodifying the historical practice of not applying mandatory bars to asylum or statutory withholding of removal at the credible fear screening stage. *See* 8 CFR 208.30(e)(5)(i)(A). As described in Section III.A of this preamble, requiring asylum officers to apply mandatory bars during credible fear screenings would make these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious. Because of the complexity of the inquiry required to develop a sufficient record upon which to base a decision to apply a mandatory bar, such a decision is most appropriately made in the context of a full merits hearing, whether before an asylum officer or an IJ, and not in a screening context. Furthermore, due process and fairness considerations counsel against applying mandatory bars during the credible fear screening process. Due to the intricacies of fact finding and legal analysis required to make a determination on the applicability of any mandatory bars,

individuals found to have a credible fear of persecution should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 proceedings provide. In light of the need to preserve the efficiency Congress intended in making credible fear screening part of the expedited removal process and to ensure due process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar, the Departments have determined that these goals can be accomplished by returning to the historical practice of not applying mandatory bars at the credible fear screening stage.

The commenter's suggestion that the Departments intend through this rulemaking to ignore any mandatory bar is mistaken. On the contrary, asylum officers are trained to gather and analyze information to determine the applicability of mandatory bars in affirmative asylum adjudications, and they are instructed to assess whether certain bars may apply in the credible fear screening context. The latter assessment is designed to flag any mandatory bar issues requiring further exploration in Asylum Merits interviews or section 240 removal proceedings. Asylum officers and IJs will continue to apply the mandatory bars in their adjudications, when justified by the facts and the law. Individuals subject to a mandatory bar will not be found eligible for any immigration benefit foreclosed by the bar.

The Departments agree with these commenters that a complicated process requiring full evidence gathering and determinations to be made on possible bars to eligibility is incompatible with the function of the credible fear interview as a screening mechanism designed to quickly identify potentially meritorious claims deserving of further consideration in a full merits hearing and to facilitate the rapid removal of individuals determined to lack a significant possibility of establishing eligibility for asylum, statutory withholding of removal, or protection under the CAT. As detailed further above, not applying mandatory bars at the credible fear screening stage both preserves the efficiency Congress intended in making credible fear screening part of the expedited removal process and helps ensure a fair process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory

withholding of removal but for the potential applicability of a mandatory bar. The Departments have determined that these goals can be accomplished by returning to the historical practice of not applying mandatory bars at the credible fear screening stage.

*Comment:* One commenter praised the Departments' proposal to generally not apply the statutory mandatory bars to asylum and withholding of removal during the credible fear screening process but urged the Departments to remove some of the limited exceptions to ensure any additional bars are not applied. The commenter stated that this is a step in the right direction, but the regulatory language should be expanded to eliminate consideration of the bars to asylum resulting from the Presidential Proclamation Bar IFR and TCT Bar rule.

*Response:* The Departments acknowledge the suggestion and note that they plan to propose to modify or rescind the regulatory changes promulgated in the Presidential Proclamation Bar IFR[71] and the TCT Bar rule[72] in separate rulemakings. These rulemakings contain the bars that the commenter has urged the Departments to remove from consideration within the credible fear process. The Departments note that these two rules are not currently in effect. Federal courts have either vacated or enjoined the Departments from implementing both the TCT Bar IFR and TCT Bar rule as well as the Presidential Proclamation Bar IFR.[73]

*Comment:* One commenter urged the Departments to implement the Global Asylum rule, including its requirement that USCIS asylum officers apply the mandatory bars to asylum and statutory withholding of removal at the credible

fear stage. The commenter cited the Departments' justification for this provision in the preamble to the Global Asylum rule, arguing that it is "pointless, wasteful, and inefficient to adjudicate claims for relief in section 240 proceedings when it can be determined that an alien is subject to one or more of the mandatory bars to asylum or statutory withholding at the screening stage.''

*Response:* The Departments note that the Global Asylum rule has been enjoined, so it cannot be implemented at this time.[74] The Departments acknowledge that in the preamble to the Global Asylum rule, they justified the departure from the historic practice of not applying the mandatory bars at the credible fear screening stage by arguing that it would be an inefficient use of an immigration court's resources to conduct full merits hearings on claims of individuals determined at the credible fear stage to be barred from asylum or statutory withholding of removal. However, as detailed further above, the Departments have subsequently determined that the stated goal of promoting administrative efficiency can be better accomplished through the mechanisms established in this rulemaking, rather than through broadly applying mandatory bars at the credible fear stage. The Departments now believe that it is speculative whether, had the Global Asylum rule been implemented, a meaningful portion of the EOIR caseload might have been eliminated because some individuals who were found at the credible fear screening stage to be subject to a mandatory bar would not have been placed into section 240 proceedings. On the other hand, requiring asylum officers to broadly apply the mandatory bars would, in many cases, increase credible fear interview and decision times. While the TCT Bar IFR was in effect, asylum officers were required to spend additional time during interviews determining whether the bar potentially applied, eliciting testimony related to the application of the bar, exploring whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record to ensure a legally sufficient determination could be made according to the higher reasonable fear standard. As discussed above, these efforts also increased the workload of supervisory asylum officers, Asylum Division Headquarters staff, USCIS

---

[71] Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Noncitizens Subject to a Bar on Entry Under Section 212(f); Procedures for Protection Claims, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC34* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Noncitizens Subject to a Bar on Entry Under Section 212(f); Procedures for Protection Claims, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC34* (last visited Mar. 14, 2022).

[72] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC69* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC69* (last visited Mar. 14, 2022).

[73] *See supra* note 4 (discussing recent regulations and their current status).

[74] *See supra* note 4 (discussing recent regulations and their current status).

Office of Chief Counsel attorneys, and IJs. Presently, asylum officers ask questions related to all mandatory bars to develop the record sufficiently to flag potential bars but, since mandatory bars are generally not applied in the credible fear determination, the record does not need to be developed to the level of detail that would be necessary if the issue was outcome determinative for the credible fear determination. If a mandatory bar were outcome determinative, it would be necessary to develop the record sufficiently to make a decision about the mandatory bar such that, in many cases, the interview would go beyond its intended purpose of being a screening for potential eligibility for protection and rather become a decision on the form of protection itself. The level of detailed testimony necessary to make such a decision, in many cases and depending on the facts, would require asylum officers to spend more time carefully developing the record during the interview and conducting additional research following the interview. IJs reviewing negative credible fear determinations where a mandatory bar was applied would similarly face additional factors to consider in their review, depending on the facts, often undermining the efficiency of that process as well.

e. Other Comments on the Proposed Credible Fear Screening Process

*Comments:* One commenter asserted that the NPRM does not improve efficiencies in adjudication or lead to cost savings when compared to having the asylum adjudication process take place outside of the context of expedited removal and detention. The commenter asserted that, rather than streamlining the process, the NPRM creates a new layer of USCIS adjudication with possibly two reviews by an immigration court. The commenter also asserted that the NPRM fails to adopt a long-suggested solution of allowing for grants of asylum at the credible fear interview stage or eliminating the credible fear screening process so that cases may proceed directly to the merits before USCIS.

*Response:* The Departments note that the goals of this rulemaking include ensuring that noncitizens placed into the Asylum Merits process receive final decisions on their claims for protection as quickly and efficiently as possible, while also providing ample procedural safeguards designed to ensure due process, respect human dignity, and promote equity. In this rule, the Departments have outlined a process that continues to allow noncitizens to seek IJ review of asylum officers'

negative credible fear determinations, as required by statute. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In addition, following an Asylum Merits interview before an asylum officer, if the asylum officer does not grant asylum, the noncitizen will have the opportunity to have their protection claims considered before an IJ in streamlined section 240 removal proceedings. The Departments expect that this new process will allow protection claims to be adjudicated more quickly—whether granted or not—than they are under the current process (in which all individuals who receive positive credible fear determinations are referred for ordinary section 240 removal proceedings) and will provide procedural safeguards to ensure that noncitizens receive full and fair adjudications of their protection claims.

The Departments have considered the commenter's proposals to eliminate credible fear screenings and adjudicate protection claims outside the context of the expedited removal process, as well as to allow for grants of asylum at the credible fear screening stage. While the Departments acknowledge the proposals, at this time, the Departments decline to adopt these proposals in favor of the approach presented in this rule. The Departments believe that a credible fear screening provides a meaningful opportunity for a noncitizen to provide USCIS asylum officers with valuable information pertaining to their protection claims, and that a subsequent Asylum Merits interview will allow noncitizens to expand on the details and circumstances surrounding their need for protection. On the other hand, the credible fear screening process allows the Departments to assess who may not be eligible for protection and promptly execute removal orders. Overall, the credible fear screening process that the Departments implement, which is consistent with congressional intent, allows for the Departments to identify noncitizens who may or may not be eligible for protection. *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1). As for allowing grants of asylum at the credible fear screening stage, the Departments acknowledge the recommendation but are not addressing the matter in this rulemaking as it falls outside of the scope of this rule.

*Comments:* Multiple commenters expressed support for the "clarification" in the NPRM that only USCIS asylum officers would conduct credible fear interviews. Some of these commenters asserted that CBP officers who had previously performed these screenings were hostile and confrontational and were more likely to make negative

credible fear determinations. Another commenter asserted that this "specification" is consistent with congressional intent because the INA expressly requires asylum officers, who have professional training in asylum law and interview techniques, to conduct credible fear interviews.

*Response:* The Departments acknowledge the commenters' support and agree that the rule clarifies that USCIS asylum officers will conduct credible fear interviews, which is consistent with the INA. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i); 8 CFR 208.30(d). USCIS asylum officers receive training and possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as nonadversarial interviewing techniques; and have ready access to country conditions experts. The Departments acknowledge the concerns of the commenters regarding the conduct of CBP officers but note that these issues fall outside of the scope of this rulemaking.

*Comments:* One commenter suggested that the Departments should codify the elimination of the Prompt Asylum Claim Review ("PACR") and the Humanitarian Asylum Review Process ("HARP") by regulation, including by imposing enhanced procedural protections for all credible fear interviews, including that they not be conducted while in CBP custody. The commenter believes that, as the Departments revisit their asylum screening procedures, they should take this opportunity to prevent reintroduction of the programs by a future administration.

*Response:* Pursuant to the E.O. on Migration's directive to cease implementing PACR and HARP, and to consider rescinding any orders, rules, regulations, guidelines, or policies implementing those programs, the Departments have ceased implementing those programs. *See* 86 FR 8270. The Departments acknowledge the recommendation that those changes be codified by regulation, but further consideration and discussion of these programs fall outside of the scope of this rulemaking.

4. Applications for Asylum

a. Written Record of the Credible Fear Determination Created by USCIS, Together With the Service of the Credible Fear Determination, Treated as an Application for Asylum

*Comments:* A commenter expressed support for the provision requiring

asylum officers to provide a summary of material facts and interview notes to asylum seekers during the credible fear screening process. Various commenters expressed concern about time constraints for asylum seekers to amend or supplement the asylum application. One commenter argued that the 7-day timeline for submitting an amended or supplemented application—10 days if mailed—would be infeasible due to the remote location of many asylum offices and the brief timeline between the interview notice and the scheduled interview. The commenter recommended that the rule impose a requirement that USCIS provide a minimum time frame for applicants prior to the Asylum Merits interview. Another commenter urged that more time be allowed for applicants and attorneys to develop a case. Some commenters argued that the credible fear documentation is often unreliable and that applicants will need adequate time and assistance to make modifications or to supplement the record. Citing the procedural limitations at proposed 8 CFR 208.9(d)(1), many commenters recommended the Departments develop a more robust procedure for the asylum seeker or counsel to make corrections or statements at any stage of the process or during the Asylum Merits interview, while providing additional time to review the hearing transcript following the hearing.

Another commenter suggested that the proposed rule be framed with the expectation that the asylum application will be supplemented, modified, or corrected prior to the hearing. The commenter also recommended the rule include a provision that would require asylum officers to encourage asylum seekers to correct or supplement the record.

Several commenters expressed concern that supplementations, modifications, or corrections to the record would undermine the applicant's credibility and negatively impact the applicant's case outcome. One commenter recommended that the Departments change the rule to explicitly protect applicant credibility with respect to modifications, corrections, or supplementations to the credible fear determination.

Finally, citing proposed 8 CFR 208.3(a)(2) allowing an applicant to amend, correct, or supplement information collected during expedited removal, a commenter stated it was unclear whether this provision would also apply to the asylum officer's credible fear interview notes.

*Response:* The Departments appreciate comments supporting the treatment of a credible fear determination as an asylum application. In creating this efficiency, the Departments aim as well to reduce potential barriers to protection for eligible applicants. The Departments acknowledge the support for the provision stating that a copy of the application for asylum, including the asylum officer's notes from the interview and basis for the determination, will be provided to the noncitizen at the time that the credible fear determination is served. *See* 8 CFR 208.30(f), (g)(1). The Departments recognize that the initial screening determination may not necessarily capture details that an asylum applicant wishes to include for further consideration of the applicant's eligibility for asylum, statutory withholding of removal, or CAT protection. Therefore, it is important that an applicant be able to modify or supplement the application for asylum. However, given commenters' concerns about credibility, ability to modify credible fear notes, and general concerns with the proposed process, the Departments want to clarify that modifications or supplements should not seek to modify or amend the credible fear determination made by the asylum officer. Under this rule, applicants may modify, amend, or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or alternatively, may supplement the information collected during their credible fear interview. The Departments are making this change to allow for applicants to make corrections or further develop their claim but are making clear that a line-by-line correction of the asylum officers' notes is not necessary or expected for purposes of the process or an assessment of credibility. The Departments do not believe that added protections are needed to protect against potential negative impacts on credibility assessments. Where there are discrepancies or inconsistencies, an applicant may explain such statements in their supplemental materials or at the Asylum Merits interview. As is always the case with any credibility determination made in the context of a nonadversarial asylum interview before USCIS, if a credibility concern arises, such as potential inconsistent testimony, the applicant will be given the opportunity to explain the inconsistency and the concern may be resolved if the applicant provides a

reasonable explanation, which in some instances may relate to the nature of the credible fear interview itself if that constitutes such a reasonable explanation in the specific case. In creating a streamlined process, the Departments do not expect the applicant to do a wholesale edit of a credible fear interview record, but rather wish to ensure that biographic and basic information about the fear claim is correct, so that the applicant may further develop the claim at the Asylum Merits interview. The Departments address comments relating to constraints on timeline below in Section IV.D.4.d of this preamble.

*Comments:* A few commenters warned that the proposal to treat the record of the credible fear determination as an asylum application would create a conflict of interest because the asylum office would create the same record that it would then adjudicate, and the asylum office would develop the record during the credible fear screening and could then not grant asylum based on that record. A commenter asserted that the person preparing the asylum application is not simply writing down what the applicant says and that such person must be a zealous advocate for the applicant, which may include arguing for a novel interpretation of the law. Another commenter said that the NPRM must be revised to promote neutral decision-making based on objective evidence in the record and correct application of U.S. and international law. Another commenter stated that if adjudicators face significant backlogs or certain types of claims are viewed unfavorably, it is possible that asylum officers responsible for preparing and lodging asylum applications may feel pressure or incentivized to file fewer claims (*e.g.,* by issuing a greater number of negative fear determinations) and suggested that robust protections through checks-and-balances (referencing firewalls, where possible, as an example) within USCIS may help alleviate such concerns.

*Response:* The Departments disagree with the commenters that the asylum officer's role in preparing the asylum application through the creation of the credible fear record represents a conflict of interest with their role in adjudicating the asylum application of an individual found to have a credible fear in the first instance. By deeming the record of the credible fear interview to constitute the asylum application, the Departments ensure that the statements made by the noncitizen, including any arguments for a novel interpretation of the law, become part of the asylum application. Similarly, 8 CFR

208.30(d)(4) provides that counsel for the noncitizen may be present at the credible fear interview and for the asylum officer to permit counsel to make a statement at the end of the interview, which statement may include an argument for a novel interpretation of the law, and which would become part of the record. Furthermore, the rule provides at 8 CFR 208.4(c)(2) that noncitizens who receive a positive credible fear determination that is treated as the asylum application may supplement the information collected during the process that concluded with a positive credible fear determination. It further provides at 8 CFR 208.9(b) that asylum applicants may have counsel or a representative present at an Asylum Merits interview. Such representative will have an opportunity to make a statement or comment on the evidence presented upon completion of the hearing. *See* 8 CFR 208.9(d). Taken together, these provisions ensure that noncitizens and their representatives have ample opportunity to engage in zealous advocacy, including the presentation of arguments for novel interpretations of the law. As neutral fact finders conducting nonadversarial interviews in both the credible fear screening and asylum adjudication contexts, asylum officers are duty-bound to consider the totality of evidence in the record and issue decisions based on the facts and the law. Their role in creating the credible fear record that will be treated as an asylum application thus poses no inherent conflict of interest. Additionally, different asylum officers may be making the credible fear determination and conducting the Asylum Merits interview, thus obviating any perceived appearance of conflict. Furthermore, contrary to the commenter's assertion, nothing in this rule pressures or incentivizes asylum officers to issue negative credible fear determinations that are not warranted by the facts and law applicable to an individual's case. This rule aims to address the backlog of asylum claims before EOIR by providing a more efficient mechanism for processing asylum claims originating in the credible fear screening process while guaranteeing due process and an objective application of the law to the facts in each case, not by pressuring asylum officers toward particular outcomes.

*Comments:* Some commenters opposed treating the written record of the credible fear interview as an asylum application on the ground that it "demands that USCIS assume the burden in what should be the non-citizen's role in the asylum application process." These commenters stated that this feature of the rule will require the Government to adjudicate more asylum applications.

*Response:* The Departments disagree that the IFR requires USCIS to assume a burden by treating the written record of the credible fear determination as an asylum application, as USCIS is required to produce this record as part of the credible fear screening process. While this change will mean that a greater percentage of noncitizens receiving a credible fear determination will subsequently receive a decision on the merits of their claims for asylum, statutory withholding of removal, and CAT, it will also mean that a final decision will be made in a more timely fashion than accomplished under the present process. As explained above, ensuring that all noncitizens who receive a positive credible fear determination quickly have an asylum application on file allows cases originating with a credible fear screening to be adjudicated substantially sooner than they otherwise would be—regardless of whether the noncitizen is granted asylum or ordered removed. Under the current process, noncitizens who receive a positive credible fear determination may wait months or years before attending a Master Calendar Hearing, and the IJ may be asked for multiple continuances to any deadline for the noncitizen to file an asylum application. By treating the credible fear documentation as the application for asylum, both the Departments and the noncitizen avoid the burden caused by delays, continuances, and rescheduled hearings sought in order for the noncitizen to file an asylum application. *See supra* Section III.B of this preamble.

**b. Date Positive Credible Fear Determination Served as Date of Filing and Receipt**

*Comments:* Multiple commenters supported the general idea that a positive credible fear determination would serve as an asylum application filing for purposes of the one-year filing deadline and to start the clock on employment authorization based on a pending asylum application, thereby helping asylum seekers avoid missing the one-year filing deadline and making it possible for asylum seekers to access employment authorization as quickly as possible. One commenter noted that this provision comports with the underlying policy goals of the one-year filing deadline. Other commenters provided opinions about the one-year filing deadline generally, suggesting that the one-year filing deadline has become a barrier to applicants as many miss the filing deadline through lack of knowledge or notice of the deadline, confusion about the process, believing they already filed, or due to the lack of coordination between DHS and DOJ leading to court proceedings not being timely initiated. One commenter provided examples of personal stories showcasing how many asylum seekers fail to meet the deadline due to trauma, grief, or hope for the possibility of safe return to their home country.

Several commenters further reasoned that the proposed change would save both asylum officers and IJs time in that they will not have to adjudicate whether an asylum application was filed within a year or whether an exception to the filing deadline was established (and, if so, whether the application was filed within a reasonable period of time given the exception). Instead, the commenter suggested that adjudicators will be able to concentrate on the substance of the claim. Some commenters went further, suggesting that Congress eliminate the one-year filing deadline entirely, as the deadline effectively acts as a bar to asylum and has arbitrarily blocked "tens of thousands of refugees" with meritorious claims for asylum.

Various commenters supported expedited access to EADs for asylum seekers deemed to have a credible fear of persecution. Commenters expressed strong support for any procedural changes that would make it easier for asylum seekers to obtain EADs as quickly as possible. An individual commenter supported eliminating any delay between a positive credible fear determination and the filing of an application for asylum by treating the written record of the determination by USCIS as an application for asylum and starting the waiting period for employment authorization based on a pending asylum application. The commenter said enabling asylum seekers earlier access to employment could reduce the public burden, reduce the burden on the asylum support network, and benefit asylum seekers in terms of equity, human dignity, and fairness. A few commenters discussed the importance of the employment authorization to asylum seekers, including the ability to build financial security; gain housing and food; pay for competent legal counsel; ensure their home gets heating and electricity; escape situations of abuse; and obtain a form of identification that may allow the individual to get a driver's license, access social benefits, open a bank account, register their child for school,

and enroll in health insurance. Citing research and examples from clients, commenters asserted that employment authorization not only allows asylum seekers to meet their basic daily needs and secure their fundamental rights, but it serves the economic interests of the United States through entrepreneurship, professional expertise, and tax revenue. A commenter argued that asylum seekers who have access to employment authorization would be less reliant on community resources and non-profit services. As expressed by commenters, individuals who experience barriers to employment authorization as a result of erroneous calculations in the starting and stopping of the waiting period for an EAD based on a pending asylum application are forced to work in exploitative situations and cannot support themselves or their families.

*Response:* The Departments agree that ensuring that asylum seekers promptly have an application for asylum on file and that claims are timely adjudicated can help promote equity and fairness for individuals, including by allowing for earlier employment authorization on the basis of the asylum application or incident to status as an asylee, which in turn may reduce burdens on asylum support networks or the public. These fairness considerations were important factors in the Departments' decision to treat the record underlying the positive credible fear determination as an application for asylum for purposes of meeting the one-year filing deadline and for purposes of beginning the time period applicants must wait before applying for or receiving employment authorization based on a pending asylum application. Instead of placing all individuals with a positive credible fear determination into removal proceedings before EOIR, where they then would have to defensively file a Form I–589, Application for Asylum and for Withholding of Removal (that would also require USCIS Service Center Operations to expend resources intaking the form and scheduling applicants for biometrics), and have them appear for multiple hearings before EOIR (where ICE resources would also be required to represent the Government in proceedings), applicants with a positive credible fear determination who are placed into the Asylum Merits process will have their credible fear record serve as the asylum application without having to expend additional agency resources to perform intake or additional applicant resources to file a new asylum application. This process will ensure applicants can apply for an EAD as soon as possible once either the requisite time period has passed based on the record underlying the positive credible fear determination that serves as the asylum application or their asylum application is granted (making the individual eligible for employment authorization incident to status). Additionally, the rule will promote equity and due process by ensuring that individuals who are allowed to remain in the United States for the express purpose of having their asylum claim adjudicated after receiving a positive credible fear determination do not inadvertently miss the one-year filing deadline.

The Departments also agree that having the record underlying the positive credible fear determination serve as the asylum application will create significant efficiencies in immigration court for noncitizens referred to streamlined section 240 proceedings when USCIS declines to grant asylum. Generally, noncitizens seeking asylum and related protections defensively during removal proceedings must complete and file the Form I–589, Application for Asylum and for Withholding of Removal. IJs must often grant continuances and delay hearings to allow noncitizens to complete the application. When a noncitizen files an asylum application defensively beyond the one-year filing deadline, the IJ and the parties must devote resources and time to resolving the issue of whether any exception to the one-year bar has been established and whether the application was thereafter filed within a reasonable period of time. However, this rule will increase efficiency during immigration court proceedings for certain cases originating from the credible fear process by reducing or eliminating the need for IJs to delay hearings for noncitizens to prepare the asylum applications and by obviating the need for IJs and the parties to spend time addressing issues related to the one-year filing deadline.

Additionally, while the Departments agree that the issue of the one-year filing deadline for asylum is an important one, the comments related generally to the one-year filing deadline go outside the scope of the present rulemaking. The one-year filing deadline (including exceptions to the deadline) is set by Congress, INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B).

*Comments:* Some commenters offered general opinions about EADs for asylum seekers and expressed concern that any waiting period for employment authorization is too long. A commenter stated that DHS should rescind employment authorization rules issued by the prior Administration because they were issued by agency officials in violation of the APA. The commenter said this Administration should immediately restore the 150-day waiting period and 30-day processing time requirement for asylum seekers. Another commenter concluded that the proposed rule "sidesteps" rescinding the timeline that leaves asylum seekers without the basic means to provide for themselves and urged DHS to enable applicants to seek employment authorization based on a grant of parole under 8 CFR 274a.12(c)(11). This commenter stated that paroling asylum seekers without employment authorization simply ensures their exploitation and destitution.

*Response:* The Departments acknowledge the comments related generally to EADs based on a pending asylum application, often referred to as "(c)(8)" EADs because of the regulatory provision under which USCIS may grant such EADs, 8 CFR 274a.12(c)(8). The "(c)(11)" EADs referred to by the commenter relate to another subsection of that same provision, 8 CFR 274a.12(c)(11), which authorizes USCIS to grant an EAD to a noncitizen paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit. The eligibility criteria for EADs based on a pending asylum application are beyond the scope of the present rule. The present rule contains no substantive changes to EAD eligibility based on a pending asylum application or the requisite waiting period for applying for an EAD based on a pending asylum application. In the 2020 Asylum EAD Rule,[75] DHS clarified that noncitizens who have been paroled into the United States after being found to have a credible fear or reasonable fear of persecution or torture may not apply under 8 CFR 274a.12(c)(11) (parole-related EADs), but may apply for employment authorization under 8 CFR 274a.12(c)(8) if they apply for asylum in accordance with the rules for (c)(8) EADs and are otherwise eligible. *See* 85 FR 38536. Those eligibility criteria are beyond the scope of the present rule. DHS welcomes comments related to these topics in separate, future rulemaking projects, as provided in the Spring and Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions.

---

[75] Asylum Application, Interview, and Employment Authorization for Applicants, 85 FR 38532 (June 26, 2020). On February 7, 2022, in *AsylumWorks v. Mayorkas*, No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated the 2020 Asylum EAD rule.

c. Inclusion of Applicant's Spouse and Children

*Comments:* Several commenters asserted that the rule should permit asylum applicants to add a spouse and children or supplement family information at any point during the application process. A few commenters suggested that the proposed rule's inflexibility with regard to changes to family information makes it more restrictive than the current rule, undermines the Departments' goal of efficiency, and contradicts the Administration's promise to keep families together. Other commenters reasoned that applicants may fail to discuss relevant family members during the credible fear process due to stress, trauma, fear, confusion regarding the asylum process and law, or because the asylum officer fails to inquire about family members. One commenter added that individuals should not be forced to choose between their own safety and reuniting with family members.

One commenter stated that the proposed rule fails to consider how the provision of a credible fear decision automatically constituting the filing of an asylum application would affect the many asylum seekers who do not cross the border with their family members (*e.g.*, different times and places, in groups or alone) and are thereby unable to join their claims. The commenter stated that the rule may result in family separations when some family members' asylum cases are approved and others are not, where they could have otherwise been joined. One commenter concluded that requiring spouses and children to arrive concurrently with the principal applicant wrongly deprives asylum seekers of protection for their spouse or children and is furthermore inefficient as USCIS will have to adjudicate a Form I–730, Refugee/ Asylee Relative Petition, for family members who do not make it into the credible fear case. Another commenter described the Form I–730 process and remarked that the adjudicatory burden on USCIS will continue for years as more forms come into play instead of USCIS adjudicating the whole family's adjustment applications all at once. A commenter also requested information about what will be the filing date in situations where multiple family members name each other as dependents and what will happen to dependents if the principal applicant is not granted asylum.

*Response:* The Departments acknowledge comments related to dependents on an asylum application for individuals placed in the Asylum Merits process after receiving a positive credible fear determination. The spouse or child (unmarried, under 21 years old) of a principal asylee may derive asylum status from their spouse or parent. The derivative asylee may be included on the original application for asylum, or, if not included as a dependent on the application, the principal asylee may petition for their relatives by filing a Form I–730, Refugee/Asylee Relative Petition, within two years of the grant of asylum. Like affirmative and defensive asylum applications, a grant of asylum to the principal asylum applicant following an Asylum Merits interview will confer asylum status on their spouse or children if they are included as dependents in the application and not subject to any mandatory bars to asylum applicable to dependents. Principal applicants will be allowed to include dependents on their application in the new process if the dependents also entered the United States concurrently with the principal applicant and are on the same credible fear case, or, in the alternative, if the spouse or child already has a pending application under this new Asylum Merits process before USCIS. Additionally, a principal asylee may file a Form I–730, Refugee/Asylee Relative Petition, on behalf of any of their qualifying derivative family members after they are granted asylum. The Departments are cognizant of the concerns expressed by commenters about the need for flexibility in allowing dependents to be added to an asylum case under the new Asylum Merits process and contend that the procedures for dependents outlined in the IFR are as flexible as possible, while still ensuring the process can run smoothly and efficiently. The Departments would like to highlight that, in the credible fear process, applicants are specifically asked about all of their family members, and this information is recorded in the Form I–870, Record of Determination/ Credible Fear Worksheet. If the applicant receives a positive credible fear determination and is placed in the new Asylum Merits process, they will be allowed another opportunity to review and correct the information in their Form I–870. Accordingly, applicants will have ample opportunity to ensure that the information related to their family members is accurately reflected in their application under the new process. And if there are any qualifying family members that entered with the applicant or are already in the United States and also have an asylum application pending with USCIS after a positive credible fear finding, the principal applicant is free to include them in his or her application. If for any reason a principal applicant fails to add a dependent to their initial asylum application, the principal applicant is not prevented from having that family member derive asylee status because the principal applicant is free to petition for that family member if and when the principal applicant is granted asylum, either by USCIS or by EOIR. With this IFR, the Departments are now establishing a procedure under which the principal applicant will receive a decision on the principal applicant's case before USCIS and, if the principal applicant is not granted asylum, the principal applicant and any dependents on the case who are not in lawful status will be served with an NTA in immigration court and placed into streamlined section 240 removal proceedings before an IJ. In streamlined section 240 proceedings, the principal applicant may still be granted asylum and, if so, may confer that asylum status upon all of the qualifying dependents on the case. If the principal applicant is not granted asylum, then the principal applicant will be considered for statutory withholding of removal or withholding or deferral of removal under the CAT, and the IJ will also consider claims of the dependents that were elicited by the asylum officer during the Asylum Merits interview to determine if they are eligible for asylum or any other form of relief or protection.

In response to the questions presented by commenters, the filing date will reflect the filing of the principal applicant. If a spouse or child is a dependent on an application under the new Asylum Merits process and also files as a principal applicant themselves, then the filing date for the dependent spouse or child's application will be either (1) the date the dependent spouse or child's Form I–589 was filed or (2) the date of service of the positive credible fear determination on their spouse or parent, whichever date is earlier. Additionally, if the principal applicant is not granted asylum, then the principal applicant and any dependents who are not in lawful status will be issued an NTA and placed in streamlined section 240 proceedings. *See* 8 CFR 208.14(c)(1). If there is a dependent under the new process who also has a pending affirmative asylum application before USCIS, then USCIS will adjudicate that asylum application on its own before placing that individual in section 240 proceedings and, if that individual is eligible for asylum as a principal applicant, the

individual would not be referred to immigration court.

Additionally, under the revised 8 CFR 208.16, for cases under the jurisdiction of USCIS following a positive credible fear determination, if USCIS found the principal applicant ineligible for asylum, though USCIS cannot grant withholding or deferral of removal, the asylum officer is authorized to make a determination on the principal applicant's eligibility for statutory withholding of removal or withholding or deferral of removal under the CAT if the principal applicant shows eligibility for such relief based on the record before USCIS. If USCIS determines that the principal applicant has shown eligibility for withholding or deferral of removal based on the record before USCIS, that determination will be given effect by the IJ if the IJ finds the principal applicant ineligible for asylum and issues a final order of removal, unless DHS demonstrates that evidence or testimony specifically pertaining to the respondent and not included in the record of proceedings for the USCIS Asylum Merits interview establishes that the respondent is not eligible for such protection(s), pursuant to the new 8 CFR 1240.17(i)(2). As described in 8 CFR 1240.17(i), once in section 240 proceedings, under the new process, the IJ will conduct a de novo review of the principal applicant's eligibility for asylum, and if the principal applicant is not granted asylum, will consider de novo the principal applicant's eligibility for statutory withholding of removal and withholding or deferral of removal under the CAT in cases where USCIS did not determine that the respondent was eligible for such relief. In cases where the principal applicant is not granted asylum by the IJ, the IJ will also review asylum eligibility for all other family members and if one family member is found eligible for asylum by EOIR and the others can receive asylum as derivative asylees, it will not be necessary for the IJ to evaluate the remaining family members' eligibility for asylum or withholding or deferral of removal. If a respondent is not granted asylum and cannot otherwise derive asylum from a family member, then the IJ will review each respondent's eligibility for statutory withholding of removal and withholding or deferral of removal under the CAT.

*Comments:* One commenter requested the regulatory language be amended to define "accompanying family members" in 8 CFR 208.30, including by specifying what family members are included (*e.g.*, siblings, cousins, etc.) and what including the family members on the form would accomplish.

*Response:* The Departments acknowledge the comment related to who may be included as an accompanying family member in a credible fear determination, but fully specifying the details of that process is beyond the scope of this rulemaking. In most cases, however, the Departments understand an "accompanying family member[ ]" to include a parent or sibling.

*Comments:* A commenter warned that the proposed inclusion of an applicant's spouse and children in the request for asylum conflicts with existing regulations. The commenter described what they called "riders," or those individuals who previously filed affirmative applications and are already in the country and remarked that existing regulations require riders not originating from a credible fear claim to receive NTAs and be referred to immigration court for section 240 removal proceedings (8 CFR 208.14(c)(1)). The commenter argued that the proposed rule does not address this or how this circumstance would work procedurally and asserted that riders cannot be included in grants of statutory withholding of removal or protection under the CAT.

*Response:* The Departments acknowledge the comments related to so-called "riders." The present rulemaking does not change the governing law with respect to who may derive asylum from a principal applicant granted asylum in the United States. INA 208(b)(3), 8 U.S.C. 1158(b)(3). Further, the present rulemaking is not changing the status quo governing withholding of removal or deferral of removal with respect to an individual—both forms of relief or protection are individual in nature and a dependent cannot derive any status from a family member's grant of withholding or deferral of removal. The present rulemaking is not changing anything about the nature of withholding or deferral of removal in that neither confer any type of status to a dependent. If a principal applicant is not granted asylum by USCIS under the new Asylum Merits process, then the principal applicant and all dependents included in the request for asylum who are not in lawful status will be issued an NTA and placed in streamlined section 240 proceedings, as described above. If one of the dependents does have a pending affirmative asylum application before USCIS, then that application will be adjudicated as well, but if that individual is not found eligible for asylum on their own, then they will also be issued an NTA and placed in section 240 proceedings if

they are not otherwise in lawful status. Accordingly, the concerns expressed by the commenter related to "riders" appear to be unfounded, as anyone without legal status who is found ineligible for asylum by USCIS, whether in the affirmative asylum process or under this new Asylum Merits process, will be issued an NTA and placed in section 240 proceedings before an IJ.

### d. Due Process in Asylum Applications

*Comments:* Some commenters emphasized the importance of formal hearings and a presentation of all available evidence in a court setting to, in their opinion, ensure due process. A few commenters argued that it was important for asylum claims to be heard before an independent, impartial judiciary.

*Response:* The Departments disagree that a court setting or independent judiciary is necessary or otherwise required to allow for due process. *See, e.g.,* 16D C.J.S., Constitutional Law sec. 2010 (2022) ("Due process always stands as a constitutionally grounded procedural safety net in administrative proceedings[.]"). Moreover, transfer of authority to the Judiciary is outside the Departments' authority and beyond the scope of this rulemaking. The Departments only have the authority to promulgate rulemaking with respect to the authority already delegated to them by statute. Congress has expressly recognized the unique and specialized role of asylum officers in making credible fear determinations and in adjudicating the merits of asylum applications. Congress explicitly designated that "asylum officers" are responsible for conducting credible fear interviews and making credible fear determinations. INA 235(b)(1), 8 U.S.C. 1225(b)(1). Further, an "asylum officer" is defined by statute at INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), as an immigration officer who: (1) "has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under" INA 208, 8 U.S.C. 1158, and (2) "is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications." Thus, Congress specifically contemplated that asylum officers act as full-time adjudicators of asylum applications and have specialized training to conduct such adjudications. Moreover, in addition to laying out the required background and role of asylum officers who both conduct credible fear determinations and adjudicate applications for asylum under INA 208,

8 U.S.C. 1158, Congress emphasized the important role of asylum officers in adjudicating asylum applications filed by even the most vulnerable applicants. In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Public Law 110–457, 122 Stat. 5044, Congress provided that asylum officers have initial jurisdiction over any asylum application filed by an unaccompanied child, and therefore asylum officers are specifically empowered to take all necessary steps to render a decision on an affirmative asylum case filed by a UAC. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). Accordingly, Congress has repeatedly recognized the vital role of asylum officers in various contexts related to asylum applications.

Under the INA, asylum officers are authorized to make initial credible fear determinations and are also the only adjudicators authorized to conduct the initial interview of the most vulnerable asylum applicants, unaccompanied children, even where those children may have already been placed into section 240 removal proceedings before EOIR. In addition to these very particular roles that Congress assigned to asylum officers, asylum officers are also recognized as full-time adjudicators of asylum claims under INA 208, 8 U.S.C. 1158. Asylum officers receive extensive training in substantive law and procedure, nonadversarial interview techniques and record development, decision writing, research skills, working with interpreters, and interviewing vulnerable individuals, including children; lesbian, gay, bisexual, transgender, queer, and intersex ("LGBTQI") persons; survivors of gender-based violence; and survivors of torture and trauma. The extensive and well-rounded training asylum officers receive is designed to enable them to conduct nonadversarial interviews in a fair and sensitive manner. Indeed, Congress recognized the special role of asylum officers when it vested asylum officers, not IJs, with initial jurisdiction over asylum applications submitted by unaccompanied children even where they have already been placed in section 240 removal proceedings before EOIR. The present rulemaking builds on the already existing role of asylum officers in adjudicating affirmative asylum applications to have asylum officers also adjudicate asylum applications of individuals retained by or referred to USCIS for further consideration through an Asylum Merits interview following a positive credible fear determination. Additionally, after considering

comments and adjusting the present rule such that asylum officers will no longer issue removal orders under the framework of this rule as described above and below, USCIS will not be issuing orders related to statutory withholding of removal or withholding or deferral of removal under the CAT. In those cases in which the asylum officer finds that an individual is not eligible for asylum, the asylum officer will determine whether the individual is nonetheless eligible for withholding of removal under 8 CFR 208.16(b) or (c) or deferral of removal under 8 CFR 208.17. As proposed in the NPRM, asylum officers will determine applicants' eligibility for withholding of removal, thereby maintaining the due process protections that already exist within affirmative asylum interviews conducted by USCIS asylum officers. *See* 8 CFR 208.9. While the Departments appreciate the concerns expressed by commenters concerned with protecting the due process rights of asylum applicants, the Departments are confident that those rights will be preserved through the nonadversarial interview process conducted by highly trained and specialized asylum officers, with a de novo review of the asylum claim by an IJ if USCIS finds the applicant ineligible for asylum. The IJ will also review any claim to statutory withholding of removal or withholding or deferral of removal under the CAT and any other potential form of relief or protection if the applicant is not granted asylum. Moreover, the rule does not contemplate any change to the noncitizen's ability to appeal an IJ's decision.

*Comments:* Various commenters expressed concern that the proposed rule does not establish a minimum amount of time between the positive credible fear determination and the Asylum Merits interview for asylum seekers to obtain counsel and prepare before the hearing. One commenter asserted that the rule seeks to "unreasonably shorten" asylum seekers' timeline for finding representation and gathering evidence—both time consuming processes that may require additional steps such as translation or mail services. Another commenter argued that the lack of "meaningful temporal space" between the credible fear determination and the asylum hearing would wrongly favor an efficient administrative process over a reasoned and fair decision of law. Another commenter suggested that provisions to expedite and replace the existing application process would go against congressional intent to identify

and protect the rights of genuine asylum seekers to due process. Similarly, another commenter expressed concern that the rule's silence on the timeline between the credible fear determination and the hearing before an asylum officer may frustrate the statutory right of access to counsel. While the rule would clarify the right to representation during the hearing, some commenters expressed the concern that asylum seekers would not be able to secure counsel in practice. They argued that the time between the credible fear determination and the hearing before an asylum officer is short and would not account for applicants with limited resources and language barriers.

Several commenters expressed concern that applicants would encounter difficulties in meeting the evidentiary requirements for the asylum hearing due to trauma, time restraints, detention, and other compounding factors. Specifically, commenters argued that survivors of trauma are often most likely to have trouble gathering sufficient evidence to support their application due to time restraints, the unavailability of documentary evidence and services, intimidation, and unawareness of available resources. One commenter expressed concern that the new credible fear process would not provide enough time for survivors of trauma or torture to recover and adequately prepare for interviews. One commenter claimed that any proposal to amend the rule that overlooks the intersection of trauma and the outcome of an asylum application will "result in systematic refoulement." Similarly, another commenter argued that some individuals—including those with low levels of literacy, those with language access issues, and those who have suffered from trauma—may require additional time and assistance to complete or amend their applications.

Many commenters recommended that the rule ensure meaningful opportunities for asylum seekers to find counsel and gather evidence by establishing an adequate timeline between the credible fear determination and the Asylum Merits interview before an asylum officer. One commenter recommended that the rule should provide a minimum 90-day timeline to submit evidence to USCIS between the credible fear determination and the Asylum Merits interview.

*Response:* The Departments acknowledge concerns raised related to the amount of time provided between service of the positive credible fear determination and the Asylum Merits interview before USCIS. The Departments understand that applicants

will need time to review their applications and supporting documentation, consult with representatives, and prepare for their Asylum Merits interview. At the same time, the underlying purpose of the present rule is to make the process more efficient by streamlining proceedings that heretofore have been drawn out for months or even years. To balance the efficiency goals of the present rule with the due process concerns raised by commenters and shared by the Departments, DHS is clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview. While recognizing that affirmative asylum applicants often spend a greater amount of time preparing their asylum application in advance of filing and have more time inside the United States to procure and consult with counsel, the Departments also must consider that delaying the Asylum Merits interview for any considerable length of time to allow applicants in the Asylum Merits process a similar amount of time would undermine the basic purpose of this rule: To more expeditiously determine whether an individual is eligible or ineligible for asylum. Accordingly, the Departments must weigh the benefits associated with more expeditiously hearing and deciding claims originating in the context of expedited removal and the credible fear screening process with the challenge applicants and representatives may face in preparing for the Asylum Merits interview during a limited time period, including where language barriers and other challenges raised in the comments are present. Thus, after careful consideration, the Departments have determined that a 21-day minimum time frame between service of the positive credible fear determination and the Asylum Merits interview is the most reasonable option. This 21-day minimum time frame will strike an appropriate balance between achieving operational efficiency and still ensuring fairness by providing applicants and their representatives time to prepare for the Asylum Merits interview.

*Comments:* Citing research, commenters also suggested that the location of the asylum interview, in addition to the timeline, affects asylum seekers' ability to gather evidence and find counsel, including where such asylum seekers are survivors of trauma with scarce resources. A commenter suggested that the ability to access counsel and have a legal representative

present at the Asylum Merits interview would only be meaningful if the hearing takes place in an accessible location and if the applicants have sufficient opportunity to gather evidence and prepare. Considering the importance of location in assessing due process concerns, one commenter urged the Departments to provide more clarity on the location of the nonadversarial Asylum Merits interviews to ensure meaningful access to legal representation and adequate opportunities to meet evidentiary requirements. A commenter also suggested the rule include a two-hour limit on the distance between the location of the scheduled interview and the applicant's location and provide an automatic mechanism for changing the location if a person moves within the United States. Another commenter recommended that this rulemaking provide a right to seek a change of venue to avoid the risk of an "unfair burden" on asylum seekers who move after being released from detention. A commenter suggested that the Asylum Merits interview occur with USCIS at the asylum seeker's initial destination outside of the expedited removal process.

*Response:* The Departments acknowledge the comments related to location of the Asylum Merits interview and potential changes in the location of the interview. Under the present rule, following the positive credible fear determination where the applicant is placed into the Asylum Merits process, the applicant's interview will be scheduled with the asylum office with jurisdiction over their case. Just like affirmative asylum cases, sometimes the asylum office with jurisdiction over the case may be distant from the applicant's residence. Unfortunately, because USCIS has limited asylum offices and office space, it would be impossible to always ensure an applicant only has to travel two hours or less to appear at an interview, but USCIS makes every reasonable effort to schedule applicants in a convenient location, including by orchestrating asylum interviews at circuit ride locations (*i.e.,* locations other than an asylum office, such as a USCIS field office, where USCIS conducts asylum interviews) throughout the United States when possible and practicable. As for the comments recommending that the hearing should take place at the asylum applicant's initial destination outside of the expedited removal process, USCIS agrees that this is the appropriate venue when the applicant has been paroled, and that is why the asylum office with

jurisdiction over the applicant's place of residence following the positive credible fear determination will be the office with jurisdiction over the applicant's case. Additionally, if an applicant changes residence prior to an Asylum Merits interview and notifies USCIS of the change, just as with an affirmative asylum interview, USCIS will attempt to reschedule the applicant's interview to occur at the office with jurisdiction over the applicant's new residence location. USCIS also appreciates the comments related to applicants securing access to counsel for their Asylum Merits interview. Just as with affirmative asylum interviews, USCIS will make reasonable efforts to ensure applicants are scheduled for their Asylum Merits interview in a time and place that ensures their representatives of record can attend and meaningfully participate in the interview.

*Comments:* Some commenters suggested that requests for adjournment or continuances should be assessed more liberally where the delay sought is to find an attorney or gather supporting evidence. One commenter recommended that the rule decouple the proposed definition of "filing" a claim from the time periods specified in the INA, including the 45 days required for initial consideration and 180 days for completion.

*Response:* The Departments acknowledge the comments related to the timeline for applications and potential continuances. The Departments cannot change the statutory procedures governing asylum under INA 208, 8 U.S.C. 1158, including the procedures set out in INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A), related to security checks and the general framework indicating that in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence no later than 45 days after the date an application is filed, and in the absence of exceptional circumstances, the administrative adjudication of the application, not including administrative appeal, shall be completed within 180 days of the filing date. Accordingly, it is not within the Departments' authority to decouple the filing date from the timeline for adjudicating the asylum application. Regarding requests to reschedule, applicants should follow the instructions on the USCIS website and their appointment notices, just as they do with affirmative asylum interviews.

*Comments:* Various commenters expressed concern about time constraints for asylum seekers to amend

or supplement the asylum application. One commenter argued that the 7-day timeline for submitting an amended or supplemented application—10 days if mailed—would be infeasible due to the remote location of many asylum offices and the brief timeline between the interview notice and the scheduled interview. The commenter recommended that the rule impose a requirement that USCIS provide at least six weeks' notice to applicants prior to the asylum hearing.

*Response:* As mentioned in the response to comments related to what form the application for asylum will take under the new rule and how it may be supplemented or modified, the Departments recognize that the initial credible fear screening determination may potentially include errors or misunderstandings and may not necessarily capture every detail an applicant would like to provide. The Departments agree with commenters that it is important for applicants to be able to modify or supplement their applications for asylum to account for such misunderstandings or errors or to add nuance. However, also as mentioned in the earlier response, the Departments note that modifications or supplements should only take the form of correcting the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or providing additional evidence beyond that collected during the credible fear interview. The credible fear determination and the notes collected by the asylum officer are part of the record of determination and form the basis for establishing a credible fear of persecution or torture, but it would not be practical or possible to expect the applicant to review the entirety of the asylum officer's notes or the asylum officer's own work product in making the credible fear determination and make modifications to those items.

As further explained in the response to previous comments on the topic of what form amendments may take, in creating a streamlined process, the Departments do not expect the applicant to do a wholesale edit of a credible fear interview, but rather wish to ensure that biographic and basic information about the fear claim is correct, so that the applicant may further develop the claim at the Asylum Merits interview. Accordingly, while the Departments appreciate commenters' concerns about the time frame under which applicants may be expected to make corrections or provide supplemental evidence, the Departments believe that the provided time frame achieves the best possible balance between allowing applicants

sufficient time to present their evidence and achieving a streamlined process. The six-week notice time frame suggested by one commenter would be twice as long as the notice provided to affirmative asylum applicants for their interviews. While the commenter might consider six weeks an ideal time frame to prepare for an asylum interview, it would not be practical or achieve the goals of operational efficiency to wait six weeks for the interview to take place in every case. As mentioned above, however, there will be a minimum time frame between the positive credible fear determination and the Asylum Merits interview of 21 days. Also, as described above, USCIS believes this time frame best reaches the goals of providing applicants in this new process with adequate time to prepare for their Asylum Merits interviews and allowing expeditious adjudications. As for the time frame for submitting additional evidence, USCIS is providing applicants in the Asylum Merits process with evidentiary submission requirements that also reflect that careful balance. It would be impractical for USCIS to require all evidence to be submitted at the credible fear stage, and USCIS recognizes that applicants may need time to collect some additional evidence. Moreover, while the burden of proof is on the applicant to establish eligibility for asylum, as always with any asylum case, documentary evidence is not required to sustain the applicant's burden of proof in establishing asylum eligibility; testimony alone may be sufficient where it is credible, persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. INA 208(b)(1)(B)(i), (ii), 8 U.S.C. 1158(b)(1)(B)(i), (ii). When applicants seek to provide documentary evidence to sustain their burden of proof, USCIS welcomes that evidence but also must place some limit on the time for submission to allow asylum officers to meaningfully engage with the evidence. Asylum officers must review each case file, including the evidence the applicant has submitted in support of the applicant's claim, sufficiently in advance of the Asylum Merits interview to begin to assess its probative value, conduct additional research if needed, and prepare to elicit testimony from the applicant about such evidence. The Departments agree with commenters that applicants need time to locate and submit such evidence, but asylum officers also need time to review and examine such evidence in advance of the interview if the evidence is to be meaningfully explored. Accordingly, the

Departments consider that requiring additional evidence be submitted at least 7 days in advance of the interview if submitted in person, or postmarked 10 days in advance if mailed, is a reasonable time given the various interests at play in setting up such a time frame. While DHS appreciates the specific comment related to the challenge of submitting evidence in person, that is precisely why DHS is allowing an additional 3 days for mailing if evidence is submitted via mail. This time frame allows for asylum offices to receive and properly file the evidence and for asylum officers to review submissions as they prepare for Asylum Merits interviews. This time frame also preserves the time available during the Asylum Merits interview to meaningfully elicit testimony from an applicant and allow representatives time to ask follow-up questions or provide additional statements if needed, instead of taking up that time with the asylum officer's review of just-submitted evidence. Notably, this time frame for the Asylum Merits interview is more generous to applicants than the time frame provided at current 8 CFR 208.9, which requires evidence to be submitted at least 14 days in advance of the interview. Given the realities of the COVID–19 pandemic, current operational practice is to require evidence to be submitted 7 days in advance of an affirmative asylum interview if submitted in person, and 10 days if submitted via mail. Moreover, if there is evidence that the applicant was unable to procure during the required time frame and that the applicant believes is highly material or essential to the applicant's case, the asylum officer has discretion to allow the applicant a brief extension to provide such evidence. Likewise, if an asylum officer identifies a piece of evidence that is essential, such as evidence necessary to establish a derivative relationship for a member of the case, the asylum officer will issue a request for evidence to the applicant and provide a reasonable time to respond. And as mentioned above, documentary evidence is not required to sustain the applicant's burden of proof in establishing asylum eligibility— testimony alone may be sufficient where it is credible, persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. INA 208(b)(1)(B)(i), (ii), 8 U.S.C. 1158(b)(1)(B)(i), (ii). Furthermore, even in cases where the asylum officer determines that the applicant should provide evidence that corroborates otherwise credible testimony, if the applicant does not have the evidence

and cannot reasonably obtain the evidence, it is not required to be provided. *Id.* Thus, even where the applicant may wish to provide additional documentary evidence, but it is not reasonably available in the time frame provided, the applicant may still meet the burden of establishing asylum eligibility.

*Comments:* Several commenters asserted that applicants must be allowed adequate representation when preparing an asylum application; one commenter explained that such representation is necessary to ''make an effective submission'' while ''meet[ing] the standards of modern corroboration requirements'' in adjudication. Commenters argued that asylum seekers may not understand what nuances in the record could affect their case due to the complex, politicized, and evolving nature of asylum standards. Therefore, as one commenter asserted, the opportunity to amend or correct the credible fear interview record would only be meaningful if applicants have access to adequate interpretation and legal services. Similarly, another commenter stated that correcting or supplementing a credible fear interview record could be ''difficult or impossible'' without legal counsel. A commenter added that a lack of resources, poor knowledge of systems, and obstacles associated with detention intensify the need for counsel in the asylum application process. Considering these challenges, the commenter recommended that agencies inform asylum seekers—in their own language—of their right to counsel, to present additional evidence, and to expand the grounds of the asylum claim. Additionally, the commenter recommended that agencies clarify the higher standards at the asylum interview compared with the credible fear interview and provide a contact list of local legal services providers.

*Response:* The Departments acknowledge the comments related to the role of counsel for applicants who are placed in the Asylum Merits interview process. As mentioned above in response to comments about amending or supplementing the application, the Departments do not expect the applicant to conduct a word-by-word, line-by-line review of the asylum officer's credible fear interview and make corrections to the notes or the asylum officer's work product. Instead, the Departments would welcome any corrections to the applicant's biographic information, clarifications the applicant would like to make to the Form I–870, or any additional evidence the applicant would like to provide in support of the application. In any event, the Departments agree with commenters that information related to the process in which the applicant is placed and access to counsel are of utmost importance. That is why the Departments plan to ensure that when an individual is placed in the Asylum Merits process, the individual is provided with a fact sheet explaining the process, including the relevant standards, and a contact list of free or low-cost legal service providers similar to that which applicants would receive in section 240 removal proceedings before EOIR.

*Comments:* Many commenters reiterated the challenges asylum seekers experience in obtaining access to adequate counsel and developing their asylum claims, particularly while in detention or during expedited processes. One commenter argued that noncitizens must be given an opportunity to amend their credible-fear interview record with representation because, in the context of detention, DHS is ''not currently capable of carrying out a proper fact-finding proceeding.'' Another commenter additionally claimed that adequate interpretation and legal services are ''nearly impossible'' to find when the applicant is detained. A commenter added that the proposed rule only allows for legal representation at no expense to the Government in the application process, compounding difficulties for asylum seekers who are ineligible to apply for employment authorization. Several commenters proposed that the Government fund legal representation programs for asylum seekers in the credible fear and Asylum Merits stages. Additionally, a commenter suggested the rule provide more information on access to counsel, legal orientation programs, and education for pro se applicants and applicants with cognitive, mental, or physical impairments.

*Response:* The Departments acknowledge the comments related to access to counsel while in expedited removal; however, such comments are outside the scope of the present rulemaking, as they relate to the expedited removal process generally. This rulemaking is not altering the expedited removal process itself but rather introducing an alternative procedure for ''further consideration'' of the asylum claims of individuals who receive a positive credible fear determination. The rule preserves applicants' ability to retain and access counsel within the new Asylum Merits process before USCIS. Further, while the Departments appreciate comments suggesting the possibility of Government-funded attorneys in the credible fear process and for the asylum application, those comments are also outside the purview of this rulemaking. The Departments agree that it is important to, whenever feasible, provide applicants with information on access to counsel and provide education for pro se applicants. That is why such information, including an advisal of the right to be represented during the interview and of information related to the nature of the interview, is provided to applicants at various stages during the credible fear interview, including during the interview itself. Further, the Departments plan to provide information about the Asylum Merits process, as well as information related to free or low-cost legal service providers, along with service of the positive credible fear determination. The Departments take commenters' concerns about applicants with cognitive, mental, or physical impairments very seriously. DHS already has a practice of placing individuals in section 240 removal proceedings when they are unable to testify on their own behalf due to possible cognitive or mental impairments, physical disability, or other factors that impede them from effectively testifying in the context of a credible fear interview. In section 240 proceedings, IJs consider whether applicants demonstrate indicia of incompetency and, if so, which safeguards are appropriate. *See, e.g., Matter of M–A–M–,* 25 I&N Dec. 474 (BIA 2011). Accordingly, applicants with indicia of incompetency will continue to have their claims considered in ordinary section 240 proceedings.

*Comments:* Commenters asserted that the NPRM's estimated 90-day case completion timeline would be ''unrealistic,'' ''troubling,'' and ''could prejudice the rights of asylum seekers.'' One of these commenters argued that the expedited timeline would affect due process, in part because asylum seekers often have limited resources, physical and emotional needs, and barriers to preparing their cases, including difficulty finding counsel. Similarly, a commenter expressed concern that the proposed rule at 8 CFR 208.3(a)(2) would maintain the 45-day timeline for consideration and 180-day requirement for completion. Another commenter argued that the 45-day timeline for completing adjudications for new arrivals would ''require extraordinary resources,'' contribute to the USCIS

backlog, and exacerbate due process concerns.

*Response:* The Departments acknowledge commenters' concerns regarding the timeline of case processing. As mentioned above with respect to the comments related to the processing timeline from positive credible fear determination to Asylum Merits interview, it is not within the Departments' authority to change the 45-day timeline for interviews and the 180-day timeline for adjudications set by Congress in INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A), absent exceptional circumstances. In this IFR, the Departments changed the rule language from that proposed in the NPRM to acknowledge that Asylum Merits decisions would generally be issued within 60 days of service of the positive credible fear determination absent exigent circumstances. *See* 8 CFR 208.9(e)(2).

*Comments:* A commenter argued that the proposal to remove the application requirement for noncitizens apprehended at the border gives such noncitizens procedural protections not afforded to asylum seekers who already reside in the United States. The commenter opposed the possibility that, under the proposed provisions, asylum seekers with strong ties to the United States would still be required to complete and submit Form I–589 in a timely fashion, while individuals seeking admission at the border would have rights beyond what existing statutes provide. The commenter added that the lack of an asylum application requirement would complicate the review of cases.

*Response:* The Departments acknowledge the comments related to the form of application created by this rule, but the present rule is not eliminating the requirement that there be an application for asylum from the principal applicants in the new process. Instead of affirmatively filing a Form I–589, as is required for individuals in the United States who have not been placed into section 240 removal proceedings and seek to file for asylum affirmatively before USCIS, or defensively filing a Form I–589, as is required for individuals in the United States who have already been placed into section 240 removal proceedings (either following a positive credible fear determination or otherwise), applicants in the process established by this IFR will be considered to have filed their asylum application in the form of the documented testimony provided under oath to an asylum officer during the credible fear interview and included as part of their positive credible fear

determination. 8 CFR 208.3(a). The Departments are streamlining the requirement for individuals who are already in the credible fear process such that the information collected in the credible fear determination itself becomes the basis of an application for asylum. To require such individuals to subsequently submit a paper I–589 asylum application in order to seek asylum would be unnecessarily repetitive. Treating the credible fear determination as the asylum application eliminates duplicative collection of information for individuals who have already been found to have a credible fear of persecution or torture. These individuals are still subject to the one-year filing deadline and the other statutory bars to filing for asylum, the same requirements to appear for an interview, the same consequences for a failure to appear before USCIS, and the same requirements for EAD eligibility as other applicants. Moreover, the underlying procedures related to attorney participation remain the same as those for affirmative asylum applicants before USCIS. Most fundamentally, the eligibility standards governing adjudication of asylum applications are identical for applicants in the new process as they are for affirmative asylum applicants.

In addition, the Departments will provide ample procedural safeguards to noncitizens throughout the new process established in this rule, including in the Asylum Merits interview itself, such as the following: (1) A verbatim transcript of the interview will be included in any referral package to the immigration judge, 8 CFR 208.9(f)(2); (2) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purpose of eligibility for employment authorization, 8 CFR 208.9(g)(2); and (3) an asylum officer will, when not granting asylum, also consider an applicant's eligibility for statutory withholding of removal or CAT protection within the context of the Asylum Merits interview. Thus, if the asylum application is not approved, the asylum officer will determine whether the noncitizen is eligible for statutory withholding or CAT protection under 8 CFR 208.16(b) or (c). *See* 8 CFR 208.16(a), 208.17(a). Even if the asylum officer determines that the applicant has established eligibility for statutory withholding of removal or CAT protection, the asylum officer shall proceed with referring the asylum application to the IJ for a hearing

pursuant to 8 CFR 208.14(c)(1). *See* 8 CFR 208.16(a).

The Departments acknowledge the commenter's concern about appellate review. As indicated above, this rulemaking does not eliminate the application requirement for principal asylum applicants. Rather, it changes the form of application for those individuals who receive a positive credible fear determination. As is the case for BIA review of asylum claims originating in the affirmative asylum process before USCIS, where an applicant has filed a Form I–589, the records created and evidence considered by asylum officers and IJs under the new process will go well beyond the application itself to include the testimony of the principal and derivative applicants, the results of background, identity, and security checks, and identity documents. They may also include affidavits and testimony from witnesses, country of origin information, civil documents, law enforcement records, medical records, court documents, and numerous other forms of evidence. By the time a case reaches the BIA, a robust record is available for the Board's consideration, only a small portion of which is the asylum application itself. Therefore, the Departments are confident that the records created before USCIS and IJs will enable the BIA to conduct a proper review under the appropriate legal standards of any cases on appeal arising out of the new processes created by this rulemaking.

e. Other Comments on Proposed Provisions on Applications for Asylum

*Comments:* A commenter supported the proposed change to allow the Asylum Office to rely on biometric information collected during the expedited removal process rather than requiring covered noncitizens to report to an Application Support Center (''ASC'') for new fingerprinting. The commenter reasoned that elimination of duplicative biometric collection prevents asylum seekers from having to take time off from work or find childcare, and eliminates the risk for adverse consequences (*e.g.,* stopping the asylum EAD clock or failure to appear at an ASC appointment). The commenter went on to state that the Government would also save time and money by not requiring the capture of biometric data that DHS has already collected previously.

*Response:* The Departments acknowledge the commenter's support for using the biometrics already captured during the expedited removal process for the asylum application, for

the reasons outlined by the commenter. It is these very concerns expressed by the commenter that weighed in favor of allowing DHS to use the biometrics already captured in the expedited removal process for purposes of the asylum application as well. USCIS may still have to require applicants to attend an ASC appointment or otherwise obtain their biometrics in support of the asylum application following a positive credible fear determination but is working to obtain the ability to reuse the biometrics already captured by other DHS entities for the asylum application before USCIS.

*Comments:* One commenter believed that, because the asylum applicant has the right to seek review of an asylum officer's decision not to grant asylum before an IJ, all denied claims will end up in our judicial system. Moreover, the commenter stated, because the rule seeks to reduce the immigration court backlog, adjudicators will be instructed to approve or grant asylum claims of individuals arriving at the border.

*Response:* The Departments disagree that the rule's aim to reduce the immigration court backlog sends signals to adjudicators that they must grant non-meritorious cases. Each adjudication is based on specific, individualized facts, and, in the case of asylum, the grant of asylum status further requires not only a finding of substantive eligibility, but also a favorable exercise of discretion. If an asylum officer does not grant asylum, the noncitizen will be placed into streamlined section 240 removal proceedings. After being placed in streamlined removal proceedings and having the asylum claim reviewed de novo by the IJ, if the IJ denies asylum, the noncitizen may (as now in ordinary section 240 proceedings) appeal the IJ's decision to the BIA. And, as with BIA decisions in ordinary section 240 proceedings, the noncitizen may then seek judicial review before the appropriate U.S. Court of Appeals. *See* INA 242(a), 8 U.S.C. 1252(a). Judicial review serves as an important mechanism to ensure fairness and due process. Further, this rule leaves in place the statutory process by which the cases of noncitizens determined to have no credible fear of persecution or torture are resolved quickly, and creates a framework that also allows clearly grantable asylum cases to also be resolved quickly. Nevertheless, nothing in the rule suggests or requires that complex cases will be rushed or essential parts of the analysis or required vetting and security checks will be ignored, as there are no changes to substantive asylum eligibility. The

Departments recognize that some cases may take longer to complete due to, for instance, particularly complex issues.

5. Adjudication of Applications for Asylum for Noncitizens With Credible Fear

a. DHS Interpretation of Statute in Creating a New Adjudication Process

*Comments:* A commenter expressed concern with the NPRM's proposal to authorize asylum officers to issue removal orders, including in cases where an asylum-seeker fails to appear for a merits hearing before USCIS. The commenter contends that this new authority would put asylum officers in an enforcement-oriented or adversarial role, which could undermine the nonadversarial proceeding. The commenter asked that ICE or IJs instead be tasked with issuing removal orders. Furthermore, the commenter stated that an applicant who may have missed a hearing inadvertently should have an opportunity to remedy the situation before a removal order is issued. The commenter urged the Government to consider nonadversarial first-instance asylum hearings in a context that corresponds with international standards on detention and affords asylum-seekers sufficient time and opportunity to recover from trauma, gather information about their cases, and have access to legal advice, assistance, and representation.

*Response:* The Departments have carefully considered the comments received in response to the NPRM regarding an asylum officer's authority to issue a removal order. As discussed elsewhere, the Departments have decided not to adopt that proposal. Instead, under the IFR, an asylum officer will issue an NTA when not granting an application for asylum and refer the case for streamlined section 240 proceedings before an IJ. Given this choice of process in the IFR, the Departments find it is unnecessary to further respond to the comments regarding an asylum officer's authority to issue a removal order, as the Departments believe the concerns of those comments are now addressed.

b. Review of Asylum Claim by an Asylum Officer, Rather Than by an Immigration Judge, in Section 240 Removal Proceedings

*Comments:* Several commenters expressed support for the proposal to have asylum officers adjudicate asylum applications in the first instance, noting that asylum officers are trained in assessing country conditions, conducting interviews, and handling

sensitive information. One commenter stated that having USCIS adjudicate asylum applications would allow for a fast yet equitable process. One commenter noted that the proposed process would encourage asylum seekers to speak openly about their fears, and stated that asylum officers are better equipped than IJs to adjudicate protection-related claims. Another commenter asked DHS to clarify what types of trainings would be offered to asylum officers and suggested such training should emphasize cultural competence.

*Response:* The Departments agree that a nonadversarial process is well-suited to adjudicating claims for asylum and related protection. The Departments concur with commenters who make specific reference to the trainings that all asylum officers undergo before they may work with vulnerable populations. The Departments note that asylum officers are trained in asylum and refugee law, interviewing techniques, country of origin information, decision-making, interviewing survivors of torture, fraud identification and evaluation techniques, and addressing national security concerns. *See e.g.,* USCIS, Asylum Division Training Programs, *https://www.uscis.gov/ humanitarian/refugees-and-asylum/ asylum/asylum-division-training-programs.* Cultural competence is an integral part of many of these trainings, and the Departments acknowledge the commenter's suggestion that trainings should emphasize this skill.

*Comments:* Many commenters opposed the proposal to have asylum officers adjudicate asylum applications in the first instance, generally stating that only IJs should grant asylum. Other commenters argued that only IJs have the requisite training or that claims should not be adjudicated by "bureaucrats." One commenter remarked that the proposal to have asylum officers adjudicate asylum claims would introduce the potential of "political abuse," and some commenters argued that asylum claim adjudication must be conducted by IJs to prevent undue bias or corruption. A few form letter campaigns expressed concern that the proposal would make asylum officers "the most powerful immigration officials in the country." One commenter expressed concern that the proposal would circumvent the careful analysis asylum applications demand and recommended increasing funding and hiring additional IJs to process the immigration backlog. Another commenter opposed allowing asylum officers to adjudicate asylum claims and suggested Federal judges should be

placed in courts near the border to handle asylum claims expediently. A commenter asked how DHS will ensure that only qualified asylum officers will adjudicate asylum claims and remarked that such qualifications are part of the legal definition of an IJ.

*Response:* The Departments strongly disagree with statements asserting or suggesting that asylum officers, who are career Government employees selected based on merit as explained earlier in Section IV.B.2.a of this preamble, are biased or otherwise politically motivated. As noted above in Section III.C of this preamble, USCIS asylum officers already must undergo ''special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles.'' 8 CFR 208.1(b). USCIS asylum officers already adjudicate asylum applications as part of their duties, and this fact will not be affected by the rule. Also, as noted above in Section IV.B.2.a of this preamble, no individual may be granted asylum or withholding of removal until certain vetting and identity checks have been conducted. INA 208(d)(5)(A)(i), 8 U.S.C. 1158(d)(5)(A)(i). Additionally, while the Departments believe that commenters' statements are grounded in misinformation, the Departments also note that Government officials are entitled to the presumption of official regularity in the manner in which they conduct their duties. *United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926). Commenters failed to provide any examples of what they incorrectly posit to be concerns with bureaucratic ''power[ ]'' or bias on part of asylum officers. The Departments believe that such concerns stem from a fundamental misunderstanding of the United States' immigration system as well as the respective roles of IJs and asylum officers. Additionally, the comments lack any meaningful explanation or evidentiary basis; such baseless accusations against public officials are ''easy to allege and hard to disprove.'' *Crawford-El* v. *Britton,* 523 U.S. 574, 585 (1998) (quotation marks omitted); *see also Nat'l Archives & Records Admin.* v. *Favish,* 541 U.S. 157, 174 (2004) (requiring the production of evidence rather than ''bare suspicion'' that ''responsible officials acted negligently or otherwise improperly in the performance of their duties'').

*Comments:* Referencing the NPRM's preamble, several commenters stated that the prior Administration's border strategy has led to a significant increase in the number of backlogged asylum cases. These commenters stated that

authorizing border cases to be handled not only by immigration courts but also by the USCIS Asylum Division will increase efficiency by eliminating redundancy. These commenters stated that permitting asylum officers to maintain jurisdiction throughout the life of a case capitalizes on the work and time already invested in each case during credible fear screenings, which will alleviate pressure on the immigration courts and eventually lead to a much more efficient immigration system. Other commenters likewise supported the proposed rule and stated that, while the number of IJs has doubled, the number of pending cases has tripled and outstripped the hiring of IJs. These commenters also stated that the immigration procedures contemplated in IIRIRA are inadequate for the number of applicants now seeking asylum in the United States. Two commenters stated that IJs can adjudicate asylum cases efficiently but that they must be provided more resources.

A commenter indicated that there is no evidence that asylum officer interviews are more efficient than IJ adjudications. The commenter added that backlogs may in fact expand as a result of reallocating funding to cases under the proposed system, stating that the asylum offices do not have room for the proposed additional hires and that asylum officers may leave their jobs. The commenter stated that asylum officers typically conduct only two interviews a day while IJs conduct multiple hearings and that the latter are more efficient because IJs and counsel are more competent in immigration law. A commenter agreed that the proposed rule would extend the backlog by extending the appeals process for asylum seekers. Another commenter stated that the proposed rule could not seriously address backlogs because credible fear determinations and asylum applications only make up a small portion of immigration court dockets. A commenter also expressed doubt that the new process would alleviate backlogs because of startup costs for the new process.

However, two commenters stated that, under the current system, outcomes of an asylum case can depend almost as much on luck as on the merits of an asylum application. The commenters cited a source indicating that approval rates by individual IJs can vary from 0.9 percent of all cases to 96.7 percent. One of the commenters stated that such disparity causes unnecessary stress for individuals and also indicates the absence of clear, uniform standards used by IJs to adjudicate cases. The

commenter stated that, conversely, the Asylum Division uses rigorous quality assurance processes and requires supervisory review of all cases and similar statutory definitions and policy guidance used by refugee officers in USCIS will also be applied to the work of asylum officers. The commenter concluded by stating that, under the new rule, the unpredictability and variance that characterize the current immigration court system will be replaced by greater consistency and clarity in the decision-making process across all asylum offices.

Other commenters asserted that the rule would not create a more expeditious process and that limiting the rights of asylum seekers in expedited removal would better streamline immigration. Commenters also stated that it would be problematic for asylum seekers to have the right to an attorney but not to grant ''the American people'' the ''right to be represented by an ICE attorney.''

*Response:* The Departments agree that allowing USCIS to adjudicate these cases will alleviate pressure on the immigration courts and eventually lead to a much more efficient immigration system. Further, the Departments understand comments relating to reallocation of resources affecting the backlog of cases, the hiring, potential loss, and retention of asylum officers, and concerns for delay as the USCIS Asylum Division takes on this new caseload. It is on this basis that the Departments are phasing in implementation of this rule. The graduated steps involved will allow for the Departments to address concerns that arise and learn how implementation can be better operationalized. In comparing adjudications between USCIS and IJs, the specialized role of asylum officers coupled with ownership of a case from screening to adjudication allows for efficiency gains. Further, the USCIS Asylum Division has steps in place to ensure consistency in adjudications, and safeguards will continue as USCIS adjudicates applications pursuant to this rule. The Departments disagree that an adversarial process is required to adjudicate the merits of an asylum application. However, as noted above in Section III.D of this preamble, this IFR will provide for a streamlined section 240 removal proceeding in the event that an asylum officer does not grant asylum. The United States Government will be represented by ICE in those adversarial proceedings in accordance with 6 U.S.C. 252(c).

c. Requirements for USCIS Asylum Merits Adjudication

*Comments:* A commenter expressed concern that the procedural safeguards for hearings before asylum officers will fall short of due process requirements. The commenter suggested that all procedural safeguards available in immigration court proceedings be included in hearings before an asylum officer to ensure fairness. Meanwhile, another commenter stated that the provisions of 8 CFR 208.9(d) alone would not violate the due process rights of noncitizens, citing the right to a de novo hearing in immigration courts under proposed § 1003.48(e)(1). The commenter cautioned, however, that the combination of 8 CFR 208.9(d) and 1003.48(e)(1) will deny noncitizens the chance to explain the circumstances of their persecution or well-founded fear of persecution in a complete and orderly way, and that the rule is inconsistent with 8 U.S.C. 1229a(4)(b) and due process guaranteed by the Fifth Amendment.

Another commenter recommended asylum officers be required to introduce relevant country-conditions evidence—including evidence on gender-based violence, gang violence, and any recognized efforts to combat the aforementioned—when the applicant has not presented such evidence during the hearing before an asylum officer. Similarly, another commenter explained that having more complete knowledge of a country's conditions would allow asylum officers to properly elicit full testimony from asylum seekers. One commenter suggested additional procedural safeguards to promote "a less traumatic procedure," such as trauma survivors being given an opportunity to request interviewers of a specific gender.

*Response:* The Departments acknowledge the concerns of the commenters regarding the procedural safeguards in Asylum Merits interviews before USCIS asylum officers and disagree that such safeguards will fall short of due process requirements. As explained earlier in this IFR, the Departments are making several modifications to the process proposed in the NPRM in response to comments, including referring noncitizens who are not granted asylum by an asylum officer to an IJ for streamlined section 240 removal proceedings. DHS will provide ample procedural safeguards to noncitizens throughout the Asylum Merits process, including in the Asylum Merits interview itself, such as the following: (1) The applicant may have counsel or a representative present, may

present witnesses, and may submit affidavits of witnesses and other evidence, 8 CFR 208.9(b); (2) the applicant or applicant's representative will have an opportunity to make a statement or comment on the evidence presented, and the representative will also have the opportunity to ask follow-up questions, 8 CFR 208.9(d)(1); (3) a verbatim transcript of the interview will be included in any referral package to the IJ, 8 CFR 208.9(f)(2); (4) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization, 8 CFR 208.9(g)(2); and (5) the failure of a noncitizen to appear for an interview may result in the referral of the noncitizen to ordinary section 240 removal proceedings before an IJ, unless USCIS, in its own discretion, excuses the failure to appear, *see* 8 CFR 208.10(b)(1). Furthermore, as explained earlier, if an asylum officer does not grant asylum to an applicant, the asylum officer will determine whether the applicant is eligible for statutory withholding and CAT protection before referring the case to streamlined section 240 removal proceedings before an IJ. The Departments believe that these procedures will give applicants a fair opportunity to present their claims, as well as have their claims heard and properly decided in an efficient manner.

As for requiring asylum officers to introduce country conditions evidence, the Departments decline to impose such a requirement. Asylum officers receive extensive country conditions training, have ready access to country conditions experts, and regularly consider country conditions when making decisions as a matter of course. In addition, current affirmative asylum interview procedures allow for applicants to request interviewers of a specific gender. These same procedures will apply in the context of Asylum Merits interviews.

*Comments:* Several commenters requested clarifications and modifications to procedures for merits hearings before asylum officers, including opportunities to present details and evidence pertaining to the case. A commenter explained that communication plays a crucial role in the interview process and asserted that the rule does not provide sufficient opportunity for legal advocates to call witnesses, present additional information, or prompt their clients to speak on their own behalf. Some commenters argued that the NPRM empowers asylum officers to present

evidence, but does not allow applicants or their counsels to frame and present their cases, or to examine or challenge any evidence introduced. Likewise, one commenter remarked that the structure of the hearing before asylum officers reverses the "normal order of adjudication," thus giving minimal opportunity to asylum seekers, who have the "burden of proof," to make statements and be directly examined.

Several commenters asserted that asylum officers provide limited to no opportunity for counsel to cross-examine applicants and present witness testimonies during interviews, which causes stress to applicants and limits the protections otherwise provided to them in section 240 removal proceedings. A few commenters asserted that limiting counsel's ability to make a statement or ask questions would jeopardize due process rights and reduce counsel's ability to properly advocate for the asylum seeker. Several commenters stated that more robust and meaningful participation by counsel during the hearing would help address the due process concerns arising from the revised provisions in 8 CFR 208.9, while reducing confusion or the need for appeals. Some commenters proposed that the rule include at least one continuance for the purpose of seeking counsel to advance equity within the adjudication process. Several commenters asserted that without access to counsel, asylum seekers would lack meaningful representation necessary for a successful hearing.

Some commenters recommended that 8 CFR 208.9 be revised to allow representatives to make an opening statement, elicit testimony from the applicant during the hearing, and provide a closing statement. Similarly, from an efficiency and due process standpoint, a commenter recommended that the asylum seeker's counsel—rather than an asylum officer with limited time to review "the often voluminous case file"—ask questions during the hearing. The commenter suggested that 8 CFR 208.9(d) be further amended to provide that the representative will also have the opportunity to ask follow-up questions during the interview or hearing. One commenter urged USCIS to consider consulting with lawyers who appear in immigration courts to receive feedback on the effects of the rule.

*Response:* The Departments acknowledge the concerns of the commenters regarding procedures for USCIS Asylum Merits adjudication, including the role of counsel in Asylum Merits interviews. As provided in 8 CFR 208.9(b), the purpose of the Asylum Merits interview will be to elicit all

**18150** **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

relevant and useful information bearing on the applicant's eligibility for asylum. USCIS asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses, engaging with counsel, and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. Noncitizens who are placed in the Asylum Merits process will have multiple opportunities to provide information relevant to their claims before USCIS asylum officers in nonadversarial settings, as well as the opportunity for an IJ to review or consider their claims. If an IJ ultimately denies protection to an applicant, BIA review will be available.

Within the context of Asylum Merits interviews, noncitizens retain the ability to access and secure counsel. *See* 8 CFR 208.9(b). As in the affirmative asylum interview context, USCIS will make every reasonable effort to ensure applicants are scheduled for their hearing in a time and place that ensures their representatives of record can attend and meaningfully participate in their interview. Applicants may request rescheduling of Asylum Merits interviews by following the instructions set forth on the USCIS website and in appointment notices. At the Asylum Merits interview, the applicant may present witnesses and may submit affidavits and other evidence. *See id.* At the completion of the Asylum Merits interview, the applicant or the applicant's representative will have an opportunity to make a statement or comment on the evidence presented. The representative will also have the opportunity to ask follow-up questions. *See* 8 CFR 208.9(d)(1). The Departments recognize the importance of the role of counsel in advising and assisting noncitizens with presenting their claims and believe that this rule provides counsel the opportunity to do so within the context of Asylum Merits interviews. As a result, the Departments decline to make further changes in response to these comments. As for the suggestion to consult with legal practitioners appearing before the immigrant courts, the Departments note that the NPRM provided the opportunity for any and all members of the public, including legal practitioners, to offer feedback on the rule, and in this

IFR the Departments are including another request for public comments.

*Comments:* Citing the impact of legal representation on asylum case outcomes, a commenter indicated that the NPRM increases access to legal representation. The commenter noted that the NPRM allows representatives with DOJ EOIR accreditation, including individuals with partial accreditation, to represent clients seeking statutory withholding of removal and CAT protection before USCIS. The commenter noted that by allowing statutory withholding of removal and CAT protection claims to proceed before USCIS, applicants would have greater access to free or low-cost legal representation from DOJ-accredited representatives. Another commenter recommended that the rule permit USCIS to appoint counsel in cases where counsel is needed, allow asylum seekers and their counsel to record objections and request the record reflect nonverbal activity, and create a procedure to report misconduct following hearings before asylum officers in the event that asylum officers mishandle such hearings.

*Response:* The Departments acknowledge the feedback on the impact that the rule may have on access to legal representation. Given the Departments' decision to have asylum officers issue final decisions solely as to the asylum claims, rather than also issuing final decisions regarding statutory withholding and CAT protection claims as proposed in the NPRM or otherwise issuing removal orders, the commenter's note about individuals with partial accreditation is no longer relevant. While the Departments appreciate comments suggesting that USCIS appoint counsel to noncitizens in certain instances, those comments are outside the purview of this rulemaking. The Departments note that asylum seekers and counsel will have the opportunity to make a statement or comment on the evidence presented at Asylum Merits interviews, which may include raising objections and requesting that the record reflect nonverbal activity. As for reporting asylum officer misconduct, USCIS will follow existing agency-wide procedures on receiving and responding to complaints and misconduct, which are available on the USCIS website.

*Comments:* Several commenters expressed support for the provision in the NPRM requiring asylum officers to record and transcribe hearings. A commenter noted that the provision allows noncitizens to receive a recording and transcript of their hearing before an asylum officer, which they

believe would place the noncitizen on equal footing with the DHS attorney. Some commenters added that the recordings and transcriptions of hearings would allow for accurate documentation of the proceedings and align with transparency and accessibility priorities. One commenter requested that DHS also clarify how asylum seekers will be able to access their hearing transcripts because it would allow noncitizens to determine whether they require help from counsel. The commenter also asked that the Departments address the possibility of widening the scope of the provision so that asylum seekers may access transcripts from IJ proceedings. Another commenter expressed concern about the inability of records to capture non-verbal cues and reactions during the hearing. This commenter suggested that a human communications specialist be consulted to determine how to incorporate non-verbal cues into hearing records.

One commenter noted that the requirement to record or transcribe the hearing may not be feasible and argued that this requirement would pose challenges for IJs conducting de novo reviews of hearings before asylum officers. Another commenter similarly urged USCIS to clarify how the review of hearing records would be conducted and the impact on the due process rights of asylum seekers. The commenter stated that full recordings of hearings would be hours long and claimed that generating transcripts would lengthen the time needed to issue decisions. Considering these issues, the commenter recommended that USCIS identify who would be reviewing the records and determine whether asylum officers would take notes in conjunction with the hearing recordings.

Another commenter suggested that all interviews, regardless of their nature, be recorded. They specified that all questions and answers be documented in the language they were initially spoken in and later interpreted. The commenter also recommended that the Departments provide adjudication documents in the asylum seeker's language, and that, in the case of literacy limitations, an interpreter read the records to an asylum seeker. Finally, in cases where the asylum seeker is detained, the commenter recommended the agencies ensure privacy to review the records.

*Response:* The Departments acknowledge the support for recording and transcribing Asylum Merits interviews. The Asylum Merits interview will be recorded so that a transcript of the interview can be

created. A verbatim transcript of the interview will be included in the referral package to the IJ. *See* 8 CFR 208.9(f)(2). A copy of that transcript will also be provided to the noncitizen. In addition, asylum officers will take notes during Asylum Merits interviews. As for nonverbal cues or reactions, asylum officers may make note of such matters as appropriate.[76] The Departments do not anticipate that these procedures will lead to significant delays in the adjudication of the noncitizen's asylum claim before USCIS. The Departments recognize one commenter's concern that there may be logistical challenges associated with implementing recording or transcription of interviews before asylum officers. However, the Departments are taking a phased approach to implementation in part to address this concern. The rule does make changes to long-standing practices, and as implementation progresses, the Departments will work to ameliorate any challenges that arise as the process is put into practice. Also, allowing for robust independent review of asylum officers' decisions to not grant asylum is an important feature that ensures administrative fairness over and above due process minimums.

In addition, USCIS will arrange for an interpreter when an applicant is unable to proceed with an Asylum Merits interview in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization. *See* 8 CFR 208.9(g)(2). At the Asylum Merits interview, the asylum officer will provide information about the hearing to the applicant, which will be interpreted for the applicant. While the Departments acknowledge the recommendation that questions and answers be documented in the language in which they were initially spoken and that adjudication documents be provided in the language spoken by the applicant, the Departments note that Asylum Merits interviews will be recorded and transcribed, and that notice of decisions will be provided to applicants in writing. The Departments believe that these various procedural safeguards sufficiently allow for applicants to access their Asylum Merits interview records and remain informed of the reasons for any decisions not to grant asylum. Thus, further

documentation or explanation requirements are not warranted in this IFR.

The comments recommending that DHS arrange a private setting for detained individuals to review their records fall outside of the scope of this rulemaking, and thus are not being addressed. The Departments believe that receipt of the transcript from the asylum officer's Asylum Merits interview will benefit the IJ and the noncitizen by providing a clear, precise, and accurate record of the basis for the adjudication. The Departments acknowledge the suggestion related to widening the scope of availability of transcripts from proceedings before IJs; however, this suggestion is beyond the scope of this IFR. Upon appeal of a decision by an IJ to the BIA, the hearing, where appropriate, is transcribed by the BIA and sent to both parties. *See EOIR Policy Manual,* Part II, Ch. 4.10(b), Part III, Ch. 4.2(f). Further, immigration hearings before the IJ are recorded. *See* 8 CFR 1240.9. If either party would like a recording of the proceedings before the IJ, an audio recording is available by making arrangements with the immigration court staff. *See EOIR Policy Manual,* Part II, Ch. 4.10(a).

*Comments:* Several commenters expressed support for the provision in the NPRM at 8 CFR 208.9(g) that would require USCIS to provide an interpreter for the hearing before an asylum officer, reasoning that such a requirement would promote fairness and accuracy in adjudication. Conversely, one commenter expressed concern that the provision in the NPRM, paired with other provisions in the NPRM, would "disproportionately harm vulnerable, minority populations" in the event that an Asylum Office cannot find an interpreter. Some commenters asserted that language barriers would result in mistakes in the record and complicate the appeal process. To address language access concerns, two commenters suggested this provision be extended to all asylum officer interviews, with some changes. The commenters suggested the agency provide specifications of the interpreter's qualifications and make Government-provided interpretation non-obligatory, asserting that these modifications would enhance asylum applicants' access to competent interpretation during the hearing.

One commenter, in support of the use of interpreters during hearings before asylum officers, urged USCIS to implement additional safeguards to combat the systemic problems associated with language access. The commenter suggested that the safeguards include a mandate for

interpretation throughout the full hearing in the asylum seeker's native language and incorporate specifications on the use of telephonic and video interpretations, and suggested that telephonic and video interpretation be used in cases where no qualified in-person interpreter is available. A commenter also suggested that the rule require everything said in any language during the interview process be part of the record to curtail the possibility of error and omission. Lastly, the commenter recommended a routine screening of interpreters to ensure consistency and accuracy in hearing records.

*Response:* As explained earlier, USCIS will provide an interpreter for Asylum Merits interviews when an applicant is unable to proceed with the hearing in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization. *See* 8 CFR 208.9(g)(2). The Departments acknowledge the commenters' support for the provision and disagree with the commenters who assert that this requirement will disproportionately harm vulnerable, minority populations. USCIS has existing contracts with telephonic interpreters to provide interpretation for credible fear screening and affirmative asylum interviews, and thus has extensive experience providing contract interpreter services.

Per contractual requirements, the USCIS contract interpreters are carefully vetted and tested. They must pass rigorous background checks as well as demonstrate fluency in reading and speaking English as well as the language of interpretation. The USCIS contractor must test and certify the proficiency of each interpreter as part of their quality control plan. The USCIS contractor also must provide interpreters capable of accurately interpreting the intended meaning of statements made by the asylum officer, applicant, representative, and witnesses during interviews or hearings. The USCIS contractor will provide interpreters who are fluent in reading and speaking English and one or more other languages. The one exception to the English fluency requirement involves the use of relay interpreters in limited circumstances at USCIS's discretion. A relay interpreter is used when an interpreter does not speak both English and the language the applicant speaks, such as a rare language or dialect.

In addition, USCIS contractor-provided telephonic interpreters must be at least 18 years of age and pass a security and background investigation

---

[76] Asylum officers conducting Asylum Merits interviews will continue to follow the guidance on note-taking they receive during their basic training. *See* USCIS, RAIO Combined Training Program: Note-Taking Training Module (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Note_Taking_LP_RAIO.pdf.*

**18152** **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

by the USCIS Office of Security and Integrity. They cannot be the applicant's attorney or representative of record; a witness testifying on the applicant's behalf; a representative or employee of the applicant's country of nationality or, if stateless, the applicant's country of last habitual residence; a person who prepares an Application for Asylum and for Withholding of Removal or Refugee/Asylee Petition for a fee, or who works for such a preparer or attorney; or a person with a close relationship to the applicant, as deemed by the Asylum Office, such as a family member. All contract interpreters must be located within the United States and its territories (*i.e.,* Puerto Rico, Guam, etc.). Additionally, under the International Religious Freedom Act of 1998, USCIS must ensure that ''persons with potential biases against individuals on the grounds of religion, race, nationality, membership in a particular social group, or political opinion . . . shall not in any manner be used to interpret conversations between aliens and inspection or asylum officers.'' 22 U.S.C. 6473(a). In light of these requirements, the Departments are confident that USCIS will be able to ensure that communication among all parties is clear and accurate.

The Departments acknowledge that current interpreter contracts cannot absorb the expected increase in the need for interpretation services. DHS anticipates that it will need to both increase funding on existing contracts and procure new contracts for interpretation services. As a result of this IFR, the need for interpretation services will increase as the number of Asylum Merits interviews USCIS performs rises, which is further discussed in Section VI of this preamble. DHS declines to make modifications in this rule related to the commenters' recommendation to extend the USCIS-provided interpreter provision to all asylum interviews before USCIS as changes to USCIS's affirmative asylum program are outside the scope of this rulemaking.[77]

---

[77] On September 17, 2021, DHS published a temporary final rule that extends and modifies the requirement for certain asylum applicants to use a USCIS-provided telephonic contract interpreter to keep the USCIS workforce and applicants safe during the COVID–19 public health emergency. *See* Asylum Interview Interpreter Requirement Modification Due to COVID–19, 86 FR 51781 (Sept. 17, 2021). The rule is effective until March 16, 2023. *See* 87 FR 14757 (Mar. 16, 2022) (extending temporary final rule); *see also* 85 FR 59655 (Sept. 23, 2020) (original temporary final rule); 86 FR 15072 (Mar. 22, 2021) (first extension of temporary final rule).

**d. Failure To Appear**

*Comments:* Various commenters opposed the proposed revisions that would allow an asylum officer to issue an order of removal when a noncitizen fails to appear for a scheduled hearing. Some of these commenters asserted that there are many reasons an asylum seeker might miss an interview that are not reasonably attributable to the applicant. Other commenters opposed this aspect of the proposal, arguing that the proposed rule offers fewer protections for asylum seekers than provided by the regulations governing in-absentia removal hearings before an IJ. Commenters argued that, unlike in section 240 removal proceedings, the proposed regulation does not contemplate safeguards to ensure that the asylum officer has provided the required evidence of inadmissibility and correctly issued the removal order. Because DHS is required to establish ''by clear, unequivocal, and convincing evidence'' that the noncitizen is removable and received written notice of the time and place of proceedings before a judge will issue an in-absentia removal order, these commenters asserted that the proposed rule requires the asylum officer to act as both the adjudicator and the prosecutor when it comes to issuing the removal order. These commenters opposed this aspect of the proposal because the proposed regulations do not include a process through which the noncitizen would seek rescission and reopening after receiving an in-absentia removal order from an asylum officer. Finally, other commenters opposed this part of the proposal because it does not include a provision that requires heightened notice of asylum hearings for children under 14, as exists in the regulations governing section 240 removal proceedings. Some commenters expressed concern about this aspect of the proposal because it would permit an asylum officer to issue a removal order without previously issuing a notice of failure to appear, which one of these commenters stated would provide an important safeguard preventing the issuance of a removal order against an individual who did not attend their hearing through no fault of their own. Commenters asserted that the agencies did not provide any rationale for the decision not to provide notice to asylum seekers of their failure to appear and that this lack of notice of failure to appear offends due process.

Also expressing due process concerns, a commenter suggested that the final rule must establish clear and fair notice procedures before any removal order is allowed. For example, the commenter expressed concern that the proposed rule does not have a requirement that the asylum officer issue a notice of further consideration hearing that would be comparable to the procedure under current 8 CFR 208.30(f), under which the officer issues an NTA for full consideration of the asylum and withholding of removal claims in section 240 removal proceedings.

Asserting that due process requires notice and an opportunity to be heard, commenters argued that the proposed regulation would violate due process by not providing an effective remedy for lack of notice and providing only a discretionary opportunity to be heard. While acknowledging that the proposed rule would provide that USCIS may excuse the failure to appear if the applicant demonstrated ''exceptional circumstances,'' the commenter argued that it is unclear whether this language would permit USCIS to rescind a removal order that had already been issued. Moreover, the commenter stated that this language keeps the decision to excuse the failure to appear entirely discretionary, unlike the statutory right to petition the immigration court to reopen in section 240 proceedings. Nor would this language, according to the commenter, provide applicants with a right to petition for reopening their cases due to lack of notice, a right they would have in section 240 removal proceedings.

One commenter argued that granting asylum officers authority to issue in-absentia removal orders as proposed would violate asylum seekers' due process rights, citing uncertainties surrounding reasonable access to legal representation in the proposed rule and the extreme consequences of an inabsentia removal order. Citing due process concerns, another commenter objected to this aspect of the proposed rule because it would not provide a mechanism for requesting postponement, aside from the discretionary ''brief extension of time'' or for requesting a change of venue. A commenter expressed concern that the proposed rule provides authority to issue a removal order for failing to appear for biometrics appointments without incorporating the limited safeguards required for in-absentia orders of removal by IJs.

Commenters recommended that the final rule include, either directly or by reference, the same or higher protections as an individual would receive in immigration court proceedings. A commenter suggested that, if the final rule adopts the NPRM's proposal, it should include provisions

that allow applicants to ask USCIS to rescind the removal order and reopen their cases where the applicant can show a due process violation or exceptional circumstances that excuse a failure to appear. Instead of allowing asylum officers to issue in-absentia removal orders, a commenter urged the Departments to require that cases be referred to immigration court when asylum seekers fail to appear for their interviews. Another commenter asserted that authorizing asylum officers to issue in-absentia removal orders would have a disproportionate and unfair impact on applicants with disabilities as well as asylum seekers who speak languages of lesser diffusion, who are less likely to receive notice of such appointments in a language they can understand.

*Response:* The Departments have considered the comments related to the possibility of asylum officers issuing in-absentia removal orders as outlined in the NPRM and, after careful consideration, have opted not to include that proposal in this IFR. Under the present rule as revised, asylum officers will not be issuing removal orders following the Asylum Merits interview. Consistent with the Departments' determination that final orders of removal for individuals whose asylum claims are being adjudicated under the framework of this IFR will only be issued by IJs, asylum officers also will not issue removal orders if an applicant fails to comply with biometrics requirements or fails to appear for the hearing. Instead, failure to appear for hearings or to comply with biometrics requirements will result in applicants not having their asylum claims considered through the process established by this IFR. In those circumstances, noncitizens will be issued an NTA and placed in ordinary section 240 proceedings before EOIR. In those ordinary section 240 proceedings, noncitizens would not be considered to have asylum applications pending but would have the opportunity to file a Form I–589.

e. Process for USCIS To Deny an Application for Asylum or Other Protection and Issue a Removal Order

*Comments:* A commenter provided a lengthy background analysis of the CAT, its implementation in the FARRA, and the authority of asylum officers to order the removal of asylum seekers. The commenter stated that the proposed rulemaking correctly does not amend the provision in 8 CFR 1208.16(f) for statutory withholding and CAT protection. Furthermore, the commenter asserted that the only statutory authority asylum officers have to order that

asylum seekers be removed is expedited removal under section 235(b)(1)(B)(iii)(I) of the INA. The commenter argued that asylum officers therefore lack authority to issue an order of removal after not granting a noncitizen's asylum claim and therefore also lack authority to adjudicate claims for statutory withholding of removal or CAT protection. Citing text from the NPRM's preamble, the commenter reasoned that the Departments incorrectly relied on a "vestigial" provision of INA regarding "orders of deportation" that were replaced by IIRIRA "orders of removal." The commenter also argued that the Departments cannot rely on *Mitondo* v. *Mukasey,* 523 F.3d 784 (7th Cir. 2008), reasoning that that case cannot be applied in the context of expedited removals because it turned on vague statutory language related to the Visa Waiver Program whereas, the commenter argued, the statutory language on asylum officers' powers of removal in section 235(b)(1) is more explicit.

*Response:* The Departments have carefully considered the comments received in response to the NPRM regarding an asylum officer's authority to issue a removal order. As discussed elsewhere, under this IFR, asylum officers will not issue removal orders. The Departments agree that an asylum officer should issue an NTA when not granting an application for asylum and refer the case for streamlined 240 proceedings before an IJ. Given this process, the Departments find it is unnecessary to further respond to the comments regarding an asylum officer's authority to issue a removal order.

f. Other Comments on Proposed Adjudication of Applications for Asylum

*Comments:* One commenter recommended several actions to address delays in the USCIS affirmative asylum adjudication process, including to reduce or eliminate the diversion of asylum office staff to conduct credible fear screenings and instead refer asylum seekers for full asylum interviews, create a new streamlined process to refer new requests for asylum originating at the U.S. border to USCIS asylum offices, ramp up hiring of asylum office staff, modernize the interview scheduling and filing systems, create an application route for cancellation of removal cases, and resolve more cases at the USCIS asylum offices in lieu of actions that typically occur in immigration courts, such as termination of immigration court proceedings for individuals who have filed an asylum application. The

commenter also urged USCIS to address the occurrence of asylum granted by an immigration court but not initially granted by USCIS.

*Response:* The Departments acknowledge the recommendations to address delays in the affirmative asylum adjudication process, but further consideration and discussion of the affirmative asylum adjudication process and different outcomes between affirmative asylum office adjudications and immigration court decisions fall outside of the scope of this rulemaking. The provisions of this rule respond to the problem of delay and backlogs for individuals encountered at the border who seek asylum or related protection by establishing a streamlined and simplified adjudication process. As discussed, the principal purpose of this IFR is to simultaneously increase the promptness, efficiency, and procedural fairness of the expedited removal process for individuals who have been found to have a credible fear of persecution or torture.

*Comments:* A commenter requested that the Departments further clarify adjudicatory timelines and processes so that stakeholders can fully evaluate the fairness, feasibility, and potential efficiencies of the rule. For example, the commenter stated that the proposed rule does not establish a timeline for the submission of evidence and does not provide for continuances but, rather, only extensions of undefined length and purpose. This commenter also requested that the Departments address the anticipated timeline and process for the adjudication of asylum claims for individuals who are released from detention following a positive credible fear determination but prior to the adjudication of their claim by an asylum officer, stating the proposed rule seemed to focus on asylum claim adjudication for detained noncitizens.

*Response:* The Departments acknowledge the request to clarify adjudicatory timelines and processes. DHS is clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview, unless the applicant requests in writing that an interview be scheduled sooner.

DOJ is also clarifying the timeline for adjudications before the immigration court should the proceedings be referred to EOIR pursuant to new 8 CFR 1240.17(a) and (b). Notably, applicants will not appear for a master calendar hearing until at least 30 days after DHS serves the NTA, as set forth at new 8 CFR 1240.17(b). Applicants will then be

provided the opportunity to elect to testify and submit additional documentary evidence, as well as to identify errors in the record of proceedings before the asylum officer, including the asylum officer's decision. 8 CFR 1240.17(e). At this stage, parties may elect to proceed on the documentary record or may request a final merits hearing. 8 CFR 1240.17(f)(1). Based on an independent evaluation of the record, the IJ will then determine whether to decide the application on the documentary record or to hold a merits hearing. 8 CFR 1240.17(f)(2). If deemed necessary, the merits hearing generally will be scheduled 60 to 70 days after the initial master calendar hearing. Proceedings may be continued and filing deadlines may be extended, subject to certain requirements previously discussed in Section III.D of this preamble. In general, the Departments expect that the initial merits proceedings will be completed within 135 days from the first master calendar hearing before an IJ, and often substantially sooner. Having provided additional clarity regarding adjudicating timelines in the IFR, the Departments invite further comments.

*Comments:* A commenter recommended that the Departments allow asylum seekers with a positive credible fear determination to proceed as affirmative asylum applicants before USCIS, with referral to an immigration court occurring after the asylum interview, as necessary. The commenter stated that this approach would reduce the burden on immigration courts and allow for efficient processing of meritorious claims in a nonadversarial system.

*Response:* The Departments acknowledge the recommendation. The IFR provides for a nonadversarial asylum officer interview and adjudication with referral to an immigration court if the applicant is not granted asylum, through a streamlined section 240 proceeding with special procedures that will appropriately introduce efficiencies made possible by the asylum officer's record and determinations.

6. Application Review Proceedings Before an Immigration Judge

*Comments:* A majority of commenters who discussed the proposed IJ review proceedings expressed due process, procedural, constitutional, and other concerns about the creation of new IJ review proceedings and argued that applicants not granted asylum by the asylum officer should instead be referred to section 240 removal proceedings.

Commenters stated that many asylum seekers with strong and straightforward claims would benefit from the chance to be granted asylum after an interview with an asylum officer. Oner commenter stated that the initial interview with an asylum officer is ''theoretically a good idea'' but would ultimately depend on implementation. However, commenters were concerned that the NPRM's IJ review proceedings would disproportionately affect applicants with more complex cases. Thus, commenters supported referral to an IJ for a full evidentiary hearing if an applicant's case was initially not granted by an asylum officer. Commenters expressed significant concern about the possibility of a noncitizen being returned to a country where he or she fears persecution or torture without receiving a full adversarial hearing.

Several commenters remarked that they would be more supportive of the NPRM's provisions regarding initial asylum officer adjudication if the NPRM retained all asylum seekers' rights to full merits hearings in immigration court.

On the other hand, some commenters were supportive of the NPRM's provisions that would have allowed a noncitizen whose application was not granted to submit additional evidence for IJ review.

*Response:* Upon careful consideration, the Departments have revised the process set forth in the NPRM so that individuals will be placed in streamlined section 240 proceedings rather than the NPRM's proposal for non-section 240 proceedings, as described in new 8 CFR 1240.17, if an asylum officer does not grant asylum after an initial adjudication. As a general matter, the Departments agree with commenters that section 240 proceedings provide a better alternative than the proceedings proposed in the NPRM. IJs, DHS attorneys, and immigration counsel are familiar and experienced with the rules and procedures that apply to section 240 proceedings because those proceedings are the most common type conducted by IJs. The statute and regulations provide detailed standards and consistent rules for the conduct of section 240 hearings and noncitizens' rights during such proceedings, *see* 8 U.S.C. 1229a *et seq.,* 8 CFR 1240.1 through 1240.19. Currently, asylum and protection applications filed by noncitizens whose cases originate from the credible fear process are adjudicated in section 240 proceedings. In contrast, the NPRM would have created a new process and

would have imposed new evidentiary standards and limitations. *See* 86 FR 46946. The Departments believe that the NPRM process could have resulted in efficiencies while still ensuring a fair process, *see, e.g., id.* at 46906; however, as commenters claim, the NPRM process may also have resulted in increased immigration court and appellate litigation surrounding the interpretation and application of the new standards and evidentiary limitations. To avoid those complications, the Departments have decided not to adopt the NPRM's approach at this time and have instead decided to place noncitizens in streamlined section 240 proceedings if an asylum officer does not approve the noncitizen's application. This process will not employ the novel evidentiary restrictions proposed in the NPRM, but will instead apply largely the same long-standing rules and standards governing the submission of evidence that apply in ordinary section 240 proceedings. However, in keeping with the NPRM's purpose to increase efficiency and procedural fairness of the expedited removal process for individuals who have been found to have a credible fear of persecution or torture, 86 FR 46909, and in light of the efficiencies gained by initial adjudication before and creation of a record by the asylum officer, these streamlined section 240 proceedings will be subject to particular procedural requirements that ensure they are completed in an expeditious manner while still preserving fairness to noncitizens.[78]

The Departments agree with the commenters' assertions that noncitizens and the overall immigration adjudication system will benefit from this rulemaking in part by authorizing asylum officers to grant asylum to noncitizens determined to have a credible fear of persecution or torture. 8 CFR 208.2(a)(1)(ii). Asylum officers receive extensive training and possess expertise, *see supra* Section III.C of this preamble; INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b), and the Departments are confident in asylum officers' ability to carry out their duties in accordance with all applicable

---

[78] Streamlined section 240 proceedings are conducted in accordance with section 240 of the INA, 8 U.S.C. 1229a, but with particular procedural requirements laid out in new 8 CFR 1240.17, as described above in Section III of this preamble. EOIR has made other such procedural changes, including the recent procedural requirements imposed on cases subject to case flow processing under *Policy Memorandum* (''PM'') *21–18, Revised Case Flow Processing before the Immigration Courts* (Apr. 2, 2021). Generally, that PM eliminates the master calendar hearing for represented non-detained cases, but those cases are still conducted pursuant to section 240 of the INA, 8 U.S.C. 1229a.

statutes and regulations and in an efficient, fair manner.

The Departments have amended their respective regulations in this IFR to provide certain procedural protections that address commenters' concerns about the process that applies if an asylum officer does not grant asylum after an initial adjudication. For example, all noncitizens not granted asylum by asylum officers after an initial adjudication will be issued an NTA and referred to streamlined section 240 proceedings, as described in new 8 CFR 1240.17. Because, under this IFR, such noncitizens will be referred for streamlined section 240 proceedings, 8 U.S.C. 1229a, the applicable evidentiary standard is consistent with the longstanding evidentiary standard for section 240 proceedings—evidence is admissible unless the IJ determines it is untimely, not relevant or probative, or that its use is fundamentally unfair. 8 CFR 1240.17(g); 8 CFR 1240.7(a); *Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings. . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'" (quoting *Espinoza,* 45 F.3d at 310)); *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (1980) (holding that evidence must be "relevant and probative and its use must not be fundamentally unfair").

As part of the streamlined section 240 proceedings adopted by DOJ in this IFR at new 8 CFR 1240.17, noncitizens may elect to testify or present additional evidence that meets this evidentiary standard. 8 CFR 1240.17(g). If the noncitizen timely requests to testify, the IJ must schedule a hearing unless the IJ determines that the application can be granted without live testimony and DHS has not requested to present testimony or cross-examine the noncitizen, as described at new 8 CFR 1240.17(f)(4)(ii). Given these protections, among others, the Departments are confident that the procedures are sufficient to ensure that noncitizens will not be removed to a country where they fear persecution or torture without the opportunity for a hearing before an IJ.

The Departments acknowledge those commenters who expressed support for the NPRM's evidentiary procedures, but the new process established by this IFR at new 8 CFR 1240.17(g), and as described above in Section III of this preamble, maintains the noncitizen's ability to submit evidence to asylum officers and IJs, albeit in accordance with a broadened evidentiary standard consistent with section 240 proceedings. The new process further includes rules governing continuances, procedures for prehearing conferences, and the requirement of submissions by the parties. The Departments believe that the revisions, including (1) transmission of the asylum office record, (2) requirements that the IJ not hold a hearing unless requested by a party or if necessary, and (3) the deadlines imposed, will prevent time-consuming evidentiary hearings and increase the overall efficiencies and effectiveness in all cases.

a. Creation of New Limited Proceedings in Lieu of Section 240 Removal Proceedings and Limitation on Relief to Asylum, Statutory Withholding of Removal, and Convention Against Torture Review Only

*Comments:* Several commenters expressed opposition to the NPRM's procedures proposing that applicants who are not granted asylum or are found ineligible for statutory withholding of removal or CAT protection by an asylum officer must affirmatively request further review by an IJ. Overall, these commenters suggested that, if the Departments move forward with the NPRM's new hearing process, these applicants should be automatically referred to the IJ for a hearing, ideally in section 240 proceedings.

Multiple commenters compared this process to the procedures for credible fear review in which applicants who neither affirmatively request IJ review nor waive review are referred to the IJ. *See* 8 CFR 208.30(g)(1).[79] Commenters stated that it was unclear why the Departments would not apply the same presumption to the NPRM's process for people who are not granted asylum by asylum officers since, commenters explained, the new hearing process is essentially an extension of the credible fear interview process at issue in 8 CFR 208.30(g)(1). In other words, commenters urged the Departments to automatically refer asylum officers' decisions to not grant asylum to the IJ for section 240 proceedings unless the asylum seeker affirmatively states or files a notice waiving IJ review (*i.e.,* "opts out").

Commenters expressed concern that requiring an applicant to affirmatively seek further review may result in some applicants not receiving further IJ review due to the applicant's confusion or the complexity of the process, and not due to a lack of desire for further review. For example, commenters noted

that many asylum seekers who receive a negative credible fear finding may not know that they can seek a "de novo review" or may not understand the consequences of failing to seek review. In addition, there may be problems for applicants with the translation of documents informing them about the appeal process into a language they can read, or with applicants understanding the gravity of the process. Finally, commenters explained that automatic referral to an IJ is preferable to requiring an affirmative election because the applicant may receive an asylum officer's decision not to grant asylum through the mail, which triggers a short time to respond and other mail difficulties.

Commenters expressed concern that the 30-day period to request review by the IJ is too short and recommended extending the time period in which a noncitizen must respond after receiving a denial in the mail from 30 to 60 days.

Some commenters compared the IJ referral procedures in the NPRM to those for applicants who have affirmatively applied before USCIS. *See* 8 CFR 208.14(c)(1) (instructing the asylum officer to refer the application of an applicant who is inadmissible or deportable for adjudication in section 240 proceedings). Commenters were concerned that the difference in the procedures would create confusion in immigrant communities and lead many asylum seekers in the NPRM process to mistakenly believe that their cases would be automatically referred to the immigration court. Similarly, commenters were concerned that having two different paths may also create confusion potentially for the asylum office itself.

Some commenters said that substituting an "appeal" for a "referral" for IJ review is confusing and potentially deceptive, especially for applicants who appear pro se at an asylum officer interview. Commenters said that such applicants will likely have difficulty understanding paperwork that explains the contours of these IJ review hearings, as well as the obligation to file a notice of appeal, thereby potentially foreclosing further administrative and judicial review. Commenters further expressed concern that additional categories of applicants would be particularly affected by the requirement to affirmatively request IJ review, including non-English speakers, individuals with mental health disabilities, trauma victims, and individuals in detention.

Commenters noted that language barriers, effects of trauma, and the detrimental effects of detention all

---

[79] This citation refers to 8 CFR 208.30(g)(1) prior to publication of the Global Asylum rule, which amended 8 CFR 208.30(g), *see* 85 FR 80392, but which has since been enjoined, *see supra* note 4 (discussing recent regulations and their current status).

negatively impact an asylum seeker's ability to affirmatively request review. In addition, commenters noted that the noncitizens who would be placed in proceedings before EOIR will have already had an asylum officer determine that the claim is credible and, therefore, not frivolous. Thus, commenters explained, such asylum seekers would be unlikely to request review, resulting in the waiver of meritorious claims.

*Response:* This IFR does not implement the NPRM's proposal for IJ review proceedings, and instead adopts streamlined section 240 proceedings, as described above in Section III of this preamble. Specifically, as described in new 8 CFR 1240.17, DHS will file an NTA and place the noncitizen in these streamlined section 240 proceedings in all cases where the noncitizen was found to have a credible fear of persecution or torture, but the asylum officer subsequently did not grant the asylum application.

The Departments believe that providing streamlined section 240 proceedings addresses nearly all of the commenters' concerns and requests on this topic. Applicants will not be required to affirmatively request review by an IJ, and applicants will not be referred to the limited IJ proceedings proposed in the NPRM. Instead, applicants will be referred to streamlined section 240 proceedings that incorporate various procedural measures to enhance efficiency, consistent with the streamlined nature of these proceedings, while still ensuring fairness to noncitizens. Proceedings under this IFR are conducted under section 240 of the Act, 8 U.S.C. 1229a, and the streamlined proceedings will advance more expeditiously than ordinary section 240 proceedings generally proceed because the IJ will have the benefit of the full asylum officer record and the IJ and the parties will be subject to timelines that ensure the proceedings are adjudicated promptly. The streamlined 240 proceedings will also ensure that the intent of the NPRM to streamline IJ review is preserved.

Nevertheless, the Departments believe that these additional procedural measures will not create confusion for noncitizens, as section 240 proceedings are the most common type of immigration proceeding, and these new, straightforward procedural requirements will be directly communicated to noncitizens. Moreover, the new procedural timelines in the IFR are responsive to commenters' concerns that noncitizens need longer than 30 days to identify errors in the asylum officer's decision. Notably, under the

IFR, as set forth at new 8 CFR 1240.17(b), the master calendar hearing will be held 30 days after the NTA is served, or, if a hearing cannot be held on that date, on the next available date no later than 35 days after the date of service. At the conclusion of the initial master calendar hearing, the IJ will schedule a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, as described at new 8 CFR 1240.17(f)(1). At status conferences provided for at new 8 CFR 1240.17(f)(2), noncitizens will indicate orally or in writing whether they intend to contest removal or seek any protections for which an asylum officer did not determine a noncitizen eligible, and if seeking protections, noncitizens will indicate whether they intend to testify before the immigration court, identify any witnesses they intend to call, and provide any additional documentation. 8 CFR 1240.17(f)(2)(i). Where a noncitizen is represented by counsel, the noncitizen shall further describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings, articulate any additional bases for asylum and related protections, and state any additional requested forms of relief. *Id.* The IFR also provides specifically for continuances and filing extensions in streamlined section 240 proceedings, which allows appropriate flexibility with regard to the established timelines. *See* 8 CFR 1240.17(h). If a noncitizen needs additional time beyond these timelines, as commenters suggested, new 8 CFR 1240.17(h)(2) provides for respondent-requested continuances and filing extensions. Thus, these timelines are clear, streamlined, and reasonable, allowing noncitizens the opportunity to reasonably present their cases while maintaining the overall efficiencies of the NPRM.

In addition to established evidentiary standards, section 240 proceedings—including the streamlined section 240 proceedings addressed in this IFR—provide a number of procedural protections established by statute and regulation, such as the right to representation, "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen's] own behalf, and to cross-examine witnesses," and the creation of a complete record of the proceedings. INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Additionally, the Act and the regulations establish that the IJ should play a robust role in

proceedings. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) (requiring IJs to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses"); 8 CFR 1003.10(b) (same and requiring IJs to take other actions that are "appropriate and necessary for the disposition of" each case); 8 CFR 1240.10(a) (requiring IJs to, inter alia, advise noncitizens of certain rights in section 240 proceedings and to explain factual allegations and legal charges in the NTA in non-technical language); 8 CFR 1240.11(a)(2) (requiring IJs to inform noncitizens of "apparent eligibility to apply for any of the benefits enumerated in this chapter"); 8 CFR 1240.1(a)(1)(iv) (authorizing IJs to "take any other action consistent with applicable law and regulations as may be appropriate" in a section 240 proceeding). Additionally, section 240 proceedings provide for special consideration for noncitizens who may present with competency issues. *See* INA 240(b)(3), 8 U.S.C. 1229a(b)(3); *Matter of M–A–M–,* 25 I&N Dec. at 479–84 (stating that where a noncitizen shows indicia of incompetency, the IJ must inquire further and establish safeguards where appropriate). In addition, the IFR carves out a specific exception to the general timeline and procedures in the streamlined 240 proceedings for a noncitizen who has exhibited indicia of incompetency at new 8 CFR 1240.17(k)(6).

The Departments note that the IFR does not permit noncitizens to "opt-out" of or decline further proceedings before an IJ because section 240 of the Act, 8 U.S.C. 1229a, requires an IJ, as opposed to the asylum officer, to issue the order of removal in cases where asylum is denied. The IFR does, however, allow a noncitizen to indicate that the noncitizen does not wish to contest removal or seek any protections for which the asylum officer did not find the noncitizen eligible, as set forth in new 8 CFR 1240.17(f)(2)(i)(B). In such a case, if the asylum officer determined the noncitizen eligible for withholding of removal or protection under the CAT, the IJ will give effect to that protection as determined by the asylum officer unless DHS makes a prima facie showing through new evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceeding for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. In addition, if a noncitizen fails to appear for the IJ proceedings, the IJ will generally be required to issue an in-absentia removal order pursuant to

existing regulations, but will similarly give effect to the asylum officer's determination, if any, that the noncitizen is eligible for withholding of removal or protection under the CAT, unless DHS demonstrates that the respondent is not eligible for such protection, as provided in new 8 CFR 1240.17(d).

*Comments:* Commenters expressed concerns that the NPRM's proposed IJ review proceedings lacked procedural protections and due process safeguards. Commenters stated that placing applicants whose cases are not granted by the asylum officer in these limited, asylum-only-type proceedings limits critical and well-established due process protections for applicants. In other words, commenters generally supported placing applicants in section 240 proceedings, to include the broader evidentiary standard applied in 240 proceedings, rather than a new limited proceeding tethered to the asylum interview record, and imposing a narrow evidentiary standard.

Commenters stated that the NPRM's proposed IJ review proceedings would erase the procedural guarantees and protections of full removal hearings and inappropriately limit immigration court consideration of asylum officer decisions. For instance, under the NPRM, an applicant would be unable to submit applications for other forms of relief without submitting additional motions, and would be unable to submit additional evidence unless an IJ deems it "necessary" and "not duplicative." Commenters stated that IJs would be expected to rule in these "reviews" without holding evidentiary hearings. Similarly, commenters expressed concern that the proceedings would effectively be limited to review of only the asylum officer's notes, which would deprive the applicant of the right to present testimonial and documentary evidence, cross-examine adverse witnesses, and review and rebut all evidence considered by the adjudicator. Commenters expressed concern that the procedures in the NPRM's proposed IJ review, as compared to section 240 proceedings, could deprive applicants of a true opportunity to be heard. Commenters stated that the evidentiary provisions of the IJ review process could not cure the absence of these procedural protections. Commenters said the evidentiary procedures proposed by the NPRM during IJ review are vague and inadequate, and the NPRM's articulated rationales for a truncated hearing rather than full section 240 proceedings are arbitrary and capricious.

Commenters expressed concern about the nature of the record before the IJ in

the review proceedings proposed by the NPRM—more specifically, that the NPRM gives a disproportionate amount of deference to asylum officer decisions while simultaneously limiting IJ adjudication to a mere review of the asylum officer-created record, rather than providing for a full de novo merits hearing. Commenters believed the NPRM would allow credible fear interview notes to be the sole basis of the asylum application, and that proposed 8 CFR 208.14(c) would allow asylum applications to be the sole piece of evidence reviewed by the IJ. Commenters also believed that relying on the asylum officer to adequately develop the record falls far short of due process standards. Commenters expressed concern that the asylum officer's notes may not explain why certain types of evidence were not allowed to be presented. Given these concerns, commenters said that this would create a chain of reliance on limited and often incomplete credible fear interview notes, would limit the ability of counsel to effectively supplement the record where necessary, and would prejudice clients who were not able to fully present their claims during the credible fear interview because of incapacity, trauma, or an improper setting for the interview.

Commenters stated that the NPRM does not explicitly guarantee the applicant a right to receive a decision from the IJ that lays out the reasons for their decision. Commenters reasoned that these decisions are critical for BIA and judicial review and thus, at a minimum, the NPRM should include the same standard of requiring an IJ to explain the reasoning underlying the court's decision as in section 240 proceedings.

Commenters expressed concern that the proposed IJ review procedure would provide insufficient review in light of the nature of the asylum officers' adjudications and decisions. Commenters stated that, in the context of asylum officers' adjudications of affirmative asylum applications or those filed by unaccompanied children, applicants receive a one-page notice explaining the decision with limited legal explanation. Assuming the decisions by asylum officers in the new procedures under the NPRM would be similar, commenters expressed concern that the NPRM does not provide the same safeguard of section 240 proceedings that is provided to these other applicants. Commenters stated that asylum officers do not always adequately review the entire record and make referrals to the immigration court for complex cases. Commenters stated

that the NPRM's proposed IJ review proceedings would not ensure that any errors or omissions by the asylum officer are uncovered, particularly where the IJ rejected additional evidence or testimony that might support the protection claim.

Commenters stated that full section 240 proceedings are necessary because many applicants who currently are referred to removal hearings by asylum officers are granted asylum by an IJ. Commenters stated that reasons for the high number of cases granted after referral to EOIR, in the current section 240 referral process, include insufficiency or inaccuracy of credible fear interview notes as a sole measure of credibility, the structure of the asylum officer's interview, access to counsel, and access to evidentiary material and witness testimony. In contrast, commenters said the standard for considering admissible evidence in section 240 proceedings is relevance and fundamental fairness, and that immigration proceedings favor broad evidentiary admissibility. Commenters said the reason for the large disparity in outcomes was the right to a full de novo court hearing, where attorneys were free to offer documents, briefs, and testimony.

Commenters also took issue with the NPRM's statement that a noncitizen would have a "full opportunity to challenge" an asylum officer's decision to not grant asylum through an IJ's review of the asylum interview record. Commenters stated that, statistically, a large number of asylum applicants are unsuccessful in making a strong case for themselves at their hearings before asylum officers, citing impacts of trauma on presenting claims and difficulties with providing documentary evidence on short notice. Thus, commenters asserted, it is not realistic or fair to expect that the record of the hearing before an asylum officer, on which the IJ would rely during their review, would be sufficient to ensure that applicants have the opportunity to adequately make their case.

Commenters stated that the availability of section 240 proceedings for some applicants and only limited proceedings under the NPRM for other asylum applicants is not rationally connected to (1) whether a noncitizen has been or may be persecuted or tortured in the country the noncitizen left behind, and (2) the noncitizen's ability to articulate the claim or timely obtain evidence. Therefore, commenters urged that any final rule preserve the right to full adversarial proceedings before an IJ for those applicants who

have not had their applications granted by an asylum officer.

Commenters stated that the NPRM is not clear as to what extent applicants who do not receive a grant of asylum by the asylum officer will be negatively impacted if placed in affirmative proceedings without a guarantee of full section 240 proceedings. Commenters stated that if the NPRM decreased due process protections of applicants by denying the benefit of full section 240 proceedings, it may reduce access to the asylum process. Commenters said the NPRM raises transparency concerns regarding how the Departments will handle cases after review by an asylum officer.

Commenters said the Departments must not enact a faster process at the expense of due process protections and one commenter expressed concern that the NPRM's limited review proceedings would result in the creation of a de facto ''rocket docket'' that would place asylum seekers at risk of summary deportations. Absent clarification on the potential impact of these provisions, the commenters said they had been denied an opportunity to meaningfully comment on the NPRM.

*Response:* As described above in Section III of this preamble, the Departments have determined that a noncitizen whose asylum claim is not granted by an asylum officer after an initial adjudication will be issued an NTA and referred to an IJ for streamlined section 240 removal proceedings, and the Departments have decided not to implement the IJ review proceedings originally proposed in the NPRM. Section 240 proceedings follow issuance of a notice of charges of inadmissibility or removability against a noncitizen, INA 239(a)(1), 8 U.S.C. 1229(a)(1); INA 240(a), 8 U.S.C. 1229a(a), and provide an opportunity for the noncitizen to make a case to an IJ, INA 240(a), 8 U.S.C. 1229a(a), (b). Accordingly, the use of section 240 proceedings provides notice and an opportunity to be heard, which satisfies due process. *See, e.g., LaChance* v. *Erickson,* 522 U.S. 262, 266 (1998) (''The core of due process is the right to notice and a meaningful opportunity to be heard.'').

The Departments' decision not to implement the NPRM's proposal for limited review proceedings for applications not granted by the asylum officer and instead to refer noncitizens to streamlined section 240 removal proceedings addresses commenters' concerns that the NPRM's proposed proceedings were overly restrictive. In response to commenters' concerns regarding the nature of the record created by the asylum officer, the Departments note that while the written record of the positive credible fear determination will be considered a complete asylum application, applicants may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination. 8 CFR 208.4(b)(2). Also, because the IFR is consistent with the evidentiary standard for section 240 proceedings, noncitizens may review and present evidence that is relevant and probative, which eliminates the NPRM's limited evidentiary standard of ''necessary'' and ''not duplicative'' and ensures noncitizens have the opportunity to supplement the record for IJ review. 8 CFR 1240.17(g). Upon conclusion of the streamlined section 240 proceedings, the DOJ regulations provide that an IJ will issue a decision considering the full record before the IJ, as set forth at new 8 CFR 1240.17(f)(5), and noncitizens will have an opportunity for appeal. 8 CFR 1240.13, 1240.15. The IJ has a duty to provide a decision orally or in writing. *See Matter of Kelly,* 24 I&N Dec. 446, 447 (BIA 2008) (holding that the IJ has a responsibility ''to insure [sic] that the decision in the record is complete''); 8 CFR 1003.37. Specifically, the IJ ''shall decide whether an alien is removable from the United States. The determination of the [IJ] shall be based only on the evidence produced at the hearing.'' INA 240(c)(1)(A), 8 U.S.C. 1229a(c)(1)(A). These provisions ensure that noncitizens receive a meaningful opportunity to be heard and afford procedural protections and due process safeguards. Moreover, under the IFR, noncitizens will not need to engage in additional motions practice—as they would have under the NPRM—should they wish to seek other forms of relief beyond the applications previously considered by the asylum officer. Further, IJs will conduct hearings for noncitizens who request to present live testimony, unless the application can be granted without a hearing, as indicated at new 8 CFR 1240.17(f)(4). The Departments find that the process set forth in this IFR addresses commenters' concerns that the NPRM provided undue deference to asylum officers while limiting the IJ's role in the proposed application review proceedings. While the Departments recognize that commenters stated they prefer ''full'' section 240 proceedings over those proposed in the NPRM, the Departments believe that the streamlined procedures set forth in this rule are necessary and appropriate for furthering efficiency interests while still ensuring fair adjudication of claims. In addition, the transcription of the hearing before an asylum officer, along with the additional timelines for completing cases that are included in this IFR, address commenters' concerns about transparency as to how the Departments will handle cases.

*Comments:* Commenters similarly stated that the NPRM does not permit procedures provided in section 240 proceedings, specifically in regard to continuances. Commenters explained that in section 240 proceedings, noncitizens are first scheduled for master calendar hearings where, among other things, IJs ask if they need a continuance to secure representation. Commenters stated that continuances are routine throughout the course of a case in immigration court. However, if proceedings are transferred to the asylum office, commenters were concerned that noncitizens will have less freedom to request their interview be rescheduled because DHS only allows for continuances of asylum officer proceedings in ''exceptional circumstances.''

Commenters also pointed out that 8 CFR 1003.48(e) as proposed in the NPRM did not adequately contemplate the legitimate needs for which an extension may be necessary (*e.g.,* to obtain representation by counsel). Commenters reasoned that applications for continuances should be fully documented, setting forth the steps already taken to secure an attorney or to obtain supporting evidence. Commenters believed that requests should be granted to allow for additional time, within reasonable limits, if applicants establish that they have been diligent and thorough with their search.

*Response:* At new 8 CFR 1240.17(h), the IFR explicitly provides for continuances in the context of streamlined section 240 proceedings. As specifically relevant to commenters' concerns, the IJ may grant initial continuances, including continuances to allow the noncitizen time to secure representation. These initial continuance standards will be governed by the long-standing, traditional ''good cause'' standard, as described at new 8 CFR 1240.17(h)(2)(i). *See* 8 CFR 1003.29.

As discussed above in Section III of this preamble, and as found at new 8 CFR 1240.17(h)(2)(ii) and (iii), the IFR also allows additional continuances beyond the initial 30-day ''good cause'' period, but the standards for additional

continuances beyond the initial 30-day "good cause" period will be increasingly restrictive as the noncitizen's requested continuances increase the aggregate delay of the proceedings. The IFR provides heightened standards for consideration when the merits hearing has been delayed for more than 90 days past the initial master calendar hearing due to continuances granted to the noncitizen. Nevertheless, the IFR preserves the opportunity for continuances as necessary to ensure a fair proceeding or to prevent a violation of statutory or constitutional rights, including the statutory right to counsel, as set forth at new 8 CFR 1240.17(h)(2)(ii)–(iii).

*Comments:* Commenters explained that the NPRM's proposed "prohibition" on immigration court consideration on the issue of removability may violate due process and result in wrongful removals. For example, commenters described a situation in which an IJ properly probed for facts and discovered that the noncitizen facing removal was in fact a U.S. citizen. However, commenters explained, if IJs are not permitted to make a ruling on admissibility or removability, there is no incentive for them to inquire to determine if the applicant before them has undiscovered legal status. To ensure that noncitizens are not removed by mistake and to avoid unnecessary hearings for those who are not removable, the commenters said that IJs should be permitted to inquire and make determinations regarding removability.

*Response:* The IFR resolves commenters' concerns with issues of removability and admissibility. In the streamlined section 240 removal proceedings introduced by this IFR, as in all section 240 proceedings, the IJ must make a determination regarding whether the noncitizen is subject to removal as charged. 8 CFR 1240.17(f)(2)(i), (k)(3); 8 CFR 1240.10(c), (d). The IFR includes an exception to the timelines in the streamlined proceedings for cases in which the noncitizen makes a prima facie showing that the noncitizen is not subject to removability and the IJ determines that the challenge cannot be resolved simultaneously with the adjudication of the noncitizen's applications for asylum, statutory withholding of removal, or withholding or deferral of removal under the CAT. Instead, these noncitizens will be subject to ordinary section 240 proceedings, as described at new 8 CFR 1240.17(k)(3).

*Comments:* Commenters disagreed with the NPRM's statement that "requiring a full evidentiary hearing before an IJ after an asylum officer's denial would lead to inefficiencies without adding additional value or procedural protections." 86 FR 46918. Commenters argued that this ignores the reality of the asylum process by assuming that applicants will be able to develop a full evidentiary record before the asylum officer, demonstrates a misunderstanding of how difficult it is to be granted asylum, and could hinder due process. Commenters said that nonadversarial hearings with asylum officers are not faster and fairer than immigration court hearings with represented applicants, especially if attorneys on both sides agree to narrow issues in dispute before the IJ. At least one commenter believed that, under the NPRM, an IJ's decision regarding rejecting or admitting evidence would not be reviewable by the BIA or a U.S. Court of Appeals because the NPRM did not require the judge to provide a reasoned decision. Therefore, commenters explained, the NPRM's proposed IJ review could deny a noncitizen the opportunity to relate clearly and completely the circumstances of persecution or a well-founded fear of persecution to either an asylum officer or IJ. Commenters anticipated that the NPRM, if it had been promulgated in that form, would be vacated because it is inconsistent with due process guaranteed by the Fifth Amendment as well as INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B), which provides that noncitizens shall have a reasonable opportunity to examine the evidence against them, to present evidence on their own behalf, and to cross-examine witnesses presented by the Government.

*Response:* The Departments disagree with commenters' concerns that the initial asylum officer adjudication of claims would not provide further efficiencies over the current expedited removal credible fear screening process. Although this IFR revises the process as proposed by the NPRM for reviewing applications that an asylum officer does not grant, the Departments maintain that having an Asylum Merits interview with an asylum officer for noncitizens with positive credible fear determinations, as both the IFR and NPRM provide, will be more expeditious than the current process of referring all noncitizens with positive credible fear determinations to section 240 proceedings before the immigration court. As described in the NPRM, immigration courts are experiencing large and growing backlogs and subsequent adjudication delays. 86 FR 46907. Asylum officers are well trained and experienced with asylum adjudications, and each case that is granted by USCIS is a direct reduction in cases that would have been before EOIR. *See id.* The threshold asylum officer hearing proposed in the NPRM also will ensure that cases referred to immigration court will include a well-developed record. Where cases are referred with such a record, IJs will not have to grant continuances for respondents to file applications for asylum and related protection. Even though parties will be able to file additional evidence, the asylum officer record will help IJs to narrow issues. For both these reasons, USCIS adjudication of claims will promote efficiency before EOIR.

In addition, the IFR does not adopt the NPRM's proposal for broad limits on introducing new evidence. Instead, the IFR provides at new 8 CFR 1240.17(g)(1) that IJs may exclude documentary evidence or witness testimony "only if it is not relevant or probative; if its use is fundamentally unfair; or if the documentary evidence is not submitted or the testimony is not requested by the applicable deadline, absent a timely request for a continuance or filing extension that is granted." The Departments believe the IFR's evidentiary standard addresses the commenters' concerns regarding the need for a full evidentiary hearing. Further, the Departments believe that, overall, the IFR's streamlined section 240 proceedings will be equally effective, if not more so, than the NPRM's proposed proceedings in enhancing efficient adjudication and replacing time-consuming evidentiary hearings. For example, the IFR provides that the asylum officer's record will be automatically transmitted upon DHS's issuance of an NTA, which will enable the parties to narrow the issues and assist the IJ's review of the case. The IFR also provides that if neither party requests to present testimony, or if the IJ determines that the asylum application can be granted without hearing testimony and DHS does not request to present testimony or evidence, the IJ can decide the case without a hearing. The IFR also provides various deadlines for the scheduling of hearings and the issuance of the IJ decision. These measures enhance efficiency by precluding the need for a full evidentiary hearing in some cases and by facilitating a more efficient hearing when one is necessary.

Finally, in response to commenters' concerns regarding administrative and judicial review of IJ decisions regarding the admission of evidence, the Departments emphasize that there is not a substantive difference regarding IJs'

decisions on the admission of evidence in these streamlined section 240 proceedings and standard 240 proceedings. Either party may challenge the IJ's decision during a subsequent appeal to the BIA, which will be reviewed pursuant to the same standards of review as for appeals from ordinary section 240 proceedings. *See* 8 CFR 1003.1; INA 242, 8 U.S.C. 1252. A noncitizen who receives an adverse decision from the BIA may file a petition for review subject to the requirements of section 242 of the INA, 8 U.S.C. 1252, and nothing in this rule affects that statutory provision.

*Comments:* Commenters expressed concerns that IJs would serve a "pseudo-appellate" role by reviewing decisions by asylum officers. The commenters characterized the current IJ review process of negative credible fear interviews as "deficient" and explained that expanding this aspect of the IJ's duty will amplify due process concerns and result in erroneous removals. Therefore, commenters urged that, if the NPRM is not withdrawn, the Departments should at least automatically refer claims not granted by asylum officers for full section 240 proceedings.

*Response:* The Departments find that the decision to place individuals whose applications are not granted by the asylum officer into streamlined 240 proceedings, rather than the NPRM's proposed IJ review proceedings, addresses commenters' concerns that the new procedures would have been akin to a credible fear review rather than an adjudication in removal proceedings. As commenters point out, section 240 proceedings allow noncitizens a fuller opportunity to present evidence and testimony to develop the record, secure and work with counsel if they have not yet done so, and participate in additional hearings as needed. *See generally* 8 CFR part 1240. The IFR includes additional procedural requirements to ensure that proceedings will proceed more expeditiously, but will still give noncitizens a full opportunity to develop the record and obtain a de novo determination as to asylum eligibility from the IJ, thus obviating commenters' concerns. When conducting these streamlined 240 proceedings, IJs will exercise independent judgment and discretion in reviewing the claims before them for adjudication. *See* 8 CFR 1003.10(b); *see generally* EOIR, *Ethics and Professionalism Guide for Immigration Judges* (Jan. 2011), *https:// www.justice.gov/eoir/sibpages/ IJConduct/EthicsandProfessionalism GuideforIJs.pdf* (*IJ Ethics and Professionalism Guide*) (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards). The Departments believe the protections provided in section 240 proceedings are appropriate to provide a sufficient record for appeal.

Nevertheless, the Departments also clarify that, contrary to commenters' conclusory statements, IJs' current credible fear review process is not "deficient" and does not violate due process. The IFR maintains the Departments' approach of restoring the credible fear screening standards that were in effect prior to the regulatory changes made between 2018 and 2020. *See* 86 FR 46911. None of those regulations has gone into effect, as all are delayed, vacated, or enjoined. *See id.* at 46909 n.24. The Departments believe that returning the regulations to the framework in place prior to the changes made between 2018 and 2020 will ensure the process is more efficient, effective, and consistent with congressional intent. *Id.* at 46914. The Supreme Court has emphasized that noncitizens who are encountered in close vicinity to and immediately after crossing the border and placed in expedited removal proceedings, which include the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. Congress provided the right to a determination whether the noncitizen has a "significant possibility" of establishing eligibility for asylum under INA 208, 8 U.S.C. 1158. *See also* INA 235(b)(1)(B)(ii), (v), 8 U.S.C. 1225(b)(1)(B)(ii), (v). Because the regulations reestablish the "significant possibility" standard, consistent with the statute, it does not infringe on noncitizens' rights. *See Thuraissigiam,* 140 S. Ct. at 1983. In addition, despite the Departments' disagreement with the commenters' characterization of the credible fear review process, the Departments find that this IFR addresses commenters' concerns as IJs will continue to have the traditional adjudicator authorities in 240 proceedings.

*Comments:* Commenters stated that the reports by the U.S. Commission on International Religious Freedom ("USCIRF"), the Administrative Conference of the United States ("ACUS"), and the Migration Policy Institute ("MPI") cited in the NPRM as support for asylum officers adjudicating defensive claims do not suggest eliminating full evidentiary IJ hearings of defensive asylum claims, which commenters believed the NPRM implied. 86 FR 46917–18. Commenters stated that requiring the applicant to petition the IJ for consideration of additional evidence would curtail due process beyond the procedure recommended by USCIRF whereby asylum officers would either grant asylum cases immediately after the credible fear interview or, in more complicated cases, refer the applicant to full proceedings before an IJ.

*Response:* The NPRM's references to reports by the USCIRF, ACUS, and MPI were not meant to imply support for the NPRM's proposed process, as commenters alleged. Rather, the NPRM clearly stated that those reports "assumed that individuals denied asylum by a USCIS asylum officer would be issued an NTA and placed into section 240 removal proceedings before an IJ, where the noncitizen would have a second, full evidentiary hearing on the asylum application with a different decision-maker. *This proposed rule would not adopt that approach . . . .*" 86 FR 46918 (emphasis added). Nevertheless, for the reasons discussed thus far and above in Section III of this preamble, this IFR replaces the NPRM's proposed IJ review procedure with streamlined section 240 removal proceedings.

*Comments:* Commenters raised concerns that the NPRM's procedures distinct from section 240 IJ review could have a negative impact on those applicants who are unrepresented by counsel, non-English speakers, or trauma survivors. Accordingly, commenters recommended that asylum seekers instead be given an opportunity to obtain counsel and present all evidence in support of their claims in section 240 merits hearings before IJs. Commenters asserted that only such a hearing would ensure that pro se applicants are not wrongfully returned to danger in violation of the United States' nonrefoulement obligations.

Commenters generally argued that issues related to lack of access to counsel stem from the fact that noncitizens appearing before the immigration courts have no right to Government-appointed counsel. Commenters urged the Departments to consider that, while many asylum seekers do not have access to legal representation at any stage of immigration proceedings, they are particularly unlikely to have legal representation at early stages of presenting their claims. Other commenters believed that the majority of asylum applicants do not have

representation. Commenters expressed concerns that, under the NPRM, unrepresented asylum seekers would not be able to adequately present their asylum claims before the asylum officer, and that these initial deficiencies would later pose significant challenges to legitimate claims, even with the assistance of counsel, once asylum seekers are before the immigration court. Commenters also raised concerns that unrepresented applicants, many of whom are unfamiliar with the complexities of immigration law and do not speak English, would be unable to adequately draft filings, fill out forms, and present their claims at all, particularly within the time constraints presented by the NPRM. Commenters noted that these concerns are further exacerbated by the fact that many applicants suffer from post-traumatic stress disorder or other mental health ailments.

Commenters stated that the NPRM would negatively impact trauma survivors' ability to present their claims because they may not be able to immediately disclose all relevant facts pertaining to their claims to their asylum officers or even their own counsel. Commenters stated that it is common for asylum seekers to disclose only limited information about their past persecution in early statements and then to provide greater detail when later questioned by an IJ. Commenters stated that it may take several meetings with an advocate before asylum seekers are comfortable enough to share the details of their persecution. Commenters asserted that the NPRM would increase the likelihood that such applicants may face erroneous adverse credibility determinations, and that the expedited process would be generally detrimental to a full exploration of claims. Commenters particularly argued that more robust procedural safeguards are critically important to guaranteeing LGBTQ+ asylum seekers the opportunity to present their claims. Commenters cited *Matter of M–A–M–*, 25 I&N Dec. 474, as an example of a case that recognized the important procedural protections available in section 240 removal proceedings. In *Matter of M–A–M–*, the BIA recognized the right for applicants who may lack mental capacity to present expert testimony to demonstrate that their mental health conditions impacted their claims. *Id.* at 479.

Moreover, commenters believed that asylum officers are not in the best position to probe an applicant on the reasons for inconsistencies in a claim, particularly when the asylum seeker acted pro se or received ineffective assistance of counsel before the Asylum Office. Commenters anecdotally stated that they have witnessed circumstances where asylum officers failed to thoroughly probe the reasons for inconsistencies, but where applicants later resolved inconsistencies during direct examination in immigration court. Without the ability to testify live on the same issues in a truly de novo proceeding, one commenter said, many traumatized asylum seekers would not have the opportunity to present critical evidence that would prove their claims.

*Response:* The IFR addresses commenter concerns about the rule's impact on vulnerable populations, including individuals with post-traumatic stress disorder, individuals who face language barriers, and individuals who are unrepresented, by providing that noncitizens whose applications are not granted by the asylum officer will be placed in streamlined section 240 proceedings rather than finalizing the IJ review procedure proposed in the NPRM. The Departments have included procedural rules to ensure the efficient disposition of these cases, and noncitizens in these streamlined 240 proceedings will receive all of the procedural protections required by section 240 of the Act, 8 U.S.C. 1229a, which commenters were concerned were lacking in the NPRM. *See* INA 240(b)(4), 8 U.S.C. 1229a(b)(4) (setting forth noncitizen's rights in proceedings); *see also Matter of M–A–M–*, 25 I&N Dec. at 479–83 (stating that where a noncitizen has indicia of incompetency, the IJ must inquire further and establish safeguards where appropriate). The Departments believe that these measures are sufficient to ensure that all noncitizens, including vulnerable noncitizens, have adequate time to prepare and present their claims. Moreover, the IFR explicitly exempts certain categories of noncitizens, including juveniles and mentally incompetent individuals, from the streamlined procedures created by this IFR, as described at new 8 CFR 1240.17(k).

With respect to commenters' concerns about noncitizens not having adequate access to or time to obtain counsel, the Departments recognize the ''immense value of legal representation in immigration proceedings, both to the individuals that come before [EOIR] and to the efficiency of [its] hearings.'' *Director's Memo* (''DM'') *22–01: Encouraging and Facilitating Pro Bono Legal Services* 1 (Nov. 5, 2021), *https:// www.justice.gov/eoir/book/file/ 1446651/download.* As with all noncitizens in section 240 removal proceedings, the individuals subject to the IFR have a right to representation at no cost to the Government. INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A).[80] Additionally, resources are available for pro se noncitizens in immigration court. *See, e.g.,* EOIR, Pro Bono Legal Service Providers, *https://probono.eoir. justice.gov;* EOIR, Immigration Court Online Resource, *https://icor.eoir. justice.gov/en/;cf.* EOIR, Press Release, EOIR Announces ''Access EOIR'' Initiative (Sept. 28, 2021) (aiming to increase representation before EOIR), *https://www.justice.gov/eoir/pr/eoir-announces-access-eoir-initiative;* EOIR, Press Release, EOIR Launches Resources to Increase Information and Representation (Oct. 1, 2020), *https:// www.justice.gov/eoir/pr/eoir-launches-resources-increase-information-and-representation.*

In addition, because noncitizens in section 240 removal proceedings, including the streamlined section 240 proceedings set forth in the IFR, have the right to provide testimony and evidence in support of their applications, the Departments find that placing noncitizens whose applications are not granted by the asylum officer in streamlined section 240 proceedings rather the NPRM's proposed distinct proceedings addresses commenters' concerns about the effect of a lack of representation early in the expedited removal or asylum application process. In other words, noncitizens who fail to provide evidence or testimony on relevant parts of their claims before asylum officers due to a lack of representation will have the ability to submit additional evidence or testimony to the IJ during subsequent streamlined section 240 proceedings, as described above in Section III of this preamble. Further, noncitizens in these streamlined section 240 proceedings will have opportunities to obtain

---

[80] The Departments strive to improve access to counsel, as evidenced through other policies and rulemakings, and recognize that increasing access to counsel will, in turn, further the efficiency of all of the Departments' operations, including those set forth in this rulemaking. *See DM 22–01: Encouraging and Facilitating Pro Bono Legal Services* (Nov. 5, 2021) (''Competent legal representation provides the court with a clearer record and can save hearing time through more focused testimony and evidence, which in turn allows the judge to make better-informed and more expeditious rulings.''); *see generally* Executive Order 14012, 86 FR 8277, 8277 (Feb. 2, 2021) (directing Attorney General and Secretary to ''identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law''). Nevertheless, recommendations from commenters calling for noncitizens to have access to appointed counsel in section 240 removal proceedings are beyond the scope of this rulemaking.

**18162** **Federal Register**/Vol. 87, No. 60/Tuesday, March 29, 2022/Rules and Regulations

representation even before removal proceedings are initiated as they may be represented during the initial adjudication conducted by the asylum officer. *See* 8 CFR 208.9.

The Departments believe that commenters' concerns that the procedures proposed in the NPRM would negatively impact individuals whose claims develop over time or who need additional time and testimony to explain inconsistencies and aspects of their claim that they do not feel were adequately addressed during the interview are ameliorated by the IFR, which does not contain the NPRM's restrictions on the introduction of new testimony or documentary evidence. Instead, the IFR incorporates evidentiary standards consistent with those in section 240 proceedings—evidence must be relevant, probative, and fundamentally fair, as described at 8 CFR 1240.17(g)(1). *See* INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B) (noncitizens must have a "reasonable opportunity" to present evidence on their behalf); 8 CFR 1240.7(a); *see also Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.' " (quoting *Espinoza,* 45 F.3d at 310)). Noncitizens may also request to provide additional testimony where they believe that it is necessary, as described above in Section III of this preamble.

*Comments:* Commenters expressed concerns that, by relying solely on the record before the asylum officer, the NPRM would effectively result in IJs "rubber-stamping" asylum officer decisions without providing meaningful review and oversight. Commenters stated that full evidentiary hearings before an IJ provide an essential check on errors during the credible fear interview and affirmative interview processes.

Commenters stated that the NPRM does not mandate that IJs have the same obligations regarding evidence and the record that are set forth in the INA for section 240 proceedings, such as an obligation to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses." INA 240(b)(1), 8 U.S.C. 1229a(b)(1). Instead, commenters stated that the NPRM would create a presumption against holding immigration court hearings and against the presentation of additional evidence or testimony. Commenters were concerned that, as a result, IJs would pretermit claims and affirm decisions

not granting asylum without first conducting a hearing in person.

Commenters urged that a fuller review is necessary to prevent a negative use of the asylum officer's increased authority under the NPRM in the future. Similarly, commenters also expressed concern that future IJ performance metrics could exacerbate these issues by encouraging overly cursory reviews.

*Response:* As an initial matter, the decision to place noncitizens whose applications are adjudicated but not granted by the asylum officer in streamlined section 240 proceedings, rather than the NPRM's proposed IJ review proceedings, addresses commenters' concerns that limited proceedings would not allow for meaningful review and oversight by the IJ. In particular, the switch to streamlined section 240 proceedings will ensure that the IJ's review is meaningful and not a "rubber-stamp" of the asylum officer's decision. The streamlined section 240 proceedings established by the IFR will allow noncitizens to submit additional testimony or evidence, if they deem it necessary, as described at new 8 CFR 1240.17(e), (f). Accordingly, commenters' concerns—that the IJ could deny an application based solely on the record before the asylum officer without allowing the noncitizen to testify or provide evidence—are no longer applicable.

The Departments believe that the procedures in this IFR also ameliorate commenters' concerns over statements in the NPRM that IJs could decide whether to accept additional evidence or make a determination based solely on the asylum officer's record. In addition to applying the statutory procedures regarding evidence and maintenance of the record set forth in section 240 of the Act, 8 U.S.C. 1229a, the IFR permits noncitizens to request to provide additional testimony where necessary and only permits the IJ to deny such requests where the IJ concludes there is sufficient evidence in the record to grant the asylum application without hearing additional testimony. The Departments further believe that the detailed review procedures set forth in the IFR alleviate commenters' concerns about IJs adjudicating applications without adequately reviewing asylum officer decisions. Because the IFR ameliorates the commenters' concerns on these points, the IFR also addresses the commenters' related concern that future IJ performance metrics could exacerbate these issues.[81]

*Comments:* Commenters disputed the NPRM's justification that the limited review proceedings would increase efficiency in the asylum adjudication process. For example, commenters stated that IJs would have to divert resources from substantive adjudications to address a large number of motions or appeals resulting from confusion over the requirement that the applicant affirmatively request further IJ review within a short time period. Commenters suggested that this provision may also spark litigation and diversion of resources to correct injustices that would otherwise lead the United States to return refugees to persecution, in violation of nonrefoulement principles.

Commenters also remarked that the NPRM did not adequately explain why establishing an entirely separate process through the Asylum Office and courts would serve efficiency interests when those same officials would continue to be tasked with their current functions and duties. Commenters said that the Departments did not provide a meaningful rationale for why a separate procedure apart from section 240 proceedings was necessary to carry out efficient, just results for asylum seekers. Commenters suggested that it would be more efficient to place all applicants in section 240 proceedings, instead of the NPRM's IJ review procedure, because the novel proceedings would give rise to prolonged disputes about the introduction of new evidence to supplement the asylum officer's record or support prima facie eligibility for alternative relief. Commenters argued that motions that would increase under the NPRM would include motions to file additional evidence; motions to vacate the limited asylum-, withholding-, and CAT-only proceedings to pursue other relief or protection; and the inevitable cross-motions, motions to reconsider, interlocutory appeals to the BIA, motions to reopen, and petitions for review by U.S. Courts of Appeals. Commenters also asserted, generally, that challenges to expedited removal cases are already compounding the backlog of cases.

---

[81] EOIR no longer reviews IJ performance through individual IJ performance metrics. IJs are held to high ethical standards, in part, to avoid impropriety or the appearance of impropriety, which would include deciding cases consistent with performance metrics rather than applicable law and regulations. *See IJ Ethics and Professionalism Guide* (providing that IJs must be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance that the IJ is violating the law or applicable ethical standards); *see also EOIR Policy Manual,* Part II, ch. 1.3(c) (stating that IJs "strive to act honorably, fairly, and in accordance with the highest ethical standards").

*Response:* The IFR addresses nearly all of the commenters' concerns by providing that noncitizens whose applications are adjudicated but not granted by the asylum officer will now be placed in streamlined proceedings under section 240 of the Act, 8 U.S.C. 1229a.

The Departments emphasize that section 240 proceedings are the default, most common type of removal proceeding. This familiar framework safeguards due process interests by ensuring that noncitizens have certain rights and protections in such proceedings. *See* INA 240(b)(4), 8 U.S.C. 1229a(b)(4). The Departments believe that adhering to this statutory framework, but establishing procedural case-processing measures specific to this category of cases, will further the Departments' efficiency interests without undermining fairness in proceedings. Further, noncitizens in streamlined section 240 proceedings may apply for other forms of relief or protection without the need to first submit a motion to the IJ to vacate the asylum officer's order of removal, which would have been the case under the NPRM at 8 CFR 1003.48(d) (proposed). *See* 86 FR 46920. The IFR provides, at new 8 CFR 1240.17(k)(2), that a noncitizen will not be subject to the streamlined procedures if the noncitizen produces evidence of prima facie eligibility and the noncitizen is seeking to apply for, or has applied for, such relief or protection other than asylum, statutory withholding of removal, withholding or deferral of removal under the CAT, and voluntary departure.

*Comments:* Commenters asserted that the NPRM's IJ review procedure would violate the Act or is otherwise contrary to congressional intent.

First, commenters asserted that the Act requires that individuals in expedited removal who seek review of asylum officers' decisions not to grant asylum be placed in full section 240 removal proceedings. Commenters further stated that none of the statutory sections on which the NPRM relied displaces the statutory presumption of section 240 removal proceedings. Commenters stated that nothing in the Act suggests that Congress exempted from section 240 removal proceedings noncitizens seeking asylum who are determined to have credible fear, or any subset of that population.

Commenters argued that the Departments' statutory interpretation erroneously rests on the negative inference that section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), permits proceedings other than section 240 proceedings because that section does not explicitly require section 240 proceedings, as compared with section 235(b)(2) of the Act, 8 U.S.C. 1225(b)(2), which explicitly requires section 240 proceedings. Commenters asserted that reading is erroneous because section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), establishes a general rule that applicants for admission must be placed in section 240 removal proceedings. Commenters believe that section 235(b)(2)(B)(ii) of the Act, 8 U.S.C.1225(b)(2)(B)(ii), then creates an exception to that automatic entitlement for those defined as ''arriving'' in section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), because such individuals are placed in expedited removal. In sum, commenters generally assert that DHS screens 8 U.S.C. 1225(b)(1) applicants to determine which of the two statutorily established methods of removal will apply: Expedited removal for those without credible fear, or standard removal proceedings for those who establish credible fear. Commenters asserted that the statute has never been and cannot now reasonably be understood to exclude all (b)(1) applicants from a full removal hearing once they are no longer subject to the expedited removal process.

Commenters also disputed the Departments' interpretation of section 235(b)(2)(A) of the Act, 8 U.S.C. 1225(b)(2)(A), and statement that ''noncitizens whom DHS has elected to process into the United States using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings.'' 86 FR 46917. Commenters argue that a credible fear screening creates an exit from expedited removal proceedings, and, by design, those who establish credible fear are no longer subject to expedited removal. Thus, commenters concluded, the Departments' view that people seeking asylum can be forced into lesser proceedings in immigration court is contrary to law.

Commenters also believe that the legislative history of expedited removal demonstrates that Congress intended for all noncitizens found to possess a credible fear of persecution or torture to be afforded section 240 proceedings. Commenters stated that, in drafting the asylum statute and significantly amending the Act through IIRIRA, it is clear that Congress contemplated that asylum seekers would be afforded an opportunity to defend against deportation before an IJ in full section 240 proceedings, which include various procedural and due process safeguards.

Specifically, commenters cited the congressional record in support of their position. *See, e.g.,* 142 Cong. Rec. S4461 (1996) (statement of Sen. Alan Simpson) (''[T]he bill provides very clearly an opportunity for every single person[, even those] without documents, or with fraudulent documents . . . to seek asylum.'').

Commenters further argued that IIRIRA includes three levels of screening to ensure that asylum seekers are clearly identified so that genuine asylum seekers are not subject to the expedited procedures that apply to non-asylum seekers. In support, commenters referenced statements by the chief drafters of the law explaining that asylum seekers can be ordered removed only after full section 240 proceedings where they can submit evidence, call witnesses, and testify. *See, e.g.,* 142 Cong. Rec. S4492 (1996) (statement of Sen. Alan Simpson) (''If [asylum seekers] have credible fear, they get a full hearing without any question.''). Commenters also suggested that other provisions in the Act demonstrate congressional intent to place such applicants in section 240 removal proceedings. For example, commenters stated that at the same time Congress enacted expedited removal, Congress gave asylum seekers a full year to submit an initial application in recognition that asylum cases take time to prepare. Accordingly, commenters said that the NPRM contravened congressional intent by precluding access to section 240 removal proceedings for applicants not granted asylum following a positive credible fear interview.

On the other hand, some commenters objected to the NPRM on the basis that it would extend the credible fear and review process further than Congress intended. Specifically, these commenters asserted that the additional review by the asylum officers and within USCIS undermined congressional intent for the expedited removal process to be truly expedited. In support, commenters cited Congress's statutory scheme to limit the administrative review of expedited removal orders and limit judicial review of determinations made during the expedited removal process. *See* INA 242, 8 U.S.C. 1252. Commenters concluded that creating additional levels of review would slow the credible fear process, waste administrative resources, and run counter to Congress's legislative aims.

Commenters stated that the restrictions on IJs in the NPRM's limited proceedings would conflict with the IJ's role to develop the record before the

court. Commenters stated that the Act and its implementing regulations require IJs to take an active role in section 240 removal proceedings to develop the record and ensure that applicants are advised of the nature of the proceedings, as well as their rights and responsibilities therein. *See, e.g., Abdurakhmanov* v. *Holder,* 735 F.3d 341, 346 n.4 (6th Cir. 2012) ("An IJ has . . . an obligation[ ] to ask questions of the [noncitizen] during the hearing to establish a full record . . . . [The questioning] should be designed to elicit testimony relevant to the fair resolution of the [noncitizen's] applications."); *Toure* v. *Att'y Gen.,* 443 F.3d 310, 325 (3d Cir. 2006) ("[A]n IJ has a duty to develop an applicant's testimony, especially regarding an issue that she may find dispositive . . . ." (citing *Matter of S–M–J–,* 21 I&N Dec. at 723– 26)). Commenters stated that this duty differentiates IJs from Article III judges but is consistent with other types of administrative proceedings. Commenters explained that in the immigration context, courts have recognized that unique features of immigration court proceedings require IJs to fill this role to ensure fair and accurate adjudications.

In addition, commenters stated that the NPRM's IJ review procedure would conflict with the United States' international obligations, including nonrefoulement, because it would diminish the significance of immigration court review as a safeguard. On the other hand, commenters stated that the protections afforded to applicants in section 240 proceedings comport with UNHCR guidance emphasizing that the asylum adjudicator's role is to "ensure that the applicant presents his case as fully as possible and with all available evidence." *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 205(b)(1) (2019), *https://www.unhcr.org/en-us/ publications/legal/5ddfcdc47/ handbook-procedures-criteria- determining-refugee-status-under-1951- convention.html* (last visited Mar. 5, 2022). Commenters also expressed concerns that the NPRM would effectively penalize asylum seekers based on their manner of entry—in violation of Article 31 of the Refugee Convention—as the NPRM would apply only to persons who have sought asylum at or after recently crossing the border.

*Response:* The Departments have considered commenters' concerns that the NPRM's proposal that noncitizens not granted asylum by the asylum officer would immediately be ordered removed, with the opportunity to seek IJ review through a newly created proceeding, would violate congressional intent, the Act, and international obligations. Through this IFR, noncitizens not granted asylum by the asylum officer instead will be referred to streamlined section 240 proceedings before an IJ. While the Departments are establishing procedural steps to ensure the efficient disposition of these cases, noncitizens in streamlined section 240 proceedings established by the IFR are entitled to the same general rights and protections as noncitizens in section 240 proceedings. *See, e.g.,* INA 240(b)(4), 8 U.S.C. 1229a(b)(4) (setting forth noncitizens' rights in proceedings). This shift generally resolves the commenters' concerns on these points by returning to the use of section 240 proceedings and affirming the role of the IJ as the adjudicator, while still ensuring that the proceedings are completed expeditiously.

The Departments disagree, however, with commenters' argument that the NPRM violates congressional intent to create an efficient expedited removal process by proposing an additional layer of adjudication and review by the asylum officer. Specifically, the Departments believe that the commenters' concerns erroneously conflate expedited removal of noncitizens who have not demonstrated a credible fear of persecution or torture with the separate process that occurs for noncitizens who have established a credible fear of persecution or torture. The Act makes clear that most noncitizens who are arriving in the United States, if inadmissible under certain provisions of the Act, will be removed "without further hearing or review." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). The Act carves out one exception to this general rule: If the noncitizen indicates a fear of persecution or torture or an intention to apply for asylum, rather than face immediate removal, the noncitizen will instead be interviewed by an asylum officer to determine whether the noncitizen has a credible fear of persecution. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). If, during the interview, the noncitizen does not demonstrate a credible fear, the Act again calls for the noncitizen's immediate removal "without further hearing or review." INA 235(b)(1)(B)(iii)(I), 8 U.S.C. 1225(b)(1)(B)(iii)(I).[82] This IFR does not

make any significant changes to the implementing regulations for these statutory provisions.

Although the initial screening process is intended to be expedited, once a noncitizen is determined to have a credible fear of persecution or torture, the Act no longer calls for the noncitizen's removal without further hearing or review. Rather, it establishes that the noncitizen's application for asylum shall be given "further consideration." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii).[83] The Act does not specify the contours of or the appropriate speed at which such further consideration should occur before a noncitizen receives a final adjudication.

The Departments believe that the "further consideration" directed by Congress reasonably encompasses establishing a procedure under which an asylum officer adjudicates the asylum application in the first instance and, if the application is not granted, refers the noncitizen to streamlined section 240 proceedings. The Departments believe that this procedure will be more efficient than the current lengthy process in which noncitizens are referred directly to section 240 proceedings, both because cases that can readily be granted by the asylum officer will be removed from the docket, and because cases referred to the immigration court will arrive in immigration court with the benefit of a record assembled by the asylum officer that enables these section 240 proceedings to be substantially streamlined, as outlined above in Section III of this preamble.

Commenters' references to provisions of the Act that limit judicial review of decisions made during the initial screening process—*i.e.,* whether there is expressed or established credible fear of persecution or torture—are inapposite because those provisions only limit judicial review of decisions made during that initial screening process. The Departments' view is that Congress did not eliminate or limit judicial review in cases involving noncitizens determined to have credible fear just because they were initially screened as possible candidates for expedited removal. *See Thuraissigiam,* 140 S. Ct. at 1965 ("Applicants can avoid

---

[82] Although the Act states that, under these circumstances, the noncitizen will be removed without further hearing or review, the Act also provides for a very limited IJ review of the asylum officer's determination that the noncitizen does not have a credible fear of persecution or torture. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). The IJ's decision reviewing the asylum officer's credible fear determination is final and not subject to reconsideration or appeal. 8 CFR 1208.30(g)(2)(iv)(A).

[83] For further discussion regarding the legal authority for the NPRM, see Section II.B of this preamble.

expedited removal by claiming asylum . . . . If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing.'' (footnotes omitted)).

*Comments:* Commenters emphasized the importance of judicial review for adjudicating applications for asylum or protection, particularly for marginalized groups, and expressed concern that the NPRM would not sufficiently protect the right to judicial review.

Commenters suggested placing applicants whose claims are adjudicated but not granted by an asylum officer in section 240 proceedings rather than a new proceeding to ensure judicial review and avoid potential future litigation about the Federal courts' jurisdiction over these cases. While commenters primarily advocated for section 240 proceedings, they also recommended additional ways to improve the NPRM's proceedings to ensure adequate judicial review, such as, for example, amending the rule so that the IJ, not the asylum officer, would issue a removal order. The noncitizen could then appeal the IJ's decision to the BIA and seek judicial review of the BIA's decision.

In contrast, other commenters disagreed that further changes are needed to protect judicial review and emphasized that the NPRM does not alter any current safeguards for individuals seeking asylum or protection. The commenters reiterated that those who are not granted asylum, withholding of removal, or protection under the CAT by an asylum officer would still have the option to have their cases heard by the immigration court, which would be a second level of review.

*Response:* The Departments agree with commenters that the Departments' procedures must ensure the right to judicial review of adjudications of applications for asylum or protection. Judicial review ensures fairness and accuracy in immigration proceedings, and Congress specifically sought to ensure review remained available for asylum applications while otherwise limiting review over other types of decisions. *See* INA 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii) (Congress limiting judicial review of agency decisions regarding discretionary forms of relief "other than the granting of relief under [INA 208(a),] section 1158(a) of this title.").

Regarding commenters' concerns that the procedure proposed in the NPRM might not allow for further judicial review, the Departments disagree with

that view and, in any case, emphasize that the process has been revised as described above in Section III of this preamble so that noncitizens whose applications are adjudicated but not granted by the asylum officer will be issued an NTA and placed in streamlined section 240 proceedings. As with all section 240 removal proceedings, a noncitizen may first appeal the IJ's decision to the BIA, 8 CFR 1240.15, and then appeal the BIA's decision to a Federal circuit court, INA 242, 8 U.S.C. 1252. In addition, under the IFR, the IJ issues the removal order, if applicable, rather than the asylum officer, consistent with some commenters' suggestions. The changes under this IFR demonstrate the Departments' continued commitment to fair adjudications, and address commenters' concerns regarding the need to ensure the availability of judicial review.

The Departments are committed to maintaining longstanding procedural protections inherent in section 240 proceedings for noncitizens subject to the expedited removal process and subsequently determined to have a credible fear of persecution or torture. The Departments acknowledge that some commenters supported the NPRM's approach, and the Departments believe that the IFR will maintain the efficiencies and benefits provided for in the NPRM through the implementation of the new streamlined 240 removal proceedings.

b. De Novo Review of Full Asylum Hearing Record and Consideration of Additional Testimony and Evidence

*Comments:* Commenters disputed the NPRM's characterization of the proposed IJ review proceedings as "de novo," stated that use of the term "de novo" is "paradoxical" and "misleading," and said that the proposed IJ review process may violate asylum seekers' due process rights. Commenters said that any standard of review other than a true de novo review would be inconsistent with the challenges associated with the effects of trauma, gathering evidence, and the asylum officers' previous role in granting or referring cases, not denying applications for asylum.

Commenters stated that, while 8 CFR 1003.48(e) as proposed in the NPRM referred to the review by the IJ as "de novo," the use of the phrase "de novo" appears to be misplaced. Commenters further stated that the current review proceedings for affirmative asylum applicants referred to immigration court, in which the IJ holds a new hearing and issues a decision

independent from the asylum officer, are considered de novo review. On the other hand, commenters noted that, while the NPRM calls the new proceedings de novo, the IJ would not be required to conduct a new hearing independent of the asylum officer's decision. The commenters said a "de novo" hearing would typically treat a case as if it were being heard for the first time, but the NPRM limits the scope of "de novo" hearings by imposing evidentiary restrictions and limiting the IJ review to the transcript of the interview. Similarly, commenters also opposed the NPRM's use of the term "shall" when directing the IJ to review the asylum officer's decision and use of the term "may" when directing the IJ to consider additional evidence. Commenters explained that such terms impute an improper deference to the asylum officer's decision and limit the applicant's ability to supplement the record.

At least one commenter expressed concern that the IJ's review of the asylum officer's decision would become similar to IJ review of asylum officers' credible fear interview decisions, which commenters disputed was a de novo review.

*Response:* First, the Departments clarify that de novo review is a "court's nondeferential review of an administrative decision, usu[ally] through a review of the administrative record plus any additional evidence the parties present." *Review, de novo review,* Black's Law Dictionary (11th ed. 2019). De novo review does not mean, as some commenters suggested, that proceedings must begin anew without reference to the underlying decision (indeed, this construction would undermine the entire concept of a review) or with unlimited opportunities to submit new record evidence. *Id.* ("[N]ondeferential review of an administrative decision" usually involves review of the "administrative record" and "additional evidence" presented by the parties.).

For example, the BIA conducts de novo review of legal questions, even though it generally may not consider new record evidence. *See* 8 CFR 1003.1(d)(3)(ii) ("The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo."). The de novo review standard permits the BIA to draw legal conclusions without deference to the IJ's decision, based upon the record before it. By contrast, the BIA may only overturn an IJ's finding of fact where, based upon the existing record, the IJ's

finding was "clearly erroneous." *See* 8 CFR 1003.1(d)(3)(i).

In sum, the distinction between de novo review and other standards of review, such as clear error, is not based upon whether parties may submit additional record evidence, but rather how much deference the adjudicator must give to the underlying determinations based upon the existing record evidence. Accordingly, commenters' implications that a credible fear review under 8 CFR 1208.30(g) is not a de novo review are inaccurate. De novo review is a widely used standard of review in immigration proceedings and, under the IFR, IJs will conduct de novo review of asylum officer decisions as described at new 8 CFR 1240.17(i).

Second, the Departments emphasize that commenters' concerns regarding the submission of evidence under the NPRM are ameliorated by the IFR's shift from the limited review proceedings to streamlined section 240 proceedings as discussed above in Section III of this preamble. Specifically, under the IFR, either party may submit record evidence and request to present testimony, pursuant to new 8 CFR 1240.17(f)(2)(i) and (ii). The IFR directs IJs to review an asylum officer's decision de novo, *see* new 8 CFR 1240.17(i), and the admission of evidence is governed by an evidentiary standard consistent with that currently used in section 240 proceedings. Given the shift to that evidentiary standard, the IFR does not contain the language stating that the IJ "may" accept additional evidence.

*Comments:* Multiple commenters expressed due process concerns associated with the NPRM's proposed de novo review proceedings before an IJ, in particular with the limitations that any additional testimony or documentation reviewed by the IJ must be "necessary" and "not duplicative." Overall, commenters stated that the NPRM seemed to eliminate or dilute longstanding procedural rights that noncitizens have had in section 240 removal proceedings. Commenters stated that the NPRM would deprive many asylum seekers of a meaningful opportunity to present their full story because a full examination would not occur before asylum officers, and evidentiary hearings before an IJ would generally be foreclosed. Commenters explained that this outcome is particularly inappropriate in situations where an IJ denies an application on the basis of an adverse credibility finding.

Some commenters stated that the Departments appeared to contemplate that the asylum seeker would not ever appear before the IJ in most cases

because the IJ would simply issue a decision based on the IJ's review of the asylum officer's record. Commenters compared this alleged limitation to EOIR's Case Flow Processing policy, which commenters stated limits master calendar hearings. Commenters explained that this hearing limitation essentially gives the IJ an appellate review role but deprives the asylum seeker's counsel from providing briefing to the IJ. One commenter stated that depriving asylum seekers of an evidentiary hearing would be "overkill" because the new proceedings outside of section 240 proceedings already would save significant time for IJs by narrowing the legal issues to be decided and shrinking the scope of relief or protection.

Commenters stated that the nature of the hearings before the IJ would exacerbate rather than correct issues that may arise in the proceedings before the asylum officer because the hearing before the IJ is one in which the IJ reviews the record already created by USCIS. For example, commenters claimed the record would be sparse and unlikely to reflect a full accounting of the harm, persecution, or torture the asylum seeker experienced. Commenters alleged that the cumulative effect of this limitation as well as the evidentiary limitation would be to extend summary removal from the stage of threshold contact through the period when the claim is disposed of on the merits. At a minimum, commenters urged that the NPRM be revised to permit the taking of fresh testimony and the submission of new evidence to the IJ upon a proper showing.

Further, commenters disputed that the NPRM's proposed procedure would result in a "complete" record. One commenter alleged that the proposed nonadversarial procedures would relegate attorneys to "passive observer status" and prevent them from developing "critical elements" of a record, usually developed through presenting testimony, calling witnesses, or submitting documentary evidence.

Also, regarding the evidentiary rules in the application review proceedings before the IJ, commenters said it is unclear whether an IJ would be required to give notice and an opportunity to provide additional evidence before summarily affirming the asylum officer's decision. Commenters said the Ninth Circuit has long held that the IJ must give the asylum applicant notice of the evidence required and an opportunity to provide it if the IJ believes further corroborating evidence is required to support an otherwise credible application. However, the

commenters continued, there is no similar process for asylum interviews, which generally occur in one day, with all evidence required to be submitted prior to the interview.

Commenters said that IJs would need additional training in order to preserve fairness and due process, given the distinct nature of reviewing interview transcripts. Commenters expressed concern that the NPRM did not adequately consider what this training may involve, but commenters urged the Departments to develop this training before enacting a final rule.

Commenters said it is reasonable to expect that many asylum seekers would want to provide supplemental evidence and recommended that the Departments provide further assurances that asylum seekers would be able to do so and are entitled to a comprehensive review of their case before an IJ.

To comport with due process and minimize the risk of refoulement, commenters asserted that the NPRM should prohibit pretermission by IJs based solely on the asylum officer's record and should instead specify a presumption of admissibility of new evidence and eliminate the requirement that parties must file motions to supplement the record.

*Response:* As described above, the Departments have decided to refer all noncitizens whose applications are adjudicated but not granted by the asylum officer to streamlined section 240 removal proceedings rather than implementing the IJ review procedure proposed in the NPRM. As part of the streamlined section 240 removal proceedings, the Departments are not proposing to apply a novel evidentiary standard, and, instead, will adopt an evidentiary standard consistent with that used in section 240 removal proceedings. Parties to proceedings are familiar with this standard, and IJs have experience in its application. Further, while streamlined section 240 removal proceedings under this IFR include certain procedural requirements to maintain the expedited nature of the overall process, noncitizens will be assured the longstanding due process rights inherent in section 240 removal proceedings.

The Departments emphasize that this decision not to adopt the NPRM's proposed evidentiary restrictions will not reduce the efficiencies the Departments sought in the NPRM. In fact, as previously explained, the Departments believe that the IFR's streamlined section 240 removal proceedings will be equally as effective as the NPRM's proposed IJ review proceedings in enhancing efficient

adjudication and replacing time-consuming evidentiary hearings. For example, the IFR provides that the asylum officer's record will be automatically transmitted upon DHS's issuance of an NTA, which will expedite the parties' ability to narrow the issues and assist the IJ's review of the case. The IFR also provides that if neither party requests to present testimony, or if the IJ determines that the asylum application can be granted without hearing testimony, and DHS does not request to present evidence or witnesses or to cross-examine the noncitizen, the IJ can decide the case without a hearing. The IFR also provides various deadlines and procedural measures to ensure efficient processing that preclude the need to conduct a full evidentiary hearing or otherwise facilitate a more efficient hearing.

The Departments disagree with commenters that noncitizens will be deprived a meaningful opportunity to present their claims to asylum officers. Asylum officers conduct interviews with the purpose of "elicit[ing] all relevant and useful information bearing on the applicant's eligibility for asylum." 8 CFR 208.9(b). Asylum officers receive specialized training and information in order to carry out their duties with professionalism and competence. *See* 8 CFR 208.1(b). Asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses, engaging with counsel, and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. As described in the NPRM, asylum officers will "develop[ ] and consider[ ] the noncitizen's claim fully, including by taking testimony and accepting evidence, during the nonadversarial proceeding." 86 FR 46918. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. Thus, the hearing before the asylum officer functions as an evidentiary hearing, as the applicant is required to "provide complete information regarding the applicant's identity, including name, date and place of birth, and nationality, and may be required to register this identity." 8 CFR 208.9(b). Further, the noncitizen may have counsel or a representative present, present witnesses, and submit affidavits of witnesses and other evidence. *Id.*

Noncitizens who are placed in the new process established by this IFR will have multiple opportunities to provide information relevant to their claims before USCIS asylum officers in nonadversarial settings, and at different stages will have the opportunity for an IJ to review or consider their asylum claim de novo.

Further, the Departments disagree with commenters that IJs need special training to review transcripts. IJs regularly review hearing notes and records from USCIS, transcripts of hearings that indicate a criminal conviction, and transcripts of oral decisions that are appealed to the BIA. *See, e.g.,* 8 CFR 1003.5(a) (transcripts for the BIA); 8 CFR 1003.41(a)(4) (criminal hearing transcripts); *see also EOIR Policy Manual,* Part VIII, Ch. VIII.3.A: Uniform Docketing System Manual (providing process under which IJs must review oral decisions and transcripts through eTranscription); *Operating Policies and Procedures Memorandum* ("OPPM") *84–9: Processing Hearing Transcriptions* (Oct. 17, 1984) (transcripts from USCIS). In light of established DOJ guidance, as well as the general presumption of administrative regularity, the Departments are confident that IJs will continue their work with professionalism and competency. *See Chem. Found.,* 272 U.S. at 14–15; *see also IJ Ethics and Professionalism Guide.*

Regarding comments on pretermission—that is, the practice of denying applications on the papers without hearing an applicant's testimony because the IJ concludes that the applicant has not made a prima facie case for the relief or protection sought—to the extent that commenters refer to pretermission of asylum applications under the separate Global Asylum rule, that rule is currently enjoined.[84] The NPRM and this IFR do not rely on or involve that rule's discussion of pretermission of asylum applications. If commenters are alleging that the NPRM's IJ review proceedings would effectively result in pretermission, the Departments disagree but emphasize that, as described above in Section III of this preamble, this IFR revises the NPRM to provide streamlined section 240 proceedings with certain procedural requirements in new 8 CFR 1240.17 that include, in part, the submission of additional evidence. In addition, as provided in new 8 CFR 1240.17(f)(4)(i)–(ii), an IJ may not determine the noncitizen's eligibility for relief in these proceedings without a hearing unless

the noncitizen does not wish to testify or the IJ determines that the application can be granted. Accordingly, the Departments find that commenters' concerns with pretermission under the Global Asylum rule, which would have allowed an IJ to pretermit and deny an application, are addressed by the procedures set out in the IFR. The IFR does not disturb the evidentiary standard applicable in section 240 removal proceedings.

*Comments:* One commenter stated that the criteria for a noncitizen to supplement the record before the IJ—whether evidence is "duplicative" or "necessary"—is a "fuzzy concept" and others argued that the standard may implicate due process violations or cause delay. Commenters urged the Departments to describe clearly what evidence and testimony is "necessary" and "not duplicative" to develop the factual record and to specify that the threshold to meet these standards is low.

For example, one commenter explained that "duplicative" can mean "effectively identical," and it can mean "involving duplication" to some lesser degree. In the latter sense, the commenter explained that it means "*unnecessarily* doubled or repeated," which would likely be subjective. The commenter said the NPRM provides no basis for determining what is "duplicative."

Likewise, commenters stated that the NPRM provides no guidance on what new testimony or documentation may be "necessary." For example, one commenter stated that much evidence that is relevant or critical can be seen as not "necessary" to "a reasoned decision." Moreover, commenters alleged that a strict reading of the "necessity" requirement could be mandated by future decisions of the Attorneys General and would turn IJs into reviewers of a record created by the asylum officer. Thus, commenters explained, the NPRM threatens to turn an immigration court proceeding in this context into one that is adversarial in name only, with a concomitant loss of faith in the integrity of the process.

Commenters stated that, given that the rules of evidence do not apply in immigration court, the interpretation of the evidentiary standards would be left to each individual IJ. Commenters stated that, based on their experience, IJs would have widely different interpretations, leading to inconsistent application and confusion among applicants and counsel. Other commenters explained that the NPRM creates a new, unknown standard in immigration court proceedings rather

---

[84] *See supra* note 4 (discussing recent regulations and their current status).

than relying on the longstanding discretionary authority of IJs to conduct and control the nature of the proceedings. One commenter found "enormous discrepancies" among IJs' handling of discretionary motions.

At least one commenter alleged that many courts along the Southwest border would be antagonistic to a discretionary motion like that contemplated by the NPRM. The commenter said the pressure, volume of cases, and speed required of IJs along the border make it far less likely that the IJs would look upon these motions favorably.

Commenters stated that pro se individuals, in particular, may hesitate to submit additional evidence out of fear that it will be rejected as duplicative or unnecessary.

Commenters stated that the NPRM lacked guidance for adjudicators on these terms and would lead to further delay because the parties would litigate the issue of admissibility of evidence. Commenters further stated that this litigation would also make judicial review of the determination to exclude evidence virtually impossible.

Commenters stated that the NPRM does not specify what an asylum officer's decision must contain, such that an incomplete or undeveloped asylum application record might pass muster at the IJ level. One commenter stated that it is unclear how IJs "will explain in court the standards for submitting additional testimony and documentation" if IJs merely conduct a paper review "solely on the basis of the record before the asylum officer." Thus, commenters urged the Departments to specify when and how IJs would provide this explanation to noncitizens and mandate that the IJ explain the standard in all cases, rather than on a discretionary basis.

*Response:* As described above in Section III of this preamble, the Departments have decided to refer noncitizens whose applications for asylum are not granted by the asylum officer to streamlined section 240 removal proceedings rather than implementing the IJ review proceedings proposed in the NPRM. As part of the streamlined section 240 proceedings, the Departments are no longer proposing to apply the NPRM's evidentiary standard, but, instead, as provided in new 8 CFR 1240.17(g)(1), will apply an evidentiary standard consistent with that applied in section 240 proceedings. *See* 8 CFR 1240.7(a); *see also Matter of D–R–,* 25 I&N Dec. 445, 458 (BIA 2011) ("In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is

fundamentally fair." (quotation marks and citation omitted)); *Matter of Interiano-Rosa,* 25 I&N Dec. 264, 265 (BIA 2010) ("[IJs] have broad discretion to conduct and control immigration proceedings and to admit and consider relevant and probative evidence.").

Parties to proceedings are familiar with this standard, and IJs have experience in its application. Accordingly, the Departments find that this change addresses commenters' concerns with the NPRM's evidentiary standard, including the potential for its inconsistent application, negative impacts on pro se individuals, the need for corresponding guidance for adjudicators, and the need for clarity regarding how noncitizens would be informed of the new standard. The IFR does not disturb the current evidentiary standard for section 240 removal proceedings.

Nevertheless, in response to commenters' concerns about IJs' inconsistent application of evidentiary standards and discretionary motions determinations, the Departments emphasize that IJs exercise independent judgment and discretion in adjudicating cases before them. *See* 8 CFR 1003.10(b); *see generally IJ Ethics and Professionalism Guide* (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards). IJs will continue to interpret and apply applicable law and regulations, regardless of geographic location or caseload.

In response to comments that the NPRM could result in the adjudication of allegedly incomplete or undeveloped asylum applications, the Departments first emphasize that asylum officers receive thorough training and regularly adjudicate affirmative applications for asylum. *See* 8 CFR 208.1(b), 208.14. Every case presents a unique set of facts, but asylum officers are trained to elicit "all relevant and useful information bearing on whether the [noncitizen] can establish credible fear" of persecution or a reasonable possibility of torture during the interview, which forms the basis of the decision. 8 CFR 208.30(d). Under the IFR in new 8 CFR 1240.17(c), asylum officers also provide numerous documents to the IJ. Also, under the IFR, in credible fear determinations, the asylum officer must provide to the IJ a written record of the determination, including copies of the asylum officer's notes, a summary of the material facts as stated by the applicant, any additional facts relied on by the asylum

officer, and the asylum officer's determination of whether, in light of such facts, the noncitizen established a credible fear of persecution or torture. 8 CFR 208.30(e)(1), (f), (g). Under new 8 CFR 1240.17(c) and (e), and 8 CFR 208.9(f), from the Asylum Merits interviews, the asylum officer must provide to the IJ all supporting information provided by the noncitizen, any comments submitted by the Department of State or DHS, any other unclassified information considered by the asylum officer in the written decision, and a verbatim transcript of the interview. Notwithstanding these requirements, under the IFR in new 8 CFR 1240.17(f)(2)(i)(A), and (g), the noncitizen may submit additional evidence or testimony, consistent with the applicable evidentiary standard, to supplement the record during any subsequent IJ review. Considering all this information, the Departments disagree with the assertion that an IJ would make a decision based on an "incomplete" or "undeveloped" record, as commenters alleged.

*Comments:* Multiple commenters said that the NPRM's process and evidentiary standards would allow IJs to review an interview transcript and concur with asylum officers' decisions to not grant asylum with little due process (so-called "rubber-stamping") and without meaningful participation by asylum seekers' counsel. Commenters alleged that the requirement that litigants make an initial showing that evidence is new and not duplicative would allow IJs to "rubber-stamp" the asylum officer's negative determination. One commenter was especially concerned that the IJ decisions would be based on "severely truncated hearings," where asylum seekers do not have a right to counsel, are not allowed to present testimony or evidence, and where asylum officers take often incomplete and incorrect notes. Commenters stated that the NPRM contained no provision by which an applicant may challenge a negative decision by the IJ to exclude additional evidence, which could lead to a "rubber-stamp" of the underlying asylum officer's decision to not grant asylum. Similarly, one commenter said that the NPRM would essentially allow the alleged current "disturbing practice" of IJs "rubber stamping" credible fear reviews to "bleed over" into the merits process.

Commenters stated that if the IJ listened to the recording of the interview before the asylum officer rather than waiting for a transcript of the interview, the entire process could be completed within a few days or

weeks of the asylum seeker's arrival in the United States, similar to other procedures under the prior Administration. Some commenters alleged that nothing in the NPRM would require an IJ who rejects testimony or other evidence to give a reasoned explanation for that decision, which could allow IJs who may have a propensity to deny claims the procedural opportunity to do so. Commenters said that IJs would have little incentive under the NPRM to permit inclusion of additional evidence and may opt to exclude evidence if there are any indicia that the facts were already in the administrative record. Commenters remarked that, as the NPRM acknowledges, IJs are overburdened with overflowing dockets. As a result, commenters argued, IJs would be inclined to deny requests for submission of additional evidence or testimony on even a vague finding that the submissions would be duplicative or unnecessary. One commenter said the NPRM would thus perpetuate what the commenter characterized as the deterioration of the immigration court system as a "rubber-stamping tool" for removal orders issued by DHS and upend the purpose of the courts.

Commenters stated that applicants with additional evidence should not be hindered by evidentiary limitations, especially given that, as alleged by commenters, case completion quotas provide IJs with incentives to adjudicate claims as quickly as possible. Likewise, commenters said that IJ performance metrics compound concerns that IJs would have a disincentive to find a need for evidentiary hearings when asylum cases are not granted. Commenters said the performance metrics are deeply problematic because they create financial incentives for IJs to prize speed over fairness. Commenters stated that over 40 percent of IJs have been on the bench for fewer than five years, and many have backgrounds in criminal prosecution or the military and need to learn the increasingly complex procedural and substantive immigration rules on the job. The commenters said these relatively new IJs would be placed in a role of appellate review of decisions rendered by asylum officers who also will have been newly hired. This combination of fewer due process rights in eliciting testimony by new asylum officers with appellate-type review by relatively new IJs would not provide adequate protection to asylum seekers.

Commenters stated that some IJs depart markedly from the average asylum grant rates in their own courts, rejecting more than 90 percent of asylum claims in non-detained cases. In addition, those commenters explained that IJs' asylum grant rates are significantly influenced by factors other than the merits of the cases, such as the gender and prior prosecutorial experience of the IJ. Commenters were therefore concerned that some IJs may likewise summarily or arbitrarily deny asylum applicants the opportunity to testify, thereby pretermitting their appeals.

Commenters asserted that the evidentiary restrictions during IJ review are particularly problematic in light of alleged problems, based on political influence, with the country conditions information available to the asylum officers who would be tasked with making the record the IJ would review. In other words, at least one commenter stated, if applicants are denied a full and fair opportunity to present evidence that challenges the country conditions information underlying the asylum officer's decision to not grant asylum or protection, IJs may "rubber-stamp" decisions that are based on inaccurate information resulting from impermissible political considerations.

*Response:* As described above, the IFR, in new 8 CFR 1240.17, revises the process so that noncitizens whose applications for asylum are not granted following the Asylum Merits interview are referred to streamlined section 240 removal proceedings, rather than implementing the novel IJ review procedure proposed by the NPRM. As part of this change, the Departments are no longer proposing evidentiary standards like those in the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Rather, the IFR adopts an approach consistent with the current evidentiary standard for section 240 removal proceedings; subject to the applicable deadline in streamlined section 240 proceedings, IJs may exclude additional evidence only if it is not relevant, probative, or timely or if its use is fundamentally unfair. In other words, unlike the NPRM, the IFR does not require the IJ to make a novel threshold determination regarding the need for the evidence. In addition, the noncitizen will have the privilege of being represented by counsel at no expense to the Government during proceedings before the IJ if the noncitizen chooses. INA 292, 8 U.S.C. 1362.[85] Further, unlike the NPRM, this IFR specifically contemplates that the IJ will, if necessary, conduct hearings to narrow the issues and take testimony or further evidence, as provided in new 8 CFR 1240.17(f)(4). These features of streamlined section 240 removal proceedings preclude the possibility that an IJ would simply "rubber-stamp" an asylum officer's asylum decision, as commenters alleged.

Regarding commenters' concerns with the process of IJs' credible fear reviews, the IFR returns the credible fear screening process to that which was in effect prior to the regulatory changes made between 2018 and 2020. *See generally* 8 CFR 208.30. The DOJ regulations at 8 CFR 1003.42 and 1208.30(g)(2) provide an extensive process through which an IJ reviews a negative credible fear determination. IJs exercise independent judgment and discretion and follow applicable laws and regulations in credible fear reviews, and they would continue to do so under this rule. *See, e.g., IJ Ethics and Professionalism Guide* (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards).

More specifically, the Departments reject commenters' contentions that IJs currently "rubber-stamp" asylum officer's negative credible fear determinations and that such practice would carry over into an IJ's review of an asylum officer's decisions under the NPRM or the IFR. Under 8 CFR 208.30(d)(4) of DHS's regulations, which the NPRM did not propose to amend, noncitizens may consult with a person or persons of their choosing before the interview, contrary to commenters' allegations that noncitizens have no right to counsel. Upon an exercise of USCIS's discretion, that person or persons may be present at the interview and may present a statement at the end of the interview. 8 CFR 208.30(d)(4). Further, noncitizens may "present other evidence, if available," *see id.,* contrary to commenters' allegations that noncitizens may not present testimony or evidence. The Departments also disagree with commenters' allegations that asylum officers take "often incomplete" or "incorrect" notes. Asylum officers receive extensive training and possess expertise, *see* 8 CFR 208.1(b); INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), and the Departments are confident in the asylum officers' ability to carry out their duties in accordance with all applicable statutes and regulations. Further, this IFR provides that the record from the Asylum Merits interview will include a verbatim transcript of the interview before the asylum officer, obviating the need for IJs

---

[85] To be sure, the NPRM proposed that noncitizens would have the same privilege. *See* 8 CFR 1003.12 (proposed), 1003.16; *see also* 86 FR 46919.

to rely exclusively on asylum officers' notes.

The Departments also disagree with commenters who recommended IJs review recordings of the Asylum Merits interviews instead of verbatim transcripts as a way to increase efficiency. The Departments prefer the review of transcripts considering their clarity, ease of use, and increased specificity in citations. Further, the Departments disagree that listening to a recording would save a significant amount of time compared to reviewing a transcript. For these reasons, the IFR includes the transcript alone in the record that is referred to the IJ for use in subsequent streamlined 240 removal proceedings.[86]

Although the Departments believe that this IFR addresses commenters' concerns about "rubber-stamping" because it provides for streamlined section 240 removal proceedings rather than the NPRM's IJ review procedure and associated standard for the submission of evidence, the Departments dispute commenters' allegations that IJs would reject evidence or refuse to hold an evidentiary hearing based on performance metrics or other bases unrelated to the specifics of an individual proceeding. IJs independently adjudicate each case by applying applicable law and regulations, not by considering performance metrics. 8 CFR 1003.10(b) (providing that IJs "may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases"). In addition, EOIR no longer reviews IJ performance through individual judge performance metrics. IJs are held to high ethical standards in part to avoid impropriety or the appearance of impropriety, which would include deciding cases consistent with performance metrics rather than applicable law and regulations. *See also IJ Ethics and Professionalism Guide* (providing that IJs must be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance that the IJ is violating the law or applicable ethical standards); *see also EOIR Policy Manual,* Part II, ch. 1.3(c) (stating that IJs "strive to act honorably, fairly, and in accordance

with the highest ethical standards"). Likewise, the Departments do not share the commenters' concerns with IJs' professional experience or diverse backgrounds. IJs are selected on merit with baseline qualifications, including possession of a J.D., LL.M., or LL.B. degree; active membership in a State bar; and seven years of experience as a licensed attorney working in litigation or administrative law. IJs receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary. IJs are also expected to maintain professionalism and competence in the law.[87] Likewise, the Departments reject commenters' implications that newly hired asylum officers are less competent or professional than IJs. As explained earlier in Section IV.B.2.a of this preamble, asylum officers are selected based on merit, receive extensive training, and possess expertise in determining eligibility for protection. The Departments are confident in asylum officers' ability to carry out their duties in accordance with all applicable statutes and regulations.

The Departments disagree with commenters' use of asylum grant rates to imply that IJs with low grant rates make arbitrary decisions or are influenced by factors outside of the merits of the case. An individual IJ's grant rate may be affected by factors outside the IJ's control. For example, an IJ assigned to a detained docket will generally have a higher percentage of applicants who are ineligible for asylum due to criminal convictions compared with an IJ who is assigned to a nondetained docket. The Departments reiterate the ethical and professional standards to which IJs are held, discussed above, which would preclude arbitrarily or summarily denying noncitizens the opportunity to testify or considering improper factors in a case, as commenters alleged. IJs are required to adjudicate cases in an impartial manner based on their independent judgment and discretion, applying applicable law and regulations. 8 CFR 1003.10(b).

Overall, commenters' accusations of bias or impropriety that would lead to due process violations are insufficient to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow* v. *Larkin,* 421 U.S. 35, 47 (1975). The Departments are confident in the competency, integrity, and professionalism of IJs and asylum officers in providing due process of law to all noncitizens before them. Further, if a noncitizen believes that an IJ has

acted improperly or otherwise prejudiced the proceeding, the noncitizen may appeal the IJ's decision to the BIA, 8 CFR 1240.15, and in turn appeal the BIA's decision to a Federal circuit court, INA 242, 8 U.S.C. 1252. *See also Avendano-Hernandez* v. *Lynch,* 800 F.3d 1072, 1075 (9th Cir. 2015) (remanding the case and stating that the IJ "exhibit[ed] some of the same misconceptions about the transgender community that [the noncitizen] faced in her home country" by failing "to recognize the difference between gender identity and sexual orientation," and refusing to allow the use of female pronouns); *see also Shahinaj* v. *Gonzales,* 481 F.3d 1027, 1029 (8th Cir. 2007) (remanding the IJ's adverse credibility finding that was based in part on "the IJ's personal and improper opinion [that the noncitizen] did not dress or speak like or exhibit the mannerisms of a homosexual"). In addition, individuals who believe that an IJ has engaged in judicial misconduct may submit a complaint to EOIR's Judicial Conduct and Professionalism Unit:

> Executive Office for Immigration Review, attn.: Judicial Conduct and Professionalism Unit, 5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041, *judicial.conduct@ usdoj.gov.*

The Departments disagree with commenters who broadly asserted that noncitizens should not be "hindered" by evidentiary limitations. Although the IFR does not adopt the NPRM's proposed evidentiary standard, the IFR includes an evidentiary standard consistent with that currently used in section 240 proceedings. *See Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'" (quoting *Espinoza,* 45 F.3d at 310)); *Matter of Ramirez-Sanchez,* 17 I&N Dec. at 505 (holding that evidence must be "relevant and probative and its use must not be fundamentally unfair"). The IFR further provides, in new 8 CFR 1240.17(g)(2), that evidence filed after the applicable deadline may be considered if it could not reasonably have been obtained and presented before the deadline through the exercise of due diligence. While the bar for admitting evidence in immigration proceedings is relatively low, noncitizens have never had a wholly unrestricted right to present any and all evidence or testimony.

Finally, the Departments also disagree with commenters' allegations that

---

[86] While USCIS will have to record the USCIS interview in order to create a transcript of the interview, the Departments did not intend to imply in the NPRM that EOIR would receive a recording with the record in every case. The receipt of the recording would be redundant with the transcript and, as noted, more time consuming to review than a transcript.

[87] *See IJ Ethics and Professionalism Guide.*

country conditions information available to asylum officers is inaccurate, inappropriately politically influenced, or otherwise problematic. Federal Government country conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information. *See, e.g., Sowe* v. *Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen* v. *U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (State Department country reports are "usually the best available source of information on country conditions" (quotation marks omitted)). Commenters have provided no reasoning beyond conclusory allegations that the country conditions information available to asylum officers is inaccurate or inappropriately politically influenced. Further, under the IFR, IJs will consider all relevant and probative evidence, consistent with the evidentiary standards in section 240 proceedings and subject to the applicable deadline. Thus, IJs may consider country conditions information in accordance with its probative value, which will vary by case, as well as evidence submitted by the noncitizen that challenges such country conditions information.

*Comments:* Multiple commenters expressed concerns that limiting an asylum seeker's oral testimony to items that are not duplicative of the written application, on the belief that the written record would suffice for deciding the applicant's veracity, would violate the asylum seeker's due process rights.

Commenters stated that it would be difficult for IJs to assess credibility issues through a transcript or videos, and commenters disagreed that IJs could review credibility issues de novo absent additional testimony. Instead, commenters asserted that live, in-person testimony is required to assess an applicant's demeanor, candor, and responsiveness to questions. Further, commenters cited *Goldberg* v. *Kelly,* 397 U.S. 254, 269 (1970), for the proposition that the right to present one's testimony is crucial "where credibility and veracity are at issue." One commenter noted that, in such instances, *Goldberg* v. *Kelly* provides that a person "must be allowed to state his position orally" and "written submissions are a wholly unsatisfactory basis for decision." *Id.* at 369. Accordingly, commenters stated that, to comport with due process, it is

critical that IJs provide applicants with ample opportunity to present their case, including the chance to explain any perceived omissions or inconsistencies, before making credibility findings.

Additionally, commenters emphasized that IJs have a duty to develop the record in immigration proceedings, for which the ability to personally examine the applicant is a crucial tool.

Relatedly, commenters stated that, if represented, the applicant's counsel should be allowed to present and guide relevant, probative testimony because this form of examination most effectively elicits the noncitizen's factual basis for relief or protection. The commenters said that records from asylum interviews do not present all of the relevant facts as coherently as a direct examination by counsel who is familiar with the case. Moreover, commenters stated that during the course of testimony, a question from counsel or from the IJ could elicit an answer that unexpectedly gives rise to a new line of questioning or even a new legal theory of the case.

*Response:* As discussed above in Section III of this preamble, the IFR provides that noncitizens whose applications are not granted by the asylum officer will be placed in streamlined section 240 removal proceedings instead of implementing the NPRM's IJ review procedure. In streamlined section 240 proceedings, the noncitizen is entitled to testify before the IJ if the noncitizen timely requests the opportunity to do so, unless the IJ determines that asylum may be granted without the need to hear additional testimony. However, under new 8 CFR 1240.17(f)(2), and (f)(4)(i)–(ii), the IJ may forego a hearing and decide the case on the documentary record if (1) neither the noncitizen nor DHS has timely requested to present testimony under the pre-hearing procedures and DHS has not requested to cross-examine the noncitizen, or (2) the noncitizen elected to testify or provide evidence but the IJ determines that relief or protection may be granted without further proceedings and DHS has not requested to cross-examine the noncitizen. Additionally, noncitizens will have the privilege of representation at no expense to the Government, and, if the noncitizen is represented, the noncitizen's representative will be able to shape the course of direct examination. INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Moreover, IJs will continue to have the authority to "interrogate, examine, and cross-examine the [noncitizen] and any witnesses," thereby maintaining the IJ's ability to

develop the record. INA 240(b)(1), 8 U.S.C. 1229a(b)(1). Further, IJs will continue to assess a noncitizen's credibility, as set forth in section 240(c)(4)(C) of the Act, 8 U.S.C. 1229a(c)(4)(C). Thus, the Departments believe that the changes made in this IFR, provided generally in new 8 CFR 1240.17, address commenters' concerns by preserving noncitizens' ability to testify before an IJ in support of their claims, while at the same time maintaining the efficiencies highlighted in the NPRM by establishing expedited procedural requirements for the timely resolution of noncitizens' proceedings.

*Comments:* Commenters also stated that applicants must be given the opportunity to submit evidence, as needed, to develop their claims in the IJ review stage because the ability to present additional evidence before the IJ is crucial to ensuring due process for immigrants seeking protection.

First, several commenters said that duplicative evidence is sometimes necessary to persuade an IJ. For example, commenters indicated that multiple reports of the same phenomena might persuade an IJ of the prevalence of an issue. Likewise, commenters said that some IJs may not be persuaded by a single piece of evidence, but duplicative evidence may satisfy the IJ or increase the evidentiary weight an IJ gives to an applicant's testimony.

Similarly, several commenters said that the law accords greater deference to Government sources, such as State Department reports, and IJs may find other or contradictory evidence deserving of little evidentiary weight. Thus, commenters explained, while duplicative in a strict sense, filing several reports from different sources that similarly rebut the State Department's conclusions can be necessary to making a successful claim. However, under the NPRM, commenters asserted that IJs can exclude this evidence merely because it is facially duplicative without ever reaching the question as to whether it is necessary.

Additionally, commenters pointed out that corroborating accounts of persecution, such as declarations from multiple witnesses about the same event, can often assist in showing the applicant's credibility and the severity of the persecution they suffered. Commenters also indicated that asylum adjudications may hinge on considering evidence in the aggregate, such as whether a series of incidents rises to the level of persecution, or whether evidence of similarly situated cases and country conditions cumulatively establish a likelihood of future harm to the applicant. Thus, commenters stated

that the NPRM creates the risk that IJs may erroneously reject evidence as "duplicative" when it is in fact critical to a cumulative analysis, noting that for the IJ, it is precisely the overwhelming nature of the evidence pointing toward one conclusion that makes it persuasive. Accordingly, commenters argued that the NPRM's restriction on duplicative evidence would make it impossible to prove, to the satisfaction of the adjudicator, many meritorious claims.

Commenters also stated that, in some instances, an IJ may not be able to determine if new evidence or testimony is "duplicative" and "necessary" until the hearing is concluded. According to commenters, questioning from counsel or from an IJ during seemingly duplicative testimony may elicit new information relevant to an asylum seeker's claim. Thus, commenters expressed concern that while the need for duplicative evidence might not become apparent until the hearing is concluded, the decision to exclude additional testimony and documentary evidence will have been made at the outset of the proceeding. As it is not always possible to predict what will be a central issue in a case, and as duplicative evidence can actually be necessary to meet the applicant's burden of proof, commenters believed that permitting duplicative evidence would not be "inefficient."

*Response:* As discussed above in Section III of this preamble, the IFR provides that individuals whose applications are not granted by the asylum officer will be placed in streamlined section 240 removal proceedings rather than the NPRM's proposed IJ review procedure. As part of those streamlined section 240 proceedings, noncitizens may submit additional evidence before the IJ in support of their claims. Because these removal proceedings are governed by section 240 of the Act, 8 U.S.C. 1229a—subject to specific procedural requirements and timelines, as described above in Section III—noncitizens will be able to submit evidence in these proceedings, as provided in new 8 CFR 1240.17(g)(1), and the IJ will only exclude such evidence if the IJ determines that the evidence is untimely, that it is not relevant or probative, or that its use is fundamentally unfair. *See* 8 CFR 1240.7(a); *see also Matter of D–R–*, 25 I&N Dec. at 458 ("In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair." (quotation marks omitted)); *Matter of Interiano-Rosa*, 25 I&N Dec. 264, 265 (BIA 2010) ("[IJs]

have broad discretion to conduct and control immigration proceedings and to admit and consider relevant and probative evidence."). In other words, the ability of noncitizens in these proceedings to introduce evidence or testimony will not hinge on the IJ's analysis of whether or not the evidence is duplicative of the record from the noncitizen's hearing before the asylum officer. Consistent with currently applicable evidentiary rules in section 240 proceedings, noncitizens may instead submit evidence that commenters noted would otherwise be duplicative. Given the above, commenters' concerns about the evidentiary restrictions in the NPRM's proposed limited IJ proceedings are moot.

*Comments:* Commenters expressed concerns that the NPRM would harm applicants who face unique hurdles during proceedings, including individuals who were unable to provide a complete record before the asylum officer due to trauma, lack an understanding of the process, are unrepresented, have language barriers, or are members of a vulnerable or marginalized population. Specifically, commenters were concerned with the NPRM's limitation that IJs only review the record created by the asylum officer and the NPRM's evidentiary standard that applicants can only submit "non-duplicative" evidence to the IJ. With so much at stake, commenters believed that these applicants should not be hindered by rules that limit their ability to fully present their claims.

Commenters provided a wide range of reasons that the NPRM's evidentiary standards would disadvantage pro se applicants. Commenters speculated that pro se individuals, particularly those without English language proficiency, may not be aware of the full scope of evidence they can provide before the asylum officer and that USCIS's traditional use of broad, open-ended questions may not be sufficient to elicit relevant information for the adjudication of an asylum claim. Similarly, commenters explained that those applicants who do not retain a lawyer prior to the Asylum Merits interview may lose their opportunity to develop the facts and law in their claim. Commenters also indicated that detained applicants frequently need time to contact family to support their legal claims; thus, commenters believed that the NPRM disproportionately disadvantages those without counsel in detention.

Commenters also believed the NPRM would make it difficult for unrepresented, noncitizens without

English language proficiency to examine the record and make their case to the IJ during the review process. According to one commenter, the record forwarded by the Asylum Office to the IJ for review will "undoubtedly be in English," making it effectively impossible for applicants who are not represented and who do not read English to ascertain what is in the record, to make arguments about how the asylum officer erred, and to determine what additional information or evidence they possess and could provide to support their claim.

Additionally, commenters stated that the NPRM did not account for language access issues, noting that when an applicant speaks a rare language or dialect, the Asylum Office frequently cannot find an interpreter, and this language gap frequently results in mistakes in the record. Given the heightened evidentiary standard for introducing new evidence into the record, commenters expressed concern that interpretation mistakes would be difficult to correct through the appeal process proposed by the NPRM.

Commenters stated that the NPRM's evidentiary restrictions in IJ review proceedings would prejudice many unrepresented applicants because pro se individuals would be unable to comply with the pre-trial procedures requiring detailed justifications for the admission of proposed evidence. One commenter did not believe that having an IJ explain "restrictive and vague standards" to pro se applicants in court would be sufficient to apprise those applicants of the procedures they should follow to provide further relevant evidence to the court. Commenters argued that most applicants cannot be expected to meet these additional procedural burdens to submit evidence. Further, commenters stated that demanding that applicants meet additional evidentiary burdens before the IJ—especially if the applicant was not adequately represented when presenting the claim to the asylum officer—does not advance the fairness of the system. Moreover, commenters indicated that if the IJ needs to make a decision to admit new evidence or to allow further testimony based on a review of the evidence the applicant seeks to present, the NPRM added what is, in effect, a motion to reopen to every asylum claim, which may overly burden the finite legal services available to applicants.

Additionally, commenters noted that some applicants suffer from cognitive or emotional issues that may prevent them from testifying effectively before the asylum officer or without a lengthy interview over the course of multiple

days or weeks. Commenters also noted that the ability to present new evidence is crucial in cases involving applicants who are members of the LGBTQ+ community because some applicants may not have ''come out'' yet to themselves or to their families when they arrive in the United States, or at the time of an asylum interview, given that the way an individual identifies may evolve over time. Similarly, commenters indicated that IJs may need more educational evidence about asylum claims for transgender and gender nonconforming applicants or applicants who are living with HIV, stating that the time to acquire evidence, to obtain legal representation, and to present testimony, including expert testimony, are particularly crucial in such cases.

*Response:* As discussed above in Section III of this preamble, the IFR provides that noncitizens whose asylum applications are not granted by an asylum officer will be placed in streamlined section 240 removal proceedings rather than finalizing the NPRM's proposed IJ review procedure. Because section 240 proceedings provide noncitizens with procedural safeguards, including the right to counsel at no expense to the Government and the ability to reasonably present their case, the Departments believe that this shift largely addresses commenters' concerns with the NPRM's effect on underrepresented, non-English speaking, traumatized, and other marginalized noncitizens. In response to commenters' concerns related to unrepresented individuals appearing before an asylum officer for an Asylum Merits interview, the Departments note that, as explained earlier in this IFR, USCIS asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. *See supra* Section IV.D.5 of this preamble. With respect to commenters' concerns about interpreters for Asylum Merits interviews, the Departments note that USCIS has existing contracts with telephonic interpreters to provide interpretation for credible fear screening and affirmative asylum interviews, and thus has extensive experience providing contract interpreter services. USCIS

contractors must provide interpreters capable of accurately interpreting the intended meaning of statements made by the asylum officer, applicant, representative, and witnesses during interviews or hearings. The USCIS contractor will provide interpreters who are fluent in reading and speaking English and one or more other languages. The one exception to the English fluency requirement involves the use of relay interpreters in limited circumstances at USCIS's discretion. A relay interpreter is used when an interpreter does not speak both English and the language the applicant speaks, such as a rare language or dialect. *See supra* Section IV.D.5 of this preamble. As explained earlier in this IFR, USCIS will arrange for the assistance of an interpreter in conducting the Asylum Merits interview, and if an interpreter is unavailable, will attribute any delays to USCIS for the purpose of employment authorization eligibility, as described in new 8 CFR 208.9(g)(2). Thus, USCIS will ensure that there is clear communication among the various individuals participating in any Asylum Merits interview.

The Departments recognize that unrepresented noncitizens may have difficulties identifying errors in the asylum officer's decision as well as making legal arguments before the IJ regarding those errors. Accordingly, under the IFR, unrepresented noncitizens are not required to submit a written statement to the IJ identifying errors in the asylum officer's decision; instead, under new 8 CFR 1240.17(f)(2), the IJ will conduct a status conference to narrow the issues, determine the noncitizen's position, and ascertain whether a merits hearing will be needed. At this status conference, the noncitizen will state whether the noncitizen intends to testify, identify any witnesses the noncitizen intends to call in support of the noncitizen's application, and provide any additional documentation in support of the noncitizen's application. *Id.* In addition, individuals who speak a language other than English will be provided an interpreter.

Further, should any noncitizen— including unrepresented or other vulnerable noncitizens—wish to provide additional testimony and evidence before the IJ, the respondent may do so under the IFR, as provided in new 8 CFR 1240.17(f)(2)(i), without needing to satisfy the kind of threshold requirements proposed in the NPRM. As previously stated, the only limitation on the admission of evidence in the IFR's streamlined section 240 proceedings is that the IJ must exclude evidence if it is

untimely, not relevant or probative, or if its use is fundamentally unfair, which is consistent with the standard evidentiary rules in all other section 240 proceedings. *Matter of D–R–,* 25 I&N Dec. at 458 (''In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'' (quotation marks omitted)).

Finally, regarding commenters' concerns over the ability of noncitizens with competency concerns to testify effectively in a short time period, the Departments note that the IFR, in new 8 CFR 1240.17(k)(6), excepts noncitizens who have exhibited indicia of incompetency. These noncitizens would instead be placed in ordinary section 240 removal proceedings.[88]

Thus, the Departments believe that the IFR adequately responds to commenters' concerns by placing all applicants who are not granted asylum following an Asylum Merits interview into streamlined section 240 removal proceedings, thereby providing additional procedural protections and safeguards, and ensuring due process. *See Hussain* v. *Rosen,* 985 F.3d 634, 644 (9th Cir. 2021) (''[D]ue process has been provided whenever a[ noncitizen] is given a full and fair opportunity to be represented by counsel, to prepare an application for . . . relief, and to present testimony and other evidence in support of the application.'' (quotation marks omitted)).

*Comments:* Commenters stated that, contrary to the Departments' goals, the NPRM's proposed evidentiary requirements would result in a less efficient and more burdensome adjudicatory system. For example, commenters stated that, in addition to providing evidence, applicants and counsel would have to proffer each piece of evidence, which would increase the time and cost of proceedings. Commenters stated that, although the NPRM provides for the possibility of supplementing the record, the NPRM frames it as the exception for the sake of judicial efficiency and places a new burden on the applicant to prove that any new evidence is necessary for the case.

Commenters said it would be impossible to gather the relevant evidence needed and to prepare clients for testimony in such a short time frame. Commenters said applicants often need

---

[88] In addition, EOIR will provide a qualified representative through the EOIR National Qualified Representative Program (''NQRP'') to a respondent who is found to be incompetent to represent themselves in immigration proceedings and who is both unrepresented and detained.

to gather evidence from their home countries, which could not be obtained in only a few weeks, especially for clients who are detained. Some commenters similarly said it is well established under U.S. law that asylum seekers often flee for their lives without the ability to first collect documentation to support their claims, and it can be difficult, if not impossible, for asylum seekers or their representatives to gather evidence from family and friends in their country of origin. It is thus unreasonable to expect that asylum seekers will present all their evidence at a streamlined hearing before an asylum officer, thus leading to an incomplete record for IJ review. Commenters stated that, to fulfill their ethical duties to their clients, legal advocates would have to immediately seek to fill the inevitable evidentiary gaps in the record, and then prepare written motions seeking to admit that evidence and seeking a full individual merits hearing.

Commenters said the NPRM's evidentiary restrictions would add challenges for an IJ to conduct meaningful de novo review of an appeal. Commenters stated IJs could instead conduct their review directly in court, without relying on proceedings with the asylum officer, and with better results because the IJ would be able to make a credibility assessment of the applicant, as well as any witnesses. Some commenters remarked that the majority of claims not granted by an asylum officer would end up in immigration court, and, under the NPRM, IJs would be flooded with requests to present new evidence and to grant individual hearings.

Commenters wrote that, if the IJ were to grant a motion to allow testimony and additional evidence, the proposed regulation would have failed to save any time or expense either to noncitizens or EOIR, because the case would then proceed in immigration court just as an affirmative case that is referred to court does now. On the other hand, if the IJ were to reject an applicant's additional testimony or other evidence, then the applicants would almost certainly file an appeal.

Commenters expressed concern that judicial review of the NPRM's evidentiary restrictions could be limited and inefficient in practice. For example, if the IJ does not provide a reasoned explanation for the rejection (which the proposed NPRM does not require), a court of appeals would be highly likely to remand the case to the BIA, with a further remand to the IJ, because judicial review of the IJ's action would be nearly impossible without such an explanation. Commenters similarly

stated that a decision by the IJ to reject additional testimony or documents would not require specific reasons, making judicial review of the determination that the evidence is not necessary or would be duplicative virtually impossible. Commenters stated that denials of requests to present additional evidence would lead to an increase in interlocutory appeals to the BIA and could lead to additional rounds of Federal circuit court appeals as asylum seekers challenge the sufficiency of the immigration court record. In addition, commenters stated, many Federal courts place onerous exhaustion requirements on petitions for review of BIA decisions, and some courts even suggest that noncitizens must seek reconsideration to point out ignored arguments or improper legal approaches before having those arguments considered on appeal. As a result, commenters stated that the NPRM's procedures, which were designed to be efficient, would cause significant inefficiencies on the back end by forcing applicants to file motions to reconsider before the immigration court and the BIA.

*Response:* As described above in Section III of this preamble, the IFR revises the process in new 8 CFR 1240.17(a) and (b), so that noncitizens whose applications for asylum are adjudicated but not granted by an asylum officer are referred to streamlined 240 proceedings through the issuance of an NTA, rather than seeking IJ review through the procedure proposed by the NPRM. As part of this change, the Departments are also removing the evidentiary standards proposed by the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Instead, as provided in new 8 CFR 1240.17(g)(1), the IFR affirms that noncitizens in the streamlined 240 proceedings may submit additional evidence to the IJ consistent with the traditional evidentiary standard applied in 240 proceedings. With this change, the IFR does not include those procedural requirements that commenters were concerned would create inefficiencies.

Specifically, unlike what was proposed in the NPRM, the IFR does not require the noncitizen to demonstrate that any desired new evidence or testimony is non-duplicative and necessary or require the IJ to make a threshold determination that the evidence satisfies that standard. Because the noncitizen may submit evidence during streamlined section 240 proceedings, any delay in the availability of evidence during the asylum officer review, and any

corresponding gap in the record, may be addressed before the IJ. The lack of an additional, novel evidentiary standard reduces the likelihood of appeals and subsequent litigation, identified by the commenters, surrounding the submission of evidence.

In addition, given that the IFR is consistent with the longstanding evidence standard used in section 240 proceedings, the Departments do not believe that the IFR will have a chilling effect on the availability of judicial review regarding an IJ's evidentiary determinations. The IFR does not amend a noncitizen's right to appeal a decision, in accordance with the statutes and regulations. *See* 8 CFR 1003.3, 1003.38.

*Comments:* Commenters stated that while the NPRM's proposed "non-duplicative" and "necessary" standard for the submission of new evidence may create more efficiency, it is inappropriate because it (1) reverses Congress's original intent to protect asylum seekers from expedited removal and give them sufficient time after their initial arrival in the United States to prepare an asylum application; (2) violates international obligations to prevent the refoulement of genuine refugees; and (3) undermines the United States' commitment to asylum protection and the preservation of human rights. Commenters stated that the proposed restriction on new evidence in the proposed IJ review proceedings would be fundamentally unfair and violate both U.S. asylum law and the Refugee Convention and Protocol. Similarly, commenters stated that the NPRM's evidentiary restrictions, if adopted, conflict with the statutory and regulatory affirmative duty of IJs to fully develop the record.

*Response:* As described above in Section III of this preamble, the IFR revises the process in new 8 CFR 1240.17(a) and (b) to provide that noncitizens whose applications for asylum are not granted by an asylum officer are referred to streamlined section 240 removal proceedings through the issuance of an NTA, rather than seeking IJ review through the procedure proposed by the NPRM. As part of this change, the Departments are also removing the "non-duplicative" and "necessary" evidentiary standards proposed by the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Instead, the IFR affirms that noncitizens in streamlined section 240 removal proceedings may submit additional evidence to the IJ, as provided in new 8 CFR 1240.17(g)(1), consistent with the traditional evidentiary standard application in 240

proceedings. This change addresses commenters' concerns that the NPRM's evidentiary standard violates congressional intent and the United States' international obligations.

Similarly, the IFR's changes address commenters' concerns regarding IJs' duty to develop the record. Unlike the proposal in the NPRM, the IFR specifically contemplates, in new 8 CFR 1240.17(f)(1) and (2), the IJ conducting a master calendar hearing in all cases, followed by a status conference to discuss the noncitizen's claim and narrow the issues. Overall, IJs will continue to exercise independent judgment and discretion in accordance with the case law, statutes, and regulations to decide each case before them. *See* 8 CFR 1003.10(b).

*Comments:* Commenters suggested numerous alternative formulations regarding the NPRM's proposed evidentiary standard for IJ review proceedings. Some commenters proposed that the standard for introduction of new evidence before the IJ should be lower, stating that a low threshold will ensure that newly-developed evidence and any evidence the asylum officer erroneously failed to include in the record is considered in immigration court. Commenters stated that lowering the evidentiary threshold would still provide improved efficiency because IJs would still only hear new evidence, decreasing the amount of time spent reviewing each case and helping to stem the growth of EOIR's case backlog.

Other commenters similarly argued that, if the proposed process cannot be amended to guarantee section 240 removal proceedings for asylum seekers, the Departments should allow applicants to freely present evidence and testimony during the IJ review proceedings.

Commenters also suggested changes that they stated would better align the procedures for these review proceedings with international law and international procedures. First, commenters stated that the Departments could follow the example set by the United Nations Committee Against Torture and require an explanation for late submission, with a presumption in favor of accepting the explanation and admitting the evidence. Second, commenters stated that the UNHCR urges states to consider all available evidence to meet their obligations under international law. Commenters noted that a more lenient evidentiary standard would better align with the United States' obligations under the Refugee Protocol, including ensuring that adjudicators consider all evidence that could support a claim,

even when only submitted on appeal, and that the unique realities implicated in adjudicating international protection claims require flexibility.

*Response:* As explained above in Section III of this preamble, under the IFR in new 8 CFR 1240.17(a) and (b), if the application for asylum is adjudicated but not granted by the asylum officer, DHS will issue an NTA and refer the applicant to streamlined section 240 removal proceedings before an IJ. Because the Departments are not pursuing the proposed IJ review procedure, including the proposed limitations on new evidence, the Departments need not further respond directly to commenters' suggestions for how those limitations could have been improved. Further, the Departments believe that the change in the IFR to streamlined 240 proceedings ultimately addresses commenters' concerns, as noncitizens will have the opportunity to address any perceived errors in the asylum officer's written decision, submit new evidence without regard to the evidentiary limitations proposed in the NPRM, and testify before the IJ.

*Comments:* Commenters expressed concern that the NPRM would essentially give the IJ an appellate review role but would not provide rights for noncitizens or their counsel to address any errors in the asylum officer's decision. Specifically, commenters stated, the NPRM does not contain any information about whether the IJ would issue a briefing schedule, whether the parties would appear before the IJ for a hearing, or whether it would be incumbent on the noncitizen to convince the IJ that further legal argument is necessary in the case. Other commenters were concerned that the NPRM did not provide sufficient guidance as to the structure of the hearing before an IJ.

*Response:* As part of the shift from the NPRM's proposed IJ review procedure to streamlined section 240 removal proceedings, this IFR contains detailed instructions regarding the mechanics of these proceedings before the IJ, including a requirement that IJs hold a status conference and afford the parties an opportunity to make additional legal argument. These provisions are designed to ensure that these proceedings are adjudicated efficiently while at the same time responding to commenters' interest in having more procedural details specified in the regulation. Specifically, under new 8 CFR 1240.17(b) and (f), the IJ will conduct at least an initial master calendar hearing in all cases and will also conduct a status conference and possibly receive written statements to

narrow the issues. Under new 8 CFR 1240.17(f)(2), the noncitizen shall describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer and provide any additional documentation in support of the applications. *See* 8 CFR 1240.17(f)(2)(i)(A)(*1*)(*ii*)–(*iii*). If, under new 8 CFR 1240.17(f)(4), the IJ determines that the application cannot be granted on the documentary record and the noncitizen has elected to testify or DHS has elected to cross-examine the noncitizen or present testimony or evidence, the IJ will hold an evidentiary hearing.

*Comments:* Commenters further indicated that the NPRM does not require the Departments to inform the noncitizen or their counsel that the case is being reviewed by an IJ.

*Response:* The Departments disagree with commenters' concerns on this point because, under the NPRM, the case would only be reviewed by an IJ if the noncitizen or their counsel first requested such review. Nevertheless, the Departments emphasize that any concerns about the provision of notice regarding the IJ review are addressed by this IFR. Under new 8 CFR 1240.17(b), a noncitizen whose application for asylum is not granted following an Asylum Merits interview will receive notice about the IJ proceedings, because DHS will serve an NTA on all such individuals in order to initiate the section 240 removal proceedings. *See also* INA 239(a)(1), 8 U.S.C. 1229(a)(1).

*Comments:* Commenters stated that, while a verbatim transcript of the Asylum Merits interview will be provided to the IJ, there is no indication that the noncitizen will have access to the audio recording of proceedings with the asylum officer to review for interpretation errors.

*Response:* The Departments intend to make available a process by which parties to EOIR proceedings under 8 CFR 1240.17 will be able to timely review, upon request, the recording of the USCIS Asylum Merits interview. In addition, noncitizens should follow EOIR's procedures to obtain access and copies of their immigration records after cases have been docketed with the immigration courts.

*Comment:* Another commenter stated that the NPRM is silent as to whether a noncitizen's motion to present further evidence to the IJ will be considered applicant-caused delay for purposes of the EAD clock and urged the Departments not to penalize noncitizens in this way for moving to include further evidence that would be

necessary to a fair adjudication of their claim.

*Response:* The Departments understand asylum applicants' desire to obtain EADs, but neither the NPRM nor this IFR amends DHS's procedures pertaining to the issuance of EADs. Accordingly, any delay attributable to an applicant, including a continuance to obtain evidence sought in immigration court, will be considered an applicant-caused delay for purposes of EAD eligibility just as it would under the status quo.

*Comments:* Commenters also expressed concerns that the NPRM "ties the hands" of the Government and that these asylum adjudications will be susceptible to fraudulent and frivolous claims. Commenters pointed out that the NPRM requires DHS to proffer evidence or testimony for an admissibility ruling but does not provide a clear opportunity for DHS to cross-examine noncitizens regarding evidence the noncitizens may have relied on during their interviews with asylum officers.

*Response:* The Departments disagree with any allegation that this rule would increase fraudulent asylum applications. First, all asylum applications submitted to USCIS for initial adjudication by the asylum officer will be subject to the consequences of filing a frivolous application. 8 CFR 208.3(c); *see also* INA 208(d)(4), 8 U.S.C. 1158(d)(4). Second, although the NPRM would have required both parties to make new threshold evidentiary showings in order to submit additional testimony or evidence before the IJ, the IFR, in new 8 CFR 1240.17(f)(2)(ii) and (f)(3), provides DHS with an explicit opportunity in all cases to respond to any new argument or evidence by the noncitizen, call witnesses, and submit additional documentation, including documentation for rebuttal or impeachment purposes. In addition, both the NPRM and IFR in 8 CFR 208.9(c) provide DHS the opportunity to address credibility concerns with the applicant during the asylum officer hearing. Although the hearing before the asylum officer is nonadversarial, the asylum officer, a DHS employee, has the authority to "present evidence, receive evidence, and question the applicant and any witnesses" during the interview. *Id.* Accordingly, the IFR maintains certain procedures proposed in the NPRM and provides additional procedures that are responsive to commenters' concerns.

c. Immigration Judge's Discretion To Vacate Asylum Officer's Removal Order

As discussed below, commenters opposed the limitation on noncitizens' ability to seek other forms of relief or protection beyond asylum, withholding of removal, or protection under the CAT in the proposed IJ review proceedings unless the noncitizen files a motion to vacate the removal order entered by the asylum officer and the IJ grants that motion as a matter of discretion. *See* 8 CFR 1003.48(d) (proposed).

*Comments:* Commenters opposed the limitation on noncitizens' ability to seek other forms of relief or protection beyond asylum, withholding of removal, or protection under the CAT in the proposed IJ review proceedings unless the noncitizen files a motion to vacate the removal order entered by the asylum officer and the IJ grants that motion as a matter of discretion. *See* 8 CFR 1003.48(d) (proposed).

Commenters pointed out that noncitizens frequently apply for other forms of immigration relief, such as Special Immigrant Juvenile classification, T nonimmigrant status, or U nonimmigrant status concurrently with their applications for asylum, withholding, and protection under the CAT, and expressed a range of concerns that the rule would limit the ability of noncitizens to pursue these types of statutorily-available statuses in the proposed limited IJ review proceedings, which commenters stated was contrary to congressional intent to provide other forms of relief or protection.

First, commenters said that the NPRM's proposed procedure for a discretionary motion to vacate a removal order and transfer the noncitizen to section 240 proceedings is insufficient and that the NPRM would effectively cut off access to these remedies for vulnerable applicants. For example, commenters speculated that unrepresented or child applicants would be unable to meet the procedural requirements for filing the proposed motion, such as a showing of prima facie eligibility. Commenters also noted that some forms of relief are much harder to seek if the applicant is removed than they would be if the applicant could have sought them during the proceedings before the IJ. For example, it could be difficult to confer with an attorney with the relevant expertise while abroad.

Second, commenters found the discretionary motion requirement inefficient. Commenters noted that applicants who seek collateral relief before USCIS, such as T or U nonimmigrant status, often seek

administrative closure or termination of the immigration court proceedings while those applications are adjudicated. Because these cases are then off the IJ's docket, administrative closure or termination in these cases serves the stated goal of efficiency in immigration proceedings, but the NPRM would not allow for this efficiency.

Third, commenters noted that the rule would effectively prevent individuals who become eligible for other relief during appeal from seeking it because they would not have sought to have the case transferred to section 240 proceedings in a timely manner. Commenters asserted that the NPRM provides no justification for this punitive and burdensome change in opportunity for an asylum applicant whose case originated in credible fear screening to seek other relief for which they may become eligible while the case is on appeal.

Finally, commenters further stated that limiting or denying access to all forms of complementary protection conflicts with international standards.

*Response:* As explained above in Section III of this preamble, the Departments are not adopting the IJ review procedure proposed in the NPRM; instead, this IFR provides that noncitizens whose applications for asylum are not granted by an asylum officer will be issued an NTA and referred to an IJ for further review of their applications in a streamlined section 240 removal proceeding. Under the new 8 CFR 1240.17(k)(2), noncitizens who provide evidence of prima facie eligibility for forms of relief or protection other than asylum, withholding of removal, protection under the CAT, and voluntary departure and who either seek to apply or have applied for such relief or protection will be exempted from the timelines applicable in these streamlined proceedings. The IJ will then consider the noncitizen's eligibility for relief as in section 240 proceedings generally. *See, e.g.,* 8 CFR 1240.1(a)(1)(ii) (providing the IJ with the authority to determine a wide range of applications for relief or protection). Further, there will no longer be an intervening requirement for the noncitizen to file a discretionary motion to vacate the asylum officer's removal order and for the IJ to grant such a motion before the noncitizen may seek additional forms of relief or protection. Instead, under new 8 CFR 1240.17(k)(2), noncitizens who produce evidence of prima facie eligibility and submit or intend to submit an application or petition for another form of relief or protection will be exempt from the streamlined

procedure set out in the IFR. Accordingly, the shift to streamlined section 240 proceedings addresses commenters' concerns about the motion process and limitation on the available forms of relief or protection for noncitizens in these proceedings.

*Comments:* Commenters were concerned that the proposal to require a motion for the IJ to vacate the removal order is a new process that will waste Government resources by adding another motion for IJs to review and that it would likely generate additional rounds of appeals. Commenters stated that it would be more efficient to instead allow an IJ to decide the entire matter in front of them without being forced to ignore or exclude other information that would show removal is unwarranted.

Similarly, rather than a process that requires the applicant to identify other grounds of immigration eligibility beyond the three enumerated in 8 CFR 1003.48(a), as set out in the NPRM, commenters argued that it would be fairer and more efficient if the asylum officer and the IJ could inquire about all possible grounds during their respective hearings. Commenters further suggested that the Departments revise the NPRM to have the asylum office refer all cases not granted asylum to section 240 removal proceedings.

*Response:* The Departments believe that these commenter concerns will be addressed by this IFR, which establishes that noncitizens who are not granted asylum after an Asylum Merits interview will be placed into streamlined section 240 removal proceedings, rather than the IJ review proceedings proposed by the NPRM. Under the IFR, asylum officers will not issue removal orders that would need to be vacated by the IJ. Rather, a noncitizen will not be ordered removed until after the IJ has reviewed the asylum officer's decision and concluded that the noncitizen does not warrant asylum.[89] Additionally, the noncitizen need not affirmatively request or seek review of the asylum officer's decision. Rather,

under new 8 CFR 1240.17(a) and (b), if the asylum officer does not grant asylum, DHS will serve the applicant with an NTA and initiate a streamlined section 240 removal proceeding by filing the NTA with the immigration court. Further, just as in all proceedings governed by section 240 of the Act, 8 U.S.C. 1229a, noncitizens may seek other forms of relief or protection, and the IJ will consider additional possible grounds for relief or protection beyond asylum, withholding of removal, and protection under the CAT. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."). Further, under new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same expedited procedures detailed in this IFR for these proceedings generally.

*Comments:* Commenters expressed concerns that the NPRM's requirement for applicants to file a motion before they may seek additional forms of relief or protection would prejudice noncitizens who are without counsel or do not speak English because these noncitizens would likely be unaware of their eligibility for additional forms of relief or protection, would be unaware of the option to file a motion for vacatur, or would not realistically be able to file such motions. Specifically, at least one commenter argued that the NPRM would lead to due process violations by denying noncitizens the right to seek relief or protection for which they might be eligible. Similarly, commenters argued that the NPRM's time and number limitations on motions for section 240 removal proceedings raise due process concerns for noncitizens with disabilities or PTSD, or those who speak rare languages.

Commenters further expressed concern that pro se individuals would be particularly harmed by the NPRM's rules for the motion to vacate. For example, one commenter noted that a pro se noncitizen who previously moved unsuccessfully to vacate with insufficient evidence or argument would be precluded from filing any additional evidence or an additional motion, even if the noncitizen later obtained the help of an attorney or representative who is able to show prima facie eligibility for asylum or protection. Instead, commenters suggested that asylum applicants should be allowed to make more than one

motion to show they are eligible for a different form of relief or protection. Commenters asserted that this change will not significantly impact the efficiency of IJ review because most asylum seekers requesting further review do not usually have a claim to a different form of relief from removal.

*Response:* The IFR's changes from the NPRM address commenter concerns about the impact of the motion to vacate requirement on pro se and non-English speaking noncitizens. Specifically, as discussed elsewhere, the IFR establishes that USCIS will affirmatively refer all applicants whose applications are not granted by the asylum officer to streamlined section 240 removal proceedings for adjudication by an IJ. Adjudication by the IJ is automatic upon DHS's filing of the NTA with the immigration court. Additionally, as in all proceedings governed by section 240 of the Act, DOJ's regulations allow noncitizens to seek other forms of relief or protection, without first filing a motion, and the IJ will consider additional possible grounds for relief or protection beyond asylum, withholding of removal, and protection under the CAT. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."); *see also Quintero,* 998 F.3d at 623–24 (collecting cases discussing an IJ's affirmative duty to develop the record). Further, pursuant to new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same expedited timeline procedures detailed in this IFR for these expedited proceedings generally. No motion is necessary to demonstrate prima facie eligibility because the IJ could make such determination based on oral representations or information otherwise provided to the IJ.

In addition, as noted above, the IFR, as provided in new 8 CFR 1240.17(k)(6), excepts respondents who have exhibited indicia of incompetency from these streamlined section 240 proceedings. These respondents would instead be placed in ordinary section 240 proceedings.

*Comments:* Commenters disagreed with the NPRM's approach that applicants who may be eligible to seek some other form of relief or protection beyond asylum, withholding of removal, and protection under the CAT would be able to do so only after the completion

---

[89] A respondent who fails to appear for their hearing, however, may be ordered removed in absentia for failure to appear. *See* INA 240(b)(5)(A), 8 U.S.C. 1229a(b)(5)(A). As discussed above in Section III of this preamble, under new 8 CFR 1240.17(d), if the asylum officer had determined that a respondent who fails to appear before the IJ was eligible for statutory withholding of removal or protection under the CAT, the IJ will issue an in-absentia removal order and generally will give effect to protection for which the asylum officer found the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS Asylum Merits interview, that the respondent is not eligible for such protection.

of a full asylum application and interview. Commenters explained that this approach would force applicants to relive and testify in depth about traumatic events in their lives relevant to their asylum claims, even if they have alternative avenues to relief—such as T nonimmigrant status or SIJ classification—that do not require in-person hearings and would not lead to possible re-traumatization.

At least one commenter disagreed with the NPRM's lack of a provision regarding continuances for a noncitizen to obtain evidence of the additional relief or protection for which they may be eligible. The commenter noted that it often takes months to obtain relevant evidence, but under the NPRM, noncitizens may be forced to go forward with IJ review before this process is complete. Additionally, commenters objected to the proposed limitations providing for only one motion for vacatur and requiring that the filing would have to precede a determination on the merits of the protection claim. Commenters argued that these limitations would effectively force applicants to choose which remedy they wish to seek before their appellate rights are exhausted with respect to the asylum, statutory withholding, and CAT claims. Commenters stated that requiring the motion to be filed prior to the IJ's decision on eligibility for asylum or related protection undermines the Departments' goal of balancing fairness and efficiency.

Commenters suggested that there should be exceptions to the time and numerical limitations on the proposed motion for vacatur to account for scenarios such as those in which (1) the noncitizen receives ineffective assistance of counsel, (2) new facts exist that give rise to new fears and forms of relief or protection, (3) updates to immigration laws are made, or (4) other unusual circumstances arise.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III of this preamble, address commenters' concerns with the NPRM's proposals related to the timing and number limits for motions to vacate the asylum officer's removal order. Specifically, because asylum officers will not be issuing removal orders and applicants instead will be placed in streamlined section 240 removal proceedings, noncitizens may seek other forms of relief or protection beyond asylum, withholding of removal, and protection under the CAT, without an intervening motion or other threshold requirement like that set out by the NPRM. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of

his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing[.]"). Should noncitizens request a continuance to obtain evidence of prima facie eligibility for other forms of relief or protection, the base standard for continuances in streamlined section 240 proceedings will continue to be good cause, as provided in new 8 CFR 1240.17(h)(2)(i). However, as discussed above in Section III of this preamble, the aggregate length of continuances for good cause is capped at 30 days, as provided in new 8 CFR 1240.17(h)(2)(i) and (h)(3). Additional continuances beyond 30 days will require a heightened showing, as provided in new 8 CFR 1240.17(h)(2)(ii)–(iii).

Further, under new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same streamlined procedures detailed in this IFR. In addition, for such cases, IJs may utilize the same common docket-management tools as those generally used in section 240 removal proceedings, such as continuances and administrative closure, in appropriate cases where a noncitizen may be eligible for alternative forms of relief, such as adjustment of status under section 245 of the Act, 8 U.S.C. 1255.

With respect to commenters who expressed concern about the possible trauma that noncitizens might endure from testifying, the Departments note that the IFR does not require noncitizens to testify before the IJ. Rather, it gives noncitizens the opportunity to provide further testimony should they wish to do so. Thus, as provided in new 8 CFR 1240.17(f)(2)(i), if noncitizens feel that they have had adequate opportunity to articulate the nature of their claims before the asylum officer, they need not elect to further testify and may rest on the record of proceedings before the asylum officer. Additionally, the IFR provides in new 8 CFR 1240.17(f)(2) that the parties will engage in a status conference prior to the merits hearing during which the parties will narrow the issues in dispute. In some instances, the IJ may determine that the application can be decided on the documentary record without additional testimony from the noncitizen. *Id.* Further, under new 8 CFR 1240.17(f)(2)(ii), DHS may decide not to contest certain issues, and noncitizens need not testify about sensitive issues that DHS does not contest. The

Departments also note that both asylum officers and IJs undergo ongoing training and support to promote the quality of adjudications and to prepare them to address sensitive claims. Asylum officers who conduct interviews are required by regulation to undergo "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 CFR 208.1(b). Asylum officers are also required to determine that noncitizens are able to participate effectively in their interviews before proceeding. 8 CFR 208.30(d)(1), (5). These DHS regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which noncitizens may express their claims to an asylum officer. Similarly, IJs must undergo comprehensive, ongoing training, as provided in DOJ's existing regulations. 8 CFR 1003.0(b)(1)(vii). IJs are further directed to conduct hearings in a manner that would not discourage a noncitizen from presenting testimony on difficult subject matter. *See OPPM 17–03: Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* 3 (Dec. 20, 2017) ("Every [IJ] should employ age-appropriate procedures whenever a juvenile noncitizen or witness is present in the courtroom."); *Matter of J–R–R–A–,* 26 I&N Dec. 609, 612 (BIA 2015) ("[W]here a mental health concern may be affecting the reliability of the applicant's testimony, the [IJ] should, as a safeguard, generally accept that the applicant believes what he has presented, even though his account may not be believable to others or otherwise sufficient to support the claim."); *Matter of Y–S–L–C–,* 26 I&N Dec. 688, 690–91 (BIA 2015) ("Conduct by an [IJ] that can be perceived as bullying or hostile can have a chilling effect on a [noncitizen's] testimony and thereby limit his or her ability to fully develop the facts of the claim . . . . [S]uch treatment of any [noncitizen] is never appropriate[.]"). DHS retains the option to issue an NTA to place the noncitizen in ordinary section 240 removal proceedings prior to the Asylum Merits interview, and it could do so if the applicant appears to have a strong claim for a form of relief or protection that the asylum officer cannot grant. This procedure would be another means of preventing the applicant from having to testify twice.

*Comments:* Several commenters expressed concern that the proposed motion to vacate removal orders would be left to the discretion of the IJ, even if the applicant had established prima

facie eligibility for a different form of relief from removal. In particular, commenters stated that the NPRM did not make clear how that discretion should be exercised. Commenters argued that the ability to appeal such denials to the BIA would not be a sufficient safeguard because of the complexity of filing an appeal for some applicants. Commenters asserted that the discretionary nature of the motion would result in the wrongful removal of noncitizens with available relief, which would run afoul of due-process obligations. Further, some commenters worried that DHS could exercise discretion not to refer an applicant to section 240 removal proceedings even if an IJ were to grant a motion to vacate.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III of this preamble, address commenters' concerns with the NPRM's proposed framework under which both the IJ and DHS would make discretionary determinations in the context of a motion to vacate. First, under the IFR, when an asylum officer does not grant asylum, DHS will serve an applicant with an NTA and initiate streamlined section 240 removal proceedings by filing the NTA with the immigration court. *See* 8 CFR 208.14(c). Second, as recognized in new 8 CFR 1240.17(k)(2), because applicants will be referred to streamlined section 240 removal proceedings, they may seek other forms of relief or protection beyond asylum, withholding of removal, and protection under the CAT, without an intervening motion or other threshold requirement like that set out by the NPRM. *See also* 8 CFR 1240.11(a)(2) (''The [IJ] shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing[.]''). Finally, as provided in new 8 CFR 1240.17(k)(2), noncitizens who produce evidence of prima facie eligibility for relief or protection other than asylum, withholding of removal, protection under the CAT, or voluntary departure and indicate an intent to apply for, or who have applied for, such form of relief or protection will be excepted from these streamlined section 240 proceedings and have their cases adjudicated under the standard processes. Accordingly, noncitizens who are eligible to seek forms of relief or protection other than asylum, withholding of removal, and protection under the CAT do not have to receive a favorable discretionary grant in order to do so.

*Comments:* Commenters asserted that the NPRM's proposed differing treatment of various categories of asylum seekers is unfairly arbitrary. For example, commenters feared that the eligibility of asylum seekers to apply for any form of relief or protection—rather than just asylum, statutory withholding of removal, and protection under the CAT—would be based solely on how CBP and ICE have exercised discretion to process noncitizens on a given day.

Commenters argued that the Departments should allow IJs to grant motions to vacate removal orders both where the noncitizen would be eligible to apply for relief or protection if in a section 240 proceeding and where the noncitizen would be eligible to apply for collateral relief adjudicated by USCIS because it did not appear that an IJ would have the authority to terminate a case under the NPRM.

Commenters also urged that a noncitizen should be allowed to file an interlocutory appeal to the BIA if an IJ denied a motion to vacate under the NPRM.

Finally, commenters requested a clarification and rationale for the NPRM's prohibition on a motion to vacate premised on an application for voluntary departure. Commenters expressed concern that, if neither USCIS nor EOIR can grant voluntary departure, individuals could be separated from their families or otherwise negatively affected.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III.D of this preamble, address commenters' concerns with the NPRM's motion to vacate framework. First, under the IFR, any applicant not granted asylum by an asylum officer after an Asylum Merits interview will be served with an NTA and placed in streamlined section 240 removal proceedings without the need to request an IJ's review.[90] Accordingly, individuals in streamlined section 240 proceedings will be able to apply for all forms of relief or protection for which they may be eligible, including voluntary departure, thus addressing commenters' concerns on this issue.

d. Immigration Judge's Authority To Review All Asylum Officer Decisions

*Comments:* Commenters stated that asylum applicants who were not granted asylum but were granted withholding of removal or CAT protection may be deterred from seeking IJ review because of the possibility of being denied all relief or protection and removed. Commenters stated that such deterrence is particularly inappropriate for individuals granted withholding of removal or CAT protection because they are unable to travel abroad or petition for relatives to follow to the United States. Commenters also stated that the proposed rule would leave those granted withholding of removal or CAT protection by the asylum officer with a difficult choice of seeking review and potentially being removed to their country of feared harm or facing permanent separation from family members. Overall, commenters expressed concern that the proposal could have a chilling effect on the decision to seek review of an asylum officer's decision to not grant asylum where doing so would require risking the loss of already-issued protection, citing international treaty obligations to not return refugees to countries where they might suffer persecution or torture. Other commenters were concerned that an asylum applicant would not receive notice that seeking review of an asylum officer's decision to not grant asylum could also result in IJ review of granted protections.

Some commenters asserted that requiring IJs to review grants of protection is contrary to the rule's stated goals of improving efficiency and addressing the immigration court backlog. Commenters argued that it is inefficient to require an IJ to revisit portions of the asylum officer's decision that neither party has requested the IJ review and observed that granted cases can and will be reviewed upon the asylee's application for permanent residence. Other commenters stated that an IJ's unilateral decision to reverse protections that were granted by an asylum officer would undercut the IJ's role as a neutral arbiter.

Commenters asserted that allowing IJs to review grants of protection is inconsistent with the principles of adversarial adjudication. Commenters noted that the proposed rule would have DHS (as the adverse party to an asylum seeker in immigration court) argue that a benefit was wrongfully granted by another DHS component (USCIS) and asserted that it would be irrational for ICE to argue in this manner before EOIR that another component of

---

[90] To the extent that commenters' concerns relate to the general discretion of DHS to determine whether to place an applicant for admission in expedited removal under section 235 of the Act, 8 U.S.C. 1235, or to issue an NTA and refer the applicant to section 240 proceedings, commenters' concerns are beyond the scope of this rule. *See, e.g., Matter of M–S–,* 27 I&N Dec. 509, 510 (A.G. 2019) (''[I]f the [noncitizen] is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings.'').

DHS erred in its decision-making. Similarly, commenters argued that the executive branch cannot contest a decision also issued by the executive branch, asserting that the same reasoning has long applied to the prohibition on DHS seeking judicial review of BIA decisions in Federal court. According to commenters, this aspect of the rule would discourage cooperation between the parties to narrow the issues or stipulate to relief, resulting in unnecessary court battles and delay.

Commenters argued that it would be inequitable for DHS to obtain automatic review of a grant of withholding of removal or CAT protection when noncitizens do not obtain automatic review of denials. Some commenters also worried that authorizing, but not requiring, IJs to review withholding of removal and CAT decisions risks inconsistent revocation of these benefits if some IJs decide to conduct this review and others do not, arguing that the risk of arbitrarily and permanently separating families outweighs any efficiency concerns.

Commenters also asserted that "mixed cases" could create confusion for noncitizens attempting to request review of their case before U.S. Courts of Appeals. For example, commenters stated that IJs could reverse the denial of withholding of removal but leave the asylum denial and order of removal on the basis of prior grounds of inadmissibility undisturbed. Commenters worried that, in such cases, noncitizens requesting review before courts of appeal would likely exceed the "mandatory and jurisdictional" 30-day limit to review their asylum denial and accompanying removal order. Finally, commenters asserted that these procedural hurdles would deter pro bono attorneys from taking cases.

*Response:* As described above in Section III of this preamble, this IFR does not adopt the NPRM's proposed IJ review procedure and instead implements streamlined section 240 removal proceedings in new 8 CFR 1240.17. One consequence of this change from the NPRM, which the Departments emphasize was requested by the majority of those who commented on this aspect of the NPRM, is that the asylum officer will not issue orders of removal or grant withholding of removal or protection under the CAT. Rather, because the IJ will issue orders of removal, the IJ will also grant or deny withholding of removal and protection under the CAT. *See Matter of I–S– & C–S–,* 24 I&N Dec. 432, 434 (BIA 2008) ("[W]hen an [IJ] decides to grant withholding of removal, an explicit

order of removal must be included in the decision.").

Nevertheless, asylum officers will continue to consider the applicant's eligibility for withholding of removal and protection under the CAT during the Asylum Merits interviews and, if they do not grant the application for asylum, will indicate whether the applicant has demonstrated eligibility for withholding of removal or protection under the CAT based on the record before USCIS. *See* 8 CFR 208.14(c)(1); 8 CFR 208.16(a). Upon an asylum officer's decision to not grant asylum, the noncitizen is placed in streamlined section 240 removal proceedings. The IFR provides that the IJ will schedule a status conference where the noncitizen will indicate whether the noncitizen intends to contest removal or seek any protections for which the asylum officer did not determine that the noncitizen was eligible. If the noncitizen does not intend to contest removal or seek any protections for which the asylum officer did not determine that the noncitizen was eligible, the IJ will order the noncitizen removed. If the asylum officer determined that the noncitizen was eligible for withholding of removal or protection under the CAT, the IJ will give effect to the protection for which the asylum officer determined that the noncitizen was eligible, subject to the ability of DHS to present new evidence establishing that the applicant is not eligible for protection.

However, the noncitizen can elect to contest removal or seek protections that were not granted by the asylum officer. Where the asylum officer did not grant the application for asylum and determined that the applicant is not eligible for statutory withholding of removal or withholding or deferral of removal under the CAT, the IJ will review each of the applications de novo as provided in new 8 CFR 1240.17(i)(1). Where the asylum officer did not grant asylum but determined that the applicant was eligible for statutory withholding of removal or protection under the CAT, the IJ will adjudicate the application for asylum de novo, as provided in new 8 CFR 1240.17(i)(2). Further, under new 8 CFR 1240.17(i)(2), if the IJ denies asylum and enters an order of removal, the IJ will also issue an order giving effect to the protections for which the asylum officer determined that the noncitizen was eligible, unless DHS affirmatively demonstrates through evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. The IJ

will grant any protections for which the IJ finds the noncitizen eligible.

The Departments believe that these procedures outlined in the IFR address many concerns of the commenters while also promoting efficiency in governmental processes. First, the IFR does not allow the IJ to reconsider sua sponte relief or protection for which the asylum officer determined the noncitizen was eligible. Instead, under new 8 CFR 1240.17(i)(2), if the noncitizen elects to contest removability or the asylum officer's determination, the burden shifts to DHS to present evidence showing that evidence or testimony not included in the asylum officer record and specifically pertaining to the noncitizen establishes that the noncitizen is not eligible for the relief or protection. The Departments believe it is necessary for DHS to be able to revisit the issue of eligibility in special circumstances, such as when there may be evidence of fraud or new derogatory information affecting eligibility. As explained above, the Departments believe that, without a process for DHS to address such issues in the streamlined section 240 removal proceedings, DHS would otherwise have to follow the procedures in 8 CFR 208.17(d) and 208.24(f) in instances where overturning the asylum officer's eligibility determination is justified.

e. Appeal of Immigration Judge's Decision to the Board of Immigration Appeals

*Comments:* Some commenters expressed support for the appeal procedures in the NPRM.

Other commenters expressed concern that, without a traditional immigration court hearing transcript to review, BIA and Federal court review would be cursory. Similarly, commenters asserted that the BIA and Federal court review under the NPRM would be meaningless because they believed such review would be conducted on the basis of a partial, incomplete record and that, in many cases, there would be initial rounds of litigation regarding application of the NPRM's limitations on the introduction of evidence.

*Response:* As discussed above in Section III of this preamble, under this IFR, applicants not granted asylum by the asylum officer after an Asylum Merits interview will be referred to streamlined section 240 removal proceedings before the immigration court. This change from the NPRM addresses commenters' concerns about the effect of the nature of the IJ review proceedings set out in the NPRM on any subsequent BIA or appellate review. Under the IFR, in new 8 CFR 1240.17(a)

and (g)(1), noncitizens will be afforded longstanding procedural protections and due process safeguards inherent in section 240 proceedings, including the right to representation at no cost to the Government and the rights to present evidence and testimony. *See* INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B). More specifically, under new 8 CFR 1240.17(a), noncitizens will have the opportunity to be heard at scheduled hearings and the ability to develop the record by presenting evidence that is timely submitted, relevant, probative, and not fundamentally unfair. Furthermore, under new 8 CFR 1240.17(g)(2), IJs may consider late-filed evidence that is filed before the IJ issues a decision in the case if it could not reasonably have been obtained and presented before the deadline through the exercise of due diligence. A complete record of all evidence and testimony will be kept in accordance with the standard procedures for section 240 proceedings. INA 240(b)(4)(C), 8 U.S.C. 1229a(b)(4)(C). This includes but is not limited to: (1) The record of proceedings before the asylum office, as outlined in 8 CFR 208.9(f); (2) a written statement, if any, from the noncitizen describing any alleged errors and omissions in the asylum officer's decision or the record of proceedings before the asylum office; and (3) documentation and testimony in support of the application for relief or protection. The Departments believe that this requirement will alleviate procedural concerns and ensure that the BIA will have a full record on appeal and that U.S. Courts of Appeals will have a full record in a petition for review.

f. Other Comments on Proposed Application Review Proceedings Before Immigration Judges

*Comments:* Commenters urged the Departments to remove the regulatory language that would permit the immigration court to reject an asylum application if proof of payment of the fee, if required, is not submitted, citing proposed 8 CFR 1208.3(a)(2). Commenters asserted that asylum applications should never require a fee because seeking safety from persecution is a fundamental human right and refusing asylum applicants for the inability to pay would effectively cause the United States to abrogate its international obligations. Stating that the prior Administration's fee rule is enjoined, commenters suggested that the Departments should not leave open the possibility for future administrations by explicitly including the possibility of an asylum application fee in this proposed regulation.

*Response:* As noted in the NPRM, the Departments published numerous rules in recent years that have been vacated, enjoined, or otherwise delayed. 86 FR 46909 n.24. Two such rules are final rules regarding application fees issued by DHS and DOJ, respectively. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 FR 46788 (Aug. 3, 2020) (enjoined by *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020), and *Nw. Immigrant Rts. Project* v. *United States Citizenship & Immigr. Servs.,* 496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed,* No. 20–5369, 2021 WL 161666 (DC Cir. Jan. 12, 2021)); Executive Office for Immigration Review; Fee Review, 85 FR 82750 (Dec. 18, 2020) (partially enjoined by *Cath. Legal Immigr. Network, Inc.* v. *Exec. Off. for Immigr. Rev.,* 513 F. Supp. 3d 154 (D.D.C. 2021)).

Language regarding the submission of an application fee, if any, for applications for asylum was included in the latter rule. 8 CFR 1208.3(c)(3); *see also* 85 FR 82765–69 (discussing commenters' concerns regarding an application fee for asylum applications). The NPRM proposed to amend the regulations only as necessary to effectuate the changes related to the credible fear and asylum adjudication processes as explained in the NPRM and this IFR. *See, e.g.,* 86 FR 46914 n.38. As a result, the NPRM did not include any proposed edits regarding the asylum application fee-related language in § 1208.3(c)(3).[91] The language related to the payment of an asylum application fee, if any, was included simply as surrounding regulatory text that was reprinted to ensure correct amendments to the language related to the credible fear and asylum adjudication processes.

DOJ, however, will be considering additional changes to the regulations regarding the applicable fees for applications and motions during EOIR proceedings. *See* Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https:// www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202110& RIN=1125-AB19* (last visited Mar. 9, 2022).

*Comments:* Commenters urged the Departments to rescind the provisions of the Global Asylum rule that expressly permit pretermission of asylum claims and to enact a broad regulatory bar on the practice. At a minimum, commenters asked the Departments to expressly prohibit IJs from pretermitting asylum applications upon review from asylum officers' decisions to not grant asylum, arguing that allowing IJs to do so under the proposed system of minimal process would violate the Constitution.

*Response:* As stated above, the NPRM only proposed to amend provisions of prior rulemakings to the extent necessary to implement the proposed changes related to the credible fear and asylum adjudication processes. *See, e.g.,* 86 FR 46914 n.38. The provisions referenced by commenters at 8 CFR 1208.13(e) regarding pretermission of applications were added by the Departments as part of a separate rulemaking known as the Global Asylum rule. *See* 85 FR 80274. Because this provision is beyond the scope of the changes needed to effectuate the credible fear and application review processes included in the NPRM, the Departments are not including any changes to this provision at this point. However, the Departments will consider whether to modify or rescind 8 CFR 1208.13(e) and the other remaining portions of the regulations affected by enjoined regulations in future rulemakings. *See, e.g.,* Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda: Department of Justice, *https://www.reginfo.gov/public/do/ eAgendaMain?operation=OPERATION_ GET_AGENCY_RULE_LIST& currentPub=true&agencyCode=& showStage=active&agencyCd=1100& csrf_token=1F5E59171165 D9C756F8D13DB0280F16BF4E61995 A08C2DA5251225495 FD83335EE930292724E7EF24BEB50141 CF0AC59747* (last visited Mar. 1, 2022).

*Comments:* Commenters urged the Departments to preserve Federal court review of asylum cases in any asylum process, stressing that judicial review protects refugees from politicized policies, rushed administrative decision-making, or discriminatory factual and legal interpretations and provides judicial oversight of administrative adjudications with life-or-death consequences. Some commenters argued that the proposed rule does not provide adequate appellate protections for asylum seekers, explaining that the provision of the NPRM subjecting asylum seekers to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), unless and until they are granted asylum, could be found by courts to trigger the INA's jurisdiction-stripping provision relating

---

[91] The commenter is incorrect that the Department included language regarding an application fee for applications for asylum at 8 CFR 1208.3(a)(2).

to expedited removal. *See* INA 242(a)(2)(A), 8 U.S.C. 1252(a)(2)(A).

Specifically, commenters expressed concern that some courts might view a challenge to the denial of an asylum application that affirms an expedited order of removal and denies all relief or protection as asking the court "to review . . . any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to [INA 235(b)(1), 8 U.S.C. 1225(b)(1)]," claims for which the statute bars jurisdiction. *See* INA 242(a)(2)(A), 8 U.S.C. 1252(a)(2)(A). Commenters asserted that the statute authorizes only two processes for the issuance of a removal order: (1) An expedited removal order under INA 235(b)(1), 8 U.S.C. 1225(b)(1), for which judicial review is barred; and (2) a removal order entered in proceedings under INA 240, 8 U.S.C. 1229a, for which judicial review is available but which the NPRM expressly proposed not to use. As such, according to commenters, the Departments' simultaneous assertion that INA 235(b)(1), 8 U.S.C. 1225(b)(1) provides the authority to create the proposed procedures while at the same time stating that an order of removal issued pursuant to those procedures is not "an order of removal pursuant to [INA 235(b)(1), 8 U.S.C. 1225(b)(1)]" could raise questions about the availability of judicial review.

Commenters also expressed concern that, even if this Administration is committed to interpreting the proposed rule as allowing for judicial review, a future administration could advise counsel at ICE and DOJ to interpret the rule more narrowly and argue that judicial review is not available. According to commenters, the possibility that the proposed rule could inadvertently deprive asylum seekers of judicial review is another reason to ensure that those not granted asylum by an asylum officer after passing a credible fear screen are referred to proceedings under INA 240, 8 U.S.C. 1229a.

Finally, some commenters questioned what items the Federal courts would review, even if there is no jurisdictional hurdle to review by a U.S. Court of Appeals. Asserting that the circuit courts of appeals are used to reviewing records that include full immigration court hearing transcripts, commenters expressed concern that, under the proposed rule, courts of appeals would review a written decision of the BIA, which reviewed an IJ's review of an asylum officer's decision. Although the record likely would include a transcript

of the asylum officer interview, commenters worried that the transcript would be two levels removed from the Federal court review and would not be in the formal format that Federal courts are accustomed to reviewing.

*Response:* As explained above in Section III of this preamble, the Departments are not adopting the IJ review procedure proposed in the NPRM; instead, under this IFR, noncitizens whose applications for asylum are adjudicated but not granted by an asylum officer will be issued an NTA and referred to an IJ for further review of their applications in streamlined section 240 removal proceedings. If the IJ in turn denies the noncitizen's application for asylum, the IJ will issue an order of removal, and the noncitizen may appeal that decision under the generally applicable procedures, first to the BIA and then in a petition for review to the appropriate U.S. Court of Appeals. 8 CFR 1003.24; INA 242, 8 U.S.C. 1252. Accordingly, this change addresses commenters' concerns regarding the availability of judicial review.

Regarding commenters' concerns about the record for judicial review, the Departments do not agree that the nature of the record presents concerns. As stated in the NPRM, USCIS will transcribe the Asylum Merits interview before the asylum officer, and that verbatim transcript will be included in the referral package sent to the immigration court, as finalized in 8 CFR 208.9(f). Because the Departments will ensure that the transcripts of these hearings are in a format that is appropriate for the IJ's review of the record, commenters' concerns that the transcript will not be sufficiently formal or otherwise helpful for BIA or Federal court review is simply speculative. The noncitizen may then supplement the record from the hearing by the asylum officer during the noncitizen's proceedings before an IJ, including by providing statements or evidence regarding any alleged insufficiency during the Asylum Merits proceedings. Further, if the noncitizen appeals the IJ's decision, all hearings conducted by the IJ will be transcribed under standard EOIR procedures. *See* 8 CFR 1003.5(a) (2020).[92]

*Comments:* Some commenters stated that, although they suggested changes to strengthen due process protections with respect to the proposed IJ review proceedings, the Departments are on track to usher in a modernized U.S. asylum system that is orderly, efficient, and fair.

Another commenter called attention to what it said is "the fundamental defect in our immigration adjudication system that gives rise to the technocratic changes proposed" in the NPRM: The lack of an independent immigration court. The commenter suggested that the Departments adopt a "new model" in which an independent court, presided over by independent judges, would assertedly "make rational decisions based on the facts and the law of the cases it hears."

Commenters also expressed concern that the proposed appeal process seems vague, among other flaws, leaving it unclear what will happen to someone where an IJ on appeal rules in contradiction of the lower authority.

*Response:* Commenters' assertions regarding problems with the immigration court system as a whole are beyond the scope of this rulemaking. Nonetheless, the Departments emphasize that IJs exercise "independent judgment and discretion" in deciding cases, 8 CFR 1003.1(d)(1)(ii) and 1003.10(b), and are prohibited from considering political influences in their decision-making, *IJ Ethics and Professionalism Guide* ("An Immigration Judge should not be swayed by partisan interests or public clamor.").

Moreover, as noted above and in Section III of this preamble, the Departments have not adopted the IJ review procedure proposed in the NPRM and instead are providing that if an asylum officer adjudicates but does not grant asylum, the noncitizen will be issued an NTA in streamlined section 240 removal proceedings. Because new 8 CFR 1240.17(a) provides that the same rules and procedures governing proceedings under 8 CFR, part 1240, subpart A, apply unless otherwise noted, if the IJ in turn denies relief or protection, a noncitizen may appeal the IJ's decision to the BIA under the DOJ regulations at 8 CFR 1240.15 and may further petition for review of the BIA's decision by a Federal circuit court. The Departments believe that this revision addresses commenters' concerns about

---

[92] DOJ amended 8 CFR 1003.5 in 2020 as part of a final rule that affected EOIR procedures related to the processing of BIA appeals. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 81588 (Dec. 16, 2020). On March 10, 2021, the United States District Court for the Northern District of California granted a nationwide preliminary injunction barring the Department from implementing or enforcing the 2020 rule or any portion thereof and stayed the effectiveness of the

rule. *Centro Legal de La Raza* v. *Exec. Off. for Immigr. Rev.*, No. 21–CV–00463–SI, 2021 WL 916804, at *1 (N.D. Cal. Mar. 10, 2021). Accordingly, the Departments cite to the regulations in effect prior to publication of the December 16, 2020 rule.

the alleged vagueness and unfairness of the proposed appeal process in the NPRM by providing a clear process for appeal and incorporating longstanding protections that ensure fairness in immigration proceedings.

*Comments:* Commenters urged the Departments to ensure that all noncitizens have access to motions to reopen protections, asserting that the NPRM is unclear about whether there would be an opportunity for the noncitizen to move to reopen if not physically removed following a removal order.

*Response:* As noted above and in Section III of this preamble, the Departments have decided not to adopt the IJ review procedure proposed in the NPRM and instead are providing that if an asylum officer adjudicated but did not grant asylum, the noncitizen will be issued an NTA in streamlined section 240 removal proceedings. The standard rules governing motions to reopen will continue to apply in those section 240 proceedings. *See* INA 240(b)(5)(C), (c)(7), 8 U.S.C. 1229a(b)(5)(C), (c)(7); 8 CFR 1003.2, 1003.23. The Departments believe this change addresses commenters' concerns about the clarity of rules governing access to motions to reopen in the NPRM.

*Comments:* Commenters urged the Departments to generally end the practice of expedited removal, particularly in the case of asylum seekers, and grant applicants a full hearing before an IJ when requesting an appeal on a negative decision by an asylum officer.

*Response:* Commenter recommendations to eliminate expedited removal are beyond the scope of this rulemaking. Nevertheless, the Departments note that expedited removal is a statutorily provided procedure. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) ("If an immigration officer determines that [a noncitizen] . . . who is arriving in the United States . . . is inadmissible . . . the officer shall order the [noncitizen] removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution."); INA 235(b)(1)(B)(iii)(I), 8 U.S.C. 1225(b)(1)(B)(iii)(I) ("[I]f the officer determines that [a noncitizen] does not have a credible fear of persecution, the officer shall order the [noncitizen] removed from the United States without further hearing or review.").

*Comments:* Commenters suggested ways to ensure timely, effective, and fair immigration court decisions: (1) Formalize IJ authority to use administrative closure to manage their dockets; (2) establish formal pre-hearing conferences for DHS attorneys and noncitizens' counsel to confer and identify issues in dispute prior to trial, stipulate to issues where there is no dispute, or agree that asylum or protection is grantable based on the written submissions; (3) clarify the IJ's authority to terminate section 240 removal proceedings to allow a noncitizen to pursue applications for permanent status before USCIS if the noncitizen establishes prima facie eligibility for such status; and (4) create a formal mechanism for asylum seekers and other immigrants to advance immigration court hearing dates to ensure that their cases are timely heard and that hearing slots do not go unused.

*Response:* Comments suggesting improvements for immigration court proceedings generally are outside the scope of this rulemaking. However, the Departments briefly explain the current legal scheme and how it may relate to this IFR.

First, regarding commenters' request that IJs be able to utilize administrative closure to manage their dockets, the Attorney General recently issued *Matter of Cruz-Valdez,* 28 I&N Dec. 326 (A.G. 2021), finding that, while the process of rulemaking proceeds, the current standard for administrative closure is set out in *Matter of Avetisyan,* 25 I&N Dec. 688 (BIA 2012), and *Matter of W–Y–U–,* 27 I&N Dec. 17 (BIA 2017). Parties should refer to the current case law until further rulemaking is completed. *See* Director Memorandum's (DM) 22–03, *Administrative Closure* (Nov. 22, 2021).

Second, regarding the commenters' request for a formal pre-hearing conference, the IFR, in new 8 CFR 1240.17(f), provides that the IJ will hold a prehearing status conference to narrow the issues and otherwise simplify the case.

Third, commenters' request that the Departments clarify general IJ authority to terminate proceedings to allow a noncitizen to pursue other relief or protection before USCIS is beyond the scope of this rulemaking. This IFR specifically addresses procedures for noncitizens subject to the expedited removal process; it does not involve general IJ authority to terminate proceedings. Regarding IJs' general authority to terminate proceedings, relevant case law provides that an IJ may dismiss or terminate section 240 removal proceedings only under the circumstances identified in the regulations. *See Matter of S–O–G– & F–D–B–,* 27 I&N Dec. 462 (BIA 2018). Further, parties may agree to dismiss proceedings for the noncitizen to pursue other relief or protection before USCIS. *See Matter of Kagumbas,* 28 I&N Dec. 400, 401 n.2 (BIA 2021) (noting that parties are not prohibited "from agreeing to dismiss proceedings so that a respondent may pursue adjustment of status before . . . USCIS"). Fourth, regarding commenters' request for EOIR to create a formal mechanism for noncitizens to file a motion to advance hearing dates, the Immigration Court Practice Manual provides formal instructions for requests to advance a hearing date. *See EOIR Policy Manual,* Part II.5.10(b). Moreover, EOIR maintains a formal policy to ensure that all available blocks of immigration court time are utilized to the maximum extent practicable. *See* EOIR, *PM 19–11, No Dark Courtrooms* (May 1, 2019), *https:// www.justice.gov/eoir/file/1149286/ download.*

*E. Other Issues Related to the Proposed Rulemaking*

1. Public and Stakeholder Input

*Comments:* Several commenters requested a comment period extension for various reasons, such as unclear deadline instructions, insufficient time to comment, and impacts of the COVID–19 pandemic. One commenter stated that commenting on this rule is difficult without understanding its interaction with other proposed rulemakings relating to the asylum system.

Additionally, two commenters requested that the proposed rule be rescinded, revised, and reposted for another comment period opportunity. One of these commenters said the agency should reissue a new NPRM after providing asylum seekers meaningful opportunities to present their own recommendations for reforming the asylum system.

*Response:* Although the APA does not require a specific time period for public comments, Executive Orders 12866, 58 FR 51735 (Sept. 30, 1993), and 13563, 76 FR 3821 (Jan. 18, 2011), recommend a comment period of at least 60 days. Here, the Departments have provided a 60-day comment period that allowed for adequate notice, evinced by the over 5200 comments received and addressed in this rule. In addition, the Departments are issuing this rulemaking as an IFR with a request for comment, thus allowing the public a further chance to provide input. The Departments consequently do not agree with the need for an extension. Additionally, suggestions to rescind, revise, and republish the rule upend the rulemaking process. The NPRM is designed to provided fair notice and

allow for public input. Engaging in continual reworking of such a notice because of public comment undermines the methodology of informal rulemaking under the APA.

*Comments:* Several commenters urged USCIS to engage with stakeholders like immigration advocates, non-governmental organizations, and asylum seekers to improve existing processes prior to publishing the rule. One commenter provided specific feedback from its members about improving the efficiency and accessibility of the asylum system.

Another commenter similarly requested that, before any further steps are taken to finalize the rule, additional consultations take place. The commenter "remind[ed]" the Departments that, in response to a rule proposed by the prior Administration, UNHCR emphasized that it was prepared to offer technical assistance, and the asylum officers' union observed that the current Administration "must make sure that the individuals tasked with implementing policy have a voice in crafting new regulations." The commenter stated that, by Executive order, the President has mandated that Federal Departments "shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders." If the Departments choose not to engage in such consultation and planning with experts, the commenter requested an explanation of why not.

*Response:* The Departments acknowledge commenters' requests for further engagement and their suggestions to improve the asylum program. Here, the Departments provided a 60-day comment period in the NPRM, which provided the opportunity for members of the public, including the commenters, public employee unions, and other stakeholders, to offer feedback on the rule. In addition, in this IFR, the Departments are including another request for public comments. Furthermore, the Departments regularly engage experts from non-governmental and intergovernmental organizations to supplement the extensive training provided to their personnel. The Departments also note that they regularly hold public engagement sessions with stakeholders, allowing further opportunity for the consultations the commenters have requested. The Departments are continually seeking ways to improve the manner in which they carry out their duties in service to

the public and take into account stakeholder feedback when doing so.

*Comments:* Some commenters requested a more specific definition of "particular social group" to better understand the proposed rule and provide feedback. Similarly, several commenters requested a delay in implementation of the rule until the "particular social group" rule is issued so that Congress has the opportunity to comment and, if necessary, to legislate on who is eligible for asylum.

*Response:* The Departments acknowledge the commenters' interest in the forthcoming rulemaking addressing, among other things, the definition of the term "particular social group" as used in the INA.[93] However, the Departments disagree that the implementation of this IFR should be delayed until the "particular social group" rule is issued. The Departments do note, however, that in issuing this rulemaking as an IFR, they are soliciting further comment on its provisions. This rulemaking does not change any of the criteria for asylum eligibility, but rather addresses the procedures and mechanisms by which the asylum claims of individuals subject to expedited removal are considered and processed. By contrast, the "particular social group" rulemaking would codify the Departments' interpretations of certain Federal statutes they are charged with implementing. The Administrator of the Office of Information and Regulatory Affairs within the Office of Management of Budget has determined that this IFR is a "major rule" within the meaning of Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act), 5 U.S.C. 804(2). Accordingly, this IFR is effective 60 days after publication, thus allowing additional time for congressional review. If Congress deems it necessary to legislate on asylum eligibility or any other topic within its authority under the United States Constitution, it may certainly do so without regard to any regulations promulgated by Executive departments. The Departments will faithfully execute any laws enacted by Congress and signed by the President.

## 2. Severability

*Comments:* A commenter expressed concern that, if certain protective provisions in the proposed rule are severed, then it "would fall short of international standards for fair and

efficient processing of asylum applications."

*Response:* The Departments acknowledge the commenter's concern. The Departments are committed to ensuring that the process afforded applicants meets the requirements of due process even if certain aspects of the IFR are enjoined by a court. With this consideration in mind, the Departments reiterate the statement on severability set forth in the NPRM. 86 FR 46921. That is, to the extent that any portion of the IFR is stayed, enjoined, not implemented, or otherwise held invalid by a court, the Departments intend for all other parts of the rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect. Thus, even if a judicial decision invalidating a portion of the IFR results in a partial reversion to the current regulations or to the statutory language itself, the Departments intend that the rest of the IFR continue to operate in tandem with the reverted provisions, if at all possible, and subject to the discretion permitting USCIS to decide to issue individuals NTAs and refer noncitizens to ordinary section 240 removal proceedings.

## 3. Discretion and Phased Implementation

### a. Discretion

*Comments:* One commenter expressed concern about providing DHS with discretion to determine whether noncitizens who receive a positive credible fear determination are issued NTAs and referred directly to section 240 removal proceedings or instead have their cases retained by USCIS for Asylum Merits interviews. The commenter urged DHS to eliminate the discretion to place noncitizens in section 240 removal proceedings rather than in the new process. This commenter believes that such discretion is arbitrary, inconsistent, and will "exacerbate negative bias" in the decision-making process. Another commenter urged the Departments to reconsider the use of discretion because the commenter believes there is a high risk of inconsistent treatment among asylum seekers subject to the new process and asylum seekers who are placed in section 240 removal proceedings in the first instance.

*Response:* The Departments acknowledge the commenters' concerns but disagree that permitting DHS to continue to exercise its discretion to place noncitizens who establish a credible fear of persecution or torture directly into ordinary section 240

---

[93] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC65* (last visited Feb. 27, 2022).

removal proceedings before an IJ, as finalized in new 8 CFR 208.30(b), is arbitrary, inconsistent, or will exacerbate negative bias. Such discretion is needed because there may be circumstances in which it may be more appropriate for a noncitizen's protection claims to be heard and considered in the adversarial process before an IJ in the first instance (for example, in cases where a noncitizen may have committed significant criminal acts, engaged in past acts of harm to others, or created a public safety or national security threat). In addition, the Departments anticipate that DHS will also need to continue to place many noncitizens receiving a positive credible fear determination into ordinary section 240 removal proceedings while USCIS takes steps needed to allow for full implementation of the new process. Noncitizens who are placed into section 240 removal proceedings in the first instance will have access to the same procedural protections that have been in place for asylum adjudications for many years. Such exercise of discretion is similar to and in line with DHS's recognized prosecutorial discretion to issue an NTA to a covered noncitizen in expedited removal proceedings at any time after the covered noncitizen is referred to USCIS for a credible fear determination. *See Matter of E–R–M– & L–R–M–*, 25 I&N Dec. at 523. Moreover, USCIS asylum officers have experience with exercising discretion in various contexts, including in the adjudication of the asylum application itself, and, thus, will be well suited to exercise discretion in this context.

b. Phased Implementation

*Comments:* Some commenters expressed opposition to the phased rule implementation approach. One commenter asserted that a Federal district court has found that the practice of expediting cases for a particular subset of individuals may violate their rights, citing *Las Americas Immigrant Advocacy Center* v. *Trump,* 475 F. Supp. 3d 1194 (D. Or. 2020). Another commenter asserted that there is no justification for what the commenter viewed as the rule's preferential treatment for non-detained families over detained individuals and single adult women and men. Another commenter suggested a detailed plan for USCIS to conduct a pilot project allowing asylum seekers to opt into the new process and then have USCIS collect evidence about the fairness and expeditiousness of the rule before it becomes final. Alternatively, the commenter suggested providing a preliminary period during

which the rule would be in effect followed by a "stay" of the regulatory changes to ensure that the new process is producing fair and expeditious decisions.

*Response:* As discussed in greater detail in the costs and benefits analysis of this rule and its impacts on USCIS, as required under Executive Orders 12866 and 13563, USCIS has estimated that it will need to hire new employees and spend additional funds to fully implement the new Asylum Merits process. If the number of noncitizens placed into expedited removal and making successful fear claims increases, the cost to implement the rule with staffing levels sufficient to handle the additional cases in a timely fashion would be substantially higher. Until USCIS can support full implementation, USCIS will need to continue to place a large percentage of individuals receiving a positive credible fear determination into ordinary section 240 removal proceedings in the first instance.

Current resource constraints will prevent the Departments from immediately achieving their ultimate goal of having the protection claims of nearly all individuals who receive a positive credible fear determination adjudicated by an asylum officer in the first instance. The Departments are also accounting for existing and emerging priorities impacting the workload of the USCIS Asylum Division, such as the affirmative asylum caseload and the streamlined asylum application processing of certain Afghan parolees as described in section 2502(a) of the Extending Government Funding and Delivering Emergency Assistance Act.[94] The Departments believe that, to fully implement the rule, additional resources will be required. The Departments therefore will expand use of the new Asylum Merits process in phases, as the necessary staffing and resources are put into place.

While the Departments acknowledge the commenters' recommendations that the Departments proceed with a pilot project or have regulatory changes take effect for a limited time, the Departments believe that the phased implementation approach is better suited for this new process. A phased implementation will allow the Departments to begin employing the new process in an orderly and controlled manner and for a limited

number of cases, giving USCIS the opportunity to work through operational challenges and ensure that each noncitizen placed into the process is given a full and fair opportunity to have protection claims presented, heard, and properly adjudicated in full conformance with the law. Phased implementation will also have an immediately positive impact in reducing the number of individuals arriving at the Southwest border who are placed into backlogged immigration court dockets, thus allowing the Departments to more quickly adjudicate some cases. Phased implementation will also ensure that EOIR is able to dedicate IJs to the streamlined section 240 removal proceedings, which will require available docket space to meet these proceedings' scheduling requirements.

Given limited agency resources, the Departments anticipate first implementing this new process for only a limited number of noncitizens who receive a positive credible fear determination after the effective date of this rule. The Departments believe this is necessary because USCIS capacity is currently insufficient to handle all referrals under this new process. The Departments also anticipate limiting referrals under the initial implementation of this rule to noncitizens apprehended in certain Southwest border sectors or stations, as well as based on the noncitizen's final intended destination (*e.g.,* if the noncitizen is within a predetermined distance from the potential interview location). As the USCIS Asylum Division gains resources and builds capacity, the Departments anticipate that additional cases could be considered for processing pursuant to this phased implementation.

The Departments also disagree that the decision in *Las Americas* precludes a phased implementation of the IFR. The relevant part of that decision addressed only whether the adoption of a separate policy constituted "final agency action" that could be challenged under the APA. 475 F. Supp. 3d at 1216. The decision did not purport to prohibit agencies from implementing regulatory programs in phases.

Overall, the Departments will work together to ensure that both agencies have capacity as this rule's implementation proceeds. For example, if EOIR does not have additional available docket space, USCIS will not expand the rule's application at that point.

---

[94] *See* Public Law 117–43, sec. 2502, 135 Stat. 344, 377 (2021); DHS, DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S. (Nov. 8, 2021), *https://www.dhs.gov/news/2021/11/08/dhs-announces-fee-exemptions-streamlined-processing-afghan-nationals-they-resettle.*

## 4. Comments on Immigration Court Inefficiencies and Bottlenecks

*Comments:* Some commenters suggested several ways to address inefficiencies and bottlenecks, such as quickly filling existing positions, surging staffing to the courts, and requesting funding from Congress to increase the number of immigration court interpreters, support staff, IJs, BIA legal and administrative staff, and BIA members. Additionally, these commenters suggested pre-hearing requirements to narrow issues for trial and to create a process to advance cases stuck in the court backlog.

*Response:* The Departments acknowledge the commenters' suggestions and recommendations to help improve the immigration adjudication process as a whole. The commenters' suggestions regarding the hiring process, staff surges, and increased funding are beyond the scope of this rulemaking. However, DOJ has already implemented or is currently implementing a number of measures referenced by the commenters, as described below. For example, DOJ has reduced the average IJ hiring process from 742 days (over 2 years) in 2017 to 8 to 10 months at present. Upon receipt of qualified applicants from the Office of Personnel Management ("OPM"), DOJ immediately begins assessment of the applicants. DOJ also consistently meets its internal deadlines for this process. As a result of these efforts, as of October 2021, DOJ had hired 65 new IJs in FY 2021, bringing the total number of IJs to 559. *See* EOIR, Adjudication Statistics: Immigration Judge (IJ) Hiring (Jan. 2022), *https://www.justice.gov/eoir/page/file/1242156/download.* DOJ continues to focus on filling all vacancies as expeditiously as possible.

DOJ has consistently requested increased funding for additional authorized positions. In its FY 2022 budget request, DOJ requested an additional 600 authorized positions, to include 300 attorney positions. Of the 300 attorney positions, DOJ anticipates hiring 100 new IJs and support staff. *See* DOJ, FY 2022 Budget and Performance Summary: Executive Office for Immigration Review (Aug. 20, 2021), *https://www.justice.gov/jmd/page/file/1399026/download.* DHS also requested funding appropriations to meet the increased workload in the immigration courts and ameliorate staffing budgetary shortfalls. For FY 2022, DHS requested 100 additional ICE litigator positions to prosecute the removal proceedings initiated by DHS, consistent with 6 U.S.C. 252(c). *See* DHS, ICE Budget Overview: FY2022 Congressional

Justification at ICE–O&S–22, *https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf.*

In new 8 CFR 1240.17(f)(1)–(3), the IFR establishes certain pre-hearing requirements for individuals in streamlined section 240 proceedings. Establishing pre-hearing requirements for all cases, however, is beyond the scope of this rulemaking. DOJ reiterates that IJs may issue orders for pre-hearing statements. 8 CFR 1003.21(b), (c). Further, EOIR's case flow processing model, which applies to certain non-detained cases with representation, incorporates short matter hearings or pre-trial conferences for cases that are not yet ready for trial, as appropriate. *See* EOIR, *PM 21–18: Revised Case Flow Processing Before the Immigration Courts* (Apr. 2, 2021), *https://www.justice.gov/eoir/filing-deadlines-non-detained-cases; see also* EOIR, *DM 22–04: Filing Deadlines in Non-Detained Cases* (Dec. 16, 2021), *https://www.justice.gov/eoir/book/file/1456951/download* (amending *PM 21–18*).

## F. Statutory and Regulatory Requirements

### 1. Impacts and Benefits (E.O. 12866 and E.O. 13563)

#### a. Methodology

*Comments:* A commenter referenced the NPRM statement that the agencies cannot accurately estimate the benefits to the agencies. Additionally, the commenter referenced several specific cost estimates and case numbers from the NPRM and reasoned that the numbers are now incorrect because more cases have been added since then, causing an increase in cost and resulting in less financial efficiency for the rule.

*Response:* USCIS acknowledges the increasing backlog and agrees that it can have an impact on credible fear asylum applicants, their families, and support networks. As stated in the NPRM, this rule is expected to slow the growth of EOIR's backlog and allow EOIR to work through its current backlog more quickly. First, the rule will allow DHS to process more noncitizens encountered at or near the border through expedited removal—rather than placing them into section 240 removal proceedings—thereby quickly and efficiently securing removal orders for those who do not make a fear claim or who receive a negative credible fear determination. Second, this rule is estimated to reduce EOIR's overall credible fear workload by at least 15 percent. This estimate is based on the average of EOIR asylum grant data over

the past five years for cases originating with a credible fear claim.[95] Under this IFR, grants of asylum for such cases would generally be made by USCIS without involvement by EOIR (setting aside those cases in which asylum is granted after referral to a streamlined section 240 proceeding). Because the Departments expect that USCIS's asylum grant rate will be approximately the same as EOIR's, approximately 15 percent of cases originating in credible fear interviews will no longer contribute to EOIR's workload. Third, the above calculation sets a lower bound on EOIR's expected workload reduction, as it does not account for efficiencies that may be realized in cases that are referred to EOIR for streamlined section 240 proceedings. In these three ways, the rule will enable IJs to focus efforts on other high-priority work, including backlog reduction. Moreover, for noncitizens who are placed into the process established by this IFR, the Departments expect that asylum decisions will be reached faster than if they were to go through the current process with EOIR.

Unfortunately, not all benefits can be quantified at this time, as the Departments acknowledged in the NPRM and affirm in this IFR. Benefits driven by increased efficiency would enable some asylum-seeking individuals to move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly, thus promoting both human dignity and equity. Adjudicative efficiency gains and changes to the regulatory standard for consideration for parole could lead to individuals spending less time in detention, which would benefit the Government, considering its limited resources and inability to detain all those apprehended, as well as the affected individuals, who would be able to continue to prepare for and pursue relief or protection outside the confines of a detention setting.

#### b. Population

*Comments:* A commenter asserted that the 75,000 to 300,000 range of

---

[95] *See supra* note 57 (discussing IJs' and asylum officers' similar approval rates on the merits of the asylum claim). Based on the five-year (FY 2017 through FY 2021) average, an estimated 15 percent of the total number of EOIR asylum cases completed originating from credible fear screening were granted asylum. *See* EOIR, Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1062976/download.* Calculation: FY 2017 to FY 2021 grant rates (14.02 percent) + (16.48 percent) + (15.38 percent) + (16.60 percent) + 14.32 percent)/5 = 15 percent average (rounded).

people cited in the NPRM who would receive credible fear determination does not include the "2019 DHS expansion of the expedited removal process to the full extent authorized by statute."

*Response:* The Departments disagree that the population cited in the NPRM underestimates the number of people who would receive credible fear determinations. Although there is no way to predict exact future filing volumes, USCIS determined the population expected to be affected by this rule to be the average number of credible fear completions processed annually by USCIS (71,363, *see* Table 3). However, as changes in credible fear cases and asylum in general can be driven by multiple factors that are difficult to predict, USCIS provided estimates for potential populations above and beyond the current number of annual credible fear completions. At present, the estimated lower bound of 75,000 is greater than current annual average of completions, and USCIS has estimated a maximum population of 300,000 people who could be impacted to account for variations and uncertainty in the future population. Although the 2019 DHS expansion of the expedited removal process is currently in place, President Biden, in his E.O. on Migration, has directed DHS to consider whether to modify, revoke, or rescind the expansion. It is unknown when or if the expansion would be rescinded or what other factors outside of this rulemaking may impact the size of this population. Therefore, the Departments have done their best to provide estimates at varying potential population levels.

c. Costs or Transfers

i. Impacts on the Credible Fear Asylum Population and Support Networks

Fees

*Comments:* Several commenters stated that the United States has a legal obligation to protect those seeking asylum, and some stated that asylum applications should never require a fee. Additionally, many commenters said fee increases disproportionately impact low-income immigrants and vulnerable populations, including gender-based violence survivors. Other commenters stated that increased fees would financially harm noncitizens seeking asylum and create a barrier for many applicants. An individual commenter suggested that the fee-based services of USCIS would endanger the freedoms of U.S. citizens.

*Response:* USCIS currently does not charge a fee to apply for asylum. This rule is not requiring low-income

noncitizens or other vulnerable populations to pay a fee for their asylum application to be adjudicated. Additionally, fee waivers are currently available for an applicant who cannot afford to pay to apply for an immigration benefit that requires a fee. The provisions of this IFR are not expected to impact any applicant who entered the United States legally and is seeking to obtain immigration benefits through the appropriate processes or any natural-born or naturalized U.S. citizen not part of an asylum applicant's support network.

*Comments:* Several commenters referenced the rule's statement that a significant investment of resources will be necessary to build up the capacity of USCIS to make this new rule fully operational. Several commenters urged DHS to secure the necessary resources from Congress to the extent possible, rather than through increased fees for applicants.

*Response:* The Departments acknowledge these comments and the concern they show for the funding of this rule. As the commenters state, fees are necessary for USCIS to collect to pay for the work USCIS performs in adjudicating applications and petitions for immigration benefits. USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volume of applicants. 86 FR 46937. This estimated increase would be attributable to the implementation of the asylum officer portions of the proposed rule only. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for such staffing actions. Although the substance of the future fee rule is outside of the scope of this rule, USCIS currently does not charge a fee to apply for asylum. USCIS is exploring all options to provide funding for this rule.

Other Impacts

*Comments:* A commenter expressed concern that the potential for more expedited denials of applications risks making some asylum seekers less likely to receive employment authorization while their cases are pending.

*Response:* This rule is intended to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while ensuring fundamental fairness. Faster processing will lead to timelier case completions for asylum claims, including both approvals and denials. Employment authorization is a discretionary benefit

that USCIS may grant to those who qualify. This rule does not change the requirements for employment authorization or for asylum, but it may change the amount of time some applicants' cases remain pending. Applicants whose asylum claims are approved can work immediately.

*Comments:* Multiple commenters asserted that the proposed rule will do little to address the backlog of cases or improve efficiency. Other commenters argued that the rule would divert already scarce agency resources away from noncitizens who submit affirmative asylum applications in addition to unaccompanied noncitizen minors, over whose asylum claims USCIS has initial jurisdiction. Another commenter expressed concern that, if USCIS shifted experienced asylum officers into this new role, it would slow down existing caseloads due to less experienced new hires.

*Response:* The Departments disagree with the criticisms from these commenters. This rule will allow EOIR to focus efforts on high-priority work and will likely contribute to EOIR's efforts to reduce its substantial current backlog over time. Ultimately, EOIR will not see the cases in which USCIS grants asylum, which the Departments estimate as at least a 15 percent reduction in EOIR's overall credible fear workload. Over time, this rule stands to reduce the backlog of cases pending in immigration courts and will enable faster processing of cases originating in credible fear screening—whether asylum is granted or denied—than if they were to go through the current process with EOIR. USCIS has estimated that it will need to hire approximately 800 new employees to fully implement the proposed asylum officer interview and adjudication process to handle approximately 75,000 cases annually. USCIS will not shift asylum officer resources from their current workload to implement this program but has explained how it will hire, train, and deploy staff specifically dedicated to this program in Section IV.B.1.b of this preamble.

Although addressing the affirmative asylum backlog is outside the scope of the rulemaking, the Departments acknowledge the importance of doing so and note that USCIS has taken other actions to address this priority. These include expanding facilities; hiring and training new asylum officers; implementing operational changes to increase interviews and case completions and reduce backlog growth; establishing a centralized vetting center; and working closely with technology partners to develop several tools that

streamline case processing and strengthen integrity of the asylum process.[96] In addition, on September 30, 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provides dedicated backlog elimination funding to USCIS for ''application processing, the reduction of backlogs within asylum, field, and service center offices, and support of the refugee program.'' Public Law 117–43, sec. 132, 135 Stat. at 351.

*Comment:* A commenter asserted that biometric information collection for both EAD submissions and asylum applications is duplicative, time-consuming, and costly due to the relatively low number of asylum offices throughout the country.

*Response:* Biometrics information is collected on every individual associated with a Form I–589 filing, and for the Form I–765(c)(8) category, USCIS started collecting biometrics, and the associated $85 biometrics service fee, in October 2020. This rule does not change biometric collection requirements related to Form I–589 or Form I–765. USCIS may still have to require applicants to attend an ASC appointment or otherwise obtain their biometrics in support of the asylum application following a positive credible fear determination but is working to obtain the ability to reuse the biometrics already captured by other DHS entities for the asylum application before USCIS.

*Comments:* One commenter said that DHS failed to consider the long-term financial and procedural impact on fee-paying legal immigrants who pay USCIS petition fees and that this proposed rule unfairly shifts the financial burden from the U.S. taxpayer (DOJ) to lawful immigrants (USCIS). The commenter asserted that it is in the best interest of those who pay fees to have the money mostly spent on adjudicating their petitions, not on humanitarian interests. The commenter argued that the United States should have funded the operation, not lawful immigrants, and that funding could have been used on projects such as e-filing systems and process improvements instead. The commenter asserted that the proposal harms fee-paying immigrants, such as those with master's and doctoral degrees in the STEM (science, technology, engineering, and mathematics) fields who are needed for the United States'

international competitiveness. The commenter suggested that DOJ hire more IJs or that funding should come from Congress or by charging asylum seekers in expedited removal a fee that fully covers the cost to adjudicate their case.

*Response:* USCIS already performs humanitarian work through credible and reasonable fear screenings, asylum interviews, and refugee processing for which the costs are covered through fees paid by applicants and petitioners. Should this rule be funded through a future fee rule, the financing would be no different. This rule is not requiring fee-paying immigrants with master's and doctoral degrees in the STEM field to take on the full burden of this new program. Although some applicants who fall into these categories may face increased fees under a future fee rule, historically, changes to fees are spread across a variety of applicants and petitioners and are fully outlined in a notice-and-comment rulemaking.

*Comment:* A commenter asserted that the NPRM would cause significant harm to its mission and programming and to the clients it serves. It stated that it will need to make significant changes in its programming to provide meaningful representation and pro bono services and may have to divert more resources to represent asylum seekers in appeals. Additionally, the commenter asserted, the fast-tracking of interviews and the limitations on attorney representation during the interviews would significantly hinder its ability to provide legal services in a timely and meaningful manner. As a result, it would have a smaller population it could represent in the United States. Without access to counsel, it asserted, asylum seekers would be less likely to prevail on the merits of their claims. The commenter alleged that the consequences of these proposed changes would be devastating for tens of thousands of refugees whom the United States has committed to protecting.

*Response:* The Departments acknowledge the commenter's concern but disagree that this rule will negatively impact asylum seekers in the manner the commenter predicts. This rule is intended to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while ensuring fundamental fairness. This rule does not change the requirements for asylum applicants or the evaluation criteria that are used during adjudication.

Prompt adjudication of these claims will benefit asylum seekers, the Departments, and the public. The

Departments understand that applicants will need time to review their applications and supporting documentation, consult with representatives, and prepare for their Asylum Merits interviews before USCIS asylum officers. At the same time, the underlying purpose of this rulemaking is to establish a process for promptly adjudicating cases that heretofore have been drawn out for months or even years before EOIR. To balance the efficiency goals of the present rule with the fairness and due process concerns raised by commenters and shared by the Departments, the Departments are clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview. This time frame mirrors the time frame provided to applicants in the affirmative asylum process, where asylum interviews are generally scheduled, and interview notices are mailed to applicants, 21 days in advance of the asylum interview date. This rule does not limit access to counsel for asylum applicants. To the contrary, 8 CFR 208.9(b) provides that ''[t]he applicant may have counsel or a representative present'' at the asylum interview, and 8 CFR 208.9(d)(1) provides the applicant's representative an opportunity to make a statement, comment on the evidence presented, and ask follow-up questions.

Moreover, the Departments are forgoing the IJ review procedure proposed by the NPRM. Rather, applicants who are not granted asylum after a hearing conducted by the asylum officer will be placed in streamlined section 240 removal proceedings. Although these proceedings will be substantially streamlined relative to ordinary section 240 proceedings, the Departments have designed a process that is intended to facilitate and preserve access to counsel and ensure that noncitizens receive a full and fair hearing.

First, noncitizens subject to these procedures who have not secured counsel by the time of their Asylum Merits interview will continue to have a meaningful opportunity to secure counsel during removal proceedings. The IFR provides for a 30-day gap between the asylum officer's decision not to grant asylum and the noncitizen's master calendar hearing in immigration court, during which time the noncitizen may seek counsel. At the master calendar hearing, IJs must advise unrepresented noncitizens of their rights in removal section 240 removal proceedings, including their right to

---

[96] *See* USCIS, *Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress* (Oct. 20, 2021), *https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf.*

representation and the availability of pro bono legal services, and provide a list of pro bono legal service providers. INA 240(b)(4), 8 U.S.C. 1229a(b)(4); 8 CFR 1240.10. The noncitizen will have an additional 30 days before the status conference to seek counsel without needing to request a continuance. A noncitizen who remains unrepresented at the status conference may request a continuance for good cause shown to secure counsel and may receive such continuances for up to an additional 30 days. *Matter of C–B–,* 25 I&N Dec. at 889 ("In order to meaningfully effectuate the statutory and regulatory privilege of legal representation . . . , the [IJ] must grant a reasonable and realistic period of time to provide a fair opportunity for a respondent to seek, speak with, and retain counsel."). The IFR permits further continuances to secure counsel in appropriate circumstances even under the rule's heightened continuance requirements, which apply after 30 days of continuances have been granted. *See, e.g., Usubakunov,* 16 F.4th at 1305 (denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to violation of his statutory right to counsel). Accordingly, the IFR provides a significant and reasonable amount of time for noncitizens to obtain counsel and allows for continuances to secure representation in appropriate circumstances.

Second, the IFR recognizes that a noncitizen might not obtain counsel before the beginning of proceedings and therefore allows for continuances or extensions of filing deadlines where counsel needs additional time to prepare, so long as counsel demonstrates that the need for the continuance or extension satisfies the applicable standard. The rule also provides flexibility to counsel by allowing noncitizens to file additional documents and supporting evidence after the filing deadline when certain conditions are met.

Third, the rule provides a meaningful opportunity for both represented and unrepresented noncitizens to present their claims during streamlined section 240 removal proceedings. The rule is consistent with IJs' duty to develop the record, and various provisions of the rule particularly enable IJs to do so in cases involving pro se respondents. In cases where the noncitizen is represented, the IFR is designed to streamline proceedings by narrowing the issues to be adjudicated, which the Departments anticipate will benefit all parties and their counsels as well as EOIR.

ii. Impacts on U.S. Workers, Companies, Economy

Approximately five commenters provided specific feedback about the impacts on U.S. workers, companies, and the economy.

*Comments:* A commenter expressed concern about the fiscal impact on American taxpayers and stated that the proposed rule is not clear about how USCIS will cover the costs related to the rule. Another commenter requested that DHS provide estimates of the proposal's impact on the number of immigrants and asylum seekers intending to enter the country and the costs associated with any increased immigration. The commenter also requested an estimate of how much the humanitarian effort of accepting asylees would cost the average U.S. citizen and expressed concern about immigration's impact on the country's limited financial resources.

*Response:* The work performed by USCIS is primarily paid for through fees collected from applicants or petitioners requesting immigration or naturalization benefits.[97] USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average of between 13 percent and 26 percent, depending on volumes of applicants. 86 FR 46937. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for past staffing actions. Although speculating on future fees is outside of the scope of this rule, USCIS currently does not charge a fee to apply for asylum. USCIS is exploring all options to provide funding for this rule.

The population expected to be affected by this rule is the average number of credible fear completions processed annually by USCIS (71,363, *see* Table 3), split between an average of 59,280 positive-screen cases and 12,083 negative-screen cases. This can be considered the maximum "encompassing" population that could be impacted. However, the Departments take into consideration larger populations to account for variations and uncertainty in the future population. Regarding the costs associated with increased immigration, this rule focuses on the direct costs to USCIS related to staffing needs to absorb the new workload it will take on from EOIR. Further, the Departments recognize the role of support networks, which could include public and private entities and family and personal friends,

legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and non-governmental organizations ("NGOs"), but it is not possible to place a monetary value on such support. The rule does not change the substantive eligibility standard for asylum or the evidentiary requirements. Therefore, USCIS has no reason to expect that the rule will have a significant effect on the number of individuals who may be granted asylum. Additionally, individuals whose asylum claims are pending are not provided any special humanitarian aid funded by U.S. taxpayers.

*Comments:* Several commenters speculated that, in the current economic situation of high inflation and low job-growth, the influx of working-age immigrants may create wage decreases impacting low-wage American workers. Another commenter cited a study and the testimony of a former member of Congress indicating that immigrants with low education and skills may compete with the most vulnerable Americans, which would assertedly lower wages and benefit businesses.

*Response:* The commenters suggesting that increased immigration, particularly of low-skilled immigrants, to the United States may adversely impact the wages of low-income Americans provide no evidence indicating such an impact would be the most likely outcome of this rulemaking. Furthermore, these comments blur the distinction between legal and illegal immigration and provide little evidence on the impact of asylum seekers in particular on wages.[98]

Faster adjudications for applicants who receive a positive credible fear determination mean they may enter the labor market sooner under this rule than they would currently. Conversely, some asylum seekers that currently enter the labor market with a pending asylum application will no longer enter the labor market under this rule if they receive a negative decision on their asylum claim at an earlier date. Therefore, at this time, it is unknown exactly how this rule will impact employment authorization for this population or what impacts such authorizations would have on the labor market. Because the "(c)(8)" EAD does not include or require, at the initial or

[97] *See* USCIS, Budget, Planning and Performance (May 28, 2021), *https://www.uscis.gov/about-us/budget-planning-and-performance.*

[98] Economic research indicates that immigration in general has had little effect on the distribution of wages in the United States in recent decades. *See* Jane G. Gravelle, Cong. Research Serv., R46212, *Wage Inequality and the Stagnation of Earnings of Low-Wage Workers: Contributing Factors and Policy Options* (Feb. 5, 2020), *https://crsreports.congress.gov/product/pdf/R/R46212/3* (last visited Mar. 5, 2022).

**18190**   **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

renewal stage, any data on employment, and since it does not involve an associated labor condition application, we have no information on wages, occupations, industries, or businesses that may employ such workers. Therefore, USCIS cannot confirm the type of work that asylum seekers obtain or the wages they earn.

The Bureau of Labor Statistics ("BLS") publishes statistics on employment that can provide insight into the current economic situation. Total nonfarm payroll employment rose by 210,000 in November 2021, while the unemployment rate fell to 4.2 percent and the number of unemployed persons fell by 542,000 to 6.9 million.[99] BLS also publishes job openings, a measure of the unmet demand for labor. In November 2021, there were 10.6 million job openings.[100] Meanwhile, BLS' quarterly employment cost index shows that wages and salaries increased for civilian, private industry, and State and local government workers in September 2021.[101] The arguments that low job growth or the influx of working-age immigrants may create wage decreases impacting low-wage American workers are speculative and not supported by the data.

iii. Impacts on Federal Government

Impacts on U.S. Citizenship and Immigration Services

Approximately 15 submissions provided feedback about the impacts to USCIS.

*Comments:* Many commenters asserted that the proposed rule will do little to address case backlogs at either EOIR or USCIS and will require extensive resources from USCIS. Several commenters argued that the financial and administrative burden will shift from EOIR to USCIS. Multiple commenters expressed concern that resources will be drawn away from the current process in order to conduct training for and implement the new process, which will increase backlogs. Another commenter suggested that newly hired asylum officers should be deployed to the existing asylum offices to reduce the already existing backlogs.

*Response:* EOIR's caseload includes a wide range of immigration and removal

cases. Allowing asylum officers to take on cases originating in the credible fear process is expected to reduce delays across all of EOIR's docket, as well as reduce the time it takes to adjudicate these protection claims. By shifting that caseload to USCIS, the rule will enable IJs to focus efforts on other high-priority work.

USCIS acknowledges that it will take time and money to hire and train new asylum officers, but it does not anticipate shifting current resources to do so. Hiring and training asylum officers is already a part of regular USCIS operations. USCIS does not anticipate increased backlogs as a direct result of this rule. As stated in the NPRM and in this IFR, there is the potential for backlogs to be mitigated, though USCIS cannot predict the timing and scope of such potential changes with accuracy. Staffing levels and priorities across the agency are continuously monitored and actions are taken as needed.

*Comments:* Several commenters asserted that training asylum officers would increase financial burden on USCIS. Additionally, multiple commenters reasoned that, since USCIS funds itself based on fees, and because fees will not be charged for this new process, USCIS will not have enough funding to cover training and implementation of the new rule. Several commenters expressed concern that the proposed rule's economic analysis did not state USCIS's ability to pay for the additional costs or address other impacts to USCIS, such as appeals or accessibility issues due to the limited number of asylum offices and the need for expanded teleconferencing technology for remote hearings.

*Response:* As outlined in the NPRM and affirmed in this IFR, this rule does have associated costs, but it also has benefits (*see* Table 1). As previously stated, if the medium- and high-volume bands of 150,000 and 300,000 asylum applicants were to be funded through a future fee rule, it would increase fees by an estimated weighted average of 13 percent and 26 percent respectively. This estimated increase would be attributable to the implementation of the asylum officer portions of the proposed rule only. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for such staffing actions. USCIS is exploring all options to provide funding for this rule.

The Departments do not expect this rule to result in an increase in appeals or the number of individuals requiring access to an asylum office, but they do recognize that the timing of appeals and asylum interviews may change because

of this rule. As part of the estimated USCIS FY 2022 and FY 2023 funding requirements by volume of credible fear referrals (*see* Tables 7 and 8), USCIS included estimated costs associated with needs such as interpreter and transcription services, facilities, IT case management, and other contracts, supplies, and equipment. The Departments agree with the commenters that there will be expanded technology needs to implement this rule.

*Comments:* A commenter stated that moving the funding type from an appropriations-funded model to a fee-based enterprise model would result in USCIS's dependency on high fees to generate revenue.

*Response:* USCIS agrees generally that, if funding is sourced to fees, higher fees over time are necessary to generate revenue in line with costs, but disagrees that fee-based funding would generate a harmful dependency. USCIS relies on fees to fund almost all the work the agency performs. USCIS is exploring all options to provide funding for this rule. However, if the rule is to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants.

*Comments:* A commenter stated that the rule does not make an appropriate comparison for the proposed new procedures. Specifically, the NPRM stated that USCIS would have to hire approximately 800 new employees and spend approximately $180 million to handle approximately 75,000 cases per year if the rule was implemented. The commenter said the rule improperly compares whether the proposed rule, backed with $180 million in new funding, would provide more fair and expeditious decisions than the existing system that receives no additional funding. The commenter said the appropriate comparison is whether the proposed rule, backed with $180 million in new funding, would provide more fair and expeditious decisions when compared with the existing system if the existing system were backed with $180 million in new funding.

*Response:* The Departments have determined that important procedural changes are needed to improve the system of asylum adjudication for cases originating in credible fear screening, and that simply adding more money to the existing procedures would not yield the same benefits in fairness and reduced delays. Implementing these important procedural changes will involve costs for, among other things, personnel and training. It is not possible

---

[99] BLS, The Employment Situation—November 2021 (Dec. 3, 2021), *https://www.bls.gov/news.release/archives/empsit_12032021.pdf* (last visited Feb. 27, 2022).

[100] BLS, Job Openings and Labor Turnover—November 2021 (Jan. 4, 2022), *https://www.bls.gov/news.release/archives/jolts_01042022.pdf* (last visited Feb. 27, 2022).

[101] BLS, Employment Cost Index—September 2021 (Oct. 29, 2021), *https://www.bls.gov/news.release/archives/eci_10292021.pdf* (last visited Feb. 27, 2022).

to place a monetary value on fairness and expeditiousness in the process of adjudicating the protection claims of noncitizens arriving at the border. However, to the extent that the $180 million amount referenced above would facilitate the implementation of the rule, the Departments believe that it will enable greater benefits in terms of fair and expeditious decisions than the same amount applied to the existing system.

Impacts on the Executive Office for Immigration Review

Approximately four submissions provided feedback about the impacts on EOIR.

*Comments:* A commenter worried that the proposed rule will do little address case backlogs and will require extensive resources from EOIR. Another commenter asserted that the proposed rule will further burden the immigration courts and create delays. A commenter argued that, although the proposed rule may limit the growth of the IJ docket, it does not offer any relief to IJs, and it merely moves some cases to USCIS, which already has a backlog of cases. A commenter was concerned that there is no reason to believe that conducting interviews in detention centers would be quicker than the EOIR process because doing so does not eliminate duplicative hearings and eliminates access to the courts.

*Response:* The rule will not directly change how cases that are already pending before EOIR are adjudicated. However, as stated in the NPRM, this rule is expected to slow the growth of EOIR's backlog and allow EOIR to work through its current backlog more quickly. First, the rule will allow DHS to process more noncitizens encountered at or near the border through expedited removal—rather than placing them into section 240 removal proceedings—thereby quickly and efficiently securing removal orders for those who do not make a fear claim or who receive a negative credible fear determination. Second, as explained above at Section IV.F.1.a of this preamble, this rule is estimated to reduce EOIR's overall credible fear workload by at least 15 percent. Third, the calculation described above sets a lower bound on EOIR's expected workload reduction, as it does not account for efficiencies that may be realized in cases that are referred to EOIR for streamlined section 240 proceedings. In these three ways, the rule will enable IJs to focus efforts on other high-priority work, including backlog reduction. The Departments agree that the interviews themselves may not take less time; however, the

overall process for asylum applicants to apply, interview, and receive a decision will take less time. Adjudicative efficiency gains and revised parole guidelines for case-by-case consideration could lead to individuals spending less time overall in detention, which would benefit the Government, considering its limited resources and inability to detain all those apprehended, and the affected individuals, who would be able to continue to prepare for and pursue relief or protection outside the confines of a detention setting. Thus, as stated in the NPRM and in this IFR, there is the potential for backlogs to be mitigated, though we cannot predict the timing and scope of such potential changes with accuracy.

*Comments:* A commenter stated that, in the four months since the NPRM was drafted, the EOIR backlog grew by more than 100,000 cases, which is already larger than the number of cases (75,000) the proposed rule is intended to address. Further, the commenter argued that this expansion of duties would address only 5 percent of the overall immigration backlog and would require 27 percent of EOIR's overall budget.

*Response:* The Departments recognize the need to address the growing EOIR backlog, which is one of the catalysts for this rule. The NPRM developed three population bounds for credible fear screenings, ranging from 75,000 as a lower bound to 300,000 as an upper bound to account for possible variations in future years. 86 FR 46923. As stated, EOIR would not see the cases in which USCIS grants asylum, which the Departments estimate will result in at least a 15 percent reduction in the number of cases that would normally arrive at EOIR after a positive credible fear determination. Such efficiency improvements, in conjunction with streamlined review, could benefit applicants and the Government, though we cannot make exact predictions germane to these changes.

Other Comments on Impacts on the Federal Government

Approximately four submissions provided other comments on impacts on the Federal Government.

*Comments:* A commenter asserted that the emphasis on expedited removal and accompanying detention is likely to maintain or increase extremely high levels of unnecessary spending on detention.

*Response:* As stated in the NPRM and affirmed in this IFR, DHS will consider paroling detained individuals in the expedited removal process, on a case-by-case basis, consistent with the INA

and relevant regulations and policies. Having considered all comments received on the issues of detention and parole, the Departments have determined that the current narrow standard should be replaced not with the standard proposed in the NPRM but with the standard of 8 CFR 212.5(b). That provision describes five categories of noncitizens who may meet the parole standard of INA 212(d)(5), 8 U.S.C. 1182(d)(5), based on a case-by-case determination, provided they present neither a security risk nor a risk of absconding: (1) Noncitizens who have serious medical conditions for which continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) noncitizens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) noncitizens whose continued detention is not in the public interest. Expanding the potential for parole out of custody for this population is expected to improve the Departments' ability to utilize expedited removal for a greater number and more diverse category of noncitizens, mitigate associated detention costs, and promote the dignity of asylum applicants.

iv. Other Comments on Costs or Transfers

Approximately three submissions provided other comments on costs or transfers.

*Comments:* A commenter stated that the proposed rule will be costly to noncitizens; ICE attorneys; judges and staff of the immigration courts and the BIA; the Office of Immigration Litigation in the Department of Justice, which will have to defend the denials of asylum and protection appeals in Federal courts; and judges and staff of the U.S. Courts of Appeals. Further, the commenter asserted that the proposed rule's economic analysis did not reflect costs to the Federal judiciary.

*Response:* The Departments do not expect this rule to be the cause of an increase in the number of appeals to the BIA or petitions for review before a U.S. Court of Appeals. Noncitizens who receive a negative credible fear determination may seek a de novo review of that determination by an IJ but otherwise have no opportunity for further appeal. *See* 8 U.S.C. 1225(b)(1)(B)(iii). The IFR does not change that. An applicant whose asylum claim is denied and who is ordered removed may appeal the decision to the BIA and further petition for review by a U.S. Court of Appeals. This rule does not change the current appeals process,

nor is it expected to result in a greater number of BIA appeals or U.S. Court of Appeals petitions for review than would occur otherwise.

*Comments:* A commenter asserted that the rule would increase costs and time frames for various reasons: interview length will increase; asylum officers will be required to write a justification for the decision in cases where they do not grant asylum; transcripts of hearings will take longer to make; asylum officers will be required to read lengthy transcripts; applicants may unfairly be denied a chance to appeal if they have to understand and file a notice of appeal; IJs will have more paperwork; and counsel will routinely appeal cases in which the IJ denied a motion to allow for additional testimony and evidence.

*Response:* The Departments estimated the costs of transcription services, which are included in Table 8 as their own line item. USCIS does not currently estimate asylum interview times because each case is unique, and there are a variety of factors outside of this rulemaking that may impact the length of an interview. Asylum officers are already required to review all documentation submitted by and pertinent to an asylum applicant prior to an interview. Likewise, regardless of the decision being made, an asylum officer provides a justification for the decision, which is then reviewed. This rule does not change the requirements for asylum applicants or the evaluation criteria that are used during adjudication.

*Comment:* Several commenters said the proposed rule would create a "massive new USCIS infrastructure," the cost of which would be borne by other applicants for USCIS benefits.

*Response:* USCIS has estimated the staffing resources it will need to implement this rule at somewhere between 794 and 4,647 total new positions. USCIS acknowledged in the NPRM that if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants. USCIS is exploring all options to provide funding for this rule and will consider the overall costs borne by applicants for USCIS benefits in doing so.

*Comments:* A commenter requested that the proposed rule be funded by taxpayers.

*Response:* USCIS is exploring all options to provide funding for this rule. USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants. That estimate, however, does not preclude USCIS from considering other sources of funding, such as funding from taxpayers.

### d. Other Comments on Impacts and Benefits of the Proposed Rulemaking

*Comments:* Several commenters said the Departments did not analyze or discuss the likelihood that the proposed rule's revisions to the asylum process would encourage more noncitizens to seek asylum. For example, the Departments considered the administrative efficiencies expected to be gained from the rule and the expected benefits conferred upon non-citizens availing themselves of the asylum process through quicker adjudication timelines. But the Departments allegedly failed to analyze or discuss whether these changes to the asylum process would in fact encourage more noncitizens living abroad to make their way to the United States. The commenters asserted that an increase in noncitizens seeking to enter the United States will further drive up enforcement actions at the Southwest border and increase the statistical likelihood of non-meritorious asylum claims and illegal entry overall. The commenter argued that MPP, for example, achieved concrete results in managing asylum seekers attempting to cross the Southwest border, but claimed it was unclear whether the proposed rule would achieve even remotely the same results because the Departments failed to analyze this issue. At a minimum, the commenter said, the Departments should have addressed with specificity whether the proposed rule would be expected to decrease or increase the number of noncitizens attempting to travel to the United States to seek asylum and explain the basis for their conclusions.

*Response:* The Departments do not expect this rule to encourage or cause an increase in the number of individuals seeking asylum in the United States. As explained above, this rule is not expected to create any significant new incentives that would drive increased irregular migration. To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim that originated in credible fear screening, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system. Although eligible individuals may be granted asylum sooner, ineligible individuals may be identified

and ordered removed more quickly. This rule does not change the substantive standard for asylum eligibility, and commenters have not identified any evident causal mechanism by which the rule as a whole, in context, would systematically and substantially incentivize more individuals to seek to enter the United States and pursue asylum.

### 2. Paperwork Reduction Act

*Comments:* A commenter requested eliminating Form I–589 in order to prevent asylum applicants from facing rejection, delays, or missing the deadline because the form was not correctly completed. The commenter argued that Form I–589 is burdensome for applicants to complete because it is technical and is written in and must be completed in English (although most asylum seekers have limited English proficiency). The commenter also stated that many asylum seekers do not have legal representation while filling out the form, often causing applicants to make mistakes and leave required questions blank, which could result in rejection of the application.

*Response:* The rule addresses the commenter's concern in that applicants with a positive credible fear determination who are placed into the Asylum Merits process will not have to file a Form I–589. Rather, such an applicant's credible fear record will serve as the asylum application. This process will also ensure applicants can apply for an EAD as soon as possible once the requisite time period has been met based on the date of service of a positive credible fear determination that serves as the date of filing of an asylum application. This streamlined process will not only promote efficiency but will also serve the interests of fairness and human dignity while simultaneously reducing the burden on asylum support networks and the public by ensuring asylum seekers have access to employment authorization as quickly as possible. Additionally, the rule will promote equity and due process by ensuring that individuals who are allowed to remain in the United States for the express purpose of having their asylum claims adjudicated after receiving a positive credible fear determination do not inadvertently miss the one-year filing deadline for asylum after being placed into section 240 removal proceedings and failing to defensively file their Form I–589 within the first 12 months. The requirement for affirmative asylum applicants and defensive asylum applicants in traditional section 240 removal

proceedings to submit a Form I–589 is outside the scope of this rulemaking.

3. Other Comments on Statutory and Regulatory Requirements

Approximately four submissions provided other feedback on statutory and regulatory requirements.

National Environmental Policy Act ("NEPA")

*Comments:* Two commenters expressed concerns that the Departments have not adequately complied with NEPA, 42 U.S.C. 4321 *et seq.,* by failing to specifically consider certain potential environmental impacts of this rule. The comments focused primarily on population growth impacts. Commenters also raised broader concerns about the adequacy of DHS's NEPA compliance procedures as set forth in the relevant DHS implementing directive and instruction manual.

*Response:* Even assuming that such impacts are amenable to meaningful analysis in some contexts, any such analysis with respect to this rule would be fundamentally speculative in nature. This rule will not alter immigration eligibility criteria or result in an increase in the number of individuals who may be admitted or paroled into the United States. Rather, this rule changes specific procedures for adjudicating certain asylum claims pursuant to existing standards and shifts certain adjudicative responsibilities from DOJ to DHS. The commenters offered no basis to conclude that such changes would result in environmental impacts susceptible to meaningful analysis. This rule will not result in any major Federal action that will significantly affect the human environment and is not part of a larger action. As discussed in the NPRM and in the NEPA section below, the rule falls squarely within Categorical Exclusions A3(a) and A3(d) in *DHS Instruction Manual 023–01–001–01. See* DHS, *Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) A–1, A–2* (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf* (*Instruction Manual 023–01*). Commenters' broader concerns about the adequacy of DHS's NEPA compliance procedures are outside the scope of this rulemaking.

Federalism

*Comments:* Commenters asserted that the proposed rule failed to properly consider and analyze federalism concerns. The commenters stated that, contrary to the Departments' conclusion that the proposed rule insubstantially impacts States and presents no substantial federalism concerns, the proposed rule would have wide-ranging effects on States' finances and resources. Finally, the commenters argued that the Departments should reassess federalism implications and republish the proposed rule.

In contrast, another commenter asserted that the proposed rule does not have sufficient federalism implications to require a federalism summary impact statement. The commenter referenced section 6 of Executive Order 13132 and stated that the proposed rule would not have direct effect on the States, the relationship between the National Government and the States, or the distribution of power and responsibilities among the different levels of government.

*Response:* The Departments did consider federalism concerns and determined that the rule would not have a substantial direct effect on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. 86 FR 46939. The Departments also determined the rule is within the purview and authority of the Departments and does not directly affect States. *Id.* As detailed above, the rule's primary consequences are to authorize a new procedure by which asylum claims originating in credible fear screening may be adjudicated and to authorize a revision to the regulations governing parole of noncitizens in expedited removal. The latter change will enable DHS to place more noncitizens encountered at or near the border into expedited removal, allowing such noncitizens who do not make a fear claim or who are determined not to have a credible fear of persecution or torture to be ordered removed more swiftly.

The Departments further note that immigration generally is an area of Federal regulation in which the Federal Government, rather than the States, has the preeminent role. *See, e.g., Toll* v. *Moreno,* 458 U.S. 1, 10–12 (1982) ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders."); *Truax* v. *Raich,* 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *accord Sure-Tan, Inc.* v. *NLRB,* 467 U.S. 883, 897 (1984) (explaining that third parties lack a cognizable interest "in procuring enforcement of the immigration laws" against third parties in particular ways).

Unfunded Mandate Reform Act ("UMRA")

*Comments:* Several commenters asserted that the proposed rule failed to analyze whether an unfunded mandate was being imposed on the States. The commenters wrote that the Departments addressed the requirements of the UMRA by denying any impact. However, the commenters raised concerns and provided examples of how States may incur costs associated with undocumented noncitizens or noncitizens who have been granted asylum. Further, the commenters said that, contrary to the requirements of the UMRA, the Departments failed to allow elected leaders in State, local, and Tribal government to provide input on the proposed rule.

*Response:* The Departments disagree with these comments. The UMRA is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. As stated in the NPRM, although this rule is expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($169.8 million in 2020 dollars based on the Consumer Price Index for All Urban Consumers ("CPI–U")),[102] the Departments do not believe this rule would impose any unfunded Federal mandates on State, local, or Tribal governments, in the aggregate, or on the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). The term "Federal intergovernmental mandate" means, in relevant part, a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See* 2

---

[102] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, By Month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf* (last visited Feb. 28, 2022). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the broader year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2020 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383)/152.383] * 100 = (106.428/152.383) *100 = 0.6984 * 100 = 69.84 percent = 69.8 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

U.S.C. 658(5). The term "Federal private sector mandate" means, in relevant part, a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See* 2 U.S.C. 658(7).

This rule does not contain such a mandate because it does not impose any enforceable duty upon any other level of government or private-sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices and would not be a consequence of an enforceable duty. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under the UMRA.[103] The requirements of the UMRA, therefore, do not apply to this rule; accordingly, the Departments have not prepared an UMRA statement.

*Comments:* Several States asserted that States and local communities "disproportionately bear the social and economic costs of illegal immigration" because immigrants may arrive with "little to no warning," a criminal record, and little to no resources, with States ultimately bearing the cost of providing assistance for such individuals. Additionally, two commenters stated that noncitizens granted the legal status of asylee are entitled to certain public benefits, such as Social Security Income, Medicaid, welfare, food stamps, employment authorization, a driver's license, education, and healthcare, which Americans rely on.

*Response:* To the extent that States and local communities bear social or economic costs associated with what the commenters term "illegal immigration," or with noncitizens entering the United States without documentation and seeking asylum, those are not costs associated with this rule. As explained above, this rule is not expected to create any significant new incentives that would drive increased irregular migration. To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system.

Moreover, with regard to the asserted "social cost," commenters cited figures associated with noncitizens within the United States who are taken into ICE custody and thus improperly conflated the characteristics of such noncitizens with the characteristics of noncitizens encountered at or near the border

seeking asylum.[104] The commenters' assumptions and generalizations about the characteristics of noncitizens seeking asylum in the United States, including their assumptions about the extent to which this population relies on public services or support rather than private support networks, are not supported by evidence.

With regard to the asserted economic or fiscal cost, commenters referenced public benefits and public services, as well as State expenditures on border security and policing. However, as explained in more detail above, estimating the net fiscal impact of immigration is a complex calculation that requires consideration of not only Government expenditures on public benefits and services but also the various tax contributions the noncitizens in question make to public finances. Commenters did not provide information or data that would allow for a reliable estimation of the net fiscal impact associated with relevant populations or associated with any marginal change in relevant populations.[105]

The Departments have acknowledged the role of support networks in supporting noncitizens affected by this rule. Notably, this rule's reduction in adjudication delays may allow some noncitizens to become eligible for employment authorization—and enter the labor market—sooner under this rule than they currently would, which could

lead to less reliance on those support networks. Individuals granted asylum may work immediately.

Executive Order 13990

*Comments:* A commenter stated that the proposed rule does not mention Executive Order 13990, which requires agencies to use an interim estimate of the social costs of greenhouse gases when monetizing the value of changes regulations. The commenter said it is clear that the Departments did not refer to the Executive order during rulemaking, and that it is arbitrary and capricious for agencies to follow the Executive order only when the Biden Administration dislikes a policy.

*Response:* Executive Order 13990 seeks to protect public health and the environment and restore science to tackle the climate crisis. The Departments agree with the commenter that they did not mention or refer to E.O. 13990 for this rulemaking. This rule establishes a new procedure by which individuals who receive a positive credible fear determination may have their claims for asylum adjudicated by USCIS in the first instance, rather than EOIR bearing the full responsibility for adjudicating such claims. The changes made through this rule are within the purview and authority of the Departments and do not have any direct or substantial link to greenhouse gas emissions. Moreover, the rule does not otherwise relate to the subject matter of E.O. 13990.[106]

*G. Comments Outside of the Scope of This Rulemaking*

The Departments received many comments outside of the scope of this rulemaking. Because these comments are outside of the relevant scope, the Departments are not providing responses to these comments or addressing the issues raised in these comments. Comments from the public outside of the scope of this rulemaking concerned the following issues: USCIS maintaining its "Last In, First Out" affirmative asylum scheduling process to reduce incentives for applicants to file only for the purpose of obtaining an EAD; termination of the Deferred Action for Childhood Arrivals ("DACA") program; a recommendation that individuals seeking protection due to climate change should receive positive credible fear determinations and be granted asylum; policies relating to Afghan evacuees; the title 42 order

---

[103] *See* 2 U.S.C. 1502(1), 658(6).

[104] For example, commenters cited ICE's FY 2020 Enforcement and Removal Operations Report for the proposition that 90 percent of the noncitizens administratively arrested by ICE in FY 2020 had either criminal convictions or criminal charges pending. But, as that report makes clear, in FY 2020, due to the COVID–19 pandemic, ICE "narrowly focus[ed] enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds." *See* ICE, *U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report* 4 (2020), *https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf.*

[105] Much of the information commenters did cite, moreover, was not specific to recently arrived noncitizens pursuing asylum claims but instead attempted to estimate—for example—total education costs associated with students with limited English proficiency, total education costs associated with all children living in a household with an undocumented person, or total costs certain States have incurred for law enforcement agencies conducting public safety and security activities near the Southwest border. *See* Marc Ferris and Spencer Raley, *The Elephant in the Classroom: Mass Immigration's Impact on Education, Federation for American Immigration Reform* 6 (Sept. 2016), *https://www.fairus.org/sites/default/files/2017-08/FAIR-Education-Report-2016.pdf* (last visited Feb. 28, 2022); Matthew O'Brien, Spencer Raley, and Jack Martin, *The Fiscal Burden of Immigration on United States Taxpayers, Federation for American Immigration Reform* 1 (2017), *https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf* (last visited Feb. 28, 2022).

[106] In addition, a district court has enjoined certain agencies from implementing Section 5 of E.O. 13990. *See Louisiana* v. *Biden,* No. 2:21–cv–1074, 2022 WL 438313 (W.D. La. Feb. 11, 2022), *appeal filed,* No. 22–30087 (5th Cir. Feb. 19, 2022).

issued by the Centers for Disease Control and Prevention; policies relating to immigration vetting and background checks; and other immigration and border management policies.

## V. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The APA generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** and allow for a period of public comment. 5 U.S.C. 553(b). The Departments published an NPRM on August 20, 2021, and allowed for a 60-day comment period. As detailed previously, in response to comments, the Departments have altered the rule in multiple ways. The Departments are in compliance with the APA's notice-and-comment requirements with respect to these changes because each change is a logical outgrowth of the proposals set forth in the NPRM, or a rule of agency procedure to which the notice-and-comment requirements do not apply, or both.

To satisfy the APA's notice-and-comment requirements, generally, the final rule an agency adopts must either meet an exception to the notice-and-comment requirements or be a logical outgrowth of the NPRM. *Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 174 (2007). The logical outgrowth test asks whether the purposes of notice and comment have been adequately served, such that there was "fair notice." *See id.* "In most cases, if the agency . . . alters its course in response to the comments it receives, little purpose would be served by a second round of comment." *Am. Water Works Ass'n* v. *EPA,* 40 F.3d 1266, 1274 (D.C. Cir. 1994). Accordingly, the "logical outgrowth" test normally is applied to consider "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Id.* The changes made in this IFR were adopted in response to comments received and build logically on the NPRM. Thus, in these circumstances, "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'' *CSX Transp., Inc.* v. *Surface Transp. Bd.,* 584 F.3d 1076, 1079–80 (D.C. Cir. 2009) (quotation marks omitted).

Moreover, the APA's notice-and-comment requirements do not apply to "rules of agency . . . procedure." 5 U.S.C. 553(b)(A). A " 'critical feature' of

the procedural exception 'is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.' " *JEM Broad. Co., Inc.* v. *FCC,* 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Batterton* v. *Marshall,* 648 F.2d 694, 707 (D.C. Cir. 1980)); *cf. Texas* v. *United States,* 809 F.3d 134, 176 (5th Cir. 2015) (holding that a rule is not procedural when it "modifies substantive rights and interests" (quoting *U.S. Dep't of Lab.* v. *Kast Metals Corp.,* 744 F.2d 1145, 1153 (5th Cir. 1984)). "In determining whether a rule is substantive, [a court] must look at [the rule's] effect on those interests ultimately at stake in the agency proceeding." *Neighborhood TV Co., Inc.* v. *FCC,* 742 F.2d 629, 637 (D.C. Cir. 1984). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *Nat'l Sec. Couns.* v. *CIA,* 931 F. Supp. 2d 77, 107 (D.D.C. 2013); *see Am. Hosp. Ass'n* v. *Bowen,* 834 F.2d 1037, 1051 (D.C. Cir. 1987). Moreover, "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *James V. Hurson Assocs., Inc.* v. *Glickman,* 229 F.3d 277, 281 (D.C. Cir. 2000). Finally, although a procedural rule generally may not "encode[ ] a substantive value judgment or put[ ] a stamp of approval or disapproval on a given type of behavior," *Bowen,* 834 F.2d at 1047, "the fact that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one," *Glickman,* 229 F.3d at 282.

Notably, many of the revisions to the proposed rule do not alter individuals' rights or interests. *See JEM Broad.,* 22 F.3d at 326. Instead, the revisions relate to the procedure by which such claims shall be presented before the agencies, *see id.,* without encoding a substantive value judgment, *see Bowen,* 834 F.2d at 1047, other than the need for procedural efficiency, *see Glickman,* 229 F.3d at 282; *see also Lamoille Valley R. Co.* v. *I.C.C.,* 711 F.2d 295, 328 (D.C. Cir 1983) (holding that an order changing the schedule for an adjudication, including when parties were to submit briefing, was a procedural rule); *Elec. Priv. Info. Ctr.* v. *U.S. Dep't of Homeland Sec.,* 653 F.3d 1, 5 (D.C. Cir. 2011) (even "a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule" (citing *Pub. Citizen*

v. *Dep't of State,* 276 F.3d 634, 640–41 (D.C. Cir. 2002)); *Ranger* v. *FCC,* 294 F.2d 240, 244 (D.C. Cir. 1961) (while holding that a rule was procedural, noting that "no substantive rights were actually involved by the regulation itself" even if "failure to observe it might cause the loss of substantive rights").

Although additional notice and comment are not required, the Departments acknowledge that they would benefit from the public's input on the provisions in this IFR as well as the IFR's implementation. However, the Departments also believe that the immigration system would benefit from rapid implementation of the rule, which is lawful given that the rule is a logical outgrowth of the NPRM and because the changes relate to procedural issues. The benefits of rapid implementation include the ability to begin allocating resources to implement the new process, including hiring asylum officers, which can take many months. Further, the benefit of additional public comment alongside practical experience with gradual implementation will aid the Departments in promulgating a future final rule. For these reasons, the Departments have decided to follow the NPRM with this IFR.

### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, to the extent permitted by law, to proceed only if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits while giving consideration, to the extent appropriate and consistent with law, to values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. In particular, E.O. 13563 emphasizes the importance of not only quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility, but also considering equity, fairness, distributive impacts, and human dignity. All of these considerations are relevant here. OIRA within OMB has designated this IFR an economically significant regulatory action under sec. 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

1. Summary of the Rule and Its Potential Impacts

As detailed previously, in response to comments, the Departments have

altered the rule in multiple ways from the NPRM. None of the revisions outlined in Section II.C of this preamble has led to revisions in the overall cost benefit analysis, which remains unchanged from the NPRM. However, relative to the NPRM, the changes in this IFR, such as the use of streamlined section 240 removal proceedings in place of the NPRM's IJ review procedure, may result in smaller overall operational efficiencies, as discussed below.

This rule changes and streamlines the overall adjudicatory process for asylum applications arising out of the expedited removal process. By reducing undue delays in the system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness.

A central feature of the rule changes the respective roles of an IJ and an asylum officer during proceedings for further consideration of asylum applications after a positive credible fear determination. Notably, IJs will retain their existing authority to review de novo the negative determinations made by asylum officers in a credible fear proceeding. In making credible fear determinations, asylum officers will return to evaluating whether there is a significant possibility that the noncitizen could establish eligibility for asylum, withholding of removal, or CAT protection for possible referral to a full hearing of the claim, and the noncitizen will still be able to seek review of that negative credible fear determination before the IJ.

Asylum officers will take on a new role of adjudicating the merits of protection claims made by some noncitizens who have received a positive credible fear determination, a role previously carried out only by IJs as part of a proceeding under section 240 of the INA. Noncitizens whose claims are not granted by an asylum officer will be referred to an IJ for a streamlined section 240 removal proceeding.

The population of individuals likely to be affected by this rule's provisions are individuals for whom USCIS completes a credible fear screening. The average annual number of credible fear screenings for FY 2016 through 2020 completed by USCIS is broken out as

59,280 positive credible fear determinations and 12,083 negative credible fear determinations, for a total of 71,363 individuals with credible fear determinations. DHS expects that this population will be affected by the rule in a number of ways, which may vary from person to person depending on (1) whether the individual receives a positive credible fear determination, and (2) whether the individual's asylum claim is granted by an asylum officer. In addition, because of data constraints and conceptual and empirical challenges, we can provide only a partial monetization of the impacts on individuals. For example, asylum seekers who establish credible fear may benefit from having their asylum claims adjudicated potentially sooner than they otherwise would. Those who are granted asylum sooner receive humanitarian protection from the persecution they faced in their country of origin on account of their race, religion, nationality, membership in a particular social group, or political opinion, and they have a possible path to citizenship in the United States. These outcomes obviously constitute a benefit in terms of human dignity and equity, but it is a benefit that is not readily monetized. Asylum seekers who establish credible fear may also benefit from cost savings associated with not having to incur filing expenses, as well as earlier labor force entry. The Departments have estimated this impact on a per-person workday basis.

As it relates to the Government and USCIS costs, the planned human resource and information-related expenditures required to implement this rule are monetized as real resource costs. These estimates are developed along three population bounds, ranging from 75,000 to 300,000 credible fear screenings to account for possible variations in future years. Furthermore, the possibility of parole for more individuals—applied on a case-by-case basis—could lower the cost to the Government per person processed. The Departments have also estimated potential employment tax impacts germane to earlier labor force entry, likewise on a per-person workday basis. Such estimates made on a per-person basis reflect a range of wages that the

impacted individuals could earn. The per-person per-workday estimates are not extended to broader monetized impacts due to data constraints.

An important caveat for the possible benefits to asylum applicants who establish a credible fear introduced above and discussed more thoroughly in this analysis is that it is expected to take time to implement this rule. Foremost, the Departments expect the resourcing of this rule to be implemented in a phased approach. Further, although up-front expenditures to support the changes from this rule based on planning models are high, the logistical and operational requirements of this rule may take time to fully implement. For instance, once USCIS meets its staffing requirements, time will be required for the new asylum staff to be trained for their positions, which may occur over several months. As a result, the benefits to applicants and the Government may not be realized immediately.

To develop the monetized costs of the rule, the Departments relied on a low, midrange, and high population bound to reflect future uncertainty in the population. In addition, resources are partially phased in over FYs 2022 and 2023, as a full phasing in of resources, potentially up to FY 2026, is not possible at this time because of budget constraints and timing of hiring, and because the Departments do not have fully developed resource projections applicable to this rule stretching past FY 2023. The average annualized cost of this rule ranges from $180.4 million to $1.0 billion, at a 3 percent discount rate, and from $179.5 million to $995.8 million, at a 7 percent discount rate. At a 3 percent discount rate, the total 10-year costs could range from $1.5 billion to $8.6 billion, with a midpoint of $3.9 billion. At a 7 percent discount rate, the total 10-year costs could range from $1.3 billion to $7.0 billion, with a midpoint of $3.2 billion.

A summary of the potential impacts of this IFR are presented in Table 1 and are discussed in more detail more in the following analysis. Where quantitative estimates are provided, they apply to the midpoint figure (applicable to the wage range or the population range).

TABLE 1—SUMMARY OF THE EXPECTED IMPACTS OF THE INTERIM FINAL RULE

| Entities impacted | Annual population estimate | Expected impacts |
|---|---|---|
| Individuals who receive a positive credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (*see* Table 3), approximately 83.1 percent of individuals screened have received a positive credible fear determination. | • Maximum potential cost-savings to applicants of Form I–589 of $364.86 per person.<br>• Potential cost savings to applicants of Form I–765 of $370.28 per person.<br><br>• Potential early labor earnings for asylum applicants who obtain an EAD of $225.44 per person per workday. This impact could potentially constitute a transfer from workers in the U.S. labor force to certain asylum applicants. We identified two factors that could drive this impact of early entry to the labor force: (i) More expeditious grants of asylum, thereby authorizing work incident to status; and (ii) a change in timing apropos to the ''start'' time for filing for employment authorization—the ''EAD-clock'' duration is not impacted, but it ''shifts'' to an earlier starting point. On the other hand, some individuals who would have reached the ''EAD-clock'' duration for a pending asylum application and obtained employment authorization under the current regulations may not obtain employment authorization if their asylum claims are promptly denied.<br>• The impacts involving compensation to individuals may be overstated because of potential value of non-paid work such as childcare or housework.<br>• Individuals might not have to wait lengthy times for a decision on their protection claims. This is a benefit in terms of equity, human dignity, and fairness.<br>• Some individuals could benefit from de novo review by an IJ of the asylum officer's decision not to grant their asylum claims. |
| Individuals who receive a negative credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (*see* Table 3), approximately 16.9 percent of individuals screened have received a negative credible fear determination. | • Some individuals may benefit in terms of human dignity if paroled from detention while awaiting their credible fear interviews and determinations.<br>• Parole may result in more individuals failing to appear for hearings. |
| DHS–USCIS | N/A | • At a 7 percent discount rate, the resource costs could be $451.2 million annually, based on up-front and continuing expenditures.<br>• It is reasonable to assume that there could be a reduction in Form I–765 filings due to more expeditious adjudication of asylum claims, but there could also be countervailing influences; hence, the volume of Form I–765 filings (writ large or for specific classes related to asylum) could decrease, remain the same, or increase—these reasons are elucidated in the analysis. A net change in Form I–765 volumes overall could impact the incumbent volume of biometrics and biometrics services fees collected; however, based on the structure of the USCIS ASC biometrics processing contract, it would take a significant change in such volumes for a particular service district to generate marginal cost increases or savings per biometrics submission. |
| EOIR | 555 current IJs as well as support staff and other personnel. | • After implementation is fully phased in, EOIR no longer adjudicates asylum claims raised in expedited removal in the first instance. EOIR would conduct streamlined section 240 removal proceedings for individuals not granted asylum.<br>• Allows EOIR to focus efforts on other high-priority work and reduce its substantial current backlog.<br>• There could be non-budget related cost savings if the actual time worked on a credible fear case decreases in the transfer of credible fear cases to USCIS. |
| Support networks for asylum applicants who receive a positive credible fear determination. | Unknown | • To the extent that some applicants may be able to earn income earlier than they otherwise could currently, burdens on the support network of the applicant may be lessened. This network could include public and private entities and family and personal friends, legal services providers and advisors, religious and charitable organizations, State and local public institutions, educational providers, and NGOs. |
| Other | Unknown | • There could be familiarization costs associated with this IFR; for example, if attorneys representing each asylum client reviewed the rule, based on average reading speed, the cost would be about $76.3 million, which would potentially be incurred during the first year the rule is effective.<br>• There may be some labor market impacts as some asylum seekers who currently enter the labor market with a pending asylum application would no longer be entering the labor market under this IFR if they receive negative decisions on their asylum claims sooner. Applicants with a positive credible fear determination may enter the labor market sooner under this IFR than they would currently.<br>• Tax impacts: Employees and employers would pay their respective portion of Medicare and Social Security taxes as a result of the earlier entry of some individuals into the labor market. We estimate employment tax impacts could be $34.49 per person on a workday basis. |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 2 presents the prepared accounting statement showing the costs and benefits associated with this regulation.

TABLE 2—OMB A–4 ACCOUNTING STATEMENT

[$ millions, FY 2020]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| Time period: FY 2022 through FY 2031 | | | | |
| **Benefits** | | | | |
| Monetized benefits ...................................................... | Not estimated | Not estimated | Not estimated | |
| Annualized quantified, but un-monetized, benefits ............................. | N/A | N/A | N/A | |
| Unquantified benefits ...................................................... | Some individuals may benefit from filing cost savings related to Forms I–589 and I–765. Early labor market entry would be beneficial in terms of labor earnings to the applicant, but also because it could reduce burdens on the applicants' support networks. Benefits driven by increased efficiency would enable some asylum-seeking individuals to move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly, thus promoting both human dignity and equity. Adjudicative efficiency gains and expanded possibility of parole on a case-by-case basis could lead to individuals spending less time in detention, which would benefit the Government and the affected individuals. Another, potentially very significant, benefit is that EOIR would not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent reduction in its overall credible fear workload. This could help mitigate the backlog of cases pending in immigration courts. Additionally, this benefit would extend to individuals granted or not granted asylum faster than if they were to go through the current process with EOIR. Depending on the individual case circumstances, this IFR would mean that such noncitizens would likely not remain in the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum would be granted asylum several years earlier than under the present process. The anticipated operational efficiencies from this IFR may provide for prompt grant of relief or protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection may be removed sooner than under current rules. Relative to the NPRM, the changes in this IFR may result in smaller operational efficiencies to DHS because the ICE Office of the Principal Legal Advisor will need to play a more significant role because noncitizens not approved for asylum will now be placed into streamlined section 240 removal proceedings. | | | Regulatory Impact Analysis ("RIA"). |
| **Costs** | | | | |
| Annualized monetized costs for 10-year period between 2021 and 2030 (discount rate in parentheses). | (3 percent) $453.8 | $180.4 | $1,002.4 | RIA. |
| | (7 percent) $451.2 | $179.5 | $995.8 | |
| Annualized quantified, but un-monetized, costs ................................... | • Potential cost-savings applicable to Form I–589 of $338.86 per person. | | | RIA. |
| | • Potential cost-savings applicable to Form I–765 of $377.32 per person.  • Familiarization costs of about $76.3 million (in 2022).  • The transfer of cases from EOIR to USCIS would allow resources at EOIR to be directed to other work, and there is a potential for cost savings to be realized for credible fear processing specifically if the average cost of worktime spent on cases by USCIS asylum officers would be lower than at EOIR currently. These would not be budgetary cost savings, and USCIS has not made a one-to-one time- and cost-specific comparison between worktime actually spent on a case at EOIR and USCIS. | | | RIA. |
| Qualitative (unquantified) costs ...................................................... | N/A | | | |

TABLE 2—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, FY 2020]

| Time period: FY 2022 through FY 2031 | | | | |
|---|---|---|---|---|
| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
| **Transfers** | | | | |
| Annualized transfers: ............................................................ | Potential transfers include labor earnings that would accrue to credible fear asylum applicants who enter the labor market earlier than they would currently. The impact accruing to labor earnings developed in this rule has the potential to include both distributional effects (which are transfers) and indirect benefits to employers. The distributional impacts would accrue to asylum applicants who enter the U.S. labor force earlier than under current regulations, in the form of increased compensation (wages and benefits) and to the Government in the form of tax impacts. A portion of this compensation gain and tax payment might be transferred to asylum applicants from others who are currently in the U.S. labor force or eligible to work lawfully. | | | |
| From whom to whom? ............................................................ | Potential transfers include a distributional economic impact in the form of a transfer to asylum applicants who enter the labor force earlier than they would currently if they take on work performed by others already in the U.S. workforce. | | | |
| Miscellaneous analyses/category ........................................ | N/A | | | RIA. |
| Effects on State, local, or Tribal governments ...................... | N/A | | | |
| Effects on small businesses ................................................ | This IFR does not directly regulate small entities, but rather individuals. | | | RFA. |
| Effects on wages ................................................................. | None | | | |
| Effects on growth ................................................................ | None | | | |

2. Background and Purpose of the Rule

The purpose of this rule is to address the rising number of apprehensions at or near the Southwest border and the ability of the U.S. asylum system to fairly and efficiently handle protection claims made by those encountered. The rule streamlines and simplifies the adjudication process for certain individuals who are encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of adjudicating applications for asylum, statutory withholding of removal, and CAT protection in a timelier fashion and with appropriate procedural protections against error. A principal feature of the rule is to transfer the initial responsibility for adjudicating asylum, statutory withholding of removal, and CAT protection applications from IJs to USCIS asylum officers for individuals within expedited removal proceedings who receive a positive credible fear determination.

The IFR may broaden the circumstances in which individuals making a fear claim during the expedited removal process could be considered for parole on a case-by-case basis prior to a positive credible fear determination being made. For such individuals, parole could be granted as an exercise of discretion consistent with INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), when continued detention is not in the public interest.

This rule applies only to recently-arrived individuals who are subject to expedited removal—*i.e.,* adults and families. The rule does not apply to unaccompanied children, as they are statutorily exempt from being placed into expedited removal. It also does not apply to individuals already residing in the United States and whose presence in the United States is outside the coverage of noncitizens designated by the Secretary as subject to expedited removal. The rule also does not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the CNMI. Those classes of noncitizens

will continue to be referred to asylum/withholding-only hearings before an IJ under 8 CFR 208.2(c). Finally, this rule does not require that a noncitizen amenable to expedited removal after the effective date of the rule be placed in the nonadversarial merits adjudication process described in this IFR. Rather, DHS generally, and USCIS in particular, retain discretion to issue an NTA to a covered noncitizen in expedited removal proceedings to instead place them in ordinary section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. at 523; *see also* 8 CFR 1208.2(c).

In this section we provide some data and information relevant to the ensuing discussion and analysis of the potential impacts of the rule. We first present USCIS data followed by EOIR data. Table 3 shows USCIS data for the Form I–589 and credible fear cases for the five-year span from FY 2016 through FY 2020.

TABLE 3—USCIS FORM I–589, APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL, AND CREDIBLE FEAR DATA

[FY 2016 through FY 2020] [107]

| FY | Form I–589 receipts | | Credible fear completions | | | Total credible fear cases [108] |
|---|---|---|---|---|---|---|
| | Initial receipts | Pending receipts | Positive screen | Negative screen | All completions | |
| 2016 | 115,888 | 194,986 | 73,081 | 9,697 | 82,778 | 94,048 |
| 2017 | 142,760 | 289,835 | 60,566 | 8,245 | 68,811 | 79,842 |
| 2018 | 106,041 | 319,202 | 74,677 | 9,659 | 84,336 | 99,035 |
| 2019 | 96,861 | 349,158 | 75,252 | 16,679 | 91,931 | 102,204 |
| 2020 | 93,134 | 386,014 | 12,824 | 16,134 | 28,958 | 30,839 |
| 5-year Total | 554,684 | N/A | 296,400 | 60,414 | 356,814 | 405,968 |
| 5-year Average | 110,937 | 307,839 | 59,280 | 12,083 | 71,363 | 81,194 |

Source: USCIS Office of Performance and Quality ("OPQ"), and USCIS Refugee, Asylum, and International Operations ("RAIO") Directorate, CLAIMS 3 database, global (received May 11, 2021).

As can be seen from Table 3, the Form I–589 pending case number has grown steadily since 2016, and, as of the fourth quarter of FY 2021, was 412,796,[109] which is well above the five-year average of 307,839. Over that same period, the majority, 83.1 percent, of completed credible fear screenings were positive, while 16.9 percent were negative.

In addition to the credible fear case data presented in Table 3, USCIS data and analysis can provide some insight concerning how long it has taken for the credible fear screening process to be completed. As detailed in this preamble, although this rule's primary concern is the length of time before incoming asylum claims are expected to be adjudicated by EOIR, changes to USCIS

processes enabled by this rule (including, for example, improved systems for conducting credible fear interviews for individuals who are not in detention facilities) are also expected to reduce processing times for credible fear cases. Table 4 provides credible fear processing durations at USCIS.

TABLE 4—CREDIBLE FEAR TIME DURATIONS FOR DETAINED AND NON-DETAINED CASES

[In average and median days, FY 2016 through FY 2021]

| FY | Screen | Detained | | Non-detained | |
|---|---|---|---|---|---|
| | | Average | Median | Average | Median |
| 2016 | Positive | 23.3 | 13 | 290.6 | 163.0 |
| | Negative | 34 | 26 | 197.1 | 80.5 |
| 2017 | Positive | 23.3 | 13 | 570.1 | 407.0 |
| | Negative | 34.2 | 25 | 496.1 | 354.0 |
| 2018 | Positive | 22.6 | 16 | 816.2 | 671.0 |
| | Negative | 32.3 | 25 | 811.7 | 668.0 |
| 2019 | Positive | 35.6 | 24 | 1,230.9 | 1,082.0 |
| | Negative | 44.7 | 33 | 1,067.3 | 959.0 |
| 2020 | Positive | 37.2 | 20 | 1,252.7 | 1,065.0 |
| | Negative | 30.3 | 16 | 1,311.2 | 1,247.0 |
| 2021 | Positive | 25.6 | 15 | 955.3 | 919.0 |
| | Negative | 29.8 | 17 | 1,174.0 | 1,109.0 |

Source: Data and analysis provided by USCIS, RAIO Directorate, SAS Predictive Modeling Environment and data-bricks databases, received May 11, 2021. FY 2021 includes partial fiscal year data as of May 2021.

Table 4 reports the "durations," defined as the elapsed days from date of apprehension to forwarding of the

credible fear screening process at USCIS, in both averages and medians. USCIS has included data through May

11, 2021. The total time for cases from apprehension to adjudication by EOIR can be found by adding the times in

---

[107] In FY 2020, the credible fear filings are captured in Form I–870, Record of Determination/ Credible Fear Worksheet. As part of the credible fear screening adjudication, USCIS asylum officers prepare Form I–870, Record of Determination/ Credible Fear Worksheet. This worksheet includes biographical information about the applicant, including the applicant's name, date of birth, gender, country of birth, nationality, ethnicity, religion, language, and information about the applicant's entry into the United States and place of detention. Additionally, Form I–870 collects sufficient information about the applicant's marital

status, spouse, and children to determine whether they may be included in the determination. Form I–870 also documents the interpreter identification number of the interpreter used during the credible fear interview and collects information about relatives or sponsors in the United States, including their relationships to the applicant and contact information. In previous years credible fear filings included Form I–867, Credible Fear Referral. Prior to FY 2020, the USCIS Asylum Division electronically received information about credible fear determinations through referral documentation provided by CBP. The referral documentation

includes a form containing information about the applicant: Form I–867, Credible Fear Referral.

[108] The credible fear total receipts are larger than the sum of positive and negative determinations because the latter apply to "completions," referring to cases forwarded to EOIR, and thus exclude cases that were administratively closed.

[109] USCIS, Immigration and Citizenship Data, *https://www.uscis.gov/tools/reports-and-studies/ immigration-and-citizenship-data* (filter by Asylum Category to search for file "All USCIS Application and Petition Form Types (Fiscal Year 2021, 4th Qtr, July 1–September 30, 2021) (Dec. 15, 2021)").

Table 4 with the times in Table 6, below.

The data in Table 4 are not utilized to develop quantitative impacts, but rather are intended to build context and situational awareness. There are several key observations from the information presented. Foremost, there is a substantial difference between durations for the detained and the non-detained populations. The existence of a gap is expected because USCIS can interface with detained individuals rapidly. However, the gap has grown over time; in 2016 the duration for positive-screened processing was 12.5 times greater, but by 2021 it had grown to a factor of nearly 40. Second, and relatedly, there was a substantial duration rise through 2019 for both detained and non-detained screenings,

although there has been a recent pullback. Furthermore, the duration for negative screenings is lower across the board than for positive screenings—as of the most recent data point, the duration was about 19 percent lower for negative screened cases. It is also seen that the FY 2021 average durations for detained cases are relatively close to FY 2016 through FY 2018 levels, with this series witnessing a spike in 2019.

Because some of the EOIR data are presented in medians, we note that the median durations are lower than the means for both screened types. This indicates that a small number of cases take an exceptionally long time to resolve, resulting in large outlier data points that skew the mean upwards. For non-detained cases, the gap between median and mean duration is relatively

consistent up to FY 2021, but the mean and median converge toward the end of the period; this feature of the data could indicate that fewer outlier durations were represented in the data.

It is possible that the rule may impact the volume and timing of employment authorization applications and approvals. Although we cannot predict the net change in filings for the Form I–765 categories, we present data on initial filings and approvals for three asylum-related categories in Table 5. As a result of the rule, there could be substitutions in Form I–765 categories from the (c)(8), Applicant for Asylum/Pending Asylum, into the (a)(5), Granted Asylum Under Section 208, and (a)(10) Granted Withholding of Removal/243 (H) categories, in Table 5.

TABLE 5—USCIS FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION INITIAL RECEIPTS AND APPROVALS RELATED TO ASYLEE CATEGORIES

[FY 2016 through FY 2020]

| FY | EAD category (a)(5) Granted asylum under section 208 | | EAD category (c)(8) applicant for asylum/pending asylum | | EAD category (a)(10) granted withholding of removal/243 (H) | |
|---|---|---|---|---|---|---|
| | Initial receipts | Approvals | Initial receipts | Approvals | Initial receipts | Approvals |
| 2016 | 29,887 | 27,139 | 169,970 | 152,269 | 2,008 | 1,621 |
| 2017 | 32,673 | 29,648 | 261,782 | 234,053 | 1,936 | 1,076 |
| 2018 | 38,743 | 39,598 | 262,965 | 246,525 | 1,733 | 1,556 |
| 2019 | 47,761 | 41,288 | 216,038 | 177,520 | 2,402 | 2,101 |
| 2020 | 31,931 | 36,334 | 233,864 | 183,820 | 3,318 | 2,554 |
| 5-year total | 180,995 | 174,007 | 1,144,619 | 994,187 | 11,397 | 8,908 |
| 5-year Average | 36,199 | 34,801 | 228,924 | 198,837 | 2,279 | 1,782 |

Source: OPQ, USCIS, Form I–765 Application for Employment Authorization: All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type (May 11, 2021), https://www.uscis.gov/sites/default/files/document/reports/I-765_Application_for_Employment_FY03-20.pdf.

Across the three relevant employment authorization categories, the total of the averages is 267,402 initial EADs, with a total of 235,420 approved EADs.

Having presented information and data applicable to USCIS specifically, we now turn to EOIR data and information. Table 6 presents average and median processing times for EOIR to complete cases originating from the credible fear screening process, positive

and negative, and detained and non-detained. The processing time represents that time between when a case is lodged in EOIR systems and a final decision. Note that the "initial case completions" are not directly comparable to USCIS completions (see Table 3) in terms of annual volumes for two primary reasons. First, there can be timing differences in terms of when a

credible fear case is sent to EOIR and when it is lodged in its processing systems. Second, not all individuals determined to have a credible fear follow up with their cases with EOIR, and some filed cases are administratively closed. Therefore, as a rule, case completions by EOIR would be necessarily lower than "completions" at USCIS.

TABLE 6—EOIR TIME DURATION METRICS, DAYS, AND COMPLETIONS FOR CASES WITH A CREDIBLE FEAR ORIGIN

| FY | Average processing time | Median processing time | Initial case completions |
|---|---|---|---|
| **6A. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions with a Credible Fear Origin** | | | |
| 2016 | 413 | 214 | 16,794 |
| 2017 | 447 | 252 | 26,531 |
| 2018 | 648 | 512 | 33,634 |
| 2019 | 669 | 455 | 55,404 |
| 2020 | 712 | 502 | 33,517 |
| 2021–March 31, 2021 (years) | 1,078 (2.95) | 857 (2.35) | 6,646 |

Case No. 1:24-cv-00762-CNS    Document 22-1    filed 06/24/24    USDC Colorado    pg 1522 of 1835

TABLE 6—EOIR TIME DURATION METRICS, DAYS, AND COMPLETIONS FOR CASES WITH A CREDIBLE FEAR ORIGIN—
Continued

| FY | Average processing time | Median processing time | Initial case completions |
|---|---|---|---|
| **6B. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions with a Credible Fear Origin and Only an Application for Asylum, Statutory Withholding of Removal, and Withholding and Deferral of Removal Under the CAT** | | | |
| 2016 ............................................................................................................ | 514 | 300 | 7,519 |
| 2017 ............................................................................................................ | 551 | 378 | 13,463 |
| 2018 ............................................................................................................ | 787 | 690 | 19,293 |
| 2019 ............................................................................................................ | 822 | 792 | 30,052 |
| 2020 ............................................................................................................ | 828 | 678 | 21,058 |
| 2021–March 31, 2021 (years) ..................................................................... | 1,283 (3.52) | 1,316 (3.61) | 3,730 |

Source: EOIR, Planning, Analysis, and Statistics Division ("PASD"), data obtained April 19, 2021. The row for FY 2021 reflects data through March 31, 2021.

The FY 2021 data point reflects data through the start of FY 2021 to March 31, 2021, and we have included the current processing times in years for situational awareness. As Table 6 shows, there was an across-the-board jump in processing times in FY 2018, followed by a leveling off until FY 2021, when the processing times surged again.

### 3. Population

The population expected to be affected by this rule is the total number of credible fear completions processed annually by USCIS (71,363, *see* Table 3), split between an average of 59,280 positive-screen cases and 12,083 negative-screen cases. This can be considered the maximum, "encompassing," population that could be impacted. However, we take into consideration larger populations to account for variations and uncertainty in the future population.

### 4. Impacts of the Rule

This section is divided into three subsections. The first (a) focuses on impacts on asylum seekers, presented on a per-person basis. The second (b) discusses costs to the Federal Government, and the third (c) discusses other, possible impacts, including benefits.

### a. Impacts on the Credible Fear Asylum Population

Under the new procedure established by this rule, asylum applicants who have established a credible fear of persecution or torture would not be required to file Form I–589 with USCIS. Individuals in this population could accrue cost savings because of this change. There is no filing fee for Form I–589, and the time burden is currently estimated at 12.0 hours per response, including the time for reviewing instructions and completing and

submitting the form.[110] Regarding cost savings, DHS believes the minimum wage is appropriate to rely on as a lower bound, as the applicants would be new to the U.S. labor market. The Federal minimum wage is $7.25 per hour; however, in this rule, we rely on the "effective" minimum wage of $11.80. As The New York Times reported, "[t]wenty-nine states and the District of Columbia have state-level minimum hourly wages higher than the federal [minimum wage]," as do many city and county governments. This New York Times report estimates that "the effective minimum wage in the United States [was] $11.80 an hour in 2019." [111] Therefore, USCIS uses the "effective" minimum hourly wage rate of $11.80 to estimate a lower bound. USCIS uses a national average wage rate across occupations of $27.07 [112] to take into consideration the variance in average wages across States as an upper bound.

DHS accounts for worker benefits by calculating a benefits-to-wage multiplier using the most recent BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS relies on a benefits-to-wage multiplier of 1.45 and, therefore, is able to estimate the full opportunity cost per applicant,

including employee wages and salaries and the full cost of benefits such as paid leave, insurance, retirement, and other benefits.[113] The total rate of compensation for the effective minimum hourly wage is $17.11 ($11.80 × benefits burden of 1.45), which is 62.8 percent higher than the Federal minimum wage.[114] The total rate of compensation for the average wage is $39.25 ($27.07 × benefits burden of 1.45).

For applicants who have established a credible fear, the opportunity cost of 12 hours to file Form I–589 at the lower and upper bound wage rates is $205.32 (12 hours × $17.11) and $471.00 (12 hours × $39.25), respectively, with a midrange average of $338.16. In addition, form instructions require a passport-style photograph for each family member associated with the Form I–589 filing. The Departments obtained an estimate of the number of additional family members applicable via data on biometrics collections for the Form I–589. Biometrics information is collected on every individual associated with a Form I–589 filing, and the tracking of collections is captured in the USCIS Customer Profile Management System ("CPMS") database. A query of this system reveals that for the five-year period of FY 2016 through FY 2020, an average of 296,072 biometrics collections accrued for the Form I–589 annually. Dividing this

---

[110] *See* USCIS, Form I–589, Application for Asylum and for Withholding of Removal: Instructions, OMB No. 1615–0067, at 14 (expires July 31, 2022), *https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf*.

[111] Ernie Tedeschi, *Americans Are Seeing Highest Minimum Wage in History (Without Federal Help)*, The New York Times (Apr. 24, 2019), *https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html* (last visited Mar. 5, 2022). We note that, with the wage level dated to 2019, we do not make an inflationary adjustment because the Federal minimum wage has not changed since then.

[112] For the average wage for all occupations, the Departments rely on BLS statistics. *See* BLS, May 2020 National Occupational Employment and Wage Estimates, *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* (last visited Feb. 28, 2022).

[113] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) ($38.60 Total Employee Compensation per hour)/($26.53 Wages and Salaries per hour) = 1.454957 = 1.45 (rounded). *See* BLS, Employer Cost for Employee Compensation—December 2020, Table 1. Employer Costs for Employee Compensation by Ownership (Dec. 2020), *https://www.bls.gov/news.release/archives/ecec_03182021.pdf* (last visited Feb. 28, 2022).

[114] The Federal minimum wage is $7.25 hourly, which burdened at 1.45 yields $10.51. It follows that: (($17.11 wage − $10.51 wage)/$10.51)) wage = 0.628, which rounded and multiplied by 100 = 62.8 percent.

figure by the same five-year period average of 110,937 initial filings (Table 3) yields a multiplier of 2.67 (rounded).[115] Under the supposition that each phase causes applicants to incur a cost of $10,[116] there could be $26.70 in additional cost-savings at either wage bound.[117] The resulting cost savings per applicant from no longer having to file Form I–589 could range from $232.02 to $497.70, with a midrange of $364.86.[118]

Though these applicants would no longer be required to file Form I–589, DHS recognizes that applicants would likely expend some time and effort to prepare for their asylum interviews and provide documentation for their asylum claims under this rule as well. DHS does not know exactly how long, on average, individuals may spend preparing for their credible fear interviews under the rule, and how that amount of time and effort would compare to the time individuals currently spend preparing for the credible fear interviews. If the increased time were substantial—*i.e.*, above and beyond that currently earmarked for the asylum application process—lower cost savings could result.

Under the rule, asylum applicants who established a credible fear would be able to file for employment authorization via the Form I–765, Application for Employment Authorization ("EAD"), while their asylum applications are being adjudicated. We cannot say, however, whether the volume of Form I–765 EADs filed would increase or decrease in upcoming years due to this rule. Currently, asylum applicants can file for an EAD under the asylum (c)(8) category while their asylum applications are pending. Such applications are subject to a waiting period that commences when their completed Form I–589s are filed. Asylum applicants who establish a credible fear would still be subject to

the waiting period.[119] Applicants would still be able to file for their EADs under the (c)(8) category. We analyze the impacts regarding the EAD filing in two steps, explaining first why filing volumes might decline and the impacts related to that decline, and then why countervailing factors might mitigate such a decline.

One result of this rule is that asylum applications for some individuals pursuant to this rule could be granted asylum earlier than they would be under current conditions. Because an asylum approval grants employment authorization incident to status, and because USCIS automatically provides an asylum granted EAD ((a)(5)) after a grant of asylum by USCIS, some applicants may choose not to file for an EAD based on the pending asylum application under the expectation that asylum would be granted earlier than the EAD approval. This could result in cost savings to some applicants.

There is currently no filing fee for the initial (c)(8) EAD Form I–765 application, and the time burden is currently estimated at 4.75 hours, which includes the time associated with submitting two passport-style photos along with the application.[120] As stated earlier, the Department of State estimates that each passport photo costs about $10 each. Submitting two passport photos results in an estimated cost of $20 per Form I–765 application. Because the (c)(8) EAD does not include or require, at the initial or renewal stage, any data on employment, and since it does not involve an associated labor condition application, we have no information on wages, occupations, industries, or businesses that may employ such workers. Hence, we continue to rely on the wage bounds

(effective minimum and national average) developed earlier. At the wage bounds relied upon, the opportunity-cost savings are $81.27 (4.75 hours × $17.11 per hour), and $186.44 (4.75 hours × $39.25). When the $20 photo cost is included, the cost savings would be $101.27 and $206.44 per applicant, respectively. However, some might choose to file for an EAD even if they hope that asylum will be granted earlier than the EAD approval because they want to have documentation that reflects that they are employment authorized.

In the discussion of the possible file volume decline for the Form I–589, above, we noted that applicants and family members would continue to submit biometrics as part of their asylum claims, and that, as a result, there would not be changes in costs or cost savings germane to biometrics. For the Form I–765(c)(8) category, USCIS started collecting biometrics, and the associated $85 biometrics service fee, in October 2020.[121]

The submission of biometrics involves travel to an ASC for the biometric services appointment. In past rulemakings, DHS estimated that the average round-trip distance to an ASC is 50 miles, and that the average travel time for the trip is 2.5 hours.[122] The cost of travel also includes a mileage charge based on the estimated 50-mile round trip at the 2021 General Services Administration ("GSA") rate of $0.56 per mile.[123] Because an individual would spend an average of 1 hour and 10 minutes (1.17 hours) at an ASC to submit biometrics,[124] adding the ASC time and travel time yields 3.67 hours. At the low- and high-wage bounds, the opportunity costs of time are $62.79 and $144.05.[125] The travel cost is $28, which is the per mileage reimbursement rate of 0.56 multiplied by 50-mile travel distance. Adding the time-related and travel costs generates a per-person

---

[115] Calculation: Average Form I–589 collections 296,072/110,937 average initial Form I–589 filings = 2.67 (rounded). Data were obtained from the USCIS Immigration Records and Identity Services ("IRIS") Directorate, via the CPMS database (data obtained May 7, 2021).

[116] The U.S. Department of State estimates an average cost of $10 per passport photo in its supporting statement for its Paperwork Reduction Act submission for the Application for a U.S. Passport, OMB #1405–0004 (DS–11) (Feb. 8, 2011), *https://www.reginfo.gov/public/do/ PRAViewDocument?ref_nbr=201102–1405–001* (last visited Feb. 28, 2022) (see question #13 of the Supporting Statement).

[117] Calculation: $10 per photo cost × 2.67 photos per Form I–589 = $26.70.

[118] Calculation: $205.32 + $26.70 = $232.02; $338.16 + $26.70 = $364.86; $471.00 + $26.70 = $497.70.

[119] On February 7, 2022, in *AsylumWorks* v. *Mayorkas*, No. 20-cv-3815 (BAH), 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the U.S. District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled "Asylum Application, Interview, and Employment Authorization for Applicants," 85 FR 38532 (June 26, 2020), and "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications," 85 FR 37502, (June 22, 2020), that addressed waiting periods. Separately, a partial preliminary injunction was issued on September 11, 2020, in *Casa de Maryland, Inc.* v. *Wolf*, 486 F. Supp. 3d 928, 935 (D. Md. 2020), that exempts certain individuals from a 365-day waiting period and certain other eligibility criteria, but retains a 180-day waiting period. Although the duration of time required for the waiting period varies based on application of these rules and the related vacaturs and injunctions, a required waiting period remains in effect notwithstanding these rules, vacaturs, or injunctions.

[120] *See* USCIS, Instructions for Application for Employment Authorization, OMB No. 1615–0040, at 31 (expires July 31, 2022), *https://www.uscis.gov/ sites/default/files/document/forms/i-765instr.pdf.*

[121] USCIS collects biometrics for Form I–765 (c)(8) submissions, but a preliminary injunction in *Casa de Maryland,* 486 F. Supp. at 935, currently exempts members of certain organizations from this biometrics collection.

[122] *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 536, 572 (Jan. 3, 2013).

[123] *See* GSA, POV Mileage Rates (Archived), *https://www.gsa.gov/travel/plan-book/ transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived* (last visited Feb. 28, 2022).

[124] *See* USCIS, Instructions for Application for Employment Authorization, OMB No. 1615–0040, at 31 (expires July 31, 2022), *https://www.uscis.gov/ sites/default/files/document/forms/i-765instr.pdf.*

[125] Calculations: Total time burden of 3.67 hours × total rate of compensation for the effective wage $17.11 = $62.79; total time burden of 3.67 hours × total rate of compensation for the average wage $39.25 = $144.05.

biometrics submission cost of $90.79, at the low-wage bound and $172.05 at the high-wage bound.[126] Although the biometrics collection includes the $85 service fee, fee waivers and exemptions are granted on a case-by-case basis (across all forms) that are immaterial to this IFR. Accordingly, not all individuals will pay the fee. When the opportunity costs of time for filing Form I–765 ($101.27 and $206.44, respectively) are added to the opportunity costs of time and travel for biometrics submissions ($90.79 and 172.05), the total opportunity costs of time to file Form I–765 and submitting biometrics are $192.07 and $378.49, respectively. For those who pay the biometrics service fee, the total costs are $277.07 and $463.49, respectively, with a midpoint of $370.28.[127] These figures represent the maximum per-person cost savings for those who choose not to file for an EAD.[128]

Having developed the cost savings for applicants who do not file for an EAD, we now turn to factors that could counteract a potential decline in Form I–765 volumes. First, applicants will benefit from a timing change relevant to the EAD waiting period as it relates to the ''filing date'' of their asylum applications that will allow an EAD to be filed earlier than it could be currently. USCIS allows for an EAD to be filed under 8 CFR 208.7 and 274a.12(c)(8) when an asylum application is pending and certain other conditions are met. Here, an asylum application will be pending when the credible fear determination is served on the individual as opposed to current practice under which the asylum application is pending when lodged in immigration court. This change in

timing could allow some EADs to be approved earlier for those who file for an EAD with a pending asylum application. In this sense, the EAD waiting period remains the same in duration, but the starting point shifts to an earlier position for asylum applicants who will file for an initial EAD under the (c)(8) category.

DHS would begin to consider for parole on a case-by-case basis all noncitizens who have been referred to USCIS for a credible fear screening under the broader standard adopted by this IFR during the relatively short period between being referred to USCIS for a credible fear screening interview and the issuance of a credible fear determination. A parole grant does not constitute employment authorization, however, and the rule provides, in 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), that noncitizens paroled pending credible fear screening will not be eligible for employment authorization based on that grant of parole from custody. Currently there are two Form I–765 classes, (a)(5), ''Granted Asylum Sec. 208,'' and (a)(10), ''Granted Withholding of Removal/243 (H),'' that could apply to noncitizens whose asylum applications are considered under the procedure established by this IFR. In the past, some parolees under these categories have been able to obtain EADs sooner than they would if they were explicitly subject to the filing clock that applies to a pending Form I–589.

Given the two changes discussed above related to the EAD filings—(1) the change in timing for when an EAD can be filed; and (2) the broadening of the standard under which certain noncitizens placed in expedited removal may be considered for parole before receiving a credible fear determination—some applicants may file for an EAD, even under the expectation that their asylum could be granted earlier, if they expect to receive an (a)(5) asylum granted EAD even sooner. In this sense, the potential for more rapid approvals of an EAD claim may be expected to provide a net pecuniary benefit, even considering a more expeditious asylum claim. Coupled with the expectation that some individuals may seek an EAD for the non-pecuniary benefit associated with its documentary value, we cannot determine if these countervailing influences might limit, or even completely absorb, any reductions in EAD filing for credible fear asylum applicants.

Regardless of whether, under the rule, it is the more expeditious asylum grant or EAD approval that results in employment authorization, individuals

who enter the labor force earlier are able to earn income earlier. The assessments of possible impacts rely on the implicit assumption that credible fear asylum seekers who receive employment authorization will enter and be embedded in the U.S. labor force. This assumption is justifiable for those whose labor force entry was effectuated by the EAD approval, as opposed to the grant of asylum. We believe this assumption is justifiable because applicants would generally not have expended the direct costs and opportunity costs of applying for an EAD if they did not expect to recoup an economic benefit. We also take the extra step of assuming these entrants to the labor force are employed. It is possible that some applicants who are eventually denied asylum are currently able to obtain employment authorizations—approved while their asylum application was pending. We do not know what the annual or current scale of this population is, but it is an expected consequence of this IFR that such individuals would not obtain employment authorizations in the future.

The impact is attributable to the difference in days between when asylum would be granted under the rule and the current baseline. USCIS describes this distributional impact in more detail. Since a typical workweek is 5 days, the total day difference (''D'') can be scaled by 0.714 (5 days/7 days) and then multiplied by the average wage (''W'') and the number of hours in a typical workday (8) to obtain the impact, as in the formula: $D \times 0.714 \times W \times 8$. In terms of each actual workday, the daily distributional impacts at the wage bounds are $136.88 ($17.11 $\times$ 8 hours) and $314.00 ($39.25 $\times$ 8 hours), respectively, on a per-person basis, with a midrange average of $225.44.

USCIS cannot expand the per-day per-day quantified impacts to a broader monetized estimate. Foremost, although Table 5 provides filing volumes for the asylum relevant EADs, we cannot determine how many individuals within this population would be affected. In addition, we cannot determine what the average day difference would be for any individual who could be impacted. To quantify the day difference, the Departments would need to simultaneously analyze the current and future interaction between the asylum grant and EAD approvals. Doing so for the current system is conceptually possible with a significant devotion of time and resources, but it is not possible to conduct a similar analysis for future cases without relying on several assumptions that may not be accurate.

---

[126] Calculations: Opportunity cost of time, effective wage $62.79 + travel cost of $28 = $90.79; Opportunity cost of time, average wage $144.05 + travel cost of $28 = $172.05.

[127] Calculations: $192.07 + biometrics services fee of $85 = $277.07; $378.49 + biometrics services fee of $85 = $463.49. Although we have the overall count for biometrics for the period from October 1, 2020, through May 1, 2021, we do not know how many biometrics service fees were collected with these biometrics' submissions; the fee data are retained by the USCIS Office of the Chief Financial Officer (''OCFO''), but the Form I–765 fee payments are not captured by eligibility class.

[128] There is a scenario that the Departments have considered, though it is not likely to occur often. Currently, an asylum applicant might file for an EAD and have the EAD approved prior to the grant of asylum. It is possible that, under this rule, asylum may be approved more expeditiously. At the time of the asylum grant, the individual will automatically receive a category (a)(5) EAD based on the grant of asylum; if the applicant did already file for an EAD, then the filing costs associated with the EAD would be sunk costs, since the (c)(8) EAD does not actually provide any benefit over the (a)(5) EAD. Because this scenario is likely to be rare, DHS has not attempted to quantify its impact.

As a result, we cannot extend the per-person cost (in terms of earnings) to an aggregate monetized cost, even if we knew either the population impacted or the day-difference average because an estimate of the costs would require both data points. The impact on labor earnings developed above has the potential to include both distributional effects (which are transfers) and indirect benefits to employers.[129] The distributional impacts would be felt by asylum applicants who enter the U.S. labor force earlier than under current regulations in the form of increased compensation (wages and benefits). A portion of this compensation gain might be transferred to asylum applicants from others who are currently in the U.S. labor force or eligible to work lawfully. Alternatively, employers that need workers in the U.S. labor market may benefit from those asylum applicants who receive their employment authorizations earlier as a result of the IFR, gaining productivity and potential profits that the asylum applicants' earlier starts would provide. Companies may also benefit by not incurring opportunity costs associated with the next-best alternative to the immediate labor the asylum applicant would provide, such as having to pay existing workers to work overtime hours. To the extent that overtime pay could be reduced, some portion of this pay could be transferred from the workers to the companies.

We do not know what the next-best alternative may be for those companies. As a result, the Departments do not know the portion of overall impacts of this IFR that are transfers or benefits, but the Departments estimate the maximum monetized impact of this IFR in terms of a daily, per-person basis compensation. The extent to which the portion of impacts would constitute benefits or transfers is difficult to discern and would depend on multiple labor market factors. However, we think it is reasonable to posit that the portion of impacts attributable to transfers would mainly be benefits, for the following reason: If there are both workers who obtain employment authorization under this rule and other workers who are available for a specific position, an employer would be expected to consider any two candidates to be substitutable to a high degree.

There is an important caveat, however. There could be costs involved in hiring asylum seekers that are not captured in this discussion. As the U.S. economy recovers from the effects of the COVID–19 pandemic, there may be structural changes to the general labor market and to specific job positions that could impact the next-best alternatives that employers face. The Departments cannot speculate on how such changes in relation to the earlier labor market entry of some asylum applicants could mitigate the beneficial impacts for employers.

The early possible entry into the labor force of some positive-screened credible fear asylum applicants is not expected to change the composition of the labor market, as it would affect only the timing under which some individuals could enter the market. The Departments do not have reason to believe the overall U.S. labor market would be affected, given the relatively small population that is expected to be impacted. Moreover, some asylum seekers who currently enter the labor market with a pending asylum application may no longer be entering the labor market under this IFR if they receive a negative decision sooner on their asylum claim. Specifically, there could be individuals who receive positive credible fear determinations, but whose asylum applications are ultimately denied within 180 days of filing. Under this rule and the resultant shortened adjudication time frame, these individuals who otherwise would have been eligible to receive (c)(8) EADs no longer will be eligible because their asylum claims will have been adjudicated (and thus their asylum applications will no longer be pending) prior to the expiration of the waiting period required for (c)(8) filings. The lost compensation to these individuals could constitute a transfer to others in the U.S. workforce. Because we cannot predict how many people would be impacted in such a way, we are not able to quantify this impact.

Furthermore, there may be tax impacts for the Government. It is difficult to quantify income tax impacts of earlier entry of some asylum seekers in the labor market because individual tax situations vary widely, but the Departments considered the effect of Social Security and Medicare taxes, which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively), with a portion paid by the employer and the same amount withheld from the employee's wages.[130]

With both the employee and employer paying their respective portions of Medicare and Social Security taxes, the total estimated accretion in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent.[131] The Departments will rely on this total tax rate where applicable. The Departments are unable to quantify other tax transfer payments, such as for Federal income taxes and State and local taxes. As noted above, the Departments do not know how many individuals with a positive credible fear determination will be affected, and what the average day-difference would be, and therefore the Departments cannot make an informed monetized estimate of the potential impact. It accordingly follows that the Departments cannot monetize the potential tax impacts of the IFR. However, the Departments can provide partial quantitative information by focusing on the workday earnings presented earlier. The workday earnings, at the wage bounds of $136.88 and $314.00, are multiplied by 0.153 to obtain $20.94 and $48.04, respectively, with a midpoint of $34.49. These values represent the daily employment tax impacts per individual. The tax impacts per person would amount to the total day-difference in earnings scaled by 0.714, to reflect a five-day workweek. Conversely, to the extent that this rule prevents a person from obtaining an EAD, there may be losses in tax revenue.

Having developed partial (based on an individual basis) monetized impacts of this IFR, there are two important caveats applicable to the population of asylum applicants who have received a positive credible fear determination. First, as we detail extensively in the following subsection, there will be resource requirements and associated costs needed to make this IFR operational and effective. These changes will not occur instantaneously and may require months or even a year or more to fully implement. Although existing USCIS resources will be able to effectuate changes for some individuals rather quickly, others (and thus the entire population from an average perspective) will face delay in realizing the impacts. These individuals thus may face a delay in realizing benefits such as earlier

---

[129] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. *See* OMB, Circular A–4 at 14, 38 (Sept. 17, 2003), *https:// www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/circulars/A4/a-4.pdf* (last visited Feb. 28, 2022) (providing further discussion of transfer payments and distributional effects).

[130] *See* Internal Revenue Service, *Publication 15 (Circular E), Employer's Tax Guide* (Dec. 16, 2021),

*https://www.irs.gov/pub/irs-pdf/p15.pdf* (last visited Feb. 28, 2022); *see also* Market Watch, *More Than 44 Percent of Americans Pay No Federal Income Tax* (Sept. 16, 2018), *https:// www.marketwatch.com/story/81-million-americans-wont-pay-any-federal-income-taxes-this-year-heres-why-2018-04-16* (last visited Mar. 5, 2022).

[131] Calculation: (6.2 percent Social Security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to Government.

asylum determinations, income gains, and possible filing cost savings. Second, despite the possibility that some baseline EAD filers may choose not to file in the future, there could be mitigating effects that would reduce the volume decline for Form I–765(c)(8) submissions.

In closing, we have noted that the impacts developed in this section apply to the population that receives a positive credible fear determination. Additionally, for the subset of this population that receives a negative asylum determination from USCIS, the possibility of de novo review of their claims by IJs may benefit some applicants by affording another opportunity for review and approval of their asylum claims.

It is possible that the earnings impact described could overstate the quantified benefits directly attributable to receiving earlier employment authorization. For those who entered the labor market after receiving employment authorization and began to receive paid compensation from an employer, counting the entire amount received by the employer as a benefit may result in an overestimate. Even without working for wages, the time spent by an individual has value. For example, if someone performs childcare, housework, or other activities without paid employment, that time still has value. Consequently, a more accurate estimate of the net benefits of receiving employment authorization under the proposed rule would attempt to account for the value of time of the individual before receiving employment authorization. For example, the individual and the economy would gain the benefit of the worker entering the workforce and receiving paid compensation but would lose the value of the worker's time spent performing non-paid activities. Due to the wide variety of non-paid activities an individual could pursue without employment authorization, it is difficult to estimate the value of that time. As an example, if 50 percent of wages were a suitable proxy of the value for this non-paid time, the day-impacts per person would be scaled by half accordingly.

### b. Impacts to USCIS

#### i. Total Quantified Estimated Costs of Regulatory Changes

In this subsection, the Departments discuss impacts on the Federal Government. Where possible, cost estimates have been quantified; otherwise they are discussed qualitatively. The total annual costs are provided only for those quantified costs that can be applied to a population.

### Costs of Staffing to USCIS

USCIS will need additional staffing to implement the provisions presented in this rule. The staffing requirement will largely depend on the volume of credible fear referrals. In addition to asylum officers, USCIS will require additional supervisory staff and operational personnel commensurate with the number of asylum officers needed. USCIS anticipates an increased need for higher-graded field adjudicators and supervisors to implement the provisions of this IFR. Approximately 92 percent of the field asylum officers are currently employed at the GS–12 pay level or lower.[132] Under this model, USCIS will be assuming work normally performed by an IJ. EOIR data indicate that the weighted average salary was $155,089 in FY 2021 for IJs; $71,925 for Judicial Law Clerks ("JLCs"); $58,394 for Legal Assistants; $132,132 for DHS Attorneys; and $98.51 per hour for interpreters.[133] Notably, entry-level IJs are required to adjudicate a wider array of immigration applications than asylum officers, and their decisions, unlike those of current USCIS asylum officers, are not subject to 100 percent supervisory review. As such, under this IFR, USCIS asylum officers making determinations on statutory withholding of removal and CAT protection claims would be performing work at a GS–13 minimum level, considering they will be conducting adjudications traditionally performed only by IJs.[134] In addition, first-line Supervisory Asylum Officers ("SAOs") reviewing these decisions would be graded at a GS–14.[135] Currently, not all SAOs are at a grade GS–14. Aligning all first line SAOs to a GS–14 ensures operational flexibility and makes this position consistent with the similar work processes and functions performed by the first-line Supervisory Refugee Officer position.

Currently, USCIS refers all individuals who receive a positive credible fear determination to IJs at

EOIR for consideration of the individuals' asylum claims. Based on historical EOIR data on the amount of time required to complete a typical hearing with a credible fear origin and only an application for asylum, the median duration for credible fear merit plus master hearings from FY 2016 through FY 2020 was about 97 minutes, or 1.6 hours. Factoring in the EOIR weighted average salaries for the IJs, JLCs, DHS Attorneys, and interpreters required for EOIR to complete these hearings, we estimate the median cost to be $470.62[136] per hearing over the same time frame.

USCIS analyzes a range of credible fear cases to estimate staffing requirement costs. At a lower bound volume of 75,000 credible fear cases, USCIS assumes it would receive fewer credible fear cases compared to prior years (apart from FY 2020, which had a lower number of credible fear cases due to the COVID–19 pandemic and resulting border closures). A volume of 300,000 credible fear cases is an upper bound, based on the assumption that nearly all individuals apprehended will be placed into expedited removal for USCIS to process. As shown in Table 3, the lowest number of credible fear cases received for FY 2016 through FY 2019 was 79,842 in FY 2017, while the highest was 102,204 in FY 2019. DHS recognizes that the estimated volume of 300,000 is nearly three times the highest annual number of credible fear cases received, but DHS presents this as an upper bound estimate to reflect the uncertainty concerning an operational limit on how many credible fear cases could be handled by the agency in the future. Inclusion of this unlikely upper bound scenario is intended only to present information concerning the potential costs should the agency consider an intervention at the highest end of the range. USCIS expects volumes to fall within the lower and upper bounds and therefore we also provide a primary estimate of 150,000 credible fear cases.[137]

---

[132] In 2021, the base salary for a GS–12 ranged from $66,829, at step 1, up to $86,881, at step 10. *See* OPM, Salary Table 2021–GS Incorporating the 1% General Schedule Increase Effective January 2021, *https://www.opm.gov/policy-data-oversight/ pay-leave/salaries-wages/salary-tables/pdf/2021/ GS.pdf* (last visited Mar. 1, 2022) ("OPM Salary Table").

[133] Weighted average base salaries across position, FY, and location are drawn from DOJ EOIR PASD analysis. Interpreter wages are considered hourly here because these positions are paid differently and not always on an annual basis. In 2021, the base salary for a GS–15 step 3 was $117,824 and step 4 was $121,506. *See* OPM Salary Table.

[134] In 2021, the base salary for a GS–13 step 1 was $79,468. *See* OPM Salary Table.

[135] In 2021, the base salary for a GS–14 step 1 was $93,907. *See* OPM Salary Table.

[136] Estimate were based on analysis provided by EOIR on May 19, 2021, of median digital audio recording length data from all merits and master asylum hearings between FY 2016 and FY 2020. The five-year average estimated cost of hearings is based on 2,087 assumed hours per year for the IJ, JLC, and DHS attorneys at the annual salaries shown, plus the hourly cost per interpreter. These annual values were multiplied by the respective sums of the annual median lengths of master and merits hearings for corresponding years to produce the five-year average cost per hearing of $470.62.

[137] The primary estimate of 150,000 is not equal to the average of the lower volume of 75,000 credible fear cases and the upper volume of 300,000 credible fear cases. Rather, this primary estimate, based on OCFO modeling, represents the number of cases that the agency may reasonably expect. The

USCIS has estimated the staffing resources it will need to implement this rule. At the three volume levels of credible fear cases, USCIS plans to hire between 794 and 4,647 total new positions, with a primary estimate of 2,035 total new positions.[138] The estimated costs associated with payroll, non-payroll, and other general expenses—including interpreter services, transcription services, facilities, physical security, information technology (''IT'') case management, and other contract, supplies, and equipment—are anticipated to begin in FY 2022.

The costs of this rule are likely to include initial costs associated with the hiring and training of staff, and those costs would continue in future years. Additionally, as was explained in Section G of the NPRM, the Departments expect a phased approach to implementation due to budgetary and logistical factors. 86 FR 46922. The cost estimates developed below focus on three volume bands and are based on initial data and staffing models that captured initial implementation costs accruing to FY 2022 and FY 2023. These estimates therefore partially capture the likely phasing of resourcing and costs, but not the full phasing that could extend into further years. The Departments do not currently have the appropriate data to include an implementation of the IFR in their estimates of quantified resource costs. However, we do not believe a partial implementation significantly skews the expected costs of this rule. We offer some additional comments concerning this phased implementation as it relates to costs at the conclusion of this analysis.

The Departments recognize that initial costs are likely to spill into future years depending on the pace of hiring; employee retention; obtaining and signing contracts (for interpreters, transcription, and facilities); and training. For the remainder of FY 2022, DHS will finalize job descriptions, post new positions, and begin the hiring process to onboard some new Federal employees, and DHS will work to procure new contracts for interpreters, transcription, facilities, and security staff as its current fiscal situation allows. In FY 2022, the implementation costs are expected to range between $179.8 million and $952.4 million with a primary cost estimate of $438.2 million, assuming all staff is hired and corresponding equipment needs are fulfilled in the fiscal year. DHS recognizes that, operationally, it may take more time to attain the necessary staffing and equipment. However, we are not able to reliably predict those timelines due to the uncertain nature of the recruitment and onboarding processes. Any delay in hiring would reduce the first-year costs of implementation, as explained further below. The itemized planned resources are presented in Table 7.

TABLE 7—ESTIMATED USCIS FY 2022 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

|  | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $140,507 | $355,175 | $806,697 |
| Payroll * | 113,602 | 285,983 | 648,257 |
| Non-Payroll | 26,905 | 69,192 | 158,440 |
| (B) General Expenses | 39,313 | 83,025 | 145,682 |
| Interpreter Services | 6,615 | 19,136 | 44,179 |
| Transcription Services | 9,366 | 26,697 | 37,362 |
| Facilities | 6,635 | 17,606 | 40,865 |
| Physical Security | 623 | 1,654 | 3,839 |
| IT Case Management | 12,500 | 12,500 | 12,500 |
| Other Contract/Supplies/Equipment | 3,574 | 5,432 | 6,937 |
| Total | 179,820 | 438,200 | 952,379 |

Source: USCIS Analysis from RAIO and USCIS OCFO, May 19, 2021.

In FY 2023, USCIS estimates costs between $164.7 million and $907.4 million, with a primary estimate of $413.6 million, as shown in Table 8. The reductions as compared to FY 2022 are mostly attributable to non-recurring, one-time costs for new staff and upgrades to IT case management systems, although a decline in costs pertaining to other contracts, supplies, and equipment is also expected. The largest expected cost decrease is for IT case management, which is estimated to decline from $12.5 million in FY 2022 down to $4.375 million in FY 2023. Meanwhile, costs for interpreter and transcription services, facilities, and physical security are expected to rise in FY 2023 because of resource cost increases. For FY 2024 through FY 2031 of implementation, DHS expects resource costs to stabilize.

TABLE 8—ESTIMATED USCIS FY 2023 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

|  | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $133,427 | $337,047 | $766,159 |
| Payroll* | 122,753 | 309,758 | 703,852 |

OCFO volume levels were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. The actual volume levels could be above or below these levels.

[138] The primary estimate of 2,035 total new positions is not equal to the average of the lower-bound 794 and upper-bound 4,647 estimates. Rather, this primary estimate, based on a staffing allocation model, represents the number of staff in a mix of occupations at a mix of grade levels that the agency may need to hire to handle the volume of credible fear cases. The staffing is commensurate with OCFO model volume levels, which were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. Actual volume levels and hence actual staffing levels could be above or below these levels.

TABLE 8—ESTIMATED USCIS FY 2023 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS—Continued

[$ in thousands]

|  | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| Non-Payroll | 10,674 | 27,289 | 62,307 |
| (B) General Expenses | 31,267 | 76,554 | 141,249 |
| Interpreter Services | 6,813 | 19,710 | 45,504 |
| Transcription Services | 9,647 | 27,498 | 38,483 |
| Facilities | 6,834 | 18,134 | 42,091 |
| Physical Security | 642 | 1,704 | 3,954 |
| IT Case Management | 4,375 | 4,375 | 4,375 |
| Other Contract/Supplies/Equipment | 2,956 | 5,133 | 6,842 |
| Total | 164,694 | 413,601 | 907,408 |

Source: USCIS Analysis from RAIO and OCFO, May 19, 2021.

To estimate the costs for each category itemized in Tables 7 and 8, USCIS considered the inputs for each. USCIS expects to hire most new staff at the GS–13, step 1 level, on average, and most of those hired will serve as asylum officers. As stated, these officers will be making determinations on statutory withholding of removal and withholding and deferral of removal under the CAT, so their pay will be higher than the current asylum officer pay, which is at a GS–12 level. Additionally, USCIS assumes step 1 because these employees are expected to be new to the position. See 5 U.S.C. 5333 (providing that new appointments generally "shall be made at the minimum rate of the appropriate grade"). Payroll costs also include Government contributions to non-pay benefits, such as healthcare and retirement. Although payroll is the greatest estimated cost to hiring staff, non-payroll costs include training, equipping, and setting staff up with resources such as laptops, cell phones, and office supplies. For example, asylum officers have been required to attend and successfully complete a multi-week residential training at a Federal Law Enforcement Training Center ("FLETC") as a condition of their continued employment. The estimated cost per student (including FLETC enrollment costs, travel, etc.) was approximately $7,000. However, USCIS is currently engaging a virtual training that is approximately $5,000 per student. Although the training is expected to shift back to in-person training in the future, we currently do not have a projected date for this shift. To fully furnish and equip new employees, USCIS estimates a cost of $3,319 per asylum employee. Costs for new equipment would be largely commensurate with the increase in staffing levels.

In addition to costs associated with hiring new staff, DHS anticipates that it will need to both increase funding on existing contracts and procure new ones. As a result of this IFR, the need for interpretation services will increase as the number of asylum interviews USCIS performs rises. Current interpreter contracts cannot absorb this expected increase. Using current contracts, USCIS applied the current cost model to the estimated increase in case volumes in order to estimate costs. The facilities and physical security estimates were similarly based on current cost models that were expanded to account for additional employees. Additional contract support will also be needed for transcription services to create a written record of the asylum hearing because such staff are not currently employed by USCIS. To create transcription service estimates, USCIS applied EOIR's current cost model to USCIS's estimated increase in case volumes. DHS also anticipates costs associated with general expenses associated with miscellaneous contract, supplies, and equipment commensurate with the increase in staff. The timing of these costs will depend on the hiring timeline but are expected to commence in the first year. DHS recognizes that if it takes more than one year to hire and equip asylum employees, costs may instead be experienced in later years.

Costs of IT Upgrades for USCIS

DHS is planning upgrades to internal management systems and databases as a requirement to implement this IFR. The estimated cost of these upgrades in FY 2022 is a one-time cost of $12.5 million that will impact virtually all processing and record-keeping systems at USCIS. This cost embodies funds for enhancements and refurbishment to the USCIS global case management system that would support features such as ensuring transition of positive credible fear screening cases to the hearing process currently provided for affirmative asylum cases; support for withholding of removal and CAT adjudication features; non-detained scheduling enhancements; and capabilities to accept and provide review for electronic documents. The one-time cost also includes funds earmarked for teams that support integrations with other internal and external-facing systems, such as record-keeping; identity management and matching; reporting and analytics; applicant-facing interfaces; and other key USCIS systems, as well as external systems at ICE, CBP, and DOJ.[139]

Included in these $12.5 million in costs are the costs to pay staff to make these upgrades. DHS estimates between 30 and 40 individuals, with a little over half being contract personnel and the rest being Federal employees, would be involved (either part- or full-time) in the implementation of these enhancements through FY 2022. The Federal personnel would mainly comprise GS–14 and GS–15 level personnel and supervisory and management staff.

IT costs are expected to decline in FY 2023 and remain flat into the future at $4.375 million. This amount accounts for ongoing operations and maintenance costs. New features or upgrades are not expected at this time, but if they were to be needed in the future, those enhancements would result in additional costs not included here.

At present, DHS does not envision its planned IT upgrades requiring new facilities or additional structures.

---

[139] Although this plan tracks the FY 2022 time frame, variations in the pace of Federal and contractor hiring and retention during the performance period, unforeseen legal or other policy challenges to any electronic process, and the ability of relevant offices to truly operationalize minimal functionality given their own staffing constraints to handle manually any additional process automations, could delay some implementation into FY 2023.

Importantly, DHS's upgrades are expected to coincide with the first electronic processing of the Form I–589. Since this will be a significant change for processing asylum applications, unexpected errors or system changes could have impacts on this project as well. Completion of the upgrades is also dependent on the availability of ICE, CBP, and DOJ systems to integrate with USCIS systems to provide for streamlined implementation. However, because this plan was developed outside the scope of this rule, we do not attribute costs to it.

As described earlier in this analysis, we expect no net change regarding biometrics collection germane to asylum applications for individuals with a positive credible fear determination. We also detailed how factors concomitant to more expeditious EAD approvals make it impossible to estimate the magnitude or even direction of the net change in Form I–765 filing volumes (related to asylum or withholding of removal), and,

hence, commensurate biometrics collections (and fee payments).

Given the parameters of this rule, however, any net change in biometrics would not impose new costs on the Federal Government. The maximum monthly volume of biometrics submissions allowed by the current ASC contract is 1,633,968 and the maximum annual volume is 19,607,616.[140] The average number of individuals that submitted biometrics annually across all USCIS forms for the period FY 2016 through FY 2020 was 3,911,857.[141] Given that the average positive-screened credible fear population is 59,280 (Table 3), which is 1.52 percent of the biometrics volume, a volume change would not encroach on the ASC contract bounds.

To better illustrate the limited impact of biometrics collection on USCIS, one scenario that we do account for relates to costs for a particular USCIS–ASC district. The DHS–ASC contract was designed to be flexible to reflect variations in benefit request volumes.

The pricing mechanism within this contract embodies such flexibility. Specifically, the ASC contract is aggregated by USCIS district, and each district has five volume bands with its pricing mechanism. The incumbent pricing strategy takes advantage of economies of scale because larger biometrics processing volumes have smaller corresponding biometrics processing prices.[142] For example, Table 9 provides an example of the pricing mechanism for a particular USCIS district. This district incurs a monthly fixed cost of $25,477.79, which will cover all biometrics submissions under a volume of 8,564. However, the price per biometrics submission decreases from an average cost of $6.66 for volumes between a range of 8,565 and 20,524 to an average of $5.19 once the total monthly volume exceeds 63,503. In other words, the average cost decreases when the biometrics submissions volume increases (jumps to a higher volume band).

TABLE 9—EXAMPLE OF PRICING MECHANISM FOR A USCIS DISTRICT PROCESSING BIOMETRICS APPOINTMENTS, FY 2021

| District X | Volume band | Minimum volume | Maximum volume | Costs |
|---|---|---|---|---|
| Baseline: Fixed price per month | AA | 0 | 8,564 | $25,477.79 |
| Fixed price per person processed | AB | 8,565 | 20,524 | 6.66 |
| Fixed price per person processed | AC | 20,525 | 31,752 | 5.94 |
| Fixed price per person processed | AD | 31,753 | 63,504 | 5.53 |
| Fixed price per person processed | AE | 63,505 | 95,256 | 5.19 |

Source: USCIS, IRIS Directorate, received May 10, 2021.

At the district level, since there are small marginal changes to costs in terms of volumes, it would take a substantial change in volumes for a particular district to experience a significant change in costs for that district. If biometrics volumes increase on net, there could be small marginal, and hence, average, cost declines; in contrast, if volumes decline, some of those marginal costs might not be realized.

Having developed the costs for USCIS to implement the rule, this section brings the total costs together as annual inputs that are discounted over a 10-year horizon. At the three population bounds, the inputs are captured in Table 10. The FY 2022 and FY 2023 costs are from Tables 7 and 8. For FY 2024 through FY 2031, human resources cost increases. As stated earlier, USCIS expects positions to be filled at step 1 for each GS level, so in years where

employees remain at the same step for more than one year, these estimates account only for human resource cost increases (FYs 2026, 2028 and 2030). The general non-IT cost increases account for expected contract pricing increases. Finally, IT costs are expected to remain flat at $4.375 million into the future, which accounts for ongoing operations and maintenance costs.

TABLE 10—MONETIZED COSTS OF THE INTERIM FINAL RULE TO USCIS

[In undiscounted 2020 dollars]

| Time Period: FYs 2022 through 2031 | | | | |
|---|---|---|---|---|
| FY | Human resources | General (non-IT) cost | IT expenditure | Annual total |
| **10A. Low Population Bound (75k Annual Cases)** | | | | |
| 2022 | $140,507,000 | $26,813,000 | $12,500,000 | $179,820,000 |

[140] Data and information were provided by the USCIS IRIS Directorate. The average annual biometrics volumes were obtained through the CPMS database. The cost of the contract reflects the most recent contract update, dated June 18, 2020.

[141] Data and information were provided by USCIS IRIS Directorate, utilizing the CPMS database.

[142] "Economies of scale" refers to a scenario where a greater quantity of output produced (in this

case, more biometric service appointments) results in a lower per-unit fixed cost or per-unit variable cost to produce that output.

TABLE 10—MONETIZED COSTS OF THE INTERIM FINAL RULE TO USCIS—Continued

[In undiscounted 2020 dollars]

| FY | Human resources | General (non-IT) cost | IT expenditure | Annual total |
|---|---|---|---|---|
| **Time Period: FYs 2022 through 2031** | | | | |
| 2023 ................................................ | 133,427,000 | 26,892,000 | 4,375,000 | 164,694,000 |
| 2024 ................................................ | 137,429,810 | 27,698,760 | 4,375,000 | 169,503,570 |
| 2025 ................................................ | 141,552,704 | 28,529,723 | 4,375,000 | 174,457,427 |
| 2026 ................................................ | 142,968,231 | 29,385,614 | 4,375,000 | 176,728,846 |
| 2027 ................................................ | 147,257,278 | 30,267,183 | 4,375,000 | 181,899,461 |
| 2028 ................................................ | 148,729,851 | 31,175,198 | 4,375,000 | 184,280,049 |
| 2029 ................................................ | 153,191,747 | 32,110,454 | 4,375,000 | 189,677,201 |
| 2030 ................................................ | 154,723,664 | 33,073,768 | 4,375,000 | 192,172,432 |
| 2031 ................................................ | 159,365,374 | 34,065,981 | 4,375,000 | 197,806,355 |
| 10-year total ................................ | 1,459,152,660 | 300,011,682 | 51,875,000 | 1,811,039,342 |
| **10B. Primary Population Bound (150k Annual Cases)** | | | | |
| 2022 ................................................ | 355,175,000 | 70,525,000 | 12,500,000 | 438,200,000 |
| 2023 ................................................ | 337,047,000 | 72,179,000 | 4,375,000 | 413,601,000 |
| 2024 ................................................ | 347,832,504 | 74,344,370 | 4,375,000 | 426,551,874 |
| 2025 ................................................ | 358,963,144 | 76,574,701 | 4,375,000 | 439,912,845 |
| 2026 ................................................ | 362,552,776 | 78,871,942 | 4,375,000 | 445,799,718 |
| 2027 ................................................ | 374,154,464 | 81,238,100 | 4,375,000 | 459,767,565 |
| 2028 ................................................ | 377,896,009 | 83,675,243 | 4,375,000 | 465,946,252 |
| 2029 ................................................ | 389,988,681 | 86,185,501 | 4,375,000 | 480,549,182 |
| 2030 ................................................ | 393,888,568 | 88,771,066 | 4,375,000 | 487,034,634 |
| 2031 ................................................ | 406,493,002 | 91,434,198 | 4,375,000 | 502,302,200 |
| 10-year total ................................ | 3,703,991,149 | 803,799,121 | 51,875,000 | 4,559,665,270 |
| **10C. High Population Bound (300k Annual Cases)** | | | | |
| 2022 ................................................ | 806,697,000 | 133,182,000 | 12,500,000 | 952,379,000 |
| 2023 ................................................ | 766,159,000 | 136,874,000 | 4,375,000 | 907,408,000 |
| 2024 ................................................ | 793,740,724 | 140,980,220 | 4,375,000 | 939,095,944 |
| 2025 ................................................ | 822,315,390 | 145,209,627 | 4,375,000 | 971,900,017 |
| 2026 ................................................ | 830,538,544 | 149,565,915 | 4,375,000 | 984,479,459 |
| 2027 ................................................ | 860,437,932 | 154,052,893 | 4,375,000 | 1,018,865,824 |
| 2028 ................................................ | 869,042,311 | 158,674,480 | 4,375,000 | 1,032,091,791 |
| 2029 ................................................ | 900,327,834 | 163,434,714 | 4,375,000 | 1,068,137,548 |
| 2030 ................................................ | 909,331,112 | 168,337,755 | 4,375,000 | 1,082,043,868 |
| 2031 ................................................ | 942,067,032 | 173,387,888 | 4,375,000 | 1,119,829,921 |
| 10-year total ................................ | 8,500,656,879 | 1,523,699,492 | 51,875,000 | 10,076,231,371 |

The totals reported in Table 10 are collated in Table 11, with the 10-year discounted present values, each at a 3 percent and 7 percent discount rate. Because the cost inputs differ for each year, the average annualized equivalence costs are not uniform across discount rates.

TABLE 11—MONETIZED COSTS OF THE INTERIM FINAL RULE

[In millions, FY 2020 dollars]

| Population level | Undiscounted | 3-percent | | 7-percent | |
|---|---|---|---|---|---|
| | 10-year cost | 10-year cost | Annualized cost | 10-year cost | Annualized cost |
| Low ................................................ | $1,811.0 | $1,538.8 | $180.4 | $1,260.8 | $179.5 |
| Primary ........................................... | 4,559.7 | 3,871.3 | 453.8 | 3,168.9 | 451.2 |
| High ............................................... | 10,076.2 | 8,550.3 | 1,002.4 | 6,993.7 | 995.8 |

As discussed in Section G of the NPRM, and mentioned earlier in this preamble, DHS expects this rule to be implemented in phases. Our quantitative cost estimates assume that the funding for the rule is essentially available when the rule takes effect, and that implementation costs are spread out over several years due to timing effects related to operational and hiring impacts. In reality, budgeting constraints and variations are expected to play a prominent role in the phasing in of the program. Our estimates thus account partially but not fully for such phasing. Incorporating additional phasing into resource allocation models is complex because of the interaction

between initial and recurring costs, and DHS is not prepared at this time to attempt to fully phase in the costs quantitatively. Despite this limitation, we do not believe that the true costs would be significantly different than those presented above. A phased implementation would not skew the actual costs, but rather allocate them to different timing sequences. In fact, from a discounting perspective, the present value of the costs would actually be lower if they were allocated to future years. DHS will continue to evaluate all pertinent data and information related to the phasing approach, and, if feasible, may include refined estimates of the resource-related costs in the final rule.

As of the final drafting of this IFR, DHS believes that, through FY 2022, new staff positions can be funded with existing resources, which would support a minimum processing level of 50,000 annual family-unit cases. For the medium and high-volume bands of 150,000 and 300,000 annual cases, respectively, DHS does not believe it can meet the full staffing requirements with current funding. Based on preliminary modeling, it could take up to three years to fully staff the medium-volume band and up to five years to staff the high-volume band.[143]

If the medium- and high-volume bands of 150,000 and 300,000 were to be funded through a future fee rule, it would increase fees by an estimated weighted average of 13 percent and 26 percent respectively. This estimated increase would be attributable to the implementation of the asylum officer portions of the IFR only, and it is provided to show the magnitude of the impact that implementation of this IFR would have beyond whatever other increases might be included in a future fee rule. The 13 percent or 26 percent estimated weighted average increase would be in addition to any changes in the Immigration Examinations Fee Account non-premium budget.

ii. Intra-Federal Government Sector Impacts

This rule is expected to shift the initial case processing of some asylum and protection claims from EOIR to USCIS. We present this shift in case processing as new resource costs for USCIS because USCIS would incur costs such as hiring new staff and funding new IT upgrades. The IJs at EOIR will continue to remain at DOJ and work on other high-priority matters. The IJs are

expected to continue to work on cases in which USCIS does not grant asylum because individuals whose asylum claims are not granted will be referred to EOIR for a streamlined section 240 removal proceeding. Cases in which USCIS grants asylum, however, would not receive further review within EOIR. Accordingly, every such case would constitute a direct reduction in new cases that EOIR would have to adjudicate. Given EOIR's significant pending caseload of approximately 1.3 million cases, reducing the number of cases referred to EOIR by 11,250 to 45,000 (assuming that approximately 15 percent of cases are granted, based on historical data as described above)[144] will enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. A reduction in the pending caseload may reduce the overall time required for adjudications because dockets would not have to be set as far into the future. This reduction in turn would better enable EOIR to meet its mission of fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws, including granting relief or protection to noncitizens who qualify.

c. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry

It is possible that there will be familiarization costs associated with this IFR. It is expected that applicants and their support networks will incur costs to read and develop an understanding of this rule and the associated changes in the current asylum process. If, for example, attorneys are utilized, the cost could be $103.81 per hour, which is the average hourly wage for lawyers including the full cost of benefits.[145] As of the time of this analysis, there are approximately 155,000 words in this IFR. Although we could not identify formal studies on the subject, some reports suggest that, on average, a person reads about 250 words per minute, though there can be variation according to individual attributes and type of material being read. Based on the word count at the time of this analysis, it would thus take

about 10.3 hours[146] to read the rule. At the burdened wage for lawyers, this would be about $612.48 per review. If each individual in the population required such a reviewer, the total familiarization cost would be about $76.3 million, which would potentially be incurred during the first year the rule is effective.[147] Since this estimate assumes each individual would hire an attorney unfamiliar with this rule, it is likely to be an overestimate of actual familiarization costs.

The rule offers other benefits to asylum applicants and the Government. Although we cannot precisely parse the portion of the IFR's impact constituting transfers and the portion constituting costs, we believe that most of the distributional effects will comprise transfers that are beneficial to some asylum applicants (which we calculated on a per-person, workday basis), as opposed to costs. These transfers may impact the support network of the applicants. This network could include public and private entities, and it may comprise family and personal friends; legal services providers and advisors; religious and charity organizations; State and local public institutions; educational providers; and non-governmental organizations. To the extent that some individuals may be able to earn income earlier, burdens on this support network may be lessened and the tax impacts could be beneficial at the local or State level. In addition, as described above, it will take time for USCIS to make the requisite resourcing and staffing changes needed to fully effectuate the changes through which the impacts could be realized. In other words, there is likely to be a delay ranging from several months to more than a year for a sizeable portion of the impacts to begin to be realized. As a result, resources and efforts related to the applicants' support networks can be expected to be maintained in the short to medium term.

---

[143] These figures are based on preliminary results of staffing and resource allocation estimates provided by DHS's USCIS RAIO Directorate, Asylum Division; information was obtained on July 7, 2021.

[144] Calculations: 75,000 cases × 15 percent = 11,250; 300,000 cases × 15 percent = 45,000.

[145] For the average wage for lawyers, the Departments rely on BLS statistics. *See* BLS, May 2020 National Occupational Employment and Wage Estimates, *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* (last visited Mar. 1, 2022).

Calculation: $71.59 × 1.45 benefits burden = $103.81 (rounded).

[146] Calculation: 155,000 words/250 words per minute = 620 minutes; 620 minutes/60 minutes per hour = 10.3 hours (rounded).

[147] The benchmark of 250 words per minute applies to most adults, according to several reports. *See, e.g.,* HealthGuidance.org, What Is the Average Reading Speed and the Best Rate of Reading? (Jan. 3, 2020), *https://www.healthguidance.org/entry/13263/1/what-is-the-average-reading-speed-and-the-best-rate-of-reading.html* (last visited Feb. 28, 2022); ExecuRead, Speed Reading Facts, *https://secure.execuread.com/facts/* (last visited Feb. 28, 2022). It is noted that the reading of technical material can be slower than other types of documents. Because this document is technical in some ways, the actual review time might be higher, thus resulting in higher familiarization costs than reported herein. Calculation: 10.3 hours × $103.81 per hour = $1,069.24; $1,069.24 × 71,363 = $76.3 million.

In addition to the likely pecuniary benefits associated with early labor force entry, there could be other benefits. As a result of this rule, DHS will begin to consider parole on a case-by-case basis for noncitizens who have been referred to USCIS for a credible fear screening under an expanded set of factors. Allowing for parole to be considered for more individuals in Government custody could allow for resource redistribution within DHS, as DHS might be able to shift resources otherwise dedicated to the transportation and detention of these individuals and families. This redistribution would allow DHS to prioritize the use of its limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety while facilitating the expanded use of the expedited removal process to order the removal of those who make no fear claim or who express a fear but subsequently fail to meet the credible fear screening standard after interview by an asylum officer (or, if applicable, by an IJ). DHS, however, does not know how many future referrals for a credible fear screening will be eligible for parole; therefore, DHS cannot make an informed monetized estimate of the impact of this potential resource redistribution.

This rule presents substantial costs for USCIS, especially as costs are incurred to upgrade IT systems and begin hiring and training new staff. However, there are several expected qualitative benefits associated with the increased efficiency that would enable many individuals determined to have a credible fear of persecution or torture to move through the asylum adjudication or removal process more expeditiously than through the current process. Currently, it takes anywhere from eight months to five years for individuals claiming credible fear to have a final asylum determination made for their case. Under this rule, it is expected that USCIS will reach a decision on the merits of an asylum application within about 60 days of the application's filing date for most cases. As a result, individuals who are granted asylum by USCIS would likely experience a much-reduced wait time for their asylum determination. Those who are not granted asylum by USCIS are also expected to receive a final decision (either denial of asylum and issuance of a removal order or grant of asylum by an IJ) faster than under the current procedures for cases originating in credible fear screening. The timelines of 8 CFR 1240.17 provide for the streamlined removal proceedings to conclude within 90 days of service of an NTA (that is, within approximately 5 months of the application's filing date) in a typical case, in the absence of continuances or extensions. Greater efficiencies in the adjudicative process could lead to individuals spending less time in detention, which is a benefit to both the individuals and the Federal Government. Another benefit is that EOIR will not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent reduction in its overall credible fear workload.[148] The Departments anticipate this reduction will help mitigate the number of cases pending in immigration court.

Additionally, this benefit will extend to individuals granted or not granted asylum faster than if they were to go through the current process with EOIR. For cases that are referred to EOIR, an asylum officer will have already prepared the equivalent of Form I–589, gathered evidence, and provided time for individuals to obtain counsel and request necessary documents from their home country, if desired. Having credible fear cases fully developed by an asylum officer will enable IJs to focus their efforts on the merits of a case instead of developing it anew, thus resulting in prompt IJ review. For those credible fear cases in which an individual receives a positive screen but a decision not granting the individual's asylum claim, USCIS recognizes that some streamlined section 240 removal proceedings will conclude with little expenditure of EOIR resources—if, for example, the applicant does not contest the asylum officer's decision. Therefore, the benefit to EOIR under the new procedures could be greater than the Departments are able to currently quantify.

The reduction of credible fear cases that EOIR would need to process would enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. It would also allow EOIR to shift some resources to other work. We cannot currently make a one-to-one comparison between the work time actually spent on credible fear cases between EOIR judges and USCIS asylum officers, but if there is a reduction in average work time spent on cases, there could be cost savings for EOIR, though it is emphasized that these cost savings would not be budgetary. Further, this rule may slow the growth of the number of Form I–765s for pending asylum applicants. As explained above, if some individuals are granted asylum faster than under current conditions, some applicants in this process may choose not to file for an EAD. This could result in cost savings to applicants, as discussed, and it would also reduce USCIS's adjudication burden.

The Departments assess that noncitizens placed into expedited removal proceedings and the new streamlined 240 procedures established by this rule will more likely receive a prompter adjudication of their claims for asylum, withholding of removal, or CAT protection than they would under the existing regulations. Depending on the individual circumstances of each case, this IFR could mean that such noncitizens would likely not remain in the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum will be granted asylum several years earlier than they are under the present process.

Overall, the anticipated operational efficiencies from this rule may provide for a prompter grant of protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection are removed sooner than they would be in the absence of this rulemaking. Relative to the NPRM, the changes in this IFR may result in smaller overall operational efficiencies for DHS because attorneys from the ICE Office of the Principal Legal Advisor ("OPLA") will need to participate in the streamlined section 240 removal process. With respect to DHS, the IFR's adoption of streamlined section 240 proceedings in place of the NPRM's proposed IJ application review proceedings means that DHS attorneys will necessarily participate in immigration court when the asylum officer does not grant asylum.[149] Likewise, with respect to EOIR, streamlined section 240 proceedings may require somewhat greater immigration court resources than would the optional IJ application review proceedings proposed in the NPRM. Considering both quantifiable and

---

[148] Based on the five-year (FY 2017 through FY 2021) average, an estimated 15 percent of EOIR asylum applicants were granted asylum in cases originating with a credible fear claim. *See* EOIR, Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/ eoir/page/file/1062976/download.* Calculation: FY 2017 to FY 2021 grant rates (14.02 percent) + (16.48 percent) + (15.38 percent) + (16.60 percent) + 14.32 percent)/5 = 15 percent average (rounded).

[149] On the other hand, relative to the baseline, the reduced number of cases that reach immigration court as a result of this rule, as described above, will translate into a workload reduction for DHS's OPLA, just as for EOIR, enabling DHS attorneys to dedicate more time to other high-priority matters.

unquantifiable benefits and costs, the Departments believe that the aggregate benefits of the rule would amply justify the aggregate costs.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* (''RFA''), imposes certain requirements on Federal agency rules that are subject to the notice-and-comment requirements of the APA. *See* 5 U.S.C. 603(a), 604(a). This IFR does not directly regulate small entities and is not expected to have a direct effect on small entities. Rather, this IFR regulates individuals, and individuals are not defined as ''small entities'' by the RFA. *See* 5 U.S.C. 601(6). Although some employers that qualify as small entities [150] could experience costs or transfer effects, these impacts would be indirect. Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this IFR would not have a significant economic impact on a substantial number of small entities.

Nonetheless, in connection with the NPRM, USCIS examined the potential impact of this rule on small entities, 86 FR 46938, and several commenters provided feedback about the rule's impact.

*Comments:* A commenter claimed that the prior analysis did not adequately analyze the impact on small entities and that the rule should therefore be withdrawn. The comment asserted that the rule's substantial changes would entail extensive legal preparation, interpretation, explanation, and evidentiary efforts by the representatives of the impacted asylum seekers. These changes would stand to affect the resources and revenue of both private attorneys and non-profit organizations, including small entities. Because the rule, according to the commenter, would increase the complexity of the asylum system, these entities could either lose money or respond by charging higher fees. The latter response, the commenter asserted, would push more clients to proceed on their own behalf.

In addition, the commenter claimed that the potential familiarization costs of about $69.05 per hour, as presented in the NPRM, were unexplained and that the required time in hours was not accounted for. The commenter also claimed that the Departments' determination that the rule does not regulate small entities is erroneous because the added legal efforts will impact the resources and operations of legal providers, including small entities.

*Response:* The Departments disagree with this assessment of the RFA. As the Government has previously recognized, ''[t]he courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities.'' [151] This rule directly regulates individuals and does not regulate small entities. Changes in resources or business operations for legal providers may be indirect impacts, but the rule imposes no mandates or requirements on such entities. Furthermore, the Departments acknowledge that the rule could impact the support networks of individuals, which could include legal services and assistance providers that might qualify as small entities, but again, these effects are indirect consequences of the rule.

Regarding the commenters' claims about familiarization costs, we provided a reference noting that the wage used to calculate those costs represents the national average for lawyers applicable to the May 2020 BLS National Occupational Employment and Wage Estimates. In this IFR, we take the additional step of providing an estimate for these costs, based on the maximum population, typical reading speed, and word count. Based on this information, familiarization costs could be around $76.3 million the first year the rule is effective, and likely less in future years.

*Comments:* Several commenters expressed concern that fee increases will negatively impact legal service providers because asylum seekers may no longer be able to afford to hire legal counsel and would demand pro bono services. Additionally, they expressed concern that regulatory changes that force cases to be processed on an expedited timeline will increase the amount of time legal service providers must spend on a case, which will limit the number of clients they can serve.

*Response:* The Departments recognize the role of legal service providers in the application process for many asylum seekers. USCIS currently does not charge a fee to apply for asylum, nor does this rule require this population to pay a fee for their asylum applications to be adjudicated. This rule does not change an asylum applicant's ability to hire legal counsel or acquire pro bono services, nor does it prevent a legal service provider from offering its services. The purpose of the rule is to make the asylum process more efficient by streamlining proceedings that heretofore have been drawn out for months or even years before EOIR.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (''UMRA'') is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.

Although this rule is expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($178 million in 2021 dollars based on the Consumer Price Index for All Urban Consumers (''CPI–U'')),[152] the Departments do not believe this rule would impose any unfunded Federal mandates on State, local, or Tribal governments, or on the private sector. The impacts are likely to apply to individuals, potentially in the form of beneficial distributional effects and cost savings. There could be tax impacts related to the distributional effects. However, these effects do not constitute ''mandates'' for purposes of the UMRA. *See* 2 U.S.C. 658 (defining mandates only as statutory or regulatory provisions that ''impose an enforceable duty'' on the private sector or on State, local, or Tribal governments). Further, the real resource costs quantified in this analysis apply to the Federal Government and also are not mandates.

---

[150] The definition of ''small entity'' includes ''small business[es].'' *See* 5 U.S.C. 601(3).

[151] *See* U.S. Small Business Administration Office of Advocacy, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act* 22 (Aug. 2017), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/06/21110349/How-to-Comply-with-the-RFA.pdf* (last visited Feb. 28, 2022).

[152] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf* (last visited Feb. 28, 2022).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(270.970−152.383)/152.383] * 100 = [(118.587/152.383) * 100 = 0.77821673 * 100 = 77.82 percent = 78 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.78 = $178 million in 2021 dollars.

Therefore, the Departments have not prepared a written UMRA statement.

*E. Congressional Review Act*

The Administrator of the Office of Information and Regulatory Affairs has determined that this IFR is a "major rule" within the meaning of Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act), 5 U.S.C. 804(2). Accordingly, this final rule is effective 60 days after publication.

*F. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Family Assessment*

The Departments have assessed this action in accordance with section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, div. A, sec. 654(c), 112 Stat. 2681, 2681–529 (1998). With respect to the criteria specified in section 654(c), the Departments determined that the rule would not have any adverse impacts on family safety or stability. The rule would expand the circumstances in which asylum-seeking families who have been placed into expedited removal and who present neither a security risk nor a risk of absconding may be paroled from custody, thereby helping preserve family unity and safety, while also avoiding the overcrowding of detention facilities and better aligning detention resources, including the use of alternatives to detention. Additionally, this rule would result in greater efficiencies in the expedited removal and asylum processes, providing speedier resolution of meritorious cases and reducing the overall asylum system backlogs.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

The Departments analyze actions to determine whether the National Environmental Policy Act, Public Law 91–190, 83 Stat. 852 (1970) (codified at 42 U.S.C. 4321–4347), applies to them and, if so, what degree of analysis is required. *See* DHS, *Implementation of the National Environmental Policy Act, Directive 023–01* (Oct. 31, 2014), *https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex* ("Directive 023–01"); *Instruction Manual 023–01*. *Directive 023–01* and *Instruction Manual 023–01* establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii). The DHS categorical exclusions are listed in Appendix A of *Instruction Manual 023–01*. For an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[153]

As discussed in more detail throughout this rule, the Departments are modifying regulations applicable to noncitizens who have been placed into the expedited removal process, specifically for those who are found to have a positive credible fear. The rule

could result in an increase in the number of noncitizens in expedited removal paroled out of custody, thereby promoting efficient processing and prioritization of DHS's limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety.

Generally, the Departments believe NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative. This rule would not alter any eligibility criteria, but rather would change certain procedures, specifically, which Federal agency adjudicates certain asylum claims. The rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence and to attempt to calculate how many noncitizens would be paroled—a highly discretionary benefit—and how many would proceed to the detention centers would be nearly impossible to determine. The Departments have no reason to believe that the IFR's amendments would change the environmental effect, if any, of the existing regulations.

Therefore, the Departments have determined that, even if NEPA applied to this action, this rule clearly fits within categorical exclusion A3(d) in *Instruction Manual 023–01*, which provides an exclusion for "promulgation of rules . . . that amend an existing regulation without changing its environmental effect." *Instruction Manual 023–01* at A–2. Furthermore, the Departments have determined that this rule clearly fits within categorical exclusion A3(a) in *Instruction Manual 023–01* because the proposed rule is of a strictly administrative or procedural nature. *Id.* at A–1. This rule is not a part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded, and no further NEPA analysis is required.

*K. Paperwork Reduction Act*

USCIS Form I–765

Under the Paperwork Reduction Act ("PRA"), Public Law 104–13, 109 Stat. 163 (1995), all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. In compliance with the PRA, DHS published a notice of proposed rulemaking on August 20, 2021, in which it requested comments on the revision to the information

---

[153] *Instruction Manual 023–01* at V.B(2)(a)–(c).

collection associated with this rulemaking.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact of the proposed collection of information for an additional 60 days. Comments are encouraged and must be submitted on or before May 31, 2022. All submissions received must include the OMB Control Number 1615–0040 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation sections of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of IT (*e.g.,* permitting electronic submission of responses).

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization. USCIS is revising the form instructions to correspond with revisions related to information about the asylum application and parole.

(5) *An estimate of the total number of noncitizens and the amount of time estimated for an average noncitizen to respond:* The estimated total number of noncitizens for the information collection I–765 paper filing is 2,178,820, and the estimated hour burden per response is 4.5 hours; the estimated total number of noncitizens for the information collection I–765 online filing is 107,180, and the estimated hour burden per response is 4 hours; the estimated total number of noncitizens for the information collection I–765WS is 302,000, and the estimated hour burden per response is 0.5 hours; the estimated total number of noncitizens for the information collection biometrics submission is 302,535, and the estimated hour burden per response is 1.17 hours; the estimated total number of noncitizens for the information collection passport photos is 2,286,000, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection of information is 11,881,376 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal Services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure, Aliens.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, 8 CFR parts 208, 212, and 235 are amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.2 by:
■ a. Revising paragraph (a);
■ b. Removing the word ''or'' at the end of paragraph (c)(1)(vii);
■ c. Removing the period at the end of paragraph (c)(1)(viii) and adding ''; or'' in its place; and
■ d. Removing and reserving paragraph (c)(1)(ix).

The revision reads as follows:

**§ 208.2  Jurisdiction.**

(a) *Jurisdiction of U.S. Citizenship and Immigration Services (USCIS).* (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Interviews provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway or alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, found to have a credible fear of persecution or torture in accordance with § 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to 8 CFR 1003.42 and 1208.30 after the immigration judge has vacated a negative credible fear determination. Interviews to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for under § 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear

determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

\* \* \* \* \*

■ 3. Amend § 208.3 by revising paragraphs (a) and (c)(3) to read as follows:

### § 208.3 Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) For asylum applicants, other than stowaways, who are awaiting further consideration of an asylum application pursuant to section 235(b)(1)(B)(ii) of the Act following a positive credible fear determination, the written record of a positive credible fear finding issued in accordance with § 208.30(f) or 8 CFR 1003.42 or 1208.30 satisfies the application filing requirements in paragraph (a)(1) of this section for purposes of consideration by USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of §§ 208.4(a), 208.7, and 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and consequences in paragraph (c) of this section upon signature at the asylum interview. The date that the positive credible fear determination is served on the alien shall be considered the date of filing and receipt. Application information collected electronically will be preserved in its native format. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to § 208.30(c), or also presently have an application for asylum pending adjudication with USCIS pursuant to § 208.2(a)(1)(ii). If USCIS does not grant the applicant's asylum application after an interview conducted in accordance with § 208.9 and if a spouse or child

who was included in the request for asylum does not separately file an asylum application that is adjudicated by USCIS, the application will also be deemed to satisfy the application filing requirements of 8 CFR 1208.4(b) for a spouse or child who was included in the request for asylum. The biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS pursuant to § 202.2(a)(1) and any subsequent immigration benefit.

\* \* \* \* \*

(c) \* \* \*

(3) An asylum application under paragraph (a)(1) of this section must be properly filed in accordance with 8 CFR part 103 and the filing instructions. Receipt of a properly filed asylum application under paragraph (a) of this section will commence the period after which the applicant may file an application for employment authorization in accordance with § 208.7 and 8 CFR 274a.12 and 274a.13.

\* \* \* \* \*

■ 4. Amend § 208.4 by redesignating paragraph (c) as paragraph (b) and revising it to read as follows:

### § 208.4 Filing the application.

\* \* \* \* \*

(b) *Amending an application after filing.* (1) For applications being considered by USCIS pursuant to § 208.2(a)(1)(i), upon the request of the alien, and as a matter of discretion, the asylum officer or immigration judge with jurisdiction may permit an asylum applicant to amend or supplement the application. Any delay in adjudication or in proceedings caused by a request to amend or supplement the application will be treated as a delay caused by the applicant for purposes of § 208.7 and 8 CFR 274a.12(c)(8).

(2) For applications being considered by USCIS pursuant to § 208.2(a)(1)(ii), the asylum applicant may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum office no later than 7 calendar days prior to the scheduled asylum interview, or for documents submitted by mail, postmarked no later than 10 calendar days prior to the scheduled asylum interview. The asylum officer,

finding good cause in an exercise of USCIS's discretion, may consider amendments or supplements submitted after the 7- or 10-day (depending on the method of submission) deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described at § 208.9(e)(2). Any amendment, correction, or supplement shall be included in the record.

■ 5. Amend § 208.9 by:
■ a. Revising paragraphs (a) through (g); and
■ b. Adding paragraph (i).
The revisions and addition read as follows:

### § 208.9 Procedure for interview before an asylum officer.

(a) *Claims adjudicated.* USCIS shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of § 208.3(a)(2) or (c)(3), when applicable, and is within the jurisdiction of USCIS pursuant to § 208.2(a). In all cases, such proceedings shall be conducted in accordance with section 208 of the Act.

(1) *Timing of interview.* For interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), USCIS shall not schedule the interview to take place fewer than 21 days after the applicant has been served with a record of the positive credible fear determination pursuant to § 208.30(f), unless the applicant requests in writing that an interview be scheduled sooner. The asylum officer shall conduct the interview within 45 days of the applicant being served with a positive credible fear determination made by an asylum officer pursuant to § 208.30(f) or made by an immigration judge pursuant to 8 CFR 1208.30, subject to the need to reschedule an interview due to exigent circumstances, such as the unavailability of an asylum officer to conduct the interview, the inability of the applicant to attend the interview due to illness, the inability to timely secure an appropriate interpreter pursuant to paragraph (g)(2) of this section, or the closure of the asylum office.

(2) [Reserved]

(b) *Conduct and purpose of interview.* The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. For interviews on applications within the

jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer shall also elicit all relevant and useful information bearing on the applicant's eligibility for withholding of removal under the Act and protection under the Convention Against Torture, and, as appropriate, elicit sufficient information to make a determination whether there is a significant possibility that the applicant's spouse or child, if included in the request for asylum, has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture in the event that the principal applicant is not granted asylum. If the asylum officer determines that there is a significant possibility that the applicant's spouse or child has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture, the asylum officer shall inform the spouse or child of that determination. At the time of the interview, the applicant must provide complete information regarding the applicant's identity, including name, date and place of birth, and nationality, and may be required to register this identity. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) *Authority of asylum officer.* The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present evidence, receive evidence, and question the applicant and any witnesses.

(d) *Completion of the interview.* Upon completion of the interview before an asylum officer:

(1) The applicant or the applicant's representative will have an opportunity to make a statement or comment on the evidence presented. The representative will also have the opportunity to ask follow-up questions of the applicant and any witness. The asylum officer may, in the asylum officer's discretion, limit the length of any statement or comment and may require its submission in writing.

(2) USCIS shall inform the applicant that the applicant must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision

will be treated as delay caused by the applicant for purposes of § 208.7.

(e) *Extensions.* The asylum officer will consider evidence submitted by the applicant together with the applicant's asylum application.

(1) For applications being considered under § 208.2(a)(1)(i), the applicant must submit any documentary evidence at least 14 calendar days in advance of the interview date. As a matter of discretion, the asylum officer may consider evidence submitted within the 14-day period prior to the interview date or may grant the applicant a brief extension of time during which the applicant may submit additional evidence. Any such extension will be treated as a delay caused by the applicant for purposes of § 208.7.

(2) For applications being considered under § 208.2(a)(1)(ii), the asylum officer may grant the applicant a brief extension of time during which the applicant may submit additional evidence, but the asylum officer shall not grant any extension to submit additional evidence that would prevent a decision from being issued on the application within 60 days of service of the positive credible fear determination made by an asylum officer pursuant to § 208.30(f) or made by an immigration judge pursuant to 8 CFR 1208.30 except when the interview has been rescheduled due to exigent circumstances pursuant to paragraph (a)(1) of this section.

(f) *Record.* (1) The asylum application, as defined in § 208.3(a), all supporting information provided by the applicant, any comments submitted by the Department of State or by DHS, and any other unclassified information considered by the asylum officer in the written decision shall comprise the record.

(2) For interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), except for statements made off the record with the permission of the asylum officer, the interview shall be recorded. A verbatim transcript of the interview shall be prepared and included in the referral package to the immigration judge as described in § 208.14(c)(1), with a copy also provided to the applicant.

(g) *Interpreters.* (1) Except as provided in paragraph (g)(2) of this section, an applicant unable to proceed with the interview in English must provide, at no expense to USCIS, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's

attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph (g)(1) may be considered a failure to appear for the interview for purposes of § 208.10.

(2) Notwithstanding paragraph (h) of this section, for interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. If a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of employment authorization pursuant to § 208.7.

\*        \*        \*        \*        \*

(i) *Dependents of applicants being considered under § 208.2(a)(1)(ii).* This paragraph (i) governs when an applicant whose application for asylum is being considered under § 208.2(a)(1)(ii) is not granted asylum pursuant to § 208.14(c) and has included a spouse or children within their request for asylum. The asylum officer will make a determination whether there is a significant possibility that the spouse or child has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture, based on the information elicited pursuant to paragraph (b) of this section. This determination will be included in the record, as otherwise described in paragraph (f) of this section. Referral of the principal applicant's application to an immigration judge, along with the appropriate charging documents, will not be made until any pending application by the spouse or child as a principal applicant is adjudicated.

\*        \*        \*        \*        \*

■ 6. Amend § 208.14 by revising paragraphs (b), (c) introductory text, and (c)(1) to read as follows:

**§ 208.14   Approval, denial, referral, or dismissal of application.**

\*        \*        \*        \*        \*

(b) *Approval by an asylum officer.* In any case within the jurisdiction of USCIS, unless otherwise prohibited in § 208.13(c), an asylum officer, subject to review within USCIS, may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer, subject to review within USCIS, does not grant asylum to an applicant after an interview conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived the applicant's right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application as follows:

(1) *Inadmissible or deportable aliens.* Except for applicants described in paragraph (c)(4)(ii) of this section who have not already been subject to proceedings in accordance with § 235.3(b) of this chapter, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

\*     \*     \*     \*     \*

■ 7. Amend § 208.16 by revising paragraphs (a) and (c)(4) to read as follows:

### § 208.16   Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* An asylum officer shall not determine whether an alien is eligible for withholding of the exclusion, deportation, or removal of the alien to a country where the alien's life or freedom would be threatened, except in the case of an alien who is determined to be an applicant for admission under section 235(b)(1) of the Act, who is found to have a credible fear of persecution or torture, whose case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii) to consider the application for asylum, and whose application for asylum is not granted; or in the case of the spouse or child of such an alien who is included in the alien's asylum application and who files a separate application for asylum with USCIS that is not granted. In such cases, the asylum officer will determine, based

on the record before USCIS, whether the applicant is eligible for statutory withholding of removal under paragraph (b) of this section or withholding or deferral of removal pursuant to the Convention Against Torture under paragraph (c) of this section. Even if the asylum officer determines that the applicant has established eligibility for withholding of removal under paragraph (b) or (c) of this section, the asylum officer shall proceed with referring the application to the immigration judge for a hearing pursuant to § 208.14(c)(1). In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

\*     \*     \*     \*     \*

(c) \*     \*     \*

(4) In considering an application for withholding of removal under the Convention Against Torture, the adjudicator shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the adjudicator determines that the alien is more likely than not to be tortured in the country of removal, the alien is eligible for protection under the Convention Against Torture, and the adjudicator shall determine whether protection under the Convention Against Torture should be granted either in the form of withholding of removal or in the form of deferral of removal. The adjudicator shall state that an alien eligible for such protection is eligible for withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section. If an alien eligible for such protection is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section, the adjudicator shall state that the alien is eligible for deferral of removal under § 208.17(a). For cases under the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer may make such a determination based on the application and the record before USCIS; however, the asylum officer shall not issue an order granting either withholding of removal or deferral of removal because that is referred to the immigration judge pursuant to § 208.14(c)(1) and 8 CFR 1240.17.

\*     \*     \*     \*     \*

■ 8. Amend § 208.30 by revising the section heading and paragraphs (b), (c), (d) introductory text, (e) heading, (e)(1) through (4), (e)(5)(i), (e)(6) introductory text, (e)(6)(ii), (f), and (g) to read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*     \*     \*     \*     \*

(b) *Process and authority.* If an alien subject to section 235(a)(2) or 235(b)(1) of the Act indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by a USCIS asylum officer in accordance with this section. A USCIS asylum officer shall then screen the alien for a credible fear of persecution or torture. An asylum officer, as defined in section 235(b)(1)(E) of the Act, has the authorities described in § 208.9(c). If in exercising USCIS's discretion, it is determined that circumstances so warrant, the asylum officer, after supervisory concurrence, may refer the alien for proceedings under section 240 of the Act without making a credible fear determination.

(c) *Treatment of family units.* (1) A spouse or child of a principal alien who arrived in the United States concurrently with the principal alien shall be included in that alien's positive credible fear evaluation and determination, unless the principal alien or the spouse or child declines such inclusion. Any alien may have his or her evaluation and determination made separately, if that alien expresses such a desire. The option for members of a family unit to have their evaluations and determinations made separately shall be communicated to all family members at the beginning of the interview process.

(2) The asylum officer in the officer's discretion may also include other accompanying family members who arrived in the United States concurrently with a principal alien in that alien's positive fear evaluation and determination for purposes of family unity.

(3) For purposes of family units in credible fear determinations, the category of "child" includes only unmarried persons under 21 years of age.

(d) *Interview.* A USCIS asylum officer will conduct the credible fear interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the alien can establish a credible fear of persecution or torture. The information provided during the interview may form the basis of an asylum application pursuant to

paragraph (f) of this section and § 208.3(a)(2). The asylum officer shall conduct the interview as follows:

\* \* \* \* \*

(e) *Determination.* (1) The asylum officer shall create a written record of the officer's determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. However, prior to January 1, 2030, in the case of an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, the officer may only find a credible fear of persecution if there is a significant possibility that the alien can establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit a positive credible fear finding pursuant to paragraph (f) of this section in order to receive further consideration of the application for asylum and withholding of removal.

(5)(i) Except as provided in paragraphs (e)(5)(ii) through (iv), or paragraph (e)(6) or (7) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and (b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless issue a Notice to Appear or retain the alien for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the alien is not a stowaway. If the alien is a

stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

\* \* \* \* \*

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the United States during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph (e)(6). The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

\* \* \* \* \*

(ii) If the alien establishes by a preponderance of the evidence that the alien qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

\* \* \* \* \*

(f) *Procedures for a positive credible fear finding.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue the alien a record of the positive credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The documents may be served in-person, by mail, or electronically. USCIS has complete discretion to either issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act, or retain jurisdiction over the application for asylum pursuant to

§ 208.2(a)(1)(ii) for further consideration in a hearing pursuant to § 208.9. Should any part of 8 CFR 1240.17 be enjoined or vacated, USCIS has the discretion to determine that it will issue a Form I–862, Notice to Appear, in all cases that receive a positive credible fear determination. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and 8 CFR 212.5.

(g) *Procedures for a negative credible fear finding.* (1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and issue the alien a record of the credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The asylum officer shall inquire whether the alien wishes to have an immigration judge review the negative decision, which shall include an opportunity for the alien to be heard and questioned by the immigration judge as provided for under section 235(b)(1)(B)(iii)(III) of the Act, using Form I–869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether the alien desires such review on Form I–869. A refusal or failure by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses or fails to either request or decline such review, the asylum officer shall serve the alien with a Form I–863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (g)(2) of this section. USCIS may, in its discretion, reconsider a negative credible fear finding that has been concurred upon by an immigration judge provided such reconsideration is requested by the alien or initiated by USCIS no more than 7 calendar days after the concurrence by the immigration judge, or prior to the alien's removal, whichever date comes first, and further provided that no previous request for reconsideration of that negative finding has already been made. The provisions of 8 CFR 103.5 shall not apply to credible fear determinations.

(ii) If the alien is not a stowaway and does not request a review by an

immigration judge, DHS shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2)(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1003.42 and 1208.30(g).

(ii) The record of the negative credible fear determination, including copies of the Form I–863, Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 9. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; section 7209 of Pub. L. 108–458 (8 U.S.C. 1185 note); Title VII of Pub. L. 110–229 (8 U.S.C. 1185 note); 8 CFR part 2; Pub. L. 115–218.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 10. Amend § 212.5 by revising paragraph (b) introductory text to read as follows:

### § 212.5   Parole of aliens into the United States.

\*   \*   \*   \*   \*

(b) *Parole from custody.* The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(b) or (c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

\*   \*   \*   \*   \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 11. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379,

1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 12. Amend § 235.3 by revising paragraphs (b)(2)(iii), (b)(4)(ii), and (c) to read as follows:

### § 235.3   Inadmissible aliens and expedited removal.

\*   \*   \*   \*   \*

(b) \*   \*   \*

(2) \*   \*   \*

(iii) *Detention and parole of alien in expedited removal.* An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal. Parole of such alien shall only be considered in accordance with section 212(d)(5) of the Act and § 212.5(b) of this chapter. A grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under § 274a.12(c)(11) of this chapter.

\*   \*   \*   \*   \*

(4) \*   \*   \*

(ii) *Detention pending credible fear interview.* Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien shall only be considered in accordance with section 212(d)(5) of the Act and § 212.5(b) of this chapter. A grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under § 274a.12(c)(11) of this chapter. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of the alien's choosing. If the alien is detained, such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the Government, and shall not unreasonably delay the process.

\*   \*   \*   \*   \*

(c) *Arriving aliens placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview under § 208.2(a)(1)(ii) of this chapter.* (1) Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien

shall only be considered in accordance with § 212.5(b) of this chapter. This paragraph (c) shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.

(2) Except as otherwise provided in this chapter, any alien over whom USCIS exercises jurisdiction pursuant to § 208.2(a)(1)(ii) of this chapter after being found to have a credible fear of persecution or torture shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with § 212.5(b) of this chapter.

\*   \*   \*   \*   \*

■ 13. Amend § 235.6 by:
■ a. Removing and reserving paragraphs (a)(1)(iii) and (iv);
■ b. Revising paragraph (a)(2)(i);
■ c. Removing the period at the end of paragraph (a)(2)(ii) and adding "; or" in its place; and
■ d. Revising paragraph (a)(2)(iii).
The revisions read as follows:

### § 235.6   Referral to immigration judge.

(a) \*   \*   \*

(2) \*   \*   \*

(i) If an asylum officer determines that the alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

\*   \*   \*   \*   \*

(iii) If an immigration officer refers an applicant in accordance with the provisions of § 208.2(c)(1) or (2) of this chapter to an immigration judge for an asylum- or withholding-only hearing.

\*   \*   \*   \*   \*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, 8 CFR parts 1003, 1208, 1235, and 1240 are amended as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 14. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 15. Amend § 1003.42 by revising the section heading and paragraph (d)(1) to read as follows:

## § 1003.42  Review of credible fear determinations.

\*    \*    \*    \*    \*

(d) \* \* \*

(1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim, and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding of removal under section 241(b)(3)(B) of the Act or deferral of removal under the Convention Against Torture.

\*    \*    \*    \*    \*

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 16. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 17. Amend § 1208.2 by:
■ a. Revising paragraph (a);
■ b. Removing and reserving paragraph (c)(1)(ix); and
■ c. Removing "paragraph (c)(1) or (c)(2)" and adding "paragraph (c)(1) or (2)" in its place in paragraph (c)(3)(i).
The revision reads as follows:

## § 1208.2  Jurisdiction.

(a) *U.S. Citizenship and Immigration Services (USCIS).* (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Interviews provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway, found to have a credible fear of persecution or torture in accordance with 8 CFR 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to §§ 1003.42 of this chapter and 1208.30, after the immigration judge has vacated a negative credible fear determination. Interviews to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for under 8 CFR 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under 8 CFR 208.30 and reasonable fear determinations under 8 CFR 208.31.

\*    \*    \*    \*    \*

■ 18. Amend § 1208.3 by:
■ a. Revising paragraph (a); and
■ b. Adding the words "under paragraph (a)(1) of this section" following "An asylum application" in paragraph (c)(3).
The revision reads as follows:

## § 1208.3  Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) In proceedings under § 1240.17 of this chapter, the written record of a positive credible fear determination issued in accordance with 8 CFR 208.30(f), and §§ 1003.42 of this chapter and 1208.30, shall be construed as the asylum application and satisfies the application filing requirements and § 1208.4(b). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of § 1208.4(a), with the date of service of the positive credible fear determination on the alien considered the date of filing and receipt, and shall be subject to the conditions and consequences provided for in paragraph (c) of this section following the applicant's signature at the asylum merits interview before the USCIS asylum officer. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to 8 CFR 208.30(c), or also presently have an application for asylum pending adjudication with USCIS pursuant to 8 CFR 208.2(a)(1)(ii). If USCIS does not grant the applicant's asylum application after an interview conducted in accordance with 8 CFR 208.9 and if a spouse or child who was included in the request for asylum does not separately file an asylum application that is adjudicated by USCIS, the application will be deemed to satisfy the application filing requirements of

§ 1208.4(b) for a spouse or child who was included in the request for asylum. The asylum applicant may subsequently seek to amend, correct, or supplement the record of proceedings created before the asylum officer or during the credible fear review process as set forth in § 1240.17(g) of this chapter concerning the consideration of documentary evidence and witness testimony.

\*    \*    \*    \*    \*

## § 1208.4  [Amended]

■ 19. Amend § 1208.4 by adding the words "except that an alien in proceedings under § 1240.17 of this chapter is not required to file the Form I–589" after "underlying proceeding" in paragraph (b)(3)(i).

## § 1208.5  [Amended]

■ 20. Amend § 1208.5(b)(2) by removing the reference to "§ 1212.5 of this chapter" and adding "8 CFR 212.5" in its place.

■ 21. Amend § 1208.14 by revising paragraphs (b), (c) introductory text, and (c)(1) to read as follows:

## § 1208.14  Approval, denial, referral, or dismissal of application.

\*    \*    \*    \*    \*

(b) *Approval by an asylum officer.* In any case within the jurisdiction of USCIS, unless otherwise prohibited in § 1208.13(c), an asylum officer, subject to review within USCIS, may grant, in the exercise of his or her distraction, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer, subject to review within USCIS, does not grant asylum to an applicant after an interview conducted in accordance with 8 CFR 208.9, or if, as provided in 8 CFR 208.10, the applicant is deemed to have waived the applicant's right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) *Inadmissible or deportable aliens.* Except for applicants described in paragraph (c)(4)(ii) of this section who have not already been subject to proceedings in accordance with 8 CFR 235.3, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging

documents may not be issued, shall dismiss the application).

\* \* \* \* \*

■ 22. Amend § 1208.16 by revising paragraph (a) to read as follows:

### § 1208.16 Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* Consideration of eligibility for statutory withholding of removal and protection under the Convention Against Torture by a DHS officer is as provided at 8 CFR 208.16. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

\* \* \* \* \*

■ 23. Amend § 1208.18 by revising paragraph (b)(1) to read as follows:

### § 1208.18 Implementation of the Convention Against Torture.

\* \* \* \* \*

(b) \* \* \*

(1) *Aliens in proceedings on or after March 22, 1999.* (i) An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999, may apply for withholding of removal under § 1208.16(c), and, if applicable, may be considered for deferral of removal under § 1208.17(a).

(ii) In addition, an alien may apply for withholding of removal under 8 CFR 208.16(c), and, if applicable, may be considered for deferral of removal under 8 CFR 208.17(a), in the following situation: The alien is determined to be an applicant for admission under section 235(b)(1) of the Act, the alien is found to have a credible fear of persecution or torture, the alien's case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at 8 CFR 208.2(a)(1)(ii) to consider the application for asylum, and that application for asylum is not granted.

\* \* \* \* \*

### § 1208.19   [Removed and Reserved]

■ 24. Remove and reserve § 1208.19.
■ 25. Revise § 1208.22 to read as follows:

### § 1208.22   Effect on exclusion, deportation, and removal proceedings.

An alien who has been granted asylum may not be deported or removed unless asylum status is terminated pursuant to 8 CFR 208.24 or § 1208.24. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation,

or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to 8 CFR 208.24 or § 1208.24 or deferral is terminated pursuant to 8 CFR 208.17 or § 1208.17(d) or (e).

■ 26. Amend § 1208.30 by revising the section heading and paragraphs (a), (e), and (g)(2) to read as follows:

### § 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, DHS has exclusive jurisdiction to make the determinations described in this subpart. Except as otherwise provided in this subpart, paragraphs (b) through (g) of this section are the exclusive procedures applicable to stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act and who receive fear interviews, determinations, and reviews under section 235(b)(1)(B) of the Act. Prior to January 1, 2030, an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands is ineligible to apply for asylum and may only establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act or withholding or deferral of removal under the regulations in §§ 1208.16(c) through (f), 1208.17, and 1208.18 issued pursuant to the Convention Against Torture's implementing legislation.

\* \* \* \* \*

(e) *Determination.* For the standards and procedures for asylum officers in conducting credible fear interviews, and in making positive and negative credible fear determinations, see 8 CFR 208.30. The immigration judges will review such determinations as provided in paragraph (g) of this section and §§ 1003.42 and 1240.17 of this chapter.

\* \* \* \* \*

(g) \* \* \*

(2) *Review by immigration judge of a negative credible fear finding.* (i) The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, or upon the applicant's refusal or failure either to request or to decline the review after being given such opportunity, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. The immigration judge shall not have the

authority to remand the case to the asylum officer.

(ii) The record of the negative credible fear determination, including copies of the Form I–863, Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

(iii) A credible fear hearing will be closed to the public unless the alien states for the record or submits a written statement that the alien is waiving that requirement; in that event the hearing shall be open to the public, subject to the immigration judge's discretion as provided in § 1003.27 of this chapter.

(iv) Upon review of the asylum officer's negative credible fear determination:

(A) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to DHS for removal of the alien. The immigration judge's decision is final and may not be appealed. USCIS may nevertheless reconsider a negative credible fear finding as provided at 8 CFR 208.30(g)(1)(i).

(B) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with § 1208.2(a)(1)(ii). Alternatively, DHS may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 1208.4(b)(3)(i).

(C) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 1208.4(b)(3)(iii). The immigration judge shall decide the application as provided in that section. Such decision may be appealed by either the stowaway or DHS to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, DHS shall terminate removal proceedings under section 235(a)(2) of the Act.

**18223**

## PART 1235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 27. The authority citation for part 1235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Title VII of Pub. L. 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Public Law 115–218.

■ 28. Amend § 1235.6 by:
■ a. Revising paragraph (a)(2)(i);
■ b. Removing the period at the end of paragraph (a)(2)(ii) and adding ''; or'' in its place; and
■ c. Revising paragraph (a)(2)(iii). The revisions read as follows:

### § 1235.6   Referral to immigration judge.

(a) * * *

(2) * * *

(i) If an asylum officer determines that an alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

*    *    *    *    *

(iii) If an immigration officer refers an applicant in accordance with the provisions of 8 CFR 208.2(b) to an immigration judge.

*    *    *    *    *

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

■ 29. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 30. Add § 1240.17 to read as follows:

### § 1240.17   Removal proceedings where the respondent has a credible fear of persecution or torture.

(a) *Scope.* This section applies in cases referred to the immigration court under 8 CFR 208.14(c)(1) where the respondent has been found to have a credible fear of persecution or torture, and U.S. Citizenship and Immigration Services (USCIS) subsequently adjudicated but did not grant the respondent's application for asylum under section 208 of the Act; or the respondent was included in a spouse's or parent's application under 8 CFR 208.2(a)(1)(ii) that USCIS subsequently adjudicated but did not grant under section 208 of the Act. Except as otherwise provided in this section, removal proceedings for such respondents shall be governed by the same rules and procedures that apply to proceedings conducted under this subpart. In all cases, such proceedings shall be conducted in accordance with section 208 of the Act. Should any part of the USCIS process governing cases covered by 8 CFR 208.2(a)(1)(ii) be enjoined or vacated, the Executive Office for Immigration Review (EOIR) shall have the discretion to adjudicate any case referred to EOIR under 8 CFR 208.14(c)(1) using the rules and procedures that apply to proceedings conducted under this subpart without regard to this section.

(b) *Commencement of proceedings.* Removal proceedings conducted under this section shall commence when DHS files a Notice to Appear (NTA) pursuant to 8 CFR part 1239 and schedules the master calendar hearing to take place 30 days after the date the NTA is served or, if a hearing cannot be held on that date, on the next available date no later than 35 days after the date of service. Where the NTA is served by mail, the date of service shall be construed as the date the NTA is mailed. The DHS component issuing the NTA shall also identify for the respondent and the immigration court that the case is subject to the provisions of this section. DHS shall personally serve the NTA on the respondent whenever practicable and by mail when personal service is not effectuated, and shall inform the respondent of the right to be represented by counsel.

(c) *Service of the record.* No later than the date of the master calendar hearing, DHS shall serve on the respondent and on the immigration court where the NTA is filed the record initiating proceedings as defined in this paragraph (c). The record initiating proceedings shall include the record of proceedings for the asylum merits interview, as outlined in 8 CFR 208.9(f), the Form I–213, Record of Deportable/Inadmissible Alien, pertaining to the respondent, and the asylum officer's written decision issued pursuant to 8 CFR 208.19. If service is not effectuated as provided in this paragraph (c), the schedule of proceedings pursuant to paragraph (f) of this section shall be delayed until service is effectuated.

(d) *Failure to appear.* An immigration judge shall issue an in absentia removal order where the respondent fails to appear at the master calendar hearing scheduled under paragraph (b) of this section, or at a later status conference or hearing under this section, if the requirements under section 240(b)(5) of the Act and § 1003.26 of this chapter are met, unless the immigration judge waives the respondent's presence under § 1003.25(a) of this chapter. If the asylum officer determined the respondent eligible for withholding of removal under the Act or withholding or deferral of removal under the Convention Against Torture, the immigration judge shall give effect to the protection for which the asylum officer determined the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s). Where DHS makes such a showing at the master calendar hearing or status conference, the immigration judge shall allow the respondent a reasonable opportunity of at least 10, but no more than 30, days to respond before issuing an order.

(e) *Form of application.* In removal proceedings under this section, the written record of the positive credible fear determination issued in accordance with 8 CFR 208.30(f) satisfies the respondent's filing requirement for the application for asylum, withholding of removal under the Act, and withholding or deferral of removal under the Convention Against Torture. The record of the proceedings for the hearing before the asylum officer, as outlined in 8 CFR 208.9(f), and the asylum officer's decision, together with any amendment, correction, or supplementation made before the immigration judge as described in § 1208.3(a)(2) of this chapter, shall be admitted as evidence and considered by the immigration judge, in addition to any further documentation and testimony provided by the parties under the procedures in this section.

(f) *Schedule of proceedings*—(1) *Master calendar hearing.* At the master calendar hearing, the immigration judge shall perform the functions required by § 1240.10(a), including advising the respondent of the right to be represented, at no expense to the Government, by counsel of the respondent's own choice. In addition, the immigration judge shall advise the respondent as to the nature of removal proceedings under this section, including: That the respondent has pending applications for asylum, withholding of removal under the Act and withholding or deferral of removal under the Convention Against Torture, as appropriate; that the respondent has the right to present evidence in support of the applications; that the respondent has the right to call witnesses and to testify at any merits hearing; and that the respondent must comply with the

deadlines that govern the submission of evidence. Except where the respondent is ordered removed in absentia, at the conclusion of the master calendar hearing, the immigration judge shall schedule a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing. The immigration judge shall inform the respondent of the requirements for the status conference. The adjournment of the case until the status conference shall not constitute a continuance for the purposes of paragraph (h)(2) of this section.

(2) *Status conference.* The purpose of the status conference shall be to take pleadings, identify and narrow the issues, determine whether the case can be decided on the documentary record, and, if necessary, ready the case for a merits hearing. At the status conference, the immigration judge shall advise the respondent that: The respondent has the right to present evidence in support of the applications; the respondent has the right to call witnesses and to testify at any merits hearing; and the respondent must comply with the deadlines that govern the submission of evidence. Based on the parties' representations at the status conference and an independent evaluation of the record, the immigration judge shall decide whether further proceedings are warranted or whether the case will be decided on the documentary record in accordance with paragraph (f)(4) of this section. If the immigration judge determines that further proceedings are warranted, the immigration judge shall schedule the merits hearing to take place 60 days after the master calendar hearing or, if the merits hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. The immigration judge may schedule additional status conferences prior to the merits hearing if the immigration judge determines that such conferences are warranted and would contribute to the efficient resolution of the case.

(i) *The respondent.* At the status conference, the respondent shall plead to the NTA under § 1240.10(c), and indicate orally or in writing whether the respondent intends to seek any protection(s) for which the asylum officer did not find the respondent eligible.

(A)(*1*) If the respondent indicates that the respondent intends to contest removal or seek any protection(s) for which the asylum officer did not determine the respondent eligible, the

respondent shall, either orally or in writing:

(*i*) Indicate whether the respondent intends to testify before the immigration court;

(*ii*) Identify any witnesses the respondent intends to call in support of the applications at the merits hearing;

(*iii*) Provide any additional documentation in support of the applications;

(*iv*) Describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer;

(*v*) Articulate or confirm any additional bases for asylum and related protection, whether or not they were presented to or developed before the asylum officer; and

(*vi*) State any additional requested forms of relief or protection.

(*2*) If the respondent is unrepresented, the respondent shall not be required to provide items set forth in paragraphs (f)(2)(i)(A)(*1*)(*iv*), (*v*), and (*vi*) of this section.

(B) If the respondent indicates that the respondent does not intend to contest removal or seek any protection(s) for which the asylum officer did not find the respondent eligible, the immigration judge shall order the respondent removed, and no further proceedings shall be held by the immigration judge. If the asylum officer determined the respondent eligible for withholding of removal under the Act or withholding or deferral of removal under the Convention Against Torture, the immigration judge shall give effect to the protection(s) for which the asylum officer determined the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s).

(ii) *DHS.* (A) At the status conference, DHS shall indicate orally or in writing whether it intends to:

(*1*) Rest on the record;

(*2*) Waive cross examination of the respondent;

(*3*) Otherwise participate in the case; or

(*4*) Waive appeal if the immigration judge decides that the respondent's application should be granted.

(B) If DHS indicates that it will participate in the case, it shall, either orally or in writing at the status conference, or in a written submission pursuant to paragraph (f)(3)(i) of this section:

(*1*) State its position on each of the respondent's claimed grounds for asylum or related protection;

(*2*) State which elements of the respondent's claim for asylum or related protection it is contesting and which facts it is disputing, if any, and provide an explanation of its position;

(*3*) Identify any witnesses it intends to call at any merits hearing;

(*4*) Provide any additional non-rebuttal or non-impeachment evidence; and

(*5*) State whether the appropriate identity, law enforcement, or security investigations or examinations required by section 208(d)(5)(A)(i) of the Act and § 1003.47 of this chapter have been completed.

(C) Any position DHS expresses pursuant to paragraph (f)(2)(ii)(A) of this section may be retracted, orally or in writing, prior to the issuance of the immigration judge's decision, if DHS seeks consideration of evidence pursuant to the standard laid out in paragraph (g)(2) of this section. Where the immigration judge holds a merits hearing or hearings, any position DHS expressed pursuant to paragraph (f)(2)(ii)(A) may only be retracted prior to the final hearing; if no such hearing is held, the retraction must take place prior to the immigration judge's decision.

(3) *Written submissions.* (i) If DHS intends to participate in the case, DHS shall file a written statement that provides any information required under paragraph (f)(2)(ii) of this section that DHS did not provide at the status conference, as well as any other relevant information or argument in response to the respondent's submissions. DHS's written statement, if any, shall be filed no later than 15 days prior to the scheduled merits hearing or, if the immigration judge determines that no such hearing is warranted, no later than 15 days following the status conference. Where DHS intends to participate in the case but does not timely provide its position as required under paragraph (f)(2)(ii) of this section, either at the status conference or in its written statement, to one or more of the respondent's claimed grounds for asylum or related protection, including which arguments raised by the respondent it is disputing and which facts it is contesting, the immigration judge shall have authority to deem those arguments or claims unopposed; provided, however, that DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference.

(ii) The respondent may submit a filing no later than 5 days prior to the scheduled merits hearing or, if the immigration judge determines that no such hearing is warranted, no later than 25 days following the status conference, that supplements the respondent's oral statement or written submission under paragraph (f)(2)(i) of this section. In the respondent's supplemental filing, if any, the respondent shall reply to any statement submitted by DHS, identify any additional witnesses, and provide any additional documentation in support of respondent's applications.

(4) *Merits hearings.* (i) If DHS has indicated that it waives cross examination and neither the respondent nor DHS has requested to present testimony under the pre-hearing procedures in paragraph (f)(2) and (3) of this section, the immigration judge shall decide the case on the documentary record, without holding a merits hearing, unless the immigration judge, after consideration of the record, determines that a merits hearing is necessary to fulfill the immigration judge's duty to fully develop the record.

(ii) If the respondent has timely requested to present testimony and DHS has indicated that it waives cross examination and does not intend to present testimony or produce evidence, and the immigration judge concludes, consistent with the immigration judge's duty to fully develop the record, that the respondent's application can be granted without further testimony, the immigration judge shall grant the application without holding a merits hearing.

(iii) In all other situations, the immigration judge shall proceed as follows:

(A) If the immigration judge determines that proceedings can be completed at the merits hearing scheduled under paragraph (f)(1) of this section, the immigration judge shall hold the scheduled merits hearing, at which the immigration judge shall swear the respondent to the truth and accuracy of any information or statements submitted pursuant to paragraphs (f)(2) and (3) of this section, hear all live testimony requested by the parties, consider the parties' submissions, and, whenever practicable, issue an oral decision in the case.

(B) If the immigration judge determines that proceedings cannot be completed at the merits hearing scheduled under paragraph (f)(1) of this section, the immigration judge may conduct a portion of the scheduled hearing, hold a status conference in lieu of the scheduled hearing, and take any other steps the immigration judge deems

necessary and efficient to expeditiously resolve the case. The immigration judge shall schedule any and all subsequent merits hearings to occur no later than 30 days after the initial merits hearing.

(5) *Decision.* Whenever practicable, the immigration judge shall issue an oral decision on the date of the final merits hearing or, if the immigration judge determines that no merits hearing is warranted, no more than 30 days after the status conference. The immigration judge may not, however, issue a decision in a case where DHS has made a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for withholding of removal or protection under the Convention Against Torture unless the respondent was first provided a reasonable opportunity of at least 10, but no more than 30, days to respond to the evidence submitted by DHS. Where issuance of an oral decision on the date specified under the first sentence of this paragraph (f)(5) is not practicable, the immigration judge shall issue an oral or written decision as soon as practicable, and in no case more than 45 days after the date specified under the first sentence of this paragraph (f)(5).

(g) *Consideration of evidence and testimony.* (1) The immigration judge shall exclude documentary evidence or witness testimony only if it is not relevant or probative; if its use is fundamentally unfair; or if the documentary evidence is not submitted or the testimony is not requested by the applicable deadline, absent a timely request for a continuance or filing extension that is granted.

(2) The immigration judge may consider documentary evidence or witness testimony submitted after the applicable deadline, taking into account any timely requests for continuances or filing extensions that are granted, but before the immigration judge has issued a decision, only if the evidence could not reasonably have been obtained and presented before the applicable deadline through the exercise of due diligence or if the exclusion of such evidence would violate a statute or the Constitution. The admission of such evidence shall not automatically entitle either party to a continuance or filing extension; such a continuance or extension is governed by paragraph (h) of this section.

(h) *Continuances, adjournments, and filing extensions*—(1) *In general.* For cases governed by this section, an immigration judge may grant a continuance of a hearing date or

extension of a filing deadline only as set forth in this paragraph (h).

(2) *Respondent-requested continuances and filings extensions.* (i) The immigration judge may, for good cause shown, grant the respondent continuances and extend the respondent's filing deadlines. Each such continuance or extension shall not exceed 10 calendar days, unless the immigration judge determines that a longer period is more efficient. The immigration judge may not grant the respondent continuances or extensions for good cause that cause a merits hearing to occur more than 90 days after the master calendar hearing.

(ii) The immigration judge may grant the respondent continuances or extensions that cause a merits hearing to occur more than 90 days after the master calendar hearing only if the respondent demonstrates that the continuance or extension is necessary to ensure a fair proceeding and the need for the continuance or extension exists despite the respondent's exercise of due diligence. The length of any such continuance or extension shall be limited to the time necessary to ensure a fair proceeding. The immigration judge may not grant the respondent continuances or extensions pursuant to this paragraph (h)(2)(ii) that cause a merits hearing to occur more than 135 days after the master calendar hearing.

(iii) The immigration judge may grant the respondent continuances or extensions notwithstanding the requirements of paragraphs (h)(2)(i) and (ii) of this section if the respondent demonstrates that failure to grant the continuance or extension would be contrary to statute or the Constitution.

(iv) In calculating the delay to a merits hearing for purposes of applying paragraphs (h)(2)(i) and (ii) of this section, the immigration judge shall exclude any continuances, hearing delays, or filing extensions issued pursuant to paragraphs (h)(3) and (4) of this section.

(3) *DHS-requested continuances and filings extensions.* The immigration judge may, based on significant Government need, grant DHS continuances and extend DHS's filing deadlines. Significant Government need may include, but is not limited to, confirming domestic or foreign law-enforcement interest in the respondent, conducting forensic analysis of documents submitted in support of a relief application or other fraud-related investigations, and securing criminal history information, translations of foreign language documents, witness testimony or affidavits, or evidence suggesting that the respondent is

described in sections 208(a)(2)(A)(C), 208(b)(2), or 241(b)(3)(B) of the Act or has filed a frivolous asylum application as defined in 8 CFR 208.20.

(4) *Continuances, adjournments, and filing extensions due to exigent circumstances.* The immigration judge may continue a status conference or a hearing, or extend a filing deadline, and a status conference or a hearing set forth in this section may be adjourned, where necessary due to exigent circumstances, such as the unavailability of an immigration judge, the respondent, or either party's counsel assigned to the case due to illness; or the closure of the immigration court or a relevant DHS office. Any such continuance, extension, or adjournment shall be limited to the shortest period feasible and shall not be counted against the time limits set forth in paragraphs (h)(2)(i) and (ii) of this section. A new finding of exigent circumstances must be made to justify any and every subsequent continuance, extension, or adjournment under this paragraph (h)(4).

(i) *Decision.* (1) Where the asylum officer did not grant asylum and did not determine that the respondent was eligible for withholding of removal under the Act or for withholding or deferral of removal under the Convention Against Torture based on the record before USCIS, the immigration judge shall adjudicate, de novo, the respondent's applications for asylum and, if necessary, for withholding of removal under the Act, and withholding or deferral of removal under the Convention Against Torture.

(2) Except as provided in paragraph (f)(2)(i)(B) of this section, where the asylum officer did not grant asylum but determined the respondent eligible for withholding of removal under the Act, or for withholding or deferral of removal under the Convention Against Torture, the immigration judge shall adjudicate, de novo, the respondent's application for asylum. If the immigration judge subsequently denies asylum and enters a removal order, the immigration judge shall give effect to the protection(s) for which the asylum officer determined the applicant eligible, unless DHS has demonstrated, through evidence or testimony that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s). The immigration judge shall also grant any additional protection(s) for which the immigration judge finds the applicant eligible. DHS shall not be permitted to appeal to the Board the grant of any protection(s) for which the asylum officer determined the respondent eligible, except to argue that the immigration judge should have denied the application(s) based on the evidence allowed under this paragraph (i)(2).

(3) Where the respondent has requested voluntary departure in the alternative to, or in lieu of, asylum and related protection, the immigration judge shall adjudicate this application where necessary.

(j) *Changes of venue.* Where an immigration judge grants a motion to change venue under § 1003.20 of this chapter, the schedule of proceedings pursuant to paragraph (f) of this section commences again with the master calendar hearing at the court to which venue has been changed.

(k) *Exceptions.* The provisions in paragraphs (f) through (h) of this section shall not apply in any of the following circumstances:

(1) The respondent was under the age of 18 on the date the NTA was issued, except where the respondent is in removal proceedings with one or more adult family members.

(2) The respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, withholding of removal under the Act, withholding or deferral of removal under the Convention Against Torture, or voluntary departure, and the respondent is seeking to apply for, or has applied for, such relief or protection.

(3) The respondent has produced evidence that supports a prima facie showing that the respondent is not subject to removal as charged (including under any additional or substitute charges of removal brought by DHS pursuant to § 1240.10(e)), and the immigration judge determines, under § 1240.10(d), that the issue of whether the respondent is subject to removal cannot be resolved simultaneously with the adjudication of the respondent's applications for asylum, withholding of removal under the Act, or withholding or deferral of removal under the Convention Against Torture.

(4) The immigration judge, pursuant to § 1240.10(f), finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or both in that alternative country or countries.

(5) The case has been reopened or remanded following the immigration judge's order.

(6) The respondent has exhibited indicia of mental incompetency.

(l) *Termination of protection.* Nothing in this section shall preclude DHS from seeking termination of asylum, withholding of removal under the Act, or withholding or deferral of removal under the Convention Against Torture pursuant to 8 CFR 208.17(d) and 208.24(f).

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

Dated: March 17, 2022.

**Merrick B. Garland,**

*Attorney General, U.S. Department of Justice.*

[FR Doc. 2022–06148 Filed 3–24–22; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

## DEPARTMENT OF STATE

[CIS No. 2724–22; DHS Docket No. USCIS–2022–0009]

RIN 1615–ZB98

### Bureau of Population, Refugees, and Migration; Central American Minors Program

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Bureau of Population, Refugees, and Migration, Department of State.

**ACTION:** Notice of enhancements to the Central American Minors Program.

**SUMMARY:** This notice announces enhancements to the Central American Minors (CAM) Program by, among other things, updating certain eligibility criteria for program access. The CAM Program allows certain qualifying individuals to request access to the U.S. Refugee Admissions Program (USRAP) on behalf of their qualifying children who are nationals of El Salvador, Guatemala, and Honduras (collectively known as northern Central America or NCA), and certain family members of those children, for possible resettlement, or if ineligible for refugee status, for possible parole in the United States. U.S. Citizenship and Immigration Services (USCIS) and the Department of State, Bureau of Population, Refugees, and Migration (PRM) are announcing changes to the CAM Program consistent with an Executive order (E.O.) issued on February 2, 2021, which directed the Secretary of Homeland Security to consider actions to reinstitute and improve upon the CAM parole process, leading to the reopening of the broader CAM Program as part of the USRAP. The CAM Program is a key component of the Collaborative Migration Management Strategy (CMMS), the first U.S. Government strategy focused on strengthening cooperative efforts to manage safe, orderly, and humane migration in North and Central America and complements other U.S. Government efforts to manage the flow of irregular migration to the United States, by providing a lawful, safe, orderly, and humane pathway for certain Central American children to come to the United States and reunite with family members. It also helps to reduce strain on limited U.S. resources

through more managed migration and promotes family unity.

**DATES:** The program enhancements announced by this notice are effective on April 11, 2023, with implementation to follow as operational updates are made to accord with the enhanced program, including required revisions to the DS–7699, Affidavit of Relationship (AOR) for Minors Who are Nationals of El Salvador, Guatemala, and Honduras, after a separate **Federal Register** notice to follow.

**FOR FURTHER INFORMATION CONTACT:** Renά Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000. Kelly Gauger, Deputy Director, Office of Refugee Admissions, Bureau of Population, Refugees, and Migration, Department of State, by mail at 2025 E Street NW, Washington, DC 20006.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

The U.S. Government (USG) is committed to implementing a comprehensive framework to manage migration throughout North and Central America, in which the CAM Program plays an important role.[1] Issued on February 2, 2021, E.O. 14010 calls for a four-pronged approach to managing this migration, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the Southwest Border (SWB) to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[2] In its section on expanding lawful pathways for protection and opportunity, E.O. 14010 specifically directs the Secretary of Homeland Security to consider actions to "reinstitute and improve upon the CAM Parole Program."[3] On February 4, 2021,

E.O. 14013 likewise directed actions to rebuild, expand, and improve the USRAP.[4] On March 10, 2021, consistent with these Executive orders, and following submission of a publicly available report to and consultation with Congressional committees, Department of Homeland Security (DHS) and the Department of State (State or DOS) publicly announced the first phase of reopening and improving the CAM Program to make certain qualified children from El Salvador, Guatemala, and Honduras eligible for potential refugee resettlement to reunite with their parent or parents in the United States in certain qualifying immigration categories.[5] On June 15, 2021, DHS and State provided the details of plans to expand access to an additional number of qualifying individuals.[6]

In July 2021, the White House published the CMMS, which described U.S. strategy to collaboratively manage migration throughout Central America, with specific reference to the structure and purpose of the CAM Program under Pillar 8, "Expand Access to Lawful Pathways for Protection and Opportunity in the United States."[7] In March 2022, DHS published an interim final rule (IFR) to allow U.S. immigration officials to more promptly consider the asylum claims of individuals encountered at or near the SWB, thereby more effectively and efficiently identifying those who have

---

[1] See, e.g., E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 1, 86 FR 8267 (Feb. 2, 2021); Collaborative Migration Management Strategy, National Security Council (July 2021) available at: https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

[2] E.O. 14010, sec. 2–4, 86 FR 8267–71.

[3] Specifically, E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration

Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 3(b)(i), directed the Secretary of Homeland Security to "consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program; 'Termination of the Central American Minors Parole Program,' 82 FR 38,926 (Aug. 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program.'' 86 FR 8269.

[4] See E.O. 14013, Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration, 86 FR 8839 (Feb. 9, 2021).

[5] Restarting the Central American Minors Program, DOS (Mar. 10, 2021), available at: https://www.state.gov/restarting-the-central-american-minors-program/.

[6] Joint Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central American Minors Program, DOS (Jun. 15, 2021), available at: https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/.

[7] Collaborative Migration Management Strategy, National Security Council (July 2021), available at: https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

valid asylum claims, while more promptly removing those who do not.[8]

Furthermore, at the Ninth Summit of the Americas in June 2022, countries in the Western Hemisphere, including the United States, endorsed the Los Angeles Declaration on Migration and Protection (Los Angeles Declaration), in which the countries made significant commitments related to promoting safe, orderly, and humane migration, and countries have since implemented initiatives or reaffirmed their commitments to continuing earlier programs. Specifically, in the Los Angeles Declaration, countries affirmed that "regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration."[9] Recognizing the importance of regular pathways, more than 20 countries, including the United States, reaffirmed their commitment to expand access to regular pathways with a goal of changing the way people migrate. Within the framework of deliverables under the Los Angeles Declaration, the United States committed to resettle up to 20,000 refugees from the Americas during the twenty-four months of fiscal years (FYs) 2023 and 2024.

A critical component of the USG's comprehensive framework to manage migration is the creation and expansion of lawful pathways through which migrants can come to the United States. The availability of lawful pathways serves two key goals: First, they provide a safe and lawful alternative to irregular migration, thus helping to reduce irregular migration flows. Second, they serve other significant public benefit and urgent humanitarian needs, including the safe reunification of children with their parents. As part of efforts to increase access to lawful pathways, DHS and State have expanded refugee processing in Central America[10] and reduced immigrant visa backlogs.[11] Additionally, DHS, in

consultation with the Department of Labor (DOL), allocated, on multiple occasions, a set number of H–2B visas to NCA countries as part of efforts to increase access to temporary nonimmigrant work visas to individuals in the region while enhancing worker protections.[12] DHS intends for the parole component of the CAM Program (or "CAM parole process") to complement these other pathways by providing a process for certain qualifying children and family members to lawfully enter the United States in a safe and orderly manner to reunite with the qualifying child's parent or legal guardian. It therefore contributes to the broader strategy of providing safe, lawful, and orderly pathways to individuals who may otherwise be driven to travel to the United States through irregular means, cuts out the smugglers who prey on vulnerable individuals seeking to make this dangerous journey, and supports the interest in promoting family reunification.

This Notice announces enhancements to the CAM parole process and expands

eligibility criteria for those who may request USRAP access for qualifying children through the CAM Program. The notice also provides historical and legal background on the CAM Program and explains the reasons for establishing and continuing the CAM Program as a whole.

## Background on the CAM Program

### History and Purpose of the CAM Program

A. Initial Establishment and 2016 Expansion

The CAM Program was initially established in December 2014,[13] following a significant surge in the number of unaccompanied children (UC) from El Salvador, Guatemala, and Honduras irregularly crossing the SWB. In Fiscal Year (FY) 2014, the number of UC encounters from these three countries increased to approximately 52,000, more than doubling the number of UC encounters from these countries in FY 2013.[14] The CAM Program was designed to address this increase by providing an alternative to irregular migration for children seeking to reunify with certain family members. Protecting children and providing them with the stability of their families are the driving forces behind the CAM Program and what distinguishes it from many other available lawful pathways. In establishing the CAM Program, the United States recognized that the dangers of irregular migration, including abuse and harm from transnational criminal organizations, are particularly acute for children.

Specifically, the CAM Program allowed, and continues to allow, qualifying parents present in the United States in certain immigration categories to request that their unmarried children under 21 years of age, as well as certain

---

[8] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[9] Los Angeles Declaration on Migration and Protection (June 10, 2022), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[10] The United States continues these efforts by pursuing the use of new technologies and processes to facilitate and expand remote case processing capabilities. It is also seeking to continue increasing U.S. Refugee Admissions Program (USRAP) processing capacity in Central America.

[11] As of January 31, 2022, the United States has resolved the backlog of immigrant visa petitions

filed on behalf of Central American nationals from a high of approximately 19,000 in April 2021.

[12] See, e.g., Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022) (DHS and DOL authorized a total of 64,716 supplemental visas, of which 20,000 visas were reserved for nationals of Central American countries); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL again authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of Central American countries, with the addition of Haiti) (available at: *https://www.federalregister.gov/documents/2022/01/28/2022-01866/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2022-numerical-limitation-for-the; see also https://www.federalregister.gov/documents/2022/02/03/C1-2022-01866/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2022-numerical-limitation-for-the* (corrected version as of Feb. 3, 2022)); Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (DHS and DOL authorized an additional 35,000 supplemental visas, of which 11,500 were reserved for nationals of Central American countries and Haiti) (available at: *https://www.federalregister.gov/documents/2022/05/18/2022-10631/exercise-of-time-limited-authority-to-increase-the-numerical-limitation-for-second-half-of-fy-2022*). On October 12, 2022, DHS announced a forthcoming rule that would authorize nearly 65,000 additional visas, of which 20,000 would be reserved for nationals of Central American countries and Haiti. See DHS, Press Release, DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for Fiscal Year 2023 (Oct. 12, 2022), *https://www.dhs.gov/news/2022/10/12/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2023* (last visited Nov. 2, 2022).

[13] "Vice President Biden announced the CAM Program publicly on November 14, 2014, at the Inter-American Development Bank as part of a broader U.S. commitment to working with Central American countries to help create the economic, social, governance, and security conditions to address factors contributing to increases in migration to the United States." Written testimony of USCIS Refugee, Asylum and International Operations Associate Director Joseph Langlois for Senate Committee on the Judiciary, Subcommittee on Immigration and The National Interest hearing titled "Eroding the Law and Diverting Taxpayer Resources: An Examination of the Administration's Central American Minors Refugee/Parole Program" (Apr. 23, 2015), available at: *https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national*.

[14] Unaccompanied Alien Children Encountered by Fiscal Year, Fiscal Years 2009–2013; Fiscal Year 2014 through September 30, Southwest Border Unaccompanied Alien Children FY 2014, U.S. Customs and Border Protection, *https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2014*.

**21696** **Federal Register** / Vol. 88, No. 69 / Tuesday, April 11, 2023 / Notices

other eligible family members who are nationals of El Salvador, Guatemala, or Honduras, gain access to the USRAP by filing with State Form DS–7699, Affidavit of Relationship (AOR) for Minors Who Are Nationals of El Salvador, Guatemala, and Honduras.[15] Qualifying children and eligible family members who are granted access to the USRAP via the CAM Program must undergo DNA testing to verify any claimed biological relationship and are interviewed by USCIS Refugee Officers to determine who may be approved for classification as a refugee. Qualifying children and eligible family members who do not establish eligibility for refugee status,[16] may then be considered, on a case-by-case basis, for parole. Qualifying children may be eligible for parole when they face a well-founded fear of harm in their home countries, regardless of whether it is on account of a protected characteristic. In addition, if a qualifying child is eligible for refugee status or parole, any accompanying family members who are ineligible for refugee status will also be considered for parole for the purpose of promoting family unity and based on the positive factor of promoting safe, legal, humane, and orderly migration. CAM applicants approved for refugee

status are admitted into the United States as refugees through the U.S. Refugee Admissions Program and are counted against the regional allocation for Latin America and the Caribbean. Parolees are allowed to temporarily enter the United States but do not have access to the benefits afforded to refugees, including lawful immigration status, the ability to sponsor additional family members for lawful immigration status, a pathway to permanent residence and ultimately citizenship, or access to resettlement services and public benefits based on said refugee status.[17]

As established in 2014, certain parents in the United States in a qualifying immigration category could, and remain able to, request access to USRAP via the CAM Program for qualifying children and eligible family members.[18] A qualified child was, and remains, defined as an unmarried child, under the age of 21, who is a national of El Salvador, Guatemala, or Honduras, and is physically located in one of those countries. In some cases, an in-country parent of the qualifying child who is part of the same household and economic unit as the qualifying child and legally married to the parent in the United States could also qualify for access.[19] Children of a qualifying child or of other eligible family members can also qualify, if those children are under the age of 21 and unmarried. If an individual receives access to USRAP via the CAM Program, but is found ineligible for refugee status because, for example, their fear of harm is not based on a protected characteristic,[20] USCIS may consider parole. Each parole determination was, and continues to be made on an individualized, case-by-case basis. Authorization of parole may be warranted based on serving a significant public benefit or for urgent humanitarian reasons, as described below, and if a favorable exercise of discretion is merited.[21]

If USCIS determines that an individual may be eligible for parole,[22] USCIS will authorize parole and issue the necessary travel documents to the beneficiary. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port of entry to join parent(s) or legal guardian(s).

In 2016, DHS and State expanded the CAM Program to allow for additional categories of family members to be eligible to be considered for USRAP access and potential refugee status or parole, also on a case-by-case basis,[23] including: (1) a biological parent of a qualifying child who is not legally married to the qualifying parent and lives in the same household as the qualifying child and is part of the same economic unit; (2) a primary caregiver of the qualifying child who does not qualify as a legal or biological parent and is related to either the qualifying parent (biologically or by legal marriage) or to the qualifying child (through a biological, step, or adoptive relationship); and (3) the qualifying parent's married and/or age 21 or older children. Individuals under these expanded categories are eligible to gain access to the USRAP only in connection with a qualifying child.

**B. Rescission**

In 2017, USCIS stopped considering parole in CAM Program cases pursuant to directives in E.O. 13767 that has since been rescinded.[24] On August 16, 2017, DHS published a **Federal Register Notice (FRN)** announcing the termination of the parole component of the CAM Program and rescinded conditional parole approvals for CAM Program beneficiaries who had not yet completed travel to the United States.[25] DHS predicated the 2017 termination of parole for CAM on a "discretionary

---

[15] Central American Minors (CAM) Refugee and Parole Program, *https://uscis.gov/CAM.*

[16] Among other things, refugee applicants must show that they meet the statutory definition in Immigration and Nationality Act (INA) sec. 101(a)(42): The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in 8 U.S.C. 1157(e)) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under 8 U.S.C. chapter 12, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well-founded fear of persecution on account of political opinion.

[17] See INA secs. 207, 209, 412.

[18] In 2013, the U.S.-based qualifying parent included those with Lawful Permanent Residence, Temporary Protected Status, Parole, Deferred Action, Deferred Enforced Departure, and Withholding of Removal.

[19] See *https://www.uscis.gov/archive/central-american-minors-cam-refugeeparole-program.*

[20] The primary reason a qualifying child would be found ineligible for refugee status is because they did not establish all elements of the refugee definition, which requires any harm experienced or feared in the future to rise to the level of persecution and to have been committed on account of at least one protected ground (*i.e.* race, religion, nationality, political opinion, or membership in a particular social group).

[21] Any person who is outside the U.S. may apply for parole using USCIS Form I–131, Application for Travel Document. See Humanitarian or Significant

Public Benefit Parole for Individuals Outside the United States, at *www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividuals outsideUS* (last viewed Feb. 14, 2023).

[22] 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5.

[23] U.S. Department of State, Bureau of the Central American Minors (CAM) Program—Fact Sheet (Nov. 15, 2016), available at: *https://2009-2017.state.gov/r/pa/prs/ps/2016/11/264332.htm.*

[24] Border Security and Immigration Enforcement Improvements, E.O. 13767 of January 25, 2017, 82 FR 8793 (Jan. 30, 2017); revoked by Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, E.O. 14010 of February 2, 2021, 86 FR 8267 (Feb. 5, 2021).

[25] Termination of the Central American Minors Parole Program, 82 FR 38926 (Aug. 16, 2017) (available at: *https://www.federalregister.gov/documents/2017/08/16/2017-16828/termination-of-the-central-american-minors-parole-program*).

change in policy'' with respect to how it utilized "the Secretary's discretionary parole authority and the broad authority to administer the immigration laws." [26] Although DHS terminated the parole component of the CAM Program, the FRN did not impact the process for requesting access to USRAP or obtaining refugee status under the CAM Program. However, the annual Report to Congress on Proposed Refugee Admissions for FY 2018 noted that the CAM Program would be phased out citing low refugee approval rates and on November 10, 2017, State stopped accepting new submissions for USRAP access through the CAM Program. On January 31, 2018, USCIS stopped interviewing new refugee cases that accessed USRAP through the CAM Program altogether. Applicants who had already been interviewed and qualified for refugee status were allowed to continue processing and seek admission into the United States as refugees. Under a court order and related settlement agreement reached over litigation regarding the termination of the parole component of the CAM Program, USCIS also agreed to continue processing cases for individuals who received a conditional parole approval notice prior to receiving rescission notices following the termination of the parole component of the CAM Program. [27]

**C. Reinstatement**

On February 2, 2021, E.O. 14010 announced the implementation of a multi-pronged approach toward managing migration throughout North and Central America and directed the Secretary of Homeland Security and Secretary of State to "consider initiating appropriate actions to reinstitute and improve upon" the CAM Program. [28] In accordance with E.O. 14010, USCIS and State re-examined the previous decision to terminate the CAM parole process as an additional mechanism for creating and expanding lawful pathways for migrants to enter the United States and seek protection. The re-examination also considered that, as a child protection and stability measure, the CAM Program could be improved upon by expanding eligibility to request USRAP access and by adjusting the duration of parole to provide additional time to pursue immigration status.

On February 12, 2021, State submitted a report, including on the CAM Program, to Congressional committees and conducted appropriate consultations regarding the President's proposal to increase refugee admissions for Fiscal Year 2021 due to an unforeseen refugee situation around the globe. On March 10, 2021, DHS and State publicly announced the reopening of the CAM Program in two phases. [29] Phase One began in March 2021 and focused on reopening and processing eligible cases that were closed without having received a refugee interview before CAM interviewing ceased on January 31, 2018. On June 15, 2021, DHS and State jointly announced the details of Phase Two of the reopening, [30] which included expanding eligibility to request USRAP access for their children and certain other qualifying relatives to: (i) legal guardians, in addition to parents, who are in the United States in certain immigration categories; and (ii) U.S.-based parents and legal guardians who have a pending asylum application or a pending petition for U nonimmigrant status [31] filed before May 15, 2021. The reopening of the CAM Program also included providing children with parole additional time to pursue immigration status by providing parole for a three-year period, rather than the previous two-year parole period. Beneficiaries of parole may also continue, as before, to individually request re-parole, where re-parole would generally continue to serve the underlying significant public benefit and/or urgent humanitarian reasons that existed at the time of their initial parole determination.

DHS acknowledges that the reinstatement of the CAM Program in 2021 and the look afresh at the process being announced in this notice are a departure from the decision to terminate the CAM parole process announced in the **Federal Register** in 2017. [32] DHS has changed its position and has initiated these actions to reinstitute and improve upon the CAM parole process after examining the termination as directed by E.O. 14010. Further, this change is permissible under the statute, and as explained in the remainder of this notice, DHS has good reasons for the change in policy and has decided that reinstating and improving the CAM parole process is a better choice than not doing so. The 2017 termination was a discretionary change in policy, and the decision to reinstate the CAM parole process and announce the changes in this FRN is not factually inconsistent or contradictory to the factual findings in the 2017 termination notice. Finally, DHS has made an effort to identify any reliance interests of the parties affected by this Notice and has determined that the 2017 termination did not result in any reliance interests inuring to the affected parties. The CAM parole process does not result in the entry of a child who will rely on state, or local governments; generally, under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), "qualified aliens" are eligible for Federal means-tested benefits after 5 years, are not eligible for "specified federal programs," and states are allowed to determine whether the qualified alien is eligible for "designated federal programs." Individuals who are paroled for more than a year, such as CAM parolees, are qualified aliens subject to that 5-year waiting period. And many state services are generally funded by fees that the CAM parolee would pay. [33] To the extent that there may be reliance interests associated with not restarting the CAM parole process that may have attached to other affected parties, DHS ultimately concludes that the other interests and policy concerns described in this document outweigh those interests.

**D. Expansion and Enhancements**

DHS and State have continued to evaluate the role of the CAM Program as a protection and stability strategy for children, and in light of the Administration's larger migration strategy, including its efforts to reduce

---

[26] Termination of the Central American Minors Parole Program, 82 FR 38926 (Aug. 16, 2017) (available at: *https://www.federalregister.gov/documents/2017/08/16/2017-16828/termination-of-the-central-american-minors-parole-program*).

[27] Under the Final Judgment and Order for Permanent Injunction in *S.A.* v. *Trump*, No. 3:18–cv–03539–LB (N.D. Cal.) issued on May 17, 2019, and related settlement agreement, DHS is required to continue to process the approximately 2,700 individuals who had been issued conditional approval notices but then received rescission notices at the time of the Program's termination, under the policies and procedures that it had in place prior to the termination.

[28] E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 3(b)(i), 86 FR 8267 (Feb. 2, 2021).

[29] Restarting the Central American Minors Program, U.S. Department of State, (Mar. 10, 2021), available at: *https://www.state.gov/restarting-the-central-american-minors-program/*.

[30] Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program (June 15, 2021), available at: *https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion*.

[31] U nonimmigrant status (U visa) is available to certain victims of qualifying crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U); 8 CFR 214.14.

[32] 82 FR 38926.

[33] *See, e.g., https://www.dps.texas.gov/section/driver-license/driver-license-fees* (last viewed February 15, 2023).

irregular migration, to cut out the role of smugglers, and to promote family unity. The Departments have concluded that further program improvements will help achieve all of these goals, as well as those laid out in E.O. 14010: to increase lawful pathways to the United States, discourage irregular migration, and promote family unity.

*USRAP Authority and Procedures*

State, through PRM, has overall responsibility for management of the USRAP in close coordination with DHS' USCIS and the Department of Health and Human Services' Office of Refugee Resettlement. According to section 207(a)(3) of the Immigration and Nationality Act (INA), "admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.[34] Individuals of special concern for consideration for potential refugee resettlement are determined through the USRAP priority system (note: in the context of USRAP, the term "priority" refers only to how an individual or group gains access to the program and does not establish any priority over other types of cases):

*Priority 1:* Cases referred by designated entities, such as the United Nations Refugee Agency, by virtue of their circumstances and apparent need for resettlement;

*Priority 2:* Groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and apparent need for resettlement;

*Priority 3:* Cases granted access for purposes of family reunification.

The Reports to Congress on Proposed Refugee Admissions for Fiscal Years 2015, 2016, 2017 and the February 12, 2021, Report to Congress on the Proposed Emergency Determination on Refugee Admissions for Fiscal Year 2021 each included a direct-access Priority 2 designation for certain lawfully present parents in the United States to request USRAP access for their unmarried children in El Salvador, Guatemala, or Honduras. The subsequent Report to Congress for Proposed Refugee Admissions for Fiscal Year 2022 expanded upon this language and extended eligibility for those who can request USRAP access to include legal guardians (in addition to parents) pursuant to any of the previous categories of qualifying lawful presence, as well as to parents and legal guardians with pending asylum applications or pending U visa petitions filed prior to May 15, 2021. It is important to note that USRAP access by means of the above priority systems in no way implies or guarantees that an applicant will ultimately be resettled as a refugee in the United States. That decision will be made by a USCIS officer who will interview and adjudicate the individual claim consistent with the requirements of the INA.

*Parole Authority*

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [35] Parole is not an admission of the individual to the United States.[36] A parolee remains an "applicant for admission" during the period of parole in the United States.[37] DHS may set the duration of the parole based on the purpose for granting the parole request.[38] DHS may terminate parole in its discretion at any time.[39]

Individuals who are paroled into the United States generally may apply for employment authorization.[40]

Under the enhanced parole component of the CAM Program, the Secretary of Homeland Security will exercise, on a case-by-case basis, this discretionary parole authority to determine whether certain qualified children who are nationals of El Salvador, Guatemala, and Honduras, as well as certain family members of those children, may join their qualifying parents or legal guardians in the United States for a temporary period of three years.[41]

Consistent with prior implementation of the CAM Program, each parole request will be considered on its own merit, on a case-by-case basis, consistent with the statute, regulations, and applicable guidance to determine whether there is a significant public benefit or urgent humanitarian reason for the parole and whether under the totality of the circumstances the individual warrants a favorable exercise of discretion, taking into account all positive and negative factors.

A three-year parole period is consistent with other family reunification parole processes, such as the Filipino World War II Veterans Parole Program,[42] Haitian Family Reunification Parole Program,[43] and DHS's Family Reunification Task Force parole policy.[44] When established in 2014, the parole component of the CAM Program provided for a two-year period of parole. Upon further consideration of the safety and stability needs for children, DHS expanded the parole period to three years in July 2021. A three-year period of parole is appropriate for CAM parolees, for the following reasons:

*First,* the period of parole needs to be sufficiently long to make it a preferable

---

[34] INA sec. 207(d)(1) and (e): with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information: (1) A description of the nature of the refugee situation; (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came; (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement; (4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States; (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees; (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States; and (7) Such additional information as may be appropriate or requested by such members.

[35] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission, including parole, to enter the United States" to "noncitizens and individuals who are not 'lawfully admitted for permanent residence in the United States'").

[36] INA secs. 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[37] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 1.2 (defining "arriving alien"), 1001.1(q) (same).

[38] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[39] 8 CFR 212.5(e).

[40] 8 CFR 274a.12(c)(11). Also, although individuals who are paroled for a period of one year or more are considered to be "qualified aliens" for purposes of eligibility for certain federal public benefits, they, like most "qualified aliens," are precluded from receiving most federal means-tested public benefits for a period of five years. 8 U.S.C. 1641(b)(4).

[41] Although section 1182(d)(5) (INA 212(d)(5)) continues to refer to the Attorney General, those references are now understood to refer to the Secretary of Homeland Security. Parole authority was transferred to the Secretary of Homeland Security under the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. 6 U.S.C. 557; *see Clark* v. *Martinez,* 543 U.S. 371, 374 n.1 (2005). USCIS may exercise the Secretary of Homeland Security's parole authority under section 1182(d)(5) of the INA with respect to certain noncitizens located outside the United States.

[42] 81 FR 28097 (May 9, 2016).

[43] 79 FR 75581 (Dec. 18, 2014).

[44] *See https://www.dhs.gov/family-reunification-task-force.*

AR_001551

alternative to the status quo, in which smugglers are responsible for the lives of child migrants entering the United States irregularly. While a two-year parole period may be sufficient to meet the significant public benefit or urgent humanitarian need in some parole processes, consideration of additional factors relevant to child migrants weighs in favor of three years, as children, and their parents, need stability. A three-year period of parole provides children a meaningful opportunity to reunite with their parents or legal guardians and stabilize that relationship, while a shorter period of parole would unnecessarily increase uncertainty for children, which can disrupt a child's emotional and educational development. In addition, DHS also recognizes that children may require more time than adults to seek humanitarian relief or other immigration benefits for which they may be eligible, given the heightened impact that trauma and separation from family can have on children. DHS thus believes that a parole period of three years balances these considerations and is sufficient to encourage potential beneficiaries to seek to utilize the CAM Program to reunify safely and lawfully rather than migrating irregularly.

*Second,* a three-year parole period provides sufficient time for a parent or legal guardian who is pursuing or has acquired a lawful immigration status to seek derivative immigration status for their children paroled into the United States through the CAM Program. This is critical; it helps ensure that children can benefit from derivative status for which they may ultimately be eligible.

Unlike any other parole processes, the parole component of the CAM Program is intended specifically and primarily as a lawful pathway for children to enter the United States and reunite with family members. While adults may be paroled into the United States through the parole component of the CAM Program, that is only permitted if they relate to a qualifying child. Therefore, the duration of the parole period should be tailored to the needs of the children expected to be the main participants in the process.

**Justification and Reasoning**

As noted above, each parole determination in this process will be made on an individualized, case-by-case basis to determine whether urgent humanitarian reasons or a significant public benefit exists to authorize parole, and whether each individual merits a favorable exercise of discretion. Several common factors listed below are likely to support findings of urgent

humanitarian reasons or significant public benefit for the CAM population and will be considered in CAM parole adjudications.

*Support Family Unity*

Consistent with the goal of promoting family unity, as laid out in section 3(b)(ii) of E.O. 14010, the parole component of the CAM Program serves a significant public benefit by providing a safe, lawful, and orderly pathway for children to reunite with parents and legal guardians on a case-by-case basis. Parents or legal guardians who are granted certain immigration benefits may petition for their children to receive immigrant visas, but those processes take time and may include a lengthy wait for visa availability. Children whose parents or legal guardians have pending applications or petitions for immigration benefits, such as a U petition or asylum, may have even longer waits—even if the parents or legal guardians have viable protection claims—during which time the family unit is often separated. The CAM parole process allows eligible children, and certain other family members, to reunify in the United States for a set period of time with the qualifying parent or legal guardian who is already in a qualifying immigration category or who has a pending application for lawful status—thus promoting family unity and protecting against prolonged separations.

By facilitating more timely, orderly, and safe family reunification, the CAM parole process improves the well-being of these families. Additionally, by facilitating such reunification temporarily through a safe, legal, and orderly pathway, it promotes the integration of CAM arrivals by incorporating them into networks already built by family members who have been legally living in the United States. This, in turn, provides families an opportunity to have stable financial foundations, housing and transportation, and school and childcare options. The CAM Program will facilitate the ability for parents, legal guardians, and beneficiaries to engage in these activities, allowing them to better integrate into the community and strengthen family ties.[45]

*Provide a Safe, Lawful, and Orderly Alternative to Irregular Migration*

Providing a safe, lawful, and orderly way for minors to reunite with their parents or guardians, serves a significant public benefit by helping to reduce the number of individuals who undertake irregular and unsafe migration in the absence of a viable alternative. While the USG works to address the root causes of irregular migration, the enhanced CAM Program will complement existing lawful alternatives to irregular migration.

In recent years, the deteriorating humanitarian situation in NCA countries has driven an increasing number of people to migrate to the United States. In the past several years, emigration from NCA countries has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In FY 2021, irregular migrants from NCA countries constituted 40 percent of all individuals encountered at the SWB.[46] Economic insecurity, food insecurity, climate change, gang violence, corruption, and sexual, gender-based, and domestic violence, coupled with the desire to reunite with family members already in the United States, are driving child migrants from NCA countries to the United States.[47] A joint report by the United Nations Children's Fund (UNICEF) and the United Nations Refugee Agency (UNHCR) published in December 2020 noted that families in NCA countries reported an increased vulnerability to persecution following the onset of the COVID pandemic.[48] The

---

[45] Providing this alternative lawful pathway to the United States is consistent with family-based immigration to the United States, such as the ability of U.S. citizens and lawful permanent residents to petition for certain relatives to be admitted to the United States as lawful permanent residents. *See* INA sec. 204(a)(1)(A)–(D). Permitting a broader set of noncitizens present in the United States to file an AOR so that their children may be considered for refugee status and, if not eligible, for parole, is consistent with the limitations Congress has

established with respect to family-based immigration pathways. *See* INA secs. 201(b)(2), (c); 202; 203(a). As stated above, unlike lawful permanent residence, parole is not an immigration status. It is temporary by nature, does not allow for derivative benefits for family members (although certain qualifying family members of the CAM program participants may be considered for parole on their own merit), and does not provide a pathway to citizenship. Because parole is not comparable to lawful permanent resident status, CAM parole does not expand upon or change Congress' determinations as to who can sponsor certain relatives for a permanent immigration status in the United States.

[46] Southwest Land Border Encounters, U.S. Customs and Border Protection, available at: *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified Aug. 3, 2022).

[47] Central America's Turbulent Northern Triangle, Council on Foreign Relations, available at: *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle* (last updated July 1, 2021); U.S. Strategy for Addressing the Root Causes of Migration in Central America, National Security Council (July 2021), available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[48] Report: Families on the Run; UNHCR and UNICEF, available at: *https://familiesontherun.org*.

report also found that, of children interviewed who traveled without accompanying family members, violence was a central reason for their displacement.[49] Without an alternative, instability and uncertainty in their home countries, combined with their desire to reunify with family in the United States after prolonged separation, may fuel the desire for children to undertake irregular and unsafe migration.

Therefore, the Administration anticipates that children in the CAM Program's eligible population may, when facing no alternative, seek reunification through irregular migration. Indeed, in the course of resuming to process certain CAM parole cases under the *S.A.* v. *Trump* Final Judgment and Order for Permanent Injunction agreement and related settlement agreement, DHS learned that a significant number of CAM parole beneficiaries whose conditional approvals of parole had been rescinded in 2017 had already found their way to the United States to reunify with their parents, doing so via irregular—and likely dangerous—means. DHS has also encountered other groups of individuals who may, when facing no alternative, seek family reunification through irregular migration. For example, DHS has encountered individuals with approved family-based immigrant visa petitions who nonetheless determined they could not wait for an immigrant visa to become immediately available before traveling to the United States.

*Protecting Children From Smuggling Networks*

The CAM Program, including the CAM parole process, serves a significant public benefit by providing a safe, orderly, and lawful alternative for qualifying children and family members who might otherwise be subject to exploitation at the hands of smuggling networks, in a quest to be reunited with family in the United States.

Transnational criminal organizations (TCOs) engaged in human smuggling along the route from the NCA to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[50] TCOs exploit irregular migration for financial gain,

either by charging migrants to cross their territory, forcing migrants to carry contraband as they cross the SWB between POEs, or forcing and coercing migrants into sex or labor trafficking. Child and adolescent migrants are particularly vulnerable to human trafficking and other severe forms of harm, particularly while traveling alone or having been separated from their families.[51] Once in the United States, children who entered the country via irregular migratory routes are at higher risk of exploitation than those who entered through regular pathways.[52]

By providing a safe, orderly, and lawful alternative to irregular migratory routes that funnel money into the hands of TCOs, the continued implementation and expansion of the CAM Program, including the CAM parole process, serves a significant public benefit, thereby supporting the USG's longstanding commitment to anti-trafficking efforts.[53]

*Reduce Strain on Limited U.S. Resources at the Southwest Border*

Increases in irregular migration from NCA countries have strained DHS' processing and holding capacity at the SWB. In response to increases in irregular migration, DHS has taken a series of actions. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities. CBP obligated $669.3 million to stand up, sustain, and operate these facilities in FY 2022. It has detailed 3,770 officers and agents from CBP and U.S. Immigration and Customs Enforcement (ICE) to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities,

transportation, medical care, and personnel costs. The Federal Emergency Management Agency has spent $260 million in FY 2021 and FY 2022 on grants to non-governmental organizations and state and local entities through the Emergency Food and Shelter Program—Humanitarian to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 appropriations that were designated SWB enforcement and processing capacities.[54]

In FY 2021, DHS encountered a significant number of UC and dedicated a significant number of resources to respond to the surge. In partnership with the U.S. Department of Health and Human Services (HHS), DHS took steps to identify and create significant efficiencies processing UC at the SWB. Among other things, DHS assisted HHS to significantly expand its emergency influx shelter capacity; established an interagency Movement Coordination Cell to streamline operations in support of the timely transfer of UC from DHS to HHS custody; provided hundreds of USCIS officers to help interview and vet potential sponsors; and activated the DHS volunteer workforce, through which approximately 300–400 volunteers across the country assisted CBP and HHS with oversight and logistics at any given time.

While this whole-of-government effort led to processing UC more efficiently, the number of UC encounters from NCA countries has continued to increase and place a significant toll on USG resources. In all cases, UC must be held separately from adults and cared for by CBP officials while awaiting transfers to the Office of Refugee Resettlement (ORR). CBP must interview each child, attempt to contact the child's parents, and create a record of referral for HHS, which must be quite detailed and requires significant resources to create.[55] ICE generates Notices to

---

[49] Report: Families on the Run; UNHCR and UNICEF, available at: *https://familiesontherun.org*.

[50] Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States, Homeland Security Operational Analysis Center (2019), available at: *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf*.

[51] Migrants and Their Vulnerability to Human Trafficking, Modern Slavery and Forced Labor, Minderoo Foundation's Walk Free initiative and the International Organization for Migration, accessible at: *https://publications.iom.int/system/files/pdf/migrants_and_their_vulnerability.pdf*.

[52] Migrants and Their Vulnerability to Human Trafficking, Modern Slavery and Forced Labor, Minderoo Foundation's Walk Free initiative and the International Organization for Migration, available at: *https://publications.iom.int/system/files/pdf/migrants_and_their_vulnerability.pdf*.

[53] National Action Plan to Combat Human Trafficking (Dec. 2021), available at: *https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf*; White House Briefing Room, Fact Sheet: The National Action Plan to Combat Human Trafficking (Dec. 3, 2021) ("As we continue to address the acute and long-term drivers of irregular migration, we must ensure our legal immigration pathways provide safe alternatives."), available at: *https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/03/fact-sheet-the-national-action-plan-to-combat-human-trafficking-nap/*.

[54] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security (Apr. 26, 2022), available at: *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[55] ORR requests the following information from the referring agency: (1) How the referring agency made the determination that the minor is a UC; (2) Health related information including, but not limited to, if the UC is pregnant or parenting and whether there are any known physical or mental health concerns; (3) Whether the child has any medication or prescription information, including how many days' supply of the medication will be provided with the child or youth when transferred into ORR custody; (4) Biographical and biometric information, such as name, gender, alien number,

Appear and must assign the child to a juvenile coordinator. Once the child is in HHS custody, ORR grantees and contractors provide housing, education, medical care, and counseling services while staff work with potential sponsors who are typically parents, legal guardians, or other relatives to complete necessary paperwork and vetting before the sponsor can be approved and a child is released to the proposed sponsor. Ultimately, nearly 40 percent of UC from CAM countries are processed and released by HHS to their parents or legal guardians.

Resettling as a refugee or paroling a child and their eligible family members through the CAM Program, on a case-by-basis, serves a significant public benefit because it is significantly less resource-intensive than processing an unaccompanied minor encountered at or near the border, who is subject to resource-intensive processing and care by a combination of CBP, ICE, and HHS' Office of Refugee Resettlement (ORR). While processing requests for access to the USRAP via the CAM Program, including refugee claims and review for parole on a case-by-case basis, draws on State as well as DHS resources within USCIS and CBP, this work involves different parts of DHS and requires fewer resources as compared to processing inadmissible noncitizens encountered at or near the SWB. Ultimately, the CAM Program provides a safe, legal, and streamlined alternative to irregular migration, and can reunite these children with their families without the cost and strain associated with the care, custody, and processing of UC encountered at the SWB.

*Foreign Affairs Considerations*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents mentioned above that call for a comprehensive, regional approach to migration: the Root Causes Strategy, the CMMS, and the Los Angeles Declaration.

The Root Causes Strategy identifies factors leading to irregular migration and states the importance of discouraging irregular migration and providing opportunities for youth to feel connected to their families and local communities. Its long-term implementation plan includes regional collaboration to "safely and humanely manage migration." [56] The CMMS shares similarly aligned strategies to "strengthen cooperative efforts to manage safe, orderly, and humane migration," and it identifies goals that include addressing humanitarian needs and enhancing access to legal migration pathways when individuals need to migrate for safety or stability. The CMMS acknowledges that the humanitarian situation in NCA countries demands an immediate response in addition to more long-term approaches, and its strategy includes restarting and continuously considering of ways to expand the CAM Program.[57]

The Los Angeles Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [58] Countries that have endorsed the Los Angeles Declaration are committed to implementing programs and policies to promote stability and assistance for communities of destination, origin, transit, and return. These countries commit to respect and ensure the human rights of all migrants and persons in need of international protection, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through countries in the Western Hemisphere. As stated above, these commitments include that of the Administration to increase refugee resettlement from the Americas to the United States by up to as many as 20,000 over the course of Fiscal Years 2023 and 2024.

The CAM Program, including the CAM parole process, serves a significant public benefit because it helps achieve the goals of these three documents by providing a lawful pathway for certain eligible minors and their family members to safely, orderly, and humanely enter the United States as refugees or parolees rather than taking a dangerous irregular journey.

**Process Improvements and Updates**

In 2021, the CAM Program was reopened as part of a "comprehensive regional migration management strategy." [59] The CAM Program reopened in two phases and aimed to reinstitute and improve upon the previous versions.[60] The first phase focused on processing eligible applications that were suspended and closed in 2017, and the second phase allowed for new applications and expanded access through eligibility requirements. The opportunity now exists to introduce enhancements to further unify families and protect children from the dangers of irregular migration.

The following changes better support the CAM Program:

*1. New Procedures for USCIS Parole Determinations for CAM (Under 18)*

USCIS is instituting new procedures regarding certain minor children issued a travel document under the CAM parole process that enables the beneficiary to travel to the United States and seek parole from CBP at a U.S. port of entry.

This FRN notifies the public that, in certain limited cases where the qualifying individual, such as a stepparent, who filed the AOR for a minor child is not that child's biological or adoptive parent or legal guardian, USCIS will, if needed, gather additional information to evaluate whether the child has a biological or adoptive parent or legal guardian in the United States, to verify that individual's relationship to the child, and to confirm their intention to remain available in the United States to provide for the child's care and physical custody if the child

---

date of birth, country of birth and nationality, date(s) of entry and apprehension, place of entry and apprehension, manner of entry, and the UC's current location; (5) Any information concerning whether the child or youth is a victim of trafficking or other crimes; (6) Whether the UC was apprehended with a sibling or other relative; (7) Identifying information and contact information for a parent, legal guardian, or other related adult providing care for the child or youth prior to apprehension, if known; (8) If the UC was apprehended in transit to a final destination, what the final destination was and who the child or youth planned to meet or live with at that destination, if known; (9) Whether the UC is an escape risk, and if so, the escape risk indicators; (9) Any information on a history of violence, juvenile or criminal background, or gang involvement known or suspected, risk of danger to self or others, State court proceedings, and probation; and (10) Any special needs or other information that would affect the care and placement for the child or youth. ORR Unaccompanied Children Program Policy Guide, available at: *https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-1#1.3.*

[56] U.S. Strategy for Addressing the Root Causes of Migration in Central America, available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[57] Collaborative Migration Management Strategy, available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[58] Los Angeles Declaration on Migration and Protection, available at: *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[59] Restarting the Central American Minors Program, U.S. Department of State (Mar. 10, 2021), available at: *https://www.state.gov/restarting-the-central-american-minors-program/.*

[60] Restarting the Central American Minors Program, U.S. Department of State (Mar. 10, 2021), available at: *https://www.state.gov/restarting-the-central-american-minors-program/.*

were paroled into the United States. USCIS will share this information with CBP as part of CAM parole processing in these limited cases. Absent new information or circumstances, CBP may rely upon the information gathered by USCIS about the biological or adoptive parent's or legal guardian's availability to provide for the child's care and physical custody in the United States. This will advance the program's goal of reuniting these children with their families by facilitating direct reunification of minor beneficiaries with their U.S.-based relatives in all appropriate instances.

## 2. Ensuring Fairness for Those Impacted by 2017 Policy Actions

Phase one of the reopening of the CAM Program in 2021 focused on applications that were suspended or closed without an interview when the program was terminated. However, Phase One did not include all CAM Program AORs for which: USCIS interviewed before February 2018, considered eligibility for refugee status, and either refrained from assessing parole eligibility or did not issue a Form I–512L, Authorization for Parole of an Alien into the United States, due to policy decisions in response to directives in the since-revoked E.O. 13767.[61] USCIS is committed to exercising its discretion to ensure fairness for this group of children and their qualifying family members who were not afforded a parole determination or an opportunity to complete parole processing. As a result, they will now be able to pursue parole as a beneficiary of the CAM Program. USCIS will verify eligibility, issue requests for evidence and interview notices if necessary, and determine parole on a case-by-case basis.

## 3. Evidence of Financial Support

In the past, at the time of AOR submission, domestic resettlement agencies collected Form I–134, Affidavit of Support, from qualifying parents or legal guardians who filed AORs that included certain categories of add-on family members, in the event that those individuals were ultimately found ineligible for refugee status and

recommended for parole. Ongoing processing efficiency reviews concluded that the submission of the I–134 at the time of AOR submission slowed intake and created delays. For that reason, in April 2022, the USG decided that the Form I–134, now called the Declaration of Financial Support, would only be requested at the point that an individual was denied refugee status and subsequently considered for parole. This change immediately improved AOR intake capacity, but the Form I–134 continues to create confusion for program participants, leading to delays in processing as families gather documentation of sufficient income or financial resources to complete the form, which is only in English. Collection of the Form I–134, however, is not the sole means of providing evidence of sufficient financial support during the parole period. Therefore, to improve operational efficiency for initial CAM parole considerations where evidence of financial support is required, USCIS will allow financial supporters to provide a sworn statement as an alternative to completing Form I–134, and USCIS may request supporting documentation as needed. (Applications for re-parole under CAM for beneficiaries already in the United States are separate from CAM parole initial processing and will still require a Form I–134 for case processing.)

## 4. Adjusting Eligibility Date and Criteria

On June 15, 2021, DHS and State jointly announced the second phase of the CAM Program reopening, which included extended eligibility to request access to the CAM Program as an additional part of a "multi-pronged approach to address the challenges of irregular migration throughout North and Central America." [62] Eligibility for completing AORs to request access to USRAP for their qualifying children was extended to parents or legal guardians with pending asylum applications or who were victims of crime with pending U visa petitions,[63] filed before May 15, 2021. This eligibility date was established as a cutoff to prevent frivolous filings solely for the purpose of gaining access to the CAM Program.

This date will be updated to extend eligibility to qualifying parents and legal guardians with pending applications for asylum or U visa petitions filed on or before April 11, 2023. Additionally, requestor eligibility will now extend to parents or legal guardians with pending applications for T nonimmigrant status [64] filed on or before April 11, 2023. New applications consistent with these new dates and categories of eligibility are contingent upon the approval of an updated Form DS–7699.

The previous termination of the CAM Program left many families in limbo mid-process, often with unrecoverable expenditures for DNA testing and medical exams, and no safe pathway for their children to travel to the United States. As a result, families lost trust in the CAM Program. With these new procedures, the USG seeks to repair that trust and create goodwill. It will also serve the objectives provided in the Justification and Reasoning section above to allow more individuals access to the CAM Program, while the updated eligibility date will limit eligibility to filings already in existence, thereby safeguarding against frivolous asylum, U, or T visa applications or petitions. Expanding access to the CAM Program in this way and allowing victims of human trafficking to also seek reunification with their children, will serve a larger segment of a vulnerable population who will benefit from this process.[65]

## Consideration of Alternatives

The Administration has considered alternative approaches, including ending the parole component of the CAM Program, continuing to operate it as currently constituted, making some or all of the changes described in this notice, or further expanding eligibility as described in greater detail below, including the benefits and drawbacks associated with each path. As stated throughout this notice, the updates to the parole component of the CAM Program with the changes announced

---

[61] E.O. 13767 stated that "[T]he Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." However, at no point did the Secretary determine that the CAM parole program was inconsistent with or an improper use of this parole authority.

[62] Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program (June 15, 2021), available at: *https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.*

[63] If parents or legal guardians are successful in their cases, they may petition for their children to join them in the United States. The CAM Program offers children an option to await results with their parents or legal guardians in the United States, rather than waiting while separated from them.

[64] T nonimmigrant status (T visa) is an immigration benefit that enables certain qualifying victims of a severe form of trafficking in persons, who generally must assist law enforcement, to remain in the United States. INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T).

[65] Data suggests that expanding the U visa eligibility date may offer CAM Program access to the families of more than 3,000 minor derivatives, and including pending T visa applicants may provide CAM Program access for the families of more than 300 minor beneficiaries. The numerical impact of changing the eligibility date for pending asylum applicants is less precise to predict, although there are tens of thousands of individuals with pending asylum cases filed after May 15, 2021 from CAM countries that might have minor children and could benefit from the CAM Program.

herein provides many more benefits than drawbacks. The Administration has determined that the updates to the CAM parole process benefits the United States in support of overall U.S. migration management strategies. The USG acknowledges that those benefits may be accompanied by potential costs, including those that some states may argue they incur for schools, social services, health care, driver's licenses, and similar services, and the Administration has decided to proceed with this notice and its implementation.[66]

As mentioned above, on August 16, 2017, the Acting Secretary of Homeland Security announced the termination of the parole component of the CAM Program through an FRN that characterized the termination as a "discretionary change in policy" to stop automatically considering for parole those found ineligible for refugee status under USRAP processing, accessed via the CAM Program. In other words, the change was the result of a new policy choice, and not a perceived inconsistency of the program with the parole statute or regulations.

When the United States decided to restart the CAM Program in 2021, it decided, as a matter of policy, to include an option for case-by-case consideration for parole for CAM Program beneficiaries. While considering subsequent improvements to the CAM Program for this Notice, the Administration evaluated several additional provisions. It considered whether to remove parole and decided that to meet the goals of providing safety and stability for children whose parents and legal guardians have immigration status or pending cases in the United States, parole needed to remain an option for CAM Program beneficiaries for the urgent humanitarian and significant public benefit reasons described above. The Administration considered including an advance parole provision for CAM Program process beneficiaries in the United States that need to depart and seek parole back into the United States. It also determined that CAM parole process beneficiaries may apply for advance parole in the same manner and under the same eligibility criteria as other individuals and additional guidance is not necessary. Additionally, the Administration considered expanding eligibility by eliminating eligibility dates for pending asylum, T visa, and U visa applicants and petitioners, and also considered announcing eligibility dates that would take effect at a later date, with a future form revision. The Administration has decided on eligibility dates that will take immediate effect based on this notice's publication date because immediate effectiveness forwards the policy objectives described throughout this notice and reserves additional changes for possible future revisions or enhancements. Finally, the Administration considered expanding the CAM Program to allow additional family members to qualify as beneficiaries. It has decided not to expand in this way due to challenges in verifying extended family relationships and a determination that the current eligible beneficiaries are closely connected to children and sufficient to provide the stability and support children need.

The parole component of the CAM Program offers an additional safe, lawful, and orderly alternative to irregular migration for the eligible population, and promotes family unity. The CAM parole process also helps to relieve pressure on the SWB, reduces the strain on U.S. Government resources, and saves lives. This enhanced CAM parole process may further discourage irregular migration and allow children to safely reunite with their families in the United States.

Additional information about the CAM Program, including the parole component, is available on the USCIS website at: *www.uscis.gov.*

## Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* the Departments are merely adopting a general statement of policy,[67] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [68] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[69] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [70] In addition, although under the APA invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that notice-and-comment procedures may result in "definitely undesirable international consequences," [71] some courts have required such a showing. This process satisfies both standards.

As described above, this process is a key component of regional migration strategies and is responsive to requests that the United States expand lawful pathways. The CMMS of 2021 identifies intra-governmental Federal strategies to address regional migration, including expanding the CAM Program. The following year, the United States was able to focus on cooperative strategies with foreign partners. In the Ninth Summit of the Americas in June 2022, countries in the Western Hemisphere, including the United States, made significant commitments in connection with the Los Angeles Declaration, including expanded access to regular pathways. As part of efforts to promote access to regular pathways, DHS and State have expanded refugee processing in Central America.[72] Therefore, the

---

[66] Estimating the fiscal effects associated with CAM parole would be extremely challenging, especially due to State and local governments' control over their budgets. A 2017 National Academies of Sciences, Engineering, and Medicine (NAS) Report, authorized by an expert panel of immigration economists, canvassed studies of the fiscal impacts of immigration as a whole, and it described such analysis as extremely challenging and dependent on a range of assumptions. The Economic and Fiscal Consequences of Immigration, NAS (2017), *https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration,* at 28. The fiscal impacts of CAM parole to State and local governments would vary based on a range of factors, such as the characteristics of the CAM parolee population within a particular jurisdiction at a particular time and local economic conditions and local rules governing eligibility for public services. These costs will depend on choices made by States and will be location specific and, therefore, difficult to quantify let alone predict. Moreover, any estimate would also need to account for the fact that minors who would migrate irregularly to the United States in the absence of the availability of CAM parole would likely also incur these costs. DHS also notes the small size of the CAM parolee population relative to any given jurisdiction's overall population. In short, DHS acknowledges that though CAM parole may result in some indirect fiscal effects on State and local governments (both positive and negative), such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments.

[67] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[68] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[69] 5 U.S.C. 553(a)(1).

[70] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[71] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[72] The United States continues these efforts by pursuing the use of new technologies and processes
Continued

parole component of the CAM Program contributes to the broader USG strategy of providing lawful pathways to individuals who may otherwise be driven to travel to the United States through irregular means due to instability in their home countries and their desire to reunite with family members already in the United States.

Immediate implementation of the process announced in this notice also supports DHS discussions and negotiations about migration management and is fully aligned with larger and important foreign policy objectives of this Administration. Prompt implementation will advance the Administration's foreign policy goals by demonstrating U.S. partnership and commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships in the region.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*

**Antony J. Blinken,**
*Secretary of State.*

[FR Doc. 2023–07592 Filed 4–7–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7070–N–19]**

### 30-Day Notice of Proposed Information Collection: Capital Needs Assessment of Public Housing; OMB Control No.: 2528–New Collection

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* May 11, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/*

*PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email Anna Guido at *PaperworkReduction ActOffice@hud.gov,* telephone 202–402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.* Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on September 7, 2022 at 87 FR 54709.

### A. Overview of Information Collection

*Title of Information Collection:* Capital Needs Assessment of Public Housing.

*OMB Approval Number:* 2528–New; pending.

*Type of Request:* New collection.

*Form Number:* N/A.

*Description of the need for the information and proposed use:* The Office of Policy Development and Research at the U.S. Department of Housing and Urban Development (HUD) is proposing the collection of information for the *Capital Needs Assessment of Public Housing.*

Public housing serves the housing needs of low- and very-low-income households, including needy families, the elderly, and the disabled. In the United States, public housing is owned and managed by public housing authorities (PHAs), which are units of state and local government. Public housing is nonetheless heavily subsidized and regulated by HUD's Office of Public and Indian Housing through the Operating Fund, Capital Fund, and other means. The capital needs of public housing have a direct

bearing on HUD's Capital Fund budget and its support to PHAs for using alternative means of financing to meet those needs.

The number of public housing developments and units in the United States and the number of PHAs that own and manage public housing developments and units have changed over time. According to the most recent HUD data, there are 2,780 PHAs that own and manage 940,330 units in 6,523 public housing developments.

The public housing Capital Fund provides funds for the capital and management activities of PHAs as authorized under section 9 of the Housing Act of 1937 (42 U.S.C. 1437g) (the Act). Capital needs are defined by section 9(d)(1) of the Act, as codified at 24 CFR part 905, with Section 200 listing eligible activities. These activities include, among others, the development, financing, and modernization of public housing, vacancy reduction, nonroutine maintenance, and planned code compliance. This work is intended to bring each PHA's projects up to applicable modernization and energy conservation standards.

This **Federal Register** Notice provides an opportunity to comment on the information collection for the capital needs assessment (CNA) of public housing.

After OMB approval of the Paperwork Reduction Act package, HUD and its contractor will administer a web-based survey to a sample of approximately 300 PHAs to collect data on their CNA estimates, their practices to arrive at those estimates, and their use of those estimates.

After analyzing the data from the first survey of PHAs, HUD and its contractor will administer a second web-based survey of another 500 PHAs. This survey will ask many of the same questions as the first survey. Both surveys will provide data that, when combined with HUD's other data sources, will be used to estimate the capital needs of public housing following an iterative and duplicable approach.

Both surveys also include questions about the processes that PHAs use to assess their capital needs. Based on responses to those questions, the study will assess PHAs' processes to see how they compare to in-person data collection methods used in previous CNAs and industry best practices.

The purpose of this assessment is to better understand if a non-inspection-

---

capabilities. It is also seeking to continue increasing USRAP processing capacity in Central America.

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103 and 214**

**[DHS No. ICEB–2017–0003]**

**RIN 1653–AA74**

**Adjusting Program Fees for the Student and Exchange Visitor Program**

**AGENCY:** U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This rule adjusts the Student and Exchange Visitor Program (SEVP) school certification petition fees and the application fees for nonimmigrants seeking to become students (F visa) or vocational (M visa) students, or exchange visitors (J visa). The rule sets the following fees: $3,000 for a school certification petition; $655 for each school site visit; $1,250 to submit a school recertification petition; and $675 to submit an appeal or motion following a denial or withdrawal of a school petition. The rule also sets new fees for filing the Form I–901 at $350 for each F or M nonimmigrant student applicant and a $220 for most J exchange visitor applicants; however, the existing $35 fee for each J nonimmigrant exchange visitor seeking admission as an au pair, camp counselor, or summer work/travel program participant will remain the same. All fee payments addressed in this final rule must be made in the amounts established by this rule beginning June 24, 2019.

**DATES:** This final rule is effective June 24, 2019.

**FOR FURTHER INFORMATION CONTACT:**
Sharon Snyder, Unit Chief, Student and Exchange Visitor Program; U.S. Immigration and Customs Enforcement, Department of Homeland Security; 500 12th Street SW, Washington, DC 20536; 703–603–3400, sevp@ice.dhs.gov. This is not a toll-free number. Program information can be found at http:// www.ice.gov/sevis/.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of Regulatory Action
  B. Summary of Major Provisions of Final Rule
  C. Costs and Benefits
II. Background
  A. The 2018 NPRM and Purpose of the Rule
  B. Authority To Collect Fees
III. Adjustment of SEVP Fees
  A. Basis for Fee Schedule
  B. SEVP Baseline Costs and Fees
  C. Methodology
    1. ABC Approach
    2. Full Cost
    3. Cost Basis for SEVP Fees Based on Current Services
  D. Summary of the Full Cost Information
    1. Fee Allocation
    2. SEVP FY 2019 and FY 2020 Cost Model Result
    3. Fee Calculations
    4. Fee Levels
IV. Technical Corrections to the Proposed Rule
V. Public Comments on the Proposed Rule
  A. General Comments
  B. Comments on Timing of Fee Increase
  C. Comments on Enhancements
    1. SEVIS Modernization
    2. Increased SEVP Adjudication Personnel
  D. Comments on Specific Fees
    1. Fee for F, M and J Nonimmigrants
    2. Impacts on Specific Applicant Groups
    3. Continued Fee of $35 for Au Pairs, Camp Counselors and Summer Work Travel
    4. Recertification Fee
    5. Site Visit Fee
VI. Statutory and Regulatory Requirements
  A. Executive Orders 12866, 13563, and 13771: Regulatory Review
    1. Background and Purpose of the Rule
    2. Impacts of Regulatory Change
    3. Alternatives to Regulatory Change
  B. Regulatory Flexibility Act
    1. Final Regulatory Flexibility Analysis
    2. A Statement of the Need for, and Objective of the Rule
    3. A Statement of Significant Issues Raised by the Public Comments
    4. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of SBA
    5. A Description and an Estimate of the Number of Small Entities
    6. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule
    7. A Description the Agency Has Taken To Minimize the Significant Economic Impacts
  C. Unfunded Mandates Reform Act
  D. Congressional Review Act
  E. Executive Order 13132: Federalism
  F. Executive Order 12988: Civil Justice Reform
  G. Energy Effects
  H. Environment
  I. Paperwork Reduction Act

## Table of Abbreviations and Acronyms

ABC   Activity Based Cost/Costing
CFO   Chief Financial Officer
CTCEU   Counterterrorism and Criminal Exploitation Unit
DHS   Department of Homeland Security
DOS   Department of State
DSO   Designated School Official
EBSVERA   Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107–173; May 14, 2002
FASAB   Federal Accounting Standards Advisory Board
FISMA   Federal Information Security Management Act
Form I–17   Petition for Approval of School for Attendance by Nonimmigrant Student
Form I–901   Fee Remittance for Certain F, J and M Nonimmigrants
Form I–290B   Notice of Appeal or Motion
HSPD–2   Homeland Security Presidential Directive–2
ICE   U.S. Immigration and Customs Enforcement
IEFA   Immigration Examinations Fee Account
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended
INA   Immigration and Nationality Act of 1952, as amended
MD   Management Directive
NEPA   National Environmental Policy Act of 1969
NPRM   Notice of Proposed Rulemaking
OMB   Office of Management and Budget
PDSO   Principal Designated School Official
RFA   Regulatory Flexibility Act
SEVIS   Student and Exchange Visitor Information System
SEVP   Student and Exchange Visitor Program
SFFAS   FASAB Statement of Federal Financial Accounting Standard
UMRA   Unfunded Mandates Reform Act of 1995
USCIS   U.S. Citizenship and Immigration Services

## I. Executive Summary

### A. Purpose of Regulatory Action

The Department of Homeland Security (DHS) is adjusting its fee schedule for nonimmigrant students and exchange visitors as well as for petitioning and certified schools. These fees are associated with SEVP and the Student and Exchange Visitor Information System (SEVIS). They were last adjusted in 2008. See 73 FR 55683 (Sept. 26, 2008).

SEVP, an ICE component, is funded entirely on fees charged to individual applicants and organizational petitioners. Fees collected from individuals and organizations are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the operational costs associated with SEVP and its management of SEVIS. See Immigration and Nationality Act (INA) section 286(m), as amended, 8 U.S.C. 1356(m), and Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, (IIRIRA) section 641(e), (g), 8 U.S.C. 1372(e), (g).

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990, 31 U.S.C. 901–903 (CFO Act), and the Office of Management and Budget (OMB) Circular A–25, SEVP reviews its associated fees that are deposited into the IEFA biennially and, if necessary, proposes adjustments to ensure recovery of costs necessary to meet national security, customer service, and adjudicative processing goals. SEVP completed a biennial fee review for

fiscal year (FY) 2016 and FY 2017 in 2017. The projected results indicated that fee levels were insufficient to recover the full cost of current and planned program activities. Section 286(m) of the INA, 8 U.S.C. 1356(m), provides that DHS may set fees for adjudication and naturalization services at a level that would ensure recovery of the full costs of providing such services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants. Additionally, section 641 of IIRIRA, 8 U.S.C. 1372, authorizes DHS to periodically revise fees that cover the cost of carrying out SEVP and maintenance of SEVIS. Pursuant to these laws, DHS is implementing the adjustments contained in this rule.

SEVP has calculated the totality of its operating costs to set fees that fully recover such costs. Following its biennial fee review, SEVP anticipated that if it continued to operate at previous fee levels, it would experience a revenue shortfall. At previous fee levels, SEVP's expenditures exceeded revenues, without any service upgrades. The deficit had been covered by surplus revenue that was previously accumulated from 2009 to 2015. As a consequence of multiple factors, including inflation, costs associated with SEVIS enhancement, complying with a two-year recertification cycle of schools, increased demand for program and investigatory services, and increased litigation related to administrative enforcement and regulatory actions, the surplus is expected to be exhausted in FY 2019 even without any further service upgrades. The projected shortfall poses a risk of degrading operations and services funded by fee revenue. The fee increases in this final rule will allow SEVP to cover the current deficit between revenue and expenditures plus make necessary service upgrades. The fee levels thus eliminate the risk of degrading operations, while also ensuring full cost recovery by providing fees for each specific benefit that will more adequately recover the cost associated with administering the benefit.

### B. Summary of Major Provisions of the Final Rule

This rule adjusts, institutes, and clarifies the application of fees pertaining to services SEVP provides to reflect existing and projected operating costs, program requirements, and continued planned program improvements, in the following manner:

• Increases the two types of individual nonimmigrant student and exchange visitor application fees, specifically the F and M fee for Form I–901, "Fee Remittance for Certain F, J and M Nonimmigrants," to $350 and the Form I–901 Full J fee to $220;

• Increases the SEVP school certification petition fee for initial certification to $3,000;

• Imposes a fee of $1,250 when a school files a petition for recertification of its existing SEVP certification;

• Imposes a $675 fee to accompany the filing of a Form I–290B, Notice of Appeal or Motion, when a school appeals or files a motion to reconsider or reopen a denial or withdrawal of its SEVP certification; and

• Maintains the $655 fee for a site visit at its current level, but clarifies that, with the effective date of the rule, SEVP is exercising its current regulatory authority to charge the site visit fee when a certified school changes its physical location or adds a new physical location or campus on its Form I–17, Petition for Approval of School for Attendance by Nonimmigrant Student.

In making these changes, the rule allows SEVP to fully fund activities included in this cost model and institute critical near-term program and system enhancements in a more equitable manner through a fairer balance of the recovery of SEVP operational costs between beneficiary classes. A summary of the current and future fee structures is provided in Table 1 below.

### C. Costs and Benefits

With this final rule, SEVP will adjust fees to the amounts listed in Table 1:

**Table 1: Current and Final Fee Amounts**

| Fee Type | Current Fee | Final Fee | Incremental Fee Adjustment |
|---|---|---|---|
| I-901 F/M | $200 | $350 | $150 |
| I-901 J-Full | $180 | $220 | $40 |
| I-901 J-Partial | $35 | $35 | $0 |
| I-17 Initial Certification | $1,700 | $3,000 | $1,300 |
| I-17 Recertification | $0 | $1,250 | $1,250 |
| Site Visit – initial | $655 | $655 | $0 |
| Site Visit – new location | $0 | $655 | $655 |
| Appeal Fee | $0 | $675 | $675 |

SEVP expects to have a total annual increase in fees of $75.2 million in FY 2019 transferred from individuals and entities for the services they receive. Table 2 shows the summary of the total annual number of payments, incremental fee amounts, and total fees projected for FY 2019. This increase in fees will allow SEVP to not only maintain its current level of service but also enhance SEVP's capability to support national security and counter immigration fraud through the continued development and implementation of critical system and programmatic enhancements. Enhancements to SEVIS, including the establishment of a student portal, will assist designated school officials (DSOs) in their regulatory obligation to provide accurate and timely information and will also rebalance this reporting requirement by providing students an automated means to update their information. Increased numbers of adjudication personnel will assist in reducing the processing times for initial petitions, updates, and recertifications, while enhanced vetting protocols will ensure that only those nonimmigrant students who are eligible to enter and remain in the country do so.

### Table 2: Annual Final Incremental Fee Amounts, FY 2019

|  | Projected Number of Payments | Final Incremental Fee Amounts | Annual Incremental Fees Transfer to Government |
|---|---|---|---|
| **I-901 F and M** | 418,393 | $150 | $62,758,950 |
| **I-901 J-Full** | 157,550 | $40 | $6,302,000 |
| **I-17 Initial Certification** | 426 | $1,300 | $553,800 |
| **I-17 Recertification** | 4,373 | $1,250 | $5,466,250 |
| **Site Visits – initial** | 426 | $0 | $0 |
| **Site Visits – new location** | 174 | $655 | $113,970 |
| **Appeals** | 54 | $675 | $36,450 |
| **Total** |  |  | $75,231,420 |

## II. Background

### A. The 2018 NPRM and Purpose of the Rule

On July 17, 2018, DHS published a Notice of Proposed Rulemaking (NPRM) to amend the fees charged by SEVP. 83 FR 33762. This final rule implements those proposed changes by amending DHS regulations governing the fees charged by SEVP to F and/or M nonimmigrant students, schools that enroll such students, and fees charged to J nonimmigrant exchange visitors.

SEVP helps ensure the integrity of the U.S. immigration system by collecting, maintaining, and analyzing information so only legitimate nonimmigrant students and exchange visitors gain admission into the United States under these programs, and by ensuring that the institutions accepting them are certified and follow the rules that govern them. The information collected by SEVP and compliance investigations conducted on students and educational institutions support other law enforcement activities within ICE.

The rule adjusts the SEVP school certification fee and implements a recertification fee, increases student and exchange visitor application fees (Form I–901 fees), and imposes a fee for a Form I–290B filed with SEVP, to reflect existing program operating costs, program requirements, and planned program enhancements. DHS maintains the fee for an initial school site visit at the current level, but clarifies that, with the effective date of the rule, DHS will exercise its current regulatory authority to charge the site visit fee not only when a certified school changes its physical location, but also when it adds a new physical location or campus. The rule sets the fee for an initial school certification petition at $3,000 and the fee for each site visit at $655. It sets a $1,250 fee for a school recertification

petition and a $675 fee to submit an appeal or motion following a denial or withdrawal of a school certification. Further, it sets the fee for each F or M student at $350. The rule sets the fee for certain J exchange visitors at $220 and maintains the fee for exchange visitors seeking admission as au pairs, camp counselors, and summer work/travel program participants at $35. All fee payments addressed in this final rule must be made in the amounts established by this rule beginning June 24, 2019.

These fee adjustments are driven by two factors: The need to comply with statutory and regulatory requirements that SEVP review its fee structure biennially to ensure that the cost of the services that are provided by SEVP are captured by fees assessed on those receiving the services, and the need to enhance SEVP's capability to achieve current programmatic goals to support national security and counter immigration fraud through the development and implementation of critical system and programmatic enhancements. Enhancements to SEVIS, including the establishment and further expansion of a student portal, will assist designated school officials (DSOs) in their regulatory obligation to provide accurate and timely information and will also rebalance this reporting requirement by providing students an automated means to update their information. ICE continues to examine programmatic goals and refine its cost projection model. Future fee reviews may capture additional includable costs, such as additional enforcement costs generated by SEVP information or compliance investigations.

The rule ensures the full recovery of SEVP operational costs in a manner that fairly allocates costs between beneficiary classes and facilitates the

development of activities designed to achieve defined program goals. These include new initiatives critical to improving homeland security through enhanced vetting of SEVIS users, increased adjudication personnel, and SEVIS modernization.

### B. Authority To Collect Fees

The Secretary is specifically authorized to collect fees for SEVP from prospective F and M nonimmigrant students and J nonimmigrant exchange visitors, subject to certain limits for certain J–1 nonimmigrants. 8 U.S.C. 1372(e)(1). The Secretary is authorized to periodically revise those fees, with certain exceptions, to take into account changes in the overall cost of carrying out the program. IIRIRA section 641(e)(4)(A), (g)(2), 8 U.S.C. 1372(e)(4)(A), (g)(2). Similarly, section 286(m) of the INA authorizes the Secretary to collect fees for adjudication and naturalization services at a level that would ensure recovery of the full costs of providing such services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants. Additionally, pursuant to INA section 286(m), the level that is set may include recovery of any additional costs associated with the administration of the fees themselves. Under this authority, user fees are employed not only for the benefit of the payer of the fee and any collateral benefit resulting to the public, but also to provide a benefit to certain others.[1]

---

[1] DHS has interpreted section 286(m), including its authorization for DHS to collect "full costs" for providing "adjudication . . . services," as granting DHS broad discretion to charge fees at a level that will ensure recovery of *all* direct and indirect costs associated with providing pertinent immigration adjudication services. This interpretation is also consistent with the SEVP-specific fee authority referenced above, which authorizes DHS to set fees

All fees collected under these authorities are deposited as offsetting receipts into the IEFA and remain available to the Secretary until expended for authorized purposes. *See* IIRIRA section 641(e)(4)(B), 8 U.S.C. 1372(e)(4)(B); INA section 286(m), 8 U.S.C. 1356(m). DHS is implementing the fee schedule contained in this rule in accordance with the above-referenced authorities.

As a general matter, in developing fees and fee rules, DHS looks to a range of governmental accounting provisions, including OMB Circular A–25, User Charges (revised). *See* 58 FR 38142 (July 15, 1993). Section 6 of OMB Circular A–25 defines "full cost" to include all direct and indirect cost to any part of the federal government for providing a good, resource, or service. For the purposes of this rulemaking, DHS considers "full cost" to mean the cost of all activities related to individual and organizational compliance issues within the jurisdiction of SEVP that DHS included in the cost model. These activities include the cost of investigating the compliance of schools participating in SEVP and exchange visitor programs, as well as investigations in which F, M, or J nonimmigrants are identified as

potential threats to national security or where it is suspected that an immigration violation or fraud may be occurring. DHS also considers OMB Circular A–11, Preparation, Submission and Execution of the Budget, section 51.13 (June 29, 2018), which states that budget requests should reflect the results of the biennial review of existing user charges and of the potential for establishing user charges, under OMB Circular A–25. This final rule adjusts fees in order to recover the cost of services provided by SEVP.

In addition, DHS considers the Federal Accounting Standards Advisory Board (FASAB) Statement of Federal Financial Accounting Standards (SFFAS) No 4: Managerial Cost Accounting Concepts and Standards for the Federal Government, July 31, 1995, updated June 2018, which provides federal government standards regarding managerial cost accounting and full cost recovery. SFFAS No. 4 defines "full cost" to include "direct and indirect costs that contribute to the output, regardless of funding sources." [2] FASAB identifies various classifications of costs to be included and recommends various methods of cost assignment to identify full cost. Activity-based costing (ABC) is highlighted as a costing methodology

useful to determine full cost within an agency. The Chief Financial Officers Act of 1990, 31 U.S.C. 901–903, requires each agency's Chief Financial Officer (CFO) to "review, on a biennial basis, the fees, royalties, rents and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect cost incurred by it in providing those services and things of value." 31 U.S.C. 902(a)(8). This final rule reflects consideration of these federal sector financial and accounting standards.

### III. Adjustment of SEVP Fees

#### A. Basis for Fee Schedule

As discussed in the NPRM, the new fees are based on estimates of funding needed to maintain and enhance SEVP's capability to achieve programmatic goals associated with its statutory mandate, including supporting national security and countering immigration fraud through the continued development and implementation of critical system and programmatic enhancements. This rule establishes the following fee structure detailed in Table 3.

### Table 3: Fee Structure

| Fee Type | Responsible Party |
|---|---|
| I-901 Fee | Student or exchange visitor issued an initial Form I-20 or DS-2019 seeking an F, M, or J visa |
| I-17 School Certification Fee | Institutions petitioning for SEVP certification to enroll international students |
| Site Visit Fee | Institutions applying for initial certification or certified schools changing locations or adding a campus/location |
| I-17 School Recertification Fee | Certified institutions seeking recertification every two years |
| Appeal or Motion Fee | Institutions that have had certification or recertification denied by SEVP, including denied I-17 updates, or that have had certification withdrawn, and which are filing an appeal or motion regarding the SEVP decision |

The current fee structure includes the Form I–901 fee, I–17 school certification fee, and the site visit fee. By introducing fees for other services, this final rule allows SEVP to fully fund activities

included in the cost model and institute critical near-term program and system enhancements in a more equitable manner. The new fee structure also includes the addition of a recertification

fee and a fee for filing an appeal or motion.

With this rule, SEVP imposes a fee for filing an appeal using Form I–290B that is similar to the current fee for appeals

---

at a level that funds the full cost of conducting the program. *See* IIRIRA section 641(e), 8 U.S.C. 1372(e). The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-

exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 81 FR 26903, 26906 n.10 (May 4, 2016).

[2] *See* FASAB, Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts 26 (June 2018), *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (last visited Oct. 26, 2018).

filed with U.S. Citizenship and Immigration Services (USCIS) using Form I–290B. *See* 8 CFR 103.7(b)(1)(i)(S) (listing the fee for appealing a decision over which the Board of Immigration Appeals does not have appellate jurisdiction). DHS also eliminates regulations that currently state there is no fee required for an appeal by a school, to maintain consistency and to more fairly balance allocation of the recovery of SEVP operational costs between beneficiary classes. Under this final rule, SEVP charges the fee for all appeals and motions.

This rule ensures the recovery of SEVP operational costs in a manner that fairly allocates costs between beneficiary classes and facilitates the development of activities designed to achieve defined program goals. For example, the rule continues funding for critical SEVIS modernization efforts and incorporates the added cost of increased analytical support for investigative operations into the Form I–901 fee. The fee schedule will provide the necessary revenue for SEVP to fund approximately 20 additional SEVP adjudication personnel, including approximately 15 new frontline adjudicators. The additional adjudicators are intended to cover site visits which are authorized under a 2016 final rule,[3] augment out-of-cycle review teams, and reduce times for recertifications, updates, and initial applications.

### B. SEVP Baseline Costs and Fees

SEVP fees are paid by individuals and organizations. DHS certifies schools that enroll F and M students; recertifies schools with active certifications; conducts site visits; administers, maintains, and develops SEVIS; collects fees from prospective F and M nonimmigrant students and J nonimmigrant exchange visitors, as well as from schools; adjudicates motions and appeals in regard to certification petitions; undertakes investigatory initiatives; and provides overall guidance to schools about program enrollment and compliance, as well as the use of SEVIS. These activities are funded solely through the collection of fees.

The Form I–901 fee, collected from students and exchange visitors, currently underwrites the operation of SEVP; the cost of administering, maintaining, and developing SEVIS; the cost of school recertification; and all activities related to individual and organizational compliance issues within the jurisdiction of SEVP. These activities include the cost of

investigating the compliance of schools participating in SEVP and exchange visitor programs, as well as investigations in which F, M, or J nonimmigrants are identified as potential threats to national security or where it is suspected that an immigration violation or fraud may be occurring.

The certification fee is paid by schools that petition for the authority to issue Certificates of Eligibility (COE), commonly referred to as Forms I–20, to prospective nonimmigrant students for the purpose of their applying for F or M visas and admission to the United States in those statuses. These monies fund the base internal cost for SEVP to process and adjudicate the initial school certification petition (Form I–17). The recertification fee paid by schools to remain certified partially funds the cost of adjudicating the recertification petition.

If SEVP finds that a petitioning or certified school does not meet regulatory standards, it will deny the affected school's Form I–17 or withdraw its SEVP certification. 8 CFR 214.4. When SEVP sends a school a notice of denial or withdrawal, the notice also includes reasons for the unfavorable decision(s), an explanation of the school's rights, and the applicable appeal and motion filing information and deadlines. In many cases, a school may file an appeal or motion to reopen and/or reconsider unfavorable decisions issued by SEVP by filing the Form I–290B pursuant to the process set forth in 8 CFR 103.3(a) or 103.5(a).[4] A school may initiate a motion to reopen or reconsider to request that the original deciding body review the unfavorable decision, including an appeals decision, pursuant to requirements in 8 CFR 103.5(a). A school may also initiate an appeal in order to request review of the unfavorable Notice of Denial, Automatic Withdrawal, or Withdrawal on Notice by an authority independent of the original deciding body. Currently, DHS uses Form I–901 funds to offset the costs of SEVP appeals and motions. As noted in the proposed rule, DHS believes that the introduction of an appeal fee will result in a more equitable distribution of costs. Although DHS declined to introduce such a fee in 2008, DHS believes that given the costs of the appeal process and the increase in the I–901 fee, it is appropriate to establish an appeal fee at this time. With this rule, DHS removes the SEVP-related

exceptions to the payment of the Form I–290B fee and amending regulatory text at 8 CFR 103.7(b)(1)(ii)(O) providing for the fee of $675 when the Form I–290B is filed with SEVP. This fee applies when schools or institutions file an appeal or motion with regard to a denied petition for initial certification or recertification or a withdrawal of certification.

With these regulatory changes for the Form I–290B filing fee, DHS more fairly balances allocation of the recovery of SEVP operational costs among beneficiary classes. To date, the cost of adjudicating appeals and motions has never been placed directly upon the beneficiaries of those adjudications—the schools seeking to obtain or maintain SEVP certification. The fee for filing the Form I–290B with SEVP is set at a level that requires those who file the Form I–290B to pay for at least a portion of the operating expenses for DHS to adjudicate the Form I–290B, while preventing the fee from becoming cost-prohibitive.

The site visit fee is currently paid by schools that petition for certification to issue Forms I–20 or by a certified school when it physically moves to a new location. DHS established this fee in the 2008 Fee Rule and with that rule codified SEVP's authority to charge the fee when a school changes its physical location or adds a new physical location or campus. *See* 8 CFR 103.7(b)(3)(ii)(B), 8 CFR 214.3(h)(3)(i), (ii). Specifically, the 2008 Fee Rule imposed a site visit fee of $655 for each location listed on the Form I–17, and required the Form I–17 to include "any physical location in which a nonimmigrant can attend classes through the school (*i.e.,* campus, extension campuses, satellite campuses, etc.)." *See* 73 FR 55683, 55698–55699 (amending 8 CFR 103.7(b)(3)(ii)(B) and 214.3(a)(1), respectively). The 2008 Fee Rule also imposed a continuing duty on schools to update school locations as changes arise, *i.e.,* even after initial certification, a school must update SEVIS within 21 days of a change to a range of information types, including school location and campus location. *See* 73 FR 55683, 55700 (amending 8 CFR 214.3(g)(2), (h)(3)). Consistent with the aforementioned regulatory amendments, the preamble to the 2008 Fee Rule made clear that these provisions require the imposition of a site visit fee for each location listed on the initial SEVP certification, as well as each location added as part of an initial event, such as a SEVIS update requesting approval of a changed or new location or campus. 73 FR 55683, 55691.

SEVP will begin collecting the fee when a certified school adds a new physical location or campus following

---

[3] *See* 81 FR 13039 (Mar. 11, 2016).

[4] Form I–290B is managed by USCIS and not ICE. USCIS has agreed to the use of the form by ICE for SEVP appeals and the use has been approved by OMB under control number 1615–0095.

the effective date of this final rule. The site visit fee applies when a certified school updates its Form I–17 in SEVIS to indicate, pursuant to 8 CFR 214.3(h)(3)(ii), it is changing its physical location or adding a new physical location or campus. This revenue assists in recovering the costs DHS incurs for site visits of these locations, including collecting evidence on school eligibility for certification, reviewing the facilities, and interviewing personnel nominated on the petition to become DSOs, including the person nominated to be the Principal Designated School Official (PDSO).

*C. Methodology*

SEVP captured and allocated cost using an ABC approach to define full cost with regards to current SEVP activities and planned enhancements, outline the sources of SEVP cost, and define the fees. The ABC approach also provides detailed information on the cost and activities allocated to each fee.

1. ABC Approach

SEVP used CostPerform ABC modeling software, Version 9.3 (0147), to determine the full cost associated with updating and maintaining SEVIS to collect and maintain information on F, M, and J nonimmigrants; certifying schools; overseeing school compliance; recertifying schools; adjudicating appeals; investigating suspected violations of immigration law and other potential threats to national security by F, M, or J nonimmigrants; providing outreach and education to users; and performing regulatory and policy analysis. SEVP also used the model to identify management and overhead costs associated with the program.

ABC is a business management methodology that links inputs (cost) and outputs (products and services) by quantifying how work is performed in an organization (activities). The ABC methodology allows fee-funded organizations to trace service costs and to calculate an appropriate fee for the service, based on the cost of activities associated with the services for which the fee is levied.

Using the ABC methodology, SEVP identified and defined the activities needed to support SEVP functions to include current and future initiatives.

SEVP captured the full cost of operations for current activities and planned enhancements and apportioned that full cost to the appropriate program activities. The full cost of each activity is then assigned to the appropriate fee category based on the nature of the activity, as described further below. By tracking costs to the various fee categories, SEVP was able to use forecasted payments to determine the appropriate fee amount for each fee type. SEVP examined historical data and performed statistical payment analysis to forecast payments in future years.

SEVP used an independent contractor and commercially available ABC software to compute the fees. The structure of the software was tailored to SEVP needs for continual and real-time fee review and cost management.

2. Full Cost

In building the ABC model, it was critical for SEVP to identify the sources and cost for all elements of the program, including all activities related to individual and organizational compliance issues within the jurisdiction of SEVP. These activities include the cost of investigating the compliance of schools participating in SEVP and exchange visitor programs, as well as investigations in which F, M, or J nonimmigrants are identified as potential threats to national security or where it is suspected that an immigration violation or fraud may be occurring. Consistent with instructive legislative and regulatory guidance, SEVP fees recoup the full cost of providing SEVP's overall resources and services.[5] The amended fees are calculated to recoup the cost of current SEVP operations, including planned enhancements detailed in the NPRM.

To the extent applicable, SEVP used the cost accounting concepts and

standards recommended in the FASAB Handbook, Version 15, "Statement of Financial Accounting Standards Number 4, Managerial Cost Accounting Concepts and Standards for the Federal Government" (2016). FASAB Standard Number 4 sets the following five standards as fundamental elements of managerial cost accounting: (1) Accumulate and report cost of activities on a regular basis for management information purposes, (2) establish responsibility segments and match the cost of each segment with its outputs, (3) determine the full cost of government goods and services,[6] (4) recognize the costs of goods and services provided among federal entities, and (5) use appropriate costing methodologies to accumulate and assign costs to outputs.

SEVP calculates projected fees using the full cost of SEVP current activities and planned enhancements, as defined by a regularly updated spend plan. The projected spend plans for FY 2019 and FY 2020 were used in calculation of SEVP's new fee structure. Tables 4 through 7 detail the full cost of SEVP operations, consistent with the spend plan, from various perspectives: By program category, by cost initiative, by fee type, and by activity.

As with the previous fee adjustment in 2008, the goal of ICE compliance efforts is to achieve full compliance with F, M, and J nonimmigrant regulations by institutions participating in these programs and to prevent any abuse of SEVP for criminal purposes. Through consistent and expanded enforcement of SEVP requirements, the integrity of the F, M, and J nonimmigrant student and exchange visitor programs within the United States is better maintained. ICE continues to examine programmatic goals and refine its cost projection models. Future fee reviews may capture additional includable costs, such as additional enforcement costs for activities resulting from SEVP information or related compliance investigations.

[5] These include but are not limited to: Direct and indirect personnel cost, including salaries and fringe benefits, such as medical insurance and retirement; retirement cost, including all (funded or unfunded) accrued cost not covered by employee contributions, as specified in OMB Circular A–11; overhead, consulting, and other indirect cost, including material and supply cost, utilities, insurance, travel, as well as rents or imputed rents on land, buildings, and equipment; management and supervisory cost; and cost of enforcement, collection, research, establishment of standards, and regulation.

[6] Full cost includes the costs associated with resources that directly or indirectly contribute to the output and supporting services within the entity and from other entities.

**23936**     **Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

3. Cost Basis for SEVP Fees Based on Current Services

The FY 2019 and FY 2020 budgets provide the cost basis for the fees. These budgets reflect the required revenue to sustain current initiatives. The revenue is also assessed to ensure a sufficient level of continued funding for program enhancements as discussed above, such as enhanced vetting and investigative

analysis to support enforcement operations, SEVIS modernization, and increased numbers of adjudication personnel. Finally, the past budgets provide the cost basis for adjusting annualized cost-of-living increases.

Determining the projected cost for continuation of current efforts involved routine budget projection processes. The budget establishes the current services of the program and projects the

mandatory and cost-of-living adjustments necessary to maintain current services. The budget adjusts the services provided by SEVP to include enhancements that reflect program policy decisions. Table 4 reflects the FY 2017 final budget, the FY 2018 approved budget, and the FY 2019 and FY 2020 planned budget requests.

**BILLING CODE 9111–28–P**

## Table 4: Student and Exchange Visitor Program Summary of Requirements by Organization and Program Category (Dollars in thousands)

| SEVP Expenses | 2017 Spend Plan | 2018 Spend Plan | 2019 Spend Plan | 2020 Spend Plan |
|---|---|---|---|---|
| **SEVP Payroll** | | | | |
| Full-Time Equivalent Personnel | 134 | 175 | 221 | 221 |
| Executive Office | $1,735 | $1,744 | $2,048 | $2,084 |
| Fee Management Section | $1,350 | $1,597 | $1,775 | $1,806 |
| Field Representative Unit | $6,480 | $6,958 | $7,641 | $7,776 |
| Policy Section | $1,178 | $969 | $1,283 | $1,325 |
| Systems Management Unit | $1,258 | $1,299 | $1,391 | $1,416 |
| SEVP Response Center Section | $652 | $652 | $931 | $941 |
| School Certification Unit | $2,993 | $2,966 | $3,291 | $3,349 |
| SEVP Analysis and Operations Section | $1,070 | $1,226 | $1,402 | $1,388 |
| New Required Positions | - | $296 | $2,357 | $5,610 |
| Office of the Principal Legal Advisor | $328 | $517 | $642 | $659 |
| SEVP Outside Positions | $1,444 | $1,776 | $2,544 | $2,629 |
| **Total SEVP Payroll** | **$18,488** | **$20,000** | **$25,305** | **$28,983** |
| **Program Expenses** | | | | |
| Advisory and Assistance Services | $58,630 | $58,108 | $52,755 | $50,977 |
| SEVIS (Modernization and O&M)* | $8,237 | $18,722 | $22,240 | $21,912 |
| Interagency Agreements with other agencies | $8,046 | $9,815 | $8,360 | $8,583 |
| Travel | $1,474 | $1,500 | $1,100 | $1,100 |
| Service-wide Costs | $3,222 | $4,015 | $2,400 | $2,400 |
| **Total Program Expenses** | **$79,609** | **$92,160** | **$86,855** | **$84,972** |
| **CTCEU / Domestic Operations** | | | | |
| Personnel Costs | $43,299 | $42,285 | $43,251 | $43,251 |
| Contract Costs | $9,767 | $19,605 | $20,166 | $20,166 |
| GE Costs | $4,585 | $2,843 | $1,316 | $1,316 |
| Relevant Direct Costs | $9,549 | $9,717 | $9,717 | $9,717 |
| **Total CTCEU/ Domestic Operations Expenses** | **$67,200** | **$74,450** | **$74,450** | **$74,450** |
| **Total, SEVP** | **$165,297** | **$186,610** | **$186,610** | **$188,405** |

*includes costs for the SEVIS Modernization and SEVIS Operations and Maintenance

AR_001565

*D. Summary of the Full Cost Information*

The total cost projection for FY 2019 is $186,610,000 and for FY 2020 is $188,405,000. Table 4 sets out the projected current services for SEVP and

supporting Counterterrorism and Criminal Exploitation Unit (CTCEU) and HSI Domestic Operations personnel in FY 2019 ($74.45 million) and FY 2020 ($74.45 million). These costs are direct extensions of the FY 2018 costs that are

supported by the current fees. Table 5 summarizes the enhancements and other costs, which include investigative analysis, SEVIS Modernization, increased numbers of adjudication personnel, and annualized inflation.

### Table 5: FY 2018, FY 2019 and FY 2020 SEVP Cost by Initiative

| Program Cost by Initiative | FY 2018 Budgeted Cost (thousands) | FY 2019 Budgeted Cost (thousands) | FY 2020 Budgeted Cost (thousands) |
|---|---|---|---|
| **Program Base:** | | | |
| SEVP (Current operational costs) | $95,097 | $94,497 | $95,106 |
| CTCEU / Domestic Operations (Current operational costs) | $70,200 | $70,200 | $70,200 |
| **Subtotal** | **$165,297** | **$164,697** | **$165,306** |
| **Enhancements and Other Costs:** | | | |
| Investigative Analysis Support | $4,250 | $4,250 | $4,250 |
| SEVIS Modernization | $13,150 | $13,750 | $13,141 |
| Increased Personnel | $1,100 | $1,100 | $3,500 |
| Annualized Inflation | $2,813 | $2,813 | $2,208 |
| **Subtotal** | **$21,313** | **$21,913** | **$23,099** |
| **TOTAL:** | **$186,610** | **$186,610** | **$188,405** |

### 1. Fee Allocation

The purpose of the ABC methodology is to trace costs to organizational elements, as well as identify all cost components associated with the services offered. For fee-based organizations such as SEVP, this allows the assignment of cost to one or more fees. SEVP defined five fee categories: The Form I–901 fee, certification fee, recertification fee, fee for filing an appeal or motion, and site visit fee.

Recently SEVP has only collected fees from students and exchange visitors— the Form I–901 fee—and from schools applying for certification, to include a separate site visit fee. In this analysis, SEVP considered the creation of additional fee categories for all the distinct services it provides in deciding how to apportion fees. For example, SEVP considered charging a separate Form I–901 fee to F, M, and J dependents. SEVP also examined various tiered fee structures and

considered assigning some specific costs to separate fees. The ABC fee model allowed SEVP to evaluate various scenarios for services provided directly by SEVP. DHS opted for an updated fee structure that segments program cost to the appropriate fee—F and M nonimmigrant students, J nonimmigrant exchange visitors, or schools.

The adjusted Form I–901 fee recovers the systems cost for SEVIS, including the remainder of certification, recertification, site visits, as well as appeals and motions costs that are not covered by the respective new fees. The Form I–901 fee is apportioned between three categories—full fee of $350 for F and M students, reduced fee of $220 for most J participants, and the further reduced fee of $35 for certain J program participants. Federal Government-sponsored J program participants are fee-exempt by law, so their costs will be funded by other fee payers. 8 U.S.C. 1372(e)(3).

The adjusted school certification fee recovers a portion of the costs necessary to process initial school certifications. The new recertification fee recovers a portion of the cost to process school recertifications and a portion of SEVP administrative costs. The adjusted site visit fee recovers the full cost of performing the site visit upon initial school certification and when a school changes its physical location or adds a new physical location or campus. The new fee for filing an appeal or motion recovers a portion of the cost to process an appeal or motion. The remainder of these costs are covered by the adjusted Form I–901 fee as detailed in the preceding paragraph.

### 2. SEVP FY 2019 and FY 2020 Cost Model Results

Table 6 shows the summary of SEVP FY 2019 and FY 2020 cost by source of cost.

**Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations **23939**

### Table 6: Total SEVP FY 2019 and FY 2020 Cost by Fee Category

| SEVP ABC Model Output Category | FY 2019 Budgeted Cost (thousands) | FY 2020 Budgeted Cost (thousands) |
|---|---|---|
| I-901 Fee | $156,989 | $157,365 |
| I-17 Certification Fee | $1,910 | $1,993 |
| I-17 Recertification Fee | $25,369 | $26,458 |
| Site Visit Fee | $386 | $390 |
| Appeal or Motion Fee | $1,956 | $2,199 |
| **Total:** | **$186,610** | **$188,405** |

Table 7 shows a more detailed cost breakdown. The numbers are shown in thousands, rather than millions, of dollars due to the level of detail. There are two levels for the costs: Process and activity. Costs are allocated from payroll, contracts, and other expenses to activities through activity surveys and volume based cost allocations. The full cost of operations from the spend plans is distributed to the activities that best describe the work being performed. Table 7 details these costs from an activity perspective. To simplify the presentation, the numbers are rounded to the nearest thousand. These numbers are not rounded in the cost model.

---

[7] SEVP Automated Management System

### Table 7: Detailed Cost Breakdown (FY 19 + FY 20, Dollars in Thousands)

| Process | Activity | I-901 | I-17 Certification | I-17 Re-certification | I-17 Site Visit | Appeal or Motion |
|---|---|---|---|---|---|---|
| Certify Schools | A-01: Certify schools (initial certification) | | $3,115 | | | |
| | A-02: Recertify schools | | | $4,614 | | |
| | A-03: Notify students if school is withdrawn | | | $129 | | |
| | A-04: Withdraw schools from SEVIS | | | $1,102 | | |
| | A-05: Process appeals/ motions | | | | | $3,420 |
| | A-06: Process petition updates | | | $3,036 | | |
| | A-07: Monitor school compliance | | | $3,761 | | |
| | A-08: Monitor school risk | | | $3,446 | | |
| Secure Compliance with Regulations and Laws | A-28: Conduct Student and Exchange Visitor (I-901) investigations | $93,921 | | $16,574 | | |
| | A-29: Conduct school and sponsor investigations | $34,238 | | $6,042 | | |
| | A-30: Operate CTCEU programs | $4,130 | | $729 | | |
| | A-31: Provide CTCEU liaison support | $417 | | $74 | | |
| | A-41: Perform I-515 operations duties | $1,471 | | | | |
| | A-43: PDSO/DSO background checks | $1,038 | | $54 | | |
| Formulate Policy | A-16: Analyze and develop policy | $3,170 | | $600 | | |
| | A-17: Develop and review rules and regulations | $2,476 | | $469 | | |
| | A-18: Implement policy | $1,501 | | $284 | | |
| | A-19: Develop future policy strategy | $816 | | $154 | | |
| Provide Stakeholder Communications | A-11: Develop and deliver SEVP communications | $9,040 | $118 | $1,224 | $24 | $130 |
| | A-12: Respond to stakeholders' policy and technical inquiries (including Tier III Help Desk) | $8,218 | | | | |
| | A-13: Provide Field Representative support | $13,731 | | $2,598 | | |
| | A-14: Prepare and attend conferences/ workshops related to the SEVIS community | $3,404 | $62 | $644 | $13 | $68 |
| | A-15: Develop and conduct strategic communications | $2,699 | $49 | $511 | | |

AR_001568

| Process | Activity | I-901 | I-17 Certification | I-17 Re-certification | I-17 Site Visit | Appeal or Motion |
|---|---|---|---|---|---|---|
| Provide Systems Program Management Support | A-20: Modify and enhance functionality of SEVP mission systems (e.g. SEVIS, SEVPAMS[7]) | $24,816 | | | | |
| | A-21: Operate and maintain SEVP mission systems (e.g. SEVIS, SEVPAMS) | $28,491 | | | | |
| | A-22: Provide Tier I and Tier II Help Desk support | $12,814 | | | | |
| | A-23: Conduct systems program management | $5,291 | | | | |
| | A-24: Analyze and disseminate program data | $3,510 | $46 | $475 | $9 | $50 |
| | A-25: Operate and maintain SEVP inter-office systems | $1,735 | $32 | $328 | | |
| Support SEVP Operations | A-26: Maintain SEVP systems security | $2,867 | $37 | $388 | | |
| | A-27: Maintain SEVP physical security | $223 | $4 | $42 | $1 | $4 |
| | A-32: Provide Executive Leadership for SEVP | $2,539 | $33 | $344 | $7 | $36 |
| | A-33: Provide SEVP administrative support | $1,599 | $21 | $217 | $4 | $23 |
| | A-34: Develop strategic plan | $1,612 | $29 | $305 | $6 | $32 |
| | A-35: Manage financial resources | $7,300 | $95 | $988 | $20 | $105 |
| | A-36: Manage procurement | $1,886 | $25 | $256 | $5 | $27 |
| | A-37: Manage personnel resources | $2,065 | $27 | $280 | $6 | $30 |
| | A-38: Manage SEVP records | $3,274 | $60 | $619 | $12 | $66 |
| | A-39: Manage facility resources | $1,782 | $23 | $241 | $5 | $25 |
| | A-40: Manage I-901 payment system | $7,766 | | | | |
| | A-42: Manage I-901 J program | $15,966 | | | | |
| | A-44: Site Visits | | | | $638 | |
| Train SEVP staff, other staff, and DSOs | A-09: Develop and deliver SEVIS training | $5,936 | $78 | $803 | $16 | $85 |
| | A-10: Develop and deliver internal training | $2,613 | $48 | $494 | $10 | $52 |
| | **Total** | **$314,355** | **$3,902** | **$51,827** | **$775** | **$4,155** |

**23942**      **Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

3. Fee Calculations

The cost model provides detailed cost information by activity and a summary cost for each, giving the aggregate fee cost by category. Next, SEVP projected the total number of fee payments of each type for FY 2019 and FY 2020 and determined the fee-recoverable budget. SEVP selected a forecasting approach to determine the total number of expected fee payments for each fee.

a. Form I–901 Fee

To calculate fee amounts for the Form I–901 fee, SEVP estimated the number of fee payments expected in FY 2019 and FY 2020 for each of the three fee payment types: The reduced fee for J participants (excluding the additional cost for initial certification and recertification of SEVP-certified schools); the full fee for J participants (excluding the additional cost for initial

certification and recertification of SEVP-certified schools); and the full fee for F and M nonimmigrant students (including additional costs for certification, recertification, and appeals). The total fee category budget is taken directly from the FY 2019 and FY 2020 SEVP ABC model, reflected in Table 8 and Table 9.

### Table 8: I-901 F/M Fee-Recoverable Budget

| Fiscal Year | I-901 F/M Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 418,393 | $117,365,448 |
| 2020 | 407,933 | $118,132,152 |
| **Total** | 826,326 | **$235,497,600** |

### Table 9: I-901 J Fee-Recoverable Budget

| Fiscal Year | I-901 J Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 316,495 | $39,624,171 |
| 2020 | 312,556 | $39,233,218 |
| **Total** | 629,052 | $78,857,390 |

Form I–901 fees are calculated by dividing the fee-recoverable budget by the anticipated number of payments. This results in a fee-recoverable amount of $290 for all F and M payments and $130 for both the J Full and J Partial fees. Model results indicate a required fee of $290 before addition of additional costs of other fee types, discussed throughout the document. Additional costs of subsidization of other SEVP fees results in a F/M fee of $350.

For reasons discussed below related to the $35 J-Partial fee, DHS must increase the J-Full fee by a proportional amount to cover the cost of operating the J program. This results in a J-Full fee of $220. Calculations for each of the three fee payment types vary because each fee type is treated differently in federal statutes and regulations. Section

641 of IIRIRA exempts Federal Government-sponsored J–1 nonimmigrant exchange visitors from the fee payment. Prior to this final rule, all F and M nonimmigrant students were required to pay $200, and nonexempt J nonimmigrant exchange visitors were required to pay $180. 8 CFR 103.7(b)(1)(ii)(H), 214.13(a). Congress modified the statute in December of 2000 to establish a reduced fee of $35 for au pairs, camp counselors, or participants in a summer work travel program, demonstrating strong congressional intent that the fee remain at that level. Act of Dec. 21, 2000, Public Law 106–553, app. B, sec. 110, 114 Stat. 2762, 2762A–51, 2762A–68. IIRIRA also provided for revising the fee once the program to collect information was expanded to include information collection on all F, M, and J nonimmigrants. As a result, the Form I–

901 fee was revised in 2008 under the provisions of IIRIRA to take into account the actual cost of carrying out the program. *See* 73 FR 55683. The Form I–901 fee is now being revised a second time, through this rule, due to an increase in the actual cost of carrying out the program.

SEVP determined the number of expected Form I–901 fee payments in FY 2019 and FY 2020. SEVP calculated the Form I–901 fee over a 2-year period to account for potential fluctuation in the forecast. SEVP used the change in the numbers of payments received to provide the trend data used to forecast Form I–901 fee payments for each Form I–901 payment type separately. Table 10 reflects aggregate historical payment data for all three Form I–901 payment types.

## Table 10: F, M, and J I-901 Payments 2007–2017

| Fiscal Year | Total | Growth Rate* |
|---|---|---|
| 2007 | 697,054 | - |
| 2008 | 753,065 | 8.0 |
| 2009 | 644,912 | -14.4 |
| 2010 | 699,983 | 8.5 |
| 2011 | 749,082 | 7.0 |
| 2012 | 744,027 | -0.7 |
| 2013 | 767,805 | 3.2 |
| 2014 | 829,636 | 8.1 |
| 2015 | 885,728 | 6.8 |
| 2016 | 866,623 | -2.2 |
| 2017 | 796,820 | -8.1 |
| * Growth rate rounded to nearest tenth of a percent | | |

As indicated in Table 10, the level of payments received varied greatly over the past 10 years. This high degree of variation in the historical data, combined with the variables affecting demand for visas, called for a forecasting methodology that would capture and account for deviations.

SEVP selected a statistical forecasting method that uses trends in historical data to forecast future payments. SEVP selected ARIMA, an autoregressive integrated moving average model to forecast payments. An ARIMA model is a statistical model that uses historical time series data to predict future trends and movements. A non-seasonal model incorporates two major components: Trend and moving average. The autoregressive portion of the model, or trend, states that past values have an effect on current or future values and that values are estimated based on the weighted sum of past values. The second component is moving average which helps to smooth out the time series to filter out extreme fluctuations or outliers. In some cases, a third component is needed: Seasonality. Visa data from 2004 to the present shows extreme seasonality in the number of F, M, and J visas issued. Seasonality is factored into the model to account for the U.S. academic calendar.

SEVP evaluated alternative forecasting methods; however, SEVP rejected these methods due to inaccuracy, poor fit, and limited data. SEVP's chosen model provided a conservative forecast that will allow SEVP to operate with stability. The fee payment forecast, reflected in Table 11, places a balanced mix of emphasis on recent and historical data and still contains sufficient data points to smooth out some variability in the underlying data.

## Table 11: Form I-901 Fee Payment Forecast FY 2019–FY 2020

| I-901 Payment Type | FY 2019 | FY 2020 |
|---|---|---|
| Full Payments, F/M | 418,393 | 407,933 |
| Full payment, J-Full | 157,550 | 153,612 |
| Subsidized, J-Partial | 158,945 | 158,945 |
| **TOTAL:** | **734,888** | **720,490** |

b. Certification Cost

SEVP uses historical data from FY 2012 to FY 2016 (Table 12) to find a three year moving average to forecast annual new initial certifications. SEVP predicts demand of approximately 426 initial certifications each year, which assumes the higher fee will not deter schools from applying for certification at a lower rate than the historical average. Historically, SEVP has used a forecasted increase in payments of approximately one percent annually due to the financial benefits schools derive from foreign student enrollment, but recent data on payments has led SEVP to apply a conservative zero percent growth.

**Table 12: Three-Year Moving Average of the Number of School Certification Payments Received**

| Fiscal Year | Payments Received | 3-Year Moving Average |
|---|---|---|
| 2012 | 457 | |
| 2013 | 382 | |
| 2014 | 446 | 428 |
| 2015 | 469 | 432 |
| 2016 | 363 | 426 |

The total fee category budget is taken directly from the FY 2019 and FY 2020 SEVP ABC model, reflected in Table 13.

**Table 13: FY 2019–FY 2020 Certification Fee-Recoverable Budget**

| Fiscal Year | Certification Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 426 | $1,909,680 |
| 2020 | 426 | $1,992,878 |
| **Total** | **852** | **$3,902,558** |

School certification fees are calculated by dividing the fee-recoverable budget by the anticipated number of payments. This results in a fee-recoverable amount from schools of $4,580 each. To arrive at the new fee, rounding was applied to the result of the fee algorithm. This results in a certification fee of $4,600 per school. Setting the certification fee at the $4,600 figure, however, leads to an increase of the current school certification fee by $2,900, resulting in a certification fee over twice the current fee amount. School certification is integral to SEVP—F and M nonimmigrant students can only attend SEVP-certified schools. While DHS is increasing the fee to ensure a more equitable distribution of costs, such a fee level could discourage potential new schools from seeking certification. At the same time, DHS considers that initial certification bestows upon the school a valuable asset, the ability to enroll F and M nonimmigrant students, and an increased fee amount is reasonable as the initial certification process becomes more extensive through the SEVIS modernization and other technological developments. Weighing these concerns, DHS decided to subsidize the Form I–17 school certification fee by increasing the payment by only $1,300 to $3,000. The remainder of the costs for Form I–17 school certification is subsidized by the Form I–901 F and M fee, which is addressed below.

c. Recertification Cost

To identify a fee level that would recover the full cost of recertification operations, SEVP determined the full cost of recertification (including level of effort and contract cost) and the approximate number of schools willing to recertify (Table 14). Because schools are required to recertify every two years, SEVP anticipates that approximately one-half of its certified schools—roughly 4,373 schools per year, given the current certified school population of 8,746—would recertify.

**Table 14: FY 2019–FY 2020 Recertification Fee-Recoverable Budget**

| Fiscal Year | Recertification Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 4,373 | $25,368,650 |
| 2020 | 4,373 | $26,457,896 |
| **Total** | **8,746** | **$51,826,546** |

To calculate an anticipated school recertification fee, DHS divides the fee-recoverable budget by the anticipated number of payments. This results in a fee-recoverable amount from schools of $5,925.74 each. To arrive at the new fee, rounding was applied to the result of the fee algorithm. This resulted in a recertification fee of $6,000 per school. DHS desires to institute a recertification fee to more accurately assign the costs of recertification adjudication to those

stakeholders who are directly requesting the adjudication—the SEVP-certified schools—particularly since the costs of recertification continue to increase as the recertification process becomes more robust.

These increased costs are due to increased review of school records and other information submitted by schools as part of recertification to ensure that schools are remaining in compliance with all requirements. Ensuring compliance is a statutory requirement under EBSVERA that has been reaffirmed through the results of GAO audits and other Executive Branch reviews of SEVP operations. For example, as part of recertification, SEVP adjudicators independently verify state licenses, accreditation information, and other related information. SEVP is continuously trying to find ways to perform these checks more efficiently to reduce the burden. These reviews should become less burdensome as the

modernization of SEVIS continues and more information becomes automated.

DHS considers that the recertification amount should be less than the initial certification amount so that schools are encouraged to seek recertification instead of allowing their SEVP certification to be withdrawn and applying for initial certification anew at some later date. Withdrawal of SEVP-certification not only leads to the school losing a valuable asset, but also leads to complications for F and M nonimmigrant students enrolled in the withdrawn school, who are then forced to transfer schools, leave the United States, or risk facing immigration law penalties for violating the terms of their nonimmigrant status. In such circumstances, the school may bear administrative costs to help students transfer to a certified school. Affected students bear costs as well. Weighing all these factors, DHS sets the Form I–17 recertification fee at $1,250. With this

rule, DHS eliminates regulations that state that no fee is required for the school recertification process in order to recover part of this cost, as part of an effort to establish a more equitable distribution of costs and more sustainable level of cost recovery relative to services provided. The costs for Form I–17 school recertification not recovered by the new fee are subsidized by the Form I–901 F and M fee. The explanation for shifting responsibility of the fee adjustment to the Form I–901 fee is included below.

d. Site Visit Cost

Site visits consist of initial certification site visits, change of location visits, and new campus or location site visits (Table 15). The anticipated workload for these site visits is 600 per year, or 1,200 visits over a 2-year period.

### Table 15: FY 2019–FY 2020 Site Visit Fee-Recoverable Budget

| Fiscal Year | Site Visit Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 600 | $385,674 |
| 2020 | 600 | $389,689 |
| **Total** | **1,200** | **$775,363** |

The current fee amount is $655 as established in the 2008 Fee Rule that codified SEVP's authority to charge the fee when a school changes its physical location or adds new physical location or campus. Following this rule's effective date, SEVP will collect the fee when a certified school adds a new physical location or campus. Thus, in addition to the site fee(s) required upon initial certification, the site visit fee will

now apply when a certified school updates its Form I–17 in SEVIS to indicate, pursuant to 8 CFR 214.3(h)(1)(ii), an added physical location or campus. The site visit fee is based on level of effort for both SEVP staff and contracts that cover the cost of operations.

e. Appeals and Motions Cost

Determining the full cost of processing an appeal is essential to

improving the fee structure. The fee for filing an appeal or motion is calculated by determining the workload of appeals and motions over the FY 2019 and FY 2020 periods. Over the past two years, SEVP has processed 54 appeals and motions annually. To maintain conservative estimates, SEVP anticipates that number will remain constant over the FY 2019 and FY 2020 periods (Table 16).

### Table 16: FY 2019–FY 2020 Appeals Fee-Recoverable Budget

| Fiscal Year | Appeal and Motion Payments Expected | Fee-Recoverable Budget |
|---|---|---|
| 2019 | 54 | $1,956,375 |
| 2020 | 54 | $2,198,825 |
| **Total** | **108** | **$4,155,200** |

BILLING CODE 9111–28–C

Fees for motions or appeals are calculated by dividing the fee-

recoverable budget by the anticipated number of payments over the FY 2019 and FY 2020 periods. This results in a

fee-recoverable amount of $38,474 for each appeal. The relative costs of seasoned federal employees involved in

rendering a decision and the few petitioners result in costs that SEVP felt should be subsidized. To arrive at the final cost, rounding was applied to the result of the fee algorithm. This results in a cost for a motion or appeal of $38,500. SEVP believes that this fee, while justified, is too high to impose on the affected schools as the first fee to be established and collected for the subject appeals and motions, and that some accommodation should be made to keep the fee at a more reasonable amount.[8] Instead, DHS is adding $4.76 to the Form I–901 F and M fees to counterbalance the unfunded costs of adjudicating appeals and motions. This will better ensure that cost is not a significant obstacle in pursuing an administrative appeal or motion. The Form I–290B fee when filed with SEVP is set at $675, which is currently the same amount charged when the form is filed with USCIS. *See* 8 CFR 103.7(b)(1)(i)(S).[9] The Form I–290B filed with USCIS is the same form used for appeals or motions related to any denial of school certification or recertification or a withdrawal of such certification. Although the appeal fee is not set at the amount necessary to recover the full costs of appeals and motions, by setting a fee of $675, schools that benefit from the appeal process bear some of its costs, and DHS more fairly balances allocation of the recovery of SEVP operational costs between beneficiary classes. DHS will charge the fee for all such appeals and motions.

### 4. Fee Levels

Viewing the SEVP fee structure and affected parties comprehensively, DHS is adjusting each fee in its fee structure based not only on cost of services, but

[8] If a school is denied certification or withdrawn from certification, it can file an appeal with an independent Administrative Appeals Team (AAT). The AAT has sustained approximately 92 percent of decisions.

[9] Because the underlying rationale for the amount of the I–290B fee differs between SEVP and USCIS, DHS may change the I–290B fee for USCIS but not for SEVP, meaning the Form I–290B may have two different fees in the future.

also on the desire to spread the impact of fee increases reasonably among the various beneficiaries of SEVP services. Despite the ABC calculations' determination of the actual cost of each service, which is represented by each fee, DHS has determined that using the Form I–901 revenue to subsidize the costs of the SEVP's other fees is an appropriate course of action for two reasons. First, the number of F and M students paying the Form I–901 fee is substantially larger than the number of entities paying each of the school certification-related fees, allowing for SEVP to lessen the impact of fee increases in the aggregate. Second, the subsidization is reasonable because individuals paying the Form I–901 fee necessarily benefit from the continued certification of schools for their enrollment and prompt and accurate adjudication of appeals.

DHS is increasing the Form I–901 fee for F and M students from $200 to $350 and the full Form I–901 fee which applies to most J exchange visitors from $180 to $220. These fees have been unchanged since 2008. 73 FR 55683 (Sept. 26, 2008). In 2008, the first time these fees had been updated since SEVP's inception in 2004, the Form I–901 fee for F and M students increased from $100 to $200, and the Form I–901 J full fee increased from $100 to $180. *See id.* The Form I–901 fee for special J-visa categories (au pair, camp counselor, and summer work travel) remains at the current $35 level, consistent with the levels set by Congress in 8 U.S.C. 1372(e)(4)(A). IIRIRA also exempts from the Form I–901 fee J–1 exchange visitors who participate in Federal Government-sponsored J–1 exchange programs. 8 U.S.C. 1372(e)(3).

DHS is increasing the initial certification fee from $1,700 to $3,000. This fee was originally set at $230, effective in 2002, prior to the reorganization of the Immigration and Naturalization Service (INS) to become part of DHS. *See* 66 FR 65811 (Dec. 21, 2001). The fee was increased in 2008 to $1,700. *See* 73 FR 55683. This is the

base fee for certification and does not include the site visit fee.

DHS is establishing a recertification fee at $1,250, maintaining the site visit fee of $655, and sets the Form I–290B fee at $675. The cost for SEVP recertification, site visits, and motions and appeals adjudication is determined by employing ABC principles, described in the proposed rule, balanced with SEVP's desire to prevent recertifications, site visits, appeals, and motions filings from becoming cost-prohibitive. *See* 83 FR 33762, 33771. DHS is setting a recertification fee and setting a Form I–290B fee for the first time, and SEVP believes that charging recertification and appeals fees sufficient to recover, on their own, the fee-recoverable amount for such services, may result in inordinately high fees from the perspective of entities who have regularly received the benefits of these SEVP services at no additional charge. As noted below, public comments received in response to the NPRM supported this assessment. Accordingly, DHS is setting these fees at amounts below the fee-recoverable cost. For the Form I–290B fee in particular, DHS is setting the amount at $675. DHS believes this amount best addresses concerns raised in public comments about entities paying a Form I–290B fee for the first time because it is less than both the fee for initial certification and the fee for recertification. Further, the amount $675 is already associated with the Form I–290B when filing it with USCIS. DHS believes $675 is a logical starting point, because this is the fee currently being charged by USCIS for motions and appeals. While the difference between the fee-recoverable amount (approximately $38,500) and the fee of $675 is substantial, subsidizing this fee by driving the additional costs to the Form I–901 fee results in an increase of only $4.76 to F/M students paying that fee. The program fee schedule for SEVP beginning in FY 2019 is shown in Table 17.

**BILLING CODE 9111–28–P**

**Table 17: FY 2019 SEVP Fees**

| Category | Amount |
|---|---|
| I-901 Fees | |
| • I-901 Primary F/M visa holders (Full) | $350 |
| • I-901 Primary J visa holders (Full) | $220 |
| • I-901 Special J-visa categories (Subsidized payment) | $35 |
| I-17 School Fees | |
| • Certification Fee | $3,000 |
| • Recertification Fee | $1,250 |
| • Site visit fee for initial certification (base fee to be multiplied by number of locations cited on the Form I-17), and for new physical locations | $655 |
| Appeal or Motion Fee | |
| • Appeal or Motion Fee | $675 |

These fee amounts, the cost model outputs, and cost reallocation amounts are shown in Table 18. The cost reallocation amounts are negative for the fees that are subsidized. The cost reallocation amounts that are positive are the amounts per fee that subsidize the other fee categories.

**Table 18: Fee Adjustment Amounts**

| Fee | Current Fee (a) | Activity Based Cost Model Output (b) | Cost Reallocation (c) | Final Fee (d = b + c) | Change in Fees (e) | % Change in Fee (f = (d / a) -1) |
|---|---|---|---|---|---|---|
| Appeal or Motion Fee: I-290B | N/A | $38,475 | ($37,800) | $675 | $675 | N/A |
| I-901 F/M | $200 | $290 | $60 | $350 | $150 | 75% |
| I-901 J-Full | $180 | $130 | $97 | $220 | $30 | 22% |
| I-901 J-Partial | $35 | $130 | ($88) | $35 | $0 | 0% |
| I-17 Initial Certification | $1,700 | $4,600 | ($1,600) | $3,000 | $1,300 | 76% |
| I-17 Recertification | N/A | $6,000 | ($4,750) | $1,250 | $1,250 | N/A |
| Site Visit – initial | $655 | $650 | $5 | $655 | $0 | 0% |
| Site Visit – new location | $0 | $650 | $5 | $655 | $655 | N/A |

Table 19 reflects the break-even analysis based on the fee schedule and the proportional fee volumes (rounded) required to generate sufficient revenue to offset projected program costs.

**23948** **Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

## Table 19: Projected Revenue–FY 2019 and FY 2020

| Fee Category | Fee Amount | Forecasted Volume | Forecasted Revenue |
|---|---|---|---|
| I-901 F/M | $350 | 826,326 | $289,214,100 |
| I-901 J-Full | $220 | 311,162 | $68,455,640 |
| I-901 J-Partial | $35 | 317,890 | $11,126,150 |
| **I-901 Subtotal:** | | | |
| Certification Fee | $3,000 | 852 | $2,556,000 |
| Recertification Fee | $1,250 | 8,746 | $10,932,500 |
| Site Visit | $655 | 1,200 | $786,000 |
| **I-17 Subtotal:** | | | |
| Appeal or Motion | $675 | 108 | $72,900 |
| **Total:** | | 1,466,284 | $383,143,290 |

BILLING CODE 9111–28–C

## IV. Technical Corrections to the Proposed Rule

DHS identified six sets of required technical corrections to the proposed rule, as follows.

First, DHS identified that in the NPRM's Table 7: *Form I–901 Fee Payment Forecast FY 2019–FY 2020,* contained a minor mathematical error due to rounding. On line three, column three, FY 2020 full payment, J-Full, stated as 153,611 is corrected to 153,612 in what is Table 11 of this final rule.

Second, DHS changed a corresponding number in the NPRM's Table 22: *Form I–901 Full J Fee Payments FYs 2010–2017* (Table 24 in this final rule), line 16, column 2 from 153,611 to the corrected 153,612. DHS also made two additional conforming corrections in the preamble text where the incorrect figure 153,611 was changed to 153,612 and in accordance corrected a sum of total increase in transfer payments from I–901 J-Full applicants from $12,446,440 to $12,446,480. These changes are minor and do not change the substance of the rule.

Third, DHS discovered that the NPRM's Table 17: *Projected Revenue— FY 2019 and FY 2020,* contained the following four errors:

• On line two, column four, a mathematical error indicating the forecasted I–901 F/M Full revenue as $289,214,144. The entry of $289,214,144 is corrected to $289,214,100.

• On line three, column four, a correlating mathematical error indicating the forecasted I–901 J-Full fee revenue as $68,455,584. The entry of $68,455,584 is corrected to $68,455,640.

• On line three, column two, a typographical error stating "210" for the Form I–901 fee the "J-Full" category. The correct amount, as included and

discussed elsewhere in the proposed rule, is "220."

• On line eleven, column four, a correlating mathematical error indicating the total forecasted revenue as $383,143,278. The entry of $383,143,278 is corrected to $383,125,290. The proposed rule included and discussed the correct "220" figure at several points in the document, and no commenter expressed confusion over these proposed dollar amounts.

Fourth, DHS identified a section of the NPRM's proposed regulatory text at 8 CFR 103.7(b)(1)(ii)(B) that could be confusing to some readers. Though no commenters expressed confusion about the provision, DHS determined that the text, as published in the NPRM, made it appear as though a school going through recertification would be required to pay the $3,000 initial certification fee in addition to the $1,250 recertification fee, plus $655 per additional site. As previously noted throughout the preamble to the NPRM, the $1,250 recertification fee is charged in lieu of the full $3,000 fee for an initial certification, and an additional fee of $655 is charged when a certified school reports a new physical location where it provides education to international students and which was not previously reported on its Form I–17. *See, e.g.,* 83 FR 33762, 33771 (discussing the basis and purpose of DHS's intention to collect a site visit fee when a school changes or adds a new physical location or campus), 33773 (noting different costs for initial certification and recertification processes), 33776 (describing the fee-recoverable amount of recertification separately from initial certification), 33781–82 & 33788–89 (explaining the impact of the recertification fee). DHS amends the regulatory text at 8 CFR

103.7(b)(1)(ii)(B) to clarify this provision.

Fifth, DHS identified a section of the NPRM's proposed regulatory text at 8 CFR 103.7(b)(1)(ii)(H) that unnecessarily referred to fee remittance for "certain" F, J, and M nonimmigrants when all potential scenarios for fee remittance in these categories are in fact addressed. DHS amends the regulatory text at 8 CFR 103.7(b)(1)(ii)(H) to delete the word "certain."

Sixth, the NPRM's proposed regulatory text at 8 CFR 214.13(a)(2) inadvertently provided that the fee for certain J–1 status applicants is $210. The correct amount, as referenced elsewhere both in the regulatory text proposed in the NPRM and in its preamble, is $220. DHS amends the regulatory text at 8 CFR 214.13(a)(2) to correct this error. The revised regulatory text of this fee level does not change the intent of the proposed rule.

Last, the authority sections for the text of the CFR are amended to include additional references to relevant statutory authorities. Specifically, DHS is adding citations to 8 U.S.C. 1356 and 8 U.S.C. 1372, which also serve as sources of authority relevant to 8 CFR parts 103 and 214.

## V. Public Comments on the Proposed Rule

DHS provided a 60-day comment period for this rulemaking following publication of the NPRM. The comment period concluded on September 17, 2018. DHS received approximately 300 comments.

DHS has carefully reviewed all comments received during the comment period and summarizes and responds to all significant comments received in the following sections of this final rule preamble, with some additional responses to small entities-related comments in the Final Regulatory

Flexibility Analysis section below.[10] This final rule does not make any substantive revisions to the proposed rule based on the comments received.

### A. General Comments

DHS received comments from a broad spectrum of individuals and organizations, including representatives of schools and universities, advocacy organizations, public policy groups and other interested persons. Most commenters expressed general opposition to the fee increases; others expressed concerns related to specific fees.

While most commenters opined the proposed fees were generally too high, many also expressed their understanding of the necessity of some fee increases. Some comments favored increasing fees, acknowledging the need to account for the costs of current SEVP services and planned enhancements without financially impacting the U.S. taxpayer. A few commenters expressed their appreciation for the fees having remained the same since 2008. Additionally, one commenter opined that the increase in fees may decrease the likelihood of visa overstays by curtailing visa applications. Another commenter expressed appreciation for the U.S. government policy related to assessing fees for the cost of government programs and opined that all costs associated with nonimmigrant students' presence in the United States should be paid by students rather than by U.S. taxpayers. Some commenters supported the fee increases but stated that the proposed fees were too low and that DHS should consider raising the fees further.

Some commenters suggested alternative methods to reduce costs and inefficiencies. DHS also received some comments on subjects that are not directly related to the proposed fee amounts and are outside the scope of the NPRM. For example, some commenters suggested that DHS should allocate funds from other areas of the department to address SEVP funding deficits rather than raise the fees.[11]

Overall, comments submitted to the docket for this rulemaking were dominated by concerns about the potential impact the increased Form I–901 fee would have on nonimmigrant student enrollments and concerns about the potential impact of the new recertification fee on a school's ability to continue being certified by SEVP. Commenters, particularly those representing institutions with few nonimmigrant students, specifically stated that the new recertification fee is excessive and would adversely affect their ability to remain an SEVP-certified school. Finally, several commenters observed that the fee changes will send a signal to nonimmigrant students that the United States intends to restrict access to its educational opportunities.

In response to these comments, SEVP notes that it supports international education. Nonimmigrant students typically have positive experiences while in the United States, and the goodwill engendered by all that the United States has to offer encourages mutually beneficial international relations. SEVP, by ensuring that individuals admitted to the United States as F, J, and M nonimmigrants are bona fide students and exchange visitors, reduces fraud, abuse, and potential terrorist threats, contributing to a safe environment for students and exchange visitors when they attend programs in the United States. In order for SEVP to continue to facilitate the benefits of U.S. educational and exchange experiences to F, J, and M nonimmigrants, SEVP must maintain its current systems and operational staff and make refinements now possible through progressive adaptions, both of which require appropriate funding.

### B. Comments on Timing of Fee Increase

Several commenters expressed their understanding of the necessity to increase the fees; however, they suggested that instead of a one-time increase, a more consumer-friendly approach would be to raise fees incrementally over time to allow schools and students more time to budget and plan for the increase. DHS recognizes that the fees impose a burden on prospective students and schools. However, in order to ensure that fee levels are sufficient to recover the full cost of activities of the program immediately upon the effective date of the final rule, DHS calculations indicate that the fee amounts must remain, at a

minimum, as proposed. If DHS does not adjust the current fees to recover the costs of processing the enrollment of F and M students, certification and recertification of schools, processing relating to J exchange visitors, appeals, and site visits, it will be forced to make reductions in oversight, security, and service as compared to current projections. Additional factors as to why DHS cannot implement such a tiered payment system at this time include the additional administrative burden and development costs such an incremental payment system would place on the program as well as time delays in development.

### C. Comments on Enhancements

#### 1. SEVIS Modernization

One commenter observed that since the NPRM was published, DHS has already implemented the SEVIS Student Portal, which the NPRM described as a part of the SEVIS modernization for which it required additional funding. In addition, a university expressed dissatisfaction with the current portal functionality and requested specific technical improvements. DHS acknowledges that the initial phase of the SEVIS Student Portal has now been launched. However, DHS clarifies that the proposed funding is intended to allow DHS to improve the portal and to expand the use of the portal to areas other than those currently online. DHS plans on building on the successes of and lessons learned from the initial Student Portal launch phase. Such expansion requires the additional revenue enabled by the fee increase.

One commenter also questioned the need for a DSO background check that is connected to SEVIS modernization and opined that such checks are duplicative as human resources offices in educational institutions already conduct their own background checks. DHS supports any school's initiative to conduct employee background checks when those employees will be accessing SEVIS but disagrees that the current DSO verification is a duplication of those efforts. FISMA, the Federal Information Security Management Act of 2002, as amended, requires that SEVP protect government information by applying appropriate suitability checks to non-government users. See generally, e.g., 44 U.S.C. 3554(a). These checks are potentially substantively different than, and not replaceable by, those background checks used by private entities.

---

[10] Overall, the final rule does not address comments seeking changes in statutes, regulations, policy or processes unrelated to or not addressed by the proposed rule. It also does not respond to requests for changes in procedures of other DHS components or other agencies, or the resolution of any other issues not within the scope of the rulemaking.

[11] In addition to noting that it would be outside the scope of this rulemaking to artificially reduce the fee amounts in the hopes of securing another lawful source of funding, DHS notes that such an approach would be irresponsible. As explained earlier in this preamble, SEVP is completely funded by the fees it collects. Congress specifically authorized SEVP to recover the full cost

of agency operations, and has not indicated an intention to increase DHS appropriations to fund costs that SEVP could have recouped through fees. DHS cannot place SEVP operations at risk in the hopes of securing additional funding.

2. Increased SEVP Adjudication Personnel

Many commenters opined that current recertification processing times are too lengthy and observed that while the NPRM indicated that hiring additional SEVP adjudication personnel was a partial reason for the fee increases, there was no description of the impact such hiring would have on reducing adjudication times. Several SEVP-certified schools expressed support for the fee increase specifically on the condition that adjudications would become more expedited after new adjudicators were hired. Other comments noted that the quality and efficiency of SEVP adjudications needed to be assessed and asked that funds be directed to improve and expedite the adjudication process. As an alternative to increasing the number of adjudication personnel, an organizational commenter, supported by other commenters, opined that "SEVP has opted to fully adjudicate nearly every change to Form I–17" and questioned whether all such adjudications are necessary. The commenter further noted that by doing so, SEVP has created unnecessary work that has created a work backlog and delays.

SEVP agrees that its policy is to adjudicate most changes to the fields contained within the Form I–17. However, the lack of sound alternative methods to mitigate risks has necessitated such adjudications. SEVP notes that it continuously investigates and assesses opportunities for more streamlined, risk-based methods available, including opportunities that may arise due to new ways of analyzing school and student data. For purposes of this rulemaking, however, the underlying fee review, as described in the NPRM preamble, uses historical staffing and workload information for current SEVP functions and planned future initiatives to establish future revenue needs. SEVP lacks a methodology to reliably estimate downward adjustments in revenue needs based on workload adjustments that have yet to be made. To the extent that ICE makes such adjustments in the future, any efficiencies would be reflected in a subsequent fee rulemaking.

This change will allow SEVP to fund additional personnel needed to improve case processing, reduce backlogs, and move toward more expedited processing times. That being said, superseding priorities may arise, which could not have been known at the time fee cycle calculations were made, that may impact SEVP's ability to meet petitioner

expectations at all times. It is possible that at times, SEVP will need to shift adjudicator workloads and priorities away from recertification to address emergent issues, which may impact case processing efficiency and backlogs.

*D. Comments on Specific Fees*

1. Fee for F, M and J Nonimmigrants

Almost all of the submitted comments voiced concern that the increase in the Form I–901 fee would adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation. Some cited decreasing nonimmigrant student enrollments in the United States and corresponding increasing enrollments in other English-speaking countries, notably in Canada and Australia. Many commenters emphasized the importance of nonimmigrant student enrollment and exchange visitor participation to U.S. productivity and innovation and specifically identified the negative impact the decrease in enrollment would have on school programs, the U.S. economy and local jobs. While DHS acknowledges the potential for increased fees to theoretically lead to decreased enrollment and subsequent negative effects on the U.S. economy, these commenters provided no supporting facts or data to demonstrate that such broad effects are a likely outcome of this particular fee increase. Therefore, DHS determines that such concerns do not outweigh the Department's need to increase the Form I–901 fee.

Some commenters suggested that SEVP could decrease the burden on students by having the student fee increase gradually over a longer period of time, amortized annually based on the length of the student program, to minimize the potential impact on student enrollment.

One commenter criticized the decision to use the Form I–901 fee to effectively reallocate some of the costs of services for which SEVP has assessed a fee, such as recertification. The commenter stated that the cost reallocation undermined the consistency of the ABC approach, and that as a result of the cost reallocation, students would bear the burden of costs that are more fairly attributed to educational institutions.

As noted above, SEVP appreciates the importance of nonimmigrant student and exchange visitor enrollment to the U.S. culture and economy and is firmly committed to lawful admission of nonimmigrants for this purpose. SEVP also observes that while many of the

comments provided historical data to show a recent decrease in nonimmigrant student enrollment, they neither cited nor provided a published study or other credible data supporting the suggestion that an increase in government fees charged to nonimmigrant students of the scale proposed in the NPRM would adversely affect their decision to choose the United States for academic or vocational study, or exchange visits. SEVP, likewise, has been unable to locate such a study. DHS thus has no objective basis for concluding that nonimmigrant students significantly base their decisions for attending educational institutions in the United States on government fees which, generally, are a small portion of the overall costs of attending these programs.

For instance, the increased Form I–901 fee represents approximately one percent of the average cost of yearly expenses for students in a four-year program.[12] DHS believes that amortizing these costs over the course of a student's stay in the United States would be administratively cumbersome and inappropriate, given the need to fund SEVP operations. For example, because many of the operational costs of nonimmigrant student enrollment associated with establishing an F or M student record in SEVIS occur prior to or at the beginning of the program of study (such as maintaining the SEVIS database and educating DSOs), amortization would result in ICE incurring costs years before it recovers such costs through fees.

In addition, there are a variety of types of educational institutions in the United States, such as community colleges and focused vocational educational programs of study that are relatively unique in the world. These United States institutions offer fields of study; academic, social, and geographic environments; and support services that cannot be found anywhere else. Noted American research facilities provide opportunities for advanced research and collaboration among an increasingly international community of scholars. Given the many variables that go into a nonimmigrant student's decision to study abroad, and the lack of validated data on this issue, there is no reliable basis to conclude that U.S. government fees represent a significant factor in

[12] *See* National Center for Education Statistics, Fast Facts: Tuition costs of colleges and universities, *https://nces.ed.gov/fastfacts/display.asp?id=76* (last visited Oct. 26, 2018) (showing the 2015–16 average total tuition, fees, room and board rates charged for full-time undergraduate students in degree-granting institutions).

persuading a student or exchange visitor to attend a school in the United States, or not. SEVP, consequently, cannot conclude at this time that the increase in the Form I–901 fee as a result of this rule would be directly or even indirectly related to a decrease in U.S. competitiveness for foreign students and exchange visitors.

Further, as discussed in the NPRM, after the fees were last increased in 2008 there was a brief decrease in the combined F, M, and J I–901 payments. However, the I–901 payment rate quickly recovered and ultimately reached record levels while the fees remained at the increased levels. *See* 83 FR 33762, 33775. Accordingly, an increase in fees does not necessarily precipitate a drop in enrollment. DHS acknowledges, however, that its analysis of the dropoff and subsequent increase in participants may not capture some applicants who forewent participation in SEVP due to the increased cost of application.

With respect to the comment about the use of cost reallocation, *i.e.,* the use of Form I–901 fee revenues to subsidize program integrity measures (such as mandatory biennial reviews) that would otherwise be funded through other fees (such as fees paid by schools), DHS notes that the benefits of program integrity measures accrue to F and M students and J exchange visitors, not just to institutions. DHS accordingly believes it reasonable for each F, M, and J nonimmigrant to share the cost by paying a small fee for this benefit rather than requiring SEVP-certified or Department of State (DOS)-designated institutions to bear the entire cost themselves. DHS also believes that such sharing of the costs, by lowering the respective costs of certification or designation, may be a contributing factor to the diversification of the type of schools that have sought SEVP certification and/or DOS designation thus benefiting F, M, and J nonimmigrants with a greater choice of schools.

In addition, as discussed above, 8 U.S.C. 1372 and 8 U.S.C. 1356(m) authorize a full range of SEVP activities and collection of fees related thereto, and not merely data collection. Also, inclusion of these costs is not inconsistent with the full cost concept as outlined in federal cost accounting guidance, generally applicable federal policy for user charges, and legal precedent.

Finally, DHS notes that even if a rise in the cost to F and M nonimmigrant students and J nonimmigrant exchange visitors were to cause a reduction in the demand by foreign students or exchange visitors for U.S. educational or exchange opportunities, that result would not alter this rulemaking. DHS and DOS must recoup the costs of administering the programs that manage F, M, and J nonimmigrants. The program cannot operate at a projected deficit based on a desire to attract a greater number of foreign students. If the rise in the cost causes a substantial reduction in the demand by foreign students or exchange visitors for U.S. educational or exchange opportunities, the lower revenue may not sustain the programs that manage the F, M, and J nonimmigrants. As stated previously, SEVP reviews its associated fees that are deposited into the IEFA biennially and, if necessary, will propose adjustments to ensure recovery of costs necessary to meet national security, customer service, and adjudicative processing goals at that time.

2. Impacts on Specific Applicant Groups

Several commenters voiced concern about the negative impact of the increased fee on all F, M, and J nonimmigrants, but particularly on students in short-term programs such as intensive English programs that are already reporting declines in enrollment. Several commenters expressed concern that specific groups of nonimmigrant students or specific programs could be disproportionately affected by the fee increases. For example, many commenters expressed concern that short-term programs of study, specifically English language training programs, would be negatively impacted by the increase in Form I–901 fees. These commenters noted that such programs are shorter than full degree programs and often cost less, making the fee increase relatively more burdensome than for students enrolled in multi-year programs of study.

For instance, some of these commenters suggested that the fee should be proportionate to the type of program of study a student is engaged in. Some of these comments suggested that students in short-term programs should be charged a lower fee than students in multi-year degree programs. One commenter suggested that for such short-term programs, the Form I–901 fee could account for 25 to 30 percent of the cost of a short-term program and stated that such a high percentage would be cost-prohibitive to many students to enroll in such programs. However, the commenter did not provide a clear basis for that 25 to 30 percent estimate, propose a specific amount for a short-term program fee, or explain how DHS would distinguish between "short-term" students and longer-term students.

Some commenters requested that DHS establish a lower or a graduated fee for the student, exchange visitor and school fees to minimize negative impact specifically of potential declining enrollments.

DHS declines to establish a lower or graduated fee for specific subgroups of nonimmigrants, such as those who require shorter-term nonimmigrant status, for multiple reasons.

First, SEVP has reviewed its program costs for processing students in short-term nonimmigrant status versus those in long-term nonimmigrant status and can find no convincing basis for charging a lower fee for students on short-term status. As discussed above and in the proposed rule, DHS must establish a fee schedule that allows for recovery of the full costs of current SEVP services and planned enhancements. The proposed fee schedule was based on a fee model that captured the full cost of operations for current activities and planned enhancements and apportioned that full cost to the appropriate program activities. The model assigned costs to the appropriate fee category based on the nature of the activity. The model does not contain separate activity types for students in short-term programs as compared to long-term programs.

DHS nonetheless conducted a qualitative review of the activities and their associated costs, and found that students in short-term programs do not necessarily impose lower costs on SEVP than students in long term programs. For instance, as indicated in Table 7, significant portion of the costs assigned to the I–901 fee are for student and exchange visitor investigations and school and sponsor investigations. Such investigations are not significantly less likely for students in short-term programs, and in some cases, poor oversight of students by short-term program DSOs has resulted in a particular need for investigations of those students and programs. Similarly, SEVP system maintenance costs are not significantly lower for short-term students.[13]

Second, DHS would incur additional administrative costs associated with separate processing of these fees, increasing the costs for all participants.

Finally, as F–1 nonimmigrant students may easily transfer from one

---

[13] For instance, the creation of a SEVIS record, regardless of program affiliation or program length, has certain fixed costs shared by all nonimmigrant students. In addition, with respect to the increased fees on the schools themselves, SEVP notes that the costs of certification, recertification, maintaining SEVIS, and training DSOs do not necessarily vary based on program type.

type of a program of study to another without paying another I–901 fee, charging a lower fee for certain types of programs creates an opportunity for abuse of the transfer function in order to avoid paying a full fee.

Accordingly, DHS will charge a single set fee regardless of the student's anticipated program length or other considerations.

3. Continued Fee of $35 for Au Pairs, Camp Counselors and Summer Work Travel

One commenter asked why the $35 fee for au pairs, camp counselors, and summer work/travel programs was not included in the funding increase and why such a fee could not be increased to subsidize F and M nonimmigrant student fee.

For the J-visa for exchange visitors, Congress provided the Department of Homeland Security with the authority to set fees consistent with the Department's estimation of the cost per individual of providing services. In addition to that general authority, Congress also specifically indicated that the fee for au pairs, camp counselors, and participants in summer work travel programs should be $35. 8 U.S.C. 1372(e)(4)(A). Based on the clear Congressional intent that the fee for au pairs, camp counselors and summer work/travel programs remain set at $35, the Department has decided to keep the fee set at that level.

4. Recertification Fee

Many commenters objected to the introduction of a recertification fee, stating that it will disproportionately burden smaller institutions, because those schools obtain less revenue from F and M nonimmigrant students. Some representatives of small institutions commented that the proposed recertification fee increase would likely be cost-prohibitive to them and they would likely not seek to renew their SEVP certification. Other commenters voiced concerns over the timing of the increase in the middle of an academic budget cycle.

DHS declines to establish a lower fee for smaller institutions, because following a qualitative review of the fee model (which does not distinguish between institutions based on size), DHS could not identify a convincing basis for doing so. Many of the administrative costs associated with recertification are fundamentally similar regardless of school size or type. Universities, secondary schools, public or private schools, and F and M schools receive the same SEVP certification. The workload and cost of certification

adjudications does not change for different types of schools. In addition, institutions with large nonimmigrant student populations typically require fewer resources in some respects, since they are more knowledgeable, have a stable professional pool of employees, and have better internal reporting systems to assist in their compliance efforts. By contrast, schools with smaller enrollments may require more frequent training of DSOs, or significant oversight if they are identified as higher risk.

With respect to the timing of the proposed fee increase, DHS appreciates this concern, but notes that DHS announced the likely publication of the proposed rule well in advance of the current academic year.[14] In addition, although the fee schedule will occur in the middle of a budget cycle, not all schools will be impacted during the current budget cycle.

Multiple commenters also opined that the interval of SEVP school recertification is too frequent at two years. One commenter suggested that the frequency of recertification should be decreased from two years to four or five years. DHS notes that EBSVERA, section 502, 8 U.S.C. 1762, and Homeland Security Presidential Directive–2 (HSPD–2) provided for DHS to periodically review all schools approved for attendance by F or M nonimmigrant students. Further, EBSVERA requires that DHS recertify all such schools within two years of enactment and conduct an additional recertification of these schools every two years thereafter. *See* 8 U.S.C. 1762(a). As the two-year recertification cycle is a statutory requirement, the frequency cannot be modified through rulemaking. Therefore, comments suggesting alternative recertification intervals are beyond the scope of this rulemaking.

5. Fee for Filing an Appeal or Motion

A few individuals and organizations commented on SEVP charging a fee to submit an appeal or motion following a denial or withdrawal of a school petition, the majority voicing their opposition to charging such a fee. Some questioned the meaningfulness of the fee when it covers only a fraction of the actual appeal cost and encouraged DHS to explore ways to increase efficiencies to decrease the cost of appeals and

motions. DHS recognizes the potentially adverse impact of a high appeal fee, and therefore reallocated some of the costs of handling appeals to other SEVP fees. DHS notes that it is exploring ways to increase efficiencies to reduce the cost of adjudications. At this time, however, DHS feels that the benefits of charging a fee to recover some portion of the costs of reviewing appeals and motions remain compelling. One commenter stated that the fee was excessive as the appeal process is the only recourse or way for the applicant to engage with adjudicators for discussion. DHS notes that this notice comes at a point in the overall process during which the applicant or petitioner has had significant opportunities for dialogue (*see, e.g.,* 8 CFR 214.4(b)(3) (referencing a school's right to request a telephonic interview after receiving a notice of intent to withdrawal SEVP certification)), and so concerns about the impact of the appeal fee amount for this reason are overstated.

6. Site Visit Fee

Some commenters asked SEVP to reconsider charging a site visit fee when an SEVP-certified school adds a new physical location or a campus where it plans to enroll F and M students. In particular, an organizational commenter objected to DHS's statement in the proposed rule that under the 2008 Fee Rule, DHS must impose a site visit fee for each location listed on the initial SEVP certification, as well as each location added as part of an initial event, such as a SEVIS update requesting approval of a changed or new location or campus. *See* 83 FR at 33771. The commenter wrote that current regulations require site visits only in the context of initial school certification under 8 CFR 214.3(h)(1), and not in the context of recertification (8 CFR 214.3(h)(2)) and out-of-cycle reviews (8 CFR 214.3(h)(3)). According to the commenter, those provisions refer to ''on-site reviews,'' not to site visits. The commenter also suggested that the on-site review, when necessary, is a less costly endeavor than an initial school certification site visit and thus a school should not be charged for an on-site review but only for an initial site visit.

As an initial matter, DHS disagrees with the commenter's assessment of the scope of the site visit fee under existing regulations. When DHS established the site visit fee, DHS made clear that for initial SEVP certification petitions, a petition fee ($1,700) is required for each institution and a site visit fee ($655) is required for each campus. DHS also made clear that SEVP-certified institutions seeking approval for change

---

[14] *See, e.g.,* Spring 2018 Unified Agenda of Federal Regulatory and Deregulatory Actions, RIN 1653–AA74, *available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804 &RIN=1653-AA74* (last visited Jan. 7, 2019) (indicating likely publication of a proposed rule in September of 2018).

of location must pay a site visit fee, and that SEVP-certified institutions seeking approval for a new campus must pay a site visit fee. 73 FR 55683, 55695.

These requirements are reflected in existing regulations, which provide as follows:

• The site visit fee applies to each location required to be listed on the form, and is not limited to the initial certification context. 8 CFR 103.7(b)(1)(ii)(B).

• As part of initial certification, SEVP will conduct a site visit for each petitioning school *and its additional schools or campuses.* 8 CFR 214.3(h)(1)(ii). As noted above, a fee is charged for each additional school or campus at the initial certification stage.

• The Form I–17 must include "any physical location in which a nonimmigrant can attend classes through the school (*i.e.,* campus, extension campuses, satellite campuses, etc.)." 8 CFR 214.3(a)(1)).

• Schools are subject to a continuing duty to update SEVIS school locations as changes arise, *i.e.,* even after initial certification, within 21 days of a change to a range of information types on the Form I–17, including school location and campus location. *See* 8 CFR 214.3(g)(2), (h)(3).

This makes amply clear that the intent of the 2008 Fee Rule was to apply the site visit fee whenever a school fulfills its duty to add a school or campus location in SEVIS.

DHS reaffirms that interpretation in this final rule. The site visit fee applies at the initial certification stage, and when a certified school updates its Form I–17 in SEVIS to indicate, pursuant to 8 CFR 214.3(g)(2)(i) and (h)(3), that it is changing its physical location or adding a new physical location or campus.

DHS emphasizes that the imposition of this fee is necessary to support the relevant operations. The revenue generated by the imposition of this fee assists in recovering the costs that DHS incurs for these site visits, which are necessary for program integrity purposes. Site visits are no less burdensome in the post-certification context, and warrant an equivalent fee, because SEVP must assess that the schools continue to possess the necessary facilities, personnel, and finances to conduct instruction regardless of the point in time at which the schools choose to use a location for the instruction of nonimmigrant students.

## VI. Statutory and Regulatory Requirements

### A. Executive Orders 12866, 13563, and 13771: Regulatory Review

Executive Orders 12866 ("Regulatory Planning and Review") and 13563 ("Improving Regulation and Regulatory Review") direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules and promoting flexibility. Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs") directs agencies to reduce regulation and control regulatory costs and provides that "for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process."

The Office of Management and Budget has designated this rule a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by OMB. This final rule imposes transfer payments between the public and the government with no new cost burdens. Thus, this rule is not subject to the requirements of Executive Order 13771.

No comments were received concerning the regulatory impact analysis contained in the proposed rule. With the exception of a minor technical amendment to Table 24, as described earlier in this preamble, there are no changes from the proposed to the final regulatory impact analysis. A final regulatory impact analysis follows.

### 1. Background and Purpose of the Rule

SEVP is a fee-funded program within ICE that provides oversight of certified schools and nonimmigrant students in the F and M visa category. SEVP uses SEVIS to monitor and track certified schools and F and M nonimmigrant students. DOS also uses SEVIS in the management of the Exchange Visitor Program for nonimmigrant exchange visitors in the J visa category. SEVIS is a web-based system administered by SEVP that retains data on nonimmigrant students and exchange visitors in the country. SEVP uses SEVIS to ensure accurate reporting and recordkeeping by schools and exchange visitor programs. SEVP also uses SEVIS to identify

enforcement actions for students and exchange visitors who are out of status.

The purpose of this final rule is to generate the necessary revenue to recover the full cost of the FY 2019 and FY 2020 budgets. SEVP is authorized to recover the full cost of all resources and services provided. The costs of SEVP activities have increased, and the fees collected no longer cover the costs. The fee increase is needed to meet long-term cash flow needs and achieve solvency.

SEVP projects an annual budget of $186.6 million in FY 2019 and $188.4 million in FY 2020. SEVP forecasts $121.6 million in revenue for FY 2019 and FY 2020 without a fee change. The implementation of this rule would provide SEVP with additional fee revenue of $75.2 million in FY 2019 and $73.5 million in FY 2020. If DHS does not adjust the current fees to recover the costs of processing the enrollment of F and M students, certification and recertification of schools, processing relating to J exchange visitors, appeals, and site visits, it will be forced to make reductions in oversight, security, and service as compared to current projections.

To determine the full cost associated with SEVP and the management of SEVIS, SEVP used ABC methodology. ABC first identifies activities in an organization and then assigns the cost of each activity according to the resources they consume. SEVP identified the following as its primary activities: Collecting and retaining information on F, M, and J nonimmigrants; certifying schools; overseeing school compliance; recertifying schools; adjudicating appeals; investigating suspected violations of immigration law and other potential threats to national security by F, M, or J nonimmigrants; providing outreach and education to users; and performing regulatory and policy analysis. SEVP also recognizes management and overhead costs associated with the program.

With this rule, SEVP will collect five fees paid by two source categories: Individuals will pay the Form I–901 fee, and institutions will pay the Form I–17 certification fee, Form I–17 recertification fee, the fee for a motion or appeal, and the site visit fee. By tracing expenditures of the activities previously listed to the various fee categories, SEVP forecasted fee payments to determine the appropriate fee amount for each fee type in this rule.

Table 20 presents an accounting statement summarizing the annualized transfer amounts and qualitative benefits of the final rule. With this rule, schools will pay a higher fee for initial SEVP certification and will incur a fee

for recertification, a site visit when adding a new physical location or campus, and the filing of a motion or appeal. In addition, F and M nonimmigrant students and J nonimmigrant exchange visitors will pay higher fees.

**BILLING CODE 9111–28–P**

## Table 20: Accounting Statement for FY 2019

| Category | Primary Estimate | |
|---|---|---|
| Qualitative Benefits | SEVP will be able to maintain the current level of service. This rule will enhance SEVP's capability to support national security and counter immigration fraud through the continued development and implementation of critical system and programmatic enhancements. Enhancements to SEVIS, including the establishment of a student portal, will assist DSOs in their regulatory obligation to provide accurate and timely information and rebalance this reporting requirement by providing students an automated means to do so. Increased adjudication personnel will assist in reducing recertification processing times, while enhanced vetting protocols will ensure that only those eligible to enter and remain in the country do so. | |
| Transfers | 7% Discount Rate $75,231,420 from schools and students to the government<br>3% Discount Rate $75,231,420 from schools and students to the government | |

| Category | Effects | Source |
|---|---|---|
| Effects on State, local, and/or tribal government | The final rule increases and establishes additional fees on state, local, and/or tribal government-funded educational institutions for support of SEVP operations. This rule increases the I-17 certification fee and creates the I-17 recertification fee and a fee for filing an appeal or motion. In addition, SEVP will collect a site visit fee when an SEVP-certified school adds a campus/location. | Final Rule, Executive Order 12866 analysis |
| Effects on small businesses | The final rule increases and establishes additional fees for educational institutions in support of SEVP operations. This final rule increases the I-17 certification fee and create the I-17 recertification fee and a fee for filing an appeal or motion. In addition, SEVP will collect a site visit fee when a school certified by SEVP adds a campus/location. | Final Regulatory Flexibility Analysis |

2. Impacts of Regulatory Change

This rule amends the current fee levels for the individual student and exchange visitor application fee (Form I–901 fee) and school certification petition for initial certification. It maintains the current fee for site visits and makes clear that SEVP will impose it for any change of location or additional physical location or campus reported as an update by a certified school. It also institutes a fee for school recertification petitions and the filing of appeals and motions by schools. The amended fee structure reflects existing and projected operating costs, program requirements, and planned program improvements.

The current Form I–901 fee levels are based on a fee analysis performed when SEVP last increased the fees in 2008. *See* 73 FR 55683. Those cost calculations were established on the basis of projected workload. Since 2008, SEVP's program mission tasks have expanded significantly. The expansions of certification, recertification, and

appeals costs and the subsidization of excess costs not recovered by fees have led to the need for the fee increase. Additionally, SEVP now provides investigative analysis to support enforcement operations, has increased numbers of adjudication personnel, and is undergoing SEVIS Modernization. Concurrently, costs associated with these program tasks have been affected by increased costs due to inflation. This rule's fees will result in recovery of the full cost of SEVP analysis and support operations with fee-generated revenue; alignment of the fees with current and projected costs and processes that have been adjusted as the program has gained experience and sophistication; and the agency's adoption of more detailed and accurate data sources and improved management tools to align resources and workload.

a. Form I–901 F and M Fee

F nonimmigrants, as defined in INA section 101(a)(15)(F), 8 U.S.C. 1101(a)(15)(F), are foreign students who come to the United States to pursue a full course of academic study in SEVP-approved schools and their dependents. M nonimmigrants, as defined in INA section 101(a)(15)(M), 8 U.S.C.1101(a)(15)(M), are foreign nationals pursuing a full course of study at an SEVP-certified vocational or other recognized nonacademic program (other than language training programs) in the United States and their dependents.

International F and M nonimmigrant students seeking temporary admission into the United States to attend a U.S. educational institution must pay the Form I–901 F and M fee. In this final rule, SEVP increases the Form I–901 F and M fee from $200 to $350.

From 2007 through 2017, SEVP received an average of 450,581 Form I–901 F and M fee payments per year. Table 21 shows the volume of Form I–901 F and M fee payments received and the annual average number of fee payments from 2007 to 2017. As previously discussed, SEVP has forecasted 418,393 Form I–901 F and M fee payments in FY 2019 and 407,933 FY 2020, respectively.

**Table 21: Form 1-901 F and M Fee Payments FYs 2010–2017**

| Fiscal Year | Fee Payments |
|---|---|
| 2007 | 358,666 |
| 2008 | 400,090 |
| 2009 | 348,815 |
| 2010 | 389,255 |
| 2011 | 431,180 |
| 2012 | 449,029 |
| 2013 | 469,986 |
| 2014 | 519,751 |
| 2015 | 574,158 |
| 2016 | 545,203 |
| 2017 | 470,261 |
| Annual Average (2007–2017) | 450,581 |
| Forecasted 2019 | 418,393 |
| Forecasted 2020 | 407,933 |

Table 22 illustrates the incremental increase DHS is finalizing with this rule for the Form I–901 F and M fee.

Individuals who submit a Form I–901 will pay an additional $150 under this final rule, which is a 75 percent increase.

**Table 22: Form I-901 F and M Incremental Fee Increase**

| Type | Current Fee | New Fee | Difference (New–Current) |
|---|---|---|---|
| I-901 F and M | $200 | $350 | $150 |

SEVP estimates that the fee increase will result in an annual increase of transfer payment from students who submit a Form I–901 to the government of approximately $62 million per year ($150 increase × 418,393 FY 2019 number of applicants = $62,758,950; $150 increase × 407,933 FY 2020 number of applicants = $61,189,950).

b. Form I–901 J—Full Fee

DOS generally oversees the exchange visitor program, which includes nonimmigrants who are charged the full Form I–901 J fee. J exchange visitors are nonimmigrant individuals approved to participate in an exchange visitor program in the United States and the spouse and dependents of the exchange visitors. This fee is associated with J–1 nonimmigrants participating in a designated exchange visitor program. Certain other J–1 categories are subject to a reduced fee or are exempt from a fee in accordance with 8 U.S.C. 1372(e). SEVP and DOS have a memorandum of reimbursable agreement. DOS sends

**23956**        Federal Register / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

SEVP its actual expenditures, and SEVP reimburses them quarterly. Each year, SEVP and DOS review and update the memorandum. Table 23 displays the affected Exchange Visitor Program categories subject to the full Form I–901 J fee and the purpose of the visit.[15]

### Table 23: J-1 Nonimmigrant Exchange Visitor Program Categories Subject to Form I-901 Full J Fee

| Exchange Visitor Program Category | Purpose of Visit |
|---|---|
| Short-term Scholar | Lecture, observe, consult, training, demonstrate special skills. |
| Professor and Research Scholar | Research Scholar: Research, observe, or consult in connection with a research project. Professor: Teach or lecture at university, observe, or consult. |
| Physician | Pursue graduate medical education or training at accredited schools of medicine or scientific institutions. |
| Intern | Structured internship program that is in the student's field of study. |
| Trainee | Structured training program that is in the trainee's professional field. |
| Specialist | Observing, consulting, or demonstrating special skills. |
| Teacher | Teach full-time in an accredited primary, including pre- kindergarten, or secondary (K-12) public or private school. |
| Secondary School Student | Study in the U.S. at accredited public or private secondary schools for an academic semester or an academic year, while living with American host families. |
| College and University Student | Participate in a degree or nondegree program at an accredited postsecondary academic institution, or participate in a student internship program. |
| Government visitor (non-Federal) | Engage in observation tours, discussions, consultations, professional meetings, conferences, workshops and travel when selected by a state or local government agency |

SEVP receives an average of 151,958 Form I–901 Full J payments per year (FYs 2007–2017). Table 24 displays the volume of Form I–901 Full J fee payments received and the annual average number of fee payments. SEVP has forecasted 157,550 Form I–901 Full J payments in FY 2019 and 153,612 in FY 2020.

---

[15] *See* Department of State, Exchange Visitor Program Category Requirements (June 2016), *https://j1visa.state.gov/wp-content/uploads/2017/* *06/Exchange-Visitor-Program-Category-Requirements.pdf (last visited Feb. 26, 2018).*

### Table 24: Form I-901 Full J Fee Payments FYs 2010–2017

| Fiscal Year | Fee Payments |
|---|---|
| 2007 | 132,213 |
| 2008 | 137,173 |
| 2009 | 129,979 |
| 2010 | 139,534 |
| 2011 | 148,253 |
| 2012 | 155,008 |
| 2013 | 160,522 |
| 2014 | 172,530 |
| 2015 | 168,967 |
| 2016 | 164,401 |
| 2017 | 162,959 |
| Average (2007–2017) | 151,958 |
| Forecasted 2019 | 157,550 |
| Forecasted 2020 | 153,612 |

The difference between the final and current fees for the Form I–901 Full J applicants is $40, an increase of approximately 22 percent, as shown in Table 25.

### Table 25: Form I-901 Full J Incremental Fee

| Type | Current Fee | New Fee | Difference (New–Current) |
|---|---|---|---|
| I-901 J-Full | $180 | $220 | $40 |

The annual increase in transfer payments from Form I–901 Full J applicants to the government is expected to be $6,302,000 in FY 2019 and $6,144,480 in FY 2020 ($40 increase in fee × 157,550 FY 2019 and 153,612 FY 2020 forecasted number of applicants). The increase in J fees is meant to recover the full cost of J program operations for SEVP, which includes the reimbursement to DOS, SEVIS costs, and other adjudication services for J exchange visitors. For the purposes of calculating fees, SEVP isolates the costs specifically incurred by operating the J visa program. As it stands, the J visa program operates at a greater cost than the revenue that Form I–901 J fees bring to the program; therefore, SEVP increases the Form I–901 Full J fee to cover the $39.4 million full cost of operating the J visa program on an annual basis.

c. Form I–17 School Certification and Recertification Fee

For a U.S. school to enroll F and M nonimmigrant students, it is required to be certified by SEVP. A school petitions for SEVP certification to enroll these students by completing and submitting Form I–17, "Petition for Approval of School for Attendance by Nonimmigrant Student," online through SEVIS.

All SEVP-certified schools are required to go through the recertification process every two years to ensure they remain qualified for certification and adhere to all requirements according to the regulations.

From FY 2012 to 2016, there has been an annual average of 423 schools applying for SEVP certification. As previously discussed, DHS calculated the three year moving average to minimize the variation in forecasting the population data. The Form I–17 initial certifications from FYs 2012 through 2016 are shown in Table 26.

**23958**     **Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

## Table 26: FYs 2012–2016 I-17 Initial Certifications

| Fiscal Year | I-17 Certification Petitions | 3-Year Moving Average |
|---|---|---|
| 2012 | 457 | - |
| 2013 | 382 | - |
| 2014 | 446 | 428 |
| 2015 | 469 | 432 |
| 2016 | 363 | 426 |
| **Total** | **2,117** | **-** |

SEVP uses the three year moving average to predict that there will be 426 initial certifications in both FY 2019 and FY 2020, respectively.

As of May 2017, there were 8,746 SEVP-certified schools. DHS assumes that approximately half, or approximately 4,373 schools, will recertify each year, including the 1,728 schools with no active F or M nonimmigrant students. DHS assumes that a school would prefer to recertify for a $1,250 fee instead of allowing certification to lapse and thereafter having to again pay the initial certification fee of $3,000. The initial certification fee is a 76 percent increase from the current fee.

The current fee to apply for initial certification is $1,700, which has not changed since 2008. SEVP does not currently charge a recertification fee; the new fee amount is $1,250. The Form I–17 initial certification and Form I–17 recertification incremental fees are shown in Table 27.

## Table 27: I-17 Incremental Fees

| Type | New Fee | Current Fee | Difference (New–Current) |
|---|---|---|---|
| I-17 Initial Certification Fee | $3,000 | $1,700 | $1,300 |
| I-17 Recertification Fee | $1,250 | $0 | $1,250 |

The annual increase in transfer payments from schools to the government from Form I–17 initial certifications is expected to be $553,800 ($1,300 increase in fee × 426 (FY 19 and FY 20 forecasted number of Form I–17 initial certifications)). The annual increase in transfer payments from schools to the government for Form I–17 recertification is expected to be $5,466,250 ($1,250 increase in fee × 4,373 (FY 2019 and FY 2020 forecasted number of recertifications)).

d. Fee for Motion or Appeal

When a school is denied certification or recertification, the school receives a denial letter through certified mail. The denial letter explains the reason for the denial and the steps to appeal. The school can appeal by filing the Form I–290B. This rule finalizes that SEVP impose a filing fee of $675, which is also the fee currently charged by USCIS upon submission of the Form I–290B.[16] SEVP does not currently collect a fee from a school that files a motion or appeal. DHS finalizes its regulations to institute this fee for a school filing an appeal or motion in order to establish a more equitable distribution of costs, improve services by decreasing an appeals or motions throughput time and a more sustainable level of cost recovery relative to the services provided.

SEVP processed an average of 54 motions and appeals from schools annually from 2013 to 2016. DHS assumes that there will be the same number of appeals or motions filed in FY 2019 and FY 2020.

The total annual increase in transfer payments from schools to the government for filing an appeal or motion is expected to be $36,450 ($675 fee × 54 (FY 2019 and FY 2020 forecasted number of fee payments)).

e. Site Visit Fee

As noted above, current regulations provide authority for SEVP to charge a site visit fee to schools that apply for initial certification or report a change of physical location, or addition of a physical location or campus. The site visit allows SEVP an opportunity to gather evidence on the school's eligibility, review school facilities, and interview personnel listed on the Form I–17 as a PDSO or DSO. SEVP currently collects the $655 fee when a school files a petition for certification to issue Forms I–20 or by a certified school when it physically moves to a new location. This final rule notifies the public that following completion of this rulemaking, SEVP plans to also collect the fee from any certified school that adds a physical location or campus, by updating its Form I–17 in SEVIS, consistent with the above authorities and the agency's longstanding interpretation.

SEVP performs 600 site visits annually. Of these 600 visits, 426 will be at schools that apply for initial certification and currently pay the $655 site visit fee. The remaining 174 site visits may include visits when a school adds a new physical location or campus. The site visit fee amount, $655, remains the same.

The annual increase in transfer payments from schools to the government due to site visits is expected to be $113,970 ($655 fee × 174 (FY 2019 and FY 2020 forecasted number of site visits)).

f. Conclusion

SEVP expects to have a total increase in fees of $68.7 million per year, discounted at seven percent, transferred from individuals and entities for the services they receive, to the government.

[16] USCIS Form I–290B, Notice of Appeal or Motion, Filing Fee of $675, https://www.uscis.gov/i-290b.

Table 28 shows the summary of the total annual number of payments, incremental fee amounts, and total fees transferred.

### Table 28: Final Annual Incremental Fee Amounts, FY 2019

|  | Annual Number of Payments | Incremental Fee Amounts | Annual Fee Transfer to Government |
|---|---|---|---|
| **I-901 F and M** | 418,393 | $150 | $62,758,950 |
| **I-901 J-Full** | 157,550 | $40 | $6,302,000 |
| **I-17 Initial Certification** | 426 | $1,300 | $553,800 |
| **I-17 Recertification** | 4,373 | $1,250 | $5,466,250 |
| **Site Visit – initial** | 426 | $0 | $0 |
| **Site Visit – new location** | 174 | $655 | $113,970 |
| **Appeal or Motion** | 54 | $675 | $36,450 |
| **Total** |  |  | $75,231,420 |

3. Alternatives to Regulatory Change

SEVP examined several alternatives to the final fee structure, including no increase to any fee, only increasing the Form I–901 fee and Form I–17 SEVP school certification fee, and the unsubsidized results of the ABC model.

Without an increase in fees, SEVP will be unable to maintain the level of service for students and schools that it currently provides as well as the compliance and national security activities discussed above. SEVP considered the alternative of maintaining fees at the current level but with reduced services and increased processing times, but has decided that this would not be in the best interest of applicants and schools. SEVP seeks to minimize the impact on all parties, but in particular small entities. If SEVP followed this alternative scenario, there would be a shortfall of revenue of over $65.4 million in FY 2019 to cover expenses. SEVP rejected this alternative. SEVP must pay for the expenses of maintaining and improving SEVIS and adjudicating schools applying to be certified by SEVP in a timely manner.

SEVP also considered raising only the Form I–901 and Form I–17 certification fees instead of including a new fee for recertification and for filing an appeal or motion. If SEVP followed this scenario, the Form I–901 F and M fee would have increased to $350 to cover the shortfall in revenue, but the Form I–17 initial certification fee would have also increased to $4,200. This would have tripled the existing certification fee while allowing schools with zero foreign students to remain active SEVP schools that require SEVP effort for recertification. SEVP rejected this fee structure as it would have continued to add workload to SEVP's recertification branch. Without any disincentive to recertify, the list of schools recertifying would likely continue to grow. The new fees, however, establish a more equitable distribution of costs and a more sustainable level of cost recovery relative to the services provided.

SEVP also considered the unsubsidized results of the ABC model as an alternative, which allocated the Form I–901 F and M fee, school certification fees, and the fee to file an appeal or motion as shown in Table 29.

### Table 29: Unsubsidized Fee Amounts

| Fee Type | Unsubsidized Fee Amounts |
|---|---|
| I-901 F and M | $290 |
| I-901 J-Full | $130 |
| I-901 J-Partial | $130 |
| I-17 Initial Certification | $4,600 |
| I-17 Recertification | $6,000 |
| Appeal or Motion | $38,475 |
| Site Visit | $650 |

BILLING CODE 9111–28–P

SEVP rejected this alternative for several reasons. As a starting point, the current fee to file Form I–290B with USCIS is $675. The same form is required to file an appeal or motion with SEVP and using the existing USCIS fee is a consistent and reasonable means of implementing this new fee without discouraging schools from seeking an appeal. Setting the appeal fee at the amount that SEVP's standard methodology would dictate ($38,475) would result in a fee that is prohibitively expensive for many SEVP-certified schools, a significant portion of which have fewer than ten nonimmigrant students. Similarly, SEVP rejected the alternative to set the recertification fee at the ABC model output amount of $6,000. A recertification fee higher than the initial certification fee would also discourage schools from seeking recertification. SEVP instead sets the recertification fee at a level that is less than the initial certification fee. When schools can maintain their certification, F and M nonimmigrant students enrolled in the withdrawn school avoid complications such as being forced to transfer schools, leave the United States, or risk facing immigration law penalties for violating the terms of their nonimmigrant status.

SEVP also rejected the initial certification fee of $4,600, an increase of almost three times the current fee of $1,700. In the fee development, DHS balanced the challenge of minimizing the costs to schools and students while recovering funding to support SEVP services. The population of Form I–901 F and M nonimmigrant students relative to the population of Form I–17 schools allows for a minimal fee adjustment to be spread over the student population to reduce the cost burden on individual institutions seeking recertification.

*B. Regulatory Flexibility Act*

1. Final Regulatory Flexibility Analysis

The Regulatory Flexibility Act (RFA) at 5 U.S.C. 604 generally requires Federal agencies to consider the economic impact of their rules on small entities. In accordance with the RFA, DHS has prepared a Final Regulatory Flexibility Analysis (FRFA) that examines the impacts of the rule on small entities. The term "small entities" encompasses small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of fewer than 50,000.

2. A Statement of the Need for, and Objective of, the Rule

This rule will adjust current fees and collect new fees to ensure that SEVP is able to recover the costs of the management and support of its program activities. DHS's objectives and legal authority for this final rule are further discussed throughout this final rule preamble. The objective of the final rule is to prevent an anticipated funding deficit in operating the SEVP. More specifically, this rule increases the SEVP funding stream by adjusting the Form I–901 F and M fee, Form I–901 J–Full fee, and Form I–17 certification fee, and by instituting the Form I–17 recertification fee and a fee for filing an appeal or motion. This final rule also announces the collection of a site visit fee when an SEVP-certified school adds a new physical location or campus at which it provides educational services to nonimmigrant students. The funding supports existing SEVP activities and planned enhancements critical to current SEVP oversight of schools and the monitoring of nonimmigrant students in the F, M, and J visa classifications for national security purposes. ICE continues to examine programmatic goals, which may include enforcement costs generated by SEVP information or compliance investigations. As such projections have not yet been completed, any related costs are beyond the scope of this rulemaking effort.

The legal basis for this final rule increasing the SEVP funding stream is grounded in the Homeland Security Act of 2002, which created DHS and imparted upon DHS the responsibility for SEVIS. DHS uses SEVIS to meet the monitoring and verification requirements under EBSVERA sections 501–02, 8 U.S.C. 1761–62), and to conduct a recertification of schools every two years following the date of EBSVERA's enactment. The Secretary of Homeland Security is authorized to collect fees for SEVP from prospective F and M nonimmigrant students and J nonimmigrant exchange visitors. IIRIRA section 641(e)(1), as amended, 8 U.S.C. 1372(e)(1). The Secretary is authorized to revise nonimmigrant fees on a periodic basis to account for changes in the cost of executing SEVP. IIRIRA section 641(g)(2), 8 U.S.C. 1372(g)(2). In addition, INA section 286(m), 8 U.S.C. 1356(m), provides that DHS may set fees "at a level that will ensure recovery of the full costs of providing [adjudication] services."

3. A Statement of Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

DHS published the Adjusting Program Fees for the Student Exchange Visitor Program NPRM which included the initial regulatory flexibility analysis on July 17, 2018 (83 FR 33762) with the comment period ending September 17, 2018. During the 60-day comment period, DHS received multiple comments that referred to the proposed rule's potential impact on small entities. These comments, however, did not result in any revisions to the established fee amounts for small entities in this final rule. DHS summarizes and responds to the significant issues raised by the public comments below.

Comments on Form I–17 Recertification Fee

Several commenters objected to the proposed Form I–17 recertification fee. Commenters specifically mentioned that the Form I–17 recertification will disproportionately burden smaller entities. Several commenters discussed concerns with the new Form I–17 recertification fee, because it is required every two years. One commenter said small rural public-school districts cannot afford the new expense of $1,250 to petition for recertification. A commenter who identified himself as affiliated with a rural high-need public school district, said the recertification fee will greatly inhibit the district's ability to continue a valuable program for its students.

One commenter wrote the proposed recertification fee would be cost-prohibitive to their international program and they would therefore be forced to pass on the additional expense incurred to the program onto international students. This commenter suggested applying a prorated fee schedule based upon the average number of Forms I–20 issued or the average number of attending students during the prior certification period.

A commenter stated that he or she was uncertain as to what information, statistics, guidance and studies were used to derive the proposed fees, but that it was not fair for a small institution to have to pay the same amount as an institution with high enrollment.

One commenter wrote that the recertification fee burden on small institutions may be the reason some institutions close their F–1 programs, which would negatively impact potential students who can no longer attend and domestic students who miss out on the opportunity for cultural and academic exchange. Overall, many commenters stated that it is not fair for a small institution to pay the same amount as an institution with larger enrollment numbers.

## DHS Response to Comments on the Form I–17 Recertification Fee

Many commenters objected to DHS requiring small schools to petition for recertification and pay the fee every two years. DHS is mandated by EBSVERA section 502, 8 U.S.C. 1762(a), and HSPD–2 to periodically review all schools approved for admission of F or M students; EBSVERA specifically mandates a two-year review cycle. The recertification fee is used to support DHS's compliance with EBSVERA and HSPD–2 and to improve the recertification process.

Regarding the commenters' suggestion that DHS apply a gradual fee scale over time or base the fee on the number of international students attending the school, DHS has ultimately decided not to institute a separate fee amount for small institutions. As DHS notes earlier under the section entitled, Recertification Fee, DHS declines establishing a lower fee for smaller institutions. Following a qualitative review of the fee model (which does not distinguish between institutions based on size), DHS could not identify a convincing basis for establishing a lower fee for small institutions. However, DHS identified two main reasons for keeping the recertification fee the same for all size schools. First, many of the administrative costs related to the recertification process are essentially similar irrespective of school type. The workload and cost of recertification adjudications does not change for different types of schools. Second, institutions with large nonimmigrant student populations typically require fewer resources in some respects, since they are more knowledgeable in the process, have a stable professional pool of employees, and have better internal reporting systems to assist in their compliance efforts. By contrast, schools

with smaller nonimmigrant enrollment may require more frequent training of DSOs, or significant oversight if they are identified as higher risk.

Further, DHS conducted an analysis that compared the amount of the recertification fee to the overall revenue of affected small entities. DHS found that of the 7,037 small schools expected to apply for recertification and pay the final fee of $1,250, 50 schools, or less than one percent of all the small schools, will experience an impact greater than one percent, but less than three percent, of the school's annual revenue. See a detailed recertification fee regulatory flexibility analysis below.

With respect to the commenter who expressed uncertainty with respect to how the recertification and other fees are determined, DHS refers the commenter to the NPRM preamble, which described SEVP's current and future spend plans by organization and program category (Table 4), described future budget plans by initiative (Table 5), and allocated costs by activity type (Table 7). The NPRM also contained a comprehensive discussion of the basis for the individual fee calculations (see, e .g., 83 FR 33775 et seq.), as well as information about how to access the software used to calculate the fees (see 83 FR 33764).

## Comments on Proposed Form I–901 Fees

Commenters objected that the proposed increase in the I–901 fees may lead to decreased enrollment at their small institutions from international students. Commenters raised objections that the increase in the I–901 fees made their small institutions less competitive with schools in other countries.

## DHS Response to Proposed Form I–901 Fees

In response to these comments, SEVP reiterates from above that it supports international education. As stated above, nonimmigrant students typically have positive experiences while in the United States, and the goodwill engendered by all that the United States has to offer encourages mutually beneficial international relations. However, DHS must establish a fee schedule that allows for recovery of the full costs of current SEVP services and planned enhancements. Increasing the Form I–901 fees allows DHS to recover the costs of SEVP services and planned enhancements.

## Comments on All Fee Adjustments and Potential Alternatives

Some commenters expressed concern that all the fee adjustments proposed would be burdensome to their small institutions and that DHS should charge its fees based on a scale of how many international students are enrolled.

## DHS Response to Comments on All Fee Adjustments and Proposed Alternatives

DHS conducted an initial regulatory flexibility act analysis to consider how all the fee adjustments may cumulatively affect a small entity that is responsible for paying them. Commenters did not provide significant new data for DHS to consider in terms of impacts to small institutions. DHS rejects the alternative suggested by commenters to have a fee structure based on a scale of how many international students are enrolled at an institution. As stated above, since many of the costs associated with establishing an F or M student record in SEVIS occur prior to or at the beginning of the program of study (such as fixed costs of maintaining the system and educating DSOs), an equitable reduction in fees based on the number of students would be insignificant. SEVP reviews its fee structure biennially and will continue to explore additional means of configuring or tailoring the fees to better meet the needs of the stakeholders, including consideration of a tiered program if justified. In light of the significant adjustments in its fee structure, in its next biennial review SEVP will take into specific consideration any reductions in participation by small entities when determining a potential need for a tiered program.

4. The Response of the Agency To Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

DHS did not receive comments from the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule.

5. A Description and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

This analysis does not apply to increases in the Form I–901 F and M fees because these fees are paid by individuals who are not, for purposes of the RFA, within the definition of small entities established by 5 U.S.C. 601(6). DHS assumes that the Form I–901 J fees are also paid by individuals and did not receive comments on this assumption.

As of May 2017, there were a total of 8,746 SEVP-certified schools that would be subject to the Form I–17 recertification fee, site visit fee, and fee to file a motion or an appeal. New schools applying for SEVP certification will be subject to the Form I–17 initial certification fee. Of the 8,746 SEVP-certified schools, 2,013 have identified as public schools on their Form I–17 form. The remaining 6,733 schools have identified themselves on the Form I–17 as private for-profit, private nonprofit, or private unspecified entities.[17]

Of the 2,013 SEVP-certified public schools, DHS conducted a random sample of 100 [18] schools to approximate the number of public schools in governmental jurisdictions with a population of less than 50,000. Out of the 100 public schools, 22 are located in a city or school district with a population fewer than 50,000. Using this finding of 22 percent, DHS infers 443 SEVP-certified public schools are considered a small entity as defined by SBA.

[17] Prior to October 1, 2016, schools had two options in SEVIS to select their school type: Public or private unspecified. With the recent SEVIS update, schools can choose one of three options: public, private for-profit, or private nonprofit.

[18] The random sample helps ensure an accurate representation of the population with each school having an equal chance of being included. In determining the sample size DHS utilized a 90 percent confidence level (z-score), 10 percent margin of error (e), and a 50 percent population proportion (ŝ) used as an unknown input and to maximize the estimate to overestimate sample size.

DHS conservatively assumes that all 1,507 private nonprofit schools certified by SEVP are small entities because they are not dominant in their fields. DHS also conservatively assumes that the 4,755 schools that are private unspecified are small entities. DHS did not receive comments on this assumption.

To determine which of the remaining 471 private for-profit schools are considered a small entity, DHS references the Small Business Administration (SBA) size standards represented by business average annual receipts. Receipts are generally defined as a firm's total income or gross income. SBA's Table of Small Business Size Standards is matched to the North American Industry Classification System (NAICS) for industries.[19] DHS matches information provided by the schools in SEVIS regarding what programs of study it is engaged in with an appropriate NAICS industry

The sample size equation used $n = (z \wedge (1 - \pi))$ / $e \wedge 2$ provided inputs ((1.55] ^2(.5)(.5))/301 = 69 and rounded up to 100 to over sample. DHS has revised the number of small public schools estimated in the Initial Regulatory Flexibility Analysis. DHS estimated the number of small public schools by first identifying that 61 of the 100 entities are state-administered entities are therefore not considered small entities under the RFA. For the remaining schools, DHS then identified geographic population data matched to the school district as provided in SEVIS, sourced from the U.S. Census Bureau, Small Area Income and Poverty Program, *https://www.census.gov/data/datasets/2016/demo/saipe/2016-school-districts.html* (last visited April 19, 2019) or to the school's city address provided in SEVIS, sourced from U.S. Census Bureau 2010–2016 Cities and Towns (Incorporated Places and Minor Civil Divisions), *https://www.census.gov/data/tables/2016/demo/popest/total-cities-and-towns.html* (last visited July 11, 2018).

[19] U.S. Small Business Administration, Tables of Small Business Size Standards Matched to NAICS Codes (Oct. 1, 2017), *https://www.sba.gov/sites/default/files/files/Size_Standards_Table_2017.xlsx.*

description. NAICS is the standard classification used to categorize business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. economy.

DHS finds that the revenue of 332 of the 471 private, for-profit schools meet the SBA size standard of a small business according to their industry. DHS estimates each private school's annual receipts by multiplying the approximate annual cost of room, board, and tuition by the average annual number of total students, based on data provided by the schools on their Forms I–17. Every two years, as part of the recertification process, a school submits the approximate annual cost of room, board, and tuition per student and the average annual number of total students, both domestic and international. DHS acknowledges that this method to estimate receipts may be an incomplete account of a school's income, which may also include contributions from private individuals or other endowments. Since these data reflect a snapshot of all SEVP-certified schools as of May 24, 2017, DHS acknowledges there may be day-to-day changes in the status of a school's certification and that a school's revenue may differ from actual revenue due to a 2-year lag in school self-reporting before a school is required to recertify.

Given these assumptions, DHS estimates that 7,037 schools meet the SBA definition of a small entity. This is approximately 80 percent of the 8,746 SEVP-certified schools included in this analysis.

Table 30 shows a summary by school type of the number of SEVP-certified schools and estimated small entities.

**BILLING CODE 9111–28–P**

### Table 30: SEVP-Certified Schools by School Type

| Description | Total | Small Entities |
|---|---|---|
| Public Schools | 2,013 | 443 |
| Private, nonprofit schools | 1,507 | 1,507 |
| Private, unspecified schools | 4,755 | 4,755 |
| Private, for-profit schools | 471 | 332 |
| Total Number of SEVP-Certified Schools | 8,746 | 7,037 |

Table 31 provides a summary of the SEVP-certified schools by industry. Table 31 also shows the NAICS industry description, the NAICS code, and the number of small and large schools by industry. Note that the number of small schools includes all nonprofits and unspecified private schools. Most industries with SEVP-certified schools consist of a majority of small schools.

### Table 31: Number of SEVP–Certified Schools by Industry

| School Industry | NAICS Industry Description | NAICS Codes | Number of Small Schools | Number of non-small Schools | Total SEVP-Certified Schools | Percent Small Schools |
|---|---|---|---|---|---|---|
| Elementary and Secondary Schools (private) | Industry primarily engaged in providing academic courses and related course work that contain a basic preparatory education. A basic preparatory education generally starts kindergarten through 12th grade. | 611110 | 3,472 | 18 | 3,490 | 99% |
| Junior Colleges | Industry primarily engaged in providing academic or technical courses and granting associate degrees, certificates, or diplomas below the baccalaureate level. | 611210 | 11 | 2 | 13 | 85% |
| Colleges, Universities, and Professional Schools | Industry primarily engaged in providing academic courses and granting degrees at baccalaureate or graduate levels. The requirement for admission is at least a high school diploma or equivalent general academic training. | 611310 | 2,150 | 57 | 2,207 | 97% |
| Computer Training | Industry primarily engaged in providing computer training (except computer repair), such as computer programming, software packages, computerized business systems, computer electronics technology, computer operations, and local area network management. | 611420 | 13 | 0 | 13 | 100% |

| School Industry | NAICS Industry Description | NAICS Codes | Number of Small Schools | Number of non-small Schools | Total SEVP-Certified Schools | Percent Small Schools |
|---|---|---|---|---|---|---|
| Professional and Management Development Training | Industry primarily engaged in providing a collection of short interval courses and sessions for management and professional development. Training for career development may be provided directly to individuals or through employers' training programs, and courses may be customized or modified to meet the special needs of customers. | 611430 | 18 | 0 | 18 | 100% |
| Cosmetology and Barber Schools | Industry primarily engaged in providing training in hair styling, barbering, or cosmetic arts, such as makeup or skin care. | 611511 | 91 | 3 | 94 | 97% |
| Flight Training | Industry primarily engaged in providing aviation and flight training. | 611512 | 199 | 1 | 200 | 100% |
| Apprentice-ship Training | Industry primarily engaged in providing apprenticeship training programs. | 611513 | 39 | 1 | 40 | 98% |
| Other Technical and Trade Schools | Industry primarily engaged in providing job or career vocational or technical courses (except cosmetology and barber training, aviation and flight training, and apprenticeship training). | 611519 | 183 | 6 | 189 | 97% |
| Fine Arts Schools | Establishments primarily engaged in offering instruction in the arts, including dance, art, drama, and music. | 611610 | 79 | 3 | 82 | 96% |

**23966**        **Federal Register** / Vol. 84, No. 100 / Thursday, May 23, 2019 / Rules and Regulations

| School Industry | NAICS Industry Description | NAICS Codes | Number of Small Schools | Number of non-small Schools | Total SEVP-Certified Schools | Percent Small Schools |
|---|---|---|---|---|---|---|
| Sports and Recreation Instruction | Industry primarily contains institutions such as camps and schools, primarily engaged in providing instruction in athletic activities to groups of individuals. | 611620 | 10 | 0 | 10 | 100% |
| Language Schools | Industry primarily engaged in providing foreign language instruction (including sign language). | 611630 | 286 | 44 | 330 | 87% |
| Exam Preparation and Tutoring | Industry primarily engaged in providing training for standardized examinations and/or educational tutoring services. | 611691 | 8 | 4 | 12 | 67% |
| All Other Misc. Schools and Instruction | Industry primarily engaged in providing instruction (except academic schools, colleges and universities, business, computer, management, technical, trade, fine arts, athletic, language instruction, tutoring, and automobile driving instruction). | 611699 | 32 | 0 | 32 | 100% |
| Educational Support Services | Industry primarily engaged in providing non-instructional services that support educational processes or systems. | 611710 | 2 | 0 | 2 | 100% |
| Public Schools (Elementary, Secondary, and High School and post-secondary) | Industry primarily engaged in providing academic courses and related course work that contain a basic public education. | N/A | 443 | 1,570 | 2,013 | 22% |
| **Total** | | | **7,037** | **1,709** | **8,746** | **80%** |

Table 32 presents the type of schools with active F and M nonimmigrant students and the percent of students enrolled in small schools. Most F and M nonimmigrant students are enrolled at small schools. Of the 8,746 SEVP-

certified schools, DHS identified 1,728 with no active F or M nonimmigrant students and determined that 1,296 of these are considered small entities as defined by SBA. Note that although there are two SEVP-certified schools in the education support services industry (shown in Table 31), there are no active F and M nonimmigrant students in these schools. DHS applies the results of the sample of SEVP-certified public schools to the number of students in SEVP-certified public schools (619,295) to estimate that the number of students in small SEVP-certified public schools is 136,245.

### Table 32: Total Number of Active F and M Students by Industry

| School Industry | Total Active F and M Students in Small Schools | Total Active F and M Students | Percent of Students at Small Schools |
|---|---|---|---|
| Elementary and Secondary Schools (private) | 60,990 | 63,491 | 96% |
| Junior Colleges | 409 | 418 | 98% |
| Colleges, Universities, and Professional Schools | 419,593 | 429,784 | 98% |
| Computer Training | 404 | 404 | 100% |
| Professional and Management Development Training | 217 | 217 | 100% |
| Cosmetology and Barber Schools | 91 | 93 | 98% |
| Flight Training | 6,598 | 6,605 | 100% |
| Apprenticeship Training | 71 | 75 | 95% |
| Other Technical and Trade Schools | 1,108 | 1,111 | 100% |
| Fine Arts Schools | 1,736 | 2,030 | 86% |
| Sports and Recreation Instruction | 13 | 13 | 100% |
| Language Schools | 33,500 | 41,867 | 80% |
| Exam Preparation and Tutoring | 1,469 | 1,984 | 74% |
| All Other Miscellaneous Schools and Instruction | 218 | 218 | 100% |
| Educational Support Services | - | - | 0 |
| Public Schools (K-12 and post secondary) | 136,245 | 619,295 | 22% |

DHS estimated SEVP-certified public schools' revenue to examine the impact of the fee adjustments on small public schools. The tuition provided by public schools in SEVIS may not represent a public school's total revenue because most of the U.S. schools would generally not pay the tuition provided to attend public schools. Instead, DHS assumes that a public school's school district, county, or city's tax revenue is the best revenue source against which to assess the impact of the fee adjustments. DHS collected local government revenue, expenditure, debt, and assets from the U.S. Census Bureau 2015 State and Local Government Survey [20] to examine the impact of the increased fees on the public schools included in the sample. A school district, county, or city's revenue may be an overestimation of a public school's capability to pay the fees related to SEVP-certification, appeals, or site visits for new locations. In other words, the use of revenue as a proxy for ability to pay may result in understating the impact of the fee increase on public schools.

Table 33 displays the range of annual revenue by each school industry and for public schools, from the small school

[20] United States Census, 2015 State & Local Government Finance Historical Tables, *https://www.census.gov/data/tables/2015/econ/gov-finances/summary-tables.html* (last visited Nov. 1, 2018).

with the lowest revenue to the median revenue of all the small schools to the small school with the largest revenue. It also shows the average revenue of all the small schools in that industry. The

Colleges, Universities, and Professional Schools industry has the widest range from maximum to minimum revenue due to the assumption that all private, unspecified schools are small entities,

while the Educational Support Services industry that only has two schools included has the smallest range of maximum to minimum revenue for any one industry.

### Table 33: Range of Annual Revenue by School Industry

| School Industry | Lowest Annual Revenue | Median Annual Revenue | Largest Annual Revenue | Average Annual Revenue |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | $28,800 | $5,116,550 | $1,680,000,000 | $13,194,355 |
| Junior Colleges | $44,400 | $2,560,000 | $15,255,000 | $4,271,901 |
| Colleges, Universities, and Professional Schools | $26,400 | $28,432,500 | $5,002,524,120 | $96,761,518 |
| Computer Training | $425,000 | $3,000,000 | $14,000,000 | $3,881,631 |
| Professional and Management Development Training | $129,600 | $717,500 | $2,904,625 | $1,000,423 |
| Cosmetology and Barber Schools | $70,000 | $2,183,000 | $66,907,200 | $4,092,673 |
| Flight Training | $36,000 | $3,000,000 | $60,000,000 | $5,959,154 |
| Apprenticeship Training | $132,000 | $10,265,875 | $106,080,000 | $21,004,563 |
| Other Technical and Trade Schools | $64,000 | $2,800,000 | $82,800,000 | $7,570,939 |
| Fine Arts Schools | $66,000 | $2,895,000 | $130,000,000 | $9,425,304 |
| Sports and Recreation Instruction | $276,800 | $1,165,000 | $9,312,500 | $2,626,805 |
| Language Schools | $118,500 | $5,725,000 | $108,000,000 | $7,514,433 |
| Exam Preparation and Tutoring | $3,150,000 | $5,043,189 | $27,000,000 | $6,983,297 |
| All Other Miscellaneous Schools and Instruction | $83,250 | $845,000 | $469,050,000 | $18,359,767 |
| Educational Support Services | $340,000 | $521,750 | $703,500 | $521,750 |
| Public Schools (K-12 and post secondary) | $2,948,000 | $65,920,500 | $8,352,908,000 | $803,913,182 |

6. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

The final rule will increase and establish additional fees for educational

institutions in support of SEVP operations. DHS estimates the annual impact to small schools based on the school cost of compliance as represented as a percentage of their annual revenue. Table 34 displays the final fees, the current fees, and the difference in these amounts. This analysis examines the impact that the final incremental fee for the Form I–17 certification and the final fees for

recertification, site visits to add a new physical location or campus, and the filing of a motion or an appeal would have on small SEVP-certified schools.

## Table 34: Finalized School Fees by Type

| Fee Type | Finalized Fee | Current Fee | Difference (Final –Current) | Percent Increase |
|---|---|---|---|---|
| I-17 Certification Fee | $3,000 | $1,700 | $1,300 | 76% |
| I-17 Recertification Fee | $1,250 | $0 | $1,250 | N/A |
| Site Visit Fee – initial | $655 | $655 | $0 | 0% |
| Site Visit Fee – new location | $655 | $0 | $655 | N/A |
| Motion or Appeal Fee | $675 | $0 | $675 | N/A |

I–17   Certification Fee

A school files a petition and pays a certification fee to become eligible to issue the Form I–20, Certificate of Eligibility for Nonimmigrant Student Status, to prospective international students after admitting them for a course of study. SEVP certification authorizes the school to enroll international students after they enter the country as F or M nonimmigrant students. Schools must initially go through the vetting process for authorization by DHS to enroll F and/ or M nonimmigrant students and pay the Form I–17 school certification fee, which is currently $1,700 and determined to increase to $3,000. The incremental fee is the difference between the finalized fee ($3,000) and current fee ($1,700), or $1,300. From 2012 to 2016, DHS processed 2,117 Forms I–17 and payments. Out of the 2,117 schools, 1,151, or 54 percent, were identified as meeting the SBA definition of a small school, or estimated to be a small public school based on the sample conducted, as illustrated in Table 35.

## Table 35: I-17 Initial Certifications FYs 2012–2016

| Fiscal Year | Total I-17 Initial Certifications | Small School I-17 Initial Certifications | Percent of Small School I-17 Initial Certifications |
|---|---|---|---|
| 2012 | 457 | 236 | 52% |
| 2013 | 382 | 218 | 57% |
| 2014 | 446 | 270 | 60% |
| 2015 | 469 | 260 | 55% |
| 2016 | 363 | 167 | 46% |
| **Total** | **2,117** | **1,151** | **54%** |
| **2014–2016 3-year annual average** | **426** | **232** | **55%** |

SEVP forecasted the total Form I–17 initial certifications in FY 2019 and FY 2020 to be 426 using the three-year annual average of FY 2014 through 2016 initial certifications. Using that same methodology, 232 small schools applied for initial Form I–17 certification on average each year. DHS assumes the growth of small schools per industry seeking SEVP certification will remain constant in the future. DHS multiplied the annual average number of small schools applying for initial certification by the percent of small schools in each industry, as presented in Table 31. This calculation yields the number of small schools expected to petition for initial Form I–17 certification by industry. The results are presented in Table 36.

**Table 36: Expected Annual Number of Small Schools to Initially Certify by School Industry**

| School Industry | Annual Number of Small Schools Applying for Initial Certification |
|---|---|
| Elementary and Secondary Schools (private) | 103 |
| Junior Colleges | 0 |
| Colleges, Universities, and Professional Schools | 64 |
| Computer Training | 0 |
| Professional and Management Development Training | 1 |
| Cosmetology and Barber Schools | 3 |
| Flight Training | 6 |
| Apprenticeship Training | 1 |
| Other Technical and Trade Schools | 5 |
| Fine Arts Schools | 2 |
| Sports and Recreation Instruction | 0 |
| Language Schools | 8 |
| Exam Preparation and Tutoring | 0 |
| All Other Miscellaneous Schools and Instruction | 1 |
| Educational Support Services | 0 |
| Public Schools (K-12 and post secondary) | 12 |
| **Total Small Schools** | **194** |

This analysis examines the impact the $1,300 incremental fee has on small schools that might seek initial certification after this final rule is effective. DHS assumes that the range of revenue of the small schools that will apply for certification is similar to the range of revenue of current SEVP-certified small schools and uses this range to show the potential impacts. Table 37 shows the impact as a percentage for the schools with the lowest annual revenue, median annual revenue, and largest annual revenue, as well as the average annual revenue for all schools in that industry. From these results, DHS does not expect the Form I–17 certification incremental fee to have an impact greater than one percent on the average small school annual revenue. However, there is an expected impact greater than one percent for some small schools with the lowest annual revenue in their industry. On average the estimated 194 small schools that apply for initial Form I–17 certification annually and pay an incremental fee of $1,300 will experience an impact of less than one percent of their estimated annual revenue.

**Table 37: Initial Certification Fee Impact for Small Schools by Type of School**

| Type of School | I-17 Initial Certification Incremental Fee Impact on the School with the Lowest Revenue | I-17 Initial Certification Incremental Fee Impact on the School with the Median Revenue | I-17 Initial Certification Incremental Fee Impact on the School with the Largest Revenue | I-17 Initial Certification Incremental Fee Impact on the Average School Revenue |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 4.5% | 0.0% | 0.0% | 0.01% |
| Junior Colleges | 2.9% | 0.1% | 0.0% | 0.03% |
| Colleges, Universities, and Professional Schools | 4.9% | 0.0% | 0.0% | 0.00% |
| Computer Training | 0.3% | 0.0% | 0.0% | 0.03% |
| Professional and Management Development Training | 1.0% | 0.2% | 0.0% | 0.13% |
| Cosmetology and Barber Schools | 1.9% | 0.1% | 0.0% | 0.03% |
| Flight Training | 3.6% | 0.0% | 0.0% | 0.02% |
| Apprenticeship Training | 1.0% | 0.0% | 0.0% | 0.01% |
| Other Technical and Trade Schools | 2.0% | 0.0% | 0.0% | 0.02% |
| Fine Arts Schools | 2.0% | 0.0% | 0.0% | 0.01% |
| Sports and Recreation Instruction | 0.5% | 0.1% | 0.0% | 0.05% |
| Language Schools | 1.1% | 0.0% | 0.0% | 0.02% |
| Exam Preparation and Tutoring | 0.0% | 0.0% | 0.0% | 0.02% |
| All Other Miscellaneous Schools and Instruction | 1.6% | 0.2% | 0.0% | 0.01% |
| Educational Support Services | 0.4% | 0.2% | 0.2% | 0.25% |
| Public Schools (K-12 and post secondary) | 0.0% | 0.0% | 0.0% | 0.0% |

I–17 Recertification Fee

SEVP-certified schools are required to file for recertification every two years to demonstrate that they have complied with all recordkeeping, retention, reporting, and other requirements when registering F and M students. There is currently no fee charged to schools for recertification, but this final rule establishes a new fee for that process.

To measure the impact on small schools, DHS first estimated the number of small schools that will recertify. DHS assumes 50 percent (4,373) of the total number of schools in this analysis (8,746) will recertify each year. DHS multiplies the recertification rate of 50 percent by the total number of small schools to generate the estimation that 3,519 [21] small schools will recertify

annually. DHS examined all 7,037 small SEVP-certified schools to determine the impact of the recertification fee, as it is assumed that a significant number of the schools will pursue recertification within the next two years.

DHS assumes that the total number of SEVP-certified schools will remain static as new schools become certified and other schools' certifications are relinquished, withdrawn, or denied. DHS therefore assumes that the annual increase of total recertifications will be zero.

As previously discussed, DHS identified 1,296 SBA-defined small schools with no active F or M nonimmigrant students. DHS included these schools in this analysis and assumes they will opt to pay the

recertification fee of $1,250 rather than reapplying for initial certification with a finalized fee of $3,000 at such time in the future that they enroll F or M nonimmigrant students.

Table 38 illustrates the number of small schools that will recertify by industry and the Form I–17 recertification incremental fee impact as a percent of the small school's annual revenue. From these findings, of the 7,037 small schools expected to apply for recertification and pay the finalized fee of $1,250, 50 schools, or 0.7 percent, will experience an impact greater than one percent but less than three percent of the school's annual revenue. For the remaining schools, DHS does not expect the incremental fee to have an impact of greater than one percent.

**Table 38: Recertification Fee Impact for Small Schools by Type of School**

| School Industry | 0% < Impact ≤ 1% | 1% < Impact ≤ 2% | 2% < Impact < 3% | Total |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 3,458 | 7 | 7 | **3,472** |
| Junior Colleges | 10 | 0 | 1 | **11** |
| Colleges, Universities, and Professional Schools | 2,135 | 12 | 4 | **2,150** |
| Computer Training | 13 | 0 | 0 | **13** |
| Professional and Management Development Training | 18 | 0 | 0 | **18** |
| Cosmetology and Barber Schools | 89 | 2 | 0 | **91** |
| Flight Training | 196 | 1 | 2 | **199** |
| Apprenticeship Training | 39 | 0 | 0 | **39** |
| Other Technical and Trade Schools | 175 | 8 | 0 | **183** |
| Fine Arts Schools | 76 | 3 | 0 | **79** |
| Sports and Recreation Instruction | 10 | 0 | 0 | **10** |
| Language Schools | 285 | 1 | 0 | **286** |
| Exam Preparation and Tutoring | 8 | 0 | 0 | **8** |
| All Other Miscellaneous Schools and Instruction | 30 | 2 | 0 | **32** |
| Educational Support Services | 2 | 0 | 0 | **2** |
| Public Schools (K-12 and post secondary) | 443 | 0 | 0 | **443** |
| **Total Small Schools** | **6,987** | **36** | **14** | **7,037** |

---

[21] 7,037 × 50 percent = 3,518.5 small schools recertifying each year.

Site Visit Fee

Current regulations provide authority for SEVP to charge a site visit fee to schools that apply for initial certification or add a new physical location or campus. The site visit allows SEVP an opportunity to gather evidence on the school's eligibility, review school facilities, and interview personnel listed on the Form I–17 petition as a PDSO or DSO. SEVP currently collects the $655 fee when a school files a petition for certification to issue Forms I–20 or by a certified school when it physically moves to a new location. This final rule notifies the public that SEVP will collect the fee from any certified school

that adds a new campus or physical location by updating its Form I–17 in SEVIS, consistent with 8 CFR 214.3(h)(3) and the agency's description when it established the fee in 2008 that such a fee could apply to such an initial event. 73 FR 55683, 55691.

SEVP performs 600 site visits annually. Of these site visits, 426 would be performed as part of the forecasted initial certifications, leaving the capacity for 174 site visits to be performed when a school adds a campus. In order to estimate the impact on a school's revenue of the site visit fee for a new instructional campus, DHS assumes that any of the currently SEVP-

certified schools could add a campus and require a site visit. Table 39 shows the finalized site visit fee impact on estimated annual revenue for all 7,037 small schools certified by SEVP and the type of school. Of the total 7,037 small schools, 7,022, or 99.8 percent, would have a site visit fee impact of less than or equal to one percent of their annual revenue. Twelve small schools, or 0.2 percent of small schools, would have an impact of greater than one percent but less than or equal to two percent of their annual revenue. Three small schools would have a site visit fee impact greater than two percent but less than three percent of their annual revenue.

### Table 39: Site Visit Fee Impact on Estimated Annual Revenue

| Type of School | 0% < Impact ≤ 1% | 1% < Impact ≤ 2% | 2% < Impact < 3% | Total |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 3,465 | 5 | 2 | **3,472** |
| Junior Colleges | 10 | 1 | 0 | **11** |
| Colleges, Universities, and Professional Schools | 2,146 | 3 | 1 | **2,150** |
| Computer Training | 13 | 0 | 0 | **13** |
| Professional and Management Development Training | 18 | 0 | 0 | **18** |
| Cosmetology and Barber Schools | 91 | 0 | 0 | **91** |
| Flight Training | 197 | 2 | 0 | **199** |
| Apprenticeship Training | 39 | 0 | 0 | **39** |
| Other Technical and Trade Schools | 182 | 1 | 0 | **183** |
| Fine Arts Schools | 79 | 0 | 0 | **79** |
| Sports and Recreation Instruction | 10 | 0 | 0 | **10** |
| Language Schools | 286 | 0 | 0 | **286** |
| Exam Preparation and Tutoring | 8 | 0 | 0 | **8** |
| All Other Miscellaneous Schools and Instruction | 32 | 0 | 0 | **32** |
| Educational Support Services | 2 | 0 | 0 | **2** |
| Public Schools (K-12 and post secondary) | 443 | 0 | 0 | 443 |
| **Total Small Schools** | **7,022** | **12** | **3** | **7,037** |

Fee To File an Appeal or Motion

When a school is denied certification or recertification, the school receives a denial letter through certified mail. The denial letter explains the reason for the denial and the steps to appeal. The school can appeal by filing the Form I–290B. This final rule imposes a $675 filing fee for submission of the Form I–

290B.[22] Currently no fee is imposed when a school submits the Form I–290B for a motion or appeal.

DHS processed 215 motions and appeals from schools from 2013 to 2016. Out of the 215 school motions and appeals, DHS determined that 74, or

[22] USCIS, Form I–290B, Notice of Appeal or Motion, Filing Fee, *https://www.uscis.gov/i-290b.*

34.4 percent, were filed by small schools. Among the 74 small schools, four schools had two appeals within the same year or over the four-year period. During the four-year period, there was an average of 19 appeals and motions filed by small schools annually.

DHS examined all 7,037 small schools to estimate the impact of the final appeal and motion fee on estimated

annual revenue. The impact is calculated by dividing the fee to file a motion or appeal by the school's estimated annual revenue. Of the 7,037 SEVP-certified small schools, 7,021, or 99.8 percent, would experience an impact less than or equal to one percent of their estimated annual revenue were the school to file an appeal or motion. DHS estimates 13 small schools, or 0.2 percent, would realize an impact between one percent and two percent of their estimated annual revenue. In addition, three small schools, or 0.04 percent, would experience an impact greater than two percent but less than three percent of estimated annual revenue. Table 40 shows the number of small schools within the range of impact to each school's estimated annual revenue.

**Table 40: Appeal and Motion Fee Impact on Estimated Annual Revenue**

| Type of School | 0% < Impact ≤ 1% | 1% < Impact ≤ 2% | 2% < Impact < 3% | Total |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 3,465 | 5 | 2 | 3,472 |
| Junior Colleges | 10 | 1 | 0 | 11 |
| Colleges, Universities, and Professional Schools | 2,146 | 3 | 1 | 2,150 |
| Computer Training | 13 | 0 | 0 | 13 |
| Professional and Management Development Training | 18 | 0 | 0 | 18 |
| Cosmetology and Barber Schools | 91 | 0 | 0 | 91 |
| Flight Training | 197 | 2 | 0 | 199 |
| Apprenticeship Training | 39 | 0 | 0 | 39 |
| Other Technical and Trade Schools | 182 | 1 | 0 | 183 |
| Fine Arts Schools | 78 | 1 | 0 | 79 |
| Sports and Recreation Instruction | 10 | 0 | 0 | 10 |
| Language Schools | 286 | 0 | 0 | 286 |
| Exam Preparation and Tutoring | 8 | 0 | 0 | 8 |
| All Other Miscellaneous Schools and Instruction | 32 | 0 | 0 | 32 |
| Educational Support Services | 2 | 0 | 0 | 2 |
| Public Schools (K-12 and post secondary) | 443 | 0 | 0 | 443 |
| **Total Small Schools** | **7,021** | **13** | **3** | **7,037** |

The possible total impact on small entities in any year can be determined by examining scenarios in which a school may pay more than one of the finalized adjustments in fees in the same year. DHS examines the following scenarios and determines that the impact on any small school's revenue is less than three percent on any school industry type: (1) A school appeals an initial certification or (2) a school appeals a recertification and adds a new location requiring a site visit.

A school may pay the initial certification fee and then it may appeal the results of the initial certification within the same year. DHS estimates that this would be an increase of $1,975 ($1,300 incremental fee for Form I–17 initial certification plus $675 fee for an appeal). More than 98 percent of schools would be impacted less than one percent in this scenario, as shown in Table 41. The impacts of this scenario would be greater than the impacts of a scenario where a school appeals a recertification, which would add to $1,925 in increased fees ($1,250 I–17 recertification fee plus $675 for an appeal).

### Table 41: Impact of Initial Certification Fee Increase Plus an Appeal Fee

| Type of School | 0% < Impact ≤ 1% | 1% < Impact ≤ 2% | 2% < Impact < 3% | Total |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 3,440 | 21 | 11 | **3,472** |
| Junior Colleges | 10 | 0 | 1 | **11** |
| Colleges, Universities, and Professional Schools | 2,126 | 15 | 10 | **2,151** |
| Computer Training | 13 | 0 | 0 | **13** |
| Professional and Management Development Training | 15 | 3 | 0 | **18** |
| Cosmetology and Barber Schools | 89 | 1 | 1 | **91** |
| Flight Training | 192 | 4 | 3 | **199** |
| Apprenticeship Training | 37 | 2 | 0 | **39** |
| Other Technical and Trade Schools | 171 | 9 | 3 | **183** |
| Fine Arts Schools | 74 | 2 | 3 | **79** |
| Sports and Recreation Instruction | 10 | 0 | 0 | **10** |
| Language Schools | 282 | 4 | 0 | **286** |
| Exam Preparation and Tutoring | 8 | 0 | 0 | **8** |
| All Other Miscellaneous Schools and Instruction | 26 | 4 | 2 | **32** |
| Educational Support Services | 2 | 0 | 0 | **2** |
| Public Schools (K-12 and post secondary) | 443 | 0 | 0 | **443** |
| **Total Small Schools** | **6,938** | **64** | **35** | **7,037** |

A school may seek recertification in the same year it adds a new physical location or campus that requires a site visit and then it may appeal the findings of a recertification. A recertification fee would not include a site visit to a new location. DHS estimates that this would be an increase of $2,580 ($1,250 Form I–17 recertification fee plus $655 for a site visit at a new location plus $675 for an appeal). Under this scenario, the impact on small schools' revenue would be less than one percent for all but 139 small schools. The impact on these 139 schools' revenues would be less than three percent as shown in Table 42.

**Table 42: Impact of Recertification Fee Plus a Site Visit – New Location Fee Plus an Appeal Fee**

| Type of School | 0% < Impact ≤ 1% | 1% < Impact ≤ 2% | 2% < Impact < 3% | Total |
|---|---|---|---|---|
| Elementary and Secondary Schools (private) | 3,426 | 28 | 18 | **3,472** |
| Junior Colleges | 10 | 0 | 1 | **11** |
| Colleges, Universities, and Professional Schools | 2,110 | 24 | 17 | **2,151** |
| Computer Training | 13 | 0 | 0 | **13** |
| Professional and Management Development Training | 15 | 3 | 0 | **18** |
| Cosmetology and Barber Schools | 87 | 2 | 2 | **91** |
| Flight Training | 191 | 5 | 3 | **199** |
| Apprenticeship Training | 37 | 2 | 0 | **39** |
| Other Technical and Trade Schools | 167 | 8 | 8 | **183** |
| Fine Arts Schools | 74 | 2 | 3 | **79** |
| Sports and Recreation Instruction | 10 | 0 | 0 | **10** |
| Language Schools | 279 | 6 | 1 | **286** |
| Exam Preparation and Tutoring | 8 | 0 | 0 | **8** |
| All Other Miscellaneous Schools and Instruction | 26 | 4 | 2 | **32** |
| Educational Support Services | 2 | 0 | 0 | **2** |
| Public Schools (K-12 and post secondary) | 443 | 0 | 0 | **443** |
| **Total Small Schools** | **6,898** | **84** | **55** | **7,037** |

7. A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected

SEVP examined several alternatives to the final fee structure, including no increase to any fee, only increasing the Form I–901 fee and Form I–17 initial school certification fee, not subsidizing the school fees with the Form I–901 F and M fees, and, as noted above, a graduated or sliding-scale fee structure based either on student population numbers or program length.

Without an increase in fees, SEVP will be unable to maintain the level of service for students and schools that it currently provides as well as the compliance and national security

activities discussed above. SEVP considered the alternative of maintaining fees at the current level but with reduced services and increased processing times, but has decided that this would not be in the best interest of applicants and schools. SEVP seeks to minimize the impact on all parties, but in particular small entities. SEVP must pay for the expenses of maintaining and improving SEVIS and adjudicating schools in a timely manner. If SEVP followed this alternative scenario, there would be a shortfall of revenue to cover the expenses of over $65.4 million in FY 2019. SEVP rejected this alternative, as SEVP must pay for the expenses of maintaining and improving SEVIS and certifying and recertifying schools in a timely manner.

SEVP also considered only raising the Form I–901 fees and the Form I–17 initial certification fee instead of including new finalized fees for recertification and for filing an appeal or motion. If SEVP followed this scenario, while the Form I–901 F and M fee would increase to $350 to cover the

shortfall in revenue, the Form I–17 initial certification fee would also increase to $4,200. This would triple the existing certification fee while continuing to allow schools with no foreign students to remain active SEVP schools that require SEVP effort for recertification. SEVP rejected this fee structure as it would continue to add workload to SEVP's recertification program. Without a disincentive to not recertify, the list of schools recertifying would never stop growing. SEVP rejected this alternative because the finalized fees would establish a more equitable distribution of costs and a more sustainable level of cost recovery relative to the services provided as compared to this alternative.

SEVP also considered the results of the ABC model as an alternative, which allocated the Form I–901 F and M fee, school certification fees, and the fee to file an appeal or motion as shown in Table 43.

### Table 43: Unsubsidized Fee Amounts

| Fee Type | Unsubsidized Fee Amounts |
|---|---|
| I-901 F and M | $290 |
| I-901 J-Full | $130 |
| I-901 J-Partial | $130 |
| I-17 Initial Certification | $4,600 |
| I-17 Recertification | $6,000 |
| Appeal or Motion | $38,475 |
| Site Visit | $650 |

BILLING CODE 9111–28–C

SEVP rejected this alternative for several reasons. Setting the fee at $38,475 may discourage schools from filing an appeal or motion.

Similarly, SEVP rejected the alternative of setting the recertification fee at $6,000. A recertification fee higher than the initial certification fee would discourage schools from seeking recertification as opposed to relinquishing certification or allowing certification to expire and subsequently applying again for initial certification.

SEVP instead sets the recertification fee at a level that is less than the initial certification fee. When schools can maintain their certification, F and M nonimmigrant students enrolled in the withdrawn school avoid complications such as being forced to transfer schools, leave the United States, or risk facing immigration law penalties for violating the terms of their nonimmigrant status.

SEVP also rejected the initial certification fee of $4,600 because it finds that an increase of almost three times the current fee of $1,700 is excessive. In the fee development, DHS balanced the challenge of minimizing the costs to schools and students while recovering funding to support SEVP services. The population of Form I–901 F and M nonimmigrant students relative to the population of Form I–17 schools allows for a minimal fee adjustment to be spread over the student population to reduce the cost burden on individual institutions seeking recertification.

### C. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, 109 Stat. 48 (codified at 2 U.S.C. 1501 *et seq.*), requires federal agencies to assess the effects of their discretionary regulatory actions. In particular, UMRA addresses actions that may result in the expenditure by a State, local, or tribal government in the aggregate or by the private sector of $100 million (adjusted for inflation) or more in any one year. 2 U.S.C. 1532(a). Though this rule will not result in such an expenditure, DHS does discuss the effects of this rule elsewhere in this preamble. In addition, DHS maintains that this rulemaking is not a "Federal mandate," as defined for UMRA purposes, 2 U.S.C. 658(6), as the payment of an SEVP certification fee by individuals, local governments, or other private sector entities is (to the extent it could be termed an enforceable duty) one that arises from participation in a voluntary Federal program (*i.e.*, applying for status as F–1, F–3, M–1, or M–3 students or as a J–1 exchange visitor in the United States or seeking approval from the United States for attendance by certain aliens seeking status as F–1, F–3, or M–1 students). 2 U.S.C. 658(7)(A)(ii). For these reasons, no additional actions were deemed necessary under the provisions of the UMRA.

### D. Congressional Review Act

This rulemaking is not a major rule, as defined by 5 U.S.C. 804, for purposes of congressional review of agency rulemaking pursuant to the Congressional Review Act, Public Law 104–121, sec. 251, 110 Stat. 868, 873 (codified at 5 U.S.C. 804). This rulemaking would not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based companies to compete with foreign-based companies in domestic and export markets. DHS will submit to Congress and the Comptroller General of the United States a report about the issuance of the final rule prior to its effective date, as required by 5 U.S.C. 801(a)(1).

### E. Executive Order 13132: Federalism

A rule has implications for federalism under Executive Order 13132, Federalism, if it has substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS has analyzed this final rule under that Order and has determined that it does not have implications for federalism.

### F. Executive Order 12988: Civil Justice Reform

This rule meets the applicable standards set forth in 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

### G. Energy Effects

DHS has analyzed this final rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. DHS has determined that it is not a "significant energy action" under that order because it is a "significant regulatory action" under Executive Order 12866 but is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

### H. Environment

DHS Management Directive (MD) 023–01 Rev. 01 establishes procedures that DHS and its Components use to comply with the National Environmental Policy Act of 1969 (NEPA), Public Law 91–190, 83 Stat. 852 (codified at 42 U.S.C. 4321–4375),

and the Council on Environmental Quality. regulations for implementing NEPA, 40 CFR parts 1500 through 1508. The Council on Environmental Quality Regulations allow federal agencies to establish categories of actions that do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1508.4. The MD 023–01 Rev. 01 lists the Categorical Exclusions that DHS has found to have no such effect. MD 023–01 Rev. 01, Appendix A, Table 1.

For an action to be categorically excluded, MD 023–01 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions.

(2) The action is not a piece of a larger action.

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect. MD 023–01 Rev. 01 section V.B(1)–(3).

Where it may be unclear whether the action meets these conditions, MD 023–01 Rev. 01 requires the administrative record to reflect consideration of these conditions. MD 023–01 Rev. 01 section V.B.

DHS has analyzed this final rule under MD 023–01 Rev. 01. DHS has made a determination that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This final rule clearly fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(a): ''Promulgation of rules . . . of a strictly administrative or procedural nature''; and A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

**I. Paperwork Reduction Act**

All Departments are required to submit to OMB for review and approval any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (codified at 44 U.S.C. 3501 et seq.). Schools will be using SEVIS to petition for recertification. The recertification process requires schools to input data in

SEVIS, print the Form I–17, and sign the form. The electronic data captured for the Form I–17 have been previously approved for use by OMB as one component of the data that are captured in SEVIS. The OMB Control Number for this collection is 1653–0038 (originally 1615–0066 before the collection was transferred from United States Citizenship and Immigration Services to ICE). With the regulatory implementation of SEVIS (67 FR 60107, Sept. 25, 2002), most schools enrolled in SEVIS were petitioning for DHS recertification, rather than initial certification (i.e., enrolling F or M nonimmigrant students for the first time). The workload for both certification and recertification was included under OMB 1615–0066.

The changes to the certification and recertification fees, as well as the Form I–901 fees, would require changes to SEVIS and the Form I–901 software to reflect the updated fee amounts, as these systems generate the pertinent petition and application forms. DHS will submit a revision to OMB with respect to any changes to existing information collection approvals.

DHS's institution of the fee for a motion or appeal with regard to a denial of school certification or recertification, or a withdrawal of such certification, will not require a form amendment to reflect the charging of the fee. The instructions associated with the Form I–290B, which is currently used for such motions and appeals, contain information regarding the $675 fee.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of Information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31

U.S.C. 9701; Pub. L.107–296, 116 Stat. 2135 (6 U.S.C. 1 et seq.); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54, 125 Stat 550.

■ 2. Amend § 103.7 by revising paragraphs (b)(1)(ii)(B) and (H) and adding paragraph (b)(1)(ii)(O) to read as follows:

**§ 103.7   Fees.**

\*      \*      \*      \*      \*

(b) \* \* \*
(1) \* \* \*
(ii) \* \* \*

(B) *Petition for Approval of School for Attendance by Nonimmigrant Student (Form I–17).* For filing a petition for school certification: $3,000, plus a site visit fee of $655 for each location required to be listed on the form. For filing a petition for school recertification: $1,250, plus a site visit fee of $655 for each new location required to be listed on the form.

\*      \*      \*      \*      \*

(H) *Fee Remittance for F, J, and M Nonimmigrants (Form I–901).* The fee for Form I–901 is:

(*1*) For F and M students: $350.
(*2*) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.
(*3*) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.
(*4*) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

\*      \*      \*      \*      \*

(O) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

\*      \*      \*      \*      \*

**PART 214—NONIMMIGRANT CLASSES**

■ 3. The authority citation for part 214 is revised to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1356, and 1372; section 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively, 48 U.S.C. 1806; 8 CFR part 2.

■ 4. Amend § 214.3 by revising paragraph (h)(2) introductory text to read as follows:

**§ 214.3   Approval of schools for enrollment of F and M nonimmigrants.**

\*      \*      \*      \*      \*

(h) * * *

(2) *Recertification.* Schools are required to file a completed petition for SEVP recertification before the school's certification expiration date, which is 2 years from the date of their previous SEVP certification or recertification expiration date. The school must submit the proper nonrefundable recertification petition fee as provided in 8 CFR 103.7(b)(1)(ii)(B). SEVP will review a petitioning school's compliance with the recordkeeping, retention, and reporting, and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section, as well as continued eligibility for certification, pursuant to paragraph (a)(3) of this section.

* * * * *

■ 5. Amend § 214.4 by revising the section heading and paragraphs (a)(1) and (h) to read as follows:

**§ 214.4 Denial of certification, denial of recertification, or withdrawal of SEVP certification.**

(a) *General*—(1) *Denial of certification.* The petitioning school will be notified of the reasons and its appeal rights if a petition for certification is denied, in accordance with the provisions of 8 CFR 103.3(a)(1)(iii). A petitioning school denied certification may file a new petition for certification at any time.

* * * * *

(h) *Appeals.* A school may file an appeal of a denial or withdrawal no later than 15 days after the service of the decision by ICE. The appeal must state the reasons and grounds for contesting the denial or withdrawal of the approval. The appeal must be accompanied by the fee as provided in 8 CFR 103.7(b)(1)(ii)(O).

* * * * *

■ 6. Amend § 214.13 by revising paragraph (a) to read as follows:

**§ 214.13 SEVIS fee for certain F, J, and M nonimmigrants.**

(a) *Applicability.* The aliens in paragraphs (a)(1) through (3) of this section are required to submit a payment in the amount indicated for their status to the Student and Exchange Visitor Program (SEVP) in advance of obtaining nonimmigrant status as an F or M student or J exchange visitor, in addition to any other applicable fees, except as otherwise provided for in this section:

(1) An alien who applies for F–1 or F–3 status in order to enroll in a program of study at an SEVP-certified institution of higher education, as defined in section 101(a) of the Higher Education Act of 1965, as amended, or in a program of study at any other SEVP-certified academic or language training institution, including private elementary and secondary schools and public secondary schools, the amount of $350;

(2) An alien who applies for J–1 status in order to commence participation in an exchange visitor program designated by the Department of State, the amount of $220, with a reduced fee for certain exchange visitor categories as provided in paragraphs (b)(1) and (c) of this section; and

(3) An alien who applies for M–1 or M–3 status in order to enroll in a program of study at an SEVP-certified vocational educational institution, including a flight school, in the amount of $350.

* * * * *

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2019–10884 Filed 5–22–19; 8:45 am]

**BILLING CODE 9111–28–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Change to the Parole Process for Haitians

**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security has authorized a change to the Parole Process for Haitians that the U.S. Department of Homeland Security (DHS) described in a **Federal Register** notice published on January 9, 2023. The change provides that those who have been interdicted at sea after April 27, 2023 will be ineligible for the announced parole process.

**DATES:** DHS will begin applying this amendment April 29, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background

On January 9, 2023, DHS published a notice titled *Implementation of a Parole Process for Haitians. See* 88 FR 1243. That notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the Southwest Border (SWB) without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this parole process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to return or removal. DHS implemented the parole process to allow certain Haitian nationals and their immediate family members to be considered on a case-by-case basis for parole and, if granted, lawfully enter the United States in a safe and orderly manner.

As described in the January 2023 notice, to be eligible, individuals must: (1) have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period; (2) pass national security and public safety vetting; (3) fly at their own expense to an interior POE, rather than entering at a land POE; and (4) possess a valid, unexpired passport. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into Mexico or Panama after January 9, 2023 (the date of the notice's publication); have entered unauthorized into the United States between POEs after January 9, 2023 (except for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process); or are otherwise deemed not to merit a favorable exercise of discretion.

The parole process for Haitians is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

### II. Amendment

In response to the increasing number of Haitians traveling to the United States by sea without authorization through January 2023, and likelihood of another record level of interdictions this fiscal year (FY), DHS is announcing an amendment to the eligibility criteria announced in the January 9, 2023 notice[1] to make individuals who have been interdicted at sea[2] after April 27, 2023 ineligible for the parole process. The policy announced in this notice is consistent with the policy and justification described in the January 9, 2023 notice, including the justification for the parole process and description of the multiple exceptions to notice-and-comment rulemaking requirements applicable to this process. DHS incorporates those justifications here by reference as appropriate. This notice makes one update to the eligibility criteria for the parole process.

### A. Impact of Cuba, Haiti, Nicaragua, and Venezuela Enforcement Processes

Parole processes established for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV) and their immediate family members have significantly reduced SWB encounters. Following the announcement of the CHNV parole processes, DHS has seen a drastic decrease in the number of Cubans, Haitians, Nicaraguans, and Venezuelans encountered at the SWB. In fact, DHS encountered 128,410 noncitizens who entered between POEs along the SWB in January 2023, which is the lowest monthly SWB encounters total since February 2021.[3] Encounters of CHNV nationals between POEs at the SWB declined from a 7-day average of 1,231 on the day of the announcement on January 5, to 35 on January 31—a drop of 97 percent in just over three weeks.[4] Those trends have endured with a daily average of 46 encounters of CHNV nationals between POEs at the SWB during the last seven days of February 2023.[5] The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal decline.[6] The data continue to underscore and support the notion that when there is a safe and orderly way to come to the United States, coupled with consequences for those who do not avail themselves of such established processes, people are less inclined to attempt the dangerous and, at times, deadly, journey to our borders, and less likely to put their lives in the hands of smugglers.

### B. Maritime Migration Continues To Increase, With Devastating Consequences for Migrants

While DHS continues to see a meaningful reduction in encounters of CHNV nationals across the SWB following the announcement of the CHNV parole processes, maritime interdictions of Cuban and Haitian nationals in the Caribbean have increased in recent FYs and persist at high levels. Total interdictions at sea increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521). Interdictions continued to rise in FY 2023 with 7,402 through January, almost 60 percent of the total in FY 2022 within four months. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020. In the first four months of FY 2023, Haitian interdictions are almost 50 percent of the Haitian FY 2022 total, comprising a

---

[1] Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023).

[2] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[3] U.S. Customs and Border Protection, *CBP Releases January 2023 Monthly Operational Update*, Feb. 10, 2023, *https://www.cbp.gov/ newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.*

[4] DHS Office of Immigration Statistics (OIS) analysis of OIS Persist Dataset based on data through January 31, 2023.

[5] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled March 2, 2023.

[6] DHS, *Unlawful Southwest Border Crossings Plummet Under New Border Enforcement Measures*, Jan. 25, 2023, *https://www.dhs.gov/news/2023/01/ 25/unlawful-southwest-border-crossings-plummet-under-new-border-enforcement-measures.*

quarter of all FY 2023 interdictions at sea.[7]

U.S. Border Patrol (USBP) apprehensions of Haitian nationals in southeast coastal sectors [8] grew to 1,840 in FY 2022 compared to 601 in FY 2021, an increase of over 200 percent. In FY 2023 to date, there have been 656 apprehensions of Haitian nationals by USBP in southeast coastal sectors, 36 percent of FY 2022 total Haitian apprehensions.[9]

The U.S. Coast Guard (USCG) has been challenged with several large group interdictions of Haitians in recent months. In one instance on January 22, 2023, the USCG encountered a sail freighter suspected of illegally transporting migrants with nearly 400 Haitians aboard, necessitating repatriations of eligible individuals back to the Bahamas.[10] Days later on January 26, the USCG interdicted and repatriated another 309 Haitians to Haiti.[11] USCG encountered yet another large group of Haitians on February 15, repatriating 311 Haitian migrants from that encounter [12] and another group of 206 Haitians were repatriated on March 2 following two successive encounters.[13] Interdicting Haitian sail freighters poses unique challenges to Coast Guard crews and migrants. These types of vessels are often overloaded with more than 150 migrants onboard, including small children. Because these vessels do not have sufficient safety equipment, including life jackets, emergency locator beacons, or life rafts in the event of an emergency, the risk in the event that these vessels overturn or sink increases, in a situation where there could be hundreds of noncitizens in the water, who may not know how to swim. Often times, noncitizens interdicted on these vessels have been at sea for several days, are dehydrated, need medical attention, or are otherwise experiencing elevated levels of stress. These factors increase the risk to Coast Guard personnel who rescue these migrants from these vessels because the number of migrants outnumber Coast Guard crews. Coast Guard encounters with sail freighters are not uncommon, but because of their capacity to carry several hundred migrants, they can exceed the holding capacity of Coast Guard cutters patrolling southeastern maritime smuggling vectors, increasing the risk not only to the migrants, but cutter crews as well.

While interdictions in February 2023 did ebb from the January peak so far this FY, the reduction to a combined 601 Haitian Coast Guard interdictions and USBP coastal apprehensions was not the same reduction in flows DHS observed along the SWB.[14] DHS assesses that in the Caribbean, the weather and migrant knowledge of increased law enforcement presence played a significant role in this reduced maritime movement. Through much of February, weather conditions were unfavorable for maritime ventures, particularly on smaller vessels. However, DHS assess this was only temporary. In the final days of February and early days of March 2023, DHS saw a return to multiple interdictions per day. Increasing levels of maritime interdictions put lives at risk and stress DHS's resources, and the increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences.

Human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment— including but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. In FY 2022, the USCG recorded 107 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor, who indicated there were 34 others on the vessel who were not in the vicinity of the capsized vessel and the survivor.[15] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[16] In November 2022, USCG and U.S. Customs and Border Protection (CBP) rescued over 180 people from an overloaded boat that became beached off of the Florida Keys.[17] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[18]

The International Organization for Migration's (IOM) Missing Migrants Project reported at least 321 documented deaths and disappearances of migrants throughout the Caribbean in 2022, signaling the highest recorded number since they began tracking such events in 2014.[19] Most of those who perished or went missing in the Caribbean were from Haiti and Cuba.[20] This data emphasizes a tragic 78% overall increase over the 180 deaths in the Caribbean documented in 2021, underscoring the perils of the journey.[21]

The U.S. Government's response to maritime migration in the Caribbean region is governed by Executive Orders, Presidential Directives, and resulting framework and plans that outline interagency roles and responsibilities. Homeland Security Task Force-Southeast (HSTF–SE) is primarily responsible for DHS's response to maritime migration in the Caribbean Sea and the Straits of Florida. Operation Vigilant Sentry is the DHS interagency operational plan for integrated operations to address and mitigate the threat of a maritime migration in the Caribbean Sea and the Straits of Florida.[22] The primary objectives of HSTF–SE are to protect the safety and security of the United States, uphold U.S. humanitarian principles, maintain the integrity of the U.S. immigration

[7] OIS analysis of USCG data.

[8] Includes Miami, Florida; New Orleans, Louisiana; and Ramey, Puerto Rico sectors where all apprehensions are land apprehensions not maritime.

[9] OIS analysis of OIS Persist Dataset based on data through January 31, 2023.

[10] Goodhue, David and Jacqueline Charles, Miami Herald, *Coast Guard stops boat with 400 Haitians off the Bahamas and likely headed to Florida*, Jan. 23, 2023, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article271514157.html#:~:text=Close%20to%20400%20people%20crowd%20the%20deck%20of,island%20in%20the%20Bahamas%2C%20according%20to%20Bahamian%20officials.*

[11] USCG, *Coast Guard Repatriates 309 People to Haiti*, Jan. 31, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3281802/coast-guard-repatriates-309-people-to-haiti.*

[12] USCG, *Coast Guard Repatriates 311 People to Haiti*, February 20, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3302743/coast-guard-repatriates-311-people-to-haiti/.*

[13] USCG, *Coast Guard Repatriates 206 People to Haiti*, March 2, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3314530/coast-guard-repatriates-206-people-to-haiti/.*

[14] OIS analysis of USCG data and UIP data pulled March 2, 2023.

[15] Adriana Gomez Licon, Associated Press, *Situation 'dire' as Coast Guard seeks 38 missing off Florida*, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[16] Adriana Gomez Licon, Associated Press, *Coast Guard suspends search for migrants off Florida*, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[17] Ashley Cox, CBS News CW44 Tampa, *More than 180 people rescued from overloaded vessel in Florida Keys*, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[18] *Id.*

[19] IOM, *Missing Migrants in the Caribbean Reached a Record High in 2022*, Jan. 24, 2023, *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[20] *Id.*

[21] *Id.*

[22] Homeland Security Task Force—Southeast, published through the U.S. Embassy in Cuba, *Homeland Security Task Force Southeast partners increase illegal migration enforcement patrols in Florida Straits, Caribbean*, Sept. 6, 2022, *https://cu.usembassy.gov/homeland-security-task-force-southeast-partners-increase-illegal-migration-enforcement-patrols-in-florida-straits-caribbean/.*

system, prevent loss of life at sea and to deter and dissuade maritime migration through mobilizing DHS resources, reinforced by other federal, state, and local assets and capabilities.

The USCG supports HSTF–SE and views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Some USCG assets were diverted from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. Through a reduction of maritime migration, USCG would in turn reduce the operational risk to its other statutory missions.

*C. Ineligibility Criteria for Maritime Interdictions*

In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been interdicted at sea after April 27, 2023 ineligible for the parole process for Haitians. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.

Migrants who take to the sea are putting their lives at incredible risk. The goal of this change, like the parole process for Haitians more broadly, is to save lives and undermine the profits and operations of the dangerous smuggling networks and transnational criminal organizations that callously prioritize their profits over the lives and safety of the people they transport and traffic. The parole process for Haitians will continue to incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey by sea.

## III. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process discussed in this notice involves two collections of information, both of which have previously been approved under emergency processing. The collections are as follows:

• USCIS, Form I–134A, *Online Request to be a Supporter and Declaration of Financial Support,* OMB control number 1615–0157.

• CBP, *Advance Travel Authorization,* OMB control number 1651–0143.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–09014 Filed 4–27–23; 8:45 am]
**BILLING CODE 9110–9M–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Change to the Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security has authorized a change to the Parole Process for Cubans that the U.S. Department of Homeland Security (DHS) described in a **Federal Register** notice on January 9, 2023. The change provides that those who have been interdicted at sea after April 27, 2023 will be ineligible for the announced parole process.

**DATES:** DHS will begin applying this amendment on April 28, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background

On January 9, 2023, DHS published a notice titled *Implementation of a Parole Process for Cubans. See* 88 FR 1266. That notice describes a new effort to address the increasing number of encounters of Cuban nationals at the Southwest Border (SWB) and at sea, which had reached record levels over the six months preceding the announcement. Cubans who do not avail themselves of this parole process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to return or removal. DHS implemented the parole process to allow certain Cuban nationals and their immediate family members to be considered on a case-by-case basis for parole and, if granted, lawfully enter the United States in a safe and orderly manner. As described in the January 2023 notice, to be eligible, individuals must: (1) have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period; (2) pass national security and public safety vetting; (3) fly at their own expense to an interior POE, rather than entering at a land POE; and (4) possess a valid, unexpired passport. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into Mexico or Panama after January 9, 2023 (the date of the notice's publication); have entered the United States without authorization between POEs after January 9, 2023 (except for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process); or are otherwise deemed not to merit a favorable exercise of discretion.

The parole process for Cubans is intended to enhance border security by addressing the number of encounters of Cuban nationals at the SWB and at sea, which reached record levels in recent months, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

### II. Amendment

In response to the increasing number of Cubans traveling to the United States by sea without authorization through January 2023, and the likelihood of another record number of interdictions this fiscal year (FY), DHS is announcing an amendment to the eligibility criteria announced in the January 9, 2023 notice [1] to make individuals who have been interdicted at sea [2] after April 27, 2023 ineligible for the parole process. The policy announced in this notice is consistent with the policy and justification described in the January 9, 2023 notice, including the justification for the parole process and description of the multiple exceptions to notice-and-comment rulemaking requirements applicable to this process. DHS incorporates those justifications here by

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023).

[2] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

procedural updates announced in this notice.

### III. Regulatory Requirements

#### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.*, a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice[24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

#### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

### DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

### Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2007, U.S. Citizenship and Immigration Services (USCIS) launched CFRP in furtherance of the United States' commitment under the U.S.-Cuba Migration Accords [1] to direct Cuban migration into lawful, safe, and orderly channels and to continue regular review of the migration situation and proper implementation of the Accords.[2] Under CFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Cuba who are the beneficiaries of an approved Form I–130, Petition for Alien Relative.[3]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[4] If granted parole into the United States, CFRP parolees may apply for employment authorization while they wait to apply to adjust to LPR status.[5] Unlike parolees under similar family reunification parole (FRP) processes, CFRP beneficiaries may apply for adjustment one year after their parole into the United States under the Cuban Adjustment Act.[6] They do not need to wait for their immigrant visas to become available to apply for adjustment.[7]

Beneficiaries must have a petitioner who filed a Form I–130 on behalf of a principal beneficiary and has been invited to participate in the CFRP

process after the Form I–130 was approved. The principal beneficiary of that petitioner's Form I–130 must be a Cuban national. Consistent with a **Federal Register** notice updating the CFRP process in 2014, beginning February 17, 2015, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary.[8] Also consistent with that notice, USCIS required that USCIS officers or U.S. Department of State (State) consular officers interview beneficiaries in Havana, Cuba, to verify their eligibility for the program.[9] If USCIS issued a travel document to a given beneficiary, that individual could then travel to the United States to seek parole.

In May 2022, the United States announced the resumption of CFRP operations following suspension of CFRP interviews in September 2019 [10] and closure of the USCIS Havana Field Office on December 10, 2018.[11] In August 2022, USCIS began mailing CFRP interview notices to petitioners with instructions for the beneficiary interview. On August 18, 2022, USCIS restarted interviews at the U.S. Embassy in Cuba. However, USCIS has had limited capacity to conduct interviews due to operational constraints in Cuba. Specifically, while both State and USCIS are working to fully resume operations in Havana, these efforts are taking time to fully realize, which is one reason DHS is implementing these operational changes. Furthermore, the economic and political crisis in Cuba, which has been marked by food shortages, rolling blackouts, and countrywide internet outages,[12] impacts

the USG capacity to process parole requests in Cuba for Cuban nationals and their immediate family members [13] under CFRP.

In short, interview capacity limitations in Cuba, resource constraints within DHS and State, and the pending application caseload have made the process inefficient and inaccessible to many beneficiaries in Cuba. Many applications are pending, and no new invitations to access CFRP have been sent since August 23, 2016.

In the meantime, technology has evolved since the launch of the CFRP process in 2007. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for CFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has implemented parole processes that are similar to CFRP but that follow different procedures that utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 CFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented FRP processes for certain Colombians,[14] Guatemalans,[15]

---

[1] See generally U.S. Department of State archived website on Cuban migration, *https://1997-2001.state.gov/regions/wha/cuba/migration.html*. Under the Accords, the United States committed itself to total legal migration to the United States from Cuba of a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USCs). See Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) as the U.S.-Cuba Migration Accords).

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 15, 2007). Note that, consistent with other processes described in this notice, DHS now refers to CFRP as a process rather than a program.

[3] Id.; see also USCIS, The Cuban Family Reunification Parole Program (Sept. 1, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program*.

[4] Id.

[5] See 8 CFR 274a.12(c)(11).

[6] See Public Law 89–732, 80 Stat. 1161 (Nov. 2, 1966), as amended (Immigration and Nationality Act (INA), sec. 245, Note 1, 8 U.S.C. 1255, Note 1).

[7] Id.

[8] Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014).

[9] 79 FR 75581.

[10] See U.S. Department of State, Biden Administration Measures to Support the Cuban People (May 16, 2022), *https://www.state.gov/biden-administration-measures-to-support-the-cuban-people/*. See also U.S. Embassy in Cuba, USCIS Resumes Cuban Family Reunification Parole Program Operations (September 1, 2022), *https://cu.usembassy.gov/uscis-resumes-cuban-family-reunification-parole-progam-operations/#:~:text= CFRP%20processing%20 was%20suspended%20due, office%20in%20Havana%20in%202018*.

[11] See USCIS, USCIS Closes Havana Field Office on December 10, 2018 (December 10, 2018). *https://www.uscis.gov/archive/uscis-closes-havana-field-office-on-dec-10-2018*.

[12] New York Times, 'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future, Dec. 10, 2022, *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html*; Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian

blackouts. *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/*; The Economist, Cuba is Facing Its Worst Shortage of Food Since the 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s*.

[13] Within this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. See INA sec. 203(d), 8 U.S.C. 1153(d); see also INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child", in general, as meaning "an unmarried person under twenty-one years of age").

[14] See Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[15] See Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

Hondurans,[16] and Salvadorans [17] along these lines. DHS is now conforming the CFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

As done under the 2007 process and the revised process in 2014, invitations to participate in the CFRP process will issue to certain petitioners who have an approved Form I–130 filed on behalf of a Cuban principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [18] Form I–130 filed on behalf of a Cuban principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Cuban principal beneficiary of an approved Form I–130, and how to file separate requests for any immediate family members of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As part of the review process, the petitioner must also pass security and background vetting, including for public safety,

national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

The threshold eligibility criteria for participation in the CFRP process continue to apply. Principal beneficiaries must be Cuban nationals who have a petitioner who has been invited to participate. However, DHS is implementing an update for the petitioner to initiate this process so the beneficiary can be considered for issuance of advance authorization to travel to the United States where the beneficiary can seek a discretionary grant of parole at an interior POE.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2007 process and the revised 2014 process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States. For consistency with other FRP processes, parole will generally be granted for a period of up to three years, rather than the two years under the previous CFRP process.

Participation in this process is not limited to beneficiaries currently living

in Cuba.[19] However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Cuban nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[20] expedited removal proceedings,[21] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be or may become ineligible for adjustment of status [22] or for an immigrant visa [23] as a result of entering without inspection and not having been admitted or paroled.[24]

---

[16] See Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[17] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[18] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (e.g., the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[19] DHS recognizes that permitting Cubans to be processed under the CFRP process when not physically present in Cuba means that not all Cubans who are paroled under the CFRP process would count towards the U.S. Government's annual obligation under the U.S.-Cuba Migration Accords.

[20] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[21] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[22] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[23] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[24] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

*C. Description of Updated Process for CFRP*

DHS announces these updates to the CFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since CFRP's inception in 2007. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated CFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this CFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[25]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[26]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and

---

[25] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[26] See 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[27]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this CFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2007 decision to implement this process remains unchanged and is severable from the procedural updates announced in this notice.

**III. Regulatory Requirements**

*A. Administrative Procedure Act*

The changes to the CFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the CFRP process, and these updates to that process, constitute a general statement of policy,[28] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to

exercise a discretionary power." [29] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [30] because it sets forth updates to how agencies will implement the CFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[31] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[32] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[33] Improving the efficiency and accessibility of CFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other

[29] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[30] 5 U.S.C. 553(b)(A).

[31] 5 U.S.C. 553(a)(1).

[32] *See* footnotes 14, 15, 16, and 17; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[33] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[34] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key migration partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Cuban nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the CFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this CFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[35]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17376 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[34] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries.

[35] Per the normal clearance procedures at 5 CFR 1320.10(e).

[27] 8 CFR 274a.12(c)(11).

[28] 5 U.S.C. 553(b)(A).

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to "survey customers to determine the kind and quality of services they want." In addition, the Foundations for Evidence-Based Policymaking Act of 2018 ("Evidence Act") enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

**Collection of Information**

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

**Comments**

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

**Implementation of Changes to the Haitian Family Reunification Parole Process**

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful,

safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

---

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visas to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new

invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9]

Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved[12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members[13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

---

[2] *Id.; see also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.* To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] *See Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). See also USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. *See* USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), *https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs.* In June 2022, USCIS reversed its 2019 announcement. *See also* The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. *See* Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-3-2-4-3-2-2-2-5-2-2-2/.*

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic

instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. *See Implementation of a Parole Process for Haitians,* 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. *See* Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80.* To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. *See* UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[8] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[9] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[10] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[11] *See Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child" in general, as meaning "an unmarried person under twenty-one years of age").

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider

other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status[16] or for an immigrant visa[17] as a result of entering without inspection and not having been admitted or paroled.[18]

---

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 3 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180

### C. Description of Updated Process for HFRP

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

---

days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

**54638**   **Federal Register** / Vol. 88, No. 154 / Friday, August 11, 2023 / Notices

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric

information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

---

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

### III. Regulatory Requirements

#### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First*, the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.*, a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second*, even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

#### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

### DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

### Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* The White House, "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals are also generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

## II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

**1280** Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

### III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

*A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes*

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

*B. Updated Eligibility Criteria*

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

## C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/*, Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:**
Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance— Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]**

**South Carolina; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:**
Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:

**Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices **43591**

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

**Implementation of a Family Reunification Parole Process for Colombians**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at

the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including

updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who

are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Colombians

As in the CFRP and HFRP processes, this FRP process for Colombians will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Colombia who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Colombian principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to

the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Colombians, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Colombia in the United

---

additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

States. Currently, nationals of Colombia with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address

irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing

migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Colombian married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Colombian married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2022 (FY22), migration from Colombia significantly increased, with border enforcement encounters at the SWB more than 20 times greater in FY22 than in the prior year (6,202 in FY21 compared to 125,172 in FY22).[44] Encounters in FY23, through April 2023, were already at more than 107,000.[45] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Colombia to the United States.[46]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[47] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Colombia and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

The increase in monthly encounters of Colombians, from approximately 7,500 per month in the first seven months of Fiscal Year (FY) 2022 to more than 15,300 per month in the first seven months of FY 2023 has contributed to the strain on DHS's reception and processing capacity at the SWB.[48] By establishing a lawful pathway for some of these migrants from Colombia, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[49] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[50]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated

---

[37] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/*.

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 8, 2023).

[45] *Id.*

[46] U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Colombia (Apr. 2023) *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/colombia/*; World Report 2023, Events of 2022 Colombia, Human Rights Watch (Jan. 2023) *https://www.hrw.org/world-report/2023/country-chapters/colombia*; ACAPS, Colombia Humanitarian overview: protection concerns and community protection responses (Nov. 17, 2022), *https://www.acaps.org/sites/acaps/files/products/files/20221117_acaps_colombia_analysis_hub_protection.pdf*; Reuters, More than 15 mln Colombians suffer food insecurity—UN (Feb. 16, 2023) *https://www.reuters.com/world/americas/more-than-15-mln-colombians-suffer-food-insecurity-un-2023-02-16/*; see also Paulina Villegas & Samantha Schmidt, *Two siblings tried reaching the U.S. by sea to reunite with their mother. Only one of them made it*, Wash. Post, Jan. 28, 2022, *https://www.washingtonpost.com/world/2022/01/28/siblings-bahamas-colombia/*.

[47] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145*; DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*.

[48] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 9, 2023).

[49] As of late May 2023, there are currently an estimated 17,400 Colombian nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Colombian nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[50] *See, e.g.*, INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

with irregular migration.[51] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[52] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[53] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic concerns in Colombia, which may be a factor driving the increasing numbers of Colombians crossing the Darién Gap.[54] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[55] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[56]

Additional remittances sent back to Colombia, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[57] Remittances from Colombian migrants already play an important role in the Colombian economy.[58] For the first nine months of 2022, remittances to Colombia increased 9 percent.[59] Additionally, Colombia receives the highest income from remittances in South America.[60] Overall, remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Colombia, potentially impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Colombian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[61] Form I–130 filed on behalf of a Colombian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Colombian principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Colombia (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United

---

[51] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[52] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[53] *Id.*

[54] The number of Colombians crossing from Colombia into Panama has increased from approximately 300 in January 2023 to over 1,600 in April 2023. Servicio Nacional de Migración de Panamá, Tránsito Irregular por Darién 2023 (last visited June 9, 2023), *https:// www.migracion.gob.pa/images/img2023/pdf/ IRREGULARES_%20POR_%20DARI%C3%89N_ ABRIL_2023.pdf.*

[55] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/ 23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending

Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https:// www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[56] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https:// www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[57] *See* Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https:// www.pewresearch.org/fact-tank/2018/01/29/ remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021). *https:// www.whitehouse.gov/wp-content/uploads/2021/07/ Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020), *https:// datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[58] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/ english/remittances-reman-vital-source-of-revenue-for-latin-americas-economies/.*

[59] The World Bank, *Remittances Grow 5% in 2022, Despite Global Headwinds* (Nov. 30, 2022), *https://www.worldbank.org/en/news/press-release/ 2022/11/30/remittances-grow-5-percent-2022.*

[60] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/ english/remittances-reman-vital-source-of-revenue-for-latin-americas-economies/.*

[61] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

States to seek a discretionary grant of parole at the POE, a beneficiary must:
- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [62] of an approved Form I–130, Petition for Alien Relative;
- be a national of Colombia or be a non-Colombian derivative beneficiary spouse or child [63] of a Colombian principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [64] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[65]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Colombia. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[66]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and

will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[67] expedited removal proceedings,[68] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [69] or for an immigrant visa [70] as a result of entering without inspection and not having been admitted or paroled.[71]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online,

---

[62] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. These "add-on derivatives" are included within the term "derivative" in this notice.

[63] Certain non-Colombians may use this process if they are a derivative beneficiary of a Colombian principal beneficiary and traveling with that Colombian beneficiary.

[64] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[65] *See, e.g.*, INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[66] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[67] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[68] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[69] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[70] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[71] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

including individualized, case-by-case identity and eligibility determinations and robust security vetting.

**Step 1: Invitation Sent to Petitioner**

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

**Step 2: Petitioner Files Form I–134A Online**

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

**Step 3: Beneficiary Electronically Provides Information To Support the Request**

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

**Step 4: Beneficiary Submits Request in CBP One Mobile Application**

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

**Step 5: Approval To Travel to the United States**

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[72] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by

CBP at the time the beneficiary arrives at the interior POE.

**Step 6: Beneficiary Seeks Parole at the POE**

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

**Step 7: Parole**

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[73]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[72] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[73] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon

thereafter would, in general, have been admitted as immigrants).[74]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Colombia still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Colombian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First*, DHS is merely adopting a general statement of policy,[75] *i.e.*, a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[76] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[77] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [78] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[79] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[80]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[81] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[74] *See, e.g.*, National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[75] 5 U.S.C. 553(b)(A).

[76] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[77] 5 U.S.C. 553(a)(1).

[78] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[79] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[80] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[81] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways which will continue to remain a central topic of bilateral relations.[82] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[83] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[85] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[86]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[87] The goal is to prevent irregular migration to the United States or other places in the hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[88] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[89]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[90] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[91] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[92]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful

[82] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration. May 2. 2023. *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[83] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-*

*from-the-united-states-and-guatemala-on-migration/*.

[84] *Id*

[85] *Id.*

[86] *Id.*

[87] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[88] *Id*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[91] *Id.*

[92] *Id.*

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

## DEPARTMENT OF HOMELAND SECURITY

**[Docket No. CISA–2023–0012]**

### Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@ cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.

• *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words "Department of Homeland Security" and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**
*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]**

**RIN 1615–ZC07**

### Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

### Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf*.

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen regional, national, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January

2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG

efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Guatemalans

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

---

DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for

Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29]

joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration

acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

---

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*. However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[28] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*; *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June

4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*; *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*; *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america*.

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://*

*www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order'''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html*.

[37] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

AR_001640

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18,

and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively.[44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular

migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB.[49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit

---

[38] See id.

[39] See Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.

[40] See id.

[41] See id.

[42] See id.

[43] See id.

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] Id.

[46] Id.

[47] See Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also NSC, U.S. Strategy for Addressing the Root Causes of Migration in Central America (July 2021) https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[48] See William Kandel, Congressional Research Service, U.S. Family-Based Immigration Policy (Feb. 9, 2018), https://crsreports.congress.gov/product/pdf/R/R43145; DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.

[49] See Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] See, e.g., INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States (2019) https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also DHS, Fact Sheet: Counter Human Smuggler Campaign Update (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and

the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

---

https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, *https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://*

*www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic source for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

**43587**

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child[66] of a Guatemalan principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making

these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea[67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between

POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by

CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

### D. Termination and No Private Rights

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

---

*statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

---

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]

RIN 1615–ZB99

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States Dates or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)
Continued

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

**Implementation of a Family Reunification Parole Process for Hondurans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the

parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and

Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Hondurans

As in the CFRP and HFRP processes, this FRP process for Hondurans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Honduras who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Honduran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Hondurans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process— Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Honduras in the United States. Currently, nationals of Honduras with approved family-based petitions often wait many years before their immigrant visas can be issued and they

---

for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Honduran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Honduran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

AR_001651

economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Hondurans at the SWB were 262 percent of the FY18 level and over 22 percent as compared to FY19, with encounters totaling approximately 319,200 in FY21 as compared to approximately 88,100 and 261,000 in FY18 and FY19, respectively.[44] Encounters of Hondurans dropped in FY22, but still remained high with about 212,900 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Hondurans accounting for approximately 11.4 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, gang violence, corruption, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Honduras, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Honduras and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available.

The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

## D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from Honduras, has strained DHS's reception and processing capacity at the SWB. Between FY20 and May 2023, encounters of Hondurans at the SWB exceeded half a million.[49] By establishing a lawful pathway for some of these migrants from Honduras, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of

---

[37] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/*.

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration*; *see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145*; DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*.

[49] CBP, Nationwide Encounters (last visited June 9, 2023); *https://www.cbp.gov/newsroom/stats/nationwide-encounters*. Total SWB encounters between FY20 and May 2023 sum to 662,470 as of date accessed.

[50] As of late May 2023, there are currently an estimated 10,700 Honduran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Honduran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

### E. Addressing Root Causes of Migration Through Remittances

This FRP process will also aid U.S. efforts in addressing economic insecurity in Honduras, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Honduras, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Honduras already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 20 percent of Gross Domestic Product (GDP) in Honduras.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Honduras specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Honduras, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Honduran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Honduran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Honduran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass

---

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Honduras, April 4, 2022, *https://www.state.gov/wp-content/uploads/2022/06/ICS_WHA_Honduras_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-*

*economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] USAID, Economic Analysis of the Honduras Remittances Ecosystem: An Assessment of the Role Remittances have on Financial Inclusion and Development Outcomes (2022) *https://pdf.usaid.gov/pdf_docs/PA00Z69J.pdf.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Honduras (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Honduras or be a non-Honduran derivative beneficiary spouse or child [66] of a Honduran principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process.

CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68] DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Honduras. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to

ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Hondurans may use this process if they are a derivative beneficiary of a Honduran principal beneficiary and traveling with that Honduran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within periods of time thereafter is inadmissible and

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case by

case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Honduras still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Honduran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole

decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/ the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[87] Id.

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration.* See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[94] Id.

[95] Id.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

RIN 1615–ZC00

## Implementation of a Family Reunification Parole Process for Salvadorans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Renā Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf*.

[3] *See* E.O. 14010 at secs. 2–4.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

RIN 1615–ZC00

**Implementation of a Family Reunification Parole Process for Salvadorans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf*.

[3] *See* E.O. 14010 at secs. 2–4.

*of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to

immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022)

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain

eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Salvadorans

As in the CFRP and HFRP processes, this FRP process for Salvadorans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of El Salvador who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Salvadoran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the

beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Salvadorans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family

---

(authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

members from El Salvador in the United States. Currently, nationals of El Salvador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

### B. Furthering Important Foreign Policy Objectives

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address

irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing

migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Salvadoran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*. However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Salvadoran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*; *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*; *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*; *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america*.

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html*.

AR_001662

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Salvadorans at the SWB increased by about 168 percent as compared to FY18, and about 7.0 percent as compared to FY19, with encounters totaling approximately 98,600 in FY21 as compared to 36,800 and 92,200 in FY18 and FY19, respectively.[44] In FY22, the encounters remained at the high levels of the previous fiscal year, with 97,000 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Salvadorans accounting for approximately 4.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including El Salvador, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of El Salvador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

## D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from El Salvador, has strained DHS's reception and processing capacity at the SWB. Between FY20 and April 2023, encounters of Salvadorans at the SWB totaled approximately a quarter million.[49] By establishing a lawful pathway for some of these migrants from El Salvador, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling

---

[37] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/*.

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145*; DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*.

[49] CBP, Nationwide Encounters (last visited June 9, 2023) *https://www.cbp.gov/newsroom/stats/nationwide-encounters*.

[50] As of late May 2023, there are currently an estimated 32,600 Salvadoran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Salvadoran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

**43616** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in El Salvador, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including El Salvador already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to nearly 21 percent of Gross Domestic Product (GDP) in El Salvador.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In El Salvador specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in El Salvador, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Salvadoran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of a Salvadoran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Salvadoran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review

---

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, Fact Sheet: Counter Human Smuggler Campaign Update (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—El Salvador, Apr. 21, 2023, *https://www.state.gov/wp-content/uploads/2023/04/ICS_WHA_El-Salvador_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized

Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—El Salvador (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=SV.*

[62] *Id.; also see* Bloomberg Línea, *Remittances to Central America on Track to Break Records* (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

A beneficiary is a national of El Salvador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;

• be a national of El Salvador or be a non-Salvadoran derivative beneficiary spouse or child[66] of a Salvadoran principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the

processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea[67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in El Salvador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in

coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] See INA sec. 203(d), 8 U.S.C. 1153(d); see also INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. The term "add-on derivatives" is included within the term "derivative" in this notice.

[66] Certain non-Salvadorans may use this process if they are a derivative beneficiary of a Salvadoran principal beneficiary and traveling with that Salvadoran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] See, e.g., INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] See 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and

assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel

via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the Poe

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-

by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of El Salvador still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Salvadoran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole

decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities like the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the

United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an

exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

---

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.

[87] Id.

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.

[94] Id.

[95] Id.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Salvadorans and is being revised in connection with this notice by increasing the burden estimate. This

process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14475 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

**[Docket No. FWS–R7–ES–2023–0008; FF07CAMM00–FX–ES111607MRG01]**

## Marine Mammals; Letters of Authorization To Take Pacific Walruses and Polar Bears in the Beaufort Sea, Alaska, in 2022

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance.

**SUMMARY:** In accordance with the Marine Mammal Protection Act of 1972, as amended, the U.S. Fish and Wildlife Service issued letters of authorization (LOA) for the nonlethal take of polar bears and Pacific walruses incidental to oil and gas industry exploration, development, and production activities in the Beaufort Sea and the adjacent northern coast of Alaska in 2022. This notice announces the LOAs issued in calendar year 2022. The LOAs stipulate conditions and methods that minimize impacts to polar bears and Pacific walruses from these activities.

**ADDRESSES:** *Document availability:* You may view the letters of authorization at *https://www.regulations.gov* under Docket No. FWS–R7–ES–2023–0008, or you may request them from the contact in **FOR FURTHER INFORMATION CONTACT.**

**FOR FURTHER INFORMATION CONTACT:** Charles Hamilton, via U.S. mail at

Marine Mammals Management, U.S. Fish and Wildlife Service, MS 341, 1011 East Tudor Road, Anchorage, AK 99503; by email at *R7mmmRegulatory@fws.gov*, or by telephone at 1–800–362–5148. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On August 5, 2021, the U.S. Fish and Wildlife Service (Service) published in the **Federal Register** a final rule (86 FR 42982) establishing regulations that allow us to authorize the nonlethal, incidental, unintentional take of small numbers of polar bears (*Ursus maritimus*) and Pacific walruses (*Odobenus rosmarus divergens*) during year-round oil and gas industry exploration, development, and production activities in the Beaufort Sea and adjacent northern coast of Alaska. These incidental take regulations are located in subpart J in part 18 of title 50 of the Code of Federal Regulations (CFR) and are effective through August 5, 2026. The rule prescribed a process under which we issue letters of authorization (LOA) to applicants conducting activities as described under the provisions of the regulations.

Each LOA stipulates conditions or methods that are specific to the activity and location. Holders of the LOAs must use methods and conduct activities in a manner that minimizes to the greatest extent practicable adverse impacts on Pacific walruses and polar bears and their habitat, and on the availability of these marine mammals for subsistence purposes. No intentional take or lethal incidental take is authorized under these regulations.

In accordance with section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) and our regulations at 50 CFR part 18, subpart J, in 2022, we issued LOAs to the companies in the Beaufort Sea and adjacent northern coast of Alaska shown in the table. The Service includes in the table all LOAs issued in 2022.

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA, is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

of our Southwest Border (SWB) by reducing the number of encounters of Cuban nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Cubans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Cuban nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Cuban Parole Process**

This notice describes the implementation of a new parole process for certain Cuban nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Cuban nationals

entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

Building on the success of the Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Cuban nationals at the SWB and at sea, which have reached record levels over the past six months. Similar to Venezuela, Cuba has restricted DHS's ability to remove

individuals to Cuba, which has constrained the Department's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Cubans will reduce the number of Cubans seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Cubans is

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Cuban Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

contingent on the GOM accepting the return, departure, or removal to Mexico of Cuban nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Cuban national (and certain non-Cuban nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Cuban nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Cubans from the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits, including adjustment of status pursuant to the Cuban Adjustment Act, Public Law 89–732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note), for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Cuban nationals pursuant to this process will provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Cubans to flee their home country, to include crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's (GOC) violent repression of dissent.[6] Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500. Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society. Other migrants who were about to enter the Darién Gap have turned around and headed back south. Still others who were intending to migrate north are staying where they are to apply for this parole process. Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Cuban Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[9] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[10] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.[11]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and

---

[6] Washington Office on Latin America, *U.S.-Cuba Relations: The Old, the New and What Should Come Next*, Dec. 16, 2022, *https://www.wola.org/analysis/us-cuba-relations-old-new-should-come-next/* (last visited Dec. 17, 2022).

[7] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[9] OIS analysis of historic CBP data.

[10] *Id.*

[11] *Id.*

1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[12] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [13] (NCA) and, since the late 2010s, from countries throughout the Americas.[14] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[15]

Cubans are fleeing the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980.[16] In FY 2022, DHS encountered about 213,709 unique Cuban nationals at the SWB, a seven-fold increase over FY 2021 rates, and a marked 29-fold increase over FY 2020.[17] FY 2022 average monthly unique encounters of Cuban nationals at the land border totaled 17,809, a stark increase over the average monthly rate of 589 unique encounters in FYs 2014–

2019.[18] These trends are only accelerating in FY 2023. In October and November 2022, DHS encountered 62,788 unique Cuban nationals at the border—almost one third FY 2022's record total.[19] The monthly average of 31,394 unique Cuban nationals is a 76 percent increase over the FY 2022 monthly average.[20] The first 10 days of December 2022 saw 15,657 encounters of Cubans at the SWB.[21] In FY 2023, Cuban nationals have represented 16.5 percent of all unique encounters at the SWB, the second largest origin group.[22]

Maritime migration from Cuba also increased sharply in FY 2022 compared to FY 2021. According to DHS data, in FY 2022, a total of 5,740 Cuban nationals were interdicted at sea, the top nationality, compared to 827 in FY 2021, an almost 600 percent increase in a single fiscal year.[23]

In addition to the increase of Cuban nationals in U.S. Coast Guard (USCG) interdictions at sea and U.S. Customs and Border Protection (CBP) encounters at the SWB, USBP encounters of Cubans in southeast coastal sectors are also on the rise.[24] In FY 2022, DHS encountered 2,657 unique Cuban nationals (46 percent of total unique encounters), an increase of 1,040 percent compared to FY 2021.[25] This trend also has accelerated sharply in FY 2023, as CBP has made 1,917 unique encounters of Cuban nationals in the first two months of the FY—almost three-quarters of FY 2022's total.[26] Cuban nationals are 72 percent of all unique encounters in these sectors in October and November.[27]

**3. Push and Pull Factors**

DHS assesses that the high—and rising—number of Cuban nationals encountered at the SWB and interdicted at sea is driven by three key factors: First, Cuba is facing its worst economic crisis in decades due to the lingering impacts of the COVID–19 pandemic, high food prices, and economic sanctions.[28] Second, the government's

response has been marked by further political repression, including widespread arrests and arbitrary detentions in response to protests.[29] Third, the United States faces significant limits on the ability to return Cuban nationals who do not establish a legal basis to remain in the United States to Cuba or elsewhere; absent the ability to return Cubans who do not have a lawful basis to stay in the United States, more individuals are willing to take a chance that they can come—and stay.

Further, in November 2021, the Government of Nicaragua announced visa-free travel for Cubans.[30] This policy provided Cubans a more convenient and accessible path into the continent, facilitating their ability to begin an irregular migration journey to the SWB via land routes.[31] Many such Cuban migrants fall victim to human smugglers and traffickers, who look to exploit the most vulnerable individuals for profit with utter disregard for their safety and wellbeing, as they attempt the dangerous journey northward through Central America and Mexico.[32]

**i. Factors Pushing Migration From Cuba**

There are a number of economic and other factors that are driving migration of Cuban nationals. Cuba is undergoing its worst economic crisis since the 1990s [33] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[34] In July 2022, the

---

[12] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2, 518–536 (Sept. 1999).

[13] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[14] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[15] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[16] El País, *The Cuban Migration Crisis, Biggest Exodus in History Holds Key to Havana-Washington Relations*, Dec. 15, 2022, https://english.elpais.com/international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html (last visited Dec. 17, 2022).

[17] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled on December 12, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[24] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[25] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[26] *Id.*

[27] *Id.*

[28] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s*, July 1, 2021, https://

www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s (last visited Dec. 17, 2022).

[29] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests*, October 2, 2022, https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html (last visited Dec. 17, 2022).

[30] Reuters, Nicaragua Eliminates Visa Requirement for Cubans, November 23, 2021, https://www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/ (last visited Dec. 17, 2022).

[31] The New York Times, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*, May 4, 2022, https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html (last visited Dec. 17, 2022).

[32] CNN, *Cubans are Arriving to the U.S. in Record Numbers. Smugglers are Profiting from Their Exodus*, https://www.cnn.com/2022/05/12/americas/cuba-mass-migration-intl-latam/index.html, May 12, 2022 (last visited Dec. 17, 2022).

[33] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s*, July 1, 2021, https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s (last visited Dec. 17, 2022).

[34] Congressional Research Service, *Cuba: U.S. Policy in the 117th Congress*, Sept. 22, 2022, https://
Continued

Government of Cuba (GOC) reported the economy contracted in 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[35] However, this projected expansion is unlikely to respond to the needs of the Cuban people. Mass shortages of dairy and other basic goods continue to persist, and Cubans wait in lines for hours to receive subsidized cooking oil or other basic goods.[36] Deepening poverty, exacerbated by the COVID–19 pandemic, has led to food shortages and rolling blackouts, and continues to batter the economy.[37] This combination of factors has created untenable economic conditions on the island that are likely to continue to drive Cubans to travel irregularly to the United States in the immediate future.[38]

The GOC has not been able to effectively address these issues to date, and has instead taken to repressive tactics to manage public discontent. Cuba remains a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which continues to restrict freedoms of expression, association, peaceful assembly, and other human rights.[39] The GOC employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.[40] While the Cuban constitution grants limited freedoms of peaceful assembly and association, the GOC restricts these freedoms in practice.[41] The government routinely blocks any attempts to peacefully assemble that might result in opposition to, or criticism of, the government.[42] This was evident when the human rights situation in Cuba began to decline significantly in 2020.[43]

In November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression.[44] This crackdown, coupled with deteriorating economic conditions (food and medicine shortages and blackouts), led to demonstrations in Havana and throughout the country.[45]

According to a Human Rights Watch report, the GOC also committed extensive human rights violations in response to massive anti-government protests in July 2021 with the apparent goal of punishing protesters and deterring future demonstrations.[46] The report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including, arbitrary detention, prosecutions without fair trial guarantees, and cases of physical ill treatment, including beatings that in some cases constitute torture.[47] Several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.[48]

Protests over the challenges of obtaining basic necessities have continued as have heavy-handed government responses. In September 2022, a prolonged blackout caused by Hurricane Ian led to protests in Havana and other cities.[49] Cuban President Miguel Díaz-Canel denounced the peaceful gatherings as "counterrevolutionary" and "indecent," remarking that "[d]emonstrations of this type have no legitimacy." [50] Amnesty International received reports of the GOC deploying the military and police to repress these protests as well as reports of arbitrary detention.[51]

The government's repression and inability to address the underlying shortages that inspired those lawful demonstrations have generated a human rights and humanitarian crisis that is driving Cubans from the country. On June 2, 2022, the Inter-American Commission on Human Rights (IACHR) in its 2021 Annual Report stated that no guarantees currently exist for exercising freedom of expression in Cuba.[52] Although the forms of harassment of independent journalists, artists, activists, and any who question government officials are not new, the 2021 Annual Report notes that they are worsening quickly.[53] The government controls formal media and closely monitors and targets perceived dissidents within the artistic community, mainstream artists, and media figures who express independent or critical views.[54] GOC frequently blocks access to many news websites and blogs and has repeatedly imposed targeted restrictions on critics' access to cellphone data.[55]

Cuba's deteriorating economic conditions and political repression continue to increasingly drive Cubans out of their country. As a result, many have taken dangerous journeys, including through maritime means, often costing their lives at sea and on land while trying to reach the United States.

ii. Return Limitations

Due to the global COVID–19 pandemic, the GOC stopped accepting regular returns of their nationals via U.S. Immigration and Customs Enforcement (ICE) aircraft after February 28, 2020. The U.S. Government has been engaged in discussions with the GOC to reactivate the Migration Accords, which specify that the United States will process 20,000 Cuban nationals—not including immediate relatives of U.S. citizens—to come to the United States through immigrant visas and other lawful pathways, such as the Cuban Family Reunification Parole (CFRP) program, and that the Cuban government will accept the repatriation of its nationals who are encountered entering the United States without authorization. A limited number of removal flights will not, absent other efforts, impose a deterrent to Cuban nationals seeking to cross, unauthorized, into the United States.

crsreports.congress.gov/product/pdf/R/R47246 (last visited Dec. 17, 2022).

[35] Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed*, Cuba Briefing, July 25, 2022, https://www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/ (last visited Sept. 25, 2022).

[36] Washington Post, *In Cuba, a Frantic Search for Milk*, May 21, 2022, https://www.washingtonpost.com/world/interactive/2022/cuba-economy-milk-shortage/ (last visited Sept. 25, 2022).

[37] New York Times, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future*, Dec. 10, 2022. https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html (last visited Dec. 16, 2022).

[38] *Id.*

[39] U.S. Department of State, *2021 Country Reports on Human Rights Practices: Cuba*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/ (last visited Dec. 17, 2022).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Congressional Research Service, Cuba: U.S. Policy Overview, Aug. 5, 2022, https://

crsreports.congress.gov/product/IF/IF10045 (last visited Dec. 17, 2022).

[44] *Id.*

[45] *Id.*

[46] Human Rights Watch, Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators, July 11, 2022. https://www.hrw.org/report/2022/07/11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators.

[47] *Id.*

[48] Human Rights Watch, World Report 2022—Cuba. See https://www.hrw.org/world-report/2022/country-chapters/cuba.

[49] Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts, https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/.

[50] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests*, October 2, 2022, https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html (last visited Dec. 17, 2022).

[51] Amnesty International, *Cuba: Tactics of Repression Must Not be Repeated*, Oct. 5, 2022, https://www.amnesty.org/en/latest/news/2022/10/cuba-repression-must-not-be-repeated/ (last viewed Dec. 19, 2022).

[52] IACHR, Annual Report 2021—Chapter IV.B—Cuba, p.678, June 2, 2022, https://www.oas.org/en/iachr/reports/ia.asp?Year=2021 (last visited Dec. 19, 2022).

[53] *Id.*

[54] *Id.*

[55] *Id.*

As a result, the U.S. did not return any Cuban nationals directly to Cuba in FY 2022. In addition, other countries, including Mexico, have generally refused to accept the returns of Cuban nationals, with limited exceptions including Cubans who have immediate family members who are Mexican citizens or who otherwise have legal status in Mexico. In FY 2022, DHS expelled 4,710 Cuban nationals to Mexico, equivalent to 2 percent of Cuban encounters for the year.[56]

Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the GOM's acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between POEs.

Returns alone, however, are not sufficient to reduce and divert the flows of Cubans. The United States will combine a consequence for Cuban nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

### 4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Cuban nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations

that were designated for SWB enforcement and processing capacities.[57]

The impact has been particularly acute in certain border sectors. The increased flows of Cuban nationals are disproportionately occurring within the remote Del Rio and Yuma sectors, both of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 73 percent of unique encounters of Cuban nationals occurred in these two sectors.[58] Thus far in FY 2023, Del Rio and Yuma sectors have accounted for 72 percent of unique encounters of Cuban nationals.[59] In FY 2022, Del Rio and Yuma sectors encountered over double (137 percent increase) the number of migrants as compared to FY 2021, a fifteen-fold increase over the average for FY 2014–FY 2019, in part as a result of the sharp increase in Cuban nationals being encountered there.[60]

The focused increase in encounters within those two sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, it has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[61]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove noncitizens in its custody by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[62] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States. USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[63] Moreover, USCG had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly

---

[56] OIS analysis of OIS Persist Dataset and CBP subject-level data through November 30, 2022.

[57] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[58] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[59] *Id.*

[60] *Id.*

[61] Data from SBCC, as of December 11, 2022.

[62] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[63] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [64] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[65] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[66] DHS may terminate parole in its discretion at any time.[67] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[68]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Cuban nationals to remain where they are and use a lawful process to request authorization to travel to air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [69]

### A. Significant Public Benefit

The parole of Cuban nationals and their immediate family members under this process—which imposes new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhance Border Security by Reducing Irregular Migration of Cuban Nationals

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be removed to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate that the process could relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a

---

[64] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[65] INA sec. 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[66] See 8 CFR 212.5(c).

[67] See 8 CFR 212.5(e).

[68] See 8 CFR 274a.12(c)(11).

[69] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Cubans who seek to enter the United States by sea, and will allow USCG to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Cuban nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Cuban nationals in substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the border in November 2022.[70] The increased volume of provisional releases of Cuban nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Cuban nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[71] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[72] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[73] Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Cuban nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a

key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[74]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[75] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[76] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[77] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[78] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[79] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[80] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[81] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area,

---

[70] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[71] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States*, Sept. 21, 2022, *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office*.

[72] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave*, Apr. 27, 2022, *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/*.

[73] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, Sept. 23, 2022, *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day*.

[74] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[77] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[79] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream*.

[80] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[81] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[82]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.[83]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.[84] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[85]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human-smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human-smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[86]

### 6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[87] the Collaborative Migration Management Strategy (CMMS);[88] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[89] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[90] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [91]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[92] These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017— which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available. Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[93] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available. Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[94]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced

---

[82] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[83] Email from U.S. Coast Guard to DHS Policy, Re: heads up on assistance needed, Dec. 13, 2022.

[84] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[85] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[86] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42* (last visited Dec. 18, 2022).

[87] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[88] National Security Council, *Collaborative Migration Management Strategy,* July 2021, *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email#utm_source=govdelivery.*

[89] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection (LA Declaration),* June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[90] *Id.*

[91] *Id.*

[92] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; *https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.*

[93] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations, https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations,* Sept. 9, 2022 (last visited Dec. 10, 2022).

[94] Public Law 89–732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, *https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf* (last viewed Dec. 16, 2022).

operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process helps achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Cuba will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Cuban nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United

States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to U.S. actions in this regard, and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions.[95] This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Cuban national and, if applicable, the national's immediate

family members.[96] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Cuba or be a non-Cuban immediate family member[97] and traveling with a Cuban principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

---

[95] *Id.*; Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, *https://crsreports.congress.gov/product/pdf/R/R47246.*

[96] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[97] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

**1276** **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Cuban national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Cuba, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[98]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[99]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023, except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[100]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements

for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

*C. Processing Steps*

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Cubans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United

States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to an interior POE of the United States.[101] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request employment authorization from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

---

[98] This limitation does not apply to immediate family members traveling with a Cuban national.

[99] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[100] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

[101] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

## D. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Cubans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Nicaraguans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## V. Regulatory Requirements

### A. Administrative Procedure Act

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[102] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[104] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [105] In addition, although the text of the Administrative Procedure Act

does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[106] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Cuban nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Cuban nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Cuban nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Cuba to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the

implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[107] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[108]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[109] The numbers of Cubans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge, and would miss a critical opportunity to reduce and divert the flow of irregular migration.[110]

Undertaking notice-and-comment rulemaking procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[111] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment

---

[102] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] 5 U.S.C. 553(a)(1).

[105] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[106] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[107] *See* 82 FR 4902 (Jan. 17, 2017).

[108] *See* 87 FR 63507 (Oct. 19, 2022).

[109] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[110] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause''] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.'' (citations omitted)).

[111] *See* 5 U.S.C. 553(b)(B).

**1278** Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

process.[112] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[113] A number of cases follow this logic in the context of economic regulation.[114]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[115] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Cuban nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[116] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[117] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[118] DHS concluded that "a surge could result in significant loss of human life."[119]

**B. Paperwork Reduction Act (PRA)**

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Cuban parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Cuban nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP

---

[112] See, e.g., Mack Trucks, Inc. v. EPA, 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); DeRieux v. Five Smiths, Inc., 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

[113] See, e.g., Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[114] See, e.g., Chamber of Commerce of U.S. v. SEC., 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[115] See, e.g., Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, July 26, 2022 (last viewed Dec. 6, 2022).

[116] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[117] Id.

[118] Id.

[119] Id.; accord, e.g., Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

include: (1) remarks from the administration and CISA leadership on salient NS/EP and cybersecurity efforts; (2) a status update on the NSTAC Addressing the Misuse of Domestic Infrastructure by Foreign Malicious Actors Subcommittee; and (3) a deliberation and vote on the *NSTAC Report to the President on a Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem.*

Dated: January 3, 2023.

**Christina Berger,**

*Designated Federal Officer, NSTAC, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–00181 Filed 1–6–23; 8:45 am]

**BILLING CODE 9110–9P–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Haitians**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Haitian nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for

admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Haitian Parole Process**

This notice describes the implementation of a new parole process for certain Haitian nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for

migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day, and as of the week ending December 4, to an average of 86 a day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Haitian Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_*

Continued

DHS anticipates that implementing a similar process for Haitians will reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all-of-government response. In FY 2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[6] In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago. Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[7]

Haitian migrants are also increasingly taking to the sea in makeshift boats. Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[8] While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could

quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti will reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea. This will be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States with the imposition of consequences for those who seek to enter without authorization between POEs along the SWB. Individuals can access this lawful process from safe locations in Haiti or in third countries. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Haitian national (and certain non-Haitian nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the

region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

## B. Conditions at the Border

### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the

---

%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[7] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf,* (last viewed Dec. 11, 2022).

[8] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[9] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[10]

Panama's daily encounters of Venezuelans also declined significantly, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[11]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[12] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[13] Still others who were intending to migrate north are staying where they are to apply for this parole process.[14] Put simply, the

Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

**2. Trends and Flows: Increase of Haitian Nationals Arriving at the Southwest Border**

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[15] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[16] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[17]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[18] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [19] (NCA) and, since the late 2010s, from countries throughout the Americas.[20] Migrant

populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[21]

*C. Trends in Haitian Migration*

1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[22] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[23]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas, within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[24] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May 2022.[25] While encounters of Haitian migrants at our border have declined since June 2022, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in

[9] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[10] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[11] Servicio Nacional de Migración de Panamá, *Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[12] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[13] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[14] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://*

*www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7 2022 (last viewed Dec. 8, 2022).

[15] OIS analysis of historic CBP data.

[16] *Id.*

[17] *Id.*

[18] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[19] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[20] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an

average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[21] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] *Id.*

[24] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio*, Oct. 7, 2021, *https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/*.

[25] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters*, (last visited, Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July 2022, to 2,170 in September, to 4,607 in November.[26]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there were 62,680 Haitians in Mexico in 2022 and projects that this population will grow to 104,541 in 2023.[27] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of any nationality and almost twice as many as the second-highest nationality.[28] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[29] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the Centers for Disease Control and Prevention (CDC) Title 42 Order is lifted.

### 2. Migration by Sea

Increasing numbers of Haitian migrants also continue to attempt migration to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea as compared to 1,205 in FY 2021 and 398 in FY 2020.[30]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived in the United States by sea.[31] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[32]

In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—composing 31 percent of total unique encounters by USBP in the southeast coastal sectors.[33]

### 3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion of gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation in Haiti is having an impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States; absent such an ability, more individuals may be willing to take a chance that they can come—and stay.

### i. Factors Pushing Migration From Haiti

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[34]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[35] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[36] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[37] The World Bank estimates

that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[38]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[39] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[40] The situation has deteriorated to such a point that the Haitian Government itself, on October 7, 2022, asked for international military assistance to help address the converging crises.[41]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[42] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.[43] This recent surge in gang

---

[26] Servicio Nacional de Migración de Panamá, Irregulares Por Darien, November 2022.

[27] UNHCR Global Focus, *Mexico*, See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[28] OIS analysis of *Instituto Nacional de Migracion* data.

[29] Estadísticas Comisión Mexicana de Ayuda a Refugiados, *Mexico Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November), https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic._.pdf*, (last visited Dec. 17, 2022).

[30] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[31] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[32] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[33] *Id.*

[34] Diana Roy, Council on Foreign Relations, *Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022* (Dec. 1, 2022). *https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022.*

[35] UNICEF, *Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families, https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti* (last viewed Dec. 12, 2022).

[36] The Washington Post, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake*, Aug. 16, 2021, *https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/*, (last viewed Dec. 19, 2022).

[37] UNICEF, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance*, Sept. 15, 20221, *https://www.unicef.org.uk/press-releases/one-month-after-*

*haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef/,* (last visited Dec. 19, 2022).

[38] The World Bank, *Haiti Overview*, Updated Nov. 8, 2022, *https://www.worldbank.org/en/country/haiti/overview#:~:text=The%20results%20of%20the%20assessment%20of%20the%20effects,in%20damage%20and%20losses%2C%20or%2011%25%20of%20GDP,* (last visited Dec. 19, 2022).

[39] *Id.*

[40] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.

[41] CNN, *Haiti government asks for international military assistance*, Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html* (last visited Dec. 17, 2022).

[42] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation* (July 7, 2021). *https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.*

[43] *See* International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists* (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists;* Office of the High Commissioner for Human Rights, *Sexual violence in Port-au-Prince: A weapon used by gangs to instill*

Case No. 1:24-cv-00762-CNS   Document 22-1   filed 06/24/24   USDC Colorado   pg 1687 of 1835

AR_001687

violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[44] Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.[45]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[46]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[47] This Haitian diaspora in South America developed after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people. Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[48] Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free. As of 2020, there were an estimated 143,000 Haitians living in Brazil and 180,000 in Chile.[49] However, over the past two years, declining economic conditions in Chile and Brazil, which were exacerbated by the COVID–19 pandemic, have led many Haitian migrants to leave those countries to head north.[50]

As noted above, UNHCR estimates 62,680 Haitians were in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[51] Many thousands more are between Mexico and South America.

### ii. Return Limitations

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by air or maritime repatriations by sea. For example, in early September 2022, destabilizing events, including gangs seizing control of a key fuel terminal, led to a pause in repatriation flights. The ability of our on-the-ground partners to help receive migrants that provide services for individuals returned to Haiti is evaluated on a day-to-day basis.[52] The ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly affected by the limitation on returns. Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources. U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.

### 4. Impact on DHS Resources and Operations

#### i. Impact on DHS Resources

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[53]

#### ii. Impact on Border Operations

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[54] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[55] All three sectors remain at risk of operating, or are currently operating, over capacity.[56] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014–FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[57]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such

---

*fear* (Oct. 14, 2022), *https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear.* Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[44] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[45] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6* (Nov. 17, 2022), *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[46] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html,* (last viewed Dec. 17, 2022).

[47] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas;* Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[48] *Id.*

[49] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* (May 2021), *https://www.migrationpolicy.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/,* (last visited Dec. 19, 2022).

[50] *Id.* Migration Policy Institute.

[51] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[52] International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). *https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.*

[53] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[54] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[55] *Id.*

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] *Id.*

as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[58]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

### iii. Impact on Maritime Operations

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[59] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[60] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast Guard deployed three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[61] USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[62] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

### II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [63] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[64] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[65] DHS may terminate parole in its discretion at any time.[66] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[67]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Haitian nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [68]

#### A. Significant Public Benefit

The parole of Haitian nationals and their immediate family members under this process—which imposes new consequences for Haitians who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

#### 1. Enhance Border Security by Reducing Irregular Migration of Haitian Nationals

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have

---

[58] Data from SBCC, as of December 11, 2022.

[59] OIS analysis of USCG data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[60] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[61] Id.

[62] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

[63] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 8 U.S.C. 2024(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[64] INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[65] See 8 CFR 212.5(c).

[66] See 8 CFR 212.5(e).

[67] See 8 CFR 274a.12(c)(11).

[68] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

AR_001689

decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

## 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-

travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

## 3. Reduce the Burden on DHS Personnel and Resources

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs, we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Haitian nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

## 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly

directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have provided services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[69] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[70] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[71] As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Haitian nationals into an orderly and lawful process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide

---

[69] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office*.

[70] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/*.

[71] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day*.

basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[72]

In FY 2022, more than 750 migrants died attempting to enter the United States,[73] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[74] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[75] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[76] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[77] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[78] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of

death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[79] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[80]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of

the capsized vessel and survivor.[81] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[82] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off the Florida Keys.[83] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[84]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[85] the Collaborative Migration Management Strategy (CMMS);[86] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[87] The

---

[72] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[73] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[74] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[80] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R*; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[81] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe06430474 0c3a3019.*

[82] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[83] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[84] *Id.*

[85] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[86] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[87] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

AR_001691

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[88] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [89]

In June 2022, the U.S. Government announced the planned resumption of operations under the Haitian Family Reunification Parole (HFRP) program.[90] Approved HFRP beneficiaries enter the United States as parolees but are eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State temporarily reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility criteria, coupled with the operational challenges posed by the security situation in Haiti and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process will help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries.

The process also will respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID–19 pandemic.[91] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[92]

Along with the Venezuelan process, this new process will add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Haiti will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to return or remove to Mexico Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[93] This process provides a safe mechanism for Haitian nationals who

---

[88] *Id.*

[89] *Id.*

[90] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (June 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.*

[91] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[92] Reuters, *Thousands of mostly Haitian Migrants Traverse Panama on Way to United States,* Sept. 26, 2021, *https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/,* (last viewed Dec. 19, 2021).

[93] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), *https://crsreports.congress.gov/product/pdf/IF/IF12182.*

seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea.

## IV. Eligibility

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Haitian national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

- be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

- be outside the United States;
- be a national of Haiti or be a non-Haitian immediate family member[81] and traveling with a Haitian principal beneficiary;
- have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- possess an unexpired passport valid for international travel;
- provide for their own commercial travel to an air U.S. POE and final U.S. destination;
- undergo and pass required national security and public safety vetting;
- comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- demonstrate that a grant of parole is warranted based on significant public

benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Haitian national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Haiti, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[94]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

- fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]
- has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;
- has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or
- is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

[94] This limitation does not apply to immediate family members traveling with a Haitian national.

### C. Processing Steps

#### Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Haitians' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

#### Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

#### Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

#### Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel

via commercial air to an interior POE of the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Haitians at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the

*Federal Register*) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[95] *i.e.,* a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [96] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[97] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [98] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[99] This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Haitian nationals to enter the United States. The United States will only implement the

new parole process while able to return or remove Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Haitian nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Haiti to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs

---

[95] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[96] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[97] 5 U.S.C. 553(a)(1).

[98] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[99] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market

dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in

response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [109] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." [110] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." [111] DHS concluded that "a surge could result in significant loss of human life." [112]

---

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]

**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

### B. Conditions at the Border

#### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20PDF_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

200 per day, and as of the week ending December 4, at an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

## 2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[18]

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

---

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[9] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf,* (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7, 2022 (last viewed Dec. 8, 2022).

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), *https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5.*

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, *https://news.un.org/en/story/2022/03/1114792,* Mar. 25, 2022 (last viewed Dec. 9, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, *https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/,* Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, *https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html,* Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime

and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that ''[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary.'' [31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive ''has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . supported by the other branches of government.'' [32] The IACHR reported in June 2022 that ''the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua,'' [33] and that as of late September, ''more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled'' since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua ''is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation,

intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists.'' [35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern ''about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country.'' [37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop ''persisted in destabilizing and provocative activities.'' [38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, ''over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily,'' and ''17 percent of children aged under five suffer from chronic malnutrition.'' [41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

---

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] *Id.*

[26] *Id.*

[27] *Id.*; OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the U.S.* (July 29, 2021), *https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.*

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections* (Nov. 8, 2022), *https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.*

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President* (Nov. 3, 2021), *https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.*

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua 2* (Sept. 2, 2022), *https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.*

[32] Inter-American Commission on Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law,* OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), *https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.*

[33] Inter-American Commission on Human Rights, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775, (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, *https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257.*

[35] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, *https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.*

[36] IACHR, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775 (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[37] Inter-American Commission on Human Rights, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 20, 2021), *http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.*

[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent* (Aug. 19, 2022), *https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.*

[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), *https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.*

[40] The World Bank, *GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false* (last visited Dec. 6, 2022).

[41] World Food Programme, *Nicaragua, https://www.wfp.org/countries/nicaragua* (last visited: Sept. 26, 2022).

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

### ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

### 4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021,

DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is

geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central De Nicaragua, Remesas Por País de Origen, *https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm* (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, *https://www.unhcr.org/en-us/displacement-in-central-america.html*.

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, *https://www.unhcr.org/62a9d1494/global-trends-report-2021*.

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] *Id.*, and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

significant public benefit.'' [52] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[54] Individuals may be granted advance authorization to travel to the United States to seek parole.[55] DHS may terminate parole in its discretion at any time.[56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization.[57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [58]

### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated

reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

#### 1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures,

withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

#### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

#### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[54] *Id.*

[55] *See* 8 CFR 212.5(f).

[56] *See* 8 CFR 212.5(e).

[57] *See* 8 CFR 274a.12(c)(11).

[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues) [66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns; [70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

---

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.*

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[74] the Collaborative Migration Management Strategy (CMMS);[75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuela process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in

Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

---

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.*

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[76] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[77] *Id.*

[78] *Id.*

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek advance or grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Nicaragua or be a non-Nicaraguan immediate family member [81] and traveling with a Nicaraguan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order; [83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.*

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this advance authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to

applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the process at any point. The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## V. Regulatory Requirements

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United

States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as

detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule regarding Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("'[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.'").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on

Social Media, *https:// www.techtransparencyproject.org/articles/inside- world-misinformation-targeting-migrants-social- media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

**1266** Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA, is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*

[102] *Id.*

[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

# Rules and Regulations

**Federal Register**

Vol. 87, No. 61

Wednesday, March 30, 2022

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 106**

**[CIS No. 2688–21; DHS Docket No. USCIS–2021–0011]**

**RIN 1615–AC73**

## Implementation of the Emergency Stopgap USCIS Stabilization Act

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** The Department of Homeland Security (DHS) is amending DHS premium processing regulations to codify statutory changes made by the Continuing Appropriations Act, 2021 and Other Extensions Act (Continuing Appropriations Act). The Continuing Appropriations Act included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), which amended the Immigration and Nationality Act (INA) by modifying U.S. Citizenship and Immigration Services' (USCIS) authority to provide premium processing services and to establish and collect premium processing fees for those services. This rule amends DHS premium processing regulations by updating the regulations to include the fees established by the USCIS Stabilization Act for immigration benefit requests that were designated for premium processing on August 1, 2020, and establishing new fees and processing timeframes consistent with section 4102(b) of the USCIS Stabilization Act.

**DATES:**

*Effective Date:* This rule is effective on May 31, 2022. The availability of premium processing for newly designated immigration benefit requests will be announced by USCIS in accordance with DHS premium processing regulations and will become available as stated at that time.

*Comment Date:* DHS will only accept comments on the revised information collection Form I–907 described in the Paperwork Reduction Act section of this rule. Comments on the revised information collection must be received on or before May 31, 2022. This comment period applies to the Paperwork Reduction Act section of this rule only; it does not cover the substance of the regulatory changes, future policy associated with premium processing availability, or on any other topic related to this rulemaking beyond the proposed revisions to the impacted information collections.

**ADDRESSES:** All comments on the information collection must be submitted through the Federal eRulemaking Portal: *https://www.regulations.gov.* The comments on the information collection must be identified by DHS Docket No. USCIS 2006–0025 and OMB Control Number 1615–0048. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS or USCIS officials, will not be considered comments on the information collection requirements and will not receive a response from DHS. Please note that USCIS cannot accept any comments that are hand delivered or couriered. In addition, USCIS cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. USCIS is also not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions. Public comments submitted on matters related to this final rule, but not specifically associated with the revised information collections, will not be considered by DHS.

**FOR FURTHER INFORMATION CONTACT:** Connie L. Nolan, Acting Associate Director, Service Center Operations, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
   A. Purpose of the Regulatory Action
   B. Legal Authority
   C. Summary of Costs and Benefits
   D. Summary of the Major Provisions of This Regulatory Action
II. Background
   A. Current State of DHS Premium Processing Regulations
   B. History of DHS Premium Processing Regulations
   C. The USCIS Stabilization Act
III. Discussion of the Changes
IV. Statutory and Regulatory Requirements
   A. Administrative Procedure Act
   B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
   C. Regulatory Flexibility Act
   D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
   E. Unfunded Mandates Reform Act of 1995
   F. Executive Order 13132 (Federalism)
   G. Executive Order 12988 (Civil Justice Reform)
   H. National Environmental Policy Act
   I. Family Assessment
   J. Paperwork Reduction Act

## Table of Abbreviations

APA—Administrative Procedure Act
BLS—Bureau of Labor Statistics
CEQ—Council on Environmental Quality
CFR—Code of Federal Regulations
CPI—Consumer Price Index
CPI–U—Consumer Price Index for All Urban Consumers
CRA—Congressional Review Act
DHS—Department of Homeland Security
EB—Employment-Based
E.O.—Executive Order
FR—Federal Register
FY—Fiscal Year
GPO—Government Publishing Office
ICE—Immigration and Customs Enforcement
INA—Immigration and Nationality Act
IT—Information technology
NARA—U.S. National Archives and Records Administration
NEPA—National Environmental Policy Act
NIW—National Interest Waiver
NPRM—Notice of Proposed Rulemaking
OP&S—Office of Policy and Strategy
OMB—Office of Management and Budget
PRD—Policy Research Division
Pub. L.—Public Law
RFA—Regulatory Flexibility Act
RIA—Regulatory Impact Analysis
SBREFA—Small Business Regulatory Enforcement Fairness Act
Secretary—Secretary of Homeland Security

Stat.—U.S. Statutes at Large
UMRA—Unfunded Mandates Reform Act of 1995
U.S.C.—U.S. Code
USCIS—U.S. Citizenship and Immigration Services
USCIS Stabilization Act—Emergency Stopgap USCIS Stabilization Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

The purpose of this rulemaking is to amend the DHS premium processing regulations to codify those fees set by the USCIS Stabilization Act under section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A), and to establish new fees and processing timeframes for new immigration benefit requests, consistent with the conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act.

In 2000, Congress added new section 286(u) to the INA, 8 U.S.C. 1356(u), to permit the former Immigration and Naturalization Service to designate certain employment-based immigration benefit requests for premium processing subject to an additional fee.[1] At the time, Congress set the premium processing fee and authorized USCIS to adjust the fee for inflation, as determined by the Consumer Price Index for All Urban Consumers (CPI–U).[2] On this basis, USCIS established premium processing fees and timeframes for certain employment-based petitions, including Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, in certain visa classifications. Petitioners and applicants request premium processing through filing Form I–907, Request for Premium Processing Service, and paying the appropriate fee.[3]

On October 1, 2020, the Continuing Appropriations Act, which included the USCIS Stabilization Act, was signed into law. The USCIS Stabilization Act set new fees for premium processing of immigration benefit requests that had been designated for premium processing as of August 1, 2020, and expanded DHS authority to establish and collect new premium processing fees, and to use those additional funds for expanded purposes.[4]

### B. Legal Authority

The Secretary of Homeland Security's (Secretary) authority for regulatory amendments is found in various provisions of the INA, 8 U.S.C. 1101, *et seq.,* and the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101, *et seq.* General authority for issuing this rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws, and to establish such regulations as the Secretary deems necessary. In addition, section 286(u) of the INA, 8 U.S.C. 1356(u), provides the Secretary with authority to establish and collect a premium fee for the premium processing of certain immigration benefit types. The Continuing Appropriations Act, 2021 and Other Extensions Act, which was signed into law on October 1, 2020, contains the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act).[5] The USCIS Stabilization Act, among other things, set new fees for immigration benefit requests that were designated for premium processing on August 1, 2020, and expanded USCIS authority to establish and collect additional premium processing fees, and to use those additional funds for expanded purposes, including to provide premium processing services to requestors, to make infrastructure improvements in adjudications processes and the provision of information and services to immigration and naturalization benefit requestors, to respond to adjudication demands, including by reducing the number of pending immigration and naturalization benefit requests, and to otherwise offset the cost of providing adjudication and naturalization services.[6]

### C. Summary of Costs and Benefits

The USCIS Stabilization Act increased the fees for premium processing services already available, sets fees for and expands premium processing to additional immigration benefits requests, and provides specific purposes for the premium processing fees.[7] The fees may be used to provide the premium processing services; make infrastructure improvements in adjudications processes and the provision of information and services to immigration and naturalization benefit requestors; respond to adjudication

demands, including by reducing the number of pending immigration and naturalization benefit requests; and otherwise offset the cost of providing adjudication and naturalization services.[8] This rule provides DHS with the opportunity to increase revenue in order to make infrastructure improvements and improve processing times, among other purposes.

This expansion of electronic filing to application and benefit requests is a prerequisite so that the premium processing form, Form I–907 (which is not currently available electronically) could be filed electronically with the benefit request form for which premium processing is being requested. USCIS plans to encumber additional IT resources needed to make the I–907 available for electronic filing independent of this rule. USCIS intends to implement expansion of premium processing availability of Forms I–539, I–765 and I–140 as soon as feasible. DHS plans on a phased implementation strategy to allow current premium processing revenue to pay for development and implementation costs associated with expanding availability of the service. DHS plans to implement expansion for certain categories of Forms I–539, I–765 and both of the new I–140 classifications in FY 2022. DHS estimates that it will not be able to expand premium processing to the additional categories of Forms I–539 and I–765 until FY 2025 due to the possibility that premium processing revenues do not yet exist to cover any potential costs associated with expanding premium processing to these additional categories without adversely affecting the processing times of other immigration benefit requests, as directed by Congress. This is explained in greater detail in the ''Government Costs'' section below. The projected implementation plan will allow current premium processing revenue to cover potential costs from the expedited processing of a large volume of new requests.

For the 10-year implementation period of the rule if year one is FY 2021, DHS estimates the annualized cost to be $13 million discounted at 3 percent and $12 million discounted at 7 percent. These costs are from the opportunity costs of time that newly eligible populations of Forms I–140, I–539, and I–765 will incur to request premium processing.

For the 10-year implementation period of the rule, DHS estimates the annualized transfer payments from the

---

[1] *See* Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000); INA sec. 286(u) (2000), 8 U.S.C. 1356(u)(2000).

[2] *Id.*

[3] *See* 66 FR 29682 (Jun. 1, 2001); *see also* 8 CFR 103.7(b)(1)(i)(SS) and (e).

[4] *See* Emergency Stopgap USCIS Stabilization Act, Public Law 116–159, sec. 4102 (Oct. 1, 2020).

[5] USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[6] *See id.* at sec. 4102.

[7] *See* USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[8] *See id.* at sec. 4102(a)(codified as amended at 8 U.S.C. 1356(u)(4) (2020)).

Form I–129 and Form I–140 fee-paying population, and from newly eligible classifications of Form I–140 petitioners, Form I–539 applicants and Form I–765 applicants to DHS to be $743 million discounted at 3 percent and $729 million discounted at 7 percent due to the increase in filing fees.

This final rule benefits petitioners of Form I–140 (EB–1, multinational executives and managers and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver) who were previously ineligible for premium processing, but will now be eligible following implementation of this final rule to request expedited review of their petitions. As a result, an adjudicative action would be taken more quickly. This change benefits businesses that previously would have had to wait longer to receive adjudicative action (such as a notice of approval) for an employee. It also benefits applicants of Form I–539 who will have the option to receive a decision on their request for a change of status or extension of stay sooner than before, which may alleviate concern about lapses in their nonimmigrant status. Applicants of Form I–765 would benefit through receipt of an adjudicative decision in a specified timeframe making those applicants eligible to work legally in the United States sooner than they would previously.

*D. Summary of the Major Provisions of This Regulatory Action*

This rule amends DHS premium processing regulations to codify those fees set by the USCIS Stabilization Act in section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A), as well as the preexisting timeframes for those immigration benefit requests that had been designated for premium processing as of August 1, 2020, and to establish new fees and processing timeframes for new immigration benefit requests, consistent with the conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act. This rule further amends DHS premium processing regulations to codify the USCIS Stabilization Act's changes to the process for adjusting premium processing fees at section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C), according to which such adjustments are permitted on a biennial basis consistent with certain changes to the Consumer Price Index for All Urban Consumers (CPI–U).[9] Finally, any

additional changes made by this rule to revise DHS regulations at new 8 CFR 106.4 pertaining to premium processing [10] are made to be consistent with amendments made by the USCIS Stabilization Act.

**II. Background**

*A. Current State of DHS Premium Processing Regulations*

On November 14, 2019, DHS published the proposed rule, "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements," in the **Federal Register** proposing to adjust certain immigration and naturalization benefit request fees charged by USCIS.[11] On August 3, 2020, DHS published the final rule with an effective date of October 2, 2020.[12] This effectively transferred DHS premium processing regulations from 8 CFR 103.7(b)(1)(i)(SS) and (e) to the new 8 CFR part 106, specifically 8 CFR 106.4, "Premium processing service."

On September 29, 2020, the U.S. District Court for the Northern District of California granted a motion for a preliminary injunction and stay under 5 U.S.C. 705 of the 2020 Fee Schedule Final Rule in its entirety.[13] On October 8, 2020, the U.S. District Court for the District of Columbia also granted a motion for a preliminary injunction and stay under 5 U.S.C. 705 of the 2020 Fee Schedule Final Rule.[14] And, on January 29, 2021, DHS published a notification of preliminary injunction in the **Federal Register** to inform the public of the two preliminary injunctions of the 2020 Fee Schedule Final Rule.[15] The Department continues to comply with the terms of those orders and is not enforcing the regulatory changes set out in the 2020 Fee Schedule Final Rule.

Litigation in *ILRC* v. *Wolf* and *NWIRP* v. *USCIS* is currently stayed through February 14, 2022, to allow DHS to move forward through notice-and-

comment rulemaking with a possible new USCIS fee schedule that would rescind and replace the changes made by the 2020 Fee Schedule Final Rule and establish new USCIS fees to recover USCIS operating costs.[16]

USCIS continued to accept the premium processing fees that were in place before October 2, 2020. On October 19, 2020, pursuant to the passage of the USCIS Stabilization Act, USCIS increased those premium processing fees that were in place at that time.[17]

Although DHS is enjoined from implementing or enforcing the 2020 Fee Schedule Final Rule and the rule has been stayed, the regulatory amendments established by the 2020 Fee Schedule Final Rule were incorporated into the Code of Federal Regulations (CFR) on October 2, 2020, by operation of the rule's publication in the **Federal Register** and as the rule instructed.[18] In that regard, DHS has not implemented and is not administering the regulatory changes made by the 2020 Fee Schedule Final Rule, but rather continues to follow the premium processing regulations as provided in the versions of 8 CFR 103.7(b)(1)(i)(SS) and (e) as they existed until October 2, 2020. Nevertheless, 8 CFR part 106 and the other regulatory changes in the 2020 Fee Schedule Final Rule have been codified. Therefore, DHS is using this rule to revise all of the enjoined and stayed regulations pertaining to premium processing at 8 CFR 106.4. Notably, DHS will continue to calculate premium processing timeframes in calendar days rather than business days, as it did before the 2020 Fee Schedule Final Rule and as it continues to do under the terms of the injunctions. Other than superseding the regulatory text set forth by the 2020 Fee Schedule Final Rule related to calculating premium processing timeframes in business days and reverting back to the established USCIS practice of calculating premium processing timeframes using calendar days, all other regulatory changes are

---

[9] When making the biennial adjustment for premium processing fees pursuant to 8 U.S.C.

1356(u)(3)(C), USCIS will use the Bureau of Labor and Statistics CPI–U All Items as the index for the adjustment. *https://www.bls.gov/news.release/cpi.t01.htm* (last visited Jan. 7, 2022).

[10] Those regulations also track the language that existed at 8 CFR 103.7(b)(1)(i)(SS) and (e) on October 1, 2020 (*i.e.*, prior to the 2020 USCIS Fee Schedule Final Rule).

[11] *See* 84 FR 62280 (Nov. 14, 2019).

[12] U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 FR 46788 (Aug. 3, 2020) (2020 Fee Schedule Final Rule).

[13] *Immigrant Legal Resource Center* v. *Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. Sept. 29, 2020) (*ILRC* v. *Wolf*).

[14] *See Northwest Immigrant Rights Project, et al.,* v. *United States Citizenship and Immigration Services, et al.* 496 F. Supp. 3d 31 (D.D.C. Oct. 8, 2020) (*NWIRP* v. *USCIS*).

[15] *See* 86 FR 7493 (Jan. 29, 2021).

[16] *See* Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, U.S. Citizenship and Immigration Services Fee Schedule, available at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC68* (last visited Feb. 8, 2022).

[17] On October 16, 2020, USCIS issued a web alert notifying the public that USCIS would increase fees for premium processing, effective October 19, 2020, as required by the Continuing Appropriations Act, 2021 and Other Extensions Act, Public Law 116– 159, signed into law on October 1, 2020. *https://www.uscis.gov/news/premium-processing-fee-increase-effective-oct-19-2020* (last updated Oct. 16, 2020).

[18] *See, e.g.,* 8 CFR part 106.

based upon those changes set forth in the USCIS Stabilization Act.

Because the entirety of 8 CFR part 106, including 8 CFR 106.4, is enjoined and stayed, and the previous DHS premium processing regulations at 8 CFR 103.7(b)(1)(i)(SS) and (e) were removed, DHS will amend 8 CFR 106.4 by revising it in its entirety. This will avoid any confusion as to which DHS premium processing regulations are current and make it clear to the public that the DHS premium processing regulations are wholly contained in 8 CFR 106.4, available as a current reference, and being followed by DHS. Legal citations to the changes being made to DHS premium processing regulations in this preamble will cite to "8 CFR 106.4" to comport with the current location of the regulations in the CFR. However, because 8 CFR part 106 has been enjoined and stayed, has not been implemented, and is not being administered by USCIS, the standard of citing to the CFR print edition date may be inaccurate. Therefore, in this rule, when DHS references the no longer existing (but still being followed) 8 CFR 103.7(b)(1)(i)(SS) and (e), DHS will refer to these regulations as they appeared in the CFR on October 1, 2020, and denote by reference to that date in any legal citation (*e.g.*, 8 CFR 103.7(b)(1)(i)(SS) or (e) (Oct. 1, 2020)).

### B. History of DHS Premium Processing Regulations

The District of Columbia Appropriations Act of 2001 added section 286(u) to the INA, 8 U.S.C. 1356(u), authorizing the collection of a $1,000 "premium fee," in addition to the regular filing fee, from persons seeking expedited processing of eligible employment-based petitions and applications.[19] Based upon this statutory authority, the former Immigration and Naturalization Service issued an interim rule establishing its premium processing service on June 1, 2001.[20] Premium processing allows filers to request 15-day processing of certain employment-based immigration benefit requests if they pay a premium processing fee in addition to the base filing fee and any other applicable fees.[21] This premium processing fee cannot be waived.[22] Premium processing is currently available for certain petitioners filing a Form I–129, Petition for a Nonimmigrant Worker, or

a Form I–140, Immigrant Petition for Alien Workers, and seeking certain employment-based classifications. USCIS informs the public by announcements on its website of the dates of availability of premium processing service for specific petitions or applications.[23]

The INA as amended by the District of Columbia Appropriations Act of 2001 provided that premium processing revenue shall be used to fund the cost of offering the service, as well as the cost of infrastructure improvements in adjudications and customer service processes. The INA as amended by the District of Columbia Appropriations Act of 2001 further provided USCIS with explicit authority to adjust the premium processing fee for inflation based on the CPI–U.[24] As such, DHS has periodically adjusted the premium processing fee by the percentage increase in inflation according to the CPI since premium processing's inception.[25] DHS first adjusted the premium processing fee from $1,000 to $1,225 in the 2010 USCIS fee rule.[26] Prior to the USCIS Stabilization Act, DHS last adjusted the premium processing fee to $1,440 in December 2019.[27]

### C. The USCIS Stabilization Act

On October 1, 2020, the Continuing Appropriations Act, 2021 and Other Extensions Act was signed into law. That enactment contains the USCIS Stabilization Act.[28] The USCIS Stabilization Act amended section 286(u) of the INA, 8 U.S.C. 1356(u), by raising the premium processing fees for

immigration benefit types designated for premium processing on or before August 1, 2020, and by expanding the benefit types that may be designated for premium processing service within prescribed limitations, among other changes.[29] These additional changes included redefining the process for adjusting premium processing fees by the CPI and expanding the permissible uses of revenue from the collection of premium processing fees, including improvements to adjudications process infrastructure, responses to adjudication demands, and to otherwise offset the cost of providing adjudication and naturalization services.

On October 16, 2020, USCIS announced it would increase the fees for premium processing, as required by the USCIS Stabilization Act, effective October 19, 2020.[30] As of that date, the fee for Form I–907, Request for Premium Processing Service, increased from $1,440 to $2,500 for all immigration benefit requests that were designated for premium processing as of August 1, 2020, with the exception that the

---

[19] *See* District of Columbia Appropriations Act of 2001, Public Law 106–553, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000).

[20] *See* 66 FR 29682 (Jun. 1, 2001).

[21] *See* 8 CFR 103.7(b)(1)(i)(SS) and (e) (Oct. 1, 2020).

[22] *See* 8 CFR 103.7(b)(1)(i)(SS)(3) (Oct. 1, 2020).

[23] *See* 8 CFR 103.7(b)(1)(i)(SS) and (e) (Oct. 1, 2020); *see also* USCIS, "How Do I Request Premium Processing?," *https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing* (last updated Apr. 12, 2021).

[24] *See* INA sec. 286(u) (2000), 8 U.S.C. 1356(u) (2000); Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000).

[25] The CPI is issued by the Department of Labor's Bureau of Labor Statistics (BLS) and can be found at *http://www.bls.gov/cpi* (last visited Jan. 7, 2022).

[26] *See* USCIS Fee Schedule; Final Rule, 75 FR 58962, 58978, 58988 (Sept. 24, 2010) (Between June 2001, when Congress established the fee, and June 2010, the CPI–U [All Items] increased by 22.45%. When that percentage increase is applied to the current premium processing fee of $1,000, the adjusted premium processing fee is $1,225 ($1,225 when rounded to the nearest $5.); 8 CFR 103.7(b)(1)(i)(RR) (effective Nov. 23, 2010, codified as amended at 8 CFR 103.7(b)(1)(i)(SS), 81 FR 73292, 73331 (Oct. 24, 2016)).

[27] *See* Adjustment to Premium Processing Fee; Final Rule, 84 FR 58303, (Oct. 31, 2019) (Between June 2001 and August 2019, the CPI–U [All Items] increased by 44.13 percent. When this percentage increase is applied to the June 2001 premium processing fee of $1,000, the adjusted premium processing fee is $1,441.34 ($1,440 when rounded to the nearest $5 increment.); 8 CFR 103.7(b)(1)(i)(SS) (effective Dec. 2, 2019).

[28] *See* USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[29] On May 23, 2006, USCIS issued an interim rule changing the premium processing regulations. *See* 71 FR 29571. Under that rule, USCIS would designate petitions and applications for premium processing by publication of notices in the **Federal Register**. That same day, USCIS designated Forms I–539 and I–765 for premium processing by a notice in the **Federal Register**. *See* 71 FR 29662. On September 24, 2010, USCIS changed the manner in which a form would be designated for premium processing. *See* 75 FR 58962. The 2010 rule provides that premium processing designation will be established through the USCIS website. Thus, for a form to be designated for premium processing it must be designated as such on the USCIS website. Forms I–539 and I–765 have not been designated for premium processing on the USCIS website since the 2010 rule became effective and so were not designated on August 1, 2020, nor did USCIS provide premium processing for Forms I–539 and I–765 on or before August 1, 2020. Thus, Forms I–539 and I–765 are not covered by INA sec. 286(u)(3)(A), 8 U.S.C. 1356(u)(3)(A) (relating to "immigration benefit types designated as eligible for premium processing on or before August 1, 2020."), as enacted by the USCIS Stabilization Act. USCIS interprets INA sec. 286(u)(3)(A), 8 U.S.C. 1356(u)(3)(A), to refer to immigration benefit requests that were designated pursuant to the premium processing regulations in effect at the time of the statute's enactment. USCIS believes this interpretation is supported by the fact that Congress specifically provided an appropriate fee and processing timeframe for Forms I–539 and I–765 in sec. 4102(b)(1) of the USCIS Stabilization Act, which provides an exception to 5 U.S.C. 553 in establishing an initial fee for those forms. Additionally, because sec. 4102(b)(1) of the USCIS Stabilization Act only applies to INA sec. 286(u)(3)(B) and to those immigration benefit requests designated for premium processing after August 1, 2020, it is clear that Congress intended for Forms I–539 and I–765 to fall under those immigration benefit requests described in INA sec. 286(u)(3)(B) and not INA sec. 286(u)(3)(A).

[30] *See* USCIS, Premium Processing Fee Increase Effective Oct. 19, 2020, *https://www.uscis.gov/news/premium-processing-fee-increase-effective-oct-19-2020* (last updated Oct. 16, 2020).

premium processing fee for petitioners filing Form I–129, Petition for a Nonimmigrant Worker, requesting H–2B or R–1 nonimmigrant status increased from $1,440 to $1,500. USCIS further announced that, while the USCIS Stabilization Act gave USCIS the ability to expand premium processing to additional forms and immigration benefit requests, USCIS was not yet taking such action and that any expansion of premium processing to other forms would be implemented as provided in the legislation.[31]

Through this rulemaking, DHS is amending DHS premium processing regulations to codify those fees set by the USCIS Stabilization Act through enactment of section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A), as well as the preexisting timeframes for those immigration benefit requests that were designated for premium processing as of August 1, 2020, and to establish new fees and processing timeframes for new immigration benefit requests, consistent with the conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act. DHS is also amending DHS premium processing regulations to codify the USCIS Stabilization Act's changes made at section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C), to the process for adjusting premium processing fees, according to which such adjustments are permitted on a biennial basis consistent with certain changes to the CPI–U.

### III. Discussion of the Changes

Prior to the USCIS Stabilization Act, premium processing provided expedited processing for certain designated classifications that are requested on Form I–129 and Form I–140.[32] USCIS had the authority to designate the classifications of employment-based immigration benefit requests that were eligible for premium processing by announcing on its official internet website (*http://www.uscis.gov*) those immigration benefit requests for which premium processing was available, the dates upon which such availability commenced or ended, and any conditions that applied. Also prior to the USCIS Stabilization Act, the fee and processing timeframes for premium processing were uniform for all

designated immigration benefit requests. Specifically, USCIS guaranteed processing for these requests within 15 days to petitioners who chose to pay the additional fee to request this service. The 15-day period would generally begin when USCIS properly received the correct version of Form I–907, Request for Premium Processing Service, with fee, at the correct filing address. Within the 15-day period, USCIS would issue either an approval notice, denial notice, notice of intent to deny, or request for evidence, or open an investigation for fraud or misrepresentation. If USCIS did not take any of the above actions within the 15-day period, USCIS would refund the premium processing fee. If the benefit required the submission of additional evidence or a response to a notice of intent to deny, a new 15-day period would begin when USCIS received a complete response to the request for evidence or notice of intent to deny. The premium processing fee was required to be paid in addition to, and in a separate remittance from, other filing fees, and could not be waived. Finally, the premium processing fee amount could be adjusted annually by notice in the **Federal Register** based on inflation according to the CPI.

While leaving in place the general concept and framework for premium processing that existed prior to its enactment, the USCIS Stabilization Act made significant changes to the INA, amending significant aspects of premium processing that had previously been established by regulation. While maintaining DHS's authority to set reasonable conditions or limitations on premium processing, the USCIS Stabilization Act expanded the immigration benefit types that can be designated for premium processing, to wit: applications to change or extend nonimmigrant status and applications for employment authorization (generally on Form I–539, Application to Extend/Change Nonimmigrant Status, and Form I–765, Application for Employment Authorization, respectively) as well as any other immigration benefit type that DHS deems appropriate for premium processing.[33] This expansion of premium processing to other immigration benefit types generally requires that the initial premium processing fee be established by regulation, with a detailed methodology supporting the proposed premium processing fee amount.[34] However, the

USCIS Stabilization Act did identify specific immigration benefit requests to which premium processing could be expanded by final rule without regard to the provisions of 5 U.S.C. 553 as long as the established premium fee and required processing timeframe are consistent with the limitations described therein.[35] These immigration benefit requests and applicable fees and timeframes are:

• Form I–140 requesting EB–1 immigrant classification as a multinational executive or manager or EB–2 immigrant classification as a member of professions with advanced degrees or exceptional ability seeking a national interest waiver (NIW). Fee: $2,500. Timeframe: 45 days;

• Form I–539 requesting a change of status to F–1, F–2, J–1, J–2, M–1, or M–2 nonimmigrant status or a change of status to or extension of stay in E–1, E–2, E–3, H–4, L–2, O–3, P–4, or R–2 nonimmigrant status. Fee: $1,750. Timeframe: 30 days; and

• Form I–765 requesting employment authorization. Fee: $1,500. Timeframe: 30 days.[36]

The primary purpose of this rule is to add these specific benefit types as those designated for premium processing in DHS regulations with both a premium processing fee and required processing timeframe, consistent with the exemption from 5 U.S.C. 553, while further reconciling the premium processing regulations with the other changes made by the USCIS Stabilization Act. In the Executive Orders 12866 and 13563 section of this rule, DHS estimates the number of newly eligible I–140 petitioners, I–539 applicants, or I–765 applicants that may choose to submit a premium processing request. However, as further discussed in section IV.B of this rule, it is difficult for DHS to determine the amount of time and resources specifically needed to accommodate these new requests for premium processing. Therefore, DHS has set the premium processing fees and timeframes for the newly eligible immigration benefit requests to be consistent with the fees and maximum processing timeframes set forth by Congress in section 4102(b)(1) of the USCIS Stabilization Act. As provided by section 4102(b)(2) of the USCIS Stabilization Act and as codified in the new 8 CFR 106.4(f)(2)(ii), the premium processing timeframe for the immigration benefit requests identified in section 4102(b) of the USCIS Stabilization Act will commence on the date that all prerequisites for

---

[31] *Id.*

[32] A list of immigration benefit requests available for premium processing and when those immigration benefit requests became available for premium processing can be found on USCIS's web page, "How Do I Request Premium Processing?," *https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing* (last updated Apr. 12, 2021).

[33] *See* USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[34] *See id.* at sec. 4102(a)(codified as amended at 8 U.S.C. 1356(u)(3)(B) (2020)).

[35] *See id.* at sec. 4102(b) (Oct. 1, 2020).

[36] *Id.*

adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

DHS is not codifying a definition of the phrase "prerequisites for adjudication" in this rule and will determine when the timeframe begins based on the benefit request and what is required to fully adjudicate it, consistent with otherwise applicable regulations. USCIS has been unable to offer premium or expedited services for many of its adjudication and naturalization services because of the difficulty in determining the appropriate fee, staffing levels, time period for adjudication, and other parameters. The USCIS Stabilization Act recognized that it is the requestor's responsibility to provide a complete request before premium processing can begin and that there is inherent ambiguity in defining the appropriate timeframe. DHS interprets "prerequisites for adjudication" in section 4102(b) to at least require a complete, fully executed form as prescribed and required by 8 CFR 1.2 and 8 CFR 103.2(a)(7), completed in accordance with the form instructions as required by 8 CFR 103.2(a)(1), and other filing requirements as may be provided in the applicable regulations for the specific benefit request, including receiving all necessary evidence and information from interviews, biometrics submission, and background checks. USCIS may specify additional prerequisites that determine when the timeframe begins when it announces those requests for which premium processing may be requested and any conditions that may apply under 8 CFR 106.4(g).

The USCIS Stabilization Act also established distinct premium processing fees and the authority to establish distinct premium processing timeframes based upon the specific immigration benefit request.[37] With respect to an immigration benefit type designated for premium processing before August 1, 2020, the premium fee was set at $2,500, except that the premium fee for petitioners filing Form I–129 requesting H–2B or R–1 nonimmigrant status was set at $1,500.[38] This rule codifies these changes by specifically defining the premium processing fee and the premium processing timeframe for those immigration benefit types that were designated for premium processing before August 1, 2020. As maintained in the new 8 CFR 106.4(f)(2)(i), the premium processing timeframe for these

benefits requests will commence on the date that the form prescribed by USCIS and fee(s) are received by USCIS.

The USCIS Stabilization Act also amended the INA by adding section 286(u)(3)(C), 8 U.S.C. 1356(u)(3)(C), which adjusts the frequency and the manner in which USCIS may periodically adjust the fees for premium processing.[39] The statute now provides that the Secretary may adjust these fees on a biennial basis by the percentage (if any) of the CPI–U [40] for the month of June preceding the date on which such adjustment takes effect exceeds the CPI–U for the same month of the second preceding calendar year.[41] Adjustments to the premium processing fees made in this manner are specifically exempted from notice-and-comment rulemaking.[42] These changes have been codified at new 8 CFR 106.4(d). DHS will maintain its practice of announcing adjustments to the premium processing fees that are not subject to notice and comment (and made pursuant to section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C)) through publication in the **Federal Register**.[43]

The premium processing regulations require USCIS to communicate which immigrant benefit requests are available for premium processing, the dates upon which availability commences and ends and any conditions that may apply to seeking a request for premium processing.[44] USCIS will maintain this practice. In order to provide USCIS with the flexibility to be adequately responsive to changing customer demands and resource constraints, new 8 CFR 106.4(g) draws on the previous process that USCIS used to announce when premium processing is available and may be requested.[45] In particular, USCIS will announce by its official website those requests for which premium processing of designated benefits is available, the dates when such availability commences or ends, and any conditions that may apply.[46] Such conditions may include establishing a prerequisite to eligibility for the underlying immigration benefit request, as is the case currently where USCIS will only accept a request for premium processing on a petition for temporary nonimmigrant religious worker (R–1 visa) after there has been a

successful onsite inspection.[47] Such conditions may also include establishing periods of pendency or specific filing dates necessary for phasing-in expanded premium processing for immigration benefit requests or delaying receipt dates for those immigration benefit requests subject to a numerical limitation (or cap) to determine whether a random selection process (or lottery) may be necessary and to complete such process when required. The use of such prerequisites and conditions is consistent with established USCIS premium processing practices as they existed prior to the USCIS Stabilization Act.

Consistent with the USCIS Stabilization Act, new 8 CFR 106.4(g) further clarifies that USCIS may suspend the availability of premium processing for certain immigration benefit requests if circumstances prevent the agency from being able to complete a significant number of such requests within the applicable processing timeframe.[48] New 8 CFR 106.4(g) also makes clear that the designation of a benefit request for premium processing and establishing the corresponding premium processing fees and timeframes, does not in itself permit a request for premium processing to be filed for an immigration benefit request, but that USCIS must also make premium processing available for each immigration benefit request type. By identifying and establishing those immigration benefit request types designated for premium processing in this rule and the corresponding fees and processing timeframes, consistent with the USCIS Stabilization Act, this rule will allow USCIS to offer and suspend premium processing for designated immigration benefit request types in reaction to customer needs and USCIS workload, when there are circumstances that prevent USCIS from completing the processing of a significant number of premium processing requests within the required timeframes and in accordance with the procedures codified at new 8 CFR 106.4(g).

Relatedly, the USCIS Stabilization Act requires that when DHS implements the availability of premium processing, or expands premium processing to new immigration benefit request types, DHS must ensure that such implementation or expansion does not result in an

---

[37] See id. at sec. 4102(b).

[38] See id. at sec. 4102(a)(codified as amended at 8 U.S.C. 1356(u)(3)(A) (2020)).

[39] See id. at sec. 4102(a)(codified as amended at 8 U.S.C. 1356(u)(3)(C) (2020)).

[40] See supra note 9.

[41] See USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[42] Id.

[43] See 8 CFR 103.7(b)(1)(i)(SS)(2) (Oct. 1, 2020); See new 8 CFR 106.4(d).

[44] See 8 CFR 103.7(e)(3)(ii) (Oct. 1, 2020).

[45] See 8 CFR 103.7(e)(3) (Oct. 1, 2020).

[46] See new 8 CFR 106.4(g)(1).

[47] See I–907, Request for Premium Processing Service—Special Instructions, https://www.uscis.gov/i-907 (last updated Sep. 30, 2021).

[48] See USCIS Stabilization Act, sec. 4102(a)(codified as amended at 8 U.S.C. 1356(u)(5)(A) (2020)), Public Law 116–159 (Oct. 1, 2020). See new 8 CFR 206.4(g)(2).

increase in processing times for immigration benefit requests not designated for premium processing or an increase in regular processing of immigration benefit requests so designated.[49] Before DHS can implement the expansion of premium processing provided in this rule, DHS must raise sufficient funds to ensure it has the staffing and information technology (IT) resources in place to expand premium processing availability to avoid increasing non-premium processing related processing times. The current processing times for the immigration benefit requests newly designated for premium processing exceed the proposed premium processing timeframes by many months as expected.

DHS generally cannot reallocate staff to adjudicate these immigration benefit requests without adversely affecting processing times for other non-premium processing related immigration benefit requests. Therefore, DHS must hire and train new staff with revenue from current premium processing requests in order to expand expedited adjudication of premium processing consistent with the statutory requirement. Delayed implementation will allow USCIS to maintain a minimum premium revenue carryover balance. USCIS will use the carryover balance to ensure fiscal stability and fund infrastructure and process improvements, such as the expansion of premium services. For these reasons and circumstances, DHS will suspend the availability of premium processing for those immigration benefit requests newly designated for premium processing by this rule and will not make those immigration benefit requests newly designated by this rule immediately available for premium processing upon the effective date of this rule.

In the 2020 Fee Schedule NPRM, DHS changed the way it calculated the 15-day premium processing clock from counting calendar days to counting business days.[50] DHS explained it was necessary to make this change, because of the frequency by which USCIS found it necessary to suspend premium processing for certain categories of employment-based petitions as a result of having to reassign officers to process long-pending non-premium filed petitions and to prevent a lapse in employment authorization for beneficiaries of Form I–129 extension of stay petitions. There were also instances when USCIS could not meet the 15-day

premium processing requirement due to surges in petitions accompanied by premium processing requests, which resulted in USCIS having to refund the premium processing fees and incurring additional costs as a result.[51]

In this rule, DHS is removing any reference to calculating premium processing timeframes in business days that were finalized in the 2020 Fee Schedule Final Rule. Following issuance of this rule, DHS intends to continue to calculate premium processing timeframes by counting calendar days. As previously discussed, the 2020 Fee Schedule Final Rule is enjoined and stayed, and the regulations as codified in 8 CFR 106.4 are not being administered by USCIS.

Because the litigation in *ILRC* v. *Wolf* and *NWIRP* v. *USCIS* is currently stayed, and because DHS plans to replace the regulations codified by the 2020 Fee Schedule Final Rule with a new rule, the regulations currently at 8 CFR 106.4 have never been implemented. USCIS currently is not calculating premium processing timeframes in business days, consistent with the terms of the injunctions and stays. Rather, USCIS is calculating premium processing timeframes, as it has always done, by counting calendar days. By removing the reference to business days in the premium processing regulations, the premium processing regulations will be clear and consistent with current practices and requirements and not be a source of confusion to the public.[52]

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act (APA) generally requires agencies to issue a proposed rule before issuing a final rule, subject to certain exceptions.[53] As explained below, the changes made in this rule do not require advance notice and opportunity for public comment, because the changes are (1) exempt from the requirements of

5 U.S.C. 553 by section 4102(b)(1) of the USCIS Stabilization Act, (2) exempt from public comment under 5 U.S.C. 553(b)(B) because they merely restate existing law, or (3) exempt as procedural under 5 U.S.C. 553(b)(A).

(1) Statutory Exemption From the Requirements of 5 U.S.C. 553

The USCIS Stabilization Act has exempted DHS from the requirements of 5 U.S.C. 553 when USCIS establishes fees that are consistent with section 4102(b) of the USCIS Stabilization Act. This exemption allows DHS to establish fees consistent with section 4102(b) of the USCIS Stabilization Act by final rule and does not require notice-and-comment rulemaking.[54]

(2) Statutorily Required Changes

The USCIS Stabilization Act made statutory changes to section 286(u) of the INA, 8 U.S.C. 1356(u).[55] DHS has good cause to bypass notice-and-comment procedures when incorporating those nondiscretionary statutory changes made by the USCIS Stabilization Act to section 286(u) of the INA, 8 U.S.C. 1356(u), through conforming changes to the DHS premium processing regulations via this rulemaking. When regulations merely restate the statute they implement (*i.e.,* when the rule does not change the established legal order), the APA does not require the agency to use notice-and-comment procedures. *See* 5 U.S.C. 553(b)(B); *Gray Panthers Advocacy Committee* v. *Sullivan,* 936 F.2d 1284, 1291 (D.C. Cir. 1991); *see also United States* v. *Cain,* 583 F.3d 408, 420 (6th Cir. 2009) (contrasting legislative rules, which require notice-and-comment procedures, "with regulations that merely restate or interpret statutory obligations," which do not); *Komjathy* v. *Nat. Trans. Safety Bd.,* 832 F.2d 1294, 1296 (D.C. Cir. 1987) (when a rule "does no more than repeat, virtually verbatim, the statutory grant of authority" notice-and-comment procedures are not required). This exception to notice and comment applies to the portions of this rule that merely restate the fees for those immigration benefit types designated for premium processing on or before August 1, 2020 and the biennial fee adjustment.[56] This exception also applies to the portions of this rule that codify the clarification provided in section 4102(b)(2) of the USCIS Stabilization Act regarding when processing timeframes will commence

---

[49] *See* USCIS Stabilization Act, sec. 4102(c), Public Law 116–159 (Oct. 1, 2020).

[50] *See* 8 CFR 106.4(a).

[51] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 FR 62280, 62311–12 (Nov. 14, 2019) (2020 Fee Schedule NPRM).

[52] Counting premium processing timeframes by calendar days is also consistent with the definition of "day" in 8 CFR 1.2, which provides that when computing the period of time for taking any action [in chapter I of title 8 of the CFR] including the taking of an appeal, [it] shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday.

[53] *See* 5 U.S.C. 553(b).

[54] *See* USCIS Stabilization Act, sec. 4102(b)(1).

[55] *See id.* at sec. 4102(a).

[56] *See* USCIS Stabilization Act, sec. 4102(a); new 8 CFR 106.4(c) and (d).

for those benefit request types described in section 4102(b)(1) of the USCIS Stabilization Act and the manner in which USCIS may suspend premium processing services now codified in section 286(u)(5)(A) of the INA, 8 U.S.C. 1356(u)(5)(A).[57]

(3) Rule of Procedure

This rule is also exempt, in its entirety, from the notice-and-comment requirements of 5 U.S.C. 553, because the rule's provisions are fundamentally procedural in nature. *See* 5 U.S.C. 553(b)(A). *See generally Mendoza* v. *Perez,* 754 F.3d 1002, 1023 (D.C. Cir. 2014) (''Procedural rules do not themselves alter the rights or interests of parties, although they may alter the manner in which the parties present themselves or their viewpoints to the agency. The distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'' (cleaned up)). This rule describes the process and the procedures that USCIS will employ to make premium processing available to the public. This rule explains that there is premium processing for certain immigration benefit requests, how to submit a request for premium processing, those immigration benefits designated for premium processing and the associated fees, how fees will be adjusted, processing timeframes (including the reversion to calendar days), processing requirements and when fees will be refunded, and how USCIS will communicate the availability of premium processing to the public. This rule communicates the mechanics and processes that USCIS has deemed to be an efficient and practical way to manage and offer a service to those willing to pay a premium to have their immigration benefit requests processed in a more expeditious manner.

*B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)*

Executive Order (E.O.) 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and to the extent permitted by law, to proceed if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). In

particular, E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, harmonizing rules, and of promoting flexibility. The Office of Information and Regulatory Affairs (OIRA), within the Office of Management and Budget (OMB), has designated this final rule an economically significant regulatory action under sec. 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

(1) Summary

The Continuing Appropriations Act, 2021 and Other Extensions Act, signed into law on October 1, 2020, contained the Emergency Stopgap USCIS Stabilization Act, which set new fees for premium processing of immigration benefit requests that had been designated for premium processing as of August 1, 2020, and expanded USCIS authority to establish and collect new premium processing fees and to use those additional funds for expanded purposes. The purpose of this rulemaking is to amend DHS premium processing regulations for previously designated benefit requests to codify those fees set by the USCIS Stabilization Act in section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A), and to establish new immigration benefit requests designated for premium processing under section 286(u)(3)(B) of the INA, 8 U.S.C. 1356(u)(3)(B), consistent with those conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act.

While DHS is able to assess the costs and benefits of premium processing for the forms and classifications for which it is currently available, it is more difficult to assess when DHS will be able to expand the availability of premium processing to all of the newly designated immigration benefit request types. Due to the statutory requirement that the expansion of availability of premium processing should not result in increased processing times for immigration benefit requests not designated for premium processing or an increase in regular processing of immigration benefit requests so designated, DHS must first raise sufficient funds to ensure it has the staffing and information technology (IT) resources to expand premium processing availability to avoid such an increase to any processing times. The current (non-premium) processing times for the newly designated immigration benefit requests exceed the proposed premium processing timeframes by many months, as expected.

DHS generally is unable to reallocate staff to adjudicate these immigration benefit requests without adversely affecting processing times for other immigration benefit requests. Therefore, DHS must hire and train new staff with revenue from current premium processing requests in order to expand expedited adjudication of premium processing consistent with the statutory requirement that other processing times not be adversely affected.

Furthermore, Section 3401 of the Stabilization Act authorizes USCIS to use fee revenue for the following, competing purposes: To provide premium processing services to requestors, to make infrastructure improvements in adjudications processes and the provision of information and services to immigration and naturalization benefit requestors, to respond to adjudication demands, including by reducing the number of pending immigration and naturalization benefit requests, and to otherwise offset the cost of providing adjudication and naturalization services. Prior to expansion, any revenues in excess of costs generated by premium processing will be used to support other authorized uses. Section 3402 of the Stabilization Act additionally directs USCIS to provide a 5-year plan for improvements in electronic filing, electronic payment, and electronic correspondence resulting in improved processing times for all immigration and naturalization benefit requests. In accordance with these authorizations and directives, DHS has prioritized and is in the process of expanding electronic filing for all applications and benefit requests. Some of the immigration benefit requests newly designated for premium processing are already filed electronically.[58]

The expansion of electronic filing to application and benefit requests is a prerequisite so that the premium processing form, Form I–907, (which is not currently available electronically) could be filed electronically with the benefit request form for which premium processing is being requested. USCIS plans to encumber additional IT resources needed to make the I–907 available for electronic filing independent of this rule. USCIS intends to implement expansion of premium processing availability of Forms I–539, I–765 and I–140 as soon as feasible.

---

[57] *See* new 8 CFR 106.4(f)(2)(ii) and (g).

[58] USCIS Forms Currently Available to File Online: *https://www.uscis.gov/file-online/forms-available-to-file-online* (last updated Dec. 21, 2021). Of the forms impacted by this rule, USCIS already provides electronic filing of certain Forms I–539 and I–765. However, Form I–907 is not currently available for electronic filing.

DHS plans on a phased implementation strategy to allow current premium processing revenue to pay for development and implementation costs associated with expanding availability of the service. DHS plans to implement expansion for certain categories of Forms I–539, I–765 and both of the new I–140 classifications in FY 2022. DHS estimates that it will not be able to expand premium processing to the additional categories of Forms I–539 and I–765 until FY 2025 due to the possibility that premium processing revenues do not yet exist to cover any potential costs of hiring additional staff to expand premium processing to these additional categories without adversely affecting other benefit's processing times, as directed by Congress. This is explained in greater detail in the ''Government Costs'' section below. The projected implementation plan will allow current premium processing revenue to cover potential costs from the expedited processing of a large volume of new requests.

For the 10-year implementation period of the rule if year one is FY 2021, DHS estimates the annualized cost to be $13 million discounted at 3 percent and $12 million discounted at 7 percent. These costs are from the opportunity costs of time that newly eligible populations of Forms I–140, I–539, and I–765 will incur to request premium processing.

For the 10-year implementation period of the rule, DHS estimates the annualized transfer payments from the Form I–129 and Form I–140 fee-paying population, and from newly eligible classifications of Form I–140 petitioners, Form I–539 applicants and Form I–765 applicants to DHS to be $743 million discounted at 3 percent and $729 million discounted at 7 percent due to the increase in filing fees.

This final rule benefits petitioners of Form I–140 (EB–1, multinational executives and managers and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver) who were previously ineligible for premium processing to receive a quicker adjudication. This change benefits businesses that previously would have had to wait longer to receive a decision (such as a notice of approval) for an employee. It also benefits applicants of Form I–539 who will have the option to receive a decision on their request for a change of status or extension of stay sooner than before, which may alleviate concern about lapses in their nonimmigrant status. Applicants of Form I–765 would benefit through receipt of an adjudicative decision in a specified timeframe making those applicants eligible to work legally in the United States sooner than they would have previously.

Table 1 provides a more detailed summary of the final rule provisions and their impacts.

### TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS OF THE FINAL RULE

| Final rule provisions | Description of change to provision | Estimated costs/transfers of provisions | Estimated benefits of provisions |
|---|---|---|---|
| • Codify fee increases from the Continuing Appropriations Act, 2021 and Other Extensions Act. | • The Continuing Appropriations Act, 2021 and Other Extensions Act, expanded USCIS authority to establish and collect new premium processing fees and to use those additional funds for expanded purposes.<br>• Codifies existing premium processing fees and processing timeframes for certain classifications *requested on* Form I–129 classifications (E–1, E–2, E–3, H–1B, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2) and Form I–140 classifications: EB–1 Aliens of extraordinary ability, EB–1 Outstanding professors and researchers, EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver, EB–3 Skilled workers, EB–3 Professionals, EB–3 Workers other than skilled workers and professionals ($2,500/15 days).<br>• Codifies existing premium processing fees and processing timeframes for certain classifications requested on Form I–129 classifications H–2B, R–1 ($1,500/15 days). | Quantitative: Petitioners—<br>• Annual transfer payments of $306,448,000 from Form I–129 petitioners to DHS from an increase in filing fees in FY 2021.<br>• Annual estimated transfer payments of $295,113,180 from Form I–129 petitioners to DHS from a projected increase in filing fees in FY 2022 through FY 2030.<br>• Annual transfer payments of $103,111,500 from Form I–140 petitioners to DHS from an increase in filing fees in FY 2021.<br>• Annual estimated transfer payments of $82,872,920 from Form I–140 petitioners to DHS from a projected increase in filing fees in FY 2022 through FY 2030.<br>DHS/USCIS—<br>• None.<br>Qualitative: Petitioners—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative: Petitioners—<br>• None.<br>DHS/USCIS—<br>• None.<br>Qualitative: Petitioners—<br>• None.<br>DHS/USCIS—<br>• The primary benefit of these provisions to DHS is the opportunity to increase revenue in order to make infrastructure improvements and processing times, among other purposes. |
| • Expansion of premium processing to Form I–140 Classifications: E13, E21 (NIW). | • Establishes a $2,500 premium processing fee and 45-day processing timeframe for newly eligible Form I–140 Classifications: EB–1, multinational executives and managers, and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver. | Quantitative: Petitioners—<br>• Cost to petitioners completing and filing Form I–907 requests will be approximately $2,934,568 annually in FY 2022 through FY 2030.<br>• Annual transfer payments of $94,427,500 from newly eligible Form I–140 petitioners to DHS due to filing fees in FY 2022 through FY 2030.<br>DHS/USCIS—<br>• None.<br>Qualitative: Petitioners—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative: Petitioners—<br>• None.<br>DHS/USCIS—<br>• None.<br>Qualitative: Petitioners—<br>• Petitioners requesting benefit requests that were not previously designated for premium processing may now be able to obtain quicker adjudicative action.<br>DHS/USCIS—<br>• The primary benefit of this provision to DHS is the opportunity to increase revenue in order to make infrastructure improvements and processing times, among other purposes. |

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS OF THE FINAL RULE—Continued

| Final rule provisions | Description of change to provision | Estimated costs/transfers of provisions | Estimated benefits of provisions |
|---|---|---|---|
| • Expansion of premium processing to Form I–539 Classifications: E–1, E–2, E–3, F–1, F–2, H–4, J–1, J–2, L–2, M–1, M–2, O–3, P–4, R–2. | • Establishes a $1,750 premium processing fee and 30-day processing timeframe for newly eligible Form I–539 Classifications: E–1, E–2, E–3, F–1, F–2, H–4, J–1, J–2, L–2, M–1, M–2, O–3, P–4, R–2. | Quantitative: Applicants—<br>• Costs to F–1, F–2, J–1, J–2, M–1, M–2 classification applicants completing and filing Form I–907 requests are estimated to be $296,648 annually starting in FY 2022 through FY 2030.<br>• Costs to E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classification applicants completing and filing Form I–907 requests are estimated to be $3,048,488 annually starting in FY 2025 through FY 2030.<br>• Total Costs to all Form I–539 applicants completing and filing Form I–907 requests are estimated to be $3,345,136 annually starting in FY 2025 through FY 2030.<br>• Annual estimated transfer payments of $17,939,250 from Form I–539 F–1, F–2, J–1, J–2, M–1, M–2 classification applicants completing and filing Form I–907 requests to DHS from filing fees in FY 2022 through FY 2030.<br>• Annual estimated transfer payments of $110,572,000 from Form I–539 E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classification applicants completing and filing Form I–907 requests to DHS from filing fees starting in FY 2025 through FY 2030.<br>• Total transfers from all Form I–539 applicants completing and filing Form I–907 requests are estimated to be $128,511,250 annually starting in FY 2025 through FY 2030.<br>DHS/USCIS—<br>• None.<br>Qualitative: Applicants—<br>• None.<br>DHS/USCIS—<br>• This final rule will require USCIS enhancements to handle the projected volumes of expedited requests without adverse impact to other processing times. | Quantitative: Applicants—<br>• None.<br>DHS/USCIS—<br>• None.<br>Qualitative: Applicants—<br>• Applicants requesting benefit requests that were not previously designated for premium processing may now be able to obtain quicker adjudicative action.<br>DHS/USCIS—<br>• The primary benefit of this provision to DHS is the opportunity to make infrastructure improvements and processing times, among other purposes. |
| • Expansion of premium processing to Form I–765 Categories. | • Establishes a $1,500 premium processing fee and 30-day processing timeframe for newly eligible Form I–765 Categories. | Quantitative: Applicants—<br>• Costs to some applicants completing and filing Form I–907 requests are expected to be approximately $6,486,289 annually starting in FY 2022 through FY 2030 for certain classifications.<br>• Costs to other applicants completing and filing Form I–907 requests are expected to be approximately $3,048,488 annually starting in FY 2025 through FY 2030 for certain classifications.<br><br>• Total Costs to all Form I–765 applicants completing and filing Form I–907 requests are estimated to be $9,534,777 annually starting in FY 2025 through FY 2030.<br>• Annual estimated transfer payments of $173,370,000 from some applicants completing and filing Form I–907 requests to DHS from filing fees in FY 2022 through FY 2030.<br>• Annual estimated transfer payments of $81,483,000 from some applicants completing and filing Form I–907 requests to DHS from filing fees starting in FY 2025 through FY 2030.<br>• Total transfers from all Form I–765 applicants completing and filing Form I–907 requests are estimated to be $254,853,000 annually starting in FY 2025 through FY 2030.<br>DHS/USCIS—<br>• None.<br>Qualitative: Applicants—<br>• None.<br>DHS/USCIS—<br>• This final rule will require USCIS enhancements to handle the projected volumes of expedited requests without adverse impact to other processing times. | Quantitative: Applicants—<br>• None.<br>DHS/USCIS—<br>• None.<br>Qualitative: Applicants—<br>• Applicants requesting benefit requests that were not previously designated for premium processing will now be able to obtain quicker adjudicative action making those applicants eligible to work legally in the United States sooner than they would have previously.<br>DHS/USCIS—<br>• The primary benefit of this provision to DHS is the opportunity to make infrastructure improvements and processing times, among other purposes. |

In addition to the impacts summarized above, and as required by

OMB Circular A–4, Table 2 presents the prepared accounting statement showing

the costs and benefits to each individual affected by this final rule.[59]

## TABLE 2—OMB A–4 ACCOUNTING STATEMENT
[$ millions, FY 2020]

Time Period: FY 2021 through FY 2030

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Monetized Benefits ............................................. | | N/A | | Regulatory Impact Analysis ("RIA"). |
| Annualized quantified, but unmonetized, benefits | N/A | N/A | N/A | RIA. |
| Unquantified Benefits .......................................... | The USCIS Stabilization Act provides specific purposes that the premium processing fees can be used for. Consistent with those permissible purposes, the primary benefit of this rule to DHS is the opportunity to increase revenue to provide the premium processing services; make infrastructure improvements in adjudications processes and information and services to immigration and naturalization benefit requestors; and respond to adjudication demands. | | | RIA. |
| | This final rule benefits petitioners of Form I–140 (EB–1, multinational executives and managers and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver) who were previously ineligible for premium processing and may now have their petitions reviewed quicker. As a result, an adjudicative action may be taken more quickly. This change benefits businesses that previously would have had to wait longer to receive adjudicative action (such as a notice of approval) for an employee. It also benefits applicants of Form I–539 would receive an adjudicative action on their request for a change of status or extension of stay sooner than before, which may alleviate concern about lapses in their nonimmigrant status. Applicants of Form I–765 would benefit through receipt of an adjudicative decision in a specified timeframe making those applicants eligible to work legally in the United States sooner than they would have previously. | | | |
| **COSTS** | | | | |
| Annualized monetized costs (7%) ...................... Annualized monetized costs (3%) ...................... | $12.2 $12.7 | N/A N/A | N/A N/A | RIA. |
| Annualized quantified, but unmonetized, costs ... | | N/A | | |
| Qualitative (unquantified) costs ........................... | This final rule will require USCIS enhancements to handle the projected volumes of expedited requests without adverse impact to other processing times. DHS must hire and train new staff with revenue from current premium processing requests in order to expand expedited adjudication of premium processing consistent with the statutory requirement that other processing times not be adversely affected. DHS does not know how much it will cost to add new categories to apply for premium processing, and these costs are unquantified. The quantified transfers from Form I–129 and Form I–140 petitioners/applicants to DHS will result in higher revenue collected by USCIS. USCIS anticipates this additional revenue would cover any future expenditures required for staffing and training purposes. | | | RIA. |
| **TRANSFERS** | | | | |
| Annualized monetized transfers (7%) ................. Annualized monetized transfers (3%) ................. | $729.3 $743.2 | N/A N/A | N/A N/A | |
| From whom to whom? | From the fee-paying petitioners of Form I–129 and Form I–140 to DHS. | | | |
| From whom to whom? | | | | |
| *Miscellaneous Analyses/Category* | *Effects* | | | *Source Citation* |
| Effects on State, local, or tribal governments ..... | None. | | | RIA. |
| Effects on small businesses ................................ | None. | | | RIA. |
| Effects on wages ................................................. | None. | | | None. |

[59] White House, OMB, *Circular A–4* (Sept. 17, 2003), available at *https://www.whitehouse.gov/ sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf* (last viewed June 1, 2021).

TABLE 2—OMB A–4 ACCOUNTING STATEMENT—Continued
[$ millions, FY 2020]

Time Period: FY 2021 through FY 2030

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| *Miscellaneous Analyses/Category* | *Effects* | | | *Source Citation* |
| Effects on growth ................................ | None. | | | None. |

(2) Background

On October 1, 2020, the Continuing Appropriations Act, 2021 and Other Extensions Act, which contained the USCIS Stabilization Act, was signed into law.[60] The USCIS Stabilization Act amended section 286(u) of the INA, 8 U.S.C. 1356(u), to raise the premium processing fees for immigration benefit types designated for premium processing on or before August 1, 2020, and to expand the immigration benefit requests that may be designated for premium processing service within prescribed limitations, among other changes.[61]

Through this rulemaking, DHS is amending DHS premium processing regulations to codify those fees set by the USCIS Stabilization Act in section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A), and to establish new immigration benefit requests designated for premium processing under section 286(u)(3)(B) of the INA, 8 U.S.C. 1356(u)(3)(B), consistent with those conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act.[62]

(3) Population

USCIS' premium processing service currently allows petitioners to pay an additional filing fee to expedite the adjudication of certain employment-based immigration benefit requests. The Continuing Appropriations Act, which included the USCIS Stabilization Act, set new fees for the premium processing of immigration benefit requests designated for premium processing as of August 1, 2020, and provided authority to establish new immigration benefit requests designated for premium processing and the associated fees.[63] This final rule will codify the new fees from the USCIS Stabilization Act into regulation and impose costs related to the newly eligible population filing Form I–907, Request for Premium Processing Service, for those immigration benefit requests designated for premium processing by this rule.

Table 3 shows the estimated total receipts received and refunds issued by USCIS for Form I–907 from fiscal year ("FY") 2017 through FY 2021. During this period, total annual receipts for Form I–907 ranged from a low of 307,981 in FY 2017 to a high of 412,836 in FY 2019. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–907 to be 365,521. In addition, the total number of refunds issued for Form I–907 decreased to 151 in FY 2021 from a high of 1,055 in FY 2017, with a 5-year annual average of 457 Form I–907 issued refunds. USCIS presents data on refunds issued by USCIS because USCIS currently guarantees processing for these requests within 15 days to petitioners who chose to pay the additional fee to request this service. The 15-day period generally begins when USCIS properly receives the correct version of Form I–907, Request for Premium Processing Service, with fee, at the correct filing address. Within the 15-day period, USCIS will issue either an approval notice, denial notice, notice of intent to deny, or request for evidence, or open an investigation for fraud or misrepresentation. If the benefit request requires the submission of additional evidence or a response to a notice of intent to deny, a new 15-day period begins when USCIS receives a complete response to the request for evidence or notice of intent to deny. The premium processing fee is required to be paid in addition to, and in a separate remittance from, other filing fees, and cannot be waived. If USCIS did not take any of the above actions within the 15-day processing service timeframe, USCIS refunds the premium processing fee.

This rule allows USCIS up to 45-days for premium processing of Form I–140 requesting EB–1 immigrant classification as a multinational executive or manager or EB–2 immigrant classification as member of professions with advanced degrees or exceptional ability seeking a national interest waiver (NIW) and allows USCIS up to 30 days for premium processing of Form I–539 and Form I–765. This change from the standard premium processing timeframe of 15 days reduces the risk that expansion of premium processing to new populations would result in a disproportionate increase in refunds beyond the levels shown in Table 3. This expansion in timeframe will not result in longer wait times for individuals requesting premium processing since the affected population is only a relatively small percentage of people whose adjudication would have required more time (0.1-percent) and therefore would have been refunded. As a result of this final rule, USCIS refunds will not increase for individuals requesting premium processing.

TABLE 3—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, RECEIPTS AND REFUNDS ISSUED, FY 2017 THROUGH FY 2021

| FY | Form I–907 receipts | | | Form I–907 refunds * | | |
|---|---|---|---|---|---|---|
| | Form I–129 | Form I–140 | Total | Form I–129 | Form I–140 | Total |
| 2017 .................................... | 236,499 | 71,482 | 307,981 | 968 | 87 | 1,055 |
| 2018 .................................... | 292,294 | 78,215 | 370,509 | 123 | 101 | 224 |
| 2019 .................................... | 333,160 | 79,676 | 412,836 | 255 | 48 | 303 |
| 2020 .................................... | 276,052 | 64,264 | 340,316 | 499 | 51 | 550 |
| 2021 .................................... | 300,200 | 97,275 | 397,475 | 42 | 109 | 151 |

[60] *See* USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

[61] *Id.*

[62] *Id.*

[63] *Id.*

TABLE 3—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, RECEIPTS AND REFUNDS ISSUED, FY 2017 THROUGH FY 2021—Continued

| FY | Form I–907 receipts | | | Form I–907 refunds * | | |
|---|---|---|---|---|---|---|
| | Form I–129 | Form I–140 | Total | Form I–129 | Form I–140 | Total |
| Total ................................................ | 1,438,205 | 390,912 | 1,829,117 | 1,887 | 396 | 2,283 |
| 5-year Average ........................................ | 287,641 | 78,182 | 365,823 | 377 | 79 | 457 |

Source: USCIS, OP&S PRD, CLAIMS3 and ELIS database, October 13, 2021.
**Notes:** * The report reflects the most up-to-date data available at the time the system was queried. Any duplicate case information has been removed.

Table 4 shows the percentage of the eligible Form I–140 petitioners who chose to submit a premium processing request from FY 2017 through FY 2021. The following classifications are currently designated for premium processing: EB–1 Aliens of extraordinary ability, EB–1 Outstanding professors and researchers, EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver, EB–3 Skilled workers, EB–3 Professionals, and EB–3 Workers other than skilled workers and professionals.[64] Currently not all Form I–140 petitioners are eligible for premium processing, therefore DHS only discusses the percentage of those who are eligible for premium processing compared to the total number of premium processing requests submitted. The population in Table 3 consist of all Form I–140 petitions that are submitted with a Form I–907. However, in FY 2020 of the 64,264 receipts 35,367 were ineligible and 28,897 were eligible. In FY 2020 there were 129,536 total receipts for Form I–140. Of those 64,501 are currently ineligible and 65,035 are eligible for premium processing. The 5-year annual average percentage of eligible Form I–140 petitioners who chose to submit a premium processing request was 52 percent. In FY 2021, there were significantly more Form I–140 petitions submitted compared to previous years; however, the percentage of Form I–140 petitions filed with a Form I–907 has stayed consistent over the past 5 years.

TABLE 4—FORM I–140 RECEIPTS ELIGIBLE FOR PREMIUM PROCESSING, FY 2017 THROUGH FY 2021

| FY | Total Form I–140 petitions eligible for premium processing | Total Form I–140 petitions submitted with Form I–907 | Percentage of Form I–907 receipts |
|---|---|---|---|
| 2017 ................................................................ | 60,255 | 32,674 | 54 |
| 2018 ................................................................ | 62,266 | 35,875 | 58 |
| 2019 ................................................................ | 70,218 | 34,898 | 50 |
| 2020 ................................................................ | 65,035 | 28,897 | 44 |
| 2021 ................................................................ | 112,070 | 58,359 | 52 |
| Total ........................................................ | 369,844 | 190,703 | ................................... |
| 5-year Annual Average ........................................ | 73,969 | 38,141 | 52 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.
**Note:** Form I–140 eligible petitioners include the following classifications are currently designated for premium processing: EB–1 Aliens of extraordinary ability, EB–1 Outstanding professors and researchers, EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver, EB–3 Skilled workers, EB–3 Professionals, and EB–3 Workers other than skilled workers and professionals.

Table 5 shows the percentage of the eligible Form I–129 petitioners who chose to submit a premium processing request along with their Form I–129 petitions from FY 2017 through FY 2021. The 5-year annual average percentage of eligible Form I–129 petitioners who choose to submit a premium processing request was 53-percent.

TABLE 5—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2017 THROUGH FY 2021

| FY | Total Form I–129 receipts | Total Form I–129 petitions submitted with Form I–907 | Percentage of Form I–907 receipts that come with Form I–129 |
|---|---|---|---|
| 2017 ................................................................ | 530,812 | 236,499 | 45 |
| 2018 ................................................................ | 548,950 | 292,296 | 53 |
| 2019 ................................................................ | 551,840 | 333,160 | 60 |
| 2020 ................................................................ | 555,093 | 274,864 | 50 |
| 2021 ................................................................ | 531,818 | 300,200 | 56 |

---

[64] See ''How Do I Request Premium Processing?'' https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing (last updated Apr. 12, 2021).

TABLE 5—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2017 THROUGH FY 2021—Continued

| FY | Total Form I–129 receipts | Total Form I–129 petitions submitted with Form I–907 | Percentage of Form I–907 receipts that come with Form I–129 |
|---|---|---|---|
| Total ................................................................... | 2,718,513 | 1,437,019 | ................................. |
| 5-year Annual Average ........................................... | 543,703 | 287,404 | 53 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.

To estimate the probability that an eligible petitioner may choose to request premium processing, DHS computes a ratio of the 5-year annual average number of requests to the 5-year annual average number of eligible petitioners. Table 6 shows that of those currently eligible for premium processing, 53-percent chose to submit a premium processing request. For purposes of this analysis, DHS assumes that demand rate will carry forward and will use this percentage to estimate the possible adoption volumes of the newly eligible Form I–539 and I–765 applicants.

TABLE 6—PERCENTAGE OF PREMIUM PROCESSING REQUESTS, FY 2017 THROUGH FY 2021

| | 5-year annual average of Forms submitted with Form I–907 | 5-year annual average of total receipts by Form | Percentage of Form I–907 receipts |
|---|---|---|---|
| Form I–140 ........................................................... | 38,141 | 73,969 | 52 |
| Form I–129 ........................................................... | 287,404 | 543,703 | 53 |
| Total ................................................................... | 325,545 | 617,672 | 53 |

Source: USCIS Analysis.

(4) Costs, Transfers, and Benefits of the Final Rule

(a) Form I–129, Petition for a Nonimmigrant Worker, Transfer Payments

Currently, petitioners requesting certain benefits on Form I–129, Petition for a Nonimmigrant Worker, are eligible to also submit a request for premium processing with their immigration benefit request. Table 7 shows the population of petitioners who submitted Form I–907 with Form I–129[65] based on the corresponding nonimmigrant classifications from FY 2017 through FY 2021. The USCIS Stabilization Act increased the premium processing fees for Form I–129. The premium processing fee for H–2B or R–1 nonimmigrant status was increased from $1,440 to $1,500, an increase of $60, which represents a 4.2-percent increase. The premium fee for all other available Form I–129 classifications (E–1, E–2, E–3, H–1B, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2) was increased from $1,440 to $2,500, and increase of $1,060, which represents a 73.6-percent increase. Because the fee for premium processing for the Form I–129 H–2B and R–1 classifications was increased by a different amount than for all other Form I–129 classifications, the data for the Form I–129 H–2B and R–1 classifications data was separated from the data for all other classifications. During this period, total annual receipts for Form I–907 with Form I–129 H–2B or R–1 classifications ranged from a low of 7,067 in FY 2020 to a high of 11,764 in FY 2021. Based on a 5-year annual average, DHS estimates the annual receipts from Form I–907 filed with Form I–129 H–2B or R–1 classifications to be 9,024.

During this period, total annual receipts for Form I–907 filed with all other available Form I–129 classifications (E–1, E–2, E–3, H–1B, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2) ranged from a low of 227,289 in FY 2017 to a high of 322,656 in FY 2019. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–907 associated with all other Forms I–129 to be 287,404, which represents 78.6-percent of all filed Form I–907 receipts.[66]

TABLE 7—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2017 THROUGH FY 2021

| FY | Form I–129 H–2B or R–1 request receipts | Form I–129 all other visa request receipts * | Total Form I–907 receipts |
|---|---|---|---|
| 2017 ..................................................................... | 9,210 | 227,289 | 236,499 |
| 2018 ..................................................................... | 9,127 | 283,169 | 292,296 |
| 2019 ..................................................................... | 10,504 | 322,656 | 333,160 |
| 2020 ..................................................................... | 7,067 | 267,797 | 274,864 |

[65] See Instructions for Petition for Nonimmigrant Worker. Form I–129. OMB No. 1615–0009 Expires Sept. 30, 2021. Accessed at *https://www.uscis.gov/ sites/default/files/document/forms/i-129instr.pdf* (last updated Mar. 10, 2021).

[66] Calculation: 287,404 Total I–129 Forms filed with an I–907 (See Table 5—Total Form I–129 Petitions submitted with Form I–907) divided by 365,823 Total Form I–907 filed = 78.6 percent.

TABLE 7—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2017 THROUGH FY 2021—Continued

| FY | Form I–129 H–2B or R–1 request receipts | Form I–129 all other visa request receipts * | Total Form I–907 receipts |
|---|---|---|---|
| 2021 ............................................................ | 11,764 | 288,436 | 300,200 |
| Total ....................................................... | 47,672 | 1,389,347 | 1,437,019 |
| 5-year Annual Average ........................................ | 9,534 | 277,869 | 287,404 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.
**\*Note:** All other includes the following classifications: E–1, E–2, E–3, H–1B, H–2A, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2.
H–2B or R–1 equals 3.3% and All other I–129 equals 96.7%. of Total Form I–907 Receipts filed with a Form I–129 petition.

On October 1, 2020, the Continuing Appropriations Act, which included the USCIS Stabilization Act, was signed into law. The USCIS Stabilization Act set new fees for premium processing of immigration benefit requests that had been designated for premium processing as of August 1, 2020, and expanded DHS authority to establish and collect new premium processing fees, and to use those additional funds for expanded purposes.[67] Table 7 shows that in FY 2021 when the fee was increased, Form I–129 petitioners were still willing to pay for premium processing. This provides suggestive evidence that petitioners' demand for premium processing is insensitive to the price increases effected by this rule. Consequently, projections of demand for expanded premium processing presented in this analysis do not anticipate a quantifiable price response.

The fee for premium processing for those petitioners requesting H–2B or R–1 nonimmigrant status was increased from $1,440 to $1,500, an increase of $60, which represents a 4.2-percent increase.[68] DHS collected an additional $705,840[69] from the new, higher premium processing fees associated with Form I–129 requests from the H–2B or R–1 nonimmigrant status fee paying population in annual transfer payments for FY 2021 to DHS. The fee for all other Form I–129 petitioners requesting premium processing was increased from $1,440 to $2,500, an increase of $1,060, which represents a 73.6- percent increase. DHS collected an additional $305,742,160[70] in transfer payments from premium processing requestors filing Form I–129 for all other visa classifications to DHS in FY 2021. The total increase in transfer payments from the Form I–129 fee-paying population to DHS in FY 2021 was $306,448,000 as shown in Table 8.

TABLE 8—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2021

| Period of analysis | FY 2021 | Fee | Total |
|---|---|---|---|
| Pre-Appropriations Act (Baseline Costs) .................................... | 11,764 | $1,440 | $16,940,160 |
| Post-Appropriations Act ............................................................ | 11,764 | 1,500 | 17,646,000 |
| Change in Transfer Payments for Form I–129 H–2B or R–1 ..................... | .................... | .................... | 705,840 |
| Pre-Appropriations Act (Baseline Costs) .................................... | 288,436 | 1,440 | 415,347,840 |
| Post-Appropriations Act ............................................................ | 288,436 | 2,500 | 721,090,000 |
| Change in Transfer Payments for Form I–129 All Other * ..................... | .................... | .................... | 305,742,160 |
| Total Change in Transfer Payments for Form I–129 in FY 2021 .............. | .................... | .................... | 306,448,000 |

Source: USCIS Analysis.
**\*Note:** All other includes the following classifications (E–1, E–2, E–3, H–1B, H–2A, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2).

DHS estimates the new premium processing fees associated with Form I–129 requests for H–2B or R–1 nonimmigrant status will result in $572,040[71] in additional annual transfer payments from the Form I–129 H–2B and R–1 fee-paying population to DHS.

The fee for all other Form I–129 petitioners requesting premium processing was increased from $1,440 to $2,500, an increase of $1,060. DHS estimates increased annual transfer payments from premium processing requestors filing Form I–129 for all other visa classifications to DHS will be $294,541,140 in FY 2022 through FY 2030.[72] The total annual increased transfer payments from the Form I–129 fee-paying population to DHS is $295,113,180 from a projected increase in filing fees in FY 2022 through FY

[67] See USCIS Stabilization Act, Public Law 116– 159 (Oct. 1, 2020).

[68] See id.; On October 16, 2020, USCIS issued a web alert notifying the public that USCIS would increase fees for premium processing, effective October 19, 2020, as required by the Continuing Appropriations Act, 2021 and Other Extensions Act, Public Law 116–159, signed into law on October 1, 2020. https://www.uscis.gov/news/ premium-processing-fee-increase-effective-oct-19- 2020 (last updated Oct. 16, 2020).

[69] Calculation: 11,764 annual Form I–129 H–2B or R–1 applications * $60 ($1,500 fee –$1,440) = $705,840.

[70] Calculation: 288,436 annual Form I–129 applications for other than H–2B and R–1 status * $1,060 ($2,500 fee –$1,440) = $305,742,160.

[71] Calculation: 9,534 average annual Form I–129 H–2B or R–1 applications * $60 ($1,500 fee –$1,440) = $572,040.

[72] Calculation: 277,869 average annual Form I– 129 applications for other than H–2B and R–1 status * $1,060 ($2,500 fee –$1,440) = $294,541,140.

2030, shown in Table 9. From a societal perspective, the opportunity cost measures represent social costs, while the filing fees represent transfers from applicants to the government.[73]

TABLE 9—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2022 THROUGH FY 2030

| Period of analysis | 5-Year annual average (FY 2017 through FY 2021) | Fee | Total |
|---|---|---|---|
| Pre-Appropriations Act (Baseline Costs) ............................................ | 9,534 | $1,440 | $13,728,960 |
| Post-Appropriations Act ............................................ | 9,534 | 1,500 | 14,301,000 |
| Annual Change in Transfer Payments for Form I–129 H–2B or R–1 ........................ | .............................. | .......................... | 572,040 |
| Pre-Appropriations Act (Baseline Costs) ............................................ | 277,869 | 1,440 | 400,131,360 |
| Post-Appropriations Act ............................................ | 277,869 | 2,500 | 694,672,500 |
| Annual Change in Transfer Payments for Form I–129 All Other * ............................ | .............................. | .......................... | 294,541,140 |
| Total Annual Change in Transfer Payments for Form I–907 in FY 2022 through FY 2030 | .............................. | .......................... | 295,113,180 |

Source: USCIS Analysis.
* **Note:** All other includes the following classifications (E–1, E–2, E–3, H–1B, H–2A, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2).

(b) Form I–140, Immigrant Petition for Alien Workers, Transfer Payments

Table 10 shows the population of petitioners who submitted Form I–907, Request for Premium Processing Service, with Form I–140, Immigrant Petition for Alien Workers,[74] based on the corresponding employment-based (EB) classifications that are currently designated for premium processing. The following classifications are currently designated for premium processing: EB–1 Aliens of extraordinary ability (E11),

EB–1 Outstanding professors and researchers (E12), EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver E21 (non-NIW), EB–3 Skilled workers (E31), EB–3 Professionals (E32), and EB–3 Workers other than skilled workers and professionals (EW3).[75]

Table 10 also shows the number of Form I–140 receipts filed with Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative (Form G–28) from FY 2017 through FY

2021. The number of Form G–28 submissions allows USCIS to estimate the cost of time for a petitioner or representative to file each form, which is addressed in the next section of this analysis. During FY 2017 through FY 2021, total annual receipts from Form I–907 filed with Form I–140 ranged from a low of 57,969 in FY 2020 to a high of 88,109 in FY 2021. Based on a 5-year annual average, DHS estimates the annual receipts of Form I–907 filed with Form I–140 to be 71,569.

TABLE 10—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE FILED WITH FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS AND THE NUMBER OF FORMS G–28 FILED WITH THOSE FORMS I–907, FY 2017 THROUGH FY 2021

| FY | Form I–907 receipts received with a Form I–140 | Form G–28 receipts received with a Form I–140 and Form I–907 | Percentage of Forms I–140 requesting premium processing and filed by an attorney or other representative (Form G–28) |
|---|---|---|---|
| 2017 ............................................ | 71,482 | 65,453 | 92 |
| 2018 ............................................ | 78,215 | 73,168 | 94 |
| 2019 ............................................ | 79,676 | 73,144 | 92 |
| 2020 ............................................ | 64,264 | 57,969 | 90 |
| 2021 ............................................ | 97,275 | 88,109 | 91 |
| Total ............................................ | 390,912 | 357,843 | .............................. |
| 5-year Annual Average ............................................ | 78,182 | 71,569 | 92 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.

[73] See Instructions for Petition for Nonimmigrant Worker. Form I–129. OMB No. 1615–0009 Expires Sept. 30, 2021. Accessed at *https://www.uscis.gov/ sites/default/files/document/forms/i-129instr.pdf* (last updated Mar. 10, 2021). The USCIS Stabilization Act did not change the time burden to

complete any of the classifications for Form I–129, nor zero fee. The public reporting burden for this collection of information is in the form instructions.

[74] See Instructions for Petition for Alien Workers. Form I–140. OMB No. 1615–0015 Expires June 30, 2022. Accessed at *https://www.uscis.gov/sites/*

*default/files/document/forms/i-140instr.pdf* (last updated Sep. 30, 2020).

[75] See "How Do I Request Premium Processing?" *https://www.uscis.gov/forms/all-forms/how-do-i- request-premium-processing* (last updated Apr. 12, 2021).

Effective October 1, 2020, the USCIS Stabilization Act increased the fee for premium processing of all designated classifications (Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3) available with Form I–140, from $1,440 to $2,500, an increase of $1,060.[76]

Using the population from FY 2021 of 97,275 applicants, DHS estimates that as a result of the fee increase the additional premium processing annual transfer payments from the Form I–140 fee-paying population to DHS was $103,111,500 in FY 2021, shown in Table 11. Consistent with demand for Form I–129 premium processing, DHS observed an increase in premium processing requests associated with Form I–140 in FY 2021 following implementation of the fee increase. This corroborates the agency's experience that requestors are insensitive to the price increases effected by this rule, and will continue to file for premium processing.

TABLE 11—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, CURRENTLY FILED WITH FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS *

| Period of analysis | FY 2021 | Fee | Total |
|---|---|---|---|
| Pre-Appropriations Act (Baseline Costs) | 97,275 | $1,440 | $140,076,000 |
| Post-Appropriations Act | 97,275 | 2,500 | 243,187,500 |
| Total Transfer Payments | | | 103,111,500 |

Source: USCIS Analysis.
* **Note:** Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3.

Using the historical 5-year annual average from FY 2017 through FY 2021 of 78,182 applicants, DHS estimates that as a result of the increase in filing fees for premium processing the additional annual transfer payments from the Form I–140 fee-paying population to DHS will be $82,872,920 a projected in FY 2022 through FY 2030 shown in Table 12. From a societal perspective, the opportunity cost measures represent social costs, while the filing fees represent transfers from applicants to the government.[77]

TABLE 12—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, CURRENTLY FILED WITH FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS *

| Period of Analysis | 5-Year annual average (FY 2017 through FY 2021) | Fee | Total |
|---|---|---|---|
| Pre-Appropriations Act (Baseline Costs) | 78,182 | $1,440 | $112,582,080 |
| Post-Appropriations Act | 78,182 | 2,500 | 195,455,000 |
| Total Transfer Payments | | | 82,872,920 |

Source: USCIS Analysis.
* **Note:** Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3.

This final rule allows USCIS 45-days for premium processing of currently eligible Form I–140 requests, instead of the existing 15-day timeframe. While USCIS is unable to determine how many of the 79 Form I–140 premium processing refunds issued under the 15-day timeframe (Table 3) would be able to have their Request for Premium Processing completed as a result of this change, this would result in a reduction of the expected transfer of refunded revenues from the government, back to those petitioners.

**(c) Form I–140, Immigrant Petition for Alien Workers Newly Eligible Population, Costs & Transfer Payments**

The following classifications are currently designated for premium processing: EB–1 Aliens of extraordinary ability, EB–1 Outstanding professors and researchers, EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver, EB–3 Skilled workers, EB–3 Professionals, EB–3 Workers other than skilled workers and professionals.[78] In this final rule, DHS is adding two new employment-based classifications that will be designated for premium processing when filing Form I–140. DHS is including EB–1, multinational executives and managers, and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver. Petitioners of Form I–140 (EB–1, multinational executives and managers and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver) who were previously ineligible for premium processing may be able to have their petitions reviewed more quickly. As a result, an adjudicative action may be taken more quickly. This change will come at a cost of time and money for this new population.

Table 13 shows the total receipts received for Form I–140 EB–1,

---

[76] See USCIS Stabilization Act; On October 16, 2020, USCIS issued a web alert notifying the public that USCIS would increase fees for premium processing, effective October 19, 2020, as required by the Continuing Appropriations Act, 2021 and Other Extensions Act, Public Law 116–159, signed into law on October 1, 2020. https://www.uscis.gov/ news/premium-processing-fee-increase-effective-oct-19-2020 (last updated Oct. 16, 2020).

[77] See Instructions for Petition for Alien Workers. Form I–140. OMB No. 1615–0015 Expires June 30, 2022. Accessed at https://www.uscis.gov/sites/default/files/document/forms/i-140instr.pdf (last updated Sep. 30, 2020). The USCIS Stabilization Act did not change the time burden to complete any of the classifications for Form I–140, nor form fee. The public reporting burden for this collection of information is in the form instructions.

[78] See "How Do I Request Premium Processing?" https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing (last updated Apr. 12, 2021).

multinational executives, and managers, and Form I–140 EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver for FY 2017 through FY 2021. During this period, total annual receipts for Form I–140 with these classifications ranged from a low of 64,501 in FY 2020 to a high of 79,135 in FY 2017. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–140 with these two classifications to be 72,637.

TABLE 13—FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS, RECEIPTS BY CLASSIFICATION, FY 2017 THROUGH FY 2021

| FY | EB–1, multinational executives, and managers receipts | EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver receipts | Total |
|---|---|---|---|
| 2017 | 16,708 | 62,427 | 79,135 |
| 2018 | 13,595 | 61,652 | 75,247 |
| 2019 | 12,492 | 65,711 | 78,203 |
| 2020 | 11,222 | 53,279 | 64,501 |
| 2021 | 10,182 | 55,916 | 66,098 |
| Total | 64,199 | 298,985 | 363,184 |
| 5-year Annual Average | 12,840 | 59,797 | 72,637 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.

DHS recognizes that not all eligible petitioners will submit a premium processing request, and therefore, DHS uses the current percentage of premium processing requests compared to the number of total receipts from the currently eligible population, 52-percent, as a proxy of the number of newly eligible petitioners that will submit a premium processing request with Form I–140. DHS estimates 37,771 petitioners (52 percent of the newly eligible population of 72,637) would submit a premium processing request with their I–140 petition, as shown in Table 14.

TABLE 14—ESTIMATED OF PREMIUM PROCESSING REQUESTS FOR NEWLY ELIGIBLE FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS

| Percent of total newly eligible Form I–140 petitioners | Newly eligible Form I–140 petitioners |
|---|---|
| 52 | 37,771 |

Source: USCIS Analysis.

Petitioners who file Form I–140 with a Form G–28 would use a lawyer or accredited representative to complete any related immigration benefit requests or forms. Based on the data from Table 10, 92 percent of Form I–140 petitions were filed with a Form G–28, while the remaining 8 percent of Form I–140 petitions are filed without a Form G–28.[79] Table 15 shows the total estimated population of petitioners who would choose to file Form I–140 requesting premium processing with an in-house or outsourced lawyer using a Form G–28[80] and the total estimated population of petitioners who would file Form I–140 requesting premium processing with a Human Resources Specialist.

TABLE 15—ESTIMATED NEWLY ELIGIBLE FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS, POPULATIONS WITH AND WITHOUT FORM G–28, NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE

| Percent | Estimated Form I–140 requesting premium processing filed by an attorney or other representative (Form G–28) (92% of 37,771) | Estimated Form I–140 requesting premium processing filed by an HR specialist (8% of 37,771) | Total |
|---|---|---|---|
| Population of Newly Eligible Form I–140 Petitioners filing for Premium Processing by Filer Type (52%) | 34,749 | 3,022 | 37,771 |

Source: USCIS Analysis.

---

[79] Calculation: 100 percent − 92 percent filing with Form G–28 = 8 percent only filing Form I–140.

[80] DHS uses an outsourced lawyer recognizing that not all entities will have in-house counsel and may need to hire outside counsel.

In order to estimate the opportunity costs of time for completing and filing Form I–907, DHS assumes that a petitioner will use a human resources (HR) specialist, an in-house lawyer, or an outsourced lawyer to prepare Form I–907 petitions.[81] DHS uses the mean hourly wage of $33.38 for HR specialists to estimate the opportunity cost of the time for preparing and submitting Form I–907.[82] Additionally, DHS uses the mean hourly wage of $71.59 for in-house lawyers to estimate the opportunity cost of the time for preparing and submitting Form I–140.[83]

DHS accounts for worker benefits when estimating the total costs of compensation by calculating a benefits-to-wage multiplier using the U.S. Department of Labor, BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS estimates that the benefits-to-wage multiplier is 1.45 and, therefore, is able to estimate the full opportunity cost per petitioner, including employee wages and salaries and the full cost of benefits such as paid leave, retirement, etc.[84] DHS multiplied the average hourly U.S. wage rate for HR specialists and in-house lawyers by 1.45 to account for the full cost of employee benefits, for a total of $48.40[85] per hour for an HR specialist and $103.81[86] per hour for an in-house lawyer. DHS recognizes that a firm may choose, but is not required, to outsource the preparation of these petitions and, therefore, presents two wage rates for lawyers. To determine the full opportunity costs of time if a firm hired an outsourced lawyer, DHS multiplied the average hourly U.S. wage rate for lawyers by 2.5 for a total of $178.98[87] to approximate an hourly wage rate for an outsourced lawyer[88] to prepare and submit Form I–907.[89]

To estimate the opportunity cost of time to complete and file Form I–907, DHS applies the estimated time burden (0.58 hours) to the newly eligible population and compensation rates of those who may file with or without a lawyer.[90] Table 16 shows the estimated annual opportunity cost of time for newly eligible Form I–140 petitioners employing an in-house or outsourced lawyer to complete and file Form I–907 requests. DHS does not know the exact number of petitioners who will choose an in-house or an outsourced lawyer, but assumes it may be a 50/50 split and therefore provides an average. These opportunity costs of time for Form I–140 petitioners who request premium processing using an attorney or other representative are estimated to range from $2,092,230 to $3,607,238 with an average of $2,849,734.

TABLE 16—AVERAGE OPPORTUNITY COSTS OF TIME TO NEWLY ELIGIBLE FORM I–140 PETITIONERS REQUESTING PREMIUM PROCESSING FILING WITH AN ATTORNEY OR OTHER REPRESENTATIVE

| | Newly eligible population of petitioners filing with a lawyer | Time burden to complete Form I–907 (hours) | Cost of time | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| In House Lawyer ($103.81/hr.) ............................................................ | 34,749 | 0.58 | $103.81 | $2,092,230 |
| Outsourced Lawyer ($178.98/hr.) ......................................................... | 34,749 | 0.58 | 178.98 | 3,607,238 |
| Average | ...................... | ...................... | ...................... | 2,849,734 |

Source: USCIS Analysis.

To estimate the remaining opportunity cost of time for a HR specialist filing Form I–907 without a lawyer, DHS applies the estimated public reporting time burden (0.58 hours) to the compensation rate of an HR specialist. For those newly eligible, shown in Table 17, DHS estimates the total annual opportunity cost of time to HR specialists completing and filing Form I–907 requests will be approximately $84,834.

---

[81] USCIS limited its analysis to HR specialists, in-house lawyers, and outsourced lawyers to present estimated costs. However, USCIS understands that not all entities employ individuals with these occupations and, therefore, recognizes equivalent occupations may also prepare and file these petitions.

[82] *See* Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2020, Human Resources Specialist." Available at *https://www.bls.gov/oes/2020/may/oes131071.htm*. Accessed April 13, 2021.

[83] *See* Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2020, Lawyers." Available at *https://www.bls.gov/oes/2020/may/oes231011.htm*. Accessed April 13, 2021.

[84] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) ($38.60 Total Employee Compensation per hour)/($26.53 Wages and Salaries per hour) = 1.454964 = 1.45 (rounded). *See* U.S. Department of Labor, Bureau of Labor Statistics, Economic News Release, *Employer Costs for Employee Compensation (December 2020)*, *Table 1. Employer Costs for Employee Compensation by ownership* (Dec. 2020), available

at *https://www.bls.gov/news.release/archives/ecec_03182021.htm*. (last visited March. 31, 2021). The ECEC measures the average cost to employers for wages and salaries and benefits per employee hour worked.

[85] Calculation: $33.38 * 1.45 = $48.40 total wage rate for HR specialist.

[86] Calculation: $71.59 * 1.45 = $103.81 total wage rate for in-house lawyer.

[87] Calculation: $71.59 * 2.5 = $178.98 total wage rate for an outsourced lawyer.

[88] The DHS analysis in, "Exercise of Time-Limited Authority to Increase the Fiscal Year 2018 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program" (83 FR 24905, May 31, 2018), available at *https://www.federalregister.gov/documents/2018/05/31/2018-11732/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2018-numerical-limitation-for-the*, used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney wages.

The DHS ICE rule, "Final Small Entity Impact Analysis: Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" at G–4 (Aug. 25, 2008), available at *https://www.regulations.gov/document/ICEB-2006-0004-0922* also uses a multiplier. The methodology used in the Final

Small Entity Impact Analysis remains sound for using 2.5 as a multiplier for outsourced labor wages in this rule, pages 143–144.

[89] The DHS analysis in, "Exercise of Time-Limited Authority to Increase the Fiscal Year 2018 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program" (83 FR 24905, May 31, 2018), available at *https://www.federalregister.gov/documents/2018/05/31/2018-11732/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2018-numerical-limitation-for-the*, used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney wages.

Also, the analysis for a DHS ICE rule, "Final Small Entity Impact Analysis: Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" at G–4 (Aug. 25, 2008), available at *https://www.regulations.gov/document/ICEB-2006-0004-0922* used a multiplier. The methodology used in the Final Small Entity Impact Analysis remains sound for using 2.5 as a multiplier for outsourced labor wages in this rule, pages 143–144.

[90] *See* Instructions for Request for Premium Processing Service. Form I–907. OMB No. 1615–0048 Expires July 31, 2022. Accessed at *https://www.uscis.gov/sites/default/files/document/forms/i-907instr.pdf* (last updated Sep. 30, 2020).

TABLE 17—OPPORTUNITY COSTS OF TIME TO NEWLY ELIGIBLE FORM I–140 PETITIONERS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE WITHOUT AN ATTORNEY OR ACCREDITED REPRESENTATIVE

| | Newly eligible population | Time burden to complete Form I–907 (hours) | HR specialist's opportunity cost of time (48.40/hr.) | Total opportunity cost of time |
| --- | --- | --- | --- | --- |
| | A | B | C | D = (A × B × C) |
| Estimate of Eligible Form I–140 Petitions (52%) ..................................... | 3,022 | 0.58 | $48.40 | $84,834 |

Source: USCIS Analysis.

The costs to the petitioners newly eligible to file Form I–907 with a Form I–140 as a result of this rule is estimated to be $2,934,568, as shown Table 18. From a societal perspective, the opportunity cost measures represent social costs, while the filing fees represent transfers from applicants to the government.[91]

TABLE 18—TOTAL COSTS TO NEWLY ELIGIBLE FORM I–140 PETITIONERS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| | Opportunity cost of time to complete and to file Form I–907 (lawyers), Table 16 | Opportunity cost of time to complete and file Form I–907 (HR specialists), Table 17 | Total cost |
| --- | --- | --- | --- |
| | A | B | D = (A + B + C) |
| Estimate of Eligible Form I–140 Petitions (52%) ................................... | $2,849,734 | $84,834 | $2,934,568 |

Source: USCIS Analysis.

In Table 19, DHS estimates that as a result of the increase in filing fees for Form I–907, Request for Premium Processing Service, the additional annual transfer payments from the new Form I–140 fee-paying population to DHS will be $94,427,500.

TABLE 19—NEW FILING FEES TO FORM I–140 PETITIONERS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| | Newly eligible population | New filing fees for Form I–907 | Total filing fees from Form I–907 |
| --- | --- | --- | --- |
| | A | B | C = (B × A) |
| Estimate of Eligible Form I–140 Petitions (52%) ................................... | 37,771 | $2,500 | $94,427,500 |

Source: USCIS Analysis.

(d) Form I–539, Application To Extend/ Change Nonimmigrant Status, Costs & Transfer Payments

In this final rule, DHS is now adding Form I–539, Application to Extend/ Change Nonimmigrant Status, to the types of immigration benefit requests that are eligible for premium processing. While Form I–539 is used for many nonimmigrants categories who may apply for an extension of stay or a change of status, premium processing will now be extended to Form I–539 requestors changing status to F–1, F–2, J–1, J–2, M–1, or M–2 nonimmigrant status or a change of status or extension of stay in E–1, E–2, E–3, H–4, L–2, O–3, P–4, or R–2 nonimmigrant status.

Table 20 shows the total receipts received for Form I–539 for FY 2017 through FY 2021 and the number of Form I–539 receipts filed with an attorney or accredited representative using Form G–28. The number of Form G–28 submissions allows USCIS to estimate the numbers of forms that are filed by an attorney or accredited representative. This in turn, allows USCIS to estimate the opportunity cost of time depending on the type of filer. During this period, total annual receipts for Form I–539 ranged from a low of 227,120 in FY 2019 to a high of 441,920 in FY 2020. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–539 to be 284,345, with 49 percent of Forms I–539 being filed by an attorney or accredited representative.

---

[91] See Instructions for Petition for Alien Workers. Form I–140. OMB No. 1615–0015 Expires June 30, 2022. Accessed at *https://www.uscis.gov/sites/ default/files/document/forms/i-140instr.pdf* (last updated Sep. 30, 2020). The USCIS Stabilization Act did not change the time burden to complete any of the classifications for Form I–140, nor form fee. The public reporting burden for this collection of information is in form instructions.

TABLE 20—USCIS RECEIPTS OF FORM I–539, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS, WITH THE NUMBER OF G–28, NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE, RECEIVED, FY 2017 THROUGH FY 2021

| FY | Receipts | Form G–28 | Percentage of Forms I–539 filed with Form G–28 |
|---|---|---|---|
| 2017 | 233,306 | 121,855 | 52 |
| 2018 | 233,437 | 130,654 | 56 |
| 2019 | 227,120 | 130,435 | 57 |
| 2020 | 441,920 | 166,298 | 38 |
| 2021 | 285,941 | 148,779 | 52 |
| Total | 1,421,724 | 698,021 | 49 |
| 5-year Annual Average | 284,345 | 139,604 | 49 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.

DHS does not know how many newly eligible Form I–539 applicants will choose to submit a premium processing request since this population has not previously been eligible to file for premium processing. DHS recognizes that not all eligible petitioners will submit a premium processing request. Table 21 shows the 5-year annual average for the classifications that are now eligible for premium processing along with the number of forms that are filed with a Form G–28 for FY 2017 through FY 2021. Overall, 49 percent [92] of Form I–539 applications will now be eligible for premium processing. Form I–539 F–1, F–2, J–1, J–2, M–1, M–2 classifications account for 14 percent [93] of the newly eligible population and are students and exchange visitors. Form I–539 E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications are employment visas and account for the remaining 86 percent [94] of the newly eligible population of Form I–539 filers.

TABLE 21—USCIS 5-YEAR ANNUAL AVERAGE OF FORM I–539 RECEIPTS, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS BY CLASSIFICATION AND FILE WITH OR WITHOUT A FORM G–28, FY 2017 THROUGH FY 2021

| Form I–539 classifications | Form I–539 filed with Form G–28 | Form I–539 filed without Form G–28 | Total Form I–539 receipts |
|---|---|---|---|
| F–1 | 22,180 | 55,680 | 77,860 |
| F–2 | 2,640 | 6,161 | 8,801 |
| J–1 | 209 | 1,033 | 1,242 |
| J–2 | 132 | 529 | 661 |
| M–1 | 333 | 7,773 | 8,106 |
| M–2 | 14 | 24 | 38 |
| F–1, F–2, J–1, J–2, M–1, M–2 Total | 25,508 | 71,200 | 96,708 |
| E–1 | 601 | 99 | 700 |
| E–2 | 10,985 | 1,966 | 12,951 |
| E–3 | 2,340 | 417 | 2,757 |
| H–4 | 372,202 | 131,452 | 503,654 |
| L–2 | 53,545 | 7,617 | 61,162 |
| O–3 | 6,825 | 1,004 | 7,829 |
| P–4 | 875 | 443 | 1,318 |
| R–2 | 4,470 | 1,236 | 5,706 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 Total | 451,843 | 144,234 | 596,077 |
| Total of all Classifications | 477,351 | 215,434 | 692,785 |
| 5-year Annual Average of all Classifications | 95,470 | 43,087 | 138,557 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 13, 2021.

Table 21 shows that of the 138,557 newly eligible applicants, DHS calculated that 19,342 would be applying for F–1, F–2, J–1, J–2, M–1, M–2 classifications (14%), and the remaining 119,215 would be applying for E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications (86%). Since Form I–539 applicants have never been eligible to request premium processing, DHS has no historical data to determine how many of the newly eligible population

[92] Calculation: 5-year Annual Average Total Newly Eligible Form I–539 applicants/5-year Annual Average of Total Form I–539 Receipts = 138,557 (Table 21)/284,345 (Table 20) = 49%.

[93] Calculation: F, J, and M Total/Total of all Classifications = 96,708/692,785 = 14%.

[94] Calculation: All Other Total/Total of all Classifications = 596,077/692,785 = 86%.

will take advantage of premium processing. Therefore, DHS uses the 53 percent average of Forms I–129 and I–140 that request premium processing for this newly eligible population as a proxy.

Of the 19,342 newly eligible applicants for F–1, F–2, J–1, J–2, M–1, M–2 classifications, DHS estimates that 10,251 applicants (53 percent of the eligible population) may submit a premium processing request along with their Form I–539 application. Of the 119,215 newly eligible applicants for E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications, DHS estimates that 63,184 applicants (53 percent of the eligible population) may submit a premium processing request along with their Form I–539 application as shown in Table 22. DHS is planning to begin accepting premium processing requests from F–1, F–2, J–1, J–2, M–1, M–2 classifications beginning in FY 2022. DHS anticipates accepting premium processing requests from E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications by FY 2025.

TABLE 22—ESTIMATED USCIS 5-YEAR ANNUAL AVERAGE FORM I–539, APPLICATION TO EXTEND/CHANGE NON-IMMIGRANT STATUS, POPULATIONS FILED WITH AND WITHOUT FORM G–28 NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE, FY 2017 THROUGH FY 2021

| Classification type | Estimated Form I–539 filed with Form G–28 | Estimated Form I–539 filed without Form G–28 | Total |
|---|---|---|---|
| F–1, F–2, J–1, J–2, M–1, M–2 classifications ............................................. | 2,704 | 7,547 | 10,251 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications ........................... | 47,895 | 15,289 | 63,184 |
| Total ............................................................................................ | 50,599 | 22,836 | 73,435 |

Source: U.S. Citizenship and Immigration Services, Office of Performance and Quality, C3 Consolidated via SAS, queried October 13, 2021.

In order to estimate the opportunity costs of time for completing and filing Form I–907, DHS assumes that an applicant will use an in-house or outsourced lawyer or will prepare Form I–907 request themselves. Many of the individuals using Form I–539 F–1, F–2, J–1, J–2, M–1, M–2 classifications may file forms on their own because they are students, professors, research scholars, trainees or interns, teachers, camp counselors, au pairs, and summer work travel exchange visitors, and may not choose to hire a lawyer.[95] Table 22 shows the total population of applicants who chose to file Form I–539 with and without an attorney or accredited representative using Form G–28 by classification.

To estimate the new opportunity cost of time for Form I–539 applicants to file Form I–907, DHS applies the estimated time burden (0.58 hours) [96] of Form I–907 to the newly eligible population and compensation rates of who may file, with or without a lawyer. For newly eligible applicants of Form I–539, Table 23 shows the estimated annual opportunity cost of time to applicants who use an in-house or outsourced lawyer to complete and file Form I–907 requests of $4,149,578.

TABLE 23—OPPORTUNITY COSTS OF TIME TO FORM I–539 APPLICANTS WHO FILE FORM I–907 WITH AN ATTORNEY OR ACCREDITED REPRESENTATIVE

| | Affected population | Time burden to complete Form I–907 (hours) | Hourly wage | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| F–1, F–2, J–1, J–2, M–1, M–2 Classifications: | | | | |
| In-House Lawyer ($103.81/hr.) ............................................. | 2,704 | 0.58 | 103.81 | 162,807 |
| Outsourced Lawyer ($178.98/hr.) ......................................... | 2,704 | 0.58 | 178.98 | 280,698 |
| Average Opp. Cost of in-house and Outsourced Lawyer ...................... | 2,704 | ................. | ................. | 221,753 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 Classifications: | | | | |
| In-House Lawyer ($103.81/hr.) ............................................. | 47,895 | 0.58 | 103.81 | 2,883,748 |
| Outsourced Lawyer ($178.98/hr.) ......................................... | 47,895 | 0.58 | 178.98 | 4,971,903 |
| Average Opp. Cost of in-house and Outsourced Lawyer ................. | 47,895 | ................. | ................. | 3,927,826 |
| Total Opportunity cost of time for all Classifications ................. | ................. | ................. | ................. | 4,149,578 |

Source: USCIS Analysis.

To estimate the new opportunity costs of time for students and exchange visitors applying for F, J or M classifications, USCIS uses an average total rate of compensation based on the effective minimum wage. DHS assumes that the following classifications: F–1, academic student, J–1, exchange visitor, J–2 spouse or child of J–1 exchange

---

[95] USCIS recognizes that professors, teachers, and research scholars in the J–1 and J–2 visa categories may not hire lawyers and may not file these forms themselves. USCIS recognizes that these forms may be filed by an HR Specialist or some other equivalent occupation at the sponsoring entity on behalf of these applicants. However, for the simplicity of this analysis, USCIS includes these categories as filing themselves which may result in a slight underestimation in the opportunity costs of time for the J category.

[96] See Instructions for Request for Premium Processing Service. Form I–907. OMB No. 1615–0048 Expires July 31, 2022. Accessed at https://www.uscis.gov/sites/default/files/document/forms/i-907instr.pdf (last updated Sep. 30, 2020).

visitor, M–1 vocational student, and M–2 spouse or child of an M–1 vocational student are young with limited work experience/education and would therefore have lower wages. As reported by The New York Times ''[t]wenty-nine states and the District of Columbia have state-level minimum hourly wages higher than the federal [minimum wage],'' as do many city and county governments. Analysis by The New York Times estimates that ''the effective minimum wage in the United States . . . [was] $11.80 an hour in 2019.'' [97] DHS relies on this more robust minimum wage of $11.80 as an estimate of the opportunity cost of time. In order to estimate the fully loaded wage rates, to include benefits, USCIS used the benefits-to-wage multiplier of 1.45 and multiplied it by the prevailing minimum hourly wage rate. The fully loaded hourly wage rate for someone earning the effective minimum wage

rate is $17.11.[98] Therefore, DHS estimates that the opportunity cost for each petitioner is $9.92 per response for those petitions.[99]

DHS accounts for worker benefits when estimating the total costs of compensation by calculating a benefits-to-wage multiplier using the U.S. Department of Labor, BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS estimates that the benefits-to-wage multiplier is 1.45 and, therefore, is able to estimate the full opportunity cost per petitioner, including employee wages and salaries and the full cost of benefits such as paid leave, insurance, retirement, and other benefits.[100] DHS uses the mean hourly wage of $27.07 per hour [101] for all occupations to estimate the opportunity cost of time for this population in this analysis. DHS calculates the total rate of

compensation as $39.25 per hour, where the mean hourly wage is $27.07 per hour worked and average benefits are $12.18 per hour.[102]

To estimate the new opportunity costs of time for a Form I–539 applicant filing Form I–907 to request premium processing, DHS applies the estimated public reporting time burden (0.58 hours) to the newly eligible population and compensation rate of the applicant. Therefore, for those newly eligible, as shown in Table 24, DHS estimates the total annual opportunity cost of time to F–1, F–2, J–1, J–2, M–1, M–2 classification applicants completing and filing Form I–907 requests is $74,895 and the opportunity cost of time for E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classification applicants is $348,054. DHS estimates the total opportunity cost of time for the affected population of Form I–539 applicants filing Form I–907 of $422,949 as shown in Table 24.

TABLE 24—OPPORTUNITY COSTS OF TIME TO FORM I–539 APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| | Affected population | Time burden to complete Form I–907 (hours) | Petitioner cost of time | Total opportunity cost of time to file Form I–907 |
|---|---|---|---|---|
| | A | B | C | D = (A x B x C) |
| F–1, F–2, J–1, J–2, M–1, M–2 classifications ......................................... | 7,547 | 0.58 | $17.11 | $74,895 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications ....................... | 15,289 | 0.58 | 39.25 | 348,054 |
| Total ....................................... | 22,836 | ...................... | ...................... | 422,949 |

Source: USCIS Analysis.

DHS estimates the total additional annual cost beginning in FY 2022 to F–1, F–2, J–1, J–2, M–1, M–2 classification applicants completing and filing Form I–907 requests are expected to be $296,648 shown in Table 25. Note that this cost includes an average opportunity cost time for lawyers, which assumes half of the applicants use an in house lawyer and half the applicants use an outsourced lawyer.

TABLE 25—TOTAL COSTS TO FORM I–539 F–1, F–2, J–1, J–2, M–1, M–2 CLASSIFICATION APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING

| | |
|---|---|
| Average Opportunity Cost Time for Lawyers to Complete Form I–907 ......................................................................................................... | $221,753 |
| Average Opportunity Cost Time for Students to Complete Form I–907 ....................................................................................................... | 74,895 |
| Total Cost ........................................................................................................................................................................................................ | 296,648 |

Source: USCIS Analysis.

[97] ''Americans Are Seeing Highest Minimum Wage in History (Without Federal Help)'' Ernie Tedeschi, The New York Times, April 24, 2019. Accessed at *https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html* (last visited June 25, 2020).

[98] Calculation: (Effective Minimum Wage Rate) $11.80 × (Benefits-to-wage multiplier) 1.45 = $17.11 per hour.

[99] Calculation: (Effective Wage) $17.11 × (Estimated Opportunity of Cost to file Form I–907) 0.58 = $9.92.

[100] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) ($38.60 Total Employee Compensation per hour)/($26.53 Wages and Salaries per hour) = 1.454964 = 1.45 (rounded). *See* U.S. Department of Labor, BLS, Economic News Release, *Employer Cost for Employee Compensation (December 2020), Table 1. Employer Costs for Employee Compensation by ownership* (Dec. 2020),

available at *https://www.bls.gov/news.release/archives/ecec_03182021.htm.* (last visited Mar. 31, 2021).

[101] *See* BLS, U.S. Department of Labor, ''Occupational Employment Statistics, May 2020, All Occupations.'' Available at *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* Accessed Apr. 13, 2021. (last visited Apr. 29, 2021).

[102] The calculation of the weighted mean hourly wage for applicants: $27.07 per hour *1.45 benefits-to-wage multiplier = $39.25 (rounded) per hour.

DHS estimates the total additional annual cost beginning in FY 2025 to E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classification applicants completing and filing Form I–907 requests are expected to be $4,275,880 shown in Table 26. From a societal perspective, the opportunity cost measures represent societal costs, while the filing fees represent transfers from applicants to the government.[103]

TABLE 26—TOTAL COSTS TO FORM I–539 E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING

| | |
|---|---|
| Average Opportunity Cost Time for Lawyers to Complete Form I–907 | $3,927,826 |
| Average Opportunity Cost Time for Workers to Complete Form I–907 | 348,054 |
| Total Cost | 4,275,880 |

Source: USCIS Analysis.

In Table 27, DHS uses the estimated new population to complete Form I–907. DHS estimates that as a result of the increase in filing fees for Form I–907, Request for Premium Processing Service, the additional annual transfer payments from the new Form I–539 F–1, F–2, J–1, J–2, M–1, M–2 classification fee-paying population to DHS will be $17,939,250 in FY 2022.

DHS also estimates that annual transfer payments from Form I–539 E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classification applicants who request premium processing by filing Form I–907 to DHS will be $110,572,000 in FY 2025.

TABLE 27—FILING FEES FOR FORM I–539 APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| | Newly eligible population (A) | New fees for Form I–907 (B) | Fees for filing Form I–907 C = (A x B) |
|---|---|---|---|
| Estimate of Eligible Form I–539 Petitions (53%) Students | 10,251 | $1,750 | $17,939,250 |
| Estimate of Eligible Form I–539 Petitions (53%) Workers | 63,184 | 1,750 | 110,572,000 |
| Total | 73,435 | 1,750 | 128,511,250 |

Source: USCIS Analysis.

(e) Form I–765, Application for Employment Authorization, Costs & Transfer Payments

In this final rule, DHS is including Form I–765, Application for Employment Authorization, to the list of immigration benefit requests permitted to apply for premium processing. Table 28 shows the total receipts received for Form I–765 for FY 2017 through FY 2021. Table 28 also shows the number of Form I–765 receipts filed with an attorney or accredited representative using Form G–28. The number of Form G–28 submissions allows USCIS to estimate the number of Forms I–765 that are filed by an attorney or accredited representative and thus estimate the opportunity costs of time for an applicant, attorney or accredited representative to file each form. From FY 2017 through FY 2021, total annual receipts for Form I–765 ranged from a low of 2,005,591 in FY 2020 to a high of 2,588,827 in FY 2021. Based on a 5-year annual average, DHS estimates the annual average receipts of Form I–765 to be 2,259,872 with 48 percent of applications filed by an attorney or accredited representative.

TABLE 28—FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION, RECEIPTS RECEIVED BY USCIS, WITH FORM G–28 NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE, FY 2017 THROUGH FY 2021

| FY | Form I–765 receipts | Form G–28 receipts received with a form I–765 receipt | Form G–28 receipts received without form I–765 receipt | Percent of Form I–765 receipts filed with a form G–28 receipt |
|---|---|---|---|---|
| 2017 | 2,372,692 | 1,077,974 | 1,294,718 | 45 |
| 2018 | 2,140,985 | 947,711 | 1,193,274 | 44 |
| 2019 | 2,191,145 | 1,052,774 | 1,138,371 | 48 |
| 2020 | 2,005,712 | 1,027,689 | 978,023 | 51 |
| 2021 | 2,588,827 | 1,355,324 | 1,233,503 | 52 |
| Total | 11,299,361 | 5,461,472 | 5,837,889 | |

[103] See Instructions for Application to Extend/Change Nonimmigrant Status. Form I–539. OMB No. 1615–0003 Expires Nov. 30, 2021. Accessed at https://www.uscis.gov/sites/default/files/document/ forms/i-539instr.pdf (last updated Mar. 10, 2021). The USCIS Stabilization Act did not change the time burden to complete any of the classifications for I–539, nor form fees. The public reporting burden for this collection of information is in the form instructions.

TABLE 28—FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION, RECEIPTS RECEIVED BY USCIS, WITH FORM G–28 NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE, FY 2017 THROUGH FY 2021—Continued

| FY | Form I–765 receipts | Form G–28 receipts received with a form I–765 receipt | Form G–28 receipts received without form I–765 receipt | Percent of Form I–765 receipts filed with a form G–28 receipt |
|---|---|---|---|---|
| 5-year Annual Average ..................................................... | 2,259,872 | 1,092,294 | 1,167,578 | 48 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, October 18, 2021.

DHS does not know how many newly eligible Form I–765 applicants will choose to submit a premium processing request because this population has not previously been eligible to file for premium processing.

DHS is prioritizing premium processing for some Form I–765 categories. DHS anticipates to begin premium processing Employment Authorization Documents for students applying for Optional Practical Training (OPT) and exchange visitors beginning in FY 2022. Table 29 shows the estimated populations that will be eligible for premium processing. Based on a 5-year annual average, DHS estimates the annual average receipts of Form I–765 eligible categories to be 218,076 beginning in FY 2022. DHS also estimates that the annual average receipts of Form I–765 for the additional categories to be 102,495 beginning in 2025 based on a 5-year annual average.

DHS identifies a final expanded eligibility group consisting of an additional 1,136,691 applicants that could be covered under this rule; however due to the size and nature of this group, DHS does not have immediate plans for when premium processing will be implemented for them. Lastly, DHS excludes remaining categories that USCIS has no current plans to expand to implement premium processing for.

TABLE 29—FORM I–765 CLASSIFICATIONS BY EXPECTED IMPLEMENTATION, FY 2017 THROUGH FY 2021

| FY | Form I–765 receipts eligible in 2022 | Form I–765 receipts eligible in 2025 | Form I–765 receipts unsure of implementation | Form I–765 receipts unlikely categories to be eligible for premium processing | Total |
|---|---|---|---|---|---|
| 2017 ........................................................ | 237,072 | 96,806 | 1,112,502 | 926,065 | 2,372,445 |
| 2018 ........................................................ | 235,622 | 100,316 | 977,641 | 827,050 | 2,140,629 |
| 2019 ........................................................ | 226,275 | 110,743 | 1,165,725 | 686,547 | 2,189,290 |
| 2020 ........................................................ | 207,550 | 110,449 | 1,056,139 | 625,570 | 1,999,708 |
| 2021 ........................................................ | 183,859 | 94,160 | 1,371,449 | 945,495 | 2,594,963 |
| Total ............................................. | 1,090,378 | 512,474 | 5,683,456 | 4,010,727 | 11,297,035 |
| 5-year Annual Average ............................. | 218,076 | 102,495 | 1,136,691 | 802,145 | 2,259,407 |

Source: U.S. Citizenship and Immigration Services, Office of Performance and Quality, C3 Consolidated via SAS, queried October 2021.
* **Note:** Totals is this table are .1% off from Table 28 due to different pull dates of the data.

Since Form I–765 applicants have never been eligible to request premium processing, DHS has no historical data to determine how many of the newly eligible population will take advantage of premium processing. Therefore, DHS uses the 53- percent average of Forms I–129 and I–140 developed in Table 6, that request premium processing for this newly eligible population as a proxy.

DHS understands that some Form I–765 classifications are already on a congressionally mandated or regulatory clock to adjudicate their forms in 30–90 days and therefore it would not be reasonable to assume these applicants would pay the additional fee to submit a premium processing request. Some Form I–765 applicants for asylum-based categories may also be submitting Form I–539 concurrently so they may not be interested in paying for premium processing twice. DHS also recognizes that some classifications could be more interested in faster adjudication times and may submit premium processing requests at a rate more consistent with the estimates applied to the other populations in this analysis. While EAD eligibility categories are not effective predictors of future likelihood to request premium processing, applying the assumptions above to the Form I–765 data by eligibility category yields a more consistent approximation of potential population requesting premium processing for their EADs.[104] Using 53-percent as a proxy, DHS estimates that 115,580 applicants (53-percent of the eligible population) out of the 218,076 employment authorization document applicants who apply annually may submit a premium processing request with their Forms I–765 application beginning in FY 2022.[105] DHS also estimates that 54,322 applicants (53-percent of the eligible population) out of the 102,495 employment authorization document applicants who apply annually may submit a premium processing request with their Form I–765 application beginning in FY 2025.[106]

In order to estimate the opportunity costs of time for completing and filing

[104] See Form I–765, Application for Employment Authorization, All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type at https://www.uscis.gov/sites/default/files/document/reports/I-765_Application_for_Employment_FY03-20.pdf. USCIS, OPQ, C3 Consolidated via SAS, queried Oct 2020. (accessed 10/15/2021)

[105] Calculation: 218,076 applicants * 53 percent = 115,580.

[106] Calculation: 102,495 applicants * 53 percent = 54,322.

a Form I–907 submitted with a Form I–765, DHS assumes that to prepare, complete, and file these forms an applicant will use either an in-house lawyer, outsourced lawyer, or will do so themselves. Based on the data from Table 30, 48-percent of Form I–765

applications were filed with an attorney or accredited representative using Form G–28, with 52- percent [107] of Form I–765 applications being filed without a Form G–28. DHS will apply these same percentages to applicants requesting premium processing with a Form I–765,

expecting that 48-percent will use an attorney or accredited representative and 52- percent will file the Form I–907 themselves. Table 30 shows the total population by percentage for applicants who may choose to file Form I–765 with and without Form G–28.

TABLE 30—ESTIMATED FORM I–765, APPLICATION FOR EMPLOYMENT AUTHORIZATION, POPULATIONS FILING WITH AND WITHOUT FORM G–28, NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR ACCREDITED REPRESENTATIVE

| Percent | Estimated Form I–765 filed with Form G–28 | Estimated Form I–765 filed without Form G–28 | Total |
|---|---|---|---|
| | A | B | C = (A + B) |
| Estimate of Eligible Form I–765 Petitions in 2022 (53%) ........................................................ | 60,102 | 55,478 | 115,580 |
| Estimate of Eligible Form I–765 Petitions in 2025 (53%) ........................................................ | 28,247 | 26,075 | 54,322 |

Source: USCIS Analysis.

To estimate the opportunity costs of time to file a Form I–907 to accompany a Form I–765 using an attorney or accredited representative, DHS applies the estimated public reporting time burden (0.58 hours) to the population

who will be eligible for premium processing beginning in FY 2022. Table 31 shows the estimated annual opportunity costs of time to complete and file Form I–907 with a Form I–765 if filed by an in-house lawyer or

outsourced lawyer. The opportunity cost of time is $4,928,911 based on a simple average of the cost for an in-house lawyer and an outsourced lawyer.

TABLE 31—TOTAL OPPORTUNITY COSTS OF TIME TO AN ATTORNEY OR ACCREDITED REPRESENTATIVE TO COMPLETE AND FILE FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE WITH A FORM I–765 BEGINNING IN FY 2022

| | Estimate of eligible Form I–765 petitions filed with Form G–28 | Time burden to complete Form I–907 (hours) | Hourly wage rate | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| In-House Lawyer ($103.81/hr.) ................................................................ | 60,102 | 0.58 | $103.81 | $3,618,729 |
| Outsourced Lawyer ($178.98/hr.) ............................................................. | 60,102 | 0.58 | 178.98 | 6,239,092 |
| Average ........................................................................................ | 60,102 | ...................... | ...................... | 4,928,911 |

Source: USCIS Analysis.

To estimate the opportunity costs of time to complete and file Form I–907 with a Form I–765 without an attorney or accredited representative, DHS applies the estimated public reporting

time burden (0.58 hours) [108] to the newly eligible population and compensation rate of the applicant. Therefore, for those newly eligible, as shown in Table 32, DHS estimates the

total annual opportunity costs of time to applicants completing and filing Form I–907 to be $1,557,378.

TABLE 32—OPPORTUNITY COSTS TO FORM I–765, APPLICATION FOR EMPLOYMENT AUTHORIZATION, APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE BEGINNING IN FY 2022

| | Newly eligible population | Time burden to complete Form I–907 (hours) | HR specialist cost of time ($/hr.) | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| Estimate of Eligible Form I–765 Petitions ......................................... | 55,478 | 0.58 | $48.40 | $1,557,378 |

Source: USCIS Analysis.

---

[107] Calculation: 100 percent − 48 percent filing with Form G–28 = 52 percent only filing Form I–765.

[108] *See* Instructions for Request for Premium Processing Service. Form I–907. OMB No. 1615–0048 Expires July 31, 2022. Accessed at *https://*

*www.uscis.gov/sites/default/files/document/forms/i-907instr.pdf* (last updated Sep. 30, 2020).

To estimate the opportunity cost of time to file a Form I–907 to accompany a Form I–765 using an attorney or accredited representative, DHS applies the estimated public reporting time burden (0.58 hours) [109] to the population who will be eligible for premium processing beginning in FY 2025 and compensation rates of filers. Table 33 shows the estimated annual opportunity costs of time to complete and file Form I–907 with a Form I–765 if filed by an in-house lawyer or outsourced lawyer. The opportunity cost of time is $2,316,511 based on a simple average of the cost for an in-house lawyer and an outsourced lawyer.

TABLE 33—TOTAL OPPORTUNITY COSTS OF TIME TO AN ATTORNEY OR ACCREDITED REPRESENTATIVE TO COMPLETE AND FILE FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE WITH A FORM I–765 BEGINNING IN FY 2025

| | Estimate of eligible Form I–765 petitions filed with Form G–28 | Time burden to complete Form I–907 (hours) | Hourly wage rate | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| In House Lawyer ($103.81/hr.) | 28,247 | 0.58 | $103.81 | $1,700,746 |
| Outsourced Lawyer ($178.98/hr.) | 28,247 | 0.58 | 178.98 | 2,932,276 |
| Average | 28,247 | ................. | .................. | 2,316,511 |

Source: USCIS Analysis.

To estimate the opportunity cost of time to complete and file Form I–907 with a Form I–765 without an attorney or accredited representative, DHS applies the estimated public reporting time burden (0.58 hours) to the population who will be eligible for premium processing beginning in FY 2025 and compensation rate of the applicant. For those newly eligible, shown in Table 34, DHS estimates the total annual opportunity cost of time to applicants completing and filing Form I–907 to be $731,977.

TABLE 34—OPPORTUNITY COSTS TO FORM I–765, APPLICATION FOR EMPLOYMENT AUTHORIZATION, APPLICANTS FOR FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE BEGINNING IN FY 2025

| | Newly eligible population | Time burden to complete Form I–907 (hours) | HR specialist cost of time ($/hr.) | Total opportunity cost |
|---|---|---|---|---|
| | A | B | C | D = (A × B × C) |
| Estimate of Eligible Form I–765 Petitions (53%) | 26,075 | 0.58 | $48.40 | $731,977 |

Source: USCIS Analysis.

Using the population estimates, DHS next calculates the total costs for the new Form I–765 population to complete and file premium processing requests using Form I–907. DHS estimates the total annual cost to applicants completing and filing Form I–907 requests to be $6,486,289 beginning in FY 2022, and $3,048,488 beginning in FY 2025 as shown in Table 35. From a societal perspective, the opportunity cost measures represent social costs, while the filing fees represent transfers from applicants to the government. [110]

TABLE 35—ANNUAL COSTS TO FORM I–765 APPLICANTS FOR COMPLETING AND FILING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| | Opportunity cost of time completing Form I–907 (lawyer), Table 31 | Opportunity cost of time completing Form I–907 (applicant), Table 32 | Annual cost |
|---|---|---|---|
| | A | B | D = (A + B + C) |
| Estimate of Eligible Form I–765 Petitions (53%) beginning in FY 2022 | $4,928,911 | $1,557,378 | $6,486,289 |
| Estimate of Eligible Form I–765 Petitions (53%) beginning in FY 2025 | 2,316,511 | 731,977 | 3,048,488 |
| Total | ............................... | ............................... | $9,534,777 |

Source: USCIS Analysis.

---

[109] See Instructions for Request for Premium Processing Service. Form I–907. OMB No. 1615–0048 Expires July 31, 2022. Accessed at *https://www.uscis.gov/sites/default/files/document/forms/i-907instr.pdf* (last updated Sep. 30, 2020).

[110] See Instructions for Application for Employment Authorization. Form I–765. OMB No. 1615–0040 Expires July 31, 2022. Accessed at *https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf* (last updated Aug. 25, 2020).

The USCIS Stabilization Act did not change the time burden to complete any of the classifications for Form I–765, nor form fee. The public reporting burden for this collection of information is in the pdf above.

**18254** **Federal Register** / Vol. 87, No. 61 / Wednesday, March 30, 2022 / Rules and Regulations

In Table 36, DHS uses the population estimates from above to calculate the transfer payments for the newly eligible Form I–765 population to DHS. DHS estimates that annual transfer payments from Form I–765 applicants requesting request premium processing using Form I–907 will be $173,370,000 to DHS.

TABLE 36—FEES TO FORM I–765 APPLICANTS REQUESTING PREMIUM PROCESSING USING FORM I–907 BEGINNING IN FY 2022

|  | Newly eligible population | New fees for Form I–907 | Fees to file Form I–907 |
|---|---|---|---|
|  | A | B | C = (B × A) |
| Estimate of Eligible Form I–765 Petitions ........................................................... | 115,580 | $1,500 | $173,370,000 |

Source: USCIS Analysis.

In Table 37, DHS uses the population estimates from above to calculate the transfer payments from the newly eligible Form I–765 population to DHS. DHS estimates that annual transfer payments from Form I–765 applicants requesting request premium processing using Form I–907 will be $81,483,000 to DHS.

TABLE 37—FEES TO FORM I–765 APPLICANTS REQUESTING PREMIUM PROCESSING USING FORM I–907 BEGINNING IN FY 2025

|  | Newly eligible population | New fees for Form I–907 | Fees to file Form I–907 |
|---|---|---|---|
|  | A | B | C = (B × A) |
| Estimate of Eligible Form I–765 Petitions (53%) ................................................... | 54,322 | $1,500 | $81,483,000 |

Source: USCIS Analysis.

(f) Government Costs of This Final Rule

This final rule will require USCIS enhancements to handle the projected volumes of expedited filings without adverse impact to other processing times. The costs of these enhancements are not estimated but are expected to be covered by the fee increases (transfers) from Form I–129 and Form I–140 petitioners/applicants that request premium processing. DHS does not know how much it will cost to add new categories to apply for premium processing, and these costs are unquantified.

The USCIS Stabilization Act prohibits USCIS from making premium processing available if it adversely affects processing times for immigration benefit requests not designated for premium processing or the regular processing of immigration benefit requests so designated. Therefore, USCIS must first raise sufficient funds to ensure it has the staffing and IT resources to expand premium processing availability. In addition to covering the costs of providing expanded premium processing services, the Stabilization Act authorizes USCIS to spend additional revenue collected as a result of this rule on infrastructure improvements in adjudication processes and information services, reducing the number of pending immigration and naturalization benefit requests or otherwise offsetting the cost of providing services.

In accordance with directives outside the scope of this rulemaking, DHS has prioritized and is in the process of expanding electronic filing for all applications and benefit requests. Some of the immigration benefit requests newly designated for premium processing are already filed electronically.[111] Specifically, Forms I–539 and I–765 are both currently available for electronic filing. However, premium processing requests through Form I–907 are currently still paper based. USCIS would need to make systems changes to give users the ability to file premium processing requests with the relevant underlying form that is electronically available. This expansion of electronic filing of the premium processing form is a prerequisite to expanding the availability of premium processing to newly designated immigration benefit requests without adversely affecting processing times for other benefits. DHS must hire and train new staff with revenue from current premium processing requests in order to expedite adjudication of premium processing for the newly eligible population, consistent with the statutory requirement, that other processing times not be adversely affected.

Because the Act authorizes USCIS to use additional revenue for other improvements and, separately, directs USCIS to semi-annually advise appropriate Congressional Committees of progress on a 5-year plan for infrastructure improvements. For the purpose of this Regulatory Impact Analysis, DHS assumes expanded premium processing to start in FY 2022 for the additional Form I–140 categories, as well as certain categories of Form I–539 and Form I–765. DHS also assumes some additional Form I–539 and Form I–765 categories will start in FY 2025 due to the possibility that revenues do not yet exist to cover any potential costs without adversely affecting other benefit's processing times, as directed by Congress.

As expected, the current processing times for the newly designated immigration benefit requests generally exceed the proposed premium processing timeframes by many months. USCIS generally cannot reallocate staff to adjudicate these immigration benefit requests without adversely affecting processing times, for other immigration benefit requests. Therefore, USCIS must hire and train new staff to handle the expanded availability of premium processing, requiring time and resources.

Future revenues from premium processing are expected to exceed future costs, accomplishing Congress' intention in authorizing the expansion

---

[111] Forms Available to File Online *https://www.uscis.gov/file-online/forms-available-to-file-online* (last updated Dec. 12, 2021).

of premium processing. USCIS is unable to hire additional employees in anticipation of a potential surge in upgrades to pending petitions and applications unless the funds are already available, to pay for those employees. If USCIS were to make premium processing available for a high volume of petitions/applications with a significant backlog and without the staff on hand to take appropriate action within the applicable processing timeframe, then USCIS would be required to refund the premium processing fees.

While potential costs to USCIS of expanding premium processing without harm to non-premium processing times are volume-dependent and difficult to quantify, the above projections suggest that the described implementation plan is expected to generate adequate resources to cover the costs required to support the expansion of premium processing without risk to non-premium processing times.

(g) Benefits to the Federal Government

The USCIS Stabilization Act provides specific purposes that the premium processing fees can be used for. Consistent with those permissible purposes, the premium processing fees collected will be used to provide the premium processing services; make infrastructure improvements in adjudications processes and the provision of information and services to immigration and naturalization benefit requestors; and respond to adjudication demands, including by reducing the number of pending immigration and naturalization benefit requests. The primary benefit of this rule to DHS is the opportunity to increase revenue needed to make improvements in adjudication processes. For example,

increases in revenue will allow USCIS to pay for infrastructure improvements, like overhead (such as facility costs, IT equipment and systems, or other expenses) and pay the salaries and benefits of current and new clerical staff, officers, and managers to provide premium processing services and improve agency response to adjudicative demands.

(h) Qualitative Benefits to Petitioners and Applicants

Petitioners of Form I–140 (EB–1, multinational executives and managers and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver) who were previously ineligible for premium processing may be able to have their petitions reviewed quicker. As a result, an adjudicative action may be taken more quickly. This change benefits businesses that previously would have had to wait longer to receive adjudicative action (such as a notice of approval) for an employee. Other benefits that may accrue to beneficiaries of Form I–140 petitions generally include INA section 204(j) portability eligibility, *see* 8 CFR 245.25, priority date retention, *see* 8 CFR 204.5(e), and AC21-based H–1B extension eligibility, *see* 8 CFR 214.2(h)(13)(iii)(E). Benefits also may accrue to H–4 dependents who may become eligible for employment pursuant to the I–140 petition approval, *see* 8 CFR 214.2(h)(9)(iv) and 274a.12(c)(26), and to beneficiaries (principal and derivative) under 8 CFR 204.5(p). and 274a.12(c)(35).

Form I–539 applicants may now receive an adjudicative action on their request for a change of status or extension of stay sooner than before, which may alleviate concern about lapses in their nonimmigrant status.

This will provide students and trainees greater predictability in processing timeframes so that they may change their status and start school or training on time. The greater predictability will also allow applicants to plan international travel as these applicants are considered to have abandoned their application if they leave the United States while their application is pending. In addition, applicants who may work or apply for work authorization pursuant to their status may do so more quickly than they could without premium processing.

Applicants of Form I–765 may now benefit through receipt of an adjudicative decision in a specified timeframe making those applicants eligible to work legally in the United States sooner than they would have previously. This will allow applicants to start working sooner rather than having to wait for the full processing time period before seeking employment. This could result in cost savings to some applicants who would have had to wait to receive wages without premium processing. This could also result in additional tax revenue to be collected by the government if these workers enter the labor force earlier than they would have otherwise.

(i) Final Costs and Transfer Payments of the Final Rule

Undiscounted Costs and Transfer Payments

DHS summarizes the annual transfer payments from Form I–129 and Form I–140 petitioners to DHS. Table 38 details the annual transfer payments of this final rule from the Form I–129 and Form I–140 fee-paying population for FY 2021 to DHS was $409,559,500 in FY 2021, due to the increase in filing fees.

TABLE 38—SUMMARY OF TRANSFER PAYMENTS FROM FEE-PAYING FORM I–129 AND FORM I–140 PETITIONERS TO DHS IN FY 2021

| Description | Increase in transfer payments |
|---|---|
| Form I–129, Petition for a Nonimmigrant Worker | $306,448,000 |
| Form I–140, Immigrant Petition for Alien Workers * | 103,111,500 |
| Annual Transfers (undiscounted) | 409,559,500 |

\* **Note:** Currently designated eligible Form I–140 Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3.

DHS summarizes the estimated annual transfer payments from currently eligible Form I–129 and Form I–140 petitioners to DHS, and the estimated annual transfer payments from newly eligible classification Form I–140 petitioners, Form I–539 applicants, and

Form I–765 applicants to DHS. Table 39 details that the estimated annual transfer payments of this final rule from the currently eligible Form I–129, Form I–140 and newly eligible Form I–140, Form I–539 and Form I–765 fee-paying population to DHS will be $663,722,850

due to the increase in filing fees for year 2 through 4 of this analysis, FY 2022 through FY 2024.

TABLE 39—SUMMARY OF ESTIMATED TOTAL TRANSFER PAYMENTS FROM FEE-PAYING FORM I–129 AND FORM I–140 PETITIONERS AND NEWLY ELIGIBLE FORM I–140 PETITIONERS, FORM I–539 APPLICANTS AND FORM I–765 APPLICANTS TO DHS IN THIS FINAL RULE, FY 2022 THROUGH FY 2024

| Description | Estimated annual transfer payments |
|---|---|
| Form I–129, Petition for a Nonimmigrant Worker | $295,113,180 |
| Form I–140, Immigrant Petition for Alien Workers* | 82,872,920 |
| Newly Eligible Form I–140, Immigrant Petition for Alien Workers,* Transfers | 94,427,500 |
| Form I–539, Application to Extend/Change Nonimmigrant Status, Transfers | 17,939,250 |
| Form I–765, Application for Employment Authorization, Transfers | 173,370,000 |
| Annual Transfers (undiscounted) | 663,722,850 |

\* **Note:** Currently designated eligible Form I–140 Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3.

DHS also presents the total annual transfers from the petitioners and applicants who may be able to request premium processing in FY 2025. The newly eligible applicants and petitioners are those that may be able to file Form I–907 with their Forms I–539 (application to extend/change nonimmigrant status, E–1, E–2, E–3, H–4, L–2, O–3, P–4, or R–2 classifications), and additional classifications of Form I–765. Table 40 details that the total annual transfer of this final rule from newly eligible premium processing requestors will be $192,055,000 to DHS due to the expected additional filing fees for year 5 through 10 of this analysis, FY 2025 through FY 2030.

TABLE 40—SUMMARY OF ESTIMATED TOTAL ANNUAL TRANSFERS IN THIS FINAL RULE AFTER FY 2025

| Filing fees | Estimated annual fees |
|---|---|
| Form I–539, Application to Extend/Change Nonimmigrant Status, Transfers | $110,572,000 |
| Form I–765, Application for Employment Authorization, Transfers | 81,483,000 |
| Total Annual Transfers (undiscounted) | 192,055,000 |

DHS presents the total annual costs to the petitioners and applicants who may now be able to request premium processing beginning in FY 2022. The newly eligible applicants and petitioners may be able to file Form I–907 with their Forms I–539 (application to extend/change nonimmigrant status, F–1, F–2, J–1, J–2, M–1, or M–2 classifications, certain classifications of Form I–765, and I–140 (EB–1, multinational executives and managers, and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver). Table 41 details the total annual costs of this final rule to premium processing requestors of $9,717,505.

TABLE 41—SUMMARY OF ESTIMATED TOTAL ANNUAL COSTS IN THIS FINAL RULE BEGINNING IN FY 2022

| Opportunity costs of time | Estimated annual cost |
|---|---|
| Newly Eligible Form I–140, Immigrant Petition for Alien Workers,* Opportunity Costs. | $2,934,568. |
| Form I–539, Application to Extend/Change Nonimmigrant Status, Opportunity Costs. | $296,648. |
| Form I–765, Application for Employment Authorization, Opportunity Costs | $6,486,289. |
| Government Costs of Providing Premium Processing to Newly Eligible Populations. | Unquantified. |
| Total Annual Costs (undiscounted) | $9,717,505 + Government Costs. |

\* **Note:** Form I–140 EB–1, multinational executives and managers, and EB–2, members of professions with advanced degrees or exceptional ability seeking a national interest waiver.

DHS presents the total annual costs to the petitioners and applicants who may now be able to request premium processing in FY 2025. The newly eligible applicants and petitioners may be able to file Form I–907 with their Forms I–539 (application to extend/change nonimmigrant status, E–1, E–2, E–3, H–4, L–2, O–3, P–4, or R–2 classifications), and additional classifications of Form I–765. Table 42 details the total annual costs of this final rule to premium processing requestors of $7,324,368.

TABLE 42—SUMMARY OF ESTIMATED TOTAL ANNUAL COSTS IN THIS FINAL RULE AFTER FY 2025

| Opportunity costs of time and filing fees | Estimated annual cost |
|---|---|
| Form I–539, Application to Extend/Change Nonimmigrant Status, Costs | $4,275,880. |
| Form I–765, Application for Employment Authorization, Costs | $3,048,488. |

TABLE 42—SUMMARY OF ESTIMATED TOTAL ANNUAL COSTS IN THIS FINAL RULE AFTER FY 2025—Continued

| Opportunity costs of time and filing fees | Estimated annual cost |
|---|---|
| Government Costs of Providing Premium Processing to Newly Eligible Populations. | Unquantified. |
| Total Annual Costs (undiscounted) .................................................................. | $7,324,368 + Government Costs. |

**Discounted Costs and Transfer Payments**

The Continuing Appropriations Act, 2021 and Other Extensions Act, signed into law on October 1, 2020, contained the Emergency Stopgap USCIS Stabilization Act, which set new fees for premium processing of immigration benefit requests that had been designated for premium processing as of August 1, 2020, and expanded USCIS authority to establish and collect new premium processing fees and to use those additional funds for expanded purposes. Table 43 shows the transfer payments from Form I–129 and Form I–140 premium processing requestors to DHS over the 10-year implementation period of this final rule. DHS used the actual transfer payments for FY 2021, and estimated FY 2022 through FY 2030 based on the 5-year annual average populations. The table also shows the estimated annual transfer payments from newly eligible classification Form I–140 petitioners, Form I–539 applicants, and Form I–765 applicants to DHS for some classifications beginning in FY 2022, and for other classifications in FY 2025. DHS estimates the total annualized transfer payments to be $743,160,614 discounted at 3 percent and $729,337,131 discounted at 7 percent.

TABLE 43—TOTAL UNDISCOUNTED AND DISCOUNTED TRANSFER PAYMENTS OF THIS FINAL RULE

| FY | Total estimated transfers | |
|---|---|---|
| | $409,559,500 (undiscounted FY 2021) $663,722,850 (undiscounted FY 2022 through FY 2024) $855,777,850 (undiscounted FY 2025 through FY 2030) | |
| | Discounted at 3 percent | Discounted at 7 percent |
| 2021 ............................................................................................................... | $397,630,583 | $382,765,888 |
| 2022 ............................................................................................................... | 625,622,443 | 579,721,242 |
| 2023 ............................................................................................................... | 607,400,430 | 541,795,553 |
| 2024 ............................................................................................................... | 589,709,156 | 506,350,984 |
| 2025 ............................................................................................................... | 738,201,491 | 610,157,780 |
| 2026 ............................................................................................................... | 716,700,477 | 570,240,916 |
| 2027 ............................................................................................................... | 695,825,705 | 532,935,435 |
| 2028 ............................................................................................................... | 675,558,937 | 498,070,500 |
| 2029 ............................................................................................................... | 655,882,463 | 465,486,449 |
| 2030 ............................................................................................................... | 636,779,091 | 435,034,064 |
| Total ............................................................................................................. | 6,339,310,776 | 5,122,558,811 |
| Annualized Cost ........................................................................................... | 743,160,614 | 729,337,131 |

In this Regulatory Impact Analysis, DHS is projecting a phased implementation and estimates the costs starting in FY 2022 for certain classifications and FY 2025 for additional new classifications, which is explained in greater detail in the "Government Costs" section of this analysis. This phased implementation will allow current premium processing revenue to cover potential costs from the expedited processing of a large volume of new requests Table 44 shows the cost over the 10-year implementation period of this final rule if some of these newly designated immigration benefit requests are available in FY 2022 and some are not available for premium processing until FY 2025. DHS estimates the annualized cost to be $12,744,217 discounted at 3 percent and $12,216,562 discounted at 7 percent. DHS is using a phased implementation plan for the annualized cost estimate for this rule. The costs to the government are not estimated or included in these totals but are expected to be covered by the fee increases (transfers) from currently eligible Form I–129 and Form I–140 petitioners/ applicants that request premium processing.

TABLE 44—TOTAL UNDISCOUNTED AND DISCOUNTED COSTS OF THIS FINAL RULE WITH DELAYED IMPLEMENTATION

[Primary]

| FY | Total estimated costs | |
|---|---|---|
| | $9,717,505 (undiscounted FY 2022 through FY 2024) $17,041,872 (undiscounted FY 2025 through FY 2030) | |
| | Discounted at 3 percent | Discounted at 7 percent |
| 2021 | $0 | $0 |
| 2022 | 9,159,680 | 8,487,645 |
| 2023 | 8,892,893 | 7,932,378 |
| 2024 | 8,633,877 | 7,413,438 |
| 2025 | 14,700,468 | 12,150,619 |
| 2026 | 14,272,300 | 11,355,719 |
| 2027 | 13,856,601 | 10,612,821 |
| 2028 | 13,453,011 | 9,918,525 |
| 2029 | 13,061,176 | 9,269,649 |
| 2030 | 12,680,753 | 8,663,224 |
| Total | 82,024,310 | 61,970,557 |
| Annualized Cost | 12,744,217 | 12,216,562 |

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA), 5 U.S.C. 605(b), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking. This rule is exempt from notice-and-comment rulemaking. Therefore, a regulatory flexibility analysis is not required for this rule.

## D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of SBREFA by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* OIRA has determined that this rule is a major rule as defined by the CRA. DHS has complied with the CRA's reporting requirements and has sent this final rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1).

## E. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal

agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.[112] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule.

In addition, the inflation-adjusted value of $100 million in 1995 is approximately $178 million in 2021 based on the Consumer Price Index for All Urban Consumers ("CPI–U").[113] This final rule does not contain a Federal mandate as the term is defined under UMRA.[114] The requirements of title II of UMRA, therefore, do not

[112] *See* 2 U.S.C. 1532(a).

[113] *See* U.S. Department of Labor, BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," available at *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf* (last visited Jan. 13, 2022). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2021); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(270.970 − 152.383)/152.383] * 100 = (118.587/152.383) * 100 = 0.77821673 * 100 = 77.82 percent = 78 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.78 = $178 million in 2021 dollars.

[114] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

apply, and DHS has not prepared a statement under UMRA.

## F. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

## H. National Environmental Policy Act

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures that DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality

(CEQ) regulations for implementing NEPA.[115]

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement.[116]

The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect.[117] Under DHS NEPA implementing procedures, for an action to be categorically excluded it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[118]

This rule codifies in regulation the USCIS Stabilization Act, which amended USCIS authority to provide premium processing services and to establish and collect premium processing fees for those services and only amends DHS premium processing regulations to codify those fees set by the USCIS Stabilization Act, as well as the pre-existing timeframes for previously designated immigration benefit requests, and to establish new fees and processing timeframes for the new immigration benefit requests that are now designated for premium processing.

DHS has determined that this rule clearly fits within categorical exclusions A3(a) and (b) in Appendix A of the Instruction Manual established for rules of a strictly administrative or procedural nature, and rules that implement, without substantive change, statutory or regulatory requirements.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

*I. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[119] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[120] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy or integrity of the family as an institution.

*J. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). The Information Collection Table 45 below shows the summary of forms that are part of this rulemaking.

TABLE 45—INFORMATION COLLECTION CHANGES ASSOCIATED WITH THIS FINAL RULE

| OMB control No. | Form No. and title | Type of information collection |
|---|---|---|
| 1615–0048 | Form I–907, Request for Premium Processing Service. | Revision of a Currently Approved Collection. |
| 1615–0003 | Form I–539, Application to Extend/Change Nonimmigrant Status. | No material or non-substantive change of a Currently Approved Collection. |
| 1615–0040 | Form I–765, Application for Employment Authorization. | No material or non-substantive change of a Currently Approved Collection. |
| 1615–0009 | Form I–129, Petition for a Nonimmigrant Worker. | No material or non-substantive change to a currently approved collection. |
| 1615–0015 | Form I–140, Immigrant Petition for an Alien Worker. | No material or non-substantive change to a currently approved collection. |

USCIS will revise one information collection in association with this rulemaking action (see table above where the Type of Information Collection column states: "Revision of a Currently Approved Collection"). This final rule will also require non-substantive edits to the forms listed above where the Type of Information Collection column states, "No material/non-substantive change to a currently approved collection." Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

USCIS Form I–907

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of this final rule. All submissions received must include the OMB Control Number 1615–0048 in the body of the letter, the agency name, and Docket No. USCIS–2006–0025. Submit comments via the Federal eRulemaking Portal website at *https://www.regulations.gov* under e-Docket ID number USCIS–2006–0025. To avoid duplicate submissions, please only

---

[115] 40 CFR parts 1500 through 1508.

[116] 40 CFR 1507.3(e)(2)(ii) and 1501.4.

[117] *See* Appendix A, Table 1.

[118] Instruction Manual section V.B(2)(a) through (c).

[119] *See* 5 U.S.C. 601 note.

[120] Public Law 105–277, 112 Stat. 2681 (1998).

submit comments according to the instructions specified in this rule. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for Premium Processing Service.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–907; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the data collected on this form to process a request for premium processing. The form serves the purpose of standardizing requests for premium processing and ensures that basic information required to assess eligibility is provided by the applicant or employer/petitioner.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–907 is 815,773 and the estimated hour burden per response is 0.58 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 473,148 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $202,923,534.

**List of Subjects in 8 CFR Part 106**

Fees, Immigration.

Accordingly, the Department of Homeland Security amends part 106 of

chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 106—USCIS Fee Schedule**

■ 1. The authority citation for part 106 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 115–218; Pub. L. 116–159.

■ 2. Section 106.4 is revised to read as follows:

**§ 106.4   Premium processing service.**

(a) *General.* A person may submit a request to USCIS for premium processing of certain immigration benefit requests, subject to processing timeframes and fees, as described in this section.

(b) *Submitting a request.* A request must be submitted on the form and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to, and in a separate remittance from, other filing fees.

(c) *Designated benefit requests and fee amounts.* Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the INA—$2,500.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA or section 222(a) of the Immigration Act of 1990, Public Law 101–649—$2,500.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA—$1,500.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the INA—$2,500.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the INA—$2,500.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the INA—$2,500.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the INA—$2,500.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the INA—$2,500.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the INA—$1,500.

(10) Application for classification of a nonimmigrant described in section 214(e) of the INA—$2,500.

(11) Petition for classification under section 203(b)(1)(A) of the INA—$2,500.

(12) Petition for classification under section 203(b)(1)(B) of the INA—$2,500.

(13) Petition for classification under section 203(b)(2)(A) of the INA not involving a waiver under section 203(b)(2)(B) of the INA—$2,500.

(14) Petition for classification under section 203(b)(3)(A)(i) of the INA—$2,500.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the INA—$2,500.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the INA—$2,500.

(17) Petition for classification under section 203(b)(1)(C) of the INA—$2,500.

(18) Petition for classification under section 203(b)(2) of the INA involving a waiver under section 203(b)(2)(B) of the INA—$2,500.

(19) Application under section 248 of the INA to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the INA—$1,750.

(20) Application under section 248 of the INA to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the INA, or to extend stay in such classification—$1,750.

(21) Application for employment authorization—$1,500.

(d) *Fee adjustments.* The fee to request premium processing service may be adjusted by notice in the **Federal Register** on a biennial basis based on the percentage by which the Consumer Price Index for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the second preceding calendar year.

(e) *Processing timeframes.* The processing timeframes for a request for premium processing are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the INA—15 days.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA or section 222(a) of the Immigration Act of 1990, Public Law 101–649—15 days.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the INA—15 days.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the INA—15 days.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the INA—15 days.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the INA—15 days.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the INA—15 days.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the INA—15 days.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the INA—15 days.

(10) Application for classification of a nonimmigrant described in section 214(e) of the INA—15 days.

(11) Petition for classification under section 203(b)(1)(A) of the INA—15 days.

(12) Petition for classification under section 203(b)(1)(B) of the INA—15 days.

(13) Petition for classification under section 203(b)(2)(A) of the INA not involving a waiver under section 203(b)(2)(B) of the INA—15 days.

(14) Petition for classification under section 203(b)(3)(A)(i) of the INA—15 days.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the INA—15 days.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the INA—15 days.

(17) Petition for classification under section 203(b)(1)(C) of the INA—45 days.

(18) Petition for classification under section 203(b)(2) of the INA involving a waiver under section 203(b)(2)(B) of the INA—45 days.

(19) Application under section 248 of the INA to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the INA—30 days.

(20) Application under section 248 of the INA to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the INA, or to extend stay in such classification—30 days.

(21) Application for employment authorization—30 days.

(f) *Processing requirements and refunds.* (1) USCIS will issue an approval notice, denial notice, a notice of intent to deny, or a request for evidence within the premium processing timeframe.

(2) Premium processing timeframes will commence:

(i) For those benefits described in paragraphs (e)(1) through (16) of this section, on the date the form prescribed by USCIS, together with the required fee(s), are received by USCIS.

(ii) For those benefits described in paragraphs (e)(17) through (21) of this section, on the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

(3) In the event USCIS issues a notice of intent to deny or a request for evidence, the premium processing timeframe will stop. The premium processing timeframe as specified in paragraphs (e)(1) through (21) of this section will start over on the date that USCIS receives a response to the notice of intent to deny or the request for evidence.

(4) Except as provided in paragraph (f)(5) of this section, USCIS will refund the premium processing service fee but continue to process the case if USCIS does not take adjudicative action described in paragraph (f)(1) of this section within the applicable processing timeframe as required in paragraph (e) of this section.

(5) USCIS may retain the premium processing fee and not take an adjudicative action described in paragraph (f)(1) of this section on the request within the applicable processing timeframe, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the immigration benefit request.

(g) *Availability.* (1) USCIS will announce by its official internet website, currently *http://www.uscis.gov,* the benefit requests described in paragraph (c) of this section for which premium processing may be requested, the dates upon which such availability commences or ends, and any conditions that may apply.

(2) USCIS may suspend the availability of premium processing for immigration benefit requests designated for premium processing if circumstances prevent the completion of processing of a significant number of such requests within the applicable processing timeframe.

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–06742 Filed 3–29–22; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF ENERGY

## 10 CFR Part 430

[EERE–2017–BT–TP–0024]

RIN 1904–AE01

## Energy Conservation Program: Test Procedure for Microwave Ovens

**AGENCY:** Office of Energy Efficiency and Renewable Energy, Department of Energy.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, DOE is amending its test procedure for microwave oven standby mode and off mode to provide additional specifications for the test conditions related to clock displays and network functions. DOE is not prescribing an active mode test procedure for microwave ovens at this time.

**DATES:** The effective date of this rule is April 29, 2022. The final rule changes will be mandatory for product testing starting September 26, 2022. The incorporation by reference of certain other publications listed in this rulemaking was approved by the Director of the Federal Register on December 17, 2012.

**ADDRESSES:** The docket, which includes **Federal Register** notices, public meeting attendee lists and transcripts, comments, and other supporting documents/materials, is available for review at *www.regulations.gov.* All documents in the docket are listed in the *www.regulations.gov* index. However, some documents listed in the index, such as those containing information that is exempt from public disclosure, may not be publicly available.

A link to the docket web page can be found at *www.regulations.gov/ docket?D=EERE-2017-BT-TP-0024.* The docket web page contains instructions on how to access all documents, including public comments, in the docket.

For further information on how to review the docket contact the Appliance and Equipment Standards Program staff at (202) 287–1445 or by email: *ApplianceStandardsQuestions@ ee.doe.gov.*

**FOR FURTHER INFORMATION CONTACT:** Dr. Stephanie Johnson, U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy, Building Technologies Office, EE–2J, 1000 Independence Avenue SW, Washington, DC 20585–0121. Telephone: (202) 287–1943. Email: *MWO2017TP0024@ ee.doe.gov.*

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 211, 212, 214, 216, 223, 235, 236, 240, 244, 245, 245a, 248, 264, 274a, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, and 392**

**[CIS No. 2627–18; DHS Docket No. USCIS–2019–0010]**

**RIN 1615–AC18**

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) proposes to adjust certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full costs of providing adjudication and naturalization services. DHS proposes to adjust USCIS fees by a weighted average increase of 21 percent, add new fees for certain benefit requests, establish multiple fees for petitions for nonimmigrant workers, and limit the number of beneficiaries on certain forms to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners. Adjustments to the fee schedule are necessary to recover the full operating costs associated with administering the nation's immigration benefits system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests, while protecting Americans, securing the homeland, and honoring our country's values. USCIS also is proposing changes to certain other immigration benefit request requirements.

**DATES:** Written comments must be submitted on or before December 16, 2019.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2019–0010, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow this site's instructions for submitting comments.

• *Mail:* Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Mailstop

#2140, Washington, DC 20529–2140. To ensure proper handling, please reference DHS Docket No. USCIS–2019–0010 in your correspondence. Mail must be postmarked by the comment submission deadline. Please note that USCIS cannot accept any comments that are hand delivered or couriered. In addition, USCIS cannot accept mailed comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives.

**FOR FURTHER INFORMATION CONTACT:** Kika M. Scott, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2130, telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Public Participation
II. Executive Summary
  A. Effective Date
III. Basis for the Fee Review
  A. Legal Authority and Guidance
  B. Full Cost Recovery
  C. Immigration Examinations Fee Account
  D. Fee Review History
IV. FY 2019/2020 Immigration Examinations Fee Account Fee Review
  A. USCIS Projected Costs and Revenue
  1. Cost Projections
  a. Use IEFA Fee Collections To Fund Immigration Adjudication Services Performed by ICE
  2. Revenue Projections
  3. Cost and Revenue Differential
  B. Methodology
  1. Volume
  a. Workload Volume and Volume Projection Committee
  b. Fee-Paying Volume
  c. Completion Rates
  C. Fee-Related Issues Noted for Consideration
  1. Accommodating E-Filing and Form Flexibility
  2. Processing Time Outlook
V. Proposed Changes in the FY 2019/2020 Fee Schedule
  A. Clarify Dishonored Fee Check Re-Presentment Requirement
  B. Eliminate $30 Returned Check Fee
  C. Fee Waivers
  1. Background
  2. Cost of Fee Waivers
  3. Proposed Fee Waiver Changes
  4. Limits on Eligible Forms and Categories
  a. Eligibility Requirements
  b. Income Requirements
  d. Subject to INA Section 212(a)(4) and Affidavit of Support Requirements
  e. USCIS Director's Discretionary Fee Waivers and Emergency and Disaster Relief
  f. Conforming Edits and Request for Comments
  D. Fee Exemptions
  1. Form I–765 Exemption Related to Asylees and Refugees
  2. Exemptions Related to International Organization Officers and to Agreement Between the U.S. Government and Other Nations
  3. Exemptions Related to VAWA and to T and U Nonimmigrant Status Categories
  E. Changes to Biometric Services Fee
  1. Incorporating Biometric Activities Into Immigration Benefit Request Fees
  2. Retaining a Separate Biometric Services Fee for Temporary Protective Status
  3. Executive Office for Immigration Review (EOIR) Biometric Services Fee
  F. Form I–485, Application To Register Permanent Residence or Adjust Status
  1. Interim Benefits
  2. Form I–485 Fee for Child Under 14, Filing With Parent
  G. Continuing To Hold Refugee Travel Document Fee to the Department of State Passport Fee
  H. Form I–131A, Carrier Documentation
  I. Separating Form I–129, Petition for a Nonimmigrant Worker, Into Different Forms
  1. Form I–129H1, Petition for Nonimmigrant Worker: H–1B or H–1B1 Classifications
  2. Forms I–129H2A and I–129H2B, Petitions for H–2A and H–2B Workers
  3. Form I–129L, Petition for Nonimmigrant Worker: L Classification
  4. Form I–129O Petition for Nonimmigrant Worker: O Classification
  5. Form I–129E&TN, Application for Nonimmigrant Worker: E and TN Classification
  6. Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification
  7. Commonwealth of the Northern Mariana Islands (CNMI) Fees
  J. Premium Processing
  1. Change Premium Processing Fee by Guidance
  2. Change Calendar Days to Business Days
  3. Actions That End or Restart the 15-Day Period
  4. Expedited Processing for Other Requests
  K. Regional Centers
  L. Secure Mail Initiative
  M. Intercountry Adoptions
  1. Adjustment to Proposed Fees for Certain Intercountry Adoption-Specific Forms
  2. Clarification of Fee Exception for Birth Siblings
  3. Suitability and Eligibility Approval Validity Period
  4. Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600
  a. Suitability & Eligibility Extensions
  b. New Approval Notices
  c. Change of Country
  d. Hague Adoption Convention Transition Cases
  5. Form I–800A, Supplement 3, Request for Action on Approved Form I–800A
  N. Changes to Genealogy Search and Records Requests
  O. Naturalization and Citizenship Related Forms
  1. No Longer Limit the Form N–400 Fee
  2. Remove Form N–400 Reduced Fee
  3. Military Naturalization and Certificates of Citizenship

4. Proposed Changes to Other Naturalization-Related Application and Certificate of Citizenship Application Fees
P. Asylum Fees
1. Fee for Form I–589, Application for Asylum and for Withholding of Removal
2. Fee for the Initial Application for Employment Authorization While an Asylum Claim Is Pending
Q. DACA Renewal Fees
R. Fees Shared by CBP and USCIS
S. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Visas
T. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100 (NACARA))
U. Miscellaneous Technical and Procedural Changes
VI. Proposed Fee Adjustments to IEFA Immigration Benefits
VII. Other Possible Fee Scenarios
   A. Fee Schedule With DACA Renewal Fees
   B. Fee Schedule Without DACA Fees
   C. Fee Schedule With Both DACA Initial and Renewal Fees
VIII. Statutory and Regulatory Requirements
   A. Executive Orders 12866 and 13563
   B. Regulatory Flexibility Act
   C. Unfunded Mandates Reform Act
   D. Congressional Review Act
   E. Executive Order 13132 (Federalism)
   F. Executive Order 12988 (Civil Justice Reform)
   G. Paperwork Reduction Act
   H. National Environmental Policy Act

**List of Acronyms and Abbreviations**

ABC   Activity-Based Costing
ASC   Application Support Center
BLS   Bureau of Labor Statistics
CAT   Convention Against Torture and Other Cruel, Unusual or Degrading Treatment or Punishment
CBP   U.S. Customs and Border Protection
CEQ   Council on Environmental Quality
CFO   Chief Financial Officer
CNMI   Commonwealth of the Northern Mariana Islands
CPI   Consumer Price Index
CPI–U   Consumer Price Index for All Urban Consumers
DACA   Deferred Action for Childhood Arrivals
DHS   Department of Homeland Security
DOD   Department of Defense
DOJ   Department of Justice
DOL   Department of Labor
DOS   Department of State
EAD   Employment Authorization Document
EB–5   Employment-Based Immigrant Visa, Fifth Preference
EIN   Employer Identification Number
EOIR   Executive Office for Immigration Review
FBI   Federal Bureau of Investigation
FY   Fiscal Year
GAO   Government Accountability Office
HHS   U.S. Department of Health and Human Services
IEFA   Immigration Examinations Fee Account
INA   Immigration and Nationality Act of 1952

INS   Immigration and Naturalization Service
IPO   Investor Program Office
IOAA   Independent Offices Appropriations Act
LIFE Act   Legal Immigration Family Equity Act
LPR   Lawful Permanent Resident
NACARA   Nicaraguan Adjustment and Central American Relief Act
NAICS   North American Industry Classification System
NBC   National Benefits Center
NEPA   National Environmental Policy Act
NOID   Notice of Intent to Deny
NPRM   Notice of Proposed Rulemaking
OIG   DHS Office of the Inspector General
OMB   Office of Management and Budget
OPQ   Office of Performance and Quality
PRC   Permanent Resident Card
RAIO   Refugee, Asylum, and International Operations Directorate
RFE   Request for Evidence
RFA   Regulatory Flexibility Act
SAVE   Systematic Alien Verification for Entitlements
SBA   Small Business Administration
TPS   Temporary Protected Status
TVPRA   William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UAC   Unaccompanied Alien Child
UMRA   Unfunded Mandates Reform Act
USCIS   U.S. Citizenship and Immigration Services
VPC   Volume Projection Committee

**I. Public Participation**

DHS invites you to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this proposed rule. Comments providing the most assistance to DHS will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that supports the recommended change.

*Instructions:* All submissions should include the agency name and DHS Docket No. USCIS–2019–0010 for this rulemaking. Providing comments is entirely voluntary. Regardless of how you submit your comment, DHS will post all submissions, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov* and will include any personal information you provide. Because the information you submit will be publicly available, you should consider limiting the amount of personal information in your submission. DHS may withhold information provided in comments from public viewing if it determines that such information is offensive or may affect the privacy of an individual. For additional information, please read the Privacy Act notice available through the link in the footer of *http://www.regulations.gov.*

*Docket:* For access to the docket, go to *http://www.regulations.gov* and enter

this rulemaking's eDocket number: USCIS–2019–0010. The docket includes additional documents that support the analysis contained in this proposed rule to determine the specific fees that are proposed. These documents include:

• Fiscal Year (FY) 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation;

• Regulatory Impact Analysis: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; and

• Small Entity Analysis for Adjustment of the U.S. Citizenship and Immigration Services Fee Schedule notice of proposed rulemaking (NPRM).

You may review these documents on the electronic docket. The software [1] used to compute the immigration benefit request fees [2] and biometric fees [3] is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling (202) 272–1969.[4]

**II. Executive Summary**

DHS proposes to adjust the USCIS fee schedule, which specifies the fee amount charged for each immigration and naturalization benefit request.[5] DHS last adjusted the fee schedule on December 23, 2016, by a weighted average increase of 21 percent. *See* 81 FR 73292 (Oct. 24, 2016) (final rule) (FY 2016/2017 fee rule).

USCIS is primarily funded by immigration and naturalization benefit request fees charged to applicants and

---

[1] USCIS uses commercially available activity-based costing (ABC) software, SAP Business Objects Profitability and Cost Management, to create financial models as described in the supporting documentation.

[2] Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose. *See* 8 CFR 1.2.

[3] DHS uses the terms biometric fees, biometric services fees, and biometric fee synonymously in this rule to describe the cost and process for capturing, storing, or using biometrics.

[4] This proposed rule describes key inputs to the ABC model (for example, budget, workload forecasts, staffing, and completion rates), both here and in the supporting documentation.

[5] For the purposes of this rulemaking, DHS is including all requests funded from the IEFA in the term "benefit request" or "immigration benefit request" although the form or request may not be to request an immigration benefit. For example, Deferred Action for Childhood Arrivals (DACA) is solely an exercise of prosecutorial discretion by DHS. It is not an immigration benefit and would fit under the definition of "benefit request" solely for purpose of this rule. For historic receipts and completion information, see USCIS immigration and citizenship data available at *https://www.uscis.gov/tools/reports-studies/immigration-forms-data.*

petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA). These fee collections fund the cost of fairly and efficiently adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants. The focus of this fee review is the IEFA, which comprised approximately 95 percent of USCIS' total FY 2018 enacted spending authority.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901–03 and Office of Management and Budget (OMB) Circular A–25, USCIS conducts biennial reviews of the non-statutory fees deposited into the IEFA. If necessary, DHS proposes fee adjustments to ensure full cost recovery. USCIS completed a fee review for the FY 2019/2020 biennial period. The primary objective of the fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund the anticipated operating costs associated with administering the nation's legal immigration system. The results indicate that current fee levels are insufficient to recover the full cost of operations funded by the IEFA. Therefore, DHS proposes to adjust USCIS fees by a weighted average increase of 21 percent.

In addition to the requirements of the CFO Act, there are other important reasons for conducting the FY 2019/2020 fee review. The fee review:

• Allows for an assessment of USCIS policy changes, staffing levels, costs, revenue, etc. USCIS evaluates operational requirements and makes informed decisions concerning program scaling, resource planning, and staffing allocations; and

• Provides those served by USCIS with an opportunity to assess the effect of fee changes.

USCIS calculates its fees to recover the full cost of operations funded by the IEFA. These costs do not include limited appropriations provided by Congress. If USCIS continues to operate at current fee levels, it would experience an average annual shortfall (the amount by which expenses exceed revenue) of $1,262.3 million. This projected shortfall poses a risk of degrading USCIS operations funded by the IEFA. As such, DHS proposes to adjust USCIS fees by a 21 percent weighted average increase to ensure full cost recovery. The weighted average

increase is the percentage difference between the current and proposed fees by immigration benefit request.[6] This rule refers to weighted average instead of straight average because the figure represents a more accurate depiction of the overall effect that the proposed fee increase would have on total fee revenue.

The proposed fees would ensure that IEFA revenue covers USCIS' costs associated with adjudicating the immigration benefit requests. The proposed fee schedule accounts for increased costs to adjudicate immigration benefit requests, detect and deter immigration fraud, and thoroughly vet applicants, petitioners, and beneficiaries. DHS also proposes to change fee waiver and fee exemption policies to limit some fee increases. Additionally, DHS proposes to establish multiple fees for different categories of petitions for nonimmigrant workers in response to DHS Office of Inspector General (OIG) audit recommendations to USCIS. DHS proposes a range of fees that vary by the nonimmigrant classification and to limit petitions for nonimmigrant workers to 25 named beneficiaries. DHS believes the proposed fees more accurately reflect the differing burdens of adjudication and enable USCIS to adjudicate these petitions more effectively.

In addition to fee changes, this proposed rule would also make changes in the forms and fee structures used by USCIS. Some of these changes would result in cost savings, and others would result in costs or transfers. For the 10-year implementation period of the proposed rule, DHS estimates the total cost of the rule to applicants/petitioners is $4,730,732,250 undiscounted, $4,035,410,566 discounted at 3-percent, and $3,322,668,371 discounted at 7-percent. DHS estimates the total cost savings (benefits) to the applicants/petitioners is $220,187,510 undiscounted, $187,824,412 discounted at 3-percent, and $154,650,493 discounted at 7-percent. Much of this

total is expected to be transfers between applicants and the federal government or between groups of applicants, rather than new, real resource costs to the U.S. economy.

*A. Effective Date*

The FY 2019/2020 fee review assumes these changes may affect the second year of the biennial period, as FY 2020 began on October 1, 2019.

**III. Basis for the Fee Review**

*A. Legal Authority and Guidance*

DHS issues this proposed rule consistent with INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants")[7] and the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees).

This proposed rule is also consistent with non-statutory guidance on fees, the budget process, and federal accounting principles. *See* OMB Circular A–25, available at *https:// www.whitehouse.gov/wp-content/ uploads/2017/11/Circular-025.pdf,* 58 FR 38142 (July 15, 1993) (establishing federal policy guidance regarding fees assessed by federal agencies for government services); Federal Accounting Standards Advisory Board Handbook, Version 17 (06/18), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4, available at *http:// files.fasab.gov/pdffiles/handbook_sffas_ 4.pdf* (generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (identifying various classifications of costs to be included and recommending various methods of cost assignment); *see also* OMB Circular A–11, Preparation, Submission, and Execution of the

---

[6] USCIS uses weighted average instead of a straight average because of the difference in volume by immigration benefit type and the resulting effect on fee revenue. The 21 percent weighted average increase is a change in the average fee for a form that currently requires a fee compared to the average proposed fee per form. The sum of the current fees multiplied by the projected FY 2019/2020 fee-paying receipts for each immigration benefit type, divided by the total fee-paying receipts = $530. The sum of the proposed fees multiplied by the projected FY 2019/2020 receipts for each immigration benefit type, divided by the fee-paying receipts = $640. There is a $110, or approximately 21 percent difference between the two averages. These averages exclude fees that do not receive cost reallocation, such as the separate biometric services fee and the proposed Form I–821D fee.

---

[7] The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. See 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

Budget, section 20.7(d), (g) (June 29, 2018)), available at *https:// www.whitehouse.gov/wp-content/ uploads/2018/06/a11_2018.pdf* (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees). DHS uses OMB Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in section III.B. of this preamble. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of IEFA costs.[8]

Finally, this rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. FY 2018 appropriations for USCIS provided funding for only the E-Verify employment eligibility verification program. Congress provided E-Verify with $108.9 million for operations and support and $22.7 million for procurement, construction, and improvements. *See* Consolidated Appropriations Act, 2018, Public Law 115–66, div. F, tit. IV (Mar. 21, 2018) (DHS Appropriations Act 2018). The total E-Verify appropriation was $131.5 million in FY 2018. FY 2019 E-Verify appropriations are $109.7 million for operations and support, plus $22.8 million for procurement, construction, and improvements; the latter sum remains available until the end of FY 2021. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019). DHS provides this information only for comparison to the IEFA. E-Verify is not included in this fee review budget because, generally, appropriations, not fees, fund E-Verify. In addition, Congress appropriated $10 million for the Citizenship and Integration Grant Program. *Id.* Together, the total FY 2019 appropriations for USCIS are $142.5 million. For the last several years, USCIS has had the authority to spend no more than $10 million for citizenship grants. The funding for the grant program came from the IEFA fee revenue or a mix of appropriations and fee revenue since 2013.[9] While Congress appropriated

funds for grants in FY 2019, it did not reduce authorized IEFA spending to offset the change. As such, the $10 million previously budgeted for citizenship grants remains in the FY 2019/2020 IEFA fee review budget.

*B. Full Cost Recovery*

Consistent with these authorities and sources, this proposed rule would ensure that USCIS recovers its full operating costs and maintains an adequate level of service in two ways:

First, where possible, the proposed rule would set fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests.[10] DHS generally follows OMB Circular A–25, which "establishes federal policy regarding fees assessed for Government services and for sale or use of Government goods or resources." OMB Circular A–25, *User Charges* (Revised), para. 6, 58 FR 38142 (July 15, 1993). A primary objective of OMB Circular A–25 is to ensure that federal agencies recover the full cost of providing specific services to users and associated costs. *See id.,* para. 5. Full costs include, but are not limited to, an appropriate share of:

• Direct and indirect personnel costs, including salaries and fringe benefits, such as medical insurance and retirement;

• Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment;

• Management and supervisory costs; and

• Costs of enforcement, collection, research, establishment of standards, and regulation. *Id.*

Secondly, this proposed rule would set fees at a level sufficient to fund overall requirements and general operations related to USCIS IEFA programs that are not associated with specific statutory fees or funded by annual appropriations, benefit requests fees that are statutorily set at a level below full cost, or benefit requests that are fee exempt, in whole or in part. As noted, Congress has provided that USCIS may set fees for providing adjudication and naturalization services at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. *See* INA section 286(m), 8 U.S.C. 1356(m).[11] DHS interprets this statutory fee-setting authority, including the authorization to collect "full costs" for providing "adjudication and naturalization services," as granting DHS broad discretion to include costs other than OMB Circular A–25 generally provides. *See OMB Circular A–25,* para. 6d1; INA section 286(m), 8 U.S.C. 1356(m). In short, DHS may charge fees at a level that will ensure recovery of all direct and indirect costs associated with providing immigration adjudication and naturalization services.[12]

Consistent with the historical position, this proposed rule would set fees at a level that ensures recovery of the full operating costs of USCIS, the entity within DHS that provides almost all immigration adjudication and naturalization services. *See* Homeland Security Act of 2002, Public Law 107–

---

[8] OMB Circulars A–25 and A–11 provide nonbinding internal Executive Branch direction for the development of fee schedules under the Independent Offices Appropriations Act (IOAA) and appropriations requests, respectively. *See* 5 CFR 1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS used the activity-based costing (ABC) methodology supported in Circulars A–25 and A–11 to develop the proposed fee schedule.

[9] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113–6) and FY 2014 (Pub. L. 113–76). USCIS did not receive appropriations for the immigrant integration

grants program in FY 2015, FY 2016, FY 2017, and FY 2018.

[10] Section 286(m) of the Act, 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception than the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA). *See Seafarers Int'l Union of N. Am. v. U.S. Coast Guard,* 81 F.3d 179 (D.C. Cir. 1996) (IOAA provides that expenses incurred by agency to serve some independent public interest cannot be included in cost basis for a user fee, although agency is not prohibited from charging applicant full cost of services rendered to applicant, which also results in some incidental public benefits). Congress initially enacted immigration fee authority under the IOAA. *See Ayuda, Inc. v. Attorney General,* 848 F.2d 1297 (D.C. Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into the separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations, and broadened the fee-setting authority. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Public law 101–515, sec. 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting IEFA fees that would not be considered in setting fees under the IOAA. *See* 72 FR at 29866–7.

[11] Congress has provided separate, but similar, authority for establishing USCIS genealogy program fees. *See* section 286(t) of the Act, 8 U.S.C. 1356(t). The statute requires that genealogy program fees be deposited into the Immigration Examinations Fee Account and that the fees for such research and information services may be set at a level that will ensure the recovery of the full costs of providing all such services. *Id.* The methodology for calculating the genealogy program fees is discussed in a separate section later in this preamble.

[12] Congress has not defined either term with any degree of specificity for purposes of subsections (m) and (n). *See, e.g., Barahona v. Napolitano,* No. 10–1574, 2011 WL 4840716, at *6–8 (S.D.N.Y. Oct. 11, 2011) ("While the term 'full costs' appears self-explanatory, section 286(m) contains both silence and ambiguity concerning the precise scope that 'full costs' entails in this context."); *see also King v. Burwell,* 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.' So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132–33 (2000))).

296, sec. 451, 116 Stat. 2142 (Nov. 26, 2002) (6 U.S.C. 271). The statute authorizes recovery of the full costs of providing immigration adjudication and naturalization services. Congress has historically relied on this authority to support the vast majority of USCIS programs and operations conducted as part of adjudication and naturalization service delivery. This conclusion is supported by Congress' historical appropriations to USCIS. The agency receives only a small annual appropriation. USCIS must use other means to fund, as a matter of both discretion and necessity, all other operations.

Certain functions, including the Systematic Alien Verification for Entitlements (SAVE) program [13] and the Office of Citizenship,[14] which USCIS has administered since DHS's inception, are integral parts of fulfilling USCIS' statutory responsibility to provide immigration adjudication and naturalization services. They are not associated with specific fees examined during the biennial fee review, but may be funded by the IEFA. Similarly, when a filing fee for an immigration benefit request such as Temporary Protected Status (TPS) is capped by statute at $50 and does not cover the cost of adjudicating these benefit requests, DHS may recover the difference with fees charged to other immigration benefit requests. *See* INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B); 8 CFR 103.7(b)(1)(i)(NN); proposed 8 CFR 106.2(a)(37)(i). Finally, when DHS exempts certain benefit requests from filing or visa fees, such as, for example, applications or petitions from victims who assist law enforcement in the investigation or prosecution of acts of human trafficking (T nonimmigrant status) or certain other crimes (U nonimmigrant status), USCIS recovers the cost of processing those fee-exempt visas with fees charged to other applicants and petitioners. *See, e.g.,* 8 CFR 103.7(b)(1)(i)(UU)–(VV); proposed 8 CFR 106.2(a)(46)–(47).

In short, the full cost of USCIS operations cannot be as directly correlated or connected to a specific fee as OMB Circular A–25 advises. Nonetheless, DHS follows OMB Circular A–25 to the extent appropriate, including directing that fees should be set to recover the costs of an agency's services in their entirety and that full costs are determined based upon the best available records of the agency. *Id.* DHS applies the discretion provided in INA section 286(m), 8 U.S.C. 1356(m), to: (1) Use Activity-Based Costing (ABC) to establish a model for assigning costs to specific benefit requests in a manner reasonably consistent with OMB Circular A–25; (2) distribute costs that are not attributed to, or driven by, specific adjudication and naturalization services;[15] and (3) make additional adjustments to effectuate specific policy objectives.[16]

By approving DHS's annual appropriations, which provide limited appropriated funds to USCIS, Congress has consistently recognized that the "full" costs of operating USCIS, including SAVE and the Office of Citizenship, less any appropriated funding, is the appropriate cost basis for establishing IEFA fees. Nevertheless, in each biennial fee review, DHS adds refinements to its determination of immigration benefit fees, including the level by which fees match directly assignable, associated, and indirect costs.

### C. Immigration Examinations Fee Account

USCIS manages three fee accounts:

• The IEFA (includes premium processing revenues),[17]

• The Fraud Prevention and Detection Account,[18] and

• The H–1B Nonimmigrant Petitioner Account.[19]

In 1988, Congress established the IEFA in the Treasury of the United States. *See* Public Law 100–459, sec. 209, 102 Stat. 2186 (Oct. 1, 1988) (codified as amended at INA sections 286(m) and (n), 8 U.S.C. 1356(m) and (n)). Fees deposited into the IEFA fund the provision of immigration adjudication and naturalization services. In subsequent legislation, Congress directed that the IEFA also fund the full costs of providing all such services, including services provided to immigrants at no charge. *See* Public Law 101–515, sec. 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990). Consequently, the immigration benefit fees were increased to recover these additional costs. *See* 59 FR 30520 (June 14, 1994). The IEFA comprised approximately 95 percent of total funding for USCIS in FY 2018 and is the focus of this proposed rule.

The Fraud Prevention and Detection Account and H–1B Nonimmigrant Petitioner Account are both funded by statutorily set fees. DHS has no authority to adjust fees for these accounts.

### D. Fee Review History

Most recently, DHS published a revised USCIS fee schedule in its FY 2016/2017 fee rule. *See* 81 FR 73292 (Oct. 24, 2016).[20] The rule and associated fees became effective on December 23, 2016. DHS adjusted the USCIS immigration benefits fee schedule for the first time in more than 6 years, increasing fees by a weighted average of 21 percent. The fee schedule adjustment recovered all projected costs for FY 2016–2017, including the Refugee, Asylum, and International Operations Directorate (RAIO), SAVE, and the Office of Citizenship. *See* 81 FR 26911 and 73293.

The fee schedule had been adjusted previously as well. Before the creation of DHS, the Department of Justice (DOJ) Immigration and Naturalization Service (INS)[21] adjusted fees incrementally in 1994. *See* 59 FR 30520 (June 14, 1994).

---

[13] USCIS funds the SAVE program by user fees and IEFA funds, as Congress has not provided any direct appropriated funds for the program since FY 2007. SAVE provides an "immigration adjudication . . . service" under INA sections 286(m) and (n) to Federal, state and local agencies who require immigration adjudication information in administering their benefits.

[14] The Homeland Security Act created the Office of Citizenship at the same time as several other mission essential USCIS offices, such as those for legal, budget, and policy. Like those offices, the Office of Citizenship has always been considered an essential part of the "adjudication and naturalization services" USCIS provides under sections 286(m) and (n) of the INA. An integral part of providing such services, as Congress recognized in creating the Citizenship office in section 451(f) of the Homeland Security Act (6 U.S.C. 271(f)), includes providing information to potential applicants for naturalization regarding the process of naturalization and related activities.

[15] The ABC model distributes indirect costs. Costs that are not assigned to specific fee-paying immigration benefit requests are reallocated to other fee-paying immigration benefit requests outside the model. For example, the model determines the direct and indirect costs for refugee workload. The costs associated with processing the refugee workload are reallocated outside the model to fee-paying immigration benefit requests.

[16] DHS may reasonably adjust fees based on value judgments and public policy reasons where a rational basis for the methodology is propounded in the rulemaking. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

[17] INA sec. 286(m), (n) & (u); 8 U.S.C. 1356(m), (n) & (u).

[18] INA secs. 214(c)(12)–(13), 286(v); 8 U.S.C. 1184(c)(12)–(13) 1356(v).

[19] INA secs. 214(c)(9), (11), 286(s); 8 U.S.C. 1184(c)(9), (11), 1356(s).

[20] The phrase "FY 2016/2017 fee rule," as used in this proposed rule, encompasses the proposed rule, final rule, fee review, and all supporting documentation associated with the regulations effective as of December 23, 2016.

[21] The Homeland Security Act of 2002 abolished the INS and transferred the INS's immigration administration and enforcement responsibilities from DOJ to DHS. The INS's immigration and citizenship services functions were specifically transferred to the Bureau of Citizenship and Immigration Services, later renamed U.S. Citizenship and Immigration Services. *See* Public Law 107–296, 451 (6 U.S.C. 271).

DOJ conducted a comprehensive fee review using activity-based costing (ABC) and adjusted most IEFA fees in 1998. *See* 63 FR 1775 (Jan. 12, 1998) (proposed rule); 63 FR 43604 (Aug. 14, 1998) (final rule). DOJ adjusted fees for small volume workloads in 2000. *See* 64 FR 26698 (May 17, 1999) (proposed rule); 64 FR 69883 (Dec. 15, 1999) (final rule). DOJ adjusted fees by inflation in 2002. *See* 66 FR 65811 (Dec. 21, 2001). Following the creation of DHS, it adjusted fees in 2004 and 2005. *See* 69 FR 20528 (Apr. 15, 2004); 70 FR 56182 (Sept. 26, 2005). After those incremental changes, DHS published a comprehensive FY 2007 fee rule. *See* 72 FR 29851 (May 30, 2007). DHS further amended USCIS fees in the FY 2010/2011 fee rule. *See* 75 CFR 58962 (Sept. 24, 2010). This rule removed the costs of the RAIO Directorate, SAVE, and the Office of Citizenship from the fee schedule, in anticipation of appropriations from Congress that DHS requested. *See* 75 FR 58961, 58966. These resources did not fully materialize, requiring USCIS to use other fee revenue to support the programs in the FY 2016/2017 fee rule. *See* 81 FR 26910–12.

The supporting documentation accompanying this proposed rule in the rulemaking docket at *www.regulations.gov* contains a historical fee schedule that shows the immigration benefit fee history since October 2005.

Table 1 summarizes the IEFA and biometric services fee schedule that took effect on December 23, 2016. DHS is proposing to change the current fee schedule as a result of the FY 2019/2020 fee review. The table excludes statutory fees that DHS cannot adjust or can only adjust by inflation.

### TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES

| Form No.[22] | Title | Fee |
|---|---|---|
| G–1041 | Genealogy Index Search Request | $65 |
| G–1041A | Genealogy Records Request | 65 |
| I–90 | Application to Replace Permanent Resident Card | 455 |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 445 |
| I–129/129CW | Petition for a Nonimmigrant Worker | 460 |
| I–129F | Petition for Alien Fiancé(e) | 535 |
| I–130 | Petition for Alien Relative | 535 |
| I–131[23] | Application for Travel Document | 575 |
| I–131A | Application for Carrier Documentation | 575 |
| I–140 | Immigrant Petition for Alien Worker | 700 |
| I–191 | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)[24] | 930 |
| I–192 | Application for Advance Permission to Enter as Nonimmigrant | [25] 930/585 |
| I–193 | Application for Waiver of Passport and/or Visa | 585 |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 930 |
| I–290B | Notice of Appeal or Motion | 675 |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant | 435 |
| I–485 | Application to Register Permanent Residence or Adjust Status | 1,140 |
| I–485 | Application to Register Permanent Residence or Adjust Status (certain applicants under the age of 14 years)[26]. | 750 |
| I–526 | Immigrant Petition by Alien Entrepreneur | 3,675 |
| I–539 | Application to Extend/Change Nonimmigrant Status | 370 |
| I–600 | Petition to Classify Orphan as an Immediate Relative | 775 |
| I–600A | Application for Advance Processing of an Orphan Petition | 775 |
| I–601 | Application for Waiver of Grounds of Inadmissibility | 930 |
| I–601A | Application for Provisional Unlawful Presence Waiver | 630 |
| I–612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended). | 930 |
| I–687 | Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | 1,130 |
| I–690 | Application for Waiver of Grounds of Inadmissibility | 715 |
| I–694 | Notice of Appeal of Decision under Section 210 or 245A | 890 |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA)[27] | 1,670 |
| I–751 | Petition to Remove the Conditions of Residence | 595 |
| I–765 | Application for Employment Authorization | 410 |
| I–800 | Petition to Classify Convention Adoptee as an Immediate Relative | 775 |
| I–800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | 775 |
| I–800A Supp. 3 | Request for Action on Approved Form I–800A | 385 |
| I–817 | Application for Family Unity Benefits | 600 |
| I–824 | Application for Action on an Approved Application or Petition | 465 |
| I–829 | Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,750 |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal[28] | 285/570 |
| I–910 | Application for Civil Surgeon Designation | 785 |
| I–924 | Application for Regional Center Designation Under the Immigrant Investor Program | 17,795 |
| I–924A | Annual Certification of Regional Center | 3,035 |
| I–929 | Petition for Qualifying Family Member of a U–1 Nonimmigrant | 230 |
| I–941 | Application for Entrepreneur Parole[29] | 1,200 |
| N–300 | Application to File Declaration of Intention | 270 |
| N–336 | Request for a Hearing on a Decision in Naturalization Proceedings | 700 |
| N–400 | Application for Naturalization | 640 |
| N–400 | Application for Naturalization (Reduced Fee) | 320 |
| N–470 | Application to Preserve Residence for Naturalization Purposes | 355 |
| N–565 | Application for Replacement Naturalization/Citizenship Document | 555 |
| N–600 | Application for Certification of Citizenship | 1,170 |
| N–600K | Application for Citizenship and Issuance of Certificate Under Section 322 | 1,170 |
| | USCIS Immigrant Fee | 220 |

TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES—Continued

| Form No.[22] | Title | Fee |
|---|---|---|
| | Biometric Services Fee ...................................................................................................................................... | 85 |

## IV. FY 2019/2020 Immigration Examinations Fee Account Fee Review

### A. USCIS Projected Costs and Revenue

The primary objective of the fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund anticipated operating costs associated with administering USCIS' role in the nation's legal immigration system. USCIS examines its recent budget history, service levels, and immigration trends to forecast costs, revenue, and operational metrics. This data helps USCIS identify the difference between anticipated costs and revenue as well as calculate proposed fees. The FY 2019/2020 fee review encompasses three core elements:
• Cost projections;
• Revenue projections; and
• Cost and revenue differential (the difference between cost and revenue projections).

### 1. Cost Projections

USCIS' FY 2018 annual operating plan (AOP) is the basis for the FY 2019/2020 cost projections. These estimates reflect the funding necessary to maintain an adequate level of operations and do not include program increases for new development, modernization, or acquisition. Cost projections also include funding for enhancements that facilitate the processing of additional workload. Examples of items in the cost projections include:
• *Transfer of funding to U.S. Immigration and Customs Enforcement ($207.6 million in FY 2019 and FY 2020).* This item is explained in section IV.A.1.a., Use IEFA Fee Collections to Fund Immigration Adjudication Services Performed by ICE.
• *Pay and benefits adjustments for on-board staff ($280.2 million in FY 2019 and $89.8 million in FY 2020).* Pay adjustments account for cost of living adjustments, within-grade pay increases, and the annualization of prior-year vacancies. The government-wide cost of living adjustment rate assumption is 2.0 percent for both FY 2019 and FY 2020. Within-grade pay increases are routine raises awarded to general schedule employees, based on length of service and performance at an acceptable level of competence. Annualization of prior-year vacancies account for a full-year cost of salaries and benefits for positions that were on-board for only a portion of FY 2018.
• *Pay and benefits for new staff ($116.7 million in FY 2019 and $128.8 million in FY 2020).* Projected FY 2019 and FY 2020 workloads exceed current workload capacity, thereby requiring additional staff. The FY 2018 Staffing Allocation Model [30] and new staff enhancement requests yield an additional 2,098 positions necessary to meet adjudicative processing goals and other USCIS mission objectives, including administrative functions. In total, the FY 2016/2017 fee rule assumed a total authorized staffing level of 14,543, whereas estimates used for this proposed rule reflect 20,958. This represents an increase of 6,415 or 44 percent. This additional staffing requirement reflects the facts that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown.
• *Net additional costs ($150.8 million in FY 2019 and $6.2 million in FY 2020).* In addition to non-pay general expenses associated with on-boarding the new staff described above, these costs include other enhancement requests such as secure mail shipping for permanent resident cards, increased background investigations, headquarters consolidation, etc. The additional resources are to sustain current operations necessary for achieving USCIS' strategic goals. USCIS considered all cost data that was available at the time it conducted this fee review, including data on cost-saving measures. It does not account for recent cost-savings initiatives for which data were not yet available at the time of this fee review. However, USCIS intends to fully evaluate and capture any relevant cost-savings data during its next biennial fee review.

Table 2 is a crosswalk summary of the FY 2018 AOP to the FY 2019/2020 cost projections. It accounts for pay and non-pay general expenses for on-board and new staff, other resource requirements or adjustments, and the removal of costs associated with temporary programs such as TPS. FY 2019 cost projections are 20 percent higher than FY 2018 costs. FY 2020 cost projections are 5 percent higher than FY 2019 cost projections. The FY 2019/2020 average annual budget is $4,670.5 million. This represents a $1,632.5 million, or 54 percent, increase over the FY 2016/2017 fee rule average annual budget of $3,038.0 million. The primary cost driver is payroll, which accounts for 30.9 percent of the increase from the prior fee rule average annual budget.

[22] Form, when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in a paper format or an electronic format as prescribed by USCIS on its official internet website. The term "Form" followed by an immigration form number includes an approved electronic equivalent of such form as made available by USCIS on its official internet website. *See* 8 CFR 1.2 and 299.1. The word "form" is used in this final rule in both the specific and general sense.

[23] As described in the NPRM, the United States' obligations under the 1967 Protocol relating to the Status of Refugees (incorporating by reference Article 28 of the 1951 Convention relating to the Status of Refugees) guide the Application for Travel Document fees for a Refugee Travel Document. The USCIS ABC model does not set these fees. *See* 8 CFR 103.7(b)(1)(i)(M)(*2*) and (*3*).

[24] Form I–191 was previously titled Application for Advance Permission to Return to Unrelinquished Domicile. *See* 8 CFR 103.7(b)(1)(i)(O).

[25] The Form I–192 fee remained $585 when filed with and processed by CBP. *See* 8 CFR 103.7(b)(1)(i)(P).

[26] This reduced fee is applied to "an applicant under the age of 14 years when [the application] is (i) submitted concurrently with the Form I–485 of a parent, (ii) the applicant is seeking to adjust status as a derivative of his or her parent, and (iii) the child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." 8 CFR 103.7(b)(1)(i)(U)(2).

[27] The form's name in the current fee provision at 8 CFR 103.7(b)(1)(i)(GG) is "Application to Adjust Status from Temporary to Permanent Resident (Under section 245A of Public Law 99–603)."

[28] Currently there are two USCIS fees for Form I–881: $285 for individuals and $570 for families. *See* 8 CFR 103.7(b)(1)(i)(QQ)(*1*). DOJ's Executive Office for Immigration Review (EOIR) has a separate $165 fee.

[29] USCIS excluded Form I–941, Application for Entrepreneur Parole, from the FY 2019/2020 fee review. As such, it will not appear in tables for workload, fee-paying volume, or elsewhere in this NPRM. DHS published a separate NPRM that proposed to terminate the program. *See* 83 FR 24415 (June 28, 2018). DHS does not propose any changes to this fee.

[30] The Staffing Allocation Model is a Microsoft Excel-based workforce planning tool that estimates the staffing requirements necessary to adjudicate workload receipt (for example, applications and petitions) forecasts at target processing times.

The funding transfer to ICE accounts for about 6 percentage points (*i.e.,* 28.5 percent) of the 21 percent total weighted average fee increase.

### TABLE 2—COST PROJECTIONS
[FY 2019/2020 fee review IEFA non-premium budget (in millions)]

| | |
|---|---:|
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585.6 |
| Plus: Spending Adjustments | 217.2 |
| Total Adjusted FY 2018 IEFA Non-Premium Budget | 3,802.8 |
| Plus: Transfer to ICE | 207.6 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 280.2 |
| Plus: Net Additional Costs | 267.5 |
| Total Adjusted FY 2019 IEFA Non-Premium Budget | 4,558.1 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 218.6 |
| Plus: Net Additional Costs | 6.2 |
| Total Adjusted FY 2020 IEFA Non-Premium Budget | 4,782.9 |
| FY 2019/2020 Average Non-Premium Budget | 4,670.5 |

a. Use IEFA Fee Collections To Fund Immigration Adjudication Services Performed by ICE

The President's FY 2019 and FY 2020 budget requests include a $207.6 million transfer of IEFA funds to ICE. DHS proposes to use USCIS fees before to recover the full amount of this proposed transfer.[31]

DHS may use fees deposited into the IEFA to fund the expenses of providing immigration adjudication and naturalization services and the cost of collection, safeguarding, and accounting for the IEFA funds. *See* INA section 286(m), 8 U.S.C. 1356(m). Funds deposited into the IEFA are primarily used by USCIS, but they may also be used to reimburse other DHS components, including ICE, for qualifying costs. DHS proposes to recover, via USCIS' fee schedule, the full amount of the proposed transfer from past budget requests. *See* INA section 286(n); 8 U.S.C. 1356(n). DHS will transfer funds annually from the IEFA to ICE's appropriations so as to reimburse those appropriations for the cost of providing qualifying services, which will increase the level of service provided beyond current levels.

DHS "immigration adjudication and naturalization services" do not end with a decision to approve or deny a request.

USCIS and ICE, as components of DHS, share a responsibility to ensure the integrity of the U.S. immigration system beyond the moment of adjudication. DHS believes that ICE investigations of potential immigration fraud perpetrated by individuals and entities who have sought immigration benefits before USCIS and efforts to enforce applicable immigration law and regulations with regard to such individuals and entities constitute direct support of immigration adjudication and naturalization services. Thus, the IEFA may fund ICE enforcement and support positions, as well as ancillary costs, to the extent that such positions and costs support immigration adjudication and naturalization services. ICE HSI could use funds transferred from the IEFA to support investigations of immigration benefit fraud via Document and Benefit Fraud Task Forces (DBFTFs), Operation Janus, and the HSI National Lead Development Center. DBFTFs facilitate information sharing and coordination among ICE, USCIS, other federal entities, as well as state and local law enforcement for the purpose of investigating document and benefit fraud in support of immigration and naturalization services. Operation Janus is a joint initiative including USCIS and ICE to ensure that individuals who have a previous order of removal have not and will not be able to fraudulently obtain immigration benefits under an alternate identity, thus ensuring the integrity of the immigration adjudication and naturalization services provided by USCIS. The HSI National Lead Development Center will receive referrals and review investigative leads as part of investigations into immigration fraud. Considering what constitutes immigration adjudication and naturalization services and

collection, safeguarding, and accounting expenses under INA sections 286(m), (n), 8 U.S.C. 1356(m), (n), adjudication and naturalization services includes all costs for work related to determining or adjudicating whether applicants may receive such services. The cost of the services provided includes the cost of any investigatory work necessary to adjudicate applications or provide services, including investigations of fraud. Therefore, these activities constitute support of immigration adjudication and naturalization services.

Moreover, while transfers between appropriations are generally prohibited absent statutory authority, INA section 286(n), 8 U.S.C. 1356(n), expressly authorizes the use of the fees deposited in the IEFA to reimburse any appropriation for expenses in providing immigration adjudication and naturalization services. DHS has determined that the IEFA may be used to reimburse appropriations that fund enforcement and support positions to the extent that such positions support adjudication and naturalization services. Therefore, DHS proposes to recover the costs through the USCIS fee schedule. To see how the ICE transfer affects proposed fees, see section VII. Other Possible Fee Scenarios in this preamble.[32]

The aforementioned cost projections serve as the basis for the additional ICE revenue of $207.6 million covered by this rule. DHS recognizes that the

---

[31] For additional information on ICE's FY 2019 costs, see pages 46 and 254–263 (called ICE—O&S–20 and ICE—IEFA–1–10, respectively, in the presentation) of the DHS ICE FY 2019 Congressional Justification located at *https:// www.dhs.gov/sites/default/files/publications/ U.S.%20Immigration% 20and%20Customs%20Enforcement.pdf.* For information of ICE's FY 2020 costs, see pages 261– 270 (called ICE—IEFA–3) of the DHS ICE FY 2020 Congressional Justification located at *https:// www.dhs.gov/sites/default/files/publications/19_ 0318_MGMT_CBJ-Immigration-Customs- Enforcement_0.pdf.*

[32] The Administration has notified Congress of its intention to shift the cost of these ICE activities from annual appropriations to IEFA. See previous footnotes. If Congress rejects the Administration's proposal, or if DHS does not ultimately shift these costs from annual appropriations to IEFA, USCIS will not include this use of these funds in the fee model for the final rule.

$207.6 million previously identified in budget requests may propose to transfer more funding to ICE than is needed to fund activities that are reimbursable through the IEFA. DHS continues to study which ICE costs would be reimbursable through the IEFA, and may announce more precise cost estimates prior to publication of a final rule. To the extent that such cost estimates are lower than the $207.6 million figure currently accounted for in the rule, fee levels would be revised downward.[33]

DHS proposes to establish all USCIS fees at a level necessary to recover the full amount of this proposed transfer. However, in the final rule, DHS may establish a separate surcharge for the amount necessary to recover the estimated funds to be transferred to ICE. The surcharge would be separately codified, but collected along with the fee for each benefit request for which a fee is established in the final rule. DHS encourages comments on the method used to recover the ICE adjudication and naturalization service costs.

2. Revenue Projections

USCIS' revenue projections are informed by internal immigration benefit request receipt forecasts and 12 months of historical actual fee-paying receipts to account for fee-waiver/fee-exemption trends. USCIS uses actual revenue collections from June 2016 to May 2017 as a basis for the fee-paying assumptions in the FY 2019/2020 revenue projections.

USCIS' current fee schedule is expected to yield $3.41 billion of average annual revenue during the FY 2019/2020 biennial period. This represents a $0.93 billion, or 38 percent, increase from the FY 2016/2017 fee rule projection of $2.48 billion. *See* 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted 5,870,989 total workload receipts and 5,140,415 fee-paying receipts. *See* 81 FR 26923–4. However, the FY 2019/2020 fee review forecasts 9,336,015 total workload receipts and 7,789,861 fee-paying receipts. This represents a 59 percent increase to workload and 52 percent increase to fee-paying receipt volume assumptions. Despite the increase in projected revenue above the FY 2016/2017 fee rule projection, this additional revenue is insufficient to recover USCIS' increased costs, as discussed in the next section.

3. Cost and Revenue Differential

USCIS identifies the difference between anticipated costs and revenue, assuming no changes in fees, to determine whether the existing fee schedule is sufficient to recover full costs or whether a fee adjustment is necessary. Table 3 summarizes the projected cost and revenue differential. Summary values may vary due to rounding.

TABLE 3—IEFA NON-PREMIUM COST AND REVENUE COMPARISON

[Dollars in millions]

| Fiscal year | FY 2019 | FY 2020 | FY 2019/2020 average |
|---|---|---|---|
| Non-Premium Revenue | $3,408.2 | $3,408.2 | $3,408.2 |
| Non-Premium Budget | 4,558.1 | 4,782.9 | 4,670.5 |
| Difference | −1,149.9 | −1,374.7 | −1,262.3 |

Historically, and for the purpose of the fee review, USCIS reports costs and revenue as an average over the 2-year period. In Table 3, FY 2019 and 2020 costs and revenue are averaged to determine the projected amounts to be recovered through this rule. Based on current immigration benefit and biometric services fees and projected volumes, USCIS expects fees to generate $3.41 billion in average annual revenue in FY 2019 and FY 2020. For the same period, the average annual cost of processing those immigration benefit requests and providing biometric services is $4.67 billion. This yields an average annual deficit of $1.26 billion. In other words, USCIS expects projected FY 2019/2020 total operating costs to exceed projected total revenue.

Because projected costs are higher than projected revenue, USCIS has several options to address the shortfall:

1. Reduce projected costs;
2. Use carryover funds or revenue from the recovery of prior year obligations; or
3. Adjust fees with notice and comment rulemaking.

DHS believes that reducing the projected costs to equal the projected revenue would risk degrading USCIS operations funded by the IEFA. However, DHS did assess several possible fee review budgets. For example, the effect of the $207.6 million transfer from USCIS to ICE is shown below in section VII. Other Possible Fee Scenarios. Projected carryover is negative in both FY 2019 and FY 2020 and thus eliminating this transfer is insufficient to bridge the gap between projected costs and revenue.[34] Likewise, USCIS estimates that recovered revenue from prior year obligations will be insufficient. USCIS estimates that it may recover $91.9 million in FY 2019 and $94.2 million in FY 2020 for the non-premium IEFA. Therefore, DHS proposes to increase revenue through the fee adjustments described in detail throughout this rule.

*B. Methodology*

When conducting a fee review, USCIS reviews its recent operating environment to determine the appropriate method to assign costs to immigration benefit requests, including biometric services. USCIS uses activity-based costing (ABC), a business management tool that assigns resource costs to operational activities and then to products and/or services. USCIS uses commercially available ABC software to create financial models. These models determine the cost of each major step towards processing immigration benefit requests and providing biometric services. This is the same methodology that USCIS used in the last five fee reviews, and it is the basis for the current fee structure. Following the FY 2016/2017 fee rule, USCIS identified several key methodology changes to improve the accuracy of its ABC model.

[33] The possible effects of a different level of ICE costs to be funded by USCIS benefit request fees is discussed further in VII. Other Possible Fee Scenarios.

[34] In the docket for this proposed rule, the FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation has more information. See the section titled IEFA Non-Premium Carryover Projections & Targets.

Please refer to the Methodology Changes Implemented in the FY 2019/2020 Fee Review section of the Supporting Documentation located in the docket of this rule.

### 1. Volume

USCIS uses two types of volume data in the fee review: Workload and fee-paying volume. Workload volume is a projection of the total number of immigration benefit requests that USCIS will receive in a fiscal year. Fee-paying volume is a projection of the number of applicants, petitioners, and requestors that will pay a fee when filing requests for immigration benefits. Not all applicants, petitioners, or requestors pay a fee. Those applicants, petitioners, and requestors for whom USCIS grants a fee waiver or to whom an exemption applies are represented in the workload volume, but not the fee-paying volume.

Applicants, petitioners, and requestors who pay a fee fund the cost of processing requests for fee-waived or fee-exempt immigration benefit requests.

#### a. Workload Volume and Volume Projection Committee

USCIS uses statistical modeling, immigration receipt data from the last 15 years, and internal assessments of future developments (such as annualized data prepared by the USCIS Office of Performance and Quality) to develop workload volume projections. All relevant USCIS directorates and program offices are represented on the USCIS Volume Projection Committee (VPC). The VPC forecasts USCIS workload volume using subject matter expertise from various directorates and program offices, including the Service Centers, National Benefits Center, RAIO,

and regional, district, and field offices. Input from these offices helps refine the volume projections. The VPC reviews short- and long-term volume trends. In most cases, time series models provide volume projections by form type. Time series models use historical receipts data to determine patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. When possible, models are also used to determine relationships between different benefit request types. Workload volume is a key element used to determine the USCIS resources needed to process benefit requests within established adjudicative processing goals. It is also the primary cost driver for assigning activity costs to immigration benefits and biometric services [35] in the USCIS ABC model.

TABLE 4—WORKLOAD VOLUME COMPARISON

| Immigration benefit request | Average annual FY 2016/2017 projected workload receipts | Average annual FY 2019/2020 projected workload receipts | Difference |
|---|---|---|---|
| I–90 Application to Replace Permanent Resident Card | 810,707 | 767,020 | −43,687 |
| I–102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 10,143 | 7,700 | −2,443 |
| I–129 Petition for a Nonimmigrant Worker Subtotal | 432,156 | 553,266 | 121,110 |
| I–129H1 | N/A | 423,304 | N/A |
| I–129H2A—Named Beneficiaries | N/A | 3,962 | N/A |
| I–129H2B—Named Beneficiaries | N/A | 2,256 | N/A |
| I–129L | N/A | 41,502 | N/A |
| I–129O | N/A | 25,456 | N/A |
| I–129CW, I–129E&TN, and I–129MISC | N/A | 43,491 | N/A |
| I–129H2A—Unnamed Beneficiaries | N/A | 8,981 | N/A |
| I–129H2B—Unnamed Beneficiaries | N/A | 4,315 | N/A |
| I–129F Petition for Alien Fiancé(e) | 45,351 | 52,000 | 6,649 |
| I–130 Petition for Alien Relative | 911,349 | 984,107 | 72,758 |
| I–131/I–131A Application for Travel Document Subtotal | 256,622 | 480,834 | 224,212 |
| I–131 Application for Travel Document | N/A | 449,073 | N/A |
| I–131 Refugee Travel Document for an individual age 16 or older | N/A | 20,714 | N/A |
| I–131 Refugee Travel Document for a child under the age of 16 | N/A | 1,248 | N/A |
| I–131A Application for Carrier Documentation | N/A | 9,799 | N/A |
| I–140 Immigrant Petition for Alien Worker | 88,602 | 161,000 | 72,398 |
| I–290B Notice of Appeal or Motion | 24,706 | 24,050 | −656 |
| I–360 Petition for Amerasian, Widow(er) or Special Immigrant | 26,428 | 42,873 | 16,445 |
| I–485 Application to Register Permanent Residence or Adjust Status | 593,717 | 632,500 | 38,783 |
| I–526 Immigrant Petition by Alien Entrepreneur | 14,673 | 14,000 | −673 |
| I–539 Application to Extend/Change Nonimmigrant Status | 172,001 | 231,000 | 58,999 |
| I–589 Application for Asylum and for Withholding of Removal | N/A | 163,000 | N/A |
| I–600/I–800/800A Intercountry Adoption-Related Petitions and Applications | 15,781 | 11,776 | −4,005 |
| I–600A/I–600 Supplement 3 Request for Action on Approved Form I–600A/I–600 | N/A | 1,500 | N/A |
| I–601A Provisional Unlawful Presence Waiver | 42,724 | 67,000 | 24,276 |
| I–687 Application for Status as a Temporary Resident | 18 | 0 | −18 |
| I–690 Application for Waiver of Grounds of Inadmissibility | 21 | 30 | 9 |
| I–694 Notice of Appeal of Decision | 39 | 10 | −29 |
| I–698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 91 | 100 | 9 |
| I–751 Petition to Remove Conditions on Residence on Permanent Resident Status | 173,000 | 156,000 | −17,000 |
| I–765 Application for Employment Authorization | 747,825 | 2,851,000 | 2,103,175 |
| I–800A Supplement 3 Request for Action on Approved Form I–800A | 1,585 | 1,500 | −85 |
| I–817 Application for Family Unity Benefits | 2,069 | 1,400 | −669 |
| I–821D Consideration of Deferred Action for Childhood Arrivals (Renewal) | N/A | 396,000 | N/A |
| I–824 Application for Action on an Approved Application or Petition | 10,921 | 11,303 | 382 |
| I–829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,562 | 3,500 | −62 |
| I–881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | N/A | 340 | N/A |
| I–910 Application for Civil Surgeon Designation | 609 | 530 | −79 |

[35] As fully explained later in this preamble, DHS is removing biometric services as a separate fee in this rule, except as associated with an Application for Temporary Protected Status and certain other

programs. Accordingly, N/A is included in the average annual FY 2019/2020 projected workload receipts and difference columns for biometrics in Table 4.

TABLE 4—WORKLOAD VOLUME COMPARISON—Continued

| Immigration benefit request | Average annual FY 2016/2017 projected workload receipts | Average annual FY 2019/2020 projected workload receipts | Difference |
|---|---|---|---|
| I–924 Application For Regional Center Designation Under the Immigrant Investor Program | 400 | 520 | 120 |
| I–924A Annual Certification of Regional Center | 882 | 950 | 68 |
| I–929 Petition for Qualifying Family Member of a U–1 Nonimmigrant | 575 | 2,200 | 1,625 |
| N–300 Application to File Declaration of Intention | 41 | 4 | −37 |
| N–336 Request for a Hearing on a Decision in Naturalization Proceedings | 4,666 | 4,700 | 34 |
| N–400 Application for Naturalization | 830,673 | 913,500 | 82,827 |
| N–470 Application to Preserve Residence for Naturalization Purposes | 362 | 110 | −252 |
| N–565 Application for Replacement Naturalization/Citizenship Document | 28,914 | 28,000 | −914 |
| N–600/600K Application for Certificate of Citizenship Subtotal | 69,723 | 64,000 | −5,723 |
| N–600 Application for Certificate of Citizenship | N/A | 61,000 | N/A |
| N–600K Application for Citizenship and Issuance of Certificate Under Section 322 | N/A | 3,000 | N/A |
| Inadmissibility Waiver Subtotal | 71,527 | 105,492 | 33,965 |
| I–191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | N/A | 260 | N/A |
| I–192 Application for Advance Permission to Enter as Nonimmigrant | N/A | 69,557 | N/A |
| I–193 Application for Waiver of Passport and/or Visa | N/A | 7,763 | N/A |
| I–212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | N/A | 6,132 | N/A |
| I–601 Application for Waiver of Ground of Excludability | N/A | 21,000 | N/A |
| I–612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | N/A | 780 | N/A |
| USCIS Immigrant Fee | 472,511 | 594,000 | 121,489 |
| G–1041 Genealogy Index Search Request | 3,605 | 4,650 | 1,045 |
| G–1041A Genealogy Records Request | 2,410 | 2,550 | 140 |
| Subtotal | 5,870,989 | 9,336,015 | 3,508,026 |
| Biometric Services | 3,028,254 | N/A | N/A |
| Total | 8,899,243 | 9,336,015 | 479,772 |

b. Fee-Paying Volume

USCIS uses historical revenue and receipt data to determine the number of individuals who paid a fee for each immigration benefit request. Total revenue for an immigration benefit request is divided by its fee to determine the number of fee-paying immigration benefit requests. Fee-paying receipts are compared to the total number of receipts (workload volume) to determine a fee-paying percentage for each immigration benefit request. When appropriate, projected fee-paying volume is adjusted to reflect filing trends and anticipated policy changes. These projections include the effects of changes that DHS is proposing in this rule to fee waiver policies, the discontinuation of free interim benefits while an Application to Register Permanent Residence or Adjust Status is pending, as well as the introduction of fees for Form I–589, Application for Asylum and for Withholding of Removal and Form I–182D, Consideration of Deferred Action for Childhood Arrivals (Renewal).[36] Some immigration benefit request volumes include estimated fee-paying volumes from CBP.[37]

TABLE 5—FEE-PAYING PROJECTION COMPARISON

| Immigration benefit request | Average annual FY 2016/2017 fee-paying projection | Average annual FY 2019/2020 fee-paying projection | Difference |
|---|---|---|---|
| I–90 Application to Replace Permanent Resident Card | 718,163 | 682,722 | −35,442 |
| I–102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 9,499 | 7,155 | −2,344 |
| I–129 Petition for a Nonimmigrant Worker Subtotal | 427,778 | 553,266 | 125,488 |
| I–129H1 | N/A | 423,304 | N/A |
| I–129H2A— | | | |
| Named Beneficiaries | N/A | 3,962 | N/A |
| I–129H2B—Named Beneficiaries | N/A | 2,256 | N/A |
| I–129L | N/A | 41,502 | N/A |
| I–129O | N/A | 25,456 | N/A |
| I–129CW, I–129E&TN, and I–129MISC | N/A | 43,491 | N/A |
| I–129H2A—Unnamed Beneficiaries | N/A | 8,981 | N/A |
| I–129H2B—Unnamed Beneficiaries | N/A | 4,315 | N/A |
| I–129F Petition for Alien Fiancé(e) | 39,277 | 47,923 | 8,646 |
| I–130 Petition for Alien Relative | 907,512 | 976,398 | 68,886 |
| I–131/I–131A Application for Travel Document Subtotal | 194,461 | 322,829 | 128,368 |
| I–131 Application for Travel Document | N/A | 291,068 | N/A |
| I–131 Refugee Travel Document for an individual age 16 or older | N/A | 20,714 | N/A |
| I–131 Refugee Travel Document for a child under the age of 16 | N/A | 1,248 | N/A |
| I–131A Application for Carrier Documentation | N/A | 9,799 | N/A |
| I–140 Immigrant Petition for Alien Worker | 88,602 | 161,000 | 72,398 |
| I–290B Notice of Appeal or Motion | 20,955 | 20,705 | −250 |

---

[36] See section V.C. Fee Waivers of this preamble for more information on the proposed changes.

[37] See section V.R. Fees Shared by CBP and USCIS of this preamble for more information.

TABLE 5—FEE-PAYING PROJECTION COMPARISON—Continued

| Immigration benefit request | Average annual FY 2016/2017 fee-paying projection | Average annual FY 2019/2020 fee-paying projection | Difference |
|---|---|---|---|
| I–360 Petition for Amerasian, Widow(er) or Special Immigrant ................................. | 8,961 | 4,224 | −4,737 |
| I–485 Application to Register Permanent Residence or Adjust Status ....................... | 473,336 | 510,926 | 37,590 |
| I–526 Immigrant Petition by Alien Entrepreneur ........................................................ | 14,673 | 14,000 | −673 |
| I–539 Application to Extend/Change Nonimmigrant Status ........................................ | 171,616 | 223,903 | 52,287 |
| I–589 Application for Asylum and for Withholding of Removal .................................... | N/A | 163,000 | N/A |
| I–600/600A; I–800/800A Orphan Petitions and Applications ...................................... | 5,811 | 6,142 | 331 |
| I–600A/I–600 Supplement 3 Request for Action on Approved Form I–600A/I–600 .... | N/A | 768 | N/A |
| I–601A Provisional Unlawful Presence Waiver ........................................................... | 42,724 | 67,000 | 24,276 |
| I–687 Application for Status as a Temporary Resident .............................................. | 0 | 0 | 0 |
| I–690 Application for Waiver of Grounds of Inadmissibility ........................................ | 17 | 25 | 8 |
| I–694 Notice of Appeal of Decision ........................................................................... | 39 | 10 | −29 |
| I–698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) ........................................................................................ | 91 | 100 | 9 |
| I–751 Petition to Remove Conditions on Residence ................................................... | 162,533 | 148,918 | −13,615 |
| I–765 Application for Employment Authorization ......................................................... | 397,954 | 1,846,491 | 1,448,537 |
| I–800A Supplement 3 Request for Action on Approved Form I–800A ........................ | 746 | 768 | 22 |
| I–817 Application for Family Unity Benefits ............................................................... | 1,988 | 1,368 | −620 |
| I–821D Consideration of Deferred Action for Childhood Arrivals (Renewal) .............. | N/A | 396,000 | N/A |
| I–824 Application for Action on an Approved Application or Petition .......................... | 10,828 | 11,147 | 319 |
| I–829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ......................................................................................................................... | 3,562 | 3,500 | −62 |
| I–881 Application for Suspension of Deportation or Special Rule Cancellation of Removal ...................................................................................................................... | N/A | 340 | N/A |
| I–910 Application for Civil Surgeon Designation ....................................................... | 609 | 530 | −79 |
| I–924 Application For Regional Center Designation Under the Immigrant Investor Program ................................................................................................................... | 400 | 520 | 120 |
| I–924A Annual Certification of Regional Center ........................................................ | 882 | 950 | 68 |
| I–929 Petition for Qualifying Family Member of a U–1 Nonimmigrant ........................ | 257 | 1012.5 | 756 |
| N–300 Application to File Declaration of Intention ..................................................... | 36 | 4 | −32 |
| N–336 Request for a Hearing on a Decision in Naturalization Proceedings .............. | 3,593 | 3,873 | 280 |
| N–400 Application for Naturalization .......................................................................... | 631,655 | 811,730 | 180,075 |
| N–470 Application to Preserve Residence for Naturalization purposes ..................... | 360 | 107 | −253 |
| N–565 Application for Replacement Naturalization/Citizenship Document ................. | 23,491 | 23,458 | −34 |
| N–600/600K Naturalization Certificate Application Subtotal ....................................... | 46,870 | 49,826 | 2,956 |
| N–600 Application for Certificate of Citizenship .................................................... | N/A | 46,857 | N/A |
| N–600K Application for Citizenship and Issuance of Certificate Under Section 322 ........................................................................................................................ | N/A | 2,970 | N/A |
| Inadmissibility Waiver Subtotal ................................................................................. | 41,902 | 58,098 | 16,196 |
| I–191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) ....................................................................................... | N/A | 260 | N/A |
| I–192 Application for Advance Permission to Enter as Nonimmigrant ................... | N/A | 22,780 | N/A |
| I–193 Application for Waiver of Passport and/or Visa ........................................... | N/A | 7,672 | N/A |
| I–212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal ....................................................................................... | N/A | 6,085 | N/A |
| I–601 Application for Waiver of Ground of Excludability ........................................ | N/A | 20,711 | N/A |
| I–612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) ............................................................. | N/A | 590 | N/A |
| USCIS Immigrant Fee .................................................................................................. | 472,511 | 572,425 | 99,914 |
| G–1041 Genealogy Index Search Request .................................................................. | 3,605 | 4,650 | 1,045 |
| G–1041A Genealogy Records Request ........................................................................ | 2,410 | 2,550 | 140 |
| Subtotal ............................................................................................................... | 4,929,707 | 7,789,861 | 2,860,154 |
| Biometric Services ...................................................................................................... | 2,598,639 | N/A | N/A |
| Grand Totals ........................................................................................................ | 7,528,346 | 7,789,861 | 261,515 |

## 2. Completion Rates

USCIS completion rates are the average hours per adjudication of an immigration benefit request. They identify the adjudicative time required to complete (render a decision on) specific immigration benefit requests. The completion rate for each benefit type represents an average. Completion rates reflect what is termed "touch time," or the time an employee with adjudicative responsibilities actually handles the case. This does not reflect "queue time," or time spent waiting, for example, for additional evidence or supervisory approval. Completion rates do not reflect the total processing time applicants, petitioners, and requestors can expect to wait for a decision on their case after USCIS accepts it.

USCIS requires employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. Adjudication hours are divided by the number of completions for the same time period to determine an average completion rate. In addition to using this data to determine fees, completion rates help determine appropriate staffing allocations to handle projected workload. The USCIS Office of Performance and Quality (OPQ), field offices, and regional management scrutinize the data to ensure accuracy. When data is inconsistent and/or anomalies are identified, the OPQ contacts the reporting office to resolve and make necessary adjustments. USCIS has confidence in the data, given the consistency of reporting over the last several years. The continual availability of the information enables USCIS to update cost information for each fee review.

### TABLE 6—COMPLETION RATES PER BENEFIT REQUEST

[Projected adjudication hours/completion]

| Immigration benefit request | Service-wide completion rate |
|---|---|
| I–90 Application to Replace Permanent Resident Card | 0.19 |
| I–102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 0.77 |
| I–129H1 | 1.10 |
| I–129H2A—Named Beneficiaries | 1.92 |
| I–129H2B—Named Beneficiaries | 2.00 |
| I–129L | 2.23 |
| I–129O | 1.90 |
| I–129CW, I–129E&TN, and I–129MISC | 1.62 |
| I–129H2A—Unnamed Beneficiaries | 0.50 |
| I–129H2B—Unnamed Beneficiaries | 0.58 |
| I–129F Petition for Alien Fiancé(e) | 0.67 |
| I–130 Petition for Alien Relative | 0.86 |
| I–131 Application for Travel Document | 0.25 |
| I–131 Refugee Travel Document for an individual age 16 or older | 0.27 |
| I–131 Refugee Travel Document for a child under the age of 16 | 0.25 |
| I–131A Application for Carrier Documentation | 1.01 |
| I–140 Immigrant Petition for Alien Worker | 1.46 |
| I–290B Notice of Appeal or Motion | 1.32 |
| I–360 Petition for Amerasian, Widow(er) or Special Immigrant | 1.65 |
| I–485 Application to Register Permanent Residence or Adjust Status | 1.63 |
| I–526 Immigrant Petition by Alien Entrepreneur | 8.65 |
| I–539 Application to Extend/Change Nonimmigrant Status | 0.51 |
| I–589 Application for Asylum and for Withholding of Removal | 4.10 |
| I–600/600A; I–800/800A Orphan Petitions and Applications | 2.22 |
| I–600A/I–600 Supplement 3 Request for Action on Approved Form I–600A/I–600 | 1.90 |
| I–601A Provisional Unlawful Presence Waiver | 2.64 |
| I–687 Application for Status as a Temporary Resident | N/A |
| I–690 Application for Waiver of Grounds of Inadmissibility | 1.05 |
| I–694 Notice of Appeal of Decision | 1.10 |
| I–698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 3.76 |
| I–751 Petition to Remove Conditions on Residence | 1.30 |
| I–765 Application for Employment Authorization | 0.20 |
| I–800A Supplement 3 Request for Action on Approved Form I–800A | 1.90 |
| I–821D Consideration of Deferred Action for Childhood Arrivals (Renewal) | 0.12 |
| I–817 Application for Family Unity Benefits | 0.91 |
| I–824 Application for Action on an Approved Application or Petition | 0.78 |
| I–829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 8.15 |
| I–881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | 2.00 |
| I–910 Application for Civil Surgeon Designation | 1.81 |
| I–924 Application For Regional Center Designation Under the Immigrant Investor Program | 34.95 |
| I–924A Annual Certification of Regional Center | 10.00 |
| I–929 Petition for Qualifying Family Member of a U–1 Nonimmigrant | 2.60 |
| N–300 Application to File Declaration of Intention | 2.68 |
| N–336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) | 3.05 |
| N–400 Application for Naturalization | 1.57 |
| N–470 Application to Preserve Residence for Naturalization purposes | 4.02 |
| N–565 Application for Replacement Naturalization/Citizenship Document | 0.89 |
| N–600 Application for Certificate of Citizenship | 1.08 |
| N–600K Application for Citizenship and Issuance of Certificate Under Section 322 | 1.57 |
| I–191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 2.10 |
| I–192 Application for Advance Permission to Enter as Nonimmigrant | 0.97 |
| I–193 Application for Waiver of Passport and/or Visa | 0.30 |
| I–212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 2.71 |
| I–601 Application for Waiver of Ground of Excludability | 3.29 |
| I–612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 0.53 |
| USCIS Immigrant Fee | N/A |

USCIS does not list completion rates for the following immigration benefit requests, forms, or other services, due to the special nature of their processing as explained below:

• *USCIS Immigrant Fees.* USCIS does not adjudicate applications for an immigrant visa. Rather, individuals located outside of the United States apply with a Department of State (DOS) overseas consular officer for an immigrant visa. If DOS issues the immigrant visa, the individual may apply with a U.S. Customs and Border Protection (CBP) officer at a port of entry for admission to the United States as an immigrant. This fee represents USCIS' costs to create and maintain files and to issue permanent resident cards to individuals who go through this process. *See* 8 CFR 103.7(b)(1)(i)(D), proposed 8 CFR 106.2(c)(3).

• *Refugee Processing and Other Forms Exempt from Fees.* These immigration benefit requests may use completion rates to determine staffing

levels. However, USCIS does not list completion rates for these workloads because these are exempt from paying a fee:

- ○ Credible Fear;
- ○ Reasonable Fear;
- ○ Registration for Classification as a Refugee, Form I–590;
- ○ Application By Refugee For Waiver of Grounds of Excludability, Form I–602;
- ○ Refugee/Asylee Relative Petition, Form I–730;
- ○ Application for T Nonimmigrant Status, Form I–914;
- ○ Petition for U Nonimmigrant Status, Form I–918; and
- ○ Application for Posthumous Citizenship, Form N–644.

- *Temporary Protected Status (TPS).* DHS proposes not to rely on TPS fee revenue for recovering USCIS' operational expenses, consistent with previous fee rules. *See* 81 FR 73312–3. TPS designations may be terminated under current law or may cease due to a reduction in the eligible population. Termination of the program, in whole or in part, after the fees are set would result in unrealized revenue and a commensurate budgetary shortfall. After the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice and comment rulemaking. Thus, temporary programs subject to termination based on changed circumstances are generally not included in the fee setting model. As such, USCIS excludes the completion rate for Form I–821, Application for Temporary Protected Status, from discussion in this rule because DHS cannot change the initial statutory registration fee permitted under section 244(c)(1)(B) of the INA or establish a re-registration fee for TPS. USCIS will continue to charge the biometric services fee, where required, and the fee for an employment authorization document, as permitted under 8 U.S.C. 1254b.

### 3. Assessing Proposed Fees

Historically, as a matter of policy, DHS uses its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at recommended ABC model output levels.[38] Previous proposed IEFA fee schedules referred to limited fee increases as "low volume reallocation" or "cost reallocation."[39]

Despite the two separate phrases, the calculation for both is the same. In the FY 2016/2017 fee rule, USCIS calculated an 8 percent limited fee increase for certain immigration benefit request fees.[40] For this proposed rule, USCIS calculated a limited fee increase of 5 percent using the same methodology as the previous rule.[41]

As such, DHS proposes that the following immigration benefit request fees are limited to a 5 percent increase above the current fees:

- Form I–290B, Notice of Appeal or Motion.
- Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant.
- Form I–600, Petition to Classify Orphan as an Immediate Relative.
- Form I–600A, Application for Advance Processing of an Orphan Petition.
- Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600.[42]
- Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative.
- Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country.
- Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

The proposed increase of approximately 5 percent may vary slightly due to rounding. DHS rounds all IEFA fees to the nearest $5 increment.

In order for the proposed fee schedule to recover full cost, DHS proposes that other fees be increased to offset the projected cost of the 5 percent limited fee increase. Similarly, DHS proposes that other fees increase to offset a projected increase in workloads that are exempt from paying fees or that are capped at a fee less than what the ABC model indicates that they should pay. In this proposed rule, DHS refers to the process of recovering full cost for

workloads without fees or the shifting of cost burdens among benefit request fees as a result of other policy decisions as cost reallocation.

Some proposed fees are significantly higher than the current fees. In some cases, this is because DHS proposes to not limit those fee increases, as it has done in the past, for policy reasons. Previous fee schedules limited the increase for certain immigration benefit requests, such as most naturalization related forms.[43] *See* 81 FR 26915–6. In this proposed rule, DHS proposes to not limit the fee increase to 5 percent for the following immigration benefit requests:

- Form I–601A, Provisional Unlawful Presence Waiver.
- Form I–765, Application for Employment Authorization.
- Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant.
- Form N–300, Application to File Declaration of Intention.
- Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings.
- Form N–400, Application for Naturalization.
- Form N–470, Application to Preserve Residence for Naturalization Purposes.

If DHS were to propose limited fee increases for these immigration benefit requests, then other proposed fees would have to increase to recover full cost. For example, if DHS were to propose limited fee increases for all of the immigration benefit request fees that were limited in the previous fee rule, then some proposed fees could increase by as much as $1,185, with the average of those changes being an increase of $12 per immigration benefit request. The rationale for some of these proposed changes is further discussed later in the preamble. See section V. Proposed Changes in the FY 2019/2020 Fee Schedule.

Public commenters generally do not support fee increases. A fee decrease may be more popular. Generally, there are several potential ways to reduce IEFA fees:

1. Reduce projected costs or use other funding sources (such as appropriations, other fee accounts, carryover, or recoveries of prior year obligations);

2. Increase projected fee-paying receipts; or

3. Reduce completion rates.

As discussed earlier, reducing the projected costs to equal the projected revenue would risk degrading USCIS

---

[38] See footnotes 15 and 16.

[39] The FY 2016/2017 proposed fee schedule used both phrases. *See* 81 FR 26915. The FY 2010/2011 and FY 2008/2009 proposed fee schedules used the phrase "low volume reallocation." *See* 75 FR 33461 and 72 FR 4910, respectively.

[40] The 8 percent increase was the percentage difference between the current fees and the model output before reallocation, weighted by fee-paying volume. *See* 81 FR 73296. The model output is a projected fee-paying unit cost from the ABC model. It is projected total cost divided by projected fee-paying receipts. While each fee review may calculate a different percentage, the formula for the calculation remains the same.

[41] In the docket for this proposed rule, the FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation has more information. See the Cost Reallocation column of Appendix Table 3: Proposed Fees by Immigration Benefit Request.

[42] DHS explains the purpose of this new proposed form in section V.M.3 of this preamble. Request for Action on Approved Application for Advance Processing of an Orphan Petition or Petition to Classify Orphan as an Immediate Relative, Form I–600A/I–600 Supplement 3.

[43] *See* V.O. Naturalization (discussion on the proposed naturalization fees).

operations funded by the IEFA.[44] Likewise, other funding sources are insufficient or unavailable.[45] Some of the proposed fees would be even higher without an increase to projected fee-paying receipts.[46] As discussed in the previous section, completion rates are based on reported adjudication hours and completions. USCIS does not believe the level of effort for future adjudications will decrease.

## C. Fee-Related Issues Noted for Consideration

DHS identifies a number of issues that do not affect the FY 2019/2020 fee review but do merit some discussion. DHS does not propose any changes related to the issues discussed in this section. USCIS may discuss these issues in future biennial fee reviews or in conjunction with other USCIS fee rules. DHS welcomes comments on all facets of the FY 2019/2020 fee review, this proposed rule, and USCIS fees in general, regardless of whether changes have been proposed here.

### 1. Accommodating E-Filing and Form Flexibility

DHS attempts, as it did in the FY 2016/2017 fee rule, to propose fees based on form titles instead of form numbers to avoid prescribing fees in a manner that could undermine the conversion of USCIS to electronic processing. *See* proposed 8 CFR 106. Form numbers are included for informational purposes, but are not intended to restrict the ability of USCIS to collect a fee for a benefit request that falls within the parameters of the adjudication for which the fee is published. As USCIS modernizes its processes and systems to allow more applicants, petitioners, and requestors to file applications online, the agency may collect fees for immigration benefit requests that do not have a form number or do not have the same form number as described in regulations. This could occur, for example, if USCIS developed an online version of a request that individuals often submit with applications for employment authorization. In this situation, USCIS may find it best to consolidate the two requests without separately labelling the different sections related to the relevant form numbers. DHS would still collect the required fee for the underlying immigration benefit request as well as the request for employment

authorization, but the actual online request would not necessarily contain form numbers corresponding to each separate request.

Similarly, USCIS may determine that efficiency would be improved by breaking a paper form into separate paper forms. For instance, USCIS could separate Form I–131, Application for Travel Document, into a separate form and form number for advance parole, humanitarian parole, refugee travel documents, or reentry permits. In this example, USCIS could continue to charge the current Form I–131 fee. This structure permits USCIS to change forms more easily without having to perform a new fee review each time the agency chooses to do so.

### 2. Processing Time Outlook

As discussed in the Cost and Revenue Differential section of this preamble, USCIS anticipates having insufficient resources to process its projected workload. USCIS estimates that it will take several years before USCIS backlogs decrease measurably. USCIS experienced an unexpectedly high volume of immigration benefit requests in FY 2016 and FY 2017. In FY 2018, USCIS implemented measures to reduce the backlog, such as adjudicating asylum workload on a last-in-first-out basis.[47] As explained in the Cost Projections section of this preamble, projected workloads for FY 2019 and FY 2020 exceed current workload capacity, thereby requiring additional staff.

A number of uncertainties remain that impede efficient case processing and timely decision making. One uncertainty is how to define the specific elements of the screening and national security vetting that USCIS will employ. This new framework will likely involve greater use of social media screenings and more in-person interviews of applicants for certain immigration benefits.[48] In addition, USCIS believes that the growing complexity of the case adjudication process over the past few years has also contributed to higher completion rates. For example, it takes more time for officers to adjudicate each case. (See section IV.B.2. Completion Rates.)

Through this rule, USCIS expects to collect sufficient fee revenue to fund additional staff that will support FY 2019/2020 workload projections as well as perform more national security vetting and screening. While USCIS is committed to ensuring the integrity of the immigration system and safeguarding national security, it is also committed to reducing processing times and the current backlog, without sacrificing proper vetting checks, by identifying ways to increase efficiency, ensuring the successful transition from paper-based to electronic processing, and increasing adjudicative resources. For example, USCIS is transitioning non-adjudicative work from adjudicators to other staff, centralizing the delivery of information services through the USCIS Contact Center, and leveraging electronic processing and automation.

Applicants, petitioners, and requestors can track the status of their immigration benefit requests online by using their receipt number or by creating an online account at *https:// uscis.gov/casestatus*. They may also make an "outside normal processing time" case inquiry for any benefit request pending longer than the time listed for the high end of the range by submitting a service request online at *https://egov.uscis.gov/e-request/Intro.do* or calling the USCIS Contact Center at 1–800–375–5283.

USCIS also expects to improve the user experience as it continues to transition to online filing and electronic processing of immigration applications and petitions. With the new person-centric electronic case processing environment, USCIS will possess the data necessary to provide near-real-time processing updates on the status and time period lapsed between actions for each individual case. This enables greater transparency to the public on how long it will take to process each case as it moves from stage to stage (for example, biometrics collection, interview, and decision).

USCIS is committed to providing applicants, petitioners, and requestors with relevant information when they need it. As a result, USCIS is transforming how it calculates and posts processing time information in an effort to improve the timeliness of such postings, but more importantly to achieve greater transparency. USCIS will continue to provide processing times in an accurate and transparent fashion.

---

[44] See section IV.A.3., Costs and Revenue Differential, of this preamble.

[45] See *id.* and section III. Basis for the Fee Review.

[46] See section V.C.3., Proposed Fee Waiver Changes, for more information.

[47] U.S. Citizenship and Immigration Services, *USCIS to Take Action to Address Asylum Backlog,* available at *https://www.uscis.gov/news-releases/uscis-take-action-address-asylum-backlog* (last reviewed/updated Feb. 2, 2018).

[48] USCIS, *USCIS to Expand In-Person Interview Requirements for Certain Permanent Residency Applicants, https://www.uscis.gov/news-releases/uscis-to-expand-in-person-interview-requirements-for-certain-permanent-residency-applicants* (last reviewed/updated Aug. 28, 2017).

## V. Proposed Changes in the FY 2019/2020 Fee Schedule

### A. Clarify Dishonored Fee Check Re-Presentment Requirement and Fee Payment Method

In the FY 2016/2017 fee rule, DHS amended the regulations regarding how USCIS treats a benefit request accompanied by fee payment (in the form of check or other financial instrument) that is subsequently returned as not payable. *See* 81 FR 73313–15 (Oct. 24, 2016); 8 CFR 103.2(a)(7)(ii) and 8 CFR 103.7(a)(2). If a financial instrument used to pay a fee is returned as unpayable after one re-presentment, USCIS rejects the filing and imposes a standard $30 charge. *See id.* In the preamble to the FY 2016/2017 fee rule, DHS stated that, to make sure a payment rejection is the result of insufficient funds and not due to USCIS error or network outages, USCIS (through the U.S. Department of the Treasury (Treasury)) will resubmit rejected payment instruments to the appropriate financial institution one time. *See* 8 CFR 103.2(a)(7)(ii)(D). While DHS's intent was to submit only checks that were dishonored due to insufficient funds, some stakeholders have interpreted the re-presentment as applying to any check DHS has deposited that is returned as unpayable. Although the Treasury check clearance regulations permit an agency to re-deposit a check dishonored due to insufficient funds, they prohibit submitting checks dishonored for other reasons for clearance a second time. *See* 31 CFR 210.3(b); 2016 NACHA Operating Rules & Guidelines: A Complete Guide to Rules Governing the ACH Network, Subsection 2.5.13.3 (limiting re-depositing a check to those that are returned due to ''Not Sufficient Funds,'' ''NSF,'' ''Uncollected Funds,'' or comparable). To comply with the Treasury regulations, DHS is proposing in this rule that if a check or other financial instrument used to pay a fee is returned as unpayable *because of insufficient funds,* USCIS will resubmit the payment to the remitter institution one time. If the remitter institution returns the instrument used to pay a fee as unpayable a second time, USCIS will reject the filing. USCIS will not re-deposit financial instruments returned as unpayable for a reason other than insufficient funds. Proposed 8 CFR 103.2(a)(7)(ii)(D).

In addition, DHS proposes that it may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date. Currently, USCIS policy is to reject a check that is dated more than a year before it is submitted. However, that policy is not codified, and DHS has been sued or threatened with litigation multiple times when a check that was dated more than a year before it was submitted was the basis of a rejection that caused the requestor to miss an important deadline. For example, USCIS has permitted an applicant to submit Form I–821 after the deadline [49] and adjudicated a Form I–485 filed after the applicant's U nonimmigrant status had expired because his initial, timely filing was rejected because it contained a check that was more than one year old. *See* 8 CFR 245.24(b)(2)(ii) (requiring the applicant to hold U nonimmigrant status at the time of application.). While most personal and business checks do not expire, they become what is known as ''stale dated'' six months after they are written. This is because many things may change in six months that may affect the check's validity or the original reason that it was written. Accordingly, the Uniform Commercial Code [50] provides that a bank may delay access to the funds from or is not obligated to deposit, cash, honor, or pay a stale check. USCIS projects that it will receive an average 7,789,861 fee payments per year.[51] It is important that its requirements for payment instruments provide certainty and minimize the likelihood of a payment being dishonored. Although commercial banks use a guideline of six months, DHS proposes to reject only year-old checks to provide requestors with more flexibility in case there are delays with their filing. Rejecting a check that is dated more than a year earlier is also consistent with the time limit for a check issued by the U.S. Treasury. *See* 31 CFR 245.3(a) (''Any claim on account of a Treasury check must be presented to the agency that authorized the issuance of such check within one year after the date of issuance of the check or within one year after October 1, 1989, whichever is later.''). Rejection of a stale check will not be mandatory, so USCIS will still have the authority to waive the check date requirement in exigent circumstances.

DHS also proposes that USCIS may require that certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method. Proposed 8 CFR 106.1(b). For example, USCIS may require that a request be submitted by using *Pay.gov,* a secure portal which transmits an applicant's payment information directly to the U.S. Treasury for processing, or may preclude the use of certain payment types such as cashier's check and money orders for the payment of a particular form or when payments are made at certain offices. The proposed change provides that payment method will be provided in the form instructions (including for online filing) or by individual notice (a bill, invoice, appointment confirmation, etc.); therefore, requestors will be clearly notified of any limitations on the payment method for the request they are filing. About 80 percent of all USCIS filings are received via a Lockbox that is well versed in intake and depositing of multiple payment types. However, the requirements and circumstances for the filing of some requests do not permit lockbox submission and intake, and the request must be filed at a particular office or in person. Various offices, such as field offices, embassies, and consulates, are limited in the method of payment that they can receive or process. Additionally, certain payment methods such as checks or cash require time-intensive procedures for cashiers and their supervisors to input, reconcile, and verify their daily receipts and deposits. Generally, federal agency offices must deposit money that they receive on the same day that it is received. *See* 31 U.S.C. 3720(a); 31 CFR 206.5; Treasury Financial Manual Vol. 1, Part 5, Chapter 2000, Section 2055.[52] There are additional requirements and guidance for timely record keeping and redundancy in personnel that similarly increase workload and processing costs. *See* 31 U.S.C. 3302(e); Treasury Financial Manual Vol. 1, Part 5, Chapter 2000, Section 2030; *see also* U.S. Government and Accountability Office (GAO) GAO–14–704G Standards for Internal Control in the Federal Government (2014).[53] The time that USCIS spends complying with payment processing requirements can be used to adjudicate cases. This proposed change would also permit USCIS to reduce

---

[49] *See* 8 CFR 244.17(a) (''Applicants for periodic re-registration must apply during the registration period provided by USCIS.'').

[50] A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than six months after its date, but it may charge its customer's account for a payment made thereafter in good faith. UCC 4–404 (2002).

[51] See section IV.B.1.b. Fee-Paying Volume in this preamble.

[52] Agencies may accumulate deposits less than $5,000 until they reach $5,000 or a given Thursday. U.S. Treasury, Treasury Financial Manual Vol 1, Part 5, Chapter 2000, *https://tfm.fiscal.treasury.gov/v1/p5/c200.html.*

[53] Principal 10, Design Control Activities, states that management should control information processing and segregation of duties to reduce risk, and accurate and timely record transactions. GAO, Standards for Internal Control in the Federal Government (Sept. 10, 2014), *https://www.gao.gov/assets/670/665712.pdf.*

**62296** **Federal Register** / Vol. 84, No. 220 / Thursday, November 14, 2019 / Proposed Rules

administrative burdens and processing errors associated with fee payments.

DHS is also clarifying that fees are non-refundable regardless of the result of the immigration benefit request or how much time the request requires to be adjudicated. As provided in 8 CFR 103.2(a)(1) USCIS filing fees generally are non-refundable and must be paid when the benefit request is filed. As discussed fully in this rule, DHS is authorized to establish fees to recover the costs of providing immigration adjudication and naturalization services. While the fees are to recover the processing costs of adjudications, the fees are due when filing an immigration benefit request before the request will be considered received and the requestor will receive a receipt date. See 8 CFR 103.2(a)(7)(ii)(D). A benefit request will be rejected if it is not submitted with the correct fee(s). Thus the fee is due at filing and is not refundable, regardless of how much time passed from filing to approval, or if the request is denied or approved. Nevertheless, USCIS has recently, greatly, expanded acceptance of credit cards for the payment of USCIS fees. To our misfortune, the increased acceptance of credit cards for the payment of USCIS fees has resulted in a sizeable increase in the number of disputes filed with credit card companies challenging the retention of the fee by USCIS. Disputes are generally filed by requestors whose request was denied, who have changed their mind about the request, or assert that the service was not provided or unreasonably delayed. Troublingly, USCIS loses many of these dispute because the credit card companies agree with the cardholder and have determined that USCIS fails to adequately warn the cardholder that the fee is not refundable and due regardless of the result or time required. As the dollar amount of fees paid with credit cards continues to increase, this result has the potential to have a significant negative fiscal effect on USCIS fee receipts. Therefore, DHS is proposing to clarify that fees will not be refunded no matter the result of the benefit request or how much time the adjudication requires. Proposed 8 CFR 103.2(a)(1). In the event that the bank that issues the credit card rescinds the payment of the fee to USCIS, USCIS reserves the authority to invoice the responsible party (applicant, petitioner, requestor) and pursue collection of the unpaid fee

in accordance with 31 CFR 900–904 (Federal Claims Collection Standards).

*B. Eliminate $30 Returned Check Fee*

DHS also proposes to amend its regulations to remove the $30 charge for dishonored payments. See 8 CFR 103.7(a)(2)(i). USCIS data indicates that the cost of collecting the $30 fee outweighs the benefits to the government derived from imposing and collecting the fee. For example, in FY 2016, USCIS collected a total of $416,541 from the $30 returned check fee while the financial service provider billed $508,770 to collect the $30 fee. Furthermore, USCIS does not retain the $30 fee for deposit into the IEFA with other immigration benefit request fees; thus the $30 fee does not provide revenue to USCIS. Agencies may prescribe regulations establishing the charge for a service or thing of value provided by the agency. See 31 U.S.C. 9701. However, federal agencies are not required to impose fees as a general matter, nor does DHS or USCIS have a specific statutory authorization or requirement to do so. Therefore, DHS is not required to charge a returned check fee. DHS proposes to remove the $30 fee from regulations.

*C. Fee Waivers*

*1. Background*

Currently, USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee. See 8 CFR 103.7(c). To request a fee waiver, the individual must submit a written waiver request for permission to have their benefit request processed without payment. Under the current regulation, the waiver request must state the person's belief that he or she is entitled to or deserving of the benefit requested and the reasons for his or her inability to pay and include evidence to support the reasons indicated. See 8 CFR 103.7(c)(2). There is no appeal of the denial of a fee waiver request. See id.

The statute authorizing USCIS to establish fees does not specifically mention fee waivers and fee exemptions for any type of applicant or group, or any criteria for fee waivers.[54] The

statute does not require that DHS provide certain services for free, but it authorizes DHS to set USCIS fees at a level that will recover the full costs of adjudication and naturalization services provided "including the costs of similar services provided without charge to asylum applicants or other immigrants."[55] DHS interprets that provision as authorizing it to provide certain services for free in all cases in the form of fee exemptions,[56] or free when certain criteria are met in the form of a waiver. DHS has always implemented fee waivers based on need, and since 2007, has precluded fee waivers for individuals that have financial means as a requirement for the status or benefit sought. See 72 FR 4912. However, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)[57] requires DHS to permit certain applicants to apply for fee waivers for "any fees associated with filing an application for relief through final adjudication of the adjustment of status."[58] DHS interprets "any fees associated with filing an application for relief through final adjudication of the adjustment of status"[59] to mean that, in addition to the main immigration benefit request that accords a status, (such as Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant or Form I–485, Application to Register Permanent Residence or Adjust Status) applicants must have the opportunity to request a fee waiver for any form associated with the main benefit application up to and including the adjustment of status application.[60] Table 7 lists the immigration categories for which DHS must provide an opportunity to request a fee waiver for main immigration benefit requests and associated forms in accordance with TVPRA.[61]

_____

[54] USCIS is primarily funded by application and petition fees. Under INA 286(m), 8 U.S.C. 1356(m), DHS has the authority to establish the fees it charges for immigration and naturalization services to recover the full costs of such services, including those provided without charge, and to recover costs associated with the administration of the fees

collected. Therefore, the fees are set at a level that is intended to recover the full cost of USCIS operations.

[55] See INA sec. 286(m), 8 U.S.C. 1356(m).

[56] See, e.g., proposed 8 CFR 106.2(a)(45) and (46) (codifying no fee for an *Application for T Nonimmigrant Status* and *Petition for U Nonimmigrant Status*).

[57] See title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[58] See id.

[59] See id.

[60] Certain USCIS forms are not listed in 8 CFR 103.7(b) and therefore have no fee. See proposed 8 CFR 106.2 for proposed fees.

[61] INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

TABLE 7—STATUTORY FEE WAIVER CATEGORIES AND ASSOCIATED FORMS

| Category | Main immigration benefit requests [62] | Associated forms |
|---|---|---|
| Violence Against Women Act (VAWA) self-petitioners.[63] | • Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee).<br>• Form I–485, Application to Register Permanent Residence or Adjust Status.<br>• Form I–751, Petition to Remove Conditions on Residence. | • Form I–131, Application for Travel Document.[64]<br>• Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal.<br>• Form I–290B, Notice of Appeal or Motion.<br>• Form I–601, Application for Waiver of Grounds of Inadmissibility.<br>• Form I–765, Application for Employment Authorization (no fee for principals).[65] |
| Victims of Severe Form of Trafficking (T visas).[66] | • Form I–914, Application for T Nonimmigrant Status (no fee).<br>• Form I–914, Supplement A, Application for Family Member of T–1, Recipient (no fee).<br>• Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons (no fee).<br>• Form I–485, Application to Register Permanent Residence or Adjust Status. | • Form I–131, Application for Travel Document.<br>• Form I–192, Application for Advance Permission to Enter as a Nonimmigrant.<br>• Form I–193, Application for Waiver of Passport and/or Visa.<br>• Form I–290B, Notice of Appeal or Motion.<br>• Form I–539, Application to Change/Extend Nonimmigrant Status.<br>• Form I–601, Application for Waiver of Grounds of Inadmissibility.<br>• Form I–765, Application for Employment Authorization (no fee for principals). |
| Victims of Criminal Activity (U visas).[67] | • Form I–918, Petition for U Nonimmigrant Status (no fee).<br>• Form I–918, Supplement A, Petition for Qualifying Family Member of U–1 Recipient (no fee).<br>• Form I–918, Supplement B, U Nonimmigrant Status Certification (no fee).<br>• Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant.<br>• Form I–485, Application to Register Permanent Residence or Adjust Status. | • Form I–131, Application for Travel Document.<br>• Form I–192, Application for Advance Permission to Enter as a Nonimmigrant.<br>• Form I–193, Application for Waiver of Passport and/or Visa.<br>• Form I–290B, Notice of Appeal or Motion.<br>• Form I–539, Application to Extend/Change Nonimmigrant Status.<br>• Form I–765, Application for Employment Authorization (no fee for principals). |
| Battered spouses of A, G, E–3, or H nonimmigrants.[68] | • Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse (no fee). | • None. |
| Battered spouses or children of a lawful permanent resident or U.S. citizen under INA 240A(b)(2).[69] | • EOIR–42B, Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (DOJ form and immigration judge determines fee waiver). | • Form I–601, Waiver of Grounds of Inadmissibility. |
| Temporary Protected Status.[70] | • I–821, Application for Temporary Protected Status.<br>• Biometric Services Fee ................................. | • Form I–131, Application for Travel Document.<br>• Form I–601, Application for Waiver of Grounds of Inadmissibility.<br>• Form I–765, Application for Employment Authorization. |

Before 2007, USCIS could waive any fee, even if a fee waiver was inconsistent with the underlying immigration benefit request. For example, before 2007, USCIS could waive fees for companies seeking to sponsor foreign workers, individuals seeking status based on substantial business investments, or individuals seeking to sponsor foreign relatives to whom the sponsors must provide financial support. *See* 72 FR 4912. Since 2007, USCIS has limited the fees that may be waived under 8 CFR 103.7(c)(3) based on the general premise that fee waivers must be consistent with any financial considerations that apply to the status or benefit sought. *See* 8 CFR 103.7(c)(1)(ii).

Following the FY 2010/2011 fee rule, USCIS also issued policy guidance to streamline fee waiver adjudications and make them more consistent across offices and form types nationwide. *See* Policy Memorandum, PM–602–0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule;* Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011) ("Fee

[62] Some immigration benefit requests may not have a fee for the specific category.

[63] *See* INA sec. 101(a)(51), 8 U.S.C. 1101(a)(51); INA section 245(l)(7), 8 U.S.C. 1255(l)(7). Public Law 110–457, 122 Stat. 5044 (Dec. 23, 2008); 22 U.S.C. 7101 *et seq.*

[64] Currently, fees for Form I–131 are exempt if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007. *See* 8 CFR 103.7(b)(1)(i)(M)(4). However, DHS proposes changes to this policy in this rule as explained later in this preamble.

[65] Form I–360 allows a principal self-petitioner to request an EAD incident to case approval without submitting a separate Form I–765. Form I–765 is required for employment authorization requests by derivative beneficiaries.

[66] *See* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[67] *See* INA sec. 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of certain criminal activity).

[68] *See* INA sec. 106, 8 U.S.C. 1105a.

[69] *See* INA sec. 240A(b)(2), 8 U.S.C. 1229b(b)(2), and INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

[70] *See* INA sec. 244, 8 U.S.C. 1254a.

Waiver Policy''). The Fee Waiver Policy clarified acceptable measures of income and documentation that individuals may present to demonstrate they are unable to pay a fee when requesting a fee waiver. In June 2011, USCIS issued Form I–912, Request for Fee Waiver, as a standardized form with instructions to request a fee waiver in accordance with the Fee Waiver Policy.[71] USCIS previously engaged in a holistic analysis of the individual's finances to determine inability to pay. *See, e.g.,* William R. Yates, *Field Guidance on Granting Fee Waivers Pursuant to 8 CFR 103.7(c)* (Mar. 4, 2004). The 2011 Fee Waiver Policy established a streamlined process where USCIS would usually waive the entire fee and the biometric services fee for forms listed in 8 CFR 103.7(c)(3) for applicants who at time of filing the fee waiver request with the benefit application:[72]

• Were receiving a means-tested benefit;

• Had a household income at or below 150 percent of the Federal Poverty Guidelines (FPG); or

• Were experiencing extreme financial hardship such as unexpected medical bills or emergencies.

The FY 2010/2011 fee rule also authorized the USCIS director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c). *See* 75 FR 58990; 8 CFR 103.7(d).

On October 25, 2019, USCIS published the updated Form I–912 [73] and corresponding policy guidance in the USCIS Policy Manual [74] that removed the means-tested benefit as a criterion in the fee waiver request determination, clarified that the submission of Form I–912 is required to request a fee waiver, and clarified some of the evidence requirements. The new

policy will be effective on December 2, 2019. Therefore, as of December 2, 2019 an individual would be eligible to request a fee waiver based on one of two criteria for inability to pay, *i.e.,* if he or she:

• Has a household income at or below 150 percent of the FPG; or

• Is experiencing extreme financial hardship such as unexpected medical bills or emergencies.

This proposed rule further limits forms eligible for a fee waiver and the criteria to establish eligibility for a fee waiver.

## 2. Cost of Fee Waivers

The U.S. Government Accountability Office (GAO), an independent, nonpartisan agency that works for Congress, describes equity of federal user fees as a balancing act between two principles:

• Beneficiary-pays; and

• Ability-to-pay.[75]

This proposed rule emphasizes the beneficiary-pays principle. Under the beneficiary-pays principle, the beneficiaries of a service pay for the cost of providing that service. *See* GAO–08–386SP at pp. 7–12.

Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. IEFA fee exemptions, fee waivers, and reduced fees for low income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee-exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request that someone else did not pay for.

In prior years, USCIS fees have given significant weight to the ability-to-pay principle. In the FY 2016/2017 fee rule, DHS noted that the estimated annual forgone revenue from fee waivers and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review. *See* 81 FR 26922 and 73307. In the FY 2016/2017 proposed rule, DHS estimated that the increase in fee waiver accounted for 9 percent of the 21 percent weighted average fee increase. *See* 81 FR 26910. In the same proposed rule, DHS provided notice that in the future it may

revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). *See* 81 FR 26922.

Each fee review plans for a certain level of fee waivers, fee exemptions, and other fee-paying policy decisions. Ideally, no IEFA revenue is lost due to fee waivers because USCIS plans for a certain level of fee waivers and fee exemptions. IEFA fees recover full cost, including the estimated cost of fee-waived and fee-exempt work. However, USCIS does forgo revenue by allowing fee waivers and fee exemptions. Forgone revenue represents the total fees that fee waiver or fee exempt applicants, petitioners, and requestors would have paid if they had paid the fees.

In the FY 2019/2020 fee review, USCIS determined that without changes to fee waiver policy, it would forgo revenue of approximately $1,494 million. The proposed fee schedule estimates $962 million forgone revenue from fee waivers and fee exemptions. The difference in forgone revenue is $532 million. Without changes to fee waiver policy, fees would increase by a weighted average of 31 percent, which is 10 percent more than in the proposed fee schedule.

## 3. Proposed Fee Waiver Changes

As previously stated, INA sec. 286(m), 8 U.S.C. 1356(m) authorizes but does not require that DHS set fees to recover the costs of administering USCIS adjudication and naturalization services. That statute also authorizes setting such fees at a level that will recover the costs of services provided without charge, but it does not require that DHS provide services without charge.[76] Nevertheless, DHS (and previously the INS) has provided fee waivers based on need. *See, e.g.,* 63 FR 43604, 43607 (stating, ''The Service often waives fees for this application when the economic need exists. The proposed rule stated, 'For FY 1998, the Service estimates that approximately 50 percent of the Form I–765 applications will be processed at no charge to applicants, at a total cost of $35.9 million.' ''). For the reasons stated in this rule, DHS has determined that it is necessary to utilize this statutory discretion to establish the following new requirements for waiving USCIS fees.

[71] The form and its instructions may be viewed at *http://www.uscis.gov/i-912*. The proposed version is available for review in the docket for this proposed rule.

[72] *See* Policy Memorandum, PM–602–0011.1, Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011); AFM Chapter 10.9(b).

[73] The Office of Information and Regulatory Affairs, Office of Management and Budget (OMB) approved the form changes on October 24, 2019, available at *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201910-1615-006#* (last visited October 25, 2019).

[74] See USCIS, Policy Alert PA 2019–06, Fees for Submission of Benefit Requests, available at *https://www.uscis.gov/sites/default/files/policymanual/updates/20191025-FeeWaivers.pdf* (last visited Oct. 25, 2019) (revising the USCIS interpretation of unable to pay in 8 CFR 103.7(c)).

[75] GAO, *Federal User Fees: A Design Guide* (May 29, 2008), available at *https://www.gao.gov/products/GAO-08-386SP*.

[76] Legislation enacted in 2008 requires that a fee waiver be considered for certain requests. INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7).

## a. Limits on Eligible Forms and Categories

Because of the costs of fee waivers, and the inconsistency of current fee waiver regulations with the beneficiary pays principal, DHS proposes to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver or where the USCIS Director exercises favorable discretion as provided in the proposed regulation. *See* proposed 8 CFR 106.3. The proposed regulation would limit the eligible forms and categories to those listed in Table 7: Statutory Fee Waiver Categories and Associated Forms.[77] Accordingly, many forms will generally no longer be eligible for a fee waiver,[78] except in limited circumstances where the law requires that a waiver be made available based on the circumstances of the applicant. Forms that would generally no longer be eligible for a fee waiver include the following:

• Form I–90, Application to Replace Permanent Resident Card;
• Form I–765, Application for Employment Authorization;
• CNMI related petitions and applications;[79]
• Form I–485, Application to Register Permanent Residence or Adjust Status;[80]
• Forms for applicants exempt from the public charge inadmissibility ground;[81]
• Form I–751, Petition to Remove Conditions on Residence;

• Naturalization and citizenship-related forms.[82]

The Senate Appropriations Committee Report that accompanied the fiscal year 2017 Department of Homeland Security Appropriations Act[83] expressed concern about the increased use of fee waivers, which force those paying fees to absorb costs for which they receive no benefit.[84] DHS believes that these changes would make the fee increase more equitable for all immigration benefit requests by requiring fees for the service to be paid by those who benefit.

## b. Eligibility Requirements

Further, DHS proposes to generally limit fee waivers to individuals who have an annual household income of less than 125 percent of the FPG as defined by the U.S. Department of Health and Human Services (HHS). Notwithstanding these general limitations, however, a fee waiver may be authorized in the USCIS Director's discretion, even for those benefit requests not normally amenable to a fee waiver,[85] if an individual meets all three of the following requirements:

• Has an annual household income at or below 125 percent of the FPG as defined by HHS;
• Is seeking an immigration benefit for which he or she is not required to submit an affidavit of support under INA section 213A, 8 U.S.C. 1183a, or is not already a sponsored immigrant as defined in 8 CFR 213a.1; and
• Is seeking an immigration benefit for which he or she is not subject to the public charge inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

In addition, DHS would update the language in the regulation to codify that a person must submit a request for a fee waiver on the form prescribed by USCIS, as provided in the previous Form I–912 notice and provide evidence of household income such as federal income tax transcripts.

USCIS believes that making these changes to the fee waiver policy would assure that fee paying applicants do not bear the increasing costs caused by application fees being waived.

## c. Income Requirements

The poverty guidelines are used as an eligibility criterion by many Federal public benefit programs and USCIS to determine income levels. The poverty guidelines are a simplified version of the poverty thresholds that the Census Bureau uses to prepare its estimates of the number of individuals and families in poverty.[86] Some federal programs use a percentage multiple of the guidelines (for example, 125 percent or 185 percent of the guidelines), as noted in relevant authorizing legislation or program regulations.[87] The poverty threshold or line (100 percent of the FPG) is the primary version of the federal poverty measure, as updated by the Census Bureau every year, and generally used to estimate the number of Americans in poverty each year.[88]

In the immigration context, USCIS uses 125 percent of the FPG as the standard for public charge and affidavit of support purposes.[89] Congress also identified 125 percent of FPG as a threshold for a sponsor to support an individual immigrant to meet the requirements of an affidavit of support in the public charge inadmissibility determination.[90] The threshold for fee waiver eligibility under current regulations of 150 percent of the FPG is higher than the threshold used in the public charge and affidavit of support context. DHS believes limiting fee waivers to households with incomes at or below 125 percent of the FPG, as proposed in this rule, would be appropriate because it would be consistent with the affidavit of support requirements under INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4).

## d. Subject to INA Section 212(a)(4) and Affidavit of Support Requirements

The current fee waiver regulation allows people who are applying for several immigration benefits—advance permission to enter as a nonimmigrant, a waiver for passport and/or visa, adjustment of status, or a waiver of grounds of inadmissibility—to file a fee waiver request if they are not subject to the public charge inadmissibility ground. *See* 8 CFR 103.7(c)(4) (stating that certain fees may be waived ''only for an alien for which a determination

---

[77] Under the settlement agreement concluded in *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 976 (N.D. Cal. 1991) (*ABC*), ''eligible class members who can demonstrate that they fall within the poverty guidelines as set forth in 45 CFR 1060.2 will not be required to pay the fee.'' DHS will continue to allow these applicants to request a fee waiver. In 1991, the U.S. Department of Health and Human Services (HHS) codified at 45 CFR 1060.2 (1990) the federal poverty guidelines issued by the former HHS Office of Economic Opportunity/ Community Services Administration. The *ABC* settlement agreement requires USCIS to waive fees for those covered by the agreement who fall squarely within the Federal Poverty Guidelines. The requirements for a fee waiver in this rule are less restrictive than the subject settlement agreement. *See* proposed 8 CFR 106.3(d).

[78] Fee waivers would still be available at the discretion of the USCIS Director, or as provided by INA 245(l)(7), 8 U.S.C. 1255(l)(7). *See* proposed 8 CFR 106.3. An applicant, petitioner, or requestor may not independently request that the Director exercise this authority.

[79] For example, Form I–129CW, Petition for CNMI-Only a Nonimmigrant Transitional Worker, and Form I–539, Application to Extend/Change Nonimmigrant Status.

[80] Certain categories may still be eligible for fee waivers of an I–485, as identified in Table 7, as provided by INA 245(l)(7), 8 U.S.C. 1255(l)(7).

[81] For example, Form I–601, Application for Waiver of Grounds of Inadmissibility, Form I–192, Application for Advance Permission to Enter as Nonimmigrant, and Form I–193, Application for Waiver for Passport and/or Visa.

[82] Including Form N–400, Application for Naturalization; Form N–470, Application to Preserve Residence for Naturalization Purposes; Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings; Form N–565, Application for Replacement of Naturalization/ Citizenship Document; Form N–600, Application for Certification of Citizenship; and Form N–600K, Application for Citizenship and Issuance of Certificate Under section 322.

[83] *See* Public Law 115–31, div. F, 131 Stat. 135, 404.

[84] *See* S. Rep. No. 114–264, at 125 (2016).

[85] *See* proposed 8 CFR 106.3(b) and (c).

[86] *See* Annual Update of the HHS Poverty Guidelines 84 FR 1167, 1168, available at *https:// www.govinfo.gov/content/pkg/FR-2019-02-01/pdf/ 2019-00621.pdf.*

[87] *See id.*

[88] *See* ASPE, Poverty Guidelines, available at *https://aspe.hhs.gov/poverty-guidelines* (last visited Aug. 16, 2019).

[89] *See* 8 CFR 212.22(b)(4)(i)(A).

[90] *See* INA sec. 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

of their likelihood of becoming a public charge under section 212(a)(4) of the Act is not required at the time of an application for admission or adjustment of status''). Consistent with this provision, DHS is proposing that fee waivers will not be available to applicants who are subject to the public charge inadmissibility ground.[91]

DHS also proposes to preclude fee waivers for applicants who are subject to an affidavit of support under INA section 213A, 8 U.S.C. 1183a, or is already a sponsored immigrant as defined in 8 CFR 213a.1. Under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress provided that the affidavit of support could be legally required and enforced for certain immigration categories.[92] A sponsor generally must demonstrate that he or she is able to maintain the sponsored alien at an annual income of not less than 125 percent of the FPG.[93] Although sponsors are not required to assist an alien with immigration fees, a sponsor is generally financially responsible for the alien; thus, an alien with a sponsor should not need a fee waiver. DHS has decided that it is inconsistent with that law and its stated objective that aliens be able to meet their needs for applicants who have a sponsor through an affidavit of support to receive immigration benefits for free, funded by others who are paying their full immigration benefit request fee. Therefore, USCIS believes that limiting fee waivers to those applicants who are not subject to affidavit of support requirements is consistent with congressional intent under IIRIRA.''[94]

DHS notes that the House Report on Department of Homeland Security Appropriations Bill, 2019 stated, ''USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver.'' H. Rep. No. 115–948 at 61 (2018). USCIS appreciates the concerns of this

recommendation and fully considered it before publishing this proposed rule. Nevertheless, DHS determined that the current trends and level of fee waivers are not sustainable. Work that USCIS provides for free or below cost impacts other fee-paying applicants by making their fees higher so DHS can recover USCIS full cost. DHS is trying to make the USCIS fee schedule more equitable for all applicants and petitioners. As shown in the supporting documentation for this rule, the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement. That indicates that, should the economy worsen, the number of fee waiver requests will increase to a level that could threaten the ability of USCIS to deliver programs without disruption.

Violence Against Women Act (VAWA) self-petitioners as defined under INA 101(a)(51); T nonimmigrants; U nonimmigrants; battered spouses of A, G, E–3, or H nonimmigrants; battered spouses or children of a lawful permanent resident or U.S. citizen as provided under INA sec. 240A(b)(2); and TPS applicants are not subject to the public charge inadmissibility provision or the affidavit of support requirements.

**e. USCIS Director's Discretionary Fee Waivers and Emergency and Disaster Relief**

DHS proposes to retain the authority in regulations for the Director of USCIS to waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law. 8 CFR 103.7(d); proposed 8 CFR 103.3(b). DHS is concerned that the current authority provides too much discretion, however, and thus proposes to limit a Director's discretionary waiver to cases related to one of the following: (1) Asylees; (2) Refugees; (3) National security; (4) Emergencies or major disasters declared in accordance with 44 CFR part 206, subpart B; (5) An agreement between the U.S. government and another nation or nations; or (6) USCIS error.

DHS also proposes to clarify the discretionary authority of the Director to authorize fee waiver requests for a case or specific class of cases such as for emergency and disaster relief including tsunamis, wildfires, and hurricanes in accordance with 44 CFR part 206, subpart B. USCIS would continue to notify the general public of eligibility for fee waivers for specific forms under this provision through policy or website updates. Individuals who would qualify

for such a fee waiver would still need to meet the requirements to request a fee waiver as provided in proposed 8 CFR 106.3(d). Proposed 8 CFR 106.3(d) complies with 42 U.S.C. 5174b. That law provides that the President, in consultation with the Governor of a State, may waive certain fees for an individual or household who lives in a federally declared disaster area, including the following USCIS fees: Form I–90, Form I–193, Form I–765, Form N–300, Form N–565, and the biometric services fee, which are forms and services related to establishing immigration status. DHS plans to carry out this permissive authority through the USCIS Director's exercise of his or her discretion to provide a specific class of fee waivers for emergency and disaster relief. *See* 84 FR 3957 (Feb. 13, 2019).

DHS acknowledges that the proposed changes to the fee waiver policies would be a significant change from past fee waiver regulations and policies. Section 286(m) of the INA, 8 U.S.C. 1356(m), authorizes DHS to set USCIS fees at an amount necessary to recover the costs of free adjudication and naturalization services provided. It does not require that DHS provide free services. In past fee rules, DHS has made clear that it would not authorize fee waivers where such a waiver is inconsistent with the benefit requested and that fee waiver policy was based on economic necessity, rather than providing certain applicants with an advantage over another. *See* 75 FR 58974. In addition, DHS has responded to comments requesting that it expand USCIS fee waivers by stating that the financial circumstances required to be eligible for certain benefits, such as intercountry adoptions, directly contradict the rationale for shifting costs related to such applications to others through fee waivers. *See* 72 FR 29863. As previously stated, fee waiver increases accounted for 9 percent of the 21 percent weighted average fee increase in the FY 2016/2017 fee rule, and DHS stated that it may revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c) because of the increasing costs of providing free services through fee waivers. *See* 81 FR 26922. Therefore, DHS is not basing the proposed changes to USCIS fee waiver policies upon factual findings that contradict those underlying the prior policy. In fact, the changes proposed in this rule are consistent with the direction that DHS previously took regarding fee waivers for emergency and disaster relief.

DHS appreciates that individuals who in the past may have received a free

---

[91] *See generally* 8 CFR 103.7(c)(4).

[92] *See* Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

[93] *See* INA 213A. A sponsor who is on active duty (other than active duty for training) in the U.S. armed forces and who is petitioning for a spouse or child only has to demonstrate the means to maintain an annual income equal to at least 100 percent of the FPG.

[94] *See* Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

service from USCIS may no longer be able to have their USCIS fees waived after these proposed changes take effect. However, to the extent that a person is in the process of completing and filing an immigration benefit request, has paid for assistance in preparing their request, including gathering necessary evidence to support the request, this rule provides public notice of the impending policy change. As for applicants who are not in the process of preparing a benefit request, there is no action that they would take as a result of assuming they will receive a fee waiver after the publication of this rule because they will be placed on notice of the likelihood of the proposed fee waiver changes and provided sufficient time to conform their behavior to the new requirements before they take effect.

### f. Conforming Edits and Request for Comments

DHS also proposes to make conforming edits in its regulations to remove references to fee waivers. *See, e.g.,* proposed 8 CFR 240.63(a), 8 CFR 244.17(a), and 8 CFR 245.15(c)(2)(iv)(B). DHS also proposes to remove fee waivers for Commonwealth of the Northern Mariana Islands (CNMI) fees. *See* proposed 8 CFR 214.2(e)(23)(xv), (w)(14)(iii). DHS welcomes comment on the proposed limits on who may file a fee waiver request and for which forms a fee waiver may be requested.

### D. Fee Exemptions

The fee-setting authority under INA section 286(m), 8 U.S.C. 1356(m), authorizes DHS to set its fees for adjudication and naturalization services at a level to ensure recovery of the full costs of providing all such services. That provision does not require that USCIS charge a fee for all of its services, and it provides that USCIS may set fees at less than full cost or provide services for free. That authority necessarily means that DHS may fund or subsidize discounted or free USCIS operations through the fees charged to other unrelated filings. DHS has exercised its discretion to provide free services in a number of ways, such as by codifying "no fee," $0 fee, or simply leaving the fee regulations silent and not codifying a fee for a particular service that it provides.

In addition, the current 8 CFR 103.7(d) provision provides that the USCIS Director may create an exemption from certain fees "for a case or specific class of cases that is not otherwise provided in this section, if the Director determines that such action would be in the public interest and the action is consistent with other

applicable law." This authority is limited to the Director and may only be delegated to the USCIS Deputy Director.

An individual would not be permitted to independently submit a request to the USCIS Director to waive his or her fee. Previous USCIS Directors have used this authority to provide fee exemptions for specific categories and groups of immigrants.

Consistent with the discussion above about the TVPRA, no law requires USCIS to provide fee exemptions for any immigration category listed below. Application fees from other form types have always been used to fund the costs of processing fee-exempt filings. *See, e.g.,* 81 FR 73295. Continuing to exempt these populations from paying associated fees would result in the costs of their requests being borne by the other proposed fees.

DHS proposes to clarify the Director's fee exemption provision in proposed 8 CFR 106.3(f) to specify that fee exemptions must be related to one of the following:

• Asylees;
• Refugees;
• National security;
• Emergencies or major natural disasters declared in accordance with 44 CFR part 206, subpart B;[95]
• A diplomatic agreement or to further relations between the U.S. Government and other nations; or
• USCIS error.

Consistent with the proposed change to the Director's exemption criteria, DHS proposes to remove the fee exemptions for an initial request for an employment authorization document (Form I–765) for the following classifications:

• Citizen of Micronesia, Marshall Islands, or Palau;
• Granted Withholding of Deportation or Removal;
• Temporary Protected Status if the individual is filing an initial TPS application and is under 14 years of age or over 65 years of age; and
• Applicant for Asylum and Withholding of Deportation or Removal.

The proposed changes for asylum applicants and an Application for Asylum and Withholding of Deportation or Removal are discussed in a later section of this preamble, V.P.2. Fee for the Initial Application for Employment Authorization while an Asylum Claim is Pending.

DHS is proposing to continue to exempt the following categories that are

consistent with the proposed criteria for a Director's exemption:

• Form I–102, Application for Replacement/Initial Nonimmigrant Arrival/Departure Document: Nonimmigrant military members of the U.S. Armed Forces, noncitizen participating in NATO or Partnership for Peace Military Program under the Status of Forces Agreement (SOFA).

• Form I–539, Application to Extend/ Change Nonimmigrant Status: Noncitizen with Ambassador, Public Ministry, or Career Diplomatic or Consular Officer and their Immediate Family and Attendant or Servant (A–1, A–2, and A–3), Designated Principal Resident Representative of a Foreign Government and Immediate Family and Attendant or Servant (G–1, G–2, G–3, G–4, and G–5) or NATO nonimmigrants status (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, NATO–6, NATO–7, and NATO–8).

• Form I–765, Application for Employment Authorization: Asylees, refugees, noncitizens paroled as refugees, N–8 and N–9 Special Immigrants under INA sections 101(a)(27)(I)(i) and (L);[96] Victims of Severe Form of Trafficking in Persons (T–1); Victim of Qualifying Criminal Activity (U–1); dependents of Certain foreign national organizations and NATO; VAWA Self-Petitioner principal;[97] an applicant who filed USCIS Form I–485 on or after July 30, 2007, and before the effective date of this rule, and paid the Form I–485 fee; Taiwanese dependents of Taipei Economic and Cultural Representative Office TECRO E–1 employees.

### 1. Form I–765   Exemption Related to Asylees and Refugees

USCIS is continuing to provide a fee exemption for Form I–765, Application for Employment Authorization, for individuals who were granted asylum (asylees) or who were admitted as refugees. This long-standing policy is consistent with Article 17(1) of the 1951 Convention relating to the Status of Refugees (as incorporated in the 1967 Protocol relating to the Status of Refugees), which states in pertinent part "The Contracting State shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign

---

[95] This authority is proposed to extend only to a Presidential declaration of a major disaster or an emergency granted in accordance with 8 CFR part 206, subpart B.

[96] N–8 is a parent of alien classed as SK3 (unmarried son or daughter of retired G–4 (international Organization Officer or Employee, or Immediate Family) and an N–9 is the child of Child of N–8 or SK1 (Retired International Organization Employee, SK2 (spouse of SKI–1), SK4 (unmarried son or daughter of G–3).

[97] DHS notes that derivatives must pay the fees but are eligible to request a fee waiver.

country in the same circumstances, as regards the right to engage in wage-earning employment.''

**2. Exemptions Related to International Organization Officers and to Agreement Between the U.S. Government and Other Nations**

Under the International Organization Immunities Act,[98] certain representatives of foreign governments may be entitled to enjoy some privileges, exemptions and immunities. USCIS has several forms that provide for NATO participants, ambassadors, and foreign government representatives, as described above. These groups of individuals are limited in number.

DHS believes that continuing to exempt these categories from the fees provides for consistency with agreements between the U.S. Government and another nation or nations, as well as concepts of reciprocity and good relations with other nations. Therefore, USCIS believes that continuing the policy to exclude these categories of applicants is appropriate to comply with agreements and promote good relations with other nations.

**3. Exemptions Related to VAWA Benefit Requests and to T and U Nonimmigrant Status Categories**

As previously discussed, TVPRA requires DHS to permit certain applicants to apply for fee waivers for ''any fees associated with filing an application for relief through final adjudication of the adjustment of status.'' DHS interprets ''any fees associated with filing an application for relief through final adjudication of the adjustment of status'' to mean that, in addition to the main benefit application, applicants must have the opportunity to request a fee waiver for any form associated with the main benefit application up to and including the adjustment of status application. The fees for the VAWA, T, and U categories for Form I–765 had previously been exempted because of the humanitarian nature of these programs and the likelihood that individuals who file requests related to the VAWA, T and U categories would qualify for a fee waiver if they request it. Thus it is more efficient to exempt that population from fees than to employ staff to review fee waiver requests that would usually be approved. Based on the same reasoning, USCIS will continue to provide a fee exemption for the Form I–765 for VAWA, T and U categories.

*E. Changes to Biometric Services Fee*

**1. Incorporating Biometric Activities Into Immigration Benefit Request Fees**

DHS proposes to incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable. Currently, a separate $85 biometric services fee may apply depending on the immigration benefit request[99] or other circumstances. *See* 8 CFR 103.7(b)(1)(i)(C). USCIS provides tables, forms, instructions and other information to help individuals assess whether they need to pay the biometric services fee. USCIS rejects an application, petition, or request that fails to pay the separate biometric services fee, if it applies. *See* 8 CFR 103.17(b). DHS proposes to incorporate the cost of biometric services into the underlying immigration benefit request fees to simplify the fee structure, reduce rejections of benefit requests for failure to include a separate biometric services fee, and better reflect how USCIS uses biometric information.

DHS has broad statutory authority to collect biometric information when such information is ''necessary'' or ''material and relevant'' to the administration and enforcement of the INA. *See, e.g.,* INA secs. 103(a), 235(d)(3), 264(a); 8 U.S.C. 1103(a), 1225(d)(3), 1304(a). The collection, use, and reuse of biometric data are integral to identity management, excluding people with criminal backgrounds, investigating and addressing national security concerns, and maintaining program integrity.

In previous fee rules, USCIS evaluated the biometric activity cost as a single biometric service fee separate from the underlying application, petition, or request. In the FY 2016/2017 fee review, USCIS called the activity Perform Biometric Services. *See* 81 FR 26913. USCIS clarified that persons filing a benefit request may be required to appear for biometrics services or an interview and pay the biometric services fee. *See* 81 FR 26917 and 81 FR 73325. There has been a single biometric services fee for many years, which includes four separate costs:

• FBI Name Checks;
• FBI fingerprints;
• Application Support Center (ASC) contractual support; and
• Biometric service management overall, including federal employees at the ASC locations.

In the FY 2019/2020 fee review, USCIS identified each of these four costs as distinct activities in the ABC model. These four activities replace the single biometric activity that USCIS used in previous fee reviews.[100] USCIS used volume estimates to allocate these costs to the proposed immigration benefit requests to which they generally apply. The biometric volume estimates were specific to the projected workload for FBI Name Checks, FBI fingerprints, and contractual support at the ASC locations. In most cases, these estimates use the average proportion of workload for each immigration benefit request over the last three years. If USCIS believed the average of the last three years did not reflect current plans, it used more recent data or other assumptions. These proportions of each biometric service to receipts can vary, because there is not always a one-to-one relationship between a specific benefit request and a biometric service. For example, USCIS may not require a new biometric collection at an ASC location if it resubmits existing, stored biometric information to the FBI. As another example, some immigration benefit requests, like adoption petitions and applications, require that all adults in a household submit biometric information. *See, e.g.,* 8 CFR 204.310(a)(3)(ii) and 204.310(b). As such, a single adoption petition or application may require one or more adults to submit biometric information. Using biometric volumes specific to individual biometric activities enables USCIS to better forecast biometric costs. DHS proposes to incorporate biometric costs into IEFA immigration benefit request fees by using this biometric activity-specific information in the proposed fees. *See* proposed 8 CFR 106.2. DHS also proposes conforming edits elsewhere in its regulations to remove references to the separate biometric services fee. *See, e.g.,* proposed 8 CFR 204.5(p)(4), 204.310(a)(3)(ii), 212.19(e), 214.2(e)(23)(viii), 214.14(c)(1), 245.15 (h)(2), and 245a.12(d)(2).

The proposed changes in this rule may assist USCIS when shifting to enterprise-wide person-centric identity management. For example, if USCIS expands FBI Name Checks to additional immigration benefit requests, then DHS may propose to increase the fee as appropriate for the affected immigration benefit requests. This approach may

---

[98] 59 Stat. 669, 22 U.S.C. 288.

[99] For a quick reference of the immigration benefit requests that currently require biometric services with the initial submission, see USCIS, Form G–1055, *Fee Schedule,* available at *https://www.uscis.gov/g-1055.*

[100] The single biometric service activity was called Perform Biometric Services in the FY 2016/2017 fee review. *See* 81 FR 26913–4. Previously, USCIS called the activity Capture Biometrics. *See* 75 FR 33459 and 72 FR 4897.

ensure that the affected applicant, petitioner, or requestor would pay the appropriate fee rather than pass the cost burden of all other biometric services to the affected applicants, petitioners, or requestors.

USCIS forecasts biometric workload volumes by immigration benefit request type in order to assign biometrics costs to the appropriate immigration benefit request. Assigning costs to the underlying immigration benefit request type may reduce the administrative burden on USCIS to administer the separate fee and make it easier for applicants, petitioners, and beneficiaries to calculate the total payment that is due. However, USCIS proposes to retain the separate biometric services fee for specific workloads, as described in the next section.

2. Retaining the Separate Biometric Services Fee for Temporary Protected Status

DHS has excluded from USCIS' ABC model for this proposed rule the costs and revenue associated with Temporary Protected Status (TPS), consistent with the previous fee rule. *See* 81 FR 73312–3. In addition, as noted above, DHS proposes generally to eliminate a separate biometric services fee and fund biometric services from the revenue received from the underlying immigration benefit request fees. However, DHS proposes to retain a separate biometric services fee for TPS. Proposed 8 CFR 106.2(a)(37)(iii).

While the TPS registration fee is capped by INA section 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B) at $50, DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b. USCIS collects biometrics for TPS registrants. USCIS requires certain TPS initial applicants and re-registrants to pay the biometric services fee in addition to the fees for Form I–821, Application for Temporary Protected Status, and Form I–765, Application for Employment Authorization, if they want employment authorization. *See* Instructions for Form I–821 ("Applicants for both initial TPS and for re-registration who are 14 years of age and older must submit the $85 biometric services fee or a fee waiver request."). Because the $50 TPS initial application fee is capped by statute and temporary by definition, USCIS has not included it in its ABC model. Nevertheless, the model output of other fees indicates that the $50 amount provided by statute does not recover the full cost of adjudicating these benefit requests.

To reduce the costs of TPS that USCIS must recover from fees charged to other immigration benefit requests, DHS proposes to use the permissive authority in 8 U.S.C. 1254b(a) to require a $30 biometric services fee for TPS initial applications and re-registrations. Proposed 8 CFR 106.2(a)(37)(iii). USCIS based the proposed $30 biometric services fee on the direct costs of collecting, storing, and using biometric information. Currently, USCIS pays approximately $11.50 to the FBI for fingerprinting results. USCIS calculated that biometric collection, storage, and use at an ASC costs approximately $19. USCIS rounded the proposed fee to the nearest $5 increment, similar to other IEFA fees. The proposed fee is less than the current $85 biometric services fee because the current fee includes indirect costs. The FY 2016/2017 fee rule held the biometric services fee to $85, which has not changed since the FY 2010/2011 fee rule.

3. Executive Office for Immigration Review (EOIR) [101] Biometric Services Fee

Similarly, DHS is maintaining the current requirement that applicants filing certain requests with EOIR submit a biometric services fee. Proposed 8 CFR 103.7(a)(2). DHS, including USCIS, handles all aspects of biometrics collection for EOIR and conducts background security checks for individuals in immigration proceedings.[102] This fee is necessary to recover the costs USCIS incurs from performing that service for EOIR. When individuals in immigration proceedings before EOIR seek to file a motion, appeal, or immigration benefit request for relief or protection from removal they are instructed to pay any applicable biometrics and application fees to DHS. *See* 8 CFR 1103.7(a)(3).[103] As previously explained, while DHS proposes to incorporate the costs of biometric services into its underlying immigration benefit request fees, DHS

has no authority to change the amounts it receives from EOIR fees to pay the costs it incurs for biometric services (which includes background checks). Under this proposed rule, DHS proposes to adjust only the fee for those requests filed with and processed by USCIS. Consequently, USCIS has calculated and proposes a biometric services fee of $30 that will be required for certain forms for which it performs intake and biometrics services on behalf of EOIR. *See* proposed 8 CFR 103.7(a)(2).

*F. Form I–485, Application To Register Permanent Residence or Adjust Status*

1. Interim Benefits

DHS proposes to require separate filing fees when filing Form I–765, Application for Employment Authorization and Form I–131, Application for Travel Document concurrently with a Form I–485, Application to Register Permanent Residence or Adjust Status, or after USCIS accepts their Form I–485 and while it is still pending.

Usually, an applicant needs approval of a principal immigration benefit request before receiving ancillary benefits such as employment authorization and a travel document. That is, USCIS only grants those ancillary benefits after or at the same time as it grants the principal immigration status or benefit. In some situations, however, an individual may qualify for an interim ancillary benefit because a benefit request is pending adjudication. For example, a person who applies for adjustment of status, in certain instances, would be able to apply for employment authorization and/or a travel document based on the pending immigration benefit request. *See* 8 CFR 274a.12(c)(9). When this occurs, these ancillary benefits are referred to generally as "interim benefits." [104]

Current DHS regulations provide that applicants who properly file and pay the required fee for a Form I–485 may also file a Form I–765 and/or a Form I–131 without paying any additional fees. *See* 8 CFR 103.7(b)(1)(i)(M)(4) & (II). Applicants may file Form I–765 and/or Form I–131 concurrently with Form I–485. Alternatively, they may file these forms after USCIS accepts their Form I–485 but while the Form I–485 is still pending.

---

[101] Within the Department of Justice, there is an Executive Office for Immigration Review (EOIR), which includes a Director, the Board of Immigration Appeals, the Office of the Chief Immigration Judge, the Office of the Chief Administrative Hearing Officer, the Office of Legal Access Programs, and other staff as the Attorney General or the Director may provide. *See* 8 CFR 1003.0. USCIS provides intake services for several requests filed with EOIR, for which biometrics may be required.

[102] Guidance is available at Immigration Benefits in EOIR Removal Proceedings, at *https:// www.uscis.gov/laws/immigration-benefits-eoir-removal-proceedings* (last reviewed/updated Aug. 22, 2011).

[103] This regulation provides that, except as provided in 8 CFR 1003.8, EOIR does not accept fees, and that fees relating to EOIR proceedings are paid to DHS.

[104] Individuals may derive interim benefits from an Application for Temporary Protected Status, Form I–821. Unless otherwise stated in this proposed rule preamble, DHS uses interim benefits to refer to benefits associated with Form I–485, Application to Register Permanent Residence or Adjust Status.

Before the FY 2008/2009 fee rule, applicants paid separate fees to apply for employment authorization or a travel document while waiting on USCIS to adjudicate Form I–485. Applicants who had not yet received a green card but who may have had to renew these interim benefits paid any associated fees for the renewals. *See* 72 FR 4894. Since the FY 2008/2009 fee rule, USCIS has allowed anyone who files Form I–485 to file Forms I–131 and I–765 concurrently (or after USCIS accepted their Form I–485 but while the Form I–485 was still pending) without a fee if they properly filed a Form I–485 with the required Form I–485 fee. Applicants who had not yet received a green card but who may have had to renew these interim benefits did not have to pay any associated fees. For the FY 2008/2009 fee rule, USCIS determined that calculating fees for Form I–485 at an amount that would include interim benefits would improve efficiency and save most applicants money. *See* 72 FR 4894 and 29861–2. By providing that the fees for interim benefits would be included in the fee for Form I–485, USCIS addressed the perception that it benefits from increased revenue by processing Forms I–485 more slowly. *See* 72 FR 4894 and 29861–2. The FY 2010/2011 fee rule continued the practice of ''bundling'' the fees for interim benefits and Form I–485. *See* 75 FR 58968.

In the FY 2016/2017 fee review, USCIS determined the workload volume and fee-paying percentage of Forms I–765 and Forms I–131 that are not associated with Form I–485. This enabled USCIS to derive a fee-paying percentage for standalone Forms I–765 and Forms I–131, meaning those forms not filed concurrently with a Form I–485. *See* 81 FR 26918 and 73300. By isolating stand-alone interim benefit applicants from those concurrently filing Form I–485, USCIS more accurately assessed fee-paying percentages, fee-paying volumes, and fees for all three benefit types. *Id.*

DHS proposes to return to charging separate fees for Forms I–485, I–765, and I–131. *See* proposed 8 CFR 106.2(a)(16); 8 CFR 106.2(a)(32); 8 CFR 106.2(a)(7)(iii). The proposed change would be subject to phased implementation. Specifically, individuals who filed a Form I–485 after July 30, 2007 (the FY 2008/2009 fee rule) and before this proposed change takes effect will continue to be able to file Forms I–131 and I–765 without additional fees for as long as their Form I–485 is pending. Individuals who filed before the FY 2008/2009 fee rule or after this proposed change becomes effective would pay separate fees for interim benefits. The proposed changes are summarized in Table 8. Dates are not available for the proposed changes.

TABLE 8—FORM I–485 FILING DATES AND INTERIM BENEFITS

| Form I–485 filing date | Bundled fee applies? |
| --- | --- |
| Before July 30, 2007 .................................................................................................................................. | No. |
| After July 30, 2007, but before [INSERT EFFECTIVE DATE OF THIS RULE] ................................................. | Yes. |
| After implementing this proposed change with a final rule .............................................................................. | No. |

DHS proposes this change in order to reduce the proposed fee increases for Form I–485 and other forms. For example, in the previous fee rule, USCIS isolated the workload volume and fee-paying percentage of Forms I–765 and I–131 that are not associated with Form I–485. *See* 81 FR 26918. Isolating the volumes for interim benefits reduced the overall volume on the fee schedule because we only counted interim benefit volumes as part of the Form I–485 forecast instead of counting them twice (for Form I–485 and the interim benefit). Based on the total number of Form I–485 applications that were concurrently filed with Forms I–131 and I–765 on the same day in FY 2017, USCIS expects approximately 424,000 annual interim benefit applications in FY 2019/2020 forecast. In the proposed fee schedule, USCIS assumes these interim benefit applicants will pay the applicable fees for Forms I–485, I–131, and I–765. If USCIS were to continue the previous approach and assume these applicants only pay the fee for Form I–485, then the proposed fee for Form I–485 would be $1,240, $120 or approximately 11 percent more than the proposed fee of $1,120. *See* 8 CFR 103.7(b)(1)(i)(U); proposed 8 CFR 106.2(a)(16). Other proposed fees would also change on this hypothetical fee schedule. For example, the Form I–90, Application to Replace Permanent Resident Card, fee would remain $455 in this hypothetical fee schedule. The proposed Form I–90 fee is $415, $40 or approximately 9 percent less than the current $455 fee. *See* 8 CFR 103.7(b)(1)(i)(G); proposed 8 CFR 106.2(a)(1). This version of the fee schedule has a weighted average fee increase of 23 percent compared to the 21 percent average fee increase in proposed fee schedule.[105] In general, the fees are higher in a fee schedule with bundled fee interim benefits because it has lower workload and fee-paying volume than the proposed fee schedule. This means there are fewer immigration benefit requests for USCS to recover projected costs in a fee schedule with bundled fee interim benefits. DHS proposes separate fees for interim benefit applications and Form I–485 applications in order to lower the proposed fees for most other applicants, petitioners, and requestors.

DHS proposes to reduce the Form I–485 fee to $1,120, which is $20 or 2 percent less than the current $1,140 fee that includes interim benefits. However, the cost reducing effects of unbundling interim benefit fees is partially offset by several other factors that increase the costs of the Form I–485. For example, background check requirements have increased.[106] USCIS is also interviewing a greater proportion of adjustment of status applicants, requiring more time and effort to adjudicate Form I–485.[107] In addition, USCIS did not realize the efficiency gains anticipated when it bundled interim benefits. *See* 72 FR 4894. This is due to a number of reasons. Mainly, annual numerical visa limits established by Congress and high demand have created long wait times for some visa categories.[108] Many

---

[105] *See* footnote 6 for more information on the weighted averages in the fee schedule. In a fee schedule with free interim benefits, the sum of the current fees multiplied by the projected FY 2019/2020 fee-paying receipts for each immigration benefit type, divided by the total fee-paying receipts is $533. This is $3 higher than in the proposed fee schedule because the fee-paying volumes are lower when we assume free interim benefits. The weighted average proposed fee is $655, $122 or 23 percent higher than the weighted average current fee of $533 in this hypothetical fee schedule that assumes free interim benefits.

[106] *See, e.g.,* Exec. Order No. 13780, *Protecting the Nation From Foreign Terrorist Entry Into the United States,* 82 FR 13209 (Mar. 6, 2017).

[107] USCIS, *USCIS to Expand In-Person Interview Requirements for Certain Permanent Residency Applicants, https://www.uscis.gov/news/news-releases/uscis-to-expand-in-person-interview-requirements-for-certain-permanent-residency-applicants* (last reviewed/updated Aug. 28, 2017).

[108] *See* USCIS, Visa Retrogression at *https://www.uscis.gov/green-card/green-card-processes-*

applicants must wait years for visas to become available. While USCIS has some control over its own allocation of resources to address processing times and backlogs, USCIS has no direct control over delays caused by the U.S. Department of State's allocation of visa numbers and Congress' annual visa numerical limits. USCIS has taken some actions to alleviate the filing burden and fees on those individuals whose Form I–485 applications are still pending due to the lack of available immigrant visas. For example, DHS now provides EADs with 2-year validity periods when the

final action date for determining visa availability retrogresses.[109]

New applicants would only pay for the benefits that they wish to receive as a result of this proposal. In the FY 2008/ 2009 and FY 2010/2011 fee rules, some commenters stated they did not want to pay for additional benefits they did not want, need, or receive. See 72 FR 29861–3 and 75 FR 58968. This proposal is in line with the beneficiary-pays principle discussed in the Fee Waivers section of this preamble. Finally, this change would treat Form I–485 applicants similarly to other applicants who apply for interim

benefits. In previous fee rules, bundled interim benefit fees were only associated with a pending Form I–485. However, several other applications may warrant interim benefits.[110] DHS has decided it is more equitable to treat all of these petitioners and applicants the same, regardless of the request that may grant interim benefits. Some applicants would pay significantly more to adjust status and apply for one or more interim benefits. Table 9 compares the current fees for Form I–485 applicants that may bundle interim benefits to the proposed fees without bundling.

TABLE 9—CURRENT AND PROPOSED FEES FOR ADJUSTMENT OF STATUS WITH INTERIM BENEFITS

| Immigration benefit request | Current fees | Proposed fees | Difference | Percentage difference |
|---|---|---|---|---|
| I–485, Application to Register Permanent Residence or Adjust Status .......... | $1,140 | $1,120 | −$20 | −2 percent |
| I–765, Application for Employment Authorization ............................................. | 410 | 490 | 80 | 20 |
| I–131, Application for Travel Document ............................................................ | 575 | 585 | 10 | 2 |
| Biometric Services Fee ..................................................................................... | 85 | [111] N/A | −85 | −100 |
| Total Fees for Form I–485 and biometric services ........................................ | 1,225 | 1,120 | −105 | −9 |
| Total Fees for Forms I–485 and I–765 and biometric services ...................... | | 1,610 | 385 | 31 |
| Total Fees for Forms I–485 and I–131 and biometric services ...................... | | 1,705 | 480 | 39 |
| Total Fees for Form I–485, all interim benefits, and biometric services ......... | | 2,195 | 970 | 79 |

2. Form I–485 Fee for Child Under 14, Filing with Parent

Currently, Form I–485 has two fees. The fee for an adult is $1,140, and the fee for a child under the age of 14 concurrently filing with a parent is $750. See 8 CFR 103.7(b)(1)(i)(U). DHS proposes to require payment of the proposed $1,120 fee for all applicants, including children under the age of 14 years concurrently filing Form I–485 with a parent.[112] See 8 CFR 103.7(b)(1)(i)(U)(2); proposed 8 CFR 106.2(a)(16).

DHS no longer believes there is a cost basis for the two different Form I–485 fees. As explained in the FY 2016/2017

fee rule, USCIS does not track the adjudication time for Form I–485 based on the age of the applicant so there is no data showing a cost difference correlated to the difference in applicant age. See 81 FR 73301. The FY 2016/ 2017 fee rule calculated the $750 fee using the model output to comply more closely with the ABC methodology for full cost recovery. See 81 FR 26919. USCIS assumed that the $750 fee would not include the cost of an EAD. Id. As such, the completion rate for the $750 fee was lower than most adults. In addition, children under the age of 14 do not typically pay the $85 biometric services fee required for adults that apply to adjust status. In the proposed

Form I–485 fee, USCIS assumes the same completion rate and biometric services for adults and children because DHS proposes to separate interim benefit request fees from the fee for Form I–485. DHS believes that a single fee for Form I–485 will reduce the burden of administering separate fees and better reflect the cost of adjudication. This proposal will affect a small percentage of Form I–485 applicants. In FY 2017 and 2018, approximately 6 percent of Form I–485 applicants paid the $750 fee. See Table 10 for Form I–485 fee-paying receipts and percentages for the two years.

---

and-procedures/visa-availability-priority-dates/ visa-retrogression (last reviewed/updated March 8, 2018).

[109] USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an individual's authorization to work in the United States. See 8 CFR 274a.12(b).

[110] See footnote 79.

[111] As noted earlier in this preamble, DHS propose to eliminate the separate $85 fee in most cases. See V.E. Changes to Biometric Services Fee section for more information.

[112] The parent may be seeking classification as an immediate relative of a U.S. citizen, a family-sponsored preference immigrant, or a family member accompanying or following to join a spouse or parent under sections 201(b)(2)(A)(i), 203(a)(2)(A), or 203(d) of the INA; 8 U.S.C. 1151(b)(2)(A)(i), 1153(a)(2)(A), or 1153(d).

TABLE 10—FORM I–485 FEE-PAYING RECEIPTS

| Form I–485 applicant type | Current fee | FY 2017 fee-paying receipts | Percent of FY 2017 | FY 2018 fee-paying receipts | Percent of FY 2018 |
|---|---|---|---|---|---|
| Applicant under the age of 14 years who submits the application concurrently with the Form I–485 of a parent ... | $750 | 32,870 | 6 | 33,290 | 6 |
| All other fee-paying applicants for Form I–485 .................. | 1,140 | 511,432 | 94 | 496,113 | 94 |
| Total ........................................................................ | N/A | 544,302 | 100 | 529,403 | 100 |

In addition, DHS is proposing to clarify the fee for applicants for adjustment of status pursuant to INA section 245(i). Such applicants are required to properly file Form I–485 with fee along with Form I–485 Supplement A and the $1,000 statutory fee, unless exempted by the statute. USCIS proposes that the fee for the Application to Adjust Status under Section 245(i) of the Act, Form I–485, Supplement A, be revised to clarify that the Form I–485 Supplement A and the $1,000 fee must be submitted when the Form I–485 is filed or still pending. *See* proposed 8 CFR 106.2(a)(17). An applicant who has not paid the $1,000 statutory fee when applying for adjustment of status has not been lawfully adjusted and cannot satisfy the "lawfully admitted" requirement of INA section 318, 8 U.S.C. 1429, for naturalization. DHS is also proposing to delete the text from the Form I–485, Supplement A, that provides that there is no fee when the applicant is an unmarried child under 17 or the spouse or the unmarried child under 21 of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program. *See* 8 CFR 103.7(b)(1)(i)(V); proposed 8 CFR 106.2(a)(17). Those fee exemptions are explicitly provided by statute and will be included in the applicable form instructions. *See* INA section 245(i)(1)(C), 8 U.S.C. 1255(i)(1)(C). It is unnecessary to codify them in the Code of Federal Regulations.

*G. Continuing To Hold Refugee Travel Document Fee to the Department of State Passport Fee*

Consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees,[113]

DHS proposes to continue to charge a fee for refugee travel documents linked to the fee for a U.S. passport book. *See* 75 FR 58972 (discussing Article 28 standards for assessing charges for a refugee travel document). In previous fee rules, DHS aligned the refugee travel document fees to the sum of the United States passport book application fee plus the additional execution fee that DOS charges for first time applicants. *See* 81 FR 73301 and 75 FR 58972. Since the FY 2016/2017 fee rule, DOS increased the execution fee from $25 to $35, a $10 or 40 percent increase. *See Department of State, Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates-Passport Services Fee Changes,* 83 FR 4425 (Jan. 31, 2018). Under this proposal, DHS would increase refugee travel document fees by a conforming amount. DHS refugee travel document fees would be $145 for adults and $115 for children under the age of 16 years, consistent with current U.S. passport fees. *See* proposed 8 CFR 106.2(a)(7)(i) and (ii).

*H. Form I–131A, Carrier Documentation*

DHS proposes to separate the fee for Form I–131A, Application for Carrier Documentation, from other travel document fees and to expand the population eligible to file Form I–131A. *See* 8 CFR 103.7(b)(1)(i)(M)(3); proposed 8 CFR 106.2(a)(8). The proposed fee for Form I–131A is $1,010, a $435 or 76 percent increase from the current $575 fee. *Id.* In 2016, USCIS began using Form I–131A, Application for Carrier Documentation. *See* 80 FR 59805. In the FY 2016/2017 fee rule, DHS implemented a fee that was calculated using the total Form I–131 and I–131A workload. *See* 81 FR 73294–5.

Currently, certain lawful permanent residents (LPRs) may use Form I–131A to apply for a travel document (carrier documentation) if their Permanent Resident Card (PRC), also known as a Green Card or Form I–551, or their reentry permit is lost, stolen, or

destroyed while outside of the United States. Carrier documentation allows an airline or other transportation carrier to board the LPR without any penalty to the airline or transportation carrier for permitting an individual to board without a visa or travel document. *See* INA section 273, 8 U.S.C. 1323 (providing for a fine of $3,000 for each noncitizen without proper documentation). In order to be eligible for carrier documentation, an LPR who was traveling on a PRC must have been outside the United States for less than one year, and an LPR who was traveling on a reentry permit must have been outside the United States for less than two years. Form I–131A is not an application for a replacement PRC or reentry permit.

DHS proposes a Form I–131A fee separate from Form I–131 because Form I–131A differs from other applications for travel documents. The proposed separate Form I–131A fee would be more equitable because the form requires a different adjudicative process than Form I–131, including processing by personnel outside of the United States, which affects the projected cost for Form I–131A. Other travel documents may be adjudicated inside or outside of the United States, while the DOS Bureau of Consular Affairs, located outside of the United States, will process Form I–131A following the closure of some USCIS international offices.[114] It generally costs more to process Form I–131A outside of the United States, and therefore, providing carrier documentation is relatively more expensive for USCIS than providing other travel documents. The proposed fee includes direct costs to account for the fee DOS charges USCIS to adjudicate Form I–131A applications, which is

---

[113] The United States is party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, 606 U.N.T.S. 267 (1968), which incorporates articles 2 through 34 of the 1951 Convention. The United States is not party to the 1951 Convention. *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through

34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951.").

[114] *See USCIS Will Adjust International Footprint to Seven Locations* at *https://www.uscis.gov/news/news-releases/uscis-will-adjust-international-footprint-seven-locations* (last reviewed/updated Aug. 9, 2019). The volume and cost projections used in this rule were generated before planning to adjust the international footprint of USCIS and do not incorporate cost changes associated with the adjustment. DHS will incorporate resulting cost changes in future fee rules.

approximately $385 each.[115] In the FY 2018 interagency agreement and in this proposed rule, USCIS projects that DOS will receive approximately 6,199 Forms I–131A each year. Separately, USCIS forecasts that USCIS or DOS will receive 3,600 Forms I–131A each year based on historic USCIS receipts. The total Form I–131A receipt forecast for USCIS or DOS is 9,799 per year.

DHS also proposes to expand the population that is eligible to use Form I–131A. DHS proposes to allow individuals whose advance parole documents or combination employment authorization and advance parole cards (combo cards) that are lost, stolen, or destroyed to use Form I–131A to apply for a carrier document while abroad. Currently, there is no clear process for individuals who lose advance parole documents while they are abroad to replace those documents. Since USCIS does not issue advance parole documents to individuals who are abroad, it is not possible to replace a lost or stolen advance parole document until the individual returns to the United States. Some have applied for humanitarian parole to return to the United States, which requires the applicant to demonstrate an urgent humanitarian reason or significant public benefit as there is currently no other appropriately established process for such individuals to obtain a travel document to return to the United States. *See generally* INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR part 223.[116] DHS proposes to permit those individuals to file Form I–131A to request carrier documentation, which would allow them to board a return flight to the United States despite their advance parole document having been lost, stolen, or destroyed. DOS personnel would verify that such an individual previously obtained the advance parole authorization before issuing the carrier documentation. At this time, USCIS cannot estimate the number of additional Form I–131A requests that may be filed as a result of this proposed change. However, USCIS expects the increase in the number of

filings to be small. While USCIS does not track Form I–131 humanitarian parole requests made specifically for carrier documentation, there were approximately 200 Form I–131 submissions in FY 2017 without a designation of the underlying basis of the request. Individuals who used humanitarian parole requests to obtain carrier documentation would be a subset of those approximately 200 receipts.

*I. Separating Form I–129, Petition for a Nonimmigrant Worker, Into Different Forms*

Currently, employers and other qualified filers, such as agents, sponsoring organizations and investors (collectively referred to as a "benefit requestor" or separately referred to as a "petitioner" or "applicant," as applicable) may use Form I–129, Petition for a Nonimmigrant Worker, to make a benefit request on behalf of a current or future nonimmigrant worker to temporarily perform services or labor, or to receive training in the United States.[117] Using this single form, petitioners or applicants can file petitions or applications for many different types of nonimmigrant workers.[118] Some classifications also allow nonimmigrants to "self-petition" or file a petition or application on behalf of themselves. Some nonimmigrant classifications require use of Form I–129 supplemental forms, such as the H Classification Supplement, or additional separate forms, such as Form I–129S, Nonimmigrant Petition Based on Blanket L Petition. Certain petitioners or applicants must pay statutory fees in addition to a base filing fee in some cases. For example, several statutory fees exist for H and L nonimmigrant workers.[119] In some cases, petitioners or applicants pay a single fee for multiple nonimmigrant beneficiaries. USCIS provides several optional checklists to help navigate the specific requirements of some nonimmigrant classifications.

DHS proposes to separate Form I–129 into several forms. These new forms will incorporate information from the various supplemental forms for specific types of workers or nonimmigrant classifications. DHS proposes different fees for these new forms. The proposed fees are calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. The current base filing fee for Form I–129 is $460. *See* 8 CFR 103.7(b)(1)(i)(I). This base filing fee is paid regardless of how many nonimmigrant workers will benefit from the petition or application, the type of worker (for example, landscaper, chef, scientist, computer programmer, physician, athlete, musician, etc.), whether an employee is identified, and without differentiating the amount of time it takes to adjudicate the different nonimmigrant classifications. Therefore, in order to reflect these differences, DHS is proposing a range of fees for petitions and applications for nonimmigrant workers, listed in Table 11 and explained in the subsequent sections. By splitting the form and proposing several different fees, USCIS believes it will simplify or consolidate the information requirements for petitioners and applicants as well as better reflect the cost to adjudicate each specific nonimmigrant classification. In addition, DHS is proposing that, where any new Form I–129 is filed for a named worker who is present in the United States, the petitioner must provide USCIS with a valid domestic address for the named worker(s) when submitting the form. DHS welcomes comments on the new forms.

In 2017, the DHS Office of Inspector General (OIG) released a report on H–1B visa participants. It discussed how USCIS verifies H–1B visa participants through the Administrative Site Visit and Verification Program (ASVVP). ASVVP includes site visits on all religious worker petitioners, including R nonimmigrants, as well as randomly selected site visits for certain H–1B and L workers to assess whether petitioners and beneficiaries comply with applicable immigration laws and regulations. As a result of the OIG audit, USCIS began to collect better information on the costs associated with ASVVP. For example, ASVVP now uses unique project and task codes in the USCIS financial system to track spending. Additionally, USCIS tracks ASVVP hours by form type in the Fraud Detection and National Security Data System, which USCIS uses to identify fraud and track potential patterns. In the

---

[115] The FY 2018 interagency agreement between Department of State and USCIS uses an Economy Act rate of $385.88 for the adjudication. USCIS used FY 2018 rates when calculating the proposed fees. The FY 2019 interagency agreement between Department of State and USCIS uses an Economy Act rate of $352.15 for the adjudication.

[116] For relevant guidance, see *USCIS to Issue Employment Authorization and Advance Parole Card for Adjustment of Status Applicants: Questions and Answers, https://www.uscis.gov/ news/questions-and-answers/uscis-issue-employment-authorization-and-advance-parole-card-adjustment-status-applicants-questions-and-answers* (last reviewed/updated March 9, 2018).

[117] See Temporary (Nonimmigrant) Workers at *https://www.uscis.gov/working-united-states/ temporary-nonimmigrant-workers* (last reviewed/ updated Sept. 7, 2011).

[118] For example, nonimmigrants workers in the following classifications: E–1, E–2, E–2C, H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, R–1, TN1, and TN2. See Form I–129, Petition for a Nonimmigrant Worker at *https://www.uscis.gov/i-129* (last reviewed/updated Sept 11, 2018).

[119] Various statutory fees apply to H and L nonimmigrants. For more information on the fees and statutory authority, see USCIS, *H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker, https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018).

FY 2019/2020 fee review, USCIS used some of this new information to identify distinct costs for these site visits. USCIS used the ASVVP hours by immigration benefit request to assign the appropriate direct costs of site visits to Forms I–129. The proposed fees would result in the cost of ASVVP being covered by the fees paid by the petitioners in proportion to the extent to which ASVVP is being used for that benefit request.

Additionally, USCIS now captures adjudication hours for nonimmigrant worker petitions based on the classification for which the petition is filed (see discussion of Completion Rates in section IV.B.2). Therefore, the proposed fees include the costs associated with the estimated adjudication hours for each of the new petitions being proposed in this rule.

TABLE 11—PROPOSED FORM NUMBERS AND FORM TITLES FOR SEPARATING FORM I–129

| Proposed form No. | Proposed form title | Proposed fee(s) |
|---|---|---|
| I–129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | $705. |
| I–129E&TN | Application for Nonimmigrant Worker: E or TN Classification | $705. |
| I–129H1 | Petition for Nonimmigrant Worker: H–1 Classification | $560. |
| I–129H2A | Petition for Nonimmigrant Worker: H–2A Classification | $860 (named); $425 (unnamed). |
| I–129H2B | Petition for Nonimmigrant Worker: H–2B Classification | $725 (named); $395 (unnamed). |
| I–129L | Petition for Nonimmigrant Worker: L Classification | $815. |
| I–129MISC | Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification | $705. |
| I–129O | Petition for Nonimmigrant Worker: O Classification | $715. |

1. Form I–129H1, Petition for Nonimmigrant Worker: H–1 Classifications

DHS proposes to create Form I–129H1, Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker. *See* proposed 8 CFR 106.2(a)(3)(i). The H–1B nonimmigrant program is for individuals who will perform services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability; while the H–1B1 nonimmigrant program is for nationals of Singapore or Chile engaging in specialty occupations. *See* INA sec. 101(a)(15)(H)(i)(b), (H)(i)(b1); 8 U.S.C. 1101(a)(15)(H)(i)(b), (H)(i)(b1).[120] DHS proposes a fee of $560 for the Form I–129H1. The proposed fee for a petitioner to file Form I–129H1 more accurately incorporates the direct cost of USCIS fraud prevention efforts for H–1B workers and other planned changes. DHS does not propose any changes to statutory fee amounts for certain H–1B petitioners because it does not have the authority to change the amount of these fees.[121]

2. Forms I–129H2A and I–129H2B, Petitions for H–2A and H–2B Workers

DHS proposes to create Form I–129H2A, Petition for Nonimmigrant Worker: H–2A Classification, and Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification. The H–2A program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary agricultural jobs.[122] The H–2B program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary nonagricultural jobs.[123] On March 6, 2017, OIG issued an audit report after reviewing whether the fee structure associated with H–2 petitions is equitable and effective.[124] OIG identified a number of issues and provided recommendations to address the issues. The creation of the two new forms, Forms I–129H2A and I–129H2B, is USCIS' response to OIG's recommendations. Further, USCIS proposes the following changes:

• Separate fees for petitions with named workers and petitions with unnamed workers;

• Limit the number of named workers that may be on a single petition to 25.

DHS proposes separate H–2A and H–2B fees for petitions with named workers and unnamed workers. Currently, petitions for H–2A or H–2B workers may include named or unnamed workers. Petitioners must name workers when (1) the petition is filed for a worker who is a national of a country not designated by the Secretary of Homeland Security as eligible to participate in the H–2A or H–2B program; or (2) the beneficiary is in the United States. *See* 8 CFR 214.2(h)(2)(iii). In addition, USCIS may require the petitioner to name H–2B workers where the name is needed to establish eligibility for H–B nonimmigrant status. USCIS estimates that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. USCIS runs background checks on named workers, but cannot do so for unnamed workers. After the petition is approved, the petitioner finds workers and the worker applies for a nonimmigrant visa with DOS, who will then vet the worker. Therefore, USCIS believes that it takes less time for a

---

[120] *See* H–1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models, *https://www.uscis.gov/working-united-states/temporary-workers/h-1b-specialty-occupations-dod-cooperative-research-and-development-project-workers-and-fashion-models* (last reviewed/updated April 3, 2017).

[121] Certain H–1B petitions may have to pay up to $6,000 in statutory fees. DHS does not have the authority to adjust the amount of these statutory fees. USCIS does not keep most of the revenue. CBP receives 50 percent of the $4,000 9–11 Response and Biometric Entry-Exit fee and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains 5 percent of the $1,500 or $750 American Competitiveness and Workforce Improvement Act (ACWIA) fee. The remainder goes to the Department of Labor and the National Science Foundation. USCIS keeps one third of the $500 Fraud Detection and Prevention fee, while the remainder is split between the Department of State and the Department of Labor. These statutory fees are in addition to the current Form I–129 fee of $460 and optional premium processing fee of $1,410. *See* USCIS, *H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker, https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018).

[122] *See* H–2A Temporary Agricultural Workers, *https://www.uscis.gov/working-united-states/temporary-workers/h-2a-temporary-agricultural-workers* (last reviewed/updated March 8, 2018).

[123] *See* H–2B Temporary Non-Agricultural Workers, *https://www.uscis.gov/working-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers* (last reviewed/updated June 11, 2018). H–2B petitioners who file with USCIS are required to pay a $150 Fraud Detection and Prevention fee per petition regardless of the number of beneficiaries to which the petition pertains. DHS does not propose any change to this statutory fee by rulemaking. *See* INA secs. 214(c)(12)–(13), 286(v); 8 U.S.C. 1184(c)(12)–(13) 1356(v). This statutory fee is in addition to the current Form I–129 fee of $460 and optional premium processing fee of $1,410.

[124] DHS OIG, *H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors* (Mar. 6, 2017), *available at https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

USCIS immigration services officer to adjudicate a petition with unnamed workers. The proposed fees reflect the average adjudication time estimated by USCIS.

USCIS proposes to implement a limit of 25 named beneficiaries per petition. Proposed 8 CFR 214.2(h)(2)(ii), (h)(5)(i)(B). Currently, there is no limit on the number of named or unnamed workers that may be on a single petition. USCIS currently charges a flat fee regardless of whether a petition includes one or hundreds of named temporary nonimmigrant workers. However, because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. In one case, a petitioner included more than 600 named workers in one petition.[125] OIG observed that the flat fee structure (meaning the same fee regardless of the number of nonimmigrants included in the petition) disproportionally costs more per nonimmigrant for petitions with few beneficiaries compared to those with large numbers of beneficiaries. In other words, petitioners filing petitions with low named beneficiary counts subsidize the cost of petitioners filing petitions with high named beneficiary counts.

OIG's interviews of USCIS immigration services officers indicated that usually a maximum of 10 petitions could be processed within a normal workday.[126] USCIS immigration services officers could generally adjudicate a petition with 1–25 named workers in 2 hours. DHS estimates the proposed change will increase H–2A and H–2B petition filing volume by approximately 2,000 based on the number of H–2A and H–2B petitions that were received in FY 2017 with 26 or more named beneficiaries. DHS assumed that the total number of named beneficiaries requested by an employer would remain the same, so that an employer petitioning for more than 25 named beneficiaries would file multiple petitions.

The proposed fees would address the inequities in the current fee structure identified by the OIG audit. The proposed limit of 25 named beneficiaries per petition may make it easier for USCIS immigration services officers to promptly adjudicate a petition. For example, the proposed $425 fee for an H–2A petition without

named workers is approximately 51 percent less than the proposed $860 fee for an H–2A petition with named workers because the adjudication requires less time. Due to the decreased complexity of the adjudication, the proposed $425 fee for a petition without named workers is $35 or 8 percent less than the current $460 fee for the Form I–129. The proposed $860 fee for a petition with named workers is $400 or 87 percent more than the current $460 fee for the Form I–129.

### 3. Form I–129L, Petition for Nonimmigrant Worker: L Classification

DHS proposes to create Form I–129L, Petition for Nonimmigrant Worker: L Classification, with a proposed fee of $815. *See* proposed 8 CFR 106.2(a)(3)(iv). Under current requirements, petitioners sponsoring L nonimmigrant workers, who are intracompany transferees,[127] may be required to submit additional statutory fees or other additional forms to USCIS. For example, two statutory fees may apply for L nonimmigrant workers.[128] Some petitions require the additional Form I–129S, Nonimmigrant Petition Based on Blanket L Petition.

The proposed Form I–129L would collect the information required for these petitions. Although the current L Classification Supplement to Form I–129 only separates out L–1A manager or executive from L–1B specialized knowledge, the proposed form would further separate out L–1A managers from L–1A executives on the form. However, DHS is not proposing different fees for managers and executives, because the agency has no records on the difference in completion

rates or costs for processing petitions for managers and executives. USCIS currently captures completion rates for H–1B, L, and other types of petitions, but not for subgroups, such as managers and executives, within classifications. The proposed fee is based on the completion rate for the average of L–1 petitions. As mentioned in section V.I. Separating Form I–129, Petition for a Nonimmigrant Worker, into Different Forms, the proposed fees also assign the direct costs of ASVVP site visits, currently used for certain H–1B, L, and all religious workers, to the specific form for the classification.

### 4. Form I–129O, Petition for Nonimmigrant Worker: O Classification

DHS proposes to create Form I–129O, Petition for Nonimmigrant Worker: O Classification, with a proposed fee of $715. *See* proposed 8 CFR 106.2(a)(3)(vi). The separate form would allow USCIS to tailor instructions and data collection requirements for these petitions for persons with extraordinary ability in the sciences, arts, education, business, or athletics, persons with extraordinary achievement in the motion picture or television industry, and qualifying essential support personnel. *See* INA secs. 101(a)(15)(O), 214(c); 8 U.S.C. 1101(a)(15)(O), 1184(c); 8 CFR 214.2(o). Similar to some other proposed changes to Form I–129, DHS proposes to limit each Form I–129O petition to 25 named beneficiaries.[129] Proposed 8 CFR 214.2(o)(2)(iv)(F). As previously discussed in the H–2A and H–2B section above, limiting the number of named beneficiaries simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts. USCIS currently captures adjudication hours for these types of petitions. As stated in section

---

[125] *Id.* at 13.
[126] *Id.* at 17.

[127] The L–1 intracompany transferee nonimmigrant classification permits a multinational organization to transfer certain employees from one of its affiliated foreign entities to one of its entities in the United States. The L–1A classification is for employees coming to the United States temporarily to perform services in a managerial or executive capacity. The L–1B classification is for employees coming to the United States temporarily to perform services that require specialized knowledge. *See* INA sec. 101(a)(15)(L), 8 U.S.C. 1101(a)(15)(L).

[128] Certain L petitioners may have to pay up to $5,000 in statutory fees. DHS does not have the authority to adjust the amount of these statutory fees. USCIS does not keep most of the revenue derived from these fees. CBP receives 50 percent of the $4,500 9–11 Response and Biometric Entry-Exit fee revenue and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains one third of the $500 Fraud Detection and Prevention fee revenue, while the remainder is split between the Department of State and the Department of Labor. These statutory fees are in addition to the current Form I–129 fee of $460 and optional premium processing fee of $1,410. *See* USCIS, *H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker, https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018).

[129] While O–1 petitions are limited to a single named beneficiary, a petition for O–2 nonimmigrant workers may include multiple named beneficiaries in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

IV.B.2. Completion Rates, the proposed fee is partly based on this data.

## 5. Form I–129E&TN, Application for Nonimmigrant Worker: E and TN Classification

DHS proposes to create a separate Form I–129 supplement for E and TN applicants entitled Form I–129E&TN, Application for Nonimmigrant Worker: E and TN Classification. The Treaty Trader (E–1) and Treaty Investor (E–2) classifications are for citizens of countries with which the United States maintains treaties of commerce and navigation. The applicant must be coming to the United States to engage in substantial trade principally between the United States and the treaty country (E–1), to develop and direct the operations of an enterprise in which the applicant has invested or is in the process of investing a substantial amount of capital (E–2), or to work in the enterprise as an executive, supervisor, or essentially skilled employee. *See* INA sec. 101(a)(15)(E), 8 U.S.C. 1101(a)(15)(E); 8 CFR 214.2(e). An E–2 CNMI or E–2C investor is a noncitizen who seeks to enter or remain in the Commonwealth of the Northern Mariana Islands (CNMI) in order to maintain an investment in the CNMI that was approved by the CNMI government before November 28, 2009. This classification allows an eligible noncitizen to be lawfully present in the CNMI in order to maintain the investment during the transition period from CNMI to federal immigration law, which was extended by Public Law 115–218, sec. 3(a) on July 24, 2018 and will expire on December 31, 2029. *See* 48 U.S.C. 1806; *proposed* 8 CFR 214.2(e)(23). The E–3 classification applies to nationals of Australia who are coming to the United States solely to perform services in a specialty occupation requiring theoretical and practical application of a body of highly specialized knowledge and at least the attainment of a bachelor's degree, or its equivalent, as a minimum for entry into the occupation in the United States. *See* INA secs. 101(a)(15)(E) and 214(i)(1); 8 U.S.C. 1101(a)(15)(E) and 1184(i)(1). The TN Classification was created to implement part of a trilateral North American Free Trade Agreement (NAFTA) between Canada, Mexico, and the United States. In accordance with the NAFTA, a citizen of Canada or Mexico who seeks temporary entry as a business person to engage in business activities at a professional level may be admitted to the United States. *See* INA sec. 214(e), 8 U.S.C. 1184(e); 8 CFR 214.6; proposed 8 CFR 106.2(a)(3)(viii).

## 6. Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification

DHS proposes to create a new form for the remaining non-immigrant worker classifications, called Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification. The costs used to determine the proposed fee for this form aggregate all identifiable costs associated with the adjudication of these different visa classifications, including the costs of administering site visits for R visa workers under the Administrative Site Visit and Verification Program. As previously discussed in sections 2 and 4, DHS proposes for classifications that allow one petition to be filed for multiple beneficiaries, to limit such petitions to 25 named beneficiaries. Proposed 8 CFR 214.2(p)(2)(iv)(F). As stated previously, this change, as with all new I–129 form types, is expected to simplify and optimize the adjudication of these petitions, which is expected to lead to reduced processing times and reduced completion rates. Because USCIS completes a background check for each named beneficiary, petitions with more beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts. USCIS does not have separate completion rates for the proposed Forms I–129E&TN and I–129MISC. Currently, USCIS adjudicators report hours on these classifications in a catch-all Form I–129 category. Creation of new separate forms may allow USCIS to track each separately and calculate specific fees for each petition or application in the future, which could serve as a basis for further refinement of the fee for the various nonimmigrant classifications in future fee rules. The proposed fee for both Forms I–129E&TN and I–129MISC is $705. *See* proposed 8 CFR 106.2(a)(3)(viii).

## 7. Commonwealth of the Northern Mariana Islands (CNMI) Fees

Two recent public laws affected statutory fees for the Commonwealth of the Northern Mariana Islands (CNMI). The Northern Mariana Islands Economic Expansion Act, Public Law 115–53, sec. 2, 131 Stat. 1091, 1091 (2017) (2017 CNMI Act) increased the CNMI

education funding fee from $150 to $200. *See* 48 U.S.C. 1806(a)(6)(A)(i). USCIS began accepting this increased fee on August 23, 2017.[130] DHS proposes to make conforming edits to the fee for the Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW, because of this statutory change. *See* 8 CFR 103.7(b)(1)(i)(J); proposed 8 CFR 106.2(c)(7). Employers must pay the fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee must be paid at the time of filing the petition. By statute, since it is for each worker approved, USCIS refunds the CNMI education funding fee if the petition is not approved. The fee is a recurring fee that petitioners must pay every year. A prospective employer requesting issuance of a permit with a validity period longer than one year must pay the fee for each year of requested validity. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers. The Northern Mariana Islands U.S. Workforce Act of 2018, Public Law 115–218, sec. 3, 132 Stat. 1547 (2018) (2018 CNMI Act), granted DHS the authority to adjust the fee for inflation. *See* 48 U.S.C. 1806(a)(6)(A)(ii). Beginning in FY 2020, DHS may adjust the $200 CNMI education funding fee once per year by notice in the **Federal Register**.[131] The adjustment must be based on the annual change in the Consumer Price Index for All Urban Consumers (CPI–U) published by the Bureau of Labor Statistics. *See* proposed 8 CFR 106.2(c)(7)(iii).

In addition to authorizing inflation adjustments for the CNMI education funding fee, the 2018 CNMI Act created a new $50 CNMI fraud prevention and detection fee. 2018 CNMI Act, sec. 3 (amending 48 U.S.C. 1806(a)(6)(A)(iv)). The new $50 fraud prevention and detection fee is in addition to other fees that employers must pay for petitions to employ CNMI-only transitional workers. *See* proposed 8 CFR 106.2(c)(6). USCIS began accepting the fee on July 25,

---

[130] USCIS, *New Legislation Increases Availability of Visas for CNMI Workers for Fiscal Year 2017, https://www.uscis.gov/news/news-releases/new-legislation-increases-availability-visas-cnmi-workers-fiscal-year-2017* (last reviewed/updated on Aug. 28, 2017).

[131] Beginning in fiscal year 2020, the Secretary of Homeland Security, through notice in the **Federal Register**, may annually adjust the supplemental fee imposed under clause (i) by a percentage equal to the annual change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics. 48 U.S.C. 1806(a)(6)(A)(ii).

2018.[132] The new fee is only due at the time of filing. It is a single $50 fee per petition, not a fee charged per beneficiary like the CNMI education funding fee. USCIS must use the revenue for preventing immigration benefit fraud in the CNMI, in accordance with INA section 286(v)(2)(B), 8 U.S.C. 1356(v)(2)(B). *See also* 48 U.S.C. 1806(a)(6)(A)(iv), as amended by 2018 CNMI Act, sec. 3.

DHS also proposes conforming edits to CNMI regulations regarding fee waivers and biometric services. Currently, some CNMI applicants and beneficiaries may qualify for a fee waiver based on inability to pay or other reasons. *See* 8 CFR 214.2(e)(23)(xv), (w)(5), and (w)(14)(iii). Generally, fee waivers are not available for employment-based applications and petitions. However, when DHS established the CW–1 petition fees, it decided to treat the CNMI with more flexibility in this regard. *See* 76 FR 55513–4. As discussed in section V.C., Fee Waivers, DHS proposes to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver. DHS proposes in this rule to treat CW–1 petitions like other employment-based petitions. *See* proposed 8 CFR 106.3. The proposed change would eliminate fee waiver eligibility for CNMI applicants and beneficiaries. *See* proposed 8 CFR 214.2(e)(23)(xv), (w)(5) and (w)(14)(iii). Currently, in addition to the petition fee paid by their employer, CNMI beneficiaries may pay an additional biometric services fee when seeking a grant or extension of CW–1 status in the CNMI. *See* 76 FR 55513–4; 8 CFR 214.2(e)(23)(viii) and (w)(15). As explained in section V. E., Changes to Biometric Services Fee, DHS proposes to incorporate the cost of biometric services into the underlying immigration benefit request fees. This proposed change would place the entire financial burden for CNMI petition fees on the employer, eliminating any fees paid by the employee. *See* proposed 8 CFR 106.2, 214.2(v)(23)(viii) and (w)(15). However, employees and their families filing Form I–539 to request a grant or extension of derivative CW–2 nonimmigrant status for a spouse or child of a CW–1 nonimmigrant would still be responsible for that filing fee. A fee waiver would no longer be available.

DHS does not propose to limit the number of named beneficiaries included in a single I–129CW filing.

*J. Premium Processing*

1. Change Premium Processing Fee by Guidance

The INA permits certain employment-based immigration benefit applicants and petitioners to request, for an additional fee, premium processing. *See* Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000); INA sec. 286(u), 8 U.S.C. 1356(u). Congress set the premium processing fee and authorized USCIS to adjust the fee for inflation, as determined by the Consumer Price Index (CPI). *Id.* DHS recently increased the premium processing fee for inflation. *See* 83 FR 44449; 8 CFR 103.7(b)(1)(i)(SS); proposed 8 CFR 106.4. The current fee is $1,410.[133] USCIS currently offers premium processing to employment-based petitions including Form I–129, Petition for Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Worker, in certain visa classifications. Currently, petitioners and applicants use Form I–907, Request for Premium Processing Service, and pay the $1,410 fee to request 15-day processing. DHS is not proposing a change to premium processing fees at this time.

DHS proposes to amend its regulations so that it can notify the public of future premium processing fee inflationary increases through changes to Form I–907 instructions (following the requirements of 5 CFR part 1320) and the USCIS website, *http://www.uscis.gov. See* proposed 8 CFR 106.2(a)(43), 106.4(c) and 106.4(e)(ii). By law, DHS may adjust the premium processing fee for inflation according to CPI; therefore, the amount of the fee increase is straightforward and need not be codified. USCIS requires the flexibility to change the fee amount without undue delay when it needs additional premium processing fee revenue to provide premium processing services and to make infrastructure improvements in the adjudications and applicant- or petitioner-service processes as authorized by INA sec. 286(u), 8 U.S.C. 1356(u).

2. Change Calendar Days to Business Days

DHS proposes to change the limitation for 15-day processing currently codified at 8 CFR 103.7(e) from calendar days to business days. Proposed 8 CFR 106.4(d). For purposes of calculating the 15-day premium processing clock, business days are those days on which the Federal Government is open for business and does not include weekends, federally observed holidays, or the days on which Federal Government offices are closed, such as for weather-related or other reasons. The closure may be nationwide or in the region where the adjudication of the benefit for which premium processing is sought will take place. The former INS established the 15-day period in June 2001. *See Establishing Premium Processing Service for Employment-Based Petitions and Applications,* 66 FR 29682 (June 1, 2001). The June 1, 2001 rule cited the District of Columbia Appropriations Act of 2001, Public Law 106–553, as specifying that the INS was required to process applications under the Premium Processing Service in 15 calendar days. 66 FR 29682. DHS has determined that the June 1, 2001 interim rule was incorrect, and that the District of Columbia Appropriations Act, 2001 did not include a requirement that the Service process applications under the Premium Processing Service in 15 calendar days. Therefore, DHS is free to interpret its authority under INA section 286(u), 8 U.S.C. 1356(u), to establish a new processing timeframe as 15 business days rather than 15 calendar days. In recent years, USCIS suspended premium processing for certain categories of employment-based petitions to permit officers to process long-pending non-premium filed petitions and to prevent a lapse in employment authorization for beneficiaries of Form I–129 extension of stay petitions. In certain instances, USCIS has been unable to accomplish the required 15-day response due to the high volume of incoming petitions and a significant surge in premium processing requests.[134] The proposed change from 15 calendar days to 15 business days will provide USCIS

---

[132] USCIS, *New Law Extends CNMI CW–1 Program, Mandates New Fraud Fee, and Will Require E-Verify Participation, https://www.uscis.gov/news/alerts/new-law-extends-cnmi-cw-1-program-mandates-new-fraud-fee-and-will-require-e-verify-participation* (last reviewed/updated on July 25, 2018).

[133] Premium processing fees are paid in addition to the regular form fee. *See* INA sec. 286(u), 8 U.S.C. 1356(u); 8 CFR 103.7(b)(1)(i)(SS)(1); proposed 8 CFR 103.4. For example, individuals would pay the proposed $545 fee for a Form I–140 under this rule, plus $1,410 for premium processing. Premium processing prioritizes the applicable application or petition for adjudication. The additional fee permits USCIS to devote specific resources to the processing of that immigration benefit request and to make infrastructure improvements in the adjudications and customer-service processes.

[134] *See* "USCIS Will Temporarily Suspend Premium Processing for All H–1B Petitions, *https://www.uscis.gov/archive/uscis-will-temporarily-suspend-premium-processing-all-h-1b-petitions* (last reviewed/updated March 3, 2017); USCIS Will Temporarily Suspend Premium Processing for Fiscal Year 2019 H–1B Cap Petitions, *https://www.uscis.gov/news/alerts/uscis-will-temporarily-suspend-premium-processing-fiscal-year-2019-h-1b-cap-petitions* (last reviewed/updated March 20, 2018).

additional time to complete the necessary processing on a premium processing petition and issue a decision. The additional time may also reduce the need for USCIS to suspend premium processing when request filing volumes are high.

## 3. Actions That End or Restart The 15-Day Period

DHS also proposes that USCIS would refund the premium processing service fee but continue to process the case if it cannot take an adjudicative action on the request, as evidenced by notification of (but not necessarily receipt of) an approval or denial notice by the end of the 15th business day, beginning on the date the properly filed premium processing request was initially accepted by USCIS or the premium processing clock reset upon receipt of a response to a request for evidence (RFE) or notice of intent to deny (NOID). Proposed 8 CFR 106.4(d). That proposal represents no change, other than how the 15 days is calculated, from the current regulations governing USCIS requests for premium processing. 8 CFR 103.7(e). However, DHS also proposes to clarify its current premium processing regulations as they relate to what actions would terminate the 15-day period or otherwise start a new 15-day period. The current regulation is potentially confusing because it includes interim actions in the list of adjudicative actions evidencing of a "final decision" for the purpose of stopping the 15-day period. 8 CFR 103.7(e)(2)(i) ("If USCIS cannot reach a final decision on a request for which premium processing was requested, as evidenced by an approval notice, denial notice, a notice of intent to deny, or a request for evidence, USCIS will refund the premium processing service fee, but continue to process the case."). In this rule, DHS proposes to clarify the two circumstances in which it would refund the premium processing fee:

1. Where USCIS does not take any adjudicative action within 15 business days from the date on which it accepts a properly filed request for premium processing, together with all required fees, or

2. Where USCIS does not take subsequent adjudicative action within 15 business days from the date on which USCIS receives a response to an RFE or a NOID.

DHS proposes that the 15-day period will stop when USCIS takes certain adjudicative actions, specifically the notification of an approval, denial, RFE or NOID. Proposed 8 CFR 106.4(d)(1). DHS also proposes to clarify that when USCIS issues an RFE or NOID on a benefit request for which premium processing service has been properly requested, including the payment of all required fees, a new 15 business day period will begin upon the receipt by USCIS of the benefit requestor's RFE or NOID response at the address that was required by the notice or online. Proposed 8 CFR 106.4(d)(2).

## 4. Expedited Processing for Other Requests

Commenters regularly request that DHS extend premium processing to other immigration benefit requests. *See, e.g.,* 75 FR 58978 and 81 FR 73309. The FY 2019/2020 fee review did not analyze the potential effect of premium processing for other forms. Congress established the premium processing service for "employment-based petitions and applications." INA sec. 286(u), 8 U.S.C. 1356(u). Congress established the premium processing fee at an amount it determined to be appropriate, and it permitted USCIS to increase the fee based on inflation. *See* 81 FR 73309. These fees cover the estimated costs of providing premium processing for the associated benefits. Nevertheless, it would be difficult to estimate the staff, resources, and costs necessary to ensure the processing of additional benefit types within a certain time frame, especially when those cases may require other types of background checks, interviews, and additional steps that USCIS does not generally control. Expanding the premium processing program would require USCIS to estimate the costs of a service that does not currently exist with sufficient confidence that it can deliver the service promised and not impair service in other product lines. DHS would require the devotion of considerable resources to study a potential new premium processing program. Thus, DHS proposes no extension of premium processing beyond its current usage. However, comments are welcome on the subject.

## K. Regional Centers

DHS proposes no fee change for Form I–924, Application for Regional Center Designation under the Immigrant Investor Program because the current fee is adequate. *See* 8 CFR 103.7(b)(1)(i)(WW); proposed 106.2(a)(47).

## L. Secure Mail Initiative

In 2016, an OIG audit recommended that USCIS evaluate the costs and benefits of using the U.S. Postal Service's hold for pickup as an alternative secure method for delivering secure documents to applicants.[135] USCIS has decided to implement Signature Confirmation Restricted Delivery (SCRD) as the sole method of delivery of secure documents for USCIS.[136] Proposed 8 CFR 103.2(b)(19)(iii). USCIS began phasing in use of the Signature Confirmation Restricted Delivery service to re-mail Permanent Resident Cards, Employment Authorization Cards, and Travel Booklets returned by USPS as non-deliverable beginning on April 30, 2018.[137] USCIS analyzed the additional costs associated with expanding this service to all USCIS secured documents and determined that the cost in FY 2019 would be $26.9 million, based on anticipated mailing volumes and the per unit mailing cost of the service. USCIS planned for similar costs in FY 2020. As detailed in the supporting documentation, the ABC model assigned this additional cost to the Issue Document activity for immigration benefit requests that may result in a Permanent Resident Card, Employment Authorization Card, or Travel Booklet. Issue Document means producing and distributing secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization.[138] As proposed, DHS, at its discretion, may require the use of Signature Confirmation Restricted Delivery for additional documents beyond Permanent Resident Cards, Employment Authorization Cards, and Travel Booklets (for example, certificates of naturalization and citizenship, which are currently being mailed to recipients) in the future by updating the relevant form instructions. Proposed 8 CFR 103.2(b)(19)(iii).

## M. Intercountry Adoptions

### 1. Adjustment to Proposed Fees for Certain Intercountry Adoption-Specific Forms

DHS proposes to limit the increase of adoption-related fees in this rule

---

[135] DHS OIG, *Better Safeguards are Needed in USCIS Green Card Issuance* (Nov. 16, 2016), *available at https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-11-Nov16.pdf.*

[136] DHS OIG, *Verification Review: Better Safeguards are Needed in USCIS Green Card Issuance* (Apr. 10, 2018), *available at https://www.oig.dhs.gov/sites/default/files/assets/2018-04/OIG-18-61-Apr18.pdf.*

[137] USCIS, *USCIS to Begin Using More Secure Mail Delivery Service, https://www.uscis.gov/news/news-releases/uscis-begin-using-more-secure-mail-delivery-service* (last reviewed/updated April 27, 2018).

[138] See the FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation included in the docket of this NPRM for more information on fee review activities.

consistent with previous fee rules. *See, e.g.*, 81 FR 73298. DHS will continue its policy of reducing fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications (Forms I–600/600A/800/800A) through the fees collected from other immigration benefit requests. If DHS used the estimated fee-paying unit cost from the ABC model for Form I–600, then this benefit request would have a fee of at least $1,423.[139] DHS believes that it would be contrary to public and humanitarian interests to impose a fee of this amount on prospective adoptive parents seeking to adopt a child from another country. Therefore, DHS proposes to apply the 5 percent weighted average increase to the current fee of $775, representing a $35 increase to $810 for Forms I–600/600A/800/800A. Proposed 8 CFR 106.2(b)(21), (22), (23), (33), (34), (35).

### 2. Clarification of Fee Exception for Birth Siblings

DHS proposes amendments to 8 CFR 106.2, 204.3, and 204.313 to clarify the regulations and align them with current practice regarding when prospective adoptive parents are not required to pay the Form I–600 or Form I–800 filing fee for multiple Form I–600 or Form I–800 petitions. Currently, prospective adoptive parents with a valid Form I–600A or Form I–800A approval to adopt more than one child are not required to pay a fee for the first Form I–600 or Form I–800 petition. They are required to pay the Form I–600 or Form I–800 filing fee for additional Form I–600 or Form I–800 petitions, unless the beneficiaries are birth siblings. If the beneficiaries are not birth siblings, the Form I–600 or Form I–800 fee is required for each petition after the first. To align with current and historical practice, DHS proposes to clarify in the regulations that this exception is limited to "birth" siblings. This approach is consistent with the special treatment afforded in the INA to "natural siblings," which allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than age 16, only if the beneficiary is the "natural sibling" of another foreign born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. INA 101(b)(1)(F)(ii) and (G)(iii); 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term "natural sibling," DHS generally uses the term "birth siblings" synonymously, which

includes half-siblings but does not include adoptive siblings.

### 3. Suitability and Eligibility Approval Validity Period

DHS proposes amendments to 8 CFR 204.3 relating to orphan cases under INA section 101(b)(1)(F), 8 U.S.C. 1101(b)(1)(F) (non-Convention cases). The proposed revisions to the orphan regulations are necessary to eliminate disparity between the 18-month approval period for the Form I–600A, Application for Advance Processing of an Orphan Petition, the 15-month validity period of FBI fingerprint clearances, and the 15-month approval period for a Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country and any approved extension.

Under current regulation, the approval of a Form I–600A in an orphan case is valid for 18 months. *See* 8 CFR 204.3(h)(3)(i). However, standard USCIS policy has been that the FBI's clearance of a person's fingerprints is valid for 15 months, thereby creating inconsistency and a gap with the 18-month approval validity period for the Form I–600A. This inconsistency was partially resolved with the ratification of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (Hague Adoption Convention) and subsequent codification of 8 CFR 204.312(e)(1), whereby the initial approval period for a Form I–800A in a Convention case is 15 months from the date USCIS received the initial FBI response for the fingerprints of the prospective adoptive parent(s) and any adult members of the household. This 15-month period also applies to the extension of the Form I–800A approval period for an additional 15 months from the date USCIS receives the new FBI response on the fingerprints. Creating parity in the approval periods for suitability and eligibility determinations provides additional protections for adopted children and provides consistency and alignment of the orphan and Hague regulations. Having a standardized 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to manage and monitor multiple expiration dates. Therefore, DHS proposes to alter the validity period for a Form I–600A approval in an orphan case to 15 months. Proposed 8 CFR 204.3(b), (d), (h)(3)(i),[140] (h)(7), & (h)(13).

### 4. Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600

DHS proposes to create a new form to further align the processes for adoptions from countries that are party to the Hague Adoption Convention, with the process for adoptions from countries that are not party to that Convention. The proposed form name is Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600. The proposed fee is $405. Proposed 8 CFR 106.2(b)(23). As discussed in the Paperwork Reduction Act section of this preamble, the draft Supplement 3 is posted in the docket of this rulemaking for the public to review and provide comments.

Currently, U.S. citizen applicants and petitioners (prospective adoptive parents) face somewhat different processes depending on whether the child or children that they wish to adopt is from a Hague Adoption Convention country or a non-Hague Adoption Convention country. USCIS uses Forms I–800, I–800A, and I–800A Supplement 3 for Hague Adoption Convention countries. USCIS uses Forms I–600 and I–600A for non-Hague Adoption Convention countries. A fee for Form I–600A/I–600 Supplement 3 would further align the Form I–600A/I–600 post-approval request process with the existing Form I–800A process in four key areas:

1. Suitability & Eligibility Extensions;
2. New Approval Notices;
3. Change of Country; and
4. Duplicate Approval Notices.

USCIS adjudicators must re-assess whether prospective adoptive parents are still suitable and eligible to adopt if the prospective adoptive parents' circumstances have changed after the initial USCIS suitability determination. The proposed fee would help recover some of the cost for this work.

Table 12 and the following sections summarize the current process and the proposed changes.

---

[139] Model output from supporting documentation in the docket, page 22.

[140] In addition to changing the 18-month period to 15 months, DHS is removing the internal procedure from 8 CFR 204.3(h)(3)(i) that provides

where documents will be forwarded and notification of overseas offices of the approval, and is correcting a reference to the number of children the prospective adoptive parents are approved for in the home study to refer to the number of children the prospective adoptive parents are approved for in the Form I–600A approval. DHS is also adding a reference to proposed 8 CFR 106.2(a)(23) in section 204.3(h)(3)(i), relating to Form I–600A extension requests. Additionally, DHS is replacing the reference to an outbreak of Severe Acute Respiratory Syndrome in section 204.3(h)(3)(ii) with a more general reference to public health or other emergencies. This revision will provide the agency with the flexibility to extend Form I–600A validity periods when it determines that an emergency situation, other than a SARS outbreak, prevents petitioners from timely filing a Form I–600 petition before expiration of their Form I–600A approval.

TABLE 12—SUMMARY OF CURRENT AND PROPOSED ADOPTION PROCESSES RELATED TO PROPOSED FORM I–600A/I–600 SUPPLEMENT 3

| Type of change | Current process | Proposed process |
|---|---|---|
| Suitability & Eligibility Extensions. | The Form I–600A approval notice reflects a validity period for the prospective adoptive parents' suitability and eligibility determination. Currently, U.S. citizen applicants (prospective adoptive parents) may request one initial extension of their Form I–600A approval without fee by submitting a request in writing. Prospective adoptive parents are not able to request a second or subsequent extension of their Form I–600A approval. | DHS proposes to require prospective adoptive parents to submit Form I–600A/I–600, Supplement 3 to request the initial no-fee extension. Form I–600A/I–600 Supplement 3 would allow prospective adoptive parents to request second or subsequent extensions with the proposed fee. |
| Home Study Updates | Currently, prospective adoptive parents can request a new approval notice based on a significant change and updated home study with no fee. New approvals require adjudicators to re-assess whether prospective adoptive parents remain suitable and eligible to adopt after the significant change in circumstances. (For example, significant decreases in finances, change of residence, other changes in the household, etc.) Prospective adoptive parents must pay the fee for Form I–600A or I–600 if it is a second or subsequent request unless they are also requesting their first (no fee) extension or first (no fee) change of country. | DHS proposes to require prospective adoptive parents to submit Form I–600A/I–600, Supplement 3 to request a new approval notice. The prospective adoptive parent must pay the fee unless they are also filing a first time request for either an extension or change of country. Second or subsequent requests would require the proposed fee. |
| Change of Country | Currently, prospective adoptive parents may change their proposed country of adoption once without fee. For example, if they are matched with an eligible orphan in a country other than the country initially identified on their Form I–600A. For subsequent country changes, prospective adoptive parents file Form I–824, Application for Action on an Approved Application or Petition, with fee. | DHS proposes to require prospective adoptive parents to submit Form I–600A/I–600, Supplement 3 to request the initial no-fee change of proposed country of adoption.* [141] Form I–600A/I–600 Supplement 3 would allow prospective adoptive parents to request a second or subsequent change in the proposed country of adoption with the proposed fee. |

*See d. below for limitations in Hague Adoption Convention transition cases and countries.

### a. Suitability & Eligibility Extensions

Currently, U.S. citizen prospective adoptive parents for non-Hague Adoption Convention countries may request no-fee initial extension of their Form I–600A approval.[142] Requests are submitted in writing and second or subsequent requests to extend their approval are not allowed. *See* 8 CFR 103.7(b)(1)(i)(Z)(*3*). DHS proposes that prospective adoptive parents be allowed to request more than one extension of their Form I–600A approval, if necessary, by filing the proposed Form I–600A/I–600 Supplement 3. The first request would be free under this proposal. Second or subsequent requests would require the proposed fee of $405. *See* proposed 8 CFR 106.2(a)(23).

### b. New Approval Notices

Currently, prospective adoptive parents using the non-Hague Adoption Convention process may request a new approval notice based on a significant change in circumstances and an updated home study at no cost. *See* 8 CFR 103.7(b)(1)(i)(Z). DHS proposes that prospective adoptive parents must file the proposed Form I–600A/I–600 Supplement 3 to notify USCIS of a significant change and request a new approval notice. *See* proposed 8 CFR 106.2(a)(23). The prospective adoptive parent must pay the proposed fee of $405 unless they are also filing either a first time request for an extension or change of country on the same Supplement 3.

### c. Change of Country

Currently, prospective adoptive parents may change the proposed country of adoption once without fee and may make subsequent country changes by filing Form I–824, Application for Action on an Approved Application or Petition, with fee. *See* 8 CFR 103.7(b)(1)(i)(OO). DHS proposes that prospective adoptive parents be allowed to change the proposed country of adoption by filing the proposed Form I–600A/I–600 Supplement 3. The first request to change countries would remain without fee under this proposal. Second or subsequent requests would require the proposed fee of $405. *Id.*

### d. Hague Adoption Convention Transition Cases

DHS proposes to clarify the processes for requesting an extension of the Form I–600A approval and other actions on an approved Form I–600A or I–600 as they pertain to adoptions from countries that newly become a party to the Hague Adoption Convention. When the Hague Adoption Convention enters into force for a country, cases that meet certain criteria are generally permitted by the new Convention country to proceed as "transition cases" under the non-Hague Adoption Convention process (Form I–600A and Form I–600 process). Provided that the new Convention country agrees with the transition criteria, USCIS will generally consider a case to be a transition case if, before the date the Convention entered into force for the country, the prospective adoptive parent(s): (1) filed a Form I–600A that designated the transition country as the intended country of adoption or did not designate a specific country; (2) filed a Form I–600 on behalf of a beneficiary from the transition country; or (3) completed the adoption of a child from the transition country. If the case does not qualify as a transition case, the prospective adoptive parents will generally need to follow the Hague

---

[141] See section V.M.4.d. for limitations in Hague Adoption Convention transition cases and countries.

[142] The Form I–600A approval notice reflects the validity period of the prospective adoptive parents' suitability and eligibility determination.

Adoption Convention process with the filing of Form I–800A and Form I–800. With the addition of the new Form I–600A/I–600 Supplement 3, DHS proposes to codify certain limitations on when the Supplement 3 can be used in the context of transition cases.

i. Suitability and Eligibility Extensions

If a case qualifies as a transition case based on the filing of Form I–600A before the entry into force date, in order to continue as a transition case the prospective adoptive parents must file the Form I–600 petition while the Form I–600A approval remains valid. Currently, prospective adoptive parents are permitted to request a one-time, no-fee extension of the Form I–600A approval in order to remain a transition case. As discussed in section a.) above, DHS proposes that prospective adoptive parents may request more than one extension of their Form I–600A approval outside of the transition context. DHS proposes that prospective adoptive parents may only be permitted to request a one-time extension of their Form I–600A approval as a qualified transition case. *See* proposed 8 CFR 106.2(a)(23). Generally, transition countries have requested that DHS limit the ability of transition cases to continue indefinitely in order to limit the confusion that having two simultaneously running processes causes to its administrative bodies and judicial systems. This will provide prospective adoptive parents who have taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force additional time to complete the adoption process under the non-Hague process, but reasonably limits the ability to indefinitely extend the validity period of the Form I–600A approval and the processing of transition cases under the non-Hague process.

ii. Change of Country

The transition criteria were generally designed to permit prospective adoptive parents who had taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force to be able to continue under the non-Hague process, rather than requiring them to begin under the Hague process, which has different processing requirements. If the prospective adoptive parents designated a country of intended adoption on their Form I–600A or prior change of country request other than the transition country, they generally would not fall into the category of families the transition criteria were intended to

reach because the designation is an indication they have begun the intercountry adoption process with the designated country and not with the transition country. Therefore, in the transition context, prospective adoptive parents who designated a country on their Form I–600A or prior change of country request that is not the transition country generally have not been permitted to change their Form I–600A approval to a transition country for purposes of being considered a transition case. DHS proposes to codify this limitation in this rule. *See* proposed 8 CFR 106.2(a)(23).

iii. Requests To Increase the Number of Children Approved To Adopt

Outside of the transition context, prospective adoptive parents are generally permitted to request an updated Form I–600A approval notice to increase the number of children they are approved to adopt. In the transition context, however, prospective adoptive parents with transition cases generally have not been permitted to request an increase in the number of children they are approved to adopt from a transition country.[143] However, unless prohibited by the new Convention country, DHS will permit prospective adoptive parent(s) to request an updated Form I–600A approval notice to increase the number of children they are approved to adopt as a transition case only in order to pursue the adoption of a birth sibling, provided the birth sibling(s) is (are) identified and the Form I–600 petition is filed before the Form I–600A approval expires. *See* proposed 8 CFR 106.2(a)(23). This approach is consistent with the special treatment afforded in the INA to ''natural siblings,'' which allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than age 16, only if the beneficiary is the ''natural sibling'' of another foreign born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. INA 101(b)(1)(F)(ii) and (G)(iii); 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term ''natural sibling,'' DHS generally uses the term ''birth siblings'' synonymously, which includes half-siblings but does not include adoptive siblings.

5. Form I–800A, Supplement 3, Request for Action on Approved Form I–800A

DHS also proposes to provide a fee of $405 at 8 CFR 106.2 and clarify 8 CFR 204.312 to align with the current process for adjudicating Form I–800A

Supplement 3. Currently, prospective adoptive parents may request a first extension of the Form I–800A approval and a first time change in the proposed country of adoption, by filing Form I–800A Supplement 3 without a fee. Second or subsequent requests for an extension or change of country can currently be made by filing Form I–800A Supplement 3 with a fee. Additionally, prospective adoptive parents can currently request a new approval notice based on a significant change and updated home study by filing Form I–800A Supplement 3. A request for a new approval notice must be submitted with a fee, unless the prospective adoptive parents are also filing a first time request for either an extension or change of country on the same Supplement 3. When DHS implemented the Hague Adoption Convention, as a matter of operational efficiency USCIS decided to accept Form I–800A Supplement 3 extension requests regardless of whether the Form I–800 petition was already filed, rather than requiring prospective adoptive parents to file a new Form I–800A to begin the process anew. That procedure generally shortens the subsequent suitability and eligibility adjudication process for prospective adoptive parents seeking an extension of their Form I–800A approval, as Supplement 3 adjudications are generally prioritized over new Form I–800A filings, allowing for a new decision on the prospective adoptive parents' suitability and eligibility to occur more quickly. Therefore, DHS proposes to amend 8 CFR 204.312(e)(1)(i) to permit the filing of Form I–800A Supplement 3 regardless of whether Form I–800 has been filed.

N. Changes to Genealogy Search and Records Requests

DHS proposes changes to the genealogy search and request fees in the FY 2019/2020 IEFA fee review. These proposals will allow USCIS to send pre-existing digital records as part of a response to requestors who have filed Form G–1041, Genealogy Index Search Request, and may otherwise help USCIS improve genealogy processes.

The USCIS genealogy program processes requests for historical records of deceased individuals. *See* Establishment of a Genealogy Program, 73 FR 28026 (May 15, 2008) (final rule). Before creating a genealogy program, USCIS processed the requests as Freedom of Information Act (FOIA) request workload, which resulted in delays. *See* Establishment of a Genealogy Program, 71 FR 20357–8 (Apr. 20, 2006) (proposed rule).

---

[143] *See https://www.uscis.gov/adoption/country-information/adoption-information-haiti.*

Requestors use the USCIS website[144] or Form G–1041, Genealogy Index Search Request, to request an index search of USCIS historical records. *See* 8 CFR 103.7(b)(1)(i)(E). USCIS informs the requestor whether any records are available by mailing a response letter. Requestors use the Form G–1041A, Genealogy Records Request, to obtain copies of USCIS historical records, if they exist. *See* 8 CFR 103.7(b)(1)(i)(F).

In the FY 2016/2017 fee rule, USCIS adopted the first change to the genealogy search and records requests fees since they had been established at $65 fee for both search requests and records requests. *See* 81 FR 73304. At the time, genealogy fees were insufficient to cover the full costs of the genealogy program. USCIS increased the fee to meet the estimated cost of the program and permit USCIS to respond to requests for such historical records and materials.

After nearly ten years of operating the genealogy program, DHS proposes to make several changes to the process. Ultimately, these changes are intended to allow USCIS to provide genealogy search results and historical records more quickly when pre-existing digital records exist.

First, DHS proposes to expand the use of online genealogy requests. DHS proposes to revise genealogy regulations to encourage requestors to submit the electronic versions of Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Records Request, through the online portal at *https://www.uscis.gov/genealogy*. *See* proposed 8 CFR 103.40(b). Electronic versions of the requests reduce the administrative burden on USCIS by eliminating the need to manually enter requestor data into its systems. Requestors that cannot submit the forms electronically may still submit paper copies of both forms with the required filing fees.

Second, DHS proposes to change the search request process so that USCIS may provide requestors with pre-existing digital records, if they exist, in response to a Form G–1041, Genealogy Index Search Request. When requestors submit Form G–1041, Genealogy Index Search Request, on paper or electronically, USCIS searches for available records. If no record is found, then USCIS notifies the requestor by mail or email. If USCIS identifies available records, then USCIS provides details on the available records, but does not provide the copies of the actual records. Under current regulations, a

requestor must file Form G–1041A, Genealogy Records Request, with a fee for each file requested, before USCIS provides any records that it found as a result of the search request. DHS proposes to provide the requestor with those pre-existing digital records, if they exist, in response to the initial search request. *See* proposed 8 CFR 103.40(f). DHS proposes in this rule to streamline the process for Form G–1041, Records Index Search and provide the pre-existing digital records to either an electronic reading room that can be accessed with a unique pin number, by mail with a CD, or paper copy and not require Form G–1041A. If no records exist, or if only paper copies of the records exist, then the requestor must follow the current process.

As a result of the proposed changes for pre-existing digital records, USCIS proposes to limit Form G–1041A, Genealogy Records Request, to only paper file requests. *See* proposed 8 CFR 103.40(g). Consistent with current practices, requestors must still pay the genealogy records request fee for a paper record requested. USCIS believes the change will increase efficiency and decrease future wait times for requestors.

Lastly, DHS proposes to change the genealogy fees as a result of these operational changes. *See* 8 CFR 103.7(b)(1)(i)(E) and (F); proposed 8 CFR 106.2(c)(1) and (2). The proposed fees are based on results from the same ABC model used to calculate other immigration benefit request fees proposed in this rule. The proposed fees for Forms G–1041 and G–1041A are $240 and $385 respectively. They are based on the projected costs and volumes of the genealogy program. The projected costs include a portion of Lockbox costs and an estimated staffing requirement for genealogy workload. USCIS estimated the workload volume based on these proposed changes. Additionally, USCIS used historic information to calculate completion rates for genealogy search and records requests. The completion rates allow for separate search and record request fees based on the average time to complete a request. As such, the proposed fees each represent the average staff time required to complete the request, similar to most other fees proposed in this rule.

*O. Naturalization and Citizenship Related Forms*

1. No Longer Limit the Form N–400 Fee

DHS proposes to increase the fee for Form N–400, Application for Naturalization, from $640 to $1,170, a $530 or 83 percent increase. *See* 8 CFR

103.7(b)(1)(BBB); proposed 8 CFR 106.2(b)(3). Prior fee rules shifted a portion of the Form N–400 cost to other fee-paying immigration benefit requestors, such as applicants for Certificates of Citizenship. In the FY 2010/2011 and the FY 2016/2017 fee rules, the Form N–400 fee was set below the ABC model output. The FY 2010/2011 fee rule held the fee to $595, the amount set in the FY 2008/2009 fee rule. *See* 75 FR 58975. The FY 2016/2017 fee rule limited the fee to only $640, a $45 or 8 percent increase. *See* 81 FR 73307.

The FY 2010/2011 proposed rule explained that holding Form N–400 to the FY 2008/2009 fee raised all other proposed fees by approximately $8 each. *See* 75 FR 33462. For DHS to recover full cost of Form N–400, the FY 2010/2011 proposed fee would have been $655, a $60 or roughly a 10 percent increase. *See* 75 FR 33462–3. In the FY 2016/2017 fee rule supporting documentation, USCIS estimated that each Form N–400 may cost $871 to complete, plus the cost for biometric services of $75, for a total of $946.[145]

In crafting prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[146] DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N–400 filings in recent years.[147] Therefore, DHS proposes to no longer limit the Form N–400 fee, thereby mitigating the fee increase of other immigration benefit requests and implementing the beneficiary-pays principle. DHS proposes a $1,170 fee for Form N–400 to recover the full cost of adjudicating the Form N–400, as well as a proportion of costs not recovered by other forms for which fees are limited or must be offered a waiver by statute.[148]

---

[144] USCIS, *Genealogy, https://www.uscis.gov/ genealogy.*

[145] See the Model Output column of Appendix Table 4: Final Fees by Immigration Benefit Request in the docket of the FY 2016/2017 fee rule. The model output is the projected total cost from the ABC model divided by projected fee-paying volume. It is only a forecast unit cost (using a budget) and not the actual unit cost (using spending from prior years). USCIS does not track actual costs by immigration benefit request.

[146] *See, e.g.,* 75 FR 33461; 81 FR 26916.

[147] Based on filing volume trends in recent years, USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10% percent increase from the FY 2016/2017 fee rule forecast. *See* Table 4: Workload Volume Comparison.

[148] See the supporting documentation of this proposed rule, Appendix V: Proposed Fee Adjustments to IEFA Immigration Benefits, for more information.

## 2. Remove Form N–400 Reduced Fee

In addition to eliminating Form N–400 fee waiver requests, as explained above at section V.C., DHS proposes to remove the reduced fee option for those naturalization applicants with family incomes greater than 150 percent and not more than 200 percent of the FPG currently codified at 8 CFR 103.7(b)(1)(i)(BBB)(*1*). Currently, qualifying applicants pay a fee of $320 plus an additional $85 for biometric services, for a total of $405. To qualify for a reduced fee, the eligible applicant must submit a Form I–942, Request for Reduced Fee, along with his or her Form N–400. Form I–942 requires the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200 percent of the FPG. DHS implemented this reduced fee option in the FY 2016/2017 fee rule to limit any potential economic disincentives that some eligible naturalization applicants may face when deciding whether to seek U.S. citizenship. *See* 81 FR 73307. DHS now proposes to eliminate the reduced fee option and return to a policy of all naturalization applicants paying the same fee. For the same reasons explained above with regard to no longer limiting the Form N–400 fee, DHS proposes to eliminate the reduced fee in order to recover full cost for naturalization services.[149] The proposed fees would also recover a portion of the cost of adjudicating forms for which USCIS is required by law to offer a fee waiver request and where the fees are limited by law, regulation, or policy, referred to as cost reallocation in the supporting documentation.[150] DHS also proposes to eliminate Form I–942 because there will no longer be a purpose for it.

## 3. Military Naturalization and Certificates of Citizenship

DHS does not propose any changes to fee exemptions for military members and veterans who file a Form N–400 under the military naturalization provisions. Military naturalization applications will continue to be fee exempt. *See* 8 CFR 103.7(b)(1)(BBB)(*2*); proposed 8 CFR 106.2(b)(3). USCIS does not charge a fee to military naturalization applicants because such fees are prohibited by statute. *See* INA secs. 328(b)(4), 329(b)(4). Applicants who request a hearing on a naturalization decision under INA sections 328 or 329 with respect to military service will continue to be fee exempt. *See* 8 CFR 103.7(b)(1)(AAA); proposed 8 CFR 106.2(b)(2). Members and veterans of any branch of the U.S. Armed Forces will continue to be exempt from paying the fee for an Application for Certificate of Citizenship, Form N–600. *See* 8 CFR 103.7(b)(1)(EEE); proposed 8 CFR 106.2(b)(6). While the statute prohibits fees for military naturalization applicants themselves, the Department of Defense (DOD) currently reimburses USCIS for costs related to such applications.[151] Accordingly, USCIS does not propose to increase fees to subsidize the costs of military naturalization applications.

## 4. Proposed Changes to Other Naturalization-Related Application and Certificate of Citizenship Application Fees

DHS proposes to adjust fees for other citizenship and naturalization forms.

Some of the proposed fees are significant increases from the current fees, but others are decreases to reflect the estimated cost of adjudicating each form.

In previous fee rules, DHS limited the fee increase for several naturalization-related forms, in addition to Form N–400. *See* 75 FR 33461 and 81 FR 26915. These naturalization-related forms are as follows:

• Form N–300, Application to File Declaration of Intention

• Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)

• Form N–470, Application to Preserve Residence for Naturalization Purposes.

In the FY 2016/2017 fee rule, USCIS estimated that the cost of processing each of these forms was significantly greater than the fee.[152] Consistent with previous fee rules, DHS used its fee setting discretion to limit the increase of these fees, as shown in Table 14 of the supporting documentation of the FY 2016/2017 fee rule. At the time, DHS recognized that charging less than the full cost of adjudicating these and other immigration benefit requests required USCIS to increase fees for other immigration benefit requests to ensure full cost recovery. *See* 81 FR 26915.

The proposed fees in this rule would recover full cost for these immigration benefit requests and a portion of cost reallocation, using the standard methodology described in the supporting documentation included in this docket. *See* proposed 8 CFR 106.2(b)(1), (2), (3), and (4).

TABLE 13—NATURALIZATION FEE-PAYING UNIT COSTS (MODEL OUTPUT) AND FEES COMPARED

| Immigration benefit request | FY 2016/ 2017 Fee-paying unit cost | Current fee | Current fee—FY 2016/2017 Cost | FY 2018/ 2019 Fee-paying unit cost | Proposed fee | Proposed fee—FY 2019/ 2020 cost |
|---|---|---|---|---|---|---|
| N–300 Application to File Declaration of Intention | $840 | $270 | −$570 | $1,111 | $1,320 | $209 |
| N–336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) | 1,294 | 700 | −594 | 1,474 | 1,755 | 281 |
| N–400 Application for Naturalization | 871 | 640 | −231 | 985 | 1,170 | 185 |
| N–470 Application to Preserve Residence for Naturalization Purposes | 792 | 355 | −437 | 1,347 | 1,600 | 253 |
| N–565 Application for Replacement Naturalization/Citizenship Document | 399 | 555 | 156 | 458 | 545 | 87 |
| N–600 Application for Certificate of Citizenship | 841 | 1,170 | 329 | 853 | 1,015 | 162 |

[149] Recently, Congress encouraged USCIS "to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver." H. Rep. 115–948 at 61. Although USCIS considered this report in formulating this proposed rule, USCIS has determined that it is neither equitable, nor in accordance with the principle of self-sufficiency that Congress has frequently

emphasized, to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee.

[150] See footnote 40.

[151] The proposed fee would increase the reimbursable agreement between USCIS and DOD by approximately $4 million. The current fees for Form N–400 ($640) and biometric services ($85) total $725 per military naturalization. In FY 2019/

2020, USCIS forecasts 9,300 military naturalizations per year. Under the current fees, this would cost DOD $6,742,500 each year. With the proposed $1,170 Form N–400 fee (which includes the cost of biometrics), the same volume would cost $10,881,000, a $4,138,500 or approximately 61 percent increase.

[152] See the Model Output column of Appendix Table 4: Final Fees by Immigration Benefit Request in the docket of the FY 2016/2017 fee rule.

Table 13—Naturalization Fee-Paying Unit Costs (Model Output) and Fees Compared—Continued

| Immigration benefit request | FY 2016/2017 Fee-paying unit cost | Current fee | Current fee—FY 2016/2017 Cost | FY 2018/2019 Fee-paying unit cost | Proposed fee | Proposed fee—FY 2019/2020 cost |
|---|---|---|---|---|---|---|
| N–600K Application for Citizenship and Issuance of Certificate Under Section 322 .......... | 841 | 1,170 | 329 | 806 | 960 | 154 |

The proposed fees for Form N–600, Application for Certificate of Citizenship, and Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322, are lower than the current fees. The current fee for both forms is $1,170. *See* 8 CFR 103.7(b)(1)(i)(EEE) and (FFF). In the previous fee rule, USCIS proposed and finalized a combined fee for both forms. DHS proposes separate fees for each, based on the estimated cost and operational metrics for each workload. *See* proposed 8 CFR 106.2(b)(6) and (7). USCIS used separate completion rates and fee-paying volumes for each proposed fee.

The proposed fee decrease for Forms N–600 and N–600K is mainly due to the effect of the proposed limitation of fee waivers, which will enable greater cost recovery for several form types and limit the need for cost reallocation to fee-paying applicants. As noted in the FY 2016/2017 fee rule, the current fees for Forms N–600 assumed that approximately one third of applicants would receive a fee waiver. *See* 81 FR 73928. To recover full cost, DHS set the N–600 and the N–600K fee at a level high enough for fee-paying applicants to cover the cost of fee-waived work. *Id.* Because fee waivers would be limited under this proposed rule, fee-paying Forms N–600 and N–600K would no longer need to cover the cost of adjudicating fee-waived Forms N–600 and N–600K.[153] The proposed fees provide for the full recovery of costs associated with adjudicating the forms. Therefore, DHS is proposing lower fees for Forms N–600 and N–600K. The proposed fee for Form N–600 is $1,015, a $155 or 13 percent decrease from the current $1,170 fee. *See* 8 CFR 103.7(b)(1)(i)(EEE); proposed 8 CFR 106.2(b)(6). The proposed fee for Form N–600K is $960, a $210 or 18 percent decrease from the current $1,170 fee. *See* 8 CFR 103.7(b)(1)(i)(FFF); proposed 8 CFR 106.2(b)(7). DHS welcomes comments on the proposed changes to naturalization and Certificate of Citizenship applications.

*P. Asylum Fees*

1. Fee for Form I–589, Application for Asylum and for Withholding of Removal

DHS proposes to establish a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, when that form is filed with USCIS (''affirmative asylum applications'').[154] *See* proposed 8 CFR 106.2(a)(20). The U.S. Government has never charged a fee for Form I–589, but rather has relied on other fee-paying benefit requestors to subsidize asylum seeking applicants. Application fees from other form types have always been used to fund the operations involved in processing asylum claims. *See, e.g.,* 81 FR 73295 and 73307. However, DHS has experienced a continuous, sizeable increase in affirmative asylum filings, and processing backlogs continue to grow. DHS is exploring ways to alleviate the pressure that the asylum workload places on the administration of other immigration benefits. A minimal fee would mitigate the fee increase of other immigration benefit requests.

Although the INA authorizes DHS to set fees ''at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants,'' INA sec. 286(m), 8 U.S.C. 1356(m), DHS proposes a $50 fee for Form I–589. The statutory authorization for fees allows, but does not require, imposition of a fee equal to the full cost of the services provided. Thus, DHS retains authority to impose asylum fees that are less than the estimated cost of adjudicating the applications. *See* INA sec. 208(d)(3), 8 U.S.C. 1158(d)(3).[155] In the FY 2019/2020 fee review, USCIS estimates that the cost of adjudicating Form I–589 is approximately $366. It represents the Asylum Division's salaries and Make Determination activity costs from the ABC model, which does not represent the full cost. It does not include estimated costs from any other Asylum Division activities or any other office within USCIS.[156] Therefore, the proposed $50 fee is in accord with INA section 208(d)(3), 1158(d)(3).[157]

To be clear, DHS is proposing a fee for a Form I–589 filed with DHS only. Whether the fee also will apply to a Form I–589 filed with EOIR is a matter within the jurisdiction of the Department of Justice rather than DHS, subject to the laws and regulations governing the fees charged in EOIR immigration proceedings. DHS also believes that the asylum fee may arguably be constrained in amount, but not prohibited, by the 1951 U.N. Convention Relating to the Status of Refugees (''1951 Convention'') and the 1967 U.N. Protocol Relating to the Status of Refugees (''1967 Protocol'').[158] The international treaty obligations of the United States under the 1951 Convention and the 1967 Protocol address the imposition of fees on individuals seeking protection, and

---

[153] See V.C.3., Proposed Fee Waiver Changes section of this preamble for more information.

[154] Affirmative asylum applications are distinguished from defensive asylum applications, which are filed in proceedings before an immigration judge. *See, e.g.,* 8 CFR 1240.11(c).

[155] This section states, ''The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication

services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).''

[156] The FY 2019/2020 fee review assigned Asylum Division projected costs into the following other activities: Conduct TECS Check; Fraud Detection and Prevention; Inform the Public; Intake; Management and Oversight; Records Management. See the fee review supporting documentation included in this docket for the definitions of these activities and other information.

[157] The Immigration and Naturalization Service (INS), the predecessor to USCIS, proposed implementing a waivable $130 fee for asylum in 1994. *See* 59 FR 62284 (Dec. 5, 1994). INS did not include a fee in the final rule. The proposed $130 fee would be approximately $222 if adjusted for inflation from December 1994 to June 2019.

[158] 1951 Convention relating to the Status of Refugees, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137; 1967 Protocol relating to the Status of Refugees, *open for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267. Although the United States is not a signatory to the 1951 Convention, it adheres to Articles 2 through 34 of the 1951 Convention by operation of the 1967 Protocol, to which the United States acceded on Nov. 1, 1968.

limit "fiscal charges" to not higher than those charged to their nationals in similar situations. Accordingly, any fee charged would need to be reasonably aligned with the fees charged for other immigration benefit requests.[159] The proposed $50 fee is in accord with this provision.

This proposal is also consistent with a Presidential Memorandum directing the Attorney General and the Secretary of Homeland Security, as applicable, to take all appropriate actions to propose regulations setting a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and setting a fee for an initial application for employment authorization for the period an asylum claim is pending.[160]

Additionally, DHS considered the asylum fees charged by other nations. To determine the fiscal charges charged by other countries, USCIS requested a report from the Law Library of Congress on fees charged to asylum applicants by countries that are party to the 1951 Convention and/or its 1967 Protocol.[161] The Law Library of Congress surveyed the 147 signatory countries to the 1951 Convention and/or the 1967 Protocol, and of 147 countries, identified three countries that charge a fee for initial applications for asylum or refugee protection.[162] Those countries and amounts, provided in Table 14, indicate that the proposed $50 fee is in line with the fiscal charges charged by other countries.[163]

TABLE 14—ASYLUM FEES IN OTHER COUNTRIES

| Country | Fee amount | Fee in USD | Notes |
|---|---|---|---|
| Australia | AUD 35 | $25 | No fee for a detained applicant. |
| Fiji | FJD 465 | 221 | Allows for fee waivers. |
| Iran | IRR 12,321,000 | 293 | For a family of 5 with some fee exemptions. |

The projected FY 2019/2020 workload for Form I–589 is 163,000 annual receipts, or approximately 2 percent of the total USCIS workload forecast. The proposed $50 fee would generate an estimated $8.15 million in annual revenue. Therefore, in addition to alleviating pressure on the immigration benefit system, the proposed $50 fee for Form I–589 mitigates the proposed fee increase of other immigration benefit requests by approximately $5 or $10.

DHS is proposing no fee for an unaccompanied alien child (UAC) in removal proceedings who files Form I–589. The Trafficking Victims Protection Reauthorization Act (TVPRA) of 2000 provides for a range of protections for UACs as amended by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. Public Law 110–457, 122 Stat. 5044 (2008). A UAC is defined by statute as a child who is less than 18 years old, has no legal status in the U.S., and has no parent or legal guardian in the U.S. who is available to provide care and physical custody. 6 U.S.C. 279(g)(2).

Among other provisions, the TVPRA gives USCIS initial jurisdiction over asylum claims filed by UACs, even by those who are in removal proceedings before EOIR such that their asylum applications would otherwise be within the jurisdiction of an immigration judge. Section 235(d)(7)(B) of the TVPRA, as codified at 8 U.S.C. 1158(b)(3)(C), provides that "[a]n asylum officer . . . [in the U.S. Citizenship and Immigration Services' ("USCIS") Asylum Division] . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child." In accordance with the statute governing asylum applications filed by UACs, they may file their Form I–589 with USCIS, even if they are in removal proceedings and their asylum claims are thus asserted as a defense to removal. Consistent with the protections provided to UACs by the TVPRA, and to avoid undue delay for this vulnerable population by impeding UACs in removal proceedings from filing a Form I–589, DHS proposes to exclude them from the proposed fee. A UAC who is not in removal proceedings will be charged the same proposed $50 Form I–589 fee as other affirmative filers.

As discussed in section V.C. of this preamble on fee waivers, DHS proposes that the $50 Form I–589, Application for Asylum and Withholding of Removal, fee will not be waivable. The proposed $50 fee would generate an estimated $8.15 million in annual revenue. If DHS permits fee waiver requests, it assumes that the costs of administering the fee waiver request review process may exceed the revenue, thereby offsetting any cost recovery achieved from the fee. Therefore, DHS proposes that the $50 Form I–589 fee is mandatory. DHS acknowledges that an alien who is not placed in removal proceedings will have no means of applying for recognition as a person in need of refugee protection and its attendant benefits such as asylum or withholding-based employment authorization, travel documents, or documentation of immigration status, if they do not pay the proposed $50 fee.[164] That is why although INA section 208(d)(3), 8 U.S.C.

---

[159] To the extent that the asylum application fee may arguably be considered to be a "fiscal charge" for purposes of Article 29(1) of the 1951 Convention Relating to the Status of Refugees—as incorporated by reference in the 1967 Protocol Relating to the Status of Refugees—the proposed $50 fee would be in accord with that provision, which limits "fiscal charges" charged to refugees to an amount not higher than those charged by the United States to U.S. nationals in similar situations. The proposed $50 fee would be reasonably aligned with the fees charged to U.S. nationals for other immigration benefit requests. And Congress, as evidenced by the express authority conferred in INA section 208(d)(3), clearly does not believe that charging a fee for asylum applications would run contrary to U.S. obligations under the 1967 Protocol. *See also INS v. Stevic,* 467 U.S. 407, 428 n.22 (1984)

(describing provisions of the Convention and Protocol as "precatory and not self-executing").

[160] *See* Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019), available at *https://www.whitehouse.gov/ presidential-actions/presidential-memorandum-additional-measures-enhance-border-security-restore-integrity-immigration-system/* (last visited Aug. 6, 2019).

[161] *See* Library of Congress, *Fees Charged for Asylum Applications by States Parties to the 1951 Refugee Convention* (Dec. 29, 2017), *https:// www.loc.gov/law/help/asylum-application-fees/ index.php.*

[162] Additionally, while it does not charge a fee for making a claim for refugee or protection status, New Zealand typically grants individuals a "Refugee Claimant Visitor Visa" while claims are processed

and charges for that visa (although that fee may be waived). Canada does not charge for making a claim of protection, but does charge for obtaining proof of permanent protection.

[163] Exchange rates as of June 30, 2019. *See* Department of the Treasury, Bureau of Fiscal Service, *Treasury Reporting Rates of Exchange: Current Rates* (Aug. 14, 2019), *https:// www.fiscal.treasury.gov/reports-statements/ treasury-reporting-rates-exchange/current.html.*

[164] *See, e.g.,* 1951 Refugee Convention Art. 27 ("The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document."), Art. 28(1) ("The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require . . . .").

1158(d)(3) expressly authorizes charging a fee up to the full cost of providing the service, DHS is proposing a fee of $50 instead of at the level permitted under the INA to recover costs. In addition, DHS does not want the inability to pay the fee to be an extraordinary circumstance excusing an applicant from meeting the one-year filing deadline in INA 208(a)(2)(B), (D). *See also* 8 CFR 208.4(a)(5)(v) (''extraordinary circumstances'' includes situations in which the alien filed the Form I–589 prior to 1-yr deadline but application was retained as not properly filed, and then alien refiled within reasonable period thereafter). DHS considered the authority provided in INA section 208(d)(3), including that the fee be paid in installments or over time, various fee amounts and decided to propose $50 because it could be paid in one payment, would not require an alien an unreasonable amount of time to save, would generate some revenue to offset costs, discourage frivolous filings, and not be so high as to be unaffordable to even an indigent alien. DHS welcomes comments on the imposition of this fee, including the amount and whether it should be waivable.

**2. Fee for the Initial Application for Employment Authorization While an Asylum Claim Is Pending**

DHS proposes to require applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum), to pay the fee for initial filings of Form I–765. Currently, USCIS exempts applicants with pending asylum applications who are filing their first EAD application under the 8 CFR 274a.12(c)(8) eligibility category from the Form I–765 fee if the applicant submits evidence of an asylum application and follows other instructions.[165] Applicants with pending claims of asylum pay the fee for EAD renewal and replacement, per Form I–765 instructions and pursuant to 8 CFR 274a.12(c)(8).[166] USCIS projects

that this change will require approximately 300,000 asylum applicants to pay the Form I–765 fee each year. USCIS will continue to require the fee for renewal EADs.

Initial applicants with pending claims of asylum are approximately 13 percent of the total Form I–765 workload volume forecast. Continuing to exempt this population from paying the Form I–765 fee would further increase the proposed fee. If DHS exempts initial applicants with pending claims of asylum, then the proposed fee would be $500 instead of $490, meaning fee-paying EAD applicants would pay $10 to fund the cost of EADs for asylum applicants. Therefore, DHS proposes that initial applicants with pending asylum claims pay a $490 Form I–765 fee in order to keep the fee lower for all fee-paying EAD applicants. All other noncitizens applying for employment authorization are required to pay fees. *See* 8 CFR 274a.13. DHS notes that INA section 208(d)(3), 8 U.S.C. 1158(d)(3), seems to limit the amount that can be charged for employment authorization for an asylum applicant where it states, ''Such fees shall not exceed the Attorney General's costs in adjudicating the applications.'' However, section 208(d)(3) also states, ''Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title.'' That sentence permits DHS to charge asylum applicants the same fee for employment authorization that it charges all others for employment authorization because we calculate the proposed fee for the Form I–765, Application for Employment Authorization Document, using the fee-setting methodology outlined in this rule in accordance with INA sec. 286(m), 8 U.S.C. 1356(m). The proposed EAD fee ensures asylum applicants will pay no more for an EAD than any other EAD applicant except those for whom the fee has been waived. Therefore, the fee for Form I–765 proposed to be charged to asylum applicants complies with section 208(d)(3).

**Q. DACA Renewal Fees**

DHS proposes to add a fee for Deferred Action on Childhood Arrivals (DACA) renewal requests. *See* proposed 8 CFR 106.2(a)(38). Currently, DACA requestors use Form I–821D, Consideration of Deferred Action for

Childhood Arrivals, for DACA renewal requests. Form I–821D currently has no fee. However, DACA requestors must pay the current fees of $410 and $85 for Form I–765 and biometrics services, respectively, which total $495 and may not be waived, although currently there are very limited circumstances where a fee exemption may be granted under DACA policy criteria. The proposed Form I–821D filing fee for renewal DACA requests is $275.[167][168] This proposed filing fee for Form I–821D includes the cost of biometric services. Under the proposal, DACA requestors would still need to pay the filing fee for Form I–765 unless they qualify for an exemption, as provided through policy.[169] The proposed Form I–821D fee to request DACA renewal, plus the EAD fee, is $765. DHS proposes that DACA fees may not be waived, consistent with its current policy. One of the focuses of DACA when it was launched in 2012 is that the processing of DACA requests, including associated applications for employment authorization, does not result in an economic drain on DHS resources. Therefore, DHS set a standard for the exemption from the Form I–765 fee for DACA requests in a manner that balances the needs of the most vulnerable population likely to request DACA against USCIS' fiscal requirements for implementing the DACA initiative. A DACA requestor who requested Form I–765 fee exemptions faced significant delays in adjudicating the deferred action and the EAD request. Requests for DACA renewal will come from individuals who have had authorization to work lawfully in the U.S. for up to two years

---

[165] This fee exemption is provided in the Instructions to Form I–765, *Application for Employment Authorization,* by the USCIS Director or Deputy Director under the authority in 8 CFR 103.7(d); *see also* 8 CFR 274a.13(a)(applicants for EADs may be required to apply on a designated form and pay fees in accordance with form instructions).

[166] Class members subject to the settlement agreement under *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991), will be charged the fee generally applicable to employment authorization applications as proposed in this rule. The revised form instructions for Form I–765, Application for Employment Authorization, provide that class members may request that their

fee be waived, as required by that agreement using the authority in proposed 8 CFR 106.3(d).

[167] Currently, DHS may also accept a limited number of requests from individuals who previously received DACA but whose most recent DACA grant expired before September 5, 2017 or was terminated at any time. Although these requests are filed as initial DACA requests because the individual is no longer eligible to file a renewal request under longstanding DACA policy, these requests would be subject to the proposed fee for renewal requests because two nationwide preliminary injunctions currently require USCIS to allow anyone who previously received DACA to request additional periods of deferred action and employment authorization.

[168] DHS does not propose to introduce a fee for Form I–821D initial DACA requests because USCIS does not currently accept such requests, except as described in footnote 167 above, or plan to accept them in the future. Should USCIS be required to accept initial DACA requests in the future, DHS would charge requestors the proposed $30 biometrics fee, because biometrics costs associated with these requests would not be recovered via the application fee of $0.

[169] *See* USCIS, Frequently Asked Questions, *https://www.uscis.gov/archive/frequently-asked-questions* (last reviewed/edited March 8, 2018).

and DHS assumes that these individuals will have found work and are currently working. Therefore, DHS proposes a consistent policy and will require the Form I–765 fee for DACA renewal.

TABLE 15—CURRENT AND PROPOSED DACA RENEWAL FEES COMPARED

| DACA renewal request fees | Current fees | Proposed fees | Difference | Percentage difference |
|---|---|---|---|---|
| I–765 Application for Employment Authorization ........................................... | $410 | $490 | $80 | 20% |
| I–821D Consideration of Deferred Action for Childhood Arrivals (Renewal) .. | 0 | 275 | 275 | N/A |
| Biometric Services ........................................................................................ | 85 | N/A | N/A | N/A |
| Total DACA Fees (Renewal) ................................................... | 495 | 765 | 270 | 55 |

The proposed Form I–821D fee does not include cost reallocation.[170] In other words, it does not recover any of the cost for workload without fees or with reduced fees. As such, the DACA workload in the proposed Form I–765 does not recover the projected costs of workload without fees or with fees below projected full cost. DHS proposes to not assign cost reallocation to the Form I–821D fee to mitigate the fiscal risk of relying on revenue from DACA in the event the DACA policy is ended in the future. However, the non-DACA related workload for Form I–765 does include cost reallocation. The Form I–765 proposed fee would be higher if both DACA and non-DACA workload included cost reallocation of workload without fees or with fees below projected full cost.

In September 2017, DHS rescinded the 2012 DACA memo and initiated a plan to wind down the policy, while opting not to terminate DACA and EADs for individuals who had a previously approved DACA request, based solely on the rescission. At present, however, DHS is operating under two nationwide preliminary injunctions issued by federal district courts in California (*Regents of University of California* v. *DHS,* No. 17–cv–05211 (N.D. Cal.)) and New York (*State of New York* v. *Trump,* No. 17–cv–05228 (E.D.N.Y.)). These injunctions require DHS to ''maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017.'' Under these injunctions, DHS is not required to accept DACA requests from individuals who have not previously been granted DACA and is not required to accept DACA-based advance parole applications. The District Court for the District of Columbia also vacated DHS's rescission of DACA and ordered the government to accept initial DACA requests and resume accepting DACA-based advance parole applications.

However, the court then ordered a limited stay of its order to preserve the status quo pending appeal. *Trustees of Princeton University* v. *United States,* No. 1:17–cv–2325 (D.D.C.), consolidated with *NAACP* v. *Trump,* No. 17–cv–01907 (D.D.C.). Additionally, the U.S. Court of Appeals for the Fourth Circuit issued a decision that vacated the DACA rescission as arbitrary and capricious and remanded the case for further proceedings, reversing a ruling by the District Court for the District of Maryland. However, the Fourth Circuit subsequently stayed issuance of the mandate pending resolution of the Government's petition for writ of certiorari. *See Casa de Maryland* v. *DHS,* Nos. 18–1521–L; 18–1522 (4th Cir. 2019). Therefore, USCIS is currently required to continue accepting and adjudicating DACA requests from individuals who have previously been granted DACA, but is not required to accept requests from other individuals, or applications for DACA-based advance parole. DHS plans to file a request with the subject courts to allow DHS to implement all of the changes proposed in this rule to the extent that they may affect past, current, or future DACA recipients.

Currently, individuals who request deferred action under DACA do so without paying a fee that recovers the full cost to adjudicate such requests. Therefore, other applicants, petitioners, and requestors ultimately bear the burden to cover the full cost of DACA adjudications. While the DHS request for the courts to approve the effects of this proposed rule on DACA are pending, DHS publishes this NPRM for public comment on the proposed DACA fees. If any of the courts deny DHS's request to impose new DACA fees, then Form I–821D fees will be removed before the final rule is adopted and the costs of administering DACA will be reallocated to fee-paying immigration benefit requests. As such, the fee for Form I–765 may increase. Refer to section *VII. Other Possible Fee*

*Scenarios* for additional information regarding potential fees with and without a fee for Form I–821D.

### R. Fees Shared by CBP and USCIS

DHS combined the estimated cost and volume information for USCIS and CBP in the proposed fees for several immigration benefit requests that both components adjudicate. This affects the proposed fees for the following immigration benefit requests:

• Form I–192, Application for Advance Permission to Enter as a Nonimmigrant.

• Form I–193, Application for Waiver of Passport and/or Visa.

• Form I–212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal.

• Form I–824, Application for Action on an Approved Application or Petition.

USCIS calculated proposed fees using the same methodology as other proposed fees and then added information from CBP into the ABC model. CBP provided revenue collections from FY 2014 to FY 2017 for these immigration benefit requests. We divided the revenue collections by the fee for each immigration benefit request to derive the fee-paying volume for each immigration benefit request. CBP estimates the total cost for Forms I–192 and I–193 as part of its statement of net cost, leveraging the same software that USCIS uses for the ABC model.[171] CBP does not estimate the total cost of Forms I–212 or I–824. Dividing CBP's total costs by fee-paying volume can determine a fee-paying unit cost, and ultimately, fees for Forms I–192 and I–

---

[170] *See* section IV.B.3. Assessing Proposed Fees for more information.

[171] USCIS uses commercially available activity-based costing software, SAP Business Objects Profitability and Cost Management, to create financial models to implement activity-based costing (ABC), as described in the Methodology section of this preamble and the supporting documentation in the docket for this proposed rule.

193. Table 16 summarizes the CBP cost estimates, derived fee-paying volumes, and estimated unit costs.

estimates, derived fee-paying volumes, and estimated unit costs.

TABLE 16—CBP FY 2017 ESTIMATED COSTS AND VOLUMES

| Form | Estimated cost | Derived fee-paying volume | Estimated fee-paying unit cost |
|---|---|---|---|
| I–192 | $2,154,502 | 6,557 | $329 |
| I–193 | 17,951,942 | 7,613 | 2,358 |
| I–212 | N/A | 232 | N/A |
| I–824 | N/A | 103 | N/A |

USCIS incorporated the total costs and derived fee-paying volume for the respective CBP workloads into the ABC model. The proposed fees represent single DHS fees for each of these workloads by combining the estimated costs and fee-paying volumes of USCIS and CBP. DHS believes that a single fee for each of these shared workloads will reduce confusion for individuals interacting with CBP and USCIS.

*S. 9–11  Response and Biometric Entry-Exit Fee for H–1B and L–1 Visas*

In 2010 Congress enacted new fees for certain H–1B or L petitioners. *See* Public Law 111–230, sec. 402.[172] USCIS concluded at that time that the statutory language in section 402 of Public Law 111–230 was ambiguous and required it to interpret the statute and determine the full extent to which the fee would apply. In particular, the statute referred to the filing fee and fraud prevention and detection fee required to be submitted with an application for admission, but it was otherwise silent regarding petitions for H–1B or L classification or for requests for a change of status or extension of stay for beneficiaries who were already admitted into the United States. USCIS interpreted the statute's ambiguity to apply the fees to petitions for H–1B or L–1 classification when the fraud fee was otherwise required because the statutory language referred to these fees as being collected in addition to the already extant filing and fraud prevention and detection fees. USCIS, therefore, implemented these fees as applying only when the fraud fee was otherwise collected, in accordance with section 214(c)(12) of the INA, 8 U.S.C. 1184(c)(12); that is, with respect to

petitions for an initial grant of status or requesting a change of employer, but not to extension petitions filed by the same employer on behalf of the same employee. The Public Law 111–230 fee sunset on September 30, 2015.

In section 402(g) of Div. O of the Consolidated Appropriations Act, 2016 (Public Law 114–113)[173] enacted December 18, 2015, Congress reenacted and doubled these fees, effective immediately through September 30, 2025.[174] Although otherwise identical to the earlier Public Law 111–230 statutory language except for the relevant dates and dollar amounts,[175] Congress added new phrasing at two places, in pertinent part: ''.  .  . the *combined* filing fee and fraud prevention and detection fee required to be submitted with an application for admission [as an H–1B or L], *including an application for an extension of such status,* shall be increased .  .  .'' (emphasis added). There is no known legislative history about the Public Law 114–113 fees before enactment.

USCIS again concluded that the language in Public Law 114–113, as in the previous statute, was ambiguous and therefore USCIS had to determine whether the fee applied to all extension

petitions by covered employers, or just those for which the fraud fee was also charged (extension of stay with change of employer).[176] The first reading would be a significant new substantive expansion of the fees compared to the 2010–2015 interpretation; the latter would be consistent with the scope of the fees charged during that earlier period (although in the higher amounts provided by the new provision). In the absence of specific legislative history elucidating the intent of the statutory changes, and given the continued ambiguity of the statute (specifically the reference to the ''combined filing fee ($4,000 for H–1B and $4,500 for L–1 respectively) and fraud prevention and detection fee ($500) required to be submitted''), USCIS interpreted the Public Law 114–113 fee to similarly apply only when the fraud fee described in section 214(c)(12) of the INA, 8 U.S.C. 1184(c)(12), is also required and issued pursuant accordingly.[177]

The construction of the statutory ambiguity USCIS adopted in 2015 was not, however, the only reasonable one.

---

[172] Public Law 111–230 required the submission of an additional fee of $2,000 for certain H–1B petitions and $2,250 for certain L–1A and L–1B petitions. These additional fees, similar to the subsequently enacted fees under Public Law 114–113, applied to petitioners who employ 50 or more employees in the United States with more than 50 percent of its employees in the United States in H–1B or L–1 nonimmigrant status.

[173] Section 402(g) of Div. O of Public Law 114–113 added a new section 411 to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note. Section 411 provided that the fees collected thereunder would be divided 50/50 between general Treasury and a new ''9–11 Response and Biometric Exit Account'', until deposits into the latter amounted to $1 billion, at which point further collections would go only to general Treasury. Deposits into the 9–11 account are available to DHS for a biometric entry-exit screening system as described in 8 U.S.C. 1365b.

[174] This sunset date was extended another two years, until September 30, 2027, by section 30203 of Public Law 115–123 (Feb. 9, 2018).

[175] The new provision's ''notwithstanding section 281 of the Immigration and Nationality Act (8 U.S.C. 1351) or any other provision of law'' clause, unlike the 2010 enactment, expressly referred to sec. 281 of the INA, but this difference made no legal difference in the scope of the clause, as that clause is not meaningfully different from ''Notwithstanding any other provision of this Act or any other provision of law'' clause in Public Law 111–230 sec. 402.

[176] In enacting the new statute, Congress used the same wording of the previous statute, with the addition of the words ''combined'' and ''including an application for an extension of such status.'' Because Congress can be assumed to have been aware of the agency's interpretation of the previous statute, USCIS concluded, as an initial matter, that Congress added the phrase ''including an application for an extension of such status'' to clarify that the new fees not only apply to initial petitions for H–1B or L classification, but also in extension of stay cases. However, it was not clear whether Congress meant the new fees to apply to *all* extension of stay requests (a substantive change) or just a certain subset of cases, meaning, those involving an initial petition by a new employer on behalf of an individual already in H–1B or L–1 status who is seeking an extension of stay (a clarification). Further, the fact that Congress not only also included the specific reference to the fraud fee, but in fact reinforced the significance of that reference by inserting the word ''combined,'' made ambiguous whether Congress intended the fee to apply to all extension cases or just those that required the fraud fee.

[177] *See* ''Fee Increase for Certain H–1B and L–1 Petitions (Pub. L. 114–113)'' at *https:// www.uscis.gov/working-united-states/temporary-workers/fee-increase-certain-h-1b-and-l-1-petitions-public-law-114-113* (last reviewed/updated Feb. 20, 2018).

Another reasonable interpretation is that the Public Law 114–113 fee applies to all extension of stay petitions even when the fraud fee is not applicable. Under this alternative interpretation, the language "including an application for an extension of such status" is a substantive amendment, and the insertion of the word "combined" is a clarifying one. It is plausible that Congress added the reference to extension of status so that the fee would be collected for all extension of stay petitions, not just those where a change of employer is also requested. In that case, the insertion of the word "combined" can be viewed as a clarifying edit that the increase to the fee is applied only once per petition and not once for the filing fee and once for the fraud fee such that it might apply two times for some petitions. Furthermore, when the fraud fee does not apply, the "combined" fee is simply the filing fee plus $0. This interpretation would give meaning to all the alterations to the earlier statute.

DHS has reexamined this matter and believes that this second, alternative interpretation of Public Law 114–113 would be most consistent with the goal of the statute to ensure employers that overly rely on H–1B or L nonimmigrant workers' pay an additional fee by making the fee applicable to all petitions by employers that meet the statute's 50 employee/50 percent test, regardless of whether or not the fraud fee also applies.[178] In other words, the fee should apply to all H–1B or L–1 petitions, whether for new employment or an extension of stay. DHS thus proposes to amend and clarify the regulations at new 8 CFR 106.2(c)(8) and (9)—currently 8 CFR 103.7(b)(1)(i)(III) and (JJJ)—to specify that this fee will apply to all H–1B and L–1 extension petitions in addition to all previously covered H–1B and L–1 petitions. The regulation would clarify that this includes individual L–1 petitions (Form I–129S) filed on the basis of a previously approved "blanket L" petition, but it does not apply to amended petitions filed by employers with respect to its employee that do not request an extension of stay. The amended regulation would also update

the sunset date for the provision from September 30, 2025 to September 30, 2027, as provided in Public Law 115–123. It would further provide for alternative fee amounts or sunset dates in case Congress changes them by a subsequently enacted law.

Beyond the above, various policy reasons support this change in DHS's implementation of the Public Law 114–113 fee provision. Fee collections under the provision are applied towards the important purposes of (1) funding the 9–11 Response and Biometric Fee Exit Account to be used for a biometric entry-exit screening system; and (2) deficit reduction and other public purposes funded by general Treasury revenues. Collections have fallen well short of projections. In its report on the fee provision in Public Law 114–113, the Congressional Budget Office (CBO) estimated annual revenues of $420 million per year (except for $380 million in the first year of FY 2016) from these fees through their lifespan.[179] However, collections for FY 2016 ($158 million), 2017 ($125 million), and 2018 ($119 million) totaled only about $402 million. DHS believes that collections have fallen short of the CBO projections mainly because of the USCIS construction of the statutory provision to exclude extension petitions except when filed to facilitate a change of employer. DHS proposes to reduce this shortfall and better achieve the funding aims of the statute through increased collections of these fees in the future.

### T. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))

DHS proposes to adjust the fee for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100 (NACARA)). The IEFA fees for this application have not changed since 2005. The proposed fees more accurately reflect USCIS' estimated costs associated with adjudicating the application. Additionally, DHS proposes to combine the current multiple fees into a single Form I–881 fee in effort to reduce administrative burden.

INS implemented two fees for this benefit request in 1999. *See* 63 FR 64895 (Nov. 24, 1998) (proposed rule) and 64

FR 27856 (May 21, 1999) (interim final rule). The two IEFA fees were $215 for an individual and $430 as a maximum per family. *See* 64 FR 27867–8. EOIR collected a separate $100 fee. *Id.* INS used ABC to determine the proposed IEFA fees. *See* 63 FR 64900. The IEFA NACARA fees have only changed by inflation since creation of the NACARA program. *See* 69 FR 20528 (Apr. 15, 2004) and 70 FR 56182 (Sept. 26, 2005). The current fees are as follows:

1. $285 for individuals,
2. $570 maximum for families, and
3. $165 at EOIR, whether an individual or family.

In FY 2018, the fees generated approximately $142,000 in IEFA revenue, when approximately 98 percent of applicants paid the $285 fee. EOIR provided receipt information for FY 2016 to FY 2018. EOIR received 339 applications in FY 2016, 326 in FY 2017, and 277 in FY 2018. DHS proposes no changes to the EOIR fee.

In prior fee rules, DHS has not changed the Form I–881 fees. *See* 72 FR 29854, 75 FR 58964, and 75 FR 73312. It excluded this immigration benefit request from previous fee rules, essentially treating it like other temporary programs or policies such as TPS and DACA. *See* 81 FR 73312. DHS expects the population will be exhausted eventually due to relevant eligibility requirements. *Id.*

DHS proposes a single $1,800 fee for any Form I–881 filed with USCIS. *See* proposed 8 CFR 106.2(a)(41). USCIS does not have systems in place that can track the different adjudicative level of effort required between Form I–881 applications by an individual compared to a family. Regardless, DHS does not have any policy reasons that would justify charging a separate fee for a small population that will soon be exhausted. Additionally, removing the distinction will simplify USCIS' revenue collections and reporting, thus reducing the administrative burden of the program.

USCIS forecasts an average of 340 annual Form I–881 receipts in the FY 2019/2020 biennial period. Current USCIS fees would generate approximately $100,000 in IEFA revenue. The proposed single fee of $1,800 would generate approximately $612,000 in revenue and slightly mitigate the proposed fee increase of other immigration benefit requests.

### U. Miscellaneous Technical and Procedural Changes

DHS proposes several technical or procedural changes. This rule moves the fee regulations for USCIS to a separate part of Chapter I of Title 8 of the Code

---

[178] USCIS counts all full-time and part-time employees when determining whether an employer must pay this fee. H–1B and all L–1 employees are combined in the counting to determine if the 50% threshold is met to trigger the fee. See *https://www.uscis.gov/working-united-states/temporary-workers/fee-increase-certain-h-1b-and-l-1-petitions-public-law-114-113*. DHS is adding the words "in the aggregate" to proposed 8 CFR 106.2(c)(8) and (9) to clarify its interpretation and how employees would be counted, consistent with current practice, to determine if this additional fee is required.

[179] See CBO Cost Estimate, H.R. 2029 Amendment #1 (2016 Omnibus), table 3 at sec. 402, *https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/costestimate/hr2029amendment1divisionsa.pdf* (Dec. 16, 2015).

of Federal Regulations. It moves them from 8 CFR part 103 to 8 CFR part 106 in an effort to reduce the length and density of part 103 as well as to make it easier to locate specific fee provisions. In addition to the renumbering and redesigning of paragraphs, this rule has reorganized and reworded some sections to improve readability.

DHS proposes to remove some redundant text and consolidate USCIS fee requirements. For example, some regulations erroneously specified that USCIS will not accept personal checks.[180] *See, e.g.,* 8 CFR 245a.2(e)(3), 245a.3(d)(3), and 245a.4(b)(5)(iii). DHS proposes to remove the erroneous or redundant text and instead refer to consolidated fee requirements in 8 CFR 106.1. *See* proposed 8 CFR 106.1, 245a.2(e)(3), 245a.3(d)(3), and 245a.4(b)(5)(iii).

DHS proposes to revise 8 CFR 214.2(p)(2)(iv)(F) to incorporate statutory changes that have occurred after 8 CFR 214.2(p)(2)(iv)(F) was codified and to conform this regulatory language to longstanding practice that allow petitions for multiple P nonimmigrants. Specifically, DHS proposes to add a reference to "team" in 8 CFR 214.2(p)(2)(iv)(F) to account for INA section 214(c)(4)(G), 8 U.S.C. 1184(c)(4)(G) ("The Secretary of Homeland Security shall permit a petition under this subsection to seek classification of more than 1 alien as a nonimmigrant under section 1101(a)(15)(P)(i)(a) of this title"), which was added in 2006 and mandates DHS to allow a petitioner to include multiple P–1A athletes in one petition.[181] DHS also proposes to delete "seeking classification based on the reputation of the group as an entity" from 8 CFR 214.2(p)(2)(iv)(F) because certain athletic teams applying for P–1 nonimmigrant classification and groups applying for P–2 or P–3 nonimmigrant classification are not necessarily required to establish reputation of the team or group as an entity. *Id.*

DHS proposes to update regulations regarding adjustment of status under INA section 245(i), 8 U.S.C. 1255(i), commonly referred to as the Legal Immigration Family Equity (LIFE) Act. The current regulations are inconsistent with Form I–485 instructions. DHS proposes to refer to the current form instructions and supporting evidence requirements. *See* proposed 8 CFR 245a.12(d). DHS also proposes to remove outdated requirements for passport photos, biographic and biometric information. *See* proposed 8 CFR 245a.12(d), (d)(2), and (d)(4). In the past, USCIS required applicants and beneficiaries to submit a fingerprint form or biographic information with benefit requests. Currently, USCIS collects biometric data at Application Support Centers.

DHS proposes to change outdated references to the Missouri Service Center, now named the National Benefits Center.[162] *See* proposed 8 CFR 245a.12(b) and (c); 245a.13(e) and (e)(1); 245a.18(c)(1); 245a.19(a); and 245a.33(a) and (b). The National Benefits Center (NBC) performs centralized front-end processing of applications and petitions that require field office interviews (primarily, Forms I–485 and N–400). In addition, the NBC adjudicates some form types to completion, including but not limited to intercountry adoption cases and immigration benefits associated with the LIFE Act. The old name is why some receipt notices for the NBC begin with the letters "MSC" instead of "NBC."

DHS also proposes to amend the title of 8 CFR part 103 to make it more descriptive of its contents. *See* proposed 8 CFR part 103. The current title of part 103 is IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS. Part 103 contains several significant requires for filing requests, forms and documents with USCIS, especially in 8 CFR 103.2, which should be made more clear to the users of that part. Therefore, DHS proposes to revise the title of the part to include a reference to filing requirements. The proposed title is, "PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS."

In addition, DHS is proposing a severability provision in new 8 CFR part 106. DHS believes that the provisions of each new part function sensibly independent of other provisions. However, to protect the goals for which this rule is being proposed DHS is codifying our intent that the provisions be severable so that, if necessary, the regulations can continue to function without a stricken provision. Proposed 8 CFR 106.6.

## VI. Proposed Fee Adjustments to IEFA Immigration Benefits

Projected USCIS costs for FY 2019 and 2020 exceed projected revenue by an average of $1,262.3 million each year. Therefore, DHS proposes to adjust the fee schedule to recover the full cost of processing immigration benefit requests and to continue to maintain or improve current service delivery standards.

After resource costs are identified, the ABC model distributes them to USCIS' primary processing activities. Table 17 outlines total IEFA costs by activity.

### TABLE 17—PROJECTED IEFA COSTS BY ACTIVITY

[Dollars in millions]

| Activity | FY 2019 | FY 2020 | FY 2019/2020 average |
|---|---|---|---|
| Conduct TECS Check | $139.7 | $148.6 | $144.2 |
| Direct Costs | 59.6 | 60.7 | 60.1 |
| Fraud Detection and Prevention | 335.8 | 378.7 | 357.3 |
| Inform the Public | 402.0 | 422.8 | 412.4 |
| Intake | 135.5 | 138.6 | 137.1 |
| Issue Document | 71.1 | 72.6 | 71.9 |
| Make Determination | 1,644.3 | 1,753.5 | 1,698.9 |
| Management and Oversight | 1,148.7 | 1,169.8 | 1,159.2 |
| Perform Biometrics Services subtotal | 222.8 | 228.3 | 225.6 |
| Manage Biometric Services | 67.8 | 70.4 | 69.1 |
| Collect Biometric Data | 81.6 | 83.1 | 82.4 |
| Check Fingerprints | 34.6 | 35.3 | 34.9 |

[180] For additional information on how to pay USCIS filing fees, see USCIS, *Paying USCIS Fees* available at, *https://www.uscis.gov/forms/paying-uscis-fees* (last reviewed/updated Feb. 14, 2018).

[181] *See* Public Law 109–463, 120 Stat. 3477 (2006).

[162] USCIS, *National Benefits Center: What It Is and What It Does* available from, *https://*

*www.uscis.gov/archive/blog/2012/06/national-benefits-center-what-it-is-and* (released June 5, 2012).

### Table 17—Projected IEFA Costs by Activity—Continued

[Dollars in millions]

| Activity | FY 2019 | FY 2020 | FY 2019/2020 average |
|---|---|---|---|
| Check Name | 38.8 | 39.6 | 39.2 |
| Records Management | 349.6 | 358.8 | 354.2 |
| Research Genealogy | 2.0 | 2.0 | 2.0 |
| Systematic Alien Verification for Entitlements | 47.0 | 48.3 | 47.7 |
| Total IEFA Costs | 4,558.1 | 4,782.9 | 4,670.5 |

Next, the ABC model distributes activity costs to immigration benefit requests. Table 18 summarizes total revenue by immigration benefit request based on the proposed fee schedule.

### Table 18—Projected FY 2019/2020 Average Annual Revenue per Immigration Benefit With Proposed Fees

[Dollars in millions]

| Immigration benefit request | Revenue forecast |
|---|---|
| I–90   Application to Replace Permanent Resident Card | $283.33 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 3.51 |
| I–129   Petition for a Nonimmigrant Worker Subtotal | 330.30 |
| I–129H1B—Named Beneficiaries | 237.05 |
| I–129H2A—Named Beneficiaries | 3.41 |
| I–129H2B—Named Beneficiaries | 1.64 |
| I–129L—Named Beneficiaries | 33.82 |
| I–129O | 18.20 |
| I–129CW, I–129E&TN, and I–129MISC | 30.66 |
| I–129H2A—Unnamed Beneficiaries | 3.82 |
| I–129H2B—Unnamed Beneficiaries | 1.70 |
| I–129F   Petition for Alien Fiancé(e) | 24.92 |
| I–130   Petition for Alien Relative | 541.90 |
| I–131   Application for Travel Document | 170.27 |
| I–131   Refugee Travel Document for an individual age 16 or older | 3.00 |
| I–131   Refugee Travel Document for a child under the age of 16 | 0.14 |
| I–131A   Application for Carrier Documentation | 9.90 |
| I–140   Immigrant Petition for Alien Worker | 87.75 |
| I–191   Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 0.21 |
| I–192   Application for Advance Permission to Enter as Nonimmigrant | 32.23 |
| I–193   Application for Waiver of Passport and/or Visa | 21.40 |
| I–212   Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 6.33 |
| I–290B   Notice of Appeal or Motion | 14.60 |
| I–360   Petition for Amerasian, Widow(er) or Special Immigrant | 1.92 |
| I–485   Application to Register Permanent Residence or Adjust Status | 572.24 |
| I–526   Immigrant Petition by Alien Entrepreneur | 56.21 |
| I–539   Application to Extend/Change Nonimmigrant Status | 89.56 |
| I–589   Application for Asylum and for Withholding of Removal | 8.15 |
| I–600/600A; I–800/800A   Intercountry Adoption-Related Petitions and Applications | 4.98 |
| I–600A/I–600   Supplement 3 Request for Action on Approved Form I–600A/I–600 | 0.31 |
| I–601   Application for Waiver of Ground of Excludability | 20.40 |
| I–601A   Provisional Unlawful Presence Waiver | 64.32 |
| I–612   Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 0.31 |
| I–687   Application for Status as a Temporary Resident | 0.00 |
| I–690   Application for Waiver of Grounds of Inadmissibility | 0.02 |
| I–694   Notice of Appeal of Decision | 0.01 |
| I–698   Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 0.16 |
| I–751   Petition to Remove Conditions on Residence | 113.18 |
| I–765   Application for Employment Authorization | 941.82 |
| I–800A   Supplement 3 Request for Action on Approved Form I–800A | 0.31 |
| I–817   Application for Family Unity Benefits | 0.81 |
| I–821D   Consideration of Deferred Action for Childhood Arrivals (Renewal) | 108.90 |
| I–824   Application for Action on an Approved Application or Petition | 5.57 |
| I–829   Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 13.65 |
| I–881   Application for Suspension of Deportation or Special Rule Cancellation of Removal | 0.61 |
| I–910   Application for Civil Surgeon Designation | 0.34 |
| I–924   Application For Regional Center Designation Under the Immigrant Investor Program | 9.25 |
| I–924A   Annual Certification of Regional Center | 4.25 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | 1.53 |
| N–300   Application to File Declaration of Intention | 0.01 |
| N–336   Request for a Hearing on a Decision in Naturalization Proceedings | 6.80 |

TABLE 18—PROJECTED FY 2019/2020 AVERAGE ANNUAL REVENUE PER IMMIGRATION BENEFIT WITH PROPOSED FEES—Continued

[Dollars in millions]

| Immigration benefit request | Revenue forecast |
|---|---|
| N–400   Application for Naturalization | 949.72 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 0.17 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 12.78 |
| N–600/600K   Naturalization Certificate Application Subtotal | 50.41 |
|     N–600   Application for Certificate of Citizenship | 47.56 |
|     N–600K   Application for Citizenship and Issuance of Certificate Under Section 322 | 2.85 |
| USCIS   Immigrant Fee | 114.49 |
| Biometric Services | 8.55 |
| G–1041   Genealogy Index Search Request | 1.12 |
| G–1041A   Genealogy Records Request | 0.98 |
| Total | 4,693.62 |

Table 19 depicts the current and proposed USCIS fees for immigration benefit requests and biometric services.

For a more detailed description of the basis for the changes described in this table, see Appendix Table 3 in the FY 2019/2020 Fee Review Supporting Documentation accompanying this proposed rule.

TABLE 19—PROPOSED FEES BY IMMIGRATION BENEFIT

| Immigration benefit request | Current fee | Proposed fee | Delta ($) | Percent change |
|---|---|---|---|---|
| I–90   Application to Replace Permanent Resident Card | $455 | $415 | −$40 | −9% |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 445 | 490 | 45 | 10 |
| I–129   Petition for a Nonimmigrant worker | 460 | N/A | N/A | N/A |
| I–129H1   I–129 H–1B—Named Beneficiaries | 460 | 560 | 100 | 22 |
| I–129H2A   I–129 H–2A—Named Beneficiaries | 460 | 860 | 400 | 87 |
| I–129H2B   I–129 H–2B—Named Beneficiaries | 460 | 725 | 265 | 58 |
| I–129L   Petition for L Nonimmigrant Worker | 460 | 815 | 355 | 77 |
| I–129O   Petition for O Nonimmigrant Worker | 460 | 715 | 255 | 55 |
| I–129CW, I–129E&TN, and I–129MISCV   Petition for a CNMI-Only Non-immigrant Transitional Worker; Application for Nonimmigrant Worker: E and TN Classification; and Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification. | 460 | 705 | 245 | 53 |
| I–129H2A   I–129 H–2A—Unnamed Beneficiaries | 460 | 425 | −35 | −8 |
| I–129H2B   I–129 H–2B—Unnamed Beneficiaries | 460 | 395 | −65 | −14 |
| I–129F   Petition for Alien Fiancé(e) | 535 | 520 | −15 | −3 |
| I–130   Petition for Alien Relative | 535 | 555 | 20 | 4 |
| I–131   Application for Travel Document | 575 | 585 | 10 | 2 |
| I–131   Travel Document for an individual age 16 or older | 135 | 145 | 10 | 7 |
| I–131   I–131 Refugee Travel Document for a child under the age of 16 | 105 | 115 | 10 | 10 |
| I–131A   Application for Carrier Documentation | 575 | 1,010 | 435 | 76 |
| I–140   Immigrant Petition for Alien Worker | 700 | 545 | −155 | −22 |
| I–191   Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 930 | 800 | −130 | −14 |
| I–192   Application for Advance Permission to Enter as Nonimmigrant | [183] 585/930 | 1,415 | 830/485 | 142/52 |
| I–193   Application for Waiver of Passport and/or Visa | 585 | 2,790 | 2,205 | 377 |
| I–212   Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 930 | 1,040 | 110 | 12 |
| I–290B   Notice of Appeal or Motion | 675 | 705 | 30 | 4 |
| I–360   Petition for Amerasian Widow(er) or Special Immigrant | 435 | 455 | 20 | 5 |
| I–485   Application to Register Permanent Residence or Adjust Status | [184] 1,140/750 | 1,120 | −20/370 | −2/49 |
| I–526   Immigrant Petition by Alien Entrepreneur | 3,675 | 4,015 | 340 | 9 |
| I–539   Application to Extend/Change Nonimmigrant Status | 370 | 400 | 30 | 8 |
| I–589   Application for Asylum and for Withholding of Removal | 0 | 50 | 50 | N/A |
| I–600/600A   Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of an Orphan Petition | 775 | 810 | 35 | 5 |
| I–600A/I–600   Supp. 3 Request for Action on Approved Form I–600A/I–600 | N/A | 405 | N/A | N/A |
| I–601   Application for Waiver of Ground of Excludability | 930 | 985 | 55 | 6 |
| I–601A   Application for Provisional Unlawful Presence Waiver | 630 | 960 | 330 | 52 |
| I–612   Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 930 | 525 | −405 | −44 |
| I–687   Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | 1,130 | 1,130 | 0 | 0 |
| I–690   Application for Waiver of Grounds of Inadmissibility | 715 | 770 | 55 | 8 |
| I–694   Notice of Appeal of Decision | 890 | 725 | −165 | −19 |

Federal Register / Vol. 84, No. 220 / Thursday, November 14, 2019 / Proposed Rules  **62327**

TABLE 19—PROPOSED FEES BY IMMIGRATION BENEFIT—Continued

| Immigration benefit request | Current fee | Proposed fee | Delta ($) | Percent change |
|---|---|---|---|---|
| I-698   Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | 1,670 | 1,615 | −55 | −3 |
| I-751   Petition to Remove Conditions on Residence | 595 | 760 | 165 | 28 |
| I-765   Application for Employment Authorization | 410 | 490 | 80 | 20 |
| I-800/800A   Petition to Classify Convention Adoptee as an Immediate Relative/Application for Determination of Suitability to Adopt a Child from a Convention Country | 775 | 810 | 35 | 5 |
| I-800A   Supp. 3 Request for Action on Approved Form I-800A | 385 | 405 | 20 | 5 |
| I-817   Application for Family Unity Benefits | 600 | 590 | −10 | −2 |
| I-821D   Consideration of Deferred Action for Childhood Arrivals (Renewal) | 0 | 275 | 275 | N/A |
| I-824   Application for Action on an Approved Application or Petition | 465 | 500 | 35 | 8 |
| I-829   Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,750 | 3,900 | 150 | 4 |
| I-881   Application for Suspension of Deportation or Special Rule Cancellation of Removal | [185] 285/570 | 1,800 | 1,515/1,230 | 532/216 |
| I-910   Application for Civil Surgeon Designation | 785 | 650 | −135 | −17 |
| I-924   Application for Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 | 0 | 0 |
| I-924A   Annual Certification of Regional Center | 3,035 | 4,470 | 1,435 | 47 |
| I-929   Petition for Qualifying Family Member of a U-1 Nonimmigrant | 230 | 1,515 | 1,285 | 559 |
| I-941   Application for Entrepreneur Parole | 1,200 | 1,200 | 0 | 0 |
| N-300   Application to File Declaration of Intention | 270 | 1,320 | 1,050 | 389 |
| N-336   Request for a Hearing on a Decision in Naturalization Proceedings | 700 | 1,755 | 1,055 | 151 |
| N-400   Application for Naturalization | 640/320 | 1,170 | 530 | 83 |
| N-470   Application to Preserve Residence for Naturalization Purposes | 355 | 1,600 | 1,245 | 266 |
| N-565   Application for Replacement Naturalization/Citizenship Document | 555 | 545 | −10 | −2 |
| N-600   Application for Certificate of Citizenship | 1,170 | 1,015 | −155 | −13 |
| N-600K   Application for Citizenship and Issuance of Certificate Under Section 322 | 1,170 | 960 | −210 | −18 |
| USCIS   Immigrant Fee | 220 | 200 | −20 | −9 |
| G-1041   Genealogy Index Search Request | 65 | 240 | 175 | 269 |
| G-1041A   Genealogy Records Request | 65 | 385 | 320 | 492 |
| Biometric Services | 85 | 30 | −55 | −65 |

## VII. Other Possible Fee Scenarios

Subject to certain limitations, the fees that DHS proposes in this rule may change in the subsequent final rule based on policy decisions, in response to public comments, intervening legislation, and other changes. DHS will explain any changes between the proposed and final fees. Nevertheless, DHS notes that the content of a final rule, beyond public comments and policy modifications, appreciably depends on two factors that are to some extent beyond its control. As previously described, this rule includes a proposed

DACA renewal fee associated with Form I-821D. See section V.Q. DACA Fees of this preamble. However, DHS is currently operating under two nationwide preliminary injunctions to maintain the DACA policy. DHS is not currently accepting initial DACA requests, except in limited circumstances.[186] USCIS evaluated separate DACA initial and renewal fees in case that changes. Additionally, the proposed fees include USCIS funding $207.6 million of ICE expenses associated with adjudication and naturalization services in both FY 2019 and FY 2020. See section IV.A.1.a. Use IEFA Fee Collections to Fund ICE Activities of this preamble. Any combination of those proposals may not materialize because DHS must obtain relief from the DACA preliminary injunctions. This rule also proposes the transfer of IEFA funds to ICE consistent with the Administration's budget requests for fiscal years 2019 and 2020. If Congress rejects the Administration's request, or if DHS does not ultimately shift these costs from annual appropriations to the IEFA, USCIS will not include this use of these funds in its

fee model for the final rule. Uncertainties associated with each aspect of the rule could result in changes to the final fees.[187]

To reduce the uncertainty that such conditions present to the affected public, USCIS proposes and evaluates six fee scenarios based on these three factors. Each scenario lays out what the fees would be if certain conditions materialize and present a range of fees. Thus, the final fees may be one of the scenarios presented, or an amount in between the highest and lowest fees proposed. Scenario A refers to the proposed fees described in detail throughout this proposed rule. Scenario B includes DACA renewal fees, but it excludes the ICE transfer. Scenario C excludes DACA fees, but it includes the ICE transfer. Scenario D excludes both DACA fees and the ICE transfer.

[183] The current fee for Form I-192 is 585 when filed with and processed by CBP. When filed with USCIS, the fee is 930. *See* 8 CFR 103.7(b)(1)(i)(P).

[184] The 750 fee applies to ''an applicant under the age of 14 years when [the application] is (i) submitted concurrently with the Form I-485 of a parent, (ii) the applicant is seeking to adjust status as a derivative of his or her parent, and (iii) the child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent.'' *See* 8 CFR 103.7(b)(1)(i)(U)(2).

[185] Currently there are two USCISs fees for Form I-881: $285 for individuals and $570 for families. *See* 8 CFR 103.7(b)(1)(i)(QQ)(1). EOIR has a separate $165 fee. DHS proposes no changes to the EOIR fee.

[186] See footnotes 167 and 168.

[187] In addition, litigation regarding various fees may result in DHS not implementing certain fees or fee increases. DHS is considering whether to include a severability provision in the final fee rule, or ''fallback'' provisions that provide for alternative fee schedules in the event that certain aspects of the rule are not implemented. DHS requests comment on this option.

Scenarios E and F list separate initial and renewal fees for DACA, with or without the ICE transfer. Table 20 lists the assumptions and effects of these three factors on each fee scenario. The following sections briefly describe the differences and list the possible fees in each scenario.

TABLE 20—PROPOSED FEE SCHEDULE SCENARIOS

| Fee scenario | DACA renewal fees included | DACA initial fee included | ICE Transfer included | Average budget ($ millions) | Percent weighted average fee increase [188] |
|---|---|---|---|---|---|
| A | Yes | No | Yes | $4,670.5 | 21% |
| B | Yes | No | No | 4,462.9 | 15 |
| C | No | No | Yes | 4,651.7 | 25 |
| D | No | No | No | 4,444.2 | 20 |
| E | Yes | Yes | Yes | 4,672.4 | 20 |
| F | Yes | Yes | No | 4,464.8 | 15 |

*A. Fee Schedule With DACA Renewal Fees*

Scenarios A and B produced fee levels in between the highest and lowest scenarios. Table 21 lists the individual fees for each. These fees are lower than in some scenarios because DACA fees recover part of USCIS costs. Scenario B produces lower fees than Scenario A because it has a lower budget by excluding the ICE transfer.

TABLE 21—PROPOSED FEE SCHEDULE WITH DACA RENEWAL FEE WITH AND WITHOUT THE ICE TRANSFER

| Immigration benefit request | Scenario A | Scenario B |
|---|---|---|
| I–90  Application to Replace Permanent Resident Card | $415 | $385 |
| I–102  Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 490 | 465 |
| I–129  Petition for a Nonimmigrant worker | N/A | N/A |
| I–129H1B—Named Beneficiaries | 560 | 535 |
| I–129H2A—Named Beneficiaries | 860 | 840 |
| I–129H2B—Named Beneficiaries | 725 | 700 |
| I–129L—Named Beneficiaries | 815 | 795 |
| I–129O | 715 | 690 |
| I–129CW, I–129E&TN, and I–129MISC | 705 | 685 |
| I–129H2A—Unnamed Beneficiaries | 425 | 400 |
| I–129H2B—Unnamed Beneficiaries | 395 | 370 |
| I–129F  Petition for Alien Fiancé(e) | 520 | 495 |
| I–130  Petition for Alien Relative | 555 | 535 |
| I–131  Application for Travel Document | 585 | 550 |
| I–131  Refugee Travel Document for an individual age 16 or older | 145 | 145 |
| I–131  Refugee Travel Document for a child under the age of 16 | 115 | 115 |
| I–131A  Application for Carrier Documentation | 1,010 | 1,010 |
| I–140  Immigrant Petition for Alien Worker | 545 | 520 |
| I–191  Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 800 | 780 |
| I–192  Application for Advance Permission to Enter as Nonimmigrant | 1,415 | 1,355 |
| I–193  Application for Waiver of Passport and/or Visa | 2,790 | 2,805 |
| I–212  Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 1,040 | 1,025 |
| I–290B  Notice of Appeal or Motion | 705 | 675 |
| I–360  Petition for Amerasian Widow(er) or Special Immigrant | 455 | 435 |
| I–485  Application to Register Permanent Residence or Adjust Status | 1,120 | 1,095 |
| I–526  Immigrant Petition by Alien Entrepreneur | 4,015 | 4,010 |
| I–539  Application to Extend/Change Nonimmigrant Status | 400 | 375 |
| I–589  Application for Asylum and for Withholding of Removal | 50 | 50 |
| I–600/600A  Orphan Adoption-Related Petitions and Applications | 810 | 770 |
| I–600A  Supplement 3 Request for Action on Approved Form I–600A | 405 | 385 |
| I–601  Application for Waiver of Ground of Excludability | 985 | 965 |
| I–601A  Provisional Unlawful Presence Waiver | 960 | 940 |
| I–612  Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 525 | 495 |
| I–687  Application for Status as a Temporary Resident | 1,130 | 1,130 |
| I–690  Application for Waiver of Grounds of Inadmissibility | 770 | 745 |
| I–694  Notice of Appeal of Decision | 725 | 705 |
| I–698  Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1,615 | 1,600 |
| I–751  Petition to Remove Conditions on Residence | 760 | 735 |
| I–765  Application for Employment Authorization | 490 | 455 |
| I–800/800A  Hague Adoption Convention Adoption-Related Petitions and Applications | 805 | 770 |
| I–800A  Supplement 3 Request for Action on Approved Form I–800A | 405 | 385 |
| I–817  Application for Family Unity Benefits | 590 | 565 |
| I–821D  Consideration of Deferred Action for Childhood Arrivals (Initial) | 0 | 0 |
| I–821D  Consideration of Deferred Action for Childhood Arrivals (Renewal) | 275 | 250 |
| I–824  Application for Action on an Approved Application or Petition | 500 | 475 |
| I–829  Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,900 | 3,895 |

[188] See footnote 6 for more information on the weighted averages in the fee schedule.

TABLE 21—PROPOSED FEE SCHEDULE WITH DACA RENEWAL FEE WITH AND WITHOUT THE ICE TRANSFER—Continued

| Immigration benefit request | Scenario A | Scenario B |
|---|---|---|
| I–881   Application for Suspension of Deportation or Special Rule Cancellation of Removal | 1,800 | 1,785 |
| I–910   Application for Civil Surgeon Designation | 650 | 625 |
| I–924   Application For Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 |
| I–924A   Annual Certification of Regional Center | 4,470 | 4,470 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | 1,515 | 1,465 |
| N–300   Application to File Declaration of Intention | 1,320 | 1,305 |
| N–336   Request for a Hearing on a Decision in Naturalization Proceedings | 1,755 | 1,730 |
| N–400   Application for Naturalization | 1,170 | 1,150 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 1,600 | 1,585 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 545 | 515 |
| N–600   Application for Certificate of Citizenship | 1,015 | 985 |
| N–600K   Application for Citizenship and Issuance of Certificate Under Section 322 | 960 | 940 |
| USCIS   Immigrant Fee | 200 | 175 |
| Biometric Services | 30 | 30 |
| G–1041   Genealogy Index Search Request | 240 | 240 |
| G–1041A   Genealogy Records Request | 385 | 385 |

*B. Fee Schedule Without DACA Fees*

Scenarios C and D exclude DACA workload from the fee schedules. Table 22 lists the fees for these scenarios. These scenarios produced some of the highest fees because they do not include DACA fee-paying volume to recover a portion of the projected budget. The fee review budget in these scenarios is lower than scenarios A, B, E, and F because USCIS removed certain estimated costs related to DACA, so as to mitigate the financial risk to USCIS of dependence upon revenue associated with a temporary program that may be eliminated in the future.[189] However, the decrease to the budget from DACA does not offset the fee increase. Scenario C yields the highest fees in some cases because it includes the ICE transfer in the budget. Scenario D fees may be higher or lower than the proposed fees in scenario A because it has the lowest total budget, but it excludes DACA fee-paying volume to recover a portion of the projected budget.

TABLE 22—FEE SCHEDULE WITHOUT DACA FEES AND WITH OR WITHOUT THE ICE TRANSFER

| Immigration benefit request | Scenario C | Scenario D |
|---|---|---|
| I–90   Application to Replace Permanent Resident Card | $440 | $410 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 510 | 480 |
| I–129   Petition for a Nonimmigrant worker | 0 | 0 |
| I–129H1B—Named Beneficiaries | 585 | 555 |
| I–129H2A—Named Beneficiaries | 870 | 850 |
| I–129H2B—Named Beneficiaries | 735 | 710 |
| I–129L—Named Beneficiaries | 830 | 805 |
| I–129O | 725 | 705 |
| I–129CW, I–129E&TN, and I–129MISC | 720 | 695 |
| I–129H2A—Unnamed Beneficiaries | 440 | 410 |
| I–129H2B—Unnamed Beneficiaries | 410 | 385 |
| I–129F   Petition for Alien Fiancé(e) | 535 | 510 |
| I–130   Petition for Alien Relative | 575 | 550 |
| I–131   Application for Travel Document | 625 | 585 |
| I–131   Refugee Travel Document for an individual age 16 or older | 145 | 145 |
| I–131   Refugee Travel Document for a child under the age of 16 | 115 | 115 |
| I–131A   Application for Carrier Documentation | 1,015 | 1,010 |
| I–140   Immigrant Petition for Alien Worker | 580 | 555 |
| I–191   Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 815 | 790 |
| I–192   Application for Advance Permission to Enter as Nonimmigrant | 1,465 | 1,395 |
| I–193   Application for Waiver of Passport and/or Visa | 2,775 | 2,790 |
| I–212   Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 1,070 | 1,050 |
| I–290B   Notice of Appeal or Motion | 735 | 700 |
| I–360   Petition for Amerasian Widow(er) or Special Immigrant | 475 | 450 |
| I–485   Application to Register Permanent Residence or Adjust Status | 1,155 | 1,125 |
| I–526   Immigrant Petition by Alien Entrepreneur | 4,015 | 4,005 |
| I–539   Application to Extend/Change Nonimmigrant Status | 420 | 395 |
| I–589   Application for Asylum and for Withholding of Removal | 50 | 50 |
| I–600/600A   Orphan Adoption-Related Petitions and Applications | 845 | 770 |
| I–600A   Supplement 3 Request for Action on Approved Form I–600A | 420 | 400 |
| I–601   Application for Waiver of Ground of Excludability | 1,035 | 1,010 |
| I–601A   Provisional Unlawful Presence Waiver | 980 | 960 |

[189] In the FY 2019/2020 fee review scenarios without DACA fees, USCIS removed contractual costs related to DACA from the ABC model. These excluded costs were for form intake, biometric collection, and EAD card production for DACA volumes. While DHS did not discuss the methodology in the FY 2016/2017 fee rule docket, DHS took a similar approach to exclude temporary or uncertain costs related to temporary programs. *See* 81 FR 26914.

TABLE 22—FEE SCHEDULE WITHOUT DACA FEES AND WITH OR WITHOUT THE ICE TRANSFER—Continued

| Immigration benefit request | Scenario C | Scenario D |
|---|---|---|
| I–612   Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 545 | 515 |
| I–687   Application for Status as a Temporary Resident | 1,130 | 1,130 |
| I–690   Application for Waiver of Grounds of Inadmissibility | 790 | 760 |
| I–694   Notice of Appeal of Decision | 740 | 715 |
| I–698   Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1,635 | 1,615 |
| I–751   Petition to Remove Conditions on Residence | 780 | 755 |
| I–765   Application for Employment Authorization | 590 | 550 |
| I–800/800A   Hague Adoption Convention Adoption-Related Petitions and Applications | 845 | 805 |
| I–800A   Supplement 3 Request for Action on Approved Form I–800A | 420 | 400 |
| I–817   Application for Family Unity Benefits | 615 | 590 |
| I–821D   Consideration of Deferred Action for Childhood Arrivals (Initial) | N/A | N/A |
| I–821D   Consideration of Deferred Action for Childhood Arrivals (Renewal) | N/A | N/A |
| I–824   Application for Action on an Approved Application or Petition | 520 | 495 |
| I–829   Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,905 | 3,895 |
| I–881   Application for Suspension of Deportation or Special Rule Cancellation of Removal | 1,825 | 1,805 |
| I–910   Application for Civil Surgeon Designation | 660 | 635 |
| I–924   Application for Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 |
| I–924A   Annual Certification of Regional Center | 4,465 | 4,460 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | 1,535 | 1,480 |
| N–300   Application to File Declaration of Intention | 1,340 | 1,315 |
| N–336   Request for a Hearing on a Decision in Naturalization Proceedings | 1,770 | 1,745 |
| N–400   Application for Naturalization | 1,195 | 1,170 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 1,615 | 1,595 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 580 | 550 |
| N–600   Application for Certificate of Citizenship | 1,035 | 1,005 |
| N–600K   Application for Citizenship and Issuance of Certificate | 975 | 950 |
| USCIS   Immigrant Fee | 215 | 185 |
| Biometric Services | 30 | 30 |
| G–1041   Genealogy Index Search Request | 240 | 240 |
| G–1041A   Genealogy Records Request | 385 | 385 |

*C. Fee Schedule With Both DACA Initial and Renewal Fees*

In scenarios E and F, USCIS adds its forecast of 43,000 initial requests for DACA. While the fee review budget is slightly higher than scenarios A and B, the increased fee-paying volume produces some of the lowest fees. Table 23 lists the fees in these scenarios.

TABLE 23—FEE SCHEDULE WITH DACA INITIAL AND RENEWAL FEES

| Immigration benefit request | Scenario E | Scenario F |
|---|---|---|
| I–90   Application to Replace Permanent Resident Card | $415 | $385 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 485 | 460 |
| I–129   Petition for a Nonimmigrant worker | 0 | 0 |
| I–129H1—Named Beneficiaries | 550 | 520 |
| I–129H2A—Named Beneficiaries | 810 | 790 |
| I–129H2B—Named Beneficiaries | 705 | 685 |
| I–129L—Named Beneficiaries | 790 | 770 |
| I–129O | 695 | 670 |
| I–129CW, I–129E&TN, and I–129MISC | 680 | 660 |
| I–129H2A—Unnamed Beneficiaries | 405 | 385 |
| I–129H2B—Unnamed Beneficiaries | 390 | 365 |
| I–129F   Petition for Alien Fiancé(e) | 500 | 475 |
| I–130   Petition for Alien Relative | 550 | 530 |
| I–131   Application for Travel Document | 585 | 550 |
| I–131   Refugee Travel Document for an individual age 16 or older | 145 | 145 |
| I–131   Refugee Travel Document for a child under the age of 16 | 115 | 115 |
| I–131A   Application for Carrier Documentation | 1,010 | 1,010 |
| I–140   Immigrant Petition for Alien Worker | 545 | 520 |
| I–191   Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 800 | 780 |
| I–192   Application for Advance Permission to Enter as Nonimmigrant | 1,415 | 1,350 |
| I–193   Application for Waiver of Passport and/or Visa | 2,790 | 2,805 |
| I–212   Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 1,040 | 1,020 |
| I–290B   Notice of Appeal or Motion | 700 | 670 |
| I–360   Petition for Amerasian Widow(er) or Special Immigrant | 455 | 430 |
| I–485   Application to Register Permanent Residence or Adjust Status | 1,120 | 1,095 |
| I–526   Immigrant Petition by Alien Entrepreneur | 4,015 | 4,010 |
| I–539   Application to Extend/Change Nonimmigrant Status | 390 | 370 |
| I–589   Application for Asylum and for Withholding of Removal | 50 | 50 |

TABLE 23—FEE SCHEDULE WITH DACA INITIAL AND RENEWAL FEES—Continued

| Immigration benefit request | Scenario E | Scenario F |
|---|---|---|
| I–600/600A   Orphan Adoption-Related Petitions and Applications | 805 | 770 |
| I–600A   Supplement 3 Request for Action on Approved Form I–600A | 400 | 380 |
| I–601   Application for Waiver of Ground of Excludability | 985 | 965 |
| I–601A   Provisional Unlawful Presence Waiver | 960 | 940 |
| I–612   Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 515 | 485 |
| I–687   Application for Status as a Temporary Resident | 1,130 | 1,130 |
| I–690   Application for Waiver of Grounds of Inadmissibility | 770 | 745 |
| I–694   Notice of Appeal of Decision | 715 | 695 |
| I–698   Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1,615 | 1,600 |
| I–751   Petition to Remove Conditions on Residence | 745 | 720 |
| I–765   Application for Employment Authorization | 480 | 445 |
| I–800/800A   Hague Adoption Convention Adoption-Related Petitions and Applications | 805 | 770 |
| I–800A   Supplement 3 Request for Action on Approved Form I–800A | 400 | 380 |
| I–817   Application for Family Unity Benefits | 590 | 565 |
| I–821D   Consideration of Deferred Action for Childhood Arrivals (Initial) | 500 | 480 |
| I–821D   Consideration of Deferred Action for Childhood Arrivals (Renewal) | 270 | 250 |
| I–824   Application for Action on an Approved Application or Petition | 495 | 475 |
| I–829   Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | 3,900 | 3,895 |
| I–881   Application for Suspension of Deportation or Special Rule Cancellation of Removal | 1,800 | 1,785 |
| I–910   Application for Civil Surgeon Designation | 650 | 625 |
| I–924   Application For Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 |
| I–924A   Annual Certification of Regional Center | 4,465 | 4,465 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | 1,510 | 1,465 |
| N–300   Application to File Declaration of Intention | 1,320 | 1,305 |
| N–336   Request for a Hearing on a Decision in Naturalization Proceedings | 1,755 | 1,730 |
| N–400   Application for Naturalization | 1,170 | 1,150 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 1,600 | 1,585 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 545 | 515 |
| N–600   Application for Certificate of Citizenship | 1,015 | 985 |
| N–600K   Application for Citizenship and Issuance of Certificate | 960 | 940 |
| USCIS   Immigrant Fee | 200 | 175 |
| Biometric Services | 30 | 30 |
| G–1041   Genealogy Index Search Request | 240 | 240 |
| G–1041A   Genealogy Records Request | 385 | 385 |

## VIII. Statutory and Regulatory Requirements

### A. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, harmonizing rules, and of promoting flexibility. This proposed rule has been designated an ''economically significant regulatory action'' under section 3(f)(1) of E.O. 12866. Accordingly, the rule has been reviewed by OMB.

USCIS' current fee schedule is expected to yield $3.41 billion of average annual revenue during the FY 2019/2020 biennial period. This represents a $0.93 billion, or 38 percent, increase from the FY 2016/2017 fee rule projection of $2.48 billion. See 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted 5,870,989 total workload receipts and 5,140,415 fee-paying receipts. See 81 FR 26923–4. However, the FY 2019/2020 fee review forecasts 9,336,015 total workload receipts and 7,789,861 fee-paying receipts. This represents a 59 percent increase to workload and 52 percent increase to fee-paying receipt volume assumptions.

USCIS would use the increase in revenue under INA section 286(m), (n), 8 U.S.C. 1356(m), (n), to ensure that USCIS would recover its full operating costs and maintain an adequate level of service. USCIS would set fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests and at a level sufficient to fund overall requirements and general operations, including the full costs of processing immigration benefit requests and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants at no charge; and the full cost of providing similar benefits to others at no charge.

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. DHS must fund the costs of providing services without charge by using a portion of the filing fees that are collected for other immigration benefits. While most immigration benefit request filing fees apply to individuals, as described above, some also apply to small entities. USCIS seeks to minimize the impact on all parties, but in particular small entities. An alternative to the increased economic burden of the proposed rule is to maintain fees at their current level for small entities. The strength of this alternative is that it assures no additional fee burden is placed on small entities; however, this alternative also would cause negative impacts to small entities.

Without the fee adjustments proposed in this rule, significant operational changes would be necessary. Given

**62332**   **Federal Register** / Vol. 84, No. 220 / Thursday, November 14, 2019 / Proposed Rules

current filing volume and other economic considerations, additional revenue is necessary to prevent immediate and significant cuts in planned spending. The proposed revenue increase is based on currently available USCIS costs and volume projections.

In addition to simple fee adjustments, the proposed rule includes numerous other changes in forms and policies related to fee payment. Some of these

changes would result in cost savings, and others would result in costs or transfers. For the 10-year implementation period of the proposed rule, DHS estimates the total cost of the rule to applicants/petitioners is $4,730,732,250 undiscounted, $4,035,410,566 discounted at 3-percent, and $3,322,668,371 discounted at 7-percent. DHS estimates the total cost savings (benefits) to the applicants/petitioners is $220,187,510

undiscounted, $187,824,412 discounted at 3-percent, and $154,650,493 discounted at 7-percent. Much of this total is expected to be transfers between applicants and the federal government or between groups of applicants, rather than new, real resource costs to the U.S. economy. These costs, transfers, and and cost savings (benefits) are briefly described below in Table 24, and in more detail in Tables 47 and 48 of the Regulatory Impact Analysis (RIA).

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| (a) Secure Mail Initiative ......................... | USCIS has decided to implement Signature Confirmation Restricted Delivery as the sole method of delivery of secure documents for USCIS. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS —<br>• Mailing costs from USPS for Signature Confirmation Restricted Delivery confirmation. | *Quantitative:*<br>Applicants—<br>• Applicants with unstable addresses or who move often will be much more certain to receive their documents.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Signature Confirmation Restricted Delivery will verify that the address information DHS has for a particular immigration benefit request is accurate.<br>• Reduces the likelihood of mis-delivered documents that could be misused. |
| (b) Clarify Dishonored Fee Check Re-presentment Requirement and Fee Payment Method. | DHS is proposing that if a check or other financial instrument used to pay a fee is returned as unpayable *because of insufficient funds,* USCIS will resubmit the payment to the re-mitter institution one time.<br>In addition, DHS proposes that it may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date.<br>DHS is also clarifying that fees are non-refundable regardless of the result of the immigration benefit request or how much time the request requires to be adjudicated. DHS is clarifying that fees will not be re-funded no matter the result of the benefit request or how much time the adjudication requires. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• The expansion by USCIS to accept credit cards for the payment of USCIS fees has resulted in a rise in the number of disputes filed with credit card companies challenging the retention of the fee by USCIS. As credit card use increases, this result has the potential to have a significant negative fiscal effect on USCIS fee receipts. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• USCIS can devote more time to adjudicate cases and to reduce administrative burdens and processing errors associated with fee payments, by clarifying the dishonored fee check re-present-ment.<br>• In the event that the bank that issues the credit card rescinds the payment of the fee to USCIS, USCIS reserves the authority to invoice the responsible party (applicant, petitioner, and requestor) for the unpaid fee. |
| (c) Eliminate $30 Returned Check Fee | DHS proposes to remove the $30 charge for dishonored payments. | *Quantitative:*<br>Applicants—<br>• None.<br><br>*Qualitative:*<br>Applicants—<br>• Costs to applicants if they had to reapply after rejection for a certain immigrant benefit.<br>DHS/USCIS—<br>• Could be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | *Quantitative:*<br>Applicants—<br>• $0.33 million annual cost savings.<br>*Qualitative:*<br>Applicants—<br>• The current $30 charge and the potential of having a benefit request rejected encourage applicants to provide the correct filing fees when submitting an application or petition.<br>• Applicants who submit bad checks would no longer have to pay a fee.<br>DHS/USCIS—<br>• None. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| (d) Fee waivers ........................ | DHS proposes to limit fee waivers to statutorily mandated fee waivers and to those applicants who have an annual household income of less than 125% of the FPG. Additionally, fee waiver applicants cannot be admitted into the United States subject to an affidavit of support under INA section 213A, 8 U.S.C 1183a and not be subject to the public charge inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182(a)(4). | *Quantitative:* Applicants— • $360.1 million annually from applicable USCIS form transfer fees. DHS/USCIS— • None. | *Quantitative:* Applicants— • Cost savings of $5.6 million annually from eliminated opportunity cost of time spent completing the fee waiver request. DHS/USCIS— • None. |
| | *Qualitative:* Applicants— • Limiting fee waivers may adversely affect some applicants' ability to apply for immigration benefits. DHS/USCIS— • None. | *Qualitative:* Applicants— None. DHS/USCIS— • Reduce or eliminate administrative costs required to maintain training or guidance necessary to adjudicate unique fee waiver requests. | |
| (e) Fee Exemptions ..................... | DHS proposes to remove the fee exemptions for an initial request for an employment authorization document (EAD) for the following classifications: • Citizen of Micronesia, Marshall Islands, or Palau; • Granted Withholding of Deportation; • Temporary Protected Status (TPS) if filing an initial TPS application for individuals under 14 years of age or over 65 years of age. • Applicant for Asylum and Withholding of Deportation or Removal. | *Quantitative:* Applicants— • Costs of $15.9 million annually in filing fees to filers of Form I–765 from the categories listed in the proposed provision no longer exempted. | *Quantitative:* Applicants— • None. |
| (a) ............................................... | | *Qualitative:* Applicants— • This could result in lost wages for the workers and lost productivity for the sponsoring employers. The lost wages and productivity can be considered as costs of the forgone benefits. This may be a very small population, and USCIS believes they will find some way to pay for their EAD filing fee. DHS/USCIS— • None. | *Qualitative:* Applicants— • The removal of fee exemptions for these populations may reduce further increases of other fees to pay for these exemptions. DHS/USCIS— • DHS notes that the continuing to provide these fee exemptions would result in the costs of those fee services being transferred to the fees for other forms. Removing the exemptions allows DHS to recover the costs of adjudication of Form I–765 for these categories from those who benefit from the service instead of other fee payers. |
| (f) Changes to Biometric Services Fee | DHS proposes to incorporate the biometric services cost into the underlying immigration benefit request fee instead of charging a flat $85 biometric services fee. | *Quantitative:* Applicants— • None. | *Qualitative:* Applicants— • EOIR and TPS applicants would save $16.0 million in cost savings resulting from a $55 reduction in biometrics service fees per applicant. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| | DHS proposes to require a $30 biometric services fee for TPS initial applications and re-registrations and EOIR applicants.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Qualitative:*<br>Applicants—<br>• Simplifies the process to submit payments.<br>• Could result in fewer incorrect payments and therefore, fewer rejected applications.<br>• Biometric costs incorporated into the fee would actually correspond to the services used.<br>DHS/USCIS—<br>• Eliminating the separate payment of the biometric services fee would decrease the administrative burden required to process both a filing fee and biometric services fee for a single benefit request.<br>• Agency can assign a biometric cost to the form fee that is based on the appropriate contract instead of a standard cost. | |
| (g) Discontinue providing free interim benefits when Forms I–75 and I–131 are filed concurrently with pending Form I–485 or when a Form I–485 is pending. | DHS proposes to require separate fees for Forms I–765 and/or I–131 when filed concurrently with Form I–485 or with a pending I–485. | *Quantitative:*<br>Applicants—<br>• $329.7 million for Forms I–765 and/or I–131 concurrently filed with Form I–485 or while it is pending.<br>*Qualitative:*<br>Applicants—<br>• None. | *Quantitative:*<br>Applicants—<br>• Not estimated.<br><br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• The proposed provision would be to isolate stand-alone interim benefit applicants from those concurrently filing Form I–485 allowing USCIS to more accurately assessed fee-paying percentages, fee-paying volumes, and fees for all three benefit types.<br>• Easier to administer separate fees than to determine if the I–131 or I–765 is supposed to be free or require a fee |
| (h) Form I–485 Fee for Children Under 14, Filing with Parent. | DHS proposes to require payment of the full $1,120 proposed fee for a child under the age of 14 years when concurrently filing Form I–485 with a parent. | *Quantitative:*<br>Applicants—<br>• Not estimated.<br>*Qualitative:*<br>Applicants—<br>• $23.3 million from increased USCIS form fees.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• Not estimated.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Easier to administer one single fee for Form I–485 would reduce the burden of adjudication and better reflect the cost of adjudication. |
| (i) Allow Individuals with Advance Parole to use Form I–131A, Application for Travel Document (Carrier Documentation) and Expand the Population Eligible to File Form I–131A. | DHS proposes to expand the population eligible to use Form I–131A to include requests for replacement advance parole documents | *Quantitative:*<br>Applicants—<br>• $4.1 million for new costs to file Form I–131A.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• The creation of a process for individuals to replace advance parole cards while abroad.<br>DHS/USCIS—<br>• None. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| (j) Separating Form I–129, Petition for a Nonimmigrant Worker, into Different Forms, and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition. | DHS proposes to separate the Petition for a Nonimmigrant Worker, Form I–129 into several forms with different corresponding fees. DHS also proposes to impose a limit of 25 named beneficiaries per petition where multiple beneficiaries are permitted. | *Quantitative:*<br>Applicants—<br>• Annual transfer form fees, opportunity costs of time, and multiple forms limited to 25 named beneficiaries to file Form I–129 would range depending on who files the form.<br>• With the new requirements some petitioners will now be required to file multiple petitions because the forms are limited to only 25 named beneficiaries. This will require additional cost for the petitioners to use a HR, In-house, or Outsourced lawyer to complete the different I–129 classifications forms, with different fees.<br>HR Specialist—$69.6 million; and In-house Lawyer—$65.4 million; or Outsourced Lawyer—$59.8 million.<br>DHS/USCIS—<br>• Not estimated.<br><br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None.<br><br>*Qualitative:*<br>Applicants—<br>• Separating forms would allow applicants to focus on each form's use and would reduce the need to navigate lengthy instructions that do not apply to their petition.<br>• Separating fees might prevent future increases in fees to one petitioner population that may be caused by some other petitioner population also using that form.<br>DHS/USCIS—<br>• By splitting the form and proposing several different fees, USCIS believes it will simplify or consolidate the information requirements for petitioners and applicants as well as better reflect the cost to adjudicate each specific nonimmigrant classification.<br>• Proposed fees would be imposed on the separate form for each specific petitioner population that causes the adjudication costs; other petitioners filing for other nonimmigrant classifications would not be burdened with costs not associated with their filings.<br>• Splitting the form and fees will allow USCIS to focus the information requirements for petitioners, better reflect the cost to adjudicate each specific nonimmigrant classification, and recover the revenue more directly from those petitioners who are receiving the benefit.<br>• Breaking out Form I–129 will affect backlogs only insofar as updating the fees enables USCIS to achieve full cost recovery and assign more resources to a particular adjudication as needs and priorities dictate. |
| (k) Extend premium processing timeframe from 15 calendar days to 15 business days. | DHS proposes to change the premium processing timeframe from 15 calendar days to 15 business days. | *Quantitative:*<br>Applicants—<br>• Not estimated. | *Quantitative:*<br>Applicants—<br>• Not estimated. Employers could lose some productivity but USCIS has no way to estimate what that loss may be. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| | | *Qualitative:*<br>Petitioners—<br>• Increased time burden and potential costs to employers who must plan for additional business days while waiting for premium processing.<br>• Applicants may have to wait longer for decisions on their cases, from 15 calendar days to 15 business days.<br>DHS/USCIS—<br>• None. | *Qualitative:*<br>Petitioners—<br>• Removes petitioner expectation of 15 calendar day processing to allow for better business planning.<br>DHS/USCIS—<br>• Reduces risk of failing to complete premium processing in the allotted timeframe, which results in refunds to petitioners and possibly suspension of the premium processing service.<br>• Allows USCIS additional time to process a petition. USCIS will avoid having to issue a refund and possibly avoid suspending premium processing service. |
| (I) Creation of Form I–600A/600 Supplement 3, Request for Action on Approved For I–600A/I–600 and new fee. | DHS proposes to:<br>Create a new form, I–600 Supplement 3, Request for Action on an Approved Form I–600A/I–600, and fee; clarify the regulations and align them with current practice regarding when prospective adoptive parents are not required to pay the Form I–600 or Form I–800 filing fee for multiple Form I–600 or Form I–800 petitions; alter the validity period for a Form I–600A approval in an orphan case from 18 to 15 months to remove inconsistencies between Form I–600A approval periods and validity of the FBI fingerprint authorization. | *Quantitative:*<br>Applicants—<br>• $0.57 million for new form fees.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• Improve and align the adjudication and approval processes for adoptions from countries that are party to the Hague Adoption Convention and countries that are not.<br>• Clarify the process for applicants who would like to request an extension of Form I–600A/I–600 and/or another type of approved change to their application/petition.<br>DHS/USCIS—<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not.<br>• Changing the validity period to 15 months will make the Form I–600A approval periods consistent with the validity of FBI biometric related background checks. The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| (m) Changes to Genealogy Search and Records Requests. | DHS proposes several changes to the USCIS genealogy program and how the agency processes genealogy requests. DHS proposes to expand the use of electronic genealogy requests; change the search request process so that USCIS may provide requesters with digital records, if they exist; and change the genealogy fees. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• USCIS may still need to mail some records in cases where requestors who cannot submit the forms electronically need to submit paper copies of both forms with required filing fees. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• Genealogy search and records request process changes would increase efficiency and decrease wait times for requestors.<br>DHS/USCIS—<br>• Reduce costs for mailing, records processing, and storage costs because electronic versions of records requests would reduce the administrative burden on USCIS.<br>• USCIS would save $16 to $45 per index search service and $26 to $55 for each textual file retrieved.<br>• Providing digital records in response to a Form G–1041 request may reduce the number of Form G–1041A requests that would be filed because there would already be a copy of the record if it was previously digitized. |
| (n) Remove Reduced Fee for Naturalization Applicants Using Form I–942, Request for Reduced Fee, When Filing Form N–400, Application for Naturalization. | DHS proposes to eliminate the reduced fee option for Form N–400 that applies to applicants whose documented household income is greater than 150 percent and not more than 200 percent of the Federal poverty level. | *Quantitative:*<br>Applicants—<br>• $2.9 million annually in transfer fees to file Form N–400 for individuals who would have previously requested a reduced Form N–400 fee using Form I–942.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Not transfer form N–400 costs to other form fees. |
| (o) Charge for an initial Form I–765 while an asylum claim is pending. | DHS proposes to require the fee for an initial Application for Employment Authorization, Form I–765, when asylum applicants apply for asylum or file an Application for Asylum and for Withholding of Removal, Form I–589. Currently, USCIS exempts these initial applicants with pending asylum applications. | *Quantitative:*<br>Applicants—<br>• $93.1 million for applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 Application for Asylum and for Withholding of Removal with USCIS (affirmative asylum), to pay the fee for initial filings of Form I–765.<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Using LIFO in fiscal year 2018 completed pending cases at an 80 percent rate in the first 30 days, and 98 percent of pending asylum cases were completed within 60 days of receipt. |
| (p) Charge a fee for Form I–589, Application for Asylum and for Withholding of Removal. | DHS proposes a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal. | *Quantitative:*<br>Applicants—<br>• Asylum applicants would pay $5.6 million in filing fee costs for Form I–589.<br>Qualitative:<br>Applicants—<br>• Some applicants may not be able to afford this fee and would no longer be able to apply for asylum. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. |
| (q) Charge a fee for Deferred Action for Childhood Arrivals (DACA) renewal requestors, Form I–821D. | DHS proposes a fee for renewal Deferred Action on Childhood Arrivals (DACA). Form I–821D currently has no fee.<br>DHS does not propose to introduce a fee for Form I–821D initial DACA requests because USCIS does not currently accept such requests, except as described in preamble above, or plan to accept them in the future. | *Quantitative:*<br>Applicants—<br>• $75.3 million for renewal application Form I–821D transfer fees.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | *Quantitative:*<br>Applicants—<br>• None.<br>*Qualitative:*<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Costs for processing DACA renewal will be recovered from those who receive the benefit rather than from other fee payers. |

TABLE 24—SUMMARY OF PROPOSED PROVISIONS AND IMPACTS—Continued

| Proposed provision | Description of proposed change to provision | Estimated costs or transfers of proposed provision | Estimated benefits of proposed provision |
|---|---|---|---|
| (r) Fee Combining for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 [NACARA]). | DHS proposes to combine the current multiple fees charged for an individual or family into a single fee for each filing of Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100, the Nicaraguan Adjustment and Central American Relief Act [NACARA]). | *Quantitative:* Applicants— • $0.90 million annual costs to apply for suspension of deportation or special rule cancellation of removal under NACARA using Form I–881. | *Quantitative:* Applicants— • $0.11 million in cost savings from the reduced passport-style photos requirement. |
| (a) .......................................... | *Qualitative:* Applicants— • None. DHS/USCIS— • None. | *Qualitative:* Applicants— • None. DHS/USCIS— • Combining the two IEFA fees into a single fee will streamline the revenue collections and reporting. • USCIS proposing a single Form I–881 fee may help reduce the administrative burden on USCIS on the small workload. | |
| (s) Clarify who must pay a 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1.. | DHS proposes to apply the 9–11 Response and Biometric Entry-Exit Fee to all covered petitions (meaning those meeting the 50 employee/50 percent H–1B or L test), whether for new employment or extension. | *Quantitative:* Applicants— • $186.2 million in transfer fees. *Qualitative:* Applicants— • None. DHS/USCIS— • None. | *Quantitative:* Applicants— • None. *Qualitative:* Applicants— • Fee would consistently be applied to all H–1B or L–1 petitions, whether for new employment or extension. DHS/USCIS— • The collected fees would help increase the 9–11 Response and Biometric Entry-Exit fee account for biometric entry-exit screening, deficit reduction, and other public purposes funded by general Treasury revenues. |

DHS has prepared a full analysis according to Executive Orders 12866 and 13563 which can be found in the docket for this rulemaking or by searching for RIN 1615–AC18 on *www.regulations.gov.*

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (Mar. 29, 1996), requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. The term "small entities" refers to small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. An "individual" is not defined by the RFA as a small entity and costs to an individual from a rule are not considered for RFA purposes. In addition, the courts have held that the RFA requires an agency to perform an initial regulatory flexibility analysis (IRFA) of small entity impacts only when a rule directly regulates small entities. Consequently, any indirect impacts from a rule to a small entity are not considered as costs for RFA purposes. Below is a summary of the small entity analysis. A more detailed analysis is available in the rulemaking docket at *http://www.regulations.gov.*

Individuals, rather than small entities, submit the majority of immigration and naturalization benefit applications and petitions. This rule would affect entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a RFA analysis for this proposed rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924.

DHS does not believe that the increase in fees proposed in this rule would have a significant economic impact on a substantial number of small entities that file Forms I–129, I–140, I–910, or I–360.

However, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I–924. DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. DHS is publishing this initial regulatory flexibility analysis to aid the public in commenting on the small entity impact of its proposed adjustment to the USCIS fee schedule. In particular, DHS requests information and data that would help to further assess the impact on small entities in the regional centers or on genealogy forms.

Initial Regulatory Flexibility Analysis (IRFA)

1. *A description of the reasons why the action by the agency is being considered.*

DHS proposes to adjust fees USCIS charges for certain immigration and naturalization benefits. DHS has determined that current fees would not recover the full costs of services provided. Adjustment to the fee schedule is necessary to recover costs and maintain adequate service.

2. *A succinct statement of the objectives of, and legal basis for, the proposed rule.*

DHS's objectives and legal authority for this proposed rule are discussed in the preamble of this rule.

3. *A description and, where feasible, an estimate of the number of small entities to which the proposed rule would apply.*

Entities affected by this rule are those that file and pay fees for certain immigration benefit applications and petitions on behalf of a foreign national. These applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program. Annual numeric estimates of the small entities impacted by this fee increase total (in parentheses) Form I–129 (77,571 entities), Form I–140 (22,165 entities), Form I–910 (428 entities), and Form I–360 (698 entities).[190] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities, therefore does not provide numeric estimates for Form I–924 or Forms G–1041 and G–1041A.[191]

This rule applies to small entities, including businesses, non-profit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140, would see a number of industry clusters impacted by this rule (see Appendix A of the Small Entity Analysis for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360). The fee for civil surgeon designation would apply to physicians requesting such designation. The fee for Amerasian, widow(er), or special immigrants would apply to any entity petitioning on behalf of a religious worker. Finally, the Form I–924 would impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–924 is also Form I–924A, which regional centers must file annually to establish continued eligibility for regional center designation for each fiscal year.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals. If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. Therefore, DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

a. Petition for a Nonimmigrant Worker, Form I–129

DHS proposes to adjust the fee for Petition for a Nonimmigrant Worker, Form I–129, from $460 to various fees. Currently, employers may use Form I–129, to petition for H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, or R–1 nonimmigrant workers. As applicable, employers also may use Form I–129 to apply for E–1, E–2, E–3, or TN nonimmigrant status for eligible workers. DHS proposes to separate the Petition for a Nonimmigrant Worker, Form I–129, into several forms. These forms would include information from the various supplemental forms for specific types of workers. DHS proposes different fees for these new forms. The proposed fees are calculated at a more detailed level than the current fees.

The current fee for Form I–129 is $460. DHS proposes the following fees for new Forms I–129 (separated into new forms by worker type):

• Form I–129H1, Petition for Nonimmigrant Worker: H–1 Classifications—$560

• Form I–129H2A, Petition for Nonimmigrant Worker: H–2A Classification (Named Beneficiaries)—$860

• Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification (Named Beneficiaries)—$725

• Form I–129L, Petition for Nonimmigrant Worker: L Classifications (Named Beneficiaries)—$815

• Form I–129O, Petition for Nonimmigrant Worker: O Classifications—$715

• Forms Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker; I–129E&TN, Application for Nonimmigrant Worker: E and TN Classifications; and I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification—$705

• Form I–129H2A, Petition for Nonimmigrant Work Classification: H–2A Classification (Unnamed Beneficiaries)—$425

• Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification (Unnamed Beneficiaries)—$395.

For petitioners filing Form I–129 for H–2A and H–2B workers with only unnamed beneficiaries, DHS proposes a lower fee than the current filing fee. DHS proposes to increase the fee when filed for all other worker types. The fee adjustments and percentage increases or decreases are summarized in Table 25.

TABLE 25—USCIS PROPOSED FEES FOR SEPARATED FORMS I–129 FOR FISCAL YEAR 2019/2020

| Immigration benefit request | Current fee | Proposed fee | Difference fee increase/ decrease | Percent change |
|---|---|---|---|---|
| Form I–129H1—Named Beneficiaries | $460 | $560 | $100 | 22 |
| Form I–129H2A—Named Beneficiaries | 460 | 860 | 400 | 87 |
| Form I–129H2A—Unnamed Beneficiaries | 460 | 425 | −35 | −8 |
| Form I–129H2B—Named Beneficiaries | 460 | 725 | 265 | 58 |

[190] Calculation: 90,726 Form I–129 * 85.5 percent = 77,571 small entities; 30,321 Form I–140 * 73.1 percent = 22,165 small entities; 476 Form I–910 * 90.0 percent = 428 small entities; 760 Form I–360 * 91.9 percent = 698 small entities.

[191] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

TABLE 25—USCIS PROPOSED FEES FOR SEPARATED FORMS I–129 FOR FISCAL YEAR 2019/2020—Continued

| Immigration benefit request | Current fee | Proposed fee | Difference fee increase/decrease | Percent change |
|---|---|---|---|---|
| Form I–129H2B—Unnamed Beneficiaries ............................................... | 460 | 395 | −65 | −14 |
| Form I–129O ............................................................................................ | 460 | 715 | 255 | 55 |
| Form I–129 L1A/L1B/LZ Blanket ............................................................ | 460 | 815 | 355 | 77 |
| Forms I–129CW, I–129E&TN, and I–129MISC ....................................... | 460 | 705 | 245 | 53 |

Source: USCIS FY 2019/2020 Proposed Fee Schedule (see preamble).

Using a 12-month period of data on the number of Form I–129 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data for each filing organization including the name, Employer Identification Number (EIN), city, state, zip code, and number/type of filings. Each entity may make multiple filings. For instance, there were receipts for 530,442 Form I–129 petitions, but only 90,726 unique entities that filed those petitions. Since the filing statistics do not contain information such as the revenue of the business, DHS used third party sources of data to collect this information. DHS used a subscription-based, online database—Hoover's—as well as three open-access databases—Manta, Cortera, and Guidestar—to help determine an organization's small entity status and then applied Small Business Administration size standards to the entities under examination.[192]

The method DHS used to conduct the small entity analysis was based on a representative sample of the impacted population with respect to each form. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 384 entities, which included using a 95 percent confidence level and a 5 percent confidence interval for a population of 90,726 unique entities filing Form I–129 petitions. Based on previous experience

conducting small entity analyses, DHS expects to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 69 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 650 randomly selected entities from a population of 90,726 unique entities that filed Form I–129 petitions.

Of the 650 searches for small entities that filed Form I–129 petitions, 473 searches returned a successful match of a filing entity's name in one of the databases and 177 searches did not match a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing entities not found in the online database are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 473 matches for Form I–129, DHS determined 346 to be small entities based on revenue or employee count and according to their assigned North American Industry Classification System (NAICS) code. Therefore, DHS

was able to classify 556 of 650 entities as small entities that filed Form I–129 petitions, including combined non-matches (177), matches missing data (33), and small entity matches (346). Using the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 33 matches missing data found in the databases lacked applicable revenue or employee count data.

DHS determined that 556 of 650 (85.5 percent) of the entities filing Form I–129 petitions were small entities. Furthermore, DHS determined that 346 of the 650 entities searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since these 346 small entities were a subset of the random sample of 650 entity searches, they were statistically significant in the context of this research. In order to calculate the economic impact of this rule, DHS estimated the total costs associated with the proposed fee increase for each entity and divided that amount by the sales revenue of that entity.[193] Based on the proposed fee increases for Form I–129, DHS calculated the average economic impact on the 346 small entities with revenue data as summarized in Table 26.

TABLE 26—ECONOMIC IMPACTS ON SMALL ENTITIES WITH REVENUE DATA

| Immigration benefit request | Fee increase/decrease | Average impact percentage |
|---|---|---|
| Form I–129H1 ............................................................................................................................ | $100 | 0.16 |
| Form I–129H2A—Named Beneficiaries .................................................................................... | 400 | 0.65 |
| Form I–129H2A—Unnamed Beneficiaries ................................................................................ | −35 | −0.06 |
| Form I–129H2B—Named Beneficiaries .................................................................................... | 265 | 0.43 |
| Form I–129H2B—Unnamed Beneficiaries ................................................................................ | −65 | −0.10 |
| Form I–129L ............................................................................................................................. | 355 | 0.57 |
| Form I–129O ............................................................................................................................ | 255 | 0.41 |
| Forms I–129CW, I–129E&TN, and I–129MISC ....................................................................... | 245 | 0.40 |

Source: USCIS calculation.

[192] U.S. Small Business Administration, Office of Advocacy, Size Standards Table. Available at *https://www.sba.gov/document/support--table-size-standards.*

[193] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity * $X difference in current fee from proposed fee)/Entity Sales Revenue.

Among the 346 small entities with reported revenue data, each one would experience an economic impact of less than 2 percent with the exception of 11 entities for any immigration benefit request using separate Forms I–129. Depending on the type of immigration benefit request, the average impact on all 346 small entities with revenue data ranges from −0.10 to 0.65 percent, as shown in the supporting comprehensive small entity analysis. Therefore, the average economic impact on the described 346 small entities is less than 1 percent, regardless of which newly separate Form I–129 petition is applicable. As a result, the additional fees this rulemaking proposes do not represent a significant economic impact on these small entities.

b. Immigrant Petition for an Alien Worker, Form I–140

USCIS proposes to decrease the fee to file Immigrant Petition for an Alien Worker, Form I–140, from $700 to $545, a decrease of $155 (22 percent). Using a 12-month period of data on the number of Form I–140 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data similar to that of Form I–129. The total number of Form I–140 petitions was 139,439, with 30,321 unique entities that filed petitions. DHS used the same databases previously mentioned to search for information on revenue and employee count.

DHS used the same method as with Form I–129 to conduct the small entity analysis based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 383 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 30,321 unique entities for Form I–140 petitions. Based on previous experience conducting small entity analyses, DHS expected to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 44 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 550 randomly selected entities from a population of 30,321 unique entities that filed Form I–140 petitions.

Of the 550 searches for small entities that filed Form I–140 petitions, 480 searches successfully matched the name of the filing entity to names in the databases and 70 searches did not match the name of a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing entities not found in the online databases are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 480 matches for Form I–140, DHS determined 324 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 402 of 550 entities as small entities that filed Form I–140 petitions, including combined non-matches (70), matches missing data (8), and small entity matches (324). Using the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 8 matches missing data that were found in the databases lacked applicable revenue or employee count statistics.

DHS determined that 402 out of 550 (73.1 percent) entities filing Form I–140 petitions were small entities. Furthermore, DHS determined that 324 of the 550 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since these 324 were a small entity subset of the random sample of 550 entity searches, they were considered statistically significant in the context of this research. Similar to Form I–129, DHS calculated the economic impact of this rule on entities that filed Form I–140 by estimating the total cost savings associated with the proposed fee decrease for each entity and divided that amount by sales revenue of that entity.

Among the 324 small entities with reported revenue data, each would experience an economic impact of less than −2 percent. Using the above methodology, the greatest economic impact proposed by this fee change totaled −1.86 percent and the smallest totaled −0.0000001 percent. The average impact on all 324 small entities with revenue data was −0.07 percent. Because of the fee decrease, these small entities would see a cost savings per application in filing fees based on petitions. The negative number represents cost savings to the petitioner. Therefore, the larger it is, the greater the cost savings for the petitioners. The average impact on all 324 small entities with revenue data was −0.07 percent. The evidence suggests that the decreased fee proposed by this rule does not represent a significant economic impact on these entities.

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine if there were any impacts to small entities when analyzed together. USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN. Only 1 entity had an EIN that overlapped in both samples; this was a small entity that submitted 3 Form I–129 petitions and 1 Form I–140 petition. Due to little overlap in entities in the samples and the relatively minor impacts on revenue of fee increases of Forms I–129 and I–140, USCIS does not expect the combined impact of these two forms to be an economically significant burden on a substantial number of small entities.

c. Civil Surgeon Designation, Form I–910

DHS proposes to decrease the fee for Civil Surgeon Designations, Form I–910, from $785 to $650, a decrease of $135 (17 percent). Using a 12-month period of data from October 1, 2016 to September 31, 2017, DHS collected internal data on filings of Form I–910. The total number of Form I–910 petitions was 757, with 476 unique entities that filed applications. The third party databases mentioned previously were used again to search for revenue and employee count information.

Using the same methodology as the Forms I–129 and I–140, USCIS conducted the small entity analysis based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 213 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 476 unique entities for Form I–910. USCIS conducted searches on 300 randomly selected entities from a population of 476 unique entities for Form I–910 petitions, a sample size approximately 40 percent larger than the minimum necessary.

Of the 300 searches for small entities that filed Form I–910 petitions, 266 searches successfully matched the name of the filing entity to names in the databases and 34 searches did not match the name of a filing entity. DHS assumes filing entities not found in the online databases are likely to be small entities. DHS also assumes all of the non-matched entities as small entities for the purpose of this analysis. Among the 266 matches for Form I–910, DHS determined 189 to be small entities based on their revenue or employee count and according to their NAICS

code. Therefore, DHS was able to classify 270 of 300 entities as small entities that filed Form I–910 petitions, including combined non-matches (34), matches missing data (47), and small entity matches (189). DHS also used the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), and the 8 matches missing data that were found in the databases lacked revenue or employee count statistics.

DHS determined that 270 out of 300 (90 percent) entities filing Form I–910 applications were small entities. Furthermore, DHS determined that 189 of the 300 entities searched were small entities based on sales revenue data, which were needed in order to estimate the economic impact of the proposed rule. Since these 189 were a small entity subset of the random sample of 300 entity searches, they were statistically significant in the context of this research.

Similar to the Forms I–129 and I–140, DHS calculated the economic impact of this rule on entities that filed Form I–910 by estimating estimated the total savings associated with the proposed fee decrease for each entity and divided that amount by sales revenue of that entity. Among the 189 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent. The greatest economic impact imposed by this proposed fee change totaled −1.350 percent and the smallest totaled −0.001 percent. The average impact on all 189 small entities with revenue data was −1.104 percent. The decreased fee will create cost savings for the individual applicant of $135. The negative number represents cost savings to the applicant. Therefore, the larger it is, the greater the cost savings for the applicants. The evidence suggests that the decreased fee proposed by this rule does not represent a significant economic impact on these entities.

d. Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS proposes to increase the fee for foreign religious workers who file using Form I–360 from $435 to $455, an increase of $20 (5 percent). Using a 12-month period of data on the number of Form I–360 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data on filings of Form I–360 for religious workers. The total number of Form I–360 petitions was 2,446, with 760 unique entities that filed petitions. DHS used the same databases mentioned previously to search for information on revenue and employee count.

DHS used the same method as with Forms I–129 and I–140 to conduct the small entity analysis based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 332 entities, which included using with a 95 percent confidence level and a 5 percent confidence interval on a population of 760 unique entities for Form I–360 petitions. To account for missing organizations in the online subscription and public databases, DHS selected a sample size that was approximately 27 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 420 randomly selected entities from a population of 760 unique entities that filed Form I–360 petitions.

Of the 420 searches for small entities that filed Form I–360 petitions, 417 searches successfully matched the name of the filing entity to names in the databases and 3 searches did not match the name of the filing entities in the databases. DHS assumes that filing entities not found in the online databases are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively assumes to consider all of the non-matched entities as small entities for the purpose of this analysis. Among the 417 matches for Form I–360, DHS determined 309 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 386 of 420 entities as small entities that filed Form I–360 petitions, including combined non-matches (3), matches missing data (74), and small entity matches (309). DHS also used the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 74 matches missing data that were found in the databases lacked revenue or employee count data.

DHS determined that 386 out of 420 (91.9 percent) entities filing Form I–360 petitions were small entities. Furthermore, DHS determined that 309 of the 420 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the proposed rule. Since 309 small entities were a subset of the random sample of 420 entity searches, they were statistically significant in the context of this research.

Similar to other forms analyzed in this RFA, DHS calculated the economic

impact of this rule on entities that filed Form I–360 by estimating the total costs associated with the proposed fee increase for each entity. Among the 309 small entities with reported revenue data, each would experience an economic impact of less than 1.0 percent. The greatest economic impact imposed by this proposed fee change totaled 0.46 percent and the smallest totaled 0.000002 percent. The average impact on all 309 small entities with revenue data was 0.02 percent.

DHS also analyzed the proposed costs by this rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[194] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $53,290 for clergy,[195] $46,980 for directors of religious activities and education,[196] and $35,860 for other religious workers.[197] Based on an average of 1.5 religious workers[198] petitioned-for per entity, the additional average annual cost would be $30 per entity.[199] The additional costs per entity proposed by this rule represent only 0.06 percent of the average annual salary for clergy, 0.06 percent of the average annual salary for directors of religious activities and education, and 0.08 percent of the average annual salary for all other religious workers.[200] Therefore, using

---

[194] Office of Advocacy, Small Business Administration, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act", page 19: https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf

[195] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Clergy": https://www.bls.gov/oes/2018/may/oes212011.htm (viewed September 24, 2019).

[196] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Directors of Religious Activities and Education": https://www.bls.gov/oes/2018/may/oes212099.htm (viewed September 24, 2019).

[197] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Religious Workers, All Other": https://www.bls.gov/oes/2018/may/oes212099.htm (viewed September 24, 2019).

[198] USCIS calculated the average filing per entity of 1.5 petitions, from the Form I–360 Sample with Petition Totals in Appendix E, of the Small Entity Analysis for the U.S. Citizenship and Immigration Services Fee Schedule Proposed Rule. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 618/420 = 1.5 average petitions filed per entity.

[199] Calculation: 1.5 average petitions per entity * $20 increase in petition fees = $30 additional total cost per entity.

[200] Calculation: $30 per entity/$53,290 clergy salary × 100 = .06 percent;

$30 per entity/$46,980 directors of religious activities and education × 100 = .06 percent;

average annual labor cost guidelines, the additional regulatory compliance costs proposed by this rule are not significant.

e. Genealogy Requests—Genealogy Index Search Request Form G–1041 and Genealogy Record Request, Form G–1041A

DHS proposes fee increases to file both types of genealogy requests: Form G–1041, Genealogy Index Search Request and Form G–1041A, Genealogy Record Request. The fee to file Form G–1041 would increase from $65 to $240, an increase of $175 (269 percent increase). The fee for Form G–1041A would increase from $65 to $385, an increase of $320 (492 percent). Based on DHS records for calendar years 2013 to 2017, there was an annual average of 3,840 genealogy index search requests made using Form G–1041 and there was an annual average of 2,152 genealogy records requests made using Form G–1041A. DHS does not have sufficient data on the requestors for the genealogy forms to determine if entities or individuals submitted these requests.

DHS has previously determined that individuals usually make requests for historical records.[201] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. Therefore, DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests.

However, DHS must still recover the full costs of this program. As stated in the preamble to this proposed rule, reducing the filing fee for any one benefit request submitted to DHS simply transfers the additional cost to process this request to other immigration and naturalization filing fees.

For this proposed fee rule, DHS proposes to expand the use of electronic genealogy requests to encourage requesters to use the electronic versions of Form G–1041 and Form G–1041A. DHS also proposes to change the search request process so that USCIS may provide requesters with electronic records, if they exist, in response to the initial index request. These proposed changes may reduce the time it takes to request and receive genealogy records and, in some cases, it would eliminate the need to make multiple search requests and submit separate fees. Moreover, DHS notes that providing digital records in response to a Form G–1041 request may reduce the number of Form G–1041A requests that would be filed because there would already be a copy of the record if it was previously digitized. As a result, the volume of Form G–1041A requests USCIS receives may decrease, though DHS is unable to estimate by how much. DHS requests comments from the public on the impacts to small entities of the proposed fee increases to the genealogy forms.

f. Regional Center Under the Immigrant Investor Program, Form I–924 and I–924A

As part of the Immigration Act of 1990, Public Law 101–649, 104 Stat. 4978, Congress established the EB–5 immigrant visa classification to incentivize employment creation in the United States. Under the EB–5 program, lawful permanent resident (LPR) status is available to foreign nationals who invest the required amount in a new commercial enterprise that will create at least 10 full-time jobs in the United States. *See* INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). A foreign national may also invest a lower amount in a targeted employment area defined to include rural areas and areas of high unemployment. *Id.*; 8 CFR 204.6(f). The INA allots 9,940 immigrant visas each fiscal year for foreign nationals seeking to enter the United States under the EB–5 classification.[202] *See* INA sec. 201(d), 8 U.S.C. 1151(d); INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). Not less than 3,000 of these visas must be reserved for foreign nationals investing in targeted employment areas. *See* INA sec. 203(b)(5)(B), 8 U.S.C. 1153(b)(5)(B).

Enacted in 1992, section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Public Law 102–395, 106 Stat. 1828, established a pilot program that requires the allocation of a limited number of EB–5 immigrant visas to individuals who invest through DHS-designated regional centers.[203] Under the Regional Center Program, foreign nationals base their EB–5 petitions on investments in new commercial enterprises located within USCIS-designated "regional centers." DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment. *See* 8 CFR 204.6(e). While all EB–5 petitioners go through the same petition process, those petitioners participating in the Regional Center Program may meet statutory job creation requirements based on economic projections of either *direct* or *indirect* job creation, rather than only on jobs directly created by the new commercial enterprise. *See* 8 CFR 204.6(j)(4)(iii), (m)(3). As of August 12, 2019, there were 826 USCIS-approved regional centers.[204] Requests for regional center designation must be filed with USCIS on Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program. *See* 8 CFR 204.6(m)(3)–(4). Once designated, regional centers must provide USCIS with updated information to demonstrate continued eligibility for the designation by submitting a Form I–924A, Annual Certification of Regional Center, on an annual basis or as otherwise requested. *See* 8 CFR 204.6(m)(6)(i)(B).

DHS proposes no adjustment to the fee for the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924. The current fee to file Form I–924 is $17,795. However, DHS is proposing to increase the fee for the Annual Certification of Regional Center, Form I–924A, from $3,035 to $4,470 per filing, an increase of $1,435 (47 percent). Using a 12-month period of data on the number of Forms I–924 and I–924A from October 1, 2016 to September 31, 2017, DHS collected internal data on these forms. DHS received a total of 280 Form I–924 applications and 847 Form I–924A applications.

Regional centers are difficult to assess because there is a lack of official data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways

---

$30 per entity/$35,860 other religious workers × 100 = .08 percent.

[201] See "Establishment of a Genealogy Program; Proposed Rule,"71 FR 20357 (April 20, 2006). Available at: *https://www.regulations.gov/ document?D=USCIS-2006-0013-0001.*

[202] An immigrant investor, his or her spouse, and children (if any) will each use a separate visa number.

[203] Current law requires that DHS annually set aside 3,000 EB–5 immigrant visas for regional center investors. Public Law 105–119, sec. 116, 111 Stat. 2440 (Nov. 26, 1997). If this full annual allocation is not used, remaining visas may be allocated to foreign nationals who do not invest in regional centers.

[204] USCIS Immigrant Investor Regional Centers: *https://www.uscis.gov/working-united-states/ permanent-workers/employment-based- immigration-fifth-preference-eb-5/immigrant- investor-regional-centers* (last reviewed/updated Aug. 20, 2019).

**62344**    **Federal Register** / Vol. 84, No. 220 / Thursday, November 14, 2019 / Proposed Rules

and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking investor funds to new commercial enterprises and job-creating projects or entities. The information provided by regional centers as part of the Forms I–924 and I–924A does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions in an attempt to analyze the small entity status of regional centers.[205] In the DHS final rule "EB–5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers. DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period fiscal years 2014 to 2017. DHS does not know the extent to which these regional centers can pass along the fee increases to the

individual investors. Passing along the costs from this rule could reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact. If DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[206] DHS welcomes comments from the public on the impacts to small entities of the proposed fee increases to Form I–924A and requests information from the public on data sources on the average revenues collected by regional centers in the form of administrative fees and the extent to which regional centers may pass along the fee increases to the individual investors.

**g. Other Possible Fee Scenarios**

As discussed earlier in the preamble, the fees that DHS proposes may change in a final rule based on policy decisions, in response to public comments, intervening legislation, and other changes. Other than fee adjustments made in response to public comments and policy modifications, DHS notes

that the fee adjustments in a final rule depend on two factors beyond its control. As previously described in the preamble, this rule includes proposed DACA fees associated with Form I–821D. However, DHS is currently operating under two nationwide preliminary injunctions to maintain the DACA policy. Additionally, the proposed fees are based on IEFA funding $207.6 million of ICE expenses. If DHS does not obtain relief from the DACA preliminary injunctions, Congress rejects the proposal to fund these ICE expenses with IEFA funding, or DHS does not ultimately shift the aforementioned ICE costs from annual appropriations to the IEFA, then fees for most of the forms analyzed in this IRFA would also change.

Table 27 shows the current and proposed fees for the forms analyzed in this IRFA according to each fee schedule scenario based on the two factors mentioned above. Scenario A refers to the proposed fees described in detail throughout this rule. Scenario B includes DACA fees, but excludes the ICE transfer. Scenario C excludes DACA fees, but includes the ICE transfer. Scenario D excludes both DACA fees and the ICE transfer. Scenario E and F includes separate initial and renewal fees for DACA fees; scenario E includes the ICE transfer, but F excludes the ICE transfer.

TABLE 28—PROPOSED FEE SCHEDULE BY SCENARIO WITH FORMS AFFECTING SMALL ENTITIES, INITIAL REGULATORY FLEXIBILITY ANALYSIS

| Immigration benefit request | Current fee | Scenario A | Scenario B | Scenario C | Scenario D | Scenario E | Scenario F |
|---|---|---|---|---|---|---|---|
| I–129 Petition for a Nonimmigrant worker | $460 | $N/A | $N/A | $N/A | $N/A | $N/A | $N/A |
| I–129H1 | 460 | 560 | 535 | 585 | 555 | 550 | 520 |
| I–129H2A—Named Beneficiaries | 460 | 860 | 840 | 870 | 850 | 810 | 790 |
| I–129H2B—Named Beneficiaries | 460 | 725 | 700 | 735 | 710 | 705 | 685 |
| I–129L | 460 | 815 | 795 | 830 | 805 | 790 | 770 |
| I–129O | 460 | 715 | 690 | 725 | 705 | 695 | 670 |
| I–129CW, I–129E&TN, and I–129MISC | 460 | 705 | 685 | 720 | 695 | 680 | 660 |
| I–129H2A—Unnamed Beneficiaries | 460 | 425 | 400 | 440 | 410 | 405 | 385 |
| I–129H2B—Unnamed Beneficiaries | 460 | 395 | 370 | 410 | 385 | 390 | 365 |
| I–140 Immigrant Petition for Alien Worker | 700 | 545 | 520 | 580 | 555 | 545 | 520 |
| I–360 Petition for Amerasian Widow(er) or Special Immigrant | 435 | 455 | 435 | 475 | 450 | 455 | 430 |
| I–910 Application for Civil Surgeon Designation | 785 | 650 | 625 | 660 | 635 | 650 | 625 |
| I–924 Application for Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 | 17,795 | 17,795 | 17,795 | 17,795 | 17,795 |
| I–924A Annual Certification of Regional Center | 3,035 | 4,470 | 4,470 | 4,465 | 4,460 | 4,465 | 4,465 |
| G–1041 Genealogy Index Search Request | 65 | 240 | 240 | 240 | 240 | 240 | 240 |
| G–1041A Genealogy Records Request | 65 | 385 | 385 | 385 | 385 | 385 | 385 |

Source: USCIS analysis.

---

[205] The methodology used to analyze the small entity status of regional centers is explained in further detail in Section D of the RFA section

within DHS final rule "EB–5 Immigrant Investor Program Modernization," available at 84 FR 35750.

[206] Calculation: 1 percent of $447,000 = $4,470 (the new fee for Form I–924A).

Further, tables 28 and 29 show the estimated economic impact on small entities based on the fee schedule proposed for each of the fee scenarios. DHS followed the same method as previously described in this IRFA to estimate the economic impact on small entities for each fee scenario, A—F.

TABLE 29—ESTIMATED ECONOMIC IMPACT ON SMALL ENTITIES FOR PROPOSED FEE SCHEDULE BY SCENARIO (A–D), RFA INITIAL REGULATORY FLEXIBILITY ANALYSIS

| Immigration benefit request | Scenario A | | Scenario B | | Scenario C | | Scenario D | |
|---|---|---|---|---|---|---|---|---|
| | Increase/ decrease from current fee | Average economic impact percent | Increase/ decrease from current fee | Average economic impact percent | Increase/ decrease from current fee | Average economic impact percent | Increase/ decrease from current fee | Average economic impact percent |
| I–129 Petition for a Nonimmigrant worker | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| I–129H1B | $100 | 0.22 | $75 | 0.16 | $125 | 0.27 | $95 | 0.21 |
| I–129H2A—Named Beneficiaries | 400 | 0.87 | 380 | 0.83 | 410 | 0.89 | 390 | 0.85 |
| I–129H2B—Named Beneficiaries | 265 | 0.58 | 240 | 0.52 | 275 | 0.60 | 250 | 0.54 |
| I–129L | 355 | 0.77 | 335 | 0.73 | 370 | 0.80 | 345 | 0.75 |
| I–129O | 255 | 0.55 | 230 | 0.50 | 265 | 0.58 | 245 | 0.53 |
| Form I–129CW, I–129E&TN, and I–129MISC | 245 | 0.53 | 225 | 0.49 | 260 | 0.57 | 235 | 0.51 |
| I–129H2A—Unnamed Beneficiaries | −35 | −0.08 | −60 | −0.13 | −20 | −0.043 | −50 | −0.11 |
| I–129H2B—Unnamed Beneficiaries | −65 | −0.14 | −90 | −020 | −50 | −0.11 | −75 | −0.16 |
| I–140 Immigrant Petition for Alien Worker | −155 | −0.221 | −180 | −0.257 | −120 | −0.171 | −145 | −0.207 |
| I–360 Petition for Amerasian Widow(er) or Special Immigrant | 20 | 0.05 | 0 | N/A | 40 | 0.0919 | 15 | 0.034 |
| I–910 Application for Civil Surgeon Designation | −135 | −0.17 | −160 | −0.20 | −125 | −0.16 | −150 | −0.19 |
| I–924 Application For Regional Center Designation Under the Immigrant Investor Program | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A |
| I–924A Annual Certification of Regional Center | 1,435 | 0.47 | 1,435 | 0.47 | 1,430 | 0.47 | 1,425 | 0.47 |
| G–1041 Genealogy Index Search Request | 175 | 2.69 | 175 | 2.69 | 175 | 2.69 | 175 | 2.69 |
| G–1041A Genealogy Records Request | 320 | 4.92 | 320 | 4.92 | 320 | 4.92 | 320 | 4.92 |

Source: USCIS analysis.
Calculation: Increase or Decrease Fee Amount per Scenario/Current Fee Amount = Average Economic Impact Percent

TABLE 30—ESTIMATED ECONOMIC IMPACT ON SMALL ENTITIES FOR PROPOSED FEE SCHEDULE BY SCENARIO (E–F), INITIAL REGULATORY FLEXIBILITY ANALYSIS

| Immigration benefit request | Scenario E | | Scenario F | |
|---|---|---|---|---|
| | Increase/ decrease from current fee | Average economic impact percent | Increase/ decrease from current fee | Average economic impact percent |
| I–129 Petition for a Nonimmigrant worker | N/A | N/A | N/A | N/A |
| I–129H1B | $90 | 0.19 | $60 | 0.13 |
| I–129H2A—Named Beneficiaries | 350 | 0.76 | 330 | 0.72 |
| I–129H2B—Named Beneficiaries | 245 | 0.53 | 225 | 0.49 |
| I–129L | 330 | 0.72 | 310 | 0.67 |
| I–129O | 235 | 0.51 | 210 | 0.46 |
| Form I–129CW, I–129E&TN, and I–129MISC | 220 | 0.48 | 200 | 0.43 |
| I–129H2A—Unnamed Beneficiaries | (55) | −0.12 | (75) | −0.16 |
| I–129H2B—Unnamed Beneficiaries | (70) | −0.15 | (95) | −0.21 |
| I–140 Immigrant Petition for Alien Worker | (155) | −0.221 | (180) | −257 |
| I–360 Petition for Amerasian Widow(er) or Special Immigrant | 20 | 0.05 | (5) | 0.01 |
| I–910 Application for Civil Surgeon Designation | (135) | −0.17 | (160) | −0.20 |
| I–924 Application for Regional Center Designation Under the Immigrant Investor Program | 0 | 0 | 0 | 0 |
| I–924A Annual Certification of Regional Center | 1,430 | 0.47 | 1,430 | 0.47 |
| G–1041 Genealogy Index Search Request | 175 | 2.69 | 175 | 2.69 |
| G–1041A Genealogy Records Request | 320 | 4.92 | 320 | 4.92 |

Source: USCIS analysis.
Calculation: Increase or Decrease Fee Amount per Scenario/Current Fee Amount = Average Economic Impact Percent

To reduce the uncertainty that such conditions present to the affected public, USCIS proposes and evaluates six fee scenarios based on these three factors. Each scenario lays out what the fees would be if certain conditions materialize and present a range of fees. Thus, the final fees may be one of the scenarios presented, or an amount in between the highest and lowest fees proposed. Scenario A refers to the proposed fees described in detail throughout this proposed rule. Scenario B includes DACA renewal fees, but it excludes the ICE transfer. Scenario C excludes DACA fees, but it includes the ICE transfer. Scenario D excludes both DACA fees and the ICE transfer.

Scenarios E and F list separate initial and renewal fees for DACA, with or without the ICE transfer. Table 20 lists the assumptions and effects of these three factors on each fee scenario. The preamble has more detail on each scenario, regarding proposed fee changes, budgets, and transfers.

Furthermore, tables 28 and 29 show the estimated economic impact on small entities based on the fee schedule proposed for each of the fee scenarios. DHS followed the same method as previously described in this IRFA to estimate the economic impact on small entities for each fee scenario. The tables illustrate each scenario with an increased/decreased form fee and average economic impact, for each immigration benefit request. The results show the decreased form fees in parenthesis produce a negative average economic impact, in scenarios A–F. This would indicate across all scenarios, the economic impact from the decreased fee would create cost savings and/or higher revenues for the individual applicant or petitioner. The negative number represents cost savings to the applicant/petitioner. Therefore, the larger it is the greater the cost savings for the applicants/petitioners. The evidence suggests that the increased/decreased fees proposed by this rule does not represent a significant economic impact on these entities.

4. *A description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirement and the types of professional skills necessary for preparation of the report or record.*

The proposed rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Forms I–129, I–140, I–910, I–360, G–1041, G–1041A, I–924, or I–924A. The proposed rule does not require any new professional skills for reporting.

5. *An identification, to the extent practical, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule.*

DHS is unaware of any duplicative, overlapping, or conflicting Federal rules, but invites any comment and information regarding any such rules.

6. *Description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and that minimize any significant economic impact of the proposed rule on small entities, including alternatives considered such as:*

(1) Establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) Clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) Use of performance rather than design standards; and

(4) Any exemption from coverage of the rule, or any part thereof, for such small entities.

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigrant applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees that are collected for other immigration benefits. Without an adjustment in fees, USCIS would not be able to sustain the current level of service for immigration and naturalization benefits. While most immigration benefit fees apply to individuals, as described above, some also apply to small entities. USCIS seeks to minimize the impact on all parties, but in particular small entities. An alternative to the increased economic burden of the proposed rule is to maintain fees at their current level for small entities. The strength of this alternative is that it assures no additional fee-burden is placed on small entities; however, this alternative also would cause negative impacts to small entities.

Without the fee adjustments proposed in this rule, significant operational changes would be necessary. Given current filing volume and other economic considerations, additional revenue is necessary to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as federal and contract staff, infrastructure spending on information technology and facilities, travel, and training. Depending on the actual level of workload received, these operational changes would result in longer application processing times, a degradation in service to applicants and petitioners, and reduced efficiency over time. These cuts would ultimately represent increased costs to small entities by causing delays in benefit processing and reduced support service. Tables 29 and 30 show the estimated economic impact on small entities based on each of the fee scenarios considered. The tables illustrate an increase/decrease in fee and average economic impact for each immigration benefit request in each scenario. The decreased form fees shown in parentheses produce negative average economic impacts in scenarios A–F. This indicates that the economic impacts from the decreased fees would create cost savings for individual applicants and petitioners.

The evidence suggests that the decreased fees proposed by this rule do not represent a significant economic impact on these entities.

7. *Questions for Comment to Assist Regulatory Flexibility Analysis*

• Please provide comment on the numbers of small entities that may be impacted by this rulemaking.

• Please provide comment on any or all of the provisions in the proposed rule with regard to the economic impact of this rule, paying specific attention to the effect of the rule on small entities in light of the above analysis, as well as the full small entity analysis on *regulations.gov.*

• Please provide comment on any significant alternatives DHS should consider in lieu of the changes proposed by this rule.

• Please describe ways in which the rule could be modified to reduce burdens for small entities consistent with the Immigration and Nationality Act and the Chief Financial Officers Act requirements.

• Please identify all relevant Federal, State or local rules that may duplicate, overlap or conflict with the proposed rule.

C. *Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2018 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $165 million. While this rule may result in the expenditure of more than $100 million by the private sector annually, the rulemaking is not a "Federal mandate" as defined for UMRA purposes.[207] The payment of immigration benefit fees by individuals or other private sector entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States.[208] Therefore, no actions were

---

[207] *See* 2 U.S.C. 658(6).

[208] *See* 2 U.S.C. 658(7)(A)(ii).

deemed necessary under the provisions of the UMRA.

### D. Congressional Review Act

This proposed rule is a major rule as defined by 5 U.S.C. 804, also known as the Congressional Review Act, as enacted in section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, 110 Stat. 847, 868 *et seq.* Accordingly, this rule, if enacted as a final rule, would be effective at least 60 days after the date on which Congress receives a report submitted by DHS under the Congressional Review Act, or

60 days after the final rule's publication, whichever is later.

### E. Executive Order 13132 (Federalism)

This proposed rule would not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. The Information Collection. table below shows the summary of forms that are part of this rulemaking.

### TABLE 30—INFORMATION COLLECTION

| OMB No. | Form No. | Form name | Type of information collection |
|---|---|---|---|
| 1615–0105 ........ | G–28 ................ | Notice of Entry of Appearance as Attorney or Accredited Representative. | No material or non- substantive change to a currently approved collection. |
| 1615–0096 ........ | G–1041 .............. | Genealogy Index Search Request ........................... | No material or non- substantive change to a currently approved collection. |
| | G–1041A .......... | Genealogy Records Request (For each microfilm or hard copy file). | |
| 1615–0079 ........ | I–102 ................ | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. | No material or non- substantive change to a currently approved collection. |
| 1615–0111 ........ | I–129CW ........... | Petition for a CNMI-Only Nonimmigrant Transitional Worker. | No material or non- substantive change to a currently approved collection. |
| 1615–XXXX ...... | I–129E&TN ........ | Application for Nonimmigrant Worker: E and TN Classifications. | New Collection. |
| 1615–0001 ........ | I–129F .............. | Petition for Alien Fiancé(e) ........................................ | No material or non- substantive change to a currently approved collection. |
| 1615–0009 ........ | I–129H1 ............ | Petition for Nonimmigrant Worker: H–1 Classifications. | Revision of a Currently Approved Collection. |
| 1615–XXXX ...... | I–129H2A .......... | Petition for Nonimmigrant Worker: H–2A Classification. | New Collection. |
| 1615–XXXX ...... | I–129H2B .......... | Petition for Nonimmigrant Worker: H–2B Classification. | New Collection. |
| 1615–XXXX ...... | I–129L .............. | Petition for Nonimmigrant Worker: L Classifications | New Collection. |
| 1615–XXXX ...... | I–129MISC ........ | Petition for Nonimmigrant Worker: H–3, P, Q, or R Classifications. | New Collection. |
| 1615–XXXX ...... | I–129O ............. | Petition for Nonimmigrant Worker: O Classifications | New Collection. |
| 1615–0012 ........ | I–130 ................ | Petition for Alien Relative ......................................... | No material or non- substantive change to a currently approved collection. |
| | I–130A .............. | Supplemental Information for Spouse Beneficiary. | |
| 1615–0013 ........ | I–131 ................ | Application for Travel Document .............................. | Revision of a Currently Approved Collection. |
| 1615–0135 ........ | I–131A .............. | Application for Travel Document (Carrier Documentation). | Revision of a Currently Approved Collection. |
| 1615–0015 ........ | I–140 ................ | Immigrant Petition for Alien Worker .......................... | No material or non- substantive change to a currently approved collection. |
| 1615–0016 ........ | I–191 ................ | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA). | No material or non- substantive change to a currently approved collection. |
| 1615–0017 ........ | I–192 ................ | Application for Advance Permission to Enter as Nonimmigrant. | No material or non- substantive change to a currently approved collection. |
| 1615–0018 ........ | I–212 ................ | Application for Permission to Reapply for Admission Into the United States After Deportation or Removal. | No material or non- substantive change to a currently approved collection. |
| 1615–0095 ........ | I–290B .............. | Notice of Appeal or Motion ....................................... | No material or non- substantive change to a currently approved collection. |
| 1615–0020 ........ | I–360 ................ | Petition for Amerasian, Widow(er), or Special Immigrant. | No material or non- substantive change to a currently approved collection. |
| 1615–0023 ........ | I–485 ................ | Application to Register Permanent Residence or Adjust Status. | No material or non- substantive change to a currently approved collection. |
| | I–485A .............. | Supplement A to Form I–485, Adjustment of Status Under Section 245(i). | |
| | I–485J .............. | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j). | |
| 1615–0026 ........ | I–526 ................ | Immigrant Petition by Alien Entrepreneur ................. | No material or non- substantive change to a currently approved collection. |

TABLE 30—INFORMATION COLLECTION—Continued

| OMB No. | Form No. | Form name | Type of information collection |
|---|---|---|---|
| 1615–0003 ........ | I–539 ............... | Application to Extend/Change Nonimmigrant Status | No material or non- substantive change to a currently approved collection. |
| 1615–0067 ........ | I–589 ............... | Application for Asylum and for Withholding of Removal. | Revision of a Currently Approved Collection. |
| 1615–0028 ........ | I–600 ............... | Petition to Classify Orphan as an Immediate Relative. | Revision of a Currently Approved Collection. |
| | I–600A ............ | Application for Advance Processing of an Orphan Petition. | |
| | I–600/A SUPP1 | Form I–600A/I–600 Supplement 1, Listing of Adult Member of the Household. | |
| | I–600/A SUPP2 | Form I–600A/I–600 Supplement 2, Consent to Disclose Information. | |
| | I–600/A SUPP3 | Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600. | |
| 1615–0029 ........ | I–601 ............... | Application for Waiver of Grounds of Inadmissibility | No material or non- substantive change to a currently approved collection. |
| 1615–0123 ........ | I–601A ............ | Application for Provisional Unlawful Presence Waiver. | No material or non- substantive change to a currently approved collection. |
| 1615–0030 ........ | I–612 ............... | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended). | No material or non- substantive change to a currently approved collection. |
| 1615–0032 ........ | I–690 ............... | Application for Waiver of Grounds of Inadmissibility | No material or non- substantive change to a currently approved collection. |
| 1615–0034 ........ | I–694 ............... | Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act. | No material or non- substantive change to a currently approved collection. |
| 1615–0035 ........ | I–698 ............... | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA). | No material or non- substantive change to a currently approved collection. |
| 1615–0038 ........ | I–751 ............... | Petition to Remove Conditions on Residence ........ | No material or non- substantive change to a currently approved collection. |
| 1615–0040 ........ | I–765 ............... | Application for Employment Authorization ............... | Revision of a Currently Approved Collection. |
| 1615–0005 ........ | I–817 ............... | Application for Family Unity Benefits ..................... | No material or non- substantive change to a currently approved collection. |
| 1615–0043 ........ | I–821 ............... | Application for Temporary Protected Status ............ | No material or non- substantive change to a currently approved collection. |
| 1615–0124 ........ | I–821D ............ | Consideration of Deferred Action for Childhood Arrivals. | Revision of a Currently Approved Collection. |
| 1615–0044 ........ | I–824 ............... | Application for Action on an Approved Application or Petition. | No material or non- substantive change to a currently approved collection. |
| 1615–0045 ........ | I–829 ............... | Petition by Entrepreneur to Remove Conditions on Permanent Resident Status. | No material or non- substantive change to a currently approved collection. |
| 1615–0072 ........ | I–881 ............... | Application for Suspension of Deportation or Special Rule Cancellation of Removal. | No material or non- substantive change to a currently approved collection. |
| 1615–0082 ........ | I–90 ................. | Application to Replace Permanent Resident Card ... | No material or non- substantive change to a currently approved collection. |
| 1615–0048 ........ | I–907 ............... | Request for Premium Processing Service ................ | No material or non- substantive change to a currently approved collection. |
| 1615–0114 ........ | I–910 ............... | Application for Civil Surgeon Designation ................ | No material or non- substantive change to a currently approved collection. |
| 1615–0116 ........ | I–912 ............... | Application for Fee Waiver ..................................... | Revision of a Currently Approved Collection. |
| 1615–0099 ........ | I–914 ............... | Application for T nonimmigrant status .................... | No material or non- substantive change to a currently approved collection. |
| 1615–0104 ........ | I–918 ............... | Application for U nonimmigrant status .................... | No material or non- substantive change to a currently approved collection. |
| 1615–0061 ........ | I–924 ............... | Application for Regional Designation Center Under the Immigrant Investor Program. | No material or non- substantive change to a currently approved collection. |
| | I–924A ............ | Annual Certification of Regional Center. | |
| 1615–0106 ........ | I–929 ............... | Petition for Qualifying Family Member of a U–1 Nonimmigrant. | No material or non- substantive change to a currently approved collection. |
| 1615–0136 ........ | I–941 ............... | Application for Entrepreneur Parole ....................... | No material or non- substantive change to a currently approved collection. |
| 1615–0133 ........ | I–942 ............... | Application for Reduced Fee .................................. | Discontinuation. |
| 1615–0122 ........ | Immigrant Fee . | Fee paid for immigrant visa processing .................. | No material or non- substantive change to a currently approved collection. |
| 1615–0078 ........ | N–300 .............. | Application to File Declaration of Intention .............. | No material or non- substantive change to a currently approved collection. |
| 1615–0050 ........ | N–336 .............. | Request for a Hearing on a Decision in Naturalization Proceedings. | No material or non- substantive change to a currently approved collection. |
| 1615–0052 ........ | N–400 .............. | Application for Naturalization ................................. | No material or non- substantive change to a currently approved collection. |

TABLE 30—INFORMATION COLLECTION—Continued

| OMB No. | Form No. | Form name | Type of information collection |
|---|---|---|---|
| 1615–0056 ........ | N–470 ............... | Application to Preserve Residence for Naturalization Purposes. | No material or non- substantive change to a cur- rently approved collection. |
| 1615–0091 ........ | N–565 ............... | Application for Replacement of Naturalization/Citi- zenship Document. | No material or non- substantive change to a cur- rently approved collection. |
| 1615–0057 ........ | N–600 ............... | Application for Certification of Citizenship ................ | No material or non- substantive change to a cur- rently approved collection. |
| 1615–0087 ........ | N–600K ............ | Application for Citizenship and Issuance of Certifi- cate under Section 322. | No material or non- substantive change to a cur- rently approved collection. |

Various USCIS Forms

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. This rule will require non-substantive edits to the forms listed above with the listed action ''No material/non-substantive change to a currently approved collection.'' These edits include: updates to the fees collected, including changes to the collection of biometric service fees; modification of various form instructions to conform with changes to USCIS Form I–912; modification to USCIS Form N–400 to conform with the discontinuation of USCIS Form I–942; modification to various form instructions to conform with changes to the conditions for fee exemptions; removal of the returned check fee; addition of language regarding delivery requirements of certain secured documents; general language modification of fee activities within various USCIS forms. Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.[209]

USCIS Form I–129H–1

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments

regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0009 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a Nonimmigrant Worker: H– 1B Classifications.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H1; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested

nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for classification of an alien as an H–1B nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay of an H–1B or H–1B1 nonimmigrant worker or to change the status of an alien currently in the United States as a nonimmigrant to H–1B or H– 1B1. The form serves the purpose of standardizing requests for H–1B and H– 1B1 nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under the H– 1B or H–1B1 nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H1 is 358,702 and the estimated hour burden per response is 4 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,434,808 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $184,731,530.00.

USCIS Form I–129H2A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

---

[209] As stated earlier DHS proposes a biometric services fee of $30 that will be required for certain forms for which it performs intake and biometrics services on behalf of EOIR and to remove the $30 fee for dishonored fee payment instruments. EOIR will make the changes to their affected forms required by this rule by submitting a Paperwork Reduction Act Change Worksheet, Form OMB 83– C, and amended information collection instruments to OMB for review and approval at DHS publishes a final rule to make these proposed changes.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for a Nonimmigrant Worker: H–2A Classifications.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H2A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested H–2A nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer or agent uses this form to petition USCIS for classification of an alien as an H–2A nonimmigrant. An employer or agent also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for H–2A nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H2A is 9,870 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Named Worker Attachment for Form I–129H2A is 68,049 and the estimated hour burden per response is 30 minutes; the estimated total number of respondents for the information collection Joint Employer Supplement for Form I–129H2A is 5,000 and the estimated hour burden per response is 10 minutes.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 64,469.50 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $5,083,050.

USCIS Form I–129H2B

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: H–2B Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H2B; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested H–2B nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer or agent uses this form to petition USCIS for classification of an alien as an H–2B nonimmigrant. An employer or agent also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H2B is 5,922 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Named Worker Attachment for Form I–129H2B is 59,325 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 47,428.50 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $3,049,830.00.

USCIS Form I–129L

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: I–129L Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129L; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on Form I–129L to determine a petitioner and beneficiary's eligibility for L–1A and L–1B classification. The form is also used to determine eligibility for an LZ Blanket petition. An employer uses this form to petition USCIS for classification of the beneficiary as an L–1

nonimmigrant. An employer also uses this form to request an extension of stay or change of status on behalf of the beneficiary. The form standardizes these types of petitioners and ensures that the information required for assessing eligibility is provided by the petitioner about themselves and the beneficiary. The form also enables USCIS to compile data required for an annual report to Congress assessing the effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129L is 42,642 and the estimated hour burden per response is 3 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 127,926 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection is $21,960,630.00.

USCIS Form I–129O

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: O Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129O; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer or agent uses this form to petition USCIS for classification of an alien as an O nonimmigrant worker. An employer or agent also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under certain nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129O is 20,652 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Attachment 1—Additional Beneficiary for Form I–129O is 1,012 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 62,462 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this

collection of information is $10,635,780.00.

## USCIS Form I–129MISC

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129MISC; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form

to petition USCIS for classification of an alien as an H–3, P, Q, or R nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay of an H–3, P, Q, or R nonimmigrant worker or to change the status of an alien currently in the United States as a nonimmigrant to H–3, P, Q, or R. The form serves the purpose of standardizing requests for H–3, P, Q, or R nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under the H–3, P, Q, or R nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129MISC is 22,378 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection H–3 Classification Supplement to Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification is 248 and the estimated hour burden per response is 0.25 hours; the estimated total number of respondents for the information collection P Classification Supplement to Form I–129MISC is 6,094 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection Q–1 International Cultural Exchange Alien Supplement to Form I–129MISC is 78 and the estimated hour burden per response is 0.167 hours; the estimated total number of respondents for the information collection R–1 Classification Supplement to Form I–129MISC is 1 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the information collection Attachment 1—Additional Beneficiary for Form I–129MISC is 6,457 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 73,494.53 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $11,524,670.

## USCIS Form I–129E&TN

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–NEW in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: E and TN Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129E&TN; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer, agent, or applicant uses this form to apply to USCIS for classification of an alien as an E–1, E–2, E–3, or TN

nonimmigrant. An employer, agent, applicant, or CNMI investor also uses this form to request an extension of stay in one of these classifications for an alien or for themselves, or to change the status of an alien currently in the United States as a nonimmigrant or their own status if they are currently in the United States as a nonimmigrant to E–1, E–2, E–3, or TN. The form serves the purpose of standardizing requests for nonimmigrant workers in these classifications, and ensuring that basic information required for assessing eligibility is provided by the applicant. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129E&TN is 11,860 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection E–1/E–2 Classification Supplement to Form I–129E&TN is 3,714 and the estimated hour burden per response is 1.45 hours; the estimated total number of respondents for the information collection E–3 Classification Supplement to Form I–129E&TN is 1,857 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the information collection NAFTA Supplement to Form I–129E&TN is 6,289 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 45,966.80 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,107,900.

USCIS Form I–131

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include

the OMB Control Number 1615–0013 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Travel Document, Form I–131; Extension, Without Change, of a Currently Approved Collection.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–131; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. Certain aliens, principally permanent or conditional residents, refugees or asylees, applicants for adjustment of status, aliens in Temporary Protected Status (TPS), and aliens abroad seeking humanitarian parole who need to apply for a travel document to lawfully enter or reenter the United States. Eligible recipients of Deferred Action for Childhood Arrivals (DACA) may now request an advance parole documents based on humanitarian, educational and employment reasons. Lawful permanent residents may now file requests for travel permits (transportation letter or boarding foil).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–131 is 464,900 and the

estimated hour burden per response is 1.9 hours; the estimated total number of respondents for biometrics processing is 86,000 and the estimated hour burden per response is 1.17 hours, the estimated total number of respondents for passport-style photos is 360,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,163,930 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $143,254,100.

USCIS Form I–131A

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0135 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Carrier Documentation.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–131A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the information provided on Form I–131A to verify the status of permanent or conditional residents, and determine whether the applicant is eligible for the requested travel document.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–131A is 5,100 and the estimated hour burden per response is .92 hours; biometrics processing is 5,100 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 10,659 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $919,275.

USCIS Form I–589

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0067 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Asylum and for Withholding of Removal.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–589; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. Form I–589 is necessary to determine whether an alien applying for asylum and/or withholding of removal in the United States is classified as refugee, and is eligible to remain in the United States.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of USCIS respondents for the information collection in Form I–589 is approximately 114,000, and the estimated annual respondents for Form I–589 filed with DOJ is approximately 150,000. The estimated hour burden per response is 13 hours per response; and the estimated number of respondents providing biometrics to USCIS is 110,000, and to DOJ (collected on their behalf by USCIS) is 150,000. The estimated hour burden per response for biometrics submissions is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection for USCIS is 1,610,700 hours, and for DOJ is 2,125,500.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information for USCIS is estimated to be $44,688,000 and for DOJ is 59 million.

USCIS Form I–600, I–600A, Supplement 1, Supplement 2, Supplement 3

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0028 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition to Classify Orphan as an Immediate Relative; Application for Advance Processing of an Orphan Petition; Supplement 1, Listing of an Adult Member of the Household; Supplement 2, Consent to Disclose Information; Supplement 3, Request for Action on Approved Form I–600A/I– 600.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–600, Form I–600A, Form I–600A/I–600 Supplement 1, Form I–600A/I–600 Supplement 2, Form I–600A/I–600 Supplement 3; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. A U.S. citizen adoptive parent may file a petition to classify an orphan as an immediate relative through Form I–600 under section 101(b)(1)(F) of the INA. A U.S. citizen prospective adoptive parent may file Form I–600A in advance of the Form I–600 filing and USCIS will make a determination regarding the prospective adoptive parent's eligibility to file Form I–600A and his or her suitability and eligibility to properly parent an orphan. A U.S. citizen prospective/adoptive parent may file a petition to classify an orphan as an immediate relative under section 201(b)(2)(A) of the INA through Form I–600. If there are other adult members of the U.S. citizen prospective/adoptive parent's household, as defined at 8 CFR 204.301, the prospective/adoptive parent must include Form I–600A/I–600 Supplement 1 when filing both Form I–600A and Form I–600. A Form I–600A/I–600 Supplement 2, Consent to Disclose Information, is an optional form that a U.S. citizen prospective/adoptive parent may file to authorize USCIS to disclose case-related information that would otherwise be protected under the Privacy Act, 5 U.S.C. 552a, to adoption service providers or other individuals. Form I–600A/I–600 authorized disclosures will assist USCIS in the adjudication of Forms I–600A and I–600. USCIS has created a new Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600, for this information collection. Form I–600A/I–600 Supplement 3 is a form that prospective/adoptive parents must use if they need to request action such as an extended or updated suitability determination based upon a significant change in their circumstances or change in the number or characteristics of the children they intend to adopt, a change in their intended country of adoption, or a request for a duplicate notice of their approved Form I–600A suitability determination.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–600 is 1,200 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600A is 2,000 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600/I–600A

Supplement 1 is 301 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 2 is 1,260 and the estimated hour burden per response is 0.25 hours; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 3 is 1,286 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the Home Study information collection is 2,500 and the estimated hour burden per response is 25 hours; the estimated total number of respondents for the Biometrics information collection is 2,520 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the Biometrics—DNA information collection is 2 and the estimated hour burden per response is 6 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 70,562.40 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,759,232.

## USCIS Form I–765

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0040 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if an alien is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Aliens in many immigration statuses are required to possess an EAD as evidence of work authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–765 is 2,096,000 and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the information collection I–765WS is 41,912 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection biometrics is 42,387 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection passport photos is 2,096,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 10,550,549 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $367,575,520.

USCIS Form I–821D

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0124 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Consideration of Deferred Action for Childhood Arrivals.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–821D; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. As part of the administration of its programs, USCIS exercises its prosecutorial discretion on a case-by-case basis to defer action on instituting removal proceedings against individuals.

(5) *An estimate of the total number of respondents and the amount of time*

*estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–821D Initial Request is 40,819 and the estimated hour burden per response is 3.08 hours. The estimated total number of respondents for the information collection I–821D Renewal Request is 418,775 and the estimated hour burden per response is 3.08 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,415,550 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $50,555,340.

USCIS Form I–912

DHS and USCIS invite the general public and other USCIS agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0116 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Fee Waiver.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–912; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the data collected on this form to verify that the applicant is unable to pay for the immigration benefit being requested. USCIS will consider waiving a fee for an application or petition when the applicant or petitioner clearly demonstrates that he or she is unable to pay the fee. Form I–912 standardizes the collection and analysis of statements and supporting documentation provided by the applicant with the fee waiver request. Form I–912 also streamlines and expedites USCIS' review, approval, or denial of the fee waiver request by clearly laying out the most salient data and evidence necessary for the determination of inability to pay. Officers evaluate all factors, circumstances, and evidence supplied in support of a fee waiver request when making a final determination. Each case is unique and is considered on its own merits. If the fee waiver is granted, the application will be processed. If the fee waiver is not granted, USCIS will notify the applicant and instruct him or her to file a new application with the appropriate fee.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–912 is 116,323 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection DACA Exemptions is 108 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection 8 CFR 103.7(d) Director's exception request is 20 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 136,247.67 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $436,211.25.

USCIS Form I–942

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. Although this rule does not impose any new reporting or recordkeeping requirements under the PRA, this rule will require the discontinuation of USCIS Form I–942, Request for Reduced Fee. This discontinuation results from the Notice of Proposed Rulemaking eliminating the option to request a reduced fee, which makes the Form I–942 unnecessary. Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

*Differences in information collection request respondent volume and fee model filing volume projections.*

DHS notes that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the model used to calculate the fee amounts proposed in this rule. For example, the fee calculation model estimates 163,000 annual Form I–589 filings while the PRA section estimates the average annual number of respondents will be 114,000. The model projects 2,851,000 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,096,000. As stated in section IV.B.1.a of this preamble, the VPC forecasts USCIS workload volume using based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the three-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 of 5 year period, with less consideration of the volume effects on planned or past policy changes. Nevertheless, when the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every three years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this proposed rule within a relatively short period after a final rule takes effect.

*H. National Environmental Policy Act*

DHS Directive (Dir) 023–01 Rev. 01 establishes the procedures that DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA. 40 CFR parts 1500–1508.[210] The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1507.3(b)(2)(ii) and 1508.4. Dir. 023–01 Rev. 01 establishes categorical exclusions that DHS has found to have no such effect. Dir. 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded from further NEPA review, Dir. 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

The Department analyzed this proposed action and concluded that NEPA does not apply because, as discussed above, the potential impacts of the rule are not amenable to further analysis which is generally unquantifiable, largely because of the lack of any direct causal relationship between the rule and any specific impact that might be asserted from generalized population growth or otherwise. Attempts at more detailed analysis would be excessively speculative. Nevertheless, even if NEPA did apply to this action, the action clearly would come within categorical exclusion A3(d) in Dir. 023–01 Rev. 01, Appendix A, Table 1, for rules that interpret or amend an existing regulation without changing its environmental effect. This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, if NEPA were determined to apply, this rule would be categorically excluded from further NEPA review.

List of Subjects

*8 CFR Part 103*

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, and Surety bonds.

*8 CFR Part 106*

Immigration, User fees.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 211*

Documentary requirements: immigrants; waivers.

Accordingly, DHS proposes to amend chapter I of title 8 of the Code of Federal Regulations as follows:

PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54, 125 Stat 550 (8 U.S.C. 1185 note).

■ 2. The heading for part 103 is revised to read as set forth above.
■ 3. Section 103.2 amended:
■ a. By revising the last sentence of paragraph (a)(1);
■ b. By revising paragraph (a)(7)(ii)(D);
■ c. In paragraph (b)(9) introductory text by removing "8 CFR 103.7(b)(1)(i)(C)" and adding in its place "8 CFR 106.2" in the second sentence; and
■ d. By revising paragraph (b)(19)(iii).

The revisions read as follows:

**§ 103.2 Submission and adjudication of benefit requests.**

(a) * * *
(1) * * * Filing fees generally are non-refundable regardless of if the benefit request is approved or denied, or how much time the adjudication requires. Except as otherwise provided

---

[210] See also DHS, Implementing the National Environmental Policy Act, *https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex* (last published Feb. 21, 2019).

in this chapter I, fees must be paid when the benefit request is filed.

\* \* \* \* \*

(7) \* \* \*

(ii) \* \* \*

(D) *Submitted with the correct fee(s).* If a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is returned as unpayable a second time, the filing may be rejected. Financial instruments returned as unpayable for a reason other than insufficient funds will not be redeposited. If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

\* \* \* \* \*

(b) \* \* \*

(19) \* \* \*

(iii) *Secure identity documents.* (A) USCIS will send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent, their attorney or accredited representative or record, as specified on the form instructions.

(B) The designated agent, or attorney or accredited representative, will be required to provide identification and sign for receipt of the secure document.

\* \* \* \* \*

### § 103.3   [Amended]

■ 4. Section 103.3 is amended by removing ''§ 103.7 of this part'' and adding in its place ''8 CFR 106.2'' in paragraph (a)(2)(i).

### § 103.5   [Amended]

■ 5. Section 103.5 is amended by removing ''§ 103.7'' and adding in its place ''8 CFR 106.2'' in paragraph (a)(1)(iii)(B).

■ 6. Section 103.7 is revised to read as follows:

### § 103.7   Fees.

(a) *DOJ fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the

document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted with the fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a)(3) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of Immigration Court fees.* An immigration judge or the Board may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8 and 1003.24.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the ''United States Department of Justice,'' in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL System Costs Fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00, or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable, but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student (Form I–17).* (i) For filing a petition for school certification: $3,000 plus, a site visit fee of $655 for each location required to be listed on the form;

(ii) For filing a petition for school recertification: $1,250, plus a site visit fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00, or

(ii) $32 for a family (applicant, spouse and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-

entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00, or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If fingerprints are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting fingerprint checks prior to accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) Fee Remittance for F, J and M Nonimmigrants *(Form I–901).* The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations:* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual ''Passenger Travel Reports via Sea and Air'' table*s:

(i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation, Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities pursuant to section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement).* $50.00.

(12) *Request for authorization for parole of an alien into the United States.* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form

I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 7. Section 103.17 is revised to read as follows:

### § 103.17   Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. If a request for immigration benefits must be submitted with a biometric services fee, 8 CFR part 106 will contain the requirement. When a biometric services fee is required, a benefit request submitted without the correct biometric services fee may be rejected.

■ 8. Section 103.40 is revised to read as follows:

### § 103.40   Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/ or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* (1) USCIS provides on its website at *https://www.uscis.gov/ genealogy* the required forms in electronic versions: Genealogy Index Search Request, or Genealogy Records Request.

(c) *Required information.* Genealogical Research Requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for each individual searched. All requests for records or index searches must include the individual's:

(i) Full name (including variant spellings of the name and/or aliases, if any).

(ii) Date of birth, at least as specific as a year.

(iii) Place of birth, at least as specific as a country and preferably the country name at the time of the individual's immigration or naturalization.

(d) *Optional information.* To better ensure a successful search, a Genealogical Research Request may include each individual's:

(i) Date of arrival in the United States.

(ii) Residence address at time of naturalization.

(iii) Names of parents, spouse, and children if applicable and available.

(d) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must:

(i) Identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(A) C-Files must be identified by a naturalization certificate number.

(B) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(C) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(e) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(f) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(g) *Processing of paper record copy requests.* This service is designed for requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

### § 103.41   [Removed and Reserved]

■ 9. Section 103.41 is removed and reserved.

■ 10. Part 106 is added to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec.
106.1   Fee requirements.
106.2   Fees.
106.3   Fee waivers and exemptions.
106.4   Premium processing service.
106.5   Authority to certify records.
106.6   DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; Pub. L. 115–218.

### § 106.1   Fee requirements.

(a) Fees must be submitted with any USCIS benefit request or other request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed below.

(b) Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location, as provided in the form instructions or by individual notice.

(c) If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice. If the approved benefit request requires multiple fees, this provision will apply if any fee submitted is not honored. Other fees that were paid for a benefit request that is revoked under this provision will be retained and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed to the USCIS Administrative Appeals Office, in accordance with 8 CFR 103.3 and the applicable form instructions.

### § 106.2   Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name: $415.

(2) *Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $490.

(i) For nonimmigrant member of in the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing.

(3) *Petition or Application for a Nonimmigrant Worker.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker, Form I–129H1: $560.

(ii) Petition for H–2A Nonimmigrant Worker, Form I–129H2A, with 1 to 25 named beneficiaries: $860.

(iii) Petition for H–2A Nonimmigrant Worker, Form I–129H2A, with only unnamed beneficiaries: $425.

(iv) Petition for H–2B Nonimmigrant Worker, Form I–129H2B, with 1 to 25 named beneficiaries: $725.

(v) Petition for H–2B Nonimmigrant Worker, Form I–129H2B, with only unnamed beneficiaries: $395.

(vi) Petition for L Nonimmigrant Worker, Form I–129L: $815.

(vii) Petition for O Nonimmigrant Worker, Form I–129O, with 1 to 25 named beneficiaries: $715.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker, Forms I–129E or I–129MISC, with 1 to 25 named beneficiaries: $705.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.* For an employer to petition on behalf of beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $705.

(i) Additional fees in 8 CFR 106.2(c) may apply.

(5) *Petition for Alien Fiancé(e),* Form I–129F:

(i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $520.

(ii) For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130: No fee.

(6) *Petition for Alien Relative,* Form I–130. For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act: $555.

(7) *Application for Travel Document, Form I–131.* For filing an application for travel document:

(i) $145 for a Refugee Travel Document for someone 16 or older.

(ii) $115 for a Refugee Travel Document for a child under 16.

(iii) $585 for advance parole and any other travel document.

(iv) There is no fee for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before [EFFECTIVE DATE OF THE FINAL RULE], and paid the Form I–485 fee, or for applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces (''ISAF'').

(8) *Application for Carrier Documentation, Form I–131A.* For filing an application to allow a lawful permanent resident to apply for a travel document (carrier documentation) to board an airline or other transportation carrier to return to the United States: $1,010.

(9) *Immigrant Petition for Alien Worker, Form I–140.* For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act: $545.

(10) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for discretionary relief under section 212(c) of the Act: $800.

(11) *Application for Advance Permission to Enter as a Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (d)(13), or (d)(14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,415.

(12) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $2,790.

(13) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense: $1,040.

(14) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction: $705. The fee will be the same for appeal of a denial of a benefit request with one or multiple beneficiaries. There is no fee for an appeal or motion associated with a denial of a petition for a special immigrant visa filed by or on behalf of

an individual seeking special immigrant status as an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(15) *Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360.* For filing a petition for an Amerasian, Widow(er), or Special Immigrant: $455. The following requests are exempt from this fee:

(i) A petition seeking classification as an Amerasian;

(ii) A self-petition for immigrant status as an abused spouse or child of a U.S. citizen or lawful permanent resident or an abused parent of a U.S. citizen son or daughter; or

(iii) A petition for special immigrant juvenile classification; or

(iv) A petition seeking special immigrant visa or status an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(16) *Application to Register Permanent Residence or Adjust Status, Form I–485.* For filing an application for permanent resident status or creation of a record of lawful permanent residence $1,120. There is no fee if an applicant is filing as a refugee under section 209(a) of the Act or for applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces (''ISAF'').

(17) *Application to Adjust Status under Section 245(i) of the Act, Form I–485 Supplement A.* Supplement A to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act: A sum of $1,000 must be paid while the applicant's *Application to Register Permanent Residence or Adjust Status* is pending, unless payment of the additional sum is not required under section 245(i) of the Act.

(18) *Immigrant Petition by Alien Entrepreneur, Form I–526.* For filing a petition for an alien entrepreneur: $4,015.

(19) *Application To Extend/Change Nonimmigrant Status, Form I–539.* For filing an application to extend or change nonimmigrant status: $400.

(i) For nonimmigrant A, G, and NATO: No fee.

(20) *Application for Asylum and for Withholding of Removal, Form I–589.* For filing an application for asylum status: $50. There is no fee for applications filed by unaccompanied

alien children who are in removal proceedings.

(21) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act.

(i) There is no fee for the first Form I–600 filed for a child on the basis of an approved Application for Advance Processing of an Orphan Petition, Form I–600A, during the Form I–600A approval or extended approval period.

(ii) Except as specified in (iii) below, if more than one Form I–600 is filed during the Form I–600A approval period, the fee is $810 for the second and each subsequent Form I–600 petition submitted.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(22) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $810.

(23) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3.* This filing fee is not charged if Form I–600A/I–600 Supplement 3 is filed in order to obtain a first extension of the approval of the Form I–600A or to obtain a first time change of non-Hague Adoption Convention country during the Form I–600A approval period. If Form I–600A/I–600 Supplement 3 is filed in order to request a new approval notice based on a significant change and updated home study, the filing fee is charged unless a first extension of the Form I–600A approval or first time change of non-Hague Adoption Convention country is also being requested on the same Supplement 3. Second or subsequent extensions of the approval of the Form I–600A, second or subsequent changes of non-Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice are permitted with Form I–600A/I–600 Supplement 3 with the filing fee: $405. Form I–600A/I–600 Supplement 3 cannot be used to extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country. Form I–600A/I–600 Supplement 3 cannot be used to request a change of country to a Hague Adoption Convention transition country for purposes of becoming a transition case if another country was already designated on the Form I–600A or prior change of country request. Form I–600A/I–600 Supplement 3 may only be used to request an increase the number of children the applicant/petitioner is approved to adopt from a transition country if the additional child is a birth sibling of a child who the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(24) *Application for Waiver of Ground of Inadmissibility, Form I–601.* For filing an application for waiver of grounds of inadmissibility: $985.

(25) *Application for Provisional Unlawful Presence Waiver, Form I–601A.* For filing an application for provisional unlawful presence waiver: $960.

(26) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I–612.* For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act: $525.

(27) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* For filing an application for status as a temporary resident under section 245A(a) of the Act: $1,130.

(28) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $770.

(29) *Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act (or a petition under section 210A of the Act), Form I–694.* For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $725.

(30) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,615. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

(31) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $760.

(32) *Application for Employment Authorization, Form I–765:* $490. *Application for Employment Authorization for Abused Nonimmigrant Spouse, Form I–765V:* No fee. There is no initial fee for:

(i) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before [EFFECTIVE DATE OF THE FINAL RULE], and paid the Form I–485 fee;

(ii) Refugees and aliens paroled as refugee;

(iii) Victims of Severe Forms of Trafficking (T–1);

(iv) Nonimmigrant Victim of Criminal Activity (U–1);

(v) Dependents of certain government and internal organizations or NATO personnel;

(vi) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(vi) VAWA Self-Petitioners;

(vii) Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"); and

(viii) Aliens granted asylee status (AS1, AS6).

(33) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* (i) There is no fee for the first Form I–800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, during the Form I–800A approval period.

(ii) Except as specified in paragraph (a)(33)(iii) of this section, if more than one Form I–800 is filed during the Form I–800A approval period, the fee is $810 for the second and each subsequent Form I–800 petition submitted.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(34) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $810.

(35) *Request for Action on Approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, Supplement 3.* This filing fee is not charged if Form I–800A Supplement 3 is filed in order to obtain a first extension of the approval of the Form I–

800A or to obtain a first time change of Hague Adoption Convention country during the Form I–800A approval period. If Form I–800A Supplement 3 is filed in order to request a new approval notice based on a significant change and updated home study, the filing fee is charged unless a first extension of the Form I–800A approval or first time change of Hague Adoption Convention country is also being requested on the same Supplement 3. Second or subsequent extensions of the Form I–800A approval, second or subsequent changes of Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice are permitted with the filing of a Form I–800A, Supplement 3 and the required filing fee: $405.

(36) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $590.

(37) *Application for Temporary Protected Status, Form I–821.* (i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services unless exempted in the applicable form instructions.

(38) *Consideration of Deferred Action for Childhood Arrivals, Form I–821D.* (i) For first time requestors: $0.

(ii) The fee for renewal is $275.

(39) *Application for Action on an Approved Application or Petition, Form I–824.* $500.

(40) *Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, Form I–829.* For filing a petition by entrepreneur to remove conditions: $3,900.

(41) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.* (i) $1,800 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS the $1,800 fee is required.

(42) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905.* $230.

(43) *Request for Premium Processing Service, Form I–907.* The Request for Premium Processing Service fee will be as provided in 8 CFR 106.4.

(44) *Application for Civil Surgeon Designation, Form I–910.* $650.

(45) *Application for T Nonimmigrant Status, Form I–914.* No fee.

(46) *Petition for U Nonimmigrant Status, Form I–918.* No fee.

(47) *Application for Regional Center Designation under the Immigrant Investor Program, Form I–924.* $17,795.

(48) *Annual Certification of Regional Center, Form I–924A.* To provide updated information and certify that a Regional Center under the Immigrant Investor Program has maintained its eligibility: $4,470.

(49) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status: $1,515.

(50) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur: $1,200.

(51) *Public charge Bond, Form I–945.* $25.

(52) *Request for Cancellation of Public Charge Bond, Form I–356.* $25.

(b) *N Forms*—(1) *Application to File Declaration of Intention, Form N–300.* For filing an application for declaration of intention to become a U.S. citizen: $1,320.

(2) *Request for a Hearing on a Decision in Naturalization Proceedings (under section 336 of the Act), Form N–336.* For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act: $1,755. There is no fee for an applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied.

(3) *Application for Naturalization, Form N–400.* For filing an application for naturalization: $1,170. No fee is charged an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service.

(4) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* For filing an application for benefits under section 316(b) or 317 of the Act: $1,600.

(5) *Application for Replacement Naturalization/Citizenship Document, Form N–565.* For filing an application for a certificate of naturalization or declaration of intention in place of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act: $545. There is no fee when this application is

submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error.

(6) *Application for Certificate of Citizenship, Form N–600.* For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act: $1,015. There is no fee for any application filed by a member or veteran of any branch of the U.S. Armed Forces.

(7) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* For filing an application for citizenship and issuance of certificate under section 322 of the Act: $960.

(c) *G Forms, Statutory Fees, and Non-Form Fees*—(1) *Genealogy Index Search Request, Form G–1041:* $240. The fee is due regardless of the search results.

(2) *Genealogy Records Request, Form G–1041A:* $385. USCIS will refund the records request fee when it is unable to locate any file previously identified in response to the index search request.

(3) *USCIS Immigrant Fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $200.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing certain H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for CNMI.* For employer petitions in CNMI as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *CNMI education funding fee.* The fee amount will be as prescribed in the form instructions and:

(i) The fee amount must be paid in addition to, and in a separate remittance from, other filing fees;

(ii) Every employer who is issued a permit must pay the education funding fee every year;

(iii) An employer who is issued a permit with a validity period of longer than 1 year must pay the fee for each year of requested validity at the time the permit is requested;

(iv) Beginning in FY 2020, the fee may be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index for All Urban

Consumers (CPI–U) since the fee was set by law at $200 on July 24, 2018.

(8) *9–11 Response and Biometric Entry-Exit Fee for H–1B Visa.* For all petitioners filing an H–1B petition who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees in the aggregate are in H–1B, L–1A or L–1B nonimmigrant status, except for petitioners filing an amended petition without an extension of stay request: $4,000. This fee will apply to petitions filed on or before September 30, 2027.

(9) *9–11 Response and Biometric Entry-Exit Fee for L–1 Visa.* For all petitioners filing an L–1 petition who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees in the aggregate are in H–1B, L–1A or L–1B nonimmigrant status, except for petitioners filing an amended petition without an extension of stay request: $4,500. This fee will apply to petitions filed on or before September 30, 2027.

(10) *Claimant under section 289 of the Act.* No fee.

### § 106.3 Fee waivers and exemptions.

(a) *Fee waiver.* No fee relating to any benefit request submitted to USCIS may be waived except as provided by section 245(l)(7) of the Act, 8 U.S.C. 1255(l)(7), any other law, or by regulation. Specifically, the following categories of requestors may apply for a waiver of any fees for an immigration benefit and any associated filing up to and including an application for adjustment of status:

(1) Violence Against Women Act (VAWA) self-petitioners as defined under INA 101(a)(51);

(2) T nonimmigrants;

(3) U nonimmigrants;

(4) Battered spouses of A, G, E–3, or H nonimmigrants;

(5) Battered spouses or children of a lawful permanent resident or U.S. citizen as provided under INA 240A(b)(2); and

(6) Applicants for Temporary Protected Status.

(b) *Director's exemption for individual requests.* (1) The Director of USCIS may authorize a waiver on an individual, case-by-case basis of a form fee required by 8 CFR 106.2 that is not otherwise waivable under this section if the Director determines that such action would be in the public interest, the action is consistent with other applicable law, and the waiver is related to one of the following:

(i) Asylees;
(ii) Refugees;
(iii) National security;
(iv) Emergencies or major disasters declared in accordance with 44 CFR part 206, subpart B;

(v) An agreement between the U.S. government and another nation or nations; or

(vi) USCIS error.

(2) The Director may not approve an exception to the requirements under paragraph (d) of this section. An applicant, petitioner, or requestor may not directly submit a request that the Director exercise this authority. This discretionary authority may be delegated only to the USCIS Deputy Director.

(c) *Director's exception.* The Director of USCIS may authorize the waiver, in whole or in part, of a form fee required by 8 CFR 106.2 that is not otherwise waivable under this section, if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. This discretionary authority may be delegated only to the USCIS Deputy Director. The Director may not waive the requirements of paragraph (d) of this section.

(d) *Eligibility for fee waiver.* A waiver of fees is limited to an alien with an annual household income at or below 125 percent of the Federal Poverty Guidelines as updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2). In addition, a waiver of fees as provided in paragraphs (b) and (c) of this section may not be provided to a requestor who is seeking an immigration benefit for which he or she:

(1) Is subject the affidavit of support requirements under section 213A of the Act, U.S.C. 1183a or is already a sponsored immigrant as defined in 8 CFR 213a.1; or

(2) Is subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

(e) *Form required.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the forms.

(f) *Exemptions.* The Director of USCIS may provide an exemption for any fee required by 8 CFR 106.2. This discretionary authority may only be delegated to the USCIS Deputy Director. The Director must determine that such action would be in the public interest, the action is consistent with the applicable law, and the exemption is related to one of the following:

(1) Asylees;
(2) Refugees;
(3) National security; and
(4) Emergencies or major disasters declared in accordance with 44 CFR part 206, subpart B;

(5) An agreement between the U.S. government and another nation or nations; or

(6) USCIS error.

(g) *Documentation of gross household income.* A person submitting a request for a fee waiver must submit the following documents as evidence of annual gross household income:

(1) A transcript(s) from the United States Internal Revenue Service (IRS) of the person's IRS Form 1040, U.S. Individual Income Tax Return;

(2) If the person was not required to file a Federal income tax return, he or she must submit their most recent IRS Form W–2, Wage and Tax Statement, Form 1099G, Certain Government Payments, or Social Security Benefit Form SSA–1099, if applicable;

(3) If the person filed a Federal income tax return, and has recently changed employment or had a change in salary, the person must also submit copies of consecutive pay statements (stubs) for the most recent month or longer;

(4) If the person does not have income and has not filed income tax returns, he or she must submit documentation from the IRS that indicates that no Federal income tax transcripts and no IRS Form W–2s were found.

### § 106.4 Premium processing service.

(a) *General.* A person submitting a request to USCIS may request 15 business-day processing of certain employment-based immigration benefit requests.

(b) *Submitting a request.* A request must be submitted on the form prescribed by USCIS and prepared and submitted in accordance with the form instructions. If the request for premium processing is submitted together with the underlying benefit request, all required fees in the correct amount must be paid.

(c) *Fee amount.* The fee amount will be prescribed in the form instructions and:

(1) Must be paid in addition to, and in a separate remittance from, other filing fees.

(2) May be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index (CPI) since the fee was set by law at $1,000 on June 1, 2001.

(d) *15-day limitation.* USCIS will refund the premium processing service fee, but continue to process the case if:

(1) USCIS does not issue a notice of any adjudicative action by the end of the 15th business day from the date USCIS accepted a properly filed request for premium processing for an eligible

employment-based immigration benefit request, including all routed fees. The adjudicative action is evidenced by the notification of, but not necessarily receipt of, an approval, denial, request for evidence (RFE) or notice of intent to deny (NOID); or

(2) USCIS does not issue a notice of a subsequent adjudicative action by the end of the 15th business-day from the date USCIS received the response to an RFE or NOID. In premium processing cases where USCIS issues an RFE or NOID within 15 business days from the initial date of acceptance, a new 15-day period begins on the date that USCIS receives the response to the RFE or NOID.

(3) USCIS may retain the premium processing fee and not reach a conclusion on the request within 15 business days, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the benefit request.

(e) *Requests eligible for premium processing.* (1) USCIS will designate the categories of employment-based benefit requests that are eligible for premium processing.

(2) USCIS will announce by its official internet website, currently *http:// www.uscis.gov,* those requests for which premium processing may be requested, the dates upon which such availability commences and ends, and any conditions that may apply.

### § 106.5  Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

### § 106.6  DHS severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions will continue in effect.

## PART 204—IMMIGRANT PETITIONS

■ 11. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1641; 8 CFR part 2.

■ 12. Section 204.3 is amended:
■ a. In paragraph (b), in the definition of ''Orphan petition'', by revising the second sentence;
■ b. By revising the fourth fifth sentences of paragraph (d) introductory text; and
■ c. By revising paragraphs (h)(3)(i) and (ii) and (h)(7) and (13).

The revisions read as follows:

### § 204.3  Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

\*     \*     \*     \*     \*

(b) \* \* \*

*Orphan petition* means \* \* \* The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. \* \* \*

\*     \*     \*     \*     \*

(d) \* \* \* If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned pursuant to paragraph (h)(7) of this section. If the prospective adoptive parents file the orphan petition after the approval period of the advanced processing application has expired, the petition will be denied pursuant to paragraph (h)(13) of this section. \* \* \*

\*     \*     \*     \*     \*

(h) \* \* \*
(3) \* \* \*
(i) If the advanced processing application is approved, the prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the date on which USCIS received the FBI response on the applicant's, and any additional adult member of the household's, biometrics, unless approval is revoked. If USCIS received the responses on different days, the 15-month period begins on the earliest response date. The notice of approval will specify the expiration date. USCIS may extend the validity period for the approval of a Form I–600A as provided in paragraph (h)(3)(ii) of this section or if requested in accordance with 8 CFR 106.2(a)(23). During this time, the prospective adoptive parents may file an orphan petition for one orphan without fee. If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for each of the additional children, to the maximum number approved. If the orphans are birth siblings, no additional fee is required. If the orphans are not birth siblings, an additional fee is required for each orphan beyond the first orphan. Approval of an advanced processing application does not guarantee that the orphan petition will be approved.

(ii) If the USCIS Director, or an officer designated by the USCIS Director,

determines that the ability of a prospective adoptive parent to timely file a petition has been adversely affected by the outbreak of a public health or other emergency in a foreign country, then Director or designated officer may extend the validity period of the approval of the advance processing application, either in an individual case or for a class of cases. An extension of the validity of the approval of the advance processing application may be subject to such conditions as the USCIS Director, or officer designated by the USCIS Director may establish.

\*     \*     \*     \*     \*

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within 15 months of the approval date of the advanced processing application, the application will be deemed abandoned. Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the fingerprint checks. The director will dispose of documentation relating to biometrics checks in accordance with current policy. Such abandonment will be without prejudice to a new filing at any time with fee.

\*     \*     \*     \*     \*

(13) *Orphan petition denied: Petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied. This action will be without prejudice to a new filing at any time with fee.

\*     \*     \*     \*     \*

■ 13. Section 204.5 is amended:
■ a. In the definition of ''Petition'' in paragraph (m)(5) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''; and
■ b. By revising paragraph (p)(4).

The revision reads as follows:

### § 204.5  Petitions for employment-based immigrants.

\*     \*     \*     \*     \*

(p) \* \* \*

(4) *Application for employment authorization.* To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must file an application for employment authorization (Form I–765), with USCIS, in accordance with 8 CFR 274a.13(a) and the form

instructions. Such applicant is subject to the collection of his or her biometric information as provided in the form instructions. Employment authorization under this paragraph may be granted solely in 1-year increments, but not to exceed the period of the alien's authorized admission.

\* \* \* \* \*

### § 204.6 [Amended]

■ 14. Section 204.6 is amended by removing "8 CFR 103.7(b)(1)(i)(XX)" and adding in its place "8 CFR 106.2" in paragraph (m)(6)(i)(C).

### § 204.310 [Amended]

■ 15. Section 204.310 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" and by removing and reserving paragraph (a)(3)(ii).

### § 204.311 [Amended]

■ 16. Section 204.311 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (u)(4).

■ 17. Section 204.312 is amended by revising paragraph (e)(3)(i) introductory text to read as follows:

### § 204.312   Adjudication of the Form I–800A.

\* \* \* \* \*

(e) \* \* \*

(3)(i) If the 15-month validity period for a Form I–800A approval is about to expire, the applicant may file Form I–800A Supplement 3, with the filing fee under 8 CFR 106.2, if required. The applicant may not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval, but must do so on or before the date on which the validity period expires. The applicant is not required to pay the Form I–800A Supplement 3 filing fee for the first request to extend the approval of a Form I–800A, or to obtain a first time change of Hague Convention country during the Form I–800A approval period. If the applicant files a second or subsequent Form I–800A Supplement 3 to obtain a second or subsequent extension or a second or subsequent change of Hague Convention country, then, the applicant must pay the Form I–800A Supplement 3 filing fee, as specified in 8 CFR 106.2, for the second, or any subsequent, Form I–800A Supplement 3 that is filed. Any Form I–800A Supplement 3 that is filed to obtain an extension of the approval of a Form I–800A or a change of Hague Convention country must be accompanied by:

\* \* \* \* \*

### § 204.313 [Amended]

■ 18. Section 204.313 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in the next to last sentence of paragraph (a) and by adding the word "birth" before "siblings" in the last sentence of paragraph (a).

\* \* \* \* \*

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

■ 19. The authority citation for part 211 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

### § 211.1 [Amended]

■ 20. Section 211.1 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (b)(3).

### § 211.2 [Amended]

■ 21. Section 211.2 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (b).

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 22. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

### § 212.2 [Amended]

■ 23. Section 212.2 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (b)(1), (c)(1)(ii), (d), and (g)(1).

### § 212.3 [Amended]

■ 24. Section 212.3 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a).

### § 212.4 [Amended]

■ 25. Section 212.4 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (b).

### § 212.7 [Amended]

■ 26. Section 212.7 is amended:
■ a. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a)(1); and
■ b. By removing "8 CFR 103.7(b)" and adding in its place "8 CFR 106.2" in paragraphs (e)(1) and (e)(5)(i).

### § 212.15 [Amended]

■ 27. Section 212.15 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (j)(2)(ii).

### § 212.18 [Amended]

■ 28. Section 212.18 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (a)(2).

■ 29. Section 212.19 is amended by revising paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

### § 212.19   Parole for entrepreneurs.

\* \* \* \* \*

(b) \* \* \*

(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

\* \* \* \* \*

(c) \* \* \*

(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

\* \* \* \* \*

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole before [EFFECTIVE DATE OF FINAL RULE] will be required to submit biometric information. An alien seeking an initial grant of parole or re-parole may be required to submit biometric information.

\* \* \* \* \*

(h) \* \* \*

(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the

exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

\* \* \* \* \*

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

\* \* \* \* \*

## PART 214—NONIMMIGRANT CLASSES

■ 30. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1356, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 31. Section 214.1 is amended:
■ a. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (c)(1);
■ b. By removing "§ 103.7 of this chapter" and adding in its place "8 CFR 106.2" in paragraph (c)(2);
■ c. By revising paragraph (c)(5); and
■ d. By removing:
■ i. "a Form I–129" and adding in its place "an application or petition" in the first sentence of paragraph (j) introductory text; and
■ ii. "Form I–129" and adding in its place "application or petition" in the second and third sentences of paragraph (j) introductory text.

The revision reads as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(c) \* \* \*

(5) *Decision on application for extension or change of status.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of

USCIS. The denial of an application for extension of stay may not be appealed.

\* \* \* \* \*

■ 32. Amend § 214.2:
■ a. By revising paragraph (e)(8)(iii), the first sentence of paragraph (e)(8)(iv) introductory text, paragraphs (e)(8)(iv)(B), and (e)(8)(v);
■ b. By removing "Form I–129 and E Supplement" and adding in its place "the form prescribed by USCIS" in paragraphs (e)(20) introductory text and in two places in paragraph (e)(21)(i);
■ c. By revising paragraph (e)(23)(viii);
■ d. By removing and reserving paragraph (e)(23)(xv);
■ e. By removing either "8 CFR 103.7", "8 CFR 103.7(b)" or "8 CFR 103.7(b)(1)" and adding in their places "8 CFR 106.2" in paragraphs (f)(9)(ii)(F)(*1*), (h)(19)(ii), (m)(14)(ii), and (r)(3), (5), and (13);
■ f. By removing "Form I–129" and adding in its place "application or petition" wherever it appears in paragraphs (h)(1)(i)(B), (h)(6)(vii), (l)(14)(ii) introductory text, and (o)(2)(iv)(G);
■ g. By revising paragraphs (h)(2)(i)(A), (h)(2)(ii), and (h)(5)(i)(B);
■ h. By removing "I–129" and adding in its place "the form prescribed by USCIS" in paragraph (h)(6)(iii)(E);
■ i. By removing "Petition for Nonimmigrant Worker (Form I–129)" and adding in its place "the form prescribed by USCIS" in paragraph (h)(19)(vi)(A);
■ j. By revising paragraphs (h)(19)(i), (m)(14)(ii) introductory text, and (o)(2)(iv)(F);
■ k. By removing "Form I–129" and adding in its place "an application or petition" in the first sentence of paragraph (o)(12)(i);
■ l. By revising paragraph (p)(2)(iv)(F);
■ m. By removing "Form I–129" and adding in its place "application or petition" wherever it appears in paragraph (p)(2)(iv)(C)(*2*), the second sentence of paragraph (q)(3)(i), and paragraphs (q)(4)(i) and (q)(6);
■ n. By removing "Form I–129" and adding in its place "the form prescribed by USCIS" in paragraphs (h)(2)(i)(D), (h)(5)(i)(A), (h)(11)(i)(A), (h)(14), (h)(15)(i), (l)(2)(iii), (l)(3) introductory text, (l)(4)(iv) introductory text, (l)(5)(ii)(F), (l)(15)(i), (l)(17)(i), (o)(2)(iv)(D), (p)(13), (p)(14)(i), (q)(4)(iii), and in the second sentence of paragraph (q)(5)(i);
■ o. By removing "Form I–129, Petition for Nonimmigrant Worker" and adding in its place "the form prescribed by USCIS" in its place in paragraphs (l)(2)(i), (l)(5)(ii)(F), (o)(2)(i), (o)(11), (p)(2)(i), (q)(3)(i), and the first sentence of paragraph (q)(5)(i);

■ p. By removing "Form I–129 petition" and adding in its place "application or petition" in paragraph (p)(2)(iv)(H); and
■ q. By revising paragraph (r)(3) introductory text and the definition of "Petitions" in paragraph (r)(3) and revising paragraphs (r)(5), (w)(5), (w)(14)(iii), and (w)(15).

The revisions read as follows:

### § 214.2   Special requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(e) \* \* \*

(8) \* \* \*

(iii) *Substantive changes.* Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) *Non-substantive changes.* Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment which would affect the alien's eligibility for E classification. \* \* \*

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change, or;

\* \* \* \* \*

(v) *Advice.* To request advice from USCIS as to whether a change is substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

\* \* \* \* \*

(23) \* \* \*

(viii) Information for background checks. USCIS may require an applicant for E–2 CNMI Investor status, including

but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

\* \* \* \* \*

(h) \* \* \*

(2) *Petitions*—(i) *Filing of petitions*—(A) *General.* A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

\* \* \* \* \*

(ii) *Multiple beneficiaries.* Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance with paragraph (h)(6)(i)(E) of this section must be filed separately.

\* \* \* \* \*

(5) \* \* \*

(i) \* \* \*

(B) *Multiple beneficiaries.* The total number of beneficiaries of a petition or series of petitions based on the same temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or less and does not exceed the number of positions indicated on the relating temporary labor certification.

\* \* \* \* \*

(19) \* \* \*

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

\* \* \* \* \*

(m) \* \* \*

(14) \* \* \*

(ii) *Application.* A M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but

not more than 90 days before the program end date. The designated school official must certify on Form I–538 that—

\* \* \* \* \*

(o) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

\* \* \* \* \*

(p) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3 beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

\* \* \* \* \*

(r) \* \* \*

(3) *Definitions.* As used in this section, the term:

\* \* \* \* \*

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

\* \* \* \* \*

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period of time spent in R–1 status does not exceed a maximum of five years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

\* \* \* \* \*

(w) \* \* \*

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention

and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

\* \* \* \* \*

(14) \* \* \*

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(15) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant or, extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

\* \* \* \* \*

### § 214.3   [Amended]

■ 33. Section 214.3 is amended:
■ a. By removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' in paragraph (h)(1)(i); and
■ b. By removing ''8 CFR 103.7(b)(1)(ii)(B)'' and adding in its place ''8 CFR 103.7(d)(2)'' in paragraph (h)(2) introductory text.

### § 214.6   [Amended]

■ 34. Section 214.6 is amended by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' in paragraphs (g)(1), (h)(1)(i), (h)(2), and (i)(2).

### § 214.11   [Amended]

■ 35. Section 214.11 is amended by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' in paragraphs (d)(2)(iii) and (k)(1).
■ 36. Section 214.14 is amended by revising paragraphs (c)(1) introductory text to read as follows:

### § 214.14   Alien victims of certain qualifying criminal activity.

\* \* \* \* \*

(c) \* \* \*

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit, Form I–918, Petition for U Nonimmigrant Status, and initial evidence to USCIS in accordance with this paragraph and the instructions to Form I–918. A petitioner who received interim relief is not required to submit initial evidence with Form I–918 if he or she wishes to rely on the law enforcement certification and other

evidence that was submitted with the request for interim relief.

\* \* \* \* \*

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

■ 37. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

### §216.4   [Amended]

■ 38. Section 216.4 is amended by removing ''§ 103.7(b) of this chapter'' and adding in its place ''8 CFR 106.2'' in paragraph (a)(1).

### §216.5   [Amended]

■ 39. Section 216.5 is amended by removing ''§ 103.7(b) of this Chapter '' and adding in its place ''8 CFR 106.2'' in paragraph (b).

### §216.6   [Amended]

■ 40. Section 216.6 is amended by removing ''8 CFR 103.7(b)(1) of this chapter '' and adding in its place ''8 CFR 106.2'' in paragraph (a)(1).

## PART 217—VISA WAIVER PROGRAM

■ 41. The authority citation for part 217 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1187; 8 CFR part 2.

### §217.2   [Amended]

■ 42. Section 217.2 is amended by removing ''§ 103.7(b)(1)'' and adding in its place ''8 CFR 103.7(d)(4)'' in its place in paragraph (c)(2).

## PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

■ 43. The authority citation for part 223 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

### §223.2   [Amended]

■ 44. Section 223.2 is amended by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' in paragraph (a).

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 45. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p.278], 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8

U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Pub. L. 112–54.

### §235.1   [Amended]

■ 46. Section 235.1 is amended by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 103.7(d)(3)'' in paragraphs (g)(1)(iii) and (g)(2).

### §235.7   [Amended]

■ 47. Section 235.7 is amended by removing ''§ 103.7(b)(1) of this chapter'' and ''§ 103.7(b)(1)'' and adding in their place ''8 CFR 103.7(d)(7)'' in paragraph (a)(4)(v).

### §235.12   [Amended]

■ 48. Section 235.12 is amended by removing ''8 CFR 103.7(b)(1)(ii)(M)'' and adding in its place ''8 CFR 103.7(d)(13)'' in paragraph (d)(2).

### §235.13   [Amended]

■ 49. Section 235.13 is amended by removing ''8 CFR 103.7(b)(1)(ii)(N)'' and adding in its place ''8 CFR 103.7(d)(14)'' in paragraph (c)(5).

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 50. The authority citation for part 236 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

### §236.14   [Amended]

■ 51. Section 236.14 is amended by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2'' in paragraph (a).

### §236.15   [Amended]

■ 52. Section 236.15 is amended by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2'' in paragraph (e).

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 53. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193]; sec. 902, Pub. L. 105–277 (112 Stat. 2681]; 8 CFR part 2.

■ 54. Section 240.63 is amended by revising paragraph (a) to read as follows:

### §240.63   Application process.

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the

application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed Form EOIR–40, Application for Suspension of Deportation, before the effective date of the form prescribed by USCIS may apply with the Service by submitting the completed Form EOIR–40 attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

\* \* \* \* \*

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 55. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

### §244.6   [Amended]

■ 56. Section 244.6 is amended by revising paragraph (a) to read as follows:

### §244.6   Application.

(a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

\* \* \* \* \*

■ 57. Section 244.17 is amended by revising paragraph (a) to read as follows:

### §244.17   Periodic Registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional

supporting documents unless USCIS requests that they do so.

\*   \*   \*   \*   \*

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 58. The authority citation for part 204 continues to read as follows:

  **Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 245.7   [Amended]

■ 59. Section 245.7 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a).

### § 245.10   [Amended]

■ 60. Section 245.10 is amended by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" in paragraph (c) introductory text.

### § 245.15   [Amended]

■ 61. Section 245.15 is amended:
■ a. By removing "§ 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (c)(2)(iv)(A);
■ b. By removing and reserving paragraph (c)(2)(iv)(B);
■ c. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (g)(1);
■ d. By removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" in paragraph (h)(1);
■ e. By removing and reserving paragraph (h)(2); and
■ f. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (n)(1), (t)(1), and (t)(2)(i).

### § 245.18   [Amended]

■ 62. Section 245.18 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (d)(1) and (k).

### § 245.21   [Amended]

■ 63. Section 245.21 is amended:
■ a. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in the first sentence of paragraph (b) and removing the second sentence in paragraph (b); and
■ b. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (f), (h), and (i).

### § 245.23   [Amended]

■ 64. Section 245.23 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (e)(1)(i) and by removing and reserving paragraph (e)(1)(iii).

### § 245.24   [Amended]

■ 65. Section 245.24 is amended:
■ a. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (d)(2) and by removing and reserving paragraph (d)(3); and
■ b. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (h)(1)(ii) and (i)(1)(iii) and by removing and reserving paragraph (i)(1)(iv).

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 66. The authority citation for part 245a continues to read as follows:

  **Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 67. Section 245a.2 is amended by revising paragraph (e)(3) to read as follows:

### § 245a.2   Application for temporary residence.

\*   \*   \*   \*   \*

  (e) \* \* \*

  (3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*   \*   \*   \*   \*

■ 68. Section 245a.3 is amended by revising paragraph (d)(3) to read as follows:

### § 245a.3   Application for adjustment from temporary to permanent resident status.

\*   \*   \*   \*   \*

  (d) \* \* \*

  (3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*   \*   \*   \*   \*

■ 69. Section 245a.4 is amended by revising paragraph (b)(5)(iii) to read as follows:

### § 245a.4   Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

\*   \*   \*   \*   \*

  (b) \* \* \*

  (5) \* \* \*

  (iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*   \*   \*   \*   \*

■ 70. Section 245a.12 is amended:
■ a. By removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraphs (b) introductory text and (c);
■ b. By revising paragraph (d) introductory text;

■ c. By removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (d)(1); and
■ d. By removing and reserving paragraphs (d)(2), (4), and (6).
  The revision reads as follows:

### § 245a.12   Filing and applications.

\*   \*   \*   \*   \*

  (d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

\*   \*   \*   \*   \*

### § 245a.13   [Amended]

■ 71. Section 245a.13 is amended:
■ a. By removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" in paragraph (d)(1); and (e)(1).
■ b. By removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraphs (e) introductory text and (e)(1); and
■ c. By removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" in paragraph (e)(1).

### § 245a.18   [Amended]

■ 72. Section 245a.18 is amended by removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraph (c)(1).

### § 245a.19   [Amended]

■ 73. Section 245a.19 is amended by removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraph (a).

### § 245a.20   [Amended]

■ 74. Section 245a.20 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a)(2).

### § 245a.33   [Amended]

■ 75. Section 245a.33 is amended by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" in paragraph (a) and by removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraphs (a) and (b).

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 76. The authority citation for part 248 continues to read as follows:

  **Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

### § 248.3   [Amended]

■ 77. Section 248.3 is amended by removing "8 CFR 103.7(b)" and adding in its place "8 CFR 106.2" in its place

in the introductory text and by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (h) introductory text.

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 78. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

### § 264.2 [Amended]

■ 79. Section 264.2 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (c)(1)(i) and (c)(2)(i).

### § 264.5 [Amended]

■ 80. Section 264.5 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a).

### § 264.6 [Amended]

■ 81. Section 264.6 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (b).

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 82. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 83. Section 274a.12 is amended by revising paragraphs (b)(9), (13), and (14) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*   \*   \*   \*   \*

(b) \* \* \*

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker pursuant to section 101(a)(15)(H)(i)(b)(1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment

authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H);

\*   \*   \*   \*   \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

\*   \*   \*   \*   \*

## PART 286—IMMIGRATION USER FEE

■ 84. The authority citation for part 286 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1356; Title VII of Public Law 110–229; 8 CFR part 2.

### § 286.9 [Amended]

■ 85. Section 286.9 is amended by removing "§ 103.7(b)(1)" and adding in its place "8 CFR 103.7(d)" in paragraph (a).

## PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH

■ 86. The authority citation for part 301 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1401; 8 CFR part 2.

### § 301.1 [Amended]

■ 87. Section 301.1 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a)(1).

## PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS

■ 88. The authority citation for part 319 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1430, 1443.

### § 319.11 [Amended]

■ 89. Section 319.11 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a) introductory text.

## PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP

■ 90. The authority citation for part 320 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

### § 320.5 [Amended]

■ 91. Section 320.5 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (b) and (c).

## PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP

■ 92. The authority citation for part 322 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

### § 322.3 [Amended]

■ 93. Section 322.3 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (a) and by removing "§ 103.7(b)(1) of this chapter" and

adding in its place "8 CFR 106.2" (b)(1) introductory text.

§ 322.5   [Amended]

■ 94. Section 322.5 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraphs (b) and (c).

## PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

■ 95. The authority citation for part 324 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

§ 324.2   [Amended]

■ 96. Section 324.2 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (b).

## PART 334—APPLICATION FOR NATURALIZATION

■ 97. The authority citation for part 334 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

§ 334.2   [Amended]

■ 98. Section 334.2 is amended by removing "8 CFR 103.7(b)(1)" and

adding in its place "8 CFR 106.2" in paragraph (a).

## PART 341—CERTIFICATES OF CITIZENSHIP

■ 99. The authority citation for part 341 continues to read as follows:

**Authority:** Pub. L. 82–414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

§ 341.1   [Amended]

■ 100. Section 341.1 is amended by removing "8 CFR 103.7" and adding in its place "8 CFR 106.2".

§ 341.5   [Amended]

■ 101. Section 341.5 is amended by removing "8 CFR 103.7" and adding in its place "8 CFR 106.2" in paragraph (e).

## PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

■ 102. The authority citation for part 343a continues to read as follows:

**Authority:** 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

§ 343a.1   [Amended]

■ 103. Section 343a.1 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR part 106" in paragraph (a).

## PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

■ 104. The authority citation for part 343b continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1454, 1455.

§ 343b.1   [Amended]

■ 105. Section 343b.1 is amended by removing the term "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in the first sentence.

## PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES

■ 106. The authority citation for part 392 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440 and note, and 1440–1; 8 CFR part 2.

§ 392.4   [Amended]

■ 107. Section 392.4 is amended by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in paragraph (e).

Kevin K. McAleenan,

*Acting Secretary* .

[FR Doc. 2019–24366 Filed 11–8–19; 4:45 pm]

**BILLING CODE 9111–97–P**